IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN  DISTRICT OF TEXAS
HOUSTON  DIVISION

| | | |
|---|---|---|
| **CHARLES MAMOU, JR.,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **CASE No. 4:14-CV-00403** |
| | § | |
| **WILLIAM STEPHENS,** | § | |
| **Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | **(Death Penalty Case)** |
| **Division,** | § | **(Judge Lee H. Rosenthal)** |
| **Respondent** | § | |
| | § | |

## PROTECTIVE SKELETAL PETITION FOR WRIT OF HABEAS CORPUS

A. Richard Ellis
Texas Bar No. 06560400
75 Magee Ave.
Mill Valley, CA 94941
(415) 389-6771
FAX (415) 389-0251
Attorney for Petitioner Charles Mamou, Jr.

# TABLE OF CONTENTS

**PAGE**

Table of Contents..................................................................................................i

Table of Authorities.............................................................................................iii

Protective Skeletal Petition For Writ of Habeas Corpus.......................................1

I. Rationale For Filing This Protective Skeletal Petition......................................1

II. Procedural History and Statement of the Case.................................................2

      A. Introduction...........................................................................................2

      B. Statement of the Case and Procedural History......................................4

          i. Procedural history.........................................................................4

          ii. Claims Raised in State Court........................................................6

      C. Summary of Trial Proceedings (in Appendix A)...................................7

III. The Standard of Review Under §2254(d) (in Appendix B)...........................8

IV. Claims For Relief..........................................................................................8


Claim 1: Mr. Mamou is Actually Innocent of Capital Murder...............  ........8

Claim 2: The Trial Court Erred In Admitting Unreliable "Magazine Marks" Firearms Testimony From State's Expert Robert Baldwin.......................................................................13

      a. Facts in Support..................................................................................14

      b. Argument............................................................................................25

Claim 3: The State Knowingly Suppressed Favorable Evidence And Presented False Testimony Regarding The Firearms Evidence And Other State's Witnesses In Violation of *Brady v. Maryland, Napue v. Illinois,* and *Giglio v. United States*...........................................................28

-i-

Claim 4: Mr. Mamou Was Deprived Of The Right To Effective Assistance Of Counsel By Their Failure To Challenge, Test, And Effectively Cross-Examine The State's Firearms and Fingerprint Experts...................................................................................................................31

    Claim 4(a): Ineffective assistance of counsel for failing to file pre-trial motions or motions *in limine* to preclude or limit Baldwin's testimony...........................................32

    Claim 4(b): Ineffective assistance of counsel for failing to seek timely discovery of any testing done by Baldwin...................................................................................33

    Claim 4(c): Ineffective assistance of counsel for failure to obtain and/or present as a witness an independent competent expert to examine Baldwin's work or failing to have it competently examined.........................................................................................34

    Claim 4(d): Ineffective assistance of counsel for failure to request a *Daubert/Kelly* hearing to challenge Baldwin's expertise, credentials and methodology...........................36

    Claim 4(e): Ineffective assistance of counsel for failure to object to the testimony of Robert Baldwin at trial.................................................................................................37

    Claim 4(f): Ineffective assistance of counsel for failure to seek a continuance to obtain an independent expert to examine and/or compare the magazine marks.....................38

    Claim 4(g): Ineffective assistance of counsel for failing to consult experts or review the relevant literature in the field of magazine mark and toolmark identification and comparisons.............................................................................................................38

    Claim 4(h): Ineffective assistance of counsel for failure to effectively cross-examine Mr. Baldwin at trial.........................................................................................................38

    Claim 4(i): Ineffective assistance of counsel for failing to challenge fingerprint examiner Rafael Saldivar, although he had been disciplined prior to Mamou's trial...........................38

    Claim 4(j): The cumulative effect of these failures deprived Petitioner of a fair trial...........39

Claim 5: Petitioner Received Ineffective Assistance of Counsel Pre-Trial...........................42

    Claim 5(a): Trial counsel rushed to trial within about three months of their appointment, without requesting a continuance, thus precluding an adequate investigation.......................42

    Claim 5(b): Defense counsel failed to file adequate and timely pre-trial motions.................43

    Claim 5(c): Defense counsel failed to conduct an adequate pre-trial investigation................44

Claim 5(d): Defense counsel failed to obtain timely and adequate discovery....................44

Claim 5(e): Ineffective assistance of counsel for failure to object to intentional discrimination in grand jury selection....................................................................................................45

Claim 5(f): Ineffective assistance for failure to object to intentional racial discrimination in the selection of petitioner's jury; failure to object to trial court rulings regarding juror selection; and failure to object to the final composition of Petitioner's jury..........................45

Claim 6: Ineffective Assistance of Counsel At The Guilt Phase of the Trial.....................46

Claim 6(a): Ineffective assistance of counsel for failure to object to biased instructions at voir dire....................................................................................................................46

Claim 6(b): Ineffective assistance of counsel for failing to object to the Court's emphasizing defendant's failure to testify........................................................................................48

Claim 6(c): Ineffective assistance of counsel for allowing the exclusion of only those jurors opposed to the death penalty.......................................................................................48

Claim 6(d): Ineffective assistance of counsel for failing to object to gruesome and redundant multiple autopsy photographs.....................................................................................49

Claim 6(e): Ineffective guilt phase argument...........................................................49

Claim 7: Petitioner Was Deprived of Effective Assistance of Counsel At the Punishment Phase of His Trial...........................................................................................................50

Claim 7(a): Ineffective assistance of counsel for failure to object to inadmissible victim impact evidence at the punishment phase......................................................................50

i. Facts in Support.................................................................................50

ii. Argument.........................................................................................57

iii. How the State Courts Erred.................................................................59

Claim 7(b): Ineffective assistance of counsel for failing to present evidence in mitigation...............................................................................................................68

Claim 8: Appellate Counsel rendered Ineffective Assistance of Counsel.......................69

Claim 8(a): Ineffective assistance of appellate counsel for failing to raise trial court error in admitting Baldwin's flawed "magazine mark" testimony...................................................70

Claim 8(b): Ineffective assistance of appellate counsel for failure to raise issue of inadmissible extraneous victim impact evidence.....................................................................70

Claim 8(c): Ineffective assistance of appellate counsel for failing to raise issues of parole eligibility and burden of proof on mitigation issues..............................................................71

Claim 9: State Post-Conviction Counsel Rendered Ineffective Assistance of Counsel.....................72

Claim 10: Petitioner Is Not Guilty Of Capital Murder Because The Evidence Is legally And Factually Insufficient To Support The Jury's Determination That Petitioner Was Guilty Of Kidnaping.........77

Claim 11: Petitioner Was Unlawfully Convicted Of Capital Murder Because There Was Insufficient Legal And Factual Corroboration Of Accomplice Testimony............................................................84

Claim 12: Petitioner Was denied His Federal Constitutional Right To A Fair Trial And Due Process Of Law As The Evidence Supporting The Future Dangerousness Special Issue Was Insufficient...87

Claim 13: The Trial Court Committed Multiple Reversible Errors.....................................................91

Claim 13(a): The trial court erred in denying Petitioner's objection to the Prosecutor's speculation that the State legislature could lessen Petitioner's parole eligibility of 40 years.................................................................................................................................91

Claim 13(b): Trial court error in denying Mamou's requested charge on false imprisonment......................................................................................................................95

Claim 13(c): The trial court erred in denying Mamou's requested charge requiring the extraneous offenses to be proved beyond a reasonable doubt..............................................96

Claim 13(d): The cumulative effect of trial errors.................................................................98

Claim 14: Reversal Is Required Based On The Cumulative Effect Of All The Errors..................98

Conclusion and Prayer for Relief .................................................................................................99

Verification......................................................................................................................................101

Certificate of Electronic Service....................................................................................................102

-iv-

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alcorta v. Texas,* 355 U.S. 28 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Anders v. California,* 386 U.S. 738 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Andres v. United States,* 333 U.S. 740 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Apprendi v. New Jersey,* 120 S. Ct. 2348 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Banks v. Dretke,* 540 U.S. 668 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Batson v. Kentucky,* 476 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Booth v. Maryland,* 482 U.S. 496, 107 S. Ct. 2529 (1987). . . . . . . . . . . . . . . . . . . . . . . . 57

*Castaneda v. Partida,* 430 U.S. 482 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Chapman v. California,* 386 U.S. 18 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Charles v. Stephens,* 736 F.3d 380 (5th Cir.2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Circu v. Gonzales,* 450 F.3d 990 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Cleveland Board of Ed. v. Loudermill,* 470 U.S. 532 (1985). . . . . . . . . . . . . . . . . . . . . . . 61

*Darden v. Wainwright,* 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Daubert v. Merrell Dow Pharmaceuticals, Incorporated,* 509 U.S. 579 (1993). 13, 25, 26, 27, 36, 37

*Day v. Quarterman,* 566 F.3d 527 (5th Cir.2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98, 99

*Evitts v. Lucey,* 469 U.S. 387 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

*Fiore v. White,* 531 U.S. 225 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Fuentes v. Shevin,* 407 U.S. 67 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Furman v. Georgia,* 408 U.S. 238 (1972).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94, 96, 97

*Giglio v. United States,* 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Goeke v. Branch,* 514 U.S. 115 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Greer v. Miller,* 483 U.S. 756 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Herrera v. Collins,* 506 U.S. 390 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 12, 13

*Hitchcock v. Dugger,* 481 U.S. 393 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*House v. Bell,* 547 U.S. 518 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*Jackson v. Virginia,* 443 U.S. 307 (1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 79, 88

*Kumho Tire Company v. Carmichael,* 526 U.S. 137 (1999). . . . . . . . . . . . . . . . . 13, 25, 27

*Kyles v. Whitley,* 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Martinez v. Ryan,* 132 S. Ct. 1309 (2012). . . . . . . . . . . . . . . . . . . . . . 14, 32, 35, 73, 74,, 75, 76

*Miller v. Pate,* 386 U.S. 1 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Miller-El v. Dretke,* 545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Mooney v. Holohan,* 294 U.S. 103 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Moore v. Ashland Chemical Incorporated.,* 151 F.3d 269 (5th Cir.1998). . . . . . . . . . . . . . . 27

*Mullane v. Central Hanover Bank and Trust Company,* 339 U.S. 306 (1950). . . . . . . . . . . . . 61

*Napue v. Illinois,* 360 U.S. 264 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Ohio Adult Parole Authority v. Woodard,* 523 U.S. 272 (1998). . . . . . . . . . . . . . . . . . . . . 61

*Panetti v. Quarterman,* 551 U.S. 930 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Payne v. Tennessee,* 510 U.S. 808, 111 S. Ct. 2597 (1991). . . . . . . . . . . . . . . . . 57, 58, 59, 60, 83, 99

*Pennsylvania v. Finley,* 481 U.S. 551 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Pliler v. Ford,* 542 U.S. 225 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Reed v. Quarterman,* 555 F.3d 364 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Rompilla v. Beard,* 545 U.S. 374, 125 S. Ct. 2456 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Schlup v. Delo,* 513 U.S. 298 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11, 12, 13, 76, 77

*Sears v. Upton,* 561 U.S. 945, 130 S. Ct. 3259 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Shiro v. Farley,* 510 U.S. 222 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Simmons v. South Carolina,* 512 U.S. 154, 114 S. Ct. 2187 (1994) . . . . . . . . . . . . . . . . . . . . 93

*Skipper v. South Carolina,* 476 U.S. 1 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Stein v. New York,* 346 U.S. 156 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*TXO Production Corp v. Alliance Resource Corporation,* 509 U.S. 443 (1993) . . . . . . . . . . . 93

*Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052 (1984) . . . . . . . . . . . 40, 41, 42, 43, 44, 50, 59, 60, 61, 68, 71, 72, 95

*Trevino v. Thaler,* 133 S. Ct. 1911 (2013) . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 21, 32, 35, 73, 74

*United States v. Bagley,* 473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*United States v. Bourgeois,* 950 F.2d 980 (5th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Johnson,* 575 F.2d 1347 (5th Cir.1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Norris,* 217 F.3d 262 (5th Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Vasquez v. Hillery,* 474 U.S. 254 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 45

*Vitek v. Jones,* 445 U.S. 480 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Wiggins v. Smith,* 539 U.S. 510, 123 S. Ct. 2527 (2003) . . . . . . . . . . . . . . . . . . . . . 41, 50, 60, 68

*Williams v. Quarterman,* 551 F.3d 352 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 4, 21, 22, 23, 34

*Williams v. Taylor,* 529 U.S. 362, 120 S. Ct. 1495 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Winship,* 397 U.S. 358, 90 S. Ct. 1068 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88, 97

*Woodson v. North Carolina,* 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

## STATE CASES

*Bible v State,* 162 S.W. 3d (Tex. Crim. App. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Brooks v. State,* 323 S.W.2d 893 (Tex. Crim. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Cantu v. State,* 939 S.W.2d 627 (Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . 51, 57, 58, 59

*Carillo v. State,* 591 S.W.2d 876 (Tex. Crim. App. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Clewis v. State,* 922 S.W.2d 126 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Ex Parte Gutierrez,* 600 S.W.2d 933 (Tex. Crim. App. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Goff v. State,* 931 S.W.2d 537 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Guevara v State,* 97 S.W. 3d (Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Keeton v. State,* 724 S.W.2d 58 (Tex. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . . . . . 90, 91, 92

*Kelly v. State,* 824 S.W.2d 568 (Tex. Crim. App. 1992). . . . . . . . . . . . . . . . . . . . . . . . . 36, 37, 39

*Lane v. State,* 822 S.W.2d 35 (Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68

*Marshburn v. State,* 522 S.W.2d 900 (Tex. Crim. App. 1975). . . . . . . . . . . . . . . . . . . . . . . 94, 95

*McDuff v. State,* 939 S.W.2d 607 (Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . 86, 87

*Muniz v. State,* 686 S.W.2d 157 (Tex. Crim. App. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Rivera v. State,* 990 S.W.2d 882 (Tex. App.-Austin 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Rodriguez v. State,* 730 S.W.2d 75 (Tex.App.-Corpus Christi 1987, no pet.). . . . . . . . . . . . 83, 85

*Russell v. State,* 598 S.W.2d 238 (Tex. Crim. App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Saldana v. State,* 59 S.W.3d 703 (Tex.App.-Austin 2001, pet. ref'd) . . . . . . . . . . . . . . . . . . . . 83

*Sexton v. Texas,* 93 S.W.3d 96 (Tex. Crim. App.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Swain v State,* 181 S.W. 3d (Tex. Crim. App 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Zuniga v. State,* 144 S.W.3d 477 (Tex. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

# FEDERAL STATUTES

28 U.S.C. § 2254(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 U.S.C. § 2254(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

28 U.S.C. §2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

U.S. Const. Amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. Amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

U.S. Const. Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. Amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 87

U.S. Const. Amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 99

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN  DISTRICT OF TEXAS**
**HOUSTON  DIVISION**

| | | |
|---|---|---|
| **CHARLES MAMOU, JR.,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **CASE No. 4:14-CV-00403** |
| | § | |
| **WILLIAM STEPHENS,** | § | |
| **Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | **(Death Penalty Case)** |
| **Division,** | § | **(Judge Lee H. Rosenthal)** |
| **Respondent** | § | |
| | § | |

## PROTECTIVE SKELETAL PETITION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Petitioner Charles Mamou, Jr. (hereafter "Petitioner")  is currently confined in the Polunsky Unit of the Texas  Department of Criminal Justice, Livingston, Texas, in the custody of the Respondent, the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.  Mr. Mamou  is confined  in violation of the Constitution and laws of the United States, and files this Skeletal Protective Petition  for a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254 *et. seq.* in order to secure the reversal of his jury verdict of guilt and sentence of death imposed by the trial court.  In support thereof, Mr. Mamou would show the following:

## I. RATIONALE FOR FILING THIS PROTECTIVE SKELETAL PETITION.

This matter is a capital *habeas corpus* proceeding in which Petitioner has invoked the jurisdiction of this Court pursuant to 28 U.S.C. §2254 *et. seq*.  Petitioner is proceeding *in forma pauperis.* (Docket No. 7.)   Because the Texas Court of Criminal Appeals denied Mamou's state post-conviction application for writ of habeas corpus, a supplemental application and a subsequent

*pro se* application on February 5, 2014,[1] under the Anti-Terrorism and Effective Death Penalty Act

("AEDPA") Mamou's federal petition is due within one year of that denial, or February 4, 2015. As

the issue of funding for experts and investigators was pending from May 13, 2014 until January 9,

2015, almost eight months of the AEDPA-one-year statute of limitations, this Court granted

Mamou's unopposed motion to amend the briefing schedule. That Order held that a skeletal

protective petition would be filed by February 20, 2015; Respondent need not answer; Mamou will

file an amended petition on or before June 4, 2015; Respondent will file an answer by Sept. 4, 2015;

and Mamou will file a reply by November 4, 2015. (Docket No. 32).  Although this Court apparently

granted equitable tolling until Feb. 20, 2015, out of an abundance of caution, this skeletal petition

is filed by Feb. 4, 2015, the AEDPA-one-year statute of limitations.[2]  Thus, it is timely filed. As the

Court denied Mamou's unopposed motion to file a 250-page skeletal petition and has limited this

skeletal petition to 100 pages (Order of January 28, 2015), Mamou presents his claims as fully as

possible in order to preserve them, within that limit.

## II. PROCEDURAL HISTORY AND STATEMENT OF THE CASE.

### A. Introduction.

Mr. Mamou's petition centers around his claim of actual innocence: that he did not kidnap

and murder Mary Carmouche.  The State's case at trial relied on testimony from admitted

participants in a scheme to rob and shoot Mamou in an abortive drug deal gone bad in Houston on

---

[1]  *Ex Parte Charles Mamou, Jr.* Nos. WR-78,122-01, WR-78,122-02, and WR-78,122-03 (Tex. Crim. App. February 5, 2014) (not designated for publication).

[2]  *See, e.g., Pliler v. Ford,* 542 U.S. 225 (2004) (remanded to court of appeals to consider appropriateness of equitable tolling based on reliance on magistrate judge's order).

December 6, 1998.[3]  The purported sellers never possessed any drugs and the purported buyers, Mr.

Mamou and an associate, never had the funds to purchase the non-existent drugs.  It ended in a fatal

shooting of an armed participant who was about to shoot Mamou.  He was not charged with this

shooting, as it was in self-defense.  However, Mamou was charged with the kidnaping and murder

of Mary Carmouche, who was in the back seat of the drug-sellers car, in which Mamou fled in order

to avoid being shot.  The testimony of the State's witnesses was particularly unreliable because they

stood to be charged with serious crimes themselves, yet the defense attorneys never seriously

investigated any deals they may have made with the prosecution in return for their testimony, or any

coercion to which they were subjected in order for them to implicate Mamou.  There was no time

for an adequate investigation, as defense counsel was appointed only three months prior to trial and

second-chair counsel was appointed only one-and-a-half months prior.  Yet there was no request for

a continuance.

     The State built its case through witnesses Kevin Walter, Samuel Johnson,  Howard Scott,

Terrence Dodson, and Anthony Trail.  All gave self-serving testimony that implicated Mamou  in

the drug deal,  in which they were all involved.  However, only Dodson gave testimony which

purported to show that Mr. Mamou had admitted his involvement in the Carmouche murder, which

Mr. Mamou has consistently denied.  There was no corroborating testimony to the Carmouche

murder from the other State's witnesses.

     Additionally,  the  State  presented  unreliable  and  unscientific  firearms "toolmark"

(specifically, "magazine mark") testimony purporting to link bullet casings found at the drug-crime

shooting to a bullet found at the scene of Mary Carmouche's murder, despite the fact that neither

---

[3]  However, only one of these participants actually purported to link Mamou to the
capital murder.

-3-

the pistol nor the magazine were ever recovered for testing.  The State's expert, Robert Baldwin,

gave false testimony in a recent capital case that was reversed as a result; his testimony has been

called into question in another capital case; and he was later disciplined by his employer, the

Houston Police Department.[4]  Baldwin's testimony was the only forensic evidence linking Mamou

to the killing of Carmouche, yet the defense failed to competently investigate it or challenge

Baldwin's credentials, methodology, or his trial testimony.  Without it, the State had no case for

capital murder, as Dodson was an accomplice, and, standing alone, this was insufficient.

Additionally, Mamou's case for actual innocence was never investigated or presented at trial.

**B.  Statement of the Case and Procedural History.**

**i.  Procedural history.**

Mr. Mamou is indigent, is represented by undersigned counsel of record and is unable to

provide funds for any aspect of his representation.  He is currently incarcerated in the Polunsky Unit

of the Texas Department of Criminal Justice   at Livingston, Texas, under the authority of

Respondent (hereafter, "the Director)  pursuant to his conviction for capital murder on October 15,

1999 in the 179th Judicial District Court of Harris County, Texas in Cause No. 800112.

On December 10, 1998, Mamou was indicted for the December 7, 1998 murder of Mary

Carmouche in Houston, Texas in the 179th Judicial District Court of Harris County, Texas.  Exhibit

1, Complaint and Indictment (CR 2-6).[5]  Shortly prior to trial, various motions were filed by defense

counsel Wayne Hill and Kurt Wentz on September 1, 1999, including a motion for discovery of

---

[4]  In that case, Baldwin's firearms work *"at best demonstrates extreme carelessness on his part and at worst calls into question his expertise." Williams v. Quarterman,* 551 F.3d 352, 356 (5th Cir. 2008) (emphasis added).

[5]  "CR" stands for the Clerk's Record in this case.  "Exhibit" refers to the exhibits filed concurrently with this petition.

victim impact testimony (Exhibit 2, CR 20-22); a motion for the State to reveal any agreements with their witnesses (Exhibit 3, CR 23-26); and a motion for the production and disclosure of any informants (Exhibit 4, CR 49-51). Jury selection began the next week, on September 8, 1999. 3 RR 3 *et. seq.*[6] At the conclusion of the guilt phase, the jury was charged on October 12, 1999 (Exhibit 5, CR 78-89) and Mamou was found guilty of capital murder on that date. (Exhibit 6, CR 90). Three days later, the jury answered the special issues submitted pursuant to Texas Code of Criminal Procedure, and pursuant to those answers, the trial court set punishment at death. TEX. CODE CRIM. PROC. Art. 37.071. (Exhibit 7, charge of the jury at punishment phase, CR 95-100; Exhibit 8, Judgment and Sentence, CR 101-103, 105-107).

Petitioner appealed this conviction and sentence. His "Appellant's Brief" was filed in the Texas Court of Criminal Appeals by attorney Floyd Freed, III on September 1, 2000. (Exhibit 10). On November 7, 2001, the Texas Court of Criminal Appeals affirmed his conviction and sentence of death on direct appeal in an unpublished opinion. *Mamou v. State,* No. 73,708 (Tex. Crim. App. November 7, 2001) (not designated for publication). (Exhibit 9).

Petitioner also sought state post-conviction relief. He filed his initial petition for state post-conviction relief, cause No. 800112-A, in the trial court on April 18, 2001. (Exhibit 11). A supplemental *pro se* application for Post-Conviction Writ of Habeas Corpus, cause No. 800112-B, was also filed in the trial court on July 31, 2013. (Exhibit 12). Additionally, Mamou, now represented by new state habeas counsel David Sergi, filed a supplemental habeas corpus application on October 29, 2013, under cause No. 800112-A. (Exhibit 13). On November 6, 2013 the prosecutor filed the "State's Proposed Findings of Fact, Conclusions of Law and Order" (Exhibit

---

[6]   Judge Bob Burdette presided over the pre-trial and jury selection (1 RR through 15 RR); Judge J. Michael Wilkinson presided over the trial. (15 RR through 24 RR).

14).   One week later, these proposed findings were adopted verbatim by Judge Kristin M. Guiney

of the 179th District Court, without changing a comma.  (*Id.* at 10).   State habeas Judge Guiney was

not the trial judge in this matter, yet findings and conclusions on disputed and controverted factual

issues were made without holding an evidentiary hearing.   On February 5, 2014, the Texas Court

of Criminal Appeals denied the state post-conviction application for writ of habeas corpus, the

supplemental application and the supplemental *pro se* application.   *Ex Parte Charles Mamou, Jr.*

Nos. WR-78,122-01, WR-78,122-02, and WR-78,122-03 (Tex. Crim. App. February 5, 2014) (not

designated for publication) (Exhibit 15).

On February 21, 2014 this Court appointed undersigned counsel as attorney for Mr. Mamou.

(Docket  No. 4.)  On March 6, 2014, this Court granted Petitioner's "Motion to Proceed *In Forma*

*Pauperis.*"  (Docket  No. 7.)  On January 28, 2015, this Court ordered that Petitioner's skeletal

protective federal habeas corpus petition is to be filed by February 20, 2015 (Docket No. 32).  Out

of an abundance of caution it is filed by Feb. 4, 2015, the AEDPA one-year statute of limitations.

**ii. Claims raised in state court.**

The following issues and claims have been raised in state court proceedings:

**a. Points of error raised on direct appeal.**

On **direct appeal**, petitioner brought the following points of error:

1.  Trial court error for denying Appellant's objection to the assistant district attorney's speculating that the Texas legislature could lessen Appellant's parole eligibility of 40 years.
2. The evidence is legally insufficient to support the conviction of capital murder in that the State failed to prove kidnaping beyond a reasonable doubt.
3.  The evidence is factually insufficient to support the conviction of capital murder in that the State failed to prove kidnaping beyond a reasonable doubt.
4.  Trial court error in denying Appellant's requested charge of false imprisonment.
5.  The evidence is legally insufficient to support the conviction of capital murder in that there is not sufficient corroboration of accomplice testimony.
6. The evidence is factually insufficient to support the conviction of capital murder in that there is not sufficient corroboration of accomplice testimony.

7. The State failed to prove beyond a reasonable doubt the probability that Appellant would constitute a continuing threat to prison society for 40 years and/or that after that time, if released, he would constitute a continuing threat to free society.

8. Trial court error for denying Appellant's requested charge that extraneous offenses be proved beyond a reasonable doubt.

(Exhibit 10).

**b. Claims raised on state habeas.**

In Mamou's **initial state habeas petition**, the following claims were presented:

1. Ineffective assistance of counsel under state and federal law (Claims 1 and 2).

2. Ineffective assistance of counsel on appeal under state and federal law. (Claims 3 and 4).

3. The effect of the above deprived Petitioner as he was subjected to cruel and unusual punishment under state and federal law. (Claims 5 and 6).

4. Deprivation of the right to counsel was a denial of due process under the 14th Amendment of the U.S. Constitution. (Claim 7).

5. Trial error in denying Appellant's objection to the assistant district attorney's speculating that the Texas legislature could lessen Appellant's parole eligibility of 40 years was a violation of the 14th Amendment. (Claim 8).

(Exhibit 11).

Petitioner's *pro se* **subsequent petition** raised the following claims:

1. Applicant was denied due process because the jurors did not hold the State to its burden of proving each element in the indictment.

2. Ineffective assistance of counsel for failure to object to the admission of an un-adjudicated offense through the testimony of Terrence Dodson.

3. Ineffective assistance of counsel for failure to object to victim impact testimony in the guilt/innocence phase of the trial through the testimony of Pat Gibson.

(Exhibit 12).

In his **subsequent state petition**, the following claims were presented:

1. Trial court error and denial of due process by allowing expert testimony of Robert Baldwin concerning "magazine marks" in violation of Tex. R. Evid. 702 and *Kelly v. State.*

2. The State failed to disclose all exculpatory evidence in violation of *Brady v. Maryland.*

3. The State failed to disclose any plea agreements entered into with witnesses in exchange for their trial testimony, violating the 14th Amendment to the U.S. Constitution.

4. The State failed to disclose all impeachment evidence in violation of *Brady v. Maryland.* and the Confrontation Clause of the 6th Amendment to the U.S. Constitution.

(Exhibit 13).

**C. Summary of trial proceedings.**

-7-

As the Court has limited this skeletal petition to 100 pages, which is inadequate to discuss Mamou's claims for relief, a summary of the trial proceedings is in <u>Appendix A</u> herein.

## III.  THE STANDARD OF REVIEW UNDER §2254(d).

As this Court has limited this skeletal petition to 100 pages, which is inadequate to discuss Mamou's claims for relief, this discussion is in <u>Appendix B</u> herein.

## IV. CLAIMS FOR RELIEF.

## <u>CLAIM ONE</u>: MR. MAMOU IS ACTUALLY INNOCENT OF CAPITAL MURDER.

Petitioner's conviction and sentence of death were unlawfully and unconstitutionally imposed in violation of his rights to due process, equal protection, fundamental fairness, a trial before a fair, impartial and representative jury, a trial untainted by prosecutorial misconduct, the effective assistance of counsel, and a reliable guilt and penalty determination, all of which are guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution, customary international law, international human rights law, and state law, in that Petitioner is factually innocent of the crime for which he was convicted.  (*Schlup v. Delo,* 513 U.S. 298 (1995); *Herrera v. Collins*, 506 U.S. 390 (1993).

If Respondent disputes any of the facts alleged below, Mamou requests an evidentiary hearing so that the factual disputes may be resolved.  His amended petition will be filed by June 4, 2015.  However, Mamou has not yet been afforded discovery and disclosure of material evidence, the use of this Court's subpoena power and the funds and opportunity to investigate fully.  The declarations and other exhibits accompanying this Petition, as well as the allegations set forth elsewhere in this petition, are hereby incorporated by reference into this claim as though set forth in full.

This claim was arguably presented on direct appeal in terms of legal and factual insufficiency

-8-

of guilt of kidnaping and insufficient corroboration. (Points of Error 2, 3, 5 and 6.)  If these appellate claims are deemed to not have specifically raised "actual innocence" as pled herein, there is an exception to procedural default for  "gateway" claims of actual innocence such as this. *See, e.g., House v. Bell,* 547 U.S. 518, 553-554 (2006) (petitioner has satisfied the gateway standard...and may proceed on remand with procedurally defaulted constitutional claims" because the "central forensic proof connecting House to the crime...has been called into question..."); *Schlup v. Delo,* 513 U.S. 298, 314-17 (1995).

### A. Facts in support.

Petitioner has been unable to investigate this claim and present facts in support of it because all funding for experts and investigators has been denied.  (Docket No. 29, Order of Jan. 9, 2015.) This claim is presented in incomplete form to preserve it for federal habeas review when an amended petition is filed.

As outlined *supra* in the statement of the case, this petition centers around Mamou's claim that he did not kidnap and murder Mary Carmouche.  The State made their case relying on testimony from admitted participants in a scheme to rob and shoot Petitioner.  Mamou's trial attorneys rushed to trial within three months of their appointment and never seriously investigated any deals they may have made with the prosecution in return for their testimony, or any coercion to which they were subjected in order for them to implicate Mr. Mamou.  Nor did Mamou's state habeas application show any evidence of such investigation.

Kevin Walter, Samuel Johnson,  Howard Scott , Terrence Dodson, and Anthony Trail were all implicated in one way or another in criminal activities.  All had ample motives to lie.  All gave self-serving testimony that implicated Mr. Mamou in the drug deal.  However, only Mr. Dodson gave testimony which purported to show that Mr. Mamou had admitted his involvement in the

Carmouche murder, the basis for the finding of capital murder. There was no eyewitness testimony to that murder from the other participants.

The allegedly collaborating firearms evidence was from a now-discredited firearms "toolmark" (specifically, "magazine mark") expert purporting to link bullet casings found at the drug-crime shooting to a bullet found at the scene of Mary Carmouche's murder. This expert, Robert Baldwin, gave false testimony in a recent capital case that was reversed as a result. This was the only forensic evidence linking the killing of Carmouche to the abortive drug-crime shooting. As would have been shown in detail with a ballistics expert, had funding been granted, this type of firearms evidence itself has come under increasing critical scrutiny in recent years. A sub-class of firearms testimony deemed particularly unreliable is "toolmark" identification. A sub-class of that sub-class is "magazine mark" identification, which is deemed even more unreliable. And a sub-class of that are cases where no gun has been recovered, which adds one more degree of unreliability. Without Baldwin's testimony, the State had no case for capital murder, as Dodson was an accomplice, and, standing alone, his testimony was insufficient. Even the State's fingerprint expert, Mr. Ralph Saldivar, who purported to show Mamou's fingerprints on the newspapers, has been embroiled in scandal and been the subject of disciplinary action. Additionally, Mr. Mamou's case for actual innocence was never investigated or presented at trial.

Despite the obvious difficulty in proving one's innocence without any investigative or expert assistance, there are some preliminary factual bases for this claim which will be developed, *inter alia,* in the amended petition:

> 1) The testimony of the now-discredited Robert Baldwin was false, unreliable and based on "junk science." Fingerprint expert Saldivar has also been disciplined. (*See* discussion of these experts *infra* at Claims Two through Five).
> 2) There are reasonable grounds to believe that the testimony of Terrence Dodson was

coerced by police pressure and was also false.[7]

3) There are also reasonable grounds to believe that the testimony of the other State's witnesses was also coerced and/or false.

**B. The "gateway" claim of actual innocence.**

There are two types of claims advanced in federal habeas corpus proceedings. "Merits" claims are those claims upon which a federal court may grant relief. "Gateway" claims are those claims which are used to explain why otherwise procedurally barred constitutional claims should be considered on the merits.

The procedural default doctrine is not applicable to gateway claims for two reasons. First, a federal court may not grant relief from a state court judgment based **purely** upon a gateway claim; the favorable resolution of a gateway claim merely permits a federal court to consider an otherwise defaulted merit claim. Thus, a state's interest in finality is not compelling at the gate-keeping stage because the petitioner is merely seeking authorization from the court to apply for the writ. Second, the question of procedural default is a *purely federal inquiry*. Federal courts decide which merit claims should be reviewed, and while a state's disposition of a case on procedural grounds is a relevant consideration with respect to merit claims, a state may not preemptively determine the scope of a federal court's discretion.

In *Herrera v. Collins*, 506 U.S. 390 (1993), and *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court defined the difference between merit claims and gateway claims. *Herrera* and *Schlup* explain that merit claims and gateway claims serve distinct purposes. In *Herrera,* the habeas petitioner alleged that he was actually innocent of the crime for which he was convicted and

---

[7] *See* Declaration of Sonja Rafeet, <u>Exhibit 27</u>; she states that Dodson's mother told her the police "were constantly following her son and harassing her son and trying to make sure that Terrence would testify against Mamou at his trial."

sentenced to death, but he did not allege a constitutional, trial error. Without an accompanying constitutional claim, a plurality of the Supreme Court held, his claim of actual innocence was irrelevant. "A claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to  have his otherwise barred constitutional claim considered on the merits." *Herrera*, 506 U.S. at 404.[8]

In  *Schlup v. Delo*, *supra,* the Supreme Court again noted the fundamental distinction between gateway claims and merit claims. Gateway claims, that Court held, are procedural rather than substantive. *Schlup,* 513 U.S. at 314. Because no relief can be granted on claims that are purely procedural, a state has no interest in blocking a federal court's review of that claim; therefore, the federal courts were not restrained by the fact that much of Schlup's evidence of actual innocence was presented for the first time in a successor habeas petition. (*Id.*)  Rather, the Supreme  Court characterized Schlup's case as resting, in the final analysis, on his underlying merit claim, which could only be addressed if Schlup proved his gateway claim. (*Id*. at 316.)

More recently, in *House v. Bell,* 126 S. Ct. 2064 (2006)  the Supreme Court held that "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted..." *House,* at 2077, *quoting Schlup* at 327-328. The Court emphasized that

> the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence. A petitioner's burden at the gateway stage is to demonstrate that, more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."
> *House,* at 2077.

---

[8]  While *Herrera* was a plurality opinion, all nine Justices of the Supreme Court agreed that Herrera's actual innocence claim could serve as a gateway to another constitutional claim.

While *Herrera*, *Schlup* and *House* all deal with the fundamental-miscarriage-of- justice exception to procedural default, they teach that all claims advanced in federal habeas proceedings and, indeed, all arguments advanced in support of them, need not be constrained by the doctrines of exhaustion and procedural default. *See  Vasquez v. Hillery*, 474 U.S. 254, 257-58 (1986) ("We have never held that presentation of additional facts to the district court, pursuant to that court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts"); *House,* at 2068 ("In certain exceptional cases involving a compelling case of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition," *citing Schlup* at 319-322.

## CLAIM TWO: THE COURT ERRED IN ADMITTING UNRELIABLE "MAGAZINE MARKS" FIREARMS TESTIMONY FROM STATE'S EXPERT ROBERT BALDWIN.

The trial court erred in admitting testimony from a State's expert, Robert Baldwin, that was unreliable, unscientific and violated Mamou's federal constitutional rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.  At the time of the trial, there was  no reliable scientific basis for Baldwin's testimony, and thus it was inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 (1999).

The testimony  (1) was not based upon sufficient facts or data, was not the product of reliable principles and methods; (2) the firearms examiner who performed the bullet comparison in this case did not apply the principles and methods reliably to the facts of the case; (3) the erroneous testimony of this expert has led to the reversal of another Texas capital case; (4) his subjective conclusion, unsupported by statistical analysis, that a particular bullet was fired from a particular weapon was so weak as to lack any probative value; and (5) any weak probative value of Baldwin's testimony

-13-

was also substantially outweighed by considerations of unfair prejudice, confusion of the issues, and misleading the jury under the due process and fair trial provisions of the Constitution.

This claim was presented in state court in the successive petition filed by Mr. Sergi, as Point of Error No. 1.  Any failure to present it on direct appeal was the result of ineffective assistance of appellate counsel.  Any failure to present it in the initial state habeas petition was the result of ineffective assistance of state habeas counsel. To the extent Baldwin's testimony was admitted due to ineffective assistance of trial counsel, any procedural default would be excused under the exceptions the Supreme Court has defined in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012) and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).

### A. Facts in Support.

### i. Testimony of Robert Baldwin.

At the guilt phase of Mamou's trial, the State called **Robert Baldwin,** a criminalist from the Houston Police Department who worked in the HPD Firearms Laboratory. 20 RR 99.  The witness was first asked whether it was possible "to take a casing that has been fired in a firearm and determine whether another casing has been fired out of the same firearm.?"  20 RR 102.  Baldwin answered that "yes...that is possible...depending on the condition...of the fired cartridge cases...are suitable for comparison..." 20 RR 102.  Baldwin was then asked whether the same comparison was possible from "a projectile that is fired from a firearm and tell whether or not they [sic] were fired in the same or different firearms" and he similarly answered that it was possible, "depending on the condition of the fired bullets."  20 RR 102-103.

Baldwin then identified State's Exhibit 38, a 9mm  pistol, which contained a number of unfired rounds, and State's Exhibit 39, unfired cartridges, three of which were test-fired in State's Exhibit 38.  20 RR 104-105.  Baldwin also compared five fired cartridges, States's Exhibits 26

-14-

through 30, with the pistol and his opinion was that none of these five fired cartridges were fired

from Exhibit 38 or from any 9 mmm pistol.  20 RR 106.  Baldwin also compared four fired bullets,

State's Exhibits 79, 84, 90 and 91 with the firearm and he concluded that none of them were fired

from State's Exhibit 38.  20 RT 106.  He also opined that the five fired 9 mm cartridges, State's

Exhibits 26 through 30,  were fired from the same firearm but he did not know which precise

firearm.  20 RR 107.

State's Exhibit 89, an unfired cartridge was recovered from the Lychester address where

Mary Carmouche's body was found.  Baldwin testified there were "magazine markings" on it.  20

RR 108.  State's Exhibit 89 was compared with the magazine markings on the fired cartridge cases,

and the witness opined that it was at some point cycled through the same magazine as one of the

fired cartridge cases (State's Exhibit 27). 20 RR 108.  State's Exhibit 27 and 89 had "the same"

magazine markings.  20 RR 108, 111.  The witness demonstrated that

> In order to fire the firearm of the pistol, an individual would have to load
> cartridges into the magazine as I'm doing now.  As you can see, I place the cartridge
> at the top of the magazine; and I depress a part of the magazine known as the
> follower, and the cartridge is slid into position...
> The first thing that would happen is that this magazine would be
> positioned...in such a manner that the first cartridge in the magazine would be
> basically at the bottom area of the slide.  And once I release the slide in that manner,
> the closing of the slide will force or strip that cartridge from the top of the magazine
> and force it forward and upward; and as that cartridge is forced out of that magazine,
> there will be markings left on the side wall...of that cartridge.  And so each time this
> cartridge were to be cycled or passed through the magazine in that manner, you
> would produce a pair of magazine marks on the right side of that cartridge.
> 20 RR 109-110.

Baldwin also testified that it was his opinion that the fired jacketed lead bullets, State's

Exhibits 79, 84, 90 and 91 were fired from the same firearm.  20 RR 111.  The witness again stated

that State's Exhibit 89, the live (unfired) round recovered from Lynchester  had the same magazine

marks as the fired cartridge case, State's Exhibit 27, that was recovered from Lantern Point, the

location of the drug shooting.  20 RR 111.  However, the only details of this were that

> [w]ith respect to all four of the fired jacketed bullets, they exhibited the same class
> characteristics.  That is, they were of the same caliber and had the same number of
> lands and grooves; the same direction of twist and width of rifling; however, it was
> only with respect to State's 79 and State's 80 (sic) that I could actually make an
> identification."
> 20 RR 112.[9]

Baldwin was asked if State's Exhibits 79 and 90 had the same "rifling characteristics;"

however, he replied the same "class characteristics."  20 RR 112.  Baldwin concluded that there was

nothing which would exclude State's Exhibit 91, the bullet taken from Mary Carmouche's body,

"from being fired in the sam firearm that fired all the other fired jacketed lead bullets."  20 RR 113.

Baldwin *claimed he lacked the ability to take photographs of the comparison microscopic exam. Id.*

The cross-examination of Baldwin was both perfunctory and ineffectual.  Defense counsel

Hill appeared to be uninformed about the firearms evidence and asked for an explanation of "class

characteristics" as he was "not sure if I understand what that means."  20 RR 113-114.  Baldwin

explained that if two pistols were, for instance, Smith & Wesson .38s, "[t]hey would have the same

number of lands and grooves, in that case five, the same direction of twists, which would be to the

right."  20 RR 114.  In other words, "you would have many .38 Special Smith & Wesson firearms

having those characteristics."  20 RR 114.  Yet there was no testimony as to the possible firearm

brand of the fired cartridges.

"Many thousands" of the kind of magazines examined here were made in the U.S.  20 RR

117.  Baldwin explained he used a microscope to examine the bullets.  20 RR 117.  In comparing

the cartridges, "all the markings may not reproduce off a cartridge case."  20 RR 119.  When asked

if each of the cartridge cases had "an equal number of markings" Baldwin stated that "I really don't

---

[9]   The witness later corrected State's Exhibit 80 to State's Exhibit 90.  20 RR 112.

recall to that extent." 20 RR 119.  Defense counsel then asked a muddled question about "[w]hat are the things you look at...what is the word I'm looking for to describe what a magazine mark is?" 20 RR 119.  Baldwin then stated that "*[m]agazine markings were not part of the initial examination of those cartridge cases against one another*," the "goal in that examination was to determine if they were fired from the same firearm." 20 RR 120.[10]  "Magazine marks are not produced during firing and, therefore, would not be an appropriate marking to use for that type of examination." 20 RR 120.  The magazine marks are produced "during the time that a cartridge is stripped from the magazine and is being chambered into the chambered forearm." 20 RR 120.  "With respect to the five fired cartridge cases, the magazine marks were not part of that determination, because I was trying to determine if the cartridge cases were fired from the same gun." 20 RR 121.  However, the firearm itself was not available. 20 RR 121.  The only fired bullets he could positively identify were Exhibits 79 and 90.  20 RR 122.

On redirect, Baldwin was asked whether magazine marks are produced as consistently as he claimed and whether he could tell from a hypothetical ten magazines which one the bullet was chambered through.  Baldwin stated that

> Theoretically, it could be done.  It would again depend on how many markings were being produced by the lips of the magazine as to whether or not you would have enough markings to make that type of determination.
> (20 RR 123-124).

Baldwin stated that State's Exhibit 89, a cartridge, and State's Exhibit 27, a cartridge case, came from the same magazine. 20 RR 124. The State rested immediately after Baldwin's testimony. 20 RR 128.

---

[10]   This is an indication that the magazine mark identification may have occurred after consulting with the prosecutors about the need to link the unfired bullet to the Lantern Point cartridge cases.

-17-

In guilt phase final argument, the prosecutor Mr. McClellan not only emphasized the firearms testimony of Mr. Baldwin in final argument, but admitted that there could be no conviction for capital murder without it. He first told the jury the importance of the linkage of the killings of Mary Carmouche and Terrence Gibson:

> For some reason you [may] decide he was justified in leaving the scene in that car, but why didn't he stop and let her out someplace else? Why didn't he let her go? And you know the reason. Because he had to kill the only witness who was left alive. He had to kill the only person he had not. He had already killed the other three...[11] the only reason he didn't is because he had to make sure there were no witnesses.
> 21 RR 9-10.

After emphasizing the alleged motive for the killing of Carmouche, the prosecutor then pointed out that the testimony of Bug Johnson was not enough:

> ...what that instruction says is that you couldn't convict Charles Mamou just on the evidence of Samuel Bug Johnson. There has to be other evidence that tends to connect the defendant to the crime, and there is tons of other evidence....
> There is all kinds of other evidence, the ballistics evidence
> 21 RR 12-13.

The prosecutor then made clear that the firearms testimony was the crucial link between Mamou and Carmouche's murder:

> Now Mr. Wentz makes a point and says, well, you see that silver bullet and that (inaudible) bullets. You bet they are. And you know what they told...what Mr. Baldwin, what the firearms examiner told you, is that the thing about this bullet is that it was chambered...not chambered, excuse me...*it was in the magazine, has a magazine mark that compares and makes it identical to one of the casings that was in the magazine of the firearm that...of the casing that was left at Lantern Point.*
> Now several times you may have gone, why are you asking about that? You can put different brands of ammunition in a clip and shoot it; so, you could have some Remington Peter, some Smith & Wesson, and some whatever. And the answer is, sure you can. The fact that you fire more than one type of brand of ammunition out of a gun is not unusual. And the fact that there were five cartridges of one type maybe between there and Lantern Point and Lynchester, he had to reload. Or maybe

---

[11]   Of course, this was not true.

-18-

this is the next one in line and there were several more like it, or they may have been whatever combination. *But what is important is...is that this was placed in the same magazine that the fired bullets were placed in, and thus, fired through that same firearm, or could have been fired through that same firearm. This wasn't fired. This was ejected.*

We talked about how you might eject one; because if you're not sure, like Terrence Gibson would have had to do, he would have had to rack in order to pull back the slide in order to put one in the chamber. Well, if there is one already in the chamber and you do that, not knowing if there is one in the chamber or not, you're going to eject one. And this...we know that would have happened, because it has the magazine marks.

(21 RR 47-48) (emphasis added).

The prosecutor kept returning to his point that the magazine marks proved that Mamou was

at the scene of Mary Carmouche's murder:

The firearms evidence, we know from there, he admits having shot rounds...at the number he's unsure of...at Lantern Point Drive. So we know that the casing that has the magazine mark was fired in a weapon in the possession of this defendant, and that's the same magazine that has this bullet in it that was found at the Lynchester address where Mary Carmouche was.

(21 RR 48).

**ii. There was no case for capital murder without Baldwin's testimony and thus the error in admitting it and the defense's failure to object cannot be harmless.**

The errors in admitting Baldwin's testimony and defense counsels' failure to object and

challenge Baldwin's flawed testimony on cross-examination cannot be held harmless, as without

it, the State had no case for capital murder. The one other witness that connected Mamou to the

killing of Carmouche was Terrence Dodson, and he was an accomplice. The instructions read to

Mamou's jury made clear that he could not be convicted solely on Dodson's testimony that Mamou

confessed to him after the murder:

An accomplice, as the term is here used, means anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act or omission on their part transpiring either before, at the time of, or after the commission of the offense, and whether or not they were present and participated in the commission of the crime. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the

-19-

conduct of another for which he was criminally responsible, or by both.  Mere presence alone, however, will not constitute one a party to an offense.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  The term 'conduct' means any act or omission and its accompanying mental state.

You are instructed that a conviction cannot be had upon the testimony of an accomplice unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

(Exhibit 5, at CR 86, Charge of the Court at Guilt/Innocence).

The instruction made reference only to Samuel "Bug" Johnson as a possible accomplice, but it is clear that Mr. Dodson was also an accomplice.  Indeed, Dodson himself testified that

---he was instrumental in setting up the deal for Mamou to purchase cocaine. 19 RR 166.

---he intended to help Mamou and Johnson rob the purported sellers of their drugs and was present at Northline Mall for that purpose  19 RR 168.

---at that location, Dodson got out of the car with Mamou and was active in discussing giving $20,000 for a kilo of cocaine. 19 RR 169-170, 194.

---although Dodson was dropped off before the drug deal occurred, he had been an integral part of the planning and the initial stages of the execution of the plan.  19 RR 172-194.

---Dodson testified that his  part in the scheme was to rob the other party with a gun he had in his possession.  19 RR 186-187.  His role was once he saw the dope, he was going to pull the gun and take it.  19 RR 188.

---he was also implicated in the Carmouche murder through his acts prior to her murder: his possession of a gun to rob the dealers; his involvement in the planning and execution of the drug deal that ultimately led to her death; and (although Mamou contended at trial and again contends herein that Dodson was untruthful) Dodson's allegations regarding his own complicity in Mamou's actions the next day.

---Dodson himself thought he was going to be indicted for capital murder based on his acts as an accomplice. 19 RR 195, 200.

Even though Dodson was not present at the drug scene shoot-out, these are more than sufficient acts for him to be seen as an accomplice.  As Mamou's jury was instructed, an accomplice is one who

by unlawful act or omission on their part transpiring either before, at the time of, or after the commission of the offense, and whether or not they were present and participated in the commission of the crime.  A person is criminally responsible as

-20-

a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he was criminally responsible, or by both.
*Id.*

So Dodson's testimony alone would not have been sufficient and Baldwin's was therefore crucial. The "fingerprint evidence" the prosecutor mentioned (21 RR 12-13) in argument connected Mamou to the cut-up newspapers found at the drug shoot-out scene, which he admitted at trial, not to the Carmouche murder. Neither did the location of the car near the body of Carmouche, also mentioned in the prosecutor's argument, (*Id.*) tie Mamou to her murder. This argument was actually a pure smoke-screen and meaningless. Mamou was not a resident of Houston, and any one of the people at the Scotts' apartment after the drug scene shooting could have driven the car to that location and shot the victim. Without "corroborating" evidence by Baldwin, Mamou could not have been found guilty of capital murder.

### iii. Robert Baldwin has been discredited and his testimony has shown to be false.[12]

Disturbingly, the testimony of Mr. Baldwin has been shown to be false in other cases and a capital case has been reversed on account of his testimony.

### a. *Williams v. Quarterman.*

In the capital case of *Williams v. Quarterman,* 551 F.3d 352 (5th Cir. 2008) the same Mr. Baldwin that testified in Mamou's case was called as a State's witness in Nanon Williams' case. In *Williams*

> [t]he other expert was a Houston police department criminalist, Robert Baldwin, who specifically testified that the "EB-1" bullet came from a .25-caliber pistol like the one witnesses claimed Williams had carried and not from a .22-caliber pistol like the one Guevara admitted to carrying. Baldwin admitted that he failed to test fire the pistols, but testified unequivocally that his analysis was correct...

---

[12]  The following facts relating to Robert Baldwin are incorporated by reference in all the following claims relating to Baldwin's testimony.

In connection with the habeas proceedings, the state trial court ordered the release of Guevara's .22-caliber pistol and the ballistics evidence.  In so doing, it determined that "EB-1" had, in fact, been fired by *Guevara's* .22-caliber pistol in direct contradiction to Baldwin's trial testimony...

In the state habeas proceedings, Williams presented Baldwin's recantation of his trial testimony.  Baldwin admitted that the "EB-1" bullet came from Guevara's gun.  To compliment Baldwin's recantation, Williams also presented an affidavit from Ronald Singer, Chief Criminologist with the Tarrant County Medical Examiner's office, whom Williams retained to independently test the ballistics evidence.  Singer opined that Collier had  suffered two wounds to the head, one inflicted by a .22-caliber weapon and one inflicted by a shotgun. According to Singer, the shotgun wound could have obliterated the smaller wound if the smaller wound had been inflicted first. Singer further stated that the bullet recovered from Rasul's foot had not been fired from the same weapon as "EB-1." He opined that, even in its damaged state, "EB-1" and the .25-caliber bullet taken from Rasul's foot were easily distinguishable, particularly with the aid of a comparison microscope. Singer believed that a competent examiner should have had no problem discerning the difference and that Baldwin's trial testimony *"at best demonstrates extreme carelessness on his part and at worst calls into question his expertise."*
*Williams,* 551 F.3d at 355-356.

Singer's 1998 (prior to Mamou's trial) affidavit in the *Williams* case was scathing about Baldwin's work.  The two bullets in question were "easily distinguishable from one another, particularly if examined with the aid of a comparison microscope, and should have presented no problem to a competent firearms examiner." (Exhibit 16 at 2.)  Singer stated that "[i]f the bullet had been correctly identified during one of the at least three times it was examined by the Houston Police Department...this might have materially affected the outcome of the trial." *Id.*

Williams also submitted trial counsel Muldrow's affidavit indicating that she should have sought funding for independent experts, particularly a ballistics expert. She opined that had she done so, she would have found a "winning" defense.  *Id.* at 356.

b.  *Johnnie Bernal.*

Robert Baldwin also gave false testimony in the capital case of Johnnie Bernal.[13] In that case, Baldwin testified for the State that as a result of his ballistics examination he could say "with certainty" that the bullet recovered from the victim's body was fired from the firearm found in Mr. Bernal's bedroom. Additionally, "Baldwin left the jury with the false impression that his ballistics examination was conducted according to standard and routine practice when in fact it significantly deviated from customary practice. Baldwin's testimony that he did not attempt a comparison between any test bullets and the comparison bullet until all test-fires had been made was likewise false." Petition For Writ of Habeas Corpus, *Bernal v. Dretke,* at 34. (Exhibit 17).

Baldwin's testimony was false and misleading in *Bernal* because standard ballistics practice is to test-fire only two or three times, because each new firing "leaves behind lead deposits in the barrel, forming a new set of microscopic striae and ultimately changing the gun's signature." *Id.* Yet Baldwin made no matches after about 13 test-fires; applied solvent to clear the lead build-up, and then test-fired it about 25 times. *Id.* at 34-35. Yet he gave the jury the impression his faulty methods were sound, as he did in Mamou's case. Both the use of solvent and test-firing it 25 times were not sound practices. As here, Bernal's court-appointed attorney never presented an independent firearms expert to counter Baldwin's testimony, although it played a crucial role at trial.

**c. The HPD Crime Lab and Baldwin's discipline.**

In March 2003, an independent audit of the Houston Police Department Crime Laboratory where Baldwin was employed revealed serious defects in that laboratory. This occurred in the wake of the HPD crime lab DNA scandal. The investigation was not limited to the flaws of the DNA

---

[13] *Bernal v. State,* No. 72,095 (Tex. Crim. App. 1999) (unpublished); *Ex Parte Bernal,* No. 55,854-01 (Tex. Crim. App. 2003) (unpublished). The facts in *Bernal* discussed herein are taken from his federal habeas petition filed in this Court on March 25, 2004. *Bernal v. Dretke,* No. 4-04-cv-01163, Docket No. 5. (Exhibit 17).

section of the crime lab but also the ballistics section of the Houston Police Department. Two grand juries each issued serious criticism of the HPD lab. The first grand jury released a statement noting that "we have learned that the knowledge of problems and a lack of action to correct them do not constitute criminal negligence. Ethics and moral violations, even if they severely violate the public trust, are beyond our jurisdiction." Exhibit 18,(Houston Chronicle article, 8/2/03). The second grand jury, impaneled by Judge Ted Poe, extended their term of service for further investigation. Upon completion of its term, the second grand jury stated that the crime lab suffered from "inexcusable, wholesale mismanagement" and "incompetence." Exhibit 18 (Houston Chronicle article 10/17/03). Mr. Baldwin was also suspended in a disciplinary action in 2003, due to various faults in supervising the firearms division. Exhibit 18, Houston Chronicle article, "Police Chief Shakes Up Lab; 2 Quit," June 13, 2003.

### d. Lack of a firearm.

Significantly, in both *Williams* and *Bernal,* there was at least a recovered firearm which could be tested. Here, however, no firearm or magazine was recovered, although Baldwin purported to be able to tell that a bullet and several casings had been chambered through the unavailable magazine and firearm. Had funding for a firearms expert been provided, Mamou would have shown that this "no gun" case comparison is even more unreliable than those done by Baldwin in *Williams* and *Bernal* where at least the firearm in question was available.

### e. The "magazine mark" comparisons in this case were inherently unreliable.[14]

_____

[14] All funding for a firearms expert has been denied by this Court. The following is presented as an outline of what could have been presented to this Court through the requested expert. Much of the following has been adapted from the seminal work of Professor Adina Schwartz, *A Systemic Challenge To The Reliability And Admissibility Of Firearms And Toolmark Identification,* Columbia Science and Technology Law Review, Vol. VI (2005).

There are three major sources of misidentifications by firearms and toolmark examiners as discussed by Prof. Adina Schwartz in her article: 1) the individual characteristics of toolmarks are comprised of non-unique marks. 2) subclass characteristics shared by more than one tool may be confused with individual characteristics unique to one and only one tool; and 3) the individual characteristics of the marks made by a particular tool change over time. Schwartz, Adina, "*A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, VI Columbia Science and Technology Review (2005) at 4 (Exhibit 19). None of these three factors were ever discussed at Mamou's trial, however, either by defense counsel or any experts.  For reasons of space, the full argument regarding toolmark unreliability cannot be summarized herein, in this skeletal petition, but the Court is referred to Prof. Schwartz's article. (Exhibit 19).

**B. Argument.**

The trial court abused its discretion by admitting the testimony of the prosecution's firearms expert, Robert Baldwin.  His testimony—concluding that the magazine markings on an unfired bullet found near where the body of Mary Carmouche was found matched magazine markings from fired shell casings found at Lantern Point, the site of the drug shoot-out---should have been excluded under the Fifth, Sixth and Eighth Amendments to the U.S. Constitution as well as Texas Rule of Evidence 702 (based on  Fed .R.Evid. 702)  because Baldwin  was not qualified to render an expert opinion on shell casing comparisons. Further, the State failed to demonstrate that the method Baldwin employed when comparing the casings met the criteria for reliability set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, (1993).

A trial court's decision to admit expert testimony under an abuse-of-discretion standard. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S. Ct. 1167 (1999) ("[This] standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate

conclusion."). "If we find an abuse of discretion in admitting the evidence, we consider any error under the harmless error doctrine, affirming the judgment unless the ruling affected a substantial right of the complaining party." *United States v. Norris,* 217 F.3d 262, 268 (5th Cir.2000).

Baldwin's shell casing comparison technique did not meet the criteria for reliability set forth in *Daubert* for several reasons. First, Baldwin could not say and did not testify (1) that his comparison methodology had ever been empirically tested; (2) whether his methodology had been published in a peer-reviewed article; (3) if any studies have been performed to calculate the rate of error for his methodology; and (4) if any standards exist for making shell-casing-to-unfired bullet comparisons.

Additionally, there was no testimony as to Baldwin's experience, training, educational background, his reliance on published academic studies, or, indeed, anything that would have qualified him as an expert.  Moreover, Baldwin's application of the casing comparison technique in this case was particularly unreliable because neither the gun nor the magazine in question had been recovered.  Nor did he testify as to how many "magazine markings" he used to make the match, how wide or deep the markings were, or precisely where the marks were located on the bullet and casings.  Additionally, he did not load or test-fire the missing pistol  to exclude magazine markings that may have been caused by differences in loading techniques or different surfaces of either the bullet or the casings.  Mamou's attorneys failed to raise these issues prior to trial and there was no *Daubert/Kelly* hearing held to examine Baldwin's qualifications. The trial court had nothing upon which to base its decision to admit Baldwin's testimony.

The Fifth Circuit has held that "[t]o qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.' " *United States v. Bourgeois,* 950 F.2d 980, 987

(5th Cir.1992) (second alteration in original) (quoting *United States v. Johnson,* 575 F.2d 1347, 1361 (5th Cir.1978)). Additionally, Fed. R. Evid. 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education...." *See also Kumho Tire Co.,* 526 U.S. at 151, 119 S.Ct. 1167 (discussing witnesses whose expertise is based purely on experience).

 Expert testimony is permissible if the trial court finds that the expert is testifying to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact issue. *Daubert,* 509 U.S. at 592, 113 S. Ct. 2786. "Under *Daubert,* Rule 702 charges trial courts to act as 'gate-keepers,' [and to] mak[e] a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 243–44 (5th Cir.2002) (quoting *Daubert,* 509 U.S. at 592–93, 113 S. Ct. 2786).

In *Daubert,* the Supreme Court announced several factors that courts should consider when exercising their gate-keeping function, including: (1) whether the technique in question has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 593–94, 113 S. Ct. 2786. The proponent of expert testimony—here, the State—has the burden of showing that the testimony is reliable. *See Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir.1998) (en banc).

Texas state courts have held Baldwin's methodology unreliable in  *Sexton v. Texas,* 93 S.W.3d 96 (Tex. Crim. App.2002). In *Sexton*  the Texas Court of Criminal Appeals assessed the reliability of the technique of using magazine markings to connect spent shell casings found at a crime scene with live shell casings found at another location, the exact situation as here. The expert

in *Sexton* had testified that certain spent shell casings and live shell casings had at one time been in the same magazine or magazines because they had similar magazine marks; however, the magazine(s) that allegedly made those marks were never found, again as here.  Similarly, the gun used to shoot the spent shell casings was never found. The Texas Court of Criminal Appeals held that the expert's methodology was not proven to be reliable given that the absence of the magazines rendered the expert unable to make test marks for comparison. *Id.* at 101.   The *Sexton* court recognized that the doubts about the identification arose from the expert's failure to examine or make test fires with the suspect magazine(s) or to consider the process by which they were manufactured.  *Id.*  Here too, the gun through which the casings and bullet were chambered was not available for purposes of comparison testing.

Additionally, while standards controlling firearms comparison testing do exist, there is nothing in the record here to show that Baldwin followed well-accepted methods and scientific procedures in making his comparisons.  There was no testimony regarding what literature he relied upon, whether they were authoritative, what the error rate might be, or even how he made the comparisons, aside from some remarks that he used a microscope. It was reversible error to admit this testimony.

## CLAIM THREE: THE STATE KNOWINGLY SUPPRESSED FAVORABLE EVIDENCE AND PRESENTED FALSE TESTIMONY REGARDING THE FIREARMS EVIDENCE AND OTHER STATE'S WITNESSES IN VIOLATION OF *BRADY V. MARYLAND, NAPUE v. ILLINOIS* AND *GIGLIO V. UNITED STATES.*

With further discovery and an evidentiary hearing, and/or in the amended petition, Mr. Mamou will show that the prosecution in this case suppressed favorable information regarding the alleged "magazine marking" match between a bullet found at the scene of Mary Carmouche's death and a bullet found at the scene of the drug shoot-out.  This violated Mamou's federal constitutional

rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.   The favorable information is expected to be that the alleged magazine markings did not and could not establish that the bullets were chambered through the same firearm and, thus there was no forensics link between Mr. Mamou and Mary Carmouche's murder.  Mr. Mamou will show that the prosecution knowingly presented false evidence through the testimony of Robert Baldwin, who testified regarding these magazine marks.  The State also presented false testimony through State's witnesses Holley, Walter, Johnson and Dodson.

**A. Facts in Support.**

Petitioner incorporates the factual and legal summary of Claim Two herein.  At the guilt phase of Mamou's trial, the State's firearms expert Robert Baldwin was shown State's Exhibit 89, an unfired cartridge found at the scene of Mary Carmouche's murder, and Baldwin testified there were "magazine markings" on it.  20 RR 108.  The live unfired cartridge was compared with the magazine markings on the fired cartridge cases, found at the scene of the drug shoot-out, and the witness opined that they were at some point cycled through the same magazine as the fired cartridge case (State's Exhibit 27).  20 RR 108.  According to Baldwin, State's Exhibit 27 and 89 had the same magazine markings.  20 RR 108, 111.  However, Baldwin did not provide any specifics as to how many similar magazine markings there were, or how he determined that they were the "same." With discovery and an evidentiary hearing, it is Mamou's belief that he would show that the prosecution in this matter knowingly presented false evidence from Mr. Baldwin and other State's witnesses.  This claim is presented in incomplete form to preserve it for review.

**B. Argument.**

**A. *Napue v. Illinois.***

In *Mooney v. Holohan*, 294 U.S. 103 (1935), the Supreme Court held that the knowing use of false testimony by the prosecution violates a defendant's right to due process, because "a deliberate deception of the court and jury by the presentation of testimony known to be perjured" is inconsistent with the rudimentary demands of justice." *Id.* at 112. In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court condemned the State's knowing use of perjured testimony as a violation of the Fourteenth Amendment to the United States Constitution. The Supreme Court has held that a prosecutor also has a constitutional obligation to correct his witness's perjured testimony, even if he did not know that the witness was going to lie or mislead. *Giglio v. United States*, 405 U.S. 150 (1972). Moreover, the prosecutor has a duty to correct a *false impression* that his witness created without committing perjury. *Miller v. Pate*, 386 U.S. 1 (1967); *Alcorta v. Texas*, 355 U.S. 28 (1957).

A petitioner is entitled to relief under *Napue* if: (1) the testimony was false; (2) the State knew the testimony was false; and, (3) there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *Napue*, 360 U.S. at 269-72. The knowing use of false testimony renders the result of a proceeding "fundamentally unfair, and must be set aside if there is *any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *United States v. Bagley*, 473 U.S. 667, 679 (1985) (emphasis added).

### 2. *Giglio* and Other Relevant Law.

*Giglio v. United States*, 405 U.S. 150 (1972) held that withholding of evidence on promise of leniency to witness was ground for new trial). The Supreme Court in that case rejected any distinction between impeachment and exculpatory evidence for the purposes of *Brady* analysis. Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if 1) the prosecution suppressed favorable evidence, and 2) the evidence was material to either the guilt phase or

punishment. *Brady,* 373 U.S. at 87. *See also, United States v. Bagley,* 473 U.S. 667 (1985)(failure to disclose impeaching evidence on request constitutes constitutional error if it deprives defendant of a fair trial); *Kyles v. Whitley,* 514 U.S. 419 (1995)(government has a duty to disclose exculpatory evidence even in the absence of a request if the withheld evidence, considered as a whole, results in a "reasonable probability" that a different result would have obtained, that the suppressed evidence "undermined confidence in the outcome of the trial." The obligation exists regardless of the good or bad faith of the prosecutor and even if the police have failed to disclose the evidence to him); *Banks v. Dretke,* 540 U.S. 668 (2004)(failure of the state to disclose that it had rehearsed the testimony of two witnesses used in both the guilt and penalty phases of a capital trial, especially when the witnesses denied any prior conversations with the prosecution, and one of the witnesses received both money and accommodations from the state, was a violation of due process under *Brady*).

 **CLAIM FOUR: MR. MAMOU WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY THEIR FAILURE TO CHALLENGE, TEST AND EFFECTIVELY CROSS-EXAMINE THE STATE'S FIREARMS AND FINGERPRINT EXPERTS.**

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because  trial counsel completely failed to test or challenge the crucial firearms testimony of State's expert Robert Baldwin and fingerprint expert Rafael Saldivar.

Specifically, Mamou was deprived of the effective assistance of counsel because of their failure to a) file pre-trial motions or motions *in limine* to exclude Baldwin's testimony based on his

unreliability and the lack of qualifications and unscientific methodology;  b) to seek timely discovery and disclosure of the methodology or results or tests allegedly performed by Mr. Baldwn; c) obtain their own ballistics expert to testify as to the faulty methodology and unreliability of magazine mark  comparisons in general and in particular those allegedly performed by Mr. Baldwin; d) seek a *Daubert/Kelly* hearing to challenge Baldwin's expertise, credentials and methodology; e) object to the testimony of Robert Baldwin at trial; f) seek a continuance based on the non-disclosure of requested ballistics discovery; g)  failed to acquaint themselves with the relevant literature in the field of magazine marks and toolmark identification and comparisons; h) failed to effectively cross–examine Mr. Baldwin at trial; and i) the cumulative effect of these failures deprived Mamou of the effective assistance of counsel.   Trial counsel also failed to challenge the fingerprint evidence presented by Houston Police Department crime lab employee Rafael Saldivar, although he had been disciplined and reprimanded in 1997, prior to Mamou's trial.

This claim was not brought in state habeas proceedings.  As with all ineffective assistance of trial counsel ("IATC") claims, any procedural default is excused under the exceptions the Supreme Court has defined in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012)  and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).

**A. Facts in Support.**

Petitioner incorporates by reference the factual and legal discussion of the prior two claims dealing with Robert Baldwin's "magazine markings" testimony.

**Claim 4(a): Ineffective assistance of trial counsel for failing to file pre-trial motions or motions *in limine* to preclude or limit Baldwin's testimony**.

The record shows that no pre-trial motions were filed by trial counsel to challenge the trial testimony of the State's firearms expert.  Nor does the record reveal that any *in limine* motions were filed to limit or preclude Baldwin's testimony.

Given that Baldwin's testimony was the only forensic evidence linking the killing of Mary Carmouche to Mamou, it was undeniably deficient performance for his defense counsel to fail to challenge that testimony.  Trial counsel were on notice that no gun had been recovered other than Gibson's gun at Lantern Point.  This gun could not have linked Mamou to the shooting of Mary Carmouche because it was not his gun and it had been abandoned before Carmouche was shot.  The unfired bullet recovered from near where Carmouche was compared to fired casings found at Lantern Point.  This is known as a "no gun" case, in which comparisons are made without the expert having access to either the magazine in question or the gun which held the magazine.

**Claim 4(b): Ineffective assistance of counsel for failing to seek timely discovery of any testing done by Baldwin.**

The record is also devoid of any efforts to seek discovery other than a boilerplate discovery motion filed by trial counsel on September 1, 1999, one week from when the trial commenced.  On September 7, 1999, *one day before jury selection began*, defense counsel were still not in possession of crucial ballistics evidence and requested that the Houston Police Department provide the evidence that allegedly showed a connection between the  shootings of victims Terrence Gibson and Mary Carmouche.  2 RR 6.  At that hearing, the defense also asked for an actual photograph showing that there was a ballistics match, rather than just an officer testifying that they matched.  2 RR 6.

The failings of the Houston Police Department Crime Lab were well known at the time of Mamou's trial in 2002, yet defense counsel failed to conduct a timely and reasonable investigation into their flawed methods.

-33-

**<u>Claim 4(c)</u>: Ineffective assistance of counsel for failure to obtain and/or present as a witness an independent competent expert to examine Baldwin's work or failing to have it competently examined.**

The record indicates the defense failed to obtain a competent independent expert to challenge or test the results allegedly obtained by Baldwin.  Respondent, as a supplement in opposing funding, submitted an "Interoffice Memorandum" purporting to show that a Max Courtney, a defense expert, examined the firearms evidence.[15]  (Docket No. 26, Exhibit A).  However, Max Courtney was not called as a defense witness.  From the "Interoffice Memorandum" alone, we have no information that the expert was knowledgeable regarding the suspect science of "toolmark" or "magazine mark" comparisons or that defense counsel were likewise knowledgeable about the defects and invalidity of such comparisons.  This was the main purpose of the requested funding for a ballistics expert, which this Court has denied.  All we can surmise from the "Interoffice Memorandum" is that a defense expert may have looked at some things shown to him by the State's now-discredited expert, Robert Baldwin.

Max Courtney was not called as a defense witness, nor was there any effective cross examination by defense counsel as to the suspect "magazine mark" testimony offered by Mr. Baldwin.[16]  Even if Courtney was hired, this would still be an instance of ineffective assistance of trial counsel for failure of the expert to point out the shortcomings of magazine mark identifications in general and in this case specifically.  Any failure to raise the claim previously would qualify as

---

[15]  Undersigned counsel has attempted, without success, to contact a forensics expert named Max Courtney of Fort Worth.  Without funding for an investigator, counsel is unable to further resolve the question of what Mr. Courtney examined and his findings at this time.

[16]  It is worth noting that the State's expert, Robert Baldwin, gave false testimony in the capital case of Nanon Williams, which was reversed as a result.  *Williams v. Quarterman*, 551 F.3d 352 (5th Cir. 2008).

-34-

an exception to any procedural default under *Martinez v. Ryan*, 132 S. Ct. 1309, 1317-1318 (2012)

and *Trevino v. Thaler*, 133  S. Ct. 1911, 1921 (2013).[17]

Assuming Courtney did examine what is purported to be evidence in this case, at trial

Mamou's defense counsel did virtually nothing to challenge Baldwin, even though his trial

testimony was extremely suspect and vague. This was a "no gun" case, where the alleged gun and

magazine, through which the bullets were allegedly chambered, was not available.  Such cases are

much more inherently unreliable than cases in which the gun is available.[18]  Baldwin provided no

details as to the number of alleged points of comparison between the unfired cartridge and other

fired cartridges; he could not recall how many marking were similar, just that he "was able to find

enough" of them (20 RR 119); he did not specify how many marks were dissimilar; he did not know

how many similar magazines may have been manufactured, only that there were "many thousands"

(20 RR 117); he testified that the cartridges have "the same magazine marks" (20 RR 108) without

---

[17]    The "Interoffice Memorandum" shows that Courtney relied completely on Mr. Baldwin to show him the evidence, brief him on "the events as to where and when the evidence from each case was collected," and to use his equipment to "do his examination."  Simply having an expert examine the prosecution's evidence in no way fulfills defense counsel's duty to meaningfully challenge this crucial evidence through expert testimony that would have cast doubt on Baldwin's testimony.  His was the only forensic evidence that purported to link Mamou to the murder of Mary Carmouche.  The case numbers cited in the "Interoffice Memorandum" as to what Courtney purportedly examined do not match the case numbers in this case.  The Mary Carmouche murder is HPD No. 98/3385 (*See, e.g.,* State's Exhibit 103, 25 RR 177183; State's Exhibit 104, 25 RR 185; State's Exhibit 106, 25 RR 189; State's Exhibits 107-111, 25 RR 191-199); the Terrence Gibson murder is HPD No. 98/3366 (*See, e.g.,* State's Exhibit 99, 25 RR 163; State's Exhibit 102, 25 RR 175); and the Anthony Williams murder was HPD No. 98/2463 (*See, e.g.,* State's Exhibit 122, 25 RR 222-229; State's Exhibits 123-124, 25 RR 231-233).  Yet the "Interoffice Memorandum" cites  HPD cases  98/953 and 98/939.  *See* Exhibit to Supplement. From this memorandum alone, we have no assurance that the evidence Robert Baldwin showed Mr. Courtney even pertained to this case, and, without further investigation, it appears it may not.

[18]    This contention, although based on common sense, is but one of many areas in which expert opinion is needed in this case.  Funding for a requested ballistics expert has been denied.

specifying whether this was specific or approximate;  and he testified  vaguely that there were "sufficient markings" (20 RR 121) to make the identification.  Additionally, his crucial comparison was with an unfired cartridge, which may not have been chambered through a firearm at all.

On the performance prong of *Strickland,* this was ineffective performance to fail to challenge the most important State's witness and the only one except the compromised and conflicted Dodson who purported to link Mamou to the murder of Carmouche.  At the very least, a defense expert could have pointed out the severe limitations and weaknesses in Baldwin's testimony.  There could be no valid strategic reason for failing to do so.

**Claim 4(d)**: **Ineffective assistance of counsel for failure to request a *Daubert/Kelly* hearing to challenge Baldwin's expertise, credentials and methodology**.

Here too, although trial counsel was on notice that the State sought to link Mamou to the killing of Carmouche through Baldwin, no *Daubert/Kelly* hearing was ever requested. Had trial counsel been even minimally aware of the shaky foundations of "magazine mark" comparisons, they would have sought such a hearing.  Had such a hearing occurred, there is a reasonable probability that Baldwin's testimony would have been excluded, as it failed to meet *Daubert/Kelly* standards.

Texas Rules of Evidence 702 (modeled on Fed. Rule of Evid. 702) allows a witness qualified as an expert to testify as to his opinion where his scientific, technical or other specialized knowledge will assist the trier of fact.  *Kelly v. State,* 824 S.W.2d 568 (Tex. Crim. App. 1992) sets forth the analytical framework a trial court may use in determining whether expert testimony is admissibale under Rule 702:

> 1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community
> 2) the existence of literature supporting or rejecting the underlying scientific theory and technique;
> 3) the clarity with which the underlying scientific theory and technique can be explained to the court;

4) the potential rate of error of the technique;
5) the availability of other experts to test and evaluate the technique;
6) the qualifications of the expert testifying; and
7) the experience and skill of the person who applied the technique on the occasion in question.
*Kelly,* 824 S.W.2d at 573.

The *Daubert* factors are similar:

a. The qualifications, experience, and skill of the person testifying;
b. The extent to which the reasoning or methodology can be and has been tested;
c. The extent to which the reasoning or methodology relies upon the subjective interpretation of the person testifying;
d. Whether the reasoning or methodology has been subjected to peer review and/or publication, and whether the theory or technique has been rejected in such literature;
e. The availability of other experts to test and evaluate the technique;
f.  The potential or known rate of error of the reasoning or methodology;
g. Whether the reasoning or methodology has been generally accepted as valid by the relevant scientific community;
h.  The non-judicial uses which have been made of the reasoning or methodology;
i.  The clarity with which the underlying theory and technique can be explained to the court.
*Daubert¸* 509 U.S. at 593;  *Kelly¸* 824 S.W.2d at 573.

The record here reveals that Baldwin would not have passed hardly any of these tests and his testimony would likely have been excluded had a hearing been requested.  His testimony was based *solely* on his own subjective opinion.  There is no indication that his methodology was widely accepted; no indication that it had academic support in the relevant literature; no indication of the potential error rate; that he had sufficient experience or background to do the comparisons and interpret the results; or even what his comparisons showed in terms of similar or dissimilar markings.

**Claim Four(e): Ineffective assistance of counsel for failure to object to the testimony of Robert Baldwin at trial.**

Even after apparently failing to obtain and/or present their own independent expert, failing to challenge Baldwin through pre-trial motions, failing to request a *Daubert* hearing on his expert

-37-

qualifications, and failing to make themselves knowledgeable about the state of the art, defense counsel utterly failed to object to Baldwin's testimony.

**Claim Four(f):  Ineffective assistance of counsel for failure to seek a continuance to obtain an independent expert to examine and/or compare the magazine marks**.

When Baldwin was called as a State's witness, defense counsel failed to ask for a continuance to seek their own expert to examine Baldwin's findings. This was despite the fact that the day before jury selection began, they were still lacking discovery on the ballistics evidence. 2 RR 6.

**Claim Four (g): Ineffective assistance of counsel for  failing to consult  experts or review the relevant literature in the field of magazine mark and toolmark identification and comparisons.**

The cross-examination of Baldwin reveals that defense counsel were unprepared and unknowledgeable about this crucial part of the State's case. *See* summary of Baldwin's testimony, *supra.*

**Claim Four (h): Ineffective assistance of counsel for failure to effectively cross–examine Mr. Baldwin at trial.**

Having failed in any way to challenge Baldwin, the record also shows that defense counsel were utterly unprepared for it.  *See* summary of testimony, *supra.* As a result their questioning was inept and not directed at exposing its flawed methodology or its status as "junk science."  Equally important was their failure to ask about the specific nature and number of the magazine markings.

**Claim Four (i): Ineffective assistance of counsel for failing to challenge fingerprint examiner Rafael Saldivar, although he had been disciplined prior to Mamou's trial.**

The State presented Rafael Saldivar, of the Houston Police Department, as a fingerprint expert who processed the blue Lexus.  20 RR 80-81.  Saldivar testified that the interior and exterior of the car were processed for latent prints.  20 RR 82.  His testimony was that two latent prints from the passenger door were determined to be from Dion Holley.  20 RR 82.  Two other latent prints

-38-

could not be identified.  20 RR 83.  No latent prints were obtained from a paper in the back seat.

20 RR 85. Saldivar stated that one latent print belonging to Charles Mamou was found on newspaper

clippings.  20 RR 88-89.  An unfired 9 hollow point millimeter bullet found in the car yielded no

prints.  20 RR 92, 97.  There were no print matches taken from the Lexus other than those of Dion

Holley.  20 RR 95.

Yet, just as with Mr. Baldwin, Mr. Saldivar could easily have been challenged by defense

counsel.  In 1997, two years prior to Mamou's trial, Saldivar was one of two Houston Police

department fingerprint analysts responsible for an error that led to "an ironworker with no criminal

record [held] in jail for four months in 1996 after the Houston Police Department's troubled

fingerprint analysis unit wrongly tied his fingerprint to a homicide."  Exhibit 20, "Fingerprint error

led to four months behind bars,"  Houston Chronicle, June 19, 2010;  "Fingerprint analyst Saldivar,

one of the people responsible for the 1996 misidentification, received a reprimand this spring for

destroying notes.  He was also reprimanded in 1997 for his role in the misidentification."  *Id.*

Although

> [t]he fingerprint examiner who made the wrong identification, Rafael Saldivar, was
> issued the written reprimand in April 1997 for the mistake, Saldivar, however, kept
> analyzing fingerprints until he was put on leave last year during an internal
> investigation into problems at the lab.  He retired this spring after receiving another
> written reprimand for destroying 'original handwritten notes instead of keeping them
> as required during the examination or re-examination of fingerprint evidence.'"
> Exhibit 20, "Botched fingerprint work raises questions on HPD," Houston Chronicle,
> June 15, 2010.

**Claim Four (j): The cumulative effect of these failures deprived Petitioner of a fair trial**.

Even if no single one of these failures can be seen to meet both prongs of the *Strickland*

standards, seen cumulatively they denied Petitioner a fair trial.  No reasonable trial counsel would

fail to seek timely discovery of a crucial State's witness or his work that was the only forensic

testimony linking their client to the murder.  Here, the record shows that the boilerplate discovery motion was filed only a week prior to the commencement of trial.  No reasonably effective trial counsel would proceed to trial when they were still lacking such discovery the day prior to the trial's commencement.   As for the prejudice prong of *Strickland,* had Baldwin's testimony either been excluded or called into question, there is little doubt that, but for the unreasonable performance of counsel, the result would have been different.

### B. Argument.

**The following section sets forth the legal standard for all of the ineffective assistance of counsel claims presented herein, and it is incorporated by reference in those claims.**

The Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, (1984), established the two-step process for assessing a Sixth Amendment claim of ineffective assistance of counsel: First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  *Id.* at 687, 104 S. Ct. 2052. To establish deficiency, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. 2052. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). However, the deference afforded counsel's informed, strategic choices, does not eliminate counsel's duty to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland,* 466 U.S. at 690–91, 104 S. Ct. 2052.

Under *Strickland*'s second prong, a petitioner must establish "that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687, 104 S. Ct. 2052; *Day v. Quarterman,* 566 F.3d 527, 536 (5th Cir.2009). Specifically, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S. Ct. 2052.

Applying *Strickland*'s two-pronged inquiry, the Supreme Court has found that trial counsel's failure to adequately investigate available mitigating evidence—for example, by declining to follow up with possible witnesses, neglecting to prepare a mitigation defense until one week before trial, and failing to discover ample available documentary evidence—amounts to ineffective assistance of counsel. *See Williams v. Taylor,* 529 U.S. 362, 395, 120 S. Ct. 1495 (2000).

Likewise, in *Wiggins v. Smith,* 539 U.S. 510, 123 S. Ct. 2527 (2003), the Supreme Court held that trial counsel's inadequate investigation of a capital defendant's social history and consequent failure to present mitigating evidence regarding the defendant's history of sexual abuse and other traumatic childhood events amounted to a violation of the defendant's Sixth Amendment right to effective assistance of counsel. *Rompilla v. Beard,* 545 U.S. 374, 125 S. Ct. 2456 (2005), held that Rompilla established ineffective assistance of counsel based on his trial attorneys' failure to review evidence provided by the prosecution which contained information that would lead a reasonable attorney to investigate further. *Id.* at 389, 125 S. Ct. 2456 ("No reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations"). Thus, regardless of other efforts made to investigate potential mitigating evidence, counsel was obligated to examine the prosecution's evidence in preparation of the punishment trial.

-41-

More recently, in *Sears v. Upton,* 561 U.S. 945, 130 S. Ct. 3259 (2010), the Supreme Court remanded for reconsideration of the prejudice prong, clarifying that when conducting a prejudice analysis under *Strickland* in the capital sentencing context, a habeas court must consider the totality of all mitigation evidence presented both at trial and in habeas proceedings and re-weigh it against the aggravating evidence, regardless of whether trial counsel initially presented some evidence of mitigation at the punishment proceeding.

Applying *Strickland, Wiggins*, and *Rompilla,* the Fifth Circuit has held that, "[i]n investigating potential mitigating evidence, counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary." *Charles v. Stephens,* 736 F.3d 380, 389 (5th Cir.2013). Neither was done here.

## CLAIM FIVE: PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL PRE-TRIAL.

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because  trial counsel failed adequately to adequately represent Mamou in pre-trial proceedings.

## Claim Five (a): Trial counsel rushed to trial within about three months of their appointment, without requesting a continuance, thus precluding an adequate investigation.

Mamou was indicted for the December 7, 1998 murder of Mary Carmouche, but an attorney was not appointed for him until May 28, 1999.  CR 5. Attorney Wayne Hill was appointed to represent Mamou on that day. *Id.*  On June 9, 1999, Mr. Hill applied for investigative and expert services.  CR 6.  On June 25, 1999 the State filed its notice of intention to seek the death penalty. CR 7.  It was not until July 26, 1999 that second chair counsel Kurt Wentz was appointed.  CR 10.

-42-

On September 1, 1999, only a few days prior to commencement of the trial, a number of boilerplate motions were filed, CR 11-57, including a boilerplate discovery motion. CR 41-48.  The trial commenced *one week later*, on September 8, 1999, with jury selection beginning that day.  3 RR 3. Testimony in Petitioner's trial began on October 4, 1999 in the 179th Judicial District Court of Harris County, Texas, Hon. Mike Wilkinson presiding. 16 RR 3.

By any reasonable standard, a little over three months is an inadequate length of time to prepare for a capital murder trial.  Co-counsel Wentz had only about six weeks to prepare. As a result of the rush to trial, defense counsel were unable to obtain and utilize investigative and expert funding to challenge Baldwin's flawed firearms evidence; to investigate and present Mamou's family background and other mitigating evidence; and to research and file motions to prevent inadmissible punishment phase victim impact testimony from family members of extraneous act victims. By any reasonable standards, this was deficient performance under *Strickland*'s first prong.

The prejudice prong of *Strickland* is shown, *inter alia,* by the following facts:

1) Trial counsel failed to file adequate pre-trial motions.  In the rush to trial, they failed to file motions to exclude the firearms testimony; challenge the magazine mark evidence,  seek rap sheets and prior criminal history of State's witnesses.
2) Due to the rush to trial, defense counsel failed to adequately investigate the State's witnesses, including Robert Baldwin and present expert their own testimony.
3) Defense counsel were unable to obtain and use any discovery provided.  One week prior to trial, they had received no discovery on the crucial firearms tests of Robert Baldwin. 2 RR 6.
4) Defense counsel utterly failed to object to inadmissible extraneous victim impact testimony at the punishment phase of the trial.  Their failure to inform themselves of the relevant law  and to file motions to exclude such testimony was inexplicable.
5) Defense counsel's rush to trial prevented an adequate investigation of Mamou's background and potential mitigating witnesses.

**Claim Five (b): Defense counsel failed to file adequate and timely pre-trial motions**.

As a result of the rush to trial, defense counsel filed only a few perfunctory and boilerplate pre-trial motions.  CR 11-57.  They were filed on September 1, 1999, only one week prior to the

-43-

commencement of trial.  *Id.*  No motions were filed regarding the composition of the grand jury which indicted Mamou, despite Harris County's history racial discrimination in grand juries;

**Claim Five(c): Defense counsel failed to conduct an adequate pre-trial investigation.**

The rush to trial meant, *inter alia,*  that the firearms evidence was not tested or challenged; Baldwin and the HPD crime lab was not investigated; the trial attorneys did not inform themselves about the low esteem in which "magazine mark" identifications were held.

**Claim Five (d):  Defense counsel failed to obtain timely and adequate discovery.**

There was simply not enough time between the appointment of counsel in late May and the commencement of trial in early September for counsel to obtain and make effective use of any discovery.  The discovery motion itself was filed on September 1, 1999, *one week* from the commencement of trial.  CR 41-48.  This alone is evidence of  insufficient trial preparation, as one week would have been insufficient time to receive the discovery and use it for trial preparation of defense witnesses and cross-examination of the State's witnesses.

For instance, on September 7, 1999, the day before jury selection began, defense counsel were still not in possession of crucial firearms evidence and requested that the Houston Police Department provide the evidence that allegedly showed a connection between the  shootings of victims Terrence Gibson and Mary Carmouche.  2 RR 6.  At that hearing, the defense also asked for an actual photograph showing that there was a ballistics match, rather than just an officer testifying that they matched.  2 RR 6. They would not have been in a position to effectively voir dire the jury or proceed to trial, which commenced the very next day, without that information.

**Claim Five(e):  Ineffective assistance of counsel for failure to object to intentional discrimination in grand jury selection.**

-44-

Petitioner has reason to suspect that the grand jury that indicted Mr. Mamou was chosen as a result of intentional discrimination in that minorities, including African-Americans and Hispanics, were under-represented.  Harris County has a history of such racial disparities in the grand jury selection process.  Petitioner has been unable to investigate this claim due to a lack of funding for experts and investigators and hence brings it here in order to preserve it for future development. *See, e.g., Vasquez v. Hillery,* 474 U.S. 254 (1986) (grand jury selection process systematically excluded blacks); *Castaneda v. Partida,* 430 U.S. 482 (1977) (Mexican-American petitioner suffered intentional discrimination in grand jury selection process; only 39 per cent of those summoned for grand jury service were Mexican-American although that group accounted for 79 percent of county population).  Petitioner presents this claim in an incomplete form in this skeletal petition in order to preserve it for  review when his amended petition is filed.

**Claim Five(f): Ineffective assistance for failure to object to intentional racial discrimination in the selection of Petitioner's jury; failure to object to trial court rulings regarding juror selection;  and failure to object to the final composition of Petitioner's jury.**

Petitioner has reason to suspect that trial counsel rendered ineffective assistance of counsel in the jury selection and voir dire process and that, as a result, the jury was chosen in a racially-discriminatory manner.  *Batson v. Kentucky,* 476 U.S. 79 (1986) (strikes of two African-Americans were racially-motivated);  *Miller-El v. Dretke,* 545 U.S. 231 (2005) (granting habeas relief on claim of racial discrimination in jury selection in violation of *Batson*); *Reed v. Quarterman,* 555 F.3d 364 (5th Cir. 2009).  As this skeletal petition is limited to 100 pages, and investigative funds have been denied, Petitioner presents this sub-claim in an incomplete form in order to preserve it for review when the amended petition is filed.

**CLAIM SIX: INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF THE TRIAL.**

Petitioner's conviction, judgment, sentence and confinement are illegal and were obtained in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair and impartial jury, the presumption of innocence, a fair trial, freedom from self-incrimination, effective assistance of counsel, due process of law, and reliable guilt and penalty determinations, because  trial counsel failed adequately to adequately represent Petitioner at the guilt phase of his trial**.**

This claim incorporates by reference the legal discussion of the prior claim.

**Claim Six(a)**: **Ineffective assistance of counsel  for failure to object to biased instructions at voir dire.**

From the beginning of the voir dire, Judge Burdette signaled that he was biased against the defense.  At the onset of the proceedings, he referred to the O.J. Simpson acquittal by saying that a lengthy trial is "not going to happen here.  This is the real world.  It is not California."  3 RT 4. This irrelevant and prejudicial comment could only have raised juror resentment at the widely-perceived-as-incorrect acquittal verdict in the Simpson trial.  He then said that being a juror "is a lot like being a pallbearer at a funeral," 3 RT 4, a stunningly inappropriate comment in a death penalty case.  The judge then told the prospective jurors  that "the State is going to seek the appropriate punishment in this case; that is, their claim that it will be the appropriate punishment, punishment of death."  3 RT 5.  Thus, the Court explicitly inferred that death was the appropriate penalty, despite his correction.  He also suggested that the jury might deliberate only one hour, 3 RT 8, in effect telling them to get on with it and not waste any time in sentencing Mamou to death.

The judge set up the penalty phase determination in a manner unfavorable to the defense:

> At the second phase of a trial wherein a defendant has been found guilty of a capital murder...you're entitled to hear about every good thing some defendant has done in his or her life.  You're also entitled to hear...about every single bad thing some defendant has ever done...and then pile that on information on the crime that was committed, what you heard at the first phase of the trial and throughout every single bit if it to answer the two questions we're going to talk about later.  But it's

-46-

no more different than it is when we're raising kids.  It's just no more different.  If we ever told a child not to do something once and the child does it again, we're going to react one way.  If we have told a child ten times in the last thirty minutes not to do something and they have done it for the tenth time, we're going to react a different way.
3 RT 17.

This exclusive focus on the acts of the defendant, comparing Mamou to a disobedient child, eliminated from consideration many mitigating facts such as poverty, an abusive or neglectful childhood, mental and physical disabilities and the like.  The jury was in effect being instructed to ignore these factors. Mitigating evidence is not limited to "good things" a defendant has done. Treating the penalty phase as a form of child discipline, with the implication of stricter punishment for repeat offenders, sent a clear message to the jury pool to focus on the defendant's bad acts, not his mitigating evidence.  The judge again repeated this error in emphasizing only the first part of the second special issue, on mitigation:

Question Number Two will ask the jury: Do you find that, taking into consideration all the evidence, including the circumstances of the offense committed—that's going to be what you heard at the first part of the trial—also including the defendant's character and background and the personal moral culpability or blameability and the responsibility of the defendant—that's going to be what you heard at the second part of the trial.
So the first part of the question just instructs you to go back over all the evidence in the case for the purpose of asking this question: Is there a sufficient mitigating circumstance or circumstances that warrant a sentence of life imprisonment rather than a death sentence be imposed?
3 RT 38.

The second part of the special issue–dealing with the defendant's character and background and moral culpability—was not explained, but the first part was, dealing with the facts adduced in the guilt phase   Here again, the emphasis was on the defendant's acts alone, downplaying the role mitigating evidence plays in the jury's consideration.  The fact that the judge later did mention mitigation and background information )(*e.g.* 3 RT at 40) did not cure this erroneous impression.

-47-

Defense counsel was ineffective for failing to object to these comments.

**Claim Six (b): Ineffective assistance of counsel for failing to object to the court's emphasizing defendant's failure to testify.**

At voir dire, the court stated as follows:

In the event the defense presents no witnesses at all at the conclusion of the State's case—as I said earlier, they don't have to. And you might say to yourselves, I sure would like to hear the defendant's side of the story. Nothing wrong with thinking that way....
But sometimes its frustrating, I know, for jurors at the conclusion of the evidence in the case to go back to a jury room in a case and you say to yourselves, boy, I wish I had heard what the defendant had to say. It would have made my job a whole lot easier. And that may be absolutely accurate. It very well may be at the conclusion of the testimony in a case, if you don't hear from the defense you might say to yourselves, boy, I sure would have liked to heard (sic) what was on their side of the street, like to have heard something else. Nothing in the world wrong with thinking that way.
3 RT 31-32.

The Court later added that "if the defendant in the case does not testify, that is no circumstance that any Judge or any jury could use as an inference, as a suggestion that the defendant is, in fact, guilty of the offense. Because otherwise, he or she would have testified." 3 RT 33. Although Mamou did testify, this was prejudicial as it made it appear he had to do so in order to show his innocence. Defense counsel failed to object.

**Claim Six (c): Ineffective assistance of counsel in allowing the exclusion of only those jurors opposed to the death penalty.**

The trial court repeatedly asked the jury pool whether there were any potential jurors who could never impose the death penalty, regardless of the evidence. *E.g.,* 3 RT 43. Two potential jurors answered affirmatively. 3 RT 43. The potential jurors were not asked whether any would always impose the death penalty, regardless of mitigating evidence.

-48-

**Claim Six (d): Ineffective assistance of counsel for failing to object to gruesome and redundant multiple autopsy photographs.**

During the testimony of medical examiner Dr. Roger Milton of the Harris County Medical Examiner's office, the prosecutor proffered eight gruesome and redundant autopsy photos of the victim Mary Carmouche, Exhibits 104-111. 20 RT 52. Defense counsel did not object to their being entered into evidence. 20 RT 53. All of these eight photos were then admitted. 20 RT 53.

**Claim Six (e): Ineffective guilt-phase closing argument.**

One of the central themes of the prosecutor's argument at the guilt phase was that the prosecution witnesses who had testified against Mamou had no reason to lie and put capital murder charges on Mamou. The prosecutor argued: "And the person you're related to, you don't make up a story and take the stand under oath and testify to a lie that he committed the offense of capital murder when you know, or don't have any reason to believe that he did." 21 RR 13. However, there was every reason in the world for these witnesses to transfer the blame to Mr. Mamou, related or not, and thereby deflect a capital murder charge away from themselves. Further arguments have the same flawed premise: "He [Dodson] had no reason to come in here and lie to you." 21 RR 13; 21 RR 54-55.

But in the defense final argument, this central prosecutorial theme was not addressed. The jury was given absolutely no reason why they should not believe Dodson, Johnson, and Walter. The defense argued that "Bug is worthless and a liar," 21 RR 18 without telling the jury why he was a liar. Nothing was presented about the various inconsistencies in their testimonies or the improbability that Mamou would "confess" to Dodson. Although the second defense argument mentioned briefly that the witnesses had reason to lie, 21 RR 28-29, the jury was given no coherent rationale for them doing so. What could and should have been argued was the simple fact that the

police treated this as capital murder from the onset of the case, and, the witnesses, to save themselves from such a charge, had to put the blame for this crime on someone else, which is exactly what they did.

**CLAIM SEVEN: PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE OF HIS TRIAL.**

Mr. Mamou's death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and comparable state law, because his attorneys failed to provide reasonably competent assistance at the punishment phase of his trial.   But for counsel's unprofessional actions and omissions, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. 510, 521, 534 (2003); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

**Claim Seven(a): Ineffective assistance of counsel for failure to object to inadmissible victim impact evidence at the punishment phase.**

Defense counsel failed to object to inadmissible victim impact testimony from Yolanda Williams and Patricia Gibson regarding the effects of unadjudicated extraneous offenses against persons not named in the indictment. The testimony was extensive, lengthy, emotional and highly prejudicial to Mamou.   The testimony was patently excludable under Texas law and in failing to exclude it, either by pre-trial motions, a preliminary hearing or during trial, defense counsel were ineffective.   As a result of this failure, Mamou was denied the effective assistance of counsel under the Sixth Amendment to the United States Constitution.   The admission of this evidence also violated due process and the Eighth Amendment to the U.S. Constitution and it rendered the punishment phase of Mamou's trial fundamentally unfair. This claim was raised in the initial state habeas petition as the first through seventh grounds; hence,  it is exhausted.

**i. Facts in Support.**

-50-

On September 1, 1999, trial counsel filed a "Motion for Hearing on Admissibility of Evidence" (CR 15) and a "Motion for Discovery of Victim Impact Testimony" (CR 20) but never obtained a ruling on these motions.  They were filed only a week prior to the start of Mamou's trial. Defense counsel also filed a "Defendant's Request For Disclosure Of Defendant's Arrest Conviction Record And Extraneous and/or Unadjudicated Acts of Misconduct To Be Offered At Guilt Or Punishment" (CR 30) that was also never ruled upon by the Court.  Defense counsel also filed a Motion *in limine* requesting extraneous offense evidence; this motion did not have an order form attached to it.  (CR 74.)

The State furnished two extraneous offenses lists to defense counsel.  CR 58 & 61.  These lists do not include the murder of Terrence Gibson or Anthony Williams as a disclosed extraneous offense, even though Anthony William's sister Yolanda Williams and Terrence Gibson's mother Patricia Gibson testified with profound emotional impact, as shown *infra.*

No hearing was ever held on the defense motions, possibly because they were filed so close to the commencement of the trial. Despite clear Texas law that prohibited the introduction of extraneous-offense victim impact testimony, *Cantu v. State,* 939 S.W.2d 627 (Tex. Crim. App. 1997), no objection under *Cantu* was made at trial to the heart-rending testimony of two such extraneous victims, Yolanda Williams and Patricia Gibson.  Defense counsel made only a generalized objection to extraneous offense evidence at the punishment phase, based only on the lack of a standard of proof; no specific objections were made to Williams or Gibson. (22 RR 37.)

Yolanda Williams, the older sister of Anthony Williams, testified about the impact on her and her family of his death in the extraneous case. Both Ms. Williams and the prosecutor made a strong emotional appeal to the jury to sentence him to death because of the effect of Anthony's death on her and her mother and father.

On direct, Ms. Gibson was questioned as follows:

Q. How are you related to Anthony Williams?
A.  That's my baby brother.
...
Q. Your brother had a nickname, is that right?
A.  Yes.
Q. What was that nickname?
A.  Bruiser.
Q. Where did he get that nickname from?
A. My aunt Mack.
A. Mack.
Q. Your Aunt Mattie?
A.  Mack.
Q. Mack. When did Aunt Mack give your brother his nickname?
A. When he was a baby.
Q. Why did she give him that nickname?
A.  Because he was so red that when you touched him he would bruise.
...
Q. When you got to the hospital, where was your brother?
A.  They said in surgery.
Q.  And at some point while you're waiting, did your parents come?
A.  Yes.
Q.  While you're waiting, how much time passed before you found out your brother had died?
A.  I don't know.
Q. When is the next time you saw your brother?
A.  When I went into the room.
Q.  Why is it that you went into the room?
A.  Because the doctors came out and told us that he was dead.
Q. Did they need someone, a family member, to identify him?
A.  Yes.
Q. And why didn't your mom or dad go in?
A.  My mother couldn't go in.  She had had a heart attack a couple of years before; and we had to take her down to the emergency room, because she thought she was having another one.
Q. This is while...after your brother had died?
A.  When they came out and told us that he had died.
Q. Ms. Williams, let's talk about the effect that your brother's murder has had on your family.  What effect has it had on your oldest brother James?
A, He cries.
Q. Were he and Bruiser close?
A.  Yes.
Q.  Did Bruiser ever live with your brother James?
A.  Yes.

-52-

Q. Is your brother James able to talk about Bruiser?

A. No.

Q. Where does your brother, James, live?

A. He lives in Lake Charles, Louisiana.

Q. Did he come here for the trial?

A. Yes.

Q. What about Aaron—I'm sorry—Anthony, Bruiser's son? What effect has it had on him?

A. He's okay, but if you talk about —if you ask him too many questions about dad, he stops talking.

Q. He clams up, won't talk about it? Have you ever been with Anthony, the little boy, since his dad's died when he's been asleep?

A. Yeah, when he spends the weekend at my house.

Q. How does he act when he's asleep?

A. He imagines that his daddy is playing with him.

Q. Does he speak about his daddy when he's asleep?

A. He tells his daddy to stop.

Q. How about with respect to the cemetery? Does he ever ask about the cemetery?

A. All the time.

Q. What does he say?

A. Auntie, can you take me to the cemetery?

Q. How about (sic), did he go to your brother's funeral?

A. Yes.

Q. What effect has it had on you Miss Williams?

A. Devastation, just, what do you do? I'm the oldest of three children. My baby brother is gone. I don't have but one brother left.

Q. Let me show you a picture, Miss Williams, State's Exhibit 128. Was this a picture of your brother and his son?

A. Yes.

Q. And when would that picture have been taken, about how long ago?

A. About five years ago.

Q. Okay. How is your dad doing, Miss Williams? What effect has it had on him?

A. He's fine physically. Mentally he's not.

Q. In what way is he not?

A. He's angry. He's hurtful.

Q. Did you try...try and ask him to come to the trial?

A. I asked him and my mother, and my mother said she wasn't coming.

Q. What effect has it had on your mom?

A. Mentally she's still...she doesn't want to deal with the fact that my little brother is gone.

Q. Do you think she's accepted the fact that he's gone?

A. I don't think she has, when she still talks about him as if he's still alive.

Q. So she still talks about him as if he's still alive, is that right?

A. Yes.

Q. What other effects do you see, with respect to your brother's death, on your mom?

A. Her diabetes has gotten worse.

Q. How old is your mom?

-53-

A.  Fifty-three.
Q. Thank you ma'am.
(22 RR 112-121.)

A reasonable juror could not have helped but be greatly moved by the description of the

hospital death of Mr. Williams, his sister's identification of the body; the effect it had on his mother;

the heart-wrenching cemetery visits by Williams' son; his crying; and the health problems the death

has caused for his mother.  The impact extended to the entire Williams family, and much of it was

hearsay, yet defense counsel made no objections.

The prosecution also called Patricia Gibson, the mother of Terrence Gibson, allegedly shot

by Mamou at the Lantern Point scene of the failed drug deal.   She testified as a punishment phase

witness, without objection from the defense, as follows:

Q.  Miss Gibson, when was the last time you saw your son, Terrence?
A.  December the 7th, the 6th.  That Sunday afternoon we all convened at my mom's for church, and he was there. He came by.
Q.  Were your sons or any other children there?
A.  Yes.
Q.  Was your husband there?
A.  Yes, he was.  I'm sorry, no, not that Sunday, no, he was not.
Q.  So both your sons, other sons, or just one there?
A.  Yes, my sons and their girlfriends, yes.
Q.  What were y'all doing at your mom's house when your son Terrence came?
A.  We were looking at pictures.  They asked to see their baby pictures, the other two, their girlfriends.  And we were on the floor looking at pictures.
Q.  So, all of y'all were looking at past baby pictures of each of the children; is that correct?
A.  That's correct.
Q.  Were y'all enjoying yourself and laughing and having a good time?
A.  Yes.
Q.  When is the last time you laughed like that?
A.  It's been a while.
Q.  When your son left that evening, what did he say to you?
A.  We were all on the floor, and he just walked in.  And everybody just kind of said, hey, Terrence.  Because we had been there, and we started looking at pictures out on the floor. And we were just looking at baby pictures; and he stayed awhile, went in the kitchen.  He always goes in to see what my mom cooks.  And we laughed and talked awhile, and then his pager went off; and he said, mom, I'm fixing to go.  And he went to my mom.
Q. What did he do when he went to your mom?

-54-

A.  He normally kisses my mom on the way out, and he just kind of patted her on the head, and he was on his way out.  And I said, Are you about to leave?  And he said, yes.  And I got up and I went in the garage with him.

Q. Did you say anything to him, or did you hug him at all?

A.  Yes, I did.  I said, Terrence, be careful.  And he left.

Q. Did you say goodbye?

A.  Yes, I did.  And I always said, Mom loves you.  So he knew that.

Q.  And that's the last time you saw him alive?

A.  That's correct.

Q.  And how did you find out he had been killed?

A.  I got a phone call about 1:15 Monday morning from Hermann Hospital, a Claudette at Hermann Hospital.  And she said, We have a young man here, and I'm not quite sure that it is your son.  And she said, does your son have a tattoo, and I said yes. She said, You need to get to Hermann Hospital as soon as you can.

Q.  Did she tell you that he had been injured or how he had been injured?

A. No.  She said, We have...she didn't even say shot.  She said, We have a young man here, and I'm not even quite sure if it's your son; but we need for you to get to the hospital as quickly as possible.  And she asked me if he had a tattoo, and I said yes.

Q.  Who did you go to Hermann Hospital with?

A.  My husband and I picked up my baby son on the way.  I called him immediately after that happened.  I got the call, and I picked him up at his apartment.

Q. What is your baby son's name?

A.  His name is Walter, IV, Walter Gibson IV.

Q. How old is he?

A.  They're thirteen months apart.

Q.  When you say they?

A.  Terrence is twenty-two and he's twenty-one.  They're thirteen months apart.

Q. Were they close?

A.  Very much, yes.

Q.  When you were driving to Hermann Hospital, about how long did that take from your house?

A.  I would think not long, because I was driving very fast.

Q. What was going through your mind?

A. I guess I just probably thought he was injured or in a car wreck.  I didn't know.

Q. When you got to the hospital, who did you speak with?

A.  I went directly to the emergency room and asked for a Claudette because she said she would be waiting when I got there.

Q. Did you speak with her?

A.  Yes, I did.  She took us immediately to the critical care waiting room.  And I just assumed, I guess, by seeing critical care that he was in critical condition or what.  All I wanted to do was get to him.  And then she said, I'm going to take you around to the trauma center.  And they took us around to the trauma center.  And the lady, the nurse that was there said, The doctors need to come out and speak with you.  We're going to take you back to a waiting area, of which they did.

Q.  And how soon before you were able to speak with a doctor?

-55-

A.  It was about three minutes.  They came in.  It was shortly after.  And my family had already made it. Everybody was already there.

Q. What did the doctor say to you?

A.  When they walked in, they asked us to sit down and said that they had done everything possible for my son and...but the way the bullet went through his heart, there was no way to...

Q. When the doctor told you that the bullet had gone through his heart and he had died, what went through your mind?

A.  I was devastated.

Q. Were yo able to go then see your son?

A.  No, they wouldn't let me see him.  But my oldest son and my husband said that they didn't think it would be a good idea, that they would go.  And they went in to see him.

Q.  Did...where did they have to go to see Terrence?

A.  In the morgue of Ben Taub.

Q.  So they had to go to Ben Taub to identify his body?

A.  I'm sorry, in Hermann, in the morgue.

Q. Hermann Hospital?

A. Yes.

Q. Can you tell the jury what effect it's had on your younger son, Walter, the one that was thirteen months apart, from Terrence's being murdered?

A.  I was very concerned about him, because they were so close.  He had his own apartment. I shared with my cousin, I thought he would be one that would revert to drinking.  And when he did, that's when we had a problem with him. We had to stay close to him and talk to him a lot, trying to get him to come to church with me; because he was having a very difficult time dealing with it, because they were very close.

Q. How about your older son? What effect has it had on him?

A.  I think more of him because he actually saw Terrence, the last one to see him actually in the morgue and just see him that way.  That was very difficult for him, and we've had to talk about it over and over again.  But that's the last thing, other than seeing him at the funeral or whatever.  He relives that over and over again.

Q. How about your husband, Miss Gibson?  What effect has it had on burying his son?

A.  We had to leave for awhile and just take an...just to get away, be able to talk it out.  And I think with him, it was just that the...the times that, I guess...my son has a five-month-old baby he'll never get a chance to know, and we have had to talk it out.

Q. How about you, as a mom?  What's it like to bury your son?

A.  That's something that I have to live with every day and think about.  Is there something else I could have said?  Is there something else I could have done?  Terrence was a follower. He was not a leader.  And I think more so, of us being parents, trying to raise our boys up as good citizens and as good boys.  But when they get a certain age, you can't make choices for them.  And he made some bad choices, as far as friends.  And at twenty-two years old...when he was young, we could choose his friends; but it seems like the more we talked to him, that made him feel big, or I don't know; but he wasn't raised that way.  And that's what, more everyday, I guess, that you have to live with every day, coming up as a young boy in church and in a Christian family home, that parents work hard to display hard-working parents.  And when he got older he made decisions to be with what I consider the

-56-

wrong crowd.  And that's I guess, the thing that's hard every day is, is there something else
I could have said?  Is there something else I could have did that my son would still be alive
today?
Q. So you blame yourself a lot of the time, Miss Gibson?
A. I don't think so much.  I think I did everything I could; because when you get a certain
age, they make choices.  But these choices cost him his life, and that's the thing I can't go
back and undo and I have to live with every day of my life.
Q.  Thank you ma'am.
(22 RR 127-134.)

At the prosecution's brief final punishment phase argument, both of these extraneous

offenses were  emphasized as compelling a death sentence for Mamou.  First, Mrs Claire Connors

argued: "And when he pulled the gun and he fired and killed Terrence and Anthony, he ripped those

families apart.  He devastated and destroyed. And that's all he's ever done, with his drugs, with his

guns.  And every time he pulled that trigger, he answered that first special issue yes, yes, yes, yes,

yes.  Seven times he answered it yes."  23 RR 39.  Mr. McLellan also mentioned the Williams

murder.  23 RR 40-42.

**ii. Argument.**

Defense counsel's allowing the introduction of this evidence was ineffective assistance of

counsel under both prongs of *Strickland.*  At the time of Mamou's trial, Texas law clearly prohibited

victim impact testimony from victims of uncharged crimes.  *Cantu v. State,* 939 S.W.2d 627 (Tex.

Crim. App. 1997).  In *Payne v. Tennessee,* 510 U.S. 808, 111 S. Ct. 2597 (1991) the Supreme Court

overruled its earlier decision in *Booth v. Maryland,* 482 U.S. 496, 107 S. Ct. 2529 (1987).  *Payne*

held that the Eighth Amendment did not bar the introduction of victim impact evidence at the

punishment phase of a trial as regards the victim of the offense charged in the indictment.

However, *Booth* remains good law as applied here, as *Payne* only applied to victim impact

evidence as regards the complainant in a criminal case.  The implied holding of both cases is that

other victim impact evidence such as that regarding extraneous offenses is still unconstitutional.

-57-

The same factors relied upon by the majority in *Booth* are evident here.  The traumatized sister of Anthony Williams testified without objection, and the harm from this error was magnified by the weakness of the evidence tying Mamou to the extraneous offense of Williams' murder.  The trial court refused to give a "burden of proof" instruction to the jury regarding the extraneous offense. The State had only one witness tying Mamou to Williams' murder, and this witness had not reported what little he knew about it for a long period of time before finally coming forward to the police. He saw Mamou leaving a club with Williams, but there was no eyewitness and the victim did not identify his assailant before he died.  (*See* factual summary in Appendix A.)

The probability that the jury would find Mamou to be a danger in the future was dramatically increased by the State's introduction of this improper victim impact testimony.  Evidence of the impact of William's or Gibson's murders on their respective families was not relevant as Mamou was not on trial for their murders.  Gibson and Williams were not the "victims" for whose death Mamou was indicted and tried.

For the same reasons that *Booth* and *Payne* held such extraneous victim impact unconstitutional, the Texas courts had, at the time of Mamou's trial, adopted a similar rule in *Cantu*. The rationale was as follows:

> However, evidence as to her good character, activities se enjoyed and the impact of her on her family is not relevant as appellant was not on trial for her murder and such evidence serves no purpose other than to inflame the jury. We note the Supreme Court in *Payne* held the Eighth Amendment did not bar introduction of evidence about the victim and the impact of the victim's death on his or her family as such evidence may be relevant as to the jury's determination as to imposition of the death penalty. The Court opined that "victim impact evidence" is designed to show the victim's "uniqueness as a human being" and "the state has legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family...." *Payne*, 501 U.S. at 825, 111 S. Ct. at 2608. Pena, however is not the "victim" for whose death appellant has been indicted

and tried, and *Payne* does not contemplate admission of such evidence as permissible under the Eighth Amendment.

> The danger of unfair prejudice to a defendant inherent in the introduction of "victim impact" evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high. The admission of such evidence would open the door to admission of victim impact evidence arising from *any* extraneous offense committed by a defendant. Extraneous victim impact evidence, if anything, is more prejudicial than the non-extraneous victim impact evidence found by this Court to be inadmissible in *Smith, supra.* We hold that such evidence is irrelevant under Tex.R.Crim.Evid. 401 and therefore irrelevant in the context of the special issues under Art. 37.071.

*Cantu,* 939 S.W.2d at 637.

Had defense counsel filed a motion to exclude this testimony, or objected timely at trial, the trial judge could not have properly overruled the objection. At the time of the trial, the holding of *Cantu* was clear that such testimony was inadmissible. Thus, failure to object was both deficient performance under *Strickland*'s first prong and prejudicial under the second prong.

In *Cantu* the testimony was held to be harmless. Here, however, defense counsel allowed the admission of extensive testimony from the family of two extraneous offense victims as to how painful the deaths had been to them and to their families. The inadmissible testimony tripled the amount of testimony harmful to Mamou. Unlike in *Cantu,* the prosecution referred to the testimony in final argument and in fact emphasized it as a reason to find future dangerousness.

### iii. How the State Courts Erred.

This claim was raised in the initial state habeas petition as the first through seventh grounds.

### 1. The State Court holding was an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1).

(i) *The state court's decision involved an unreasonable application of* Strickland v. Washington *because it failed to conduct an analysis of whether trial counsel made a reasonable investigation of law and fact before determining that the failure to exclude the inadmissible victim impact testimony was a reasonable strategic decision.*

The state court found that trial counsel made a reasonable strategic decision not to exclude Yolanda Williams's and Patricia Gibson's inadmissible victim impact testimony. (*See* State's Proposed Findings and Conclusions, <u>Exhibit 14</u>, at 5, 8; 1 SHCR at 246, 249).

Clearly established federal law holds that counsel has a duty to make "thorough" investigations "of law and facts" relevant to plausible options or to make a reasonable decision that makes particular investigations unnecessary. *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Strategic decisions are "virtually unchallengeable" *only* when "made after thorough investigation of law and facts relevant to plausible options." *Id*. Thus, when a state court fails to conduct the predicate analysis into the thoroughness of trial counsel's preparation before deferring to an alleged strategic decision, its application of *Strickland's* governing legal principles is objectively unreasonable under Section 2254(d)(1). *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Here, the state court failed to conduct the requisite analysis of the reasonableness of trial counsel's investigation into the facts and law before finding the decision not to object to be reasonable strategy. <u>Exhibit 14</u>, at 5 (1 SHCR at 246) (adopted by order of the convicting court Nov. 13, 2013, <u>Exhibit 14</u> at 10 (1 SHCR at 251) (adopted by order of the CCA Feb. 5, 2014). Indeed, the record is entirely silent about what investigation trial counsel made into the law and facts before allegedly making a "strategic" decision not to exclude inadmissible victim impact testimony related to alleged extraneous offenses. Thus, the state court's application of the *Strickland* legal standard was objectively unreasonable. Accordingly, the exception to the relitigation bar contained in 28 U.S.C. § 2254(d)(1) has been met and the court is not prohibited from granting relief on Mamou's *Strickland* claim related to the Williams and Gibson victim impact testimony should it be proven meritorious.

(ii) *The state court's decision involved an unreasonable application of procedural due process when it resolved disputed, material facts without affording the applicant notice or an opportunity to respond to evidence submitted by the State.*

"When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Here, the state court's adjudication of Mamou's *Strickland* claim was dependent on an antecedent unreasonable application of federal law when it proceeded irregularly and resolved disputed, material facts without affording the applicant notice or an opportunity to respond to evidence submitted by the State and upon which the state court relied.

States have no constitutional obligation to provide an avenue for collaterally challenging a criminal judgment, but state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment. *Vitek v. Jones*, 445 U.S. 480, 488, 1 (1980). Texas's enactment of a judicial mechanism for obtaining a remedy for confinement in violation of the United States constitution creates a liberty interest in a habeas corpus remedy for a prisoner. Additionally, a capitally-sentenced prisoner retains a life interest until extinguished by execution. *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring in part and concurring in the judgment) (recognizing protected life interest in death-sentenced prisoner until executed); *id*. at 291-92 (Stevens, J., dissenting) (four justices recognizing protected life interest in capitally sentenced prisoner). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Accordingly, the procedures utilized by a state that provides a judicial process for collaterally challenging a criminal judgment must observe fundamental fairness requisite to the interests at stake. *Vitek*, 445

U.S. at 490-491, n.6 ("the adequacy of statutory procedures" for deprivation of a protected interest "must be analyzed in constitutional terms").

Although fundamental fairness does not require a state to appoint a lawyer to a prisoner for purpose of making a collateral challenge to his confinement, *Pennsylvania v. Finley*, 481 U.S. 551 (1987), fundamental fairness in the context of state judicial collateral proceedings is not devoid of all content. At its minimum, fundamental fairness requires that "convicted persons be permitted to seek legal remedies without arbitrary governmental interference." *Murray v. Giarratano*, 492 US 1, 16 (1989) (Stevens, J., dissenting). And it is clearly established federal law that fundamental fairness includes the right to notice and an opportunity to be heard at meaningful time and in meaningful manner. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1983). The state court violated this clearly established law in the course of adjudicating Mamou's state habeas corpus application, and this antecedent violation of clearly established law satisfies the first exception to §2254(d)'s relitigation bar.

On May 4, 2000, Roland Moore was appointed to represent Charles Mamou in his state habeas proceeding. On April 18, 2001, Moore filed an application for writ of habeas corpus pursuant to Tex. Code Crim. Proc. art. 11.071. (Exhibit 11). The application raised nine grounds for relief, including that Mamou was deprived of effective assistance of trial counsel when counsel failed to exclude inadmissible victim impact evidence at sentencing. On November 12, 2001, the trial court signed an order directing trial counsel Wayne Hill and Kurt Wentz and appellate counsel Floyd Freed to file affidavits responding to the following allegations:

(i) trial counsel allegedly failed to object to the testimony of Yolanda Williams and Patricia Dodson as victim impact evidence concerning the effects of unadjudicated extraneous offenses against persons not named in the indictment;

-62-

(ii) trial counsel allegedly failed to properly object to the prosecutor's argument and questioning concerning the possibility that the Texas Legislature might change the laws concerning parole eligibility;

(iii) appellate counsel allegedly failed to raise the issue on direct appeal that the applicant's trial counsel was ineffective for allegedly failing to object to victim impact evidence of Yolanda Williams and Patricia Dodson; and

(iv) appellate counsel failed to raise an issue on appeal that comported with trial counsel's objection to the prosecutor's argument and questioning concerning the possibility that the Texas Legislature might change the laws concerning parole eligibility.

(Exhibit 21).

The witnesses were directed to file the affidavits with the Appellate Division of the District Clerk's Office within 20 days of the date of the order. *Id.*

On January 17, 2002, the State filed its original answer. 1 SHCR at 114. Attached to the answer was an affidavit from appellate counsel Floyd Freed.[19] 1 SHCR at 162. On February 21, 2002, state habeas counsel filed a motion for evidentiary hearing because "the principal issues in his case involving the deficient performance of trial and appellate counsel cannot be adequately explored without the testimony and cross-examination of the aforesaid previous counsel." (Exhibit 22, 1 SHCR at 165. The motion further asserted a hearing was necessary because "neither trial counsel has filed an affidavit in this case regarding the presence or absence of trial strategy with respect to the errors and omissions at trial." *Id*. No action was taken on the motion.

On January 19, 2007, a motion to substitute David Sergi for Roland Moore was filed. 1 SHCR at 174. The motion was granted the same day. *Id.* at 177. On August 1, 2012, the CCA entered an order directing the trial court "to resolve any remaining issues within 90 days from the date of this order." *Id.* at 187-88. On October 5, 2012, the State filed an unopposed motion requesting that the trial court request a six-month extension of time from the CCA. *Id.* at 185. The

---

[19] The state court record does not reflect that the affidavit was ever filed with the Appellate Division of the District Clerk's Office as ordered.

trial court granted the motion the same day. *Id.* at 190. The order was not served on the parties until November 15, 2012. *Id.* at 191. The trial court record does not reflect that any request was actually made nor the result of the request, if any. The CCA docket, however, reflects that an extension was granted on December 3, 2012 and that a second extension was granted on October 21, 2013.

On November 6, 2013, the State filed proposed findings of fact and conclusions of law. (Exhibit 14).  Attached to its proposed findings was an affidavit from trial counsel Wayne Hill, signed on November 4, 2013 (*Id.,* 1 SHCR at 252) relied upon to find that trial counsel did not perform deficiently in failing to object to inadmissible victim impact testimony. (Exhibit 14 at 1-2, 5-6; 1 SHCR at 242-43, 246-47.) The state habeas judge (who was not the trial court judge) adopted the State's proposed findings on November 13, 2013. (Exhibit 14 at 10; 1 SHCR at 251. The District Clerk mailed the State's proposed findings to habeas counsel for applicant on November 15, 2013. 1 SHCR at 259. The record does not reflect the existence of any order directing the parties to submit proposed findings of fact and conclusions of law by any certain date, nor does it reflect that the applicant was given any notice of the filing of the State's proposed findings or of Wayne Hill's affidavit prior to the state habeas court's adoption of the State's proposed findings.

After the State files its answer, Article 11.071 requires the trial court to determine, based on the application and answer "whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist." Tex. Code Crim. Proc. art. 11.071 § 8(a). If it finds that they do, the trial court must "enter an order, not later than the 20th day after the last date the state answers the application, designating the issues of fact to be resolved and the manner in which the issues shall be resolved." *Id*. § 9(a). To resolve them, the court may "require affidavits, depositions, interrogatories, and evidentiary hearings and may use personal recollection." *Id.*

-64-

Here, the state habeas court determined that disputed, material fact issues did exist. Although it did not designate which material facts it was going to resolve, it did order that Mamou's trial and appellate counsel submit affidavits responding generally to two issues. Mamou's appellate counsel apparently gave an affidavit to the State instead of filing it publicly, and the State attached the affidavit to its answer that it filed in January of 2002. Thereafter, nothing substantive occurred in the case until 2012, when the CCA ordered the trial court to resolve outstanding issues and transmit the case to the CCA as required by the statute. At that point, only Mamou's appellate lawyer had filed any affidavit.

On November 6, 2013, the State filed proposed findings of fact and conclusions of law. (Exhibit 14). No court order exists in the record directing the parties to file proposed findings. The State's proposed findings relied upon an affidavit from one of Mamou's trial lawyers, Wayne Hill, which had been signed just two days prior. The state habeas court thereafter adopted the State's proposed findings just one week later, *before the district clerk had even served applicant's counsel with the State's proposed findings*. (Exhibit 14 at 10; 1 SHCR at 251). The state court therefore adjudicated Mamou's claim without notice and relied upon evidence that the applicant had no meaningful opportunity to contest. This procedure did not afford fundamental fairness and violated due process. *Circu v. Gonzales*, 450 F.3d 990, 994 (9th Cir. 2006) (failure to afford asylum applicant an opportunity to counter evidence relied upon by immigration judge to rule against her violated due process). The state court had previously designated Hill's affidavit "material" to the resolution of

 Mr. Mamou's claim, and it in fact relied upon it when it adopted the State's proposed findings.[20] Thus, there can be no question as to its materiality in the proceeding.

_____

[20] Kurt Wentz, Mr. Mamou's other trial lawyer, never submitted an affidavit. The court disposed of the application without taking any additional steps to secure his testimony, despite

**2.  The State Court holding was also an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).**

The state court found as a fact that trial counsel's decision not to object to Yolanda Williams's and Patricia Gibson's victim impact testimony was strategic in nature. This finding was explicitly based upon trial counsel Wayne Hill's affidavit. (Exhibit 14 at 5; 1 SHCR at 246). A reasonable reading of Hill's affidavit does not support this factual finding.  Hill allegation that the decision was strategic was merely conclusory. The specific factual assertions contained within Hill's affidavit do not support that conclusion, and hence it was unreasonable for the state court to so find, at least without conducting further factual development. Hill's affidavit relates:

> My decisions regarding the manner in which to handle the punishment testimony of Yolanda Williams and Patricia Gibson were strategic. Their testimony was brief in comparison to the entirety of the evidence at trial, not particularly compelling, and I believe effectively countered on cross-examination. Yolanda Williams' brother, Anthony Williams aka "Bruiser", was killed by the defendant during a drug sale. On Yolanda Williams' cross-examination, I pointed out to the jury that the victim was a drug dealer and had voluntarily put himself into a dangerous situation. (Exhibit 14; 1 SHCR at 254).

As shown above, Williams' and Gibson's testimony was not "brief"[21] but it was "particularly compelling" by any reasonably objective standard.  Additionally, that Williams's and Gibson's testimony was (1) brief (actually, it was not); (2) not "particularly" compelling; and (3) effectively countered are not reasons to refrain from excluding it. They are opinions that their client was not prejudiced by the failure to do so.  Moreover, Hill did not establish through Yolanda Williams's

---

having previously found it material to resolve disputed facts.

[21]  The holding that it was "brief" was unreasonable, as the state court held that "their complained-of testimony comprised approximately ten pages out of over 300 pages of punishment phase proceedings." Exhibit 14 at 4 (1 SHCR at 245).  In actuality, it was over 22 pages as Williams' testimony was 11 pages (22 RR 112-123) and Gibson's was also 11 pages (22 RR 127-138), not counting four pages out of the jury's presence. (22 RR 123-127).

cross-examination that Anthony Williams had been killed during a drug sale. The following

exchange occurred during cross-examination:

> Q. Did the family ever talk about whether he was ever involved in any kind of drug
> dealing or anything in his lifetime?
> A. *No drug dealing that we knew of.*
> 22 R.R. 122 (emphasis supplied).

At no point during the cross-examination did the defense use Yolanda Williams to establish

that Anthony Williams was killed during a drug sale. However, if the defense had wanted to

establish that, it could have done so without permitting Yolanda Williams to give victim impact

testimony. *See Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991) (testimony regarding the

circumstances surrounding extraneous offenses admissible in capital sentencing proceeding pursuant

to Tex. Code Crim. Proc. art. 37.071). In short, Hill's alleged strategic decision itself has no legal

basis to stand on. To elicit the circumstances of the offense from Yolanda Williams did not, as a

legal matter, require permitting her to testify about the impact of her son's death on direct

examination. Thus, it was unreasonable in light of the record before it for the state court to find as

a factual matter that the decision not to object to the unconstitutional admission of Yolanda

Williams's victim impact testimony was strategic in nature, notwithstanding the conclusory and

face-saving assertion by trial counsel Hill that it was.

Additionally, Hill's affidavit addressed only Yolanda Williams's testimony. It did not

address the reasons for failing to exclude Patricia Gibson's victim impact testimony at all. It simply

asserted facts about her testimony: (1) she testified that she last saw Terrance at a family gathering;

(2) she testified that Terrance Gibson's pager went off; (3) she testified that she told Terrance to be

careful as he left; and (4) she testified on cross-examination that her son had elected to do

inappropriate things, and she counseled one of his friends to change his life and learn a lesson from

what happened to her son. (Exhibit 14, 1 SHCR at 254). Hill then asserted, "While I could have objected to the line of questioning offered by the State, I did not do so. I do not believe that the introduction of this evidence was a critical or overriding factor in the jury's decision to return the death penalty in this case." *Id.* Once again, Hill simply stated an opinion that Gibson's testimony was not overwhelmingly harmful; he did not assert any strategic basis for not excluding the inadmissible evidence. State habeas counsel submitted an affidavit from attorney Jim Leitner (Exhibit 11; 1 SHCR at 53) and another from attorneyTom Moran stating that "[t]here could be no rational strategic reason for failure to object to the inadmissible extraneous victim impact evidence," (Exhibit 23, at 3).  The state habeas court summarily dismissed them as "unpersuasive" because "claims challenging counsel's effectiveness are resolved by courts pursuant to the standard outlined in *Strickland v. Washington...*" (Exhibit 14 at 6; 1 SHCR at 247), despite the fact that attorney Moran's affidavit explicitly mentioned and was based on  *Strickland.* (Exhibit 23 at 3-4).

There is *no* evidence in the state court record at all that supports a factual determination that trial counsel made a strategic decision not to exclude Patricia Gibson's victim impact testimony. Accordingly, the state court's factual determination that a strategic decision was made is unreasonable in light of the evidence before it. Because the state court decision was based on these unreasonable determinations of fact, an exception to § 2254(d)'s relitigation bar has been met, and the Court is not prohibited from granting relief on Mr. Mamou's *Strickland* claim related to the Williams and Gibson victim impact testimony should review of it prove meritorious.

**Claim Seven (b): Ineffective assistance of counsel for failing to present evidence in mitigation.**

Largely as a result of trial counsels' rush to trial three months after the initial appointment of counsel, and a mere six weeks after second chair counsel was appointed, Mamou's trial attorneys failed to present significant mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

-68-

**A. Facts in Support.**

The defense called seven family members and friends as mitigation witnesses case at the punishment phase, but their testimony totaled only about 100 pages of testimony, including cross-examination.  23 RR 23-132.  Not contacted by the defense attorneys were 1) Claudia Milton, who could have testified about the many charitable good deeds Mamou performed in Sunset, Louisiana (Exhibit 24); 2) Christopher Terrill Mamou, Mamou's brother, who could have testified to his brother's emotional and financial support of their family (Exhibit 25); and 3) Mark Benoit, a friend, who could have testified as to Mamou's generosity for friends, family and the community (Exhibit 26).  All were willing to testify had they been asked.

## CLAIM EIGHT : APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.

Petitioner's right to due process of law, equal protection of the laws, and a reliable sentence, trial by jury, and by an impartial sentencer, was violated by his failure to receive effective assistance of appointed appellate counsel, through state court action.  U.S. Const. Amends. V, VI, VIII, XIV.

**A. Facts in Support.**

One of Mr. Mamou's trial attorneys, Floyd W. Freed II, was appointed to represent him on appeal. On November 7, 2001,  the Texas Court of Criminal Appeals affirmed his conviction and sentence of death on direct appeal in an unpublished opinion.  *Mamou v. State,* No. 73,708 (Tex. Crim. App. November 7, 2001) (not designated for publication). (Exhibit 9).

Mr. Freed failed to raise several record-based claims in his initial petition that were specifically mentioned in the Texas Court of Criminal Appeals' denial of Mamou's habeas petition. The CCA held that "[w]e also noted that Allegations Five, Six, Eight and Nine are procedurally

barred." *Ex Parte Mamou,* Nos. WR-78,122-01, 78-122-02, 78,122-03 (Tex. Crim. App. Feb. 5, 2014) at *2.

Allegations Five and Six were that the introduction of the inadmissible extraneous victim evidence deprived Mamou violated the Eighth Amendment of the United States Constuitution as he was subjected to cruel and unusual punishment. Allegation Eight was that the trial court erroneously overruled an objection to the prosecutor's speculating that the legislature could lessen Mamou's parole eligibility of forty years. Allegation Nine was trial court error in refusing to instruct the jury that the State had a burden of proof beyond a reasonable doubt on the mitigation special issue.

Petitioner adopts and incorporates by reference the facts and legal discussion of these claims in this claim for relief. Appellate counsel was ineffective for failing to raise on direct appeal all claims that were record-based but not raised in the direct appeal. The effect of this omission violated Petitioner's constitutional right to effective assistance of counsel on appeal.

**Claim Eight (a): Ineffective assistance of appellate counsel for failing to raise trial court error in admitting Baldwin's flawed "magazine mark" testimony.**

Mamou incorporates herein the factual and legal discussion of Claim Two herein. To the extent the claim is record-based and should have been raised on direct appeal, failure to do so was ineffective assistance of appellate counsel.

**Claim Eight(b): Ineffective assistance of appellate counsel for failure to raise issue of inadmissible extraneous victim impact evidence.**

Mamou argues in Claim Seven herein that trial counsel was ineffective for failing to object to the admission of extraneous victim impact evidence. Ineffective assistance of counsel claims are normally not brought on direct appeal. However, should the Court find that trial counsel did preserve trial error, appellate counsel rendered constitutionally defencive performance in failing to raise the error on direct appeal.

**Claim Eight (c):** **Ineffective assistance of appellate counsel for failing to raise parole eligibility and burden of proof on mitigation issues.**

Mamou incorporates the factual and legal discussion of Claims Twelve and Thirteen herein.

**B. Argument.**

Every criminal defendant has a right to effective assistance of counsel on his first direct appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984). Counsel's role on direct appeal is "that of an expert professional whose assistance is necessary in a legal system governed by complex rules and procedures for the defendant to obtain a decision at all -- much less a favorable decision -- on the merits of the case." *Evitts*, 469 U.S. at 394. Appellate counsel must make "a conscientious examination" of the record to identify all of the potential issues for an appeal, thoroughly research every colorable claim, and make a reasonable professional judgment about which points to raise. *Anders v. California*, 386 U.S. 738, 744 (1967). Therefore, appellate counsel "must have a firm command of the facts of the case as well as governing law before [they] can render reasonably effective assistance of counsel."

In reaching its conclusion in *Evitts,* the Supreme Court stated, "[i]n short, when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and,  in particular, in accord with the Due Process Clause." *Evitts,* at 401. *See also Goeke v. Branch,* 514 U.S. 115, 119-20 (1995).

> The Supreme Court in *Evitts* concluded that "[a] first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney... In short, the promise...that a criminal defendant has a right to counsel on appeal—like the promise...that a criminal defendant has a right to counsel at trial—would be a futile gesture unless it comprehended the right to the effective assistance of counsel.
> *Evitts,* at 396-97.  *See also Goeke v. Branch,* 514 U.S. 115, 120 (1995).

Any purely-record-based claims or sub-claims discussed herein could and should have been raised on the direct appeal if the basis for them was entirely present in the record itself.  As to any such claims or sub-claims, direct appeal counsel's performance was unreasonable under the prevailing professional norms and there is a reasonable probability that, but for appellate counsels' errors, Petitioner's conviction or sentence would have been reversed on direct appeal.  The two-pronged *Strickland* standard of deficient performance and prejudice governing claims of ineffectiveness of trial counsel likewise applies to the ineffectiveness of direct appeal counsel. *Evitts,* 469 U.S. 387.  Appellate counsel's inexcusable failure to raise a point of error that had a reasonable probability of success would be sufficient to make the showing of deficient performance.

Should this or any subsequent court hold that any purely-record-based claims or sub-claims were not properly brought on the direct appeal Petitioner submits that although he had counsel on appeal, that counsel did not provide the representation mandated by the Constitution.  *Evitts v. Lucy,* 469 U.S. 387, 396 (1985) ("To be sure, counsel did have nominal representation when he brought this appeal.  But nominal representation on an appeal as of right – like nominal representation at trial – does not suffice to render the proceeding constitutionally adequate; a party whose counsel is unable to provide effective representation is in no better position that one who has no counsel at all.")

## CLAIM NINE: STATE POST-CONVICTION COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.

Petitioner received ineffective assistance in state habeas proceedings when his initial state habeas counsel, Mr. Roland Moore, failed to investigate and present many meritorious claims of ineffective assistance of trial counsel ("IATC"). Any procedural default for failure to present these

claim in state habeas proceedings is excused under the holdings of *Martinez v. Ryan,* 132 S. Ct. 1309 (2013) and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).

*Martinez*'s first relevant requirement is  that "a prisoner must [] demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez,* 132 S. Ct. at 1318 (citing *Miller-El v. Cockrell, supra*, describing the standards for certificates of appealability). *Trevino* did not modify that requirement. The *Miller-El* standard requires only a *threshold* showing that is dependant on how the district court disposed of the claim.

### A. Facts in Support.

A substantial number of viable IATC claims were not brought by initial state habeas counsel:

1) IATC for calling Ms. Morgan as a penalty phase witness and her harmful testimony regarding the prospects of Mamou being paroled.  This defence witness gave harmful testimony.[22]

2) IATC for failure to coherently address the future dangerousness special issue.  While this issue was crucial to the jury's life or death determination, Mamou's jury was never presented with an adequate risk assessment or a statistical basis upon which they could base their decision.  Defense counsel called Dr. Walter Quijano to testify in generic terms about prisons and security.  They also called a harmful witness in Ms. Morgan, who left at least one jury member with the impression that Mamou could be paroled in less than 40 years. I SHCR 54.

3) IATC for failing to object to biased procedures at voir dire and biased instructions.

4) IATC for trial counsel's ineffective guilt-phase closing argument.

5) IATC for failure to effectively cross-examine State's witnesses or challenge them regarding their stories and possible deals.

6) IATC for failure to challenge the State's firearms expert or offer any countering firearms evidence.  This would be an extra-record claim, as state habeas counsel would have had to hire an expert to show the unreliability of the state's trial expert, which he failed to do.  This is the basis of Mamou's request for a ballistics expert.   The Court held that "Mamou

---

[22]   She admitted the no-paroles-for-40-years policy could be changed in the future by the parole Board.  23 RR 14.  She also testified that previously, a capital murderer could be eligible for parole in less time.  23 RR 17-18.  She could not assure the jury that the current 40 years would never be changed.  23 RR 18.  This witness also admitted that there have been problems with persons released on parole. 23 RR 19.

forfeited consideration of his argument about the ballistics expert by raising it in a successive habeas application." Order at 9. This is erroneous, because any failure to bring it in the initial state habeas application would qualify as an exception to default under *Martinez.* Secondly, the issue was not properly raised in the successive habeas application, as successive state habeas counsel Mr. Sergi also failed to present his own expert and simply relied on a similar case.

## B. Argument.

### i. *Martinez v. Ryan* and *Trevino v. Thaler*.

*Martinez v. Ryan,* 132 S. Ct. 1309 (2013) held that a federal court may find cause excusing failure of initial state habeas counsel to raise IATC claims where (1) the IATC is a "substantial" claim; (2) the cause consisted of either no counsel or IAHC; (3) the state collateral review proceeding was the initial review proceeding with regard to the IATC claim; and (4) state law requires that an IATC claim be raised in that initial review collateral proceeding. *Trevino,* 133 S. Ct. at 1918 (citing *Martinez,* 132 S. Ct. at 1320). *Trevino v. Thaler* applied *Martinez* to Texas. *Trevino* thus requires that a Texas habeas petitioner such as Mr. Mamou now be provided a full and meaningful review of his meritorious claims of IATC and IAHC.

The second relevant requirement under *Martinez/Trevino* is a showing that the state habeas counsel was ineffective ("IAHC"). *Trevino,* 133 S. Ct. at 1918 (citing *Martinez,* 132 S. Ct. at 1320). Mr. Mamou's initial appointed state habeas attorney, Mr. Roland Moore, filed a state habeas corpus petition that was undeniably deficient which raised only record-based issues. It consisted of a 46-page petition (Exhibit 11, 1 SHCR 3-48). Although it purported to raise nine "grounds of error" it really raised only three claims: the wrongful admission of extraneous victim impact testimony (1 SCHR 7-31); the improper questioning of a defense witness, Ms. Morgan, on parole eligibility (1 SCHR 31-35); and an oft-raised and oft-rejected challenge to the constitutionality and burden of proof of the Texas mitigation special issue, which comprised twelve pages. (1 SCHR 35-47).

Record-based claims of ineffective assistance of counsel related to the failure to object to the extraneous victim impact testimony.

Several exhibits were appended to the petition which also did not show any investigation of non-record-based issues. The investigator Cynthia Patterson's affidavit states simply that the testimony of Ms. Morgan raised a juror's concern about parole eligibility, yet there was no IATC claim for calling this witness nor any affidavit from the juror. 1 SCHR 54. Affidavits of attorneys Jim Leitner and Tom Moran were included (1 SHCR 53; Exhibit 23), but they related simply to the record-based claim of improper victim impact evidence and their opinion that failure to object was ineffective assistance. 1 SCHR 53.

State court billing records reveal that little investigation was carried out by Mr. Moore. Of the total of 142.5 hours he billed the court,[23] 38 hours were billed as "review of transcript" and over 61 hours were devoted to researching, drafting and filing the writ. 1 SHCR 99-100. Other than procuring a jury list, sending out "jury letters" and two meetings with the investigator, there is little evidence of investigation, as the total time on these tasks is under 10 hours. *Id.* A total of 2.5 hours seems to have been spent with the investigator. *Id.* Sixty-four of the hours billed were for the three week prior to the filing of the writ. *Id.*[24]

Investigator Cynthia Patterson's billing also shows IAHC. She billed a total of only 33 hours. 1 SHCR 93-94. Only about 15 of these hours were actual interviews or attempts to interview potential witnesses or potential affiants. *Id.* However, none of this showed up as work product, save

---

[23]   Apparently in two vouchers, the first for 50 hours and the second for 92.5 hours. 1 SHCR 99.

[24]   Mr. Moore has informed undersigned counsel that he contacted the trial ballistics expert Max Courtney, and a motion for his appointment was filed. (Exhibit 28). However, Mr. Moore does not recall his findings and the record does not indicate that he made any findings.

for the one-page hearsay affidavit as to what one juror allegedly told Ms. Patterson. 1 SHCR 54. No affidavits were forthcoming from the persons she allegedly interviewed. The state court adopted the district attorney's findings that Ms. Patterson's affidavit should be disregarded on the basis that it was hearsay. 1 SHCR 248.

Thus, initial state habeas counsel, Mr. Roland Moore, incontestably failed to perform the basic tasks necessary to identifying the factual bases for a habeas corpus application, much less the investigation necessary to plead and prove any habeas claims.

The state habeas court adopted verbatim the prosecutor's proposed findings and conclusions (1 SHCR 251) which in turn were adopted by the CCA.[25] These nine-page findings and conclusions clearly show the lack of any effort by initial habeas counsel to go beyond the record and perform any investigation into extra-record claims. As such, state habeas counsel was ineffective.

### ii. Texas capital habeas corpus counsel has a statutory duty to conduct a thorough extra-record investigation and identify the factual bases for relief.

Article 11.071 of the Texas Code of Criminal Procedure governs Texas capital habeas corpus proceedings and it *requires* that counsel conduct an extra-record investigation. *Id*. at § 3 (emphasis added). Counsel must be thorough and exercise reasonable diligence to uncover the factual basis for every available claim. *Id*. at § 5(e) (claims are not cognizable in subsequent habeas applications, and thus waived, unless "the factual basis was not ascertainable through the exercise of reasonable diligence" when the prior application was filed). Investigation is so fundamentally important that

---

[25] *See* Exhibit 14. Among these findings and conclusions were: 1) without holding a hearing, that the self-serving affidavits of trial counsel were believable and those of Mr. Leitner and Mr. Moore were not (I SHCR 242-243); that the court "need not consider" the investigator's affidavit (1 SHCR 248); that the error in not objecting to the victim impact testimony was harmless (1 SHCR 249-250); and the issue as to the burden of proof on mitigation had been often rejected. (1 SHCR 248-249).

Texas courts are obligated to grant all reasonable investigative funding requests.  *Id*. at § 3(c); § 3(d).

      **iii.  The prevailing professional standards in Texas capital habeas corpus cases, as reflected in State Bar of Texas materials, prescribed a broad and thorough investigation.**

      In 1996, the State Bar of Texas published the third edition of the Texas Criminal Appellate Manual.[26]  Due to the fact this brief is limited to 100 pages, the Court is referred to the Manual at pages 31 through 38, which  discusses in detail the need for investigation of non-record claims, which was not done here. (*See* Docket 22, <u>Appendix 1</u>).

      In sum, both the statute that governed habeas counsel's appointment and the prevailing professional standards in capital habeas corpus proceedings mandated that counsel conduct substantial extra-record investigation.  Mamou's state habeas petition  reveals  no evidence of any investigation of extra-record claims, as they are all record-based.  Nor do the billing records of either Mr. Moore or his investigator reveal much in terms of such investigation.  1 SHCR 93-94, 99-100.  Basing Mamou's state habeas corpus application on in-the-record claims did nothing to fulfill habeas counsel's duty.  It merely provided a facade of post-conviction representation.

<u>**CLAIM TEN**</u>**: PETITIONER IS NOT GUILTY OF CAPITAL MURDER BECAUSE THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT THE JURY'S DETERMINATION THAT PETITIONER WAS GUILTY OF KIDNAPPING.**

      As detailed in the factual summary, the State's evidence to prove that Mamou was guilty of kidnapping Mary Carmouche was insufficient. *Jackson v. Virginia,* 443 U.S. 307 (1979).

      This claim is exhausted as it was brought on direct appeal as Points of Error 2 and 3.

      **A. Factual Summary.**

---

    [26]  Attached to Motion for Reconsideration of Order Denying Funding, Docket No. 22, as Appendix 1.

The facts related at Mamou's trial were insufficient to show that he was guilty of kidnapping the victim Mary Carmouche.   The alleged kidnapping of Mary Carmouche could not have been proved through most of the State's witnesses, as they did not witness it.

1) The alleged kidnapping was not shown through the testimony of Kevin Walter, who admitted he was part of the attempt to rob Mamou.   Walter testified he was shot at Lantern Point, before Mamou drove off. 16 RR 65, 132, 155. Mamou could not have been found guilty of kidnaping through Walter's testimony alone.

2) Nor could Mamou have been found guilty of kidnapping Carmouche through the testimony of Dion Holley.   He testified that at Lantern Point, when he heard gunshots, he ran towards a nearby field.  18 RR 44, 111.  He heard more gunshots and then he was hit in the arm. 18 RR 44, 114.  He saw Mamou get in the Lexus and heard the cars leaving in their car with Mary Carmouche in the back.   18 RR 45, 122.  That was the last he saw of Ms. Carmouche.

3) Similarly, Mamou could not have been found guilty of kidnapping through the testimony of Samuel "Bug" Johnson.  Johnson testified he saw Mamou jump inside the Lexus when shots were fired and sped off. 19 RR 42, 112-113.  Johnsom was aware that the girl was in the Lexus with Mamou when he drove off.  19 RR 43.

4) Nor could Mamou have been found guilty of kidnapping though the only other witness linking him to the victim, Terrence Dodson.  His testimony was that Mamou allegedly called after the drug shooting and confessed to killing Carmouche.  There was nothing in this testimony that was sufficient for Mamou to have been found guilty of kidnapping, especially as Dodson was an accomplice due to his involvement in the drug scheme which led to Carmouche's death.

Here, as discussed further *infra,* there was no restraint of Carmouche, intentional or not. Mamou fled the shoot-out scene for his own safety, not with the intent of kidnapping Carmouche,

whose presence in the back seat of the car was not known to him when he hastily left the scene. Lastly, Mamou's testimony was that Carmouche refused to get out of the car and accompanied him to the apartment complex where she left with Johnson.

**B. Argument.**

The conviction and death sentence should be reversed because the prosecution at trial failed to present sufficient evidence to prove Petitioner was guilty of kidnapping Mary Carmouche, and therefore Petitioner's "conviction is not consistent with the demands of the Federal Due Process Clause." *Fiore v. White,* 531 U.S. 225 (2001) (*per curiam*).

**i.  Legal Insufficiency.**

In *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781 (1979), the Supreme Court established the framework to be used by federal courts reviewing habeas corpus petitions in which a prisoner challenges a state court conviction on grounds of insufficiency of the evidence.  Focusing on the Fourteenth Amendment's Due Process protection, the Court held that habeas relief is warranted "if it is found that upon the record adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324 n.16, 99 S. Ct. 2781.  The *Jackson* Court instructed that federal courts are to rely on substantive state criminal law when reviewing a state conviction for constitutional sufficiency.  Hence, that state law will be discussed here.

In reviewing the sufficiency of the evidence, an appellate court must view the evidence in the light most favorable to the verdict to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, and also would have found against appellant on the defensive issue beyond a reasonable doubt. *Jackson, supra,* 443 U.S. 307 at 319.

**ii.  Factual Insufficiency.**

-79-

In a factual sufficiency review, the appellate court views all the evidence in a neutral light and determines whether evidence supporting the verdict is too weak to support the finding of guilt beyond a reasonable doubt or if evidence contrary to the verdict is strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Zuniga v. State*, 144 S.W.3d 477, 486 (Tex. Crim. App. 2004).

In *Brooks v. State,* 323 S.W.2d 893 (Tex. Crim. App. 2010) the Texas Court of Criminal Appeals overruled *Clewis v. State,* 922 S.W.2d 126 (Tex. Crim. App. 1996) which established the factual sufficiency standard of reviewing elements of the offense in criminal cases. *Brooks* set aside the factual sufficiency standard of review and held "[T]he *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks,* at 911.

Here there was noting in the testimony of these witnesses that indicated Mamou acted with the intent to kidnap Carmouche. Rather, it is clear that when he left the shoot-out in the other party's car, he did not know Carmouche was in the back seat, let alone that he took the car with the intent to kidnap her or hold her for ransom. To the extent that the evidence of kidnapping was based on Johnson's testimony, it was uncorroborated accomplice testimony.

### iii.  The state court decision was an unreasonable determination of the facts under 2254(d)((2).

The state court's denial of this claim on direct appeal and on state habeas was an unreasonable determination of the facts under 2254(d)(2).

On appeal, the Texas Court of Criminal Appeals first held that "the state was required to prove that appellant murdered Carmouche in the course of committing or attempting to commit

kidnapping." <u>Exhibit 9</u>, *Mamou v. State,* No. 73,708 (Tex. Crim. App. 2002) at *10.  The CCA then

held that

> [a] person commits the offense of kidnapping when he knowingly or intentionally
> abducts another person.... 'Abduct' means to restrain a person with the intent to
> prevent her liberation by either: (1) secreting or holding her in a place where she is
> not likely to be found, or (2) using or threatening to use deadly force...The state had
> the burden to prove that a restraint was accomplished and that appellant evidenced
> a specific intent to prevent Carmouche's liberation by either secretation or deadly
> force."
> (<u>Exhibit 9</u>, *Mamou,* at *10).

The CCA also held that

> The evidence at trial shows that appellant shot Carmouche's companions, left the
> scene in Holley's Lexus with Carmouche in the back seat, and transported her to a
> vacant house where he took her into the backyard and shot her.  Johnson disputed
> appellant's version of events and testified that he last saw Carmouche in the lexus
> with appellant.  Dodson testified that appellant admitted to him that he drive away
> from a "shoot out" with a girl in a Lexus and that he took her to an abandoned house
> where he shot her because "she was scared" and "she was looking at him funny, like
> she was going to tell...[t]he jury could rationally infer from the evidence that
> appellant restrained Carmouche without her consent.  Viewing the evidence in the
> light most favorable to the verdict, we conclude that a rational jury could have found
> beyond a reasonable doubt that appellant restrained Carmouche with the intent to
> prevent her liberation by either secretion or deadly force....Point of error number two
> is overruled.
> (<u>Exhibit 9</u>, *Mamou,* at *11).

As to the factual insufficiency challenge, the CCA held

> Under the factual sufficiency standard...we will reverse the fact finder's
> determination only if 'a manifest injustice has occurred....appellant again asserts that
> the state failed to prove the underlying offense because he did not 'restrain'
> Carmouche.  However, Dodson testified that appellant admitted that he drove away
> from a 'shoot out' with a girl in a Lexus and took her to an abandoned house where
> he shot her.  Further, appellant admitted shooting Gibson, and ballistics tests
> revealed that the bullets taken from the bodies of Carmouche and Gibson shared the
> same class characteristics.
> Appellant testified that he did not know that Carmouche was in the car, that she
> refused to get out of the car when he asked her to do so, and that she voluntarily
> accompanied him to Scott's apartment where she left with Johnson.  Scott and
> Johnson, however, disputed appellant's version of events.  The jurors were free to
> place whatever value they wished upon appellant's testimony.  They apparently

rejected his testimony and concluded that he restrained Carmouche when he transported her from Lantern Point Drive to the backyard of a vacant house, where he shot her.  Viewing the evidence in a neutral light, we cannot say that the jury's finding that appellant kidnapped Carmouche is 'manifestly unjust.'...Appellant's third point of error is overruled.
(Exhibit 9, *Mamou* at *12).

Thus, the CCA relied on Dodson's brief testimony of an alleged telephonic confession by Mamou after the shoot out, and also on Scott and Johnson's testimony.  Indeed, there was no other testimony regarding what transpired after Mamou left Lantern Point Drive with Carmouche in the back seat. Dodson's testimony did not establish either that there was a kidnapping or that Carmouche was " restrained."  Dodson was not a witness to either the Lantern Point events or their aftermath, and he testified only as to an alleged "confession" by Mamou that did not include any admission to a kidnapping.

Dodson testified only that Mamou said he "burned off" with the girl in the car (19 RR 179), which does not show an intent to kidnap her.  Mamou would not likely have known she was in the back seat when he "burned off," as he quickly jumped in the car after the night-time shoot-out and left hurriedly, as he was himself trying to avoid being shot.  Dodson said he shot the girl because she looked at him "funny" like she was going to tell and she was scared.  19 RR 182.  Nor did Howard Scott or Samuel Johnson's testimony make the State's case for kidnapping.  Scott did not testify that he saw Carmouche with Mamou after the shoot-out and Johnson testified only that the girl was in the Lexus with Mamou when he drove off from Lantern Point.  19 RR 43.

This is insufficient evidence of a kidnapping or restraint.  To show that Mamou kidnapped or attempted to kidnap Carmouche, the State had the burden of proving that: (1) Mamou restrained Carmouche or accomplished more than mere preparation for restraint; (2) the restraint was without Carmouche's consent; and (3) Mamou acted with the specific intent to prevent Carmouche's

-82-

liberation by either secreting her in a place where she was unlikely to be found or by using or threatening to use deadly force to restrain her. *See* Tex..Penal Code Ann. §§ 20.01(1), (2), 20.03(a); *Saldana v. State,* 59 S.W.3d 703, 708 (Tex.App.-Austin 2001, pet. ref'd).

    1) *Evidence of Restraint*

There is insufficient evidence of restraint as Dodson, Johnson and Scott's testimony did not show a kidnapping, let alone that Carmouche was "restrained." The court must consider all of the evidence in   the sufficiency review, *Russeau v. State,* 171 S.W.3d 871, 879 n. 2 (Tex.Crim.App.2005), and the evidence of kidnapping or restraint is not there.  While it is true that the jury could have believed Mamou that Carmouche remained in the car voluntarily at first but was later kidnapped, there was no testimony establishing that a kidnapping subsequently occurred. *See Rodriguez v. State,* 730 S.W.2d 75, 79 (Tex.A pp.-Corpus Christi 1987, no pet.). Likewise, neither Scott nor Johnson "disputed appellant's version of events" as the CCA held (*Mamou* at *12), at least as to the kidnapping, as they did not observe Carmouche being restrained or held against her will after the Lantern Point incident.

    2) *Lack of Consent*

There is also legally insufficient evidence that even if there was restraint that it was without Carmouche's consent. Neither Dodson, Johnson nor Scott testified about consent.  While it is true that Mamou's alleged confession to Dodson implied she was led to abandoned houses in Sugar Land without her consent, this alone was insufficient.

    3)  *Specific Intent to Prevent Liberation*

Finally, we consider whether Mamou acted with the specific intent to prevent Carmouche's liberation by either secreting her in a place where she was unlikely to be found or by using or threatening to use deadly force to restrain her.  Here again, Dodson's testimony alone was

insufficient and Scott and Johnson did not address the issue.  The jury's conclusion and the CCA's

holding was erroneous and an unreasonable determination of the facts under 2254(d)(2).

**CLAIM ELEVEN: PETITIONER WAS UNLAWFULLY CONVICTED OF CAPITAL MURDER BECAUSE THERE WAS INSUFFICIENT LEGAL AND FACTUAL CORROBORATION OF ACCOMPLICE TESTIMONY.**

This claim is exhausted as it was brought on direct appeal as Point of Error Five and Six.

**A. Factual Summary.**

The one witness that connected Mamou to the killing of Carmouche, other than the flawed

and false testimony of Mr. Baldwin,  was Terrence Dodson, and he was an accomplice.  The

instructions read to Mamou's jury made clear that he could not be convicted solely on Dodson's

testimony that Mamou confessed to him after the murder:

> An accomplice, as the term is here used, means anyone connected with the crime charged, as a party thereto, and includes all persons who are connected with the crime by unlawful act or omission on their part transpiring either before, at the time of, or after the commission of the offense, and whether or not they were present and participated in the commission of the crime.  A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he was criminally responsible, or by both.  Mere presence alone, however, will not constitute one a party to an offense.
>
> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  The term 'conduct' means any act or omission and its accompanying mental state.
>
> You are instructed that a conviction cannot be had upon the testimony of an accomplice unless the accomplice's testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.
>
> (Exhibit 5, at CR 86, Charge of the Court at Guilt/Innocence).

The instruction made reference only to Samuel "Bug" Johnson as a possible accomplice, but

it is clear that Mr. Dodson was also an accomplice.  Indeed, Dodson himself testified that

---he was instrumental in setting up the deal for Mamou to purchase cocaine. 19 RR 166.

-84-

---he intended to help Mamou and Johnson rob the purported sellers of their drugs and was present at Northline Mall for that purpose  19 RR 168.

---at that location, Dodson got out of the car with Mamou and was active in discussing giving $20,000 for a kilo of cocaine. 19 RR 169-170, 194.

---although Dodson was dropped off before the drug deal occurred, he had been an integral part of the planning and the initial stages of the execution of the plan.  19 RR 172-194.

---Dodson testified that his  part in the scheme was to rob the other party with a gun he had in his possession.  19 RR 186-187.  His role was once he saw the dope, he was going to pull the gun and take it.  19 RR 188.

---he was also implicated in the Carmouche murder through his acts prior to her murder: his possession of a gun to rob the dealers; his involvement in the planning and execution of the drug deal that ultimately led to her death; and (although Mamou contended at trial and again contends herein that Dodson was untruthful) Dodson's allegations regarding his own complicity in Mamou's actions the next day.

---Dodson himself thought he was going to be indicted for capital murder based on his acts as an accomplice. 19 RR 195, 200.

Even though Dodson was not present at the drug scene shoot-out, these are more than sufficient acts for him to be seen as an accomplice.  As Mamou's jury was instructed, an accomplice is one who is connected with the crime

> by unlawful act or omission on their part transpiring either before, at the time of, or after the commission of the offense, and whether or not they were present and participated in the commission of the crime.  A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he was criminally responsible, or by both.
> (Exhibit 5, at CR 86).

So Dodson's testimony alone would not have been sufficient.  The "fingerprint evidence" the prosecutor mentioned (21 RR 12-13) in argument connected Mamou to the cut-up newspapers found at the drug shoot-out scene, which he admitted at trial, not to the Carmouche murder. Neither did the location of the car near the body of Carmouche, also mentioned in the prosecutor's argument, (*Id.*) tie Mamou to the murder of Carmouche.  This argument was actually a pure smoke-screen and meaningless.  Mamou was not a resident of Houston, and any one of the people at the Scotts' apartment after the drug scene shooting could have driven the car to that location and shot the victim.

-85-

### B. Argument.

Under Texas law, an accomplice is someone who has participated with someone else, during or after the commission of a crime. *Russell v. State,* 598 S.W.2d 238 (Tex. Crim. App. 1980); *Carillo v. State,* 591 S.W.2d 876 (Tex. Crim. App. 1979).

Mr. Dodson was criminally responsible because he acted with the intent to promote or assist in the commission of the robbery. *See* Texas Penal Code Section 7.02(a)(2); *Rivera v. State,* 990 S.W.2d 882 (Tex. App.–Austin 1999). Further, a defendant's criminal responsibility may include acts for which he may or may not be the primary or principal actor. *Goff v. State,* 931 S.W.2d 537, 544 (Tex. Crim. App. 1996), *cert denied,* 520 U.S. 1171 (1997). It was foreseeable that murder may occur during the course of a robbery with a gun.

Here, the State did not corroborate the testimony of Mr. Dodson pursuant to Article 38.14 of the Texas Code of Criminal Procedure. In applying the test of *McDuff v. State,* 939 S.W.2d 607, 612 (Tex. Crim. App. 1997) the testimony of Dodson is removed and the State was left with no witness that could corroborate him. This cannot support Mamou's conviction for murder.

### C. The state court decision was an unreasonable determination of the facts under 2254(d)((2).

The state court's denial of this claim on direct appeal and on state habeas was an unreasonable determination of the facts under 2254(d)(2). On appeal, the Texas Court of Criminal Appeals held that "[t]here was no evidence that Dodson committed an affirmative act to assist appellant in the kidnapping or murder of Carmouche...Because Dodson was not an accomplice witness, his testimony was not subject to the corroboration requirement of art. 38.14. Appellant's fifth and sixth points or error are overruled." " Exhibit 9, *Mamou v. State,* No. 73,708 (Tex. Crim. App. 2002) at *13-14. However, it is clear that Dodson participated in the overall scheme to rob,

which resulted in Carmouche's death.  His extensive participation in that scheme rises well above the CCA's holding that "the fact that Dodson knew about the murder after it took place does not make him an accomplice."  *Id.* at *13.  This was an unreasonable determination of the facts under 2254(d)(2).

**CLAIM TWELVE: PETITIONER WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW, AS THE EVIDENCE SUPPORTING THE FUTURE DANGEROUSNESS SPECIAL ISSUE WAS INSUFFICIENT.**

The evidence in this matter was legally insufficient to support the jury's answer to the "future dangerousness" special issue (Special Issue No. 1; Exhibit 8)  as the State failed to prove beyond a reasonable doubt that there is a probability that Mr. Mamou would commit criminal acts of violence and would constitute a continuing threat to society.  Thus, Petitioner's sentence of death violates his constitutional right to due process of law.  U.S. Const., amends IV, V and XIV.

**A. Facts in Support.**

The trial court at the punishment phase of Petitioner's trial submitted a jury charge which contained the "continuing threat" Special Issue No. 1 which read as follows: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant Charles Mamou, Jr. would commit criminal acts of violence that would constitute a continuing threat to society?" (Exhibits 7,  8.)  The mitigation special issue was number two.  (Exhibits 7, 8.)  The jury answered these issues "yes" and "no" respectively.  (Exhibits 7, 8.)  Thereafter, the court pronounced Petitioner's sentence of death by lethal injection based upon these two answers.  (Exhibit 8.) This sentence violated Petitioner's federal constitutional right to due process of law.

On direct appeal, as Point of Error 7, Mamou asserted that the State failed to prove, beyond a reasonable doubt, that Mamou would constitute a continuing threat to society and that it should

be subject to a sufficiency review.  (Exhibit 9, *Mamou v. State*, opinion on direct appeal.)  Thus, this claim is exhausted.

**B. Argument.**

The standard of review for the legal sufficiency for the issue of future dangerousness is whether a rational trier of fact could have concluded beyond a reasonable doubt that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781 (1979).

The State bears the burden of proof requiring each and every element of the offense.  *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068 (1970); *Apprendi v. New Jersey,* 120 S. Ct. 2348 (2000).  *See also* Tex. Penal Code. Ann. Sec. 2.01 (Vernon 1994).  Proof beyond a reasonable doubt requires that the State produce evidence showing something more than a strong suspicion, and this standard of "proof beyond a reasonable doubt" is a federal constitutional one, guaranteed by a citizen's federal constitutional right to due process of law.  *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

Art. 37.071 sec. 2 (a) (2) (b) (1) of the Tex. Crim. Proc. Code Ann. (Vernon 2001) reads as follows:

(b)  On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury: (1)  whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]

This special issue was included in the court's charge on punishment. (Exhibit 7, CR 101). When evaluating whether the evidence is legally sufficient to support the jury's affirmative answer to the "future dangerousness" special issue this Court and the state courts review the evidence in the light most favourable to the jury's verdict to determine whether any rational trier of fact could have

concluded beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Jackson v Virginia* at 573*; Swain v State,* 181 S.W. 3d 359, 368 (Tex. Crim. App. 2005) *cert. denied,* 166 L.Ed. 2d 106 (2006)*; Bible v State,* 162 S.W. 3d 234, 245 (Tex. Crim. App. 2005)*; Mathis v State,* 67 S.W. 3d 918, 922 (Tex. Crim. App. 2002)*.*   The non-exclusive list of factors that may be considered on review of a finding of future dangerous in a capital murder prosecution include (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was acting alone or with other parties; (2) the calculated nature of defendant's acts; (3) forethought and deliberateness exhibited by the crime's execution; (4) existence of a prior criminal record and severity of the prior crimes; (5) defendant's age and personal circumstances at the time of the offense; (6) whether defendant was acting under duress or domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Manns v State,* 122 S.W. 3d 171, 193 (Tex. Crim. App. 2003); *Wardrip v State,* 56 S.W. 3d 588, 594 (Tex. Crim. App. 2001).   Though the circumstances surrounding the actual offense can be sufficient taken alone to sustain an affirmative finding, this is not always the case. *Valle v State,* 109 S.W. 3d 500, 502-03 (Tex. Crim. App. 2003); *Guevara v State,* 97 S.W. 3d 579, 581 (Tex. Crim. App. 2003); *Hall v State,* 67 S.W. 3d 870, 874 (Tex. Crim. App. 2002**)** *cert. granted, vacated and remanded,* 154 L.Ed. 2d 4 (2002) *aff'd*, 160 S.W. 3d 24 (Tex. Crim. App. 2004).

Mamou had no extensive prior history of criminality.  The State produced Joseph Melancon at the punishment phase who testified about the uncharged Anthony Williams homicide on September 5, 1998.  22 RR 61-104.  Mamou, however, had an alibi for that date from Shannon Johnson.  23 RR 22-25.  Mamou's mother testified that Mamou was well-behaved and helped his family members, 23 RR 37-42, had been gainfully and legitimately employed, 23 RR 37-42,

although she was also aware that at some point he became a small-time drug dealer in Sunset, Louisiana.  Joseph Savioe, a teacher, testified that Mamou took care of his family, 23 RR 102, and Mamou's sister Michelle testified that he bought her required school books.  23 RR 77.  The facts surrounding this offense, though severe, do not rise to the level of supporting the jury's affirmative answer to the first special issue.  For this reason the evidence is legally insufficient to support the jury's answer.

This violated Petitioner's rights to due process and a fair trial under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.  Additionally, the state court's finding denying this point of error on direct appeal "resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under Section 2254(d)(1) of AEDPA.

**C. How the State Courts Erred.**

This claim, brought on direct appeal as Point of Error No. 7, was denied by the Texas Court of Criminal Appeals.  Exhibit 9, *Mamou v. State,* No. 73,708 (Nov. 7 2001) at *14-15.  In that opinion, the CCA first enumerated the factors

> relevant to the jury's determination of whether the evidence supports a finding of future dangerousness include, but are not limited to: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence.  *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).
> (Exhibit 9, *Mamou v. State* at 14.)

The CCA's opinion cited Mamou's drug dealing; his being pulled over for speeding; Mamou's alleged involvement in the uncharged Anthony Williams shooting; and Mamou's leaving

Houston after the Carmouche murder. (*Id.* at 14-15.)   These specifics, when considered cumulatively, fall well short of showing a "probability" that Mamou would commit future acts of violence.

## CLAIM THIRTEEN: THE TRIAL COURT COMMITTED MULTIPLE REVERSIBLE ERRORS.

Petitioner's conviction and death sentence is unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because he was denied a fair and impartial tribunal due to the errors committed by the trial judge.

### Claim Thirteen(a): The Trial Court Erred In Denying Petitioner's Objection to the Prosecutor's Speculation That the State Legislature Could Lessen Petitioner's Parole Eligibility of 40 Years.

At the punishment phase of Mamou's trial, the prosecutor elicited information from a defence witness that encouraged the jurors to violate their oaths and consider the possibility of parole in their penalty determinations.   The trial court overruled defence counsel's objection to this questioning.   This was contrary to state law and this trial error deprived Mamou of his federal constitutional rights.   This sub-claim is exhausted as it was brought as Point of Error No. 1 on direct appeal.   Exhibit 9, at 9-12.

### i. Facts in Support.

At the penalty phase of Mamou's trial, his attorneys called Dorothy Morgan, the parole supervisor for the Southern Region Institutional Parole office. 23 RR 3.   She testified, among other areas, as to the parole process of a person convicted of capital murder and sentenced to prison.   She told the jury that victims and the local district attorney would be  notified if anyone applies for parole. 23 RR 13.   She also testified that at the time of Mamou's trial, an individual convicted of

capital murder would not be eligible for parole until 40 years.  23 RR 13.  There would have to be a two-thirds majority of the 18-person board for it to be approved.  23 RR 14.

After her direct testimony, defense counsel presented an oral motion *in limine* to preclude the prosecutor from cross examining her on changes in parole laws and other speculative matters relating to parole.  (23 RR 15).  This motion was denied.  *Id.*

On cross-examination, the prosecutor than began to question Ms. Morgan in a series of questions calculated to inform the jury of changes in non-capital parole law.  23 RR 15-16.  The prosecutor asked Ms. Morgan: "So today, as we sit here today, a person so convicted of capital murder and receives a life sentence must serve for forty calendar years?"  The witness replied "That is right."  23 RR 17.  The prosecutor then asked "You are not implying to this jury are you, that that could never be changed?"  *Id.*  Defense counsel immediately objected on the grounds that it called for speculation on the part the witness.  The trial court overruled the objection.  *Id.*  The prosecutor then continued with his questioning:

> Q.  You're not implying to the jury they could never be changed, are you?
> A.  Well, I couldn't tell the jury that it would be or would not be.  I'm just saying, I know today.  And no, I cannot tell them that.
> Q.  All right.  Because that's not always been the law.  Forty years day-for-day has not always been the law.  It's a pretty recent situation.
> A.  That is true; however it was less time.  IT was thirty-five.
> Q.  And before that it was even less time, wasn't it?  Even before that, it was a life sentence, you might get out in eight or nine years?
> A.  Could be.  Not capital felony.
> Q.  Are you sure about that?
> A.  I'm not an attorney, no, I couldn't say.
> Q.  You said that the ...so you cannot guarantee the ladies and gentlemen of the jury that forty years, calender years, day-for-day, will ever be changed.  You can't assure us of that, can you?
> A. I can only tell the jury what it is today.
> Q.  I understand, which means you cannot assure us it can never be changed?
> A. Right.
> Q. You indicated that the goal of the parole division, the first goal, is to protect society?
> A.  True.

(23 RR 17-18).

When the jury was charged at the punishment phase, the instructions contained specific language regarding parole eligibility being contingent on Mamou serving forty calendar years without consideration of good time.  (CR 198).  The prosecutor's cross-examination invited the jurors to disregard the law, violate their instructions and violate their oaths in answering both special issues.  A juror, Tracy Karam, stated that the testimony of Ms. Morgan regarding the possibility of parole did affect her decision as to Special Issue No. 1. (Exhibit 11, 1 SHCR at 54.)

**ii. Argument**.

The United States Supreme Court has held that the possibility that a jury may be confused about facts important to their capital-sentencing role has Constitutional implications.  *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187 (1994).   There the Supreme Court held that a criminal defendant must be given the opportunity to inform the jury that he would never be eligible for parole if given a life sentence.  *Id.* at 2196 (plurality opinion per Blackmun).  The plurality reasoned that "[t]he jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested."  *Id.* at 2195.

The requirement that information conveyed to juries not be unduly prejudicial is a crucial component of ensuring the effective fulfilment of justice in sentencing proceedings.  Indeed, as the Supreme Court has stated, "[J]urors are not infallible guardians of the public good.  They are ordinary citizens whose decisions can be shaped by influences impermissible in our system of justice. … Arbitrariness, caprice, passion, bias, and even malice can replace reasoned judgment and law as the basis for jury decisionmaking." *TXO Production Corp v. Alliance Resource Corp.*, 509 U.S. 443, 474 (1993).  This is a primary reason why our justice system incorporates safeguards

against such influences.  Restricting the State to confine its jury arguments to non-prejudicial matters is one such necessary safeguard.

Where capital cases are at issue, these concerns are greatly heightened.  As the Supreme Court has many times recognized, "death is a punishment different from all other sanctions in kind rather than degree. *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976); *Furman v. Georgia*, 408 U.S. 238, 306 (Stewart, J., concurring).  From this, the Court has reasoned that "heightened reliability is required at all stages of the capital trial." *Shiro v. Farley*, 510 U.S. 222, 238 (1994). Indeed, it is the "universal experience in the administration of criminal justice that those charged with capital offenses are granted special considerations" and afforded heightened procedural protections. *Furman v. Georgia*, 408 U.S. 238, 286 (1972); *Stein v. New York*, 346 U.S. 156, 196 (1953) ("In death cases doubts … should be resolved in favor of the accused); *Andres v. United States,* 333 U.S. 740, 752 (1948) (Reed, J., concurring) ("I do not concede that whatever process is 'due' an offender faced with a fine or a prison sentence necessarily satisfies the requirements of the Constitution in a capital case.  The distinction is by no means novel, …nor is it negligible, being literally that between life and death.").

The questioning of Ms. Moragn was a clear invitation for the jury to discuss Mamou's parole eligibility in their deliberations. Texas has long required the trial court to instruct the jury at the penalty phase that it may not consider parole in fixing punishment.  *See, e.g., Marshburn v. State,* 522 S.W.2d 900, 905, n.7 (Tex. Crim. App. 1975)("In determining the punishment in this case you are instructed that you are not to discuss among yourselves how long the defendant will be required to serve any sentence you decide to impose.")

**iii.  How the state courts decided this claim.**

This claim was brought on direct appeal as Point of Error One.  The Texas Court of Criminal Appeals held that "[b]ecause appellant's trial objections do not comport with the issue raised on appeal, he has preserved nothing for review." *Mamou v. State,* No. 73,708, at \*18. (Tex. Crim. App. Nov. 7, 2001) (*per curiam*) (not designated for publication).

### iv.  How the state court erred.

The CCA's ruling erroneously referred only to the "trial objections," not to the motion *in limine* orally presented by defense counsel prior to the cross-examination of this witness.  While trial counsel objected on the basis that the questioning called for speculation (23 RR 17), the prior oral motion *in limine*  was broader.  Defense counsel Mr. Wentz stated that he "would ask that there be a motion *in limine* as to cross-examination relating to changes in the board...changes in the parole law; and those things might [not] be considered, also.  23 RR 15. The Court asked for authority for the motion and the prosecutor then interjected "because he wants it." *Id.*  Mr. Wentz then added that [i]t also involves speculation on the part of this witness as to what the legislature would do." *Id.*

This objection, based on what the legislature might do, sufficiently encompassed the claim brought on direct appeal.  Counsel did not have to explicitly state that "the jury should be forbidden to speculate that the legislature might lessen the parole eligibility period," which is apparently how the CCA construed this claim.  In any case, review here is *de novo*, as the state court did not reach the merits of this claim.  To the extent that trial counsel failed to preserve the issue for appeal, then any such failure was ineffective assistance of counsel under the standards of *Strickland v. Washington,* 466 U.S. 668 (1984).

**Claim Thirteen(b):  Trial Court Error In Denying Mamou's Requested Charge on False Imprisonment.**

When both sides rested at the end of the guilt phase, Mamou's counsel objected to the Court's charge pursuant to Article 36.14 of the Texas Code of Criminal Procedure for not including False Imprisonment, also known as unlawful restraint, in the jury charge. The trial court denied the requested charge. 21 RR 3. However, false imprisonment is a lesser included offense of kidnaping. *Ex Parte Gutierrez,* 600 S.W.2d 933, 935 (Tex. Crim. App. 1980).

In Claim Ten, Mamou raises the insufficiency of the evidence of kidnaping and incorporates that herein by reference. When evidence from any source raises a defensive issue, and the defendant requests a jury charge on that issue, the trial court must submit the issue to the jury. *Muniz v. State,* 686 S.W.2d 157 (Tex. Crim. App. 1984). Mamou was deprived of the jury's consideration imprisonment as a lesser included offense of kidnaping, of which there was insufficient evidence.

## Claim Thirteen (c): The Trial Court Erred in Denying Mamou's Requested Charge Requiring the Extraneous Offenses To Be Proved Beyond A Reasonable Doubt.

### i. Facts in Support.

Defense counsel requested that a jury instruction be given to Mamou's jury at the punishment phase which assigned a burden of proof beyond a reasonable doubt. (24 RR 3.) The request was denied by the trial court. *Id.* This sub-claim is exhausted as it was brought on direct appeal as Point of Error No. 8.

### ii. Argument.

Central to the holding of *Furman v. Georgia,* 408 U.S. 238 (1972) was the conviction that the vesting of standardless sentencing power in the jury violated the Eighth and Fourteenth Amendments. "A standard of proof represents an attempt to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases 'preponderance of the evidence' and 'proof

-96-

beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions." *In re Winship,* 397 U.S. 358, 370 (1970)(Harlan, J., concurring). In this trial court charge, there is no degree of confidence correctness because the charge does not instruct the jury as to a standard of proof to be used in evaluating the evidence.  The charge is therefore incompatible with the dictates of due process.

Without waiving any other claim, Petitioner contends that as a result of the trial court's charge, the jury by fiat or caprice likely weighed the evidence for or against petitioner using whatever the jury deemed was necessary to uphold the State's version of the facts concerning Petitioner's commission of the extraneous offenses which were relevant to a determination of his future dangerousness. Under the Court's charge, the jury could have concluded that less than a scintilla of evidence in the State's favor as to these offenses was more than sufficient to overcome any defence evidence to the contrary.

Fundamental fairness requires that there must be a standard of proof and a burden of proof assigned to the question of the burden of proof of the commission of the special issues.  Because the trial court did not charge the jury as to  the burden of proof or as to the burden of proof to be used in deciding whether the State had proved the extraneous offenses, the charge did not fulfill *Furman* or *Winship*'s basic requirement that arbitrary and wanton jury discretion must be replaced with objective standards to guide, regularize and make rationally reviewable the process for imposing a sentence of death.

**iii.  The state court decision was contrary to clearly established Federal law and an unreasonable determination of the facts under 2254(d)(1) and (2).**

The state court's denial of this claim was both contrary to clearly established federal law under 2254(d)(1) and also an unreasonable determination of the facts under 2254(d)(2).

This claim was brought on direct appeal as Point of Error 8.  The Texas Court of Criminal Appeals held, by adopting the State's Proposed Findings and Conclusions, that the defendant had the burden of proof, that the issue of Petitioner's mental retardation was litigated properly and Petitioner was not harmed by any error.  State's Proposed Findings and Conclusions at 28.  The state court analysis fails to deal with Petitioner's *federal* constitutional claim, as discussed *supra.* It was decided only under state law.

**Claim Thirteen (d): The Cumulative Effect of Trial Errors.**

The cumulative effect of these egregious errors and misconduct in the prosecution's arguments and statements was that they "infected the trial with unfairness." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).  Thus, even if this Court holds that any one of the misconduct and errors alone was not sufficient to create this fundamental unfairness, the proper framework for the analysis is to examine the argument as a whole, as the jury heard it, and not simply to test the individual claims separately.

**CLAIM FOURTEEN:   REVERSAL IS REQUIRED BASED ON THE CUMULATIVE EFFECT OF ALL THE ERRORS**.

Petitioner's conviction and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved the petitioner's trial violated his rights to a fair trial, due process, effective assistance of counsel, presentation of a defense, and a reliable determination of guilt and penalty, and fundamental fairness.

Even if  none of the errors in this case are found to be individually prejudicial, the cumulative effect of these errors nevertheless undermines the confidence in the integrity of the guilt and penalty phase proceedings and warrants reversal of Petitioner's  judgment of conviction and sentence of death.  Even where no single error in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may be so harmful that reversal is required.  *See Donnelly v. DeChristoforo* 416 U.S. 637, 642-643 (1974) [cumulative errors may so infect "the trial with unfairness as to make the resulting conviction a denial of due process"]; *Greer v. Miller,* 483 U.S. 756, 764 (1987)).  Reversal is required unless it can be said that the combined effect of all of the errors, constitutional and otherwise, was harmless beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18,  24 (1967).

The errors in this case include, *inter alia*, ineffective assistance of counsel at both the guilt/innocence and penalty phases of the trial; petitioner's claim of actual innocence; trial error in admitting flawed and false firearms testimony from State's expert Robert Baldwin and ineffective assistance of trial counsel for failing to object to it, file motions to exclude it or effectively cross-examine Mr. Baldwin; denial of the right to a fair and impartial jury; and multiple instances of trial court error and prosecutorial misconduct.  The cumulative effect of these errors so infected Petitioner's trial with unfairness as to make the resulting conviction a denial of due process (U.S. Const., 14th Amend.; *Donnelly v. DeChristoforo*, *supra*, 416 U.S. at  643.  *See also Hitchcock v. Dugger*, 481 U.S. 393, 399 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986); *Caldwell v. Mississippi*, *supra*, 472 U.S. at 341.

## CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Mamou  prays and requests that this Honourable Court:

-99-

A.  After the filing of the amended petition, issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

B. Conduct a hearing at which evidence and argument may be offered concerning the allegations of his petition;

C. Grant him the authority to obtain subpoenas *in forma pauperis* for witnesses and discovery of documents, and grant him the authority to take depositions and obtain other information necessary to prove the facts as alleged in his petition;

D.  Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of law raised by this petition or such hearing;

E.  Enter Findings of Fact and Conclusions of Law recommending that his conviction and sentence of death be vacated and that his case be remanded for a new sentencing hearing,  and

F.  Grant such other relief as may be necessary and appropriate.

Respectfully submitted,

*s/s A. Richard Ellis*

_____

**A. Richard Ellis**
Attorney at Law
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
Attorney for Petitioner

Dated: February 4, 2015.

-100-

**VERIFICATION**

I, A. Richard Ellis, am  the attorney for Charles Mamou, Jr., the  petitioner in the foregoing Protective Skeletal Petition for Writ of Habeas Corpus.  I have read the petition and am familiar with its contents.  On behalf of Charles Mamou, Jr.  and upon information and belief, I hereby verify, under penalty of perjury, that the factual matters stated in the petition are true and correct.

DATED: February 4, 2015.

/s/ A. Richard Ellis
_____
A. RICHARD ELLIS
Attorney for Petitioner

**CERTIFICATE OF SERVICE**

I hereby certify that  a true and correct copy of this *Petitioner's Protective Skeletal Petition For Writ Of Habeas Corpus* was served on counsel of record for Respondent via the Court's automatic electronic service  this 4th of February, 2015, to:

      Ms. Katherine D. Hayes
      Assistant Attorney General
      Criminal Appeals Division
      Office of the Texas Attorney General
      P.O. Box 12548, Capitol Station
      Austin, Texas  78711-2548

              */s/ A. Richard Ellis*

              _____
              A. RICHARD ELLIS
              Counsel for Petitioner