# Exhibit 14

EX PARTE § IN THE 179TH DISTRICT COURT

§ OF

CHARLES MAMOU, JR., § HARRIS COUNTY, TEXAS
Applicant

## STATE'S PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

Having reviewed the application for writ of habeas corpus in cause no. 800112-A;

*Respondent's Original Answer* filed in cause no. 800112-A; the affidavits and exhibits

filed by the parties; and, the record of the trial proceedings in cause no. 800112, the

Court recommends the denial of habeas relief in cause no. 800112-A and makes the

following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.     On October 12, 1999, Charles Mamou, Jr., the applicant, was found guilty for the felony offense of capital murder in the 179th District Court, cause no. 800112.  On October 15, 1999, pursuant to the jury's answers to the special issues, the trial court sentenced the applicant to death by lethal injection.

2.     The State's guilt/innocence case involved a drug transaction during which the applicant shot and killed Terrance Gibson, shot and injured Kevin Walter and Dion Holley, and kidnapped and murdered a young female, Mary Carmouche. *Mamou v. State*, No. 73,708, slip op. at 2-8 (Tex. Crim. App. Nov. 7, 2001)(not designated for publication).

3.     At the punishment phase of trial, the State presented evidence of the applicant's commission of an extraneous 1998 murder as well as a 1996 incident where a Louisiana police officer stopped the applicant for speeding and discovered a .9 millimeter pistol in the applicant's waistband. *Mamou*, No. 73,708, slip op. at 8-9.

4.     On November 7, 2001, the Court of Criminal Appeals affirmed the applicant's conviction in an unpublished opinion. *Id.*

FIRST THROUGH SEVENTH GROUNDS: YOLANDA WILLIAMS AND PATRICIA GIBSON TESTIMONY

*-REPRESENTATION IN GENERAL*

5.     Wayne Hill was appointed lead counsel to represent the applicant at trial; Kurt Wentz was subsequently appointed as trial co-counsel; and, Floyd Freed represented the applicant on direct appeal.  *See attached affidavits of trial counsel Wayne Hill and appellate counsel Floyd Freed, cause no. 800112-A.*

6.      The Court finds, based on the record and personal knowledge, that the attorneys appointed to represent the applicant at trial have extensive experience in criminal trial and appellate matters, and both counsel have represented numerous criminal defendants at trial and on appeal for serious felony offenses, including death penalty cases. *See attached affidavit of trial counsel Wayne Hill, cause no. 800112-A.*

7.      The Court finds credible the affidavit of trial counsel Hill presented during the habeas proceedings in cause no. 800112-A. *See attached affidavit of trial counsel Wayne Hill, cause no. 800112-A.*

8.      The Court finds, based on Hill's habeas affidavit, that lead trial counsel Hill has been certified in Criminal Law by the Texas Board of Legal Specialization since 1985; that Hill was formerly a prosecutor with the Harris County District Attorney's Office; that Hill has been in private practice since 1982 with his practice devoted to criminal defense; that Hill served as a president of the Harris County Criminal Lawyers Association, as a director of the Texas Criminal Defense Lawyers Association, as a member of the National Association of Criminal Defense Lawyers, and, as a member of the Harris County District Court's Capital Murder Peer Review Committee; that Hill currently serves on the Second Judicial Region of Texas Capital Murder Certification Committee; that, for years, Hill was the Panel Chair of a Houston area State Bar Grievance Committee; and, that, in 2012, Hill completed six years of service as a member of the Texas Board of Legal Specialization Criminal Law Advisory Commission. *See attached affidavit of trial counsel Wayne Hill, cause no. 800112-A.*

9.      The Court finds, based on the record and Hill's habeas affidavit, that the defense team was assisted by an investigator and pre-trial preparation by defense counsel included, but was not limited to the following: visiting the scene of the primary offense and other locations; reviewing the entire police offense report and autopsy reports; obtaining discovery from the State; meeting with the defendant on several occasions to discuss the State's case, the defensive theories and strategies, the defendant's background, and potential witnesses; filing numerous pre-trial motions, including discovery and suppression motions; interviewing witnesses who were relevant to the defense case and willing to speak to trial counsel; and, traveling to Louisiana to interview potential witnesses, including the defendant's family members. *See attached affidavit of trial counsel Wayne Hill, cause no. 800112-A.*

10.     The Court finds, based on the record, that trial counsel conducted a thorough voir dire; that trial counsel vigorously cross-examined the State's witnesses at both phases of trial; that trial counsel presented nine witnesses for the applicant at punishment, including a clinical psychologist, a parole witness, the applicant's parents, his uncle, his cousin, his sister, his ex-girlfriend, and an alibi witness on an extraneous offenses; that trial counsel made strong arguments for acquittal at guilt/innocence and subsequently a life sentence based on the applicant's alleged lack of extraneous offenses, the alleged lack of bad conduct while the applicant was awaiting trial, and the level of security afforded criminal defendants sentenced to life imprisonment; and, that trial counsel filed a motion for new trial based on sufficiency of the evidence, jury charge error, and the admission of extraneous offenses (I C.R. at 66-70, 109-111; XVI R.R. at 77; XVII R.R. at 3, 55, 79, 100, 146; XVIII R.R. at 56, 131, 141, 164, 183; XIX R.R. at 3, 49, 129, 162,

: 00243

184; XX R.R. at 15, 36, 44, 65, 93, 113; XXI R.R. at 15-40; XXII R.R. at 24, 46, 57, 80, 121, 135, 154, 158; XXIII R.R. at 3, 21, 31, 36, 72, 79, 93, 115; XXIV R.R. at 9-29).

11.　　On direct appeal, appellate counsel Freed filed a forty-three page brief urging eight points of error, including challenges to the sufficiency of the evidence and alleged jury charge error. *Mamou*, No. 73,708. *See attached affidavit of appellate counsel Floyd Freed, cause no. 800112-A.*

　　　-GROUNDS FOR RELIEF

12.　　The applicant bases his first seven grounds for habeas relief on the admission of punishment phase victim-impact testimony and the State's argument concerning such testimony, contending that trial counsel was ineffective in preventing the admission of the testimony; that appellate counsel was ineffective for failing to urge error on appeal concerning the testimony; and, that the applicant was subjected to cruel and unusual punishment and due process as a result of trial and appellate counsels' alleged errors. *Applicant's writ at 7-31.*

13.　　On March 3, 1999, the applicant was indicted for the December 7, 1998 murder of Mary Carmouche, committed while in the course of or attempting to commit kidnapping. In a second paragraph of the indictment, the applicant was charged with murdering Mary Carmouche and Terrance Gibson during the same criminal transaction (I C.R. at 4); *Mamou*, No. 73,708, slip op. at 1-2, n. 2.

14.　　The Court finds, based on the record, that Terrance Gibson was named in the original indictment; however, prior to trial, the State abandoned the second paragraph of the indictment charging the applicant with murdering Mary Carmouche and Terrance Gibson during the same criminal transaction (I C.R. at 4; XVI R.R. at 3).

15.　　At the punishment phase of trial, the State presented evidence through Houston Police Department officers Steven Hooper and Christopher Duncan and then Joseph Melancon regarding the applicant's September 5, 1998 murder of Anthony Williams during a drug transaction (XXII R.R. at 40-108).

16.　　The Court finds, based on the record, that Anthony Williams was not named in the indictment of the primary case (I C.R. at 4).

17.　　Immediately after the State called HPD officer Hooper to the stand, trial counsel objected to the State's presentation of evidence concerning the applicant's extraneous murder of Anthony Williams, alleging violations of the applicant's constitutional rights, and the trial court overruled counsel's objection (XXII R.R. at 37-8).

18.　　Yolanda Williams, Anthony Williams' sister, testified for the State at punishment that she was the oldest of two brothers, James and then Anthony Williams, aka Bruiser, who was murdered by the applicant in 1998; that, on the morning of September 5, 1998, she took Anthony to lunch; that she saw Anthony in the hospital after his death that evening; that her brother James cried over Anthony's death and was not able to talk about Anthony; that Anthony's son imagined his father playing with him and asked to go to the cemetery; that Yolanda was devastated by her brother's death; that Anthony's father was angry and hurtful as a result of his son's murder; and, that Anthony's mother

3

talked about Anthony as if he was alive and her diabetes worsened after Anthony's death (XXII R.R. at 113-118).

19.     On cross-examination by trial counsel, Yolanda Williams admitted that Anthony Williams had been in trouble before and that her family wondered what Anthony was doing the night of his death to put him in a position to be murdered (XXII R.R. at 121-2).

20.     Additionally on cross-examination, trial counsel suggested to Yolanda Williams that her brother, Anthony, was involved in dealing drugs (XXII R.R. at 122).

21.     Patricia Gibson, Terrance Gibson's mother, testified for the State at punishment that she last saw her son alive on Sunday, December 6, 1998, when he came by her mother's house; that Terrance's pager went off and he told Patricia that he had to leave; that Patricia followed her son out the door and told him to be careful; that Patricia received a call at 1:15 a.m. on Monday, December 7, 1998, informing her that Terrance was in the hospital; that Patricia learned that Terrance had died when she arrived at the hospital, and she was devastated; that Terrance's younger brother had a difficult time dealing with Terrance's death and started drinking; that it was difficult for Terrance's older brother to see Terrance in the hospital morgue, and he often relived that experience; that it was difficult for Patricia to bury her son, and she wondered whether she could have said something else to Terrance; that she raised Terrance in the right way, but he made choices that cost him his life; and, that Patricia did not blame herself for Terrance's death (XXII R.R. at 127-134).

22.     On cross-examination, Patricia Gibson agreed with trial counsel's statement that she and her husband did everything possible to instill important values and morals in Terrance, but there were some things that Terrance chose to do that were not appropriate (XXII R.R. at 135).

23.     Additionally, on cross-examination by trial counsel, Patricia Gibson testified that, when Dion Holley, one of the individuals involved in the primary offense, came to offer his condolences to Patricia at the hospital, Patricia told Dion that he could learn from what happened to Terrance and Dion should change his life (XXII R.R. at 136).

24.     The Court finds, based on the record, that trial counsel did not object to the punishment testimony of Yolanda Williams or Patricia Gibson on the basis now advanced in the instant habeas petition.

25.     The Court finds, based on the record, that Yolanda Williams and Patricia Gibson were two of eighteen witnesses who testified at the punishment phase of the applicant's capital murder trial, and their complained-of testimony comprised approximately ten pages out of over 300 pages of punishment phase proceedings (XXII R.R. at 3, 18, 38, 52, 61, 105, 112, 119-121, 127-134, 138, 158; XXIII R.R. at 3, 21, 31, 36, 72, 79, 93, 115).

26.     The Court finds, based on the record, that the State did not specifically refer to or emphasize the complained-of testimony of Yolanda Williams and Patricia Gibson during punishment arguments. Rather, the State's sole mention of their testimony consisted of the following, unobjected-to statement: "And when he pulled the gun and he fired and killed Terrence and Anthony, he ripped those families apart. He devastated and

: 000245

destroyed. And that's all he's ever done, with his drugs, with his guns" (XXIV R.R. at 39).

27.    The Court finds, based on the record and the habeas affidavit of trial counsel Hill, that trial counsel's decisions regarding the manner in which to handle the punishment testimony of Yolanda Williams and Patricia Gibson were strategic. *See attached affidavit of trial counsel Wayne Hill, cause no. 800112-A.*

28.    The Court further finds, based on the record and the habeas affidavit of trial counsel Hill, that trial counsel's decision not to object to the complained-of testimony of Yolanda Williams and Patricia Gibson was a reasonable strategic decision based upon testimony elicited from the witnesses that portrayed Anthony Williams and Terrance Gibson in an unfavorable manner. *See Harrington v. Richter*, 131 S.Ct. 770, 787 (2011)(in reviewing counsel's representation, court affords counsel the "strong presumption" that counsel's representation fell within a "wide range" of "reasonable professional assistance"); *Robertson v. State*, 187 S.W.3d 475, 481 (Tex. Crim. App. 2006)(observing that there are countless ways to provide effective assistance in any given case, and even the best criminal defense attorneys would not defend a particular client in the same way).

29.    The Court finds, based on the record and the habeas affidavit of trial counsel Hill, that the applicant was not harmed by the complained-of punishment testimony of Yolanda Williams and Patricia Gibson in light of the brevity of their testimony, the defense's effective cross-examinations, and the prosecutor's lack of emphasis of their testimony during final argument at punishment. *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997)(holding that admission of punishment phase victim-impact evidence concerning a victim not named in the indictment was harmless beyond a reasonable doubt, based on the brevity of the testimony and the prosecutor's lack of emphasis of such testimony in closing argument); *see also Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000)(acknowledging that counsel's failure to object to extraneous victim impact evidence was not presumptively ineffective but could be part of counsel's strategic plan). *See attached affidavit of trial counsel Wayne Hill, cause no. 800112-A.*

30.    Additionally, based on the trial record and the habeas affidavit of trial counsel Hill, the Court finds that the applicant fails to demonstrate prejudice with respect to his ineffective claims in light of the State's evidence concerning the primary offense; the applicant's extraneous offenses, including an extraneous murder; the applicant's damaging cross-examination at guilt/innocence where the applicant admitted that he was a life-long drug dealer - with several employees, the applicant volunteered to demonstrate for the jury the manner in which the primary case shootings occurred, and the State questioned the applicant regarding statements that he made to police after his arrest as well as his admission to Terrance Dodson that he shot and killed Mary Carmouche after she performed oral sex on him; the applicant's demeanor and actions in the courtroom during the punishment phase of trial, including the applicant's refusal to dress in a suit and the continual need for trial counsel to remind the applicant that his comments and expressions at counsel table could prejudice him; and, the applicant's loud and angry outburst in the jury's presence at punishment where the applicant accused a witness of lying, criticized the jury's guilty verdict, asked the prosecutor if he thought that the applicant was Jeffrey Dahmer, and announced that he was "tired of this

5

: 00246

goddam shit" (XX R.R. at 160, 194, 215-221; XXII R.R. at 63); *see attached affidavit of trial counsel Wayne Hill, cause no. 800112-A.*

31.     The Court finds unpersuasive the 2001 habeas affidavits of Jim Leitner and Tom Moran setting forth their opinions regarding whether the applicant was denied the effective assistance of counsel at trial because claims challenging counsel's effectiveness are resolved by the courts pursuant to the standard outlined in *Strickland v. Washington*, 466 U.S. 668 (1984).

32.     Further, the applicant does not demonstrate that he was denied the effective representation of counsel on direct appeal. *See Ex parte Butler*, 884 S.W.2d 782, 783 (Tex. Crim. App. 1994)(holding *Strickland* standard applies to appellate counsel as well as trial counsel). According to the habeas affidavit of appellate counsel Freed, counsel did not raise any issues related to the complained-of testimony of Yolanda Williams and Patricia Gibson because error was not preserved at trial and the record was not developed to raise the issue pursuant to the guidelines set forth in the Court of Criminal Appeals' holding in *Tong v. State*, 25 S.W. 3rd 707, 712 (Tex. Crim. App. 2000)(holding that impact testimony from extraneous offense victim was arguably objectionable; however, the record was silent as to why counsel failed to object and was insufficient to overcome the presumption that counsel's actions were strategic). *See attached affidavit of appellate counsel Floyd Freed, cause no. 800112-A.*

33.     The Court finds, based on a review of the trial and habeas proceedings, that the totality of the representation afforded the applicant at trial was competent under prevailing professional norms; that the applicant fails to demonstrate that trial or appellate counsel were deficient in their representation of the applicant; and, that the applicant fails to establish harm based on any alleged deficiency in representation. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003)(for ineffective assistance of counsel claims, a defendant must meet the standard established in *Strickland* by showing that "counsel's performance was deficient and that the deficiency prejudiced the defense").

34.     Finally, the applicant fails to demonstrate a violation of his constitutional rights as the result of the admission of allegedly improper punishment phase testimony.

EIGHTH GROUND: PAROLE ELIGIBILITY

35.     In his eighth ground for relief, the applicant contends that the trial court erred in allowing a witness to be questioned concerning possible changes in the law concerning parole eligibility. *Applicant's writ at 31-5.*

36.     During the punishment phase of trial, the defense presented Dorothy Morgan, a parole supervisor for the Southern Region Institutional Parole Office with approximately eighteen years of experience, who testified regarding parole eligibility and that an inmate sentenced to life imprisonment for capital murder "would not be eligible for parole consideration for forty flat years" (XXIII R.R. at 5-13).

37.     Following trial counsel's direct examination of Morgan, the defense orally requested a motion in limine prohibiting the State from cross-examining Morgan regarding changes in parole law, stating that such questioning involved speculation by Morgan as to what the Legislature might do, and the trial court denied the motion (XXIII R.R. at 15).

6

: 000247

38.     On the State's cross-examination of Morgan, trial counsel objected to the State's questions regarding changes in parole eligibility on the basis of speculation, relevance, and materiality, and the trial court overruled the defense's objections (XXIII R.R. at 15-19).

39.     The Court finds, based on the record, that the applicant fails to establish that the trial court abused its discretion in allowing the State to follow-up trial counsel's direct examination of Morgan concerning parole eligibility, much less that the applicant was harmed, in light of the evidence presented at both phases of the applicant's capital murder trial. TEX. R. EVID. 107; *see also Carter v. State*, 480 S.W.2d 735, 738 (Tex. Crim. App. 1972) (holding where subject matter is inquired into first by defense, same subject matter may be further explored on cross-examination by State).

40.     On direct appeal, the applicant urged a point of error contending that the trial court erred in overruling his objections to the State's cross-examination of Morgan regarding parole eligibility, arguing that the State's questioning was contrary to law and constituted "a blatant effort for the jurors to disregard their instructions and violate their oaths in answering the continuing threat special issue and the mitigation special issue"; however, the Court of Criminal Appeals overruled the applicant's point of error, finding that the applicant failed to preserve error because his trial-level objections did not comport with the issue urged on direct appeal. *Mamou*, No. 73,708, slip op. at 18-19.

41.     The Court finds that the hearsay habeas affidavit of Cynthia Patterson, summarizing her purported interview with juror Tracy Karam regarding the punishment testimony of Dorothy Morgan, is neither persuasive nor dispositive as to the merits of the instant habeas claim. *Dowthitt v. Johnson*, 230 F.3d 733, 742 (5th Cir. 2000)(holding that hearsay affidavits supporting defendant's actual innocence claim were suspect and did not raise substantial doubt as to defendant's guilt); *Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997)(habeas petitioner's hearsay affidavits failed to provide factual basis warranting evidentiary hearing).

42.     Additionally, the Court need not consider Cynthia Patterson's hearsay habeas in resolving factual issues or making a recommendation as to the merits of the instant habeas claim based on TEX. R. EVID. 606(b).

NINTH GROUND:  BURDEN OF PROOF ON MITIGATION

43.     In his ninth ground for relief, the applicant alleges that the trial court erred in failing to instruct the jury that the State had the burden of proof beyond a reasonable doubt on the mitigation special issue. *Applicant's writ at 35-45.*

44.     The Court finds, based on the record, that the trial court submitted a punishment charge which was consistent with applicable state statutes that have withstood numerous constitutional challenges; that the state statutory provisions meet the federal constitutional requirements by narrowing the class of defendants eligible for the death penalty and providing a jury a vehicle to full consider mitigating evidence. *See Smith v. State*, 297 S.W.3d 260, 277-8 (Tex. Crim. App. 2009)(mitigation special issue is a defensive issue for which the State has no burden of proof); *Luna v. State*, 268 S.W.3d 594, 609 (Tex. Crim. App. 2008)(rejecting defendant's claim that Article 37.071 impermissibly shifts burden to defendant); *Busby v. State*, 253 S.W.3d 661, 667 (Tex.

: 000248

Crim. App. 2008)(rejecting defendant's complaint concerning mitigation special issue's failure to place burden on State).

45.     The Court finds that the Court of Criminal Appeals has repeatedly refused to assign a burden of proof on the issue of mitigating evidence and has rejected capital defendants' challenges to the constitutionality of the Texas death penalty scheme based on the lack of burden of proof on the mitigation special issue. *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Resendiz v. State*, 112 S.W.3d 541, 550 (Tex. Crim. App. 2003); *Jackson v. State*, 33 S.W.3d 828, 840-1 (Tex. Crim. App. 2000); *Matchett v. State*, 941 S.W.2d 922, 935 (Tex. Crim. App. 1996).

46.     The Court finds, based on the Court of Criminal Appeals' decision in *Resendiz v. State*, 112 S.W.3d 541, 548-9 (Tex. Crim. App. 2003), that the Texas death penalty scheme does not violate *Apprendi v. New Jersey*, 530 U.S. 466 (2000), or *Ring v. Arizona*, 536 U.S. 584 (2002), for its failure to place the burden on the State to disprove the mitigation special issue. Additionally, the Court finds that the holdings in *Apprendi* and *Ring* are inapplicable to the applicant's case and to the mitigation issue of the Texas death penalty scheme.

## CONCLUSIONS OF LAW

FIRST THROUGH SEVENTH GROUNDS:  YOLANDA WILLIAMS AND PATRICIA GIBSON TESTIMONY

1.     The applicant fails to demonstrate deficient performance, much less harm, based on alleged deficiencies in trial counsel's representation. *Strickland v. Washington*, 466 U.S. 668 (1984). Additionally, the applicant does not overcome the strong presumption that trial counsel's actions fell within the wide range of reasonable professional behavior and were motivated by sound trial strategy. *Id.* at 689; *Thompson v. State*, 9 S.W.3d 808, 813-4 (Tex. Crim. App. 1999); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

2.     Any alleged error on the part of trial counsel with respect to the punishment phase testimony of Yolanda Williams and Patricia Gibson was harmless to the applicant, based on the following factors: (1) Yolanda Williams and Patricia Gibson were two of eighteen witnesses who testified at the punishment phase of the applicant's capital murder trial; (2) their complained-of testimony was brief, comprising less than ten pages out of over 300 pages of punishment phase proceedings; (3) the State did not emphasize the testimony of Yolanda Williams and Patricia Gibson during punishment argument; (4) the egregious nature of the primary offense; (5) the applicant's extraneous murder offense; and (6) the applicant's damaging testimony and behavior during the trial proceedings.

3.     Based on the totality of the representation afforded the applicant at trial, as demonstrated by counsel's vigorous defense of the applicant, the applicant's claim that he was denied effective representation at trial is without merit. *See Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986)(analysis for ineffective assistance of counsel claim is undertaken in light of the "totality of the representation" rather than by examining isolated acts or omissions of trial counsel).

8

: 000249

4. Additionally, the applicant fails to show ineffective assistance of appellate counsel. *See Ex parte Butler*, 884 S.W.2d 782, 783 (Tex. Crim. App. 1994)(holding *Strickland* standard applies to appellate counsel as well as trial counsel). Appellate counsel is not obligated to raise every possible claim on direct appeal; rather, appellate counsel need only raise the claims that he believes have the best chance of success.

<u>EIGHTH GROUND: PAROLE ELIGIBILITY</u>

5. The applicant fails to demonstrate that the trial court erred in allowing a witness to be questioned concerning possible changes in the law regarding parole eligibility or that the applicant was harmed by the admission of such evidence; accordingly, the applicant's eighth ground for relief is without merit.

<u>NINTH GROUND: BURDEN OF PROOF ON MITIGATION</u>

6. The trial court's punishment charge accorded with applicable state statutes that have withstood numerous constitutional challenges; accordingly, the applicant's ninth ground for relief alleging error on the basis of an erroneous punishment charge is meritless. *See Smith v. State*, 297 S.W.3d 260, 277-8 (Tex. Crim. App. 2009)(mitigation special issue is a defensive issue for which the State has no burden of proof); *Luna v. State*, 268 S.W.3d 594, 609 (Tex. Crim. App. 2008)(rejecting defendant's claim that Article 37.071 impermissibly shifts burden to defendant); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008)(rejecting defendant's complaint concerning mitigation special issue's failure to place burden on State).

7. The Texas death penalty scheme does not violate the precepts of either *Apprendi v. New Jersey*, 530 U.S. 466 (2000), or *Ring v. Arizona*, 536 U.S. 584 (2002), for its lack of burden on the State to disprove the mitigation special issue. *See Resendiz v. State*, 112 S.W.3d 541, 548-50 (Tex. Crim. App. 2003)(rejecting argument that *Apprendi* required State to bear burden to prove beyond reasonable doubt that mitigation issue should be negatively answered; noting that decisions in *Apprendi* and *Ring* involve issues increasing statutory maximum punishment and Texas mitigation issue potentially decreases maximum statutory punishment).

8. The applicant fails to show that *Apprendi* or *Ring* are applicable to the mitigation issue of the Texas death penalty scheme; the mitigation special issue does not increase the statutory maximum punishment; instead, the mitigation issue is designed to allow for imposition of less than the statutory maximum. *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003)(holding that Texas death penalty scheme does not violate *Apprendi* or *Ring* for its failure to place burden on State to disprove mitigation issue); *Paredes v. State*, 129 S.W.3d 530, 541 (Tex. Crim. App. 2004)(holding that mitigation issue does not increase statutory maximum because statutory maximum for capital offense is death; dismissing applicability of *Ring* to Texas death penalty scheme).

9. The applicant fails to demonstrate that his conviction was unlawfully obtained. Accordingly, it is recommended to the Texas Court of Criminal Appeals that relief be denied.

00250

Cause No. 800112-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179TH DISTRICT COURT |
| | § | OF |
| CHARLES MAMOU, JR.,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## ORDER

THE CLERK IS HEREBY **ORDERED** to prepare a transcript of all papers in cause numbers 800112-A and transmit same to the Court of Criminal Appeals, as provided by Article 11.071 of the Texas Code of Criminal Procedure. The transcript shall include certified copies of the following documents:

1. all of the applicant's pleadings filed in cause number 800112-A, including any exhibits and affidavits;
2. all of the Respondent's pleadings filed in cause number 800112-A, including exhibits and affidavits;
3. this court's findings of fact, conclusions of law and order denying relief in cause number 800112-A;
4. the Proposed Findings of Fact and Conclusions of Law submitted by Respondent in cause number 800112-A;
5. any Proposed Findings of Fact and Conclusions of Law submitted by the applicant in cause number 800112-A;
6. the affidavits of Wayne Hill and Floyd Freed; and,
7. the indictment, judgment, sentence, docket sheet, and appellate record in cause number 800112, unless they have been previously forwarded to the Court of Criminal Appeals.

THE CLERK IS FURTHER **ORDERED** to send a copy of the court's findings of fact and conclusions of law, including its order, to applicant's counsel: David Sergi; 329 S. Guadalupe; San Marcos, Texas 78666 and to Respondent: Lynn Hardaway; Harris County District Attorney's Office; 1201 Franklin; Suite 600; Houston, Texas 77002-1901.

BY THE FOLLOWING SIGNATURE, THE COURT ADOPTS THE STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CAUSE NO. 800112-A.

SIGNED this 13 day of ___NOV.___, 2013.

KRISTIN M. GUINEY
Presiding Judge
179th District Court

10

: 00251

Cause No. 800112-A

| EX PARTE | § | IN THE 179TH DISTRICT COURT |
|---|---|---|
| | § | OF |
| CHARLES MAMOU, JR.,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF WAYNE T. HILL

| STATE OF TEXAS | § | DATE: November 4, 2013 |
|---|---|---|
| HARRIS COUNTY | § | |

Before me, the undersigned authority, a Notary Public in and for Harris County, Texas, on this day personally appeared Wayne T. Hill, who being by me duly sworn, upon his oath deposes and says:

"My name is Wayne T. Hill. I am presently licensed to practice law in the State of Texas and have been licensed since May 15, 1978. My Texas bar number is 09656300. Also, I am licensed in New York and admitted to practice before the United States Supreme Court, the Fifth Circuit Court of Appeals, and the United States District Court for the Southern District of Texas.

I was employed as an Assistant District Attorney with the Harris County District Attorney's Office from 1978 to 1982. In 1982, I entered private practice and, since that time, my practice has been devoted to criminal defense. I have been appointed on numerous capital cases that were either dismissed, reduced or tried as non-death cases. Also, I have tried numerous felony cases, both as a prosecutor and defense attorney, including death capital cases.

I have been certified in Criminal Law by the Texas Board of Legal Specialization since 1985. Additionally, I served as a president of the Harris County Criminal Lawyers Association, as a director of the Texas Criminal Defense Lawyers Association, and as a member of the National Association of Criminal Defense Lawyers. I served as a member of the Harris County District Court's Capital Murder Peer Review Committee. I currently serve on the Second Judicial Region of Texas Capital Murder Certification Committee. For years, I was the Panel Chair of a Houston area State Bar Grievance Committee. In 2012, I completed six years of service as a member of the Texas Board of Legal Specialization Criminal Law Advisory Commission.

The defendant, Charles Mamou, Jr., was charged with capital murder in cause number 800112, and I was appointed as lead counsel to represent the defendant. My co-counsel, Kurt Wentz, was subsequently appointed, and he also has extensive experience in criminal trial and appellate matters.

Co-counsel and I retained an investigator to assist with trial preparation which included going to the scene of the primary offense and other locations; reviewing the entire police offense report and autopsy reports; obtaining discovery from the State; meeting with the defendant on several occasions to discuss the State's case, the defensive theories and strategies, the defendant's background, and potential witnesses; filing numerous pre-trial motions, including discovery and suppression motions; and, interviewing witnesses who were relevant to the defense case and willing to speak with us. Also, co-counsel and I traveled to Sunset, Louisiana where we interviewed potential witnesses, including several members of the defendant's family.

The State presented guilt/innocence evidence to establish a drug transaction referred to as a "rip on a rip" during which the defendant shot and killed Terrance Gibson, shot and injured Kevin Walter and Dion Holley, and subsequently kidnapped and murdered a young female, Mary Carmouche. The crime scene included cut up newspaper the size of dollar bills. The State's pretrial notice of the defendant's prior arrests/convictions and extraneous offenses included two additional murders, drug-related offenses, and aggravated arson. The State presented one of the extraneous murders at punishment which involved the killing of a man in Southwest Houston. This crime scene also included cut up newspaper the size of dollar bills. The State also presented evidence of a 1996 incident where a Louisiana police officer stopped the defendant for driving 100 mph in a 55 mph zone and discovered a 9 millimeter pistol in the defendant's waistband.

At the conclusion of the State's presentation at guilt/innocence, co-counsel and I believed that the state of the evidence gave the defense some issues to argue before the jury. The defense presented two witnesses at guilt/innocence, including the defendant who testified against the advice of counsel. The defense presented nine witnesses at punishment. The defense punishment witnesses included a mental health expert, a parole supervisor, an ex-girlfriend, and several of the defendant's relatives.

I previously reviewed the defendant's initial post-conviction habeas application and am familiar with some of the defendant's allegations challenging his conviction and sentence, particularly the claim that co-counsel and I were ineffective for failing to object to the victim-impact testimony of Yolanda Williams and Patricia Gibson. The record will reflect that the defense filed a motion for discovery of victim impact testimony prior to trial. Upon the commencement of the State's presentation of punishment testimony regarding the defendant's shooting of Anthony Williams, I objected to the admission of the extraneous murder, and the judge overruled the objection.

Before Yolanda Williams and Patricia Gibson testified, several noteworthy events occurred. First, the defendant insisted on testifying at guilt/innocence. He testified against our advice, and his cross-examination testimony was damaging to the defense's case. On cross-examination, the defendant admitted that he was a life-long drug dealer with several people working for him, and he volunteered to demonstrate for the jury the manner in which the shootings occurred. Further, the prosecutor was able to cross-examine the defendant regarding previous statements

that he made after his arrest as well as his alleged admission to Terrance Dodson that he shot and killed Mary Carmouche after she gave the defendant oral sex.

Additionally, the defendant was upset and mad about the jury's guilty verdict. The defendant's demeanor changed drastically between the guilt/innocence and punishment phases of the trial. The defendant refused to talk about witnesses – only shrugging his shoulders when we attempted to discuss upcoming State's witnesses with him. The defendant refused to dress in a suit like on previous court days. Further damaging to the defense's case was the defendant's loud and angry outburst in front of the jury early in the State's punishment case. The defendant sprung up from his seat at counsel table and began making loud comments directed to the jury and the prosecutor. The defendant was critical of the jury's guilty verdict and sarcastically asked the prosecutor if he thought the defendant was Jeffrey Dahmer. The courtroom bailiffs immediately escorted the defendant from the courtroom. After that incident, the defendant elected not to be in the courtroom for a period of time. During defendant's absence from the courtroom, co-counsel, Kurt Wentz, went back to the courtroom holdover cell to ask defendant if there were any questions he wanted asked of the witness. Mr. Wentz found the defendant asleep. When the defendant eventually reentered the courtroom, there was a continuing need to remind him that his continuing comments and expressions at counsel table could prejudice him in the eyes of the jury. The defendant's actions throughout the remainder of the State's punishment evidence created continuing distractions.

My decisions regarding the manner in which to handle the punishment testimony of Yolanda Williams and Patricia Gibson were strategic. Their testimony was brief in comparison to the entirety of the evidence at trial, not particularly compelling, and I believe effectively countered on cross-examination. Yolanda Williams' brother, Anthony Williams aka "Bruiser", was killed by the defendant during a drug sale. On Yolanda Williams' cross-examination, I pointed out to the jury that the victim was a drug dealer and had voluntarily put himself into a dangerous situation. When Patricia Gibson testified on direct, she stated that she last saw Terrance at a family gathering. Terrance's pager went off, and Patricia told him to be careful as he left. On cross-examination, Gibson admitted that her son had elected to do inappropriate things, and she counseled one of his friends to change his life and learn a lesson from what happened to her son. While I could have objected to the line of questioning offered by the State, I did not do so. I do not believe that the introduction of this evidence was a critical or overriding factor in the jury's decision to return the death penalty in this case.

In light of the State's guilt/innocence and punishment evidence as well as the events set forth above, I do not believe the defendant was prejudiced by my strategic decisions or the punishment testimony of Yolanda Williams and Patricia Gibson.

I have read the above statement and find it to be true and correct to the best of my knowledge."

WAYNE T. HILL
Affiant

SWORN AND SUBSCRIBED before me, under oath, on this the 4th day of November, 2013.

*Adriane Headley*

NOTARY PUBLIC in and for the
State of Texas

My commission expires: 6/29/16

ADRIANE HEADLEY
MY COMMISSION EXPIRES
June 29, 2016

NO. 800,112-A

| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| vs. | § | 179TH JUDICIAL DISTRICT |
| CHARLES MAMOU, JR. | § | HARRIS COUNTY, TEXAS |

AFFIDAVIT

THE STATE OF TEXAS   §
                           §
COUNTY OF HARRIS   §

BEFORE ME, the undersigned authority, on this day, personally appeared, FLOYD W. FREED, III, who after being by me duly sworn, deposed and stated as follows:

"My name is Floyd W. Freed, III. I am an attorney duly licensed to practice law in the State of Texas and I was the attorney of record for the Defendant, Charles Mamou, Jr., on appeal.

Appellate counsel did not raise on direct appeal any issues related to victim impact evidence of Yolanda Williams and Patricia Dodson due to the fact that trial counsel did not preserve error, if any, pursuant to Rule 33 of the Texas Rules of Appellate Procedure. Adverse rulings were not obtained on the Defendant's Motion for Victim Impact Testimony (C.R. 20) Further, trial counsel's objection at trial was not sufficient to preserve error related to victim impact testimony in that it did not relate to any specific testimony of Yolanda Williams and/or Patricia Dodson. Nor was a "running objection" sought to such testimony.

Appellate counsel did not raise ineffective assistance of counsel because the record was not developed for appellate purposes to raise the issue pursuant to the guidelines as set forward in Tong v. State, 25 S.W. 3rd 707, 712 (Tex. Crim. App. 2000).

Appellate counsel did raise speculation in his Point of Error One. The trial objection was set forth in an oral Motion in Limine which in part asked that cross examination by the State of Texas to be precluded as to examining the defense witness, Dorothy Morgan, as to future changes in the parole law. Appellate counsel avers that the issue raised on appeal does comport to the trial objection and adverse ruling thereon in whole or in part.

I have read the foregoing Affidavit and it is true and correct to the best of my knowledge and belief.

Further Affiant saith not. 

_____
FLOYD W. FREED, III

SUBSCRIBED AND SWORN TO BEFORE ME by FLOYD W. FREED, III, on the 8th day of January, 2002, to certify which witness my hand and seal of office.



BERNARD L. MATHEWS
Notary Public, State of Texas
My Commission Expires
3-6-2004

_____
Notary Public in and for the State of Texas

# Exhibit 15



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NOS. WR-78,122-01, WR-78,122-02, and WR-78,122-03

## EX PARTE CHARLES MAMOU, JR.

### ON APPLICATIONS FOR WRITS OF HABEAS CORPUS IN CAUSE NO. 800112 IN THE 179ᵀᴴ DISTRICT COURT HARRIS COUNTY

*Per Curiam.*

### O R D E R

This is a post-conviction application for writ of habeas corpus filed pursuant to the

provisions of Texas Code of Criminal Procedure Article 11.071.

In 1999, a jury convicted applicant of the offense of capital murder and returned

affirmative answers to the punishment issues submitted under Article 37.071.[1] The trial

court, accordingly, set punishment at death. This Court affirmed applicant's conviction and

---

[1] Unless otherwise specified, all references to Articles refer to the Texas Code of Criminal Procedure.

sentence on direct appeal. *Mamou v. State,* No. 73,708 (Tex. Crim. App. November 7, 2001) (not designated for publication).

Applicant presents nine allegations in his initial application in which he challenges the validity of his conviction and sentence. The trial court did not hold a live evidentiary hearing. As to all of these allegations, the trial court entered findings of fact and conclusions of law and recommended that relief be denied.

This Court has reviewed the record with respect to the allegations made by applicant. We agree with the trial judge's recommendation and adopt the trial judge's findings and conclusions. We also note that Allegations Five, Six, Eight, and Nine are procedurally barred. *See Ex parte Jimenez,* 364 S.W.3d 866, 880-81 (Tex. Crim. App. 2012). Based upon the trial court's findings and conclusions and our own review, we deny relief.

Additionally, applicant filed a Supplemental Application for Post-Conviction Writ of Habeas Corpus and a Subsequent *Pro Se* Application for Art. 11.071 Writ of Habeas Corpus after the deadline provided for filing an initial application for habeas corpus. We find that the Supplemental and Subsequent *Pro Se* applications are subsequent applications. *See* Art. 11.071. We further find that they fail to meet any of the exceptions provided for in Article 11.071, § 5. Therefore, we dismiss the Supplemental and Subsequent *Pro Se* applications as an abuse of the writ without considering the merits of the claims.

IT IS SO ORDERED THIS THE 5TH DAY OF FEBRUARY, 2014.

Do Not Publish

# Exhibit 16

# AFFIDAVIT

STATE OF TEXAS

COUNTY OF TARRANT

Before me, the undersigned authority, came and appeared RONALD L. SINGER, who, after being sworn, deposed and said:

1. My name is Ronald L. Singer, I am over 18 years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated. I am Chief Criminalist of the Tarrant County Medical Examiner's Office in Fort Worth, Texas. From 1972 until 1988 I was employed by the Jefferson Parish Sheriff's Office Crime Laboratory in Metairie, Louisiana, as a Criminalist and as the Laboratory Director. I am experienced in the scientific testing, evaluation, and proper handling of physical evidence. By way of Background, I am a Fellow of the Criminalistics Section of the American Academy of Forensic Sciences and a past member of that organization's Board of Directors; and am a Distinguished Member of the Association of Firearm and Toolmark Examiners, and am Past President of that organization. A copy of my complete resume is available. I have been qualified as a forensic science expert in numerous courts in Texas, Louisiana, Kansas, Colorado and Oklahoma, at the local, State and Federal level.

2. Defense counsel in the case of Nanon McKewn Williams, Harris County district court cause number 634442, has retained me to examine and evaluate numerous photographs, reports, a video tape, and certain items of physical evidence, including the following:

a. One sealed clear plastic bag containing one Davis Industries model DM-22 .22 Magnum caliber double barrel derringer, serial number 354714,

b. one sealed coin envelope containing two .25 auto caliber cartridges and three .22 Magnum caliber cartridges,

c. one Federal brand 12 gauge shotgun shell, fired,

d. one sealed clear plastic bag containing one "zip-loc" plastic bag containing one 12 gauge plastic wad, one plastic bag containing shotgun pellets, one fired projectile, and one lastic screw top, (State's Exhibit # 21 at trial, containing the EB-1 projectile) and

e. one sealed coin envelope containing one fired projectile (State's exhibit 22 at trial, also referred to as EB-2).

3. My review of these items has led to the following conclusions and opinions:

a. The victim Adonius Collier suffered two wounds to the head; one from a 12 gauge shotgun firing number 6 shot, the other from a firearm firing .22 Magnum ammunition. The defect left by the shotgun blast would be considerably larger than that left by the entering .22 caliber bullet, and therefore could have easily obliterated the smaller wound if the smaller wound had been inflicted first.

b. A second bullet submitted with the case, identified as EB-2, State's Exhibit 22, was determined to be a .25 auto caliber fired bullet. One side is flattened, and bears markings which appear to be due to the bullet coming into contact with a hard, rough surface. This bullet could not have been fired from the Davis Industries Model DM-22 pistol that was also submitted.

c. I have no reason to disagree with the conclusion of Robert D. Baldwin, firearms examiner with the Houston Police Department, that the .22 Magnum caliber bullet recovered from the head of of Adonius Collier was fired in the bottom barrel of the Davis Industries model DM-22 .22 Magnum caliber derringer, serial number 354714 (letter dated January 15, 1998). The derringer was found to operate normally and to be free from mechanical defects. This conclusion is based on independent testing that I performed, including the test firing of the Davis derringer and comparison of the reference material obtained to the bullet, EB-1.

d. There is no indication from any of the documents that I received that any of the individuals involved in this shooting were tested for the presence of gunshot residue. As there is potentially a difference between the compositions of the priming mixtures contained in the various types of ammunition used in this incident, these tests should have been conducted, as they might have provided information regarding which firearms were discharged by whom.

e. Even in their "damaged" state, the .22 Magnum caliber bullet, State's Exhibit EB-1 and the .25 Auto caliber bullet, State's Exhibit EB-2 are easily distinguishable from one another, particularly if examined with the aid of a comparison microscope, and should have presented no problem to a competent firearms examiner. Mr. Baldwin's testimony at trial that EB-1 was a .25 caliber projectile that could have been fired from the same gun as the bullet EB-2, recovered from another victim's foot, at best demonstrates extreme carelessness on his part, and at worst calls into question his expertise. If the bullet had been correctly identified during one of the at least three times it was examined by the Houston Police Department, the bullet ould have been compared to the Davis derringer prior to trial; this might have materially affected the outcome of the trial.

f. Given the scientific issues in this case, particularly those regarding the firearms matters and the ultimate cause of death of Adonius Collier, original counsel should have

Affidavit of Ronald L. Singer
Re: Nanon McKewn Williams
Page 3

consulted with an expert before the trial, and was remiss in not doing so.

g. The opinions listed above are based on the information and evidence available to me at the time of preparation of this affidavit and are subject to change or modification should new or additional evidence become available.



Signature: Ronald L. Singer

SWORN AND SUBSCRIBED before me on this _15th_ day of April, 1998.

My commission expires: _9-14-1998_

Carolyn Faye Gilbreath

Notary Public's Signature, State of Texas

Notary Public's printed name:

CAROLYN FAYE GILBREATH
Notary Public
STATE OF TEXAS
My Comm. Exp. 09/14/98

# Exhibit 17

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
**FILED**

MAR 2 5 2004

Michael N. Milby, Clerk.

| | | |
|---|---|---|
| JOHNNIE BERNAL, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | CIVIL ACTION NO. ▬▬▬ |
| | § | |
| | § | |
| | § | **H-04 -1163** |
| DOUGLAS DRETKE, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

FILED
2004 MAR 25 PM 5: 34
U.S. COURTS
SOUTHERN DISTRICT
OF TEXAS

PETITION FOR A WRIT OF HABEAS CORPUS

THIS IS A CAPITAL CASE

David Dow
Attorney-in-Charge
Texas Bar No. 06064900
TEXAS INNOCENCE NETWORK
University of Houston Law Center
100 Law Center
Houston TX 77204
TEL: (713) 743-2171
FAX: (713) 743-2131

Morris Moon
Texas Bar No 24032750
TEXAS DEFENDER SERVICE
412 Main, Ste 1150
Houston TX 77002
TEL: (713) 222-7788
FAX: (713) 222-0260

even when prosecuting attorney is unaware of the perjury).

## B.   Robert Baldwin knowingly testified falsely.

Robert Baldwin's testimony that as a result of his ballistics examination he could say "with certainty" that State's Exhibit 74, the bullet recovered from the victim's body, was fired from State's Exhibit 1, the firearm found in Mr. Bernal's bedroom, was false. Additionally, Baldwin left the jury with the false impression that his ballistics examination was conducted according to standard and routine procedure when in fact it significantly deviated from customary practice. Baldwin's testimony that he did not attempt a comparison between any test-bullets and the comparison bullet until all test-fires had been made was likewise false.

As described above in Part VI, Robert Baldwin's alteration of the firearm from the condition it was in when received into evidence and his uncustomary ballistics examination prevented any match from being made in this case. Standard ballistics practice calls for the examiner to fire only two or three test fires. Following this protocol is of the utmost importance when handling a weapon where the firing of lead bullets results in the deposit of lead in the barrel. This is because as each new bullet is fired, it leaves behind lead deposits in the barrel, forming a new set of microscopic striae and ultimately changing the gun's signature. Exhibit 1 at ¶ 7. Because the generation of new striae is a totally random event, it is not possible to replicate the condition a firearm was in when it was received and before any test fires have been made. *Id.* Even more obviously, it is impossible to replicate the condition a firearm was previously in by applying a solvent to clear out lead deposits existing in the barrel of the firearm at the time it was received into evidence. As a result, any match can only be detected within the first few test fired bullets. Nonetheless, Robert Baldwin and Prosecutor Wisner left the jury with the false

34

impression that such a feat could be accomplished:

> Q:   Sir, at first were you able to obtain sufficient characteristics or markings
> on the bullets submitted to you to compare to State's Exhibit No. 74?
>
> A:   Not initially.  The condition of the bore of the firearm was such that it was
> lead fouled.  And we made some initial testings, test firings, but the lead
> fouling was interfering with the marking that would be normally produced
> by the lands and grooves.  This necessitated a removal of that lead using a
> solvent material and then retest firing.
>
> Q:   What is lead fouling?
>
> A:   Whenever a firearm such as this is fired using lead projectiles, some of
> that lead will be deposited on the interior surface because of the softness
> of the material.  Repeated firings of lead projectiles can lead to buildup of
> lead on the interior surface of the barrel.
>
> Q:   Sir, obviously you wouldn't have any way to determine how many times
> State's Exhibit No. 1 was fired between the time it fired State's Exhibit
> No. 74 until Sergeant Elliott recovered that weapon?
>
> A:   No, sir, I would not.

S.F. Vol. 32: 104-05.

The above exchange led the jury to believe that the weapon discovered in Bernal's room

was not lead fouled at the time of the shooting, and that it had been fired many times since,

causing lead to build in the barrel.  Mr. Baldwin's application of solvent and removal of lead

from the weapon is thus presented to the jury as a means of restoring the weapon to the condition

it was in when the murder occurred, rather than the alteration of the condition the weapon was in

when found and a significant deviation from customary ballistics protocol.  Robert Baldwin

never informed the jury that this step, by fundamentally altering the firearm's signature, actually

precluded him from making any match in this case.  Rather, Baldwin falsely testified that he was

able to conclude, based on his examination, that the evidence bullet was fired from the weapon.

35

S.F. Vol. 32: 107. Moreover, he testified that he could say so with certainty. *Id.* Through discovery and an independent comparison of the test-fired bullets in this case with the evidence bullet, Mr. Bernal will prove that Mr. Baldwin did not in fact make any match between the firearm and State's Exhibit 74 and that his testimony to the contrary was false.

Mr. Bernal will also prove that Mr. Baldwin's testimony left the jury with the uncorrected false impression that his examination followed accepted and customary ballistics standards when in fact his examination entailed extreme deviations even from HPD's own standards. The specific deviations from customary practice are described in Part VI, above, and include: (1) firing more than two or three test firings to effect a match; (2) the application of solvent to the barrel of the firearm after firing thirteen test fires, four of which are unaccounted for even by Mr. Baldwin's explanation of his methodology; and (3) firing more than two or three test fires after the application of the solvent; and (4) firing an additional twelve test fires in all after the application of the solvent to the firearm. The State's failure to correct the false impression that Mr. Baldwin left with the jury regarding his ballistics methodology allowed the jury to give his purported results more credence than they deserved.

Mr. Baldwin also testified falsely when he represented that he did not make individual examinations until all test fires had been made. In fact, standard ballistics protocol calls for the examiner to compare the test-fired bullets to the evidence bullet after two or three test fires. Exhibit 1 at ¶ 5; Exhibit 2 at ¶ 3. Mr. Baldwin testified that, after making thirteen initial test fires, applying a solvent to clean the lead build-up from the barrel, and making twelve additional test fires, only then did he "select one" for comparison with the evidence bullet and detect a match. S.F. Vol. 32: 106. Based on his knowledge of standard ballistics protocol, Mr. Ernest

suspects that Mr. Baldwin in fact fired two or three test fires, made a comparison, but was unable to obtain a positive match.[8]  Exhibit 1 at ¶ 5.  In pursuit of this match, Baldwin deviated from protocol by making additional test fires and by applying a solvent to the barrel of the firearm, ultimately firing twenty five bullets in all.  Mr. Bernal therefore intends to prove that Mr. Baldwin did indeed make unsuccessful comparisons after making three test fires, and that he continued to make unsuccessful comparisons as he fired more and more bullets, finally giving up after twenty-five test-fires and testifying falsely instead that he was able to effect a match.

The circumstantial evidence of misconduct in Bernal's case, described above, is reinforced by a currently emerging pattern and practice of suppression and dubious presentation of HPD ballistics identification evidence by the Harris County District Attorney's office. As interest has stirred in the press recently over the HPD crime lab's DNA section, the press has also exposed problems associated with the ballistics section and ballistics testimony. Two additional death penalty cases with similarly very troubling ballistics elements have come to light: Nanon Williams and Anibal Rousseau.

### 1.  Nanon Williams

In the same year as Bernal's trial, Mr. Wisner and Mr. Baldwin teamed up again to produce similarly dubious testimony in Nanon Williams' capital murder case.  *See* Roma Khanna, *Cases Cast Doubt On Ballistics Work at HPD Lab*, Houston Chronicle, March 23, 2003

---

[8] In his affidavit, Mr. Baldwin in fact confirms that he did indeed make three initial test firings.  He states that sometimes additional test fires are required depending on certain variables such as the condition of the firearm, but he does not explain on what basis he actually made the decision to continue firing bullets in this case.  Baldwin's admission that he did initially fire three test fires lends support to Mr. Ernest's suspicions that Baldwin made an unsuccessful attempt to compare the three initial test firings to the evidence bullet, causing him to fire more bullets in pursuit of a match.

# Exhibit 18



Previous | Next | Return to Hitlist | Return to Search Screen

## HOUSTON CHRONICLE ARCHIVES

**Paper:** Houston Chronicle
**Date:** SAT 08/02/03
**Section:** A
**Page:** 29 Metfront
**Edition:** 2 STAR

# Panel ends crime *lab* review with criticism / Finds`no criminal wrongdoing,' but `moral violations'

By STEVE McVICKER, ROMA KHANNA
Staff

**Correct:** CLARIFICATION: This article incorrectly stated that all 22 criminal district judges in Harris County had signed a letter calling on District Attorney Chuck Rosenthal to step aside from the investigation into the Houston Police Department crime *lab* . The April 11 letter carried the typed signature of Debbie Mantooth Stricklin, administrative judge of the criminal division courts here, on behalf of the 22 judges, who had voted unanimously that day to ask Rosenthal to step aside. Clarification published 8/6/*03* .

No indictments were returned, but a Harris County *grand jury* completing its investigation of the Houston Police Department crime *lab* Friday criticized how officials dealt with the problem that shook public confidence in the criminal justice system.

"Sadly, we have learned that the knowledge of problems and a lack of action to correct them do not constitute criminal negligence," the panel wrote in a statement released Friday. "Ethics and moral violations, even if they severely violate the public trust, are beyond our jurisdiction."

The second Harris County *grand jury* investigating the *lab* requested an extension of its term until Oct. 29. Both *grand* juries have taken the unusual step of conducting their investigation without assistance from the Harris County district attorney's office, which traditionally leads such probes.

"We voted to do an independent study on our own, because we felt like there would not be any (outside) influence on us that way," said *grand jury* member Ursula Huhn, a retired Houston Independent School District clerk.

Others involved in the crime *lab* debate, including the chairman of a state legislative committee conducting an investigation and the Harris County Criminal Defense Lawyers Association, were more critical.

During its 90-day term, the *grand jury* issuing its statement Friday heard from numerous witnesses, including crime *lab* personnel, defense attorneys, DNA experts, and Police Chief C.O. Bradford, who gave more than eight hours of testimony.

Reaction to the statement came from Harris County District Attorney Chuck Rosenthal, who said he appeared before the *grand jury* , but did not give testimony.

In its report, the panel cited concerns about a potential conflict of interest with Harris County prosecutors, who used HPD's evidence to win convictions in hundreds of cases.

On Thursday, Rosenthal was also questioned by the *grand jury* still in session. His appearance - along with *grand jury* report Friday - renewed calls for him to recuse himself and his office from the crime *lab* investigation and allow appointment of a special prosecutor.

The administrative judge of criminal district courts in Harris County on Friday reaffirmed a call for Rosenthal to step aside.

"We (the judges) have said that the next move is his, and I think we're still in that same position," said state District Judge Debbie Mantooth Stricklin, the administrative judge of the criminal district courts of Harris County.

Earlier this year, all of the county's 22 criminal district judges signed a letter asking Rosenthal to step aside (SEE CLARIFICATION). At that time, Rosenthal told the Houston Chronicle that he would clear the way for someone else to lead the investigation of the crime *lab* "if we get to the point where there is a conflict of interest."

Rosenthal on Friday again said he would not step aside, adding that his office continues to investigate problems at the crime *lab* .

"The investigations are not over yet," he said, declining to elaborate.

According to the *grand jury* statement, his office was under the panel's microscope.

"During the course of (the) investigation, we found no vast conspiracies, and no criminal wrongdoing by anyone we looked at in the D.A.'s office," *grand* jurors wrote.

The district attorney's office started reviewing approximately 1,300 of its convictions in January after the police department shut down the DNA division of its crime *lab* . That came after an independent audit exposed widespread problems in the *lab* . Auditors found that *lab* workers were insufficiently trained, equipment was not maintained and the roof leaked, jeopardizing evidence.

To date, prosecutors have ordered retests in 370 of the 1,300 cases reviewed. In the 33 cases retested thus far, at least three have turned up possible problems with original *lab* analysis. One retest resulted in the release of a man from prison.

On Friday, Bradford reacted to the *grand jury* criticism with a brief statement through a spokesman.

"Because there is still an active *grand jury* looking into HPD's crime *lab* , it would be improper to comment at this time," the department spokesman said.

Bradford announced last month he would retire as head of the department in September, saying he wanted to spend more time with his pregnant wife. However, the announcement followed news reports on internal police documents suggesting that *lab* employees had informed Bradford of ongoing problems long before they became public.

Meanwhile, state Rep. Kevin Bailey, D-Houston, chairman of the legislative committee that has been conducting its own investigation of the crime *lab* scandal, said his House Committee on General Investigations will hold additional hearings later this month.

"I'm not sure there was criminal activity, but there sure was a lack of interest and concern that is surprising of people in (leadership) positions," said Bailey. "And I guess you can't indict people for that. But they sure failed the public and failed the criminal justice system by not being concerned with what was going on (at the crime *lab* )."

Stan Schneider with the Harris County Criminal Defense Lawyers Association was more critical.

"I think (the blame) includes everyone in the system." he said. "And it's not a ringing endorsement of any of the leaders of our community."

**Copyright notice:** All materials in this archive are copyrighted by Houston Chronicle Publishing Company Division, Hearst Newspapers Partnership, L.P., or its news and feature syndicates and wire services. No materials may be directly or indirectly published, posted to Internet and intranet distribution channels, broadcast, rewritten for broadcast or publication or redistributed in any medium. Neither these materials nor any portion thereof may be stored in a computer except for personal and non-commercial use.

Previous Next Return to Hitlist Return to Search Screen


Previous | Next | Return to Hitlist | Return to Search Screen

**HOUSTON CHRONICLE ARCHIVES**

Paper: Houston Chronicle
Date: FRI 10/17/03
Section: A
Page: 01
Edition: 2 STAR

# *Lab* probe finishes with no indictments /Jurors blame DA for hampering efforts

By ROMA KHANNA, STEVE McVICKER
Staff

A Harris County *grand jury* completed its investigation of the Houston crime *lab* Thursday, finding mismanagement but no criminal wrongdoing, though members criticized District Attorney Chuck Rosenthal for impeding their efforts.

The *grand jury* , completing a six-month investigation that included testimony from the district attorney and 66 other witnesses, said the Houston Police Department crime *lab* suffered from "inexcusable, wholesale mismanagement" and "incompetence" before widespread problems in the DNA division were publicly exposed last year.

"There seemed to be a total lack of concern about profound errors committed by certain members of the *lab* staff," said Joe King, a *grand* juror who read a statement for the panel. "Although seemingly criminal, these acts do not meet the necessary requirement for indictment."

The *grand jury* chose to operate without the usual assistance of the Harris County District Attorney's Office because it feared a conflict of interest with prosecutors who used evidence from the crime *lab* to win convictions.

At the beginning of their term, jurors asked Rosenthal to step aside and appoint an independent prosecutor to assist with their investigation. When Rosenthal refused, the jurors acted on their own, seeking help from other lawyers and the state Attorney General's Office.

While they were free from the conflict of interest, jurors said, their probe was hampered because of the lack of guidance.

"It was a little frustrating that because we went down a different avenue, we often would run into roadblocks and speed bumps," King said. "It all would have been more smooth, if he (Rosenthal) had just recused himself. But if he had, he would have lost control."

Rosenthal was adamant Thursday that he had made the right decision not to step aside and noted that his office continues to investigate the crime *lab* .

"A special prosecutor wasn't needed in this case," he said. "I have a constitutional duty to perform my job. If it ever got close to a conflict of interest, I would have recused myself."

Rosenthal and several of his prosecutors were among those called before the *grand jury* over its lengthy term.

Harris County's 22 criminal district court judges and an organization of defense attorneys have also asked Rosenthal to recuse himself from any investigation of the crime *lab* in the months since it was shuttered amid questions about the quality and accuracy of its work.

Members of both groups echoed the *grand jury*'s frustration Thursday and questioned the effect Rosenthal's stance had on the investigation.

"The public got screwed," said Stan Schneider, a member of the Harris County Criminal Lawyers Association, which asked for an independent investigation of the *lab*'s problems. The *jury*'s failure to return indictments, he said, "is a perfect example of why you needed somebody guiding them."

State District Judge Ted Poe, who impaneled the *grand jury*, said Rosenthal hamstrung its ability to get to the heart of the question of whether criminal acts were involved in the mismanagement of the crime *lab*.

"I think the *grand jury* did a superb job, especially since they did not have special counsel to assist them," said Poe, who plans to step down from the bench at the end of the month. "It would have been better - as they agree - if they would have had some special prosecutor to help them. I think that that was unfortunate."

Among the crimes that may have been committed in connection with the crime *lab*, Schneider said, was perjury. Several crime *lab* employees misstated their credentials or other details about crime *lab* management during trials and in other sworn statements.

"I don't think they've had an opportunity to really go into each and every case in which these people testified," Schneider said of the *grand* jurors. "They needed to go in and get the testimony and go over it line by line. And these people don't have the time, and they need direction. So, what do you expect?"

*Grand* jurors, who also took on such other issues as a review of expert testimony from Andrea Yates murder trial, said they were close to returning indictments in several incidents.

"It got to the point of voting on some items," said panel member Will Matthews. "But if you can't get nine votes, you can't issue an indictment."

"We were close on some things," he said.

Some also expressed frustration at not being able to establish that some problems rose to the level of criminal acts.

"I think all of us regretted, at times, and in different cases, that you have got to meet certain conditions under the law to indict," King said. "The problems at the crime *lab* didn't just happen. They were allowed to happen by poor management from the top, clear on down to the analysts at the work bench."

Jurors said the responsibility lies with the Police Department command staff and the city government

above it.

"I would have liked to have seen faster reaction to these problems from the people on City Council, the mayor and the police chief," said panel foreman Jim Brooks.

Mayor Lee Brown pointed to HPD's internal investigation that led to discipline recommendations, including termination, for nine employees.

"Now we have to look ahead and make sure the city has a quality crime *lab* ," he said.

Last week, HPD named Irma Rios as new head of the crime *lab* .

**Copyright notice:** All materials in this archive are copyrighted by Houston Chronicle Publishing Company Division, Hearst Newspapers Partnership, L.P., or its news and feature syndicates and wire services. No materials may be directly or indirectly published, posted to Internet and intranet distribution channels, broadcast, rewritten for broadcast or publication or redistributed in any medium. Neither these materials nor any portion thereof may be stored in a computer except for personal and non-commercial use.

| Previous | Next | Return to Hitlist | Return to Search Screen |



Previous | Next | Return to Hitlist | Return to Search Screen

## HOUSTON CHRONICLE ARCHIVES

**Paper:** Houston Chronicle
**Date:** WED 05/21/03
**Section:** A
**Page:** 25 Metfront
**Edition:** 3 STAR

# *Grand jury* begins probe into HPD *lab*

### By ROMA KHANNA, STEVE McVICKER
Staff

A Harris County *grand jury* has begun investigating the Houston Police Department crime *lab* independent of the district attorney's office, which usually leads such probes.

The *grand jury* has subpoenaed Houston Chronicle reporter James Kimberly and other journalists, said Joel White, an attorney with Ogden, Gibson, White, Broocks and Longoria, who represents the Chronicle and other clients.

Meanwhile, District Attorney Chuck Rosenthal said he soon will present information about the *lab* to another *grand jury* .

Rosenthal said he may address a *grand jury* this week about the HPD *lab* , where DNA testing has been suspended amid questions about accuracy.

He has repeatedly been asked to step aside from any investigation of the crime *lab* because his office often uses HPD evidence to prosecute cases and some of its employees may be called to testify.

Rosenthal said he has developed a "cast of characters" to give to a *grand jury* . He said he also will present a report from the National Forensic Science Technology Center, which found poor management was the *lab* 's worst problem. He would not elaborate on his other plans or say if he is developing a case for any criminal charges.

It was not clear Tuesday whether any other *grand jury* is investigating the crime *lab* . There are five *grand* juries convened for 90-day terms that began this month. Their proceedings are secret.

State District Judge Ted Poe, who convened the *grand jury* that issued the subpoenas, said he believes "one or more" *grand* juries will look into the matter, but he could not say if any other *grand* juries have begun an investigation.

Harris County's 22 criminal district judges have requested a *grand jury* inquiry into the HPD crime *lab* and asked Rosenthal to recuse himself. Rosenthal has said he does not yet see a clear conflict of interest and will not step aside.

If Rosenthal recuse himself, he would clear the way for the appointment of a special prosecutor from

outside the district attorney's office who could then lead a *grand jury* investigation into the *lab*'s problems.

HPD shut down the DNA division of its crime *lab* after an independent audit uncovered serious problems.

The closure has prompted a review of the evidence from thousands of incidents processed at the *lab* and the district attorney's office has ordered the retesting of evidence in 187 cases.

To date, a private *lab* has completed retests on 17 cases. The *lab*'s tests support the defendants' guilt in 13 cases and disagree with or have been unable to duplicate HPD's results in four. One man, Josiah Sutton, has been released from prison after DNA retesting excluded him as a rape suspect.

**Copyright notice:** All materials in this archive are copyrighted by Houston Chronicle Publishing Company Division, Hearst Newspapers Partnership, L.P., or its news and feature syndicates and wire services. No materials may be directly or indirectly published, posted to Internet and intranet distribution channels, broadcast, rewritten for broadcast or publication or redistributed in any medium. Neither these materials nor any portion thereof may be stored in a computer except for personal and non-commercial use.

| Previous | Next | Return to Hitlist | Return to Search Screen |



Previous | Next | Return to Hitlist | Return to Search Screen

**HOUSTON CHRONICLE ARCHIVES**

**Paper:** Houston Chronicle
**Date:** TUE 08/05/03
**Section:** A
**Page:** 1S
**Edition:** 3 STAR

# GRAND SLAM /Jury finds ethical shortcomings throughout justice system

Staff

**Correct:** CLARIFICATION: This editorial incorrectly stated that all 22 criminal district judges in Harris County had signed a letter calling on District Attorney Chuck Rosenthal to step aside from the investigation into the Houston Police Department crime *lab* . The April 11 letter carried the typed signature of Debbie Mantooth Stricklin, administrative judge of the criminal division courts here, on behalf of the 22 judges, who had voted unanimously that day to ask Rosenthal to step aside. Clarification published 8/6/03 .

A skillful prosecutor, the saying goes, can get a *grand jury* to indict a ham sandwich. In Harris County, however, the tables were turned as two *grand* juries investigated prosecutors and police crime *lab* officials.

The *grand jury* whose term has ended released a report Friday that was not a criminal indictment but a moral one. While the ethical charges carry no fines or prison time, they convey plenty of shame for officials still capable of harboring that emotion.

The report regretted that knowledge of problems in the crime *lab* and failure to correct them do not constitute criminal negligence: "Ethics and moral violations, even if they severely violate the public trust, are beyond our jurisdiction."

The *grand jury* 's scathing report concludes that incompetence and irresponsibility are not against the law. However, deliberately presenting false testimony and misrepresenting sloppily handled and erroneously analyzed evidence in court constitutes perjury. This *grand jury* did not collaborate with Harris County District Attorney Chuck Rosenthal. The public would have more confidence in the *grand jury* 's decision to return no indictment had the panel enjoyed the expertise of an impartial special prosecutor.

Rosenthal's contention is that for years neither he nor scores of senior prosecutors suspected anything was wrong with evidence prepared by the Houston Police Department crime *lab* . However, working alongside a department with a history of periodic planting of evidence and giving false testimony ("testalying," in police jargon), at least one prosecutor should have stumbled onto the fact that things were amiss.

Case 4:02-cv-01508    Document 27-10    Filed in TXSD on 06/04    Page 7 of 2

Earlier, all 22 criminal district judges in the county signed a letter asking Rosenthal to recuse himself from the investigation (SEE CLARIFICATION). The sooner he does, the sooner an impartial special counsel can determine whether police and prosecutors violated the law, or whether their shortcomings were merely moral and ethical ones.

**Copyright notice:** All materials in this archive are copyrighted by Houston Chronicle Publishing Company Division, Hearst Newspapers Partnership, L.P., or its news and feature syndicates and wire services. No materials may be directly or indirectly published, posted to Internet and intranet distribution channels, broadcast, rewritten for broadcast or publication or redistributed in any medium. Neither these materials nor any portion thereof may be stored in a computer except for personal and non-commercial use.

| Previous | Next | Return to Hitlist | Return to Search Screen |

# Coffee Bean Direct Deal

Buy Fair Trade Coffee Online $5 Off Purchases $30+. Code: CBDEAL

Get a HoustonChronicle.com digital subscription
SUBSCRIBE ▶

Subscribe to the Houston Chronicle | Shopping | Classifieds | Obits | Place an Ad | La Voz

Like ‹ 121k   Register | Sign In

59°F  **Mostly Cloudy** | Houston Weather

Search   ● Chron.com ○ Local Directory

Friday January 30, 2015

Home | Local | US & World | Sports | Business | Entertainment | Lifestyle | Jobs | Cars | Real Estate

News

# Police chief shakes up crime lab; 2 officials quit

2 officials quit; others disciplined

ROMA KHANNA and STEVE McVICKER, Copyright 2003 Houston Chronicle | June 13, 2003

Comments 0   E-mail   Print   **Share** 0   Tweet 0   8+1 0

## Coffee Bean Direct Deal
coffeebeandirect.com/Deal
Buy Fair Trade Coffee Online $5 Off Purchases $30+. Code: CBDEAL

## Lost Dreams

 Buy Now

$1.00

Houston Police Chief C.O. Bradford cleaned house at the department's crime lab Thursday, recommending two top officials be fired and seven others disciplined, holding them responsible for problems that have raised questions about the evidence used to win hundreds of convictions.

Assistant Chief Milton C. Simmons and DNA division supervisor James Bolding resigned Wednesday rather than be fired. The director of the crime lab retired in February after the exposure of widespread problems there, but Bradford also recommended he be fired.

Simmons and Bolding could not be reached for comment Thursday.

The head of the crime lab's ballistics division, which has also faced questions about the quality and accuracy of its work, was suspended along with five other analysts in the DNA division.

Bradford described the disciplinary action as "very difficult but necessary to bring accountability" to the crime lab, where DNA testing was suspended after an audit uncovered shoddy science, an undertrained staff and conditions ripe for contamination.

**Related Stories**

DNA analysis disputed in capital murder case

Crime-lab analysts had avoided serious penalties

DNA retests back crime lab findings in 14 cases

Meanwhile, a union spokesman said the house cleaning did not go far enough.

"The punishment should have gone all the way to the top," said Hans Marticiuc, noting that some of Bradford's reasons for the discipline also apply to the chief himself.







**Latest Videos**



10 Best Anti Virus Review — Compare 10 Best AntiVirus of 2015. Download & Protect Yourself Today!

PG&E Home: Rent Your Roof — California Homeowners: FSS Pays Homeowners To Go Solar. Sign Up!

Veteran Home Loans — Get a Free Quote on a VA Loan. PreQualify for $0 Down up to $417K!

Bradford recommended Simmons be fired because of, among other things, his "failure to act on several crime lab issues brought to his attention."

In March, Bradford told the Chronicle, through a spokesman, that he knew the roof over the crime lab leaked for more than five years, adding "there is always a concern about evidence contamination when you have a structural problem." Yet, for years, Bradford did nothing to permanently fix the roof.

Marticiuc also pointed to Bradford's role in the internal investigation that led to the punishment announced Thursday. The investigators asked Bradford a number of questions, which he answered in a letter that was reviewed by a lawyer, Marticiuc said. The union spokesman called such participation "unprecedented."

Robert Hurst, a department spokesman, said the chief "was involved in the (internal) investigation" but refused to elaborate.

The recommended discipline cites violations ranging from failure to oversee the lab and follow accepted guidelines for forensic work to individual errors on cases, including capital murders. The discipline fell heaviest on the supervisors, who Bradford said set up improper procedures that their subordinates followed.

Among the cited employees and their violations:

· Regina Ortiz-Boyd was a DNA analyst until she left the lab in 1999. She inadvertently deleted all of the information from an analysis in a sexual assault case.

· **Robert Baldwin** is head of the lab's ballistics division. He failed to complete inspections of his area and equipment and did not do paperwork about his division. Bradford said these failures were the only reason Baldwin was suspended for seven days, though questions have been raised about the quality of his work. The Chronicle reported that Baldwin misidentified a bullet from a capital murder case and used unsound methods -- shooting a gun 25 times to obtain a ballistics match -- in another capital case.

· Christi Kim is a DNA analyst who tested the DNA used to convict Josiah Sutton of a 1998 rape. Sutton has been released from prison on bond after new DNA tests discredited Kim's. Police investigators cited her for incorrectly documenting the results of DNA profiles, failing to report the full set of DNA results in an unnamed case and making an incorrect data entry in an unnamed capital murder case.

· Joseph Chu is a DNA analyst who incorrectly documented results in two sexual assault cases and incorrectly reported statistics in a capital murder case. Houston police would not say what capital murder case, but the Chronicle reported in May that Chu analyzed the DNA evidence used against Jorge Villanueva, a death row inmate whose conviction has been questioned because of unsound lab techniques.

The chairman of the state legislative committee that has been conducting its own investigation of the crime lab on Thursday praised Bradford's action.

"I'm very glad to see that after seven years, some action has been taken to correct the problems that are going on with the Houston Police Department crime lab," said state Rep. Kevin Bailey, D-Houston, referring to a 1996 audit of the lab that was supposed to address some of the problems.

"I hope that from here on out the Police Department works diligently to make corrections, hire the proper people, and get the crime lab back up and working and instill confidence in the citizens of Texas."

While the discipline marks the end of the department's major probe into problems at the lab, questions remain about its future, and other investigations continue.

Bradford said he has not decided whether he will reopen the DNA division of the crime lab. He is awaiting the final report from the National Forensic Science Technology Center that will outline what steps HPD must take to get its lab accredited for lab quality. HPD is the largest police department in the county without an accredited crime lab. The center is expected to complete its report in two months.

The Harris County District Attorney's Office also continues its review of more than 1,300 cases in which DNA was analyzed by the lab. Prosecutors have ordered the retesting of DNA in more than 200 cases. Retests have been completed in 22 cases, supporting initial findings in 18 and disagreeing or inconclusive in four.

Meanwhile, two Harris County grand juries are exploring whether criminal charges should be brought over the problems that began with the crime lab but have had far-reaching implications at all levels of the Harris County justice system.



Missed: Did You See? · · · Sc

More videos:

  

**You Might Also Like**


How This Old Flip Phone Could Make You a Fortune
(The Motley Fool)


These Beautiful Bracelets Were Made From Guns Taken From City Streets
(CoExist)


Miss Israel's Selfie Puts Another Miss in a Bind
(The New York Times)


Want to Make Your Bank Mad? Try This Mortgage Trick
(Bills.com)


What You Missed: Did You See the Epic Twist on 'Scandal' Coming?


What Not to Miss: Forget Football, The 'Puppy Bowl' is Back!


This Forgotten Day in Houston: Children's TV Heroes Visit '51 Rodeo!

**Stay Connected**

   
 

**Top Stories**

NBA legend files million dollar lawsuit

Topless celeb calls for peace in the Middle East

Photos of Texas reservoirs leached dry

Four arrested in Magnolia meth bust