IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES MAMOU, JR., | § | |
| Petitioner, | § | |
| | § | |
| v. | § | NO. 4:14-CV-00403 |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT STEPHEN'S ANSWER AND
MOTION FOR SUMMARY JUDGMENT**

Petitioner Charles Mamou, Jr., was convicted and sentenced to death for the kidnapping and murder of Mary Carmouche.  Mamou, unsuccessful in state court, now seeks federal habeas relief.  *See* 28 U.S.C. § 2254.  This Court possesses both personal and subject-matter jurisdiction. *See* 28 U.S.C. §§ 2241, 2254. Respondent, Director William Stephens (the Director), denies all of Mamou's assertions of fact except those supported by the record or admitted herein.  Mamou fails to show that any of his claims have merit or that he is entitled to further factual development. Accordingly, the Director respectfully requests that the Court grant the Director's motion for summary judgment, deny the petition for writ of habeas corpus, and deny him a certificate of appealability.

## PETITIONER'S ALLEGATIONS

The Director understands Mamou to raise the following grounds for relief in his federal habeas petition:

1. Mamou is actually innocent of capital murder;

2. The trial court violated Mamou's Fifth, Sixth, and Eighth Amendment rights by admitting unreliable firearms testimony from the State's ballistic expert, Robert Baldwin.

3. The state violated Mamou's right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959) by suppressing evidence and presenting false testimony at his trial;

4. Mamou was deprived of his right to effective assistance of counsel in violation of the Sixth Amendment as set out in *Strickland v. Washington*, 466 U.S. 668 (1984), as a result of trial counsel's failure to effectively challenge the testimony of the State's ballistics and fingerprint experts;

5. Mamou was deprived of his right to effective assistance of counsel during the pre-trial phase in violation of the Sixth Amendment as set out in *Strickland* as a result of trial counsel's:

   a. failure to adequately investigate Mamou's case before going to trial;

   b. failure to file adequate and timely pre-trial motions; and

   c. failure to obtain adequate and timely discovery;

6. Mamou was deprived of his right to effective assistance of counsel during the voir dire and guilt-innocence phases of his trial in violation of the Sixth Amendment as set out in *Strickland* as a result of trial counsel's:

   a. failure to object to biased instructions by the trial court during voir dire;

    b.    allowing the trial court to exclude jurors who expressed opposition to the death penalty without questioning them further on their views of capital punishment;

    c.    failure object to gruesome and redundant autopsy photos; and

    d.    ineffective closing argument on guilt-innocence;

7.    Mamou was deprived of his right to effective assistance of counsel during the punishment phase of trial in violation of the Sixth Amendment as set out in *Strickland* as a result of trial counsel's:

    a.    failure to object to impermissible victim impact testimony; and

    b.    failure to investigate, discover, and present adequate mitigating evidence;

8.    Mamou was deprived of his right to effective assistance of counsel on appeal in violation of the Sixth Amendment as a result of appellate counsel's:

    a.    failure to allege as error the trial court's admission of unreliable testimony from ballistics expert Robert Baldwin;

    b.    failure to raise the issue of inadmissible victim impact testimony; and

    c.    failure to raise as error the issues of parole eligibility and the burden of proof on the mitigation special issue;

9.    Mamou's was denied effective representation by counsel during his state habeas proceedings excusing the procedural default of his ineffective-assistance-of trial-counsel (IATC) claims.

10.    The evidence at trial was factually and legally insufficient to support the jury's verdict on guilt-innocence finding Mamou guilty of kidnapping Mary Carmouche;

11.     The evidence at trial was insufficient to corroborate accomplice witness testimony introduced at the guilt-innocence phase of trial;

12.     The evidence at trial was legally insufficient to support the jury's affirmative finding on the future dangerousness special issue;

13.     The trial court erred during Mamou's trial by:

    a.     overruling Mamou's objection to the witness testimony regarding potential changes to parole eligibility laws;

    b.     rejecting Mamou's request for a lesser-included offense instruction on false-imprisonment; and

    c.     refusing to instruct the jury that the extraneous offenses introduced by the State during the punishment phase must be proven beyond a reasonable doubt.

14.     The cumulative effect of all these errors necessitate habeas relief.


## STATEMENT OF THE CASE

## I.     Facts Establishing Mamou's Guilt of Capital Murder

The Court of Criminal Appeals summarized the facts establishing Mamou's guilt as follows:

> The evidence at trial showed that on the afternoon of December 6, 1998, [Mamou] called Kevin Walter and Dion Holley to inquire about buying cocaine.  Walter and Holley agreed to sell [Mamou] a kilo of cocaine for $20,000 that evening in the parking lot of Northline Mall in Houston; however, they actually planned to trick [Mamou] into thinking they had the cocaine and to take his money.  Their friend, Terrance Gibson, overheard their conversation with [Mamou] and "wanted in."  Gibson agreed to drive Walter's car with a gun and act as backup in case anything went wrong.

> Meanwhile, [Mamou] devised his own plan to rob Walter and Holley of the cocaine.  Samuel "Bug" Johnson, driving a red

4

Chrysler Concord, picked up [Mamou] from Howard Scott's apartment at approximately 7:00 p.m. Johnson and [Mamou] then pick up Terrance Dodson, [Mamou's] cousin, from his home in southwest Houston.  On the way to Northline Mall, they stopped at a convenience store and purchased a newspaper, which [Mamou] cut into dollar-sized pieces and placed in a Victoria's secret gift bag.  [Mamou's] plan was to pretend to have cash in the bag, then have Dodson pull his gun on Walter and Holley while [Mamou] robbed them of the cocaine.

Walter and Holley arrived at the Northline Mall parking lot at around 7:30 p.m. in Holley's blue Lexus and parked next to Johnson's car.  They exited the Lexus, and [Mamou] approached them with the Victoria's Secret bag in his hands.  After they talked for a few minutes, Walter said he felt uncomfortable with the location and told [Mamou] to meet them in the parking lot of a nearby grocery store.   They again failed to complete the transaction at the grocery store because both parties refused to show each other the drugs or the money. [Mamou] told Walter that he would call him later.  Johnson and [Mamou] left the grocery store and drove Dodson home.

Walter and Holley left the grocery store and met up with Gibson at a Chevron station.  Gibson followed them to Walter's house, dropped off Walter's car, and got into the Lexus with them.  While they were driving around in the Lexus, they received a phone call from Holley's friend, seventeen-year-old Mary Carmouche.  They picked up Carmouche from her parent's house and continued driving around until [Mamou] called them. They arranged to meet [Mamou] and Johnson at Bennigan's restaurant on Southwest Freeway.  When they arrived at Bennigan's, they went inside the restaurant, ordered food, and talked for a while.  At some point, they decided to leave the restaurant and conduct their business elsewhere.  They stopped at a few locations before deciding on Lantern Point Drive, a dark isolated street.

When they arrived at Lantern Point Drive, they parked their cars facing each other to make it look as if one car was giving the other a "boost."  Walter was in the driver's seat of the Lexus with Gibson in the passenger seat and Holly and Carmouche in the back seat. Gibson and [Mamou] got out of the cars and went to the back of the

5

Lexus.  As Holley got out of the car to tell them they were not parked in a good spot, he heard a gunshot.  Holley started running towards a nearby field when he heard more gunshots and was shot in the arm.

Walter grabbed the steering wheel and tried to drive away when he heard gunshots, but [Mamou] shot him through the car window before he could do so.  The bullet shattered the glass of the closed window and hit him in the left shoulder.  Walter struggled with [Mamou] and ran towards the back of the car.  As he was running, he heard several more gunshots and was shot in the back.  He saw Gibson lying on the ground and reached down to take his gun.  When he looked up, he saw the red car and the Lexus drive away.

John Wayne McDonald, a security guard at a nearby apartment complex, heard gunshots coming from the direction of Lantern Point Drive and drove to the scene.  He observed Walter and Gibson lying on the ground and Holley staggering toward Walter.  Gibson's eyes were wide open and he had no pulse.  McDonald also observed a gift bag containing newspaper on the ground.  Walter and Holley told McDonald they had been shot when they stopped to help a car that appeared to be in trouble.  They stated that the assailants stole their car and drove away with Carmouche.

Houston Police Officer Oral R. Warrant arrived on the scene and spoke with Holley, who told him they stopped to help two black men whose car appeared to be in need of a jumpstart.[1]  He stated that the men that shot them, abducted Carmouche, and drove way in their red car and Holley's blue Lexus.  He described Carmouche as a black, eighteen-year-old female wearing a red shirt and jeans.  Walter and Holley were transported to two separate medical facilities for treatment.   Gibson died at the scene as a result of a gunshot wound to his chest.

On Monday afternoon, December 7, 1998, Holley's blue Lexus was found at an apartment complex in southwest Houston.   The following day, December 8, 1998, Walter admitted to Detective Ted Boyd that a man named "Chucky" had shot him and gave Boyd

---

[1]     Holley testified that he told the false story to the authorities to avoid "getting in trouble." [footnote in original].

6

"Chucky's" telephone number.   The telephone number was registered to Robin Scott, who lived with her husband, Howard Scott, in the apartment complex where the Lexus was found.  The Scotts gave Boyd consent to search their apartment, but [Mamou] was no longer there.   After speaking to the Scotts, Boyd was informed that the body of a black female had just been discovered.

Alex Longoria, an employee of Reliant Energy HL&P, discovered the body around noon on December 8, 1998.  As Longoria, entered the backyard of a vacant house at 9227 Lynchester to read the light meter, he saw the body of a young, black female lying on the ground in blue jeans and a red shirt.  When Houston Police Officer Larry Foltz arrived on the scene, he observed the body was lying face down, there was blood on the ground, and there was an unfired bullet cartridge on the ground nearby.   The house was locked and there was no signs of forced entry.  Carmouche's father identified the body.  Dr. Roger Milton, who performed Carmouche's autopsy, concluded that a single gunshot wound to the chest caused her death.  The bullet entered her chest, traveled through her right lung, heart, and liver, and lodged in the muscle in her back.

Following the discovery of Carmouche's body, Detective G.J. Novak spoke with [Mamou's] father, Charles Mamou, Sr., who directed him to Dodson.   Dodson told Novak where to locate Johnson and Anthony Trail.   After talking to these individuals, Novak put together photo spreads which contained pictures of Johnson and [Mamou].  Walter and Holley identified them in the photo spreads.   Once the identifications were made, Novak contacted investigator Thad Badeaux of the Lafayette Parish Sheriff's office in Louisiana and request him to arrest [Mamou]. Badeaux found [Mamou] hiding in a closet in a house in Sunset, Louisiana, on December 9, 1998.

[Mamou] testified at trial that he shot Gibson and Walter, but he did not recall shooting Holley.  With regard to the events that transpired after he left the scene of the shooting, [Mamou] testified that he left Lantern Point Drive in the Lexus because Johnson had already driven away in the red car.  He noticed Carmouche for the first time in the rearview mirror when he came to a stop sign at McNee and Lantern Point Drive.  He asked her to get out when he

came to a stoplight near a Burger King on Main Street, but she did not exit the vehicle. After [Mamou] drove through the stoplight, Johnson came up behind him in his car, flashed his lights, and motioned for [Mamou] to follow him to Howard Scott's apartment. When they arrived at the apartment complex, Johnson, Scott, and Shawn England wiped down the interior of the Lexus and searched for cocaine. At the time, a man named Kevin, also known as "Skin," arrived on a bicycle. When [Mamou] went inside the apartment with England and Scott and changed his clothes, Carmouche left in the red car with Johnson and "Skin." [Mamou] went for a short walk. When he came back to the apartment complex, he watched from a distance and observed Johnson and "Skin" return in Johnson's car. Later, Johnson left in his car, "Skin" left on his bicycle, and England left in a taxicab. After they left, [Mamou] returned to Scott's apartment where he spent the night.

Johnson gave a different version of events. He testified that he saw [Mamou] shoot Walter and drive way in the Lexus with Carmouche in the backseat. He followed [Mamou] until they reached the intersection of Highway 610 and South Main, but Johnson stayed on 610 and drove home. He did not hear from [Mamou] again until Tuesday, when [Mamou] called him and told him "to shut the hell up" about what happened.

Scott also disputed [Mamou's] version of events. Scott testified that [Mamou] left his apartment with Johnson around 7:30 p.m. on Sunday evening. Scott stayed home that evening, watched television for a while with England and another friend named "Ken," and then went to bed. He was awakened in the middle of the night by [Mamou] knocking on the door. He opened the door for [Mamou] and went back to bed. When he left the next morning to take his wife to work, [Mamou] was still asleep.

Dodson testified that Johnson and [Mamou] drove him home after they left the grocery store and that he didn't hear from [Mamou] until the next day, when [Mamou] called him and told him to ride with Anthony Trial to a Burger King on Fondren and Belfort. When they arrived, [Mamou] got in the car, showed them a set of car keys, and said he has a Lexus. Trial and [Mamou] took Dodson home. Trail testified that [Mamou] then had him drive to a dead-

end street in southwest Houston where he retrieved a pair of glasses. Trail testified that [Mamou] said he dropped the glasses when he was there with a female who performed oral sex on him. [Mamou] later had Trial take him to the bus station, and he went to Louisiana.

Dodson further testified that [Mamou] called him from Louisiana. When Dodson told [Mamou] that he had seen a new report about a stolen Lexus and a missing girl, [Mamou] told him that he had been in a "shootout" and that he had "burned off" with a girl in the Lexus. He stated that he had taken the girl to an abandoned house where she performed oral sex on him. He said that he shot her afterwards because "she was looking at him funny" and he thought she was going to tell the police what happened.

Ralph Saldivar, the deputy administrator of the Houston Police Department's latent print laboratory, identified [Mamou's] fingerprints on the newspaper clippings inside the Victoria's Secret bag found on Lantern Point Drive. Robert Baldwin, a criminalist in the Houston Police Department's firearm's lab, performed tests on the bullets taken from the bodies of Carmouche and Gibson, the bullets found at both crime scenes, and a bullet fragment from Holley's arm. The tests revealed that the bullets taken from Gibson's body and Holley's arm were fired from the same firearm. These bullets, which were consistent with a nine millimeter Lugar pistol, share the "same characteristics" as a bullet recovered from the Lexus and the bullet taken from Carmouche's body. Baldwin concluded that the unfired bullet found near Carmouche's body was cycled through the same magazine as one of the nine millimeter Lugar cartridge casings found on Lantern Point Drive. He could not exclude the possibility that the bullet that killed Carmouche was fired form the same gun as the others.[2]

*Mamou v. State*, No. 73, 708, slip op. at 2-8 (Tex. Crim. App. Nov. 7, 2001).

---

[2]   Ballistic tests also showed that none of the bullets were fired from Gibson's gun. [footnote in original]

## II.   Facts relating to the testimony of State's ballistics expert, Robert Baldwin.[3]

Robert Baldwin, a criminalist with the Houston Police Department Crime Laboratory, testified during the guilt-innocence phase of Mamou's trial. 20 RR 101.  Baldwin testified that he had worked for the HPD lab for more than a decade and had in excess of twenty years of experience in the criminalistics field, twelve of those years in firearms related examinations.  20 RR 101-02.  He held a Bachelor of Science degree, as well as a juris doctorate. 20 RR 102.  He had also received specialized training in the area of firearms. 20 RR 102.

Baldwin was first asked about his comparison of State's Exhibit 38, a gun recovered from the scene of the Lantern Point shootout, and five fired cartridge casings—State's Exhibits 26-30—also recovered from that same location.  20 RR 105.  Baldwin opined that the casings "were not fired from a 9 millimeter semiautomatic pistol, which is States Exhibit 38."  20 RR 105-06. Baldwin further testified that he was able to determine that these cartridges were all fired from a single firearm, though he did not know the precise

_____

[3]   Because Baldwin's testimony regarding the "magazine markings" figures prominently in several of the claims raised by Mamou in his federal habeas petition— including his claim that (1) he is actually innocence of capital murder; (2) the trial court erred in admitting Baldwin's testimony, (3) trial and appellate counsel were ineffective for failing to properly challenge the admissibility of this evidence; and (4) the State suppressed evidence regarding the falsity of Baldwin's testimony— Baldwin's testimony in set out in more detail here.

firearm.  20 RR 106-07.

Baldwin was also questioned regarding the comparison of several fired projectiles recovered in the case, with that same weapon.[4]  Baldwin testified that in his opinion, "… none of the bullets in either State's [exhibits] 79, 84, 90, or 91 were fired in this 9 millimeter pistol, State's [exhibits] 38."  He also testified that his examination revealed that State's Exhibit 79, the bullet fragment recovered from Holley's Lexus, and State's Exhibit 90, the bullet recovered from Gibson were fired from the same firearm.  20 RR 111-12.  But, according to Baldwin, all four of the fired projectiles exhibited the same class characteristics.  20 RR 112.  He explained this observation:

> That is, they were all of the same caliber and had the same number of lands and grooves, the same direction of the twist and width of rifling; however, it's only with respect to State's Exhibit 79 and State's [90] that I could actually make an identification.
>
> … [Class characteristics] it's a group of characteristics, for instance, probably best explained by the fact you had two Smith & Wesson revolvers, Smith and Wesson .38 Specials, for instance, those would have the same caliber.  They would have the same number of lands and grooves, in that case five, the same direction of twists, which would be right.  And traditionally, their rifling patterns is about equal of the land widths and groove widths.  That would be class characteristics, so that you would have many .38 Special Smith & Wesson firearms having those characteristics.

[4]    State's Exhibit 79 was a bullet fragment recovered from Holley.  17 RR 100.  State's Exhibit 84 was a fired bullet recovered from Holley's Lexus.  17 RR 146.  State's Exhibit 90 was a bullet recovered from Gibson.  20 RR 61.  State's Exhibit 91 was a bullet recovered from the victim in this case, Carmouche.  18 RR 75.

20 RR 112; 114.   With respect to the bullet fragment recovered from Carmouche, State's Exhibit 91, Baldwin testified there was nothing in his examination that would exclude it from having been fired by the same firearm that discharged the other fired bullets recovered from Gibson, Holley, and Holely's Lexus.  20 RR 113.

Additionally, Baldwin offered testimony regarding his examination of State's Exhibit 89, a live (unfired) cartridge recovered from the Lynchester scene (where Carmouche's body was found).  20 RR 107-11.  He indicated that there were magazine markings present on the unfired cartridge that he was able to compare with the magazine markings on State's Exhibit 27, one of the fired cartridge casings recovered from the Lantern Point shootout scene.  20 RR 108.   Based on his examination, he opined that the unfired cartridge, State's Exhibit 89, "was cycled at some time through the same magazine as the fired cartridge case which is designated in [State's Exhibit 27]."  20 RR 108. Baldwin offered this explanation to the jury regarding magazine marks:

> What I have in my left hand is a – perhaps a typical detachable style magazine that would be commonly used with a semiautomatic pistol.  In order to fire the firearm of a pistol, and individual would have to load cartridges into the magazine as I'm doing now.  As you can see, I place the cartridge at the top of the magazine; and I depress a part of the magazine known as the follower, and the cartridge is slid into position.   And you do this, of course, until you've loaded the magazine to its full capacity or however many you plan to place in the magazine. And you'll notice that once the cartridge is place in the magazine, the cartridge at

12

the top is being held in position by these two extensions of top edges of the magazine known as the lips of the magazine.

Once this magazine then would be inserted into the firearm, the first thing that would have to be done – and I won't actually insert the magazine into the firearm – but if I were to insert the magazine into the firearm; the first thing that would happen is that this magazine would be positioned – excuse me – in such a manner that the first cartridge in the magazine would be basically at the bottom area of the slide.  And once I release the slide in that manner, the closing of the slide will force or strip that cartridge from the top of the magazine and force it forward and upward; and that cartridge is forced out of that magazine and there will be markings left on the side wall – this area – of that cartridge.  And so each, time this cartridge were to be cycled or passed through the magazine in that manner, you would produce a pair of magazine marks on the side wall of that cartridge.

20 RR 109-110.

## III.   State's Punishment Evidence

### A.   State's Evidence

The State re-offered all of the evidence admitted during the guilt-innocence phase of trial during the punishment hearing.  22 RR 3.  The state also introduced evidence regarding additional shootings and drugs transactions Mamou participated in immediately prior to the capital murder of Carmouche.   Finally, the state presented victim impact testimony from family members of Mamou's murdered victims.

Eric Beyer, a general surgery resident at the University of Texas, stated that Kevin Walters was able to talk when he was brought into the trauma room, but that a large amount of blood was spewing from his liver.  22 RR 6-8.

13

Beyer further testified that he had to tie of a major artery to remove Walter's gall bladder and that drugs were found present in Walter's system.  22 RR 10-14.

Troy James Herbert, of the Louisiana State Police, testified that on December 17, 1996, he caught Mamou driving one hundred miles per hour in a fifty-five mile-per-hour zone.  22 RR 20.  Mamou did not stop however, for more than three miles, and was found carrying a nine-millimeter handgun in his waistband. 22 RR 23.

On September 5, 1998, Steven Hopper with the Houston Police Department was dispatched to a shooting on the 14600 block of Alrover at Mannings Auto Repair Shop.  22 RR 40.  A man who had been shot was being loaded into the ambulance and Hooper recalled seeing rectangular newspaper clippings in the shape of dollar bills at the scene.  22 RR 42. Christopher D. Duncan, also with the Houston Police Department, went to 3420 West Fuqua in response to a shooting incident and observed scattered newspaper clippings in the shape of dollar bills in the parking lot.  22 RR 54.

Joseph Melancon, a former classmate of Mamou's, testified that he met up with Mamou on September 5, 1998. 2 RR 66.  While they were together, Mamou answered the phone and said, "You got that for me," and then drove to West Fuqua.  2 RR 68.  Mamou went into a store, came out with two brown paper bags, then got into the driver's seat of another car and drove off with

14

Anthony "Bruiser" Williams without saying anything to Melancon.  2 RR 72, 113.   Melancon then heart a gunshot and saw Anthony lying on the ground saying, "My boys shot me.  My boys shot me."  22 RR 74.  Anthony Williams died the next day from a gunshot wound.  22 RR 108.  Later, that day Mamou called Melancon, who asked Mamou what had happened. 22 RR 76.  Mamou replied, "Some bullshit."  *Id*.

Yolanda Williams, Anthony's sister, testified that Anthony's son's imagines that his dad is playing with him when he is asleep.  22 RR 120.  She also testified that as a result of the murder Anthony's father became angry and hurtful, and that his mother's diabetes worsened.  22 RR 120-21.

Patricia Gibson testified that she last saw her son Terrence on December 7th, the day before his murder, when they all got together for church.  22 RR 127.  She told the jury that it was difficult to bury her son, that she raised him right, and that she doesn't blame herself for his death.  22 RR 133.

Finally, Carmouche's father testified that she was a senior at Barbara Jordan High School and wanted to be a model or a cosmetologist.  22 RR 142. He stated that approximately one thousand people came to her funeral.  22 RR 148.  He also told the jury that he and his daughter used to go on family outings together, and that her death affected her grandfather because they were very close.  22 RR 148, 150.

15

**B.    Defense Evidence**

Walter Quijano, a clinical psychologist, stated that the applicant's lack of gang involvement would predict less future dangerousness, that the rules in prison are more restrictive than in civilian population, and that guards are specially trained to handle the inmates.  22 RR 164, 169, 171.  Quijano also state that an individual's propensity for violent is highest in the late teens and early twenties and declines after that.  22 RR 173.

Dorothy Morgan, a parole supervisor, testified that she would compile a parole case summary for any person convicted of capital murder, that she would update that file for twenty-nine years and six months, and that the file would include the offender's life history as well as protest letters.  2 RR 14. Morgan also testified that the time a convicted capital offender must serve before becoming eligible for parole has always increased and that it was currently longer than for any other type of crime.  23 RR 20.

Shannon Johnson, testified that she was with Mamou at Bondell Richardson's house on September 5, 1998, the night of Anthony Williams's murder. 23 RR 23.  David Wayne Green, Mamou's first cousin, testified that Mamou came to his house that same evening with a girl.  23 RR 33.

Mamou's mother, Angelice Mary Johnson Mamou, testified that Mamou was born December 6, 1974. 23 RR 35.  The family moved to Houston when Mamou was three weeks old, but Angelice separated from her husband and

returned to Sunset, Louisiana, when Mamou was five years old.  23 RR 38.
Mamou was sick a lot as a baby and was in and out of the hospital.  23 RR 39.
She told the jury that Mamou was an achiever when he first started school,
but that he got sick again, with an ulcer, and stopped doing well in school.  23
RR 41.   He was well-mannered and well-behaved. Angelice testified that
Mamou played football, basketball, and was in the band for a bit, playing the
trombone, and that he graduated high school with a GED, that he signed up
for the military but was not accepted. 23 RR 43-44.  Mamou had five children,
all with different mothers, and he sold drugs to support them.  23 RR 46.
According to Angelice, Mamou took care of his kids, and his sister looked up to
him as a father-figure.  23 RR 54.

Michelle Mamou, Mamou's nineteen-year-old sister, stated that the
Mamou was her father figure, and that he bought her a dress so that she could
go to her eight grade graduation.  23 R 72, 76.  She further testified that
Mamou made her stay in school and gave her a dollar to keep her from running
away from home, and that during her first semester in college Mamou pawned
one of his gold chains to buy her books.  23 RR 77.

Sedonia Marie Gotch, Mamou's ex-girlfriend, and mother of one of his
children, stated that Mamou had a good relationship with his family.  23 RR
82. Gotch testified that it was "good" when they were together, that they had
"rough time and bad times" but that Mamou was always there for her and

always had something funny to say that would make other people laugh. 23 RR 82-83. She also testified Mamou's family depended on him, and went to him when they needed something. 23 RR 84. For example, he would pay the light and insurance bills for his family. 23 RR 84.

Joseph Dwight Savoie, Mamou's uncle, testified that Mamou's grandfather, who Mamou spent a lot of time with growing up, was an alcoholic, that Mamou split time between his mother and father while growing up, and eventually resented his father. 23 RR 96. He stated that Mamou was not in gangs and took responsibility for his family, that he was basically the big brother and father, because his mother was a single parent. 23 RR 101. He also told the jury that Mamou grew up extremely poor, and that there were times there wasn't any food in the house to eat. 23 RR 102. Savoie also testified that Mamou, who wore glasses as a child, quit wearing them because he was teased by other kids. 23 RR 102-103. He stated that Mamou was a "fun kid" who was respectful, basically tried to do the right thing, and was generous to a fault. 12 RR 103-04.

Finally, Mamou's father, Charles Mamou, Sr., testified that he used to drink and gamble and was not a good father. 23 RR 19. Nevertheless, he felt that he and Mamou were close. 23 RR 123. Mamou also testified regarding his separation with Angelice and the impact that had on Mamou. 23 RR 123-125. He urged the jury to "use their own minds" when assessing punishment

18

for his son.  23 RR 126.

## IV.    Course of Post-Conviction Proceedings

A jury found Mamou guilty of capital murder for her participation in the kidnapping and murder of Mary Carmouche, and he was sentenced to death following a separate punishment hearing.  CR 105-106.[5]  Mamou appealed his conviction and sentence but the Court of Criminal Appeals (CCA) affirmed both.  *Mamou v. State*, No. 73,708, (Tex.Crim.App. Nov. 7, 2001).  Mamou did not petition the Supreme Court of the United States for a writ of certiorari from his direct appeal.

While his direct appeal was still pending, Mamou filed an application for state habeas relief in the trial court.  SHCR 2–48.[6]  Thereafter, Mamou filed two subsequent applications, the first a *pro se* petition, SHCR2 6-29[7], and the second a subsequent petition filed by new habeas counsel, SHCR 196-240.  In a single order, the CCA dismissed the two successive applications and an abuse of the writ under Article 11.071 § 5 of the Texas Code of Criminal Procedure, and adopted the trial court's findings of fact and conclusions of law

---

[5]    "CR" refers to the Clerk's Record, preceded by volume number and followed by the relevant page number

[6]    "SHCR" refers to the documents and pleadings filed in the state habeas court, or state habeas clerk's record, followed by page numbers.

[7]    "SHCR2" refers to the documents and pleadings filed in the state habeas court, or state habeas clerk's record, of Mamou's *pro se* state writ application, followed by page numbers.

recommending the denial of relief on Mamou's original state habeas application. *Ex parte Mamou*, WR-78,112-01, WR-78,112-02, WR-78,112-03 (Tex. Crim. App. Feb. 5, 2014). The present federal habeas proceedings followed.

## STANDARD OF REVIEW

Mamou's federal habeas petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also* 28 U.S.C. § 2254(d). One component of AEDPA, § 2254(d), "imposes a highly deferential standard of review for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam) (quoting *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam)).

Claims raised in state court are presumed to have been adjudicated on the merits. *See Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013). State court adjudication, in turn, requires review under § 2254(d). *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011). When § 2254(d) applies, review "is limited to the record that was before the state court." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398–99 (2011).

Under § 2254(d), a federal court may not grant habeas relief unless the state court adjudication (1) "was contrary to federal law then clearly established in the holdings of" the Supreme Court; or (2) "involved an

20

unreasonable application of" clearly established Supreme Court precedent; or (3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Richter*, 562 U.S. at 100 (internal quotation marks omitted) (quoting § 2254(d)(1)–(2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (*Terry Williams*)).

A state court decision is contrary to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent yet reaches an opposite result. *Terry Williams*, 529 U.S. at 405–06. A state court unreasonably applies clearly established federal law if it correctly identifies the governing Supreme Court precedent but unreasonably applies it to the facts of a particular case. *Id*. at 407–09.

To determine whether Supreme Court precedent has been unreasonably applied, a federal court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision[] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's

decision. *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Further, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664.

It is the state court's "ultimate decision" that is to be tested for unreasonableness and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Indeed, state courts are presumed to "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even if the state court's decision lacks reasoning, § 2254(d) applies and must be overcome by the inmate. *Richter*, 562 U.S. at 98.

AEDPA also provides that the state-court factual findings "shall be presumed to be correct" unless the inmate carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C § 2254(e)(1). Further, "[t]he presumption of [factual] correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

For claims adjudicated on the merits in state court and thus subject to § 2254(d), there is "no reason for . . . an evidentiary hearing." *Blue v. Thaler*, 665 F.3d 647, 661 (5th Cir. 2011). And an inmate may not escape § 2254(d)'s

22

deferential review by "using evidence that is introduced for the first time" in federal court. *Id.* at 656.

Claims without a state-court merits adjudication are subject to § 2254(e)(2)'s limitation on new evidence. *Pinholster*, 131 S. Ct. at 1401. An inmate must first prove that he or she did not fail to develop the factual basis of a claim in state court. *Williams v. Taylor*, 529 U.S. 420, 430 (2000) (*Michael Williams*). If the inmate was less than diligent in developing the facts, an evidentiary hearing is permissible only where there is a new, retroactive rule of constitutional law, *or* where the facts could not have been discovered with due diligence *and* such facts demonstrate actual innocence of the crime by clear and convincing evidence. 28 U.S.C. § 2254(e)(2)(A)–(B).

If, on the other hand, diligence was exercised, a district court still has discretion to deny a hearing. *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007). A hearing should be granted only where the inmate was denied a full and fair hearing in state court and the inmate's allegations, if true, would warrant relief. *Blue*, 665 F.3d at 655. Further, a district court may deny a hearing if the federal record is sufficiently developed to make an informed decision. *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998).

## ARGUMENT

The vast majority of Mamou's federal habeas claims are procedurally barred. Mamou fails in his attempt to demonstrate cause and prejudice to excuse the default, or that the failure to review the merits of these claims would result in a fundamental miscarriage of justice. Regardless, these and the remaining non-defaulted claims lack merit. Summary judgment is appropriate in this case.

**I.     Mamou Cannot Demonstrate Cause and Prejudice to Excuse His Procedurally Barred Claims, Nor is He Able to Establish His Actual Innocence Such That the Failure to Review the Merits of His Defaulted Claims Would Result in a Fundamental Miscarriage of Justice.**

The second, third, fourth, fifth, sixth, and fourteenth claims raised in Mamou's federal habeas petition are procedurally barred. So too are portions of his seventh, eighth, and thirteenth claims. Details regarding the default of these claim are set out in the sections that follow. Mamou asserts in the first claim of his petition that these claims are nevertheless reviewable because he is actually innocent of capital murder, and failure to consider their merits would result in a fundamental miscarriage of justice. His ninth claim attempts to excuse the procedural default of his IATC claims under *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), by establishing that his state habeas counsel was ineffective for failing to raise these claims in his state writ application. Neither claim is supportable.

24

### A. Mamou fails to demonstrate his innocence of capital murder, thus, there is no fundamental miscarriage of justice excusing his procedurally barred claims.

The standard for proving actual innocence is a stringent one that Mamou cannot meet. Newly discovered evidence impeaching the testimony of trial witnesses is not enough to prove, as a matter of fact, that Mamou is not responsible for Carmouche's murder. Additionally Mamou's argument attacking the legal sufficiency of the evidence introduced at trial misses the mark entirely. As such, his claims remain defaulted and should be dismissed by this Court.

### 1. Successful "gateway" actual innocence claims affording merits review of defaulted claims are rare and not easily established.

The Supreme Court has unequivocally held that claims of "actual innocence" based on newly discovered evidence do not constitute a cognizable claim for federal habeas relief. *Herrera v. Collins*, 506 U.S. 390, 400-401 (1993). Instead, a petitioner's claim of innocence serves only as "a gateway through which [he] must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup v. Delo*, 512 U.S. 298, 314 (1995). As explained by the Supreme Court,

> In the usual case, the presumed guilt of a petitioner convicted in state court counsels against federal review of defaulted claims. Yet a petition supported by a convincing *Schlup* gateway showing, "raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the

> assurance that the trial was untainted by constitutional error";
> hence, "a review of the merits of the constitutional claims" is
> justified.

*House v. Bell*, 547 U.S. 518, 537 (2006); quoting *Schlup*, 513 U.S. at 317. Thus, a petitioner's persuasive demonstration of his actual innocence essentially constitutes a "fundamental miscarriage of justice" sufficient to excuse any procedural default. *See Murray v. Carrier*, 477 U.S. 478, 495 (1986) (recognizing a narrow exception to the cause-and-prejudice requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the offense charged); *see also House*, 547 U.S. at 536 (recognizing that "in appropriate cases ... the principles of comity and finality that inform the concepts of cause and prejudice "must yield to the imperative of correcting a fundamentally unjust incarceration." (quoting *Carrier*, 477 U.S. at 495)).

In order to "ensure[ ] that petitioner's case is truly 'extraordinary,' while providing petitioner a meaningful avenue by which to avoid manifest injustice," the Supreme Court has held that gateway claim of actual innocence will succeed only where the petitioner establishes that, "in light of new evidence 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. 536-37 (quoting *Schlup*, 513 U.S. at 327). Or, removing the double-negative, a petitioner must demonstrate "that more likely than not any reasonable juror would have a

reasonable doubt." *House*, 547 U.S. at 538. To state this yet another way, if any reasonable juror could, in light of the new evidence, find the petitioner guilty beyond a reasonable doubt, he has not sufficiently proven his innocence. Notably, this standard is "demanding" and will permit review only in "extraordinary" cases. *Id.* (citing *Schlup*, 513 U.S. at 327). The Supreme Court has expressly cautioned that "tenable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013)

Moreover, "to be credible such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 512 U.S. at 324. A habeas court must consider "all the evidence," including both "old and new, exculpatory and inculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern at trial." *Id.* at 327-28 (internal citations and quotations omitted). The district court may, however, "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.* at 331-32. Ultimately, "the court's function is not to make an independent factual determination about what likely occurred, but rather assess the likely impact of the evidence on reasonable jurors." *House*, 547 U.S. at 538 (citing *Schlup*, 513 U.S. at 329).

### 2.     This demanding standard is not one that Mamou can meet.

A reasonable juror would find Mamou guilty of capital murder despite the "new" evidence presented in his federal habeas petition. Mamou's claim of innocence rests on his assertions that (1) the testimony of ballistics experts Robert Baldwin concerning the "magazine marks" was false and unreliable; and (2) there are reasonable grounds to believe that the state coerced testimony from lay witnesses included Terrence Dodson, Howard Scott, Robin Scott, Kevin Walter, Samuel Johnson, and Anthony Trial. But neither demonstrates that Mamou was not the party responsible for kidnapping and murdering Mary Carmouche. At best, the evidence impeaches the testimony of some of the State's witnesses at trial. This is not enough to satisfy the stringent *Schlup* standard.

> ### a.     Even assuming the testimony of the State's ballistics expert regarding the "magazine marks" is scientifically discredited, impeaching Baldwin's testimony does not prove Mamou's innocence of Carmouche's kidnapping and murder.

Baldwin testified during the guilt-innocence phase of Mamou's trial that the magazine marks found on an unfired cartridge case found near Carmouche's body matched the magazine marks on one of the fired cartridge cases recovered from the scene of the shootout. 20 RR 109-11. Mamou presents evidence in these proceedings suggesting that this type of firearm comparison

28

is scientifically unreliable.  Specifically, he points to several scholarly articles published in various journals calling into question the reliability and admissibility of firearms and toolmark identification.   DE 39 at 69-81. Additionally, Mamou points to a the CCA's decision in *Sexton v. Texas*, wherein the court held that while the theory of toolmark examination could be reliable in a given case, the State had not demonstrated that the theory that two unfired shell casings could be identified by magazine markings as having been chambered in the same gun was reliable.  93 S.W.3d 96, 100-101 (Tex. Crim. App. 2002).

As an initial matter, newly discovered evidence must be "material, not merely cumulative or impeaching." *Lucas v. Johnson*, 132 F.3d 1069, 1075 n.3 (5th Cir. 1998).  Attempts by Mamou to impeach the validity of Baldwin's testimony, even if successful, are not enough to prove his is factually innocent of Carmouche's capital murder.  Even without this evidence, any reasonable juror would have found him guilty.   Mamou argues that without Baldwin's testimony, the State had no case for capital murder, but the record does not support this assertion.  As set out fully in section II(C), *infra*, Baldwin's testimony was not material to Mamou's conviction.

The evidence in the record established that Mamou was the last person to be seen with this victim.  He stole the car in which she was a passenger after shooting her friends at the Lantern Point location where they met for a drug

deal.  As the prosecutor argued during closing arguments, it is obvious from viewing the entirety of the criminal transaction that Mamou was the only one with the motive and opportunity to kill Carmouche.  More to the point, Mamou admitted to his cousin Terrance Dodson that he killed Carmouche.  While Baldwin's testimony regarding the magazine markings certainly bolstered the evidence proving Mamou guilty of capital murder, it was neither essential, nor even a critical or highly significant factor at trial.   Merely impeaching Baldwin's testimony with newly discovered evidence questioning the reliability of magazine marking identification is not enough to exculpate Mamou and obtain review of his procedurally defaulted claims.

> **b.   Mamou wholly fails to support his assertion that the testimony of several state's witnesses was coerced and untruthful; but even if he could, impeachment of these witnesses does not establish his innocence.**

Several of the witnesses called by the State to testify during the guilt-innocence phase of trial were individuals who had been present during, or were otherwise involved in, the attempted drug transaction that resulted in a shootout at the Lantern Point Road. Mamou's actual innocence claim is partially premised on his wholly unsupported assertion that the self-serving testimony of witnesses Kevin Walter, Samuel Johnson, Howard Scott, Terrence Dodson, and Anthony Trial resulted from inducements and deals by the State and was false.

But there is no proof of any such "inducements and deals" and no evidence that their testimony was false. Mamou merely contends that "[i]t is entirely unreasonable to believe that these witnesses, who were all engaged in serious criminal activities, testified for the State and implicated themselves in serious crimes, including drug dealing and/or murder, without any such inducements for them to do so." Conclusory allegations unsupported in fact do even begin to meet the rigorous *Schlup* standard.

Regardless, even assuming such evidence existed, impeaching the credibility of the State's witnesses will not support a finding of actual innocence. *See Lucas*, 132 F.3d at 1075, n. 3 (holding that evidence proving actual innocence must be "material, not merely cumulative or impeaching"). This is especially true in Mamou's case, where the criminal character of the State's witnesses and their motivation to lie was glaringly obvious on the face of their testimony. Indeed, several of them admitted on the record to lying to police. Cumulative impeach of these witnesses fall well short of the mark set by *Schlup*.

Mamou's allegation that the testimony of Dodson, as well as Robin and Howard Scott was coerced fairs no better. As support he cites to a statement by Sonja Rafeet who asserts that Robin Scott told her she and her husband were harassed by the Houston police department prior to Mamou's trial. DE 39 at 50 (citing Petitioner's Exhibit 27). Similarly, Rafeet stated that Dodson's

31

mother told her that the police harassed and followed her son trying to make sure the he would testify against Mamou at trial. *Id.* at 51. While the hearsay nature of Rafeet's statement does not preclude the Court from considering it as evidence of Mamou's innocence, the Court need not to turn a blind eye to the unreliable nature of hearsay evidence. *See Schlup*, 512 U.S. at 327-28, 331-32 (holding that the district court  must consider the evidence with regard to whether it would be admissible at trial, but may "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence").

Moreover, the fact that these witnesses, who were obviously reluctant to testify, felt harassed by the police does not mean their testimony was coerced or false.  Any reluctant witness served with a subpoena might feel coerced or harassed.  The fact that Dodson and the Scotts were reticent to testify against Mamou does not indicate, as Mamou would like this court to believe, that their testimony was false.  Again, conclusory allegations lacking a solid foundation in fact are not the type of new discovered evidence contemplated by *Schlup*.

### c. *Schlup* requires more than merely an attack on the sufficiency of the evidence at trial.

Notably, Mamou fails to produce any newly discovered evidence showing that he did not, as a matter of fact, kidnap and murder Mary Carmouche.  Nor does he bring forth evidence showing that someone else is responsible for the

crime.  Instead, he attempts to attack and undermine the credibility of the state's evidence at trial.  But as noted by the Supreme Court in *Blousy v. United States*, "'actual innocence' means factual innocence, not mere legal insufficiency."  523 U.S. 614, 623 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).  For this and the reasons set out above, there is not basis upon which to find Mamou actually innocent of capital murder.  As such, his claims remain procedurally barred from federal habeas review.

### B.  Mamou cannot excuse the default of his IATC claim under *Martinez* and *Trevino*.

Mamou raises several unexhausted and procedurally defaulted IATC claims in his federal habeas petition, including his fourth, fifth, sixth, and seventh claims, that allege various error by counsel during the pre-trial, voir dire, guilt-innocence, and punishment phases of trial.  Mamou maintains in his ninth claim that the Supreme Court's decisions in *Martinez* and *Trevino* afford him review of his barred claims because state habeas counsel was ineffective for failing to assert these IATC claims in his state writ application.  Because Mamou cannot demonstrate that any of the unexhausted IATC claims are "substantial," the exception carved out in *Martinez* and *Trevino* cannot not save Mamou from default.

Under *Coleman v. Thompson*, 501 U.S. 772, 750 (1991), a petitioner can obtain federal habeas review of a procedurally barred claim where "cause and

prejudice" is established.  To show cause a petitioner must demonstrate that an external, objective factor precipitated the default.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Prejudice is found where the petitioner is able to prove that the alleged constitutional error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 167 (1982).

In *Coleman*, the Supreme Court explicitly noted that that ineffective assistance of state habeas counsel would not suffice to establish "cause" to excuse procedural default.  501 U.S. at 752-53.  The Court changed course in *Martinez*, recognizing a "narrow exception" to the *Coleman* holding where state law required IATC claims to be raised for the first time in a collateral proceedings.  *Martinez*, 132 S.Ct. at 1315.  The Court reasoned that because these "initial-review collateral proceedings" constitute a prisoner's "one and only appeal" as to IATC, inadequate assistance of counsel at these proceedings may establish cause for the procedural default of these types of claims.  *Id*. *Trevino* found this narrow exception applicable to cases arising in Texas courts because "the Texas procedural system—as a matter of structure, design, and operation—does not offer most defendant's a meaningful opportunity to present a claim of ineffective assistance of counsel on direct appeal."  133 S.Ct. at 1921.

Under *Martinez*, cause to excuse a procedural default as to an IATC

34

claim is established by demonstrating that (1) state habeas counsel was constitutionally deficient in failing to include an IATC claim in the first state habeas application; and (2) the underlying IATC claim is "substantial." 132 S.Ct. at 1318. To prove a claim "substantial," a "prisoner must demonstrate that the claim has some merit." *Id.* An "insubstantial" IATC claim, by contrast, is one that "does not have any merit" or that is "wholly without factual support." *Id.* at 1319.

### 1. Mamou fails to demonstrate that state habeas counsel was constitutionally deficient.

Initially, counsel's performance in this case stands in noted contrast to the inadequacies of state habeas counsel that precipitated the Court's ruling in *Martinez*. Martinez was convicted in Arizona state court of sexual conduct with a minor, and his conviction was affirmed on direct appeal. *Id.* at 1313-15. During the pendency of his appeal, Martinez's appellate counsel initiated collateral review in state court by filing a notice of post-conviction relief, but then filed a statement that she could find no colorable claim for post-conviction relief. *Id.* The state court gave Martinez the option of filing a pro se petition, but Martinez alleged that his counsel failed to inform him that he needed to do so. *Id.* After the time to file a petition expired, the trial court dismissed the collateral action. *Id.* Later, represented by new counsel, Martinez filed a new notice of post-conviction relief in state court and alleged that his trial counsel

35

had been unconstitutionally ineffective, but this petition was dismissed because the claim was not presented in the first proceeding. *Id.* In federal habeas proceedings, the district court then denied Martinez's claims as procedurally barred. *Id.*

Here, counsel for Mamou filed a state habeas application raising eight points of error challenging (1) trial and appellate counsel's representation with respect to the admission of victim impact testimony; (2) the trial court's admission of testimony concerning possible changes in parole-eligibility laws; and (3) the trial court's failure to instruct the jury that the State had the burden of proof on the mitigation special issue. SCHR 03-48. *Martinez* thus does not help Mamou because counsel did not fail to file or otherwise abandon his client. Instead, counsel simply did not raise the claims that he now believes (in hindsight) he should have raised. But simply because counsel did not raise the allegations that Mamou now contends he should have raised does not render counsel's assistance ineffective under *Strickland*. *Cf. Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding appellate counsel is not ineffective merely because he fails to raise issues that his client requests him to raise); *Jones v. Barnes*, 463 U.S. 745, 751-53 (1983) (holding appellate counsel is only constitutionally obligated to raise and brief those issues that are believed to have the best chance of success); *Engle v. Isaac*, 456 U.S. 107, 134 (1982) ("[T]he constitution guarantees criminal defendants only a fair trial and a

competent attorney.  It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.").

### 2.   More importantly, however, none of procedurally defaulted IATC claims are "substantial."

As set out in the sections that follow, Mamou's procedurally barred IATC claims are entirely lacking in merit.  In his fourth claim, Mamou raises numerous allegations accusing counsel of deficient representation for failing to properly challenge the testimony of the State's ballistics expert, Robert Baldwin.  This claim, however, is wholly based on hindsight.  *See* section IV, *infra*. The scholarly articles and court cases cited to factually support his assertion that counsel ought to have challenged Baldwin's testimony on the "magazine markings" are dated years after Mamou's trial.  Because he has not demonstrated this same information was readily available to counsel at the time of trial, he cannot demonstrate deficient performance.  Moreover, the record belies Mamou's assertion that Baldwin's testimony was the only evidence linking him to Carmouche's murder.  Given the circumstance of the offense and the Mamou's confession to Dodson that he killed Carmouche, it would have been difficult for the jury to do anything other than convict Mamou of capital murder.  Mamou's fifth claim, complaining about counsel's representation during the pre-trial hearing is duplicative of his other IATC claims, with the exception of his claim that counsel failed to request timely

discovery to obtain the criminal histories of the State's witnesses. *See* section V, *infra*. Aside from the fact that it was obvious on the face of their testimony that most of the State's witnesses were engaged in criminal behavior, the record reveals that counsel indeed filed a discovery request for "[t]he juvenile and criminal arrest/or conviction record of the complainant and all state's witnesses." CR 46. Mamou's sixth claim, accusing counsel of ineffective representation during voir-dire and guilt-innocence, contains numerous truncated citations to, and quotations from, the record, that when considered in context absolutely repudiate any claim of deficiency. *See* section VI*, infra*. Finally, subpart (b) of Mamou's seventh claim, alleging inadequate investigation, discovery, and presentation of mitigating evidence during the punishment phase essentially admits the dearth of factual support and blames it on the denial of funding for investigative assistance. Because Mamou's IATC claims are "insubstantial" and "wholly lacking in factual support," he fails to demonstrate cause under *Martinez* to overcome the procedural default.

## II. Federal Habeas Relief is Foreclosed on Mamou's Claim That the Trial Court Erred in Admitting Unreliable "Magazine Marks" Testimony from the State's Ballistics Expert.

This claim was dismissed by the state court on independent and adequate state procedural grounds. As such, it is defaulted in federal court. Even if it were not, this claim fails to raise a constitutional challenge to Mamou's conviction and is, therefore, not cognizable on federal habeas review.

Nevertheless, the admission of the State's ballistics evidence did not violate due process.  This Court should deny relief.

### A.    This claim is procedurally defaulted.

Federal courts are without jurisdiction to review a habeas claim "if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision." *Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir. 2012) (citing *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001) (internal quotations and emphasis omitted)).  The Fifth Circuit in *Roberts* explained the application of this procedural bar:

> [A]s a rule, a state prisoner's habeas claims may not be entertained by a federal court when (1) a state court [has] declined to address those claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds. The twin requirements of independence and adequacy demand that the state court's dismissal must  clearly and expressly indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. Put differently, to produce a federally cognizable default, the state procedural rule must have been firmly established and regularly followed by the time as of which it is to be applied.

*Id.* at 604-605 (internal quotations and citations omitted).  Notably, federal habeas review is precluded even if the state court rejects the claim on the merits in the alternative.  *See Harris v. Reed,* 489 U.S. 255, 264 n. 10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative*

holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

This claim was raised for the first time in Mamou's subsequent application for state habeas relief. SHCR 309-317. The CCA clearly and expressly dismissed this application and the claims it contained as an abuse of the writ under article 37.071 § 5 of the Texas Code of Criminal Procedure. *Ex parte Mamou*, WR-78,112-01, WR-78,112-02, WR-78,112-03, slip op. at 2. The Fifth Circuit has held since 1994 that "the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar." *Hughes v. Quarterman*, 530 F.3d 336, 340 (5th Cir. 2008) (citing *Kunkle v. Dretke,* 352 F.3d 980, 988-89 (5th Cir.2003); *Fearance v. Scott,* 56 F.3d 633, 642 (5th Cir.1995); *Emery v. Johnson,* 139 F.3d 191, 195-96 (5th Cir.1997). Because "there is nothing in the perfunctory dismissal of the claims that suggests that [the CCA] actually considered or ruled on the merits," the state court's decision is "independent of federal law for purposes of application of the procedural default doctrine. *See Hughes,* 530 F.3d at 342; *see also Rocha v. Thaler*, 626 F.3d 815, 836 (5th Cir. 2010) (holding that "*Hughes* illustrates the proper application of *Coleman v. Thompson,* to a CCA determination that a successive habeas application does not satisfy § (5)(a)(1)").

To overcome this procedural bar, Mamou must demonstrate either "cause and prejudice" or that the failure to review the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. For the reasons set out in section I, *supra*, he has established neither. Thus, there is nothing for this Court to review, and this claim should be dismissed.

**B.    Even absent the procedural default, federal habeas relief on this claim is foreclosed because, it fails to raise a constitutional issue cognizable on federal habeas review.**

Mamou contends that trial court abused its discretion by admitting Baldwin's testimony on the magazine marks. Specifically he contends that this evidence should have been excluded under the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, as well as under Texas Rule of Evidence 702. Mamou cites to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), to support his argument.

A federal habeas court reviewing a petition filed under 28 U.S.C. § 2254 is only authorized to consider whether petitioner's conviction or sentence—or both—violate the Constitution, laws or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). Although Mamou cites to the Fifth, Sixth, and Eighth Amendments in his argument, he provides no authority demonstrating that those amendments speak to the admissibility of scientific evidence. *Daubert*

41

and its progeny do not save Mamou's argument because *Daubert* did not set a constitutional standard for the admissibility of scientific evidence, but rather examined the applicable standard under the Federal Rule of Evidence. *See Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994). Moreover, Mamou was tried in a Texas trial court where the Federal Rules of Evidence are inapplicable. Thus, there is nothing here for this Court to review.

### C. Finally, even assuming it was Mamou's intention to challenge the admissibility of Baldwin's magazine marks testimony under due process, this claim would not succeed.

The Fifth Circuit has consistently resisted ordinary challenges to evidentiary matters on habeas review. *Herrera v. Collins*, 904 F.2d 944, 950 (5th Cir. 1990); *Anderson v. Maggio*, 555 F.2d 447, 551 (5th Cir. 1977); *Woods v. Estelle*, 547 F.2d 269, 271 (5th Cir. 1977). Only where the petitioner demonstrates that the state's evidentiary ruling resulted in the denial of fundamental fairness, thus violating due process, will habeas relief be granted. *Woods*, 547 F.2d at 271; *Mullen v. Blackburn,* 808 F.2d 1143, 1145 (5th Cir.1987). To guide the court's application of the "fundamental fairness" criterion, the Fifth Circuit has explained that "the erroneous admission of prejudicial evidence can justify habeas corpus relief if it is material in the sense of a crucial, critical, highly significant factor." *Woods*, 547 F.2d at 271. Baldwin's testimony regarding the magazine marks was not material.

Mamou attempts to convince this court that without Baldwin's

testimony, there could be no capital murder conviction.  But that is simply not the case.  The evidence in the record established that Mamou was the last person to be seen with this victim.  He stole the car in which she was a passenger after shooting the friends with whom she rode to the Lantern Point location for the drug deal.  Only Mamou's incredible, self-serving testimony, contradicted by other witnesses at trial, points the finger of responsibility for Carmouche's death in another direction.  Even more incriminating is the fact that Mamou admitted to his friend Terrance Dodson that he killed Carmouche.  While Baldwin's testimony regarding the magazine marking certainly bolstered the evidence proving Mamou guilty of capital murder, it was neither essential, nor even a critical or highly significant factor at trial.

Mamou points to the State's closing arguments at guilt-innocence to assert that the prosecution not only emphasized Baldwin's testimony, but admitted there could be no conviction for capital murder without it.  He overstates and grossly mischaracterizes the State's argument.  Mamou cites to a following portion of the State's closing argument wherein the prosecutor is discussing the jury instruction on accomplice witness testimony in an effort to demonstrate the state's reliance on Baldwin's testimony:

> …what that instruction says is that you couldn't convict Charles Mamou just on the evidence of Samuel Bug Johnson.  There has to be other evidence that tends to connect the defendant to the crime, and there is tons of other evidence … There is all kinds of other evidence, the ballistic evidence […] (21 RR 12-13).

DE 39 at 62.  Yet, he omits the final piece of that argument, the portion that belies his suggestion that the state's relied on Baldwin's testimony to prove capital murder.  Restated more fully, the prosecutor argued: "There is all kinds of other evidence, the ballistics evidence, fingerprint evidence, the location of the car, all kinds of evidence, plus the admission the defendant made to his cousin, Terrance Dodson."  21 RR 12-13. Notably, the prosecutor references only "ballistics evidence" in general, not the magazine mark testimony about which Mamou complains here.  The prosecutor's argument mentions the magazine markings specifically only once—and even then in response to argument made by opposing counsel during their closing.  21 RR 47-48.  The discussion of this portion of Baldwin's testimony comprises barely one and a half pages of the State's twenty-five page argument.  The most significant part of the State's argument was painting a holistic view of the entire criminal transaction to demonstrate that Mamou was the only one with the motive and opportunity to kill Carmouche, and highlighting the incredibility of Mamou's protestation of innocence.  21 RR 6-15, 40-57.  As such, Mamou fails to establish that Baldwin's testimony regarding the magazine marks violated due process. This Court should deny relief.

### III. Mamou's Allegations that the State Suppressed Evidence and Presented False Testimony in Violation of Due Process Do Not Support Federal Habeas Relief.

Mamou's *Brady* and *Napue* allegations are procedurally barred on federal habeas review. Initially, Mamou's claim that the State suppressed and presented false evidence regarding the "magazine markings" in unexhausted, and because it would be now be defaulted in state court under Texas's abuse-of-the-writ doctrine, it is barred here. Mamou's other allegations, though exhausted, are procedurally barred because they were dismissed by the state court on independent and adequate state procedural grounds. Regardless, the claims are conclusory and wholly lacking in evidentiary support. Mamou's request for discovery and an evidentiary hearing to pursue evidence to support them is insupportable. This Court should deny relief.

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady*, 373 U.S. at 87). To succeed on a *Brady* claim, the petitioner must prove three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must be suppressed by the state, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material and

45

results in prejudice where there exists a reasonable probability that the result at trial would have been different had the evidence been disclosed. *Banks*, 540 U.S. at 699. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

A due process violation similarly occurs where there is a "deliberate deception of the court and jury by the presentation of testimony known to be perjured." *Mooney v Holohan*, 294 U.S. 103, 112 (1935). This is also true "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To prove a violation based on the prosecution's knowing use of false testimony, the petitioner must demonstrate (1) the testimony at issue was false; (2) the prosecution knew the testimony was false; and (3) the testimony was material. *Giglio v. United States,* 405 U.S 150, 153-54 (1972); *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000).

Mamou accuses the State of both suppressing evidence in violation of *Brady* and knowingly presenting false testimony as proscribed under *Napue*. Specifically, he claims that the State suppressed (1) favorable impeachment evidence demonstrating that the magazine marks did not and could not establish the live round found near Carmouche's body was cycled through the magazine of the same gun involved in the shootout at Lantern Point Drive; (2) evidence of prior inconsistent statements of State's witnesses; (3) evidence

demonstrating that the State's fingerprint expert was discredited; (4) evidence indicated that Dodson was pressured by police to testify against Mamou; and (5) evidence that the several State's witnesses testified in exchange for favorable treatment from the prosecution.  He further accuses the State of knowingly offering Baldwin's magazine marks testimony when it knew his testimony to be false.

### A.    Mamou has defaulted his *Brady* and *Napue* claims.

Mamou's allegation that the State suppressed evidence and presented false testimony regarding the "magazine markings" was never presented to the state court for review as required by 28 U.S.C § 2254(b)(1)(A).   AEDPA precludes this Court from granting relief on claims that have not been properly exhausted.  As the Fifth Circuit explained:

> The exhaustion doctrine of 28 U.S.C. §22554 (b)(1) codified long-developed principles of comity.  Before a federal court can find merit in alleged errors by state courts, a petitioner must have first provided the state's highest court with a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations.  This requirement is designed to give state courts the initial opportunity to pass upon state prisoner's conviction or sentence.  The purpose of exhaustion is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court.

> A fair opportunity requires that all the grounds of the claim be "fairly presented" to the state court.  In other words, in order for a claim to be exhausted, the state court system must have been presented with the same facts and legal theory upon which the

> petitioner bases his current assertions . . . Exhaustion requires a
> state prisoner to present the state courts with the same claim he
> urges upon the federal court.

*Ruiz v. Quarterman*, 460 F.3d 638,642-43 (5th Cir. 2006) (internal quotations

and citations omitted).

More importantly, unexhausted claim are procedurally defaulted where

"the court to which the petitioner would be required to present his claims in

order to meet the exhaustion requirement would now find the claims

procedurally barred." *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 2015)

(citing *Coleman v. Thompson*, 501 U.S. at 735 n.1). Because the Texas abuse-

of-the-writ doctrine, set out in Tex. Code Crim. Proc. art. 11.071 § 5, would

procedurally bar Mamou's attempt to raise this unexhausted claim in a

subsequent writ application, it is defaulted here.  *Finley,* 243 at 219–20

(citing *Fearance,* 56 F.3d at 642).

The remaining *Brady* allegations are also procedurally barred.  These

claims, though exhausted, were presented to the state court in a subsequent

writ application that was denied by the CCA as an abuse of the writ under

Texas Code of Criminal Procedure article 37.071 § 5. *Ex parte Mamou*, WR-

78,112-01, WR-78,112-02, WR-78,112-03, slip op. at 2.  The Fifth Circuit has

held since 1994 that "the Texas abuse of the writ doctrine has been consistently

applied as a procedural bar, and that it is an independent and adequate state

ground for the purpose of imposing a procedural bar."  *Hughes*, 530 F.3d at

340. Because "there is nothing in the perfunctory dismissal of the claims that suggests that [the CCA] actually considered or ruled on the merits," the state court's decision is "independent of federal law for purposes of application of the procedural default doctrine. *See Hughes,* 530 F.3d at 342; *see also Rocha v. Thaler*, 626 F.3d 815, 836 (5th Cir. 2010) (holding that "*Hughes* illustrates the proper application of *Coleman v. Thompson*, to a CCA determination that a successive habeas application does not satisfy § (5)(a)(1)").

To overcome the default on these claims, Mamou must demonstrate either "cause and prejudice" or that the failure to review the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. For the reasons set out in section I, *supra*, he has shown neither. These claims are not, therefore, reviewable and ought to be dismissed by this Court.

## B.   Regardless, these allegations are conclusory and lacking in support of any kind.

Mamou acknowledges that he cannot factually support his due process accusations against the State. He claims that he will prove the merits of his claims once he obtains "funding, discovery, and an evidentiary hearing." DE 39 at 89. This Court has already denied funding because Mamou's claims are procedurally barred and speculative. DE 21. For these same reasons, further factual development is not warranted on these claims. *See* subsection(C), *infra*. That leaves Mamou with his conclusory allegations that fall well short of

entitling him to federal habeas relief.   Circuit precedent clearly dictates that conclusory and speculative claims are insufficient to support federal habeas relief. *Murphy v. Johnson*, 205 F.3d 809, 813-14 (5th Cir. 2000); *United States v. Woods,* 870 F.2d 285, 288 (5th Cir.1989); *Schlang v. Heard,* 691 F.2d 796, 799 (5th Cir.1982).

Initially, Mamou's challenge against Baldwin and his magazine marks testimony is premised on information that was not available at the time of trial.   He has produced *nothing* even hinting that the State could or should have been aware of information contained in scholarly articles that had not been published and caselaw that was not decided until years after his conviction in this case. *See* section IV, *infra*.   The State cannot suppress impeachment evidence that does not exist at the time of trial.

Mamou's claim regarding the State's alleged suppression of prior inconsistent statements by the State's witnesses is equally speculative.   He maintains that "it is difficult to believe" that the 34 pages of handwritten investigator notes he discovered while combing through both his state habeas attorney and the prosecutor's file with "extreme diligence" is the total result of the investigation of Carmouche's murder.   DE 39 at 91.   Mamou's belief with respect to what the files of habeas counsel and the prosecutor ought to contain is not enough to prove the State suppressed evidence.

Even further, it is apparent on the face of the record, that the State did

not suppress the fact that several of its witnesses had made prior inconsistent statements.  Kevin Walter admitted on cross-examination to lying to police while at the hospital.  16 RR 140.  It is clear from counsel's cross-examination of Walter, that the defense was well aware of the fact that Walter had made statement prior to trial that were inconsistent with his trial testimony.  *Id.* at 140-143.  Dion Holley also testified that he initially lied to police and the security guard who were the first to appear at the scene.  18 RR 49, 51.  Indeed, Holley admitted on cross-examination that he had "always lied to police about the case" and that he had "never given them the truth about the case."  18 RR 59-60.  Samuel "Bug" Johnson, another witness for the state, similarly admitted to lying in his initial interview with police.  19 RR 47.  Considering that both counsel and the jury was aware of the fact that several of the State's witnesses had prior inconsistent statements, it is not possible for Mamou to prove either suppression or materiality as required by *Brady*.

With respect to his insinuation that the State suppressed evidence that it made deals with witnesses in exchange for their testimony, all Mamou offers under the heading of his *Brady* claim is the following: "It appears that most or all of the State's witnesses Dodson, Walter, Holly, and Johnson were never charged with any crimes as a result of their cooperation with the prosecution and conviction of Mamou."  DE 39 at 90.  He is a bit more explicit arguing his actual innocence claim.  There Mamou maintains that,

51

[he] has reason to believe that these witnesses were all given inducements and deals by the State to testify as they did and that these inducements and deals were concealed from the defense, raising issues under *Brady v. Maryland*, [ ].  It is unreasonable to believe that these witnesses, who were all engage in serious criminal activities, testified for the State and implicated themselves in serious crimes, including drug dealing and/or murder, without any such inducements for them to do so.

DE 39 at 51-52.

This Court found similar statements asserted in Mamou's motion for funding for investigative and expert assistance speculative and insufficient to warrant funding.  DE 21 at 5-7.  In particular the Court noted that Mamou "provided few details," and "is speculating that agreements actually existed." *Id*. at 6.  The Court further held that "Mamou has not provided any reasonable basis to believe that the State made deals requiring the witnesses to commit perjury."  *Id*. at 7.  The same is true here.  Other than Mamou's belief that it is unreasonable to expect witnesses to implicate themselves in serious crimes without a deal for favorable treatment, nothing supports this allegation.

Mamou's claim alleging that Dodson's testimony was coerced and false suffers from a similar deficiency.  The only evidence offered to substantiate this claim is a double-hearsay statement from Sonja Rafeet, who claims that Dodson's mother told her that the police were "constantly following her son and harassing her son and trying to make sure that Terrence would testify against Mamou at trial."   DE 39 at 51. The subjective impression of the witness's

mother's that her son was being harassed by police because they wanted to ensure his testimony at trial does not, even if true, demonstrate that the testimony Dodson offered at trial was false. A witness's reluctance to testify does not undermine the veracity of their testimony.

Finally, Mamou's allegation that the "State's fingerprint expert Saldivar has [ ] been discredited" proves nothing. *See* DE 39 at 90. In his ineffective assistance of trial counsel claim, Mamou cites to news articles printed in the Houston Chronicle in 2010, discussing a written reprimand Saldivar received in 1997. DE 39 at 104-105. Once again, he offers no proof that this evidence was suppressed by the State. Indeed, the only argument found under the heading of his *Brady* claim is a statement asserting that Saldivar was discredited. Because conclusory and speculative allegations do not support federal habeas relief, Mamou fails to prove the merits of this and the previously discussed *Brady* and *Napue* claims.

## IV. Federal Habeas Relief is not Warranted on Mamou's Claim that Trial Counsel Failed to Effectively Defend Mamou Against Evidence Presented by the State's Ballistics and Fingerprint Experts.

Mamou failed to present these claims to the state court for review. As such, they are unexhausted and procedurally barred. Nevertheless, Mamou's allegations against counsel for failing to adequately investigate and challenge the expert testimony of the State's firearms and fingerprint examiners engage

in precisely the sort of hindsight analysis that *Strickland* cautions against. While impeachment material may have come to light in the years following Mamou's conviction, the strategic decisions made by counsel at trial were reasonable in light of the information known to them at that time. Regardless, Mamou cannot demonstrate that he was prejudiced by counsel's failure to exclude the Baldwin's testimony. This Court should deny relief.

### A. Mamou's ineffective assistance of counsel claims are unexhausted and procedurally barred.

None of the many allegations Mamou lodges here against counsel been presented to the state courts, either on direct appeal or during state habeas proceedings. A federal habeas petitioner must fully exhaust available state court remedies before seeking relief in federal court. 28 U.S.C. § 2254(b)(1); *Ward v. Stephens*, 777 F3.d 250, 357-58 (5th Cir. 2015); *Ruiz*, 460 F.3d at 642-43. To satisfy the statute, "a habeas petitioner must have fairly presented the substance of his claims to the state courts." *Ward*, 777 F.3d at 358 (quoting *Nobles*, 127 F.3d at 420). Unexhausted claims are procedurally defaulted where "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* (citing *Coleman,* 501 U.S. at 735 n. 1). Because the Texas abuse-of-the-writ doctrine, set out in Tex. Code Crim. Proc. art. 11.071 § 5, would procedurally bar Mamou's attempt to raise this unexhausted claim

in a subsequent writ application, it is defaulted here. *Finley,* 243 F.3d at 219–20 (citing *Fearance*, 56 F.3d at 642).

To excuse the default on these claims, Mamou must demonstrate either "cause and prejudice" or that the failure to review the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. For the reasons set out in section I, *supra*, he has shown neither. These claims are not, therefore, reviewable and ought to be dismissed by this Court.

### B.   Even if these claims were not defaulted, they lack merit.

Mamou alleges nine deficiencies criticizing counsel's failure to adequately challenge the testimony of the State's ballistics and fingerprint experts, but none of these claims entitle him to relief. All but one of his allegations focus on what Mamou claims is counsel's failure to adequately challenge ballistics expert Robert Baldwin's qualifications as an expert and testimony regarding magazine markings. To this end, Mamou complains that counsel failed to 1) file proper pre-trial motions to exclude Baldwin's testimony; 2) seek timely discovery of testing performed by Baldwin; 3) present testimony from an independent witness; 4) request a *Daubert* hearing to challenge Baldwin's expertise, credentials, and methodology; 5) object to Baldwin's testimony at trial; 6) seek a continuance to obtain an independent expert; 7) review literature and consult experts in the field of magazine marks and toolmark identification; and the 8) effectively cross-examine Baldwin at trial.

55

Mamou also argues that counsel was ineffective for failing to challenge fingerprint expert Rafael Saldivar, who had received a prior reprimand for a misidentification in 1997.

### 1. These claims are reviewed under the familiar *Strickland* standard that governs ineffective assistance of counsel claims.

The two-prong test set out in *Strickland* governs ineffective-assistance-of-trial-counsel claims. *See Pinholster*, 131 S. Ct. at 1403 ("There is no dispute that the clearly established federal law here is *Strickland v. Washington*."). To prove ineffectiveness, an inmate must establish that counsel's actions or omissions were deficient and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687.

To establish deficiency, an inmate must show that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. A "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance applies. *Id*. at 689. An inmate's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

Concerning prejudice, an inmate must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.* at 694. And it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To make this determination, a reviewing court must "consider *all* the relevant evidence that the jury would have had before it if [the inmate] had pursued a different path—not just the . . . evidence [the inmate] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. And, under § 2254(d), "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). As such, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult. The standards created by *Strickland* and [AEDPA] are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted).

57

### 2. Initially, the adequacy of trial counsel's performance cannot be judged by information that did not come to light until after Mamou's trial.

Virtually all of the factual support relied upon by Mamou in his effort to prove counsel deficient postdates his trial. First Mamou claims that Baldwin has been discredited and his testimony shown to be false in two cases: Nannon William and Johnny Bernal. To support this assertion he points to the Fifth Circuit's opinion in *Williams v. Quarterman*—decided in 2008—that references an opinion by independent ballistics expert, Ronald Singer, that Baldwin's testimony in the Williams case "at best demonstrates extreme carelessness on his part and at worst calls into question his expertise." 551 F.3d 352, 356 (5th Cir. 2008). Besides overstating the significance of the *Williams* decision, Mamou fails to demonstrate how it is that counsel might have utilized information that appeared in a case decided nearly a decade after his trial. The mere fact that Singer's affidavit in the Williams case was signed in 1998, the year preceding his trial, does not prove that this affidavit was, as Mamou would like this Court to find, readily available to trial counsel. Mamou alleges no connection between the cases or the attorneys handling the cases, or any other reason why counsel should have known of this particular affidavit, in this particular case. It is entirely unreasonable to expect trial counsel to be aware of every contrary affidavit filed by an independent expert in every other criminal case.

58

With respect to Johnnie Bernal's case, Mamou cites to discussion from Bernal's federal habeas petition—filed in March 2005—regarding Baldwin's testimony in that case.  Aside from the fact that an unrelated federal habeas petitioner's allegation that Baldwin testified falsely at his trial proves nothing, Mamou does not even assert how counsel could have known this at the time of his trial.  Indeed, Mamou stated in his petition that the facts in Bernal's case were taken from his federal habeas petition because the state court's opinions were unpublished.

To further undermine Baldwin's competence as an expert, Mamou points to the HPD Crime Laboratory scandal that erupted in the early 2000.  Specifically, he cites to newspaper articles—published by the Houston Chronical in August and October 2003—reporting details of the investigation into the laboratories policies and procedures, and referencing Baldwin's 2003 disciplinary suspension.  *See* Petitioner's Exhibit 18.   Counsel cannot be deficient for failing to impeach Baldwin's testimony and credentials with information that was not brought to the public's attention until several years after Mamou's trial.

Next, Mamou contends that the magazine mark identifications are unreliable and that Baldwin's testimony further relied upon a "currently indefensible conceptual foundation" of discernable uniqueness.  To support this he cites to, and quotes extensively from, two scholarly articles; one published

by Professor Adina Swartz in 2005 and the other by Williams Tobin and Peter Blau in 2013. *See* Petitioner's Exhibit 19 & 33. Again, it is unclear how trial counsel could have been deficient for failing to investigate, discover, and utilize this literature to attack the validity of Baldwin's testimony when it was published several years after Mamou was tried and convicted of capital murder. Mamou's citation to the CCA's opinion in *Sexton v. State*, *supra*— decided three years after Mamou's trial—also fails to aid Mamou in establishing that trial counsel was deficient in the manner alleged. Although this CCA opinion questioned the validity of the magazine mark testimony offered in that case, counsel clearly did not have the advantage of this precedent in preparing their case against Mamou.

Finally, Mamou's allegation that counsel was deficient for failing to challenge the testimony of the latent fingerprint examiner based on his having been disciplined by HPD for a misidentification made in a 1997 case is flawed for similar reasons. Although Saldivar was disciplined two years prior to Sandoval's trial, Mamou cites to a 2010 Houston Chronicle article reporting this fact. *See* Petitioner's Exhibit 20. Mamou fails to demonstrate how it is that counsel ought to have been aware of facts not reported publically until 2010.[8]

---

[8]     Regardless, given that Mamou testified at trial and admitted to participating in the attempted robbery of Gibson, Holley, and Walter (and subsequent shooting of

*Strickland* makes clear that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective *at the time*." 466 U.S. at 690 (emphasis added). By condemning counsel's performance in light of information not readily available at the time of trial, Mamou engages in the type of post-conviction retrospection that *Strickland* cautions against, and upon which the Supreme Court has refused to find counsel deficient. *See Richter*, 562 U.S. at 107 (overturning Court of Appeals grant of federal habeas relief on an ineffective assistance of counsel claim finding the lower court had relied upon "the harsh light of hindsight" to cast doubt on a trial that took place over a decade earlier) (quoting *Bell v. Cone*, 535 U.S. 685, 702 (2002)).

### 2. Counsel sought timely discovery of testing done by the State's firearm's examiner.

In the only claim concerning counsel's presentation with respect to Baldwin's testimony that is not supported by post-trial evidence, Mamou asserts that "[t]he record is devoid of any effort to seek discovery other than a boilerplate discovery motion filed by trial counsel on September 1, 1999, one

Gibson and Walter), it was clearly reasonable for counsel not to challenge, thus drawing further attention to, the fact that Mamou's prints were found on the newspaper clippings found at the scene.

week before trial commenced." DE 39 at 78. Yet, the boilerplate discovery

motion asked for disclosure, among several other things, of the following:

### SCIENTIFIC TEST RESULTS

11.    Any written report of any test that is biological, microscopic
or scientific analysis of any items which was conducted pursuant
to the investigation of the instant case regardless of whether said
test was prepared or conducted at the request of any law
enforcement official, by the State of Texas or its agents, State
agency or private citizen, within the knowledge of the police or
District Attorney, or any of his employees, together with their
descriptions, test dates, and any determination as well as the
name and address of the individuals who conducted such test
results.

### … FIREARMS EXAMINATION

17.    The weapon or weapons which the State of Texas alleged or
may allege was used in the commission of the alleged offense,
including any weapons or evidence found at any crime scene.
Defendant specifically requested that the court order the Houston
Police Department Firearms Laboratory to provide comparison
microscope       photographs      depicting      any      purported
comparison/match made of shell casings examined in this case.

CR 44-45, 46. These discovery requests clearly encompass any and all testing

done by Baldwin. Indeed, other than disparaging the "boilerplate" nature of

counsel's discovery motion, Mamou fails to indicate what additional effort

counsel ought to have taken to secure information regarding the State's

ballistics evidence.

Additionally, contrary to what Mamou suggests in his petition, the fact

that defendant was not in possession of the ballistics evidence on September 7,

1999, the day before jury selection began in this case, does not demonstrate

deficiency on counsel's part. It is clear from the record that counsel had requested discovery of this information by filing a motion, urged this issue with Judge Wilkinson the week prior to the September 7th pre-trial hearing, and then raised the issue again at the September 7th pre-trial hearing with Judge Burdette. CR 444-45, 46; 2 RR 5-6. Counsel's persistence demonstrates his diligence in attempting to obtain this information. There is no deficient performance here.

### 3. Even assuming counsel were deficient in the manner alleged by Mamou here, there is no prejudice.

Mamou attempts to convince this Court that had counsel been effective Baldwin's testimony would likely have been excluded, and there would be no capital murder conviction. But the record does not support this. The evidence in the record established that Mamou was the last person to be seen with the victim. He stole the car in which she was a passenger after shooting the friends with whom she rode to the Lantern Point location for the drug deal. Only Mamou's incredible, self-serving testimony, contradicted by other witnesses at trial, points the finger of responsibility for Carmouche's death in another direction. Even more incriminating is the fact that Mamou admitted to his friend Terrance Dodson that he killed Carmouche. While Baldwin's testimony regarding the magazine marking certainly bolstered the evidence proving Mamou guilty of capital murder, it was neither essential, nor even a critical or

highly significant factor at trial.

Mamou points to the State's closing arguments at guilt-innocence to assert that the prosecution not only emphasized Baldwin's testimony, but admitted there could be no conviction for capital murder without it. He overstates and grossly mischaracterizes the State's argument. Mamou cites to the following portion of the State's closing argument wherein the prosecutor is discussing the jury instruction on accomplice witness testimony in an effort to demonstrate the State's reliance on Baldwin's testimony:

> …what that instruction says is that you couldn't convict Charles Mamou just on the evidence of Samuel Bug Johnson. There has to be other evidence that tends to connect the defendant to the crime, and there is tons of other evidence … There is all kinds of other evidence, the ballistic evidence […] (21 RR 12-13).

DE 39 at 62. Yet, he omits the final piece of that argument, the portion that belies his suggestion that the State relied on Baldwin's testimony to prove capital murder. Restated more fully, the prosecutor argued: "There is all kinds of other evidence, the ballistics evidence, fingerprint evidence, the location of the car, all kinds of evidence, plus the admission the defendant made to his cousin, Terrance Dodson." 21 RR 12-13.

Notably, the prosecutor references only "ballistics evidence" in general, not the magazine mark testimony about which Mamou complains here. The prosecutor's argument mentions the magazine markings specifically only once—and even then in response to argument made by opposing counsel during

64

their closing.   21 RR 47-48.   The discussion of this portion of Baldwin's testimony comprises barely one and a half pages of the State's twenty-five page argument.   The most significant part of the State's argument was painting a holistic view of the entire criminal transaction to demonstrate that Mamou was the only one with the motive and opportunity to kill Carmouche, and highlighting the incredibility of Mamou's protestation of innocence.   21 RR 6-15, 40-57.  As such, Mamou does not demonstrate a reasonable likelihood that the outcome of the proceedings would have been different absent Baldwin's testimony.

It is equally apparent that Mamou cannot prove prejudice arising from counsel failure to challenge the testimony of the latent fingerprint examiner. The incriminating portion of Saldivar testimony was that one latent fingerprint belonging to Mamou was found on the newspaper clippings found at the scene of the Lantern Point Drive shoot out.   Not only did several of the State's witnesses testify to the Mamou's involvement in the attempted drug "rip," but Mamou testified and admitted his involvement to the jury directly. The latent finger print evidence was entirely insignificant to Mamou's conviction of capital murder in this case.   Neither prejudice, nor deficient performance has been proven.  This Court should deny relief.

## V.   Mamou Fails to Establish that Federal Habeas Relief Should be Granted on His Claim that Counsel's Representation During the Pre-Trial Proceedings was Deficient.

This claim is largely duplicative of other IATC claims raised in Mamou's federal habeas petition.   Mamou complains that counsel rushed to trial without conducting the proper investigation and research necessary to file sufficient pre-trial motions and obtain timely discovery that would have enabled Mamou to (1) challenge Baldwin's ballistics testimony regarding the magazine markings; (2) discredit Baldwin's credentials, qualifications, and expertise; (3) discover and present adequate mitigating evidence at the punishment phase of trial; (4) obtain criminal histories of the state's witnesses; and (5) challenge the admissibility of the victim impact testimony offered by family member of extraneous murder victims at the punishment hearing.   The first and second allegations are raised in Mamou's fourth claim and are discussed in the previous section.   The third and fifth allegations are raised in Mamou's seventh claim and are addressed in section VII, *infra*.   Only the fourth allegation is examined here.

### A.   This claim is unexhausted and procedurally barred from federal habeas review.

This claim has never been presented to the state court for review.   A federal habeas petitioner must fully exhaust available state court remedies before seeking relief in federal court.   28 U.S.C. § 2254(b)(1); *Ward*, 777 F3.d

at 357-58; *Ruiz*, 460 F.3d at 642-43. To satisfy the statute, "a habeas petitioner must have fairly presented the substance of his claims to the state courts." *Ward*, 777 F.3d at 358 (quoting *Nobles*, 127 F.3d at 420). Unexhausted claims are procedurally defaulted where "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* (citing Coleman, 501 U.S. at 735 n. 1). Because the Texas abuse-of-the-writ doctrine, set out in Tex. Code Crim. Proc. art. 11.071 § 4, would procedurally bar Mamou's attempt to raise this unexhausted claim in a subsequent writ application, it is defaulted here. *Finley*, 243 F.3d at 219–20 (citing *Fearance*, 56 F.3d at 642).

In order to overcome the default on this claim, Mamou must demonstrate either "cause and prejudice" or that the failure to review the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. For the reasons set out in section I, *supra*, he has shown neither. Accordingly, there is nothing for this Court to review, and this claim should be dismissed.

### B.    Regardless, Mamou fails to prove either the deficiency or prejudice prong of *Strickland*.

Stated simply, the record proves this claim false. Counsel did, in fact, request discovery of the State's witness's criminal histories. In a discovery motion filed prior to trial, counsel requested, "[t]he juvenile and criminal arrest/or conviction record of the complainant, and all state witnesses." CR 46.

Accordingly, Mamou cannot prove counsel deficient in the manner alleged. In any case, it is difficult to imagine how Mamou could possibly have been prejudiced had counsel failed to request this information. The circumstances of the present offense revealed the criminal character of most, if not all of the State's witnesses. With the exception of Carmouche, every participant was engaged in some level of criminal activity. The victims were planning to rob Mamou of his money. Johnson assisted Mamou in attempting to steal the cocaine from Walter. Although Dodson was not present at the shootout or subsequent events, he accompanied Mamou and Johnson on the initial, aborted attempt. Evidence of criminal history beyond this is merely cumulative, and was not likely to have any impact on the jury's verdict. This Court should deny relief.

## VI.   Federal Relief is Not Available on Mamou's Claims that Counsel was Ineffective During the Voir Dire and Guilt-Innocence Phases of Trial.

These claims are unexhausted and procedurally barred from federal habeas review. Even if they were not, Mamou would not succeed. His allegations of deficient performance are not supported by the record. In many instances, the appropriate context is sufficient to undermine the validity of Mamou's complaint. Even where this is not the case, Mamou fails to demonstrate deficient performance or prejudice. This Court should deny relief.

### A.    These IATC claims are unexhausted and defaulted here.

Mamou asserts four separate complaints regarding counsel's representation during the voir dire and guilt-innocence phases of trial in his federal habeas petition.   But none of the present allegations have been presented to the state court for review.   A federal habeas petitioner must fully exhaust available state court remedies before seeking relief in federal court. 28 U.S.C. § 2254(b)(1); *Ward*, 777 F3.d at 357-58; *Ruiz*, 460 F.3d at 642-43. To satisfy the statute, "a habeas petitioner must have fairly presented the substance of his claims to the state courts."   *Ward*, 777 F.3d at 358 (quoting *Nobles*, 127 F.3d at 420).   Unexhausted claims are procedurally defaulted where "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* (citing Coleman, 501 U.S. at 735 n. 1).   Because the Texas abuse-of-the-writ doctrine, set out in Tex. Code Crim. Proc. art. 11.071 § , would procedurally bar Mamou's attempt to raise this unexhausted claim in a subsequent writ application, it is defaulted here.   *Finley*, 243 F.3d at 219–20 (citing *Fearance*, 56 F.3d at 642).

In order to overcome the default on this claim, Mamou must demonstrate either "cause and prejudice" or that the failure to review the claim will result in a fundamental miscarriage of justice.   *Coleman*, 501 U.S. at 750.   For the reasons set out in section I, *supra*, he has shown neither.   As such, this Court

is precluded from reviewing the merits of this claim, and it should be dismissed.

**B.    Even absent the default, Mamou would not be entitled to relief because he fails to prove the merits of his claims under *Strickland*.**

Mamou selectively cites to and quotes portions of the record in support of his claims that counsel was ineffective for failing to object to (1) biased instructions by the trial court during voir dire; and (2) the trial court's exclusion of two venire members based on their opposition to the death penalty without questioning them in depth about their views.   Context is all that is necessary to defeat these allegations.   Mamou's claim that counsel was ineffective for failing to object to the redundant autopsy photos of Carmouche is conclusory and cannot support relief under *Strickland*.   Finally, Mamou's complaint regarding counsel's ineffective guilt-phase argument cannot succeed because counsel made reasonable strategic choices that are presumed correct under *Strickland*.   This Court should deny relief.

**1.    Contrary to Mamou's assertion, there was nothing objectionable in the trial court's instructions to the venire during voir dire; thus, counsel's failure to lodge objections was not deficient performance, nor did it prejudice Mamou's defense.**

Mamou accuses the trial court of making several biased, inappropriate, and incorrect statements while instructing the venire during voir dire and faults counsel for not objecting.   But, when the trial court's comments are

70

viewed in their entirety and placed in the proper context, it becomes evident

that there was no valid legal basis for an objection.  *Strickland* does not require

counsel to raise futile objections.  *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.

1990).

First, Mamou contends that the trial judge demonstrated his bias

against the defense at the beginning of the voir dire proceedings:

> …[H]e referred to the O.J. Simpson acquittal by saying that a
> lengthy trial is "not going to happen here.  This is the real world.
> It is not California."  3 RR 4.  This irrelevant and prejudicial
> comment could only have raised juror resentment at the widely-
> perceived-as-incorrect acquittal verdict in the Simpson trial.
> Comparing Mamou to O.J. Simpson would have prejudiced Mamou
> in the eyes of the jury.

DE 39 at 113.  This is not an accurate portrayal of the trial court's reference to

the O.J. Simpson murder trial.  The trial court made no comparison between

Mamou and O.J. Simpson and in no way demonstrated bias against the

defense.  Rather, the court was simply attempting to put ease any trepidation

the venire members had regarding the inconvenience of serving on the jury in

a capital murder case:

> And most of you, if not all of you, the sum total of the information
> you get about what goes on downtown at the courthouse, about the
> criminal justice system, is what you see on television and what you
> know of Lance Ito and O.J. Simpson in that trial.
>
> First off folks, eliminate from that—that thought from your mind.
> That's not going to happen here. This is the real world.  It is not
> California. If you came here fearful that you might very well be
> locked up in some old dingy hotel room, kept away from your

> family, or friends, or job, your loved ones for weeks and months at
> a time, I'm going to tell you right now, that is simply not going to
> happen to you. And the reason I can guarantee it's not going to
> happen to you is because if you guys get locked up in a hotel room,
> I'd have to get locked up in a hotel room. And I'm not about to do
> that, so just simply don't worry about it.

3 RR  3-4.   Because there is nothing in these instructions that indicates bias

or prejudiced Mamou's defense, counsel was not deficient for failing to object,

and there is no reasonable likelihood these comment has any impact on the

jury's verdict at guilt-innocence or punishment.

Next, Mamou argues that counsel ought to have objected when the trial

court informed the venire that being a juror "is a lot like being a pallbearer at

a funeral." 3 RR 4. Mamou characterizes this as a "stunningly, inappropriate

comment in a death penalty case. While there are perhaps other analogies

that might have been used, viewing the statement in context reveals that there

was no valid basis for objecting.

> Second, thing is I know that all of you are in a place that is
> unfamiliar to you. Being a juror in a case, whether it's a criminal
> case or a civil case, is a lot like being a pallbearer in a funeral.
> You're in a place you don't want to be. You're doing something you
> don't want to do. You're not sure you know what's expected of you.

3 RR 4. Indeed, harm was more likely to result from an objection drawing even

more attention to the court's comments than it would from the counsel's failure

to do so.

Mamou further insists that counsel should have objected when the trial

judge told prospective jurors that "the State is going to seek the appropriate punishment in this case; that is, their claim that it will be the appropriate punishment, punishment of death."  3 RR 5.  According to Mamou, the trial court "explicitly inferred that death was the appropriate penalty, despite the correction." DE 39 at 113.  But this is not the case.  Indeed, what the trial court made explicit to the jurors was that it was up to them to decide the appropriate punishment:

> When we have a case that is a case of this type—that is to say, a capital murder case—and in this case the State of Texas has made known to the defendant, made known to the Court, made known to the lawyers, that in the event a jury in this case were to find the defendant guilty of the offense of capital murder, the State is going to seek the appropriate punishment in the case; that is their claim that it will be the appropriate punishment, punishment of death.
>
> Whether you, the jury agree with what they're going to want or not, that's your call. And you'll make that decision on the basis of the evidence presented to you.

3 RR 5-6.  The court reinforced this sentiment a short time later during another portion of its instruction to the venire: "Now the death penalty is a possible punishment.  Whether it's an appropriate punishment, nobody can say until after the evidence is offered."  3 RR 41.   Here again, there was no legal basis upon which to object.  Not only are frivolous objections not constitutionally required, but there is potential for them to negatively impact the jury's perception of the defense team.  Furthermore, given the trial court's express instructions to the contrary, there is no reasonable likelihood that the jury

73

could infer from the trial court's instruction that the death penalty was the appropriate punishment in Mamou's case.

In another baseless complaint, Mamou claims that the trial court suggested that the jury might deliberate for only one hour, 3 RR 8, "in effect telling them to hurry up, implying that it was an open-and-shut case, and that they should not waste any time in sentencing Mamou to death." DE 39 at 113. In reality, what the trial court said was this:

> The evidence in the case will begin on Monday, the 4th of October. The trial, as anticipated, will last perhaps a little longer than that one week; but it would not last as long as two weeks. So, that's how long the testimony is going to take in this case. The reason that we have—that we can't be more precise than that is very simply this: We can pretty well figure out based on the number of witnesses who are going to testify and what's anticipated they're going to say, how long it will take to present the evidence in this case. The variable in every case that is always different is that nobody has any idea how long a particular jury will take to deliberate on a particular—as to the particular evidence presented to them.

> You could have, conceivably in a case, three juries listening to exactly the same evidence in exactly the same courtroom at exactly the same time and go out in three different rooms to deliberate. And one jury might come back with a verdict in an hour. One might take a day. And one of them might be in there three days before they realize there is a doorknob on the bathroom inside the jury room. There is just simply no way of telling. But that's the variable over which none of us has control, and that's why we can't be more precise than a little longer than a week, but not as much as two.

3 RR 7-8. The actual statements made by the trial court bear no resemblance to the accusation Mamou makes in his petition. Clearly, there was nothing

inappropriate in these instructions, and no legal basis for an objection.  It is equally clear that Mamou cannot prove prejudice here.

Mamou insists in his last complaint concerning the trial court's instructions during voir dire that the trial court "set up the penalty phase determination in a manner unfavorable to the defense." DE 39 at 113.  He objects to the following statements by the trial court:

> At the second phase of a trial wherein a defendant has been found guilty of capital murder, basically—and this is an over generalization, but it's basically accurate—you're entitled to hear about every good thing some defendant has done in his or her life, if there are good things.  You're also entitled to hear basically at the second phase of the capital murder trial every single bad thing some defendant has ever done before, if there are any bad things. And you take all the good stuff and all the bad stuff here at the second phase of trial, then pile on information on the crime that was committed, what you heard at the first phase of the trial and throughout every single bit of it to answer the two questions we're going to talk about later.  But it's no more different than when we're raising kids.  It's just no more different.  If we ever told a child not to do something once and the child does it again, we're going to react one way.  If we have told a child ten times in the last thirty minutes not to do something and they have done it for the tenth time, we're going to react a different way.

3 RR 17.  According to Mamou, "[t]his exclusive focus on the acts of the defendant, comparing Mamou to a disobedient child, eliminated from consideration many mitigating factors such as poverty, an abusive or neglectful childhood, mental and physical disabilities, and the like.  The jury was in effect being instructed to ignore this mitigating evidence … ."  DE 39 at 114.

This argument ignores the fact that these were simply the trial court's

introductory comments to the venire and not the official charge of the court. Indeed the trial court explicitly told the jury before making these comments that they were "an over generalization." Additionally, almost immediately following these statements, the trial court told the jury that, "[t]he law will be given to you in the Court's charge at the conclusion of the testimony at each phase of trial." 3 RR 18. The fact that the trial court did not, at this point in the proceedings engage in an in depth discussion of the mitigation special issue is not something reasonable counsel need object to in order render constitutionally effective representation. More importantly, however, Mamou is unable to demonstrate prejudice arising from these comments because the jury in his case received the proper instruction on the mitigation special issue immediately prior to their deliberation on punishment. The jury was charged to consider mitigating evidence to be "evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of defendant's background, character, record, or circumstances of the offense that mitigates against the imposition of the death penalty." *See* CR 97. For this, and the reasons stated above, Mamou has not demonstrated that counsel should have lodged objections to the trial court's instruction on voir dire. Nor has he proven prejudice. This Court should deny relief.

### 2. The record belies Mamou's claim that the trial court excused jurors simply because they expressed opposition to the death penalty; as such, counsel cannot be ineffective for failing to object on this basis.

Mamou asserts the following in support of his claim that trial counsel was ineffective for allowing the exclusion of only those jurors opposed to the death penalty:

> The trial court repeatedly asked the jury pool whether there were potential jurors who could never impose the death penalty, regardless of the evidence. *E.g.* 3 RR 43. Two potential jurors answered affirmative. 3 RR 43. The potential jurors were not asked whether they would always impose the death penalty, regardless of mitigating evidence.

DE 39 at 115. The trial court did it indeed, identify two venire members—juror 16 and 26—who indicated in response to the court's inquiry that they would "refuse to follow the evidence and answer [the special issues] in a way such that the death penalty would not be imposed "because of their religious, moral, conscientious, or philosophical objections to the capital punishment. 3 RR 43. But these jurors were not excused by court at this time. Immediately after this exchange, the trial court instructed the entire venire that they would be returning in the days following for individual voir dire. 3 RR 43-44. A short time, these two jurors, along with eleven others were excused from service by agreement between the parties. 3 RR 50. The record does not reveal the reasons underlying this agreement, only that the parties agreed "for various reasons" that these jurors should be excused. *Id*. These facts are clearly

77

insufficient to Mamou's assertion that the trial court excused jurors based solely on their opposition to the death penalty, and his allegation that counsel was ineffective for failing to object their dismissal. This Court should deny relief.

> ### 3. Trial counsel was not ineffective for failing to object to the admissibility of the eight autopsy photos because their probative value was not substantially outweighed by the risk of substantial prejudice.

During the guilt-innocence phase testimony of Dr. Roger Milton, assistant medical examiner with the Harris County Medical Examiner's Office, the State introduced eight autopsy photographs without objection from the defense. 20 RR 52-53. Dr. Milton testified that Carmouche died as a result of a gunshot wound to the chest. 20 RR 56. Mamou contends that the counsel was ineffective for allowing these eight "gruesome and redundant" autopsy photos to be admitted without objection. He submits that because "[t]he cause of death was not in issue and the only purpose for all eight of these pictures to be introduced would have been to prejudice the jury." DE 39 at 119. This claim is conclusory.

The CCA explained the admissibility of autopsy photographs in *Rojas v. State*,

> Rule 403 requires an admissible photograph to possess "some probative value and that its probative value not be substantially outweighed by its inflammatory nature." Relevant factors in making this determination include: the number of exhibits offered,

their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up shots, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case. The admissibility of photographs over a challenge is within the sound discretion of the trial judge. Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself.

986 S.W.2d 241, 249 (Tex. Crim. App. 1998).

In arguing that counsel was deficient for failing to object to the admissibility of the autopsy photos, Mamou neglects any discussion identifying the factors that render the photographs inadmissible under Rule 403's balancing test, other than to point out his conclusory assertion that the photographs were "gruesome" and that there were eight photographs admitted. He makes no mention of what is contained in the photographs, whether they are close up, whether the body is naked of clothed, whether the photographs were in color or were black and white, whether they were taken pre-autopsy or depicted mutilation of the victim caused by the autopsy. Conclusory allegations like this one will not afford relief. *See, e.g., Collier v. Cockrell,* 300 F.3d 577, 587 (5th Cir.2002) ("This Court has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding.") (citing *Miller v. Johnson,* 200 F.3d 274, 282 (5th Cir.2000)); *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir.1998) ("Mere conclusory allegations in support of a claim of

ineffective assistance of counsel are insufficient to raise a constitutional issue.")

Had Mamou briefed the issue more fully, it would have been readily apparent that there was no basis upon which to object. Critically, the autopsy photos introduced at his trial were not particularly gruesome. State's Exhibit 104 was a head shot, showing lividity in the face resulting from the body being found face down. 20 RR 56. State's Exhibit 105 was a "relatively close" picture of the gunshot wound to the right side of the chest. 20 RR 56. Exhibits 106, 107, 108, 109, 110, and 111 were pictures of Carmouche's right and left hands and arms, showing "multiple excoriations … consistent with postmortem insect feeding." 20 RR 56-57. These were not full body, naked photos depicting extreme trauma or wounds that are typically thought to engender and emotional response from the jury. These were photographs introduced by the State in an effort to carry their burden of proving the manner and cause of death, something the law requires irrespective of whether this is an issue disputed by the defense. Any objection by counsel would have been overruled by the trial court. As state previously, *Strickland* does not require counsel to raise futile objections. *Koch*, 907 F.2d at 527.

Furthermore, the failure of Mamou to demonstrate the potential prejudice of these photographs for purposes of establishing that counsel was deficient precludes him from satisfying *Strickland's* prejudice prong. Absent a

showing of potential prejudice, Mamou cannot prove a reasonable likelihood that the outcome of the proceedings would have been different had these photographs not been admitted.  This Court should deny relief.

> **4.    Mamou's fails to demonstrate that counsel's closing argument on punishment was not reasonable trial strategy, and thus fails to prove the merits of this IATC claim.**

During closing argument on guilt-innocence, the prosecutor made the following observations regarding Dodson's testimony that Mamou admitted to him that he had murdered Carmouche:

> I'm sure they're going to come in and say, the defendant said Terrence was afraid they were going to file charges on him, and that's why he said what he said.
>
> Well, you don't come in and make up a story that someone is guilty of capital murder just because you're afraid someone is going to file a charge on you.  And the person you're related to, you don't make up a story and take the stand under oath and testify to a lie that he committed the offense of capital murder when you know, or don't have any reason to believe that he did.

20 RR 13.  Mamou, in his final allegations regarding counsel's representation at the guilt-innocence phase, contends that counsel failed to effectively counter the State's suggestion that Dodson had no motivation to lie and implicate his cousin of capital murder.  According to Mamou, counsel should have argued to the jury that there was every reason for Dodson, Walter, or Johnson to lie; "to save themselves from [a capital murder] charge, [they] had to put the blame for this crime on someone else, which is exactly what they did." DE 39 at 119.

Mamou's bid for federal habeas relief on this claim fails because he is unable to "overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal citation and quotation omitted). Reasonable, informed tactical and strategic decisions by counsel will not be second-guessed on appeal. *Pape v. Thaler,* 645 F.3d 281, 291 (5th Cir. 2011); *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997). This deference exists to avoid the "risk that hindsight bias will cloud a court's review of counsel's trial strategy." *Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012).

It is apparent on the face of counsel's closing argument that the defense was focused on convincing the jury to credit Mamou's testimony and consider that Johnson was more involved in the offense that he testified to at trial. 20 RR 18-21, 28. Counsel also highlighted the defense of necessity, and the fact that it was the State, and not the defendant, that had the burden of proof. 21 RR 17, 22, 27.

Moreover, contrary to Mamou's assertion, counsel did in fact call into question the credibility of the State's witnesses. First counsel said this about the veracity of Johnson's testimony, "… I think we all know that Bug [Johnson] is worthless and a liar," 21 RR 18; and then later, "[a]nd all this goes to illustrate what an absolute liar Bug is." 21 RR 19-20. Counsel also suggested to the jury that the State's witnesses all had an incentive to testify the way

they did:

> How come it is that in real life when a person is suspected of a crime and they're under the hot lights, if you will, they're not supposed to figure out they need to give up some information that will help the State and get the monkey off their back?
>
> Because that's what each one of the State's witnesses was put in the position of.  Now come on, ladies and gentlemen, you don't lose your common sense when you go back in the jury room.  And I think for somebody to suggest that you don't have a reason why the like of Terrence Dodson and the like of Anthony Trial and Bug Johnson—and they don't understand the game well and recognize that, you know what? This isn't going real well for me. But coincidentally, magically, it's the power of the State to decide who gets charged and who doesn't get charged.  We don't have any charges of any type regarding any offense that all these other people were committing.  Isn't that real strange.  We don't want the taint to fall on any of them.
>
> Maybe they get up on the witness stand, take that witness stand, and tell you a story and not have to worry about it being used against them; because the decision has already been made, they're not getting charged with anything at all.  And the evidence is clear and it's abundant that everybody was committing a criminal act out there.

21 RR 28-29.

The record demonstrates that counsel effectively responded to the State's assertion that Dodson had no incentive to testify falsely.  Counsel went further and insinuated to the jury that all of the State's witnesses had motivation to point the finger at Mamou.  Regardless, the points that counsel chose to emphasize during closing argument is a matter of trial strategy that is presumed reasonable under *Strickland*. The fact that Mamou, with the benefit

of hindsight might have argued differently on one point or another does not render counsel constitutionally ineffective.

For many of the same reasons, Mamou cannot prove that prejudice here. Most notably, counsel made many of the arguments that Mamou claims were necessary to be effective.  Even if counsel had not, the fact that the State's witnesses were engaged in criminal activities and might be testifying in a manner that shielded them from criminal liability that was easily understood based on the circumstances of the offenses.  This was a "rip on rip," two drug dealers attempting to rob each other.  Most witnesses testified to having previously lied to the police regarding the events that occurred.  The jury did not need explicit argument from counsel to infer that their might be motivation to shift the blame to another party.  Accordingly, prejudice has not been proven and this Court should deny relief.

## VII.   Federal Habeas Relief Should Not Be Granted on Mamou's Claim that Counsel Was Ineffective During the Punishment Phase of Trial.

The state court reasonably determined that trial counsel's decision not to object to the victim impact testimony offered by family members of extraneous murder victims was sound trial strategy.  Even if it were not, Mamou cannot demonstrate that he was harmed by this testimony. Additionally, Mamou's claim that counsel was ineffective for failing to investigate, discover and present sufficient mitigating evidence on punishment

is not supported by the facts.  This Court should deny relief.

> **A.   The state court's rejection of Mamou's claim that counsel was ineffective for failing to object to victim impact evidence at the punishment phase of trial is a reasonable application of *Strickland*.**

During the punishment phase of trial, the State re-offered all the evidence introduced during the guilt-innocence phase of trial, including the defendant's testimony in which he admitted to the extraneous murder of Terrance Gibson.  22 RR 3.  The State also submitted punishment evidence regarding Mamou's involvement in the extraneous murder of Anthony Williams.  22 RR at 40-108.  Neither were Gibson nor Williams were named victim in the indictment in this case.  CR 4.  Gibson's mother, Patricia Gibson, and Anthony Williams's sister, Yolanda Williams offered victim impact testimony regarding their deaths.  Counsel did not object. 22 RR 112-121, 127-134.

The state habeas court summarized the victim testimony that Mamou now objects to on appeal in its findings of fact:

> Yolanda Williams, Anthony Williams' sister, testified for the state at punishment that she was the oldest of two brothers, James and then Anthony Williams, aka Bruiser, who was murdered by [Mamou] in 1998; that on the morning of September 5, 1998, she took Anthony to lunch; that she saw Anthony in the hospital after his death that evening; that her brother James cried over Anthony's death and was not able to talk about Anthony; that Anthony's son imagined his father playing with him and asked to go to the cemetery; that Yolanda was devastated by her brother's death; that Anthony's father was angry and hurtful as a result of

his son's murder; and that Anthony's mother talked about Anthony as if he was alive and her diabetes worsened after Anthony's death.

… Patricia Gibson, Terrance Gibson's mother, testified for the State at punishment that she last saw her son alive on Sunday, December 6, 1998, when he came by her mother's house; that Terrance's pager went off and he told Patricia that he had to leave; that Patricia followed her son out the door and told him to be careful, that Patricia received a call at 1:15 a.m. on Monday, December 7, 1998, informing her that Terrance was in the hospital; that Patricia learned that Terrance had died when she arrived at the hospital, and she was devastated; that Terrance's younger brother had a difficult time dealing with Terrance's death and started drinking; that it was difficult for Terrance's older brother to see Terrance in the hospital morgue, and he often relived that experience; that it was difficult for Patricia to bury her son, and she wondered whether she could have said something else to Terrance; that she raised Terrance in the right way, but he made choices that cost him his life; and that Patricia did not blame herself for Terrance's death.

SHCR 244-45 (citing 22 RR 113-118, 127-134).

Mamou complains that counsel was ineffective for failing to object to this victim impact testimony because it was inadmissible under state law. This claim was presented to the state court in Mamou's state writ application. The CCA denied relief finding that neither the deficiency nor the prejudice prong of *Strickland* had been proven. SCHR 244-47. Specifically, the court found that counsel's decision not to object was a "reasonable strategic decision" and that Mamou could not establish harm resulting from that decision in light of "the brevity of their testimony, the defense's effective cross-examination, and the prosecutor's lack of emphasis of their testimony during final argument at

86

punishment," as well as the strength of the State's evidence on punishment. SHCR 246.

Mamou attacks the state court's decision in several fronts. First, he argues that the state court unreasonably applied *Strickland* in determining that counsel's failure to object was reasonable trial strategy. Second, he complains about the adequacy of the state court habeas process. Finally, Mamou contends that the state court's decision that he was not harmed by counsel's action was an unreasonable determination of the facts in light of the record. For the reasons set out below, none of these argument are availing.

> **1.    The state court reasonably applied *Strickland* in determining that counsel's failure to object to the victim impact testimony was a reasonable strategic decision.**

*Strickland* and its progeny make clear that reasonable, informed tactical and strategic decisions by counsel will not be second-guessed on appeal. *Pape,* 645 F.3d at 291; *Ransom*, 126 F.3d at 721. This deference exists to avoid the "risk that hindsight bias will cloud a court's review of counsel trial strategy." *Feldman*, 695 F.3d at 378. Counsel testified in an affidavit submitted during the state habeas proceedings that:

> [t]he record will reflect that the defense filed a motion for discovery of victim impact testimony prior to trial. Upon commencement of the State's presentation of punishment testimony regarding the defendant's shooting of Anthony Williams, I objected to the admissibility of the extraneous murder, and the judge overruled the objection.

Before Yolanda Williams and Patricia Gibson testified, several noteworthy events occurred. First, the defendant insisted on testifying at guilt/innocence. He testified against our advice, and his cross-examination was damaging to the defense's case. On cross-examination, the defendant admitted that he was a life-long drug dealer with several people working for him, and he volunteered to demonstrate for the jury the manner in which he shooting occurred. Further, the prosecutor was able to cross-examine the defendant regarding previous statements that he made after his arrest as well as his admission to Terrance Dodson that he shot and killed Mary Carmouche after she gave him oral sex.

Additionally, the defendant was upset and mad about the jury's verdict. The defendant's demeanor changed drastically between the guilt-innocence and punishment phases of trial. The defendant refused to talk about witnesses—only shrugging his shoulders when we attempted to discuss upcoming State's witnesses with him. The defendant refused to dress in a suit like on the previous court days. Further damaging the defense's case was the defendant's loud and angry outburst in front of the jury early in the State's punishment case. The defendant sprung up from his seat and began making loud comments directed to the jury and the prosecutor. The defendant was critical of the jury's verdict and sarcastically asked the prosecutor if he thought the defendant was Jeffrey Dahmer. The courtroom bailiffs immediately escorted the defendant from the courtroom. After that incident, the defendant elected not to be in the courtroom, co-counsel Kurt Wentz, went to back to the courtroom holdover cell to ask defendant if there were any questions he wanted to ask of the witness. Mr. Wentz found the defendant asleep. When the defendant eventually returned to the courtroom, there was a continuing need to remind him that his continuing comments and expressions at counsel table could prejudice him in the eyes of the jury. The defendant's actions throughout the remainder of the State's punishment evidence created a continuing distraction.

My decisions regarding the manner in which to handle the punishment testimony of Yolanda Williams and Patricia Gibson were strategic. Their testimony was brief in comparison to the

entirety of the evidence at trial, not particularly compelling, and I believe I effectively countered on cross-examination. Yolanda Williams' brother, Anthony Williams aka "Bruiser", was killed by the defendant during a drug sale. On Yolanda's cross-examination, I pointed out to the jury that the victim was a drug dealer and had voluntarily put himself into a dangerous situation. When Patricia Gibson testified on direct, she stated that she last saw Terrance at a family gathering. Terrance's pager went off, and Patricia told him to be careful as he left. On cross-examination, Gibson admitted that her son had elected to do inappropriate things, and she counseled one of his friends to change his life and learn from what happened to her son. While I could have objected to the line of questioning offered by the State, I did not do so. I do not believe the introduction of this evidence was a critical or overriding factor in the jury's decision to return the death penalty in this case.

SHCR 253-54.

Mamou asserts that the state court unreasonably applied *Strickland* in its adjudication of this claim because the court "failed to conduct the requisite analysis of the reasonableness of trial counsel's investigation into the facts and law before finding the decision not to object to be reasonable strategy." DE 39 at 131. He further claims that the "record is entirely silent" about what investigation counsel made into the law and facts before making this strategic decision. Mamou is wrong about this. Counsel's affidavit speaks to this directly.

First, is it clear that counsel was sufficiently aware of both the facts and law necessary to make an informed decision. Counsel filed a pre-trial motion seeking discovery of any victim impact testimony, the facts needed to

determine the potential damaging effect this testimony might have.  Counsel also indicated that he knew he could have objected to the victim impact testimony, but chose not to.  This evinces counsel's awareness of the law relevant to this type of testimony.

More importantly however, counsel goes into great detail in his affidavit about tense and difficult circumstances existing at the time the State introduced Yolanda Gibson's and Patricia Williams's testimony.  Counsel was clearly trying to manage the damaging effects of Mamou's testimony at guilt-innocence, the prejudice no doubt resulting from his disruptive, violent outburst during Melancon's testimony, and the continued, uncooperative behavior that ensued.  This case epitomizes the need for, and rationale behind, the deference afforded under *Strickland* to strategic decisions made by counsel at the time of trial. Counsel had pressing concerns to consider and juggle in an effort to salvage Mamou's punishment hearing that went beyond the facts and law relevant to the admissibility of this victim impact testimony.  Second guessing counsel's actions on a cold record with the benefit of hindsight in circumstances such as these could not be more inappropriate.  The state court's adjudication of this claim was entirely reasonable, and relief ought not be granted.

## 2.   The adequacy of the state habeas process does not provide a valid basis for challenging the state court's decision on this claim.

Mamou complains that the state court, in adjudicating this claim, "proceeded irregularly and resolved disputed, material facts without affording [him] notice or an opportunity to respond to evidence submitted by the State upon which the state court relied."   DE 39 at 132.   Mamou refers to the fact that trial counsel's affidavit was attached to the state court's proposed findings of fact and conclusions of law that were ultimately adopted verbatim by the state habeas judge (who was not the trial court judge).   DE 39 at 135.

Few principles are more well-settled than the rule that complaints attacking the petitioner's state habeas procedure are not cognizable on federal habeas review.   See *Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005) ("alleged infirmities in state habeas proceedings are not grounds for federal habeas relief"); *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) ("It is axiomatic that 'infirmities in state habeas proceedings do not constitute grounds for federal habeas relief. This is because 'an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself.'"(citation omitted)); *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) ("It is well-settled that 'infirmities in state habeas proceedings do not constitute grounds for federal habeas relief.'); *Rudd v. Johnson*, 256 F.3d 317, 319–20 (5th Cir. 2001) ("A long line of cases from our circuit dictates that

infirmities in state habeas proceedings do not constitute grounds for relief in federal court.' That is because an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself." (citations omitted)); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001) ("infirmities in state habeas proceedings do not constitute grounds for relief in federal court").  As such, there is nothing here for this court to consider.

### 3. The state court reasonably determined that Mamou was not harmed by the admission of this victim impact testimony during punishment.

In finding that Mamou failed to meet *Strickland*'s prejudice prong, proving a reasonable likelihood that the outcome of the proceedings would have been different absent Yolanda Williams and Patricia Gibbon's testimony, the state court cited these factors (1) the testimony was brief; (2) defense counsel effectively cross-examined both witnesses; (3) the prosecutor did not emphasize this testimony during closing arguments; (4) the overwhelming nature of the State's punishment evidence; and (5) Mamou's loud, angry outburst during the punishment hearing.  Although Mamou contests the court's finding that the testimony was brief and that counsel was able to effectively cross-examine these witnesses, he offers no rebuttal to the other factors.  Critically, he fails to establish how the victim impact testimony could have any effect on the jury's verdict in light of the overwhelming evidence supporting a death sentence.

The evidence at Mamou's trial proved that he was a life-long drug dealer

responsible for three murders.  The murder in the instant case was particularly cruel given that Carmouche was an innocent victim caught in the middle of a double-crossing drug deal gone bad.  And, there was little in the way of mitigation to convince the jury that a life-sentence was appropriate.  The fact that Mamou grew up an impoverished child of separated parents and took responsibility for his family does not excuse his violent life-style.  Additionally, the victim impact of Williams and Gibson's deaths was diminished by the fact that both were drug dealers who willingly placed themselves in the dangerous circumstances that resulted in their deaths.  Given this, there is no reasonable likelihood that Mamou would have received a life sentence had the victim impact testimony been excluded.   Relief should not be granted on this claim.

**B.      Mamou's claim that counsel was ineffective for failure to investigate and present adequate mitigating evidence at the punishment phase of trial is procedurally barred and without merit.**

This claims is unexhausted and procedurally barred.  Even if it were not, it would fails on the merits.  Mamou has not demonstrated that counsel failed to uncover mitigating evidence that was reasonably likely to have impacted the outcome of the jury's punishment verdict.  This Court should deny relief.

### 1.   This claim is procedurally barred from federal habeas review.

This claim has never been presented to the state court for review.  A federal habeas petitioner must fully exhaust available state court remedies before seeking relief in federal court.  28 U.S.C. § 2254(b)(1); *Ward*, 777 F3.d at 357-58; *Ruiz*, 460 F.3d at 642-43. To satisfy the statute, "a habeas petitioner must have fairly presented the substance of his claims to the state courts." *Ward*, 777 F.3d at 358 (quoting *Nobles*, 127 F.3d at 420).  Unexhausted claims are procedurally defaulted where "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id*. (citing Coleman, 501 U.S. at 735 n. 1).  Because the Texas abuse-of-the-writ doctrine, set out in Tex. Code Crim. Proc. art. 11.071 § 5, would procedurally bar Mamou's attempt to raise this unexhausted claim in a subsequent writ application, it is defaulted here. *Finley*, 243 F.3d at 219–20 (citing *Fearance*, 56 F.3d at 642).

In order to overcome the default on this claim, Mamou must demonstrate either "cause and prejudice" or that the failure to review the claim will result in a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  For the reasons set out in section I, *supra*, he has shown neither.  Accordingly, there is nothing for this Court to review, and this claim should be dismissed.

94

> **2. Alternatively, Mamou fails to prove the factual basis of his allegation that trial counsel failed to present adequate mitigating evidence at the punishment phase of his trial.**

"Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." *Riley v. Cockrell*, 339 F.3d 308, 316 (5th Cir. 2003) (citing *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999)). Accordingly, counsel may be constitutionally ineffective for failing to exercise reasonable professional judgment in investigating a defendant's personal history that would be relevant to evaluating her moral culpability. *Id*. (citing *Wiggins v. Smith*, 539 U.S. 510, 522 (2003)). But the "failure to investigate, develop, or present mitigating evidence is not ineffective assistance *per se*." *Smith v. Cockrell*, 311 F.2d 661, 669 (5th Cir. 2002); *Wiggins*, 539 U.S. at 522; *Moore*, 194 F.3d at 615. *See also Rompilla*, 545 U.S. at 389-90 (recognizing that *Strickland* necessarily requires a case-by-case analysis). Counsel's decision not to investigate a particular matter "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 522.

The burden of demonstrating that counsel's investigation or trial decisions were professionally unreasonable remains with the criminal

defendant challenging counsel's performance. *See Strickland*, 466 U.S. 689 (emphasizing "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"). To meet this burden, a defendant must do more than merely allege a failure to investigate; he must affirmatively prove that the investigation counsel actually conducted fell below minimum professional standards. *Id.* at 690. Petitioners alleging that counsel was ineffective for failing to conduct a reasonable investigation must state with specificity what additional evidence would have resulted from further investigation and how such evidence would have altered the outcome of the case. *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998); *Anderson*, 18 F.3d at 1221; *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

Counsel testified in his affidavit that in preparation for trial, they interviewed several members of Mamou's family and other potential witnesses, even traveling to Sunset, Louisiana to do so. SHCR 253. During the punishment phase of trial, counsel presented testimony from several family members and an ex-girlfriend who was the mother of one of Mamou's five children. These witnesses testified regarding Mamou's impoverished upbringing and the separation of Mamou's parents when he was five years old. Several witnesses, including Mamou's sister, ex-girlfriend, and uncle testified regarding the fact that Mamou was a father figure in his family and helped take care of them.

Mamou claims that counsel neglected to uncover "significant mitigating evidence" that could have changed the outcome of the punishment verdict. To support this claim he cites to affidavits from Mamou's brother and two friends who would have been willing and available to testify at trial that Mamou emotionally and financially supported his family, and that he was generous with his friends, family, and community, and performed charitable good deeds in Sunset. DE 39 at 140 (citing Petitioner's Exhibits 24-26).

This evidence is not substantial, and is almost entirely cumulative. Virtually every one of Mamou's punishment witnesses testified regarding his emotional and financial support of his family. Mamou's sister told the jury about how Mamou bought her a dress so she could attend her eight grade graduation, convinced her not to run from home, encouraged her to be thankful when she was disappointed about her Christmas gift, and sold jewelry to help buy her books in college. 23 RR 72-77. Mamou's uncle also testified to Mamou's support of his family, and added that Mamou was "generous to a fault." 23 RR 101-104. Mamou's ex-girlfriend testified that Mamou would pay the light and insurance bills for his family. 23 RR 84.

The evidence presented here by Mamou is not enough to overcome the strong presumption that counsel's conduct constituted reasonable professional assistance regarding the investigation and development of mitigating evidence. Even further, the cumulative nature of the evidence precludes

Mamou from demonstrating that he was prejudiced by the failure of counsel
introduce this evidence at trial. *See United States v. Harris*, 408 F.3d 186, 191
(5th Cir. 2005) (refusing to find the omission of cumulative testimony
constituted ineffective assistance of counsel) (citing *Murray v. Maggio*,736 F.2d
279, 282 (5th Cir. 1984)); *see also Wong*, 558 U.S. at 23 (refusing to find
prejudice result from counsel's failure to present cumulative evidence of
defendant's background and humanizing features because "[a]dditional
evidence on these points would have offered an insignificant benefit, if any at
all"). This Court should deny relief.

## VIII. Mamou Has Not Demonstrated that He is Entitled to Relief on His Claim that Appellate Counsel's Representation on Direct Appeal was Ineffective.

The same two-pronged standard for evaluating ineffective assistance
claims against trial counsel announced in Strickland applies to complaints
about the performance of counsel on appeal. *Smith v. Robbins*, 528 U.S. 259,
285 (2000). Accordingly, a petitioner arguing ineffective assistance by his
appellate counsel must establish both (1) his appellate counsel's performance
was objectively unreasonable and (2) there is a reasonable probability that, but
for appellate counsel's objectively unreasonable conduct, the petitioner would
have prevailed on appeal. *Id*; *Henderson v. Quarterman*, 460 F.3d 654, 665
(5th Cir.2006).

Appellate counsel filing a merits brief is not required to raise every non-

frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith*, 528 U.S. at 288; *Jones v. Barnes*, 463 U.S. 745, 751; *Henderson*, 460 F.3d at 665.  The process of sorting out weaker arguments to focus on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones*, 463 U.S. at 751–52.  Nevertheless, appellate counsel is obligated to research relevant facts and law or to make an informed decision that certain avenues will not prove fruitful. *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2004) (a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not be fruitful); *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003) (failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate representation). Likewise, solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention. *Schaetzle*, 343 F.3d at 445.

A.   **This claim is defaulted; but even if it were not, there was no basis in law or fact to support a claim on direct appeal challenging the admissibility of the magazine mark testimony by Robert Baldwin.**

Mamou asserts that, to the extent his claim challenging the admissibility of Baldwin's magazine mark's testimony is record-based, appellate counsel was ineffective for failing to raise this issue on appeal.  Initially, this claim was not

99

presented to the state court for review.  It is, therefore, unexhausted and procedurally barred.  *See* Section III(A), *supra*.  Beyond that, Mamou fails to identify, nor can the Director discern, any part of his challenge to the admissibility of Baldwin's testimony that is record based.  As discussed previously in section IV, Mamou supports this claim with information that was not even available until years after Mamou's trial.  Council is not deficient for failing to raise a claim that has no evidentiary support in the record.  This Court should deny relief.

### B.   The state court reasonably concluded that appellate counsel was not ineffective for failing to challenge the admissibility of the extraneous victim impact evidence on appeal.

Mamou alleges in a prior claim that trial counsel was ineffective for failing to object to victim impact testimony offered by the family members of extraneous murder victims.  In the present claim, Mamou acknowledges that "[i]neffective assistance of counsel claims are normally not brought on direct appeal."  DE 39 at 142.  Nonetheless, he urges that "should the Court find that trial counsel did preserve error, then appellate counsel rendered constitutionally [defective] performance in failing to raise the error on direct appeal."  DE 39 at 142.  This claim is plainly meritless.  Mamou does not suggest how the Court might find the error preserved when it is clear from the record that counsel did not object.  Certainly, the Court is not obligated to hunt

for ways this might be true.  Precedent is clear that conclusory and speculative ineffective assistance of counsel claims do no support federal habeas relief. *Murphy*, 205 F.3d at 813-14; *Woods*, 870 F.2d at 288; *Schlang*, 691 F.2d at 799.

> **C.    Appellate counsel was not ineffective for failing to raise on appeal the issue of testimony regarding potential changes in the parole law, or that the trial court erred in refusing to instruct the jury that the State had the burden of proving the mitigation special issue.**

Mamou cannot succeed on his claim that appellate counsel was ineffective for failing to raise the issue of parole eligibility testimony on direct appeal because counsel did, in fact, raise this issue on direct appeal. *See Mamou v. State*, slip op. at 18-19.  It was dismissed by the CCA because appellate counsel argued the admissibility of this evidence on grounds different from those asserted at trial.  *Id*.  Notably, the grounds appellate counsel asserted on direct appeal are the same as those urged by Mamou in claim 13(a) of the present petition.  Clearly, there is no basis for relief here.

Mamou is also unable to prove the merits of his claim that appellate counsel was ineffective for failing to raise as error on direct appeal the trial court's failure to assign a burden of proof on the mitigation special issue.  This claim was, however, raised by habeas counsel in Mamou's state writ application.  In rejecting the claim, the CCA held that it has repeatedly refused to assign a burden of proof on the issue of mitigation and has rejected capital

defendants' challenges to the constitutionality of the Texas death penalty scheme based on the lack of burden of proof on the mitigation special issue. SHCR 249 (citing *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Resendiz v. State*, 112 S.W.3d 541, 550 (Tex. Crim. App. 2003); *Jackson v. State*, 33 S.W.3d 828, 840-841 (Tex. Crim. App. 2000); *Matchett v. State*, 941 S.W.2d 922, 935 (Tex. Crim. App. 1996)).   Counsel is not deficient for failing to raise a claim that the CCA has so consistently rejected.  Regardless, Mamou cannot establish a reasonable probability that the outcome of his direct appeal would have been different had counsel raised this claim, because the CCA— the  same court that would have considered this claim on direct appeal— rejected it on state habeas review.  This Court should deny relief.

## IX.  Federal Habeas Relief is Not Warranted on Mamou's Claim that the Evidence at Trial was Legally and Factually Insufficient to Support His Conviction of Capital Murder.

The evidence at trial was legally sufficient to demonstrate that Mamou shot and killed Carmouche after having kidnapped her from scene of the "shoot out" that resulted subsequent to the attempted robbery of Carmouche's friends. Despite Mamou's assertions to the contrary, there was ample evidence at trial to enable any rational trier of fact to find that the State had proven the essential elements of kidnapping beyond a reasonable doubt.  Mamou's related challenge to the factual sufficiency of the evidence is not cognizable on federal habeas review.  For these reasons, this Court should deny relief.

102

**A.    Mamou's factual insufficiency claim is not cognizable on federal habeas review.**

A federal habeas court reviewing a petition filed under 28 U.S.C. § 2254 is only authorized to consider whether petitioner's conviction or sentence—or both—violate the Constitution, laws or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). "It is not the province of a federal habeas court to re-examine state court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68. The factual sufficiency review requested here by Mamou is a claim originating under state law. *See Clewis v. State*, 922 S.W.2d 126, 129-30 (Tex. Crim. App. 1996) (holding that the Texas Constitution—article V, sections 5 and 6— confers jurisdiction on Texas appellate courts to review the factual, as well as legal, sufficiency of the evidence). Clearly, Mamou's factual sufficiency claim does not present this Court with a valid basis for habeas relief. It should be dismissed accordingly.

**B.    The State Court's determination that the evidence at trial was legally sufficient to support Mamou's conviction of capital murder is a reasonable determination of the facts in light of the record.**

Constitutional claims challenging the evidentiary sufficiency of a state court conviction on federal habeas review are governed by the stringent legal-sufficiency analysis set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). In this case, the Supreme Court established a constitutional standard for sustaining

a conviction in accordance with due process. *Wood v. Cockrell*, 307 F.3d 353,358 (5th Cir. 2002). This Court must view the evidence "in the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found the existence of the facts necessary to establish the essential elements of the offense beyond a reasonable doubt." *Jackson*, 443 U.S. 318-19. Under this standard, all credibility choices and conflicting inferences are resolved in favor of the fact-finder. *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999).

Mamou presented his legal sufficiency claim to the state court on direct appeal where he argued, as he does here, that the evidence was insufficient to prove kidnapping and restraint. *Mamou v. State*, slip op. at 9-10. Specifically, he asserted that he fled for safety in Holley's Lexus and that he did not know that Carmouche was hiding in the back seat until he reached the first stop sign. *Id.* He further contended that Carmouche refused to get out of the car when he asked her to do so and that she voluntarily accompanied his to the apartment complex where she was left with Johnson. *Id.*

The CCA found the evidence legally sufficient to support the jury's verdict and denied relief. *Id.* at 9-11. In doing so, the court first set out Texas law regarding the elements of kidnapping:

> Here, the state was required to prove that [Mamou] murdered Carmouche in the course of committing or attempting to commit kidnapping. TEX. PEN. CODE § 19.03(a)(2). A person commits the

offense of kidnapping when he knowingly or intentionally abducts another person.  TEX. PEN. CODE § 20.03(a).  "Abduct" means to restrain a person with the intent to prevent her liberation by either (1) secreting or holding her in a place where she is not likely to be found, or (2) using or threatening to use deadly force.  TEX. PEN. CODE § 20.01(2).  "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with her liberty, by moving her from one place to another or by confining her.  TEX. PEN. CODE § 20.01(1).  Restraint is accomplished without the victim's consent if deadly force, intimidation, or deception is used.  *Id.*  The state has the burden to prove that a restraint was accomplished and that [Mamou] evidenced a specific intent to prevent Carmouche's liberation by either secretion or deadly force.

*Id.*, at 10.  Next the court made the following observations regarding the evidence in this case:

The evidence at trial shows that [Mamou] shot Carmouche's companions, left the scene in Holly's Lexus with Carmouche in the back seat, and transported her to a vacant house where he took her into the backyard and shot her.  Johnson disputed [Mamou's] version of events and testified that he last saw Carmouche in the Lexus with [Mamou].  Dodson testified that [Mamou] admitted to him that he drove away from the "shoot out" with a girl in a Lexus and that he took her to an abandoned house where he shot her because "she was scared" and "she was looking at him funny, like she was going to tell"

*Id.* at 11.  From this the court concluded,

The jury could rationally infer from the evidence that [Mamou] restrained Carmouche without her consent.  Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that [Mamou] restrained Carmouche with the intent to prevent her liberation by either secretion or deadly force.

*Id.* (citing *Jackson*, 443 U.S. at 319).

Mamou maintains in the present petition that the CCA's adjudication

was an unreasonable determination of the facts in light of the record. Specifically, he asserts that the evidence at trial, even if viewed in the light most favorable to the prosecution, does not prove 1) restraint; 2) lack of consent; or 3) specific intent on Mamou's part to prevent liberation. But the record clearly belies these assertions.

By his own admission, Mamou drove off in a car that he stole from people he was attempting to rob, and with whom, he had engaged in a shootout. 20 RR 142-43, 100-200. Carmouche was in the backseat of that car. 20 RR 143. She had accompanied Walter and Holley to the scene, then waited in the backseat of Holley's Lexus while they attempted to conduct a drug transaction with Mamou and his friends. 16 RR 42, 63-67; 18 RR 27-29. After shooting both Gibson and Walter, Mamou jumped into Holley's car and fled the scene. 20 RR 192-200. As noted by the CCA, "restraint" under Texas law occurs where the defendant "restrict[s] a person's movements without consent, so as to interfere substantially with her liberty by moving her from one place to another or by confining her." *Mamou v. State*, slip op. at 11 (citing TEX. PEN. CODE § 20.01(1)). Regardless of whether Mamou was aware of Carmouche's presence, stealing the car after shooting her friends and driving away with her in the backseat, clearly interfered with Carmouche's liberty to a substantial effect without her consent. Carmouche was not free to leave the moving vehicle, and was being moved from one place to the other against her will. No

106

rational juror could view these facts otherwise.

Mamou further contends that the state cannot prove that he acted with specific intent to prevent Carmouche's liberation, but, her dead body proves otherwise.  Even assuming that Mamou was not aware of Carmouche's presence in the car when he stole the car and first drove away from the scene, the fact that she was later found dead and that Mamou confessed to having killed her proves that at some point, whether initially or subsequently after becoming aware of Carmouche's presence in the car, Mamou formed the specific intent to restrain her liberty.  His self-serving testimony that he gave Carmouche the opportunity to get out of the car, but that she refused to leave and voluntarily accompanied him to the Scott's apartment, where he left her, has no impact here.  As previously stated, a legal sufficiency review considers the fact in the light most favorable to the jury's verdict, and the jury was certainly free to disregard this testimony and consider instead, Dodson's testimony that Mamou confessed to killing her.  Indeed, given the fact that other testimony clearly disputed Mamou's version of events, this is the most reasonable interpretation of the facts.

Mamou insists, however, that Dodson's testimony alone, is insufficient to support the jury's verdict on the matter of kidnapping, because it was accomplice witness testimony that must, under Texas law, be corroborated before it can be considered as evidence against him.  But, as set out previously,

in section XI, *infra*, the CCA held otherwise determining that Dodson was not an accomplice under state law.  This Court has no jurisdiction to review the matter further.

More importantly, however, Dodson's testimony is not the only evidence in the record proving Mamou guilty of kidnapping.  This is a reasonable conclusion based on the totality of the circumstances in this case.  Mamou shot Carmouche's friends then stole their care with Carmouche in the back seat. Testimony of other witnesses at trial clearly contradicts Mamou's self-serving testimony that he urged Carmouche to get out of the car, then eventually left when he arrived at Scott's apartment complex.  Even further, Anthony Trail testified that the day after the shootout, he drove Mamou to a dead-end street on the west side of Houston where Mamou retrieved a pair of glasses.  20 RR 11-12.  Mamou told Trail that he had dropped them when he was with a female, who performed oral sex on him.  20 RR 20-13.  Trail's testimony regarding what Mamou told him is consistent with Dodson's testimony that Mamou confessed to him that he took Carmouche to an abandoned building in Sugar Land where she performed oral sex on him, and then he shot her because he was afraid she was "going to tell."  19 RR 180-82.

For these reasons, and those stated previously, Mamou cannot demonstrate that State's court's denial of his legal sufficiency claim was an unreasonable application of *Jackson*, or an unreasonable determination of the

facts in light of the record.  This Court should deny relief.

## X.    Mamou's Claim that the Evidence at Trial Was Insufficient to Corroborate Accomplice Witness Testimony Does Not State a Valid Basis for Federal Habeas Relief.

This allegation does not raise a constitutional issue.  Whether sufficient evidence exists to corroborate the testimony of an accomplice witness is purely a question of state law; as is the determination of whether an individual constitutes an "accomplice" in the first instance.  This Court has no jurisdiction to decide either issue, and should dismiss this claim.

The Texas Code of Criminal Procedure prescribes the following concerning the testimony of accomplice witnesses:

> A conviction cannot be had upon testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. art. 38.14.  An "accomplice" is further defined as a person who "participates before, during, or after the commission of the crime and can be prosecuted for the same offense as the defendant or for a lesser-included offense."  *Medina v. State*, 7 S.W. 3d 633, 641 (Tex. Crim. App. 1999).

Mamou complains that the evidence at trial was insufficient to corroborate the testimony of Terrence Dodson.  Dodson provided damaging testimony during guilt-innocence directly linking Mamou to the kidnapping and murder of Carmouche.  Specifically, Dodson testified that Mamou called

him from Louisiana after the offense. 19 RR 177-78. During that conversation, Mamou discussed the attempted robbery of the drug dealers indicating that a "shoot out happened" and he "burned off" in the Lexus with a girl in the car. 19 RR 178-79. Regarding Carmouche, Mamou told Dodson that he took her to an abandoned house where she performed oral sex on him, and then he shot her because she was "looking at him funny, like she was going to tell." 19 RR 179-183. Mamou argues that without Dodson's testimony, which cannot be considered without sufficient corroboration, the evidence is legally insufficient to sustain his conviction for capital murder.

The CCA considered this claim on direct appeal and rejected it after determining that Dodson was not an "accomplice" under Texas law. *Mamou v. State*, slip op. at 12-14. In particular, the court found,

> The fact that a witness knew of the crime and failed to disclose it, or even concealed it, does not make the witness as accomplice. "In order to be an accomplice witness, there must be some affirmative act on the witness' part to assist in the commission of the offense."

*Id*. at 13 (quoting *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986)). The Court further held that while the evidence demonstrated that Dodson was a party to Mamou's initial attempts to rob Walter and Holly, there was no evidence indicating that Dodson participated in Carmouche's kidnapping or murder. *Id*. at 13. "Dodson was present when [Mamou] and Johnson met with Walter and Holley at Northline Mall and the grocery store;

however, [Mamou] and Johnson took him home after they left the grocery store and he did not have any further contact with [Mamou] until the next day." *Id*.

As stated previously, only federal constitutional claims are cognizable on federal habeas review. *Estelle*, 502 U.S. at 67-68. The Fifth Circuit has expressly held that that claims regarding Texas's accomplice-witness corroboration requirement do not raise a federal constitutional issue. *Brown v. Collins*, 937 F.2d 175, 182 n. 12 (5th Cir. 1991). As explained in *Brown*, "the Constitution imposes no requirement that the testimony of an accomplice-witness be corroborated by independent evidence. The prosecutor's failure to satisfy the accomplice-witness sufficiency rule, and the state court's failure to enforce that rule, are not a basis for federal habeas relief." *Id*. Accordingly, there is nothing here for the Court to review. This claim should be dismissed.

**XI.    Mamou Fails to Demonstrate that He is Entitled to Federal Habeas Relief on His Claim that the Evidence at Trial was Insufficient to Support the Jury's Affirmative Finding on the Future Dangerousness Special Issue.**

Mamou cannot demonstrate that the state court unreasonably applied the *Jackson* sufficiency standard in determining that the evidence at trial was sufficient to prove a probability that Mamou would constitute a continuing threat to society.   The state's punishment evidence was overwhelming and evinced Mamou's tendency toward violent, criminal behavior.   This Court should deny relief.

At the punishment phase of Mamou's trial, the following special issue was submitted to the jury for consideration:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Charles Mamou, Jr., would commit criminal acts of violence that would constitute a continuing threat to society.

CR 101; *see also* Tex. Code Crim. Proc. art. 37.071 § 2(a)(2)(b)(1).  The jury was instructed that "[t]he State must prove Special Issue No. 1 submitted to you beyond a reasonable doubt."  CR 96.

Mamou contends that his death sentence is unconstitutional because the evidence introduced by the State during trial was insufficient to support the jury's verdict on the future dangerousness special issue.  This claim was first presented to the state court on direct appeal where it was rejected by the CCA after concluding that "[v]iewing the evidence in the light most favorable to the

112

jury's affirmative finding on the 'future dangerousness' special issue, we cannot say that this finding is irrational." *Mamou v. State*, slip op. at 15. The CCA identified numerous factors relevant to the future dangerousness special issue before considering the facts in this case. *Id.* at 14. Those factors included:

> (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crimes executed; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or domination of another at the time of the commission of the offense; (7) psychiatric evidence; and (8) character evidence.

*Id.* (citing *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). In considering the fact in Mamou's case, the court noted,

> [Mamou] was an admitted drug dealer who had been convicted of possession with intent to distribute in Louisiana. The following year, he was discovered in possession of a firearm after he was pulled over for speeding at a rate of 100 miles per hour on the interstate freeway in Louisiana. Melancon testified that, three months prior to Carmouche's murder, [Mamou] shot and killed Anthony Williams during a drug transaction which was similar in respects to the incident on Lantern Point Drive. Melancon further testified that he left Houston immediately after the William's murder because he feared [Mamou]. [Mamou] became so angry during Melancon's testimony that he yelled at him in front of the jury and requested to leave the courtroom for the remainder of the proceedings.
>
> With regard to the instant offense, [Mamou] admitted at trial that he shot Walter and Gibson on Lantern Point Drive before he left in Holley's car with Carmouche. According to Dodson, [Mamou] admitted to him that he took a girl to a vacant house after a "shoot

113

out" and then shot her because he thought she was going to tell police what happened.

*Id.* at 14-15.

When presented with a challenge to the sufficiency of the evidence supporting the jury's affirmative finding on the future dangerousness special issue, the limited inquiry on federal habeas review is whether the state court's decision rejecting the claim was an objectively unreasonable application of clearly established federal law as set out in *Jackson v. Virginia, supra. See Martinez v. Johnson*, 255 F.3d 229, 241 n. 21 (5th Cir. 2001); *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993) (citing *Jackson*).  The Supreme Court held in *Jackson*, that a conviction passes constitutional muster if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319.

Mamou argues that the state court's determination that the evidence was sufficient to prove future dangerousness was an unreasonable determination of the facts under § 2254(d)(2).  Specifically, he maintains that it was unreasonable for the court to base a finding of future dangerousness "on a few isolated and/or uncharged incidents coupled with the absence of prior criminal convictions involving violence."  DE 39 at 150.  According to Mamou "[his] drug dealing; his being pulled over for speeding; his alleged involvement

114

in the uncharged Anthony Williams shooting; and Mamou's leaving Houston after the Carmouche murder … fall well short of showing a 'probability' that Mamou would commit future acts of violence." *Id.*

Initially, a glaring deficiency in Mamou's argument is his failure to consider the impact of the facts of the present offense on the jury's verdict. At the onset of the punishment hearing, the prosecutor re-offered all of the evidence introduced during the guilt-innocence phase for the jury's deliberation on punishment. The fact of the crime alone may, in some instances, be sufficient to support a jury's affirmative finding of future dangerousness. *Miller v. Johnson*, 200 F3d 274, 286 (5th Cir. 2000) (citing *Voung v. State*, 830 S.W.2d 939, 935 (Tex. Crim. App. 1992). This is certainly the case here. Mamou devised a calculated plan to rob drug dealers of cocaine. This is not a novice offense. In the course of attempting to carry out this plan, he shot two people, Walter and Gibson, then stole Holley's car and fled the scene. But the violence did not stop there. Regardless of whether he knew initially or sometime shortly thereafter that Carmouche was in the back seat of the car, he sexually assaulted then killed her instead of simply letting her go.

Furthermore, the evidence of Mamou's involvement in the Williams shooting is not simply, as Mamou would characterizes it, an "isolated and/or uncharged incident[ ]." Any rational juror could infer from the similarities

115

between this incident and the present offense a pattern of violent behavior. Thus, contrary to Mamou's assertion, this is precisely the type of evidence that would support a jury's affirmative finding on the future dangerousness special issue. Add to this Mamou's testimony admitting to dealing drugs, and the fact that he was discovered in possession of a firearm, while driving at excessive speeds and there is more than enough evidence to prove beyond a reasonable doubt the probability that Mamou would continue to engage in violent acts that endanger society. Mamou was far short of demonstrating that the state court's adjudication of this claim was an unreasonable determination of the facts in light of the record. This Court should deny relief.

## XII. Federal Habeas Relief Should Not be Granted on Mamou's Claims Alleging the Trial Court Committed Constitutional Error During the Guilt-Innocence and Punishment Phases of His Trial.

Mamou's claim that the trial court erred in denying his objection to testimony regarding potential changes to the law on parole eligibility and in denying his requested instruction that extraneous offenses be proven beyond a reasonable doubt are procedurally barred. Alternatively, they lack merit. Finally, the state court's decision refusing to find that the evidence at trial warranted a lesser-included offense instruction on false imprisonment was a reasonable application of clearly established federal law. This Court should deny relief.

**A.   Mamou's claim that the trial court erred in overruling his objection to the State's cross-examination of parole supervisor, Dorothy Morgan, is procedurally barred; but even if it were not, it lacks merit.**

The Court of Criminal Appeals accurately summarized the facts leading

up to the contested testimony as follows:

> During the punishment phase, [Mamou] called Dorothy Morgan, a parole supervisor for the Southern Regional Institutional Parole Office with over eighteen years of experience, to testify about Parole Board procedures. Morgan testified that an inmate convicted of capital murder and sentenced to life in prison, "would not be eligible for parole consideration for forty flat years." After his direct examination of Morgan, [Mamou] orally requested a motion in limine to prevent the state from cross-examining her on "changes in the parole law" because it "involves speculation on the part of this witness as to what the Legislature would do." The trial court denied [Mamou's] motion in limine.

*Mamou v. State*, slip op. at 18. The following testimony ensued:

> Q.   You're not implying to the jury they could never be changed, are you?
>
> A.   Well, I couldn't tell the jury that it would be or wouldn't be. I'm just saying, I know today. And no, I cannot tell them that.
>
> Q.   All right. Because that's not always been the law. Forty years day-for-day has not always been the law. It's a pretty recent situation.
>
> A.   That is true; however, it was less time. It was thirty-five.
>
> Q.   And before that it was even less time, wasn't it? Even before that, it was a life sentence, you might get out in eight or nine years.
>
> A.   Could be. Not a capital felony.

117

Q.   Are you sure about that?

A.   I'm not an attorney, no, I couldn't say

Q.   You said that the …so you cannot guarantee the ladies and gentlemen of the jury that forty years, calendar years, day-for-day, will ever be changed.  You can't assure us of that can you?

A.   I can only tell the jury what it is today.

Q.   I understand, which means you cannot assure us it can never be changed?

A.   Right.

23 RR 17-18.

Mamou appealed the trial court's decision to allow this cross-examination by the state arguing that it was contrary to the law and constituted "a blatant effort for the jury to disregard their instruction and violate their oaths in answering the continuing threat special issue and the mitigation special issue." *Mamou v. State*, slip op. at 18.  The CCA, however, after noting that Mamou's trial objection was lodged "on the ground of speculation, materiality, and relevance," held that the issue was not preserved for appeal "[b]ecause [Mamou's] trial objections do not comport with the issue raised on appeal." *Id.* at 18-19. (citing TEX. R. APP. PROC. 33.1; *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *Turner v. States*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991)).

118

### 1. The state court's dismissal of this claim on independent and adequate state procedural grounds defaults this claim in federal court.

As set out fully in section II, *supra*. Federal courts are without jurisdiction to review a habeas claim "if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision." *Roberts*, 681 F.3d at 604 (citing *Finely*, 243 F.3d at 218 (internal quotations and emphasis omitted)). In this case, the state court clearly and expressly dismissed Mamous's claim on direct appeal because she failed to properly preserve the complaint by lodging a timely and reasonably specific objection at trial.  *Mamou v. State*, slip op. at 2.  It is well settled that the Texas's contemporaneous objection rule constitutes an independent and adequate state procedural ground sufficient to default a claim in federal court. *Duncan v. Cain,* 278 F.3d 537 (5th Cir. 2002) (citing *Wainwright v. Sykes,* 433 U.S. 72, 87–88, 97 (1977)). Thus, the claim is defaulted.

The only way for Mamou to overcome this bar is to demonstrate either "cause and prejudice" or that the failure to review the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.  For the reasons set out in section I, *supra*, there is nothing to excuse the default in this case.

### 2.   Regardless of the default, Mamou would not be entitled to relief on this claim because it lacks merit.

Mamou argues that the prosecutor's cross-examination of Morgan "invited the jury to disregard the law, violate their instructions and violate their oath in answering both special issues," and that the trial court erred in not sustaining his objection to this testimony.  DE 39 at 156.  As previously stated, ordinary challenges to evidentiary matters are not generally reviewable on habeas review. *Herrera*, 904 F.2d at 950; *Anderson*, 555 F.2d at 551; *Woods*, 547 F.2d at 271.  Only where the petitioner demonstrates that the state's evidentiary ruling resulted in the denial of fundamental fairness, thus violating due process, will habeas relief be granted.  *Woods*, 547 F.2d at 271; *Mullen v. Blackburn*, 808 F.2d 1143, 1145 (5th Cir. 1987).  To guide the Court's application of the "fundamental fairness" criterion, the Fifth Circuit has explained that "the erroneous admission of prejudicial evidence can justify habeas corpus relief if it is material in the sense of a crucial, critical, highly significant factor." *Woods*, 547 F.2d at 271.

Mamou fails to demonstrate how the prosecutor's cross-examination of Morgan was likely to incite the jury to speculate regarding parole law during its punishment deliberations.  Morgan testified unequivocally regarding the parole law in effect at the time of Mamou's trial.  More importantly, the trial court instructed the jury prior to its deliberations on punishment that,

120

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served equals forty (40) years calendar years, without consideration of goodtime conduct.  Parole eligibility does not guarantee that parole will be granted.

CR 98.  Mamou does not contest the accuracy of this instruction, and the law presumes that a jury follows its instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).   As such, Mamou has not proven that Morgan's testimony was material such that its admission violated his constitutional right to due process.

### B.   The state court reasonable concluded that Mamou was not entitled to a lesser-included offense instruction on false imprisonment.

After both sides rested at the end of guilt-innocence, the trial court asked whether there were any objections to the proposed jury charge.  21 RR 3. Mamou objected to the absence of a lesser-included offense instruction on false imprisonment and requested that one be included.  21 RR 3.  The trial court denied this request. 21 RR 3.

In *Beck v. Alabama*, the Supreme Court held that a blanket ban on the submission of lesser included offense instructions in a capital case violates due process. 477 U.S. 625, 635-37 (1980).  As explained by the court,

> when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a

121

> capital offense—the failure to give the jury the "third option"of
> convicting of a lesser-included offense would seem inevitably to
> enhance the risk of unwarranted convictions.

*Id.* at 637. It does not follow, however, that a lesser-included offense instruction is required in every case. "Due process requires that a lesser-included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982).

In *Cordova v. Lynaugh*, the Fifth Circuit read *Beck* and *Hopper* to apply to cases where the state trial court refused to submit a lesser included offense instruction for the jury's consideration. 838 F.3d 764, 767 (5th Cir. 1988). The Court held that both the Eighth and Fourteenth Amendments mandated that a jury in a capital case be allowed to consider convicting the defendant of a lesser included, noncapital offense if the jury could rationally acquit the defendant of the capital crime and convict the defendant of the non-capital crime. *Id.*

Texas courts apply a two-part test to determine entitlement to such an instruction. *See Rousseau v. State,* 855 S.W.2d 666, 672–73 (Tex. Crim. App.1993) (en banc). "[F]irst, the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record *that would permit a jury rationally to find* that if the defendant is guilty, he is guilty only of the lesser offense." *Id.* at 673; *accord* TEX.CODE CRIM. PROC. ANN. art. 37.09 (Vernon 1981) (defining

lesser included defense).  There is no question that false imprisonment is a lesser-included offense of kidnapping.  *See Mamou v. State*, slip op. at 16 (citing *Schweinle v. State*, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996)).  Equally plain, as set out below, is that there is no evidence in the record that would permit a jury to rationally find Sheppard guilty of false imprisonment but not kidnapping.

Kidnapping under Texas law requires proof that the defendant knowingly or intentionally abducts another person.  Tex. Penal Code § 20.03(a).  "Abduct" means to restrain a person with the intent to prevent her liberation by either (1) secreting or holding her in a place where she is not likely to be found; or (2) using or threatening to use deadly force.  Tex. Penal Code. § 20.01(2).  False Imprisonment—termed "Unlawful Restraint" in the Texas Penal Code—occurs where the defendant intentional of knowingly restrains another person.  Tex. Penal Code § 20.02(a).

The state court reasonably concluded on direct appeal that there was nothing in the State's evidence that would permit the jury to rationally find the defendant guilty of false-imprisonment, while acquitting him of kidnapping.  That is, there was no evidence proving Mamou guilty of restraint, but restraint with the intent to prevent liberation by secretion or deadly force.

> The state's evidence showed that [Mamou] abducted Carmouche.
> Mamou, who was armed with a nine-millimeter pistol and had just
> shot Carmouche's companion's, "restrained" Carmouche when he

123

transported her from Lantern Point Drive to the backyard of the vacant house. He "intended to prevent [her] liberation" because he thought she was going to tell the police what happened. He used "secretion" to prevent her liberation by taking her to a secluded place where she was not likely to be found. He used "deadly force" to prevent her liberation when he shot her with his nine-millimeter pistol.

*Mamou v. State*, slip op. at 16-17.

The CCA further held that in applying the second prong of the two-part analysis a lesser-included offense instruction is not required where a defendant either "presents evidence that he committed no offense or presents no evidence, and there is no evidence showing that he is guilty only of a lesser-included offense." *Mamou v. State*, slip op. at 16 (citing *Bignall v. State*, 887 S.W.2d 21,23 (Tex. Crim. App. 1994)). Mamou, through his own testimony, offered evidence at trial that he neither abducted nor restrained Carmouche. Specifically, he testified that he was not aware of Carmouche's presence in Holley's Lexus when he stole it and drove away from the scene of the shootout. He stated that upon discovering her in the backseat, he told her to get out of the car, but that she refused. Mamou essentially testified that he committed no offense. The CCA concluded that this testimony "is not adequate to raise the issue of a lesser-included offense." *Mamou v. State*, slip op. at 17.

Mamou has not established that this adjudication is an unreasonable application of clearly established federal law. His petition merely incorporates his briefing on the sufficiency of the evidence at trial to prove kidnapping, and

asserts that "[w]hen evidence from any source raises a defensive issue, and the defendant requests a jury charge on that issue, the trial court must submit the issue to the jury." DE 39 at 160; *Muniz v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984). This is not enough.

Initially, citations to state court precedent will not support relief under AEDPA. The statute requires the petitioner to prove that the state court's decision was contrary to, or an unreasonable application of "clearly established federal law as set out by the United States Supreme Court." 28 U.S.C. § 2254(d)(1). Furthermore, Mamou's briefing on his legal sufficiency claim offers no aid here. A lesser-included offense instruction is only warranted where the evidence at trial supports a finding that the defendant actually committed the lesser-included offense (but not the greater one). As held by the CCA on direct appeal, no instruction is required where the defendant presents evidence that no offense occurred. Mamou's legal sufficiency argument is premised on his assertion that the evidence is inadequate to demonstrate that he restrained Carmouche. This is, in effect, an assertion that no offense occurred. Because the evidence supported either a finding that Mamou was guilty of kidnapping, *see* section IX, *supra*, or that he was guilty of no offense, a lesser-included instruction of false imprisonment was not warranted.

The state adjudication of the claim was a reasonable application of federal law on this issue, and this Court should deny relief.

### C.   The state court reasonably rejected Mamou's claim that due process requires unadjudicated offenses be proven beyond a reasonable doubt.

Established precedent simply does not support Mamou's claim that unadjudicated offenses introduced during the punishment phase in a capital trial must be proven beyond a reasonable doubt.  Were this Court inclined to forge new ground and find constitutional error where previous courts have found none, federal habeas relief would nevertheless be foreclosed under *Teague v. Lane*, 489 U.S. 288 (1989).

It is well settled under Texas law that evidence of extraneous offenses, adjudicated or otherwise, is relevant and admissible during the punishment phase of a capital murder trial. *McFarland v. State*, 928 482, 512 (Tex.Crim.App. 1996), *overruled on other grounds by Mosely v. State,* 983 S.W.2d 249 (Tex.Crim.App. 1998) (citing *Kemp v. State*, 846 S.W.2d 289, 307 (Tex.Crim.App. 1992); *Smith v. State*, 676 S.W.2d 379, 390 (Tex.Crim.App. 1984)).  This type of evidence is admissible in capital cases where it is "clearly prove[n] that an offense was committed and that the accused was the perpetrator," *Kemp*, 846 S.W.2d at 307.

Mamou nevertheless requested that the jury in his case be instructed during the punishment phase that the State must prove any extraneous offenses beyond a reasonable doubt.  24 RR 3.  Specifically, the proposed instruction would have charged the jury, in relevant part:

> You may consider the evidence of an extraneous crime or bad act in assessing punishment even if the defendant has not yet been charged with or finally convicted of the crime or act.  However, you may consider such evidence only if the extraneous crime or bad act has been shown by the State beyond a reasonable doubt to have been committed by the defendant or is one for which the defendant is could be held criminally responsible.

CR 92.  But, the trial court denied Mamou's request and refused to submit the instruction to the jury.  *Id.*

On direct appeal Mamou challenged the trial court's refusal to submit the requested instruction.  *Mamou v. State*, slip op. at 17.  The CCA rejected that claim:

> We have repeatedly held that, so long as the jury has been properly instructed concerning the burden of proof with regard to the special issues, the trial court does not err in failing to submit in the punishment charge a separate instruction on the burden of proof on extraneous offenses.  The record in the instant case reflects that the jury was told that the state had the burden to prove the issue of future dangerousness beyond a reasonable doubt.  Thus, it was not error for the trial judge to deny [Mamou's] requested instruction.

*Id.* at 17-18 (internal citations omitted).  This adjudication was not an unreasonable application of clearly established federal law.

### 1. Circuit precedent contradicts Mamou's assertion that unadjudicated offenses must be proven beyond a reasonable doubt.

There is a long line of Fifth Circuit cases denying the very claim that Mamou raises here.  *Brown v. Dretke*, 419 F.3d 365, 376-77 (5th Cir. 2005); *Turner v. Johnson*, 106 F.3d 1178, 1188-89 (5th Cir. 1997); *Harris v. Johnson*,

81 F.3d 535, 540-41 (5th Cir. 1996); *Williams v. Lynaugh*, 814 F.2d 205, 207-08 (5th Cir. 1987); *Milton v. Procunier*, 744 F.2d 1091, 1097 (5th Cir. 1984). Despite acknowledging society's reservation regarding the use of crimes and bad acts against a defendant where there is no conviction for that conduct, the Court in *Williams* nevertheless rejected the petitioner's challenge to the admissibility of this type of evidence. 814 F.2d at 208.

> We emphasize that evidence of Williams' extraneous unadjudicated offense was not allowed to be introduced until the punishment phase and thus eliminates any concern that the jury used this unadjudicated offense to influence its decision in the guilt phase of the trial. The focus of the Texas capital sentencing procedure is to have all the relevant evidence before the jury when answering the special issues which determine whether the death penalty will be imposed.

*Id*. The Court further explained that concerns about the use of unadjudicated offenses "are addressed by properly applied standards of relevance and sufficiency of proof." *Id*. (quoting *Milton*, 744 F.2d at 1097). There is no question that evidence of extraneous offenses—adjudicated or otherwise—is "clearly relevant" to the jury's determination of the future dangerousness special issue. *Id*. Furthermore, the State is required to provide "clear proof" that the defendant committed the extraneous offense for it to be admissible. *Kemp*, 846 S.W.2d at 307. There is no constitutional requirement that the standard of proof be higher to include proof beyond a reasonable doubt. *Brown*, 419 F.3d at 376-77. Despite what Mamou asserts, the admissibility of this type

of evidence does not violate due process.  *Id.*

### 2.    Federal habeas relief is also barred under *Teague*.

Even if this Court were to agree with Mamou on the issue, relief remains unavailable.  *Teague* prohibits the retroactive application of new constitutional rules of criminal procedure on collateral review.  489 U.S. at 310.  A new rule, for *Teague* purpose, "is one that either breaks new ground, imposes a new obligation on the states or the federal government, or was not dictated by precedent existing at the time the defendant's conviction became final." *Hughes*, 412 F.3d at 591 (citing *Graham v. Collins*, 506 U.S. 461, 467 (1993)). The Fifth Circuit has recognized that granting relief on a claim like the present one would constitute the announcement and application of a new rule of law, in violation by *Teague*.  *Harris*, 81 F.3d at 540-41; *Hughes*, 412 F.3d at 593. Accordingly, there is no valid basis upon which to grant federal habeas relief on this claim.

## XIII. Mamou's Cumulative Error Claim Does Not State a Valid Basis for Relief.

The Fifth Circuit set out in *Derden v. McNeel* the limited circumstances under which a cumulative error claim will succeed:

> Federal habeas relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved a matter of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the trial that the resulting conviction violated due process."

978 F.3d 1453, 1454 (5th Cir. 1992) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Because as set out fully in the preceding sections, Mamou has not proven any occurrence of constitutional error during his trial there is nothing to cumulate.  Furthermore, the vast majority of his petition is procedurally barred.  Only claims 7(a), 8(b), 10, 11, 12, 13(a), and 13(b) are even eligible for consideration here.  And again, none of these claim establish constitutional error.  Thus, this Court should deny relief.

## XV.  Mamou is not entitled to discovery or an evidentiary hearing to further develop the factual basis of his claims.

Throughout his petition Mamou requests discovery an evidentiary hearing to develop facts in support of his federal habeas claims.  But he cannot demonstrate that his request is warranted.  As explained by the Fifth Circuit in *Murphy v. Johnson*,

> Rule 6 of the Rules Governing § 2254 cases permits discovery only if and only to the extent that the district court finds good cause. Good cause may be found when a petition for habeas corpus relief "establishes a prima facie claim for relief." *Harris [v. Nelson,* 394 U.S. 286, (1086) (1969)].  Additionally, a petitioner's factual allegations must be specific, as opposed to merely speculative or conclusory, to justify discovery under Rule 6. *See West v. Johnson,* 92 F.3d 1385, 1399-1400 (5th Cir.1996) (citing *Ward v. Whitley,* 21 F.3d 1355, 1367 (5th Cir.1994)). Simply put, Rule 6 does not authorize fishing expeditions. *See Ward,* 21 F.3d at 1367.

205 F.3d 809, 814 (5th Cir. 2000).  The briefing above sets out the conclusory and speculative nature of Mamou's *Brady* and IATC claims.  Furthermore,

Mamou cannot demonstrate a prima facie case for relief because these claims are also procedurally defaulted.

Further, evidence not presented in state court cannot be considered in federal court unless an inmate overcomes 28 U.S.C. § 2254(e)(2). *See Holland v. Jackson*, 542 U.S. 649, 653 (2004) (per curiam). To leap that statutory hurdle, Mamou would have to prove that he was not at fault not for failing to factually develop this claims in state court, or if at fault, that his claim relies on a new, retroactive rule of constitutional law or that he could not have discovered the claim using due diligence *and* that he is actually innocent of capital murder. § 2254(e)(2)(A)–(B); *see Williams v. Taylor*, 529 U.S. 420, 431–37 (2000). For the reasons set out in the Director's response to Mamou's speculative, conclusory, unexhausted, and procedurally defaulted claims, he fails to demonstrate an evidentiary hearing is warranted in this case.

## CONCLUSION

For the reasons set out above, the Director respectfully requests that this Court grant the Director's motion for summary judgment and dismiss Mamou's petition with prejudice.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

___s/ Tina J. Miranda_____
TINA J. MIRANDA
Assistant Attorney General
   *Counsel of Record*

P. O. Box 12548, Capitol Station
Austin, Texas  78711
(512) 936-1400
(512) 936-1280 (FAX)
tina.miranda@texasattorneygeneral.gov

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2016, I electronically filed the foregoing

document with the clerk of the court for the United States District Court,

Southern District of Texas, using the electronic filing system of the court.  The

electronic case filing system sent a "Notice of Electronic Filing" to the following

attorney of record who has consented in writing to accept this Notice as service

of this document by electronic means:

A. Richard Ellis
75 Magee Avenue
Mill Valley, CA 94941
a.r.ellis@att.net                                    s/ Tina J. Miranda_____
                                                     Tina J. MIRANDA
                                                     Criminal Appeals Division

132