## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN  DISTRICT OF TEXAS
## HOUSTON  DIVISION

| | | |
|---|---|---|
| **CHARLES MAMOU, JR.,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **CASE No. 4:14-CV-00403** |
| | § | |
| **WILLIAM STEPHENS,** | § | |
| **Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | **(Death Penalty Case)** |
| **Division,** | § | **(Judge Lee H. Rosenthal)** |
| **Respondent** | § | |
| | § | |

### PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND
### MOTION FOR SUMMARY JUDGMENT

A. Richard Ellis
Texas Bar No. 06560400
75 Magee Ave.
Mill Valley, CA 94941
(415) 389-6771
FAX (415) 389-0251
Attorney for Petitioner Charles Mamou, Jr.

# TABLE OF CONTENTS

**PAGE**

**Table of Contents**................................................................................................i

**Table of Authorities**.........................................................................................v

**Petitioner's Reply to Respondent's Answer**.............................................1

**I. Incorporation By Reference**.......................................................................1

**II. The Director's Arguments Regarding the Standard of Review Under 2254(d)**...... ........2

    A.  The AEDPA deferential standard of review does not apply to any of Mr. Mamou's claims that were not adjudicated on the merits..............................................................2

    B. The Director's discussion of the 2254(d) standards........................................3

**III. The Director Is Not Entitled To Summary Judgment**..............................9

    A. The Director has neither pled nor proved a case for summary judgment.........................9

    B.  The Director's Answer shows the existence of disputed issues of material fact..............10

**IV. Mamou Has Shown Cause and Prejudice To Excuse The Default Of Any Procedurally-Barred Claims and a Fundamental Miscarriage of Justice**.........................................13

    A. Cause and prejudice under *Martinez* as to the IATC claims...............................13

        i. Mamou has shown "substantiality" under *Martinez*..................................14

        ii. Mamu has also shown that his state habeas counsel was ineffective ("IAHC")......15

    B. Cause and prejudice under *Martinez* due to lack of expert and investigative funding.....16

    C. No AEDPA deference to state court findings as there was no evidentiary hearing in state court and Mamou is entitled to a federal evidentiary hearing..............................18

    D. "Cause and Prejudice"................................................................................................20

    E. Fundamental miscarriage of justice...............................................................................23

**V. <u>Reply To the Director's Argument On Claims For Relief</u>**.....................................................24


<u>Claim 1</u>: Mr. Mamou is Actually Innocent of Capital Murder............................................24

<u>Claim 2</u>: The Trial Court Erred In Admitting Unreliable "Magazine Marks" Firearms Testimony From State's Expert Robert Baldwin....................................................................................26

    A.  The claim is not procedurally defaulted..........................................................................26

    B. The claim raises a federal constitutional issue ..............................................................29

    C. The Director's mischaracterization of the State's argument regarding Baldwin...............30

    D. The Director fails to deal with the flaws in Baldwin's testimony.....................................33

<u>Claim3</u>: The State Knowingly Suppressed Favorable Evidence And Presented False Testimony Regarding The Firearms Evidence And Other State's Witnesses In Violation of *Brady v. Maryland, Napue v. Illinois,* and *Giglio v. United States*.....................................................................35

<u>Claim 4</u>: Mr. Mamou Was Deprived Of The Right To Effective Assistance Of Counsel By Their Failure To Challenge, Test, And Effectively Cross-Examine The State's Firearms and Fingerprint Experts..............................................................................................................................38

    A. There is no procedural bar to this claim.........................................................................39

    B. The Director's claim that Baldwin's information came to light only after Mamou's trial.........................................................................................................................................40

    C. The Director's arguments regarding discovery of Baldwin's testing................................43

    D. Mamou's claim regarding the failure to investigate or present evidence regarding Baldwin's work (Claim 4(c))..............................................................................................44

<u>Claim 5</u>: Petitioner Received Ineffective Assistance of Counsel Pre-Trial........................45

    A. Trial counsel rushed to trial without adequate preparation (Claim 5(a))..........................45

<u>Claim 6</u>: Ineffective Assistance of Counsel At The Guilt Phase of the Trial......................46

<u>Claim 6(a)</u>: Ineffective assistance of counsel for failure to object to biased instructions at voir dire...................................................................................................................................46

<u>Claim 6(b)</u>: Ineffective assistance of counsel for failing to object to the Court's emphasizing defendant's failure to testify (<u>withdrawn</u>)..............................................................................

<u>Claim 6(c)</u>: Ineffective assistance of counsel for allowing the exclusion of only those jurors opposed to the death penalty........................................................................................48

<u>Claim 6(d)</u>: Ineffective assistance of counsel for failing to object to gruesome and redundant multiple autopsy photographs...........................................................................................48

<u>Claim 7</u>: Petitioner Was Deprived of Effective Assistance of Counsel At the Punishment Phase of His Trial.............................................................................................................................49

<u>Claim 7(a)</u>: Ineffective assistance of counsel for failure to object to inadmissible victim impact evidence at the punishment phase.............................................................................49

A. The State court did not reasonably apply <i>Strickland</i>.............................................51

B. The Director's arguments regarding the adequacy of the state habeas process.....57

<u>Claim 7(b)</u>: Ineffective assistance of counsel for failing to present evidence in mitigation...........................................................................................................................61

<u>Claim 8</u>: Appellate Counsel rendered Ineffective Assistance of Counsel.........................................61

<u>Claim 8(a)</u>: Ineffective assistance of appellate counsel for failing to raise trial court error in admitting Baldwin's flawed "magazine mark" testimony......................................................62

<u>Claim 8(b)</u>: Ineffective assistance of appellate counsel for failure to raise issue of inadmissible extraneous victim impact evidence....................................................................62

<u>Claim 8(c)</u>: Ineffective assistance of appellate counsel for failing to raise issues of parole eligibility and burden of proof on mitigation issues...............................................................63

<u>Claim 9</u>: State Post-Conviction Counsel Rendered Ineffective Assistance of Counsel.....................63

<u>Claim 10</u>: Petitioner Is Not Guilty Of Capital Murder Because The Evidence Is legally And Factually Insufficient To Support The Jury's Determination That Petitioner Was Guilty Of Kidnaping..........63

<u>Claim 11</u>: Petitioner Was Unlawfully Convicted Of Capital Murder Because There Was Insufficient Legal And Factual Corroboration Of Accomplice Testimony.............................................................65

<u>Claim 12</u>: Petitioner Was Denied His Federal Constitutional Right To A Fair Trial And Due Process Of Law As The Evidence Supporting The Future Dangerousness Special Issue Was Insufficient...65

<u>Claim 13</u>: The Trial Court Committed Multiple Reversible Errors......................................................67

    <u>Claim 13(a)</u>: The trial court erred in denying Petitioner's objection to the Prosecutor's speculation that the State legislature could lessen Petitioner's parole eligibility of 40 years..........................................................................................................................................67

    <u>Claim 13(b)</u>: Trial court error in denying Mamou's requested charge on false imprisonment...............................................................................................................................69

    <u>Claim 13(c)</u>: The trial court erred in denying Mamou's requested charge requiring the extraneous offenses to be proved beyond a reasonable doubt.............................................72

    <u>Claim 13(d)</u>: The cumulative effect of trial errors.................................................................73

<u>Claim 14</u>: Reversal Is Required Based On The Cumulative Effect Of All The Errors.....................73

**VI. <u>Conclusion and Prayer for Relief</u>** ...........................................................................................73

**Certificate of Electronic Service**........................................................................................................74

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adickes v. S.H. Kress and Company,* 398 U.S. 144 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Anderson v. Liberty Lobby,* 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Blackledge v. Allison,* 431 U.S. 63 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Blair v. Armontrout,* 916 F.2d 1310 (8th Cir. 1990), cert. denied, 502 U.S. 825 (1991). . . . . . . 21

*Booth v. Maryland,* 482 U.S. 496, 107 S. Ct. 2529 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Bouchillon v. Collins,* 907 F.2d 589 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bousley v. United States,* 523 U.S. 614 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Brady v. Maryland,* 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21, 22

*Brown v. Collins,* 937 F.2d 175 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Brown v. Dretke,* 419 F.3d 365 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Brumfield v. Cain,* —— U.S. ——, 135 S. Ct. 2269 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Canales v. Stephens,* 765 F.3d 551 (5th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cavazos v. Smith,* 565 U.S. ___, 132 S. Ct. 2 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cave v. Singletary,* 971 F.2d 1513 (11th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Celotex Corporation v. Catrett,* 477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ciak v. United States,* 59 F.3d 296 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Circu v. Gonzales,* 450 F.3d 990 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Clabourne v. Ryan,* 745 F.3d 362 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cleveland Board of Ed. v. Loudermill,* 470 U.S. 532 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Coleman v. Thompson,* 501 U.S. 722 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 23

*Cone v. Bell,* 556 U.S. 449 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 70

*Cooper v. Pate,* 378 U.S. 546 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cullen v. Pinholster,* 563 U.S. __, 131 S. Ct. 1388 (2011). . . . . . . . . . . . . . . . . . . . . . 2, 6, 7, 8

*Daubert v. Merrell Dow Pharmaceuticals, Incorporated,* 509 U.S. 579 (1993). . . . . . . . . . . . 27

*Detrich v. Ryan,* 740 F.3d 1237 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dickens v. Ryan,* 740 F.3d 1302 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 62

*Edwards v. Carpenter,* 529 U.S. 446, 120 S. Ct. 1587 (2000). . . . . . . . . . . . . . . . . . . . . . . . . 21

*Fiore v. White,* 531 U.S. 225 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Fontaine v. United States,* 411 U.S. 213 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Fuentes v. Shevin,* 407 U.S. 67 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Gallow v. Cooper,* 133 S. Ct. 2730 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Glock v. Singletary,* 84 F.3d 385 (11th Cir.), cert. denied, 117 S. Ct. 616 (1996). . . . . . . . . . . 19

*Graves v. Dretke,* 442 F.3d 334 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Greene v. Fisher,* 132 S. Ct. 38 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17, 18

*Guidry v. Dretke,* 397 F.3d 306 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Harrington v. Richter,* 562 U.S. __, 131 S. Ct. 770 (2011). . . . . . . . . . . . . . . . . . . . . . 2, 3, 4, 6, 7

*Harris v. Nelson,* 394 U.S. 286 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Harris v. Reed,* 489 U.S. 255 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*House v. Bell,* 547 U.S. 518 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27, 28

*Jackson v. Virginia,* 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28, 64, 72

*Jefferson v. Upton,* 560 U.S. ___, 130 S. Ct. 2217 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Johnson v. Estelle,* 704 F.2d 232 (5th Cir. 1983), cert. denied, 465 U.S. 1009 (1984). . . . . . . . 11

*Kumho Tire Company v. Carmichael,* 526 U.S. 137 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kyles v. Whitley,* 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Machibroda v. United States,* 368 U.S. 487 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Martinez v. Ryan,* 132 S. Ct. 1309 (2012). . . . . . . . . . . . . . . . . . 13, 14, 15, 16, 17, 18, 39, 40, 45, 46, 63

*Miller-el v. Cockrell,* 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14, 15, 39

*Mullane v. Central Hanover Bank and Trust Company,* 339 U.S. 306 (1950). . . . . . . . . . . . . 59

*Murphy v. Johnson,* 205 F.3d 809 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Murray v. Carrier,* 477 U.S. 478 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21, 28

*Neal v. Puckett,* 286 F.3d 230 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*O'Blasney v. Solem,* 774 F.2d 927 (8th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Paradis v. Arave,* 130 F.3d 385 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Payne v. Tennessee,* 510 U.S. 808, 111 S. Ct. 2597 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Perillo v. Johnson,* 79 F.3d 441 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Porter v. McCollum,* 130 S. Ct. 447 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 8

*Reed v. Ross,* 468 U.S. 1 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Renico v. Lett,* 599 U.S. ___, 130 S. Ct. 1855 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Cullen v. Pinholster,* 563 U.S. ___, 131 S. Ct. 1388 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Rivera v. Quarterman,* 505 F.3d 349 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Salts v. Epps,* 676 F.3d 468 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Sasser v. Hobbs,* 735 F.3d 833 (8th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sawyer v. Whitley,* 505 U.S. 333 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 28

*Schlup v. Delo,* 513 U.S. 298 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 28, 29

*Simmons v. South Carolina,* 512 U.S. 154, 114 S. Ct. 2187 (1994). . . . . . . . . . . . . . . . . . . . . . . 72

*Smith v. Dretke,* 422 F.3d 269 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 39

*Snodgrass v. Angelozzi,* 545 F. App'x 698 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Street Amant v. Benoit,* 806 F.2d 1294 (5th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Strickland v. Washington,* 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . 7, 18, 50, 55, 57, 59, 61, 68

*Strickler v. Greene,* 527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Sumner v. Mata,* 449 U.S. 539 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tennard v. Dretke,* 542 U.S. 274 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 39

*Toliver v. Pollard,* 688 F.3d 853 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Trevino v. Thaler,* 133 S. Ct. 1911 (2013)...........................................13, 16, 17, 18, 39, 45, 46, 63

*United States v. Frady,* 456 U.S. 152 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Galloway,* 56 F.3d 1239 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Valdez v. Cockrell,* 274 F.3d 941948 (5th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Valles v. Lynaugh,* 835 F.2d 126 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wardrip v. Thaler,* 705 F.Supp.2d 593 (N.D.Tex., 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wesson v. Oglesby,* 910 F.2d 287 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wiggins v. Smith,* 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 57

*Wiley v. Epps,* 625 F.3d 199 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Williams v. Quarterman,* 551 F.3d 352 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . 30, 37, 38, 40, 43

*Williams v. Taylor,* 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Williams(Michael) v. Taylor,* 529 U.S. 420, 120 S. Ct. 1479 (2000). . . . . . . . . . . . . . . . . . . . 19

*Woodford v. Visciotti,* 537 U.S. 19 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Ylst v. Nunnemaker,* 501 U.S. 797 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATE CASES

*Aguilar v. State,* 682 S.W.2d 556 (Tex. Crim. App.1985). . . . . . . . . . . . . . . . . . . . . . . . . 70, 72

*Anderson v. State,* 125 S.W.3d 729 (Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . . . . . . . 71

*Bignall v. State,* 887 S.W.2d 21 (Tex. Crim. App. 1994). . . . . . . . . . . . . . . . . . . . . . 69, 70, 72

*Booth v. State,* 679 S.W.2d 498 (Tex. Crim. App. 1984). . . . . . . . . . . . . . . . . . . . . . . . . 69, 71

*Brooks v. State,* 323 S.W.2d 893 (Tex. Crim. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Cantu v. State,* 939 S.W.2d 627 (Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . 50, 52

*Clewis v. State,* 922 S.W.2d 126 (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Ex Parte Gutierrez,* 600 S.W.2d 933 (Tex. Crim. App. 1980). . . . . . . . . . . . . . . . . . . . . . . . 69

*Guevara v State,* 97 S.W. 3d (Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Hall v State,* 67 S.W. 3d (Tex. Crim. App. 2002) cert. granted, vacated and remanded, 154 L.Ed. 2d
    4 (2002) aff'd, 160 S.W. 3d 24 (Tex. Crim. App. 2004). . . . . . . . . . . . . . . . . . . . . . . 65, 67

*Lane v. State,* 822 S.W.2d 35 (Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

*Thompson v. State,* 521 S.W.2d 621 (Tex. Crim. App.1974). . . . . . . . . . . . . . . . . . . . . . . 69, 71

*Valle v State,* 109 S.W. 3d (Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

## FEDERAL STATUTES

28 U.S.C. § 2243. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 6, 7, 12, 60

28 U.S.C. § 2254(d)(1)..................................................... 57

28 U.S.C. §2253(c)(2)..................................................... 14, 39

28 U.S.C. §2254(e)(2)..................................................... 19, 20

28 U.S.C.A. §2254(e)(1)................................................... 12

Fed. R. Civ. P. 56....................................................... 9

Fed. R. Civ. P. 56(c)..................................................... 9, 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **CHARLES MAMOU, JR.,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **CASE No. 4:14-CV-00403** |
| | § | |
| **WILLIAM STEPHENS,** | § | |
| **Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | **(Death Penalty Case)** |
| **Division,** | § | **(Judge Lee H. Rosenthal)** |
| **Respondent** | § | |
| | § | |

## PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Petitioner Charles Mamou, Jr. (hereafter "Petitioner") files his "Petitioner's Reply to Respondent's Answer and Motion for Summary Judgment," which was filed in this Court on March 3, 2016. ECF No. 49. In support thereof, Mr. Mamou would show the following:

## I. INCORPORATION BY REFERENCE

Pending before the Court is Mr. Mamou's first amended application for federal habeas corpus relief. All prior pleadings and exhibits in this matter, including the petition, all subsequent briefs, motions, replies and responses, and all exhibits and affidavits filed in support of those petitions,[1] briefs, motions, replies and responses are specifically adopted and incorporated herein by reference.

---

[1] Exhibits 1 through 28 were previously submitted with the Skeletal Protective Petition, Exhibits 29 to 39 were previously submitted with the Amended Petition; hence all are in the record.

The Director's factual and legal allegations are denied in their totality except as to those that have been found to be true and supported in fact or law by a court of competent jurisdiction and those admitted herein. Any failure to deny a specific allegation in the Director's Motion that is not discussed in this opposition is not to be construed as an admission of that allegation.[2]

## II. THE DIRECTOR'S ARGUMENTS REGARDING THE STANDARD OF REVIEW UNDER 2254(d).

This section considers the Director's "standard of review" arguments. Respondent's Answer and Motion for Summary Judgment (hereafter, "RA") at 20-24. Mr. Mamou's petition has discussed both the merits of his claims and how they meet the heightened standards of review of 2254(d) (Mamou's petition at 18-28), if those standards apply to his case. In light of *Cullen v. Pinholster*, 563 U.S. __, 131 S. Ct. 1388 (2011) and *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770 (2011), "merits" review arguably encompasses separate but related inquiries, as discussed herein and in Mamou's petition.

### A. The AEDPA deferential standard of review does not apply to any of Mr. Mamou's claims that were not adjudicated on the merits.

The Director bases his discussion of the standard of review on the assumption that the AEDPA applies to all of Mr. Mamou's claims. RA at 20-23. However, the AEDPA deferential standard of review applies only to claims that were actually "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), that is, their merits under the applicable *federal* law. *Pinholster*, 131 S. Ct. at 1399-1400 (distinguishing case where federal claims was procedurally defaulted such that § 2254(d) did not apply); *Richter*, 131 S. Ct. at 784. As the Supreme Court restated,

---

[2]   It appears that the Director has used page references to Mamou's petition from the ECF page number, which includes the tables of contents and cases. Mamou will reference his petition ("petition at___") by the actual page number of the petition, not counting the tables. Therefore, Mamou's petition page cites should normally be 17 pages less than the Director's.

When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. *Cf. Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). [¶] The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely. *See, e.g.*, *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

*Richter*, 131 S. Ct. at 785-86.

Where the state courts did not reach a federal constitutional issue, "the claim is reviewed *de novo*." *Cone v. Bell,* 556 U.S. 449, 472 (2009)("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA...Instead, the claim is reviewed *de novo*"); *Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir. 2006). Where no state court has squarely addressed the merits of a habeas claim, "we review the claim under the pre-AEDPA standard of 28 U.S.C. § 2243, under which we dispose of the matter as law and justice require." *Toliver v. Pollard,* 688 F.3d 853, 859 (7th Cir. 2012); *Porter v. McCollum,* 130 S. Ct. 447, 452 (2009)(*per curiam*). The operative decision under review is that of the last state court to address a given claim on the merits. *Greene v. Fisher,* 132 S. Ct. 38, 45 (2011). Here, the "last state court" would be the Texas Court of Criminal Appeals ("CCA") for those issues brought on direct appeal, and, as for the issues brought on state habeas, the trial court's findings of fact and conclusions of law, as adopted by the CCA.

As will be discussed herein as to the various claims and sub-claims, some of Mr. Mamou's claims were never adjudicated on the merits and hence the deferential standard of 28 U.S.C. § 2254(d) does not apply to those claims.

**B. The Director's discussion of the 2254(d) standards**.

The Director's discussion of the standard of review under §2254(d) is at RA at pages 17 to

21.  First, the Director's 2254(d) argument is tantamount to advocating a "hands-off" view of federal review of state court decisions. This "hands off" view has been rejected in *Brumfield v. Cain,* ——— U.S. ——, 135 S. Ct. 2269, 2280 (2015), where the Supreme Court critically examined several state court fact findings and found them unsupported by the record (*e.g.,* the Court held that petitioner's "low birth weight," placement in special education classes at an "early age," and "commitment to mental health facilities at a young age," among other evidence, "provided substantial grounds to question [the petitioner's] adaptive functioning").

In a similar vein, the Director argues that the focus is only on a state court's "ultimate decision," not its reasoning (RA at 22, citing *Neal v. Puckett,* 286 F.3d 230 (5th Cir. 2002)(*en banc*)); that a presumption of correctness applies even to "unarticulated findings which are necessary to the state court's conclusions," (RA at 22, citing *Valdez v. Cockrell,* 274 F.3d 941948 n.11 (5th Cir. 2001)); and that 2254(d) applies to even state court decisions that "lack reasoning" (RA at 22, citing *Richter,* 562 U.S. at 98). Here too, *Brumfield* puts limits on *Richter's* "unarticulated findings" and "imagined rationale" approach, pointing out that *Richter* is not a license to solely focus on the state court outcome or disregard a flawed factual analysis of the state court fact-finding procedures or conclusions.

*Neal* is cited for the proposition that the focus should be on the "ultimate decision" reached by the state courts. (RA at 22.) *Neal* does not stand for the proposition that the state court's reasoning can or should be ignored, nor does the Director so argue. The Fifth Circuit has made clear that "*Neal* does not speak to the standard of review where a state court applies erroneous law." *Salts v. Epps,* 676 F.3d 468, 479 (5th Cir. 2012).[3] *Neal* "considered a state court of appeals's decision

---

[3] And also, by implication, nor does *Santellan.*

-4-

identifying the correct legal rule and the question was solely whether the state court was unreasonable in its application of that rule." *Salts,* 676 F.3d at 479. The analysis here involves no such identification of a correct rule and its application. In the claims in which the "unreasonable application of clearly established Federal law" test under §2254(d)(1) is analyzed, it will be shown that the state courts applied or interpreted such law erroneously. Nor does *Neal* speak to cases where the state court unreasonably applied the facts, the test under §2254(d)(2). Thus, the restrictive scope of review under *Neal* is inapplicable here. And, as mentioned *supra, Brumfield v. Cain* mandates a close scrutiny of state court findings, the state court's reasoning and the reasonableness of the state court determination.. Where the state court decision is based on unreasonable factual determinations not supported by the record, as in *Brumfield,* it should be reversed.

The Director also cites *Woodford v. Visciotti,* 537 U.S. 19 (2002) for the proposition that the "state courts are presumed to know and follow the law." (RA at 22.) This cannot equate to a standard of review, as the Director implies, that Mamou is required to show that the state courts did not follow the law. This interpretation was explicitly rejected in *Salts:*

> Nor can *Neal* be read beyond the situation before the Court these, to stand for the proposition that, in order to grant relief, the habeas court must always determine that the relevant legal tests could not have been reasonably applied by the state court to deny relief. Such a reading would require, for example, a habeas court to assume state court applied legal rules it did not, and then ask whether such rules could still reasonably support the result. That reading, however, would run afoul of the Supreme Court's command that, where a state court does not apply a legal test, 'our review is not circumscribed by a state court conclusion.'
> *Salts,* 676 F.3d at 479-480, citing *Wiggins v. Smith,* 539 U.S. 510, 534 (2003).

All that Mamou has to show is that the state court decision "was 'contrary to' clearly established Federal law. That is sufficient to remove §2254(d)(1)'s bar to relief....[petitioner] need not also show that the state appeals court's decision involved an 'unreasonable application' of such law." *Salts,* 676 F.3d at 480.

Both Mamou and the Director (RA at 20) agree that *Cullen v. Pinholster*, 563 U.S. __ 131 S.Ct. 1388 (2011), holds that "§2254(d)(1) is limited to the record that was before the state court." *Id*. at 1398.  When a federal habeas court is called upon to apply § 2254(d)(1), *Pinholster* held, the court's assessment of the reasonableness of the state court's adjudication must be determined on the basis of the facts that were before the state court.  *Id*. at 1400; *see* RA at 20.  The statute's "backward-looking language requires an examination of the state-court decision at the time it was made."  *Id.* at 1398.  "[R]eview under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399.

The Director describes the AEDPA deferential standard as mandating that this Court must first determine what arguments or theories "supported or could have supported the state court's decision," and then ask whether it is possible that *"*fairminded jurists could disagree" on the correctness of the state court's decision,"  RA at 21, quoting *Harrington v. Richter,* 562 U.S. at 101-102, 131 S. Ct. at 786 (2011).

However, the *Richter* holding does not mandate upholding the state court's ruling if any possible theory or argument could be found to have supported it as the Director's argument seems to imply.  In *Jefferson v. Upton*, 560 U.S. ___, 130 S. Ct. 2217 (2010), the Supreme Court reversed an Eleventh Circuit decision that failed to consider alternative grounds for overcoming the presumption of correctness under the pre-AEDPA § 2254(d).  The Court emphasized that Congress had adopted eight alternative means of overcoming the presumption of correctness and stated them in the disjunctive.  130 S. Ct. at 2221.  The Court held "the Court of Appeals did not properly consider the legal status of the state court's factual findings" when it considered only one of the eight enumerated exceptions despite the petitioner having argued that others applied.  *Id.* at 2222-23.

As *Richter* held, "[t]he writ of habeas corpus stands as a safeguard against imprisonment of

-6-

those held in violation of the law.  Judges must be vigilant and independent in reviewing petitions

for the writ, a commitment that entails substantial judicial resources."[4]  *Harrington v. Richter*, 131

S. Ct. at 780.  And as the Supreme Court has emphasized, the deference § 2254(d) requires "does

not imply abandonment or abdication of judicial review."  *Miller-el v. Cockrell*, 537 U.S. 322, 340

(2003).  On the contrary, recent cases such as *Richter* and *Cullen v. Pinholster*, 563 U.S. ___, 131

S. Ct.  1388 (2011), make clear that AEDPA added a layer of judicial review – "§ 2254(d) review"

– that a state court decision must survive in order to receive deference.

Where a claim presents mixed questions of law and fact, such as a claim under *Strickland*

*v. Washington*, 466 U.S. 668, 698 (1984), the *Pinholster* court held that, under § 2254(d)(1), if the

state court decision identifies the correct governing legal principle in effect at the time of its

decision, the federal court must ask whether the state court unreasonably applied that principle to

the facts of the prisoner's case, the § 2254(d)(2) analysis, *Id.*, 131 S. Ct. at 1399, *citing (Terry)*

*Williams v. Taylor*, 529 U.S. 362, 413 (2000).  The Director seems to agree with this analysis.  *See*

RA at 20-23.

*Pinholster* holds that once the court has conducted the requisite "thorough review of the state

court record," 131 S. Ct. at 1402, it must apply *either* the contrary-to standard of 2254(d)(1), or the

objective standard of reasonableness the Court adopted in *Terry Williams*, or both.[5]  *Id.* at 1399; *see*

---

[4]  *See also*, *Murray v. Carrier*, 477 U.S. 478, 500 (1986) ("'The writ of habeas corpus is
the fundamental instrument for safeguarding individual freedom against arbitrary and lawless
state action.'") (*quoting Harris v. Nelson*, 394 U.S. 286, 290-291 (1969)); *Harris*, 394 U.S. at
292 ("There is no higher duty of a court, under our constitutional system, than the careful
processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings
that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful
confinement and that he is deprived of his freedom contrary to law.").

[5]  *See also Cavazos v. Smith*, 565 U.S. ___, 132 S. Ct. 2 (2011) (*per curiam*) (observing
that federal habeas relief is available "only if the state court decision was 'objectively

*also Terry Williams*, 529 U.S. at 404-05 ("2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court" and lower court "properly accorded both the 'contrary to' and 'unreasonable application' clauses independent meaning"). The Court in *Pinholster* did not have occasion to apply § 2254(d)(1)'s contrary-to clause, which the statute lists in the disjunctive. This case does require consideration of that clause. The "contrary to" clause applies when a state court's decision relied to any extent on a legal standard that substantially differs from the clearly established Supreme Court precedent governing the petitioner's claim. Federal habeas review of claims previously adjudicated on the merits in state court involves the sort of two-tiered analysis described above – as opposed to a more superficial "reasonableness" examination suggested by terms like "deference" or "standard of review." The Supreme Court used the same framework in *Porter v. McCollum*, 558 U.S. ___, 130 S. Ct. 447 (2009) – first conducting a careful review of the mitigating evidence Porter claimed his trial counsel ineffectively failed to uncover and present during the penalty phase of his capital trial, before then determining that the state court's decision that Porter suffered no prejudice was an unreasonable application of federal law.

In view of these issues, Mamou's petition presents substantial, strong evidence that the CCA either applied legal standards that are contrary to clearly established federal law, unreasonably applied the correct legal standards, or either did not resolve factual disputes or did so in ways the Supreme Court and Fifth Circuit have held are unreasonable. Mr. Mamou also requests an evidentiary hearing or depositions so that he may complete the available evidence and present it.

All of Mamou's state habeas claims were presented as federal constitutional claims.

---

unreasonable'") (quoting *Renico v. Lett*, 599 U.S. ___, 130 S. Ct. 1855, 1862 (2010)).

### III.  THE DIRECTOR  IS NOT ENTITLED TO SUMMARY JUDGMENT

**A) The Director has neither pled nor proved a case for summary judgment.**

The Director's Answer includes a request that "the Court grant the Director's motion for summary judgment." (RA at 1, 131).  But nowhere in that 131-page document is there an actual "Motion for Summary Judgment," nor has the Director has not presented this Court with any affidavits, depositions, answers to interrogatories, or other evidence which resolve or controvert the disputed factual issues.   Nor is there any discussion of the standards for entitlement to summary judgment in the Answer.  Accordingly, the Director has not met the requirements for summary judgment.  FED. R. CIV. P. 56, *and see* further argument herein.   Thus, even without a consideration of Mamou's pleadings, summary judgment would be unavailable to the Director, as he has failed to make a case for it in this matter.

Summary judgment is proper only if "there is no genuine issue as to any material fact and... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  If the proofs offered in favor of the motion fail to exclude all bases on which judgment might be rendered in favor of the person against whom the motion is made, summary judgment must be denied. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). *See also* James, Hazard and Leubsdorf, *Civil Procedure*, 4th ed., at 209 (Little, Brown & Co.,  Boston, 1992): "The device is not intended to resolve issues that are within the traditional province of the trier of fact, but rather to see whether there are such issues."

"The requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (emphasis in original). An issue is "genuine" if the supporting evidence, and all inferences drawn therefrom, would be sufficient to support a verdict in favor of the nonmoving party. *St. Amant v. Benoit*, 806 F.2d 1294 (5th Cir. 1987).  A fact is material if it "affects the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. At the summary judgment

stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial, *Id.* at 249, or in the habeas corpus context, for an evidentiary hearing. The inquiry is whether "there are genuine factual issues that properly can be resolved in favor of either party." *Id.* at 250.

**B) The Director's Answer shows the existence of disputed issues of material fact.**

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the record which "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Director's Answer actually demonstrates the exact opposite: that genuine issues of material fact do exist regarding Mr. Mamou's factual allegations. *See, e.g.*, Answer to Claim 1, actual innocence, RA at 28-32 (lengthy, intensive fact-based discussion of the claim, purporting to show Mr. Mamou's guilt; disputing Mamou's version of the facts); Claim 2, Answer at 38-44 (lengthy detailed discussion of factual disputes regarding ballistics expert Baldwin; disputing Mamou's trial testimony (RA at 43)[6]; disputing the factual importance of Baldwin's testimony (RA at 44); Claim 3, Answer at 45-53 (fact-based discussion disputing claim under *Brady v. Maryland,* 373 U.S. 83 (1963). Claim 4, ineffective assistance of counsel for failing to present evidence countering Baldwin's firearms testimony and fingerprint testimony, Answer at 54-63 (discussion of disputed factual issues concerning both experts; Answer at 63, citing "Mamou's incredible, self-serving testimony, contradicted by other witnesses at trial...") Many other claims have as their basis disputed issues of material fact. Thus, as discussed *supra,* since summary judgment is available only if "there is no genuine issue as to any material fact and.. the moving party is entitled to a judgment as a matter of law" (FED. R. CIV. P.

---

[6] Described as "incredible" (RA at 43) which in itself indicates there is a dispute as to its credibility.

56(c)), the Director has neither pled nor proved a case for summary judgment and the Answer admits many such disputed material factual issues.

Nor did the state courts resolve any of these disputed factual issues by simply rubber-stamping prosecutor-prepared findings of fact and conclusions of law. The "Findings and Recommendations" entered by the state habeas court (Exhibit 14) and the affirmation of those recommendations in a summary order by the Texas Court of Criminal Appeals in 2014 (Exhibit 15) contain no original fact-findings, but simply adopt the State's responsive pleadings ("State's Proposed Findings of Fact, Conclusions of Law," Exhibit 14) as the trial court's own. The district attorney prepared the proposed findings and conclusions of the trial court, and, only seven days later, the state habeas judge then adopted the "State's Proposed Findings of Fact and Conclusions of Law" as its own, without changing a comma. (Exhibit 14 at 10). The CCA then adopted them.

There were numerous disputed issues of material fact before the state courts and the state habeas judge, Judge Kristin M. Guiney, who did not preside at Mamou's trial, had no personal basis upon which to determine these controverted factual issues. Prosecutor-prepared findings were approved verbatim, such as "find[ing] credible the affidavit of trial counsel Hill;" determining that "trial counsel conducted a thorough voir dire;" that the State's witnesses were "vigorously cross-examined;" or that defense counsel made "strong arguments for acquittal." State's Proposed Findings and Conclusions, Exhibit 14 at 2.

Unless patently false, the facts alleged in Mamou's petition must be presumed to be true for summary judgment purposes.[7] If the facts alleged "point to a 'real possibility of constitutional

_____

[7] *See, e.g., Blackledge v. Allison,* 431 U.S. 63, 76 (1977); *Cooper v. Pate,* 378 U.S. 546 (1964); *Machibroda v. United States,* 368 U.S. 487, 495-96 (1962); *Cave v. Singletary,* 971 F.2d 1513, 1516 (11th Cir. 1992); *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988); *Johnson v. Estelle,* 704 F.2d 232, 234-35, 239-40 (5th Cir. 1983), *cert. denied,* 465 U.S. 1009 (1984).

error,'" summary dismissal is not appropriate.[8]   Controverting affidavits, evidence and affidavits outside the context of the state court findings are absent.  Even a "presumption of correctness" still affords no basis for summary judgment if the record indicates or the petitioner pleads facts which, if true, show that the state court proceedings that produced those  state court fact-findings were clearly wrong, as Mamou has done here.[9]   Thus, there never has been a proper resolution of the factual disputes, as the state courts denied an evidentiary hearing, despite these controverted factual issues.  Fact witnesses have never  been subject to cross examination in an attempt to discover who is telling the truth regarding these disputed issues of fact.

If, as here, the court cannot be certain, on the basis of the state court fact-findings and record, that the findings are reliable, that they were the result of full and fair proceedings, *and* that they are impervious to even extra-record proof that they are clearly wrong, summary judgment is not permissible.[10]   Instead, further fact development proceedings must take place to determine the appropriate disposition.[11]   A full evidentiary hearing is a necessary and logical  culmination of this process. Thus, the Director's request for summary judgment must be denied.

---

[8]   *Blackledge, supra,* 431 U.S. at 75 n.7 (quoting Advisory Committee Note to Rule 4 of the Rules Governing §2254 Cases).  *Accord, e.g., Fontaine v. United States,* 411 U.S. 213, 215 (1972) (*per curiam*).  *See also Wesson v. Oglesby,* 910 F.2d 287, 282 (5th Cir. 1990) (when frivolousness is test for dismissal, court may not summarily dismiss solely because it disbelieves prisoner's allegations and believes respondent's, unless prisoner's version of facts is inherently implausible or internally inconsistent).

[9]   *See* 28 U.S.C.A. §2254(e)(1) (presumption of correctness may be rebutted "by clear and convincing evidence"); *Sumner v. Mata,* 449 U.S. 539, 550 (1981).

[10]   *See, e.g. Blackledge, supra,* 431 U.S. at 76-78 & n.16; *Machibroda v. United States,* 368 U.S. 487, 494-95 (1962).

[11]   *See O'Blasney v. Solem,* 774 F.2d 927 (8th Cir. 1985) ("Even though the final decision of a state court is entitled to great deference, it is not to be accepted conclusively by a federal court in a habeas corpus action without first determining that there is factual and legal support for that decision").

# IV. MAMOU HAS SHOWN CAUSE AND PREJUDICE TO EXCUSE THE DEFAULT OF ANY PROCEDURALLY-BARRED CLAIMS AND A FUNDAMENTAL MISCARRIAGE OF JUSTICE

As the Director combines his arguments regarding procedural default in his discussion of Claim 1 (RA at 24, 33-38), the procedural default arguments will be addressed first. The Director alleges that Claims 2, 3, 4, 6, and 14 and portions of Claims 7, 8, and 13 are procedurally defaulted. (RA at 24). The Director also asserts that ineffective assistance of trial counsel ("IATC") claims 4 through 7 are also procedurally defaulted. (RA at 33-38).

Firearms expert Baldwin's testimony and the fingerprint experts's testimony was admitted largely due to ineffective assistance of trial counsel (Claims 2 and 4); and Claims 4 through 7 deal with ineffective assistance of counsel pre-trial, at the guilt phase and at the punishment phase. As to all claims of ineffective assistance of trial counsel ("IATC"), any procedural default would be excused under the exceptions the Supreme Court has defined in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012) and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).

## A. Cause and prejudice under *Martinez* as to the IATC claims.

The Director argues that the default cannot be excused under *Martinez* and *Trevino* because 1) Mamou has not shown that state habeas counsel was constitutionally deficient (RA at 35-37); and 2) none of the IATC claims are substantial. (RA at 37-38).

As for the Director's first argument, it is based on a fundamental misunderstanding of *Martinez.* The Director argues that because state habeas counsel filed a state habeas application "*Martinez* thus does not help Mamou because counsel did not fail to file or otherwise abandon his client." (RA at 36). The state habeas attorney in *Martinez* did not fail to file a petition or abandon his client, nor is *Martinez* limited to such "failure to file" situations. None of the post-*Martinez* cases have limited the application of that case to situations where state habeas counsel either failed

to file a petition or abandoned their client. *See, e.g., Haynes v. Thaler,* 576 Fed. Appx. 364 (5th Cir. 2014).

As to the Director's second argument, that none of the IATC claims are substantial, the arguments are based on misinterpretations of Mamou's arguments and/or the evidence. The Director argues that "the record belies Mamou's assertion that Baldwin's testimony was the only evidence linking him to Carmouche's murder." (RA at 37). Mamou has never asserted this. He has repeatedly stated in his petition that Baldwin's testimony was the only *forensic* evidence linking him to the murder. Petition at 3, 31, 77, 87. Additionally, as discussed in the next sections, the Director mischaracterizes Mamou's presentation when he claims it simply amounts to Mamou claiming that state habeas counsel " did not raise the allegations that Mamou now contends he should have raised." (RA at 36).

### i. Mamou has shown "substantiality" under *Martinez.*

*Martinez*'s first relevant requirement is that "a prisoner must [] demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez,* 132 S. Ct. at 1318 (citing *Miller-El v. Cockrell,* 537 U.S. 322 (2003), describing the standards for certificates of appealability). *Trevino* did not modify that requirement. The standard of "substantiality" under *Martinez* is substantially similar to the standards for a certificate of appealability. *See Miller-El* at 336-338; *accord Tennard v. Dretke,* 542 U.S. 274, 276 (2004) ("A COA should issue if the applicant has 'made a substantial showing of the denial of a constitutional right,' 28 U.S.C. §2253(c)(2), which we have interpreted to require that the 'petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong,'"); *Smith v. Dretke,* 422 F.3d 269, 273 (5th Cir. 2005) ("we must be mindful that 'a claim can be debatable even

though every jurist of reason might agree, after the COA has been granted, and the case has received full consideration, that petitioner will not prevail,'") citing *Miller-El* 537 U.S. at 338.

The substantiality of the IATC claims are considered *infra* as to each claim.

**ii. Mamou has also shown that his state habeas counsel was ineffective ("IAHC").**

The second relevant requirement under *Martinez/Trevino* is a showing that the state habeas counsel was ineffective (IAHC). *Trevino,* 133 S. Ct. at 1918 (citing *Martinez,* 132 S. Ct. at 1320).

Attorney Roland Moore, Mamou's state-court-appointed habeas counsel, filed a state habeas corpus petition that was undeniably deficient which raised only record-based issues. It consisted of a 46-page petition (Exhibit 11, 1 SHCR 3-48). Although it purported to raise nine "grounds of error" it really raised only three claims: the wrongful admission of extraneous victim impact testimony (1 SCHR 7-31); the improper questioning of a defense witness, Ms. Morgan, on parole eligibility (1 SCHR 31-35); and an oft-raised and oft-rejected challenge to the constitutionality and burden of proof of the Texas mitigation special issue, which comprised twelve pages. (1 SCHR 35-47).

The inadequacy of this filing has been discussed in detail in Mamou's petition and need not be repeated here. (Petition at 128-136). *See, e.g., Canales v. Stephens*, 765 F.3d 551, 569 (5th Cir. 2014) (holding that state habeas counsel's failure to perform a mitigation investigation, based on a mistaken belief that no funding was available, fell below an objective standard of reasonableness). It is well-documented that state habeas counsel has an obligation to investigate and present extra-record evidence that could not have been raised on appeal, as Mamou has shown in his petition (at 128-136).

**B. Cause and prejudice under *Martinez* due to lack of expert and investigative funding.[12]**

Cause and prejudice is also shown by the complete lack of funding for experts and investigation. Mamou filed a motion to proceed *ex parte* and confidentially on his motion for funding for expert and investigative assistance on May 13, 2014. (Docket Nos. 12-14.) Respondent opposed that motion and, after briefing, this Court denied it on June 24, 2014. (Docket No. 17.) Mamou then filed his motion for funding on a non-confidential basis; after further briefing, that opposed motion was also denied on August 28, 2014. (Docket No. 21.) A motion for reconsideration of that order was filed on September 5, 2014 and, although Respondent apparently did not oppose *all* funding,[13] that motion was also denied on January 9, 2015, less than one month prior to the due date for filing the petition. (Docket No. 29.) Consequently, no funding for experts and investigation has been authorized to date. The resolution of the funding question took almost eight months. Thus, further factual development through discovery, the subpoena power of this Court and an evidentiary hearing will be necessary for some claims.

Mamou has had no funding or opportunity to investigate his IATC claims that have been procedurally defaulted because of state habeas counsel's own failure to develop them. This frustrates the purpose of *Martinez* and *Trevino*. As the Supreme Court explained, the equitable exception recognized in *Martinez* serves to "protect prisoners with a potentially legitimate claim" of

---

[12]   Mamou argues here and in his petition that he has shown that his IATC claims under *Martinez* are substantial. The argument here is presented in the alternative to that argument. If the Court finds he has not made that showing, then the lack of investigative and expert funding provides cause and prejudice to excuse any such failure.

[13]   "...or in the alternative provide funding in an appropriately reduced amount." Respondent's Opposition to Motion for Reconsideration of Denial of Funding. (Docket No. 24 at 1.)

ineffective assistance of trial counsel from being denied an opportunity to develop that claim and receive full judicial consideration of its merits. 132 S. Ct. at 1315 (emphasis added). In many cases, *Martinez* will apply precisely because no professionally reasonable investigation of the ineffective-assistance claim was ever conducted. *Martinez* and *Trevino* would be meaningless unless the petitioner is given the resources to investigate his IATC claims.

In other cases, *Martinez* has been given meaning by providing habeas petitioners some opportunity to prove cause and prejudice and develop their defaulted ineffective-assistance claims before rejecting them on their merits. For example, in *Sasser v. Hobbs*, 735 F.3d 833 (8th Cir. 2013), an Arkansas case, the district court rejected Sasser's ineffective-assistance claims as procedurally barred. The Supreme Court subsequently decided *Trevino*, and the Eighth Circuit applied the reasoning of that case to hold that *Martinez* applies in Arkansas. *Id.* at 851-853. In light of that holding, the Eighth Circuit held that Sasser was entitled to an evidentiary hearing to develop his claims and remanded with instructions to give Sasser "an opportunity to present evidence related to [the defaulted] claims." *Id.* at 853854.

The Ninth Circuit has similarly recognized that courts should allow petitioners whose IATC claims might fall within the *Martinez* exception an opportunity to develop those claims before rejecting them on the merits. *See, e.g., Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc), where the Court held that the petitioner was entitled on remand, in light of *Martinez*, "to present evidence" of cause, prejudice, and the substantiality of his claim. *See also Snodgrass v. Angelozzi*, 545 F. App'x 698, 700 (9th Cir. 2013) (in case where ineffective-assistance claim was rejected as defaulted before *Martinez,* "prudential course" is to remand to district court). This approach is consistent with the ordinary practice of courts considering cause and prejudice, which often turns on factual questions unlikely to have been addressed in state court. See 2 Hertz &

Liebman, Federal Habeas Corpus Practice And Procedure § 26.3[e] (6th ed. 2011). *Martinez* and *Trevino* "ensure that proper consideration [i]s given to a substantial claim," *Martinez,* 132 S. Ct. at 1318, after a petitioner has had a "meaningful opportunity" to present it, *Trevino*, 133 S. Ct. at 1921. Mamou has not yet had that opportunity.

In *Martinez*, the Supreme Court limited the equitable exception to the procedural-default rule to cases in which the petitioner's ineffective-assistance claim is "substantial." 132 S. Ct. at 1318.[14] The Director's argument effectively requires Mamou to produce evidence regarding the substantiality of his claims and establishing his entitlement to relief under *Strickland v. Washington*, 466 U.S. 668 (1984) without any funding.[15] Were this so, it would render meaningless the holdings of *Martinez* and *Trevino.*

## C.    No AEDPA deference to state court findings as there was no evidentiary hearing in state court and Mamou is entitled to a federal evidentiary hearing.

There was no evidentiary hearing in state habeas proceedings. This deficiency shows procedural unfairness and it also entitles Mamou to a federal court evidentiary hearing. *See, e.g.,*

---

[14]    Outside the Fifth Circuit, the precise relationship between *Martinez*'s "substantiality" requirement and the prejudice elements of *Strickland* and the "cause and prejudice" standard has generated some confusion. *See, e.g., Clabourne v. Ryan*, 745 F.3d 362, 375-378 (9th Cir. 2014); *compare Detrich v. Ryan*, 740 F.3d 1237, 1243-1246 (9th Cir. 2013) (en banc) (opinion of Fletcher, J.), with *id*. at 1260-1262 (Nguyen, J., concurring in result), and *id*. at 1265 n.3 (Graber, J., dissenting), *cert. denied*, 134 S. Ct. 2662 (2014). Yet courts consistently recognize that the substantiality standard does not call for a court to "pass[] judgment on the merits of the petitioner's [ineffective-assistance] claim." *Weber v. Sinclair,* 2014 WL 1671508, at *7 (W.D. Wash. Apr. 28, 2014); *Ngabirano v. Wengler*, 2014 WL 517494, at *8 (D. Idaho Feb. 7, 2014) ("The first *Martinez* prong is not the same as a merits review[.]").

[15]    Recently, in *Gallow v. Cooper,* 133 S. Ct. 2730 (2013)(statement regarding the denial of the petition for writ of certiorari) Justice Breyer, the author of *Trevino,* wrote "[t]he ineffective assistance of state habeas counsel might provide cause to excuse the default of the claim, thereby allowing the federal habeas court to consider the full contours of Gallow's ineffective-assistance claim." *Id.* at 2731. In other words, cause and prejudice under *Strickland* are determined "separately from, *and after*, a determination of "cause" under *Martinez." Id.*

*Glock v. Singletary,* 84 F.3d 385, 386 (11th Cir.), *cert. denied,* 117 S. Ct. 616 (1996) (petitioner entitled to evidentiary hearing because claim not meritless on its face and has "heretofore been resolved on the record, without an evidentiary hearing" in either state or federal court); *Perillo v. Johnson,* 79 F.3d 441, 444-45 (5th Cir. 1996) (petitioner entitled to federal evidentiary hearing because state court proceedings did not include hearing on factual questions that could be dispositive in resolving claim of conflict of interest by trial counsel); *Bouchillon v. Collins,* 907 F.2d 589 (5th Cir. 1990) (because state trial court did not hold hearing on competence to stand trial, relying instead on statements of trial counsel and trial judge's own observations, federal hearing required).

Under these circumstances, it is clear that Mamou did all he could to develop the facts. As discussed above, the controverted facts involved ineffective assistance of counsel, and the state relied heavily on prosecutor-prepared findings and conclusions that were adopted verbatim by the state courts.

In *Michael Williams v. Taylor,* 529 U.S. 420, 432, 120 S. Ct. 1479 (2000) the Supreme Court held that, under 28 U.S.C. §2254(e)(2) a habeas petitioner has not failed to develop the factual basis of a claim in state court unless there has been a lack of diligence, or some greater fault, on the part of petitioner or petitioner's counsel. The Court further stated that diligence depends upon whether the petitioner made a reasonable attempt to investigate and pursue claims in state court. *Id.* at 435. "Diligence will therefore require that a petitioner, at a minimum, seek an evidentiary hearing in state court and that the petitioner be diligent in developing the record and presenting, if possible, all claims of constitutional error." *Wardrip v. Thaler,* 705 F.Supp.2d 593, 604 (N.D.Tex., 2010), *citing Williams* at 437. "As the Fifth Circuit has noted, the Supreme Court's holding in *Williams* means that, if a petitioner develops the factual basis of a claim in state court, or sufficiently *attempts* to do so, §2254(e)(2) does not bar an evidentiary hearing in district court. *Guidry v. Dretke,* 397 F.3d 306,

323 (5ᵗʰ Cir. 2005)." *Wardrip, supra,* at 604.

As in the Fifth Circuit's holding in *Wardrip,* "Petitioner's state habeas counsel requested an evidentiary hearing in state court to develop claims of ineffective assistance of counsel, but this request was denied." *Wardrip* at 604-605. Thus, as the Fifth Circuit held in *Wardrip,* "[a]ccordingly, because state habeas counsel requested an evidentiary hearing in state court and sufficiently attempted to develop the factual bases for the claims through other means, §2254(e)(2) does not bar an evidentiary hearing in this Court." *Wardrip* at 605. The Fifth Circuit in *Wardrip* granted a hearing for the exhausted non-record claims for which additional information needed to be developed. *Id.*

The Fifth Circuit has repeatedly held that "a state court's failure to provide [a petitioner] with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA." *Wiley v. Epps,* 625 F.3d 199, 207 (5ᵗʰ Cir. 2010); *see also Rivera v. Quarterman,* 505 F.3d 349, 358 (5ᵗʰ Cir. 2007). The Fifth Circuit has also held that "[b]oth before AEDPA and after, we have consistently held that 'when there is a factual dispute which if resolved in the petitioner's favor, would entitle the petitioner to relief and the state has not afforded the petitioner a full and fair hearing, a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing." *Murphy v. Johnson,* 205 F.3d 809, 815 (5ᵗʰ Cir. 2000)(quoting *Perillo v. Johnson,* 79 F.3d 441, 444 (5ᵗʰ Cir. 1996).

**D. "Cause and prejudice."**

When adequacy and independence are established, a court may consider a defaulted claim if the petitioner shows cause for the default and prejudice as a result of the alleged violation of federal law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Even then, if the petitioner cannot show cause and prejudice, this Court must still examine his defaulted federal claim if failure to do

so would result in a fundamental miscarriage of justice. *Id*.

The Supreme Court has not precisely defined the parameters of what constitutes cause. *Edwards v. Carpenter*, 529 U.S. 446, 120 S. Ct. 1587, 1591 (2000) ("[W]e have not identified with precision exactly what constitutes `cause' to excuse a procedural default . . . ."). At a minimum, cause must be a factor or combination of factors external to the defense that constituted an impediment to petitioner raising the constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 488, 492 (1986). One such example is ineffective assistance of counsel. *Edwards*, 120 S. Ct. at 1591; *Murray*, 477 U.S. at 492. Other examples of cause are the state's suppression of exculpatory materials and the state's maintenance of an "open file policy." *Strickler v. Greene*, 527 U.S. 263, 283 (1999). "[B]oth [are] fairly characterized as conduct attributable to the State that impeded trial counsel's access to the factual basis for making a *Brady* claim." *Id*. A situation in which the factual or legal basis for a claim was not reasonably available to counsel at the time of the procedural default (*e.g.,* Claim 2) constitutes cause. *Id*. at 283 n.24. "`[T]he question of cause' is a `question of federal law.'" *Edwards*, 120 S. Ct. at 1593 (Breyer, J., concurring) (*quoting Murray*, 477 U.S. at 489)). Therefore, the factual or legal basis for a claim is not reasonably available to counsel, if counsel relied on untruthful representations of state officials, *Strickler*, 527 U.S. at 289, or if state witnesses refused to speak to defense counsel. *Strickler*, 527 U.S. at 285 n.27.

Cause can also be shown if the legal basis for the claim was not decided when the default took place (*Reed v. Ross*, 468 U.S. 1, 16 (1984)), or if the procedural context in which the default occurred impeded petitioner from raising the claim at the requisite time. *See Blair v. Armontrout*, 916 F.2d 1310, 1325-26 (8th Cir. 1990) (Petitioner lacked factual predicate for claim in earlier proceedings because claim was premised on state court's treatment of petitioner in later proceedings.), *cert. denied*, 502 U.S. 825 (1991). Similarly, a petitioner shows cause for failing to

present an ineffective assistance of counsel if he is still represented by the ineffective lawyer. *See Ciak v. United States*, 59 F.3d 296, 303 (2d Cir. 1995); *United States v. Galloway*, 56 F.3d 1239, 1241 (10th Cir. 1995) (en banc).

Once this Court finds that Mamou has established cause for his default, this Court must next determine whether he was prejudiced by the default. As with cause, the Supreme Court has not precisely defined "prejudice." In *Strickler*, the Court equated the prejudice that a petitioner must show to excuse a procedural default with the prejudice necessary to establish the materiality aspect of a *Brady* claim – "that there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." 527 U.S. at 289. "'The question is not whether the defendant would more likely than not have received a different verdict . . . but whether . . . he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Id*. (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

The Ninth Circuit has adopted a test from *United States v. Frady*, 456 U.S. 152 (1982): To establish prejudice, the petitioner must show that the error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Paradis v. Arave*, 130 F.3d 385, 393 (9th Cir. 1997) (quoting *United States v. Frady*, 456 U.S. at 170) (emphasis in original). Mamou must show that his due process rights were impeded by the constitutional error such that he suffered an actual and substantial disadvantage. 130 F.3d at 395. "The measure of prejudice is the trial he would have been afforded had he not been disadvantaged; it is not the trial that he actually had. That the actual trial evidence is sufficient to convict him in no way undermines that he was at an actual and substantial disadvantage of constitutional dimension at that trial." *Id*. (discussing prejudice accruing from the state's failure to disclose exculpatory information at trial). Like cause, prejudice sufficient to excuse a procedural default is a federal question upon which this

Court must make a determination independent of any state court determination.

Mamou has shown "cause" for the failure to present his claims in state court due to the failure of state habeas counsel to bring any non-record based claims. Additionally, as to Claim 1, that is a "gateway" claim and not ordinarily subject to procedural default which would be "cause" not to present it.

### E. Fundamental miscarriage of justice.

Should this Court find that Mamou has failed to establish cause and prejudice to excuse any procedural default, this Court may nonetheless consider the merits of any defaulted claims if failure to do so would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). As with cause and prejudice, the Supreme Court has not defined precisely what constitutes a fundamental miscarriage of justice. At the very least, the incarceration of one who is actually innocent of the crime for which he was committed would constitute a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 321-22 (1995). Thus, a petitioner who shows that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt absent the constitutional violation demonstrates a fundamental miscarriage of justice sufficient to overcome a procedural default. *Bousley v. United States*, 523 U.S. 614, 623 (1998).

A petitioner likewise demonstrates a fundamental miscarriage of justice when he shows that the constitutional violation probably resulted in the imposition of a death sentence upon one who is "actually innocent" of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 340-47 (1992). Innocence of the death penalty means the petitioner was not death-eligible. *Id*. at 345. A petitioner who shows by clear and convincing evidence that, but for the constitutional violation, he would not have been eligible for the death penalty, demonstrates a fundamental miscarriage of justice sufficient

-23-

to excuse procedural default. *Id*. at 347-48.[16]

The primary underlying constitutional violation of the majority of Mamou's constitutional claims is a Sixth Amendment violation due to the ineffective assistance of his trial counsel. There was an unreasonable failure to effectively challenge the toolmark examiner Baldwin, to investigate the facts of the case, the failure to call favorable witnesses to the stand at the punishment phase, and other instances of unreasonable, deficient performance which are detailed in the Petition.

## V.  REPLY TO THE DIRECTOR'S ARGUMENT ON CLAIMS FOR RELIEF

## CLAIM ONE: MR. MAMOU IS ACTUALLY INNOCENT OF CAPITAL MURDER.

The Director's arguments as to Claim 1 are combined with his argument regarding procedural default and "cause and prejudice." RA at 24-38.  As mentioned *supra,* there is an exception to procedural default for  "gateway" claims of actual innocence such as this. *See, e.g., House v. Bell,* 547 U.S. 518, 553-554 (2006) (petitioner has satisfied the gateway standard...and may proceed on remand with procedurally defaulted constitutional claims" because the "central forensic proof connecting House to the crime...has been called into question..."); *Schlup v. Delo,* 513 U.S. 298, 314-17 (1995).

As to the merits of the claim, the Director argues that Mamou's evidence of false testimony by Robert Baldwin and fingerprint expert Saldivar and evidence of coerced testimony by prosecution witnesses is not sufficient, "[a]t best, the evidence impeaches the testimony of some of the State's witnesses at trial." RA at 28.  As the Director disputes the facts of this claim, Mamou

---

[16]  The standard for establishing innocence of the death penalty is not as stringent as the standard for establishing constitutional insufficiency of the evidence under *Jackson v. Virginia*, 443 US. 307 (1979) – that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  *Schlup v. Delo*, 513 U.S. 298, 323 n.38 (1995).

requests an evidentiary hearing and discovery so that these factual disputes may be resolved.

The main evidence connecting Mamou to the killing of Carmouche was the testimony of Terrence Dodson, who said that Mamou supposedly confessed, and the flawed ballistics testimony of Robert Baldwin. The declaration of Sonja Rafeet, (Exhibit 27) states that Dodson's mother said that she and her son were being constantly harassed by the Houston Police as was Robin and Howard Scott, key witnesses in the case. Investigative funding to follow up on these leads has been denied by this Court. Mamou requested funding to contact and investigate key State witnesses Kevin Walter (16 RR 81-151); Samuel Johnson (19 RR 16-117); Howard Scott (19 RR 121-151); Terrence Dodson (19 RR 164-190) and Anthony Trail (20 RR 4-27), among others,[17] all of whom gave self-serving testimony that implicated Mamou in the drug deal, yet they were also involved in that deal. Funding was denied. Additionally, Mamou requested but was denied funding to interview Dodson regarding his testimony which purported to show that Mr. Mamou had admitted his involvement in the Carmouche murder, which Mr. Mamou has consistently denied.

Without funding for this investigation, Mamou has been unable to perform it.[18] Mamou submitted a motion to proceed *ex parte* on his funding requests on March 13, 2014 (ECF No. 12) and the Director opposed that. (ECF No. 15). This Court denied that motion on June 24, 2014. (ECF

---

[17] "RR" refers to the Reporter's Record on appeal, with the volume number preceding the page number.

[18] As Mamou pointed out at length in his motion for reconsideration of the funding denial (Docket No. 22 at 19-22), the Court's basis for denying funding were based on factual mis-perceptions and errors. For instance, there was no testimony that Mamou wiped down the car, no testimony that he confessed to these witnesses other than Dodson (which he disputes), and his innocence claim does not presuppose that the State made deals with the prosecution witnesses. As for the holding that any heretofore unexhausted claims would be unviable, Mamou also argued that procedural default of the IATC claims in state court would be excused under the *Martinez/Trevino* holdings.

No. 17). Mamou then submitted his non-confidential motion for funding on July 1, 2014 (ECF No. 18) and the Director also opposed that (ECF No. 19) and the Court also denied that motion on August 28, 2014. (ECF No. 21). A few days later, on September 5, 2014, Mamou submitted a revised request for funding (ECF No. 22) and the Director opposed that and that motion was also denied by this Court on October 20, 2014. (ECF No. 23). A supplement to the revised funding motion was filed on November 19, 2014 (ECF No. 26); and that was also denied by this Court on January 9, 2015. (ECF No. 29). To date, no funding for investigation has been authorized.

As previously pointed out in his motion for reconsideration of the denial of funding (at 20-21), Mamou does not claim to be innocent because the prosecution did not disclose deals made to their witnesses. Mamou claims to be innocent because he did not murder Mary Carmouche. One of the factors contributing to that false testimony may or may not be the possibility that deals were made to the witnesses in order to induce their testimony against Mamou. However, Mamou's showing of innocence does not depend in any way on proving that such deals were made, if indeed they were. These witnesses may very well have testified as they did to conceal their own involvement in the murder of Mary Carmouche, without any inducements by the State. The Court's denial of funding has put Mamou in a classic "Catch -22" position: funding is denied because he cannot show that he is innocent but he cannot show his innocence without funding.

**CLAIM TWO: THE COURT ERRED IN ADMITTING UNRELIABLE "MAGAZINE MARKS" FIREARMS TESTIMONY FROM STATE'S EXPERT ROBERT BALDWIN.**

**A. The claim is not procedurally defaulted.**

The Director argues that this claim "was dismissed by the state court on independent and adequate state procedural grounds" and "[a]s such, it is defaulted in federal court." RA at 38. This argument is unavailing. First, this claim is at least partly based on ineffective assistance of trial

counsel for failing to investigate or challenge Baldwin (Claim Four herein), which is an exception to the re-litigation bar, as discussed in the 2254(d) section (<u>Appendix B</u> to the petition) and herein under the holdings of *Martinez* and *Trevino* for the failure of initial state habeas counsel to bring the claim in Mamou's initial state application. Mamou has shown that, at the time of the trial, there was no reliable scientific basis for Baldwin's testimony, and counsel were remiss in not challenging it, and thus it was inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 (1999).[19]

Secondly, if the claim is held to be record-based, then it should have been brought on direct appeal and any failure to present it on direct appeal was the result of ineffective assistance of appellate counsel.

Third, even if the claim is not cognizable under the *Martinez* and *Trevino* exception to procedural default, Mamou has pled actual innocence (Claim 1), which would excuse any procedural default of this claim. In *House v. Bell,* 547 U.S. 518 (2006) the Supreme Court reaffirmed the analytical framework of the *Schlup v. Delo, supra,* "actual innocence" exception to procedural default. The Court emphasized that

> the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence. A petitioner's burden at the gateway stage is to demonstrate that, more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."
> *House,* at 538.

---

[19] Ronald Singer's 1998 declaration in the Nanon Williams case was a scathing criticism of Robert Baldwin, and it was available at the time of Mamou's trial. Additionally, Baldwin's testimony was based on the theory of "discernable uniqueness," and the fallacy of that theory was also well known at the time of Mamou's trial, as Mr. Singer's affidavit attests. (<u>Exhibit 39</u>). It should also be noted again that all requests for expert funding, including a ballistics expert, were denied by this Court.

The *House* court added that "[b]ecause a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House, id.* Simply stated, the standard is "whether reasonable jurors would have reasonable doubt." *House* at 540. Subtracting Baldwin's testimony, the only forensic expert evidence connecting Mamou to the crime, along with the prosecutor's inaccurate argument, would have left the State's case in vastly weaker posture.

The *Schlup* court held that the proper standard was the more lenient one of *Murray v. Carrier,* 477 U.S. 478 (1986), where a procedurally defaulted petitioner has to show that a constitutional violation has *probably* resulted in the conviction of one who is actually innocent, *Schlup* at 326, rather than the more stringent standard of *Sawyer v. Whitley,* 505 U.S. 333 (1992), which required a showing to show by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under state law. *Schlup,* 513 U.S. at 323-326.[20] In other words, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup* at 327. *Schlup* emphasizes that the standard is *not* that of *Jackson v. Virginia,* 443 U.S. 307 (1979)("[N]o rational trier of fact *could* have found proof of guilt beyond a reasonable doubt.")(emphasis added) *Schlup* at 323 n. 38; 330.

Instead, *Schlup* holds that to satisfy the *Carrier* gateway standard, "a petitioner must show that it is *more likely than not* that no reasonable juror would have found petitioner guilty beyond a

---

[20] "Accordingly, we hold that the *Carrier* "probably resulted" standard rather than the more stringent *Sawyer* standard [clear and convincing evidence] must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims." *Schlup* at 326-327.

reasonable doubt." *Schlup* at 327 (emphasis added). As *Schlup* points out,

> the line between innocence and guilt is drawn with reference to a reasonable
> doubt....even in *Sawyer,* with its emphasis on eligibility for the death penalty, the
> Court did not stray from the understanding that the eligibility determination must be
> made with reference to reasonable doubt. Thus, whether a court is assessing
> eligibility for the death penalty under *Sawyer,* or is deciding whether a petitioner has
> made the requisite showing of innocence under Carter, the analysis must incorporate
> the understanding that proof beyond a reasonable doubt marks the legal boundary
> between guilt and innocence.
> *Schlup* at 328.

*Schlup* also instructs that "[i]t is not the district court's independent judgment as to whether

reasonable doubt exists that the standard addresses; rather, the standard requires the district court

to make a probabilistic determination about what reasonable, properly instructed jurors would do."

*Schlup* at 329; *see also House* at 540 (stressing the inquiry is not the independent judgment of the

district court, but "*Schlup*'s predictive standard regarding whether reasonable jurors would have

reasonable doubt"). *Schlup* also stressed that "[u]nder a proper application of either *Sawyer* or

*Carrier,* petitioner's showing of actual innocence is not insufficient solely because the trial record

contained sufficient evidence to support the jury's verdict." *Schlup* at 331.

In a holding of great importance for Mamou's case, the court also held that

> in assessing the adequacy of petitioner's showing, therefore, the district court is not
> bound by the rules of admissibility that would govern at trial. Instead, the emphasis
> on 'actual innocence' allows the reviewing tribunal also to consider the probative
> force of relevant evidence that was either excluded or unavailable at trial.
> *Schlup* at 327-328.

**B. The claim raises a federal constitutional issue.**

The Director's second argument is that this claim does not raise a cognizable federal

constitutional issue. RA at 41-42. This argument is also unavailing. It is based on the Director's

mischaracterization of the claim as "ordinary challenges to evidentiary matters on habeas review."

RA at 42. First, the issue raises basic federal constitutional questions regarding Mamou's federal

constitutional rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution, including the right to a fair trial, due process, effective assistance of counsel and the right to be tried based on reliable evidence. Contrary to the Director's mischaracterization of the claim, it does raise an issue of the "denial of fundamental fairness, thus violating due process." RA at 42.

Second, the Fifth Circuit has explicitly rejected the Director's argument. For instance, the capital case of *Williams v. Quarterman,* 551 F.3d 352 (5th Cir. 2008) involved the same Robert Baldwin that testified in Mamou's case who was called as a State's witness in Nanon Williams' case. The Fifth Circuit reversed and granted a hearing based on Baldwin's unreliable testimony in that case, holding that Baldwin's trial testimony *"at best demonstrates extreme carelessness on his part and at worst calls into question his expertise." Williams,* 551 F.3d at 355-356.[21]

### C. The Director's mischaracterization of the State's argument regarding Baldwin.

The Director faults Mamou for "overstat[ing] and grossly mischaracteriz[ing] the State's argument" regarding Baldwin. (RA at 43). In support, the following State's argument at trial is cited:

> ...what that instruction says is that you couldn't convict Charles Mamou just on the evidence of Samuel Bug Johnson. There has to be other evidence that tends to connect the defendant to the crime, and there is tons of other evidence....
> There is all kinds of other evidence, the ballistics evidence...
> (21 RR 12-13, cited in Petition at 44).

The Director complains that "he [Mamou] omits the final piece of that argument, the portion that belies his suggestion that the state relied on Baldwin's testimony to prove capital murder." RA at 44. That final portion of the State's argument that was omitted was: "...fingerprint evidence, the location of the car, all kinds of evidence, plus the admission the defendant made to his cousin,

---

[21]    The *Williams* opinion is at <u>Exhibit 30</u>. The resume of Ronald L. Singer is at <u>Exhibit 31</u>.

Terrence Dodson." (RA at 44, citing 21 RR 12-13).

First, the rest of the prosecutor's argument was omitted because it was redundant to the point being made here, contained in the heading in the Petition which preceded the above quote: "[a]fter emphasizing the alleged motive for the killing of Carmouche, the prosecutor then pointed out that the testimony of Bug Johnson was not enough." Petition at 44. The quote itself included the phrase, "[t]here is all kind of other evidence." 21 RR 12-13 quoted in Petition at 44. The point being made here, in citing that argument, is the prosecutor's admission that the testimony of Bug Johnson was not sufficient, and that there was other evidence, including ballistics.

Secondly, the quote above was *not*, as the Director argues, Mamou's "effort to demonstrate the state's reliance on Baldwin's testimony" (RA at 43), or Mamou's "suggestion that the state relied on Baldwin's testimony to prove capital murder." RA at 44. The above quote was a lead-in to the relevant argument, quoted in the Petition immediately following.[22] This second quote was prefaced by the statement that "[t]he prosecutor then made clear that the firearms testimony was the crucial link between Mamou and Carmouche's murder..." (Petition at 44). That argument was as follows:

> Now Mr. Wentz makes a point and says, well, you see that silver bullet and that (inaudible) bullets. You bet they are. And you know what they told...what Mr. Baldwin, what the firearms examiner told you, is that the thing about this bullet is that it was chambered...not chambered, excuse me...*it was in the magazine, has a magazine mark that compares and makes it identical to one of the casings that was in the magazine of the firearm that...of the casing that was left at Lantern Point.*
> Now several times you may have gone, why are you asking about that? You can put different brands of ammunition in a clip and shoot it; so, you could have

---

[22] For this reason, the Director's argument that "the prosecutor references only 'ballistics evidence' in general, not the magazine mark testimony about which Mamou complains here," RA at 44, is misleading and a mischaracterization, as the magazine mark references are contained in the second quote and elsewhere.

some Remington Peter, some Smith & Wesson, and some whatever. And the answer is, sure you can. The fact that you fire more than one type of brand of ammunition out of a gun is not unusual. And the fact that there were five cartridges of one type maybe between there and Lantern Point and Lynchester, he had to reload. Or maybe this is the next one in line and there were several more like it, or they may have been whatever combination. *But what is important is...is that this was placed in the same magazine that the fired bullets were placed in, and thus, fired through that same firearm, or could have been fired through that same firearm. This wasn't fired. This was ejected.*

We talked about how you might eject one; because if you're not sure, like Terrence Gibson would have had to do, he would have had to rack in order to pull back the slide in order to put one in the chamber. Well, if there is one already in the chamber and you do that, not knowing if there is one in the chamber or not, you're going to eject one. And this...we know that would have happened, because it has the magazine marks.

(21 RR 47-48) (emphasis added) (quoted in Petition at 44-45).

Yet this argument, undeniably emphasizing the importance of Baldwin's testimony and specifically mentioning magazine marks, is simply brushed off by the Director as "barely one and a half pages of the State's twenty-five page argument." RA at 44. Nor does the State's argument "mention[] the magazine markings specifically only once," RA at 44 as the Director claims. Magazine markings are specifically mentioned *three times*, 21 RR 47 and 48 (twice), using the "discernable uniqueness" language of certainty that has been discredited:

1) ("[It] has a magazine mark that compares and makes it identical to one of the casings that was in the magazine of the firearm that...of the casing that was left at Lantern Point" (21 RR 47);

2) "we know that would have happened [the ejection of the casing], because it has the magazine marks" (21 RR 48);

3) "so we know that the casing that has the magazine mark was fired in a weapon in the possession of this defendant, and that's the same magazine that has this bullet in it that was found at the Lychester address where Mary Carmouche was") (21 RR 48).

Nor is it "barely one and a half pages." RA at 44. (*See* 21 RR 47-48).

The Director's characterization of the entire argument as a "holistic view of the entire criminal transaction" RA at 44, is another attempt to downplay or ignore the significance of the prosecutor's heavy reliance on Baldwin at 21 RR 47-48 by misleadingly stressing only the prefatory argument at 21 RR 12-13. The Director's argument is that Mamou has relied on the argument at 21 RR 12-13 "in an effort to demonstrate the state's reliance on Baldwin's testimony," RA at 43, and that the omitted part of the prefatory argument "belies his suggestion that the state relied on Baldwin's testimony to prove capital murder." RA at 44. This grossly mischaracterizes both Mamou's argument and the State's argument. Even if the State's argument was "holistic," and the prosecutor touched on other points of his case, as is common in most prosecutorial arguments, this does not negate the harmful effects of the prosecutor's repeated mention of the "currently indefensible conceptual foundation" of discernable uniqueness and certainty. ("makes it identical....we know....we know...[it was] the same magazine," 21 RR 47-48). This was explicitly relied upon by the prosecution both in Baldwin's testimony and in the prosecutions's final arguments. Both Baldwin's extensive testimony and the prosecutor's argument belie the Director's argument that it "was neither essential, nor even a critical or highly significant factor at trial." RA at 43. If there has been any "overstating" and "gross mischaracterization" of the State's argument, it is not by Mamou.[23]

**D. The Director fails to deal with the flaws in Baldwin's testimony**.

The main point of this claim, that Baldwin relied on the inherently unreliable magazine marks and a theory of discernable uniqueness, is never addressed by the Director. We have gaping holes in Baldwin's methodology that are never addressed: 1) the individual characteristics of

---

[23]   The Director repeats this mischaracterization of the prosecutor's argument verbatim in his discussion of Claim 4. RA at 64-65.

toolmarks are comprised of non-unique marks;  2) subclass characteristics shared by more than one tool may be confused with individual characteristics unique to one and only one tool; and 3) the individual characteristics of the marks made by a particular tool change over time. Singer's 1998 affidavit in *Williams* makes clear that "this individualization fallacy was well known at the time of Mamou's trial.  Affidavit of Ronald Singer (Exhibit 39).

The many questions raised regarding Baldwin's testimony are not addressed by the Director: 1) How many "magazine marks" were similar, how many dissimilar?;  3) what were the size, location, and characteristics of the marks that made them identifiable as "similar"?; 4) did Baldwin even test and measure the marks or was his testimony simply based on "eyeballing"?;  5) under what conditions were the tests or comparisons made?;  6) what were his criteria for finding that the "magazine marks" were similar; 7)why couldn't he take photos of his alleged  microscopic examination*?  (*20 RR 113)*; 8) was he told beforehand by his employer that a "match" would be crucial in linking Mamou to Carmouche's murder?

A competent defense in a routine drunk driving case would not allow similar questions as to the integrity and methodology and protocol of the breath-analyzer and its operator to go unanswered, yet in a capital case these questions and Baldwin himself is deemed "neither essential, not even a critical or highly significant factor..."  RA at 43.  As Mr. Singer has summarized:

> Mr. Baldwin's testimony is based on the foundation of 'discernable uniqueness.'...Baldwin testified that the magazine marks on the unfired cartridge found at the site of Mary Carmouche's murder matched magazine marks on one of the fired casings found at the site of the shooting. Vol. 20 Reporter's Record page 108.  The prosecutor also, in his final argument, presented to the jury his opinion that the match was a certainty.  Such opinions however are inherently probabilistic in nature.  The defense attorneys failed to address the flaw of "discernable uniqueness" and allowed the prosecutor to present this to the jury.  Had they presented a competent ballistics expert at trial, that expert should have been able to inform the jury that such opinions are flawed as they ignore the inherently probabilistic nature

of such comparisons.  This individualization fallacy was well known at the time of Mamou's trial.
Affidavit of Ronald Singer (Exhibit 39).

Mamou has shown that Baldwin's "training and experience" and competency have been shown to be lacking, as he gave false testimony in the capital Nanon Williams case (Exhibits 16, 30) and others, and was also disciplined by his employer (Exhibit 18); and  even if a defense expert had examined Baldwin's work, because Baldwin's opinion was apparently entirely subjective, the defense expert would have had no way either to test it for reliability or to reproduce it. In a drunk driving case, this would not pass muster; so much less should it in a capital case.

**CLAIM THREE: THE STATE KNOWINGLY SUPPRESSED FAVORABLE EVIDENCE AND PRESENTED FALSE TESTIMONY REGARDING THE FIREARMS EVIDENCE AND OTHER STATE'S WITNESSES IN VIOLATION OF *BRADY V. MARYLAND, NAPUE v. ILLINOIS* AND *GIGLIO V. UNITED STATES*.**

The Director argues that 1) the claim is procedurally barred and unexhuasted and would be defaulted in state court should the case be stayed and the claim presented there and 2) the claim is conclusory.  RA at 45-53.

Mamou has been denied all funding by this Court and he has admitted that the claim in its present shape is necessarily conclusory.  The Director opposed all motions for investigative and expert funding in this matter.  Mamou submitted a motion to proceed *ex parte* on his funding requests on March 13, 2014 (ECF No. 12) and the Director opposed that. (ECF No. 15).  This Court denied that motion on June 24, 2014. (ECF No. 17).  Mamou then submitted his non-confidential motion for funding on July 1, 2014 (ECF No. 18) and the Director also opposed that (ECF No. 19) and the Court also denied that motion on August 28, 2014. (ECF No. 21).  A few days later, on September 5, 2014, Mamou submitted a revised request for funding (ECF No. 22) and the Director

opposed that and that motion was also denied by this Court on October 20, 2014. (ECF No. 23). A supplement to the revised funding motion was filed on November 19, 2014 (ECF No. 26); and that was also denied by this Court on January 9, 2015. (ECF No. 29).

With funding, discovery and an evidentiary hearing, Mamou hopes to show that the prosecution suppressed favorable information regarding the alleged "magazine marking" match between a bullet found at the scene of Mary Carmouche's death and a bullet found at the scene of the drug shoot-out. This violated Mamou's federal constitutional rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. As Mamou has been denied all funding for expert and investigative assistance, this claim was presented in incomplete form. It is prefaced with the statement that "with funding, discovery and an evidentiary hearing..." Petition at 71.

The Director mischaracterizes this claim (RA at 46-47), stating that "Mamou accuses the State of both suppressing evidence in violation of *Brady* and knowingly presenting false testimony as proscribed under *Napue.*" RA at 46. Without funding or investigation, Mamou is unable to make such accusations and he has not. He has pled the following, which is all under the heading of what he hopes or expects to show with such funding, discovery and investigation, as stated in the first sentence:

> The favorable information is expected to be that the alleged magazine markings did not and could not establish that the bullets were chambered through the same firearm and, thus there was no forensics link between Mr. Mamou and Mary Carmouche's murder. Mr. Mamou will show that the prosecution knowingly presented false evidence through the testimony of Robert Baldwin, who testified regarding these magazine marks. The State also presented false testimony through State's witnesses Holley, Walter, Johnson and Dodson.
> (Petition at 72).

All of the alleged accusations against the State mentioned by the Director at RA 46-47, are what Mamou *hopes* to show given funding, discovery and a hearing. While the last sentence of the

paragraph above should perhaps have also included the phrase "Mamou will (or hopes to) show...," the meaning should be clear that Mamou is unable to show this until he is granted funding and an investigation. The Director seems to recognize this later in his presentation, stating that "Mamou acknowledges that he cannot factually support his due process accusations against the state. He claims that he will prove the merits of his claims once he obtains "funding, discovery and an evidentiary hearing." RA at 49. Mamou has made the claim in its present form in order to preserve it should such factual development be allowed.

The Director also claims that Mamou "has produced *nothing* even hinting that the State could or should have been aware of information contained in scholarly articles that had not been published and caselaw that was not decided until years after his conviction in this case." RA at 50. However, this is incorrect. Mr. Singer in his affidavit points out that the basis of Baldwin's testimony was known at the time of Mamou's trial:

> Mr. Baldwin's testimony is based on the foundation of "discernable uniqueness." In the Mamou case, Baldwin testified that the magazine marks on the unfired cartridge found at the site of Mary Carmouche's murder matched the unfired casings found at the site of the shooting. Vol. 20 Reporter's Record page 108. The prosecutor also, in his final argument, presented to the jury his opinion that the match was a certainty. Such opinions however are inherently probabilistic in nature. The defense attorneys failed at address the flaw of "discernable uniqueness" and allowed the prosecutor to present this to the jury. Had they presented a competent ballistics expert at trial, that expert should have been able to inform the jury that such opinions are flawed as they ignore the inherently probabilistic nature of such comparisons. This individualization fallacy was well known at the time of Mamou's trial.[24]

Additionally, Singer's 1998 declaration in the Nanon Williams trial was also available at the time of Mamou's trial. Mr. Williams' trial occurred in 1995, *Williams,* 551 F.3d at 353, *four years before Mamou's* trial. Mr. Williams was able to secure a reversal because he was afforded funding

---

[24] *Id.*

for experts and an evidentiary hearing, while Mr. Mamou has not been afforded any factual development funding to date.

While the scholarly articles appended as exhibits may have been published after Mamou's trial, the basis for their conclusions pre-dated the trial. The basis for their conclusions did not suddenly appear on the scientific horizon in the last fifteen years. These scholarly articles discuss the discredited "individualization fallacy" and the false testimony that presented the matches as a "certainty" instead of in a probabilistic framework, and Singer's affidavit makes clear that this was known at the time of Mamou's trial. The Director has failed to produce any countervailing evidence, declarations, experts, or scholarly articles to the contrary to contravene Mamou's evidence or to show that the information was unavailable at Mamou's trial. Mamou's showing is un-controverted.

The Director also mischaracterizes Mamou's argument in claiming that his present counsel "maintains that 'it is difficult to believe' that the 34 pages of handwritten investigator notes he discovered...is the total result of the [police] investigation," discovered through "extreme diligence." RA at 50. This is not "Mamou's belief," RA at 50, meaning present counsel, but is taken from the state habeas successor petition and it relates to state habeas counsel's beliefs. *See* Subsequent State Application, <u>Exhibit 13</u>, at 16-18.

**CLAIM FOUR: MR. MAMOU WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY THEIR FAILURE TO CHALLENGE, TEST AND EFFECTIVELY CROSS-EXAMINE THE STATE'S FIREARMS AND FINGERPRINT EXPERTS.**

The Director asserts this claim in unexhausted and procedurally barred. RA at 53. As to the merits, he claims they engage in "hindsight analysis," RA at 54, because "impeachment material may have come to light in the years following Mamu's conviction." *Id.*

**A. There is no procedural bar to this claim.**

As to the Director's first contention, there is no procedural bar, because, as with all ineffective assistance of trial counsel ("IATC") claims, any procedural default is excused under the exceptions the Supreme Court has defined in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012) and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).

*Martinez* requires that "a prisoner must [] demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez,* 132 S. Ct. at 1318 (citing *Miller-El v. Cockrell,* 537 U.S. 322 (2003), describing the standards for certificates of appealability). *Trevino* did not modify that requirement. The standard of "substantiality" under *Martinez* is substantially similar to the standards for a certificate of appealability. *See Miller-El* at 336-338; *accord Tennard v. Dretke,* 542 U.S. 274, 276 (2004) ("A COA should issue if the applicant has 'made a substantial showing of the denial of a constitutional right,' 28 U.S.C. §2253(c)(2), which we have interpreted to require that the 'petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong,'"); *Smith v. Dretke,* 422 F.3d 269, 273 (5th Cir. 2005) ("we must be mindful that 'a claim can be debatable even though every jurist of reason might agree, after the COA has been granted, and the case has received full consideration, that petitioner will not prevail,'") citing *Miller-El* 537 U.S. at 338.

IATC Claims Four(a) through (h) deal with trial counsel's failure to investigate, challenge, competently question and object to toolmark expert Robert Baldwin. Under the *Strickland* standard, these multiple failures were, both individually and cumulatively, ineffective assistance of counsel as Baldwin was the crucial link between Mamou and the murder of Mary Carmouche. Without Baldwin, the State had no case for capital murder aside from the compromised accomplice testimony

of Dodson and various participants in the drug deal, who the Director himself has admitted repeatedly lied and gave prior inconsistent statements to the police. RA at 50-51. The prejudice showing under *Strickland* is also clear: had Baldwin's methods been investigated; had his assertions been discredited by expert testimony; had the trial court been informed of the "junk science" status of his testimony; and had he been properly cross-examined, then the State would have had no forensics link and a significantly diminished case for capital murder if it had been properly excluded.

As for fingerprint expert Saldivar, although his testimony did not directly implicate Mamou in anything more than his fingerprints on the newspaper clippings, had Saldivar's prior misdeeds and false testimony been made known to the jury, it could also have undermined the State's case.

Thus, all of these claims satisfy the first "substantiality" requirement of *Martinez/Trevino.* The second relevant requirement under *Martinez/Trevino* is a showing that the state habeas counsel was ineffective (IAHC). *Trevino,* 133 S. Ct. at 1918 (citing *Martinez,* 132 S. Ct. at 1320). This has already been extensively shown in the petition (at pages 128-136) and need not be repeated here.

**B. The Director's claim that the Baldwin information came to light only after Mamou's trial.**

The Director asserts that counsel cannot be faulted for not knowing about the flaws in Baldwin's testimony—specifically the *Williams v. Quarterman,* 551 F.3d 352, 356 (5th Cir. 2008) opinion—because it was handed down after Mamou's trial. RA at 58-59. This ignores the fact that Mr. Williams' trial occurred in 1995, *Williams,* 551 F.3d at 353, *four years before Mamou's* trial. Also the Bernal case trial was approximately the same time as Mamou's or earlier, as Bernal's direct appeal was denied in 1999. Exhibit 17. Mr. Williams and Mr. Bernal were able to show Baldwin's errors—similar to the ones he committed in this case—because they were granted expert assistance,

for instance in the form of Mr. Singer,[25] and an evidentiary hearing in the Williams case, none of which has yet been afforded to Mamou. Additionally, as previously pointed out, Mr. Singer's affidavit (Exhibit 39) points out that the "individualization fallacy" and Baldwin's false testimony as to the certainty of his matching was well known at the time of Mamou's trial, and these flaws are the main subjects of the scholarly articles appended to Mamou's petition. The Director has produced no controverting evidence to rebut this.

The Director attacks the scholarly articles pointing out the "discernable uniqueness" fallacy as post-dating Mamou's trial. RA 59-60. Mamou has previously discussed herein that the bases for that literature were well known at the time of Mamou's trial, as Singer's affidavit points out. Exhibit 39. The Director's arguments rely on his assertion that the "information [was] not readily available at the time of trial," RA at 61, but aside from assertions, the Director has produced nothing to show that.

In his attempt to show that there was no prejudice, the Director repeats his mischaracterization of the prosecutor's argument. RA at 63-65. As shown above, Director faults Mamou for "overstat[ing] and grossly mischaracteriz[ing] the State's argument" regarding Baldwin by citing the prefatory remarks (21 RR 12-13, cited in Mamou's Petition at 44) in order to complain that "he [Mamou] omits the final piece of that argument, the portion that belies his suggestion that the state relied on Baldwin's testimony to prove capital murder." RA at 64.

The complained-about omissions at 21 RR 12-13 were redundant to the point being made at that point, that the testimony of Bug Johnson was not sufficient, and that there was other evidence, including ballistics. Secondly, this quote was not Mamou's "effort to demonstrate the state's

---

[25] Who assisted Mamou "pro bono" in this case. Had he been funded, Mr. Singer would have been able to go well beyond his efforts here.

reliance on Baldwin's testimony" (RA at 64), or Mamou's "suggestion that the state relied on Baldwin's testimony to prove capital murder" RA at 64, but a lead-in to the relevant argument where that suggestion was made, which was quoted in the Petition immediately following. (21 RR 47-48) (emphasis added) (quoted in Petition at 44-45).

The prosecution's argument at 21 RR 47-48 is again brushed off by the Director as "barely one and a half pages of the State's twenty-five page argument." RA at 65. Nor does the State's argument "mention[] the magazine markings specifically only once," RA at 64, as the Director again misleadingly claims. As shown *infra,* magazine markings are specifically mentioned *three times*, 21 RR 47 and 48 (twice), using the "discernable uniqueness" language of certainty that has been discredited. ("[It] has a magazine mark that compares and makes it identical to one of the casings that was in the magazine of the firearm that...of the casing that was left at Lantern Point" (21 RR 47); "we know that would have happened [the ejection of the casing], because it has the magazine marks" (21 RR 48); "so we know that the casing that has the magazine mark was fired in a weapon in the possession of this defendant, and that's the same magazine that has this bullet in it that was found at the Lychester address where Mary Carmouche was") (21 RR 48). Nor is it "barely one and a half pages." RA at 65. (21 RR 47-48).

The Director's repeated characterization of the entire argument as a "holistic view of the entire criminal transaction" RA at 65, is another attempt to downplay the significance of the prosecutor's heavy reliance on Baldwin at 21 RR 47-48 by misleadingly over-emphasizing the prefatory remarks at 21 RR 12-13 and then claiming that Mamou has relied on those remarks "in an effort to demonstrate the state's reliance on Baldwin's testimony." RA at 64. The prosecutor's repeated mention of the "currently indefensible conceptual foundation" of discernable uniqueness was explicitly relied upon in final arguments. Both Baldwin's extensive testimony and the argument

-42-

belie the Director's argument that it "was neither essential, nor even a critical or highly significant factor at trial." RA at 63-64. Again, if there has been any "overstating" and "gross mischaracterization" of the State's argument, it is not by Mamou.

**C. The Director's argument regarding discovery of Baldwin's testing. (Claim 4(b)).**

The Director produces part of the discovery motion, which he apparently does not dispute is "boilerplate" (RA at 62), but alleges "Mamou fails to indicate what additional effort counsel ought to have taken to secure information regarding the State's ballistics evidence." RA at 62. The Director also alleges that even though defense counsel were still not in possession of this ballistics evidence *one day before jury selection began,* this "does not demonstrate deficiency on counsel's part," RA at 63, apparently because they raised the issue in the prior week. *Id.* This hardly meets even minimal standards for trial preparation, as even if they sought the information a week prior to trial, they would not have been able to effectively prepare countering evidence or expert testimony to discredit Baldwin's flawed methodology. Indeed, defense counsel's cross-examination of Baldwin revealed the prejudice by this failure. Defense counsel Hill did not even know the meaning of the term "class characteristics," as he stated he was "not sure if I understand what that means." 20 RR 113-114. Defense counsel asked "[w]hat are the things you look at...what is the word I'm looking for to describe what a magazine mark is?" 20 RR 119. Defense counsel failed to ask Baldwin why "[m]agazine markings were not part of the initial examination of those cartridge cases against one another," the main point of his testimony. 20 RR 120.

The boilerplate motion was filed too late to be of any effective help, and the result was that one day prior to the start of trial, the defense still did not have this information.

**D. Mamou's claim regarding the failure to investigate or present expert evidence regarding Baldwin's work. (Claim 4(c)).**

The Director does not seem to address this claim. Even if there was a defense expert named Max Courtney, as previously suggested by the Director (Docket No. 26, Exhibit A), Mamou's defense counsel did virtually nothing to challenge Baldwin, even though his trial testimony was extremely suspect and vague. This was a "no gun" case, where the alleged gun and magazine, through which the bullets were allegedly chambered, was not available. Such cases are much more inherently unreliable than cases in which the gun is available.[26] Baldwin provided no details as to the number of alleged points of comparison between the unfired cartridge and other fired cartridges; he could not recall how many marking were similar, just that he "was able to find enough" of them (20 RR 119); he did not specify how many marks were dissimilar; he did not know how many similar magazines may have been manufactured, only that there were "many thousands" (20 RR 117); he testified that the cartridges have "the same magazine marks" (20 RR 108) without specifying whether this was specific or approximate; and he testified vaguely that there were "sufficient markings" (20 RR 121) to make the identification. Additionally, his crucial comparison was with an unfired cartridge, which may not have been chambered through a firearm at all.

In his affidavit Ronald Singer states that

[a]ssuming that Mr. Hill had Mr. Baldwin's report prior to trial, it was essential that he get such assistance. An independent firearm examiner could have re-examined the firearm evidence in question to determine if Mr. Baldwin's opinions were supported by the physical evidence, could explain the significance of the fired bullets which were not matched to each other and more particularly could have educated Mr.

---

[26] Ronald Singer, the expert in the Nanon Williams case and the current Technical and Administrative Director of the Tarrant County Medical Examiner's office has supplied an affidavit in which he agrees that the absence of a recovered gun or magazine "rendered Mr. Baldwin's opinions much more problematic, because it could not be checked or verified...All we have is his word that they 'matched'". Exhibit 39, Affidavit of Ronald L. Singer.

Hill regarding the significance of the match based on magazine marks identified by Mr. Baldwin. This information would have led to a significantly different line of cross-examination which, if successful, could have led to a different trial outcome.[27]


**<u>CLAIM FIVE</u>: PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL PRE-TRIAL.**

The Director argues that "[t]his claim is largely duplicative of other IATC claims raised in Mamou's federal habeas petition." RA at 66. As for the Director's argument that the claim is unexhausted and procedurally barred (RA at 66), any failure to bring the claims in the first state petition qualifies as an exception to procedural default and the re-litigation bar under *Martinez v. Ryan*, 132 S. Ct. 1309, 1317-1318 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013).

**A. Trial counsel rushed to trial without adequate preparation (Claim 5(a)).**

The Director does not seem to directly address the fact that defense counsel Wayne Hill was appointed on May 28, 1999 (CR 5), only about three months prior to the trial, and on July 26, 1999 second chair counsel Kurt Wentz was appointed (CR 10), only a little over a month prior to the trial's commencement. On September 1, 1999, only a few days prior to commencement of the trial, a number of boilerplate motions were filed (CR 11-57); and the trial commenced *one week later*, on September 8, 1999, with jury selection beginning that day. 3 RR 3. Testimony in Petitioner's trial began on October 4, 1999.

By any reasonable standard, a little over three months is an inadequate length of time to prepare for a capital murder trial. And as for co-counsel Wentz, he had only a scant six weeks to prepare. The prejudice prong of *Strickland* is shown, *inter alia,* by the following facts:

---

[27] *Id.*

1) Trial counsel failed to file adequate pre-trial motions. In the rush to trial, they failed to file motions to exclude the firearms testimony; challenge the magazine mark evidence, seek rap sheets and prior criminal history of State's witnesses.

2) Due to the rush to trial, defense counsel failed to adequately investigate the State's witnesses, including Robert Baldwin and present expert their own testimony.

3) Defense counsel were unable to obtain and use any discovery provided. One week prior to trial, they had received no discovery on the crucial firearms tests of Robert Baldwin. 2 RR 6.

4) Defense counsel utterly failed to object to inadmissible extraneous victim impact testimony at the punishment phase of the trial. Their failure to inform themselves of the relevant law and to file motions to exclude such testimony was inexplicable.

5) Defense counsel's rush to trial prevented an adequate investigation of Mamou's background and potential mitigating witnesses.

The Director fails to address these facts.


**CLAIM SIX: INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF THE TRIAL.**

The Director alleges that "these claims are unexhausted and procedurally barred." RA at 68-70. As with all IATC claims, any failure to bring them in the first state petition qualifies as an exception to procedural default and the re-litigation bar under *Martinez v. Ryan*, 132 S. Ct. 1309, 1317-1318 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013).

**Claim Six(a): Ineffective assistance of counsel for failure to object to biased instructions at voir dire.**

The Director argues that various voir dire comments were taken out of context by Mamou. RA at 70-76. First, the Director provides a fuller quote of the O.J. Simpson reference. RA at 71-72. Whatever the scope of reference, whatever the context, and regardless of whether or not this signaled actual bias on the part of Mamou's trial judge, it is clear that no competent defense attorney would want the trial judge to reference the highly-controversial Simpson trial—with its widely-perceived-as-incorrect acquittal verdict—in a case where their African-American client was on trial

for murder.   Simply put, even the mention of the Simpson trial would have prejudiced Mamou in the eyes of the jury, despite any later correctives or elaboration from the trial court.

Secondly, the trial judge's comment that being a juror "is a lot like being a pallbearer at a funeral," 3 RR 4, is dismissed as "there are perhaps other analogies that might have been used."  RA at 72. Mamou continues to maintain that this was a stunningly inappropriate comment in a death penalty case, deliberate or not.

As for the judge's comment that "the State is going to seek the appropriate punishment in this case; that is, their claim that it will be the appropriate punishment, punishment of death" 3 RR 5, the Director provides a fuller quote, RA at 73, and the Court's correction that "[w]hether it's an appropriate punishment, nobody can say until after the evidence is offered."  RA at 73.   Notably, this correction was given *36 transcript pages later*,  3 RR 41, so it is not in context with the initial remarks.  As for the suggestion that the jury might deliberate only one hour, 3 RR 8, the Director again provides a fuller quotation.  RA at 74-75.  It is unreasonable that defense counsel would fail to object to even the suggestion or possibility that the jurors might be fulfilling their duty by deliberating only one hour in a complex capital case, no matter how many other possibilities or scenarios were provided to them.

As for the last failure to object is the trial judge's comparison of Mamou to a child who has ignored parental instructions, 3 RR 17, Mamou stands by his arguments in the petition. Mamou's argument did not "ignore[] the fact that these were simply the trial court's introductory comments to the venire..." RA at 75-76, as the Director claims.  This was the explicit heading of Claim 6(a) and this was never argued that these remarks were "the official charge of the court" as the Director implies. RA at 76.   A reasonably alert defense attorney would not want an emphasis on "bad behavior" which neglected  mitigating facts such as poverty, an abusive or neglectful childhood,

mental and physical disabilities and the like. Treating the penalty phase as a form of child discipline, and treating Mamou as a disobedient child, with the Court's explicit approval of stricter punishment for repeat offenders, sent a clear message to the jury pool to focus on the defendant's bad acts, not his mitigating evidence. The fact that the judge, quite a bit later, mentioned mitigation and background information (*e.g.* 3 RR at 40) did not cure this erroneous initial impression.

**Claim Six (c): Ineffective assistance of counsel in allowing the exclusion of only those jurors opposed to the death penalty.**

This claim relates to the trial court repeatedly questioning the jury pool about whether there were any potential jurors who could never impose the death penalty, regardless of the evidence. *E.g.,* 3 RR 43. Two potential jurors answered affirmatively. 3 RR 43. The potential jurors were not asked whether any would always impose the death penalty, regardless of mitigating evidence.

The Director agrees that the two prospective venire members identified themselves as unable to impose the death penalty, RA at 77, and "[a] short time [later] these two jurors, along with eleven others were excused from service by agreement between the parties." RA at 77. The Director asserts that the record is insufficient as to the reasons why they were excused. RA at 77-78. Accepting this argument at face value, this is therefore a claim that needs further factual development in terms of investigative assistance and funding, of which to date there has been none.

**Claim Six (d): Ineffective assistance of counsel for failing to object to gruesome and redundant multiple autopsy photographs.**

This sub-claim is termed "conclusory," that Mamou "neglects any discussion identifying the factors that render the photographs inadmissible," and that the claim is not adequately briefed. RA at 78-81. The "conclusory briefing" was in part due to page limits imposed on Mamou's brief. However, Mamou accepts the Director's comments and therefore withdraws this sub-claim.

<u>Claim Six (e)</u>: **Ineffective guilt-phase closing argument.**

The Director argues that the failure to object to the prosecutor's argument that Dodson had no motive to lie (21 RR 13, 54-55) was strategy, that counsel suggested that all the State's witnesses had a motive to lie, and counsel "made many of the arguments Mamou claims were necessary to be effective." RA at 81-84. However, telling the jury that "Bug is worthless and a liar," 21 RR 18, without telling the jury why he was a liar or what he stood to gain by lying does not excuse the defense's failure to address the rationale behind the lying. The Director quotes a passage at 21 RR 28-29 (RA at 83) (the same passage cited by Mamou in his petition, at 101) but it too does not address the various inconsistencies in their testimonies or the improbability that Mamou would "confess" to Dodson. Although this argument mentioned briefly that the witnesses had reason to lie, 21 RR 28-29, the jury was given no coherent rationale as to why they would do so.

<u>CLAIM SEVEN</u>: **PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE OF HIS TRIAL.**

The Director asserts that defense counsel's failure to object to victim impact testimony "was sound trial strategy;" Mamou cannot demonstrate harm; and the claim is not supported by the facts. RA at 84-98.

<u>Claim Seven(a)</u>: **Ineffective assistance of counsel for failure to object to inadmissible victim impact evidence at the punishment phase.**

This sub-claim concerns the failure of defense counsel to object to the admission of testimony from Yolanda Williams and Patricia Gibson regarding the effects of unadjudicated extraneous offenses against persons not named in the indictment. The Director concedes that neither Gibson nor Williams were named as victims in the indictment (CR 4) in this case. RA at 85. Nor is it contested that this was error. At the time of Mamou's trial, Texas law clearly prohibited victim

-49-

impact testimony from victims of uncharged crimes.  *Cantu v. State,* 939 S.W.2d 627 (Tex. Crim. App. 1997).  *Cantu* is based on federal constitutional principles. *Cantu,* 939 S.W.2d at 637.

This claim is **not** based on Texas evidentiary principles, but on the federal constitutional holdings of *Payne v. Tennessee,* 510 U.S. 808, 111 S. Ct. 2597 (1991) and *Booth v. Maryland,* 482 U.S. 496, 107 S. Ct. 2529 (1987) as well as *Strickland*.  *Payne* held that the Eighth Amendment did not bar the introduction of victim impact evidence at the punishment phase of a trial as regards the victim of the offense charged in the indictment.  Neither Williams nor Gibson were named in the indictment. *Booth* remains good law as applied here, as *Payne* only applied to victim impact evidence as regards the complainant in a criminal case.  The implied holding of both cases is that other victim impact evidence such as that regarding extraneous offenses is still unconstitutional. As a result of this failure, Mamou was denied the effective assistance of counsel under the Sixth Amendment to the United States Constitution.  The admission of this evidence also violated due process and the Eighth Amendment to the U.S. Constitution and it rendered the punishment phase of Mamou's trial fundamentally unfair.

The Director's argument merely repeats the flawed state court holdings, citing "the brevity of their testimony, the defense's effective cross-examination, and the prosecutor's lack of emphasis of their testimony during final argument at punishment."  RA at 86-87, citing SHCR 246.  Mamou has shown extensively how those findings are multiply flawed (petition at 112-122) and the Court is respectfully referred to that argument, which need not be repeated here.  The Director has not effectively challenged  Mamou's showing that the state court findings do not pass muster under 2254(d)(1) (an unreasonable interpretation of the law) *and* 2254(d)(2) (unreasonable application of the facts).

The testimony of Williams and Gibson has been presented in detail in Mamou's petition (Williams, petition at 104-106, citing her testimony at 22 RR 112-121; Gibson, petition at 106-109, citing her testimony at 22 RR 127-134) and need not be repeated here. The page numbers regarding the length of their testimony alone belie the state court's holding and the Director's argument that their testimony was "brief." SHCR 246; RA at 86.

**A. The state court did not reasonably apply _Strickland._**

The Director initially attempts to defend the state court's analysis with an extensive quote from the affidavit of Wayne Hill, one of Mamou's trial counsel. RA at 87-89 (the affidavit is at SHCR 253-54). Hill's affidavit states that 1) he objected to the punishment phase testimony regarding the shooting of Williams, but was overruled; 2) Mamou insisted on testifying, 3) Mamou's demeanor changed between the guilt and punishment phases and there were outbursts, 4) and his decisions regarding the testimony of Yolanda Williams and Patricia Gibson "were strategic" because "their testimony was brief in comparison to the entirety of the evidence at trial," "not particularly compelling and I believe I effectively countered [it] on cross-examination." SHCR at 253-54, cited at RA 87-89.

None of Hill's affidavit supports the Director's arguments or the state court's holdings. First, as to defense counsel's objections, on September 1, 1999, trial counsel filed a "Motion for Hearing on Admissibility of Evidence" (CR 15) and a "Motion for Discovery of Victim Impact Testimony" (CR 20) but never obtained a ruling on these motions. They were filed only a week prior to the start of Mamou's trial. Defense counsel also filed a "Defendant's Request For Disclosure Of Defendant's Arrest Conviction Record And Extraneous and/or Unadjudicated Acts of Misconduct To Be Offered At Guilt Or Punishment" (CR 30) that was also never ruled upon by the Court. Defense counsel also filed a Motion _in limine_ requesting extraneous offense evidence; this motion did not have an order

form attached to it. (CR 74.) The State furnished two extraneous offenses lists to defense counsel. CR 58 & 61. These lists do not include the murder of Terrence Gibson or Anthony Williams as a disclosed extraneous offense, even though Anthony William's sister Yolanda Williams and Terrence Gibson's mother Patricia Gibson testified with profound emotional impact, as shown *infra.* No hearing was ever held on the defense motions, possibly because they were filed so close to the commencement of the trial. Despite clear Texas law that prohibited the introduction of extraneous-offense victim impact testimony, *Cantu v. State,* 939 S.W.2d 627 (Tex. Crim. App. 1997), no objection under *Cantu* was made at trial to the heart-rending testimony of two such extraneous victims, Yolanda Williams and Patricia Gibson. Thus, it is disingenuous for Hill to claim that he "objected to the admissibility of the extraneous murder, and the judge overruled the objection," SHCR 253, cited at RA at 87.

Even so, a failed objection to the introduction of the "defendant's shooting of Anthony Williams" does not provide a rationale for failing to object to inadmissible victim impact evidence as a result of that shooting. The fact that the court allowed evidence of the shooting itself is a determination separate from whether to allow evidence of the impact of that shooting on the victims.

Nor does Mamou's testifying or his demeanor excuse any failure to object, as it is completely irrelevant. The Director tries to characterize this as "[c]ounsel was clearly trying to manage the damaging effects of Mamou's testimony at guilt-innocence, the prejudice no doubt resulting from his disruptive, violent outburst..." RA at 90. Attempting to "manage the damaging effects of Mamou's testimony" is no reason to fail to object to damaging inadmissible testimony.

The Director's further argument is equally irrelevant: "[c]ounsel had pressing concerns to consider and juggle in an effort to salvage Mamou's punishment hearing that went beyond the facts and law relevant to the admissibility of this victim impact testimony." RA at 90. This seems to be

a tacit admission that trial counsel dropped the "victim impact ball" he was considering and juggling. It is no excuse under the *Strickland* standards that counsel had more than one concern to deal with but only failed in one area.  Capital murder cases always involve a multiplicity of factual and legal issues.  As Mark Twain wrote, "Whoso, clinging to a rope, severeth it above his hands, must fall; it being no defense that the rest of the rope is sound."  Twain, *"A Connecticut Yankee in King Arthur's Court*."

Williams' and Gibson's testimony was not "brief"[28] but it was "particularly compelling"[29] by any reasonably objective standard.  Additionally, even if Williams's and Gibson's testimony was (1) brief (actually, it was not); (2) not "particularly compelling" (it was); and (3) effectively countered (it was not), these are not strategic reasons to refrain from challenging it. They are merely trial counsel Hill's opinions that their client was not prejudiced by their failure to do so. Here too, trial counsel seem to tacitly admit their failure.

The Director also fails to address the fact that Hills's affidavit is additionally flawed because he did not establish through Yolanda Williams's cross-examination that Anthony Williams had been killed during a drug sale, as he claimed. The following exchange occurred during cross-examination:

---

[28]  The Director fails to address the flawed state court holding that this testimony was "brief."  This holding was unreasonable, as the state court held that "their complained-of testimony comprised approximately ten pages out of over 300 pages of punishment phase proceedings." Exhibit 14 at 4 (1 SHCR at 245).  In actuality, it was over 22 pages as Williams' testimony was 11 pages (22 RR 112-123) and Gibson's was also 11 pages (22 RR 127-138), not counting four pages of testimony out of the jury's presence. (22 RR 123-127).  This error is an unreasonable determination of the facts under §2254(d)(2).

[29]  For instance, Williams' testimony included the description of the hospital death of Mr. Williams, his sister's identification of the body; the effect it had on his mother; the heart-wrenching cemetery visits by Williams' son; his crying as a result of the death of his father; and the health problems the death of Williams has caused for his mother.

Q. Did the family ever talk about whether he was ever involved in any kind of drug dealing or anything in his lifetime?
A. *No drug dealing that we knew of.*
22 R.R. 122 (emphasis supplied).

At no point during the cross-examination did the defense use Yolanda Williams to establish that Anthony Williams was killed during a drug sale. However, if the defense had wanted to establish that, it could have done so without permitting Yolanda Williams to give victim impact testimony. *See Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991) (testimony regarding the circumstances surrounding extraneous offenses admissible in capital sentencing proceeding pursuant to Tex. Code Crim. Proc. art. 37.071).

The Director's position is untenable and we cannot ignore the record simply because Hill invoked the magic word "strategy." The state court made an unreasonable determination of the facts in finding that the decision not to object to the unconstitutional admission of Yolanda Williams's victim impact testimony was strategic, based on the conclusory and face-saving assertion by trial counsel Hill that it was.

Additionally, Hill's affidavit addressed only Yolanda Williams's testimony. It did not address the reasons for failing to exclude Patricia Gibson's victim impact testimony at all. The affidavit simply asserted facts about her testimony: (1) she testified that she last saw Terrance at a family gathering; (2) she testified that Terrance Gibson's pager went off; (3) she testified that she told Terrance to be careful as he left; and (4) she testified on cross-examination that her son had elected to do inappropriate things, and she counseled one of his friends to change his life and learn a lesson from what happened to her son. (Exhibit 14, 1 SHCR at 254). Hill then asserted, "[w]hile I could have objected to the line of questioning offered by the State, I did not do so. I do not believe that the introduction of this evidence was a critical or overriding factor in the jury's decision to

return the death penalty in this case." *Id.* Once again, Hill simply stated an opinion that Gibson's testimony was not overwhelmingly harmful; this was not a strategic basis for not objecting to the inadmissible evidence. The Director argues that because "[c]ounsel also indicated that he knew he could have objected to the victim impact testimony, but chose not to," that this "evinces counsel's awareness of the law relevant to this type of testimony." RA at 90. Simply put, awareness of the law is not sufficient under *Strickland*; acting according to the law is the well-accepted standard.

The Director fails to address the affidavits from state habeas attorney Jim Leitner (<u>Exhibit 11</u>; 1 SHCR at 53) and another from attorney Tom Moran stating that "[t]here could be no rational strategic reason for failure to object to the inadmissible extraneous victim impact evidence," (<u>Exhibit 23</u>, at 3). The state habeas court summarily dismissed these affidavits as "unpersuasive" because "claims challenging counsel's effectiveness are resolved by courts pursuant to the standard outlined in *Strickland v. Washington...*" (<u>Exhibit 14</u> at 6; 1 SHCR at 247). This is a complete non-sequitur as attorney Moran's affidavit explicitly mentioned and was based on the *Strickland.* standards. (<u>Exhibit 23</u> at 3-4). Mamou has shown both deficient performance and prejudice under the *Strickland* standard.

As we have seen, the state court holding that "counsel's decision not to object was a 'reasonable strategic decision,'" and that Mamou could not establish harm, RA at 86, this holding was based on the incorrect holding that the testimony was "brief" and on "the defense's effective cross-examination," which is also false.

As for the state court holding that any error was harmless due to "the prosecutor's lack of emphasis on their testimony during final argument at punishment," SHCR 246, cited by the Director at 86-87, this too was misleading and erroneous. At the prosecution's brief final punishment phase argument, both of these extraneous offenses (the Gibson and Williams deaths) were emphasized

as compelling a death sentence for Mamou.  Gibson is mentioned as 24 RR 14, 24 RR 17; 24 RR 29; 24 RR 31; 24 RR 33; 24 RR 37; 24 RR 40.  Williams is mentioned at 24 RR 29; 24 RR 31; 24 RR 33; 24 RR 35; 24 RR 38; 24 RR 39; 24 RR 40; 24 RR 41; 24 RR 42; 24 RR 43.  First, prosecutor Claire Connors argued: "And when he pulled the gun and he fired and killed Terrence and Anthony, he ripped those families apart.  He devastated and destroyed.  And that's all he's ever done, with his drugs, with his guns.  And every time he pulled that trigger, he answered that first special issue yes, yes, yes, yes, yes.  Seven times he answered it yes."  24 RR 39.  Prosecutor Mr. McLellan also mentioned the Williams murder: "And they made fun of the fact about the Labor Day killing...let me suggest to you that now you know information, and now the police know information that they didn't know back on September the 5th, 1998.  (24 RR 40-41).  Additionally, Mr. McLellan argued

> So we have a dope dealer who goes with Melancon; and they're going to go clubbing, but he's got to do some business.  Well, if it was his legitimate business or if he wasn't planning on killing someone, why didn't Melancon go with him?  Why does Melancon have to get out and wait while he takes someone to do some business?  Because I'm going to take someone and I'm going to kill them, and you're just going to be in the way, so wait here.
> 24 RR 41.

And more:

> Here is the defendant going off around the corner with Anthony Williams, and what is left is a dead body and paper on the floor—paper on the ground, just like at Lantern Point, a dead body and paper on the ground.  I'm an admitted dope dealer, who doesn't go back and pick up Melancon so they can go clubbing.  Just kind of disappears for that night.
> 24 RR 42.

Even though the impact of the Gibson and Williams killings on their families was not directly emphasized, the repeated and extensive emphasis on Gibson and Williams directly implicated the victim impact of their deaths.  The repeated mentions of Williams in a relatively short

prosecutorial argument are one more showing that the state court determination was an unreasonable determination of the facts under 2254(d)(2).

**B. The Director's arguments regarding the adequacy of the state habeas process.**

The Director initially misconstrues Mamou's argument in claiming that "[f]ew principles are more well-settled than the rule that complaints attacking the petitioner's state habeas procedure are not cognizable on federal habeas review." RA at 91. The Court need not be detained for long with this argument (at RA 91-92), as this section of Mamou's petition (at 112-119) does not assert a cognizable "claim;" it argues an exception to the re-litigation bar for the underlying cognizable claim. Mamou argues that when a state court fails to conduct the predicate analysis into the thoroughness of trial counsel's preparation before deferring to an alleged strategic decision, its application of *Strickland's* governing legal principles is objectively unreasonable under Section 2254(d)(1). *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). Here, the state court failed to conduct the requisite analysis of the reasonableness of trial counsel's investigation into the facts and law before finding the decision not to object to be reasonable strategy. Exhibit 14, at 5 (1 SHCR at 246) (adopted by order of the convicting court Nov. 13, 2013, Exhibit 14 at 10 (1 SHCR at 251) (adopted by order of the CCA Feb. 5, 2014). Thus, the state court's application of the *Strickland* legal standard was objectively unreasonable. Accordingly, the exception to the relitigation bar contained in 28 U.S.C. § 2254(d)(1) has been met and the court is not prohibited from granting relief on Mamou's *Strickland* claim related to the Williams and Gibson victim impact testimony.

Next, the Director cites the five factors the state court relied upon in finding Williams and Gibson's testimony harmless: "1) the testimony was brief; 2) defense counsel effectively cross-examined both witnesses; 3) the prosecutor did not emphasize this testimony during closing

arguments; 4) the overwhelming nature of the State's punishment evidence; and 5) Mamou's loud, angry outburst during the punishment hearing." RA at 92.

The Director then claims that "although Mamou contests the court's finding that the testimony was brief and that counsel was able to effectively cross-examine these witnesses, he offers no rebuttal to the other factors." RA at 92. This misrepresents and ignores Mamou's arguments. Mamou clearly contested the first two findings and showed them both to be false rationales, as discussed in the previous section. He also not only contested the third finding (prosecutor not emphasizing it at final argument, shown in the petition (at 109 and also shown above) but also showed it was false and an unreasonable determination of the facts under 2254(d)(2). As for the fourth factor, "overwhelming nature of the State's punishment evidence," (RA at 92), this is vastly overstated, as the "overwhelming nature of the State's punishment evidence" was focused on the Williams murder itself, part of which was the victim-impact testimony of Ms. Williams. The State seems to want to separate the evidence of the Williams murder, which it calls "overwhelming," from the evidence of the victim impact evidence of that same murder, which it dismisses as inconsequential. Mamou submits that this strange bifurcation or compartmentalization would not have been made by Mamou's jurors. After having been presented with the State's punishment case which mainly focused on Williams, and extensive mentions of Gibson and Williams in the final argument, they would have seen Ms. Williams' and Ms. Gibson's testimony as an integral part of that presentation, and treated it with the same seriousness and weight as that evidence. Earlier, the Director asserted that the State's guilt phase final argument "paint[ed] a holistic view of the entire criminal transaction," RA at 44, 65, but wants the Court to see the punishment phase argument as less than holistic.

In any case, the State's case at punishment was not "overwhelming." Other than an incident in which Mamou was caught speeding with a gun in his possession, for which he was not charged, the State's case at punishment mainly relied on the Williams murder: Melancon relating the incident; the medical examiner relating the cause of Williams' death; and Ms. Williams relating the impact of that death. Essentially, the Director attempts to have it both ways: he asserts there was "overwhelming evidence supporting a death sentence" and Mamou's alleged responsibility "for three murders," while simultaneously arguing that "the victim impact of Williams and Gibson's deaths was diminished by the fact that both were drug dealers who willingly placed themselves in the dangerous circumstances that resulted in their death." RA at 93. While the Director minimizes the impact of Mamou's mitigating evidence, there was no "overwhelming evidence supporting a death sentence" as the Director claims, when one subtracts the testimony of Williams and Gibson. RA at 92.

As for Mamou's lengthy description of the inadequacy of the state habeas process itself (Petition at 114-119), the Director has nothing to say beyond mischaracterizing the argument as a separate claim for relief. Mamou has shown in those pages that the state court's adjudication of his *Strickland* claim resolved disputed, material facts without affording him notice or an opportunity to respond to evidence submitted by the State and upon which the state court relied. "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Clearly established federal law holds that fundamental fairness includes the right to notice and an opportunity to be heard at meaningful time and in meaningful manner. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1983). The state court violated this clearly established law in the course of

adjudicating Mamou's state habeas corpus application, and this antecedent violation of clearly established law satisfies the first exception to §2254(d)'s relitigation bar.

The Director has not contested Mamou's showing that the state habeas judge (who was not the trial judge) adopted the State's proposed findings and conclusions, which included Hill's affidavit, on November 13, 2013, only one week after they were filed on November 6. Mamou has extensively discussed this in his petition as 114-119, and that discussion is incorporated herein. The state habeas court adopted these proposed findings *before the district clerk had even served Mamou's counsel with them*. (Exhibit 14 at 10; 1 SHCR at 251). The state court therefore adjudicated Mamou's claim without notice and relied upon evidence that the applicant had no meaningful opportunity to contest. This procedure did not afford fundamental fairness and violated due process. *Circu v. Gonzales*, 450 F.3d 990, 994 (9th Cir. 2006) (failure to afford asylum applicant an opportunity to counter evidence relied upon by immigration judge to rule against her violated due process). The state court had previously designated Hill's affidavit "material" to the resolution of Mr. Mamou's claim, and it in fact relied upon it when it adopted the State's proposed findings.[30] Thus, there can be no question as to its materiality in the proceeding.

Additionally, the Director and the state courts fail to address the fact that Hill's affidavit gives no strategic reasons for his decision not to exclude Patricia Gibson's victim impact testimony. This shows once again that the state court's factual determination that a strategic decision was made is unreasonable in light of the evidence before it. Because the state court decision was based on these unreasonable determinations of fact, an exception to § 2254(d)'s relitigation bar has been met, and

---

[30] Kurt Wentz, Mr. Mamou's other trial lawyer, never submitted an affidavit. The court disposed of the application without taking any additional steps to secure his testimony, despite having previously found it material to resolve disputed facts.

the Court is not prohibited from granting relief on Mr. Mamou's *Strickland* claim related to both the Williams and Gibson victim impact testimony. Mamou has shown herein that the claim is meritorious.

**Claim Seven (b)**: **Ineffective assistance of counsel for failing to present evidence in mitigation.**

The Director asserts this claim is procedurally barred and even if it were not, that Mamou has not shown any harm. RA at 93-98. Any procedural default because of the failure to bring this claim in the state courts is excused under the holdings of *Martinez* and *Trevino.*

As to the merits, the Director asserts that the uninvestigated and unpresented evidence "is not substantial and is almost entirely cumulative." RA at 97.

Not contacted by the defense attorneys were 1) Claudia Milton, who could have testified about the many charitable good deeds Mamou performed in Sunset, Louisiana (Exhibit 24); 2) Christopher Terrill Mamou, Mamou's brother, who could have testified to his brother's emotional and financial support of their family (Exhibit 25); and 3) Mark Benoit, a friend, who could have testified as to Mamou's generosity for friends, family and the community (Exhibit 26). All were willing to testify had they been asked. The three uncalled witnesses could have testified to Mamou's good reputation in the community, his acts of generosity, and his financial support of his family. To date, Mamou has been denied all funding for investigation of this claim and must present it in its current form.

**CLAIM EIGHT : APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.**

This claim concerns appellate counsel's failure to raise several claims in his initial petition that were specifically mentioned in the Texas Court of Criminal Appeals' denial of Mamou's habeas petition. The CCA held that "[w]e also noted that Allegations Five, Six, Eight and Nine are

procedurally barred." <u>Exhibit 15</u>, *Ex Parte Mamou,* Nos. WR-78,122-01, 78-122-02, 78,122-03 (Tex. Crim. App. Feb. 5, 2014) at *2.

Allegations Five and Six in the initial state habeas application were that the introduction of the inadmissible extraneous victim evidence deprived Mamou violated the Eighth Amendment of the United States Constitution as he was subjected to cruel and unusual punishment. Those allegations correspond to Claim 7(a) herein. Allegation Eight was that the trial court erroneously overruled an objection to the prosecutor's speculating that the legislature could lessen Mamou's parole eligibility of forty years. That corresponds to Claim 13(a) herein. Allegation Nine was trial court error in refusing to instruct the jury that the State had a burden of proof beyond a reasonable doubt on the mitigation special issue. That corresponds to Claim 8(c) herein.

### <u>Claim Eight (a)</u>: Ineffective assistance of appellate counsel for failing to raise trial court error in admitting Baldwin's flawed "magazine mark" testimony.

The Director argues that this claim is defaulted. RA at 99. Some courts have extended the *Martinez/Trevino* rationale to include ineffective assistance of habeas counsel for failure to raise claims of ineffective assistance of appellate counsel. *E.g., Dickens v. Ryan,* 740 F.3d 1302 (9th Cir. 2014). Mamou acknowledges that the Fifth Circuit has to date not extended *Martinez* in this manner and has raised the issue in order to preserve that possibility. However, Mamou acknowledges that this claim is based mainly on non-record evidence, and it therefore is properly raised as ineffective assistance of habeas counsel, discussed above.

### <u>Claim Eight(b)</u>: Ineffective assistance of appellate counsel for failure to raise issue of inadmissible extraneous victim impact evidence.

The Director argues this claim is meritless. RA at 100. As Mamou has stated in his petition that "ineffective assistance of counsel claims are normally not brought on direct appeal," petition at 124, Mamou agrees that this claim was raised in error, as it duplicates Claim 7(a), and should be

withdrawn. Mamou apologizes to the Court for this error. The claim is properly raised as Claim 7(a), *supra,* ineffective assistance of counsel for failing to object at trial.

**Claim Eight (c): Ineffective assistance of appellate counsel for failing to raise parole eligibility and burden of proof on mitigation issues.**

The CCA held that this claim was procedurally barred for failure to raise it on appeal. Exhibit 15, *Ex Parte Mamou,* Nos. WR-78,122-01, 78-122-02, 78,122-03 (Tex. Crim. App. Feb. 5, 2014) at *2. The Director argues that the CCA has "repeatedly refused to assign a burden of proof on the issue of mitigation and has rejected capital defendants' challenges to the constitutionality of the Texas death penalty scheme..." RA at 102. Mamou acknowledges the authorities cited by the Director, RA at 102, and raises it here in order to preserve the issue should the precedent change.

**CLAIM NINE: STATE POST-CONVICTION COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.**

Petitioner received ineffective assistance in state habeas proceedings when his initial state habeas counsel, Mr. Roland Moore, failed to investigate and present many meritorious claims of ineffective assistance of trial counsel ("IATC"). Any procedural default for failure to present these claims in state habeas proceedings is excused under the holdings of *Martinez v. Ryan,* 132 S. Ct. 1309 (2013) and *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).

The Director does not address this claim separately, but as to the individual claims of IATC in Claims Four through Seven. Mamou does likewise and rests on the arguments raised in those claims and in this claim in his petition. (at 127-136).

**CLAIM TEN: PETITIONER IS NOT GUILTY OF CAPITAL MURDER BECAUSE THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT THE JURY'S DETERMINATION THAT PETITIONER WAS GUILTY OF KIDNAPPING.**

The Director argues that the "evidence at trial was legally sufficient to demonstrate that Mamou shot and killed Carmouche after having kidnapped her..." RA at 102. As detailed in the

factual summary, the State's evidence to prove that Mamou was guilty of kidnapping Mary Carmouche was insufficient. *Jackson v. Virginia,* 443 U.S. 307 (1979). The Director does not dispute that this claim is exhausted, as it was brought on direct appeal as Points of Error 2 and 3.

The Director argues that "[t]he factual sufficiency review requested here by Mamou is a claim originating under state law," RA at 103, citing *Clewis v. State,* 922 S.W.2d 126, 129-130 (Tex. Crim. App. 1996). However, as Mamou pointed out in his petition (at 139), in *Brooks v. State,* 323 S.W.2d 893 (Tex. Crim. App. 2010) the Texas Court of Criminal Appeals overruled *Clewis v. State,* 922 S.W.2d 126 (Tex. Crim. App. 1996) which established the factual sufficiency standard of reviewing elements of the offense in criminal cases. *Brooks* set aside the factual sufficiency standard of review and held "[T]he *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks,* at 911.

So *Jackson v. Virginia* applies to both legal and factual sufficiency review. The *Jackson* Court instructed that federal courts are to rely on substantive state criminal law when reviewing a state conviction for constitutional sufficiency and hence state law was cited in support of this claim.

Next, the Director argues that the CCA's finding of evidence sufficient to support a charge of kidnapping. RA at 104-109. The Director cites various aspects of the trial testimony in support of that argument. Mamou's arguments were presented in his petition and there is no need to repeat them here.

**CLAIM ELEVEN: PETITIONER WAS UNLAWFULLY CONVICTED OF CAPITAL MURDER BECAUSE THERE WAS INSUFFICIENT LEGAL AND FACTUAL CORROBORATION OF ACCOMPLICE TESTIMONY.**

The Director argues that this claim does not raise a constitutional issue. RA at 109. Mamou has presented his arguments as to this claim in the petition but recognizes the contrary authority of *Brown v. Collins,* 937 F.2d 175, 182 n.12 (5th Cir. 1991).

**CLAIM TWELVE: PETITIONER WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW, AS THE EVIDENCE SUPPORTING THE FUTURE DANGEROUSNESS SPECIAL ISSUE WAS INSUFFICIENT.**

The Director addresses this claim on the merits and argues that "[t]he state's punishment evidence was overwhelming and evinced Mamou's tendency toward violent criminal behavior." RA at 112. This claim was brought on direct appeal, as Point of Error 7, and the Director does not contest that this claim is exhausted.

As to the merits, the Director first argues that "a glaring deficiency in Mamou's argument is his failure to consider the impact of the facts of the present offense on the jury's verdict." RA at 115. Mamou does acknowledge that in some instances it has been held that "[t]he fact of the crime alone may...be sufficient to support a jury's affirmative finding of future dangerousness." RA at 115. However, the CCA has held that this is not true in all cases. *Valle v State,* 109 S.W. 3d 500, 502-03 (Tex. Crim. App. 2003); *Guevara v State,* 97 S.W. 3d 579, 581 (Tex. Crim. App. 2003); *Hall v State,* 67 S.W. 3d 870, 874 (Tex. Crim. App. 2002**)** *cert. granted, vacated and remanded,* 154 L.Ed. 2d 4 (2002) *aff'd*, 160 S.W. 3d 24 (Tex. Crim. App. 2004).

From that point, however, the Director overstates the circumstances of the underlying offense. The Director argues that Mamou "shot two people," RA at 115, while omitting the fact that he was not charged with one of them, Gibson, because it was deemed to be in self-defense. The Director also argues that the offense was heinous because it was part of a "calculated plan to rob

drug dealers of cocaine," RA at 115, while simultaneously earlier arguing that "the victim impact of Williams and Gibson's deaths was diminished by the fact that both were drug dealers who willingly placed themselves in the dangerous circumstances that resulted in their death." RA at 93. In other words, the deaths are "heinous" when weighed on the "future dangerousness" scale, but "diminished" when weighed on the "victim impact" scale.

The Director argues that Mamou "stole Holley's car and fled the scene," RA at 115, while ignoring that the car theft could not have been part of a "calculated plan" to rob them, as the shoot-out was certainly not planned, Gibson was prepared to shoot Mamou to obtain what he thought was his money, and Mamou fled in the car to avoid being shot himself. In fact, the circumstances of the putative drug robbery, with its many false starts and abortive transactions, suggests anything but a "calculated plan."

As shown above in Claim 7(a), the State's case at punishment was far from overwhelming, as it concentrated on the uncharged Williams shooting, for which Mamou had an alibi. 23 RR 22-25. While Mamou had a prior history of criminal offenses, it was hardly extensive. Mamou's mother testified that Mamou was well-behaved and helped his family members, 23 RR 37-42, had been gainfully and legitimately employed, 23 RR 37-42, although she was also aware that at some point he became a small-time drug dealer in Sunset, Louisiana. Joseph Savioe, a teacher, testified that Mamou took care of his family, 23 RR 102, and Mamou's sister Michelle testified that he bought her required school books. 23 RR 77. The two incidents cited by the Director (RA at 116) as showing a high propensity for future violence, the Williams shooting and his high-speed driving while in possession of a firearm, were both uncharged offenses. Similarly, the CCA's opinion cited Mamou's drug dealing; his being pulled over for speeding; Mamou's alleged involvement in the uncharged Anthony Williams shooting; and Mamou's leaving Houston after the Carmouche murder.

(*Mamou*, at 14-15.)  These specifics, when considered cumulatively, fall well short of showing a "probability" that Mamou would commit future acts of violence.

**CLAIM THIRTEEN: THE TRIAL COURT COMMITTED MULTIPLE REVERSIBLE ERRORS.**

The Director asserts this claim is procedurally barred and without merit.  RA at 116.

**Claim Thirteen(a): The Trial Court Erred In Denying Petitioner's Objection to the Prosecutor's Speculation That the State Legislature Could Lessen Petitioner's Parole Eligibility of 40 Years.**

The Director argues this claim is procedurally barred because the trial attorneys "failed to properly preserve the complaint by lodging a timely and reasonably specific objection at trial." RA at 119.  This claim was brought on direct appeal as Point of Error One.  The Texas Court of Criminal Appeals held that "[b]ecause appellant's trial objections do not comport with the issue raised on appeal, he has preserved nothing for review."  Exhibit 9, *Mamou v. State,* No. 73,708, at *18. (Tex. Crim. App. Nov. 7, 2001) (*per curiam*) (not designated for publication).

The Director (RA at 119) fails to engage with Mamou's arguments that this procedural ruling was flawed.  The CCA's ruling erroneously referred only to the "trial objections," not to the objections contained in the motion *in limine* orally presented by defense counsel prior to the cross-examination of this witness.  While trial counsel objected on the basis that the questioning called for speculation (23 RR 17), the prior oral motion *in limine*  was broader.  Defense counsel Mr. Wentz stated that he "would ask that there be a motion *in limine* as to cross-examination relating to changes in the board...changes in the parole law; and those things might [not] be considered, also." 23 RR 15. The Court asked for authority for the motion and the prosecutor then interjected "because he wants it." *Id.*  Mr. Wentz then added that [i]t also involves speculation on the part of this witness as to what the legislature would do." *Id.*

This objection, based on changes in the parole law and what the legislature might do, sufficiently encompassed the claim brought on direct appeal. Counsel did not have to explicitly state that "the jury should be forbidden to speculate that the legislature might lessen the parole eligibility period," which is apparently how the CCA construed this claim. In any case, review here is *de novo*, as the state court did not reach the merits of this claim. To the extent that trial counsel failed to preserve the issue for appeal, any such failure was ineffective assistance of counsel under the standards of *Strickland v. Washington,* 466 U.S. 668 (1984). Thus, by ignoring the factual basis of the broader *in limine* motion, this is an exception to the re-litigation bar under 2254(d)(2). It was also an unreasonable determination of the facts.

The Director has ignored this argument, treating the CCA's holding as a valid procedural bar, RA at 118-119. Mamou does not have to show "cause and prejudice" or a "miscarriage of justice" to excuse the default, as the Director claims, RA at 119, as he has shown that the underlying premise of the state court ruling failed to consider defense counsel's *in limine* motion.

On the merits, although the Director attempts to frame the claim as an "evidentiary matter," RA at 120, Mamou has shown extensively the federal constitutional underpinnings of the claim. Petition at 157-158. While the Director cites the jury instruction that contained specific language regarding parole eligibility being contingent on Mamou serving forty calendar years without consideration of good time, RA at 121, citing CR 98, the prosecutor's cross-examination invited the jurors to disregard the law, violate their instructions and violate their oaths in answering both special issues. And although the Director argues that "Mamou has not proven that Morgan's testimony was material," RA at 121, this ignores the fact that a juror, Tracy Karam, stated that the testimony of Ms. Morgan regarding the possibility of parole did affect her decision as to Special Issue No. 1. (Exhibit 11, 1 SHCR at 54.) One juror is all it takes to show prejudice.

**Claim Thirteen(b):  Trial Court Error In Denying Mamou's Requested Charge on False Imprisonment.**

The Director argues that "[t]he state court reasonably concluded on direct appeal that there was nothing in the State's evidence that would permit the jury to rationally find the defendant guilty of false imprisonment while acquitting him of kidnapping."  RA at 123.

When both sides rested at the end of the guilt phase, Mamou's counsel objected to the Court's charge pursuant to Article 36.14 of the Texas Code of Criminal Procedure for not including False Imprisonment, also known as unlawful restraint, in the jury charge. The trial court denied the requested charge.  21 RR 3.   However, false imprisonment is a lesser included offense of kidnaping. *Ex Parte Gutierrez,* 600 S.W.2d 933, 935 (Tex. Crim. App. 1980).

The Director cites *Bignall v. State,* 887 S.W.2d 21, 23 (Tex. Crim. App. 1994) for the proposition that because Mamou "essentially testified that he committed no offense...this testimony 'is not adequate to raise the issue of a lesser-included offense.'" RA at 124, citing *Mamou v. State,* at 17.   The Director's argument and the CCA's holding in *Mamou* are both incorrect and directly contrary to *Bignall's* holding, which will be quoted at length:

> In *Bell v. State,* this Court held that "a jury, as trier of fact, was entitled to believe all or part of the conflicting testimony *proffered and introduced* by either side." 693 S.W.2d at 443. We further held that a jury can selectively believe all or part of the evidence admitted at trial. *Id. See also Booth v. State,* 679 S.W.2d 498, 501–502 (Tex. Crim. App.1984); *Lugo v. State,* 667 S.W.2d at 146–147; *Thompson v. State,* 521 S.W.2d 621, 624 (Tex. Crim. App.1974). Construing the foregoing language, we are satisfied it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence directly germane to a lesser included offense for the factfinder to consider before an instruction on a lesser included offense is warranted.
> ...the jury is the sole judge of the credibility of the witnesses,  and it does not matter whether the evidence is strong, weak, unimpeached or contradicted. *Booth,* 679 S.W.2d at 500....
> The court of appeals held that Appellant's evidence indicated he was not guilty of any offense, and therefore, an instruction on theft was unnecessary. However, the court of appeals has misconstrued our caselaw and erroneously focused

solely on Appellant's evidence, while disregarding the remainder of the record as noted above. The correct test, as stated in *Aguilar v. State,* 682 S.W.2d 556 (Tex. Crim. App.1985), is as follows: "If a defendant either presents evidence that he committed no offense or presents no evidence, *and there is no evidence otherwise showing he is guilty only of a lesser included offense,* then a charge on a lesser included offense is not required. *Id.* at 558 (emphasis added). In this case, we have more than a mere denial of the commission of the offense. As noted above, evidence negating the presence of a gun was positively and affirmatively presented from several sources. The court of appeals' opinion glosses over this evidence and focuses on Appellant's testimony. Under such an interpretation, anytime a defendant denies the commission of an offense, a charge on a lesser included offense will not be warranted. This is clearly not the law of this state, as this Court has ruled otherwise in *Bell.*

   Our opinion today is consistent with a line of cases that has been developed by this Court since inception of the rule in *Daywood v. State,* more than 40 years ago. 157 Tex. Crim. 266, 248 S.W.2d 479 (1952). Our cases have uniformly held that a defendant is entitled to an instruction on a lesser included offense if evidence, from any source, affirmatively raises the issue. After *Rousseau,* the only restriction placed on this evidence is that it must permit a rational jury to find that the defendant is guilty of the lesser included offense, which the facts of this case allow. The purpose of liberally permitting charges on lesser included offenses is clear.
"If no charge [on the lesser included offense] is given, then the jury has two options which are equally distasteful. The first option is to vote not guilty in a situation where they believe the defendant committed [the lesser offense]. The other option is to vote guilty of [the greater offense], an offense they believe the defendant did not commit." *Eldred v. State,* 578 S.W.2d at 723.
 The court of appeals' arbitrary limitation of instructions on lesser included offenses in this case frustrates this purpose. Because the evidence in this case clearly satisfies the standards for an instruction on a lesser included offense, we reverse the court of appeals' opinion and remand the cause to the court of appeals for a harm analysis.
*Bignall v. State,* 887 S.W.2d at 24-25. (Emphasis in original)

Mamou presented evidence that he was guilty only of unlawful restraint (false imprisonment): his own testimony. The jury could well have believed that he did not know that Carmouche was in the car when he leapt in and tried to escape, and they could also have believed that Mamou only later, after he discovered her presence, unlawfully restrained Carmouche from leaving the car. This is contrary to the CCA's holding and the Director's argument that "there was no evidence proving Mamou guilty of restraint." RA at 123.

Additionally, the Director erroneously states that "[t]he state court reasonably concluded that there was nothing in the State's evidence that would permit the jury to rationally find the defendant guilty of false-imprisonment." RA at 123. The evidence is not limited to "the State's evidence;" as *Bignall, supra,* held, "a jury can selectively believe all or part of the evidence admitted at trial. *Bignall,* 887 S.W.3d at 24. *See also Booth v. State,* 679 S.W.2d 498, 501–502 (Tex. Crim. App.1984); *Lugo v. State,* 667 S.W.2d at 146–147; *Thompson v. State,* 521 S.W.2d 621, 624 (Tex. Crim. App.1974).

The CCA has defined kidnapping and unlawful restraint as follows:

> A person commits the offense of kidnapping if the person "intentionally or knowingly abducts another person." Tex. Pen.Code Ann. § 20.03 (Vernon 2003).. ...As used in Chapter 20 of the Texas Penal Code, the term "abduct" means to restrain a person with intent to prevent the person's liberation by either (1) secreting or holding the victim in a place where the victim is not likely to be found, or (2) by using or threatening to use deadly force. Tex. Pen.Code Ann. § 20.01(2) (Vernon Supp.2004). ..
>
> A person commits the offense of unlawful restraint if the person intentionally or knowingly restrains another person. Tex. Pen.Code Ann. § 20.02(a) (Vernon 2003). Chapter 20 of the Texas Penal Code defines "restrain" as "restrict[ing] a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." Tex. Pen.Code Ann. § 20.01(1). Restraint is accomplished without consent if the actor uses deception, intimidation, or force. *Id.*
>
>  *Anderson v. State,* 125 S.W.3d 729, 730 (Tex. Crim. App. 2003)

Mamou was thus entitled to the instruction on unlawful restraint. The Director's argument that because "Mamou testified he committed no offense," he was not entitled to the requested charge, RA at 124, misconstrues *Bignall.*

As for the Director's argument that "Mamou has not established that this adjudication is an unreasonable application of clearly established federal law," RA at 124, this is also error. Claim 13 was prefaced as follows: "Petitioner's conviction and death sentence is unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to

the United States Constitution, because he was denied a fair and impartial tribunal due to the errors committed by the trial judge." Petition at 154. Mamou also incorporated by reference the facts and argument from Claim 10, which was based on the federal constitutional premise that Mamou's "conviction is not consistent with the demands of the Federal Due Process Clause." *Fiore v. White,* 531 U.S. 225 (2001) (*per curiam*) (petition at 138); also cited was *Jackson v. Virginia,* 443 U.S. 307 (1979) (petition at 136). Additionally, Claim 13(a) which also related to trial error, had an extensive discussion of federal constitutional law, Petition at 157-158, including the Supreme Court holding that "the possibility that a jury may be confused about facts important to their capital-sentencing role has Constitutional implications. *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187 (1994)." Petition at 157.

In citing Mamou's reference to Claim 10, the Director again errs in claiming that "Mamou's legal insufficiency argument is premised on his assertion that the evidence is inadequate to demonstrate that he restrained Carmouche. This is in effect, an assertion that no offense occurred." RA at 125. The correct test is *Aguilar v. State,* 682 S.W.2d 556, 558 (Tex. Crim. App.1985),("If a defendant either presents evidence that he committed no offense or presents no evidence, *and there is no evidence otherwise showing he is guilty only of a lesser included offense,* then a charge on a lesser included offense is not required.") And as in *Bignall,* "we have more than a mere denial of the commission of the offense." *Bignall, supra,* at 24.

**Claim Thirteen (c): The Trial Court Erred in Denying Mamou's Requested Charge Requiring the Extraneous Offenses To Be Proved Beyond A Reasonable Doubt.**

The Director argues this sub-claim is contrary to Fifth Circuit precedent, including *Brown v. Dretke,* 419 F.3d 365, 376-77 (5th Cir. 2005). RA at 127. Mamou acknowledges this precedent.

**Claim Thirteen (d): The Cumulative Effect of Trial Errors.**

The Director presumably asserts there was no error. Mamou rests on the arguments in his petition.

**CLAIM FOURTEEN: REVERSAL IS REQUIRED BASED ON THE CUMULATIVE EFFECT OF ALL THE ERRORS**.

The Director asserts there was no constitutional error. RA at 130. Mamou rests his claim on the briefing in the petition.

## VI. CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Mr. Mamou prays and requests that this Honourable Court:

A. Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional sentence of death;

B. Conduct a hearing at which evidence and argument may be offered concerning the allegations of his petition;

C. Grant him the authority to obtain subpoenas *in forma pauperis* for witnesses and discovery of documents, and grant him the authority to take depositions and obtain other information necessary to prove the facts as alleged in his petition; and provide funding for these tasks;

D. Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of law raised by this petition or such hearing;

E. Enter Findings of Fact and Conclusions of Law recommending that his conviction and sentence of death be vacated and that his case be remanded for a new sentencing hearing, and

F. Grant such other relief as may be necessary and appropriate.

Respectfully submitted,

*s/s A. Richard Ellis*

_____

**A. Richard Ellis**
Attorney at Law
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
Attorney for Petitioner

Dated: April 29, 2016.



# CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2016, a true and correct copy of this *Petitioner's Reply To*

*Respondent's Answer and Motion For Summary Judgment* was served on counsel of record for

Respondent via the Court's automatic electronic service  this , to:


Ms. Tina J. Miranda
Assistant Attorney General
Criminal Appeals Division
Office of the Texas Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548

*/s/ A. Richard Ellis*

_____

A. RICHARD ELLIS
Counsel for Petitioner