United States District Court
Southern District of Texas

**ENTERED**

December 08, 2016

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CHARLES MAMOU, JR., | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-403 |
| | § | |
| LORIE DAVIS,[1] | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM AND ORDER**

In 1999, a Texas jury convicted Charles Mamou, Jr. of capital murder and sentenced him to death. Mamou unsuccessfully appealed, sought state habeas remedies, and then filed this federal habeas petition. The respondent, Lorie Davis, has answered and moved for summary judgment. (Docket Entry No. 49). Based on the record, the pleadings, and the applicable law, the court grants the summary judgment motion, finds that Mamou has not shown a basis to grant the habeas relief he seeks, denies his petition, and does not issue a certificate of appealability. The reasons for these rulings are set out below.

**FACTUAL BACKGROUND**

This background summary is taken from the trial record. A Reliant Energy employee entered the backyard of a vacant house in southwest Houston to read a light meter on December 8, 1998. He saw the body of a young black female lying on the ground, face down, near an unfired bullet

---

[1]       Effective May 1, 2016, Lorie Davis replaced William Stephens as the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice. Under Rule 25 of the Federal Rules of Civil Procedure, Davis "is automatically substituted as a party." FED.R.CIV.P. 25(d).

cartridge.  The police soon identified the victim as 17-year-old Mary Carmouche.[2]  A single gunshot to her chest had caused her death.

No forensic evidence conclusively identified the killer.  The State built its case primarily on eyewitness accounts of the events leading up to Mary Carmouche's abduction and on Mamou's own statements.  Mamou was indicted, tried, and convicted for intentionally killing Mary Carmouche during a kidnapping.  Trial testimony established that Mary's death was the last event in a drug transaction during which Mamou shot three other people, one of whom, Terrance Gibson, died.  Mamou, with Samuel Johnson and Terrence Dodson, was in a group of drug buyers; Kevin Walter, Dion Holley, and Terrance Gibson were selling drugs.

Mamou was a drug dealer from Sunset, Louisiana.  In late 1998, he bought cocaine from Kevin Walter, who was in Houston, Texas.  Tr. Vol. 20 at 167.  After that, Mamou repeatedly called Walter to buy more drugs.  Tr. Vol. 16 at 26.[3]

Mamou came to Houston in early December 1998 to buy a large amount of cocaine.  He called Kevin Walter and Dion Holley and asked them for a kilo.  The price set was  $20,000.  Tr. Vol. 16 at 28.  Mamou used the phone at his friend Howard Scott's apartment to arrange to meet Walter  and  Holley  on  December  6.    The  buyers–Mamou,  Johnson,  and  Dodson–met  the sellers–Walter, Holley, and Gibson–in a mall parking lot.  Holley drove the buyers to the parking lot in a blue Lexus.  Over several hours, the men traveled to various locations, unable to complete the deal because neither group would show the drugs or the money.  The sellers eventually picked up Holley's friend, Mary Carmouche.  Johnson and Mamou took Dodson home.  The two groups

---

[2]     The court refers to the minor victim by her first name or her full name.

[3]     Walter testified that he had known Mamou for only  a few weeks before the murders.  Tr. Vol. 16 at 21.  Mamou had repeatedly called him about buying cocaine.  Tr. Vol. 20 at 26.

finally met on Lantern Point Drive, a dark, isolated street.  The two groups parked their cars facing each other, to make it look like one car was charging the other car's battery.  It became apparent that this was not a drug deal, but rather what witnesses called a "jack on jack."  Mamou did not want to buy cocaine; he intended to take it from the sellers and keep the money.  The other group, Walter, Holley and Gibson, did not want to sell cocaine; they intended to take the buyers' money and keep the drugs.

Mamou had planned with Johnson and Dodson to pretend to have cash in a bag that was actually full of cut newspaper.  When the exchange was to occur, one man would pull a gun on the sellers while Mamou took the cocaine.

Mamou, Walter, Holley, and Johnson all testified at Mamou's trial.[4]  While some details differed, their testimony provided a generally consistent narrative of the events leading up to Mamou shooting three men before abducting Mary Carmouche.  Mamou and Gibson got out of their respective cars.  Both were armed.  Holley got out of the sellers' car to tell the other men that the location was not a good one.  As Holley turned back toward his car, Mamou began shooting.  Gibson was the only seller carrying a weapon.  Tr. Vol. 16 at 95.  He fell, fatally shot, and died from his wounds.[5]  Holley ran toward a nearby field, and Mamou shot him in the arm.

---

[4]     Under Article 38.14 of the Texas Code of Criminal Procedure "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed . . . ."  Texas defines an accomplice as someone who "participates before, during, or after the commission of the crime and can be prosecuted for the same offense as the defendant or for a lesser-included offense."  *Medina v. State*, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999).  The trial court refused to find that Johnson was an accomplice as a matter of law, but instructed the jury that he could be an accomplice as a matter of fact.  Tr. Vol. 21 at 3.  The state argued to jurors that Johnson "may have been an accomplice to a drug deal.  He may have been an accomplice to a drug transaction that he thought was going to be taking place.  But . . . the evidence is clear that he's not an accomplice as to capital murder."  Tr. Vol. 21 at 12.  Even though Dodson was not present at the shootings, Mamou argued on direct appeal that he was an accomplice whose testimony was not sufficiently corroborated.  The Court of Criminal Appeals held that "Dodson was not an accomplice witness[.]"  Opinion at 14.

[5]     Mamou incorrectly states that he "was never charged with the death of Gibson; as shown at trial, the evidence was that Gibson was armed at the time he was shot and the killing was deemed to be in self-defense."  (Docket

(continued...)

3

Walter grabbed the steering wheel of the blue Lexus to drive away.  Mamou walked up and shot him through the window.  Mamou opened the car door and, as Walter stepped out and said "whatever you do, don't hurt the girl," Mamou shot him again.  Tr. Vol. 16 at 66, 134.  The two men scuffled.  Walter tried to run, and Mamou shot him in the back.

Walter ran past where Gibson was lying on the ground and bent down to grab a gun lying by Gibson's hand.  Walter saw Mamou get in the blue Lexus and drive away with Mary Carmouche in the car.  Johnson followed in the other car, but soon drove in a different direction.  No witness saw Mary Carmouche after Walter saw her in the car with Mamou.

The police began investigating what they thought was a car jacking and kidnapping, not a drug transaction.  Walter and Holley initially hid the drug aspect by telling police officers that he and the others he was with had stopped to help people who seemed to be having car trouble.  Tr. Vol. 16 at 188-89.  Walter and Holley claimed that the men they stopped to help had shot them and stolen the car with Mary Carmouche inside.  After Walter and Holley revealed what had actually happened, the police learned Mamou's name and the phone number he used to plan the drug transaction.  Further investigation led the police to interview Howard Scott, the person Mamou had stayed with.  Scott testified that Mamou had left the apartment with Johnson the evening of December 6 and returned alone around 2:00 a.m.  Tr. Vol.19 at 126.

Johnson testified that he did not see Mamou after the failed supposed drug deal but talked to him by phone.  Tr. Vol. 19 at 43.  Mamou later called Johnson and told him to "shut the hell up."  Tr. Vol. 19 at 44-45.

---

[5]      (...continued)
Entry No. 39 at 11, n.12).  The State of Texas indicted Mamou for the capital murder of Gibson, but abandoned that charge before trial.  Clerk's Record at 4; Tr. Vol. 16 at 4-5.  The state habeas court found that "Terrance Gibson was named in the original indictment; however, prior to trial, the State abandoned the second paragraph of the indictment charging [Mamou] with murdering Mary Carmouche and Terrance Gibson during the same criminal transaction."  State Habeas Record at 244.  The record does not reveal why the State elected to try Mamou only for killing Mary Carmouche.

Mamou later made statements to two men–Terrence Dodson and Anthony Trail–suggesting that he had killed Mary Carmouche.  The day after the shootings, Trail picked up his cousins, Dodson and Mamou.  Mamou showed the two men keys and told them that he had a Lexus, explaining that he had purchased it.  Tr. Vol. 19 at 173, 174, 176.  After Mamou returned to Louisiana, he called Dodson and talked "about the news reports about a Lexus . . . being taken."  Tr. Vol. 19 at 178.  Mamou told Dodson that there had been "a jack on a jack" at which a "[s]hoot out happened, and he burned off . . . [i]n the Lexus with the female."  Tr. Vol. 19 at 180.  Mamou told Dodson that "he shot her" after she "performed oral sex on him," because "she was looking at him funny, like she was going to tell.  She was scared."  Tr. Vol. 19 at 180, 182.[6]

Trail also testified that Mamou told him about the Lexus.  Tr. Vol. 20 at 8.  Mamou asked Trail to drive to a dead-end street near Trail's house.  Tr. Vol. 20 at 9-11.  Mamou got out of the car, picked some eyeglasses off the ground, and got back in the car.  He explained that he had left the eyeglasses when "he was with a female" who "was giving him oral sex."  Tr. Vol. 20 at 12-13.  The next day, Trail took Mamou to a bus station to go back to Louisiana.  Mamou later called Trail and asked "what had been on the news about a missing person, Mary Carmouche."  Tr. Vol. 20 at 15.

---

[6]     Mamou's federal habeas petition disputes Dodson's testimony and asserts that he "was threatened by the police officers."  (Docket Entry No. 39 at 15).  Neither Mamou's nor Dodson's testimony indicated that the police had threatened Dodson.  In the section cited in the federal habeas petition, the prosecution cross-examined Mamou, as follows:

| The State: | So your first cousin, Terrence Dodson, decided to come in here and just make all kinds of lies up? |
| Mamou: | Well, he also gave testimony that he was threatened, if I'm not mistaken. |
| The State: | Threatened? |
| Mamou: | By the police officers. |
| The State: | Oh, he's threatened by the police officers. |
| Mamou: | I mean, I could have heard wrong; but I thought that's what I heard. |

Tr. Vol. 20 at 211-12.  Dodson, however, did not testify that police officers threatened him.  The closest he came was expressing his belief that the police saw him as a possible capital murder suspect.  On cross-examination by the defense, trial counsel asked "And at that point in time what exactly are you thinking at the time that you were picked up by the police?  Is it clear to you that they are looking at you as a suspect for capital murder?"  Tr. Vol. 19 at 200.  Dodson said that it was "clear to" him, "[n]ot real clear but . . . [i]n so many words, yeah."  Tr. Vol. 19 at 200.

In addition to the witness testimony, circumstantial forensic evidence linked Mamou to the crime.  Mamou's fingerprints were found on the discarded package containing the newspaper that Mamou wanted to pass off as money.  Tr. Vol. 20 at 88.  The police recovered the blue Lexus at the apartment complex where Scott lived.  The police did not find Mamou's fingerprints on the Lexus.  Nor did the police find the murder weapon.  Forensic firearms testing provided evidence connecting Mamou to the murder.

Robert Baldwin, a criminalist in the Houston Police Department firearms lab, testified about the ammunition found near Mary Carmouche's body and at the Lantern Point Drive location where Holley and Gibson were shot.  Baldwin testified that the unfired cartridge found near Carmouche's body had unique "magazine marks," indicating that it had cycled through the same gun magazine as one of the nine-millimeter casings found on Lantern Point Drive.  Tr. Vol. 20 at 108.  Baldwin also compared bullets taken from the bodies of Mary Carmouche and Gibson with a bullet fragment taken from Holley's arm.  Baldwin testified that the bullets taken from Gibson's body and Holley's arm were fired from the same weapon and shared the same "class characteristics" as the bullet recovered from the body.  Tr. Vol. 20 at 112.  Baldwin could not exclude the possibility that the bullet that killed Mary Carmouche was fired from the same gun as the others.  Tr. Vol. 20 at 111-13.[7]

The defense called two witnesses in the liability phase.[8]  Mamou testified on his own behalf. On direct, Mamou testified to what happened when he left Lantern Point Drive, after Holley and

---

[7]     Testing confirmed that none of the recovered bullets came from Gibson's gun.

[8]     Wayne Hill and Kurt Wentz represented Mamou at trial.  The state habeas court reviewed trial counsel's extensive experience in criminal defense.  State Habeas Record at 243.

Gibson had been shot.  Mamou testified that when he drove away, he did not realize that Mary Carmouche was in the backseat of the blue Lexus.  Tr. Vol. 20 at 143-44.  When he figured it out, Mamou stopped and "told her to get out of the car," but "she did not."  Tr. Vol. 20 at 145.  Mamou testified that when he left Lantern Point Drive, Johnson followed him to Scott's apartment, and Johnson and a man named Shawn England, wearing hand covers to avoid leaving prints, searched the Lexus for drugs.  Tr. Vol. 20 at 146, 149.[9]  Mamou testified that Mary Carmouche stood nearby talking to Johnson.  According to Mamou, Mary Carmouche later left with Johnson and England. Tr. Vol. 20 at 145-50, 152.

The cross-examination focused on inconsistencies between Mamou's account and that of the other witnesses.  Mamou responded by claiming that the other witnesses were lying and that he shot Gibson and Holley in self-defense.

After Mamou's testimony, the State called a police officer to testify.  He stated that Mamou had agreed to speak in an "off-the-record conversation."  In that conversation, Mamou gave an account that differed from his trial testimony.  Tr. Vol. 20 at 253-54.  Mamou claimed that he never shot anyone on Lantern Point Drive.

The defense called an employee of the Yellow Cab company, who testified that someone named "Shawn" called a cab from Scott's apartment at around 4:00 a.m. on December 7, 1998.  Tr. Vol. 20 at 129-38.

---

[9]        In the preliminary stages of this case, Mamou requested the allocation of funds for expert and investigative assistance.  With a limited review of the record and without adequate information from Mamou concerning how the funds would support procedurally viable claims, the court denied those funds.  Mamou contends that this court's "basis for denying it [was] based on factual mis-perceptions and errors."  (Docket Entry No. 39 at 33).  Mamou has particularly emphasized that the court said that "[w]itnesses said that they later helped Mamou search the stolen car for drugs and wipe it down to remove fingerprints."  (Docket Entry No. 21 at 4).  The court, however, should have clarified that it was Mamou's trial testimony that other witnesses (particularly Johnson and Scott) had searched for drugs and wiped down the blue Lexus.  On a full and exhaustive review of the record, and in light of the plenary briefing regarding Mamou's claims, the court again finds that he has not shown that investigative or expert assistance is reasonably necessary to an adjudication of his claims.

7

The jury deliberated for almost four hours before finding Mamou guilty of capital murder.

Under Texas law, a jury that has convicted a capital defendant answers special-issue questions that

are used to decide the punishment.   The trial court's questions asked the jury these questions:

### Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Charles Mamou, Jr., would commit criminal acts of violence that would constitute a continuing threat to society?

### Special Issue No. 2

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendants character and background, and the personal moral culpability of the defendant, Charles Mamou, Jr., that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Clerk's Record at 101-02.  In the sentencing phase, the jury could consider the evidence submitted

in the liability phase, including of Mamou's violence.  The State presented evidence that Mamou

had prior convictions for possessing and intending to distribute cocaine on May 25, 1995, in

Louisiana, and that Mamou had been charged in Louisiana for driving 100 miles an hour on the

interstate.  The arresting officer found a nine-millimeter firearm in Mamou's jacket.  The State also

presented the jury with evidence that, only months before the shootings, kidnapping, and death of

Mary Carmouche, Mamou had killed a man in a drug transaction similar to the one that led to

Mary's death.  The jury considering Mamou's sentence knew that he had killed three people, had

shot others, and had committed other crimes.  The jury also heard witnesses who described the effect

Mamou's killings had on family members.

Mamou's trial attorneys presented a robust case against a death sentence.  The defense called

a psychologist, Dr. Walter Quijano, to describe prison life, explain the tendency to age out of crime,

and opine that Mamou's lack of gang membership would make him less dangerous.  The defense

8

called a supervisor in the Texas Parole Office to describe the parole process for one serving a life sentence for capital murder. The defense also called two witnesses to dispute that Mamou had killed another person in the unrelated drug transaction.

The defense also called members of Mamou's family to describe his upbringing and character.[10] Mamou grew up in extreme poverty, often without enough to eat. He was frequently sick. Mamou did well when he started school, but his performance dropped after illnesses. Mamou parents separated when he was five years old, and he spent time with his mother but lived with his grandfather and father. Both men had drinking problems. The family-member witnesses testified that Mamou was nonetheless a respectful child who tried to do the right thing. Mamou participated in sports, acquired a GED, and unsuccessfully tried to join the military. As an adult, Mamou had a good relationship with his family and was generous to his siblings. Mamou's sister looked to him as a father figure. Mamou had five children with different mothers, and he supported his children with drug proceeds.

The jury answered the Texas special-issue questions in a manner requiring the imposition of a death sentence. The jury found that Mamou would be a future societal danger and that no sufficient circumstances mitigated against a death sentence. Clerk's Record at 101-02. The trial court sentenced Mamou to death.

## PROCEDURAL BACKGROUND

After sentencing, the counsel appointed to represent Mamou on direct appeal[11] raised eight issues. On November 7, 2001, the Texas Court of Criminal Appeals found no reversible error and

---

[10]     Mamou called Angelice Mary Johnson Mamou (his mother); Michelle Mamou (his sister); Sedonia Marie Stock (his ex-girlfriend); Joseph Dwight Savoie (his uncle); and Charles Mamou (his father).

[11]     Floyd W. Freed, III, represented Mamou on direct appeal.

9

affirmed the trial court's judgment.  *Mamou v. State*, No. 73,708 (Tex. Crim. App. Nov. 7, 2001).

The lawyer appointed to represent Mamou on state habeas review sought funds for expert and

investigative assistance and filed a habeas application raising 8 grounds for relief.[12]

The state habeas proceedings took 13 years.  During that time, Mamou also submitted a *pro se* state habeas application raising new claims.  The state habeas attorney initially appointed to represent Mamou withdrew, and the trial court appointed new counsel.  Mamou's new habeas attorney submitted a "supplemental" habeas application raising four new grounds for relief on October 24, 2013.

The state habeas trial court did not rule on Mamou's habeas application until 2014.  The trial-level habeas court entered findings of fact and conclusions denying Mamou's initial habeas application.  State Habeas Record at 242-51.  The Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief.  The Court of Criminal Appeals construed Mamou's *pro se* and supplemental pleadings as subsequent or successive habeas applications and found that he did not meet any of the statutory exceptions to the Texas abuse-of-the-writ doctrine. The Court of Criminal Appeals dismissed both pleadings without considering the merits.  Federal review followed.

## THE GROUNDS FOR RELIEF

Mamou's amended federal petition raises 15 grounds for relief, many combining arguments. Stated broadly, Mamou asserts these grounds for relief:

1.      He is actually innocent of capital murder.

2.      The trial court erred in admitting testimony from the State's firearm expert Robert Baldwin.

---

[12]      Roland Brice Moore, III initially represented Mamou on state habeas review.  On January 19, 2007, the trial court substituted David K. Sergi as Mamou's counsel of record.  State Habeas Record at 177.

3.      The State suppressed favorable evidence and presented false testimony through Baldwin and other witnesses.

4.      Mamou's trial counsel provided ineffective representation by failing to challenge the State's expert witnesses on fingerprint and firearms evidence.

5.      Trial counsel provided ineffective representation in preparing for trial.

6.      Trial counsel made errors in the liability phase of trial.

7.      Trial counsel provided ineffective assistance in defending against a death sentence.

8.      Appellate counsel failed to raise several grounds for relief.

9.      State habeas counsel provided ineffective representation.

10.     Insufficient evidence supported the jury's determination that Mamou kidnapped the victim.

11.     The State did not present evidence to corroborate the testimony of a witness who Mamou describes as an accomplice.

12.     Insufficient evidence supported the jury's determination that Mamou would be a future danger to society.

13.     The trial court committed reversible errors.

14.     The cumulative effect of the errors requires federal habeas relief.

The respondent filed an answer and a motion for summary judgment. (Docket Entry No. 49).

Mamou replied. (Docket Entry No. 50).

### AEDPA AND THE LIMITS OF FEDERAL REVIEW

Federal habeas review is secondary to the state court process and limited in scope. The states "possess primary authority for defining and enforcing criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982). Federal habeas review addresses only violations of "the Constitution or law or

treaties of the United States."  28 U.S.C. 2254(a).  How an inmate has litigated his claims in state court determines the course of federal habeas adjudication.  Under 28 U.S.C. § 2254(b)(1), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]"  Exhaustion "reflects a policy of federal-state comity designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted).

A corollary to exhaustion, the procedural-bar doctrine, requires inmates to litigate their claims in compliance with state procedural law.  *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). When an inmate fails to follow well-established state procedural requirements for attacking his conviction or sentence, and the state court finds a procedural default, federal habeas adjudication is barred.  *See Lambrix*, 520 U.S. at 523; *Coleman*, 501 U.S. at 732.  A federal court may review an inmate's unexhausted or procedurally barred claims only if he shows: (1) cause and actual prejudice; or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'"  *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated the merits, AEDPA allows federal review but limits its depth.  "[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief."  *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).  A petitioner cannot meet this burden by merely alleging

12

constitutional error.  Instead, "focus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), an inmate must show that the state court's adjudication of the alleged constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341; *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").[13]

Summary judgment is proper when the record shows "that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c).  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  A district court considering a motion for summary judgment usually construes disputed facts in a light most favorable to the nonmoving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), but must also view the evidence through "the prism of the substantive evidentiary burden," *id.* at

---

[13]     Mamou argues that this court should not apply the presumption of correctness to the state habeas court's factual findings because the trial judge signed the State's proposed findings and conclusions without changes. In another context, the Supreme Court has criticized the "verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985); *see also Jefferson v. Upton*, 560 U.S. 284, 294-95 (2010) ("Although we have stated that a court's verbatim adoption of findings of fact prepared by prevailing parties should be treated as findings of the court, we have also criticized that practice.") (quotation omitted). The Fifth Circuit, however, has rejected the contention that habeas findings adopted verbatim from those a state submits are not entitled to deference.  *See Basso v. Stephens*, 555 F. App'x 335, 342, 343 (5th Cir. 2014); *Green v. Thaler*, 699 F.3d 404, 416 n. 8 (5th Cir. 2012).

254.  The general summary judgment standards hold to the extent they do not conflict with AEDPA

and other habeas law.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir.2002) (Rule 56 "applies

only to the extent that it does not conflict with the habeas rules"), *overruled on other grounds by*

*Tennard v. Dretke*, 542 U.S. 274 (2004).

Mamou's federal habeas petition raises 14 grounds for relief.  The respondent argues that

Mamou has presented most of his claims in a procedural posture that precludes full consideration

of the merits.  The claims and argument fall into 4 categories:

**First**, the respondent argues claims, 1, 9, and 11 do not implicate federal constitutional

concerns.

**Second**, as to the claims that Mamou exhausted in state court, claims 10, 12, and 13 were

raised on direct appeal and claim 7(a) was raised on state habeas review.  AEDPA requires a federal

court to review the state-court decision with deference.  *See* 28 U.S.C. § 2254(d).

**Third**, as to the claims raised in a supplemental or successive habeas application–claims 2

and 3–Texas courts strictly enforce the abuse-of-the-writ doctrine, codified at TEX. CODE CRIM. PRO.

art. 11.071 § 5(a).  This doctrine generally prohibits filing successive habeas applications.  The state

court refused to consider the merits of claims 2 and 3 on this ground.  The respondent argues that

procedural bar precludes federal review as well.  Mamou responded that he has raised actual

innocence, allowing this court to adjudicate those claims on the merits.

**Fourth**, Mamou raises some claims, 4, 5, 6, 7, 8, and 14, for the first time in federal court.

"A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the

court to which the petitioner would be required to present his claims in order to meet the exhaustion

requirement would now find the claims procedurally barred.'"  *Nobles v. Johnson*, 127 F.3d 409,

420 (5th Cir. 1997) (quoting *Coleman*, 501 U.S. at 734 n.1); *see also Steele v. Young*, 11 F.3d 1518,

14

1524 (10th Cir. 1993) (when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review").  If the Texas courts would not allow Mamou to raise these new federal claims in a successive state habeas application, then, according to the respondent, procedural bar forecloses federal review.

Each category of claims and argument is analyzed in that order.

## ANALYSIS

## I.    Does Mamou Raise Federal Habeas Grounds for Relief in Claims 1, 9, and 11?

Mamou asserts in claim 1 that he is actually innocent of capital murder.[14]  The Supreme Court has not accepted actual innocence as a cognizable ground for federal habeas corpus relief. *See Schlup v. Delo*, 513 U.S. 298, 315 (1995); *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also Kinsel v. Cain*, 647 F.3d 265, 270 n.20 (5th Cir. 2011); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006).

Mamou asserts in claim 9 that deficiencies in his state habeas counsel's representation require federal habeas relief.  Federal law does not recognize ineffective representation during state collateral proceedings as an independent ground for habeas relief.  *See* 28 U.S.C. § 2254(I) ("The

---

[14]    On federal review, a criminal defendant's claim of actual innocence arises in two distinct contexts, only one of which is actionable: (1) as a noncognizable free-standing claim that the defendant is, as a matter of fact, innocent of the charged offense, *see Herrera v. Collins*, 506 U.S. 390, 404 (1993); or (2) as a gateway to collateral review of a forfeited constitutional claim or of a claim barred from review by a procedural default, *see Schlup v. Delo*, 513 U.S. 298 (1995).  Before filing his federal petition, Mamou assured the court that his "actual innocence claim will be a 'gateway' claim that would allow this Court to reach the merits of any otherwise procedurally-barred claims." (Docket Entry No. 18 at 14).  Mamou's federal petition, however, lists his actual innocence as a ground for relief and otherwise assumes that it is a stand-alone habeas claim.  Mamou did not exhaust an actual-innocence claim in state court even though, unlike federal law, Texas law recognizes an inmate's innocence as a ground for relief.  *See Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996); *State ex rel. Holmes v. Court of Appeals for the Third District*, 885 S.W.2d 389 (Tex. Crim. App. 1994).  Texas recently created a new habeas remedy for cases in which convictions involving "relevant scientific evidence" that: "(1) was not available to be offered by a convicted person at the convicted person's trial; or (2) contradicts scientific evidence relied on by the state at trial.  TEX. CRIM. PRO. CODE ANN. art. 11.073.  Mamou has not invoked that potential ground and the record discloses no ground for doing so.

ineffectiveness or incompetence of counsel during . . . State collateral post-conviction proceedings shall not be a ground for relief"); *see also Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008).

Mamou's eleventh claim argues that insufficient evidence corroborated inculpatory testimony from Terrrence Dodson. Mamou asserts that his role as "[t]he one witness that connected Mamou to the killing of Carmouche" makes his testimony insufficient as an accomplice. (Docket Entry No. 39 at 161). Under Texas law, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PRO. art. 38.14. But whether or not Dodson was an accomplice or other evidence corroborated his testimony does not implicate federal constitutional concerns. Even if state law made Dodson an accomplice to capital murder, "the Constitution imposes no requirement that the testimony of an accomplice-witness be corroborated by independent evidence. The prosecution's alleged failure to satisfy the accomplice-witness sufficiency rule, and the state court's failure to enforce that purely state rule, "simply [does] not warrant constitutional attention." *Brown v. Collins*, 937 F.2d 175, 182, n.12 (5th Cir. 1991). Because "the proper interpretation of state law is not cognizable in federal habeas proceedings," *Beazley v. Johnson*, 242 F.3d 248, 261 (5th Cir. 2001), this court cannot grant relief on Mamou's claim that insufficient evidence corroborated Dodson's testimony.[15]

---

[15]       The trial court instructed jurors to consider whether Johnson, not Dodson, was an accomplice. Mamou nonetheless argues that Dodson was also an accomplice even though he was not present at the Lantern Point Drive shootout, and that insufficient evidence substantiated Dodson's testimony. The Court of Criminal Appeals found on direct appeal that because "[t]here was no evidence that Dodson committed an affirmative act to assist [Mamou] in the kidnapping or murder of Carmouche," he "was not an accomplice witness" and "his testimony was not subject to the corroboration requirement of art. 38.14." Opinion at 13-14. Even if Mamou's claim involving accomplice witness testimony raised federal constitutional issues, he has not shown that the state court was unreasonable in finding no error.

(continued...)

The court grants summary judgment for the respondent denying claims 1, 9, and 11 because they do not present grounds for federal habeas relief.

## II. Does Mamou Have Grounds for Federal Habeas Relief on the Claims He Exhausted in State Court? (Claims 10, 12, 13, and Part of Claim 7)

### A. The Standard of Review

If an inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts adjudicated the merits, AEDPA allows for federal review, but it is deferential to the state courts. The Supreme Court "has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, ___ U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 16 (2013)). An inmate may secure relief only after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),(2). The exhausted issues in Mamou's federal petition are analyzed under this standard.

### B. Was the Evidence Supporting Mamou's Conviction Sufficient? (Claim 10)

Mamou alleges that insufficient evidence supported the jury's verdict that he committed murder during the kidnapping of Mary Carmouche, making it capital murder. The jury instructions allowed for a capital murder conviction if Mamou kidnapped, or attempted to kidnap, Mary. The

---

[15]     (...continued)

Dodson's participation in the criminal episode ended well before Mamou committed the acts leading to Mary Carmouche's death.

prosecution had to prove the underlying kidnapping offense by showing beyond a reasonable doubt that Mamou "intentionally or knowingly abduct[ed]" Mary, TEX. PENAL CODE art. 20.03(a), and that in turn required proof that Mamou "restrain[ed] [Mary] with intent to prevent [her] liberation by secreting or holding [her] in a place where [she] is not likely to be found; or using or threatening to use deadly force." TEX. PENAL CODE art. 20.01(2)(A), (B). Mamou contends that he did not restrain Mary against her will or intend to prevent her liberation. Relying heavily on his own trial testimony that Mary Carmouche had voluntarily accompanied him after he shot her friends, Mamou argues that insufficient evidence supported the underlying kidnapping and resulting capital murder conviction.

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court affirms a jury's conviction if, considering all of the evidence in a light most favorable to the prosecution, a rational trier of fact could have returned a verdict unfavorable to the defendant. This demanding inquiry is highly deferential to, and resolves any conflicting evidence in favor of, the jury's verdict. *See United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002); *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990). AEDPA augments the deferential *Jackson* analysis, creating a enhanced barrier to federal habeas relief. *See Coleman v. Jackson*, ___ U.S. ___, 132 S. Ct. 2060, 2062 (2012); *Perez v. Cain*, 529 F.3d 588, 599 (5th Cir. 2008). Together, *Jackson* and the AEDPA create a "double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011). A federal habeas court questions only whether the state court reasonably applied the *Jackson* standard.

In state court, Mamou unsuccessfully raised a federal *Jackson* claim and a state-law factual insufficient-evidence claim. *See Clewis v. State*, 922 S.W.2d 126, 129-30 (Tex. Crim. App. 1996).[16]

---

[16]     Texas courts no longer recognize a separate factual and legal sufficiency review. *See Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010). Even when factual sufficiency was a separate cognizable claim in Texas
(continued...)

The Texas Court of Criminal Appeals found that sufficient evidence supported the underlying

offense of kidnapping, explaining that:

> . . . [t]he evidence at trial shows that [Mamou] shot Carmouche's companions, left
> the scene in Holley's Lexus with Carmouche in the back seat, and transported her to
> a vacant house where he took her into the backyard and shot her.  Johnson disputed
> [Mamou's] version of events and testified that he last saw Carmouche in the Lexus
> with [Mamou].  Dodson testified that [Mamou] admitted to him that he drove away
> from a "shoot out" with a girl in a Lexus and that he took her to an abandoned house
> where he shot her because "she was scared" and "she was looking at him funny like
> she was going to tell."
>
> The jury could rationally infer from the evidence that [Mamou] restrained
> Carmouche without her consent.  Viewing the evidence in the light most favorable
> to the verdict, we conclude that a rational jury could have found beyond a reasonable
> doubt that [Mamou] restrained Carmouche with the intent to prevent her liberation
> by either secretion or deadly force.

Opinion at 10-11.

In reviewing Mamou's state-law factual-insufficiency claim, the Court of Criminal Appeals

additionally observed that:

> . . . [i]n support of his factual insufficiency argument, [Mamou] again asserts that the
> state failed to prove the underlying kidnapping offense because he did not "restrain"
> Carmouche.  However, Dodson testified that [Mamou] admitted that he drove away
> from a "shoot out" with a girl in a Lexus and took her to an abandoned house where
> he shot her. Further, [Mamou] admitted shooting Gibson and ballistics tests revealed
> that the bullets taken from the bodies of Carmouche and Gibson shared the same
> class characteristics.
>
> [Mamou] testified that he did not initially know that Carmouche was in the
> car, that she refused to get out of the car when he asked her to do so and that she
> voluntarily accompanied him to Scott's apartment where she left with Johnson. Scott
> and Johnson, however, disputed [Mamou's] version of events.  The jurors were free
> to place whatever value they wished upon [Mamou's] testimony.  They apparently
> rejected his testimony and concluded that he restrained Carmouche when he
> transported her from Lantern Point Drive to the backyard of a vacant house, where
> he shot her.  Viewing this evidence in a neutral light, we cannot say that the jury's

---

[16]     (...continued)

courts, it did not implicate federal constitutional concerns and was not a basis for federal habeas relief.  *See Woods v.*
*Cockrell*, 307 F.3d 353, 358 (5th Cir. 2002).

finding that [Mamou] kidnapped Carmouche is manifestly unjust.

Opinion at 12.

Relying heavily on his own trial testimony, Mamou in this court argues that the Texas Court of Criminal Appeals decision was unreasonable because the evidence did not show the predicate requirements of a kidnapping. The record undermines his argument. Mamou stole a car from the men he intended to rob of their cocaine. He shot three men in carrying out his scheme, then fled with Mary Carmouche in the car. Mamou claimed that she was there voluntarily and that she could leave when she wanted, but that she would not leave the vehicle. Ample testimony disputed Mamou's statement that Mary voluntarily accompanied him to Scott's apartment. As the prosecutor argued, it was "stretching credibility" to believe that Mamou "just got through dusting three people" and Mary "would then go with him . . . and she's just kinda hanging around with the guys" who had just shot her friends. Tr. Vol. 21 at 45-46.

The jury was not obligated to believe Mamou's story that Mary Carmouche voluntarily remained with him. The verdict shows that the jury did not accept Mamou's account. The trial evidence showed that Mamou stole the car with Mary in the back seat. He later told Dodson that he had killed her. Ample trial testimony allowed jurors reasonably to find that Mamou interfered with Mary's liberty through force, intimidation, or deception.

The *Jackson* standard requires courts to draw all inferences in favor of the jury's guilty verdict. In light of the doubly deferential AEDPA standard, the Court of Criminal Appeals was not unreasonable in finding that sufficient evidence supported the capital-murder verdict and the underlying kidnapping offense. The court grants the respondent's motion for summary judgment and denies Mamou's tenth ground for relief.

C.      **Was the Evidence Supporting Punishment Sufficient?  (Claim 12)**

The jury answered two special issue questions.  One asked whether "there is a probability that the defendant, Charles Mamou, Jr., would commit criminal acts of violence that would constitute a continuing threat to society?"  Clerk's Record at 105.  Mamou contends that insufficient evidence supported the jury's affirmative finding of future dangerousness because he "had no extensive prior history of criminality."  (Docket Entry No.39 at 149).  Mamou emphasizes the mitigating evidence he put before the jury and argues that he had an alibi for the extraneous murder shown by evidence introduced in the penalty phase.

On direct appeal, the Court of Criminal Appeals found that sufficient evidence supported the jury's future-dangerousness finding:

> [Mamou] was an admitted drug dealer who had been convicted of possession with intent to distribute cocaine in Louisiana.  The following year, he was discovered in possession of a firearm after he was pulled over for speeding at a rate of 100 miles per hour on the interstate freeway in Louisiana.  [Joseph] Melancon testified that three months prior to Carmouche's murder, [Mamou] shot and killed Anthony Williams during a drug transaction which was similar in some respects to the incident on Lantern Point Drive.  Melancon further testified that he left Houston immediately after the Williams murder because he feared [Mamou].  [Mamou] became so angry during Melancon's testimony that he yelled at him in front of the jury and requested to leave the courtroom for the remainder of the proceedings.

> With regard to the  instant offense, [Mamou] admitted at trial that he shot Walter and Gibson on Lantern Point Drive before he left in Holley's car with Carmouche.  According to Dodson,  [Mamou] admitted to him that he took a girl to a vacant house after a "shoot out" and then shot her because he thought she was going to tell police what happened."

> Viewing the evidence in the light most favorable to the jury's affirmative finding on the future dangerousness special issue, we cannot say that this finding is irrational.

Opinion at 15 (footnote omitted).

*Jackson* and AEDPA require assessing the evidence in the light favorable to the jury's

verdict and deferring to the state court's determination.   Mamou's federal petition and characterization of the trial evidence understates the criminal history that supported a future-dangerousness finding.   The jury could consider Mamou's involvement in large-scale drug transactions and other criminal acts in evaluating his future threat. Mamou had a history of violence in dealing drugs, including using firearms prohibited by his felony conviction.   The events leading to Mary Carmouche's killing included other shootings.   Mamou "had committed another murder—the most powerful imaginable aggravating evidence." *Wong v. Belmontes*, 558 U.S. 15, 28 (2009) (quotation omitted).   With that history and the federal court's doubly deferential review, the Texas Court of Criminal Appeals was not unreasonable in finding that sufficient evidence supported the jury's answer to the future-dangerousness special issue.   This court grants the respondent's motion for summary judgment of claim 10 and denies relief on this claim.

### D.      Does Trial Court Error Support Federal Habeas Relief? (Claim 13)

Mamou asserts that he was "denied a fair and impartial tribunal due to the errors committed by the trial judge." (Docket Entry No. 39 at 154).  He argues that the trial judge erred when he: (1) did not sustain the objection to testimony about possible changes in parole law; (2) denied the request for a lesser-included offense instruction; and (3) did not specifically instruct jurors to consider the extraneous offenses if the State had proven them beyond a reasonable doubt.  Mamou argues that the cumulative effect of those trial errors prejudiced his constitutional rights.

#### 1.      *The Possibility of Change in Texas Parole Law*

Mamou contends that the trial court should not have overruled his objection to a witness's testimony that parole law could change.  In the penalty phase, Mamou called Dorothy Morgan, a parole supervisor for the Southern Region Institutional Parole Office, to testify about the Texas Parole Board procedures.  Morgan testified that a capital defendant receiving a life sentence "would

not be eligible for parole consideration for forty flat years." Tr. Vol. 23 at 13.  When the direct examination ended, trial counsel asked the court to prevent the State from asking speculative questions on cross "relating to changes in . . . the parole law . . . ." Tr. Vol. 23 at 15.  The court denied the motion.  The prosecutor asked questions eliciting testimony that the state legislature sometimes changes parole law and that it could change in the future.  Tr. Vol. 26 at 15-18.  Trial counsel objected that the testimony was speculative, immaterial, and irrelevant.

On direct appeal, Mamou argued that "the state's cross-examination was contrary to the law and constituted a blatant effort for the jurors to disregard their instructions and violate their oaths in answering the continuing threat special issue and the mitigation special issue."  Opinion at 18 (quotation omitted).  Texas law follows the contemporaneous-objection rule, requiring parties to make a timely, specific objection to preserve error.  *See* TEX. R. APP. P. 33.1(a)(1)(A).  Because Mamou's argument on appeal differed from the error preserved at trial, the Court of Criminal Appeals found that Mamou "ha[d] preserved nothing for review."  Opinion at 18 (quoting TEX. R. APP. P. 33.1).

The Fifth Circuit "has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims."  *See Allen v. Stephens*, 805 F.3d 617, 635 (5th Cir. 2015); *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999).  Mamou's failure to make a timely objection is a procedural default barring consideration of this issue.  He has not shown cause or prejudice to overcome the procedural bar.  Texas law precludes federal consideration of Mamou's allegation about testimony discussing possible changes in parole law.

Alternatively, Mamou has not shown that this claim merits federal habeas relief.  Mamou argues that the State's questioning of Morgan "was a clear invitation for the jury to discuss Mamou's

parole eligibility in their deliberations." (Docket Entry No. 39 at 158). Mamou has not shown that the Constitution prohibits jurors from considering parole eligibility and future changes to parole law in sentencing deliberations. *See Salazar v. Dretke*, 419 F.3d 384, 403 n.31 (5th Cir. 2005) ("There is no indication from the Supreme Court that . . . a jury's discussion of parole law runs counter to any constitutional principle."). Added protection arose from the trial court's instruction prohibiting jurors from considering how parole could affect a life sentence for Mamou:

> It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.
>
> You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Clerk's Record at 98. The law presumes that a jury follows the court's instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). The state court was not unreasonable in rejecting Mamou's allegation of error in the trial court's admission of testimony about parole law.

### 2.   *The Jury Charge on False Imprisonment*

Before the liability phase closing arguments, Mamou's counsel objected to the trial court's "failure to include the lesser included offense of false imprisonment in the jury charge." Tr. Vol. 21 at 3. Texas law entitles a defendant to a lesser-included-offense instruction when: (1) the lesser-included offense is included within the proof necessary to establish the offense charged, and (2) there is some evidence showing that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672-673 (Tex. Crim. App. 1993). False imprisonment is a lesser-included offense of kidnapping. A "[k]idnapping is accomplished by abduction, which includes restraint, but false imprisonment is committed by restraint only." *Schweinle v. State*, 915

24

S.W.2d 17, 19 (Tex. Crim. App. 1996).[17]

When Mamou raised this claim on direct appeal, he relied on his own trial testimony that he neither restrained nor abducted Mary Carmouche.  The Court of Criminal Appeals held that Mamou was not entitled to the requested jury instruction because "there was no evidence that would permit the jury to rationally find [him] guilty only of false imprisonment."  Opinion at 17.  On federal review, Mamou argues that, "[w]hen evidence from any source raises a defensive issue, and the defendant requests a jury charge on that issue, the trial court must submit the issue to the jury." (Docket Entry No. 39 at 160).  His argument is unpersuasive.  The Constitution does not require jury instructions on every lesser-included offense that the evidence conceivably supports.  In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court explained when a trial court must instruct jurors on a lesser-included offense.  *Beck* addressed the use of an all-or-nothing approach that gives a jury only two choices: either convict the defendant of a capital crime or release him into society.  *See Schad v. Arizona*, 501 U.S. 624, 647 (1991) ; *Spaziano v. Florida*, 468 U.S. 447, 455 (1984).  Under *Beck* and later cases, "[a] lesser included offense charge serves to protect the jury (and, by extension, the criminal defendant) from the false dichotomy of choosing between convicting on the capital charges or outright acquittal when a 'third option' of a lesser included offense exists." *Pippin v. Dretke*, 434 F.3d 782, 791 (5th Cir. 2005).

Mamou's jury did not face an all-or-nothing choice.  Instead, the jury could consider several alternatives to convicting Mamou for capital murder.  The jury instructions allowed for Mamou's conviction of capital murder, murder, aggravated kidnapping, or kidnapping.  Clerk's Record at 90-

---

[17]    Under Texas law, unlawful restraint is defined as follows: "A person commits an offense if he intentionally or knowingly retrains another person." Tex. Penal Code § 20.02(a).  Aggravated kidnapping is defined as follows: "A person commits an offense if the person intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense." Tex. Penal Code § 20.04(b).

91. The absence of an instruction on false imprisonment did not force jurors "into an all-or-nothing choice between capital murder and innocence." *Spaziano*, 468 U.S. at 455. There is no federal constitutional violation when, as here, the trial court's instruction effectively provides jurors with the option of a lesser-included offense, even if it differs from the instruction the defense wanted. *See Livingston v. Johnson*, 107 F.3d 297, 313 (5th Cir. 1997); *Allridge v. Scott*, 41 F.3d 213, 220 (5th Cir. 1994); *Montoya v. Collins*, 955 F.2d 279, 285 (5th Cir. 1992). Mamou has not shown that the state court was unreasonable in rejecting his claim that the federal constitution also required a jury instruction on false imprisonment. He has not shown a basis for relief on this claim.

### 3.      The Jury's Consideration of the Extraneous Offenses

The prosecution presented testimony and evidence in the punishment phase showing that Mamou had committed extraneous and unadjudicated offenses. Defense counsel unsuccessfully moved for an instruction requiring jurors to consider those crimes under a beyond-a-reasonable-doubt standard. Tr. Vol. 24 at 3; *see also* Clerk's Record at 92. Mamou argues that due process requires this strict burden of proof for extraneous offenses.

Texas capital inmates have repeatedly challenged using extraneous offenses in sentencing. But the Fifth Circuit has consistently held that "extraneous offenses offered at the punishment phase of a capital trial need not be proven beyond a reasonable doubt." *Reed v. Stephens*, 739 F.3d 753, 789 (5th Cir. 2014) (quotation omitted); *see also Brown v. Dretke*, 419 F.3d 365, 376-77 (5th Cir. 2005); *Beazley v. Johnson*, 242 F.3d 248, 262 (5th Cir. 2001); *Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir. 1998); *Turner v. Johnson*, 106 F.3d 1178, 1189 (5th Cir. 1997). As the Court of Criminal Appeals observed on direct appeal, "the jury was told that the state had the burden to prove the issue of future dangerousness beyond a reasonable doubt." Opinion at 18. Mamou has not met the AEDPA burden on his claim that the lack of a beyond-a-reasonable-doubt instruction requires

federal habeas relief.

### 4.     The Claim of Cumulative Error

Mamou's argument that the cumulative effect of the trial court's alleged mistakes requires federal habeas relief fails because he has not shown any error.  "Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996).  Because Mamou "has presented nothing to cumulate," *Yohey v. Collins*, 985 F.2d 222, 229 (5th Cir. 1993), his cumulative-error argument does not entitle him to relief.

### E.     Did Mamou Receive Ineffective Assistance as to the Victim-Impact Evidence? (Claim 7(a))

Mamou faults his trial counsel for not objecting to testimony by two witnesses in the penalty phase.  Counsel filed pretrial motions requiring the State to disclose victim-impact testimony.  Clerk's Record at 15, 30, 74.  The State told defense counsel that it would present testimony about the murders of Terrance Gibson and Anthony Williams.  Clerk's Record at 58, 61.  During the punishment phase, Gibson's mother and Williams's sister provided emotional testimony about the men who died and how the loss impacted their families.  The State did not emphasize the victim-impact testimony in closing arguments, other than mentioning that Mamou had "ripped those families apart."  State Habeas Record at 245.  Citing *Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997), Mamou argues that trial counsel provided ineffective representation because Texas law prohibited testimony from or about victims of uncharged crimes.

Under *Strickland v. Washington*, 466 U.S. 668, 686 (1984), a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense."  *Yarborough v. Gentry*, 540 U.S.

1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

Trial counsel submitted an affidavit to the state habeas court outlining why he had not objected to the testimony at issue:

> My decisions regarding the manner in which to handle the punishment testimony of Yolanda Williams and Patricia Gibson were strategic.  Their testimony was brief in comparison to the entirety of the evidence at trial, not particularly compelling, and I believe effectively countered on cross-examination.  Yolanda Williams['] brother Anthony Williams, aka "Bruiser," was killed by the defendant during a drug sale. On Yolanda Williams cross-examination, I pointed out to the jury that the victim was a drug dealer and had voluntarily put himself into a dangerous situation.  When Patricia Gibson testified on direct, she stated that she last saw Terrance at a family gathering. Terrance's pager went off, and Patricia told him to be careful as he left. On cross-examination, Gibson admitted that her son had elected to do inappropriate things, and she counseled one of his friends to change his life and learn a lesson from what happened to her son.  While I could have objected to the line of questioning offered by the State, I did not do so.  I do not believe that the introduction of this evidence was a critical or overriding factor in the jury's decision to return the death penalty in this case.
>
> In light of the State's guilt/innocence and punishment evidence as well as the events set forth above, I do not believe the defendant was prejudiced by my strategic decisions or the punishment testimony of Yolanda Williams and Patricia Gibson.

State Habeas Record at 254.[18]

Based on counsel's affidavit, the state habeas court found that the decision not to object was "strategic" because the testimony "portrayed Anthony Williams and Terrance Gibson in an unfavorable manner."  State Habeas Record at 246-47.  The state habeas court emphasized that challenged testimony was brief: "Yolanda Williams and Patricia Gibson were two of eighteen witnesses who testified at the punishment phase of [Mamou's] capital murder trial and their complained-of testimony comprised approximately ten pages out of over 300 pages of punishment

---

[18]     Only Hill provided an affidavit.  The state habeas court ordered Wentz to do so, but the record does not contain an affidavit from him.

28

phase proceedings." State Habeas Record at 245. Citing "the brevity of their testimony, the defense's effective cross-examinations and the prosecutor's lack of emphasis of their testimony during final argument at punishment," the state habeas court found that Mamou was "not harmed by the complained-of punishment testimony . . . ." State Habeas Record at 246, 249.[19] The state habeas court reviewed all the aggravating evidence against Mamou and concluded that he had failed to prove *Strickland* prejudice. State Habeas Record at 246-47.

The state court's denial of this claim readily withstands review. "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105. "To be clear, the Eighth Amendment does not per se bar the introduction of victim impact evidence in capital cases." *Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012) (citing *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)). Texas state law limits victim-impact testimony, however. In *Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997), the Court of Criminal Appeals found that trial-court error in admitting victim-impact testimony when the witness's son was killed in an extraneous offense. Since *Cantu*, the Texas cases have extensively addressed what types of victim-impact testimony are not admissible in the penalty phase. *See Adams v. Thaler*, 421 F. App'x 322, 333 (5th Cir. 2011) (discussing Texas cases). The question is whether, had trial counsel objected under Texas law, there was a reasonable probability of a different result.

The respondent has not disputed that a defense lawyer could have raised a serious objection to the testimony from the victims of extraneous offenses. But the state habeas court validated trial counsel's reasoned choice not to object and found no prejudice from that decision. Under *Strickland*, 'strategic choices made after thorough investigation of law and facts relevant to plausible

---

[19] The state habeas court found that "the State did not specifically refer to or emphasize the complained-of testimony of Yolanda Williams and Patricia Gibson during punishment arguments" other than one brief mention that Mamou "ripped those families apart." State Habeas Record at 245.

options are virtually unchallengeable . . . .'" *Strickland*, 466 U.S. at 690-91; *see also Cullen v. Pinholster*, 563 U.S. 170, 231 (2011); *Sears v. Upton*, 561 U.S. 945, 954 (2010). The jury knew that Mamou was a violent drug dealer and that he killed the two men whose family members testified. Trial counsel's strategic choice allowed him to ask questions emphasizing that, like Mamou, the victims had engaged in violent drug transactions.

The state habeas court also found that the length of the testimony, its content, and ample weighty evidence against Mamou precluded finding any prejudice. This court cannot say that the state habeas court was unreasonable in finding neither *Strickland* deficient performance nor prejudice. Mamou has not shown that the state-habeas court rejection of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). Relief on this claim is denied.

## III.   Did Mamou Lose Federal Court Review of Claims 2 and 3 Because They Were Procedurally Barred?

In his second claim for relief, Mamou argues that the trial court erred in allowing the State's firearm expert, Robert Baldwin, to testify. Mamou's third ground contends that the State suppressed favorable evidence and presented false testimony through witnesses, particularly Baldwin. The issue is whether these claims are procedurally barred.

### A.   Procedural Bar

Mamou raised claims 2 and 3 in a "supplemental" state habeas application during the pendency of state habeas review. The Texas statutory habeas procedure generally forbids raising new claims late in a habeas case. If an inmate files amendments outside the time constraints, Texas law treats that pleading as a new habeas action. *See* TEX. CODE CRIM. PRO. art. 11.071 § 5(f) ("If an amended or supplemental application is not filed within the time specified under Section 4(a) or

30

(b), the court shall treat the application as a subsequent application under this section."). The Texas courts construed Mamou's supplemental pleading as a successive habeas application subject to the abuse-of-the-writ rule. *See* TEX. CODE CRIM. PRO. art. 11.071, § 5(a). The Court of Criminal Appeals found that Mamou "fail[ed] to meet any of the exceptions" to this rule and dismissed the supplemental pleading without considering its merits.[20]

The Fifth Circuit has held that the Texas abuse-of-the-writ rule is an independent and adequate state procedural ground barring federal habeas review. *Balentine v. Thaler*, 626 F.3d 842, 851 (5th Cir. 2010). A state procedural default may be excused if an inmate "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. A petitioner must overcome this procedural hurdle. *See McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). Mamou asserts that he can show both a fundamental miscarriage of justice and cause and prejudice that will allow federal review of Claims 2 and 3.

### B.     A Fundamental Miscarriage of Justice

A "fundamental miscarriage of justice" exists if a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. A defendant tried for an alleged offense is presumed innocent unless and until the state proves his guilt beyond a reasonable doubt. "Society's resources have been concentrated at [a criminal trial] in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *see also McFarland v. Scott*, 512 U.S. 849, 859 (1994) (a "criminal trial is the 'main event' at which a defendant's rights are to be determined").

---

[20]     Under the Texas Code of Criminal Procedure, 11.071 § 5, an inmate can proceed on a successive habeas action only if he shows applicable new law or facts (§ 5(a)(1)); actual innocence of his conviction (§ 5(a)(2)); or actual innocence of the death penalty (§ 5(a)(3)).

"Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera*, 506 U.S. at 399. A convicted defendant invoking federal habeas jurisdiction "comes before the habeas court with a strong–and in the vast majority of the cases conclusive–presumption of guilt." *Schlup*, 513 U.S. at 326; *see also Herrera*, 506 U.S. at 399-400 (a petitioner "does not come before the Court as one who is 'innocent,' but, on the contrary, as one who has been convicted by due process of law"); *Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) ("[T]here is no presumption of innocence at a habeas proceeding."). What a federal court has "to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved." *Moore v. Dempsey*, 261 U.S. 86, 88 (1923).

As a safety valve against unfair applications of the procedural-bar rule, "a persuasive showing that [an inmate] is actually innocent of the charges against him" allows federal review. *See Schlup v. Delo*, 513 U.S. 298, 315-16 (1995); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *Bousley v. United States*, 523 U.S. 614, 623 (1998). A *Schlup* actual-innocence argument, "[t]o be credible . . . requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup*, 513 U.S. at 324.[21] The new evidence must be "material, not merely cumulative or impeaching." *Lucas v. Johnson*, 132 F.3d 1069, 1075 n. 3 (5th Cir. 1998); *see also Calderon v. Thompson*, 523 U.S. 538, 563 (1998)*; Foster v. Thaler*, 369 F. App'x 598, 602-03 (5th Cir. 2010). Given these hurdles, successful actual-innocence

---

[21]     Some tension exists between Mamou's arguments for actual innocence and his claim that trial counsel should have challenged Baldwin's testimony. Federal case law explicitly requires *Schlup* evidence to be "new," *Cantu v. Thaler*, 632 F.3d 157, 166 n. 31 (5th Cir. 2011), *judgment vacated on other grounds*, 132 S. Ct. 1797 (2012), meaning it was not "always within the reach of [the inmate's] personal knowledge or reasonable investigation." *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008). Mamou's *Strickland* claim presupposes that his arguments under *Schlup* were always available to trial counsel.

arguments are "extremely rare." *Schlup*, 513 U.S. at 324.

Mamou relies on three factual bases to prove his actual innocence: (1) "[t]here are reasonable grounds to believe that the testimony of Terrence Dodson, Howard Scott, and Robin Scott was coerced by police pressure and was false"; (2) "[t]here are reasonable grounds to believe that the testimony of the other State's witnesses was also coerced and/or false"; and (3) the forensic evidence in this case is suspect or false. (Docket Entry No. 39 at 32-33). Mamou's arguments do not identify new, reliable evidence as needed to prove actual innocence.

> 1.      *False or Coerced Testimony*.

Building on unsupported allegations in his successive state habeas application, Mamou contends that "the testimony of Terrence Dodson, Howard Scott, and Robin Scott was coerced by police pressure and false" and that he "has reason to believe that [the prosecution's witnesses] were all given inducements and deals to testify as they did and that these inducements were concealed from the defense. . . ." (Docket Entry No. 39 at 32, 34). Mamou does not point to competent evidence supporting his argument that police pressure or undisclosed deals resulted in false testimony. The allegations of coerced or false testimony lack record support. To start, Robin Scott did not even testify at trial. While Terrence Dodson and Howard Scott did testify, Mamou did not submit or point to an affidavit or other evidence from those witnesses disavowing their trial testimony. Nor has Mamou presented or pointed to any evidence suggesting that the prosecution coerced witnesses or otherwise knowingly put false testimony before the jury. Instead, Mamou bases his allegations of innocence on an unnotarized "declaration" from an investigator, Sonja Dee Rafeet, who stated that Robin Scott had told her that "the Houston police had harassed her and her husband prior to Mamou's trial." Rafeet also stated that she met with Dodson's mother, who told her that "the police were constantly following her son and harassing her son and trying to make sure

that [Dodson] would testify against Mamou at his trial." (Docket Entry No. 34, Exhibit 27). The hearsay-within-hearsay and vagueness of Rafeet's declaration limit its value for showing a miscarriage of justice. *See Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008) (an affidavit used to show actual innocence "hardly counted as 'evidence,' given that it almost entirely consisted of inadmissable hearsay, and, importantly, it was vague to boot, lacking any specificity . . . "). Vague hearsay allegations that the police followed and harassed a witness are not new, reliable evidence that could show coercion resulting in false testimony.

Similarly, Mamou has not provided or pointed to any evidence showing that the prosecution made undisclosed deals with trial witnesses. Instead, Mamou broadly labels the witnesses' testimony as "self-serving," and appears to presume that this in itself shows undisclosed deals. *See Bell v. Watkins*, 692 F.2d 999, 1010 (5th Cir. 1982) (even when a court may "understand [a defendant's] suspicions" that the prosecution made "a secret deal with witnesses," he "must rely on more than mere inference drawn from the circumstances of the trial in order to make out his claim").

The state trial court denied Mamou's request for funds to investigate the claim that witnesses were offered undisclosed deals or were coerced into testifying. (Docket Entry No. 21). Mamou did not show that additional investigation would provide any proof or support for his suspicions. Unsupported, conclusory conjecture is inadequate to require added investigation. Mamou has not brought forth, or shown that he could develop, reliable new evidence of his innocence based on the trial witness testimony.

2.    *The Ballistics Testimony*.

Mamou's primary argument for his actual innocence is that the forensic evidence was unreliable. Mamou's actual-innocence argument attacks the qualifications and testimony of firearms

34

examiner Robert Baldwin.  Baldwin's testimony connected the ballistics evidence recovered from Lantern Point Drive with the evidence found near Mary Carmouche's body in two ways: (1) the magazine marks on the unfired cartridge; and (2) similar "class characteristics" between the slugs found in Gibson's body, Holley's arm, and Mary's body.  Tr. Vol. 20 at 108-113.

Mamou overstates the importance of Baldwin's testimony in relation to the other trial evidence.  Mamou claims that "[t]here was no case for capital murder" without Baldwin's testimony and that "the firearms testimony was the crucial link between Mamou and Carmouche's murder." (Docket Entry No. 39 at 44-45).  Mamou predicates his actual-innocence argument on undercutting or ignoring the significant inculpatory testimony identifying him as the gunman at Lantern Point Drive, showing that Mary Carmouche was last seen with him, and proving his own incriminating statements.  Mamou has not provided any meaningful basis for questioning trial testimony from the prosecution's witnesses.

Mamou generally criticizes Baldwin's expertise and trustworthiness as a firearms expert, but specifically discusses only Baldwin's testimony about the "magazine markings" on the discarded cartridges.  (Docket Entry No. 39 at 52).  Independent of this testimony, Baldwin explained that the fired bullets the police recovered at each location had the same class characteristics.  Baldwin modestly testified that he could not exclude the possibility that the slugs the police recovered from both locations could have been fired from the same weapon.  Whether or not Baldwin gave incorrect testimony about magazine markings, the arguments do not specifically or persuasively challenge the expert testimony connecting Mamou to Mary Carmouche's murder through the fired slugs, or the other evidence of Mamou's guilt.[22]

_____

[22]    On a similar basis, Mamou cursorily argues that "[t]he State's fingerprint expert . . . has also been discredited . . . ."  (Docket Entry No. 39 at 72).  Mamou has not identified any specific errors in the fingerprint evidence,
(continued...)

Mamou bases his challenge to the magazine-markings testimony on academic literature, an affidavit from a different ballistics expert, and general criticisms of Baldwin's work in other cases. The academic articles generally question the forensic comparison of firearm magazine markings by challenging an examiner's ability to identify unique characteristics, called "toolmarks", on bullets or cartridges. The articles generally criticize forensic identification of ballistic evidence when, as here, the police do not have the weapon.[23] Criminal defendants have brought similar challenges to ballistics testimony about toolmarks, with different results.[24] The Fifth Circuit has observed that

_____

[22]        (...continued)
particularly given the other evidence and testimony linking him with the attempt to take the cocaine without paying.

[23]        Mamou emphasizes an article by Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, VI COLUMBIA SCIENCE AND TECHNOLOGY REVIEW (2005). One court summarized the content of the Schwartz article as follows:

> . . . Dr. Adina Schwartz—a Professor at John Jay College of Criminal Justice who spent several years as an Associate Appellate Counsel in The Legal Aid Society's Federal Defender Services Unit Appeals Bureau—has written . . . an article often quoted by the defense bar . . . assert[ing] that toolmark examiners have "not developed the requisite statistical empirical foundations" to substantiate the claim that they are "able to single out a particular firearm or other tool as the source of an evidence toolmark, to the exclusion of all other tools in the world." In that same article, Dr. Schwartz argues that "rigorous proficiency testing has yet to occur," noting that proficiency testing of particular examiners cannot be generalized to the field of firearms and toolmark examination as a whole in light of the subjectivity involved and the lack of "specific, articulable criteria for determining when the resemblances between toolmarks are so great that they must have come from the same tool." Dr. Schwartz concludes that "all firearms and toolmark identifications should be excluded until the development of firm statistical empirical foundations for identifications and a rigorous regime of blind proficiency testing."

*United States v. Sebbern*, 2012 WL 5989813, at *5 (E.D.N.Y. Nov. 30, 2012) (citation to Dr. Schwartz's article omitted). In another case, Dr. Schwarz testified as a witness and "admitted during the *Daubert* hearing that she does not regard herself as a neutral scholar on the topic of forensic firearms and toolmark identifications but rather as an advocate." When cross-examined about testimony given previously in another matter, "she also admitted that she takes the position that she has a moral responsibility to prevent the admission of firearms-related toolmark identification evidence." *United States v. Otero*, 849 F. Supp. 2d 425, 437 (D.N.J. 2012), *aff'd*, 557 F. App'x 146 (3d Cir. 2014).

[24]        Other federal courts have exhaustively considered similar arguments, including ones based on the Schwartz article, and found toolmark comparison testimony admissible. *See United States v. Sebbern*, 2012 WL 5989813, at *8 (E.D.N.Y. Nov. 30, 2012); *United States v. Otero*, 849 F. Supp. 2d 425, 437 (D.N.J. 2012), *aff'd*, 557 F. App'x 146 (3d Cir. 2014); *United States v. Willock*, 696 F. Supp. 2d 536, 572 (D. Md. 2010), *aff'd sub nom. United States v. Mouzone*, 687 F.3d 207 (4th Cir. 2012); *United States v. Diaz*, No. CR 05-00167 WHA, 2007 WL 485967, at *1 (N.D. Cal. Feb. 12, 2007); *United States v. Monteiro*, 407 F. Supp. 2d 351, 366 (D. Mass. 2006). As one court observed, "[a]lthough the scholarly literature is extraordinarily critical, court after court has continued to allow the admission of this testimony." *United States v. Green*, 405 F. Supp. 2d 104, 122 (D. Mass. 2005).

"the matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades." *United States v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004).  Texas has approved the use of magazine markings for toolmark comparison, *see Ramey v. State*, No. AP-75,678, 2009 WL 335276, at *9 (Tex. Crim. App. Feb. 11, 2009), but has restricted this testimony when an expert's qualifications and experience do not allow for a reliable identification.  *See Sexton v. State*, 93 S.W.3d 96, 101 (Tex. Crim. App. 2002).[25]  Resolving Mamou's actual-innocence arguments does not require taking a position about ballistics evidence in general.  Academic opinions about the unreliability of toolmark identification, even posttrial opinions, are not new, reliable evidence that support an actual-innocence argument.

Mamou also relies on an affidavit from Ronald L. Singer, a former director of the Tarrant County Medical Examiner's Crime Lab.  Singer identified problems with Baldwin's testimony, particularly for identifying the magazine marks without the weapon available for comparison. Mamou points to other cases in which Baldwin subsequently recanted his trial testimony, was later found to have provided incorrect testimony, or was disciplined for faults in supervising a firearms division of the crime lab.  This information is impeaching, but is not new, reliable evidence as required to support a valid actual-innocence claim.  *See Wadlington v. United States*, 428 F.3d 779, 784 (8th Cir. 2005) (distinguishing under *Schlup* between an affidavit that "is, at best, impeachment" and one that "exonerate[s]"); *Vega v. Johnson*, 149 F.3d 354, 364 (5th Cir. 1998) (evidence showing a miscarriage of justice must be "material, not merely cumulative or impeaching").

The question is not whether the trial court should have admitted Baldwin's testimony.  The question is whether Mamou has presented or pointed to new, reliable evidence of actual innocence.

---

[25]      Even in *Saxton*, the Court of Criminal Appeals "conclude[d], based on the record before us, that the underlying theory of toolmark examination could be reliable in a given case, but that the State failed to produce evidence of the reliability of the technique used in this case."  *Sexton v. State*, 93 S.W.3d 96, 101 (Tex. Crim. App. 2002)

No scientific evidence (such as DNA analysis), new physical evidence, or new, reliable testimony undercuts Mamou's guilt.  At most, Mamou has witness testimony in an area involving scientific judgment and subject to disagreements among experts.  At most, Mamou has shown that Baldwin's methodology and conclusions could have been impeached more effectively.  Enhanced impeachment evidence is not the same as factual-innocence evidence and does not meet the burden the case law imposes to show actual innocence.

### 3.  The Evidence as a Whole.

Mamou's arguments for actual innocence "must be considered in light of the proof of petitioner's guilt at trial[.]"  *Herrera*, 506 U.S. at 417.  A reviewing court does not look at the "new" evidence in isolation.  Instead, the court makes "a holistic judgment about 'all the evidence,'" including "how reasonable jurors would react to the overall, newly supplemented record."  *House v. Bell*, 547 U.S. 518, 539 (2006) (quoting *Schlup*, 513 U.S. at 328).  Despite his speculation about police coercion of, or of undisclosed deals with, certain witnesses, the trial evidence showed that Mamou intended to steal drugs from the victim's friends; a shoot-out resulted; and Mamou shot three men, killing one.  Mamou fled in a stolen car with Mary Carmouche inside.  Mamou was the last person seen with her.  The only exculpatory evidence was Mamou's own account of what happened and evidence contradicted his account.  The evidence included Mamou's statements to two cousins suggesting that he killed Mary Carmouche.  Mamou's new arguments, while providing a stronger basis to challenge or impeach some of the trial testimony, do open the actual-innocence gateway or otherwise meet the burden of showing actual innocence.[26]  Mamou has not shown actual innocence and has not overcome the procedural bar as to claims 2 and 3.

---

[26]     For those same reasons, the court would deny federal habeas relief even if the merits of claims two and three were fully available for federal review.

C.          **Does Mamou Overcome the Procedural Bar By Showing Cause and Prejudice Under *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309 (2012)?**

In *Martinez*, the Supreme Court held that ineffective representation by a state habeas attorney may amount to cause excusing procedural default if state procedural law requires that an ineffective assistance of trial counsel claim be raised in an initial state habeas application. In *Trevino v. Thaler*, ___ U.S. ___. 133 S. Ct. 1911 (2013), the Supreme Court extended *Martinez* to Texas cases. Neither *Martinez* nor *Trevino* help Mamou. The *Martinez* exception precludes deficiencies in habeas representation from opening the door to federal review in this case. *Martinez* and *Trevino* create "a narrow exception," inapplicable to "claims [that] do not pertain to the effectiveness of counsel." *Vasquez v. Stephens*, 597 F. App'x 775, 778 (5th Cir. 2015); *see also Martinez*, 132 S. Ct. at 1315; *Wilkins v. Stephens*, 560 F. App'x 299, 306 n.44 (5th Cir. 2014); *Reed v. Stephens*, 739 F.3d 753, 778 (5th Cir. 2014). Under current circuit authority, *Martinez* does not allow review of Mamou's second and third claims. The respondent's motion for summary judgment dismissing claims 2 and 3 is granted, and these claims are dismissed.

## IV.    Can Mamou Proceed on His Unexhausted Claims? (Claims 4, 5, 6, 7, 8, and 14)

Mamou raises these claims for the first time on federal habeas review. In claim 4, Mamou contends that trial counsel provided ineffective representation in failing to challenge, test, and cross-examine the prosecution's firearms and fingerprints experts. Four claims–claims 5, 6, 7, and 8–assert that trial counsel provided ineffective representation:

- in the pretrial stage by rushing to trial without requesting a continuance (claim 5(a)), failing to file unspecified pretrial motions (Claim 5(b)); failing to investigate firearms evidence (Claim 5(c)), and failing to engage in adequate discovery (Claim 5(d));[27]

- in the guilt phase, by failing to object to *voir dire* instructions that allegedly

---

[27]    Mamou has withdrawn claims 5(e), 5(f), and 6(b). (Docket Entry No. 39 at 94, 97).

disposed jurors against Mamou and in favor of the death penalty (Claim 6(a)), allowing the trial court to excuse two jurors who said that they could never deliver a death sentence (Claim 6(c)), object to autopsy photographs (Claim 6(d)), and not adequately responding to the prosecutor's main theme in closing arguments (claim 6(e)); and

• in the penalty phase, by failing to present mitigating evidence (Claim 7(b)).

Mamou also alleges that appellate counsel provided ineffective representation by failing to: (1) argue that the trial court erred by allowing Baldwin to testify as an expert (Claim 8(a)); (2) challenge the admissibility of victim-impact testimony (Claim 8(b)); and (3) raise issues relating to testimony about parole eligibility and the burden of proof in answering the mitigation special issue (Claim 8(c)).  Finally, Mamou contends that the cumulative effective of the alleged errors requires federal habeas relief (Claim 14).

The threshold question is whether the court can review these unexhausted claims.

### A.      The Consequences of Failing to Exhaust

Mamou did not raise claims 4 through 8 and 14 in state court.   Federal courts "rigorously enforce[] total exhaustion" and require inmates to purse "full relief first from the state courts . . . ." *Rose v. Lundy*, 455 U.S. 509, 518-19 (1982); 28 U.S.C. § 2254(b)(1)..   AEDPA codifies the exhaustion requirement.

An inmate who files a federal petition that includes unexhausted claims usually cannot return to a Texas state court on those claims because the Texas abuse-of-the-writ rule doctrine, codified at TEX. CODE CRIM. PRO. art. 11.071 § 5, stringently limits successive state habeas actions.  "A procedural default . . . occurs when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'"  *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir.1997) (quoting *Coleman*, 501 U.S. at 734 n. 1); *see also Steele v. Young*, 11 F.3d 1518,

1524 (10th Cir. 1993) (when "it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review").

The Texas courts would not allow Mamou to raise his unexhausted federal clams in a successive state habeas application. Procedural bar forecloses federal review unless Mamou shows cause and prejudice or a fundamental miscarriage of justice. But he has not shown, and cannot show, his actual innocence of capital murder. Ths issue is whether Mamou has shown cause and prejudice to overcome the procedural bar of his unexhausted claims.

### B.     Does Ineffective State Habeas Representation Overcome the Procedural Bar?

Mamou argues that deficiencies in his habeas counsel's representation allow him to overcome the procedural bar of his ineffective-assistance claims under *Martinez*. The cause test uses the *Strickland* standard. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (to show cause "[n]ot just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution"); *Murray v. Carrier*, 477 U.S. 478, 492 (1986) ("Attorney error short of ineffective assistance of counsel does not constitute cause[.]"). In any context, "[s]urmounting *Strickland*'s high bar is never an easy task[.]" *Padilla v. Kentucky*, ___ U.S. ___, 130 S. Ct. 1473, 1485 (2010). To meet the *Strickland* standard in the habeas context, the petitioner must do more than identify issues or claims that habeas counsel did not raise and are now barred. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014) ("generalized allegations are insufficient in habeas cases" to meet the *Martinez* exception); *Smith v. Murray*, 477 U.S. 527, 535 (1986) ("'[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.'") (quoting *Carrier*, 477 U.S. at 486-87). A state habeas attorney "need not (and

41

should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal" because "counsel cannot be deficient for failing to press a frivolous point." *Vasquez v. Stephens*, 597 F. App'x 775, 779(5th Cir. 2015) (quotations omitted).

Under *Martinez*, a petitioner may meet the cause element by showing "(1) that his claim of ineffective assistance of counsel at trial is substantial–i.e., has some merit–and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). The federal court's focus is on state habeas counsel's performance. *See Matthews v. Davis*, 2016 WL 6543501, at *6 (5th Cir. Nov. 3, 2016); *Martinez v. Davis*, 2016 WL 3509589, at *8 (5th Cir. June 24, 2016); *Trevino v. Davis*, 829 F.3d 328 (5th Cir. 2016). To show that state habeas counsel's deficiency resulted in actual prejudice, a petitioner must show harm to his case"significantly greater than that necessary" to establish plain error on direct review. *Carrier*, 477 U.S. at 493-94. In this circuit, "actual prejudice" requires the petitioner to "establish not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *see also Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013); *Barrientes v. Johnson*, 221 F.3d 741, 769 (5th Cir. 2000). When reviewing "whether state habeas counsel was ineffective in failing to present the trial court ineffectiveness claim in the state habeas proceeding," "[p]rejudice . . . means that [a petitioner] must show a reasonable probability that he would have been granted state habeas relief had his habeas counsel's performance not been deficient."[28]

Mamou raises a stand-alone claim for ineffective habeas representation (Claim 9) which is

---

[28]      *Martinez v. Davis*, 653 F. App'x 308, 318 (5th Cir. 2016).

42

not cognizable on federal habeas review.  His briefing and the record on Claim 9, however, provide context for his allegations about habeas counsel's representation.

In May 2000, the trial court appointed Roland Brice Moore III to represent Mamou on state habeas review.  Mamou emphasizes that "[s]tate court billing records reveal that little investigation was carried out by Mr. Moore," based primarily on the fact that Moore only billed the state court for 142.5 hours of time.  (Docket Entry No. 129); *see also* State Habeas Record at 98-100 (Moore's voucher through April 2001).  Mamou contends that "there is little evidence of investigation" with the exception of "procuring a jury list, sending out 'jury letters; and two meetings with the investigator. . . ."  (Docket Entry No. 39 at 129).

The record undermines Mamou's claim.  The record shows the efforts his habeas counsel, Moore, made to develop the claims at issue.  Moore filed a Freedom of Information Request with the Harris County District Attorneys Office, seeking details about the kidnapping and death.  State Habeas Record at 59.  In his briefs, Moore stated that he was investigating the extraneous murder that the State relied on in the penalty phase, and that he had retained a mental-health expert who was reviewing Mamou's records.  State Habeas Record at 59.  Moore also secured affidavits from other attorneys to support Mamou's claims that trial counsel had provided ineffective representation.  State Habeas Record at 53, 68-71.  Moore moved for additional time to file the habeas application to allow him to investigate further, which he did.  State Habeas Record at 62.[29]

Moore filed Mamou's habeas application on April 18, 2001.  State Habeas Record at 1-56.  Mamou's state habeas application raised 8 claims in 55 pages.  Moore later filed an *ex parte* motion for additional funds to retain experts and an investigator.  State Habeas Record at 90.  The state court

---

[29]        Mamou's state habeas investigator filed a voucher listing her efforts in this case.  State Habeas Record at 93-94.

authorized the funds for an investigator.  State Habeas Record at 97.  In May 2003, Moore moved

for the appointment of a ballistics expert, Dr. James Luther Booker.  State Habeas Record at 167-69.

The habeas court granted the motion.  State Habeas Record at 170.  Moore sought $2775.00 in fees,

in addition to the $16,200.00 in attorney and expert fees he had already been paid.  State Habeas

Record at 179.  In 2003, Moore also filed a motion for postconviction DNA testing under Chapter

64 of the Texas Code of Criminal Procedure.  State Habeas Record at 193.  The record does not

disclose Moore's further efforts to get DNA testing, but it does not appear that the motion was

granted.

In June 2003, Mamou filed a *pro se* habeas application.  The record does not divulge the full

extent of the problems that existed between Mamou and his habeas counsel.  Mamou told the state

habeas court only that "Mr. Moore's refusal to assist [Mamou] in filing [his] Subsequent Writ

ma[de] it necessary [for him to] file [the] pro se writ."  State Habeas Record # 3 at 26.  The trial

court granted Mamou's request for new counsel and substituted David K. Sergi as habeas counsel

on January 19, 2007.  State Habeas Record at 177.  On October 29, 2013, Sergi filed a second state

habeas application raising four issues, all of which Mamou renews in some form on federal habeas

review.

This record does not support Mamou's claim that Moore "incontestably failed to perform the

basic tasks necessary to identifying the factual bases for a habeas corpus application, much less the

investigation necessary to plead and prove any habeas claims." (Docket Entry No. 39 at 130).  Even

though the initial habeas application does not fully reflect his efforts, Moore investigated extra-

record claims and obtained and using an investigator, a mental-health expert, and a ballistics expert.

Mamou's specific arguments for showing cause and prejudice are analyzed based on this record and

the legal standards.

44

1.   *The Claim that Trial Counsel Failed to Challenge Ballistics Evidence (Claims 4(a) through (h); 5(c) and (d)).*

Mamou challenges trial counsel's approach to the ballistics evidence.[30]  Mamou's counsel requested, and the trial court approved, the appointment of a ballistics expert.[31]  The record does not reveal the specific conclusions that the expert reached.  State habeas counsel also consulted a ballistics expert.  (Docket Entry No. 39 at 130).  The record does not show any evidence or basis to conclude that trial or habeas counsel were required to further investigate the magazine markings.

Mamou claims that habeas counsel should have raised a *Strickland* claim based on Baldwin's testimony because: (1) "his testimony has been shown to be false" in other cases (Docket Entry No. 39 at 47-48); (2) "Baldwin was suspended in a disciplinary action in 2003, due to various faults in supervising the firearms division" (Docket Entry No. 39 at 50); and (3) academic literature has condemned using "magazine marking" as a method of firearms identification, particularly in cases where the police have not recovered the weapon.  Most of that information was not available or not well-established, or both, when the habeas petition was filed in 2001.  The respondent observes that "[v]irtually all of the factual support relied upon by Mamou in his effort to prove counsel deficient postdates his trial."  (Docket Entry No. 49 at 58).  Mamou has not identified anything contemporaneous to trial or habeas review generally condemning Baldwin's expertise or conclusions.  The record shows that the discipline Baldwin received for his administration of a crime lab occurred years after Mamou's trial.  The academic literature on which Mamou bases his wholesale attack on the magazine-makings evidence was published long after the trial.  While some

---

[30]   Mamou's briefing states that "[d]efense counsel failed to conduct an adequate pre-trial investigation" and "failed to obtain timely and adequate discovery," but both claims only discuss trial counsel's approach to the firearms evidence.  (Docket Entry No. 39 at 93).

[31]   Mamou states that: "Mr. Moore has informed undersigned counsel that he contacted the trial ballistics expert Max Courtney, and a motion for his appointment was filed.  However, Mr. Moore does not recall his findings and the record does not indicate that he made any findings."  (Docket Entry No. 39 at 130 n. 91).

of the underlying theories were possibly known at the time of trial, they were not well-established and remained disputed within the discipline. Mamou has not shown that state habeas counsel, much less trial counsel, had or had available the information to challenge Baldwin's ballistics analysis or conclusions.

Even assuming that Mamou has shown that a reasonable habeas attorney would have raised a *Strickland* claim challenging Baldwin's expertise, testing, and conclusions, he has not shown actual prejudice from the failure to do so. The magazine markings were not the only forensic evidence connecting Mamou to the people he shot on Lantern Point Drive and to Mary Carmouche's death. Mamou's arguments do not challenge Baldwin's testimony that bullets taken from Gibson's body and Holley's arm shared the same "class characteristics" as the bullet recovered from Mary's body. Tr. Vol. 20 at 112. That testimony did not conclusively match the slugs to a weapon, but it connected the Lantern Point Drive shootings with Mary Carmouche's killing.

Mamou incorrectly argues "that there was no case for capital murder without Baldwin's testimony . . . ." (Docket Entry No. 39 at 45). The forensic evidence was far from the only evidence of Mamou's guilt. Testimony that Mamou was the last person seen with Mary Carmouche created a strong probability that Mamou kidnapped and killed her. Mamou's own inculpatory boasts connect him to the shooting. The record shows no basis to conclude that, even if counsel had vigorously challenged the ballistics evidence, the outcome would have been different.

Mamou has not shown deficient performance or prejudice on either trial or habeas counsel's handling of the State's ballistics testimony. He has not, and cannot, overcome the procedural bar to Claim four.

46

>    2.    *The Claim that Trial Counsel Failed to Challenge Fingerprint Evidence*
>          *(Claim 4(i)).*

Rafael Saldivar, a fingerprint examiner for the Houston Police Department, identified two latent prints on the outside of the passenger door on the blue Lexus as Dion Holley's.  Tr. Vol. 20 at 82.  Saldivar could not identify two other prints.  He examined fingerprints from the cut-up newspaper clippings found at the Lantern Point Drive location and testified that the prints were Mamou's.  Tr. Vol. 20 at 87-88.  Mamou contends that his trial counsel should have challenged Saldivar's testimony on the basis that he had been reprimanded two years earlier for misidentifying fingerprints in another case.  (Claim 4(I)).  Mamou's claim is available for federal review if habeas counsel's failure to raise it violated *Strickland*.

The record shows that if trial counsel had cross-examined Saldivar about error in another case, there is no basis to conclude that Saldivar lacked the experience or expertise to testify as a fingerprint expert in this case.  Nor is there any record evidence that Saldivar made an error in this case.  Specifically, there is no basis to infer that Saldivar misidentified Mamou's fingerprint on the cut-up newspapers found at Lantern Hill Drive.  Both Johnson and Dodson testified that Mamou bought newspapers, cut them into strips, and used those in the robbery.  Tr. Vol. 19 at 23, 170.  Their testimony independently linked Mamou to the cut-up newspaper.  Mamou has shown neither deficient nor prejudicial representation based on trial counsel's failure to ask Saldivar about an error in another case.

>    3.    *The Claim that Trial Counsel's Pretrial Investigation Was Deficient (Claim*
>          *5).*

Mamou makes broad allegations about trial counsel's pretrial efforts, but he does not provide specifics about what trial counsel should have done differently or how that would have affected the trial outcome.  Mamou contends that trial counsel failed to file pretrial motions, but he does not

specify what motions should have been but were not filed.  Mamou argues that trial counsel should have asked for a continuance, but not requesting more time does not amount to constitutionally deficient representation without evidence of what more time would have permitted.  Mamou contends that more time would have allowed counsel to do what his other ineffective-assistance claims allege he should have done.  Mamou's other *Strickland* arguments subsume his claim that trial counsel should have sought a continuance.  The allegations in Mamou's fifth claim provide no separate *Strickland* claim.

> 4.   *The Claim that Trial Counsel Made Numerous Errors in the Liability Phase (Claim 6).*

Mamou's sixth ground for relief contends that his trial counsel provided ineffective representation in the liability phase.  Mamou specifically faults trial counsel for failing to: object to voir dire instructions that allegedly disposed jurors against Mamou and in favor of the death penalty (claim 6(a)); prevent the trial court from excusing two jurors who said that they could never deliver a death sentence (claim 6(c)); object to autopsy photographs (claim 6(d)); and adequately respond to the prosecutor's main theme in closing argument (claim 6(e)).  The claims lack substance under *Martinez* or as an underlying *Strickland* claim.

In claim 6(a), Mamou challenges statements that the trial court made, but to which trial counsel did not object.  For each statement, however, Mamou misconstrues and overstates or fails to place the statement in context.  Mamou faults the trial court for "[c]omparing Mamou to O.J. Simpson," (Docket Entry No. 39 at 95), when the trial court used that example to tell jurors that they would not be sequestered.  Tr. Vol. 3 at 4.  Mamou contends that trial counsel should have objected to the trial court mentioning that jurors were like pallbearers, when the trial court in context innocuously said that "[b]eing a juror in a case, whether it's a criminal or civil case, is a lot like

being a pallbearer at a funeral. You're in a place you don't want to be. You're doing something you don't want to do. You're not so sure you know what's expected of you." Tr. Vol. 3 at 4. Mamou faults the trial judge for telling jurors that the death penalty was the appropriate punishment, but the trial court actually merely mentioned that the State was "going to seek the appropriate punishment," and quickly explained that "[w]hether you, the jury, agree with what they're going to want or not, that's your call." Tr. Vol. 3 at 5. Mamou contends that the trial judge "suggested that the jury might deliberate only one hour." (Docket Entry No. 39 at 95). The record shows that the trial judge said that some jurors may take an hour in some cases, but other jurors on cases would take much longer. Tr. Vol. 3 at 8. The trial court in no way suggested that jurors should rush to verdict in Mamou's case. Finally, Mamou contends that the trial court "set up the penalty phase determination in a manner unfavorable to the defense" by comparing the jury's role to how a parent deals with a disobedient child. (Docket Entry No. 39 at 95). The judge's comments early in the trial process, however, told jurors that his example was an "oversimplification," and the judge later correctly instructed jurors about mitigating evidence.

In each instance, viewed in context, the trial court's comments were minor, fleeting, and innocuous, given the evidence and instruction that followed. Reasonable attorneys could come to different conclusions about whether to object and risk drawing undue attention to these innocuous comments. And the record makes clear that no prejudice resulted from failing to object. "The comments of the court . . . during *voir dire* were surely a distant and convoluted memory by the time the jurors began their deliberations . . . ." *Penry v. Johnson*, 532 U.S. 782, 802 (2001). Mamou has not shown, and cannot show, either *Strickland* deficient performance or prejudice in trial counsel's failure to object to the trial court's comments.

In claim 6(c), Mamou contends that trial counsel should have objected to "the exclusion of

only those jurors opposed to the death penalty."  (Docket Entry No. 39 at 97).  Prospective jurors

may be excluded if they "would automatically vote against the imposition of capital punishment

without regard to any evidence," *Witherspoon v. Illinois*, 391 U.S. 510, 522 n. 21 (1968), but not

if they are only "hesitant in their ability to sentence a defendant to death." *Morgan v. Illinois*, 504

U.S. 719, 732 (1992).  Mamou alleges that trial counsel should have objected to the exclusion of two

jurors:

> The trial court repeatedly asked the jury pool whether there were any potential jurors
> who could never impose the death penalty, regardless of the evidence.  *E.g.*, 3 RR
> 43.  Two potential jurors answered affirmatively.  3 RR 43.  The potential jurors
> were not asked whether any would always impose the death penalty, regardless of
> mitigating evidence.

(Docket Entry No. 39 at 97).  Mamou argues that he was unfairly denied impartial jurors because

trial counsel did not object to the two jurors' dismissal without being "asked whether [they] would

always impose the death penalty, regardless of mitigating evidence."  (Docket Entry No. 50 at 48).

After the trial court questioned the jury panel, the parties agreed to dismiss several potential

jurors "for various reasons."  Tr. Vol. 3 at 50.  The record shows that Mamou himself agreed to

dismiss these jurors.  The trial court asked each attorney to state their agreement to excuse the jurors

on the record.  Tr. Vol. 3 at 50.  The trial court then asked Mamou if he personally "request[ed] each

of those [jurors] be excused."  He responded "Yes, sir."  Tr. Vol. 3 at 50.  Mamou cannot fault trial

counsel for decisions he agreed to in open court.  *See Faretta v. California*, 422 U.S. 806, 819

(1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the

accused; it grants to the accused personally the right to make his defense."); *Moore v. Johnson*, 194

F.3d 586, 606 (5th Cir. 1999).  Mamou provides no reason to infer hat his own agreement to

dismissing the prospective jurors resulted from ineffective representation.

Mamou alleges that trial counsel failed to object to autopsy photographs of Mary

Carmouche. (Claim 6(d)).  Mamou complains that the photographs were gruesome and redundant, Mamou does not identify any basis to infer that the photos were not admissible, were more prejudicial than probative, or were otherwise inadmissible.  The Fifth Circuit "has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000).  Mamou has failed to show deficient performance, much less prejudice, in habeas counsel's failure to raise a *Strickland* claim relating to the photographs.

Mamou contends in claim 6(e) that trial counsel provided ineffective representation by not responding to a central theme of the prosecution's closing argument,"that the prosecution witnesses who had testified against Mamou had no reason to lie and put capital murder charges on Mamou." (Docket Entry No. 39 at 101).  Mamou argues that trial counsel should have told jurors that the witnesses had "every reason in the world . . . to transfer the blame to Mamou . . . and thereby deflect a capital murder charge away from themselves."  (Docket Entry No. 39 at 101).  Trial counsel, however, did challenge the honesty of the State's witnesses in his closing arguments.  Tr. Vol. 21 at 18-20.  Trial counsel told jurors that the witnesses had crafted their stories to avoid criminal charges.  Tr. Vol. 18 at 28-29.  Trial "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).  Courts recognize that "[j]udicial review of a defense attorney's summation is therefore highly deferential." *Id.*  There is no record basis to find that state habeas counsel was deficient for not raising a *Strickland* claim based on counsel's closing argument.

Mamou has not shown deficient performance or prejudice in trial counsel's or state habeas counsel's failure to raise the arguments asserted in claim 6.

5.      *The Claim of Trial Counsel's Deficiencies in the Penalty Phase (Claim 7(b)).*

Mamou contends that trial counsel did not put on a sufficiently strong case against a death

sentence.  Trial counsel called seven family members and friends in the penalty phase.  Through

those witnesses, the defense presented evidence of Mamou's poverty-stricken childhood and his

good characteristics as an adult.  Mamou criticizes trial counsel for the brevity of the mitigating

testimony.  Mamou argues that trial counsel should have called three additional witnesses:

> 1) Claudia Milton, who could have testified about the many charitable good deeds
> Mamou performed in Sunset, Louisiana (Exhibit 24); 2) Christopher Terrill Mamou,
> Mamou's brother, who could have testified to his brother's emotional and financial
> support of their family (Exhibit 25); and  3) Mark Benoit, a friend, who could have
> testified as to Mamou's generosity for friends, family and the community (Exhibit
> 26).

(Docket Entry No. 39 at 140).

The record reveals that, contrary to Mamou's claims, trial counsel presented a robust case

against the death penalty.  "The mitigation evidence presented at trial, in terms of both quantity and

quality, would not suggest to a reasonable habeas attorney that . . . trial counsel rendered ineffective

assistance."  *Matthews v. Davis*, No. 15-70028, 2016 WL 6543501, at *6 (5th Cir. Nov. 3, 2016).

Mamou has not shown that a reasonable habeas attorney would need to investigate a *Strickland*

claim challenging trial counsel's penalty-phase efforts.

Even if habeas counsel should have investigated more, the mitigating theories supported by

the new witness testimony vary little from what trial counsel put before the jury.  Mamou's uncle

testified that Mamou was generous to a fault.  Tr. Vol. 12 at 103-04.  An ex-girlfriend described

Mamou's generosity to his family and their dependence on him to pay bills.  Tr. Vol. 23 at 84.  A

sister described Mamou's generous acts.  Tr. Vol. 23 at 72, 76.  Mamou's mother described how he

supported his family.  Tr. Vol. 23 at 46.  Mamou's argument here that trial counsel should have

augmented the mitigating evidence "comes down to a matter of degrees" and is "even less susceptible to judicial second-guessing" than other claims. *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999). The added potential testimony Mamou describes is "largely cumulative and differ[s] from the evidence presented at trial only in detail, not in mitigation thrust." *See Villegas v. Quarterman*, 274 F. App'x 378, 384 (5th Cir. 2008). The case law makes clear that no *Strickland* error is shown when trial counsel presented similar mitigating evidence at trial, even if only in outline form. *See Wong v. Belmontes*, 558 U.S. 15, 22 (2009); *Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007); *Rodriguez v. Quarterman*, 204 F. App'x 489, 501 (5th Cir. 2006); *Alexander v. Quarterman*, 198 F. App'x 354, 359-60 (5th Cir. 2006); *Parr v. Quarterman*, 472 F.3d 245, 257-58 (5th Cir. 2006). Mamou's trial counsel did more than present mitigating evidence in outline form.

Given that the new mitigating evidence Mamou identifies is so similar to that presented at trial, Mamou has also not shown a reasonable probability that jurors would have answered the special issues differently had trial counsel presented the added evidence. The record makes clear that Mamou has not shown, and cannot show, that state habeas counsel provided deficient or prejudicial performance by not raising a claim faulting trial counsel's penalty-phase representation.

### C.     Did Appellate Counsel Provide Deficient Performance? (Claim 8)

Mamou raises an unexhausted claim challenging appellate counsel's representation. The threshold issue is whether a procedural bar precludes federal habeas consideration of this claim and whether, even if it does not, the claim merits federal habeas relief.

In claim 8(a), Mamou alleges that appellate counsel provided ineffective representation by failing to raise on appeal trial counsel's failure to object to Baldwin's testimony. Mamou has

conceded that claim 8(a) lacks merit.  (Docket Entry 50 at 62).  Mamou's petition also raises two other issues, that appellate counsel failed to challenge the admissibility of victim-impact testimony (claim 8(b)), or to raise issues relating to the testimony about parole eligibility and the burden of proof in answering the mitigation special issue (claim 8(c)).  Mamou has withdrawn claim 8(b) and concedes that precedent does not support it.  (Docket Entry No. 50 at 62-63).  Reviewing the merits of all Mamou's allegations against the record of appellate counsel's performance shows that, even if procedural law did not bar full federal consideration, he has not shown that he merits habeas relief on those arguments.

### D.     Does Cumulative Error Require Habeas Relief? (Claim 14).

Mamou raises an unexhausted claim that the cumulative effect of the errors requires federal habeas relief, even if the specific errors do not justify it.  (Claim 14).  But Mamou's inability to show a basis for relief on any claim, whether because of procedural bar or the absence of merit, precludes granting relief on this claim.  "[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'"  *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Because none of Mamou's claims has merit, he has not shown, and cannot show, anything to cumulate.  *See Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (acknowledging that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised"); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Zero times twenty is still zero.").

Mamou is not entitled to the relief he seeks.  The respondent is entitled to summary

judgment.  Final judgment is entered by separate order.

## CERTIFICATE OF APPEALABILITY

AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b).  Mamou has not sought a certificate of appealability, but this court may consider the issue on its own, *see Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000), and address whether an appeal is justified.  *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2).  This requires the petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  The petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El*, 537 U.S. at 336.  When the denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

After careful review of the pleadings and the applicable law, the court concludes that reasonable jurists would not find that this court was incorrect in its procedural rulings or that the court's assessment of the constitutional claims was debatable or wrong.  Because Mamou does not otherwise allege facts showing that his claims could be resolved differently, no certificate of appealability is issued.

**CONCLUSION**

Mamou has not shown entitlement to federal habeas relief.  The respondent's motion for summary judgment is granted, Mamou's petition is denied, and this case is dismissed with prejudice. No certificate of appealability is issued.

SIGNED on December 8, 2016, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge