*73708*

REPORTER'S RECORD

VOLUME 1 OF 25 VOLUMES

TRIAL COURT CAUSE NO. 800112

| | | |
|---|---|---|
| CHARLES MAMOU, JR. | ) | IN THE DISTRICT COURT |
| Appellant | ) | |
| VS | ) | HARRIS COUNTY, TEXAS |
| | ) | |
| THE STATE OF TEXAS | ) | |
| Appellee | ) | 179TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MASTER INDEX

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 7th day of September, 1999, the following proceedings came on to be heard

in the above-entitled and numbered cause before the Honorable Bob Burdette and Judge

Michael Wilkinson, Judge Presiding, held in Houston, Harris County, Texas:

Proceedings reported by computer aided transcription/stenograph machine.

**FILED IN**
**COURT OF CRIMINAL APPEALS**

MAR 2 1 2000

Troy C. Bennett, Jr., Clerk

**ORIGINAL**



**DISK**
**ENCLOSED**

# APPEARANCES

MR. LYN MCCLELLAN

SBOT NO. 13396100

MS. CLAIRE CONNORS

SBOT NO. 0470500

Assistant District Attorneys

201 Fannin

Houston, Texas 77002

Phone: 713.755.5800

ATTORNEYS FOR THE STATE OF TEXAS


MR. WAYNE HILL

SBOT NO. 59656300

4515 Southwest Freeway

Houston, Texas 77027

PHONE: 713.623.8312

MR. KURT WENTZ

SBOT NO. 21179300

5629 W FM 1960

Houston, Texas 77069

PHONE: 281.587.0088

ATTORNEYS FOR DEFENDANT

|  | PAGE | VOL. |
|---|---|---|
| Master Index |  | 1 |
| September 7, 1999    Pretrial Hearing |  | 2 |
| Arraignment | 3 | 2 |
| Motion to Voir Dire on Parole Law granted | 3 | 2 |
| Motion to disclose existence of any testing, questioning, surveillance or observations granted if any exists | 4 | 2 |
| Motion for Jury list granted | 5 | 2 |
| Proceedings concluded | 7 | 2 |
| Court Reporter's certificate | 8 | 2 |
| September 8, 1999    Voir Dire Examination |  | 3 |
| Panel Voir Dire | 3 | 3 |
| Proceedings concluded | 56 | 3 |
| Court Reporter's certificate | 57 | 3 |
| See supplement of Wendy Wilkerson |  | 4 |
| See supplement of Wendy Wilkerson |  | 5 |
| September13, 1999    Voir Dire Examination |  | 6 |
| Panel Voir Dire | 3 | 6 |
| Proceedings concluded | 63 | 6 |
| Court Reporter's Certificate | 64 | 6 |
| September 14, 1999   Voir Dire |  | 7 |

| Venirepersons | Court | State | Defense |  |
|---|---|---|---|---|
| Lynne Warren Cantrell | 34 | 36 | 52 | 7 |
| Katheryne M. Stephens | 71 | 74 | 88 | 7 |
| Damietta L. Landry | 105 | 108 | 123 | 7 |

|                              | Court | State | Defense | PAGE | VOL. |
|------------------------------|-------|-------|---------|------|------|
| Katherine Marie Waller       | 137   | 140   | 155     |      | 7    |
| Michael Evans                | 170   | 173   | 184     |      | 7    |
| Michele Beasley              | 199   | 203   | 210     |      | 7    |
| Cecilia Fine                 | 219   | 224   | 232     |      | 7    |
| Proceedings concluded        |       |       |         | 244  | 7    |
| Court Reporter's Certificate |       |       |         | 245  | 7    |
| September 15, 1999   Voir Dire Examination | |  |     |      | 8    |
| Panel Voir Dire              |       |       |         | 3    | 8    |

| Venirepersons                | Court | State | Defense |      |      |
|------------------------------|-------|-------|---------|------|------|
| Vera Saldana Garcia          | 45    | 48    | 60      |      | 8    |
| James Thomas Pryor           | 73    | 75    |         |      | 8    |
| Rose Crawford Turner         | 78    | 80    | 94      |      | 8    |
| Thomas Eugene Smith          | 110   | 114   |         |      | 8    |
| Donald Nelson                | 126   | 131   | 146     |      | 8    |
| Douglas Polega               | 153   |       |         |      | 8    |
| Proceedings concluded        |       |       |         | 156  | 8    |
| Court Reporter's Certificate |       |       |         | 157  | 8    |
| September 16, 1999   Voir Dire Examination | |  |     |      | 9    |
| Panel Voir Dire              |       |       |         | 3    | 9    |

| Venirepersons                | Court | State | Defense |      |      |
|------------------------------|-------|-------|---------|------|------|
| Steven Allen Wiedmann        | 45    | 50    |         |      | 9    |
| Zenobia Prince               | 53    | 56    | 69      |      | 9    |
| Suzette Yvette Barr          | 82    | 85    | 102     |      | 9    |
| Gilbert Cantu                | 117   | 119   | 121     |      | 9    |
| Gregory Adams                | 122   | 124   | 134     |      | 9    |
| Proceedings concluded        |       |       |         | 146  | 9    |
| Court Reporter's Certificate |       |       |         | 147  | 9    |
| September 17, 1999   Voir Dire Examination | |  |     |      | 10   |

|                                      |        |        |         | PAGE | VOL. |
|--------------------------------------|--------|--------|---------|------|------|
| Panel Voir Dire                      |        |        |         | 3    | 10   |
| Venirepersons                        | Court  | State  | Defense |      |      |
| Charles Gilbert                      | 44     | 45     | 57      |      | 10   |
| Elyse Conner Sony                    | 69     | 71     | 80      |      | 10   |
| Stacie Cokinos                       | 91     | 91     | 101     |      | 10   |
| Panel Voir Dire                      |        |        |         | 110  | 10   |
| Court concluded                      |        |        |         | 166  | 10   |
| Court Reporter's Certificate         |        |        |         | 167  | 10   |
| September 20, 1999   Voir Dire Examination |  |      |         |      | 11   |
| Panel Voir Dire                      |        |        |         | 4    | 11   |
| Venirepersons                        | Court  | State  | Defense |      |      |
| Glen Dinkins                         | 46     | 48     | 56      |      | 11   |
| Matthew Taylor                       | 67     | 71     |         |      | 11   |
| Linda Kay Cook                       | 73     | 75     | 90      |      | 11   |
| Judith Lynne Barnett                 | 103    | 105    | 116     |      | 11   |
| Latonya Harris                       | 123    | 127    | 135     |      | 11   |
| Proceedings concluded                |        |        |         | 141  | 11   |
| Court Reporter's Certificate         |        |        |         | 142  | 11   |
| September 21, 1999   Voir Dire Examination |  |      |         |      | 12   |
| Panel Voir Dire                      |        |        |         | 3    | 12   |
| Venirepersons                        | Court  | State  | Defense |      |      |
| Houston Norman Hamilton              | 49,79  | 51     | 67,84   |      | 12   |
| Joyce Stoner Williams                | 86,97  | 91,100 | 110     |      | 12   |
|                                      | 105    |        |         |      |      |
| Nohemy Bonilla                       | 111    | 115    | 125     |      | 12   |
| Linda Deaton                         | 131    | 133    | 140     |      | 12   |
| Traci Lee Karam                      | 149    | 151    | 169     |      | 12   |
| Joseph Michael Mathews               | 182    | 188    | 197     |      | 12   |
| William Glenn Kelly                  | 210    | 214    | 224     |      | 12   |
| Wesley Dwayne Mikle                  | 231    | 234    | 243     |      | 12   |

|  | | | | PAGE | VOL. |
|---|---|---|---|---|---|
| Proceedings concluded | | | | 246 | 12 |
| Court Reporter's Certificate | | | | 247 | 12 |
| September 22, 1999    Voir Dire Examination | | | | | 13 |
| Panel Voir Dire | | | | 3 | 13 |
| Venirepersons | Court | State | Defense | | |
| Rita Frame Shotwell | 44 | 45 | 61 | | 13 |
| Roland Thomas Volker | 68 | 70 | 82 | | 13 |
| Evelyn Michka | 93 | 95 | 107 | | 13 |
| Proceedings concluded | | | | 119 | 13 |
| Court Reporter's Certificate | | | | 120 | 13 |
| September 27, 1999    Voir Dire Examination | | | | | 14 |
| Panel Voir Dire | | | | 4 | 14 |
| Venirepersons | Court | State | Defense | | 14 |
| Brenda Dixon | 46 | 48 | 63 | | 14 |
| Roger Baumgarten | 73 | 75 | 89 | | 14 |
| Mary Jones Smith | 99 | 101 | 114 | | 14 |
| Michael Lee Smith | 124 | | | | 14 |
| Dale Hauck | 127 | 130 | 139 | | 14 |
| John Reeves | 144 | 147 | 149 | | 14 |
| Proceedings concluded | | | | 153 | 14 |
| Court Reporter's Certificate | | | | 154 | 14 |
| September 29, 1999    Voir Dire Examination | | | | | 15 |
| Jury selected | | | | 56 | 15 |
| Proceedings concluded | | | | 66 | 15 |
| Court Reporter's Certificate | | | | 67 | 15 |
| October 4, 1999    Trial-Guilt/Innocence | | | | | 16 |

| | PAGE | VOL. |
|---|---|---|
| Arraignment outside presence of Jury | 3 | 16 |
| Jury sworn | 4 | 16 |
| Arraignment with Jury present | 5 | 16 |
| Opening statement by Mr. McClellan | 5 | 16 |

| State's Witnesses | Direct | Cross | V. D. | |
|---|---|---|---|---|
| Kevin Walter | 19,37,62,152 | 77,163 | 36,61 | 16 |
| John Wayne McDonald | 170 | | | 16 |

| | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 195 | 16 |
| Court Reporter's Certificate | 196 | 16 |
| October 5, 1999     Trial-Guilt/Innocence | | 17 |

| State's Witnesses | Direct | Cross | V. D. | |
|---|---|---|---|---|
| John Wayne McDonald | 25,34 | 3,30 | | 17 |
| Jeff Cruser | 36,68 | 55,70 | | 17 |
| Oral L. Warren | 71 | 79 | | 17 |
| Detective Ted Bloyd | 85,127 | 100,132 | | 17 |
| Glen Riddle | 137,154 | 146,155 | | 17 |

| | PAGE | VOL. |
|---|---|---|
| Court concluded | 156 | 17 |
| Court Reporter's Certificate | 157 | 17 |
| October 6, 1999     Trial-Guilt/Innocence | | 18 |

| State's Witnesses | Direct | Cross | V. D. | |
|---|---|---|---|---|
| Dion Holley | 3,119,124 | 56,121,124 | | 18 |
| Alex Longoria | 125 | 131 | | 18 |
| Larry D. Foltz | 131,147 | 141,149 | | 18 |
| D.H. Couch | 151,169 | 164,169 | | 18 |
| G.J. Novak | 170,176 | 183 | 176 | 18 |

| | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 195 | 18 |
| Court Reporter's Certificate | 196 | 18 |
| October 7, 1999     Trial-Guilt/Innocence | | 19 |

|  |  |  |  | PAGE | VOL. |
|---|---|---|---|---|---|
| State's Witnesses | Direct | Cross | V. D. | | |
| G.J. Novak | 10 | 3 | | | 19 |
| Samuel L. Johnson | 14 | 49 | | | 19 |
| Howard Scott | 121,152,154 | 129,152,155 | | | 19 |
| Thad Badeaux | 157 | 162 | | | 19 |
| Terrence Dodson | 164,201 | 184,204 | | | 19 |
| Court concluded | | | | 207 | 19 |
| Court Reporter's Certificate | | | | 208 | 19 |
| October 8, 1999 | Trial-Guilt/Innocence | | | | 20 |
| State's Witnesses | Direct | Cross | V. D. | | |
| Anthony Trail | 3,31,33 | 15,32,33 | | | 20 |
| Pat Gibson | 34 | 36 | | | 20 |
| James Martin Carmouche | 40 | 44 | | | 20 |
| Dr. Roger Milton | 49 | 65 | | | 20 |
| Ralph Saldivar | 78 | 93 | | | 20 |
| Robert Baldwin | 101,122 | 113 | | | 20 |
| State rests | | | | 128 | 20 |
| Motion for instructed verdict denied | | | | 129 | 20 |
| Defense Witnesses | Direct | Cross | V. D. | | |
| Roger Ruffcorn | 129,134,139 | 135,139 | 133 | | 20 |
| Charles Harold Mamou, Jr. | 140,247 | 158 | | | 20 |
| Defense rests | | | | 252 | 20 |
| State's Witnesses | Direct | Cross | V. D. | | |
| Ted C. Bloyd | 252,263 269,275 | 255,266,273 | | | 20 |
| State closes | | | | 275 | 20 |
| Defense closes | | | | 275 | 20 |
| Proceedings concluded | | | | 278 | 20 |
| Court Reporter's Certificate | | | | 279 | 20 |

|  | PAGE | VOL. |
|---|---|---|
| October 12, 1999 Arguments of Counsel |  | 21 |
| Objections to charge denied | 3 | 21 |
| Motion for accomplice as a matter of law denied | 4 | 21 |
| Charge read | 5 | 21 |
| Closing by Mr. McClellan | 6 | 21 |
| Closing by Mr. Wentz | 15 | 21 |
| Closing by Mr. Hill | 23 | 21 |
| Closing by Mr. McClellan | 40 | 21 |
| Jury out for deliberations | 59 | 21 |
| Verdict received | 60 | 21 |
| Court adjourned | 61 | 21 |
| Court Reporter's Certificate | 62 | 21 |
| October 13, 1999        Punishment |  | 22 |

| State's Witnesses | Direct | Cross | V. D. |  |
|---|---|---|---|---|
| Dr. Eric Beyer | 3 |  |  | 22 |
| Troy James Hebert | 18,35 | 24,36 |  | 22 |
| Steven Hooper | 38 | 46 |  | 22 |
| Christopher D. Duncan | 52,60 | 57 |  | 22 |
| Joseph Melancon | 61 | 80 |  | 22 |
| Dr. Roger Milton | 105 |  |  | 22 |
| Yolanda Williams | 112 | 121 |  | 22 |
| Patricia Gibson | 127,136 | 135,137 | 123 | 22 |
| James Martin Carmouche | 138 | 154 |  | 22 |

| State rests |  |  | 156 | 22 |
|---|---|---|---|---|
| Request for instructed verdict denied |  |  | 157 | 22 |

| Defense Witnesses | Direct | Cross | V. D. |  |
|---|---|---|---|---|
| Dr. Walter Quijano | 158 | 180 |  | 22 |

| | | | | PAGE | VOL. |
|---|---|---|---|---|---|
| Proceedings concluded | | | | 189 | 22 |
| Court Reporter's Certificate | | | | 190 | 22 |
| October 14, 1999   Punishment | | | | | 23 |
| Defense Witnesses | Direct | Cross | V. D. | | |
| Dorothy Morgan | 3,19 | 15 | | | 23 |
| Motion in Limine denied | | | | 15 | 23 |
| Shannon Johnson | 21 | 27 | | | 23 |
| David Green | 31 | 34 | | | 23 |
| Angelice Mary Johnson | | | | | |
| Mamou | 36,70 | 52,71 | | | 23 |
| Michelle Mamou | 72 | | | | 23 |
| Sedonia Gotch | 79 | 86 | | | 23 |
| Joseph Dwight Savoie | 93,114 | 106,115 | | | 23 |
| Charles Mamou, Sr. | 115 | 126 | | | 23 |
| Proceedings concluded | | | | 135 | 23 |
| Court Reporter's Certificate | | | | 136 | 23 |
| October 15, 1999   Punishment | | | | | 24 |
| Motion requesting change in Jury charge denied | | | | 3 | 24 |
| Charge read | | | | 5 | 24 |
| Closing argument by Mr. McClellan | | | | 5 | 24 |
| Request for mistrial denied | | | | 8 | 24 |
| Closing argument by Mr. Hill | | | | 9 | 24 |
| Closing argument by Mr. Wentz | | | | 20 | 24 |
| Closing argument by Ms. Connors | | | | 29 | 24 |
| Closing argument by Mr. McClellan | | | | 40 | 24 |
| Request for mistrial denied | | | | 46 | 24 |

|  | PAGE | VOL. |
|---|---|---|
| Jury retires for deliberations | 48 | 24 |
| Request for instructed verdict denied | 48 | 24 |
| Verdict received | 49 | 24 |
| Statement by Witness | 50 | 24 |
| Sentencing | 51 | 24 |

| Witnesses | Court | Direct | Cross | |
|---|---|---|---|---|
| Angelice Mary Johnson Mamou | | 52 | 57 | 24 |
| Katherine Waller | 60 | | | 24 |
| Stacie Cokinos | 64 | | | 24 |
| Nohemy Bonilla | 67 | | | 24 |

|  | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 70 | 24 |
| Court Reporter's certificate | 71 | 24 |

## ALPHABETICAL INDEX

| State's Witnesses | Direct | Cross | V. D. | |
|---|---|---|---|---|
| Badeaux, Thad | 157 | 162 | | 19 |
| Baldwin, Robert | 102,122 | 113 | | 20 |
| Beyer, Dr. Eric | 3 | | | 22 |
| Bloyd, Detective Ted | 85,127 | 100,132 | | 17 |
| Bloyd, Detective Ted | 252,263 269,275 | 255,266,273 | | 20 |
| Carmouche, James Martin | 40 | 44 | | 20 |
| Carmouche, James Martin | 138 | 154 | | 22 |
| Couch, D.H. | 151,169 | 164,169 | | 18 |
| Cruser, Jeff | 36,68 | 55,70 | | 17 |

| | PAGE | | VOL. |
|---|---|---|---|
| Dodson, Terrence | 164,201 | 184,204 | | 19 |
| Duncan, Christopher D. | 52,60 | 57 | | 22 |
| Foltz, Larry D. | 131,147 | 141,149 | | 18 |
| Gibson, Pat | 34 | 36 | | 20 |
| Gibson, Pat | 127,136 | 135,137 | 123 | 22 |
| Hebert, Troy James | 18,35 | 24,36 | | 22 |
| Holley, Dion | 3,119,124 | 56,121,124 | | 18 |
| Hooper, Steven | 38 | 46 | | 22 |
| Longoria, Alex | 125 | 131 | | 18 |
| Johnson, Samuel | 14 | 49 | | 19 |
| McDonald, John Wayne | 170 | | | 16 |
| McDonald, John Wayne | 25,35 | 3,30 | | 17 |
| Melancon, Joseph | 61 | 80 | | 22 |
| Milton, Dr. Roger | 49 | 65 | | 20 |
| Milton, Dr. Roger | 105 | | | 22 |
| Novak, G.J. | 170,176 | 183 | 176 | 18 |
| Novak, G.J. | 10 | 3 | | 19 |
| Riddle, Glen | 137,154 | 146,155 | | 17 |
| Saldivar, Ralph | 78 | 93 | | 20 |
| Scott, Howard | 121,152,154 | 129,152,155 | | 19 |
| Trail, Anthony | 3,31,33 | 15,32,33 | | 20 |
| Walter, Kevin | 19,37,62,152 | 77,163 | 36,61 | 16 |

|  |  |  | PAGE | VOL. |
|---|---|---|---|---|
| Warren, Oral L. | 71 | 79 |  | 17 |
| Williams, Yolanda | 112 | 121 |  | 22 |
| Defense Witnesses |  |  |  |  |
| Gotch, Sedonia | 79 | 86 |  | 23 |
| Green, David | 31 | 34 |  | 23 |
| Johnson, Shannon | 21 | 27 |  | 23 |
| Mamou, Angelice<br>    Mary Johnson | 36,70 | 52,71 |  | 23 |
| Mamou, Charles, Jr. | 140,247 | 158 |  | 20 |
| Mamou, Charles, Sr. | 115 | 126 |  | 23 |
| Mamou, Michelle | 72 |  |  | 23 |
| Morgan, Dorothy | 3,19 | 15 |  | 23 |
| Quijano, Dr. Eric | 158 | 180 |  | 22 |
| Ruffcorn, Roger | 129,134,139 | 135,139 | 133 | 20 |
| Savoie, Joseph Dwight | 93,114 | 106,115 |  | 23 |

## EXHIBITS

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---|---|---|---|---|
| Exhibit 1 | Photo | 185 | 185 | 16 |
| Exhibit 2 | Photo | 184 | 184 | 16 |
| Exhibit 3 | Photo | 184 | 184 | 16 |
| Exhibit 4 | Photo | 185 | 185 | 16 |

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---------|-------------|---------|----------|--------|
| Exhibit 5 | Photo | 3 | 3 | 18 |
| Exhibit 6 | Photo | 3 | 3 | 18 |
| Exhibit 7 | Photo | 3 | 3 | 18 |
| Exhibit 8 | Photo | 3 | 3 | 18 |
| Exhibit 9 | Photo | 3 | 3 | 18 |
| Exhibit 10 | Photo | 3 | 3 | 18 |
| Exhibit 11 | Photo | 185 | 185 | 16 |
| Exhibit 12 | Photo | 185 | 185 | 16 |
| Exhibit 13 | Photo | 185 | 185 | 16 |
| Exhibit 14 | Photo | 185 | 185 | 16 |
| Exhibit 15 | Photo | 185 | 185 | 16 |
| Exhibit 16 | Photo | 3 | 3 | 18 |
| Exhibit 17 | Photo | 3 | 3 | 18 |
| Exhibit 18 | Photo | 3 | 3 | 18 |
| Exhibit 19 | Photo | 3 | 3 | 18 |
| Exhibit 20 | Photo | 47 | 47 | 17 |
| Exhibit 21 | Photo | 74 | 74 | 17 |
| Exhibit 22 | Diagram | 39 | 40 | 17 |
| Exhibit 23 | Diagram | 181 | 181 | 16 |
| Exhibit 24 | Aerial photo | 54 | 55 | 16 |
| Exhibit 25 | Key Map diagram | 55 | 56 | 16 |
| Exhibit 26 | Fired cartridge casing | 41 | 41 | 17 |

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---------|-------------|---------|----------|--------|
| Exhibit 27 | Fired cartridge casing | 41 | 41 | 17 |
| Exhibit 28 | Fired cartridge casing | 41 | 41 | 17 |
| Exhibit 29 | Fired cartridge casing | 41 | 41 | 17 |
| Exhibit 30 | Fired cartridge casing | 41 | 41 | 17 |
| Exhibit 31 | Victoria's Secret bag | 43 | 43 | 17 |
| Exhibit 32 | Swab/blood | | | |
| Exhibit 33 | Swab/blood | | | |
| Exhibit 34 | Swab/blood | | | |
| Exhibit 35 | Swab/blood | | | |
| Exhibit 36 | Swab/blood | | | |
| Exhibit 37 | Swab/blood | | | |
| Exhibit 38 | Gun | 127 | 128 | 20 |
| Exhibit 39 | Live cartridge | | | |
| Exhibit 40 | Photo | 14 | 14 | 18 |
| Exhibit 41 | Diagram | | | |
| Exhibit 42 | Chart of names | 3 | 3 | 18 |
| Exhibit 43 | Chart | 39 | 39 | 16 |
| Exhibit 45 | Videotape | 52 | 52 | 17 |
| Exhibit 46 | Diagram | 155 | 155 | 18 |
| Exhibit 47 | Photo | 127 | 127 | 18 |
| Exhibit 48 | Photo | 154 | 154 | 18 |
| Exhibit 49 | Photo | 147 | 148 | 18 |

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---------|-------------|---------|----------|--------|
| Exhibit 50 | Photo | 154 | 154 | 18 |
| Exhibit 51 | Photo | 154 | 154 | 18 |
| Exhibit 52 | Photo | 127 | 127 | 18 |
| Exhibit 54 | Photo | 127 | 127 | 18 |
| Exhibit 55 | Photo | 154 | 154 | 18 |
| Exhibit 56 | Photo | 148 | 148 | 18 |
| Exhibit 57 | Photo | 127 | 127 | 18 |
| Exhibit 58 | Photo | 154 | 154 | 18 |
| Exhibit 59 | Videotape | 162 | 162 | 18 |
| Exhibit 61 | Key Map | 12 | 12 | 19 |
| Exhibit 62 | Photo | 73 | 73 | 16 |
| Exhibit 63 | Photo | 92 | 93 | 17 |
| Exhibit 64 | Photo | 92 | 93 | 17 |
| Exhibit 66 | Photo | 94 | 94 | 17 |
| Exhibit 67 | Photo | 139 | 139 | 17 |
| Exhibit 68 | Photo | 139 | 139 | 17 |
| Exhibit 69 | Photo | 139 | 139 | 17 |
| Exhibit 70 | Photo | 139 | 139 | 17 |
| Exhibit 71 | Photo | 139 | 139 | 17 |
| Exhibit 72 | Photo | 139 | 139 | 17 |
| Exhibit 73 | Photo | 139 | 139 | 17 |
| Exhibit 74 | Photo | 139 | 139 | 17 |

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---------|-------------|---------|----------|--------|
| Exhibit 75 | Photo | 139 | 139 | 17 |
| Exhibit 76 | Photo | 23 | 23 | 16 |
| Exhibit 77 | Photo | 23 | 23 | 16 |
| Exhibit 78 | Aerial photo | 59 | 59 | 16 |
| Exhibit 79 | Bullet fragment | 100 | 100 | 17 |
| Exhibit 80 | Photospread | 75 | 75 | 16 |
| Exhibit 81 | Photospread | 77 | 77 | 16 |
| Exhibit 82 | Photospread | 75 | 76 | 16 |
| Exhibit 83 | Photo | 22 | 22 | 16 |
| Exhibit 84 | Fired bullet | 146 | 146 | 17 |
| Exhibit 85 | Photo | 89 | 89 | 20 |
| Exhibit 86 | Photo | 5 | 5 | 18 |
| Exhibit 87 | Photo | 32 | 32 | 18 |
| Exhibit 87 | Photo | 11 | 11 | 19 |
| Exhibit 88 | Photo | 9 | 9 | 19 |
| Exhibit 89 | Bullet | 160 | 160 | 18 |
| Exhibit 90 | Fired bullet | 61 | 61 | 20 |
| Exhibit 91 | Fired bullet | 175 | 176 | 18 |
| Exhibit 92 | Photo | 10 | 11 | 19 |
| Exhibit 93 | Newspaper clippings | 87 | 87 | 20 |
| Exhibit 94 | Photo | 101 | 101 | 20 |
| Exhibit 95 | Print card | | | |

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---------|-------------|---------|----------|--------|
| Exhibit 96 | Firearms chart | 127 | 127 | 20 |
| Exhibit 97 | Unfired bullet | | | |
| Exhibit 98 | Bullet | | | |
| Exhibit 99 | Autopsy report | 60 | 60 | 20 |
| Exhibit 100 | Photo | 64 | 64 | 20 |
| Exhibit 101 | Photo | 64 | 64 | 20 |
| Exhibit 102 | Photo | 64 | 64 | 20 |
| Exhibit 103 | Autopsy report | 52 | 52 | 20 |
| Exhibit 104 | Photo | 53 | 53 | 20 |
| Exhibit 105 | Photo | 53 | 53 | 20 |
| Exhibit 106 | Photo | 53 | 53 | 20 |
| Exhibit 107 | Photo | 53 | 53 | 20 |
| Exhibit 108 | Photo | 53 | 53 | 20 |
| Exhibit 109 | Photo | 53 | 53 | 20 |
| Exhibit 110 | Photo | 53 | 53 | 20 |
| Exhibit 111 | Photo | 53 | 53 | 20 |
| Exhibit 112 | Probation revocation | 244 | 245 | 20 |
| Exhibit 113 | Arrest warrant | | | |
| Exhibit 114 | Photo | 43 | 43 | 22 |
| Exhibit 115 | Photo | 43 | 43 | 22 |
| Exhibit 116 | Photo | 43 | 43 | 22 |
| Exhibit 117 | Photo | 43 | 43 | 22 |

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---|---|---|---|---|
| Exhibit 118 | Photo | 43 | 43 | 22 |
| Exhibit 119 | Photo | 43 | 43 | 22 |
| Exhibit 120 | Video | 56 | 57 | 22 |
| Exhibit 121 | Autopsy report | 106 | 106 | 22 |
| Exhibit 122 | Photo | 70 | 70 | 22 |
| Exhibit 122 | Photo | 107 | 107 | 22 |
| Exhibit 123 | Photo | 107 | 107 | 22 |
| Exhibit 124 | Photo | 107 | 107 | 22 |
| Exhibit 125 | Photo | 107 | 107 | 22 |
| Exhibit 126 | Body chart | 18 | 18 | 22 |
| Exhibit 127 | Med records | 5 | 5 | 22 |
| Exhibit 128 | Photo | 70 | 71 | 22 |
| Exhibit 129 | Med records | 5 | 6 | 22 |
| Exhibit 130 | Photo | 107 | 107 | 22 |
| Exhibit 131 | Cut up paper | 55 | 55 | 22 |
| DEFENSE | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
| Exhibit 1 | Diagram | 24 | 24 | 17 |
| Exhibit 2 | Drawing | 153 | 153 | 17 |
| Exhibit 3 | Photo | 146 | 147 | 18 |
| Exhibit 4 | Photo | 146 | 147 | 18 |
| Exhibit 5 | Photo | 146 | 147 | 18 |
| Exhibit 6 | Photo | 10 | 10 | 19 |

| DEFENSE | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---|---|---|---|---|
| Exhibit 7 | Photo | 10 | 10 | 19 |
| Exhibit 8 | Photo | 10 | 10 | 19 |
| Exhibit 9 | Yellow Cab records | 132 | 134 | 20 |
| Exhibit 10 | Stipulation of Evidence | | 158 | 22 |
| Exhibit 11 | Stipulation of Evidence | | 158 | 22 |
| Exhibit 12 | Photo | 26 | 26 | 23 |
| Exhibit 13 | Photo | 26 | 26 | 23 |
| Exhibit 14 | Video box | 179 | | 22 |
| Exhibit 14A | Videotape | 179 | 179 | 22 |

1                    REPORTER'S RECORD

2               VOLUME 2 OF 25 VOLUMES

3             TRIAL COURT CAUSE NO. 800112

4

5    CHARLES MAMOU, JR.      )    IN THE DISTRICT COURT

6             Appellant     )

7                           )

8    VS.                    )    HARRIS COUNTY, TEXAS

9                           )

10   THE STATE OF TEXAS     )

11            Appellee      )    179TH JUDICIAL DISTRICT

12

13

14            * * * * * * * * * * * * * * * * * * * *

15                   PRETRIAL HEARING

16            * * * * * * * * * * * * * * * * * * * *

17

18       On the 7th day of September, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Bob Burdette, Judge

21   Presiding, held in Houston, Harris County, Texas:

22       Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

```
 1              A P P E A R A N C E S

 2      MR. LYN MCCLELLAN

 3      SBOT NO. 13396100

 4      MS. CLAIRE CONNORS

 5      SBOT NO. 0470500

 6      Assistant District Attorneys

 7      201 Fannin

 8      Houston, Texas 77002

 9      Phone:  713.755.5800

10      ATTORNEYS FOR THE STATE OF TEXAS

11

12      MR. WAYNE HILL

13      SBOT NO. 59656300

14      4615 Southwest Freeway

15      Houston, Texas 77027

16      PHONE:  713.623.8312

17      MR. KURT WENTZ

18      SBOT NO. 21179300

19      5629 W FM 1960

20      Houston, Texas 77069

21      ATTORNEYS FOR THE DEFENDANT
22

23

24

25
```

INDEX

VOLUME 2 OF 25

|  | PAGE | VOL. |
|---|---|---|
| September 7, 1999      Pretrial Hearing |  | 2 |
| Arraignment | 3 | 2 |
| Motion to Voir Dire on Parole Law granted | 3 | 2 |
| Motion to disclose existence of any testing, questioning, surveillance or observations granted if any exists | 4 | 2 |
| Motion for Jury list granted | 5 | 2 |
| Proceedings concluded | 7 | 2 |
| Court Reporter's certificate | 8 | 2 |

**3**

1           (Defendant arraigned.)
2           THE COURT: To which indictment,
3   Mr. Mamou, how do you plead, guilty or not guilty?
4           THE DEFENDANT: Not guilty, Your Honor.
5           THE COURT: All right.
6           All right. I have some motions that I
7   don't know if they've been ruled on or not.
8           MR. MCCLELLAN: No.
9           MR. HILL: Judge Wilkinson ruled on some.
10          THE COURT: Defendant's motion to voir
11  dire on the parole law, that motion is granted.
12  Defendant's motion to disclose existence of any testing,
13  questioning, surveillance, or observations of the
14  defendant by State's agents or representatives. And I
15  don't know specifically -- well, the motion claims the
16  request includes audio, electronic, or photographic, or
17  other means of documenting any of the matters set forth
18  in Paragraph Number 1, which states that counsel for the
19  defendant believes that the defendant is subject to the
20  testing, questioning, surveillance, or observations of
21  the defendant by State's agents or representatives,
22  including jail inmates.
23          MR. HILL: I want to know if there was any
24  agents, obviously, Judge, that --
25          THE COURT: Have you seen this?

**4**

1           MR. MCCLELLAN: I have, Your Honor.
2           THE COURT: Is there any?
3           MR. MCCLELLAN: There is none.
4           (Off-the-record discussion.)
5           THE COURT: Mr. Hill, for your purposes,
6   I'm not going to deny the motion, but I am going to ask
7   the State if there is any that goes along while the
8   trial is in progress, I'm not going to limit it just to
9   the jury selection portion.
10          MR. MCCLELLAN: Right.
11          THE COURT: Please inform us, and we'll
12  take it up from there.
13          It's granted, if and when it exists.
14          Motion for production of disclosure of
15  informant. Is there such a creature.
16          MR. MCCLELLAN: No, sir.
17          THE COURT: Motion for hearing on the
18  admissibility of evidence. I'll leave that to Judge
19  Wilkinson. Motion for discovery of victim impact
20  testimony, same. State reveal any agreements of the
21  same. Motion to discover the portions of defendant's
22  statement. I understand there is none, is there?
23          MR. MCCLELLAN: There is just an oral
24  statement, and it's in the offense report, and they've
25  had access to the offense report.

**5**

1           THE COURT: But, I mean, is that to the
2   constabulary.
3           MR. MCCLELLAN: That's to the
4   constabulary.
5           THE COURT: Request for conviction
6   records. I assume that's been accommodated.
7           MR. MCCLELLAN: I'm providing them a
8   written notice tomorrow of all the extraneouses.
9           THE COURT: Motion for the jury list. I
10  assume y'all have been served, have you not? But that
11  request is granted. Motion for the Court to direct the
12  court reporter to take voir dire and bench conferences
13  and final arguments. The reporter is agreeing. She
14  will take them down. Demand for individual voir dire.
15  The motion to present written questionnaire. I gather
16  you all have agreed on whatever the questionnaire
17  contains. Motion for discovery. Is there anything
18  about that? I'll leave that to Judge Wilkinson.
19          MR. MCCLELLAN: I'm going through it line
20  by line, and I'll get with Mr. Hill.
21          MR. HILL: The only one area that I
22  brought to the Court's attention last week, and actually
23  to Mr. McClellan, is with regard to firearms
24  examination. We had asked that the Court order the
25  Houston -- on our motion for discovery.

**6**

1           THE COURT: You brought it to my
2   attention?
3           MR. HILL: No, I'm sorry. Judge Wilkinson
4   was here the other day. Part of it has been what Mr.
5   Wentz presented regarding the testing aspect. I had
6   specifically requested in the motion to have the Houston
7   Police Department provide photographs of their
8   comparison, microscope, findings of the shell casings,
9   or the marks on the shell casings that they're claiming
10  show the shooting of Gibson and the shooting of
11  Carmouche are connected. They're two different alleged
12  crime scenes. And obviously, a shell casing or a live
13  round, one matches supposedly the shell casings of the
14  other. So, we're asking that the Houston Police
15  Department provide an actual photograph that shows the
16  comparison as opposed to just having the officer or the
17  lab person testify that there is a match.
18          THE COURT: And you all had begun this
19  with Judge Wilkinson?
20          MR. MCCLELLAN: Yes. And I believe Judge
21  Wilkinson's position was he wasn't going to be directing
22  them on how to do their job.
23          THE COURT: What I was going to say is no
24  matter what Judge Wilkinson said, if you started with
25  him, I was going to let you finish with him.

```
7
 1              Are there any other motions that need to
 2   be tended to?
 3              MR. HILL:  If that's the whole stack right
 4   there, those are the ones we have for right now.
 5              THE COURT:  It's my understanding
 6   Mr. Mamou has been served with a copy of this week's
 7   list.
 8              (Off-the-record discussion.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

```
                                                          8
 1   THE STATE OF TEXAS   )

 2   COUNTY OF HARRIS     )

 3              I, Pamela Kay Knobloch, Official/Deputy
     Official Court Reporter in and for the 179th District
 4   Court of Harris County, State of Texas, do hereby certify
     that the above and foregoing contains a true and correct
 5   transcription of all portions of evidence and other
     proceedings requested in writing by counsel for the
 6   parties to be included in this volume of the Reporter's
     Record, in the above-styled and numbered cause, all of
 7   which occurred in open court or in chambers and were
     reported by me.
 8
              I further certify that this Reporter's Record
 9   of the proceedings truly and correctly reflects the
     exhibits, if any, admitted by the respective parties.
10
          I further certify that the total cost for the
11   preparation of this Reporter's Record is $_____ and
     was paid by Harris County.
12
          WITNESS MY OFFICIAL HAND this the _____ day of
13   _____, 2000.

14

15                                    .
     _____
16   Pamela Kay Knobloch, Texas CSR No. 1650
     Expiration date:  12/31/2000
17   Official Court Reporter, 179th District Court
     Harris County, Texas
18   301 San Jacinto
     Houston, Texas 77002
19   713.755.6340

20   APPELLANT:  CHARLES MAMOU, JR.
                 CAUSE NO. 800112
21

22
23
24
25
```

**$**

$ [1] 8:11

**0**

0470500 [1] 2:5

**1**

1 [1] 3:18
12/31/2000 [1] 8:16
13396100 [1] 2:3
1650 [1] 8:16
179th [3] 1:11 8:3 8:17
1960 [1] 2:19
1999 [1] 1:18

**2**

2 [1] 1:2
2000 [1] 8:13
201 [1] 2:7
21179300 [1] 2:18
25 [1] 1:2

**3**

301 [1] 8:18

**4**

4615 [1] 2:14

**5**

5629 [1] 2:19
59656300 [1] 2:13

**7**

713.623.8312 [1] 2:16
713.755.5800 [1] 2:9
713.755.6340 [1] 2:19
77002 [2] 2:8 8:18
77027 [1] 2:15
77069 [1] 2:20
7th [1] 1:18

**8**

800112 [2] 1:3 8:20

_____ [1] 8:12

_____ [1] 8:15

**A**

Above-entitled [1] 1:19
Above-styled [1] 8:6
Access [1] 4:25
Accommodated [1] 5:6
Actual [1] 6:15
Admissibility [1] 4:18
Admitted [1] 8:9
Agents [3] 3:14 3:21 3:24
Agreed [1] 5:16
Agreeing [1] 5:13
Agreements [1] 4:20
Aided [1] 1:22
Alleged [1] 6:11
Appellant [2] 1:6 8:20
Appellee [1] 1:11
Area [1] 5:21
Arguments [1] 5:13
Arraigned [1] 3:1
Aspect [1] 6:5
Assistant [1] 2:6
Assume [2] 5:6 5:10

Attention [2] 3:22 6:2
Attorneys [2] 2:6 2:10 2:21
Audio [1] 3:16

**B**

Begun [1] 6:18
Believes [1] 3:19
Bench [1] 5:12
Bob [1] 1:20
Brought [1] 5:22 6:1
Burdette [1] 1:20

**C**

Carmouche [1] 6:11
Casing [1] 6:12
Casings [3] 6:8 6:9 6:13
Certify [3] 8:4 8:8 8:10
Chambers [1] 8:7
CHARLES [2] 1:5 8:20
Claiming [1] 6:9
Claims [1] 3:15
CLAIRE [1] 2:4
Comparison [2] 6:8 6:16
Computer [1] 1:22
Conferences [1] 5:12
Connected [1] 6:11
CONNORS [1] 2:4
Constabulary [2] 5:2 5:4
Contains [1] 5:17 8:4
Conviction [1] 5:5
Copy [1] 7:6
Correct [1] 8:4
Correctly [1] 8:9
Cost [1] 8:10
Counsel [1] 8:9
County [6] 1:8 1:21 8:2 8:4 8:11 8:17
Court [25] 1:3 1:5 3:2 3:5 3:10 3:25 4:2 4:5 4:11 4:17 5:1 5:5 5:9 5:11 5:12 5:18 6:21 6:18 6:23 7:5 8:3 8:4 8:7 8:17 8:17
Court's [1] 5:22
Creature [1] 4:15
Crime [1] 6:12
CSR [1] 8:16

**D**

Date [1] 8:16
Defendant [7] 2:21 3:1 3:4 3:14 3:19 3:19 3:21
Defendant's [3] 3:10 3:12 4:21
Demand [1] 5:14
Deny [1] 4:6
Department [2] 6:7 6:15
Different [1] 6:11
Dire [3] 3:11 5:12 5:14
Direct [1] 5:11
Directing [1] 6:21
Disclose [1] 3:12
Disclosure [1] 4:14
Discover [1] 4:21
Discovery [3] 4:19 5:17 5:25
Discussion [2] 4:7 7:8
District [5] 1:5 1:11 2:6 8:3 8:17
Documenting [1] 3:17
Down [1] 5:14

**E**

Electronic [1] 3:16
Evidence [2] 4:10 0:5

Examination [1] 3:22
Exhibits [1] 8:9
Existence [1] 3:12
Exists [1] 4:13
Expiration [1] 8:16
Extraneouses [1] 5:8

**F**

Fannin [1] 2:7
Final [1] 5:13
Findings [1] 6:8
Finish [1] 6:25
Firearms [1] 5:23
FM [1] 2:19
Following [1] 1:16
Foregoing [1] 8:4
Forth [1] 3:17
Freeway [1] 2:14

**G**

Gather [1] 5:15
Gibson [1] 6:10
Granted [3] 3:11 4:13 5:11
Guilty [2] 3:3 3:3 3:4

**H**

HAND [1] 8:12
Harris [6] 1:8 1:21 8:2 8:4 8:11 8:17
Heard [1] 1:19
Hearing [1] 1:15 4:17
Held [1] 1:21
Hereby [1] 8:4
Hill [8] 2:12 3:9 3:23 4:5 5:20 5:21 6:3 7:3
Honor [2] 3:4 4:1
Honorable [1] 1:20
Houston [8] 1:21 2:8 2:15 2:20 5:25 6:6 6:14 8:18

**I**

Impact [1] 4:19
Included [1] 8:6
Includes [1] 3:16
Including [1] 3:22
Indictment [1] 3:2
Individual [1] 5:14
Inform [1] 4:11
Informant [1] 4:15
Inmates [1] 3:22

**J**

Jacinto [1] 8:18
Jail [1] 3:22
Job [1] 6:22
JR [2] 1:5 8:20
Judge [9] 1:20 3:9 3:24 4:18 5:18 6:3 6:19 6:20 6:24
JUDICIAL [1] 1:11
Jury [4] 4:9 5:9

**K**

Kay [2] 8:3 8:16
Knobloch [2] 8:3 8:16
KURT [2] 2:17

**L**

Lab [1] 6:17
Last [1] 5:22
Law [1] 3:11
Leave [2] 4:18 5:18
Limit [1] 4:8
Line [2] 5:19 5:20
List [1] 5:9 7:7

Live [1] 5:24
LYN [1] 2:2

**M**

Machine [1] 1:23
Mamou [4] 1:5 3:3 7:6 8:20
Marks [1] 6:9
Match [1] 6:17
Matches [1] 6:13
Matter [1] 6:24
Matters [1] 3:17
McClellan [12] 2:2 3:8 4:1 4:3 4:10 4:16 4:23 5:3 5:7 5:19 5:23 6:20
Mean [1] 5:1
Means [1] 3:17
Microscope [1] 6:8
Motion [15] 3:10 3:11 3:12 3:15 4:6 4:14 4:17 4:19 4:21 5:9 5:11 5:15 5:17 5:25 6:6
Motions [2] 3:6 7:1

**N**

Need [1] 7:1
None [2] 4:3 4:22
Notice [1] 5:8
Number [1] 3:18
Numbered [1] 1:20 8:6

**O**

Observations [2] 3:13 3:20
Obviously [2] 3:24 6:12
Occurred [1] 8:7
Off-the-record [2] 4:4 7:8
Offense [2] 4:24 4:25
Officer [1] 6:16
Official [3] 8:3 8:12 8:17
Official/Deputy [1] 8:3
One [2] 5:21 6:13
Ones [1] 7:4
Open [1] 8:7
Opposed [1] 6:16
Oral [1] 4:23
Order [1] 5:24

**P**

Paid [1] 8:11
Pamela [2] 8:3 8:16
Paragraph [1] 3:18
Parole [1] 3:11
Part [1] 6:4
Parties [2] 8:6 8:9
Person [1] 6:17
Phone [2] 2:9 2:16
Photograph [1] 6:15
Photographic [1] 3:16
Photographs [1] 6:7
Plead [1] 3:3
Police [2] 6:7 6:14
Portion [1] 4:9
Portions [2] 4:21 8:5
Position [1] 5:21
Preparation [1] 8:11
Present [1] 5:15
Presented [1] 6:5
Presiding [1] 1:21
PRETRIAL [1] 1:15
Proceedings [4] 1:19 1:22 8:5 8:9
Production [1] 4:14

**Progress** [1] 4:8
**Provide** [2] 6:7 6:15
**Providing** [1] 5:7
**Purposes** [1] 4:5

## Q

**Questioning** [2] 3:13 3:20
**Questionnaire** [2] 5:15 5:16

## R

**Record** [4] 1:1 8:6 8:8 8:11
**Records** [1] 5:6
**Reflects** [1] 8:9
**Regard** [1] 5:23
**Regarding** [1] 6:5
**Report** [2] 4:24 4:25
**Reported** [2] 1:22 8:7
**Reporter** [4] 5:12 5:13 8:3 8:17
**Reporter's** [4] 1:1 8:6 8:8 8:11
**Representatives** [2] 3:14 3:21
**Request** [3] 3:16 5:5 5:11
**Requested** [2] 6:6 8:5
**Respective** [1] 8:9
**Reveal** [1] 4:20
**Round** [1] 6:13
**Ruled** [2] 3:7 3:9

## S

**San** [1] 8:18
**SBOT** [4] 2:3 2:5 2:13 2:18
**Scenes** [1] 6:12
**Selection** [1] 4:9
**September** [1] 1:18
**Served** [2] 5:10 7:6
**Set** [1] 3:17
**Shell** [4] 6:8 6:9 6:12 6:13
**Shooting** [2] 6:10 6:10
**Show** [1] 6:10
**Shows** [1] 6:15
**Sorry** [1] 6:3
**Southwest** [1] 2:14
**Specifically** [2] 3:15 6:6
**Stack** [1] 7:3
**Started** [1] 6:24
**State** [6] 1:10 2:10 4:7 4:20 8:1 8:4
**State's** [2] 3:14 3:21
**Statement** [2] 4:22 4:24
**States** [1] 3:18
**Subject** [1] 3:19
**Supposedly** [1] 6:13
**Surveillance** [2] 3:13 3:20

## T

**Tended** [1] 7:2
**Testify** [1] 6:17
**Testimony** [1] 4:20
**Testing** [3] 3:12 3:20 6:5
**Texas** [12] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 8:1 8:4 8:16 8:17 8:18
**They've** [2] 3:7 4:24
**Tomorrow** [1] 5:8
**Total** [1] 8:10
**Transcription** [1] 8:5
**Transcription/stenograph** [1] 1:23

**Trial** [2] 1:3 4:8
**True** [1] 8:4
**Truly** [1] 8:9
**Two** [1] 6:11

## U

**Up** [1] 4:12

## V

**Victim** [1] 4:19
**Voir** [3] 3:10 5:12 5:14
**Volume** [2] 1:2 8:6
**VOLUMES** [1] 1:2
**VS** [1] 1:8

## W

**WAYNE** [1] 2:12
**Week** [1] 5:22
**Week's** [1] 7:6
**Wentz** [2] 2:17 6:5
**Whole** [1] 7:3
**Wilkinson** [6] 3:9 4:19 5:18 6:3 6:19 6:24
**Wilkinson's** [1] 6:21
**WITNESS** [1] 8:12
**Writing** [1] 8:5
**Written** [2] 5:8 5:15

## Y

**Y'all** [1] 5:10

1                          REPORTER'S RECORD

2                       VOLUME 3 OF 25 VOLUMES

3                   TRIAL COURT CAUSE NO. 800112

4

5      CHARLES MAMOU, JR.        )     IN THE DISTRICT COURT

6             Appellant          )

7                                )

8      VS.                       )     HARRIS COUNTY, TEXAS

9                                )

10     THE STATE OF TEXAS        )

11            Appellee           )     179TH JUDICIAL DISTRICT

12

13

14                      * * * * * * * * * * * * * * * * * * * *

15                      VOIR DIRE EXAMINATION

16                      * * * * * * * * * * * * * * * * * * * *

17

18        On the 8th day of September, 1999, the following

19     proceedings came on to be heard in the above-entitled and

20     numbered cause before the Honorable Bob Burdette, Judge

21     Presiding, held in Houston, Harris County, Texas:

22        Proceedings reported by computer aided

23     transcription/stenograph machine.

24

25

```
 1              A P P E A R A N C E S

 2     MR. LYN MCCLELLAN

 3     SBOT NO. 13396100

 4     MS. CLAIRE CONNORS

 5     SBOT NO. 0470500

 6     Assistant District Attorneys

 7     201 Fannin

 8     Houston, Texas 77002

 9     Phone:  713.755.5800

10     ATTORNEYS FOR THE STATE OF TEXAS

11

12     MR. WAYNE HILL

13     SBOT NO. 59656300

14     4615 Southwest Freeway

15     Houston, Texas 77027

16     PHONE:  713.623.8312

17     MR. KURT WENTZ

18     SBOT NO. 21179300

19     Houston, Texas 77069

20     ATTORNEYS FOR THE DEFENDANT
21

22

23

24

25
```

i

INDEX

VOLUME 3 OF 25

|  | PAGE | VOL. |
|---|---|---|
| September 8, 1999      Jury Voir Dire Examination |  | 3 |
| Voir Dire by the Court | 3 | 3 |
| Proceedings concluded | 56 | 3 |
| Court Reporter's certificate | 57 | 3 |

3

```
1                    (Prospective jurors are seated.)
2              THE COURT:  Good morning.  The case that
3    we've asked you to come over here so that we might visit
4    with you about the prospect of serving as a juror is the
5    case of the State of Texas versus Charles Mamou, Jr.
6              Mr. Mamou, stand up and face the jury
7    panel, please, sir.
8              Mr. Mamou is represented by his attorneys,
9    Mr. Wayne Hill and Kurt Wentz.  Again, the State of
10   Texas is represented by her Assistant District
11   Attorneys, Mr. Lyn McClellan and Ms. Claire Connors.
12             Is there anybody here who feels that you
13   know any of the people that I introduced to you?  I take
14   it by your silence, then, and the fact I see no
15   indication to the contrary, that nobody knows any of the
16   lawyers or the defendant involved in the case.  And so
17   from that point -- that standpoint, we're all going to
18   start off on the same even footing.
19             In this case this defendant stands charged
20   by indictment with the offense of capital murder.  It's
21   alleged to have occurred in Harris County, Texas, on or
22   about the 7th day of December of 1998.  Now I know that
23   you have been kind enough yesterday to spend some time
24   filling out these questionnaires that we have.
25             Before we go any further, I also know that
```

4

```
1    most of you, if not all of you, the sum total of the
2    information you get about what goes on downtown at the
3    courthouse, about the criminal justice system, is what
4    you see on television and what you know of Lance Ito and
5    O.J. Simpson in that trial.
6              First off, folks, eliminate from that --
7    that thought from your mind.  That's not going to happen
8    here.  This is the real world.  It is not California.
9    If you came here fearful that you might very well be
10   locked up in some old dingy hotel room, kept away from
11   your family, or friends, or job, your loved ones for
12   weeks and months at a time, I'm going to tell you right
13   now that is simply not going to happen to you.  And the
14   reason I can guarantee it's not going to happen to you
15   is because if you guys got locked up in a hotel room,
16   I'd have to get locked up in a hotel room.  And I'm not
17   about to do that, so just simply don't worry about it.
18             Second thing is I know that all of you are
19   in a place that is unfamiliar to you.  Being a juror in
20   a case, whether it's a criminal case or a civil case, is
21   a lot like being a pallbearer at a funeral.  You're in a
22   place you don't want to be.  You're doing something you
23   don't want to do.  You're not so sure you know what's
24   expected of you.  Next and the last thing that's
25   consistent is the only reason you're doing it in the
```

5

```
1    first place is out of a sense of duty or sense of
2    loyalty.  Therefore, the four lawyers in the case and
3    myself understand that we cannot get the best work
4    product that you, a jury, has to offer if we waste your
5    time, so we're not.
6              Now we're going to spend some time talking
7    this morning about this case generally, the kinds of
8    rules that can come into play during the trial of a case
9    like this.  Whether they do come into play or not, we
10   simply don't know; because that will depend upon the
11   evidence in the case.  But we're going to spend some
12   time talking about it.  It is, by the clock on the wall
13   as I see it, about eight minutes after 10:00.  You folks
14   will all be out of here by noon.  When we have a case
15   that is a case of this type -- that is to say, a capital
16   murder case -- and in this case the State of Texas has
17   made known to the defendant, made known to the Court,
18   made known to the lawyers that in the event a jury in
19   this case were to find this defendant guilty of the
20   offense of capital murder, the State is going to seek
21   the appropriate punishment in this case; that is, their
22   claim that it will be the appropriate punishment,
23   punishment of death.
24             Whether you, the jury, agree with what
25   they're going to want or not, that's your call.  And
```

6

```
1    you'll make that decision on the basis of the evidence
2    as presented to you.  But any time the death penalty is
3    a potential punishment in a case, the law requires that
4    we do the jury selection process differently.  And the
5    difference is that we have to talk to each of you
6    individually.
7              Now, obviously it would take thirty times
8    longer to talk to each one of you one at a time than it
9    would take to talk to all of you at the same time.  So
10   what we're going to do when we get through with our
11   business this morning is that we are going to have
12   broken you down into groups, who is going to come --
13   we're going to need you back here one day.  We're going
14   to talk to you either tomorrow or Friday.  And I suspect
15   we'll be able to get through with all of you by Friday.
16             At the conclusion of that conversation,
17   either tomorrow or Friday, we may get you back; because
18   what we're going to do is after the individual
19   conversations have concluded, we're going to be creating
20   a pool or a panel of roughly fifty people that will get
21   back here.  And out of that fifty people, we will
22   extract the twelve and the alternates who will become
23   the jury in the case.  That will be done on the 30th of
24   September.
25             Now if we talk to you tomorrow and we want
```

7

1  you back here on the 30th, tomorrow being what, the 10th
2  or the 9th?  Whatever day tomorrow is, between then and
3  the 30th of September, don't you alter your life one bit
4  for us.  You do the things that you would ordinarily do,
5  and you do them in the way you would ordinarily do them.
6  If you have a chance to leave town, take the chance and
7  go.  Don't change your business one bit for us, because
8  that's self-defeating from our standpoint.  But we are
9  going to want you back here that one day, and on the
10  30th everybody will leave here knowing whether they are
11  or are not a juror in the case.
12       Now, that's basically the framework of
13  the trial itself.  The evidence in the case will begin
14  on Monday, the 4th of October.  The trial, as
15  anticipated, will last perhaps a little bit longer than
16  that one week; but it would not last as long as two
17  weeks.  So, that's how long the testimony is going to
18  take in the case.  The reason that we have -- that we
19  can't be more precise than that is very simply this:  We
20  can pretty well figure out based upon the number of
21  witnesses who are going to testify and what's
22  anticipated they're going to say, how long it will take
23  to present the evidence in the case.  The variable in
24  every case that is always different is that nobody has
25  any idea how long a particular jury will take to

8

1  deliberate on a particular -- as to particular evidence
2  that was presented to them.
3       You could have, conceivably in a case,
4  three juries listening to exactly the same evidence in
5  exactly the same courtroom at exactly the same time and
6  go out in three different jury rooms to deliberate.  And
7  one jury might come back with a verdict in an hour.  One
8  might take a day.  And one of them might be in there
9  three days before they realize there is a doorknob on
10  the bathroom door inside the jury room.  There is just
11  simply no telling.  But that's the variable over which
12  none of us have any control, and that's why we can't be
13  more precise than a little bit longer than a week, but
14  not as much as two.
15       Now having said that, let's talk about
16  some things generally about a trial; this one, all the
17  other ones, too.  Let's talk first off about what your
18  job is as a juror.  And let's talk and compare it with
19  what my job as a Judge is.  As a juror, you are going to
20  be the exclusive judges of the facts proved, of the
21  credibility of the witnesses, and the weight that you
22  want to give to the witnesses' testimony, meaning that
23  as to one hypothetical witness, it may very well be
24  after that witness has concluded testifying, that you
25  might choose to believe one hundred percent of what that

9

1  witness says.
2       As to the second hypothetical witness,
3  after that witness has concluded testifying, it may very
4  well be that you choose to disbelieve one hundred
5  percent of what that witness says.  And as to
6  hypothetical witness number three, after that witness
7  has concluded testifying, it may very well be that you
8  choose to disbelieve and -- or that you choose to
9  believe part or some of that witness's testimony.  That
10  is entirely your option.  You decide who you want to
11  believe, and those you do decide you want to believe,
12  how much weight you want to give to their testimony.
13  And we say, how much weight do you want to give to a
14  witness's testimony?
15       Because if -- obviously, if in some
16  imaginary case there are fifty witnesses who testify,
17  all fifty witnesses can't say things of exactly the same
18  magnitude.  Some things they say are going to be more
19  important than what some things said by some other
20  witness are going to be.  So, you decide the
21  believability and the importance; that is to say, the
22  weight of their testimony.  That is your job.
23       My job, on the other hand, has absolutely
24  nothing to do with deciding who's believable, who's not
25  believable as a witness.  My job is to listen to every

10

1  single thing that the witnesses say.  Whether I believe
2  them or not makes absolutely no difference.  So, as a
3  result of all of the testimony that all of the witnesses
4  have given to the jury, my job is to arm you in the
5  Court's charge with all of the law that is raised by the
6  testimony of those jurors.  So of all the testimony
7  that's raised, you will determine out of that testimony
8  who is believable; and therefore, however, the Court's
9  charge, which will contain all of the law in the case,
10  you will extract that portion that applies to the
11  believable testimony that you will determine.  So you
12  determine the believability of the witnesses, and I
13  supply the law.  And between the two things working
14  together, we come up with what we think is the right
15  result to reach based upon the information you have
16  received in terms of the witnesses testimony and the law
17  has been given to you in the Court's charge.  That's the
18  difference between a jury and a judge in a case.
19       Now, let's talk about the only rule that
20  exists that has some interference with how you, as a
21  juror, can determine the believability, the credibility
22  of a witness.  And I think that you'll find that this
23  one rule makes a lot of sense, and that rule is really
24  very simple.  The Rule is this:  Jurors can't choose to
25  believe, jurors can't choose to disbelieve, what a

11

1   witness is going to say before the witness ever says it,
2   meaning you got to give the witness a shot.  From a
3   priest to a derelict, you've got to give them a shot.
4           Now, once you hear what they got to say,
5   you decide, do I believe them or don't I?  And if I do
6   believe them, how much weight do I want to give to their
7   testimony?  But we can't choose to automatically
8   believe, or conversely, to automatically disbelieve what
9   a witness says before the witness ever says it.  A piece
10  of that is that we can't decide that we're going to
11  believe somebody just because of the job they got and
12  not for any other reason, meaning simply this:  Can you
13  see what kind of a fix we would be in if our law said
14  that everybody who ever testified down at the criminal
15  courthouse who was either a junior high school principal
16  or an accountant, those people are going to have to
17  always be believed because they are junior high school
18  principals and accountants.  But if somebody ever
19  testified down at the courthouse that was either a used
20  car salesman or lawyer, those people can't ever be
21  believed; because you see, they are used car salesmen
22  and lawyers.  The point being, you make your decision on
23  who you want to believe on the basis of the quality and
24  the content of what the witness says, not because they
25  happen to possess a job for which you have a great deal

12

1   of fondness for or one for which you have a substantial
2   disdain.
3           I say that for this reason, among others:
4   I would assume that because of the nature of this case,
5   there is going to be testimony from law enforcement
6   officers, whether they be police officers, constables,
7   sheriffs, D.P.S. people, whatever.  Don't know, but I'm
8   assuming that there will be some testimony.  Our law
9   says that just because somebody is a law enforcement
10  officer does not give them any more credibility before
11  they ever testify.  And the reason for it is perfectly
12  simple.  The reason that we don't give them, them being
13  law enforcement personnel, any more credibility, or any
14  less credibility for that matter, before they testify is
15  because the one common feature that every law
16  enforcement officer possesses is this:  They are all
17  extracts from the human race, and they don't get any
18  more honest.  They don't get any smarter.  They don't
19  get any more dishonest.  And they don't get any dumber
20  by putting on a uniform.  They are whatever they are at
21  the time they take the uniform.
22          So, what we're saying is this:  If at some
23  point in time in your past when you were growing up, for
24  example, you might have known somebody who you just
25  thought the world of, was the neatest nicest, most

13

1   honorable kid you'd ever known, went on to become a
2   police officer somewhere, just because that friend of
3   yours, who you did know, who was so neat and nice and
4   honest and dependable, trustworthy was that way doesn't
5   mean that all of the people with whom he or she works is
6   the same.  Now maybe some of them are, but maybe some
7   of them aren't.
8           The flip side of it is this:  If five or
9   six years ago you were driving along in traffic and you
10  got pulled over by some nasty old cop who was rude and
11  hassled you, gave you a ticket that you knew was
12  perfectly and honestly unjustified, inaccurate, and you
13  weren't guilty, just because that cop did that to you on
14  that day does not mean that all the rest of them she
15  works with is the same.  Now maybe some of them are; but
16  then again, maybe some of them aren't.  The point being,
17  please don't draw any conclusions about what qualities a
18  witness possesses before the witness testifies.  And
19  once the witness has concluded, base your decision on
20  whether you do choose or whether you choose not to
21  believe the witness' testimony on the basis of the
22  quality and content of what they have to tell you, not
23  simply because of some job they happen to possess.
24  Anybody here have any quarrel, any dispute, or any
25  disagreement or discussion about that particular facet

14

1   of our law?
2           Now, if you came here today and you think
3   if you were a juror in the case you're going to hear a
4   whole bunch of out and out lying going on, I'm going to
5   tell you it can happen; but I'm also going to tell you
6   what can happen is this:  Sometimes people say things or
7   have recalled events that occurred in the past, and
8   their recollection is a little bit different than what
9   another witness' might be.  And those two might be a
10  little bit different than what a third person's might
11  be.  That is to say, there are some aspects of testimony
12  that may be inconsistent.
13          Inconsistencies do not amount to
14  intentional lies.  I say that to you for this reason:
15  As to you thirty folks, right now we could take you out
16  there in that hallway, stage some ruckus for you to
17  catch your eye, have it last fifteen seconds, terminate
18  it, bring each of you in here individually one at a
19  time, ask you what you saw; and you know, we'd get
20  thirty different stories.  Because some of you would be
21  closer to it to see it than others.  Some of you would
22  be able to hear it better than you could see it.  Some
23  of you could see it and hear it real good, but your mind
24  was wandering off on something else.  Some others of you
25  were so upset about being here in the first place, you

15

1  had no idea about what was going on, nor did you much
2  care. So, the point being, just because the first
3  person gets to talk about what they say they heard, what
4  they observed, does not mean that the twenty-nine people
5  who talked about it later were lying. It means they saw
6  things differently than what the first person sees.
7        So while certainly there is out and out
8  lying that goes on down here under oath from the witness
9  stand, there is just no question about that, there are
10 also many, many occasions or people who are accurately,
11 to the best of their ability, giving an accounting of a
12 circumstance that existed for a fleeting period of time
13 if their life, perhaps as much as a year ago. So,
14 please keep that in mind, too. To this point, does
15 anybody have any questions for me about anything we
16 talked about up till now?
17        I want to spend a couple of minutes
18 talking to you about how this trial will unfold, and
19 it's going to unfold just like every other criminal
20 trial is. The first part of the trial the jury's only
21 determination is going to be deciding whether the
22 defendant is or is not guilty. If the defendant is
23 found not guilty, the case is over with and that's the
24 end of that. If, however, the defendant is found guilty
25 of capital murder, we come back and have a second phase

16

1  of the trial.
2        The second phase of the trial will have
3  nothing to do with deciding whether the defendant did
4  the crime or not, because you would have already decided
5  that at the first phase of the trial. The second phase
6  of the trial exists simply for the purposes of giving
7  you some more information about the defendant, himself,
8  to better arm you with the ability to make decisions
9  about how to answer two questions, two Special Issues
10 that we'll talk about in a couple of minutes. And how
11 you answer those questions will determine what
12 punishment will be imposed.
13        So, because the focus -- because the
14 purpose of the two phases of trial are different, the
15 focus of the evidence is different. At the first phase
16 of the trial, the focus of the evidence is going to be
17 on the offense that was committed. The whos, the
18 wheres, the hows, the whens, the whats, the whys, if
19 there is or is not a prior relationship of the people
20 involved in the crime. Everything there is to know
21 about the crime you'll hear at the first phase of the
22 trial.
23        If you find the defendant guilty of
24 capital murder, at the second phase of the trial the
25 focus of the evidence is going to shift. And the focus

17

1  of the evidence on the second phase of the trial is
2  going to get off the crime itself and instead is going
3  to be on the defendant. And at the second phase of a
4  trial wherein a defendant has been found guilty of a
5  capital murder, basically -- and this is an over
6  generalization, but basically it's accurate -- you're
7  entitled to hear about every single good thing some
8  defendant has ever done before in his or her life, if
9  there are any good things. You're also entitled to hear
10 basically at the second phase of a capital murder trial
11 about every single bad thing some defendant has ever
12 done before, if there are any bad things. And you take
13 all that good stuff and all that bad stuff here at the
14 second phase of the trial, then pile that on
15 information on the crime that was committed, what you
16 heard at the first phase of the trial and throughout
17 every single bit of it to answer the two questions we're
18 going to talk about later.
19        But it's no more different than it is when
20 we're raising kids. It's just no more different. If we
21 ever told a child not to do something once and the child
22 does it again, we're going to react one way. If we have
23 told a child ten times in the last thirty minutes not to
24 do something and they have done it for the tenth time,
25 we're going to react a different way. And that's all

18

1  this is. See, while you're in a place different than
2  what you're used to being, you're doing things that are
3  out of your routine, things you don't ordinarily do, the
4  truth of the matter is that is a perfectly simple
5  operation. It's like going to a strange town and
6  getting lost and asking directions.
7        First off, you want to choose somebody
8  that you think knows, unless you're desperate; you need
9  anything. Second thing is you decide whether you want
10 to believe them or not. Third thing is, does it make
11 any sense? It's the same way in here. All that you're
12 going to have to do is you're going to have to listen.
13 Now there ain't no substitute for listening. You're
14 going to have to listen to what the witnesses say.
15 You're going to have to analyze what they say. And then
16 you're going to have to react. You're going to listen
17 to what they say. You're going to decide whether you
18 believe them or not. And you're going to come up with a
19 verdict based upon your result. That's all this is
20 about.
21        So, that's also the order of trial and the
22 law. The law will be given to you in the Court's charge
23 at the conclusion of the testimony at each phase of the
24 trial. And the law that is the Court's charge is the
25 law that applies to the trial of the case that's on

19

1   trial.  For example -- because if you're in a capital
2   murder case and you get the Court's charge that
3   applies -- that sets out all the law that applies to the
4   testimony that was presented, you take that charge with
5   you back in the jury room and you say to yourselves,
6   well, you know, I just read a dime novel about six
7   months ago, and the butler does it.  And we all know
8   butlers don't do nothing except serve food and kill
9   people in the books, so I believe there must have been a
10   butler in this case.  And the butler might have done it,
11   and there is no evidence in the case about a butler.
12   You've got to apply the testimony in this case.  You
13   can't go running off to what you saw on television.  And
14   I know every TV channel that you see, you've got to
15   watch through seven minutes of dead bodies being dragged
16   out of apartments, put in body bags, hauled off in cars,
17   and you get to hear snippets about what happened.  And
18   they've got do it real quick, because just in a short
19   time, they're going to take a recess so they can go sell
20   Tylenol.  And that's what we're armed with when we come
21   down to the courthouse, and that's simply not fair to
22   you.  It's not the real world.  And everybody involved
23   in a trial, especially, you the citizen, the jurors, are
24   entitled to a better deal.  So that's what we're going
25   to spend a couple of minutes right now talking about is

20

1   that kind of stuff.
2           First of -- and these are general
3   principles, general rules that apply to every single
4   criminal case that exists in this country.  First of
5   all, we have talked about the fact that in this case,
6   this defendant stands charged by indictment with the
7   offense of capital murder.   You'll be told in the
8   Court's charge -- I'm going to tell you right now, the
9   fact that somebody was arrested for having committed a
10   crime, that singular event is no evidence they have
11   committed that crime.  The fact that somebody was
12   charged with having committed a crime, the singular
13   event of them having been charged is no evidence they
14   committed the crime.  The fact that somebody was
15   indicted for having committed a crime, that singular
16   event is no evidence that they committed that crime.
17           Now, how can that be?  Well, let's just
18   say that in Houston, Texas, two months ago there was a
19   burglary of a building of a whole bunch of (inaudible)
20   stuff was taped.  And just right now through that door
21   come twenty Houston Police Officers who arrest me today,
22   right now, for having committed that burglary two months
23   ago.  Can you see that because I was arrested today
24   can't possibly be any evidence that two months ago I
25   committed that crime?  Now those twenty police officers

21

1   may have nine buckets full of perfectly wonderful
2   evidence that two months ago I committed that crime.
3   That's a deal.  But my arrest today can't possibly be
4   any evidence that two months ago I committed that
5   burglary.  Anybody have any disagreement with that?
6           And the same applies to being charged with
7   committing a crime and being indicted for having
8   committed a crime.  That is an allegation, and each
9   of those steps must occur before a case can be brought
10   into a courtroom, jurors selected from the community, to
11   listen to testimony, to see whether or not the
12   accusation is supported by the testimony in the case.
13           So, I'll tell you in the Court's charge
14   and I tell you now, the fact that somebody was arrested,
15   charged for, indicted for, having been indicted in the
16   commission of a crime, none of those events are any
17   evidence, nor can they be considered or taken by a Judge
18   or a jury as any evidence that the defendant, in fact,
19   did commit that crime.  Is there anybody here who has
20   any quarrel, who has any dispute, or who has any
21   discussion about that aspect of our law?
22           Okay.  I'll bet from having watched
23   television in the past -- and I spend a lot of time
24   talking about Judge Judy, because that's one of the most
25   amazing things I've ever seen in my whole life.  And

22

1   you're going to have to notice, I ask you to notice,
2   that Judge Judy don't deal with lawyers.  Judge Judy
3   only deals with individuals she can harass, and the same
4   is true with Mills Lane.  We're dealing with lawyers
5   here, so it's different.  Please, please excise that
6   Judge Judy business from your thoughts.
7           But in the lawyer shows that have been on
8   for years and years and years, I know in my heart that
9   every single one of you have heard this phrase:  The guy
10   was found guilty beyond a shadow of a doubt.  Everybody
11   has heard that.  Most of you possibly used it.  The law
12   doesn't require somebody to be proved guilty beyond a
13   shadow of a doubt.  Perry Mason, first television lawyer
14   show I ever watched.  I was a little kid.  And it wasn't
15   till about three or four years of watching that stuff it
16   occurred to me Hamilton Burger -- you remember Hamilton.
17   Hamilton was the District Attorney.  Why would those
18   people continue to reelect Hamilton as their District
19   Attorney if he never won a case?  So once you know that,
20   you can pretty well figure out the fictitiousness of the
21   whole thing.  Perry Mason, always guilty beyond a shadow
22   of a doubt.  Got to prove somebody guilty beyond all
23   doubt, beyond every point.
24           Well, the government, the prosecution,
25   never has to prove somebody's guilt beyond a shadow of a

23

1  doubt. They don't have to prove it beyond every doubt,
2  and they don't have to prove it beyond all doubt. That
3  has never been the law in this country, is presently not
4  the law in this country, and in all reasonable
5  probability it will never be the law in this country.
6  The law, however, does require that the prosecution
7  prove a person's guilt beyond a reasonable doubt. And
8  in the Court's charge I will give you the definition
9  that we are required in our state to give you as to what
10  the term reasonable doubt means.
11          I'm now going to give you a portion of
12  that definition. It is not -- because I want you to
13  know about it before the trial ever begins. It is not
14  required that the prosecution prove guilt beyond all
15  possible doubt. It is required that the prosecution's
16  proof excludes all reasonable doubt concerning the
17  defendant's guilt. A reasonable doubt is a doubt based
18  on reason and common sense after a careful and impartial
19  consideration of all of the evidence in the case. It is
20  the kind of doubt that would make a reasonable person
21  hesitate to act in the most important of his own
22  affairs. Proof beyond a reasonable doubt, therefore,
23  must be proof of such a convincing character that you
24  would be willing to rely and act upon it without
25  hesitation in the most important of your own affairs.

24

1          That, ladies and gentlemen, is the
2  standard of proof that the State must present to you
3  through their witnesses to encourage you to believe the
4  accuracy of the allegation against the defendant. Now
5  the point of it, and the significant point, is this: It
6  is always, always, always the State's job to prove that
7  a person is guilty. It is never ever, ever a
8  defendant's job to prove that he is or she is not
9  guilty.
10          Now you might say to yourselves, well, I
11  don't agree with that. I think a defendant ought to
12  have to prove that he or she didn't commit the crime.
13  And I suggest to you that probably if you thought about
14  it for a second in practical terms, you wouldn't have
15  that conclusion. For example, today is the 9th -- 8th
16  of September. Whatever it is, that's what today is, 8th
17  of September of 1999.
18          Let's go back five years ago today,
19  8th of September, 1994. And I go back five years
20  just simply to pick a day that has existed in our lives
21  before where we may not have a recollection of what we
22  did that day. It was a day that all we know is we have
23  successfully been fortunate enough to live through. If,
24  however, the 8th of September is a day that does have
25  some significance to you, an anniversary, a birthday, a

25

1  significant event that does cause you to -- then pick
2  another day. Pick October, August, April, some other
3  day.
4          But at any rate, let's say when we get
5  through in our business in a little bit, you're walking
6  out to the elevator, waiting outside the courtroom is a
7  nice deputy sheriff, walks up to you and says, Are you
8  Mr. A, or Are you Miss B? Well, yes, I am. Well, I
9  have something for you. Because, you see, while you
10  were in that courtroom making yourself available for
11  jury duty, a Grand Jury in Harris County, Texas, in one
12  of their secret sessions -- and the law requires they be
13  secret -- has just returned an indictment against you
14  today, charging you with having, on the 8th of September
15  of 1994, committed the offense of sexual assault of a
16  child. Have a nice day.
17          What is going to be the second thing that
18  you're going to do? The first thing you're going to do
19  is pass out. The second thing you're going to do is
20  you're going to say, I didn't do it. And, of course,
21  you didn't. Now, how do you prove it? Well, you might
22  say to yourselves, if the 8th of September of '94 was a
23  workday, I know that I ordinarily get to to work at 8:15
24  every morning, and I habitually get home at 6:15 or 6:30
25  in the evening.

26

1          Let's just say the 8th of October or 8th
2  of September was a workday, and I don't know whether it
3  was or wasn't. That means that you are armed, if it
4  was, with information to prove when you go to work and
5  when you get home. And in your wildest dreams, you
6  cannot believe that proves you did not commit that
7  crime. The point being, it's not your job to prove that
8  you didn't do it. It's the State's job to prove that
9  you did do it.
10          It's just like so many -- not a system,
11  but a thread of justice that has been in all of our
12  bodies ever since we first started interacting with
13  kids, whether it was going to school, whether it was
14  neighbor kids on the block, whoever it might have been.
15  And that was this: If anybody in our peer group ever
16  blamed us for having done something wrong to the other
17  members in our peer group, it was the person's job who
18  was doing the blame to go prove that we did do something
19  wrong. And it is absolutely no different here in the
20  courtroom. The people doing the blaming are the people
21  who have to do the proving. The State's doing the
22  blaming. The State's got to do the proving. How much
23  proving the State's got to do, I don't know; but it's
24  got to be at least that satisfies you beyond a
25  reasonable doubt that the allegation is accurate.

27

1      So unless or until the State's evidence
2 does prove beyond a reasonable doubt the defendant's
3 guilt, the defendant is not guilty. The defendant is
4 not guilty. Right now the defendant stays innocent.
5 Stays innocent -- presumption of innocence -- unless or
6 until the time comes when, based upon the evidence
7 presented by the State, that presumption of innocence,
8 that presumption of being not guilty, is erased by the
9 quality and the contents of the evidence; and the jury,
10 instead, finds the defendant to be guilty based on that
11 evidence.
12      Now you say to yourselves, for example,
13 well, what if the only information -- I'm jumping a
14 little bit of ahead of myself, because I don't want to
15 run the risk of forgetting this later on. What if the
16 State is the only one that presents evidence and the
17 other side doesn't? Doesn't make any difference;
18 because, you see, you might not believe the State's
19 evidence. Just because they're the only people that are
20 talking doesn't make them accurate. Just because people
21 get to talk last don't make them right. The point
22 being, you analyze, think about, you evaluate every
23 witness' testimony based upon the quality of the
24 contents of it and how they hit you, they, as a witness,
25 how they come across to you. So just because the State

28

1 is the only side that presents testimony doesn't mean
2 that testimony is believable.
3      It could be at the conclusion that you
4 determined it to be it. Could also be at the conclusion
5 you determine it's not. So keep your mind open the
6 whole way through. Now, any questions to this one? I'm
7 sure every single one of you live your lives in such a
8 way that when it comes down to making an important
9 decision in your life, whatever that decision might be,
10 that you want to possess, to gather all of the
11 information you can possibly gather for the purposes of
12 helping you make a better informed and a more
13 intelligent decision.
14      You go shopping for cars. You get all the
15 information. You go shopping for houses. You get all
16 the information. You go shopping for spouses -- well,
17 that might be different. Sometimes the information is
18 not accurate, because there ain't no warranties about
19 that stuff. But the point being, you want to gather all
20 the information you can; because it just broadens your
21 comfort zone. It makes you feel a whole lot better
22 about the decision you do make.
23      So, we bring you down here to the
24 courthouse, ask you to take some time, do your duty,
25 serve as a juror in a case. And you come down here, and

29

1 I'm going to tell you right now, it may very well be
2 that we don't tell you, we don't give you all the
3 information you might like to have. Now see, that just
4 rips it sometimes; but I want to spend some time talking
5 about that, because there is a very legitimate and
6 actually a logical reason as to why that happens.
7      And I use this example till even I'm sick
8 of it, but it's true. Years and years and years ago,
9 when I was a kid -- years and years ago is when I had
10 kids, I should say. One evening I was in a room.
11 Six-year-old daughter comes in, takes a big old deep
12 breath, puts her hands on her hips, got just as dramatic
13 as she could possibly get and said, Daddy, do you know
14 what your other daughter did? And I said, No, I don't.
15 She said, You know the cookies that mom had been
16 spending this afternoon making? I said, I do. Did you
17 know Amanda ate mine? No, I didn't. You've been
18 through something like that, every single one of you
19 have. What's the first thing we do? We fall for it
20 every time. We get the other kid in. Why? We want to
21 play the other kid off on the one that's telling us a
22 story. Why? Because we're not so sure we believe the
23 first kid. Why? Well, they might have been fighting
24 that day. Who knows? That's just what we do. We all
25 want to get all that information.

30

1      You're at work. Your job for years at
2 work has been to manufacture a widget, seventy-five
3 cents a unit. Out of the blue, somebody walks into your
4 office one day and says, Hey, I know how we can make
5 this widget at sixty-five cents a unit, a dime cheaper.
6 It's going to be the same quality. It's just going to
7 save us money. What's the first thing you do? You get
8 everybody up and down the marketing chain, the
9 manufacturing chain. You get them together in a room,
10 and y'all talk about it. Can we really do it for
11 sixty-five cents? You want to get all of the
12 information you can get. You do the same thing when
13 you're on the committee at the church that's going to
14 hire the preacher that's going to replace the one that's
15 just recently retired. You want to talk to all of them.
16      Same thing when you elect next year's PTA
17 President at school. You want to hear from everybody,
18 because it broadens your comfort zone. You assemble all
19 the information you can get to help you make a better
20 decision. Down here we say that may not happen. And
21 let's talk about why it's not going to happen -- why it
22 may not -- not why it's not, but why it may not.
23 Because we have talked about the fact that it's the
24 State's job to prove a defendant committed a crime.
25 It's not the defendant's job to prove he did not commit

31

1    the crime.
2            So after the conclusion of the evidence in
3    a case, when the State rests their case, when they have
4    presented whatever evidence they're going to present,
5    one of three things can happen. It may very well be
6    that the defense chooses to rest immediately. That is
7    to say, presented no evidence at all immediately upon
8    the conclusion of the State's evidence.
9            Second thing might be the defense intends
10   to present evidence and does present evidence that does
11   not include the defendant's testimony. That is to say,
12   other witnesses, but not the defendant.
13           Third possibility is other witnesses and
14   the defendant. In the event the defense presents no
15   witnesses at all at the conclusion of the State's
16   case -- as I said earlier, they don't have to. And you
17   might say to yourselves, I sure would like to hear the
18   defendant's side of the story. Nothing wrong with
19   thinking that way. But can you see it's the State's job
20   to prove he did it? It's not his job to prove that he
21   didn't. And just because you only heard one side of the
22   story does not mean that you have to believe that side.
23           It's just like when you go shopping for a
24   car. If you see one salesman and it's the only person
25   you talk to and you don't talk to anybody else, that

32

1    doesn't mean you have to believe the one you talked to.
2    Doesn't mean he has to be accurate. Doesn't mean he has
3    to be honest. It simply means that's all the
4    information you got. You decide for yourself whether
5    you believe it, whether you don't believe it. But
6    sometimes it's frustrating, I know, for jurors at the
7    conclusion of the evidence in the case to go back to a
8    jury room in a case and you say to yourselves, boy, I
9    sure wish I had heard what the defendant had to say. It
10   would have made my job a whole lot easier. And that may
11   be absolutely accurate. It may very well be at the
12   conclusion of the testimony in a case, if you don't hear
13   from the defense you might say to yourselves, boy, I
14   sure would have liked to heard what was on their side of
15   the street, like to have heard something else. Nothing
16   in the world wrong with thinking that way. The problem,
17   however, is that it's not the defendant's job to prove
18   anything to you. It's the State's job. So, you can't
19   hold it against a defendant for having not testified or
20   a defendant for having presented no testimony.
21           Your job is to make your decision on the
22   basis of the information you're given. The jurors' very
23   first function will be that you will take an oath, and
24   that oath will be that the verdict you return in the
25   case, whatever that verdict winds up being, will be

33

1    based exclusively upon the testimony that you hear from
2    the witnesses under oath, as well as any physical items
3    of evidence that might be admitted for your benefit, as
4    well as the law that's contained in the Court's charge.
5    So, that's all. You can't go out and find an imaginary
6    butler and say, they're possibly guilty of the offense,
7    because that's not the evidence in the case from our
8    example earlier. You have to base your decision on
9    information you do have. You cannot base your decision
10   on information that you do not have, nor speculate as to
11   why you don't have it.
12           So, I'll tell you in the Court's charge
13   and I'll tell you now, that if the defendant in the case
14   does not testify, that is no circumstance that any Judge
15   or any jury could use as an inference, as a suggestion
16   that the defendant is, in fact, guilty of the offense.
17   Because otherwise, he or she would have testified;
18   because it's not his or her job to disprove their guilt.
19   It's the State's job to prove their guilt.
20           Now having said that, having also talked
21   about you've got to make your decision on the basis of
22   the information you were given, I also can tell you that
23   sometimes you go out and you say to yourselves, I sure
24   wish Lawyer A had asked a witness so-and-so. I wish
25   Lawyer B had presented us with testimony by such and

34

1    such. And they may be perfectly wonderful thoughts, and
2    maybe that should have occurred. Maybe it would have
3    been simply -- but can you also see that perhaps that
4    testimony never existed in the first place.
5            So it's just like when an example I've
6    also used. When I was a teenager growing up, there was
7    about a year there where there were five boys in the
8    family, four brothers and myself; and we were all
9    teenagers at the same time, and we ate like horses. And
10   at 6:00 o'clock every evening when mom came into the
11   dinner table, she would sit down the meat platter. And
12   the fastest fork got the best piece of meat. And there
13   were seven pieces of meat. One for the boys, one for
14   mom, and one for dad. And when all seven pieces of meat
15   were gone from that platter, nobody ever thought mom was
16   going to take that meat platter up to that kitchen and
17   load it back up again.
18           I'm just saying, here in the courtroom
19   when all the evidence is through, it's all you're going
20   to get. And if that evidence is enough that creates a
21   broad enough comfort zone to make you believe based upon
22   that evidence beyond a reasonable doubt the defendant's
23   guilty, then your obligation is to find him guilty. And
24   if that evidence and that information is not enough that
25   makes your comfort zone broad enough to make you believe

35

1  that beyond a reasonable doubt the defendant is guilty,
2  your job is to find him not guilty. But your job is to
3  make the decision on the basis of the information you're
4  presented with and your evaluation of that testimony.
5       And the reason that the other side doesn't
6  have to testify -- and we talked about the little kid
7  coming in, and we get the other kid in to hear the other
8  side of the story, and all the competing thoughts and
9  processes, and the widget business, and the preachers
10 and all this stuff is simply this: That first kid who
11 told me that her little sister had eaten all the
12 cookies, do you know that that little sister was not
13 going to be liable to the death sentence? The first
14 child was wrong, so the first child didn't have to prove
15 that to me beyond a reasonable doubt. In the courtroom
16 the proof has to be beyond a reasonable doubt, because
17 somebody could die.
18      The widget business, the guy who claims we
19 can do it for sixty-five cents instead of seventy-five
20 cents, doesn't have to prove beyond a reasonable doubt;
21 because if he's wrong, nobody's going to die. The
22 preacher who says, I'm going to increase the size of
23 your congregation by thirty-three percent over the next
24 year doesn't have to be accurate, because he's not going
25 to die if he's wrong. In the courtroom, somebody might

36

1  die, and that's why the State has to prove it beyond a
2  reasonable doubt. And that's why you don't have to have
3  competing sides to dispute the first side, because it's
4  the quality of the evidence. So first, it's not the
5  number of the witnesses, not anything else. It's the
6  quality of the believable evidence. So you go back to
7  the premise, this part of it. Is there anybody here
8  who -- and the instruction in the Court's charge will be
9  if the defendant in this case does not testify, that is
10 no suggestion, that is no inference, that they're hiding
11 something. And you cannot believe that a defendant is
12 guilty simply because a defendant did not do something
13 that the Constitution doesn't require him to do, and
14 that's testify. Is there anybody here who has any
15 dispute, any quarrel, any disagreement, or any
16 conversation about -- any discussion about that facet of
17 our law?
18      Okay. We talked about the fact -- and I
19 know the questionnaire, the cover letter in the
20 questionnaire touched on this, also. We talked about
21 the fact that the death penalty is a possible punishment
22 in this case. I'm not going to spend a great deal of
23 time on this, but I do want you to know what the system
24 is, what the system calls for, and how a result can
25 occur.

37

1       If a defendant is found guilty of capital
2  murder at the conclusion, we talked about coming back
3  and having a second phase of the trial. In the second
4  phase of the trial, testimony is going to be presented
5  to you about aspects of the defendant's background and
6  character, perhaps their responsibility, and in terms of
7  the crime itself, if there are multiple people involved.
8  But at the conclusion of the evidence at the second
9  phase of the trial, in the Court's charge you'll be
10 given the law that is raised by the testimony as it
11 applies to that phase of the trial. And your verdict at
12 that time will be based upon how you answer two Special
13 Issues, how you answer two questions.
14      These questions are up here on the board.
15 I don't know if you can see them. If you can, that's a
16 deal. If you can't, don't worry about them; because I'm
17 not going to spend any real great time talking to you
18 about them, except I want you to know they exist. The
19 first question you'll be asked is this: Do you find
20 from the evidence beyond a reasonable doubt that there
21 is a possibility that the defendant would commit
22 criminal acts of violence that would constitute a
23 continuing threat to society, based upon the testimony
24 in the case?
25      Now no matter who the defendant is, no

38

1  matter who the victim was, no matter what the testimony
2  was, and no matter what the case was, there are only two
3  possible answers as to that question, yes or no. The
4  jury will answer the question whichever way the evidence
5  in the case directs them in their judgment. Question
6  Number Two will ask the jury: Do you find that, taking
7  into consideration all the evidence, including the
8  circumstances of the offense committed -- that's going
9  to be what you heard at the first phase of the trial --
10 also including the defendant's character and background
11 and the personal moral culpability or blameability and
12 the responsibility of the defendant -- that's going to
13 be what you heard at the second part of the trial.
14      So the first half of the second question
15 just instructs you to go back over all the evidence in
16 the case for the purpose of asking you this question:
17 Is there a sufficient mitigating circumstance or
18 circumstances that warrant a sentence of life
19 imprisonment rather than a death sentence be imposed?
20 Again, no matter who the defendant, no matter who the
21 victim, no matter what the evidence, no matter what the
22 case, there are only two possible answers to that
23 question, either yes or no. And the jury will answer
24 that question whatever way that the evidence dictates.
25      If the jury should answer yes to Question

39

1  Number One and if the jury should answer no to Question
2  Number Two, the law says that I have no choice, I have
3  no discretion, I have no option. I must sentence the
4  defendant to death. And that is exactly what I'll do.
5          On the other hand, if the jury should
6  answer these questions in any way other than yes and no,
7  in that order, the law once again says I have no choice,
8  I have no option, I have no discretion. I must sentence
9  the defendant to life. And that's exactly what I'll do.
10 So -- and these questions will always be asked in that
11 order, the Number One that I told you about, Question
12 Two I told you about. Always going to be in that order.
13         So from that, you can see at the outset
14 that at the conclusion of some capital murder cases, a
15 result might be a death sentence imposed as a result.
16 In another case, might be a life sentence imposed.
17 These questions never change. The order in which
18 they're given never changes. The one thing that is
19 always different is the defendant on trial, the
20 background, the character of the defendant, the victim
21 involved, the facts of the case, the testimony of the
22 witnesses. Those are the variables that exist.
23         And the jury -- as we talked earlier, two
24 juries could hear the same things, drawing entirely
25 different conclusions based upon how you evaluate the

40

1  testimony. So can you see that while one of the
2  standardizations that exist in a capital murder case is
3  these questions, the thing, the variable always exists;
4  that is, the uniqueness of the individual case both in
5  terms of the offense, the background of the defendant,
6  and the jury that was involved, which means at the
7  conclusion of the evidence in one case, where a life
8  sentence was imposed, that may be the absolute most
9  appropriate decision in the world to make based upon
10 that particular case.
11        In another case a person found guilty of
12 capital murder, death sentence is imposed. The
13 questions are answered in such a way that the death
14 sentence is imposed. Again, that might be the most
15 appropriate decision to make based upon the facts and
16 the evidence in that case. But the point being, every
17 case has the uniqueness that causes you to have to judge
18 a case on the basis of its merits at the time the
19 testimony is presented to you and not compared to some
20 other case that's not involved in the trial at all or
21 some other circumstance.
22        So, having said that to you, that is the
23 system. And that's how it is determined whether a life
24 sentence is imposed or a death sentence is imposed if a
25 defendant is found guilty of capital murder. Again, I'm

41

1  not going to go into detail about the questions today.
2  I will when we talk about this on an individual basis,
3  but I did want you to know the format, so to speak.
4          Now the death penalty is a possible
5  punishment. Whether it's the appropriate punishment,
6  nobody can say until after the evidence is offered. But
7  since the death penalty is a possible punishment, I'm
8  going to ask each of you a question, and again, in a
9  group. I'm going to ask you one time. Before I ask you
10 the question, we're going to do like we used to do in
11 the Army. I'm going to tell you what the question is
12 going to be that I'm going to ask you. Then I'm going
13 to ask you the question. Then I'm going to tell you
14 what it was I just asked you. So, please don't answer
15 my question first. The question I'm going to ask you
16 when I get to it is this: Because the death penalty is
17 a possible punishment and because both sides have the
18 right to have jurors who will freely exercise their
19 ability to answer these questions based upon the
20 evidence in the case, irrespective of what punishment it
21 may cause, but because both sides have the right to have
22 jurors who can consider the whole range of punishment.
23 And since the death penalty is a possible punishment, is
24 there anybody here who, if after having heard all of the
25 evidence in the case, and if based upon that evidence

42

1  that you believe that the death penalty was an
2  appropriate punishment to be considered -- is there
3  anybody here who, because of some religious, some
4  philosophical, some conscientious, or some moral reason
5  would refuse to consider it as a possible punishment,
6  even though the evidence dictated to you intellectually
7  that you should, you would refuse to consider it no
8  matter what the evidence?
9          Now, that's the question I'm going to ask
10 you. I'm going to clean it up and explain the question
11 a little more thoroughly. Is there anybody here who, if
12 you were a juror and if you got down to the conclusion
13 of the evidence in the case -- is there anybody here who
14 would refuse to consider answering these two questions
15 in such way that the death penalty would be imposed,
16 simply and only because of some philosophical, some
17 religious, some moral or conscientious internal thought
18 that you had that would cause you to override the
19 evidence in the case and follow your moral -- moral
20 thought, I should say, or conscientious objection to
21 answer these questions?
22         Now, that's the question. I'm not talking
23 about how you'll vote in this case. I'm not talking
24 about whether you would or not like the death penalty or
25 whether this would be difficult or not difficult.

43

1     That's not the point. The point is, is there ever,
2     ever, ever, ever going to be in your mind, no matter
3     what it might be, no matter how powerful, no matter how
4     gruesome, no matter how awful -- is there ever, ever,
5     ever going to be a time when, no matter what the
6     evidence was, you would refuse to follow that evidence
7     and answer these questions in such a way that the death
8     penalty was imposed because you had some religious, some
9     moral, some conscientious, or some philosophical
10    objection to the consideration of death as a possible
11    punishment in a case?
12             Is there anybody in the first six? No one
13    in the first six. Anybody on the second row? Nobody on
14    the second row. Is there anybody on the first row on
15    the right?
16             Yes, ma'am, and your number, please?
17             VENIREPERSON: 16.
18             THE COURT: 16. Thank you. Anybody on
19    the third row on the left? Anybody on the second row on
20    the right?
21             Your number, please, sir?
22             VENIREPERSON: 26.
23             THE COURT: All right. Thank you.
24             Okay. We had talked earlier about how
25    we're going to go about this process. We're going to

44

1     get you back either tomorrow or Friday. If you're not
2     due back until Friday, you do tomorrow whatever it is
3     you ordinarily do. Don't worry about us. If you're due
4     here Friday, obviously we want you here Friday. So
5     we're going to have you here either tomorrow or Friday.
6             We're also going to have to say that there
7     is a chance that we will want you back on Wednesday, the
8     30th of September, which is what? Three weeks from
9     today? Okay. Three weeks from today. And what we're
10    going to be doing in the three-week period is we'll have
11    other people just like you in here and we'll be creating
12    a pool and wind up with about fifty. And we'll come
13    back on that day, the 29th of September, and we'll --
14    it's not going to last any longer than today will
15    probably. And everybody will leave here on that day,
16    Wednesday, the 29th, knowing whether they are or are not
17    a juror in the case.
18             If you're not a juror in the case, you
19    won't care about when the case starts. But if you are a
20    juror in the case, the case will start the following
21    Monday, being October the 4th, and lasting no longer --
22    and probably not this long -- two working weeks. Now I
23    know -- we all know that everybody who is here today is
24    here today laboring, to some degree or another, under
25    some inconvenience. If the only inconvenience that

45

1     you're here today laboring under is the fact when you
2     backed out of the driveway this morning, instead of
3     taking a right to go to work, which is what you would
4     have done, you had to take a left to come downtown.
5     That starts everything off wrong, and nothing ever gets
6     rehabilitated as a result of that. I recognize that.
7     That's why we're not going to waste your time.
8             But I want to get past inconveniences, and
9     I want to talk about either Thursday or Friday, tomorrow
10    or Friday. I want to talk about the 30th of
11    September -- I'm sorry -- 29th of September. And then I
12    want to talk about not more than the weeks of October
13    3 -- October 4 and 11. Excuse me. Now, is there
14    anybody here for whom those dates are an impossibility?
15    And I'm not talking inconveniences. Anybody here for
16    whom some circumstance exists in your life that would
17    prevent you from being with us on those occasions?
18    First six over here, on the first left row? Anybody
19    there? Nobody? Second row? Anybody there? Nobody
20    there? The third row, on the first -- on the right?
21             Yes, ma'am, your number?
22             VENIREPERSON: 15.
23             THE COURT: 15. And what is your
24    situation, please?
25             VENIREPERSON: School.

46

1             THE COURT: And where do you go to school?
2             VENIREPERSON: Northwest College.
3             THE COURT: Northwest. Is that a junior
4     college?
5             VENIREPERSON: Yes, sir.
6             THE COURT: The third row, the six on the
7     left? Anybody there? Second row? Second row of six on
8     the right? Anybody there?
9             Yes, sir?
10            VENIREPERSON: 29.
11            THE COURT: Uh-huh?
12            VENIREPERSON: I'm going to be relocating
13    to Minnesota.
14            THE COURT: Just in time for winter.
15            VENIREPERSON: Well, I start next Monday.
16            THE COURT: That will get you there in
17    time for winter.
18            Okay. Mr. McClellan and Mr. Hill, is
19    there anything that I have omitted discussing with the
20    jury before we get together? And I have not forgotten
21    that one situation.
22            MR. HILL: I don't believe so.
23            MR. MCCLELLAN: No.
24            THE COURT: Ladies and gentlemen, what's
25    going to happen next, the lawyers and I are going to get

47

1  up here and sort information out both from your
2  questionnaires and your conversation today. And we're
3  going to ask some of you to come back. I don't want you
4  to think that you're supposed to sit here quiet, not say
5  anything at all. That's just unnatural and not the
6  case. But keep in mind, also, that we're going to have
7  to be up here. We're going to have to talk loud enough
8  that we can hear each other, but quietly enough so you
9  can't hear us. So if you guys get loud, that's okay.
10         I don't know if you ever had happen in a
11 big old room what I've had happen. You're going to tell
12 your friend the biggest, juiciest, best piece of gossip
13 you possess. And the room is noisy, and you set it up.
14 And just before you deliver the punch line, everybody
15 goes quiet; and everybody hears what you got to say. I
16 guess all I'm telling you is if you get loud, please
17 stay loud. And in about ten minutes, we'll be back with
18 you. Thank you very much.
19         But before we go any further with that,
20 I'm going to ask Miss Scott, would you come up here,
21 please?
22         (At the bench:)
23         THE COURT: Miss Scott, how are you? I
24 don't want you to feel singled out. There is a question
25 I want to ask about. You said in your questionnaire

48

1  that had you had -- Question Number 2 on Page 4 asks, Do
2  you have any knowledge of this case or a capital murder
3  case involving Charles Mamou, Jr., Terrence Gibson, and
4  Mary Carmouche? And you checked "yes." Your answer was
5  that you got that from the newspapers and the TV.
6          Now the information that you possess about
7  this case, has it caused you to form an opinion before
8  the trial ever begins about the defendant's guilt in
9  this case?
10         VENIREPERSON: No.
11         THE COURT: Has the information that you
12 possess, whatever it might be, caused you in any way to
13 form an opinion, if the defendant's guilty, what
14 punishment he should receive before the case ever
15 begins?
16         VENIREPERSON: No.
17         THE COURT: Has information that you're
18 aware of -- have you heard about the case from anywhere
19 other than from the television, newspapers?
20         VENIREPERSON: No.
21         THE COURT: No friends or acquaintances
22 that y'all talked about the case?
23         VENIREPERSON: No.
24         THE COURT: Would the information that you
25 possess in any way interfere with your ability to

49

1  determine any factual dispute? That is to say, the
2  testimony in the case, as you hear it from the courtroom
3  and the witnesses under oath?
4          VENIREPERSON: No.
5          THE COURT: Mr. McClellan, any questions?
6          MR. MCCLELLAN: No.
7          THE COURT: Mr. Hill?
8          MR. HILL: No, sir.
9          THE COURT: Miss Turner, would you come
10 up, please, ma'am, Number 50?
11         (At the bench:)
12         THE COURT: Miss Turner, you had said that
13 you were going to school, Northwest Junior College.
14 When do you go?
15         VENIREPERSON: I go in the evenings, but I
16 have a final exam to make up on Thursday.
17         THE COURT: Thursday of this week?
18         VENIREPERSON: Uh-huh.
19         THE COURT: If we schedule you Friday --
20         VENIREPERSON: That would be fine.
21         THE COURT: -- would that fix your
22 problem?
23         VENIREPERSON: Yes, sir.
24         THE COURT: The other times we've talked
25 about, any problems there?

50

1          VENIREPERSON: Huh-uh.
2          THE COURT: Thank you very much. You may
3  have a seat.
4          (Defendant joins bench conference.)
5          THE COURT: Okay. If I'm understanding
6  correctly, for various reasons -- if I'm understanding
7  correctly, there is an agreement by and between the
8  parties that the following venirepersons, for various
9  reasons, may be excused from this panel of thirty, those
10 being: Venirepersons Number 1, 3, 5, 7, 11, 13, 14, 16,
11 17, 20, 25, 26, and 29, each may be excused.
12         Mr. McClellan, is that your agreement,
13 sir?
14         MR. MCCLELLAN: Yes, Your Honor.
15         THE COURT: Miss Connors, yours ma'am?
16         MS. CONNORS: Yes, sir.
17         THE COURT: Mr. Hill, yours?
18         MR. HILL: Yes, sir.
19         THE COURT: Mr. Wentz?
20         MR. WENTZ: Yes.
21         THE COURT: Yours, Mr. Mamou?
22         THE DEFENDANT: Yes, sir.
23         THE COURT: Do you request each of those
24 be excused?
25         THE DEFENDANT: Yes, sir.

51

1        THE COURT: Very well. I'll honor that
2  request, and they're excused.
3        Okay, so that's seventeen.
4        (Off-the-record discussion.)
5        THE COURT: Anything else we want to talk
6  about?
7        (Continuing in jury's hearing:)
8        THE COURT: Ladies and gentlemen, we've
9  come up with, out of the thirty of you, we're going to
10  ask for seventeen of you to come back. We're going to
11  ask for ten of you to come back tomorrow. We're going
12  to ask seven of you to come back Friday. Each of those
13  days we're going to want you up here outside this door
14  before 8:30 a.m.
15        Now let's talk about what we're doing.
16  The law says that we have to talk to you in the same
17  order in which we received you today. So of the people
18  we're going to ask back tomorrow, for example, if you
19  were to be the first person that we're going to talk to
20  tomorrow morning and if you don't get here until 9:15,
21  that means that we can't have talked to anybody. And I
22  want to share that information with you so that when you
23  do roll in here at 9:15, you'll understand how quickly
24  you have made about a dozen powerful enemies; because we
25  can't do this without you being here.

52

1        If you're the first person we talk to,
2  we're not going to keep you here. As soon as we're
3  through talking to you, you're free to go. But we can't
4  start without all the others. And my notion -- and I'm
5  speaking for myself, and I'm not speaking for the
6  lawyers. My notion is this: That you folks are
7  entitled to rely upon the accuracy of the commitments
8  that I make to you as it affects a clock. Therefore, I
9  am entitled to rely on yours. I will keep my word to
10  you as to being able to get you out of here on time, but
11  I cannot keep that word to you if you refuse to let me
12  get started on time.
13        So, it's your deal, not mine. But it's
14  kind of like the parent that grounds the child for two
15  weeks. Parents can't go out, either. So, while it's
16  your fault, I'm stuck with it. And it upsets me. And I
17  wish I weren't this way, but I'm real goofy about a
18  clock.
19        (Speaking to bailiff) Where in the hell
20  did these people come from? Good Lord, don't let that
21  happen.
22        I have no idea where I was, but you people
23  will either pick it up or you won't. Be on time. All
24  right. I'm going to call out the numbers and the names
25  of the people that we want here and the days we want you

53

1  back here. I'm going to try and do this in
2  chronological order, meaning that if your number happens
3  to be 75, and if I call it and the next number I call is
4  78, 76 and 77 don't need to worry about coming back.
5  I'm not going to jump around unless I screw this up, and
6  I'm capable of that. So, please, everyday it's 8:30.
7  Everyday it's before 8:30 out here in this hallway. You
8  know about the gonculator, or whatever those things are
9  called, the metal detectors. It's crowded in the
10  mornings, so plan on -- wherever it is you're coming
11  from and whatever your mode of transportation is, plan
12  on factoring in your parking. Plan on factoring that
13  into getting to where you can be up on the eighth floor
14  of this building before 8:30 tomorrow.
15        Okay. First one is Number 2, Mr. George
16  Pena; Number 4, Miss Joyce Scott; Number 6, Frances
17  Hashagen; is that correct? Number 8, Ruben Cardenas;
18  Number 9, Eric Hernandez; Number 10, Alejandra Amie;
19  Number 12, Brenda -- is it Wagy or Wagy?
20        VENIREPERSON: Wagey.
21        THE COURT: Number 18, Jerri Tinnemeyer;
22  Number 19, Ramie Cooksey; Number 21, Stacie Sibley.
23  Those ten people by 8:30 tomorrow morning, outside this
24  door. Is there anybody here who has any questions about
25  who those ten are, or about where you're supposed to be,

54

1  or about when you're supposed to be there?
2        Okay. The following seven people, Friday
3  morning, before 8:30, outside this doorway: Number 15,
4  Kelly Trainor; Number 22, Henry Spencer; Number 23,
5  Linda Wyatt; Number 24, Dana Goodman; Number 27, Raymond
6  Russell; Number 28, Louis Willis; and Number 30, Deanna
7  Jones. Is there any question in anybody's mind as to
8  who the seven people are that we will want to be here
9  Friday morning at 8:30?
10        Sir?
11        VENIREPERSON: I notice my number wasn't
12  called either time.
13        THE COURT: I wouldn't ask no questions.
14  I might figure out -- don't worry about it. I'm going
15  to touch on it. If your number wasn't called, you're
16  going to be a very happy person. If your number is
17  called, you're going to be back here. We'll try to make
18  you even happier. We may fail, but we're going to make
19  the effort.
20        Is there anybody whose number was called
21  who has any questions at all for me that will be of the
22  type question that the law will permit me to answer at
23  this stage? And I guess the question I'm trying to
24  limit you to is, do you know where you're supposed to be
25  and when you're supposed to be there? In just a second

55

1    I'm going to excuse you.

2         I guess it's thirteen of you whose numbers
3    weren't called.  You thirteen folks don't need to worry
4    about coming back.  In just a second you're going to get
5    a piece of paper, an excuse, a permit -- what do we call
6    them in junior high?  Hall passes -- to let somebody
7    know who just is demanding to know where it was you were
8    today.  Whether that be your employer or your spouse,
9    that's your deal.  But you're going to leave here armed
10   with some document to show where you have been today.
11   If you are due back here, we'll give you another one as
12   that thing unfolds.

13        Mr. McClellan, Mr. Hill, anything further
14   I need to visit about?

15        MR. HILL:  No, Your Honor.

16        MR. MCCLELLAN:  No, Your Honor.

17        THE COURT:  Anybody at all have any
18   questions for me?  If you folks don't have any questions
19   at all for me, when you get these documents, please feel
20   free to leave.  Please, if you are coming back, remember
21   where it is you are.  Remember where you parked.  If you
22   like that parking place, do it again tomorrow.  If you
23   want to move around and get another parking place, do
24   that.  But plan your travel in such a way that you can
25   be through the metal detector devices and up here by

56

1    8:00 o'clock in the morning.

2         One last chance.  Any questions?  Okay.
3    Thank y'all very much.  And when you get your things,
4    you're free to go.

5         (Court adjourned.)

57

1    THE STATE OF TEXAS   )

2    COUNTY OF HARRIS     )

3         I, Pamela Kay Knobloch, Official/Deputy
     Official Court Reporter in and for the 179th District
4    Court of Harris County, State of Texas, do hereby certify
     that the above and foregoing contains a true and correct
5    transcription of all portions of evidence and other
     proceedings requested in writing by counsel for the
6    parties to be included in this volume of the Reporter's
     Record, in the above-styled and numbered cause, all of
7    which occurred in open court or in chambers and were
     reported by me.

8
         I further certify that this Reporter's Record
9    of the proceedings truly and correctly reflects the
     exhibits, if any, admitted by the respective parties.
10
         I further certify that the total cost for the
11   preparation of this Reporter's Record is $_____ and
     was paid by Harris County.
12
         WITNESS MY OFFICIAL HAND this the _____ day of
13   _____, 1999.

14

15                              _____
16   Pamela Kay Knobloch, Texas CSR No. 1650
     Expiration date:  12/31/2000
17   Official Court Reporter, 179th District Court
     Harris County, Texas
18   301 San Jacinto
     Houston, Texas 77002
19   713.755.6340

20   APPELLANT:   CHARLES MAMOU, JR.
              CAUSE NO. 800112

**$**

| $ | [1] 57:11 |

**'**

'94 [1] 25:22

**0**

0470500 [1] 2:5

**1**

1 [1] 50:10
10 [1] 53:18
10:00 [1] 5:13
10th [1] 7:1
11 [2] 45:13 50:10
12 [1] 53:19
12/31/2000 [1] 57:16
13 [1] 50:10
13396100 [1] 2:3
14 [1] 50:10
15 [3] 45:22 45:23 54:3
16 [3] 43:17 43:18 50:10
1650 [1] 57:16
17 [1] 50:11
179th [3] 1:11 57:3 57:17
18 [1] 53:21
19 [1] 53:22
1994 [2] 24:19 25:15
1998 [1] 3:22
1999 [3] 1:18 24:17 57:13

**2**

2 [2] 48:1 53:15
20 [1] 50:11
201 [1] 2:7
21 [1] 53:22
21179300 [1] 2:18
22 [1] 54:4
23 [1] 54:4
24 [1] 54:5
25 [2] 1:2 50:11
26 [2] 43:22 50:11
27 [1] 54:5
28 [1] 54:6
29 [2] 46:10 50:11
29th [3] 44:13 44:16 45:11

**3**

3 [3] 1:2 45:13 50:10
30 [1] 54:6
301 [1] 57:18
30th [6] 6:23 7:1 7:3 7:10
44:8 45:10

**4**

4 [3] 45:13 48:1 53:16
4615 [1] 2:14
4th [2] 7:14 44:21

**5**

5 [1] 50:10
50 [1] 49:10
59656300 [1] 2:13

**6**

6 [1] 53:16
6:00 [1] 34:10
6:15 [1] 25:24
6:30 [1] 25:24

**7**

7 [1] 50:10

713.623.8312 [1] 2:16
713.755.5800 [1] 2:9
713.755.6340 [1] 57:19
75 [1] 53:3
76 [1] 53:4
77 [1] 53:4
77002 [2] 2:8 57:18
77027 [1] 2:15
77069 [1] 2:19
78 [1] 53:4
7th [1] 3:22

**8**

8 [1] 53:17
800112 [2] 1:3 57:20
8:00 [1] 56:1
8:15 [1] 25:23
8:30 [7] 51:14 53:6 53:7
53:14 53:23 54:3 54:9
8th [9] 1:18 24:15 24:16
24:19 24:24 25:14 25:22 26:
1 26:1

**9**

9 [1] 53:18
9:15 [2] 51:20 51:23
9th [2] 7:2 24:15

| [1] 57:12

| [1] 57:15

**A**

A.m. [1] 51:14
Ability [4] 15:11 16:8 41:
19 48:25
Able [3] 6:15 14:22 52:10
Above-entitled [1] 1:19
Above-styled [1] 57:6
Absolute [1] 40:8
Absolutely [4] 9:23 10:2
26:19 32:11
Accountant [1] 11:16
Accountants [1] 11:18
Accounting [1] 15:11
Accuracy [2] 24:4 52:7
Accurate [1] 17:6 26:25
27:20 28:18 32:2 32:11 35:24
Accurately [1] 15:10
Accusation [1] 21:12
Acquaintances [1] 48:21
Act [2] 23:21 23:24
Acts [1] 37:22
Adjourned [1] 56:5
Admitted [2] 33:3 57:8
Affairs [2] 23:22 23:25
Affects [1] 52:8
Afternoon [1] 29:16
Ago [11] 13:9 15:13 19:7
20:18 20:23 20:24 21:2 21:4
24:18 29:8 29:9
Agree [2] 5:24 24:11
Agreement [2] 50:7 50:12
Ahead [1] 27:14
Aided [1] 1:22
Ain't [2] 18:13 28:18
Alejandra [1] 53:18
Allegation [3] 21:8 24:4
26:25
Alleged [1] 3:21
Alter [1] 7:3
Alternates [1] 6:22

Amanda [1] 29:17
Amazing [1] 21:25
Amie [1] 53:18
Amount [1] 14:13
Analyze [2] 18:15 27:22
Anniversary [1] 24:25
Answer [16] 16:9 16:11 17:
17 37:12 37:13 38:4 38:23
38:25 39:1 39:6 41:14 41:19
42:21 43:7 48:4 54:22
Answered [1] 40:13
Answering [1] 42:14
Answers [2] 38:3 38:22
Anticipated [2] 7:15 7:22
Apartments [1] 29:16
Appellant [2] 1:6 57:20
Appellee [1] 1:11
Applies [6] 10:10 18:25
19:3 19:3 21:6 37:11
Apply [2] 19:12 20:3
Appropriate [6] 5:21 5:
22 40:9 40:15 41:5 42:2
April [1] 25:2
Arm [2] 10:4 16:8
Armed [3] 19:20 26:3 55:9
Army [1] 41:11
Arrest [2] 20:21 21:3
Arrested [3] 20:9 20:23
21:14
Aspect [1] 21:21
Aspects [2] 14:11 37:5
Assault [1] 25:15
Assemble [1] 30:18
Assistant [2] 2:6 3:10
Assume [1] 12:4
Assuming [1] 12:8
Ate [2] 29:17 34:9
Attorney [2] 22:17 22:19
Attorneys [5] 2:6 2:10 2:
20 3:8 3:11
August [1] 25:2
Automatically [2] 11:7
11:8
Available [2] 25:10
Aware [1] 48:18
Awful [1] 43:4

**B**

Backed [1] 45:2
Background [4] 37:5 38:
10 39:20 40:5
Bad [3] 17:11 17:12 17:13
Bags [1] 19:16
Bailiff [1] 52:19
Base [3] 13:19 33:8 33:9
Based [16] 7:20 10:15 18:
19 23:17 27:6 27:10 27:23
33:1 34:21 37:12 37:23 39:
25 40:9 40:15 41:19 41:25
Basis [8] 6:1 11:23 13:21
32:22 32:21 35:3 40:18 41:2
Bathroom [1] 8:10
Become [6] 6:22 13:1
Begin [1] 7:13
Begins [3] 23:13 48:8 48:
15
Believability [3] 9:21
10:10 10:21
Believable [6] 9:24 9:25
10:8 10:11 28:2 36:6
Bench [3] 47:22 49:11 50:4
Benefit [1] 33:3
Best [4] 5:3 15:11 34:12
47:12
Bet [1] 21:22
Better [6] 14:22 16:8 19:

Amanda [1] 29:17
Between [4] 7:2 10:13 10:
18 50:7
Beyond [20] 22:10 22:10
22:21 22:22 22:23 22:25 23:
1 23:2 23:7 23:14 23:22 26:
24 27:2 34:22 35:1 35:15 35:
16 35:20 36:1 37:20
Big [2] 29:11 47:11
Biggest [1] 47:12
Birthday [1] 24:25
Bit [9] 7:3 7:7 7:15 8:13
14:8 14:10 17:17 25:5 27:14
Blame [1] 26:18
Blameability [1] 38:11
Blamed [1] 26:16
Blaming [2] 26:20 26:22
Block [1] 26:14
Blue [1] 30:3
Board [1] 37:14
Bob [1] 1:20
Bodies [2] 19:15 26:12
Body [1] 19:16
Books [1] 19:9
Boy [2] 32:8 32:13
Boys [2] 34:7 34:13
Breath [1] 29:12
Brenda [1] 53:19
Bring [1] 14:18 28:23
Broad [2] 34:21 34:25
Broadens [2] 28:20 30:18
Broken [1] 6:12
Brothers [1] 34:8
Brought [1] 21:9
Buckets [1] 21:1
Building [2] 20:19 53:14
Bunch [1] 14:4 20:19
Burdette [1] 1:20
Burger [1] 22:16
Burglary [2] 20:19 20:22
21:5
Business [6] 6:11 7:7 22:
6 25:5 35:9 35:18
Butler [5] 19:7 19:10 19:
10 19:11 33:6
Butlers [1] 19:8

**C**

California [1] 4:8
Cannot [5] 5:3 26:6 33:9
36:11 52:11
Capable [1] 53:6
Capital [15] 3:20 5:15 5:
20 15:25 16:24 17:5 17:10
19:1 20:7 37:1 39:14 40:2
40:12 40:25 48:2
Car [3] 11:20 11:21 31:24
Cardenas [1] 53:17
Care [2] 15:2 44:19
Careful [1] 23:18
Carmouche [1] 48:4
Cars [1] 19:16 28:14
Case [90] 3:2 3:5 3:16 3:
19 4:20 4:20 4:20 5:2 5:7 5:
8 5:11 5:14 5:15 5:16 5:16
5:19 5:21 6:3 6:23 7:11 7:
13 7:18 7:23 7:24 8:3 9:16
10:9 10:18 12:4 14:3 15:23
18:25 19:12 19:10 19:11 19:
12 20:4 20:5 21:9 21:12 22:
19 23:19 28:25 31:3 31:3 31:
16 32:7 32:8 32:12 32:25 33:
3 33:13 36:9 36:22 37:24 38:
2 38:5 38:16 38:22 39:16 39:
21 40:2 40:4 40:7 40:10 40:
11 40:16 40:17 40:18 40:20
41:20 41:25 42:13 42:19 42:
21 43:11 44:17 44:18 44:19
44:20 44:20 47:6 48:2 48:3

48:7 48:9 48:14 48:18 48:22 49:2

**Cases** [1] 39:14
**Catch** [1] 14:17
**Caused** [2] 48:7 48:12
**Causes** [1] 40:17
**Cents** [5] 30:3 30:5 30:11 35:19 35:20
**Certainly** [1] 15:7
**Certify** [3] 57:4 57:8 57:10
**Chain** [2] 30:8 30:9
**Chambers** [1] 57:7
**Chance** [4] 7:6 7:6 44:7 56:2
**Change** [2] 7:7 39:17
**Changes** [1] 39:18
**Channel** [1] 19:14
**Character** [4] 23:23 37:6 38:10 39:20
**Charge** [14] 10:5 10:9 10:17 18:22 18:24 19:2 19:4 20:8 21:13 23:8 33:4 33:12 36:8 37:9
**Charged** [6] 3:19 20:6 20:12 20:13 21:6 21:15
**Charging** [1] 25:14
**Charles** [4] 1:5 3:5 48:3 57:20
**Cheaper** [1] 30:5
**Checked** [1] 48:4
**Child** [7] 17:21 17:21 17:23 25:16 35:14 35:14 52:14
**Choice** [2] 39:2 39:7
**Choose** [10] 8:25 9:4 9:8 9:8 10:24 10:25 11:7 13:20 13:20 18:7
**Chooses** [1] 31:6
**Chronological** [1] 53:2
**Church** [1] 30:13
**Circumstance** [5] 15:12 33:14 38:17 40:21 45:16
**Circumstances** [2] 38:8 38:18
**Citizen** [1] 19:23
**Civil** [1] 4:20
**Claim** [1] 5:22
**Claims** [1] 35:18
**Claire** [2] 2:4 3:11
**Clean** [1] 42:10
**Clock** [5] 5:12 52:8 52:18
**Closer** [1] 14:21
**College** [3] 46:2 46:4 49:13
**Comfort** [4] 28:21 30:18 34:21 34:25
**Coming** [6] 35:7 37:2 53:4 53:10 55:4 55:20
**Commission** [1] 21:16
**Commit** [5] 21:19 24:12 26:6 30:25 37:21
**Commitments** [1] 52:7
**Committed** [16] 16:7 17:15 20:9 20:11 20:12 20:14 20:15 20:16 20:22 20:25 21:2 21:4 21:8 25:15 30:24 38:8
**Committee** [1] 30:13
**Committing** [1] 21:7
**Common** [2] 12:15 23:18
**Community** [1] 21:10
**Compare** [1] 8:18
**Compared** [1] 40:19
**Competing** [2] 35:8 36:3
**Computer** [1] 1:22
**Conceivably** [1] 8:3
**Concerning** [1] 23:16
**Concluded** [5] 6:19 8:24

**Conclusion** [15] 6:16 18:23 24:15 28:3 28:4 31:2 31:8 31:15 32:7 32:12 37:2 37:7 39:14 40:7 42:12
**Conclusions** [2] 13:17 39:25
**Conference** [1] 50:4
**Congregation** [1] 35:23
**Connors** [4] 2:4 3:11 50:15 50:16
**Conscientious** [4] 42:4 42:17 42:20 43:9
**Consider** [4] 41:22 42:5 42:7 42:14
**Consideration** [3] 23:19 38:7 43:10
**Considered** [2] 21:17 42:2
**Consistent** [1] 4:25
**Constables** [1] 12:6
**Constitute** [1] 37:22
**Constitution** [1] 36:13
**Contain** [1] 10:9
**Contained** [1] 33:4
**Contains** [1] 57:4
**Content** [1] 11:24 13:22
**Contents** [2] 27:9 27:24
**Continue** [1] 22:18
**Continuing** [2] 37:23 51:7
**Contrary** [1] 3:15
**Control** [1] 8:12
**Conversation** [3] 6:16 36:16 47:2
**Conversations** [1] 6:19
**Conversely** [1] 11:8
**Convincing** [1] 23:23
**Cookies** [2] 29:15 35:12
**Cooksey** [1] 53:22
**Cop** [2] 13:10 13:13
**Correct** [2] 53:17 57:4
**Correctly** [1] 50:6 50:7 57:9
**Cost** [1] 57:10
**Counsel** [1] 57:5
**Country** [4] 20:4 23:3 23:4 23:5
**County** [8] 1:8 1:21 3:21 25:11 57:2 57:4 57:11 57:17
**Couple** [3] 15:17 16:10 19:25
**Course** [1] 25:20
**Court** [46] 1:3 1:5 3:2 5:17 43:18 43:23 45:23 46:1 46:3 46:6 46:11 46:14 46:16 46:24 47:23 48:11 48:17 48:21 48:24 49:5 49:7 49:9 49:12 49:17 49:19 49:21 49:24 50:2 50:5 50:15 50:17 50:19 50:21 50:23 51:1 51:5 51:8 53:21 54:13 55:17 56:5 57:3 57:4 57:7 57:17 57:17
**Court's** [13] 10:5 10:8 10:17 18:22 18:24 19:2 20:8 21:13 23:8 33:4 33:12 36:8 37:9
**Courthouse** [5] 4:3 11:15 11:19 19:21 28:24
**Courtroom** [9] 8:5 21:10 25:6 25:10 26:20 34:18 35:15 35:25 49:2
**Cover** [1] 36:19
**Creates** [1] 34:20
**Creating** [2] 6:19 44:11
**Credibility** [5] 8:21 10:21 12:10 12:13 12:14
**Crime** [22] 16:4 16:20 16:21 17:2 17:15 20:10 20:11 20:12 20:14 20:15 20:16 20:25 21:2 21:7 21:8 21:16 21:19 24:12 26:7 30:24 31:1 37:7

**Criminal** [6] 4:3 4:20 11:14 15:19 20:4 37:22
**Crowded** [1] 53:9
**CSR** [1] 57:16
**Culpability** [1] 38:11

**D**

**D.P.S.** [1] 12:7
**Dad** [1] 34:14
**Daddy** [1] 29:13
**Dana** [1] 54:5
**Date** [1] 57:16
**Dates** [1] 45:14
**Daughter** [2] 29:11 29:14
**Days** [3] 8:9 51:13 52:25
**Dead** [1] 19:15
**Deal** [8] 11:25 19:24 21:3 22:2 36:22 37:16 52:13 55:9
**Dealing** [1] 22:4
**Deals** [1] 22:3
**Deanna** [1] 54:6
**Death** [19] 5:23 6:2 35:13 36:21 38:19 39:4 39:15 40:12 40:13 40:24 41:4 41:7 41:16 41:23 42:1 42:15 42:24 43:7 43:10
**December** [1] 3:22
**Decide** [8] 9:10 9:11 9:20 11:5 11:10 18:9 18:17 32:4
**Decided** [1] 16:4
**Deciding** [3] 9:24 15:21 16:3
**Decision** [15] 6:1 11:22 13:19 28:9 28:9 28:13 28:22 30:20 32:21 33:8 33:9 33:21 35:3 40:9 41:5
**Decisions** [1] 16:8
**Deep** [1] 29:11
**Defeating** [1] 7:8
**Defendant** [49] 2:20 3:16 3:19 5:17 5:19 15:22 15:22 15:24 16:3 16:7 16:23 17:3 17:4 17:8 17:11 20:6 21:18 24:4 24:11 27:3 27:3 27:4 27:10 30:24 31:12 31:14 32:9 32:19 32:20 33:13 33:16 35:1 36:9 36:11 36:12 37:1 37:21 37:25 38:12 38:20 39:4 39:9 39:19 39:20 40:5 40:25 50:4 50:22 50:25
**Defendant's** [12] 23:17 24:8 27:2 30:25 31:11 31:18 32:17 34:22 37:5 38:10 48:8 48:13
**Defense** [4] 31:6 31:9 31:14 32:13
**Definition** [2] 23:8 23:12
**Degree** [1] 44:24
**Deliberate** [2] 8:1 8:6
**Deliver** [1] 47:14
**Demanding** [1] 55:7
**Dependable** [1] 13:4
**Deputy** [1] 25:7
**Derelict** [1] 11:3
**Desperate** [1] 18:8
**Detail** [1] 41:1
**Detector** [1] 55:25
**Detectors** [1] 53:9
**Determination** [1] 15:21
**Determine** [7] 10:7 10:11 10:12 10:21 16:11 28:5 49:1
**Determined** [2] 28:4 40:23
**Devices** [1] 55:25
**Dictated** [1] 42:6
**Dictates** [1] 38:24
**Die** [4] 35:17 35:21 35:25 36:1
**Difference** [4] 6:5 10:2

**Different** [16] 7:24 8:6 14:8 14:10 14:20 16:14 16:15 17:19 17:20 17:25 18:1 22:5 26:19 28:17 39:19 39:25
**Differently** [2] 6:4 15:6
**Difficult** [2] 42:25 42:25
**Dime** [1] 19:6 30:5
**Dingy** [1] 4:10
**Dinner** [1] 34:11
**DIRE** [1] 1:15
**Directions** [1] 18:6
**Directs** [1] 38:5
**Disagreement** [3] 13:25 21:5 36:15
**Disbelieve** [4] 9:4 9:8 10:25 11:8
**Discretion** [3] 39:3 39:8
**Discussing** [1] 46:19
**Discussion** [4] 13:25 21:21 36:16 51:4
**Disdain** [1] 12:2
**Dishonest** [1] 12:19
**Disprove** [1] 33:18
**Dispute** [5] 13:24 21:20 36:3 36:15 49:1
**District** [8] 1:5 1:11 2:6 3:10 22:17 22:18 57:3 57:17
**Document** [1] 55:10
**Documents** [1] 55:19
**Done** [6] 6:23 17:8 17:12 17:24 19:10 26:16 45:4
**Door** [4] 8:10 20:20 51:13 53:24
**Doorknob** [1] 8:9
**Doorway** [1] 54:3
**Doubt** [25] 22:10 22:13 22:22 22:23 22:23 23:1 23:1 23:2 23:7 23:10 23:15 23:16 23:17 23:17 23:20 23:22 26:25 27:2 34:22 35:1 35:15 35:16 35:20 36:2 37:20
**Down** [12] 6:12 11:14 11:19 15:8 19:21 28:8 28:23 28:25 30:8 30:20 34:11 42:12
**Downtown** [2] 4:2 45:4
**Dozen** [1] 51:24
**Dragged** [1] 19:15
**Dramatic** [1] 29:12
**Draw** [1] 13:17
**Drawing** [1] 39:24
**Dreams** [1] 26:5
**Driveway** [1] 45:2
**Driving** [1] 13:9
**Due** [3] 44:2 44:3 55:11
**Dumber** [1] 12:19
**During** [1] 5:8
**Duty** [3] 5:1 25:11 28:24

**E**

**Easier** [1] 32:10
**Eaten** [1] 35:11
**Effort** [1] 54:19
**Eight** [1] 5:13
**Eighth** [1] 53:13
**Either** [6] 6:14 6:17 11:15 11:19 38:23 44:1 44:5 45:9 52:15 52:23 54:12
**Elect** [1] 30:16
**Elevator** [1] 25:6
**Eliminate** [1] 4:6
**Employer** [1] 55:8
**Encourage** [1] 24:3
**End** [1] 15:24
**Enemies** [1] 51:24
**Enforcement** [4] 12:5 12:

9 11:17 12:16
**Entirely** [2] 9:10 39:24
**Entitled** [5] 17:7 17:9 19:24 52:7 52:9
**Erased** [1] 27:8
**Eric** [1] 53:18
**Especially** [1] 19:23
**Evaluate** [2] 27:22 39:25
**Evaluation** [1] 35:4
**Evening** [3] 25:25 29:10 34:10
**Evenings** [1] 49:15
**Event** [6] 5:18 20:10 20:13 20:16 25:1 31:14
**Events** [2] 14:7 21:16
**Everyday** [2] 53:6 53:7
**Evidence** [61] 5:11 6:1 7:13 7:23 8:1 8:4 16:15 16:16 16:25 17:1 19:11 20:10 20:13 20:16 20:24 21:2 21:4 21:17 21:18 23:19 27:1 27:6 27:9 27:11 27:16 27:19 31:2 31:4 31:7 31:8 31:10 31:10 32:7 33:3 33:7 34:19 34:20 34:22 34:24 36:4 36:6 37:8 37:20 38:4 38:7 38:15 38:21 38:24 40:7 40:16 41:6 41:20 41:25 41:25 42:6 42:8 42:13 42:19 43:6 43:6 57:5
**Exactly** [6] 8:4 8:5 8:5 9:17 39:4 39:9
**Exam** [1] 49:16
**EXAMINATION** [1] 1:15
**Example** [8] 12:24 19:1 24:15 27:12 29:7 33:8 34:5 51:18
**Except** [2] 19:8 37:18
**Excise** [1] 22:5
**Excludes** [1] 23:16
**Exclusive** [1] 8:20
**Exclusively** [1] 33:1
**Excuse** [3] 45:13 55:1 55:5
**Excused** [4] 50:9 50:11 50:24 51:2
**Exercise** [1] 41:18
**Exhibits** [1] 57:9
**Exist** [3] 37:18 39:22 40:2
**Existed** [3] 15:12 24:20 34:4
**Exists** [5] 10:20 16:6 20:4 40:3 45:16
**Expected** [1] 4:24
**Expiration** [1] 57:16
**Explain** [1] 42:10
**Extract** [2] 6:22 10:10
**Extracts** [1] 12:17
**Eye** [1] 14:17

## F

**Face** [1] 3:6
**Facet** [2] 13:25 36:16
**Fact** [12] 3:14 20:5 20:9 20:11 20:14 21:14 21:18 30:23 33:16 36:18 36:21 45:1
**Factoring** [2] 53:12 53:12
**Facts** [3] 8:20 39:21 40:15
**Factual** [1] 49:1
**Fail** [1] 54:18
**Fair** [1] 19:21
**Fall** [1] 29:19
**Family** [2] 4:11 34:8
**Fannin** [1] 2:7
**Fastest** [1] 34:12
**Fault** [1] 52:16
**Fearful** [1] 4:9
**Feature** [1] 12:15
**Fictitiousness** [1] 22:20
**Fifteen** [1] 14:17

**Fifty** [5] 6:20 6:21 9:16 9:17 44:12
**Fighting** [1] 29:23
**Figure** [3] 7:20 22:20 54:14
**Filling** [1] 3:24
**Final** [1] 49:16
**Fine** [1] 49:20
**First** [40] 4:6 5:1 8:17 14:25 15:2 15:6 15:20 16:5 16:15 16:21 17:16 18:7 20:2 20:4 22:13 25:18 26:12 29:19 29:23 30:7 32:23 34:4 35:10 35:13 35:14 36:3 36:4 37:19 38:9 38:14 41:15 43:12 43:13 43:14 45:18 45:18 45:20 51:19 52:1 53:15
**Five** [4] 13:8 24:18 24:19 34:7
**Fix** [1] 11:13 49:21
**Fleeting** [1] 15:12
**Flip** [1] 13:8
**Floor** [1] 53:13
**Focus** [5] 16:13 16:15 16:16 16:25 16:25
**Folks** [4] 4:6 5:13 14:15 52:6 55:3 55:18
**Follow** [2] 42:19 43:6
**Following** [4] 1:18 44:20 50:8 54:2
**Fondness** [1] 12:1
**Food** [1] 19:8
**Footing** [1] 3:18
**Foregoing** [1] 57:4
**Forgetting** [1] 27:15
**Forgotten** [1] 46:20
**Fork** [1] 11:13
**Form** [2] 48:7 48:13
**Format** [1] 41:3
**Fortunate** [1] 24:23
**Four** [3] 5:2 22:15 34:8
**Framework** [1] 7:12
**Frances** [1] 53:16
**Free** [3] 52:3 55:20 56:4
**Freely** [1] 41:18
**Freeway** [1] 2:14
**Friday** [6] 6:14 6:15 6:17 44:1 44:2 44:4 44:4 44:5 45:9 45:10 49:19 51:12 54:2 54:9
**Friend** [2] 13:2 47:12
**Friends** [2] 4:11 48:21
**Frustrating** [1] 32:6
**Full** [1] 21:1
**Function** [1] 32:23
**Funeral** [1] 4:21

## G

**Gather** [3] 28:10 28:11 28:19
**General** [2] 20:2 20:3
**Generalization** [1] 17:6
**Generally** [2] 5:7 8:16
**Gentlemen** [3] 24:1 46:24 51:8
**George** [1] 53:15
**Gibson** [1] 48:3
**Given** [7] 10:4 10:17 18:22 32:22 33:22 37:10 39:18
**Gonculator** [1] 53:8
**Goodman** [1] 54:5
**Goofy** [1] 52:17
**Gossip** [1] 47:12
**Government** [1] 22:24
**Grand** [1] 25:11
**Great** [3] 11:25 36:22 37:17

**Grounds** [1] 52:14
**Group** [3] 26:15 26:17 41:9
**Groups** [1] 6:12
**Growing** [2] 12:23 34:6
**Gruesome** [1] 43:4
**Guarantee** [1] 4:14
**Guess** [3] 47:16 54:23 55:2
**Guilt** [8] 22:25 23:7 23:14 23:17 27:3 33:18 33:19 48:8
**Guilty** [28] 5:19 13:13 15:22 15:23 15:24 16:23 17:4 22:10 22:12 22:21 22:22 24:7 24:9 27:3 27:4 27:8 27:10 33:6 33:16 34:23 34:23 35:1 35:2 36:12 37:1 40:11 40:25 48:13
**Guy** [2] 22:9 35:18
**Guys** [2] 4:15 47:9

## H

**Habitually** [1] 25:24
**Half** [1] 38:14
**Hall** [1] 55:6
**Hallway** [2] 14:16 53:7
**Hamilton** [4] 22:16 22:16 22:17 22:18
**Hand** [5] 9:23 39:5 57:12
**Hands** [1] 29:12
**Happier** [1] 54:18
**Happy** [1] 54:16
**Harass** [1] 22:3
**Harris** [8] 1:8 1:21 3:21 25:11 57:2 57:4 57:11 57:17
**Hashagen** [1] 53:17
**Hassled** [1] 13:11
**Hauled** [1] 19:16
**Hear** [17] 11:4 14:3 14:22 14:23 16:21 17:7 17:9 17:9 30:17 31:17 32:12 33:1 35:7 39:24 47:8 47:9 49:2
**Heard** [13] 1:19 15:3 17:16 22:9 22:11 31:21 32:9 32:14 32:15 38:9 38:13 41:24 48:18
**Hearing** [1] 51:7
**Hears** [1] 47:15
**Heart** [1] 22:8
**Held** [1] 1:21
**Hell** [1] 52:19
**Help** [1] 30:19
**Helping** [1] 28:12
**Henry** [1] 54:4
**Hereby** [1] 57:4
**Hernandez** [1] 53:18
**Hesitate** [1] 23:21
**Hesitation** [1] 23:25
**Hiding** [1] 36:10
**High** [3] 11:15 11:17 55:6
**Hill** [10] 2:12 3:9 46:18 46:22 49:7 49:8 50:17 50:18 55:13 55:15
**Himself** [1] 16:7
**Hips** [1] 29:12
**Hire** [1] 30:14
**Hit** [1] 27:24
**Hold** [1] 32:19
**Home** [2] 25:24 26:5
**Honest** [3] 12:18 13:4 32:3
**Honestly** [1] 13:12
**Honor** [4] 50:14 51:1 55:15 55:16
**Honorable** [2] 1:20 13:1
**Horses** [1] 34:9
**Hotel** [3] 4:10 4:15 4:16
**Hour** [1] 8:7

**Houses** [1] 28:15
**Houston** [7] 1:21 2:8 2:15 2:19 20:18 20:21 57:18
**Human** [1] 12:17
**Hundred** [2] 8:25 9:4
**Hypothetical** [3] 8:23 9:2 9:6

## I

**Idea** [3] 7:25 15:1 52:22
**Imaginary** [1] 9:16 33:5
**Immediately** [2] 31:6 31:7
**Impartial** [1] 23:18
**Importance** [1] 9:21
**Important** [4] 9:19 23:21 23:25 28:8
**Imposed** [4] 16:12 38:19 39:15 39:16 40:8 40:12 40:14 40:24 40:24 42:15 43:8
**Impossibility** [1] 45:14
**Imprisonment** [1] 38:19
**Inaccurate** [1] 13:12
**Inaudible** [1] 20:19
**Include** [1] 31:11
**Included** [1] 57:6
**Including** [2] 38:7 38:10
**Inconsistencies** [1] 14:13
**Inconsistent** [1] 14:12
**Inconvenience** [2] 44:25 44:25
**Inconveniences** [2] 45:8 45:15
**Increase** [1] 35:22
**Indication** [1] 3:15
**Indicted** [2] 20:15 21:7 21:15 21:15
**Indictment** [3] 3:20 20:6 25:13
**Individual** [3] 6:18 40:4 41:2
**Individually** [2] 6:6 14:18
**Individuals** [1] 22:3
**Inference** [2] 33:15 36:10
**Information** [28] 4:2 10:15 16:7 17:15 26:4 27:13 28:11 28:15 28:16 28:17 28:20 29:3 29:25 30:12 30:19 32:4 32:22 33:9 33:10 33:22 34:24 35:3 47:1 48:6 48:11 48:17 48:24 51:22
**Informed** [1] 28:12
**Innocence** [2] 27:5 27:7
**Innocent** [2] 27:4 27:5
**Inside** [1] 8:10
**Instead** [4] 17:2 27:10 35:19 45:2
**Instruction** [1] 36:8
**Instructs** [1] 38:15
**Intellectually** [1] 42:6
**Intelligent** [1] 28:13
**Intends** [1] 31:9
**Intentional** [1] 14:14
**Interacting** [1] 26:12
**Interfere** [1] 48:25
**Interference** [1] 10:20
**Internal** [1] 42:17
**Introduced** [1] 3:13
**Involved** [7] 3:16 16:20 19:22 37:7 39:21 40:6 40:20
**Involving** [1] 48:3
**Irrespective** [1] 41:20
**Issues** [2] 16:9 37:13
**Items** [1] 33:2
**Ito** [1] 4:4
**Itself** [3] 7:13 17:2 37:7

## J

**Jacinto** [1] 57:18
**Jerri** [1] 53:21
**Job** [28] 4:11 8:18 8:19 9: 22 9:23 9:25 10:4 11:11 11: 25 13:23 24:6 24:8 26:7 26: 8 26:17 30:1 30:24 30:25 31: 19 31:20 32:10 32:17 32:18 32:21 33:18 33:19 35:2 35:2
**Joins** [1] 50:4
**Jones** [1] 54:7
**Joyce** [1] 53:16
**Jr** [1] 1:5 3:5 48:3 57:20
**Judge** [10] 1:20 8:19 10: 18 21:17 21:24 22:2 22:2 22: 6 33:14 40:17
**Judges** [1] 8:20
**Judgment** [1] 38:5
**JUDICIAL** [1] 1:11
**Judy** [4] 21:24 22:2 22:2 22:6
**Juiciest** [1] 47:12
**Jump** [1] 53:5
**Jumping** [1] 27:13
**Junior** [5] 11:15 11:17 46: 3 49:13 55:6
**Juries** [2] 8:4 39:24
**Juror** [12] 3:4 4:19 7:11 8:18 8:19 10:21 14:3 28:25 42:12 44:17 44:18 44:20
**Jurors** [9] 3:1 10:6 10:24 10:25 19:23 21:10 32:6 41: 18 41:22
**Jurors'** [1] 32:22
**Jury** [28] 3:6 5:4 5:18 5: 24 6:4 6:23 7:25 8:6 8:7 8: 10 10:4 10:18 19:5 21:18 25: 11 25:11 27:9 32:8 33:15 38: 4 38:6 38:23 38:25 39:1 39: 5 39:23 40:6 46:20
**Jury's** [1] 15:20 51:7
**Justice** [2] 4:3 26:11

## K

**Kay** [2] 57:3 57:16
**Keep** [6] 15:14 28:5 47:6 52:2 52:9 52:11
**Kelly** [1] 54:4
**Kept** [1] 4:10
**Kid** [9] 13:1 22:14 29:9 29: 20 29:21 29:23 35:6 35:7 35: 10
**Kids** [4] 17:20 26:13 26:14 29:10
**Kill** [1] 19:8
**Kind** [5] 3:23 11:13 20:1 23:20 52:14
**Kinds** [1] 5:7
**Kitchen** [1] 34:16
**Knobloch** [2] 57:3 57:16
**Knowing** [2] 7:10 44:16
**Knowledge** [1] 48:2
**Known** [5] 5:17 5:17 5:18 12:24 13:1
**Knows** [3] 3:15 18:8 29:24
**Kurt** [2] 2:17 3:9

## L

**Laboring** [2] 44:24 45:1
**Ladies** [3] 24:1 46:24 51:8
**Lance** [1] 4:4
**Lane** [1] 22:4
**Last** [8] 4:24 7:15 7:16 14: 17 17:23 27:21 44:14 56:2
**Lasting** [1] 44:21
**Law** [31] 6:3 10:5 10:9 10: 13 10:16 11:13 12:5 12:8 12:

9 12:13 12:15 14:1 18:22 18: 22 18:24 19:3 19:3 21:21 22:11 23:3 23:4 23:5 23:6 25:12 33:4 36:17 37:10 39:2 39:7 51:16 54:22
**Lawyer** [5] 11:20 22:7 22: 13 33:24 33:25
**Lawyers** [8] 3:16 5:2 5:18 11:22 22:2 22:4 46:25 52:6
**Least** [1] 26:24
**Leave** [5] 7:6 7:10 44:15 55:9 55:20
**Left** [4] 43:19 45:4 45:18 46:7
**Legitimate** [1] 29:5
**Less** [1] 12:14
**Letter** [1] 36:19
**Liable** [1] 35:13
**Lies** [1] 14:14
**Life** [11] 7:3 15:13 17:8 21:25 28:9 38:18 39:9 39:16 40:7 40:23 45:16
**Limit** [1] 54:24
**Linda** [1] 54:5
**Line** [1] 47:14
**Listen** [1] 9:25 18:12 18: 14 18:16 21:11
**Listening** [2] 8:4 18:13
**Live** [1] 24:23 28:7
**Lives** [2] 24:20 28:7
**Load** [1] 34:17
**Locked** [3] 4:10 4:15 4:16
**Logical** [1] 29:6
**Lord** [1] 52:20
**Lost** [1] 18:6
**Loud** [4] 47:7 47:9 47:16 47:17
**Louis** [1] 54:6
**Loved** [1] 4:11
**Loyalty** [1] 5:2
**Lying** [3] 14:4 15:5 15:8
**Lyn** [2] 2:2 3:11

## M

**Ma'am** [4] 43:16 45:21 49: 10 50:15
**Machine** [1] 1:23
**Magnitude** [1] 9:18
**Mamou** [7] 1:5 3:5 3:6 3:8 48:3 50:21 57:20
**Manufacture** [1] 30:2
**Manufacturing** [1] 30:9
**Marketing** [1] 30:8
**Mary** [1] 48:4
**Mason** [2] 22:13 22:21
**Matter** [16] 12:14 18:4 37: 25 38:1 38:1 38:2 38:20 38: 20 38:21 38:21 42:8 43:2 43: 3 43:3 43:4 43:5
**McClellan** [12] 2:3 2:11 46:18 46:23 49:5 49:6 50:12 50:14 55:13 55:16
**Mean** [8] 13:5 13:14 15:4 28:1 31:22 32:1 32:2 32:2
**Meaning** [4] 8:22 11:2 11: 12 53:2
**Means** [6] 15:5 23:10 26:3 32:3 40:6 51:21
**Meat** [5] 34:11 34:12 34:13 34:14 34:16
**Members** [1] 26:17
**Merits** [1] 40:18
**Metal** [2] 53:9 55:25
**Might** [30] 3:3 4:9 8:7 8:

**Mills** [1] 22:4
**Mind** [7] 4:7 14:23 15:14 28:5 43:2 47:6 54:7
**Mine** [2] 29:17 52:13
**Minnesota** [1] 46:13
**Minutes** [7] 5:13 15:17 16: 10 17:23 19:15 19:25 47:17
**Miss** [7] 25:8 47:20 47:23 49:9 49:12 50:15 53:16
**Mitigating** [1] 38:17
**Mode** [1] 53:11
**Mom** [4] 29:15 34:10 34:14 34:15
**Monday** [3] 7:14 44:21 46: 15
**Money** [1] 30:7
**Months** [7] 14:2 19:7 20: 18 20:22 20:24 21:2 21:4
**Moral** [6] 38:11 42:4 42: 17 42:19 42:19 43:9
**Morning** [10] 3:2 5:7 6:11 25:24 45:2 51:20 53:23 54:3 54:9 56:1
**Mornings** [1] 53:10
**Most** [8] 4:1 12:25 21:24 22:11 23:21 23:25 40:8 40:14
**Move** [1] 55:23
**Multiple** [1] 37:7
**Murder** [15] 3:20 5:16 5: 20 15:25 16:24 17:5 17:10 19:2 20:7 37:2 39:14 40:2 40:12 40:25 48:2
**Must** [6] 19:9 21:9 23:23 24:2 39:3 39:8

## N

**Names** [1] 52:24
**Nasty** [1] 13:10
**Nature** [1] 12:4
**Neat** [1] 13:3
**Neatest** [1] 12:25
**Need** [5] 6:13 18:8 53:4 55: 3 55:14
**Neighbor** [1] 26:14
**Never** [8] 22:19 22:25 23: 3 23:5 24:7 34:4 39:17 39:18
**Newspapers** [2] 48:5 48:19
**Next** [6] 4:24 30:16 35:23 46:15 46:25 53:3
**Nice** [3] 13:3 25:7 25:16
**Nicest** [1] 12:25
**Nine** [1] 21:1
**Nobody** [3] 3:15 7:24 34: 15 41:6 43:13 45:19 45:19
**Nobody's** [1] 35:21
**Noisy** [1] 47:13
**None** [2] 8:12 21:16
**Noon** [1] 5:14
**Northwest** [3] 46:2 46:3 49:13
**Nothing** [6] 9:24 16:3 19: 8 31:18 32:15 45:5
**Notice** [3] 22:1 22:1 54:11
**Notion** [2] 52:4 52:6
**Novel** [1] 19:6
**Number** [36] 7:20 9:6 36:5 38:6 39:1 39:2 39:11 43:16 43:21 45:21 48:1 49:10 50: 10 53:2 53:3 53:15 53:16 53: 16 53:17 53:18 53:18 53:19 53:21 53:22 53:22 54:3 54:4 54:4 54:5 54:5 54:6 54:6 54: 11 54:15 54:16 54:20
**Numbered** [2] 1:20 57:6
**Numbers** [2] 52:24 55:2

## O

**O'clock** [2] 34:10 56:1

**Mills** section...

**O.J.** [1] 4:5
**Oath** [5] 15:8 32:23 32:24 33:2 49:3
**Objection** [2] 42:20 43:10
**Obligation** [1] 34:23
**Observed** [1] 15:4
**Obviously** [3] 6:7 9:15 44:4
**Occasions** [2] 15:10 45:17
**Occur** [2] 21:9 36:25
**Occurred** [3] 3:21 14:7 22:16 34:2 57:7
**October** [6] 7:14 25:2 26: 1 44:21 45:12 45:13
**Off-the-record** [1] 51:4
**Offense** [9] 5:10 5:20 16: 17 20:7 25:15 33:6 33:16 38: 8 40:5
**Offer** [1] 5:4
**Offered** [1] 41:6
**Office** [1] 30:4
**Officer** [2] 12:10 12:16 13:2
**Officers** [4] 12:6 12:6 20:21 20:25
**Official** [3] 57:3 57:12 57:17
**Official/Deputy** [1] 57: 3
**Old** [5] 4:10 13:10 29:11 29:11 47:11
**Omitted** [1] 46:19
**Once** [5] 11:4 13:19 17:21 22:19 39:7
**One** [48] 6:18 6:8 6:13 7:3 7:7 7:9 7:16 8:7 8:7 8:8 8: 16 8:23 8:25 9:4 10:23 12:1 12:15 14:18 17:22 21:24 22: 9 25:11 27:16 28:6 28:7 29: 10 29:18 29:21 30:4 30:14 31:5 31:21 31:24 32:1 34:13 34:13 34:14 39:1 39:11 39: 18 40:1 40:7 41:9 43:12 46: 21 53:15 55:11 56:2
**Ones** [2] 4:11 8:17
**Open** [2] 28:5 57:7
**Operation** [1] 18:5
**Opinion** [2] 48:7 48:13
**Option** [3] 39:10 39:3 39:8
**Order** [7] 18:21 39:7 39: 11 39:12 39:17 51:17 54:21
**Ordinarily** [5] 7:4 7:5 18:3 25:23 44:3
**Otherwise** [1] 33:17
**Ought** [1] 24:11
**Outset** [1] 39:13
**Outside** [4] 25:6 51:13 53: 23 54:3
**Override** [1] 42:18
**Own** [2] 23:21 23:25

## P

**Page** [1] 48:1
**Paid** [1] 57:11
**Pallbearer** [1] 4:21
**Pamela** [2] 57:3 57:16
**Panel** [3] 3:7 6:20 50:9
**Paper** [1] 55:5
**Parent** [1] 52:14
**Parents** [1] 52:15
**Parked** [1] 55:21
**Parking** [3] 53:12 55:22 55:23
**Part** [4] 9:9 15:20 36:7 38: 13
**Particular** [5] 7:25 8:1 8:1 13:25 40:10
**Parties** [3] 50:8 57:6 57:9

**Pass** [1] 25:19
**Passes** [1] 55:6
**Past** [4] 12:23 14:7 21:23 45:8
**Peer** [2] 26:15 26:17
**Pena** [1] 53:16
**Penalty** [10] 6:2 36:21 41:4 41:7 41:16 41:23 42:1 42:15 42:24 43:8
**People** [26] 3:13 6:20 6:21 11:16 11:20 12:7 13:5 14:6 15:4 15:10 16:19 19:9 22:18 26:20 26:20 27:19 27:20 37:7 44:11 51:17 52:20 52:22 52:25 53:23 54:2 54:8
**Percent** [3] 8:25 9:5 35:23
**Perfectly** [5] 12:11 13:12 18:4 21:1 34:1
**Perhaps** [4] 7:15 15:13 34:3 37:6
**Period** [2] 15:12 44:10
**Permit** [2] 54:22 55:5
**Perry** [2] 22:13 22:21
**Person** [9] 15:3 15:6 23:20 24:7 31:24 40:11 51:19 52:1 54:16
**Person's** [3] 14:10 23:7 26:17
**Personal** [1] 38:11
**Personnel** [1] 12:13
**Phase** [18] 15:25 16:2 16:5 16:5 16:15 16:21 16:24 17:1 17:3 17:10 17:14 17:24 18:23 37:3 37:4 37:9 37:11 38:9
**Phases** [1] 16:14
**Philosophical** [3] 42:4 42:16 43:9
**Phone** [2] 2:9 2:16
**Phrase** [1] 22:9
**Physical** [1] 33:2
**Pick** [4] 24:20 25:1 25:2 52:23
**Piece** [4] 11:9 34:12 47:17 55:5
**Pieces** [2] 34:13 34:14
**Pile** [1] 17:14
**Place** [8] 4:19 4:22 5:1 14:25 18:1 34:4 55:22 55:23 55:24
**Plan** [4] 53:10 53:11 53:12 55:24
**Platter** [3] 34:11 34:15 34:16
**Play** [3] 5:8 5:9 29:21
**Point** [14] 3:17 11:22 12:23 13:16 15:2 15:14 24:5 24:5 26:7 27:21 28:19 40:16 43:1 43:1
**Police** [4] 12:6 13:2 20:21 20:25
**Pool** [2] 6:20 44:12
**Portion** [2] 10:10 23:11
**Portions** [1] 57:5
**Possess** [7] 11:25 13:23 28:10 47:13 48:6 48:12 48:25
**Possesses** [2] 12:16 13:18
**Possibility** [2] 31:13 37:21
**Possible** [10] 23:15 36:21 38:3 38:22 41:4 41:7 41:17 41:23 42:5 43:10
**Possibly** [6] 20:24 21:3 22:11 28:11 29:13 33:6
**Potential** [1] 6:3
**Powerful** [2] 43:3 51:24
**Practical** [1] 24:14
**Preacher** [2] 30:14 35:22
**Preachers** [1] 35:22
**Precise** [2] 7:19 8:13
**Premise** [1] 36:7

**Preparation** [1] 57:11
**Present** [5] 7:23 24:2 31:4 31:10 31:10
**Presented** [11] 6:2 8:2 19:4 27:7 31:4 31:7 32:20 33:25 35:4 37:4 40:19
**Presently** [1] 23:3
**Presents** [3] 27:16 28:1 31:14
**President** [1] 30:17
**Presiding** [1] 1:21
**Presumption** [3] 27:5 27:7 27:8
**Pretty** [2] 7:20 22:20
**Prevent** [1] 45:17
**Priest** [1] 11:3
**Principal** [1] 11:15
**Principals** [1] 11:18
**Principles** [1] 20:3
**Probability** [1] 23:5
**Problem** [2] 32:16 49:22
**Problems** [1] 49:25
**Proceedings** [4] 1:19 1:22 57:5 57:9
**Process** [2] 6:4 43:25
**Processes** [1] 35:9
**Product** [1] 5:4
**Proof** [5] 23:16 23:22 23:23 24:2 35:16
**Prosecution** [5] 22:24 23:6 23:14
**Prosecution's** [1] 23:15
**Prospect** [1] 3:4
**Prospective** [1] 3:1
**Prove** [24] 22:22 22:25 23:1 23:2 23:7 23:14 24:6 24:8 24:12 25:21 24:6 24:7 26:8 26:18 27:2 30:24 30:25 31:20 31:20 32:17 33:19 35:14 35:20 36:1
**Proved** [2] 8:20 22:12
**Proves** [1] 26:6
**Proving** [3] 26:21 26:22 26:23
**PTA** [1] 30:16
**Pulled** [1] 13:10
**Punch** [1] 47:14
**Punishment** [17] 5:21 5:22 5:23 6:3 16:12 36:21 41:5 41:5 41:7 41:17 41:20 41:22 41:23 42:2 42:5 43:1 48:14
**Purpose** [2] 16:14 38:16
**Purposes** [2] 16:6 28:11
**Put** [1] 19:16
**Puts** [1] 29:12
**Putting** [1] 12:20

**Q**

**Qualities** [1] 13:17
**Quality** [7] 11:23 13:22 27:9 27:23 30:6 36:4 36:6
**Quarrel** [1] 13:24 21:20 36:15
**Questionnaire** [3] 36:19 36:20 47:25
**Questionnaires** [2] 3:24 47:2
**Questions** [24] 15:15 16:9 16:11 17:17 28:6 37:13 37:14 39:6 39:10 39:17 40:3 40:13 41:1 41:19 42:14 42:21 43:7 49:5 53:24 54:13 54:21 55:18 55:18 56:2
**Quick** [1] 19:18
**Quickly** [1] 51:23
**Quiet** [2] 47:4 47:15
**Quietly** [1] 47:8

**R**

**Race** [1] 12:17
**Raised** [3] 10:5 10:7 37:10
**Raising** [1] 17:20
**Ramie** [1] 53:22
**Range** [1] 41:22
**Rate** [1] 25:4
**Rather** [1] 38:19
**Raymond** [1] 54:5
**Reach** [1] 10:15
**React** [3] 17:22 17:25 18:16
**Read** [1] 19:6
**Real** [6] 4:18 14:23 19:18 19:22 37:17 52:17
**Realize** [1] 8:9
**Really** [10] 10:23 30:10
**Reason** [12] 4:14 4:25 7:18 11:12 12:3 12:11 12:12 14:14 23:18 29:6 35:5 42:4
**Reasonable** [16] 23:4 23:7 23:10 23:16 23:17 23:20 23:22 26:25 27:2 34:22 35:1 35:15 35:16 35:20 36:2 37:20
**Reasons** [2] 50:6 50:9
**Recalled** [1] 14:7
**Receive** [1] 48:14
**Received** [2] 10:16 51:17
**Recently** [1] 30:15
**Recess** [1] 19:19
**Recognize** [1] 45:6
**Recollection** [2] 14:8 24:21
**Record** [7] 1:1 57:6 57:8 57:11
**Reelect** [1] 22:18
**Reflects** [1] 57:9
**Refuse** [5] 42:5 42:7 42:14 43:6 52:11
**Rehabilitated** [1] 45:6
**Relationship** [1] 16:19
**Religious** [3] 42:3 42:17 43:8
**Relocating** [1] 46:12
**Rely** [3] 23:24 52:7 52:9
**Remember** [3] 22:16 55:20 55:21
**Replace** [1] 30:14
**Reported** [1] 1:22 57:7
**Reporter** [2] 57:3 57:17
**Reporter's** [4] 1:1 57:6 57:8 57:11
**Represented** [2] 3:8 3:10
**Request** [2] 50:23 51:2
**Requested** [1] 57:5
**Require** [2] 22:12 23:6 36:13
**Required** [3] 23:9 23:14 23:15
**Requires** [2] 6:3 25:12
**Respective** [1] 57:9
**Responsibility** [2] 37:6 38:12
**Rest** [2] 13:14 31:6
**Rests** [1] 31:3
**Result** [7] 10:3 10:15 18:19 36:24 39:15 39:15 45:6
**Retired** [1] 30:15
**Return** [1] 32:24
**Returned** [1] 25:13
**Rips** [1] 29:4
**Risk** [1] 27:15
**Roll** [1] 51:3
**Room** [10] 4:10 4:15 4:16 8:10 19:5 29:10 30:9 32:8 47:

**Rooms** [1] 8:6
**Roughly** [1] 6:20
**Routine** [1] 18:3
**Row** [11] 43:13 43:14 43:14 43:19 43:19 45:18 45:19 45:20 46:6 46:7 46:7
**Ruben** [1] 53:17
**Ruckus** [1] 14:16
**Rude** [1] 13:10
**Rule** [4] 10:19 10:23 10:23 10:24
**Rules** [2] 5:8 20:3
**Run** [1] 27:15
**Running** [1] 19:13
**Russell** [1] 54:6

**S**

**Salesman** [2] 11:20 31:24
**Salesmen** [1] 11:21
**San** [1] 57:18
**Satisfies** [1] 26:24
**Save** [1] 30:7
**Saw** [3] 14:19 15:5 19:13
**SBOT** [4] 2:3 2:5 2:13 2:18
**Schedule** [1] 49:19
**School** [7] 11:15 11:17 26:13 30:17 45:25 46:1 49:13
**Scott** [3] 47:20 47:23 53:16
**Screw** [1] 53:5
**Seat** [1] 50:3
**Seated** [1] 3:1
**Second** [28] 4:18 9:2 15:25 16:2 16:5 16:24 17:1 17:3 17:10 17:14 18:9 24:14 25:17 25:19 31:9 37:3 37:3 37:8 38:13 38:14 43:13 43:14 43:19 45:19 46:7 54:25 54:7 55:4
**Seconds** [1] 14:17
**Secret** [2] 25:12 25:13
**See** [21] 3:14 4:4 5:13 11:13 11:21 14:21 14:22 14:23 18:1 19:14 24:20 25:5 25:9 27:18 29:3 31:19 31:24 34:3 37:15 39:13 40:1
**Seek** [1] 5:20
**Sees** [1] 15:6
**Selected** [1] 21:10
**Selection** [1] 6:4
**Self** [1] 7:8
**Self-defeating** [1] 7:8
**Sell** [1] 19:19
**Sense** [5] 5:1 5:1 10:23 18:11 23:18
**Sentence** [12] 35:13 38:18 38:19 39:3 39:8 39:15 39:16 40:8 40:12 40:14 40:24 40:24
**September** [14] 1:18 6:24 7:3 24:16 24:17 24:19 24:24 25:14 25:22 26:2 44:8 44:13 45:11 45:11
**Serve** [2] 19:8 28:25
**Serving** [1] 3:4
**Sessions** [1] 25:12
**Set** [1] 47:13
**Sets** [1] 19:3
**Seven** [6] 19:15 34:13 34:14 51:12 54:2 54:8
**Seventeen** [2] 51:3 51:10
**Seventy-five** [2] 30:2 35:19
**Sexual** [1] 25:15
**Shadow** [4] 22:10 22:13 22:21 22:25
**Share** [1] 51:22

**Sheriff** [1] 25:7

**Sheriffs** [1] 12:7

**Shift** [1] 16:25

**Shopping** [4] 28:14 28:15 28:16 31:23

**Short** [1] 19:18

**Shot** [2] 11:2 11:3

**Show** [2] 22:14 55:10

**Shows** [1] 22:7

**Sibley** [1] 53:22

**Sick** [1] 29:7

**Side** [10] 13:8 27:17 28:1 31:18 31:21 31:22 32:14 35: 5 35:8 36:3

**Sides** [3] 36:3 41:17 41:21

**Significance** [1] 24:25

**Significant** [2] 24:5 25:1

**Silence** [1] 3:14

**Simple** [3] 10:24 12:12 18: 4

**Simply** [15] 4:13 4:17 5: 10 7:19 8:11 11:12 13:23 16: 6 19:21 24:20 32:3 34:3 35: 10 36:12 42:16

**Simpson** [1] 4:5

**Single** [8] 10:1 17:7 17: 11 17:17 20:3 22:9 28:7 29: 18

**Singled** [1] 47:24

**Singular** [2] 20:10 20:12 20:15

**Sister** [2] 35:11 35:12

**Sit** [2] 34:11 47:4

**Situation** [2] 45:24 46:21

**Six** [8] 13:9 19:6 29:11 43: 12 43:13 45:18 46:6 46:7

**Six-year-old** [1] 29:11

**Sixty-five** [3] 30:5 30: 11 35:19

**Size** [1] 35:22

**Smarter** [1] 12:18

**Snippets** [1] 19:17

**So-and-so** [1] 33:24

**Society** [1] 37:23

**Sometimes** [5] 14:6 28:17 29:4 32:6 33:23

**Somewhere** [1] 13:2

**Soon** [1] 52:2

**Sorry** [1] 45:11

**Sort** [1] 47:1

**Southwest** [1] 2:14

**Speaking** [3] 52:5 52:5 52:19

**Special** [2] 16:9 37:12

**Speculate** [1] 33:10

**Spencer** [1] 54:4

**Spend** [9] 3:23 5:6 5:11 15:17 19:25 21:23 29:4 36: 22 37:17

**Spending** [1] 29:16

**Spouse** [1] 55:8

**Spouses** [1] 28:16

**Stacie** [1] 53:22

**Stage** [2] 14:16 54:23

**Stand** [2] 3:6 15:9

**Standard** [1] 24:2

**Standardizations** [1] 40:2

**Standpoint** [2] 3:17 7:8

**Stands** [2] 3:19 20:6

**Start** [4] 3:18 44:20 46: 15 52:4

**Started** [2] 26:12 52:12

**Starts** [2] 44:19 45:5

**State** [15] 1:10 2:10 3:5 3:9 5:16 5:20 23:9 24:2 27: 7 28:11 29:19 55:3 55:19 57: 1 57:4

**State's** [13] 24:6 26:8 26: 21 26:22 26:23 27:1 27:18 30:24 31:8 31:15 31:19 32: 18 33:19

**Stay** [1] 47:17

**Stays** [2] 27:4 27:5

**Steps** [1] 21:9

**Stories** [1] 14:20

**Story** [4] 29:22 31:18 31: 22 35:8

**Strange** [1] 18:5

**Street** [1] 32:15

**Stuck** [1] 52:16

**Stuff** [7] 17:13 17:13 20: 1 20:20 22:15 28:19 35:10

**Substantial** [1] 12:1

**Substitute** [1] 18:13

**Successfully** [1] 24:23

**Sufficient** [1] 38:17

**Suggest** [1] 24:13

**Suggestion** [2] 33:15 36: 10

**Sum** [1] 4:1

**Supply** [1] 10:13

**Supported** [1] 21:12

**Supposed** [5] 47:4 53:25 54:1 54:24 54:25

**Suspect** [1] 6:14

**System** [5] 4:3 26:10 36: 23 36:24 40:23

## T

**Table** [1] 34:11

**Taped** [1] 20:20

**Teenager** [1] 34:6

**Teenagers** [1] 34:9

**Television** [5] 4:4 19:13 21:23 22:13 48:19

**Ten** [5] 17:23 47:17 51:11 53:23 53:25

**Tenth** [1] 17:24

**Term** [1] 23:10

**Terminate** [1] 14:17

**Terms** [4] 10:16 24:14 37: 6 40:5

**Terrence** [1] 48:3

**Testified** [4] 11:14 11: 19 32:19 33:17

**Testifies** [1] 13:18

**Testify** [8] 7:21 9:16 12: 11 12:14 33:14 35:6 36:9 36: 14

**Testifying** [3] 8:24 9:3 9:7

**Testimony** [40] 7:17 8:22 9:12 9:12 9:14 9:22 10:3 10: 6 10:6 10:7 10:11 10:16 11: 7 12:5 12:8 13:21 14:11 18: 23 19:4 19:12 21:11 21:12 27:23 28:1 28:2 31:11 32:12 32:20 33:1 33:25 34:4 35:4 37:4 37:10 37:23 38:1 39:21 40:1 40:19 49:2

**Texas** [18] 1:8 1:10 1:21 2:8 2:10 2:15 2:19 3:5 3:10 3:21 5:16 20:18 25:11 57:1 57:4 57:16 57:17 57:18

**Therefore** [4] 5:2 10:8 23:22 52:8

**They've** [1] 19:18

**Thinking** [2] 19:13 32:16

**Third** [6] 14:10 18:10 31: 13 43:19 45:20 46:16

**Thirteen** [2] 55:2 55:3

**Thirty** [6] 6:7 14:15 14: 20 17:23 50:9 51:9

**Thirty-three** [1] 35:23

**Thoroughly** [1] 24:4

**Thoughts** [3] 22:6 34:1 35:8

**Thread** [1] 26:11

**Threat** [1] 37:23

**Three** [8] 8:4 8:6 8:9 9:6 22:15 31:5 44:8 44:9

**Three-week** [1] 44:10

**Throughout** [1] 17:16

**Thursday** [3] 45:9 49:16 49:17

**Ticket** [1] 13:11

**Tinnemeyer** [1] 53:21

**Today** [19] 14:2 20:21 20: 23 21:3 24:15 24:16 24:18 25:14 41:1 44:9 44:9 44:14 44:23 44:24 45:1 47:2 51:17 55:8 55:10

**Together** [3] 10:14 30:9 46:20

**Tomorrow** [15] 6:14 6:17 6:25 7:1 7:2 44:1 44:2 44:5 45:9 51:11 51:18 51:20 53: 14 53:23 55:22

**Total** [2] 4:1 57:10

**Touch** [1] 54:15

**Touched** [1] 36:20

**Town** [2] 7:6 18:5

**Traffic** [1] 13:9

**Trainor** [1] 54:4

**Transcription** [1] 57:5

**Transcription/stenograph** [1] 1:23

**Transportation** [1] 53:11

**Travel** [1] 55:24

**Trial** [37] 1:3 4:5 5:8 7: 13 7:14 8:16 15:18 15:20 15: 20 16:1 16:2 16:5 16:6 16: 14 16:16 16:22 16:24 17:1 17:4 17:10 17:14 17:16 18: 21 18:24 18:25 19:1 19:23 23:13 37:3 37:4 37:9 37:11 38:9 46:23 47:14 47:20 48:8

**True** [3] 22:4 29:8 57:4

**Truly** [1] 57:9

**Trustworthy** [1] 13:4

**Truth** [1] 18:4

**Try** [2] 53:1 54:17

**Trying** [1] 54:23

**Turner** [2] 49:9 49:12

**TV** [2] 19:14 48:5

**Twelve** [1] 6:22

**Twenty** [2] 20:21 20:25

**Twenty-nine** [1] 15:4

**Two** [24] 7:16 8:14 10:13 14:2 16:9 16:9 16:14 17:17 20:18 20:22 20:24 21:2 21:4 37:12 37:13 38:2 38:6 38:22 39:2 39:12 39:23 42:14 44: 22 52:14

**Tylenol** [1] 19:20

**Type** [2] 5:15 54:22

## U

**Under** [5] 15:8 33:2 44:24 45:1 49:3

**Unfamiliar** [1] 4:19

**Unfold** [2] 15:18 15:19

**Unfolds** [1] 55:12

**Uniform** [2] 12:20 12:21

**Uniqueness** [2] 40:4 40:17

**Unit** [2] 30:3 30:5

**Unjustified** [1] 13:12

**Unless** [4] 18:8 27:1 27:5 53:5

**Unnatural** [1] 47:5

**Up** [29] 3:6 4:10 4:15 4:16 10:14 12:23 15:16 18:18 25:

**Upset** [1] 34:6 34:16 34: 17 37:14 42:10 44:12 47:1 47:7 47:13 47:20 49:10 49: 16 51:9 51:13 52:23 53:5 53: 13 55:25

**Upset** [1] 14:25

**Upsets** [1] 52:16

## V

**Variable** [3] 7:23 8:11 40:3

**Variables** [1] 39:22

**Various** [2] 50:6 50:8

**VENIREPERSON** [21] 43:17 43:22 45:22 45:25 46:2 46:5 46:10 46:12 46:15 46:18 46: 18 48:20 48:23 49:4 49:15 49:18 49:20 49:23 50:1 53: 20 54:11

**Venirepersons** [2] 50:8 50:10

**Verdict** [5] 8:7 18:19 32: 24 32:25 37:11

**Versus** [1] 3:5

**Victim** [3] 38:1 38:21 39: 20

**Violence** [1] 37:22

**Visit** [2] 3:3 55:14

**VOIR** [1] 1:15

**Volume** [1] 1:2 57:6

**VOLUMES** [1] 1:2

**Vote** [1] 42:23

**VS** [1] 1:8

## W

**Wagey** [1] 53:20

**Wagy** [2] 53:19 53:19

**Waiting** [1] 25:6

**Walking** [1] 25:5

**Walks** [2] 25:7 30:3

**Wall** [1] 5:12

**Wandering** [1] 14:24

**Warrant** [1] 38:18

**Warranties** [1] 28:18

**Waste** [2] 5:4 45:7

**Watch** [1] 19:15

**Watched** [2] 21:22 22:14

**Watching** [1] 22:15

**Wayne** [2] 2:12 3:9

**Wednesday** [2] 44:7 44:16

**Week** [3] 7:16 8:13 49:17

**Weeks** [7] 4:12 7:17 44:8 44:9 44:22 45:12 52:15

**Weight** [5] 8:21 9:12 9:13 9:22 11:6

**Wentz** [4] 2:17 3:9 50:19 50:20

**Whens** [1] 16:18

**Wherein** [1] 17:4

**Wheres** [1] 16:18

**Whichever** [1] 38:4

**Whole** [8] 14:4 20:19 21: 25 22:21 28:6 28:21 32:10 41:22

**Whys** [1] 16:18

**Widget** [4] 30:2 30:5 35:9 35:18

**Wildest** [1] 26:5

**Willing** [1] 23:24

**Willis** [1] 54:6

**Wind** [1] 44:12

**Winds** [1] 32:25

**Winter** [2] 46:14 46:17

**Wish** [4] 32:9 33:24 33:24 52:17

**Witness** [24] 8:23 8:24 9: 1 9:2 9:3 9:5 9:6 9:6 9:20

9:25 10:22 11:1 11:1 11:2
11:9 11:9 11:24 13:18 13:18
13:19 15:8 27:24 33:24 57:12

**Witness'** [3] 13:21 14:9
27:23

**Witness's** [2] 9:9 9:14

**Witnesses** [17] 7:21 8:21
9:16 9:17 10:1 10:3 10:12
10:16 18:14 24:3 31:12 31:
13 31:15 33:2 36:5 39:22 49:
3

**Witnesses'** [1] 8:22

**Won** [1] 22:19

**Wonderful** [2] 21:1 34:1

**Word** [2] 52:9 52:11

**Workday** [2] 25:23 26:2

**Works** [2] 13:5 13:15

**World** [5] 4:8 12:25 19:22
32:16 40:9

**Worry** [6] 4:17 37:16 44:3
53:4 54:14 55:3

**Writing** [1] 57:5

**Wyatt** [1] 54:5

---

## Y

**Y'all** [3] 30:10 48:22 56:3

**Year** [4] 15:13 29:11 34:7
35:24

**Year's** [1] 30:16

**Years** [13] 13:9 22:8 22:8
22:8 22:15 24:18 24:19 29:8
29:8 29:8 29:9 29:9 30:1

**Yes,sir** [1] 50:16

**Yesterday** [1] 3:23

**Yourself** [2] 25:10 32:4

**Yourselves** [8] 19:5 24:
10 25:22 27:12 31:17 32:8
32:13 33:23

---

## Z

**Zone** [4] 28:21 30:18 34:21
34:25

**4**

(note: contained in
separate binder due
to a different court
reporter)

(note: contained in a
separate binder due to
a different court reporter)

1       REPORTER'S RECORD

2       VOLUME 6 OF 25 VOLUMES

3       TRIAL COURT CAUSE NO. 800112

4

5    CHARLES MAMOU, JR.        )    IN THE DISTRICT COURT

6           Appellant          )

7                              )

8    VS.                       )    HARRIS COUNTY, TEXAS

9                              )

10   THE STATE OF TEXAS        )

11          Appellee           )    179TH JUDICIAL DISTRICT

12

13

14              * * * * * * * * * * * * * * * * * * * *

15              VOIR DIRE EXAMINATION

16              * * * * * * * * * * * * * * * * * * * *

17

18       On the 13th day of September, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Bob Burdette, Judge

21   Presiding, held in Houston, Harris County, Texas:

22       Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

```
 1                 A P P E A R A N C E S

 2      MR. LYN MCCLELLAN

 3      SBOT NO. 13396100

 4      MS. CLAIRE CONNORS

 5      SBOT NO. 0470500

 6      Assistant District Attorneys

 7      201 Fannin

 8      Houston, Texas 77002

 9      Phone:  713.755.5800

10      ATTORNEYS FOR THE STATE OF TEXAS

11

12      MR. WAYNE HILL

13      SBOT NO. 59656300

14      4615 Southwest Freeway

15      Houston, Texas 77027

16      PHONE:  713.623.8312

17      MR. KURT WENTZ

18      SBOT NO. 21179300

19      5629 W FM 1960

20      Houston, Texas 77069

21

22      ATTORNEYS FOR THE DEFENDANT
23

24

25
```

i

## INDEX

### VOLUME 6 OF 25

|  | PAGE | VOL. |
|---|---|---|
| September 13, 1999    Voir Dire | 3 | 6 |
| Panel Voir Dire |  | 6 |
| Proceedings concluded | 63 | 6 |
| Court Reporter's Certificate | 64 | 6 |

3

1          (Jury panel brought in and seated.)
2          THE COURT:  Good morning to you.  And
3    first off, let me tell all of you how much I appreciate
4    your being here on time.  You have no idea how
5    frustrating it is to have to wait for somebody, and you
6    don't even know who it is you're waiting for.  We've
7    asked you to come here so that we might visit with you
8    about prospective service as a juror in the case of the
9    State of Texas verse Charles Mamou, Jr.
10         Mr. Mamou, stand up and face the jury
11   panel.
12         Mr. Mamou is represented by his two
13   attorneys, Mr. Wayne Hill, who had to step out just a
14   second and he'll be right back, and Mr. Kurt Wentz.
15   The State of Texas is represented by two of her
16   Assistant District Attorneys, Mr. Lyn McClellan and Miss
17   Claire Connors.
18         Thank you.  Be seated, please, folks.
19   First off, ladies and gentlemen, is there anybody here
20   who, either because of familiarity of face or
21   familiarity of name, feel that you know any of the four
22   people to whom you have been introduced and seen and the
23   fifth person to whom you have been introduced and have
24   not yet seen?
25         Yes, ma'am?

4

1          VENIREPERSON:  I know Charles Mamou.
2          THE COURT:  Your number, please?
3          VENIREPERSON:  64.
4          THE COURT:  Thank you very much.  In this
5    case, ladies and gentlemen, Mr. Mamou stands charged by
6    indictment with the offense of capital murder that's
7    alleged to have occurred in Harris County, Texas, on or
8    about the 7th day of December of 1998.
9          Now before we go any further, let me tell
10   you a couple of things that I think are probably on the
11   minds of some of you, if not many of you.  First off,
12   you went through the process of filling out these
13   questionnaires for us for the purposes of speeding this
14   operation up; and I can assure you it did speed it up.
15         Secondly, you might have had a number of
16   different thoughts in your mind about what might happen
17   to you as a result of being asked to come over here to
18   visit with us about this particular case.
19         Thirdly, my best guess is, as for ninety
20   percent of you, the only association you have about what
21   goes on at the courthouse, except from the standpoint of
22   a capital murder case, is what you saw on television
23   with O.J. Simpson.  Let's just stop right there.
24         And fourthly, your real association with
25   the courthouse is watching Judge Judy.  See, my job gets

5

1    harder and harder, trying to take all that conditioned
2    process out of you and tell you that you're really in
3    the real world.
4          Let's talk for a couple of seconds.  First
5    off, the business about this being a capital murder
6    case, if you came here thinking that the chances were
7    real good that you were going to get locked up in some
8    old dingy hotel room, kept away from your family, your
9    friends, your job, your loved ones for weeks or months
10   at a time, I'm going to tell you, don't think that way
11   anymore.  That is simply not going to happen to you.
12   And the reason that I can promise to you it's not going
13   to happen is because if you guys got locked up in a
14   dingy old hotel room, that means I'd have to get locked
15   up in one; and I'm not about to do that.  So just don't
16   worry.  It's not going to happen.
17         Next let's talk about Judge Judy for a
18   second.  My eighty-year-old father simply does not
19   understand, after having spent all of the money that he
20   spent to educate me, why I can't perform feats of
21   justice at exactly the same sixteen-minute pace everyday
22   that Judge Judy does.  I simply haven't the ability to
23   explain it to him.  Please keep in mind one thing about
24   Judge Judy and those kinds of things.  You never see
25   them talking to lawyers.  They're only talking to

6

1    citizens that they can harass.  In here we talk to
2    lawyers.  So right there you know it's different.
3          Next, in this kind of a case we have to --
4    this kind of case being the kind of case wherein the
5    State has made known they and they have made known to the
6    defendant, they have made known to the Court, they have
7    made known to everybody that in the event the defendant
8    in this case is found guilty, the State is going to
9    attempt to persuade the jury through the evidence they
10   present to return a verdict in such a way that causes
11   the death penalty to be imposed.
12         At the conclusion of all of the evidence
13   in the case, whether the jury does agree or does not
14   agree, we don't know; but that's the point of the trial.
15   But at any rate, where the death penalty is a possible
16   punishment, whether it's the appropriate punishment,
17   nobody will ever know until the evidence is all in.  But
18   where the death penalty is a possible punishment, the
19   law says that we have to go about the jury picking
20   process in a different way than what we would go through
21   on a regular case.
22         More specifically, the difference is this:
23   We have to talk to each one of you on an individual
24   basis now.  There being sixty of you here, obviously it
25   would take sixty times longer to talk to each of you

7

```
 1   individually than it's going to take to talk to sixty of
 2   you one time in a group.  I understand that.  Let me
 3   tell you something else that we understand.  These four
 4   lawyers and myself all understand that every single one
 5   of you that's here today is here today laboring, to some
 6   degree or another, under an inconvenience.  If the
 7   inconvenience under which you're laboring is absolutely
 8   nothing different than the fact that when you backed out
 9   of your driveway today to come down here, you made a
10   left at the stop sign to come here instead of making a
11   right that you ordinarily would have made to go to work.
12   So, right there things are different, and that just
13   throws everything off.
14           You're also here in a place that's got
15   some sort of hocus-pocus to it; because you know there
16   is funny stuff that goes on in the courthouse, but you
17   just can't identify for sure what it is at all times.
18   And as a juror, you come here -- and I guess the best
19   explanation that I've ever had about a juror, a person
20   being a juror is it's a lot like being a pallbearer at a
21   funeral.  You're in a place you do not want to be.  You
22   are doing something you do not want to do.  You do not
23   know for certain what it is that's expected of you next.
24   And the only reason you're doing it in the first place
25   is out of a sense of duty.  So what I want to spend a
```

8

```
 1   couple of seconds talking to you about is jury service
 2   in this kind of a case, what can happen.
 3           First off,  there is nothing more complex
 4   to being a juror in a criminal case than going to a
 5   strange town, picking out somebody on the street for the
 6   purposes of asking them directions and then deciding, do
 7   you believe them or not?  All we're going to want you to
 8   do is sit in the chairs and do three things; listen,
 9   evaluate what you heard, and then react to your
10   evaluations of what you heard.  That's your verdict.
11   That's all this is about.
12           Now, let's talk about the trial itself.
13   How can it come about?  The general framework involved
14   in a trial like this, once the jury is selected, can
15   come in two parts.  The first part of the trial, the
16   jury -- this is Mr. Hill.  I told you he would be here.
17   Does anybody recognize Mr. Hill?  Okay.  A trial like
18   this can come in two parts.  The first part of the
19   trial, the jury's only concern is going to be with
20   deciding the question of whether the defendant is or is
21   not guilty.
22           If the defendant is not guilty, the case
23   is over with and that's the end of that.  If the
24   defendant is found guilty, we come back and we have
25   another short trial.  Additional evidence can be
```

9

```
 1   presented to you.  And the evidence at the second phase
 2   of the trial is going to be remarkably different from
 3   the evidence at the first phase of the trial, because
 4   the purpose for the second phase is different than the
 5   purpose for the first phase.  Since the first phase of
 6   the trial the jury concern is going to be with deciding
 7   whether the defendant is or isn't guilty, the focus of
 8   the evidence is going to be on the offense that was
 9   committed.  Who did it?  Where was it done?  When was it
10   done?  How was it done?  What was the relationship of
11   the parties involved, if there was one?  Everything
12   about the crime can be presented to you at the first
13   phase of the trial.
14           If you find the defendant guilty, the
15   second phase of the trial the focus of the evidence is
16   going to shift.  It's going to get off the crime that
17   was committed, and the focus is not on the crime that
18   was committed.  The second phase is going to be of the
19   character, the background of the defendant on trial.  At
20   the second phase of a trial wherein a person has been
21   found guilty of capital murder, you're entitled to hear
22   basically about every single good thing some defendant's
23   ever done before in his or her life, if there are any
24   good things.  You can also hear basically at the second
25   phase of a trial, wherein a person has been found guilty
```

10

```
 1   of capital murder, about every single bad thing some
 2   defendant's ever done before in his or her life, if
 3   there are any bad things.  And you take that good stuff
 4   and that bad stuff that you hear at the second phase of
 5   the trial, you pile it onto all of the stuff you heard
 6   about the crime and how it was committed at the first
 7   phase of the trial, and you use every single bit of it
 8   in helping you decide what do you think is the right
 9   punishment in the case based upon the crime committed
10   and the person that committed it.
11           We want to give you information about the
12   defendant for exactly the same reason that you made
13   decisions during the course of your life, when you're
14   raising children, about what do you do when you tell a
15   child not to do something and they do it again?  You
16   might react one way.  You might react differently if you
17   told a child ten times not to do something and they
18   continued to do it.  So we want you to hear about the
19   good stuff, the bad stuff, whatever there is about a
20   defendant on trial.  That's the way the trial could
21   flow.
22           Now, let's talk about a jury's job.  What
23   do you do?  What do you, the jury, do in relation to me,
24   the Judge, and what it is I do?  Well, you are the
25   exclusive judges of the facts proved, of the credibility
```

11

1  of the witnesses, and the weight that you want to give
2  to their testimony, meaning as to the first hypothetical
3  witness, after that person has concluded testifying, you
4  may very well say to yourself, I believe 100 percent of
5  what that witness says. At the conclusion of the
6  testimony of the second hypothetical witness, you may
7  say to yourself, I don't believe a single word that
8  witness says. And at the conclusion of the third
9  hypothetical witness' testimony, you may very well say
10 to yourself, well, I believe some of what they said; but
11 I don't believe some of what they said, too. That's
12 your call.
13        You're the exclusive judges of the facts
14 proved and of the credibility of the witnesses and of
15 the weight to be given their testimony. And the weight
16 to be given their testimony is important for this
17 reason: If in some imaginary case there are fifty
18 witnesses who testify, obviously all fifty witnesses
19 can't say something of exactly the same magnitude. So
20 you decide, A, who was believable and how much weight to
21 give to that believable testimony. That's your job. My
22 job, on the other hand, has absolutely nothing to do
23 with sorting out who the believable witnesses are.
24        My job, on the other hand, has to do with
25 listening to what the witnesses say. Whether I believe

12

1  them or not makes absolutely no difference. I provide
2  you with the law that applies to the testimony that the
3  witnesses have presented. So I'm going to give you in
4  the Court's charge a whole bunch of laws, some of which
5  you may find don't even apply; because the reason that
6  those laws are in the charge might become -- might be
7  prompted by some testimony presented by witnesses that
8  you determine you don't believe. So, if you don't
9  believe them, the law that applies to their testimony
10 doesn't apply. So the point of it is you decide what
11 the believable facts are. I arm you with the evidence.
12 I arm you with the law on all of the evidence that's
13 presented. And out of that, we put the two things
14 together and come up with what we think is the right
15 decision to reach based upon the law and the evidence
16 that's involved in the trial of a case. That's the
17 comparative function of the Judge and the jury.
18        Now insofar as a jury is concerned, there
19 is only one rule that exists that affects how a jury
20 determines the credibility, the believability of
21 witnesses. And I think that you'll find the rule makes
22 a whole lot of sense. The Rule is simply this: We
23 can't choose to either automatically believe or
24 automatically disbelieve what some witness says before
25 that witness ever says it. Makes sense? You got to

13

1  give some witnesses a shot. A derelict can tell the
2  truth. You got to hear what the person has to say.
3        Secondly, we can't choose to make
4  decisions about the believability or the lack of
5  believability of a witness' testimony simply and only
6  because of the witness' occupation and for no other
7  reason. Look at this. What would happen if we said,
8  all right, down there at the courthouse everybody who
9  ever testified in a criminal case that was either a
10 junior high school principal or an accountant, now those
11 people have to always be believed simply and only
12 because they are junior high school principals and
13 accountants. But if we had anybody down at the
14 courthouse that ever testified that was either a used
15 car salesman or a lawyer, those people can't possibly be
16 believable simply because they are a used car salesman
17 or lawyer. You decide who it is you want to believe,
18 but you make that decision on the basis of the quality
19 and the content of that witness' testimony, not simply
20 because they possess some occupation for which you might
21 have a great degree of fondness or one for which you
22 might hold a substantial amount of disdain. That can
23 come into play in a case like this for an obvious
24 reason.
25        I would assume, being the nature of the

14

1  crime involved, or the crime alleged, I should say, that
2  there is going to be testimony from police officers.
3  Our law says that police officers don't get one bit of
4  more credibility because they're carrying a brown
5  uniform or blue uniform around on their shoulders than
6  if they weren't carrying one around on their shoulders.
7  The police officers are no more believable and no less
8  believable than any other witness. And the reason we
9  know that is because every single law enforcement
10 officer that exists on the face of this earth is one who
11 belongs to the human race. And no person of the human
12 race is more believable than the other portion.
13        So, what I'm saying is this: If, when you
14 were a child growing up, you grew up with a kid next
15 door and his name was Johnny and you thought Johnny was
16 the neatest and nicest kid, had all the sorts of
17 integrity, great judgment and wonderful, and Johnny grew
18 up to be a law enforcement officer, just because Johnny
19 was the neatest, nicest kid you had ever known doesn't
20 mean that everybody that Johnny works with is. Now
21 maybe some of them are; but then again, maybe some of
22 them aren't.
23        The flip side of the coin is that you're
24 driving home one night. It's 11:00 o'clock, and you
25 have had a harrowing day. And some cop stops you and

15

1  pulls you over, completely unjustifiably charges you
2  with some sort of traffic offense that you know you
3  didn't commit, was rude to you, hassled you, harassed
4  you, was just simply a miserable experience for you.
5  That doesn't mean that every police officer who comes
6  and testifies is just that rude, is just that same -- is
7  just that unreasonable.  Now, maybe some of them are;
8  but then again, maybe some of them aren't.  The point of
9  it is don't base your decision on the credibility of a
10  witness because of an experience that occurred before in
11  your life.  Base your decision on the credibility of a
12  witness on the quality and the content of their
13  testimony, how they give it to you, how much trust they
14  project in your mind's eye, and how does it fit with all
15  the other information you possess about the
16  circumstances in the crime.
17       So, what we're simply saying is this:  No
18  human being comes to the witness stand being presumed to
19  tell the truth before they ever do.  No witness ever
20  comes to the witness stand being presumed to never tell
21  the truth before they ever do.  Anybody have any
22  quarrel, any disagreement, any comment, any discussion
23  about that facet of our life?
24       Now if you came here today thinking that
25  if you're a juror in this case you're going to hear a

16

1  mess of out and out lies and goings on from the witness
2  stand, I'm going to tell you that is something that can
3  happen, and does.  But I'll tell you something else.
4  What happens more often than not is that you have people
5  who come along, take the witness stand, and tell about
6  an experience or event that occurred in their life and
7  give to you the best answers to the questions that are
8  asked of them as they can possibly recall.  You may
9  very well, as a result, have inconsistencies from one
10  witness to another witness to another witness.  But an
11  inconsistency is far different than an intentional lie.
12       We could take you sixty folks out in the
13  hallway, for example, right now, stage some sort of
14  dramatic event for your benefit, terminate the event,
15  bring each of you in here individually and ask you one
16  at a time, what did you see?  And you know we're going
17  to get sixty different answers.  Some of you are going
18  to be closer to the event that's going on out there that
19  you could see it.  Some of you couldn't see it.  But you
20  could hear it.  Some of you couldn't see it, and you
21  couldn't hear it.  Some of you are right up front; and
22  you could have seen it, and you could have heard if you
23  wanted to.  But you're so disgusted with the whole deal,
24  you want to go home.
25       Well, that can happen up on the eighth

17

1  floor of this building.  It can happen out in the
2  street.  The point being, just because there are
3  inconsistencies doesn't amount to an intentional lie.
4  But it is your job to sort out the credibility of all
5  those witnesses, with the consistencies, without the
6  consistencies, however it is they find.  That's what
7  goes on here.
8       Now I mentioned the Judge Judy business
9  and the lawyering program and so forth.  And I remember
10  Perry Mason programs.  I don't know if y'all remember
11  Perry Mason.  I used to wonder why the citizens of the
12  imaginary community where Hamilton Burger, who was the
13  District Attorney -- why those citizens would always
14  continue to re-elect Hamilton as their District Attorney
15  when he never could win a case.  And it's not something
16  that's worthy of thinking about; but it is something
17  worthy, I think, of factoring in to show you how goofy
18  those things are.
19       I watch the same newscasts you do, and I
20  spend the same three or four minutes at the first of
21  every newscast just like you do, having to watch all the
22  dead bodies being dragged out of apartments, put in
23  purple body bags, shoved into a car, taken away, or you
24  hear three minutes worth of about six or seven killings.
25  And if we don't have enough good killings in town, the

18

1  media will run off to St. Paul, Minnesota, to talk about
2  one of theirs.  And then the next thing that happens is
3  they take a commercial, because they've got to go sell
4  Tylenol.
5       And you've got to wonder, why am I
6  listening to this?  Because I know I'm not hearing
7  anything about it.  The point being, now this is the
8  location.  The courtroom is the location of where you do
9  get to hear about it, and that's what we're going to ask
10  you to do.  We know that we aren't going to get the best
11  possible product you, the jury, possess if -- that is to
12  say, your attention, your evaluation and your result --
13  we're not going to get it if we waste your time.  So
14  we're not going to waste your time, because it's
15  self-defeating for all of us, because what we do want is
16  your best work product.
17       So, let me tell you how we're going to go
18  about this.  We're going to spend a while this morning
19  talking about some general principles of law that apply
20  to this case.  Certain applications apply to every kind
21  of criminal case that there is.  We're going to ask some
22  of you to come back.  I don't know for sure how many
23  that's going to be just yet.  But we're going to bring
24  some of you back on Tuesday.  We're going to bring some
25  of you back on Wednesday, some of you back on Thursday,

19

1   some of you back on Friday.
2           Now if you're due back on Friday, Tuesday,
3   Wednesday, Thursday, blow us off. Don't even factor us
4   into your life. You do exactly what you would have done
5   exactly the same way you would have done it. We want
6   you here Friday. So we don't want you around us if we
7   aren't going to be able to use you, because we're using
8   up the good time you've got. And we don't want to do it
9   that way. We want to do it by doing things with you.
10          Now what we're going to do, what we have
11  been doing, is we're talking to folks individually for
12  the purposes of creating a pool or a panel of folks.
13  Going to be somewhere around 48, maybe 50, that we're
14  going to get back one day. That's going to be
15  Wednesday, the 29th of September, two weeks from this
16  coming Wednesday. We're going to spend a couple of
17  hours with you that morning. And on that day we're
18  going to choose the twelve people who are going to be
19  the jurors. So we're going to want you today -- you
20  know that because you're already here -- we're going to
21  want you perhaps one other day this week, depending upon
22  how that day goes. We're going to want you on the 29th
23  of September. The evidence in this case is going to
24  begin on the 4th day of October, which is three weeks
25  from today; and the trial is going to last for longer

20

1   than one work week, but it is not going to last as long
2   as two full work weeks. That's the case in a nutshell.
3   We'll talk more about that in just a couple of minutes.
4           But having said that, let's talk for just
5   a couple of seconds about these kinds of cases, that
6   being criminal cases generally. At the conclusion of
7   the testimony at each of the phases of the trial, that
8   being the first phase of the trial and, if the defendant
9   is found guilty, at the conclusion of the testimony at
10  the second phase of the trial, I'll give you what's
11  called the Court's charge.
12          The Court's charge is going to be a
13  document that's going to have -- could be eight to ten
14  to twelve pages of legal instructions and definitions
15  that are given to you simply for the purposes of setting
16  out for you what the law is based upon the testimony
17  that was presented and some definitions and instructions
18  to assist you during the course of your deliberations.
19          I want to talk to you for just a couple of
20  minutes about some general principles of law that will
21  certainly be contained within the Court's charge. First
22  off, we have already talked about the fact that in this
23  case this defendant stands charged by indictment with
24  offense of capital murder.  I will tell you in the
25  Court's charge, and I'm going to tell you now, the fact

21

1   that some human being was arrested for an offense, the
2   fact that some human being was charged with having
3   committed an offense, the fact that some human being was
4   indicted for having committed an offense, is not and
5   cannot be considered by a jury as any evidence of that
6   human being's guilt.
7           You say, why would that be?  Well, how
8   about this?  Let's say two months ago, here in Houston,
9   Texas, a burglary was committed.  And just right now
10  through that door comes twelve Houston Police Officers
11  and arrest me today for having, two months ago,
12  committed that burglary.  Can you see that the singular
13  event of my being arrested today cannot possibly be any
14  evidence that two months ago I committed that burglary?
15          Now those police officers may very
16  well have nine buckets full of other perfectly wonderful
17  evidence that does show that two months ago I did commit
18  that burglary, but the fact they arrested me today is no
19  evidence that I did it.  Anybody have any quarrel or
20  dispute with that?  The fact that I was charged today
21  with having committed that burglary is no evidence that
22  two months ago I did it.  The fact that a Grand Jury
23  indicted me today for having two months ago committed
24  that burglary is no evidence that I did it.  All those
25  three processes are steps that are required to be taken

22

1   to bring a case into a courtroom so that twelve jurors
2   can be selected and hear testimony to see whether or not
3   I committed that burglary two months ago.
4           So, I will tell you in the Court's charge
5   and I will tell you again, the fact that somebody was
6   arrested for, the fact that somebody was charged with,
7   the fact that somebody was indicted for having committed
8   a crime.  That event, the arrest or the charge or the
9   indictment -- or those events cannot be considered by
10  any Judge or by any jury as any evidence that, in fact,
11  the person charged, arrested, or indicted committed that
12  crime.  Is there anybody here who has any quarrel, who
13  has any dispute or who has any disagreement with that
14  facet of our law?
15          Back to these television shows, very
16  briefly, I'll bet that somewhere along the way many of
17  you, if not all of you, have heard this phrase, person
18  was found guilty beyond a shadow of a doubt.  Did you
19  ever hear about the shadow of a doubt business?  We get
20  that from the Perry Mason shows.  It is not necessary
21  for the State, the District Attorney, the prosecution in
22  order to obtain a conviction in a case.  It is not
23  necessary for them to show a jury a person's guilty
24  beyond a shadow of a doubt.  It is not necessary in
25  order to obtain a conviction for the prosecution to

23

1  prove to a jury a defendant's guilt beyond all doubt.
2  It is not necessary for the State, in order to obtain a
3  conviction, to prove to a jury through their evidence a
4  person's guilty beyond every doubt. It is, however,
5  necessary for the State's evidence to persuade the jury
6  beyond a reasonable doubt as to the defendant's guilt.
7  They don't have to show a person's guilt beyond a shadow
8  of a doubt, beyond all doubt, beyond every doubt. That
9  has never been the law in the country. That's presently
10  not the law in this country. In all reasonable
11  probability, it never will be the law in this country.
12  It is, however -- the law presently, has always been,
13  and it'll certainly continue to be, that the State must
14  prove a person's guilt beyond a reasonable doubt.
15         In the Court's charge I will give the
16  definition as to what, in our state, a reasonable doubt
17  means. I'm now going to tell you the definition I give
18  you in the Court's charge, because I want you to be
19  aware of it. It is not required that the prosecution
20  prove guilt beyond all possible doubt. It is required
21  that the prosecution's proof excludes all reasonable
22  doubt concerning the defendant's guilt. A reasonable
23  doubt is a doubt based upon reason and common sense
24  after a careful and impartial consideration of all of
25  the evidence in the case. It is the kind of doubt that

24

1  would make a reasonable person hesitate to act in the
2  most important of his own affairs. Proof beyond a
3  reasonable doubt, therefore, must be proof of such a
4  convincing character that you would be willing to rely
5  and act upon it without hesitation in the most important
6  of your own affairs.
7         That is the quality of the testimony that
8  the State must present to you and that you must believe
9  in order to find somebody guilty of a criminal offense,
10  whether it is a capital murder case, whether it's a
11  speeding ticket, whether it's a shoplifting case,
12  whether it's an aggravated robbery. It makes no
13  difference. That is the level of testimony that the
14  State must present and a jury must believe before a
15  person could be found guilty of the offense.
16         Now the flip side of that coin is this:
17  Since it is the State's job to prove a person's guilt
18  beyond a reasonable doubt and it is -- it is never ever,
19  ever a defendant's job to prove that he or she is not
20  guilty. We know from our civics classes that in every
21  criminal case a person charged with having committed a
22  crime starts the trial off being not guilty, stays not
23  guilty until the time comes, if it ever does, when the
24  State's evidence overcomes that presumption of being not
25  guilty and establishes beyond a reasonable doubt in the

25

1  jury's mind that the defendant is, in fact, guilty. So,
2  no defendant has to prove his or her innocence. The
3  State always has to prove the guilt of the defendant on
4  trial.
5         You might say to yourselves, well, I don't
6  think that's right. I think the defendant ought to have
7  to prove he didn't do it, or she didn't do it. And I'd
8  ask you to consider this for a second. Today is the
9  13th day of September, and it's 1999. And let's go back
10  five years ago today, 13th of September of 1994. And I
11  pick that day just to be far enough back in our lives to
12  where maybe it's a day that we don't have an independent
13  recollection as to exactly what we did. Throughout the
14  course of the day, if you do have a recollection, if it
15  was a day that there was some singularly important event
16  to you, a birthday, anniversary, whatever it might be,
17  pick another day. Pick August the 8th or the 17th or
18  something.
19         But let's just say when we conclude this
20  process here this morning, you're out there at the
21  elevator bank waiting to get an elevator to get out of
22  here. Nice deputy sheriff of Harris County, Texas,
23  walks on up to you and says, Excuse me. Are you Mr. A?
24  Are you Mrs. B? You say, Yes, I am. And the deputy
25  sheriff says, Well, let me tell you something. I need

26

1  to visit with you; because while you were in that
2  courtroom making yourself available for jury duty, a
3  Grand Jury in Harris County, Texas, in one of their
4  secret sessions -- and the law requires their sessions
5  to be secret -- but one of the Grand Juries in Harris
6  County, in one of their secret sessions just this
7  morning, has returned an indictment against you,
8  charging you with having, on the 13th of September,
9  1994, committed the offense of sexual assault of a
10  child.
11         Now would you tell me, please, what the
12  second thing is that you would do after receiving that
13  information? The first thing we know is you would be
14  picking yourself up off the floor from having passed
15  out, and we understand that. How would you prove you
16  didn't do that? Quite simply. You wouldn't. You might
17  say to yourselves, If the 13th of September of '94 was a
18  workday, I know I ordinarily get to work at 8:15 in the
19  morning and usually get home at 6:15. I might check out
20  a calendar and see that the 13th of September was a
21  workday. If it was, that means you're armed with the
22  ability to prove to a jury when it was you go to work
23  and usually what time you get home. And you can't, in
24  your wildest dreams, believe that proves you did not
25  commit that crime on that day. The point being, it's

27

1  not your job to prove you didn't do it. It's the
2  State's job to prove you did do it. I don't know how
3  things were when and where you grew up as a kid; but I
4  knew where I grew up, my little peer group we had, if
5  some of the kids that I ran around with when I was four
6  or five or six years old blamed us for having done
7  something wrong, they had to prove that we did something
8  wrong. The people doing the blaming had to do the
9  proving.
10         That same little elementary system of
11  justice is what works in a courtroom. The people doing
12  the blaming are the people who have to do the proving.
13  The State's doing the blaming. The State's got to do
14  the proving. How much proving does the State got to do?
15  I don't know; but I do know that whatever the amount of
16  proof is, it's got to be enough that satisfies the jury
17  beyond a reasonable doubt that their blame is accurate
18  and that the defendant did, in fact, commit the offense.
19  The point being, it is never ever, ever this defendant's
20  job to prove that he didn't commit the crime. It is
21  always, always, always the State's job to prove that he
22  did commit it, and they must prove that beyond a
23  reasonable doubt. Is there anybody here who has any
24  quarrel, discussion, objection with that facet of our
25  law?

28

1         Now let's talk about something that's a
2  little bit more nebulous. We ask you to give of your
3  time and come down here for the purposes of making a
4  powerfully important decision, deciding, for example,
5  whether a person is or is not guilty of capital murder.
6  And if you decide they are guilty, then decide which
7  punishment should the person receive, life or death?
8  That's heavy stuff. And you know as well as I do that
9  we're going to ask you to do it. And we may not tell
10  you everything that you want to hear. That gets
11  frustrating. And I want to talk about it, because I'll
12  bet you when we're through with this conversation it
13  will make sense to you.
14         First off, every single day of our lives
15  when we make decisions, we try to assemble all of the
16  very best information we can get about it. We're having
17  to decide so that we can broaden the comfort zone within
18  which we exist for the purpose of making that decision.
19  What do we do? We go out and we'll buy a car. We go
20  car shopping. We talk to a half a dozen people. We
21  might get on the Internet. Whatever you do, you
22  assemble together all the information you possibly can.
23  You're in the market for buying a house. What do you
24  do? You go look at houses. You go get all the
25  information you can get. You're getting ready to get

29

1  married. You go spouse shopping. Well, sometimes you
2  don't always get good information, but you get the best
3  introduction. The point being, you want to feel as good
4  as you can possibly feel about being informed as it
5  relates to the decision that's confronted. You came
6  down here. And you know, you might not get to hear
7  exactly what you thought.
8         First off, I know that at the conclusion
9  of a trial there are a lot of times when a jury goes
10  out, a juror says to him or herself, boy, I sure wish
11  Lawyer A had asked such-and-such a witness so-and-so
12  question. Perfectly natural thought. And frankly, it
13  might have been the best question in the whole case.
14  You might say to yourselves, well, why didn't Lawyer B
15  prove such-and-such. Legitimate thought. Good question
16  to you. But keep in mind that evidence may never have
17  existed in the first place. Just because you wanted
18  them to ask it doesn't mean that the evidence ever
19  existed. So, keep in mind that your decision in a case
20  is going to have to be based on what you do hear.
21         Now, you're back to this getting all the
22  information together business. You're at the house. I
23  know this has happened to some of you. May have
24  happened to most of you. It's happened to me. Kid
25  coming in the room says, daddy, you know what your other

30

1  daughter did? What did she do? She ate the cookies
2  that mom saved for me. What do you do? You get the
3  other kid in the room. Every single one of us does
4  that. We fall for it time after time, child after
5  child. Why? Because we want to play one of them off on
6  the other. Why? Because we're not so sure we believe
7  the one doing the blaming.
8         You're at work. Again, we want to get all
9  the information we can. You're at work. Job for years
10  has been to manufacture a widget at seventy-five cents a
11  unit. Out of the blue one day, somebody comes and says,
12  hey, I know how we can do this widget for sixty-five
13  cents, a whole dime cheaper. Same quality. Everything
14  is the same. What do you do? You'll get everybody up
15  and down the marketing chain, everybody up and down the
16  manufacturing chain to see, can we really do this widget
17  a dime cheaper?
18         You're on the committee at church. Your
19  job is to hire the replacement for the preacher who has
20  just retired. What do you do? You want to talk to all
21  of them, see what plans do they have? Same deal. You're
22  getting ready to elect next year's PTA president. What
23  do you want to do? You want to get all of the
24  information you can possibly get. We bring you down to
25  the courtroom and tell you right now, you may not get to

31

1  hear everything you want to hear, and it just simply
2  drives you crazy.
3          Consider this: That kid who blamed her
4  little sister for having eaten the cookies that her mom
5  has been saving for her is not going to have to prove
6  that to us beyond a reasonable doubt; because the kid
7  who does eat the cookies is not going to receive the
8  death penalty. Here that's what happened. The guy who
9  claims to you, we can make this widget for sixty-five
10 cents instead of seventy-five cents doesn't have to
11 prove it to you beyond a reasonable doubt. If it's
12 wrong, he's not going to die for it.
13         The preacher who says, I'm campaigning for
14 this job in your church because I sure do like your
15 congregation, and I promise to increase its size by
16 fifty percent in the next two years is not going to get
17 executed if he fails to perform. That's what happens in
18 the courtroom. And that's why the rules are different.
19 And you say to yourselves, well, I sure wish I could
20 hear both sides of the story. It has nothing to do with
21 both sides of the story. What you're really saying is,
22 I want my comfort zone broader; because it's the State's
23 job to prove somebody's guilty, and they have to prove
24 it beyond a reasonable doubt.
25         In some hypothetical case it may very well

32

1  be that you only hear from the State's witnesses. Just
2  because you only hear from the State's witnesses does
3  not mean there is a requirement that you have to believe
4  the State's witnesses. So hearing from only one side
5  has absolutely nothing to do with what your verdict is
6  going to be. Hearing from only one side and then
7  determining whether you do or do not believe that side,
8  that's what makes a difference as to what your verdict
9  is going to be.
10         It's just like when you go out trying to
11 buy a car, or trying to buy something, anything. If you
12 only talk to one salesman because you chose to only talk
13 to one of them doesn't mean that you're required to
14 believe what that one says. It's just the same in here.
15 Because you only hear from one side doesn't mean you
16 have to believe it. Maybe you do. Maybe you will wind
17 up a believer, but you don't have to.
18         In the case of a trial such as this, at
19 the conclusion of the State's case -- that is to say,
20 when they have presented all the witnesses that they
21 intend to present -- they're going to rest. When the
22 State rests, one of two -- one of three things can
23 happen. It may very well be that the defense rests
24 right behind them, presents absolutely no evidence
25 whatsoever. Well, we know they don't have to, because

33

1  it's not their job to prove that the defendant's not
2  guilty. It's the State's job, through the quality of
3  their evidence, to prove beyond a reasonable doubt that
4  the defendant is guilty.
5          So, maybe the defense presents no
6  witnesses. Maybe it will be another imaginary case that
7  the defense will present witnesses, but not the
8  defendant. Nothing in the world wrong with that. It
9  may very well be in a third imaginary case that the
10 defense presents witnesses and presents the defendant.
11         Let's talk about what happens if a
12 defendant does testify. First off, if a defendant in a
13 criminal case does testify in his or her own case, the
14 first thing that happens is that the defendant does not
15 get any extra credit for having testified. They don't
16 get any extra points for having done something that the
17 law doesn't obligate them to do. They can't be
18 compelled to testify. They don't have to testify. If
19 they do testify, that's voluntary and they don't get any
20 extra credit for it.
21         Next, we know all defendants are presumed
22 to be innocent, start the trial off not guilty. The
23 presumption of innocence never ever, ever spills over to
24 become a presumption that the defendant, as a witness,
25 will tell the truth. There is not a single human being

34

1  alive on the face of this earth that is presumed to be a
2  truth teller under oath before they ever testify. So,
3  that's what happens when a defendant does testify. You
4  take him or her, whatever the gender of the defendant is
5  on trial -- in this case it's a male. You take that
6  person as a witness. You evaluate them. You critique
7  them just like you did all the other witnesses in the
8  case, and you decide for yourself whether you do or
9  whether you do not believe them. That's your deal.
10         On the other hand, if at the conclusion of
11 a trial if a defendant does not testify, I will tell you
12 in the Court's charge and I will tell you right now that
13 that is not a circumstance -- that is to say, if a
14 defendant does not testify in his or her case, that is
15 not a circumstance that any jury can use to infer, to
16 insinuate, or to speculate that the defendant on trial
17 is, in fact, guilty.
18         It's just like -- and I've used this
19 example till I'm sick of it. There was a brief time in
20 my life that teenagers -- there were five boys in the
21 family, and all five were teenagers at the same time.
22 And we ate like horses. And at 6:00 o'clock at night
23 when mom would bring in the platter, the meat platter,
24 there would be seven pieces of meat on it; mom, dad, and
25 five boys. The fastest four, which usually came from

35

1  the oldest, got the best piece of meat.  When the meat
2  platter was empty, there wasn't a soul sitting around
3  that table that ever thought that mom was going to take
4  it back out to the kitchen and load it back up again.
5  We did with what we had.
6          And it's the same way in a courtroom.
7  When the evidence is all over with, that's all you're
8  going to get.  Now if it's enough to persuade you beyond
9  a reasonable doubt that the defendant is guilty, it is
10  your obligation to find him guilty.  If it is not enough
11  to persuade you beyond a reasonable doubt of the
12  defendant's guilt, your obligation is to find him not
13  guilty.  But when a case is over with, and if you
14  haven't heard from somebody that you wanted to hear
15  from, if you haven't heard a specific piece of testimony
16  or evidence that you wanted to hear, you've got to make
17  your decision on the basis of what you do hear.  You
18  can't make it on the basis of, A, what you didn't hear,
19  supply some secret information that you feel you might
20  possess because you read it in a dime novel several
21  years ago, and the butler does it.  And everybody knows
22  that butlers do nothing except serve food and kill
23  people.  You just do it on the basis of what you got.
24          The oath that you take as a juror is the
25  very first event that occurs, is that you take an oath;

36

1  and that oath will be that the verdict that you return
2  in the case, whatever the verdict winds up being, will
3  be based upon the evidence that you hear from the
4  witness stand, as well as the law that you receive in
5  the Court's charge, and not from any other source.  So,
6  if you feel in some imaginary case -- or if a juror
7  feels in some imaginary case that, for example, there
8  has been botched up investigative work, you can't pick
9  up the slack for the investigators.
10          Because a juror's job is not to be a cop.
11  Juror's job is not to be a lawyer.  Juror's job is to
12  decide the case on the basis of the information; that is
13  to say, the evidence that the lawyers give to you.  The
14  lawyers' job is to provide you with information.  Your
15  job is to evaluate the information they provided you.
16  If after you evaluate their information it's enough to
17  find a person guilty beyond a reasonable doubt, do it.
18  If it's not, find him not guilty.  Any questions about
19  that?
20          Okay.  I want to spend just a couple of
21  seconds with you talking about the capital punishment
22  aspect of a trial, and then we're pretty close to this
23  through.  In the State of Texas, if a person is
24  convicted of the offense of capital murder, there are
25  only two possible punishments.  One of those possible

37

1  punishments is life.  One of those possible punishments
2  is death.  In just a couple of minutes I'm going to ask
3  you some questions about that.
4          Before I do, I want to talk to you just
5  generally so you'll have a feel or a sense of how it's
6  determined at the conclusion of a trial whether a life
7  sentence is imposed or a death sentence is imposed.  If
8  a jury finds a defendant guilty of the offense of
9  capital murder, we talked earlier about the fact that we
10  come back and we have some more testimony that relates
11  to the character, the background, the personal, moral --
12  personal involvement, I should say, personal
13  responsibility of the defendant on trial for the
14  commission of a crime.  I say that aspect because if you
15  have, say, three or four people involved in a capital
16  murder, maybe not all of them will have had equal
17  involvement.  Maybe some of them, a jury might view to
18  be less involved.  So, that aspect comes into play, or
19  can come into play, at the second phase of the capital
20  murder trial.
21          But at the conclusion of all of the
22  evidence at the second phase of a capital murder trial,
23  a jury is going to be asked to answer two questions.
24  Sometimes we call them Special Issues; but they're two
25  questions, and they're over here on this board.  And if

38

1  you can't see them I understand, because we can't do
2  this in such a way that everybody here can see it; and
3  it's not important that you know specifically the
4  details of it, because we'll talk more about it later.
5  But I want to give you a feel for how it's decided.
6          If a jury finds the defendant guilty of
7  capital murder, comes back for the second phase of the
8  trial, have the testimony, both sides rest, Court's
9  charge is read to you, lawyers argue their case to you,
10  and you go back to deliberate the question of
11  punishment.  That is to say, what answers are you going
12  to give to those two questions?
13          The first question you're going to be
14  asked to answer is this:  Do you find from the evidence
15  beyond a reasonable doubt that there is a probability
16  that the defendant on trial would commit criminal acts
17  of violence that would constitute a continuing threat to
18  society?  Now, no matter who the defendant is on trial,
19  no matter what the evidence was in the case, no matter
20  who the victim was in the case, there's never ever, ever
21  going to be but two possible answers to that question;
22  either yes or no.  Answer it whichever way the evidence
23  leads you.
24          Question Number Two, we'll ask you this:
25  Taking into consideration all of the evidence, including

39

1   the circumstances of the offense. That's going to be
2   what you heard the first half of the trial. Also,
3   including the character, the background, and the
4   personal moral culpability or responsibility. That's
5   going to be what you heard at the second part of the
6   trial.
7           So, the first half of the second question
8   simply instructs the jury to go back over all of the
9   evidence in the case and ask yourselves this: Is there
10  a sufficient mitigating circumstance, or perhaps
11  circumstances, that make you believe in this particular
12  case a life sentence would be more appropriate verdict
13  than a death sentence? Again, no matter who the
14  defendant, no matter who the victim, no matter what the
15  testimony, no matter what the injuries, there's never
16  ever, ever, ever but two possible answers to that
17  question; either yes or no. And again, answer it
18  however you view the evidence in the case.
19          If the jury answers that -- excuse me --
20  those questions will always be asked that way. They
21  will always contain those words, and they will always be
22  in that order. If the jury should answer the first
23  question yes and if the jury should answer the second
24  question no, that is to say a yes answer and a no
25  answer, in that order, then the law says that I have no

40

1   choice, I have no option, I have no discretion. I must
2   sentence the defendant to death. And that's exactly
3   what I'll do.
4           On the other hand, if the jury should
5   answer those two questions in any other way other than
6   yes and no, in that order, that is to say, a no answer
7   to the first question or a yes answer to the first one
8   and yes answer to the second question -- if those
9   questions are answered in any way other than yes or no,
10  in that order, the law again says I have no choice, I
11  have no option, and I have no discretion. I must
12  sentence the defendant to life. And that's exactly what
13  I'll do.
14          So, first off what you can see is that, A,
15  the State of Texas never sentences somebody to death.
16  And in a capital murder case, they never sentence
17  somebody to life. What they do is they answer those two
18  questions based upon the uniqueness of whatever the
19  testimony was in that particular case. Now, you are
20  entitled to know what the results of your answers is
21  going to cost; that is to say, a yes and a no is a
22  death. Anything else is a life.
23          But a jury does not go back and
24  subjectively say, well, I just think in this case what
25  we ought to do is give this one life, and I think in

41

1   that case we ought to give that one death. We don't do
2   it that way. The questions are standardized. They
3   never change. Sometimes -- I know that you've seen or
4   heard about results of capital murder trials wherein a
5   life sentence was the result. Sometimes you've seen or
6   heard of capital murders, at the conclusion a death
7   sentence was the result. And in each of those cases,
8   even though they're remarkably different results or
9   outcomes, they may very well be the absolutely most
10  appropriate result for that particular case.
11          Because the things that are always
12  different in a trial are the defendants are always
13  different. Their backgrounds are always different. Who
14  they are is always different. A victim in a case is
15  always different. Who they are is always different.
16  Their backgrounds are always different. The crimes are
17  always different. Nothing is ever the same. And in
18  every single case, every single case, all twelve of the
19  jurors are always different from the next twelve, from
20  the next twelve, and from the next twelve. And we could
21  have four jurors, and we could fit them into this
22  courtroom for -- four juries, I should say. If we could
23  fit them into this courtroom, listening to exactly the
24  same testimony from exactly the same people at exactly
25  the same time, and have all four of them go out into

42

1   different jury rooms and deliberate, you can come up
2   with four exactly different verdicts.
3           So, that's why every single criminal trial
4   is as unique as a fingerprint. Not another one will
5   ever be the same because of the difference of the
6   parties, because of the difference of the circumstances,
7   and because of the difference in the juries. So all I'm
8   trying to point out is the questions. The law never
9   changes. What makes verdicts appropriate is that the
10  facts always change and the combination of facts.
11          So I go back to what I said earlier, that
12  in this case there are two possible punishments, life or
13  death. Since the death penalty is a possible
14  punishment, I'm going to ask you a question. Before I
15  ask it, I'm going to tell you the question, what it is
16  I'm going to ask. Thereafter, I'm going to explain the
17  question that I'm going to ask. And then I'm going to
18  ask you the question for real. So, don't answer the
19  question till I ask it for real, because I'm going to
20  try to explain it without confusing it. And I'm
21  perfectly capable of confusing it.
22          Assume with me that you're a juror in some
23  imaginary capital murder case. The jury's found the
24  defendant guilty of capital murder. Whatever the
25  evidence was makes no difference. That's the result.

43

1    You come back to the second phase of this capital murder
2    trial, and you hear additional evidence. And let's just
3    say that after having heard all the evidence in the case
4    that you believed that those two questions we talked
5    about should be answered yes and no, in that order,
6    meaning that the death penalty would be imposed.
7            My question is this: It's going to be
8    this: Is there anybody here who has such a firm
9    opinion, whether it be -- whether it be a conscientious,
10   a religious, a moral, or a philosophical opinion against
11   the consideration of death as a punishment in a criminal
12   case that that opinion would override your ability to
13   evaluate the testimony in the case and cause you,
14   therefore, to answer those questions in such a way that
15   a life sentence would be imposed?
16           So, the explanation of the question is
17   simply this: We are never, never, never going to get
18   into what the testimony or the evidence is going to show
19   in a particular case. That has to come from the
20   witnesses. But let's just say for the purposes of this
21   conversation there is -- let me ask you this: Is there
22   anybody here who never, ever, no matter what the
23   circumstances, no matter what the testimony, no matter
24   who the victims, no matter who the defendant, never
25   ever, under any set of circumstances, no matter what it

44

1    is, would ever answer those two questions in such a way
2    that the death penalty would be imposed, even though
3    they knew the imposition of the death penalty would be
4    the right result in the case?
5            Now, that's the explanation. Now I'm
6    going to ask the question. Is there anybody here who
7    has a feeling that is so strong, a feeling of
8    conscience, a feeling of religion, a moral feeling, a
9    philosophical feeling, that would override and interfere
10   with their ability to objectively answer those two
11   questions and, if the evidence called for it
12   intellectually, vote in such a way that the questions
13   would be answered, the death penalty would be imposed;
14   and as a result, your strong feelings would overcome
15   your ability to do that and prevent you from doing it,
16   no matter what the evidence, no matter what the
17   testimony, and no matter what the case. The front half
18   of the first row? Anybody there? I see no hands.
19           VENIREPERSON: You asked the question.
20   You said --
21           THE COURT: Yeah, go ahead.
22           THE JUROR: You said it makes no
23   difference what the person -- I think I'm understanding
24   you to say, what my belief is --
25           THE COURT: Is that --

45

1            VENIREPERSON: -- the question -- or it
2    wouldn't make no difference what my belief is, that the
3    question is going to override.
4            THE COURT: If you did have a belief
5    against the imposition or the consideration of death as
6    a punishment, is there any set of circumstances, any set
7    of facts, any defendant, any innocent victim, that the
8    combination of those things would rise to the level that
9    would cause you to set your feelings aside and consider
10   the death penalty as an appropriate punishment? What's
11   the answer to my question?
12           VENIREPERSON: I'm opposed to the death
13   penalty, and it's because of religion.
14           THE COURT: That's not my question. My
15   question to you is, is there any set of circumstances
16   that you can dream up -- and I don't want you to tell me
17   what they might be; a bombing of a schoolhouse. I
18   simply don't care. Is there any set of circumstances
19   that if, after you heard them, might rise to the level
20   that would cause you to put your opposition aside and
21   consider death as a possible punishment? I'm not asking
22   you about this case. I'm just saying, is there
23   something out there where you could consider that?
24   Anybody on the first row? First left?
25           Yes, ma'am, and your number is?

46

1            VENIREPERSON: 31.
2            THE COURT: Yes, ma'am. And next -- was
3    there somebody else?
4            Yes, ma'am?
5            VENIREPERSON: 34.
6            THE COURT: All right.
7            VENIREPERSON: All of a sudden, I'm
8    confused about the question. The question is --
9            THE COURT: I can do that.
10           VENIREPERSON: Sorry. The question is if
11   I would raise my hand if I believed there was a
12   circumstance --
13           THE COURT: The question is this: Is
14   there anybody here -- I guess it really should be a
15   two-part question. Is there anybody here who is opposed
16   to the death penalty? Now if you are, that's a deal.
17   But does that opposition rise to the level that no
18   matter what the evidence was in a case, you could never
19   consider it? Because some cases get so bad that the
20   objection to the death penalty dwindles by comparison.
21   And I'm simply asking: Could you consider answering
22   these questions in such a way that the death penalty is
23   imposed, depending upon the circumstance of the case?
24   Anybody else?
25           VENIREPERSON: The question that you're

47

1  asking us is not whether or not we believe in the death
2  penalty, but whether or not in a given circumstance we
3  could let our belief overrule that and vote for the
4  death penalty?
5          THE COURT: Exactly.
6          VENIREPERSON: Okay.
7          THE COURT: Thank you. I should have used
8  you a whole lot earlier. And also along those lines,
9  not what would you do in this case? Don't ever --
10  because you don't have any idea what you would do in
11  this case. Just simply the idea is, are you available
12  to both possible punishments? Whichever one you select,
13  would you please select it on the basis of the evidence
14  in the case, not because of your moral or
15  philosophical -- yes, ma'am?
16          VENIREPERSON: Now my other question is:
17  Are you going to ask the second half of that, which is
18  could we vote -- could we not vote for the death penalty
19  under any circumstances, or is that all in one?
20          THE COURT: You've been asked -- I'm not
21  going to ask that; because if there are only two
22  possible punishments, then there is only one other
23  alternative, and that's a life sentence.
24          Yes, ma'am?
25          VENIREPERSON: No. I'm holding my hands

48

1  up.
2          THE COURT: We've been talking so long, if
3  I ever knew your number, I don't know -- I don't
4  remember. And your number is what?
5          VENIREPERSON: 39.
6          THE COURT: Thank you very much.
7          VENIREPERSON: I have to ask this: We
8  raise our hand if we --
9          THE COURT: Tell me if you would refuse to
10  answer those two questions on the basis of the evidence,
11  ignoring what result your answers to those questions
12  would cause.
13          VENIREPERSON: I wouldn't refuse on the
14  basis of the evidence.
15          THE COURT: Okay. So --
16          VENIREPERSON: So, I don't raise my hand.
17  Okay.
18          THE COURT: Well, all right. Anybody else
19  on the front row? Okay. Second row, on the left? I
20  see no hands on the second row on the left. Second row,
21  on the right? I see no hands. Third row, on the left?
22          Yes, ma'am, and your number, please?
23          VENIREPERSON: 57.
24          THE COURT: 57. Thank you. Anybody else?
25  Third row on the right? Nobody there. Along the back

49

1  row? Anybody there? Nobody there? Front row of the
2  jury box? Anybody? I see no hands. Second row of the
3  jury box? Anybody?
4          Your number, please?
5          VENIREPERSON: (Inaudible.)
6          THE COURT: Thank you. We talked awhile
7  ago about the schedule. We know that we're going to do
8  one of the days this week for those of you who come
9  back. We know that we're going to make the final jury
10  pool together on the 29th of September, which is a
11  Wednesday, two weeks from this coming Wednesday. We
12  know the testimony in the case is going to begin October
13  the 4th. Going back to what I said earlier, that we
14  recognize everybody here is, to some degree or another,
15  laboring under an inconvenience. But we have already
16  talked about those problems, and what I want to do is
17  address this situation. Is there anybody here for whom
18  one of the days this week, the 29th of September, and
19  more than one work week, October the 4th, but not as
20  much as two work weeks. So that would mean the week of
21  October 4th and October the 11th. Is there anybody for
22  whom that time frame is an absolute impossibility to fit
23  us into your life?
24          I'll get to you. If I jump around, I'll
25  miss somebody; and I don't want to do that. Front left

50

1  row, is there anybody for whom that is an impossibility?
2          Yes, ma'am, and you are 31?
3          VENIREPERSON: 31.
4          THE COURT: Anybody else in that front row
5  left? Nobody else. Front row right? Yes, sir, your
6  number?
7          VENIREPERSON: 40.
8          THE COURT: 40. And what is your
9  circumstance, please, sir?
10          VENIREPERSON: I have purchased
11  nonrefundable airfare for a vacation and paid for other
12  arrangements.
13          THE COURT: What are those dates, please?
14          VENIREPERSON: The 25th through the 2nd.
15          THE COURT: Of September?
16          VENIREPERSON: Yes.
17          THE COURT: Okay. Thank you. Anybody
18  else on that front row? Nobody? Second row, left side?
19  Anybody? Yes, ma'am?
20          THE JUROR: I don't know whether this is
21  proper, but I have night classes. Will it affect the
22  night and evening?
23          THE COURT: No. And in a simple way for
24  all of you, if this is an issue to anybody, trust me.
25  All of us inside this rail here, we've all got lives,

51

1 too; and we don't spend nights down here. You just see
2 that on television. Not a problem. Second row, right?
3 Yes, sir?
4           VENIREPERSON: I'm on an Exxon mobile
5 transition team, which is planning personnel --
6           THE COURT: I'm sorry. What is your
7 number, please?
8           VENIREPERSON: 49.
9           THE COURT: All right.
10           VENIREPERSON: And we're planning
11 personnel moves. The merger is expected to be approved
12 by the end of this month, and we're going to actually be
13 moving employees around, notifying --
14           THE COURT: All right. I have no idea
15 what will come of that. Thank you. Anybody else? Yes,
16 sir?
17           VENIREPERSON: I just have a question.
18           THE COURT: Please.
19           VENIREPERSON: Will this last beyond
20 October 13th? I have nonrefundable tickets.
21           THE COURT: October 13th is a Wednesday,
22 is it not? I can't guarantee you that it won't, but
23 thank you. If it doesn't, you can't play. What's your
24 number?
25           VENIREPERSON: 51.

52

1           THE COURT: Okay. Thank you. Yes, sir?
2           VENIREPERSON: Juror Number 53. I've got
3 a question.
4           THE COURT: Yes, sir.
5           VENIREPERSON: You said possibly we might
6 have to come back next Monday or Tuesday?
7           THE COURT: No, sir.
8           VENIREPERSON: No, sir?
9           THE COURT: Yes, sir.
10           VENIREPERSON: I'm 54.
11           THE COURT: Uh-huh.
12           VENIREPERSON: I'm involved in a couple of
13 projects right now that requires my attention. I need
14 to be there.
15           THE COURT: I'm sure that applies to a lot
16 of folks. Thank you. Third row, left? Yes, sir?
17           VENIREPERSON: Number 59. I have my own
18 auto repair business. I am the only man.
19           THE COURT: We'll get back to you. Thank
20 you. Third row, right? Yes, sir? Yes, sir?
21           VENIREPERSON: I have a baby due October
22 1st.
23           THE COURT: All right. What's your
24 number?
25           VENIREPERSON: 61.

53

1           THE COURT: Thank you. Yes, sir?
2           VENIREPERSON: 63, same circumstance. Due
3 date is October 10th; but it will probably be before
4 that, hopefully.
5           THE COURT: All right. Thank you. Yes,
6 ma'am?
7           VENIREPERSON: I have nonrefundable plane
8 tickets to be out of town the 17th.
9           THE COURT: The 17th of?
10           VENIREPERSON: A week will be Friday, all
11 the next week of September.
12           THE COURT: The 17th you leave, and you'll
13 be back?
14           VENIREPERSON: 22nd.
15           THE COURT: Piece of cake. Thank you.
16 Number 66. The whole back row?
17           VENIREPERSON: I have a question.
18           THE COURT: Yes, ma'am?
19           VENIREPERSON: It may seem silly; but I'm
20 an educator, and I'd be away from my classroom that
21 amount of time.
22           THE COURT: We'll do the best we can to
23 sort that out. Thank you. Front row, jury box?
24 Nobody? Second row, jury box? Yes, ma'am?
25           VENIREPERSON: I have airfare tickets

54

1 tomorrow.
2           THE COURT: Your number?
3           THE VENIREPERSON: 85.
4           THE COURT: Okay.
5           VENIREPERSON: I'm leaving on a conference
6 with my husband. I'll be gone all the rest of this
7 week. But the main problem I have is I talked to -- I
8 own a bed and breakfast in Bryan, Texas; and I talked to
9 my manager this morning. She's been interviewing for a
10 job up in Dallas and effectively has the job, and which
11 she's said a two-week notice. And I'm the only person
12 left to run it, so --
13           THE COURT: Yes, ma'am.
14           THE VENIREPERSON: 87. We have a wedding
15 in New Orleans.
16           THE COURT: Okay. Thank you. Yes, sir?
17           VENIREPERSON: Number 90. I'm a medical
18 resident intern, so I'm medical education.
19           THE COURT: Thank you. Okay. Let me tell
20 you folks what's going to happen next. That will be
21 before I tell them --
22           Have I left anything out, folks? Mr.
23 McClellan? Mr. Hill?
24           MR. HILL: No, Your Honor.
25           THE COURT: Next thing that's going to

55

1  happen is the lawyers and I are going to visit for a
2  second for the purposes of determining who is going to
3  come back. Nobody expects you to sit here in stone
4  silence while we do this, because it's going to take
5  maybe ten minutes. I don't know if you have ever been
6  in a crowded room where you were trying to tell a nice,
7  juicy piece of gossip to friends of yours, and you have
8  to talk loudly enough so the friends could hear it over
9  the noise in the room, but still low enough so nobody
10 else could hear. And just when you told the punch line
11 to the big old juicy piece of gossip, the crowd stopped
12 talking and everybody heard every single thing you said.
13 That's happened to me, and it's most embarrassing.
14         I guess what I'm saying to you is this: I
15 don't care how loud y'all get while we're doing this;
16 but however loud you get, always stay that loud. And
17 in about ten minutes, we'll be right back with you.
18 Before I start, does anybody have any questions?
19         VENIREPERSON: Do we leave to go to the
20 restroom?
21         THE COURT: No, ma'am. If -- and I hate
22 to use the word urgent, because I used to do that to my
23 kids. If you have to go, do it; because we'd rather
24 have you more comfortable than not. But please come
25 back as quickly as possible. And I don't know where to

56

1  go up here.
2         (Off-the-record discussion.)
3         (At the bench:)
4         THE COURT: All right. It's my
5  understanding there is an agreement by and between the
6  parties that the following 33 venirepersons from the
7  pool, which includes Number 31 through Number 90, for
8  various agreements may each be excused. Those numbers
9  to be excused are 31, 32, 34, 35, 39, 41, 45, 46, 47,
10 51, 54, 55, 57, 58, 59, 60, 61, 64, 66, 67, 68, 71, 73,
11 75, 76, 79, 80, 82, 88, 85, 6, and 7, 89.
12         Mr. McClellan, is that your agreement?
13         MR. MCCLELLAN: Yes, Your Honor.
14         THE COURT: Miss Connors?
15         MS. CONNORS: Yes, Your Honor.
16         THE COURT: Mr. Hill?
17         MR. HILL: Yes, Your Honor.
18         THE COURT: Mr. Wentz?
19         MR. WENTZ: Yes, Your Honor.
20         THE DEFENDANT: Yes, Your Honor.
21         THE COURT: Sir, you specifically
22 requested each of those people be excused?
23         THE DEFENDANT: Yes, sir.
24         THE COURT: Okay, ladies and gentlemen,
25 out of the sixty folks here, the attorneys have agreed

57

1  to invite back 27 people. And what we're going to do is
2  we're going to bring you back eight on Tuesday, eight on
3  Wednesday, eight on Thursday, and the final three on
4  Friday. We're going to do our business here, right here
5  in this courtroom. I'm going to ask all of you who are
6  coming back to please be here by 8:30 in the morning.
7         Now every day, whatever day you're
8  supposed to be back, we're always going to start that
9  day. I can't possibly keep my word to you about when I
10 can get you out of here if you can't let me get started
11 on time. If I can get started on time, I'll have you
12 out of here; but if I can't start on time, then we all
13 just have to wait.
14         Let me tell you something else that's
15 unique. Our law requires that I speak with you in the
16 same order in which you were sent to us today; meaning,
17 that, for example, if on Thursday, if you're the first
18 person that we're scheduled to talk to you and if you're
19 supposed to be here at 8:30 and if you don't show up
20 until 9:15, I want you to know why you have so many
21 people so angry with you. Now once we've concluded
22 talking with you on an individual basis, you're through.
23 We're not going to hold you hostage until we're through
24 with everybody. But we do have to talk now the way in
25 which we got you, and we can't do that until you're all

58

1  here.
2         Now I'm going to call your names out and
3  your numbers as to who is supposed to be back. It's
4  always going to be right here. It's always going to be
5  by 8:30 in the morning. It's going to be either
6  Tuesday, Wednesday, Thursday, or Friday. Now please
7  keep in mind how long it took you to get through the
8  gonculator, or whatever that thing is called downstairs
9  that checks for weapons and so forth. Please factor
10 that in, because it's crowded in the morning. Also,
11 where you park, that's your call. If you parked today
12 over in the jury assembly room because that's a place
13 you are familiar with from having done that on Friday,
14 that's your call. But please factor all that in in such
15 a way that you know you can be here by 8:30.
16         Let me tell you something else. There's
17 never going to be a day when we don't talk to you. Not
18 going to happen. If we have to order from the hospital
19 six sets of I.V. fluids to lay here on gurney tables and
20 talk to you, we're going to get to talk to you. You're
21 never going to make two days trip back for this purpose.
22 It's just not going to happen, because that gets into
23 the wasting your time business.
24         Now having said that, let's talk about the
25 eight people who are due back tomorrow morning by 8:30.

59

1    I'm sorry.  Before I do this, one more thing.  Let me
2    say, I'm going to make the attempt to do this
3    chronologically.  There is nobody here who has Number
4    120, so that's why I'm going to use that number.  If
5    your number is 120, and if I call that number to be back
6    here on a certain day, and if the next number I call is
7    123, that means 121 and Number 122 don't need to worry
8    about coming back unless I mess this up somehow.  And
9    I'm capable of that.  But I'm not going to jump around
10   and just all over the place.  I'm going to try and do
11   this as orderly as I possibly can.
12         So with that in mind, tomorrow morning by
13   8:30, the following eight people:  Lynne Cantrell,
14   Number 33; Katheryne Stephens, Number 36; Demetta
15   Landry, Number 37; Katherine Waller, Number 38; Number
16   40, Ross Smith; Number 42, Michael Evans; Number 43,
17   Michele Beasley; and Number 44, Cecelia Fine.  Each of
18   those eight people due back tomorrow, Tuesday morning by
19   8:30.  Of you eight folks whose name I called, do any of
20   you have any questions from me?
21         Okay.  The next eight names I'm going to
22   call are folks for Wednesday morning again.  Same place,
23   right out here in the hallway; same time, by 8:30.
24   These eight people are first off.  Number 48, Vera
25   Garcia; Number 49, James Pryor; Number 50, Rose Turner;

60

1    Number 52, Thomas Smith; Number 53, Donald Nelson;
2    Number 56, Douglas Polega; Number 62, -- and I'm sorry.
3    I can't read the Xeroxing.  Is it Eric Garcia?  And
4    Number 63, Richard Ardoin.  Those eight people back
5    Wednesday morning by 8:30.  Did any of you eight folks
6    have any questions for me about when you're supposed to
7    be back or who is supposed to be back?
8          Okay.  The following eight people will be
9    Thursday morning.  Same location, right out here by the
10   door; same time, by 8:30.  Those eight people are first
11   off:  Number 65, Steven Wiedmann; Number 69, Margarita
12   Byrum; Number 70, Lori McGarity; Number 72, Zenobia
13   Prince; Number 74, Anna Haydock; Number 77, Suzette
14   Barr; Number 78, Gilbert Cantu; and Number 81, Gregory
15   Adams.  Those eight folks Thursday morning by 8:30.
16         The last three people Friday morning; same
17   place, same time, by 8:30.  They are Number 83, Charles
18   Gilbert; Number 84, Elyse Sony; and Number 88, Stacie
19   Cokinos?  What would be closer?
20         VENIREPERSON:  Cokinos.
21         THE COURT:  Those three folks Friday
22   morning 8:30.
23         Now, first off, if you didn't hear your
24   name called and your number called, I'll bet you're
25   pretty pleased.  Those of you who do come back, we're

61

1    going to attempt to make you even happier than those
2    we're not bringing back.  Do any of you have any
3    questions at all for me?
4          Yes, sir?
5          VENIREPERSON:  When will we find out
6    whether we will be selected?
7          THE COURT:  Thank you.  At the conclusion
8    of our individual conversations, everybody will leave
9    here knowing whether they are to be back on the 29th of
10   September; or if they're not -- if you're not to be back
11   on the 29th of September, your jury service will have
12   concluded; and I'll tell you that right there on the
13   spot.
14         If you are to be back on the 29th, we're
15   going to start at 9:30, and we ought to be through by
16   noon.  And on the 29th of September, with the whole
17   panel the whole pool of everybody, everybody will leave
18   here that day knowing definitely whether they are or are
19   not a juror in the case.  So we're just taking different
20   phases as we go through the process.  But if, after your
21   individual conversation, which I guess if you're coming
22   back would be tomorrow; is that correct?  You'll know
23   when you leave here tomorrow whether you're still in the
24   deal or not.  But I will not have the capacity, nor will
25   anybody here have the ability, to project tomorrow what

62

1    your status might be on the 29th of September.  Anybody
2    else have any questions?
3          Okay.  In just a second Alice our clerk,
4    is going to have some excuses for you, hall passes, or
5    whatever you want to call them, documents to take for
6    anybody that has a real, real interest in knowing where
7    you were yesterday and today.  First thing we're going
8    to do is get these to those of you who are not coming
9    back, because we won't see you again.  Those of you who
10   are coming back, if you have to have one between now and
11   when we see you again, Alice will get that for you.  And
12   we'll have it before you leave; but if you don't need
13   one, what we will do is give you one for the date you're
14   due back, add to it Friday when you were here, add to it
15   today when you were here to make it all three days at
16   once.  If you can live that way, that would be easier
17   for us.  If you can't, we're not going to punish you
18   because we've got to do it.  Anybody have any questions?
19         Okay.  When you get whatever stuff you
20   need, then you are excused.  And to all of you, thank
21   you very much, very, very much.  And we look forward to
22   seeing you after a bit.
23
24
25

63

```
1    THE STATE OF TEXAS  )

2    COUNTY OF HARRIS    )

3              I, Pamela Kay Knobloch, Official/Deputy
     Official Court Reporter in and for the 179th District
4    Court of Harris County, State of Texas, do hereby certify
     that the above and foregoing contains a true and correct
5    transcription of all portions of evidence and other
     proceedings requested in writing by counsel for the
6    parties to be included in this volume of the Reporter's
     Record, in the above-styled and numbered cause, all of
7    which occurred in open court or in chambers and were
     reported by me.

8
              I further certify that this Reporter's Record
9    of the proceedings truly and correctly reflects the
     exhibits, if any, admitted by the respective parties.

10
              I further certify that the total cost for the
11   preparation of this Reporter's Record is $_____ and
     was paid by Harris County.

12
              WITNESS MY OFFICIAL HAND this the _____ day of
13   _____, 2000.

14

15
     _____
16   Pamela Kay Knobloch, Texas CSR No. 1650
     Expiration date:  12/31/2000
17   Official Court Reporter, 179th District Court
     Harris County, Texas
18   301 San Jacinto
     Houston, Texas 77002
19   713.755.6340

20   APPELLANT:   CHARLES MAMOU, JR.
                  CAUSE NO. 800112
21

22
23
24
25
```

## $

**$** _____ [1] 63:11

**'94** [1] 26:17

## 0

**0470500** [1] 2:5

## 1

**100** [1] 11:4
**10th** [1] 53:3
**11:00** [1] 14:24
**11th** [1] 49:21
**12/31/2000** [1] 63:16
**120** [2] 59:4 59:5
**121** [1] 59:7
**122** [1] 59:7
**123** [1] 59:7
**13396100** [1] 2:3
**13th** [8] 1:18 25:9 25:10 26:8 26:17 26:20 51:20 51:21
**1650** [1] 63:16
**179th** [3] 1:11 63:3 63:17
**17th** [4] 25:17 53:8 53:9 53:12
**1960** [1] 2:19
**1994** [2] 25:10 26:9
**1998** [1] 4:8
**1999** [2] 1:18 25:9
**1st** [1] 52:22

## 2

**2000** [1] 63:13
**201** [1] 2:7
**21179300** [2] 2:18
**22nd** [1] 53:14
**25** [1] 1:2
**25th** [1] 50:14
**27** [1] 57:1
**29th** [9] 19:15 19:22 49:10 49:18 61:9 61:11 61:14 61:16 62:1
**2nd** [1] 50:14

## 3

**301** [1] 63:18
**31** [5] 46:1 50:2 50:3 56:7 56:9
**32** [1] 56:9
**33** [2] 56:6 59:14
**34** [2] 46:5 56:9
**35** [1] 56:9
**36** [1] 59:14
**37** [1] 59:15
**38** [1] 59:15
**39** [2] 48:5 56:9

## 4

**40** [3] 50:7 50:8 59:16
**41** [1] 56:9
**42** [1] 59:16
**43** [1] 59:16
**44** [1] 59:17
**45** [1] 56:9
**46** [1] 56:9
**4615** [2] 2:14
**47** [1] 56:9
**48** [2] 19:13 59:24
**49** [2] 51:8 59:25
**4th** [4] 19:24 49:13 49:19 49:21

## 5

**50** [2] 19:13 59:25
**51** [2] 51:25 56:10
**52** [1] 60:1
**53** [2] 52:2 60:1
**54** [2] 52:10 56:10
**55** [1] 56:10
**56** [1] 60:2
**5629** [1] 2:19
**57** [3] 48:23 48:24 56:10
**58** [1] 56:10
**59** [2] 52:17 56:10
**59656300** [2] 2:13

## 6

**6** [2] 1:2 56:11
**60** [1] 56:10
**61** [2] 52:25 56:10
**62** [1] 60:2
**63** [2] 53:2 60:4
**64** [2] 4:3 56:10
**65** [1] 60:11
**66** [2] 53:16 56:10
**67** [1] 56:10
**68** [1] 56:10
**69** [1] 60:11
**6:00** [1] 34:22
**6:15** [1] 26:19

## 7

**7** [1] 56:11
**70** [1] 60:12
**71** [1] 56:10
**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 63:19
**72** [1] 60:12
**73** [1] 56:10
**74** [1] 60:13
**75** [1] 56:11
**76** [1] 56:11
**77** [1] 60:13
**77002** [2] 2:8 63:18
**77027** [1] 2:15
**77069** [1] 2:20
**78** [1] 60:14
**79** [1] 56:11
**7th** [1] 4:8

## 8

**80** [1] 56:11
**800112** [2] 1:3 63:20
**81** [1] 60:14
**82** [1] 56:11
**83** [1] 60:17
**84** [1] 60:18
**85** [2] 54:3 56:11
**87** [1] 54:14
**88** [2] 56:11 60:18
**89** [1] 56:11
**8:15** [1] 26:18
**8:30** [13] 57:6 57:19 58:5 58:15 58:25 59:13 59:19 59:23 60:5 60:10 60:15 60:17 60:22
**8th** [1] 25:17

## 9

**90** [2] 54:17 56:7
**9:15** [1] 57:20
**9:30** [1] 61:15

_____ [1] 63:12
_____
_____
_____ [1] 63:15

## A

**Ability** [6] 5:22 26:22 43:12 44:10 44:15 61:25
**Able** [1] 9:7
**Above-entitled** [1] 1:19
**Above-styled** [1] 63:6
**Absolute** [1] 49:22
**Absolutely** [6] 7:7 11:22 12:1 32:5 32:24 41:9
**Accountant** [1] 13:10
**Accountants** [1] 13:13
**Accurate** [1] 27:17
**Act** [2] 24:1 24:5
**Acts** [1] 38:16
**Adams** [1] 60:15
**Add** [2] 62:14 62:14
**Additional** [2] 8:25 43:2
**Address** [1] 49:17
**Admitted** [1] 63:9
**Affairs** [2] 24:2 24:6
**Affect** [1] 50:21
**Affects** [1] 12:19
**Aggravated** [1] 24:12
**Ago** [10] 21:8 21:11 21:14 21:17 21:22 21:23 22:3 25:10 35:21 49:7
**Agree** [2] 6:13 6:14
**Agreed** [1] 56:25
**Agreement** [2] 56:5 56:12
**Agreements** [1] 56:8
**Ahead** [1] 44:21
**Aided** [1] 1:22
**Airfare** [2] 50:11 53:25
**Alice** [2] 62:3 62:11
**Alive** [1] 34:1
**Alleged** [2] 4:7 14:1
**Alternative** [1] 47:23
**Amount** [4] 13:22 17:3 27:15 53:21
**Angry** [1] 57:21
**Anna** [1] 60:13
**Anniversary** [1] 25:16
**Answer** [19] 37:23 38:14 38:22 39:17 39:22 39:23 39:24 39:25 40:5 40:6 40:7 40:8 40:17 42:18 43:14 44:1 44:10 45:11 48:10
**Answered** [3] 40:9 43:5 44:13
**Answering** [1] 46:21
**Answers** [8] 16:7 16:17 38:11 38:21 39:16 39:19 40:20 48:11
**Apartments** [1] 17:22
**Appellant** [1] 1:6 63:20
**Appellee** [1] 1:11
**Applications** [1] 18:20
**Applies** [3] 12:2 12:9 52:15
**Apply** [4] 12:5 12:10 18:19 18:20
**Appreciate** [1] 3:3
**Appropriate** [5] 6:16 39:12 41:10 42:9 45:10
**Approved** [1] 51:11
**Ardoin** [1] 60:4
**Argue** [1] 38:9
**Arm** [2] 12:11 12:12
**Armed** [1] 26:21

**Arrangements** [1] 50:12
**Arrest** [2] 21:11 22:8
**Arrested** [5] 21:1 21:13 21:18 22:6 22:11
**Aside** [2] 45:9 45:20
**Aspect** [3] 36:22 37:14 37:18
**Assault** [1] 26:9
**Assemble** [2] 28:15 28:22
**Assembly** [1] 58:12
**Assist** [1] 20:18
**Assistant** [2] 2:6 3:16
**Association** [4] 4:20 4:24
**Assume** [2] 13:25 42:22
**Assure** [1] 4:14
**Ate** [2] 30:1 34:22
**Attempt** [3] 6:9 59:2 61:1
**Attention** [2] 18:12 52:13
**Attorney** [3] 17:13 17:14 22:21
**Attorneys** [6] 2:6 2:10 2:22 3:13 3:16 56:25
**August** [1] 25:17
**Auto** [1] 52:18
**Automatically** [2] 12:23 12:24
**Available** [2] 26:2 47:11
**Aware** [1] 23:19
**Awhile** [1] 49:6

## B

**Baby** [1] 52:21
**Backed** [1] 7:8
**Background** [3] 9:19 37:11 39:3
**Backgrounds** [2] 41:13 41:16
**Bad** [5] 10:1 10:3 10:4 10:19 46:19
**Bags** [1] 17:23
**Bank** [1] 25:21
**Barr** [1] 60:14
**Base** [2] 15:9 15:11
**Based** [7] 10:9 12:15 20:16 23:23 29:20 36:3 40:18
**Basis** [10] 6:24 13:18 35:17 35:18 35:23 36:12 47:13 48:10 48:14 57:22
**Beasley** [1] 59:17
**Become** [2] 12:6 33:24
**Bed** [1] 54:8
**Begin** [2] 19:24 49:12
**Behind** [1] 32:24
**Being's** [1] 21:6
**Belief** [4] 44:24 45:2 45:4 47:3
**Believability** [3] 12:20 13:4 13:5
**Believable** [8] 11:20 11:21 11:23 12:11 13:16 14:7 14:8 14:12
**Believer** [1] 32:17
**Belongs** [1] 14:11
**Bench** [1] 56:3
**Benefit** [1] 16:14
**Best** [10] 4:19 7:18 16:7 18:10 18:16 28:16 29:2 29:13 35:1 53:22
**Bet** [2] 32:16 28:12 60:24
**Between** [2] 56:5 62:10
**Beyond** [24] 22:18 22:24 23:1 23:4 23:6 23:7 23:8 23:9 23:14 23:20 24:2 24:18 24:25 27:17 27:22 31:6 31:11 31:24 33:3 35:8 35:11 36:17 38:15 51:19
**Big** [1] 55:11

**Birthday** [1] 29:16

**Bit** [4] 10:7 14:3 28:2 62:22

**Blame** [1] 27:17

**Blamed** [2] 27:6 31:3

**Blaming** [4] 27:8 27:12 27:13 30:7

**Blow** [1] 19:3

**Blue** [2] 14:5 30:11

**Board** [1] 37:25

**Bob** [1] 1:20

**Bodies** [1] 17:22

**Body** [1] 17:23

**Bombing** [1] 45:17

**Botched** [1] 36:8

**Box** [4] 49:2 49:3 53:23 53:24

**Boy** [1] 29:10

**Boys** [2] 34:20 34:25

**Breakfast** [1] 54:8

**Brief** [1] 34:19

**Briefly** [1] 22:16

**Bring** [7] 16:15 18:23 18:24 22:1 30:24 34:23 57:2

**Bringing** [1] 61:2

**Broaden** [1] 28:17

**Broader** [1] 31:22

**Brought** [1] 3:1

**Brown** [1] 14:4

**Bryan** [1] 54:8

**Buckets** [1] 21:16

**Building** [1] 17:1

**Bunch** [1] 12:4

**Burdette** [1] 1:20

**Burger** [1] 17:12

**Burglary** [7] 21:9 21:12 21:14 21:18 21:21 21:24 22:3

**Business** [7] 5:5 17:8 22:19 29:22 52:18 57:4 58:23

**Butler** [1] 35:21

**Butlers** [1] 35:22

**Buy** [3] 28:19 32:11 32:11

**Buying** [1] 28:23

**Byrum** [1] 60:12

---

**C**

**Cake** [1] 53:15

**Calendar** [1] 26:20

**Campaigning** [1] 31:13

**Cannot** [3] 21:5 21:13 22:9

**Cantrell** [1] 59:13

**Cantu** [1] 60:14

**Capable** [2] 42:21 59:9

**Capacity** [1] 61:24

**Capital** [21] 4:6 4:22 5:5 9:21 10:1 20:24 24:10 28:5 36:21 36:24 37:9 37:15 37:19 37:22 38:7 40:16 41:4 41:6 42:23 42:24 43:1

**Car** [6] 13:15 13:16 17:23 28:19 28:20 32:11

**Care** [2] 45:18 55:15

**Careful** [1] 23:24

**Carrying** [2] 14:4 14:6

**Case** [79] 3:8 4:5 4:18 4:22 5:6 6:3 6:4 6:4 6:8 6:13 6:21 8:2 8:4 8:22 10:9 11:12 12:16 13:9 13:23 15:25 17:15 18:20 18:21 19:23 20:2 20:23 22:1 22:22 23:25 24:10 24:11 24:21 29:13 29:19 31:25 32:18 32:19 33:6 33:9 33:13 33:13 34:5 34:8 34:14 35:13 36:2 36:6 36:7 36:12 38:9 38:19 38:20 39:9 39:12 39:18 40:16 40:19 40:24 41:1 41:10 41:14 41:18 41:18

**Cases** [4] 20:5 20:6 41:7 46:19

**Causes** [1] 6:10

**Cecelia** [1] 59:17

**Cents** [4] 30:10 30:13 31:10 31:10

**Certain** [1] 7:23 18:20 59:6

**Certainly** [2] 20:21 23:13

**Certify** [3] 63:4 63:8 63:10

**Chain** [2] 30:15 30:16

**Chairs** [1] 8:8

**Chambers** [1] 63:7

**Chances** [1] 5:6

**Change** [2] 41:3 42:10

**Changes** [1] 42:9

**Character** [4] 9:19 24:4 37:11 39:3

**Charge** [3] 12:4 12:6 20:11 20:12 20:21 20:25 22:4 22:8 23:15 23:18 34:12 36:5 38:9

**Charged** [7] 4:5 20:23 21:2 21:20 22:6 22:11 24:21

**Charges** [1] 15:1

**Charging** [1] 26:8

**Charles** [5] 1:5 3:9 4:1 60:17 63:20

**Cheaper** [2] 30:13 30:17

**Check** [1] 26:19

**Checks** [1] 58:9

**Child** [6] 10:15 10:17 14:14 26:10 30:4 30:5

**Children** [1] 10:14

**Choice** [2] 40:1 40:10

**Choose** [3] 12:23 13:3 19:18

**Chose** [1] 32:12

**Chronologically** [1] 59:3

**Church** [2] 30:18 31:14

**Circumstance** [8] 34:13 34:15 39:10 46:12 46:23 47:2 50:9 53:2

**Circumstances** [10] 15:16 39:1 39:11 42:6 43:23 43:25 45:6 45:15 45:18 47:19

**Citizens** [3] 6:1 17:11 17:13

**Civics** [1] 24:20

**Claims** [1] 31:9

**Claire** [2] 2:4 3:17

**Classes** [2] 24:20 50:21

**Classroom** [1] 53:20

**Clerk** [1] 62:3

**Close** [1] 36:22

**Closer** [2] 16:18 60:19

**Coin** [2] 14:23 24:16

**Cokinos** [2] 60:19 60:20

**Combination** [2] 42:10 45:8

**Comfort** [2] 27:17 31:22

**Comfortable** [1] 55:24

**Coming** [8] 19:16 29:25 49:11 57:6 59:8 61:21 62:8 62:10

**Comment** [1] 15:22

**Commercial** [1] 18:3

**Commission** [1] 31:9

**Commit** [7] 15:3 21:17 26:25 27:18 27:20 27:22 28:6

**Committed** [18] 9:9 9:17 9:18 10:6 10:9 10:10 21:3

**Committee** [1] 30:18

**Common** [1] 23:23

**Community** [1] 17:12

**Comparative** [1] 12:17

**Comparison** [1] 46:20

**Compelled** [1] 33:18

**Completely** [1] 15:1

**Complex** [1] 8:3

**Computer** [1] 1:22

**Concern** [2] 8:19 9:6

**Concerned** [1] 12:18

**Concerning** [1] 23:22

**Conclude** [1] 25:19

**Concluded** [3] 11:3 57:21 61:12

**Conclusion** [12] 6:12 11:5 11:8 20:6 20:9 29:8 32:19 34:10 37:6 37:21 41:6 61:7

**Conditioned** [1] 5:1

**Conference** [1] 54:5

**Confronted** [1] 29:5

**Confused** [1] 46:8

**Confusing** [2] 42:20 42:21

**Congregation** [1] 31:15

**Connors** [4] 2:4 3:17 56:14 56:15

**Conscience** [1] 44:8

**Conscientious** [1] 43:9

**Consider** [7] 25:8 31:3 45:9 45:21 45:23 46:19 46:21

**Consideration** [4] 23:24 38:25 43:11 45:5

**Considered** [2] 21:5 22:9

**Consistencies** [1] 17:5 17:6

**Constitute** [1] 38:17

**Contain** [1] 39:21

**Contained** [1] 20:21

**Contains** [1] 63:4

**Content** [3] 13:19 15:12

**Continue** [2] 17:14 23:13

**Continued** [1] 10:18

**Continuing** [1] 38:17

**Conversation** [3] 28:12 43:21 61:21

**Conversations** [1] 61:8

**Convicted** [1] 36:24

**Conviction** [3] 22:22 22:25 23:3

**Convincing** [1] 24:4

**Cookies** [3] 30:1 31:4 31:7

**Cop** [2] 14:25 36:10

**Correct** [1] 61:22 63:4

**Correctly** [1] 63:9

**Cost** [2] 40:21 63:10

**Counsel** [1] 63:5

**Country** [3] 23:9 23:10 23:11

**County** [10] 1:8 1:21 4:7 25:22 26:3 26:6 63:2 63:4 63:11 63:17

**Couple** [10] 4:10 5:4 8:1 19:16 20:3 20:5 20:19 36:20 37:2 52:12

**Course** [3] 10:13 20:18 25:14

**Court** [70] 1:3 1:5 3:2 4:2 4:4 6:6 44:21 44:25 45:4 45:14 46:2 46:6 46:9 46:13 47:5 47:7 47:20 48:2 48:6 48:9 48:15 48:18 48:24 49:6 50:4 50:8 50:13 50:15 50:17 50:23 51:6 51:9 51:14 51:18 51:21 52:1 52:4 52:7 52:9 52:11 52:15 52:19 52:23 53:...

**Committee** [1] 30:18

**Court's** [11] 12:4 20:11 20:12 20:21 20:25 22:4 23:15 23:18 34:12 36:5 38:8

**Courthouse** [5] 4:21 4:25 7:16 13:8 13:14

**Courtroom** [10] 18:8 22:1 26:2 27:11 35:25 31:18 35:6 41:22 41:23 57:5

**Crazy** [1] 31:2

**Creating** [1] 19:12

**Credibility** [7] 10:25 11:14 12:20 14:4 15:9 15:11 17:4

**Credit** [2] 33:15 33:20

**Crime** [14] 9:12 9:16 9:17 10:6 10:9 14:1 14:1 15:16 22:8 22:12 24:22 26:25 27:20 37:14

**Crimes** [1] 41:16

**Criminal** [10] 8:4 13:9 18:21 20:6 24:9 24:21 33:13 38:16 42:3 43:11

**Critique** [1] 34:6

**Crowd** [1] 55:11

**Crowded** [2] 55:6 58:10

**CSR** [1] 63:16

**Culpability** [1] 39:4

---

**D**

**Dad** [1] 34:24

**Daddy** [1] 29:25

**Dallas** [1] 54:10

**Date** [3] 53:3 62:13 63:16

**Dates** [1] 50:13

**Daughter** [1] 30:1

**Days** [4] 49:8 49:18 58:21 62:15

**Dead** [1] 17:22

**Deal** [4] 16:23 34:9 46:16 61:24

**Death** [30] 6:11 6:15 6:18 28:7 36:17 37:2 37:7 39:13 40:2 40:15 40:22 41:1 41:6 42:13 42:13 43:6 43:11 44:2 44:3 44:13 45:5 45:10 45:12 45:21 46:16 46:20 46:22 47:1 47:4 47:18

**December** [1] 4:8

**Decide** [9] 10:8 11:20 12:10 13:17 28:6 28:6 28:17 34:8 36:12

**Decided** [1] 38:5

**Deciding** [4] 8:6 8:20 9:6 28:4

**Decision** [9] 12:15 13:18 15:9 15:11 28:4 28:18 29:5 29:19 35:17

**Decisions** [3] 10:13 13:4 28:15

**Defendant** [44] 2:22 6:6 6:7 8:20 8:24 9:7 9:14 9:19 10:12 10:20 20:8 20:23 25:1 25:2 25:3 25:6 27:18 33:4 33:8 33:10 33:12 33:12 33:14 33:24 34:3 34:4 34:11 34:14 34:16 35:9 37:8 37:13 38:6 38:16 38:18 39:14 40:2 40:12 42:24 43:4 47:5 56:20 56:23

**Defendant's** [9] 9:22 10:2 23:1 23:6 23:22 24:19 27:19 33:1 35:12

**Defendants** [2] 33:21 41:12

**Defense** [4] 32:23 33:5 33:7 33:10

**Definitely** [1] 61:18

**Definition** [2] 23:17 40:
17
**Definitions** [1] 20:14 20:
17
**Degree** [1] 7:6 13:21 49:14
**Deliberate** [2] 38:10 42:1
**Deliberations** [1] 20:18
**Demetta** [1] 59:14
**Deputy** [2] 25:22 25:24
**Derelict** [1] 13:1
**Details** [1] 38:4
**Determine** [1] 12:8
**Determined** [1] 37:6
**Determines** [1] 12:20
**Determining** [2] 32:7 55:2
**Die** [1] 31:12
**Difference** [10] 6:22 12:
1 24:13 32:8 42:5 42:6 42:7
42:25 44:23 45:2
**Different** [23] 4:16 6:2
6:20 7:8 7:12 9:2 9:4 16:11
16:17 31:18 41:8 41:12 41:
13 41:13 41:14 41:15 41:15
41:16 41:17 41:19 42:1 42:2
61:19
**Differently** [1] 10:16
**Dime** [3] 30:13 30:17 35:20
**Dingy** [2] 5:8 5:14
**DIRE** [1] 1:15
**Directions** [1] 8:6
**Disagreement** [2] 15:22
22:13
**Disbelieve** [1] 12:24
**Discretion** [2] 40:1 40:11
**Discussion** [3] 15:22 27:
24 56:2
**Disdain** [1] 13:22
**Disgusted** [1] 16:23
**Dispute** [2] 21:20 22:13
**District** [9] 1:5 1:11 2:
6 3:16 17:13 17:14 22:21 63:
3 63:17
**Document** [1] 20:13
**Documents** [1] 62:5
**Donald** [1] 60:1
**Done** [10] 9:9 9:10 9:10 9:
23 10:2 19:4 19:5 27:6 33:
16 58:13
**Door** [3] 14:15 21:10 60:10
**Doubt** [29] 22:18 22:19 22:
24 23:1 23:4 23:6 23:8 23:8
23:8 23:14 23:16 23:20 23:
23 23:23 23:23 23:25 24:3
24:18 24:25 27:17 27:23 31:
6 31:11 31:24 33:3 35:9 35:
11 36:17 38:15
**Douglas** [1] 60:2
**Down** [9] 7:9 13:8 13:13 28:
3 29:6 30:15 30:15 30:24 51:
1
**Downstairs** [1] 58:8
**Dozen** [1] 28:20
**Dragged** [1] 17:22
**Dramatic** [1] 16:14
**Dream** [1] 45:16
**Dreams** [1] 26:24
**Drives** [1] 31:2
**Driveway** [1] 7:9
**Driving** [1] 14:24
**Due** [6] 19:2 52:21 53:2 58:
25 59:18 62:14
**During** [2] 10:13 20:18
**Duty** [1] 7:25 26:2
**Dwindles** [1] 46:20

**E**

**Earth** [2] 14:10 34:1
**Easier** [1] 62:16

**Eat** [1] 49:19
**Eaten** [1] 31:4
**Educate** [1] 5:20
**Education** [1] 54:18
**Educator** [1] 53:20
**Effectively** [1] 54:10
**Eight** [15] 20:13 57:2 57:
2 57:3 58:25 59:13 59:18 59:
19 59:21 59:24 60:4 60:5 60:
8 60:10 60:15
**Eighth** [1] 16:25
**Eighty** [1] 5:18
**Eighty-year-old** [1] 5:
18
**Either** [7] 3:20 12:23 13:
9 13:14 38:22 39:17 58:5
**Elect** [1] 30:22
**Elementary** [1] 27:10
**Elevator** [2] 25:21 25:21
**Elyse** [1] 60:18
**Embarrassing** [1] 55:13
**Employees** [1] 51:13
**Empty** [1] 35:2
**End** [2] 8:23 51:12
**Enforcement** [2] 14:9 14:
18
**Entitled** [2] 9:21 40:20
**Equal** [1] 37:16
**Eric** [1] 60:3
**Establishes** [1] 24:25
**Evaluate** [5] 8:9 34:6 36:
15 36:16 43:13
**Evaluation** [1] 18:12
**Evaluations** [1] 8:10
**Evans** [1] 59:16
**Evening** [1] 50:22
**Event** [9] 6:7 16:6 16:14
16:14 16:18 21:13 22:8 25:
15 35:25
**Events** [1] 22:9
**Everyday** [1] 5:21
**Evidence** [49] 6:9 6:12 6:
17 8:25 9:1 9:3 9:8 9:15 12:
11 12:12 12:15 19:23 21:5
21:14 21:17 21:19 21:21 21:
24 22:10 23:3 23:5 23:25 24:
24 29:16 29:18 32:24 33:3
35:7 35:16 36:3 36:13 37:22
38:14 38:19 38:22 38:25 39:
9 39:18 42:25 43:2 43:3 43:
18 44:11 44:16 46:18 47:13
48:10 48:14 63:5
**Exactly** [14] 5:21 10:12
11:19 19:4 19:5 25:13 29:7
40:2 40:12 41:23 41:24 41:
22 41:22 47:5
**EXAMINATION** [1] 1:15
**Example** [6] 16:13 28:4 34:
19 36:7 57:17
**Except** [4] 4:21 35:22
**Excludes** [1] 23:21
**Exclusive** [2] 10:25 11:13
**Excuse** [2] 25:23 39:19
**Excused** [4] 56:8 56:9 56:
22 62:20
**Excuses** [1] 62:4
**Executed** [1] 31:17
**Exhibits** [1] 63:9
**Exist** [1] 28:18
**Existed** [2] 29:17 29:19
**Exists** [2] 12:19 14:10
**Expected** [2] 7:23 51:11
**Expects** [1] 55:3
**Experience** [3] 15:4 15:
10 16:6
**Expiration** [1] 63:16
**Explain** [3] 5:23 42:16 42:
20

**Explanation** [3] XSD
16 44:5
**Extra** [3] 33:15 33:16 33:
20
**Exxon** [1] 51:4
**Eye** [1] 15:14

**F**

**Face** [4] 3:10 3:20 14:10
34:1
**Facet** [3] 15:23 22:14 27:
24
**Fact** [16] 7:8 20:22 20:25
21:2 21:3 21:18 21:20 21:22
22:5 22:6 22:7 22:10 25:1
27:18 34:17 59:7
**Factor** [3] 19:3 58:9 58:14
**Factoring** [1] 17:17
**Facts** [6] 10:25 11:13 12:
11 42:10 42:10 45:7
**Fails** [1] 31:17
**Fall** [1] 30:4
**Familiar** [1] 58:13
**Familiarity** [2] 3:20 3:21
**Family** [2] 5:8 34:21
**Fannin** [1] 2:7
**Far** [2] 16:11 25:11
**Fastest** [1] 34:25
**Father** [1] 5:18
**Feats** [1] 5:20
**Feelings** [2] 44:14 45:9
**Fifth** [1] 3:23
**Fifty** [3] 11:17 11:18 31:
16
**Filling** [1] 4:12
**Final** [2] 49:9 57:3
**Fine** [1] 59:17
**Fingerprint** [1] 42:4
**Firm** [1] 43:8
**First** [39] 3:3 3:19 4:11
5:4 7:24 8:3 8:15 8:18 9:3
9:5 9:5 9:12 10:6 11:2 17:
20 20:8 20:21 26:13 28:14
29:8 29:17 33:12 33:14 35:
25 38:13 39:2 39:7 39:22 40:
7 40:7 40:14 44:18 45:24 45:
24 57:17 59:24 60:10 60:23
62:7
**Fit** [4] 15:14 41:21 41:23
49:22
**Five** [5] 25:10 27:6 34:20
34:21 34:25
**Flip** [2] 14:23 24:16
**Floor** [2] 17:1 26:14
**Flow** [1] 10:21
**Fluids** [1] 58:19
**FM** [1] 2:19
**Focus** [3] 9:7 9:15 9:17
**Folks** [13] 3:18 16:12 19:
11 19:12 52:16 54:20 54:22
56:25 59:19 59:22 60:5 60:
15 60:21
**Following** [4] 1:18 56:6
59:13 60:8
**Fondness** [1] 13:21
**Food** [1] 35:22
**Foregoing** [1] 63:4
**Forth** [2] 17:9 58:9
**Forward** [1] 62:21
**Four** [10] 3:21 7:3 17:20
27:5 34:25 37:15 41:21 41:
22 41:25 42:2
**Fourthly** [1] 4:24
**Frame** [1] 49:22
**Framework** [1] 8:13
**Frankly** [1] 29:12
**Freeway** [1] 2:14
**Friday** [10] 19:1 19:2 19:

**Explanation** [3] 58:6 58:13 60:
16 60:21 62:14
**Friends** [3] 5:9 55:7 55:8
**Front** [9] 16:21 44:17 48:
19 49:1 49:25 50:4 50:5 50:
18 53:23
**Frustrating** [2] 3:5 28:11
**Full** [2] 2:9 21:16
**Function** [1] 12:17
**Funeral** [1] 7:21
**Funny** [1] 7:16

**G**

**Garcia** [2] 59:25 60:3
**Gender** [1] 34:4
**General** [3] 8:13 18:19 20:
20
**Generally** [2] 20:6 37:5
**Gentlemen** [3] 3:19 4:5
56:24
**Gilbert** [2] 60:14 60:18
**Given** [4] 11:15 11:16 20:
15 47:2
**Goings** [1] 16:1
**Gonculator** [1] 58:8
**Goofy** [1] 17:17
**Gossip** [2] 55:7 55:11
**Grand** [3] 21:22 26:3 26:5
**Great** [2] 13:21 14:17
**Gregory** [1] 60:14
**Grew** [4] 14:14 14:17 27:3
27:4
**Group** [2] 7:2 27:4
**Growing** [1] 14:14
**Guarantee** [1] 51:22
**Guess** [5] 4:19 7:18 46:14
55:14 61:21
**Guilt** [10] 21:6 23:1 23:6
23:7 23:14 23:20 23:22 24:
17 25:3 35:12
**Guilty** [34] 6:8 8:21 8:22
8:24 9:7 9:14 9:21 9:25 20:
9 22:18 22:23 23:4 24:9 24:
15 24:20 24:22 24:23 24:25
25:1 28:5 28:6 31:23 33:2
33:4 33:22 34:17 35:9 35:10
35:13 36:17 36:18 37:8 38:6
42:24
**Gurney** [1] 58:19
**Guy** [1] 31:8
**Guys** [1] 5:13

**H**

**Half** [5] 28:20 39:2 39:7
44:17 47:17
**Hall** [1] 62:4
**Hallway** [2] 16:13 59:23
**Hamilton** [2] 17:12 17:14
**Hand** [8] 11:22 11:24 34:10
40:4 46:11 48:8 48:16 63:12
**Hands** [5] 44:18 47:25 48:
20 48:21 49:2
**Happier** [1] 61:1
**Harass** [1] 6:1
**Harassed** [1] 15:3
**Harder** [2] 5:1 5:1
**Harris** [10] 1:8 1:21 4:7
25:22 26:3 26:5 63:2 63:4
63:11 63:17
**Harrowing** [1] 14:25
**Hassled** [1] 15:3
**Hate** [1] 55:21
**Haydock** [1] 60:13
**Hear** [30] 9:21 9:24 10:4
10:18 13:2 15:25 16:20 16:
21 17:24 18:9 22:2 22:19 28:
10 29:6 29:20 31:1 31:1 31:
30 32:1 32:2 32:15 35:14 35:

Heard [15] 1:19 8:9 8:10
10:5 16:22 22:17 35:14 35:
15 39:2 39:5 41:4 41:6 43:3
45:19 55:12
Hearing [3] 18:6 32:4 32:6
Heavy [1] 28:8
Held [1] 1:21
Helping [1] 10:8
Hereby [1] 63:4
Herself [1] 29:10
Hesitate [1] 24:1
Hesitation [1] 24:5
High [2] 13:10 13:12
Hill [2] 2:12 3:13 8:18 8:
17 54:23 54:24 56:16 56:17
Hire [1] 30:19
Hocus-pocus [1] 7:15
Hold [2] 13:22 57:23
Holding [1] 47:25
Home [1] 14:24 16:24 26:19
26:23
Honor [6] 54:24 56:13 56:
15 56:17 56:19 56:20
Honorable [1] 1:20
Hopefully [1] 53:4
Horses [1] 34:22
Hospital [1] 58:18
Hostage [1] 57:23
Hotel [2] 5:8 5:14
Hours [1] 19:17
House [2] 28:23 29:22
Houses [1] 28:24
Houston [7] 1:21 2:8 2:15
2:20 21:8 21:10 63:18
Human [8] 14:11 14:11 15:
18 21:1 21:2 21:3 21:6 33:25
Husband [1] 54:6
Hypothetical [4] 11:2
11:6 11:9 31:25

## I

I.V. [1] 58:19
Idea [4] 3:4 47:10 47:11
51:14
Identify [1] 7:17
Ignoring [1] 48:11
Imaginary [7] 11:17 17:
12 33:6 33:9 36:6 36:7 42:23
Impartial [1] 23:24
Important [6] 11:16 24:2
24:5 25:15 28:4 38:3
Imposed [8] 6:11 37:7 37:
7 43:6 43:15 44:2 44:13 46:
23
Imposition [2] 44:3 45:5
Impossibility [2] 49:22
50:1
Inaudible [1] 49:5
Included [1] 63:6
Includes [1] 56:7
Including [1] 38:25 39:3
Inconsistencies [2] 16:
9 17:3
Inconsistency [1] 16:11
Inconvenience [3] 7:6 7:
7 49:15
Increase [1] 31:15
Independent [1] 25:12
Indicted [1] 21:4 21:23
22:7 22:11
Indictment [4] 4:6 20:23
22:9 26:7
Individual [4] 6:23 57:
22 61:8 61:21
Individually [3] 7:1 16:

Infer [1] 34:15
Information [15] 10:11
15:15 26:13 26:18 28:22 28:
25 29:2 29:22 30:9 30:24 35:
19 36:12 36:14 36:15 36:16
Informed [1] 29:4
Injuries [1] 39:15
Innocence [2] 25:2 33:23
Innocent [2] 33:22 45:7
Inside [1] 50:25
Insinuate [1] 34:16
Insofar [1] 12:18
Instead [1] 24:5
Instructions [2] 20:14
20:17
Instructs [1] 39:8
Integrity [1] 14:17
Intellectually [1] 44:12
Intend [1] 32:21
Intentional [2] 16:11 17:
3
Interest [1] 62:6
Interfere [1] 44:9
Intern [1] 54:18
Internet [1] 28:21
Interviewing [1] 54:9
Introduced [1] 3:22 3:23
Introduction [1] 29:3
Investigative [1] 36:8
Investigators [1] 36:9
Invite [1] 57:1
Involved [7] 8:13 9:11
12:16 14:1 37:15 37:18 52:12
Involvement [2] 37:12 37:
17
Issue [1] 50:24
Issues [1] 37:24
It'll [1] 23:13
Itself [1] 8:12

## J

Jacinto [1] 63:18
James [1] 59:25
Job [26] 4:25 5:9 10:22 11:
21 11:22 11:24 17:4 24:17
24:19 27:1 27:2 27:20 27:21
30:9 30:19 31:14 31:23 33:1
33:2 36:10 36:11 36:11 36:
14 36:15 54:10 54:12
Johnny [5] 14:15 14:15 14:
17 14:18 14:20
Jr [3] 1:5 3:9 63:20
Judge [9] 1:20 4:25 5:17
5:22 5:24 10:24 12:17 17:8
22:10
Judges [2] 10:25 11:13
Judgment [1] 14:17
JUDICIAL [1] 1:11
Judy [5] 4:25 5:17 5:22 5:
24 17:8
Juicy [2] 55:7 55:11
Jump [1] 49:24 59:9
Junior [2] 13:10 13:12
Juries [3] 26:5 41:22 42:7
Juror [4] 3:8 7:18 7:19
7:20 8:4 15:25 29:10 35:24
36:6 42:22 44:22 50:20 52:2
61:19
Juror's [3] 36:10 36:11
36:11
Jurors [4] 19:19 22:1 41:
19 41:21
Jury [46] 3:1 3:10 6:9 6:
13 6:19 8:1 8:14 8:16 9:6
10:23 12:17 12:18 12:19 18:
11: 21:5 21:22 22:10 22:23
23:1 23:3 23:5 24:14 26:2

37:8 37:17 37:23 38:6 39:8
39:19 39:22 39:23 40:4 40:
23 42:1 49:2 49:3 49:9 53:
23 53:24 58:12 61:11
Jury's [4] 8:19 10:22 25:
1 42:23
Justice [2] 5:21 27:11

## K

Katherine [1] 59:15
Katheryne [1] 59:14
Kay [2] 63:3 63:16
Keep [5] 5:23 29:16 29:19
57:9 58:7
Kept [1] 5:8
Kid [8] 14:14 14:16 14:19
27:3 29:24 30:3 31:7 31:6
Kids [2] 27:5 55:23
Kill [1] 35:22
Killings [2] 17:24 17:25
Kind [6] 6:3 6:4 6:4 8:2
18:20 23:25
Kinds [2] 5:24 20:5
Kitchen [1] 35:4
Knobloch [2] 63:3 63:16
Knowing [3] 61:9 61:18 62:
6
Known [5] 6:5 6:5 6:6 6:7
14:19
Knows [1] 35:21
Kurt [2] 2:17 3:14

## L

Laboring [3] 7:5 7:7 49:
15
Lack [1] 13:4
Ladies [3] 3:19 4:5 56:24
Landry [1] 59:15
Last [4] 19:25 20:1 51:19
60:16
Law [24] 6:19 12:2 12:19
12: 12:15 14:3 14:9 14:18 18:
19 20:16 20:20 22:14 23:9
23:10 23:11 23:12 26:4 27:
25 33:17 36:4 39:25 40:10
42:8 57:15
Laws [2] 12:4 12:6
Lawyer [5] 13:15 13:17 29:
11 29:14 36:11
Lawyering [1] 17:9
Lawyers [6] 5:25 6:2 7:4
36:13 38:9 55:1
Lawyers' [1] 36:14
Lay [1] 58:19
Leads [1] 38:23
Leave [6] 53:12 55:19 61:
8 61:17 61:23 62:12
Leaving [1] 54:5
Left [11] 7:10 45:24 48:19
48:20 48:21 49:25 50:5 50:
18 52:16 54:12 54:22
Legal [1] 20:14
Legitimate [1] 29:15
Less [1] 14:7 37:18
Level [4] 24:13 45:8 45:
19 46:17
Lie [2] 16:11 17:3
Lies [1] 16:1
Life [5] 9:23 10:2 10:13
15:11 15:23 16:6 19:4 28:7
34:20 37:1 37:6 39:12 40:12
40:17 40:22 40:25 41:5 42:
12 43:15 47:23 49:23
Line [1] 55:10
Lines [1] 47:8
Listen [1] 8:8
Listening [3] 11:25 18:6
41:23

Live [2] 45:7 59:16
Lives [3] 25:11 28:14 50:
25
Load [1] 35:4
Location [3] 18:8 18:8
60:9
Locked [3] 5:7 5:13 5:14
Look [3] 17:8 28:24 62:21
Lori [1] 60:12
Loud [3] 55:15 55:16 55:16
Loudly [1] 55:8
Loved [1] 5:9
Low [1] 55:9
Lyn [2] 2:2 3:16
Lynne [1] 59:13

## M

Ma'am [14] 3:25 45:25 46:
2 46:4 47:15 47:24 48:22 50:
2 50:19 53:6 53:18 53:24 54:
13 55:21
Machine [1] 1:23
Magnitude [1] 11:19
Main [1] 54:7
Male [1] 34:5
Mamou [5] 1:5 3:9 3:10 3:
12 4:1 4:5 63:20
Man [2] 52:18
Manager [1] 54:9
Manufacture [1] 30:10
Manufacturing [1] 30:16
Margarita [1] 60:11
Market [2] 28:23
Marketing [1] 30:15
Married [1] 29:1
Mason [3] 17:10 17:11 22:
20
Matter [16] 38:18 38:19
38:19 39:13 39:14 39:14 39:
15 43:22 43:23 43:23 43:24
43:25 44:16 44:16 44:17 46:
18
McClellan [5] 2:2 3:16
54:23 56:12 56:13
McGarity [1] 60:12
Mean [7] 14:20 15:5 29:18
32:3 32:13 32:15 49:20
Meaning [3] 11:2 43:6 57:
16
Means [4] 5:14 23:17 26:
21 59:7
Meat [4] 34:23 34:24 35:1
35:1
Media [1] 18:1
Medical [2] 54:17 54:18
Mentioned [1] 17:8
Merger [1] 51:11
Mess [2] 16:1 59:8
Michael [1] 59:16
Michele [1] 59:16
Might [23] 3:7 4:15 4:16
10:16 10:16 12:6 12:6 13:20
13:22 25:5 25:16 26:16 26:
19 28:21 29:6 29:13 29:14
35:19 37:17 45:17 45:19 52:
5 62:1
Mind [7] 4:16 5:23 25:1 29:
16 29:19 58:7 59:12
Mind's [1] 15:14
Minds [1] 4:11
Minnesota [1] 18:1
Minute [1] 5:21
Minutes [7] 17:20 17:24
20:3 20:20 37:2 55:5 55:17
Miserable [1] 15:4
Miss [3] 3:16 49:25 56:14
Mitigating [1] 39:10

**Mobile** [1] 51:4

**Mom** [5] 30:2 31:4 34:23 34: 24 35:3

**Monday** [1] 52:6

**Money** [1] 5:19

**Month** [1] 51:12

**Months** [8] 5:9 21:8 21:11 21:14 21:17 21:22 21:23 22:3

**Moral** [5] 37:11 39:4 43: 10 44:8 47:14

**Morning** [19] 3:2 18:18 19: 17 25:20 26:7 26:19 54:9 57: 6 58:5 58:10 58:25 59:12 59: 18 59:22 60:5 60:9 60:15 60: 16 60:22

**Most** [5] 24:2 24:5 29:24 41:9 55:13

**Moves** [1] 51:11

**Moving** [1] 51:13

**Murder** [19] 4:6 4:22 5:5 9:21 10:1 20:24 24:10 28:5 36:24 37:9 37:16 37:20 37: 22 38:7 40:16 41:4 42:23 42: 24 43:1

**Murders** [1] 41:6

**Must** [9] 23:13 24:3 24:8 24:8 24:14 24:14 27:22 40:11

**N**

**Name** [4] 3:21 14:15 59:19 60:24

**Names** [2] 58:2 59:21

**Natural** [1] 29:12

**Nature** [1] 13:25

**Neatest** [2] 14:16 14:19

**Nebulous** [1] 28:2

**Necessary** [5] 22:20 22: 23 22:24 23:2 23:5

**Need** [5] 25:25 52:13 59:7 62:12 62:20

**Nelson** [1] 60:1

**Never** [23] 5:24 15:20 17: 15 23:9 23:11 24:18 27:19 29:16 33:23 38:20 39:15 40: 15 40:16 41:3 42:8 43:17 43: 17 43:17 43:22 43:24 46:18 58:17 58:21

**New** [1] 54:15

**Newscast** [1] 17:21

**Newscasts** [1] 17:19

**Next** [18] 5:17 6:3 7:23 14: 14 18:2 30:22 31:16 33:21 41:19 41:20 41:20 46:2 52:6 53:11 54:20 54:25 59:6 59:21

**Nice** [2] 25:22 55:6

**Nicest** [2] 14:16 14:19

**Night** [4] 14:24 34:22 50: 21 50:22

**Nights** [1] 51:1

**Nine** [1] 21:16

**Ninety** [1] 4:19

**Nobody** [9] 6:17 48:25 49: 1 50:5 50:18 53:24 55:3 55: 9 59:3

**Noise** [1] 55:9

**Nonrefundable** [3] 50:11 51:20 53:7

**Noon** [1] 61:16

**Nothing** [8] 7:8 8:3 11:22 31:20 32:5 33:8 35:22 41:17

**Notice** [1] 54:11

**Notifying** [1] 51:13

**Novel** [1] 35:20

**Number** [50] 4:2 4:15 38: 24 45:25 48:3 48:4 48:22 49: 4 50:6 51:7 51:24 52:2 52: 17 52:24 53:16 54:2 54:17 56:7 56:7 59:3 59:4 59:5 59: 5 59:6 59:7 59:14 59:14 59:

**O**

**O'clock** [2] 14:24 34:22

**O.J.** [1] 4:23

**Oath** [4] 34:2 35:24 35:25 36:1

**Objection** [2] 27:24 46:20

**Objectively** [1] 44:10

**Obligate** [1] 33:17

**Obligation** [2] 35:10 35: 12

**Obtain** [3] 22:22 22:25 23: 2

**Obvious** [1] 13:23

**Obviously** [2] 6:24 11:18

**Occupation** [2] 13:6 13:10

**Occurred** [4] 4:7 15:10 16:6 63:7

**Occurs** [1] 35:25

**October** [9] 19:24 49:12 49:19 49:21 49:21 51:20 51: 21 52:21 53:3

**Off-the-record** [1] 56:2

**Offense** [14] 4:6 9:8 15:2 20:24 21:1 21:3 21:4 24:9 24:15 26:9 27:18 36:24 37:8 39:1

**Officer** [3] 14:10 14:18 15:5

**Officers** [5] 14:2 14:3 14:7 21:10 21:15

**Official** [3] 63:3 63:12 63:17

**Official/Deputy** [1] 63: 3

**Often** [1] 16:4

**Old** [5] 16:8 5:14 5:18 27:6 55:11

**Oldest** [1] 35:1

**Once** [3] 8:14 57:21 62:16

**One** [51] 5:15 5:23 6:23 7: 2 7:4 9:11 10:16 12:19 13: 21 14:3 14:6 14:10 14:24 16: 9 16:15 18:2 19:14 19:21 20: 1 26:3 26:5 26:6 30:3 30:5 30:7 30:11 30:21 32:4 32:6 32:12 32:13 32:14 32:15 32: 22 32:22 36:25 37:1 40:7 40: 25 41:1 42:4 47:12 47:19 47: 22 49:8 49:18 49:19 59:1 62: 10 62:13 62:13

**Ones** [1] 5:9

**Open** [1] 63:7

**Operation** [1] 4:14

**Opinion** [3] 43:9 43:10 43: 12

**Opposed** [2] 45:12 46:15

**Opposition** [2] 45:20 46: 17

**Option** [2] 40:1 40:11

**Order** [11] 22:22 22:25 23: 2 24:9 39:22 39:25 40:6 40: 10 43:5 57:16 58:18

**Orderly** [1] 59:11

**Ordinarily** [2] 7:11 26:18

**Orleans** [1] 54:15

**Ought** [4] 25:6 40:25 41:1 61:15

**Outcomes** [1] 44:14

**Overcome** [1] 44:14

**Overcomes** [1] 24:24

**Override** [1] 43:24 45:3

**Overrule** [1] 47:3

**Own** [5] 24:2 24:6 33:13 52: 17 54:8

**P**

**Pace** [1] 5:21

**Pages** [1] 20:14

**Paid** [2] 50:11 63:11

**Pallbearer** [1] 7:20

**Pamela** [2] 63:3 63:16

**Panel** [4] 3:1 3:11 19:12 61:17

**Park** [1] 58:11

**Parked** [1] 58:11

**Part** [5] 8:15 8:18 39:5

**Particular** [5] 4:18 39: 11 40:19 41:10 43:19

**Parties** [5] 9:11 42:6 56: 6 63:6 63:9

**Parts** [2] 8:15 8:18

**Passed** [1] 26:14

**Passes** [1] 62:4

**Paul** [1] 18:1

**Peer** [1] 27:4

**Penalty** [17] 6:11 6:15 6: 18 31:8 42:13 43:6 44:2 44: 3 44:13 45:10 45:13 46:16 46:20 46:22 47:2 47:4 47:18

**People** [23] 3:22 13:11 13: 15 16:4 19:18 27:8 27:11 27: 12 28:20 35:23 37:15 41:24 56:22 57:1 57:21 58:23 59: 3 59:18 59:24 60:4 60:8 60: 10 60:16

**Percent** [3] 4:20 11:4 31: 16

**Perfectly** [3] 21:16 29: 12 42:21

**Perform** [2] 5:20 31:17

**Perhaps** [2] 19:21 39:10

**Perry** [3] 17:10 17:11 22: 20

**Person** [21] 3:23 7:19 9: 5 25:25 10:10 11:3 13:2 14: 11 22:11 22:17 24:1 24:15 24:21 28:5 28:7 34:6 36:17 36:23 44:23 54:11 57:18

**Person's** [5] 22:23 23:4 23:7 23:14 24:17

**Personal** [4] 37:11 37:12 12:2 39:4

**Personnel** [2] 51:5 51:11

**Persuade** [6] 6:9 23:5 35: 8 35:11

**Phase** [18] 9:1 9:3 9:4 9: 5 9:5 9:13 9:15 9:18 9:20 9: 25 10:4 10:7 20:8 20:10 37: 19 37:22 38:7 46:7

**Phases** [2] 20:7 61:20

**Philosophical** [3] 43:10 44:9 47:15

**Phone** [2] 2:9 2:16

**Phrase** [1] 22:17

**Pick** [4] 25:11 25:17 25:17 36:8

**Picking** [3] 6:19 8:5 26:14

**Piece** [5] 35:1 35:15 53: 15 55:7 55:11

**Pieces** [1] 34:24

**Pile** [1] 10:5

**Place** [8] 7:14 7:21 7:24 29:17 58:12 59:10 59:22 60: 17

**Plane** [1] 53:7

**Planning** [2] 51:5 51:10

**Plans** [1] 30:21

**Platter** [3] 34:23 34:23

**Play** [5] 13:23 30:5 37:18 37:19 51:23

**Pleased** [1] 60:25

**Point** [9] 6:14 12:10 15:8 17:2 18:7 26:25 27:19 29:3 42:8

**Points** [1] 33:16

**Polega** [1] 60:2

**Police** [6] 14:2 14:3 14:7 15:5 21:10 21:15

**Pool** [4] 19:12 49:10 56:7 61:17

**Portion** [1] 14:12

**Portions** [1] 63:5

**Possess** [4] 13:20 15:15 18:11 35:20

**Possible** [5] 6:15 6:18 18:11 23:20 36:25 36:25 37: 1 38:21 39:16 42:12 42:13 45:21 47:12 47:22 55:25

**Possibly** [9] 13:15 16:8 21:13 28:22 29:4 30:24 52:5 57:9 59:11

**Powerfully** [1] 28:4

**Preacher** [2] 30:19 31:13

**Preparation** [1] 63:11

**Present** [5] 6:10 24:8 24: 14 32:21 33:7

**Presented** [7] 9:1 9:12 12:3 12:7 12:13 20:17 32:20

**Presently** [2] 3:9 23:12

**Presents** [4] 32:24 33:5 33:10 33:10

**President** [1] 30:22

**Presiding** [1] 1:21

**Presumed** [4] 15:18 15:20 33:21 34:1

**Presumption** [3] 24:24 33: 23 33:24

**Pretty** [2] 36:22 60:25

**Prevent** [1] 44:15

**Prince** [1] 60:13

**Principal** [1] 13:10

**Principals** [1] 13:12

**Principles** [2] 18:19 20: 20

**Probability** [2] 23:11 38: 15

**Problem** [2] 51:2 54:7

**Problems** [1] 49:16

**Proceedings** [4] 1:19 1: 22 63:5 63:9

**Process** [5] 4:12 5:2 6:20 25:20 61:20

**Processes** [1] 21:25

**Product** [2] 18:11 18:16

**Program** [1] 17:9

**Programs** [1] 17:10

**Project** [2] 15:14 61:25

**Projects** [1] 52:13

**Promise** [5] 5:12 31:15

**Prompted** [1] 12:7

**Proof** [4] 23:21 24:2 24:3 27:16

**Proper** [1] 50:21

**Prosecution** [3] 22:21 22: 25 23:19

**Prosecution's** [1] 23:21

**Prospective** [1] 3:8

**Prove** [24] 23:1 23:3 23: 14 23:20 24:17 24:19 25:2 25:3 25:7 26:15 26:22 27:1 27:2 27:7 27:20 27:21 27:22 29:15 31:5 31:11 31:23 31: 23 33:1 33:3

**Proved** [2] 10:25 11:14

**Proves** [1] 26:24

**Provide** [2] 12:1 12:15
**Provided** [1] 36:15
**Proving** [4] 27:9 27:12 27:14 27:14
**Pryor** [1] 59:25
**PTA** [1] 30:22
**Pulls** [1] 15:1
**Punch** [1] 55:10
**Punish** [1] 62:17
**Punishment** [12] 6:16 6:16 6:18 10:9 28:7 36:21 38:11 42:14 43:11 45:6 45:10 45:21
**Punishments** [6] 36:25 37:1 37:1 42:12 47:12 47:22
**Purchased** [1] 50:10
**Purple** [1] 17:23
**Purpose** [4] 9:4 9:5 28:18 58:21
**Purposes** [7] 4:13 6:8 6:19:12 20:15 28:3 43:20 55:2
**Put** [3] 12:13 17:22 45:20

**Q**

**Quality** [5] 13:18 15:12 24:7 30:13 33:2
**Quarrel** [4] 15:22 21:19 22:12 27:24
**Questionnaires** [1] 4:13
**Questions** [26] 16:7 36:18 37:3 37:23 37:25 38:12 39:20 40:5 40:9 40:18 41:2 42:8 43:4 43:14 44:1 44:11 44:12 46:22 48:10 48:11 55:18 59:20 60:6 61:3 62:2 62:18
**Quickly** [1] 55:25
**Quite** [1] 26:16

**R**

**Race** [2] 14:11 14:12
**Rail** [1] 50:25
**Raise** [3] 46:11 48:8 48:16
**Raising** [1] 10:14
**Ran** [1] 27:5
**Rate** [1] 6:15
**Rather** [1] 55:23
**Re-elect** [1] 17:14
**Reach** [1] 12:15
**React** [3] 8:9 10:16 10:16
**Read** [3] 35:20 38:9 60:3
**Ready** [2] 28:25 30:22
**Real** [7] 4:24 5:3 5:7 42:18 42:19 62:6 62:6
**Really** [4] 5:2 30:16 31:21 46:14
**Reason** [9] 5:12 7:24 10:12 11:17 12:5 13:7 13:24 14:8 23:23
**Reasonable** [20] 23:6 23:10 23:14 23:16 23:21 23:22 24:1 24:3 24:18 24:25 27:17 27:23 31:6 31:11 31:24 33:3 35:9 35:11 36:17 38:15
**Receive** [3] 28:7 31:7 36:4
**Receiving** [1] 26:12
**Recognize** [2] 8:17 49:14
**Recollection** [2] 25:13 25:14
**Record** [4] 1:1 63:6 63:8 63:11
**Reflects** [1] 63:9
**Refuse** [2] 48:9 48:13
**Regular** [1] 6:21
**Relates** [2] 29:5 37:10
**Relation** [1] 10:23
**Relationship** [1] 9:10
**Religion** [2] 44:8 45:13

**Religious** [2] 44:2 44:9
**Rely** [1] 24:4
**Remarkably** [2] 9:2 41:8
**Remember** [3] 17:9 17:10 48:4
**Repair** [1] 52:18
**Replacement** [1] 30:19
**Reported** [1] 1:22 63:7
**Reporter** [2] 63:3 63:17
**Reporter's** [4] 1:1 63:6 63:8 63:11
**Represented** [2] 3:12 3:15
**Requested** [2] 56:22 63:5
**Required** [4] 21:25 23:19 23:20 32:13
**Requirement** [1] 32:3
**Requires** [2] 26:4 52:13 57:15
**Resident** [1] 54:18
**Respective** [1] 63:9
**Responsibility** [2] 37:13 39:4
**Rest** [3] 32:21 38:8 54:6
**Restroom** [1] 55:20
**Rests** [2] 32:22 32:23
**Result** [10] 4:17 16:9 18:12 41:5 41:7 41:10 42:25 44:4 44:14 48:11
**Results** [3] 40:20 41:4 41:8
**Retired** [1] 30:20
**Return** [2] 6:10 36:1
**Returned** [1] 26:7
**Richard** [1] 60:4
**Rise** [3] 45:8 45:19 46:17
**Robbery** [1] 24:12
**Room** [7] 5:8 5:14 29:25 30:3 56:4 55:9 58:12
**Rooms** [1] 42:1
**Rose** [1] 59:25
**Ross** [1] 59:16
**Row** [22] 44:18 45:24 48:19 48:19 48:20 48:20 48:21 48:25 49:1 49:1 49:2 50:1 50:4 50:5 50:18 50:18 51:2 52:16 52:20 53:16 53:23 53:24
**Rude** [2] 15:3 15:6
**Rule** [2] 12:19 12:21 12:22
**Rules** [1] 31:18
**Run** [2] 18:1 54:12

**S**

**Salesman** [3] 13:15 13:16 32:12
**San** [1] 63:18
**Satisfies** [1] 27:16
**Saved** [1] 30:2
**Saving** [1] 31:5
**Saw** [1] 4:22
**SBOT** [4] 2:3 2:5 2:13 2:18
**Schedule** [1] 49:7
**Scheduled** [1] 57:18
**School** [3] 13:10 13:12
**Schoolhouse** [1] 45:17
**Seated** [2] 3:1 3:18
**Second** [31] 3:14 5:18 9:1 9:4 9:15 9:18 9:20 9:24 10:7 11:6 20:10 25:8 26:12 37:19 37:22 38:7 39:5 39:7 39:23 40:8 43:1 47:17 48:19 48:24 55:2 62:3
**Secondly** [2] 4:15 13:3
**Seconds** [5] 5:4 8:1 20:5 36:21
**Secret** [4] 26:4 26:5 26:6 35:19

**Religious** [2] 16:19 16:19 16:21 20:12 22:2 26:20 30:16 30:21 38:1 38:2 40:14 44:18 48:20 48:21 49:2 51:1 62:9 62:11
**Seeing** [1] 62:22
**Seem** [1] 53:19
**Select** [2] 47:12 47:13
**Selected** [3] 8:14 22:2 61:6
**Self-defeating** [1] 18:15
**Sell** [1] 18:3
**Sense** [6] 7:25 12:22 12:25 23:23 28:13 37:5
**Sent** [1] 57:16
**Sentence** [11] 37:7 37:7 39:12 39:13 40:2 40:12 40:16 41:5 41:7 43:15 47:23
**Sentences** [1] 40:15
**September** [16] 1:18 19:15 19:23 25:9 25:10 26:8 26:17 26:20 49:10 49:18 50:15 53:11 61:10 61:11 61:16 62:1
**Serve** [1] 35:22
**Service** [3] 3:8 8:1 61:11
**Sessions** [3] 26:4 26:4 26:6
**Set** [6] 43:25 45:6 45:6 45:9 45:15 45:18
**Sets** [1] 58:19
**Setting** [1] 20:15
**Seven** [2] 34:24 34:24
**Seventy-five** [2] 30:10 31:10
**Several** [1] 35:20
**Sexual** [1] 26:9
**Shadow** [4] 22:18 22:19 22:24 23:7
**Sheriff** [2] 25:22 25:25
**Shift** [1] 9:16
**Shoplifting** [1] 24:11
**Shopping** [2] 28:20 29:1
**Short** [1] 8:25
**Shot** [1] 13:1
**Shoulders** [2] 14:5 14:6
**Shoved** [1] 17:23
**Show** [6] 17:17 21:17 22:23 23:7 43:18 57:19
**Shows** [2] 22:15 22:20
**Sick** [1] 34:19
**Side** [7] 14:23 24:16 32:4 32:6 32:7 32:15 50:18
**Sides** [3] 31:20 31:21 38:8
**Sign** [1] 7:10
**Silence** [1] 55:4
**Silly** [1] 53:19
**Simple** [1] 50:23
**Simply** [18] 5:11 5:18 5:22 12:23 13:5 13:11 13:16 13:19 15:4 15:17 20:15 26:16 31:1 39:8 43:17 45:18 46:21 47:11
**Simpson** [1] 4:23
**Single** [13] 7:4 9:22 10:1 10:7 11:7 14:9 28:14 33:3 33:25 41:18 41:18 42:3 55:12
**Singular** [1] 21:12
**Singularly** [1] 25:15
**Sister** [1] 31:4
**Sit** [2] 8:8 55:3
**Sitting** [1] 35:2
**Situation** [1] 49:17
**Six** [4] 17:24 27:6 58:19
**Sixteen** [1] 5:21
**Sixteen-minute** [1] 5:21
**Sixty** [6] 6:24 6:25 7:1 16:12 16:17 56:25
**Sixty-five** [2] 30:12 31:9

**Slack** [1] 36:9
**Smith** [2] 59:16 60:1
**So-and-so** [1] 29:11
**Society** [1] 38:18
**Sometimes** [4] 29:1 37:24 41:3 41:5
**Somewhere** [2] 19:13 22:16
**Sony** [1] 60:18
**Sorry** [4] 46:10 51:6 59:1 60:2
**Sort** [5] 7:15 15:2 16:13 17:4 53:23
**Sorting** [1] 11:23
**Sorts** [1] 14:16
**Soul** [1] 35:2
**Source** [1] 36:5
**Southwest** [1] 2:14
**Special** [1] 37:24
**Specific** [1] 35:15
**Specifically** [3] 6:22 38:3 56:21
**Speculate** [1] 34:16
**Speed** [1] 4:14
**Speeding** [2] 4:13 24:11
**Spend** [6] 7:25 17:20 18:18 19:16 36:20 51:1
**Spent** [2] 5:19 5:20
**Spills** [1] 33:23
**Spot** [1] 61:13
**Spouse** [1] 29:1
**St** [1] 18:1
**Stacie** [1] 60:18
**Stage** [1] 16:13
**Stand** [6] 3:10 15:18 15:20 16:2 16:5 36:4
**Standardized** [1] 41:2
**Standpoint** [1] 4:21
**Stands** [4] 5:4 5:20:23
**Start** [5] 33:22 55:18 57:8 57:12 61:15
**Started** [2] 57:10 57:11
**Starts** [1] 24:22
**State** [19] 1:10 2:10 3:9 3:15 6:5 6:8 22:21 23:2 23:13 23:16 24:8 24:14 25:3 27:14 32:22 36:23 40:15 63:1 63:4
**State's** [13] 23:5 24:17 24:24 27:2 27:13 27:13 27:21 31:22 32:1 32:2 32:4 32:19 33:2
**Status** [1] 62:1
**Stay** [1] 55:16
**Stays** [1] 24:22
**Step** [1] 3:13
**Stephens** [1] 59:14
**Steps** [1] 21:25
**Steven** [1] 60:11
**Still** [2] 55:9 61:23
**Stone** [1] 55:3
**Stop** [2] 4:23 7:10
**Stopped** [1] 55:11
**Stops** [1] 14:25
**Story** [2] 31:20 31:21
**Strange** [1] 8:5
**Street** [2] 6:5 17:2
**Strong** [2] 44:7 44:14
**Stuff** [8] 7:16 10:3 10:4 10:5 10:19 11:19 28:8 62:19
**Subjectively** [1] 40:24
**Substantial** [1] 13:22
**Such-and-such** [2] 29:11 29:15
**Sudden** [1] 46:7
**Sufficient** [1] 39:10

**Supply** [1] 35:19
**Supposed** [5] 57:8 57:19 58:3 60:6 60:7
**Suzette** [1] 60:13
**System** [1] 27:10

## T

**Table** [1] 35:3
**Tables** [1] 58:19
**Team** [1] 51:5
**Teenagers** [2] 34:20 34:21
**Television** [3] 4:22 22: 15 51:2
**Teller** [1] 34:2
**Ten** [4] 10:17 20:13 55:5 55:17
**Terminate** [1] 16:14
**Testified** [3] 13:9 13:14 33:15
**Testifies** [1] 15:6
**Testify** [10] 11:18 33:12 33:13 33:18 33:18 33:19 34: 2 34:3 34:11 34:14
**Testifying** [1] 11:3
**Testimony** [30] 11:2 11:6 11:9 11:15 11:16 11:21 12:2 12:7 12:9 13:5 13:19 14:2 15:20 20:7 20:9 20:16 22:2 24:7 24:13 35:15 37:10 38:8 39:15 40:19 41:24 43:13 43: 18 43:23 44:17 49:12
**Texas** [21] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 3:9 3:15 4:7 21:9 25:22 26:3 36:23 40:15 54:8 63:1 63:4 63:16 63:17 63:18
**Theirs** [1] 18:2
**Thereafter** [1] 42:16
**Therefore** [2] 24:3 43:14
**They've** [1] 18:3
**Thinking** [3] 5:6 15:24 17:16
**Third** [6] 11:8 33:9 48:21 48:25 52:16 52:20
**Thirdly** [1] 4:19
**Thomas** [1] 60:1
**Thoughts** [1] 4:16
**Threat** [1] 38:17
**Three** [11] 8:8 17:20 17: 24 19:24 21:25 32:22 37:15 57:3 60:16 60:21 62:15
**Throughout** [1] 25:13
**Throws** [1] 7:13
**Thursday** [7] 18:25 19:3 57:3 57:17 58:6 60:9 60:15
**Ticket** [1] 24:11
**Tickets** [3] 51:20 53:8 53: 25
**Today** [17] 7:5 7:5 7:9 15: 24 19:19 19:25 21:11 21:13 21:18 21:20 21:23 25:8 25: 10 57:16 58:11 62:7 62:15
**Together** [4] 12:14 28:22 29:22 49:10
**Tomorrow** [7] 54:1 58:25 59:12 59:18 61:22 61:23 61: 25
**Took** [1] 58:7
**Total** [1] 63:10
**Town** [3] 8:5 17:25 53:8
**Traffic** [1] 15:2
**Transcription** [1] 63:5
**Transcription/stenograph** [1] 1:23
**Transition** [1] 51:5
**Trial** [46] 1:3 6:14 8:12 8:14 8:15 8:17 8:19 8:25 9: 2 9:3 9:6 9:13 9:15 9:19 9: 20 9:25 10:5 10:7 10:20 10:

10 12:16 19:25 20:4 20:6 10 24:22 25:4 29:9 32:18 33: 3 34:5 34:11 34:16 36:22 37:6 37:13 37:20 37:22 38:8 38:16 38:18 39:2 39:6 41:12 42:3 43:2
**Trials** [1] 41:4
**Trip** [1] 58:21
**True** [1] 63:4
**Truly** [1] 63:9
**Trust** [2] 15:13 50:24
**Truth** [3] 13:2 15:19 15: 21 33:25 34:2
**Try** [3] 28:15 42:20 59:10
**Trying** [5] 5:1 32:10 32: 11 42:8 55:6
**Tuesday** [6] 18:24 19:2 52: 6 57:2 58:6 59:18
**Turner** [1] 59:25
**Twelve** [9] 19:18 20:14 21: 10 21:15 22:1 41:18 41:19 41:20 41:20
**Two** [35] 3:12 3:15 8:15 8: 18 12:13 19:15 20:2 21:8 21: 11 21:14 21:17 21:22 21:23 22:3 31:16 32:22 36:25 37: 23 37:24 38:12 38:21 38:24 39:16 40:5 40:17 42:12 43:4 44:1 44:10 47:21 48:10 49: 11 49:20 54:11 58:21
**Two-part** [1] 46:15
**Two-week** [1] 54:11
**Tylenol** [1] 18:4

## U

**Under** [6] 7:6 7:7 34:2 43: 25 47:19 49:15
**Uniform** [2] 14:5 14:5
**Unique** [2] 42:4 57:15
**Uniqueness** [1] 40:18
**Unit** [1] 30:11
**Unjustifiably** [1] 15:1
**Unless** [1] 59:8
**Unreasonable** [1] 15:7
**Up** [31] 3:10 4:14 4:14 5:7 5:13 5:15 12:14 14:14 14:14 14:18 16:21 16:25 19:8 25: 23 26:14 27:3 27:4 30:14 30: 15 32:17 35:4 36:2 36:8 36: 9 42:1 45:16 48:1 54:10 56: 1 57:19 59:8
**Urgent** [1] 55:22

## V

**Vacation** [1] 50:11
**Various** [1] 56:8
**VENIREPERSON** [52] 4:1 4: 3 44:19 45:1 45:12 46:1 46: 5 46:7 46:10 46:25 47:6 47: 16 47:25 48:5 48:7 48:13 48: 16 48:23 49:5 50:3 50:7 50: 10 50:14 50:16 51:4 51:8 51: 10 51:17 51:19 51:25 52:2 52:5 52:8 52:10 52:12 52:17 52:21 52:25 53:2 53:7 53:10 53:14 53:17 53:19 53:25 54: 3 54:5 54:14 54:17 55:19 60: 20 61:5
**Venirepersons** [1] 56:6
**Vera** [1] 59:24
**Verdict** [7] 6:10 8:10 32: 5 32:8 36:1 36:2 39:12
**Verdicts** [2] 42:2 42:9
**Verse** [1] 3:9
**Victim** [4] 38:20 39:14 41: 14 45:7
**Victims** [1] 43:24
**View** [2] 37:17 39:18
**Violence** [1] 38:17
**Visit** [4] 3:7 4:18 26:1 55:1

**Voir** [1] 1:15
**Volume** [2] 1:2 63:6
**VOLUMES** [1] 1:2
**Voluntary** [1] 33:19
**Vote** [4] 44:12 47:3 47:18 47:18
**VS** [1] 1:8

## W

**Wait** [2] 3:5 57:13
**Waiting** [2] 3:6 25:21
**Walks** [1] 25:23
**Waller** [1] 59:15
**Waste** [2] 18:13 18:14
**Wasting** [1] 58:23
**Watch** [2] 17:19 17:21
**Watching** [1] 4:25
**Wayne** [2] 2:12 3:13
**Weapons** [1] 58:9
**Wedding** [1] 54:14
**Wednesday** [11] 18:25 19: 3 19:15 19:16 49:11 49:11 51:21 57:3 58:6 59:22 60:5
**Week** [19] 19:21 20:1 49:8 49:18 49:19 49:20 53:10 53: 11 54:7 54:11
**Weeks** [7] 5:9 19:15 19:24 20:2 49:11 49:20
**Weight** [4] 11:1 11:15 11: 15 11:20
**Wentz** [4] 2:17 3:14 56:18 56:19
**Whatsoever** [1] 32:25
**Wherein** [4] 6:4 9:20 9:25 41:4
**Whichever** [2] 38:22 47:12
**Whole** [9] 12:4 12:22 16: 23 29:13 30:13 47:8 53:16 61:16 61:17
**Widget** [4] 30:10 30:12 30: 16 31:9
**Wiedmann** [1] 60:11
**Wildest** [1] 26:24
**Willing** [1] 24:4
**Win** [1] 17:15
**Wind** [1] 32:16
**Winds** [1] 36:2
**Wish** [2] 29:10 31:19
**Witness** [13] 11:3 11:5 11: 10 15:12 15:18 15:19 15:20 16:1 16:5 16:10 16:10 16:10 29:11 33:24 34:6 36:4 63:12
**Witness'** [4] 11:9 13:5 13:6 13:19
**Witnesses** [20] 11:1 11: 14 11:18 11:18 11:23 11:25 12:3 12:7 12:21 13:1 17:5 32:1 32:2 32:4 32:20 33:6 33:7 33:10 34:7 43:20
**Wonder** [2] 17:11 18:5
**Wonderful** [2] 14:17 21:16
**Word** [3] 11:7 55:22 57:9
**Words** [1] 39:21
**Workday** [2] 26:18 26:21
**Works** [2] 14:20 27:11
**World** [2] 5:3 33:8
**Worry** [2] 5:16 59:7
**Worth** [1] 17:24
**Worthy** [2] 17:16 17:17
**Writing** [1] 63:5

## X

**Xeroxing** [1] 60:3

## Y

**Y'all** [2] 17:10 55:15

**Year** [1] 5:18
**Year's** [1] 30:22
**Years** [5] 25:10 27:6 30:9 31:16 35:21
**Yesterday** [1] 62:7
**Yourself** [6] 11:4 11:7 11:10 26:2 26:14 34:8
**Yourselves** [5] 25:5 26: 17 29:14 31:19 39:9

## Z

**Zenobia** [1] 60:12
**Zone** [2] 28:17 31:22

1

1          REPORTER'S RECORD

2        VOLUME 7 OF 25 VOLUMES

3       TRIAL COURT CAUSE NO. 800112

4

5   CHARLES MAMOU, JR.          ) IN THE DISTRICT COURT

6          Appellant           )

7                              )

8   VS.                        ) HARRIS COUNTY, TEXAS

9                              )

10  THE STATE OF TEXAS          )

11         Appellee            ) 179TH JUDICIAL DISTRICT

12

13

14            * * * * * * * * * * * * * * * * * * *

15            VOIR DIRE EXAMINATION

16            * * * * * * * * * * * * * * * * * * *

17

18      On the 14th day of September, 1999, the following

19  proceedings came on to be heard in the above-entitled

20  and numbered cause before the Honorable Bob Burdette,

21  Judge Presiding, held in Houston, Harris County, Texas:

22      Proceedings reported by computer aided

23  transcription/stenograph machine.

24

25

2

1              A P P E A R A N C E S

2      MR. LYN MCCLELLAN

3      SBOT NO. 13396100

4      MS. CLAIRE CONNORS

5      SBOT NO. 0470500

6      Assistant District Attorneys

7      201 Fannin

8      Houston, Texas 77002

9      Phone:  713.755.5800

10      ATTORNEYS FOR THE STATE OF TEXAS

11

12      MR. WAYNE HILL

13      SBOT NO. 59656300

14      4615 Southwest Freeway

15      Houston, Texas 77027

16      PHONE:  713.623.8312

17

18      MR. KURT WENTZ

19      SBOT NO. 21179300

20      5629 W FM 1960

21      Houston, Texas 770

22      ATTORNEYS FOR THE DEFENDANT
23

24

25

i

INDEX

VOLUME 7 OF 25

|  | | PAGE | VOL. |
|---|---|---|---|
| September 14, 1999   Voir Dire | | | 7 |

| Venirepersons | Court | State | Defense | | VOL. |
|---|---|---|---|---|---|
| Lynne Warren Cantrell | 34 | 36 | 52 | | 7 |
| Katheryne M. Stephens | 71 | 74 | 88 | | 7 |
| Damietta L. Landry | 105 | 108 | 123 | | 7 |
| Katherine Marie Waller | 137 | 140 | 155 | | 7 |
| Michael Evans | 170 | 173 | 184 | | 7 |
| Michele Beasley | 199 | 203 | 210 | | 7 |
| Cecilia Fine | 219 | 224 | 232 | | 7 |

| | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 244 | 7 |
| Court Reporter's Certificate | 245 | 7 |

3

1  (Prospective jurors brought in as a
2  group.)
3  THE COURT: Good morning, ladies and
4  gentlemen. I want to spend some time before we start
5  visiting individually, talking about a few things that
6  we didn't talk about yesterday. And we didn't talk
7  about them yesterday for a reason, and the reason was
8  that our crowd was so big we could have made absolutely
9  no headway with any of this stuff.
10  Before we begin, let me say, my best guess
11  is that we're going to be talking about some things that
12  you have never in your life given any thought to, nor is
13  there any reason whatsoever that you should have. You
14  might find it a little bit peculiar as compared to your
15  work at your job and your ordinary routine. But please,
16  don't get frustrated with what we're talking about,
17  because all we're going to do is talk about the rules
18  that can come into play during the course of a trial
19  like this.
20  Whether these rules do come into play
21  depend upon the testimony presented in the case. But
22  we're going to talk about things that can happen. It is
23  not going to be necessary for you to try to memorize
24  what it is we're talking about. Because if these rules
25  do come into play, these rules are all going to be given

4

1  to you in writing. They're going to be in the Court's
2  charge. You will have the Court's charge and these
3  rules with you during the entire time that you're
4  deliberating, so don't worry about trying to memorize
5  it.
6  I just want to give you an idea of what
7  you might anticipate. The ultimate question is going to
8  be: Is there anything about any of these rules that
9  causes you to feel that you would refuse to follow them
10  if you were a juror in the case? So, with that in mind,
11  let's start off. We talked yesterday about the fact
12  that this defendant, Mr. Mamou, is charged with the
13  offense of capital murder. His attorney, Mr. Wayne
14  Hill, is present in the courtroom. Mr. Kurt Wentz, his
15  other attorney, has had to step out for a minute. State
16  of Texas is represented by two of her Assistant District
17  Attorneys, Mr. Lyn McClellan and Miss Claire Connors.
18  We talked about the fact that the
19  defendant, Mr. Mamou, is indicted for the offense of
20  capital murder. We also talked about the fact that if a
21  person in the State of Texas is convicted of the offense
22  of capital murder, there are two possible punishments
23  that can be imposed. One of those possible punishments
24  is a life sentence. One of those possible punishments
25  is a death sentence. Whichever punishment is imposed

5

1  depends upon how a jury answers two questions that will
2  be presented to you at the second phase of the trial.
3  We talked yesterday about the fact that at
4  the first phase of the trial the burden of proving the
5  defendant's guilt is on the State, and they must prove
6  to a jury's satisfaction beyond a reasonable doubt that
7  the allegations contained in the Grand Jury's indictment
8  are, in fact, correct. If they do that, the jury's job
9  is to find the defendant guilty. If they fail to do
10  that, the jury's job is to find the defendant not
11  guilty. But starting out at trial, the defendant is not
12  guilty. And the defendant stays -- remains not guilty
13  throughout the testimony in the case unless or until the
14  testimony in the case proves to the jury beyond a
15  reasonable doubt that, in fact, the defendant is not
16  innocent. The defendant is, in fact, guilty.
17  Now we talked about the testimony at the
18  first phase of the trial is going to focus on the
19  offense that was committed; because that's going to be
20  your decision that you have to make, is whether the
21  defendant is guilty or not guilty. So the fact that the
22  evidence at the first phase is going to be on the
23  question of the crime -- Who did it? Where was it
24  done? When was it done? How was it done? What was
25  the relationship of the parties, if there was any? Why

6

1  was it done, if that information is known?
2  So at the second phase of the trial, if
3  the defendant is found guilty, at the second phase the
4  focus of the evidence is going to get off the crime that
5  was committed, because you will have already heard all
6  there is to hear about that; and instead, at the second
7  phase of the trial the focus of the evidence is going to
8  be on the character, the background of the defendant
9  involved, so that you can take the background of the
10  defendant, match it up with the crime that you would
11  have found the defendant guilty of having committed, and
12  come up with what you think is the right decision to
13  reach, taking into account all those factors.
14  We talked about the two questions that are
15  involved. They're over here on the board, and I want to
16  spend some time talking with you about them. And
17  certainly feel free to look at them as we're talking,
18  because we're going to spend some time talking about the
19  contents. The first question, we know, starts -- asks:
20  Do you find from the evidence beyond a reasonable doubt
21  that the defendant -- there is a probability that the
22  defendant would commit criminal acts of violence that
23  would constitute a continuing threat to society. We
24  talked yesterday about the fact that no matter what the
25  evidence, no matter who the defendant, no matter who the

7

```
1   victim, no matter who the jury, there's never but two
2   possible answers to that question, either yes or no.
3           Question Number Two asks:  Do you find
4   from the evidence -- I'm sorry -- asks:  Taking into
5   consideration all of the evidence in the case, including
6   the circumstances of the offense -- that's going to be
7   the stuff that you heard at the first phase of the trial
8   about the crime.  Also, including the character and the
9   background and the personal moral culpability -- same as
10  responsibility.  That's going to be what you hear at the
11  second half of the trial.
12          So the first half of the second question
13  simply is an instruction to the juries to go back over
14  all of the evidence in the case for the purpose of
15  asking yourself this question:  Is there in this case a
16  sufficient mitigating circumstance or circumstances that
17  make me believe that a life sentence would be a more
18  appropriate verdict than a death sentence?  Again, no
19  matter what the evidence, no matter who the defendant,
20  no matter who the victim, only two possible answers, yes
21  or no.
22          If you answer yes to the first question
23  and if you answer no to the second one, I have no
24  choice, I have no option, and I have no discretion.  I
25  must sentence the defendant to death, and that is
```

8

```
1   exactly what I'll do.  If the jury should answer those
2   questions in any way other than yes and no, that order,
3   again, I have no choice, no option, no discretion.  I
4   must sentence the defendant to life.
5           So, we talked yesterday about the fact
6   that the jury does not subjectively go out and say to
7   themselves, well, in this case we think we'll give this
8   one the death penalty.  And in that case we'll give that
9   one a life sentence.  The jury doesn't sentence to life
10  or sentence to death.  The jury simply answers those two
11  questions.  But you are entitled to know what result
12  your answers to those questions will cause.  A yes and a
13  no, in that order, is a death sentence.  Anything else
14  is a life sentence.  Any questions so far?
15          Okay.  Let's take the questions
16  individually and then go through the contents of them.
17  We talked yesterday about the fact that in the Court's
18  charge there is going to be a number of things defined
19  for you, a number of terms that are going to be defined
20  for you.  And we're going to find as we talk about these
21  questions there is also going to be a number of them
22  that are not going to be defined for you.
23          If you say to yourself, how in the world
24  do you people decide what definitions you're going to
25  give us, which ones you're not?  The answer to that is
```

9

```
1   really pretty simple, and the answer is this:  If we're
2   going to be using a word that has some meaning that's
3   peculiar to the lawyering business, we have no
4   justifiable right to think that you ought to come here
5   armed with knowing what that is; because it's not your
6   job, so we're going to define that word for you.  If,
7   however, we're going to be using words of common usage
8   that we all use all the time, we're not going to define
9   those words.
10          First question.  The first question starts
11  off with a phrase, do you find from the evidence beyond
12  a reasonable doubt -- we talked about the reasonable
13  doubt business yesterday.  We talked about the
14  definition.  We talked about it from the standpoint of
15  that being the amount of proof that the State must
16  present in order for a jury to be able to find a
17  defendant guilty of the offense of capital murder, or
18  any other criminal offense for that matter.  It is
19  exactly the same amount of proof that relates to the
20  second -- to this first question at the second phase of
21  the trial; because it starts off with the phrase, do you
22  find from the evidence beyond a reasonable doubt --
23  anytime we see that phrase, we know that that means the
24  State has to prove to you what the answer should be by
25  the quality of their testimony.  The evidence must be
```

10

```
1   such that it excludes all reasonable doubt as to the
2   defendant's guilt.  Also excludes all reasonable doubt
3   that the answer to that first question should be yes.
4           We talked about the presumption of being
5   innocent at the first phase of the trial.  We know that
6   presumption can be eliminated by the quality of the
7   evidence in the case.  And if the quality of the
8   evidence is such that it establishes a defendant's guilt
9   beyond a reasonable doubt, obviously the presumption of
10  innocence has gone away.
11          If a defendant is found guilty of capital
12  murder, beginning at the second phase of the trial, a
13  whole new presumption pops up to replace the presumption
14  of innocence.  And that whole new presumption is this:
15  It is presumed that for every person convicted of the
16  offense of capital murder, the appropriate punishment is
17  life.  Now, how in the world did I get there?  Well,
18  because that first question starts off with the phrase,
19  do you find from the evidence beyond a reasonable doubt?
20  Meaning, the State's got to prove to you what the answer
21  to that question should be.  If they don't prove to you
22  what the answer to that question -- that the answer to
23  that question should be yes, the answer to that question
24  is no.
25          We understand from our conversation this
```

11

1 morning and yesterday that a no answer to the first
2 question is different than yes and no, in that order,
3 which is what it takes for a death sentence. So a no
4 answer to the first question means a life sentence, and
5 that's the way the question starts off being answered
6 unless the State's evidence proves beyond a reasonable
7 doubt that the question should be answered yes. Does
8 that make any sense? Okay. So, the State's job is to
9 prove beyond a reasonable doubt that the answer is yes
10 to that first question. If they don't, the answer is
11 no.
12        Do you find from the evidence beyond a
13 reasonable doubt that there is a probability? Let's
14 talk about the word "probability." This is a word
15 that's not going to be defined for you, because we use
16 that term all the time. I'm not permitted to give you a
17 definition for that word, but I am permitted to visit
18 with you about whatever the word probability does mean
19 to you. There are two things that it cannot mean. The
20 first thing that a probability cannot mean is that it
21 can't mean the same thing as a possibility. Anything
22 could possibly happen. Simply because it could possibly
23 happen does not mean it's probably going to, whatever
24 the word probability means to you. On the other hand,
25 it cannot mean something as great as a certainty.

12

1 Anything -- or simply just because something is probably
2 going to happen does not mean it's certain to happen.
3        And keep in mind the context within which
4 we're using this word probability and what it does. We
5 are requiring the State to prove beyond a reasonable
6 doubt the existence of future acts of violence. Can you
7 see how grossly unfair it would be to a defendant if all
8 the State was required to do was to prove the existence
9 of the possibility that a defendant on trial could
10 commit criminal acts of violence? That wouldn't be fair
11 to the defendant.
12        On the flip side, it wouldn't be fair to
13 the State if we required them to prove beyond a
14 reasonable doubt that there was a certainty that a
15 defendant would commit criminal acts of violence. So,
16 what we did was we split the baby. If probability means
17 to you something more likely to happen than likely not
18 to happen, that's a deal. We're now getting into
19 football season. Odds on a football game. Probability.
20 The greater the odds, the less the probability. The
21 weatherman, whenever he or she says twenty percent,
22 forty percent, all probabilities. And I don't mean to
23 equate what we're doing with a sporting event or rain,
24 but the point of it is there is no reason to make
25 probability into something it's not. Anybody have any

13

1 questions about probability and what it is? What it's
2 not, more specifically?
3        Do you find from the evidence beyond a
4 reasonable doubt there is a probability that the
5 defendant would commit criminal acts of violence? In
6 order to obtain a yes answer to this question, the State
7 is not limited in their proof to show that a defendant
8 on trial would probably commit future capital murders.
9 Certainly if that evidence exists, the State's entitled
10 to present it to you. But we're talking about the State
11 proving beyond a reasonable doubt the existence of a
12 probability that a defendant would commit, not a
13 specific crime, but a broad category of crime; that
14 being some crime that is an act of violence. And the
15 act of violence can be an act of violence either as to
16 persons or as to property.
17        Certainly capital murders, murders,
18 assaults, rapes, robberies, kidnappings, all criminal
19 acts of violence as to persons. Criminal acts of
20 violence as to property. Arsons, the burning of
21 somebody's vehicle, a building. Certain kinds of
22 burglaries that require breaking in to get onto land or
23 into a building, taking of a big bat, beating out the
24 windshield of an automobile. Those are all criminal
25 acts of violence as to property. Those are the type of

14

1 things generically that the State is obligated to prove
2 that a defendant would probably commit in the future,
3 not a specific crime. And these criminal acts of
4 violence must rise to the level that they constitute a
5 continuing threat to society.
6        Now, let's talk about society for just a
7 second. I think that more often than not when we think
8 of society, the first thing we think of is people that
9 we see; people in the neighborhood, people at the job,
10 family members, and so forth, the people that were
11 around. More often than not we don't think, when we
12 think of society, about people behind the walls of the
13 penitentiary; but they, also, are a piece of society.
14 And I'd ask you to consider making a distinction, if you
15 feel comfortable with a distinction, between the words
16 community and society. We all live in different
17 communities, but we're all a piece of the same society.
18        So, the lady who teaches school behind the
19 walls of the penitentiary, when she goes and she clocks
20 in at 8:00 o'clock in the morning to go do her work, we
21 know that when she gets into the penitentiary system
22 behind the walls, she does not lose her right to be free
23 from criminal acts of violence. And if she escapes
24 through the day with her life and gets back outside the
25 walls of the penitentiary, she doesn't reacquire the

**15**

1  freedom to be free from criminal acts of violence.
2  That's preposterous. So, that's how we know the people
3  behind the penitentiary walls are also a piece of
4  society. That includes teachers, medical personnel,
5  administrators, guards; and it also includes other
6  prisoners who also have the right to be free from
7  criminal acts of violence.
8       So this question, when we talked about it
9  being continuing -- a continuing threat to society, we
10  know that we're not speaking about a community; because
11  if we were, the question would read, that the defendant
12  would commit criminal acts of violence that would
13  constitute a continuing threat to the citizens of Harris
14  County, Texas. And the question doesn't say that.
15       It talks about society. So in that
16  context society can mean all the people, all the time,
17  everywhere. Now that's the first question. Any
18  questions about the first question? If the jury should
19  answer that first question no, the case is over. It's
20  over because there is no way you can answer the second
21  question to resurrect the possibility of the death
22  penalty, because a no answer to the first question is
23  different than yes or no. If the jury answers yes to
24  the first question, we'll go to the second question.
25       Now, let's consider where a jury

**16**

1  necessarily must be when they take up the second
2  question. First off, necessarily they must have found
3  the defendant guilty of capital murder; because if they
4  had not, we would never have these questions in the
5  first place.
6       Secondly, necessarily the jury would have
7  had to have answered yes to Question Number One; because
8  if they had not, we would have never gotten to Question
9  Number Two. So, what we're saying is that to get --
10  when you get to Question Number Two, if you do, your
11  jury will have unanimously and consistently voted in
12  such a way to cause the defendant to receive the death
13  penalty. Question Number Two asks you to review all the
14  evidence in the case, to make sure that's the decision
15  that you want to reach. It's your chance to withdraw a
16  death sentence and substitute, instead, a life sentence.
17       Now the first feature about Question
18  Number Two that we can see is this: We don't have the
19  phrase, do you find from the evidence beyond a
20  reasonable doubt? That phrase is not in that question.
21  Now, that tells us something. First thing it tells us
22  is since the phrase is not in the question, the State's
23  not required to prove to you what the answer to that
24  question should be. Well, we know from our conversation
25  yesterday that the defendant never has to prove

**17**

1  anything, because he is the accused.
2       Well, if the State doesn't have to prove
3  what the answer to that second question should be and
4  they don't, and if the defendant doesn't have to prove
5  to you what the answer to that second question should be
6  and they don't, what does that tell us? That tells us
7  that the law recognizes that there may be many, many
8  cases where during the course of the trial there is
9  absolutely no testimony of a mitigating nature at all.
10  And we know that the law recognizes that as a
11  possibility, because neither side is required to put
12  that testimony in the case. The only requirement posed
13  by the second question is that the jury review the whole
14  case to see if there is anything of a mitigating
15  circumstance in the case.
16       The first half of the second question is
17  simply an instruction to the jury to go back over all of
18  the evidence in the case, every single bit, for the
19  purposes of deciding, is there a sufficient reason and
20  death penalty should be eliminated in this case and
21  replaced with a life sentence? When we use the word
22  mitigating here, we're talking about some justifiable
23  reason, if there is any, that makes you think that the
24  punishment should be lessened from death to life. We're
25  not talking about excusing conduct. We're not talking

**18**

1  about justifiable conduct. We're not talking about that
2  at all, because obviously a life sentence is the very
3  least that's going to happen.
4       The question that you need to resolve is
5  this: Out of all the bad stuff that you heard about the
6  case -- that is to say, all the bad stuff that was
7  sufficient to cause you to unanimously find a defendant
8  guilty of capital murder -- in all the bad stuff that
9  caused you to unanimously answer yes to the first
10  question, is there anything in the case that makes me
11  believe that compared to all that bad stuff, there is
12  some redeeming feature that makes me think a life
13  sentence -- just because of the uniqueness of the case,
14  whether it be the uniqueness of the defendant,
15  uniqueness of the offense, uniqueness of the victim,
16  whatever, perhaps all three -- that make me think a life
17  sentence would be appropriate.
18       What a mitigating circumstance might be to
19  one of you, that same information might not be
20  mitigating to the rest of you. It's your call. For
21  example, sometimes folks tend to think that if you have
22  a young person on trial, comparative youthfulness might
23  be mitigating, the idea being the person is not of a
24  mature mind and sophisticated enough to make good
25  intelligent decisions.

19

1          Other people might think -- having heard
2     exactly the same evidence -- might think, well, that's
3     not true. Anybody that's that mean at that young age is
4     going to be that mean for the rest of their life. It's
5     the same piece of information, just evaluated
6     differently by different people. Sometimes in a case
7     there might be testimony about mental retardation. Some
8     people think that might be mitigating. Some people
9     might not. Some people say, wouldn't it depend on how
10    retarded they are? We're talking about mildly,
11    moderately, severely? Makes a difference. That's your
12    call. The point being that if you determine there is
13    any mitigating evidence in the case -- and there may be,
14    and there may not be -- the next question you have to
15    ask yourself is, does the mitigating evidence in the
16    case, if there is any, rise to the level in your mind
17    that makes you think that the death penalty should be
18    withdrawn and replaced by a life sentence? If your
19    answer to that question is yes, your answer to that
20    whole question is yes. If your answer to that question
21    is no, we don't think the mitigating testimony does rise
22    to that occasion, then your answer to the whole question
23    is no. Any questions about the second question?
24         Okay. We talked about the punishment
25    being life or death. What's the reason for spending

20

1     time talking about what we mean by death? But sometimes
2     we find folks come in with different thoughts about what
3     a life sentence really means, and I'm going to tell you
4     in this case what a life sentence really means. If this
5     defendant is found guilty of capital murder, and if the
6     jury should answer those two questions in such a way
7     that I'm obligated to sentence the defendant to life, a
8     life sentence means that the defendant cannot become
9     eligible for parole consideration until the defendant
10    has actually served forty calendar years, day for day,
11    week for week, month for month, year for year. So,
12    we're talking 2039.
13         Now what's going to happen in 2039, we
14    haven't the foggiest. It's perfectly conceivable that
15    one hypothetical defendant, after having served forty
16    years -- and let's just say he's at the age of sixty at
17    that time, the hypothetical defendant. It may very well
18    be that person might spend the remainder of his life
19    locked up in the pen and never get out. It's perfectly
20    possible. It's also perfectly possible that another
21    hypothetical defendant, at the conclusion of serving
22    forty years, might very well be granted parole. We
23    don't know what's going to happen, because whether
24    parole is or is not granted is going to be made by
25    evaluations of prison officials. That is to say, what

21

1     kind of a person was this during his or her forty-year
2     stay with us? Those evaluations made by those prison
3     officials are going to be sent to the Board of Pardons
4     and Paroles.
5          The Board of Pardons and Paroles is going
6     to take those evaluations, and they're going to make
7     recommendations to the governor of the State of Texas.
8     And based upon -- I shouldn't say based upon -- the
9     governor of the State of Texas is going to decide
10    whether to grant parole or not grant parole. Now I
11    don't know in the year 2039 who the governor of the
12    State of Texas is going to be, but I do know it may very
13    well be that they might make a decision to whether to
14    grant or deny parole based upon the evaluation and
15    recommendations made. It may be that they reject those
16    evaluations or recommendations and make some decision on
17    their own.
18         I simply don't know, but what I do want
19    you to be sure of is that it's not going to be before
20    forty years that a person becomes eligible to be
21    considered for parole. Eligibility for parole
22    consideration does not in any way mean that parole is
23    going to be granted necessarily. Now, having said that,
24    I also want you to know that your answer to these
25    questions has got to be based on the testimony in the

22

1     case. And I'm spending some time with you about this
2     forty-year business; because I don't want somebody to
3     think, well, I have heard that a person can get paroled
4     in five years; and I don't want this to happen, so I'm
5     going to always answer these questions in such a way
6     that the death penalty is imposed. Well, that is not a
7     possibility. It's forty years. So, I do want you to
8     know what the rules are.
9          But we can't take into account how those
10    rules are going to be applied to a particular human
11    being forty years from now, because the variables are
12    too great. We need to make our decision in the trial,
13    whatever the decision is, on the basis of how you folks
14    evaluate the information that these lawyers give to you.
15    Anybody have any questions about that? Okay. Let's
16    say that you can set it aside and talk about something
17    else for a second. We have spent all of our time
18    talking about capital murder.
19         In this case, the claim is two different
20    types of conduct, that if either is proved beyond a
21    reasonable doubt would warrant a jury's finding a
22    defendant guilty of capital murder. There are about
23    twelve different types of conduct that in the State of
24    Texas, if proved beyond a reasonable doubt, would
25    warrant a jury finding somebody guilty of capital

23

1  murder. We are here involved with two of them. And
2  what we're going to find is that in each case, the
3  requirement is that the State prove that there was
4  intentional murder. No accident, no self-defense. That
5  a person intended to cause the result, and committed
6  that murder during the course of another serious felony.
7      One of the serious felonies alleged is
8  kidnapping, kidnapping during the course of a murder --
9  or murder during the course of a kidnapping, it should
10 say, is a capital offense. A murder during the course
11 of a murder -- that is, the intentional taking of the
12 life of more than one person during the same episode --
13 is also capital murder. Those are the two that we're
14 dealing with. The other ten, let's don't spend any
15 time, because there is no way they can come into play in
16 this particular situation.
17      But let's talk about something that could
18 possibly occur. I don't know that it's going to, but I
19 want you to know it's a possibility; because anytime the
20 State is required to prove the existence of two things
21 beyond a reasonable doubt, there are three possible
22 outcomes. Possible outcome No. 1. Maybe they can. And
23 if they do prove the existence of the murder during the
24 murder, or the murder during the kidnapping, then the
25 jury's obligation is to find the defendant guilty of

24

1  capital murder.
2      Possible outcome No. 2. Maybe they can't
3  prove beyond a reasonable doubt the existence of either
4  of the two things. If they can't, the jury's obligation
5  is to find the defendant not guilty of anything.
6      Possible outcome No. 3. Maybe the State
7  can prove beyond a reasonable doubt the existence of the
8  murder but, not be able to prove to the jury beyond a
9  reasonable doubt that it occurred during the course of
10 the commission of kidnapping. If that were to happen, I
11 would give you a third option. You'll have the option
12 of guilty, not guilty, capital murder.
13      The third option would be guilty of the
14 offense of murder. That is to say, not capital murder,
15 but murder. And we're talking about a lesser offense
16 carved out of a greater offense, the greater offense
17 being capital murder. And if you don't believe that it
18 was committed during a kidnapping, which is a
19 kidnapping/murder being a capital -- if you don't
20 believe the murder occurred in a kidnapping, the lesser
21 offense carved out would be the murder. Kind of like a
22 piece of pie carved out of the whole pie.
23      The range of punishment for murder is just
24 simply remarkably different than the range of capital.
25 There is no range. It's life or death. But if a person

25

1  is convicted of the offense of murder in the State of
2  Texas, that person could be punished by confinement in
3  the penitentiary for life, or by confinement in the
4  penitentiary for any number of years as long as that
5  number is not less than five and not higher than
6  ninety-nine. And in addition to the confinement, a fine
7  not to exceed $10,000 may also be imposed. That's an
8  awfully wide range of punishment, and it is because
9  there are all sorts of different kinds of murder, there
10 are all sorts of different kinds of defendants, and
11 there are all sorts of different kinds of victims. Some
12 dead bodies were not as valuable alive as others were
13 valuable alive. We know that, because we wouldn't think
14 that a dope dealer would be quite as valuable to mankind
15 on the whole as a preacher. The point being, whatever
16 the evidence in the case, we want you to have room to
17 roam through the range of punishment and come up with
18 what you think is the right punishment to fight, A, the
19 crime that was committed, and B, the person that
20 committed it.
21      For example, here we've got a
22 seventy-five-year-old couple, been married for fifty
23 years, and they love each other dearly. And the Mrs. is
24 on a life support system, and she is simply -- she and
25 her husband have talked about this at the hospital.

26

1  They have been throughout it all. They have prayed.
2  They've talked. They're cried about it. Done
3  everything they could possibly think of to do. And she
4  tells him she doesn't want the indignity of suffering
5  and being in pain, and so forth, and being hooked up to
6  this apparatus. And he thinks about it for several
7  days; and finally he walks over to the wall, pulls out
8  of plug, and she dies.
9      Now, without going into the morality of
10 that, in this state that's murder. That may very well
11 not be the kind of murder that you would think, if you
12 were a juror, would be worth a life sentence; because
13 the fellow that did it didn't do it out of hate, didn't
14 do it out of anger, didn't do it out of revenge, didn't
15 do it out of anything except for love. See, I say that
16 to you just simply because I know out of what you see on
17 television, you're all -- we are led to believe that all
18 murders are just about the same. And they are.
19      So my question to you, to each of you is
20 this: Assume with me for a second that you're a juror
21 in some imaginary capital murder case. Your jury hears
22 all the testimony in the case. Your jury goes out and
23 deliberates, and your jury unanimously determines that
24 the defendant on trial is not guilty of capital murder.
25 But your jury does unanimously determine that the

27

1 defendant on trial is guilty of murder.

2 You come back and you hear evidence at the
3 second phase of the trial about the character and
4 background of the defendant, whatever that evidence
5 might be. Your jury goes out, and your jury
6 deliberates. Is there anybody here who -- or under that
7 set of circumstances, if after having heard all of the
8 evidence in the case, and if you find that a life
9 sentence was the appropriate punishment for the
10 circumstances of that case, is there anybody here who
11 would refuse to take a life sentence into consideration
12 as a sentencing option if you thought that was the right
13 thing to do based upon the facts in the case? I take it
14 that it would be a consideration. And I'm not asking
15 you would you do it? I'm just simply saying, is it
16 available to you as a consideration if you think the
17 right set of circumstances exist?

18 We'll take that same question and flip it.
19 You're a juror in an imaginary capital murder case. The
20 jury finds the defendant not guilty of capital murder,
21 but the jury finds the defendant guilty of murder. You
22 come back to hear at the second phase of trial about the
23 character or background of the defendant, whatever
24 evidence that might be. Your jury goes out and
25 deliberates. My question to you is this: If after

28

1 having heard all of that evidence in that case, whatever
2 that evidence might have been, is there anybody here who
3 would refuse to consider assessing that imaginary
4 defendant's punishment at confinement in the
5 penitentiary for five years if you thought, based upon
6 the uniqueness of the testimony in that case, that that
7 was the right result? And again, would five years be a
8 legitimate sentencing option to you if you thought that
9 was the right result to reach based upon the facts of
10 that particular case? I gather that you would. And
11 again, I'm not asking, would you do that? I'm asking,
12 would you take that into consideration? And what we're
13 trying to do is simply say at both extremes of the
14 punishment range for the offense of murder, are you
15 available to do either extreme or anywhere in --
16 anywhere in between? And whatever decision you reach,
17 would you reach that decision because that's where the
18 facts led you, whether it's five years, twenty years,
19 fifty years, seventy-five years, ninety-nine years, or
20 life? Anybody have any questions about that?
21 Sir?
22 VENIREPERSON: Your Honor, I was
23 wondering, if a defendant is convicted and sentenced to
24 life and is incarcerated, if after that the Legislature
25 changes the law --

29

1 THE COURT: It won't be retroactive as to
2 the person that's there. Was that going to be your
3 question?

4 VENIREPERSON: Yeah, because I recall a
5 few years back the Legislature passed a law that did
6 reduce sentences for people who had been incarcerated.

7 THE COURT: I don't recall that. The
8 Legislature has spent a lot of time in the last ten
9 years tightening up the parole laws. And so people who
10 were convicted were under a new set of parole laws more
11 strict than people who had been convicted. And those
12 people were getting out, because that was the law that
13 existed at the time of their conviction. Okay.

14 Two other things I wanted to talk about
15 real quickly. We have a feature in our law and I just
16 want to talk for a couple of seconds about a concept
17 more than being specific and technically accurate.
18 Basically, in the State of Texas our law says that if
19 two or more people conspire to commit a crime and they
20 go off and commit it, one of those people cannot be
21 convicted solely upon the testimony of a coconspirator
22 and nothing else. Our law says that a conviction can be
23 had upon the testimony of a coconspirator as long as
24 that testimony is corroborated by some other independent
25 testimony or evidence that rises to the level that tends

30

1 to connect the defendant to the commission of the crime.

2 So, what I'm staying is this: If somebody
3 else and I agree to go rob a bank and I'm the wheel man,
4 and the bank robber goes in, robs the bank, comes out,
5 jumps in the car, and off we drive, and I'm not in the
6 bank, so nobody can identify me -- if the only testimony
7 in the case is from the bank robber, and if there are no
8 fingerprints found on the bank bag, for example, on the
9 getaway car, for example, and nobody can identify me or
10 I haven't given a confession or there is nothing else
11 that tends to connect me to the commission of the crime,
12 then I can't be found guilty solely on the testimony of
13 the coconspirator. Now, anybody here have any objection
14 to that concept in our law that rises to the level that
15 would prohibit you from being able to follow it if it
16 came into play in this case? I don't know whether it
17 will.

18 One other area. We have two different
19 kinds of evidence that can be presented during the
20 course of a trial. We have direct evidence, and we have
21 circumstantial evidence. Direct evidence means somebody
22 saw something happen, or the person who is charged with
23 a crime confesses to having committed the crime.

24 Circumstantial evidence is anything else.
25 Circumstantial evidence can be testimony certainly other

31

1  than eyewitness testimony that's conducive to establish
2  a circumstance consistent with guilt when taken with
3  other circumstances in the case shows guilt. Sometimes
4  we hear people say, I couldn't ever find anybody guilty
5  of crime based on circumstantial evidence. Well, let's
6  talk about it.
7          For example, a fingerprint is
8  circumstantial evidence. We all know from television,
9  if from nothing else, that a fingerprint is absolutely
10 the best identifying feature of a human being there
11 could possibly be. The reason a fingerprint is
12 circumstantial is we know that the person touched the
13 object, but we don't know, A, when the object was
14 touched; and B, we don't know where the object was when
15 it was touched. So it's circumstantial.
16         Sometimes we have cases with direct
17 evidence where the eyewitnesses are so untrustworthy, or
18 unreliable, I should say, as witnesses that you don't
19 believe beyond a reasonable doubt their testimony to be
20 true. For example, let's say down here there is some
21 goings on, and a human being gets shot with a gun, a
22 pistol. There are three absolute near passed out drunks
23 laying down there on the ground, and they see it. They
24 come in and they swear under oath, man, I was drunker
25 than a goat, but this is what I saw. Can you see how a

32

1  jury might not find that imaginary defendant guilty
2  based upon the testimony of three drunks?
3          Let's take that same set of circumstances,
4  and let's say you have three other people in addition to
5  the three drunks instead of the three drunks. You got
6  to have one person who sees the victim standing right
7  where the victim fell. You see -- you have another
8  person who sees the defendant just before the shot fired
9  within ten feet of the victim with his gun in his hand.
10 He never sees the gun fired. You have a third person
11 who the only thing he sees is, ten seconds after he
12 hears the gunshot, he turns around, sees the victim
13 laying on the ground and sees the defendant walking off
14 with a gun in his hands. Nobody sees the gunshot. Can
15 you see how the -- even though that circumstantial
16 evidence that might be -- excuse me -- in addition,
17 ballistically it's determined that the bullet that's in
18 the victim's body was fired from the gun that was in the
19 defendant's hand. Can you see how that circumstantial
20 evidence might be far more reliable than that direct
21 evidence from those three drunks?
22         So the point of it is, the law doesn't
23 care whether testimony in a case is either direct or
24 circumstantial. The law busies itself with a notion
25 that whatever kind of evidence it is, it must be such

33

1  that excludes all reasonable doubt in the jury's mind as
2  to the defendant's guilt. So my question to you is
3  this: Let's assume that you're a juror in a case and
4  it's a capital murder case. You have heard all the
5  evidence in the case; and all of the evidence in the
6  case is circumstantial, but you do believe that evidence
7  beyond a reasonable doubt. Is there anybody here who
8  would refuse to find that imaginary defendant guilty of
9  capital murder simply because the evidence was
10 circumstantial even though you believed it beyond a
11 reasonable doubt? Does that create a problem with
12 anybody?
13         Okay. First year of law school is over.
14 What questions do you have? Yes, ma'am?
15         VENIREPERSON: I understood the
16 distinction between the punishment for capital murder
17 and murder, but I didn't understand the distinction
18 between what classifies one act as capital murder.
19         THE COURT: Capital murder -- well, the
20 murder -- let's start at the bottom. Murder is the
21 intentional taking of the life of another human being
22 without any legal justification or excuse. Capital
23 murder is exactly the same conduct, but with -- but
24 being committed as another felony was also being
25 committed and, as we've talked about, in one case the

34

1  felony of kidnapping, the other case a felony of another
2  intentional murder. Anybody else?
3          Okay. If you would, retire to the
4  hallway. We'll call you back just as quickly as
5  possible and get you on your way.
6          Miss Cantrell, please.
7          LYNNE WARREN CANTRELL,
8  having been first duly sworn, testified as follows:
9          VOIR DIRE EXAMINATION
10 BY THE COURT:
11 Q.  So you did succumb to the pressure.
12 A.  I tried so hard.
13 Q.  Very well. Miss Cantrell, let me ask a couple
14 of questions before we begin. First off, take into
15 account yesterday the things we talked about. Add to it
16 this morning the things we talked about. Out of
17 everything to this point that we have talked about, do
18 you have any questions for me?
19 A.  No.
20 Q.  Is there anything up to this point that we have
21 not yet touched on that you feel as though we should
22 talk about because it might have some bearing on your
23 service as a juror in this case?
24 A.  No. But if something comes up, can I ask?
25 Q.  We don't want you to keep it -- yes. Is there

35

1 anything, as far as you know right now, about your
2 personal life, about your professional life, about your
3 health, or anything else for that matter, that you feel
4 would in any way interfere with your ability to be a
5 juror in this case during the time frame we've talked
6 about?
7    A.  No.
8    Q.  I believe, Miss Cantrell -- and this is just my
9 notion -- but I believe that what this process we're in
10 right now is meant to accomplish is two things.  The
11 first thing is to share with you what the rules are that
12 can come into play during the course of the trial like
13 this.  And my question to you along those lines is, is
14 there anything you've heard so far about which you find
15 repugnant, displeasing, to the degree you would be
16 unable to follow those rules if you were a juror in the
17 case?
18    A.  No.
19    Q.  The second thing that I think this aspect is
20 about is for you to satisfy yourself that if you did
21 take a chair on one of these cases in this jury box
22 during the course of this trial that you would sit back,
23 listen to everything, drink it all in, evaluate it
24 however you saw fit, and call it just the way you think
25 it ought to be called based upon the evidence that's

36

1 presented to you in the case.  The idea being your job
2 is not to satisfy one side or the other side; your job
3 is certainly not to satisfy me, except for being on
4 time.  But your job is to satisfy yourself; because
5 five years from now you're -- when you wake up one day,
6 we want you to be able to say, what I did back then was
7 absolutely the right thing to do.  Does that sound like
8 something you could do?
9    A.  Most definitely.
10    Q.  Before we begin, have you any questions?
11       THE COURT:  Mr. McClellan.
12       MR. MCCLELLAN:  Thank you, Your Honor.
13          VOIR DIRE EXAMINATION
14 BY MR. MCCLELLAN:
15    Q.  Miss Cantrell, my name is Lyn McClellan.  I,
16 along with Claire Connors, we represent the State of
17 Texas in this case.  I want you to sit back and relax.
18 We're going to ask you to share with us, if you will,
19 some of your opinions and beliefs about certain aspects
20 of the law that might apply in a case like this, give us
21 a better idea of what your thoughts may be about a
22 process like this.  Okay?
23       First of all, you filled out the
24 questionnaire the other day, I guess Friday or so.  You
25 had a chance to listen to the Judge's voir dire both

37

1 yesterday and today.  Is there anything that's changed
2 about what opinions you may have expressed or anything
3 you think of that, well, you know, Friday I was thinking
4 this, but now I've really got a different view on
5 something?
6    A.  No.
7    Q.  All right.  Can you tell me what kind of cases
8 come to your mind when you think of cases where you
9 think the death penalty ought to be available as one of
10 the forms of punishment?
11    A.  You mean, just like scenarios?
12    Q.  Yeah, types of crimes, anything in particular
13 that comes to your mind and says, well, if somebody
14 commits this type of crime, I think it definitely ought
15 to be available for that?
16    A.  Most definitely an intentional or thought-out,
17 planned, you know, taking the life of another person.
18 Most definitely if another person were being involved,
19 like another murder, because of that, you know, if two
20 people were to die because someone wanted to kill
21 another person and somebody else got in the way, most
22 definitely I think that should be.
23    Q.  Okay.  Available for those type cases?
24    A.  Uh-huh.
25    Q.  Now I assume you understand.  If you don't, let

38

1 me talk to you about that.  There is no crime in the
2 State of Texas where you automatically get the death
3 penalty?
4    A.  Okay.
5    Q.  There is two parts to the trial.  Guilt or
6 innocence.  Your job as a juror, along with the other
7 jurors, is to determine whether or not the defendant has
8 committed the crime as alleged in the indictment.  We've
9 alleged in this indictment that the defendant
10 intentionally took the life of another person in Harris
11 County, Texas, on a certain day, in the course of a
12 kidnapping, murder during the kidnapping.
13       We've also alleged in the same indictment
14 another way of committing capital murder, which is
15 taking two or more people's lives during one criminal
16 episode.  Okay.  Now the difference is -- the lady asked
17 over there before we broke -- the difference between
18 murder and capital murder is capital murder is murder
19 plus some aggravating circumstance; murder during a
20 robbery, murder during a kidnapping.  We have a list
21 here; during a burglary or a sexual assault; killing a
22 police officer in the line of duty, killing a child
23 under a certain age, killing two or more people in one
24 criminal episode are kinds of cases the Legislature said
25 the death penalty is available for.  Any problem with

39

1   that aspect?
2       A.   No.
3       Q.   Now the death penalty is not available for an
4   intentional, premeditated murder unless there is some
5   other aggravating circumstance.  And that's what the
6   Judge was talking to you about the range of punishment
7   for a murder case being five years to ninety-nine years,
8   or life.  All murder -- for it to be murder is, by
9   definition, an intentional act.  So murder is the
10  intentional taking of another person's life without any
11  legal justification.  By that we mean not self-defense,
12  not an accident.  We're talking about intending to kill
13  someone and doing so.  But for that the range of
14  punishment is five to ninety-nine years, or life.
15          If that intentional murder is coupled
16  with, as we've alleged here, aggravated kidnapping or
17  taking another person's life, killing two people or more
18  in one criminal episode, then it becomes capital murder.
19  Any problems with those distinctions?
20      A.   Huh-uh.
21      Q.   Do you have any problem with the fact that in a
22  murder case the death penalty doesn't apply and the
23  range of punishment is five years to ninety-nine years,
24  or life?  Can you keep your mind open in that type of
25  case to that full range of punishment?

40

1       A.   Most definitely, uh-huh.
2       Q.   Now some people come to us and say they are in
3   favor of the death penalty as an appropriate punishment
4   for certain types of crimes.  Some people then go
5   further and tell us they do not believe they could ever
6   participate in a process whereby they would be called
7   upon to make decisions; in other words, answer these
8   questions over here knowing that the answers they gave,
9   under order of this Judge -- or it could depend on how
10  it's answered -- would order this Judge to order the
11  execution of the defendant sitting over here on trial.
12  Do you have any doubts about your ability to participate
13  in that type of process and make that type of decision
14  if that's what the law and the evidence calls for?
15      A.   I don't have a problem with it.
16      Q.   Now I want to talk to you for a moment about
17  the punishment stage of a capital murder case.  And I
18  don't mean to slight the guilt/innocence stage, but
19  guilt/innocence is basically we either prove what
20  happened in the indictment or we don't.
21          There is going to be an indictment -- I
22  mean, a charge to the jury that will say, Now if you
23  find from the evidence beyond a reasonable doubt that
24  on -- it will set out certain elements and we prove
25  those elements, you find him guilty of capital murder.

41

1   If you don't, you find him not guilty.  If he's not
2   guilty, we all go home.  If he's guilty, then we go to a
3   second part of the trial.
4       A.   Okay.
5       Q.   At this second part of the trial you may now
6   hear additional evidence that you did not hear at
7   guilt/innocence.  You may hear evidence about a
8   defendant's character, his background, his criminal
9   history, or lack thereof, his mental ability or
10  disability, how he grew up in his life, the type of
11  surroundings he was around; because the emphasis there
12  is on this individual who you have found guilty of
13  capital murder, because you're going to decide what
14  punishment this individual should receive for the crime
15  you've already found that he's committed.  So you're
16  looking at information about that individual to help you
17  decide what punishment to assess.
18      A.   Right.
19      Q.   Now when you get finished with all that
20  evidence, then you'll be given these two questions at
21  the punishment stage of a trial.  So first you would
22  have had to find the defendant guilty.
23      A.   Uh-huh.
24      Q.   That part's over.  You then go to the
25  punishment stage, hear additional evidence.  After that

42

1   part's over, then you go back and you're given these
2   questions to answer.  Now in answering those questions,
3   you can look back to the evidence at guilt or innocence;
4   because that may help you in deciding that issue.  In
5   fact, you're going to be directed by one of the
6   questions.  You can look at evidence about a defendant's
7   character, his background, criminal history, or lack
8   thereof, of the individual in helping answer those
9   Special Issues, also.
10          Now just because you find someone guilty
11  of capital murder doesn't tell you, or shouldn't tell
12  you, what punishment you're going to receive (sic);
13  because you haven't heard the rest of the evidence yet
14  that is about the individual himself.
15      A.   Uh-huh.
16      Q.   You have to wait till you've heard all the
17  evidence and process it altogether.  Any problem with
18  doing that?
19      A.   No.
20      Q.   Some people have come to us and said, well, if
21  I found someone guilty of capital murder, which is, in
22  fact, the intentional taking of another person's life,
23  without any legal justification during the course of
24  kidnapping or during the course of killing another
25  person, I'm going to always find this person ought to

43

1 get the death penalty regardless of what else I hear.
2 Well, that person has already made their mind up before
3 they ever get to the punishment stage of the trial; and
4 that's not proper. Can you assure us you're still open,
5 after finding somebody guilty of capital murder, to both
6 ranges of punishment, either life or death, depending
7 upon the answers to these questions?
8    A. Yes.
9    Q. All right. Now keep in mind that you had to
10 have found someone guilty; otherwise, you never get to
11 those issues.
12    A. Right.
13    Q. Issue Number One says: Do you find from the
14 evidence beyond a reasonable doubt -- and there again,
15 they're using those words. It puts the burden of proof
16 on the State. So you know the automatic answer to this
17 question is going to be no, unless and until the State
18 proves beyond a reasonable doubt that the answer's yes.
19 It's kind of like the automatic answer on
20 guilt/innocence is not guilty because of the presumption
21 of innocence until the State proves, if it does, beyond
22 a reasonable doubt that the defendant is guilty, okay.
23 So it says, do you find from the evidence beyond a
24 reasonable doubt there is a probability that the
25 defendant would commit criminal acts of violence that

44

1 would constitute a continuing threat to society?
2        First of all, they use the word
3 probability. It doesn't use the word possibility. They
4 could have chosen that word. They did not. It doesn't
5 use the word certainty. They could have used that word
6 and they didn't. Possibility -- I suggest to you
7 anything is possible.
8    A. Right.
9    Q. Certainty means it's definitely going to
10 happen. And probability might be defined as more likely
11 than not. So, in other words, it's more than fifty
12 percent chance that this would occur. So the question
13 is, do you find from the evidence beyond a reasonable
14 doubt there is a possibility or that it's more likely
15 than not that the defendant would commit criminal acts
16 of violence -- doesn't say another murder or capital
17 murder -- those are all criminal acts of violence.
18 Could be any other criminal act that is also violent in
19 nature; a robbery, a burglary, a shooting someone with a
20 gun but not killing them, hitting someone with your fist
21 so hard you knock them out, things of that nature.
22        And then you're to determine, after
23 hearing all the evidence, do you believe that the State
24 has proven that the defendant, as he sits there that
25 day, that there is a probability that he would be a

45

1 continuing threat to commit future acts of violence?
2 Are you open to answering that question either yes or
3 no, depending upon what evidence you heard at both the
4 guilt/innocence, as well as the punishment stage of the
5 trial?
6    A. Uh-huh.
7    Q. Okay. Now if you find that the answer to that
8 is no -- and that's the inquiry -- then the defendant
9 receives a life sentence. If you answer it yes, then
10 the defendant's going to receive the death penalty.
11 Notice in Issue Number Two, you decide he is not.
12 Because Issue Number Two then does not start out, do you
13 find beyond a reasonable doubt?
14    A. Right.
15    Q. It asks you, do you find that, taking into
16 consideration all of the evidence -- and then it goes on
17 to specify, including the circumstances of the crime --
18 that would be what happened at guilt or innocence, what
19 you heard at guilt/innocence, the defendant's character
20 and background -- that would be what you heard at the
21 punishment stage of the trial -- and his personal moral
22 culpability -- I'd like to refer to it as his personal
23 responsibility for the commission of the crime. In
24 other words, was he the person who pulled the trigger,
25 or stabbed with the knife, or choked with the hands, or

46

1 was he a getaway driver? His personal responsibility.
2        Do you find there is sufficient mitigating
3 circumstance or circumstances -- I like to refer to it
4 as sufficient reasons -- why this person ought to
5 receive life as opposed to death? So what that question
6 is asking you now is to go back and look at everything
7 you have heard so far. And do you find there is
8 sufficient reasons why this person who you have found
9 guilty of capital murder and who you found to be a
10 probability of a continuing threat to commit future acts
11 of violence, his life ought to be spared because of some
12 mitigating circumstance, some reason that you found in
13 the evidence.
14        And to show you how that works, you may
15 have heard during the trial, of course, the defendant
16 was high on drugs or alcohol when he committed the
17 crime. Juror Number 1 may say, I think that mitigates
18 towards a life sentence; because when you get high on
19 drugs or alcohol, you do things you wouldn't ordinarily
20 do. Juror Number 2 may say, Wait a second. I know
21 people who have been high on drugs or alcohol many
22 times. They didn't go out and commit a capital murder.
23 I don't see a connection between that and the commission
24 of this crime, because they don't think it's mitigating.
25 So two people have looked at the very same piece of

47

```
 1   evidence, and one came up with one and one came up with
 2   another.  And that's okay, because that's what the
 3   question is asking you to do.  It's asking you to look
 4   at the evidence.  You decide in your mind what effect,
 5   if any, it ought to be given.
 6          Same thing about the age of the defendant.
 7   Maybe he's a very young man.  Juror Number 1 may say, I
 8   think that's mitigation towards a life sentence.  Juror
 9   Number 2 may say, I don't think that has anything to do
10   with whether he ought to get life or death.  So two
11   people, again, have different opinions.  And that's
12   okay.
13          You may have heard evidence at the trial
14   the defendant was a special ed-type student.  Somebody
15   said, I think that mitigates towards life.  Somebody
16   else may say, Well, I don't think that has any effect.
17   I know people that have the same mental problem he has
18   in my neighborhood, church, work, whatever, school; and
19   it's not a problem to them.  I don't see how that's a
20   connection to this.  All that question does is permit
21   you to go back and look at the evidence and see, are
22   there reasons why we should give this person life as
23   opposed to death?   And if you find them, and they are
24   sufficient in your belief to change your vote from death
25   to life, would you do so?   If not, then you leave it
```

48

```
 1   like it was.  All right?
 2       A.  Uh-huh.
 3       Q.  Any problem with that aspect?
 4       A.  No.
 5       Q.  What did you think about last night when you
 6   were thinking about, well, I'm going to have to come
 7   down here; and, you know, it's a prospect I could be a
 8   juror in case like this, and the prospect of the death
 9   penalty might be an option in a situation.  Any
10   particular thoughts that went through your mind?
11       A.  I do think it's interesting.   Actually, I
12   prayed about it, and I just -- I'm at peace with it.  If
13   I were to be chosen to make a decision one way or the
14   other, I'm at peace with it.
15       Q.  Okay.  Do you have any preconceived idea of
16   what your decision would be?
17       A.  No, I haven't heard any evidence.
18       Q.  You haven't heard any evidence.  That's a good
19   response; because without that, I don't know how you
20   would ever know.  But you'd be surprised.  Some people
21   come in and say, I could never consider a certain range
22   of punishment.  And we go, You haven't heard the facts.
23   How do you know you can't consider it?  Some people have
24   already written it off ahead of time.
25          There was a question in the questionnaire
```

49

```
 1   that says, Do you believe that mitigating evidence,
 2   concerning a capital murder, of the defendant's
 3   background should be considered in deciding whether or
 4   not he or she should receive the death penalty?  And you
 5   checked no as your response there.  Now having been
 6   through this process, you know that mitigating evidence
 7   is basically, by law, required to be considered?
 8       A.  Right, which I didn't know.
 9       Q.  Do you have any problem with that?
10       A.  No.
11       Q.  The fact that it's required to be considered --
12   and I've tried to explain to you on Issue Number Two
13   about how you have to look through all the evidence and
14   see if there is things that are mitigating.  A lot of
15   times I'm not sure people understand what the word
16   mitigating means in this concept.
17       A.  It's not whether or not he would be guilty.
18   It's just deciding the punishment.
19       Q.  That's exactly right.  At the punishment stage
20   of a trial, your answer to those questions will never
21   undo finding him guilty.
22       A.  Okay.
23       Q.  It will affect what punishment he should
24   receive, and that's why we have that stage of the trial.
25   So because you go through, and let's say you find there
```

50

```
 1   is mitigating evidence, doesn't mean you're finding that
 2   it was okay to have killed a person.  You're just
 3   finding that, based upon all the circumstances that
 4   you've heard and all the evidence, that a life sentence
 5   is more appropriate for this defendant for what he did
 6   than what a death sentence might be.  You could
 7   obviously have a wide range of types of people that we
 8   have on trial.
 9          You may have somebody who's never been in
10   trouble with the law before, or a straight A student,
11   choirboy, Eagle Scout, whatever.  You may have somebody
12   else that's been in and out of trouble all their life.
13   You may have anywhere in between those two extremes.
14   And your job then is to look at that evidence and see
15   how that affects either of those issues, either Number
16   One or Number Two.  And would you be able to do that?
17       A.  Yes.
18       Q.  We are looking for [r people who can take an
19   oath that they will a true verdict render based upon the
20   law given to them by the Court and the evidence they
21   hear from the witness stand.  And the Judge often puts
22   it this way:  Your job as a juror is to go wherever the
23   law and the evidence leads you.  And if it leads you to
24   find a person not guilty, so be it.  If it leads you to
25   find them guilty, so be it.  If it leads you to answer
```

51

1    these questions in such way that death results or leads
2    you to answer in such way that life results, okay.  You
3    just go where the law and the evidence leads you.  Any
4    reason that you know of that you wouldn't be able to
5    take that oath and follow those instructions?
6        A.  No.
7        Q.  Anything that you think I need to know that
8    would affect your service as a juror in case like this?
9        A.  No.
10       Q.  Okay.  One last thing.  You talked about the
11   kinds of cases where it came to your mind when you think
12   of cases where the death penalty ought to be available,
13   and you talk about intentional and premeditated-type
14   situation.  And, of course, as I say, all murders are
15   intentional; but for the offense of murder by itself,
16   the death penalty doesn't apply.
17       A.  Uh-huh.
18       Q.  Can you assure me that just because the crime
19   is an intentional crime, which it has to be in order for
20   the defendant to be the victim, that that won't lead you
21   to believe that a person automatically ought to receive
22   the death penalty just because it's an intentional
23   crime, because it has to be?
24       A.  Right, yes, I can.
25       Q.  Thank you very much, Miss Cantrell.

52

1            MR. MCCLELLAN:  And I'll pass the
2    venireman.
3            THE COURT:  Thank you.
4            Mr. Hill.
5            MR. HILL:  Thank you.
6                VOIR DIRE EXAMINATION
7    BY MR. HILL:
8        Q.  Miss Cantrell, my name is Wayne Hill.  Kurt and
9    I both are representing Mr. Mamou.  I'm going to take a
10   few moments to visit with you.  The reason I sit up here
11   is that ledge is in the way of seeing people.
12   Mr. McClellan has spent some time basically explaining
13   certain concepts of the law to you and trying to get you
14   to commit that you would follow the law, and that's
15   fine.  Those people that come here individually,
16   privately, are given the opportunity to just express
17   themselves; because this is the only point in time where
18   if a person has a particular feeling one way or the
19   other, whether it favors the State, whether it favors
20   the defense to the point where it might disqualify them
21   as a prospective juror, that we get to find out about
22   that.
23            In other words, you have not been given
24   the oath of a juror just yet.  So if you had a feeling
25   about any point of law that has been discussed with you

53

1    that you feel very strongly about and, in all fairness,
2    you feel would play a large role in your ability to sit
3    in a case like this, now is the time to tell us.
4    Because it's, quite frankly, too late if you get put on
5    the jury, you're sitting in the jury room; and for the
6    first time it dawns on you that, gosh, you know, I
7    thought I could do this; but now that I really think
8    about it, I should have told somebody about this aspect
9    of my life or my feelings about a particular law.
10           So if we have that understanding, that's
11   all I ask we do; because we all have to trust you have
12   given this your complete consideration, as you obviously
13   have, and that you would share things with us.  It's not
14   a test to see if you're a good person.  It's not a
15   civics test.  Quite frankly, all of us have personal
16   feelings about any number of things.
17       A.  Uh-huh.
18       Q.  And the real barometer is, does our personal
19   feelings cause us to view things in a certain way that,
20   in all fairness to both sides, possibly they should know
21   about?  So that's all I ask that we do.  Is there
22   anything at all that has been discussed with you up to
23   this point that's even made you feel a little bit
24   uncomfortable?  Maybe some aspects of the law the Judge
25   has discussed or anything that Mr. McClellan has

54

1    discussed with you?
2        A.  No, not at all.
3        Q.  Oftentimes questions will be posed to you in a
4    way that they kind of project what the answer should be.
5        A.  Uh-huh.
6        Q.  You know, some people tell us they would
7    automatically vote for the death penalty if somebody
8    were found guilty of capital murder.  The law requires
9    you to consider everything before making a decision.
10   Well, in that situation you're told ahead of time that
11   if you're going to say, well, I don't feel comfortable
12   with that, that you're basically saying that you're not
13   going to follow the law.
14           I'm interested in you educating me about
15   yourself.  Okay.  You said that it was interesting when
16   Lyn asked you about your thoughts.  What do you mean by
17   that?
18       A.  Just to see how the system really works and to
19   be a part of it.  Not that I'm taking this lightly at
20   all.  I'm not.
21       Q.  I would hope that anybody that is involved in
22   this process at all, at any level, would take it on a
23   very serious note.
24       A.  Uh-huh.
25       Q.  What do you mean by, you're at peace with

55

1  yourself? How do you arrive at that point where you're
2  comfortable, I assume, with being here and if called
3  upon, make decisions?
4       A. Well, just that, to make a decision, I feel
5  that I am -- I'm a real open-minded person and I just
6  know I can look at everything and then make a decision;
7  and based on what I'm supposed to look at what I am, you
8  know, like following the law and not letting any of my
9  personal beliefs in any way, I think, interfere with
10 that decision at all.
11      Q. Tell me some of the things that you do think,
12 because that allows us to have a fuller picture of who
13 you are, if there is any -- what is the strongest
14 feeling that you have about the death penalty? If you
15 had to make an argument in favor of the death penalty,
16 what would your strongest argument be?
17      A. That there is -- I just believe that people
18 need to be responsible for their behavior --
19      Q. Right?
20      A. -- whether it's good or bad. You know, there
21 is consequences for everything.
22      Q. Right.
23      A. And if the law -- if, you know, the law is
24 this, and this is a consequence for it and you break
25 that, that's just the way it is.

56

1       Q. Okay. Well, when you look at those questions,
2  when you -- and you understand, you don't even get to
3  those questions until such time as you have found beyond
4  a reasonable doubt that the person is guilty of the
5  crime they're charged with?
6       A. Right.
7       Q. And in this particular case the State has
8  alleged that either Mr. Mamou killed a woman while they
9  were kidnapping her or -- alternatively, or they're
10 going to try and prove that this individual killed a
11 woman and a man during the same transaction. So, you
12 know, as you sit there, if you and eleven other people
13 find unanimously that Mr. Mamou committed that crime,
14 you're then going to be faced only with the decision of
15 whether he receives life or death.
16      A. Right.
17      Q. Now, what are your feelings going into that
18 second stage of the trial, especially in light of the
19 fact that you now understand what it takes to be found
20 guilty of capital murder?  How do you approach these
21 two questions?
22      A. Well, I don't know the circumstances; but
23 people do things -- I mean, he could have
24 accidentally --
25      Q. No, no accident, no self-defense, no legal

57

1  justification at all.
2       A. Well, the death of this woman and the death of
3  this man -- I don't know what triggered him to do this.
4  I mean, you need to know all those things. Was this a
5  jealous -- I mean, there is all kinds of things that go
6  through people's heads when they do things.
7       Q. The reason that I jumped in as soon as you said
8  accident, I wanted to very clearly remove any question
9  in your mind; because a lot of jurors, the first thing
10 that comes to people's mind is, well, if it was an
11 accident or if it was in self-defense. If anything's
12 constituted a legal defense to the allegation, your job
13 would be to find the person not guilty altogether.
14      A. Right.
15      Q. So that's why I jumped in.
16      A. Maybe I shouldn't use the word accident. I
17 meant, didn't really want to or mean to kill her.
18      Q. Okay.
19      A. You know what I'm saying?
20      Q. Yes. Would it be a fair statement -- am I
21 interpreting what you just said to mean that the
22 circumstances of the very crime for which you have found
23 the person guilty could cause you to feel that a life
24 sentence rather than the death penalty would be most
25 appropriate?

58

1       A. Correct, not whether or not he's guilty, but
2  depending on the -- right.
3       Q. What?
4       A. And him, everything about him.
5       Q. Okay. So do you think in a hypothetical case
6  you could have somebody that's been in trouble before,
7  yet the circumstances of how this particular case
8  occurred could be causing you to view it in a way that
9  mitigation does exist?
10      A. Uh-huh.
11      Q. And potentially, a life sentence would be
12 appropriate?
13      A. Uh-huh.
14      Q. Each case and each circumstance of that case
15 has to be taken on its own merits then?
16      A. Right.
17      Q. What exactly does your daily job as a customer
18 service representative bring you?  What do you do?
19      A. Try to make people happy.
20      Q. Are you good at it?
21      A. Yeah, but I get a lot of -- I'm the brunt of a
22 lot of unhappiness, you know. I have to fix problems.
23      Q. Like a mediator?
24      A. Right, most definitely, that's what I do all
25 day.

59

1    Q.   You like that job?

2    A.   Uh-huh.

3    Q.   You've been doing it about six months?

4    A.   Customer service about six years actually, but

5  at this company, yeah.

6    Q.   Now I notice when it asked, Name three people

7  you respect, you put mom and dad and the co-worker.  Is

8  the co-worker Marlene Farmer.  How come?

9    A.   She's just a very honest, sincere -- she's just

10  a very good person, and she -- yeah, yeah.

11    Q.   She must be somebody that leaves a very lasting

12  impression.  I assume you've only known her about six

13  months?

14    A.   Right.

15    Q.   Real upbeat individual?

16    A.   Yeah, not real outgoing or anything.  She's

17  very real, very real, genuine.

18    Q.   Do you think that's how she would describe you?

19    A.   Yeah.  She might throw in a little outgoing in

20  there.

21    Q.   Okay.  Do you see yourself as a person that is

22  pretty well seated in terms of your beliefs and, you

23  know, you're real comfortable with your own decision

24  with --

25    A.   Who I am?

60

1    Q.   -- decision making abilities?

2    A.   Most definitely.

3    Q.   What type of pressure do you think you would

4  feel if you're listening to a case; say it's a horrible

5  set of circumstances; you hear all this terrible

6  evidence.

7    A.   Uh-huh.

8    Q.   And yet, you really don't believe that the

9  State has proven their case beyond a reasonable doubt.

10  The Judge is going to give you a definition of what that

11  means; but ultimately, you and eleven others will have

12  to decide whether or not the State's evidence matches up

13  properly to that burden.  How are you going to feel

14  about the prospect of you having to say not guilty?  You

15  think that there was a lot of evidence that may have

16  suggested or strongly hinted at a defendant's guilt; and

17  then you have to, you know, go to work the next day.

18  And maybe somebody says, Hey, Lynne, how did that case

19  go?  I mean, are you going to feel awkward among your

20  coworkers or maybe your friends or family?   Are you

21  going to feel like you have to explain to them why you

22  reached whatever decision you did?

23    A.   No, because it's my job to make a decision on

24  what evidence is given to me.  So if there is a problem,

25  I can't hold myself responsible for that.

61

1    Q.   A lot of times people react when they see

2  things in the newspaper.  I think we're all -- that's a

3  natural reaction, if you read something in the

4  newspaper; and, of course, headlines, by their very

5  definition, are placed in the paper to grab your

6  attention.

7    A.   Uh-huh.

8    Q.   Would you agree with me, though, that if you

9  were to try and decide a case based on what you read in

10  the news, that may not be the fairest way to go about

11  doing it?

12    A.   No, not all.

13    Q.   You know, I look back.  And one of the examples

14  I always like to use is the situation years ago in

15  Washington, where then President Reagan was getting out

16  of the vehicle, or walking towards a vehicle, and John

17  Hinkley was charged with attempting to kill him.  And

18  here we have a case tried in the nation's capital.

19  Different people come in from different walks of life.

20  They listen to the case, and they ultimately find this

21  individual not guilty by reason of insanity.  Do you

22  think that that was an easy decision for twelve people

23  to have to make, knowing full well the president was, in

24  fact, shot and there is no doubt about the fact that

25  this is the man who fired the shots?  But they had to

62

1  decide that case on a legal basis as opposed to a

2  factual basis.   You know, did he do it?   There is

3  something wrong with the man's head, obviously, that

4  caused the jury to make the finding they did.  How did

5  you feel about something like that?

6    A.   I'm sure it would be difficult.  But, you know,

7  I'm sure they went through what I'm going through.  And

8  they had their chance to speak up and say they couldn't

9  feel comfortable with it, so I wouldn't think it would

10  be that hard for them.

11    Q.   You think those are the twelve people that got

12  to listen to all the evidence day in and day out --

13    A.   Uh-huh.

14    Q.   -- rather than maybe the news reporter that was

15  there for the morning session, but missed the afternoon

16  session?

17    A.   Right.

18    Q.   You know, the State oftentimes refers to people

19  as victims, and that conjures up a thought in people's

20  mind right away that they're a victim.  It means that

21  that person has no blameworthiness or has nothing to do

22  with, you know, either contributing to their death or

23  causing their death at all.

24        I want to make sure you understand the

25  indictment.  Nowhere in the indictment does it allege

63

1  that either Mary Carmouche or Terrence Gibson are the
2  victim. They are named as individuals that the State
3  alleges our client was responsible for taking the life
4  of under circumstances that did not constitute
5  self-defense or an accident. But I don't want jurors
6  coming into the case making that assumption, because --
7  and I'm not suggesting that there couldn't be victims in
8  the case. But the question of whether or not a
9  particular defendant is responsible for their death or
10  anything like that is of concern to me. You see where
11  I'm coming from?
12      A.  Uh-huh.
13      Q.  How do you feel about sitting on a case -- you
14  know that the Judge has indicated to you that the burden
15  is always upon the State, and they must prove their case
16  beyond a reasonable doubt. How do you feel about
17  sitting on a case and having to possibly make a decision
18  based on the standard of beyond a reasonable doubt
19  rather than actually making a determination that a
20  particular defendant is innocent? Do you see the
21  distinction between innocence and the burden of proof,
22  beyond a reasonable doubt?
23      A.  Right, right. You mean, if I really thought he
24  was guilty, but the State didn't have enough evidence to
25  prove to me within a reasonable doubt?

64

1      Q.  Yes.
2      A.  I wouldn't be happy, but I would have to decide
3  as the law told me to. It doesn't mean I'd like my
4  decision.
5      Q.  Are you comfortable with that, though? Because
6  obviously, I'm making sure that of the twelve people
7  that are seated on this jury, that I can rely honestly
8  on all the answers they give, and also any commitments
9  they make to me. Mr. McClellan received several
10  commitments from you about following the law. And
11  obviously, I wanted to do the same. I want to make sure
12  you're comfortable. And if you're comfortable with that
13  and you can make that pledge to me, that if it came down
14  to a question of, I didn't feel that the State had
15  established beyond a reasonable doubt the defendant's
16  guilt, or I don't feel that the State has established
17  beyond a reasonable doubt that there is a likelihood
18  that he would be a continuing threat to society, I'll
19  make whatever answers I think the evidence will show?
20      A.  Right, I have no problem with that.
21      Q.  Because I don't think there is any case tried
22  in the criminal courthouse that doesn't call out for an
23  emotional response. This is a very real place. Right
24  now it's not so real, because it's kind of sterile.
25  We're just sitting here talking. So there is a great

65

1  deal at stake, but the pressure that exists during the
2  trial is not the same as it is right now. And I just
3  want to make sure that people understand the distinction
4  and they're comfortable with it?
5      A.  Uh-huh.
6      Q.  Do you think you could realistically conceive
7  of a situation where a person has been found guilty of
8  capital murder, you found beyond a reasonable doubt that
9  that person is likely to be a continuing threat to
10  society; in other words, you answered Question Number
11  One yes, and you would still consider life as an
12  appropriate option or alternative to the death penalty?
13      A.  Yes.
14      Q.  Okay. Because that's exactly what you're going
15  to do if the State establishes this case. You are going
16  to be called upon to determine really just one question
17  at that point. Because you understand that the moment
18  you find a person guilty of capital murder, life is
19  automatic. The only thing that can go from being a
20  life sentence to becoming a death penalty.
21      A.  Right.
22      Q.  And as Mr. McClellan said, you don't undo your
23  verdict. In other words, you get there and you believe
24  that there is mitigation. You believe maybe the
25  circumstances of the crime that you had found the

66

1  defendant guilty of may really cause you to have some
2  confusion, maybe some residual doubt, something about
3  that that leaves the jury with the feeling that, you
4  know, the death penalty is just not appropriate for
5  whatever reason. It doesn't undo the guilty verdict.
6  It merely says life rather than death. And you're okay
7  with that?
8      A.  I'm fine.
9      Q.  Do you think that that is a comfortable option
10  that the Legislature has given you, as a juror?
11      A.  Yes.
12      Q.  Would you include a third option, and would you
13  take away a life sentence and make it mandatory that the
14  death penalty be assessed in situations where a person
15  commits capital murder?
16      A.  No; because then I would be saying there is no
17  circumstances at all, no.
18      Q.  Right. One of the things that I ask people --
19  and see, this is one of those situations where it's
20  unrealistic; because you've never been in trouble
21  before, right?
22      A.  No.
23      Q.  Never been charged with a crime before?
24      A.  I have. I got a speeding ticket.
25      Q.  You could never, in your wildest dreams,

67

1 conceive of sitting in that chair where Mr. Mamou is
2 sitting?
3     A. No.
4     Q. But I'm going to put you there for a moment.
5     A. Okay.
6     Q. I'm your attorney. And the jury has just found
7 you guilty of capital murder, and now we have to proceed
8 to a second stage of the trial. What difference would
9 it make about anything in your life up to that point for
10 this jury to make a decision? Why would you want the
11 jury to know anything about you at all?
12     A. Because if they had a chance to change my
13 punishment from death to life, I would want them to know
14 exactly what happened, what kind of person I am, how I
15 grew up, everything that I could possibly let them know
16 about me so they could make their decision.
17     Q. Okay.
18     A. So they can make a better decision.
19     Q. You see that the sheer weight of the kind of
20 decision that the jury is going to be making if they
21 have found somebody guilty of capital murder demand that
22 nothing less than that be done?
23     A. Uh-huh.
24     Q. I don't want jurors who are going to tell me
25 things like, if you do the crime you got to do the time,

68

1 cliches like that, or everybody needs to be treated the
2 same. That sounds like an inherently fair statement.
3 Would you agree? That sounds right at first, or maybe
4 it doesn't.
5     A. Kind of, but not really.
6     Q. Okay. Because think of somebody --
7     A. Nobody is the same.
8     Q. That's why this is an individualized process.
9 You can't lump people together, and you can't paint with
10 a broad brush. You've got to be real specific, and
11 you've got to look at the situation. You wouldn't want
12 anything less for yourself?
13     A. Correct.
14     Q. And you wouldn't deny that to Mr. Mamou or
15 anybody else?
16     A. No.
17     Q. What type of questions do you have of me?
18     A. None, I guess.
19     Q. Because we don't get to ask any more questions,
20 or you don't get to ask us questions beyond this point.
21 Once we say we're going to invite Miss Cantrell back to
22 sit on the panel on the 29th, we'll talk to you a little
23 more at that time and decide either you're one of the
24 twelve or you go home. Any reason that I should be
25 uncomfortable sitting here, as a defense attorney,

69

1 looking at you and saying, you know, trust the case to
2 her?
3     A. No. Are you?
4     Q. No. But I always give people that option,
5 because you just never know what a person is thinking.
6 And if there is even the slightest hesitation on the
7 part of the juror, you know, this is kind of the time to
8 tell the Judge or us. And otherwise, you get called
9 back for the 29th.
10     A. No, I don't have any other questions.
11     Q. Okay. Thanks a lot.
12     THE COURT: Miss Cantrell, in just a
13 second I'm going to excuse you. Before I do, I want to
14 tell you that we do want you back on the 29th. In just
15 a second I'll give you a piece of paper. And then what
16 we're doing is we're talking to folks. There will
17 eventually be probably about 48. Every single one of
18 you will have been through exactly what you've been
19 through on that day. We'll spend maybe as much as two
20 hours. I can't imagine it would be longer than that.
21 And when we conclude on that day, everybody will leave
22 here knowing definitely whether they are or are not a
23 juror on the case.
24     Between now and the 29th, which I believe
25 to be two weeks from tomorrow, don't you alter your life

70

1 one bit for us. Do your things just exactly like you
2 do. Do your personal things exactly like you do them.
3 If you have a chance to leave town, take the chance and
4 go. All that we ask of you between now and when we see
5 you next is this: Please do not talk about this case
6 with anybody.
7     A. Okay.
8     Q. Please do not permit anybody to talk about this
9 case with you. If there should be any news media
10 treatment regarding this case, avoid it. Anything on
11 the television, refuse to watch it; radio, refuse to
12 hear it; newspaper, refuse to read it. The reason for
13 each of those are five restrictions, at least the three
14 aspects of the media -- and you're talking about
15 everybody else for the purposes of accomplishing the
16 same single objective, and that objective is this: If
17 you do become a juror in the case, that decision that
18 you reach, whatever it winds up being, is to be based
19 exclusively upon information you receive from within the
20 courtroom, and cannot in any way be affected or
21 influenced by anything outside of the court information.
22 So we'll try to make it as pristine as we possibly can
23 from that standpoint.
24     If anybody needs to know where you have
25 been or what -- if anybody wants to know that you have

71

1  been here for three days, that will cover it. That is
2  your personal reminder as to where and when we want you
3  to be the 29th. Nobody else gets one. Be here by 9:30
4  right outside the door; and if we can get started on
5  time, that's a deal.
6           KATHERYNE M. STEPHENS,
7  having been first duly sworn, testified as follows:
8               VOIR DIRE EXAMINATION
9  BY THE COURT:
10     Q.  How are you today?
11     A.  Okay, thank you.
12     Q.  Miss Stephens, first off, let me ask you to
13  remember back to yesterday and the things we talked
14  about yesterday when we were together. Add to it this
15  morning, the things we talked about this morning. Out
16  of everything that we have talked about up to now, do
17  you have any questions at all for me?
18     A.  No, I don't.
19     Q.  Is there anything to this point that we have
20  not yet addressed or touched on that you feel as though
21  we should, because it might have some bearing on your
22  ability to be a juror in this case?
23     A.  No.
24     Q.  You don't possess any secret information?
25     A.  No.

72

1     Q.  Is there anything at all that you can think of,
2  whether it be something about your personal life or
3  whether it be something about your professional life or
4  something about your health or something else, that in
5  any way, in your mind, would interfere with your ability
6  to be a juror in this case during the time frame that
7  we've talked about?
8     A.  The time frame is only in October, so there is
9  nothing in October.
10     Q.  I think that this process is about, primarily
11  for the purpose of accomplishing two things. One, to
12  give you some idea about some of the rules that can come
13  into play. Obviously, as we've talked about, whether
14  they do or do not, it would depend upon what the
15  evidence in the case is. But any rules you've heard us
16  talk about so far about which you have any disagreement
17  or any dispute?
18     A.  No disagreement.
19     Q.  I take it then if you were a juror in the case
20  and if any of these rules we have talked about do come
21  into play, as a juror, you could both follow, as well as
22  enforce those rules?
23     A.  Right.
24     Q.  I think the second thing this phase is about,
25  Miss Stephens, is for you to be sure with yourself, to

73

1  satisfy yourself that if you are a juror in the case,
2  you'll sit back in any one of those twelve chairs and
3  listen to all the testimony that's presented, evaluate
4  however you think, and come up with whatever you think
5  is the right result based upon how you evaluate the
6  information the lawyers give to you. Does that sound
7  like something you can do?
8     A.  Yes.
9     Q.  We talked about the fact that there are two
10  equally available punishments if a person is found
11  guilty of capital murder. One of those available
12  punishments is life. One of those available punishments
13  is death. And we talked about how it was decided who
14  gets life and who gets death, and it's by how the jury
15  answers those questions.
16           Can you see, Miss Stephens, that each of
17  those questions is independent from the other question?
18     A.  Yes, I can see that.
19     Q.  The first -- because they ask for two different
20  things. Now you look at the same body of information,
21  that being the testimony in the case; but it asks you to
22  analyze different things for the purposes of coming up
23  with a different answer.
24           So what I'm saying is just simply because
25  the first question is answered one way, that in and of

74

1  itself does not dictate how the second question is
2  answered.
3     A.  Yes.
4     Q.  Before we begin, do you have any questions?
5     A.  Not yet.
6           THE COURT:  Okay. Mr. McClellan.
7           MR. McCLELLAN:  Thank you, Your Honor.
8               VOIR DIRE EXAMINATION
9  BY MR. McCLELLAN:
10     Q.  Miss Stephens, my name is Lynn McClellan; and
11  along with Claire Conners, we represent the State of
12  Texas in this case. I want you to sit back and relax.
13  We're just going to ask you to share with us, if you
14  will, some of your opinions about certain aspects of the
15  law. I also want to go through your questionnaire and
16  follow-up on some of your answers there and try to get a
17  better idea of what your thoughts are about this
18  process.
19           Can you tell me in your own words what you
20  think about the death penalty?
21     A.  What I believe is that it is necessary for some
22  cases, depending the circumstances.
23     Q.  What kind of cases come to your mind when you
24  think of cases you think the death penalty ought to be
25  available as a form of punishment?

75

1     A.  I think if it was a person who, for example,
2  you know, that killed children and that I believe that
3  they would continue to do that.
4     Q.  Okay.  Anything else come to your mind?
5     A.  Other cases, I think if it was just a case
6  where a person would be a threat to society and I would
7  not want them out for parole anytime --
8     Q.  Okay.
9     A.  -- depending on their backgrounds.  You know,
10  that would depend on the case.
11     Q.  Their backgrounds?
12     A.  And their backgrounds.
13     Q.  You indicated on your questionnaire that you
14  used to be opposed to the death penalty, and you then
15  changed your mind; is that correct?
16     A.  Yes, when I was younger.
17     Q.  Was there anything that caused you to change
18  your mind, where you identify with the point in time you
19  changed it?
20     A.  I was raised to believe it's not right to kill
21  for any reason.  But then as I grew older and, you know,
22  more experienced in life and seeing, you know, through
23  the years cases of crimes committed, then I came to
24  believe that in some cases it is necessary.
25     Q.  Okay.  Now --

76

1     A.  If that is the law, then I would follow the
2  law.
3     Q.  Okay.  Have you ever heard of cases where you
4  heard someone received the death penalty and you said,
5  well, that doesn't sound right; doesn't appear to me the
6  person ought to receive the death penalty for that type
7  of case.  Heard any case you would disagree with?
8     A.  I never heard a case I disagreed with the death
9  penalty.
10     Q.  Did you ever follow the Carla Faye Tucker case?
11  You know, it was -- she was convicted of capital murder
12  here in Harris County.  It's often referred to as the
13  "pick axe murder."
14     A.  Yes, I remember that.
15     Q.  She had this religious conversion and asked for
16  a pardon from the governor at the time her execution
17  came up, and the governor refused to do so.  Did you
18  have an opinion on that case as to whether or not she
19  should have received some type of commutation?
20     A.  I was glad she did not receive a pardon.
21     Q.  Okay.  You are a teacher at Pasadena I.S.D.
22  and, I guess, a teacher throughout Cy-Fair, Spring,
23  also?
24     A.  Yes.
25     Q.  And I saw how one of your degrees, anyway, is

77

1  in special education?
2     A.  Right.
3     Q.  Cy-Fair, at least, you taught high school age,
4  special ed students.  Is that what you currently do in
5  Pasadena or --
6     A.  No.  In Cy-Fair, those were emotionally
7  disturbed high school, and this is a regular high
8  school.  I'm a home economics teacher.
9     Q.  So you're back in a regular classroom?
10     A.  Yes, the regular classroom.
11     Q.  In dealing with the emotionally disturbed
12  students at Cy-Fair, what courses did you teach?  Did
13  you teach a whole curriculum of courses, or how did that
14  work?  When did you have them?
15     A.  We had a self-contained ten to twelve students.
16  They were self-contained.  We had them all year.  We
17  taught them all their high school courses.  Because of
18  their illness, they're emotionally disturbed, they need
19  to stay in that room.  And we were trained to deal with
20  those type of children; so, we taught them all their
21  courses, like science and math.
22     Q.  Now by emotionally disturbed, are you talking
23  about people with psychiatric-type problems or also
24  people with environmental-type problems that may have
25  brought on this emotional instability?

78

1     A.  They were labeled emotionally disturbed,
2  because they couldn't function and learn in a regular --
3  in a learning environment.  They had -- they did have
4  environmental problems, like drug use, abusive parents,
5  and prison.
6     Q.  Right.  So, they were somewhat disciplinary
7  problems, as well, I assume?
8     A.  Yes, they all had -- or most had -- I shouldn't
9  say all, but some of them had violent behavior.
10     Q.  All right.  There was a question in here, it
11  says that anyone can overcome a neglectful or abusive
12  childhood; and you say you generally disagree.  Was that
13  based somewhat on that experience, or why did you
14  generally disagree that someone cannot overcome a
15  neglectful childhood?
16     A.  This is based on -- we have a lot of
17  conferences with psychologists over our students, and
18  there were some cases where we had students that the --
19  that's what the psychologist said, that, you know, there
20  are certain ages, sometimes they can't be turned around.
21  For instance, one of our students was raised in L.A., in
22  a gang environment.  And they said he was sixteen now
23  and -- well, that was -- I'm taking the opinion of the
24  psychologist.  He -- there are some cases that cannot be
25  turned around.

79

1    Q. And obviously, you could hear from
2 psychologists in a case like this. Would you always
3 just accept what the psychologist has to say as being
4 true; or would you be able to examine that and say,
5 well, I'm not sure?
6    A. I would have -- yeah, I took his as being
7 general; so, I would have to look at the individual.
8    Q. Okay. There is a question about, Do you
9 believe that teenagers and young adults change as they
10 grow older? And you say, I think they can change if
11 circumstance and the right support are available, but
12 there are some teens who cannot change after a certain
13 age. Depends on how they were raised, and their
14 backgrounds, and was that opinion based upon just what
15 that psychologist said or based upon some of your
16 experiences in dealing with these children?
17    A. It's based on some of my dealings with students
18 and their follow-up.
19    Q. So, did you ask to follow up with the students
20 after they may have left your school and followed up
21 what they had done later?
22    A. Yes, uh-huh.
23    Q. Question about, Do you have any religious,
24 moral, or personal beliefs that would prevent you from
25 returning a verdict which would result in the execution

80

1 of another human being? And you said, No, but then put,
2 Not if I was certain the person committed the crime and
3 the law required the punishment. You underlined the
4 word certain.
5        Of course, you know now, after the Judge's
6 voir dire, or may have known before that, the burden of
7 proof is on the State. We must prove our case beyond a
8 reasonable doubt. Do you also understand we can -- our
9 burden is not to prove the case beyond all doubt or to a
10 one hundred percent certainty?
11    A. Yes, I understand that.
12    Q. Because I don't think I could ever prove
13 anything beyond all doubt unless you were a witness in
14 the case. And if you were a witness, you couldn't be a
15 juror in the case. So, you'll be given a definition of
16 beyond a reasonable doubt by the Court. And I assume
17 you would be able to follow that and make your
18 decisions?
19    A. Yes. I still -- I understand the definition of
20 beyond a reasonable doubt.
21    Q. Okay. All right. Have you ever been on a jury
22 before?
23    A. No.
24    Q. Okay. You indicated you had read an article in
25 the newspaper about what crimes are given the death

81

1 penalty. Anything about that article that affected your
2 opinion about the death penalty?
3    A. No, it just -- I can remember reading that it
4 talked about crimes that were committed along with
5 another crime, and it listed some of them. And I had
6 just never seen that written down before.
7    Q. Okay.
8    A. I had just learned more information.
9    Q. Right. I think you said your niece's husband
10 is a highway patrolman. Do you ever have much
11 interaction with him?
12    A. No. I rarely see him. In fact, they just
13 recently been married.
14    Q. It says a niece is a probation officer. Do you
15 have much contact with her about her job?
16    A. I have some contact with her, but her job is
17 never discussed.
18    Q. Okay. Do you have any doubt about your ability
19 to participate in a process whereby you would be called
20 upon to make a decision; in other words, to answer these
21 questions, knowing that in doing so, in participating in
22 that process, could result in this Judge ordering the
23 execution of the defendant sitting over there on trial?
24 Do you have any doubts about your ability to participate
25 in that type of process and make that type decision if

82

1 that's what the law and the evidence called for?
2    A. I don't have -- you're saying, do I doubt my
3 judgment or --
4    Q. Some people come in and say, I believe in the
5 death penalty; but hey, I could never sit and make that
6 type of decision?
7    A. I believe I could judge based on facts -- I
8 think I can make a decision based on the background and
9 the facts of the case.
10    Q. Facts and evidence?
11    A. And the evidence.
12    Q. You have not heard anything about this case, I
13 assume?
14    A. No. I didn't even recognize the name or
15 anything.
16    Q. Now, the Court told you, and I just kind of
17 want to go over it briefly and make sure you understand
18 what we're talking about. Two parts to the trial, if
19 you will. First part is guilt/innocence. The burden is
20 on us to prove that on a certain date, in Harris County,
21 Texas, the defendant took the life of a certain person
22 in the course of kidnapping or killed two more people
23 during one criminal episode. You can prove either one.
24 Jury would return -- beyond a reasonable doubt -- jury
25 would return a verdict of guilty of capital murder.

**83**

1 They don't have to choose which. Six people could think
2 it's kidnapping/murder. Two people could think it's
3 killing two people in one criminal episode.
4      If you find a person guilty of capital
5 murder, then you go to the punishment stage of the
6 trial. There you may hear evidence about a defendant's
7 character, background, criminal history, or the lack
8 thereof, mental acts or disabilities, the kind of life
9 they grew up in, to kind of know about their social and
10 economic and other type of backgrounds they have.
11      And then you're going to be asked to use
12 all that evidence, both the punishment stage evidence,
13 as well as the guilt/innocence evidence in answering
14 these questions. And Number One asks you if there is a
15 probability that that person would be a continuing
16 threat to future acts of violence. Doesn't say a
17 certainty. Doesn't say it's a possibility. Anything is
18 possible. They use probability, more likely than not.
19 If you believe that's what the evidence shows beyond a
20 reasonable doubt, you answer, Yes.
21      What kinds of information you think is
22 helpful in determining whether or not you believe a
23 person would be, to a probability, a continuing threat
24 to commit future acts of violence?
25    A.  Well, the character and their background. I

**84**

1 think even -- I was trying to think of a case like that
2 when he was talking to us earlier. I think even if
3 their age -- if they were eighty years old when this
4 happened, you know, life sentence, that's forty more
5 years. I was thinking even the simple fact of an age
6 could affect that second question.
7    Q.  Well, I guess the fact it could affect either
8 one. You may think they were a little too old to be a
9 continuing threat anymore to commit future acts of
10 violence.
11      And then the second question asks if there
12 is any reason based -- tells you to look back at the
13 evidence, the crime, the defendant's character and
14 background, their personal responsibility for the
15 commission of the crime, and if you find there are any
16 mitigating circumstances -- what I like to refer to as
17 reasons -- why this person ought to receive life as
18 opposed to death. Gives you an opportunity to look back
19 through all the evidence and say, is there some reason
20 this person's life ought to be spared? Because when you
21 get to that question, you would have already found
22 they're guilty of capital murder. You've already found
23 they're a continuing threat to commit future acts of
24 violence. And now you're trying to say, is there any
25 reason why this person ought to have his life spared in

**85**

1 a life sentence versus death?
2      So, you go back and look at all that
3 evidence to see if there is anything there to prevent
4 you -- if there is, you would answer that question yes,
5 or you would receive a life sentence. If you find there
6 is not anything sufficient, you change your vote from
7 death to life, or you answer it no and the defendant
8 will receive the death penalty. Any problem with that
9 question or that aspect?
10    A.  No, no problem.
11    Q.  Do you want to go back and look through all of
12 that?
13    A.  Yes, I think it would be necessary to go back
14 and look through the evidence.
15    Q.  Anything that comes in your mind that you
16 think, well, if I heard evidence of this, whatever that
17 might be, that would, in my mind, always be mitigating.
18 In other words, you could always give me at least a
19 reason to give this person life as opposed to death.
20 Anything that comes to your mind and says, well, if I
21 heard this, that would always be a bell ringing for me
22 to say this person ought to get a life sentence.
23    A.  I can't think of anything now, except for that
24 age thing.
25    Q.  Okay. All right. And in looking at this type

**86**

1 of information, you go back and you can consider, one
2 juror might say, because of the age of a person, I think
3 it's going to be a mitigating factor, you know. It's a
4 reason to give that person life as opposed to death.
5      Somebody else on the other side may say, I
6 don't think that has any effect at all. I know lots of
7 people, whatever the age may be, they don't commit
8 capital murders. I don't think age has anything to do
9 with it. You know, I think one thing that I would
10 suggest to you would be -- in an appropriate way of
11 viewing it -- would be if someone said, well, because
12 you know that life sentence means forty years day for
13 day, if you factor that in and say, okay, he's a certain
14 age -- let's say he's fifty years old. He's going to go
15 forty years day for day. He's going to be ninety; so
16 I'm going to give him life as opposed to death, because
17 there is not any difference. That would be, I suggest,
18 an inappropriate way of using that. I don't think that
19 fits into answering any of those questions; because
20 those questions determine, is he a continuing threat?
21 And it doesn't matter. He might be for the next --
22 doesn't say he was a continuing threat after he gets out
23 after forty years. Doesn't say that. It says as he
24 sits -- basically, I suggest to you, my interpretation
25 is as he sits there that day.

87

1      A.   Okay.

2      Q.   Can you assure me that that fact, a person

3  would serve forty years day for day in a life sentence

4  wouldn't be a factor you would then factor in to answer

5  the questions?

6      A.   Ask me that again.

7      Q.   If knowing -- in other words, if somebody says,

8  I know --

9      A.   Would I use that -- I can assure you -- you're

10  saying -- I just need to repeat this for myself.  Are

11  you asking me would I use that age thing?

12      Q.   The fact a person would do forty years day for

13  day is something the Court has told you if they get a

14  life sentence.  The only way that can be considered in

15  answering those questions is to already know the answer

16  to one of the questions, and then --

17      A.   Yes, I understand what you're saying, yeah,

18  that wouldn't be the right thing.

19      Q.   Any questions you have of me?

20      A.   No.

21      Q.   All right.  Thank you very much?

22           MR. MCCLELLAN:  And I'll pass.

23           THE COURT:  Thank you.

24           Mr. Hill?

25           MR. HILL:  And I thank you, Judge.

88

1                VOIR DIRE EXAMINATION

2  BY MR. HILL:

3      Q.   Hi, Miss Stephens.  My name is Wayne Hill.

4  Kurt Wentz and I both represent Mr. Mamou in this case.

5  I'm going to sit up here, because that ledge gets in the

6  way.  And I just want to talk to you a little bit, take

7  a few minutes to go over some things in your

8  questionnaire.  Obviously, the State has had an

9  opportunity to visit with you and find out some thoughts

10  that you have.

11           I am going to ask you some questions, and

12  I want to let you know fairly ahead of time that there

13  might be some questions that I ask that go into some

14  things on the questionnaire.  And I don't mean to make

15  you feel uncomfortable or feel like we're picking on

16  you.  That's why we do these individual voir dires

17  outside the presence of everybody else.  It gives us an

18  opportunity to ask you some questions.

19           If there is a question that I'm asking you

20  that you're just real uncomfortable answering, just let

21  me know and we can decide whether we need to go any

22  further or not.  Okay?  Because all I'm looking for is

23  to, in twenty minutes, be able to figure out whether or

24  not you should be sitting on this jury with eleven other

25  people.  We're going to speak to hundreds of people to

89

1  get twelve people.  People come from all different walks

2  of life, have different feelings about different issues.

3           It's incumbent upon us to try to find out

4  any issues that you might feel, either if they're ones

5  that the State wants to know about you or the defense

6  knows about before we sit you on the jury; because it

7  does no good if we don't ask you the questions and you

8  sit on the case and then you figure out for the first

9  time, oh, gosh, I wish I had mentioned something to

10  those guys; because this is really important for them to

11  know about you, okay?

12           So, if there is anything you can think of

13  at the outset that I should ask you or that you would

14  like me to know that you think is important to the case,

15  please do so.  Anything at all that you can think of?

16      A.   You mean, about this case in particular?

17      Q.   This case, maybe feelings that you have about

18  criminal cases in general, the death penalty in

19  specific.  Anything, at all that you can think of that

20  you think me, sitting here as a defense attorney

21  representing a man that's charged with capital murder,

22  should know?

23      A.   I can't think of anything right now.

24      Q.   If you think of something, let me know.  You

25  made several comments in response to Mr. McClellan's

90

1  questioning you about the generally disagree with the

2  proposition that people can overcome a bad childhood.

3  And you said --

4      A.   Well, I just meant there are some -- I believe

5  there is some who can and then --

6      Q.   Right.  What did you mean by the die is cast?

7  What does that mean?

8      A.   I don't think I said those words, did I?

9      Q.   Okay.  I thought you said that one of the

10  psychologists --

11      A.   Oh, okay.

12      Q.   That you were referring to kind of "the die is

13  cast and they can't be turned around" were the phrases

14  that I noted down here.  And I may be paraphrasing a

15  little, but what does that mean?

16      A.   It means that he'll always be a threat to

17  society.  That was my interpretation.

18      Q.   Does that necessarily mean that that person's

19  childhood should not be even considered when it comes to

20  the punishment stage of a capital murder trial?  In

21  other words, if you also know a person is going to be a

22  threat to society, in all fairness, would it make any

23  difference what the person's childhood was like, you

24  know, whether they had a good childhood or bad

25  childhood?  Should that make any difference to a jury's

91

1    evaluation of whether or not to assess the death penalty
2    or life in prison?
3        A.  Oh, I think that we couldn't decide whether
4    that would be the case beforehand.  You would have to
5    look at -- is that what you're asking me?
6        Q.  Right.
7        A.  I don't think you decide about any person
8    unless you looked at all the evidence --
9        Q.  Okay.
10       A.  -- and their past character.
11       Q.  Are you of the opinion --
12       A.  And I wasn't saying that that was just a
13   general statement that there may be -- it's possible, I
14   think.
15       Q.  Okay.  What is your impression of a statement
16   that if a person is found guilty of intentionally taking
17   a life of one or more persons in the same criminal
18   transaction?  In other words, they intend to kill two
19   people and they do so, and you further find after
20   evaluating the evidence that that person is going to be
21   a continuing threat to society.  Is there really any
22   circumstance that would cause you to feel that a life
23   sentence would be appropriate for that type of person?
24   Or in all fairness, do you in all fairness feel like
25   there could never be any mitigating circumstances that

92

1    would cause you to feel that a life sentence is the
2    appropriate answer?
3        A.  Oh, I believe there could be mitigating
4    circumstances.
5        Q.  I believe Mr. McClellan even asked you, he
6    said, What evidence would be helpful in answering the
7    first question?  And then he said, Is there any evidence
8    that would automatically cause you to answer Number Two
9    yes?
10           I'd like you to tell me what type of
11   evidence you, as an individual juror, would find helpful
12   in evaluating Question Number Two and arriving at an
13   answer.  What type of evidence would be important for
14   you to know about the case or the defendant before
15   deciding whether that person should receive life or
16   death?
17       A.  And that's after we've already decided that he
18   is a threat?
19       Q.  Uh-huh.
20       A.  Or she's a threat?
21       Q.  Yeah, because you wouldn't get to that question
22   if you hadn't already found them guilty beyond a
23   reasonable doubt.  You already found beyond a reasonable
24   doubt he's going to be a threat to society.  Now you're
25   deciding life or death.  So what type of factors --

93

1    because really at that point, you're a step away from
2    assessing the death penalty.  That Question Number Two
3    is only going to cause you to say, well, we're going to
4    go back to life.  We're just going to go life instead of
5    death.  So, I guess I'm looking for the type of factors,
6    the type of evidence that would be helpful for your
7    evaluation of a life sentence.
8        A.  Okay.  Threat to society could be acts of
9    violence that are not even to do with murder; is that
10   correct?
11       Q.  That's correct.
12       A.  Well, that could factor in if I felt that he
13   wouldn't or she wouldn't commit murder, but other acts
14   of violence, you know, maybe like if they were just, you
15   know, not serious as that.  That could be.
16       Q.  That really goes to Question Number One.
17       A.  Oh, it does.
18       Q.  Question Number One asks you do you believe
19   this person is going to be a continuing threat to
20   society?  You've already gotten past that question.
21   You've already answered it, yes, I believe that person
22   is going to be a threat.
23       A.  Okay.
24       Q.  So my question is, what type of evidence would
25   you want to hear?  What type of evidence would be

94

1    helpful as you sit there saying, I'm either going to
2    decide he receives a death penalty or life?  And we
3    already know that the only thing that's going to happen
4    to remove the death penalty is for you to find some
5    mitigating evidence or mitigating circumstance or
6    circumstances to, in your mind, justify life over death
7    for that person.
8            And I'm trying to get a feel for if there
9    was some evidence you would like to hear that would help
10   you answer that question, knowing you've already found
11   the person guilty beyond a reasonable doubt of capital
12   murder, knowing you've already found beyond a reasonable
13   doubt he's going to be a continuing threat to society.
14       A.  Okay.  As I understand it, to answer Question
15   Number Two, you have to look back over the actual crime
16   itself, plus their background, plus their character.
17       Q.  But is there something in particular of those
18   circumstances that would be especially important for
19   you, personally?  What would be a deciding factor, if
20   there is one, that would say to you life over death?  Is
21   there some overriding issue in a case that would pretty
22   much sum it up for you?
23       A.  To be honest, I don't know.  I would have to
24   look.  I don't know.
25       Q.  Why didn't you think that it was a good idea

95

1  for Carla Faye Tucker to get a pardon?  When
2  Mr. McClellan asked you that question, he said, Did you
3  feel like that was a good decision?  You said it was
4  good she didn't get a pardon.  And I guess I wanted to
5  kind of talk with you a little bit about why you felt
6  that way.
7      A.  Because I think because of the nature of the
8  crime, and no one knows for sure if she really had this
9  change.  You know, it could be in her mind she could
10 have that change.  But what if she didn't really, you
11 know?  And I wouldn't want to change the decision;
12 because I think it's important to keep the first
13 decision and not get pardoned, because that sets a
14 precedent for other cases.
15     Q.  Do you think people are incapable of change?
16     A.  I think it's possible they can change.
17     Q.  Are you suspicious of the fact that maybe this
18 was all made up on her behalf to try and gain favor and
19 sympathy?
20     A.  I was suspicious.
21     Q.  So I take it if you had been governor for the
22 day, you would have done the same thing that Governor
23 Bush did in denying a pardon?
24     A.  Yes.
25     Q.  Okay.  You made a comment in answering one of

96

1  the questions on the questionnaire.  It asked you your
2  feelings about, do you have any religious, moral, or
3  personal beliefs that would cause you to return a
4  verdict or have problems returning a verdict of guilt or
5  innocence for somebody being accused.  And you said, Not
6  if I was certain the person committed the crime, which
7  is what Mr. McClellan asked you.
8          And then it said, And the law requires the
9  punishment -- do you understand the law doesn't require
10 any particular punishment in a case like this?  That's
11 up to the jury to decide?  You're not going to have any
12 set punishment that the law says you must assess, other
13 than life or death.  But it's not, if you find these
14 factors, it will always be life or it will always be
15 death.  You're going to have to make that decision.
16     A.  I understand that now, yes.
17     Q.  Okay.  In your opinion, what is the best
18 argument against the death penalty?
19     A.  The moral code of "Thou Shalt not kill."
20     Q.  You're meaning that from the perspective of a
21 juror, you're concerned that you may not have that
22 authority, the moral authority to take another person's
23 life?  I'm trying to interpret what you meant by that.
24     A.  You know, I remember that was a hard question
25 to answer.  That's all I could think of is the best

97

1  argument against it; because other than that argument, I
2  couldn't think of another argument against it.  I mean,
3  I'm trying to be honest in saying that.
4      Q.  Okay.  What about the -- and this is one of
5  those areas where I kind of hesitate a little bit; but I
6  want to ask, you said that you -- you had asked about a
7  divorce and talked about an emotionally abusive
8  situation.  Did that spill over at all onto the kids?
9      A.  Yes.
10     Q.  Okay.  How was that reflected?  I mean, were
11 any of the children -- did they require any kind of
12 counseling or anything like that to get through that?
13     A.  Yes, we did.
14     Q.  Do you feel like that has left its mark on any
15 of the three children, even to this day?
16     A.  Yes.
17     Q.  Okay.  Is that reflected in perhaps how they --
18 are any of them -- are you a grandmother yet?
19     A.  Yes, uh-huh.
20     Q.  Do you see anything they're doing with their
21 own children that reflects the impact that that had on
22 them?  In other words, that they've learned perhaps from
23 that situation and not repeating it?  Because I'm
24 assuming when you say the emotionally abusive situation,
25 that had to have a negative effect on them.  I assume as

98

1  they were younger, it had more of a negative than a
2  positive effect on them?
3      A.  Yes, and do I see that coming out with the way
4  they're taking care of the children?
5      Q.  Right.  In other words, have they learned that
6  perhaps?
7      A.  One of them has learned to yell at her child.
8  I think she -- I believe that's where she got the
9  yelling at the child.  But that's the only thing that I
10 see evidence.
11     Q.  Okay.
12     A.  And the only other evidence I see from my
13 children is they do not have good judgement in choosing
14 mates, because -- and I don't know if it's because they
15 had an abusive father or -- but I think they're getting
16 better.
17     Q.  How would you feel sitting on a case like this?
18 Is that a -- are you comfortable having to sit and judge
19 a case of this magnitude; or do you feel like it would
20 make you feel uncomfortable, make you uneasy to have to
21 sit in judgment of somebody with this type of case?
22     A.  I think that I would feel okay with doing it.
23 I would just know that going into it, it would be
24 something very important.  It's a major decision, and I
25 would be very careful and consider everything.

99

1    Q.  One thing that you put in there was that you
2  believe that drugs causes a person to commit crimes.
3    A.  Yes.
4    Q.  Not that it excuses their conduct; but that you
5  see a direct correlation between somebody that is on
6  drugs, in that drug culture, versus somebody that's not?
7    A.  Yes, I believe that sometimes even if there is,
8  you know -- of course, we all -- I think we all have the
9  possibility to commit crimes.  I think drugs, some
10 people might give them -- you know, they have more
11 courage, or I don't know what to say.  They just don't
12 have good judgment during that time when they're under
13 the drug, the influence.
14    Q.  Do you think that whole drug culture can make a
15 deep impact on somebody and how they look at society and
16 the rules that everybody else lives by?
17    A.  Or maybe --
18    Q.  Do you think they view things differently?
19    A.  Yes, and I believe that maybe that's why
20 they're in that culture; because maybe they already view
21 it differently.
22    Q.  Okay.
23    A.  I'm not sure.
24    Q.  Who is your friend in the D.A.'s Office in Fort
25 Bend?

100

1    A.  His name is -- I know him through my boyfriend,
2  so hang on.  I'll think of his name in just a second.
3    Q.  That's okay.
4    A.  For some reason, it's not someone I see a lot,
5  but we see him socially.
6    Q.  My only --
7    A.  Glen.  It's Glen something.
8    Q.  Glen Cook?
9    A.  It might be.
10    Q.  Yeah, little husky, tall?
11    A.  Oh, very husky.
12    Q.  Yeah.  He used to work in my office.  He used
13 to be in the D.A.'s Office.
14    A.  His wife is expecting twins now.
15    Q.  Yeah?
16    A.  Yes.
17    Q.  Well, I don't know if they're expecting twins.
18    A.  Yes, they are.  And I hope that's not a secret.
19    Q.  I won't tell if you don't.  The last question
20 is -- we look at these questionnaires.  We try to pick
21 up on things that might signal to me, as a defense
22 lawyer, to be concerned, be wary of the fact that maybe
23 there are some things that you need to visit with the
24 juror about.
25            And I'd ask you whether or not you ever

101

1  felt uncomfortable with the prospect of being
2  victimized, breaking in while you're at home.  And you
3  specifically said the possibility of, like, a sexual
4  assault.  Has there ever been a situation where that's
5  been an issue for you, or just the overriding concern
6  that that personal invasion and somebody breaking into
7  your home and something like that -- has there ever been
8  a personal experience that we should be aware of --
9    A.  No, sir.
10    Q.  -- as to why you answered that question?
11    A.  I think that's just a fear that women have,
12 even though I know that it did happen to my daughter;
13 but only it was more like a date type of thing.
14    Q.  You're the only one that can answer this
15 question, and there is no right or wrong answer.
16    A.  Okay.
17    Q.  But I want you to understand that the
18 indictment in this case alleges Mr. Mamou abducted a
19 woman and caused her death.  Okay.  And only you can
20 tell us whether or not there is anything that strikes so
21 close to home that if you're, for even a minute, are
22 going to feel like, you know, maybe I'm not comfortable
23 and maybe I couldn't really fairly judge a case like
24 this because I'm going to think back to my daughter's
25 situation, we just need to know that.  And whatever your

102

1  answer is is fine, but we just want to make sure we know
2  what it is before we evaluate whether we place you on
3  the jury or not.  How do you feel about that?  Do you
4  feel like there would be some concern about you being
5  able to presume him innocent, knowing the nature of the
6  allegation against him and maybe looking back on the
7  situation that your daughter experienced?
8    A.  Well, I can see right now it's not the same
9  situation at all.
10    Q.  Okay.
11    A.  So --
12    Q.  So your answer would be that you don't have a
13 problem?
14    A.  I don't have a problem.
15    Q.  Or you feel like that's not something --
16    A.  I don't feel like that's connected.
17    Q.  And I can rely upon that, and so can the State?
18    A.  Yes.
19    Q.  That neither one of us have to think while
20 you're back there deliberating the case that all of a
21 sudden, thoughts are going to go through your mind that,
22 you know, my daughter experienced a situation with a
23 man, anything along those lines?
24    A.  No, there is no problem with that.
25    Q.  Was there anything else you wanted to say?  I'm

103

1    not trying to cut you off. I just want to know --
2    because you're the only person that knows. Is there
3    something inside, anything at all, that you need to tell
4    the Judge or us about you or about experiences that
5    really, when you really have to examine yourself
6    inwardly you say, You know what? I can't be fair on
7    this case. Not because I'm not a good person; but I
8    have a strong feeling as to a particular issue, and I
9    might not be so suited to sit and listen to this case?
10       A.  I think I could be fair.
11       Q.  Do you have any questions of me?
12       A.  No.
13       Q.  Okay. Thank you.
14           THE COURT: Thank you, sir.
15           Miss Stephens, in just a second I'm going
16   to excuse you. Before I do, I will tell you that we
17   want you back Wednesday, the 29th, being two weeks from
18   tomorrow. We are talking to folks individually for the
19   purposes of creating a pool or a panel of about
20   forty-eight people, everybody, every single one of whom
21   have been exactly through what you've been through.
22   We'll get everybody back on the 28th, start at 9:30, be
23   through by noon. When we're through on the 29th,
24   everybody will leave here knowing definitely whether
25   they are or are not on the case.

104

1            Between now and then, don't alter your
2    life one bit for us. Do your business thing like you
3    would do. Do your personal thing just like you would
4    do. If you have a chance to leave town, take the chance
5    and go. All that we ask of you between now and the next
6    time we see you is this: Please do not talk about this
7    case with anybody. Please do not permit anybody to talk
8    about this case with you. If there should be any news
9    media treatment about the case between now and when we
10   get together next, avoid it. Anything about the case on
11   the television, refuse to watch it. Newspaper, refuse
12   to read it. Radio, refuse to hear it.
13           The reason, Ms. Stephens, for each of
14   those five restrictions is to attempt to accomplish the
15   same goal. And that is this: If you do become a juror
16   in the case, the decision that you reach, whatever it
17   winds up being, has got to be based exclusively upon the
18   information you received from within the courtroom.
19   Cannot in any way be affected or influenced by any
20   outside of the courtroom information, so that's why we
21   try to keep you away from all that stuff.
22           If you need something for the folks to
23   show them where you have been for the three days you
24   have been with us, that will take care of that. This is
25   a reminder note as to the where and when we want you to

105

1    be back, which is right back out here where you were
2    this morning, by 9:30. Before you leave, have you any
3    questions?
4            VENIREPERSON: No.
5            THE COURT: Thank you very much. You are
6    excused. See you in a couple of weeks.
7            DAMIETTA L. LANDRY,
8    having been first duly sworn, testified as follows:
9            VOIR DIRE EXAMINATION
10   BY THE COURT:
11       Q.  Miss Landry, first off, let me ask you this:
12   You remember back yesterday and all the things we talked
13   about? Add to it this morning and the things we talked
14   about. Out of everything that we have talked about so
15   far, do you have any questions at all from me?
16       A.  No.
17       Q.  Is there anything to this point we have not
18   talked about, touched on, that you think we ought to
19   talk about because it might have some wearing on your
20   ability to be a juror in this case?
21       A.  The only question was the last question, that I
22   feel like I might know some of the family members.
23       Q.  Okay. The family members of who?
24       A.  I think it would be the Carmouches', because
25   that's not a common name.

106

1    Q.  I understand. Well, let's talk about that.
2    Let's just assume that during the course of the trial,
3    family members do testify. May very well be that one of
4    them you do know. Let's assume that you do. How would
5    that affect your ability to be a fair juror in this
6    case? Would it have an effect?
7        A.  No, I don't think so.
8        Q.  Do you know the family members -- is your
9    relationship with them, whoever they might be, assuming
10   they are within the same family; we don't know that --
11   but is your relationship or your association with them a
12   close relationship?
13       A.  No.
14       Q.  Just more of an acquaintance than anything
15   else?
16       A.  More of an acquaintance.
17       Q.  Don't socialize?
18       A.  My daughter may have attended a birthday party
19   once several years ago.
20       Q.  All we can do is inquire, Miss Landry, because
21   you're the one who possesses all the information that
22   we're receiving.
23       A.  Right.
24       Q.  And the information we're seeking is this: If
25   it were to be you did know one of the family members,

107

1  would that in any way interfere with your ability to be
2  a fair juror to each side --
3      A.  No.
4      Q.  -- to evaluate the testimony as you heard it
5  and come up with what you think is the right result?
6      A.  No, it wouldn't.
7      Q.  Is there anything at all, Mrs. Landry, whether
8  it be something about your personal belief or something
9  about your professional life, whether it be something
10  about your health or something else unrelated that you
11  can think of that in any way might interfere with your
12  ability to be a juror in this case during the time frame
13  that we talked about?
14      A.  No.
15      Q.  In terms of these rules that we have spent some
16  time yesterday and today talking about, is there
17  anything that we've touched on about which you find you
18  have no disagreement?
19      A.  No.
20      Q.  So if any of these rules did come into play, as
21  a juror, you could both follow, as well as enforce them?
22      A.  Yes.
23      Q.  I think another aspect of this phase of the
24  trial is meant for you, as a prospective juror, to
25  satisfy yourself, for the defense to be satisfied with

108

1  themselves, that if you were a juror in the case, you
2  would just simply sit back in those chairs and listen to
3  all the testimony that's presented, evaluate however you
4  see fit, and come up with what you think is the right
5  result to reach based upon the evidence in the case.
6  Does that sound like you?
7      A.  Yes.
8      Q.  Before we begin, do you have any questions for
9  me?
10      A.  No.
11          THE COURT:  Mr. McClellan.
12          MR. MCCLELLAN:  Thank you, Your Honor.
13              VOIR DIRE EXAMINATION
14  BY MR. MCCLELLAN:
15      Q.  My name is Lyn McClellan.  Along with Claire
16  Conners, we represent the State of Texas in this case.
17  I want to go over your questionnaire and follow up on
18  some of your answers there.  I want to talk to you about
19  certain aspects of the law that might apply in a case
20  like this and get your feel for how you think those
21  work, whatever.
22          But first of all, just let me ask you
23  this:  Can you tell me just in your own words what you
24  think about the death penalty?
25      A.  Personally, I think the death penalty is needed

109

1  in some cases.  It's not something that I would do in
2  all cases.  It just depends on the circumstance.
3      Q.  All right.  What kind of cases come to your
4  mind when you think of cases where you think the death
5  penalty ought to be available as one of the forms of
6  punishment?
7      A.  Mass murderer, serial killers, people who just
8  kill with no thought.  I mean, they have no thought --
9  no value of human life.  They just kill to kill.
10      Q.  Right, okay.  Obviously, Oklahoma City bombing,
11  something like that, might come to mind.  Obviously,
12  this is not that type of case.  A person could also,
13  though, kill just to kill, and kill four people and not
14  be -- you know, not be a mass murderer.  The quantity of
15  people, I guess killed, does that play a factor to you?
16      A.  It would be the intent.
17      Q.  Attitudes and why they did it, right?
18  Disregard for the life when they're doing it?
19      A.  Right.
20      Q.  There is a question in here about your opinion
21  concerning the death penalty.  And it says, What are
22  your feelings about the death penalty?  And you said, I
23  personally do not believe I could take a life, but I
24  believe the punishment should fit the crime.  Now I --
25  can you tell me what you meant by saying that?

110

1      A.  I don't think I could be the person that sat
2  there and gave the lethal injection.  Or given the
3  circumstances, I don't think I could personally kill
4  someone.
5      Q.  Like self-defense?
6      A.  Self-defense kind of situation, but I believe
7  the death penalty is reasonable in some cases.
8      Q.  All right.  Do you have any doubts about your
9  ability to participate in a process whereby you might
10  serve as a juror, listen to the law, and be given
11  questions to answer, knowing that the answers that you
12  give may well result in this Judge -- or in the
13  execution of the defendant sitting over here on trial?
14  Do you have any doubts about your ability to participate
15  in that type process and make that type of life and
16  death decision, if that's what the law and the evidence
17  called for?
18      A.  No.
19      Q.  Could you do that?
20      A.  I could do that.
21      Q.  Has there ever been a period of time in your
22  life where you opposed the death penalty, thought you
23  shouldn't have it, immoral, against my personal,
24  religious, philosophical beliefs; just ought to be
25  something that should be done?

111

1      A.   Maybe when I was a lot younger, maybe in my
2   twenties, college years.
3      Q.   How did you come about going to college in
4   Massachusetts and then to Oklahoma and Kansas?
5      A.   My history teacher's wife went to Smith, and so
6   he sold me on going to Smith.
7      Q.   I assume you're a teacher then?
8      A.   Teacher got me into it; and then I married a
9   person in the Army, and that's how I ended up at Fort
10  Sill and Fort Riley.
11     Q.   That's where you started your tour of the
12  United States?
13     A.   Right.
14     Q.   Now you also mentioned in your questionnaire
15  that you have a cousin who had been shot?
16     A.   Yes.
17     Q.   Can you tell me something about that?
18     A.   I really don't remember a lot about it, because
19  I was young.
20     Q.   Okay.
21     A.   But they were -- I want to say it was at a
22  party or something, and they may have been playing
23  Russian Roulette.
24     Q.   Was this cousin older than you were?
25     A.   Yes, yes.  I was probably somewhere between

112

1   seven and ten maybe, and the cousin was in the teens.
2      Q.   Okay.  All right.  You also said recently a
3   family friend's son was killed, and allegedly robbery
4   was the motive?
5      A.   Yes.  And the more I thought about it, I've
6   been in two situations like that in probably the last
7   two years.
8      Q.   Is that right?
9      A.   Two of my board members lost sons.  One to
10  gambling; someone shot him over a dollar.  And then
11  recently -- the motive wasn't determined.  They just
12  found his body in his house.  But according to the
13  community, it was over gambling and drugs.
14     Q.   Okay.  Now this was -- these were friends of
15  yours or people you knew?
16     A.   Yes.
17     Q.   Now, with either case, has anyone been charged
18  with those crimes?
19     A.   I'm not sure.  I'm not sure.
20     Q.   Are those the kinds of crimes people end up
21  killing somebody over drugs or killing somebody over a
22  dollar that you think shows a disregard for life that
23  maybe the death penalty ought to be meritorious for
24  their consideration or not?
25     A.   I can't say, because I don't know what the

113

1   circumstances really were of the situation; so, sir, it
2   could be and then it couldn't be.
3      Q.   Right.
4      A.   Because I don't know any details.  I don't even
5   know if they went to court in the first one.
6      Q.   Right, okay.  You say both of these have
7   occurred over the last two years?
8      A.   One was about three weeks ago, and then the
9   other one was probably about two to three years ago.
10     Q.   All right.  The one two weeks ago was the one
11  where the guy was found?
12     A.   In his home shot, uh-huh.
13     Q.   There is a question about, anyone can overcome
14  a neglectful or abusive childhood.  You said you
15  generally agree with that.
16     A.   Yes.
17     Q.   What do you think is required in order to do
18  that, to overcome an abusive or neglectful childhood?
19     A.   Change of environment, people in the community,
20  citizens helping, like with the YMCA that I work for,
21  giving them alternatives to that abusive family, places
22  to go to get away from it.
23     Q.   And what is your job with the YMCA?
24     A.   I'm the executive director; so I'm management,
25  but I supervise about thirty staff people.  We run new

114

1   sports programs, child care programs, teen outreach,
2   that kind of thing.  We collaborate with a lot of
3   different groups in our community.
4      Q.   You indicated that on prior jury service that
5   you had been on both civil and criminal juries?
6      A.   Yes.
7      Q.   Do you remember what kind of criminal jury you
8   were on?
9      A.   No.  It wasn't -- it wasn't capital murder.
10  That's for sure.  But it was -- it had to have been some
11  type of robbery or theft, and they plea bargained before
12  we got to go to trial.
13     Q.   All right.  So, you didn't actually hear
14  evidence?
15     A.   No.
16     Q.   And is that the only criminal case?
17     A.   The only one I remember.
18     Q.   All right.  Let me talk to you for a moment
19  about the -- what happens in a capital murder case.
20  Obviously, as the Court indicated to you, the first
21  thing a jury decides is the guilt or innocence of a
22  defendant.  The Court will give you a charge, which will
23  basically set out that the defendant was charged with
24  having committed a certain crime in Harris County,
25  Texas, on a certain day, killing a certain person,

115

1  during the course of kidnapping or killing two or more
2  people during one criminal episode. And both
3  allegations are alleged.
4          The jurors' responsibility is to determine
5  if either or both of those occurred. Jury doesn't have
6  to agree on which of the two. Just as long as either
7  one of them occurred beyond a reasonable doubt, the
8  verdict would be to find the defendant guilty of capital
9  murder, as charged in the indictment. So, six people
10  could believe it's kidnapping, six people could believe
11  it's two people killed in one criminal episode, or they
12  may all believe both sides.
13          If you've found someone guilty of capital
14  murder, then you go to the punishment stage of the
15  trial. And the punishment stage of the trial is where
16  you hear additional evidence that you did not hear at
17  guilt/innocence. Guilt/innocence, you'll hear about
18  what happened before, during, and after the commission
19  of the crime.
20          Before the crime. Was it a spur of the
21  moment jealousy deal, or was it a preplanned,
22  premeditated, thought out? What happened during the
23  course of a crime, how the person was shot or killed,
24  whatever the manner and means of taking someone's life.
25          What happened after the commission of the

116

1  crime? Was the person, you know, very remorseful; or
2  was he braggadocious, bragging to all the other people
3  about what he had done? That kind of information is to
4  be used in about what happened in the crime.
5          But then you also need -- you'll hear
6  evidence about the individual at the punishment stage of
7  the trial about his character, his background, criminal
8  history, or lack thereof, mental disabilities, type of
9  neighborhood he grew up in, type of school person he
10  was, all kinds of information about the individual.
11  Because at that stage of the trial you are determining
12  what punishment the person ought to receive for a crime
13  that you've already found him guilty of. Okay. And at
14  the punishment stage of the trial, then you're able to
15  consider the evidence that you hear there about the
16  individual, as well as look back at the evidence that
17  you heard about the crime itself in answering the two
18  questions that are up there on the board.
19          First question you get is, do you find
20  from the evidence beyond a reasonable doubt there was a
21  probability that the defendant would commit criminal
22  acts of violence that would constitute a continuing
23  threat to society?
24          First of all, it uses the word
25  probability. Doesn't use the word possibility, because

117

1  anything is possible. Doesn't use the word certainty.
2  Probability, I suggest, means more likely than not. Is
3  it more likely than not that the defendant that we have
4  found guilty of capital murder would continue to commit
5  criminal acts of violence? Doesn't say another murder
6  or capital murder. Those are obviously criminal acts of
7  violence. Could be a murder. Could be a robbery.
8  Could be shooting someone with a gun, didn't die. Could
9  be hitting someone with a fist so hard you would knock
10  them out. Anything that's criminal or violent in
11  nature. Do you think you would be able to determine
12  from the evidence to a probability whether someone would
13  be a continuing threat to commit future acts of
14  violence?
15      A.  Yes.
16      Q.  What kinds of evidence do you think would be
17  helpful in making that type of determination?
18      A.  Their past records, character witnesses, things
19  that they like to do, hobbies, or just general stuff
20  about them and what they have been doing for the past
21  few years.
22      Q.  If you found that someone was a continuing
23  threat, to a probability, to commit future acts of
24  violence, you answer that question yes. Then you go to
25  Issue Number Two. At that time you would have already

118

1  decided that the person was guilty of capital murder.
2  You've decided, in your opinion, he's a continuing
3  threat to commit future acts of violence.
4          And now you're asked to look back at all
5  that evidence and see if there are any reasons, what
6  they call mitigating circumstances, as to why this
7  person ought to receive life as opposed to death. So,
8  you're asked to look back through that evidence and see
9  if there is anything that gives you a reason to change
10  your vote from death to life. If you find things that
11  you think were sufficient to change your mind, then you
12  change your vote and say, yeah, he should receive life.
13  If you don't find anything sufficient to convince you of
14  that, you don't change it and he receives the death
15  penalty. Any problem with that aspect?
16      A.  No.
17      Q.  In looking at that, some people, you go back
18  and look at all the evidence. You may have heard
19  evidence from the trial that -- excuse me -- a person
20  was high on drugs or alcohol when he committed the
21  crime. One juror may say, well, I think that mitigation
22  was a life sentence; because when you get high on drugs
23  or alcohol, you do things you wouldn't ordinarily do.
24          Somebody else may say, well, I don't think
25  it deserves a life sentence; because I know a lot of

119

1  people that have been high on drugs or alcohol before,
2  and they didn't go out and commit any violent crimes or
3  capital murders. I don't see any relationship between
4  that and the commission of a crime. I don't think it's
5  mitigating.
6        Two people that looked at the very same
7  piece of evidence came up with different opinions, and
8  that's okay; because that's what the law asks you to do
9  is you, yourself, to review the evidence. If you find
10 anything that's mitigating, if you think it's
11 sufficiently mitigating to change your answer, you
12 change your answer. If it's not, you don't.
13       Same thing about the age of a person. If
14 you determine that the person was a young age who
15 committed the crime, some person may say, I think that
16 mitigates towards a life sentence. Somebody else may
17 say, well, you know -- somebody may say it's mitigating
18 because when you're young, you do things that you
19 wouldn't ordinarily do, and kind of stupid. You're
20 irresponsible. And as you get older or more mature, you
21 make better decisions.
22       Somebody else may say, well, that may be
23 true; but if he's already committing capital murder at
24 that age, no telling what he'll do down the road. So
25 they don't think it's mitigating. Again, two people

120

1  look at the very same piece of evidence, come up with
2  different opinions. Any problem with this aspect of the
3  law, going back and looking at the evidence and
4  determining whether or not something was mitigating or
5  not and whether the person ought to receive either life
6  or death?
7     A.  No.
8     Q.  Anything that comes to your mind that you would
9  think and say, well, if I heard evidence of this,
10 whatever it might be, that would always be mitigating in
11 my mind. In other words, the thing that sticks out and
12 says, well, if I heard that this happened, that's it; or
13 that will always be mitigating in my mind?
14    A.  No, I don't think so.
15    Q.  Do you think someone who's high on drugs or
16 alcohol and commits a crime ought to still be held
17 responsible for the crime that they committed.
18    A.  Yes.
19    Q.  Okay. Do you think someone who may be less
20 smart than you or I or normal people, but they know the
21 difference between right and wrong? They don't have any
22 problem about that. They just don't have maybe the
23 mental capacity that the normal person has. Do you
24 think they ought to be held responsible for their
25 conduct, as long as they know the difference between

121

1  right and wrong?
2     A.  Yes.
3     Q.  In this questionnaire this was asking you about
4  the best argument against the death penalty. And yours
5  is a religious one, that God is the only one that can
6  sit in judgment. And those who are free from sin should
7  judge none -- should judge none of us, or without making
8  some wrong decisions. In your religion that you have,
9  does your church have a position on the death penalty?
10    A.  I suppose they do, but I can't just tell you if
11 they're dead set against it or dead set for it. I think
12 there is probably a balance of most of the people that
13 attend my church, their opinions.
14    Q.  Right. Let's say if you found out that the
15 pastor of your church, though, was opposed to the death
16 penalty after you became a juror in case like this,
17 would that affect your ability to serve as a juror?
18    A.  No, it wouldn't. But the pastor happens to be
19 my father, so it would not matter. We differ on a lot
20 of things, so it wouldn't matter.
21    Q.  Well, that's some information I didn't know
22 there. Where is your father a pastor at?
23    A.  Mount Pleasant Missionary Baptist Church. It's
24 in the Acres Home area.
25    Q.  Landry. Okay. All right. I didn't know that.

122

1  Do you have any brothers or sisters?
2     A.  I have a brother who is, I want to say,
3  thirty-three; and he's autistic.
4     Q.  You mentioned that. Does he live here in
5  Houston area?
6     A.  He lives with me.
7     Q.  He does?
8     A.  Yes.
9     Q.  Does he work outside of the home?
10    A.  Yes, he does.
11    Q.  Okay. Anything that you can think of that you
12 think I should know or we should know that would affect
13 our decision in deciding whether or not you ought to be
14 a juror?
15    A.  No, I don't think so.
16    Q.  All right. You want to be a juror?
17    A.  Yes.
18    Q.  Okay. Why?
19    A.  Because I think it's my duty. I -- the right
20 to vote, the right to serve on a jury, those kinds of
21 things are important to me. I think that it's a
22 privilege. It's something everybody ought to want to do
23 at least one time, you know, do your duty.
24    Q.  Okay. Now you had mentioned -- just one last
25 thing -- that the name Carmouche comes to your mind?

123

1      A.  Yes.
2      Q.  It's kind of an unusual name.  If you were to
3    learn after you became a juror in the case that, in
4    fact, the person named in the indictment with the name
5    of Carmouche is, in fact, the person that you knew and
6    maybe that your daughter went to her birthday party,
7    would that keep you from being a fair and impartial
8    juror in this case?
9      A.  No.
10     Q.  All right.  Thank you very much.
11         MR. MCCLELLAN:  I'll pass the
12   venireperson.
13         THE COURT:  Thank you.
14         Mr. Hill.
15         MR. WENTZ:  Actually, it's me.
16         THE COURT:  I'm sorry, Mr. Wentz.
17             VOIR DIRE EXAMINATION
18   BY MR. WENTZ:
19     Q.  My name is Kurt Wentz, and Wayne Hill, and this
20   is Charles Mamou.  For the next few minutes I'd like to
21   talk to you about you and nobody else.
22     A.  Okay.
23     Q.  There is a real problem we run into when we
24   talk about jurors and we talk about defendants, and we
25   don't really personalize them.  We don't get to know

124

1    them.  Charles is Charles, and you are you.  And I'd
2    like to know a little bit more about you, and I'd like
3    to know about the reasons that you've answered the
4    questionnaire the way that you did with the questions
5    that Mr. McClellan has put to you.  I'd like to find out
6    the reasons you answered those questions in the manner
7    that you did, so please feel free to expound upon your
8    answers.  Tell me the why, why you're answering.
9      A.  Okay.
10     Q.  And I think that one of the things that we
11   sometimes skip over is the fact that we have two parts
12   of the trial, the guilt or innocence phase and the
13   punishment phase.  Because in this type of setting, we
14   spend so much time talking about the punishment phase;
15   but before you can get to that, a jury has to make some
16   important decisions on whether or not there was a
17   capital murder committed.
18             And we're talking here about an
19   intentional taking of somebody's life in the course of
20   another felony.  Maybe -- and I've always felt the real
21   job of the juror is to define conduct.  In other words,
22   look at the conduct they've heard described to them, and
23   determine whether or not it fits what the State says it
24   fits.  And you may find that it isn't.
25             They say there is a murder committed

125

1    during the course of a kidnapping.  You may listen to
2    the evidence and say, well, I don't see there was a
3    kidnapping.  I don't believe the defendant on trial was
4    responsible for that murder, so you can find them guilty
5    of something less when an allegation of two people's
6    lives or being taken in the course of the same
7    transaction.  You may find that, yes, their lives were
8    taken, but they weren't taken in the course of the same
9    transaction.
10             And I know you mentioned serial murders.
11   And sometimes things may be in the back of people's
12   minds that's linking between taking multiple people's
13   lives and being in the course of the same transaction.
14   That's not really what I believe the same transaction
15   is.  A serial murderer may kill somebody in Florida and
16   go up to Ohio three weeks later and kill somebody and go
17   to California and do it.  I don't believe that's the
18   same transaction.  I think when we talk about the same
19   transaction, it's something that happens in close
20   proximity to one another over a short period of time.
21   And there is a general linkage between the two, not the
22   type of situation that I talked to you about a serial
23   murderer.  Do you see the distinction between those two?
24     A.  Yes.
25     Q.  One of the other things, before you even get to

126

1    this punishment phase, you have to make those type of
2    determinations.  You may feel that the person is simply
3    not guilty of the capital murder.  But once you do make
4    that conclusion, you do get to view those Special Issues
5    and a lot of the things we've already talked about this
6    morning.
7             Let me ask you -- you've had a lot of
8    people close to suffer tragedies.  You've talked about
9    two.  How do you think that affects you in possibly
10   being a juror in a case like this?  You've told us about
11   two cases that are -- could, themselves, be capital
12   murders.  I don't know the general facts; but from what
13   you told me, it's possible that they could be two
14   capital murders you're telling us about.  How do you
15   feel, knowing about those people, knowing those people
16   are involved, and coming to sit here possibly.
17     A.  I don't think it has an effect on me, because I
18   come across a lot of things everyday, knowing a lot of
19   people; and I have to judge each situation on its
20   merits, you know.  The most recent situation I talked
21   about, there was a side of his life that I didn't know
22   anything about, and he kind of put himself in jeopardy
23   for that, the murder.
24     Q.  The one who was --
25     A.  Just recently killed.

127

1    Q.   The gambling one or the drug one?
2    A.   The one where they found him in the house.
3  Listening to what the community people are telling us
4  that happened in this situation, that may have been a
5  side of the young man that I did not know.  So, I can't
6  say that it -- how I would really feel towards someone
7  else if the same situation happened and I didn't know
8  them, just because I don't know all the facts.  And then
9  I'm kind of person that would have to listen to both
10  sides, and then I decide how I feel about the situation.
11  So even though that may be similar to this, I'd have to
12  wait until I hear the evidence on what the situation
13  was.
14    Q.   Did you actually know these two individuals?
15    A.   I knew the one recently.  The other young man,
16  I didn't really know him.  I knew his father.  I knew
17  his cousins.  So I didn't know what he was into.  I
18  mean, he went to military school and just happened to be
19  on one of those evenings they're hanging out on the
20  corner.
21    Q.   Is that the individual who was involved with
22  gambling, I think?
23    A.   They were shooting dice, from what I
24  understand, on the corner; and one young man lost a
25  dollar, and he just shot him because he wanted his

128

1  dollar back.
2    Q.   And the other one, the one involved in a
3  burglary of the person's home or a robbery?
4    A.   Possibly a burglary of the home for money that
5  they said he had from gambling.
6    Q.   I thought you had said something about drugs
7  being involved?
8    A.   Well, they mentioned that the person was a drug
9  dealer that did the shooting.
10    Q.   How does that make you feel?  Here is somebody
11  doing something wrong, and obviously you're living
12  this --
13    A.   It surprised me, knowing their upbringing;
14  because everybody is their own individual pretty much to
15  me.  At that point both these young men were at least
16  eighteen, and they had made their own decisions of which
17  way to go.
18    Q.   I'm going to talk to you a little bit more
19  about the situation where you were kind enough to talk
20  on this very last question, 76, about, I don't know the
21  victims; but because of the location, I could possibly
22  know the relatives and friends of the victims.  And I
23  think you've indicated that one of your two daughters
24  went to a birthday party?
25    A.   Actually, it was at a hotel.  I want to say it

129

1  was a slumber party.
2    Q.   When was that?
3    A.   When my daughter was in middle school.  And so,
4  she's in the 10th grade now.  So possibly two or three
5  years ago.
6    Q.   That was slumber parties.  I'm going to assume
7  there was some adults there?
8    A.   I wasn't there, no.  I just dropped her off
9  with some other friends that were going.  I was like the
10  drop off mom.
11    Q.   When you wrote that in Number 76, how did you
12  feel when suddenly you're at the point where you
13  realize, hum, I may know these people; I may know
14  relatives?
15    A.   I didn't feel concerned about myself and how I
16  would deal with the situation.  I felt concerned about
17  how he would feel about somebody that possibly knew
18  somebody that he was accused of doing something to, and
19  the thought of, how would she react?  I mean, how is she
20  actually going to deal with me?  And that's why I was
21  like, I need to put this in here; because more so for
22  them than myself.  I think I'm a fair person; but that
23  doesn't mean he thinks I'm a fair person, or would think
24  I'm a fair person later on.
25    Q.   And you mentioned how she, I think would -- you

130

1  said she would think of you, if I'm not mistaken?
2    A.   I meant he.  I'm meaning the defendant.
3    Q.   Okay, fine.  A lot of types of evidence that
4  you can hear.  Judge Burdette has already told you about
5  direct evidence, circumstantial evidence.  It is quite
6  possible at the punishment phase of the trial you might
7  hear victim impact type of evidence; and you know,
8  you're hearing evidence about a family or somebody that
9  you may have had some contact with.  How would you feel
10  about that type of evidence, being so personal in
11  nature, and you knowing these individuals on some
12  personal basis?
13         Because let me back up.  I know that we
14  all put labels on everyone, but we're all people.  And I
15  think these type of situations do touch us, as people;
16  and that's the kind of thing that I'm trying to talk
17  with you about here.
18    A.   I don't know.  I don't know how I'll react to a
19  personal comment.
20    Q.   Do you think you may empathize more with the
21  victims in the case -- in that particular circumstance,
22  given your familiarity with the family?
23    A.   No, I don't think I'll be more familiar -- I
24  mean, I don't think I would sympathize with them any
25  more than I would another parent that lost a child.

131

1  Q.  Tell me why you say that.
2  A.  Well, because we weren't that close; so it's
3  not like my cousin's daughter that I have, you know, all
4  the time and I'm with all the time.  This is more of a
5  person who was an acquaintance that we may have seen
6  each other at P.T.A. meetings or something like that, or
7  they were at the Y kind of situation.  Like I said, I
8  don't think it was the victim at all.  I think it was a
9  relative, but it's not someone that I socialize with on
10 a regular basis or that's really close to me.
11 Q.  Have you heard or read anything about this
12 case?
13 A.  When it happened, yes.
14 Q.  Could you tell me what your remember hearing or
15 reading?
16 A.  I remember hearing that when the people in the
17 car had stopped to help someone on the side of the road
18 that something happened, and the two guys were shot and
19 the girl was taken off.  And then they found her body,
20 like, two or three days later.
21 Q.  Okay.  How did you feel when you heard that?
22 A.  Upset and said, That can't be all to it.  I
23 mean, that sounds really strange or bizarre.
24 Q.  What made you sort of come to that conclusion?
25 A.  Working in the neighborhood that I work in,

132

1  everything happens.  I hear about it all the time.  I'm
2  just kind of used to there being more to a situation
3  than what it was.
4  Q.  Do you believe what you heard?
5  A.  I don't know what to believe, to tell you the
6  truth.
7  Q.  Have you ever found or heard something in the
8  news or read in the news that really wasn't true?
9  A.  Yes.
10 Q.  Question I'm going to ask you is pretty
11 obvious.  You can possibly anticipate what it is.  And
12 basically, it's having received the information that you
13 have, thinking about it, whatever you think about it,
14 could you be a fair juror in this case?
15 A.  Yes.
16 Q.  You understand why?
17 A.  Uh-huh, I understand.
18 Q.  You anticipated the question, too?
19 A.  Uh-huh.
20 Q.  Let me talk to you a little bit about your
21 questionnaire.  Specifically, your father is your
22 minister?
23 A.  Yes.
24 Q.  You're not sure about the position of your
25 church on the death penalty?

133

1  A.  I'm not a regular churchgoer.
2  Q.  He wants to know, would you like to call your
3  father and find out?
4  A.  No.
5  Q.  Any particular reason?
6  A.  No.  I really don't know what his position is,
7  to tell you the truth.  I don't.
8  Q.  Could we have the benefit of your position,
9  though?  If you became a juror in this case, would we
10 have the benefit of your position, your thoughts on
11 this?
12 A.  Yes.
13 Q.  And not your father's?
14 A.  And nobody else's, yes.
15 Q.  You're asked all these questions; and one of
16 them was, What are your feelings about the death
17 penalty?  And you say, I personally do not believe I
18 could take a life -- which you told us again this
19 morning -- but I believe the punishment should fit the
20 crime.  Can you tell us what that means?  Because
21 obviously, we're dealing with a death here.  And if the
22 punishment should fit the crime, then you automatically
23 think that the death penalty should be the punishment
24 for somebody who took another person's life?  What do
25 you -- what did you mean when you were writing that?

134

1  A.  That I, personally, could not kill someone, you
2  know, with my hands, by a gun, by an injection or
3  anything like that.  I don't think I could do that.  But
4  if someone killed someone intentionally, with no
5  thoughts, I mean, just total disregard for human life,
6  then I think they need to have the death penalty.  I
7  could say yes to that.
8  Q.  Okay.  You understand that in determining
9  whether or not somebody is guilty of capital murder, you
10 know that that's an intentional death; they intended
11 that result to be the product of their unlawful act.  In
12 other words, they didn't shoot the person in the foot
13 when they died.  They shot them with the intention they
14 die.  So you always have that intentional taking of a
15 person's life.
16 Are you telling me that having found
17 somebody guilty of that type of an intentional act in
18 the capital murder scenario, so to speak, you feel that
19 that person is the one who deserves the death penalty.
20 A.  If I really felt that that person intentionally
21 took that person's life, I possibly would vote for the
22 death penalty.
23 Q.  Are you saying, then, that you would look at
24 the Special Issue, knowing that they had done that act,
25 because you're always going to have that evidence with

135

1  you to answer these Special Issues and having come to
2  that conclusion answer Special Issue Number One yes?
3  A.  Yes.
4  Q.  Can you do that in every case?
5  A.  Right.
6  Q.  And you'd do that?
7  A.  If I believe that they did that, yep.
8  Q.  And basically, that would be your personal
9  answer to that question?
10  A.  Yes.
11  Q.  No matter what anyone else says?
12  A.  No matter what anybody else said.  If you talk
13  to anybody, everybody would tell you I'm fair with
14  everybody and I'm not influenced by other people.
15  THE COURT:  Miss Landry, I have a couple
16  of questions for you.  I want to be sure I understand
17  your answer that you've just given Mr. Wentz.  Are you
18  saying that if you found somebody guilty of capital
19  murder that you would always answer that first question
20  yes?
21  VENIREPERSON:  I believe so.
22  THE COURT:  You're excused.  Thank you,
23  ma'am.
24  Mr. Wentz, for purposes of the record, do
25  you have a motion?

136

1  MR. WENTZ:  Yes, Your Honor.
2  THE COURT:  Defense's challenge is
3  granted.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

137

1                  KATHERINE MARIE WALLER,
2  having been first duly sworn, testified as follows:
3                  VOIR DIRE EXAMINATION
4  BY THE COURT:
5  Q.  How are you this morning?  First off, Miss
6  Waller, I'd ask you to remember about yesterday, about
7  the things we talked about, this morning and the things
8  we talked about.  Out of everything we have talked
9  about, do you have any questions at all for me?
10  A.  No, sir.
11  Q.  Is there anything, to this point, we haven't
12  talked about that you would like for us to put on the
13  table because it might have some bearing on your service
14  as a juror in this case?
15  A.  Not that I can think of.
16  Q.  Anything about your personal life, anything
17  about your professional life, anything about your
18  health, or any other thing that you can think of, that
19  might interfere with your ability to be a juror in this
20  case during the time frame?
21  A.  No.
22  Q.  I believe that all this process is about now is
23  to visit with you about the rules that can come into
24  play during the course of a trial like this to see if
25  you have any disagreement with them to the extent that

138

1  would cause you to not be able to follow them.  And from
2  what you've heard up to this point, any disagreement
3  about any of the stuff we talked about?
4  A.  Huh-uh.
5  Q.  You said if you were a juror, you could call it
6  down the middle; whatever the evidence is, wherever the
7  evidence takes you, that would be the verdict you would
8  return?
9  A.  Uh-huh.
10  Q.  Now, Miss Waller, I want to invite your
11  attention to the concept for just a second.  Because if
12  I had never been to the courthouse before and if
13  somebody told me that if you're a juror in capital
14  murder case and if your jury finds a defendant guilty of
15  capital murder, and then we know we get to these
16  questions; and if the jury answers based upon the
17  evidence in a given case yes to Question Number One, in
18  that you found that the person not only committed the
19  capital murder, but that they are also a continuing
20  threat to society, in that event I'd always answer
21  Question Number One in such way that the death penalty
22  would be imposed.  You could see how somebody would
23  think that?
24  A.  Uh-huh.
25  Q.  But can you see that if that were the way it

**139**

1  was supposed to be, we would never ask the second
2  question?
3     A.  Right.
4     Q.  So the second question is looking for some
5  independent feature, or asking the jury to look for some
6  independent feature contained within the testimony.  And
7  it may be there, and it may not be there, case to case
8  to case.  But it is the jury's obligation to search the
9  evidence to see if there is something in the case that,
10  in jury's mind, is sufficient to reduce the death
11  sentence to a life sentence.  Do you find that's
12  something that makes sense?
13     A.  Yes.
14     Q.  And again, whatever that feature is there in a
15  given case for you, that's your call; but the only
16  obligation is that you research the case to see.  If
17  it's no, answer the question no.  The death penalty is
18  imposed.  If the answer is yes, you answer that question
19  yes.  And then a life sentence is imposed.  Any
20  questions about that at all?
21     A.  No.
22     Q.  Any questions before we start?
23     A.  No.
24     Q.  Okay.
25         THE COURT:  Mr. McClellan.

**140**

1           VOIR DIRE EXAMINATION
2  BY MR. MCCLELLAN:
3     Q.  Miss Waller, my name is Lyn McClellan.  And
4  along with Claire Connors, we're representing the State
5  of Texas in this case.  Ask you to sit back and tell
6  us -- we're going to ask your opinion about certain
7  aspects.  We're going to go over your answers in the
8  questionnaire and try get a better feel for what your
9  thoughts are about the issues that might affect a case
10  like this.
11       First of all, there is a question in here
12  that says, What are your feelings about the death
13  penalty?  And you said, I believe sometimes it is
14  necessary.  Then in quotation marks you put "mixed
15  feelings."  Can you tell me what your thoughts are?
16     A.  Well, basically, I just think that it's from
17  case to case.  I don't feel like I could make a blanket
18  statement that I'm for the death penalty or I'm against
19  the death penalty.  So, I determine that to be mixed
20  because --
21     Q.  Sometimes when people say mixed feelings, I
22  think they're trying to tell me that they have doubts
23  about their ability to make that type of decision,
24  regardless of what the evidence is.  In other words,
25  some people come in and say, yeah, I believe in the

**141**

1  death penalty.  I think it's a proper-type punishment
2  for certain types of crimes, but I don't think I could
3  ever make that type of decision or decisions knowing
4  that it would result in this Judge ordering the
5  execution of the defendant sitting over here on trial.
6  Do you have any doubts about your ability to participate
7  in this type process and make that type of decision if
8  that's what the law and evidence called for?
9     A.  No.
10     Q.  So, you could participate in the process and
11  make a decision that's required by whatever the law and
12  the evidence showed?
13     A.  Correct.
14     Q.  Was there ever a period of time in your life
15  where you opposed the death penalty?
16     A.  No.
17     Q.  All right.  There is also -- in the
18  questionnaire there is also some agree/disagree areas.
19  Everybody rolls their eyes about those, but one in
20  particular says that -- you checked that you agreed on
21  life imprisonment is more effective than the death
22  penalty.  Can you tell me what your thoughts were about
23  that?
24     A.  Initially, my first thought, I didn't agree or
25  disagree with that statement; and we didn't have another

**142**

1  choice.  And I must -- in my professional career, I
2  write questionnaires.  And, so --
3     Q.  Oh, you do?
4     A.  I had a little difficulty going from critiquing
5  the questionnaire to answering truthfully; and I know
6  y'all run into that, too.
7     Q.  We'll consult with you later on that.
8     A.  So, but I have -- I don't have a call to that;
9  but I didn't have a choice, so I didn't necessarily
10  disagree with it.  But, so, I agreed more than I
11  disagreed.  Does that make sense?  There wasn't a good
12  choice.
13     Q.  Yeah.  Some people come up and say -- or have
14  told us, I think a life sentence is worse than the death
15  penalty; because you have to live with your consequences
16  all your life, everyday and all that.  Of course,
17  somebody doesn't care --
18     A.  I think that's an individual call on the person
19  who has the sentence.
20     Q.  I want to make sure you're not saying you would
21  favor life every time; and only in the very, very rare
22  circumstances would death ever be an option?
23     A.  No.
24     Q.  Another question.  And, of course, again, may
25  go back to the /TKPWHEFRLDZ /RAOEUG above it.  Says, It

143

1 doesn't make any difference to me whether or not we have
2 the death penalty, and you checked you agree with that.
3 Tell me what your thoughts were there.
4     A.  Well, again, you had to be black or white.  And
5 it's not a passion of the law for me, and that's what I
6 was just trying to say there, if there is a law.  And I
7 have lived in the State of Texas, and so I respect that
8 law.  And if the evidence says, then I will respect the
9 Texas law.  But --
10     Q.  Do you think -- let's put it a different way.
11 Let's say you're queen for a day, and you got to choose
12 what laws were going to be or not be?
13     A.  Uh-huh.
14     Q.  Would you keep the death penalty in the State
15 of Texas, or would you do away with it?
16     A.  Again, back to my profession, we don't ever do
17 anything without tons and tons of research.  So I would
18 personally, if I was queen for a day, I guess be a quick
19 study and do research before I would answer that
20 question.  I hate to say that, but I wouldn't -- I don't
21 have an opinion.  I would definitely base that on
22 research.
23     Q.  Okay.  Tell me about your job and what you do
24 there.
25     A.  I'm an instructional technologist.  And we do

144

1 the instructional systematic design process where we
2 develop training for corporations.  I'm a former
3 schoolteacher, so we develop questionnaires to identify
4 needs and assessments for performance gaps and
5 corporations and develop and come up with solutions to
6 fix their problems.  And it can be anywhere from
7 performance appraisal to an end user's job performance.
8 They need to learn how to put a roll on a roll tender
9 for a printing press.  So I develop training like that,
10 so it's very research-based.
11     Q.  How did you go from being involved like in Deer
12 Park I.S.D., where you taught, to doing this?
13     A.  I have a master's in instructional technology,
14 so it kind of led me from the classroom to the business.
15 You can do either way.  You can stay within the
16 education system and move throughout.
17     Q.  What did you teach when you taught education?
18     A.  I thought fifth grades and eighth grade, and my
19 emphasis was mathematics; but I also taught science,
20 social studies, writing, spelling, and arts.
21     Q.  You say you read true crime, and you say you
22 forgot the author.  Are you talking about true crime
23 meaning that type of topic or a book?
24     A.  This was a book.
25     Q.  Called True Crime?

145

1     A.  Uh-huh, it was just kind of bizarre, the
2 question.  I read it like three months ago, because it
3 had Clint Eastwood on the cover.  So --
4     Q.  Was it about trials?
5     A.  Death penalty.
6     Q.  What did it say about the death penalty?
7     A.  It was actually the Beecham case in St. Louis
8 or something; and he was sentenced to the death penalty
9 and he apparently was innocent, so --
10     Q.  Okay.  Did you determine that that was the
11 case, that he was innocent?
12     A.  Well, that was -- I guess the governor -- I
13 think it's a pretty -- I don't know how fictional the
14 book became between the facts -- I found it interesting.
15 I, again, didn't -- it didn't sway my opinion on the
16 death penalty or anything.
17     Q.  The fact that you may have heard of cases where
18 people have gotten the death penalty and have been
19 determined, from whatever evidence, later to be innocent
20 or their sentence was commuted, you think that would
21 cause you to be reluctant to give the death penalty if
22 you thought the law and evidence called for it in the
23 case you heard?
24     A.  No, because I think the process of appeals
25 works, obviously, if that's the case; and that's why

146

1 it's there, so --
2     Q.  Okay.  All right.  You say you have a friend of
3 the family that's a D.P.S. Officer.  Do you ever talk
4 with --
5     A.  He's retired, actually.
6     Q.  Okay.  And your sister-in-law was a Dallas D.A.
7 several years ago?
8     A.  I want to say it was like five years ago.
9     Q.  Do you ever talk with her about her cases or
10 anything?
11     A.  No.
12     Q.  You have to pardon me if I ask a question I've
13 already asked.  We've been doing this for quite awhile.
14 What kind of cases come to your mind when you think of
15 cases where you think the death penalty ought to be
16 available?
17     A.  No, you haven't asked that question.
18     Q.  Good.
19     A.  You know, that's a real hard call.  I mean, I
20 don't have, like, an immediate response.  It depends.  I
21 mean, I guess if it was something I would consider
22 heinous, murder, you know.  I don't know.
23     Q.  Do you think whether it's --
24     A.  I'm sorry.
25     Q.  In making that type decision, do you think it's

147

1  important to know whether the crime was committed --
2  let's say you've had a spur-of-the-moment decision
3  versus a plan.
4      A.  Yes.
5      Q.  Okay.  Do you think it's a factor as to whether
6  or not a person may have had some disagreement with the
7  person as opposed to being someone they didn't know?
8      A.  That would depend on the disagreement.  And,
9  yeah, probably if they didn't know them and they just,
10  in cold blood, you know, it would probably affect me
11  more than if there was some history.
12     Q.  A lot of people have come in and said, if
13  someone intentionally -- you know, intentionally takes
14  someone's life of an innocent person for no particular
15  reason or no justified reason -- of course, murder is --
16  by definition, murder is the intentional taking of
17  another person's life.
18     A.  Uh-huh.
19     Q.  And we're not talking in self-defense, and
20  we're not talking accident.  We're talking when you
21  intend to kill someone, and then it becomes capital
22  murder if that murder is committed while committing
23  another crime.  Like, what we have alleged in this
24  indictment is murder during a kidnapping, and also
25  killing two or more people during the one criminal

148

1  episode.
2          We have alleged two different ways of
3  committing capital murder within the same indictment.
4  That would allow a jury then to either find one or the
5  other beyond a reasonable doubt and find guilty as
6  charged in the indictment.  All twelve of them don't
7  have to agree whether it was kidnapping, or murder, or
8  whether it was a multiple murder, just as long as they
9  agree with one or the other.  If they don't believe it,
10  it's not guilty.  If they believe it's one or the other
11  or both, then it's guilty.
12         Once you determine, if you do, that
13  someone is guilty of capital murder, you go to the
14  second stage of the trial.  And the Judge talked to you
15  in the beginning about in order to get there, you would
16  have had to have already found someone guilty of capital
17  murder.  If you find someone guilty of capital murder,
18  that means they intentionally took the life of another
19  person without any legal justification during the course
20  of a kidnapping or while killing another person.
21         At the punishment stage of a trial you may
22  hear additional evidence about the defendant's
23  character, background, criminal history, or lack
24  thereof, other than abilities and disabilities.  Then
25  you're asked to answer these questions based on all that

149

1  evidence, evidence about the individual, evidence about
2  the crime.  And the first question you get is:  Do you
3  find from the evidence beyond a reasonable doubt that
4  there is a probability -- I'd suggest to you more likely
5  than not -- that the defendant would commit criminal
6  acts of violence -- doesn't have to be another murder or
7  capital murder.  Could be any criminal act that is
8  violent in nature; burglary, robbery, hitting someone
9  and knocking them out, causing injury, shooting someone
10  and not killing them, anything that's criminal violence.
11         So, you're asked to determine after you've
12  heard all the evidence, as the defendant sits before you
13  that day, Do you find from the evidence beyond a
14  reasonable doubt there is a probability that it's more
15  likely than not that that person would be a continuing
16  threat to commit criminal acts of violence that would be
17  a continuing threat to society?  Do you think you would
18  be able to make that type of decision, depending upon
19  what the evidence was?
20     A.  Yes.
21     Q.  All right.  What kind of evidence do you think
22  is helpful in making a determination about whether or
23  not a person you had already found guilty of capital
24  murder would be, within a probability, a continuing
25  threat to commit criminal acts of violence?

150

1      A.  One, that they somehow could prove they were
2  even there.
3      Q.  Okay.  Now you would have to do that before you
4  found the person guilty.
5      A.  Repeat the question.
6      Q.  Okay.  If you find someone guilty and you go to
7  Issue Number One -- and it says, Do you find from the
8  evidence beyond a reasonable doubt there is a
9  probability or more likely than not that this person we
10  have found guilty would be a continuing threat to commit
11  future acts of violence?  What kind of information would
12  you need to make that decision?
13     A.  Right.  Well, we would get their history and
14  their past?  We will get to know their past?
15     Q.  If there were any, right, you would see that
16  kind of information is the kind of information you would
17  be looking for about the history of the individual, his
18  past criminal record, or that kind of stuff?
19     A.  Uh-huh.
20     Q.  Now, do you understand if you found someone
21  guilty of capital murder -- well, let me ask you this:
22  Let's say you found someone guilty of capital murder.
23     A.  Okay.
24     Q.  What's the punishment going to be?
25     A.  Immediately?

151

1    Q.  Yeah.  Do you know what the punishment is going
2  to be?  I mean, we know we have two parts to the trial.
3  But do you know what the punishment is going to be after
4  you found him guilty of capital murder, or are you going
5  to wait till you hear the other evidence and go through
6  that?
7    A.  So, personally, because I was going to say life
8  or death, no, I would wait and listen before I decided.
9    Q.  Let's say, even if I ask you that question,
10  find someone guilty of capital murder, you tell me life
11  or death, can you tell me without knowing what the facts
12  were?
13    A.  My understanding was that if they were
14  convicted of a capital murder, that those were the only
15  two options.  So, I thought I was giving you a multiple
16  choice answer.  I don't know the law; so, no, I wouldn't
17  know until -- I mean, is there another choice?
18    Q.  Well, no.  The choice is made by answering
19  these questions.
20    A.  Okay.
21    Q.  Some people, though, may come in and say, hey,
22  if I found them guilty of capital murder, there is only
23  one choice in my mind and that's death.  Forget about
24  it.
25    A.  No, I don't think I'm that way.

152

1    Q.  So, on Issue Number One, if you answer that no,
2  that he's not a continuing threat, then he's going to
3  get a life sentence and the process is over.
4    A.  Okay.
5    Q.  If you answered yes, there is a probability he
6  is a continuing threat to commit criminal acts of
7  violence that would be a continuing threat to society,
8  then you go to the second issue.  By the time you get
9  there to the second issue, you would have already found
10  a person guilty of capital murder and you would have
11  found they're a continuing threat to commit future acts
12  of violence, at least to a probability.  At that point
13  the defendant's going to receive death.  And unless you
14  decide on Issue Number Two, that he's not -- because it
15  asks you to go back and look at the evidence to the
16  crime.  That's what you heard at guilt or innocence.
17  The defendant's character and background, that's what
18  you heard in punishment.  His personal moral
19  culpability.  I'd like to refer to it as his personal
20  responsibility.  Is he the shooter, or the stabber, or
21  the getaway driver?  And do you find there is sufficient
22  mitigating circumstance or circumstances -- I'd like to
23  refer to it as sufficient reasons -- why this person
24  should receive life as opposed to death?  It gives you
25  the opportunity to change the vote from death to life if

153

1  you find there is sufficient reasons that merit it.
2    A.  Uh-huh.
3    Q.  Okay.  That doesn't mean you always would.
4  Just means you have the opportunity.  Kind of a
5  fail-safe question.  You've made decisions already based
6  on the evidence.  Are you absolutely sure you want to
7  stick with the decision you made of death, or do you
8  find there are reasons -- there is circumstances about
9  the crime, circumstances about the individual,
10  circumstances that we've heard about what had happened
11  and how it happened; and we believe life is more
12  appropriate than death.  It gives the option of doing
13  that so that you're not stuck with this black or white
14  deal.  You get to make that choice.  Okay.  Any problem
15  with that aspect?
16    A.  No.
17    Q.  Now you may go through and look through the
18  evidence and find nothing mitigating; or you may find
19  things that are mitigating, but they're not sufficiently
20  mitigating to change your answer, you know.  But you're
21  committed to the search, to looking for that type of
22  information.  People have asked me before, well, once
23  you found them guilty of capital murder, or once you
24  found they're a continuing threat to commit future acts
25  of violence, isn't that pretty much what we're all

154

1  about?  It does mean they get death unless you decide on
2  Issue Number Two that -- or there is a reason or reasons
3  why they should not.  If you do make that decision, I
4  give you every opportunity to make that choice.  You
5  don't have to stay with the decision already made.  Any
6  problem with that?
7    A.  No.
8    Q.  Is there any reason you can think of why you
9  could not serve as a juror in case like this?
10    A.  No, and I'll be honest.  I wish I could.
11    Q.  Looks like you were saying, well, what can I
12  think of now?
13    A.  No.
14    Q.  Well, are you saying you don't want to be a
15  juror in this case?
16    A.  I can honestly say I'm torn.  I feel like I'm a
17  good citizen, and I feel like that I need to be making
18  myself available for this and that I shouldn't -- it
19  kind of made me uncomfortable when people or talking
20  about how they were going to try and get out of it.
21       On the other aspect, I just started a job
22  in July; but we looked in the calendar, and it shouldn't
23  be too taxing, barring our big proposal doesn't come
24  through.  But we've managed to work it out.  That's my
25  only fear, is if we come through and we've won this

155

1  quarter of a million dollar account and I'm going to be
2  working. But I talked it over with my coworker and
3  bosses, and we just have to do some evenings.
4     Q. You think you would be able to handle that
5  aspect if you're chosen?
6     A. Yeah. I handled full-time school and full-time
7  work. I think I can.
8     Q. Okay. Appreciate it. Well, thank you very
9  much, and I appreciate your time. I'll pass you.
10         THE COURT: Thank you, Mr. Wentz.
11          VOIR DIRE EXAMINATION
12  BY MR. WENTZ:
13     Q. Good morning.
14     A. Morning -- afternoon almost.
15     Q. My name is Kurt Wentz. This is Wayne Hill, and
16  this is Charles Monroe (sic). And for about the next
17  fifteen or twenty minutes, I'd like to talk to you about
18  a whole lot of things. As we visit, please don't
19  hesitate -- in fact, I encourage you to tell me the
20  reasons that you're answering my questions the way in
21  which you are, okay?
22     A. Okay.
23     Q. You do questionnaires?
24     A. For a different purpose, obviously, but yes.
25     Q. On 18 you're asked about what clubs you belong

156

1  to, and there is this International Society for
2  Performance Improvement. What is that?
3     A. Have you ever heard of A.S.T.D.? It's just a
4  training -- national organization for trainers, but the
5  new buzz word is performance improvement instead of
6  training.
7     Q. It asked a question, Do you know people in law
8  enforcement? And you talked about your sister-in-law is
9  an Assistant District Attorney. It also asked whether
10  or not you knew any attorneys and Judges and that sort
11  of thing, and you mentioned a Lisa Andrews?
12     A. That's correct.
13     Q. Is she the Lisa Andrews who is a District
14  Attorney here in Harris County?
15     A. I believe she is. Lisa and I went to high
16  school together, and I know she went to law school. And
17  through the small town that I live in, I heard she was
18  working there. So as of a year ago when I saw her at
19  the last wedding shower, she was still working here; but
20  we don't speak on a regular basis.
21     Q. You say the small town that you live in. What
22  did you mean by that?
23     A. Deer Park. I actually live in Pasadena, but I
24  went to Deer Park school; so --
25     Q. To some extent, I'm going to repeat some of the

157

1  things you've heard this morning. I don't mean to take
2  up your time. I know it's valuable, but I just think we
3  need to go over this a little bit. And the Judge
4  visited with you and you've already been spoken to about
5  this thing called capital murder and lesser offenses,
6  and you know that capital murder involves the
7  intentional taking of somebody else's life. In other
8  words, you intend to kill them. No doubt about it. And
9  to have a capital murder, you have that intentional
10  taking of the life.
11        It's been alleged in this case in the
12  course of a kidnapping, or you may have the taking --
13  intentional taking of two people's lives in the course
14  of the same transaction. And if you believe that, then
15  you could find the person guilty of capital murder if
16  you believe it beyond a reasonable doubt. But it's
17  possible for people who listen to the evidence to maybe
18  say, well, gosh, I see the case. I see there is a
19  killing, but I didn't see a kidnapping. Or you may say,
20  I see a kidnapping, but I don't see how that person may
21  have been responsible for that death.
22        So, you might say there is a finding of a
23  lesser offense of kidnapping. By the same token, you
24  may look at the two deaths in the course of the same
25  transaction and you say, well, that's not the same

158

1  transaction. There are two different types of death --
2  two different deaths. There is no connection. And you
3  find the person guilty of murder, still a very serious
4  crime. That's what the Judge told you by the punishment
5  it carries with it.
6        One of the things that we talk about with
7  people and we ask them, you know, what types of crimes
8  do you think deserve the death penalty? And people will
9  say, serial murder. And I think we all have images of
10  that person in your mind. We think about those kind of
11  things, impulse or whatever. And it may be somebody
12  who, at the first of the year, kills somebody in
13  Florida, and in June they kill somebody in Montana, and
14  maybe October they kill somebody in Florida again.
15        So, we have that multiple killing, but
16  that's not necessarily in the course of the same
17  transaction. I believe the same transaction
18  contemplates, basically, in a short period of time, to a
19  continuous matter of conduct over the short period of
20  time. So, you can see how there is two different
21  things?
22     A. Yes.
23     Q. Am I making myself clear?
24     A. Yes, you are.
25     Q. When you were doing your teaching, did your

159

1 teaching job lead you to where you are in terms of your
2 employment? I think you said you were teaching fifth
3 grade, if I'm not mistaken?
4     A. Uh-huh.
5     Q. Was this sort of a natural progression, or did
6 you see this field out there and you went from teaching
7 into it? How did that work out?
8     A. Actually, you can either stay in education --
9 and in that case, you would do somewhat of a different
10 role. But it's an education degree. My master's degree
11 is teaching adults and teaching children. While there's
12 different theories, there isn't much difference; but I
13 enjoy the development side of getting the course ready
14 and the execution of it without the parent phone calls
15 and disciplining aspect of it.
16     Q. Do you think young adults can change over time?
17     A. I can just speak for myself, and I can say I'm
18 quite a different person from the day I graduated high
19 school till the present. So --
20     Q. If somebody comes to believe beyond a
21 reasonable doubt that the State has proven somebody
22 guilty of capital murder, then we get to this second
23 phase of the trial. And that's where these Special
24 Issues come into play.
25         And one of the things that I think is a

160

1 problem, whenever we come to the courthouse, we're
2 confronted with labels. People introduce me, and I'm an
3 attorney. And they immediately make all these
4 assumptions about me, but they don't know me. I'm
5 talking to you as a potential juror. You may be
6 referred to as a juror, and people make assumptions
7 about jurors. And that's unfair, because it's not about
8 you. And when it comes to the punishment phase of the
9 trial, it's supposed to be an individualized process.
10 If you found Charles guilty of this capital murder, it's
11 supposed to be individualized for him or any defendant
12 who is on trial. Do you understand that?
13     A. Yes.
14     Q. Do you think that's important?
15     A. Yes, I do.
16     Q. That first question, it sets out to, I think,
17 determine whether or not you believed beyond a
18 reasonable doubt that the person you found guilty of
19 capital murder would be a future danger. And we know
20 going into this situation that the answer is no; because
21 the State has the burden of proof. And again, it's
22 beyond a reasonable doubt. Judge Burdette read that to
23 you the other day when he visited with you.
24         And I would submit that if it ever meant
25 anything to you at any time, it has to mean something to

161

1 you when you answer that Special Issue Number One in the
2 course of a capital murder case. And it asks you to
3 look at whether or not this person that you found guilty
4 of capital murder would commit criminal acts of violence
5 that would constitute a continuing threat to society.
6 And the Judge was very good this morning in talking to
7 you about all these words, so we don't have legal
8 definitions for them. What they mean to you is what
9 they mean.
10     A. Uh-huh.
11     Q. Have you basically ever thought of what -- put
12 all those words together, criminal acts of violence that
13 constitute a continuing threat to society? Did you ever
14 worry about that term or that phrase before?
15     A. Before yesterday?
16     Q. Before yesterday.
17     A. No, not before yesterday.
18     Q. And I think the point is that it's not any
19 crime. It's a real -- it's a serious crime, and you
20 determine the level of seriousness for you. And it's
21 meant as a safeguard; because it's certainly possible
22 that any of us could do anything wrong, let alone
23 somebody who had done a capital murder. There has to be
24 some elevated level of seriousness before special Issue
25 Number One could be answered yes. Would you agree or

162

1 disagree? Could you repeat that?
2     A. Could you repeat that?
3     Q. All right. I asked it bad. I guess I was
4 really asking for your thoughts; because when the Judge
5 was talking to you, I think he said you have to consider
6 the words in context. And he talked about criminal acts
7 of violence.
8     A. Uh-huh.
9     Q. And that anything is possible for any
10 individual to do a D.W.I.
11     A. Uh-huh.
12     Q. And that's a crime. It's something wrong. Or
13 you could hit somebody in the nose. That's a crime.
14 That's wrong. But it doesn't necessarily rise to the
15 level of a criminal act of violence that would
16 constitute a continuing threat to society. Would you
17 answer that Special Issue Number One yes just because
18 you thought the person might commit a crime, or would it
19 have to be a more serious type of crime for you to
20 answer, such as this is contemplated by criminal acts of
21 violence that would constitute a continuing threat to
22 society. So, I guess it's hard to say. If you punch
23 someone in the nose, is it, you know, just -- that was a
24 bad example.
25     A. Okay. I would look for a violent act, and I

163

1 would consider that with intent to do harm of some
2 nature towards property or person.
3     Q.   The second Special Issue comes into play only
4 after you've made two pretty overwhelming decisions.
5 One, somebody's guilty of an egregious case, capital
6 murder.  And you've also rendered this decision that you
7 thought they were going to be a future danger to
8 society.  That's a shorthand version of it.
9          When you were given the questionnaire, you
10 were given a Question 68.  It's about, do you believe
11 mitigating evidence concerning a capital murder --
12 capital murder, defendant's background, should be
13 considered in deciding whether or not he or she should
14 receive the death penalty, and you said yes.  Do you
15 remember that question.
16     A.   Uh-huh.
17     Q.   Can you tell me why you answered that question
18 in that manner?
19     A.   Can I give you an example?
20     Q.   Sure.
21     A.   It's like when I taught school.  It's like it
22 was real hard to be -- you know the students.  You know
23 their background.  You know everything they've done.
24 They spent a large majority of their life at the --
25 sometimes they do things.  And even perfect children

164

1 that have never gotten in trouble before, have perfect
2 conduct, do wrong things.  And I think that when you're
3 looking at what happened and you get both sides of the
4 story.  And you're thinking of what you have to do with
5 children.  You don't get to only hear one side.  You
6 have to look at the circumstances, and who the person
7 is, and what the true intent was of -- you know, was it
8 truly an accident, or was it a crime?  And all that
9 comes into play, I think.  And so that's why I suggest
10 just because of past experience, even if he's been a
11 rotten person the whole year, but then in this instance
12 that was not their intent, it was, you know, whatever
13 the case may be then that needs to be taken into account
14 with the punishment.  So, that's why.
15     Q.   That question is good, because it looks to the
16 person's background.  But Special Issue Number Two also
17 contemplates you looking at a couple of other things.
18 One, the circumstances of the offense, as well as the
19 defendant's character, background, and his moral
20 culpability.  And it's quite possible sometimes for you
21 to look at the crime itself and say, well, gosh, yes,
22 that's a capital murder; but there is some circumstance
23 of that crime that caused me to have a problem, that
24 caused me to think, well, maybe this person does warrant
25 a life sentence.  You can look at the crime itself and

165

1 come to some sort of conclusion and find if there is
2 mitigating evidence there so that the person may receive
3 a life sentence.
4          You mentioned reading this book, True
5 Crimes.  Did you see the movie?
6     A.   Yes.
7     Q.   Was the movie like the book?
8     A.   No.  It was close.  They had different -- a few
9 different scenes.
10     Q.   I didn't read the book, but whatever.  The way
11 I saw that, it had to do with basically somebody who got
12 the death penalty.  And there was some evidence
13 discovered that maybe they didn't do the crime, and the
14 whole case got reversed.  That's my shorthand rendition.
15     A.   Right.
16     Q.   Okay.  Basically, Special Issue Number Two is a
17 little bit like that, except it has allowed you to look
18 at this person again and decide whether or not you feel
19 that the death penalty is warranted and to make your own
20 decision that, no, it shouldn't.  And I think that's an
21 awfully important and grave responsibility for any
22 citizen to have.  Do you feel comfortable making that
23 decision?
24     A.   I do.
25     Q.   One of the -- did you follow the Carla Faye

166

1 Tucker case?
2     A.   No.
3     Q.   When we've talked to other people about cases
4 and what they thought was proper for a capital murder
5 case, somebody would say, like the taking of an innocent
6 person's life and they're just a bystander.  Somebody
7 intends to kill somebody.  They had some history between
8 them.  And somehow he took the life of a bystander; and
9 they refer to the bystander as the innocent person,
10 which they truly are.  Do you hear what I'm saying in
11 terms of that being an innocent person, and that would
12 be intentional death?
13     A.   Uh-huh.
14     Q.   Could you consider maybe the situation where
15 there is somebody who is the unfortunate victim of a
16 crime of violence, and then there may be some history
17 between the person who was killed and the person who
18 actually does the shooting.  And that might be a
19 circumstance of the case.
20     A.   Uh-huh.
21     Q.   Let me ask you, is there anything you'd like to
22 tell me about yourself that you think I should know?
23     A.   Not that I can think of, no.  Sorry.
24     Q.   Let me consult one second.
25          Thank you very, very much.

167

1          THE COURT: Thank you.

2          Miss Waller, in just a second I'm going to

3 excuse you. Before I do, I will tell you we want you

4 back two weeks from tomorrow, Wednesday, September 29th.

5 What we're doing is talking to folks individually.

6 We're creating a pool of about forty-eight people to be

7 back that day, every single one of whom who have been

8 through exactly what you've been through. If we can

9 start at 9:30 that day, we'll be through with you

10 finally. When we leave here the 29th, everybody will

11 leave here knowing definitely whether they are or are

12 not a juror in the case.

13         Between now and when we see you next,

14 don't you alter your lifestyle one bit for us. You do

15 your professional things just like you would ordinarily.

16 Do your personal things the same. If you have a chance

17 to leave town, take the chance and go. All that we ask

18 of you between now and when we see you next is this:

19 Please don't talk about this case with anyone, and don't

20 let anybody talk about it. If there should be any news

21 media treatment about the case and the 29th, as to

22 anything on the television, refuse to watch it;

23 newspaper, refuse to read it; radio, refuse to listen to

24 it.

25         Each of those five restrictions is for the

168

1 purpose of accomplishing the same objective, and that's

2 this: If you do become a juror in the case, your

3 decision, whatever that winds up being, must be based

4 exclusively upon the information you receive in the

5 courtroom. You cannot in any way be influenced or

6 affected by any outside of the courtroom's information.

7         If you need anything for the folks at work

8 to show where you have been for three days, this will

9 suffice. This is a reminder note as to the where and

10 when we want you to be on the 29th, which is right

11 outside the doors where you were this morning, by 9:30.

12 Do you have any questions for me?

13         VENIREPERSON: No.

14         THE COURT: Do I understand there is an

15 agreement by and between the parties that the

16 Venireperson 40, that being Mr. Ross Menefee Smith, by

17 agreement of all concerned may be excused.

18 Mr. McClellan, is that your agreement?

19         MR. MCCLELLAN: Yes, Your Honor.

20         THE COURT: Can you speak for Miss

21 Connors?

22         MR. MCCLELLAN: Yes, Your Honor.

23         THE COURT: It is hers, also. Mr. Wentz,

24 your agreement, sir?

25         MR. WENTZ: Yes, it is.

169

1         THE COURT: Mr. Wentz, is it also

2 Mr. Hill's agreement?

3         MR. WENTZ: It is.

4         THE COURT: Mr. Mamou, is it your

5 agreement?

6         THE DEFENDANT: Yes, sir, Your Honor.

7         THE COURT: Specifically, sir, do you

8 request Mr. Smith be excused?

9         THE DEFENDANT: Yes, Your Honor.

10         MR. MCCLELLAN: We also have an additional

11 agreement related to Juror Number 63, and also Juror

12 Number 70, which I think is for Thursday.

13         THE COURT: And Juror 70, being Lorie

14 Lowrie McGarity, by agreement of all concerned, also may

15 be excused. Mr. McClellan?

16         MR. MCCLELLAN: Yes, Your Honor.

17         THE COURT: Is it Miss Connors'?

18         MR. MCCLELLAN: Yes, Your Honor.

19         THE COURT: Mr. Wentz?

20         MR. WENTZ: Yes, sir.

21         THE COURT: And is it Mr. Hill's?

22         MR. WENTZ: Yes, sir.

23         THE COURT: Is it yours, Mr. Mamou?

24         THE DEFENDANT: Yes, sir.

25         THE COURT: Do you request each of those

170

1 be excused?

2         THE DEFENDANT: Yes.

3         MICHAEL EVANS,

4 having been first duly sworn, testified as follows:

5         VOIR DIRE EXAMINATION

6 BY THE COURT:

7    Q.  Mr. Evans, thank you for your patience. It's

8 been a long day for all of us. First off, I'd like to

9 ask you to remember back to yesterday the things we

10 talked about and to this morning when the group was in

11 the jury box, the things we talked about this morning.

12 Out of everything that we have talked about, do you have

13 any questions at all for me?

14    A.  No.

15    Q.  Is there anything to this point that we haven't

16 put on the table and talked about that you feel as

17 though we should, because it might have some bearing on

18 your ability to be a juror in this case?

19    A.  No.

20    Q.  It's not necessary that there be; but if there

21 was, I wanted you to have a chance to bring it up.

22    A.  Sure.

23    Q.  Is there anything at all you can think of, sir,

24 whether it might be something about your personal life,

25 perhaps something about your professional life, or

171

1  perhaps something about your health, or something else
2  that you think in any way would interfere with your
3  ability to be a juror in this case during the time frame
4  that we've talked about?
5      A.  Nothing I can think of.
6      Q.  I believe that this phase of the trial is meant
7  to accomplish two things.  First off, to visit with the
8  prospective jurors to give you an idea about what some
9  of the rules are that could possibly come into play
10  during the course of a trial like this for the purpose
11  of seeing if you have any dispute or any disagreements.
12  If you were a juror, you would be obligated to enforce
13  them.
14          And my question to you is, have you heard
15  anything that causes you such discomfort that you
16  couldn't follow those rules if a single one of them, or
17  any of them, or whatever, if they came into play?
18      A.  No.
19      Q.  Second part of this process is for you to
20  satisfy yourself and for the lawyers to be satisfied
21  that if you were a juror, you would call the case as you
22  saw it.  Let them give you the information.  You
23  evaluate the information that they give to you.  And
24  whatever result occurs, that result would be reached
25  based upon your evaluation of the evidence presented.

172

1      A.  Sure.
2      Q.  We talked this morning, Mr. Evans, about
3  capital murder business.  We talked about these
4  questions.  And my thought about what might be going
5  through a juror's mind in this phase of the process is
6  this:  Let's see if I got this right.  If I find
7  somebody guilty of capital murder, I'm saying to myself,
8  then the next thing that happens is we come back with
9  additional evidence for the purposes of answering these
10  two questions.
11          The first question basically asks me to
12  determine from the evidence whether or not I believe
13  beyond a reasonable doubt that the defendant on trial is
14  likely to be a future danger.  And let's just say,
15  hypothetically, I believe the evidence supports a yes
16  answer.  So, what I have done now is I found somebody
17  guilty of the intentional commission of capital murder.
18  I've also found beyond a reasonable doubt they're a
19  future danger.
20          Now I've got this other question I'm
21  confronted with.  And I can see how some people might
22  say, well, if I have made those two findings to that
23  point, there's never going to be a time I'm going to
24  answer that second question in such a way that a life
25  sentence is going to be imposed.  I can see how somebody

173

1  might say that to themselves.  But can you see that the
2  second question asks something so remarkably different
3  from the first two that it is completely independent of
4  the answers to the other questions?
5          Now, it may very well be that the same
6  evidence in the case is used to cause you to come up
7  with an answer.  But you're looking at it from a
8  different perspective.  Not, is he guilty?  And not, is
9  he a future danger?  Is there something in the case that
10  makes us think a life sentence is more appropriate than
11  a death sentence?
12          But can you see how just because a finding
13  of guilt of capital murder, a yes answer to the Question
14  Number One is given by a jury, that those events in and
15  of themselves do not require a no answer to the second
16  question.  There may be evidence.  Any questions of me
17  before we begin?
18      A.  No.
19      Q.  Thank you, sir.
20          THE COURT:  Mr. McClellan.
21          MR. MCCLELLAN:  Thank you, Your Honor.
22              VOIR DIRE EXAMINATION
23  BY MR. MCCLELLAN:
24      Q.  Mr. Evans, my name is Lyn McClellan.  Along
25  with Claire Conners, we represent the State of Texas in

174

1  this case.  I want to briefly go over some of the stuff
2  in your questionnaire and then go over some of the
3  aspects of the law and make sure we're on the same page.
4          I assume, since we're here today and we've
5  gotten this far, that you indicated on your
6  questionnaire there was a hearing problem in one ear,
7  that that's not a problem for our purposes?
8      A.  Not as long as I can watch and see.
9      Q.  Okay.  And can you assure me that if it is a
10  problem, if you have to be a juror on the case, that
11  you'll let somebody know so we can correct that
12  situation and put you in a position where you can
13  correct that?
14      A.  Right.  My right ear is a hundred percent deaf.
15      Q.  Now, you also were a major in psychology.  Not
16  using that at this time, what were your plans when you
17  became a psychology major?
18      A.  Sales.  In general, sales is what I aspired to
19  do.
20      Q.  As a result of that, there may be psychologists
21  or psychiatrists that might testify in a case like this
22  at the punishment stage of a trial.  Do you
23  automatically believe everybody that --
24      A.  No, no.
25      Q.  There is a question here.  You served on a jury

175

1  about twenty-five years ago in an aggravated assault
2  case. Was that here in Harris County?
3      A. That was in New Orleans.
4      Q. New Orleans?
5      A. Uh-huh.
6      Q. And y'all reached a verdict and assessed
7  punishment?
8      A. Yes.
9      Q. Anything about that case that would keep you
10 from you being fair and impartial?
11     A. No.
12     Q. Now I want to talk -- well, on the last page
13 there is an agree/disagree statement. And it asks about
14 a couple of these. One is a statement, Life
15 imprisonment is more effective than the death penalty.
16 And you checked that you generally agree with that. Can
17 you tell me what your thought was there?
18     A. Yes. I think that quite often in a violent
19 crime that it's almost an easy out for the death penalty
20 for the one who committed the crime. It would be worse,
21 in my opinion, if I were that person to have to spend
22 the rest of my life thinking about what I had done
23 really and living the life in prison. I would rather be
24 put to death quickly if I were, in fact, guilty than to
25 serve the rest of my life under those circumstances.

176

1      Q. And to expound on that, I think you hit on what
2  a lot of people say, that this would -- if they were in
3  this situation, obviously you might realize there may be
4  some people who commit a crime and could care less?
5      A. Sure.
6      Q. Have no remorse, so living everyday with it
7  ain't no problem; because they didn't care about you to
8  begin with. See how that might work?
9      A. Absolutely.
10     Q. Another thing it says is, It doesn't make any
11 difference to me whether or not we have the death
12 penalty. You checked that you generally agreed with
13 that. Can you tell me what your thought was there?
14     A. Whether we have it?
15     Q. Yeah.
16     A. Well, again, based on the fact that I think the
17 worst punishment would be life in prison.
18     Q. Okay. All right.
19     A. But I could be part of imposing the death
20 penalty. I have no objection to that. I'm just not
21 convinced that is the best -- always the best
22 punishment.
23     Q. Right. Now, you have now been explained the
24 system which we use in making that determination. And I
25 would suggest to you that that system is based on

177

1  answering these questions up here and not upon deciding
2  whether or not we think it's worse for them if we give
3  life or death. I assume you would abide by the system?
4      A. Yes, sure.
5      Q. Any doubts about your ability to participate in
6  a process; that is, be a juror where you would be called
7  upon to make decisions; that is, answer questions up
8  here, knowing that in answering those questions it could
9  result in ordering this Judge to order the execution of
10 the defendant sitting over here on trial? Anything
11 about your disability to participate in that process and
12 make that type of decision if that's what the law and
13 the evidence called for?
14     A. No problem.
15     Q. All right. You mentioned in the
16 questionnaire -- and I think a lot of people write this
17 same statement -- I think the punishment ought to fit
18 the crime. And I guess it might be that these questions
19 up here expand that maybe a little. It ought to fit the
20 crime and the person. There are two things we'll be
21 talking about.
22     A. Sure.
23     Q. And that's the type of evidence you hear in the
24 case. And I want to kind of jump to the punishment
25 stage of the trial, because this is the only opportunity

178

1  we get to talk to you about your feelings about that
2  punishment stage. Guilt or innocence stage is most
3  likely the guilt or innocence stage of the aggravated
4  assault case you were on. You're here to decide whether
5  the State has proven beyond a reasonable doubt all the
6  elements of the offense that are set out in the
7  indictment. If you find we've proven them beyond a
8  reasonable doubt, you find him guilty. If you find he
9  didn't, then you find him not guilty.
10         The punishment stage of a capital murder
11 case is different than the punishment stage at any other
12 crime, of any other case. Here you don't have a range
13 of punishment from "X" number of years to "Y" number of
14 years. Instead you have either life or death. And
15 that's decided not by voting life or death, but by
16 answering these questions. So, I want to spend some
17 time talking about these questions.
18         Keep in mind, though, you don't get to
19 those questions until you've already found someone
20 guilty of capital murder. And at the punishment stage
21 of trial, you may hear additional evidence that you did
22 not hear at the guilt/innocence; evidence about a
23 defendant's character, his background, his criminal
24 history, or lack thereof, his mental abilities or
25 disabilities; because that kind of information will be

179

1  used in deciding what the -- what punishment the
2  individual shall receive for the crime you've already
3  found him guilty of.
4          Issue Number One then asks you, after
5  hearing all of that evidence about the crime itself at
6  guilt/innocence and about the individual himself at the
7  punishment stage, then decide, do you find from all of
8  that evidence beyond a reasonable doubt there was a
9  probability -- doesn't say possibility; doesn't say
10 certainty.  It's in between there, kind of more likely
11 than not that the defendant could commit criminal acts
12 of violence -- whatever is criminal acts and whatever is
13 violent -- that would constitute a continuing threat to
14 society.
15         So, you're asked to determine, in your
16 opinion, after hearing all the evidence, as the
17 defendant sits before you that day, is this person
18 likely to be the type of person who will be a threat to
19 commit criminal acts of violence in the future?  Okay?
20    A.  Okay.
21    Q.  More likely than not, there is a probability he
22 would do that.  What kind of evidence do you think would
23 be helpful in making that type of determination?
24    A.  If it has his background, his records.
25    Q.  Right, okay.

180

1     A.  Well, his backgrounds, whatever that means.  I
2  don't know where it comes from, where he comes from,
3  what all he's done.
4     Q.  And, of course, it might be a determining
5  factor about the facts of the case itself that you
6  heard.  You would know by the facts of the case what
7  happened before, during, and after the crime.  Was it a
8  spur-of-the-moment crime, or was it planned and
9  premeditated?  Was the crime vicious and malicious and
10 killing innocent people, or was there some tussle or
11 relationship between the parties?
12    A.  Right.
13    Q.  What happened after the crime?  Was the person
14 braggadocious, or was he remorseful in turning himself
15 in?  And all those kinds of things.  Any problem with
16 answering that question, Issue Number One, either yes or
17 no, depending upon what the facts may show in the case?
18    A.  No.
19    Q.  Now, some people think, well, if I have found
20 someone guilty of capital murder, intentionally killing
21 someone during the course of a kidnapping or
22 intentionally killing two or more people during one
23 criminal episode, which is the kind of cases we have
24 alleged, that I would automatically or always then find
25 that there is a continuing -- there is at least a

181

1  probability that it be a continuing threat to society.
2          Other people, though, realize you have to
3  look at the crimes -- the defendant, himself; because,
4  you know, it might be important in making that
5  determination about whether or not he would be a future
6  threat; if he's never done anything before, if he's been
7  a class act, a straight A student, a Boy Scout, a
8  choirboy, whole nine yards.  This may be an aberration
9  in his life.  Somebody else, this might be just another
10 stepping stone along the way.
11         So, are you comfortable with the fact that
12 you get to consider all of this, not only the crime
13 itself, but also the individual in making that decision?
14    A.  Absolutely.
15    Q.  Now if you answer that question yes, then the
16 defendant is going to receive the death penalty.  And
17 last, on Issue Number Two, you determine there are
18 reason or reasons he should not.  It asks you to go back
19 and look at all of the evidence.  And then it spells it
20 out; the circumstances of the crime, the defendant's
21 character and background, his personal moral
22 culpability.  I'd like to refer to it as his personal
23 responsibility for the commission of the crime.  And do
24 you find there is sufficient mitigating circumstance or
25 circumstances?  I'd like to refer to it as sufficient

182

1  reasons why this person ought to receive life as opposed
2  to death.  So, what it's asking you is -- because at the
3  point in time you get to Issue Number Two, you would
4  have already found a person guilty of capital murder.
5  You would have found they're going to be a continuing
6  threat to commit future acts of violence, at least to a
7  probability.
8          And now you have to decide, are there any
9  reasons there why we should give this person life as
10 opposed to death?  Because your answers to that point
11 have indicated he should receive death.  And it gives
12 you that opportunity to re-examine the evidence and to
13 change your mind from death to life, if that's what you
14 think the evidence calls for, see if there is sufficient
15 mitigating circumstances.
16         Example how that may happen is you may
17 have heard during the trial that the defendant was high
18 on drugs or alcohol.  One juror may think, well, that
19 mitigates towards a life sentence in my mind; because
20 when you're high on drugs or alcohol, you do things you
21 wouldn't ordinarily do.  Juror Number 2 may say, wait a
22 second.  I know people who have been high on drugs or
23 alcohol all their life, and they don't go commit capital
24 murder.  I don't think there is any relationship between
25 the two.

183

1    Two people have looked at the very same
2    piece of evidence but come up with different opinions.
3    That's okay, because that's what the question is asking
4    you to do is to go back and for you to search through
5    the evidence and see what's mitigating and what's not
6    and for you to weigh it in determining what effect. Do
7    you have any problem with that aspect of the law?
8    A. No.
9    Q. Same type of any -- a person's mental ability,
10   a person's age. Somebody may think it's mitigating.
11   Somebody may think it's not. It's just for you to make
12   that determination, what -- in your mind, determine what
13   effect it ought to have and determine what you think it
14   should be given. Okay?
15   A. Uh-huh.
16   Q. What we're basically talking about is the
17   ability of someone to take an oath, be a juror, and a
18   true verdict render based on the law and the evidence.
19   Wherever the law and the evidence leads you, that's
20   where you ought to go. If you find a person not guilty,
21   you find them not guilty. If you find a person guilty,
22   you find them guilty. Just answer these questions in
23   such a way life would result, so be it; or if death
24   results, so be it, just where the law and the evidence
25   leads you. Okay?

184

1    A. Okay.
2    Q. Any problem with that aspect of the law?
3    A. No.
4    Q. Any reason to believe you have any preconceived
5    notion at this point in time as to what you would do in
6    a capital murder case, or would you have to wait and
7    listen to all the evidence?
8    A. Surely, yes, sir.
9    Q. All right. Thank you, Mr. Evans. I appreciate
10   your time, and I'm going to pass you to the other side.
11   THE COURT: Thank you, sir.
12   Mr. Wentz.
13   VOIR DIRE EXAMINATION
14   BY MR. WENTZ:
15   Q. Good afternoon. As you've been told, my name
16   is Kurt Wentz. Wayne Hill is not with us at this time.
17   And this is Mr. Charles Mamou. I'd like to ask you some
18   questions. As I go about asking you questions, I would
19   be very grateful if you would tell me the reasons that
20   you're answering them in a way that you do. So right
21   this minute, and for the next fifteen minutes or so, I'm
22   as interested in your reasons for answering the
23   questions as the answers themselves. And let me, first
24   of all --
25   MR. WENTZ: May I stand, Your Honor?

185

1    THE COURT: Surely.
2    BY MR. WENTZ:
3    Q. You filled out a questionnaire, and you had the
4    opportunity to go through -- this is your questionnaire.
5    If you'd like to look at it, it may help us as we go
6    through it. Share with us your feelings about the death
7    penalty. And I think if you go to Question 58, that
8    just generally addresses the subject.
9    A. Well, I'm not passionate one way or the other
10   about the death penalty. If it is the law, Texas law,
11   that it shall be imposed in certain circumstances,
12   again, I can listen to the evidence and make the
13   decision accordingly. I have no particular religion or
14   moral or other reason not to vote in favor of it, or
15   specifically, to vote one way or the other.
16   Q. When you were given that question to respond
17   to, did you have any idea that our death penalty system
18   operated in the manner in which it does? Did you know
19   about these Special Issues?
20   A. No.
21   Q. So you were just basically saying, you do
22   something wrong, death penalty. You didn't know about
23   the Special Issues?
24   A. No; but I assumed that the Court would give me
25   the instructions, you know, that would tell me how it

186

1    works at the time. And I could make a decision based on
2    those instructions. At least, I assume that I could.
3    I've never done this.
4    Q. So, Page 12, you've sort of touched on this
5    already. You're asked, What do you believe the most
6    important purpose of punishment is in a criminal case?
7    And you've got -- that's 62. And on 63, What is the
8    best way to achieve that purpose? And it talks about
9    punishing the accused, making the punishment fit the
10   crime, and the obvious follow-up to that.
11   Inasmuch as we're talking about the
12   intentional taking of a life, does that mean that that
13   person's life should be taken? Could you visit with me
14   a little bit about your thoughts and views on that?
15   A. Not necessarily. I really don't believe in an
16   eye for an eye, but I do not -- of the three choices
17   there, I chose retribution. I don't believe that giving
18   the death sentence to one person will deter the next
19   one. I don't believe the guy on the street is going to
20   think about that or care about that in his moment of
21   passion, or for whatever reason he's committing a crime.
22   So I don't believe that prison is much of a place for
23   rehabilitation for most people. Maybe for a select few
24   it works; but for the majority, I feel that it is not a
25   very good place to be rehabilitated.

187

1    Q.  I'd like to follow up with you on that; because
2    on the very next page, Page 14, you were asked a
3    question: Agree/disagree; prison makes convicted people
4    worse.  And you agreed with that statement.  And I think
5    you possibly can anticipate my question.  If you believe
6    that prison does make people worse, well, isn't that
7    some sort of added justification for the death penalty
8    being received by that person?
9    A.  Well, no, not necessarily.  By saying it may
10   make them worse, I don't think that, in general, it
11   makes them great.  What I have seen, the people that
12   I've known, including my own son -- ex son-in-law that I
13   have talked about in this, who has been through the
14   system for a few years, he's picked up more new tricks.
15   It's like going to grad school probably for him, dealing
16   with others who think the way he does and associating
17   with accomplished criminals, if you will.  I don't think
18   that any attempt was made to rehabilitate him.  He was
19   just put away.
20          And you hear about the rare case perhaps.
21   I don't know if it's rare or not; but once in awhile on
22   TV, the exceptional cases where somebody has been
23   rehabilitated and gone on and gotten their college
24   degree, advanced degrees, and really changed their whole
25   outlook on life.  But I doubt, as a whole, that that is

188

1    going to be the case for most of the prison population.
2    Q.  Were you aware of the forty-year minimum for
3    somebody who was convicted of capital murder and
4    received a life sentence?
5    A.  No.
6    Q.  How long was your son-in-law in prison?
7    A.  He was sentenced for eight years.  He possibly
8    served -- I don't remember exactly when he went in, but
9    maybe four, something like that.
10   Q.  Let me visit with you a little bit.  And a lot
11   of this at this point -- I'm going to repeat something
12   that the Judge said this morning, and I don't mean to
13   take up your time.  But he talked to you about looking
14   at the case, determining the conduct that you heard in
15   determining whether or not the State had met its burden
16   of proof, beyond a reasonable doubt.  Namely, was a
17   capital murder committed, or was some other type of
18   crime committed?
19          And you know that capital murder involves
20   two situations, the intentional taking of somebody's
21   life in the course of another felony, such as
22   kidnapping, or taking two people's lives in the course
23   of the same transaction.  And it's quite possible to
24   listen to that evidence and come to the conclusion that
25   the State may have failed in its burden of proof; and

189

1    they may have proven a kidnapping, but not necessarily
2    that the person took that person's life wherein the
3    person would be guilty of aggravated kidnapping or
4    kidnapping.
5          Or you might have a situation where you
6    didn't feel that the two deaths were the result of that
7    occurrence within a criminal transaction, and there
8    would be a finding of murder.  When you get to the point
9    where you do believe the State has met its burden of
10   proof, that person, in my mind -- or you've made a real
11   important decision that that person is guilty of
12   society's worst crime, and you've branded them a capital
13   murder criminal for all of us.
14          And you come to the second part of the
15   case, and you come to consider these Special Issues.
16   And you've had a situation with your son-in-law.  Can
17   you tell us -- I think you've indicated that he was
18   involved with sex with a minor?
19   A.  Yes.
20   Q.  Had he been convicted of that when you came to
21   know him, or is this something that occurred after he
22   became, if you will, a member of the family?
23   A.  He was my son-in-law at the time and,
24   basically, got too friendly with the teenager in the
25   neighborhood.

190

1    Q.  And he was already your son-in-law?
2    A.  Yes, with children, two of my grandchildren.
3    Q.  Had you ever expected that to happen?
4    A.  No, never.
5    Q.  Came as a shock to you?
6    A.  Sure.
7    Q.  Because I will say that sometimes we see people
8    we know people; they may be our friends.  When they do
9    something wrong, it doesn't surprise us.  That's a sad
10   thing to say, but there are those situations where you
11   may know somebody and you feel it's going to happen
12   anytime now.  But it was a surprise in that particular
13   instance?
14   A.  Well, to some degree.  I suppose -- I'm looking
15   back on it now, and I know him better now than I did at
16   the time.  This time I guess it was a surprise.  Looking
17   back on it, I guess, now I could say that, well, maybe
18   it shouldn't have been such a surprise.
19   Q.  And I think you've indicated in your responses
20   in the questionnaire, Questions 33, 38, and 39, that he
21   received probation, and he continued to do other things
22   and he had his probation revoked?
23   A.  He totally disregarded -- he had no regard for
24   authority, and that's the basic problem with his whole
25   life.  But he continued to flunk the attitude and

191

1 &eventually got caught. And he asked the Judge for
2 probation again, another chance. And he said, No,
3 you've already had your chance. You're off to jail.
4 So, it was his own doing.
5     Q. Let me ask you this: In this situation he
6 picked up the case. It came as a surprise. It came as
7 a shock to you. At some point he became identified to
8 you as somebody who had unfortunately done something
9 wrong. And then you, knowing him, knowing his problem,
10 you saw him violate his probation. At that point, when
11 you saw he had done something wrong, he had been
12 convicted of doing something wrong, did you anticipate
13 he would ever violate his probation, or is this
14 something that came as a surprise to you?
15     A. No surprise that he would do that. Again, lack
16 of respect for authority. Just thought he was above it
17 all.
18     Q. Special Issue Number One sort of addresses your
19 attention to that particular problem, because you've
20 found somebody guilty of capital murder. And at the
21 very least, at the punishment phase you're going to take
22 that evidence with you into the jury room and answer
23 that question. And I guess the point that I had have to
24 address with you is, having made that type of decision,
25 having received that information, and also, you know,

192

1 from your own background, do you feel that person is
2 then going to be a future danger to society?
3         Because that's the way I sort of look at
4 Special Issue Number One. Is the person, more likely
5 than not, going to do criminal acts of violence in the
6 future? And, you know, given your experience, given the
7 fact that you've now, for your own personal purpose in
8 this case, found this person guilty of capital murder,
9 do you feel that person is always going to be a future
10 danger.
11     A. When we get into the second question and learn
12 more about his background, I will have perhaps a totally
13 different view.
14     Q. Okay. But I'm going to go -- I'm going to sort
15 of go by the numbers, and I'm just going to talk about
16 Special Issue Number One right now. Having found
17 somebody guilty of capital murder, does that mean for
18 you that they will always be a danger in the future?
19     A. Not necessarily. It depends on the evidence
20 you've presented to get me to that point. What else
21 have you told me about him or her?
22     Q. Let's just assume for the purpose of our
23 conversation right this minute that you haven't received
24 any more information. You have taken all of this
25 information that's convinced you beyond a reasonable

193

1 doubt that he intentionally killed somebody and that
2 intentional killing occurred in the way that a capital
3 murder occurs.
4         And then you had -- you're sitting in
5 punishment of him. You're considering just that
6 evidence. You may get more certainly, but you'll always
7 have at least that. Are you saying, then, that Special
8 Issue Number One, for you, is then answered
9 affirmatively, yes, he would be a future danger to
10 society, that there is a probability he would commit
11 criminal acts of violence in the future?
12     A. It's hard to answer.
13     Q. Let's focus on One at this time.
14     A. Just Question Number One?
15     Q. Yeah?
16     A. Well, presumably the answer is, yes, I have
17 found, based on the evidence presented, that I believe
18 he's a continuing threat to society.
19     Q. Would you do so if you found him guilty of
20 capital murder?
21         THE COURT: Automatically.
22         THE WITNESS: No. That's what I'm trying
23 to say, is not automatically. I need to know more
24 information about him? Is this an isolated case? Or
25 he's a choirboy for the rest (sic) of his life; and all

194

1 of a sudden, whatever happened when this occurred, I
2 need to know that information.
3         And Question Number One may have presented
4 the evidence that he had did, in fact, do the crime; but
5 without further evidence about what led up to it and the
6 background and attitude and all these things, I can't
7 tell you whether I think he'll do it again or be a
8 continuing threat. So, I need more information. And
9 so, I guess the answer is, I will not automatically,
10 just because he's guilty of this crime -- I guess my
11 answer is that not automatically will he be a threat,
12 continuing threat.
13     Q. Now, you understand it's the State's burden to
14 prove that? I do not have to prove that he will not be?
15     A. I understand.
16     Q. And you also understand I don't
17 have to prove that to you beyond a reasonable doubt?
18 In other words, if there is any reason to hesitate upon
19 the State's proof, you should answer that question, no,
20 he's not going to be a future danger. And when you look
21 at this Special Issue, I think it also asks you just not
22 whether or not he's going to do something wrong; but
23 what he's going to be doing wrong, in your opinion, is
24 of such magnitude that it would be an act of violence
25 that would constitute a continuing threat to society.

195

1          In other words, you can do wrongful acts
2    that are totally disrespectful of authority. If you
3    could be on probation and not respect authority and,
4    let's say, not report to your probation officer -- I'm
5    just using that as an example. And that would be a
6    disrespect of authority, but it wouldn't necessarily be
7    a criminal act of violence. Do you see?
8          A. Sure.
9          Q. And, of course, your being in the military,
10   often when you're in the military, you have a lot of
11   rules and regulations that you have to live by that you
12   don't when you return to civilian life. And it's quite
13   possible that in the course of being in the military,
14   you could violate one of these rules that you have to
15   live under. I think I wasn't allowed to have a mustache
16   beyond the corners of my lip if I'm not mistaken.
17   You'll get written up for that. Obviously, that's
18   something wrong within the context of being in the Army;
19   but it's certainly not a criminal act of violence.
20         A. Sure.
21         Q. Do you understand -- do you think it's a good
22   idea that they require you to prove that the Special
23   Issue requires that level of violence, that level of
24   danger to society?
25         A. Yes.

196

1          Q. And I just have two more questions for you.
2    When you look at Special Issue Number Two, you've
3    indicated that you could consider mitigating evidence,
4    in your questionnaire. Could you also consider the
5    nature of the crime? Because that's one of the things
6    that asks you, Where is this mitigating evidence to be
7    found? Within the circumstances of the offense,
8    defendant's character, as well as his criminal
9    responsibility. There may be something about the crime
10   that causes you to say, well, gosh, you know, this
11   is -- there is something there. For me, life is the
12   appropriate thing. Do you have any problem with Special
13   Issue Number Two?
14         A. None at all.
15         Q. Why not?
16         A. One thing, I've considered myself in that
17   position. I have a concealed carrying weapons license.
18   I don't carry it, but I could. And if I were to come to
19   the aid of someone or to defend my own family or myself
20   from violence and ended up perhaps shooting somebody, I
21   certainly would go to trial and whatnot. I would hope
22   that somebody would consider my background and
23   mitigating circumstances under which I committed that
24   crime, defended myself. So, yes, absolutely believe it.
25         Q. Is there anything you'd like to tell me about

197

1    yourself before I sit down?
2          A. No. I think you pretty well see it all now. I
3    did want to mention that I have the concealed carrying a
4    weapons license. That last question, I didn't know
5    whether I should have or should not have mentioned it,
6    if it means anything or if you care, but that was all.
7          Q. Thank you very much.
8                THE COURT: Thank you, sir.
9                Mr. Evans, in just a second I'm going to
10   excuse you. Before I do, I will tell you that we want
11   you back Wednesday, the 29th of September, which I
12   believe to be two weeks from tomorrow. In just a second
13   I'll give you a piece of paper about that, before you
14   leave. So, before you leave, I'll tell you that we're
15   talking to folks individually. We're going to create a
16   panel of about forty-eight people. Every single person
17   will have been through exactly what you've been through.
18   On the 29th of September, if we get started on time,
19   which is 9:30, we ought to be out of here by noon. When
20   we finish that day, everybody will leave here knowing
21   whether they are or are not a juror in the case.
22               Between now and when we see you again,
23   don't you alter your lifestyle one bit for us. You do
24   your professional things just exactly like you would
25   ordinarily do them, your family things the same way. If

198

1    you have a chance to leave town between now and then,
2    take the chance. All that we ask of you between now and
3    when we see you next is this: Please don't talk about
4    this case with anybody. Please do not permit anybody to
5    talk about this case with you.
6                I don't know if there will be any
7    additional media coverage about this case between now
8    and when we get together next; but if there is anything
9    about the case in the media, avoid it. If there is
10   anything on the television, refuse to watch it; radio,
11   refuse to listen to it; and newspaper, refuse to read
12   it.
13               If you do become a juror in the case, the
14   decision you reach must be based exclusively upon the
15   information you received from within the courtroom. If
16   you need anything for anybody to show where you have
17   been for the three days you've been with us, that will
18   take care of that aspect of it. This is a reminder note
19   as to when and where you will be at about 9:30 on
20   Wednesday, the 29th. Whatever it says on there is
21   accurate.
22               Before you leave, have you any questions
23   for me? Thank you very much. You're excused.
24
25

199

                    MICHELE BEASLEY,
1

2   having been first duly sworn, testified as follows:

3                  VOIR DIRE EXAMINATION

4   BY THE COURT:

5       Q.  I ask you to remember back, Miss Beasley, and

6   the things we talked about and to this morning.  Out of

7   everything we have talked about so far, do you have any

8   questions at all for me?

9       A.  No, sir.

10      Q.  Is there anything to this point that we have

11  not yet addressed that you feel as though we should

12  because it might have some bearing on your service as a

13  juror in this case?

14      A.  No, sir.

15      Q.  Is there anything at all, Miss Beasley, that

16  you can think of, whether it be something about your

17  personal life, or whether it be something about your

18  professional life, whether it be something about your

19  health, or something entirely different that you feel,

20  in any way, would interfere with your ability to be a

21  juror in this case during the time frame we're talking

22  about?

23      A.  No, sir.

24      Q.  I believe, Miss Beasley, this phase of the

25  trial is meant to do two things; to share with the

200

1   prospective jurors the rules that could conceivably come

2   into play during the course of a trial like this;

3   because we want to know, will the jurors that we select

4   be able to follow and enforce these rules if the jurors

5   believe the testimony that has caused these rules to

6   come into play?

7            Is there anything you've heard so far

8   about what we've talked about, about which you have some

9   disagreement.

10      A.  No.

11      Q.  Do I understand, then, that you are making the

12  comment to me that if you were a juror in the case, not

13  only could you follow the laws that we've talked about,

14  but also, as a juror, enforce them?

15      A.  Yes, sir.

16      Q.  The second aspect of this operation, Miss

17  Beasley, is for you to satisfy yourself, for the lawyers

18  to be satisfied, that if you become a juror in this

19  case, you sit back in any one of those twelve chairs,

20  listen to all of the information the lawyers give to

21  you; then you evaluate that information however you see

22  it, and you come up with what you think is the right

23  result to reach based upon how you evaluate the

24  information they give to you.  Does that sound right,

25  Miss Beasley?

201

1       A.  Right.

2       Q.  We talked earlier today, and I want to spend

3   just a second to separate some things.  We talked to you

4   this morning about how a trial like this can unfold.

5   Jury goes out the first time to decide whether the

6   defendant's guilty or not.  If the jury finds the

7   defendant guilty of capital murder, that means

8   necessarily they will have found that the person on

9   trial intentionally took the life of another human being

10  without any legal justification or excuse during the

11  course of another major felony.  Was it you that asked

12  the question?

13      A.  Uh-huh.

14      Q.  We come back to the second phase of the trial,

15  and you get to hear information at the second phase of

16  the trial that gets -- again, the focus gets off the

17  offense committed and gets onto the person that

18  committed it; that is to say, the character, the

19  background, and so forth.

20           It may very well be in some hypothetical

21  case that based upon all the evidence in the case the

22  jury, after having found a defendant guilty of capital

23  murder, might find that all of the evidence in the case

24  also supports a yes answer to that first question, that,

25  in fact, because of the circumstances of the particular

202

1   case a person, a juror, does believe that the defendant

2   would be a future -- future threat to society.

3       A.  Uh-huh.

4       Q.  So, now, what's your posture in this imaginary

5   case that I'm conjuring up?  We're now in the posture of

6   a jury having found a defendant guilty of capital

7   murder.  Obviously, having also been found unanimously

8   that the defendant on trial is such a disgusting person

9   that you know he's going to be a future threat to

10  society.  But can you see how that's not the end?

11      A.  Uh-huh.

12      Q.  But still, there may be features in the case

13  that might be -- might rise to the level that makes you

14  think that even though you found him guilty of capital

15  murder, even though you're satisfied he's a future

16  threat to society, that maybe you think a life sentence

17  might be more appropriate.

18           So, what I'm simply saying is that each of

19  those three verdicts that you're going to ask to

20  return -- that is, guilty/not guilty in the first phase.

21  You answer the first question.  You answer the second

22  question.  They are all independent of each other.  And

23  by that I mean that just because one verdict you return

24  in one way, it has no bearing on how you should answer

25  either one of those two questions.  And how you answer

203

1  either one of those two questions has no bearing on how
2  you answer the other question. Can you see how that is
3  all independent of each other?
4      A.  Right.
5      Q.  Before we begin, have you any questions for me?
6      A.  No, sir.
7      Q.  Okay.
8          THE COURT:  Mr. McClellan.
9          MR. MCCLELLAN:  Thank you, Your Honor.
10             VOIR DIRE EXAMINATION
11 BY MR. MCCLELLAN:
12     Q.  Miss Beasley my name is Lynn McClellan.  Along
13 with Claire Conners, we represent the State of Texas in
14 this case.  I wanted to kind of go over your
15 questionnaire and go over some of your answers there and
16 talk about some aspects of the law that might apply in a
17 case like this, and then I think we'll be through.
18         First of all, I appreciate the information
19 that you gave us in the questionnaire.  The
20 questionnaire contains a lot of personal information
21 that, obviously, you did have to share that we would not
22 have known otherwise; and I appreciate that.
23         Having been a person addicted to drugs in
24 the past and now having been off that for a long period
25 of time, is there anything that you think we ought to be

204

1  concerned about or that you think would affect your
2  ability to serve as a juror in a case?  Obviously, many
3  times crimes revolve around drugs.  Anything about that
4  that you think would affect your decision in a case like
5  this?
6      A.  No, sir.
7      Q.  Okay.  In your questionnaire there was a couple
8  of things I wanted to talk about.  You said -- What are
9  your feelings about the death penalty?  And you said, In
10 the cases where someone murdered an innocent person or
11 several murders, I believe in the death penalty.  I
12 guess the argument could be made that in every capital
13 murder case, or in many capital murder cases, the person
14 is going to be innocent.
15     A.  Meaning -- what you mean by innocent?
16     Q.  Whether they're deserving, or whatever type
17 situation.  Obviously, if I kill someone in
18 self-defense, it's not capital murder.  It's a not
19 guilty.  If I kill somebody by accident, it's again not
20 a crime.  So, capital murder is the intentional taking
21 of another person's life without any legal
22 justification.  So conceivably, you could say that
23 person was innocent, as far as not deserving to die, but
24 not of capital murder.  As you know now, according to
25 the way you've seen the system is set up, will result in

205

1  a person getting the death penalty.  So, do you agree
2  with the process or that type of setup, where it's set
3  up to where not everyone who is guilty of capital murder
4  will always receive the death penalty?  You have to
5  examine all the facts and circumstances of not only the
6  crime, but of the individual's background?
7      A.  Yes, sir.  I don't think I was aware of the
8  Issue Number Two before this process.
9      Q.  And I'm sure you had no reason to be.  I don't
10 know that anybody is.  If they were aware of it, I'd
11 like to know why; because it's not something that would
12 usually come out, I think.
13         In your questionnaire, you also
14 answered -- there is a list of agree/disagree.  And it
15 says, The death penalty is always justified for an
16 intentional murder.  And you agreed to that.  Of course,
17 now you know that every murder is an intentional murder.
18 I mean, that's the definition of murder.
19     A.  Yeah.
20     Q.  Murder is the intentional taking of another
21 person's life.  So, there are no unintentional murders,
22 accidental murders; because they're not murders if
23 they're that.  Do you believe that everybody who commits
24 murder ought to receive the death penalty?
25     A.  No, based on what the circumstances were.

206

1      Q.  Right.  A lot of people have come to us from
2  time to time on jury duty, and I think it's common
3  whenever you -- whenever you think of capital murder, I
4  assume you're thinking of something pretty bad.  If
5  somebody's thinking of murders, they're thinking of
6  something pretty bad.  There is literally thousands of
7  situations that constitutes murder or capital murder;
8  and you couldn't think of them all, and I couldn't think
9  of them all.  And that's why you have to wait and hear
10 what the facts and circumstances are before you make
11 your decision.
12         Just like the Judge talked to you, in a
13 murder case, the range is from ninety-nine years -- five
14 years to ninety-nine years, or life.  Sometimes we get
15 people that say, I could never consider five years.  And
16 I'm going, how do you know?  You don't know what the
17 facts are.  And how could you have already decided
18 without knowing the facts?  And you're going to figure
19 out you can't.  But when you're thinking of something in
20 your mind, when you think of murder -- and you're not
21 thinking of some real nice situation when you think of a
22 bad situation.  You may think it's common or uncommon
23 that people are thinking the worst explanations.
24         But you see through the system that's set
25 up here, you have to consider all the facts of the

207

1  crime; and that might give you reason to believe the
2  death penalty shouldn't result. You also get to hear
3  about all the individual's -- his character, background,
4  criminal history, or lack thereof, mental abilities,
5  disabilities, all kinds of information about the
6  individual himself that may also indicate whether or not
7  they should receive the death penalty or not.
8        Many years ago in South Carolina there was
9  a lady named Sue Smith, who put two kids in the backseat
10 of her car and rolled it off into the lake and killed
11 the two children, reported somebody else had done it or
12 whatever. She was convicted capital murder, but she
13 received a life sentence. As horrible as that crime
14 was, jurors might have decided that there was not -- she
15 was not a continuing threat to commit future acts of
16 violence; because it wasn't likely she would do anything
17 like that again, or she was not a threat to go out and
18 commit robberies or other acts of violence.
19        And I don't know if they have that issue
20 or not, but it could cause you to conceivably think
21 that -- you have to look at a person's background. And
22 if this act you did is horrible and it's capital murder
23 doesn't mean -- I mean, it could mean that is a total
24 aberration of the rest of his life. You have to look at
25 that and weigh all the circumstances. All that is to

209

1  instance, if he's an innocent bystander or someone they
2  knew, violence of the crime, and all the evidence of the
3  mental state. In other words, you think of all kinds of
4  things you would need to know in making that type of
5  determination as opposed to just saying capital murder/
6  death. We don't have that. And if that's the way you
7  believe, that's fine. We just need to know you'll set
8  that aside if that's what you believe or if you don't
9  believe that. We have to follow the law and the
10 evidence. Some people can. Some people can't. We just
11 need to know if you can.
12    A.  I can. In all honesty, I was in a very big
13 hurry when I was filling that thing out.
14    Q.  You and a bunch of other people, I imagine,
15 except they knew as soon as you finish this, you get to
16 go home for the rest of the day.
17        Let me see here. Anything about you or
18 your opinions or beliefs that you think I ought to be
19 concerned about, being the State of Texas? Obviously,
20 we're seeking the death penalty in this case. We're
21 going to try to convince jurors the defendant is
22 convicted of capital murder and the answers ought to be
23 yes and no, since the death penalty applies.
24        All I look forward to is jurors that will
25 give us a shot and listen to all that evidence and call

208

1  say, you have to wait until you hear all of the facts
2  until you can ever really decide what the appropriate
3  punishment is and how you would answer any of these
4  questions.
5    A.  Yes, sir.
6    Q.  You agree with that?
7    A.  Yes, sir.
8    Q.  Of course, if a person was asking you on the
9  street, what's your opinion about this and what's your
10 opinion about that, people have opinions. And that's
11 fine and, you know, it's no problem having them. But if
12 you find that your opinion conflicts with what the law
13 is, you have to be able to set it aside and follow the
14 law.
15        Some people say, I can't do that. I'm
16 going to follow my opinion, and I don't care what the
17 law is. We just need to know of people who can take an
18 oath to a true verdict render based on the law and the
19 evidence. Are you that type of person?
20    A.  Yes, sir.
21    Q.  It's like this question, I guess. It says,
22 What things do you think are important in deciding
23 whether or not the person should be sentenced to the
24 death penalty or life imprisonment? And you put
25 criminal history, the crime, who the crime was on. For

210

1  it the way they see it. And do I have a shot with you
2  to listen to that evidence and call it the way you see
3  it?
4    A.  Yes, sir.
5    Q.  Thank you, Miss Beasley. I appreciate it?
6        THE COURT:  Thank you.
7        Mr. Hill.
8        MR. HILL:  Thank you, Judge. I'm sorry.
9             VOIR DIRE EXAMINATION
10 BY MR. HILL:
11    Q.  How are you today?
12    A.  Fine.
13    Q.  I just have a couple of questions that will
14 really get right to the matter from the defense
15 perspective. Obviously, Mr. McClellan and Miss Connors
16 have a view of you; and they want to know a prospective
17 juror can look at a case. And in all fairness to you,
18 both sides aren't looking for a fair and impartial
19 juror. They're both looking for a juror that will be a
20 little bit fairer to their side.
21        So, Mr. McClellan gave you an example of
22 Susan Smith in South Carolina. How did you feel about
23 that when you heard about that verdict in the news? Did
24 you have a particular feeling one way or the other when
25 she received life?

211

1    A. When I initially heard about the story, yeah,
2  or at any point. I thought it was horrible that a
3  mother could do that.
4    Q. Okay. Do you see where whoever had the
5  responsibility for ultimately sentencing her had to make
6  that decision based on all the facts that they had at
7  their disposal?
8    A. Yes, sir.
9    Q. Would you agree with the proposition that it
10 would be unfair for other people to criticize that
11 Judge's or that jury's finding since they're the ones
12 that sat there and listened to everything from start to
13 finish?
14   A. Yes.
15   Q. Okay. Give me a few reasons why, as I'm
16 sitting here as a defense attorney, Mr. Wentz and I,
17 when we sit down and discuss it should say, Miss Beasley
18 is somebody that we're all comfortable with. She's
19 really going to be the type of person who, in all
20 fairness, may not give us extra points; but she's
21 going to be somebody that we don't have to fear carries
22 a particular agenda with her as she sits in one of these
23 seats. So, can you think of anything that would make us
24 feel more comfortable?
25   A. I just think I'm a pretty fair person. I don't

212

1  judge people by their race or by their sexual preference
2  or anything like that. I think everybody is a person,
3  and you should be fair with everybody.
4    Q. Do you feel that the way Texas has this system
5  set up for determining for those people who are
6  convicted of capital murder -- do you think this is a
7  fair system about how to go about doing it?
8    A. Yes. As a matter of fact, I didn't realize
9  that their backgrounds could be considered.
10   Q. Okay. Do you think background necessarily
11 talks about bad background, good background, or the
12 entirety of their background?
13   A. The entirety.
14   Q. Most people, when they come down here, when
15 they talk about background right away, they're thinking
16 in terms of, I'll bet you there is something about this
17 particular defendant that, you know, I should hear at
18 some point and maybe I'm not going to hear about at the
19 guilt stage. And I just need to know whether or not you
20 have any of those thoughts or concerns at all?
21   A. I'm sorry?
22   Q. Sometimes people come down and say, oh, we're
23 going to hear about their character or their background.
24 People are concerned sometimes that they don't get to
25 hear about that information. Do you think that's

213

1  helpful to hear about the background?
2    A. Uh-huh, yes.
3    Q. How come?
4    A. Because it kind of lets you know what kind of
5  person they've been up to that point.
6    Q. If you were a person on trial for capital
7  murder, you were my client today, okay, jury's just
8  found you guilty, what would you want the jury to know
9  about you?
10   A. The good things.
11   Q. Well, would you want them to know about things
12 you had to work through in your life to show what
13 adversities you faced?
14   A. Yeah, and the fact that I got through them,
15 yes.
16   Q. Were there other people that you knew that had
17 similar problems that didn't get through?
18   A. Uh-huh.
19   Q. What type of questions would you have of me
20 about this process?
21   A. I don't think I have any.
22   Q. Did you have any particular feelings when you
23 finished filling out the questionnaire; you knew you
24 were going to be coming down here today and be
25 questioned? Were there any things that ran through your

214

1  mind about this type of case or the allegations,
2  specifically, that's been made against Mr. Mamou?
3    A. No, not really.
4    Q. Give me just a minute. There is a couple of
5  questions that you answered on the questionnaire
6  regarding the death penalty. Talked about what was
7  the -- what was one of your arguments against the death
8  penalty? And I noticed that that was left blank. Could
9  you kind of fill in the blank for me, if you will?
10   A. Against the death penalty? I don't know that I
11 have one. I mean, I don't know that I have an argument
12 against it.
13   Q. Would you consider yourself a strong proponent
14 of the death penalty?
15   A. I don't really consider myself strong one way
16 or the other about it.
17   Q. Okay. Sometimes that might be an unfair
18 question, to ask for somebody to kind of come up with an
19 argument against it, so -- it did say, though, what are
20 your feelings about the death penalty? In the cases
21 where someone murdered an innocent person or several
22 murders, I agree with the death penalty. And you said,
23 The best argument for the death penalty is prison
24 overcrowding. If a person in his right mind knowingly
25 killed another, especially repeat offenders, he should

215

1   get the death penalty. How does prison overcrowding
2   come into that? What were you thinking about?
3       A.  I guess like if it was a repeat offender, or
4   they killed -- when I say innocent person, I'm talking
5   about like a child or an innocent bystander. It wasn't
6   an ex-spouse they were fighting with.
7       Q.  Okay. What did you think when Judge Burdette
8   mentioned this morning, specifically addressing what
9   life in Texas means? Did that perhaps answer some of
10  the concerns that you may have expressed in the
11  questionnaire here. I don't know if you remember all
12  the questions that were asked, but a couple of them --
13  one was people were getting out of prison on good
14  behavior.
15      A.  You mean when he talked about forty years with
16  no --
17      Q.  Yes. I mean, are you left with any concern?
18  Because this is the only time we're going to get to know
19  it. If you're going back to the jury room, if you found
20  somebody guilty of capital murder, are you going to sit
21  there and say, My God, you know, forty years is a long
22  time; there is the possibility somebody could be
23  released at the 40th year or the 41st year, would that
24  enter into your deliberations at all in evaluating the
25  answers to those questions?

216

1       A.  The fact he was released after forty years?
2       Q.  No, the fact he might be released after forty
3   years.
4       A.  No, that wouldn't affect the way I answered it.
5       Q.  You would answer the questions based on the
6   evidence? And don't speculate; because as Judge
7   Burdette said, one scenario is he would serve the rest
8   of his remaining life in prison. And another is, it's
9   just speculation; because we don't know what any
10  executive board might do.
11      A.  Right.
12      Q.  The last area I just want to ask you about real
13  quickly is when Mr. McClellan was posing the questions
14  to you about the answers to these questions, he snapped
15  his finger and kind of said, you know, you wouldn't do
16  things automatically. I just need to know whether or
17  not in the real world you were faced with a situation,
18  given any kind of capital murder case, understanding
19  what that is, that you had found a person guilty of --
20  beyond a reasonable doubt of capital murder.
21          And you're now at the punishment stage,
22  and you believe beyond a reasonable doubt that a person
23  is, in fact, going to be a continuing threat to society.
24  At that point are you basically saying to us that
25  Question Number Two would always have to be answered no.

217

1   In other words, you could never find any set of
2   circumstances or a circumstance that would be sufficient
3   mitigation to result in a life sentence. In other
4   words, the combination of finding the person guilty of
5   capital murder beyond a reasonable doubt and whatever it
6   is that convinced you that Question Number One is yes,
7   you've answered that yes.
8       A.  Would I have to answer Number Two yes? Would I
9   feel like I had to answer it yes?
10      Q.  Would you feel like you have to answer it no,
11  because a no answer --
12      A.  No, I wouldn't feel that way.
13      Q.  No questions of me?
14      A.  Huh-uh.
15          MR. HILL: Thank you, Judge.
16          THE COURT: Thank you.
17          Miss Beasley, in just a second I'm going
18  to excuse you. Before I do, I will tell you that we
19  want you back two weeks from tomorrow, which is
20  Wednesday, the 29th. I'll give you a piece of paper
21  with the information in just a second. What we're doing
22  is talking to folks individually for the purposes of
23  creating a pool or panel. There is going to be about
24  forty or so people here on the 29th of September.
25  Everybody will have gone through exactly what you've

218

1   been through. If we could get started on time that day,
2   that being 9:30, everybody ought to be out of here by
3   noon.
4           When we leave on the 29th of September,
5   everybody will leave here knowing definitely whether
6   they are or are not a juror. Between now and when we
7   see you in two weeks, don't alter your lifestyle one bit
8   for us. You do your personal life exactly like you're
9   doing, your professional things just like you're doing.
10  If between now and when we see you next, if you have a
11  chance to leave town for a while, take a chance.
12          All that we do ask of you between now and
13  when we see you next is this: Please do not talk about
14  this case with anybody. Please do not permit anybody to
15  talk about this case with you. I don't know if there
16  will be any news media treatment of the case between now
17  and when we see you. If there is anything about the
18  case, avoid it. Anything about the case on the
19  television, refuse to watch it; newspaper, refuse to
20  read it; radio, refuse to listen to it.
21          And the reason, Mrs. Beasley, for each of
22  those restrictions is to attempt to accomplish the same
23  common goal or objective; and that's this: If you do
24  become a juror in the case, the decision that you reach,
25  whatever it is, must be based exclusively on the

219

1 information you get when you're in the courtroom. You
2 cannot, at any phase, let anything outside the courtroom
3 affect you. If anybody needs to know or wants to know
4 where you have been, we will take care of it. Do you
5 have any questions of me?
6     A. No, sir.
7     Q. Thank you very much.
8                 CECILIA FINE,
9 having been first duly sworn, testified as follows:
10             VOIR DIRE EXAMINATION
11 BY THE COURT:
12     Q. Just have a seat make yourself comfortable,
13 please. We all recognize it's been a long day for you.
14 And the only thing we can say is we haven't been wasting
15 our time, either. Miss Fine, before we begin, I'd ask
16 you to remember back to yesterday the things we talked
17 about with the whole group. Add to it this morning the
18 things we talked about when eight of you were here this
19 morning. Out of everything that we have talked about so
20 far, do you have any questions for me?
21     A. No.
22     Q. Is there anything to this point that we have
23 not yet touched on that you think we ought to talk about
24 because it might have some bearing on your ability to be
25 a juror in this case?

220

1     A. No.
2     Q. Anything at all that you could think of
3 presently, maybe something is to do with your personal
4 life, might be something to do with your professional
5 life, might be something to do with your health, might
6 be something to do with something entirely different,
7 that in any way would cause you to believe you could not
8 serve as a juror in this case during the time frame
9 we've discussed?
10     A. No.
11     Q. Miss Fine, this phase of the trial is meant to
12 accomplish two things. One is to attempt to give the
13 prospective jurors a bit of an overview as to what rules
14 can come into play during the course of a trial like
15 this. Because we're going to want to know, if you are a
16 juror in this case, can you follow these rules? From
17 what we've talked about so far, anything I've mentioned
18 that what you find objectionable and feel, as a juror,
19 you could not follow or enforce?
20     A. No.
21     Q. So, we have no problems with the rules. Second
22 aspect of this process, I think, has to do with the
23 ability you have to satisfy yourself, the lawyers need
24 to be satisfied, that if you became a juror in the case,
25 you're equipped to sit back, listen to all the evidence,

221

1 evaluate it however you see it, and come up with what
2 you think is the right result to reach based upon your
3 evaluation of the evidence that they present to you.
4 Does that sound like you?
5     A. Yes.
6     Q. I mean by that, your job is not to try and
7 satisfy one side or the other or please them. Your job
8 is certainly not to please me. Your job is to be
9 satisfied with yourself five years from now when you
10 wake up in the morning, you say to yourself, What I did
11 five years ago was absolutely the right thing, whatever
12 the result.
13         I want to spend just a second talking to
14 you about this kind of a case generally speaking.
15 Because sometimes we see that folks come down for jury
16 service, and the thing kind of snowballs a little bit
17 from this standpoint: Let's say hypothetically that
18 you're a juror in a case wherein a defendant has been
19 found guilty of capital murder, obviously an awful
20 murder. Don't know what the testimony is, but we'll say
21 that's the result.
22         You know, you come back, you hear the
23 second phase of the trial, the testimony about the
24 defendant, himself. You heard about the crime. Now
25 you're going to hear about the defendant. Whatever that

222

1 testimony was, let's just say that it rises to the level
2 that proved to you beyond a reasonable doubt the answer
3 to this first question that we talked about today, about
4 being a future danger, you believe that answer should be
5 yes. So, what we've done now is we have found somebody
6 guilty of capital murder. We have found that they're a
7 future danger to society. But can you see that the
8 whole thing is not over yet, because there is still that
9 next question to answer.
10         And there may very well be in a case
11 evidence of a mitigating circumstance, a sufficient
12 reason that makes you believe that while you did find
13 the defendant guilty of capital murder, while you also
14 found they were a future threat, there may also be
15 evidence that satisfies you that a life sentence still
16 would be a more appropriate verdict because of
17 circumstances of the case, whatever they might be, or
18 the circumstances of the defendant, whatever they might
19 be.
20         So, I guess what I'm asking you to keep in
21 mind is each question that you're asked to answer, being
22 the first phase of the trial, when you're to decide is
23 he guilty or not guilty, that being if you find him
24 guilty of capital murder, first question. At the second
25 phase of the trial, if you answer that question yes, the

223

1　third question -- the second question at the second
2　phase of trial.  Those three verdicts are all
3　independent of each other.  And just because you return
4　a finding of guilt of capital murder, in and of itself,
5　has nothing to do with how you think that first question
6　should be answered.
7　　　　　Now maybe you think it should be answered
8　yes; but then maybe, again, you might think it should be
9　answered no.  So, everything starts all over again.
10　When you get to one question, you start off at ground
11　zero.  Assemble all the evidence.  Talk about it,
12　because you're going to go use the same body of
13　information as that being the evidence in the case; but
14　you're going to be asked different things about that
15　same body of information.  So how one question is
16　answered can't possibly dictate how the next question is
17　answered, in and of itself.  Am I making any sense at
18　all?
19　　　A.  Yes.
20　　　Q.  You're very kind, because I couldn't have
21　sorted that out and I heard me talk about it.  Before we
22　begin, do you have any questions of me?
23　　　A.  No.
24　　　Q.  We're going to let the smart guys talk to you.
25　　　　　THE COURT:  Go ahead.

224

1　　　　　　VOIR DIRE EXAMINATION
2　BY MR. MCCLELLAN:
3　　　Q.  My name is Lyn McClellan.  Along with Claire
4　Conners, I represent the State of Texas in this case.  I
5　want to go over your questionnaire and ask some
6　questions about it and talk to you about certain aspects
7　of the laws and we'll be through.
8　　　　　First of all, before you became a
9　full-time housewife, you worked for Dr. Greensway?
10　　　A.  Yes, sir.
11　　　Q.  And what did you do for him?
12　　　A.  I did the payroll.
13　　　Q.  Okay.  And E.S.L. Incorporated, what is that?
14　　　A.  It's a subsidiary of T.R.W. Electronics firm.
15　　　Q.  So it's not English as a second language?
16　　　A.  Nope.
17　　　Q.  Can you tell me in your own words, what is your
18　opinion about the death penalty?
19　　　A.  My own opinion, since I've never been asked
20　that, in some cases I think it's -- it should be used
21　if --
22　　　Q.  Go ahead.
23　　　A.  I was going to say if the person is harmful to
24　society, then I think it should be used.
25　　　Q.  What kind of cases come to mind if you think of

225

1　cases where you think the death penalty ought to be
2　available.  Does any type of cases come to mind?
3　　　A.  You mean a certain case?
4　　　Q.  Or just a certain type of crime?
5　　　A.  If the person has no regard for life at all and
6　has shown that always.
7　　　Q.  Shown that always.  Do you mean, has been the
8　consistent killer of people?  Obviously, that would be
9　an easy one if they were.
10　　　A.  Yes.
11　　　Q.  Is that something that you think would be
12　required to show, that the person killed over and over
13　again?
14　　　A.  Just didn't care about human life in general.
15　　　Q.  All right.  Has there ever been a point in time
16　in your life where you opposed the death penalty and
17　thought it was not appropriate?
18　　　A.  You mean, a certain case?
19　　　Q.  Either that or just in general?
20　　　A.  No.
21　　　Q.  Okay.  Some people say when they were young --
22　I don't know that anybody could ever pinpoint when they
23　made up their mind about the death penalty one way or
24　the other.  I don't know if that's an event in anyone's
25　life?

226

1　　　A.  I mean, the only time would be, hopefully for
2　sure, that person was guilty and deserved to die.  If
3　they were wrong in saying that he wasn't guilty, yeah,
4　that would -- hopefully, he's guilty.
5　　　Q.  Right.  Okay.  Of course, you'll be able to be
6　the one that makes that decision?
7　　　A.  Right.
8　　　Q.  Some people come to us and say they believe in
9　the death penalty.  They think it's a proper type of
10　punishment for certain types of crimes.  Ought to keep
11　it available; ought to keep it on the books.  But
12　certain people go further and tell us they don't believe
13　they, themselves, could ever participate in a process --
14　in other words, be on a jury where they're called upon
15　to make a decision or decisions, knowing that those
16　decisions would result in this Judge ordering the
17　execution of the defendant sitting over here on trial.
18　Do you have any doubts about your ability to participate
19　in this type process and make those type of decisions if
20　that's what the law and the evidence called for?
21　　　A.  I think I could.
22　　　Q.  All right.  You've never been on a jury before?
23　　　A.  Never.
24　　　Q.  Have you ever been called down before?
25　　　A.  No.

227

1      Q.  First time out of the box, and here you are.
2  Okay.  And you're going to find most people that are
3  going to be on the jury with you are going to be people
4  who either, one, never had jury duty before, or this is
5  definitely the first time many of them will ever sit on
6  a jury to hear a case.
7           Did you, in the questions about the agree
8  statements, agree/disagree, hedge like some people do on
9  a lot of these?  It says, The death penalty is
10 absolutely justified.  And you said, In some cases.  And
11 the death penalty is just and necessary.  And you said,
12 In some cases.  Then the prison makes convicted people
13 worse.  And you said, In some cases.
14     A.  Well, because I would have to know the
15 circumstances.
16     Q.  That's a good point, because this whole process
17 revolves around having another circumstance.
18     A.  Right.
19     Q.  I don't think anybody, truthfully, knows.  Some
20 people will come and tell us they could -- truthfully
21 couldn't tell us what they would do in finding whether a
22 person is guilty or not guilty until they hear the
23 facts.
24     A.  Right.
25     Q.  If I told them they had found someone guilty of

228

1  capital murder, I don't think they could truthfully tell
2  me what punishment they're going to give unless they
3  knew what the facts were, and all the information about
4  the defendant, and everything else, and the facts the
5  law calls for.  That's what you do.  And if it doesn't
6  call for it, don't do it.  And some people criticize
7  being an oversimplification, but that's basically what
8  it boils down to.  You're going to take an oath to a
9  true verdict render based on the law and the evidence.
10 If you do that, where you follow where the law and the
11 evidence leads you, then you'll satisfy your oath as a
12 juror.  I need you to find a person not guilty, that's
13 fine.  I need you to find a person guilty, that's fine.
14 You want to give death and give life, either one, that's
15 what the law and the evidence calls for.
16          Issue Number One talks about future
17 continuing threat to society.  In other words, it's
18 talking about a person -- you don't get to that issue
19 unless you've already found someone guilty of capital
20 murder, whatever the facts were in the case you heard
21 before you make that decision.  You then have those
22 facts to look at.
23          And then at the punishment stage of the
24 trial, before answering that question, you may hear
25 additional evidence about a defendant's character and

229

1  background, criminal history or lack thereof, mental
2  abilities or disabilities.  And then you're asked to
3  determine has the State proven to you beyond a
4  reasonable doubt that there is a probability -- I
5  suggest to you that that means more likely than not --
6  that this person on trial would commit criminal acts of
7  violence that will be a continuing threat to society?
8  Doesn't say, would commit another murder or capital
9  murder, although those are obviously criminal acts of
10 violence.  Could be a burglary, or a robbery, or hitting
11 someone so hard with your fist you knock them out,
12 anything that's criminal or violent in nature.  Do you
13 think you would be able to make that determination as to
14 whether or not there is a probability that someone would
15 commit criminal acts of violence that would constitute a
16 continuing threat to society, based on the evidence that
17 you heard, either yes or no?
18     A.  Yes.
19     Q.  Okay.  If you answer that question yes, the
20 defendant's going to receive the death penalty, unless
21 on Issue Number Two you decide he's not.
22          Number two asks you and gives you a
23 checklist of things.  Says, now take into consideration
24 all of the evidence, including the circumstances of the
25 crime, the defendant's character and background, his

230

1  personal moral culpability.  I'd like to refer to it as
2  his personal responsibility in the commission of the
3  crime, or the person who pulled the trigger that killed
4  someone, or the getaway driver.  That has to do with
5  their responsibility.
6           And do you find there is sufficient
7  mitigating circumstance or circumstances -- I'd like to
8  refer to it as sufficient reasons why this person should
9  receive life as opposed to death.  It gives you the
10 opportunity, after having heard everything and
11 considering everything, to go back -- in fact, it
12 demands you go back and look at the evidence, and can
13 you find anything that's mitigating, gives me a reason
14 to give a person life as opposed to death.  And if you
15 find evidence of that nature, then you weigh it in your
16 mind to determine if it's sufficient to change your vote
17 from death to life.  And if you think that's the right
18 thing to do, that's what you do.  If you don't think
19 it's the right thing to change your vote, then you
20 don't.  You leave it like it was.  Any reason you
21 couldn't follow that aspect of the law?
22          Now, keep in mind that before you get to
23 Issue Number Two, you would have already found someone
24 guilty.  You would have already found they're a
25 continuing threat to commit future acts of violence.

231

1   And a lot of people may say, wait a second.  If I found
2   they're guilty and they're going to commit criminal acts
3   of violence, at least to a probability, that's the kind
4   of evidence the death penalty is made for, isn't it?
5   And quite frankly, Issue Number Two commits you to going
6   back to look to see, to make sure and see if there is
7   anything there that ought to change that vote from death
8   to life.  And if it is, it gives you the opportunity to
9   do it.  And if not, you say, so be it.  Any problem with
10  that?
11      A.   No.
12      Q.   You have to be pretty much, you know, down the
13  middle of the road; and you'll listen and take the
14  evidence and make a decision.  And that's kind of what
15  we're looking for, people who can do that.  Anything you
16  can think of that you think would affect your ability to
17  serve as a juror?
18      A.   Huh-uh.
19      Q.   Any reason -- so you'll know, the State of
20  Texas is seeking the death penalty in this case.  I'm
21  going to ask -- try to convince jurors and ask them to
22  find the defendant guilty of capital murder, try to
23  convince the jurors that Issue Number One has been
24  answered yes, and Issue Two no, such that the death
25  penalty would be imposed.  Is there anything I need to

232

1   know or be concerned about your ability to render those
2   type of decisions if that's what the law and the
3   evidence called for you to do?
4          Thank you very much.  I appreciate it.
5          THE COURT:  Thank you, sir.
6          Mr. Hill.
7              VOIR DIRE EXAMINATION
8   BY MR. HILL:
9       Q.   Hi, Miss Fine.  I just want to talk with you a
10  little bit about some of the answers that you gave --
11  I'm sorry.  I can't hear myself think.  We've been doing
12  this all day long.  This is not something that we take
13  lightly, but occasionally we kid with one another.  I
14  want to ask you a few questions from a defense
15  perspective so I can satisfy myself, along with
16  Mr. Wentz, that if we ask you to return back on the 29th
17  of September so that we can visit and figure out exactly
18  whether you're going to make the last twelve, that we've
19  given you a fair opportunity to share some thoughts with
20  us.
21          Okay.  I looked at these questionnaires.
22  I picked a few things that maybe I want to follow up on.
23  One of things that I'm struck by is there is a question
24  that asked you how you feel about the different
25  purposes.  Says, What do you believe is the most

233

1   important purpose for punishment in a criminal case?
2   The two that you picked was deterrence, and the third
3   would be rehabilitation, or to reform the accused.  I
4   guess I'd like to ask you whether or not you feel that
5   rehabilitation plays a role, potentially, for you in a
6   capital murder case.
7          In other words, when you're talking about
8   rehabilitation for an offender, do you think that that
9   is something you would look at if you had found somebody
10  guilty of capital murder and you're trying to evaluate
11  whether or not this person should die by lethal
12  injection or whether they should be sentenced to life in
13  prison?  Do you think rehabilitation is a factor that
14  you would look at?  In other words, do you think it's
15  something that you will spend your time thinking about,
16  or it's just not relevant at all.
17      A.   I would think it would depend on the
18  circumstances of the murder.
19      Q.   Okay.  What do you mean by that?  Give me --
20      A.   I mean, his background, how the murder took
21  place.
22      Q.   Do you think that -- and this is somewhat
23  rhetorical -- but do you think that every murder case
24  that occurs where a jury sits and listens to all of the
25  evidence and where those juries find people guilty of a

234

1   crime -- do you think they're all committed essentially
2   the same way?
3       A.   No.
4       Q.   What type of factors or circumstances would be
5   important for you to take into consideration?  What are
6   the type of circumstances that you think might help you
7   to understand how a case should be decided, maybe some
8   of the factors you'd wanted to know of?
9       A.   I don't know if I understand.  I don't know if
10  I understand the question.  I'm sorry.
11      Q.   Okay.  Some people have told us they would want
12  to know whether or not the people that were involved had
13  a relationship before, whether or not they were total
14  strangers to each other, whether or not they were
15  involved in any wrongdoing at the time the events took
16  place that led to somebody committing a different crime.
17  Would that factor be important for somebody like you?
18      A.   Yeah.  Anything that had to do with the crime
19  would be important and why the person did what they did.
20      Q.   If you looked -- and if it seems that we're
21  spending an inordinate amount of time questioning you
22  about the death penalty, this is our only opportunity to
23  visit with you.  There may be additional questioning in
24  a couple of weeks, brief questioning on some topics; but
25  this is essentially the only time we're going to be

235

1 talking to you about the death penalty issue, so we
2 necessarily have to address that.
3     A.   Right.
4     Q.   When you look at Question Number Two, obviously
5 you've already found a person guilty of capital murder.
6 You have already agreed with eleven other people that
7 that person found guilty, in all likelihood, would be a
8 continuing threat.  So, now you have this question that
9 is basically going to say he either gets life or death.
10 A yes answer gives him life; the no answer, it stays
11 with the death penalty.  Clearly, once you find somebody
12 guilty of capital murder, the very best that that person
13 can do is serve life in prison, nothing else, unless you
14 give him the death penalty.
15    A.   Right.
16    Q.   Look at this question, and it asks you to look
17 at the circumstances of the offense, the defendant's
18 character and background, and the personal moral
19 culpability of the defendant.  As I read that question,
20 it basically gives you three broad areas of inquiry that
21 you're looking at, okay?  Can you tell me which of those
22 three you would place the most emphasis on or whether
23 you would feel like all three are equally important?
24    A.   They're possibly all important.
25    Q.   Okay.  What time of -- all right.  So, the

236

1 circumstances of the offense -- that would be what we
2 talked about before, you know, the full picture of what
3 took place, who were the parties involved, how it
4 evolved.  Do you think there could be a case or cases
5 where you are satisfied beyond a reasonable doubt that
6 the crime was committed; yet, you still have some
7 nagging concerns about everything that took place?  In
8 other words, not enough to rise to the level of
9 reasonable doubt?  You feel like the State's proven
10 their case, but there is some real question in the back
11 of your mind whether you're comfortable giving that
12 person life or death.
13    A.   No.  I mean, if I had all -- I mean, if I
14 believed all the evidence against him, no, I wouldn't
15 have a problem, if that's what you're asking.
16    Q.   Okay.
17    A.   No.
18    Q.   Let me ask you this:  If you, personally, found
19 somebody guilty beyond a reasonable doubt of capital
20 murder, you didn't have a reasonable doubt at all as to
21 what the person did and you found them guilty? --
22    A.   Right.
23    Q.   -- and if the evidence convinced you beyond a
24 reasonable doubt that that person was going to be a
25 continuing threat to society, do you believe that

237

1 Question Number Two, based on all that evidence, has
2 already been answered for you?
3     A.   No, no.
4     Q.   So you would want to take a complete look at
5 everything and make an evaluation independent of those
6 first two questions?
7     A.   Yes.
8     Q.   One of the things that the Judge said to you --
9 and I can only ask you to pay particular attention to
10 it, and hopefully you will embrace this concept that he
11 wants you to have a comfort zone.  He wants you to be
12 able to look back five years from now, whatever your
13 decision is, whether it be to find the person not
14 guilty, guilty, life, death, whatever issues you have to
15 face in the case, and be comfortable knowing that you
16 made the right decision.
17         I'll ask you this:  Have you ever heard of
18 cases where a jury of twelve people absolutely convinced
19 beyond a reasonable doubt that a person committed a
20 crime find out later on in life that maybe there was
21 some evidence that didn't come out?  Have you ever seen
22 TV shows, like "48 Minutes," or "20/20," any of those
23 shows that talk about cases like that?
24    A.   I possibly have, but -- no, I guess, no, I
25 haven't.

238

1     Q.   What type of security clearance did you have
2 when you were working at E.S.A.?  What did that entail?
3     A.   Top secret.
4     Q.   Is that for on line trade secret type stuff or
5 government use?
6     A.   Government contracts, yea.
7     Q.   I notice that you had a couple of years of
8 college.  Where was that at?
9     A.   It was just a business college.
10    Q.   Your husband is an engineer?
11    A.   Yes.
12    Q.   What were is the -- that company that he --
13    A.   Cyboss (phonetically)?
14    Q.   Yeah.  What is that?
15    A.   It's actually a French company.  So, they work
16 in the oil business, and it's a French company.
17    Q.   You indicated when Mr. McClellan was
18 questioning you on the issue of the death penalty, you
19 felt that that was appropriate for somebody who had no
20 regard for life.  Am I correctly stating what your
21 answer was?
22    A.   Yes.
23    Q.   Now, let me ask you -- this is kind of a
24 convoluted question; but when I hear somebody saying
25 that and I hear them say, I think the death penalty is

239

1  appropriate for somebody who has no regard for life,
2  that suggests to me if you felt the person did have a
3  regard for life, that that might take the person out of
4  the rim of the death penalty candidate.
5          In other words, that would be one factor.
6  Not that that would be the only factor; but if you felt
7  that a person had committed capital murder, clearly took
8  the life of somebody without legal justification, do you
9  feel that that person, that defendant, could still value
10  life, could still have regard for life even though he
11  had taken someone else's life?
12      A.  Again, it would have to depend on the evidence;
13  why he did that, if he just did it without knowing the
14  person.  It's hard to answer that if you don't know.
15      Q.  Okay.
16      A.  Does that make sense?
17      Q.  It does.  It's hard for us, too; because we're
18  in a vacuum here.  We're not allowed to tell you what we
19  believe the facts to show, so we ask you these
20  hypothetical questions that sometimes sounds like
21  they're coming out of left field.
22      A.  I'm sounding very ignorant, but it's hard to
23  answer it if I don't know.
24      Q.  Know what it is you're being asked to decide.
25  How would somebody describe you?  How would your

240

1  neighbors describe you?  I know there was a question
2  there.  Let me see what you put as your answer.
3      A.  I think I put a kind person or good person.
4      Q.  See, as Mr. Wentz and I sit here, and we're
5  trying to decide, you know, whether you're the type of
6  individual we would want to have sitting on this jury
7  listening to the facts of this case, knowing that it's a
8  capital murder allegation and knowing that it's this man
9  sitting right here to my left that's the person that's
10  accused of this crime, why -- or some reason why we
11  should feel comfortable having you sit on the jury in
12  kind of a self-evaluation, if you will?
13      A.  Because I usually try to do what's right, I
14  believe, between right and wrong.
15      Q.  What about if Mr. McClellan was asking that
16  same question to you?
17      A.  I'd say the same.
18      Q.  Be the same answer?
19      A.  Same answer.
20      Q.  Do you have any problem, or would it create any
21  stress or conflict for you if you had to decide a case
22  of this magnitude, and the issue that you were actually
23  resolving had more to do with has the State proven its
24  case beyond a reasonable doubt versus I really think
25  this man is innocent?  In other words, you have a case

241

1  where you've heard a lot of evidence.  You're not
2  convinced of the pure innocence of the person, but you
3  don't think the State has proven their case beyond a
4  reasonable doubt.  Would you be okay sitting on a jury
5  and returning a not guilty verdict, knowing that the
6  evidence didn't get you where the law required you to
7  find guilt?
8      A.  I hope I answer that the way I understand the
9  question.  I would do what I feel was right.  If I
10  didn't feel he was innocent, I would say he was guilty.
11  I mean, if they gave me the evidence.  Does that make
12  sense?  It has -- it would -- no matter what he said, I
13  have to have the evidence, and I have to believe what I
14  believe in.  So, no, they wouldn't persuade me one way
15  or the other, if that's what you're asking.
16      Q.  Well, my question is this:  If you felt that --
17  if you did not feel that the person on trial was truly
18  innocent -- that's a moral concept, really, when you get
19  down to it -- you feel like the State has come very
20  close to proving guilt beyond a reasonable doubt based
21  on the Court's instructions, would you be able to return
22  a not guilty verdict even though inside you say, gees, I
23  don't even think this guy is totally innocent.  State
24  hasn't proven it.  I have to return a not guilty
25  verdict.  Are you able to do that, or would the fact

242

1  that you have lingering concerns that he may have been
2  involved and it's just the State didn't prove it -- is
3  that going to create a problem for you where you would
4  have to --
5      A.  No, I understand what you're saying.  I said it
6  the other way around, right?
7      Q.  People don't always like the decisions they
8  have to make; but we, as defense lawyers, always have to
9  be prepared to question people and find out whether or
10  not they are capable and can comfortably serve with
11  eleven others when the going gets rough.  You hear
12  twenty witnesses, and they all have a little bit of
13  something to say about a case.  And you have all sorts
14  of, well, I feel like maybe they came close; but bottom
15  line is that I'm not convinced beyond a reasonable
16  doubt.  Are you comfortable with your ability to serve
17  on a case like that? --
18      A.  Yes.
19      Q.  -- and return whatever verdict you think the
20  law and the evidence took you to?
21      A.  Yes.
22      Q.  Okay.  Thank you.
23          THE COURT:  Miss Fine, in just a second
24  I'm going to tell you your day has concluded with us.
25  We're going to want you to back two weeks from tomorrow,

243

1  September 29th. What we're doing is talking to folks
2  individually for the purposes of creating a panel of
3  about forty-eight people. Every single one of them will
4  have been through exactly what you've been through.
5  We'll have them back on Wednesday, the 29th. If we can
6  start on time, which will be 9:30, we ought to be out of
7  here by noon. On that day, everybody will leave here
8  knowing whether they are or are not a juror in the case.
9        Now, between now and when we have you back
10 in a couple of weeks, don't you alter your schedule one
11 bit for us. Do your personal things just like you would
12 ordinarily do them. You do business things, whatever it
13 is. If you have a chance to leave town, take the chance
14 to do it.
15        All that we ask of you between now and
16 when we see you next is this: Please do not talk about
17 this case with anyone. Do not permit anybody to talk to
18 you about the details.  I don't know if there is going
19 to be any news media treatment regarding this case
20 between now and when we get together next. But if there
21 is anything in the media, avoid it; anything on the
22 television, refuse to watch it; newspaper, refuse to
23 read it; radio, refuse to listen to it.
24        And the reason, Miss Fine, for each of
25 those is in an attempt to accomplish the same objective

244

1  and that's this: If you become a juror in the case,
2  the decision that you reach, whatever that decision is,
3  must be based exclusively upon the information received
4  from within the courtroom and cannot in any way be
5  affected or influenced outside the courtroom.
6        If you need anything for anybody to show
7  them where you have been for what is now the three days
8  you've been with us, that will take care that. This is
9  a reminder note as to when and where we want you to be
10 on the 29th of September, which is right outside this
11 door, right where you were this morning, by 9:30.
12 Before you leave, do you have any questions at all of
13 me?
14        VENIREPERSON: No.
15        THE COURT: Thank you very much. Look
16 forward to seeing you in a couple of weeks.
17
18
19
20
21
22
23
24
25

245

1  THE STATE OF TEXAS  )
2  COUNTY OF HARRIS    )
3        I, Pamela Kay Knobloch, Official/Deputy
   Official Court Reporter in and for the 179th District
4  Court of Harris County, State of Texas, do hereby certify
   that the above and foregoing contains a true and correct
5  transcription of all portions of evidence and other
   proceedings requested in writing by counsel for the
6  parties to be included in this volume of the Reporter's
   Record, in the above-styled and numbered cause, all of
7  which occurred in open court or in chambers and were
   reported by me.
8
9        I further certify that this Reporter's Record
   of the proceedings truly and correctly reflects the
10 exhibits, if any, admitted by the respective parties.
11       I further certify that the total cost for the
   preparation of this Reporter's Record is $_____ and
12 was paid by Harris County.
13       WITNESS MY OFFICIAL HAND this the _____ day of
   _____, 2000.
14
15
16 _____
   Pamela Kay Knobloch, Texas CSR No. 1650
17 Expiration date:  12/31/2000
   Official Court Reporter, 179th District Court
   Harris County, Texas
18 301 San Jacinto
   Houston, Texas 77002
19 713.755.6340
20 APPELLANT:  CHARLES MAMOU, JR.
             CAUSE NO. 800112
21
22
23
24
25

**$**

**$10,000** [1] 25:7
**$** [1] 245:11

**/**

**/RAOEUG** [1] 142:25
**/TKPWHEFRLDZ** [1] 142:25

**0**

**0470500** [1] 2:5

**1**

**1** [3] 23:22 46:17 47:7
**10th** [1] 129:4
**12** [1] 186:4
**12/31/2000** [1] 245:16
**13396100** [1] 2:3
**14** [1] 187:2
**14th** [1] 1:18
**1650** [1] 245:16
**179th** [3] 1:11 245:3 245:17
**18** [1] 155:25
**1960** [1] 2:20
**1999** [1] 1:18

**2**

**2** [4] 24:2 46:20 47:9 182:21
**20/20** [1] 237:22
**2000** [1] 245:13
**201** [1] 2:7
**2039** [3] 20:12 20:13 21:11
**21179300** [1] 2:19
**25** [1] 1:2
**28th** [1] 103:22
**29th** [21] 68:22 69:9 69:14 69:24 71:3 103:17 103:23 167:4 167:10 167:21 168:10 197:11 197:18 198:20 217:20 217:24 218:4 232:16 243:1 243:5 244:10

**3**

**3** [1] 24:6
**301** [1] 245:18
**33** [1] 190:20
**38** [1] 190:20
**39** [1] 190:20

**4**

**40** [1] 168:16
**40th** [1] 215:23
**41st** [1] 215:23
**4615** [1] 2:14
**48** [2] 69:17 237:22

**5**

**5629** [1] 2:20
**58** [1] 185:7
**59656300** [1] 2:13

**6**

**62** [1] 186:7
**63** [2] 169:11 186:7
**68** [1] 163:10
**6eventually** [1] 191:1

**7**

**7** [1] 1:2
**70** [2] 169:12 169:13
**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 245:19

**76** [2] 128:20 129:11
**770** [1] 2:21
**77002** [2] 2:8 245:21
**77027** [1] 2:15

**8**

**800112** [2] 1:3 245:20
**8:00** [1] 14:20

**9**

**9:30** [10] 71:3 103:22 105:2 167:9 168:11 197:19 198:19 218:2 243:6 244:11

**—**

**_____** [1] 245:12

**_____**
**_____** [1] 245:15

**A**

**Abducted** [1] 101:18
**Aberration** [2] 181:8 207:24
**Abide** [1] 177:3
**Abilities** [5] 60:1 148:24 178:24 207:4 229:2
**Ability** [31] 35:4 40:12 41:9 53:2 71:22 72:5 81:18 81:24 105:20 106:5 107:1 107:12 110:9 110:14 121:17 137:19 140:23 141:6 170:18 171:3 177:5 183:9 183:17 199:20 204:2 219:24 220:23 226:18 231:16 232:1 242:16
**Able** [22] 9:16 24:8 30:15 36:6 50:16 51:4 79:4 80:17 88:23 102:5 116:14 117:11 138:1 149:18 155:4 200:4 208:13 226:5 229:13 237:12 241:21 241:25
**Above-entitled** [1] 1:19
**Above-styled** [1] 245:6
**Absolute** [1] 31:22
**Absolutely** [11] 3:8 17:9 31:9 36:7 153:6 176:9 181:14 196:24 221:11 227:10 237:18
**Abusive** [8] 78:4 78:11 97:7 97:24 98:15 113:14 113:18 113:21
**Abut** [1] 82:12
**Accept** [1] 79:3
**Accident** [10] 23:4 39:12 56:25 57:8 57:11 57:16 63:5 147:20 164:8 204:19
**Accidental** [1] 205:22
**Accidentally** [1] 56:24
**Accomplish** [6] 35:10 104:14 171:7 218:22 220:12 243:25
**Accomplished** [1] 168:1
**Accomplishing** [3] 70:15 72:11 168:1
**According** [2] 112:12 204:24
**Accordingly** [1] 185:13
**Account** [5] 6:13 22:9 34:1 155:1 164:13
**Accurate** [2] 29:17 198:21
**Accused** [6] 17:1 96:5 129:18 186:9 233:3 240:10
**Achieve** [1] 186:8
**Acquaintance** [3] 106:14 106:16 131:5
**Acres** [1] 121:24
**Act** [17] 13:14 13:15 13:15 33:18 39:9 44:18 134:11 134:17 134:24 149:7 162:15 162:25 181:7 194:24 195:7 195:

**Acts** [56] 6:22 12:6 12:10 12:15 13:5 13:19 13:19 14:12 13:4 13:4 14:23 15:1 15:7 15:12 43:25 44:15 44:17 45:1 46:10 83:8 83:16 83:24 84:9 84:23 93:8 93:13 116:22 117:5 117:6 117:13 117:23 118:3 149:6 149:16 149:25 150:11 152:6 152:12 153:24 161:4 161:12 162:6 162:20 179:11 179:17 179:19 182:6 192:5 193:11 195:1 207:15 207:18 229:6 229:9 229:15 230:25 231:2
**Actual** [1] 94:15
**Add** [4] 34:15 71:14 105:13 219:17
**Added** [1] 187:7
**Addicted** [1] 203:23
**Addition** [3] 25:6 32:4 32:16
**Additional** [10] 41:6 41:25 115:16 148:22 169:10 172:9 178:21 198:7 228:25 234:23
**Address** [2] 191:24 235:2
**Addressed** [2] 71:20 199:11
**Addresses** [2] 185:8 191:18
**Addressing** [1] 215:8
**Administrators** [1] 15:5
**Admitted** [1] 245:9
**Adults** [4] 79:9 129:7 159:1 159:16
**Advanced** [1] 187:24
**Adversities** [1] 213:13
**Affect** [14] 49:23 51:8 84:6 84:7 106:5 121:17 122:12 140:9 147:10 204:1 204:4 216:4 219:3 235:2
**Affected** [5] 70:20 81:1 104:19 168:6 244:5
**Affects** [2] 50:15 126:9
**Affirmatively** [1] 193:9
**Afternoon** [3] 62:15 155:14 184:15
**Age** [18] 19:3 20:16 38:23 47:6 77:3 79:13 84:3 84:5 85:24 86:2 86:7 86:8 86:14 87:11 119:13 119:14 119:24 183:10
**Agenda** [1] 211:22
**Ages** [1] 78:20
**Aggravated** [4] 39:16 175:1 178:3 189:3
**Aggravating** [2] 38:19 39:5
**Ago** [13] 61:14 106:19 113:8 113:9 113:10 129:5 145:2 146:7 146:8 156:18 175:1 207:8 221:11
**Agree** [16] 30:3 61:8 68:3 113:15 115:6 141:24 143:2 148:7 148:9 161:25 175:16 205:1 208:6 219:1 227:22 227:7
**Agree/disagree** [5] 141:8 175:13 187:3 205:14 227:8
**Agreed** [6] 141:20 142:10 176:12 187:4 205:16 235:6
**Agreement** [8] 168:15 168:17 168:18 168:24 169:2 169:5 169:11 169:14
**Ahead** [5] 48:24 54:10 88:12 223:25 224:22
**Aid** [1] 196:19
**Aided** [1] 1:22
**Ain't** [1] 176:7
**Alcohol** [10] 46:16 46:19 46:21 118:20 118:23 119:1 120:16 182:18 182:20 182:23
**Alive** [2] 25:12 25:13

**Allegation** [4] 57:12 102:6 125:5 240:8
**Allegations** [3] 5:7 115:3 214:1
**Allege** [1] 62:25
**Alleged** [11] 23:7 38:8 38:9 38:13 39:16 56:8 115:3 147:23 148:2 157:11 180:24
**Allegedly** [1] 112:3
**Alleges** [2] 63:3 101:18
**Allow** [1] 148:4
**Allowed** [3] 165:17 195:15 239:18
**Allows** [1] 155:14 175:19
**Almost** [2] 155:14 175:19
**Alone** [1] 161:22
**Alter** [6] 69:25 104:1 167:14 197:23 218:7 243:10
**Alternative** [1] 65:12
**Alternatively** [1] 56:9
**Alternatives** [1] 113:21
**Altogether** [2] 42:17 57:13
**Amount** [3] 9:15 9:19 234:21
**Analyze** [1] 73:22
**Andrews** [2] 156:11 156:13
**Anger** [1] 26:14
**Answer** [122] 7:22 7:23 8:1 8:25 9:1 9:24 10:3 10:20 10:22 10:22 10:23 11:1 11:4 11:9 11:10 13:6 15:19 15:20 15:22 16:23 17:3 17:5 18:9 19:19 19:19 19:20 19:22 20:6 21:24 22:5 40:7 42:2 42:8 43:16 43:19 45:7 45:9 49:20 50:25 51:2 54:4 73:23 81:20 83:20 85:4 85:7 87:4 87:15 92:2 92:8 92:13 94:10 94:14 96:25 101:14 101:15 102:1 102:12 110:11 117:24 119:11 119:12 135:1 135:2 135:9 135:17 135:19 138:17 139:17 139:18 139:18 143:19 148:25 151:16 152:1 153:20 160:20 161:1 162:17 162:20 172:16 172:24 173:7 173:13 173:15 177:7 181:15 183:22 191:22 193:12 193:16 194:9 194:11 194:19 201:24 202:21 202:21 202:24 202:25 203:2 208:3 215:9 216:5 217:18 217:9 217:10 217:11 222:2 222:4 222:9 222:21 222:25 229:19 235:10 235:10 238:21 239:14 239:23 240:2 240:18 240:19 241:8
**Answer's** [1] 43:18
**Answered** [27] 11:5 11:7 16:7 40:10 65:10 73:25 74:2 93:21 101:10 124:3 124:6 152:5 161:25 163:17 193:8 205:14 214:5 216:4 216:25 217:7 223:6 223:7 223:9 223:16 223:17 231:24 237:2
**Answering** [21] 42:2 45:2 83:13 86:19 87:15 88:20 92:6 95:25 116:17 124:8 142:5 151:18 155:20 172:9 177:1 177:8 178:16 180:16 184:20 184:22 228:24
**Answers** [25] 5:1 7:2 7:20 8:10 8:12 15:23 40:8 43:7 64:8 64:19 73:15 74:16 108:18 110:11 124:8 138:16 140:7 173:4 182:10 184:23 203:15 209:22 215:25 216:14 232:10
**Anticipate** [4] 4:7 132:11 187:5 191:12
**Anticipated** [1] 132:18
**Anytime** [4] 9:23 23:19 75:7 190:12
**Anyway** [1] 76:25
**Apparatus** [1] 26:6

**Appeals** [1] 145:24
**Appear** [1] 76:5
**Appellant** [2] 1:6 245:20
**Appellee** [1] 1:11
**Applied** [1] 22:10
**Applies** [1] 209:23
**Apply** [5] 36:20 39:22 51:16 108:19 203:16
**Appraisal** [1] 144:7
**Appreciate** [7] 155:8 155:9 184:9 203:18 203:22 210:5 232:4
**Approach** [1] 56:20
**Appropriate** [22] 7:18 10:16 18:17 27:9 40:3 50:5 57:25 58:12 65:12 66:4 86:10 91:23 92:2 153:12 173:10 196:12 202:17 208:2 222:16 225:17 238:19 239:7
**Area** [4] 30:18 121:24 122:5 216:12
**Areas** [3] 97:5 141:18 235:20
**Argument** [11] 55:15 55:16 96:18 97:1 97:1 97:2 121:4 204:12 214:11 214:19 214:23
**Arguments** [1] 214:7
**Armed** [1] 9:5
**Army** [2] 111:9 195:18
**Arrive** [1] 55:1
**Arriving** [1] 92:12
**Arsons** [1] 13:20
**Article** [2] 80:24 81:1
**Arts** [1] 144:20
**Aside** [3] 22:16 208:13 209:8
**Aspect** [18] 35:19 39:1 48:3 53:8 85:9 107:23 118:15 120:2 153:15 154:21 155:5 159:15 183:7 184:2 198:18 200:16 222:22 230:21
**Aspects** [9] 36:19 53:24 70:14 74:14 108:19 140:7 174:3 203:16 224:6
**Aspired** [1] 174:18
**Assault** [4] 38:21 101:4 175:1 178:4
**Assaults** [1] 13:18
**Assemble** [1] 223:11
**Assess** [3] 41:17 91:1 96:12
**Assessed** [2] 66:14 175:6
**Assessing** [2] 28:3 93:2
**Assessments** [1] 144:4
**Assistant** [3] 2:6 4:16 156:9
**Associating** [1] 187:16
**Association** [1] 106:11
**Assume** [18] 26:20 33:3 37:25 55:2 59:12 78:7 80:16 82:13 97:25 106:2 106:4 111:7 129:6 174:4 177:3 186:2 192:22 206:4
**Assumed** [1] 185:24
**Assuming** [2] 97:24 106:9
**Assumption** [1] 63:6
**Assumptions** [2] 160:4 160:6
**Assure** [5] 43:4 51:18 87:2 87:9 174:9
**ASTD** [1] 156:3
**Attempt** [5] 104:14 187:18 218:22 220:12 243:25
**Attempting** [1] 61:17
**Attend** [1] 121:13
**Attended** [1] 16:8
**Attention** [4] 61:6 138:11 191:19 237:9

**Attitude** [2] 190:25 194:6
**Attitudes** [1] 109:17
**Attorney** [9] 4:13 4:15 67:6 85:25 89:20 156:9 156:14 160:3 211:16
**Attorneys** [5] 2:6 2:10 2:22 4:17 156:10
**Author** [1] 144:22
**Authority** [7] 96:22 96:22 190:24 191:16 195:2 195:3 195:6
**Autistic** [1] 122:3
**Automatic** [3] 43:16 43:19 65:19
**Automatically** [12] 38:2 51:21 54:7 92:8 133:22 174:23 180:24 193:21 193:23 194:9 194:11 216:16
**Automobile** [1] 13:24
**Available** [18] 27:16 28:15 37:9 37:15 37:23 38:25 39:3 51:12 73:10 73:11 73:12 74:25 79:11 109:5 146:16 154:18 225:2 226:11
**Avoid** [5] 70:10 104:10 198:9 218:18 243:21
**Aware** [4] 101:8 188:2 205:7 205:10
**Awful** [1] 221:19
**Awfully** [2] 25:8 165:21
**Awhile** [2] 146:13 187:21
**Awkward** [1] 60:19
**Axe** [1] 76:13

**B**

**Baby** [1] 12:16
**Background** [43] 6:9 7:9 27:4 27:23 41:8 42:7 45:20 49:3 82:8 83:7 83:25 84:14 94:16 116:7 148:23 152:12 163:12 163:23 164:16 164:19 178:23 179:24 181:21 192:1 192:12 194:6 196:22 201:19 205:6 207:3 207:21 212:10 212:11 212:11 212:12 212:15 212:23 213:1 229:1 229:15 229:23 233:20 235:18
**Backgrounds** [7] 75:9 75:11 75:12 79:14 83:10 180:1 212:9
**Backseat** [1] 207:9
**Bad** [13] 18:5 18:6 18:8 18:11 55:20 90:2 90:24 162:3 162:24 206:4 206:6 206:22 212:11
**Bag** [1] 30:8
**Balance** [1] 121:12
**Ballistically** [1] 32:17
**Bank** [6] 30:3 30:4 30:4 30:4 30:7 30:8
**Baptist** [1] 121:23
**Bargained** [1] 114:11
**Barometer** [1] 53:18
**Barring** [1] 154:23
**Base** [1] 143:21
**Based** [52] 21:8 21:8 21:14 21:25 27:13 28:5 28:9 31:5 32:2 35:25 50:3 50:19 55:7 61:9 63:18 70:18 73:5 78:13 78:16 79:14 79:15 79:17 82:7 82:8 84:12 104:17 108:5 138:16 144:10 148:25 153:5 168:3 171:25 176:16 176:25 183:18 186:1 193:17 198:24 200:23 201:21 205:25 208:18 211:6 216:5 218:25 221:2 228:9 229:16 237:1 241:20 244:3
**Basic** [1] 190:24
**Basis** [6] 22:13 62:1 62:2 130:12 131:10 156:20
**Bat** [1] 13:23

**Bearing** [8] 34:22 71:21 137:13 170:17 199:12 202:24 203:1 219:24
**Beasley** [11] 199:1 199:5 199:15 199:24 200:17 200:25 203:12 210:5 211:17 217:17 218:21
**Beating** [1] 13:23
**Became** [9] 121:16 123:3 139:3 145:14 174:17 189:22 191:7 220:24 224:8
**Become** [6] 20:8 70:17 104:15 168:2 198:13 200:18 218:24 244:1
**Becomes** [3] 21:20 39:18 147:21
**Becoming** [1] 65:20
**Beecham** [1] 145:7
**Beforehand** [1] 91:4
**Begin** [10] 3:10 34:14 36:10 74:4 108:8 173:17 176:8 203:5 219:15 223:22
**Beginning** [2] 10:12 148:15
**Behalf** [1] 95:18
**Behavior** [3] 55:18 78:9 215:14
**Behind** [4] 14:12 14:18 14:22 15:3
**Belief** [2] 47:24 107:8
**Beliefs** [7] 36:19 55:9 59:22 79:24 96:3 110:24 209:18
**Bell** [1] 85:21
**Belong** [1] 155:25
**Bend** [1] 99:25
**Benefit** [2] 133:8 133:10
**Best** [10] 3:10 31:10 96:17 96:25 121:4 176:21 176:21 186:8 214:23 235:12
**Bet** [1] 212:16
**Better** [7] 36:21 67:18 74:17 98:16 119:21 140:8 190:15
**Between** [42] 14:15 28:16 33:16 33:18 38:17 46:23 50:13 63:21 69:24 70:4 99:5 104:1 104:5 104:9 111:25 119:3 120:21 120:25 125:12 125:21 125:23 145:14 166:7 166:17 167:13 167:18 168:15 179:10 180:11 182:24 197:22 198:1 198:2 198:7 218:4 243:9 243:15 243:20
**Beyond** [83] 5:6 5:14 6:20 9:11 9:22 10:9 10:19 11:6 11:9 11:12 12:5 12:13 13:3 13:11 16:19 22:20 22:24 23:21 24:3 24:7 24:8 31:9 33:7 33:10 40:23 43:14 43:18 43:21 43:23 44:13 45:13 56:3 60:9 63:16 63:18 63:22 64:15 64:17 65:8 68:20 80:7 80:13 80:16 80:20 82:24 83:19 92:14 92:18 94:1 94:12 115:7 116:20 148:5 149:3 149:13 150:18 157:16 159:20 160:17 160:22 172:13 172:18 178:5 178:7 179:8 188:16 192:25 194:17 195:16 216:20 216:22 217:5 222:2 229:3 236:5 236:19 236:23 237:19 240:24 241:3 241:20 242:15
**Big** [4] 3:8 13:23 154:23 209:12
**Birthday** [3] 106:18 123:6 128:24
**Bit** [24] 3:14 17:18 53:23 70:1 88:6 95:5 97:5 104:2 124:2 128:18 132:20 157:3 165:17 167:14 186:14 188:10 197:23 210:20 218:7 220:13 221:16 232:10 242:12 243:11
**Bizarre** [2] 131:23 145:1
**Black** [3] 143:4 153:13

**Blameworthiness** [1] 62:21
**Blank** [2] 214:8 214:9
**Blanket** [1] 140:17
**Blood** [1] 147:10
**Board** [6] 6:15 21:3 21:5 112:9 116:18 216:10
**Bob** [1] 1:20
**Bodies** [1] 25:12
**Body** [6] 32:18 73:10 122:12 131:19 223:12 223:15
**Boils** [1] 228:8
**Bombing** [1] 109:10
**Book** [6] 144:23 144:24 145:14 165:4 165:7 165:10
**Books** [1] 226:11
**Bosses** [1] 155:3
**Bottom** [2] 33:20 242:14
**Box** [3] 35:21 170:11 227:1
**Boy** [1] 181:7
**Boyfriend** [1] 100:1
**Braggadocious** [2] 116:2 180:14
**Bragging** [1] 116:2
**Branded** [1] 189:12
**Break** [1] 55:24
**Breaking** [3] 13:22 101:2 101:6
**Brief** [1] 234:24
**Briefly** [2] 82:17 174:1
**Bring** [2] 58:18 170:21
**Broad** [3] 13:13 68:10 235:20
**Broke** [1] 38:17
**Brother** [1] 122:2
**Brothers** [1] 122:1
**Brought** [2] 3:1 77:25
**Brunt** [1] 58:21
**Brush** [1] 68:10
**Building** [2] 13:21 13:23
**Bullet** [1] 32:17
**Bunch** [1] 209:14
**Burden** [13] 5:4 43:15 60:13 63:14 63:21 80:6 80:9 82:19 160:21 188:15 188:25 189:9 194:13
**Burdette** [5] 1:20 130:4 160:22 215:7 216:7
**Burglaries** [1] 13:22
**Burglary** [6] 38:21 44:19 128:3 128:4 149:8 229:10
**Burning** [1] 13:20
**Bush** [1] 95:23
**Busies** [1] 32:24
**Business** [9] 9:3 9:13 22:2 104:2 144:14 172:3 238:9 238:16 243:12
**Buzz** [1] 156:5
**Bystander** [5] 166:6 166:8 166:9 209:1 215:5

**C**

**Calendar** [2] 20:10 154:22
**California** [1] 125:17
**Candidate** [1] 239:4
**Cannot** [13] 11:19 11:20 11:25 20:8 29:20 70:20 78:14 78:24 79:12 140:16 165:5 219:2 244:4
**Cantrell** [9] 34:6 34:7 34:13 35:8 36:15 51:25 52:8 68:21 69:12
**Capable** [1] 242:10
**Capacity** [1] 120:23
**Capital** [169] 4:13 4:20 4:22 9:17 10:11 10:16 13:8 13:17 16:3 18:8 20:5 22:18 22:

22 22:25 23:10 23:13 24:1
24:12 24:14 24:17 24:19 24:
24 26:21 26:24 27:19 27:20
33:4 33:9 33:16 33:18 33:19
33:22 38:14 38:18 38:18 39:
18 40:17 40:25 41:13 42:11
42:21 43:5 44:16 46:9 46:22
49:2 54:8 56:20 61:18 65:8
65:18 66:15 67:7 67:21 73:
11 76:11 82:25 83:4 84:22
86:8 89:21 90:20 94:11 114:
9 114:19 115:8 115:13 117:4
117:6 118:1 119:3 119:23
124:17 126:3 126:11 126:14
134:9 134:18 135:18 138:13
138:15 138:19 147:21 148:3
148:13 148:16 148:17 149:7
149:23 150:21 150:22 151:4
151:10 151:14 151:22 152:10
153:23 157:5 157:6 157:9
157:15 159:22 160:10 160:19
161:2 161:4 161:23 163:5
163:11 163:12 164:22 166:4
172:3 172:7 172:17 173:13
178:10 178:20 180:20 182:4
182:23 184:6 188:3 188:17
188:19 189:12 191:20 192:8
192:17 193:2 193:20 201:7
201:22 202:6 202:14 204:12
204:13 204:18 204:20 204:24
205:3 206:3 206:7 207:12
207:22 209:5 209:22 212:6
213:6 215:20 216:18 216:20
217:5 221:19 222:6 222:13
222:24 223:4 228:1 228:19
229:8 231:22 233:6 233:10
235:5 235:12 236:19 239:7
240:8

**Car** [4] 30:5 30:9 131:17
207:10

**Care** [14] 32:23 98:4 104:
24 114:1 142:17 176:4 176:7
186:20 197:6 198:18 208:16
219:4 225:14 244:8

**Career** [1] 142:1

**Careful** [1] 98:25

**Carla** [3] 76:10 95:1 165:
25

**Carmouche** [3] 63:1 122:
25 123:5

**Carmouches'** [1] 105:24

**Carolina** [2] 207:8 210:22

**Carries** [2] 158:5 211:21

**Carry** [1] 196:18

**Carrying** [2] 196:17 197:3

**Carved** [3] 24:16 24:21 24:
22

**Case** [275] 3:21 4:10 5:13
5:14 7:5 7:14 7:15 8:7 8:8
10:7 15:19 16:14 17:12 17:
14 17:15 17:18 17:20 18:6
18:10 18:13 19:6 19:13 19:
16 20:4 22:1 22:19 23:2 25:
16 26:21 26:22 27:8 27:10
27:13 27:19 28:1 28:6 28:10
30:7 30:16 31:3 32:23 33:3
33:4 33:5 33:6 33:25 34:1
34:23 35:5 35:17 36:1 36:17
36:20 39:7 39:22 39:25 47:
17 48:8 51:8 53:3 56:7 58:5
60:18 61:9 61:18 61:20 62:1
63:6 63:8 63:13 63:15 63:17
64:21 65:15 69:1 69:23 70:5
70:9 70:10 70:17 71:22 72:6
72:15 72:19 73:1 73:21 74:
12 75:5 75:10 76:7 76:7 76:
8 76:10 76:18 79:7 80:7 80:
9 80:14 80:15 82:9 82:12 84:
1 88:4 89:8 89:14 89:16 89:
17 91:4 92:14 94:21 96:10
98:17 98:19 98:21 101:18
101:23 102:20 103:7 103:9
103:25 104:7 104:8 104:9
104:10 104:16 105:20 106:6
107:12 108:1 108:5 108:16
108:19 109:12 112:17 114:16
126:10 130:21 131:12 132:14
133:9 135:4 137:14 137:20

138:14 138:17 139:7 139:7
139:8 139:19 139:15 139:16
140:5 140:9 140:17 140:17
145:7 145:11 145:23 145:25
154:9 154:15 157:11 157:18
159:9 161:2 163:5 164:13
165:14 166:1 166:5 166:19
167:12 167:19 167:21 168:2
170:18 171:3 171:21 173:6
173:9 174:1 174:10 174:21
175:2 175:9 177:24 178:4
178:11 178:12 180:5 180:6
180:17 184:6 186:6 187:20
188:1 188:14 189:15 191:6
192:8 193:24 197:21 198:4
198:5 198:7 198:9 198:13
199:13 199:21 200:12 200:19
201:21 201:21 201:23 202:1
202:5 202:12 203:14 203:17
204:2 204:4 204:13 206:13
209:20 210:17 214:1 216:18
218:14 218:15 218:16 218:18
218:18 218:24 219:25 220:8
220:16 220:24 221:14 221:18
222:10 222:17 223:13 224:4
225:3 225:18 227:6 228:20
231:20 233:1 233:6 233:23
234:7 236:4 236:10 237:15
240:7 240:21 240:24 240:25
241:3 242:13 242:17 243:8
243:17 243:19 244:1

**Cases** [46] 17:8 31:16 35:
21 37:7 37:8 37:23 38:24 51:
11 51:12 74:22 74:23 74:24
75:5 75:23 75:24 76:3 78:18
78:24 89:18 95:14 109:1 109:
2 109:3 109:4 110:7 126:11
145:17 146:9 146:14 146:15
166:3 180:23 187:9 204:10
204:13 214:20 224:20 224:25
225:1 225:2 227:10 227:12
227:13 236:4 237:18 237:23

**Cast** [2] 90:6 90:13

**Category** [1] 13:13

**Caught** [1] 191:1

**Caused** [2] 18:9 62:4 75:
17 101:19 164:23 164:24 200:
5

**Causes** [4] 4:9 99:2 171:
15 196:10

**Causing** [3] 58:8 62:23
149:9

**CECILIA** [1] 219:8

**Certain** [32] 12:2 13:21
36:19 38:11 38:23 40:4 40:
24 48:21 52:13 53:19 74:14
78:20 79:12 80:2 80:4 82:20
82:21 86:13 96:6 108:19 114:
24 114:25 114:25 140:6 141:
2 185:11 224:6 225:3 225:4
225:18 226:10 226:12

**Certainly** [10] 6:17 13:9
13:17 30:25 36:3 161:21 193:
6 195:19 196:21 221:8

**Certainty** [8] 11:25 12:
14 44:5 44:9 80:10 83:17
117:1 179:10

**Certify** [3] 245:4 245:8
245:10

**Chair** [2] 35:21 67:1

**Chairs** [3] 73:2 108:2 200:
19

**Challenge** [1] 136:2

**Chambers** [1] 245:7

**Chance** [20] 16:15 36:25
44:12 62:8 67:12 70:3 70:3
104:4 104:4 167:16 167:17
170:21 191:2 191:3 198:1
198:2 218:11 218:11 243:13
243:13

**Change** [26] 47:24 67:12
75:17 79:7 79:10 79:18 95:6
95:9 95:10 95:11 95:15 95:
16 113:19 118:9 118:11 118:
12 118:14 119:11 119:12 152:
25 153:20 159:16 182:13 230:
16 230:19 231:7

**Changed** [4] 37:1 75:15 75:

19 187:24

**Changes** [1] 28:25

**Character** [26] 6:8 7:8
27:3 27:23 41:8 42:7 45:19
83:7 83:25 84:13 91:10 94:
16 116:7 117:18 148:23 152:
17 164:19 178:23 181:21 196:
8 201:18 207:3 212:23 228:
25 229:25 235:18

**Charge** [5] 4:2 4:2 8:18
40:22 114:22

**Charged** [10] 4:12 30:22
56:5 61:17 66:23 89:21 112:
17 114:23 115:9 148:6

**Charles** [8] 1:5 123:20
124:1 124:1 155:16 160:10
184:17 245:20

**Checked** [5] 49:5 141:20
143:2 175:16 176:12

**Checklist** [1] 229:23

**Child** [6] 38:22 98:7 98:9
114:1 130:25 215:5

**Childhood** [9] 78:12 78:
15 90:2 90:19 90:23 90:24
90:25 113:14 113:18

**Children** [13] 75:2 77:20
79:16 97:11 97:15 97:21 98:
4 98:13 159:11 163:25 164:5
190:2 207:11

**Choice** [11] 7:24 8:3 142:
1 142:9 142:12 151:16 151:
17 151:18 151:23 153:14 154:
4

**Choices** [1] 186:16

**Choirboy** [3] 50:11 181:8
193:25

**Choked** [1] 45:25

**Choose** [2] 83:1 143:11

**Choosing** [1] 98:13

**Chose** [1] 186:17

**Chosen** [4] 44:4 48:13 155:
5

**Church** [6] 47:18 121:9
121:13 121:15 121:23 132:25

**Churchgoer** [1] 133:1

**Circumstance** [22] 7:16
17:15 18:18 31:2 38:19 39:5
46:3 46:12 58:14 79:11 91:
22 94:5 109:2 130:21 152:22
164:22 166:19 181:24 217:2
222:11 227:17 230:7

**Circumstances** [56] 7:6
7:16 27:7 27:10 27:17 31:3
32:3 45:17 46:3 50:3 56:22
57:22 58:7 60:5 63:4 65:25
66:17 74:22 84:16 91:25 92:
4 94:6 94:18 110:3 113:1
118:6 142:22 152:22 153:8
153:9 153:10 164:6 164:18
175:25 181:20 181:25 182:15
185:11 196:7 196:23 201:25
205:5 205:25 206:10 207:25
229:24 230:7 233:18 234:4
234:6 235:7 236:4 236:6 237:
19 239:7

**Circumstantial** [13] 30:
21 30:24 30:25 31:5 31:8 31:
12 31:15 32:15 32:19 32:24
33:6 33:10 130:5

**Citizen** [2] 154:17 165:22

**Citizens** [2] 15:13 113:20

**City** [1] 109:10

**Civics** [1] 53:15

**Civil** [1] 114:5

**Civilian** [1] 195:12

**Claim** [1] 22:19

**Claire** [9] 2:4 4:17 36:16
74:11 108:15 140:4 173:25
203:13 224:3

**Class** [1] 181:7

**Classifies** [1] 33:18

**Classroom** [3] 77:9 77:10
144:14

**Clear** [1] 158:23

**Clearance** [1] 238:1

**Clearly** [3] 57:8 235:11
239:7

**Cliches** [1] 68:1

**Client** [2] 63:3 213:7

**Clint** [1] 145:3

**Clocks** [1] 14:19

**Close** [9] 101:21 106:12
125:19 126:8 131:2 131:10
165:8 241:20 242:14

**Clubs** [1] 155:25

**Co** [1] 59:7

**Co-worker** [2] 59:7 59:8

**Coconspirator** [3] 29:21
29:23 30:13

**Code** [1] 96:19

**Cold** [1] 147:10

**Collaborate** [1] 114:2

**College** [5] 111:2 111:3
187:23 238:8 238:9

**Combination** [1] 217:4

**Comfort** [1] 237:11

**Comfortable** [14] 14:15
54:11 55:2 59:23 62:9 64:5
64:12 64:12 65:4 66:9 98:18
101:22 165:22 181:11 211:18
211:24 219:12 236:11 237:15
240:11 242:16

**Comfortably** [1] 242:10

**Coming** [7] 63:6 63:11 73:
22 98:3 126:16 213:24 239:21

**Comment** [3] 95:25 130:19
200:12

**Comments** [1] 89:25

**Commission** [12] 24:10 30:
1 30:11 45:23 46:23 84:15
115:18 115:25 119:4 172:17
181:23 230:2

**Commit** [51] 6:22 12:10 12:
15 13:5 13:8 13:12 14:2 15:
12 29:19 29:20 43:25 44:15
45:1 46:10 46:22 52:14 83:
24 84:9 84:23 86:7 93:13 99:
2 99:9 116:21 117:4 117:13
117:23 118:3 119:2 149:5
149:16 149:25 150:10 152:6
152:11 153:24 161:4 162:18
176:4 179:11 179:19 182:6
182:23 193:10 207:15 207:18
229:6 229:8 229:15 230:25
231:2

**Commitments** [2] 64:8 64:
10

**Commits** [5] 37:14 66:15
120:16 205:23 231:5

**Committed** [38] 5:19 6:5
6:11 23:5 24:18 25:19 25:20
30:23 33:24 33:25 38:8 41:
15 46:16 56:13 75:23 80:2
81:4 96:6 114:24 118:20 119:
15 120:17 124:17 124:25 138:
18 147:1 147:22 153:21 175:
20 188:17 188:18 196:23 201:
17 201:18 234:1 236:6 237:
19 239:7

**Committing** [6] 38:14 119:
23 147:22 148:3 186:21 234:
16

**Common** [5] 9:7 105:25 206:
2 206:22 218:23

**Communities** [1] 14:17

**Community** [6] 14:16 15:
10 112:13 113:19 114:3 127:3

**Commutation** [1] 76:19

**Commuted** [1] 145:20

**Company** [4] 59:5 238:12
238:15 238:16

**Comparative** [1] 18:22

**Compared** [2] 3:14 18:11

**Complete** [2] 53:12 237:4

**Completely** [1] 173:3

**Computer** [1] 1:22
**Concealed** [2] 196:17 197:3
**Conceivable** [1] 20:14
**Conceivably** [3] 200:1 204:22 207:20
**Conceive** [2] 65:6 67:1
**Concept** [6] 29:16 30:14 49:16 138:11 237:10 241:18
**Concepts** [1] 52:13
**Concern** [4] 63:10 101:5 102:4 215:17
**Concerned** [10] 96:21 100:22 129:15 129:16 168:17 169:14 204:1 209:19 212:24 232:1
**Concerning** [3] 49:2 109:21 163:11
**Concerns** [4] 212:20 215:10 236:7 242:1
**Conclude** [1] 69:21
**Concluded** [1] 242:24
**Conclusion** [6] 20:21 126:4 131:24 135:2 165:1 188:24
**Conducive** [1] 31:1
**Conduct** [12] 17:25 18:1 22:20 22:23 33:23 99:4 120:25 124:21 124:22 158:19 164:2 188:14
**Conferences** [1] 78:17
**Confesses** [1] 30:23
**Confession** [1] 30:10
**Confinement** [4] 25:2 25:3 25:6 28:4
**Conflict** [1] 240:21
**Conflicts** [1] 208:12
**Confronted** [2] 160:2 172:21
**Confusion** [1] 66:2
**Conjures** [1] 62:19
**Conjuring** [1] 202:5
**Connect** [2] 30:1 30:11
**Connected** [1] 102:16
**Connection** [3] 46:23 47:20 158:2
**Conners** [5] 74:11 108:16 173:25 203:13 224:4
**Connors** [6] 2:4 4:17 36:16 140:4 168:21 210:15
**Connors'** [1] 169:17
**Consequence** [1] 55:24
**Consequences** [2] 55:21 142:15
**Consider** [23] 14:14 15:25 28:3 48:21 48:23 54:9 65:11 86:1 98:25 116:15 146:21 162:5 163:1 166:14 181:12 189:15 196:3 196:4 196:22 206:15 206:25 214:13 214:15
**Consideration** [12] 7:5 20:9 21:22 27:11 27:14 27:16 28:12 45:16 53:12 112:24 229:23 234:5
**Considered** [9] 21:21 49:3 49:7 49:11 87:14 90:19 163:13 196:16 212:9
**Considering** [2] 193:5 230:11
**Consistent** [3] 31:2 225:8
**Consistently** [1] 16:11
**Conspire** [1] 29:19
**Constitute** [13] 6:23 14:4 15:13 44:1 63:4 116:22 161:5 161:13 162:16 162:21 179:13 194:25 229:15
**Constituted** [1] 57:12
**Constitutes** [1] 206:7
**Consult** [2] 142:7 166:24
**Contact** [3] 81:15 81:16 130:9
**Contained** [3] 5:7 77:16 159:6

**Contains** [1] 203:20 245:4
**Contemplated** [1] 162:20
**Contemplates** [1] 158:18 164:17
**Contents** [2] 6:19 8:16
**Context** [4] 12:3 15:16 162:6 195:18
**Continue** [2] 75:3 117:4
**Continued** [2] 190:21 190:25
**Continuing** [53] 6:23 14:5 15:9 15:9 15:13 44:1 45:1 46:10 64:18 65:9 83:15 83:23 84:9 84:23 86:20 86:22 91:21 93:19 94:13 116:22 117:13 117:22 118:2 138:19 149:15 149:17 149:24 150:10 152:2 152:6 152:7 152:11 153:24 161:5 161:13 162:16 162:21 179:13 180:25 181:1 182:5 193:18 194:8 194:12 194:25 207:15 216:23 228:17 229:7 229:16 230:25 235:8 236:25
**Continuous** [1] 158:19
**Contracts** [1] 238:6
**Contributing** [1] 62:22
**Conversation** [3] 10:25 16:24 192:23
**Conversion** [1] 76:15
**Convicted** [17] 4:21 10:5 10:25:1 28:23 29:10 29:11 29:21 76:11 151:14 187:3 180:3 189:20 191:12 207:12 209:22 212:6 227:12
**Conviction** [2] 29:13 29:22
**Convince** [4] 118:13 209:21 231:21 231:23
**Convinced** [7] 176:21 192:25 217:6 236:23 237:18 241:2 242:15
**Convoluted** [1] 238:24
**Cook** [1] 100:8
**Corner** [2] 127:20 127:24
**Corners** [1] 195:16
**Corporations** [1] 144:2
**Correct** [11] 5:8 58:1 68:13 75:15 93:10 93:11 141:13 156:12 174:11 174:13 245:4
**Correctly** [2] 238:20 245:9
**Correlation** [1] 99:5
**Corroborated** [1] 29:24
**Cost** [1] 245:10
**Counsel** [1] 245:5
**Counseling** [1] 97:12
**County** [13] 1:8 1:21 15:14 38:11 76:12 82:20 114:24 156:14 175:2 245:2 245:4 245:11 245:17
**Couple** [15] 25:22 29:16 34:13 105:6 135:15 164:17 175:14 204:7 210:13 214:4 215:12 234:24 238:7 243:10 244:16
**Coupled** [1] 39:15
**Courage** [1] 99:11
**Course** [51] 3:18 17:8 23:6 23:8 23:9 23:10 24:9 30:20 35:12 35:22 38:11 42:23 42:24 46:15 51:14 61:4 80:5 82:22 99:8 106:2 115:1 115:23 124:19 125:1 125:6 125:8 147:15 148:19 157:12 157:11 157:24 158:16 159:13 161:2 171:10 180:4 180:21 188:21 188:22 195:9 195:13 200:2 201:11 205:16 208:8 220:14 226:5

**Courses** [1] 77:17 77:21
**Court** [67] 1:3 1:5 3:3 29:1 29:7 33:19 34:10 36:11 50:20 52:3 69:12 70:21 71:9 74:6 80:16 82:16 87:13 87:23 103:5 105:5 105:10 108:11 113:5 114:20 114:22 123:13 135:15 135:22 136:2 137:4 139:25 155:10 167:1 168:14 168:20 168:23 169:1 169:4 169:7 169:13 169:17 169:19 169:21 169:23 169:25 170:6 173:20 184:11 185:1 185:24 193:21 197:8 199:4 203:8 210:6 217:16 219:11 223:25 232:5 242:23 244:15 245:3 245:4 245:7 245:17 245:17
**Court's** [4] 4:1 4:2 8:17 241:21
**Courthouse** [3] 64:22 138:12 160:1
**Courtroom** [10] 4:14 70:20 104:18 104:20 168:5 198:15 219:1 219:2 244:4 244:5
**Courtroom's** [1] 168:6
**Cousin** [3] 111:15 111:24 112:1
**Cousin's** [1] 131:3
**Cousins** [1] 127:17
**Cover** [2] 71:1 145:3
**Coverage** [1] 198:7
**Coworker** [1] 155:2
**Coworkers** [1] 60:20
**Create** [4] 33:11 197:15 240:20 242:3
**Creating** [4] 103:19 167:6 217:23 243:2
**Cried** [1] 26:2
**Crime** [117] 5:23 6:4 6:10 7:8 13:13 13:13 13:14 14:3 25:19 29:19 30:1 30:11 30:23 30:23 31:5 37:14 38:1 38:8 41:14 45:17 45:23 46:17 46:24 51:18 51:19 51:23 56:5 56:13 57:22 65:25 66:23 67:25 80:2 81:5 84:13 84:15 94:15 95:8 96:6 109:24 114:24 115:19 115:20 115:23 116:7 116:14 116:12 116:17 118:21 119:4 119:15 120:16 120:17 133:20 133:22 144:21 144:22 144:25 147:1 147:23 149:2 152:19 158:4 161:19 161:22 162:12 162:13 162:18 162:19 164:8 164:21 164:23 164:25 165:13 166:16 175:19 175:20 176:4 177:18 177:20 178:12 179:2 179:5 180:7 180:8 180:9 180:13 181:12 181:20 181:23 186:10 186:21 188:18 189:12 194:2 194:10 196:5 196:9 196:24 204:20 205:6 207:1 207:13 208:25 209:2 221:24 225:4 229:25 230:3 234:1 234:16 234:18 236:6 237:20 240:10
**Crimes** [16] 37:12 40:4 75:23 80:25 81:4 99:2 99:9 112:18 112:20 119:2 141:2 158:7 165:5 181:3 204:3 226:10
**Criminal** [74] 6:22 9:18 12:10 12:15 13:5 13:18 13:19 13:24 14:3 14:23 15:1 15:7 15:12 38:15 38:24 39:18 41:8 42:7 43:25 44:15 44:17 46:17 62:22 82:23 83:3 87:7 89:18 91:17 114:5 114:7 114:16 115:21 116:17 116:7 117:22 117:25 148:15 149:7 149:25 150:18 152:6 161:4 161:12 162:6 162:15 162:18 178:23 179:11 179:12 179:19 180:23 186:6 189:7 189:13 192:5 193:11 195:7 195:19 196:8 207:4 208:25

**Criminals** [1] 187:17
**Criticize** [2] 211:10 228:6
**Critiquing** [1] 142:4
**Crowd** [1] 3:8
**CSR** [1] 245:16
**Culpability** [7] 7:9 45:22 152:19 164:20 181:22 230:1 235:19
**Culture** [3] 99:6 99:14 99:20
**Curriculum** [1] 77:13
**Customer** [2] 58:17 59:4
**Cut** [1] 103:1
**Cy** [4] 76:22 77:3 77:6 77:12
**Cy-Fair** [4] 76:22 77:3 77:6 77:12
**Cyboss** [1] 238:13

**D**

**D.A.** [1] 146:6
**D.A.'s** [2] 99:24 100:13
**D.P.S.** [1] 146:3
**D.W.I.** [1] 162:10
**Dad** [1] 59:7
**Daily** [1] 58:17
**Dallas** [1] 146:6
**DAMIETTA** [1] 105:7
**Danger** [13] 160:19 163:7 172:14 172:19 173:9 192:2 192:10 192:18 193:9 194:20 195:24 222:4 222:7
**Date** [3] 82:20 101:13 245:16
**Daughter** [7] 101:12 102:7 102:22 106:18 123:6 129:3 131:3
**Daughter's** [1] 101:24
**Daughters** [1] 128:23
**Dawns** [1] 53:6
**Days** [7] 26:7 71:1 104:23 131:20 168:8 198:17 244:7
**Dead** [3] 25:12 121:11 121:11
**Deaf** [1] 174:14
**Deal** [8] 12:18 65:1 71:5 77:19 115:21 129:16 129:20 153:14
**Dealer** [2] 25:14 128:9
**Dealing** [5] 23:14 77:11 79:16 133:21 187:15
**Dealings** [1] 79:17
**Dearly** [1] 25:23
**Death** [212] 4:25 7:18 7:25 8:8 8:10 8:13 11:3 15:21 16:12 16:16 17:20 17:24 19:17 19:25 20:1 22:6 24:25 37:9 38:2 38:25 39:3 39:22 40:3 43:1 43:6 45:10 46:5 47:50 6 51:1 51:12 51:16 51:22 54:7 55:14 55:15 56:15 57:2 57:5 57:24 62:22 62:23 63:9 65:12 65:20 66:4 66:6 66:14 67:13 73:13 73:14 74:20 74:24 75:14 76:4 76:6 76:8 80:25 81:2 82:5 84:18 85:1 85:7 85:8 85:19 86:4 86:16 89:18 91:1 92:16 92:25 93:2 93:5 94:2 94:4 94:6 94:20 96:13 96:15 96:18 101:19 108:24 108:25 109:4 109:21 109:22 110:7 110:16 110:22 112:23 118:7 118:10 118:14 120:6 121:4 121:9 121:15 132:25 133:16 133:21 133:23 133:23 134:6 134:10 134:22 138:3 134:10 139:14 140:12 140:18 140:19 141:1 141:15 141:21

142:14 142:22 143:2 143:14
145:5 145:6 145:8 145:16
145:18 145:21 146:15 151:8
151:11 151:23 152:13 152:24
152:25 153:7 153:12 154:1
157:21 158:1 158:8 163:14
165:12 165:19 166:12 173:11
175:15 175:19 175:24 176:11
176:19 177:3 178:14 178:15
181:16 182:2 182:10 182:11
182:13 183:23 185:6 185:10
185:17 185:22 186:18 187:7
204:9 204:11 205:1 205:4
205:15 205:24 207:2 207:7
208:24 209:6 209:20 209:23
214:6 214:7 214:10 214:14
214:20 214:22 214:23 215:1
224:18 227:5 227:16 228:14
226:9 227:9 227:11 228:14
229:16 229:19 232:2 242:7

**Deaths** [3] 157:24 158:2
189:6

**Decide** [30] 8:24 21:9 41:
13 41:17 45:11 47:4 60:12
61:9 62:1 64:2 68:23 88:21
91:3 91:7 94:2 96:11 127:10
152:14 154:1 165:18 178:4
179:7 182:8 201:5 208:2 222:
22 229:21 239:24 240:5 240:
21

**Decided** [9] 73:13 92:17
118:1 118:2 151:8 178:15
206:17 207:14 234:7

**Decides** [1] 114:21

**Deciding** [12] 17:19 42:4
49:3 49:18 92:15 92:25 94:
19 122:13 163:13 177:1 179:
1 208:22

**Decision** [75] 5:20 6:12
16:14 21:13 21:16 22:12 22:
13 28:16 28:17 40:13 48:13
48:16 54:9 55:4 55:6 55:10
56:14 59:23 60:1 60:22 60:
23 61:22 63:17 64:4 67:10
67:16 67:18 67:20 70:17 81:
20 81:25 82:6 82:8 95:3 95:
11 95:13 96:15 98:24 104:16
110:16 122:13 140:23 141:3
141:7 141:11 146:25 147:2
149:18 150:12 153:7 154:3
154:5 163:6 165:20 165:23
168:3 177:12 181:13 185:13
186:1 189:11 191:24 198:14
204:4 206:11 211:6 218:24
226:6 226:15 228:21 231:14
237:13 237:16 244:2 244:2

**Decisions** [17] 18:25 40:
7 55:3 80:18 119:21 121:8
124:16 128:16 141:3 153:5
163:4 177:7 226:15 226:16
226:19 232:2 242:7

**Deep** [1] 99:15

**Deer** [3] 144:11 156:23 156:
24

**Defend** [1] 196:19

**Defendant** [121] 2:22 4:
12 4:19 5:9 5:10 5:11 5:12
5:15 5:16 5:21 6:3 6:8 6:10
6:11 6:21 6:22 6:25 7:19 7:
25 8:4 9:17 10:11 12:7 12:9
12:11 12:15 13:5 13:7 13:12
14:2 15:11 16:3 16:12 16:25
17:4 18:7 18:14 20:5 20:7
20:8 20:9 20:15 20:17 20:21
22:23 23:25 24:5 26:24 27:1
27:4 27:20 27:21 27:23 28:
23 30:1 32:1 32:8 32:13 33:
8 38:7 38:9 40:11 41:22 43:
22 43:25 44:15 44:24 45:8
46:15 47:6 47:14 50:5 51:20
63:9 63:20 66:1 81:23 82:21
85:7 92:14 110:13 114:22
114:23 115:8 116:21 117:3
125:3 130:2 138:14 141:5
149:5 149:12 160:11 169:6
169:9 169:24 170:2 172:13

**Defendant's** [28] 5:5 10:
2 10:8 28:4 32:19 33:2 41:8
42:6 45:10 45:19 49:2 60:16
64:15 83:6 84:13 148:22 152:
12 152:17 163:12 164:19 178:
23 181:20 196:8 201:6 228:
25 229:20 229:25 235:17

**Defendants** [2] 25:10 123:
24

**Defended** [1] 196:24

**Defense** [17] 23:4 39:11
52:20 56:25 57:11 57:12 68:
25 89:5 89:20 100:21 107:25
147:19 204:18 210:14 211:16
232:14 242:8

**Defense's** [1] 136:2

**Define** [3] 9:6 9:8 124:21

**Defined** [5] 8:18 8:19 8:
22 11:15 44:10

**Definitely** [15] 36:9 37:
14 37:16 37:18 37:22 40:1
44:9 58:24 60:2 69:22 103:
24 143:21 167:11 218:5 227:5

**Definition** [9] 9:14 11:
17 39:9 60:10 61:5 80:15 80:
19 147:16 205:18

**Definitions** [2] 8:24 161:
8

**Degree** [5] 35:15 159:10
159:10 187:24 190:14

**Degrees** [2] 76:25 187:24

**Deliberates** [3] 26:23 27:
6 27:25

**Deliberating** [2] 4:4
102:20

**Deliberations** [1] 215:24

**Demand** [1] 67:21

**Demands** [1] 230:12

**Deny** [2] 21:14 68:14

**Denying** [1] 95:23

**Describe** [3] 59:18 239:
25 240:1

**Described** [1] 124:22

**Deserve** [1] 158:8

**Deserved** [1] 226:2

**Deserves** [2] 118:25 134:
19

**Deserving** [2] 204:16 204:
23

**Design** [1] 144:1

**Details** [2] 113:4 243:18

**Deter** [1] 186:18

**Determination** [9] 63:19
117:17 149:22 176:24 179:23
181:5 183:12 209:5 229:13

**Determinations** [1] 126:2

**Determine** [23] 19:12 26:
25 38:7 44:22 65:16 86:20
115:4 117:11 119:14 124:23
140:19 145:10 148:12 149:11
160:17 161:20 172:12 179:15
181:17 183:12 183:13 229:3
230:16

**Determined** [3] 32:17 112:
11 145:19

**Determines** [1] 26:23

**Determining** [9] 83:22
116:11 120:4 134:8 180:4
183:6 188:14 188:15 212:5

**Deterrence** [1] 233:2

**Develop** [4] 144:2 144:3
144:5 144:9

**Development** [1] 159:13

**Dice** [1] 127:23

**Dictate** [2] 74:1 223:16

**Die** [8] 37:20 90:6 90:12

---

117:8 134:14 204:23 226:2
233:11

**Died** [1] 134:13

**Dies** [1] 26:8

**Differ** [1] 121:19

**Difference** [12] 19:11 38:
16 38:17 67:8 86:17 90:23
90:25 120:21 120:25 143:1
159:12 176:11

**Different** [46] 11:2 14:
16 15:23 19:6 20:2 22:19 22:
23 24:9 25:9 25:10 25:11
30:18 37:4 47:11 61:19 61:
19 73:19 73:22 73:23 89:1
89:2 89:2 114:3 119:7 120:2
143:10 148:2 155:24 158:1
158:2 158:20 159:9 159:12
159:18 165:8 165:9 173:2
173:8 178:11 183:2 192:13
199:19 220:6 223:14 232:24
234:16

**Differently** [3] 19:6 99:
18 99:21

**Difficult** [1] 62:6

**Difficulty** [1] 142:4

**Dire** [24] 1:15 34:9 36:13
36:25 52:6 71:8 74:8 80:6
88:1 105:9 108:13 123:17
137:3 140:1 155:11 170:5
173:22 184:13 199:3 203:10
210:9 219:10 224:1 232:7

**Direct** [7] 30:20 30:21 31:
16 32:20 32:23 99:5 130:5

**Directed** [1] 42:5

**Director** [1] 113:24

**Dires** [1] 88:16

**Disabilities** [6] 83:8
116:8 148:24 178:25 207:5
229:2

**Disability** [2] 41:10 177:
11

**Disagree** [7] 76:7 78:12
78:14 90:1 141:25 142:10
162:1

**Disagreed** [2] 76:8 142:11

**Disagreement** [8] 72:16
72:18 107:18 137:25 138:2
147:6 147:8 200:9

**Disagreements** [1] 171:11

**Disciplinary** [1] 78:6

**Disciplining** [1] 159:15

**Discomfort** [1] 171:15

**Discovered** [1] 165:13

**Discretion** [2] 7:24 8:3

**Discuss** [1] 211:17

**Discussed** [5] 22:25 53:
22 53:25 54:1 81:17 220:9

**Disgusting** [1] 202:8

**Displeasing** [1] 35:15

**Disposal** [1] 211:7

**Dispute** [2] 72:17 171:11

**Disqualify** [1] 52:20

**Disregard** [3] 109:18 112:
22 134:5

**Disregarded** [1] 190:23

**Disrespect** [1] 195:6

**Disrespectful** [1] 195:2

**Distinction** [7] 14:14 14:
15 33:16 33:17 63:21 65:3
125:23

**Distinctions** [1] 39:19

**District** [8] 1:5 1:11 2:
6 4:16 156:9 156:13 245:3
245:17

**Disturbed** [5] 77:7 77:11
77:18 77:22 78:1

**Divorce** [1] 97:7

**Dollar** [5] 112:10 112:22
127:25 128:1 155:1

**Done** [22] 5:24 5:24 5:24 6:
1 26:2 67:21 79:21 95:22

---

110:25 116:3 134:24 161:23
163:23 176:12 175:22 180:3
181:6 186:3 191:8 191:11
207:11 222:5

**Door** [2] 71:4 244:11

**Doors** [1] 168:11

**Dope** [1] 25:14

**Doubt** [94] 5:6 5:15 6:20
9:12 9:13 9:22 10:11 10:2 10:
9 10:19 11:7 11:9 11:13 12:
6 12:14 13:4 13:11 16:20 22:
21 22:24 23:21 24:3 24:7 24:
9 31:19 33:1 33:7 33:11 40:
23 43:14 43:18 43:22 43:24
44:14 45:13 56:4 60:9 61:24
63:16 63:18 63:22 63:25 64:
15 64:17 65:8 66:2 80:8 80:
9 80:13 80:16 80:20 81:18
82:2 82:24 83:20 92:23 92:
24 94:11 94:13 115:7 116:20
148:5 149:3 149:14 150:8
157:8 157:16 159:21 160:18
160:22 172:13 172:18 178:5
178:8 179:8 187:25 188:16
193:1 194:17 216:20 216:22
217:5 222:2 229:4 236:5 236:
9 236:19 236:20 236:24 237:
19 240:24 241:4 241:20 242:
16

**Doubts** [8] 40:12 81:24
110:8 110:14 140:22 141:6
177:5 226:18

**Down** [18] 31:20 31:23 48:7
64:13 81:6 90:14 119:24 138:
6 197:1 211:17 212:14 212:
22 213:24 221:15 226:24 228:
8 231:12 241:19

**Dr** [1] 224:9

**Dreams** [1] 66:25

**Drink** [1] 35:23

**Drive** [1] 30:5

**Driver** [3] 46:1 152:21
230:4

**Drop** [1] 129:10

**Dropped** [1] 129:8

**Drug** [6] 78:4 99:6 99:13
99:14 127:1 128:8

**Drugs** [18] 46:16 46:19 46:
21 99:2 99:6 99:9 112:13
112:21 118:20 118:22 119:1
120:15 128:6 182:18 182:20
182:22 203:23 204:3

**Drunker** [1] 31:24

**Drunks** [5] 31:22 32:2 32:
5 32:5 32:21

**Duly** [7] 34:8 71:7 105:8
137:2 170:4 199:2 219:9

**During** [53] 3:18 4:3 17:8
21:1 23:6 23:8 23:9 23:10
23:12 23:23 23:24 24:9 24:
18 30:19 35:5 35:12 35:22
38:12 38:15 38:19 38:20 38:
21 42:23 42:24 46:15 56:11
65:1 72:6 82:23 99:12 106:2
107:12 115:1 115:2 115:18
115:22 125:1 137:20 137:24
147:24 147:25 148:19 171:3
171:10 180:7 180:21 180:22
182:17 199:21 200:2 201:10
220:8 220:14

**Duty** [5] 38:22 122:19 122:
23 206:2 227:4

### E

**Eagle** [1] 50:11

**Ear** [2] 174:6 174:14

**Eastwood** [1] 145:3

**Easy** [3] 61:22 175:19 225:9

**Economic** [1] 83:10

**Economics** [1] 77:8

**Ed** [2] 47:14 77:4

**Ed-type** [1] 47:14

**Educating** [1] 54:14

**Education** [5] 77:1 144:

16 144:17 159:8 159:10

**Effect** [9] 47:4 47:16 86:6 97:25 98:2 106:6 126:17 183:6 183:13

**Effective** [2] 141:21 175:15

**Egregious** [1] 163:5

**Eight** [2] 188:7 219:18

**Eighteen** [1] 128:16

**Eighth** [1] 144:18

**Eighty** [1] 84:3

**Either** [36] 7:2 13:15 22:20 24:3 28:15 32:23 40:19 43:6 45:2 50:15 50:15 56:8 62:22 63:1 68:23 82:23 84:7 89:4 94:1 112:17 115:5 115:6 120:5 144:15 148:4 159:8 178:14 180:16 202:25 203:1 219:15 225:19 227:4 228:14 229:17 235:9

**Electronics** [1] 224:14

**Elements** [3] 40:24 40:25 178:6

**Elevated** [1] 161:24

**Eleven** [5] 56:12 60:11 188:24 235:6 242:11

**Eligibility** [1] 21:21

**Eligible** [2] 20:9 21:20

**Eliminated** [2] 10:6 17:20

**Embrace** [1] 237:10

**Emotional** [2] 64:23 77:25

**Emotionally** [7] 77:6 77:11 77:18 77:22 78:1 97:7 97:24

**Empathize** [1] 130:20

**Emphasis** [3] 41:11 144:19 235:22

**Employment** [1] 159:2

**Encourage** [1] 155:19

**End** [3] 112:20 144:7 202:10

**Ended** [2] 111:9 196:20

**Enforce** [6] 72:22 107:21 171:12 200:4 200:14 220:19

**Enforcement** [1] 156:8

**Engineer** [1] 238:10

**English** [1] 224:15

**Enjoy** [1] 159:13

**Entail** [1] 238:2

**Enter** [1] 215:24

**Entire** [1] 4:3

**Entirely** [2] 199:19 220:6

**Entirety** [2] 212:12 212:13

**Entitled** [2] 8:11 13:9

**Environment** [3] 78:3 78:22 113:19

**Environmental** [2] 77:24 78:4

**Environmental-type** [1] 77:24

**Episode** [10] 23:12 38:16 38:24 39:18 82:23 83:3 115:2 115:11 148:1 180:23

**Equally** [2] 73:10 235:23

**Equate** [1] 12:23

**Equipped** [1] 220:25

**ESA** [1] 238:2

**Escapes** [1] 14:23

**ESL** [1] 224:13

**Especially** [3] 56:18 94:18 214:25

**Essentially** [2] 234:1 234:25

**Establish** [1] 31:1

**Established** [2] 64:15 64:16

**Establishes** [2] 10:8 65:15

**Evaluate** [12] 22:14 35:23 73:3 73:5 102:2 107:4 108:3 171:23 200:21 200:23 221:1 233:10

**Evaluated** [1] 19:5

**Evaluating** [3] 91:20 92:12 215:24

**Evaluation** [7] 21:14 91:1 93:7 171:25 221:3 237:5 240:12

**Evaluations** [4] 20:25 21:2 21:6 21:16

**Evans** [6] 170:3 170:7 172:2 173:24 184:9 197:9

**Evenings** [2] 127:19 155:3

**Event** [2] 12:23 138:20 225:24

**Events** [2] 173:14 234:15

**Eventually** [1] 69:17

**Everyday** [3] 126:18 142:16 176:6

**Everywhere** [1] 15:17

**Evidence** [244] 5:22 6:4 6:7 6:20 6:25 7:4 7:5 7:14 7:19 9:11 9:22 9:25 10:7 10:8 10:19 11:6 11:12 13:3 13:9 16:14 16:19 17:18 19:2 19:13 19:15 25:16 27:2 27:4 27:8 27:24 28:1 28:2 29:25 30:19 30:20 30:21 30:21 30:24 30:25 31:5 31:8 31:17 32:16 32:20 32:21 32:25 33:5 33:5 33:6 33:9 35:25 40:14 40:23 41:6 41:7 41:20 41:25 42:3 42:6 42:12 42:13 42:17 43:14 43:22 43:25 43:25 44:23 45:3 45:16 46:13 47:1 47:4 47:13 47:21 48:17 48:18 49:1 49:6 49:13 50:1 50:4 50:14 50:20 50:23 51:3 60:6 60:12 60:15 60:24 62:12 63:24 64:19 72:15 82:1 82:10 82:11 83:6 83:12 83:13 83:19 84:13 84:19 85:3 85:14 85:16 91:8 91:20 92:6 92:7 92:11 92:13 93:6 93:24 93:25 94:5 94:9 98:10 98:12 108:5 110:16 114:14 115:16 116:6 116:15 116:16 116:20 117:12 117:16 118:5 118:8 118:18 118:19 119:7 119:9 120:1 120:3 120:9 125:2 127:12 130:3 130:5 130:5 130:7 130:20 130:10 134:25 138:6 138:7 138:17 139:9 140:24 141:8 141:12 143:8 145:19 145:22 148:22 149:1 149:1 149:1 149:3 149:12 149:13 149:19 149:21 150:8 151:5 152:15 153:6 153:18 157:17 163:11 165:2 165:12 171:25 172:9 172:12 172:15 173:6 173:16 177:13 177:23 178:21 178:22 179:15 179:8 179:16 179:22 181:19 182:12 182:14 183:2 183:5 183:18 183:19 183:24 184:7 185:12 188:24 191:22 192:19 193:6 193:17 194:4 194:5 196:3 196:6 201:21 201:23 208:19 209:2 209:10 209:25 210:2 216:6 220:25 221:3 222:11 222:15 223:11 223:13 226:20 228:9 228:11 228:15 228:25 229:16 229:24 230:12 230:15 234:1 231:14 232:3 233:25 236:14 236:23 237:1 237:21 242:12 241:1 241:6 241:11 241:13 242:20 245:5

**Evolved** [1] 236:4

**Ex** [2] 187:12 215:6

**Ex-spouse** [1] 215:6

**Exactly** [20] 8:1 9:19 19:2 33:23 49:19 58:17 65:14 67:14 69:18 70:1 70:2 103:2 167:8 188:8 197:17 197:24 217:25 218:8 232:17 243:4

**EXAMINATION** [22] 1:15 34:9 36:13 52:6 71:8 74:8 88:1

105:9 108:13 123:17 137:3 140:1 155:11 170:5 173:22 184:13 199:3 203:10 210:9 219:10 224:1 232:7

**Examine** [3] 79:4 103:5 205:5

**Example** [12] 18:21 25:21 30:8 30:9 31:7 31:20 75:1 162:24 163:19 182:16 195:5 210:21

**Examples** [1] 61:13

**Exceed** [1] 25:7

**Except** [5] 26:15 36:3 85:23 165:17 209:15

**Exceptional** [1] 187:22

**Excludes** [3] 10:1 10:2 33:1

**Exclusively** [6] 70:19 104:17 168:4 198:14 218:25 244:3

**Excuse** [9] 32:16 33:22 69:1 103:16 118:19 167:3 197:10 201:10 217:18

**Excused** [7] 105:6 135:22 167:18 169:8 169:15 170:1 198:23

**Excuses** [1] 99:4

**Excusing** [1] 17:25

**Execution** [9] 40:11 76:16 79:25 81:23 110:13 141:5 159:14 177:9 226:17

**Executive** [2] 113:24 216:10

**Exhibits** [1] 245:9

**Exist** [2] 27:17 58:9

**Existed** [1] 29:13

**Existence** [7] 12:6 12:8 13:11 23:20 23:23 24:3 24:7

**Exists** [2] 13:9 65:1

**Expand** [1] 177:19

**Expected** [1] 190:3

**Expecting** [2] 100:14 100:17

**Experience** [4] 78:13 101:8 164:10 192:6

**Experienced** [3] 75:22 102:7 102:22

**Experiences** [2] 79:16 103:4

**Expiration** [1] 245:16

**Explain** [2] 49:12 60:21

**Explained** [1] 176:23

**Explaining** [1] 52:12

**Explanations** [1] 206:23

**Expound** [2] 124:7 176:1

**Express** [1] 52:16

**Expressed** [2] 37:2 215:10

**Extent** [2] 137:25 156:25

**Extra** [1] 211:20

**Extreme** [1] 28:15

**Extremes** [2] 28:13 50:13

**Eye** [2] 186:16 186:16

**Eyes** [1] 141:19

**Eyewitness** [1] 31:1

**Eyewitnesses** [1] 31:17

---

## F

**Face** [1] 237:15

**Faced** [3] 56:14 213:13 216:17

**Fact** [44] 4:11 4:18 4:20 5:3 5:8 5:15 5:16 5:21 6:24 8:5 8:17 39:21 42:5 42:22 49:1 56:19 61:24 61:24 73:9 81:12 84:5 84:7 87:2 87:12 90:17 100:22 123:4 123:5 124:11 141:17 159:19 175:24 176:16 181:11 192:7 194:4 201:25 212:8 213:14 216:1 216:2 216:23 230:11 241:25

**Factor** [13] 86:3 86:13 87:4 87:4 93:12 94:19 109:15 147:5 180:5 233:13 234:17 239:5 239:6

**Factors** [6] 6:13 92:25 93:5 96:14 234:4 234:8

**Facts** [28] 27:13 28:9 28:18 48:22 82:5 82:9 82:10 126:12 127:8 145:14 151:11 180:5 180:6 180:17 205:5 206:10 206:17 206:18 206:25 208:1 211:6 227:23 228:3 228:4 228:20 228:22 239:19 240:7

**Factual** [1] 62:2

**Fail** [1] 5:9

**Fail-safe** [1] 153:5

**Failed** [1] 188:25

**Fair** [24] 12:10 12:12 57:20 68:2 76:22 77:3 77:6 77:12 103:6 103:10 106:5 107:2 123:7 129:22 129:23 129:24 132:14 135:13 175:10 210:18 211:25 212:3 212:7 232:19

**Fairer** [1] 210:20

**Fairest** [1] 61:10

**Fairly** [2] 88:12 101:23

**Fairness** [8] 53:1 53:20 90:22 91:24 91:24 210:17 211:20 211:20

**Familiar** [1] 130:23

**Familiarity** [1] 130:22

**Family** [16] 14:10 60:20 105:22 105:23 106:3 106:8 106:10 106:25 112:3 113:21 130:8 130:22 146:3 189:22 196:19 197:25

**Fannin** [1] 2:7

**Far** [13] 8:14 32:20 35:1 35:14 46:7 72:16 105:15 174:5 199:7 200:7 204:23 219:20 220:17

**Farmer** [1] 59:8

**Father** [6] 98:15 121:19 121:22 146:16 132:21 133:3

**Father's** [1] 133:13

**Favor** [5] 40:3 55:15 95:18 142:21 185:14

**Favors** [2] 52:19 52:19

**Faye** [3] 76:10 95:1 165:25

**Fear** [3] 101:11 154:25 211:21

**Feature** [7] 16:17 18:12 29:15 31:10 139:5 139:6 139:14

**Features** [1] 202:12

**Feelings** [9] 53:9 53:16 53:19 56:17 89:2 89:17 96:2 109:22 133:16 140:12 140:15 140:21 178:1 185:6 204:9 213:22 214:20

**Feet** [1] 32:9

**Fell** [1] 32:7

**Fellow** [1] 26:13

**Felonies** [1] 23:7

**Felony** [7] 23:6 33:24 34:1 34:1 124:20 188:21 201:11 124:20 129:16 134:20 238:19 239:2 239:6 241:16

**Few** [12] 3:5 29:5 52:10 88:7 117:21 123:20 165:8 186:23 187:14 211:15 232:14 232:22

**Fictional** [1] 145:13

**Field** [2] 159:6 239:21

**Fifteen** [2] 155:17 184:21

**Fifth** [2] 144:18 159:2

**Fifty** [4] 25:22 28:19 44:11 86:14

**Fight** [1] 25:18

**Fighting** [1] 215:6

**Figure** [4] 88:23 89:8 206:18 232:17

**Fill** [1] 214:9

**Filled** [2] 36:23 185:3

**Filling** [2] 209:13 213:23

**Finally** [2] 26:7 167:10

**Findings** [1] 172:22

**Fine** [16] 25:6 52:15 66:8 102:1 130:3 208:11 209:7 210:12 219:8 219:15 220:11 228:13 228:13 232:9 242:23 243:24

**Finger** [1] 216:15

**Fingerprint** [3] 31:7 31:9 31:11

**Fingerprints** [1] 30:8

**Finish** [3] 197:20 209:15 211:13

**Finished** [2] 41:19 213:23

**Fired** [4] 32:8 32:10 32:18 61:25

**Firm** [1] 224:14

**First** [83] 5:4 5:18 5:22 6:19 7:7 7:12 7:22 9:10 9:10 9:20 10:3 10:5 10:18 11:1 11:4 11:10 11:20 14:8 15:17 15:18 15:19 15:22 15:24 16:2 16:5 16:17 16:21 17:16 18:9 33:13 34:8 34:14 35:11 36:23 41:21 44:2 53:6 57:9 68:3 71:7 71:12 73:19 73:25 82:19 89:8 92:7 95:12 105:8 105:11 108:22 113:5 114:20 116:19 116:24 135:19 137:2 137:5 140:11 141:24 149:2 158:12 160:16 170:4 170:8 171:7 172:11 173:3 184:23 199:2 201:5 201:24 202:20 202:21 203:18 219:9 222:3 222:22 222:24 223:5 224:8 227:1 227:5 237:6

**Fist** [3] 44:20 117:9 229:11

**Fit** [8] 35:24 108:4 109:24 133:19 133:22 177:17 177:19 186:9

**Fits** [3] 86:19 124:23 124:24

**Five** [19] 22:4 25:5 25:22 28:5 28:7 28:18 36:5 39:7 39:14 39:23 70:13 104:14 146:8 167:25 206:13 206:15 221:9 221:11 237:12

**Fix** [2] 58:22 144:6

**Flip** [1] 12:12 27:18

**Florida** [3] 125:15 158:13 158:14

**Flunk** [1] 190:25

**FM** [1] 2:20

**Focus** [5] 5:18 6:4 6:7 193:13 201:16

**Foggiest** [1] 20:14

**Folks** [12] 18:21 20:2 22:1 69:16 103:18 104:22 167:5 168:7 197:15 217:22 221:15 243:1

**Follow** [27] 4:9 30:15 35:1 51:5 52:14 54:13 72:21 76:1 76:10 79:19 80:17 107:21 108:17 138:1 165:25 171:8 187:1 200:4 200:13 208:1 208:16 209:9 220:16 220:9 228:10 230:21 232:8

**Follow-up** [3] 74:16 79:18 186:10

**Followed** [1] 79:20

**Following** [3] 1:18 55:8 64:10

**Follows** [7] 34:8 71:7 105:8 137:2 170:4 199:2 219:9

**Foot** [1] 134:12

**Football** [2] 12:19 12:19

**Foregoing** [1] 245:4

**Forget** [1] 151:23

**Forgot** [1] 144:22

**Form** [1] 74:25

**Former** [1] 144:2

**Forms** [2] 37:10 109:5

**Fort** [3] 99:24 111:9 111:10

**Forth** [4] 14:10 26:5 201:19

**Forty** [21] 12:22 20:10 20:15 20:22 21:1 21:20 22:7 22:11 84:4 86:12 86:15 86:23 87:3 87:12 188:2 215:15 215:21 216:1 216:2 217:24

**Forty-eight** [4] 103:20 167:6 197:16 243:3

**Forty-year** [3] 21:1 22:2 188:2

**Forward** [2] 209:24 244:16

**Four** [2] 109:13 188:9

**Frame** [8] 35:5 72:6 72:8 107:12 137:20 171:3 199:21 220:8

**Frankly** [3] 53:4 53:15 231:5

**Free** [6] 6:17 14:22 15:1 15:6 121:6 124:7

**Freedom** [1] 15:1

**Freeway** [1] 2:14

**French** [2] 238:15 238:16

**Friday** [2] 36:24 37:3

**Friend** [2] 99:24 146:2

**Friend's** [1] 112:3

**Friendly** [1] 189:24

**Friends** [5] 60:20 112:14 128:22 129:9 190:8

**Frustrated** [1] 3:16

**Full** [3] 39:25 61:23 236:2

**Full-time** [3] 155:6 155:6 224:9

**Fuller** [1] 55:12

**Function** [1] 78:2

**Future** [40] 12:6 13:8 14:2 45:1 46:10 83:16 83:24 84:9 84:23 117:13 117:23 118:3 150:11 152:11 153:24 160:19 163:7 172:14 172:19 173:9 179:19 181:5 182:6 192:2 192:6 192:9 192:18 193:9 193:11 194:20 202:2 202:2 202:7 202:15 207:15 222:4 222:7 222:14 228:16 230:25

---

## G

**Gain** [1] 95:18

**Gambling** [5] 112:10 112:13 127:1 127:22 128:5

**Game** [1] 12:19

**Gang** [1] 78:22

**Gaps** [1] 144:4

**Gather** [1] 28:10

**Gees** [1] 241:22

**General** [10] 79:7 89:18 91:13 117:19 125:21 126:12 174:18 187:10 225:14 225:19

**Generally** [8] 78:12 78:14 90:1 113:15 175:16 176:12 185:8 221:14

**Generically** [1] 14:1

**Gentlemen** [1] 3:4

**Genuine** [1] 59:17

**Getaway** [4] 30:9 46:1 152:21 230:4

**Gibson** [1] 63:1

**Girl** [1] 131:19

**Given** [29] 3:12 3:25 30:1 41:20 42:1 47:5 50:20 52:16 52:23 53:12 62:04 66:10 80:15 80:25 110:2 110:10 130:22 135:17 138:17 139:15

**Glad** [1] 76:20

**Glen** [3] 100:7 100:7 100:8

**Goal** [2] 104:15 218:23

**Goat** [1] 31:25

**God** [2] 121:5 215:21

**Goings** [1] 31:21

**Gosh** [5] 53:6 89:9 157:18 161:21 196:10

**Government** [2] 238:5 238:6

**Governor** [9] 21:7 21:9 21:11 76:16 76:17 95:21 95:22 145:12

**Grab** [1] 61:5

**Grad** [1] 187:15

**Grade** [3] 129:4 144:18 159:3

**Grades** [1] 144:18

**Graduated** [1] 159:18

**Grand** [1] 5:7

**Grandchildren** [1] 190:2

**Grandmother** [1] 97:18

**Grant** [3] 21:10 21:10 21:14

**Granted** [4] 20:22 20:24 21:23 136:3

**Grateful** [1] 184:19

**Grave** [1] 165:21

**Great** [4] 11:25 22:12 64:25 187:11

**Greater** [2] 12:20 24:16 24:16

**Greensway** [1] 224:9

**Grew** [5] 41:10 67:15 75:21 83:9 116:9

**Grossly** [1] 12:7

**Ground** [2] 31:23 32:13 223:10

**Group** [3] 3:2 170:10 219:17

**Groups** [1] 114:3

**Grow** [1] 79:10

**Guards** [1] 15:5

**Guess** [25] 3:10 36:24 68:18 76:22 84:7 93:5 95:4 109:15 143:18 145:12 146:21 162:3 162:22 177:18 190:16 190:17 191:23 194:9 194:10 204:1 212:20 215:3 222:20 233:4 237:24

**Guilt** [22] 5:5 10:2 10:8 31:2 31:3 33:2 38:5 42:3 45:18 60:16 64:16 96:4 114:21 124:12 152:16 173:13 178:2 178:3 212:19 223:4 241:7 241:20

**Guilt/innocence** [12] 40:18 40:19 41:7 43:20 45:4 45:19 82:19 83:13 115:17 115:17 178:22 179:6

**Guilty** [197] 5:9 5:11 5:12 5:12 5:16 5:21 5:21 6:3 6:11 9:17 10:11 16:3 18:8 20:5 22:22 22:25 23:25 24:5 24:12 24:12 24:13 26:24 27:1 27:20 27:21 30:12 31:4 32:1 33:8 40:25 41:1 41:2 41:2 41:12 41:22 42:10 42:21 43:5 43:10 43:20 43:22 46:9 49:1 51:5 50:24 50:25 54:8 56:4 56:20 57:13 57:23 58:1 60:14 61:21 63:24 65:7 65:16 66:1 66:5 67:7 67:21 73:11 82:25 83:4 84:22 91:16 92:22 94:11 115:8 115:13 116:13 117:4 118:1 125:4 126:3 134:9 134:17 135:18 138:14 148:5 148:10 148:11 148:13 148:16 148:17 149:23 150:4 150:6 150:10 150:21

163:9 163:10 173:14 183:14 185:16 192:6 192:6 216:18 232:19

150:22 151:4 151:10 151:22 152:10 153:23 157:15 158:3 159:22 160:10 160:18 161:3 163:5 172:7 172:17 173:8 175:24 178:8 178:9 178:20 179:3 180:20 182:4 183:20 183:21 183:21 183:22 189:3 191:1 191:20 192:8 192:17 193:19 194:10 201:6 201:7 201:22 202:6 202:14 202:20 204:19 205:3 213:8 215:20 216:19 217:4 221:19 222:6 222:13 222:23 222:23 222:24 226:2 226:3 226:4 227:22 227:22 227:25 228:12 228:13 228:19 230:24 231:2 231:22 233:10 233:25 235:5 235:7 235:12 236:19 236:21 237:14 237:14 241:5 241:10 241:22 241:24

**Guilty/not** [1] 202:20

**Gun** [8] 31:21 32:9 32:10 32:14 32:18 44:20 117:8 134:2

**Gunshot** [2] 32:12 32:14

**Guy** [3] 113:11 186:19 241:23

**Guys** [3] 89:10 131:18 223:24

---

## H

**Half** [3] 7:11 7:12 17:16

**Hallway** [1] 34:4

**Hand** [4] 11:24 32:9 32:19 245:12

**Handle** [1] 155:4

**Handled** [1] 9:6

**Hands** [3] 32:14 45:25 134:2

**Hang** [1] 100:2

**Hanging** [1] 127:19

**Happy** [2] 58:19 64:2

**Hard** [13] 34:12 44:21 62:10 96:24 117:9 146:19 162:22 163:22 193:12 229:11 239:14 239:17 239:22

**Harm** [1] 163:1

**Harmful** [1] 224:23

**Harris** [13] 1:8 1:21 15:13 38:10 76:12 82:20 114:24 156:14 175:2 245:2 245:4 245:11 245:17

**Hate** [2] 26:13 143:20

**Head** [1] 62:3

**Headlines** [1] 61:4

**Heads** [1] 57:6

**Headway** [1] 3:9

**Health** [7] 35:3 72:4 107:10 137:18 171:1 199:19 220:5

**Hear** [54] 6:6 7:10 27:2 27:22 31:4 41:6 41:6 41:7 41:25 43:1 50:21 60:5 70:12 79:1 83:6 93:25 94:9 104:12 114:13 115:16 115:16 115:17 116:5 116:15 127:12 130:4 130:7 132:1 148:22 151:5 164:5 166:10 177:23 178:21 178:22 187:20 201:15 206:9 207:1 208:1 212:17 212:18 212:23 221:22 221:25 222:6 227:22 228:24 232:11 238:24 238:25 242:11

**Heard** [64] 1:19 6:5 7:7 18:5 19:1 22:3 27:7 28:1 33:4 35:14 42:13 42:16 45:3 45:19 45:20 46:7 46:15 47:13 48:17 48:18 48:22 50:4 72:15 76:3 76:4 76:7 76:8 82:12 85:16 85:21 107:4 116:17 118:18 120:9 120:12 124:22 131:11 131:21 132:4 132:7 138:2 145:17 145:23 149:12 152:16 152:18 153:10 156:3 156:17 171:7 171:14 180:6 182:17 188:14 200:7 210:23

**211:**1 221:24 223:21 228:20
229:17 230:10 237:17 241:1
**Hearing** [7] 44:23 130:8
131:14 131:16 174:6 179:5
179:16
**Hears** [2] 26:21 32:12
**Hedge** [1] 227:8
**Heinous** [1] 146:22
**Held** [3] 1:21 120:16 120:24
**Help** [6] 41:16 42:4 94:9
131:17 185:5 234:6
**Helpful** [9] 83:22 92:6 92:
11 93:6 94:1 117:17 149:22
179:23 213:1
**Helping** [2] 42:8 113:20
**Hereby** [1] 245:4
**Hesitate** [3] 97:5 155:19
194:18
**Hesitation** [1] 69:6
**Hi** [2] 88:3 232:9
**High** [16] 46:16 46:18 46:
21 77:3 77:7 77:7 77:17 118:
20 118:22 119:1 120:15 156:
15 159:18 182:17 182:20 182:
22
**Higher** [1] 25:5
**Highway** [1] 81:10
**Hill** [20] 2:12 4:14 52:4
52:5 52:7 52:8 87:24 87:25
88:2 88:3 123:14 123:19 155:
15 184:16 210:7 210:8 210:
10 217:15 232:6 232:8
**Hill's** [2] 169:2 169:21
**Himself** [7] 42:14 126:22
179:6 180:14 181:3 207:6
221:24
**Hinkley** [1] 61:17
**Hinted** [1] 60:16
**History** [15] 41:9 42:7 83:
7 111:5 116:8 147:11 148:23
150:13 150:17 166:7 166:16
178:24 207:4 208:25 229:1
**Hit** [2] 162:13 176:1
**Hitting** [4] 44:20 117:9
149:8 229:10
**Hobbies** [1] 117:19
**Hold** [1] 60:25
**Home** [12] 41:2 68:24 77:8
101:2 101:7 101:21 113:12
121:24 122:9 128:3 128:4
209:16
**Honest** [4] 59:9 94:23 97:
3 154:10
**Honestly** [2] 64:7 154:16
**Honesty** [1] 209:12
**Honor** [14] 28:22 36:12 74:
7 108:12 136:1 168:1 168:
22 169:6 169:9 169:16 169:
18 173:21 184:25 203:9
**Honorable** [1] 1:20
**Hooked** [1] 26:5
**Hope** [4] 54:21 100:18 196:
21 241:8
**Hopefully** [3] 226:1 226:
4 237:10
**Horrible** [4] 60:4 207:13
207:22 211:2
**Hospital** [1] 25:25
**Hotel** [1] 128:25
**Hours** [1] 69:20
**House** [2] 112:12 127:2
**Housewife** [1] 224:9
**Houston** [6] 1:21 2:8 2:15
2:21 122:5 245:18
**Hum** [1] 129:13
**Human** [9] 22:10 31:10 31:
21 33:21 80:1 109:9 134:5
201:9 225:14
**Hundred** [2] 80:10 174:14
**Hundreds** [1] 88:25

**Hurry** [1] 209:13
**Husband** [3] 25:25 81:9
238:10
**Husky** [2] 100:10 100:11
**Hypothetical** [6] 20:15
20:17 20:21 58:5 201:20 239:
20
**Hypothetically** [2] 172:
15 221:17

---

**I**

**I.S.D.** [1] 76:21
**Idea** [11] 4:6 18:23 36:1
36:21 48:15 72:12 74:17 94:
25 171:8 185:17 195:22
**Identified** [1] 191:7
**Identify** [4] 30:6 30:9
75:18 144:3
**Identifying** [1] 31:10
**Ignorant** [1] 239:22
**Illness** [1] 77:18
**Images** [1] 158:9
**Imaginary** [6] 26:21 27:
19 28:3 32:1 33:8 202:4
**Imagine** [2] 69:20 209:14
**Immediate** [1] 146:20
**Immediately** [2] 150:25
160:3
**Immoral** [1] 110:23
**Impact** [3] 97:21 99:15
130:7
**Impartial** [1] 123:7 175:
10 210:18
**Important** [21] 89:10 89:
14 92:13 94:18 95:12 98:24
122:21 124:16 147:1 160:14
165:21 181:4 186:6 189:11
208:22 233:1 234:5 234:17
234:19 235:23 235:24
**Imposed** [10] 4:23 4:25 22:
6 25:7 138:22 139:18 139:19
172:25 185:11 231:25
**Imposing** [1] 176:19
**Impression** [2] 59:12 91:
15
**Imprisonment** [3] 141:21
175:15 208:24
**Improvement** [2] 156:2
156:5
**Impulse** [1] 158:11
**Inappropriate** [1] 86:18
**Inasmuch** [1] 186:11
**Incapable** [1] 95:15
**Incarcerated** [1] 28:24
29:6
**Include** [1] 66:12
**Included** [1] 245:6
**Includes** [2] 15:4 15:5
**Including** [5] 7:5 7:8 45:
17 187:12 229:24
**Incorporated** [1] 224:13
**Incumbent** [1] 89:3
**Independent** [9] 29:24 73:
17 139:5 139:6 173:3 202:22
203:3 223:13 237:5
**Indicate** [1] 207:6
**Indicated** [12] 63:14 75:
13 80:24 114:4 114:20 128:
23 174:5 182:11 189:17 190:
19 196:3 238:17
**Indicted** [1] 4:19
**Indictment** [15] 5:7 38:8
38:9 38:13 40:20 40:21 62:
25 62:25 101:18 115:9 123:4
147:24 148:3 148:6 178:7
**Indignity** [1] 26:4
**Individual** [26] 41:12 41:
14 41:16 42:8 42:14 56:10
59:15 61:21 79:7 88:16 92:
11 116:6 116:10 116:16 127:

**211:**18 214:12 1497:1 150:
17 153:9 162:10 179:2 179:6
181:13 207:6 240:6
**Individual's** [2] 205:6
207:3
**Individualized** [3] 68:8
160:9 160:11
**Individually** [8] 3:5 8:
16 52:15 103:18 167:5 197:
15 217:22 243:2
**Individuals** [3] 63:2 127:
14 130:11
**Influence** [1] 99:13
**Influenced** [5] 70:21 104:
14 135:14 168:5 244:5
**Information** [51] 6:1 18:
19 19:5 22:14 41:16 70:19
70:21 71:24 73:6 73:20 81:8
83:21 86:1 104:18 104:20
106:21 106:24 116:3 116:10
121:21 132:12 150:11 150:16
150:16 153:22 168:4 168:6
171:22 171:23 178:25 191:25
192:24 192:25 193:24 194:2
194:8 198:15 200:20 200:21
200:24 201:15 203:18 203:20
207:5 212:25 217:21 219:1
223:13 223:15 228:3 244:3
**Inherently** [1] 68:2
**Injection** [3] 110:2 134:
2 233:12
**Injury** [1] 149:9
**Innocence** [14] 10:10 10:
14 38:6 42:3 43:21 45:18 63:
21 96:5 114:21 124:12 152:
16 178:2 178:3 241:2
**Innocent** [24] 5:16 10:5
63:20 102:5 145:9 145:11
145:19 147:14 166:5 166:9
166:11 180:10 204:10 204:14
204:15 204:23 209:1 214:21
215:4 215:5 240:25 241:10
241:18 241:23
**Inordinate** [1] 234:21
**Inquire** [1] 106:20
**Inquiry** [2] 45:8 235:20
**Insanity** [1] 61:21
**Inside** [1] 103:3 241:22
**Instability** [1] 77:25
**Instance** [4] 78:21 164:
11 190:13 209:1
**Instead** [6] 6:6 16:16 32:
5 93:4 156:5 178:14
**Instruction** [2] 7:13 17:
17
**Instructional** [3] 143:
25 144:1 144:13
**Instructions** [4] 51:5
185:25 186:2 241:21
**Intelligent** [1] 18:25
**Intend** [3] 91:18 147:21
157:8
**Intended** [2] 23:5 134:10
**Intending** [1] 39:12
**Intends** [1] 166:7
**Intent** [4] 109:16 163:1
164:7 164:12
**Intention** [1] 134:13
**Intentional** [31] 23:4 23:
11 33:21 34:2 37:16 39:4 39:
9 39:10 39:15 42:22 51:13
51:15 51:19 51:22 124:19
134:10 134:14 134:17 147:16
157:7 157:9 157:13 166:12
172:17 186:12 188:20 193:2
201:16 205:17 205:20
**Intentionally** [11] 38:
10 91:16 134:4 134:20 147:
13 147:13 148:18 180:20 180:
22 193:1 201:9
**Interaction** [1] 81:11
**Interested** [2] 54:14 184:
22

**Interesting** [3] 48:11 54:
15 145:14
**Interfere** [8] 35:4 55:9
72:5 107:1 107:11 137:19
171:2 199:20
**International** [1] 156:1
**Interpret** [1] 96:23
**Interpretation** [2] 86:
24 90:17
**Interpreting** [1] 57:21
**Introduce** [1] 160:2
**Invasion** [1] 101:6
**Invite** [2] 68:21 138:10
**Involved** [15] 6:9 6:15
23:1 37:18 54:21 126:16 127:
21 128:2 128:7 144:11 189:
18 234:12 234:15 236:3 242:2
**Involves** [2] 157:6 188:19
**Inwardly** [1] 103:6
**Irresponsible** [1] 119:20
**ISD** [1] 144:12
**Isolated** [1] 193:24
**Issue** [47] 42:4 43:13 45:
11 45:12 49:12 94:21 101:5
103:8 117:25 134:24 135:2
150:7 152:1 152:8 152:9 152:
14 154:2 161:1 161:24 162:
17 163:3 164:16 165:16 179:
4 180:16 181:17 182:3 191:
18 192:4 192:16 193:8 194:
21 195:23 196:2 196:13 205:
8 207:19 228:16 228:18 229:
21 230:23 231:5 231:23 231:
24 235:1 238:18 240:22
**Issues** [13] 42:9 43:11 50:
15 89:2 89:4 126:4 135:1
140:9 159:24 185:19 185:23
189:15 237:14
**Itself** [12] 32:24 51:15
74:1 94:16 116:17 164:21
164:25 179:5 180:5 181:13
223:4 223:17

---

**J**

**Jacinto** [1] 245:18
**Jail** [1] 191:3
**Jealous** [1] 57:5
**Jealousy** [1] 115:21
**Jeopardy** [1] 126:22
**Job** [27] 3:15 5:8 5:10 9:6
11:8 14:9 36:1 36:2 36:4 38:
6 50:14 50:22 57:12 58:17
59:1 60:23 81:15 81:16 113:
23 124:21 143:23 144:7 154:
21 159:1 221:6 221:7 221:8
**John** [1] 61:16
**JR** [2] 1:5 245:20
**Judge** [38] 1:21 39:6 40:9
40:10 50:21 53:24 60:10 63:
16 69:8 81:22 82:7 87:25 98:
18 101:23 103:4 110:12 121:
7 121:7 126:19 130:4 141:4
148:14 157:3 158:4 160:22
161:6 162:4 177:9 188:12
191:1 206:12 210:8 212:1
215:7 216:6 217:15 226:16
237:8
**Judge's** [3] 36:25 80:5
211:11
**Judgement** [1] 98:13
**Judges** [1] 156:10
**Judgment** [4] 82:3 98:21
99:12 121:6
**JUDICIAL** [1] 1:11
**July** [1] 154:22
**Jump** [1] 177:24
**Jumped** [2] 57:7 57:15
**Jumps** [1] 30:5
**June** [1] 158:13
**Juries** [3] 7:13 114:5 233:
25
**Juror** [98] 4:10 26:12 26:

20 27:19 33:3 34:23 35:5 35:
16 38:6 46:17 46:24 47:7 47:
8 48:8 50:22 51:8 52:21 52:
24 66:10 69:7 69:23 70:17
71:22 72:6 72:19 72:21 73:1
80:15 86:2 92:11 96:21 100:
24 104:15 105:20 106:5 107:
2 107:12 107:21 107:24 108:
1 110:10 118:21 121:16 121:
17 122:14 122:16 123:3 123:
8 124:21 126:10 132:14 133:
9 137:14 137:19 138:5 138:
13 154:9 154:15 160:5 160:6
167:12 168:2 169:11 169:11
169:13 170:18 171:3 171:12
171:21 174:10 177:6 182:18
182:21 183:17 197:21 198:13
199:13 199:21 200:12 200:14
200:18 202:1 204:2 210:17
210:19 210:19 218:6 218:24
219:25 220:8 220:16 220:18
220:24 221:18 228:12 231:17
243:8 244:1

**Juror's** [1] 172:5

**Jurors** [17] 3:1 38:7 57:9
63:5 67:24 123:24 160:7 171:
8 200:1 200:3 200:4 207:14
209:21 209:24 220:13 231:21
231:23

**Jurors'** [1] 115:4

**Jury** [79] 5:1 5:14 7:1 8:1
8:6 8:9 8:10 9:8 15:8 15:
23 15:25 16:6 16:11 17:13
17:17 20:6 22:25 24:8 26:21
26:22 26:23 26:25 27:5 27:5
27:20 27:21 27:24 32:1 35:
21 40:22 53:5 53:5 62:4 64:
7 66:3 67:6 67:10 67:11 67:
20 73:14 80:21 82:24 82:24
88:24 89:6 96:11 102:3 114:
4 114:7 114:21 115:5 122:20
124:15 138:14 138:16 139:5
148:4 170:11 173:14 174:25
191:22 201:5 201:6 201:22
202:6 206:2 213:8 215:19
221:15 226:14 226:22 237:18
240:6 240:11 241:4

**Jury's** [13] 5:6 5:7 5:8 9:
10 22:15 23:25 24:4 33:1 90:
25 139:8 139:10 211:11 213:7

**Justifiable** [3] 9:4 17:
22 18:1

**Justification** [9] 33:22
39:11 42:23 57:1 148:19 187:
7 201:10 204:22 239:8

**Justified** [3] 147:15 205:
15 227:10

**Justify** [1] 94:6

---

## K

**Kansas** [1] 111:4

**KATHERINE** [1] 137:1

**KATHERYNE** [1] 71:6

**Kay** [2] 245:3 245:16

**Keep** [14] 12:3 34:25 39:24
43:9 95:12 104:21 123:7 143:
14 175:9 178:18 222:20 226:
10 226:11 230:22

**Kid** [1] 232:13

**Kidnapping** [31] 23:8 23:
8 23:9 23:24 24:10 24:10 24:
20 34:1 38:12 38:12 38:20
39:16 42:24 56:9 82:22 115:
1 115:10 125:1 125:3 147:24
148:7 148:20 157:12 157:19
157:20 157:23 180:21 188:22
189:1 189:3 189:4

**Kidnapping/murder** [2]
24:19 83:2

**Kidnappings** [1] 13:18

**Kids** [2] 97:8 207:9

**Kill** [24] 37:20 39:12 57:
17 61:17 75:20 91:18 96:19
109:8 109:9 109:9 109:13
109:13 109:19 110:3 125:15
125:16 134:1 147:21 157:8

---

## L

158:13 158:14 166:7 204:17
204:19

**Killed** [18] 50:2 56:8 56:
10 75:2 82:22 109:15 112:3
115:11 115:23 126:25 134:4
166:17 193:1 207:10 214:25
215:4 225:12 230:3

**Killer** [1] 225:8

**Killers** [1] 109:7

**Killing** [20] 38:21 38:22
38:23 39:17 42:24 44:20 83:
3 112:21 112:21 114:25 115:
1 147:25 148:20 149:10 157:
19 158:15 180:10 180:20 180:
22 193:2

**Kills** [1] 158:12

**Kind** [65] 21:1 24:21 26:11
32:25 37:7 43:19 54:4 64:24
67:14 67:19 68:5 69:7 74:23
82:16 83:8 83:9 90:12 95:5
97:5 97:11 109:3 110:6 114:
21 114:7 116:3 119:19 123:2
126:22 127:19 128:19 130:16
131:7 132:2 144:14 145:1
146:14 149:21 150:11 150:16
150:16 150:18 153:4 154:19
158:10 177:24 178:25 179:10
179:22 180:23 203:14 213:4
213:4 214:9 214:18 216:15
216:18 221:14 221:16 223:20
224:25 231:3 231:14 238:23
240:3 240:12

**Kinds** [16] 13:21 25:9 25:
10 25:11 30:19 38:24 51:11
57:5 83:21 112:20 116:10
117:16 122:20 180:15 207:5
209:3

**Knife** [1] 45:25

**Knobloch** [2] 245:3 245:16

**Knock** [3] 44:21 117:9 229:
11

**Knocking** [1] 149:9

**Knowing** [33] 9:5 40:8 61:
23 69:22 81:21 87:7 94:10
94:12 102:5 103:24 110:11
126:15 126:15 126:18 128:13
130:11 134:24 141:3 151:11
167:11 177:8 191:9 191:9
197:20 206:18 218:5 226:15
237:15 239:13 240:7 240:8
241:5 243:8

**Knowingly** [1] 214:24

**Known** [5] 6:1 59:12 80:6
187:12 203:22

**Knows** [4] 89:6 95:8 103:2
227:19

**Kurt** [7] 2:18 4:14 52:8 88:
4 123:19 155:15 184:16

---

## L

**Labeled** [1] 78:1

**Labels** [2] 130:14 160:2

**Lack** [9] 41:9 42:7 83:7
116:8 148:23 178:24 191:15
207:4 229:1

**Ladies** [1] 3:3

**Lady** [3] 14:18 38:16 207:9

**Lake** [1] 207:10

**Land** [1] 13:22

**Landry** [6] 105:7 105:11
106:20 107:7 121:25 135:15

**Language** [1] 224:15

**Large** [2] 53:2 163:24

**Last** [15] 29:8 48:5 51:10
100:19 105:21 112:6 113:7
122:24 128:20 156:19 175:12
181:17 197:4 216:12 232:18

**Lasting** [1] 59:11

**Late** [1] 53:4

**Law** [81] 17:7 17:10 28:25
29:5 29:12 29:15 29:18 29:
22 30:14 32:22 32:24 33:13
36:20 40:14 49:7 50:10 50:
20 50:23 51:3 52:13 52:14

---

55:25 53:9 53:24 54:8 54:13
74:15 76:1 76:2 80:3 82:1
96:8 96:9 96:12 108:19 110:
10 110:16 119:8 120:3 141:8
141:11 143:5 143:6 143:8
145:12 146:6 151:6 151:16
156:7 156:16 174:3 177:12
183:7 183:18 183:19 183:24
184:2 185:10 185:10 188:6
189:16 203:16 208:12 208:14
220:5 228:9 228:10 228:15
230:21 232:2 241:6 242:20

**Laws** [5] 29:9 29:10 143:12
200:13 224:7

**Lawyer** [1] 100:22

**Lawyering** [1] 9:3

**Lawyers** [7] 22:14 73:6
171:20 200:17 200:20 220:23
242:8

**Laying** [2] 31:23 32:13

**Lead** [2] 51:20 159:1

**Leads** [9] 50:23 50:23 50:
24 50:25 51:1 51:3 183:19
183:25 228:11

**Learn** [4] 78:2 123:3 144:
8 192:11

**Learned** [4] 81:8 97:22 98:
5 98:7

**Learning** [1] 78:3

**Least** [13] 18:3 70:13 77:
3 85:18 122:23 128:15 152:
12 180:25 182:6 186:2 191:
21 193:7 231:3

**Leave** [21] 47:25 69:21 70:
3 103:24 104:4 105:2 167:10
167:11 167:17 197:14 197:14
197:20 198:1 198:22 218:4
218:5 218:11 230:20 243:7
243:13 244:12

**Leaves** [2] 59:11 66:3

**Led** [5] 26:17 28:18 144:14
194:5 234:16

**Ledge** [2] 52:11 88:5

**Left** [6] 79:20 97:14 214:8
215:17 239:21 240:9

**Legal** [11] 32:22 39:11 42:
23 56:25 57:12 62:1 148:19
161:7 201:10 204:21 239:8

**Legislature** [5] 28:24 29:
5 29:8 30:4 66:10

**Legitimate** [1] 28:8

**Less** [7] 12:20 25:5 67:22
68:12 120:19 125:5 176:4

**Lessened** [1] 17:24

**Lesser** [4] 24:15 24:20
157:5 157:23

**Lethal** [2] 110:2 233:11

**Letting** [1] 55:8

**Level** [13] 14:4 19:16 29:
25 30:14 54:22 161:20 161:
24 162:15 195:23 195:23 202:
13 222:1 236:8

**License** [2] 196:17 197:4

**Life** [228] 3:12 4:24 7:17
8:4 8:9 8:9 8:14 10:17 11:4
14:24 16:16 17:21 17:24 18:
2 18:12 18:16 19:8 19:18 19:
25 20:3 20:4 20:7 20:8 20:
18 23:12 24:25 25:3 25:24
26:12 27:8 27:11 28:20 28:
24 33:21 35:2 35:2 37:17 38:
10 39:8 39:10 39:14 39:17
45:5 46:11 46:18 47:8 47:10
47:15 47:22 47:25 50:4 50:
12 51:2 53:9 56:15 57:23 58:
11 61:19 63:3 65:11 65:18
66:20 66:6 66:13 67:9 67:13
69:25 72:2 72:3 73:12 73:14
84:20 84:25 85:1 85:5 85:7
85:16 85:21 86:4 86:12 86:
16 87:3 87:14 89:2 91:2 91:

---

93:4 93:4 93:7 94:2 94:6 94:
20 96:13 96:14 96:23 104:2
107:9 109:9 109:18 109:23
110:15 110:22 112:22 115:24
118:7 118:10 118:12 118:18
118:25 119:16 120:5 124:19
126:21 133:18 133:24 134:5
134:15 134:21 137:16 137:17
139:11 139:19 141:14 141:21
142:14 142:16 142:21 147:14
147:17 148:18 151:7 151:10
152:3 152:24 152:25 153:11
157:7 157:10 163:24 164:25
166:5 166:8 166:16 166:8 170:24
170:25 172:24 173:10 175:14
175:22 175:23 175:25 176:17
177:3 178:14 178:15 181:9
182:1 182:9 182:13 182:19
182:23 183:23 186:12 186:13
187:25 188:4 188:21 189:2
190:25 193:25 195:12 196:11
199:17 199:18 201:9 202:16
204:21 205:21 206:14 207:13
207:24 208:24 210:25 213:12
215:9 216:8 217:3 218:8 220:
4 220:5 222:15 225:5 225:14
225:16 225:25 228:14 230:9
230:14 230:17 231:8 233:12
235:9 235:10 235:13 236:12
237:14 237:20 238:20 239:1
239:3 239:8 239:10 239:10
239:11

**Lifestyle** [3] 167:14 197:
23 218:7

**Light** [1] 56:18

**Lightly** [2] 54:19 232:13

**Likelihood** [2] 64:17 235:
7

**Likely** [19] 12:17 12:17
44:10 44:14 65:9 83:18 117:
2 117:3 149:4 149:15 150:9
172:14 178:3 179:10 179:18
179:21 192:4 207:16 229:5

**Limited** [1] 13:7

**Line** [3] 38:22 238:4 242:15

**Lines** [2] 35:13 102:23

**Lingering** [1] 242:1

**Linkage** [1] 125:21

**Linking** [1] 125:12

**Lip** [1] 195:16

**Lisa** [3] 156:11 156:13 156:
15

**List** [2] 38:20 205:14

**Listed** [1] 81:5

**Listen** [24] 35:23 36:25
61:20 62:12 73:3 103:9 108:
2 110:10 125:1 127:9 151:8
157:17 167:23 184:7 185:12
188:24 198:11 200:20 209:25
210:2 218:20 220:25 231:13
243:23

**Listened** [1] 211:12

**Listening** [3] 60:4 127:3
240:7

**Listens** [1] 233:24

**Literally** [1] 206:6

**Live** [8] 14:16 122:4 142:
15 156:17 156:21 156:23 195:
11 195:15

**Lived** [1] 143:7

**Lives** [8] 38:15 99:16 122:
6 125:6 125:7 125:13 157:13
188:22

**Living** [3] 128:11 175:23
176:6

**Location** [1] 128:21

**Locked** [1] 20:19

**Look** [63] 6:17 42:3 42:6
46:6 47:3 47:21 49:13 50:14
55:6 55:7 56:1 61:13 68:11
73:20 79:7 84:12 84:18 85:2
85:11 85:14 91:5 94:15 94:
19 95:10 100:20 116:16 118:
4 118:8 118:18 120:1 124:22

134:23 139:5 152:15 153:17
157:24 161:3 162:25 164:6
164:21 164:25 165:17 181:3
181:19 185:5 192:3 194:20
196:2 207:21 207:24 209:24
210:17 228:22 230:12 231:6
233:9 233:14 235:4 235:6
235:16 237:4 237:12 244:15
**Looked** [7] 46:25 91:8 119:6 154:22 183:1 232:21 234:20
**Looking** [22] 41:16 50:18 69:1 85:25 88:22 93:5 102:6 118:17 120:3 139:4 150:17 153:21 164:3 164:17 173:7 188:13 190:14 190:16 210:18 210:19 231:15 235:21
**Looks** [2] 154:11 164:15
**Lorie** [1] 169:13
**Lose** [1] 14:22
**Lost** [3] 112:9 127:24 130:25
**Louis** [1] 145:7
**Love** [2] 25:23 26:15
**Lowrie** [1] 169:14
**Lump** [1] 68:9
**Lyn** [8] 2:2 4:17 36:15 54:16 118:15 140:3 173:24 224:3
**Lynn** [2] 74:10 203:12
**Lynne** [2] 34:7 60:18

## M

**Ma'am** [2] 33:14 135:23
**Machine** [1] 1:23
**Magnitude** [3] 98:19 194:24 240:22
**Major** [4] 98:24 174:15 174:17 201:11
**Majority** [2] 163:24 186:24
**Malicious** [1] 180:9
**Mamou** [16] 1:5 4:12 4:19 52:9 56:8 56:13 67:1 68:14 88:4 101:18 123:20 169:4 169:23 184:17 214:2 245:20
**Man** [13] 30:3 31:24 47:7 56:11 57:3 61:25 89:21 102:23 127:5 127:15 127:24 240:8 240:25
**Man's** [1] 62:3
**Managed** [1] 154:24
**Management** [1] 113:24
**Mandatory** [1] 66:13
**Mankind** [1] 25:14
**Manner** [4] 115:24 124:6 163:18 185:18
**MARIE** [1] 137:1
**Mark** [1] 97:14
**Marks** [1] 140:14
**Marlene** [1] 59:8
**Married** [3] 25:22 81:13 111:8
**Mary** [1] 63:1
**Mass** [2] 109:7 109:14
**Massachusetts** [1] 111:4
**Master's** [2] 144:13 159:10
**Match** [1] 6:10
**Matches** [1] 60:12
**Mates** [1] 98:14
**Math** [1] 77:21
**Mathematics** [1] 144:19
**Matter** [18] 6:24 6:25 6:25:7 7:19 7:19 7:20 9:18 35:3 86:21 121:19 121:20 135:11 135:12 158:19 210:14 212:8 241:12
**Mature** [2] 14:24 119:20
**McClellan** [50] 2:2 4:17 36:11 36:12 36:14 36:15 52:1 52:12 53:25 64:9 65:22 74:

6 74:7 74:9 74:10 87:22 92:5 95:2 96:7 108:11 108:12 108:14 108:15 123:11 124:5 139:25 140:2 140:3 168:18 168:19 168:22 169:10 169:15 169:16 169:18 173:20 173:21 173:23 173:24 203:8 203:9 203:11 203:12 210:15 210:21 216:13 224:2 224:3 238:17 240:15
**McClellan's** [1] 89:25
**McGarity** [1] 169:14
**Mean** [77] 11:18 11:19 11:20 11:21 11:23 11:25 12:2 12:22 15:16 19:3 19:4 20:1 21:22 37:11 39:11 40:18 40:25 57:4 57:5 57:17 57:21 60:19 63:23 64:3 84:18 89:16 90:6 90:7 90:15 90:18 97:2 97:10 109:8 127:18 129:19 129:23 130:24 131:23 133:25 134:5 146:19 146:21 151:2 151:17 153:3 154:1 156:22 157:1 160:25 161:8 161:9 186:12 188:12 192:17 202:23 204:15 205:18 207:23 207:23 207:23 214:11 215:15 215:17 221:6 225:3 225:7 225:18 226:1 233:19 233:20 236:13 236:13 241:11
**Meaning** [6] 9:2 10:20 96:20 130:2 144:23 204:15
**Means** [24] 9:23 11:4 11:24 12:16 20:3 20:4 20:8 30:21 44:9 49:16 60:11 62:20 86:12 90:16 115:24 117:2 133:20 148:18 153:4 180:1 197:6 201:7 215:9 229:5
**Meant** [12] 35:10 57:17 90:4 96:23 107:24 109:25 130:2 160:24 161:21 171:6 199:25 220:1
**Media** [9] 70:9 70:14 104:9 167:21 198:7 198:9 218:16 243:19 243:21
**Mediator** [1] 58:23
**Medical** [1] 15:4
**Meetings** [1] 131:6
**Member** [1] 189:22
**Members** [7] 14:10 105:22 105:23 106:3 106:8 106:25 112:9
**Memorize** [2] 3:23 4:4
**Men** [1] 128:15
**Menefee** [1] 168:16
**Mental** [11] 19:7 41:9 47:17 83:8 116:8 120:23 178:24 183:9 207:4 209:3 229:1
**Mention** [1] 197:3
**Mentioned** [13] 89:9 111:14 122:4 122:24 125:10 128:8 129:25 156:11 165:4 177:15 197:5 215:8 220:17
**Merely** [1] 66:6
**Merit** [1] 153:1
**Meritorious** [1] 112:23
**Merits** [2] 58:15 126:20
**Met** [2] 188:15 189:9
**MICHAEL** [1] 170:3
**MICHELE** [1] 199:1
**Middle** [3] 129:3 138:6 231:13
**Might** [84] 3:14 4:7 18:18 18:19 18:22 19:1 19:2 19:7 19:8 19:9 20:18 20:22 21:13 27:5 27:24 28:2 32:1 32:16 32:20 34:22 36:20 44:10 48:9 50:6 52:20 59:19 71:21 85:17 86:2 86:21 88:13 89:4 99:1 100:9 100:21 105:10 105:19 105:22 106:9 107:11 108:1 109:11 110:9 120:10 130:6 137:13 137:19 140:9 157:22 162:18 166:18 170:17 170:

24 172:4 172:21 173:1 174:21 176:3 176:8 177:18 180:4 181:4 181:9 189:5 199:12 201:23 202:13 202:13 202:17 203:16 207:1 207:14 214:17 216:2 216:10 219:24 220:4 220:5 220:25 222:18 223:8 234:6 239:3
**Mildly** [1] 19:10
**Military** [4] 127:18 195:9 195:10 195:13
**Million** [1] 155:1
**Mind** [54] 4:10 12:3 18:24 19:16 33:1 37:8 37:13 39:24 43:2 43:9 47:4 48:10 51:11 57:9 57:10 62:20 72:5 74:23 75:4 75:15 75:18 85:15 85:17 85:20 94:6 95:9 102:21 109:4 109:11 118:11 120:8 120:11 120:13 122:25 139:10 146:14 151:23 158:10 172:5 178:18 182:13 182:19 183:12 189:10 206:20 214:1 214:24 222:21 224:25 225:23 230:16 230:22 236:11
**Minds** [1] 125:12
**Minimum** [1] 188:2
**Minister** [1] 132:22
**Minor** [1] 189:18
**Minute** [5] 4:15 101:21 184:21 192:23 214:4
**Minutes** [6] 88:7 88:23 123:20 155:17 184:21 237:22
**Miss** [39] 4:17 34:6 34:13 35:8 36:15 51:25 52:8 68:21 69:12 71:12 72:25 73:16 74:10 88:3 103:15 105:11 106:20 135:15 137:5 138:10 140:3 167:2 168:20 169:17 199:5 199:15 199:24 200:16 200:25 203:12 210:5 210:15 211:17 212:15 215:11 220:11 232:9 242:23 243:24
**Missed** [1] 62:15
**Missionary** [1] 121:23
**Mistaken** [3] 130:1 159:3 195:16
**Mitigates** [4] 46:17 47:15 119:16 182:19
**Mitigating** [51] 7:16 17:9 17:14 17:22 18:18 18:20 18:23 19:9 19:13 19:15 19:21 46:2 46:12 46:24 49:1 49:6 49:14 49:16 50:1 84:16 85:17 86:3 91:25 92:3 94:5 94:5 118:6 119:5 119:10 119:11 119:17 119:25 120:4 120:10 120:13 152:22 153:18 153:19 153:20 163:11 165:2 181:24 182:15 183:5 183:10 196:3 196:6 196:23 222:11 230:7 230:13
**Mitigation** [5] 47:8 58:9 65:24 118:21 217:3
**Mixed** [3] 140:14 140:19 140:21
**Moderately** [1] 19:11
**Mom** [1] 59:7 129:10
**Moment** [8] 40:16 65:17 67:4 114:18 115:21 147:2 180:8 186:20
**Moments** [1] 52:10
**Money** [1] 128:4
**Monroe** [1] 155:16
**Montana** [1] 158:13
**Month** [2] 20:11 20:11
**Months** [3] 59:3 59:13 145:2
**Moral** [13] 7:9 45:21 79:24 96:2 96:19 96:22 152:18 164:19 181:21 185:14 230:1 235:18 241:18
**Morality** [1] 96:17
**Morning** [29] 3:3 11:1 14:

24 34:16 62:15 71:15 71:15 205:2 105:13 126:6 133:19 137:5 137:7 155:13 155:14 157:1 161:6 168:11 170:10 170:11 172:2 188:12 199:6 201:4 215:8 219:17 219:19 221:10 244:11
**Most** [19] 36:9 37:16 37:18 37:21 40:1 57:24 58:24 60:2 78:8 121:12 126:20 178:2 186:5 186:23 188:1 212:14 227:2 232:25 235:22
**Mother** [2] 211:3
**Motion** [1] 135:25
**Motive** [2] 112:4 112:11
**Mount** [1] 121:23
**Move** [1] 144:16
**Movie** [2] 165:5 165:7
**Multiple** [4] 125:12 148:8 151:15 158:15
**Murder** [233] 4:13 4:20 4:22 9:17 10:12 10:16 16:3 18:8 20:5 22:18 22:22 23:1 23:4 23:6 23:8 23:9 23:10 23:11 23:13 23:23 23:24 23:24 24:1 24:8 24:12 24:14 24:14 24:15 24:17 24:20 24:21 24:23 25:1 25:9 26:10 26:11 26:21 26:24 27:1 27:19 27:20 27:21 28:14 33:4 33:9 33:16 33:17 33:18 33:19 33:20 33:20 33:23 34:2 37:19 38:12 38:14 38:16 38:18 38:18 38:19 38:20 39:4 39:7 39:8 39:9 39:19 39:15 39:18 39:22 40:17 40:25 41:13 42:11 42:21 43:5 44:16 44:17 46:9 46:22 49:2 51:15 54:8 56:20 65:8 65:16 66:15 67:7 67:21 73:11 76:11 76:13 82:25 83:5 84:22 89:21 90:20 93:9 93:13 94:12 114:9 114:19 115:9 115:14 117:4 117:5 117:6 117:7 118:1 119:23 124:17 124:25 125:4 126:3 126:23 134:9 134:18 135:19 138:14 138:15 138:19 146:22 147:15 147:16 147:22 147:22 147:24 148:3 148:7 148:8 148:13 148:17 148:17 149:6 149:7 149:24 150:21 150:22 151:4 151:10 151:14 151:22 152:10 153:23 157:5 157:6 157:9 157:15 158:3 158:9 159:22 160:10 160:19 161:2 161:4 161:23 163:6 163:11 163:12 164:22 166:4 172:3 172:7 172:17 173:13 178:10 178:20 180:20 182:4 182:24 184:6 188:3 188:17 188:19 189:8 189:13 191:20 192:8 192:17 193:3 193:20 201:7 201:23 202:7 202:15 204:13 204:13 204:18 204:20 204:24 205:3 205:16 205:17 205:25 205:20 205:24 206:3 206:7 206:7 206:13 206:20 207:12 207:22 209:5 209:22 212:6 213:7 215:20 216:18 216:20 217:5 221:19 221:20 222:6 222:13 222:24 223:4 228:1 228:20 229:8 229:9 231:22 233:6 233:10 233:18 233:20 233:23 235:5 235:12 236:20 239:7 240:8
**Murdered** [2] 204:10 214:21
**Murderer** [4] 109:7 109:14 125:15 125:23
**Murders** [16] 13:8 13:17 13:17 26:18 51:14 86:8 119:3 125:10 126:12 126:14 204:1 205:10 205:22 205:22 206:2 206:5 214:22
**Must** [18] 5:5 7:25 8:4 9:15 9:25 14:4 16:1 16:2 32:25 59:11 63:15 80:7 96:12 142:1 168:3 198:14 218:25 244:3
**Mustache** [1] 195:15

## N

**Nagging** [1] 236:7
**Name** [20] 36:15 52:8 59:6 74:10 82:14 88:3 100:1 100:2 105:25 108:15 122:25 123:2 123:4 123:19 140:3 155:15 173:24 184:15 203:12 224:3
**Named** [3] 63:2 123:4 207:9
**Namely** [1] 188:16
**Nation's** [1] 61:18
**National** [1] 156:4
**Natural** [2] 61:3 159:5
**Nature** [12] 17:9 44:19 44:21 95:7 102:5 117:11 130:11 149:8 163:2 196:5 229:12 230:15
**Near** [1] 31:22
**Necessarily** [16] 16:1 16:2 16:6 21:23 90:18 142:9 158:16 162:14 186:13 187:9 189:1 192:19 195:6 201:8 212:10 235:2
**Necessary** [7] 3:23 74:21 75:24 85:13 140:14 170:20 227:11
**Need** [35] 18:4 22:12 51:7 55:18 57:4 77:18 87:10 88:21 100:23 101:25 103:3 104:22 116:5 129:21 134:6 144:8 150:12 154:17 157:3 168:7 193:23 194:2 194:8 198:16 208:17 209:4 209:7 209:11 212:19 216:16 220:23 228:12 228:13 231:25 244:6
**Needed** [1] 108:25
**Needs** [5] 68:1 70:24 144:4 164:13 219:3
**Negative** [2] 97:25 98:1
**Neglectful** [4] 78:11 78:15 113:14 113:18
**Neighborhood** [5] 14:9 47:18 116:9 131:25 189:25
**Neighbors** [1] 240:1
**Never** [33] 3:12 7:1 16:4 16:8 16:25 20:19 32:10 43:10 48:21 49:20 50:9 66:20 66:23 66:25 69:5 76:8 81:6 81:17 82:5 91:25 138:12 139:1 164:1 172:23 181:6 186:3 190:4 206:15 217:1 224:19 226:22 226:23 227:4
**New** [8] 10:13 10:14 29:10 113:25 156:5 175:3 175:4 187:14
**News** [10] 61:10 62:14 70:9 104:8 132:8 132:8 167:20 210:23 218:16 243:19
**Newspaper** [9] 61:2 61:4 70:12 80:25 104:11 167:23 198:11 218:19 243:22
**Next** [22] 19:14 60:17 70:5 86:21 104:5 104:10 123:20 155:16 167:13 167:18 172:8 184:21 186:18 187:2 198:3 198:8 218:10 218:13 222:9 223:16 243:16 243:20
**Nice** [1] 206:21
**Niece** [1] 81:14
**Niece's** [1] 81:9
**Night** [1] 48:5
**Nine** [2] 25:6 181:8
**Ninety** [2] 25:6 86:15
**Ninety-nine** [7] 25:6 28:19 39:7 39:14 39:23 206:13 206:14
**Nobody** [7] 30:6 30:9 32:14 68:7 71:3 123:21 133:14
**None** [4] 68:18 121:7 121:7 196:14
**Noon** [4] 103:23 197:19 218:3 243:7
**Normal** [2] 120:20 120:23

**Nose** [2] 162:13 162:23
**Note** [5] 54:23 104:25 168:9 198:18 244:9
**Noted** [1] 90:14
**Nothing** [10] 29:22 30:10 31:9 62:21 67:22 72:9 153:18 171:5 223:5 235:13
**Notice** [3] 45:11 59:6 238:7
**Noticed** [1] 214:8
**Notion** [3] 32:24 35:9 184:5
**Nowhere** [1] 62:25
**Number** [74] 7:3 8:18 8:19 8:21 16:7 16:9 16:10 16:13 16:18 25:4 25:5 43:13 45:11 45:12 46:17 46:20 47:7 47:9 49:12 50:15 50:16 53:16 65:10 83:14 92:8 92:12 93:2 93:16 93:18 94:15 117:25 129:11 135:2 138:17 138:21 150:7 152:1 152:14 154:2 161:1 161:25 162:17 164:16 165:16 169:11 169:12 173:14 178:13 178:13 179:4 180:16 181:17 182:3 182:21 191:18 192:4 192:16 193:8 193:14 194:3 196:2 196:13 205:8 216:25 217:6 217:8 228:16 229:21 229:22 230:23 231:5 231:23 235:4 237:1
**Numbered** [2] 1:20 245:6
**Numbers** [1] 192:15

## O

**O'clock** [1] 14:20
**Oath** [8] 31:24 50:19 51:5 52:24 183:17 208:18 228:8 228:11
**Object** [3] 31:13 31:13 31:14
**Objection** [2] 30:13 176:20
**Objectionable** [1] 220:18
**Objective** [5] 70:16 70:16 168:1 218:23 243:25
**Obligated** [3] 14:1 20:7 171:12
**Obligation** [4] 23:25 24:4 139:8 139:16
**Obtain** [1] 13:6
**Obvious** [2] 132:11 186:10
**Obviously** [30] 10:9 18:2 50:7 53:12 62:3 64:6 64:11 72:13 79:1 88:8 109:10 109:1 114:20 117:6 128:11 133:21 145:25 155:24 176:3 195:7 202:7 203:21 204:2 204:7 209:19 210:15 221:19 225:8 229:9 235:4
**Occasion** [1] 19:22
**Occasionally** [1] 232:13
**Occur** [2] 23:18 44:12
**Occurred** [10] 24:9 24:20 58:8 113:7 115:5 115:7 189:21 193:2 194:1 245:7
**Occurrence** [1] 189:7
**Occurs** [3] 171:24 193:3 233:24
**October** [3] 72:8 72:9 158:14
**Odds** [2] 12:19 12:20
**Offender** [2] 215:3 233:8
**Offenders** [1] 214:25
**Offense** [25] 4:13 4:19 4:21 5:19 7:6 9:17 9:18 10:16 18:15 23:10 24:14 24:15 24:16 24:21 25:1 28:14 51:15 157:23 164:18 178:6 196:7 201:17 235:17 236:1
**Offenses** [1] 157:5
**Office** [3] 99:24 100:12 100:13

**Officer** [4] 38:22 81:14 146:13 195:4
**Official** [3] 245:3 245:12 245:17
**Official/Deputy** [1] 245:3
**Officials** [2] 20:25 21:3
**Often** [6] 14:7 14:11 50:2 21 76:12 175:18 195:10
**Oftentimes** [2] 54:3 62:18
**Ohio** [1] 125:16
**Oil** [1] 238:16
**Oklahoma** [2] 109:10 111:4
**Old** [4] 25:22 84:3 84:8 86:14
**Older** [4] 75:21 79:10 111:24 119:20
**Once** [8] 68:21 106:19 126:3 148:12 153:22 153:23 187:21 235:11
**One** [184] 4:23 4:24 7:23 8:8 8:9 16:7 18:19 20:15 23:7 23:12 29:20 30:18 32:6 33:18 33:25 35:21 36:2 36:5 37:9 38:15 38:23 39:18 42:5 43:13 47:1 47:1 47:1 48:13 50:16 51:10 52:18 61:13 65:11 65:16 66:18 66:19 68:23 69:17 70:1 71:3 72:11 73:2 73:3 75:13 73:23 75:25 76:25 78:21 80:10 82:23 82:23 83:3 83:4 84:8 86:1 86:9 87:16 90:9 91:17 93:16 93:18 94:20 95:8 95:25 97:4 98:7 99:1 101:14 102:19 103:20 104:2 106:3 106:21 106:25 109:5 112:9 113:5 113:8 113:9 113:10 113:10 114:17 115:2 115:22:23 122:24 124:10 125:20 125:25 126:24 127:1 127:1 127:2 127:15 127:19 127:24 128:2 128:2 128:23 133:15 134:19 135:2 138:17 138:21 141:19 147:25 148:4 148:9 148:10 150:1 150:7 151:23 152:1 158:6 159:25 161:1 164:18 165:25 166:24 167:7 167:14 171:16 173:14 174:6 175:14 175:20 179:4 180:16 180:22 182:18 185:9 185:15 186:18 186:19 191:18 192:4 192:16 193:8 193:13 193:14 194:3 195:14 196:5 196:16 197:23 200:19 202:23 202:24 202:25 203:1 210:24 211:22 214:7 214:11 214:15 215:13 216:7 217:6 218:7 220:12 221:7 223:10 223:15 225:9 225:23 226:6 227:4 228:14 228:16 231:23 232:13 232:23 237:8 239:5 241:14 243:3 243:10
**Ones** [3] 8:25 89:4 211:11
**Open** [4] 39:24 43:4 45:2 245:7
**Open-minded** [1] 55:5
**Operated** [1] 185:18
**Operation** [1] 200:16
**Opinion** [20] 76:18 78:23 79:14 80:2 91:11 96:17 109:20 118:2 140:6 143:21 145:15 175:21 179:16 194:23 208:9 208:10 208:12 208:16 224:18 224:19
**Opinions** [10] 36:19 37:2 47:11 74:14 119:7 120:2 121:13 183:2 208:10 208:16
**Opportunity** [14] 52:16 84:18 88:9 88:18 152:25 153:4 154:4 177:25 182:12 185:4 230:10 231:8 232:19 236:22
**Opposed** [20] 46:5 47:23 62:1 75:14 84:18 85:19 86:4 86:16 110:22 118:7 121:15 141:15 147:7 152:24 182:1

**Officer** [4] 38:22 81:14

**Option** [14] 7:24 8:3 24:11 24:11 24:13 27:12 28:8 48:9 65:12 66:9 66:12 69:4 142:22 153:12
**Options** [1] 151:15
**Order** [12] 8:2 8:13 9:16 11:2 13:6 40:9 40:10 40:10 51:19 113:17 148:15 177:9 **Ordering** [4] 81:22 141:4 177:9 226:16
**Ordinarily** [7] 46:19 118:23 119:19 167:15 182:21 197:25 243:12
**Ordinary** [1] 3:15
**Organization** [1] 156:4
**Orleans** [2] 175:3 175:4
**Otherwise** [3] 43:10 69:8 203:22
**Ought** [46] 9:4 35:25 37:9 37:14 42:25 46:4 46:11 47:5 47:10 51:12 51:21 74:24 76:6 84:17 84:20 84:25 85:22 105:18 109:5 110:24 112:23 116:12 118:7 120:5 120:16 120:24 122:13 122:22 146:15 177:17 177:19 182:1 183:13 183:20 197:19 203:25 205:24 209:18 209:22 218:2 219:23 225:1 226:10 226:11 231:7 243:6
**Outcome** [3] 23:22 24:2 24:6
**Outcomes** [1] 23:22
**Outgoing** [2] 59:16 59:19
**Outlook** [1] 187:25
**Outreach** [1] 114:1
**Outset** [1] 89:13
**Outside** [11] 14:24 70:21 71:4 88:17 104:20 122:9 168:6 168:11 219:2 244:5 244:10
**Overcome** [5] 78:11 78:14 90:2 113:13 113:18
**Overcrowding** [2] 214:24 215:1
**Overriding** [2] 94:21 101:5
**Oversimplification** [1] 228:7
**Overview** [1] 220:13
**Overwhelming** [1] 163:4
**Own** [16] 21:17 58:15 59:23 74:19 97:21 108:23 128:14 128:16 165:19 187:12 191:4 192:1 192:7 196:19 224:17 224:19

## P

**P.T.A.** [1] 131:6
**Page** [5] 174:3 175:12 186:4 187:2 187:2
**Paid** [1] 245:11
**Pain** [1] 26:5
**Paint** [1] 68:9
**Pamela** [2] 245:3 245:16
**Panel** [5] 68:22 103:19 197:16 217:23 243:2
**Paper** [4] 61:5 69:15 197:13 217:20
**Paraphrasing** [1] 90:14
**Pardon** [6] 76:16 76:20 95:1 95:4 95:23 146:12
**Pardoned** [1] 95:13
**Pardons** [2] 21:3 21:5
**Parent** [2] 130:25 159:14
**Parents** [1] 78:4
**Park** [3] 144:12 156:23 156:24
**Parole** [12] 20:9 20:22 20:24 21:10 21:10 21:14 21:21

21:21 21:22 29:9 29:10 75:7

**Paroled** [1] 22:3

**Paroles** [2] 21:4 21:5

**Part** [8] 41:3 41:5 54:19 69:7 82:19 171:19 176:19 189:14

**Part's** [2] 41:24 42:1

**Participate** [12] 40:6 40:12 81:19 81:24 110:9 110:14 141:6 141:10 177:5 177:11 226:13 226:18

**Participating** [1] 81:21

**Particular** [28] 22:10 23:16 28:10 37:12 48:10 52:18 53:9 56:7 58:7 63:9 63:20 89:16 94:17 96:10 103:8 130:21 133:5 141:20 147:14 185:1 190:12 191:19 201:25 210:24 211:22 212:17 213:22 237:9

**Parties** [7] 5:25 129:6 168:15 180:11 236:3 245:6 245:9

**Parts** [4] 38:5 82:18 124:11 151:2

**Party** [5] 106:18 111:22 123:6 128:24 129:1

**Pasadena** [3] 76:21 77:5 156:23

**Pass** [5] 52:1 87:22 123:11 155:9 184:10

**Passed** [2] 29:5 31:22

**Passion** [2] 143:5 186:21

**Passionate** [1] '185:9

**Past** [9] 91:10 93:20 117:18 117:20 150:14 150:14 150:18 164:10 203:24

**Pastor** [3] 121:15 121:18 121:22

**Patience** [1] 170:7

**Patrolman** [1] 81:10

**Pay** [1] 237:9

**Payroll** [1] 224:12

**Peace** [3] 48:12 48:14 54:25

**Peculiar** [2] 3:14 9:3

**Pen** [1] 20:19

**Penalty** [130] 8:8 15:22 16:13 17:20 19:17 22:6 37:9 38:3 38:25 39:3 39:22 40:3 43:1 45:10 48:9 49:4 51:12 51:16 51:22 54:7 55:14 55:15 57:24 65:12 65:20 66:4 66:14 74:20 74:24 75:14 76:4 76:6 76:9 81:1 81:2 82:5 85:8 89:18 91:1 93:2 94:2 94:4 96:18 108:24 108:25 109:5 109:21 109:22 110:7 110:22 112:23 118:15 121:4 121:9 121:16 132:25 133:17 133:23 134:6 134:19 134:22 138:21 139:17 140:13 140:18 140:19 141:1 141:15 141:22 142:15 143:2 143:14 145:5 145:6 145:8 145:16 145:18 145:21 146:15 158:8 163:14 165:12 165:19 175:15 175:19 176:12 176:20 181:16 185:7 185:10 185:15 185:22 187:7 204:9 204:11 205:1 205:4 205:15 205:24 207:2 207:7 208:24 209:20 209:23 214:6 214:8 214:10 214:14 214:20 214:22 214:23 215:1 224:18 225:1 225:16 225:23 226:9 227:9 227:11 229:20 231:4 231:20 231:25 234:22 235:1 235:11 235:14 238:18 238:25 239:4

**Penitentiary** [8] 14:13 14:19 14:21 14:25 15:3 25:3 25:4 28:5

**People** [171] 8:24 14:8 14:9 14:9 14:10 14:12 '15:2 15:16 19:1 19:6 19:8 19:8 19:9

29:6 29:9 29:11 29:12 29:19 29:20 31:4 32:4 37:20 38:23 39:17 40:2 40:4 42:20 46:21 46:25 47:11 47:17 48:20 48:23 49:15 50:7 50:18 52:11 52:15 54:6 55:17 56:12 56:23 58:19 59:6 61:1 61:19 61:22 62:11 62:18 64:6 65:3 66:16 68:9 69:4 77:23 77:24 82:4 82:22 83:1 83:2 83:3 86:7 88:25 88:25 89:1 89:1 90:2 91:19 95:15 99:10 103:20 109:7 109:13 109:15 112:15 112:20 113:19 113:25 115:2 115:9 115:10 115:11 116:2 118:17 119:1 119:6 119:25 120:20 121:12 126:8 126:15 126:15 126:19 127:3 129:13 130:14 130:15 131:16 135:14 140:21 140:25 142:13 145:18 147:12 147:25 151:21 153:22 154:19 156:7 157:17 158:7 158:8 160:2 160:6 166:3 167:6 172:21 176:2 176:4 177:16 180:10 180:19 180:22 181:2 182:22 183:1 186:23 187:3 187:6 187:11 190:7 190:8 197:16 206:1 206:15 206:23 208:10 208:15 208:17 209:10 209:10 209:14 211:10 212:1 212:5 212:14 212:22 212:24 213:16 215:13 217:24 225:8 225:21 226:8 226:12 227:2 227:3 227:8 227:12 227:20 228:6 231:1 231:15 233:25 234:11 234:12 235:6 237:18 242:7 242:9 243:3

**People's** [9] 30:15 57:6 57:10 62:19 125:5 125:11 125:12 157:13 188:22

**Percent** [5] 12:21 12:22 44:12 80:10 174:14

**Perfect** [2] 163:25 164:1

**Perfectly** [3] 20:14 20:19 20:20

**Performance** [5] 144:4 144:7 144:7 156:2 156:5

**Perhaps** [10] 18:16 97:17 97:22 98:6 170:25 171:1 187:20 192:12 196:20 215:9

**Period** [6] 110:21 125:20 141:14 158:18 158:19 203:24

**Permit** [6] 47:20 70:8 104:7 198:4 218:14 243:17

**Permitted** [2] 11:16 11:17

**Person** [214] 4:21 10:15 18:22 18:23 20:18 21:1 21:20 22:3 23:5 23:12 24:25 25:2 25:19 29:2 30:22 31:12 32:6 32:8 32:10 37:17 37:18 37:21 38:10 42:25 42:25 43:2 45:24 46:4 46:8 47:22 50:2 50:24 51:21 52:18 53:14 55:5 56:4 57:13 57:23 59:10 59:21 62:21 65:7 65:9 65:18 66:1 66:47:14 69:5 73:10 75:1 75:6 76:6 80:2 82:21 83:4 83:15 83:23 84:17 84:25 85:19 85:22 86:2 86:4 87:2 87:12 90:21 91:7 91:16 91:20 91:23 92:15 93:19 93:21 94:7 94:11 96:6 99:2 103:2 103:7 109:12 110:1 111:9 114:25 115:23 116:1 116:9 116:12 118:1 118:7 118:19 119:13 119:14 119:15 120:15 120:23 123:4 123:5 126:2 127:9 128:8 129:22 129:23 129:24 131:5 134:12 134:19 134:20 138:14 142:18 147:6 147:7 147:14 148:19 148:20 149:15 149:2 150:4 150:9 152:10 152:17 153:15 157:20 158:13 158:15 159:18 160:18 160:18 161:3 162:16 163:2 164:6 164:11 164:24 165:2 165:18 166:9 166:11 166:16 167:17 175:21 177:20 179:11 179:18 180:13 182:1 182:4 182:9 183:20 183:21 186:18 187:8 189:2 189:3 189:10 189:11 192:1 192:4

**192:8** 192:9 197:16 201:8 201:17 202:1 202:8 203:23 204:10 204:13 204:23 205:1 208:8 208:19 208:23 211:19 211:25 212:2 213:5 213:6 214:21 214:24 215:4 216:19 216:22 217:4 224:23 225:5 225:12 226:2 227:22 228:12 228:13 228:18 229:6 230:3 230:8 230:14 233:11 234:19 235:5 235:7 235:12 236:12 236:21 236:24 237:13 237:19 239:2 239:3 239:7 239:9 239:24 240:3 240:3 240:9 241:2 241:17

**Person's** [21] 39:10 39:17 42:22 84:20 90:18 90:23 96:22 128:3 133:24 134:15 134:21 147:17 164:16 166:6 183:9 183:10 186:13 189:2 204:21 205:21 207:21

**Personal** [39] 7:9 35:2 45:21 45:22 46:1 53:15 53:18 55:9 70:2 71:2 72:2 79:24 84:14 96:3 101:6 101:8 104:3 107:8 110:23 130:10 130:12 130:19 135:8 137:16 152:18 152:19 167:16 170:24 181:21 181:22 192:7 199:17 203:20 218:8 220:3 230:1 230:2 235:18 243:11

**Personalize** [1] 123:25

**Personally** [9] 94:19 108:25 109:23 110:3 133:17 134:1 143:18 151:7 236:18

**Personnel** [1] 15:4

**Persons** [3] 13:16 13:19 91:17

**Perspective** [4] 96:20 173:8 210:15 232:15

**Persuade** [1] 241:14

**Phase** [35] 5:2 5:4 5:18 5:22 6:2 6:3 6:7 7:7 9:20 10:5 10:12 27:3 27:22 72:24 107:23 124:12 124:13 124:14 126:1 130:6 159:23 160:8 171:6 172:5 191:21 199:24 201:14 201:15 202:20 219:2 220:11 221:23 222:22 222:25 223:2

**Philosophical** [1] 110:24

**Phone** [3] 2:9 2:16 159:14

**Phonetically** [1] 203:17

**Phrase** [9] 9:11 9:21 9:23 10:18 16:19 16:20 16:22 161:14

**Phrases** [1] 90:13

**Pick** [2] 76:13 100:20

**Picked** [4] 187:14 191:6 232:22 233:2

**Picking** [1] 88:15

**Picture** [2] 55:12 236:2

**Pie** [2] 24:22 24:22

**Piece** [12] 14:13 14:17 15:19:5 24:22 46:25 69:15 119:7 120:1 183:2 197:13 217:20

**Pinpoint** [1] 225:22

**Pistol** [1] 31:22

**Place** [10] 16:5 64:23 102:2 186:22 186:25 233:21 234:16 235:22 236:3 236:7

**Placed** [1] 61:5

**Places** [1] 113:21

**Plan** [1] 147:3

**Planned** [2] 37:17 180:8

**Plans** [1] 174:16

**Play** [20] 3:18 3:20 3:25 23:15 30:16 35:12 53:2 72:13 72:21 107:20 109:15 137:24 159:24 163:3 164:9 171:9 171:17 200:2 200:6 220:14

**Playing** [1] 111:22'

**Plays** [1] 233:5

**Plea** [1] 114:11

**Pleasant** [1] 121:23

**Pledge** [1] 64:13

**Plug** [1] 26:8

**Plus** [3] 38:19 94:16 94:16

**Point** [43] 12:24 19:12 25:15 32:22 34:17 34:20 52:17 52:20 52:25 53:23 55:1 65:17 67:9 68:20 71:19 75:18 93:1 105:17 128:15 129:12 137:11 138:2 152:12 161:18 170:15 172:23 182:3 182:10 184:5 188:11 189:8 191:7 191:10 191:23 192:20 199:10 211:2 212:18 213:5 216:24 219:22 225:15 227:16

**Police** [1] 38:22

**Pool** [3] 103:19 167:6 217:23

**Pops** [1] 10:13

**Population** [1] 188:1

**Portions** [1] 245:5

**Posed** [2] 17:12 54:3

**Posing** [1] 216:13

**Position** [7] 121:9 132:24 133:6 133:8 133:10 174:12 196:17

**Positive** [1] 98:2

**Possess** [1] 71:24

**Possesses** [1] 106:21

**Possibility** [15] 11:21 12:9 15:21 17:11 22:7 23:19 44:3 44:6 44:14 83:17 99:9 101:3 116:25 179:9 215:22

**Possible** [25] 4:22 4:23 4:24 7:2 7:20 20:20 20:20 23:21 23:22 24:2 24:6 34:5 44:7 83:18 91:13 95:16 117:1 126:13 130:6 157:17 161:21 162:9 164:20 188:23 195:13.

**Possibly** [23] 11:22 11:22 23:18 26:3 31:11 53:20 63:17 67:15 70:22 126:9 126:16 128:4 128:21 129:4 129:17 132:11 134:21 171:9 187:5 188:7 223:16 235:24 237:24

**Posture** [2] 202:4 202:5

**Potential** [1] 160:5

**Potentially** [2] 58:11 233:5

**Prayed** [2] 26:1 48:12

**Preacher** [1] 25:15

**Precedent** [1] 95:14

**Preconceived** [2] 48:15 184:4

**Preference** [1] 212:1

**Premeditated** [4] 39:4 51:13 115:22 180:9

**Premeditated-type** [1] 51:13

**Preparation** [1] 245:11

**Prepared** [1] 242:9

**Preplanned** [1] 115:21

**Preposterous** [1] 15:2

**Presence** [1] 88:17

**Present** [5] 4:14 9:16 13:10 159:19 221:3

**Presented** [10] 3:21 5:2 30:19 36:1 73:3 108:3 171:25 192:20 193:17 194:3

**Presently** [1] 220:3

**President** [2] 61:15 61:23

**Presiding** [1] 1:21

**Press** [1] 144:9

**Pressure** [3] 34:11 60:3 65:1'

**Presumably** [1] 193:16

**Presume** [1] 102:5

**Presumed** [1] 10:15

**Presumption** [7] 10:4 10:6 10:9 10:13 10:13 10:14 43:20

**Pretty** [13] 9:1 59:22 94:21 128:14 132:10 145:13 153:25 163:4 197:2 206:4 206:6 211:25 231:12

**Prevent** [2] 79:24 85:3

**Primarily** [1] 72:10

**Printing** [1] 144:9

**Prison** [18] 20:25 21:2 78:5 91:2 175:23 176:17 186:22 187:3 187:6 188:1 188:6 214:21 215:1 215:13 216:8 227:12 233:13 235:13

**Prisoners** [1] 15:6

**Pristine** [1] 70:22

**Privately** [1] 52:16

**Privilege** [1] 122:22

**Probabilities** [1] 12:22

**Probability** [41] 6:21 11:13 11:14 11:18 11:20 11:24 12:4 12:16 12:19 12:20 12:25 13:1 13:4 13:12 43:24 44:3 44:10 44:25 46:10 83:15 83:18 83:23 116:21 116:25 117:2 117:12 117:23 149:4 149:14 149:24 150:9 152:5 152:12 179:9 179:21 181:1 182:7 193:10 229:4 229:14 231:3

**Probation** [8] 81:14 190:21 190:22 191:2 191:10 191:13 195:3 195:4

**Problem** [41] 33:11 38:25 39:21 40:15 42:17 47:17 47:19 48:3 49:9 60:24 64:20 85:8 85:10 102:13 102:14 102:24 118:15 120:2 120:22 123:23 153:14 154:6 160:1 164:23 174:6 174:7 174:10 176:7 177:14 180:15 183:7 184:2 190:24 191:9 191:19 196:12 208:11 231:9 236:15 240:20 242:3

**Problems** [10] 39:19 58:22 77:23 77:24 78:4 78:7 96:4 144:6 213:17 220:21

**Proceed** [1] 67:7

**Proceedings** [4] 1:19 1:22 245:5 245:9

**Process** [33] 35:9 36:22 40:6 40:13 42:17 49:6 54:22 68:8 72:10 74:18 81:19 81:22 81:25 110:9 110:15 137:2 141:7 141:10 144:1 145:24 152:3 160:9 171:19 172:5 177:6 177:11 205:2 205:8 213:20 220:22 226:13 226:19 227:16

**Product** [1] 134:11

**Profession** [1] 143:16

**Professional** [11] 35:2 72:3 107:9 137:17 142:1 167:15 170:25 197:24 199:18 218:9 220:4

**Programs** [2] 114:1 114:1

**Progression** [1] 159:5

**Prohibit** [1] 30:15

**Project** [1] 54:4

**Proof** [11] 9:15 9:19 13:7 43:15 63:21 80:7 116:21 188:16 188:25 189:10 194:19

**Proper** [4] 43:4 141:1 166:4 226:9

**Proper-type** [1] 141:1

**Properly** [1] 60:13

**Property** [4] 13:16 13:20 13:25 163:2

**Proponent** [1] 214:13

**Proposal** [1] 154:23

**Proposition** [2] 90:2 211:9

**Prospect** [4] 48:7 48:8

**Prospective** [7] 3:1 52:21 107:24 171:8 200:1 210:16 220:13

**Prove** [35] 5:5 9:24 10:20 10:21 11:9 12:5 12:8 12:13 14:1 16:23 16:25 17:2 17:4 23:3 23:20 23:23 24:3 24:7 24:8 40:19 40:24 56:10 63:15 63:25 80:7 80:9 80:12 82:20 82:23 150:1 194:14 194:14 194:17 195:22 242:2

**Proved** [2] 22:20 22:24 222:2

**Proven** [11] 44:24 60:9 159:21 178:5 178:7 189:1 229:3 236:9 240:23 241:3 241:24

**Proves** [4] 5:14 11:6 43:18 43:21

**Proving** [3] 5:4 13:11 241:20

**Proximity** [1] 125:20

**Psychiatric** [1] 77:23

**Psychiatric-type** [1] 77:23

**Psychiatrists** [1] 174:21

**Psychologist** [4] 78:19 78:24 79:3 79:15

**Psychologists** [4] 78:17 79:2 90:10 174:20

**Psychology** [2] 174:15 174:17

**Pulled** [2] 45:24 230:3

**Pulls** [1] 26:7

**Punch** [1] 162:22

**Punished** [1] 25:2

**Punishing** [1] 186:9

**Punishment** [87] 4:25 10:16 17:24 19:24 24:23 25:8 25:17 25:18 27:9 28:4 28:14 33:16 37:10 39:6 39:14 39:23 39:25 40:3 40:17 41:14 41:17 41:21 41:25 42:12 43:3 43:6 45:4 45:21 48:22 49:18 49:19 49:23 67:13 74:25 80:3 83:5 83:12 90:20 96:9 96:10 96:12 109:6 109:24 115:14 115:15 116:6 116:12 116:14 124:13 124:14 126:1 130:6 133:19 133:22 133:23 141:1 148:21 150:24 151:1 151:3 152:18 158:4 160:8 164:14 174:22 175:7 176:17 176:22 177:17 177:24 178:2 178:10 178:11 178:13 178:20 179:1 179:7 186:6 186:9 191:21 193:5 208:3 216:21 226:10 228:2 228:23 233:1

**Punishments** [6] 4:22 4:23 4:24 73:10 73:12 73:12

**Pure** [1] 241:2

**Purpose** [10] 7:14 72:11 155:24 168:1 171:10 186:6 186:8 192:7 192:22 233:1

**Purposes** [10] 17:19 70:15 73:22 103:19 135:24 172:9 174:7 217:22 232:25 243:2

**Put** [23] 17:11 53:4 59:7 67:4 80:1 99:1 124:5 126:22 129:21 130:14 137:12 140:14 143:10 144:8 161:11 170:16 174:12 175:24 187:19 207:9 208:24 240:2 240:3

**Puts** [2] 43:15 50:21

**Quality** [3] 9:25 10:6 10:7

**Quantity** [1] 109:14

**Quarter** [1] 155:1

**Queen** [2] 143:11 143:18

**Questioned** [1] 213:25

**Questioning** [5] 90:1 234:21 234:23 234:24 238:18

**Questionnaire** [32] 36:24 48:25 74:15 75:13 88:8 89:6 96:1 108:17 111:14 121:3 124:4 132:21 140:8 141:18 142:5 163:9 174:2 174:6 177:16 185:3 185:4 190:20 196:4 203:15 203:19 203:20 204:7 205:13 213:23 214:5 215:11 224:5

**Questionnaires** [5] 100:20 142:2 144:3 155:23 232:21

**Questions** [114] 5:1 6:14 8:2 8:11 8:12 8:14 8:15 8:21 13:1 15:18 16:4 19:23 20:6 21:25 22:5 22:15 28:20 33:14 34:14 34:18 36:10 40:8 41:20 42:2 42:2 42:6 43:7 49:20 50:1 54:3 56:1 56:3 56:21 68:17 68:19 68:20 69:6 71:17 73:15 73:17 74:4 81:21 83:14 86:19 86:20 87:5 87:15 87:16 87:19 88:11 88:13 88:18 89:7 96:1 103:1 105:3 105:15 108:8 110:16 111:18 124:4 124:6 133:15 135:16 137:9 138:16 139:20 139:22 148:25 151:19 155:20 168:12 170:13 172:4 172:10 173:4 173:16 177:1 177:7 177:8 177:18 178:16 178:17 178:19 183:22 184:18 184:18 184:23 190:20 196:1 198:22 199:8 202:25 203:1 203:5 208:4 210:13 213:19 214:5 215:12 215:25 216:5 216:13 216:14 217:13 219:5 219:20 223:22 224:6 227:7 232:14 237:6 239:20 244:12

**Quick** [1] 143:18

**Quickly** [4] 29:15 34:4 175:24 216:13

**Quite** [11] 25:14 53:4 53:15 130:5 146:13 159:18 164:20 175:18 188:23 195:12 231:5

**Quotation** [1] 140:14

**R**

**Race** [1] 212:1

**Radio** [6] 70:11 104:12 167:23 198:10 218:20 243:23

**Rain** [1] 12:23

**Raised** [3] 75:20 78:21 79:13

**Ran** [1] 213:25

**Range** [14] 24:23 24:24 24:25 25:8 25:17 28:14 39:6 39:13 39:23 39:25 48:21 50:7 178:12 206:13

**Ranges** [1] 43:6

**Rapes** [1] 13:18

**Rare** [3] 142:21 187:20 187:21

**Rarely** [1] 81:12

**Rather** [5] 57:24 62:14 63:9 66:6 175:23

**Re-examine** [1] 182:12

**Reach** [13] 6:13 16:15 28:9 28:16 28:17 70:18 104:16 108:5 198:14 200:23 218:24 221:2 244:2

**Reached** [3] 60:22 171:24 175:6

**Reacquire** [1] 14:25

**React** [3] 61:1 129:19 130:18

**Reaction** [1] 61:3

**Read** [17] 15:11 61:3 61:9 70:12 80:24 104:12 131:11 132:8 144:21 145:2 160:22 165:10 167:23 198:11 218:20 235:19 243:23

**Reading** [3] 81:3 131:15 165:4

**Ready** [1] 159:13

**Reagan** [1] 61:15

**Real** [22] 29:15 53:18 55:5 59:15 59:16 59:17 59:17 59:23 64:23 64:24 68:10 88:20 123:23 124:20 146:19 161:19 163:22 189:10 206:21 216:12 216:17 236:10

**Realistically** [1] 65:6

**Realize** [4] 129:13 176:3 181:2 212:8

**Really** [43] 9:11 20:3 20:4 37:4 53:7 54:18 57:17 60:8 63:23 65:16 66:1 68:5 89:10 91:21 93:1 93:16 95:8 95:10 101:23 103:5 103:5 111:18 113:1 123:25 125:14 127:6 127:16 131:10 131:23 132:8 133:6 134:20 162:4 175:23 186:15 187:24 208:2 210:14 211:19 214:3 214:15 240:24 241:18

**Reason** [44] 3:7 3:7 3:13 12:24 17:19 17:23 19:25 31:11 46:12 51:4 52:10 57:7 61:21 66:5 68:24 70:12 75:21 84:12 84:19 84:25 85:19 86:4 100:4 104:13 118:9 133:5 147:15 147:15 154:2 154:8 181:18 184:4 185:14 186:21 194:18 205:9 207:1 218:21 222:12 230:13 230:20 231:19 240:10 243:24

**Reasonable** [87] 5:6 5:15 6:20 9:12 9:12 9:22 10:1 10:2 10:9 10:19 11:16 11:9 11:13 12:5 12:14 13:4 13:11 16:20 22:21 22:24 23:21 24:3 24:7 24:9 31:19 33:1 33:7 33:11 40:23 43:14 43:18 43:22 43:24 44:13 45:13 56:4 60:9 63:16 63:18 63:22 63:25 64:15 64:17 65:8 80:8 80:16 80:20 82:24 83:20 92:23 92:23 94:11 94:12 110:7 115:7 116:20 148:15 149:3 149:14 150:8 157:16 159:21 160:18 160:22 172:13 172:18 178:5 178:8 179:8 188:16 192:25 222:2 229:4 236:5 236:9 236:19 236:20 236:24 237:19 240:24 241:4 241:20 242:15

**Reasons** [19] 46:4 46:8 47:22 84:17 118:5 124:3 124:6 152:23 153:1 153:8 154:2 155:20 181:18 182:1 182:9 184:19 184:22 211:15 230:8

**Receive** [35] 16:12 41:14 42:12 45:10 46:5 49:4 49:24 51:21 70:19 76:6 76:20 84:17 85:5 85:8 92:15 116:12 118:7 118:12 120:5 152:13 152:24 163:14 165:2 168:4 179:2 181:16 182:1 182:11 205:4 205:24 207:7 229:20 230:9

**Received** [14] 64:9 76:4 76:19 104:18 132:12 187:8 188:4 190:21 191:25 192:23 198:15 207:13 210:25 244:3

**Receives** [4] 45:9 56:15 94:2 118:14

**Receiving** [1] 106:22

**Recent** [1] 126:20

**Recently** [5] 81:13 112:2 112:11 126:25 127:15

**Recognize** [2] 82:14 219:13

**Recognizes** [2] 17:7 17:10

**Recommendations** [3] 21:7 21:15 21:16

**Record** [6] 1:1 135:24 150:18 245:6 245:8 245:11

**Records** [2] 117:18 179:24

**Redeeming** [1] 18:12

**Reduce** [2] 6:24 139:10

**Refer** [10] 45:22 46:3 84:

16 152:19 152:23 166:9 161: 22 181:25 230:1 230:8

**Referred** [2] 76:12 160:6
**Referring** [1] 90:12
**Refers** [1] 62:18
**Reflected** [2] 97:10 97:17
**Reflects** [2] 97:21 245:9
**Reform** [1] 233:3
**Refuse** [22] 4:9 27:11 28: 3 33:8 70:11 70:11 70:12 104:11 104:11 104:12 167:22 167:23 167:23 198:10 198:11 198:11 218:19 218:19 218:20 243:22 243:22 243:23
**Refused** [1] 76:17
**Regard** [6] 190:23 225:5 238:20 239:1 239:3 239:10
**Regarding** [3] 70:10 214: 6 243:19
**Regardless** [2] 43:1 140: 24
**Regular** [7] 77:7 77:9 77: 10 78:2 131:10 133:1 156:20
**Regulations** [1] 195:11
**Rehabilitate** [1] 187:18
**Rehabilitated** [2] 186: 25 187:23
**Rehabilitation** [5] 186: 23 233:3 233:5 233:8 233:13
**Reject** [1] 21:15
**Related** [1] 169:11
**Relates** [1] 9:19
**Relationship** [8] 5:25 106:9 106:11 106:12 119:3 180:11 182:24 234:13
**Relative** [1] 131:9
**Relatives** [2] 128:22 129: 14
**Relax** [1] 36:17 74:12
**Released** [3] 215:23 216: 1 216:2
**Relevant** [1] 233:16
**Reliable** [1] 32:20
**Religion** [2] 121:8 185:13
**Religious** [5] 76:15 79: 23 96:2 110:24 121:5
**Reluctant** [1] 145:21
**Rely** [2] 64:7 102:17
**Remainder** [1] 20:18
**Remaining** [1] 216:8
**Remains** [1] 5:12
**Remarkably** [2] 24:24 173: 2
**Remember** [17] 71:13 76: 14 81:3 96:24 105:12 111:18 114:7 114:17 131:14 131:16 137:6 163:15 170:9 188:8 199:5 215:11 219:16
**Reminder** [5] 71:2 104:25 168:9 198:18 244:9
**Remorse** [1] 176:6
**Remorseful** [2] 116:1 180: 14
**Remove** [2] 57:8 94:4
**Render** [5] 50:19 183:18 208:18 228:9 232:1
**Rendered** [1] 163:6
**Rendition** [1] 165:14
**Repeat** [7] 87:10 150:5 156:25 162:2 188:11 214:25 215:3
**Repeating** [1] 97:23
**Replace** [1] 10:13
**Replaced** [2] 17:21 19:18
**Report** [1] 195:4
**Reported** [1] 1:22 207:11 245:7
**Reporter** [3] 62:14 245:3 245:17

**Reporter's** [4] 1:1 245:6 245:8 245:11
**Represent** [7] 36:16 74: 11 88:4 108:16 173:25 203: 13 224:4
**Representative** [1] 58:18
**Represented** [1] 4:16
**Representing** [3] 52:9 89:21 140:4
**Repugnant** [1] 35:15
**Request** [2] 169:8 169:25
**Requested** [1] 245:5
**Require** [5] 13:22 96:9 97: 11 173:15 195:22
**Required** [12] 12:8 12:13 16:23 17:11 23:20 49:7 49: 11 80:3 113:17 141:11 225: 12 241:6
**Requirement** [2] 17:12 23: 3
**Requires** [3] 54:8 96:8 195:23
**Requiring** [1] 12:5
**Research** [5] 139:16 143: 17 143:19 143:22 144:10
**Research-based** [1] 144: 10
**Residual** [1] 66:2
**Resolve** [1] 18:4
**Resolving** [1] 240:23
**Respect** [5] 59:7 143:7 143:8 191:16 195:3
**Respective** [1] 245:9
**Respond** [1] 185:16
**Response** [5] 48:19 49:5 64:23 89:25 146:20
**Responses** [1] 190:19
**Responsibility** [12] 7: 10 45:23 46:1 84:14 115:4 152:20 165:21 181:23 196:9 211:5 230:2 230:5
**Responsible** [8] 55:18 60: 25 63:3 63:9 120:17 120:24 125:4 157:21
**Rest** [9] 18:20 19:4 42:13 175:22 175:25 193:25 207:24 209:16 216:7
**Restrictions** [4] 70:13 104:14 167:25 218:22
**Result** [26] 8:11 23:5 28: 7 28:9 73:5 79:25 81:22 107: 5 108:5 110:12 134:11 141:4 171:24 171:24 174:20 177:9 183:23 189:6 200:23 204:25 207:2 217:3 221:2 221:12 221:21 226:16
**Results** [3] 51:1 51:2 183: 24
**Resurrect** [1] 15:21
**Retardation** [1] 19:7
**Retarded** [1] 19:10
**Retire** [1] 34:3
**Retired** [1] 146:5
**Retribution** [1] 186:17
**Retroactive** [1] 29:1
**Return** [12] 82:24 82:25 96:3 138:8 195:12 202:20 202:23 223:3 232:16 241:21 241:24 242:19
**Returning** [3] 79:25 96:4 241:5
**Revenge** [1] 26:14
**Reversed** [1] 165:14
**Review** [3] 16:13 17:13 119:9
**Revoked** [1] 190:22
**Revolve** [1] 204:3
**Revolves** [1] 227:17
**Rhetorical** [1] 233:23
**Riley** [1] 111:10

**Rim** [1] 239:4
**Ringing** [1] 85:21
**Rise** [6] 14:4 19:16 19:21 162:14 202:13 236:8
**Rises** [3] 29:25 30:14 222: 1
**Road** [3] 119:24 131:17 231: 13
**Roam** [1] 25:17
**Rob** [1] 30:3
**Robber** [2] 30:4 30:7
**Robberies** [2] 13:18 207: 18
**Robbery** [8] 38:20 44:19 112:3 114:11 117:7 128:3 149:8 229:10
**Robs** [1] 30:4
**Role** [3] 53:2 159:10 233:5
**Roll** [2] 144:8 144:8
**Rolled** [1] 207:10
**Rolls** [1] 141:19
**Room** [5] 25:16 53:5 77:19 191:22 215:19
**Ross** [1] 168:16
**Rotten** [1] 164:11
**Rough** [1] 242:11
**Roulette** [1] 111:23
**Routine** [1] 3:15
**Rules** [28] 3:17 3:20 3:24 3:25 4:3 4:8 22:8 22:10 35: 11 35:16 72:12 72:15 72:20 72:22 99:15 107:15 107:20 137:23 171:9 171:16 195:11 195:14 200:1 200:4 200:5 220:13 220:16 220:21
**Run** [3] 113:25 123:23 142:6
**Russian** [1] 111:23

---

## S

**Sad** [1] 190:9
**Safeguard** [1] 161:21
**Sales** [2] 174:18 174:18
**San** [1] 245:18
**Sat** [2] 110:1 211:12
**Satisfaction** [1] 5:6
**Satisfied** [7] 107:25 171: 20 200:18 202:15 220:24 221: 9 236:5
**Satisfies** [1] 222:15
**Satisfy** [12] 35:20 36:2 36:3 36:4 73:1 107:25 171: 20 200:17 220:23 221:7 228: 11 232:15
**Saw** [9] 30:22 31:25 35:24 76:25 156:18 165:11 171:22 191:10 191:11
**SBOT** [4] 2:3 2:5 2:13 2:19
**Scenario** [2] 134:18 216:7
**Scenarios** [1] 37:11
**Scenes** [1] 165:9
**Schedule** [1] 243:10
**School** [18] 14:18 33:13 47:18 77:3 77:7 77:8 77:17 79:20 116:9 127:18 129:3 155:6 156:16 156:16 156:24 159:19 163:21 187:15
**Schoolteacher** [1] 144:3
**Science** [2] 77:21 144:19
**Scout** [2] 50:11 181:7
**Search** [3] 139:8 153:21 183:4
**Season** [1] 12:19
**Seat** [1] 219:12
**Seated** [2] 59:22 64:7
**Seats** [1] 211:23
**Second** [7] 5:2 6:2 6:3 6: 6 7:11 7:12 7:23 9:20 9:20 10:12 14:7 15:20 15:24 16:1

**Rim** [1] 239:4 (... continuation of column)
1:13 17:5 17:13 17:16 19:23 22:17 26:20 27:3 27:22 35: 19 41:3 41:5 46:20 56:18 67: 8 69:13 69:15 72:24 74:1 84: 6 84:11 100:2 103:15 138:11 139:1 139:14 148:14 152:8 152:9 159:22 163:3 166:24 167:2 171:19 172:24 173:2 173:15 182:22 189:14 192:11 197:9 197:12 200:16 201:3 201:14 201:15 202:21 217:17 217:21 220:21 221:13 221:23 222:24 223:1 223:1 224:15 231:1 242:23
**Secondly** [1] 16:6
**Seconds** [2] 29:16 32:11
**Secret** [4] 71:24 100:18 238:3 238:4
**Security** [1] 238:1
**See** [96] 9:23 12:7 14:9 16: 18 17:14 26:15 26:16 31:23 31:25 32:7 32:15 32:19 46: 23 47:19 47:21 49:14 50:14 53:14 54:18 59:21 61:1 63: 10 63:20 66:19 67:19 70:4 73:16 73:18 81:12 85:3 97: 20 98:3 98:10 98:12 99:5 100:4 100:5 102:8 104:6 105: 6 108:4 118:5 118:8 119:3 125:2 125:23 137:24 138:22 138:25 139:9 139:16 150:15 157:18 157:18 157:19 157:20 157:20 158:20 159:6 165:5 167:13 167:18 172:6 172:21 172:25 173:1 173:12 174:8 176:8 182:14 183:5 190:7 195:7 197:2 197:22 198:23 200:21 202:10 203:2 206:24 209:17 210:1 210:2 211:4 218:7 218:10 218:13 218:17 221:1 221:15 222:7 231:6 231:6 240:2 240:4 243:16
**Seeing** [4] 52:11 75:22 171:11 244:16
**Seeking** [3] 106:24 209:20 231:20
**Sees** [7] 32:6 32:8 32:10 32:11 32:12 32:13 32:14
**Select** [2] 186:23 200:3
**Self** [8] 23:4 39:11 56:25 57:11 77:16 147:19 204:18 240:12
**Self-contained** [2] 77: 15 77:16
**Self-defense** [9] 23:4 39:11 56:25 57:11 63:5 110: 5 110:6 147:19 204:18
**Self-evaluation** [1] 240:12
**Sense** [6] 1:18 139:12 142: 11 223:17 239:16 241:12
**Sent** [1] 21:3
**Sentence** [68] 4:24 4:25 7:17 7:18 7:25 8:4 8:9 8:9 8:10 8:13 8:14 11:3 11:4 16: 16 16:16 17:21 18:2 18:13 18:17 19:18 20:3 20:4 20:7 20:8 26:12 27:9 27:11 45:9 46:18 47:8 50:4 50:6 57:24 58:11 65:20 66:13 84:4 85:1 85:5 85:22 86:12 87:3 87:14 91:23 92:1 93:7 118:22 118: 25 119:16 139:11 139:11 139: 19 142:14 142:19 145:20 152: 3 164:25 165:3 172:25 173: 10 173:11 182:19 186:18 188: 4 202:16 207:13 217:3 222:22
**Sentenced** [5] 28:23 145: 5 188:7 208:23 233:12
**Sentences** [1] 29:6
**Sentencing** [3] 27:12 28: 8 211:5
**Separate** [1] 201:3
**September** [9] 1:18 167:4 197:11 197:18 217:24 218:4 232:17 243:1 244:10
**Serial** [5] 109:7 125:10

125:15 125:22 158:9
**Serious** [7] 23:6 23:7 54:
23 93:15 158:3 161:19 162:19
**Seriousness** [2] 161:20
161:24
**Serve** [13] 87:3 110:10
121:17 122:20 154:9 175:25
204:2 216:7 220:8 231:17
235:13 242:10 242:16
**Served** [4] 20:10 20:15
174:25 188:8
**Service** [8] 34:23 51:8 58:
18 59:4 114:4 137:13 199:12
221:16
**Serving** [1] 20:21
**Session** [2] 62:15 62:16
161:24
**Set** [19] 22:16 27:7 27:17
29:13 32:3 40:24 60:5 96:12
114:23 121:11 121:11 178:6
204:25 205:2 206:24 208:13
209:7 212:5 217:1
**Sets** [2] 95:13 160:16
**Setting** [1] 124:13
**Setup** [1] 205:2
**Seven** [1] 112:1
**Seventy** [1] 25:22
**Seventy-five** [1] 28:19
**Seventy-five-year-old**
[1] 25:22
**Several** [7] 26:6 64:9 89:
25 106:19 146:7 204:11 214:
21
**Severely** [1] 19:11
**Sex** [1] 189:18
**Sexual** [3] 38:21 101:3
212:1
**Shall** [2] 179:2 185:11
**Shalt** [1] 96:19
**Share** [8] 35:11 36:18 53:
13 74:13 185:6 199:25 203:
21 232:19
**Sheer** [1] 67:19
**Shock** [2] 190:5 191:7
**Shoot** [1] 134:12
**Shooter** [1] 152:20
**Shooting** [7] 44:19 117:8
127:23 128:9 149:9 166:18
196:20
**Short** [3] 125:20 158:18
158:19
**Shorthand** [2] 163:8 165:
14
**Shot** [12] 31:21 32:8 61:24
111:15 112:10 113:12 115:23
127:25 131:18 134:13 209:25
210:1
**Shots** [1] 61:25
**Show** [11] 13:7 46:14 64:19
104:23 168:8 180:17 198:16
213:12 225:12 239:19 244:6
**Showed** [1] 141:12
**Shower** [1] 156:19
**Shown** [2] 225:6 225:7
**Shows** [5] 31:3 83:19 112:
22 237:22 237:23
**Sic** [3] 42:12 155:16 193:25
**Side** [14] 12:12 17:11 36:2
36:2 86:5 107:2 126:21 127:
5 131:17 159:13 164:5 184:
10 210:20 221:7
**Sides** [5] 53:20 115:12
127:10 164:3 210:18
**Signal** [1] 100:21
**Sill** [1] 111:10
**Similar** [2] 127:11 213:17
**Simple** [2] 9:1 84:5
**Simply** [16] 7:13 8:10 11:
22 12:1 17:17 21:18 24:24
25:24 26:16 27:15 28:13 33:
9 73:24 108:2 126:2 202:18

**Sin** [1] 121:6
**Sincere** [1] 59:9
**Single** [8] 17:18 69:17 70:
16 103:20 167:7 171:16 197:
16 243:3
**Sister** [1] 146:6
**Sister-in-law** [2] 146:6
156:8
**Sisters** [1] 122:1
**Sit** [28] 35:22 36:17 52:10
53:2 56:12 68:22 73:2 74:12
82:5 88:5 89:6 89:8 94:1 98:
18 98:21 103:9 108:2 121:6
126:16 140:5 197:1 200:19
211:17 215:20 220:25 227:5
240:4 240:11
**Sits** [7] 44:24 86:24 86:25
149:12 179:17 211:22 233:24
**Sitting** [21] 40:11 53:5
63:13 63:17 64:25 67:1 67:2
68:25 81:23 88:24 89:20 98:
17 110:13 141:5 177:10 193:
4 211:16 226:17 240:6 240:9
241:4
**Situation** [39] 23:16 48:
9 51:14 54:10 61:14 65:7 68:
11 97:8 97:23 97:24 101:4
101:25 102:7 102:9 102:22
110:6 113:1 125:22 126:19
126:20 127:4 127:7 127:10
127:12 128:19 129:16 131:7
132:2 160:20 166:14 174:12
176:3 189:5 189:16 191:5
204:17 206:21 206:22 216:17
**Situations** [7] 66:14 66:
19 112:6 130:15 188:20 190:
10 206:7
**Six** [6] 59:3 59:4 59:12 83:
1 115:9 115:10
**Sixteen** [1] 78:22
**Sixty** [2] 20:16
**Skip** [1] 124:11
**Slight** [1] 40:18
**Slightest** [1] 69:6
**Slumber** [2] 129:1 129:6
**Small** [2] 156:17 156:21
**Smart** [2] 120:20 223:24
**Smith** [6] 111:5 111:6 168:
16 169:8 207:9 210:22
**Snapped** [1] 216:14
**Snowballs** [1] 221:16
**Social** [2] 83:9 144:20
**Socialize** [2] 106:17 131:
9
**Socially** [1] 100:5
**Society** [51] 6:23 14:5 14:
6 14:8 14:12 14:13 14:16 14:
17 15:4 15:9 15:15 15:16 44:
1 64:18 65:10 75:6 90:17 90:
22 91:21 92:24 93:8 93:20
94:13 99:15 116:23 138:20
149:17 152:7 156:1 161:5
161:13 162:16 162:22 163:8
179:14 181:1 192:2 193:10
193:18 194:25 195:24 202:2
202:10 202:16 216:23 222:7
224:24 228:17 229:7 229:16
236:25
**Society's** [1] 189:12
**Sold** [1] 111:6
**Solely** [1] 29:21 30:12
**Solutions** [1] 144:5
**Someone** [55] 37:20 39:13
42:10 42:21 43:10 44:19 44:
20 76:4 78:14 86:11 100:4
110:4 112:10 115:13 117:8
117:9 117:12 117:22 120:15
120:19 127:6 131:9 131:17
134:1 134:4 134:4 147:7 147:
13 147:21 148:13 148:16 148:
17 149:8 149:9 150:6 150:20
150:22 151:10 162:23 178:19
180:20 180:21 183:17 196:19
204:10 204:17 209:1 214:21

227:25 228:19 229:11 229:14
230:4 230:23 239:11
**Sometimes** [20] 18:21 19:
6 20:1 31:3 31:16 78:20 99:
7 124:11 125:11 140:13 140:
21 163:25 164:20 190:7 206:
14 212:22 212:24 214:17 221:
15 239:20
**Somewhat** [4] 70:6 78:13
159:9 233:22
**Somewhere** [1] 111:25
**Son** [4] 112:3 187:12 188:6
189:16
**Son-in-law** [5] 187:12
188:6 189:16 189:23 190:1
**Sons** [1] 112:9
**Soon** [2] 57:7 209:15
**Sophisticated** [1] 18:24
**Sorry** [8] 7:4 123:16 146:
24 166:23 210:8 212:21 232:
11 234:10
**Sort** [9] 131:24 156:10 159:
5 165:1 186:4 187:7 191:18
192:3 192:14
**Sorted** [1] 223:21
**Sorts** [4] 25:9 25:10 25:
11 242:13
**Sound** [6] 36:7 73:6 76:5
108:6 200:24 221:4
**Sounding** [1] 239:22
**Sounds** [4] 68:2 68:3 131:
23 239:20
**South** [2] 207:8 210:22
**Southwest** [1] 2:14
**Spared** [3] 46:11 84:20 84:
25
**Speaking** [2] 15:10 221:14
**Special** [26] 42:9 47:14
77:1 77:4 126:4 134:24 135:
1 135:2 159:23 161:1 161:24
162:17 163:3 164:16 165:16
185:19 185:23 189:15 191:18
192:4 192:16 193:7 194:21
195:22 196:2 196:12
**Specific** [5] 13:13 14:3
29:17 68:10 89:19
**Specifically** [7] 13:2
101:3 132:21 169:7 185:15
214:2 215:8
**Specify** [1] 45:17
**Speculate** [1] 216:6
**Speculation** [1] 216:9
**Speeding** [1] 66:24
**Spelling** [1] 144:20
**Spells** [1] 181:19
**Spend** [12] 3:4 6:16 6:18
20:18 23:14 69:19 124:14
175:21 178:16 201:2 221:13
233:15
**Spending** [3] 19:25 22:1
234:21
**Spent** [5] 22:17 29:8 52:
12 107:15 163:24
**Spill** [1] 97:8
**Split** [1] 12:16
**Spoken** [1] 157:4
**Sporting** [1] 12:23
**Sports** [1] 114:1
**Spouse** [1] 215:6
**Spring** [1] 76:22
**Spur** [3] 115:20 147:2 180:8
**Spur-of-the-moment** [2]
147:2 180:8
**St** [1] 145:7
**Stabbed** [1] 45:25
**Stabber** [1] 152:20
**Staff** [1] 113:25
**Stage** [33] 40:17 40:18 41:
41 41:25 43:3 45:4 45:21 49:
19 49:24 56:18 67:8 83:5 83:

12 90:20 115:14 115:15 116:
6 116:11 116:14 148:14 148:
21 174:22 177:25 178:2 178:
2 178:3 178:10 178:11 178:
20 179:7 212:19 216:21 228:
23
**Stake** [1] 65:1
**Stand** [2] 50:21 184:25
**Standard** [1] 63:18
**Standing** [1] 32:6
**Standpoint** [3] 9:14 70:
23 221:17
**Start** [10] 3:4 4:11 33:20
45:12 103:22 139:22 167:9
211:12 223:10 243:6
**Started** [5] 71:4 111:11
154:21 197:18 218:1
**Starting** [1] 5:11
**Starts** [6] 6:19 9:10 9:21
10:18 11:5 223:9
**State** [70] 1:10 2:10 4:15
4:21 5:5 9:15 9:24 12:5 12:
8 12:13 13:6 13:10 14:1 17:
2 21:7 21:9 21:12 22:23 23:
3 23:20 24:6 25:1 26:10 29:
18 36:16 38:2 43:16 43:17
43:21 44:23 52:19 56:7 60:9
62:18 63:2 63:15 63:24 64:
1 64:16 65:15 74:11 80:7
88:8 89:5 102:17 108:16 124:
23 140:4 143:7 143:14 159:
21 160:21 173:25 178:5 188:
15 188:25 189:9 203:13 209:
3 209:19 224:4 229:3 231:19
240:23 241:3 241:19 241:23
242:2 245:1 245:4
**State's** [9] 10:20 11:6 11:
8 13:9 16:22 60:12 194:13
194:19 236:9
**Statement** [10] 57:20 68:
2 91:13 91:15 140:18 141:25
175:13 175:14 177:17 187:4
**Statements** [1] 227:8
**States** [1] 111:12
**Stating** [1] 238:20
**Stay** [5] 21:2 77:19 144:15
154:5 159:8
**Staying** [1] 30:2
**Stays** [2] 5:12 235:10
**Step** [2] 4:15 93:1
**Stephens** [8] 71:6 71:12
72:25 73:16 74:10 88:3 103:
15 104:13
**Stepping** [1] 181:10
**Sterile** [1] 64:24
**Stick** [1] 153:7
**Sticks** [1] 120:11
**Still** [12] 43:4 65:11 80:
19 120:16 156:19 158:3 202:
12 222:8 222:15 236:6 239:9
239:10
**Stone** [1] 181:10
**Stopped** [1] 131:17
**Story** [2] 164:4 211:1
**Straight** [2] 50:10 181:7
**Strange** [1] 131:23
**Strangers** [1] 234:14
**Street** [2] 186:19 208:9
**Stress** [1] 240:21
**Strict** [1] 29:11
**Strikes** [1] 101:20
**Strong** [3] 103:8 214:13
214:15
**Strongest** [2] 55:13 55:16
**Strongly** [2] 53:1 60:16
**Struck** [1] 232:23
**Stuck** [1] 153:13
**Student** [3] 47:14 50:10
181:7
**Students** [9] 77:4 77:12
77:15 78:17 78:18 78:21 79:

**Studies** [1] 144:20
**Study** [1] 143:19
**Stuff** [12] 3:9 7:7 18:5 18:6 18:8 18:11 104:21 117: 19 138:3 150:18 174:1 238:4
**Stupid** [1] 119:19
**Subject** [1] 185:8
**Subjectively** [1] 8:6
**Submit** [1] 160:24
**Subsidiary** [1] 224:14
**Succumb** [1] 34:11
**Sudden** [2] 102:21 194:1
**Suddenly** [1] 129:12
**Sue** [1] 207:9
**Suffer** [1] 126:8
**Suffering** [1] 26:4
**Suffice** [1] 168:9
**Sufficient** [22] 7:16 17: 19 18:7 46:2 46:4 46:8 47: 24 85:6 118:11 118:13 139: 10 152:21 152:23 153:1 181: 24 181:25 182:14 217:2 222: 11 230:6 230:8 230:16
**Sufficiently** [2] 119:11 153:19
**Suggest** [9] 44:6 86:10 86: 17 86:24 117:2 149:4 164:9 176:25 229:5
**Suggested** [1] 60:16
**Suggesting** [1] 63:7
**Suggests** [1] 239:2
**Suited** [1] 103:9
**Sum** [1] 94:22
**Supervise** [1] 113:25
**Support** [2] 25:24 79:11
**Supports** [2] 172:15 201: 24
**Suppose** [2] 121:10 190:14
**Supposed** [4] 55:7 139:1 160:9 160:11
**Surely** [2] 184:8 185:1
**Surprise** [7] 190:9 190: 12 190:16 190:18 191:6 191: 14 191:15
**Surprised** [2] 48:20 128: 13
**Surroundings** [1] 41:11
**Susan** [1] 210:22
**Suspicious** [2] 95:17 95: 20
**Sway** [1] 145:15
**Swear** [1] 31:24
**Sworn** [7] 34:8 71:7 105:8 137:2 170:4 199:2 219:9
**Sympathize** [1] 130:24
**Sympathy** [1] 95:19
**System** [13] 14:21 25:24 54:18 144:16 176:24 176:25 177:3 185:17 187:14 204:25 206:24 212:4 212:7
**Systematic** [1] 144:1

**T**

**Table** [2] 137:13 170:16
**Talks** [4] 15:15 186:8 212: 11 228:16
**Tall** [1] 100:10
**Taught** [7] 77:3 77:17 77: 20 144:12 144:17 144:19 163: 21
**Taxing** [1] 154:23
**Teach** [3] 77:12 77:13 144: 17
**Teacher** [5] 76:21 76:22 77:8 111:7 111:8
**Teacher's** [1] 111:5

**Teachers** [1] 15:4
**Teaches** [1] 14:18
**Teaching** [6] 158:25 159: 1 159:2 159:6 159:11 159:17
**Technically** [1] 29:17
**Technologist** [1] 143:25
**Technology** [1] 144:13
**Teen** [1] 114:1
**Teenager** [1] 189:24
**Teenagers** [1] 79:9
**Teens** [2] 79:12 112:1
**Television** [8] 26:17 31: 8 70:11 104:11 167:22 198: 10 218:19 243:22
**Ten** [6] 23:14 29:8 32:9 32: 11 77:15 112:1
**Tend** [1] 18:21
**Tender** [1] 144:8
**Tends** [2] 29:25 30:11
**Term** [2] 11:16 161:14
**Terms** [6] 8:19 59:22 107: 15 159:1 166:11 212:16
**Terrence** [1] 63:1
**Terrible** [1] 60:5
**Test** [2] 53:14 53:15
**Testified** [7] 34:8 71:7 105:8 137:2 170:4 199:2 219: 9
**Testify** [2] 106:3 174:21
**Testimony** [32] 3:21 5:13 5:14 5:17 9:25 17:9 17:12 19:7 19:21 21:25 26:22 28:6 29:21 29:23 29:24 29:25 30: 6 30:12 30:25 31:1 31:19 32: 2 32:23 73:3 73:21 107:4 108:3 139:6 200:5 221:20 221:23 222:1
**Texas** [40] 1:8 1:10 1:21 2:8 2:10 2:15 2:21 4:16 4: 21 15:14 21:7 21:9 21:12 22: 24 25:2 29:18 36:17 38:2 38: 11 74:12 82:21 108:16 114: 25 140:5 143:7 143:9 143:15 173:25 185:10 203:13 209:19 212:4 215:9 224:4 231:20 245:1 245:4 245:16 245:17 245:18
**Theft** [1] 114:11
**Themselves** [8] 8:7 52:17 108:1 126:11 173:1 173:15 184:23 226:13
**Theories** [1] 159:12
**Thereof** [8] 41:9 42:8 83: 8 116:8 148:24 178:24 207:4 229:1
**They've** [5] 26:2 97:22 124:22 163:23 213:5
**Thinking** [16] 37:3 48:6 69:5 84:5 132:13 164:4 175: 22 206:4 206:5 206:5 206:19 206:21 206:23 212:15 215:2 233:15
**Thinks** [2] 26:6 129:23
**Third** [6] 24:11 24:13 32: 10 66:12 223:1 233:2
**Thirty** [2] 113:25 122:3
**Thirty-three** [1] 122:3
**Thou** [1] 96:19
**Thought-out** [1] 37:16
**Thoughts** [17] 20:2 36:21 48:10 54:16 74:17 88:9 102: 21 133:10 134:5 140:9 140: 15 141:22 143:3 162:4 186: 14 212:20 232:19
**Thousands** [1] 206:6
**Threat** [67] 6:23 14:5 15: 9 15:13 44:1 45:1 46:10 64: 18 65:9 75:6 83:16 83:23 84: 9 84:23 86:20 86:22 90:16 90:22 91:21 92:18 92:20 92: 24 93:8 93:19 93:22 94:13 116:23 117:13 117:23 118:3

**Three** [29] 18:16 23:21 31: 22 32:2 32:4 32:5 32:5 32: 21 59:6 70:13 71:1 97:15 104:23 113:8 113:9 122:3 125:16 129:4 131:20 145:2 168:8 186:16 198:17 202:19 223:2 235:20 235:22 235:23 244:7
**Throughout** [4] 5:13 26:1 76:22 144:16
**Throw** [1] 59:19
**Thursday** [1] 169:12
**Ticket** [1] 66:24
**Tightening** [1] 29:9
**Today** [9] 37:1 71:10 107: 16 174:4 201:2 210:11 213:7 213:24 222:3
**Together** [7] 68:9 71:14 104:10 156:16 161:12 198:8 243:20
**Token** [1] 157:23
**Tomorrow** [6] 69:25 103: 18 167:4 197:12 217:19 242: 25
**Tons** [2] 143:17 143:17
**Took** [15] 38:10 79:6 82:21 133:24 134:21 148:18 166:8 189:2 201:9 233:20 234:15 236:3 236:7 239:7 242:20
**Top** [1] 238:3
**Topic** [1] 144:23
**Topics** [1] 234:24
**Torn** [1] 154:16
**Total** [4] 134:5 207:23 234:13 245:10
**Totally** [4] 190:23 192:12 195:2 241:23
**Touch** [1] 130:15
**Touched** [9] 31:12 31:14 31:15 34:21 71:20 105:18 107:17 186:4 219:23
**Tour** [1] 111:11
**Towards** [8] 46:18 47:8 47: 15 61:16 119:16 127:6 163:2 182:19
**Town** [8] 70:3 104:4 156:17 156:21 167:17 198:1 218:11 243:13
**Trade** [1] 238:4
**Tragedies** [1] 126:8
**Trained** [1] 77:19
**Trainers** [1] 156:4
**Training** [4] 144:2 144:9 156:4 156:6
**Transaction** [15] 56:11 91:18 125:7 125:9 125:13 125:14 125:18 125:19 157:14 157:25 158:1 158:17 158:17 188:23 189:7
**Transcription** [1] 245:5
**Transcription/stenograph** [1] 1:23
**Treated** [1] 68:1
**Treatment** [5] 70:10 104: 9 167:21 218:16 243:19
**Trial** [93] 1:3 3:18 5:2 5: 4 5:11 5:18 6:2 6:7 7:7 7: 11 9:21 10:5 10:12 12:9 13: 8 17:8 18:22 22:12 26:24 27: 1 27:3 27:22 30:20 35:12 35: 22 38:5 40:11 41:3 41:5 41: 13 49:20 49:24 50:8 56:18

**65** [2] 67:8 81:23 82:18 83:6 90:20 106:2 107:24 110:13 114:12 115:15 115:15 116:7 116:11 116:14 118:19 124:12 125:3 130:6 137:24 141:5 148:14 148:21 151:2 159:23 160:9 160:12 171:6 171:10 172:13 174:22 177:10 177:25 178:21 182:17 196:21 199:25 200:2 201:4 201:9 201:14 201:16 202:8 213:6 220:11 220:14 221:23 222:22 222:25 223:2 226:17 228:24 229:6 241:17
**Trials** [1] 145:4
**Tricks** [1] 187:14
**Tried** [4] 34:12 49:12 61: 18 64:21
**Trigger** [2] 45:24 230:3
**Triggered** [1] 57:3
**Trouble** [5] 50:10 50:19 58:6 66:20 164:1
**True** [15] 19:3 31:20 50:19 79:4 119:23 132:8 144:21 144:22 144:25 164:7 165:4 183:18 208:18 228:9 245:4
**Truly** [4] 164:8 166:10 241:17 245:9
**Trust** [2] 53:11 69:1
**Truth** [2] 132:6 133:7
**Truthfully** [4] 142:5 227: 19 227:20 228:1
**TRW** [1] 224:14
**Try** [17] 3:23 56:10 58:19 61:9 70:22 74:16 89:3 95:18 100:20 104:21 140:8 154:20 209:21 221:6 231:21 231:22 240:13
**Trying** [15] 4:4 28:13 52: 13 84:1 84:24 94:8 96:23 97: 3 103:1 130:16 140:22 143:6 193:22 233:10 240:5
**Tucker** [3] 76:10 95:1 166: 1
**Turned** [3] 78:20 78:25 90: 13
**Turning** [1] 180:14
**Turns** [1] 32:12
**Tussle** [1] 180:10
**TV** [2] 187:22 237:22
**Twelve** [12] 22:21 61:22 62:11 64:6 68:24 73:2 77:15 89:1 148:6 200:19 232:18 237:18
**Twenties** [1] 111:2
**Twenty** [5] 12:21 28:18 88: 23 155:17 242:12
**Twenty-five** [1] 175:1
**Twins** [2] 100:14 100:17
**Two** [131] 4:16 4:22 5:1 6: 14 7:1 7:3 7:20 8:10 11:19 16:9 16:10 16:13 16:18 20:6 22:19 23:1 23:13 23:20 24:4 29:14 29:19 30:18 35:10 37: 19 38:5 38:15 38:23 39:17 41:20 45:11 45:12 46:25 47: 10 49:12 50:13 50:16 56:21 69:19 69:25 72:11 73:9 73: 19 82:18 82:22 83:2 83:3 91: 18 92:8 92:12 93:2 94:15 103:17 112:6 112:7 112:9 112:17 113:9 113:10 115:1 115:6 115:11 116:17 117:25 119:6 119:25 124:11 125:5 125:21 125:23 126:9 126:11 126:13 127:14 128:23 129:4 131:18 131:20 147:25 148:2 151:2 151:15 152:14 154:2 157:13 157:24 158:1 158:22 159:20 163:4 164:16 165:16 167:4 171:7 172:10 172:22 173:3 177:20 180:22 181:17 182:3 182:25 183:1 188:20 188:22 189:6 190:2 196:1 196:2 196:13 197:12 199:25 202:25 203:1 205:8 207:9

**207**:11 216:25 217:8 217:19
218:7 220:12 229:21 229:22
230:23 231:5 231:24 233:2
235:4 237:1 237:6 242:25
**Type** [80] 13:25 37:14 37:
23 39:24 40:13 40:13 41:10
47:14 51:13 60:3 68:17 76:6
76:19 77:20 77:23 77:24 81:
25 81:25 82:6 83:10 85:25
91:23 92:10 92:13 92:25 93:
5 93:6 93:24 93:25 98:21
103:13 109:12 110:15 110:15
114:11 116:8 116:9 117:17
124:13 125:22 126:1 130:7
130:10 130:15 134:17 140:23
141:1 141:3 141:7 141:7 144:
23 146:25 149:18 153:21 162:
19 177:12 177:23 179:18 179:
23 183:9 188:17 191:24 204:
16 205:2 208:19 209:4 211:
19 213:19 214:1 225:2 225:4
229:6 226:19 226:19 232:2
234:4 234:6 238:1 238:4 240:
5
**Types** [12] 22:20 22:23 37:
12 40:4 50:7 130:3 141:2
158:1 158:7 226:10

## U

**Ultimate** [1] 4:7
**Ultimately** [3] 60:11 61:
20 211:5
**Unable** [1] 35:16
**Unanimously** [7] 16:11 18:
7 18:9 26:23 26:25 56:13
202:7
**Uncomfortable** [7] 53:24
68:25 88:15 88:20 98:20 101:
1 154:19
**Uncommon** [1] 206:22
**Under** [10] 27:6 29:10 31:
24 38:23 40:9 63:4 99:12
175:25 195:15 196:23
**Underlined** [1] 80:3
**Understood** [1] 33:15
**Undo** [3] 49:21 65:22 66:5
**Uneasy** [1] 98:20
**Unfair** [4] 12:7 160:7 211:
10 214:17
**Unfold** [1] 201:4
**Unfortunate** [1] 166:15
**Unfortunately** [1] 191:8
**Unhappiness** [1] 58:22
**Unintentional** [1] 205:21
**Uniqueness** [5] 18:13 18:
14 18:15 18:15 28:6
**United** [1] 111:12
**Unlawful** [1] 134:11
**Unless** [12] 5:13 11:6 39:
4 43:17 80:13 91:8 152:13
154:1 220:2 228:19 229:20
235:13
**Unrealistic** [1] 66:20
**Unrelated** [1] 107:10
**Unreliable** [1] 31:18
**Untrustworthy** [1] 31:17
**Unusual** [1] 123:2
**Up** [77] 6:10 6:12 10:13 16:
1 20:19 25:17 26:5 29:9 34:
20 34:24 36:5 41:10 43:2 47:
1 47:1 52:10 53:22 60:12 62:
8 62:19 67:9 67:15 70:18 71:
16 73:4 73:22 76:17 79:18
79:20 83:9 88:5 94:22 95:18
96:11 100:21 104:17 107:5
108:4 108:17 111:9 112:20
116:9 116:18 119:7 120:1
125:16 130:13 138:2 142:13
144:5 157:2 168:3 170:21
173:6 177:1 177:7 177:19
183:2 187:1 187:14 188:13
191:6 194:5 195:17 196:20
200:22 202:5 204:25 205:3
206:25 212:5 213:5 214:18

**221**:1 221:10 225:23 232:22
**Upbeat** [1] 59:15
**Upbringing** [1] 128:13
**Upset** [1] 131:22
**Usage** [1] 9:7
**User's** [1] 144:7
**Uses** [1] 116:24

## V

**Vacuum** [1] 239:18
**Valuable** [4] 25:12 25:13
25:14 157:2
**Value** [2] 109:9 239:9
**Variables** [1] 22:11
**Vehicle** [3] 13:21 61:16
61:16
**Venireman** [1] 52:2
**Venireperson** [9] 28:22
29:4 33:15 105:4 123:12 135:
21 168:13 168:16 244:14
**Verdict** [21] 7:18 50:19
65:23 66:5 79:25 82:25 96:4
96:4 115:8 138:7 175:6 183:
18 202:23 208:18 210:23 222:
16 228:9 241:5 241:22 241:
25 242:19
**Verdicts** [2] 202:19 223:2
**Version** [1] 163:8
**Versus** [4] 85:1 99:6 147:
3 240:24
**Vicious** [1] 180:9
**Victim** [13] 7:1 7:20 18:
15 32:6 32:7 32:9 32:12 51:
20 62:20 63:2 130:7 131:8
166:15
**Victim's** [1] 32:18
**Victimized** [1] 101:2
**Victims** [6] 25:11 62:19
63:7 128:21 128:22 130:21
**View** [8] 37:4 53:19 58:8
99:18 99:20 126:4 192:13
210:16
**Viewing** [1] 86:11
**Views** [1] 186:14
**Violate** [3] 191:10 191:13
195:14
**Violence** [65] 6:22 12:6
12:10 12:15 13:5 13:14 13:
15 13:15 13:19 13:20 13:25
14:4 14:23 15:1 15:7 15:12
43:25 44:16 44:17 45:1 46:
11 83:16 83:24 84:10 84:24
93:9 93:14 116:22 117:5 117:
7 117:14 117:24 118:3 149:6
149:10 149:16 149:25 150:11
152:7 152:12 153:25 161:4
161:12 162:7 162:15 162:21
166:16 179:12 179:19 182:6
192:5 193:11 194:24 195:7
195:19 195:23 196:20 207:16
229:15 230:25 231:3
**Violent** [9] 44:18 78:9
117:10 119:2 149:8 162:25
175:18 179:13 229:12
**Visit** [11] 11:17 52:10 88:
9 100:23 137:23 155:18 171:
7 186:13 188:10 232:17 234:
23
**Visited** [2] 157:4 160:23
**Visiting** [1] 3:5
**Voir** [25] 1:15 34:9 36:13
36:25 52:6 71:8 74:8 80:6
88:1 88:16 105:9 108:13 123:
17 137:3 140:1 155:11 170:5
173:22 184:13 199:3 203:10
210:9 219:10 224:1 242:14
**Volume** [2] 1:2 245:6
**VOLUMES** [1] 1:2
**Vote** [13] 47:24 54:7 85:6
118:10 118:12 122:20 134:21
152:25 185:14 185:15 230:16
230:19 231:7

**Voted** [1] 16:11
**Voting** [1] 178:15
**VS** [1] 1:8

## W

**Wait** [10] 42:16 46:20 127:
12 151:5 151:8 182:21 184:6
206:9 208:1 231:1
**Wake** [2] 36:5 221:10
**Walking** [2] 32:13 61:16
**Walks** [3] 26:7 61:19 89:1
**Wall** [1] 26:7
**Waller** [5] 137:1 137:6
138:10 140:3 167:2
**Walls** [5] 14:12 14:19 14:
22 14:25 15:3
**Wants** [6] 70:25 89:5 133:
2 219:3 237:11 237:11
**Warrant** [3] 22:21 22:25
164:24
**Warranted** [1] 165:19
**WARREN** [1] 34:7
**Wary** [1] 100:22
**Washington** [1] 61:15
**Wasting** [1] 219:14
**Watch** [7] 70:11 104:11
167:22 174:8 198:10 218:19
243:22
**Wayne** [7] 2:12 4:13 52:8
88:3 123:19 155:15 184:16
**Ways** [1] 148:2
**Weapons** [2] 196:17 197:4
**Wearing** [1] 105:19
**Weatherman** [1] 12:21
**Wedding** [1] 156:19
**Wednesday** [6] 103:17 167:
4 197:11 198:20 217:20 243:5
**Week** [2] 20:11 20:11
**Weeks** [14] 69:25 103:17
105:6 113:10 125:16
167:4 197:12 217:19 218:7
234:24 242:25 243:10 244:16
**Weigh** [3] 183:6 207:25
230:15
**Weight** [1] 67:19
**Wentz** [28] 2:18 4:14 88:4
123:15 123:16 123:18 123:19
135:17 135:24 136:1 155:10
155:12 155:15 168:23 168:25
169:1 169:3 169:19 169:20
169:22 184:12 184:14 184:16
184:25 185:2 211:16 232:16
240:4
**Whatnot** [1] 196:21
**Whatsoever** [1] 3:13
**Wheel** [1] 30:3
**Whereby** [3] 40:6 81:19
110:9
**Wherein** [2] 189:2 221:18
**Whichever** [1] 4:25
**White** [2] 143:4 153:13
**Whole** [19] 10:13 10:14 17:
13 19:20 19:22 24:22 25:15
77:13 99:14 155:8 164:11
165:14 181:8 187:25 187:25
190:24 219:17 222:8 227:16
**Wide** [2] 25:8 50:7
**Wife** [2] 100:14 111:5
**Wildest** [1] 66:25
**Winds** [3] 70:18 104:17
168:3
**Windshield** [1] 13:24
**Wish** [2] 89:9 154:10
**Withdraw** [1] 16:15
**Withdrawn** [1] 19:18
**Witness** [5] 50:21 80:13
80:14 193:22 245:12
**Witnesses** [3] 31:18 117:
18 242:12

**Woman** [4] 56:8 56:11 57:2
101:19
**Women** [1] 101:11
**Won** [1] 154:25
**Wondering** [1] 28:23
**Word** [21] 9:2 9:6 11:14 11:
14 11:17 11:18 11:24 12:4
17:21 44:2 44:3 44:4 44:5
44:5 49:15 57:16 80:4 116:
24 116:25 117:1 156:5
**Words** [41] 9:7 9:9 14:15
40:7 43:15 44:11 45:24 52:
23 65:10 65:23 74:19 81:20
85:18 87:7 90:8 90:21 91:18
97:22 98:5 108:23 120:11
124:21 134:12 140:24 157:8
161:7 161:12 162:6 194:18
195:1 209:3 217:1 217:4 224:
17 226:14 228:17 233:7 233:
14 236:8 239:5 240:25
**Worker** [1] 59:7
**Works** [5] 46:14 54:18 145:
25 186:1 186:24
**World** [8] 8:23 10:17 216:
17
**Worry** [2] 4:4 161:14
**Worse** [7] 142:14 175:20
177:2 187:4 187:6 187:10
227:13
**Worst** [3] 176:17 189:12
206:23
**Worth** [1] 26:12
**Write** [2] 142:2 177:16
**Writing** [4] 4:1 133:25
144:20 245:5
**Written** [3] 48:24 81:6
195:17
**Wrongdoing** [1] 234:15
**Wrongful** [1] 195:1
**Wrote** [1] 129:11

## Y

**Y'all** [2] 142:6 175:6
**Yards** [1] 181:8
**Year** [14] 20:11 20:11 21:1
21:11 22:2 25:22 33:13 77:
16 156:18 158:12 164:11 188:
2 215:23 215:23
**Years** [62] 20:10 20:16 20:
22 21:20 22:4 22:7 22:11 25:
4 25:23 28:5 28:7 28:18 28:
18 28:19 28:19 28:19 29:5
29:9 36:5 39:7 39:7 39:14
39:23 39:23 59:4 61:14 75:
23 84:3 84:5 86:12 86:14 86:
15 86:23 87:3 87:12 106:19
111:2 112:7 113:7 113:9 117:
21 129:5 146:7 146:8 175:1
178:13 178:14 187:14 188:7
206:13 206:14 206:14 206:15
207:8 215:15 215:21 216:1
216:3 221:9 221:11 237:12
238:7
**Yell** [1] 98:7
**Yelling** [1] 98:9
**Yesterday** [22] 3:6 3:7 4:
11 5:3 6:24 8:5 8:17 9:13
11:1 16:25 34:15 37:1 71:13
71:14 105:12 107:16 137:6
161:15 161:16 161:17 170:9
219:16
**YMCA** [2] 113:20 113:23
**Young** [13] 18:22 19:3 47:
7 79:9 111:19 119:14 119:18
127:5 127:15 127:24 128:15
159:16 225:21
**Younger** [3] 75:16 98:1
111:1
**Yourself** [23] 7:15 8:23
19:15 35:20 36:4 54:15 55:1
59:21 68:12 72:25 73:1 103:
5 107:25 119:9 166:22 171:
20 197:1 200:17 214:13 219:
12 220:23 221:9 221:10

**Youthfulness**  [1] 18:2

## Z

**Zero**  [1] 223:11

**Zone**  [1] 237:11

1          REPORTER'S RECORD

2      VOLUME 8 OF 25 VOLUMES

3     TRIAL COURT CAUSE NO. 800112

4

5   CHARLES MAMOU, JR.      )    IN THE DISTRICT COURT

6        Appellant          )

7                           )

8   VS.                     )    HARRIS COUNTY, TEXAS

9                           )

10  THE STATE OF TEXAS      )

11       Appellee           )    179TH JUDICIAL DISTRICT

12

13

14              * * * * * * * * * * * * * * * * * * *

15              VOIR DIRE EXAMINATION

16              * * * * * * * * * * * * * * * * * * *

17

18      On the 15th day of September, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Bob Burdette, Judge

21   Presiding, held in Houston, Harris County, Texas:

22      Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

```
 1              A P P E A R A N C E S

 2    MR. LYN MCCLELLAN

 3    SBOT NO. 13396100

 4    MS. CLAIRE CONNORS

 5    SBOT NO. 0470500

 6    Assistant District Attorneys

 7    201 Fannin

 8    Houston, Texas 77002

 9    Phone:  713.755.5800

10    ATTORNEYS FOR THE STATE OF TEXAS

11

12    MR. WAYNE HILL

13    SBOT NO. 59656300

14    4615 Southwest Freeway

15    Houston, Texas 77027

16    PHONE:  713.623.8312

17    MR. KURT WENTZ

18    SBOT NO. 21179300

19    5629 W FM 1960

20    Houston, Texas 77069

21    PHONE:  281.587.0088

22    ATTORNEYS FOR THE DEFENDANT
23

24

25
```

i

INDEX

VOLUME 8 OF 25

|  | PAGE | VOL. |
|---|---|---|
| September 15, 1999   Jury Voir Dire Examination |  | 8 |

| Venirepersons | Court | State | Defense |  |
|---|---|---|---|---|
| Vera Saldana Garcia | 45 | 48 | 60 | 8 |
| James Thomas Pryor | 73 | 75 |  | 8 |
| Rose Crawford Turner | 78 | 80 | 94 | 8 |
| Thomas Eugene Smith | 110 | 114 |  | 8 |
| Donald Nelson | 126 | 131 | 146 | 8 |
| Douglas Polega | 153 |  |  | 8 |

|  | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 156 | 8 |
| Court Reporter's Certificate | 157 | 8 |

3

1          (Jury panel brought in.)
2          THE COURT:  Good morning, ladies and
3   gentlemen.  I want to spend some time visiting with you
4   about some things we did not talk about the other day
5   when your group was together.  And the reason we didn't
6   talk about them, frankly, is because they were so
7   detailed; and we had so many people, we could have made
8   no progress.  So we're going to spend some time this
9   morning before we start our individual conversations
10  talking about these things.
11         Before we begin, I'll remind you this is
12  the case of the State of Texas versus Charles Mamou.
13  Mr. Mamou is seated over here to next to his attorney,
14  Mr. Wayne Hill, Mr. Kurt Wentz.  The State of Texas is
15  represented by two of her Assistant District Attorneys,
16  Mr. Lyn McClellan, who is present right now, and Miss
17  Claire Connors, who will be along in a couple of
18  minutes.
19         We talked the other day about the fact
20  this defendant stands charged by indictment with the
21  offense of capital murder that's alleged to have
22  occurred in Harris County, Texas, on or about the 7th
23  day of December, 1998.  There is in the State of Texas
24  about twelve different types of conducts that if proved
25  beyond a reasonable doubt would warrant a jury finding

4

1   some defendant guilty of the offense of capital murder.
2   Suffice it to say, the common thread that runs through
3   all twelve of the types of conduct is this:  There must
4   be an intentional murder, being the intentional taking
5   of the life of another human being without any legal
6   justification and without any legal excuse, meaning
7   self-defense is not murder, meaning accident is not
8   murder.
9          The way it becomes a capital murder is if
10  that murder, that intentional murder, is committed
11  during the course of another serious felony offense,
12  like is alleged in this case.  One murder, it is
13  claimed, is committed during the course of the
14  commission of a kidnapping.  If that's proved beyond a
15  reasonable doubt, that's a capital murder.
16         Another paragraph within the indictment
17  claims that there was a murder committed during the
18  course of another murder, that if proved would also
19  warrant a jury finding a defendant guilty of capital
20  murder.  So that's what we're dealing with.  That's the
21  allegation.  Whether the allegation is accurate or not,
22  that's why we're having a trial.
23         Now, we talked the other day about the
24  fact that if a person is convicted of capital murder,
25  there are only two possible punishments.  One of them is

5

1   life.  One of them is death.  We talked about the fact
2   that at the first phase of the trial, the jury's only
3   concern is going to be with whether the defendant is or
4   isn't guilty.  If a defendant's not guilty, obviously
5   the case is over with; because we just don't sentence
6   people to the electric chair, or lethal injection, I
7   should say, for not being guilty.  So if you're not
8   guilty, the case is over.  If they were guilty, we come
9   back and there is a second phase of the trial.
10         And at the second phase of the trial,
11  additional evidence can be presented to you for the
12  purposes of showing what kind of a person you're dealing
13  with on trial.  The first part of the trial you're going
14  to hear testimony about the crime that was committed.
15  Second part of the trial you're not going to hear
16  anymore testimony about that, because you've heard all
17  there is to hear.
18         Instead, at the second phase of the trial
19  you're going to hear testimony about the character, the
20  background, and perhaps the comparative involvement of
21  the defendant on trial with the commission of the crime,
22  if there are two or three or four other people involved
23  in the commission of the crime.  The idea behind doing
24  that is just the same as decisions you make at home
25  when, for example, you're disciplining a child.  You

6

1   tell a child not to do something.  Child goes ahead and
2   does it.  After you tell them one time, you might react
3   one way.  The child does it ten or twelve or fourteen
4   times just as soon as you've told them not to, you might
5   react entirely differently.
6          So, we want you to see what the
7   defendant's like both from the standpoint of the
8   prosecution's potential evidence and both from the
9   standpoint of the defendant's potential evidence.  You
10  can see all the good stuff, all the bad stuff, if there
11  is any, about the defendant at the second phase of the
12  trial.  And you take all that information that you get;
13  that is to say, all the information at the second phase
14  of the trial about what kind of a person the defendant's
15  like.  You pile information on top of all the
16  information you got at the first phase of the trial
17  about the crime or what kind of a case it was, and you
18  use every single bit of that evidence to help you answer
19  two special issues or two questions that are over here
20  on this easel.  And we're going to spend some time
21  talking about it.
22         Before we start talking about them, let me
23  say this to you:  We're going to spend much of today, or
24  at least I am during my conversation with you, talking
25  about the second, or the punishment phase of a trial.

**7**

1  Please don't read into that -- you say, why are you
2  talking about the second phase when we haven't even
3  heard any testimony about the first phase?  And that's
4  true.  Please don't read into the fact that we're
5  talking about the second phase of the trial before it
6  ever begins, before the first phase ever begins, as
7  being some indication that we aren't honoring the
8  defendant's presumption of being innocent.  That's not
9  the case at all.  We certainly are honoring it.  Don't
10  read into it the defendant is going to wind up pleading
11  guilty.  That's simply not going to happen.  Don't wind
12  up reading into it the defendant's defense attorneys,
13  Mr. Hill and Wentz, are going to throw in the towel and
14  virtually lay down.  That's simply not going to happen.
15  I can tell you that.  But this is the only time we ever
16  have a chance to talk to you, so we have to talk to you
17  about the rules that can come into play from the
18  beginning of the trial to the end of the trial.
19          For example, if we did not talk to you now
20  about the punishment phase of the trial, if you, the
21  jury, went out and heard the evidence in the first
22  phase, you came back and you found the defendant guilty
23  of capital murder, and if I sat you down, the twelve of
24  you who were the jurors, and I said, okay, ladies and
25  gentlemen, here are the rules that come into play at the

**8**

1  second phase of the trial, these questions, and so on,
2  so forth.  One of the jurors says, wait a second.  I
3  didn't know that was the deal.  I don't agree with that
4  rule at all; and I'm telling you right now, I simply
5  won't follow it.  That means I'd have to excuse that
6  juror.  That means I'd be left with eleven.  I've got to
7  have twelve.  That means we'd have to have a mistrial.
8  That means everything we will have done will have been a
9  total waste of time, so that's why we talk about it now
10  and for no devious reason whatsoever.  It's just that
11  simple.
12          Now we talked the other day about how --
13  one other thing.  We're going to talk about some things
14  with some degree of specificity.  I know full well that
15  what we're going to talk about today are things that you
16  have never spent a second in your life ever thinking
17  about, and there is no reason why you ever should have
18  to.  So what we're going to do is, I want you to know
19  that while we're talking about it here today, don't feel
20  that you have to memorize what we're talking about.  You
21  don't.  The reason you don't have to memorize what we're
22  talking about is because you'll have these rules in
23  writing in the Court's charge.  You'll have the Court's
24  charge with you back in the jury room during the
25  entirety of your deliberations.  So, you can see it's

**9**

1  not necessary to memorize what we're talking about.  So
2  what I'm saying is, don't get frustrated because it's
3  moving along quickly and things you've never heard of
4  before are thought about.  Please don't worry about
5  that.  I'm just trying to give you an idea of what can
6  come into play.  Whether it does come into play will
7  depend upon the testimony in the case.  So, some of
8  these things we're going to talk about may not happen;
9  but then again, they may.  And I wanted you to be aware
10  of it.
11          First off, we talked about the fact that
12  how the jury answers these two Special Issues, these two
13  questions at the second phase of the trial will dictate
14  what punishment you must impose.  If the jury answers
15  yes to the first question and if the jury answers no to
16  the second question, the law says that I have no choice,
17  I have no option, I have no discretion.  I must sentence
18  the defendant to death, and that's what I'm going to do.
19          On the other hand, the law says that if
20  the jury should answer those questions any way other
21  than yes and no, in that order, again, I have no choice,
22  no option, no discretion.  I must sentence the defendant
23  to life, and that's exactly what I'll do.
24          So, first off, you can see that in the
25  State of Texas, a jury does not sentence somebody to

**10**

1  death.  A jury does not sentence somebody to life.  A
2  jury simply takes the evidence that exists in the case
3  and applies it to answering each of these two questions.
4  You're entitled, however, to know what the result of
5  your answers is going to cause.  And a yes and a no is a
6  death.  Anything else is a life.  Any questions so far?
7          We're going to talk in just a couple of
8  minutes about these questions in detail.  Before we do,
9  go back to what I've told you about the Court's charge.
10  You'll have it with you in the jury room.  At the
11  conclusion of all the testimony at the first phase of
12  the trial, you'll have a different Court's charge that
13  sets out the law for you that applies to the punishment
14  phase of the trial, if you get to that phase of the
15  trial, back in the jury room after the evidence has
16  concluded at the second phase of the trial.
17          There are going to be lots of terms that
18  are going to be defined for you.  There are going to be
19  lots of instructions and then the law set out that is
20  raised by the testimony in the case.  Some of these
21  words that we're going to talk about that are contained
22  within these two questions are going to be defined in
23  the Court's charge, as some of them aren't.  And if you
24  ask yourselves, well, how do you guys decide at the
25  courthouse what words you're going to define for us and

11

1  what words you're not, the answer to that question is
2  very simply.  If we're going to be using some term that
3  is peculiar to the law, we have absolutely no reason to
4  expect you to come down here from your jobs, not being
5  lawyers, and be armed with information as to what those
6  terms mean.  That's ridiculous.  So, those are the words
7  we're going to define for you.
8       If, on the other hand, we're using words
9  that we all use all the time anyway, we're not going to
10  define those words.  We're going to talk about some of
11  each in these questions.  The first question over here
12  starts off with the phrase -- well, let me go through
13  the whole question.  Question asks, Do you find from the
14  evidence beyond a reasonable doubt that there is a
15  probability that the defendant would commit criminal
16  acts of violence that would constitute a continuing
17  threat to society?  No matter what the case, no matter
18  who the defendant, no matter anything else, there are
19  only two possible answers to that question, either yes
20  or no.  Question starts off with the phrase, Do you find
21  from the evidence beyond a reasonable doubt?  If you
22  will recall the other day, we talked about that term,
23  reasonable doubt; and we talked about it from the
24  standpoint that that's the amount of evidence that the
25  State must present to a jury to satisfy them of the

12

1  defendant's guilt.  If they present that evidence, the
2  jury is satisfied it establishes beyond a reasonable
3  doubt the defendant's guilt, the jury is obligated to
4  find that defendant guilty.
5       If the State's evidence does not satisfy a
6  jury beyond a reasonable doubt as to the defendant's
7  guilt, then the jury's obligation is to find the
8  defendant not guilty.  That's why we have the
9  presumption of being innocent.  That's why we have the
10  presumption of being not guilty at the time the trial
11  begins, because there is no evidence on the table.  And
12  at the conclusion of the evidence, the jury's question
13  to ask themselves is, what we have heard, do we have
14  enough believable evidence in here that establishes in
15  our mind beyond a reasonable doubt the defendant's
16  guilt?
17       So, what we're saying is while starting
18  off, every criminal case, the person on trial starts off
19  being presumed to be innocent.  Obviously, that
20  presumption can be eliminated by the quality of the
21  State's evidence.  And if the quality of the State's
22  evidence rises to the level of establishing a person's
23  guilt beyond a reasonable doubt, obviously the
24  presumption of being not guilty is erased; and, in fact,
25  the defendant's guilty.

13

1       Now anytime we see the phrase, do you find
2  from the evidence beyond a reasonable doubt, which is
3  the way this first question starts out, also, that is a
4  triggering mechanism that tells us that means the State
5  has to show us what the answer should be.  Their proof
6  has to satisfy us beyond a reasonable doubt as to what
7  the answer should be.
8       At the first phase of the trial, do you
9  find the defendant guilty beyond a reasonable doubt?
10  That means the jury has got to be satisfied that the
11  State's evidence proves that the defendant is guilty
12  beyond a reasonable doubt.  Likewise, at the second
13  phase of the trial the State's evidence has got to show
14  to you beyond a reasonable doubt that the answer to that
15  first question should be yes.  So, what we're saying is
16  this:  At the time a defendant is convicted of the
17  offense of capital murder, and as we go into the second
18  phase of the trial, that part will be dealing with the
19  background and the character of the defendant and so
20  forth.
21       What we're saying is, there is a
22  presumption that exists that all defendants convicted of
23  capital murder should receive a life sentence.  And that
24  presumption exists up until the time comes, if it does,
25  when the State's evidence proves to you beyond a

14

1  reasonable doubt that the answer to this first question
2  should be yes.  Because unless the State's evidence
3  proves that the answer to that first question should be
4  yes, the answer must be no, right?  We already
5  understand from our conversation this morning that it
6  takes a yes and a no answer, in that order, for the
7  death sentence to be imposed.  So, a no answer to the
8  first question is different than yes or no.  So a no
9  answer to the first question means a life sentence is
10  imposed.
11       So, that's why starting off at the
12  punishment phase of a capital murder case, it's presumed
13  that the appropriate punishment would be life, unless
14  the State's evidence proves beyond a reasonable doubt
15  the answer to that first question should be yes.
16  Anybody have any questions about that?
17       Okay.  Let's take the first question.  Do
18  you find from the evidence beyond a reasonable doubt
19  that there is a probability?  The word probability is
20  not going to be a word that's going to be defined for
21  you in the charge.  We use that all the time.  My
22  heavenly days with football season, we even use it more;
23  because we're talking about odds on a football game.
24  Who is going to win?  Who is going to lose?  Except when
25  Baylor is playing, probably they're going to lose.

**15**

1  That's my school, so I can say it. Weather reports,
2  twenty percent, forty percent, talking probabilities. I
3  am not permitted to define for you the term probability,
4  but I am permitted to, by comparison, tell you that
5  whatever the word probability does mean to you, there
6  are two things that it cannot be.
7       For example, probability, whatever it
8  means to you, must mean something more than a
9  possibility. Anything could possibly happen. Because
10  it could possibly happen does not mean it's probably
11  going to. Whatever the word probability means to you,
12  it cannot mean something as much as a certainty; because
13  something is probably going to occur does not mean that
14  with a certainty it occurred.
15       And let's take this word, probability, and
16  put it within the context of this question. It's the
17  obligation of the State to prove beyond a reasonable
18  doubt the existence of a probability that the defendant
19  would commit future acts of criminal violence. Can you
20  see how grossly unfair it would be to any defendant if
21  the only requirement was that the State prove a
22  possibility that the defendant on trial would commit
23  future acts of criminal violence? Because that's
24  always -- that's simply going to occur. There is always
25  that possibility. Can you see, on the other hand, how

**16**

1  grossly unfair it would be to the State if we required
2  the State to prove the existence of a certainty that the
3  defendant on trial would commit future acts of criminal
4  violence?
5       So, what we did was we split the baby. We
6  use the word probability, something being perhaps more
7  likely to happen than not happen. If that squares with
8  your notion, that's a deal. If you have another idea of
9  what it means, that's also just fine, as long as
10  whatever a probability means to you, it means something
11  more than a possibility, but not something as great as a
12  certainty, somewhere in between. Any questions about
13  that? That the defendant on trial would commit criminal
14  acts of violence.
15       In order to obtain a yes answer to this
16  question, it is not necessary that the State prove to
17  you the existence of a probability that a defendant on
18  trial would commit certain crimes in the future. They
19  are required to prove to you the probability that a
20  defendant would commit a certain class of crimes. That
21  class of crimes being those that are crimes of violence.
22  And a crime of violence can be violence as to persons or
23  violence as to property. As you can see, that question
24  makes no distinction. It just says crimes of violence.
25       So, what I'm saying is the State is not

**17**

1  required to prove to a probability that a defendant on
2  trial would commit future capital murders. Certainly if
3  that testimony exists, they're entitled to present it to
4  you. But we're talking about a category of crimes,
5  those being crimes of violence. Capital murder, certain
6  crimes of violent murders, or attempted murders, or
7  rapes, or robberies, or kidnappings, all are crimes of
8  violence as to persons.
9       Crimes of violence as to property could be
10  arsons, the burning of somebody's house, the burning of
11  somebody's building, the burning of somebody's vehicle.
12  Certain kinds of burglaries, the kind of burglary that
13  requires a breaking in to get into property or onto
14  premises, the taking of a brick bat, so to speak, and
15  breaking in the windshield of an automobile. Criminal
16  acts of violence all against property. That's the kind
17  of stuff we're talking about. Can you see the
18  distinction between those kinds of crimes and, for
19  example, shoplifting, till tapping, reaching into a cash
20  register, pulling out a ten dollar bill, walking out the
21  store and leaving. Maybe those aren't. There is no
22  violence involved.
23       Anyway, I'm just using that as an example
24  for you to see the distinction between some types of
25  crimes. And these criminal acts of violence that we're

**18**

1  talking about -- finish up with that first question --
2  they must rise to the level that they constitute a
3  continuing threat to society.
4       Now, let's talk for a second about the
5  word society. That's another word that's not going to
6  be defined for you. However, ask you to consider making
7  a distinction, if you feel comfortable with the
8  distinction between the words community and society. We
9  all live in different communities, but we're all a piece
10  of the same society. Now that can be important for this
11  reason: Most of the time -- at least, we first started
12  talking about the word society, who is in it. We think
13  about the people with whom we have contact; family,
14  neighbors, friends, coworkers, whatever it might be.
15       Ordinarily, we don't think, for example,
16  of those people being involved in society who are behind
17  the penitentiary wall; but they are also a piece of
18  society. Because if they weren't, the lady who is the
19  teacher, who goes into the school at 8:00 o'clock in the
20  morning, punches her card to go up and teach whatever
21  class she teaches. We know when she punches in, goes
22  behind the walls of the penitentiary, she does not lose
23  her right to be free from criminal acts of violence.
24  And at the conclusion of her workday, if she escapes
25  with her life and gets back outside the wall of the

19

1   penitentiary, she doesn't thereafter reacquire her right
2   to be free from criminal acts of violence. That's
3   preposterous. It's not the case. The point being those
4   folks behind the walls of the penitentiary also have the
5   right to be free from criminal acts of violence. And
6   that means nurses, medical personnel, prison wardens,
7   officials, administrators, guards, teachers, those kinds
8   of people. And it also includes inmates, because they
9   also have the right to be free from criminal acts of
10  violence.
11          So, what we're simply saying is that
12  society, as used in this context here, can mean all the
13  people, all the time, everywhere. Because if it didn't
14  mean that, then that question would read, Do these
15  criminal acts constitute a continuing threat to the
16  citizens of Harris County, Texas? And it doesn't say
17  that. So, that's the first question. Any questions
18  about the first question? Any?
19          Okay. If your jury answers that question
20  no, the case is over; because there is no way you could
21  answer that second question that's going to make the
22  death sentence a possibility. A life sentence will be
23  imposed. If, however, your jury answers yes to the
24  first question, you move along to the second question.
25  And before we take up the words contained within the

20

1   second question, I want to spend a couple of seconds
2   talking to you about where a jury necessarily must be in
3   the process before we get to that second question.
4          First off, necessarily, the jury would
5   have had to have found a defendant guilty of capital
6   murder; because if they didn't, we wouldn't have gotten
7   to these questions. Secondly, a jury, necessarily, must
8   have found that the answer to that first question is
9   yes; that is to say, the defendant on trial is a future
10  danger to society. But the case isn't over, because
11  this third question -- I say third question. It's the
12  second one in punishment, the first question meaning, is
13  he guilty or not guilty?
14          This question asks you to review the
15  evidence for the purposes of answering an entirely
16  different question. Second question says, Do you find
17  that, taking into consideration all of the evidence,
18  including the circumstances of the offense -- now that's
19  going to be what you heard at the first part of the
20  trial -- also including the character and the background
21  and the personal moral culpability or the personal moral
22  responsibility -- that's going to be what you heard at
23  the second part of the trial. So the first half of that
24  second question simply instructs the jury to go back
25  over all of the evidence in the case for the purposes of

21

1   asking yourself this one question: Is there a
2   sufficient mitigating circumstance or perhaps
3   circumstances that make you believe that a life sentence
4   would be a more appropriate verdict than the death
5   sentence?
6          Again, no matter who the defendant, no
7   matter what the evidence, there is always going to be
8   two answers to that question, two possible answers, yes
9   or no. Now that second question, I think, is asking
10  simply this: If in the face of all this bad stuff that
11  you have found in this case has happened, is there any
12  stuff that's in the case that rises to the level that
13  makes you think, in spite of all that bad stuff, a life
14  sentence would be more appropriate than a death
15  sentence?
16          Now, maybe sometimes it would be there.
17  Maybe sometimes it won't be there, because every case is
18  simply different. Nobody is claiming that it's there,
19  but the agreement must be made that you'll look for it.
20  If it's there, react to it. If it's not there, then
21  that's it. First thing that we see about that second
22  question is this: Nowhere in that question do we see
23  the phrase, Do you find from the evidence beyond a
24  reasonable doubt? That phrase isn't in that question.
25  So, this is going to be the first time that you're going

22

1   to be asked to answer that question, or answer a
2   question, or make a decision where the State doesn't
3   have to prove to you what the answer to that question
4   should be. Because as we said, State's got to prove the
5   phrase, Do you find from the evidence beyond a
6   reasonable doubt? It's not there. Well, now that
7   really tells us something significant. And what it
8   tells us is this: Since the term "Do you find from the
9   evidence beyond a reasonable doubt" is not contained
10  within that first -- second question, I should say, that
11  means the State doesn't have to prove to you what the
12  answer to that question should be.
13          We know from our conversation the other
14  day that a defendant on trial never has to prove
15  anything, so the defendant doesn't have to prove to you
16  what the answer to that question should be. Where does
17  that leave us? Well, that leaves us with this: The
18  law recognizes by telling us that the law recognizes
19  that there are going to be many cases where there are no
20  mitigating circumstances, because nobody's required to
21  put them in the case. No one's required to present
22  evidence of it. The only requirement is that the jury
23  will go over the case to see if there are any in there.
24          So, what I'm saying is this: Well, let me
25  finish with that question. When we talked about

23

1  mitigating, all we're talking about is, is there some
2  unique feature in the evidence in a case that makes you
3  think that what you ought to do is withdraw the death
4  penalty and substitute in its place a life sentence?  So
5  when we talk about mitigating, we're not talking about
6  forgiving.  We're not talking about justifying.  We're
7  not talking about excusing.  Because obviously, that's
8  not going to happen; because the very least that's going
9  to happen to them is he's going to get a life sentence.
10         Again, there may not be anything in the
11  case that makes you think that case is worthy of a life
12  sentence.  But if there is, this is the only chance
13  you'll have to pursue that option.  Each of the three
14  decisions that you make in the case, that being whether
15  the defendant is guilty or not guilty, answer to that
16  first question and to the second question, you're going
17  to make that decision on the basis of the evidence that
18  exists in the case.   But can you see that each of the
19  three questions that are involved -- Did he do it?   Is
20  he a future danger?   Is there some reason why I think a
21  life sentence would be more appropriate than the death
22  sentence?  While that decision is based upon all the
23  evidence in the case, can you see that each of those
24  questions is remarkably different from each other; and
25  therefore, your answer to one of these questions has

24

1  absolutely no bearing on how you ought to answer the
2  second question.  Has no bearing on how you ought to
3  answer the third question.
4         So, what we're saying is this:  If you
5  found somebody guilty of capital murder, and if you find
6  based upon the evidence in the case that the answer to
7  the first question should be yes, that has nothing to
8  do, in and of itself, with how you ought to answer the
9  third question.  And I keep saying third question.  I'm
10  sorry.  It's the mitigating question, because it's your
11  third decision.  Because there may be something in the
12  case that you view to be unique to the degree that it is
13  sufficient to cause you to withdraw the death sentence
14  and replace it with a life sentence.  Because keep in
15  mind that when you get to this third question, your
16  third decision, you will have made the other two
17  decisions unanimously and consistently with requiring me
18  to sentence the defendant to death, guilty of capital
19  murder.  Yes to the first question.
20         Now the second question asks you,
21  basically, are you really satisfied based upon the
22  testimony in the case that that is what you want to do?
23  This is your chance to say, yes, it is.  We've checked
24  it all over.  We reinforce our decision.  We're
25  satisfied that is what we want to do.  Or, no, because

25

1  of some unique feature in the case, unique evidence, you
2  don't know.  All sorts of different kinds of things that
3  could be mitigating.  And what it might be to one of you
4  might not be to another.
5         For example, sometimes some folks might
6  tend to think that comparative youthfulness might be a
7  mitigating circumstance in a case, the idea being some
8  seven-year -- seventeen-year-old kid is not mature
9  enough to make good judgement in decisions, and so
10  forth.  And that might be a feature that a juror might
11  think was mitigating.  Hearing exactly that same
12  testimony, another juror might say, that's not
13  mitigating.  My Lord, anybody who is that mean that
14  young, we've lost them.  Same exact information, just
15  evaluated differently.
16         Sometimes some folks might think that if
17  in a case there's testimony of mental retardation, some
18  folks might believe that to be mitigating.  Others might
19  not.  The idea being, there is no way to fix
20  retardation.  It is what it's going to be.  Another
21  group of people on the same jury might say, whether it's
22  mitigating, that's not really the only question.  The
23  question also is, is it sufficient?  So if it's
24  sufficient, wouldn't that depend on how severe the
25  retardation is?  Is it minimal, marginal?   Is it

26

1  moderate?  Is it severe?  Now if it's severe, that
2  might be mitigating.  If it's moderate, that might not.
3  The point being, that's your call.  But you need to be
4  satisfied that we're starting out with the notion that
5  the only requirement that the second question poses --
6  it is no requirement on the State or the defense to
7  produce evidence.  The only requirement is the jury to
8  go back and reevaluate all the evidence in the case with
9  an open mind, with the idea of, if you think there is
10  anything in the case that is sufficient to cause you to
11  think a life sentence is appropriate, then we want you
12  to answer that question yes.
13         If after having gone back over the
14  evidence in the case you're satisfied that the evidence
15  is sufficient to make you think a life sentence would be
16  more appropriate, then we want you to answer that
17  question no.  But a guilty of capital murder, and yes,
18  you're a future danger, that doesn't close the case;
19  because that third question still has to be dealt with.
20  Anybody have any questions about the questions?
21         And the natural reaction would be -- I
22  mean, if I came down here and sat in one of your chairs
23  and somebody asked me that question, well, if you find
24  somebody guilty of capital murder and you find they were
25  a future danger, wouldn't you always answer that third

27

1   question in such a way that the death penalty would be
2   imposed because they're too scary to let out, I'd have
3   to think about that for a second.  But then I'd say to
4   myself, wait just a second.  What if, in a case, a week
5   before the crime for which the defendant was standing
6   trial was committed, what if the testimony was that the
7   defendant, who I knew to be a Vietnam war veteran,
8   Desert Storm veteran, was driving down the street in his
9   car.  There was a fire in the apartment building.  He
10  stops to run in, runs in to risk his own life, saves a
11  couple of kids that would have otherwise surely perished
12  in the fire.  Then testimony is presented to me by some
13  arson official that saw him at the scene.  At any rate,
14  because he got all screwed up in the service, he went
15  off and committed this crime, I might say, maybe, maybe
16  this conduct on that one day, this capital murder, was
17  an absolute aberration as to that individual's life and
18  all the other years of his life.  Maybe that would be
19  sufficient.
20        So, what I'm simply saying is, I'm not
21  asking you to agree with my example.  That's not the
22  point of it.  But the point of it is to expose you to
23  the notion that just because you answer that guilty and
24  yes to One has nothing to do with how you're supposed to
25  answer Two, how you evaluate all the evidence in the

28

1   case, whatever that evidence might be, and answer the
2   question honestly based upon your evaluation of that
3   evidence; because every case is simply remarkably
4   different and all defendants are different.  We all know
5   that.
6         All testimony is different.  We all know
7   that.  You can take the same testimony, exactly the same
8   words, and going on the evidence of whoever the
9   individual is, in your mind, that's the least
10  trustworthy person in the world delivering that
11  testimony.  And then in another case, have exactly that
12  same testimony delivered by whoever it is you think is
13  the most trustworthy person.  So the point being, who
14  delivers the message.  Is the message every bit as
15  important as the messenger?  Because you can have an
16  accurate message; but if you don't believe the
17  messenger, who cares what the message was?
18        Also, all jurors are different.  The
19  twelve folks that will be jurors in this case will be
20  remarkably different from any other twelve jurors.  What
21  I'm saying is we could have four juries in this room at
22  the same time, listening to the exact same testimony,
23  from exactly the same people.  I send you out to
24  deliberate.  We may very well get four different
25  verdicts.  You heard the same stuff.  You heard it the

29

1   same time.  That's why everything is different.  That's
2   why these questions are all independent of each other.
3         And how you answer one, for that reason,
4   does not influence you how you answer the next.  What
5   influences you is the testimony in the case.  Those are
6   the questions, in a nutshell.  Anybody have any
7   questions about the questions?  Okay.
8         We talked about the two punishments
9   alleged, life and death.  We know that death is not
10  going to be difficult for you to figure out.  Sometimes,
11  however, we have some erroneous thoughts about what a
12  life sentence is.  I'm going to tell you in the charge
13  and I'm going to tell you now that in the event in this
14  case, if this defendant is found guilty of capital
15  murder and if these questions are answered in such a way
16  that the law requires the defendant to be sentenced to
17  life in the penitentiary, a life sentence for this
18  defendant in this case for the offense of capital murder
19  means that he cannot be considered eligible for parole
20  until he has actually served forty calendar years.  That
21  is, day for day, week for week, month for month, year
22  for year.
23        Now, what happens at the conclusion of
24  forty years?  I don't know.  But I do know that at the
25  conclusion of forty years, the defendant thereafter

30

1   becomes -- at that time becomes eligible for parole
2   consideration.  Eligibility for parole consideration has
3   absolutely nothing to do with whether parole will or
4   will not be granted.  It is perfectly conceivable in one
5   imaginary set of circumstances some defendant who was
6   convicted at the age of twenty was sentenced to life in
7   the penitentiary, and at the age of sixty becomes
8   eligible for parole.  Might live another twenty years,
9   to the age of eighty, and spends every single second of
10  it behind the bars of the penitentiary.  That is a
11  perfectly legitimate possibility.
12        On the other hand, you might have some
13  other imaginary defendant who is twenty at the age of a
14  conviction, sixty at the age of the forty years and
15  might get paroled.  Don't know what's going to happen in
16  this case.  We can't take into account what might happen
17  in this case in the Year 2039, because that will be the
18  fortieth year.
19        But what we do know is that whether parole
20  will or will not be awarded is based upon evaluations
21  made by prison authorities.  That is to say, what was
22  the person like during the forty-year stay they had with
23  us?  Those evaluations by the prison authorities will
24  be forwarded to the Board of Pardons and Paroles, who
25  will make recommendations to the Governor of the State

31

1 of Texas as to what he or she should do.  The Governor
2 of the State of Texas, whoever he or she is going to be
3 in the year 2039, may very well follow those
4 recommendations and may very well refuse to follow them.
5 We don't know.  The point being, these questions deserve
6 to be answered on the basis of the testimony involved in
7 the instant case, not on the projection or speculation
8 as to what might occur forty years from now.
9          And I'm telling you this rule.  I'm
10 telling you what it is.  I'm also getting ready to tell
11 you, but that can't be an issue now or a determining
12 process to you in deciding how you should answer these
13 questions.  But I don't want you to be in the jury room
14 and have somebody say to themselves, I know deep down
15 that if I answer these questions in such a way that the
16 Judge gives a life sentence, this defendant could be out
17 of the penitentiary in five years.  That's not possible.
18 That's why I'm explaining this to you.  We know it's
19 going to be forty years.  It could be a lot longer.  Any
20 questions about that?
21          Okay.  We have spent time talking about
22 capital murder, and we talked about the fact it's an
23 intentional murder during the course of another major
24 felony; kidnapping in one instance is claimed, another
25 murder, another instance is also claimed.  That means

32

1 that the State is required to prove the existence of
2 those two things beyond a reasonable doubt.  Anytime the
3 State's required to prove two things to you beyond a
4 reasonable doubt, there are three possible outcomes that
5 can occur.
6          Possible outcome number one:  They do
7 prove both of them beyond a reasonable doubt.  If that's
8 the case, your obligation is to find the defendant
9 guilty of capital murder.  Possible outcome number two:
10 They can't prove beyond a reasonable doubt either of
11 those two features.  Cannot prove the intentional
12 murder.  Can't prove during the course of a kidnapping
13 or during the course of another felony.  If that were to
14 be the case, your obligation would be to find the
15 defendant not guilty of anything.  Possible outcome
16 number three:  Maybe they can prove the existence beyond
17 a reasonable doubt of the intentional murder, but cannot
18 prove beyond a reasonable doubt that it occurred in a
19 kidnapping or perhaps the second murder.  Maybe a jury
20 finds that that was done in self-defense, because we
21 said murder is the intentional taking of a life of
22 another human being without any legal justification or
23 excuse.  Self-defense is a legal justification.
24          So, if something like that were to
25 happen -- and I'm certainly not claiming it is in this

33

1 case, because I don't know.  But I do know it's a
2 theoretical possibility.  If that were to happen -- that
3 is to say, the State can prove beyond a reasonable doubt
4 the existence of a murder, but not be able to prove
5 beyond a reasonable doubt the existence of the other
6 felony, I would be required to give you a third option.
7 That is to say, you would have the option of guilty of
8 capital murder.  You would have had the option of not
9 guilty of anything.  The third option, you find the
10 defendant guilty of murder, not capital murder.  Exactly
11 the same crime.  Intentional taking of the life of
12 another human being without a legal justification or
13 excuse, but that you find it wasn't done during the
14 commission of an additional felony.
15          So, what we're talking about is a lesser
16 crime, that being murder, out of a greater crime, that
17 being capital murder.  Just like taking a slice out of a
18 pie.  It's a lesser included offense based upon the
19 evidence in the case.
20          We know the punishment for capital murder
21 is life or death.  The punishment range for murder is by
22 confinement in the penitentiary for life, or by
23 confinement in the penitentiary for a number of years,
24 as long as that number is not less than five, not more
25 than ninety-nine.  And in addition to the confinement, a

34

1 fine not to exceed $10,000 may also be imposed.
2          Now, that's -- that range is so broad,
3 it's almost incredible; but it's broad for a reason.  We
4 know there are all sorts of different circumstances, all
5 sorts of different victims, all sorts of different
6 defendants.  We know that during a person's lifetime,
7 some people are less valuable living than other people
8 are valued at living, meaning the dope dealers who are
9 killed may not be the same value to society as somebody
10 else.  We know that all people who commit crimes are
11 different.  For some people, their conduct in the past
12 may have been exemplary; and for some reason they just
13 went off the deep end and committed this crime.  Other
14 people, they may spend their whole life committing
15 crimes and that's how they survive.
16          So, what I'm saying is that down here at
17 the courthouse, we are not going to be presumptuous
18 enough to ask you people who sit in those chairs to come
19 down here and give of your time and then demand that
20 every case is worth exactly the same punishment.  That's
21 why the range is broad enough, so you can take what you
22 hear and plug it in along that line where you think it's
23 appropriate.
24          So, for example, I know that when you
25 think of murder, when people think of murder, there are

**35**

1  certain things they think of.  And ordinarily, they
2  think of things we're conditioned to seeing on the
3  media, because the media's job is not to be accurate.
4  The media's job is to sell Tylenol, because they don't
5  make a profit.  Being accurate is not going to help.
6          So, my question -- I was going to say
7  this:  For example, you might have a
8  seventy-five-year-old couple, been married for fifty
9  years.  The Mrs. gets sick.  She's on a life support
10  system.  She is not going to survive.  They talk about
11  it.  They pray over it.  She asks him to pull the plug.
12  He thinks about it for a couple of days, and one day he
13  simply walks into that hospital room and pulls the plug
14  and she dies.  Without getting into the morality of this
15  circumstance, in this state that's murder.  That's the
16  intentional taking of the life of another human being
17  without legal justification and without legal excuse.
18          Now, certainly the crime wasn't done
19  maliciously.  It wasn't done out of hate.  It wasn't
20  done out of anger.  It wasn't done out of revenge.  It
21  was done out of love.  Maybe you would not think that
22  would be murder.  Because of the uniqueness of its
23  circumstances, maybe it would be a murder that you were
24  to give a life sentence.  I don't know.  Maybe you
25  would.  That would be your call.  But if you thought it

**36**

1  was worth something less than that, can you see why
2  we've got to give the right to roam, so to speak?
3          So, let me ask each of you this question.
4  Assume with me for just a second you're a juror in some
5  imaginary capital murder case.  Your jury hears all the
6  evidence at the first phase of the trial.  You go out
7  and deliberate; and your jury unanimously determines
8  that the defendant on trial, whoever he or she is, is
9  not guilty of capital murder.  But your jury does
10  unanimously determine that the defendant on trial is, in
11  fact, guilty of murder.
12          You come back and you hear the second
13  phase of the trial.  Whatever that testimony may have
14  been doesn't make any difference, but let's just say
15  this:  Whatever that testimony was, you add it to the
16  testimony about the crime.  If you were a juror in that
17  kind of a case, in that situation, is there anybody here
18  who would refuse to consider sending -- assessing that
19  particular defendant's punishment at confinement in the
20  penitentiary for life?  You thought, after having heard
21  all of the evidence in the case, that that was the right
22  result to reach?  Anybody here who wouldn't consider
23  that if you thought that was the right result?
24          Now, I'm not asking you to commit, would
25  you do it?  I obviously can't, because that would depend

**37**

1  upon the evidence.  I'm simply asking, is that an
2  available sentence option to you if you think the
3  circumstances deserve it?  And I see no reason to think
4  the contrary, that you wouldn't, so I assume.
5          I'm going to take that same question and
6  flip it.  Same kind of jury, capital murder jury.  The
7  jury unanimously finds the defendant not guilty of
8  capital murder, but your jury unanimously finds the
9  defendant guilty of murder.  You come back and you hear
10  the second phase of the trial about the defendant.  You
11  hear the evidence about that, whatever that evidence
12  might be.  Is there anybody here who, after having heard
13  all of the testimony in that particular case, could not
14  consider assessing that imaginary defendant's punishment
15  at confinement in the penitentiary for five years if you
16  find, based upon the uniqueness of the testimony in that
17  case, that that was the right result to reach?
18          Again, not would you do it?  But would
19  that be a legitimate consideration for a sentencing
20  option if you thought the circumstances of the case
21  deserved it?  The idea behind it is whatever result you
22  reach in any case, whether it's capital murder, a
23  murder, whatever it is, we want you to be open to
24  reaching the result that the testimony takes you to,
25  both the crime that was committed, as well as the person

**38**

1  that committed it, as well as the victim in the case.
2  And wherever, within that range of punishment, you think
3  you ought to be because of the evidence, that's where we
4  want you to go.  What you do, that's your call.  But the
5  fact that you're available to all the possibilities,
6  that's the only commitment we're trying to extract from
7  you.  And once you hear the evidence, then you obviously
8  do exactly what you want do.  Any questions about that?
9          Two other things real, real briefly.  And
10  the first thing I'm going to talk about -- I'm not going
11  to talk about the legal steps, but I'm going to talk to
12  you about a concept.  We have a concept in our law that
13  says that anytime a couple of people get together to
14  conspire to commit a felony or commit a crime and that
15  crime is committed, one of those conspirators cannot be
16  convicted only on the testimony of another conspirator.
17  That is to say, there must be some additional evidence
18  other than evidence of the conspirator from some
19  independent source that tends to connect the person on
20  trial to the commission of the crime.
21          For example, another guy and I agree to
22  rob a bank.  I'm the wheel man.  He's the robber.  He
23  goes in, robs the bank, comes back, jumps in the car,
24  and off we go.  The only person that gets seen during
25  the robbery is that idiot, because I sent him in with a

39

1   gun. I'm in the car. I'm okay. We get arrested. Can
2   you see that if that bank robber, if he testifies
3   against me, a conviction cannot be had against me if
4   there is no other evidence in the case other than his.
5         Now the only other evidence, whatever it
6   might be, if there is any evidence from some independent
7   source -- that is, for example, the fingerprints on a
8   bank note -- that tends to connect me to the commission
9   of a crime, something that corroborates what the other
10  defendant says. Is there anybody here who has any
11  dispute with that facet of our law? I don't know if
12  that's going to come into play in this case, but I do
13  know that law applies to all cases. And all we say in
14  the State of Texas is, sure, the person can be convicted
15  upon the testimony of an accomplice, but there has got
16  to be some corroborating feature to the testimony; and
17  that corroborating feature has to be something in and of
18  itself doesn't prove the defendant's guilt beyond a
19  reasonable doubt, but the corroborating feature must be
20  something that ties him to the commission. Anybody have
21  any dispute or qualms with that facet of our law?
22        One last thing. We got two kinds of
23  evidence that exist in the trial of a case, in this
24  town, in this case, in this country. Those two kinds of
25  evidence are direct testimony and circumstantial

40

1   testimony, direct evidence and circumstantial evidence.
2   I want to bring this up, because sometimes we hear
3   people say, I could not ever convict anybody on
4   circumstantial evidence. And they have no idea what
5   you're talking about. The law doesn't care what kind of
6   testimony -- what kind of evidence there is in the case.
7   The law doesn't care if in one case it's all direct.
8   The law doesn't care if in another case it's all
9   circumstantial. And in the third case the law doesn't
10  care if it's some direct and some circumstantial. The
11  law just simply doesn't care about that.
12        The law does care that whatever the
13  evidence is, the quality of that evidence must, to the
14  jury, rise to such a level that it proves the
15  defendant's guilt beyond a reasonable doubt. Just like
16  the law doesn't care how many witnesses there are in a
17  case. Law only cares, do you find those witnesses'
18  testimony to be credible? And does that credible
19  testimony establish a person's guilt beyond a reasonable
20  doubt? Whether it comes from two witnesses or
21  twenty-seven witnesses doesn't make any difference.
22        So, back to the direct and circumstantial
23  evidence business. For example, we all know, because
24  we're conditioned by television -- I am, too -- that the
25  most credible identifying feature about an individual is

41

1   a fingerprint; because even Jack Webb taught you in
2   "Dragnet" that no two people have a fingerprint alike on
3   the face of the world.
4         Now we've gotten into DNA, and that's even
5   more sophisticated; but you see, a fingerprint is
6   circumstantial evidence. And it's circumstantial,
7   because we know that the individual left a fingerprint;
8   but we don't know when the individual left the
9   fingerprint, and we don't know where the object was when
10  the fingerprint was left. Now if the object is
11  immoveable, we can pretty well figure where he is; but
12  if it's a gun and my fingerprints are on a gun doesn't
13  mean I committed the crime, because we don't know why he
14  touched the gun and we don't know where the gun was.
15        So when we talk about direct evidence,
16  we're talking about somebody who saw something; I mean,
17  actually point-blank saw it, or a confession by a
18  defendant admitting he or she committed it.
19  Circumstantial evidence means simply testimony of
20  independent circumstances that, when taken together with
21  other circumstances, can show that somebody committed a
22  crime. It's the quality of the evidence in the case,
23  not whether it's direct or circumstantial.
24        For example, we can have it down here near
25  where they're building the ballpark down here, Enron

42

1   Field. So you might have somebody who is just out there
2   in that area and who absolutely gets shot with a
3   handgun, killed, and he dies. You might have three
4   absolute drunks who were here testifying and who were on
5   the verge of passing out just before the crime was
6   committed. They tell you that, I was drunk as a skunk,
7   but this is what I saw. Can you see how a jury may have
8   difficulty believing beyond a reasonable doubt the
9   reliability of that testimony even though it was direct
10  testimony, direct evidence they saw, according to them?
11        On the other hand, we might have three
12  people, one of whom saw a defendant with a handgun in
13  his hand down there. Ten seconds later, another
14  defendant, or another witness sees a victim fall to the
15  ground after having heard a gunshot. A third witness
16  sees, ten seconds after the gunshot is fired, the
17  defendant with a gun in his hand. And when the
18  defendant is arrested and the gun is taken as evidence,
19  ballistically, it is determined that the bullet in the
20  dead man's body that caused his death was, in fact,
21  fired from that gun. Not a single soul saw the
22  defendant fire the gun. But can you see under those
23  circumstances, that circumstantial evidence might very
24  well be more reliable and trustworthy to a jury?
25        The point being, whether it is or is not

43

1  direct or is or is not circumstantial is not the point.
2  The point is whether you believe it beyond a reasonable
3  doubt. My question to you is this: If, in a case, a
4  capital murder case, there were testimony and that the
5  only testimony in the case was circumstantial but you
6  believed that circumstantial evidence beyond a
7  reasonable doubt, whatever it might have been, it grows
8  to the level you believe it beyond a reasonable doubt,
9  is there anybody here who would refuse to find that
10  imaginary defendant guilty of capital murder simply and
11  only because the testimony was circumstantial and not
12  direct? Again, assume you believed it beyond a
13  reasonable doubt. And I gather that you will.
14         Okay. Anybody have any questions for me?
15  You've just finished your first year in law school. Let
16  me tell you what I think this is about, and this is just
17  my notion. What I think we're embarking upon is
18  something that's meant to accomplish two primary
19  purposes. Primary purpose number one is to give you an
20  overview to what kind of rules can come into play during
21  the course of a trial like this. Now it may be some of
22  these that we've talked about. I don't know. Maybe
23  they all will. I don't know. But I want you to be
24  aware of them; but the ultimate question is going to be,
25  too, if you were a juror in the case, is there anything

44

1  that you have heard so far in terms of these rules that
2  you object to so much that if you were a juror, you
3  would refuse to follow it?
4         Thing number two: I think this process is
5  meant to accomplish for you to be satisfied with
6  yourself, certainly for the lawyers to be satisfied,
7  that if you were a juror in this case, starting out, you
8  have no preconceived idea in the world about what result
9  you'll reach, that you're going to listen to the
10  information they're going to give to you, and you're
11  going to take their information and evaluate it
12  yourself. And based on that, you're going to come up
13  with what you think is the right result to reach. And
14  if it's guilty of capital murder, if it's not guilty of
15  capital murder, if it's guilty of murder, if that comes
16  into play, your job isn't to make the prosecution happy.
17  Your job isn't to make the defense happy, and your job
18  certainly, certainly isn't to make me happy. Your job
19  is to be satisfied with yourself five years from now, or
20  whenever it is, as you look back and say to yourself, I
21  don't remember the names of any of those human beings
22  that were involved in that trial down there at that
23  courthouse, but I do know that I'm still satisfied what
24  I did do was the right thing to do based upon the
25  information that I was given during the course of that

45

1  trial and take that information and apply to it the law
2  of the case. Is there anybody here who feels as though
3  they can't do that anyway?
4         Okay. If you would, please retire to the
5  hallway. We're going to call you in individually, get
6  you out of here just as quickly as we possibly can.
7  Thank you very much.
8         VERA SALDANA GARCIA,
9  having been first duly sworn, testified as follows:
10         VOIR DIRE EXAMINATION
11  BY THE COURT:
12     Q.  How are you today? Please have a seat and make
13  yourself comfortable. Miss Garcia, first off I'd like
14  for you to think back in your mind to the other day, the
15  thing we talked about, add to it this morning the things
16  we've talked about. Out of everything that we have
17  talked about so far, do you have any questions at all
18  for me?
19     A.  One question about -- you put a scenario where
20  there was an older couple that the wife was ill, the
21  husband pulls the plug. I didn't understand what you
22  said after that, whether there was any way -- were you
23  saying there was any way that the juror would not find
24  that person to where they would be eligible to go for
25  more than five years in prison?

46

1     Q.  What I said was, that conduct in this state is
2  murder.
3     A.  Okay.
4     Q.  It is the intentional taking of the life of
5  another human being without any legal justification or
6  without any legal excuse.
7     A.  Okay.
8     Q.  Now, I also said, but can you see that that
9  particular offense was not committed maliciously?
10  Certainly no hate. Certainly no revenge. It was
11  actually committed out of love. Can you see? Just an
12  example. But when people think of murder cases, they
13  just think of something horrible like they see on
14  television; and there are others. And I just threw that
15  out, and maybe that would be the kind of a case that you
16  might not think that seventy-five-year-old gentleman,
17  who had never done anything wrong in his whole life,
18  ought to be sent to the penitentiary for the rest of his
19  life. That was the only point of that, just to see that
20  things are different. Not, what would you do? Because
21  that doesn't come into play at all. It was meant to be
22  a vehicle so that you could see all sorts of different
23  kinds of circumstances, and that's why the range of
24  punishment for murder is so wide.
25         The range of punishment for capital murder

47

1  is not wide at all.  It's life or death, right?
2      A.  Right.
3      Q.  Okay.  Any other questions?
4      A.  No.
5      Q.  Anything that we have not yet talked about that
6  you think we should talk about because it might have
7  some bearing on your service as a juror?
8      A.  No, sir.
9      Q.  Anything at all, Miss Garcia, whether it be
10  something perhaps about your personal life, perhaps
11  something about your professional life, perhaps
12  something about your health, or perhaps something about
13  something else that you feel in any way would interfere
14  with your ability to be a juror in this case during the
15  time frame we've talked about?
16      A.  Well, I do have -- it's just my personal
17  life -- about the death penalty.  I'm kind of with my
18  religious beliefs, but I do also believe that there has
19  to be justice and there has to be law.
20      Q.  And can you -- is what you're saying to me,
21  Miss Garcia, that while you may have intellectual and
22  religious reservations about the imposition of the death
23  penalty, that you recognize there are just simply some
24  sets of circumstances where you think that you would
25  have to put those thoughts aside; and if those

48

1  circumstances do exist, you could and would vote in such
2  a way the death penalty was imposed?
3      A.  Yes.
4      Q.  Not that it would be something you would want
5  to do, and I understand that.  But you do recognize
6  there is -- some of those situations just simply exist?
7      A.  Right.
8      Q.  Before we begin, do you have any questions at
9  all for me?
10      A.  No, sir.
11      Q.  Can you see on all these questions -- all these
12  decisions, I should say, that the jury has to make are
13  all independent of the other decisions that you make?
14      A.  Yes.
15      Q.  That just because you make one for one reason,
16  that doesn't mean necessarily that you'll make the same
17  decision as to the next question; because the next
18  question -- any questions about that?
19      A.  No.
20      Q.  Thank you.
21          THE COURT:  Mr. McClellan?
22          MR. MCCLELLAN:  Thank you, Your Honor.
23              VOIR DIRE EXAMINATION
24  BY MR. MCCLELLAN:
25      Q.  Miss Garcia, my name is Lyn McClellan.  Along

49

1  with Claire Conners, we represent the State of Texas in
2  this case.  I want you to sit back and relax.  We're
3  going to ask you some questions about your answers in
4  the questionnaire, try to get a better feel for what
5  your thoughts and opinions are about a case like this.
6  And we'll start out first of all and just ask you, what
7  are your feelings about the death penalty?  Put it in
8  your own words.
9      A.  The death penalty is something that I -- that
10  we see more and more, and it's because of the violent
11  crimes that are being committed to our society.  And so,
12  there has got to be some kind of justice, maybe just so
13  other people can either be educated that's not right,
14  that there is punishments for those that deserve to be
15  punished.
16      Q.  Now you mentioned to the Judge about religious
17  beliefs, and I see on the questionnaire where you're
18  Catholic.  I'm a member of the Catholic church myself,
19  even though I'm not Catholic.  My wife is, and I know
20  the Catholic church opposes the death penalty.  And the
21  last few weeks we had a homily where the priest talks
22  about the church's stance against the death penalty as
23  punishment for crimes.  How does that work into -- I
24  know you're very religious and go to church every week
25  and take your religion seriously.  And how would that

50

1  affect, if it would, your service as a juror in a case?
2      A.  I believe that I would base it on the
3  circumstances, based on the evidence, based on what was
4  presented without a reasonable doubt.  I would have to
5  do my duty as a citizen.
6      Q.  Okay.  All right.  And I often wonder, not only
7  with Catholics, but with other people who have their
8  religion, or their pastor, or their priest, or whoever,
9  may be in a position to where they, personally, oppose
10  the death penalty; and that's who's leading the church.
11  And I always wonder if a person was on a jury and they
12  happen to go to church on Sunday during the jury service
13  period and the priest or the pastor or whoever the
14  leader in the church was to preach about the fact that
15  the death penalty is wrong and it's a sin, et cetera,
16  for us to participate in that, how that would affect a
17  person who was serving on a jury?  Do you think that
18  would ever have any effect on you?
19      A.  I think, also, again, based on if I -- I served
20  as a citizen, I would need to do my -- what I think my
21  conscience was after all the evidence was presented.
22      Q.  Do you think that would control over your
23  religious beliefs in relation to this particular type of
24  case?
25      A.  I would have to say yes.

51

1    Q.  Okay.  All right.  Because you know that the
2    State of Texas is seeking the death penalty in this
3    case.  We're going to be asking jurors to answer the
4    question that the defendant is guilty of capital murder.
5    Hope to prove that beyond a reasonable doubt and ask the
6    jurors to return a verdict of guilty.  We're going to
7    ask the jurors, in presenting evidence, to answer those
8    questions in such a way that death would result.  And
9    so, we will be seeking the death penalty.  There is no
10   doubt about that.  Do you have any doubts about your
11   ability to participate in a process whereby you would be
12   called upon to make decisions that you knew would result
13   in this Judge ordering the execution of the defendant
14   sitting over here on trial if that's what the law and
15   the evidence called for?
16   A.  I wouldn't have any problem with that.
17   Q.  You had been on a robbery jury before, I
18   believe, in your questionnaire.  Can you tell us
19   something about that?  Was that here in Harris County,
20   I assume?
21   A.  Yeah.  It's been such a long time, but it was
22   where a person was involved in a robbery with another
23   person in a convenience store.
24   Q.  Was there a gun involved, or do you remember?
25   Did somebody go in and hold up a clerk?

52

1    A.  Yes, it was a gun involved.
2    Q.  And y'all reached a verdict -- you need the
3    questionnaire?  Y'all reached a verdict, and you
4    assessed the punishment; is that correct?
5    A.  Yes.
6    Q.  Did the defendant in that case testify, if you
7    recall?
8    A.  No.
9    Q.  And what punishment did y'all assess, if you
10   recall?
11   A.  It was probation, like ten years of probation
12   and community service, I think.
13   Q.  How old was the defendant?  Do you know?
14   A.  About mid thirties.
15   Q.  Do you recall what court that was in?
16   A.  No, sir, I don't.
17   Q.  Can you tell me what, in your -- the jurors'
18   minds and your minds -- when you thought that probation
19   was the prudent punishment as opposed to penitentiary
20   time, what factors entered into that decision?
21   A.  I think there was a mention of the suspect
22   having family, having children; and he didn't have a job
23   at the time, and that kind of thing.  And behind the
24   decision was, among the jurors, that maybe he would be
25   better served being outside and working towards

53

1    providing for his family instead of incarcerated.
2    Q.  Did you -- did this person -- was that the
3    first time this person had ever been in trouble with the
4    law?
5    A.  Well, we weren't told until afterwards that
6    this person had been involved in some other kind of
7    crime.
8    Q.  Okay.  And did that make you --
9    A.  It sort of made me feel like if we would have
10   known some of their history, that maybe the punishment
11   would have been different.
12   Q.  Okay.  All right.  What kinds of -- had he been
13   in the same type of problems before?
14   A.  I think he was involved in some kind of car
15   theft.
16   Q.  Okay.  All right.  You say in your
17   questionnaire that you saw the movie, "Dead Man
18   Walking," I guess?
19   A.  Uh-huh.
20   Q.  What did that -- or what were your thoughts
21   about that movie?
22   A.  Well, it was sad; but then it was -- the crime
23   in that movie was horrendous.  It was something that no
24   one should -- it was just very violent, and there was no
25   reason for any kind of crime like that.  Innocent

54

1    people --
2    Q.  I forget what the crime was that was involved.
3    Do you remember what --
4    A.  It was a young couple.  I think they were
5    both -- they were -- the woman was sexually assaulted
6    and murdered; and both of them were murdered execution
7    style, that kind of thing.
8    Q.  Would that be kind of a crime -- seeing that
9    movie, is that the kind of situation you think the death
10   penalty may be appropriate for that type of a case?
11   A.  Yes.
12   Q.  Do you think everybody can be rehabilitated?
13   A.  Not everybody, no; but given the chance, some
14   people might take the opportunity to be rehabilitated.
15   Q.  You think rehabilitation might be easy for
16   someone who has not committed a violent crime?  You
17   know, somebody that robs a store and doesn't hurt
18   anybody, or somebody that burglarizes a house and
19   doesn't confront anybody, as opposed to a situation
20   where maybe somebody commits the offense of murder or
21   more?
22   A.  I think someone that commits any kind of crime,
23   or crimes that are, I guess, serious, like robbery or
24   something like that can be rehabilitated.  I think just
25   really anyone, but it all depends on their history.  I

55

1    mean --
2        Q.  Do you think rehabilitation depends more on the
3    person, or does it depend upon the type of program
4    that's being used to try to rehabilitate?
5        A.  On a person, definitely.
6        Q.  In the questionnaire it has these five
7    different options here.  One statement that best
8    summarizes your general views about the death penalty.
9    And you chose the one that says, I'm opposed to the
10   death penalty except in a few cases where it might be
11   appropriate.  What kinds of cases come to your mind?
12   What kind of cases come to your mind when you think the
13   cases -- think of cases where it might be appropriate?
14       A.  Well, I think when I filled out the
15   questionnaire, I wasn't too clear on what capital murder
16   was --
17       Q.  Okay.
18       A.  -- what the difference -- you know, different
19   violent crimes; but I think I would still say that my
20   answer would be just that.  But as far as crimes that
21   are committed that are just -- that are awful and a
22   person has no remorse, I would say -- and then there was
23   the evidence that was -- all the evidence was there, and
24   then I would say I do believe in capital punishment in
25   the death penalty.

56

1        Q.  You indicated about what things you think are
2    important in deciding whether a person should be
3    sentenced to death or life imprisonment, and you
4    indicated premeditated crime or hate crimes.  So, I
5    assume then you can think of a case where it's thought
6    out ahead, taking someone's life, as opposed to
7    something that might happen the spur of the moment?  Do
8    you think there is a difference between that or not?
9        A.  I think that sort of falls under hate crime.  I
10   would think anybody wanting to do malicious crime
11   against another human being is -- to me, it's just
12   violent and malicious, either hate or someone thinking
13   about what they want to do.
14       Q.  Now I want to talk to you just for a minute or
15   so about the way this system was set up.  Realize, first
16   of all, if you don't find someone guilty of capital
17   murder, that's the end of the trial.  Everybody goes
18   home.  So before you get to the punishment stage of the
19   trial and you get to these questions, you had to have
20   already found someone guilty of capital murder, which
21   means you had to have found someone intentionally took
22   the life of another person without any legal
23   justification.  They intended to.  It wasn't an
24   accident.  It wasn't self-defense.  They intended on
25   killing somebody, kidnapping, as alleged in one part of

57

1    the indictment.  Or killing one or two persons during a
2    criminal episode is alleged in the second part of the
3    indictment.
4            So, a jury could find either/or, either of
5    those two, or they could find both of those existed
6    regardless of whether you have six people that think
7    it's kidnapping/murder.  Six people may think it's
8    murder during the course of another murder.  You would
9    still return a verdict finding the defendant guilty, as
10   charged in the indictment.  Guilty of capital murder,
11   because both scenarios are capital murder, as defined in
12   our statute.
13       A.  Okay.
14       Q.  If you found someone guilty of capital murder,
15   then you have to look at Issue Number One, which
16   basically asks you to determine, do you believe beyond a
17   reasonable doubt there is a probability that it's more
18   likely than not that the defendant would commit criminal
19   acts of violence that would constitute a continuing
20   threat to society?  If you had found someone
21   intentionally took the life of another person without
22   any legal justification during the commission of another
23   felony, do you think that would be helpful in
24   determining in your mind whether or not it was more
25   likely than not that that person would commit criminal

58

1    acts of violence in the future?  Do you think that would
2    be helpful in making that decision?
3        A.  Yes.
4        Q.  What other type of information, if you can
5    think of something, would you like to know in helping
6    make that decision?  Would it be helpful to know about
7    his background?
8        A.  Yes.
9        Q.  You talked about the trial you were in before,
10   you weren't able to find out about the background of a
11   person.  That would not apply in a case like this.  In a
12   case like this, you would be able to find out about a
13   person's background, criminal history, lack thereof, you
14   know, all kinds of the character, the background, mental
15   abilities or disabilities, any kinds of things about the
16   individual themselves.  Do you think that is helpful in
17   making a determination as to whether or not a person
18   would be a threat to commit criminal acts of violence?
19       A.  Yes.
20       Q.  If you found that a person was guilty of
21   capital murder, then Issue Number One, you found they
22   were a continuing threat to a probability to commit
23   future acts of violence.  Issue Number Two then asks you
24   to look and see if there are any mitigating
25   circumstances, what we call reasons -- any reasons why

59

1  this person ought to receive life as opposed to death.
2  Gives you the opportunity to change your mind from death
3  to life.  If a person -- you found a person guilty of
4  capital murder and if you found they were a continuing
5  threat to commit criminal acts of violence, in your
6  mind, do you think there could ever be anything that's
7  mitigating, that would give you a reason to give the
8  person life as opposed to death?
9     A.  Offhand, I would say no; but under the evidence
10  or the character of the person, there might be some
11  reason.
12    Q.  You'd have to hear it to find out for sure?
13    A.  Right.
14    Q.  And are you open to going through that process,
15  looking for --
16    A.  Yes.
17    Q.  Obviously, that question would give someone an
18  out if they wanted to use it that way who had
19  reservations about the death penalty because of
20  something unrelated to the evidence.  In other words,
21  it's -- take, for example, a person like yourself, whose
22  religion basically says, we shouldn't do the death
23  penalty, though you, personally, believe that justice
24  has to be done.  If that's the right thing, that's the
25  right thing.  That question would give the opportunity,

60

1  obviously, to always say life, even though the evidence
2  may say that; and, you know, nobody would know.  I mean,
3  nobody would be -- other than you, you would know what
4  you did.
5         Can I be comfortable with you, as a juror,
6  in the belief that you will make your decision on what
7  the law and the evidence says and not let your religious
8  preference override the law and the evidence?
9     A.  Yes.
10    Q.  Okay.  Thank you, ma'am.  I appreciate your
11  time, and I'll pass you.
12        THE COURT:  Mr. Hill.  Mr. Wentz.  I'm
13  sorry.
14        VOIR DIRE EXAMINATION
15  BY MR. WENTZ:
16    Q.  Good morning.
17    A.  Good morning.
18        MR. WENTZ:  I'm going to move, if I might,
19  Your Honor.  I'm having -- okay.
20        How are you this morning?
21    A.  I'm okay.  Thank you.
22    Q.  (BY MR. WENTZ) You've had a chance to fill out
23  a questionnaire.  And what I'd like to do, if I might,
24  is to go over some of your responses on the
25  questionnaire.  Would that be okay?

61

1     A.  That's fine.
2         MR. WENTZ:  Your Honor, may I?
3     Q.  (BY MR. WENTZ)  And I think it's a little bit
4  easier if you have it in front of you.  What I'd like to
5  do with you for maybe about the next fifteen minutes or
6  so is try to learn a little bit more about you.  And
7  this is a pretty unfair process, because you've already
8  told us so much about you.  But as we talk, I'd really
9  appreciate it if you would tell me the reasons for your
10  answers; because they interest me just as much as what
11  your answers are.  Okay?  So if you would maybe expound
12  upon why you're saying what you're saying, I'd
13  appreciate it.
14        You've indicated that you come here today
15  in this capital murder situation with some religious
16  reservations about the death penalty; but knowing what
17  the process is, knowing what the death penalty system
18  is, that you could participate in it.  Is that an
19  accurate statement of your feelings?
20    A.  Yes, yes.
21    Q.  In your conversation with Mr. McClellan, you
22  used the word justice a couple of times in terms of what
23  the result might be.  Do you feel that justice, as it --
24  as you see it, requires somebody receiving the death
25  penalty if they're guilty of capital murder?

62

1     A.  I think so, yes.
2     Q.  So, in other words -- it's a really big --
3  in my mind, it's always been a really big determination
4  when somebody looks at the evidence, believes beyond a
5  reasonable doubt that a crime of capital murder
6  occurred; and they brand that person a capital murderer.
7  Because to me, that says an awful lot about their
8  conduct.  It's reprehensible.
9         And then you get to that punishment phase.
10  And I guess what I need to ask you, if I could -- and if
11  you could elaborate a little bit more.  You know that we
12  have these Special Issues.  Are you telling us that,
13  having found somebody guilty of capital murder during
14  the intentional taking of somebody's life, that when it
15  comes to the punishment phase, that you would always
16  answer the Special Issues in such a manner that the
17  person would receive the death penalty so that justice
18  might occur?
19    A.  Yes, I would.
20        THE COURT:  Ma'am, listen to the question.
21  Would you always answer those questions in such a way
22  that the death penalty occurs?  That would mean no
23  matter what the evidence was?  And if that is your
24  answer, that's fine; but that's -- I'm not satisfied
25  that, based upon what I've heard from you so far, that

63

1  that is your answer.
2         VENIREPERSON:  I'm sorry.  I guess I
3  misunderstood.
4         THE COURT:  The question, as I heard it
5  was, if you found somebody guilty of capital murder,
6  would you always answer these questions in such a way
7  that the death penalty was imposed?
8         VENIREPERSON:  Oh, I'm sorry.
9         THE COURT:  See, always is the key word in
10  that question.
11        VENIREPERSON:  No, I couldn't say that I
12  would answer those questions like that.
13     Q.  (BY MR. WENTZ) Okay.  When you looked at the
14  questionnaire -- and could you tell me why your feelings
15  are that justice might incline you to feel that the
16  death penalty would be the appropriate punishment for
17  somebody who is guilty of capital murder?  Just what are
18  your feelings that lead you towards that direction?
19     A.  Well, I guess in our society, the way there is
20  so many crimes that if we don't believe in the law, that
21  they are going to be just that someone who has committed
22  a crime should be punished.  If it's a crime that
23  deserves the death penalty, then it should be.  It's
24  just, to me -- I guess maybe justice is not the right
25  word.  But to me, that's how I see it, that someone that

64

1  has committed a crime, /TWERPT society here (CH) and we
2  come to court.  And based on the evidence and
3  everything, then we make that call, whether someone has
4  committed a crime.  And if they have, then they need to
5  pay the price of what -- of that crime.
6     Q.  Okay.  Now when we talked about Special Issue
7  Number One, you know that when it comes time to answer
8  that Special Issue, that you will always have the facts
9  of the case.  In other words, you will have the facts
10  that prove to you beyond a reasonable doubt that this
11  person is guilty of capital murder.  And it asks you to
12  determine for yourself whether or not you believe there
13  is a probability that that person would commit future
14  criminal acts.
15         And I think you've indicated that you have
16  a concern with crime occurring.  And we talked about
17  probability, and I think the Judge even mentioned
18  possibility.  Do you feel that the person who commits a
19  capital murder is exactly the kind of person who is
20  probably going to commit criminal acts of violence in
21  the future?
22     A.  That could be, but I can't say for sure that a
23  person that commits a capital murder will be a threat to
24  society after that.  But if everything is with the
25  evidence and everything that they have the character,

65

1  the person, then it has to be -- it's a decision based
2  on what is represented.
3     Q.  Okay.  And the reason I ask you about that is
4  that you would say, basically, what these words mean,
5  it's just what the Judge told us, what they mean to you.
6  And we use that word, probability or possibility.  Do
7  they mean the same thing to you, or do you see a
8  distinction?  Or tell me about that.
9     A.  Well, I took his explanation of probability as
10  opposed to the other two words that he used.  I can't
11  remember exactly right now those other two words, but
12  there is a distinction between probability and --
13     Q.  Possibility?
14     A.  -- possibility, right.
15     Q.  I know when you come to find somebody guilty of
16  a capital murder, obviously that tells you a whole lot
17  about that person.  At least, I would think that it
18  would.  What does it tell you about the person if you
19  found them guilty of capital murder?
20         Let me give you an example.  If I hear
21  that somebody has gone out and gotten two public
22  intoxications within a short period of time, I'm going
23  to assume pretty much that that person probably has a
24  problem with alcohol.  You know, that's what I get from
25  that type of decision.  What type of information does

66

1  finding somebody guilty of capital murder tell you.
2     A.  Tells me that they had a situation where they
3  just -- they decided they were going to do whatever they
4  were going to do, without even thinking of what the
5  outcome was going to be, so they didn't take nothing
6  into consideration.  It was just an act --
7     Q.  Okay.
8     A.  -- of violence.
9     Q.  Given your feelings, you've talked about
10  Special Issue Number One or Two; and you've indicated
11  that you feel that you could -- that's not an automatic
12  given for you?  Is that what you're telling me?
13     A.  Right.
14     Q.  When you were talking with the prosecutor about
15  Special Issue Number Two, I think you indicated that --
16  I think your words were, Nothing would be mitigating;
17  because at the point that Special Issue Number Two comes
18  into play, you've found a person guilty of a capital
19  murder.  You also have found that person is going to be
20  a future danger to society.   And from what you've told
21  us about the punishment fitting the crime and your views
22  of justice, could you answer Special Issue Number Two
23  yes?
24     A.  Would it be yes for me?
25     Q.  No.  Could you ever imagine answering Special

67

1  Issue Number Two yes, having found somebody guilty of
2  capital murder, and believe they were going to be a
3  future danger to society?
4      A.  Okay, yeah.  You're talking about Special Issue
5  Number Two or --
6      Q.  Two, yes, I'm sorry.  You can see why I moved?
7      A.  Yeah.
8          THE COURT:  Question is, is it possible
9  for you to answer the question yes, ma'am, if the
10  evidence would support a yes answer?
11      A.  There is a possibility, yes.
12      Q.  (BY MR. WENTZ)  And Special Issue Number Two,
13  as you've been talking with Mr. McClellan about it, he's
14  talked about this search for mitigation.  But it's not
15  just a search.  It's also the determination for you as
16  to whether or not anything could ever be sufficient to
17  warrant somebody receiving a life sentence, who was a
18  capital murderer, who was a future danger to society?
19          So, you can very well commit yourself to
20  the search for this thing called mitigating evidence.
21  But you think there is anything that could ever be
22  sufficient for you that would allow you to answer that
23  Special Issue yes?
24      A.  Something sufficient, now, I would have to say
25  yes.

68

1      Q.  Could you tell us what that might be?
2          MR. MCCLELLAN:  I'd object, Your Honor.
3          THE COURT:  Sustained.
4          VENIREPERSON:  Well, if I understand this
5  correctly, based on the character of the person, of
6  course -- I think the example the Judge put before us
7  was if someone that committed a crime maybe a few days
8  before had run in to save children's lives from a
9  burning building or something like that, that kind of
10  character, I would have to say that I would consider
11  that, but only if it applies -- I mean, only if there is
12  something that would really stand out beyond everything
13  else that was presented, you know, the character of the
14  person, who led him to commit a crime, the crime that he
15  committed.  But if there was something about a person,
16  then I would have /TKHRAOPLDZ question.
17      Q.  (BY MR. WENTZ)  Okay.
18      A.  Is that what you're asking?
19      Q.  I'm listening.  Whatever you're telling me is
20  the answer, that's fine.  One of the things -- and I saw
21  the movie; I didn't read the book -- when that film,
22  "Dead Man Walking," came to be revisited -- or it came
23  out that what happened in trial was really different
24  than what happened in reality.  It was still bad.  I'm
25  not saying it wasn't.  But you remember how at the end

69

1  we realized a bad crime had happened, but it was a
2  different crime than happened in court in terms of what
3  the evidence was?  Do you think you could consider how a
4  crime occurred and determine Special Issue Number Two?
5  Because it asks you to consider the circumstances of the
6  crime, the person's character, as well as his moral
7  culpability.
8      A.  I didn't understand your question.
9      Q.  Well, you know, sometimes there may be some
10  reservations you have about the person, how the crime
11  was done.  Maybe it wasn't self-defense, but there was a
12  cloud over how the crime occurred.  Do you see how that
13  could be a factor for you to consider?
14      A.  I still don't understand.
15      Q.  I guess what I'm saying is, you look at all the
16  evidence.
17      A.  Right.
18      Q.  And that's the circumstances of the crime.
19  There may be something about how the crime occurred that
20  renders the person less blameworthy, such as -- you
21  know, you used this example with the Judge.  There may
22  be a situation where there may be some doubt about who
23  may have done what.  Not enough that you're not sure
24  beyond a reasonable doubt, but there may be some
25  lingering concern of yours about how the crime occurred.

70

1  And you could say that, Well, this concern does give me
2  some uneasiness; and maybe life is the proper punishment
3  for this particular crime.  Might be less responsible
4  than somebody else?
5      A.  Okay.
6      Q.  And that's the type of evidence that you could
7  consider, also?
8      A.  I could consider that.
9      Q.  One of the things people often want is feelings
10  of remorse and sorrow for what somebody did in terms of
11  punishment.  And you know that a defendant has a right
12  against self incrimination.  Would you require the
13  defendant to testify at the punishment phase of the
14  trial?  Before you could answer those Special Issues no
15  or yes, before you would find him worthy of life, would
16  you require him to testify?
17      A.  No.
18      Q.  Because realistically, that's really the only
19  place those personal feelings of remorse could come
20  from, or regret.  Would you agree with me?
21      A.  Yeah, I would agree to that; that's right.
22      Q.  But you would not require him to testify at the
23  punishment phase of the trial?  Is that what you're
24  telling us?
25      A.  Well, I guess no, I wouldn't require.

71

1      Q.   Let me look at your questionnaire.  Ma'am, what
2  would you like to tell us about yourself that you think
3  we should know before I sit down?
4      A.   Other than I pride myself in being a citizen,
5  and I want crime -- it is very important that crime does
6  start -- that crime -- there is programs to help people.
7  Maybe not help, but just -- I just feel like there is
8  just too much crime.  And I have children, and I want
9  them to have a successful adult life like everybody else
10  and not in fear of violent crime.
11      Q.   Given your feelings, the importance of this
12  case, can you presume Charles Mamou not guilty, innocent
13  at this time?
14      A.   Yeah, because I haven't heard anything.
15      Q.   Thank you very much.
16      THE COURT:  Thank you, Miss Garcia.
17  Listen to me, ma'am.  In just a second I'm going to
18  excuse you.  Before I do, I will tell you that we want
19  you back here two weeks from today.  As I told you the
20  other day, we're talking to folks on an individual basis
21  for the purpose of creating a pool or a panel of about
22  forty-eight people.
23          We'll have all forty-eight people here two
24  weeks from today.  Every one of those people will have
25  been through exactly what you've been through.  You may

72

1  spend as much as two hours with the group, but it's not
2  going to be a long process is what I'm saying.  At the
3  conclusion of that process, everybody will leave here
4  knowing definitely whether they are or are not a juror
5  in the case.
6      VENIREPERSON:  Okay.
7      THE COURT:  Between now and when we see
8  you again, Miss Garcia, don't you alter your schedule
9  for us.  Do your professional things just exactly like
10  you would ordinarily do them.  Do your personal things
11  like you would ordinarily do.  If you have a chance to
12  leave town for a couple of days, take the chance.
13          All that we ask of you between now and
14  when we see you next is this:  Do not talk about this
15  case with anybody.  Do not permit anybody to talk about
16  this case.  If there should be any media treatment about
17  this case, avoid it.  Anything about this case on the
18  television, refuse to watch it.  Newspaper, refuse to
19  read it.  Radio, refuse to hear it.
20          And the reason for each of those
21  restrictions, Miss Garcia, is to attempt to accomplish
22  the same result and that's this:  If you become a juror
23  in the case, the decision that you reach, whatever it
24  is, that decision must be based exclusively upon the
25  information that you received from here inside the

73

1  courtroom.  It cannot in any way be affected or
2  influenced by any information you receive outside the
3  courtroom.
4      VENIREPERSON:  Okay.
5          (Court gives further instructions and
6  venireperson is excused for the day.)
7          JAMES THOMAS PRYOR,
8  having been first duly sworn, testified as follows:
9          VOIR DIRE EXAMINATION
10  BY THE COURT:
11      Q.   First off, Mr. Pryor, let me ask you this:
12  Taking into account the things we talked about whatever
13  day it was, add to it the things we've talked about
14  today.  Out of everything that we have talked about so
15  far, do you have any questions at all from me?
16      A.   No.
17      Q.   Is there anything, Mr. Pryor, that to this
18  point we have not touched on that you feel as though we
19  ought to put it on the table and address it, because it
20  might have some bearing on your service as a juror in
21  this case?
22      A.   Yes, sir.
23      Q.   Okay.  Sir?
24      A.   I mentioned in my survey, and also the other
25  day when you asked I raised my hand, that I'm on a

74

1  transition team for Exxon with Mobil.  And that
2  transition team has been working for several weeks and
3  will continue to work close through the change of
4  control, which is anticipated to occur on October the
5  1st, 1999, which you could read that in the paper this
6  morning.  There is only -- out of 120,000 employees
7  between the two companies, there is less than a thousand
8  on the transition teams.  And the purpose is to plan
9  acquisition and talk to the employees at the time of
10  change of control.  It's very, very possible that that
11  change of control is going to occur shortly before or
12  during this trial, and I'm in a position to where I will
13  either be here or there.  And either place, I'm going to
14  have my mind in two different places; but I'm the only
15  excise tax manager for Exxon in the country, and I have
16  some fifty employees that I have to worry about.  So,
17  that's my major concern.  Other than that, everything
18  I've heard I could handle.
19      Q.   If I'm hearing you correctly, we know that if
20  after today you come back on the 29th, and if nothing
21  works out on the 29th and if you're not selected on that
22  day, everything is okay?
23      A.   Absolutely.
24      Q.   Okay.  Then let's just ride with that in mind.
25  We'll see what happens then.

75

1    A.   Okay, that's fine.
2    Q.   Anything other than that, anything in your
3  personal life, any health situations you feel might
4  have --
5    A.   No, sir.
6    Q.   Okay.  I guess the sum total, Mr. Pryor, before
7  the lawyers talk with you -- sum total of what I was
8  trying to do this morning was to try and point out that
9  there is no automatic answer in a situation like this.
10  The bodies from which all the information is extracted
11  is the same common body, but it asks different
12  questions.  And therefore, you have to look at it a
13  little bit differently.  And I'm sure you have far
14  better examples in your business of what you do than
15  what I can dream up now.  But I'm going to encourage you
16  to ask whatever question you have of me, if you do have
17  one.  I'm hopeful you don't.  And if you don't, I'm
18  going to turn you over to Mr. McClellan.
19          THE COURT:  Go ahead, sir.
20              VOIR DIRE EXAMINATION
21  BY MR. MCCLELLAN:
22    Q.   Mr. Pryor --
23          THE COURT:  Excuse me.  I don't know if
24  you guys were doing some stuff; but if I heard Mr. Pryor
25  correctly, he's copesetic for today, as well as for the

76

1  29th.
2    Q.   (BY MR. MCCLELLAN)  Right, but the real
3  issue -- and we're going to ask him about that.  Today,
4  or the 29th, or whatever days, if you're on the jury,
5  are you going to be able to give your undivided
6  attention to what's happening in the courtroom?  Which I
7  believe everybody would possibly be in agreement that
8  you need to do in order to be a fair juror to both
9  sides.  If you can, that's fine.  If you can't, we need
10  to know that.  Might as well know it today.
11    A.   Absolutely.  I think that if the change of
12  control occurs, let's say, shortly before or during this
13  trial, then I'm put in a position to where somebody is
14  having to talk to my employees while I'm here telling
15  them they have a job, what that job will be, and where
16  it will be.
17          And to answer your question as directly as
18  I can, if that happens during this trial, it's going to
19  be very difficult for me to not worry about what's going
20  on there and probably having to, once the trial day is
21  over, check in to see what's going on.
22    Q.   All right.  And what I'm looking for -- and
23  only you know the answer.  The law doesn't allow us to
24  excuse somebody because they don't want to be here or
25  because they have work commitments or whatever.  If

77

1  there were commitments, if there are other things in
2  life that are going on in their life, whether it maybe
3  somebody was having cancer treatment, or somebody's
4  going through a divorce, or somebody has a merger
5  situation, if it's going to keep you from giving your
6  undivided attention to this case -- because it's
7  important for us; it's important for the defendant.  His
8  life is at stake, and we have victims that we represent.
9  And it's very important for us.  We want people to give
10  their undivided attention to this.  If you can do that
11  say, You bet you I can.  Don't worry about it.  Let's go
12  on.  If there is doubt in your mind about your ability
13  to do that, that's what we need to know now.
14    A.   Absolutely.  What I'm saying is I can't think
15  of any other circumstance in my life that would keep me
16  from doing that except something similar to what I'm
17  describing to you right now.
18    Q.   So, you're saying you can assure us you can
19  give your undivided attention?
20    A.   No, I cannot.
21          THE COURT:  Mr. Pryor, thank you very
22  much.
23          There is an agreement that Mr. James
24  Pryor, Venireperson Number 49, may be excused.  Is this
25  your agreement, Mr. McClellan?

78

1          MR. MCCLELLAN:  Yes, Your Honor.
2          THE COURT:  Mr. Hill?
3          MR. HILL:  Yes, Your Honor.
4          THE COURT:  Mr. Wentz?
5          MR. WENTZ:  Yes, Your Honor.
6          THE COURT:  Yours, Mr. Mamou?
7          THE DEFENDANT:  Yes, Your Honor.
8          THE COURT:  Are you agreeing he may be
9  excused?
10          THE DEFENDANT:  Yes, sir.
11              ROSE CRAWFORD TURNER,
12  having been first duly sworn, testified as follows:
13              VOIR DIRE EXAMINATION
14  BY THE COURT:
15    Q.   Miss Turner, first let me ask you this:  Out of
16  everything that we talked about, both this morning, as
17  well as the other morning when the whole group was here,
18  do you have any questions at all for me?
19    A.   No, sir.
20    Q.   Is there anything, Miss Turner, that up to now
21  we have not yet talked about that you feel as though we
22  should, because it might have some bearing on your
23  service as a juror in this case?
24    A.   No, sir.
25    Q.   Is there anything that you can think of at the

79

1  present, ma'am, whether it might be something that has
2  to do with your family, something that has to do with
3  your job, something to do with your health, or something
4  unrelated to those things, that you think in any way
5  would interfere with your ability to be a juror in this
6  case during the time frame that we've talked about?
7      A.  No, sir.
8      Q.  Can you see from our conversation this morning,
9  Miss Turner, that in a trial like this, everybody --
10  both sides -- deserve to have jurors who can return a
11  verdict based upon the evidence in that particular case?
12      A.  Yes, sir.
13      Q.  And can you see how just because somebody might
14  be found guilty of capital murder, that fact and that
15  fact alone does not necessarily mean how those questions
16  should be answered?
17      A.  Yes, sir.
18      Q.  You'll have to look at everything.  And does
19  that sound like something you can do?
20      A.  Yes, sir.
21      Q.  Any of these rules that we've talked about that
22  you find you have any disagreement about?
23      A.  No, sir.
24      Q.  Before I turn you over to the lawyers, do you
25  have any questions?

80

1      A.  No, sir.
2              THE COURT:  Mr. McClellan.
3              MR. MCCLELLAN:  Thank you, Your Honor.
4                  VOIR DIRE EXAMINATION
5  BY MR. MCCLELLAN:
6      Q.  Miss Turner, we're going to have to get you to
7  say something other than "yes, sir" and "no, sir."
8  We're going to have to figure out another question here.
9  I appreciate your responses.
10          Let me just -- my name is Lyn McClellan.
11  This is Claire Conners.  We represent the State of Texas
12  in this case.  Can you just tell me in your own words
13  what your opinion is about the death penalty?
14      A.  Well, the death penalty is a law that's
15  established by the State; and I've learned to accept the
16  laws, because all things come from God.  And whether I
17  see it as good or bad, it exists because of the law of
18  the land and I accept it.
19      Q.  Okay.  If you were making the laws, would you
20  keep the death penalty or would you do away with it?
21      A.  Keep it.
22      Q.  Okay.  Do you think it's proper punishment for
23  certain types of crimes?
24      A.  I do, yes.
25      Q.  What kinds of things come to your mind --

81

1  excuse me -- when you think of cases where you think the
2  death penalty might be proper?
3      A.  When a life is taken maliciously, and no
4  concern for the victim, and the consequences of what is
5  brought about.
6      Q.  Okay.  All right.  Now, there is something in
7  your questionnaire I want to go over and ask you and try
8  to get a better feel for what you were telling us in the
9  questionnaire.
10      A.  Okay.
11      Q.  You indicated that you had a cousin who was
12  killed at age thirteen, and I think you were the same
13  age?
14      A.  Yes, sir.
15      Q.  What happened in that event?  Is that -- well,
16  how did he get killed?
17      A.  My uncle was having an adulterous relationship
18  with the person that did the killing, and he was angry.
19  So, the person came back and shot through my aunt's
20  house.
21      Q.  And happen to strike him?
22      A.  And striking him as a result.
23      Q.  Was he prosecuted?
24      A.  Yes, sir.
25      Q.  What happened to that?

82

1      A.  Well, this happened in Ohio.  And at that time,
2  Ohio did not have a death penalty; so, he was just
3  sentenced to life.
4      Q.  Do you think that was proper?
5      A.  Yes, sir.
6      Q.  You also indicated you had, I believe, a family
7  or a friend of yours whose son was killed?
8      A.  Yes, sir.
9      Q.  How long ago was that?
10      A.  Oh, possibly about three years ago.
11      Q.  What happened?  What were the circumstances
12  surrounding that?
13      A.  He was dealing with drugs, and at some point in
14  time his life was -- he was killed.
15      Q.  Okay.  Over drugs?
16      A.  Over drugs.
17      Q.  Was anybody prosecuted for that crime?
18      A.  I don't know.  I didn't follow up with it after
19  that.
20      Q.  Do you think somebody should have been
21  prosecuted for that crime?
22      A.  I don't know the circumstances, so I can't say.
23      Q.  Obviously, he was dealing in drugs and he was
24  doing wrong.
25      A.  Uh-huh.

83

```
 1     Q.  Do you think that justifies him being killed?
 2     A.  No, sir, I don't think it justifies him being
 3  killed.
 4     Q.  All right.  Now, you say you have a daughter
 5  who was working at T.D.C.  I guess "was" means she no
 6  longer is?
 7     A.  Right.
 8     Q.  As a correctional guard?
 9     A.  Right.
10     Q.  What unit did she work in?
11     A.  She worked at a couple of units.  She worked in
12  Rosharon, she worked in Dayton, and she worked in
13  Beaumont.
14     Q.  What does she do now?
15     A.  She's now going to school for a peace officer
16  at Houston Community College.
17     Q.  Okay.  And have you talked with her about her
18  job?
19     A.  Oh, yes, on numerous occasions.
20     Q.  Told you about things that happen in the
21  penitentiary, et cetera.  Anything about that or that
22  relationship or those conversations that would affect
23  you in being a juror in a case like this?
24     A.  No, sir.
25     Q.  Okay.  She wants to be a peace officer?
```

84

```
 1     A.  Yes, sir.
 2     Q.  She wants to continue in this area?
 3     A.  Yes, sir.
 4     Q.  Now your other daughter, I think, is in medical
 5  school?
 6     A.  Yes, sir.  She just graduated from University
 7  of Houston, and she wants to go to med school at Baylor
 8  College.  And she now works at Baylor and is in the
 9  biochemistry lab.
10     Q.  All right.  Very good.  Now, you also
11  indicated -- well, you're also a nurse in the nursing
12  field, right?
13     A.  Yes, sir.
14     Q.  Your life is dedicated to helping people and
15  taking care of people and making them well.  We're now
16  asking you to possibly sit on a jury where you would be
17  asked to take someone's life.  Would that cause a
18  problem in that you would say, Wait a second.  I spend
19  all my life helping people, and now they're asking me to
20  sit over here and possibly take someone's life if I find
21  out they did something wrong?  Would that cause you a
22  problem?
23     A.  I don't see it as I'm taking someone's life.
24     Q.  Okay.
25     A.  The way I see it is I'm sitting here to
```

85

```
 1  evaluate evidence that has been given to us and then to
 2  come up with a decision based on the evidence.  And so,
 3  I don't see it as I am personally taking someone's life.
 4     Q.  Right.  I understand.  Do you -- you know, some
 5  people come to us and say they believe in the death
 6  penalty.  They think it's a proper type punishment for
 7  certain types of crime.  Some other people, though, come
 8  in and say they don't think they could ever participate
 9  in a process where they would be called upon to make
10  decisions if they knew the decisions they were going to
11  make would result in this Judge ordering the execution
12  of this defendant sitting over here on trial.  Do you
13  have any doubts about your ability to participate in
14  that type of process and make that type of decision if
15  that's what the law and the evidence called for?
16     A.  No, sir, I have no problem.
17     Q.  All right.  Now, also, you indicated that your
18  husband had been to the penitentiary?
19     A.  Yes, sir.
20     Q.  And for drugs?
21     A.  Yes, sir, for drugs.
22     Q.  And how long ago was that?
23     A.  As a matter of fact, he's still there.
24     Q.  Okay.  All right.  When was he sent there?
25     A.  It's been eight years.
```

86

```
 1     Q.  Okay.  How much time did he get?
 2     A.  He got forty-five years.
 3     Q.  Okay.  For possession, or delivery, or what?
 4     A.  They said possession with the intent to
 5  deliver.
 6     Q.  Okay.  And did he have a trial?
 7     A.  Yes, sir, he had a trial.
 8     Q.  And did you attend the trial?
 9     A.  Yes, sir, I did.
10     Q.  Did you think he was treated fairly or
11  unfairly?
12     A.  I thought he was treated fairly.
13     Q.  Do you think what he did was wrong?
14     A.  I think -- this is what I tell him:  These are
15  the consequences of your choices you made.  You make bad
16  choices, you have bad consequences.  You make good
17  choices, you have good consequences.  And these are just
18  the consequences of your choices.
19     Q.  Is this the first time he had been in trouble
20  with the law?
21     A.  This is the first time since we were together;
22  but he told me twenty years ago, prior to us being
23  married, he had been in trouble with the law when he was
24  twenty.
25     Q.  Had he gone to the penitentiary then?
```

87

1    A.  He said he went for five years.

2    Q.  What crime then?

3    A.  I think it was robbery he told me.

4    Q.  Did you know that when you married him?

5    A.  No, sir.

6    Q.  Did you find that out then before the trial or

7 during the trial?

8    A.  I found it out before the trial.

9    Q.  Did you find out before he committed the crime

10 of the drugs?

11    A.  I found it out during that time.

12    Q.  During that time.  That's what brought it up?

13    A.  That's what brought it all up.

14    Q.  Now, uniquely -- to me, anyway -- when you list

15 in here the people you respect most, you put your

16 pastor, your mother, and your husband.

17    A.  Because the reason why I put my husband,

18 because he's accepted it.  He's understood.  He now

19 learns his errors.  And hopefully, with God on his side,

20 he can come out whenever he comes out and become a

21 productive citizen.

22    Q.  Okay.  You put on your questionnaire you were

23 separated.  I assume that's because he's in the

24 penitentiary, and you're here, and not any other type of

25 conflict?

88

1    A.  Exactly.

2    Q.  Okay.  How did your daughters accept that?

3    A.  It was rough for all of us.  It was pretty

4 rough for all of us, but that's -- at that point in

5 time, that's when we really got close to the Lord.  And

6 through our closeness with God, it held us together; and

7 it has given us all a different viewpoint on life, and

8 we were able to go on.  And my daughter finished

9 school -- because it's been eight years -- and she

10 finished college.  And my other babies -- my oldest one

11 still wants to be in law enforcement, so I use that as

12 an experience in life.

13    Q.  You indicated you don't believe people ought to

14 have -- the only people that ought to have handguns are

15 police?

16    A.  Yes, sir.

17    Q.  Any bad experiences with handguns that

18 personally affected you or your family?

19    A.  Just the incident with my cousin, when he was

20 killed at thirteen.

21    Q.  Finally, let me ask you one other thing.

22 You're obviously a very religious person.  You accept

23 your religion and practice it very sincerely.  You

24 indicated your pastor is one of the persons you most

25 respect.  Do you know what your church's position is, if

89

1 they have one, on the death penalty?

2    A.  There is some people in my church that don't

3 agree with the death penalty at all, but I attribute

4 that to their lack of knowledge to what God says about

5 authority.  And when we have that conversation, I bring

6 it up to them, Well, do you know what God says about

7 authority, whether you see it as good authority or bad

8 authority.

9    Q.  What is it about your position on what God says

10 about authority?

11    A.  God says authority -- he has allowed all

12 authority to be in existence, whether I see it as good

13 authority or whether I see it as bad authority.  And if

14 I have a problem with authority, ultimately I have a

15 problem with what God says.

16    Q.  Would you have any problem with sitting on a

17 jury, making a decision about the death penalty and,

18 say, in finding someone ought to receive the death

19 penalty for a crime they've committed, going back to

20 your church and people saying, I can't believe you sat

21 in judgment and found somebody guilty and then found

22 they ought to get the death penalty?

23    A.  No, sir.  And I've talked to my pastor about

24 this, and he cleared it up to me.  So, I say whatever --

25 if I'm chosen, then I'll do what I feel is right within

90

1 my soul.  And that's how I see it.

2    Q.  What did your pastor say about it?

3    A.  I said, he's the one that took me to the

4 scripture on authority again and told me we have to

5 learn how to abide by the rules that exist in our

6 society today.

7    Q.  Okay.  The job of a juror is to a true verdict

8 render based on the law and the evidence.  I would

9 expect that you could not tell me what you're going to

10 do in a case until I can tell you what the evidence is

11 going to be in the case.  Would that be right?

12    A.  That's correct.

13    Q.  So, you don't have any preconceived notions.

14 Now, they're easy to come by because somebody says,

15 Well, if you found someone guilty of capital murder,

16 well, that automatically conjures up in somebody's minds

17 something; but as the Judge told us a long time ago, we

18 can't talk about the facts of this case.  That's going

19 to come from the witness stand.  We're not going to talk

20 about it during voir dire.  We're just trying to find

21 people who can listen to facts and determine the result

22 that ought to happen as a result of deciding what the

23 facts are and following the laws the Court gives you.

24    That means, as I say, there is no case in

25 the State of Texas or anywhere else in the nation that I

91

1    know of where you get the death penalty, automatically,
2    as a result of finding someone guilty of capital murder.
3    It will always depend upon the facts and circumstances
4    both as to whether or not a person is guilty or not and
5    to whether or not what the punishment ought to be;
6    because there is two possible punishments, life or
7    death.  But they're decided by answering questions up
8    here and not by going back and voting for life or death.
9        So, if someone tries to commit me to what
10   I would do, I think my automatic response would always
11   have to be, Well, I'd have to hear the facts and I'd
12   decide.  Somebody might say, Well, if I found someone
13   guilty of capital murder, going to Issue Number One,
14   wouldn't I think that there is at least a probability
15   that they would commit criminal acts of violence that
16   would constitute a continuing threat to society?
17       Well, in some cases there well may be.
18   But there may be other circumstances where I find
19   someone guilty of capital murder; but because of their
20   background and character and everything, I think they've
21   learned from their experiences.  I don't think they'll
22   be a threat in the future.  So, are you open to both
23   issues when waiting to see what the evidence shows and
24   what is proven?
25       A.  Yes, sir, I am.

92

1        Q.  Do you visit your husband in the penitentiary?
2        A.  Yes, sir, I do.
3        Q.  Do your daughters, also?
4        A.  Yes, sir, we do.
5        Q.  We represent the State of Texas.  We're going
6    to be seeking to have jurors find the defendant guilty
7    of capital murder, try to present evidence that proves
8    to y'all beyond a reasonable doubt the defendant's
9    guilty of capital murder.
10       Then we're going to present further
11   evidence that we hope convinces you beyond a reasonable
12   doubt as to Issue Number One.  There is a probability he
13   would be a continuing threat to future acts of violence.
14   You could answer that yes; and on Issue Number Two,
15   while there is no burden of proof, we're going to
16   contend the evidence will not raise any mitigating
17   circumstance that is sufficient to change your vote from
18   death to life.
19       Mitigating circumstances mean reasons why
20   someone might ought to get a lesser punishment for the
21   crime they've committed.  And Issue Number Two asks you,
22   after you found the defendant guilty, did you -- because
23   you don't get there unless you do that, and after you've
24   answered Issue Number One yes, because you don't get to
25   Issue Number Two unless you've done that.  We would then

93

1    ask you to go back and look at all the evidence and
2    determine in your mind, do you think there are any
3    reasons there why this person ought to get life as
4    opposed to death?
5        Now, I could ask you if you could think of
6    any reasons now; and I suggest you would probably say,
7    Well, I don't know.  Give me all the evidence, and maybe
8    then I'll tell you.  And that's what you have to do.
9    You have to wait till you hear the evidence, look back
10   at that.  And if there is a reason that you think, you
11   know, because this guy deserves death, there is
12   something in this case, something in his background,
13   something in his character, there is something about the
14   facts of the case, wherever it may come from, that
15   convince me that life is more appropriate than death,
16   then that's the decision you, as an individual, have to
17   make.  And all twelve have to make their individual
18   decision.  Okay?
19       A.  Uh-huh.
20       Q.  It gives you that opportunity, kind of a
21   fail-safe, to make sure that's what you want to do and
22   to change your vote if you find there are reasons to
23   change your vote.  Okay?
24       A.  Uh-huh.
25       Q.  Look at your questionnaire.  From talking to

94

1    you, I can't imagine there is anything that I need to
2    know that I don't already know; because you sound like
3    the type of person who will call it like you see it and
4    not call it till you do see it.
5        A.  Uh-huh.
6        Q.  Anything -- you know I'm seeking the death
7    penalty.  We're seeking to get that.  Is there any
8    reason we ought to be uncomfortable having you sit as a
9    juror in a case like this?
10       A.  No, sir.
11       Q.  Thank you, ma'am.  I appreciate your time, and
12   I'm going to pass you.
13           THE COURT:  Mr. Hill.
14           MR. HILL:  Thank you, Judge.
15               VOIR DIRE EXAMINATION
16   BY MR. HILL:
17       Q.  Hi, Miss Turner.  How are you?
18       A.  I'm fine.  How are you?
19       Q.  I'm doing all right.  My name is Wayne Hill.
20   Kurt Wentz and I both represent Mr. Mamou.  Obviously,
21   Mr. McClellan has asked you a series of questions, as he
22   has with each juror.  And we do, also, and try to
23   determine whether or not there is something either in
24   your background, your makeup, who you are, what you do,
25   that causes either side to be the least bit

95

1   uncomfortable.
2           Because obviously, it wouldn't do very
3   much good to have this process and just take twelve
4   people, all of who have exactly the same strong beliefs
5   in the death penalty, for instance.  Because what if you
6   and eleven other people listen to all of the facts of
7   the case, you conclude that the State has proven their
8   case beyond a reasonable doubt, and you find our client
9   guilty of capital murder.  Well, we might as well just
10  sit back and expect the worst to happen at that point,
11  right?
12          So, that's why we do this.  What I'd like
13  you to do for me is understand there are no right or
14  wrong answers.  When we say we don't care what your
15  answers are, that's not exactly correct.  We care very
16  much what your answers are.  We want to make sure you
17  don't feel any pressure to give a certain type of
18  answer.  If you give an answer and you feel strongly
19  about a topic, tell us.  You're not a juror just yet.
20  And if you say something, or if there is a particular
21  area of the law that you have a particular disagreement
22  with -- and you and only you would know that -- and you
23  feel like it's such a strong disagreement you can't
24  really follow that law, you couldn't take the oath to
25  follow that law, please let us know now; because it

96

1   doesn't do anybody any good to find out two-and-a-half,
2   three weeks from now when you're sitting on the jury and
3   for the first time you reveal maybe inwardly to
4   yourself, I should have said something to them.  Now I'm
5   faced with a predicament.
6           It's an extremely important case.
7   Everybody recognizes that.  Take a look at Mr. Mamou.
8   What goes through your mind when you're a prospective
9   juror?  There is a face to this individual.  What do you
10  see?  What do you think?
11      A.  Well, all I see is a young man convicted of a
12  crime.
13      Q.  I'm sorry?
14      A.  All I see is a young man accused of committing
15  a crime.
16      Q.  Okay.
17      A.  That's all I see.
18      Q.  What do you think when you hear the nature of
19  the crime that's alleged against him?
20      A.  It's a serious crime.  Lives have been
21  destroyed and sadness in both cases.
22      Q.  Okay.  What if we were sitting here -- we are
23  sitting here actually.  And I'm going to ask you in a
24  hypothetical sense to make the best argument you could
25  make for giving a capital murderer life in prison.

97

1       A.  What would it be?  I guess I really couldn't
2   answer that, because I've never been put in a situation
3   to be able to call out of my own experience anything
4   that could -- I could argue that point; so, I really
5   couldn't say.
6       Q.  But you find it -- is it more comfortable
7   making the argument for you why a person convicted of
8   capital murder should get the death penalty?
9       A.  No.
10      Q.  Okay.  You see why I asked that question?
11  Because it would concern me greatly if I'm talking to an
12  individual and potentially having to have that person
13  make my client's decision, or make the decision on my
14  client's case and they feel so strongly about a
15  particular type of punishment that if that should come
16  up, it's pretty much a certainty as to what's going to
17  occur.  I think it takes a lot for any juror to sit and
18  listen to a case like this.
19          And more importantly, if they ultimately
20  find that the State has discharged its burden of proving
21  the case beyond a reasonable doubt, then they've got to
22  struggle with whether or not they're going to take that
23  man's life or not.  You know, starting out, if you find
24  somebody guilty of capital murder, you've held that
25  person responsible for causing a person's death, or in

98

1   this case the possibility of showing that two people
2   died during the same transaction.
3           Okay.  You know, we use this word,
4   mitigation.  It's asked to you in one of the questions
5   in the questionnaire.  It's even put in the charge.
6   What does that mean to you?  When you hear the word
7   "mitigation," is that even a word that you would think
8   to use prior to coming in here today?
9       A.  No, sir, it wouldn't.  No, sir, it's not.
10      Q.  Is there a word that, in your mind, kind of can
11  be used in place of the word, mitigation?
12      A.  I guess from listening to the Judge this
13  morning, mitigation would mean any possibilities, any
14  evidence, any things that have arised to cause me to go
15  either one way or another.
16      Q.  Do the words "extenuating circumstances" or
17  "reasons" sound like words that could be replaced for
18  the word "mitigating"?
19      A.  Extenuating circumstances or reasons?  I guess
20  so, from my understanding of it.
21      Q.  Okay.  What do you think if you found -- and
22  again, we're talking hypothetically.  We're not allowed
23  to discuss the facts of this case with you.  Assume with
24  me for a moment that you had found somebody guilty of
25  capital murder, taking the life of two people during the

99

1   same criminal transaction.  Is there anything about the
2   way the crime was committed or what led up to the crime
3   that would be important to you in determining what the
4   punishment is?
5       A.   I honestly couldn't answer that question until
6   I knew about it.  And the only thing I have to recall
7   from would be the O.J. Simpson case, and we all know
8   about that.  A life is a life.  The way a life is taken,
9   whether it's taken cleanly or uncleanly, the life is
10  still taken.
11      Q.   Right.
12      A.   So --
13      Q.   Do you see it as pretty much an open and shut
14  type of situation?  If a life is taken, it really
15  doesn't matter at all how it was taken or under what
16  circumstances?  Once I have found -- once you have found
17  that a person illegally took a person's life, at that
18  point are you focused on only one punishment as a proper
19  response?
20      A.   I honestly can't answer that question now.
21      Q.   Okay.  And that's because?
22      A.   And that's because I would have to -- I can't
23  put myself into a place to where I can say, let's
24  imagine.  It would have to be real to me --
25      Q.   I understand.

100

1       A.   -- and then I could make those decisions.
2       Q.   Well, let me ask you this:  If your husband had
3   been on trial for capital murder and had been convicted
4   by a jury of capital murder, what circumstances do you
5   think that jury should have heard about him in order to
6   determine whether he received life or death?
7       A.   I think they should hear what kind of person he
8   was prior to, what kind of person he was during, that
9   led up to it, and as a result, how this has affected his
10  life afterwards.
11      Q.   Okay.  How has it affected -- getting off the
12  hypothetical, how has forty-five years in the
13  penitentiary affected your husband?
14      A.   Tremendously.  He --
15      Q.   In what regards?
16      A.   He has accepted his responsibility in this.  He
17  has recognized his errors in this.  He has come to know
18  the Lord, most importantly, through there, and given a
19  chance.  He -- whenever -- if he comes out, it's God's
20  will; but he knows now that life is not in his control.
21      Q.   Let me ask you something.  I think this raises
22  an interesting question for me.  He has now accepted
23  what he did --
24      A.   Uh-huh.
25      Q.   -- right?

101

1       A.   Uh-huh.
2       Q.   And why he's there?
3       A.   Uh-huh.
4       Q.   Yet, he had a trial.  He had a jury trial.  He
5   pled not guilty in that trial, right?
6       A.   Uh-huh.
7       Q.   When you were sitting there, did you have an
8   opportunity to sit in the courtroom during the trial or
9   did you have to wait outside?
10      A.   I sat in the courtroom.
11      Q.   You heard all the evidence?
12      A.   Uh-huh.
13      Q.   Was it painfully obvious to you that he was
14  guilty?
15      A.   Yes, sir, it was.
16      Q.   How did that make you feel as you sat there, as
17  his wife?  And basically, am I correct in assuming that
18  prior to you hearing all the evidence, he was telling
19  you, Hey, I'm not guilty of this?  This is --
20      A.   Uh-huh.
21      Q.   -- not a righteous case against me.  How did
22  that make you feel?
23      A.   I was hurt.  I was destroyed, really.  I was
24  destroyed.  And I actually thought about leaving him a
25  couple of times, but then I come -- then, because of my

102

1   background, there is people in my family that also knew
2   the Lord.  And as a result, they brought me to church;
3   and I invited God into my life.  And God's allowed me
4   to, first of all, get myself right and recognize that
5   there is consequences to your actions.
6              And if you choose wrong decisions, then
7   you're going to have wrong -- bad results.  And I told
8   him this.  And throughout the years he's come to
9   understand, you're responsible for this.
10      Q.   Do you think there was still a lot of good in
11  your husband even though he had to go off to prison for
12  forty-five years?
13      A.   Yes, sir, I do.
14      Q.   Do you think that in his situation, maybe he
15  wasn't willing to own up to things; but after things
16  became obvious, he was able to put it behind him and
17  maybe a better person came forward?
18      A.   Yes, sir, I do.
19      Q.   Do you have any idea when he's eligible for
20  parole?
21      A.   Well, he's supposed to talk to the people in
22  November.  This is his third time.
23      Q.   They've set him off?
24      A.   They've set him off twice.
25      Q.   Let me ask you something; because I want to

103

1    make sure if you sit on this jury, you don't have any
2    misapprehension.  Because parole law with regard to
3    somebody like your husband is totally different.  It is
4    not the same.
5       A.   I understand that.
6       Q.   And Judge Burdette has explained that.  I want
7    to make sure that if you were on this jury, and let's
8    assume again that you found somebody guilty of capital
9    murder, do I have a commitment from you that if you
10   honestly believed that the circumstances of the crime,
11   the background of the defendant, whatever he is, even
12   though you have found him guilty of a very heinous
13   crime, which capital murder would be, do I have your
14   commitment that you would not go back to the jury room
15   and somehow say, well, I know that parole exists; and
16   even though it's forty years in the future, I'm not
17   going to even consider life in prison; I'm just going to
18   go ahead and give the death penalty?
19      A.   No, sir, I could never do that.  I could never
20   do that.
21      Q.   As I'm sitting here, I'm speaking with a woman
22   who, you know, has obviously a very responsible job.
23   Your daughters are doing great.  And but for the tragedy
24   of your husband's predicament, everything seems to be
25   going pretty well for you, right?

104

1       A.   Yes, sir.
2       Q.   And it gives people the opportunity to kind of
3    do a self test or a gut check, if you will.  And I ask
4    people, all right, look down inside of you; because only
5    you know you, the way you are.
6            In twenty minutes I'm not going to know
7    everything I need to know about it or have any great
8    insight.  So, I ask you to tell me, can you come up with
9    a couple of reasons -- one reason, even -- why I should
10   have you on this jury, and then tell me a reason or
11   reasons why I shouldn't, again, realizing I'm
12   representing the person that's accused of committing a
13   very serious crime?
14      A.   With everything that I put on the form that I
15   filled out and what I said, I guess I couldn't answer
16   that question.  I couldn't answer that question.  That
17   would be left up --
18      Q.   I'm looking to make sure I don't have somebody
19   that's going to tell me, well, look, I know somebody
20   killed a couple of people.  And obviously, if I sat on
21   the jury and I found he killed two people, I would have
22   found that it wasn't in self-defense.  I would have
23   found it was not an accident.  You know, at that point,
24   kiss it good-bye; because I don't see the point in even
25   considering life in prison.  I think it would have to be

105

1    the death penalty for that person under all those
2    circumstances.  Are you that person?
3       A.   No, I can't be.
4       Q.   Let me just talk for a moment about when your
5    daughter was working at T.D.C.
6       A.   Uh-huh.
7       Q.   Did she ever tell you of reprehensible things
8    that happened to her?
9       A.   Yes, she did.
10      Q.   Would you share those with us?
11      A.   She had worked for the prison system maybe five
12   or six months.  And she came home and she told me they
13   had put her in the part where they isolate the worst of
14   the criminals from the rest of the prison population.
15   And she said one of the inmates had -- one of the
16   officers was talking to her, and she turned around and a
17   prisoner was talking to her; and he got angry because
18   she was listening to her officer.  And when she turned
19   around, he hit her and knocked her out.
20      Q.   Did she have to go to the hospital?
21      A.   She didn't have to go to the hospital; but when
22   she came home, her face was swollen.
23      Q.   Okay.  That must have scared you a great deal.
24      A.   It did.
25      Q.   So, let me ask you this question:  You know

106

1    that if you were to give someone a life sentence, the
2    answer to those questions are going to result in
3    somebody receiving a life sentence.  They're going to be
4    living in a prison system.  They're going to have access
5    to people.  I need you to tell us what, if any, impact
6    your daughter's situation, her horrible situation, would
7    have on your ability to evaluate life versus death as a
8    meaningful punishment for somebody convicted of capital
9    murder.
10      A.   From my understanding and from my personal
11   feelings in all of this, prison -- if you're in prison,
12   life has been taken away from you.  To lose your
13   freedom, to me, you have lost a part of your life.  And
14   so, I guess to answer your question, life is still lost
15   if you're behind prison bar doors.  The only difference
16   is you have breath that you can actually feel and see
17   things, but life is still lost.
18      Q.   Now, some people say -- and, of course, the
19   major complaint that you hear most often on death
20   penalty cases for somebody that has received the death
21   penalty, takes too long to execute them.  Do you agree
22   that executions have sped up?  Do you see that process
23   has become drastically reduced in time?
24      A.   Uh-huh.
25      Q.   We're probably dealing with cases that have

**107**

```
 1   been in the system a long time, but newer cases people
 2   are coming up much quicker.
 3       A.  Uh-huh.
 4       Q.  Do you feel like in some instances having to
 5   serve a life sentence is actually a worse punishment for
 6   somebody than the death penalty?  Maybe in the death
 7   penalty, in some respects, it's over with.  You go and
 8   meet your maker, and that's about it.
 9       A.  So, what you're asking me, do I feel life --
10       Q.  Do you think in some instances --
11       A.  -- is better?
12       Q.  No, it's worse that you're actually -- like
13   you're saying, you're breathing air; but everyday you're
14   having to think about why you're there, what you did,
15   what caused you to be there?
16       A.  To me, sometimes I do think life in prison
17   would be worse.
18       Q.  My last question to you, and I'm going to sit
19   down.  I'm going to ask you if you have any questions
20   for me.  Do we have an absolute commitment from you --
21   and this could be very critical -- if you found somebody
22   guilty of capital murder, you go back in that jury room
23   and the jury, for whatever reason, is discussing their
24   answer to these questions and whether or not a
25   particular defendant would be a threat to society.
```

**108**

```
 1          And that society, you've now been told,
 2   includes the prison society.  Can you absolutely swear
 3   and understand that you would not be permitted and it
 4   would be improper for you to say, well, let me tell you
 5   what happened to my daughter when she was in a prison
 6   system?  Do you understand why I would be concerned
 7   about something like that happening?  Are you the kind
 8   of person --
 9       A.  No, sir.
10       Q.  -- that would be able to not say anything about
11   that at all?
12       A.  Yes, sir.
13       Q.  Even though you might say, boy, I'd like to
14   tell you something?
15       A.  Yes, sir, that has nothing to do with this
16   case.
17       Q.  Okay.  Questions of me?
18       A.  No.
19       Q.  Anything you'd like to know?
20       A.  No, sir.
21       Q.  Thank you.
22          THE COURT:  Thank you, sir.
23          Miss Turner, in just a second I'm going to
24   excuse you.  Before I do, I will tell you we want you
25   back here two weeks from today.  And as I think said
```

**109**

```
 1   to you the other day, what we're doing is talking to
 2   folks individually for the purposes of creating a pool
 3   or a group of about forty-eight folks.  We'll have
 4   everybody back here on Wednesday, the 29th.
 5          Whoever comes back will have been through
 6   exactly what you've been through.  We hope to start at
 7   9:30 in the morning.  And if we do get started, then
 8   we'll all be out of here by noon.  When we finish that
 9   day, Miss Turner, everybody will leave here knowing
10   definitely whether they are or are not a juror in the
11   case.
12          Between now and when we see you next,
13   don't you alter your life one bit for us.  You do your
14   family things just like you would do them.  Do your
15   professional things just like you would.  If you have a
16   chance to leave town, take the chance and go.  All that
17   we ask of you between now and when we see you next is
18   this:
19          Please do not talk about this case with
20   anybody.  Please do not permit anybody to talk about it
21   with you.  I don't know whether there will be any news
22   media treatment about this case or not; but if there is,
23   avoid it.  If there is anything about this case on the
24   television, refuse to watch it; newspaper, refuse to
25   read it; radio, refuse to hear it.
```

**110**

```
 1          And the reason for each of those
 2   restrictions, Miss Turner, is for the purpose of
 3   accomplishing the same objective and that's this:  If
 4   you do become a juror in the case, the decision that you
 5   reach, whatever it is, must be based exclusively on what
 6   you hear from inside the courtroom, not from any
 7   information you get outside the courtroom.  So, that's
 8   why we try to eliminate that, so that it's not a factor.
 9          (Venireperson excused for the day.)
10               THOMAS EUGENE SMITH,
11   having been first duly sworn, testified as follows:
12               VOIR DIRE EXAMINATION
13   BY THE COURT:
14       Q.  How are you today?
15       A.  Doing well, thank you.
16       Q.  Please make yourself as comfortable as you can
17   be.  Mr. Smith, first off, let me ask you a couple of
18   questions.  Specifically, I'd you to remember back in
19   your mind to Monday, when the big group was here, the
20   things we talked about then.  Add to it this morning the
21   things we talked about this morning.  Out of anything
22   that we've talked about so far, do you have any
23   questions for me?
24       A.  No, sir.
25       Q.  Anything, Mr. Smith, that to this point we have
```

111

1    not addressed that you feel is something that would be
2    worthy of us talking about, because it might have some
3    influence or some bearing on your service as a juror?
4       A.  No, sir.
5       Q.  Is there anything at all, sir, whether it might
6    be something perhaps about your personal life, perhaps
7    about your work, perhaps about your health, or anything
8    else for that matter, that you feel in any way would
9    interfere with your ability to be a juror in this case
10   during the time frame we've set out?
11      A.  No, sir.
12      Q.  We try to spend some time this morning,
13   Mr. Smith, talking about who and making a point that in
14   a case like this, as in any kind of trial for that
15   matter, there is no automatic result. The result can't
16   be automatic, because in every case the evidence is
17   going to differ.
18      A.  Yes, sir.
19      Q.  So, that's why in a case like this because --
20   or not because, but if a jury finds a person guilty of
21   capital murder, that reason and that reason alone does
22   not dictate what the answer to these other two questions
23   should be. Can you see that?
24      A.  Yes, sir.
25      Q.  Because in some cases the evidence may very

112

1    well be that you think they'll also be a future threat.
2    The evidence may also very well be in another case that
3    because of the circumstances, the uniqueness of the
4    crime, that they're not going to be a future threat.
5           And one of the lawyers has used a story,
6    about four or five or six years ago, about the woman in
7    South Carolina named Susan Smith that ran her car off in
8    the lake, had the two kids in the back, they were both
9    killed. She claims somebody else. She ultimately was
10   arrested, charged, tried and convicted of capital murder
11   and given a life sentence.
12           Maybe the jury's thought was that to
13   society as a whole, like that question talks about,
14   she's not a future threat as to her children. She might
15   be. But can you see how a thought like that might cause
16   a jury to answer that question yes or no, depending upon
17   the evidence in the case?
18      A.  Yes, sir.
19      Q.  Then the Question Number Two has no bearing --
20   the answer yes, I should say, is not related to how the
21   first question is answered. You might have somebody in
22   some imaginary case that you find guilty of capital
23   murder. You might also have somebody in the same case
24   that you find would be a future threat to society based
25   upon the evidence in this case; but you also find that,

113

1    for example, possibly because of their comparative
2    involvement in the commission of the crime, that they
3    weren't as bad a person in the commission of a crime.
4           For example, they might have been the
5    getaway driver, didn't do murder at all. That might
6    have a bearing on some jurors in some cases. So, can
7    you see it's not until after everything is over with
8    that we can project how we're going to answer the
9    question?
10      A.  Yes, sir.
11      Q.  And what we're spending some time on now is
12   making sure that you don't start off with the idea of
13   thinking or leaning which way you're going to go;
14   because you can't until you hear the evidence.
15      A.  All right.
16      Q.  Just absolutely neutral until then. And what
17   happens after you hear it, that's your call. But
18   starting out, you have no commitment to anything. Does
19   that sound like you?
20      A.  Yes, sir.
21      Q.  Any of these rules that we've talked about that
22   you find objectionable in any way that you couldn't
23   follow and enforce if you were a juror?
24      A.  No, sir.
25      Q.  Do you have any questions before we start?

114

1      A.  No, sir.
2           THE COURT:  Okay, Mr. McClellan.
3           MR. MCCLELLAN:  Thank you, Your Honor.
4           VOIR DIRE EXAMINATION
5    BY MR. MCCLELLAN:
6      Q.  Mr. Smith, my name is Lyn McClellan. Along
7    with Claire Conners, we represent the State of Texas in
8    this case. I want you to sit back and relax. I'm going
9    to ask you about some of the stuff in your
10   questionnaire, talk to you about concepts that may
11   affect a case like this, and try to get your feelings
12   about those. You've never been on a jury before; is
13   that correct?
14      A.  That is correct.
15      Q.  As a juror, you will be asked to take an oath
16   to a true verdict render based upon the law and the
17   evidence. That means if you had some personal opinion
18   about the way things maybe ought to happen, you have to
19   set that aside and tell the Court that you'll take an
20   oath that you would make your decision based on whatever
21   law the Court gave you and the evidence you heard in the
22   courtroom. Any reason to believe you cannot do that?
23      A.  No, sir.
24      Q.  Anything happening in your life that would keep
25   you from being able to give your full attention to a

115

1  case like this?
2     A.  I don't see where it would be a factor.  I
3  mean, in every facet I'm going to be thinking about
4  work; and we're really busy, and I would possibly be
5  going to work after I got out, you know, on a daily
6  basis.  But, I mean --
7     Q.  Only you can answer that question.  And I
8  assume you thought about that process, and that doesn't
9  cause such a conflict that you think that would keep you
10  from being able to give your full attention while you're
11  here?
12     A.  That's correct.
13     Q.  Now, capital murder is different than murder.
14  Murder is the intentional taking of another person's
15  life without any legal justification.  By that, I mean
16  it's not killing someone in self-defense.  That's not
17  murder.  It's not killing someone accidentally.  That's
18  not murder.  Murder is the intentional taking of another
19  person's life, okay?
20     A.  Yes, sir.
21     Q.  Capital -- excuse me.  Capital murder then
22  becomes murder plus some other circumstance; and what we
23  have alleged in this case is murder during kidnapping
24  and murder killing two or more people during one
25  criminal episode are the kinds of cases we've alleged as

116

1  capital murder in this case.
2       The Legislature has set out the types of
3  capital murder; and there is other kinds of cases such
4  as murder during a robbery, murder during a burglary,
5  killing a police officer in the line of duty, killing a
6  child under a certain age.  All of these cases are
7  capital murder, where the death penalty is available.
8  There is no case in the State of Texas or anywhere else
9  that I know of where you automatically get death, having
10  been found guilty of committing a crime, okay?
11     A.  Yes, sir.
12     Q.  Instead, there is two possible punishments for
13  capital murder, that being life or death.  And a
14  decision is made by not only consideration of the facts
15  of the case and the evidence you heard at
16  guilt/innocence; but when you get to the punishment
17  stage of a trial, you may now hear additional evidence
18  about a defendant's character, background, criminal
19  history, or lack thereof, mental abilities or
20  disabilities, all kinds of information about the
21  individual himself.
22       We often bring people in and say, Well,
23  could you consider the full range of punishment for,
24  let's say, a murder case?  Well, when you do that, when
25  you ask somebody that just comes from off the street,

117

1  like yourself or anybody else that comes down for jury
2  duty, when they think of murder, they're thinking of
3  something really, really bad.
4       And, of course, a lot of murders are
5  really, really bad; but there are lots of fact
6  situations that fall within that concept of murder that
7  may make the punishment from one end of the extreme to
8  the other.  So, you don't know whether you do until
9  you've heard what the facts were.  You agree with that?
10     A.  Yes, sir.
11     Q.  Because not every murder is alike.  Not every
12  capital murder is alike.  Now, they'll all have certain
13  characteristics.  Every murder will be an intentional
14  taking of another person's life.  But as the Judge said,
15  it may be a mercy killing on one end, or it might be a
16  drive-by shooting of a kid on a bicycle.  Those are
17  vastly different circumstances but the same conduct,
18  same results.
19       Capital murders, there could be a wide
20  variation.  There could be all kinds of circumstances
21  there.  And so, you have to wait until you hear what all
22  the facts are, first of all, to know whether or not you
23  find someone guilty.  And if you found someone guilty,
24  you know, what punishment you would assess, I would
25  assume, would depend upon the facts that you heard.

118

1  Would that be correct?
2     A.  Yes, sir.
3     Q.  Often, I think, people come in and think, well,
4  if I found someone guilty of capital murder, that means
5  he gets death, right?  You know it does.  You now know
6  through this system, as the Court has explained to you,
7  that when you go to the punishment stage of trial, not
8  only may you hear additional evidence that you hadn't
9  already heard before, but you're asked to answer the
10  questions.  And the answer to those questions will tell
11  what the punishment is going to be.
12       And what we're looking for is jurors who
13  are open and listening to all that evidence before they
14  decide what the answer to the questions are.  And would
15  you be able to do that?
16     A.  I believe so.
17     Q.  Okay.  Sir, what I'm trying to get at, I guess,
18  some people may say or may think, well, if I found
19  someone guilty of capital murder, to put it as bad as I
20  can put it, that's the intentional taking of another
21  person's life without any legal justification during the
22  course of a kidnapping, or during the course of killing
23  another person, is the way it's alleged in the
24  indictment.  If I find someone guilty, then it goes to
25  Issue Number One.

119

1	And it says, Do you find from the evidence
2	beyond a reasonable doubt there is a probability that
3	the defendant would commit criminal acts of violence
4	that would constitute a continuing threat to society?
5	Someone might think automatically, well, you know, if I
6	found he did this one time, there is at least a
7	probability he would do it again.
8	Now, I suggest to you there is always a
9	possibility, but that's not the word they use.  They use
10	the word probability, which means more likely than not.
11	And then they precede that with evidence beyond a
12	reasonable doubt, which means I have to prove beyond a
13	reasonable doubt there is a probability that he would
14	commit criminal acts of violence in the future; or if I
15	don't, you have to answer that no.
16	So, the automatic answer to that
17	question -- even though it's an issue that you're asked
18	to answer after you found someone guilty, the automatic
19	answer is no, just like the automatic answer on guilt or
20	innocence. He's not guilty, because he's presumed to be
21	innocent unless and until we prove to you beyond a
22	reasonable doubt that he is guilty.
23	The automatic answer to , say, Issue
24	Number One is no until we prove, if we do, beyond a
25	reasonable doubt that the answer is yes.  Any problem

120

1	with that aspect?
2	    A.   No, sir.
3	    Q.   Have you ever heard of any cases where someone
4	was -- read about in the paper or whatever -- that
5	someone was convicted of capital murder and thought that
6	was -- and given the death penalty, you thought that was
7	the improper punishment for the case as you understood
8	in the paper?
9	    A.   I don't understand your question.
10	    Q.   Have you ever learned about a case in the news
11	or the paper where a person was convicted of capital
12	murder and given the death penalty; and then you read
13	about the facts and circumstances of the crime and you
14	say, That doesn't sound right?  That doesn't sound like
15	the proper punishment?  I don't think they should have
16	got the death penalty for having committed that crime?
17	    A.   No.
18	    Q.   Vice versa:  Have you ever heard about a case
19	or a crime where the person did not receive the death
20	penalty for capital murder, and you thought maybe they
21	should have?
22	    A.   Well, I'm sure there is, based on what the
23	media -- I mean, I can't think of any specific
24	instances; but I know I've read about things in the
25	paper and seen them on the news to where, you know, not

121

1	just in capital murder, but in other cases to where,
2	like, how come he's only getting this much, or how come
3	she's only getting that much?  What are the survivors --
4	I guess you could say, What are they going to be doing
5	with what's happening to this person?  Is that fair?
6	    Q.   Is it fair to say the questions, from what I've
7	heard, seem to be putting the evidence on what you've
8	heard, like, that may not be all there is?
9	    A.   Well, yes, sir.  Media is not going to give you
10	everything.
11	    Q.   Right.  Do you have any preconceived notion
12	what the punishment ought to be for someone found guilty
13	of capital murder?
14	    A.   Well, I'm pretty much a firm believer of an eye
15	for an eye.  You know, it's kind of conservative
16	thinking that I believe that if you kill somebody and
17	it's proven that you've done it and it's malicious, then
18	it's an eye for an eye, yes, sir.
19	    Q.   Now, you know the way this system is set up,
20	it's not --
21	    A.   Yes, sir, I just learned that.
22	    Q.   Can you follow that?  Can you set aside this
23	personal belief that you've had before of an eye for an
24	eye and follow the instructions given to you by the
25	Court and the evidence that you hear?  And, of course,

122

1	if that turns out to be an eye for an eye, then maybe
2	so; but there may be situations where it's not.
3	    A.   I believe I can follow the rules, and that's
4	not to say that I might lean one way or another because
5	of my -- the way I was brought up and everything.
6	That's the society effect on me, but I believe I can
7	follow the rules.
8	    Q.   Now, to follow the rules you'd have to take an
9	oath to a true verdict render based on the law and the
10	evidence?
11	    A.   Yes, sir.
12	    Q.   So that means that if the evidence was there to
13	where, let's say, the State on Issue Number One didn't
14	prove to you beyond a reasonable doubt there is a
15	probability that the defendant would commit criminal
16	acts of violence that constitute a continuing threat to
17	society, but your position and how you've been raised
18	and how you thought all along is an eye for an eye.  And
19	you obviously know you wouldn't get to those issues
20	unless you found him guilty of capital murder.
21	But you heard other evidence, and there
22	wasn't sufficient evidence to prove to you that this is
23	the type of case where the person would be a continuing
24	threat to commit future acts of violence.  Are you
25	saying that because of your upbringing and what you

123

```
1   talked about, that you -- that would cause you, then, to
2   answer that question yes, that there is a probability,
3   even though the State didn't meet its burden of proof?
4       A.  From our conversation that we had on Monday
5   when we were in here, I put a lot of thought on what
6   you're talking about; and I've come to the conclusion,
7   honestly, that if there was a situation, on this first
8   question, where there is a probability, and you have
9   proven that  -- you've presented your case.  And if the
10  evidence, there is a -- you know, I believe it's kind of
11  what you might call a gray area in my mind, I would
12  probably lean towards the yes answer.
13      Q.  Does that mean you're not following your oath?
14      A.  Not --
15      Q.  Your oath is to a true verdict render based on
16  the law and the evidence.
17      A.  Okay.  Based on the way I interpret the
18  evidence that's presented, I would say that if there is
19  a gray area and I don't know which way to go, as far as
20  the way I'm thinking, I would probably, if I had to give
21  an answer, a yes or no answer -- I mean, am I not
22  answering the right question?
23      Q.  No.  You're telling us what you think, and
24  that's fine.  What I interpret in my mind, if there is a
25  gray area that you don't know, that means I haven't met
```

124

```
1   my burden of proof.
2       A.  Okay.
3       Q.  Because beyond a reasonable doubt means I've
4   removed that gray area.
5       A.  Okay.
6       Q.  And if you're in that gray area where the State
7   hasn't quite proven it to you beyond a reasonable doubt,
8   the law would say you give -- the benefit of the tie
9   goes to the runner, and the runner is over there.  Yes,
10  sir?
11      A.  I understand what you're saying.
12      Q.  You do.  That's what you do.  Can you do that?
13      A.  Having not been in that situation, I have a
14  hard time answering that question.
15      Q.  I understand, and I know it's hard to think.
16  Obviously, we're seeking the death penalty.  We think
17  we're going to be able to meet the burden, but the
18  defense obviously has another idea about this situation.
19              And what we need is jurors who will call
20  it down the middle.  And quite frankly, I don't need
21  someone to help me over the hump.
22      A.  Yes, sir.
23      Q.  If I can't get over it by myself, then I don't
24  think it deserves to be there.
25      A.  Yes, sir.
```

125

```
1       Q.  I'm kind of a firm believer in the facts and
2   circumstances of the crime go a long way in dictating
3   what ought to happen, and I leave it up to these twelve
4   people to make that decision.  Now, obviously, they're
5   going to be very concerned if I got a head start.
6       A.  Yes, sir.
7       Q.  I need to make sure for all sides that you
8   don't give me a head start, that you can call it down
9   the middle; and if there is a gray, whether it be at
10  guilt/innocence or whether it be Issue Number One, gray
11  to me means the State ain't there.  State's not there.
12  That doesn't mean just any doubt.  But if there is a
13  reasonable doubt about what occurred, I'm not trying to
14  box myself in the corner, either; because I can't prove
15  any case beyond all doubt.
16      A.  Right.
17      Q.  But if, after you've heard all the evidence, if
18  you're not comfortable with that decision, you go, well,
19  I just don't think the State's quite got there, and
20  you've got to go with not guilty, or you got to go with
21  no to Issue Number One.  You got to feel comfortable
22  we're there where we're at and not let some opinion -- I
23  just need to know if you would do that, how you were
24  brought up.  And I respect that, and people can't change
25  over night.
```

126

```
1               But I guess some people can set aside
2   their eye for an eye situation and follow the law.  And
3   some people may say, I don't know that I could ever do
4   that.  What do you think.
5       A.  I don't know if I could do that or not.  I feel
6   like I'm an honest person, and I would give everything
7   the benefit of the doubt.  But stating it the way that
8   you've put it, I haven't been in the situation; I don't
9   know.
10      Q.  Okay.
11              MR. MCCLELLAN:  I'll pass.
12              MR. HILL:  I'd like to make a challenge.
13              THE COURT:  Mr. Smith, I'm going to go
14  ahead and excuse you.
15              All right, Mr. Hill, your challenge is
16  granted.
17                  DONALD NELSON,
18  having been first duly sworn, testified as follows:
19                  VOIR DIRE EXAMINATION
20  BY THE COURT:
21      Q.  Mr. Nelson, first off, I'd like to go back to
22  this past Monday, the things we talked about that day,
23  and this morning, the things we were talking about this
24  morning.  Out of everything we talked about up to now,
25  do you have any questions of me?
```

127

1     A.  I think you pretty well covered it.
2     Q.  Is there anything that, to this point, we have
3  not yet talked about that you feel as though we should,
4  because it might have some bearing on your service as a
5  juror?
6     A.  No, other than what we talked about.
7     Q.  And I was going to get into that.  And
8  Mr. Nelson, I have related to the lawyers for both sides
9  exactly what our conversation was.
10    A.  Uh-huh.
11    Q.  And I told them -- and I don't mean to put
12 words in your mouth, and I certainly don't mean to put
13 words in their mouth.  But my conclusion with the way
14 that you and I left our conversation this morning was
15 this:  That we're going to go ahead with today.  We're
16 going to go ahead with September the 29th, when that
17 comes into play.  And on September the 29th, you'll be
18 armed, hopefully, with more information; and you'll
19 apprise us on that day if there is anything that, as far
20 as you feel, would interfere with your service, as we
21 said, a little bit longer than a week, but not as much
22 as two?
23    A.  Okay.
24    Q.  Good.  Is that okay with you?
25    A.  That's fine.  Could I say something?

128

1     Q.  Surely.
2     A.  I'm being totally honest.  If it does come up
3  worse, that I have to take chemotherapy treatments, I
4  cannot say that I'm going to be here and be totally
5  focused.
6     Q.  Well, if you're here -- I'm sorry.
7     A.  Because I have lost two members of the family
8  from cancer.
9     Q.  We understand that, Mr. Nelson.  And I'm
10 thinking that we're going -- you're going to tell us
11 about that on the 29th?
12    A.  Right.
13    Q.  If that's the case, we will completely
14 understand that that's the deal..
15    A.  Great, great.
16    Q.  But we're just trying to buy some time until
17 you're armed with enough information to be able to know
18 what your situation is.
19    A.  Sure.
20    Q.  It's just kind of like the trial.  We're not
21 trying to buy some time, but we can't make any decisions
22 about the trial till we've heard what the evidence is.
23    A.  Sure, I understand.
24    Q.  But please, we are not insensitive to your
25 situation.

129

1     A.  Oh, I understand; but at the same time, I'll
2  make my feelings known.
3     Q.  Absolutely.  I guess, Mr. Nelson, what I'm
4  trying to spend some time doing today and any other days
5  is to point out that during the course of a trial, there
6  is no automatic conclusion.  And there is never an
7  automatic conclusion; because the conclusion would
8  depend upon the evidence, the believability of it, as
9  well as what the testimony was.
10          Can you see from our conversation this
11 morning how the three decisions that the jury makes --
12 whether a person is guilty or not, answer to Question
13 One, answer to Question Two -- those decisions must all
14 be made based upon evaluation of evidence that comes
15 from a common pot, so to speak, but that each question
16 that you're being asked to resolve asks you to look at
17 that evidence in a little bit different language.
18 That's why the answer to one of those decisions, in and
19 of itself, does not direct you as to how the next answer
20 should be; because the question is remarkably different.
21    A.  Right.
22    Q.  For example, is somebody guilty or not guilty?
23 Well, if they're guilty, that's the deal; but just
24 because they're guilty, that doesn't necessarily mean
25 they're going to probably commit future acts of violence

130

1  and be a threat to society.  And it may very well be,
2  based upon the uniqueness of the testimony in one case,
3  that you're perfectly satisfied that the conduct was an
4  absolute aberration compared to the way the human being
5  lived the rest of his life.
6          Might very well be, however, if you did
7  answer that first question yes, you might look back
8  through all the evidence and determine, but there is a
9  mitigating circumstance that makes me think a life
10 sentence is more appropriate.  May very well be in some
11 given case.  May very well be that because of the nature
12 of the crime committed, maybe the victim in the crime,
13 who certainly should not have been killed, wasn't
14 completely innocent his own self.  That might be a
15 situation that might cause you to be influenced into
16 thinking a life sentence.
17          But the point is not to try to commit you
18 to an example, but to commit you to the notion that you
19 would never make a conclusion as to what the answer
20 would be to any of these questions until after you've
21 heard all the evidence.
22    A.  Sure.
23    Q.  Before we begin, do you have any questions of
24 me?
25    A.  No, sir.

131

1    Q.   Thank you.
2         THE COURT:  Mr. McClellan.
3         MR. MCCLELLAN:  Thank you, Your Honor.
4              VOIR DIRE EXAMINATION
5    BY MR. MCCLELLAN:
6    Q.   Mr. Nelson, my name is Lyn McClellan.  Along
7    with Claire Conners, we represent the State of Texas in
8    this case.  I want to just kind of go over your
9    questionnaire some and follow up some questions on
10   that --
11   A.   Sure.
12   Q.   -- and then talk to you about certain aspects
13   of the law.  You indicated that you're retired.  What
14   did you do before you retired?
15   A.   I worked for Kraft Foods as a salesman for
16   twenty-six years.
17   Q.   You indicated that you consider yourself
18   liberal.  Why do you consider yourself liberal?
19   A.   Let me think about that for just a minute.  I
20   believe in rights.
21   Q.   Okay.
22   A.   Some people might be a stickler to a certain
23   thing.  I'm open to different ideas.
24   Q.   Okay.  All right.  You also participate in
25   Citizens on Patrol, I guess in your neighborhood?

132

1    A.   Yes.
2    Q.   That's kind of a neighborhood watch-type?
3    A.   It's a volunteer.
4    Q.   How long have you been doing that?
5    A.   I started the latter part of May.
6    Q.   Okay.  And how often do you patrol?
7    A.   I put in anywhere from two to four hours a
8    week.  I have a weekend place in Livingston, so I spend
9    fifty percent of the time back and forth.  I have more
10   time in Houston.  I spend more time, but at least two
11   hours a month.  So it could run as much as four or six
12   hours a month.
13   Q.   And y'all just patrol certain hours or
14   something, or how do you do that?
15   A.   Each person picks a certain time, certain day.
16   My particular time, I patrol Sundays, usually from about
17   12:00 to 1:00 or 1:30.
18   Q.   At night or during the day?
19   A.   During the day.
20   Q.   Okay.
21   A.   We do have some that patrol at night.  People
22   that work during the day, they do patrol at night.
23   Q.   What subdivision do you live in?
24   A.   Timbergrove.
25   Q.   What part of the town is that?

133

1    A.   Just west -- down like 11th and TC Jester.
2    Q.   Yes.
3    A.   We're east of the White Oak Bayou.
4    Q.   Have y'all -- you, personally -- have you
5    encountered any type of crimes going on during the
6    period of time you patrol?
7    A.   No.
8    Q.   How long has this been in operation in the
9    subdivision?
10   A.   Since 1991.
11   Q.   Long time.  You indicate -- let me just ask
12   you, what is your opinion about the death penalty, kind
13   of in your own words?
14   A.   I believe in it as a means to deter crime.
15   Q.   Did you always believe that?
16   A.   No.  As I've gotten older -- as I was younger,
17   I was doubtful about it.
18   Q.   All right.  Okay.  You checked on the -- this
19   list of -- there is fifty-two groups of five.  And you
20   checked the first one that says, I'm in favor of the
21   death penalty, except in a few cases where it may be
22   inappropriate.  Okay.
23   A.   What I was thinking of is where there wasn't
24   just, you know, enough evidence.
25   Q.   Okay.

134

1    A.   I would have to be convinced 100 percent.
2    Q.   Now 100 percent causes me some concern.
3    A.   Well, I say a hundred.  Best of my ability as a
4    juror.
5    Q.   I think that's what most people mean.  I could
6    never prove anybody guilty a hundred percent, unless you
7    were a witness to the case.  And if you're a witness,
8    you couldn't be a juror.
9    A.   True.
10   Q.   The law requires beyond a reasonable doubt,
11   which you'll be given.  Anything about that?
12   A.   Just strike the hundred percent.  To the best
13   of my ability.
14   Q.   The next area said, There are some kinds of
15   cases which I know I could not vote for the death
16   penalty even if the law allowed me to, but others in
17   which I would be willing to consider voting for it.  Can
18   you tell me what you were thinking about in that regard?
19   A.   Repeat that again.
20   Q.   There are some crimes, some kinds of cases
21   which I know I could not vote for the death penalty even
22   if the law allowed me to, but others in which I would be
23   willing to consider voting for the death penalty.
24   A.   It might BE something where it might be
25   questionable.  It might be a case of self-defense.

135

1   Q. All right. So, basically what was
2 questionable, if that person actually committed the
3 crime. Of course, that will be resolved at the
4 guilt/innocence stage of the trial. If you have a
5 question about whether or not they committed the crime,
6 that means you've got a reasonable doubt about it. If
7 you have a reasonable doubt as to whether or not they're
8 guilty of capital murder, you find them not guilty.
9   A. Right.
10   Q. So we never get to the punishment stage of the
11 trial then.
12   A. Right.
13   Q. So, that would not be a case in which the law
14 would allow you to give the death penalty; because you
15 would never get to the punishment stage, because you
16 wouldn't have ever found someone guilty.
17   A. True.
18   Q. Same thing with self-defense.
19   A. True.
20   Q. Capital murder is murder plus some other
21 circumstance. What we've alleged in this case is murder
22 during kidnapping, and also a second paragraph, murder
23 of two or more people during one criminal episode.
24 Murder is the intentional taking of another person's
25 life without any legal justification. By that I mean,

136

1 not in self-defense, not an accident, but where they
2 intend to kill somebody and do so. And then a capital
3 is during the course of a kidnapping or during the
4 course of killing two or more people during one criminal
5 episode. Are those the kinds of cases, where there is
6 an intentional taking of someone's life during the
7 commission of another felony offense, you think the
8 death penalty should be available?
9   A. Yes, sir.
10   Q. Some people come to us and say they are in
11 favor of the death penalty; but they do not believe that
12 they, themselves, could ever participate in a process --
13 some people say that they believe in the death penalty;
14 but they don't believe that they, themselves, can ever
15 participate in a process by where they would be called
16 upon to make decisions that would result in this Judge
17 ordering the execution of the defendant sitting over
18 here on trial.
19   A. Uh-huh.
20   Q. Do you have any doubts about your ability to
21 participate in that type process or make that type of
22 decision if that's what the law and the evidence called
23 for?
24   A. No problem.
25   Q. And the last -- next to the last page there was

137

1 a list of agree/disagree; and either you got tired of
2 reading them, or you only answered one of them?
3   A. Well, Friday was a very bad day for me. It was
4 my off day. If you'd like, I'll go over it more and
5 I'll try to --
6   Q. Why don't we --
7     MR. MCCLELLAN: Can you just show him that
8 questionnaire, Judge?
9   Q. (BY MR. MCCLELLAN) Let's kind of go down
10 through these. The death penalty has never been
11 effective in preventing any crime. Do you agree or --
12   A. I disagree.
13   Q. The death penalty is absolutely justified?
14   A. What page are you on?
15   Q. Number 14. I'm sorry. The next to the last
16 page.
17   A. Okay. All right. Got it.
18   Q. The first one you checked. The second one you
19 say you disagree, that the death penalty has never been
20 effective. Number 3 says, The death penalty is
21 absolutely justified?
22   A. I'll agree.
23   Q. Any person, man or woman, young or old, who's
24 guilty of capital murder should pay with their own
25 lives.

138

1   A. I'd have to disagree with that.
2   Q. We must have the death penalty for some crimes?
3   A. Yes.
4   Q. Don't believe in the death penalty under any
5 circumstances?
6   A. No, disagree.
7   Q. Death penalty is not necessary in modern
8 civilization?
9   A. Disagree.
10   Q. Life imprisonment is more effective than the
11 death penalty?
12   A. Disagree.
13   Q. The execution of criminals is a disgrace to a
14 civilized society?
15   A. Disagree.
16   Q. Death penalty is just and necessary?
17   A. Agree.
18   Q. I do not believe in the death penalty; however,
19 I do not believe it should be abolished?
20   A. Disagree.
21   Q. The death penalty gives the criminal what he
22 deserves, as applied to that?
23   A. Yes.
24   Q. It doesn't make any difference to me whether or
25 not we have the death penalty?

**139**

1    A.   Disagree.

2    Q.   Death penalty is always justified for

3  intentional murder?

4    A.   Agree.

5    Q.   The death penalty should be available for -- as

6  punishment for more crimes than it is now?

7    A.   Disagree.  That one could be --

8    Q.   Could go either way?

9    A.   Either way, yeah.

10    Q.   Prison makes convicted people worse?

11    A.   I lean towards disagree.

12    Q.   And prison rehabilitates people convicted of

13  crime?

14    A.   Hopefully, I agree.

15    Q.   What we're looking for and what happens is that

16  jurors are going to be asked to take an oath to a true

17  verdict render based on the law the Court gives them and

18  the evidence they hear from the witness stand.  Okay.

19  Those two factors go into making your decision what the

20  law is and what the evidence is, which means you have to

21  set aside any personal opinions and beliefs if you're

22  going to follow the law and the evidence.

23         Some people come in here and say, I

24  believe if you told me -- you tell me someone's guilty

25  of capital murder, and I'm going tell you the death

**140**

1  penalty ought to apply.  But, of course, our system is

2  set up to where you get additional evidence and look at

3  other things; and you're asked to answer questions.

4  You're asked to go back over it again and make sure and

5  reevaluate things and look at all the evidence before

6  you make up your mind, not only about the crime, but

7  also about the individual himself.

8         Do you believe in your mind that there

9  was -- ought to be, if you've found someone guilty of

10  capital murder, that ought to pretty well settle the

11  issue?  And if you're guilty of capital murder, you

12  ought to automatically get the death penalty.

13    A.   Not necessarily.

14    Q.   Do you understand that basically, I guess, if

15  there is an automatic answer on punishment, it is that

16  they get life?  Because Issue Number One says the burden

17  of proof is on us to prove there is a probability that

18  he will commit criminal acts of violence that would be a

19  continuing threat to society.

20         Since the burden of proof is on us, if we

21  fail to prove the answer's yes, the answer would be no;

22  and they would get life.  Just like at guilt/innocence,

23  it is burden of proof on us.  He has the presumption of

24  innocence.  He's presumed to be innocent until and

25  unless we prove he's guilty beyond a reasonable doubt.

**141**

1  The same way the presumption is he's not guilty, and we

2  have to prove that he is.  Otherwise, we don't get

3  there.  And if you found someone guilty, the presumption

4  is, on Number One the answer is no; because we have the

5  burden of proof, unless and until we prove to a

6  probability that the person would commit criminal acts

7  of violence that would constitute a continuing threat to

8  society.  Any problem with that aspect of the law?

9    A.   No.

10    Q.   Understand in making that decision on Number

11  One about whether or not someone would be a continuing

12  threat to society, you can use the facts of the case

13  that you found him guilty of capital murder on.  Maybe

14  those facts are so horrendous by themselves that they

15  convince you by themselves, without anything else, that

16  a person is a continuing threat.

17         On the other extreme, maybe they're not.

18  Maybe it's a Boyscout, choirboy, straight A student,

19  never been in trouble with the law before, did a capital

20  murder.  I'm not taking that away; but this is like

21  total aberration from the rest of their personality, the

22  rest of their life.  And that type of person -- you may

23  think, I don't know if that person will be a continuing

24  threat; because this was just a total aberration because

25  of the circumstances of the crime.  He's still guilty of

**142**

1  capital murder.  Issue Number One never undoes that.

2  Doesn't unravel that.  That just determines whether he

3  gets life or death.

4    A.   True.

5    Q.   And can you see sometimes that maybe a life

6  sentence is appropriate?

7    A.   Yes.

8    Q.   I'm of the opinion that if I were to ask you or

9  anyone else who found someone guilty of capital murder,

10  can you tell me what the punishment was going to be,

11  knowing the way the system was set up, they would not be

12  able to tell me that, what the punishment was going to

13  be; because they haven't heard all the evidence that

14  they need to hear.

15         Are you of that feeling, or do you think

16  once you found someone guilty of capital murder,

17  school's out.

18    A.   I have to hear the whole thing, their

19  background and what they might do in the future.  I'd

20  have to have the whole picture.

21    Q.   And you think that's important in making these

22  decisions?

23    A.   Of course.

24    Q.   Now another problem you arrive at is, let's say

25  you get to Issue Number Two, which means you've already

143

1 found a person guilty of a capital murder, intentionally
2 took the life of a person during the kidnapping or
3 killed two or more people during one criminal episode.
4 The answer to Number One is yes.
5           In other words, if you had evidence
6 sufficient to prove to you beyond a reasonable doubt
7 there is a probability that the person on trial would
8 commit criminal acts of violence that would be a
9 continuing threat to society, so you found him guilty,
10 and you also think he would be a continuing threat,
11 Issue Number Two now asks you to stop and reevaluate
12 everything you've heard so far.  And do you find there
13 is sufficient reason or reasons, what they call
14 mitigating circumstances, that would give you a reason
15 to give the person life as opposed to death?
16           It asks you to go back and reevaluate
17 everything you've heard so far to make sure you've
18 reached the decisions you want to reach, and if you find
19 there are reasons, to change your vote from death to
20 life.  If you don't find there is a reason to change
21 your vote and leave it like it was, then he receives the
22 death penalty.  Any problem with that aspect?
23     A.  No.
24     Q.  Okay.  That exhaling there, what were you
25 thinking?  Anything going through your mind there about

144

1 that?
2     A.  Again, I would want to go back to what we
3 covered before, before I made that second decision.
4     Q.  Right.
5     A.  And to me, I would have to be, you know, as
6 close as possible, sure, before I made that decision.
7     Q.  Right.  Okay.  You know the State of Texas is
8 seeking the death penalty in this case.  We're going to
9 be asking a jury to find the defendant guilty of capital
10 murder.
11           We're going to be asking you to answer
12 Issue Number One yes and Issue Number Two no, which
13 means the death penalty would be imposed.  Okay?
14     A.  Right.
15     Q.  Is there anything I need to know about you, in
16 determining whether or not you ought to be a juror, that
17 would affect your ability to make those type of
18 decisions if that's what the law and the evidence called
19 for?
20           Somebody could be sitting up there and
21 saying, Mr. McClellan, you know, some other type of
22 juror, I might be a pretty good juror for you on this;
23 but you've got your work cut out for you with me on this
24 case.  Or somebody could say, Hey, I can listen to the
25 evidence and call it like I see it.

145

1     A.  Some cases I might have -- I'd have to think
2 about it a long time.
3     Q.  What do you mean?  Are you saying in cases you
4 might have a problem giving the death penalty, or some
5 cases maybe?
6     A.  Making the right decision.
7     Q.  Okay.  Does that increase my burden of proof,
8 do you think?
9     A.  Pardon?
10     Q.  Does that increase my burden of proof?   Do I
11 have to make you more sure --
12     A.  Huh-uh.
13     Q.  -- than I would someone else?
14     A.  Uh-uh.
15     Q.  Now, you know the burden of proof is beyond a
16 reasonable doubt.
17     A.  Okay, okay.
18     Q.  But are you comfortable with that?
19           The law says the burden of proof is beyond
20 a reasonable doubt.  You can say, well, that's fine what
21 the laws says; but you need to convince me, Mr.
22 McClellan.  You're going to have to give me
23 ninety-nine --
24     A.  Beyond -- I would in that case.
25     Q.  Okay.  You're saying because the death penalty

146

1 is a potential punishment, you think you would hold me
2 to a higher burden of proof than just beyond a
3 reasonable doubt?
4     A.  I think beyond a reasonable doubt would get it.
5     Q.  Would get it.  Okay.
6     A.  Yeah.
7     Q.  All right.  Thank you, sir.  I appreciate your
8 time, and I'll pass you.
9           THE COURT:  Mr. Hill.
10           VOIR DIRE EXAMINATION
11 BY MR. HILL:
12     Q.  Hi, Mr. Nelson.  How are you doing today?
13     A.  Fine.
14     Q.  I'm only going to ask you a few questions.  I
15 know you've been here several days and having to go
16 through quite a bit right now.  That probably kind of
17 preoccupies your time, so I just want to ask you a few
18 questions and we'll let you get out of here.
19           Put you in a position where you're
20 governor of the State of Texas right now, and you have
21 the authority to change the law.  Okay.  And the two
22 options that you have are as follows:  For people
23 convicted of capital murder, the automatic sentence
24 shall be life.  Or, for people convicted of capital
25 murder, the automatic sentence shall be death.  Which

147

1    would you choose, if you can?
2        A.   Okay.  This is all hypothetical?
3        Q.   Sure.
4        A.   One way or the other?
5        Q.   Right.
6        A.   I'd go with life.
7        Q.   Now, I found one of the questions, one of the
8    answers was kind of interesting; and I wanted to follow
9    up if I could.  One of the questions asked you whether
10   or not, would a person's -- an individual's use or sale
11   of drugs prevent them from relying on any defense
12   available to other members of society?  And you
13   answered, Yes.  And then you said, People might not be
14   impartial.
15       A.   Repeat that a little bit again.
16       Q.   Page ten.  See Question Number 46 there?
17       A.   Yes.
18       Q.   Okay.  I just wanted to understand the answer.
19   You said, Yes, people might not be impartial.
20       A.   No, no.  If I'm reading that right, they sell
21   drugs; and they're not able to have a defense, as far as
22   trial, or something like that.
23       Q.   Yeah.  The question was not worded very well.
24   I think if -- I can paraphrase, let me ask this
25   question.

148

1        A.   That would be a definite no.
2        Q.   In other words, if a person is charged with one
3    crime -- say a person is charged with murder, and there
4    was other evidence to suggest that person had used drugs
5    in the past and they were dealing drugs.  Would that
6    prevent that person from relying upon a defense to the
7    murder allegation?
8             In other words, you're not saying because
9    I use drugs, I'm not guilty.  If a person were trying to
10   rely upon self-defense, or accident, or any other
11   identifiable defense, would the fact that you had heard
12   evidence that the person may have been a drug user
13   prevent them from relying upon that other defense?
14       A.   One more time.  I'm sorry, I am.
15       Q.   If you're sitting as juror in a case, and let's
16   say it's a murder case.
17       A.   Okay.
18       Q.   Person is charged with intentionally taking the
19   life of someone.  And you hear evidence that that person
20   on trial uses drugs, or is a drug dealer.  Would that
21   cause you to say, well, because of that, I'm not going
22   to give him the benefit of any issue regarding
23   self-defense?
24       A.   No.
25       Q.   One has nothing to do with the other?

149

1        A.   No.  I hadn't heard the information, no.
2        Q.   Tell me what it was like growing up in Roswell.
3    That's where you grew up, you said, twenty-seven years?
4        A.   Right.  I grew up in the '60s.  Times have
5    changed.
6             THE COURT:  The little men had already
7    left.
8             VENIREPERSON:  The town was basically
9    about 35,000.  They had an Air Force base there.  It was
10   a good size town.  I had a hard time, due to the fact
11   that my dad -- I had to help support my family, really;
12   because my dad was ill.
13            So, looking back, some of my high school
14   wasn't the greatest in the world; but my junior high and
15   early parts of high school I enjoyed.  It was an era.  I
16   had a lot of people I thought a lot about.  John F.
17   Kennedy was one.  I thought he was a great man, and I
18   think -- his address he had when he was elected, what
19   were his words exactly?  He said, Think not what your
20   country can do for you, but what you can do for your
21   country.  That was inspiring to me, and I think that --
22   it might sound corny; but I think today if we could
23   think in terms of that philosophy, we would be a lot
24   better off.
25            Martin Luther King, I thought he was a

150

1    great man.  I worked on civil rights and had a concept
2    of nonviolence.  And he gave the ultimate, his life.
3    Franklin Roosevelt, I thought he was great.  He got us
4    through the war and through the depression, but I moved
5    to Roswell in the late '60s, about '64.  I went to night
6    school there; and I went to college full-time for one
7    semester, dropped out, and then I moved to Houston
8    because of better employment opportunities.
9        Q.   Okay.
10       A.   And I worked for NASA for two years and then
11   went to work for Kraft.
12       Q.   You were with that employer for twenty-six
13   years?
14       A.   Right.
15       Q.   Okay.  What do you do in your spare time?  I
16   know you do the Citizens on Patrol.  What other things?
17       A.   I walk.  I walk five times a week, about
18   forty-five minutes per day.  I quit smoking, so that
19   helps me when I quit smoking.  It's a good habit.  Makes
20   me feel a lot better.  I like to read a lot, so I was
21   lucky enough, I didn't have to enlist -- I wasn't
22   drafted for Vietnam.  I read a lot about Vietnam because
23   of my period of time growing up, and I like to read a
24   lot.  Walking.  I do boating, do a little fishing if
25   it's not too hot.  I like to be comfortable when I fish.

151

1    Q.   Okay.  Is there anything you'd like to ask us
2  from the defense side of the table over here?
3    A.   Nothing I can think of right now.
4    Q.   If I were sitting here and I'm having to pick
5  you right now, not coming back in a few weeks, is there
6  anything you could tell me to convince me I shouldn't
7  pick you as a juror?
8    A.   I would give it my best shot.
9    Q.   Fair enough.
10    A.   That's all any of us can do.
11         THE COURT:  Mr. Nelson, in just a second
12  I'm going to excuse you.  Before I do, I'll tell you
13  we'll want you back here Wednesday, the 29th of
14  September, which is two weeks from today.  What we'll do
15  is, we're talking to folks individually for the purposes
16  of creating a pool of roughly forty-eight people.  Every
17  single one of them will have been through exactly what
18  you've been through; and we'll have everybody back here
19  on Wednesday, the 29th.
20         Between now and -- oh, and if we can get
21  started on time that day -- and that would be 9:30 --
22  everybody would be out of here by noon on that day.
23  Everybody will leave here knowing for certain whether
24  they are or are not a juror in the case.  And we
25  recognize you still have some variables out there.

152

1         VENIREPERSON:  But if worse comes to
2  worst, in my case, would it be a problem as far as
3  getting dismissed from the jury?
4         THE COURT:  You just tell us that day,
5  because we're going to be relying on you.
6         VENIREPERSON:  Good deal.
7         THE COURT:  And we're all anticipating
8  good news, by the way.  Between now and when we see you
9  again, don't you alter your life one bit for us.  Do the
10  things you ordinarily do, and do them exactly the same
11  way.  All we ask is, don't talk about the case with
12  anybody.  Don't let anybody talk to you.  I don't know
13  if there is going to be any news media treatment about
14  the case between now and when we get going; but if there
15  is, avoid it.  If there is anything about the case on
16  the television, refuse to watch it; newspaper, refuse to
17  read it.
18         Now each those restrictions is for the
19  point of trying to accomplish the same objective, and
20  that's this:  If you do become a juror in the case, the
21  decision that you do reach, whatever it is, that's got
22  to be based exclusively upon the information you
23  received; and your decision can in no way be influenced
24  or affected by anything you hear outside.  So, that's
25  why we try to do that.

153

1         (Juror excused.)
2              DOUGLAS POLEGA,
3  having been first duly sworn, testified as follows:
4              VOIR DIRE EXAMINATION
5  BY THE COURT:
6    Q.   How are you today?
7    A.   Good.
8    Q.   Good.  Is it Polega?  Mr. Polega, I'd ask you
9  to remember back to Monday when the big group was here,
10  the things we were talking about on that day, add to it
11  this morning the things we talked about this morning.
12  And out of everything we have talked about so far, do
13  you have any questions at all for me?
14    A.   No.
15    Q.   Is there anything to this point that we have
16  not yet talked about that you feel as though we should
17  address, because it might have some bearing on your
18  service as a juror in this case?
19    A.   No.
20    Q.   Is there anything at all, sir, that you can
21  think about, whether it be something perhaps about your
22  personal life, something perhaps about your job,
23  something perhaps about your health, or maybe even
24  something related to something else that you think in
25  any way could interfere with your ability to be a juror

154

1  in this case during the time we talked about?
2    A.   Possibly my job.
3    Q.   Let's talk about that.
4    A.   I just started about two months ago, and we're
5  coming up on the Year 2,000 problems.
6    Q.   I thought we didn't have any of those.
7    A.   We do.  But we have a company.  We have a
8  company-wide deadline of October 16th to have all that
9  resolved, and I play -- not a key part, but I do play a
10  part in that.  And if I were not able to participate in
11  that, that would not really look very good for me, as an
12  employee.
13         THE COURT:  Guys, tell me what I'm
14  supposed to do.
15         MR. HILL:  You might want to delve in.
16         THE COURT:  I recognize that, but I was
17  looking for an easy way out.
18         MR. MCCLELLAN:  There are no easy ways.
19         THE COURT:  Nor are there any free
20  lunches, either.
21    Q.   (BY THE COURT)  Here's what I think.  You know,
22  there is a chance that we might get together back again
23  on the 29th of September.  I have no idea what's going
24  to happen on that day in terms of what's going to happen
25  to you, whether you are a juror or not.  And these

## 155

1  lawyers, right now, they couldn't answer that question
2  for you, either; because normally we visit with you with
3  all the other people.
4          But my question to you is this:  If you
5  were a juror, we would start the evidence on the 4th of
6  October; so, that gives you two-and-a-half weeks right
7  there.  The people know that you're here, don't they?
8  A.  Yes.
9  Q.  They know not what the case is about, but they
10  know the seriousness of the case; so, they're armed with
11  information?
12          MR. MCCLELLAN:  Judge, we resolved your
13  problem.
14          THE COURT:  Thank you very much.  You're
15  excused.
16          If I'm understanding correctly, there is
17  an agreement by and between the parties that
18  Venireperson Number 62, that being Mr. Eric Garcia, as
19  well as Venireperson Number 56, that being Mr. Douglas
20  Polega, who's being excused by agreement of all
21  concerned.  Each may be excused.
22          Mr. McClellan, is that your agreement?
23          MR. MCCLELLAN:  Yes, Your Honor.
24          THE COURT:  Miss Connors?
25          MS. CONNORS:  Yes, sir, Your Honor.

## 156

1          THE COURT:  Mr. Hill, is that your
2  agreement?
3          MR. HILL:  Yes, sir, Your Honor.
4          THE COURT:  Mr. Wentz, is that your
5  agreement?
6          MR. WENTZ:  Yes, sir, Your Honor.
7          THE COURT:  And yours, Mr. Mamou?
8          THE DEFENDANT:  Yes, sir.
9          THE COURT:  Is it your request he be
10  excused?
11          THE DEFENDANT:  Yes, sir.
12          THE COURT:  Very well.

## 157

1  THE STATE OF TEXAS  )
2  COUNTY OF HARRIS     )
3          I, Pamela Kay Knobloch, Official/Deputy
Official Court Reporter in and for the 179th District
4  Court of Harris County, State of Texas, do hereby certify
that the above and foregoing contains a true and correct
5  transcription of all portions of evidence and other
proceedings requested in writing by counsel for the
6  parties to be included in this volume of the Reporter's
Record, in the above-styled and numbered cause, all of
7  which occurred in open court or in chambers and were
reported by me.
8
9  I further certify that this Reporter's Record
of the proceedings truly and correctly reflects the
10  exhibits, if any, admitted by the respective parties.
11  I further certify that the total cost for the
preparation of this Reporter's Record is $_____ and
12  was paid by Harris County.
13  WITNESS MY OFFICIAL HAND this the _____ day of
_____, 2000.
14
15  _____
16  Pamela Kay Knobloch, Texas CSR No. 1650
Expiration date:  12/31/2000
17  Official Court Reporter, 179th District Court
Harris County, Texas
18  301 San Jacinto
Houston, Texas 77002
19  713.755.6340
20  APPELLANT:   CHARLES MAMOU, JR.
CAUSE NO. 800112

**$**

$10,000 [1] 34:1
$ [1] 157:11

**'**

'60s [2] 149:4 150:5
'64 [1] 150:5

**/**

/TKHRAOPLDZ [1] 68:16
/TWERPT [1] 64:1

**0**

0470500 [1] 2:5

**1**

100 [2] 134:1 134:2
11th [1] 133:1
12/31/2000 [1] 157:16
120,000 [1] 74:6
12:00 [1] 132:17
13396100 [1] 2:3
14 [1] 137:15
15th [1] 1:18
1650 [1] 157:16
16th [1] 154:8
179th [3] 1:11 157:3 157:17
1960 [1] 2:19
1991 [1] 133:10
1998 [1] 3:23
1999 [2] 1:18 74:5
1:00 [1] 132:17
1:30 [1] 132:17
1st [1] 74:5

**2**

2,000 [1] 154:5
2000 [1] 157:13
201 [1] 2:7
2039 [2] 30:17 31:3
21179300 [1] 2:18
25 [1] 1:2
281.587.0088 [1] 2:21
29th [11] 74:20 74:21 76:1 76:4 109:4 127:16 127:17 128:11 151:13 151:19 154:23

**3**

3 [1] 137:20
301 [1] 157:18
35,000 [1] 149:9

**4**

46 [1] 147:16
4615 [1] 2:14
49 [1] 77:24
4th [1] 155:5

**5**

56 [1] 155:19
5629 [1] 2:19
59656300 [1] 2:13

**6**

62 [1] 155:18

**7**

713.623.8312 [1] 2:16
713.755.5800 [1] 2:9
713.755.6340 [1] 157:19
77002 [2] 2:8 157:18
77027 [1] 2:15

**7**

7069 [1] 68:16
7th [1] 3:22

**8**

8 [1] 1:2
800112 [2] 1:3 157:20
8:00 [1] 18:19

**9**

9:30 [2] 109:7 151:21

[1] 157:12

[1] 157:15

**A**

Aberration [4] 27:17 130:4 141:21 141:24
Abide [1] 90:5
Abilities [2] 58:15 116:19
Ability [12] 47:14 51:11 77:12 79:5 85:13 106:7 111:9 134:3 134:13 136:20 144:17 153:25
Able [16] 33:4 58:10 58:12 76:5 88:8 97:3 102:16 108:10 114:25 115:10 118:15 124:17 128:17 142:12 147:21 154:10
Abolished [1] 138:19
Above-entitled [1] 1:19
Above-styled [1] 157:6
Absolute [4] 27:17 42:4 107:20 130:4
Absolutely [12] 11:3 24:1 30:3 42:2 74:23 76:11 77:14 108:2 113:16 129:3 137:13 137:21
Accept [4] 80:15 80:18 88:2 88:22
Accepted [3] 87:18 100:16 100:22
Access [1] 106:4
Accident [5] 4:7 56:24 104:23 136:1 148:10
Accidentally [1] 115:17
Accomplice [1] 39:15
Accomplish [4] 43:18 44:5 72:15 152:19
Accomplishing [1] 110:3
According [1] 42:10
Account [2] 30:16 73:12
Accurate [5] 4:21 28:16 35:3 35:5 61:19
Accused [2] 96:14 104:12
Acquisition [1] 74:9
Act [1] 66:6
Actions [1] 102:5
Acts [29] 11:16 15:19 15:23 16:3 16:14 17:16 17:25 18:23 19:2 19:5 19:9 19:15 57:19 58:1 58:18 58:23 59:5 64:14 64:20 91:15 92:13 119:3 119:14 122:16 122:24 129:25 140:18 141:6 143:8
Add [5] 36:15 45:15 73:13 110:20 153:10
Addition [1] 33:25
Additional [6] 5:11 33:14 38:17 116:17 118:8 140:2
Address [3] 73:19 149:18 153:17
Addressed [1] 111:1
Administrators [1] 19:7
Admitted [1] 157:9
Admitting [1] 41:18

Adult [1] 131:12
Adulterous [1] 81:17
Affect [5] 50:1 50:16 83:22 114:11 144:17
Affected [6] 73:1 88:18 100:9 100:11 100:13 152:24
Afterwards [2] 53:5 100:10
Age [8] 30:6 30:7 30:9 30:13 30:14 81:12 81:13 154:4
Ago [7] 82:9 82:10 85:22 86:22 90:17 112:6 154:4
Agree [13] 8:3 27:21 38:21 70:20 70:21 89:3 106:21 117:9 137:11 137:22 138:17 139:4 139:14
Agree/disagree [1] 137:1
Agreeing [1] 78:8
Agreement [9] 21:19 76:7 77:23 77:25 155:17 155:20 155:22 156:2 156:5
Ahead [7] 6:1 56:6 75:19 103:18 126:14 127:15 127:16
Aided [1] 1:22
Ain't [1] 125:11
Air [2] 107:13 149:9
Alcohol [1] 65:24
Alike [3] 41:2 117:11 117:12
Allegation [3] 4:21 4:21 148:7
Alleged [10] 3:21 4:12 29:9 56:25 57:2 96:19 115:23 115:25 118:23 135:21
Allow [3] 67:22 76:23 135:14
Allowed [5] 89:11 98:22 102:3 134:16 134:22
Almost [1] 34:3
Alone [2] 79:15 111:21
Alter [3] 72:8 109:13 152:9
Amount [1] 11:24
Anger [1] 35:20
Angry [2] 81:18 105:17
Answer [100] 6:18 9:20 11:1 13:5 13:7 13:14 14:1 14:3 14:4 14:6 14:7 14:9 14:15 16:15 19:21 20:8 22:1 22:1 22:3 22:12 22:16 23:15 23:24 24:1 24:3 24:6 24:8 26:12 26:16 26:25 27:23 27:25 28:1 29:3 29:4 31:12 31:15 51:3 51:7 55:20 62:16 62:21 62:24 63:1 63:6 63:12 64:7 66:22 67:9 67:10 67:22 68:20 70:14 75:9 76:17 76:23 92:14 95:18 95:18 97:2 99:5 99:20 104:15 104:16 106:2 106:17 104:21 112:22 112:16 112:20 113:8 115:7 118:9 118:10 118:14 119:15 119:16 119:18 119:19 119:19 119:23 119:25 123:2 123:12 123:21 123:21 129:12 129:13 129:18 129:19 130:7 130:19 140:3 140:15 140:21 141:4 143:4 144:11 147:18 155:1
Answer's [1] 140:21
Answered [7] 29:15 31:6 79:16 92:24 112:21 137:22 147:13
Answering [6] 10:3 20:15 66:25 91:7 123:22 124:14
Answers [16] 9:12 9:14 9:15 10:5 11:19 19:19 19:23 21:8 21:8 49:3 61:10 61:11 95:14 95:15 95:16 147:8
Anticipated [1] 74:4
Anticipating [1] 152:7
Anytime [3] 13:1 32:2 38:13
Anyway [4] 11:9 17:23 45:

Apartment [1] 27:9
Appellant [2] 1:6 157:20
Appellee [1] 1:11
Applied [1] 138:22
Applies [4] 10:3 10:13 39:13 68:11
Apply [3] 45:1 58:11 140:1
Appreciate [6] 60:10 61:9 61:13 80:9 94:11 146:7
Apprise [1] 127:19
Appropriate [14] 14:13 21:4 21:14 23:21 26:11 26:16 34:23 54:10 55:11 55:13 63:16 93:15 130:10 142:6
Area [9] 42:2 84:2 95:21 123:11 123:19 123:25 124:4 124:6 134:14
Argue [1] 97:4
Argument [2] 96:24 97:7
Arised [1] 98:14
Armed [4] 11:5 127:18 128:17 155:10
Arrested [3] 39:1 42:18 112:10
Arrive [1] 142:24
Arson [1] 27:13
Arsons [1] 17:10
Aside [5] 47:25 114:19 121:22 126:1 139:21
Aspect [3] 120:1 141:8 143:22
Aspects [1] 131:12
Assaulted [1] 54:5
Assess [2] 52:9 117:24
Assessed [1] 52:4
Assessing [2] 36:18 37:14
Assistant [2] 2:6 3:15
Assume [11] 36:4 37:4 43:12 51:20 56:5 65:23 87:23 98:23 103:8 115:8 117:25
Assuming [1] 101:17
Assure [1] 77:18
Attempt [1] 72:21
Attempted [1] 17:6
Attend [1] 86:8
Attention [6] 76:6 77:6 77:10 77:19 114:25 115:10
Attorney [1] 3:13
Attorneys [5] 2:6 2:10 2:22 3:15 7:12
Attribute [1] 89:3
Aunt's [1] 81:19
Authorities [2] 30:21 30:23
Authority [12] 89:5 89:7 89:7 89:8 89:10 89:11 89:12 89:13 89:13 89:14 90:4 146:21
Automatic [14] 66:11 75:9 91:10 111:15 111:16 119:16 119:18 119:19 119:23 129:6 129:7 140:15 146:23 146:25
Automatically [5] 90:16 91:1 116:9 119:5 140:12
Automobile [1] 17:15
Available [6] 37:2 38:5 116:7 136:8 139:5 147:12
Avoid [3] 72:17 109:23 152:15
Awarded [1] 30:20
Aware [2] 9:9 43:24
Awful [2] 55:21 62:7

**B**

Babies [1] 88:10
Baby [1] 16:5
Background [14] 5:20 13:

19 20:20 58:7 58:10 58:13
58:14 91:20 93:12 94:24 102:
1 103:11 116:18 142:19
**Bad** [17] 6:10 21:10 21:13
68:24 69:1 80:17 86:15 86:
16 88:17 89:7 89:13 102:7
113:3 117:3 117:5 118:19
137:3
**Ballistically** [1] 42:19
**Ballpark** [1] 41:25
**Bank** [4] 38:22 38:23 39:2
39:8
**Bar** [1] 106:15
**Bars** [1] 30:10
**Base** [2] 50:2 149:9
**Based** [32] 23:22 24:6 24:
21 28:2 30:20 33:18 37:16
44:12 44:24 50:3 50:3 50:19
62:25 64:2 65:1 68:5 72:24
79:11 85:2 90:8 110:5 112:
24 114:16 114:20 120:22 122:
9 123:15 123:17 129:14 130:
2 139:17 152:22
**Basis** [4] 23:17 31:6 71:
20 115:6
**Bat** [1] 17:14
**Baylor** [3] 14:25 84:7 84:8
**Bayou** [1] 133:3
**Bearing** [10] 24:1 24:2 47:
7 73:20 78:22 111:3 112:19
113:6 127:4 153:17
**Beaumont** [1] 83:13
**Became** [1] 102:16
**Become** [5] 72:22 87:20
106:23 110:4 152:20
**Becomes** [5] 4:9 30:1 30:1
30:7 115:22
**Begin** [3] 3:11 48:8 130:23
**Beginning** [1] 7:14
**Begins** [3] 7:6 7:6 12:11
**Behind** [9] 5:23 18:16 18:
22 19:4 30:10 37:21 52:23
102:16 106:15
**Beings** [1] 44:21
**Belief** [2] 60:6 121:23
**Beliefs** [5] 47:18 49:17
50:23 95:4 139:21
**Believability** [1] 129:8
**Believable** [1] 12:14
**Believer** [2] 121:14 125:1
**Believes** [1] 62:4
**Benefit** [3] 124:8 126:7
148:22
**Best** [5] 55:7 96:24 134:3
134:12 151:8
**Bet** [1] 77:11
**Better** [9] 49:4 52:25 75:
14 81:8 102:17 107:11 149:
24 150:8 150:20
**Between** [15] 16:12 17:18
17:24 18:8 56:8 65:12 72:7
72:13 74:7 109:12 109:17
151:20 152:8 152:14 155:17
**Beyond** [63] 3:25 4:14 11:
14 11:21 12:2 12:6 12:15 12:
23 13:2 13:6 13:9 13:12 13:
14 13:25 14:14 14:18 15:17
21:23 22:5 22:9 32:2 32:3
32:7 32:10 32:16 32:18 33:3
33:5 39:18 40:15 40:19 42:8
43:2 43:6 43:8 43:12 51:5
57:16 62:4 64:10 68:12 69:
24 92:8 92:11 95:8 97:21
119:2 119:11 119:12 119:21
119:24 122:14 124:3 124:7
125:15 134:10 140:25 143:6
145:15 145:19 145:24 146:2
146:4
**Bicycle** [1] 117:16
**Big** [4] 62:2 62:3 110:19
153:9
**Bill** [1] 17:20

**Biochemistry** [1] 84:9
**Bit** [13] 6:18 28:14 61:3
61:6 62:11 75:13 94:25 109:
13 127:21 129:17 146:16 147:
15 152:9
**Blameworthy** [1] 69:20
**Board** [1] 30:24
**Boating** [1] 150:24
**Bob** [1] 1:20
**Bodies** [1] 75:10
**Body** [2] 42:20 75:11
**Book** [1] 68:21
**Box** [1] 125:14
**Boy** [1] 108:13
**Boyscout** [1] 141:18
**Brand** [1] 62:6
**Breaking** [2] 17:13 17:15
**Breath** [1] 106:16
**Breathing** [1] 107:13
**Brick** [1] 17:14
**Briefly** [1] 38:9
**Bring** [3] 40:2 89:5 116:22
**Broad** [3] 34:2 34:3 34:21
**Brought** [7] 3:1 81:5 87:
12 87:13 102:2 122:5 125:24
**Building** [4] 17:11 27:9
41:25 68:9
**Bullet** [1] 17:14
**Burden** [14] 92:15 97:20
123:3 124:1 124:17 140:16
140:20 140:23 141:5 145:7
145:10 145:15 145:19 146:2
**Burdette** [1] 1:20 103:6
**Burglaries** [1] 17:12
**Burglarizes** [1] 54:18
**Burglary** [2] 17:12 116:4
**Burning** [4] 17:10 17:10
17:11 68:9
**Business** [2] 40:23 75:14
**Busy** [1] 115:4
**Buy** [2] 128:16 128:21
**Bye** [1] 104:24

## C

**Calendar** [1] 29:20
**Cancer** [2] 77:3 128:8
**Cannot** [11] 15:6 15:12 29:
19 32:11 32:17 38:15 39:3
73:1 77:20 114:22 128:4
**Capital** [116] 3:21 4:1 4:
9 4:15 4:19 4:24 7:23 13:17
13:23 14:12 17:2 17:5 20:5
24:5 24:18 26:17 26:24 27:
16 29:14 29:18 31:22 32:9
33:8 33:10 33:17 33:20 36:5
36:9 37:6 37:8 37:22 43:4
43:10 44:14 44:15 46:25 51:
4 55:15 55:24 56:16 56:20
57:10 57:11 57:14 58:21 59:
4 61:15 61:25 62:5 62:6 62:
13 63:5 63:17 64:11 64:19
64:23 65:16 65:19 66:1 66:
18 67:2 67:18 79:14 90:15
91:2 91:13 91:19 92:7 92:9
95:9 96:25 97:8 97:24 98:25
100:3 100:4 103:8 103:13
106:8 107:22 111:21 112:10
112:22 115:13 115:21 115:21
116:1 116:3 116:7 116:13
117:12 117:19 118:14 118:19
120:5 120:11 120:20 121:1
121:13 122:20 135:8 135:20
136:2 137:24 139:25 140:10
140:11 141:13 141:19 142:1
142:9 142:16 143:1 144:9
146:23 154:6
**Car** [5] 27:9 38:23 39:1 53:
14 112:7
**Card** [1] 18:20
**Care** [10] 40:5 40:7 40:8
40:10 40:11 40:12 40:16 84:

**Cares** [2] 28:17 40:17
**Carolina** [1] 112:7
**Case** [174] 3:12 4:12 5:5 5:
8 6:17 7:9 9:7 10:2 10:20
11:17 12:18 14:3 19:3 19:
20 20:10 20:25 21:11 21:12
21:17 22:21 22:23 23:2 23:
11 23:11 23:14 23:18 23:23
24:6 24:12 24:22 25:1 25:7
25:17 26:8 26:10 26:14 26:
18 27:4 28:1 28:3 28:11 28:
19 29:5 29:14 29:18 30:16
30:17 31:7 32:8 32:14 33:1
33:19 34:20 36:5 36:17 36:
21 37:13 37:17 37:20 37:22
38:1 39:4 39:12 39:23 39:24
40:6 40:7 40:8 40:9 40:17
41:22 43:3 43:4 43:5 43:25
44:7 45:2 46:15 47:14 49:2
49:5 50:1 50:24 51:3 52:6
54:10 56:5 58:11 58:12 64:9
71:12 72:5 72:15 72:16 72:
17 72:17 72:23 73:21 77:6
78:23 79:6 79:11 80:12 83:
23 90:10 90:11 90:18 90:24
93:12 93:14 94:9 95:7 95:8
96:6 97:14 97:18 97:21 98:1
98:23 99:7 101:21 108:16
109:11 109:19 109:22 109:23
110:4 111:9 111:14 111:16
111:19 112:2 112:17 112:22
112:23 112:25 114:8 114:11
115:1 115:23 116:1 116:8
116:15 116:24 120:7 120:10
120:18 122:23 123:9 125:15
128:13 130:2 130:11 131:8
134:7 134:25 135:13 135:21
141:12 144:8 144:24 145:24
148:15 148:16 151:24 152:2
152:11 152:14 152:15 152:20
153:18 154:1 155:9 155:10
**Cases** [28] 22:19 39:13 46:
12 55:10 55:11 55:12 55:13
55:13 81:1 91:17 96:21 106:
20 106:25 107:1 111:25 113:
6 115:25 116:3 116:6 120:3
121:1 133:21 134:15 134:20
136:5 145:1 145:3 145:5
**Cash** [1] 17:19
**Category** [1] 17:4
**Catholic** [4] 49:18 49:18
49:19 49:20
**Catholics** [1] 50:7
**Caused** [2] 42:20 107:15
**Causes** [2] 94:25 134:2
**Causing** [1] 97:25
**Certain** [16] 16:18 16:20
17:5 17:12 35:1 80:23 85:7
95:17 116:6 117:12 131:12
131:22 132:13 132:15 132:15
151:23
**Certainly** [11] 7:9 17:2
32:25 35:18 44:6 44:18 44:
18 46:10 46:10 127:12 130:13
**Certainty** [5] 15:12 15:
14 16:2 16:12 97:16
**Certify** [3] 157:4 157:8
157:10
**Cetera** [2] 50:15 83:21
**CH** [1] 64:1
**Chair** [1] 5:6
**Chairs** [2] 22:22 34:18
**Challenge** [2] 126:12 126:
15
**Chambers** [1] 157:7
**Chance** [11] 7:16 23:12 24:
23 54:13 60:22 72:11 72:12
100:19 109:16 109:16 146:25
**Change** [12] 59:2 74:3 74:
10 74:11 76:11 92:17 93:22
93:23 125:24 143:19 143:20
146:21
**Changed** [1] 149:5
**Character** [13] 5:19 13:
19 20:20 58:14 59:10 64:25

**Characteristics** [1]
117:13
**Charge** [8] 8:23 8:24 10:9
10:12 10:23 14:21 29:12 98:5
**Charged** [6] 3:20 57:10
112:10 148:2 148:3 148:18
**Charles** [4] 1:5 3:12 71:
12 157:20
**Check** [2] 76:21 104:3
**Checked** [4] 24:23 133:18
133:20 137:18
**Chemotherapy** [1] 128:3
**Child** [5] 5:25 6:1 6:1 6:
3 116:6
**Children** [3] 52:22 71:8
112:14
**Children's** [1] 68:8
**Choice** [2] 9:16 9:21
**Choices** [4] 86:15 86:16
86:17 86:18
**Choirboy** [1] 141:18
**Choose** [2] 102:6 147:1
**Chose** [1] 55:9
**Chosen** [1] 89:25
**Church** [9] 49:18 49:20 49:
24 50:10 50:12 50:14 89:2
89:20 102:2
**Church's** [2] 49:22 88:25
**Circumstance** [8] 21:2
25:7 35:15 77:15 92:17 115:
22 130:9 135:21
**Circumstances** [37] 20:
18 21:3 22:20 30:5 34:4 35:
23 37:3 37:20 41:20 41:21
42:23 46:23 47:24 48:1 50:3
58:25 69:5 69:18 82:11 82:
22 91:3 91:18 92:19 98:16
98:19 99:16 100:4 103:10
105:2 112:3 117:17 117:20
120:13 125:2 138:5 141:25
143:14
**Circumstantial** [15] 39:
25 40:1 40:4 40:9 40:10 40:
22 41:6 41:6 41:19 41:23 42:
23 43:1 43:5 43:6 43:11
**Citizen** [4] 50:5 50:20 71:
4 87:21
**Citizens** [3] 19:16 131:
25 150:16
**Civil** [1] 150:1
**Civilization** [1] 138:8
**Civilized** [1] 138:14
**Claimed** [3] 4:13 31:24 31:
25
**Claiming** [2] 21:18 32:25
**Claims** [2] 4:17 112:9
**Claire** [6] 2:4 3:17 49:1
80:11 114:7 131:7
**Class** [3] 16:20 16:21 18:
21
**Cleanly** [1] 99:9
**Clear** [1] 55:15
**Cleared** [1] 89:24
**Clerk** [1] 51:25
**Client** [1] 95:8
**Client's** [2] 97:13 97:14
**Close** [4] 26:18 74:3 88:5
144:6
**Closeness** [1] 88:6
**Cloud** [1] 69:12
**College** [4] 83:16 84:8 88:
10 150:6
**Comfortable** [9] 18:7 45:
13 60:5 97:6 110:16 125:18
125:21 145:18 150:25
**Coming** [4] 98:8 107:2 151:
5 154:5
**Commission** [11] 4:14 5:

21 5:23 33:14 38:20 39:8 39:
20 57:22 113:2 113:3 136:7
**Commit** [33] 11:15 15:19
15:22 16:3 16:13 16:18 16:
20 17:2 34:10 36:24 38:14
38:14 57:18 57:25 58:18 58:
22 59:5 64:13 64:20 67:19
68:14 91:9 91:15 119:3 119:
14 122:15 122:24 129:25 130:
17 130:18 140:18 141:6 143:8
**Commitment** [5] 38:6 103:
9 103:14 107:20 113:18
**Commitments** [2] 76:25 77:
1
**Commits** [4] 54:20 54:22
64:18 64:23
**Committed** [32] 4:10 4:13
4:17 5:14 27:6 27:15 34:13
37:25 38:1 38:15 41:13 41:
18 41:21 42:6 46:9 46:11 49:
11 54:16 55:21 63:21 64:1
64:4 68:7 68:15 87:9 89:19
92:21 99:2 120:16 130:12
135:2 135:5
**Committing** [4] 34:14 96:
14 104:12 116:10
**Common** [3] 4:2 75:11 129:
15
**Communities** [1] 18:9
**Community** [3] 18:8 52:12
83:16
**Companies** [1] 74:7
**Company** [2] 154:7 154:8
**Company-wide** [1] 154:8
**Comparative** [3] 5:20 25:
6 113:1
**Compared** [1] 130:4
**Comparison** [1] 15:4
**Complaint** [1] 106:19
**Completely** [2] 128:13
130:14
**Computer** [1] 1:22
**Conceivable** [1] 30:4
**Concept** [4] 38:12 38:12
117:6 150:1
**Concepts** [1] 114:10
**Concern** [8] 5:3 64:16 69:
25 70:1 74:17 81:4 97:11
134:2
**Concerned** [3] 108:6 125:
5 155:21
**Conclude** [1] 95:7
**Concluded** [1] 10:16
**Conclusion** [12] 10:11 12:
12 18:24 29:23 29:25 72:3
123:6 127:13 129:6 129:7
129:7 130:19
**Conditioned** [2] 35:2 40:
24
**Conduct** [7] 4:3 27:16 34:
11 46:1 62:8 117:17 130:3
**Conducts** [1] 3:24
**Confession** [1] 41:17
**Confinement** [5] 33:22 33:
23 33:25 36:19 37:15
**Conflict** [2] 87:25 115:9
**Confront** [1] 54:19
**Conjures** [1] 90:16
**Connect** [2] 38:19 39:8
**Conners** [4] 49:1 80:11
114:7 131:7
**Connors** [2] 2:4 3:17 155:
24 155:25
**Conscience** [1] 50:21
**Consequences** [6] 81:4
86:15 86:16 86:17 86:18 102:
5
**Conservative** [1] 121:15
**Consider** [16] 18:6 36:18
36:22 37:14 68:10 69:3 69:5
69:13 70:7 70:8 103:17 116:

**Consideration** [6] 20:17
30:2 30:2 37:19 66:6 116:14
**Considered** [1] 29:19
**Considering** [1] 104:25
**Consistently** [1] 24:17
**Conspirator** [2] 38:16 38:
18
**Conspirators** [1] 38:15
**Conspire** [1] 38:14
**Constitute** [8] 11:16 18:
2 19:15 57:19 91:16 119:4
122:16 141:7
**Contact** [1] 18:13
**Contained** [3] 10:21 19:
25 22:9
**Contains** [1] 157:4
**Contend** [1] 92:16
**Context** [2] 15:16 19:12
**Continue** [2] 74:3 84:2
**Continuing** [18] 11:16 18:
3 19:15 57:19 58:22 59:4 91:
16 92:13 119:4 122:16 122:
23 140:19 141:7 141:11 141:
16 141:23 143:9 143:10
**Contrary** [1] 37:4
**Control** [6] 50:22 74:4 74:
10 74:11 76:12 100:20
**Convenience** [1] 51:23
**Conversation** [10] 6:24
14:5 22:13 61:21 79:8 89:5
123:4 127:9 127:14 129:10
**Conversations** [2] 3:9
83:22
**Convict** [1] 40:3
**Convicted** [17] 4:24 13:
16 13:22 30:6 38:16 39:14
96:11 97:7 100:3 106:8 112:
10 120:5 120:11 130:10 139:
12 146:23 146:24
**Conviction** [2] 30:14 39:3
**Convince** [4] 93:15 141:
15 145:21 151:6
**Convinced** [1] 134:1
**Convinces** [1] 92:11
**Copesetic** [1] 75:25
**Corner** [1] 125:14
**Corny** [1] 149:22
**Correct** [9] 52:4 90:12 95:
15 101:17 114:13 114:14 115:
12 118:1 157:4
**Correctional** [1] 83:8
**Correctly** [5] 68:5 74:19
75:25 155:16 157:9
**Corroborates** [1] 39:9
**Corroborating** [2] 39:16
39:17 39:19
**Cost** [1] 157:10
**Counsel** [1] 157:5
**Country** [4] 39:24 74:15
149:20 149:21
**County** [9] 1:8 1:21 3:22
19:16 51:19 157:2 157:4 157:
11 157:17
**Couple** [16] 3:17 10:7 20:
1 27:11 35:8 35:12 38:13 45:
20 54:4 61:22 72:12 83:11
101:25 104:9 104:20 110:17
**Course** [21] 4:11 4:13 4:
18 31:23 32:12 32:13 43:21
44:25 57:8 68:6 106:18 117:
4 118:22 118:22 125:25 129:
5 135:3 136:3 136:4 140:1
142:23
**Court** [62] 1:3 1:5 3:2 45:
11 48:21 52:15 60:12 62:20
63:4 63:9 64:2 67:8 68:3 69:
2 71:16 72:7 73:5 73:10 75:
19 75:23 77:21 78:2 78:4 78:
6 78:8 78:14 80:2 90:23 94:

13 108:22 110:13 114:2 114:
19 114:21 118:6 121:25 126:
13 126:20 131:2 139:17 146:
9 149:6 151:11 152:4 152:7
154:21 155:14 155:16 154:19
156:4 156:7 156:9 156:12
157:3 157:4 157:7 157:17
157:17
**Court's** [5] 8:23 8:23 10:
9 10:12 10:23
**Courthouse** [3] 10:25 34:
17 44:23
**Courtroom** [8] 73:1 73:3
76:6 101:8 101:10 110:6 110:
7 114:22
**Cousin** [2] 81:11 88:19
**Covered** [2] 127:1 144:3
**Coworkers** [1] 18:14
**CRAWFORD** [1] 78:11
**Creating** [3] 71:21 109:2
151:16
**Credible** [3] 40:18 40:18
40:25
**Crime** [91] 5:14 5:21 5:23
6:17 16:22 27:5 27:15 33:11
33:16 33:16 34:13 35:18 36:
16 37:25 38:14 38:15 38:20
39:9 41:13 41:22 42:5 53:7
53:22 53:25 54:2 54:8 54:16
54:22 56:4 56:9 56:10 62:5
63:22 63:22 64:1 64:4 64:5
64:16 66:21 68:7 68:14 68:
14 69:1 69:2 69:4 69:6 69:
10 69:12 69:18 69:19 69:25
70:3 71:5 71:5 71:6 71:8 71:
10 82:17 82:21 85:7 87:2 87:
9 89:19 92:21 96:12 96:15
96:19 96:20 99:2 99:2 103:
10 103:13 104:13 112:4 113:
2 113:3 116:10 120:13 120:
16 120:19 125:2 130:12 130:
12 133:14 135:3 135:5 137:
11 139:13 140:6 141:25 148:3
**Crimes** [26] 16:18 16:20
16:21 16:21 16:24 17:4 17:5
17:6 17:7 17:9 17:18 17:25
34:10 34:15 49:11 49:23 54:
2 55:19 55:20 56:4 63:20
80:23 133:5 134:20 138:2
139:6
**Criminal** [35] 11:15 12:
18 15:19 15:23 16:3 16:13
17:15 17:25 18:23 19:2 19:5
19:9 19:15 57:2 57:18 57:25
58:13 58:18 59:5 64:14 64:
20 91:15 99:1 115:25 116:18
119:3 119:14 122:15 135:23
136:4 138:21 140:18 141:6
143:3 143:8
**Criminals** [2] 105:14 138:
13
**Critical** [1] 107:21
**CSR** [1] 157:16
**Culpability** [2] 20:21 69:
7
**Cut** [1] 144:23

**D**

**Dad** [2] 149:11 149:12
**Daily** [1] 115:5
**Danger** [7] 20:10 23:20 26:
18 26:25 66:20 67:3 67:18
**Date** [1] 157:16
**Daughter** [5] 83:4 84:4
88:8 105:5 108:5
**Daughter's** [1] 106:6
**Daughters** [3] 88:2 92:3
103:23
**Days** [7] 14:22 35:12 68:7
72:12 76:4 129:4 146:15
**Dayton** [1] 3:24
**Dead** [3] 42:20 53:17 68:22
**Deadline** [1] 154:8
**Deal** [6] 8:3 16:0 105:23

128:14 129:23 152:6
**Dealer** [1] 148:20
**Dealers** [1] 34:8
**Dealing** [7] 4:20 5:12 13:
18 82:13 82:23 106:25 148:5
**Dealt** [1] 26:19
**Death** [121] 5:9 9:18 10:1
10:6 14:7 19:22 21:4 21:14
23:3 23:21 24:13 24:18 27:1
29:9 29:9 33:21 42:22 47:1
47:17 47:22 48:2 49:7 49:9
49:20 49:22 50:10 50:15 51:
2 51:8 51:9 54:9 55:8 55:10
55:25 56:3 59:1 59:2 59:8
59:19 59:22 61:16 61:17 61:
24 62:17 62:22 63:7 63:16
63:23 80:13 80:14 80:20 81:
2 82:2 85:5 89:1 89:3 89:17
89:18 89:22 91:1 91:7 91:8
92:18 93:4 93:11 93:15 94:6
95:5 97:8 97:25 100:6 103:
18 105:1 106:7 106:19 106:
20 107:6 107:6 116:7 116:9
116:13 118:5 120:6 120:12
120:16 120:19 124:16 133:12
133:21 134:15 134:21 134:23
135:14 136:8 136:11 136:13
137:10 137:13 137:19 137:20
138:2 138:4 138:7 138:11
138:16 138:18 138:21 138:25
139:2 139:5 139:25 140:12
142:3 143:15 143:19 143:22
144:8 144:13 145:4 145:25
146:25
**December** [1] 3:23
**Decide** [3] 10:24 91:12
118:14
**Decided** [2] 66:3 91:7
**Deciding** [3] 31:12 56:2
90:22
**Decision** [36] 22:2 23:17
23:22 24:11 24:16 24:24 48:
17 52:20 52:24 58:2 58:6 60:
6 65:1 65:25 72:23 72:24 85:
2 85:14 89:17 93:16 93:18
97:13 97:13 110:4 114:20
116:14 125:4 125:18 136:22
139:19 141:10 144:3 144:6
145:6 152:21 152:23
**Decisions** [19] 5:24 23:
14 24:17 25:9 48:12 48:13
51:12 85:10 85:10 100:1 102:
6 128:21 129:11 129:13 129:
18 136:16 142:22 143:18 144:
18
**Dedicated** [1] 84:14
**Deep** [2] 31:14 34:13
**Defendant** [81] 2:22 3:20
4:1 4:19 5:3 5:21 6:11 7:10
7:22 9:18 9:22 11:15 11:18
12:4 12:8 13:9 13:11 13:16
13:19 15:18 15:20 15:22 16:
3 16:13 16:17 16:20 17:1 20:
5 20:9 21:6 22:14 22:15 23:
15 24:18 27:5 27:7 29:14 29:
16 29:18 29:25 30:5 30:13
31:16 32:8 32:15 33:10 36:8
36:10 37:7 37:9 37:10 39:10
41:18 42:12 42:14 42:17 42:
18 42:22 43:10 51:4 51:13
52:6 52:13 57:9 57:10 70:11
70:13 77:7 78:7 78:10 85:12
92:6 92:22 103:11 107:25
119:3 122:15 136:17 144:9
156:8 156:11
**Defendant's** [17] 5:4 6:7
6:9 6:14 7:8 7:12 12:1 12:3
12:6 12:15 12:25 36:19 37:
14 39:18 40:15 92:8 116:16
**Defendants** [3] 13:22 28:
4 34:6
**Defense** [19] 7:12 26:6 32:
20 44:17 56:24 69:11 104:22
115:16 124:18 135:18 136:1
147:11 147:21 148:6 148:10
148:11 148:13 148:23 151:2
**Define** [4] 10:25 11:7 11:
10 15:3

**Defined** [5] 10:18 10:22 14:20 18:6 57:11
**Definite** [1] 148:1
**Definitely** [3] 55:5 72:4 109:10
**Degree** [2] 8:14 24:12
**Deliberate** [2] 28:24 36:7
**Deliberations** [1] 8:25
**Deliver** [1] 86:5
**Delivered** [1] 28:12
**Delivering** [1] 28:10
**Delivers** [1] 28:14
**Delivery** [1] 86:3
**Delve** [1] 154:15
**Demand** [1] 34:19
**Depression** [1] 150:4
**Describing** [1] 77:17
**Desert** [1] 27:8
**Deserve** [4] 31:5 37:3 49:14 79:10
**Deserved** [1] 37:21
**Deserves** [4] 63:23 93:11 124:24 138:22
**Destroyed** [3] 96:21 101:23 101:24
**Detail** [1] 10:8
**Detailed** [1] 3:7
**Deter** [1] 133:14
**Determination** [3] 58:17 62:3 67:15
**Determine** [9] 36:10 57:16 64:12 69:4 90:21 93:2 94:23 100:6 130:8
**Determined** [1] 42:19
**Determines** [2] 36:7 142:2
**Determining** [4] 31:11 57:24 99:3 144:16
**Devious** [1] 8:10
**Dictate** [2] 9:13 111:22
**Dictating** [1] 125:2
**Died** [1] 98:2
**Dies** [2] 35:14 42:3
**Differ** [1] 111:17
**Difference** [6] 36:14 40:21 55:18 56:8 106:15 138:24
**Different** [35] 3:24 10:12 14:8 18:9 20:16 21:18 23:24 25:2 28:4 28:4 28:6 28:18 28:20 28:24 29:1 34:4 34:5 34:5 34:11 46:20 46:22 53:11 55:7 55:18 68:23 69:2 74:14 75:11 88:7 103:3 115:13 117:17 129:17 129:20 131:23
**Differently** [3] 6:5 25:15 75:13
**Difficult** [2] 29:10 76:19
**Difficulty** [1] 42:8
**Dire** [15] 1:15 45:10 48:23 60:14 73:9 75:20 80:4 90:20 94:15 110:12 114:4 126:19 131:4 146:10 153:4
**Direct** [13] 39:25 40:1 40:7 40:10 40:22 41:15 41:23 42:9 42:10 43:1 43:12 78:13 129:19
**Direction** [1] 63:18
**Directly** [1] 76:17
**Disabilities** [2] 58:15 116:20
**Disagree** [11] 137:12 137:19 138:1 138:6 138:9 138:12 138:15 138:20 139:1 139:7 139:11
**Disagreement** [3] 79:22 95:21 95:23
**Discharged** [1] 97:20
**Disciplining** [1] 5:25
**Discretion** [2] 9:17 9:22
**Discuss** [1] 98:23

**Discussing** [1] 107:23
**Disgrace** [1] 138:13
**Dismissed** [1] 152:3
**Dispute** [2] 39:11 39:21
**Distinction** [7] 16:24 17:18 17:24 18:7 18:8 65:8 65:12
**District** [6] 1:5 1:11 2:6 3:15 157:3 157:17
**Divorce** [1] 77:4
**DNA** [1] 41:4
**Dollar** [1] 17:20
**DONALD** [1] 126:17
**Done** [14] 8:3 32:20 33:13 35:18 35:19 35:20 35:20 35:21 46:17 59:24 69:11 69:23 92:25 121:17
**Doors** [1] 106:15
**Dope** [1] 34:8
**Doubt** [71] 3:25 4:15 11:14 11:21 11:23 12:3 12:6 12:15 12:23 13:2 13:6 13:9 13:13 13:14 14:1 14:14 14:18 15:18 21:24 22:6 22:9 32:2 32:4 32:7 32:10 32:17 32:18 33:3 33:5 39:19 40:15 40:20 42:8 43:3 43:7 43:8 43:13 50:4 51:5 51:10 57:17 62:5 64:10 69:22 69:24 77:12 92:8 92:12 95:8 97:21 119:2 119:12 119:13 119:22 119:25 122:14 124:3 124:7 125:12 125:13 125:15 126:7 134:10 135:6 135:7 140:25 143:6 145:16 145:20 146:3 146:4
**Doubtful** [1] 133:17
**Doubts** [3] 51:10 85:13 136:20
**Douglas** [2] 153:2 155:19
**Down** [20] 7:14 7:23 11:4 26:22 27:8 31:14 34:16 34:19 41:24 41:25 42:13 44:22 71:3 104:4 107:19 117:1 124:2 125:8 133:1 137:9
**Drafted** [1] 150:22
**Dragnet** [1] 41:2
**Drastically** [1] 106:23
**Dream** [1] 75:15
**Drive-by** [1] 117:16
**Driver** [1] 113:5
**Driving** [1] 27:8
**Dropped** [1] 150:7
**Drug** [2] 148:12 148:20
**Drugs** [13] 82:13 82:15 82:16 82:23 85:20 85:21 87:10 147:11 147:21 148:4 148:5 148:9 148:20
**Drunk** [1] 42:6
**Drunks** [1] 42:4
**Due** [1] 149:10
**Duly** [6] 45:9 73:8 78:12 110:11 126:18 153:3
**During** [53] 4:11 4:13 4:17 6:24 8:24 30:22 31:23 32:12 32:13 33:13 34:6 38:24 43:20 44:25 47:14 50:12 57:1 57:8 57:22 62:13 74:12 76:12 76:19 79:6 87:7 87:11 87:1 92:20 98:2 98:25 100:8 101:8 111:10 115:23 115:24 116:4 116:4 118:21 118:22 129:5 132:18 132:19 132:22 133:5 135:22 135:23 136:3 136:3 136:4 136:6 143:2 143:3 154:1
**Duty** [3] 50:5 116:5 117:2

# E

**Early** [1] 149:15
**Easel** [1] 6:20
**Easier** [1] 61:4
**East** [1] 133:3

**Easy** [4] 54:15 90:14 154:17 154:18
**Educated** [1] 49:13
**Effect** [2] 50:18 122:6
**Effective** [3] 137:11 137:20 138:10
**Eight** [2] 85:25 88:9
**Eighty** [1] 30:9
**Either** [16] 11:19 32:10 49:13 56:12 57:4 74:13 74:13 94:23 94:25 98:15 125:14 137:1 139:8 139:9 154:20 155:2
**Either/or** [1] 57:4
**Elaborate** [2] 62:11
**Elected** [1] 149:18
**Electric** [1] 5:6
**Eleven** [2] 8:6 95:6
**Eligibility** [1] 30:2
**Eligible** [5] 29:19 30:1 30:8 45:24 102:19
**Eliminate** [1] 110:8
**Eliminated** [1] 12:20
**Embarking** [1] 43:17
**Employee** [1] 154:12
**Employees** [4] 74:6 74:9 74:16 76:14
**Employer** [1] 150:12
**Employment** [1] 150:8
**Encountered** [1] 133:5
**Encourage** [1] 75:15
**End** [6] 7:18 34:13 56:17 68:25 117:7 117:15
**Enforce** [1] 113:23
**Enforcement** [1] 88:11
**Enjoyed** [1] 149:15
**Enlist** [1] 150:21
**Enron** [1] 41:25
**Entered** [1] 52:20
**Entirely** [2] 6:5 20:15
**Entirety** [1] 8:25
**Entitled** [2] 10:4 17:3
**Episode** [5] 57:2 115:25 135:23 136:5 143:3
**Era** [1] 149:15
**Erased** [1] 12:24
**Eric** [1] 155:18
**Erroneous** [1] 29:11
**Errors** [2] 87:19 100:17
**Escapes** [1] 18:24
**Establish** [1] 40:19
**Established** [1] 80:15
**Establishes** [2] 12:2 12:14
**Establishing** [1] 12:22
**Et** [2] 50:15 83:21
**EUGENE** [1] 110:10
**Evaluate** [4] 27:25 44:11 85:1 106:7
**Evaluated** [1] 25:15
**Evaluation** [2] 28:2 129:14
**Evaluations** [2] 30:20 30:22
**Event** [2] 29:13 81:15
**Everyday** [1] 107:13
**Everywhere** [1] 19:13
**Evidence** [157] 5:11 6:8 6:9 6:18 7:21 10:12 11:11 11:21 11:24 12:1 12:5 12:12 12:14 12:21 12:22 13:11 13:13 13:25 14:2 14:14 14:18 20:15 20:17 20:25 21:7 21:23 22:8 22:23 23:17 23:23 24:6 25:21 26:28:1 26:8 33:19 36:

**6** 36:21 37:1 37:11 37:11 38:3 38:7 38:17 38:18 39:4 39:5 39:6 39:23 39:25 40:1 40:1 40:4 40:6 40:13 40:13 40:23 41:6 41:15 41:19 41:22 42:10 42:18 42:23 43:6 50:3 50:21 51:7 51:15 55:23 55:23 59:9 59:20 60:11 60:7 60:8 62:4 62:23 64:2 64:25 67:10 67:20 69:3 69:16 70:6 70:6 79:5 85:1 85:2 85:15 90:8 90:10 91:23 92:7 92:11 92:16 93:1 93:7 93:9 98:14 101:11 101:18 111:16 111:25 112:2 112:17 112:25 113:14 114:17 114:21 116:15 116:17 118:8 118:13 119:1 119:11 121:7 121:25 122:10 122:12 122:21 122:22 123:10 123:16 123:18 125:17 128:22 129:8 129:14 129:17 130:8 130:21 133:24 136:22 139:18 139:20 139:22 140:2 140:5 142:13 143:5 144:18 144:25 148:4 148:12 148:19 155:5 157:5
**Exact** [2] 25:14 28:22
**Exactly** [20] 9:23 25:11 28:7 28:11 28:23 31:10 34:20 38:8 64:19 65:11 71:25 72:9 88:1 95:4 95:15 109:6 127:9 149:19 151:17 152:10
**EXAMINATION** [15] 1:15 45:10 48:23 60:14 73:9 75:20 78:13 80:4 94:15 110:12 114:4 126:19 131:4 146:10 153:4
**Example** [23] 5:25 7:19 15:7 17:19 17:23 18:15 25:5 27:21 34:24 35:7 38:21 39:7 40:23 41:24 46:12 59:21 65:20 68:6 69:21 113:1 113:4 129:22 130:18
**Examples** [1] 75:14
**Exceed** [1] 34:1
**Except** [4] 14:24 55:10 77:16 133:21
**Excise** [1] 74:15
**Exclusively** [3] 72:24 110:5 152:22
**Excuse** [14] 4:6 8:5 32:23 33:13 35:17 46:6 71:18 75:23 76:24 81:1 108:24 115:21 126:14 151:12
**Excused** [9] 73:6 77:24 78:9 110:9 153:1 155:15 155:20 155:21 156:10
**Excusing** [1] 23:7
**Execute** [1] 106:21
**Execution** [5] 51:13 54:6 85:11 136:17 138:13
**Executions** [1] 106:22
**Exemplary** [1] 34:12
**Exhaling** [1] 143:24
**Exhibits** [1] 157:9
**Exist** [4] 39:23 48:1 48:6 90:5
**Existed** [1] 57:5
**Existence** [8] 15:18 16:2 16:17 32:1 32:16 33:4 33:5 89:12
**Exists** [7] 10:2 13:22 13:24 17:3 23:18 80:17 103:15
**Expect** [3] 11:4 90:9 95:10
**Experience** [2] 88:12 97:3
**Experiences** [2] 88:17 91:21
**Expiration** [1] 157:16
**Explained** [2] 103:6 118:6
**Explaining** [1] 31:18
**Explanation** [1] 65:9
**Expose** [1] 27:22
**Expound** [1] 61:11
**Extenuating** [2] 98:16 98:19
**Extract** [1] 38:6

**Extracted** [1] 75:10
**Extreme** [2] 117:7 141:17
**Extremely** [1] 96:6
**Exxon** [2] 74:1 74:15
**Eye** [12] 121:14 121:15 121:18 121:18 121:23 121:24 122:1 122:1 122:18 122:18 126:2 126:2

## F

**Face** [4] 21:10 41:3 96:9 105:22
**Faced** [1] 96:5
**Facet** [3] 39:11 39:21 115:3
**Fact** [17] 3:19 4:24 5:1 7:4 9:11 12:24 31:22 36:11 38:5 42:20 50:14 79:14 79:15 85:23 117:5 148:11 149:10
**Factor** [3] 69:13 110:8 115:2
**Factors** [2] 52:20 139:19
**Facts** [18] 64:8 64:9 90:18 90:21 90:23 91:3 91:11 93:14 95:6 98:23 116:14 117:9 117:22 117:25 120:13 125:1 141:12 141:14
**Fail** [2] 93:21 140:21
**Fail-safe** [1] 93:21
**Fair** [4] 76:8 121:5 121:6 151:9
**Fairly** [2] 86:10 86:12
**Fall** [2] 42:14 117:6
**Falls** [1] 56:9
**Family** [10] 18:13 52:22 53:1 79:2 82:6 88:18 102:1 109:14 128:7 149:11
**Fannin** [1] 2:7
**Far** [15] 10:6 44:1 45:17 55:20 62:25 73:15 75:13 110:22 123:19 127:19 143:12 143:17 147:21 152:2 153:12
**Favor** [2] 133:20 136:11
**Fear** [1] 71:10
**Feature** [7] 23:2 25:1 25:10 39:16 39:17 39:19 40:25
**Features** [1] 32:11
**Feelings** [11] 49:7 61:19 63:14 63:18 66:9 70:9 70:19 71:11 106:11 114:11 129:2
**Felony** [8] 4:11 31:24 32:13 33:6 33:14 38:14 57:23 136:7
**Few** [7] 49:21 55:10 68:7 133:21 146:14 146:17 151:5
**Field** [2] 42:1 84:12
**Fifteen** [1] 61:5
**Fifty** [3] 35:8 74:16 132:9
**Fifty-two** [1] 133:19
**Figure** [3] 29:10 41:11 80:8
**Fill** [1] 60:22
**Filled** [2] 55:14 104:15
**Film** [1] 68:21
**Finally** [1] 88:21
**Fine** [12] 16:9 34:1 61:1 62:24 68:20 75:1 76:9 94:18 123:24 127:25 145:20 146:13
**Fingerprint** [6] 41:1 41:2 41:5 41:7 41:9 41:10
**Fingerprints** [2] 39:7 41:12
**Finish** [3] 18:1 22:25 109:2
**Finished** [3] 43:15 88:8 88:10
**Fire** [3] 27:9 27:12 42:22
**Fired** [2] 42:16 42:21
**Firm** [2] 121:14 125:1

**First** [63] 5:2 5:13 6:14 7:3 7:6 7:21 9:11 9:15 9:24 10:11 11:11 13:3 13:8 13:5 14:1 14:3 14:8 14:9 14:15 14:17 18:1 18:11 19:17 19:18 19:24 20:4 20:8 20:12 20:19 20:23 21:21 21:25 22:10 23:16 24:7 24:19 36:6 38:10 43:15 45:9 45:13 49:6 53:3 56:15 73:8 73:11 78:12 78:15 86:19 86:21 96:3 102:4 110:11 110:17 112:21 117:22 123:7 126:18 126:21 130:7 133:20 137:18 153:3
**Fish** [1] 150:25
**Fishing** [1] 150:24
**Fitting** [1] 66:21
**Five** [12] 31:17 33:24 37:15 44:19 45:25 46:16 55:6 87:1 105:11 112:6 133:19 150:17
**Fix** [1] 25:19
**Flip** [1] 37:6
**FM** [1] 2:19
**Focused** [2] 99:18 128:5
**Folks** [9] 19:4 25:5 25:16 25:18 28:19 71:20 109:2 109:3 151:15
**Follow** [17] 8:5 31:3 31:4 44:3 82:18 95:24 95:25 113:23 121:22 121:24 122:3 122:7 122:8 126:2 131:9 139:22 147:8
**Following** [3] 1:18 90:23 123:13
**Follows** [7] 45:9 73:8 78:12 110:11 126:18 146:22 153:19
**Foods** [1] 131:15
**Football** [2] 14:22 14:23
**Force** [1] 149:9
**Foregoing** [1] 157:4
**Forget** [1] 54:2
**Forgiving** [1] 23:6
**Form** [1] 104:14
**Forth** [4] 8:2 13:20 25:10 132:9
**Fortieth** [1] 30:18
**Forty** [5] 2:9 29:20 29:24 29:25 30:14 30:22 31:8 31:19 103:16
**Forty-eight** [4] 71:22 71:23 109:3 151:16
**Forty-five** [4] 86:2 100:12 102:12 150:18
**Forty-year** [1] 30:22
**Forward** [1] 102:17
**Forwarded** [1] 30:24
**Four** [6] 5:22 28:21 28:24 112:6 132:7 132:11
**Fourteen** [1] 6:3
**Frame** [3] 47:15 79:6 111:10
**Franklin** [1] 150:3
**Frankly** [2] 3:6 124:20
**Free** [5] 18:23 19:2 19:5 19:9 154:19
**Freedom** [1] 106:13
**Freeway** [1] 2:14
**Friday** [1] 137:3
**Friend** [1] 82:7
**Friends** [1] 18:14
**Front** [1] 61:4
**Frustrated** [1] 9:2
**Full** [4] 8:14 114:25 115:10 116:23
**Full-time** [1] 150:6
**Future** [27] 15:19 15:23 16:3 16:18 17:2 20:9 23:20 26:18 26:25 58:1 58:23 64:13 66:21 66:20 67:3 67:18 91:22 92:13 103:16 112:1 112:4 112:14 112:24 119:14 122:24 129:25 142:19

## G

**Game** [1] 14:23
**Garcia** [9] 45:8 45:13 47:9 47:21 48:25 71:16 72:8 72:21 155:18
**Gather** [1] 43:13
**General** [1] 55:8
**Gentleman** [1] 46:16
**Gentlemen** [2] 3:3 7:25
**Getaway** [1] 113:5
**Given** [14] 44:25 54:13 66:9 66:12 71:11 85:1 88:7 100:18 112:11 120:6 120:12 121:24 130:11 134:11
**God** [9] 80:16 87:19 88:6 89:4 89:6 89:9 89:11 89:15 102:3
**God's** [2] 100:19 102:3
**Good-bye** [1] 104:24
**Governor** [3] 30:25 31:1 146:20
**Graduated** [1] 84:6
**Granted** [2] 30:4 126:16
**Gray** [7] 123:11 123:19 123:25 124:4 124:6 125:9 125:10 149:17 150:1 150:3
**Great** [9] 16:11 103:23 104:7 105:23 128:15 128:15 149:17 150:1 150:3
**Greater** [1] 33:16
**Greatest** [1] 149:14
**Greatly** [1] 97:11
**Grew** [2] 149:3 149:4
**Grossly** [2] 15:20 16:1
**Ground** [1] 42:15
**Group** [7] 3:5 25:21 72:1 78:17 109:3 110:19 153:9
**Groups** [1] 133:19
**Growing** [2] 149:2 150:23
**Grows** [1] 43:7
**Guard** [1] 83:8
**Guards** [1] 19:7
**Guess** [21] 53:18 54:23 62:10 63:2 63:19 63:24 69:15 70:25 75:6 83:5 97:1 98:12 98:19 104:15 106:14 118:17 121:4 126:1 129:3 131:25 140:14
**Guilt** [9] 12:1 12:3 12:7 12:16 12:23 19:18 40:15 40:19 119:19
**Guilt/innocence** [4] 116:16 125:10 135:4 140:22
**Guilty** [117] 4:1 4:19 5:4 5:4 5:7 5:8 5:8 7:11 7:22 12:4 12:8 12:10 12:24 12:25 13:9 13:11 20:5 20:13 20:13 23:15 23:15 24:5 24:18 26:17 26:24 27:23 29:14 32:9 32:15 33:7 33:9 33:10 36:9 36:11 37:7 37:9 43:10 44:14 44:14 44:15 51:4 51:6 56:16 56:20 57:9 57:10 57:14 58:2 59:3 61:25 62:13 63:5 63:17 64:11 65:15 65:19 66:1 66:18 67:1 71:12 79:14 89:21 90:15 91:2 91:4 91:13 91:19 92:6 92:22 95:9 97:19 103:8 103:12 107:22 111:20 112:22 116:10 117:23 117:23 118:4 118:19 118:24 119:2 120:25 120:22 121:12 122:20 125:20 129:12 129:22 129:25 129:23 129:24 134:6 135:8 135:8 135:16 137:24 139:14 140:21 140:25 141:1 141:3 141:13 141:25 142:9 142:16 143:1 143:9 144:9

**Gut** [1] 104:3
**Guy** [2] 38:21 93:11
**Guys** [3] 10:24 75:24 154:13

## H

**Habit** [1] 150:19
**Half** [2] 20:23 96:1
**Hallway** [1] 64:15
**Hand** [9] 9:19 11:8 15:25 30:12 42:11 42:13 42:17 73:25 157:12
**Handgun** [2] 42:3 42:12
**Handguns** [2] 88:14 88:17
**Handle** [1] 74:18
**Happy** [3] 44:16 44:17 44:18
**Hard** [3] 124:14 124:15 149:10
**Harris** [9] 1:8 1:21 3:22 19:16 51:19 157:2 157:4 157:11 157:17
**Hate** [5] 35:19 46:10 56:4 56:9 56:12
**Head** [2] 125:5 125:8
**Health** [5] 47:12 75:3 79:3 111:7 153:23
**Hear** [32] 5:14 5:15 5:17 5:19 34:22 36:12 37:9 37:11 38:7 40:2 59:12 65:20 72:19 91:11 93:9 96:18 98:6 100:7 106:19 109:25 110:6 113:14 113:17 116:17 117:21 118:8 121:25 139:18 142:14 142:18 148:19 152:24
**Heard** [39] 1:19 5:16 7:3 7:21 9:3 12:13 20:19 20:22 28:25 28:25 36:20 37:12 42:15 44:1 62:25 63:4 71:14 74:18 75:24 100:5 101:11 114:21 116:15 117:9 117:25 118:9 120:13 120:18 121:17 121:8 122:21 125:17 128:22 130:21 142:13 143:12 143:17 148:11 149:1
**Hearing** [3] 25:11 74:19 101:18
**Hears** [1] 36:5
**Heavenly** [1] 14:22
**Heinous** [1] 103:12
**Held** [3] 1:21 88:6 97:24
**Help** [6] 6:18 35:5 71:6 71:7 124:21 149:11
**Helpful** [4] 57:23 58:2 58:6 58:16
**Helping** [5] 58:5 84:14 84:19
**Helps** [1] 150:19
**Hereby** [1] 157:4
**Hi** [2] 94:17 146:12
**High** [3] 149:13 149:14 149:15
**Higher** [1] 146:2
**Hill** [17] 2:12 3:14 7:13 60:12 78:2 78:3 94:13 94:14 94:16 94:19 126:12 126:15 146:9 146:11 154:15 156:1 156:3
**Himself** [2] 116:21 140:7
**History** [4] 53:10 54:25 58:13 116:19
**Hit** [1] 105:19
**Hold** [2] 51:25 146:1
**Home** [4] 5:24 56:18 105:12 105:22
**Homily** [1] 49:21
**Honest** [2] 126:6 128:2

**Honestly** [5] 28:2 99:5 99:20 103:10 123:7
**Honor** [15] 48:22 60:19 61: 2 68:2 78:1 78:3 78:5 78:7 80:3 114:3 131:3 155:23 155: 25 156:3 156:6
**Honorable** [1] 1:20
**Honoring** [2] 7:7 7:9
**Hope** [3] 51:5 92:11 109:6
**Hopeful** [1] 75:17
**Hopefully** [3] 87:19 127: 18 139:14
**Horrendous** [1] 53:23 141: 14
**Horrible** [2] 46:13 106:6
**Hospital** [3] 35:13 105: 20 105:21
**Hot** [1] 150:25
**Hours** [5] 72:1 132:7 132: 11 132:12 132:13
**House** [3] 17:10 54:18 81: 20
**Houston** [9] 1:21 2:8 2:15 2:20 83:16 84:7 132:10 150: 7 157:18
**Human** [8] 4:5 32:22 33:12 35:16 44:21 46:5 56:11 130:4
**Hump** [1] 124:21
**Hundred** [3] 134:3 134:6 134:12
**Hurt** [2] 54:17 101:23
**Husband** [9] 45:21 85:18 87:16 87:17 92:1 100:2 100: 13 102:11 103:3
**Husband's** [1] 103:24
**Hypothetical** [3] 96:24 100:12 147:2
**Hypothetically** [1] 98:22

**I**

**Idea** [13] 5:23 9:5 16:8 25: 7 25:19 26:9 37:21 40:4 44: 8 102:19 113:12 124:18 154: 23
**Ideas** [1] 131:23
**Identifiable** [1] 148:11
**Identifying** [1] 40:25
**Idiot** [1] 38:25
**Ill** [2] 45:20 149:12
**Illegally** [1] 99:17
**Imaginary** [6] 30:5 30:13 36:5 37:14 43:10 112:22
**Imagine** [3] 66:25 94:1 99: 24
**Immoveable** [1] 41:11
**Impact** [1] 106:5
**Impartial** [2] 147:14 147: 19
**Importance** [1] 71:11
**Important** [10] 18:10 28: 15 56:2 71:5 77:7 77:7 77:9 96:6 99:3 142:21
**Importantly** [2] 97:19 100:18
**Impose** [1] 9:14
**Imposed** [8] 14:7 14:10 19: 23 27:2 34:1 48:2 63:7 144: 13
**Imposition** [1] 47:22
**Imprisonment** [2] 56:3 138:10
**Improper** [2] 108:4 120:7
**Inappropriate** [1] 133:22
**Incarcerated** [1] 53:1
**Incident** [1] 88:19
**Incline** [1] 63:15
**Included** [2] 33:18 157:6
**Includes** [2] 19:8 108:2
**Including** [2] 20:18 20:20

**Increase** [2] 145:7 145:10
**Incredible** [1] 34:3
**Incrimination** [1] 70:12
**Independent** [5] 29:2 38: 19 39:6 41:20 48:13
**Indicate** [1] 133:11
**Indicated** [14] 56:1 56:4 61:14 64:15 66:10 66:15 81: 11 82:6 84:11 85:17 88:13 88:24 131:13 131:17
**Indication** [1] 7:7
**Indictment** [6] 3:20 4:16 57:1 57:3 57:10 118:24
**Individual** [13] 3:9 28:9 40:25 41:7 41:8 58:16 71:20 93:16 93:17 96:9 97:12 116: 21 140:7
**Individual's** [2] 27:17 147:10
**Individually** [3] 45:5 109:2 151:15
**Influence** [1] 29:4 111:3
**Influenced** [1] 73:2 130: 15 152:23
**Influences** [1] 29:5
**Information** [22] 6:12 6: 13 6:15 6:16 11:5 25:14 44: 10 44:11 44:25 45:1 58:4 65: 25 72:25 73:2 75:10 110:7 116:20 127:18 128:17 149:1 152:22 155:11
**Injection** [1] 5:6
**Inmates** [2] 19:8 105:15
**Innocence** [2] 119:20 140: 24
**Innocent** [8] 7:8 12:9 12: 19 53:25 71:12 119:21 130: 14 140:24
**Insensitive** [1] 128:24
**Inside** [3] 72:25 104:4 110:6
**Insight** [1] 104:8
**Inspiring** [1] 149:21
**Instance** [3] 31:24 31:25 95:5
**Instances** [3] 107:4 107: 12 120:24
**Instant** [1] 31:7
**Instead** [3] 5:18 53:1 116: 12
**Instructions** [3] 10:19 73:5 121:24
**Instructs** [1] 20:24
**Intellectual** [1] 47:21
**Intend** [1] 136:2
**Intended** [2] 56:23 56:24
**Intent** [1] 86:4
**Intentional** [18] 4:4 4:4 4:10 31:23 32:11 32:17 32: 21 33:11 35:16 46:4 62:14 115:14 115:18 117:13 118:20 135:24 136:6 139:3
**Intentionally** [4] 56:21 57:21 143:1 148:18
**Interest** [1] 61:10
**Interesting** [2] 100:22 147:8
**Interfere** [5] 47:13 79:5 111:9 127:20 153:25
**Interpret** [2] 123:17 123: 24
**Intoxications** [1] 65:22
**Invited** [1] 102:3
**Involved** [12] 5:22 17:22 18:16 23:19 31:6 44:22 51: 22 51:24 52:1 53:6 53:14 54: 2
**Involvement** [2] 5:20 113: 2
**Inwardly** [1] 96:3

**Isolate** [1] 105:13
**Issue** [36] 31:11 57:15 58: 21 58:23 64:6 64:8 66:10 66: 15 66:17 66:22 67:1 67:4 67: 12 67:23 69:4 76:3 91:13 92: 12 92:14 92:21 92:24 92:25 118:25 119:17 119:23 122:13 125:10 125:21 140:11 140:16 142:1 142:25 143:11 144:12 144:12 148:22
**Issues** [7] 6:19 9:12 62: 12 62:16 70:14 91:23 122:19
**Itself** [3] 24:8 39:18 129: 19

**J**

**Jacinto** [1] 157:18
**Jack** [1] 41:1
**James** [2] 73:7 77:23
**Jester** [1] 133:1
**Job** [15] 35:3 35:4 44:16 44:17 44:17 44:18 52:22 76: 15 76:15 79:3 83:18 90:7 103:22 153:22 154:2
**Jobs** [1] 11:4
**John** [1] 149:16
**JR** [1] 1:57:20
**Judge** [17] 1:20 31:16 49: 16 51:13 64:17 65:5 68:6 69: 21 85:11 90:17 94:14 98:12 103:6 117:14 136:16 137:8 155:12
**Judgement** [1] 25:9
**Judgment** [1] 89:21
**JUDICIAL** [1] 1:11
**Jumps** [1] 38:23
**Junior** [1] 149:14
**Juries** [1] 28:21
**Juror** [47] 8:6 25:10 25: 12 36:4 36:16 43:25 44:2 44: 7 45:23 47:7 47:14 50:1 60: 5 72:4 72:22 73:20 76:8 78: 23 79:5 83:23 90:7 94:9 94: 22 95:19 96:9 97:17 109:10 110:4 111:3 111:9 113:23 114:15 127:5 134:4 134:8 141:16 144:22 144:22 148:15 151:7 151:24 152:20 153:1 153:18 153:25 154:25 155:5
**Jurors** [15] 7:24 8:2 28: 18 28:19 28:20 51:3 51:6 51: 7 52:24 79:10 92:6 113:6 118:12 149:9 152:17
**Jurors'** [1] 52:17
**Jury** [67] 3:1 3:25 4:19 7: 21 8:24 9:12 9:14 9:15 9:20 9:25 10:1 10:2 10:10 10:15 11:25 12:2 12:3 12:6 13:10 19:19 19:23 20:2 20:4 20:7 20:24 22:22 25:21 26:7 31: 13 32:19 36:5 36:7 36:9 37: 6 37:6 37:7 37:8 40:14 42:7 42:24 48:12 50:11 50:12 50: 17 51:17 57:4 76:4 84:16 89: 17 96:2 100:4 100:5 101:4 103:1 103:7 103:14 104:10 104:21 107:22 107:23 111:20 112:16 114:12 117:1 129:11 144:9 152:3
**Jury's** [4] 5:2 12:7 12:12 112:12
**Justice** [9] 47:19 49:12 59:23 61:22 61:23 62:17 63: 15 63:24 66:22
**Justification** [11] 4:6 32:22 33:23 33:12 35:17 46: 5 56:23 57:22 115:15 118:21 135:25
**Justified** [3] 137:13 137: 21 139:2
**Justifies** [2] 83:1 83:2
**Justifying** [1] 23:6

**K**

**Kay** [2] 157:3 157:16
**Keep** [8] 24:9 24:14 77:5 77:15 80:20 80:21 114:24 115:9
**Kennedy** [1] 149:17
**Key** [2] 63:9 154:9
**Kid** [2] 25:8 117:16
**Kidnapping** [10] 4:14 31: 24 32:12 32:19 56:25 115:23 118:22 115:22 136:3 143:2
**Kidnapping/murder** [1] 57:7
**Kidnappings** [1] 17:7
**Kids** [2] 27:11 112:8
**Kill** [2] 121:16 136:2
**Killed** [14] 34:9 42:3 81: 12 81:16 82:7 82:14 83:1 83: 3 88:20 104:20 104:21 112:9 130:13 143:3
**Killing** [11] 56:25 57:1 81:18 115:16 115:17 115:24 116:5 116:5 117:15 118:22 136:4
**Kind** [41] 5:12 6:14 6:17 17:12 17:16 36:17 37:6 40:5 40:6 43:20 46:15 47:17 49: 12 52:23 53:6 53:14 53:25 54:7 54:8 54:9 54:22 55:12 64:19 68:9 93:20 98:10 100: 7 100:8 104:2 108:7 111:14 121:15 121:10 125:1 128:20 131:8 132:2 133:12 137:9 146:16 147:8
**Kinds** [19] 17:12 17:18 19: 7 25:2 39:22 39:24 46:23 53: 12 55:11 58:14 58:15 80:25 115:25 116:3 116:20 117:20 134:14 134:20 136:5
**King** [1] 149:25
**Kiss** [1] 104:24
**Knobloch** [2] 157:3 157:16
**Knocked** [1] 105:19
**Knowing** [6] 61:16 61:17 72:4 109:9 142:11 151:23
**Knowledge** [1] 89:4
**Known** [2] 53:10 129:2
**Knows** [1] 100:20
**Kraft** [2] 131:15 150:11
**Kurt** [3] 2:17 3:14 94:20

**L**

**Lab** [1] 84:9
**Lack** [3] 58:13 89:4 116:19
**Ladies** [2] 3:2 7:24
**Lady** [1] 18:18
**Lake** [1] 112:8
**Land** [1] 80:18
**Language** [1] 129:17
**Last** [6] 39:22 49:21 107: 18 136:25 136:25 137:15
**Late** [1] 150:5
**Latter** [1] 132:5
**Law** [60] 9:16 9:19 10:13 10:19 11:3 22:18 22:18 29: 16 38:12 39:11 39:13 39:21 40:5 40:7 40:8 40:9 40:11 40:12 40:16 40:17 43:15 45: 1 47:19 51:14 53:4 60:7 60: 8 63:20 76:23 80:14 80:17 85:15 86:20 86:23 88:11 90: 8 95:21 95:24 95:25 103:2 114:16 114:21 122:9 123:16 124:8 126:2 131:13 134:10 134:15 134:22 135:13 136:22 139:17 139:20 139:22 141:8 141:19 144:18 145:19 146:21
**Laws** [4] 80:16 80:19 90:23 145:21
**Lawyers** [7] 11:5 44:6 75:

7 79:24 112:5 127:8 155:1
**Lay** [1] 7:14
**Lead** [1] 63:18
**Leader** [1] 50:14.
**Leading** [1] 50:10
**Lean** [3] 122:4 123:12 139:
11
**Leaning** [1] 113:13
**Learn** [2] 61:6 90:5
**Learned** [4] 80:15 91:21
120:10 121:21
**Learns** [1] 87:19
**Least** [9] 6:24 18:11 23:8
28:9 65:17 91:14 94:25 119:
6 132:10
**Leave** [8] 22:17 72:3 72:
12 109:9 109:16 125:3 143:
21 -151:23
**Leaves** [1] 22:17
**Leaving** [2] 17:21 101:24
**Led** [3] 68:14 99:2 100:9
**Left** [7] 8:6 41:7 41:8 41:
10 104:17 127:14 149:7
**Legal** [15] 4:5 4:6 32:22
32:23 33:12 35:17 35:17 38:
11 46:5 46:6 56:22 57:22
115:15 118:21 135:25
**Legislature** [1] 116:2
**Legitimate** [1] 37:19
**Legitimately** [1] 30:11
**Less** [6] 33:24 34:7 36:1
69:20 70:3 74:7
**Lesser** [3] 33:15 33:18 92:
20
**Lethal** [1] 5:6
**Level** [5] 12:22 18:2 21:
12 40:14 43:8
**Liberal** [2] 131:18 131:18
**Life** [133] 4:5 5:1 8:16 9:
23 10:1 10:6 13:23 14:9 14:
13 18:25 19:22 21:3 21:13
23:4 23:9 23:11 23:21 24:14
26:11 26:15 27:10 27:17 27:
18 29:9 29:12 29:17 29:17
30:6 31:16 32:21 33:11 33:
21 33:22 34:14 35:9 35:16
35:24 36:20 46:4 46:17 46:
19 47:1 47:10 47:11 47:17
56:3 56:6 56:22 57:21 59:1
59:3 59:8 60:1 62:14 67:17
70:22 71:5 71:9 75:3 77:2
77:2 77:8 77:15 81:3 82:3
82:14 84:14 84:17 84:19 84:
20 84:23 85:3 88:7 88:12 91:
6 91:8 92:18 93:3 93:15 96:
25 97:23 98:25 99:8 99:8 99:
8 99:9 99:14 99:17 100:6
100:10 100:20 102:3 103:17
104:25 106:1 106:3 106:7
106:12 106:13 106:14 106:17
107:5 107:9 107:16 109:13
111:6 112:11 114:24 115:15
115:19 116:13 117:14 118:21
130:5 130:9 130:16 135:25
136:6 138:10 140:16 140:22
141:22 142:3 142:5 143:2
143:15 143:20 146:24 147:6
148:19 150:2 152:9 153:22
**Lifetime** [1] 34:6
**Likely** [4] 16:7 57:18 57:
25 119:10
**Likewise** [1] 13:12
**Line** [2] 34:22 116:5
**Lingering** [1] 69:25
**List** [3] 87:14 133:19 137:1
**Listen** [7] 44:9 62:20 71:
17 90:21 95:6 97:18 144:24
**Listening** [5] 28:22 68:
19 98:12 105:18 118:13
**Live** [3] 18:9 30:8 132:23
**Lived** [1] 130:5
**Lives** [3] 68:8 96:20 137:
25

**Living** [3] 34:7 34:8 106:4
**Livingston** [1] 132:8
**Look** [19] 21:19 44:20 57:
15 58:24 69:15 71:1 75:12
79:18 93:1 93:9 93:25 96:7
104:4 104:19 129:16 130:7
140:2 140:15 154:11
**Looked** [1] 63:13
**Looking** [7] 59:15 76:22
104:18 118:12 139:15 149:13
154:17
**Looks** [1] 62:4
**Lord** [4] 25:13 88:5 100:18
102:2
**Lose** [4] 14:24 14:25 18:22
106:12
**Lost** [5] 25:14 106:13 106:
14 106:17 128:7
**Love** [2] 35:21 46:11
**Lucky** [1] 150:21
**Lunches** [1] 154:20
**Luther** [1] 149:25
**Lyn** [6] 2:2 3:16 48:25 80:
10 114:6 131:6

## M

**Ma'am** [7] 60:10 62:20 67:
9 71:1 71:17 79:1 94:11
**Machine** [1] 1:23
**Major** [3] 31:23 74:17 106:
19
**Maker** [1] 107:8
**Makeup** [1] 94:24
**Malicious** [3] 56:10 56:
12 121:17
**Maliciously** [3] 35:19 46:
9 81:3
**Mamou** [9] 1:5 3:12 3:13
71:12 78:6 94:20 96:7 156:7
157:20
**Man** [8] 38:22 53:17 68:22
96:11 96:14 137:23 149:17
150:1
**Man's** [2] 42:20 97:23
**Manager** [1] 74:15
**Manner** [1] 62:16
**Marginal** [1] 25:25
**Married** [3] 35:8 86:23 87:
4
**Martin** [1] 149:25
**Matter** [10] 11:17 11:17
11:18 21:6 21:7 62:23 85:23
99:15 111:8 111:15
**Mature** [1] 25:8
**McClellan** [36] 2:2 3:16
48:21 48:22 48:24 48:25 61:
21 67:13 68:2 75:18 75:21
76:2 77:25 78:1 80:2 80:3
80:5 80:10 94:21 114:2 114:
3 114:5 114:6 126:11 131:2
131:3 131:5 131:6 137:7 137:
9 144:21 145:22 154:18 155:
12 155:22 155:23
**Mean** [37] 11:6 15:5 15:8
15:10 15:12 15:13 19:12 19:
14 25:13 26:22 41:13 41:16
41:18 55:1 60:2 62:22 65:4
65:5 65:7 68:11 79:15 92:19
98:6 98:13 115:3 115:6 115:
15 120:23 123:13 123:21 125:
12 127:11 127:12 129:24 134:
5 135:25 145:3
**Meaning** [4] 4:6 4:7 20:12
34:8
**Meaningful** [1] 106:8
**Means** [33] 8:5 8:6 8:7 8:
8 13:4 13:10 14:9 15:8 15:
11 16:9 16:10 16:10 19:6 22:
21 29:19 31:25 41:19 56:21
83:5 90:24 114:17 118:4 119:
10 119:12 122:12 123:25 124:
3 125:11 133:14 135:6 139:

20 142:25 144:13
**Meant** [3] 43:18 44:5 46:21
**Mechanism** [1] 13:4
**Med** [1] 84:7
**Media** [6] 35:3 72:16 109:
22 120:23 121:9 152:13
**Media's** [2] 35:3 35:4
**Medical** [1] 19:6 84:4
**Meet** [3] 107:8 123:3 124:17
**Member** [1] 49:18
**Members** [2] 128:7 147:12
**Memorize** [3] 8:20 8:21 9:
1
**Men** [1] 149:6
**Mental** [3] 25:17 58:14
116:19
**Mention** [1] 52:21
**Mentioned** [3] 49:16 64:
17 73:24
**Mercy** [1] 117:15
**Merger** [1] 77:4
**Message** [3] 28:14 28:14
28:16 28:17
**Messenger** [2] 28:15 28:17
**Met** [1] 123:25
**Mid** [1] 52:14
**Middle** [2] 124:20 125:9
**Might** [88] 6:2 6:4 18:14
25:3 25:4 25:5 25:6 25:10
25:10 25:12 25:16 25:18 25:
18 25:21 26:2 26:2 27:15 28:
1 30:8 30:12 30:15 30:16 31:
8 35:7 37:12 39:6 42:1 42:3
42:11 42:23 43:7 46:16 47:6
54:14 54:15 55:10 55:13 56:
7 59:10 60:18 60:23 61:23
62:18 63:15 68:1 70:3 73:20
75:3 76:10 78:22 79:1 79:13
81:2 91:12 92:20 95:9 108:
13 111:2 111:5 112:14 112:
15 112:21 112:23 113:4 113:
5 117:15 119:5 122:4 123:11
127:14 130:4 130:14 130:16
130:15 131:22 134:24 134:24
134:25 142:19 144:22 145:1
145:4 147:13 147:19 149:22
153:17 154:15 154:22
**Mind** [24] 12:15 24:15 26:9
28:9 45:14 55:11 55:12 57:
24 59:2 59:6 62:3 74:4 74:
24 77:12 80:25 93:2 96:8 98:
10 110:19 123:11 123:24 140:
6 140:8 143:25
**Minds** [3] 52:18 52:18 90:
16
**Minimal** [1] 25:25
**Minute** [2] 56:14 131:19
**Minutes** [5] 3:18 10:8 61:
5 104:6 150:18
**Misapprehension** [1]
103:2
**Miss** [17] 3:16 45:13 47:9
47:21 48:25 71:16 72:8 72:
21 78:15 78:20 79:9 80:6 94:
17 108:23 109:9 110:2 155:24
**Mistrial** [1] 8:7
**Misunderstood** [1] 63:3
**Mitigating** [21] 21:2 22:
20 23:1 23:5 24:10 25:3 25:
7 25:11 25:13 25:18 25:22
26:2 58:24 59:7 66:16 67:20
92:16 92:19 98:18 130:9 143:
14
**Mitigation** [5] 67:14 98:
4 98:7 98:11 98:13
**Mobil** [1] 74:1
**Moderate** [2] 26:1 26:2
**Modern** [1] 138:7
**Moment** [5] 56:7 98:24 105:
4
**Monday** [4] 110:19 123:4
126:22 153:9

**Month** [4] 29:21 29:21 132:
11 132:12
**Months** [2] 105:12 154:4
**Moral** [3] 20:21 20:21 69:6
**Morality** [1] 35:14
**Morning** [24] 3:2 3:9 14:5
18:20 45:15 60:16 60:17 60:
20 74:6 75:8 78:16 78:17 79:
8 98:13 109:7 110:20 110:21
111:12 126:23 126:24 127:14
129:11 153:11 153:11
**Most** [8] 18:11 28:13 40:25
87:15 88:24 100:18 106:19
134:5
**Mother** [1] 87:16
**Mouth** [2] 127:12 127:13
**Move** [2] 19:24 60:18
**Moved** [3] 67:6 150:4 150:7
**Movie** [5] 53:17 53:21 53:
23 54:9 68:21
**Moving** [1] 9:3
**Murder** [165] 3:21 4:1 4:4
4:7 4:8 4:9 4:10 4:10 4:12
4:15 4:17 4:18 4:20 4:24 7:
23 13:17 13:23 14:12 17:5
20:6 24:5 24:19 26:17 26:24
27:16 29:15 29:18 31:22 31:
23 31:25 32:9 32:12 32:17
32:19 32:21 33:4 33:8 33:10
33:10 33:16 33:17 33:20 33:
21 34:25 34:25 35:15 35:22
35:23 36:5 36:9 36:11 37:6
37:8 37:9 37:22 37:23 43:4
43:10 44:14 44:15 44:15 46:
2 46:12 46:24 46:25 51:4 54:
20 55:15 56:17 56:20 57:8
57:8 57:10 57:11 57:14 58:
21 59:4 61:15 61:25 62:5 62:
13 63:5 63:17 64:11 64:19
64:23 65:16 65:19 66:1 66:
19 67:2 79:14 90:15 91:2 91:
13 91:19 92:7 92:9 95:9 97:
8 97:24 98:25 100:3 100:4
100:9 103:13 106:9 107:22
111:21 112:10 112:23 113:5
115:13 115:13 115:14 115:17
115:18 115:18 115:21 115:22
115:23 115:24 116:1 116:3
116:4 116:4 116:7 116:13
116:24 117:2 117:6 117:11
117:12 117:13 118:4 118:19
120:5 120:12 120:20 121:1
121:13 122:20 135:8 135:20
135:20 135:21 135:22 135:24
137:24 139:3 139:25 140:10
140:11 141:13 141:20 142:1
142:9 142:16 143:1 144:10
146:23 146:25 148:3 148:7
148:16
**Murdered** [2] 54:6 54:6
**Murderer** [3] 62:6 67:18
96:25
**Murders** [5] 17:2 17:6 17:
6 117:4 117:19
**Must** [19] 4:3 9:14 9:17 9:
22 11:25 14:4 15:8 18:2 20:
2 20:7 21:19 38:17 39:19 40:
13 72:24 105:23 110:5 129:
13 138:2

## N

**Name** [5] 48:25 80:10 94:19
114:6 131:6
**Named** [1] 112:7
**Names** [1] 44:21
**NASA** [1] 150:10
**Nation** [1] 90:25
**Natural** [1] 26:21
**Nature** [2] 96:18 130:16
**Near** [1] 41:24
**Necessarily** [7] 20:2 20:
4 20:7 48:16 79:15 129:24
140:13
**Necessary** [4] 9:1 16:16
130:7 130:16

**Need** [18] 26:3 50:20 52:2 62:10 64:4 76:8 76:9 77:13 94:11 104:7 106:5 124:19 124:20 125:7 125:23 142:14 144:15 145:21

**Neighborhood** [2] 131:25 132:2

**Neighbors** [1] 18:14

**Nelson** [8] 126:17 126:21 127:8 128:9 129:3 131:6 146:12 151:11

**Neutral** [1] 113:16

**Never** [17] 8:16 9:3 22:14 46:17 97:2 103:19 103:19 114:12 129:6 130:19 134:6 135:10 135:15 137:10 137:19 141:19 142:1

**Newer** [1] 107:1

**News** [5] 109:21 120:10 120:25 152:8 152:13

**Newspaper** [3] 72:18 109:24 152:16

**Next** [12] 3:13 29:4 48:17 48:17 61:5 72:14 109:12 109:17 129:19 134:14 136:25 137:15

**Night** [5] 125:25 132:18 132:21 132:22 150:5

**Nine** [1] 33:25

**Ninety** [1] 33:25

**Ninety-nine** [2] 33:25 145:23

**Nobody** [3] 21:18 60:2 60:3

**Nobody's** [1] 22:20

**Nonviolence** [1] 150:2

**Noon** [2] 109:8 151:22

**Normally** [1] 155:2

**Note** [1] 39:8

**Nothing** [9] 24:7 27:24 30:3 66:5 66:16 74:20 108:15 148:25 151:3

**Notion** [6] 16:8 26:4 27:23 43:17 121:11 130:18

**Notions** [1] 90:13

**November** [1] 102:22

**Nowhere** [1] 21:22

**Number** [46] 32:6 32:9 32:16 33:23 33:24 43:19 44:4 57:15 58:21 58:23 64:7 66:10 66:15 66:17 66:22 67:1 67:5 67:12 69:4 77:24 91:13 92:12 92:14 92:21 92:24 92:12 125:19 125:23 127:15 127:20 140:16 141:4 141:10 142:1 142:25 143:4 143:11 144:12 144:12 147:16 155:18 155:19

**Numbered** [2] 1:20 157:6

**Numerous** [1] 83:19

**Nurse** [1] 84:11

**Nurses** [1] 19:6

**Nursing** [1] 84:11

**Nutshell** [1] 29:6

### O

**O'clock** [1] 18:19

**O.J.** [1] 99:7

**Oak** [1] 133:3

**Oath** [7] 95:24 114:15 114:20 122:9 123:13 123:15 139:16

**Object** [4] 41:9 41:10 44:2 68:2

**Objectionable** [1] 113:22

**Objective** [2] 110:3 152:19

**Obligated** [1] 12:3

**Obligation** [4] 12:7 15:17 32:8 32:14

**Obtain** [1] 16:15

**Obvious** [2] 101:13 102:16

**Obviously** [19] 5:4 12:19 12:23 23:7 36:25 38:7 59:17 60:1 65:16 82:23 88:22 94:20 95:2 103:22 104:20 122:19 124:16 124:18 125:4

**Occasions** [1] 83:19

**Occur** [8] 15:13 15:24 31:8 32:5 62:18 74:4 74:11 97:11

**Occurred** [10] 3:22 15:14 32:18 62:6 69:12 69:19 69:25 125:13 157:7

**Occurring** [1] 64:16

**Occurs** [2] 62:22 76:12

**October** [3] 74:4 154:8 155:6

**Odds** [1] 14:23

**Offense** [10] 3:21 4:1 4:11 13:17 20:18 29:18 33:18 46:9 54:20 136:7

**Offhand** [1] 59:9

**Officer** [4] 83:15 83:25 105:18 116:5

**Officers** [1] 105:16

**Official** [4] 27:13 157:3 157:12 157:17

**Official/Deputy** [1] 157:3

**Officials** [1] 19:7

**Often** [6] 50:6 70:9 106:19 116:22 118:3 132:6

**Ohio** [2] 82:1 82:2

**Old** [4] 25:8 46:16 52:13 137:23

**Older** [2] 45:20 133:16

**Oldest** [1] 88:10

**Once** [5] 38:7 76:20 99:16 99:16 142:16

**One** [94] 4:12 4:25 5:1 6:2 6:3 8:2 8:13 20:12 21:1 23:25 25:3 26:22 27:16 27:24 29:3 30:4 31:24 32:6 35:12 38:15 39:22 40:7 42:12 43:19 45:19 48:15 48:15 53:24 55:7 55:9 56:25 57:1 57:15 58:21 64:7 66:10 68:20 70:9 71:24 75:17 88:10 88:21 88:8 88:9 91:13 92:12 92:1 92:24 98:15 99:18 104:9 105:15 105:15 109:13 112:5 115:24 117:7 117:15 118:25 119:6 119:24 122:4 122:13 125:10 125:21 129:18 136:4 137:2 137:18 137:18 139:7 140:16 141:4 141:11 142:1 143:3 143:4 144:12 147:4 147:7 147:7 147:9 148:2 148:14 148:25 149:17 150:6 151:17 152:9

**One's** [1] 22:21

**Open** [8] 26:9 37:23 59:14 91:22 99:13 118:13 131:23 157:7

**Operation** [1] 133:8

**Opinion** [5] 80:13 114:17 125:22 133:12 142:8

**Opinions** [2] 49:5 139:21

**Opportunities** [1] 150:8

**Opportunity** [6] 54:14 59:2 59:25 93:20 101:8 104:2

**Oppose** [1] 50:9

**Opposed** [9] 52:19 54:19 55:9 56:6 59:1 59:8 65:10 93:4 143:15

**Opposes** [1] 49:20

**Option** [9] 9:17 9:22 23:13 33:6 33:7 33:8 33:9 37:2 37:20

**Options** [2] 55:7 146:22

**Order** [5] 9:21 14:6 16:15 7G:0 100:5

**Ordering** [3] 51:13 95:11 136:17

**Ordinarily** [5] 18:15 35:1 72:10 72:11 152:10

**Otherwise** [2] 27:11 141:2

**Ought** [25] 23:3 24:1 24:2 24:8 38:3 46:18 59:1 73:19 88:13 88:14 89:18 89:22 90:22 91:5 92:20 93:3 94:8 114:18 121:12 125:3 140:1 140:9 140:10 140:12 144:16

**Outcome** [4] 32:6 32:9 32:16 66:5

**Outcomes** [1] 32:4

**Outside** [6] 18:25 52:25 73:2 101:9 110:7 152:24

**Override** [1] 60:8

**Overview** [1] 43:20

**Own** [8] 27:10 49:8 80:12 97:3 102:15 130:14 133:13 137:24

### P

**Page** [4] 136:25 137:14 137:16 147:16

**Paid** [1] 157:11

**Painfully** [1] 101:13

**Pamela** [2] 157:3 157:16

**Panel** [2] 3:1 71:21

**Paper** [5] 74:5 120:4 120:8 120:11 120:25

**Paragraph** [2] 4:16 135:22

**Paraphrase** [1] 147:24

**Pardon** [1] 145:9

**Pardons** [1] 30:24

**Parole** [9] 29:19 30:1 30:2 30:3 30:8 30:19 102:20 103:2 103:15

**Paroled** [1] 30:15

**Paroles** [1] 30:24

**Part** [13] 5:13 5:15 13:18 20:19 20:23 56:25 57:2 105:13 106:13 132:5 132:25 154:9 154:10

**Participate** [10] 50:16 51:11 61:18 85:8 85:13 131:24 136:12 136:15 136:21 154:2

**Particular** [11] 36:19 37:13 46:9 50:23 70:3 79:11 95:20 95:21 97:15 107:25 132:16

**Parties** [3] 155:17 157:6 157:9

**Parts** [1] 149:15

**Pass** [4] 60:11 94:12 126:11 146:8

**Passing** [1] 42:5

**Past** [3] 34:11 126:22 148:5

**Pastor** [6] 50:8 50:13 87:16 88:24 89:23 90:2

**Patrol** [8] 131:25 132:6 132:13 132:16 132:21 132:22 133:6 150:16

**Pay** [2] 64:5 137:24

**Peace** [2] 83:15 83:25

**Peculiar** [1] 11:3

**Penalty** [84] 23:4 27:1 47:17 47:23 48:2 49:7 49:9 49:20 49:22 50:10 50:15 51:2 51:9 54:10 55:8 55:10 55:25 59:19 59:23 61:16 61:17 61:25 62:17 62:22 63:7 63:16 63:23 80:13 80:14 80:20 81:2 82:2 85:6 89:1 89:3 89:17 89:19 89:22 91:1 94:7 95:5 97:8 103:18 105:1 106:20 106:21 107:6 107:7 116:7 120:6 120:12 120:16 120:20 124:16 133:12 133:14 134:16 134:21 134:23 135:14 136:8 136:11 136:13 137:20 138:2 138:4

**People** [84] 3:7 5:6 5:22 18:13 18:16 19:8 19:13 25:21 28:23 34:7 34:7 34:10 34:11 34:14 34:18 34:25 38:13 40:3 41:2 42:12 46:12 49:13 50:7 54:1 54:14 57:6 57:7 70:9 71:6 71:22 71:23 71:24 77:9 84:14 84:15 84:19 85:5 85:7 87:15 88:13 88:14 89:2 89:20 90:21 95:4 95:6 98:1 98:25 102:1 102:21 104:2 104:4 104:20 104:21 106:5 108:7 107:1 115:24 116:22 118:3 118:18 125:4 125:24 126:1 126:3 131:22 132:21 134:5 135:23 136:4 136:10 136:13 139:10 139:12 139:23 143:3 146:22 146:24 147:13 147:19 149:16 151:16 155:3 155:7

**Per** [1] 150:18

**Percent** [7] 15:2 15:2 132:9 134:1 134:2 134:6 134:12

**Perfectly** [3] 30:4 30:11 130:3

**Perhaps** [14] 5:20 16:6 21:2 32:19 47:10 47:10 47:11 47:12 111:6 111:6 111:7 153:21 153:22 153:23

**Period** [4] 50:13 65:22 133:6 150:23

**Perished** [1] 27:11

**Permit** [2] 72:15 109:20

**Permitted** [3] 15:3 15:4 108:3

**Person** [98] 4:24 5:12 6:14 12:18 28:10 28:13 30:22 37:25 38:19 38:24 39:14 45:24 50:11 50:17 51:22 51:23 53:2 53:3 53:6 55:3 55:5 55:22 56:2 56:22 57:21 57:25 58:11 58:17 58:20 59:1 59:3 59:3 59:8 59:10 59:21 62:6 62:17 64:11 64:13 64:10 64:19 64:23 65:1 65:17 65:18 65:23 66:16 66:19 68:5 68:14 68:15 69:10 69:20 81:18 81:19 88:22 91:4 93:3 94:3 97:7 97:12 97:25 99:17 100:7 100:8 102:17 104:12 105:1 105:2 108:8 111:20 113:3 118:23 120:11 120:19 121:5 122:23 122:4 129:12 132:15 135:2 137:23 141:6 141:16 142:3 143:21 143:1 143:2 143:7 143:15 148:2 148:3 148:4 148:6 148:9 148:12 148:18 148:19

**Person's** [13] 12:22 34:6 40:19 58:13 69:6 97:25 99:17 115:14 115:19 117:14 118:21 135:24 147:10

**Personal** [13] 20:21 20:21 47:10 47:16 70:19 72:10 75:3 106:10 111:6 114:17 121:23 139:21 153:22

**Personality** [1] 141:21

**Personally** [5] 50:9 59:23 85:3 88:18 133:4

**Personnel** [1] 19:6

**Persons** [4] 16:22 17:8 57:1 88:24

**Phase** [31] 5:2 5:9 5:10 5:18 6:11 6:13 6:16 6:25 7:2 7:5 7:6 7:20 7:22 8:1 9:12 13:10:11 10:14 10:16 10:17 11:10 12:13 14:12 36:6 36:13 37:10 62:9 62:15 70:

13 70:23
**Philosophy** [1] 149:23
**Phone** [3] 2:9 2:16 2:21
**Phrase** [6] 11:12 11:20 13:
1 21:23 21:24 22:5
**Pick** [2] 151:4 151:7
**Picks** [1] 132:15
**Picture** [1] 142:20
**Pie** [1] 33:18
**Piece** [2] 18:9 18:17
**Pile** [1] 6:15
**Place** [6] 23:4 70:19 74:
13 98:11 99:23 132:8
**Places** [1] 74:14
**Plan** [1] 74:8
**Play** [12] 7:17 7:25 9:6 9:
6 39:12 43:20 44:16 46:21
66:18 127:17 154:9 154:9
**Playing** [1] 14:25
**Pleading** [1] 7:10
**Pled** [1] 101:5
**Plug** [4] 34:22 35:11 35:13
45:21
**Plus** [2] 115:22 135:20
**Point** [27] 19:3 26:3 27:
22 27:22 28:13 31:5 42:25
43:1 43:2 46:19 66:17 73:18
75:8 82:13 88:4 95:10 97:4
99:18 106:23 104:24 110:25
111:13 127:2 129:5 130:17
152:19 153:15
**Point-blank** [1] 41:17
**Polega** [4] 153:2 153:8
153:8 155:20
**Police** [2] 88:15 116:5
**Pool** [3] 71:21 109:2 151:16
**Population** [1] 105:14
**Portions** [1] 157:5
**Poses** [1] 26:5
**Position** [7] 50:9 74:12
76:13 88:25 89:9 122:17 146:
19
**Possession** [2] 86:3 86:4
**Possibilities** [2] 38:5
98:13
**Possibility** [14] 15:9 15:
22 15:25 16:11 19:22 30:11
33:2 64:18 65:6 65:13 65:14
67:11 98:1 119:9
**Possible** [13] 4:25 11:19
21:8 31:17 32:4 32:6 32:9
32:15 67:8 74:10 91:6 116:
12 144:6
**Possibly** [10] 15:9 15:10
45:6 76:7 82:10 84:16 84:20
113:1 115:4 154:2
**Pot** [1] 129:15
**Potential** [3] 6:8 6:9
146:1
**Potentially** [1] 97:12
**Practice** [1] 88:23
**Pray** [1] 35:11
**Preach** [1] 50:14
**Precede** [1] 119:11
**Preconceived** [3] 44:8
90:13 121:11
**Predicament** [2] 96:5 103:
24
**Preference** [1] 60:8
**Premeditated** [1] 56:4
**Premises** [1] 17:14
**Preoccupies** [1] 146:17
**Preparation** [1] 157:11
**Preposterous** [1] 19:3
**Present** [8] 3:16 11:25 12:
1 17:3 22:21 79:1 92:7 92:10
**Presented** [7] 5:11 27:12
50:4 50:21 68:13 123:9 123:
18

**Presenting** [1] 51:7
**Presiding** [1] 1:21
**Pressure** [1] 95:17
**Presume** [1] 71:12
**Presumed** [4] 12:19 14:12
119:20 140:24
**Presumption** [10] 7:8 12:
9 12:10 12:20 12:24 13:22
13:24 140:23 141:1 141:3
**Presumptuous** [1] 34:17
**Pretty** [11] 41:11 61:7 65:
23 88:3 97:16 99:13 103:25
121:14 127:1 140:10 144:22
**Prevent** [3] 147:11 148:6
148:13
**Preventing** [1] 137:11
**Price** [1] 64:5
**Pride** [1] 71:4
**Priest** [3] 49:21 50:8 50:
13
**Primary** [2] 43:18 43:19
**Prison** [19] 19:6 30:21 30:
23 45:25 96:25 102:11 103:
17 104:25 105:11 105:14 106:
4 106:11 106:11 106:15 107:
16 108:2 108:5 139:10 139:12
**Prisoner** [1] 105:17
**Probabilities** [1] 15:2
**Probability** [33] 11:15
14:19 14:19 15:3 15:5 15:7
15:11 15:15 15:18 16:6 16:
10 16:17 16:19 17:1 57:17
58:22 64:13 64:17 65:6 65:9
65:12 91:14 92:12 119:2 119:
7 119:10 119:13 122:15 123:
2 123:8 140:17 141:6 143:7
**Probation** [3] 52:11 52:
11 52:18
**Problem** [16] 51:16 65:24
84:18 84:22 85:16 89:14 89:
15 89:16 119:25 136:24 141:
8 142:24 143:22 145:4 152:2
155:13
**Problems** [2] 53:13 154:5
**Proceedings** [4] 1:19 1:
22 155:5 157:9
**Process** [17] 20:3 31:12
44:4 51:11 59:14 61:7 61:17
72:2 72:3 85:9 85:14 95:3
106:22 115:8 136:12 136:15
136:21
**Produce** [1] 26:7
**Productive** [1] 87:21
**Professional** [3] 47:11
72:9 109:15
**Profit** [1] 35:5
**Program** [1] 55:3
**Programs** [1] 71:6
**Progress** [1] 3:8
**Project** [1] 113:8
**Projection** [1] 31:7
**Proof** [13] 13:5 92:15 123:
3 124:1 140:17 140:20 140:
23 141:5 145:7 145:10 145:
15 145:19 146:2
**Proper** [5] 70:2 80:22 81:
2 82:4 85:6 99:18 120:15
**Property** [4] 16:23 17:9
17:13 17:16
**Prosecuted** [3] 81:23 82:
17 82:21
**Prosecution** [1] 44:16
**Prosecution's** [1] 6:8
**Prosecutor** [1] 66:14
**Prospective** [1] 96:8
**Prove** [37] 15:17 15:21 16:
2 16:16 16:19 17:1 22:3 22:
4 22:11 22:14 22:15 32:1 32:
3 32:7 32:10 32:11 32:12 32:
16 32:18 33:3 33:4 39:18 51:
5 64:10 119:12 119:21 119:

24 122:14 122:22 125:14 134:
6 140:17 140:21 140:25 141:
2 141:5 143:6
**Proved** [3] 3:24 4:14 4:18
**Proven** [5] 91:24 95:7 121:
17 123:9 124:7
**Proves** [5] 11:3 11:13 25:14:
3 14:14 40:14 92:7
**Providing** [1] 53:1
**Proving** [1] 97:20
**Prudent** [1] 52:19
**Pryor** [8] 73:7 73:11 73:
17 75:6 75:22 75:24 77:21
77:24
**Public** [1] 65:21
**Pull** [1] 35:11
**Pulling** [1] 17:20
**Pulls** [2] 35:13 45:21
**Punches** [1] 18:20 18:21
**Punished** [2] 49:15 63:22
**Punishment** [55] 6:25 7:
20 9:14 10:21 12:14 12:13
20:12 33:20 33:21 36:23 36:
19 37:14 38:2 46:24 46:25
49:23 52:4 52:9 52:19 53:10
55:24 56:18 62:9 62:15 63:
16 66:21 70:2 70:11 70:13
70:23 80:22 85:6 91:5 92:20
97:15 99:4 99:18 106:8 107:
5 116:16 116:23 117:7 117:
24 118:7 118:11 120:7 120:
121:12 135:10 135:15 139:
6 140:15 142:10 142:12 146:1
**Punishments** [5] 4:25 29:
8 49:14 91:6 116:12
**Purpose** [4] 43:19 71:21
74:8 110:2
**Purposes** [6] 5:12 20:15
20:25 43:19 109:2 151:15
**Pursue** [1] 23:13
**Put** [25] 15:16 22:21 45:19
47:25 49:7 68:6 73:19 76:13
87:15 87:17 87:22 97:2 98:5
99:23 102:16 104:14 105:13
118:19 118:20 123:5 126:8
127:11 127:12 132:7 146:19
**Putting** [1] 121:7

___Q___

**Quality** [4] 12:20 12:21
40:13 41:22
**Qualms** [1] 39:21
**Questionable** [2] 134:25
135:2
**Questionnaire** [19] 49:4
49:17 51:18 52:3 53:17 55:6
55:15 60:23 60:25 63:14 71:
1 81:7 81:9 87:22 93:25 98:
5 114:10 131:9 137:8
**Questions** [70] 6:19 8:1
9:13 9:20 10:3 10:6 10:8 10:
22 11:11 14:16 16:12 19:17
20:7 23:19 23:24 23:25 26:
20 26:20 29:2 29:6 29:7 29:
7 29:15 31:5 31:13 31:15 31:
20 38:8 43:14 45:17 47:3 48:
8 48:11 48:18 49:3 51:8 56:
19 62:21 63:6 63:12 73:15
75:12 78:18 79:15 79:25 91:
7 94:21 98:4 106:2 107:19
107:24 108:17 110:18 110:23
111:22 113:25 113:24 118:10
118:14 121:6 126:25 130:20
130:23 131:9 140:3 146:14
146:18 147:7 147:9 153:13
**Quicker** [1] 107:2
**Quickly** [2] 9:3 45:6
**Quit** [2] 150:18 150:19
**Quite** [4] 124:7 124:20
125:19 146:16

___R___

**Radio** [2] 72:19 109:25
**Raise** [1] 92:16

**Raised** [3] 10:20 73:6
122:17
**Raises** [1] 100:21
**Ran** [1] 112:7
**Range** [7] 33:21 34:2 34:
21 38:2 46:23 46:25 116:23
**Rapes** [1] 17:7
**Rate** [1] 27:13
**Reach** [7] 36:22 37:17 37:
22 44:9 44:13 72:23 110:5
143:18 152:21
**Reached** [3] 52:2 52:3 143:
18
**Reaching** [2] 17:19 37:24
**Reacquire** [1] 19:1
**React** [3] 6:2 6:5 21:20
**Reaction** [1] 26:21
**Read** [15] 7:1 7:4 7:10 19:
14 68:21 72:19 74:5 109:25
120:4 120:12 120:24 150:20
150:22 150:23 152:17
**Reading** [3] 7:12 137:2
147:20
**Ready** [1] 31:10
**Real** [4] 38:9 38:9 76:2 99:
24
**Realistically** [1] 70:18
**Reality** [1] 68:24
**Realize** [1] 56:15
**Realized** [1] 69:1
**Realizing** [1] 104:11
**Really** [23] 22:7 24:21 25:
22 54:25 61:8 62:2 62:3 68:
12 68:23 70:18 88:5 95:24
97:1 97:14 99:14 101:23 115:
4 117:3 117:3 117:5 117:5
149:11 154:11
**Reason** [30] 3:5 8:10 8:17
8:21 11:3 18:11 23:20 29:3
34:3 34:12 37:3 48:15 53:25
59:7 59:11 65:3 72:20 87:17
93:10 94:8 104:9 104:10 107:
23 110:1 111:21 111:21 114:
22 143:13 143:14 143:20
**Reasonable** [65] 3:25 4:
15 11:14 11:21 11:23 12:2
12:6 12:15 12:23 13:2 13:2 16:4
13:9 13:12 13:14 14:1 14:14
14:18 15:17 21:24 22:6 22:9
32:2 32:4 32:7 32:10 32:17
32:18 33:3 33:5 39:19 40:15
40:19 42:8 43:2 43:7 43:8
43:13 50:4 51:5 57:17 62:5
64:10 69:24 92:8 92:11 95:8
97:21 119:2 119:12 119:13
119:22 119:25 122:14 124:3
124:7 125:13 134:10 135:6
135:7 140:25 143:6 145:16
145:20 146:3 146:4
**Reasons** [13] 58:25 58:25
61:9 92:19 93:3 93:6 93:22
98:17 98:19 104:9 104:11
143:13 143:19
**Receive** [6] 13:23 59:1 62:
17 73:2 89:18 120:19
**Received** [4] 72:25 100:6
106:20 152:23
**Receives** [1] 143:21
**Receiving** [3] 61:24 67:
17 106:3
**Recognize** [5] 47:23 48:5
102:4 151:25 154:16
**Recognized** [1] 100:17
**Recognizes** [3] 22:18 22:
18 96:7
**Recommendations** [2] 30:
25 31:4
**Record** [4] 1:1 157:6 157:
8 157:11
**Reduced** [1] 106:23
**Reevaluate** [4] 26:8 140:
5 143:11 143:16
**Reflects** [1] 157:9

**Refuse** [12] 31:4 36:18 43:9 44:3 72:18 72:18 72:19 109:24 109:24 109:25 152:16 152:16

**Regard** [2] 103:2 134:18

**Regarding** [1] 148:22

**Regardless** [1] 57:6

**Regards** [1] 100:15

**Register** [1] 17:20

**Regret** [1] 70:20

**Rehabilitate** [1] 55:4

**Rehabilitated** [3] 54:12 54:14 54:24

**Rehabilitates** [1] 139:12

**Rehabilitation** [2] 54:15 55:2

**Reinforce** [1] 24:24

**Related** [3] 112:20 127:8 153:24

**Relation** [1] 50:23

**Relationship** [2] 81:17 83:22

**Relax** [2] 49:2 114:8

**Reliability** [1] 42:9

**Reliable** [1] 42:24

**Religion** [4] 49:25 50:8 59:22 88:23

**Religious** [8] 47:18 47:22 49:16 49:24 50:23 60:7 61:15 88:22

**Rely** [1] 148:10

**Relying** [4] 147:11 148:6 148:13 152:5

**Remarkably** [4] 23:24 28:3 28:20 129:20

**Remember** [7] 44:21 51:24 54:3 65:11 68:25 110:18 153:9

**Remind** [1] 3:11

**Remorse** [3] 55:22 70:10 70:19

**Removed** [1] 124:4

**Render** [5] 90:8 114:16 122:9 123:15 139:17

**Renders** [1] 69:20

**Repeat** [2] 134:19 147:15

**Replace** [1] 24:14

**Replaced** [1] 98:17

**Reported** [1] 1:22 157:7

**Reporter** [2] 157:3 157:17

**Reporter's** [4] 1:1 157:6 157:8 157:11

**Reports** [1] 15:1

**Reprehensible** [2] 62:8 105:7

**Represent** [7] 49:1 77:8 80:11 92:5 94:20 114:7 131:7

**Represented** [2] 3:15 65:2

**Representing** [1] 104:12

**Request** [1] 156:9

**Requested** [1] 157:5

**Require** [4] 70:12 70:16 70:22 70:25

**Required** [8] 16:1 16:19 17:1 22:20 22:21 32:1 32:3 33:6

**Requirement** [5] 15:21 22:22 26:5 26:6 26:7

**Requires** [4] 17:13 29:16 61:24 134:10

**Requiring** [1] 24:17

**Reservations** [4] 47:22 59:19 61:16 69:10

**Resolve** [1] 129:16

**Resolved** [3] 135:3 154:9 155:12

**Respect** [2] 87:15 88:25 125:24

**Respective** [1] 157:9

**Respects** [1] 107:7

**Response** [2] 91:10 99:19

**Responses** [2] 60:24 80:9

**Responsibility** [2] 20:22 100:16

**Responsible** [4] 70:3 97:25 122:9 103:22

**Rest** [5] 46:18 105:14 130:5 141:21 141:22

**Restrictions** [3] 72:21 110:2 152:18

**Result** [23] 10:4 36:22 36:22 37:17 37:21 37:24 44:8 44:13 51:18 51:12 61:23 72:22 81:22 85:11 90:21 90:22 91:2 100:9 102:2 106:2 111:15 111:15 136:16

**Results** [2] 102:7 117:18

**Retardation** [3] 25:17 25:20 25:25

**Retire** [1] 45:4

**Retired** [2] 131:13 131:14

**Return** [3] 51:6 57:9 79:10

**Reveal** [1] 96:3

**Revenge** [2] 35:20 46:10

**Review** [1] 20:14

**Revisited** [1] 68:22

**Ride** [1] 74:24

**Ridiculous** [1] 11:6

**Righteous** [1] 101:21

**Rights** [2] 131:20 150:1

**Rise** [2] 18:2 40:14

**Rises** [2] 12:22 21:12

**Risk** [1] 27:10

**Roam** [1] 36:2

**Rob** [1] 38:22

**Robber** [2] 38:22 39:2

**Robberies** [1] 17:7

**Robbery** [6] 38:25 51:17 51:22 54:23 87:3 116:4

**Robs** [2] 38:23 54:17

**Room** [8] 8:24 10:10 10:15 28:21 31:13 35:13 103:14 107:22

**Roosevelt** [1] 150:3

**ROSE** [1] 78:11

**Rosharon** [1] 83:12

**Roswell** [2] 149:2 150:5

**Rough** [2] 88:3 88:4

**Roughly** [1] 151:16

**Rule** [2] 8:4 31:9

**Rules** [11] 7:17 7:25 8:22 43:20 44:1 79:21 90:5 113:21 122:3 122:7 122:8

**Run** [3] 27:10 68:8 132:11

**Runner** [2] 124:9 124:9

**Runs** [2] 4:2 27:10

---

## S

**Sad** [1] 53:22

**Sadness** [1] 96:21

**Safe** [1] 93:21

**SALDANA** [1] 45:8

**Sale** [1] 147:10

**Salesman** [1] 131:15

**San** [1] 157:18

**Sat** [6] 7:23 26:22 89:20 101:10 101:16 104:20

**Satisfied** [12] 12:2 13:10 24:21 24:25 26:4 26:14 44:5 44:6 44:19 44:23 62:24 130:3

**Satisfy** [3] 11:25 12:5 13:1

**Save** [1] 68:8

**Saves** [1] 27:10

**Saw** [9] 27:13 41:16 41:17 42:7 42:10 42:12 42:21 53:17 68:20

**SBOT** [4] 2:3 2:5 2:13 2:18

**Scared** [1] 105:23

**Scary** [1] 27:2

**Scenario** [1] 45:19

**Scenarios** [1] 57:11

**Scene** [1] 27:13

**Schedule** [1] 72:8

**School** [10] 15:1 18:19 43:15 83:15 84:5 84:7 88:9 149:13 149:15 150:6

**School's** [1] 142:17

**Screwed** [1] 27:14

**Scripture** [1] 90:4

**Search** [3] 67:14 67:15 67:20

**Season** [1] 14:22

**Seat** [1] 45:12

**Seated** [1] 3:13

**Second** [48] 5:9 5:10 5:15 5:18 6:11 6:13 6:25 7:2 7:5 8:1 8:2 8:16 9:13 9:16 10:16 13:12 13:17 18:4 19:21 19:24 20:1 20:3 20:12 20:16 20:23 20:24 21:9 21:21 22:10 23:16 24:2 24:20 26:5 27:3 27:4 30:9 32:19 36:4 36:12 37:10 57:2 71:17 84:18 108:23 135:22 137:18 144:3 151:11

**Secondly** [1] 20:7

**Seconds** [3] 20:1 42:13 42:16

**See** [73] 6:6 6:10 8:25 9:24 13:1 15:20 15:25 16:23 17:17 17:24 21:21 21:22 22:2 23:18 23:23 36:1 37:13 39:2 41:5 42:7 42:22 46:8 46:11 46:13 46:19 46:22 48:11 49:10 49:17 58:24 61:24 63:9 63:25 65:7 67:6 69:12 72:7 72:14 74:25 76:21 79:8 79:13 80:17 84:23 84:25 85:3 89:7 89:12 89:13 90:1 91:23 94:3 94:4 96:10 96:11 96:14 96:17 97:10 99:13 104:24 106:16 106:22 109:12 109:17 111:23 112:15 113:7 115:2 129:10 142:5 144:25 147:16 152:8

**Seeing** [2] 35:2 54:8

**Seeking** [7] 51:2 51:9 92:6 94:6 94:7 124:16 144:8

**Seem** [1] 121:7

**Sees** [2] 42:14 42:16

**Selected** [1] 74:21

**Self** [12] 32:20 56:24 69:11 70:12 104:3 104:22 115:16 130:14 135:18 136:1 148:10 148:23

**Self-defense** [12] 4:7 32:20 32:23 56:24 69:11 104:22 115:16 144:25 135:18 136:1 148:10 148:23

**Sell** [2] 35:4 147:20

**Semester** [1] 150:7

**Send** [1] 28:23

**Sending** [1] 36:18

**Sense** [1] 96:24

**Sent** [3] 38:25 46:18 85:24

**Sentence** [39] 5:5 9:17 9:22 9:25 10:1 13:23 14:7 14:9 19:22 19:22 21:3 21:5 21:14 21:15 23:4 23:9 23:12 23:21 23:22 24:13 24:14 24:18 26:11 26:15 29:12 29:17 31:16 35:24 37:2 67:17 106:1 106:3 107:5 112:11 130:10 130:16 142:6 146:23 146:25

**Sentenced** [4] 29:16 30:6 56:3 82:3

**Sentencing** [1] 37:19

**Separated** [1] 87:23

**September** [5] 1:18 127:16 127:17 151:14 154:23

**Series** [1] 94:21

**Serious** [4] 4:11 54:23 96:20 104:13

**Seriously** [1] 49:25

**Seriousness** [1] 155:10

**Serve** [1] 107:5

**Served** [3] 29:20 50:19 52:25

**Service** [11] 27:14 47:7 50:1 50:12 52:12 73:20 78:23 111:3 127:4 127:20 153:18

**Serving** [1] 50:17

**Set** [14] 10:19 30:5 56:15 102:23 102:24 111:10 114:19 116:2 121:19 121:22 126:1 139:21 140:2 142:11

**Sets** [2] 10:13 47:24

**Settle** [1] 140:10

**Seven** [1] 25:8

**Seven-year** [1] 25:8

**Seventeen** [1] 25:8

**Seventeen-year-old** [1] 25:8

**Seventy** [1] 46:16

**Seventy-five-year-old** [2] 35:8 46:16

**Several** [2] 74:2 146:15

**Severe** [3] 25:24 26:1 26:1

**Sexually** [1] 54:5

**Shall** [2] 146:24 146:25

**Share** [1] 105:10

**Shooting** [1] 117:16

**Shoplifting** [1] 17:19

**Short** [1] 65:22

**Shortly** [2] 74:11 76:12

**Shot** [3] 42:2 81:19 151:8

**Show** [4] 13:5 13:13 41:21 137:7

**Showing** [2] 5:12 98:1

**Shows** [1] 91:23

**Shut** [1] 99:13

**Sick** [1] 35:9

**Side** [3] 87:19 94:25 151:2

**Sides** [4] 76:9 79:10 125:7 127:8

**Significant** [1] 22:7

**Similar** [1] 77:16

**Simple** [1] 8:11

**Simply** [19] 7:11 7:14 8:4 10:2 11:2 15:24 19:11 20:24 21:10 21:18 27:20 28:3 35:13 37:1 40:11 41:19 43:10 47:23 48:6

**Simpson** [1] 99:7

**Sin** [1] 50:15

**Sincerely** [1] 88:23

**Single** [4] 6:10 30:9 42:21 151:17

**Sit** [12] 34:18 49:2 71:3 84:16 84:20 94:8 95:10 97:17 101:8 103:1 107:18 114:20

**Sitting** [13] 51:14 84:25 85:12 89:16 96:2 96:22 96:23 101:7 103:21 136:17 144:20 148:15 151:4

**Situation** [21] 36:17 54:9 54:19 61:15 66:2 69:22 75:9 77:5 97:2 99:14 102:14 106:6 106:6 123:7 124:13 124:18 126:2 126:8 128:18 128:25 130:15

**Situations** [4] 48:6 75:3 117:6 122:2

**Six** [5] 57:6 57:7 105:12

112:6 132:11
**Sixty** [2] 30:7 30:14
**Size** [1] 149:10
**Skunk** [1] 42:6
**Slice** [1] 33:17
**Smith** [7] 110:10 110:17 110:25 111:13 112:7 114:6 126:13
**Smoking** [2] 150:18 150:19
**Society** [36] 11:17 18:3 18:5 18:8 18:10 18:12 18:16 18:18 19:12 20:10 34:9 49:11 57:20 63:19 64:1 64:24 66:20 67:3 67:18 90:6 91:16 107:25 108:1 108:2 112:13 112:24 119:4 122:6 122:17 130:1 138:14 140:19 141:8 141:12 143:9 147:12
**Someone** [42] 54:16 54:22 56:12 56:16 56:20 56:21 57:1 57:20 59:17 63:21 63:25 64:3 68:7 89:18 90:15 91:2 91:9 91:12 91:19 92:20 106:1 115:16 115:17 117:23 117:23 118:4 118:19 118:24 119:5 119:18 120:3 120:5 121:12 124:21 135:16 140:9 141:3 141:11 142:9 142:16 145:13 148:19
**Sometimes** [9] 21:16 21:17 25:5 25:16 29:10 40:2 69:9 107:16 142:5
**Somewhere** [1] 16:12
**Son** [1] 82:7
**Soon** [1] 6:4
**Sophisticated** [1] 41:5
**Sorrow** [1] 70:10
**Sorry** [9] 24:10 60:13 63:2 63:8 67:6 96:13 128:6 137:15 148:14
**Sort** [2] 53:9 56:9
**Sorts** [5] 25:2 34:4 34:5 34:5 46:22
**Soul** [2] 42:21 90:1
**Sound** [7] 79:19 94:2 98:17 113:19 120:14 120:14 149:22
**Source** [2] 38:19 39:7
**South** [1] 112:7
**Southwest** [2] 2:14
**Spare** [1] 150:15
**Speaking** [1] 103:21
**Special** [16] 6:19 9:12 62:12 62:16 64:6 64:8 66:10 66:15 66:17 66:22 66:25 67:4 67:12 67:23 69:4 70:14
**Specific** [1] 120:23
**Specifically** [1] 110:18
**Specificity** [1] 8:14
**Speculation** [1] 31:7
**Sped** [1] 106:22
**Spend** [7] 3:3 3:8 6:20 6:23 20:1 34:14 72:1 84:18 111:12 129:4 132:8 132:10
**Spending** [1] 113:11
**Spends** [1] 30:9
**Spent** [2] 8:16 31:21
**Spite** [1] 21:13
**Split** [1] 16:5
**Spur** [1] 56:7
**Squares** [1] 16:7
**Stage** [5] 56:18 116:17 118:7 135:4 135:10 135:15
**Stake** [1] 77:8
**Stance** [1] 49:22
**Stand** [3] 68:12 90:19 139:18
**Standing** [1] 27:5
**Standpoint** [3] 6:7 6:9 11:24

**Stands** [1] 3:20
**Start** [10] 3:9 6:22 49:6 71:6 109:6 113:12 113:25 125:5 125:8 155:5
**Started** [5] 18:11 109:7 132:5 151:21 154:4
**Starting** [6] 12:17 14:11 26:4 44:7 97:23 113:18
**Starts** [4] 11:12 11:20 12:18 13:3
**State** [43] 1:10 2:10 3:12 3:14 3:23 9:25 11:25 13:4 15:17 15:21 16:1 16:2 16:16 16:25 22:2 22:11 26:10 30:25 31:2 32:1 33:3 35:15 39:14 46:1 49:1 51:2 80:11 80:15 90:25 92:5 95:7 97:20 114:7 116:8 122:13 123:3 124:6 125:11 131:7 144:7 146:20 157:1 157:4
**State's** [12] 12:5 12:21 12:21 13:11 13:13 13:25 14:2 14:14 22:4 32:3 125:11 125:19
**Statement** [2] 55:7 61:19
**Stating** [1] 126:7
**Statute** [1] 57:12
**Stay** [1] 30:22
**Steps** [1] 38:11
**Stickler** [1] 131:22
**Still** [14] 26:19 44:23 55:19 57:9 68:24 69:14 85:23 88:11 99:10 102:10 106:14 106:17 141:25 151:25
**Stop** [1] 143:11
**Stops** [1] 27:10
**Store** [3] 17:21 51:23 54:17
**Storm** [1] 27:8
**Story** [1] 112:5
**Straight** [1] 141:18
**Street** [2] 27:8 116:25
**Strike** [2] 81:21 134:12
**Striking** [1] 81:22
**Strong** [2] 95:4 95:23
**Strongly** [2] 95:18 97:14
**Struggle** [1] 97:22
**Student** [1] 141:18
**Stuff** [9] 6:10 6:10 17:17 21:10 21:12 21:13 28:25 75:24 114:9
**Style** [1] 54:7
**Subdivision** [2] 132:23 133:9
**Substitute** [1] 23:4
**Successful** [1] 71:9
**Suffice** [1] 4:2
**Sufficient** [14] 21:2 24:1 23:23 25:24 26:10 26:15 27:19 67:16 67:22 67:24 92:17 122:22 143:6 143:13
**Suggest** [3] 93:6 119:8 148:4
**Sum** [2] 75:6 75:7
**Summarizes** [1] 55:8
**Sunday** [1] 50:12
**Sundays** [1] 132:16
**Support** [3] 35:9 67:10 149:11
**Supposed** [3] 27:24 102:21 154:14
**Surely** [2] 27:11 128:1
**Surrounding** [1] 82:12
**Survey** [1] 73:24
**Survive** [2] 34:15 35:10
**Survivors** [1] 121:3
**Susan** [1] 112:7
**Suspect** [1] 52:21
**Sustained** [1] 68:3

**Swear** [1] 108:2
**Swollen** [1] 105:22
**Sworn** [6] 45:9 73:8 78:12 110:11 126:18 153:3
**System** [11] 35:10 56:15 61:17 105:11 106:4 107:1 108:6 118:6 121:19 140:1 142:11

**T**

**T.D.C.** [2] 83:5 105:5
**Table** [3] 12:11 73:19 151:2
**Talks** [2] 49:21 112:13
**Tapping** [1] 17:19
**Taught** [1] 41:1
**Tax** [1] 74:15
**TC** [1] 133:1
**Teach** [1] 18:20
**Teacher** [1] 18:19
**Teachers** [1] 19:7
**Teaches** [1] 18:21
**Team** [2] 74:1 74:2
**Teams** [1] 74:8
**Television** [5] 40:24 46:14 72:18 109:24 152:16
**Ten** [6] 6:3 17:20 42:13 42:16 52:11 147:16
**Tend** [1] 25:6
**Tends** [2] 38:19 39:8
**Term** [4] 1:2 11:22 15:3 22:8
**Terms** [8] 10:17 11:6 44:1 61:22 69:2 70:10 149:23 154:24
**Test** [1] 104:3
**Testified** [6] 45:9 73:8 78:12 110:11 126:18 153:3
**Testifies** [1] 39:2
**Testify** [4] 52:6 70:13 70:16 70:22
**Testifying** [1] 42:4
**Testimony** [42] 5:14 5:16 5:19 7:3 9:7 10:11 10:20 17:3 24:22 25:12 25:17 27:6 27:12 28:6 28:7 28:11 28:12 28:22 29:5 31:6 36:13 36:15 36:16 37:13 37:16 37:24 38:16 39:15 39:16 39:25 40:1 40:6 40:18 40:19 41:19 42:9 42:10 43:4 43:5 43:11 129:9 130:2
**Texas** [31] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 3:12 3:14 3:22 3:23 9:25 19:16 31:1 31:2 39:14 49:1 51:2 80:11 90:25 92:5 114:7 116:8 131:7 144:7 146:20 157:1 157:4 157:16 157:17 157:18
**Theft** [1] 53:15
**Themselves** [7] 12:13 31:1 58:16 136:12 136:14 141:14 141:15
**Theoretical** [1] 33:2
**Thereafter** [2] 19:1 29:25
**Therefore** [2] 23:25 75:12
**Thereof** [2] 58:13 116:19
**They've** [6] 89:19 91:20 92:21 97:21 102:23 102:24
**Thinking** [13] 8:16 56:12 116:3 115:3 117:21 121:16 123:20 130:18 130:16 133:23 134:18 143:25
**Thinks** [1] 35:12
**Third** [15] 20:11 20:11 24:24:9 24:9 24:11 24:15 24:16 26:19 26:25 33:6 33:9 40:9 42:15 102:22
**Thirteen** [2] 81:12 88:20
**Thirties** [1] 52:14

**THOMAS** [2] 73:7 110:10
**Thoughts** [4] 29:11 47:25 49:5 53:20
**Thousand** [1] 74:7
**Thread** [1] 4:2
**Threat** [27] 11:17 18:3 19:15 57:20 58:18 58:22 59:5 64:23 91:16 91:22 92:13 107:25 112:1 112:4 112:14 112:24 119:4 122:16 122:24 130:1 140:19 141:7 141:12 141:16 141:24 143:9 143:10
**Three** [10] 5:22 23:13 23:19 32:4 32:16 42:3 42:11 82:10 96:2 129:11
**Threw** [1] 46:14
**Throughout** [1] 102:8
**Throw** [1] 7:13
**Tie** [1] 124:8
**Ties** [1] 39:20
**Timbergrove** [1] 132:24
**Tired** [1] 137:1
**Today** [22] 6:23 8:15 8:19 45:12 61:14 71:19 71:24 73:14 74:20 75:25 76:3 76:10 90:6 98:8 108:25 110:14 127:15 129:4 146:12 149:22 151:14 153:6
**Together** [6] 3:5 38:13 41:20 86:21 88:6 154:22
**Took** [6] 56:21 57:21 65:9 90:3 99:17 143:2
**Top** [1] 6:15
**Topic** [1] 95:19
**Total** [6] 8:9 75:6 75:7 141:21 141:24 157:10
**Totally** [3] 103:3 128:2 128:4
**Touched** [2] 41:14 73:18
**Towards** [4] 52:25 63:18 123:12 139:11
**Towel** [1] 7:13
**Town** [6] 39:24 72:12 109:16 132:25 149:8 149:10
**Tragedy** [1] 103:23
**Transaction** [2] 98:2 99:1
**Transcription** [1] 157:5
**Transcription/stenograph** [1] 1:23
**Transition** [3] 74:1 74:2 74:8
**Treated** [2] 86:10 86:12
**Treatment** [4] 72:16 77:3 109:22 152:13
**Treatments** [1] 128:3
**Tremendously** [1] 100:14
**Trial** [85] 1:3 4:22 5:2 5:9 5:10 5:13 5:13 5:15 5:18 5:21 6:12 6:14 6:16 6:25 7:5 7:18 7:18 7:20 8:1 9:13 10:12 10:14 10:15 10:16 12:10 12:18 13:8 13:13 13:18 15:22 16:3 16:13 16:18 17:2 20:9 20:20 20:23 22:14 27:6 36:6 36:8 36:10 36:13 37:10 38:20 39:23 43:21 44:22 45:1 51:14 56:17 56:19 58:9 68:23 70:14 70:23 74:12 76:13 76:18 76:20 79:9 85:12 86:6 86:7 86:8 87:6 87:7 87:8 100:3 101:4 101:4 101:5 101:8 111:14 116:17 118:7 128:20 128:22 129:5 135:4 135:11 136:18 143:7 147:22 148:20
**Tried** [1] 112:10
**Tries** [1] 91:9
**Triggering** [1] 13:4
**Trouble** [4] 53:3 86:19 86:23 141:19
**True** [11] 7:4 90:7 114:16

122:9 123:15 134:9 135:17
135:19 139:16 142:4 157:4
**Truly** [1] 157:9
**Trustworthy** [3] 28:10 28:
13 42:24
**Try** [13] 49:4 55:4 61:6 75:
8 81:7 92:7 94:22 110:8 111:
12 114:11 130:17 137:5 152:
25
**Trying** [11] 9:5 38:6 75:8
90:20 118:17 125:13 128:16
128:21 129:4 148:9 152:19
**Turn** [2] 75:18 79:24
**Turned** [2] 105:16 105:18
**Turner** [9] 78:11 78:15 78:
20 79:9 80:6 94:17 108:23
109:9 110:2
**Turns** [1] 122:1
**Twelve** [10] 3:24 4:3 6:3
7:23 8:7 28:19 28:20 93:17
95:3 125:3
**Twenty** [7] 15:2 30:6 30:8
30:13 86:22 86:24 104:6
**Twenty-seven** [2] 40:21
149:3
**Twenty-six** [2] 131:16
150:12
**Twice** [1] 102:24
**Two** [77] 3:15 4:25 5:22 6:
19 6:19 9:12 9:12 10:3 10:
22 11:19 15:6 21:8 21:8 24:
16 27:25 29:8 32:2 32:3 32:
9 32:11 38:9 39:22 39:24 40:
20 41:2 43:18 44:4 57:1 57:
5 58:23 65:10 65:11 65:21
66:10 66:15 66:17 66:22 67:
1 67:5 67:6 67:12 69:4 71:
19 71:23 72:1 74:7 74:14 91:
6 92:14 92:21 92:25 96:1 98:
1 98:25 104:21 108:25 111:
22 112:8 112:19 115:24 116:
12 127:22 128:7 129:13 132:
7 132:10 135:23 136:4 139:
19 142:25 143:3 143:11 144:
12 146:21 150:10 151:14 154:
4
**Two-and-a-half** [2] 96:1
155:6
**Tylenol** [1] 35:4
**Type** [24] 50:23 53:13 54:
10 55:3 58:4 65:25 65:25 70:
6 85:6 85:14 85:14 87:24 94:
3 95:17 97:15 99:14 122:23
132:2 133:5 136:21 136:21
141:22 144:17 144:21
**Types** [6] 3:24 4:3 17:24
80:23 85:7 116:2

**U**

**Ultimate** [2] 43:24 150:2
**Ultimately** [3] 89:14 97:
19 112:9
**Unanimously** [5] 24:17 36:
7 36:10 37:7 37:8
**Uncle** [1] 81:17
**Uncleanly** [1] 99:9
**Uncomfortable** [2] 94:8
95:1
**Under** [7] 42:22 56:9 59:9
99:15 105:1 116:6 138:4
**Understood** [2] 87:18 120:
7
**Undivided** [4] 76:5 77:6
77:10 77:19
**Undoes** [1] 142:1
**Uneasiness** [1] 70:2
**Unfair** [3] 15:20 16:1 61:7
**Unfairly** [1] 86:11
**Unique** [4] 23:2 24:12 25:
1 25:1
**Uniquely** [1] 87:14
**Uniqueness** [4] 35:22 37:
16 112:3 130:2

**Unit** [1] 83:10
**Units** [1] 83:11
**University** [1] 84:6
**Unless** [9] 14:2 14:13 92:
23 92:25 119:21 122:20 134:
6 140:25 141:5
**Unravel** [1] 142:2
**Unrelated** [2] 59:20 79:4
**Up** [46] 7:10 7:12 13:24 18:
1 18:20 19:25 27:14 40:2 44:
12 51:25 56:15 75:15 78:20
82:18 85:2 87:12 87:13 89:6
89:24 90:16 91:7 97:16 99:2
100:9 102:15 104:8 104:17
106:22 107:2 121:19 122:5
125:3 125:24 126:24 128:2
131:9 140:2 140:6 142:11
144:20 147:9 149:2 149:3
149:4 150:23 154:5
**Upbringing** [1] 122:25
**User** [1] 148:12
**Uses** [1] 148:20

**V**

**Valuable** [1] 34:7
**Value** [1] 34:9
**Valued** [1] 34:8
**Variables** [1] 151:25
**Variation** [1] 117:20
**Vastly** [1] 117:17
**Vehicle** [2] 17:11 46:22
**Venireperson** [14] 63:2
63:8 63:11 68:4 72:6 73:4
73:6 77:24 110:9 149:8 152:
1 152:6 155:18 155:19
**VERA** [1] 45:8
**Verdict** [11] 21:4 51:6 52:
2 52:3 57:9 79:11 90:7 114:
16 122:9 123:15 139:17
**Verdicts** [1] 20:25
**Verge** [1] 42:5
**Versa** [1] 120:18
**Versus** [3] 3:12 106:7
**Veteran** [2] 27:7 27:8
**Vice** [1] 120:18
**Victim** [4] 38:1 42:14 81:
4 130:12
**Victims** [1] 34:5 77:8
**Vietnam** [7] 27:7 150:22
150:22
**View** [1] 24:12
**Viewpoint** [1] 88:7
**Views** [2] 55:8 66:21
**Violence** [37] 11:16 15:
19 15:23 16:4 16:14 16:21
16:22 16:22 16:23 16:24 17:
5 17:8 17:9 17:16 17:22 17:
25 18:23 19:2 19:5 19:10 57:
19 58:1 58:18 58:23 59:5 64:
20 66:8 91:15 92:13 119:3
119:14 122:16 122:24 129:25
140:18 141:7 143:8
**Violent** [7] 17:6 49:10 53:
24 54:16 55:19 56:12 71:10
**Virtually** [1] 7:14
**Visit** [2] 92:1 155:2
**Visiting** [1] 3:3
**Voir** [15] 1:15 45:10 48:23
60:14 73:9 75:20 80:4 90:20
94:15 110:12 114:4 126:19
131:4 146:10 153:4
**Volume** [2] 1:2 157:6
**VOLUMES** [1] 1:2
**Volunteer** [1] 132:3
**Vote** [8] 48:1 92:17 93:22
93:23 134:15 134:21 143:19
143:21
**Voting** [3] 91:8 134:17
134:23
**VS** [1] 1:8

149:14
**Wait** [6] 8:2 27:4 84:18 93:
9 101:9 117:21
**Waiting** [1] 91:23
**Walk** [2] 150:17 150:17
**Walking** [4] 17:20 53:18
68:22 150:24
**Walks** [1] 35:13
**Wall** [2] 18:17 18:25
**Walls** [1] 18:22 19:4
**Wants** [4] 83:25 84:2 84:7
88:11
**War** [2] 27:7 150:4
**Wardens** [1] 19:6
**Warrant** [3] 3:25 4:19 67:
17
**Waste** [1] 8:9
**Watch** [4] 72:18 109:24
132:2 152:16
**Watch-type** [1] 132:2
**Wayne** [3] 2:12 3:14 94:19
**Ways** [1] 154:18
**Weather** [1] 15:1
**Webb** [1] 41:1
**Wednesday** [3] 109:4 151:
13 151:19
**Week** [7] 27:4 29:21 29:21
49:24 127:21 132:8 150:17
**Weekend** [1] 132:8
**Weeks** [9] 49:21 71:19 71:
24 74:2 96:2 108:25 151:5
151:14 155:6
**Wentz** [17] 2:17 3:14 7:13
60:12 60:15 60:18 60:22 61:
2 61:3 63:13 67:12 68:17 78:
4 78:5 94:20 156:4 156:6
**West** [1] 133:1
**Whatsoever** [1] 8:10
**Wheel** [1] 38:22
**Whereby** [1] 51:11
**White** [1] 133:3
**Whole** [8] 11:13 34:14 46:
17 65:16 78:17 112:13 142:
18 142:20
**Wide** [4] 46:24 47:1 117:19
154:8
**Wife** [3] 45:20 49:19 101:17
**Willing** [3] 102:15 134:17
134:23
**Win** [1] 14:24
**Wind** [2] 7:10 7:11
**Windshield** [1] 17:15
**Withdraw** [2] 23:3 24:13
**Witness** [7] 42:14 42:15
90:19 134:7 134:7 139:18
157:12
**Witnesses** [3] 40:16 40:
20 40:21
**Witnesses'** [1] 40:17
**Woman** [4] 54:5 103:21 112:
6 137:23
**Wonder** [2] 50:6 50:11
**Word** [21] 14:19 14:20 15:5
15:11 15:16 16:6 18:5 18:5
18:12 61:22 63:9 63:25 65:6
98:3 98:6 98:7 98:10 98:11
98:18 119:9 119:10
**Worded** [1] 147:23
**Words** [27] 10:21 10:25 11:
1 11:6 11:8 11:10 18:8 19:
25 28:8 49:8 59:20 62:2 64:
9 65:4 65:10 65:11 66:16 80:
12 98:16 98:17 127:12 127:
13 133:13 143:5 148:2 148:8
149:19
**Workday** [1] 18:24
**Works** [2] 74:21 84:8
**World** [4] 28:10 41:3 44:8

**Worry** [4] 9:4 74:16 76:19
77:11
**Worse** [6] 107:5 107:12
107:17 128:3 139:10 152:1
**Worst** [3] 95:10 105:13
152:2
**Worth** [2] 34:20 36:1
**Worthy** [3] 23:11 70:15
111:2
**Writing** [2] 8:23 157:5

**Y**

**Y'all** [6] 52:2 52:3 52:9
92:8 132:13 133:4
**Year** [11] 25:8 25:8 29:21
29:22 30:17 30:18 30:22 31:
3 43:15 46:16 154:5
**Years** [30] 27:18 29:20 29:
24 29:25 30:8 30:14 31:8 31:
17 31:19 33:23 35:9 37:15
44:19 45:25 52:11 82:10 85:
25 86:2 86:22 87:1 88:9 100:
12 102:8 102:12 103:16 112:
6 131:16 149:3 150:10 150:13
**Young** [5] 25:14 54:4 96:
11 96:14 137:23
**Younger** [1] 133:16
**Yourself** [15] 21:1 44:6
44:12 44:19 44:20 45:13 59:
21 64:12 67:19 71:2 96:4
110:16 117:1 131:17 131:18
**Yourselves** [1] 10:24
**Youthfulness** [1] 25:6

1                    REPORTER'S RECORD

2                VOLUME 9 OF 25 VOLUMES

3            TRIAL COURT CAUSE NO. 800112

4

5    CHARLES MAMOU, JR.        )    IN THE DISTRICT COURT

6            Appellant        )

7                             )

8    VS.                      )    HARRIS COUNTY, TEXAS

9                             )

10   THE STATE OF TEXAS       )

11          Appellee          )    179TH JUDICIAL DISTRICT

12

13

14              * * * * * * * * * * * * * * * * * * *

15              VOIR DIRE EXAMINATION

16              * * * * * * * * * * * * * * * * * * *

17

18      On the 16th day of September, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Bob Burdette, Judge

21   Presiding, held in Houston, Harris County, Texas:

22      Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

```
 1              A P P E A R A N C E S

 2      MR. LYN MCCLELLAN

 3      SBOT NO. 13396100

 4      MS. CLAIRE CONNORS

 5      SBOT NO. 0470500

 6      Assistant District Attorneys

 7      201 Fannin

 8      Houston, Texas 77002

 9      Phone:  713.755.5800

10      ATTORNEYS FOR THE STATE OF TEXAS

11

12      MR. WAYNE HILL

13      SBOT NO. 59656300

14      4615 Southwest Freeway

15      Houston, Texas 77027

16      PHONE:  713.623.8312

17      MR. KURT WENTZ

18      SBOT NO. 21179300

19      5629 W FM 1960

20      Houston, Texas 77069

21      PHONE:  281.587.0088

22      ATTORNEYS FOR THE DEFENDANT
23

24

25
```

i

# INDEX

## VOLUME 9 OF 25

|  |  | PAGE | VOL. |
|---|---|---|---|
| September 16, 1999   Voir Dire Examination |  |  | 9 |
| Panel Voir Dire |  | 3 | 9 |

| Venirepersons | Court | State | Defense |  |
|---|---|---|---|---|
| Steven Allen Wiedmann | 45 | 50 |  | 9 |
| Zenobia Prince | 53 | 56 | 69 | 9 |
| Suzette Yvette Barr | 82 | 85 | 102 | 9 |
| Gilbert Cantu | 117 | 119 | 121 | 9 |
| Gregory Adams | 122 | 124 | 134 | 9 |

|  | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 146 | 9 |
| Court Reporter's Certificate | 147 | 9 |

3

1  THE COURT:  As I understand, there is an
2  agreement by and between the parties Venireperson Number
3  69, Margarita Byrum, and Venireperson Number 74, Miss
4  Anna Haydock, by the agreement of all concerned, may be
5  excused.
6  Mr. McClellan, is that your agreement?
7  MR. MCCLELLAN:  Yes, Your Honor.
8  THE COURT:  Is it Miss Connors' agreement,
9  too?
10  MR. MCCLELLAN:  Yes, Your Honor.
11  THE COURT:  Mr. Hill, your agreement?
12  MR. HILL:  Yes, sir.
13  THE COURT:  Is it Mr. Wentz'.
14  MR. HILL:  Yes, sir.
15  THE COURT:  Is it your agreement, also?
16  THE DEFENDANT:  Yes, sir.
17  THE COURT:  Is it your request?
18  THE DEFENDANT:  Yes, sir.
19  THE COURT:  Your requested is granted.
20  (Venire panel brought in and seated.)
21  THE COURT:  Good morning, ladies and
22  gentlemen.  To remind you, we've asked you here so we
23  might visit with you about your prospective service as a
24  juror in the case of the State of Texas versus Charles
25  Mamou.  The defendant over here is represented by his

4

1  attorneys, Mr. Wayne Hill, Mr. Kurt Wentz, who will be
2  with us in just a second.
3  The State of Texas is represented by two
4  of her Assistant District Attorneys, Mr. Lyn McClellan,
5  who is present now, and Miss Claire Connors, who will be
6  along in a couple of moments.  We talked the other day
7  about the fact this defendant stands charged by
8  indictment with the offense of capital murder that's
9  alleged to have occurred in Harris County, Texas, on or
10  about December 7th, 1998.  We spent a good deal of time
11  the other day talking about some of the rules that can
12  come into play during the course of a trial such as
13  this.  We talked about the fact that your job, as
14  jurors, is to gauge and judge and evaluate the
15  credibility of the witnesses and the weight you want to
16  give their testimony.
17  My job, on the other hand, has nothing to
18  do with that.  My job -- what my job has to do with is
19  to listen to what the witnesses say.  Whether I believe
20  them or not makes absolutely no difference, and you'll
21  never know.  But whatever they say, my job is to arm you
22  with the law that is raised by the testimony that they
23  give, and I'll give you that law in the Court's charge.
24  And you'll take that law, that being those rules that
25  are raised by the testimony, and evaluate the testimony

5

1  of the witnesses, extract from all the testimony the
2  believable portions of that testimony, and apply the law
3  that is raised by the believable portions of the
4  testimony.  That's a comparative job.
5  Before we begin our individual
6  conversation today, I want to spend a couple of minutes
7  talking with you a little bit more in detail about some
8  of the rules that can come into play during the course
9  of a trial like this.  Before we start, let me tell you
10  that I know we're going to be talking about stuff you
11  have never thought about before in your whole life; and
12  there simply was never any reason for you to.  Please, I
13  know it's going to be different to you, but don't get
14  frustrated with it.  Don't get frustrated with me,
15  because we're going over a lot of material and it's
16  somewhat specific.  Please don't feel you have to
17  memorize what it is I'm telling you, because you don't
18  have to get frustrated with me and you don't have to
19  memorize it; because if these rules we're going to be
20  talking about this morning do come into play, they're
21  all going to be in writing.  They're all going to be in
22  the Court's charge, and you're going to have it before
23  you at all times during the whole time you're out
24  deliberating.  So it's not necessary for you to try to
25  commit to memory what it is we're talking about.  I just

6

1  want to give you an idea about what can occur.  Whether
2  it does or doesn't, as I said earlier, will depend upon
3  the testimony.
4  We're going to spend some time talking
5  today about the second phase or the punishment phase of
6  a capital murder trial.  You might say to yourselves,
7  well, why in the world would you talk about the second
8  phase of the trial when the first phase hasn't even
9  started yet?  And that's a good question.  The answer
10  to that question is perfectly simple.  This is the only
11  time we're ever going to get to talk to you to see if
12  all the rules that can come into play, if there are any
13  of them that you have such a strong objection to that
14  you would refuse to follow and to enforce it if it came
15  into play.
16  Because you can see if we only talked
17  right now about the first phase of the trial, and if a
18  jury found a defendant guilty of capital murder and we
19  came back before the second phase of the trial before we
20  started talking to you about the rules involved in the
21  second phase.  And if one of those twelve jurors said,
22  wait just a second, I can't possibly follow one of those
23  rules, I just simply have an objection to that, and you
24  will refuse to do that under any circumstances, then
25  that means we would have to dismiss that juror.  That

**7**

1 means we would only have eleven, and I've got to have
2 twelve. So that means we have a mistrial, and that
3 means everything we've done is a total waste of time.
4 So that's why we have to talk about everything that
5 could conceivably occur before the trial ever begins.
6 So don't read anything nefarious into what it is we're
7 doing about taking the second half of the trial and
8 talking about it before the first half ever starts.
9        And we also recognize it's entirely
10 conceivable we'll never get to the second half. And if
11 the defendant is found not guilty, we won't. That's why
12 we're talking about it now before the trial begins. We
13 talked the other day when we were together about the
14 trial could come in two parts.
15        The first part of the trial is going to be
16 whether the defendant is or isn't guilty. Defendant's
17 not guilty, case is over. The defendant is found guilty
18 of capital murder, we come back and have a second phase
19 of the trial. And the testimony at each phase of the
20 trial is going to focus on a separate area.
21        The first phase of the trial, the focus of
22 the testimony is going to be on the offense that was
23 committed. Who did the crime? Where was it done? How
24 was it done? When was it done? What was the prior
25 relationship of the parties, if there was one? What

**8**

1 was the reason for having done it, if there was one or
2 if it's known? But everything about the crime you're
3 going to hear at the first phase of the trial.
4        If a defendant is found guilty of capital
5 murder, we come back and we have a second phase. And at
6 the second phase of the trial, the focus of the evidence
7 will shift. It will get off the crime itself, because
8 you already heard all there is to hear about that. And
9 instead, the second phase of the trial will focus on the
10 character, the background, the comparative involvement
11 of the defendant in the commission of the crime.
12        So, we wanted you to know both about the
13 offense committed and the type of person that committed
14 it so that you're better armed, better equipped, and
15 better informed to make an intelligent answer to these
16 questions that you're going to deal with at the
17 conclusion of the evidence at the second phase of the
18 trial.
19        We talked the other day briefly about
20 these questions, and we talked about how it is they come
21 into play. And the questions are over here on this
22 board. Please feel free to look at them as we go
23 through them, because we are going to spend about ten or
24 fifteen minutes on them in just a second.
25        Question Number One asks: Do you find

**9**

1 from the evidence beyond a reasonable doubt that there
2 is a probability that the defendant would commit
3 criminal acts of violence that would constitute a
4 continuing threat to society? No matter who the
5 defendant is, no matter what the case is, no matter who
6 the jury is, there's never but two possible answers to
7 that question. One of them is yes, and one of them is
8 no. You'll answer that question whichever way the
9 evidence leads you.
10        Question Number Two asks: Taking into
11 consideration all the evidence, including the
12 circumstances of the offense -- that's going to be what
13 you heard at the first half of the trial -- also
14 including the character and background of the defendant,
15 as well as the defendant's personal moral culpability.
16 Same as responsibility. That's going to be what you
17 heard at the second part of the trial.
18        So you can see the first half of the
19 second question simply instructs you to go back over all
20 of the evidence in the case for the purposes of asking
21 yourself this question: Is there a sufficient
22 mitigating circumstance or circumstances -- meaning, is
23 there a sufficient reason to make me believe that a life
24 sentence will be more appropriate than a death sentence?
25        Again, no matter who the defendant, no

**10**

1 matter what the evidence, no matter what the jury, there
2 is two possible answers, yes or no. If the jury answers
3 that first question yes and if the jury answers that
4 second question no, the law says I have no choice. I
5 have no option. I have no discretion. I must sentence
6 the defendant to death, and that's exactly what I'm
7 going to do.
8        On the other hand, if the jury should
9 answer those questions in any way other than yes and no,
10 in this order, meaning a no answer for the first
11 question, or if there is a yes answer to the first
12 question and a yes answer to the second question, if
13 those questions are answered in any way other than yes
14 and no, in that order, once again, the law says I have
15 no choice. I have no luxury. I have no discretion. I
16 must sentence the defendant to life, and that's exactly
17 what I'm going to do.
18        So, the first thing I want you to know is
19 that a jury in the State of Texas never sentences
20 somebody to death, never sentences somebody to life for
21 the commission of a capital murder. What a jury does is
22 take the evidence in the case, whatever it is, use every
23 single bit of it for the purposes of answering these two
24 questions. You're -- while you don't determine life or
25 death, you are entitled to know what the effect of your

11

1  answers will be.  Any questions so far?
2       Okay.  We talked the other day about the
3  beginning of every criminal trial, whether it's a
4  capital murder case or a speeding ticket, whether it's
5  anything in between.  Before the trial begins, the
6  person who was accused of having committed that crime is
7  innocent.  They're not guilty.  They stay innocent, they
8  stay not guilty, unless or until, during the course of
9  the trial the evidence presented by the State is
10  sufficient to prove to the jury beyond a reasonable
11  doubt that the defendant is, in fact, guilty of the
12  offense.  Unless or until that happens, the defendant is
13  never guilty.  Does that make sense?  We all agree with
14  that?
15       Okay.  So what we're saying necessarily is
16  that that's a presumption.  The presumption can be
17  overcome, but it can only be overcome if the quality of
18  the State's evidence is sufficient to prove a
19  defendant's guilt beyond a reasonable doubt.  At the
20  conclusion of a capital murder case, if a defendant is
21  found guilty of capital murder, obviously the
22  presumption in being innocent has been erased by the
23  quality of the evidence.
24       At the beginning of every capital --
25  excuse me -- at the beginning of the punishment phase,

12

1  the second phase of a capital murder trial, there is a
2  brand-new presumption that pops into play, and that
3  brand new presumption is this:  For all defendants who
4  are found guilty of capital murder, it is presumed that
5  the appropriate punishment is life in the penitentiary.
6  It is up to the State, through its evidence, to persuade
7  you to believe beyond a reasonable doubt that, in fact,
8  it should be the death penalty.  So, we always start off
9  with a lesser of all possibilities; and the State's
10  obligated to prove with their evidence that the
11  possibility should be bumped up from not guilty to
12  guilty, from life to death.  Any questions about that?
13       We're going to talk about the questions
14  themselves specifically in just a second.  In the
15  Court's charge there are going to be a lot of
16  instructions for you that are given to you for the
17  purposes of assisting you during your deliberations.
18  There are going to be a lot of terms that are going to
19  be defined for you.  And we're going to find as we talk
20  along here that there are also going to be a number of
21  terms I'm not going to define for you.
22       And if you ask yourselves, well, how do
23  you guys decide down here at the courthouse what words
24  you're going to tell us about and aren't going to tell
25  us about.  I'm going to tell you, it's really pretty

13

1  simple.  If we're going to be using a word that has some
2  meaning to a lawyer in business, we have absolutely no
3  right to expect you, who are not lawyers, to know what
4  those words are; so we're going to tell you what they
5  are.
6       But on the other hand, if we're going to
7  be using words that you and I and the lawyers and
8  everybody here uses all the time at home, work, family,
9  friends, socializing, whatever, we're not going to tell
10  you what they are; because you already know what they
11  are.  We're going to see examples of both of those in
12  just a second, but let's look at the first question.
13       The first question starts off with a term,
14  Do you find from the evidence beyond a reasonable doubt?
15  We talked about a reasonable doubt the other day.  We
16  talked about the definition.  We talked about it the
17  other day from the standpoint of that's how much proof
18  the State -- the quality, I should say, of proof that
19  the State must present to you before a jury will be
20  warranted in finding a defendant guilty.  That is to
21  say, the proof must show a defendant's guilt beyond a
22  reasonable doubt.
23       So it is that the first question, the
24  State's got to prove to you beyond a reasonable doubt
25  that this question should be answered yes.  That means

14

1  starting out, the answer to this first question is no.
2  Just like starting out at trial in the first phase,
3  defendant starts out being not guilty.  Stays not guilty
4  unless the evidence proves to a jury that the defendant
5  is guilty beyond a reasonable doubt.
6       Anytime we see the phrase, "Do you find
7  from the evidence beyond a reasonable doubt," that means
8  that the State, or the prosecution, has to present
9  evidence to prove to you what the answer to the question
10  should be.  If that's where the proof is, that bumps
11  everything up a notch, from not guilty to guilty, from
12  life to death.  Does the State's proof -- does it show a
13  person's guilt beyond a reasonable doubt?  Or as it
14  relates to this question, does it show this question
15  beyond a reasonable doubt should be answered yes?
16  Unless or until they do so, the answer is no.
17       We understand that if a no answer to the
18  first question is what the result is, that's different
19  than yes and no, in this order.  Yes and no, in that
20  order, is what it takes for a death sentence.  So a no
21  answer to the first question means the case is over,
22  because there is no way you can answer the second
23  question that will ever bring the death penalty back
24  into a possible role in that particular case.
25       So can you see how it's presumed at the

15

1 beginning of the second phase of a capital murder trial
2 that if the appropriate punishment is life; because it's
3 presumed the answer to that first question is no, unless
4 the State's evidence proves beyond a reasonable doubt
5 that the answer should be yes.
6 Okay. Back to the first question. Do you
7 find from the evidence beyond a reasonable doubt that
8 there is a probability? Let's talk about the word
9 "probability," because that's a word I'm not going to
10 define for you; because we use the word all the time,
11 especially during football season. Odds on football
12 games. The greater the odds, the less the
13 probabilities. The greater the probabilities that one
14 team will win, the other will lose.
15 At any rate, weather reports, same thing;
16 twenty percent, forty percent, different probabilities.
17 So I'm not permitted to tell you by definition in the
18 Court's charge what the word "probability" means. I am
19 permitted, however, to tell you by comparison that
20 whatever the word probability does mean to you, there
21 are two things that it cannot mean to you. One,
22 whatever the word probability does mean to you, it must
23 mean something more than a possibility. Anything could
24 possibly occur. Because it could possibly happen does
25 not mean that it's probably going to. On the other

16

1 hand, whatever the word "probability" does mean to you,
2 it cannot mean something as great as a certainty.
3 Because something is probably going to happen does not
4 mean that it's certain to happen.
5 And keep in mind how we're using the word
6 "probability" within this first question. We're asking
7 the State to prove the existence of a probability that a
8 defendant would commit future acts of criminal -- future
9 criminal acts of violence. Can you see how unfair it
10 would be to a defendant on trial if the State did not
11 have to prove the existence of a probability, but only
12 had to prove the existence of a possibility? Anything
13 could possibly happen.
14 Let's take that same thought process, and
15 let's see how unfair it would be to the State if the law
16 required the State to prove the existence of a
17 certainty. Can't possibly do that. So what we do is we
18 simply split the baby, took the middle row
19 probabilities. If the word "probability" means
20 something to you that's something more likely to happen
21 than not, that's a deal. If you have some other ideas as
22 to what the word "probability" means, that's fine too,
23 as long as your personal definition of the word
24 "probability" makes it greater than something that is a
25 possibility and makes it not as great as something

17

1 that's a certainty. Does that make sense? Anybody
2 have any questions about that?
3 Do you find from the evidence beyond a
4 reasonable doubt there is a probability that the
5 defendant would commit criminal acts of violence? It
6 is -- in order to obtain a yes answer to this question,
7 it is not required that the State prove the existence of
8 a probability that the defendant on trial would commit
9 future capital murders. Certainly if that evidence
10 exists, the State's entitled to present it to you. But
11 in order to get a yes answer to this question, the State
12 does not have to prove the probability that a defendant
13 on trial would commit a specific crime.
14 They are, however, required to prove the
15 existence of a probability that the defendant would
16 commit a certain category of crimes, that category of
17 crimes being a category that constitutes an act of
18 violence. And since the question doesn't say an act of
19 violence as to persons or as to property, it can be
20 either. Certainly capital murders are acts of violence
21 as to persons. Murders, or assaults, or rapes, or
22 robberies, or kidnappings are all acts of violence as to
23 persons.
24 Acts of violence as to property. Arson,
25 the burning of somebody's building, the burning of

18

1 somebody's property. Acts of violence. Certain kinds
2 of burglaries that require breaking, the breaking of a
3 window or the breaking of a door to get into a window or
4 a house, those are criminal acts of violence as to
5 property. The taking of a baseball bat or brick,
6 beating in the windshield of an automobile. Criminal
7 acts of violence as to property. It is that general
8 tenor, that general category of conduct that the State
9 must prove beyond a reasonable doubt the existence of a
10 probability that a defendant would commit. Not a
11 specific crime within that general category. And these
12 criminal acts of violence, to conclude the question,
13 must be such that they constitute a continuing threat to
14 society.
15 Now, the word society is not going to be
16 defined for you. Most of the time when we think of
17 society, we think of people that we are in contact with;
18 people in our family, people at our neighborhood, people
19 at our job, people at our school, wherever we might be.
20 Ordinarily we don't think of people when we think of
21 society that we don't have much contact with. I say
22 that to you for this reason: I ask you to consider
23 making a distinction, if you feel comfortable with
24 making a distinction, between the word society and
25 community.

**19**

1      We all live in different communities, but
2   all of our communities are within our society.  I say
3   that for this reason:  We don't often think of society
4   as including the people behind the penitentiary walls,
5   but certainly they are within societies.  For example,
6   the person who, at 8:00 o'clock in the morning, punches
7   in to go behind the walls of a penitentiary unit for the
8   purposes of teaching a class to the inmates.  She
9   doesn't lose her right to be free from criminal acts of
10  violence once she punches in and gets behind the walls
11  and does her job.  And then at the conclusion of every
12  workday, if she is able to escape with her life and
13  punch out, she does not thereafter reacquire her right
14  to be free from criminal acts of violence on the outside
15  of the walls.  That's preposterous, and it's not the
16  case.
17      The people behind the penitentiary walls
18  have just as much right to be free from criminal acts of
19  violence as those of us who aren't.  That includes
20  medical personnel, nurses, doctors, aids, so forth.
21  That includes teachers, so forth.  That includes guards,
22  administrators, warden.  And it also includes the people
23  who are confined, the inmates; because they also have
24  the right to be free from criminal acts of violence.
25  Because we hope there might ever be a chance to

**20**

1   rehabilitate somebody, that can't possibly be done if
2   we're going to let them always be a victim.  So all I'm
3   trying to point out is this, is the word "society" can
4   include all the people all the time everywhere.  Because
5   if it didn't, then that first question would read,
6   criminal acts of violence that constitute a continuing
7   threat to the citizens of Harris County, Texas.  And it
8   doesn't say that.  It says a continuing threat to
9   society.  That's the first question.  Any questions
10  about the first question?
11      If you answer no to that question, as I
12  say, the case is over; because in order to get the death
13  penalty, got to be a yes and no, in that order.  And if
14  you answer no to the first question, there is no answer
15  you can make to the second one that's going to bring the
16  death penalty back in play.  If a jury should answer yes
17  to the first question, we'll move to the second
18  question.
19      Now, before we take up the contents of the
20  second question, let's think for just a second, talk to
21  ourselves about it, where a jury necessarily will have
22  to be in their business before they take up the second
23  question.  First off, necessarily the jury would have
24  had to have found the defendant guilty of capital
25  murder.  Because if they hadn't, we never would have

**21**

1   gotten to these questions in the first place.
2      Secondly, the jury would have necessarily
3   had to have answered yes to the first question, meaning
4   not only did they find the defendant to be guilty of
5   capital murder, but they also found in the first
6   question the defendant was a continuing threat to
7   society.  So what the jury necessarily would have had to
8   have done before they ever took up the second question
9   was to have voted unanimously and to have voted
10  consistently in such a way that the defendant's going to
11  get the death penalty unless in the second question,
12  because of some evidentiary feature within the case, if
13  there is one, the jury decides to withdraw that death
14  penalty and replace it with a life sentence.
15      Now, let's talk about the second question.
16  The first thing we can see in the second question -- and
17  it is most unique -- is the fact that we don't have the
18  phrase, Do you find from the evidence beyond a
19  reasonable doubt?  Now this is going to be the third
20  verdict that a jury's going to be asked to return.
21  First one being guilty or not guilty.  Second one being
22  the answer to the Special Issue Number One.  The third
23  one here.  This is the first time you'll be asked to
24  answer a question where the State doesn't have to prove
25  to you what the answer to that question should be.  And

**22**

1   we know the State doesn't have to prove that because
2   that phrase, Do you find from the evidence beyond a
3   reasonable doubt," is not in that question.  Well, where
4   in the world does that leave us then?  Because if the
5   State doesn't have to prove to you what the answer to
6   that second question should be and they do not, we know
7   from our conversation the other day that the defendant
8   on trial never has to prove anything; so he doesn't have
9   to prove to you what the answer to that second question
10  should be.
11      So, what's that mean?  If the State
12  doesn't have to prove what the answers should be and if
13  the defense doesn't have to prove what the answers
14  should be, then that necessarily means that the law
15  recognizes there are going to be perhaps a lot of cases
16  wherein there is absolutely no evidence of a mitigating
17  circumstance in a case; because nobody's required to
18  prove it, to put it there.  The only requirement in the
19  second question is that the jury search over the
20  evidence in the case to see if it's there.  And then if
21  it is there, if it is there, if there is mitigating
22  evidence in that case, does the jury view it to be
23  sufficient to withdraw the death sentence and replace it
24  with a life sentence?
25      Now the first half of that second

23

1  question, as we said a couple of minutes ago, all it is
2  is an instruction to go back over every single piece of
3  evidence in the whole case.  Is there a sufficient
4  reason why a life sentence in this case -- and I'm not
5  talking about this one; but whichever is an imaginary
6  case, is there a sufficient reason why a life sentence
7  would be more appropriate in this case than a death
8  sentence?
9          Now, I'm not going to define for you what
10  the word "mitigating" means, because it's just simply --
11  I can tell you it's consistent with a reason.  Is there
12  a reason for it, a sufficient reason?  Some people
13  might think -- and I cut myself off -- I'm not going to
14  define mitigating for you; because what it might mean to
15  one of you, you might have exactly the same information
16  and another juror might think exactly the opposite.
17          For example, sometimes some folks may
18  think if there is testimony in a case of a defendant on
19  trial being seventeen years old at the time of the
20  crime, some people might think the comparative
21  youthfulness of that defendant might be mitigating,
22  because the person is not mature enough to make good
23  judgements and good decisions.
24          Some people, on the other hand, with
25  exactly the same information may say, well, but I'm

24

1  going to tell you something.  Anybody who is so mean
2  that they would commit that crime at that young age,
3  we've lost him anyway.  Same information reacted to
4  differently by different people.
5          In another case, you might have a case
6  where there's testimony of a person being mentally
7  retarded.  Some people might say mental retardation,
8  that's mitigating.  Other people might say, no, it's
9  not, because you can't fix it this time.  It is what
10  it's always going to be.  A third group of people may
11  very well say, well, wouldn't it make a difference as to
12  the degree of the retardation?   Is it just borderline
13  retarded?   Is it moderately retarded?  Is it severely
14  retarded?   The more retardation, perhaps the more
15  mitigation.  The less retardation, perhaps the less
16  mitigation.
17          So, you can see that everybody reacts
18  differently to what it is.  That's your call.  We are
19  never going to try to commit you as to how far or as to
20  what result you're going to come up with if there is any
21  mitigation in the case, whether it's sufficient to do a
22  life sentence or not.  But we are entitled to commit you
23  to the fact that you'll consider everything, listen to
24  it.  For heaven's sake, if you don't think it's
25  worthwhile, throw it out; but put an end to the mix of

25

1  stuff that you use to evaluate.  Throw it out.  It's not
2  worthy of your consideration.  Use it if it is.
3          Now if the jury says, yeah, there is some
4  mitigating evidence in this case, your next question to
5  decide is, is there mitigating evidence sufficient to
6  make us believe that a life sentence would, on the
7  whole, really be a more just verdict in this case in
8  that instance.  If your answer to that question is yes,
9  your answer to that whole question is yes.  If your
10  answer is, yeah, we believe there is mitigating
11  evidence, but we don't think it's sufficient to withdraw
12  the death sentence, we're going to keep it, then you
13  answer that whole question no.  Any questions about the
14  questions?
15          Let's talk for just a second about this.
16  I can't necessarily put myself in the seats of any of
17  the five of you folks, but I can say this:  That if I
18  didn't spend my life down at the courthouse, and if I
19  was a citizen coming down here for jury duty, and if
20  somebody said to me, let me see if I got this right, I'm
21  a juror in a case; and in this imaginary case, whatever
22  it might be, the State puts on enough evidence that
23  makes me believe beyond a reasonable doubt a defendant's
24  guilty of capital murder.  And let's just also say that
25  the State puts on enough evidence to make me believe the

26

1  answer to that Question Number One should be yes.
2          That is to say, not only is the defendant
3  on trial guilty of capital murder, but I also believe
4  that he's a future threat to society.  Now how is it
5  that I'm going to come up with an answer that's going to
6  make me say, but I don't think the death penalty should
7  apply.  It's by the consideration of the evidence in the
8  case.  I'm not saying that you should come up with a yes
9  answer.  I'm not saying you should come up with a no
10  answer.  I'm saying, that's your decision.  But what I
11  am saying is each of these decisions that a jury makes
12  is independent of the next decision that the jury makes.
13  And because you answered one question one way has
14  absolutely no bearing on how you should answer the other
15  question.
16          Now you may consider the three
17  decisions -- the guilty/not guilty, yes and no to one,
18  yes and no to two -- as being, say, three points of a
19  triangle.  All the information you're going to use to
20  make that decision comes from inside the triangle.  That
21  is the evidence in the case.  Every single bit of
22  information is going to go come from there.  But the
23  questions all address that pile of information from a
24  different perspective, and they're asking something
25  different.

27

1  So, that's why no matter how you answer
2  one question, that can't possibly be the reason why you
3  would answer the next question in one way or the other.
4  You've got to go back and look at the evidence in the
5  case.  I have used examples of the second question about
6  age and the mental retardation.  Doesn't have to be
7  anything like that at all.  It could be the facts of the
8  case.  Maybe your jury thought there might be -- that
9  the victim in the case really, really had -- (inaudible)
10  it wasn't as pure, for example, as yours might have
11  been.
12  You might say when the first question
13  starts out, "taking into consideration the circumstances
14  of the offense," maybe he would say, well, that might be
15  enough to make me think there is a reason why a death
16  sentence should not be imposed.  Maybe, on the other
17  hand, it might be some particular aspect of a
18  defendant's conduct.
19  You may have a defendant on trial who is a
20  veteran from Desert Storm/Vietnam, who led a perfectly
21  miserable life after getting out of the service.  You
22  might find somebody who, just a week before the crime
23  occurred, was driving down the street, doing absolutely
24  nothing wrong, saw a house on fire, jumps in the
25  apartment house, saves a couple of kids that would have

28

1  surely perished but for his work at the risk of his own
2  life.
3  You might find conduct such as that
4  deserves some attention.  You might find in one case
5  that it is sufficient to make you withdraw the death
6  sentence and replace it with a life sentence.  Maybe you
7  wouldn't.  That's your call.  But that's the kind of
8  stuff we're thinking about and talking about.  And the
9  idea is to not start off now saying that because you
10  answer guilty and yes to One that, you know, that you're
11  never going to answer yes to Two.  What we're trying to
12  commit you to doing is that you'll give a legitimate
13  consideration to all of the testimony in the case before
14  you do come up with an answer to Question Number Two.
15  And if you -- if the consideration leads you to a yes
16  answer, that's what we want to you do.  If your
17  consideration leads you to a no answer, that's what we
18  want you to do.  But we want you to make your decisions
19  on the basis of how you evaluate whatever the evidence
20  is in a given case.  Anybody have any questions about
21  that?
22  Punishment for capital murder is life and
23  death.  That's pretty simple.  Well, death is pretty
24  simple.  Life; let's talk about it, because sometimes we
25  find folks have different ideas about what a life

29

1  sentence means.  I'll tell you in the Court's charge and
2  I'll tell you now that in the event this defendant is
3  found guilty of the offense of capital murder, and in
4  the event the jury answers these two questions in such a
5  way that a life sentence is imposed, I will tell you
6  that this defendant cannot be released from the
7  penitentiary before he has actually served at least
8  forty calendar years.  So if this is 1999, we're talking
9  about the year 2039.
10  Now, at the conclusion of forty years the
11  defendant would become eligible to be considered for
12  parole, whether parole will or will not good granted is
13  something over which we have no earthly idea, right?
14  Whether a person is or is not paroled will depend upon
15  evaluations made by prison authorities.  That is to say,
16  what was the person like during their forty years here?
17  Those evaluations by those prison authorities will be
18  sent to the Board of Pardons and Paroles.
19  The Board of Pardons and Paroles.  We have
20  no idea who they'll be forty years from now.  The Board
21  of Pardons and Paroles will make recommendations based
22  upon those evaluations or perhaps based upon whatever
23  they want to think about.  The governor of the State of
24  Texas, we have no idea who he or she is going to be
25  during the year 2039.  And the Governor of the State of

30

1  Texas can either follow those evaluations or
2  recommendations, refuse to follow them, or make just
3  simply remarkable political decisions.  We don't know
4  what's going to happen.  The point being, no matter what
5  does happen, it's just as likely one defendant who gets
6  a life sentence will be paroled at the conclusion of
7  forty years, and it's just as likely that another
8  defendant who gets a life sentence will be kept there
9  until he draws his absolute last breath.  There is just
10  no telling.
11  The point I'm getting at is we can't
12  factor into the mix today in the courtroom what is going
13  to happen forty years from now.  It is necessary for the
14  jury to answer these two questions based upon the
15  evidence that exists in the trial of the case.  But I do
16  want you to know what the rule is as to what a life
17  sentence means to the minimum, and to the minimum it
18  means forty years.  It may mean natural life, but it's
19  never going to mean less than forty years.
20  Now I say that, because I don't want some
21  juror who might have in his or her mind the notion is,
22  well, I've read a person that gets a life sentence can
23  get out on parole in forty or forty-five years;
24  therefore, I'm not going to answer the questions in such
25  a way that a life sentence is assessed.  That's not

31

1   enough. Any questions about that?
2           Now take this capital murder business and
3   set it aside for just a second, except to this extent.
4   The capital murders that we're talking about here, the
5   types of conduct that cause or justify a capital murder
6   allegation is the intentional murder; that is to say,
7   the intentional taking of the life of another human
8   being without there being any legal justification for
9   having done it, without there being any legal excuse for
10  having done it. Meaning, can't be self-defense.
11  Self-defense is a legal excuse. Can't be an accident,
12  because it's not intentional. So it takes somebody who
13  wants a result to occur and chooses a course of conduct
14  that will cause that result to occur.
15          But capital murder is, first off, a
16  murder, the intentional taking of the life of a human
17  being without any justification, without any excuse.
18  And it's done during the course of the commission of one
19  other major felony. One portion of our indictment, the
20  claim is that the murder was committed during the
21  course -- during the course of committing a kidnapping.
22  That's the other major felony. Another one, it's
23  claimed a murder committed during the course of another
24  major felony. That other major felony being another
25  murder. Two murders at the same time, same criminal

32

1   episode. That's what it takes for the State to prove a
2   capital murder. They've got to prove both the
3   intentional murder and the other felony, the kidnapping,
4   or the other murder; and they have to prove the
5   existence of each of them to you beyond a reasonable
6   doubt, though.
7           Anytime the State's required to prove
8   beyond a reasonable doubt the existence of two things,
9   there are three possible outcomes. Possible outcome
10  number one is they can. And if they can, then the
11  jury's obligation is to find the defendant guilty of
12  capital murder. Possible outcome number two: They
13  can't prove either one of them. If that's the outcome,
14  the jury's responsibility is to find the defendant not
15  guilty of anything. Possible outcome number three:
16  Maybe they could show -- the State could show beyond a
17  reasonable doubt the existence of the intentional
18  murder.
19          But let's just say they can't show it's
20  done during the commission of a kidnapping. Obviously,
21  you don't let the defendant go. So what I'd do if
22  something like that were to occur, if the evidence were
23  to suggest that possibility, I'd give you the third
24  possible verdict form. You'd have guilty, not guilty of
25  anything. The third possible verdict would be guilty of

33

1   murder. That is to say, not capital murder, but guilty
2   of murder. And can you see that the murder that we're
3   talking about is a lesser offense carved out of the
4   greater offense of capital murder? That is to say, the
5   intentional murder during a kidnapping where they can't
6   prove the kidnapping. We still have the intentional
7   murder.
8           The punishment range for murder in the
9   State of Texas is remarkably different than the
10  punishment range for capital murder. The range of
11  punishment is for confinement in the penitentiary for
12  life, or by confinement in the penitentiary for any
13  number of years not less than five, or more than
14  ninety-nine; and a jury can -- if they think it makes
15  some difference in a case, they can also impose a fine
16  as long as the amount of the fine does not exceed
17  $10,000.
18          But you can see that the simplistic terms,
19  five years to life, is an awful lot of room to roam
20  within which to assess somebody's punishment. And there
21  is a reason for that. All sorts of different kinds of
22  defendants? Some of them are better than others. All
23  sorts of different kinds of victims. Some of them have
24  more worthy lives to society than others. All sorts of
25  different kinds of circumstances; some more gruesome,

34

1   some more vicious, some more heinous than others. And
2   we want you, the jury, to have a chance to take the
3   evidence in a given case and put it up and down that
4   line or range of punishment, wherever you think it ought
5   to fit.
6           Because wouldn't it be pretty disgusting
7   if we ask you to give up your time, come down here and
8   have a trial, and then ordered to sentence a defendant
9   to a particular period, saying, no case could ever
10  possibly be different from another. That's just simply
11  not the case, because they are all different.
12          For example -- and I know that we're all
13  conditioned by television, what we see and hear and so
14  forth. And you think of a murder case, and a particular
15  set of circumstances comes to your mind. They --
16  whatever that set of circumstances is, there are at
17  least as many circumstances that will offset that.
18          For example, you think of murder. Very
19  seldom do we think about the seventy-five-year-old
20  couple, been married for fifty years, and they love each
21  other dearly. She is on a life support system. She's
22  going to die. He knows it. She knows it. They pray
23  about it. She talks to him. She convinces him she
24  doesn't want to suffer and go through the degradation of
25  living a few months, or whatever it is, on life support.

35

1  She wants him to take her out of her misery. She prays
2  about it. She thinks about it. Just one day, seeing
3  her while she's asleep, walks over to the wall, pulls
4  the plug, and she dies. Without getting into the
5  morality of that, in this state that's murder. That's
6  the intentional taking of a life of a human being
7  without there being any legal justification, without
8  there being any legal excuse.
9        Now maybe you would think that would be a
10 case where that seventy-five-year-old husband who did
11 that, not out of anger, not out of hate, not out of
12 revenge, but out of love -- maybe you wouldn't think
13 that seventy-five-year-old gentleman ought to receive a
14 life sentence in the penitentiary. I don't know. Maybe
15 you would. But you see, if you didn't think that, we've
16 got to give the room to do something else.
17       So, my question to you is this: Let's
18 consider the possibility that you're a juror in some
19 imaginary capital murder case, and your jury has heard
20 all the evidence at the first phase of the trial. Your
21 jury goes out, your jury deliberates, and your jury
22 unanimously -- a person determines that the defendant on
23 trial, whoever he or she is, is not guilty of capital
24 murder; but you do determine that the defendant on trial
25 is guilty of murder.

36

1        You come back. You have the second phase
2  of the trial. Whatever the evidence was at the second
3  phase of the trial doesn't make any difference,
4  specifically; but you go out and deliberate as to what
5  punishment you're going to impose, because you've got
6  life and five to ninety-nine.
7        Let's just say that your jury determines
8  that the defendant on trial, based upon the evidence,
9  ought to receive a life sentence. Is there anybody here
10 who could not consider assessing that imaginary
11 defendant's punishment at confinement in the
12 penitentiary for life if you thought, based upon
13 whatever the uniqueness of the testimony was in that
14 particular case, that that was the right result to
15 reach? I'm not asking you if that's what you'd do.
16 I'm asking you, are you available to that being a
17 legitimate sentencing option if the circumstances
18 dictated it in your mind? Anybody here who would not
19 consider that certain circumstance, certain being the
20 ones you thought right?
21       Okay. We'll take that same question, and
22 I'm going to flip it. Your jury finds the defendant in
23 a capital murder not guilty of capital murder. Jury
24 finds the defendant guilty of murder. You come back and
25 hear more evidence at the second phase of the trial

37

1  regarding the defendant's character and background.
2  Whatever that evidence was doesn't make any difference,
3  specifically.
4        But your jury goes out. Jury believes a
5  life -- excuse me -- five-year sentence is appropriate.
6  Is there anybody here who could not consider assessing
7  that imaginary defendant's punishment at confinement in
8  the penitentiary for five years, if, after having heard
9  all of the evidence in the case and the uniqueness of
10 it, whatever it was, if you thought that was the right
11 thing to do based upon the circumstances of that case?
12 And again, I'm not asking you, would you do it? I'm
13 asking if -- are you open to the notion that that could
14 be a legitimate sentencing option under the appropriate
15 conditions? And I gather y'all could.
16       Okay. All we're trying to do -- and all
17 we're trying to do is make sure you're open to
18 everything. Whatever result you choose, you'll choose
19 that result on the basis of whatever evidence is
20 presented to you in the case. And can you see that's
21 exactly the same thing we talked about with these
22 questions? We want to be sure that you're available to
23 go either way; whatever way it goes, you'll go there
24 because that's where the evidence takes you. But
25 whether you go to one direction on one of these

38

1  questions doesn't mean you have to go in the same
2  direction on the other question, because that question
3  is asking you different things.
4        Just like buying a car. You've got a list
5  of things. Does the car have a motor? Yes. Does the
6  car have a steering wheel? Yes. That doesn't mean
7  that the car has got tires. That's a pretty stupid
8  example, but consider the source. Oh, no comment?
9        Okay. There is just a couple of other
10 quick things I want to talk about for a second. One of
11 them -- and I don't want to talk about this in legalese,
12 because I don't think it's worthy of it at this point in
13 time. But I do want to touch with you about the
14 concept. We have an aspect of our law that says that
15 if two or more people get together, conspire to commit a
16 felony offense, a crime, that a conviction of one of
17 those cocospirators cannot be had solely and only on
18 the testimony of another cocospirator without
19 absolutely any other corroborating information.
20       What we mean by that is this: If another
21 guy and I agree to rob a bank, I'm the getaway driver,
22 he's the bank robber, pull into the bank, he runs in,
23 robs the bank, I stay in the car, he comes back out of
24 the bank, jumps in the car, and I drive him off. And
25 I'm saying to myself, I'm pretty clever, because

39

```
 1   everybody saw him; they didn't see me.  And off we go.
 2   We get caught.
 3            If he is going to testify against me --
 4   whether he is convicted or not convicted makes no
 5   difference -- but if he's going to testify against me,
 6   in order for me to be convicted, there has to be some
 7   other evidence from an independent source other than a
 8   coconspirator that is such evidence that it tends to
 9   connect me to the commission of the crime.   It does
10   not, on its own, have to establish beyond a reasonable
11   doubt that I committed the crime.  It has to tend to
12   connect me to the commission of the crime.
13            For example, if there is a bank bag my
14   coconspirator, the robber, says, He's the one that did
15   it.  There is absolutely no evidence, but on the bank
16   bag there is my fingerprints.  Is there evidence from an
17   independent source that tends to connect me to the
18   commission of the crime and corroborate the testimony of
19   the coconspirator.  Is there anybody here who has a
20   disagreement to that -- as to that law that is to the
21   level that you wouldn't follow it if it came into play
22   in this case?
23            And I don't have any idea if it will or if
24   it won't.  Okay.  I take it then, that aspect of the
25   law, that you would enforce it if you were a juror;
```

40

```
 1   because as a juror, your job is, "A," to follow the law,
 2   and to "B" enforce the law that's contained in the
 3   Court's charge.  And I gather that you will.
 4            One other area.  We have two different
 5   brands, I guess is one way to describe it, of evidence
 6   that can come into play during the course of a trial.
 7   There is direct evidence, and there is circumstantial
 8   evidence.   Direct evidence means eyewitness testimony.
 9   Somebody actually saw something happen, or a defendant
10   on trial who confesses to having committed a crime.  But
11   you can still see that's eyewitness testimony, also.
12            The other kind of testimony is
13   circumstantial testimony, circumstantial evidence.
14   Circumstantial evidence is all other kinds of evidence,
15   save and except for direct evidence, eyewitness
16   testimony.  Sometimes we hear people say, I couldn't
17   ever convict anybody on circumstantial evidence.  And
18   they really don't have any idea about what they're
19   saying.  The law doesn't care whether testimony in a
20   case is direct or whether testimony in a case is
21   circumstantial.  What the law cares is:  Does the
22   quality of the evidence in the case rise to the level
23   that it satisfies a jury beyond a reasonable doubt of
24   the defendant's guilt?
25            Just like the law doesn't care how many
```

41

```
 1   witnesses there are in a case.  The law doesn't say it
 2   takes a minimum of twenty-seven witnesses to establish
 3   reasonable doubt.  The law says one of them is good
 4   enough, if the jury believes one of them beyond a
 5   reasonable doubt.  So, I say that for this reason:
 6   Circumstantial evidence, while it's not direct
 7   testimony, we all know that one of the singular best
 8   identifying features of a human being is a fingerprint;
 9   because we've been conditioned all our lives to know
10   that nobody has the -- no two people have the same
11   fingerprint.
12            But a fingerprint, while it specifically
13   establishes the identity of somebody, is circumstantial
14   evidence.  It's circumstantial evidence; because while
15   that's my fingerprint, there is no way to establish when
16   I put it there, depending upon the object with my
17   fingerprint.  So there is no way to show where the
18   object was when my fingerprint was put there.  Now if
19   it's a nonmoveable object, obviously you know where it
20   was; but if it's a gun, you don't.  Could have been in
21   my hand at the house, where I have a right to have it.
22   Could have been in my hand at the bank.  Don't know.
23            So, what I'm saying is this:  It is the
24   quality of the testimony and how the jury evaluates the
25   credibility of that testimony that's important.  It's
```

42

```
 1   not whether it's direct or circumstantial.
 2            For example, you might have three drunks
 3   who are laying out here by Enron Park while construction
 4   is going on.  And some man gets shot.  And the three
 5   drunks come in and testify.  They were, each of them, on
 6   the verge of just passing out and drunker than Cooter
 7   Brown, who saw this person shoot.  Can you see how a
 8   jury may very well not believe beyond a reasonable doubt
 9   that whoever that defendant was on trial was the one who
10   committed that crime because of the quality of the
11   witnesses, or the condition of the witnesses, I guess I
12   should say, at the time they claim they saw this?
13            On the other hand -- but that's direct
14   testimony.  On the other hand, you might have a man
15   that's a pillar of the community, who sees a defendant
16   with a gun standing right next to the man who's dead.
17   They're buds.  They're talking.  That's all he sees, and
18   he leaves.  Five seconds later another man comes up,
19   hears a gunshot, doesn't see who shoots who, but sees
20   the defendant standing there with a gun, sees the man on
21   the ground bleeding, doesn't see who did the shooting.
22   The third man sees the defendant walk away from the
23   scene with the gun in his hand, calls the police.
24   Police arrest him, seize the gun.
25            Ballistics shows the gun was in the hands
```

43

1  of the defendant at the time he was arrested leaving the
2  scene, was exactly the same gun that fired the bullet
3  into the body of the man that was killed. Not a single
4  piece of eyewitness testimony. But can you see, based
5  upon those circumstances all intertwined together, a
6  jury might believe in that case beyond a reasonable
7  doubt that that particular defendant on trial was the
8  one that committed that crime? So the point being, it's
9  not the kind of evidence, whether it was direct or
10 circumstantial; it's the quality of the believability.
11         So my question is this: Is there anybody
12 here, who if after having heard all the evidence in the
13 case -- and I don't know if this is going to come into
14 play or not -- is there anybody here who after having
15 heard all the evidence in the case and all the testimony
16 was circumstantial, but if you believe that testimony
17 beyond a reasonable doubt, is there anybody here who
18 would refuse to find a particular defendant not guilty,
19 even though you believe the defendant, but because it
20 was circumstantial?
21         MR. MCCLELLAN: I think you asked that
22 question wrong. I think you said, Could you find him
23 not guilty if you believe it? You possibly ought to go
24 the other way.
25         THE COURT: If I said that, you obviously

44

1  were following me. Would you refuse to find the
2  defendant guilty, even if you believe the testimony
3  beyond a reasonable doubt, but it was circumstantial
4  evidence and only because it was circumstantial. Did I
5  say it right? You guys know what I'm trying to say?
6  Thank you. Anybody here who wouldn't do that? I
7  apologize. What questions do any of the five of you
8  have for me?
9         What we're going to do next is we're going
10 to send you out and bring you in individually. And
11 these folks know what they're doing. They are going to
12 ask you questions. They'll ask them right. And the
13 whole idea is this: Quite frankly, it is to run the
14 rules by you that can come into play; because we want to
15 know, are you going to be able to follow them when and
16 if you're a juror? And I gather from what you've heard
17 so far that everybody can.
18         The second thing we're going to want to
19 know, and the real purpose for this is for you to
20 satisfy yourself and for the lawyers certainly to be
21 satisfied that if you are a juror in the case, you'll
22 listen to everything that was presented to you, evaluate
23 however you saw fit, and come up with what you think is
24 the right result to reach, no matter who sits here.
25         If you find the defendant guilty, that's a

45

1  deal. If you find the defendant not guilty, that's a
2  deal. If you answer the questions and a life sentence
3  is imposed or death sentence is imposed, that's final;
4  because your job is not to please the lawyers, not to
5  please me. Your job is to be satisfied with yourself
6  that five years from now when you have long since
7  forgotten the name of every single person in this
8  courtroom, but you're still satisfied as you look back
9  on it that what you did in September of 1999 was, in
10 fact, the right thing to do.
11         And then -- and you can't make that
12 decision in your mind, I don't believe, without being
13 completely open to all the possibilities before the
14 evidence ever begins. Now once the evidence concludes,
15 you do what you think you ought to do; but be open to
16 all the possibilities before it begins. Does that sound
17 like a deal? Does anybody have any questions?
18         Okay. If you would, retire to the
19 hallway.
20         (Prospective jurors retire to hallway.)
21         STEVEN ALLAN WIEDMANN,
22 having been first duly sworn, testified as follows:
23         VOIR DIRE EXAMINATION
24 BY THE COURT:
25    Q.  Mr. Wiedmann, first off, let me ask you this:

46

1  Taking into consideration the things we talked about
2  this morning, adding to it the things we talked about
3  the other day when the whole group was here, out of
4  everything we have talked about up here, do you have any
5  questions for me?
6     A.  None right now.
7     Q.  Is there anything to this point, sir, that we
8  have not addressed that you feel as though we should
9  talk about because it might have some bearing on your
10 service as a juror in this case?
11    A.  The only thing is just a matter of me missing
12 two weeks of work.
13    Q.  Talk to me about it.
14    A.  I mean, I would be able to make it; but it sure
15 would put me in a financial bind. But other than
16 that --
17    Q.  Well, is it something that's somewhere in here?
18 And I don't remember where the question is, but is there
19 anybody here -- where was that question? Okay. You
20 know from our conversation, Mr. Wiedmann, that depending
21 upon today, we may have you back on the 29th of
22 September, which is two weeks from yesterday. You also
23 know that the trial, if you are selected as a juror,
24 will begin on Monday, the 4th of October. We know it
25 will last for longer than one full week, but we know it

47

1    will not last for as long as two.  I recognize the fact
2    that the finances, for all of us from time to time --
3    and I want to tell you that I don't think -- this is
4    just my thought.  I don't think that people ought to
5    have to be required to serve as a juror in a case and
6    then be punished for having done it.
7            But the flip side of that coin is this:
8    If you can give us your attention, give us your
9    judgment, give us your common sense during the period of
10   time that we were talking about, we had rather have you.
11   Now, that's your call.  What's your answer?
12       A.   I mean, if y'all select me, I'll be here.
13       Q.   Okay.  Well -- and along those lines,
14   Mr. Wiedmann, let me reinforce something I mentioned the
15   other day.  We are not going to waste your time; because
16   if we do, we're not going to get your best product, and
17   that's what we're after.  That's why the lawyers spend
18   some time trying to determine who it is they do want,
19   because they do want the best product out of whoever it
20   is they have.  So, you're okay if selected?
21       A.   Yeah.
22       Q.   Is there anything else that you can think of
23   that in any way might interfere with your service as a
24   juror in this case during the time frame we talked
25   about?

48

1        A.   No, sir.
2        Q.   Anything about all the rules that you have any
3    disagreement with at all?
4        A.   Huh-uh.
5        Q.   So if you were a juror, you could follow them,
6    as well as enforce them?
7        A.   Yes.
8        Q.   The idea we talked about in terms of being
9    open-minded to everything, does that sounds like you?
10       A.   Pretty much.
11       Q.   Well, now -- now you're hesitating on me.
12   What's your thought?   You had a reservation, and I
13   don't know what it was about.
14       A.   It's just a matter of what you consider fair,
15   as far as I'm concerned.
16       Q.   Well, fair being open-minded before you ever
17   hear anything?
18       A.   Yeah.
19       Q.   This business, honestly, is no more difficult
20   than you being in a strange town sorting out who you
21   want to ask directions from.  We all know we guys don't
22   ask directions.  Because what we're dealing with is not
23   only the message, but the messenger.  You might have
24   somebody use exactly the words that are meaningful to
25   you, but you don't believe the person who's saying them.

49

1    So that's why you got to be open to begin with.
2            Now once you hear stuff, then that
3    influences you what you're going to do; and that's the
4    way it's supposed to be.  But can you see, also, Mr.
5    Wiedmann, what we talked about, that if you answered yes
6    -- if you found somebody guilty of capital murder, and
7    if you answer that Question Number One yes, that you
8    thought the person would be a future danger, that still
9    doesn't necessarily mean that that person ought to
10   receive the death penalty.  You agree with that?
11       A.   Yes.
12       Q.   Because you still have to consider that second
13   question.  There may be something about the case,
14   whether it be about the defendant, the victim, the facts
15   of the case, that make you think a life sentence is more
16   appropriate.  So you're not foreclosing the possibility
17   of a life sentence, even though you find somebody guilty
18   of capital murder and even though you find he's a future
19   danger, are you?  Right?
20       A.   Okay.
21       Q.   You're not foreclosing.  Before we begin, do
22   you have any questions for me?
23       A.   No.  That about covers it.
24       Q.   Mr. McClellan is going to make this most
25   painless for you.

50

1                VOIR DIRE EXAMINATION
2    BY MR. MCCLELLAN:
3        Q.   Mr. Wiedmann, first thing I want to know is,
4    are you in a situation where if you are here, you don't
5    get paid?
6        A.   Yes.
7        Q.   So everyday you're down here, if you were in
8    trial for two weeks, you would not get paid for two
9    weeks?
10       A.   Exactly.
11       Q.   Does that put you in a pretty severe situation?
12       A.   I mean, I'm only making about $340 a week right
13   now.  So, I mean, that's -- I got a truck payment I have
14   to worry about, and a few other purchases I made before
15   that I still have to worry about.  So, I mean, like I
16   said, I would possibly be able to swing it, but it would
17   put me in a bind for the next couple of months.
18       Q.   Mr. Wiedemann, you're pretty much in control of
19   your own destiny here.  My belief is you shouldn't have
20   to lose money to be on a jury.  Most jurors that are
21   going to be sitting other over here are going to be paid
22   by their employer, because they're a salaried employee.
23   They don't work by the hour.  Or they work for Exxon,
24   and they're going to pay part of their civic duty.
25           Evidently being in the job you're in,

51

1  plumbing, and being the plumber, if you're not there,
2  you don't get paid.   A lot of people who -- obviously,
3  most people could never give up two weeks and would try
4  to think of something to say to get off the jury, and I
5  appreciate the fact you're not doing that.  But if you
6  were a juror for that period of time, is that going to
7  put you in such a situation that your concern, logically
8  so, would be somewhere other than the trial at all
9  times.
10        In other words, you'd be concerned about
11 how I'm going to make the bills meet.  And if we have
12 deliberations, I can't tell you how long they may last.
13 They may last several hours.  They may last several
14 days.  And every day longer than they last is a day
15 longer that you don't get paid.  And there is just
16 competing things there that, naturally, you would be
17 concerned about other things and could not give your
18 full, undivided attention; because everybody else is
19 going to be being paid.  You're the only one that's
20 there suffering under that circumstance.  Would this be
21 a situation that would cause your mind, you think, to be
22 other places at certain times?
23    A.  I think it would.
24    Q.  Okay.  And thus, you probably -- you couldn't
25 assure us you could give your full, undivided attention?

52

1    A.  Not the whole time.
2    Q.  Okay.
3        MR. MCCLELLAN:  I think we have an
4  agreement, Your Honor.
5        THE COURT:  As I understand, there is an
6  agreement by and between the parties Number 65, Mr.
7  Wiedemann, may be excused.
8        Mr. McClellan, your agreement?
9        MR. MCCLELLAN:  Yes, Your Honor.
10       THE COURT:  Ms. Connors?
11       MS. CONNORS:  Yes, Your Honor.
12       THE COURT:  Mr. Hill?
13       MR. HILL:  Yes, sir.
14       THE COURT:  Mr. Wentz?
15       MR. WENTZ:  Yes, Your Honor.
16       THE COURT:  Mr. Mamou, yourself?
17       THE DEFENDANT:  Yes, sir.
18       THE COURT:  Is it your request, sir?
19       THE DEFENDANT:  Yes, it is.
20       THE COURT:  Mr. Wiedemann is excused by
21 agreement.
22
23
24
25

53

1              ZENOBIA PRINCE,
2  having been first duly sworn, testified as follows:
3              VOIR DIRE EXAMINATION
4  BY THE COURT:
5    Q.  How are you today?
6    A.  Okay.
7    Q.  Miss Prince, before we begin, let me ask you
8  this:  I'd ask you to remember back to Monday, when the
9  whole group was together, the things we talked about
10 that day.  Add to it this morning the things we talked
11 about this morning.  And out of everything we have
12 talked about so far, do you have any questions at all
13 for me?
14    A.  I don't have any questions.
15    Q.  Is there anything to this point, Miss Prince,
16 that we have not yet talked about that you feel as
17 though we should because it might have some bearing on
18 your service as a juror in this case?
19    A.  Not that you've talked about, no.
20    Q.  Okay.  Is there anything at all that you can
21 think of, whether it be something about your personal
22 life, something about perhaps your professional life,
23 something perhaps about your health, or something -- any
24 other thing you could think of that might in any way
25 interfere with your ability to be a juror in this case

54

1  during the time frame that we've discussed?
2    A.  When you initially told us about the time
3  frame, you said the trial would start the first week in
4  October?
5    Q.  Yes, ma'am.
6    A.  Possibly through the second week?
7    Q.  No longer than.
8    A.  On the 16th, I have a state exam that I'm
9  already registered for.
10    Q.  What day of the week is that?
11    A.  That's a Friday.
12    Q.  Well, we're anticipating it will be over with.
13    A.  Okay.
14    Q.  What happens if it's not?
15    A.  What happens if it's not?  Well, I wouldn't be
16 able to take the test.
17    Q.  Okay.  And is that something that's curable
18 somewhere?
19    A.  I'm sorry?
20    Q.  Is that something you could fix later on, that
21 you can take later on?
22    A.  Yes, I can take it another time.
23    Q.  Okay.  Miss Prince, you had told us on your
24 questionnaire, Question Number Two actually was asked of
25 you.  Question was:  Do you believe you have any

55

1   knowledge of this case or capital murder case involving
2   Charles Mamou, Jr., and Terrence Gibson and/or Mary
3   Carmouche?  You answered, Yes, I recognize the name,
4   Mary Carmouche.  Tell us about that, ma'am.  When you
5   say, I recognize it, do you mean just in its literal
6   sense?  It's a name you've heard before?
7       A.   Yes.
8       Q.   Does it belong to a person you've ever known?
9       A.   No.
10      Q.   Any family members?
11      A.   No.
12      Q.   The fact that it's a name you have heard
13  before, do you recall from what source or where it was
14  or what context you knew the name?
15      A.   I believe it was a media -- from the media,
16  some news report; but I'm not sure.  I just thought I
17  recognized it.
18      Q.   And it is perhaps somewhat of a distinctive
19  name.  The fact it's a name you feel as though you may
20  have heard from some source in the past, would that in
21  any way interfere with or affect your ability to serve
22  as a juror in this case?
23      A.   No.  I don't know who it is.
24      Q.   Thank you very much.  Before we begin the
25  process, do you have any questions at all for me?

56

1       A.   No.
2               THE COURT:  Mr. McClellan.
3               MR. MCCLELLAN:  Thank you, Your Honor.
4                    VOIR DIRE EXAMINATION
5   BY MR. MCCLELLAN:
6       Q.   Miss Prince, my name is Lyn McClellan.  Along
7   with Claire Conners, we represent the State of Texas in
8   this case.  Why don't you just sit back and relax.
9   We're going to ask you to share with us, if you will,
10  some of your opinions and beliefs about certain aspects
11  of the law.  I want to go over your questionnaire and
12  ask you some additional questions about that and try to
13  get a better feel for what your thoughts are and beliefs
14  are about issues that might affect a case like this.
15      A.   Okay.
16      Q.   You say you may have heard that name,
17  Carmouche, in the news or whatever?
18      A.   Uh-huh.
19      Q.   Do you recall anything you may have heard?  How
20  that was reported in there?
21      A.   No, just the name.  Just the name.
22      Q.   Can you kind of tell me in your own words, what
23  is your opinion about --
24      A.   I'm sorry.
25      Q.   -- about the death penalty?

57

1       A.   I believe that it is something that our country
2   has or the world has used as a form of punishment for as
3   long -- for being in history, as I can recall, and that
4   sometimes that is the result of the crime, that you have
5   to pay by your life.  Your penalty is life.
6       Q.   What kind of crimes do you think would call for
7   that type of --
8       A.   What types of crimes?
9       Q.   Right.
10      A.   Depending on the circumstances and the
11  evidence, I would assume that a crime that results in
12  the death of someone else is a loss of life.
13      Q.   Okay.  All right.  Now in your questionnaire it
14  says, What are your dealings and feelings about the
15  death penalty?  And one of things you said, If you do
16  the crime, you have to suffer the consequences.
17      A.   Yes.
18      Q.   Do you think the consequences for taking
19  someone else's life is that your life may also have to
20  be given?
21      A.   Not necessarily.
22      Q.   What do you think determines that, if it were
23  to turn out to be that case?
24      A.   I suppose it would be the evidence that was
25  given, circumstances, whether or not it would be

58

1   punishable by death.
2       Q.   Okay.  What kinds of circumstances do you think
3   it would -- that you might hear that would make you
4   believe, if I heard circumstances such as these, I would
5   think death is probably more proper than something else?
6   Is there anything?
7       A.   I don't know if I could just give you an
8   example of, you know.
9       Q.   You say you watched some programs about the
10  death penalty?
11      A.   Uh-huh.
12      Q.   On television?
13      A.   Yes.
14      Q.   And there is one about a person who was on
15  death row and interviewing a man going through the
16  process?
17      A.   Yeah.
18      Q.   What thoughts did you have about the death
19  penalty after seeing that program?
20      A.   My thought was that first of all, he was on
21  death row a long time.  I thought that was, you know, a
22  long time to be on death row.
23      Q.   Right.
24      A.   I thought that it was hard on the family, the
25  appeal process.  You know, get to the point; and then

59

1  appeal, appeal, and then back to death row.
2      Q.  Right.
3      A.  And --
4      Q.  Which family are you talking about?
5      A.  Well, both sides.  It was hard, from what I saw
6  on both sides of the family, to go through that.
7      Q.  Right.
8      A.  And then, you know, I think the person was
9  given the opportunity to make his peace.  And basically,
10  I think this person contended that he was not guilty.
11      Q.  Okay.
12      A.  So I thought it was really hard on the family
13  to have to deal with that, but I thought the process was
14  a little lengthy.
15      Q.  Okay.  Did you get a feeling for yourself from
16  looking at that program that -- as to whether or not you
17  thought he was guilty or not?
18      A.  I didn't -- it was just a documentation.  I was
19  just looking at the process.
20      Q.  Did they tell much about the crime he allegedly
21  committed?
22      A.  Yes, they talked about his crime.
23      Q.  Was that a type of crime that he committed that
24  you thought the death penalty ought to be available for?
25      A.  I don't think I had an opinion.  I wasn't

60

1  involved.  I was just looking at the process.  I didn't
2  determine whether or not he should get death.
3      Q.  Some jurors come and say they are in favor of
4  the death penalty.  They think it's a proper type
5  punishment for certain types of crime.  But certain
6  jurors also go further and tell us they don't believe
7  they could ever participate in a process whereby they
8  would be called upon to make decisions that they knew
9  would result in this Judge ordering the execution of the
10  defendant sitting over here on trial.  Do you have any
11  doubts about your ability to participate in that type
12  process and make that type of life or death decision if
13  you thought that's what the law and the evidence called
14  for?
15      A.  I, personally, would not want to be the one to
16  do it.  I could do it, I think, if the evidence
17  indicated; but I feel like that job was for someone else
18  to do.  I mean, someone has to give the lethal injection
19  or pull the switch for the execution.  That's someone's
20  job.  It's not my job.  If I was put in that situation
21  where I had to make the decision, I probably could.  I
22  just wouldn't necessarily choose to do it.
23      Q.  Right.  What about the process that we're
24  talking about now being on a jury where you listen to
25  evidence, and you're going to basically make some

61

1  decisions that can result in the life or death of the
2  person on trial?  Any doubt about your ability to make
3  those type decisions?
4      A.  Because I believe in the process, the criminal
5  justice process.  If I was chosen and I had to make that
6  decision, I would make that decision.
7      Q.  You indicated that your husband's nephew, I
8  guess, had been sent to the penitentiary?
9      A.  Who, my husband?
10      Q.  Your husband's nephew?
11      A.  Oh, nephew, yes.
12      Q.  Released, I'm not sure when?
13      A.  Yeah.
14      Q.  What did he go to the penitentiary for?
15      A.  I'm not sure about all the circumstances, but I
16  think he was involved in some type of robbery.
17      Q.  Okay.  All right.  Was that here in Harris
18  County or somewhere else?
19      A.  Yes.
20      Q.  Did he have a trial, or do you know?
21      A.  Yes, he did.
22      Q.  Did you attend any of the trial?
23      A.  No.
24      Q.  Or did your husband attend?
25      A.  I think my husband did attend.

62

1      Q.  How much time did he get for the robbery?  Do
2  you know?
3      A.  I'm not sure.  I would say a couple of years.
4  I'm not really sure.
5      Q.  Did you have an opinion or did your husband
6  have an opinion as to whether or not his nephew was
7  treated fairly or not?
8      A.  I never heard him say that he wasn't treated
9  fairly.
10      Q.  Was there a gun involved, or do you know?
11      A.  I don't know.
12      Q.  You don't know about that.  You say your father
13  was in the fast food restaurant when it was being
14  robbed?
15      A.  Yes.
16      Q.  Was he the victim of a robbery then?
17      A.  No.
18      Q.  They were just robbing the establishment, and
19  he happened to be a customer?
20      A.  Right.
21      Q.  Anything about that?  Did he ever talk about
22  that as being a scary situation?
23      A.  My mother was more afraid.  She was outside in
24  the car.
25      Q.  So he went inside to get food to take home or

63

1 whatever?

2    A. Right.

3    Q. And somebody came in and robbed?

4    A. Yes.

5    Q. So he was in pretty close proximity?

6    A. He was in the room. I don't think he realized

7 what was going on until toward the end.

8    Q. Do you remember how long ago was it you were on

9 a criminal jury? You were on a criminal jury, and the

10 case was dismissed?

11    A. I would say maybe five or six years ago, maybe.

12    Q. What kind of case was it? Do you know?

13    A. No, I don't remember.

14    Q. Did y'all go through voir dire, or did you just

15 get in a room and you've been told it was dismissed?

16    A. I was chosen.

17    Q. You were chosen?

18    A. But we never did take our seats. We were told

19 it was dismissed.

20    Q. There is a question here that says, Do you have

21 any religious, moral, or ethical considerations that

22 would prevent you from sitting in judgment of another

23 person? You checked, no, that you did not have a

24 problem with that. Then you wrote, I do not sit in

25 judgment of people. Their actions speak for themselves.

64

1 A person is innocent with me until proven guilty. The

2 question, I think, was asking, Do you have any -- you

3 know, some people say, I could never sit in judgment and

4 make a determination as to whether or not a person is

5 guilty or not guilty. Can you do that?

6    A. Yes.

7    Q. Were you saying, then, that you think that

8 that's more their responsibility for what they did than

9 it was you sitting in judgment whenever you said, I do

10 not sit in judgment of people?

11    A. The question originally was, did I have a moral

12 or religious reason why I couldn't?

13    Q. Right.

14    A. And I do not have a moral or religious reason

15 why I could not sit in judgment.

16    Q. Right. And if -- it says, I do not sit in

17 judgment of people. Their actions speak for themselves.

18    A. I don't assume anything about a person before I

19 get to know them personally.

20    Q. You wait and see what the evidence shows?

21    A. Any relationship, I just take a person as I

22 see -- as I meet them. And they're fine with me unless

23 something else is proven.

24    Q. Right. Now the question about, In your

25 opinion, what's the best argument against the death

65

1 penalty? You said, When the law is not carried out

2 fairly without respect of a person, and then when all

3 possible rehabilitation has not been tried. Do you

4 think a person who is found guilty of a violent crime,

5 such as taking another person's life -- do you think

6 they are as easily rehabilitated as someone who does a

7 robbery, or something like that, like your husband's

8 nephew?

9    A. Not necessarily. You have people that you say,

10 like my nephew, that probably committed just -- I mean,

11 a robbery may be more difficult or just as much

12 difficulty being rehabilitated as someone who commits a

13 murder.

14    Q. Okay. One of the issues in the capital murder

15 case, if you found someone guilty of capital murder,

16 then you go to Issue Number One. It says, Do you find

17 from the evidence beyond a reasonable doubt there is a

18 probability that the defendant would commit criminal

19 acts of violence that would constitute a continuing

20 threat to society?

21    So, basically, you're asking to determine

22 from the evidence at the trial, as well as evidence you

23 may have heard about at the punishment stage, where you

24 hear about a defendant's character, his background, his

25 criminal history, or lack thereof. And let's say,

66

1 hypothetically, during -- if, after you hear all the

2 evidence, you found a person guilty; so we know that's

3 never going to change. We're just talking about what

4 punishment you'd receive.

5    Issue Number One. You can look at the

6 past and say, well, the guy's been in trouble before,

7 but they really never tried to rehabilitate. He's never

8 been sent to programs or given opportunities for

9 somebody to teach him to turn his life around or

10 whatever. Do you think that's a fact, in making a

11 decision on Issue Number One, that a person hasn't been

12 given programs or whatever, a chance to rehabilitate

13 himself?

14    A. You mean, based on evidence that we have on a

15 particular case, would you consider that at that time?

16    Q. Well, do you think if a person has not had an

17 opportunity for rehabilitation, that that would be a

18 factor in determining in your mind whether or not this

19 person would be a future danger?

20    A. If that person, himself, would be a future

21 danger?

22    Q. Right.

23    A. To himself or to the society?

24    Q. To society.

25    A. Would I consider that evidence that I've heard?

67

1    Q.  No.  You hear the evidence.  You say, This guy
2    has never been given a chance to rehabilitate.  He's
3    never been given any programs, boot camp or drug
4    programs, or given any type of rehabilitation program.
5         Okay.  What effect does that have, knowing
6    that he hasn't been given that opportunity, on your
7    decision as to whether or not you think he might be a
8    continuing threat in answering Number One?
9    A.  I'm sure I would consider it.  I would consider
10   it.  I'm not sure which way -- how much effect it would
11   have.
12   Q.  All right.  Do you think everybody is
13   rehabilitatable?
14   A.  Not necessarily, no.  I don't know.
15   Q.  There is some agree/disagree questions on the
16   back of the questionnaire, and I just want to go over
17   some of those.  You checked you agreed on 2, and that
18   is:  We must have the death penalty on some crimes, and
19   the death penalty is just and necessary.
20        Another question is:  The death penalty is
21   absolutely justified.  And you checked that you
22   disagreed with that.  Can you tell me what your thoughts
23   were on that?
24   A.  Read the question again for me, please.
25   Q.  It's a statement.  It says, The death penalty

68

1    is absolutely justified.  And you said you disagree with
2    that.  Can you tell me what your thoughts were there?
3    A.  I think I was thinking about, depending on the
4    evidence and the crime.
5    Q.  Another one says, The death penalty gives the
6    criminal -- a criminal what he deserves as applied
7    today.  You said you disagree with that.
8    A.  Read the question again.
9    Q.  Okay.  The death penalty gives a criminal what
10   he deserves as applied today?
11   A.  And I checked what?
12   Q.  You checked you disagree.
13   A.  I'm not sure I understand the question.  I'm
14   not sure what I was thinking at the time.
15   Q.  There is one you didn't answer, which says:
16   The death penalty should be available as punishment for
17   more crimes then it is now.
18   A.  I didn't answer, because I didn't know what --
19   Q.  What it was available for?
20   A.  Yeah.
21   Q.  The death penalty, as you now know, is not
22   available for murder.  It's available only for murder
23   plus some aggravating circumstance.  Some people think
24   it ought to be available for murder.  What is your
25   thought?

69

1    A.  I think the law, as it is, is probably more
2    fair.
3    Q.  Okay.  All right.  Thank you, ma'am.  I
4    appreciate your time.
5         MR. MCCLELLAN:  And I'll pass the witness.
6         THE COURT:  Thank you.
7         Mr. Hill.
8              VOIR DIRE EXAMINATION
9    BY MR. HILL:
10   Q.  Hi, Miss Prince.  How are you?  My name is
11   Wayne Hill.  Kurt Wentz and I both represent Mr. Mamou.
12   And I'm going to ask you a few questions, if I may.  Mr.
13   McClellan has been pretty comprehensive.  He's gone
14   through a lot of the stuff.  I think you can appreciate
15   that looking at the circumstances from a defense
16   perspective causes us perhaps to have maybe a different
17   view of things, and I might want to ask you some
18   different questions.
19        So, let me ask you this:  What goes
20   through a person's mind?  You, specifically when you
21   were contemplating coming down here and possibly being
22   chosen to sit on a capital murder case, where if you
23   find a person guilty of capital murder, you have to
24   decide whether they live or die.  Because that's
25   essentially what you're going to do in answering these

70

1    questions.  What goes through a person's mind, if
2    anything?
3    A.  I feel like it is my duty to serve if I'm
4    chosen.
5    Q.  Okay.
6    A.  As a citizen, that's something that -- I mean,
7    I don't regret having to come.  Of course, I have to
8    consider my family and my work status; but I feel like
9    as a citizen, that's something I should do.
10   Q.  I notice that you got to serve on a previous
11   jury, but that the case -- I couldn't tell whether the
12   jury was dismissed or if the case was dismissed.  Do you
13   remember serving on a criminal jury several years ago?
14   A.  I remember being chosen on two cases.  I think
15   one was a civil case that got settled.
16   Q.  Okay.
17   A.  And the criminal case, I'm not sure what
18   happened; but we didn't have to serve.
19   Q.  Did you get to sit in the twelve chairs?
20   A.  No, we --
21   Q.  Because it was a large panel?
22   A.  No, we were off the panel.  We had made it away
23   from the panel.  We were going to go in, and we never --
24   Q.  So maybe that case settled, also?
25   A.  I assume it was settled.

71

1    Q.   Tell me a little bit about your church
2    attendance.  It looks like you're very involved in your
3    church affairs.  Tell me what you do.
4    A.   Well, I've grown up in the church, you know,
5    and I'm pretty active.  I am active.  Choir member,
6    participate in the youth organization as a youth
7    advisor/counsel, a Sunday schoolteacher, work with the
8    women's organization.
9    Q.   Pretty involved?
10   A.   Uh-huh.
11   Q.   What type of youth activities do you perform,
12   and was there an outreach program?  Is there summer
13   camps?  What type of things do you do with youths?
14   A.   We do have a summer camp where we go with
15   teenagers up until about fourteen or fifteen years old;
16   and we give them activities, Bible studies, something
17   during the summertime.
18   Q.   Okay.
19   A.   Our youth group also has a mission to feed the
20   hungry from time to time, things like that.
21   Q.   Pretty fulfilling?
22   A.   Yes, uh-huh.
23   Q.   Do you know whether or not your church has a
24   particular view regarding the death penalty?
25   A.   As a church, no.

72

1    Q.   Okay.  Each congregate is left to his or her
2    own feelings regarding that.
3    A.   Yes.
4    Q.   If I'm asking you -- and understand that as a
5    defense lawyer, I'm charged with the responsibility of
6    representing this man, who the State is going to try and
7    prove committed two murders.  Because one of the
8    allegations is that he is charged with taking the life
9    of a man and a woman during the same transaction.
10             If that is true, if you find there is no
11   legal defense to that, it didn't occur in self-defense,
12   it wasn't an accident, it wasn't somebody else, your
13   responsibility under the law would be to find him guilty
14   of capital murder.  And then the only decision you would
15   be left with is determining the answer to those two
16   questions, the answers to which will either decide life
17   or death.
18             I'm a defense lawyer sitting here.  I've
19   not met you before.  I'm going to have maybe twenty
20   minutes to visit with you and try to evaluate, as the
21   State will be evaluating, whether you're somebody that
22   should ultimately serve with eleven other people.  So I
23   ask you to look inside, whatever makes you tick, whoever
24   you are, and tell me whether or not, as a defense
25   attorney, am I making an error in judgment if I choose

73

1    to have you on the jury?  And if so, why?
2    A.   If you're making an error.
3    Q.   Yes.
4    A.   I wouldn't think so.
5    Q.   Okay.  All right.  So why am I not making an
6    error?
7    A.   I think I would not let myself be influenced.
8    I would be fair and listen to the evidence and make my
9    decision based on the evidence.
10   Q.   All right.  You said that you wouldn't let
11   your -- did you say you wouldn't let your prejudice --
12   A.   Any prejudice?
13   Q.   Any feeling you have?
14   A.   Yeah.
15   Q.   Everybody has feelings.
16   A.   Right.
17   Q.   There might be -- are there any cases you can
18   think of -- we're not talking about capital murder.  Is
19   there any kind of case where if you were called down to
20   sit on a jury, you would have to raise your hand and
21   say, I can't be a fair juror, because of maybe the
22   nature of the case?  Maybe it involved children.
23   Whatever it might be, do you think there is any case
24   where you couldn't sit and be a fair juror?
25   A.   Nothing comes to my mind.

74

1    Q.   The law does not require anybody to serve as a
2    juror.  The law requires that if you take the oath of a
3    juror, you'll follow the rules that the Court gives for
4    you?
5    A.   Uh-huh.
6    Q.   And when you are deliberating with eleven other
7    people, the Judge will give a set of instructions that
8    guides you.  You're going to determine what the facts
9    are or what the facts are not.  And then again, somebody
10   should be held criminally responsible for the conduct
11   that's alleged against them.  Do you have any hesitation
12   being able to sit and listen to all the evidence and
13   make whatever decision you think is appropriate, given
14   the facts and law?
15   A.   I don't have a problem with that.
16   Q.   If you had an opportunity to say, I definitely
17   want to serve on this jury, or I would rather not serve
18   on this jury, or somewhere in between, where do you
19   think you would lie?
20   A.   Somewhere in between.
21   Q.   Okay.  You said you enjoy watching "The
22   Practice"?
23   A.   Uh-huh.
24   Q.   Do you think it's realistic?
25   A.   I don't know.  You know, I don't know that it's

75

1   realistic.  I don't think that it's probably realistic.
2       Q.   Okay.  Do you find any of the shows that you've
3   seen especially disturbing from the standpoint of what
4   type of issues the defense attorney would have to
5   confront while representing somebody?
6       A.   I don't remember anything in particular.
7       Q.   You just find that it's a good show; they seem
8   to have a pretty good script?
9       A.   Yeah, yeah.
10      Q.   Tell me a little bit about your son.  He's
11  seventeen, goes to H.S.P.V.A.  What area?
12      A.   He's instrumentalist.  He likes the base
13  instrument.  He plays in a jazz band.  He also plays at
14  church, and they have a little group that goes around
15  and plays.  He's -- I think he's talented.
16      Q.   Is that what he would like -- would he like to
17  be a musician as a job?
18      A.   He says he wants to be a veterinarian.
19      Q.   That means he's going to have to back Aggies?
20      A.   He's almost, but I'm sure that his music does
21  play an important role to him.  I wouldn't want him to
22  be a professional musician.
23      Q.   But you would enjoy that he continues playing?
24      A.   Yes.
25      Q.   And maybe kind of as more of a hobby?

76

1       A.   Yes.
2       Q.   I notice that for a while, it looks like you
3   and your husband worked together in his business?
4       A.   Yes, uh-huh.
5       Q.   Was there anything in particular that caused
6   you to work with him for three years?  I notice you
7   were at the Blood Center.  Then you worked for three
8   years with your husband, and he has since retired from
9   business?
10      A.   Right, uh-huh.
11      Q.   Did he sell his business?
12      A.   He had his business, but he was also working
13  for a different company.  And when he sold his business,
14  he was still employed.
15      Q.   And that was with Hormel?
16      A.   Yes, uh-huh.
17      Q.   So what do you do on a daily basis as
18  audiological testing?
19      A.   I work for a practice of five doctors, E.N.T.,
20  ear, nose, and throat doctors.  My particular job is to
21  test for a hearing loss; and also, I do a particular
22  vestibular function test for patients that have
23  dizziness, vertigo, and imbalance problems.
24      Q.   You enjoy what you do?
25      A.   Yes.

77

1       Q.   Any lasting impact about when your dad was in
2   the fast food place when the robbery occurred?  Was
3   that discussed with the -- you and the other members of
4   the family when it happened, or do you recall what your
5   dad went through?  Did he say what it was like being in
6   there?
7       A.   My dad didn't -- he wasn't really aware of what
8   was -- he saw the circumstances.  I mean, saw what was
9   happening.  And it didn't click to him what was going on
10  until possibly it was about over.
11      Q.   Okay.
12      A.   And nothing really lasting effect on him or the
13  family.
14      Q.   Do you think your views on the death penalty --
15  and let me explain to you that in order for a person to
16  serve on a capital murder case in Texas, they have to
17  believe in the death penalty.  If somebody were to say,
18  I don't believe in the death penalty, I'm going to let
19  it interfere with my service; because even if I got on
20  the jury, I would never vote for the death penalty.  I'm
21  telling you that up front, that person doesn't get to
22  serve.  So, necessarily the twelve people that are
23  sitting in judgment of somebody are going to have a view
24  that generally favors the death penalty.  I'm looking
25  for people that -- I'm trying to find out how strongly a

78

1   person views the death penalty, obviously trying to
2   avoid those people that just say, hey, capital murder,
3   that's it.  Don't even bother me with these two
4   questions, because what's the point?  If somebody takes
5   somebody else's life, they should pay with their own
6   life.  I need to know, where do you lie in the continuum
7   of things?  If zero was, "I'll never assess the death
8   penalty," and ten were, "Every time I am finding
9   somebody guilty of capital murder, they're getting the
10  death personality," where do you think you might fall
11  in that zero to ten range?
12      A.   At a five.
13      Q.   You feel like you could do it if you're
14  absolutely convinced beyond a reasonable doubt that,
15  number one, the person is guilty, and number two, that
16  the answer to those two questions have to be answered in
17  a way that results in the death penalty?
18      A.   Uh-huh.
19      Q.   Would you hesitate at all to answer those
20  questions, based on the evidence, in a way that gave a
21  life sentence, and then have to have some concern that
22  you might have to face questioning by your friends, your
23  family, your neighbors about, God, how could you have
24  done that?  We read in the paper that it was a horrible
25  crime.  How could you give somebody life for something

79

1   like that?  Do you think you would allow that kind of
2   an outside influence to affect your decision-making
3   process in this courtroom?
4       A.  You mean, after the trial was over?
5       Q.  No, as you're sitting there trying to make a
6   decision, you're saying, Gees, somebody is going to
7   question me about this?
8       A.  No, I don't have a problem with that.
9       Q.  You have the type of strength of character
10  that, I will do what I believe the evidence and the law
11  requires?
12      A.  Right.
13      Q.  Not that it requires you to do; but I'm
14  comfortable with my decision, because I have evaluated
15  everything completely?
16      A.  Right.  Also, people wouldn't know what I
17  heard, the evidence I was given.
18      Q.  And in all fairness, what you read in the
19  newspaper probably never bears any resemblance as to
20  what takes place during an entire day of testimony.
21      A.  No.
22      Q.  Do you have any questions of me?
23      A.  No.
24      Q.  So you'd like to be invited back to serve on
25  the jury?

80

1       A.  Not necessarily.
2       Q.  Okay.  Thanks.
3            THE COURT:  Miss Prince, in just a second
4   I'm going to excuse you.  Before I do, I'm going to tell
5   you, you're invited back.  We want you back on
6   Wednesday, the 29th of September, which is two weeks
7   from yesterday.  What we're doing is, we are talking to
8   folks individually for the purposes of creating a panel
9   of people, every one of whom will be back here on the
10  29th of September, every one of whom will have been
11  through exactly what you've been through.  On that day
12  we may spend as much as a couple of hours with you.
13  Won't be a long time, but everybody will leave here that
14  day knowing definitely whether they were or are not a
15  juror in the case.
16           Between now and when we see you next,
17  don't you change your schedule one bit for us.  You do
18  your professional things just like you ordinarily do
19  them.  Do your personal things just like you do them.
20  All that we ask of you between now and when we see you
21  next is don't talk about this case with anybody.  Do not
22  permit anybody to talk about this case with you.
23           If there is any news media treatment about
24  this case between now and when we see you next, avoid
25  it.  Anything about the case on the television, refuse

81

1   to watch it.  Anything about the case in the newspaper,
2   refuse to read it.  Anything about the case on the
3   radio, refuse to hear it.  And the reason, Miss Prince,
4   for each of those restrictions is for the purpose of
5   trying to accomplish the same objective, and that's
6   this:  If you do become a juror in the case, the
7   decision you reach, whatever it is, must be based only
8   on what you hear from inside the courtroom.  Your
9   decision cannot in any way be influenced or affected by
10  what you might hear away from the courtroom.
11           If you need anything for the folks at work
12  to show them where you have been for what is now the
13  three days you've been with us, that will take care of
14  it.  This is a reminder note as to where and when we
15  want you to be on the 29th of September.  We want you to
16  be right outside this door, where you were this morning,
17  by 9:30 on Wednesday, the 29th.  If we can get everybody
18  here and if we can get started at 9:30, we'll all be
19  through by noon.
20           Before you leave, do you have any
21  questions for me?
22           VENIREPERSON:  No.
23
24
25

82

1            SUZETTE YVETTE BARR,
2   having been first duly sworn, testified as follows:
3                VOIR DIRE EXAMINATION
4   BY THE COURT:
5       Q.  How are you today?
6       A.  I'm fine.
7       Q.  Miss Barr, first off, I ask you to remember
8   back to Monday, when the group was together here, and
9   the things we talked about, and this morning, the things
10  we talked about this morning.  Out of everything we have
11  talked about up to this point, do you have any questions
12  at all for me?
13      A.  Huh-uh.
14      Q.  Is there anything up to now that we have not
15  yet addressed, not yet touched on, that you feel as
16  though we should because it might have some bearing on
17  your service as a juror?
18      A.  No.
19      Q.  Is there anything at all, whether it might be
20  something perhaps about your professional life,
21  something about your personal life, something about your
22  health, or anything else that you can think of that, in
23  your mind, would in any way interfere with your ability
24  to be a juror in this case during the time frame we
25  talked about --

83

1    A.   Huh-uh.

2    Q.   -- rules that we've heard about as we've

3 talked about so far?  Have you heard anything at all

4 about any of them that rises to the level and causes you

5 some discomfort?  If you were a juror, could you

6 enforce, as well as follow them?

7    A.   Uh-huh.

8    Q.   The fact -- the idea about making a decision in

9 the case based upon whatever evidence you hear, does

10 that sound like you?

11    A.   Uh-huh.

12    Q.   No precommitted idea as to what you're doing?

13    A.   Uh-huh.

14    Q.   You're going to have to use words.  We all know

15 what you're saying.

16    A.   Sorry.

17    Q.   Do you have any questions about the idea that

18 just simply because you find somebody guilty of capital

19 murder, and for that reason alone, that doesn't mean

20 punishment should necessarily be imposed?

21    A.   No.

22    Q.   That life is equally an option as death?

23    A.   Uh-huh, yes.

24    Q.   Whatever decision should be made would be made

25 upon the evidence in a given case?

84

1    A.   Uh-huh.  Yes, I'm sorry.

2    Q.   And if after having heard the evidence in the

3 case, if you found that the answer to this first

4 question should be yes, are you still open to the fact

5 that a life sentence may be the appropriate verdict in

6 the case?

7    A.   Still hoping?

8    Q.   Are you still open?

9    A.   Oh, I am.

10    Q.   If somebody is found guilty of capital murder,

11 which is obviously a horrible crime, and the evidence in

12 the case is such that it influences a juror to believe

13 that a person is also going to be a future danger to

14 society, that means that they are death penalty

15 eligible.  The question is:  Is there anything in the

16 case that is a sufficient reason to substitute a life

17 sentence for the death sentence?  That's the second

18 question.  And you're still open to considering all the

19 evidence in that regard?

20    A.   Yes.

21    Q.   So finding of guilt and finding of future

22 danger would not automatically mean that in all cases

23 you're going to answer that second question in such a

24 way the death penalty is imposed?

25    A.   No.

85

1    Q.   It would depend upon the facts?

2    A.   Yes.

3    Q.   Before we begin, have you any questions at all

4 for me?

5    A.   No.

6         THE COURT:  Mr. McClellan.

7              VOIR DIRE EXAMINATION

8 BY MR. MCCLELLAN:

9    Q.   Miss Barr, my name is Lyn McClellan.  Along

10 with Claire Conners, we represent the State of Texas in

11 this case.  I want to go over your questionnaire and go

12 over some of your answers that you have there, and also

13 talk to you about certain aspects of the law that might

14 apply in a case like this and get your thoughts about

15 that.  When you filled out the questionnaire, you had

16 not had the benefit of having the Judge's voir dire the

17 other day, as well as today.  And a lot of people,

18 whenever they're asked about, you know, what do they

19 think the punishment ought to be for someone killing

20 somebody, they may just say that, I think (inaudible.)

21 Because when you get to this point, though, and having

22 listened to the voir dire and the prospect of being on a

23 jury, you found out there could really be just lots of

24 circumstances that constitute a murder case.  Not every

25 murder case is alike.

86

1         There are obviously a lot of murder cases

2 where a person's life may also be taken; but there are

3 also facts and circumstances that suggest to you that

4 maybe in the other cases where it is a murder case, but

5 based upon the circumstances and the facts, that might

6 not be the appropriate penalty.  In your mind, are you

7 open to the full range of punishment in a murder case,

8 from as low as five years to as high as ninety-nine

9 years, or life?

10    A.   Yes.

11    Q.   And the thing that a lot of people usually --

12 or we've had people come in before that says, if you

13 take someone else's life, you ought to get the maximum

14 punishment.  But what they're thinking about is a real

15 horrible case, and what they're thinking about that

16 probably would be the appropriate situation, not knowing

17 there could be lots of other circumstances that still

18 constitute murder.  That may not be what they're

19 thinking about.  The job of a juror is to listen to all

20 the evidence, and wait until you've heard it all and

21 then give -- receive the law from the Court, and then

22 you make your decision.  Are you the type of person that

23 could wait until you've heard all the evidence and

24 receive the law from the Court before you make your mind

25 up about either guilt or innocence or punishment?

87

1    A.  Yes.
2    Q.  Now in your questionnaire that you had filled
3  out, there is a question about -- I think it said, What
4  is the best argument for the death penalty?  And you
5  said, If you choose to take a life deliberately, I feel
6  yours should be taken away, too, which basically
7  translates, in other words, into an eye for an eye.  In
8  other words, if you kill somebody, your life ought to
9  also be taken.
10         Now that you know what the law is and
11 there is no automatic death penalty for any particular
12 case, instead you have to go through a different process
13 to make those type of decisions, and there may be cases
14 where someone takes someone's life in a capital murder
15 situation where life imprisonment is an appropriate
16 punishment.  Are you open then to answering these
17 questions in such a way that either life or death could
18 result, and you just wait and see what the facts show?
19   A.  Yeah.
20   Q.  Some people come in and say they have a
21 preconceived idea or preconceived notion.  And if you
22 have a strong belief that it should be an eye for an
23 eye, that's okay, as long as they can set it aside and
24 follow what the law and the evidence is.  Every juror
25 we're going to ask to take an oath, and that oath will

88

1  be to a true verdict render based upon the law they get
2  from the Court and the evidence they hear in the
3  courtroom.  Would you be able to take that type of oath?
4    A.  Yeah.
5    Q.  Let me ask you this:  What types of cases come
6  to your mind when you think of cases where you think the
7  death penalty ought to be available as a form of
8  punishment?
9    A.  Type of cases like a mass murder, what happens
10 when somebody goes in and shoots people in the post
11 office, or place of work, or take a life intentionally
12 for no apparent reason, just because.
13   Q.  Okay.  And, of course, mass murder, that would
14 be capital murder.  And taking someone's life without
15 any reason, intentionally taking their life without any
16 reason, that is murder and not capital murder.  Because
17 for it to be capital murder, where the death penalty is
18 available, it must be murder, which is always an
19 intentional taking of another person's life -- that's
20 murder; we're not talking self-defense; we're talking
21 about intend to kill somebody -- but that's not capital
22 unless it's coupled with another felony.  Murder during
23 a kidnapping is one of the things we have alleged here.
24 Murder of two or more people in one criminal episode is
25 another thing we have alleged here; but if someone were

89

1  to walk up to someone on the street without any other
2  person around, put a gun to somebody's head and shoot
3  and kill them, that is murder; and the death penalty
4  does not apply.  Any problem with -- in that type of
5  case where someone, you know, disregards a human life
6  and takes someone else's life?
7          Range of punishment is from five years to
8  ninety-nine years, or life.  Death penalty is not
9  available.  Are you still open to that full range of
10 punishment in that type of case?
11   A.  Uh-huh.
12   Q.  That's what the law is.  So what we're looking
13 for are people who have not made up their mind about any
14 aspect of the case.  And, of course, that may sound
15 silly, because you haven't heard any of the facts.  How
16 could you make your mind up about it?  But I guess some
17 people may react to say, If a person's been found guilty
18 of capital murder, what punishment should he receive?
19 And I hope that you would respond, Well, what's the
20 evidence?  You know, what about the crime and the
21 individual?  Are you comfortable with the fact that you
22 cannot tell me what punishment ought to be received for
23 capital murder --
24   A.  Yeah.
25   Q.  -- without knowing it?

90

1    A.  Yeah.
2    Q.  Okay.  I wanted to talk to you for a moment
3  about the punishment stage of a capital murder case,
4  and that's different from the punishment stage of any
5  other crime.  Because here, instead of a range of years
6  like you have in a murder case, you have questions.  And
7  depending upon the answer to the questions tells the
8  Judge what punishment he must assess.  Keep in mind
9  that you never get to those questions unless you have
10 found someone guilty of capital murder.  And capital
11 murder is the intentional taking of another person's
12 life without any legal justification.  We're not talking
13 accident.  We're not talking self-defense during the
14 course of a kidnapping, or killing two or more people in
15 one criminal episode.
16         Okay.  Having found that, you then go to
17 the punishment stage of the trial.  At that stage, you
18 may hear additional evidence about a defendant's
19 character or background, their criminal history or lack
20 thereof, their mental abilities, disabilities, all kinds
21 of information about the individual, himself, that may
22 help you in deciding the answer to these questions.
23         So when you go to answer the questions,
24 you have two bodies of knowledge to draw from.  One is
25 the information you received at the guilt/innocence

91

1  stage of the trial, where you found someone guilty of
2  capital murder. And two is evidence about the
3  individual, himself, that you heard at the punishment
4  stage of the trial. All that can help you in answering
5  these questions.
6      Okay. First question says: Do you find
7  from the evidence beyond a reasonable doubt? First of
8  all, that tells you, when it says beyond a reasonable
9  doubt, the burden is on the State of Texas. But there
10 is a probability. And it doesn't say possibility,
11 because anything is possible. Doesn't say certainty.
12 It says a probability, more likely than not, that the
13 defendant would commit criminal acts of violence.
14 Doesn't say another murder or capital murder, although
15 those are obviously criminal acts of violence. Could be
16 a robbery. Could be a burglary. Could be shooting
17 someone with a gun who does not die. It could be
18 hitting someone with your fist so hard you knock them
19 out. It could be anything that's criminal and violent
20 in nature that would constitute a continuing threat to
21 society.
22     So, basically what you're asked to do is
23 go back and listen to the evidence both about the crime
24 and about the individual. And do you find that, based
25 upon all that evidence, the State has proven beyond a

92

1  reasonable doubt there is at least a probability that
2  the defendant would commit criminal acts of violence
3  that would be a continuing threat to society? Do you
4  think you would be able to answer that question either
5  yes or no, depending on what the facts may show?
6      A. Yes.
7      Q. Do you see that there are certain cases, just
8  because you found someone guilty of capital murder --
9  because you don't ever get to that question unless --
10 the fact that you found someone guilty of capital murder
11 does not always dictate what the answer would be. I
12 mean, there may be cases that are so bad that when you
13 found them guilty, that was also enough evidence to
14 answer Issue Number One yes.
15     But there may be other cases where finding
16 him guilty was not sufficient to answer that yes. And
17 when hearing all the evidence about character and
18 background, there still wasn't sufficient evidence to
19 answer that yes. See, some people, I think, get the
20 misimpression that if you find a person guilty of
21 capital murder, that you always would find that he's a
22 continuing threat to commit future acts of violence.
23 And that's not always the case. Are you comfortable
24 with that proposition?
25     A. Yeah.

93

1      Q. For example, you may -- when you look at a
2  person's character and background, you may find they're
3  a straight A student, an Eagle Scout, a choirboy, never
4  been in trouble with the law before. This act of
5  capital murder, which is heinous in and of itself, was a
6  total aberration from the rest of his life. You didn't
7  expect them to do that. And now, further looking, you
8  wouldn't expect them to do anything like that ever
9  again. There may have been circumstances that arose
10 that caused them to do it. Doesn't exonerate them from
11 committing the crime, but those circumstances may be
12 helpful in deciding that he would not be a continuing
13 threat. Okay. In other words, in extremes there may be
14 somebody that's been in and out of trouble all their
15 life; and you figure this is just a stepping stone along
16 the way to their graduate degree in criminology, but
17 they're going to always be a threat from now on. So,
18 are you comfortable with the idea that when you -- just
19 because you find someone guilty of capital murder, you
20 still have to look at Issue Number One and the State
21 still has to prove that there is at least a probability
22 that this person would be a continuing threat to commit
23 future acts of violence?
24     A. Yeah.
25     Q. You don't answer yes just because you found

94

1  them guilty of capital murder.
2      A. No.
3      Q. If you answer that question yes, then the
4  defendant's going to receive a death penalty, unless you
5  decided on Issue Number Two that there is some reason or
6  reasons he should not. And that question basically asks
7  you to go back and look at all the evidence again. In
8  fact, it says, Do you find that, taking into
9  consideration all of the evidence, including the
10 circumstances of the offense -- that would be what you
11 heard at guilt/innocence -- and background of the
12 defendant -- that would be what you heard at
13 punishment -- and the defendant's personal moral
14 culpability -- I'd like to refer to it as his personal
15 responsibility for the commission of the crime. What
16 were the acts that he did that helped cause this crime?
17     Do you find there is sufficient mitigating
18 circumstance or circumstances -- I'd like to refer to it
19 as sufficient reasons -- why that person should receive
20 life as opposed to death? It gives you the opportunity
21 to change your vote of death to life if you find there
22 are reasons in the testimony that you heard, whether it
23 be guilt or innocence, or whether it be punishment, or
24 wherever it may be, it gives you the opportunity to give
25 that person a break, make sure the death penalty is what

95

1  you want to do; and if you're not sure that's what you
2  want, then you give him a life sentence. Any problem
3  with that aspect of the law?
4      A.  No.
5      Q.  Some people come and say, well, if I have found
6  someone guilty of capital murder, intentionally killing
7  someone without a legal justification during the course
8  of a kidnapping, or killing two or more people during
9  one criminal episode, then if I further went on and
10  found there is a probability beyond a reasonable doubt
11  that that person would be a continuing threat to commit
12  future acts of violence, you know, I along think -- I
13  mean, I'll never think there is some reason to change my
14  vote from death to life. And I don't know whether it
15  will be or not, but what Issue Number Two commits you to
16  do is to search; and in looking for it, to go back
17  through that evidence and weigh it in your mind.
18          For example, you may go back and look
19  through the evidence in Issue Number Two and remember
20  that, well, I remember during the trial they said the
21  defendant was high on drugs or alcohol when he committed
22  the crime. Juror Number 1 may say, I believe that
23  mitigation warrants a life sentence; because when you're
24  high on drugs or alcohol, you do things you wouldn't
25  ordinarily do. Juror Number 2 may say, Wait a second.

96

1  That doesn't have anything to do with it. I know people
2  who get high on drugs or alcohol every week, and they
3  don't go out and commit capital murder. I don't see any
4  connection there. Two people can look at the evidence,
5  same piece of evidence, and come up with different
6  opinions. That's okay, because that's what the
7  questions asks you to do, for you to look at the
8  evidence, for you to weigh in your mind, and for you to
9  decide what effect it should have. Any problem with
10  that aspect?
11      A.  No.
12      Q.  Same thing when you look back at the evidence.
13  You may find the defendant was a young man. Somebody
14  may say, well, you know, I think his youth is a
15  mitigating factor; because when we're young, we do
16  things that are stupid. We do things we look back on
17  and say, why in the world did I do that when I was that
18  age? As you get older, you get more mature. Somebody
19  else may think it's mitigating. Somebody else may say,
20  well, wait a minute. At this age, he's already
21  committed a crime. What makes you think he won't do
22  something worse down the road? Same thing with mental
23  disabilities. Somebody may think that's mitigating.
24  Somebody may say, I know other people who have the same
25  disabilities this person has, but that doesn't -- they

97

1  don't go out and commit these types of crimes. I don't
2  think there is any connection between that and the
3  commission of this crime; and thus, I don't think it's
4  mitigating.
5          All that is to say that Issue Number Two
6  commits yourself that you'll go back and look at all the
7  evidence. Stop and reevaluate everything. Make sure
8  the decision you've arrived at is the one you're going
9  to stay with. And if it is, you say, no, there are no
10  mitigating circumstances that deserve life as opposed to
11  death. If you find that there is circumstances where
12  you ought to change that vote, then you say, yes, there
13  are circumstances this person ought to get life as
14  opposed to death. See how that works.
15      A.  Uh-huh.
16      Q.  Any problem with you going through that process
17  and making that type of decision?
18      A.  Nope.
19      Q.  If you had already found some -- hypothetically
20  already found someone guilty of capital murder, and then
21  you found them be a continuing threat to commit future
22  acts of violence, at least to a probability, are you
23  still open to going through and looking to see if there
24  is anything that's mitigating?
25      A.  Yeah.

98

1      Q.  I mean, I don't know whether you'd find it or
2  not. And I suggest you wouldn't know, either, until you
3  heard what the facts and circumstance were, and they'll
4  all be different. The State of Texas is seeking the
5  death penalty in this case. We're going to seek to
6  commit jurors -- to convince jurors beyond a reasonable
7  doubt that the defendant is guilty of capital murder,
8  and we're going to seek to convince jurors that Issue
9  Number One ought to be answered yes and Issue Number Two
10  ought to be answered no, such that the death penalty
11  would result. If the law and the evidence convinces you
12  that it ought to be that way, is there any reason you
13  could not vote that way?
14      A.  No.
15      Q.  If the law and the evidence didn't convince you
16  that it ought to be that way, is there any reason you
17  could not find the defendant not guilty? Or if you
18  found him guilty, is there any reason you couldn't find
19  that life is appropriate if you thought that's what the
20  law and the evidence called for?
21      A.  No.
22      Q.  You indicated that you know someone who's been
23  sent to prison. Said, broke probation, possession of an
24  illegal substance, and I think he's still in high
25  school. Who was that?

99

1     A.   My best friend's father.
2     Q.   Your --
3     A.   Best friend's father, or stepdad.
4     Q.   And that person went there for drugs?
5     A.   Yes.
6     Q.   And how has that affected your best friend?
7     A.   Well, she knew basically about her dad; so, you
8     know, she goes and sees him.  I haven't seen him; but
9     she goes and sees him, and she takes her kids.  So, you
10    know, she knows what's right and wrong.  I don't think
11    it's really affected her bad.
12    Q.   Indicated that you had -- your cousin's ex-wife
13    was murdered in Dallas?
14    A.   Uh-huh.
15    Q.   How long ago was that?
16    A.   About two years ago.
17    Q.   Was anybody ever prosecuted for that?
18    A.   Not to my knowledge, no.
19    Q.   Would that have any effect on you being a juror
20    in a case like this?
21    A.   No.
22    Q.   Back on the questionnaire there was a question
23    that says -- it's not a question -- a statement which
24    asks, do you agree or disagree?  Do you agree with this
25    statement:  Any person, man or woman, young or old,

100

1     who's guilty of capital murder should pay with their own
2     life.  Okay.  You said you agreed to that.
3            Some people interpret that to mean the
4     death penalty ought to apply whether you're a man or a
5     woman, whether you're young or old, though necessarily
6     it should be a factor that ought to be applied equally
7     across the board.  But somebody else could interpret
8     this to mean any person; because everybody is either a
9     man or a woman, everybody is either young or old.  That
10    means any person guilty of capital murder ought to get
11    the death penalty every time.  Is that what you believe,
12    that every person guilty of capital murder ought to get
13    the death penalty every time, regardless of the
14    circumstances?
15    A.   No, I don't even think I seen that question as
16    that way.  I think they should pay with their life, and
17    not to take their life away.  It could either be they
18    need to spend life in prison.
19    Q.   That's another way of looking at it, also;
20    because there is only two punishments, and the person --
21    you now know that life means at least forty years, day
22    for day.  So the person is -- most likely it would be a
23    person's natural life.
24            There is also a question -- and, of
25    course, this is before any of the voir dire or the

101

1     process.  Says, Do you believe mitigating evidence
2     concerning a capital murder defendant's background
3     should be considered in deciding whether or not he or
4     she should receive the death penalty?  And you checked
5     no.  Now you understand that the question up there
6     directs the jury to look at mitigating evidence.  Did
7     you know what they meant by mitigating evidence?
8     A.   No.
9     Q.   I think a lot of times people look at that as
10    meaning like excuses for someone's conduct ought to be
11    considered.
12    A.   Uh-huh.
13    Q.   Mitigating conduct does not mean excuses;
14    because it does not excuse the conduct, because you've
15    already found a person guilty.  Mitigating evidence
16    determines what punishment you're going to get, either
17    life or death.  It's never going to undo your finding of
18    guilt, and that's when it comes into effect.  Mitigating
19    evidence does not come into effect on guilt/innocence,
20    only at the punishment stage.  And you would be able to
21    consider that and look at that like the law requires you
22    to?
23    A.   Yeah.
24    Q.   Any questions you have of me?
25    A.   No.

102

1     Q.   All right.  Thank you very much.
2            MR. MCCLELLAN:  And I'll pass the juror.
3            THE COURT:  Mr. Hill.
4            MR. HILL:  Thank you, Judge.
5                   VOIR DIRE EXAMINATION
6     BY MR. HILL:
7     Q.   Hi, Miss Barr.  How are you?
8     A.   Fine.
9     Q.   So far I've heard you say yes and no to a lot
10    of questions that have been posed to you; and I've heard
11    a lot of comments made to you about, this is what the
12    law requires, and you'd follow the law, and the law
13    requires you to do this, and you could do that.  But I
14    haven't heard how you feel about things.  I think I had
15    a fairly good idea of what your thoughts were when I
16    read your questionnaire.  Do you think that the
17    questionnaire gave an opportunity to express your views
18    on the different issues we've discussed?
19    A.   I think so.
20    Q.   Okay.  Like you said, that if a person
21    deliberately takes the life of another person, their
22    life should be taken away, too.  Is that a fairly
23    succinct statement of your beliefs regarding somebody
24    who commits intentional murder?
25    A.   Yeah.  I guess -- how did I phrase it?  What

103

1   I'm saying when I say take their life, they should give
2   their life. It's not always going to be they're going
3   to die if they're dead. I guess what I'm saying is
4   taking their life away means their life, as in their
5   freedom to choose this, you know, through their Bill of
6   Rights, their right to do their life. And that's the
7   way I foresee that. And not so much as whether they
8   should be killed, but just as, you know, they should
9   have their lives, as I see it, taken away.
10      Q.  Okay. See, it's important to ask people
11  questions on those, and I like to ask questions. I hope
12  that you don't feel like I'm prying or kind of getting
13  too personal; but obviously, Mr. Wentz and I have a
14  tremendous responsibility.
15          This young man sitting here is charged
16  with killing two people at the same time, or
17  alternatively, that he kidnapped somebody and killed
18  them. I can't think of a more serious allegation being
19  brought against somebody; so I can't just rest on a
20  person's comments that, yes, I'm following the law. I
21  want to make sure you understand what it is that the law
22  requires versus what you feel.
23      A.  Uh-huh.
24      Q.  The law can't make you feel a certain way. As
25  an example, if you were called to jury service up in

104

1   Dallas -- see, a lot has been said about the law
2   requires you to set aside your personal views and just
3   look at the facts and the evidence in the case.
4       A.  Uh-huh.
5       Q.  And that sounds fair, and nobody wants to say
6   anything that sounds like they're not going to be fair
7   in a case. But would you agree with me that there might
8   be some cases where you can't set aside the views that
9   you have, that there is no way you can put them aside
10  and sit and listen to a case? Do you think there is
11  some cases where your views are so strong that you may
12  not be able to set the views aside?
13      A.  There might be. I don't know, but --
14      Q.  I'll give you an example. It's a poor example,
15  but imagine if you lived in Dallas. You got called down
16  for jury service, and it turns out that the case on
17  trial is one of your cousins. Now, there is no way in
18  the world you would be able to sit there and honestly
19  say, well, I can set aside any feelings I have. And
20  that's a bizarre example. But what are some of the
21  other types of cases that you might think about that
22  might run through your mind that you feel like, you
23  know, I just feel so strongly about a particular topic
24  that, in all fairness, if I'm sitting on trial myself,
25  I'd want the juror to raise their hand and say, look,

105

1   I'm a good person. I could possibly be a good juror in
2   any other case, but this one cuts a little too close to
3   home. Or my feelings are so strong, I just don't feel
4   like I can give you the best shot that I can. Do you
5   have some cases like that?
6       A.  I think crimes against children. I could
7   probably be as objective as I could possibly be, but I
8   don't think -- I think my beliefs and stuff, it would
9   possibly hinder my decision.
10      Q.  I think that's probably the single most often
11  heard comment when asked that question. I don't think
12  I've ever gotten a different response. It's always
13  having to do with children because the sense of, they
14  have no say in the matter. They are truly helpless.
15  They are truly innocent victims, and somebody takes
16  their life. There is no justification whatsoever, I
17  guess, unless there was an accidental situation.
18          Now you answered the question -- it asked,
19  Do you believe that mitigation should be taken into
20  consideration in deciding whether or not the death
21  penalty should be received? And you did answer it no.
22  What did mitigating mean to you as you were reading that
23  question? Because obviously, you answered the
24  question.
25      A.  To be honest, I don't know. Some of that stuff

106

1   was overwhelming, so a lot of it -- I mean, I tried to
2   be as honest as I could; but there was a lot that was
3   overwhelming.
4       Q.  We throw a lot of questions out, and then we
5   batter you around a little more when you're sitting up
6   on the witness stand. Does mitigation sound like
7   reasons to give the death penalty, such as a person's
8   prior convictions, bad acts, things like that? Do you
9   view mitigation more from the State's perspective, that
10  it's reasons to give the death penalty; or do you see it
11  as reason or reasons not to give the death penalty?
12      A.  I see it as not to give the death penalty.
13      Q.  Okay. Now I haven't asked you to specify a
14  particular thing that you're always going to find to be
15  mitigating. Mr. McClellan tried to kind of give you a
16  suggestion of some things. And I heard him say that,
17  Well, one juror may say it is mitigating, and another
18  might say it's not mitigating. Any things that come to
19  your mind that you would like to hear before you make a
20  life or death decision? I mean, what kind of evidence
21  do you think comes to your mind as possibly mitigating?
22      A.  Honestly, I don't know. I mean, I really don't
23  know.
24      Q.  Do you think the circumstances of the crime
25  itself that you have found somebody guilty of might play

**107**

1  a role in deciding whether the person receives life or
2  death?
3      A.  Yeah, I think it might.
4      Q.  Okay.  Go a step further with me, if you will,
5  and try to distinguish circumstances of a case that
6  might suggest the death penalty versus circumstances of
7  a case that might suggest life in prison would be
8  appropriate.
9      A.  Yeah.
10     Q.  Could you think of any kind of scenario just
11  floating out there that might suggest one versus the
12  other?  And if you can't, I understand.
13     A.  To be honest, this is my first time I've ever
14  done anything like this.
15     Q.  Okay.  Now one thing -- let me ask you this:
16  If somebody were to ask you whether or not you see
17  yourself as a fairly conservative person when it comes
18  to law and order, would this be a fair assessment, that
19  you would tend to be more conservative with regard to
20  criminal justice issues?
21     A.  Yeah, I would think so.
22     Q.  Let's say you've just been elected to the House
23  of Representatives for your district in Texas.  There is
24  two bills on the floor, and you're going to vote for one
25  or the other.  One bill says, For all people that commit

**108**

1  capital murder, the automatic punishment is life in
2  prison.  The other bill says, For all people convicted
3  of capital murder, the automatic punishment is death.
4  In other words, we're not going to have this scenario
5  anymore.  Texas is now going to an either/or situation.
6  And you're in the House of Representatives; and they
7  call out, Suzette Barr, how do you vote?  Which would
8  you choose?
9      A.  I couldn't.  I couldn't choose.
10     Q.  Okay.  What would your argument be for either
11  one of those?  Like, would you -- what would your
12  argument be for an automatic death penalty, if that's
13  what the law was going to be?
14     A.  Well, my argument, I guess, would be saying,
15  you're assuming that all cases are the same.  Everybody
16  is going to be the same is the reason why you know as to
17  why they killed or kidnapped, or whatever you're saying.
18  Okay.  That since Jane did this, that Joe did this, but
19  it's different circumstances.  They're all going to get
20  the same sentence, and I don't think that's right.  Each
21  case should be accounted differently.
22     Q.  So what do you do as a Legislator if, for some
23  reason, the only two bills that are put on the floor for
24  your consideration says it's always life or it's always
25  death?  How do you resolve that?  Do you just abstain?

**109**

1      A.  Yeah, I would think I would just abstain.
2      Q.  You don't get to abstain on the jury here.
3      A.  I couldn't do it.
4      Q.  You're going to have to cast your vote.  And
5  I'm not trying to trivialize this.  I'm just trying to
6  get some heartfelt thoughts that you have --
7      A.  Uh-huh.
8      Q.  -- so that I can sit there with Mr. Wentz and
9  talk to him and say, here we have this woman who, among
10  other things, initially said, I don't think mitigation
11  should be considered in assessing life or death.
12  Somebody has said -- some people -- Do not let the
13  accused have an appeal.  Stand your ground.  What does
14  that mean?  That was one of the answers to the questions
15  about the best way to achieve the purpose of, you know,
16  addressing punishment and crime?
17     A.  I think that if they were adequately defended
18  and if the State prosecuted and they did get the truest
19  punishment, I don't think they should be offered an
20  appeal.  If you did it and the evidence said you did it
21  and, you know, this is how they, you know, the jury, you
22  know, said you did.  And I just don't think -- I think
23  you should serve your time, and that should be okay.
24     Q.  Let me ask you one question, because you made a
25  very interesting comment at the very beginning of your

**110**

1  answer.  If the person was represented properly, if the
2  State presented their evidence properly, and the jury
3  concluded beyond a reasonable doubt, how would we know
4  whether, like in one instance you wrote, you know,
5  whether Mr. Wentz and I had done a proper job, if there
6  is no appeal of that decision?  Just kind of a
7  philosophical question.
8      A.  I guess when I say proper, I guess getting
9  the -- actually, defend -- I mean, the people to give
10  the evidence, the actual evidence, is to defend -- well,
11  I don't have to defend his innocence, because he's
12  automatically innocent.  But if the State had the proper
13  evidence to say that he's guilty, I mean, it was
14  definitely clear that, yeah, you know, he was seen by
15  five people doing this crime, and all these five people
16  were not at the same, you know, same spot.
17     Q.  They weren't the drunks that the Judge was
18  talking about?
19     A.  Yeah, and stuff.  So, I think it could be, you
20  know.
21     Q.  Okay.  Let me ask you one thing.  Let me ask
22  you first:  Have you ever seen on TV, or read in the
23  newspaper, some media source, of cases where twelve
24  jurors got together, absolutely convinced beyond a
25  reasonable doubt the person did it?  May be given death;

111

1    may be given life in prison; whatever it might be, five
2    or ten years. And later evidence comes to light that,
3    in fact, the person does not commit the crime, or that
4    witnesses lied, or whatever. What do you feel when you
5    see something like that in the media? Have you ever
6    heard of such a case or seen anything like that?
7        A.   I think there was a movie about it. I'm not
8    sure. How would I feel?
9        Q.   Yeah.
10       A.   Stupid, especially if I was on that jury, if I
11   was one of the ones. But then again, I did the best I
12   could with what was given to me.
13       Q.   Exactly.
14       A.   And so, you know, I don't know. I may not. I
15   don't know how I would feel. I may not feel either way.
16       Q.   Okay. So, here I am. I'm a lawyer, along with
17   Mr. Wentz, representing Mr. Mamou. He's charged with a
18   horrible crime. You'd agree the allegation is terrible.
19   I don't think anybody would disagree with that, anytime
20   somebody's charged with the most serious crime.
21            I've got to speak to you for a short time.
22   I've read your questionnaire. I heard what you said to
23   Mr. McClellan when he was questioning you. I want you
24   to put yourself in that chair for a moment as the
25   defendant. You're my client, okay? And we're looking

112

1    at your twin sister. Did you ever have a sister?
2        A.   Huh-uh.
3        Q.   So, the mirror image of you sitting on the
4    witness stand. And we're saying, well, I wonder if
5    she's told us everything. I wonder if there is anything
6    we missed that we need to ask her, in all fairness. And
7    you turn to me, as the defendant, and say, look, let me
8    tell you why I either want to keep her or why I don't
9    want to keep her. What would you tell me, being your
10   defense lawyer?
11       A.   Being my defense lawyer?
12       Q.   Uh-huh, remembering that I'm essentially making
13   the decision of whether to say yes or no on your sitting
14   on this jury. So, you look deep inside of you right now
15   for a moment and tell me what I should do.
16       A.   I think you should pick me, because I can be
17   open-minded to what's going on, and I think I could
18   weigh the evidence equally and give the honest and best
19   thing.
20       Q.   One thing I want to be absolutely clear on,
21   because a lot of people -- and I'm not singling you out,
22   because everybody has struggled with this: We ask them,
23   Are there cases where you think the death penalty is not
24   appropriate? And I notice you left yours blank. You
25   did not answer it, which concerns me. And I think,

113

1    well, she doesn't have an argument against the death
2    penalty at all.
3            I just want to ask you this: Are we clear
4    on the fact that when we're talking about mitigation, we
5    are not talking about a situation where somebody acted
6    in self-defense, or it was an accident? Because what
7    would have happened if that's what you believed the
8    evidence showed? Tell me what you would have done if
9    the evidence was presented to you by the State. Then
10   after hearing all the evidence, you believed that either
11   death occurred accidentally or the death occurred as a
12   result of self-defense, that the person had a
13   justification for taking somebody's life. What would
14   the result have been in terms of your verdict?
15       A.   Oh, it would definitely not have been the death
16   penalty, no. It would have more than likely been life.
17       Q.   Well, here's my problem with that. What about
18   the guilt stage of the trial when you are trying to
19   determine whether or not the person was guilty or not?
20   Would that not have played a factor at that stage of the
21   trial? In other words, if you felt the person --
22       A.   Oh, yeah, oh, yeah; but that's not what you
23   said.
24       Q.   Okay. And maybe I confused my own question to
25   you. What would your vote have been at any stage of the

114

1    trial if we would have gotten to the punishment stage of
2    a trial if you believe the person acted in self-defense?
3        A.   That, honestly, I don't know. Depends. It
4    would have to depend on the circumstances as to
5    self-defense, you know. If it was a barroom fight or
6    something like that, and the person he was fighting was
7    killed, I don't know. To be honest, I really don't
8    know.
9        Q.   Let me ask you, because we use the phrase --
10   and maybe you've never been exposed to it. Do you know
11   what self-defense is?
12       A.   Yeah, you're defending your life.
13       Q.   Okay.
14       A.   But I don't look -- I guess I look at it
15   differently. I'm thinking, if I'm going to defend my
16   life, you're actually going to harm me or I'm going to
17   think you're doing harm to me.
18       Q.   That's exactly what self-defense is. You're
19   either under immediate attack, or you reasonably believe
20   that you're about to be and you fear for your life. The
21   law says you're allowed to take the other person's life
22   if --
23            MR. MCCLELLAN: I object. That's not the
24   law.
25            THE COURT: I understand. That's the

115

1  problem.  I understand.

2      Q.  (BY MR. HILL)  If you believed, according to

3  your understanding of self-defense, that a person acted

4  in self-defense; they did cause a person's death, but it

5  was based on self-defense, how would you have to vote in

6  that situation?  Would you vote a person guilty or not

7  guilty?

8      A.  To be honest, like I said, I don't know.  I

9  don't know what I would do.  It depends on the evidence,

10  what's going on.  Just depends.

11      Q.  Assume the evidence convinced you it was

12  self-defense, okay.  You listened to all the evidence,

13  and you are convinced that it was self-defense.  Would

14  you then find that person guilty or not guilty?

15      A.  I would possibly find him not guilty if it was

16  actually self-defense.

17      Q.  But, of course, you're not going to be called

18  upon to make that decision until you've heard all the

19  evidence.

20      A.  Uh-huh.

21      Q.  My concern was that we not confuse

22  self-defense, which would have resulted in the person

23  being found not guilty, right?

24      A.  Uh-huh.

25      Q.  We're on the same page.  Many people make the

116

1  comment when we ask them, What type of evidence do you

2  think would be mitigating that would cause you to vote

3  for life rather than death?  And people say, well, if it

4  was done in self-defense.  Well, if it was done in

5  self-defense, the person would never have been convicted

6  in the first place.  We would have never gotten to the

7  second stage of the trial.  You follow how the process

8  works?

9      A.  Yeah.

10      Q.  I think it's confusing; because if you've never

11  had to serve on a jury before like that, there is a lot

12  of different things being asked of you.  And sometimes

13  people find it difficult to figure out exactly which

14  stage we're talking about.  If you had to very quickly

15  describe for me the process of a capital murder trial,

16  could you do that for me?

17      A.  As to whether the evidence gets presented, and

18  then the verdict, and then the sentencing phase?   Is

19  that what you're --

20      Q.  That's it.  Most people stand there and say,

21  well, we've got to decide life or death.  And they kind

22  of conveniently leave out the whole part about, we would

23  have first had to have found the person committed a

24  crime before we get to the punishment.

25      A.  Uh-huh.

117

1      Q.  But you're right.  Decide the facts and come

2  back at sentencing in the punishment phase.  Do you have

3  any questions of me?

4      A.  No.

5      Q.  Still want to serve on the jury?

6      A.  Yeah, I think so.

7      Q.  Okay, thanks.

8          THE COURT:  Thank you, sir.

9          Miss Barr, in just a second I'm going to

10  excuse you.  (Court admonishes juror.)

11              GILBERT CANTU,

12  having been first duly sworn, testified as follows:

13              VOIR DIRE EXAMINATION

14  BY THE COURT:

15      Q.  How are you, sir?

16      A.  Pretty good.

17      Q.  Mr. Cantu, first off, let me ask you to

18  remember back to Monday, everybody was here together --

19      A.  Yes.

20      Q.  -- and the things we talked about on that day.

21  Add to this morning the things we talked about this

22  morning.  Out of everything that we have talked about up

23  to now, do you have any questions at all for me?

24      A.  No.

25      Q.  Is there anything up to now that we have not

118

1  yet addressed that you feel as though we should talk

2  about because it might have some bearing or some

3  influence on your being a juror in this case?

4      A.  No.  I was wondering about a case on -- I was

5  wondering why a case about a neighbor shooting a

6  neighbor.  He got convicted of murder and got ten years

7  probation.  I was wondering about that.  That's what you

8  would -- you were talking to us.

9      Q.  Well, you see, why they got ten years probation

10  was based upon whoever was viewing the evidence in this

11  case and whatever that evidence was.  But can you see

12  how that's murder and this is capital murder?

13      A.  Right, right, yeah, I understand.

14      Q.  I can't get more specific in terms of an

15  answer, because I don't have any idea what case it is.

16      A.  Right.

17      Q.  But I know that's the reason for it.  Having

18  addressed that issue, can you think of anything at all,

19  Mr. Cantu, whether it be something about your personal

20  life or something about your professional life, whether

21  it be something about your health or anything else?

22      A.  No, I'm sorry.

23      Q.  Anything at all you can think of that would

24  interfere with your being a juror in this case?

25      A.  No, sir.

119

1      THE COURT: Mr. McClellan.
2      MR. MCCLELLAN: Thank you, Your Honor.
3              VOIR DIRE EXAMINATION
4  BY MR. MCCLELLAN:
5      Q.  I didn't think you would ever get there, Mr.
6  Cantu.
7      A.  Yes.
8      Q.  My name is Lyn McClellan.  Along with Claire
9  Conners, we represent the State of Texas in this case.
10 Got just a couple of questions for you.  On your
11 questionnaire you checked this question:  Do you have
12 any health problems that would affect your service as a
13 juror?  You said yes and didn't list any.
14     A.  No.  I said yes?
15     Q.  You checked yes.
16     A.  Oh, no, I don't.  I'm sorry.
17     Q.  That's why I'm checking.   Look pretty healthy
18 to me.  There is a question here:  Do you have any
19 religious, moral, or personal beliefs that would prevent
20 you from returning a verdict which would result in the
21 execution of another human being?  And you checked yes.
22     A.  I'm trying to figure out why I checked yes,
23 because I don't feel like I would have any -- I don't
24 have any religious or moral issues.
25     Q.  We're seeking the death penalty in this case.

120

1      A.  Right.
2      Q.  For us to put somebody on the jury over here
3  that could never give the death penalty would be kind of
4  stupid on my part.  Are you the type of person that will
5  make me look stupid?  Are you the type of person that
6  could never give the death penalty?
7      A.  No.
8      Q.  So you think it's appropriate in certain types
9  of cases?
10     A.  Right.
11     Q.  What kind of cases do you think it's
12 appropriate?
13     A.  I would say, depends on the situation.  I'm not
14 against the death penalty.  And also, I can give a life
15 sentence, but depends on the situation.
16     Q.  Ten years probation would be a little light for
17 you?
18     A.  Well, that would.
19     Q.  All right.  Thank you very much, sir.
20         MR. MCCLELLAN:  I'll pass the venireman.
21         THE COURT:  Mr. Hill.
22
23
24
25

121

1              VOIR DIRE EXAMINATION
2  BY MR. HILL:
3      Q.  Are you having a good day so far?
4      A.  Yes.
5      Q.  Can you give me any reason at all why Mr. Wentz
6  and I should not choose you to sit in judgment of this
7  case, knowing that we represent this man right here
8  that's charged with capital murder?
9      A.  No.
10     Q.  Okay.  Are you one of these individuals that's
11 just chomping at the bit to get on the jury?  Or if I'm
12 chosen, I'll do everything I can to listen carefully,
13 make whatever decision I feel is appropriate under the
14 law and the evidence?
15     A.  I think I'm very objective.  I've never served
16 before, and it's not a rush to get into the jury.  It's
17 just if I do have to get in, or if I am elected to get
18 in there, I'm pretty objective.  I think I can do a good
19 job.
20     Q.  Okay.  Just a moment, please.  Thank you, sir.
21         THE COURT:  Mr. Cantu, in just a second
22 I'm going to excuse you.  Before I do, I will tell you
23 that we want you back two weeks from yesterday,
24 Wednesday, September the 29th.  I'm going to give you a
25 piece of paper.  (Court gives juror admonishments.)

122

1              GREGORY ADAMS,
2  having been first duly sworn, testified as follows:
3              VOIR DIRE EXAMINATION
4  BY THE COURT:
5      Q.  How are you today?
6      A.  Good.
7      Q.  Mr. Adams, first off let me ask you this:  If
8  you would, in your mind's eye, remember back Monday,
9  when everybody was here in a group, the things we talked
10 about, add to it this morning when y'all were in the
11 jury box the things we talked about this morning.  Out
12 of everything we have talked about so far, do you have
13 any questions at all for me?
14     A.  Not so far.
15     Q.  Is there anything up to now that we have not
16 yet talked about that you feel as though we should
17 address or confront because it might have some bearing
18 on your service as a juror in this case?
19     A.  Not that I know of.
20     Q.  Is there anything at all, sir, that you can
21 think of that you're aware at the present time, whether
22 it be something about your personal life, something
23 about your professional life, something about your
24 health, or anything else for that matter, that you can
25 think of that would in any way interfere with your

123

1  ability to be a juror in this case during the time frame
2  we've talked about?
3      A.   I don't know of any.
4      Q.   The rules we have set out, the things we talked
5  about that can come into play during the course of a
6  trial like this, any of them that you have found to be
7  objectionable in any way?
8      A.   No.
9      Q.   So that if you were a juror, then, if I'm
10 hearing you correctly, you would be both willing to
11 follow, as well as enforce those rules as a juror?
12     A.   That's correct.
13     Q.   The idea that -- and I know we have spent some
14 time today talking about the second aspect of a trial
15 such as this, which is not in any way meant to diminish
16 the first half of the trial, because you never get to
17 the second half unless there has been a finding of guilt
18 at the first half.
19          But can you see from the time we have
20 spent on each of the three decisions that a jury can be
21 called upon in a capital murder case are all independent
22 of each other?  The finding of guilt in the first phase,
23 if there is one, in and of itself does not dictate how
24 these two questions should be answered.  The finding of
25 guilt of capital murder, finding of yes as to Special

124

1  Issue number One, a future danger.  That is the jury's
2  verdict.  Those events, in and of themselves, do not
3  dictate what the answer to the second question should
4  be.  Are you okay with that?
5      A.   That's correct.
6      Q.   The idea being whatever results you reach,
7  would you commit to us that you would never reach it
8  until after all the evidence was in; and carefully, for
9  your own self, evaluate all that evidence in the case?
10     A.   Yes.
11     Q.   Before we start, have you any questions of me?
12     A.   Not yet.
13     Q.   Okay.
14          THE COURT:  Mr. McClellan.
15          MR. MCCLELLAN:  Thank you, Your Honor.
16              VOIR DIRE EXAMINATION
17 BY MR. MCCLELLAN:
18     Q.   Mr. Adams, my name is Lyn McClellan.  Along
19 with Claire Conners, we represent the State of Texas in
20 this case.  I want to go over your questionnaire, go
21 over some of your answers there, and talk to you about
22 certain aspects of the law that apply in a case like
23 this.  You filled out the questionnaire before you had
24 the benefit of the Judge's voir dire the other day, as
25 well as voir dire again today, and a lot of people

125

1  who -- just their general opinions about things may be
2  one way, but you were on a jury once before.  I think
3  you said an assault case?
4      A.   That's correct.
5      Q.   You know, having been on a jury, that if you
6  have certain opinions, you may, in order to be a juror,
7  have to set those aside and follow whatever the law and
8  evidence is in that particular case.
9      A.   That's correct.
10     Q.   Are you the type of person that can do that?
11     A.   Yes, I am.
12     Q.   Can you tell me something about that assault
13 case, if you remember anything about it, that you were
14 on several years ago?
15     A.   That was about twelve years ago.
16     Q.   Was it six people or twelve on the jury?  Do
17 you recall that?
18     A.   I believe that we had twelve and two
19 alternates.
20     Q.   Okay.  So it was an assault case.  Can you tell
21 me what the facts were?  Did somebody die?
22     A.   No.  I believe that it was an assault by
23 physical punching, I think.
24     Q.   Fistfight?
25     A.   Yeah, fistfight.

126

1      Q.   And injuries as a result of that?
2      A.   That is correct.
3      Q.   And you said you reached a verdict, and y'all
4  assessed punishment in the case?
5      A.   That is correct.
6      Q.   Do you remember what punishment you assessed?
7      A.   The party was found guilty, but I don't recall
8  how many -- I don't know what the sentence was.
9      Q.   You don't recall whether it was probation or
10 pen time or anything?
11     A.   I don't recall.
12     Q.   I assume there is nothing about that jury
13 service that would keep you from being -- that would
14 affect your service as a juror in a case like this?
15     A.   Again, that was just so long ago, and I don't
16 really recall a lot of the facts about the case.
17     Q.   All right.  There was a question in here, also,
18 that asked about, What is your feeling about the death
19 penalty?  And you said, I agree with the death penalty
20 for various crimes.  And then it asks you for your best
21 argument for the death penalty; and you listed murder,
22 rape with intent to kill, or rape of child.
23          As you now know, those are cases where the
24 death penalty doesn't apply.  The death penalty only
25 applies in the State of Texas when there is murder plus

127

1  some aggravating circumstance.  So murder by itself
2  doesn't qualify.  Rape with intent to kill doesn't
3  qualify.  If the person was killed during a rape, that
4  would qualify.  And rape of a child doesn't qualify for
5  the death penalty.  But there are a lot people who think
6  the death penalty should be expanded and include other
7  things.
8          You know from voir dire, from the Judge's
9  voir dire that in Texas, murder is the intentional
10 taking of another person's life without any legal
11 justification.  By this, I mean, we're not talking
12 self-defense.  We're not talking accident.  We're
13 talking intent to kill.  So the death penalty is only
14 available when that is then connected with some other
15 crime.
16         We have alleged in our indictment here
17 murder during a kidnapping.  That makes it a capital.
18 We also allege killing two or more people in one
19 criminal episode.  That makes it a capital.  Other types
20 of capital murder are murder during a robbery, murder
21 during a sexual assault, or burglary, killing a peace
22 officer in the line of duty, killing a child under a
23 certain age, all kinds of cases the Legislature said the
24 death penalty ought to be available; because there is no
25 one case, any case, where the death penalty is

128

1  automatic.  We don't have the automatic death.  We have
2  the death penalty that's available, depending on your
3  answers to the questions.
4          The Judge talked to you today about this.
5  Do you have any problem with the way the law is set up;
6  the death penalty is only available for murder plus some
7  aggravating circumstance?
8      A.  No, I do not have a problem with the law the
9  way it's set up.  And I did learn through the Judge in
10 his conversation with us exactly now what capital murder
11 is and how a capital murder trial is conducted,
12 resulting in another crime in addition.
13     Q.  Right.  And I assume you did not know that
14 prior?
15     A.  I did not.
16     Q.  And most people don't have any reason to know
17 that, because it's probably something they wouldn't come
18 in contact with?
19     A.  Right.
20     Q.  There was another question, also, in the
21 questionnaire that says, Do you believe that mitigating
22 evidence concerning a capital murder defendant's
23 background should be considered in deciding whether or
24 not he or she should receive the death penalty?  And you
25 checked no.  Now what did you think mitigating evidence

129

1  meant back when you were filling that out?
2      A.  I think I probably felt that special
3  circumstances occurred.
4      Q.  Now you know from the voir dire that in Issue
5  Number Two, you'll be directed to look and see if there
6  were mitigating circumstances; and they will be defined
7  as special circumstances.  They have them -- you have to
8  weigh and decide in your mind, are they such to change
9  your vote from death to life?  Are you open to looking
10 at mitigating evidence?   That is evidence that tends to
11 make you believe that life, as opposed to death, ought
12 to be the punishment.   Are you open to examining that
13 type of evidence?
14     A.  Yes, sir.
15     Q.  You wouldn't know whether it would be
16 sufficient to change your mind or not without knowing
17 what it was, and listen to all the evidence, and weigh
18 in your mind.  What we need to find out is that you
19 would give it that shot and you would give it that
20 consideration that the law's going to direct you do?
21     A.  That's right.  I think it's only fair to do
22 that.
23     Q.  Right.  It boils down to -- and some people
24 make fun when I say this.  But you're going to be asked,
25 as a juror, to take an oath to a true verdict render

130

1  based on the law and the evidence.  You don't know what
2  the law of capital murder that you're going to be given
3  is going to be.  A lot of that stuff the Judge talked
4  about is what he'll give you in the law; but you'll be
5  given a charge, as a juror, and it will have the law
6  that affects the case.  You'll be given two charges if
7  you found the defendant guilty, because then there will
8  be basically two small trials.
9          First you'll be given a charge about guilt
10 or innocence.  It tells you what the State must prove.
11 At the punishment stage of a trial you'll also be given
12 a charge, if you get to that stage; and it will tell you
13 how to answer the questions.  So, you'll have the law
14 and the charge you'll take back in the jury room.  Then
15 you have the evidence from the witness stand at guilt/
16 innocence, as well as punishment.  You'll have people
17 come in and testify.  You listen to what they have to
18 say, and you judge their credibility.  You believe what
19 you want to believe, disbelieve what you don't want to
20 believe, and then make your decision based upon the law
21 and the evidence.  Any reason you could not do that?
22     A.  No.
23     Q.  So what that means, then, is if you have some
24 preconceived idea -- you have an idea, well, if
25 someone -- if someone takes another person's life, they

131

1  ought to have to pay with their own life.  That's not
2  what this process is going to be about.  That may end up
3  resulting in that, but you may have to follow the law
4  that's from the evidence in the courtroom.  And if it
5  doesn't result in that, you got to be able to abide by
6  that decision that doesn't result in that.  Any problem
7  with that?
8      A.   No.
9      Q.   People say they're in favor of the death
10  penalty.  It's a proper punishment for certain types of
11  crimes; but some people have gone further and said, I
12  don't believe I could ever participate in a process
13  where I would be called upon to make a decision where I
14  knew it would result in this Judge ordering the
15  execution of this defendant on trial.  Do you have any
16  doubts about your ability to participate in that type
17  process and make that type of decision if that's what
18  the law and the evidence calls for?
19      A.   I wouldn't have a problem with that.
20      Q.   All right.  There is a statement that -- or an
21  answer to a question in here that I also wanted to
22  follow up on that was talking about drugs and the effect
23  of drugs on people.  It said, In your opinion, how do
24  illegal drugs affect a person.  You said, If they are
25  taking drugs, they are not of the right mind.  Okay.  So

132

1  by -- what do you mean by that?
2      A.   Not ever taking any drugs, I think it's just
3  more of something learned, or read, or that you heard,
4  or you're taught.
5      Q.   You're talking about the effect --
6      A.   The effects of the drugs.
7      Q.   -- will put you in a situation of --
8      A.   You may not be of the right mind.
9      Q.   Right, I understand.  And, of course, some
10  people say you're not of your right mind if you decide
11  to take drugs, because you're messing up things.  Do you
12  believe that a person who takes drugs, let's say is high
13  on drugs or alcohol -- I mean, you may hear in the trial
14  that person was high on drugs or alcohol that committed
15  a crime.  Some people say, I think that ought to mean
16  they're not responsible for the conduct.  Some people
17  say, well, I think you're responsible for your conduct
18  whether or not you're on drugs or not, as long as you're
19  not insane; in other words, you know right from wrong.
20  If you're not so far gone you couldn't tell right from
21  wrong, you ought to be responsible for your conduct
22  whether you're downing alcohol or whether you're
23  intoxicated with a controlled substance.  How do you
24  feel?
25      A.   I believe that everyone is responsible for

133

1  their actions.
2      Q.   Right.
3      A.   And if they're on drugs or alcohol or out in
4  space there somewheres because of the effects of these
5  drugs; and they commit a crime, or they do something
6  that is illegal, then I still think that they are
7  responsible for their actions.
8      Q.   Okay.  And that's what the law says.  Law says
9  that voluntary intoxication is not a defense.
10  Obviously, somebody slipped something into your drink or
11  something that you were having and you passed out or did
12  something and went on and drove off the road and killed
13  somebody or whatever, that might be a different
14  situation; but it's voluntary intoxication.  In other
15  words, when it's your decision to go ahead and take the
16  drugs or drink the alcohol, then you're still held
17  responsible for your conduct.  So what you're saying is
18  you agree with the law?
19      A.   That's correct.
20      Q.   The reason I'm having trouble, Mr. Adams, is
21  because due to your questionnaire, it appears you're the
22  type person who can listen to the evidence, make your
23  decision on what the evidence is, follow the law; and
24  that's what we're looking for, people that can follow
25  the law and the evidence.  Do you have any preconceived

134

1  notions coming into this case that, you know, what if I
2  find someone guilty of capital murder?  You know, my
3  automatic leaning is that they ought to get the death
4  penalty unless someone proved to me they shouldn't.  Do
5  you have any concept like that?
6      A.   I don't think a person should until they hear
7  everything, because we may find out some things that --
8  you know, I can't make a decision on something I haven't
9  heard.
10      Q.   Agree.  You're exactly right.  You'd be
11  surprised, though, the number of people that can, based
12  on what they tell us.  One thing, also -- well, when you
13  said that, it made me think of something, but I forgot.
14  But I'm sure Mr. Hill, who is a little more eloquent
15  than I, will think of it.
16          MR. MCCLELLAN:  I'll pass him.
17          THE COURT:  Mr. Hill, the pressure is on.
18              VOIR DIRE EXAMINATION
19  BY MR. HILL:
20      Q.   Hi, Mr. Adams, how are you?
21      A.   Hello, how are you?
22      Q.   I can't stand all these backhanded compliments
23  that I'm getting from McClellan, but I'll try to measure
24  up if I can.  I looked at your questionnaire.  I see a
25  lot of things that jump out at me.  If I'm only going to

135
1  look at you from a defense perspective, if I'm going to
2  look at you the way a typical defense lawyer looks at a
3  prospective juror and says, oh, my God, every answer, or
4  a lot of answers this guy gives seems to suggest he's
5  probably going to vote for death, if he's given the
6  opportunity, every time.  Okay.  And I think we do a
7  disservice to people if that's the way we judge them.
8        Obviously, I'm not going to shy away from
9  my responsibility to Mr. Mamou, and neither will
10  Mr. Wentz.  But I think it's only fair to give you an
11  opportunity to talk to us a little bit and kind of visit
12  on some of these topics; because ultimately, I'm going
13  to have to give either the thumbs up or thumbs down on
14  whether you're going to sit with eleven other people.
15  It's not going to be a reflection either way, or it
16  wouldn't be a reflection if I ultimately said, well, I'm
17  just not comfortable with having Mr. Adams on the case.
18  He would be a great person in every other case.  I
19  haven't made that decision yet.  I hope in visiting with
20  you a little bit, maybe I'll feel more comfortable with
21  whatever decision I am going to make.  Okay?
22        A.  Okay.
23        Q.  I don't mean to offend you.  I don't mean to
24  invade your privacy or anything; but I think you can
25  understand, given the magnitude of this case, I better

136
1  go ahead and ask some questions, even if they are tough
2  questions, to give you an opportunity to visit with me.
3        A.  Sure.
4        Q.  We hear all the time about the law says this;
5  you know, you can follow the law.  And people tend to
6  kind of get boxed in a little bit; and they feel as
7  though if they start objecting or saying they don't feel
8  comfortable with a particular law or aspect of the law,
9  that somehow they're not going to be perceived as a good
10  juror.  Maybe they feel like they're failing a civics
11  test.
12        I'll tell you right now, if I'm called
13  down for jury service and I find out the allegation is
14  something against a child, you know, if I'm going to be
15  honest with myself and I'm going to be honest with the
16  attorneys, I'm going to have to raise my hand.  I've got
17  three kids, very close to my children.  I'm sorry.  I
18  don't know that I could honestly set aside the feelings
19  that I have, having seen the kids from infancy to now,
20  one of them in college, two about to go off.  If our
21  system is going to work, I think I owe it to everybody
22  to let them know, let them call it the way they see.  If
23  they think, hey, we still want Hill on the jury, fine.
24  If they don't, I'll go on to the next case.  Talk to me
25  a little bit about your views on the death penalty.

137
1        If I'm sitting on the bench down at the
2  jury assembly room, we introduce one another to
3  ourselves and we're talking.  Are you telling me
4  about your views of the death penalty?  Are you telling
5  me about how you think of crime, in general?
6        A.  Okay.  Death penalty, to me, is very a touchy
7  subject.  I think it's an issue and opinion of a lot of
8  people.  To me the death penalty is a punishment that I
9  feel is necessary in our society for a lot of crimes
10  that are committed.
11        Q.  Okay.  If I'm playing devil's advocate and I'm
12  saying, well, gee, Mr. Adams, you know, I understand
13  that; but what about for people that -- maybe the way
14  the crime was committed; maybe the people knew one
15  another; maybe there was some circumstances there beyond
16  just the bare bones, one or two people were killed.
17  Don't you think that circumstances sometimes can kind of
18  help explain how a situation occurs?
19        A.  You bet.  I still feel like whatever is heard
20  in trial, I think that would depend on the sentence
21  given.
22        Q.  Okay.  Could we both agree that the
23  circumstances of a crime may require us both to find
24  that person guilty, hold them responsible for their
25  conduct, yet you and I may disagree as to what the

138
1  eventual sentence should be?
2        A.  That's correct, we could disagree.
3        Q.  Okay.
4        A.  But we might have found the same -- we may have
5  ended up with the same result, as far as all the
6  evidence led to a guilty verdict.
7        Q.  Right.  Okay.  So it's critical for me to make
8  sure, and I really don't have any serious concern about
9  you understanding that there are potentially -- and I
10  underline potentially -- separate trials we're talking
11  about here.
12        The first trial is:  Has the State proven
13  beyond a reasonable doubt my client committed any crime?
14  And the Judge just told you you could listen to all the
15  facts and circumstances, and maybe you didn't feel like
16  the State had proven all the elements of a capital
17  murder; but you do believe that maybe some other crime
18  included within that murder or kidnapping was committed.
19  So, that would be a situation where we might look at the
20  evidence and ultimately conclude, yes, he is responsible
21  legally for what he did.  No self-defense.  No accident.
22  No mistake.  Nothing that absolves him of criminal
23  responsibility.
24        We now move to the second trial that says,
25  okay, now you've got this guy that's been found guilty.

139

1  What do we do with him?  Do we give him life, do we
2  give him death, if it's a capital murder case?  You're
3  sitting there and you're saying, look, I'm being asked
4  to make a life and death decision no matter how you cut
5  it, no matter if you say you don't really do it.  You
6  know what's going to happen.  We told you what's going
7  to happen in terms of your answers.
8       A.   Right.
9       Q.   What do you want to hear before you make that
10  kind of decision?  What is the totality of the evidence
11  or the facts?  What's going to make you feel most
12  comfortable before you make a decision?
13      A.   I think, if I'm hearing this correctly, this
14  will come into the second part of the trial --
15      Q.   Correct.
16      A.   -- that I'm going to hear that.  I'm going to
17  hear additional information that leads to the character
18  or the who, how this person was brought up, how or where
19  they lived, just all the circumstances, more information
20  that may help me make the determination of whether it's
21  death or life.
22      Q.   Is that what you want?
23      A.   I do.  I mean, I really want to know before I
24  make that final decision.  See, I think there is a
25  difference between us sitting down maybe over a cup of

140

1  coffee in a cafeteria and talking about social issues
2  and when you're sitting in one of these twelve chairs
3  and you've got to really do the decision making.  I
4  might have very strong feelings that may not be
5  reflective of what a defense attorney typically thinks.
6  But when I sit on this jury, I have to go ahead and do
7  exactly what my conscience tells me to do based upon my
8  thorough review of all the evidence and what instruction
9  the Judge gives me.
10          The Judge tells me if the State leaves out
11  a particular aspect of the evidence and they don't prove
12  something, I can't make it up for him.  I can't say,
13  well, gee, this was a horrible, gut-wrenching decision;
14  but I'm going to go ahead -- and I kind of forgot what
15  my oath is -- and I'm going to go ahead and find them
16  guilty anyway.  I'm not looking for additional
17  information.  I mean, I know there is a cutoff point,
18  and that's all you're doing here.
19      Q.   Yeah, at some point the evidence is going to
20  stop.
21      Q.   There are some cases where you're sitting there
22  saying, gee, I wish I would have heard something more.
23  We, as attorneys, we may ask all the questions that we
24  think gets to the point.  And it often happens we go
25  back and talk to the jurors; and they say, Why didn't

141

1  you ask this?  And I'm, like, I didn't think it was
2  important.  I thought it was clear from my questioning.
3  So that could happen.
4           One of the things -- you mentioned a
5  person's upbringing, childhood and stuff, to know all of
6  that before making an evaluation.  I want to make sure
7  you're not having twelve people who are sitting on the
8  jury and are saying things like, oh, you know, the
9  defense lawyer, he's going to tell us that Johnny didn't
10  have a cookie everyday at lunch, and that's how come
11  we're here.  We're not trivializing that type of
12  situation.  We're not talking about that type of
13  situation.  We're talking about knowing as much as you
14  can about a person that you're going to sentence.  And I
15  take it from your response, you would want that
16  information.  You would want to have as much information
17  as is available before you make a decision.  Is that
18  pretty much what it comes down to?
19      A.   That is correct.
20      Q.   I notice you have a fifteen-year-old?
21      A.   That's correct.
22      Q.   And he's over at Welch?
23      A.   Yes.
24      Q.   Both lawyers?
25      A.   Right.

142

1       Q.   Do you have custody of your son?
2       A.   Yes, I do.  In fact, I adopted him two years
3  ago.
4       Q.   Okay.  Let me ask you this:  Are there
5  extracurricular activities he's engaged in?
6       A.   Isn't at the time.  He likes baseball, but I
7  haven't signed him up yet.
8       Q.   Does he play with Westbury Little League?
9       A.   He's not playing at all yet.
10      Q.   What kind of questions -- it's only fair you
11  get to ask some questions, if you have any.  We get to
12  ask you all these questions, make you sit there,
13  probably feel like, jeez, when is this going to stop?
14  But what questions do you have of me?
15      A.   Well, I really don't right now.
16      Q.   That's okay.  I just feel like it's fair to
17  give you an opportunity if you do.  Here, one thing
18  that if I put on my defense attorney hat for a minute --
19  and we lawyers generally tend to read things and read
20  them very literally, and they start getting nervous
21  about things.  So I'm going to read this answer you gave
22  and just ask you one part of it.
23          It says, What is your opinion of -- and it
24  says prosecutors?  You admire them because they are
25  trying to bring justice to the society.  Defense

143

1    attorneys.  I respect them because they have a job to
2    do, to defend a person until they are found guilty.
3    What do you think about your answer there concerns me?
4        A.  Probably the part that "until they are found
5    guilty."
6        Q.  What were you thinking as you responded to that
7    question?  Help me understand that answer.
8        A.  I think just -- where I was heading with that
9    is that you have a job do, just like we all do.  And no
10   matter how, no matter what you feel about the case or
11   what evidence is brought, I believe that you, with all
12   of your ability, have to defend this person.  And it
13   only goes up until the time that the trial or the case
14   is over, and then you move on.
15       Q.  Here is my concern.  I'll be honest with you.
16   You said, "until they're found guilty."  And I'm sitting
17   there going, oh, my God.  If he and eleven others find
18   Mr. Mamou guilty, we've got a punishment stage still.
19   And it's like, what's the point?  You see?
20       A.  I mean, after the whole trial.
21       Q.  So now we know what the law requires and what
22   the process requires.  I want to ask you this:  I want
23   to know your feelings.  I want to know whether you still
24   feel that, quote, "special circumstances or mitigation"
25   really doesn't play a part in evaluating a life or death

144

1    decision?
2        A.  I do believe it does now.  I think I probably
3    didn't say that in there, but I've learned a lot in this
4    process just over the last few days.  I do believe you
5    have to listen to everything involved in the case.
6        Q.  When you answered that question -- in all
7    fairness to you, when you answered that question, were
8    you thinking along the lines of, well, I don't want to
9    know information; I don't think any information is
10   really relevant to the punishment decision?
11       A.  No.  I guess I was really thinking that a lot
12   of times I know that people try to say that because of
13   how they grew up, how they lived in low income, or
14   didn't have the money or whatever.
15       Q.  Right.
16       A.  They turn out bad, or they do bad things, or
17   they're found guilty of this or that.  But then it's a
18   lot of other people who were raised that same way, and
19   they didn't turn out that way.  So, I'm just saying
20   there always are circumstances, depending on that person
21   and what happened in their lives as they were growing
22   up.
23       Q.  Let me throw this one out at you, because I
24   think it kind of underscores where I'm coming from and
25   what I think jurors really believe if they personalize

145

1    it to themselves.  How does this sound?  You do the
2    crime, you've got to do the time.  Does that sound like
3    a cliche that everybody is comfortable with?
4        A.  Well, you always hear that.
5        Q.  Let me ask you this one:  Do you think
6    everybody that commits the same crime should be treated
7    the same?
8        A.  No.
9        Q.  Here's the follow-up to it.  I'm your lawyer,
10   and you have just been found guilty of capital murder.
11   And we're sitting at counsel table and, of course, this
12   would have been discussed before this point in
13   preparation.  And I say, okay, great.  You know, they
14   found you guilty of capital murder.  What do you want
15   them to know about it?  What would you think if you had
16   twelve people sitting up here saying, Doesn't matter
17   about Greg's background.  What difference does that
18   make?  We don't need to hear anything about him.  He's
19   already committed capital murder.  How would you feel
20   being judged by twelve people like that?
21       A.  I think I would want them to know as much as
22   they can about how I was raised and the circumstances of
23   maybe why I didn't turn out to be a good citizen or a
24   good person.
25       Q.  Would you want them to know as much about you

146

1    as possible before they had to make a personal decision
2    whether you live or die?
3        A.  I think I would, yes.
4        Q.  You don't find anything offensive about that;
5    that you, yourself, if you were on trial, would at least
6    want the jury to know about you and have whatever
7    information they felt -- you know, they may find all the
8    information about you is totally irrelevant.
9        A.  I think it's -- sir, let me try to explain
10   this.  I think that there are reasons in a person's
11   upbringing why things happen, but I believe that the
12   jury -- or I think I could decide whether or not -- I
13   know I don't make this decision; but whether it's a
14   twenty-year punishment, or forty-year punishment, or
15   sixty-year punishment is based on a lot of things.
16       Q.  Right, you determine what factors are
17   important.
18       A.  I do.
19       Q.  Last chance.  Any questions?
20       A.  No, I don't.
21       Q.  Thanks?
22           THE COURT:  Thank you.
23           (Court admonishes prospective juror.)
24
25

147

```
1    THE STATE OF TEXAS  )

2    COUNTY OF HARRIS    )

3              I, Pamela Kay Knobloch, Official/Deputy
     Official Court Reporter in and for the 179th District
4    Court of Harris County, State of Texas, do hereby certify
     that the above and foregoing contains a true and correct
5    transcription of all portions of evidence and other
     proceedings requested in writing by counsel for the
6    parties to be included in this volume of the Reporter's
     Record, in the above-styled and numbered cause, all of
7    which occurred in open court or in chambers and were
     reported by me.

8
               I further certify that this Reporter's Record
9    of the proceedings truly and correctly reflects the
     exhibits, if any, admitted by the respective parties.

10
               I further certify that the total cost for the
11   preparation of this Reporter's Record is $_____ and
     was paid by Harris County.

12
               WITNESS MY OFFICIAL HAND this the _____ day of
13   _____, 2000.

14

15
     _____
16   Pamela Kay Knobloch, Texas CSR No. 1650
     Expiration date:  12/31/2000
17   Official Court Reporter, 179th District Court
     Harris County, Texas
18   301 San Jacinto
     Houston, Texas 77002
19   713.755.6340

20   APPELLANT:  CHARLES MAMOU, JR.
                 CAUSE NO. 800112
21

22
23
24
25
```

**$**

**$10,000** [1] 33:17
**$340** [1] 50:12
**$** [1] 147:11

**0**

**0470500** [1] 2:5

**1**

**1** [1] 95:22
**12/31/2000** [1] 147:16
**13396100** [1] 2:3
**1650** [1] 147:16
**16th** [1] 1:18 54:8
**179th** [3] 1:11 147:3 147:17
**1960** [1] 2:19
**1998** [1] 4:10
**1999** [3] 1:18 29:8 45:9

**2**

**2** [2] 67:17 95:25
**2000** [1] 147:13
**201** [1] 2:7
**2039** [2] 29:9 29:25
**21179300** [1] 2:4
**25** [1] 1:2
**281.587.0088** [1] 2:21
**29th** [6] 46:21 80:6 80:10 81:15 81:17 121:24

**3**

**301** [1] 147:16

**4**

**4615** [1] 2:14
**4th** [1] 46:24

**5**

**5629** [1] 2:19
**59656300** [1] 2:13

**6**

**65** [1] 52:6
**69** [1] 3:3

**7**

**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 147:19
**74** [1] 3:3
**77002** [2] 2:8 147:18
**77027** [1] 2:15
**77069** [1] 2:20
**7th** [1] 4:10

**8**

**800112** [2] 1:3 147:20
**8:00** [1] 19:6

**9**

**9** [1] 1:2
**9:30** [2] 81:17 81:18

**[1]** 147:12

**[1]** 147:15

**A**

**Aberration** [1] 93:6
**Abide** [1] 131:5

**Abilities** [1] 90:20
**Ability** [8] 53:25 55:21 60:11 61:2 82:23 123:1 131:16 143:12
**Able** [12] 19:12 44:15 46:14 50:16 54:16 74:12 88:3 92:4 101:20 104:12 104:18 131:5
**Above-entitled** [1] 1:19
**Above-styled** [1] 147:6
**Absolute** [1] 30:9
**Absolutely** [12] 4:20 13:2 22:16 26:14 27:23 38:19 39:15 67:21 68:1 78:14 110:24 112:20
**Absolves** [1] 138:22
**Abstain** [3] 108:25 109:1 109:2
**Accident** [6] 31:11 72:12 90:13 113:6 127:12 138:21
**Accidental** [1] 105:17
**Accidentally** [1] 113:11
**Accomplish** [1] 81:5
**According** [1] 115:2
**Accounted** [1] 108:21
**Accused** [2] 11:6 109:13
**Achieve** [1] 109:15
**Act** [3] 17:17 17:18 93:4
**Acted** [3] 113:5 114:2 115:3
**Actions** [4] 63:25 64:17 133:1 133:7
**Active** [1] 71:5 71:5
**Activities** [3] 71:11 71:16 142:5
**Acts** [26] 9:3 16:8 16:9 17:5 17:20 17:22 17:24 18:1 18:4 18:7 18:12 19:9 19:14 19:18 19:24 20:6 65:19 91:13 91:15 92:2 92:22 93:23 94:16 95:12 97:22 106:8
**Actual** [1] 110:10
**Adams** [7] 122:1 122:7 124:18 133:20 134:20 135:17 137:1
**Add** [3] 53:10 117:21 122:10
**Adding** [1] 46:2
**Addition** [1] 128:12
**Additional** [4] 56:12 90:18 139:17 140:16
**Address** [2] 26:23 122:17
**Addressed** [4] 46:8 82:15 118:1 118:18
**Addressing** [1] 109:16
**Adequately** [1] 109:17
**Administrators** [1] 19:22
**Admire** [1] 142:24
**Admitted** [1] 147:9
**Admonishes** [2] 117:10 146:23
**Admonishments** [1] 121:25
**Adopted** [1] 142:2
**Advisor/counsel** [1] 71:7
**Advocate** [1] 137:11
**Affairs** [1] 71:3
**Affect** [6] 55:21 56:14 79:2 119:12 126:14 131:24
**Affected** [3] 81:9 99:6 99:11
**Affects** [1] 130:6
**Afraid** [1] 62:23
**Age** [4] 24:2 27:6 96:18 96:20 127:23
**Aggies** [1] 75:19
**Aggravating** [3] 68:23 127:1 128:7
**Ago** [10] 23:1 63:8 63:11

**10:15** [1] 95:11 95:11 128:14
**125:15 126:15 142:3**
**Agree** [11] 11:13 38:21 49:10 99:24 99:24 104:7 111:18 126:19 133:18 134:10 137:22
**Agree/disagree** [1] 67:15
**Agreed** [2] 67:17 100:2
**Agreement** [10] 3:2 3:4 3:6 3:8 3:11 3:15 52:4 52:6 52:8 52:21
**Ahead** [5] 133:15 136:1 140:6 140:14 140:15
**Aided** [1] 1:22
**Aids** [1] 19:20
**Alcohol** [8] 95:21 95:24 96:2 132:13 132:14 132:22 133:3 133:16
**Alike** [1] 85:25
**ALLAN** [1] 45:21
**Allegation** [4] 31:6 103:18 111:18 136:13
**Allegations** [1] 72:8
**Allege** [1] 127:18
**Alleged** [5] 4:9 74:11 88:23 88:25 127:16
**Allegedly** [1] 59:20
**Allow** [1] 79:1
**Allowed** [1] 114:21
**Almost** [1] 75:20
**Alone** [1] 83:19
**Alternates** [1] 125:19
**Alternatively** [1] 103:17
**Amount** [1] 33:16
**Anger** [1] 35:11
**Anna** [1] 3:4
**Answer** [75] 6:9 8:15 9:8 10:9 10:10 10:11 10:12 14:1 14:9 14:16 14:17 14:21 14:22 15:3 15:5 17:6 17:11 20:11 20:14 20:16 20:21 21:22 21:25 22:5 22:9 25:8 25:9 25:10 25:13 26:1 26:5 26:9 26:10 26:14 27:1 27:3 28:10 28:11 28:14 28:16 28:17 30:14 30:24 45:2 47:11 49:7 68:15 68:18 72:15 78:16 78:19 84:2 84:23 90:7 90:2 90:23 92:4 92:11 92:14 92:16 92:19 93:25 94:3 105:2 110:1 112:25 118:15 124:3 130:13 131:21 135:3 142:1 143:3 143:7
**Answered** [15] 10:13 13:25 14:15 21:3 26:13 49:5 55:3 78:16 98:9 98:10 105:18 105:23 123:24 144:6 144:7
**Answering** [5] 10:23 67:8 69:25 87:16 91:4
**Answers** [15] 9:6 10:2 10:2 10:3 11:1 22:12 22:13 29:4 72:16 85:12 109:14 124:21 128:3 135:4 139:7
**Anticipating** [1] 54:12
**Anytime** [3] 14:6 32:7 111:19
**Anyway** [24] 3:140:16
**Apartment** [1] 27:25
**Apologize** [1] 44:7
**Apparent** [1] 88:12
**Appeal** [6] 58:25 59:1 59:1 109:13 109:20 110:6
**Appellant** [2] 1:6 147:20
**Appellee** [1] 1:11
**Applied** [3] 68:6 68:10 100:6
**Applies** [1] 126:25
**Apply** [7] 5:2 26:7 85:14 89:4 100:4 124:22 126:24
**Appreciate** [3] 51:5 69:4 69:14
**Appropriate** [18] 9:24 12:

**10** [1] 37:5 37:14 49:16 74:13 84:5 86:6 86:16 87:15 98:19 107:8 112:24 120:8 120:12 121:13
**Area** [3] 7:20 40:4 75:11
**Argument** [7] 64:25 87:4 108:10 108:12 108:14 113:1 126:21
**Arm** [1] 4:21
**Armed** [1] 8:14
**Arose** [1] 93:9
**Arrest** [1] 42:24
**Arrested** [1] 43:1
**Arrived** [1] 97:8
**Arson** [1] 17:24
**Aside** [9] 31:3 87:23 104:2 104:8 104:9 104:12 104:19 125:7 136:18
**Asleep** [1] 35:3
**Aspect** [9] 27:17 38:14 39:24 89:14 95:3 96:10 123:14 136:8 140:11
**Aspects** [3] 56:10 85:13 124:22
**Assault** [5] 125:3 125:12 125:20 125:22 127:21 125:3
**Assaults** [1] 17:21
**Assembly** [1] 137:2
**Assess** [3] 33:20 78:7 90:8
**Assessed** [3] 30:25 126:4 126:6
**Assessing** [3] 36:10 37:6 109:11
**Assessment** [1] 107:18
**Assistant** [2] 2:6 4:4
**Assisting** [1] 12:17
**Assume** [6] 57:11 64:18 70:25 115:11 126:12 128:13
**Assuming** [1] 108:15
**Assure** [1] 51:25
**Attack** [1] 114:19
**Attend** [3] 61:22 61:24 61:25
**Attendance** [1] 71:2
**Attention** [4] 28:4 47:8 51:18 51:25
**Attorney** [4] 72:25 75:4 140:5 142:18
**Attorneys** [8] 2:6 2:10 2:22 4:1 4:4 136:16 140:23 143:1
**Audiological** [1] 76:18
**Authorities** [2] 29:15 29:17
**Automatic** [7] 87:11 108:1 108:3 108:12 128:1 128:1 134:3
**Automatically** [2] 84:22 110:12
**Automobile** [1] 18:6
**Available** [16] 36:16 37:22 59:24 68:16 68:19 68:22 68:22 68:24 68:8 77:88:18 89:9 127:14 127:24 128:2 128:6 141:17
**Avoid** [2] 78:2 80:24
**Aware** [2] 77:7 122:21
**Awful** [1] 33:19

**B**

**Baby** [1] 16:18
**Background** [11] 8:10 9:14 37:1 65:24 90:19 92:18 93:2 94:11 101:2 128:23 145:17
**Backhanded** [1] 134:22
**Bad** [5] 92:12 99:11 106:8 144:16 144:16
**Bag** [2] 39:13 39:16

**Ballistics** [1] 42:25
**Band** [1] 75:13
**Bank** [8] 38:21 38:22 38:22 38:23 38:24 39:13 39:15 41:22
**Bare** [1] 137:16
**Barr** [6] 82:1 82:7 85:9 102:7 108:7 117:9
**Barroom** [1] 114:5
**Base** [1] 75:12
**Baseball** [2] 18:5 142:6
**Based** [22] 29:21 29:22 30:14 36:8 36:12 37:11 43:4 66:14 73:9 78:20 81:7 83:9 86:5 88:1 91:24 115:5 118:10 130:1 130:20 134:11 140:7 146:15
**Basis** [3] 28:19 37:19 76:17
**Bat** [1] 18:5
**Batter** [1] 106:5
**Bearing** [6] 26:14 46:9 53:17 82:16 118:2 122:17
**Bears** [1] 79:19
**Beating** [1] 18:6
**Become** [2] 29:11 81:6
**Begin** [7] 5:5 46:24 49:1 49:21 53:7 55:24 85:3
**Beginning** [5] 11:3 11:24 11:25 15:1 109:25
**Begins** [5] 7:5 7:12 11:5 45:14 45:16
**Behind** [4] 19:4 19:7 19:10 19:17
**Belief** [2] 50:19 87:22
**Beliefs** [5] 56:10 56:13 102:23 105:8 119:19
**Believability** [1] 43:10
**Believable** [2] 5:2 5:3
**Believes** [2] 37:4 41:4
**Belong** [1] 55:8
**Bench** [1] 137:1
**Benefit** [2] 85:16 124:24
**Best** [13] 41:7 47:16 47:19 64:25 87:4 99:1 99:3 99:6 105:4 109:15 111:11 112:18 126:20
**Bet** [1] 137:19
**Better** [6] 8:14 8:14 8:15 33:22 56:13 135:25
**Between** [11] 3:2 11:5 18:24 52:6 74:18 74:20 80:16 80:20 80:24 97:2 139:25
**Beyond** [39] 9:1 11:10 11:19 12:7 13:14 13:21 13:24 14:5 14:7 14:13 14:15 15:4 15:7 17:3 18:9 21:18 22:2 25:23 32:5 32:8 32:16 39:10 40:23 41:4 42:8 43:6 43:17 44:3 65:17 78:14 91:7 91:8 91:25 95:10 98:6 110:3 110:24 137:15 138:13
**Bible** [1] 71:16
**Bill** [3] 103:5 107:25 108:2
**Bills** [3] 51:11 107:24 108:23
**Bind** [2] 46:15 50:17
**Bit** [11] 5:7 10:23 26:21 71:1 75:10 80:17 121:11 135:1 135:20 136:6 136:25
**Bizarre** [1] 104:20
**Blank** [1] 112:24
**Bleeding** [1] 42:21
**Blood** [1] 76:7
**Board** [5] 8:22 29:18 29:19 29:20 100:7
**Bob** [1] 1:20
**Bodies** [1] 90:24
**Body** [1] 43:3
**Boils** [1] 129:23

**Bones** [1] 137:16
**Boot** [1] 67:3
**Borderline** [1] 24:12
**Bother** [1] 78:3
**Box** [1] 122:11
**Boxed** [1] 136:6
**Brand** [1] 12:3
**Brand-new** [1] 12:2
**Brands** [1] 40:5
**Break** [1] 94:25
**Breaking** [3] 18:2 18:2 18:3
**Breath** [1] 30:9
**Brick** [1] 18:5
**Briefly** [1] 8:19
**Bring** [4] 14:23 20:15 44:10 142:25
**Broke** [1] 98:23
**Brought** [4] 3:20 103:19 139:18 143:11
**Brown** [1] 42:7
**Buds** [1] 42:17
**Building** [1] 17:25
**Bullet** [1] 43:2
**Bumped** [1] 12:11
**Bumps** [1] 14:10
**Burden** [1] 91:9
**Burdette** [1] 1:20
**Burglaries** [1] 18:2
**Burglary** [2] 91:16 127:21
**Burning** [2] 17:25 17:25
**Business** [9] 13:2 20:22 31:2 48:19 76:3 76:9 76:11 76:12 76:13
**Buying** [1] 38:4
**Byrum** [1] 3:3

## C

**Cafeteria** [1] 140:1
**Calendar** [1] 29:8
**Camp** [2] 67:3 71:14
**Camps** [1] 71:13
**Cannot** [6] 15:21 16:2 29:6 38:17 81:9 89:22
**Cantu** [5] 117:11 117:17 118:19 119:6 121:21
**Capital** [94] 4:8 6:6 6:18 7:18 8:4 10:21 11:4 11:20 11:21 11:24 12:1 12:4 15:1 17:9 17:20 20:24 21:5 25:24 26:3 28:22 29:3 31:2 31:4 31:5 31:15 32:2 32:12 33:1 33:4 33:10 35:19 35:23 36:23 36:23 49:6 49:18 55:1 65:14 65:15 69:22 69:23 72:14 73:18 77:16 78:2 78:9 83:18 84:10 87:14 88:14 88:16 88:17 88:21 89:18 89:23 90:3 90:10 90:10 91:2 91:14 92:8 92:10 92:21 93:5 93:19 94:1 95:6 96:3 97:20 98:7 100:11 100:10 100:12 101:2 108:1 108:3 116:15 118:12 121:8 123:21 123:25 127:17 127:19 127:20 128:10 128:11 128:22 130:2 134:2 138:16 139:2 145:10 145:14 145:19
**Car** [3] 38:4 38:5 38:6 38:7 38:23 38:24 62:24
**Care** [3] 40:19 40:25 81:13
**Carefully** [2] 121:12 124:8
**Cares** [1] 40:21
**Carmouche** [3] 55:3 55:4 56:17
**Carried** [1] 65:1
**Carved** [1] 33:3
**Case** [157] 3:24 7:17 9:5 9:20 10:22 11:4 11:20 14:21

14:24 19:16 20:12 21:12 22:6 22:17 22:20 22:22 23:3 23:4 23:6 23:7 23:18 24:5 24:5 24:23 21 25:4 25:7 25:21 25:21 26:8 26:21 27:5 27:8 27:9 28:4 28:13 28:20 30:15 33:15 34:3 34:9 34:11 34:14 34:20 35:1 36:14 37:9 37:11 37:20 39:22 40:20 40:20 40:22 41:1 43:6 43:13 43:15 44:21 46:10 47:5 47:24 49:13 49:15 53:18 53:25 55:1 55:1 55:22 56:8 56:14 57:23 63:10 63:2 65:15 66:15 69:22 70:11 70:12 70:15 70:17 70:24 73:19 73:22 73:23 77:16 80:15 80:21 80:22 80:24 80:25 81:1 81:2 81:6 82:24 83:9 83:25 84:3 84:6 84:12 84:16 85:11 85:14 85:24 85:25 86:4 86:7 86:15 87:12 89:5 89:10 89:14 90:3 90:6 92:23 98:5 99:20 104:3 104:7 104:10 104:16 105:2 107:5 107:7 108:21 111:6 118:3 118:4 118:5 118:11 118:15 118:24 119:9 119:25 121:7 122:18 123:1 123:21 124:9 124:20 124:22 125:3 125:8 125:13 125:20 126:4 126:14 126:16 127:25 127:25 130:6 134:1 135:17 135:18 135:25 136:24 139:2 143:10 143:13 144:5
**Cases** [25] 22:15 70:14 73:17 84:22 86:1 86:4 87:13 88:5 88:6 88:9 92:7 92:12 92:15 104:8 104:11 104:21 105:5 108:15 110:23 112:23 120:9 120:11 126:23 127:23 140:21
**Cast** [1] 109:4
**Category** [5] 17:16 17:16 17:17 18:8 18:11
**Caught** [1] 39:2
**Caused** [2] 76:5 93:10
**Causes** [2] 69:16 83:4
**Center** [1] 76:7
**Certain** [7] 16:4 17:16 18:1 36:19 36:19 51:22 56:10 60:5 60:5 85:13 92:7 103:24 120:8 124:22 125:6 127:23 131:10
**Certainly** [4] 17:9 17:20 19:5 44:20
**Certainty** [4] 16:2 16:17 17:1 91:11
**Certify** [3] 147:4 147:8 147:10
**Chair** [1] 111:24
**Chairs** [2] 70:19 140:2
**Chambers** [1] 147:7
**Chance** [5] 19:25 34:2 66:12 67:2 146:19
**Change** [7] 66:3 80:17 94:21 95:13 97:12 129:8 129:16
**Character** [9] 8:10 9:14 37:1 65:24 79:9 90:19 92:17 93:2 139:17
**Charge** [10] 4:23 5:22 12:15 15:18 29:1 40:3 130:5 130:9 130:12 130:14
**Charged** [7] 4:7 72:5 72:8 103:15 111:17 111:20 121:8
**Charges** [1] 130:6
**Charles** [4] 1:5 3:24 55:2 147:20
**Checked** [11] 63:23 67:17 67:21 68:11 68:12 101:4 119:11 119:15 119:21 119:22 128:25
**Checking** [1] 119:17
**Child** [4] 126:22 127:4 127:22 136:14
**Childhood** [1] 141:5
**Children** [4] 73:22 105:6 105:13 136:11

**Choice** [2] 10:4 10:15
**Choir** [1] 71:5
**Choirboy** [1] 93:3
**Chomping** [1] 121:11
**Choose** [9] 37:18 37:18 60:22 72:25 87:5 103:5 108:8 108:9 121:6
**Chooses** [1] 31:13
**Chosen** [7] 61:5 63:16 63:17 69:22 70:4 70:14 121:12
**Church** [6] 71:1 71:3 71:4 71:23 71:25 75:14
**Circumstance** [9] 9:22 22:17 36:19 51:20 68:23 94:18 98:3 127:1 128:7
**Circumstances** [46] 6:24 9:12 9:22 27:13 33:25 34:15 34:16 34:17 36:17 37:11 43:5 57:10 57:25 58:2 58:4 61:5 15 69:15 77:8 85:24 86:3 86:5 86:17 93:9 93:11 94:10 94:18 97:10 97:11 97:13 100:14 106:24 107:5 107:6 108:19 114:4 129:3 129:6 129:7 137:5 137:17 137:23 138:15 139:19 143:24 144:20 145:22
**Circumstantial** [15] 40:7 40:13 40:13 40:14 40:17 40:21 41:6 41:13 41:14 42:1 43:10 43:16 43:20 44:3 44:4
**Citizen** [4] 25:19 70:6 70:9 145:23
**Citizens** [1] 20:7
**Civic** [1] 50:24
**Civics** [1] 136:10
**Civil** [1] 70:15
**Claim** [2] 31:20 42:12
**Claimed** [1] 31:23
**Claire** [6] 2:4 4:5 56:7 85:10 119:8 124:19
**Class** [1] 19:8
**Clear** [4] 110:14 112:20 113:3 141:2
**Clever** [1] 38:25
**Cliche** [1] 145:3
**Click** [1] 77:9
**Client** [2] 111:25 138:13
**Close** [3] 63:5 105:2 136:17
**Coconspirator** [4] 38:18 39:8 39:14 39:19
**Coconspirators** [1] 38:17
**Coffee** [1] 140:1
**Coin** [1] 47:7
**College** [1] 136:20
**Comfortable** [10] 18:23 79:14 89:21 92:23 93:18 135:17 135:20 136:8 139:12 145:3
**Coming** [4] 25:19 69:21 134:1 144:24
**Comment** [4] 38:8 105:11 109:25 116:1
**Comments** [2] 102:11 103:20
**Commission** [9] 8:11 10:21 31:18 32:20 39:9 39:12 39:18 94:15 97:3
**Commit** [27] 5:25 9:2 16:8 17:5 17:8 17:13 17:16 18:10 24:2 24:19 24:22 28:12 38:15 65:18 91:13 92:2 92:22 93:22 95:11 96:3 97:1 97:21 98:6 107:25 111:3 124:7 133:5
**Commits** [5] 65:12 95:15 97:6 102:24 145:6
**Committed** [21] 7:23 8:13 8:13 11:6 31:20 31:23 39:11 40:10 42:10 43:8 59:21 59:23 65:10 72:7 95:21 96:21 116:23 132:14 137:10 137:14 138:13 138:18 145:19

**Committing** [2] 31:21 93:11
**Common** [1] 47:9
**Communities** [2] 19:1 19:2
**Community** [2] 18:25 42:15
**Company** [1] 76:13
**Comparative** [3] 5:4 8:10 23:20
**Comparison** [1] 15:19
**Competing** [1] 51:16
**Completely** [2] 45:13 79:15
**Compliments** [1] 134:22
**Comprehensive** [1] 69:13
**Computer** [1] 1:22
**Conceivable** [1] 7:10
**Conceivably** [1] 7:5
**Concept** [2] 38:14 134:5
**Concern** [5] 51:7 78:21 115:21 138:8 143:15
**Concerned** [4] 3:4 48:15 51:10 51:17
**Concerning** [2] 101:2 128:22
**Concerns** [2] 112:25 143:3
**Conclude** [2] 18:12 130:20
**Concluded** [1] 110:3
**Concludes** [1] 45:14
**Conclusion** [5] 8:17 11:20 19:11 29:10 30:6
**Condition** [1] 42:11
**Conditioned** [2] 34:13 41:9
**Conditions** [1] 37:15
**Conduct** [14] 18:8 27:18 28:3 31:5 31:13 74:10 101:10 101:13 101:14 132:16 132:17 132:21 133:17 137:25
**Conducted** [1] 128:11
**Confesses** [1] 40:10
**Confined** [1] 19:23
**Confinement** [4] 33:11 33:12 36:11 37:7
**Confront** [2] 75:5 122:17
**Confuse** [1] 115:21
**Confused** [1] 113:24
**Confusing** [1] 116:10
**Congregate** [1] 72:1
**Connect** [3] 39:9 39:12 39:17
**Connected** [1] 127:14
**Connection** [2] 96:4 97:2 119:9 124:19
**Conners** [4] 56:7 85:10
**Connors** [4] 2:4 4:5 52:10 52:11
**Connors'** [1] 3:8
**Conscience** [1] 140:7
**Consequences** [2] 57:16 57:18
**Conservative** [2] 107:17 107:19
**Consider** [16] 18:22 24:23 26:16 35:18 36:10 36:19 37:6 38:8 48:14 49:12 66:15 66:25 67:9 67:9 70:8 101:21
**Consideration** [12] 9:11 25:2 26:7 27:13 28:13 28:15 28:17 46:1 94:9 105:20 108:24 129:20
**Considerations** [1] 63:21
**Considered** [5] 29:11 101:3 101:11 109:11 128:23
**Considering** [1] 84:18
**Consistent** [1] 23:11
**Consistently** [1] 21:10
**Conspire** [1] 38:15
**Constitute** [7] 9:3 18:13

**Constitutes** [1] 17:17
**Construction** [1] 42:3
**Contact** [2] 18:17 128:18
**Contained** [1] 40:2
**Contains** [1] 147:4
**Contemplating** [1] 69:21
**Contended** [1] 59:10
**Contents** [1] 20:19
**Context** [1] 55:14
**Continues** [1] 75:23
**Continuing** [14] 9:4 18:13 20:6 20:8 21:6 65:19 67:9 91:20 92:3 92:22 93:12 93:22 95:11 97:21
**Continuum** [1] 78:6
**Control** [1] 50:18
**Controlled** [1] 132:23
**Conveniently** [1] 116:22
**Conversation** [4] 5:6 22:7 46:20 128:10
**Convict** [1] 40:17
**Convicted** [6] 39:4 39:4 39:6 108:2 116:5 118:6
**Conviction** [1] 38:16
**Convictions** [1] 106:8
**Convince** [3] 98:6 98:8 98:15
**Convinced** [4] 78:14 110:24 115:11 115:13
**Convinces** [2] 34:23 98:11
**Cookie** [1] 141:10
**Cooter** [1] 42:6
**Correct** [12] 123:12 124:5 125:4 125:9 126:2 126:5 133:19 138:2 139:15 141:19 141:21 147:4
**Correctly** [3] 123:10 139:13 147:9
**Corroborate** [1] 39:18
**Corroborating** [1] 38:19
**Cost** [1] 147:10
**Counsel** [2] 145:11 147:5
**Country** [1] 57:1
**County** [9] 1:8 1:21 4:9 20:7 61:18 147:2 147:4 147:11 147:17
**Couple** [10] 4:6 5:6 23:1 27:25 34:20 38:9 50:17 62:3 80:12 119:10
**Coupled** [1] 88:22
**Course** [19] 4:12 5:8 11:8 31:13 31:18 31:21 31:21 31:23 40:6 70:7 88:13 89:14 90:14 95:7 100:25 115:17 123:5 132:9 145:11
**Court** [48] 1:3 1:5 3:1 3:8 3:11 3:13 3:15 3:17 3:19 3:21 43:25 45:24 52:5 52:10 52:12 52:14 52:16 52:18 52:20 53:4 56:2 69:6 74:3 80:3 82:4 85:6 86:21 86:24 88:2 102:3 114:25 117:8 117:10 117:14 119:1 120:21 121:21 121:25 122:4 124:14 134:17 146:22 146:23 147:3 147:4 147:7 147:17 147:17
**Court's** [6] 4:23 5:22 12:15 15:18 29:1 40:3
**Courthouse** [2] 12:23 25:18
**Courtroom** [7] 30:12 45:8 79:3 81:8 81:10 88:3 131:4
**Cousin's** [1] 99:12
**Cousins** [1] 104:17
**Covers** [1] 49:23
**Creating** [1] 80:8
**Credibility** [3] 4:15 41:25 130:18

**Crime** [56] 7:23 8:2 8:7 8:10 11:6 11:13 11:23 13:20 24:21 27:22 38:16 39:9 39:11 39:12 39:18 40:10 42:10 43:22 57:4 57:11 57:16 59:20 59:22 59:23 60:5 65:4 68:4 78:25 84:11 89:20 90:5 91:23 93:11 94:15 94:16 95:22 96:1 97:3 106:24 109:16 110:24 127:15 128:12 132:15 133:5 137:14 137:19 138:17 138:17 138:23 138:23 142:6
**Crimes** [1] 17:16 17:17 57:6 57:8 67:18 68:17 97:1 105:6 126:20 131:11 137:9
**Criminal** [35] 9:3 11:3 16:8 16:9 17:5 18:4 18:6 18:12 19:9 19:14 19:18 19:24 20:6 31:25 61:4 63:9 63:9 65:18 65:25 68:6 68:6 68:9 70:13 70:17 88:24 90:15 90:19 91:13 91:15 91:19 92:2 95:9 107:20 127:19 138:22
**Criminally** [1] 74:10
**Criminology** [1] 93:16
**Critical** [1] 138:7
**CSR** [1] 147:16
**Culpability** [2] 9:15 94:14
**Cup** [1] 139:25
**Curable** [1] 54:17
**Custody** [1] 142:1
**Customer** [1] 62:19
**Cut** [2] 23:13 139:4
**Cutoff** [1] 140:17
**Cuts** [1] 105:2

## D

**Dad** [4] 77:1 77:5 77:7 99:7
**Daily** [1] 76:17
**Dallas** [3] 99:13 104:1 104:15
**Danger** [7] 49:8 49:19 66:19 66:21 84:13 84:22 124:1
**Date** [1] 147:16
**Days** [3] 51:14 81:13 144:4
**Dead** [2] 42:16 103:3
**Deal** [4] 4:10 8:16 16:21 45:1 45:2 45:17 59:13
**Dealing** [1] 48:22
**Dealings** [1] 57:14
**Dearly** [1] 34:21
**Death** [136] 9:24 10:6 10:20 10:25 12:8 12:12 14:12 14:20 14:23 20:12 20:16 21:11 21:13 22:23 23:7 25:12 26:6 27:15 28:5 28:23 28:23 45:3 49:10 56:25 57:12 57:15 58:1 58:5 58:10 58:15 58:18 58:21 58:22 59:1 59:24 60:2 60:4 60:12 61:1 64:25 67:18 67:19 67:20 67:25 68:5 68:9 68:16 68:21 71:24 72:17 77:14 77:17 77:18 77:20 77:24 78:1 78:7 78:10 78:17 83:22 84:14 84:17 84:24 87:4 87:11 87:17 88:7 88:17 89:3 89:8 94:14 94:20 94:21 94:25 95:14 97:11 97:14 98:5 98:10 100:4 100:11 100:13 101:4 101:17 105:20 106:7 106:10 106:11 106:12 106:20 107:2 107:6 108:3 108:12 108:25 109:11 110:25 112:23 113:1 113:11 113:11 113:15 120:3 120:6 120:14 126:18 126:19 126:21 126:24 126:24 127:5 127:6 127:13 127:24 127:25 128:1 128:2 128:6 128:24 129:9 129:11 131:9 134:3 135:5 136:25 137:4 137:6 137:8 139:2 139:4 139:21 143:25

**December** [1] 4:10
**Decide** [10] 12:23 25:5 69:24 72:16 96:9 116:21 117:1 129:8 132:10 146:12
**Decided** [1] 94:5
**Decides** [1] 21:13
**Deciding** [6] 90:22 93:12 101:3 105:20 107:1 128:23
**Decision** [49] 26:10 26:12 26:20 45:12 60:12 60:21 61:6 61:6 66:11 67:7 72:14 73:9 74:13 79:2 79:6 79:14 81:7 81:9 83:8 83:24 86:22 97:8 97:17 105:9 106:20 110:6 112:13 115:18 121:13 130:20 131:6 131:13 131:17 133:15 133:23 134:8 135:19 135:21 139:4 139:10 139:12 139:24 140:3 140:13 141:17 144:1 144:10 146:1 146:13
**Decision-making** [1] 79:2
**Decisions** [10] 23:23 26:11 26:17 28:18 30:3 60:8 61:1 61:3 87:13 123:20
**Deep** [2] 112:14
**Defend** [6] 110:9 110:10 110:11 114:15 143:2 143:12
**Defendant** [80] 2:22 3:16 3:18 3:25 4:7 6:18 7:11 7:16 7:17 8:4 8:11 9:2 9:5 9:14 9:25 10:16 10:16 11:11 11:12 11:20 13:20 14:3 14:4 16:8 16:10 17:5 17:8 17:12 17:18 18:10 20:24 21:4 21:6 22:7 23:18 23:21 26:2 27:19 29:2 29:6 29:11 30:5 30:8 32:15 32:14 32:21 34:8 35:22 35:24 36:8 36:22 36:24 40:9 42:9 42:15 42:20 42:22 43:1 43:7 43:18 43:19 44:2 44:25 95:21 96:13 98:7 98:17 111:25 112:7 130:7 131:15 25 132:8 139:11 143:16
**Defendant's** [17] 7:16 9:15 11:19 13:21 21:10 25:23 27:18 36:11 37:1 37:7 40:24 65:24 90:18 94:4 94:13 101:2 128:22
**Defendants** [2] 12:3 33:22
**Defended** [1] 109:17
**Defending** [1] 114:12
**Defense** [35] 22:13 31:10 31:11 69:15 72:5 72:11 72:12 72:18 72:24 75:4 88:20 112:10 112:11 113:6 113:12 114:2 114:5 114:11 115:3 115:4 115:5 115:12 115:13 115:22 116:4 116:5 127:12 133:9 135:1 135:2 138:21 140:5 141:9 142:18 142:25
**Define** [4] 12:21 15:10 23:9 23:14
**Defined** [3] 12:19 18:16 129:6
**Definitely** [4] 74:16 80:14 110:14 113:15
**Definition** [3] 13:16 15:17 16:23
**Degradation** [1] 34:24
**Degree** [2] 24:12 93:16
**Deliberate** [1] 36:4
**Deliberately** [2] 87:5 102:21
**Deliberates** [1] 35:21
**Deliberating** [1] 5:24 74:6
**Deliberations** [2] 12:17 51:12
**Describe** [2] 40:5 116:15
**Desert** [1] 27:20
**Deserve** [1] 97:10
**Deserves** [3] 28:4 68:6

68:10
**Destiny** [1] 50:19
**Detail** [1] 5:7
**Determination** [2] 64:4 139:20
**Determine** [8] 10:24 35:24 47:18 60:2 65:21 74:8 113:19 146:16
**Determines** [4] 35:22 36:7 57:22 101:16
**Determining** [2] 66:18 72:15
**Devil's** [1] 137:11
**Dictate** [1] 92:11 123:23 124:3
**Dictated** [1] 36:18
**Die** [6] 34:22 69:24 91:17 103:3 125:21 146:2
**Dies** [1] 35:4
**Difference** [8] 4:20 24:11 33:15 36:3 37:2 39:5 139:25 145:17
**Different** [28] 5:13 14:18 15:16 19:1 24:4 26:24 26:25 28:25 33:9 33:21 33:23 33:25 34:10 34:11 38:3 40:4 69:16 69:18 76:13 87:12 90:4 96:5 98:4 102:18 105:12 108:19 116:12 133:13
**Differently** [4] 24:4 24:18 108:21 114:15
**Difficult** [3] 48:19 65:11 116:13
**Difficulty** [1] 65:12
**Diminish** [1] 123:15
**Dire** [24] 1:15 45:23 50:1 53:3 56:4 63:14 69:8 82:3 85:7 85:16 85:22 100:25 102:5 117:13 119:3 121:1 122:3 124:16 124:24 124:25 127:8 127:9 129:4 134:18
**Direct** [9] 40:7 40:8 40:15 40:20 41:6 42:1 42:13 43:9 129:20
**Directed** [1] 129:5
**Direction** [2] 37:25 38:2
**Directions** [2] 48:21 48:22
**Directs** [1] 101:6
**Disabilities** [3] 90:20 96:23 96:25
**Disagree** [7] 68:1 68:7 68:12 99:24 111:19 137:25 138:2
**Disagreed** [1] 67:22
**Disagreement** [2] 39:20 48:3
**Disbelieve** [1] 130:19
**Discomfort** [1] 83:5
**Discretion** [2] 10:5 10:15
**Discussed** [4] 54:1 77:3 102:18 145:12
**Disgusting** [1] 34:6
**Dismiss** [1] 6:25
**Dismissed** [5] 63:10 63:15 63:19 70:12 70:12
**Disregards** [1] 89:5
**Disservice** [1] 135:7
**Distinction** [2] 18:23 18:24
**Distinctive** [1] 55:18
**Distinguish** [1] 107:5
**District** [7] 1:5 1:11 2:6 4:4 107:23 147:3 147:17
**Disturbing** [1] 75:3
**Dizziness** [1] 76:23
**Doctors** [3] 19:20 76:19 76:20
**Documentation** [1] 59:18
**Done** [18] 7:3 7:23 7:24 7:

24 8:1 20:1 21:8 31:9 31:10 31:18 32:20 47:6 78:24 107:14 110:5 113:8 116:4 116:4
**Door** [2] 18:3 81:16
**Doubt** [41] 9:1 11:11 11:19 12:7 13:14 13:15 13:22 13:24 14:5 14:7 14:13 14:15 15:4 15:7 17:4 18:9 21:19 22:3 25:23 32:6 32:8 37:17 39:11 40:23 41:3 41:5 42:8 43:7 43:17 44:3 61:2 65:17 78:14 91:7 91:9 92:1 95:10 98:7 110:3 110:25 138:13
**Doubts** [2] 60:11 131:16
**Down** [17] 12:23 25:18 25:19 27:23 34:3 34:7 50:7 69:21 73:19 96:22 104:15 129:23 135:13 136:13 137:1 139:25 141:18
**Downing** [1] 132:22
**Draw** [1] 90:24
**Draws** [1] 30:9
**Drink** [2] 133:10 133:16
**Drive** [1] 38:24
**Driver** [1] 38:21
**Driving** [1] 27:23
**Drove** [1] 133:12
**Drug** [1] 67:3
**Drugs** [18] 95:21 95:24 96:2 99:4 131:22 131:23 131:24 131:25 132:2 132:6 132:11 132:12 132:13 132:14 132:18 133:3 133:5 133:16
**Drunker** [1] 42:6
**Drunks** [3] 42:2 42:5 110:17
**Due** [1] 133:21
**Duly** [5] 45:22 53:2 82:2 117:12 122:2
**During** [34] 4:12 5:8 5:23 11:8 12:17 15:11 29:16 29:25 31:18 31:20 31:21 31:23 32:20 33:5 40:6 47:9 47:24 54:1 66:1 71:17 72:9 79:20 82:24 88:22 90:13 95:7 95:8 95:20 123:1 123:5 127:5 127:12 127:20 127:21
**Duty** [4] 25:19 50:24 70:3 127:22

**E**

**Eagle** [1] 93:3
**Ear** [1] 76:20
**Earthly** [1] 29:13
**Easily** [1] 65:6
**Effect** [10] 10:25 67:5 67:10 77:12 96:9 99:19 101:18 101:19 131:22 132:5
**Effects** [2] 132:6 133:4
**Either** [20] 17:20 30:1 32:13 37:23 72:16 86:25 87:17 92:4 98:2 100:8 100:9 100:17 101:16 108:10 111:15 112:8 113:10 114:19 135:13 135:15
**Either/or** [1] 108:5
**Elected** [2] 107:22 121:17
**Elements** [1] 138:16
**Eleven** [5] 7:1 72:22 74:6 135:14 143:17
**Eligible** [2] 29:11 84:15
**Eloquent** [1] 134:14
**Employed** [1] 76:14
**Employee** [1] 50:22
**Employer** [1] 50:22
**End** [3] 24:25 63:7 131:2
**Ended** [1] 138:5
**Enforce** [6] 6:14 39:25 40:2 48:6 83:6 123:11
**Engaged** [1] 142:5
**Enjoy** [3] 74:21 75:23 76:

24
**Enron** [1] 42:3
**ENT** [1] 76:19
**Entire** [1] 79:20
**Entirely** [1] 7:9
**Entitled** [3] 10:25 17:10 24:22
**Episode** [5] 32:1 88:24 90:15 95:9 127:19
**Equally** [3] 83:22 100:6 112:18
**Equipped** [1] 8:14
**Erased** [1] 11:22
**Error** [3] 72:25 73:2 73:6
**Escape** [1] 19:12
**Especially** [3] 15:11 75:3 111:10
**Essentially** [2] 69:25 112:12
**Establish** [3] 39:10 41:2 41:15
**Establishes** [1] 41:13
**Establishment** [1] 62:18
**Ethical** [1] 63:21
**Evaluate** [7] 4:14 4:25 25:1 28:19 44:22 72:20 124:9
**Evaluated** [1] 79:14
**Evaluates** [1] 41:24
**Evaluating** [2] 72:21 143:25
**Evaluation** [1] 141:6
**Evaluations** [4] 29:15 29:17 29:22 30:1
**Event** [2] 29:2 29:4
**Events** [1] 124:2
**Eventual** [1] 138:1
**Everyday** [2] 50:7 141:10
**Everywhere** [1] 20:4
**Evidence** [171] 8:6 8:17 9:1 9:9 9:11 9:20 10:1 10:22 11:9 11:18 11:23 12:6 12:10 13:14 14:4 14:7 14:9 15:4 15:7 17:3 17:9 21:18 22:2 22:16 22:20 22:22 23:3 25:4 25:5 25:11 25:22 25:25 26:7 27:4 28:19 30:15 32:22 34:3 35:20 36:2 36:8 36:5 37:2 37:9 37:19 37:24 39:8 39:15 39:16 40:5 40:7 40:8 40:8 40:13 40:14 40:15 40:15 40:17 40:22 41:6 41:14 41:14 43:9 43:12 43:5 44:4 45:14 45:14 57:11 57:24 60:13 60:16 60:25 64:2 20 65:17 65:22 65:22 66:2 66:14 66:25 67:1 68:4 73:8 73:9 74:12 78:20 79:10 79:17 83:9 83:25 84:2 84:11 84:19 86:20 86:23 87:24 88:2 89:20 90:18 91:2 91:7 91:23 91:25 92:13 92:17 92:18 94:7 94:9 95:17 95:19 96:4 96:5 96:8 96:12 97:7 98:11 98:5 98:20 101:1 101:6 101:7 101:15 101:19 104:3 106:20 109:20 110:2 110:10 110:10 110:13 111:2 112:18 113:8 113:9 113:10 115:9 115:11 116:2 116:11 116:16 116:17 118:10 118:11 121:14 124:8 129:10 129:10 129:13 129:17 131:18 133:22 133:23 133:25 138:6 138:20 139:10 140:8 140:11 140:19 143:11 147:5
**Evidentiary** [1] 21:12
**Evidently** [1] 50:25
**Ex-wife** [1] 99:12
**Exactly** [16] 10:6 10:16 23:15 23:16 23:25 37:21 43:2 48:24 50:10 80:11 111:13 114:18 116:13 128:10 134:10 140:7

**24**
**Exam** [1] 54:8
**EXAMINATION** [15] 1:15 45:23 50:1 53:3 56:4 69:8 82:3 85:7 102:5 117:13 119:3 121:1 122:3 124:16 134:18
**Examining** [1] 129:12
**Example** [16] 19:5 23:17 27:10 34:12 34:18 38:8 39:13 42:2 58:8 93:1 95:18 103:25 104:14 104:14 104:20
**Examples** [2] 13:11 27:5
**Exceed** [1] 33:16
**Except** [2] 31:3 40:15
**Excuse** [10] 11:25 31:9 31:11 31:17 35:8 37:5 80:4 101:14 117:10 121:22
**Excused** [3] 3:5 52:7 52:20
**Excuses** [2] 101:10 101:13
**Execution** [4] 60:9 60:19 119:21 131:15
**Exhibits** [1] 147:9
**Existence** [10] 16:7 16:11 16:12 16:16 17:7 17:15 18:9 32:5 32:8 32:17
**Exists** [2] 17:10 30:15
**Exonerate** [1] 93:10
**Expanded** [1] 127:6
**Expect** [3] 13:3 93:7 93:8
**Expiration** [1] 147:16
**Explain** [3] 77:15 137:18 146:9
**Exposed** [1] 114:10
**Express** [1] 102:17
**Extent** [1] 31:3
**Extract** [1] 5:1
**Extracurricular** [1] 142:5
**Extremes** [1] 93:13
**Exxon** [1] 50:23
**Eye** [5] 87:7 87:7 87:22 87:23 122:8
**Eyewitness** [4] 40:8 40:11 40:15 43:4

**F**

**Face** [1] 78:22
**Fact** [20] 4:7 4:13 11:11 12:7 21:17 24:23 45:10 47:1 51:5 55:12 55:19 66:10 83:8 84:4 89:21 92:10 94:8 111:3 113:4 142:2
**Factor** [5] 30:12 66:18 96:15 100:6 113:20
**Factors** [1] 146:16
**Facts** [18] 27:7 49:14 74:8 74:9 74:14 85:1 86:3 86:5 87:18 89:15 92:5 98:3 104:3 117:1 125:21 126:16 138:15 139:11
**Failing** [1] 136:10
**Fair** [13] 48:14 48:16 69:2 73:8 73:21 73:24 104:5 104:6 107:18 129:21 135:10 142:10 142:16
**Fairly** [6] 62:7 62:9 65:2 102:15 102:22 107:17
**Fairness** [4] 79:18 104:24 112:6 144:7
**Fall** [1] 78:10
**Family** [11] 13:8 18:18 55:10 58:24 59:4 59:6 59:12 70:8 77:4 77:13 78:23
**Fannin** [1] 2:7
**Far** [12] 11:1 24:19 44:17 48:15 53:12 83:3 102:9 121:3 122:12 122:14 132:20 138:5
**Fast** [2] 62:13 77:2
**Father** [3] 62:12 99:1 99:3
**Favor** [2] 60:3 131:9
**Favors** [1] 77:24

**Fear** [1] 114:20

**Feature** [1] 21:12
**Features** [1] 41:8
**Feed** [1] 71:19
**Feelings** [8] 57:14 72:2
73:15 104:19 105:3 136:18
140:4 143:23
**Felony** [7] 31:19 31:22 31:
24 31:24 32:3 38:16 88:22
**Felt** [3] 113:21 129:2 146:7
**Few** [4] 34:25 50:14 69:12
144:4
**Fifteen** [3] 8:24 71:15
141:20
**Fifteen-year-old** [1]
141:20
**Fifty** [1] 34:20
**Fight** [1] 114:5
**Fighting** [1] 114:6
**Figure** [3] 93:15 116:13
119:22
**Filled** [3] 85:15 87:2 124:
23
**Filling** [1] 129:1
**Final** [2] 45:3 139:24
**Finances** [1] 47:2
**Financial** [1] 46:15
**Fine** [7] 16:22 33:15 33:16
64:22 82:6 102:8 136:23
**Fingerprint** [6] 41:8 41:
11 41:12 41:15 41:17 41:18
**Fingerprints** [1] 39:16
**Fire** [1] 27:24
**Fired** [1] 43:2
**First** [62] 6:8 6:17 7:8 7:
15 7:21 8:3 9:13 9:18 10:3
10:10 10:11 10:18 13:12 13:
13 13:23 14:1 14:2 14:18 14:
21 15:3 15:6 16:6 20:5 20:9
20:10 20:14 20:17 20:23 21:
1 21:3 21:5 21:16 21:21 21:
23 22:25 27:12 31:15 35:20
45:22 45:25 50:3 53:2 54:3
58:20 82:2 82:7 84:3 91:6
91:7 107:13 110:22 116:6
116:23 117:12 117:17 122:2
122:7 123:16 123:18 123:22
130:9 138:12
**Fist** [1] 91:18
**Fistfight** [2] 125:24 125:
25
**Fit** [2] 34:5 44:23
**Five** [20] 25:17 33:13 33:
19 34:19 35:10 35:13 36:6
37:5 37:8 42:18 44:7 45:6
63:11 76:19 78:12 86:8 89:7
110:15 110:15 111:1
**Five-year** [1] 37:5
**Fix** [2] 24:9 54:20
**Flip** [2] 36:22 47:7
**Floating** [1] 107:11
**Floor** [2] 107:24 108:23
**FM** [1] 2:19
**Focus** [4] 7:20 7:21 8:6 8:
9
**Folks** [6] 23:17 25:17 28:
25 44:11 80:8 81:11
**Follow** [20] 6:14 6:22 30:
1 30:2 39:21 40:1 44:15 48:
5 74:3 83:6 87:24 102:12
116:7 123:11 125:7 131:3
131:22 133:23 133:24 134:5
**Follow-up** [1] 145:9
**Following** [1] 1:18 44:11
103:20
**Follows** [5] 45:22 53:2 82:
2 117:12 122:2
**Food** [3] 62:13 62:25 77:2
**Football** [2] 15:11 15:11
**Foreclosing** [2] 49:16 49:

**Foregoing** [1] 147:4
**Foresee** [1] 103:7
**Forgot** [2] 134:13 140:14
**Forgotten** [1] 45:7
**Form** [3] 19:20 19:21 34:
14
**Forth** [3] 19:20 19:21 34:
14
**Forty** [12] 15:16 29:8 29:
10 29:16 29:20 30:7 30:13
30:18 30:19 30:23 100:21
146:14
**Forty-five** [1] 30:23
**Forty-year** [1] 146:14
**Fourteen** [1] 71:15
**Frame** [5] 47:24 54:1 54:3
82:24 123:1
**Frankly** [1] 44:13
**Free** [5] 8:22 19:9 19:14
19:18 19:24
**Freedom** [1] 103:5
**Freeway** [1] 2:14
**Friday** [1] 54:11
**Friend** [1] 99:6
**Friend's** [2] 99:1 99:3
**Friends** [2] 13:9 78:22
**Front** [1] 77:21
**Frustrated** [2] 5:14 5:14
5:18
**Fulfilling** [1] 71:21
**Full** [5] 46:25 51:18 51:25
86:7 89:9
**Fun** [1] 129:24
**Function** [1] 76:22
**Future** [15] 16:8 16:8 17:
9 26:4 49:8 49:18 66:19 66:
20 84:13 84:21 92:22 93:23
95:12 97:21 124:1

## G

**Games** [1] 15:12
**Gather** [3] 37:15 40:3 44:
16
**Gauge** [1] 4:14
**Gee** [3] 137:12 140:13 140:
22
**Gees** [1] 79:6
**General** [5] 18:7 18:8 18:
11 125:1 137:5
**Generally** [2] 77:24 142:
19
**Gentleman** [1] 35:13
**Gentlemen** [1] 3:22
**Getaway** [1] 38:21
**Gibson** [1] 55:2
**GILBERT** [1] 117:11
**Given** [26] 12:16 28:20 34:
3 57:20 57:25 59:9 66:8 66:
12 67:2 67:3 67:4 67:6 74:
73 79:17 83:25 110:25 111:1
111:12 130:2 130:5 130:6
130:9 130:11 135:5 135:25
137:21
**God** [3] 78:23 135:3 143:17
**Governor** [2] 29:23 29:25
**Graduate** [1] 93:16
**Granted** [2] 3:19 29:12
**Great** [4] 16:2 16:25 135:
18 145:13
**Greater** [4] 15:12 15:13
16:24 33:4
**Greg's** [1] 145:17
**GREGORY** [1] 122:1
**Grew** [1] 144:13
**Ground** [2] 42:21 109:13
**Group** [7] 24:10 46:3 53:9
71:19 75:14 82:8 122:9
**Growing** [1] 144:21

**Grown** [1] 144:14
**Gruesome** [1] 33:25
**Guards** [1] 19:21
**Guess** [12] 40:5 42:11 61:
8 89:16 102:25 103:3 105:17
108:14 110:8 110:8 114:14
144:11
**Guides** [1] 74:8
**Guilt** [14] 11:19 13:21 14:
13 40:24 84:21 86:25 94:23
101:18 113:18 123:17 123:22
123:25 130:9 130:15
**Guilt/innocence** [3] 90:
25 94:11 101:19
**Guilty** [102] 6:18 7:11 7:
16 7:17 7:17 8:4 11:7 11:8
11:11 11:13 11:21 12:4 12:
11 12:12 13:20 14:3 14:3 14:
5 14:11 14:11 20:24 21:4 21:
21 21:21 25:24 26:3 26:17
28:10 29:3 32:11 32:15 32:
24 32:24 32:25 33:1 35:23
35:25 36:23 36:24 43:18 43:
23 44:2 44:25 45:1 49:6 49:
17 59:10 59:17 64:1 64:5 64:
5 65:4 65:15 66:2 69:23 72:
13 78:9 78:15 83:18 84:10
89:17 90:10 91:1 92:8 92:10
92:13 92:16 92:20 93:19 94:
1 95:6 97:20 98:7 98:17 98:
18 100:1 100:10 100:12 101:
15 106:25 115:13 113:19 115:
6 115:7 115:14 115:14 115:
15 115:23 126:7 130:7 134:2
137:24 138:16 138:25 140:16
143:2 143:5 143:16 143:18
144:17 145:10 145:14
**Guilty/not** [1] 26:17
**Gun** [10] 41:20 42:16 42:20
42:23 42:24 42:25 43:2 62:
10 89:2 91:17
**Gunshot** [1] 42:19
**Gut** [1] 140:13
**Gut-wrenching** [1] 140:13
**Guy** [4] 38:21 67:1 135:4
138:25
**Guys** [3] 12:23 44:5 48:21

## H

**H.S.P.V.A.** [1] 75:11
**Half** [9] 7:7 7:8 7:10 9:13
9:18 22:25 123:16 123:17
123:18
**Hallway** [2] 45:19 45:20
**Hand** [15] 4:17 10:8 13:6
16:1 23:24 27:17 41:21 41:
22 42:13 42:14 42:23 73:20
104:25 136:16 147:12
**Hands** [1] 42:25
**Hard** [4] 58:24 59:5 59:12
91:18
**Harm** [2] 114:16 114:17
**Harris** [9] 1:8 1:21 4:9
20:7 61:17 147:2 147:4 147:
11 147:17
**Hat** [1] 142:18
**Hate** [1] 35:11
**Haydock** [1] 3:4
**Head** [1] 89:2
**Heading** [1] 143:8
**Health** [5] 53:23 82:22
118:21 119:12 122:24
**Healthy** [1] 119:17
**Hear** [26] 8:3 8:8 34:13 36:
25 40:16 48:17 49:2 58:3 65:
24 66:1 67:1 81:3 81:8 81:
10 83:9 88:2 90:18 106:19
132:13 134:6 136:4 139:9
139:16 139:17 145:4 145:18
**Heard** [42] 1:19 8:8 9:13
9:17 35:19 37:8 43:12 43:15
14:16 55:6 55:12 55:20 56:
16 56:19 58:4 62:8 65:23 66:

**Grown** [1] 144:14 (continued)
20 86:23 89:15 91:3 94:11
94:12 94:22 98:3 102:9 102:
10 102:14 105:11 106:16 111:
6 111:22 115:18 132:3 134:9
137:19 140:22
**Hearing** [5] 76:21 92:17
113:10 123:10 139:13
**Hears** [1] 42:19
**Heartfelt** [1] 109:6
**Heaven's** [1] 24:24
**Heinous** [3] 34:1 93:5
**Held** [3] 1:21 74:10 133:16
**Hello** [1] 134:21
**Help** [5] 90:22 91:4 137:18
139:20 143:7
**Helped** [1] 94:16
**Helpful** [1] 93:12
**Helpless** [1] 105:14
**Hereby** [1] 147:4
**Hesitate** [1] 78:19
**Hesitating** [1] 48:11
**Hesitation** [1] 74:11
**Hi** [3] 69:10 102:7 134:20
**High** [7] 86:8 95:21 95:24
96:2 98:24 132:12 132:14
**Hill** [20] 2:12 3:11 3:12 3:
14 4:1 52:12 52:13 69:7 69:
9 69:11 102:3 102:4 102:6
115:2 120:21 121:2 134:14
134:17 134:19 136:23
**Himself** [5] 66:13 66:20
66:23 90:21 91:3
**Hinder** [1] 105:9
**History** [5] 57:3 65:25 90:
19
**Hitting** [1] 91:18
**Hobby** [1] 75:25
**Hold** [1] 137:24
**Home** [3] 13:8 62:25 105:3
**Honest** [5] 105:25 106:2
107:13 112:18 114:7 115:8
136:15 136:15 143:15
**Honestly** [5] 48:19 104:
18 106:22 114:3 136:18
**Honor** [9] 3:7 3:10 52:4
52:9 52:11 52:15 56:3 119:2
124:15
**Honorable** [1] 1:20
**Hope** [4] 19:25 89:19 103:
11 135:19
**Hoping** [1] 84:7
**Hormel** [1] 76:15
**Horrible** [5] 78:24 84:11
86:15 111:18 140:13
**Hour** [1] 50:23
**Hours** [2] 51:13 80:12
**House** [6] 18:4 27:24 27:
25 41:21 107:22 108:6
**Houston** [5] 1:21 2:8 2:15
2:20 147:18
**Human** [6] 31:7 31:16 35:6
41:8 89:5 119:21
**Hungry** [1] 71:20
**Husband** [7] 35:10 61:9 61:
24 61:25 62:5 76:3 76:8
**Husband's** [3] 61:7 61:10
65:7
**Hypothetically** [2] 66:1
97:19

## I

**Idea** [21] 6:1 16:21 28:9
29:13 29:20 29:24 39:23 40:
18 44:13 48:8 83:8 83:12 83:
17 87:21 93:18 102:15 118:
15 123:13 124:6 130:24 130:
24
**Ideas** [1] 28:25
**Identifying** [1] 41:8

**Identity** [1] 4:21

**Illegal** [3] 98:24 131:24 133:6

**Image** [1] 112:3

**Imaginary** [5] 23:5 25:21 35:19 36:10 37:7

**Imagine** [1] 104:15

**Imbalance** [1] 76:23

**Immediate** [1] 114:19

**Impact** [1] 77:1

**Important** [5] 41:25 75: 21 103:10 141:2 146:17

**Impose** [2] 33:15 36:5

**Imposed** [6] 27:16 29:5 45: 3 45:3 83:20 84:24

**Imprisonment** [1] 87:15

**Inaudible** [1] 27:9 85:20

**Include** [2] 20:4 127:6

**Included** [2] 138:18 147:6

**Includes** [4] 19:19 19:21 19:21 19:22

**Including** [4] 9:11 9:14 19:4 94:9

**Income** [1] 144:13

**Independent** [4] 26:12 39: 7 39:17 123:21

**Indicated** [4] 60:17 61:7 98:22 99:12

**Indictment** [3] 4:8 31:19 127:16

**Individual** [5] 5:5 89:21 90:21 91:3 91:24

**Individually** [2] 44:10 80:8

**Individuals** [1] 121:10

**Infancy** [1] 136:19

**Influence** [2] 79:2 118:3

**Influenced** [2] 73:7 81:9

**Influences** [2] 49:3 84:12

**Information** [18] 23:15 23:25 24:3 26:19 26:22 26: 23 38:19 90:21 90:25 139:17 139:19 140:17 141:16 141:16 144:9 144:9 146:7 146:8

**Informed** [1] 8:15

**Injection** [1] 60:18

**Injuries** [1] 126:1

**Inmates** [2] 19:8 19:23

**Innocence** [5] 86:25 94: 23 110:11 130:10 130:16

**Innocent** [6] 11:7 11:7 11:22 64:1 105:15 110:12

**Insane** [1] 132:19

**Inside** [5] 26:20 62:25 72: 23 81:8 112:14

**Instance** [2] 25:8 110:4

**Instead** [3] 8:9 87:12 90:5

**Instruction** [2] 23:2 140: 8

**Instructions** [2] 12:16 74:7

**Instructs** [1] 9:19

**Instrument** [1] 75:13

**Instrumentalist** [1] 75: 12

**Intelligent** [1] 8:15

**Intend** [1] 88:21

**Intent** [2] 126:22 127:2 127:13

**Intentional** [13] 31:6 31: 7 31:12 31:16 32:3 32:17 33: 5 33:6 35:6 88:19 90:11 102: 24 127:9

**Intentionally** [3] 88:11 88:15 95:6

**Interesting** [1] 109:25

**Interfere** [7] 47:23 53: 25 55:21 77:19 82:23 118:24

**Interpret** [2] 100:3 100:7

**Intertwined** [1] 43:5

**Interviewing** [1] 58:15

**Intoxicated** [1] 132:23

**Intoxication** [2] 133:9 133:14

**Introduce** [1] 137:2

**Invade** [1] 135:24

**Invited** [2] 79:24 80:5

**Involved** [6] 6:20 60:1 61:16 62:10 71:2 71:9 73:22 144:5

**Involvement** [1] 148:10

**Involving** [1] 55:1

**Irrelevant** [1] 146:8

**Issue** [16] 21:22 65:16 66: 5 66:11 92:14 93:20 94:5 95: 15 95:19 97:5 98:8 98:9 118: 18 124:1 129:4 137:7

**Issues** [5] 56:14 65:14 75: 4 102:18 107:20 119:24 140:1

**Itself** [5] 8:7 93:5 106: 25 123:23 127:1

## J

**Jacinto** [1] 147:18

**Jane** [1] 108:18

**Jazz** [1] 75:13

**Jeez** [1] 142:13

**Job** [21] 4:13 4:17 4:18 4: 18 4:21 5:4 18:19 19:11 40: 1 45:4 45:5 50:25 60:17 60: 20 60:20 75:17 76:20 86:19 110:5 121:19 143:1 143:9

**Joe** [1] 108:18

**Johnny** [1] 141:9

**Jr** [3] 1:5 55:2 147:20

**Judge** [16] 1:20 4:14 60:9 74:7 90:8 102:4 110:17 128: 4 128:9 130:3 130:18 131:14 135:7 138:14 140:9 140:10

**Judge's** [3] 85:16 124:24 127:8

**Judged** [1] 145:20

**Judgements** [1] 23:23

**Judgment** [11] 47:9 63:22 63:25 64:3 64:9 64:10 64:15 64:17 72:25 77:23 121:6

**JUDICIAL** [1] 1:11

**Jump** [1] 134:25

**Jumps** [2] 27:24 38:24

**Juror** [54] 3:24 6:25 23: 16 25:21 30:21 35:18 39:25 40:1 44:16 44:21 46:10 46: 23 47:5 47:24 48:5 51:6 53: 18 53:25 55:22 73:21 73:24 74:2 74:3 80:15 81:6 82:7 82:24 83:5 84:12 86:19 87: 24 95:22 95:25 99:19 102:3 104:25 105:1 106:17 117:10 118:3 118:24 119:13 121:25 122:18 123:1 123:9 123:11 125:6 126:14 129:25 130:5 135:3 136:10 146:23

**Jurors** [12] 4:14 6:21 45: 20 50:20 60:3 60:6 98:6 98: 6 98:8 110:24 140:25 144:25

**Jury** [84] 6:18 9:6 10:1 10: 2 10:3 10:8 10:19 10:21 11: 10 13:19 14:4 20:16 20:21 20:23 21:2 21:7 21:13 22:19 22:22 25:3 25:19 26:11 26: 12 27:8 29:4 30:14 33:14 34: 2 35:19 35:21 35:21 35:21 36:7 36:22 36:23 37:4 37:4 40:23 41:4 41:24 42:8 43:6 50:20 51:4 60:24 63:9 63:9 70:11 70:12 70:13 73:1 73: 20 74:17 74:18 77:20 79:25 85:23 101:6 103:25 104:16 109:2 109:21 110:2 111:10 112:14 116:11 117:5 120:2

**Jury's** [4] 21:20 32:11 32: 14 124:1

**Justice** [3] 61:5 107:20 142:25

**Justification** [8] 31:8 31:17 35:7 90:12 95:7 105: 16 113:13 137:14

**Justified** [2] 67:21 68:1

**Justify** [1] 31:5

## K

**Kay** [2] 147:3 147:16

**Keep** [6] 16:5 25:12 90:8 112:8 112:9 126:13

**Kept** [1] 30:8

**Kidnapped** [2] 103:17 108: 17

**Kidnapping** [10] 31:21 32: 3 32:20 33:5 33:6 88:23 90: 12 127:17 138:18

**Kidnappings** [1] 17:22

**Kids** [4] 27:25 99:9 136:17 136:19

**Kill** [6] 87:8 88:21 89:3 126:22 127:2 127:13

**Killed** [8] 43:3 103:8 103: 17 108:17 114:7 127:3 133: 12 137:16

**Killing** [8] 85:19 90:14 95:6 95:8 103:16 127:18 127: 21 127:22

**Kind** [24] 28:7 40:12 43:9 56:22 57:6 63:12 73:19 75: 25 79:1 103:12 106:15 106: 20 107:10 110:6 116:21 120: 3 120:11 135:11 136:6 137: 17 139:10 140:14 142:10 144: 24

**Kinds** [8] 18:1 33:21 33: 23 33:25 40:14 58:2 90:20 127:23

**Knobloch** [2] 147:3 147:16

**Knock** [1] 91:18

**Knowing** [7] 67:5 80:14 86: 16 89:25 121:7 129:16 141:13

**Knowledge** [3] 55:1 90:24 99:18

**Known** [2] 8:2 55:8

**Knows** [3] 34:22 34:22 99: 10

**Kurt** [3] 2:17 4:1 69:11

## L

**Lack** [2] 65:25 90:19

**Ladies** [1] 3:21

**Large** [1] 70:21

**Last** [9] 30:9 46:25 47:1 51:12 51:13 51:13 51:14 144: 4 146:19

**Lasting** [1] 77:1 77:12

**Law** [74] 4:22 4:23 4:24 5: 2 10:4 10:14 16:15 22:14 38: 17 39:20 39:25 40:1 40:2 40: 19 40:21 40:25 41:1 41:3 56: 11 60:13 65:1 69:1 72:13 74: 1 74:22 74:14 79:10 85:13 86: 21 86:24 87:10 87:24 88:1 89:12 93:4 95:3 98:11 98:15 98:20 101:21 102:12 102:12 102:12 103:20 103:21 103:24 104:1 107:18 108:13 114:21 124:6 124:11 124:22 125:7 128:5 128:8 130:1 130:2 130: 4 130:5 130:13 130:20 131:3 131:18 133:8 133:8 133:18 133:23 133:25 136:4 136:5 136:8 136:13 140:21

**Law's** [1] 129:20

**Lawyer** [9] 13:2 72:5 72:

**Lawyers** [7] 13:3 13:7 44: 20 45:4 47:17 141:24 142:19

**Laying** [1] 42:3

**Leads** [4] 9:9 28:15 28:17 139:17

**League** [1] 142:8

**Leaning** [1] 134:3

**Learn** [1] 128:9

**Learned** [2] 132:3 144:3

**Least** [7] 29:7 34:17 92:1 93:21 97:22 100:21 146:5

**Leave** [4] 22:4 80:13 81: 20 116:22

**Leaves** [2] 42:18 140:10

**Leaving** [1] 43:1

**Led** [2] 27:20 138:6

**Left** [3] 72:1 72:15 112:24

**Legal** [9] 31:8 31:9 31:11 35:7 35:8 72:11 90:12 95:7 127:10

**Legalese** [1] 38:11

**Legally** [1] 138:21

**Legislator** [1] 108:22

**Legislature** [1] 127:23

**Legitimate** [3] 28:12 36: 17 37:14

**Lengthy** [1] 59:14

**Less** [5] 15:12 24:15 24:15 30:19 33:13

**Lesser** [2] 12:9 33:3

**Lethal** [1] 60:18

**Level** [3] 39:21 40:22 83:4

**Lie** [2] 74:19 78:6

**Lied** [1] 111:4

**Life** [137] 5:11 9:23 10:16 10:20 10:24 12:5 12:12 14: 12 15:2 19:12 21:14 22:24 23:4 23:6 24:2 25:6 25:18 27:21 28:2 28:6 28:22 28:24 28:25 29:5 30:6 30:8 30:16 30:18 30:22 30:25 31:7 31: 16 33:12 33:19 34:21 34:25 35:6 35:14 36:6 36:9 36:12 37:5 45:2 49:15 49:17 53:22 53:22 57:5 57:5 57:12 57:19 57:19 60:12 61:1 65:5 66:9 72:8 72:16 78:5 78:6 78:21 78:25 82:20 82:21 83:22 84: 5 84:16 86:2 86:9 86:13 87: 5 87:8 87:14 87:15 87:17 88: 11 88:14 88:15 88:19 89:5 89:6 89:8 90:12 93:6 93:15 94:20 94:21 95:2 95:14 95: 23 97:10 97:13 98:19 100:2 100:16 100:17 100:18 100:21 100:23 101:17 102:10 102:12 103:1 103:2 103:4 103:4 103: 6 105:16 106:20 107:1 107:7 108:1 108:24 109:11 111:1 113:13 113:16 114:12 114:16 114:20 114:21 116:3 116:21 118:20 118:20 120:14 122:22 122:23 127:10 129:9 129:11 130:25 131:1 139:1 139:4 139:21 143:25

**Light** [2] 111:2 120:16

**Likely** [6] 16:20 30:5 30: 7 91:12 100:22 113:16

**Line** [2] 34:4 127:22

**Lines** [2] 47:13 144:8

**List** [2] 38:4 119:13

**Listed** [1] 126:21

**Listen** [15] 4:19 24:23 44: 22 60:24 73:8 74:12 86:19 91:23 104:10 121:12 129:17 130:17 133:22 138:14 144:5

**Listened** [2] 85:22 115:12

**Literal** [1] 55:5

**Literally** [1] 142:20

**Live** [3] 19:1 69:24 146:2

Case 4:11-cr-00488 Document 713-3 Filed on 04/17/14 in TXSD Page 262 of 327

**Lived** [3] 104:15 139:19 144:13

**Lives** [4] 33:24 41:9 103:9 144:21

**Living** [1] 34:25

**Logically** [1] 51:7

**Look** [31] 8:22 13:12 27:4 45:8 66:5 72:23 93:1 93:20 94:17 95:18 96:4 96:7 96:12 96:16 97:6 101:6 101:9 101:21 104:3 104:25 112:7 112:14 114:14 114:14 119:17 120:5 129:5 135:1 135:2 138:19 139:3

**Looked** [1] 134:24

**Looking** [14] 59:16 59:19 60:1 69:15 77:24 89:12 93:7 95:16 97:23 100:19 111:25 129:9 133:24 140:16

**Looks** [3] 71:2 76:2 135:2

**Lose** [3] 15:14 19:9 50:20

**Loss** [2] 57:12 76:21

**Lost** [1] 24:3

**Love** [2] 34:20 35:12

**Low** [2] 86:8 144:13

**Lunch** [1] 141:10

**Luxury** [1] 10:15

**Lyn** [6] 2:2 4:4 56:6 85:9 119:8 124:18

---

**M**

**Ma'am** [3] 54:5 55:4 69:3

**Machine** [1] 1:23

**Magnitude** [1] 135:25

**Major** [4] 31:19 31:22 31:24 31:24

**Mamou** [9] 1:5 3:25 52:16 55:2 69:11 111:17 135:9 143:18 147:20

**Man** [16] 42:4 42:14 42:16 42:18 42:20 42:22 43:3 58:15 72:6 72:9 96:13 99:25 100:4 100:9 103:15 121:7

**Margarita** [1] 3:3

**Married** [1] 34:20

**Mary** [2] 55:2 55:4

**Mass** [2] 88:9 88:13

**Material** [1] 5:15

**Matter** [18] 9:4 9:5 9:5 9:25 10:1 10:1 27:1 30:4 44:24 46:11 48:14 105:14 122:1 139:4 139:5 143:12 10 145:16

**Mature** [2] 23:22 96:18

**Maximum** [1] 86:13

**McClellan** [35] 2:2 3:6 3:7 3:10 4:4 43:21 49:24 50:2 52:3 52:8 52:9 56:2 56:3 56:5 56:6 69:5 69:13 85:6 85:8 85:9 102:2 106:15 111:23 114:23 119:1 119:2 119:4 119:8 120:20 124:14 124:15 124:17 124:18 134:19 134:23

**Mean** [53] 15:20 15:21 15:22 15:23 15:25 16:1 16:2 16:4 22:11 23:14 24:1 30:18 30:19 38:1 38:6 38:20 46:14 47:12 49:9 50:12 50:13 50:15 55:5 60:18 65:9 66:16 67:6 77:8 79:4 83:19 84:22 92:12 95:13 98:1 100:3 100:8 101:13 105:23 106:16 106:19 106:21 106:22 109:14 110:9 110:13 127:1 132:1 132:13 132:15 135:23 135:23 139:23 140:17 143:20

**Meaning** [6] 9:22 10:10 13:2 21:3 11:10 101:10

**Meaningful** [1] 48:24

**Means** [22] 6:25 7:1 7:2 7:3 13:25 14:7 14:21 15:18 16:1 16:22 22:14 23:10 29:1 30:17 30:18 40:8 75:19 84:

**Meant** [3] 101:7 123:15 129:1

**Measure** [1] 134:23

**Media** [5] 55:15 55:15 80:23 110:23 111:5

**Medical** [1] 19:20

**Meet** [2] 51:11 64:22

**Member** [1] 71:5

**Members** [2] 55:10 77:3

**Memorize** [2] 5:17 5:19

**Memory** [1] 5:25

**Mental** [4] 24:7 27:6 90:20 96:22

**Mentally** [1] 24:6

**Mentioned** [2] 47:14 141:4

**Message** [1] 48:23

**Messenger** [1] 48:23

**Messing** [1] 132:11

**Met** [1] 72:19

**Middle** [1] 16:18

**Might** [61] 3:23 6:6 18:19 19:25 23:13 23:14 23:15 23:16 23:20 23:21 24:5 24:7 24:8 25:22 27:8 27:10 27:12 27:14 27:17 27:22 28:3 28:4 30:21 42:2 42:14 43:6 46:9 47:23 48:23 53:17 53:24 56:14 58:3 67:7 69:17 73:17 73:23 78:10 78:22 81:10 82:16 82:19 85:13 86:5 104:7 104:13 104:21 104:22 106:18 106:25 107:3 107:6 107:7 107:11 111:1 118:2 122:17 133:13 138:4 138:19 140:4

**Mind** [28] 16:5 30:21 34:15 36:18 45:12 51:21 66:18 69:20 70:1 73:25 82:23 86:6 86:24 88:6 89:13 89:16 90:8 95:17 96:8 104:22 106:19 106:21 129:8 129:16 129:18 131:25 132:8 132:10

**Mind's** [1] 122:8

**Minimum** [3] 30:17 30:17 41:2

**Minute** [2] 96:20 142:18

**Minutes** [4] 5:6 8:24 23:1 72:20

**Mirror** [1] 112:3

**Miserable** [1] 27:21

**Misery** [1] 35:1

**Misimpression** [1] 92:20

**Miss** [14] 3:3 3:8 4:5 53:7 53:15 54:23 56:6 69:10 80:3 81:3 82:7 85:9 102:7 117:9

**Missed** [1] 112:6

**Missing** [1] 46:11

**Mission** [1] 71:19

**Mistake** [1] 138:22

**Mistrial** [1] 7:2

**Mitigating** [33] 9:22 22:16 22:21 23:10 23:14 23:21 24:8 25:4 25:5 25:10 94:17 96:15 96:19 96:23 97:4 97:10 97:24 101:1 101:6 101:7 101:13 101:15 101:18 105:22 105:15 106:17 106:18 106:21 116:2 128:21 128:25 129:6 129:10

**Mitigation** [10] 24:15 24:16 24:21 95:23 105:19 106:6 106:9 109:10 113:4 143:24

**Mix** [2] 24:25 30:12

**Moderately** [1] 24:13

**Moment** [4] 90:2 111:24 112:15 121:20

**Moments** [1] 4:6

**Monday** [5] 46:24 53:8 82:8 117:18 122:8

**Money** [2] 50:20 144:14

**Months** [3] 106:10 100:23 143:23

**Moral** [7] 9:15 63:21 64:11 64:14 94:13 119:19 119:24

**Morality** [1] 35:5

**Morning** [13] 3:21 5:20 19:6 46:2 53:10 53:11 81:16 82:9 82:10 117:21 117:22 122:7 122:10 122:11

**Most** [11] 18:16 21:17 49:24 50:20 51:3 100:22 105:10 111:20 116:20 136:18 139:11

**Mother** [1] 62:23

**Motor** [1] 38:5

**Move** [3] 20:17 138:24 143:14

**Movie** [1] 111:7

**Murder** [138] 4:8 6:6 6:18 7:18 8:5 10:21 11:4 11:20 11:21 12:1 12:4 15:1 20:25 21:5 25:24 26:3 28:22 29:3 31:2 31:5 31:6 31:15 31:16 31:20 31:23 31:25 32:2 32:3 32:4 32:12 32:18 33:1 33:1 33:2 33:2 33:4 33:5 33:7 33:8 33:10 34:14 34:18 35:5 35:19 35:24 35:25 36:23 36:23 36:24 49:6 49:18 55:1 65:13 65:14 65:15 68:22 68:22 68:25 69:22 69:23 72:14 73:18 77:16 78:2 78:9 83:19 84:10 85:24 85:25 86:1 86:4 86:7 86:18 87:14 88:9 88:13 88:18 88:18 88:16 88:17 88:18 88:20 88:22 88:24 89:3 89:18 89:23 90:3 90:6 90:10 90:11 91:2 91:14 91:14 92:8 92:10 92:21 93:5 93:19 94:1 95:6 96:3 97:20 98:7 100:1 100:10 100:12 101:2 102:24 108:1 108:3 116:15 118:6 118:12 118:12 118:21 118:24 123:21 123:25 126:21 126:25 127:1 127:9 127:17 127:20 127:20 127:20 128:6 128:10 128:11 128:22 134:2 138:17 138:18 139:2 145:10 145:14 145:19

**Murdered** [1] 99:13

**Murders** [6] 17:9 17:20 17:21 31:4 31:25 72:7

**Music** [1] 75:20

**Musician** [2] 75:17 75:22

**Must** [12] 10:5 10:16 13:19 13:21 15:22 18:9 18:13 67:18 81:7 88:18 90:8 130:10

---

**N**

**Name** [15] 45:7 55:3 55:6 55:12 55:14 55:19 55:19 56:6 56:16 56:21 56:21 69:10 85:9 119:8 124:18

**Natural** [2] 30:18 100:23

**Naturally** [1] 51:16

**Nature** [1] 73:22 91:20

**Necessarily** [16] 11:15 20:21 20:23 21:2 21:7 22:14 22:15 52:14 57:21 60:22 65:9 67:14 77:22 80:1 83:20 100:5 100:7

**Necessary** [4] 5:24 30:13 67:19 137:9

**Need** [6] 78:6 81:11 100:18 112:6 129:18 145:18

**Nefarious** [1] 7:6

**Neighbor** [2] 118:5 118:6

**Neighborhood** [1] 18:18

**Neighbors** [1] 78:23

**Nephew** [6] 61:7 61:10 61:11 62:6 65:8 65:10

**Nervous** [1] 142:20

**Never** [39] 4:21 5:11 5:12 7:10 9:6 10:19 10:20 11:13 20:25 22:8 24:19 28:11 30:19 51:3 62:8 63:18 64:3 66:6 67:6 66:7 67:2 67:3 70:23 77:20 78:17 79:19 90:9 93:3

**New** [1] 12:3

**News** [3] 55:16 56:17 80:23

**Newspaper** [3] 79:19 81:1 110:23

**Next** [10] 25:4 26:12 27:3 42:16 44:9 50:17 80:16 80:21 80:24 136:24

**Nine** [2] 33:14 36:6

**Ninety** [2] 33:14 36:6

**Ninety-nine** [4] 33:14 36:6 86:8 89:8

**Nobody** [2] 41:10 104:5

**Nobody's** [1] 22:17

**None** [1] 46:6

**Nonmoveable** [1] 41:19

**Noon** [1] 81:19

**Nose** [1] 76:20

**Notch** [1] 14:11

**Note** [1] 81:14

**Nothing** [6] 4:17 27:24 73:25 77:12 126:12 138:22

**Notice** [5] 70:10 76:2 76:6 112:24 141:20

**Notion** [3] 30:21 37:13 87:21

**Notions** [1] 134:1

**Number** [34] 3:2 3:3 8:25 9:10 12:20 21:22 26:1 28:14 32:10 32:12 32:15 33:13 49:7 52:6 54:24 65:16 66:5 66:11 67:8 78:15 78:15 92:14 93:20 94:5 95:15 95:19 95:22 95:25 97:5 98:9 98:9 124:1 129:5 134:11

**Numbered** [1] 1:20 147:6

**Nurses** [1] 19:20

---

**O**

**O'clock** [1] 19:6

**Oath** [6] 74:2 87:25 87:25 88:3 129:25 140:15

**Object** [4] 41:16 41:18 41:19 114:23

**Objecting** [1] 136:7

**Objection** [2] 6:13 6:23

**Objectionable** [1] 123:7

**Objective** [4] 81:5 105:7 121:15 121:18

**Obligated** [1] 12:10

**Obligation** [1] 32:11

**Obtain** [1] 17:6

**Obviously** [13] 11:21 32:20 41:19 43:25 51:2 78:1 84:11 86:1 91:15 103:13 105:23 133:10 135:8

**Occur** [7] 6:1 7:5 15:24 31:13 31:14 32:22 72:11

**Occurred** [7] 4:9 27:23 77:2 113:11 113:11 129:3 147:7

**Occurs** [1] 137:18

**October** [6] 46:24 54:4

**Odds** [2] 15:11 15:12

**Offend** [1] 135:23

**Offense** [11] 4:8 7:22 8:13 9:12 11:12 27:14 29:3 33:3 33:4 38:16 94:10

**Offensive** [1] 146:4

**Offered** [1] 109:19

**Office** [1] 88:11

**Officer** [1] 127:22

**Official** [3] 147:3 147:12 147:17

**Official/Deputy** [1] 147:3

**Offset** [1] 34:17

**Often** [3] 19:3 105:10 140:24

**Old** [9] 23:19 34:19 35:10 35:13 71:15 99:25 100:5 100:9 141:20

**Older** [1] 96:18

**Once** [5] 10:14 19:10 45:14 49:2 125:2

**One** [103] 6:21 6:22 7:25 8:1 8:25 9:7 9:7 15:13 15:21 20:15 21:13 21:21 21:21 21:22 21:23 23:15 25:11 26:1 26:13 26:13 26:17 27:2 27:3 28:4 28:10 30:5 31:18 31:19 31:22 32:10 32:13 35:2 37:25 37:25 38:10 38:16 39:14 40:4 40:5 41:3 41:4 41:7 42:9 43:8 46:25 49:7 51:19 57:15 58:14 60:15 65:14 65:16 66:1 66:11 67:8 68:5 68:15 70:15 72:7 78:15 80:9 80:10 80:1 87:88:23 88:24 90:15 90:24 92:14 93:20 95:9 97:8 98:9 104:17 105:2 106:17 107:11 107:15 107:24 107:25 108:11 109:14 109:24 110:4 110:21 111:11 112:20 121:10 123:23 124:1 125:2 127:18 127:25 134:12 136:20 137:2 137:14 137:16 140:2 141:4 142:17 142:22 144:23 145:5

**Ones** [2] 36:20 111:11

**Open** [15] 37:13 37:17 45:13 45:15 49:1 84:4 84:8 84:18 86:7 87:16 89:9 97:23 129:9 129:12 147:7

**Open-minded** [3] 48:9 48:16 112:17

**Opinion** [8] 56:23 59:25 62:5 62:6 64:25 131:23 137:7 142:23

**Opinions** [4] 56:10 96:6 125:1 125:6

**Opportunities** [1] 66:8

**Opportunity** [11] 59:9 66:17 67:6 74:16 94:20 94:24 102:17 135:6 135:11 136:2 142:17

**Opposed** [4] 94:20 97:10 97:14 129:11

**Opposite** [1] 23:16

**Option** [4] 10:5 36:17 37:14 83:22

**Order** [12] 10:10 10:14 14:19 14:20 17:6 17:11 20:12 20:13 39:6 77:15 107:18 125:6

**Ordered** [1] 34:8

**Ordering** [2] 60:9 131:14

**Ordinarily** [3] 18:20 80:18 95:25

**Organization** [2] 71:6 71:8

**Originally** [1] 64:11

**Ought** [31] 34:4 35:13 36:9 43:23 45:15 47:4 49:9 59:24 68:24 85:19 86:13 87:8 88:7 89:22 97:12 97:13 98:9 98:10 98:12 98:16 100:4 100:6 100:10 100:12 101:10 127:24 129:11 131:1 132:15 132:21 134:3

**Ourselves** [2] 20:21 137:3

**Outcome** [4] 32:9 32:12 32:13 32:15

**Outcomes** [1] 32:9

**Outreach** [1] 71:12

**Outside** [4] 19:14 62:23 79:2 81:16

**Overcome** [2] 11:17 11:17

**Overwhelming** [2] 106:1 106:3

**Owe** [1] 136:21

**Own** [10] 28:1 39:10 50:19 56:22 72:2 78:5 100:1 113:24 124:9 131:1

## P

**Page** [1] 115:25

**Paid** [7] 50:5 50:8 50:21 51:2 51:15 51:19 147:11

**Painless** [1] 49:25

**Pamela** [2] 147:3 147:16

**Panel** [3] 3:20 70:21 70:22 70:23 80:8

**Paper** [2] 78:24 121:25

**Pardons** [3] 29:18 29:19 29:21

**Park** [1] 42:3

**Parole** [3] 29:12 29:12 30:23

**Paroled** [2] 29:14 30:6

**Paroles** [3] 29:18 29:19 29:21

**Part** [9] 7:15 9:17 50:24 116:22 120:4 139:14 142:22 143:4 143:25

**Participate** [5] 60:7 60:11 71:6 131:12 131:16

**Particular** [19] 14:24 27:17 34:9 34:14 36:14 43:7 43:18 66:15 71:24 75:6 76:5 76:20 76:21 87:11 104:23 106:14 125:8 136:8 140:11

**Parties** [5] 3:2 7:25 52:6 147:6 147:9

**Parts** [1] 7:14

**Party** [1] 126:7

**Pass** [4] 69:5 102:2 120:20 134:16

**Passed** [1] 133:11

**Passing** [1] 42:6

**Past** [2] 55:20 66:6

**Patients** [1] 76:22

**Pay** [6] 50:24 57:5 78:5 100:1 100:16 131:1

**Payment** [1] 50:13

**Peace** [2] 59:9 127:21

**Pen** [1] 126:10

**Penalty** [83] 12:8 14:23 20:13 20:16 21:11 21:14 26:6 49:10 56:25 57:5 57:15 58:10 58:19 59:24 60:4 65:1 67:18 67:19 67:20 67:25 68:5 68:9 68:16 68:21 71:24 77:14 77:17 77:18 77:20 77:24 78:1 78:8 78:17 84:14 84:24 86:6 87:4 87:11 88:7 88:17 89:3 89:8 94:4 94:25 98:5 98:10 100:4 100:11 100:13 101:4 105:21 106:7 106:10 106:11 106:12 107:6 108:12 112:23 113:2 113:16 116:19:25 120:3 120:6 120:14 126:19 126:19 126:21 126:24 126:24 127:5 127:6 127:13 127:24 127:25 128:2 128:6 128:24 131:10 134:4 136:25 137:4 137:6 137:8

**Penitentiary** [12] 12:5 19:4 19:7 19:17 29:7 33:11 33:12 35:14 36:12 37:8 61:8 61:14

**People** [93] 18:17 18:18 18:18 18:18 18:18 18:19 18:20 19:1 19:17 19:22 20:4 23:12 23:19 20 23:24 24:4 24:7 24:8 24:10 38:15 40:16 41:10 47:4 51:2 51:3 63:25 64:3 64:10 64:17 65:9 68:23 72:22 74:7 77:22 77:25 78:2 79:16 80:9 85:17 86:11 86:12 87:20 88:10 88:24 89:13 89:17 90:14 92:19 95:5 95:8 96:1 96:4 96:24 100:3 101:9 103:10 103:16 107:25 108:2 109:12 110:9 110:15 110:15 112:21 115:25 116:3 116:16 116:20

**Perceived** [1] 136:9

**Percent** [2] 15:16 15:16

**Perfectly** [2] 6:10 27:20

**Perform** [1] 71:11

**Perhaps** [9] 22:15 24:14 24:15 29:22 53:22 53:23 55:18 69:16 82:20

**Period** [3] 34:9 47:9 51:6

**Perished** [1] 28:1

**Permit** [1] 80:22

**Permitted** [2] 15:17 15:19

**Person** [90] 8:13 11:6 19:6 23:22 24:6 29:14 29:16 30:22 35:22 42:7 45:7 48:25 49:8 49:9 55:8 58:14 59:8 59:9 10 61:2 63:23 64:1 64:4 64:6 18 64:21 65:2 65:4 66:2 66:1 66:16 66:19 66:20 69:23 77:15 77:21 78:1 78:15 84:3 86:22 89:2 92:20 93:22 94:19 94:25 95:11 96:25 97:13 99:4 99:25 100:8 100:10 100:12 100:20 100:22 101:5 107:1 107:17 110:1 110:25 111:3 113:12 113:19 113:22 114:2 114:6 115:3 115:6 115:14 115:22 116:5 116:23 120:4 120:5 125:10 127:3 131:24 132:12 132:14 133:22 134:6 135:17 138:24 139:18 141:14 143:2 143:12 144:20 145:24

**Person's** [18] 14:13 65:5 69:20 70:1 86:2 88:19 89:17 90:11 93:2 100:23 103:20 106:7 114:21 115:14 127:10 130:25 141:5 146:10

**Personal** [13] 9:15 16:23 53:21 80:19 82:21 94:13 94:14 103:13 104:2 118:19 119:19 122:22 146:1

**Personality** [1] 78:10

**Personalize** [1] 144:25

**Personally** [2] 60:15 64:19

**Personnel** [1] 19:20

**Persons** [3] 17:19 17:21 17:23

**Perspective** [4] 26:24 69:16 106:9 135:1

**Persuade** [1] 12:6

**Phase** [26] 6:5 6:5 6:8 6:8 6:17 6:19 6:21 7:18 7:19 7:21 8:3 8:5 8:6 8:9 8:17 11:25 12:1 14:2 15:1 35:20 36:1 36:3 36:25 116:18 117:2 123:22

**Philosophical** [1] 110:7

**Phone** [3] 2:9 2:16 2:21

**Phrase** [5] 14:6 21:18 22:2 102:25 114:9

**Physical** [1] 125:23

**Pick** [1] 112:16

**Piece** [4] 23:2 43:4 96:5 121:25

**Pile** [1] 26:23

**Pillar** [1] 42:15

**Place** [5] 21:1 77:2 79:20 88:11 116:6

**Places** [1] 51:22

**Play** [17] 4:12 5:8 5:20 6:12 6:15 8:21 12:2 20:16 39:21 40:6 43:14 44:14 75:21 106:25 123:5 142:8 143:25

**Played** [1] 113:20

**Playing** [3] 75:23 137:11 142:9

**Plays** [3] 75:13 75:13 75:15

**Plug** [1] 35:4

**Plumber** [1] 51:1

**Plumbing** [1] 51:1

**Plus** [3] 82:23 126:25 128:6

**Point** [16] 20:3 30:4 30:11 38:12 43:8 46:7 53:15 58:25 78:4 82:11 85:21 140:17 140:19 140:24 143:19 145:12

**Points** [1] 26:18

**Police** [2] 42:23 42:24

**Political** [1] 30:3

**Poor** [1] 104:14

**Pops** [1] 12:2

**Portion** [1] 31:19

**Portions** [3] 5:2 5:3 147:5

**Posed** [1] 102:10

**Possession** [1] 98:23

**Possibilities** [3] 12:9 45:13 45:16

**Possibility** [8] 12:11 15:23 16:12 16:25 32:23 35:18 49:16 91:10

**Possible** [12] 9:6 10:2 14:24 32:9 32:9 32:12 32:15 32:24 32:25 65:3 91:11 146:1

**Possibly** [6] 6:22 15:24 15:24 16:13 16:17 20:1 27:2 34:10 43:23 50:16 54:6 69:21 77:10 105:1 105:7 105:9 106:21 115:15

**Post** [1] 88:10

**Potentially** [2] 138:9 138:10

**Practice** [2] 74:22 76:19

**Pray** [1] 34:22

**Prays** [1] 35:1

**Precommitted** [1] 83:12

**Preconceived** [4] 87:21 87:21 130:24 133:25

**Prejudice** [2] 73:11 73:12

**Preparation** [2] 145:13 147:11

**Preposterous** [1] 19:15

**Present** [5] 4:5 13:19 14:8 17:10 122:21

**Presented** [6] 11:9 37:20 44:22 110:2 113:9 116:17

**Presiding** [1] 1:21

**Pressure** [1] 134:17

**Presumed** [2] 12:4 14:25 15:3

**Presumption** [5] 11:16 11:16 11:22 12:2 12:3

**Pretty** [19] 12:25 28:23 28:23 34:6 38:7 38:25 48:10 50:11 50:18 63:5 69:13 71:5 71:9 71:21 75:8 117:16 119:17 121:18 141:18

**Prevent** [2] 63:22 119:19

**Previous** [1] 70:10

**Prince** [8] 53:1 53:7 53:15 54:23 56:6 69:10 80:3 81:3

**Prison** [7] 29:15 29:17 98:23 100:18 107:7 108:2 111:1

**Privacy** [1] 135:24

**Probabilities** [4] 15:13 15:13 15:16 16:19

**Probability** [25] 9:2 15:8 15:9 15:18 15:20 15:22 16:1 16:6 16:7 16:11 16:19 16:22 16:24 17:4 17:8 17:12 17:15 18:10 65:18 91:10 91:12 92:1 93:21 95:10 97:22

**Probation** [5] 98:23 118:7 118:9 120:16 126:9

**Problem** [13] 63:24 74:15

79:8 89:4 95:2 96:9 97:16
113:17 115:1 128:5 128:8
131:6 131:19
**Problems** [2] 76:23 119:12
**Proceedings** [4] 1:19 1:
22 147:5 147:9
**Process** [23] 16:14 55:25
58:16 58:25 59:13 59:19 60:
1 60:7 60:12 60:23 61:4 61:
5 79:3 87:12 97:16 101:1
116:7 116:15 131:2 131:12
131:17 143:22 144:4
**Product** [2] 47:16 47:19
**Professional** [6] 53:22
75:22 80:18 82:20 118:20
122:23
**Program** [4] 58:19 59:16
67:4 71:12
**Programs** [5] 58:9 66:8
66:12 67:3 67:4
**Proof** [5] 13:17 13:18 13:
21 14:10 14:12
**Proper** [6] 58:5 60:4 110:
5 110:8 110:12 131:10
**Properly** [2] 110:1 110:2
**Property** [5] 17:19 17:24
18:1 18:5 18:7
**Proposition** [1] 92:24
**Prosecuted** [2] 99:17 109:
18
**Prosecution** [1] 14:8
**Prosecutors** [1] 142:24
**Prospect** [1] 85:22
**Prospective** [4] 3:23 45:
20 135:3 146:23
**Prove** [31] 11:10 11:18 12:
10 13:24 14:9 16:7 16:11 16:
12 16:16 17:7 17:12 17:14
18:9 21:24 22:1 22:5 22:8
22:9 22:12 22:13 22:18 32:1
32:2 32:4 32:7 32:13 33:6
72:7 93:21 130:10 140:11
**Proved** [1] 134:4
**Proven** [5] 64:1 64:23 91:
25 138:12 138:16
**Proves** [2] 14:4 15:4
**Proximity** [1] 63:5
**Prying** [1] 103:12
**Pull** [2] 38:22 60:19
**Pulls** [1] 35:3
**Punch** [1] 19:12
**Punches** [2] 19:6 19:10
**Punching** [1] 125:23
**Punishable** [1] 58:1
**Punished** [1] 47:6
**Punishment** [57] 6:5 11:
25 12:5 15:2 28:22 33:8 33:
10 33:11 33:20 34:4 36:5 36:
11 37:7 57:2 60:5 65:23 66:
4 68:16 83:20 85:19 86:7 86:
14 86:25 87:16 88:8 89:7 89:
10 89:18 89:22 90:3 90:4 90:
8 90:17 91:3 94:13 94:23
109:16 109:19 114:1 116:24
117:2 126:4 126:6 129:12
130:11 130:16 131:10 137:8
143:18 144:10 146:14 146:14
146:15
**Punishments** [1] 100:20
**Purchases** [1] 50:14
**Pure** [1] 27:10
**Purpose** [3] 44:19 81:4
109:15
**Purposes** [5] 9:20 10:23
12:17 19:8 80:8
**Put** [18] 22:18 24:25 25:16
34:3 41:16 41:18 46:15 50:
11 50:17 51:7 60:20 89:2
104:9 108:23 111:24 120:2
132:7 142:18
**Puts** [2] 25:22 25:25

# Q

**Qualify** [4] 127:2 127:3
127:4 127:4
**Quality** [7] 11:17 11:23
13:18 40:22 41:24 42:10 43:
10
**Questioning** [3] 78:22
111:23 141:2
**Questionnaire** [17] 54:
24 56:11 57:13 67:16 85:11
85:17 87:2 99:22 102:16 102:
17 111:22 119:11 124:20 124:
23 128:21 133:21 134:24
**Questions** [75] 8:16 8:20
8:21 10:9 10:13 10:24 11:1
12:12 12:13 17:2 20:9 21:1
25:13 25:14 26:23 28:20 29:
4 30:14 30:24 31:1 37:22 38:
1 44:7 44:12 45:2 45:17 46:
5 49:22 53:12 53:14 55:25
56:12 67:15 69:12 69:18 70:
1 72:16 78:4 78:16 78:20 79:
22 81:21 82:11 83:17 85:3
87:17 90:6 90:7 90:9 90:22
90:23 91:5 96:7 101:24 102:
10 103:11 103:11 106:4 109:
14 117:3 117:23 119:10 122:
13 123:24 124:11 128:3 130:
13 136:1 136:2 140:23 142:
10 142:11 142:12 142:14 146:
15
**Quick** [1] 38:10
**Quickly** [1] 116:14
**Quite** [1] 44:13
**Quote** [1] 143:24

# R

**Radio** [1] 81:3
**Raise** [3] 73:20 104:25
136:16
**Raised** [5] 4:22 4:25 5:3
144:18 145:22
**Range** [9] 33:8 33:10 33:
10 34:4 78:11 86:7 89:7 89:
9 90:5
**Rape** [5] 126:22 126:22 127:
2 127:3 127:4
**Rapes** [1] 17:21
**Rate** [1] 15:15
**Rather** [3] 47:10 74:17
116:3
**Reach** [3] 36:15 44:24 81:
7 124:6 124:7
**Reached** [1] 126:3
**Reacquire** [1] 19:13
**React** [1] 89:17
**Reacted** [1] 24:3
**Reacts** [1] 24:17
**Read** [15] 7:6 20:5 30:22
67:24 68:8 78:24 79:18 81:2
102:16 110:22 111:22 132:3
142:19 142:19 142:21
**Reading** [1] 105:22
**Real** [2] 44:19 86:14
**Realistic** [3] 74:24 75:1
75:1
**Realized** [1] 63:6
**Really** [24] 12:25 25:7 27:
9 27:9 40:18 59:12 62:4 66:
7 77:7 77:12 85:23 99:11
106:22 114:7 126:16 138:8
139:5 139:23 140:3 142:15
143:25 144:10 144:11 144:25
**Reason** [35] 5:12 8:1 9:23
18:22 19:3 23:4 23:6 23:11
23:12 23:12 27:2 27:15 33:
21 41:5 64:12 64:14 81:3 83:
19 84:16 88:12 88:15 88:16
94:5 95:13 98:12 98:16 98:
18 106:11 108:16 108:23 118:
17 121:5 128:16 130:21 133:
20
**Reasonable** [40] 9:1 11:

10 11:19 12:7 13:14 13:15
13:22 13:24 14:5 14:7 14:13
14:15 15:4 15:7 17:4 18:9
21:19 22:3 25:23 32:5 32:8
32:17 39:10 40:23 41:3 41:5
42:8 43:6 43:17 44:3 65:17
78:14 91:7 91:8 92:1 95:10
98:6 110:3 110:25 138:13
**Reasonably** [1] 114:19
**Reasons** [7] 94:6 94:19 94:
22 106:7 106:10 106:11 146:
10
**Receive** [11] 35:13 36:9
49:10 66:4 86:21 86:24 89:
18 94:4 94:19 101:4 128:24
**Received** [3] 89:22 90:25
105:21
**Receives** [1] 107:1
**Recognize** [4] 7:9 47:1
55:3 55:5
**Recognized** [1] 55:17
**Recognizes** [1] 22:15
**Recommendations** [2] 29:
21 30:2
**Record** [4] 1:1 147:6 147:
8 147:11
**Reevaluate** [1] 97:7
**Refer** [2] 94:14 94:18
**Reflection** [2] 135:15
135:16
**Reflective** [1] 140:5
**Reflects** [1] 147:9
**Refuse** [8] 6:14 6:24 30:2
43:18 44:1 80:25 81:2 81:3
**Regard** [2] 84:19 107:19
**Regarding** [4] 37:1 71:24
72:2 102:23
**Regardless** [1] 100:13
**Registered** [1] 54:9
**Regret** [1] 70:7
**Rehabilitatable** [1] 67:
13
**Rehabilitate** [4] 20:1
66:7 66:12 67:2
**Rehabilitated** [2] 65:6
65:12
**Rehabilitation** [3] 65:3
66:17 67:4
**Reinforce** [1] 47:14
**Relates** [1] 14:14
**Relationship** [2] 7:25
64:21
**Relax** [1] 56:8
**Released** [2] 29:6 61:12
**Relevant** [1] 144:10
**Religious** [5] 63:21 64:
12 64:14 119:19 119:24
**Remarkable** [1] 30:3
**Remarkably** [1] 33:9
**Remember** [14] 46:18 53:8
63:8 63:13 70:13 70:14 75:6
82:7 95:19 95:20 117:10 122:
8 125:13 126:6
**Remembering** [1] 112:12
**Remind** [1] 3:22
**Reminder** [1] 81:8
**Render** [2] 88:1 129:25
**Replace** [3] 21:14 22:23
28:6
**Report** [1] 55:16
**Reported** [3] 1:22 56:20
147:7
**Reporter** [2] 147:3 147:17
**Reporter's** [4] 1:1 147:6
147:8 147:11
**Reports** [1] 15:15
**Represent** [6] 56:7 69:11
85:10 119:9 121:7 124:19
**Representatives** [2]

107:23 108:6
**Represented** [3] 3:25 4:3
110:1
**Representing** [3] 72:6
75:5 111:17
**Request** [3] 3:17 52:18
**Requested** [2] 3:19 147:5
**Require** [3] 18:2 74:1 137:
23
**Required** [6] 16:16 17:7
17:14 22:17 32:7 47:5
**Requirement** [1] 22:18
**Requires** [10] 74:2 79:11
79:13 101:21 102:12 102:13
103:22 104:2 143:21 143:22
**Resemblance** [1] 79:19
**Reservation** [1] 48:12
**Resolve** [1] 108:25
**Respect** [2] 65:2 143:11
**Respective** [1] 147:9
**Respond** [1] 89:19
**Responded** [1] 143:6
**Response** [2] 105:12 141:
15
**Responsibility** [9] 9:16
32:14 64:8 72:5 72:13 94:15
103:14 135:9 138:23
**Responsible** [9] 74:10
132:16 132:17 132:21 132:25
133:7 133:17 137:24 138:20
**Rest** [2] 93:6 103:19
**Restaurant** [1] 62:13
**Restrictions** [1] 81:4
**Result** [21] 14:18 24:20
31:13 31:14 36:14 37:18 37:
19 44:24 57:4 60:9 61:1 87:
18 98:11 113:12 113:14 119:
20 126:1 131:5 131:6 131:14
138:5
**Resulted** [1] 115:22
**Resulting** [2] 128:12 131:
3
**Results** [3] 57:11 78:17
124:6
**Retardation** [5] 24:7 24:
12 24:14 24:15 27:6
**Retarded** [4] 24:7 24:13
24:13 24:14
**Retire** [2] 45:18 45:20
**Retired** [1] 76:8
**Return** [1] 21:20
**Returning** [1] 119:20
**Revenge** [1] 35:12
**Review** [1] 140:8
**Rights** [1] 103:6
**Rise** [1] 40:22
**Rises** [1] 83:4
**Risk** [1] 28:1
**Road** [2] 96:22 133:12
**Roam** [1] 33:19
**Rob** [1] 38:21
**Robbed** [2] 62:14 63:3
**Robber** [2] 38:22 39:14
**Robberies** [1] 17:22
**Robbery** [8] 61:16 62:1 62:
16 65:7 65:11 77:2 91:16
127:20
**Robbing** [1] 62:18
**Robs** [1] 38:23
**Role** [3] 14:24 75:21 107:1
**Room** [6] 33:19 35:16 63:6
63:15 130:14 137:2
**Row** [5] 16:18 58:15 58:21
58:22 59:1
**Rule** [1] 30:16
**Rules** [13] 4:11 4:24 5:8
5:19 6:12 6:20 6:23 44:14
48:2 74:3 83:2 123:4 123:11

**Run**
Runs [1] 38:22
Rush [1] 121:16

## S

Sake [1] 24:24
Salaried [1] 50:22
San [1] 147:18
Satisfied [3] 44:21 45:5 45:8
Satisfies [1] 40:23
Satisfy [1] 44:20
Save [1] 40:15
Saves [1] 27:25
Saw [9] 27:24 39:1 40:9 42:7 42:12 44:23 59:5 77:8 77:8
SBOT [4] 2:3 2:5 2:13 2:18
Scary [1] 62:22
Scenario [2] 107:10 108:4
Scene [2] 42:23 43:2
Schedule [1] 80:17
School [2] 18:19 98:25
Schoolteacher [1] 71:7
Scout [1] 93:3
Script [1] 75:8
Search [2] 22:19 95:16
Season [1] 15:11
Seated [1] 3:20
Seats [2] 25:16 63:18
Second [59] 4:2 6:5 6:7 6:19 6:21 6:22 7:7 7:10 7:18 8:5 8:6 8:9 8:17 8:24 9:17 9:19 10:4 10:12 12:1 12:14 13:12 14:22 15:1 20:15 20:17 20:20 20:20 20:22 21:8 21:11 21:15 21:16 21:21 22:6 22:19 22:25 25:15 27:5 31:3 36:1 36:2 36:25 38:10 44:18 49:12 54:6 80:3 84:17 84:23 95:25 116:7 117:9 121:21 123:14 123:17 124:3 138:24 139:14
Secondly [1] 21:2
Seconds [1] 42:18
See [50] 6:11 6:16 9:18 13:11 14:6 14:25 16:9 16:15 21:16 22:20 24:17 25:20 33:2 33:18 34:13 35:15 37:20 39:1 40:11 42:7 42:19 42:21 43:4 49:4 64:20 64:22 80:16 80:20 80:24 87:18 92:7 92:19 96:3 97:14 97:23 103:9 103:10 104:1 106:10 106:12 107:6 111:5 118:9 118:11 123:12 129:5 134:24 136:22 139:24 143:19
Seeing [2] 35:2 58:19
Seek [2] 95:5 98:8
Seeking [2] 98:4 119:25
Seem [1] 75:7
Sees [7] 42:15 42:17 42:19 42:20 42:22 99:8 99:9
Seize [1] 42:24
Seldom [1] 34:19
Select [1] 47:12
Selected [2] 46:23 47:20
Self [20] 31:10 31:11 72:11 88:20 113:6 113:12 114:2 114:5 114:11 115:3 115:4 115:5 115:12 115:13 115:22 116:4 116:5 124:9 127:12 138:21
Self-defense [22] 31:10 31:11 72:11 88:20 90:13 113:6 113:12 114:2 114:5 114:11 114:18 115:3 115:4 115:5 115:12 115:13 115:16 115:22 116:4 116:5 127:12 138:21
Sell [1] 76:11
Send [1] 44:10

Sense [1]
55:6 105:13
Sent [4] 29:18 61:8 66:8 98:23
Sentence [44] 9:24 9:24 10:5 10:16 14:20 21:14 22:23 22:24 23:4 23:6 23:8 24:22 25:6 25:12 27:16 28:6 28:6 29:1 29:5 30:6 30:8 30:17 30:22 30:25 34:8 35:14 36:9 37:5 45:2 45:3 49:15 49:17 78:21 84:5 84:17 84:17 95:2 95:23 108:20 120:15 128:6 137:20 138:1 141:14
Sentences [2] 10:19 10:20
Sentencing [4] 36:17 37:14 116:18 117:2
Separate [2] 7:20 138:10
September [7] 1:18 45:9 46:22 80:6 80:10 81:15 121:24
Serious [3] 103:18 111:20 138:8
Serve [15] 47:5 55:21 70:3 70:10 70:18 72:22 74:1 74:17 74:17 77:16 77:22 79:24 109:23 116:11 117:5
Served [2] 29:7 121:15
Service [14] 3:23 27:21 46:10 47:23 53:18 77:19 82:17 103:25 104:16 119:12 122:18 126:13 126:14 136:13
Serving [1] 70:13
Set [14] 31:3 34:15 34:16 74:7 87:23 104:2 104:8 104:12 104:19 123:4 125:7 128:5 128:9 136:18
Settled [3] 70:15 70:24 70:25
Seventeen [2] 23:19 75:11
Seventy [3] 34:19 35:10 35:13
Seventy-five-year-old [3] 34:19 35:10 35:13
Several [4] 51:13 51:13 70:13 125:14
Severe [1] 50:11
Severely [1] 24:13
Sexual [1] 127:21
Share [1] 56:9
Shift [1] 8:7
Shoot [2] 42:7 89:2
Shooting [3] 42:21 91:16 118:5
Shoots [2] 42:19 88:10
Short [1] 111:21
Shot [3] 42:4 105:4 129:19
Show [11] 13:21 14:12 14:32 16:2 32:16 32:19 41:17 75:7 81:12 87:18 92:5
Showed [1] 113:8
Shows [3] 42:25 64:20 75:2
Shy [1] 135:8
Side [1] 47:7
Sides [2] 59:5 59:6
Signed [1] 142:7
Silly [1] 89:15
Simple [4] 6:10 13:1 28:23 28:24
Simplistic [1] 33:18
Simply [8] 5:12 6:23 9:19 16:18 23:10 30:3 34:10 83:18
Single [6] 10:23 23:2 26:21 43:3 45:7 105:10
Singling [1] 112:21
Singular [1] 41:7
Sister [2] 112:1 112:1
Sit [18] 56:8 63:24 64:3 64:10 64:15 64:16 69:22 70:19 73:20 73:24 74:12 104:10

Sits [1] 44:24
Sitting [21] 50:21 60:10 63:22 64:9 72:18 77:23 79:5 103:15 104:24 106:5 112:3 112:13 137:1 139:3 139:25 140:2 140:21 141:7 143:16 145:11 145:16
Situation [20] 50:4 50:11 51:7 51:21 60:20 62:22 86:16 87:15 105:17 108:5 113:5 115:6 120:13 120:15 132:7 133:14 137:18 138:19 141:12 141:13
Six [2] 63:11 125:16
Sixty [1] 146:15
Sixty-year [1] 146:15
Slipped [1] 133:10
Small [1] 130:8
Social [1] 140:1
Socializing [1] 13:9
Societies [1] 19:5
Society [21] 9:4 18:14 18:15 18:17 18:21 18:24 19:2 19:3 20:3 20:9 21:7 26:4 33:24 65:20 66:23 66:24 84:14 91:21 92:3 137:9 142:25
Sold [1] 76:13
Solely [1] 38:17
Someone [29] 57:12 57:19 60:17 60:18 65:6 65:12 65:15 85:19 86:13 87:14 88:25 89:1 89:5 89:6 90:10 91:1 91:17 91:18 92:8 92:10 93:19 95:6 95:7 97:20 98:22 130:25 134:2 134:4
Sometimes [6] 23:17 28:24 40:16 57:4 116:12 137:17
Somewhat [2] 5:16 55:18
Somewhere [6] 46:17 51:8 54:18 61:18 74:18 74:20
Somewheres [1] 133:4
Son [2] 75:10 142:1
Sorry [7] 54:19 56:24 83:16 84:1 118:22 119:16 136:17
Sorting [1] 48:20
Sorts [3] 33:21 33:23 33:24
Sound [6] 45:16 83:10 89:14 106:6 145:1 145:2
Sounds [3] 48:9 104:5 104:6
Source [6] 38:8 39:7 39:17 55:13 55:20 110:23
Southwest [1] 2:14
Space [1] 133:4
Special [5] 21:22 123:25 129:2 129:7 143:24
Specific [4] 5:16 17:13 18:11 118:14
Specifically [5] 12:14 36:4 37:3 41:12 69:20
Specify [1] 106:13
Speeding [1] 11:4
Spend [7] 5:6 6:4 8:23 25:18 47:17 80:12 100:18
Spent [3] 4:10 123:13 123:20
Split [1] 16:18
Spot [1] 110:16
Stage [17] 65:23 90:3 90:4 90:17 90:17 91:1 91:4 101:20 113:18 113:20 113:25 114:1 116:7 116:14 130:11 130:12 143:18
Stand [8] 106:6 109:13 112:4 116:20 130:15 134:22
Standing [2] 42:16 42:20
Standpoint [2] 13:17 75:3
Stands [1] 4:7

Start [9] 12:8 28:9 54:3 124:11 136:7 142:20
Started [3] 6:9 6:20 81:18
Starting [2] 14:1 14:2
Starts [4] 7:8 13:13 14:3 27:13
State [51] 1:10 2:10 3:24 4:3 10:19 11:9 12:6 13:18 13:19 14:8 16:7 16:10 16:15 16:16 17:7 17:11 18:8 21:24 22:1 22:5 22:11 25:22 25:25 29:23 29:25 32:1 32:16 33:9 35:5 54:8 56:7 72:6 72:21 85:10 91:9 91:25 93:20 98:4 109:18 110:2 110:12 113:9 119:9 124:19 126:25 130:10 138:12 138:16 140:10 147:1 147:4
State's [8] 11:18 12:9 13:24 14:12 15:4 17:10 32:7 106:9
Statement [5] 67:25 99:23 99:25 102:23 131:20
Status [1] 70:8
Stay [4] 11:7 11:8 38:23 97:9
Stays [1] 14:3
Steering [1] 38:6
Step [1] 107:4
Stepdad [1] 99:3
Stepping [1] 93:15
STEVEN [1] 45:21
Still [25] 33:6 40:11 45:8 49:8 49:12 50:15 76:14 84:4 84:7 84:8 84:18 86:17 89:9 92:18 93:20 93:21 97:23 98:24 117:5 133:6 133:16 136:23 137:19 143:18 143:23
Stone [1] 93:15
Stop [3] 97:7 140:20 142:13
Storm/Vietnam [1] 27:20
Straight [1] 93:3
Strange [1] 48:20
Street [2] 27:23 89:1
Strength [1] 79:9
Strong [5] 6:13 87:22 104:11 105:3 140:4
Strongly [2] 77:25 104:23
Struggled [1] 112:22
Student [1] 93:3
Studies [1] 71:16
Stuff [10] 5:10 25:1 28:8 49:2 69:14 105:8 105:25 110:19 130:3 141:5
Stupid [5] 38:7 96:16 111:10 120:4 120:5
Subject [1] 137:7
Substance [2] 98:24 132:23
Substitute [1] 84:16
Succinct [1] 102:23
Suffer [3] 34:24 57:16
Suffering [1] 51:20
Sufficient [18] 9:21 9:23 11:10 11:18 22:23 23:3 23:6 23:12 24:21 25:5 25:11 28:5 84:16 92:16 92:18 94:17 94:19 129:16
Suggest [7] 32:23 86:3 98:2 107:6 107:7 107:11 135:4
Suggestion [1] 106:16
Summer [2] 71:12 71:14
Summertime [1] 71:17
Sunday [1] 71:7
Support [2] 34:21 34:25
Suppose [1] 57:24
Supposed [1] 49:4
Surely [1] 28:1
Surprised [1] 134:11

| | | | |
|---|---|---|---|
| **Suzette** [2] 82:1 108:7 | **TICK** [1] 42:23 | **Twenty-year** [1] 146:14 | **Victim** [4] 20:2 27:9 49: |

**Suzette** [2] 82:1 108:7
**Swing** [1] 50:16
**Switch** [1] 60:19
**Sworn** [5] 45:22 53:2 82:2 117:12 122:2
**System** [2] 34:21 136:21

**T**

**Table** [1] 145:11
**Talented** [1] 75:15
**Talks** [1] 34:23
**Taught** [1] 132:4
**Teach** [1] 66:9
**Teachers** [1] 19:21
**Teaching** [1] 19:8
**Team** [1] 15:14
**Teenagers** [1] 71:15
**Television** [3] 34:13 58: 12 80:25
**Ten** [7] 8:23 78:8 78:11 111:2 118:6 118:9 120:16
**Tend** [4] 39:11 107:19 136: 5 142:19
**Tends** [3] 39:8 39:17 129: 10
**Tenor** [1] 18:8
**Term** [1] 13:13
**Terms** [7] 12:18 12:21 33: 18 48:8 113:14 118:14 139:7
**Terrence** [1] 55:2
**Terrible** [1] 111:18
**Test** [4] 54:16 76:21 76:22 136:11
**Testified** [5] 45:22 53:2 82:2 117:12 122:2
**Testify** [4] 39:3 39:5 42: 5 130:17
**Testimony** [33] 4:16 4:22 4:25 4:25 5:1 5:2 5:4 9:17 19:7:22 23:18 24:6 28:13 36: 13 38:18 39:18 40:8 40:11 40:12 40:13 40:16 40:19 40: 20 41:7 41:24 41:25 42:14 43:4 43:15 43:16 44:2 79:20 94:22
**Testing** [1] 76:18
**Texas** [31] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 3:24 4:3 4:9 10:19 20:7 29:24 30:1 33:9 56:7 77:16 85:10 91:9 98:4 107:23 108:5 119:9 124: 19 126:25 127:9 147:1 147:4 147:16 147:17 147:18
**Themselves** [5] 12:14 63: 25 64:17 124:2 145:1
**Thereafter** [1] 19:13
**Therefore** [1] 30:24
**Thereof** [2] 65:25 90:20
**They've** [1] 32:2
**Thinking** [10] 28:8 68:3 68:14 86:14 86:15 86:19 114: 15 143:6 144:8 144:11
**Thinks** [2] 35:2 140:5
**Third** [6] 21:19 21:22 24: 10 32:23 32:25 42:22
**Thorough** [1] 140:8
**Thoughts** [7] 56:13 58:18 67:22 68:2 85:14 102:15 109: 6
**Threat** [16] 9:4 18:13 20: 7 20:8 21:6 26:4 65:20 67:8 91:20 92:3 92:22 93:13 93: 17 93:22 95:11 97:21
**Three** [11] 26:16 26:18 32: 9 32:15 42:2 42:4 76:6 76:7 81:13 123:20 136:17
**Throat** [1] 76:20
**Throw** [4] 24:25 25:1 106: 4 144:23
**Thumbs** [2] 135:13 135:13

**TICK** [1] 42:23
**Ticket** [1] 11:4
**Tires** [1] 38:7
**Today** [13] 5:6 6:5 30:12 46:21 53:5 68:7 68:10 82:5 85:17 122:5 123:14 124:25 128:4
**Together** [8] 7:13 38:15 43:5 53:9 76:3 82:8 110:24 117:18
**Took** [2] 16:18 21:8
**Topic** [1] 104:23
**Topics** [1] 135:12
**Total** [7] 3:93 6:4 147:10
**Totality** [1] 139:10
**Totally** [1] 146:8
**Touch** [1] 38:13
**Touched** [1] 82:15
**Touchy** [1] 137:6
**Tough** [1] 136:1
**Toward** [1] 63:7
**Town** [1] 48:20
**Transaction** [1] 72:9
**Transcription** [1] 147:5
**Transcription/stenograph** [1] 1:23
**Translates** [1] 87:7
**Treated** [3] 62:7 62:8 145: 6
**Treatment** [1] 80:23
**Tremendous** [1] 103:14
**Trial** [83] 1:3 4:12 5:9 6: 6 6:8 6:17 6:19 7:5 7:7 7: 12 7:14 7:15 7:19 7:20 7:21 8:3 8:6 8:9 8:18 9:13 9:17 11:3 11:5 11:9 12:1 14:2 15: 1 16:10 17:8 17:13 22:8 23: 19 26:3 27:19 30:15 34:8 35: 20 35:23 35:24 36:2 36:3 36: 8 36:25 40:6 40:10 41:24 42: 7 46:23 50:8 51:8 54:3 60: 10 61:2 61:20 61:22 65:22 79:4 90:17 91:1 91:14 95:20 104:17 104:24 113:18 113:21 114:1 114:2 116:7 116:15 123:6 123:14 123:16 128:11 130:11 131:15 132:13 137:20 138:12 138:24 139:14 143:13 143:20 146:5
**Trials** [2] 130:8 138:10
**Triangle** [2] 26:19 26:20
**Tried** [3] 66:3 66:7 106:1 106:15
**Trivialize** [1] 109:5
**Trivializing** [1] 141:11
**Trouble** [4] 66:6 93:4 93: 14 133:20
**Truck** [1] 50:13
**True** [4] 72:10 88:1 129:25 147:4
**Truest** [1] 109:18
**Truly** [5] 105:14 105:15 147:9
**Try** [10] 5:24 24:19 51:3 56:12 72:6 72:20 107:5 134: 23 144:12 146:9
**Trying** [15] 20:3 28:11 37: 16 37:17 44:5 47:18 77:25 78:1 79:5 81:5 109:5 109:5 113:18 119:22 142:25
**Turn** [6] 57:23 66:9 112:7 144:16 144:19 145:23
**Turns** [1] 104:16
**TV** [1] 110:22
**Twelve** [6] 6:21 7:2 70: 19 77:22 110:23 125:15 125: 16 125:18 140:2 141:7 145: 16 145:20
**Twenty** [3] 15:16 72:19 146:14
**Twenty-seven** [1] 41:2

**Twenty-year** [1] 146:14
**Twin** [1] 112:1
**Two** [58] 4:3 7:14 9:6 9:10 10:2 10:23 15:21 26:18 28: 11 28:14 29:4 30:14 31:25 32:8 32:12 38:15 40:4 41:10 46:12 46:22 47:1 50:8 50:8 51:3 54:24 70:14 72:7 72:15 78:3 78:15 78:16 80:6 88:24 90:14 90:24 91:2 94:5 95:8 95:15 95:19 96:4 97:5 98:9 99:16 100:20 103:16 107:24 108:23 121:23 123:24 125:18 127:18 129:5 130:6 130:8 136:20 137:16 142:2
**Type** [30] 8:13 57:7 59:23 60:4 60:11 60:12 61:3 61:16 67:4 71:11 71:13 75:4 79:9 86:22 87:13 88:3 88:9 89:4 90:10 97:17 116:1 120:4 120: 5 125:10 129:13 131:16 131: 17 133:22 141:11 141:12
**Types** [9] 31:5 57:8 60:5 88:5 97:1 104:21 120:8 127: 19 131:10
**Typical** [1] 135:2
**Typically** [1] 140:5

**U**

**Ultimately** [4] 72:22 135: 12 135:16 138:20
**Unanimously** [2] 21:9 35: 22
**Under** [7] 6:24 37:14 51: 20 72:13 114:19 121:13 127: 25
**Underline** [1] 138:10
**Underscores** [1] 144:24
**Undivided** [2] 51:18 51:25
**Undo** [1] 101:17
**Unfair** [2] 16:9 16:15
**Unique** [1] 21:17
**Uniqueness** [2] 36:13 37:9
**Unit** [1] 19:7
**Unless** [14] 11:8 11:12 14: 4 14:16 15:3 21:11 64:22 88: 22 90:9 92:9 94:4 105:17 123:17 134:4
**Up** [48] 12:6 12:11 14:11 20:19 20:22 21:8 24:20 26:5 26:8 26:9 28:14 34:3 34:7 42:18 44:23 46:4 51:3 71:4 71:15 77:21 82:11 82:14 86: 25 89:1 89:13 89:16 96:5 101:5 103:25 106:5 117:22 117:25 122:15 128:5 128:9 128:12 131:22 132:11 134:24 135:13 138:5 139:18 140:12 142:7 143:13 144:13 144:22 145:16
**Upbringing** [2] 141:5 146: 11
**Uses** [1] 13:8

**V**

**Various** [1] 126:20
**Venire** [1] 3:20
**Venireman** [1] 120:20
**Venireperson** [3] 3:2 3: 3 81:22
**Verdict** [13] 21:20 25:7 32:24 32:25 84:5 88:1 113: 14 116:18 119:20 124:2 126: 3 129:25 138:6
**Verge** [1] 42:6
**Versus** [4] 3:24 103:22 107:6 107:11
**Vertigo** [1] 76:23
**Vestibular** [1] 76:22
**Veteran** [1] 27:20
**Veterinarian** [1] 75:18
**Vicious** [1] 34:1

**Victim** [4] 20:2 27:9 49: 14 62:16
**Victims** [2] 33:23 105:15
**View** [5] 22:22 69:17 71:24 77:23 106:9
**Viewing** [1] 118:10
**Views** [9] 77:14 78:1 102: 17 104:2 104:8 104:11 104: 12 136:25 137:4
**Violence** [25] 9:3 16:9 17:5 17:18 17:19 17:20 17: 22 17:24 18:1 18:4 18:7 18: 12 19:10 19:14 19:19 19:24 20:6 65:19 91:13 91:15 92:2 92:22 93:23 95:12 97:22
**Violent** [2] 65:4 91:19
**Visit** [4] 3:23 72:20 135: 11 136:2
**Visiting** [1] 135:19
**Voir** [24] 1:15 45:23 50:1 53:3 56:4 63:14 69:8 82:3 85:7 95:16 85:22 105:25 102: 5 117:13 119:3 121:1 122:3 124:16 124:24 124:25 127:8 127:9 129:4 134:18
**Volume** [1] 1:2 147:6
**VOLUMES** [1] 1:2
**Voluntary** [2] 133:9 133: 14
**Vote** [14] 77:20 94:21 95: 14 97:12 98:13 107:24 108:7 109:4 113:25 115:5 115:6 116:2 129:9 135:5
**Voted** [2] 21:9 21:9
**VS** [1] 1:8

**W**

**Wait** [7] 6:22 64:20 86:20 86:23 87:18 95:25 96:20
**Walk** [2] 42:22 89:1
**Walks** [1] 35:3
**Wall** [1] 35:3
**Walls** [5] 19:4 19:7 19:10 19:15 19:17
**Wants** [4] 31:13 35:1 75: 18 104:5
**Warden** [1] 19:22
**Warranted** [1] 13:20
**Warrants** [1] 95:23
**Waste** [2] 7:3 47:15
**Watch** [1] 81:1
**Watched** [1] 58:9
**Watching** [1] 74:21
**Wayne** [3] 2:12 4:1 69:11
**Weather** [1] 15:15
**Wednesday** [3] 80:6 81:17 121:24
**Week** [7] 27:22 46:25 50:12 54:3 54:6 54:10 96:2
**Weeks** [7] 46:12 46:22 50: 8 50:9 51:3 80:6 121:23
**Weigh** [5] 95:17 96:8 112: 18 129:8 129:17
**Weight** [4] 4:15
**Welch** [1] 141:22
**Wentz** [11] 2:17 4:1 52:14 52:15 69:11 103:13 109:8 110:5 111:17 121:5 135:10
**Wentz'** [1] 3:13
**Westbury** [1] 142:8
**Whatsoever** [1] 105:16
**Wheel** [1] 38:6
**Whereby** [1] 60:7
**Wherein** [1] 22:16
**Whichever** [2] 9:8 23:5
**Whole** [5] 5:11 5:23 23:3 25:7 25:9 25:13 44:13 46:3 52:1 53:19 116:22 143:20
**Wiedemann** [3] 50:18 52:7

52:9
**Wiedmann** [6] 45:21 45:25 46:20 47:14 49:5 50:3
**Willing** [1] 123:10
**Win** [1] 15:14
**Window** [2] 18:3 18:3
**Windshield** [1] 18:6
**Wish** [1] 140:22
**Withdraw** [4] 21:13 22:23 25:11 28:5
**Witness** [5] 69:5 106:6 112:4 130:15 147:12
**Witnesses** [8] 4:15 4:19 5:1 41:1 41:2 42:11 42:11 111:4
**Woman** [5] 72:9 99:25 100:5 100:9 109:9
**Women's** [1] 71:8
**Wonder** [2] 112:4 112:5
**Wondering** [3] 118:4 118:5 118:7
**Word** [16] 13:1 15:8 15:9 15:10 15:18 15:20 15:22 16:1 16:5 16:19 16:22 16:23 18:15 18:24 20:3 23:10
**Words** [14] 12:23 13:4 13:7 48:24 51:10 56:22 83:14 87:7 87:8 93:13 108:4 113:21 132:19 133:15
**Workday** [1] 19:12
**Works** [2] 97:14 116:8
**World** [5] 6:7 22:4 57:2 96:17 104:18
**Worry** [2] 50:14 50:15
**Worse** [1] 96:22
**Worthwhile** [1] 24:25
**Worthy** [3] 25:2 33:24 38:12
**Wrenching** [1] 140:13
**Writing** [2] 5:21 147:5
**Wrote** [2] 63:24 110:4

## Y

**Y'all** [5] 37:15 47:12 63:14 122:10 126:3
**Year** [10] 29:9 29:25 34:19 35:10 35:13 37:5 141:20 146:14 146:14 146:15
**Years** [35] 23:19 29:8 29:10 29:16 29:20 30:7 30:13 30:18 30:19 30:23 33:13 33:19 34:20 37:8 45:6 62:3 63:11 70:13 71:15 76:6 76:8 86:8 86:9 89:7 89:8 90:5 99:16 100:21 111:2 118:6 118:9 120:16 125:14 125:15 142:2
**Yesterday** [3] 46:22 80:7 121:23
**Young** [7] 24:2 96:13 96:15 99:25 100:5 100:9 103:15
**Yourself** [9] 9:21 44:20 45:5 52:16 59:15 97:6 107:17 111:24 146:5
**Yourselves** [2] 6:6 12:22
**Youth** [5] 71:6 71:6 71:11 71:19 96:14
**Youthfulness** [1] 23:21
**Youths** [1] 71:13
**YVETTE** [1] 82:1

## Z

**ZENOBIA** [1] 53:1
**Zero** [2] 78:7 78:11

1    REPORTER'S RECORD

2    VOLUME 10 OF 25 VOLUMES

3    TRIAL COURT CAUSE NO. 800112

4

5    CHARLES MAMOU, JR.        )    IN THE DISTRICT COURT

6              Appellant        )

7                               )

8    VS.                        )    HARRIS COUNTY, TEXAS

9                               )

10   THE STATE OF TEXAS         )

11             Appellee         )    179TH JUDICIAL DISTRICT

12

13

14                  * * * * * * * * * * * * * * * * * * * *

15                  VOIR DIRE EXAMINATION

16                  * * * * * * * * * * * * * * * * * * * *

17

18        On the 17th day of September, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Bob Burdette, Judge

21   Presiding, held in Houston, Harris County, Texas:

22        Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

2

```
 1                  A P P E A R A N C E S

 2       MR. LYN MCCLELLAN

 3       SBOT NO. 13396100

 4       MS. CLAIRE CONNORS

 5       SBOT NO. 0470500

 6       Assistant District Attorneys

 7       201 Fannin

 8       Houston, Texas 77002

 9       Phone:  713.755.5800

10       ATTORNEYS FOR THE STATE OF TEXAS

11

12       MR. WAYNE HILL

13       SBOT NO. 59656300

14       4615 Southwest Freeway

15       Houston, Texas 77027

16       PHONE:  713.623.8312

17       MR. KURT WENTZ

18       SBOT NO. 21179300

19       5629 W FM 1960

20       Houston, Texas 77069

21       PHONE:  281.587.0088

22       ATTORNEYS FOR THE DEFENDANT
23

24

25
```

i

# INDEX

## VOLUME 10 OF 25

|  |  | PAGE | VOL. |
|---|---|---|---|
| September 17, 1999   Voir Dire Examination |  |  | 10 |
| Panel Voir Dire |  | 3 | 10 |

| Venirepersons | Court | State | Defense |  |
|---|---|---|---|---|
| Charles Gilbert | 44 | 45 | 57 | 10 |
| Elyse Conner Sony | 69 | 71 | 80 | 10 |
| Stacie Cokinos | 91 | 91 | 101 | 10 |

|  | PAGE | VOL. |
|---|---|---|
| Panel Voir Dire | 110 | 10 |
| Court concluded | 166 | 10 |
| Court Reporter's Certificate | 167 | 10 |

3

```
1              (Panel is brought in and seated.)
2         THE COURT:  Folks, come on down on this
3   end.  Good morning.  To remind you, we were here to
4   visit with you about your prospective service as a juror
5   in the case of the State of the Texas versus Charles
6   Mamou, Jr.  Mr. Mamou is seated over here next to his
7   attorneys, Mr. Wayne Hill, Mr. Kurt Wentz.  State of
8   Texas is represented by two of her Assistant District
9   Attorneys, Mr. Lyn McClellan, who is present right now,
10  and Miss Claire Connors, who will be along in a little
11  bit.
12         We talked to you the other day about some
13  things that had to do with the rules that can come into
14  play during the course of a trial like this.  We talked
15  about the fact that whatever rules do actually come into
16  play will depend upon whatever the testimony is in the
17  case.  We talked about the difference between your job
18  as a juror and my job as a Judge.  You decide the facts.
19  I decide the law.  You take what you believe to be the
20  believable testimony and, therefore, apply the
21  applicable law out of the Court's charge.
22         We talked about the fact that the trial
23  can come in two parts.  The first part of the trial, the
24  jury's only concern is going to be with deciding whether
25  the defendant is or is not guilty.  If the defendant is
```

4

```
1   found not guilty, obviously the case is over with.  If,
2   however, the defendant is found guilty, we can come
3   back.  We do come back, and we can have a second portion
4   of the trial.
5         The second portion of the trial, the
6   evidence will be presented that is going to be
7   remarkably different than the evidence presented at the
8   first phase of the trial, because the jury's function is
9   remarkably different.  Since your job at the first phase
10  of the trial is to decide the question of whether the
11  defendant is or is not guilty, the focus of the evidence
12  is going to be on the crime that was committed.  Who did
13  it?  Where was it done?  When was it done?  How was
14  it done?  Who did it?  The relationship of the
15  parties, if there was one.  The reason for doing it, if
16  it's known.  But that's all the stuff you're going to
17  hear at the first phase of the trial.
18         At the second phase of the trial, if there
19  is a finding of guilt, the focus of the evidence is
20  going to shift and go away from the evidence about the
21  crime; because you've already heard all there is to hear
22  about the crime.  And at the second phase of the trial,
23  the focus of the evidence is going to be on the
24  background, the character, and the comparative
25  involvement, so to speak, of the defendant on trial.
```

5

```
1   Because what we're going to want you to do is possess
2   enough information about the first part of the trial,
3   the crime itself, also possess enough information about
4   the person that committed the crime so you can
5   intelligently answer two Special Issues or two questions
6   that will be given to you at the second phase of the
7   trial.
8         We're going to spend some time talking
9   today about some things that we have not talked about
10  before, when the big group was together.  And to be
11  perfectly honest with you, the reason we didn't talk
12  about it then is because that group was too large.  I
13  don't mean the personalities within the group, but the
14  numbers.
15         Tell you something else.  We're going to
16  talk about some things.  I'll bet you none of the three
17  of you have ever before thought about this in your whole
18  life, and there is absolutely no reason why you should.
19  And you may find -- and you may believe that some of
20  this stuff is pretty specific and pretty precise.
21  Please don't get frustrated.  Don't, to yourselves,
22  mentally throw up your hands and say, I can't do this.
23  It's too hard.  It's not.
24         First off, let me tell you, you're not
25  going to have to memorize what it is I'm telling you
```

6

```
1   today.  That's not the point of this.  I'm telling you
2   this today so you'll have an idea about what can happen.
3   It's kind of like reasoning is forewarned.
4         The second thing is, the reason you don't
5   have to memorize what I'm going to tell you is because
6   all of these rules that we're talking about, if the
7   testimony in the case does bring them into play, these
8   rules will be given to you in writing.  They will be in
9   the Court's charge.  You will have the Court's charge,
10  the written instrument, with you back in the jury room
11  during the totality of your deliberations.
12         So what we're talking about today is going
13  to be written for you.  You need to apply it if that
14  time does come, so don't worry about memorizing.  I just
15  want to give you an overview, an overview for the
16  purposes of maybe making you feel a little bit more
17  comfortable doing something that you may not have ever
18  done before.
19         Now we talked the other day that at the
20  first phase of the trial all people charged with crime
21  start off being not guilty, and they stay not guilty
22  unless or until the quality of the State's evidence
23  persuades the jury beyond a reasonable doubt that, in
24  fact, the defendant is guilty.
25         The burden of proving the defendant's
```

7

1   guilt is on the State, so starting off the verdict for
2   the jury is not guilty. And it's the State's job,
3   through the quality of their evidence and the quality
4   has to be sufficient that proves beyond a reasonable
5   doubt the defendant's guilt. It's the State's job to
6   bump up that not guilty to a guilty. And they bump it
7   up on the basis of the quality of their testimony, the
8   evidence they present. And trust me, bump it up, as I'm
9   using it, is not a legal term. And as you'll find out,
10  I'll try to avoid using as many of those terms as I can.
11          Say we come back to the second phase of
12  the trial, if there was a finding of guilt, for purposes
13  of determining, now what do we do with the person?
14  We've got two questions. We need to answer those two
15  questions on the board. And I want to spend some time
16  talking about the questions.
17          The first question asks: Do you find from
18  the evidence beyond a reasonable doubt that there is a
19  probability that the defendant would commit criminal
20  acts of violence that would constitute a continuing
21  threat to society? Now, no matter who the defendant, no
22  matter what the defendant, no matter who the case,
23  there's never but two possible answers to that question.
24  Answer yes or no answer, whichever way you think the
25  evidence dictates.

8

1          Question Number Two says: Taking into
2   consideration all of the evidence, including the
3   circumstances of the offense -- that's going to be what
4   you heard at the first phase of the trial, which is
5   including character and background of the defendant, as
6   well as the defendant's personal moral culpability,
7   personal responsibility. And that can come into play if
8   you have a case, for example, where it might be multiple
9   defendants committing the crime. You want to know, how
10  did this one's comparative conduct fit in compared to
11  the other defendant's conduct? That's the reason for
12  that part.
13          So the first half of the second question,
14  you can see, is simply an instruction to the jury to go
15  back over all of the evidence in the case for the
16  purposes of asking yourself this question: Is there a
17  sufficient mitigating circumstance or circumstances that
18  make you believe that a life sentence would be a more
19  appropriate verdict than a death sentence? No matter
20  who the defendant, no matter who the victim, no matter
21  what the case, there's two possible answers, yes or no.
22  Again, answer that question the way you think it ought
23  to be answered based on the evidence. We know from our
24  conversation the other day that these questions are
25  always going to be asked in this order.

9

1          These questions, the words never change in
2   these questions. You and I know that we see cases in
3   the paper reported where sometimes at the conclusion of
4   a capital murder trial, some jury -- a life sentence is
5   imposed. Sometimes a death sentence is imposed. Those
6   things vary. And the things that vary, those verdicts
7   vary from case to case to case. These questions never
8   vary. The reason that the verdicts vary is because the
9   facts are always different. The defendants are always
10  different. The victims are always different.
11          And you may not have ever thought about
12  this before, but the juries are always different.
13  Because we could have four juries in here listening to
14  the same testimony at exactly the same time go out in
15  separate rooms and deliberate. We could have basically
16  four different verdicts, hearing the same stuff from the
17  same people at the same time, just evaluated a little
18  bit different.
19          But the point of it is at this point I
20  want to say it's not the jury's function to sentence
21  somebody to life. It's not the jury's function to
22  sentence somebody to death. It's the jury's function to
23  take the evidence that exists in the case simply for the
24  purpose of coming up with answers to these two
25  questions.

10

1          Now these questions will be contained in
2   the Court's charge at the second phase of the trial if
3   the defendant was convicted of capital murder. We
4   talked the other day briefly about the fact that in the
5   Court's charge, the rules that come into play are going
6   to be contained in the charge. And there are going to
7   be a number of words that are going to be defined for
8   you.
9          There are also going to be a number of
10  words that are not going to be defined for you in the
11  Court's charge. And your question is: How in the world
12  do you people decide what you will tell us about and
13  what you won't tell us about? The answer to that is
14  really very simple. There is no reason for us to expect
15  jurors to come and give up their time and be armed with
16  knowing, defining -- if we're going to be using a term
17  that's peculiar to the lawyering business, we're going
18  to define it for you in the Court's charge. If we're
19  going to be using words that we use everywhere we are,
20  work, play, family, school, whatever, then we're not
21  going to define those words; because they're words of
22  common usage, so we're going to find with these
23  questions, we've got some of each of those.
24          Let's start off talking about these
25  questions, talking about the words contained in them for

11

1 a couple of minutes. The first question starts off with
2 the phrase: Do you find from the evidence beyond a
3 reasonable doubt? Well, let's stop right there;
4 because we've already talked about reasonable doubt. We
5 talked about it the other day. And we talked about when
6 we did from the standpoint of that's what the State's
7 got to prove in order to establish a defendant's guilt.
8 It is exactly the same burden as to this first question
9 at the second phase of the trial. The State's got to
10 prove to you what the answer to this first question
11 should be.
12        Now if at the first phase of the trial a
13 defendant starts off being not guilty, then it's the
14 State's job through their evidence to bump it up to a
15 guilty verdict. That exact same logic applies to the
16 first question at the second phase of the trial. That
17 question starts off being answered no. And it's the
18 State's job through their evidence to bump it up to a
19 yes answer.
20        Now, that tells us something. Anytime we
21 see the phrase, do you find from the evidence beyond a
22 reasonable doubt, that means the State's got to prove to
23 you what the answer should be. Now starting off the
24 beginning of the second phase of a capital murder
25 trial -- that is to say, once a person has been found

12

1 guilty of capital murder, the presumption of being not
2 guilty, obviously, has been eliminated, been erased
3 because of the quality of the evidence. But while the
4 presumption of innocence has gone away, a brand-new
5 presumption pops in its place; and that new presumption
6 is this: It is presumed that for all people convicted
7 of capital murder, the appropriate punishment is life in
8 the penitentiary.
9        Now, how in the world did I get to that?
10 Well, I got to that from this way: The State is
11 required to prove to you beyond a reasonable doubt that
12 the answer to that first question is yes. If they don't
13 prove it to you, the answer to the first question is no.
14 We understand that in order for the death sentence to be
15 imposed, it takes a yes answer and a no answer to these
16 questions, in that order.
17        A no answer to the first question is
18 different than a yes and a no, in that order. That
19 means a life sentence is going to be imposed. So just
20 like at the first phase, the defendant starts off being
21 not guilty and at the second phase starts off getting a
22 life sentence unless the quality of the State's evidence
23 is such that it causes you to believe the first
24 answer -- first question should be answered yes. Any
25 questions about how I got to that point?

13

1        So, right -- yes, sir?
2        VENIREPERSON: One question. Start off
3 with the presumption of innocence, okay. And if it's
4 guilty, the first part of the question is a presumption
5 of life imprisonment. The prosecutors have to present
6 enough evidence that it will be a continuing threat for
7 a death sentence?
8        THE COURT: Yes, sir. Okay. So, also,
9 what we've learned is this: That life and death term
10 equals possibilities as sentencing options. Whichever
11 is appropriate would depend upon how the jury views the
12 evidence. So what that tells us is that simply and only
13 because a defendant has been found guilty of capital
14 murder, for that reason and that reason only, cannot
15 have any bearing on what the answer to that first
16 question should be. Because it asks you something
17 entirely different than, did he do it? Go back and look
18 at the same body of evidence, perhaps; but you look at
19 it for the purposes of getting it -- to find out
20 something different about it.
21        But anyway, first question: Do you find
22 from the evidence beyond a reasonable doubt there is a
23 probability? The word probability is not going to be
24 defined for you, because you folks use that word all the
25 time. While I can't tell you what a probability is, the

14

1 law permits me by comparison to tell you that whatever
2 probability does mean to you, there are two things it
3 can't mean.
4        The first thing that it cannot mean is --
5 first thing is whatever probability does mean to you, it
6 must mean something more than the possibility. Anything
7 could possibly happen. Just because it could possibly
8 happen does not mean it's probably going to. Whatever
9 the word probable means to you, it cannot mean something
10 as great as a certainty; because something could
11 probably happen does not mean that it's certain to
12 happen.
13        Now let's talk about the word probability
14 and talk about the context within which we're using it
15 in. The State is being required to prove to you the
16 existence of the fact that the defendant is a future
17 threat to society. That's paraphrasing. Can you see
18 how grossly unfair it would be to a defendant if the
19 State only had to prove the existence of a possibility
20 that a defendant would be a future threat to society?
21 Because obviously, it's possible that you three and
22 myself could be threats to society. Probably a greater
23 possibility that I would be than you would. But at any
24 rate, the point being, anything is possible.
25        The flip side of that is, can you see how

**15**

1  grossly unfair it would be to the State if the law
2  required them to prove to a certainty that the defendant
3  would be a future threat to society?  So what we did --
4  and it doesn't take a Rhodes scholar to figure it out.
5  We simply split the baby and cut it right down the
6  middle.  Probability.  If probability to you means
7  something more likely to happen than not, that's fine.
8  If it's something different from them, that's just fine,
9  too, as long as whatever probability does mean to you,
10  it means something more than a possibility, but not
11  something as high as a certainty.  Probability that the
12  defendant would commit criminal acts of violence.  The
13  State, in order to obtain a yes answer to this question,
14  is not required to prove the existence of a probability
15  that a defendant would commit a specific crime in the
16  future.  The State is obligated to prove that a
17  defendant on trial would probably commit a certain
18  category of crimes.
19          For example, it is not required the State
20  prove the existence of a probability that a defendant
21  would commit future capital murders.  Certainly if that
22  test exists, the State's entitled to present it to you.
23  But we're talking about conduct that amounts to a crime,
24  the kind of crime -- it's kind of a crime of violence,
25  and the crime of violence can either be as to persons or

**16**

1  as to property, because that doesn't say.  It talks
2  about criminal acts of violence.  We're talking about
3  capital murders, murders, assaults, rapes, robberies,
4  kidnapping, all criminal acts of violence as to persons.
5  Criminal acts of violence as to property could be
6  arsons, the burning of somebody's building or car or
7  house, certain kinds of burglaries that require breaking
8  to get either into a building or onto property.  The
9  taking of a club, beating in the windshield of a
10  vehicle.
11          It is that category of conduct that the
12  State must prove to you beyond a reasonable doubt in the
13  existence of a probability that would be committed by a
14  defendant, not a specific crime from within that
15  category.  And these criminal acts of violence must be
16  such that they constitute a continuing threat to
17  society.
18          The word society is not going to be
19  defined for you; but I'd ask you to consider making a
20  distinction, if you feel comfortable with the
21  distinction, between the word society and the word
22  community.  We all live in different communities, all of
23  our communities.  And I say that because quite often
24  when we think of society, the first thing we do think of
25  is people that we work with, family members, neighbors,

**17**

1  people that we come in contact with.
2          But the truth of the matter is the people
3  that we don't see are also a piece of society.  And I
4  say that from the standpoint, people behind the walls of
5  the penitentiary are also a piece of society.  We know
6  that's got to be the case, because it -- if it weren't,
7  the woman who is the school teacher, whoever she is or
8  wherever she is, she teaches school behind the walls of
9  the penitentiary.  When she punches her little clock in
10  at 8:00 o'clock in the morning to go behind the walls to
11  do her job, she does not lose her right to be free from
12  criminal acts of violence while she's back there doing
13  her job.  And if she escapes at the end of her workday
14  with her life, once she gets out in the free world, she
15  reapplies her right to be -- that's preposterous.
16          The point being, the people behind the
17  walls of the penitentiary are a part of society.  The
18  medical personnel, the directors, the teachers, the
19  wardens, the guards, whoever they all are.  And even the
20  inmates -- I shouldn't say even -- but the inmates,
21  also, are a piece of society; because if we ever thought
22  or hoped that rehabilitation was a possibility, it's
23  never going to be a possibility if we don't protect the
24  inmates from criminal acts of violence, or if they don't
25  have the right to be free from criminal acts of

**18**

1  violence.
2          So, what I'm simply saying is, as used in
3  this context, society can mean all the people all the
4  time in all the places.  Because if it did not mean
5  that, then that question would be that these criminal
6  acts of violence would constitute a continuing threat to
7  the citizens of Harris County, Texas.  And it does not
8  say that at all.  So that's the first question.  Again,
9  based upon how you evaluate the evidence in the case,
10  you'll answer the question either yes or no.
11          If your jury answers that question no, the
12  case is over; because a life sentence is going to be
13  imposed, because there is no way you could answer that
14  second question, ever bring the possibility of the death
15  sentence back into play.  Because it takes a yes and a
16  no for that, a no to the first one.  Any questions about
17  the first question?
18          Okay.  Let's go to the second question.
19  And before we get to the second question, let's
20  visualize in our minds where a jury would necessarily
21  have to be before they take up the second question.
22  First off, necessarily, they would have had to have
23  found the defendant guilty of capital murder.  Because
24  if they had not, we'd never get to these questions in
25  the first place.

19

1    Secondly, a jury necessarily would have
2  had to have answered yes to the first question; because
3  if they answered no, we'd never get to the second
4  question.  So what we're saying is when a jury takes up
5  the second question, they have unanimously been
6  consistent voting in such a way that the defendant's
7  going to be sentenced to death.  The second question
8  asks you -- and these are my words -- are you guys
9  really satisfied that's really what you want to do?  It
10  gives you a chance to go back over all the testimony in
11  the case to satisfy yourself as to whether there were or
12  are not any unique features that rise to the level that
13  makes you think that death penalty ought to be withdrawn
14  and in its place substituted a life sentence.
15    And we talked about the second question.
16  We talked about -- before we go into detail, let's talk
17  about what's not in the second question.  Nowhere in the
18  second question do you see the phrase, Do you find from
19  the evidence beyond a reasonable doubt?  So that means
20  the State doesn't have to prove to you what the answer
21  to that question should be.  Well, we know from our
22  conversation the other day that the defendant never has
23  to prove to you anything, because the defendant is the
24  one that's on trial.
25    Well, if the State doesn't have to prove

20

1  what the answer to that second question should be and
2  they don't, and if the defendant doesn't have to prove
3  to you what the answer to that second question should be
4  and they don't, that means necessarily that the law
5  understands that there may be a great number of cases
6  where there is absolutely no testimony of a mitigating
7  nature in the case, because nobody's required to put it
8  there.  The only requirement that the second question
9  imposes is that the jury go back and review all the
10  evidence in the case to see if there is any mitigating
11  evidence there.  Do you see the distinction?
12    The first half of the second question, as
13  we talked earlier, is simply an instruction to the jury
14  to go back over every single bit of testimony in the
15  case; first phase of the trial, second phase of the
16  trial, to ask yourselves this question:  And this is the
17  way I phrased it and not what the question asks.  Do you
18  find that there is a good enough reason in the evidence
19  in the case to withdraw the death sentence that
20  heretofore you had imposed and replace it with a life
21  sentence?  What's it take to be good?
22    We're talking about mitigating here.  When
23  we use the word mitigating in this context, we're
24  talking about a reason to reduce the sentence from death
25  to life.  We're not talking about excusing conduct.

21

1    Obviously, the conduct is not excused; because the
2  defendant's been found guilty, and the very least that's
3  going to happen to him is a life sentence.  We're not
4  talking about anything of that sort.  We're talking
5  about, is there some unique feature in the case, whether
6  it has to do with the defendant, himself, his character,
7  his background, his history, something to do with the
8  victim in the case, something to do with the
9  circumstances of the offense.  Some unique feature that
10  makes you believe a life sentence would be more
11  appropriate than a death sentence.
12    The reason mitigating -- the word
13  mitigating as used in this second question is not going
14  to be defined for you; because what might be mitigating
15  to one might not be mitigating to another.  We've
16  probably seen -- I'm sure you've heard of some times
17  where there may be evidence in a particular trial that
18  the defendant on trial is -- let's just say seventeen.
19  And I'm not talking about this case.  I'm dreaming up
20  some case.  Some folks might tend to believe that
21  because the person is seventeen years old, comparative
22  youthfulness, not emotionally developed to make
23  particularly intelligent decisions.  Some folks on a
24  jury may think that tends to be mitigating.  Others
25  might say, Well, no.  If that person commits an act this

22

1  bad at an age that young, then we've lost that person
2  anyway.  People are looking at exactly the same evidence
3  and just viewing it from a different standpoint.
4    In some case, maybe you would have
5  testimony about the defendant's mental retardation, if
6  there is any.  Sometimes some jurors might think that's
7  mitigating.  Sometime others might not.  A whole batch
8  of other jurors might say, well, wait a second.  Doesn't
9  it make a difference as to how severely the retardation
10  is?  In other words, is it borderline retarded?  Is it
11  significantly retarded?  Would that in -- and whether
12  it was or wasn't, or whichever it was, I should say,
13  that might make the difference as to whether it was
14  sufficient mitigating evidence to withdraw the sentence.
15    You might have in another case a guy that
16  was -- guy who was a defendant on trial, who had been in
17  Vietnam, been in Desert Storm, and got himself all
18  screwed up when he got out, never been in any trouble,
19  just was absolutely aimless, directionless, and a week
20  before the crime occurred that caused the defendant to
21  go on trial for capital murder, he was driving down the
22  street, saw a fire in an apartment complex, went over,
23  saved a couple of kids who certainly would have burned
24  to death, but for the disregard of his own personal
25  safety.

23

1       You might find that to be a feature or
2   character as to a defendant's life that might be
3   sufficient to cause you to think, or maybe as to this
4   guy on the whole -- that's your calling, but that's the
5   kind of stuff we're talking about. And the whole idea
6   is, first off, to search the case over and see, is there
7   any mitigating evidence? The answer is no. The answer
8   to that question is no. If you say, yes, there is
9   mitigating evidence in the case.
10      Your next decision to make is, all right.
11  Is this mitigating evidence sufficient to make us think
12  that we ought to withdraw the death sentence that we
13  have heretofore voted on and replace it with a life
14  sentence. And if your answer to that question is yes or
15  answer to the whole question is yes, those are the
16  questions. Any questions about the questions? So what
17  we can see is each of the three decisions that a jury
18  makes is independent of the other two. Just because you
19  find somebody guilty of capital murder, just because you
20  answer yes to Question Number One, has absolutely no
21  bearing, in and of itself, as to how Question Number Two
22  should be answered. It's kind of like all the evidence
23  in the case is inside a triangle, and each of three
24  points of the triangle is where the question is, and
25  each question is just simply remarkably different. And

24

1   while you explore the same pile of information to get
2   your answer, each of the questions is so different that
3   the answer to the presiding question, in and of itself,
4   can't possibly direct what the answer to the next
5   question should be. Does that make any sense at all?
6       We talked about if the answer to the
7   questions are yes and no, that's death. Anything else
8   is life. We know what a death sentence is, but
9   sometimes we have some confusion about what a life
10  sentence is. And I will tell you in the Court's charge
11  and I'll tell you now, that in the event -- in the event
12  this defendant is convicted of capital murder, and in
13  the event these questions are answered in such a way
14  that the life sentence -- a life sentence is imposed,
15  the law says this defendant cannot be considered for
16  parole, cannot become eligible for parole until he has
17  actually served forty years of his sentence. And that's
18  day for day, week for week, month for month, year for
19  year. And another way to put it is we're talking about
20  the Year 2039.
21      Now, what happens at 2039? I don't know.
22  What I do know is that whether the defendant is not
23  awarded parole will depend upon evaluations made by
24  prison authorities. That is to say, what kind of person
25  was he during his forty years here? Those evaluations

25

1   will be directed to or sent to the Board of Pardons and
2   Paroles. Board of Pardons and Paroles may follow those
3   evaluations. They may disregard them. Who knows?
4       But the Board of Pardons and Paroles is
5   obligated to make recommendations as to whether to or to
6   not award parole to a person to the governor of the
7   State of Texas. In the Year 2039, I haven't the
8   foggiest notion as to who the governor in this state is
9   going to be. The governor in this state can follow
10  those recommendations, disregard them, and completely
11  make a political decision.
12      Do you know what he or she will do? But
13  the point I'm getting at is this: The variables that
14  exist after the expiration of forty years are so great
15  that they cannot be taken into account during the course
16  of the trial today. These questions are entitled to
17  have their answers given on the basis of the evidence as
18  presented to you in the case. Whether parole -- excuse
19  me. The fact that after forty years a person becomes
20  eligible for parole consideration has absolutely nothing
21  to do with whether parole will or will not be granted.
22  As to one hypothetical defendant, it might very well be
23  after forty years, that that person is denied parole for
24  the rest of his life and breathes his very last natural
25  breath of air behind the walls of the penitentiary.

26

1       On the other hand, it's perfectly
2   possible another hypothetical defendant at the
3   expiration of forty years in this situation may be
4   awarded parole. I don't know. But what I do want you
5   to know is you cannot apply the variables that come into
6   play at the expiration of forty years into your
7   decision-making process in this case. But I do want
8   you, also, to be aware of the fact that we know there
9   are some people who believe this to be the case. Don't
10  want somebody back in the jury room saying to
11  themselves, well, if you've been hearing that a person
12  on a life sentence gets paroled at the end of five
13  years, that being the case, I'm never going to answer
14  these questions in such a way a life sentence is
15  imposed; because I don't want anybody out in five years.
16      I'm telling you, that's not the case.
17  That's simply not the case. And it is for that purpose
18  only as to why I'm telling you what the rule is.
19  Anybody have any questions about that?
20      Okay. Let's get off the capital murder
21  business for just a second; but before we do, let's --
22  we touched on very briefly the other day what capital
23  was. Capital murder always requires the intentional
24  murder; that is to say, the intentional taking of a life
25  of a human being without any legal justification and

27

1 without any legal excuse. That necessarily means it
2 can't be self-defense, because self-defense is a legal
3 justification. That necessarily means it can't be an
4 accident; because if it was an accident, it wouldn't
5 have been intentional. So we're talking about somebody
6 that wants to accomplish some goal. And to go out, go
7 and accomplish that goal, they get a gun and shoot
8 somebody, if that's the case.
9        But this intentional taking of another
10 life without any legal justification or legal excuse has
11 got to be committed along with or during the course of
12 the commission of another specific felony for it to be
13 capital murder. In our case we have two different
14 things. We have a kidnapping being the other felony in
15 one case, and we have another murder, another
16 intentional murder, felony in another case. So we've
17 got two or more people killed during the same
18 transaction and murder during the course of a
19 kidnapping. That's what the allegations are in this
20 case, as you can see already.
21        And what if a jury didn't believe beyond a
22 reasonable doubt that the intentional murder was
23 committed during kidnapping? They believe the
24 intentional murder, but not the kidnapping. What if, on
25 the other hand, the jury believed that one of these

28

1 intentional murders -- one of these murders was
2 intentional, and it was without legal justification and
3 legal excuse. But the other one was done in
4 self-defense; therefore, it was not a murder because it
5 was legally justified. So what is it telling you, the
6 State, in order to obtain a conviction for capital
7 murder, must prove beyond a reasonable doubt the
8 existence of both of those features. The intentional
9 murder and during the course of the other felony. Are
10 we together so far?
11        Anytime the State's required to prove
12 beyond a reasonable doubt the existence of two things,
13 three possible results can occur. One possible result
14 is they can. And if they can and do, the jury's
15 obligated to find the defendant guilty of capital
16 murder.
17        Possible outcome number two: They can't
18 prove beyond a reasonable doubt the existence. And if
19 that's the case, the jury's obligation to find the
20 defendant not guilty of anything.
21        Possible outcome number three: They can
22 prove the existence of the intentional murder beyond a
23 reasonable doubt, but not the existence of the other
24 felony. If that were to happen -- I say happen -- if
25 the evidence in the case or the testimony were to

29

1 suggest that, I would be obligated to give you a third
2 possibility. You would have guilty of capital murder,
3 not guilty of anything. The third possibility would be,
4 is the defendant guilty of murder? That is to say, the
5 intentional taking of the life of a human being without
6 a legal justification or excuse, but not during the
7 course of another felony. What we're talking about is a
8 lesser included offense, or a smaller offense carved out
9 of a greater offense, the greater offense being the
10 capital murder, intentional murder during the other
11 felony.
12        They don't prove the other felony. Piece
13 of pie out of the whole pie. If a person in the State
14 of Texas is convicted of murder, the range of punishment
15 is simply remarkably different and far more broad than
16 the life or death that's available for a person
17 convicted of capital murder. And I'm not saying this is
18 going to come into play in this case. I am saying to
19 you it is, however, a theoretical possibility. In the
20 State of Texas, if a person is convicted of murder, that
21 person can be punished by confinement in the
22 penitentiary for life, or by confinement in the
23 penitentiary for any number of years, as long as it's
24 not less than five or more than ninety-nine. And the
25 jury can, if they think it's appropriate, impose a fine

30

1 in some amount, as long as the amount does not exceed
2 $10,000.
3        For the purpose of our conversation here,
4 this evidence, we're going to blow off the fine. That's
5 more of a nuisance than it is anything else. The range
6 is so broad, because everything is always so different.
7 When you think of murder, perhaps you think it was a
8 specific set of circumstances, which may be absolutely
9 brutal, horrible, vicious, all that stuff, but there are
10 also circumstances because it's got all sorts of people
11 who will differ. You've got the defendants, people who
12 may be a five-time convict. You've got people who are
13 defendants for whom the conduct in this case is simply
14 an aberration and completely inconsistent with the way
15 they've lived their life up to now. That might make a
16 difference to you in some cases. In other cases it
17 might not make any difference to you. Because you see,
18 you've got to give you the room to roam; so if it does
19 make a difference, you can make the adjustments you
20 think is important.
21        For example, you would be -- seventy-five-
22 year-old couple been married for fifty years. They love
23 each other tremendously. And the wife is ill. She's on
24 a life support system, and she doesn't want to go
25 through the misery of the suffering and humility and

**31**

1 indignity of being on that machine. She's asked her
2 husband for days and days to please pull the plug and
3 let her go in peace. He has prayed about it, thought
4 about it, talked to his minister about it, talked to
5 everybody he can about it. And finally, one day, he
6 just walks over while she's asleep and pulls the plug
7 and she expired.
8     Without getting into the reality of that,
9 in this state that's murder. That's the intentional
10 taking of the life of a human being without any legal
11 justification, without any legal excuse. Now while that
12 is the case, maybe you wouldn't think that that
13 seventy-five-year-old man would get a life sentence from
14 having done that, because he didn't do it out of anger.
15 Maybe you do think he ought to get a life sentence, but
16 that would be your call. But if you thought you've got
17 to give something different, we've got to give you the
18 room so you can move.
19     So, my question to you is this: Assume
20 with me for just a second that you're a juror in some
21 imaginary capital murder case. You go out and
22 deliberate; and your jury unanimously determines that
23 the defendant on trial is not guilty of capital murder,
24 but your jury unanimously does determine that the
25 defendant on trial is guilty of murder. State's proved

**32**

1 one of them, not both of them.
2     Your jury comes back. You hear evidence
3 at the second phase of the trial. You go out and begin
4 your deliberations as to punishment. Whatever evidence
5 you heard at the second phase doesn't make any
6 difference. Let's just say this: That the evidence in
7 the second phase makes us believe a life sentence could
8 be proper. Is there anybody here who would not consider
9 giving that imaginary defendant's punishment or
10 assessing -- consider assessing that defendant's
11 punishment at confinement in the penitentiary for life,
12 if you thought based upon the uniqueness of the
13 testimony in this case, whatever that testimony was,
14 that that was the right result to reach? Anybody here
15 who would refuse to consider that as a legitimate
16 sentencing option if you thought the circumstance
17 deserved it? Okay. I gather that you wouldn't.
18     We'll take that same question and flip it.
19 The jury in a capital murder case, you find the
20 defendant not guilty of capital murder. You find him
21 guilty of murder. You come back and accept the evidence
22 at the second phase of the trial, whatever that was; but
23 when you leave, after having heard everything, you say
24 to yourself, I think in this case five years is the
25 right thing to do. Is there anybody here who could not

**33**

1 consider assessing that imaginary defendant's punishment
2 at confinement in the pen for five years?
3     Now if you thought, based upon whatever
4 the uniqueness of the testimony in that case, that
5 was -- that was the right result to reach -- and I'm not
6 asking how would you do either one of them? I'm going
7 to take each of them as a legitimate sentencing option.
8 If the facts and circumstances deserve it in your mind,
9 or anything in between, and just ride up and down the
10 scale of punishment. Because do you see how grossly
11 unjust it would be for us -- meaning me -- to ask you
12 folks to give of your time to come down here, sit as
13 jurors, and dictate to you the value of every dead body;
14 because the value of every dead body depends on, depends
15 on, A, who it belonged to while it was living; and, B,
16 the circumstances that caused the body to come down.
17 All of these features are integral parts. What
18 punishment should we impose? And that's why we don't
19 have a specific punishment, so the jury can be
20 comfortable that the facts and circumstances of the case
21 fit the punishment. Any questions about that?
22     Two other quick areas. Can you see why we
23 didn't talk about this the other day? I'm not going to
24 talk about this in the legal sense. I'm going to talk
25 to you about it in its concept. We have something in

**34**

1 our law that says if you have two or more people,
2 multiple people who get together and conspire to commit
3 a felony, commit a crime, and if they accomplish that
4 conspiracy and do commit the crime, that a conviction of
5 one of those codefendants cannot be had solely, only,
6 and exclusively upon the testimony of another
7 codefendant.
8     There, instead, must be some additional
9 supporting or corroborating testimony from some
10 independent source that rises to the level that it tends
11 to connect the defendant on trial to the commission of
12 the crime. Now that other evidence from some
13 independent source -- it could be another witness in a
14 case; it could be physical evidence; it could be almost
15 anything. And the other independent evidence simply --
16 independent evidence, I should say, does not, itself,
17 have to prove a defendant's guilt beyond a reasonable
18 doubt. It only needs to tend to connect the defendant
19 to the committing of the crime.
20     Oh, for example, we know historically, at
21 least, of DNA and fingerprints. We've always known that
22 to be just absolutely the best singular identifying
23 feature to sort out human beings' identity. Anything
24 else? Let's say somebody else and I agree to rob a
25 bank. I'm the driver. He's the getaway -- I mean, I'm

35

1  the getaway driver. He's the robber. I pull up to the
2  bank. He runs in, does the robbery, comes out, off we
3  go. He gets caught, and he fingers me.
4          Well, no one's seen me, because I stayed
5  in the car; and that poor klutz got the whole problem.
6  If there is no other independent evidence that tends to
7  connect me to the crime to support his testimony, I
8  don't get convicted. If, however, there is other
9  independent evidence tending to connect me to the crime
10  from some other source, I do get convicted.
11          For example, if on the bank bag that was
12  taken from the bank my fingerprints are on it, the
13  fingerprint that's on it does not necessarily indicate
14  when it was that I touched that bank bag. The
15  fingerprint could have been on it before the robbery
16  occurred, theoretically. But can you see that my
17  fingerprint being on the bag does tend to connect me to
18  the commission of that robbery? That's what we're
19  talking about. I don't know if that's going to come
20  into play in this case. But is there anybody here, any
21  of the three of you, who have any disagreement?
22          One last area. We have two types of
23  evidence that exist in a trial of a case; direct
24  evidence and circumstantial evidence. The law simply
25  doesn't care what kind of evidence is used in a case.

36

1  You can have some cases that are exclusively direct
2  evidence, some exclusively circumstantial. Direct
3  evidence means somebody saw a crime occur, or the
4  defendant confesses to having commit the crime.
5  Circumstantial evidence means anything else. It's the
6  proof of circumstance surrounding the commission of a
7  crime that when interwoven with other circumstances
8  presented to a jury tend to how the defendant on trial
9  did commit the crime.
10          As I say, the law doesn't care whether
11  testimony is evidence -- and I should say direct or
12  circumstantial -- just like the law doesn't care how
13  many witnesses there must be in a case for there to be a
14  conviction; because the Rule is exactly the same as to
15  each. The number of witnesses makes no difference. The
16  type of evidence makes no difference, as long as either
17  the number of witnesses or the type of evidence, et
18  cetera, established in a jury's mind beyond a reasonable
19  doubt the defendant's guilt. You can have one witness
20  who can do that. You can have twenty-seven witnesses
21  who can't do that. It depends on them and what they
22  saw.
23          Direct evidence. For example, down here
24  at Enron Field, you might have some guy down there who
25  is shot with a gun, a handgun, virtually face-to-face.

37

1  You got three absolute derelict drunks laying down
2  there, each of them just a whisper away from passing
3  out. And they see a defendant shoot the victim. All
4  three of those drunks come, and they testify to a jury,
5  this is what I saw. I was drunker than Cooter Brown,
6  and I just about passed out. In fact, I did after. Can
7  you see that even though that's direct testimony,
8  eyewitness testimony, can you see how a jury may not
9  believe them beyond a reasonable doubt?
10          Now let's talk that same dead body case,
11  and let's say you have three people who just happen to
12  be walking by. One guy sees a defendant -- sees the
13  defendant on trial, whoever that defendant is, with a
14  gun, a handgun in his hand, keeps on walking. The other
15  guy hears a gunshot. After he hears the gunshot, he
16  turns and he sees the defendant standing over this body
17  that's laying on the ground bleeding. He just keeps on
18  walking along. He doesn't see any shots. Third witness
19  sees the defendant about twenty yards from where the
20  previous witness saw him, gun still in his hand, calls
21  the police. The police come and arrest him. The gun,
22  it is determined ballistically, fired the bullet, caused
23  the bullet to go into the man's body that caused his
24  death. Nobody actually ever saw the defendant shoot the
25  victim. But can you see under those circumstances how a

38

1  jury may very well believe beyond a reasonable doubt
2  that the defendant on trial was, in fact, guilty of that
3  murder, even though that testimony was purely
4  circumstantial? So if it's not direct or circumstantial
5  to this issue, does the jury believe the testimony
6  beyond a reasonable doubt?
7          But we hear sometimes people say, Oh, I
8  couldn't ever convict anybody on circumstantial
9  evidence. They have no idea what they're saying.
10  That's just repeating something they hear on television,
11  Judge Judy or something. And the truth of the matter
12  is, as wonderful as an identifying feature as a
13  fingerprint, a fingerprint is circumstantial evidence;
14  because we know who the fingerprints belong to. But we
15  don't know, first off, when the fingerprint was placed
16  on the item. And secondly, we don't know where the item
17  was when the fingerprint was placed on there.
18          Now if it's an immoveable object,
19  obviously we can figure it's going to depend where it
20  was; but that doesn't account for when the print was put
21  there. If it was a moveable object, such as a handgun,
22  who would know where I was when I put the print on it?
23  So, what we're simply asking is this: I don't know this
24  is going to be a situation in this case. But again, I
25  know it's theoretically possible. If you're a juror in

**39**

1 the case and the testimony in the case is exclusively
2 circumstantial, but if you believe that circumstantial
3 evidence beyond a reasonable doubt, is there anybody
4 here who would refuse to find that imaginary defendant
5 guilty, even though the testimony in the case was
6 circumstantial and you believed it beyond a reasonable
7 doubt? I guess what I'm really trying to say is, is
8 there anybody here who would demand direct evidence?
9 Now you have just finished your first year in law
10 school. What questions do you have for me?
11        Let me tell you what we're going to do.
12 We're going to, in a couple of minutes, begin talking to
13 you individually. We're going to do it with -- as
14 quickly as we can; because in about an hour and fifteen
15 minutes, we have another sixty folks like we had with
16 you coming in. But I don't want to do that so quickly
17 that I might not have a chance to follow the connections
18 and so forth that we're trying to make in the case.
19        I think -- and this is just my thought --
20 but I think the purpose of this phase of the trial is
21 meant to do two things. One to talk to all of you about
22 the possible rules, the laws, that can come into play to
23 see if you have any disagreement with them that rises to
24 the level that if you were a juror in the case, I would
25 not feel that you were morally able to, A, support, B,

**40**

1 reinforce those laws. Is there anybody here who's heard
2 anything from Monday or today that you have any
3 disagreement or dispute with that rises to the level
4 that you wouldn't follow that rule if it did come into
5 play?
6        Okay. Second thing I think this is about
7 is to make sure -- you to make sure for yourself, the
8 lawyers to also make sure that if you were a juror in a
9 case, you start off the case, I mean, just point blank,
10 no preconceived idea as to what result you're going to
11 reach or where you're going to go, and just let the
12 evidence act like kind of a road that takes you to
13 wherever it is you're going to go. When you get there,
14 decide what it is you're going to do. And if your
15 decision, after you hear all the evidence, is such that
16 causes you to answer the first verdict as a guilty, do
17 it. Nothing to it. Not guilty of capital murder, but
18 guilty of murder. He did it.
19        The second phase of the trial, if you find
20 somebody guilty of capital murder, answer that first
21 question however you think the evidence suggested that
22 you should answer it. Answer the second question
23 however you think the evidence suggests you should
24 answer it. And if the answers wind up being a death
25 sentence, that's a deal. If they wind up being a life

**41**

1 sentence, that's a deal. But don't put yourself in
2 somebody else's shoes.
3        For example, if in some imaginary case you
4 are convinced there is some sloppy police work -- and
5 I'm not claiming that's the case here. Just using this
6 as an example. You can't substitute yourself for them.
7 You've got to take what you're given. If what you're
8 given is enough to prove a person's guilt beyond a
9 reasonable doubt, it's your obligation to do that. If
10 what you're given is not enough to prove a person's
11 guilt beyond a reasonable doubt, then it's your
12 obligation to find him not guilty. It's not your job as
13 a juror to help one side out or help the other side out.
14 Your job as a juror is to evaluate the information they
15 give to you and come up with what you think is the right
16 result to reach.
17        Now, that's the deal. And I will tell you
18 right now, if I were one of you three folks and if I
19 didn't spend any time down here at the courthouse, one
20 of the things that I would have found out right now that
21 would have just simply blown my mind would be this: Are
22 you telling me, if I heard the evidence in that case and
23 it was such that I wound up believing the defendant was
24 guilty of capital murder, and if I came back at the
25 second phase of the trial, and after having heard more

**42**

1 evidence, if I found out that that defendant on trial
2 was, in fact, a future danger to society and I answered
3 that first question yes, guilty of capital murder and a
4 future danger, you're telling me then that that doesn't
5 mean that the death penalty is going to be imposed? And
6 that's exactly what I'm telling you, because the case
7 isn't over because you haven't answered the second
8 question.
9        Those two verdicts, guilty of capital
10 murder and yes to the first question, there is still the
11 option that you've explored the testimony in the case to
12 see is there is any feature within the case that makes
13 you believe that a life sentence would be a more
14 appropriate verdict than a death sentence? So the
15 case -- so I watched the whole thing last night about
16 Yogi Berra. It ain't over till it's over, and that's
17 just about what this is. And it's not over till you get
18 past Number Two. Is there anybody here -- because that
19 almost doesn't make sense to us in the way we do things.
20        But think of it this way: I used this
21 example yesterday, and I wish I hadn't; but my mind is
22 not fresh enough to come up with a new one today. There
23 are three different decisions to make. Just because you
24 made two of them doesn't mean that you know what the
25 answer to the third one is without investigating the

43

1  circumstance. If you're going to go buy a car, and if
2  you ask the driver -- the car salesman, does the car
3  have a motor? The car has got a great motor. Has the
4  car got a steering wheel? Car got a wonderful steering
5  wheel. You can't presume that the car's got wheels.
6  And I apologize for doing this. They heard it
7  yesterday, and you guys are just being nice and batting
8  your eyes and shaking your heads. And even I don't like
9  it; but point of it is just because you got two answers,
10  that does not dictate the third. And each side has the
11  right to have you hold out on committing yourself to
12  what the answer to that third -- or that second question
13  should be, that being the third decision, is what I'm
14  trying to say, until you've gone back over all the
15  evidence in the case. Does that cause any problems to
16  anybody?
17          Is there anybody here that has anything in
18  your personal life, anything in your professional life,
19  or anything at all that you can think of that, in your
20  mind, would interfere with your ability to be a juror in
21  this case during the time frame we've talked about?
22  What is it?
23          VENIREPERSON: I'm a contract worker, and
24  I've been off for five weeks. And I've been told by my
25  employer that there is a possibility I'll be called back

44

1  in the next week or so, and it would cause a financial
2  hardship.
3          THE COURT: When will we know?
4          VENIREPERSON: You mean, if I'm going to
5  be called back?
6          THE COURT: Yes. Or is that your
7  question, too?
8          VENIREPERSON: That's my question. I was
9  told five weeks ago it was going to be two days; I was
10  going to be off for two days. So I've been off for five
11  weeks, and I may not be called back for six weeks.
12          THE COURT: I understand. Thank you for
13  sharing that with us. I don't know what we're going to
14  do, but we're going to do something. Anybody else have
15  a question? Okay. If you would, retire to the
16  hallway. We'll get you in here as quickly as we can.
17          CHARLES GILBERT,
18  having been first duly sworn, testified as follows:
19          VOIR DIRE EXAMINATION
20  BY THE COURT:
21  Q.  Are you well today, I hope?
22  A.  Yes, sir.
23  Q.  Good. Do you have any questions at all for me?
24  A.  No, sir, I think I understood your charges, or
25  so forth, whatever the term is for it.

45

1  Q.  Thank you.
2          THE COURT: Mr. McClellan, if you would,
3  please.
4          MR. MCCLELLAN: Thank you, Your Honor.
5          VOIR DIRE EXAMINATION
6  BY MR. MCCLELLAN:
7  Q.  Mr. Gilbert, my name is Lyn McClellan. And
8  along with Claire Connors, we represent the State of
9  Texas in this case. I want to go over your
10  questionnaire and follow up on some of your answers
11  there and talk to you about certain aspects of the law
12  that apply in a case like this?
13  A.  Yes, sir.
14  Q.  First of all, can you just kind of tell me in
15  your own words, what is your opinion about the death
16  penalty?
17  A.  I think in instances that it's an appropriate
18  sentence.
19  Q.  What type of instances come to your mind when
20  you think of instances where you think it's appropriate?
21  A.  Well, with the Judge's instructions, I think I
22  understood better about a murder charge and the
23  consequences of that as opposed to a capital murder
24  charge on it. So I believe the way it was explained
25  this morning as to a capital murder charge, that that

46

1  would be appropriate.
2  Q.  Where it's murder plus some aggravating
3  circumstance?
4  A.  Additional crime committed at the same time was
5  the way I understood that this morning, yes, sir.
6  Q.  So you don't have a problem with the way it's
7  set up?
8  A.  No, sir.
9  Q.  Some people think it ought to also be available
10  for murder, though it's not. And that's okay if they
11  think that, just as long as they can follow whatever the
12  law is the Court gives them.
13  A.  Yes, sir.
14  Q.  Do you think possibly that capital murder
15  punishment should be expanded to include more crime than
16  it now includes.
17  A.  Well, I thought capital murder is capital
18  murder. Maybe I'm missing the question.
19  Q.  Some people think, well, it's murder plus
20  another crime. Other people think, well, I think it
21  ought to be just for murder. There is murders by
22  themselves that are so heinous that it may be
23  appropriate, in my mind. If I were to change the law, I
24  might change it to where it would also be available for
25  murder. What do you think about that?

47

1    A.   In your context there was a heinous murder-type
2  crime deal on there, that it would be appropriate in
3  some instances on there; but that's not the law as I
4  understand.
5    Q.   You're right.  It's not the law.  And you're
6  right in understanding that what we're talking about,
7  you jurors who will take an oath to follow the law and a
8  true verdict render based on the law and the evidence.
9    A.   Yes, sir.
10    Q.   So what we want to do today is talk to you
11  about your opinions about whether or not you can follow
12  the law.  If you can't follow the law, we want you to
13  tell us that.  But I assume you're going to be able to
14  take that oath and follow the law and set aside any
15  personal opinions you may have that may differ from that
16  and do whatever the law and the evidence tells you.
17    A.   Yes, sir, that is correct.
18    Q.   Was there ever a period of time in your life
19  where you opposed the death penalty, thought it was not
20  the appropriate thing?
21    A.   Not that I can recollect, sir, no, sir.
22    Q.   I believe you indicated that you have a brother
23  who has been to the penitentiary?
24    A.   Yes, sir.
25    Q.   What kind of case was that?

48

1    A.   I was in the service when that occurred, and I
2  think it was a burglary charge.  Possibly could have
3  been a robbery, something along the lines of that on
4  there.  That was back in the early --
5    Q.   I'm sorry, go ahead.
6    A.   That was back in the early '70's, just prior to
7  me being released from the service.
8    Q.   Was he -- your brother older?
9    A.   No, sir, he's approximately four years younger
10  than I am.
11    Q.   Assume he's out of the penitentiary?
12    A.   Yes, sir, he has been for a number of years.
13    Q.   And he's gone on to do other things in his
14  life?
15    A.   I think it helped his life tremendously for his
16  future at that point in time, sir.
17    Q.   Now you also shared with us the fact that, I
18  guess, your daughter was charged with possession of
19  cocaine?
20    A.   She hasn't been charged with that, no, sir.
21  She is a recovering addict.  This is my opinion.  No one
22  ever really recovers from that.  It's kind of like
23  alcoholism.  She has not done coke in a couple of years
24  at least.
25    Q.   I thought there was something in here that you

49

1  said she was going to trial?
2    A.   That is for child endangerment, sir; and I'll
3  explain that, too.
4    Q.   Okay.
5    A.   My daughter has her six children and two sets
6  of twins, and all these children are pretty young on
7  there.
8    Q.   All right.
9    A.   They were at our house one afternoon, and we
10  have a screened-in back porch, patio, whatever you want
11  to call it.  And my wife had put the youngest set of
12  twins on the back porch, which they've just turned two
13  years old recently.
14    Q.   Right.
15    A.   They either tore one of the screen panels, or
16  it was torn.  They went out and got on the road.  The
17  neighbor found one of them.  When my wife and daughter
18  found out they were missing, which was almost
19  immediately, they went searching for them and
20  everything.  The lady that found the first baby, one
21  called the Harris County law; and they came out did a
22  short investigation on it.  Of course, they never left
23  the immediate area there.  But anyways, they -- about
24  four hours later, they had came back out while my
25  daughter was still at my house there and had said they

50

1  talked to the District Attorney and they had -- the
2  District Attorney's Office had elected to file charges
3  on her since she was the parent of the children.
4    Q.   All right.  Okay.  And was that case set for
5  trial?  I don't know when you filled out the
6  questionnaire.
7    A.   That day, which was a week from today last week
8  on there, they were going to court that day; and it has
9  been postponed to sometime next month on there.  I
10  expect several different postpones on it.  That's my
11  opinion, anyway.
12    Q.   Obviously, the District Attorney's Office, of
13  which I'm a member of the D.A.'s Office -- our office is
14  the one that elected to file charges.  How would that
15  affect your ability to be on a jury where we're
16  presenting evidence?
17    A.   I don't think that would bother me at all, sir.
18  I have some knowledge of the law.  Not a professional
19  law person or anything, but I know how things work.  And
20  just because she's been accused of that doesn't mean
21  she's guilty.
22    Q.   Right.  Who is her lawyer?
23    A.   I don't know, sir.  My wife and my daughter
24  have been coordinating all of that.  My days are pretty
25  well occupied where I work at.

51

1 Q. Work?

2 A. Yes, sir.

3 Q. I understand. You know, as the Court has told

4 you, that just because someone's convicted of capital

5 murder, that does not mean, in and of itself, that the

6 person receives the death penalty. And it depends then

7 on the circumstances of the crime, the defendant's

8 character, and his background, and his personal

9 responsibility for the commission of the crime.

10 A lot of these things are taken into

11 consideration in determining, one, whether or not he's a

12 continuing threat to commit future acts of violence, and

13 two, whether or not there is any mitigating

14 circumstances that would indicate or lead jurors to

15 determine that life, as opposed to death, is more

16 appropriate. If a person was, though, convicted of

17 capital murder, the intentional taking of another

18 person's life without any legal justification. We're

19 not talking accident. We're not talking self-defense.

20 We're talking intending to kill someone and doing so

21 during the commission of another crime.

22 A. Uh-huh.

23 Q. What we have alleged here is murder during

24 kidnapping. We've also alleged in the second paragraph

25 murder during the course of a murder, which means

52

1 killing two or more people during one criminal episode.

2 If you found someone guilty of that crime, what do you

3 think would be important in determining whether or not

4 the person would be a continuing threat or whether or

5 not circumstances would lend itself to giving life as

6 opposed to death? What factors do you think would be

7 important other than the facts of the crime itself that

8 you've heard? What else do you think would be

9 important?

10 A. I would say the way that he possibly took the

11 lives.

12 Q. How the crime was committed?

13 A. Yes, sir. Which type of weapons, whether it

14 was something possibly like a torture-type deal involved

15 with it, something along the lines of that.

16 Q. And, of course, during the course of trial,

17 you'll be able to hear about what happened before,

18 during, and after the commission of the crime. What

19 happened before the commission of the crime, you would

20 be able to find out, was it a spur of the moment act as

21 a result of something that happened, or was it planned

22 out ahead of time? What happened during the course of

23 the crime? You would be able to learn whether or not a

24 person -- how they actually committed that crime, you

25 know, how they were involved.

53

1 A. Uh-huh.

2 Q. With a getaway driver, like the Judge used in

3 his example, where the person who pulled the trigger, or

4 stabbed the person with a knife, or choked with hands,

5 or whatever the cause of death was. And what happened

6 after the crime, you'd be able to show if a person

7 showed a lot of remorse and upset for what he did, or if

8 he was braggadocious, carefree, didn't care?

9 A. Right.

10 Q. And you think all that information is helpful,

11 then, in deciding what the punishment ought to be?

12 A. What?

13 Q. You take all you have, that information, and

14 it's helpful in deciding what a punishment ought to be?

15 A. Well, it would be.

16 Q. Life or death?

17 A. Yes or no. On the first question, yes, sir.

18 Q. You have two daughters; is that correct?

19 A. Yes, sir.

20 Q. Have either of them ever been the victim of any

21 type of crime?

22 A. Not that I'm aware of, no, sir.

23 Q. Okay. One of the things on mitigation, when it

24 talks about Special Issue Number Two, you've got

25 mitigating circumstance. I like to refer to it as

54

1 reasons why a person ought to receive life as opposed to

2 death. Jurors are basically asked to go back and listen

3 to all the evidence, see what's there, weigh it in their

4 minds. Is that mitigating or not?

5 For example, you may hear evidence during

6 a trial a defendant was high on drugs or alcohol when he

7 committed the crime. One juror may say, I think that's

8 mitigating; because when you're high on drugs or

9 alcohol, you do things you wouldn't ordinarily do if you

10 were not in that condition. Juror Number 2 will say, I

11 don't think that's mitigating at all; because even

12 though you do things you wouldn't ordinarily do, you

13 ought to be responsible for your conduct regardless of

14 whether you're high on alcohol or not. You may get high

15 on drugs or alcohol again, go out and commit something

16 else; or they may know people who have been intoxicated

17 on drugs or alcohol, and they didn't go out and commit

18 capital murder.

19 So, why is that a fact? Do you think

20 people who are intoxicated or high on drugs or alcohol,

21 whenever they commit a crime, do you think they still

22 ought to be responsible for their crime?

23 A. Yes, sir, I do. I think that's their free

24 will, their free choice to take that action, to become

25 intoxicated or high on drugs there to begin with on

55

1    there.

2    Q.  And that's what the law says, that voluntary
3    intoxication is not a defense to the commission of a
4    crime.  In other words, if someone were to slip
5    something in a drink you had and you got intoxicated or
6    something unbeknownst to you; but if it's your own free
7    will, as you say, to do it, you're still held
8    responsible.

9          Obviously, some people are smarter than
10   others.  Some people have a lot of trouble in school.
11   Some people are special ed students.  Some are not quite
12   as bright as others.  Do you think that a person's
13   mental condition, as long as they know right from
14   wrong -- because if you don't know right from wrong,
15   then that's insanity and that's a different issue, I
16   suggest.  But as long as you know the difference between
17   right and wrong, do you think the -- despite the fact
18   you may be a poor student or not intelligent book-wise,
19   but you still ought to be held responsible for your
20   conduct.

21   A.  Yes, sir.

22   Q.  Some people look at mitigating circumstances
23   such as, it could be the age of a person.  Person could
24   be a young age, or a person could be a very old age.
25   And somebody may say, Well, I think that's mitigating

---

56

1    towards a life sentence; because if they're young, they
2    do things you wouldn't ordinarily do.  As you get older,
3    you get more mature.  You make better decisions.  You
4    make bad decisions when you're young, and that's part of
5    the growing up.

6          Somebody else may say, Well, that may be
7    true; but a person still ought to be responsible for
8    their conduct, regardless of what their age is.  And if
9    they've already committed capital murder at this age,
10   what are they going to do one, ten, or fifteen years
11   down the road?  So you can see then people can look at
12   the very same piece of evidence and come up with
13   different opinions.  And that's okay; because that's
14   what Issue Number Two is asking you to do, is to look
15   back through the evidence and see if there was any
16   evidence there that mitigates, in your mind.  So it
17   gives you reasons why a person should receive life as
18   opposed to death.  And if there is, that's fine.  And
19   then you determine, is it sufficient to change your
20   answer?  Because if there is not any, then that's fine.
21   And you don't change your answer, but you're committed
22   to the search.  Any problem with that aspect?

23   A.  Any problems with that?  No, sir.

24   Q.  I mean, as the Judge indicated in his voir
25   dire, some people say -- it may be common sense to

---

57

1    think, if I find someone guilty of capital murder, then
2    if I find on Issue Number One on they're going to be a
3    continuing threat, to a probability, to commit future
4    acts of violence, why wouldn't this person get the death
5    penalty?

6          But you're still committed to go through
7    and answer that last question.  Maybe you'd still answer
8    it in such a way that death applies; but you're
9    committed to that search, in looking for evidence to see
10   if there is anything that gives a reason to give life as
11   opposed to death.  But, of course, the law wants you to
12   be sure that your decision is what you want to make.
13   You understand how that operates?

14   A.  Do I have an opinion?

15   Q.  Do you have any problem with that?

16   A.  No, sir.

17   Q.  Do you think the system, the way it's set up,
18   is a good system to arrive at these decisions?

19   A.  Yeah, I do.  In my opinion, I think our legal
20   system is a just system.  Put it that way.

21   Q.  Thank you, sir.  I appreciate your time, and
22   I'm going to pass you at this time.

23         THE COURT:  All right.  Mr. Wentz.

24         VOIR DIRE EXAMINATION

25   BY MR. WENTZ:

---

58

1    Q.  As you've been told, my name is Kurt Wentz.
2    Wayne Hill is not with us for the moment.  This is
3    Charles Mamou.  I'm going to talk to you for a brief
4    period of time, but I would appreciate you continuing to
5    do something you've already done.  And that's not only
6    just answer my question, but you've already begun to
7    give the reasons for answering the way you do when you
8    were talking to Mr. McClellan.  I'd like for you, if you
9    would, to continue to do that as you talk to me.

10   A.  Okay.

11   Q.  And I think you know already that this type of
12   trial is different than just about any other type of
13   trial.  It's a very individualized process.  That's why
14   we're talking to you individually.  And as you sit here,
15   you only see one defendant.  I think sometimes we have a
16   tendency to lump and to group people into categories.
17   And this is only Charles Mamou's case; no one else's.
18   Could you judge this as his own individual case?

19   A.  Yes, sir.  He's the one that's on trial.  It's
20   the individual charged here.

21   Q.  And I think if you were on trial, you would
22   consider that to be sort of important for you, too.  You
23   would want to be judged as the person you are, for what
24   you may or may not have done.

25   A.  I want my own day in trial, as the saying goes,

59

1 oh, yes, sir.
2    Q.   Okay.  Fine.  You don't have your questionnaire
3 in front of you, so I'm going to try and go through it
4 briefly, if I could.
5            MR. WENTZ:  May I stand, Your Honor?
6            THE COURT:  Yes, sir.
7    Q.   (BY MR. WENTZ)  One of the questions is Number
8 25.  And you're asked, Have you ever known anyone who
9 was killed accidentally or otherwise?  And you answer,
10 yes.  Could you tell me about that, if you would,
11 please, sir?
12    A.   I have had a suicide, sir.  Not in my family.
13    Q.   I'm sorry.
14    A.   Also, I'll expand on that.  When I was in
15 Vietnam, there was a lot of death, too.
16    Q.   Well, you anticipated my next area of inquiry,
17 because I guess where we are in this time, we see that
18 question about, Have you been in the military?  That's
19 not checked as much as it used to be.  And, in fact,
20 you're one of the really few people that have checked
21 that block, so I was going to follow along with that.
22    A.   Yes, sir.
23    Q.   You've talked to us already that while you were
24 serving your country that your brother, younger brother,
25 unfortunately got in some difficulty, that you weren't

60

1 around for him.  And he went to prison and served some
2 time for a burglary; and I think you've told us that it
3 helped, in your opinion?
4    A.   Uh-huh.
5    Q.   First of all, how do you think it helped?
6    A.   I think it helped him focus more on his future
7 instead of just immediate time of day right there, you
8 know.
9    Q.   Okay.  Were you and he close?  I mean, I know
10 you had to go away and you didn't have very much choice
11 in it?
12    A.   When we were young, we were very close.  As I
13 got into my teens, there is, like I say, about a
14 four-year age difference on there.  We weren't as close.
15 I married at a young age, when I was seventeen, and
16 moved out of the house.  So he was still like a preteen
17 when I moved out.  There was a long separation there
18 where we weren't, and still aren't, intimate like a lot
19 of brothers, I will say.  Yes, sir.
20    Q.   One of the things -- and reason I asked you
21 that is you've seen that prison can be actually -- and
22 this may sound strange, but I think you and I both can
23 understand it can actually have a positive influence on
24 somebody.  Yet when you're asked on this Question Number
25 71, where you agree or disagree, you say, Prison makes

61

1 people worse.  And you say, Yes, you would agree with
2 that.
3    A.   I'm sorry.  What did I mark on there?
4    Q.   You said you agreed that prison makes convicted
5 people worse.  And I guess what you're saying there is,
6 That may be a thought that you have had, that your own
7 personal experience is very different from mine.
8    A.   You know, with my personal experience for my
9 brother, it helped on there, okay.  But I hear so many
10 times now about people that go into prison that are in
11 there for a short period of time and then come outside
12 more hardened with more crime capabilities, I would say,
13 from other people that are in prison and so forth.  I
14 know prison would be very hard for myself.
15    Q.   I think I had explained to you, actually, the
16 full meaning, at the very least, of what a life sentence
17 means in the context in which you and I are talking
18 about imprisonment; because we're only talking about two
19 punishments, life imprisonment and the death penalty.
20 And, you know, you understand at the very least a life
21 sentence would be forty years before you can become
22 eligible for parole.  And certainly an individual could
23 change dramatically over a forty-year period.
24            In fact, I was thinking if you believe
25 these actuary tables that insurance companies give us,

62

1 it's not very likely that you will even be alive in
2 forty years.
3    A.   Myself, when I said that about the coming out
4 more hardened and so forth on there -- and I believe I
5 mentioned it -- I was talking about for a short term
6 type punishment on there.  You know, I'll say a couple
7 of years.  Could be longer, whatever type of deal they
8 have.
9    Q.   One of the things that he found is sometimes
10 when we're confronted with an individual, we make a
11 judgment about that person.  I'm just talking about in
12 our daily lives.  And once we make that judgment about
13 that person, how we think about that person in the
14 future, we generally want to conform with our initial
15 impression or our initial judgment of the person.
16            I'm going to try and give you an example.
17 Child goes to school.  And the teacher thinks, well,
18 this child doesn't do very well on these tests, or he's
19 not performing very well; and he's thought to be, if you
20 will, dumb, stupid, whatever.  And they put him down at
21 the slower levels of the classes where things go slower.
22 People begin, well, if the teacher thinks you're dumb, I
23 guess you must be dumb.  And kids begin to follow this.
24 And the thing is, he's not really dumb.  There are many
25 number of reasons why a child, you know, might

63

1　underperform in school. And I guess what I'm getting to
2　is that as a juror in a case like this, you're called to
3　make a real big decision; and that's whether or not
4　somebody -- and in this case, Charles Mamou -- is guilty
5　of society's worst crime, capital murder.
6　　　　And it seems to me that when you make that
7　judgment, you make a very, very conclusive judgment
8　about that person. One, legally he's guilty of capital
9　murder. And possibly along the way he makes some other
10　decisions about it, as well. Not that you wouldn't, but
11　I think it's very common. But when you get to the
12　second phase of this trial, you've been told you've got
13　these two other issues to answer.
14　　　　You know from your conversation this
15　morning with the Judge that all of these decisions are
16　supposed to be independent of one another. In other
17　words, you make one and you make the other. Then you
18　make the third one. But going back to my example with
19　the child, you may possibly have concluded that
20　somebody's guilty of capital murder automatically.
21　Well, if you're guilty of capital murder, you're going
22　to be a future danger to society. How do you feel about
23　that?
24　　　A. That's where the evidentiary part of it comes
25　in on there, where you have -- you have to determine

64

1　first the guilt or innocence on there, and then whether
2　he would be a continuing threat at that point to society
3　on there. I may not be explaining this good enough for
4　you.
5　　　Q. No, you're doing a good job.
6　　　A. And I certainly am glad those are two separate
7　questions on the deal on there. I didn't know those
8　were before; but yeah, you just have to take everything
9　into consideration on that on there, you know.
10　　　Q. And you see what happens here -- and I think
11　you can understand -- I didn't ask you that question
12　because, you know, if you just decide somebody's guilty
13　of capital murder, there is always going to be a future
14　danger. There is almost no sense to the question. It
15　doesn't really call for that independent inquiry the
16　Judge was talking to you about. And when you get to the
17　second phase of the trial, as the Judge told you, all of
18　these words, with the exception of proof beyond a
19　reasonable doubt, were defined as you define them. They
20　don't have a legal definition.
21　　　　And the Judge talked to you about a
22　probability, responsibility. And when -- you know, when
23　we talked about this Special Issue Number One, we're
24　talking about probability. And certainly you're talking
25　about it in a real important context, because we're

65

1　essentially talking about how somebody's life is going
2　to be decided. And that thing called probability can
3　mean anything it wants to you. You're going to define
4　it for yourself.
5　　　　You may decide, well, maybe more likely
6　than not is enough. But if I'm going to be deciding
7　whether or not somebody is getting the death penalty, I
8　want to be real sure they're going to be engaging in
9　that kind of conduct. And you ask yourself, what kind
10　of conduct is that? Well, it's pretty extreme conduct.
11　So if you look at the words "criminal acts of violence,"
12　that would constitute a continuing threat to society,
13　we're not talking about just any crime. I think we're
14　talking about a very serious level of crime. Would you
15　agree with me or disagree with me?
16　　　A. I'm sorry. Repeat that question one more time.
17　　　Q. Well, as I look at the last two sentences, or
18　last two lines there, these criminal acts of violence
19　must be so serious that they would constitute a
20　continuing threat to society. And I guess what I'm
21　saying or asking is, that's just not any crime. It's a
22　higher level of crime when it involves violence. Would
23　you agree with that?
24　　　A. Yeah, as to violence, yes, sir.
25　　　Q. And one of the things that -- and I think

66

1　you've experienced -- sometimes you can be put in an
2　institutional setting, such as the Army; and you'll live
3　under certain rules. And the rules are a little bit
4　more stringent, let's say, than the rules that you live
5　by when you're not in the Army, such as you have to
6　dress a certain way. You can violate those kinds of
7　rules pretty easily. I'm not saying you might have, but
8　it's certainly possible. But they really don't come to
9　the level or rise to the level of acts of criminal
10　violence that would constitute a continuing threat to
11　society.
12　　　A. Yes, sir, I understand it.
13　　　Q. And when you get to Special Issue Number 2,
14　you've gotten to a point where, quite truthfully -- and
15　if you get that far, I'm going to assume for the
16　purposes of our discussion you get that far -- that you
17　essentially have a life or death decision to make.
18　Because if this question is answered no, then the death
19　penalty would be imposed. If it's answered yes, then
20　the person may receive the life sentence we've talked
21　about. And it asks for you to look through this thing
22　called mitigating evidence, through maybe one of a
23　couple of areas, the circumstances of the offense, the
24　defendant's character and background, and the personal
25　moral culpability of the defendant.

67

1      And I'd like to talk to you basically
2  about each one of those three, and the first part has to
3  do with the circumstances of the offense.  Now you know
4  you've already been satisfied that -- or believe beyond
5  a reasonable doubt that he intentionally took that
6  person's life in a capital murder context.   There is no
7  self-defense, there is no accident, there is no
8  insanity, nothing like that.  But it's felt that
9  sometimes from the facts of the case that there might be
10 something there that stops or lessens of the person's
11 deathworthiness.
12         You could all say if somebody goes into a
13 room, and with the intention of robbing somebody and
14 kills them, that may be -- and he does that, then
15 certainly -- that is certainly a very reprehensible set
16 of capital murder circumstances.  Somebody goes into a
17 room, does the robbery; and suddenly in the course of
18 it, a fistfight breaks out and the death occurs.  That's
19 a little bit different than the first circumstance.
20         With regards to the person's moral -- the
21 defendant's character and background, that allows you to
22 go back and look at them to determine a little bit more
23 about them, who they are, why they are where they are,
24 so to speak.  And when we get to thinking about those
25 things, sometimes we talk about them as excuses.

68

1  That's -- am I going to hear about the bad background,
2  the poor childhood again?  How do you feel about
3  listening about somebody's background in deciding how
4  you're going to answer the Special Issues in answering
5  Question Two about the personal background of an
6  individual.
7          So there is one reason I'm asking you
8  about that; because in Question Number 68 you're asked
9  about, do you believe that you could consider mitigating
10 evidence in determining whether or not somebody deserved
11 the death penalty?  And you say, no.  And this is
12 exactly the point where mitigating evidence gets to be
13 considered.  Could you give --
14      A.   I can explain to you why some of those answers
15 are that way on there.
16      Q.   Mind if I sit down?
17      A.   I have no problems with that.  I'm not a
18 student of the law, okay.  And I do pick up on things
19 reasonably well.  I think I do, anyway, quickly on
20 there.  And I think that now with issues that have been
21 shown to me on this stuff, on this particular point of
22 law, I'll call it on there that, yeah, that sometimes
23 possibly things in the background could be in there
24 where I, as a juror at that point in time, would have to
25 weigh those things for my own decision-making process on

69

1  there.  Is that what you're looking for?  If that's not
2  something -- let me rephrase that on there.  Is there
3  another part to that question that I didn't answer for
4  you on there?
5      Q.   You've done great, and I really appreciate your
6  talking with me this morning.  Thank you.
7          THE COURT:  Thank you, sir.
8          (Court admonishes prospective juror.)
9               ELYSE CONNER SONY,
10 having been first duly sworn, testified as follows:
11              VOIR DIRE EXAMINATION
12 BY THE COURT:
13      Q.   I have a couple of questions for you before we
14 start.  I can't talk without her.  Let's go back to what
15 you mentioned earlier about the possibility of being
16 called back.  I looked at your questionnaire, and I
17 didn't see any mention of that in the questionnaire.
18      A.   Right.
19      Q.   And you're going to be answering my question,
20 because I was the one that asked it; but these guys have
21 to hear your answer, too.  So just speak to them, too;
22 because it's going to be easier for me to hear.  Talk to
23 me.
24      A.   Why I didn't answer on the questionnaire?
25      Q.   Is the information you gave us this morning

70

1  more recent than when you filled out the questionnaire?
2  Did you get a call?
3      A.   Well, at that -- at the time that I was called
4  for jury duty, yes, I was off work.  And I had been told
5  that it was indefinite as to when I would be called
6  back.  You know, it may be Christmas.  It may be after.
7  And I wanted to answer as clearly as I could.  If I
8  wasn't called back to work, there would be no reason for
9  me not to be able to serve on jury.  That's the reason I
10 answered it that way.
11      Q.   Have you heard anything from anybody?
12      A.   Nothing, unfortunately.
13      Q.   I understand.  I sympathize with you.  This is
14 my thoughts.  That being the case, Miss Sony, if I'm
15 hearing you correctly, you may or may not hear from them
16 before this trial has concluded?
17      A.   That is correct, sir.
18      Q.   We may or may not hear from them before the
19 29th of September, which is the next stage of this
20 process?
21      A.   That is correct, sir.
22      Q.   So, my thought right now would be -- and you
23 tell me if your thought is contrary to mine -- is let's
24 just go ahead for right now, see where we are on the
25 29th.

71

1     A.  I very much want to be a part of the process.
2  I feel very strongly about it.
3     Q.  Before we begin the process, do you have any
4  questions at all for me?
5     A.  No.  You answered some questions that I had
6  this morning.
7     Q.  Thank you.
8         THE COURT:  Mr. McClellan?
9         MR. MCCLELLAN:  Thank you, Your Honor.
10             VOIR DIRE EXAMINATION
11 BY MR. MCCLELLAN:
12    Q.  Miss Sony, just to that one area, obviously,
13 let's say you're picked to be on the jury when we get to
14 the 29th.  That's the date we're going to bring
15 everybody back, and we each have fifteen strikes.  Let's
16 say you are on that jury.  You come back on the 4th of
17 October.  And on the 5th of October, you get a call
18 saying, come back to work.  But you're on a jury.
19    A.  I have to stay on the jury.
20    Q.  You can give us your full attention?
21    A.  Yes, sir.
22    Q.  So that would be the only thing we worry about,
23 is that if someone got that call they'd say, well, let's
24 hurry up and get this deal over with; because I've got
25 to get to work.  And we can't hurry it up,

72

1  unfortunately.  So that wouldn't be a problem?
2     A.  No, sir.
3     Q.  Let me go over some other things in your
4  questionnaire.  You've indicated you had at least more
5  than one friend who has been murdered?
6     A.  Yes, sir.
7     Q.  You said a friend was killed in a drive-by on a
8  bus in Dallas?
9     A.  Yes, sir.
10    Q.  How long ago was that?
11    A.  It's been seven years.
12    Q.  Was anybody prosecuted for that crime?
13    A.  I don't know, sir.
14    Q.  How close a friend was that?
15    A.  It was a very close friend.
16    Q.  Did you live in Dallas, or did they?
17    A.  We were workers, and we talked on a daily
18 basis.
19    Q.  This is somebody that worked in Dallas?
20    A.  Yes, sir.
21    Q.  And you worked with her, and y'all talked on
22 the phone?
23    A.  Yes, sir.  And there were several business
24 meetings.  And when he would come to Houston, we were
25 just good friends.

73

1     Q.  Says, Three friends of mine, a mother and her
2  two sons, were murdered by her estranged husband?
3     A.  Yes, sir.
4     Q.  When was that?
5     A.  Four years ago.
6     Q.  Was that here in Houston?
7     A.  Yes, sir.
8     Q.  Was someone prosecuted for that?
9     A.  The man that did it killed himself after he
10 killed the three.
11    Q.  After he killed them, he committed suicide?
12    A.  Yes, sir.
13    Q.  The fact that you've had that many friends die
14 as a result of gunfire, and knowing this case involves a
15 murder, alleged to be a capital murder, does that affect
16 your ability to be fair and impartial?
17    A.  No, sir.
18    Q.  That won't carry over into this case?
19    A.  No, sir.
20    Q.  You indicated your daughter was charged with
21 public intoxication, and the cops were a bunch of jerks,
22 and this, that, the other, and all that?
23    A.  That's correct, sir.
24    Q.  I have no doubt about that.  That didn't happen
25 to be Precinct 4, did it?

74

1     A.  No, no, it wasn't.
2     Q.  It could have been?
3     A.  Actually, it could have been.
4     Q.  Police officers are going to testify in a case
5  like this.  Listen to what the police officers testify
6  to.  And if you think that police officer is a jerk,
7  you're able to follow that law?  If you think they're
8  okay and they're telling the truth, you can follow that,
9  too?
10    A.  I don't believe all police officers are jerks.
11 I believe, as in every human race, there are bad.
12    Q.  Always bad in everything?
13    A.  That's right.
14    Q.  The -- in your questionnaire, from reading your
15 questionnaire, it appears that you believe the death
16 penalty is a proper type punishment for certain types of
17 crime; is that correct?  Is that right?
18    A.  Yes, sir.
19    Q.  What kinds of cases come to your mind when you
20 think of cases where you think the death penalty ought
21 to be available as a form of punishment?
22    A.  If in the act of committing a crime, or if the
23 crime in and of itself is the murder -- I mean, if a
24 person sets out to kill someone because they didn't like
25 the way something that person did that they took

75

1    someone's life, I just think that that's wrong.
2        Q.   And --
3        A.   Taking someone's life just because you're mad
4    at them or because they have something you want is, you
5    know.
6        Q.   Okay.  Now the Judge talked to you about the
7    difference between murder and capital murder?
8        A.   Yes, sir.
9        Q.   And murder could be killing someone because you
10   don't like them or for some reason like that; but the
11   law says that's not capital murder, death penalty
12   doesn't apply.
13       A.   Yes, sir.
14       Q.   It only applies when it's murder plus some
15   other felony offense?
16       A.   Yes, sir.
17       Q.   What we have alleged here is murder during a
18   kidnapping, and also, murder during a murder, killing
19   two people or more during one criminal episode.  If we
20   prove it's one of those, then the defendant would be
21   found guilty of capital murder.  So we've alleged two
22   ways of committing capital murder in our indictment,
23   murder during the kidnapping, and also, the law -- the
24   law says capital murder is murder during a robbery or
25   burglary, during a sexual assault or kidnapping, those

76

1    kinds of felonies, killing two or more people during one
2    criminal episode, police officer in the line of duty,
3    taking that person's life, or a child under -- killing a
4    child under a certain age.  We've alleged two of those
5    manner and means of committing capital murder in our
6    indictment.
7            Some of the jury can believe one -- six
8    can believe one and six believe the other, and they can
9    all believe it's one or the other two capital murders,
10   or they could all believe it's one and not the other.
11   Any scenario, they're still guilty of capital murder.
12   Okay.
13           Just because it's capital murder, though,
14   as the Judge has told you, it doesn't mean that tells
15   you what the punishment is going to be; because you have
16   to look at all the facts and circumstances.  Even
17   killing two or more people during one criminal episode,
18   that's still -- you don't know what the facts are to
19   that.
20           I think we often run into the problems in
21   the fact that it's common that a person doesn't deal
22   with this on an everyday basis.  They hear the word
23   murder, they think of something very horrible.  And I'm
24   not saying murder is not very horrible.  Murder is the
25   intentional taking of another person's life without any

77

1    legal justification; but as the Judge indicated to you,
2    it would be all the way from a mercy killing one end to
3    a drive-by shooting of a kid on a bicycle on the other
4    end.  Totally different type circumstances.  And that's
5    why we have the questions up here, and that's why each
6    question has to be answered independently; because I
7    suggest -- and you tell me if you think I'm wrong --
8    that you can't tell me what you're going to do in a
9    capital murder case.  Even if I told you a person was
10   guilty, you still couldn't tell me what you're going to
11   do unless you knew what the facts and circumstances
12   were.
13       A.   That's correct.
14       Q.   Now some people, though, do come in and say,
15   hey, if I find someone guilty of capital murder, forget
16   it.  I'm going to give that guy the death penalty.
17   They've already written everything off, and they've
18   decided what the facts are without ever hearing them.  I
19   want to make sure you're not that type person.
20       A.   Yes, sir.
21       Q.   Now some people tell us, come in and say, I
22   believe in the death penalty.  I believe it's a proper
23   type punishment for certain types of crimes.  But some
24   of those people then go further and tell us, I don't
25   believe, though, that I, myself, could ever participate

78

1    in a process where I would be called upon to make
2    decisions that I know would result in this Judge
3    ordering the execution of the defendant sitting over
4    here on trial.  Do you have any doubts about your
5    ability to participate in that type of process and make
6    those type of decisions if that's what the law and the
7    evidence called for?
8        A.   No, sir.
9        Q.   You understand -- maybe I'm basically banking
10   on the fact that you listened to the Judge's voir dires
11   and understand how the process is set up; because, you
12   know, we all come in with personal opinions.  We all
13   come in with personal thoughts, and a lot of these --
14   like a person asked me, what do I think about capital
15   murder?  I'm going to be thinking of some scenario in
16   my mind.  I may not play it out piece by piece, but I'm
17   going to be thinking of something pretty bad.  I
18   sometimes don't often stop to think that there may be
19   other -- where a person still gives you capital murder,
20   but there may be other circumstances that might affect
21   what my decision might be.
22           Somebody may say, what do you think the
23   punishment ought to be for aggravated sexual assault?
24   Aggravated sexual assault is going to be pretty high;
25   but, of course, I don't know what the facts and

79

1  circumstances are of this case.  There may be all kinds
2  of things that come out, something like, say,
3  endangering a child.  All these things sound bad, but
4  you have to wait till you hear the facts and
5  circumstances to keep your mind open to everything
6  that's available there to make that final decision.  Are
7  you the type of person that can do that?
8       A.  Yes, sir.
9       Q.  If I were an accused charged with capital
10  murder and you're a prospective juror, would I want you
11  as a juror?
12      A.  I believe so.
13      Q.  If I am the family member of a victim who is
14  the victim in a capital murder and I'm coming to watch
15  the trial, do I want you sitting in judgment on the
16  person that allegedly took my child's life?
17      A.  I believe so.
18      Q.  And why do you say that on both cases?
19      A.  Because I feel like I have the ability to
20  evaluate honestly and follow what my heart tells me.  I
21  mean, after what I hear.  There has been many times,
22  after raising two children, that I go into a situation
23  thinking, I know exactly how I'm going to handle this
24  situation.  But due to the circumstances involved, my
25  decision -- I mean, how I handle it is completely

80

1  different than what I thought going into it because of
2  the thought processes.
3       Q.  Right.  And that brings up another issue that
4  strikes close to my heart.  In raising kids, do you
5  often find, also, that your kids tell you one thing; and
6  then when you kind of get them pinned down on something
7  else, they finally come clean?
8       A.  Many times.
9       Q.  I assume -- or you tell me, do you have any
10  preconceived idea of what the punishment ought to be for
11  this case?
12      A.  I don't know anything about this case, sir.
13      Q.  And can you follow the law given to you by the
14  Court and make your decision based on that law and the
15  evidence you hear in the courtroom and nothing else?
16      A.  Yes, sir.
17      Q.  All right.  Thank you.
18          THE PROSECUTOR:  I'll pass the witness.
19          THE COURT:  Thank you.  Mr. Hill.
20          MR. HILL:  Thank you, Judge.
21              VOIR DIRE EXAMINATION
22  BY MR. HILL:
23      Q.  Hi, Miss Sony.  My name is Wayne Hill.  Kurt
24  Wentz and I both represent Mr. Mamou.  I'll take a few
25  minutes to visit with you, if I could, about the things

81

1  you put in your questionnaire; and I'll ask them from a
2  slightly different perspective, obviously, than
3  Mr. McClellan.  I guess the main concern that I have
4  about anyone that sits in that chair that your attention
5  right now is that you're bombarded with comments to the
6  effect of, The law says this; The law says that; The law
7  would require you to do this or to do that.
8           Ultimately, what you do in a case is your
9  sole decision as a juror.  We want to make sure that at
10  this time, which is the only time that we get to speak
11  personally with you, that you are given an opportunity
12  to fully express anything that's on your mind that could
13  play a part in this case, either from the State's
14  perspective or the defense perspective.  So if I ask you
15  a question and you think that it's either too personal
16  or that it's not something you care to answer, please
17  tell me.  Okay?
18      A.  Okay.
19      Q.  My intent is not to pry.  It's to try and
20  really figure out in twenty minutes, who is Miss Sony?
21  Is she the type of person that we are comfortable with
22  as far as your serving on this case?  Okay.  The law
23  doesn't require you to artificially dispose of the
24  feelings you have when you come into court.  I think
25  that would be improper, because we all are products of

82

1  your environment, upbringing, and day-to-day lives.  And
2  so, it's important for us to know what your feelings are
3  and let the chips fall where they may.
4           Okay.  I'll ask you one thing.  As a
5  defense lawyer, I'm reading this one answer you gave,
6  and I'll see if I can't get you to change the answer a
7  little bit.  Listen to the question.  Says, What does --
8  well, it talks about, Do you believe -- or what is the
9  most important purpose for punishment in a criminal
10  case?  And you said retribution and deterrence.  And the
11  follow-up question was, What is the best way to achieve
12  that purpose?  Your answer was, Good prosecutors, and
13  good defender, and good jurors who approach their
14  responsibility with conviction.  Would you mind changing
15  the word conviction to commitment for me?  Because I
16  think, as a defense lawyer, I don't need to be
17  approaching it from a conviction standpoint.  Would you
18  agree to change your word from conviction to commitment?
19      A.  Okay.
20      Q.  Okay.
21          The State has no objection.
22          THE COURT:  Anything else?
23      Q.  (BY MR. HILL)  Okay.  Mr. McClellan was talking
24  to you, and he said that murder is the intentional
25  taking of another person's life without legal

83

1  justification. In your own words, can you tell me what
2  legal justification means to you?
3    A.  In the case of someone coming at you,
4  threatening to take your life or harming you or your
5  family.
6    Q.  Okay.
7    A.  And in the course of that event, the only
8  action or the only outcome is that you have taken their
9  life. I think that's justified.
10   Q.  Okay. And that's a classic case of
11 self-defense. The reason I ask that is because many
12 times when we're talking to prospective jurors, they get
13 very confused about where that fits into a trial. You
14 understand that the State is alleging clearly that two
15 people were killed.
16         The question of whether or not those
17 killings took place in a way that makes a person
18 responsible in the criminal law has to do with
19 potentially those very issues. You, as a juror, would
20 sit and listen to the facts. And you may conclude that
21 an individual caused somebody's death. The decision
22 that you have to make is, what were the circumstances?
23 Are the circumstances such that that person should be
24 found guilty or found not guilty? Okay. And that's all
25 done at that first stage of the trial that the Judge is

84

1  describing. Do you understand that if you were to
2  believe, along with eleven others, that the State had
3  failed to prove their case beyond a reasonable doubt and
4  that maybe the jury found there was some type of
5  self-defense that you've just described, you understand
6  we would never proceed to a second stage of a trial?
7    A.  Yes, sir, I do.
8    Q.  There is a whole lot of people that are just
9  so -- because nobody deals with this stuff, and
10 especially when you're talking about a capital murder
11 prosecution. The rules are totally different. It
12 doesn't proceed exactly the same way as a normal trial
13 does. So it's important for me to make sure that jurors
14 even understand Number one, the basic process and the
15 words that we use so that we're not saying one thing and
16 the juror is thinking something else and we're kind
17 of -- we're not on the same wavelength. Okay. What's
18 it feel like to sit there and be viewed as a prospective
19 juror in the most serious type of crime in the State of
20 Texas?
21   A.  It's sobering. It's very sobering to me;
22 because you're talking about not only was someone's life
23 taken, but you're talking about the possibility of
24 taking someone else's life. So it's a very sobering
25 feeling. I realized that the other day, last Friday

85

1  when we had our first group in here, that it was -- I
2  went home realizing that this is very serious, very
3  sobering, and it's something to deliberate very
4  carefully.
5    Q.  It's really real now?
6    A.  Very real to me.
7    Q.  Do you think that your views or the way you
8  would express your feelings contrasting how you might
9  visit with maybe some neighbors or something over coffee
10 versus here we are in the courtroom today? Do you think
11 your feelings might differ a little bit sitting around,
12 just having a general conversation about a topic like
13 this versus how far you're viewing the situation right
14 now?
15   A.  Most definitely, most definitely.
16   Q.  I take it then that you take this as a very
17 serious -- something that will require a great deal of
18 thought. And whatever decision you ultimately make on
19 any issues that are presented to you, you would feel
20 comfortable with your ability to evaluate everything
21 before making a decision?
22   A.  I would have to be very sure in my own heart as
23 to what decision, because it is -- there is two sides,
24 and both sides, or one side, has already been hurt and
25 the other side stands to be hurt. So it's something I

86

1  would think very carefully over.
2    Q.  You know, oftentimes when we talk about -- or
3  if the question were asked from the State's perspective,
4  what information would you think would be important
5  before deciding whether a person should be sentenced to
6  life or death? We hear things like, well, we want to
7  know about the person's background. We want to know if
8  they have a prior conviction. We want to know if
9  they've been in trouble before. I will look very
10 closely at the way the crime was committed to see
11 whether it was one of those cases where it was
12 premeditated, so thought out, so cunning, versus maybe
13 the offense happened very quickly, and certainly the
14 person takes the person's life; but the circumstance
15 helped to explain why. Okay. That would be from the
16 State's perspective perhaps. What do you think would be
17 important from the defense perspective to present to you
18 as to why a person under those circumstances shouldn't
19 receive a life sentence rather than a death penalty,
20 knowing that you had just found beyond a reasonable
21 doubt that the person did take one of two people's lives
22 intentionally, without legal justification?
23   A.  It's very difficult to answer the question
24 or --
25   Q.  I know.

**87**

1     A.   I would have to just hear what's presented, I
2   mean, and base it on what it is then.
3     Q.   Let me put it -- let me make it a little bit
4   more personal to you and see whether or not you kind of
5   come up with some reasons.  Let's assume for a moment
6   you're my client.  You've just been convicted of capital
7   murder.  Okay.  And I turn to you and say, Okay, Miss
8   Sony, the jury's sitting there trying to determine
9   whether or not you receive life in prison or the death
10  penalty.  What do you want me to tell them about you?
11  What would be important, do you think, for the jury to
12  know about you before making that type of decision?
13    A.   If it were me, on a more personal -- I
14  appreciate the way you did that -- there were mitigating
15  circumstances.  There was some -- there was other things
16  involved, and the kind of person I am, and the life I've
17  led prior, leading up to this in no way indicates that
18  I'm the kind of person that would -- that does this or
19  would do this again, that there were mitigating
20  circumstances that caused the whole series of events to
21  occur.
22    Q.   Okay.  You see what I try to avoid when I'm
23  looking at a prospective juror as the person that I
24  refer to as a knee-jerk reaction, or when I throw out a
25  buzz phrase like everybody that commits a crime, or the

**88**

1   same crime, should be treated the same.  That sounds
2   like it's inherently fair.  It sounds like, well, yes,
3   if A and B both commit the exact same crime, they should
4   both be punished the same.  Well, it completely ignores
5   who A and B are.
6          In your scenario, where I'm representing
7   you, you would want the jury to know as much as possible
8   about you and about the circumstances of the offense you
9   had been found guilty.
10    A.   Right.
11    Q.   Okay.  See, you get to wear hats when you're
12  sitting in that chair before you serve on the jury.  So
13  now we're going to make you one of many house
14  representatives here in Texas.  You've been voted in as
15  the representative from your particular area, and there
16  is a movement afoot to change the process as it relates
17  to criminal prosecution of capital murder cases.
18          You know, right now a jury is given the
19  option by answering these two questions of, will a
20  person receive life in prison or the death penalty?
21  Well, somebody in the Legislature has introduced two
22  bills for consideration in this session.  One bill says
23  for every person convicted of capital murder, the
24  automatic sentence shall be death.  The other bill says
25  for every defendant convicted of capital murder, the

**89**

1   automatic sentence shall be life in prison.  Those are
2   the only two bills you get to vote on.  There is nothing
3   in between.  There are no other options.  Which of those
4   two bills do you feel you would be more comfortable with
5   voting for, or do you have something else you'd rather
6   say about the prospect of only having those two options?
7     A.   Well, I would prefer to withdraw my vote and
8   not make a vote at all.  But if those were the only two
9   things I had to vote on and I had to vote on one or the
10  other, I would vote on the second one; because the first
11  one would mean that it doesn't matter what the
12  circumstances were involved that caused this thing to
13  happen.
14    Q.   Okay.
15    A.   No matter what they are.  At least with the
16  second one I feel like in those circumstances where
17  there were mitigating circumstances that caused this
18  crime to be committed, those -- I guess to -- that's
19  probably how I would vote if I had to vote, but I would
20  prefer to withdraw my vote.
21    Q.   Okay.  Do I take it then you're more
22  comfortable with what we have right now?
23    A.   Yeah.  I didn't know about these until --
24    Q.   Hardly anybody does.  You know, unless you're
25  probably maybe a teacher of history or civics or

**90**

1   something, it's very unlikely that people are going to
2   understand or have ever been exposed to the actual
3   process of how we walk through a case like this and what
4   type of decisions the jury will make.  So, you're
5   comfortable with the process as it is?
6     A.   Uh-huh.
7     Q.   Any questions that you have of me or any
8   comments that you'd like to make to me about, gee,
9   here's something about me you haven't even asked,
10  Mr. Hill, that you need to know.  The red flag should go
11  up that as a defense attorney representing somebody
12  that's charged with capital murder, you should be smart
13  enough to ask this question; because otherwise, you're
14  not going to hear the answer.  Is there anything like
15  that?
16    A.   No.  I think the only thing you missed was our
17  blood type.  I think you pretty much covered everything.
18    Q.   Well, you know, Mr. McClellan wanted that
19  question included, and I said that I thought it was a
20  personal invasion.  Okay.  Thank you.
21          THE COURT:  Thank you, sir.
22          (Court admonishes prospective juror.)
23
24
25

91

1          STACIE COKINOS,
2  having been first duly sworn, testified as follows:
3          VOIR DIRE EXAMINATION
4  BY THE COURT:
5      Q.  I asked you the other day, and you gave me the
6  answer, which is Cokinos.  I'm going to take a run at
7  it.  Cokinos?
8      A.  Cokinos.
9      Q.  Miss Cokinos, do you have any questions at all
10  for me about anything we talked about this morning?
11     A.  Not this morning, no.
12     Q.  In that event, I will turn you over to
13  Mr. McClellan.
14         MR. MCCLELLAN:  Did you call on me again?
15  You're always calling on me first.
16         THE COURT:  He's been talking in class.
17         VOIR DIRE EXAMINATION
18  BY MR. MCCLELLAN:
19     Q.  My name is Lyn McClellan, ma'am, and this is
20  Claire Connors.  We represent the State of Texas in this
21  case.  Why don't you just sit back and relax.  We're
22  going to ask you to share with us, if you will, some of
23  your opinions and beliefs about certain aspects of the
24  law, kind of go over your questionnaire, maybe some
25  things, if I can find some things, that raises questions

92

1  in my mind or I want to know more about.
2         You know, you filled the questionnaire
3  out.  And we grade these as -- we don't grade them, but
4  we take this last series of questions about these 1
5  through 5, two sets of 1 through 5; and you come out a
6  three three.  And a three three means, I'd consider the
7  death penalty on some cases.  I could do it in the
8  proper case and that's what the law and evidence called
9  for.  It's right down the middle.  That's really kind of
10  where we end up getting all of our jurors; because if
11  someone is too close to the one, that means they can
12  never do it.  If they're to close to the fives, they
13  would do it every time.  So those that fall in the three
14  three category, it's like not talking during a regular
15  voir dire.  You're the one that gets picked, because
16  both sides are more comfortable with those types of
17  people.
18         Let me just ask you -- I know you've dealt
19  with the juvenile probation department in a volunteer
20  capacity, I guess.  What do you do in this intense
21  screening process?
22     A.  That was a -- I guess it was through the Junior
23  League of Houston.  It was volunteer service, and it
24  was -- I don't remember what years it was, but it's been
25  a few years ago since I've done it.  But one night a

93

1  week I would go in and receive cases, up to three cases.
2  And the family and the child would have been scheduled
3  that evening to meet with me, and we would look at the
4  case and determine -- I'd meet with the child
5  one-on-one; see, it may have been shoplifting -- they
6  were misdemeanor crimes and make a determination then on
7  what happens next.  I mean, in a lot of cases it was a
8  very first offense and the other circumstances.  I
9  didn't have any heavy crimes.  That's why they let
10  volunteers handle them.
11     Q.  And then you decide whether or not it's going
12  to be referred or not or whether it's going to be
13  handled like -- these people, I assume, are not in
14  custody, the ones that you talk to?
15     A.  No, they're not.
16     Q.  Their parents bring them down, and everybody
17  talks with them.  And they also talk with the parents?
18     A.  Right, right.
19     Q.  Can you tell me in your own words what is your
20  opinion about the death penalty?
21     A.  It's very serious.  I mean, I think that in
22  some cases it's warranted; but to make that decision or
23  decisions that would lead up to that sentence is a --
24  would be a tremendous challenge.  I mean, I don't think
25  it's something that should ever be taken lightly.

94

1      Q.  No.  And I think everyone agrees with you
2  that's going to be on jury, but it would be the most
3  serious decision you'll probably make in your life.
4      A.  Absolutely, uh-huh.
5      Q.  What kind of cases come to your mind when you
6  think of cases of crimes where you think the death
7  penalty ought to be available?
8      A.  I guess the word "heinous" comes to mind.  It's
9  something that just is almost maybe beyond comprehension
10  or something that is just so severe, your history may
11  well come into that if there is -- maybe the individual
12  case may not be heinous, to use my word.  But if there
13  are previous circumstances that led up to this that you
14  can see a real pattern there.  But, I mean, I feel like
15  for me to be a part of that decision-making process, I'd
16  have to really be very comfortable with knowing a lot of
17  information.  It's not something I could take on a
18  little bit of information or any information from
19  limited sources.
20     Q.  Okay.  Now you understand that in the criminal
21  process, the only side that is required to present
22  evidence is our side.  Defense has no burden of proof.
23  They're not required to present any evidence to
24  anything.  That doesn't mean they won't.  I'm just
25  saying there is no requirement there.

95

1       And a lot of people like to say -- and
2   it's common sense that you want to hear both sides
3   before you make up your mind.  In a criminal case, you
4   don't always get to hear both sides; because the other
5   side has no obligation.  Any problem with that aspect?
6   Do you think the circumstances of a crime -- by that I
7   mean, you know, affect whether you think a death penalty
8   is appropriate?  By that, I mean this:  You would hear
9   evidence about what happened before, during, and after
10  the commission of the crime.
11      What happened before the crime?  One
12  example could be this was a spur of the moment act that
13  happened as a result of circumstances.  Another could be
14  preplanned, premeditated, thought-out.  What happens
15  during the course of a crime, you would be able to hear
16  evidence about how the crime was committed, whether
17  shooting, stabbing, choking, you know, how the situation
18  occurred.  What happened after the crime would be
19  whether a person, you know, was remorseful about what
20  they had done or they were braggadocious about what had
21  happened during the course of a crime.  You think all
22  that information is helpful in determining not only
23  guilt/innocence of a defendant, but what type of
24  punishment the person ought to receive?
25      A.  Absolutely, very necessary.

96

1       Q.  In the questionnaire you said -- I want to go
2   over that just for a moment.  There were some on Page
3   14, agree/disagree statements.
4       A.  Uh-huh.
5       Q.  And you're asked to check if you're more likely
6   to agree or disagree.  Number 4 said, Any person, man or
7   woman, young or old, who's guilty of capital murder
8   should pay with their own life.  And you checked that
9   you more likely agreed with that.  Can you tell me what
10  your thoughts were about that?
11      A.  Would you read that one again for me?
12      Q.  Any person, man or woman, young or old, who's
13  guilty of capital murder should pay with their own life.
14      A.  Well, I interpreted the capital murder as being
15  a very serious offense, and today's description helped
16  me to understand the capital part of that better.  But I
17  guess maybe a way to describe it is the responsibility.
18  Because, I mean, I'm a very responsible person; and I
19  expect others to be responsible, as well, until they
20  prove themselves.
21      Q.  And I think that question is open to many
22  interpretations.  One interpretation a person could give
23  is that when you say any person, man or woman, young or
24  old -- well, everybody's either a man or woman, young or
25  old -- is guilty of capital murder should pay with their

97

1   own life.  That's like saying everybody that's guilty of
2   capital murder should get the death penalty.
3       Obviously, now, having heard the Judge's
4   voir dire, that's not the way our system was set up.
5       A.  Right.
6       Q.  And do you have any problem with the way our
7   system was set up?
8       A.  No.  Actually, I think it's a good, a strong
9   system.  It's fair.
10      Q.  Some people would come in and say -- and it
11  doesn't appear you would be that type person, but tell
12  me if I'm wrong -- that if I find someone guilty of
13  capital murder, school is out.  That person is going to
14  get the death penalty.  But there is a whole different
15  part of the case that needs to be heard.  On the guilt/
16  innocence, the focus is on the crime itself; because
17  we're trying to determine beyond a reasonable doubt
18  whether or not the defendant committed a crime, as
19  alleged in the indictment.
20      Punishment stage of the trial you may hear
21  additional evidence, because that evidence that you hear
22  at punishment was not relevant to whether or not a crime
23  was committed.  You may hear evidence about a
24  defendant's character, their background, their criminal
25  history or lack thereof, their mental abilities or

98

1   disabilities, all kinds of information about the
2   individuals, themselves.  Because at that stage, your
3   determination is what punishment this person should
4   receive for the crime you have found him guilty of.  So,
5   you get additional evidence.
6       And then in answering these questions, you
7   get to look at both bodies of evidence, the crime itself
8   and also the individual's character, background, all
9   that information.  You use all that information in
10  determining, one, whether or not the person, to a
11  probability, would be a continuing threat to commit
12  future acts of violence; and two, whether or not there
13  is sufficient reason or reasons, what they call
14  mitigating circumstances, why someone should receive
15  life as opposed to death?
16      In looking at these mitigating
17  circumstances, you're asked to basically go back and
18  look at all the evidence in the trial, weigh it in your
19  mind, and determine is this mitigating or not?  And if
20  it is, what effect it should be given.  What do you
21  think it should be given?
22      During the course of a trial you may hear
23  the defendant was high on drugs or alcohol when he
24  committed the crime.  One juror may say, I think that
25  mitigates towards a life sentence; because if you're

**99**

1  high on drugs or alcohol, you're out of your right mind.
2  And then Juror Number 2 may say, I don't agree with
3  that. I know people that are on drugs or alcohol, and
4  they don't commit capital murder. So, I don't see the
5  connection on that. So two people could look at the
6  very same evidence but come up with different opinions.
7      That's okay; because what the last
8  question asks you to do, as an individual juror, is for
9  you to examine the evidence, weigh it in your mind, and
10  determine what effect it was given. Same thing with the
11  age of a person. Somebody may think that's mitigating
12  because they're a young age. Somebody else may say, I
13  don't think it is. Somebody may say mental abilities or
14  disabilities is mitigating. Somebody else may say, I
15  don't think that is mitigating at all. I know other
16  people that are slow learners or whatever. They don't
17  go out and commit capital murder. I don't see the
18  connection. Is there anything in your mind that you
19  thought about that comes to your mind when thinking
20  about mitigating circumstances, thinking about reasons
21  why someone ought to receive a break, if you will, a
22  lesser punishment of life as opposed to death. Anything
23  that automatically comes to your mind that says, well,
24  if I hear evidence about this, then that would always,
25  in my mind, mean that that would indicate that life is

**100**

1  more appropriate than death?
2      A. I don't think it would be any specific. I
3  think anything could be a possibility when it's looked
4  at in the context of that person's life, because if I
5  would have had the same experiences -- you have to look
6  at all -- the whole life.
7      Q. Right. So drugs are a problem in that a lot of
8  people are affected by that. Do you think someone who
9  is high on drugs or alcohol when they commit a crime
10  ought to still be held responsible for their conduct in
11  the commission of that crime?
12      A. Absolutely.
13      Q. And that's what the law says. The law says
14  that voluntary intoxication -- I'm still responsible for
15  my conduct.
16      A. Uh-huh.
17      Q. It doesn't -- it's not a defense. Have you
18  ever known someone that drugs adversely affected their
19  life or changed their life dramatically?
20      A. Not someone personally. I've seen this through
21  extended peer groups, people who have made poor
22  judgment; but there has been nobody close to me.
23      Q. Okay. There is a question in here about,
24  Anyone can overcome a neglectful or abusive childhood.
25  And you said you strongly disagreed with that. Can you

**101**

1  tell me what your thoughts are in regards to that?
2      A. I think the scars are there. It's just that
3  some things are just -- you can adapt to it, but I don't
4  know that it would ever completely be eradicated from
5  the person's life. And again, I mean every case would
6  be different. And depending on the severity, but I
7  don't think you can say blanketly that anyone can
8  overcome it.
9      Q. Thank you very much, ma'am. I appreciate your
10  time, and I'm going to pass you to the other side.
11          THE COURT: Mr. Hill.
12              VOIR DIRE EXAMINATION
13  BY MR. HILL:
14      Q. Hi, Miss Cokinos. How are you?
15      A. Fine.
16      Q. Is your mom still alive?
17      A. Yes.
18      Q. What's her name, first name?
19      A. Bonnie.
20      Q. Are you related at all to Ellen?
21      A. Uh-huh. She married my cousin.
22      Q. Is that how you got involved in juvenile
23  probation?
24      A. Oh, no, completely separate. She hadn't
25  married my cousin yet when I did that work. It just

**102**

1  happens that there is an overlap in our interest.
2      Q. Have you ever been over to the Children's
3  Assessment Center?
4      A. Yes, I have. I toured this year.
5      Q. Pretty spectacular place?
6      A. Yeah, it's fabulous.
7      Q. Here I am. I'm one of the defense lawyers in
8  the case. And I'm sitting here, going to visit with you
9  for fifteen or twenty minutes to try and evaluate, try
10  and get a feel for whether or not you're one of those
11  people we want, one of those people we want to have
12  sitting in the chairs, deciding the fate of this man
13  sitting here.
14          You've given some answers to
15  Mr. McClellan's questions, and I'd like to maybe take a
16  little different perspective. Question No. 13 is one
17  that both sides like to focus on a little bit about the
18  issue of abuse of childhood or a bad childhood, and can
19  people overcome it? And your last response talked about
20  generally disagreeing, as a blanket statement, you don't
21  think that's valid. I'm going to make a kind of
22  strange statement. I want to get the reaction to it.
23  All right?
24      A. Okay.
25      Q. Here down at the courthouse, you read in the

103

1   newspaper people talking about a capital murder case
2   being tried. And oftentimes the jury is presented with
3   some evidence from the defendant about his childhood,
4   his upbringing, either. And to capsulize it people
5   might say something like, well, Johnny had a bad
6   childhood, and that's why he committed this murder. I
7   want to know your response to that. Does that sound
8   like there might be some validity to that statement; or
9   on the other hand, is that a ridiculous statement?
10      A.   No. I certainly think it could play a role in
11  leading to the offense.
12      Q.   All right. Go ahead.
13      A.   I wouldn't -- I mean, you can't take that as a
14  blanket, oh, well, then that's it, case closed. That's
15  all it was, but it certainly would be a factor that
16  might lead to that.
17      Q.   Okay. You don't think that every crime that's
18  committed is committed in a vacuum. There are
19  circumstances that help you to understand why or, you
20  know, under what circumstances the events took place?
21      A.   Uh-huh.
22      Q.   Would you want to know that? Would you want
23  to have as much information as possible --
24      A.   Absolutely.
25      Q.   -- before you make any decision?

104

1       A.   Absolutely.
2       Q.   Let me ask you whether -- do you think there is
3   some crime that is culturally based. By that I mean,
4   let's take for example the drug culture. There is some
5   questions in this questionnaire about, if a person was
6   shown to be using drugs or selling drugs, would that
7   mean they lose the right to defenses available to other
8   people? Do you think there is a certain set of rules
9   for people that are kind of in a drug culture versus
10  people that are in the normal society that aren't
11  violating those rules?
12      A.   No. I think it's the same set of standards.
13  Those people in that culture, they had a choice --
14      Q.   Right.
15      A.   -- whether to be a of part of that culture or
16  not --
17      Q.   I agree.
18      A.   -- and the consequences of that choice.
19      Q.   But do you think their lifestyle and their
20  culture is the same as the one you live in?
21      A.   No.
22      Q.   Would you even begin to know what some of the
23  rules are, some of the mores of a drug culture?
24      A.   Huh-uh.
25      Q.   Other than being exposed to it peripherally,

105

1   would you be open to evidence being presented to you
2   that might delve into those type of subcultures?
3       A.   I think it was -- it would add to the
4   understanding, yeah.
5       Q.   Do you believe if a person was taken out of a
6   culture like that and placed in prison, that their
7   ability to operate has changed? In other words, their
8   abilities to have that drug culture has changed?
9       A.   Based on what I heard about the prison system,
10  I would answer no, that it might be just as accessible.
11  It's a different building that the culture still exists.
12      Q.   What do you base that on? Where have you --
13      A.   Just from news and prime time TV, to be honest,
14  but it's an opinion based on that.
15      Q.   Have you seen any -- did you ever see the
16  presentation that Ted Koppel did on the Texas prison
17  system?
18      A.   Huh-uh, I don't think so.
19      Q.   Talking about their administrative segregation
20  units?
21      A.   I don't think so.
22      Q.   You ever heard that some prisoners are housed
23  individually in cells for twenty-three hours a day.
24  They're allowed to walk outside by themselves with a
25  guard for one hour a day.

106

1       A.   Not specifically, no.
2       Q.   What do you do at the Junior League?
3       A.   It's a volunteer capacity. And I've actually
4   just gone on a retired status, which means I'm no longer
5   active. And the active membership just implies a
6   volunteer commitment every year. And my time at Casa
7   Esperanza is part of fulfilling that commitment, and I
8   just liked the agency so much that I'm hanging around.
9       Q.   That's pretty much what you did when you were
10  active?
11      A.   Yes, it's the same, yeah.
12      Q.   All right. I'm going to make you a legislator
13  for a moment. You're representing your district in the
14  Texas Legislature. Somebody has introduced two bills
15  for consideration; and they both have to do with the
16  death penalty, or capital murder, I should say. Okay.
17      A.   Okay.
18      Q.   One bill says that for all people convicted of
19  capital murder, the automatic punishment shall be death.
20  The other bill says for all people convicted of capital
21  murder, the automatic punishment shall be life in
22  prison. If you are only given one vote and you have to
23  choose between those two, do you feel like you would
24  choose one over the other, or would you have a different
25  explanation that you'd like to offer up?

107

1  A.  I would choose the second one.  I'd choose
2  life.  If I had to make a choice between the two, I
3  would choose life.
4  Q.  Why would that be?
5  A.  Because to choose the death option then rules
6  out any of the mitigating information that came in.
7  Just said it basically just takes guilt or innocence,
8  guilty.  And then there is -- it's too strong.
9  Q.  Okay.  Can I interpret and can I rely upon my
10  impression that you are then comfortable with the
11  process that is given to you, as a juror, as it exists
12  today?
13  A.  Absolutely.
14  Q.  Can I also rely upon my, at least perception,
15  that you're now an individual, that if you found an
16  individual guilty of capital murder beyond a reasonable
17  doubt that you would not approach Question Number One
18  with the feeling of, well, my God, if we've just found
19  this person guilty of capital murder, clearly there's
20  got to be some probability that he would be a continuing
21  threat to society.
22  A.  No.
23  Q.  Now the question, I think, becomes a little bit
24  progressively difficult; because now if you answer
25  Question Number One at the punishment stage yes, you

108

1  know that, for lack of a better way of describing it,
2  you're two-thirds of the way to a death penalty.  For
3  those individuals, that third question is going to
4  determine his life or death ultimately.  Are you also
5  the type of person that could address Question Number
6  Three if you're called upon to do so with the same open
7  mind and the same resistance to making any automatic
8  answers as you have in the first stage of the trial and
9  with regard to Question Number One?
10  A.  Uh-huh.  It really could be the biggest
11  question, also.
12  Q.  And certainly would be if you had answered that
13  question.
14  A.  Yeah.
15  Q.  I'm sitting here as a defense attorney.  I have
16  a big decision to make ultimately, whether to give a
17  thumbs up or thumbs down.  And that's about as candid as
18  I can be.  What should I do when it comes -- when Number
19  88, Stacy Cokinos, comes up, what should I do?
20  A.  Well, I'm willing to serve.  I think it would
21  be an incredible challenge.  Would certainly be an
22  educational opportunity.  And it is not something I
23  would enter into lightly at all.  And, I mean, I do
24  think that would kind of -- in my personality, if you
25  will, that I -- that fairness is one of -- is very

109

1  important to me and looking at all sides.  There is
2  always another side to it.  So I think I would approach
3  it very fairly and very open-mindedly.
4  Q.  So as you look at Mr. Mamou, I take it then
5  that you would feel comfortable telling me and through
6  me -- him that you should be chosen to sit as a juror in
7  this case?
8  A.  Uh-huh.
9  Q.  Do you have any questions of me?
10  A.  No.
11  Q.  Thank you.
12  (Court admonishes juror.)
13  THE COURT:  For the purpose of the record,
14  before we go any further, the next panel, which is due
15  shortly, consists of Numbers 91 through 151.  Number
16  146 -- we've all talked about this, but the record
17  doesn't reflect it -- is a medical doctor.  The
18  occupation is insignificant.  And yesterday when the --
19  these folks were selected from the panel at the central
20  jury room, this gentleman informed the jury shepherd
21  that he was going to be out of town today because of a
22  previous commitment.  And the jury shepherd was told
23  that it was agreeable to excuse him.  Is there any
24  objection from either side as to that, Mr. McClellan?
25  MR. MCCLELLAN:  No, Your Honor.

110

1  THE COURT:  Miss Connors.
2  MS. CONNORS:  No, Your Honor.
3  THE COURT:  Mr. Hill?
4  MR. HILL:  No, Your Honor.
5  THE COURT:  Mr. Wentz?
6  MR. WENTZ:  No, Your Honor.
7  THE COURT:  Mr. Mamou?
8  THE DEFENDANT:  No, sir.
9  THE COURT:  And do you request he be
10  excused?
11  THE DEFENDANT:  Yes, it is.
12  (Jury panel brought in and seated.)
13  THE COURT:  Good morning to you.  The case
14  that we've asked you to come over here so we might visit
15  with you about your prospective service as a juror in
16  the case of the State of Texas verse Charles Mamou.
17  Mr. Mamou, stand up and face the jury
18  panel.  Mr. Mamou is represented by his two attorneys,
19  Mr. Wayne Hill, Mr. Kurt Wentz; and the State of Texas
20  is represented by two of her Assistant District
21  Attorneys, Mr. Lyn McClellan and Miss Claire Connors.
22  First off, ladies and gentlemen, is there anybody here
23  who, either because of familiarity of face or
24  familiarity of name, feel that you know any of the five
25  people to whom you have just been introduced?

111

1    Yes, ma'am?
2         VENIREPERSON: I'm Juror Number 133. My
3    two children were distant relatives of the deceased.
4         MR. MCCLELLAN: What's your number?
5         VENIREPERSON: 133.
6         THE COURT: Yes, ma'am?
7         VENIREPERSON: I'm Juror 150, and my
8    younger brother was a good friend of one.
9         THE COURT: First off, ladies and
10   gentlemen, let me visit with you a couple of seconds
11   about what is going on here. We are in the process of
12   selecting a jury, and we are finishing the second week.
13   My best guess is that some of you, if not most of you,
14   when you saw the questionnaire -- and you could pretty
15   well figure out it was a case involving an alleged
16   capital murder -- you probably became terrified,
17   thinking you were going to get locked up in some dingy
18   hotel room, kept away from your family and friends and
19   your loved ones and your job for weeks at a time. I'm
20   going to tell you right now, that's not going to happen
21   to you. The reason I can assure you it's not going to
22   happen to you is because if it happened to you, it would
23   happen to me; and I've got too many things I want to do.
24        Let me tell you something else. We're
25   going to spend about an hour-and-a-half here, and we're

112

1    going to be through for the day. Third thing I want to
2    tell you is, get off Judge Judy; because that's been
3    what conditions most of us. One of the ways it's going
4    to be different is because Judge Judy only gets to
5    harass private citizens. She never talks to lawyers.
6    We talk with lawyers.
7         This is not going to be a particularly
8    complicated thing. It's not going to be a long and
9    drawn out thing. The four lawyers and myself recognize
10   that each and every one of you folks that is here this
11   morning are laboring, to some degree or another, under
12   some inconvenience. If inconvenience amounts to
13   absolutely nothing more than when you backed out of the
14   driveway to come down here, instead of taking a left at
15   the stoplight to come to go to work, you took a right.
16   That right there throws your day off. We all understand
17   that.
18        We also understand that we are not going
19   to get the best work product that a jury has if we waste
20   a jury's time. So we're not going to waste your time,
21   because what we want is the best product you've got to
22   give us. But while I can commit to you that we'll get
23   you out of here on time, I'm never going to be able to
24   keep that commitment unless you folks let me get started
25   on time. So that's why 10:30 means 10:30, not ten after

113

1    11:00.
2         Now having said that, let's talk about
3    this type of stuff, generally speaking, jury service.
4    Generally speaking, many of you may very well have never
5    before served as a juror. I'm going to make the claim
6    to you that being a juror in a case is no more than a
7    complicated opinion, being in a strange town and lost
8    and trying to decide who it is you're going to ask for
9    directions. You're going to make a decision when they
10   give them to you. You're going to make the decision on
11   the basis of the way they present themselves. That is
12   to say, how sure are they of what they had to say, as
13   well as the logic of what they have to say? That's what
14   we want you to do here, to make a decision based upon
15   what the people say. And the way you can go about
16   deciding their credibility is how they say it, how
17   logical, and how much sense does it make to you? I have
18   heard it explained -- and maybe there is some accuracy
19   to it -- that being a juror in a case is an awful lot
20   like being a pallbearer at a funeral. You're in a place
21   you don't really want to be in. You are doing something
22   you really don't want to do. You aren't really so
23   comfortable that you know for sure what's expected of
24   you next. And the only real reason you're here in the
25   first place is out of a sense of duty.

114

1         All this process is about is three things;
2    listen, evaluate, and react. Listen to what the
3    witnesses say, evaluate the credibility of the
4    witnesses, and react to their testimony in terms of,
5    what verdict do you return? That's all this is about.
6    So you do that same stuff in your work world everyday
7    some way or another. You're just in a different work
8    world. And we're going to spend a little bit of time
9    talking about some stuff.
10        I want to spend some time talking to you
11   about some of the rules that can come into play during
12   the course of a trial like this. Whether they do come
13   into play or not, we don't know; because that will
14   depend upon what testimony is presented in the case.
15   But rules -- but we are going to talk about some rules
16   that we know can come into play. The reason we're
17   talking about them is this: Because if you're a juror
18   in the case, we want you to have some sort of an
19   overview as to what it is you might anticipate; because
20   it's only fair to us to know if these rules do come into
21   play, can you follow them? Because as a juror, your
22   oath would be not only would you follow the rules that
23   come into play, but that you will enforce them.
24        A trial like this -- I say "like this" --
25   a criminal trial, all criminal trials can come in two

115

 1  parts.  The first part of the trial, the jury's only
 2  concern is going to be deciding whether the defendant is
 3  or is not guilty.  If the jury finds the defendant not
 4  guilty, the case is over with and that's that.  We just
 5  simply don't punish people who didn't commit a crime.
 6  If a jury finds a defendant guilty, we come back to the
 7  second phase of the trial; and you can hear additional
 8  testimony that's going to be different from the
 9  testimony you heard at the first phase of the trial.
10          And the reason the second phase of the
11  trial exists is to arm you with information as to -- to
12  help you better make a decision to what punishment
13  should be imposed to the person that you would have
14  necessarily found guilty of having committed the crime,
15  or we wouldn't have had a punishment phase.  So, since
16  the purpose for the two phases is remarkably different,
17  the focus of the evidence is going to be remarkably
18  different.
19          At the first phase of the trial the
20  evidence is going to focus on the offense that was
21  committed.  Who did it?  Where was it done?  How was
22  it done?  When was it done?  What was the relationship
23  of the parties, if there was one?  What was the motive
24  for having done it, if there was one and if it's not?
25          All the things about the crime you'll hear

117

 1  called the Court's charge.  The Court's charge will
 2  contain all of the law that applies or that is raised by
 3  the testimony that's present in the case.  You'll have
 4  that charge, that written charge, with you back in the
 5  jury room during the whole time that you're
 6  deliberating.
 7          So it's for that reason, that reason that
 8  I just mentioned, why you don't have to try and memorize
 9  what it is I'm getting ready to tell you.  You don't.
10  Because if these rules come into play, you'll have these
11  rules in writing in the jury room.  But I want to give
12  you some idea before we start on the -- some of the
13  rules that can come into play.  It just simply might
14  take some of the surprise, therefore, some of the
15  anxiety you might have out of it for you.
16          First off, let's talk about what in the
17  world a jury does in the trial of a case as compared to
18  what it is a Judge does in the trial of a case.  A jury
19  in a trial is the exclusive judges of the facts proved,
20  of the credibility of the witnesses, and of the weight
21  that you want to give to their testimony, meaning as to
22  the first witness, it may very well be after that
23  witness finishes testifying that the jury chooses to
24  believe one hundred percent of what that witness says.
25  As to the second witness, after that one finishes

116

 1  at the first phase of the trial.  The second phase of
 2  the trial, the focus of the evidence is going to shift;
 3  and it's going to get off the defendant that you would
 4  have found guilty of having committed the crime; and
 5  instead, the focus of the evidence on the second phase
 6  of the trial is going to focus upon the character, the
 7  background, and the involvement of the defendant on
 8  trial with the crime that was committed.  It's just like
 9  you, at home, when you are disciplining and raising
10  children.  If you tell a child to do -- not to do
11  something and they do it immediately one time after, you
12  might do something, might react one way.  If the child
13  does it twelve times within the first hour after you
14  tell them not to do it, you might react a different way.
15  You want to know who you're dealing with.
16          So, we want you to know at the second
17  phase of the trial the character, the background, the
18  good stuff, the bad stuff, if there is any of either,
19  about the defendant on trial.  So, that's how the trial
20  can unfold or will unfold, if there are two phases.
21          First phase the jury's only concern is
22  deciding guilt or innocence.  Second phase the jury's
23  only concern is deciding what punishment should be
24  imposed.  Now at the conclusion of the testimony at each
25  phase of the trial, I will give you in writing what is

118

 1  testifying, it may very well be that the jury chooses to
 2  disbelieve one hundred percent whatever that witness
 3  says.  As to the third witness in the case, after that
 4  one concludes, it may be that the jury chooses to
 5  believe some and disbelieve some of what that witness
 6  says.  That is exclusively the jury's function, to sort
 7  out the credibility of the witnesses and what weight
 8  should be given to those credible witnesses that you
 9  find in the trial of a case.  Determining the weight to
10  the testimony is as important as determining the
11  credibility; because if we had a case where there were
12  fifty witnesses who testified, obviously all fifty of
13  them can't be testifying about something of exactly the
14  same magnitude.
15          So sometimes you might find some testimony
16  to be more heavily weighted than others.  That's your
17  call.  But the jury's function is to determine the
18  credibility of the witnesses and the weight you want to
19  give to their testimony.  My function, on the other
20  hand, has absolutely nothing to do with deciding about
21  the believability of witnesses.  My function is to
22  listen to everything that's said from the witness stand.
23          Whether I believe it or not makes
24  absolutely no difference.  I listen to everything that
25  is received.  And as a result of what is said, I place

**119**

1  in the Court's charge for you all of the law that has
2  been raised by the testimony of the witnesses in the
3  case. So what you'll do is you'll take all the
4  witnesses' testimony, determine what aspects of it are
5  credible; therefore, extract from the Court's charge the
6  applicable law that applies to the credible witnesses.
7  And between those two functions, we would come up with
8  what we think is the right decision to reach based upon
9  the evidence as you believed it to be and the law as it
10  was given to you in the Court's charge. That's the job
11  that each of us have.
12       Now, there is only one Rule that exists in
13  our system that affects how a jury gauges the
14  credibility of witnesses. And I think that rule -- I
15  hope that you'll find that the Rule really makes sense.
16  The Rule is simply this: Our law does not permit jurors
17  to determine the believability of witnesses before the
18  witnesses ever testified. Does that make sense? You
19  got to give somebody a run. You got to hear what they
20  say before they ever say it. The idea being, we can't
21  choose to automatically believe. We can't choose to
22  automatically disbelieve what a witness says simply
23  because of their occupation, for example, and not for
24  any other reason. Can you imagine what kind of a fix we
25  would be in if our law said everybody who testifies at

**120**

1  the courthouse is either a junior high school principal
2  or accountant. They have to all believe that anybody
3  who testifies at the courthouse is either a used car
4  salesman or a lawyer. They can't ever believe. You
5  believe who you want to believe. That's your -- that's
6  what we'll call upon you to do. But you base that
7  decision upon the quality and the content of what a
8  witness says, not simply because they might happen to
9  possess a job for which you have a great degree of
10  fondness or one for which you might have a substantial
11  amount of disdain.
12       That can be an issue; because in this
13  case, this defendant being charged with the offense of
14  capital murder, I assume, perhaps wrong, but I'm
15  getting -- I'm going to be accurate -- that there is
16  going to be testimony from police officers. I say
17  police officers. Law enforcement officers. Could be
18  police. Could be sheriffs. Could be constables,
19  whatever; but some law enforcement officer.
20       Our law says that law enforcement officers
21  are not entitled to any more believability before they
22  testify than anybody else. And the reason our law says
23  that is because we recognize that law enforcement
24  officers are extractions from the human race; therefore,
25  there are going to be some good ones and maybe some that

**121**

1  aren't so.
2       And what we're going to ask you to do as a
3  jury is withhold making a decision as to whether you do
4  or do not believe a witness, be they police officer, law
5  enforcement officer, or somebody else, until after you
6  have heard their testimony. And then based upon the
7  quality and the content of that testimony, you determine
8  for yourself whether you do attach credibility to their
9  testimony or you do not. And if you do attach
10  credibility to it, how much weight do you give to it.
11       And the reason for that is this: Every
12  single one of us that's in here, in this room right now,
13  comes into this room armed with our own life
14  experiences. Some of them are good. Some of them are
15  bad. Most of them probably are somewhere in between.
16  But if we, for example, as we were growing up, grew up
17  with a kid next door whose name was Johnny and we always
18  thought that Johnny was the neatest, the nicest, most
19  trustworthy little kid or human being we'd ever known in
20  your lives, and we had nothing but admiration and
21  respect for him both in terms of his judgment, as well
22  as his integrity. And Johnny went off to become a law
23  enforcement officer. Just because we liked and were
24  very fond of Johnny because of his judgement and his
25  integrity, that doesn't necessarily mean that everybody

**122**

1  that Johnny works with has the same judgment and the
2  same integrity. Now maybe some of them do; but then
3  again, maybe some of them don't.
4       The flip side of that coin is, if you were
5  out driving around about five years ago and it was 10:00
6  o'clock at night or whatever the time of day it was and
7  you were pulled over by some police officer, stopped on
8  traffic, charged with having committed a traffic offense
9  that you know you didn't do and you're completely not
10  guilty and the person was rude to you, nasty to you,
11  harassed you, and you got absolutely an unpleasant
12  experience as you ever had in your whole life. Just
13  because that person, five years ago, that law
14  enforcement officer was rude and nasty and harassed you
15  doesn't mean all the rest of them are going to be that
16  same way. Now again, maybe some of them are. Then
17  again, maybe some of them aren't. That's why somebody
18  with a uniform doesn't get either the benefit of having
19  Johnny being in your life sometime in the past, nor do
20  they get the detriment of the police officer that pulled
21  you over and harassed you. That person that walks in
22  this court in the uniform to testify in this case has
23  the right to have you accept or reject his or her
24  testimony on the basis of quality of what it is they
25  tell you, the information they possess, and the way they

123

1  deliver.
2          So, I will tell you now, tell you later,
3  that no juror can make a decision as to a person's
4  believability before they ever hear the person testify
5  and that we can't give anybody a leg up, nor can we hold
6  anybody to a higher standard as to credibility simply
7  because of their job and for no other reason. Is there
8  anybody here who has any quarrel, or any disputes, or
9  any disagreement with that facet of our law.
10         Okay. In this case, ladies and gentlemen,
11  this defendant stands charged by indictment with the
12  offense of capital murder. It is alleged to have
13  occurred in Harris County, Texas, on or about December
14  7th of 1998. So we're talking what? Ten months ago in
15  round numbers. I will tell you in the Court's charge
16  and I will tell you now -- excuse me. Before I get into
17  that, let me say this: Engaging in credibility of
18  witnesses. If you came down here today thinking that
19  you're going to hear a whole bunch of out and out lying
20  going on from the witness stand, I'm going to tell you
21  it can happen and it does. But I'm also going to tell
22  you that more often than not, what happens is citizens
23  come down here and testify and try to recall something
24  that they saw for a brief period of time in their life
25  and give us as good an accounting of the events as they

124

1  possibly can. Sometimes there are going to be conflicts
2  from Witness One, to Witness Two, to Witness Three as to
3  what was said or what they saw.
4          Conflicts, inconsistencies, don't amount
5  to intentional lies. For example, as to the sixty of
6  you who are here, if we took you out in this hallway
7  right now and staged some dramatic event for you, had it
8  last twenty seconds, terminate the event and brought
9  each one of you in here individually and asked you what
10  it was that you saw, you know, we'd get sixty different
11  stories.
12         Because if you were closer to it means you
13  could see it better than hear it. Some of you could
14  hear it better than you can see it. Some of you were in
15  the back and you couldn't hear it, couldn't see it.
16  Some of you were in the front, and you could see it,
17  could hear it, but you're so disgusted with being here
18  in the first place that you just shut them out. The
19  point being, the first person that testifies as to what
20  they saw and did doesn't make the other fifty-nine who
21  tell something different than that a lie. It means that
22  their observations from their perspective were just
23  simply different. And certainly it can be the same in a
24  trial, but I just want to put that in; because I know
25  that most of us who are here today are here today

125

1  laboring under the conditioning process that television
2  has given us as to a courthouse.
3          Judge Judy, my absolute all time favorite;
4  Mills Lane, the guy who's also the referee in the ring
5  for the heavyweight boxing championship fights; and a
6  few others; and even old Perry Mason. Do you remember
7  Hamilton Burger, who was the prosecutor? Hamilton just
8  died -- I don't know what his real name is. He just
9  died about two months or so ago. I read it in the
10  paper. I always used to wonder as a kid when I would
11  watch Perry Mason shows. I didn't know where the
12  imaginary community was where Perry Mason did his work.
13  I figured it to be Los Angeles, but I was always amazed
14  people continued to elect Hamilton Burger as their
15  Assistant District Attorney, when he never won a case.
16         But at any rate, that's what we go
17  through. And we watch the news at night, and I watch
18  the same news as you do. And in the first three minutes
19  out of every newscast I want to watch, a body is being
20  taken away. Then you hear a snippet about what's
21  supposed to have happened, but then they have to break
22  away for a commercial. And you've got to wonder, am I
23  really getting the full idea about what happened? If
24  we don't have enough dead bodies one night, they'll go
25  up to St. Paul, Minnesota, and show us some of theirs.

126

1  We come down here at the courthouse, and that's the way
2  we start thinking things are. And they aren't.
3          Let's talk for just a couple of minutes
4  about some rules that do come into play in all criminal
5  cases and talk about why they are the way they are. And
6  hopefully -- and the reason I'm spending a little bit of
7  time talking to you about why the rules are the way they
8  are is, hopefully, it will give you a little bit more of
9  a broader foundation and understanding of why we work
10  the way we do work.
11         First off, I will tell you in the Court's
12  charge and I'll tell you now, the fact that some
13  individual was arrested for having committed a crime,
14  the fact that somebody was charged with having committed
15  a crime, the fact that somebody was indicted for having
16  committed a crime, may not be considered by any Judge or
17  by any jury as evidence that they, in fact, did commit
18  that crime.
19         Now, how in the world could that be?
20  Well, how about this: Let's say that two months ago,
21  today in Houston, Texas, there was a burglary at a
22  particular residence. And just right now, through that
23  door, in walked eight Houston Police Officers and arrest
24  me today for having committed that burglary two months
25  ago. How can it possibly be that my arrest today is

127

1  evidence that two months ago I committed that burglary?
2  It can't be. It's not.
3  Now, those police officers who arrest me
4  today for having committed that burglary two months ago
5  may have nine buckets full of wonderful evidence that
6  does, in fact, show that two months ago I committed that
7  burglary. And at the trial, that's what they present to
8  the jury. But the fact that I am -- the singular event
9  of my arrest today can't possibly be any evidence that
10  two months ago I committed that crime. The fact that I
11  was hard -- the fact I was charged today of having
12  committed that offense two months ago, a singular event
13  of me being charged, is no evidence that I committed
14  that crime. The fact that I was indicted today for
15  having committed that crime two months ago, the singular
16  event of my indictment, is no evidence I committed that
17  crime.
18  Because can you see if it were evidence
19  then why would you have a trial?  Because the evidence
20  is there, you were arrested. And we all know that's not
21  the case. Because some of us here have been given
22  traffic tickets. And we know that that was an arrest,
23  and we know we were charged, and we also know we didn't
24  do it.
25  So I'll tell you in the Court's charge and

128

1  I'll tell you now, the fact that somebody was arrested
2  for a crime, the fact that somebody was charged with
3  having committed a crime, the fact somebody was indicted
4  for having committed a crime, those three events cannot
5  ever be considered by a jury as any evidence that, in
6  fact, the defendant on trial did commit the crime.
7  Those three events were a necessary occurrence to get a
8  case into a courtroom so that a jury can be selected so
9  that they can hear evidence to determine whether the
10  defendant on trial did, in fact, commit the crime. Is
11  there anybody here who has any quarrel, who has any
12  disagreement with that particular aspect of our law?
13  In this case, like all criminal cases, the
14  State's required to prove that a person is guilty. The
15  burden, the responsibility of proving a person's guilt,
16  is upon the State. And please make that thing go away.
17  I'll bet some of you, Perry Mason shows are one of those
18  things, like some of you, maybe all of you, have heard
19  the phrase, find somebody guilty beyond a shadow of a
20  doubt. Anybody ever hear about the shadows of doubts?
21  You've got to find somebody guilty by beyond all doubt,
22  beyond every doubt. Ladies and gentlemen, that's not
23  the law in this country.
24  The State, in order to obtain a conviction
25  in a case, does not have to prove the person's guilt

129

1  beyond a shadow of a doubt. They do not have to prove a
2  person's guilt beyond every doubt. They do not have to
3  prove a person's guilty beyond all doubt. That's never
4  been the law in this country. It's never been the law
5  in this country. And in all reasonable probability, it
6  never will be the law in this country. What, however,
7  is the law in this country is that the State must prove
8  a person's guilt beyond a reasonable doubt.
9  In the Court's charge I will give you the
10  definition as to what a reasonable doubt is. I'm going
11  to right now, also, give you that definition so starting
12  out, you will have some sense or feel for what we're
13  talking about. It is not required that the prosecution
14  prove guilt beyond all possible doubt. It is required
15  that the prosecution prove guilt beyond a reasonable
16  doubt concerning the defendant's guilt.
17  A reasonable doubt is a doubt based on
18  reason and common sense after careful and impartial
19  consideration of all of the evidence in the case. It is
20  the kind of doubt that would make a reasonable person
21  hesitate to act in the most important of his own
22  affairs. Proof beyond a reasonable doubt, therefore,
23  must be proof of such a convincing character that you
24  would be willing to rely and act upon it without
25  hesitation in the most important of your own affairs.

130

1  That is the definition that the law requires I give to
2  you as to the term, reasonable doubt. It is the amount
3  of proof necessary for you, after having evaluated all
4  of the evidence in the case, to satisfy yourself that
5  the defendant is, in fact, guilty. And it must be the
6  degree of proof that you would be willing to conduct in
7  your affairs.
8  The point is, it is always, always, always
9  the State's job to prove that a person's guilty. It is
10  never ever, ever a defendant's job to prove that he or
11  she is not guilty. Starting out every trial, every
12  defendant starts out being not guilty. And that
13  defendant stays not guilty unless or until, during the
14  course of the evidence presented during the trial, the
15  State's evidence overcomes that presumption of being not
16  guilty and establishes beyond a reasonable doubt in the
17  jury's mind the fact that the defendant is, in fact,
18  guilty.
19  Now, some people sometimes say, well, I
20  don't think that's the way it ought to be. I think a
21  defendant ought to have to prove that he or she didn't
22  commit the crime. And I'd ask you to consider this for
23  just a second. This is the 17th of January (sic) of
24  1999. Let's go back five years ago today, 17th of
25  January (sic) of 1994. And the reason they'll go back

131

1  five years is to pick a day that's far enough to go back
2  in our lives that maybe we don't have a specific
3  recollection as to what it was we do throughout the
4  course of that day.
5      Now if that day was a birthday, an
6  anniversary, some significant event in your life that
7  does cause you to remember that day, then you please
8  select another one. Pick August 12, 16th, whatever.
9  But let's say when we get through with this process
10 right here, you're right by the elevators. And a nice
11 deputy sheriff in and for Harris County, Texas, comes up
12 to you and says, Excuse me, are you Mr. "X"? Or, Are
13 you Miss "Y"? And you say, Yes, I am. And the deputy
14 sheriff says, While you were in that courtroom making
15 yourself available for jury service, a Grand Jury in
16 Harris County, Texas, today, in one of their secret
17 sessions -- and I will tell you folks that the Grand
18 Jury sessions are all required to be held in secret. A
19 Grand Jury, in one of their secret sessions today, has
20 returned an indictment against you, charging you with
21 having, on the 17th of September of 1994, committed the
22 offense of sexual assault of a child.
23      Now, it's your job to prove that you
24 didn't commit that crime. And if you don't remember
25 what it was you did on the 17th of September of 1994,

132

1  what do you guess the second thing is that you're going
2  to do after having received that information from that
3  deputy sheriff? The first thing we know would have
4  been, you passed out. And you would have said, I didn't
5  do that. And, of course, you didn't.
6      The point being, how do you prove you
7  didn't? Well, you don't. You can't. It's not
8  possible. You might say to yourselves, well, the 17th,
9  1994, was a workday. I know that traditionally I get to
10 work at 8:15 in the morning, and ordinarily I get home
11 6:15 to 6:30 in the evening. And let's just say for the
12 purposes of this conversation that September 17 of '94
13 was a workday, and I don't have any idea whether it was
14 or wasn't. But let's say it was. That means that
15 you're armed with information to tell that jury to whom
16 you have to prove that you did not commit that crime
17 when you went to work that day and then you went home.
18 And you can't possibly think, in your wildest dreams,
19 that you committed that crime.
20      The point being, it's not your job to show
21 you didn't do it. It's the State's job to show you did
22 do it. Most all of us, from the time we were little
23 kids and started to have any interaction with other kids
24 on a social basis, there was an elementary thread of
25 justice in our body and that was this: If somebody in

133

1  our peer group, our other little buddies, started
2  talking around to our buddies that we had done something
3  wrong, the rule was the people doing the blaming are the
4  people who have to do the proving. If the kid's blaming
5  me for having done something wrong, it's the kid's job.
6  Show my buddies that I did something wrong. And that
7  elementary system of justice is exactly what we have in
8  a courtroom. The people doing the blaming are the
9  people who have to do the proving. The State's doing
10 the blaming. The State has to do the proving. How much
11 proving does the State have to do? I don't know. But I
12 do know that whatever they have to do has got to be
13 enough that it satisfies a jury beyond a reasonable
14 doubt as to the defendant's guilt.
15      Again, it is always, always, always the
16 State's job to prove that a person is guilty. It is
17 never ever, ever a defendant's job to prove that he or
18 she is not guilty. Is there anybody here who has any
19 quarrel, disputes, or disagreement with that facet of
20 our law?
21      Okay. Many of you have, perhaps from time
22 to time, followed a trial, or some trial you might have
23 had some interest in in some way or another in the
24 media, whether it be the newspaper, or television, or
25 "60 Minutes," or something like that. You probably have

134

1  a feel for the idea that sometimes during the course of
2  a trial you might not get to hear some of the things
3  that you would like to hear. And I want to spend a
4  couple of minutes talking with you about that; because
5  I'll bet that every single one of us, when it comes down
6  to making what we think are important decisions in our
7  life want to assemble, get together all the information
8  we could possibly get together for the purposes of
9  helping us make better informed and a more intelligent
10 decision. We ask you to come down here to give of your
11 time to serve as a juror in a capital murder case to
12 determine first off, did the defendant on trial commit
13 the capital murder? That's a pretty heavy decision, in
14 and of itself. And then if he did do it, should he
15 receive a life sentence or a death sentence? That's
16 probably even a heavier decision.
17      So almost always, everybody wants to hear
18 all sorts of things, and really, for the purposes of
19 broadening their comfort zone, making them feel better
20 about the decision they've reached. When you go out and
21 you shop for a car, you go to various car places, and
22 you get all the information you can possibly get, and
23 you talk to all the salesmen. When you're going out to
24 shop for a house, you do exactly the same thing. You
25 get a realtor or several of them, perhaps, and get all

135

1  sort of information.
2      You try to assemble accurate information
3  when you go out shopping for a spouse, but not always is
4  it available. But you try to get together all the
5  information you can. You come down here to the
6  courthouse in a courtroom, you listen to a case, the
7  case is over with, and you go back to begin your
8  deliberations. And you say to yourselves, Why in the
9  world didn't Lawyer A bring us evidence about so-and-so?
10  Why didn't lawyer B ask the question so and so?  Well,
11  it may very well be that that evidence wasn't available
12  in the first place. It may very well be that evidence
13  never existed in the first place. Your particular
14  question that you wish had been asked may very well have
15  been a wonderful question, but is one to which there was
16  no answer.
17      I want to spend some time talking about
18  that; because since it is the State's obligation to
19  prove a defendant guilty, and since the defendant
20  doesn't have to prove that he is not guilty, that means
21  the State must present evidence to you. It means, also,
22  that the defense does not have to present any evidence
23  to you, because it's not the defendant's obligation to
24  prove anything. It's the State's obligation to prove
25  guilt. Nor is it the defense's obligation to disprove

136

1  anything that the State presents to you.
2      And starting off we might say to
3  ourselves, well, I'd have to hear from both sides before
4  I could make a decision. Well, obviously that's not the
5  case; because you're the judges of the credibility of
6  the witnesses. You determine how much weight to be
7  given their testimony. And if the law -- and the law
8  doesn't say that if you only hear from the State, you
9  have to believe his witnesses. It doesn't say that
10  any more than the law says if you go out to shop for a
11  car, you've got to believe what the first person says,
12  too. That's not the case.
13      So in many cases, it may be after the
14  State has presented their evidence, you might hear the
15  State -- excuse me -- the defense rests right behind
16  them and presents no testimony at all. You're still
17  going to be called upon to decide whether the strength
18  of the State's evidence is such that it proves the
19  allegations beyond a reasonable doubt. Perhaps in some
20  instances it does. Perhaps in some instances it does
21  not.
22      You may have in other cases situations
23  where the State presents its evidence. They rest.
24  Defense presents the defendant, himself, as a witness,
25  along with other witnesses. You do get to hear from

137

1  both sides. Let's talk for just a second about what
2  happens if a defendant in a criminal case does testify
3  in his case. First off, a defendant does not have to
4  testify in his case; because he doesn't have to prove he
5  didn't do it. If a defendant does testify, that means
6  that the defendant does not get any extra credit for
7  having done something that the law doesn't require him
8  to do. You don't give a defendant points or some sort
9  of a break or some kind of credit because he testifies
10  in his own case and the law didn't require it.
11      Secondly, because a defendant testifies in
12  his case, the fact that there is the presumption of
13  innocence, the presumption of being not guilty never
14  ever spills over to being the presumption that the
15  defendant on trial, if he testifies, is telling the
16  truth. There is no presumption anywhere in our law that
17  any human being that's alive on the face of this earth
18  is presumed to tell the truth before they testify. It
19  simply doesn't exist. So that's what happens if a
20  defendant does testify in his case. He gets no extra
21  credit, and there is no presumption he's telling the
22  truth. You would be just as critical of the defendant
23  as a witness as you were critical of the State's
24  witnesses when they testified. You listen to what they
25  say, evaluate it, and make your decision as to their

138

1  credibility on the basis of the quality and contents of
2  their testimony.
3      Third possibility. It may be that after
4  the State rests, the defense presents witnesses but did
5  not present the defendant. You'll take the witnesses
6  from the defense. You take their testimony, put it into
7  the mix with all the other testimony in the case, and
8  determine for yourself, has the State proved the
9  allegations beyond a reasonable doubt?
10      You may say to yourselves, well, I sure do
11  wish I would have heard from the defendant. It would
12  have made my job a whole lot easier. And that may very
13  well be the case. You say to yourselves, when the case
14  is all over with, boy, I sure would like to have heard
15  the defendant's side of this story. That's a perfectly
16  natural response; because that's what we do all our
17  lives, is check one side off against the other. That's
18  also a perfectly natural response. But I will tell you
19  in the Court's charge and I'll tell you now, that if a
20  defendant in a case does not testify in his or her
21  behalf, this is no circumstance that any Judge or jury
22  could use to infer, to insinuate, or to suggest that the
23  defendant is, in fact, guilty of the offense because he
24  or she did not testify. Because the law doesn't require
25  them to prove that they didn't do the crime. The law

139

1  requires the State to prove they did commit the crime.
2      Now that's just different, probably, than
3  the way all of us live our daily lives; because we want
4  to hear everything we can hear about something before we
5  decide. You have a kid at home. Kid comes in -- and
6  it's happened to me -- kid comes in, a six-year-old
7  child, daughter, with her hand on her hip one evening,
8  just takes a big old deep breath and got as dramatic as
9  I've ever seen. And she says, Daddy, do you know what
10  your other child did? No, I don't. You know those
11  cookies mom had been spending a lot of time on? Yes.
12  You know, she's saving them.
13     A.  Yeah.
14     Q.  Amanda ate them. What do I do? You've been
15  thrown something like that. You get the other kid in
16  the room. We do it all the time. Why do we do it?
17  Well, we want to check off one kid against the other,
18  because we aren't so sure we believe the first kid.
19  You're at work. Your job at work is to produce a widget
20  at seventy-five cents a unit. Out of the blue somebody
21  comes in and says, Hey, I know how we can do that same
22  widget for sixty-five cents a unit, save a dime apiece.
23  What do you do? You get everybody up and down the
24  marketing chain, everybody up and down the manufacturing
25  chain. Can we really do it for sixty-five cents? You

140

1  want to get all the information you can. You're on the
2  committee at church. Your job is to replace the
3  preacher who just retired. You want to talk to all of
4  them, see what it is they can do. You're getting ready
5  to vote for next year's PTO president. Same thing. You
6  want to know what it is they're going to do, because you
7  want to hear from everybody and get all the information
8  you can. And then I ask you to come down here at the
9  courthouse. And we tell you right up front, but you may
10  not get to hear everything you want to hear. And you
11  say to yourself, well, that rips it.
12      And let's talk about why you're not going
13  to get to hear, perhaps, in a case everything you wanted
14  to hear. Because that older kid that proved to the --
15  that told me that her little sister had eaten her
16  cookies did not have to prove that to me beyond a
17  reasonable doubt. Because her little sister wasn't
18  going to get executed if she did. The guy at work who
19  tells you, we can make this seventy-five-cent widget at
20  sixty-five cents doesn't have to prove that to you
21  beyond a reasonable doubt; because he's not going to get
22  executed. The preacher who you talk to to replace the
23  one that's retiring, who commits to you, I'm going to
24  double the size of this congregation in three years, is
25  not going to get executed if he doesn't do it. And same

141

1  with the PTO president.
2      And in a courtroom, that's exactly what
3  happens is they do get executed, or they can get
4  executed if they do it. That's why the burden of
5  proving a defendant guilty is upon the State, because
6  they're claiming he did it. Therefore, they have to
7  prove that he did it, and they have to prove it beyond a
8  reasonable doubt. And there is no obligation on any
9  defendant to prove that he didn't do it or to disprove
10  anything that the State presents to you.
11      And at the conclusion of the evidence in
12  the case, you're going to be asked to make a decision.
13  And your decision, whatever it winds up being, is going
14  to have to be based upon the information that the
15  lawyers gave to you during the course of the trial.
16  That is to say, the evidence in the case. Sometimes
17  that evidence is more than enough to justify a jury
18  finding a defendant guilty beyond a reasonable doubt.
19  Sometimes it's not. When you're asked to make a
20  decision and you say, I can't because I've only heard
21  one side, then what you're suggesting to me is you don't
22  have enough information to find them guilty beyond a
23  reasonable doubt.
24      When I was a kid growing up, there was a
25  brief time in my life we ate like horses. At 6:00

142

1  o'clock every evening at the dinner table, mom would
2  bring in the dinner platter and there would be seven
3  pieces of meat on that platter. And the fastest fork
4  always got the best piece of meat. And as soon as those
5  seven pieces of meat were gone, one for mom, one for
6  dad, and one for the five boys, there was nobody at that
7  table that thought mom was going to take that platter
8  back to the kitchen and load it back up again. We did
9  with what we had, and it's the same in the courtroom.
10      When both sides close the evidence in the
11  case, you got what you're going to have. It'll either
12  be enough to prove a person's guilt beyond a reasonable
13  doubt -- and if it is, it's your obligation to do
14  that -- or it's not enough to prove a person's guilt
15  beyond a reasonable doubt. And in that event, it's the
16  jury's obligation to return a verdict of not guilty.
17      But the point of what I'm trying to get
18  at, as a jury, your obligation is to base a verdict on
19  the testimony that was presented, not to guess as to
20  what the testimony that you wanted to hear but did not
21  hear would have been, nor to speculate as to why you
22  didn't hear it. And if the defendant in the case does
23  not testify, no Judge and no jury can use that as a
24  suggestion or inference that the defendant is hiding
25  something and, therefore, didn't testify. Because it's

143

1  not his job to prove he didn't do it. It's the State's
2  job to prove that he did it. Is there anybody here who
3  has any quarrel, dispute, or disagreement with that
4  facet of our law?
5      VENIREPERSON: I don't disagree with you,
6  but I'd still want to hear his story.
7      THE COURT: I understand, and that's a
8  perfectly natural thing. But can you see that if you
9  don't hear it, that doesn't make the quality of the
10 State's testimony any better?
11     VENIREPERSON: Right, but I'd still want
12 to hear it.
13  Q. I got you. Okay. There are a couple of things
14 I want to visit with you about for a couple of minutes.
15 In our state a person convicted for -- a person who is
16 convicted of the offense of capital murder can receive
17 one of only two possible punishments. One of those
18 possible punishments is life. One of those possible
19 punishments is death.
20     I want to spend just a very brief time
21 visiting with you about how that decision is made. I
22 don't want you to worry about the preciseness of what
23 I'm going to say. Right now, I want you to know about
24 the system, the mechanics. We talked about the fact
25 that the first phase of the trial, the jury's concerned

144

1  with whether the defendant is guilty.
2      The defendant -- if a defendant is found
3  guilty of capital murder, we come back and we have a
4  second phase of the trial. You get to hear additional
5  evidence. At this time the evidence is going to be
6  about the character and background of the defendant on
7  trial. Every single good thing he or she has ever done
8  before in his life, if there are any good things. Every
9  single bad thing some defendant's ever done before in
10 his or her life, any bad thing. And you take all that
11 good stuff and bad stuff that you hear about the
12 defendant on trial, the second half of the trial, you
13 pile it onto all this information you heard about the
14 crime that was committed at the first part of the trial,
15 and you use every single bit for the purpose of helping
16 you answer two questions that's going to be your verdict
17 at the second phase of the trial.
18     Now these questions are always going to be
19 asked in the order that I'm going to tell you about
20 them. They're always going to be the same questions.
21 They don't change. The first question is going to ask
22 you, do you find from the evidence beyond a reasonable
23 doubt that there is a probability that the defendant
24 would commit criminal acts of violence that would
25 constitute a continuing threat to society? In round

145

1  numbers, are you satisfied beyond a reasonable doubt
2  that the defendant would be a future danger? That's
3  not precisely what it says, but just to give you a feel
4  for it.
5      Can you see that no matter who the
6  defendant, no matter what the evidence was, no matter
7  who the victim was, there's never going to be but two
8  possible answers to that question, yes or no; and the
9  jury will answer the question whichever way they believe
10 the evidence dictates?
11     The second question will ask the jury,
12 after taking into consideration all of the evidence,
13 including the circumstances of the offense -- that's
14 going to be what you heard the first part of the
15 trial -- also including the character and background of
16 the defendant, as well as the defendant's personal moral
17 culpability, responsibility, that's going to be what you
18 heard the second part of the trial.
19     So, what the first half of the second
20 question tells the jury is to go back over all the
21 evidence in the case, ask yourself this: Is there a
22 sufficient mitigating circumstance, or perhaps
23 circumstances, that make you think that a life sentence
24 would be a more appropriate verdict than a death
25 sentence?

146

1      Again, no matter who the defendant, no
2  matter who the victim, no matter what the evidence,
3  there is two possible answers, yes or no. If the jury
4  should answer yes to that first question and if the jury
5  should answer no to that second question, the law says
6  that I have no choice; I have no option; I have no
7  discretion. I must sentence the defendant to death, and
8  that's exactly what I'm going to do.
9      If, however, the jury should answer those
10 two questions in any way other than yes and no, in that
11 order, again, the law says I have no choice; I have no
12 option; I have no discretion. I must sentence the
13 defendant to life, and that's exactly what I'll do.
14     So, first off, what we can see is that a
15 jury never goes out in the State of Texas and
16 determines, well, I just feel like in this case we ought
17 to give this one life, and in that case we ought to give
18 that one death. Juries don't sentence people to life or
19 death. Juries answer the two questions on the basis of
20 the testimony that's presented in the case.
21     Secondly, you can see, however, that while
22 you don't sentence a person to life or death, you're
23 entitled to know what the effect of your answers is
24 going to be. And the effect is going to be a yes and a
25 no, in that order death, and anything else is life. Now

147

```
 1   that's just to give you a feel for how it is that the
 2   punishment is determined after the conviction in a
 3   capital murder case.  And my notion is that probably
 4   many of you have heard of cases before, capital murder
 5   cases, where at the conclusion of them, a life sentence
 6   is imposed.
 7            Some of them can be that a death sentence
 8   was imposed.  And keep in mind, if you would, please,
 9   these questions that we talked about, they never change.
10   Those words are always the same.  But in some cases the
11   defendants are different.  Sometimes you have a
12   seventeen-year-old defendant who's never before done
13   anything wrong.  There's other times you might have a
14   forty-five-year-old defendant who is a six-time
15   ex-convict.  Sometimes -- always -- not sometimes, but
16   always the victim's are going to be different.  Some of
17   them during their lifetime would have been more valuable
18   citizens than others.
19            Always, the evidence is going to be
20   different.  Always, the witnesses are going to be
21   different.  Because just because a witness comes and
22   says the exact same words that you think in your mind's
23   eye whatever they might be would be necessary for you to
24   find somebody guilty.  Just because the witnesses used
25   those words doesn't mean that you're going to believe
```

148

```
 1   that witness.  So the witnesses are always different.
 2            And lastly, certainly not least, the
 3   juries are always different.  If we could have four
 4   juries in this courtroom listening to precisely the same
 5   witnesses testify and at precisely the same time began
 6   their deliberations, we could have had four different
 7   verdicts.  So that's why the results of trials can be
 8   life or death, either one.  That might be the most
 9   appropriate verdict in the world based upon the
10   uniqueness in that particular case.
11            So, what I'm simply saying is whether the
12   decision is made for me to sentence somebody to life or
13   for me to sentence somebody to death is going to depend
14   upon the uniqueness of the evidence in that given case
15   and how that jury evaluated that evidence in coming up
16   with the answer to those questions we talked about.
17            Now, again, I don't want right now to get
18   into this in more detail; but I want you to have an
19   overview as to how it is determined, on the one hand a
20   life sentence, on the other hand a death sentence.  Any
21   questions so far?  Okay.  Since what we're saying is
22   that the death sentence is a possible punishment in the
23   case, whether it's the appropriate punishment or not,
24   we'll never know until the trial is over and the
25   evidence is all in.  But since the death penalty is a
```

149

```
 1   possible punishment in the case, I'm obligated to ask
 2   each of you -- and I'm going to do this in a group --
 3   ask each of you a question.
 4            Let me tell you what the question is going
 5   to be.  First, let me explain the question.  And then
 6   the third time through it, I'm going to ask you to
 7   answer the question.  Kind of like being in the army.
 8   Is there anybody here who, if after you heard all the
 9   evidence in the case, and if you believe that the
10   evidence in that case was such that should call you to
11   answer these two questions we talked about in such a way
12   that I sentence the defendant to death, is there anybody
13   here that has a philosophical, a religious, a moral, a
14   conscientious objection against the consideration of
15   death as a possible punishment that is so strong, it
16   would overcome your ability to answer those questions
17   based upon the evidence, and instead, answer them in
18   such a way that I would have to make a life sentence --
19   have to sentence the defendant to life.
20            That is to say, do you have some notion,
21   whether it's some internal thought, conscientious,
22   moral, religious, whatever it might be, philosophical,
23   that would be so strong it would override your
24   intellectual capacity to analyze the evidence and answer
25   the questions based upon your intellectual analysis of
```

150

```
 1   the evidence in the case.
 2            Now the last time I tried to do that the
 3   folks started off with a pretty good idea about what the
 4   question was until I explained it.  Maybe that happened
 5   to you.  I don't know.  But let me tell you again.  I
 6   ask the question one time.  Is there anybody here who
 7   has a philosophical, a religious, a moral, or a
 8   conscientious objection to the consideration of death as
 9   a possible punishment in a case wherein after having
10   heard all the facts and all the testimony in the case,
11   you thought that was the appropriate punishment, you
12   would not consider it ever because of your religious or
13   moral or your conscientious or philosophical feelings
14   against the death penalty.
15            Now, is there anybody who has an objection
16   to the death penalty that would never ever, ever permit
17   you to consider it as a punishment, no matter what the
18   evidence?  First row, anybody there?  Yes?
19            VENIREPERSON:  I would not.
20            THE COURT:  What's your number?
21            VENIREPERSON:  92.
22            THE COURT:  Anybody?  Ma'am, number?
23            VENIREPERSON:  96.
24            THE COURT:  Front right, anybody?  Yes,
25   ma'am?
```

151

```
 1                    VENIREPERSON:  102.
 2          THE COURT:  Never, ever, ever?
 3                    VENIREPERSON:  Right.
 4          THE COURT:  You didn't convince me.
 5                    VENIREPERSON:  I would not.
 6          THE COURT:  Ever, ever, ever?
 7                    VENIREPERSON:  Right.
 8          THE COURT:  Second row, please?
 9                    VENIREPERSON:  106.
10          THE COURT:  106.  Second row, right,
11    number?
12                    VENIREPERSON:  109.
13          THE COURT:  Nobody else?  Third row, left?
14                    VENIREPERSON:  116.
15          THE COURT:  116?
16                    VENIREPERSON:  Yes.
17          THE COURT:  Nobody else in the third row,
18    right?  No hands.  Back row, just one row?  Yes, ma'am?
19                    VENIREPERSON:  Number 130.
20          THE COURT:  You?
21                    VENIREPERSON:  133.
22          THE COURT:  Number, please?
23                    VENIREPERSON:  137.
24          THE COURT:  137.  Front row, jury box?
25    Number, please?
```

152

```
 1                    VENIREPERSON:  143.
 2          THE COURT:  143?
 3                    VENIREPERSON:  Yes, sir.
 4          THE COURT:  Back row?
 5                    VENIREPERSON:  147.
 6          THE COURT:  7, did you say?
 7                    VENIREPERSON:  147.
 8          THE COURT:  Name?
 9                    VENIREPERSON:  149.
10                    VENIREPERSON:  150.
11          THE COURT:  150?  Okay.  Let's talk next
12    about, when it comes to these kinds of cases, I mean,
13    the kind of cases where the death penalty can be a
14    possible punishment, the law says we go about the jury
15    picking business differently than we would go about it
16    in an ordinary case.  Specifically, the difference is
17    that we have to talk to each of the jurors on an
18    individual basis.  Obviously, theoretically, it would
19    take sixty times longer to talk to each one of you, one
20    at a time, than it would take to talk to all sixty of
21    you in a group once.
22          So, this is what we're going to do.  We
23    are going to, after a bit -- and I say, after a bit --
24    in just about ten minutes the lawyers and I get
25    together, and they're going to determine who it is they
```

153

```
 1    want back.  What we're going to do is this:  We're going
 2    to break it down into groups.  I don't know how many out
 3    of this group we're going to ask back.  But I do know
 4    we're going to bring five of you back Monday and talk to
 5    you then.  We're going to bring ten of you back on
 6    Tuesday and talk to you then.  We're going to bring five
 7    more of you back on Wednesday and talk to you then.  And
 8    the remainder of you, however many that is, past twenty,
 9    we're going to bring back a week from this coming
10    Monday.
11          Now let's talk about that for a second.  I
12    mentioned to you earlier that we are not going to waste
13    your time.  If you're not due back here on one of those
14    days -- excuse me -- if you're due back here a week from
15    Monday, blow us off.  Next week you do whatever it is
16    you ordinarily do, and you do it exactly the same way
17    you would ordinarily do it.  I don't want you here,
18    because you can't do anything here.  I want you here
19    when you can do something here.
20          Likewise, if we talk to you on Monday --
21    and what we're doing is talking to folks individually,
22    for the purposes of creating a pool or a panel.  We're
23    going to get everybody in that pool, or panel, whoever
24    they are, and we've got 24 of them.  Now back here on
25    Wednesday, the 29th of September, which is a week from
```

154

```
 1    this coming Wednesday, we'll spend maybe as much as two
 2    hours with them on that day.  And on that day when we're
 3    through, everybody will know who is and who is not a
 4    juror in the case.
 5          So if we talk to you Monday, and if we
 6    invite you back to that panel on the 29th, until then,
 7    do whatever it is you would ordinarily do.  Go to work,
 8    leave town, go fishing, do whatever it is you do; but be
 9    back on that day.  Now having said that, is -- excuse
10    me -- the testimony in the case is going to begin on
11    Monday, October 4th.  The testimony -- not the
12    testimony, but the trial itself will last probably a bit
13    more than one week, one work week.  The trial will not
14    last more than two work weeks.  So the week of October
15    4th and the week of October 11th.  A portion of that
16    second week is the duration of the trial.
17          Now as I said at the outset, I know that
18    everybody here is here, not wanting to be here, and is
19    here laboring to some degree or another under some
20    inconvenience.  My position is that we have passed the
21    inconvenience hurdle.  My question to y'all is this:  Is
22    there anybody here who has something going on in your
23    life that rises to the level that makes it impossible
24    for you to be here one of the days we've talked about;
25    Monday, Tuesday, Wednesday of next week or the following
```

155

1    Monday?  That's not more than two weeks that we've
2    talked about, beginning October the 4th.  Now front row
3    left, anybody there?  I see no hands.  Front row right?
4    Sir?
5              VENIREPERSON:  I will be out of town.
6              THE COURT:  When?
7              VENIREPERSON:  The 29th through the 6th.
8              THE COURT:  And your number is?
9              VENIREPERSON:  (Inaudible.)
10             THE COURT:  Anybody else on that front
11   row?  Yes, ma'am?
12             VENIREPERSON:  I have scheduled vacation
13   October 7th through the 11th.
14             THE COURT:  Okay.  Second row left?  I see
15   no hands.  Second row right, any hands?  I see no
16   hands.  Third row left, any hands?  Yes, sir.  I see
17   two hands.  I'm sorry.
18             VENIREPERSON:  I have two kids and a
19   husband out of town, scheduled to go out of town October
20   4th for that week.
21             THE COURT:  Okay.  And your number?
22             VENIREPERSON:  119.
23             THE COURT:  Now is the husband going out
24   of town, taking the kids?
25             VENIREPERSON:  No, he's going out of town.

156

1              THE COURT:  That's the problem.  He's
2    going out of town, leaving the kids there.  Did you say
3    119?
4              VENIREPERSON:  119.
5              THE COURT:  And 120?
6              VENIREPERSON:  I'll be out of town the
7    4th, 5th, and 6th.  I have surgery scheduled on the 7th.
8              THE COURT:  All right.  That was third row
9    left.  Third row right, anybody?  I see no hands, third
10   row right.  In the last row, any hands?  Yes, ma'am,
11   and your number?
12             VENIREPERSON:  134.  And I have business
13   all day Monday and through next week, various projects
14   that have already been scheduled.
15             THE COURT:  So if we needed you back, we
16   could get you back Monday, the following week?
17             VENIREPERSON:  I don't know.  I mean, I
18   just in-house counsel.
19             THE COURT:  I understand.
20             VENIREPERSON:  It's busy.
21             THE COURT:  Anybody else on that back row?
22   No other hands.  Front row, jury box, any hands?  No
23   hands.  Second row, jury box, any hands?  No hands.
24             VENIREPERSON:  Can I back up?  The 23rd,
25   is that next Wednesday?

157

1              THE COURT:  Thursday.
2              VENIREPERSON:  Your Honor.
3              THE COURT:  Sir?
4              VENIREPERSON:  I also have a problem with
5    the dates, because I have my child visitation.
6              THE COURT:  And your number was what?
7              VENIREPERSON:  I'm 109.
8              THE COURT:  That's fine.  We'll talk more
9    about it if we need to.
10             VENIREPERSON:  Because I have confused
11   dates.
12             THE COURT:  I understand.  Thank you.
13   Ladies and gentlemen, let me tell you the next thing
14   that's going to happen.  The lawyers and I -- excuse me.
15   Before I do that, is there anything I left out?
16             MR. HILL:  No, sir.
17             THE COURT:  The lawyers and I are going to
18   get together, and they're going to tell me who it is
19   they want back.  Not a soul here thinks that you ought
20   to sit here in absolute stone silence while we're doing
21   this.  It may take ten minutes.  But I don't know if you
22   have ever been in a situation -- I know it's happened to
23   me -- where you're in a room.  There is a crowd, and a
24   lot of people are talking.  And you're going to tell a
25   juicy piece of gossip to somebody.  You know, you have

158

1    to speak loudly enough so the person can hear it over
2    the noise of the crowd; but you have to also keep it to
3    where the crowd doesn't hear your gossip.  And just
4    before you deliver the punch line, the crowd stops
5    talking.
6              I guess what I'm saying to you is this:  I
7    don't care how loud you get, as long as you stay that
8    loud.  That's my only request, folks.  Come on up and
9    let's get this thing on the road.
10             Before we go any further, ladies and
11   gentlemen, Miss Joyce Williams, would you come up for a
12   second, please, ma'am?
13             (At the bench, Juror No. 108.)
14             THE COURT:  Miss Williams, on your
15   questionnaire there was a question asked whether or not
16   you or an acquaintance or family member ever been found
17   guilty of a crime.  And you said -- and you had said
18   that somebody that you knew had been convicted of a
19   crime; is that correct?
20             VENIREPERSON:  Yes.
21             THE COURT:  And who was that?
22             VENIREPERSON:  Two of my coworkers.
23             THE COURT:  But not you?
24             VENIREPERSON:  Oh, no.
25             THE COURT:  Okay.  Thank you very much.

159

1  You can have a seat.
2          (Off-the-record discussion.)
3          (At the bench:)
4          THE COURT:  As I understand it, there was
5  an agreement by and between the parties that as to this
6  particular panel, the Court has just concluded the
7  Court's voir dire.  These panelists are -- being No. 91
8  through 151 inclusive, with the exception of No. 146,
9  that of a group of sixty people, it is agreed twenty-six
10  of those sixty people may be, for various reasons,
11  excused.  Those sixty -- those twenty-six people, as I
12  understand, on each side are the following:  92, 96, 7,
13  8, 9, 1 and 2, 106, 8, 9, 115 and 116, 120, 23, and 26,
14  130, 131, 3, 5, 7, 141 143, 6, 7, 8, 9, 150.  The first
15  one up, 91.
16          I understand that by agreement by and
17  between the parties that each of these people's numbers,
18  as set out, may be excused?
19          MR. MCCLELLAN:  Yes, Your Honor.
20          MS. CONNORS:  Yes, Your Honor.
21          THE COURT:  Mr. Hill?
22          MR. HILL:  Yes, Your Honor.
23          MR. WENTZ:  Yes, Your Honor.
24          THE DEFENDANT:  Yes, Your Honor.
25          THE COURT:  Mr. Mamou, do you specifically

160

1  request these be excused?
2          THE DEFENDANT:  Yes, Your Honor.
3          THE COURT:  All right.  They're excused.
4          (Continuing in the jury panel's hearing:)
5          THE COURT:  All right.  Ladies and
6  gentlemen, if you would, please, I'm going to now tell
7  you who it is that we want back; and I'm going to tell
8  you when it is that we want you to be back.
9          Let me, before I do that, tell you this:
10  I'm going to go through the list.  I'm going -- well,
11  our law says that if we're going to visit with you
12  individually, we have to visit with you in the same
13  sequential order that you came over here.  For example,
14  if your number happens to be 273 -- and nobody's number
15  here is 273.  That's why I used it -- we'd have to talk
16  to you before we talk to 274.  So, it is necessary for
17  everybody to be here at the time we start in the
18  morning.
19          Every morning that we begin, we will begin
20  by 8:30.  If, for example, you are to be the first
21  person that we're to talk to that day, and if you don't
22  come tooling in until 9:15, I want you to know why the
23  other members of the panel are so furious at you;
24  because we can't do anything with them, because you
25  weren't here.  So, you have held all of us hostage and

161

1  prevented us from working.
2          Please, I go back to what I said earlier.
3  I'll get you out of here, but I can't do it if you won't
4  let me get started.  And there are so very few things in
5  this world I absolutely care about.  One of them is a
6  clock.  And 9:30 doesn't mean sometime in the morning.
7  8:30 doesn't mean sometime in the morning.  See, I even
8  got that wrong.  Please, 8:30, I mean 8:30; and I'll get
9  you out of here as fast as I can.
10          Now as I go through the list, I will tell
11  you that everything that we do is going to be in this
12  courtroom.  So, where you are right now is where we want
13  you to be back.  You know the time of morning that we
14  want you here.  It's going to be by 8:30.  So the only
15  variance is going to be what day we want you back, if
16  you're among the people we want back.  And I don't know
17  if I told you this or not; but of the sixty of you here,
18  thirty-four of you we want back.  So, I'm going to go
19  through these.  I'm going to attempt to go through these
20  sequentially.  What I'm saying is, I'm not going to do
21  what they used to do to me when I was in school.
22  They're going to jump around and call your numbers out
23  and make sure you're paying attention.  That's
24  self-defeating, because that costs me more time.  It's
25  like me grounding my kids.  I'm the one that has to stay

162

1  home.  So unless I mess this up -- Lord knows I'm
2  capable of it -- if you don't hear your name called and
3  or your number called and you hear a number later than
4  yours, that ought to mean you need not worry about
5  coming back.  Don't get up and bolt out of here just
6  yet, but that ought to be what that means.
7          Okay.  For Monday, there are six folks
8  that we want back.  Those six folks are the following
9  people:  No. 93, Glen Dinkins; No. 94, Matthew Taylor;
10  No. 95, Linda Cook; No. 99, Judith Barnett; No. 100,
11  Latonya Glasper; and No. 103, Cynthia Mills.
12          First off, ladies and gentlemen, of the
13  six names that I called, is there anybody who has any
14  questions about whether their name was one of those six
15  names?  Any of you have any question as to what day
16  you're supposed to be back, where you're supposed to be,
17  or what time you're supposed to be there?
18          Okay.  The following group is Tuesday:
19  Again, the location is the same.  The time is the same.
20  The day is different.  Instead of Monday, it's Tuesday,
21  September 21.  No. 104, Janet Johnson; 105, Houston
22  Hamilton; No. 107, Craig Baker; 108, Joyce Williams;
23  110, Nohemy Bonilla; 111, Maria Brooks; 112, Linda
24  Deaton; 113, Traci Karam; 114, Joseph Mathews; 117,
25  William Kelly; and 118, Wesley Mikle.  Those eleven

163

1   people, Tuesday morning by 8:30, right up here outside
2   this courtroom. Do any of you eleven folks have any
3   question about whose name I called, or who is supposed
4   to be here, or when and where you're supposed to be
5   here?
6           Okay. Next we go to Wednesday, that being
7   the 22nd. The location is the same. The time is the
8   same. No. 119, Carolyn Balfoort; No. 121, Noe DeLeon;
9   No. 122, Roland Volker; No. 124, Rita Shotwell; 125,
10  Evelyn Michka. Do any of the five of you folks have any
11  question about whose name was called, or where you're
12  supposed to be, or when you're supposed to be here?
13          Okay. The following names I'm going to
14  call, and I knew at one time how many there were. I
15  think thirteen, but I wouldn't swear to it. We're going
16  to want you here one week from tomorrow. I'm sorry.
17  Don't come one week from tomorrow. There will be
18  absolutely nobody here. One week from Monday. Excuse
19  me. And we're not doing it Thursday and Friday, because
20  I am required to be out of town to tend to a case that I
21  had that I've got to finish up. And that's -- don't
22  hold our absence of work on Thursday and Friday on these
23  guys here, because it has nothing to do with them
24  whatsoever. It's a problem I've got to fix.
25          So on Monday, which will be the 27th,

164

1   again, the same time, the same location: No. 127,
2   Brenda Dixon; No. 128, Roger Baumgarten; No. 129, Mary
3   Smith; No. 132, Joseph Brasic; No. 134, Patricia Hawley;
4   No. 136, Robert Williams; No. 138, Michael Smith; No.
5   139, detail Hauck; No. 140 Lydia Hernandez; No. 142,
6   Charlsie Hendrix; No. 144, Darrell Parrish; No. 145,
7   Carol Shutter; and No. 151, John Reeves. Those folks,
8   Monday, a week, that being the 27th of September, at
9   8:30. Any of you folks have any questions as to whose
10  name was called, and who is supposed to be here?
11          VENIREPERSON: Can I ask something?
12          THE COURT: Yes, ma'am.
13          VENIREPERSON: I'm going to ask the D.A.
14  Can I ask the D.A. something?
15          THE COURT: No.
16          VENIREPERSON: My son is a guard in
17  T.D.C.
18          THE COURT: Just have a seat. If you're
19  supposed to be back, be back. Is there anybody who has
20  any questions at all about when you're supposed to be
21  back? Yes, ma'am?
22          VENIREPERSON: This wasn't filled out.
23  Does that matter?
24          THE COURT: Let me -- thank you. Here's
25  what we did, because we're trying to get you out of here

165

1   as fast as possible. You're already an hour late for
2   lunch if you eat at noon, which means we're an hour late
3   for lunch; and we've been here doing this since 8:30.
4   If there is somebody in your life who has some
5   compelling reason to need to know where you were
6   yesterday and today, that document will answer that
7   question. We didn't wait till we found out who was
8   coming back for the purposes of putting that on there,
9   because that just would have held you hostage for
10  another thirty minutes, which means it would have held
11  us hostage another thirty minutes. But you see, the
12  thirty-four of you all know who is supposed to be back,
13  and the twenty-six of you who know you're not supposed
14  to be back aren't going to have to wait for us to do
15  that.
16          So if you're due back, on the day you're
17  back we will give you a brand-new one of those for
18  covering the day that you're back here. Now that's the
19  best way I can answer that. Those of you who are not
20  due back here, my best guess is that you're really
21  pretty pleased about that. For those of you who are due
22  back here, we're going to try and make you a whole lot
23  happier than the people who are not going to have to be
24  back. I don't know if we can do that, but we're going
25  to try. Does anybody here have any questions at all for

166

1   me about who is supposed to be back, who is not, or
2   anything else?
3           Thank all of you.
4           (Court adjourned.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1   THE STATE OF TEXAS   )

 2   COUNTY OF HARRIS     )

 3           I, Pamela Kay Knobloch, Official/Deputy
     Official Court Reporter in and for the 179th District
 4   Court of Harris County, State of Texas, do hereby certify
     that the above and foregoing contains a true and correct
 5   transcription of all portions of evidence and other
     proceedings requested in writing by counsel for the
 6   parties to be included in this volume of the Reporter's
     Record, in the above-styled and numbered cause, all of
 7   which occurred in open court or in chambers and were
     reported by me.

 8
             I further certify that this Reporter's Record
 9   of the proceedings truly and correctly reflects the
     exhibits, if any, admitted by the respective parties.

10
             I further certify that the total cost for the
11   preparation of this Reporter's Record is $_____ and
     was paid by Harris County.

12
             WITNESS MY OFFICIAL HAND this the _____ day of
13   _____, 2000.

14

15
     _____
16   Pamela Kay Knobloch, Texas CSR No. 1650
     Expiration date:  12/31/2000
17   Official Court Reporter, 179th District Court
     Harris County, Texas
18   301 San Jacinto
     Houston, Texas 77002
19   713.755.6340

20   APPELLANT:  CHARLES MAMOU, JR.
                 CAUSE NO. 800112
21

22
23
24
25
```

**$**

**$10,000** [1] 30:2
**$_____** [1] 167:11

**'**

**'94** [1] 132:12

**0**

**0470500** [1] 2:5

**1**

**1** [3] 92:4 92:5 159:13
**10** [1] 1:2
**100** [1] 162:10
**102** [1] 151:1
**103** [1] 162:11
**104** [1] 162:21
**105** [1] 162:21
**106** [3] 151:9 151:10 159:13
**107** [1] 162:22
**108** [2] 158:13 162:22
**109** [2] 151:12 157:7
**10:00** [1] 122:5
**10:30** [2] 112:25 112:25
**110** [1] 162:23
**111** [1] 162:23
**112** [1] 162:23
**113** [1] 162:24
**114** [1] 162:24
**115** [1] 159:13
**116** [3] 151:14 151:15 159:13
**117** [1] 162:24
**118** [1] 162:25
**119** [4] 155:22 156:3 156:4 163:8
**11:00** [1] 113:1
**11th** [2] 154:15 155:13
**12** [1] 131:8
**12/31/2000** [1] 167:16
**120** [2] 156:5 159:13
**121** [1] 163:8
**122** [1] 163:9
**124** [1] 163:9
**125** [1] 163:9
**127** [1] 164:1
**128** [1] 164:2
**129** [1] 164:2
**13** [1] 102:16
**130** [2] 151:19 159:14
**131** [1] 159:14
**132** [1] 164:3
**133** [3] 111:2 111:5 151:21
**13396100** [1] 2:3
**134** [2] 156:12 164:3
**136** [1] 164:4
**137** [2] 151:23 151:24
**138** [1] 164:4
**139** [1] 164:5
**14** [1] 96:3
**140** [1] 164:5
**141** [1] 159:14
**142** [1] 164:5
**143** [3] 152:1 152:2 159:14
**144** [1] 164:6
**145** [1] 164:6
**146** [2] 109:16 159:8
**147** [2] 152:5 152:7
**149** [1] 152:9
**150** [4] 111:7 152:10 152:11 159:14
**151** [3] 109:15 159:8 164:7

**2**

**2** [4] 54:12 66:13 99:2 159:13
**2000** [1] 167:13
**201** [1] 2:7
**2039** [3] 24:20 24:21 25:7
**21** [1] 162:21
**21179300** [1] 2:18
**22nd** [1] 163:7
**23** [1] 159:13
**23rd** [1] 156:24
**24** [1] 153:24
**25** [2] 1:2 59:8
**26** [1] 159:13
**273** [2] 160:14 160:15
**274** [1] 160:16
**27th** [2] 163:25 164:8
**281.587.0088** [1] 2:21
**29th** [4] 70:19 70:25 71:14 153:25 154:6 155:7

**3**

**3** [1] 159:14
**301** [1] 167:18

**4**

**4** [2] 73:25 96:6
**4615** [1] 2:14
**4th** [6] 71:16 154:11 154:15 155:2 155:20 156:7

**5**

**5** [3] 92:5 92:5 159:14
**5629** [1] 2:19
**59656300** [1] 2:13
**5th** [2] 71:17 156:7

**6**

**6** [1] 159:14
**60** [1] 133:25
**68** [1] 68:8
**6:00** [1] 141:25
**6:15** [1] 132:11
**6:30** [1] 132:11
**6th** [2] 155:7 156:7

**7**

**7** [4] 152:6 159:12 159:14 159:14
**70's** [1] 48:6
**71** [1] 60:25
**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 167:19
**77002** [2] 2:8 167:18
**77027** [1] 2:15
**77069** [1] 2:20
**7th** [3] 123:14 155:13 156:7

**8**

**8** [3] 159:13 159:13 159:14

**800112** [2] 1:3 167:20
**88** [1] 108:19
**8:00** [1] 17:10
**8:15** [1] 137:10
**8:30** [8] 160:20 161:7 161:8 161:8 161:14 161:14 163:1 164:9 165:3

**9**

**9** [3] 159:13 159:13 159:14
**91** [2] 109:15 159:7 159:15
**92** [2] 150:21 159:12
**93** [1] 162:9
**94** [1] 162:9
**95** [1] 162:10
**96** [2] 150:23 159:12
**99** [1] 162:10
**9:15** [1] 160:22
**9:30** [1] 161:6

**____**

**_____** [1] 167:12

**_____**

**_____** [1] 167:15

**A**

**Aberration** [1] 30:14
**Abilities** [3] 97:25 99:13 105:8
**Ability** [8] 43:20 50:15 73:16 78:5 79:19 85:20 105:7 149:16
**Able** [10] 39:25 47:13 52:17 52:20 52:23 53:6 70:9 74:7 95:15 112:23
**Above-entitled** [1] 1:19
**Above-styled** [1] 167:6
**Absence** [1] 163:22
**Absolute** [3] 37:1 125:3 157:20
**Absolutely** [19] 5:18 20:6 22:19 23:20 25:20 30:8 34:22 94:4 95:25 100:12 103:24 104:1 107:13 112:13 118:20 118:24 122:11 161:5 163:18
**Abuse** [1] 102:18
**Abusive** [1] 100:24
**Accept** [2] 32:21 122:23
**Accessible** [1] 105:10
**Accident** [4] 27:4 27:4 51:19 67:7
**Accidentally** [1] 59:9
**Accomplish** [3] 27:6 27:7 34:3
**Account** [2] 25:15 38:20
**Accountant** [1] 120:2
**Accounting** [1] 123:25
**Accuracy** [1] 113:18
**Accurate** [2] 120:15 135:2
**Accused** [2] 50:20 79:9
**Achieve** [1] 82:11
**Acquaintance** [1] 158:16
**Act** [7] 21:25 40:12 52:20 74:22 95:12 129:21 129:24
**Action** [2] 54:24 83:8
**Active** [3] 106:5 106:5 106:10
**Acts** [17] 7:20 15:12 16:2 16:4 16:5 16:15 17:12 17:24 17:25 18:6 51:12 57:4 65:11 65:18 66:9 98:12 144:24
**Actual** [1] 90:2
**Actuary** [1] 61:25
**Adapt** [1] 101:3
**Add** [1] 105:3
**Addict** [1] 48:21

**Additional** [6] 34:8 46:4 97:21 98:5 115:7 144:4
**Address** [1] 108:5
**Adjourned** [1] 166:4
**Adjustments** [1] 30:19
**Administrative** [1] 105:19
**Admiration** [1] 121:20
**Admitted** [1] 167:9
**Admonishes** [3] 69:8 90:22 109:12
**Adversely** [1] 100:18
**Affairs** [3] 129:22 129:25 130:7
**Affect** [4] 50:15 73:15 78:20 95:7
**Affected** [2] 100:8 100:18
**Affects** [1] 119:13
**Afoot** [1] 88:16
**Afternoon** [1] 49:9
**Age** [11] 22:1 55:23 55:24 55:24 56:8 56:9 60:14 60:15 76:4 99:11 99:12
**Agency** [1] 106:8
**Aggravated** [2] 78:23 78:24
**Aggravating** [1] 46:2
**Ago** [17] 44:9 72:10 73:5 92:25 122:5 122:13 123:14 125:9 126:20 126:25 127:1 127:4 127:6 127:10 127:12 127:15 130:24
**Agree** [9] 34:24 60:25 61:1 65:15 65:23 82:18 96:6 99:2 104:17
**Agree/disagree** [1] 96:3
**Agreeable** [1] 109:23
**Agreed** [3] 61:4 96:9 159:9
**Agreement** [2] 159:5 159:16
**Agrees** [1] 94:1
**Ahead** [4] 48:5 52:22 70:24 103:12
**Aided** [1] 1:22
**Aimless** [1] 22:19
**Ain't** [1] 42:16
**Air** [1] 25:25
**Alcohol** [10] 54:6 54:9 54:14 54:15 54:17 54:20 98:23 99:1 99:3 100:9
**Alcoholism** [1] 48:23
**Alive** [3] 62:1 101:16 137:17
**Allegations** [3] 27:19 136:19 138:9
**Alleged** [9] 51:23 51:24 73:15 75:17 75:21 76:4 97:19 111:15 123:12
**Allegedly** [1] 79:16
**Alleging** [1] 83:14
**Allowed** [1] 105:24
**Allows** [1] 67:21
**Almost** [6] 34:14 42:19 49:18 64:14 94:9 134:17
**Amanda** [1] 139:14
**Amazed** [1] 125:13
**Amount** [5] 30:1 30:1 120:11 124:4 130:2
**Amounts** [2] 15:23 112:12
**Analysis** [1] 149:25
**Analyze** [1] 149:24
**Angeles** [1] 125:13
**Anger** [1] 31:14
**Anniversary** [1] 131:6
**Answer** [75] 5:5 7:14 7:24 7:24 8:22 10:13 11:10 11:19 11:23 12:12 12:13 12:15 12:15 12:17 12:24 13:15 15:13

18:10 18:13 19:20 20:1 20:3
23:7 23:7 23:14 23:15 23:20
24:2 24:3 24:4 24:6 26:13
40:16 40:20 40:22 40:22 40:
24 42:25 43:12 56:20 56:21
57:7 57:7 58:6 59:9 63:13
68:4 69:3 69:21 69:24 70:7
81:16 82:5 82:6 82:12 86:23
90:14 91:6 105:10 107:24
135:16 144:16 145:9 146:4
146:5 146:9 146:19 148:16
149:7 149:11 149:16 149:17
149:24 165:6 165:19
**Answered** [4] 8:23 11:17
12:24 19:2 19:3 23:22 24:13
42:2 42:7 66:18 66:19 70:10
71:5 77:6 108:12
**Answering** [5] 58:7 68:4
69:19 88:19 98:6
**Answers** [14] 7:23 8:21 9:
24 18:11 25:17 40:24 43:9
45:10 68:14 102:14 108:8
145:8 146:3 146:23
**Anticipate** [1] 114:19
**Anticipated** [1] 59:16
**Anxiety** [1] 117:15
**Anytime** [1] 11:20 28:11
**Anyway** [4] 13:21 22:2 50:
11 68:19
**Anyways** [1] 49:23
**Apartment** [1] 22:22
**Apiece** [1] 139:22
**Apologize** [1] 43:6
**Appear** [1] 97:11
**Appellant** [2] 1:6 167:20
**Appellee** [1] 1:11
**Applicable** [2] 3:21 119:6
**Applies** [5] 11:15 57:8 75:
14 117:2 119:6
**Apply** [5] 3:20 6:13 26:5
45:12 75:12
**Appreciate** [5] 57:21 58:
4 69:5 87:14 101:9
**Approach** [2] 82:13 107:
17 109:2
**Approaching** [1] 82:17
**Appropriate** [19] 8:19 12:
7 13:11 21:11 29:25 42:14
45:17 45:20 46:1 46:23 47:2
47:20 51:16 95:8 100:1 145:
24 148:9 148:23 150:11
**Area** [5] 35:22 49:23 59:16
71:12 88:15
**Areas** [2] 33:22 66:23
**Arm** [1] 115:11
**Armed** [3] 10:15 121:13
132:15
**Army** [3] 66:2 66:5 149:7
**Arrest** [6] 37:21 126:23
126:25 127:3 127:9 127:22
**Arrested** [3] 126:13 127:
20 128:1
**Arrive** [1] 57:18
**Arsons** [1] 16:6
**Artificially** [1] 81:23
**Aside** [1] 47:14
**Asleep** [1] 31:6
**Aspect** [3] 56:22 95:5 128:
12
**Aspects** [3] 45:11 91:23
119:4
**Assault** [4] 75:25 78:23
78:24 131:22
**Assaults** [1] 16:3
**Assemble** [2] 134:7 135:2
**Assessing** [3] 32:10 32:
10 33:1
**Assessment** [1] 102:3
**Assistant** [4] 2:6 3:8
110:20 125:15
**Assume** [8] 31:19 47:13 48:

11 46:15 80:9 87:5 93:15
120:14
**Assure** [1] 111:21
**Ate** [2] 139:14 141:25
**Attach** [2] 121:8 121:9
**Attempt** [1] 161:19
**Attention** [3] 71:20 81:4
161:23
**Attorney** [4] 50:1 90:11
108:15 125:15
**Attorney's** [2] 50:2 50:12
**Attorneys** [7] 2:6 2:10 2:
22 3:7 3:9 110:18 110:21
**August** [1] 131:8
**Authorities** [1] 24:24
**Automatic** [4] 88:24 89:1
106:19 106:21 108:7
**Automatically** [4] 63:20
99:23 119:21 119:22
**Available** [19] 9:16 46:
9 46:24 74:21 79:6 94:7 104:
7 131:15 135:4 135:11
**Avoid** [2] 7:10 87:22
**Award** [1] 25:6
**Awarded** [2] 24:23 26:4
**Aware** [2] 26:8 53:22
**Awful** [1] 113:19

## B

**Baby** [2] 15:5 49:20
**Backed** [1] 112:13
**Background** [17] 4:24 8:5
21:7 51:8 66:24 67:21 68:1
68:3 68:5 68:23 86:7 97:24
98:8 116:7 116:17 144:6 145:
15
**Bad** [14] 22:1 56:4 68:1 74:
11 74:12 78:17 79:3 102:18
103:5 116:18 121:15 144:9
144:10 144:11
**Bag** [3] 35:11 35:14 35:17
**Baker** [1] 162:22
**Balfoort** [1] 163:8
**Ballistically** [1] 37:22
**Bank** [5] 34:25 35:2 35:11
35:12 35:14
**Banking** [1] 78:9
**Barnett** [1] 162:10
**Base** [4] 87:2 105:12 120:6
142:18
**Based** [17] 8:23 18:9 32:
12 33:3 47:8 80:14 104:3
105:9 105:14 113:14 119:8
121:6 129:17 141:14 148:9
149:17 149:25
**Basic** [1] 84:14
**Basis** [10] 7:7 25:17 72:
18 76:22 113:11 122:24 132:
24 138:1 146:19 152:18
**Batch** [1] 22:7
**Batting** [1] 43:7
**Baumgarten** [1] 164:2
**Bearing** [2] 13:15 23:21
**Beating** [1] 16:9
**Became** [1] 111:16
**Become** [4] 24:16 54:24 61:
21 121:22
**Becomes** [2] 25:19 107:23
**Began** [1] 148:5
**Begin** [5] 32:3 39:12 54:
25 62:22 62:23 71:3 104:22
135:7 154:10 160:19 160:19
**Beginning** [2] 11:24 155:2
**Begun** [1] 58:6
**Behalf** [1] 138:21
**Behind** [6] 17:4 17:8 17:
10 17:16 25:25 136:15
**Beings'** [1] 34:23
**Beliefs** [1] 91:23

**Believability** [4] 118:
21 119:17 120:21 123:4
**Believable** [1] 3:20
**Belong** [1] 38:14
**Belonged** [1] 33:15
**Bench** [2] 158:13 159:3
**Benefit** [1] 122:18
**Berra** [1] 42:16
**Best** [8] 34:22 82:11 111:
13 112:19 112:21 142:4 165:
19 165:20
**Bet** [5] 5:16 128:17 134:5
**Better** [10] 45:22 56:3 96:
16 108:1 115:12 124:13 124:
14 134:9 134:19 143:10
**Between** [12] 3:17 16:21
33:9 55:16 75:7 89:3 106:23
107:2 119:7 121:15 159:5
159:17
**Beyond** [53] 6:23 7:4 7:18
11:2 11:21 12:11 13:22 16:
12 19:19 27:21 28:7 28:12
28:18 28:22 34:17 36:18 37:
9 38:1 38:6 39:3 39:6 41:8
41:11 64:18 67:4 84:3 86:20
94:9 97:17 107:16 128:19
128:21 128:22 129:1 129:2
129:3 129:8 129:14 129:15
129:22 130:16 133:13 136:19
138:9 140:16 140:21 141:7
141:18 141:22 142:12 142:15
144:22 145:1
**Bicycle** [1] 77:3
**Big** [4] 5:10 63:3 108:16
139:8
**Biggest** [1] 108:10
**Bill** [4] 88:22 88:24 106:
18 106:20
**Bills** [4] 88:22 89:2 89:4
106:14
**Birthday** [1] 131:5
**Bit** [20] 3:11 6:16 9:18 20:
14 66:3 67:19 67:22 82:7 85:
11 87:3 94:18 102:17 107:23
116:8 126:6 126:8 144:15
152:23 152:23 154:12
**Blaming** [4] 133:3 133:4
133:8 133:10
**Blank** [1] 40:9
**Blanket** [2] 102:20 103:14
**Blanketly** [1] 101:7
**Bleeding** [1] 37:17
**Block** [1] 59:21
**Blood** [1] 90:17
**Blow** [2] 30:4 153:15
**Blown** [1] 41:21
**Blue** [1] 139:20
**Board** [4] 7:15 25:1 25:2
25:4
**Bob** [1] 1:20
**Bodies** [2] 98:7 125:24
**Body** [9] 13:18 33:13 33:14
33:16 37:10 37:16 37:23 125:
19 132:25
**Bolt** [1] 162:5
**Bombarded** [1] 81:5
**Bonilla** [1] 162:23
**Bonnie** [1] 101:19
**Book** [1] 55:18
**Book-wise** [1] 55:18
**Borderline** [1] 22:10
**Bother** [1] 50:17
**Box** [3] 151:24 156:22 156:
23
**Boxing** [1] 125:5
**Boy** [1] 138:14
**Boys** [1] 142:6
**Braggadocious** [2] 53:8
95:20
**Brand-new** [2] 12:4 165:17

**Brasil** [1] 164:3
**Break** [4] 99:21 125:21
137:9 153:2
**Breaking** [1] 16:7
**Breaks** [1] 67:18
**Breath** [2] 25:25 139:8
**Breathes** [1] 25:24
**Brenda** [1] 164:2
**Brief** [4] 58:3 123:24 141:
25 143:20
**Briefly** [3] 10:4 26:22 59:
4
**Bright** [1] 55:12
**Bring** [10] 6:7 18:14 71:
14 93:16 135:9 142:2 153:4
153:5 153:6 153:9
**Brings** [1] 80:3
**Broad** [2] 29:15 30:6
**Broadening** [1] 134:19
**Broader** [1] 126:9
**Brooks** [1] 162:23
**Brother** [6] 47:22 48:8 59:
24 59:24 61:9 111:8
**Brothers** [1] 60:19
**Brought** [3] 3:1 110:12
124:8
**Brown** [1] 37:5
**Brutal** [1] 30:9
**Buckets** [1] 127:5
**Buddies** [3] 133:1 133:2
133:6
**Building** [3] 16:6 16:8
105:11
**Bullet** [2] 37:22 37:23
**Bump** [5] 7:6 7:6 7:8 11:14
11:18
**Bunch** [2] 73:21 123:19
**Burden** [5] 6:25 11:8 94:
22 128:15 141:4
**Burdette** [1] 1:20
**Burger** [2] 125:7 125:14
**Burglaries** [1] 16:7
**Burglary** [8] 48:2 60:2
75:25 126:21 126:24 127:1
127:4 127:7
**Burned** [1] 22:23
**Burning** [1] 16:6
**Bus** [1] 72:8
**Business** [5] 10:17 26:21
72:23 152:15 156:12
**Busy** [1] 156:20
**Buy** [1] 43:1
**Buzz** [1] 87:25

## C

**Candid** [1] 108:17
**Cannot** [9] 13:14 14:4 14:
9 24:15 24:16 25:15 26:5 34:
5 128:4
**Capabilities** [1] 61:12
**Capable** [1] 162:2
**Capacity** [3] 92:20 106:3
149:24
**Capital** [93] 9:4 10:3 11:
24 12:7 13:13 15:21 16:
3 18:23 22:21 23:19 24:12
26:20 26:22 26:23 27:13 28:
6 28:15 29:2 29:10 29:17 31:
21 31:23 32:19 32:20 40:17
40:20 41:24 42:3 42:9 45:23
45:25 46:14 46:17 46:17 51:
4 51:17 54:18 56:9 57:1 63:
5 63:8 63:20 63:21 64:13 67:
6 67:16 73:15 75:7 75:11 75:
21 75:22 75:24 76:5 76:9 76:
11 76:13 77:9 77:15 78:14
78:19 79:9 79:14 84:10 87:6
88:17 88:23 88:25 90:12 96:
7 96:13 96:14 96:16 96:25

97:2 97:13 99:4 99:17 103:7
106:16 106:19 106:20 107:16
107:19 111:16 120:14 123:12
134:11 134:13 143:16 144:3
147:3 147:4

**Capsulize** [1] 103:4

**Car** [12] 16:6 35:5 43:1 43:
2 43:2 43:3 43:4 43:4 120:3
134:21 134:21 136:11

**Car's** [1] 43:5

**Care** [7] 35:25 36:10 36:12
53:8 81:16 158:7 161:5

**Carefree** [1] 53:8

**Careful** [1] 129:18

**Carefully** [2] 85:4 86:1

**Carol** [1] 164:7

**Carolyn** [1] 163:8

**Carry** [1] 73:18

**Carved** [1] 29:8

**Casa** [1] 106:6

**Case** [173] 3:5 3:17 4:1 6:
7 7:22 8:8 8:15 8:21 9:7 9:
7 9:7 9:23 17:6 18:9 18:12
19:11 20:7 20:10 20:15 20:
19 21:5 21:8 21:19 21:20 22:
4 22:15 23:6 23:9 23:23 25:
18 26:7 26:9 26:13 26:16 26:
17 27:8 27:13 27:15 27:16
27:20 28:19 28:25 29:18 30:
11 30:12 31:21 32:13 32:19
32:24 33:4 33:20 34:14 35:
20 35:23 35:25 36:13 37:10
38:24 39:1 39:1 39:5 39:18
39:24 40:9 40:9 41:3 41:5
41:22 42:6 42:11 42:12 42:
15 43:15 43:21 45:9 45:12
47:25 50:4 58:17 58:18 63:2
63:4 67:9 70:14 73:14 73:18
80:7 80:11 80:11 80:12
81:8 81:13 81:22 82:10 83:3
83:10 84:3 90:3 91:21 92:8
93:4 94:12 95:3 97:15 101:5
102:8 103:1 103:14 109:7
110:13 110:16 111:15 113:6
113:19 114:14 114:18 115:4
117:3 117:17 117:18 118:3
118:9 118:11 119:3 120:13
122:22 123:10 125:15 127:21
130:4 134:11 135:6 135:7
136:5 136:12 137:2 137:3
137:4 137:10 137:12 137:20
138:7 138:13 138:13 138:20
140:13 141:12 141:16 142:11
142:22 145:21 146:16 146:17
146:20 147:3 148:10 148:14
148:23 149:1 149:9 149:10
150:1 150:9 150:10 152:16
154:4 154:10 163:20

**Cases** [26] 9:2 20:5 30:16
30:16 36:1 74:19 74:20 79:
18 86:11 88:17 92:7 93:1 93:
1 93:7 93:22 94:5 94:6 126:
5 128:13 136:13 136:22 147:
4 147:5 147:10 152:12 152:13

**Categories** [1] 58:16

**Category** [4] 15:18 16:11
16:15 92:14

**Caught** [1] 35:3

**Caused** [8] 22:20 33:16 37:
22 37:23 83:21 87:20 89:12
89:17

**Causes** [2] 12:23 40:16

**Cells** [1] 105:23

**Cent** [1] 140:19

**Center** [1] 102:3

**Central** [1] 109:19

**Cents** [4] 139:20 139:22
139:25 140:20

**Certain** [11] 14:11 15:17
16:7 45:11 66:3 66:6 74:16
76:4 77:23 91:23 104:8

**Certainly** [15] 15:21 22:
23 61:22 64:6 64:24 66:8 67:
5 67:15 86:13 103:10 103:
15 108:12 108:21 124:23 148:

---

2

**Certainty** [3] 14:10 15:2
15:11

**Certify** [3] 167:4 167:8
167:10

**Cetera** [1] 36:18

**Chain** [2] 139:24 139:25

**Chair** [1] 81:4 88:12

**Chairs** [1] 102:12

**Challenge** [2] 93:24 108:
21

**Chambers** [1] 167:7

**Championship** [1] 125:5

**Chance** [2] 9:10 39:17

**Change** [11] 9:1 46:23 46:
24 56:19 56:21 61:23 82:6
82:18 88:16 144:21 147:9

**Changed** [3] 100:19 105:7
105:8

**Changing** [1] 142:14

**Character** [14] 4:24 8:5
21:6 23:2 51:8 66:24 67:21
97:24 98:8 116:6 116:17 129:
23 144:6 145:15

**Charge** [25] 3:21 6:9 6:9
10:2 10:5 10:6 10:11 10:18
24:10 45:22 45:24 45:25 48:
2 117:1 117:1 117:4 117:4
119:1 119:5 119:10 123:15
126:12 127:25 129:9 138:19

**Charged** [15] 6:20 48:18
48:20 58:20 73:20 79:9 90:
12 120:13 122:8 123:11 126:
14 127:11 127:13 127:23 128:
2

**Charges** [3] 44:24 50:2 50:
14

**Charging** [1] 131:20

**Charles** [8] 1:5 3:5 44:17
58:3 58:17 63:4 110:16 167:
20

**Charlsie** [1] 164:6

**Check** [3] 96:5 138:17 139:
17

**Checked** [3] 59:19 59:20
96:8

**Child** [16] 49:2 62:17 62:
18 62:25 63:19 76:3 76:4 79:
3 93:2 93:4 116:10 116:12
131:22 139:7 139:10 157:5

**Child's** [1] 79:16

**Childhood** [6] 68:2 100:
24 102:18 102:18 103:3 103:6

**Children** [6] 49:5 49:6
50:3 79:22 111:3 116:10

**Children's** [1] 102:2

**Chips** [1] 82:3

**Choice** [7] 54:24 60:10
104:13 104:18 107:2 146:6
146:11

**Choked** [1] 53:4

**Choking** [1] 95:17

**Choose** [8] 106:23 106:24
107:1 107:1 107:3 107:5 119:
21 119:21

**Chooses** [3] 117:23 118:1
118:4

**Chosen** [1] 109:6

**Christmas** [1] 70:6

**Church** [1] 140:2

**Circumstance** [10] 8:17
32:16 36:6 43:1 46:3 53:25
67:19 86:14 138:21 145:22

**Circumstances** [44] 8:3
8:17 21:9 30:8 30:10 33:8
33:16 33:20 36:7 37:25 51:7
51:14 52:5 55:22 66:23 67:3
67:16 76:16 77:4 77:11 78:
20 79:1 79:5 79:24 83:22 83:
23 86:18 87:15 87:20 88:18
89:12 89:16 89:17 93:8 94:
13 95:6 95:13 98:14 98:17

---

**Circumstantial** [11] 35:
24 36:2 36:5 36:12 38:4 38:
4 38:8 38:13 39:2 39:2 39:6

**Citizens** [4] 18:7 102:15
123:22 147:18

**Civics** [1] 89:25

**Claim** [1] 113:5

**Claiming** [2] 41:5 141:6

**Claire** [5] 2:4 3:10 45:8
91:20 110:21

**Class** [1] 91:16

**Classes** [1] 62:21

**Classic** [1] 83:10

**Clean** [1] 80:7

**Clearly** [3] 70:7 83:14
107:19

**Client** [1] 87:6

**Clock** [2] 17:9 161:6

**Close** [10] 60:9 60:12 60:
14 72:14 72:15 80:4 92:11
92:12 100:22 142:10

**Closed** [1] 103:14

**Closely** [1] 86:10

**Closer** [1] 124:12

**Club** [1] 16:9

**Cocaine** [1] 48:19

**Codefendant** [1] 34:7

**Codefendants** [1] 34:5

**Coffee** [1] 85:9

**Coin** [1] 122:4

**Coke** [1] 48:23

**Cokinos** [7] 91:1 91:6 91:
7 91:8 91:9 101:14 108:19

**Comfort** [1] 134:19

**Comfortable** [13] 6:17 16:
20 33:20 81:21 85:20 89:4
89:22 90:5 92:16 94:16 107:
10 109:5 113:23

**Coming** [10] 9:24 39:16 62:
3 79:14 83:3 148:15 153:9
154:1 162:5 165:8

**Comments** [2] 81:5 90:8

**Commercial** [1] 125:22

**Commission** [17] 27:12 34:
11 35:18 36:6 51:9 51:21 52:
18 52:19 55:3 95:10 100:11

**Commit** [31] 7:19 15:12 15:
15 15:17 15:21 34:2 34:3 34:
4 36:4 36:9 51:12 54:15 54:
17 54:21 57:3 88:3 98:11 99:
4 99:17 100:9 112:22 115:5
126:17 128:6 128:10 130:22
131:24 132:16 134:12 139:1
144:24

**Commitment** [6] 82:15 82:
18 106:6 106:7 109:22 112:24

**Commits** [3] 21:25 87:25
140:23

**Committed** [45] 4:12 5:4
16:13 27:11 27:23 46:9 52:
12 52:24 54:7 56:9 56:21 57:
6 57:9 73:11 86:10 89:18 95:
16 97:18 97:23 98:24 103:6
103:18 103:18 115:14 115:21
116:4 116:8 122:8 126:13
126:14 126:16 126:24 127:1
127:4 127:6 127:10 127:12
127:13 127:15 127:16 128:3
128:4 131:22 131:24 144:14

**Committee** [1] 140:2

**Committing** [6] 8:9 34:19
43:11 74:22 75:22 76:5

**Common** [6] 10:22 56:25 63:
11 76:21 95:2 129:18

**Communities** [2] 16:22 16:
23

**Community** [2] 16:22 125:
12

**Companies** [1] 61:25

---

**Comparative** [3] 4:24 8:
10 21:21

**Compared** [2] 8:10 117:17

**Comparison** [1] 14:1

**Compelling** [1] 165:5

**Completely** [7] 25:10 30:
14 79:25 88:4 101:4 101:24
122:9

**Complex** [1] 22:22

**Complicated** [2] 112:8
113:7

**Comprehension** [1] 94:9

**Computer** [1] 1:22

**Concept** [1] 33:25

**Concern** [5] 3:24 81:3 115:
2 116:21 116:23

**Concerned** [1] 143:25

**Concerning** [1] 129:16

**Conclude** [1] 83:20

**Concluded** [3] 63:19 70:
16 159:6

**Concludes** [1] 118:4

**Conclusion** [4] 9:3 116:
24 141:11 147:5

**Conclusive** [1] 63:7

**Condition** [2] 54:10 55:13

**Conditioning** [1] 125:1

**Conditions** [1] 112:3

**Conduct** [8] 16:10 8:11 15:
23 16:11 20:25 21:1 30:13
54:13 55:20 56:8 65:9 65:10
65:10 100:10 100:15 130:6

**Confesses** [1] 36:4

**Confinement** [4] 29:21 29:
22 32:11 33:2

**Conflicts** [2] 124:1 124:4

**Conform** [1] 62:14

**Confronted** [1] 62:10

**Confused** [2] 83:13 157:10

**Confusion** [1] 24:9

**Congregation** [1] 140:24

**Connect** [5] 34:11 34:18
35:7 35:9 35:17

**Connection** [2] 99:5 99:18

**Connections** [1] 39:17

**CONNER** [1] 69:9

**Connors** [6] 2:4 3:10 45:8
91:20 110:1 110:2 110:21
159:20

**Conscientious** [4] 149:
14 149:21 150:8 150:13

**Consequences** [2] 45:23
104:18

**Consider** [11] 16:19 32:8
32:10 32:15 33:1 58:22 68:9
92:6 130:22 150:12 150:17

**Consideration** [10] 8:2
25:20 51:11 64:9 88:22 106:
16 129:19 145:12 149:14 150:
8

**Considered** [4] 24:15 68:
13 126:16 128:5

**Consistent** [1] 19:6

**Consists** [1] 109:15

**Conspiracy** [1] 34:4

**Conspire** [1] 34:2

**Constables** [1] 120:18

**Constitute** [7] 7:20 16:
16 18:6 65:12 65:19 66:10
144:25

**Contact** [1] 17:1

**Contain** [1] 117:2

**Contained** [3] 10:1 10:6
10:25

**Contains** [1] 167:4

**Content** [2] 120:7 121:7

**Contents** [1] 138:1

**Context** [8] 14:14 18:3 20:

23 47:1 61:17 64:25 67:6
100:4
**Continue** [1] 58:9
**Continued** [1] 125:14
**Continuing** [16] 7:20 13:
6 16:16 18:6 51:12 52:4 57:
3 58:4 64:2 65:12 65:20 66:
10 98:11 107:20 144:25 160:4
**Contract** [1] 43:23
**Contrary** [1] 70:23
**Contrasting** [1] 85:8
**Conversation** [6] 8:24
19:22 30:3 63:14 85:12 132:
12
**Convict** [3] 30:12 38:8
147:15
**Convicted** [19] 10:3 12:6
24:12 29:14 29:17 29:20 35:
8 35:10 51:4 51:16 61:4 87:
6 88:23 88:25 106:18 106:20
143:15 143:16 158:18
**Conviction** [10] 28:6 34:
4 36:14 82:14 82:15 82:17
82:18 86:8 128:24 147:2
**Convince** [1] 151:4
**Convinced** [1] 41:4
**Convincing** [1] 129:23
**Cook** [1] 162:10
**Cookies** [2] 139:11 140:16
**Coordinating** [1] 50:24
**Cooter** [1] 37:5
**Cops** [1] 73:21
**Correct** [97] 47:17 53:18
70:17 70:21 73:23 74:17 77:
13 158:19 167:4
**Correctly** [2] 70:15 167:9
**Corroborating** [1] 34:9
**Cost** [1] 167:10
**Costs** [1] 161:24
**Counsel** [2] 156:18 167:5
**Country** [6] 59:24 128:23
129:4 129:5 129:6 129:7
**County** [11] 1:8 1:21 18:7
49:21 123:13 131:11 131:16
167:2 167:4 167:11 167:17
**Couple** [13] 11:1 22:23 30:
22 39:12 48:23 62:6 66:23
69:13 111:10 126:3 134:4
143:13 143:14
**Course** [24] 3:14 25:15 27:
11 27:18 28:9 29:7 49:22 51:
2 52:16 52:16 52:22 57:11
67:17 78:25 83:7 95:15 95:
21 98:22 114:12 130:14 131:
4 132:5 134:1 141:15
**Court** [96] 1:3 1:5 3:2 13:
8 44:3 44:6 44:12 44:20 45:
2 46:12 50:8 51:3 57:23 59:
6 69:7 69:8 69:12 71:8 80:
14 80:19 81:24 82:22 90:21
90:22 91:4 91:16 101:11 109:
12 109:13 110:1 110:3 110:5
110:7 110:9 110:13 111:6
111:9 122:22 143:7 150:20
150:22 150:24 151:2 151:4
151:15 151:17 151:20 151:22
151:24 152:2 152:4 152:6
152:8 152:11 155:6 155:8
155:10 155:14 155:21 155:23
156:1 156:5 156:8 156:15
156:19 156:21 157:1 157:3
157:6 157:8 157:12 157:17
157:24 158:23 159:12 158:25
159:4 159:6 159:21 159:25
160:3 160:5 164:12 164:15
164:18 164:24 166:4 167:3
167:4 167:7 167:17 167:17
**Court's** [19] 3:21 6:9 6:9
10:2 10:5 10:8 10:18 24:10
117:1 117:1 119:1 119:5 119:
10 123:15 126:11 127:25 129:
9 138:19 159:7
**Courthouse** [8] 41:19 102:

25 120:1 120:3 125:2 126:1
135:6 140:9
**Courtroom** [11] 80:15 85:
10 128:8 131:14 133:8 135:6
141:2 142:9 148:4 161:12
163:2
**Cousin** [2] 101:21 101:25
**Covered** [1] 90:17
**Covering** [1] 165:18
**Coworkers** [1] 158:22
**Craig** [1] 162:22
**Creating** [1] 153:22
**Credibility** [13] 113:16
114:3 117:20 118:7 118:11
118:18 119:14 121:8 121:10
123:6 123:17 136:5 138:1
**Credible** [3] 118:8 119:5
119:6
**Credit** [3] 137:6 137:9
137:21
**Crime** [104] 4:12 4:21 4:
22 5:3 5:4 6:20 8:9 15:15
15:23 15:24 15:24 15:25 16:
14 22:20 34:3 34:4 34:12 36:
19 35:7 35:9 36:3 36:4 36:7
36:9 46:4 46:15 46:20 47:2
51:7 51:9 51:21 52:2 52:7
52:12 52:18 52:19 52:23 52:
24 53:6 53:21 54:7 54:21 54:
22 55:4 61:12 63:5 65:13 65:
6 65:21 65:22 72:12 74:17
74:22 74:23 84:19 86:10 87:
25 88:1 88:3 90:18 95:6 95:
10 95:11 95:15 95:16 95:18
95:21 97:16 97:18 97:22 98:
4 98:7 98:24 100:9 100:11
103:17 104:3 115:5 115:14
115:25 116:4 116:8 126:13
126:15 126:16 126:18 127:10
127:14 127:15 127:17 128:2
128:3 128:4 128:6 128:10
130:22 131:24 132:16 132:19
138:25 139:1 144:14 158:17
158:19
**Crimes** [15] 15:18 77:23 93:
6 93:9 94:6
**Criminal** [29] 7:19 15:12
16:2 16:4 16:5 16:15 17:12
17:24 17:25 18:5 52:1 65:11
65:18 66:9 75:19 76:2 76:17
82:9 83:18 88:17 94:20 95:3
97:24 114:25 114:25 124:6
128:13 137:2 144:24
**Critical** [2] 137:22 137:
23
**Crowd** [4] 157:23 158:2
158:3 158:4
**CSR** [1] 167:16
**Culpability** [3] 8:6 66:
25 145:17
**Culturally** [1] 104:3
**Culture** [9] 104:4 104:9
104:13 104:15 104:20 104:23
105:6 105:8 105:11
**Cunning** [1] 86:12
**Custody** [1] 93:14
**Cut** [1] 15:5
**Cynthia** [1] 162:11

## D

**D.A.** [2] 164:13 164:14
**D.A.'s** [1] 50:13
**Dad** [1] 142:6
**Daddy** [1] 139:9
**Daily** [3] 62:12 72:17 139:
3
**Dallas** [3] 72:8 72:16 72:
19
**Danger** [5] 42:2 42:4 63:
22 64:14 145:2
**Darrell** [1] 164:6
**Date** [2] 71:14 167:16
**Dates** [2] 157:5 157:11

**Daughter** [7] 48:18 49:5
49:17 49:25 50:23 73:20 139:
7
**Daughters** [1] 53:18
**Day-to-day** [1] 82:1
**Days** [7] 31:2 31:2 44:9 44:
10 50:24 153:14 154:24
**Dead** [6] 33:13 33:14 37:10
125:24
**Deal** [10] 40:25 41:1 41:17
47:2 52:14 62:7 64:7 71:24
76:21 85:17
**Dealing** [1] 116:15
**Deals** [1] 84:9
**Dealt** [1] 92:18
**Death** [85] 8:19 9:5 9:22
12:14 13:7 13:9 18:14 19:7
19:13 20:19 20:24 21:11 22:
24 23:12 24:7 24:8 29:16 37:
24 40:24 42:5 42:14 45:15
47:19 51:6 51:15 52:6 53:5
53:16 54:2 56:18 57:4 57:8
57:11 59:15 61:19 65:7 66:
17 66:18 67:18 68:11 74:15
74:20 75:11 77:16 77:22 83:
21 86:6 86:19 87:9 88:20 88:
24 92:7 93:20 94:6 95:7 97:
2 97:14 98:15 99:22 100:1
106:16 106:19 107:5 108:2
108:4 134:15 143:19 145:24
146:7 146:18 146:19 146:22
146:25 147:7 148:8 148:13
148:20 148:22 148:25 149:12
149:15 150:8 150:14 150:16
152:13
**Deathworthiness** [1] 67:
11
**Deaton** [1] 162:24
**Deceased** [1] 111:3
**December** [1] 123:13
**Decide** [11] 3:18 3:19 4:
10 10:12 40:14 64:12 65:5
93:11 113:8 136:17 139:5
**Decided** [2] 65:2 77:18
**Deciding** [12] 3:24 53:11
53:14 65:6 68:3 86:5 102:12
113:16 115:2 116:22 116:23
118:20
**Decision** [43] 23:10 25:
11 26:7 40:15 43:13 57:12
63:3 66:17 68:25 78:21 79:6
79:25 80:14 81:9 83:21 85:
18 85:21 85:23 87:12 93:22
94:3 94:15 103:25 108:16
113:9 113:10 113:14 115:12
119:8 120:7 121:3 123:3 134:
10 134:13 134:16 134:20 136:
4 137:25 141:12 141:13 141:
20 143:21 148:12
**Decision-making** [3] 26:
7 68:25 94:15
**Decisions** [13] 21:23 23:
17 42:23 56:3 56:4 57:18 63:
10 63:15 78:22 78:6 90:4 93:
23 134:6
**Deep** [1] 139:8
**Defeating** [1] 161:24
**Defendant** [126] 2:22 3:
25 3:25 4:2 4:11 4:25 6:24
7:19 7:21 7:22 8:5 8:20 10:
3 11:13 12:20 13:13 14:16
14:18 14:20 15:2 15:12 15:
19:22 19:23 20:2 21:6 21:18
22:16 22:20 24:12 24:20 24:
22 25:22 26:2 28:15 28:20
29:4 31:23 31:24 32:20 34:
11 34:18 36:4 36:8 37:3 37:
12 37:13 37:13 37:16 37:19
37:24 38:2 39:4 41:23 42:1
54:6 58:15 66:25 75:20 78:3
88:25 95:23 97:18 98:23 103:
3 110:8 110:11 115:2 115:3
115:8 116:7 116:19 116:20
120:13 123:11 128:6 128:10
130:5 130:12 130:13 130:17
130:21 134:12 135:19 135:19

**Defendant's** [26] 6:25 7:
5 8:6 8:11 11:7 19:6 21:2
22:5 23:2 32:9 32:10 33:1
34:17 36:19 51:7 66:24 67:
21 97:24 129:16 130:10 133:
14 133:17 135:23 138:15 144:
9 145:16
**Defendants** [5] 8:9 9:9
30:11 30:13 147:11
**Defender** [1] 82:13
**Defense** [20] 27:2 28:4 51:
19 55:3 67:7 81:14 82:5 82:
16 83:11 86:17 90:11 94:22
100:17 102:7 100:15 135:22
136:15 136:24 138:4 138:6
**Defense's** [1] 135:25
**Defenses** [1] 104:7
**Define** [4] 10:18 10:21 64:
19 65:3
**Defined** [6] 10:7 10:10 13:
24 16:19 21:14 64:19
**Defining** [1] 10:16
**Definitely** [2] 85:15 85:
15
**Definition** [4] 64:20 129:
10 129:11 130:1
**Degree** [4] 112:11 120:9
130:6 154:19
**DeLeon** [1] 163:8
**Deliberate** [3] 9:15 31:
22 85:3
**Deliberating** [1] 117:6
**Deliberations** [4] 6:11
32:4 135:8 148:6
**Deliver** [2] 123:1 158:4
**Delve** [1] 105:2
**Demand** [1] 39:8
**Denied** [1] 25:23
**Department** [1] 92:19
**Deputy** [3] 131:11 131:13
132:3
**Derelict** [1] 37:1
**Describe** [1] 96:17
**Described** [1] 84:5
**Describing** [2] 84:1 108:1
**Description** [1] 96:15
**Desert** [1] 22:17
**Deserve** [1] 33:8
**Deserved** [2] 32:17 68:10
**Despite** [1] 55:17
**Detail** [3] 19:16 148:18
164:5
**Determination** [2] 93:6
98:3
**Determine** [20] 31:24 51:
15 56:19 63:25 67:22 87:8
93:4 97:17 98:19 99:10 108:
4 118:17 119:4 119:17 121:7
128:9 134:12 136:6 138:8
152:25
**Determined** [3] 37:22 147:
2 148:19
**Determines** [2] 31:22 146:
16
**Determining** [8] 7:13 51:
11 52:3 68:10 95:22 98:10
118:9 118:10
**Deterrence** [1] 82:10
**Detriment** [1] 122:20
**Developed** [1] 21:22
**Dictate** [2] 33:13 43:10

**Dictates** [2] 7:25 145:10

**Die** [1] 73:13

**Died** [2] 125:8 125:9

**Differ** [3] 30:11 47:15 85:11

**Difference** [14] 3:17 22:9 22:13 30:16 30:17 30:19 32:6 36:15 36:16 55:16 60:14 75:7 118:24 152:16

**Different** [55] 4:7 4:9 9:9 9:10 9:10 9:12 9:16 9:18 12:18 13:17 13:20 15:8 16:22 22:3 23:25 24:2 27:13 29:15 30:6 31:17 42:23 50:10 55:15 56:13 58:12 61:7 67:19 77:4 80:1 81:2 84:11 97:4 99:6 101:6 102:16 105:11 106:24 114:4 114:7 115:8 115:16 115:18 116:14 124:10 124:21 124:23 139:2 147:11 147:16 147:20 147:21 148:1 148:3 148:6 162:20

**Differently** [1] 152:15

**Difficult** [2] 86:23 107:24

**Difficulty** [1] 59:25

**Dime** [1] 139:22

**Dingy** [1] 111:17

**Dinkins** [1] 162:9

**Dinner** [2] 142:1 142:2

**Dire** [14] 1:15 44:19 45:5 56:25 57:24 69:11 71:10 80:21 91:3 91:17 92:15 97:4 101:12 159:7

**Direct** [9] 24:4 35:23 36:1 36:2 36:11 36:23 37:7 38:4 39:8

**Directed** [1] 25:1

**Directionless** [1] 22:19

**Directions** [1] 113:9

**Directors** [1] 17:18

**Dires** [1] 78:10

**Disabilities** [2] 98:1 99:14

**Disagree** [4] 60:25 65:15 96:6 143:5

**Disagreed** [1] 100:25

**Disagreeing** [1] 102:20

**Disagreement** [7] 35:21 39:23 40:3 123:9 128:12 133:19 143:3

**Disbelieve** [3] 118:2 118:5 119:22

**Disciplining** [1] 116:9

**Discretion** [2] 146:7 146:12

**Discussion** [2] 66:16 159:2

**Disdain** [1] 120:11

**Disgusted** [1] 124:17

**Dispose** [1] 81:23

**Disprove** [2] 135:25 141:9

**Dispute** [2] 40:3 143:3

**Disputes** [2] 123:8 133:19

**Disregard** [3] 22:24 25:3 25:10

**Distant** [1] 111:3

**Distinction** [3] 16:20 16:21 20:11

**District** [12] 1:5 1:11 2:6 3:8 50:1 50:2 50:12 106:13 110:20 125:15 167:3 167:17

**Dixon** [1] 164:2

**DNA** [1] 34:21

**Doctor** [1] 109:17

**Document** [1] 165:6

**Done** [23] 4:13 4:13 4:14 6:18 28:3 31:14 48:23 58:5 58:24 69:5 83:25 92:25 95:20

**Door** [15] 21 115:22 115:22 154:21 154:21 133:2 133:5 137:7 144:7 144:9 147:12

**Door** [2] 121:17 126:23

**Double** [1] 140:24

**Doubt** [59] 6:23 7:5 7:18 11:3 11:4 11:22 12:11 13:22 16:12 19:19 27:22 28:7 28:12 28:18 28:23 34:18 36:19 37:9 38:1 38:6 39:3 39:7 41:9 41:11 64:19 67:5 73:24 84:3 86:21 97:17 107:17 128:20 128:21 128:22 129:1 129:2 129:3 129:8 129:10 129:14 129:16 129:17 129:17 129:20 129:22 130:2 130:16 133:14 136:19 138:9 140:17 140:21 141:8 141:18 141:23 142:13 142:15 144:23 145:1

**Doubts** [2] 78:4 128:20

**Down** [29] 3:2 15:5 22:21 33:9 33:12 33:16 36:23 36:24 37:1 41:19 56:11 62:20 68:16 80:6 92:9 93:16 102:25 108:17 112:14 123:18 123:3 126:1 134:5 134:10 135:5 139:23 139:24 140:8 153:2

**Dramatic** [2] 124:7 139:8

**Dramatically** [2] 61:23 100:19

**Drawn** [1] 112:9

**Dreaming** [1] 21:19

**Dreams** [1] 132:18

**Dress** [1] 66:6

**Drink** [1] 55:5

**Drive-by** [2] 72:7 77:3

**Driver** [4] 34:25 35:1 43:2 53:2

**Driveway** [1] 112:14

**Driving** [2] 22:21 122:5

**Drug** [4] 104:4 104:9 104:23 105:8

**Drugs** [14] 54:6 54:8 54:15 54:17 54:20 54:25 98:23 99:1 99:3 100:7 100:9 100:18 104:6 104:6

**Drunker** [1] 37:5

**Drunks** [2] 37:1 37:4

**Due** [7] 79:24 109:14 153:13 153:14 165:16 165:20 165:21

**Duly** [3] 44:18 69:10 91:2

**Dumb** [4] 62:20 62:22 62:23 62:24

**Duration** [1] 154:16

**During** [40] 3:14 6:11 24:25 25:15 27:11 27:17 27:18 27:23 28:9 29:6 29:10 43:21 51:21 51:23 51:25 52:1 52:16 52:18 52:22 54:5 75:17 25 76:1 76:17 92:14 95:9 95:15 95:21 98:22 114:11 117:5 130:13 130:14 134:1 141:15 147:17

**Duty** [3] 70:4 76:2 113:25

### E

**Early** [2] 48:4 48:6

**Earth** [1] 137:17

**Easier** [2] 69:22 138:12

**Easily** [1] 66:7

**Eat** [1] 165:2

**Eaten** [1] 140:15

**Ed** [1] 55:11

**Educational** [1] 108:22

**Effect** [5] 81:6 98:20 99:10 146:23 146:24

**Eight** [1] 126:23

**Either** [19] 15:25 16:8 18:10 33:6 36:16 49:15 53:20 81:13 81:15 96:24 103:4 109:

**Elect** [1] 125:14

**Elected** [2] 50:2 50:14

**Elementary** [2] 132:24 133:7

**Elevators** [1] 131:10

**Eleven** [3] 84:2 162:25 163:2

**Eligible** [3] 24:16 25:20 61:22

**Eliminated** [1] 12:2

**Ellen** [1] 101:20

**ELYSE** [1] 69:9

**Emotionally** [1] 21:22

**Employer** [1] 43:25

**End** [6] 3:3 17:13 26:12 77:2 77:4 92:10

**Endangering** [1] 79:3

**Endangerment** [1] 49:2

**Enforce** [1] 91:17

**Enforcement** [7] 120:17 120:19 120:20 120:23 121:5 121:23 122:14

**Engaging** [2] 65:8 123:17

**Enron** [1] 36:24

**Enter** [1] 108:23

**Entirely** [1] 13:17

**Entitled** [4] 15:22 25:16 120:21 146:23

**Environment** [1] 82:1

**Episode** [4] 52:1 75:19 76:2 76:17

**Equals** [1] 13:10

**Eradicated** [1] 101:4

**Erased** [1] 12:2

**Escapes** [1] 17:13

**Especially** [1] 84:10

**Esperanza** [1] 106:7

**Essentially** [2] 65:1 66:17

**Establish** [1] 11:7

**Established** [1] 36:18

**Establishes** [1] 130:16

**Estranged** [1] 73:2

**Et** [1] 36:17

**Evaluate** [8] 18:9 41:14 79:20 85:20 102:9 114:2 114:3 137:25

**Evaluated** [3] 9:17 130:3 148:15

**Evaluations** [3] 24:23 24:25 25:3

**Evelyn** [1] 163:10

**Evening** [4] 93:3 132:11 139:7 142:1

**Event** [12] 24:11 24:11 24:13 83:7 91:12 124:7 124:8 127:8 127:12 127:16 131:6 142:15

**Events** [5] 87:20 103:20 123:25 128:4 128:7

**Everyday** [2] 76:22 114:6

**Everywhere** [1] 10:19

**Evidence** [152] 4:6 4:7 4:11 4:19 4:20 4:23 6:22 7:3 7:8 7:18 7:25 8:2 8:15 8:23 9:23 11:2 11:14 11:18 11:21 12:3 12:22 13:6 13:12 13:18 13:22 18:9 19:19 20:10 20:20 21:10 21:17 22:2 22:14 23:7 23:9 23:11 23:22 25:17 28:25 30:4 32:2 32:4 32:6 32:21 34:12 34:14 34:15 34:16 35:6 35:9 35:23 35:25 36:1 36:16 36:17 36:23 36:9 38:13 39:3 39:8 40:12 40:15 40:21 40:23 41:2 42:1 43:15 47:8 47:16 50:16 54:3 54:

**Enforce** [1] 74:3

(center column continues)

**E - column 3**

56:12 56:16 57:9 66:22 68:10 68:12 78:7 80:15 92:8 94:22 94:23 95:9 95:16 97:21 97:21 97:23 98:5 98:7 98:18 99:6 99:9 99:24 103:3 105:1 115:17 115:20 116:2 116:5 119:9 126:17 127:1 127:5 127:9 127:13 127:16 127:18 127:19 128:5 128:9 129:19 130:4 130:14 130:15 135:9 135:11 135:12 135:21 135:22 136:14 136:18 136:23 141:11 141:16 141:17 142:10 144:5 144:5 144:22 145:6 145:10 145:12 145:21 146:2 147:19 148:14 148:15 148:25 149:9 149:10 149:17 149:24 150:1 150:18 167:5

**Evidentiary** [1] 63:24

**Ex** [1] 147:15

**Ex-convict** [1] 147:15

**Exact** [3] 11:15 88:3 147:22

**Exactly** [15] 9:14 11:8 22:2 36:14 42:6 68:12 79:23 84:12 118:13 133:7 134:24 141:2 146:8 146:13 153:16

**EXAMINATION** [10] 1:15 44:19 45:5 57:24 69:11 71:10 80:21 91:3 91:17 101:12

**Examine** [1] 99:9

**Example** [20] 8:8 15:19 30:21 34:20 35:11 36:23 41:3 41:6 42:21 53:3 54:5 62:16 63:18 95:12 104:4 119:23 121:16 124:5 160:13 160:20

**Exceed** [1] 30:1

**Exception** [2] 64:18 159:8

**Exclusive** [1] 117:19

**Exclusively** [5] 34:6 36:1 36:2 39:1 118:6

**Excuse** [14] 25:18 27:1 27:10 28:3 29:6 31:11 109:23 123:16 131:12 136:15 153:14 154:9 157:14 163:18

**Excused** [6] 21:1 110:10 159:11 159:18 160:1 160:3

**Excuses** [1] 67:25

**Excusing** [1] 20:25

**Executed** [5] 140:18 140:22 140:25 141:3 141:4

**Execution** [1] 78:3

**Exhibits** [1] 167:9

**Exist** [3] 25:14 35:23 137:19

**Existed** [1] 135:13

**Existence** [10] 14:16 14:19 15:14 15:20 16:13 28:8 28:12 28:18 28:22 28:23

**Exists** [6] 9:23 15:22 105:11 107:11 115:11 119:12

**Expand** [1] 59:14

**Expanded** [1] 46:15

**Expect** [3] 10:14 50:10 96:19

**Expected** [1] 113:23

**Experience** [3] 61:7 61:8 122:12

**Experienced** [1] 66:1

**Experiences** [2] 100:5 121:14

**Expiration** [4] 25:14 26:3 26:6 167:16

**Expired** [1] 31:7

**Explain** [4] 49:3 68:14 86:15 149:5

**Explained** [4] 45:24 61:15 113:18 150:4

**Explaining** [1] 64:3

**Explanation** [1] 106:25

**Explore** [1] 24:1

**Explored** [1] 42:11

**Exposed** [2] 90:2 104:25
**Express** [2] 81:12 85:8
**Extended** [1] 100:21
**Extra** [2] 137:6 137:20
**Extract** [1] 119:5
**Extractions** [1] 120:24
**Extreme** [1] 65:10
**Eye** [1] 147:23
**Eyes** [1] 43:8
**Eyewitness** [1] 37:8

**F**

**Fabulous** [1] 102:6
**Face** [5] 36:25 36:25 110:17 110:23 137:17
**Face-to-face** [1] 36:25
**Facet** [2] 123:9 133:19 143:4
**Fact** [38] 3:15 3:22 6:24 10:4 14:16 25:19 26:8 37:6 38:2 42:2 48:17 54:19 55:17 59:19 61:24 73:13 76:21 78:10 126:12 126:14 126:15 126:17 127:6 127:8 127:10 127:11 127:14 128:1 128:2 128:3 128:6 128:10 130:5 130:17 130:17 137:12 138:23 143:24
**Factor** [1] 103:15
**Factors** [1] 52:6
**Facts** [15] 3:18 9:9 33:8 33:20 52:7 67:9 76:16 76:18 77:11 77:18 78:25 79:4 83:20 117:19 150:10
**Failed** [1] 84:3
**Fair** [4] 73:16 88:2 97:9 114:20
**Fairly** [1] 109:3
**Fairness** [1] 108:25
**Fall** [2] 82:3 92:13
**Familiarity** [2] 110:23 110:24
**Family** [8] 10:20 16:25 59:12 79:13 83:5 93:2 111:18 158:16
**Fannin** [1] 2:7
**Far** [8] 28:10 29:15 66:15 66:16 81:22 85:13 131:1 148:21
**Fast** [2] 161:9 165:1
**Fastest** [1] 142:3
**Fate** [1] 102:12
**Favorite** [1] 125:3
**Feature** [6] 21:5 21:9 23:1 34:23 38:12 42:12
**Features** [3] 19:12 28:8 33:17
**Feelings** [5] 81:24 82:2 85:8 85:11 150:13
**Felonies** [1] 76:1
**Felony** [10] 27:12 27:14 27:16 28:9 28:24 29:7 29:11 29:12 34:3 75:15
**Felt** [1] 67:8
**Few** [5] 59:20 80:24 92:25 125:6 161:4
**Field** [1] 36:24
**Fifteen** [4] 39:14 56:10 71:15 102:9
**Fifty** [3] 30:22 118:12 118:12
**Fifty-nine** [1] 124:20
**Fights** [1] 125:5
**Figure** [4] 15:4 38:19 81:20 111:15
**Figured** [1] 125:13
**File** [2] 50:2 50:14
**Filled** [4] 50:5 70:1 92:2 164:22
**Final** [1] 79:6

**Finally** [2] 31:5 80:7
**Financial** [1] 44:1
**Fine** [9] 15:7 15:8 29:25 30:4 56:18 56:20 59:12 115:7 115:17:8
**Fingerprint** [7] 35:13 35:15 35:17 38:13 38:13 38:15 38:17
**Fingerprints** [3] 34:21 35:12 38:14
**Fingers** [1] 35:3
**Finish** [1] 163:21
**Finished** [1] 39:9
**Finishes** [2] 117:23 117:25
**Finishing** [1] 111:12
**Fire** [1] 22:22
**Fired** [1] 37:22
**First** [93] 3:23 4:8 4:9 4:17 5:2 5:24 6:20 7:17 8:4 8:13 11:1 11:8 11:10 11:12 11:16 12:12 12:13 12:17 12:20 12:23 12:24 13:4 13:15 13:21 14:4 14:5 16:24 18:8 18:18:17 18:22 18:25 19:2 20:12 20:15 23:6 38:15 39:9 40:16 40:20 42:3 42:10 44:18 45:14 49:20 53:17 60:5 64:1 67:2 67:19 69:10 83:25 85:1 89:10 91:2 91:15 93:8 101:18 108:8 110:22 111:9 113:25 115:1 115:9 116:1 116:13 116:21 117:16 117:22 124:18 124:19 125:18 126:11 132:3 134:12 135:12 135:13 136:11 137:3 139:18 143:25 144:14 144:21 145:14 145:19 146:4 146:14 149:5 150:18 159:14 160:20 162:12
**Fishing** [1] 154:8
**Fistfight** [1] 67:18
**Fit** [2] 8:10 33:21
**Fits** [1] 83:13
**Five** [22] 26:12 26:15 29:11 30:22 30:21 31:13 32:24 33:2 43:24 44:9 44:10 110:24 122:5 122:13 130:24 131:1 140:19 142:6 153:4 153:6 163:10
**Five-time** [1] 30:12
**Fives** [1] 92:12
**Fix** [2] 119:24 163:24
**Flag** [1] 90:10
**Flip** [3] 14:25 32:18 122:4
**FM** [1] 2:19
**Focus** [11] 4:11 4:19 4:23 60:6 97:16 102:17 115:17 115:20 116:2 116:5 116:6
**Foggiest** [1] 25:8
**Folks** [20] 3:2 13:24 21:20 21:23 33:12 39:15 41:18 109:19 112:10 112:24 131:17 150:3 153:21 158:8 162:7 162:8 163:2 163:10 164:7 164:9
**Follow** [19] 25:2 25:9 39:17 40:4 45:10 46:11 47:7 47:1 47:12 47:14 59:21 62:23 74:7 74:8 79:20 80:13 82:11 114:21 114:22
**Follow-up** [1] 82:11
**Followed** [1] 133:22
**Following** [7] 1:18 154:25 156:16 159:12 162:8 162:18 163:13
**Follows** [3] 44:18 69:10 91:2
**Fond** [1] 121:24
**Fondness** [1] 120:10
**Forearmed** [1] 6:3
**Foregoing** [1] 167:4
**Forewarned** [1] 6:3

**Forget** [1] 77:15
**Fork** [1] 142:3
**Form** [1] 74:21
**Forth** [4] 39:18 44:25 61:13 62:4
**Forty** [10] 24:17 24:25 25:14 25:19 25:23 26:3 26:6 61:21 61:23 62:2
**Forty-five-year-old** [1] 147:14
**Forty-year** [1] 61:23
**Foundation** [1] 126:9
**Four** [9] 9:13 9:16 48:9 49:24 60:14 73:5 112:9 148:3 148:6
**Four-year** [1] 60:14
**Frame** [1] 43:21
**Free** [6] 17:11 17:14 17:25 54:23 54:24 55:6
**Freeway** [1] 2:14
**Fresh** [1] 42:22
**Friday** [3] 84:25 163:19 163:22
**Friend** [5] 72:5 72:7 72:14 72:15 111:8
**Friends** [4] 72:25 73:1 73:3 111:18
**Front** [9] 59:3 124:16 140:9 150:24 151:24 155:2 155:3 155:10 156:22
**Frustrated** [1] 5:21
**Fulfilling** [1] 106:7
**Full** [6] 61:16 71:20 125:23 127:5
**Fully** [1] 81:12
**Function** [6] 4:8 9:20 9:21 9:22 118:6 118:17 118:19 118:21
**Functions** [1] 119:7
**Funeral** [1] 113:20
**Furious** [1] 160:23
**Future** [16] 14:16 14:20 15:3 15:16 15:21 42:2 42:4 48:16 51:12 57:3 60:6 62:14 63:22 64:13 98:12 145:2

**G**

**Gather** [1] 32:17
**Gauges** [1] 119:13
**Gee** [1] 90:8
**General** [1] 85:12
**Generally** [4] 62:14 102:20 113:3 113:4
**Gentleman** [1] 109:20
**Gentlemen** [8] 110:22 111:10 123:10 128:22 157:13 158:1 160:6 162:12
**Getaway** [3] 34:25 35:1 53:2
**Gilbert** [2] 44:17 45:7
**Given** [21] 5:6 6:8 25:17 41:7 41:8 41:10 80:13 81:11 88:18 98:20 98:21 99:10 102:14 106:22 107:11 118:8 119:1 120:5:2 127:21 136:7 148:14
**Glad** [1] 64:6
**Glasper** [1] 162:11
**Glen** [1] 162:9
**Goal** [2] 27:6 27:7
**God** [1] 107:18
**Gossip** [2] 157:25 158:3
**Governor** [3] 25:6 25:8 25:9
**Grade** [2] 92:3 92:3
**Grand** [3] 131:15 131:17 131:19
**Granted** [1] 25:21
**Great** [7] 14:10 20:5 25:14 43:3 69:5 85:17 120:9

**Greater** [3] 14:22 29:9 29:15
**Grew** [1] 121:16
**Grossly** [3] 14:18 15:1 33:10
**Ground** [1] 37:17
**Grounding** [1] 161:25
**Group** [11] 5:10 5:12 5:13 58:16 85:1 133:1 149:2 152:21 153:3 159:9 162:18
**Groups** [2] 100:21 153:2
**Growing** [3] 56:5 121:16 141:24
**Guard** [2] 105:25 164:16
**Guards** [1] 17:19
**Guess** [8] 39:7 48:18 59:17 61:5 62:23 63:1 65:20 81:3 89:18 92:20 92:22 94:8 96:17 111:13 132:1 142:19 158:6 165:20
**Guilt** [24] 4:19 7:1 7:5 7:12 11:7 34:17 36:19 41:8 41:1 64:1 97:15 107:7 116:22 128:15 128:25 129:2 129:8 129:14 129:15 129:16 133:14 135:25 142:12 142:14
**Guilt/innocence** [1] 95:23
**Guilty** [94] 3:25 4:1 4:2 4:11 6:21 6:21 6:24 7:2 7:6 7:6 11:13 11:15 12:1 12:2 12:21 13:4 13:13 18:23 21:2 23:19 28:15 28:20 29:2 29:3 29:4 31:23 31:25 32:20 32:1 38:2 39:5 40:16 40:17 40:18 40:20 41:12 41:24 42:3 42:9 50:21 52:2 57:1 63:4 63:8 63:20 63:21 64:12 75:21 76:11 77:10 77:15 83:24 83:24 88:9 96:7 96:13 96:25 97:1 97:12 98:4 107:8 107:16 107:19 110:5 115:4 115:6 115:14 116:4 122:10 128:14 128:19 128:21 129:3 130:5 130:9 130:11 130:12 130:13 130:16 130:18 133:16 133:18 135:19 135:20 137:13 138:23 141:5 141:18 141:22 142:16 144:1 144:3 147:24 158:17
**Gun** [5] 27:7 36:25 37:14 37:20 37:21
**Gunfire** [1] 73:14
**Gunshot** [2] 37:15 37:15
**Guy** [9] 22:15 22:16 23:4 36:24 37:12 37:15 77:16 125:4 140:18
**Guys** [4] 19:8 43:7 69:20 163:23

**H**

**Half** [4] 8:13 20:12 144:12 145:19
**Hallway** [2] 44:16 124:6
**Hamilton** [4] 125:7 125:7 125:14 162:22
**Hand** [10] 26:1 27:25 37:14 37:20 103:9 118:20 139:7 148:19 148:20 167:12
**Handgun** [3] 36:25 37:14 38:21
**Handle** [3] 79:23 79:25 93:10
**Handled** [1] 93:13
**Hands** [16] 5:22 53:4 151:18 155:3 155:15 155:15 155:16 155:16 155:17 156:9 156:10 156:22 156:22 156:23 156:23 156:23
**Hanging** [1] 106:8
**Happier** [1] 165:23
**Harass** [1] 112:5
**Harassed** [3] 122:11 122:14 122:21
**Hard** [3] 5:23 61:14 127:11

**Hardened** [2] 61:12 62:4
**Hardly** [1] 89:24
**Hardship** [1] 44:2
**Harming** [1] 83:4
**Harris** [11] 1:8 1:21 18:7 49:21 123:13 131:11 131:16 167:2 167:4 167:11 167:17
**Hats** [1] 88:11
**Hauck** [1] 164:5
**Hawley** [1] 164:3
**Heads** [1] 43:8
**Hear** [68] 4:17 4:21 32:2 38:7 38:10 40:15 52:17 54:5 61:9 68:1 69:21 69:22 70:15 70:18 76:22 79:4 79:21 80: 15 86:6 87:1 90:14 95:2 95: 4 95:8 95:15 97:20 97:21 97: 23 98:22 99:24 115:7 115:25 119:19 123:4 123:19 124:13 124:14 124:15 124:17 125:20 128:9 128:20 134:2 134:3 134:17 136:3 136:8 136:14 136:25 139:4 139:4 140:7 140:10 140:10 140:13 140:14 142:20 142:21 142:22 143:6 143:9 143:12 144:4 144:11 158:1 158:3 162:2 162:3
**Heard** [29] 1:19 4:21 8:4 21:16 32:5 32:23 40:1 41:22 41:25 43:6 52:8 70:11 97:3 97:15 105:9 105:22 113:18 115:9 121:6 128:18 138:11 138:14 141:20 144:13 145:14 145:18 147:4 149:8 150:10
**Hearing** [5] 9:16 26:11 70: 15 77:18 160:4
**Hears** [2] 37:15 37:15
**Heart** [3] 79:20 80:4 85:22
**Heavier** [1] 134:16
**Heavily** [1] 118:16
**Heavy** [2] 93:9 134:13
**Heavyweight** [1] 125:5
**Heinous** [4] 46:22 47:1 94: 8 94:12
**Held** [8] 1:21 55:7 55:19 100:10 131:18 160:25 165:9 165:10
**Help** [4] 41:13 41:13 103: 19 115:12
**Helped** [7] 48:15 60:3 60: 5 60:6 61:9 86:15 96:15
**Helpful** [1] 53:10 53:14 95:22
**Helping** [2] 134:9 144:15
**Hendrix** [1] 164:6
**Hereby** [1] 167:4
**Heretofore** [2] 20:20 23: 13
**Hernandez** [1] 164:5
**Hesitate** [1] 129:21
**Hesitation** [1] 129:25
**Hi** [2] 80:23 101:14
**Hiding** [1] 142:24
**High** [12] 15:11 54:6 54:8 54:14 54:14 54:20 54:25 78: 24 98:23 99:1 100:9 120:1
**Higher** [2] 65:22 123:6
**Hill** [17] 2:12 3:17 58:2 80: 19 80:20 80:22 80:23 82:23 90:10 101:11 101:13 110:3 110:4 110:19 157:16 159:21 159:22
**Himself** [4] 21:6 22:17 73: 9 136:24
**Hip** [1] 139:7
**Historically** [1] 34:20
**History** [4] 21:7 89:25 94: 10 97:25
**Hold** [3] 43:11 123:5 163:22
**Home** [6] 85:2 116:9 132:10 132:17 139:5 162:1

**Honest** [2] 5:11 105:13
**Honestly** [1] 79:20
**Honor** [14] 45:4 59:5 71:9 109:25 110:2 110:4 110:6 157:2 159:19 159:20 159:22 159:23 159:24 160:2
**Honorable** [1] 1:20
**Hope** [2] 44:21 119:15
**Hoped** [1] 17:22
**Hopefully** [2] 126:6 126:8
**Horrible** [3] 30:9 76:23 76:24
**Horses** [1] 141:25
**Hostage** [3] 160:25 165:9 165:11
**Hotel** [1] 111:18
**Hour** [5] 39:14 105:25 116: 13 165:1 165:2
**Hour-and-a-half** [1] 111:25
**Hours** [3] 49:24 105:23 154:2
**House** [6] 16:7 49:9 49:25 60:16 88:13 134:24
**Housed** [1] 105:22
**Houston** [11] 1:21 2:8 2: 15 2:20 72:24 73:6 92:23 126:21 126:23 162:21 167:18
**Human** [8] 26:25 29:5 31: 10 34:23 74:11 120:24 121: 19 137:17
**Humility** [1] 30:25
**Hundred** [2] 117:24 118:2
**Hurdle** [1] 154:21
**Hurry** [1] 71:24 71:25
**Hurt** [2] 85:24 85:25
**Husband** [4] 31:2 73:2 155: 19 155:23
**Hypothetical** [2] 25:22 26:2

## I

**Idea** [11] 6:2 23:5 38:9 40: 10 80:10 117:12 119:20 125: 23 132:13 134:1 150:3
**Identifying** [2] 34:22 38: 12
**Identity** [1] 34:23
**Ignores** [1] 88:4
**Ill** [1] 30:23
**Imaginary** [6] 31:21 32:9 33:1 39:4 41:3 125:12
**Imagine** [1] 119:24
**Immediate** [1] 49:23 60:7
**Immediately** [2] 49:19 116:11
**Immoveable** [1] 38:18
**Impartial** [2] 73:16 129: 18
**Implies** [1] 106:5
**Important** [17] 30:20 52: 3 52:7 52:9 58:22 64:25 82: 2 82:9 84:13 86:4 86:17 87: 11 109:1 118:10 129:21 129: 25 134:6
**Impose** [2] 29:25 33:18
**Imposed** [14] 9:5 9:5 12: 15 12:19 18:13 20:20 24:14 26:15 42:5 66:19 115:13 116: 24 147:6 147:8
**Imposes** [1] 20:9
**Impossible** [1] 154:23
**Impression** [2] 62:15 107: 10
**Imprisonment** [3] 13:5 61:18 61:19
**Improper** [1] 81:25
**In-house** [1] 156:18
**Inaudible** [1] 155:9

**Include** [1] 46:15
**Included** [3] 29:8 90:19 167:6
**Includes** [1] 46:16
**Including** [4] 8:2 8:5 145:13 145:15
**Inclusive** [1] 159:8
**Inconsistencies** [1] 124:4
**Inconsistent** [1] 30:14
**Inconvenience** [4] 112: 12 112:12 154:20 154:21
**Incredible** [1] 108:21
**Indefinite** [1] 70:5
**Independent** [9] 23:18 34: 10 34:13 34:15 34:16 35:6 35:9 63:16 64:15
**Independently** [1] 77:6
**Indicate** [3] 35:13 51:14 99:25
**Indicated** [5] 47:22 56: 24 72:4 73:20 77:1
**Indicates** [1] 87:17
**Indicted** [3] 126:15 127: 14 128:3
**Indictment** [6] 75:22 76: 6 97:19 123:11 127:16 131:20
**Indignity** [1] 31:1
**Individual** [12] 58:18 58: 20 61:22 62:10 68:6 83:21 94:11 99:8 107:15 107:16 126:13 152:18
**Individual's** [1] 98:8
**Individualized** [1] 58:13
**Individually** [6] 39:13 58:14 105:23 146:9 153:21 160:12
**Individuals** [4] 98:2 108: 3
**Infer** [1] 138:22
**Inference** [1] 142:24
**Influence** [1] 60:23
**Information** [31] 5:2 5:3 24:1 41:14 53:10 53:13 69: 25 86:4 94:17 94:18 94:18 95:22 98:1 98:9 98:9 103:23 107:6 115:11 122:25 132:2 132:15 134:7 134:22 135:1 135:2 135:5 140:1 140:7 141: 14 141:22 144:13
**Informed** [2] 109:20 134:9
**Inherently** [1] 88:2
**Initial** [2] 62:14 62:15
**Inmates** [3] 17:20 17:20 17:24
**Innocence** [7] 12:4 13:3 64:1 97:16 107:7 116:22 137: 13
**Inquiry** [2] 59:16 64:15
**Insanity** [2] 55:15 67:8
**Inside** [1] 23:23
**Insignificant** [1] 109:18
**Insinuate** [1] 138:22
**Instances** [6] 45:17 45: 19 45:20 47:3 136:20 136:20
**Instead** [4] 34:8 60:7 112: 14 116:5 149:17 162:20
**Institutional** [1] 66:2
**Instruction** [2] 8:14 20: 13
**Instructions** [1] 45:21
**Instrument** [1] 6:10
**Insurance** [1] 61:25
**Integral** [1] 33:17
**Integrity** [3] 121:22 121: 25 122:2
**Intellectual** [2] 149:24 149:25
**Intelligent** [3] 21:23 55:

18 134:9
**Intelligently** [1] 5:5
**Intending** [1] 51:20
**Intense** [1] 92:20
**Intent** [1] 81:19
**Intention** [1] 67:13
**Intentional** [18] 26:23 26:24 27:5 27:9 27:16 27:22 27:24 28:1 28:2 28:8 28:22 29:5 29:10 31:9 51:17 76:25 82:24 124:5
**Intentionally** [2] 67:5 86:22
**Interaction** [1] 132:23
**Interest** [2] 102:1 133:23
**Interfere** [1] 43:20
**Internal** [1] 149:21
**Interpret** [1] 107:9
**Interpretation** [1] 96:22
**Interpretations** [1] 96: 22
**Interpreted** [1] 96:14
**Interwoven** [1] 36:7
**Intimate** [1] 60:18
**Intoxicated** [4] 54:16 54: 20 54:25 55:5
**Intoxication** [3] 55:3 73:21 100:14
**Introduced** [3] 88:21 106: 14 110:25
**Invasion** [1] 90:20
**Investigating** [1] 42:25
**Investigation** [1] 49:22
**Invite** [1] 154:6
**Involved** [6] 52:14 52:25 79:24 87:16 89:12 101:22
**Involvement** [2] 4:25 116: 7
**Involves** [2] 65:22 73:14
**Involving** [1] 111:15
**Issue** [10] 38:5 53:24 55: 15 56:14 57:2 64:23 66:13 80:3 102:18 120:12
**Issues** [6] 5:5 63:13 68:4 68:20 83:19 85:19
**It'll** [1] 142:11
**Item** [2] 38:16 38:16
**Itself** [12] 5:3 23:21 24: 3 34:16 51:5 52:5 52:7 74: 23 97:16 98:7 134:14 154:12

## J

**Jacinto** [1] 167:18
**Janet** [1] 162:21
**January** [2] 130:23 130:25
**Jerk** [2] 74:6 87:24
**Jerks** [2] 73:21 74:10
**Job** [29] 3:17 3:18 4:9 7:2 7:5 11:14 11:18 17:11 17:13 41:12 41:14 64:5 111:19 119: 10 120:9 123:7 130:9 130:10 131:23 132:20 132:21 133:5 133:16 133:17 138:12 139:19 140:2 143:1 143:2
**John** [1] 164:7
**Johnny** [7] 103:5 121:17 121:18 121:22 121:24 122:1 122:19
**Johnson** [1] 162:21
**Joseph** [2] 162:24 164:3
**Joyce** [2] 158:11 162:22
**Jr** [3] 1:5 3:6 167:20
**Judge** [1] 1:20 3:18 38: 11 53:2 56:24 58:18 63:15 64:16 64:17 64:21 75:6 76: 14 77:1 78:2 80:20 83:25 112:2 112:4 117:18 125:3 126:16 138:21 142:23
**Judge's** [3] 45:21 78:10

97:3
**Judged** [1] 58:23
**Judgement** [1] 121:24
**Judges** [2] 117:19 136:5
**Judgment** [9] 62:11 62:12 62:15 63:7 63:7 79:15 100:22 121:21 122:1
**JUDICIAL** [1] 1:11
**Judith** [1] 162:10
**Judy** [4] 38:11 112:2 112:4 125:3
**Juicy** [1] 157:25
**Jump** [1] 161:22
**Junior** [3] 92:22 106:2 120:1
**Juries** [6] 9:12 9:13 146:18 146:19 148:3 148:4
**Juror** [40] 3:4 3:18 31:20 38:25 39:24 40:8 41:13 41:14 43:20 54:7 54:10 63:2 68:24 69:8 79:10 79:11 81:9 83:19 84:16 84:19 87:23 90:22 98:24 99:2 99:8 107:11 109:6 109:12 110:15 111:2 111:7 113:5 113:6 113:19 114:17 114:21 123:3 134:11 154:4 158:13
**Jurors** [13] 10:15 22:6 22:8 33:13 47:7 51:14 54:2 82:13 83:12 84:13 92:13 146:19 152:17
**Jury** [90] 6:10 6:23 7:2 8:14 9:4 13:11 18:11 18:20 19:1 19:4 20:9 20:13 21:24 23:17 26:10 27:21 27:25 29:25 31:22 31:24 32:2 32:19 33:19 36:8 37:4 37:8 38:1 38:5 50:15 70:4 70:9 71:13 71:16 71:18 71:19 76:7 84:4 87:11 88:7 88:12 88:18 90:4 94:2 103:2 109:20 109:20 109:22 110:12 110:17 111:12 112:19 113:3 115:3 115:6 117:5 117:11 117:17 117:18 117:23 118:1 118:4 119:13 121:3 126:17 127:8 128:5 128:8 131:15 131:15 131:18 131:19 132:15 133:13 138:21 141:17 142:18 142:23 145:9 145:11 145:20 146:4 146:9 146:15 148:15 151:24 152:14 156:22 156:23 160:4
**Jury's** [18] 3:24 4:8 9:20 9:21 9:22 28:14 28:19 36:18 87:8 112:20 115:1 116:21 116:22 118:6 118:17 130:17 142:16 143:25
**Justice** [2] 132:25 133:7
**Justification** [11] 26:25 27:3 27:10 28:2 29:6 31:51 51:18 77:1 83:1 83:2 86:22
**Justified** [2] 28:5 83:9
**Justify** [1] 141:17
**Juvenile** [2] 92:19 101:22

**K**

**Karam** [1] 162:24
**Kay** [2] 167:3 167:16
**Keep** [4] 79:5 112:24 147:8 158:2
**Keeps** [2] 37:14 37:17
**Kelly** [1] 162:25
**Kept** [1] 111:18
**Kid** [12] 77:3 121:17 121:19 125:10 139:5 139:5 139:6 139:15 139:17 139:18 140:14 141:24
**Kid's** [1] 133:4 133:5
**Kidnapping** [9] 16:4 27:14 27:19 27:23 27:24 51:24 75:18 75:23 75:25
**Kids** [10] 22:23 62:23 80:4 80:5 132:23 132:23 155:18

155:24 156:2 161:25
**Kill** [2] 51:20 74:24
**Killed** [7] 27:17 59:9 72:7 73:9 73:10 73:11 83:15
**Killing** [5] 52:1 75:9 75:18 76:1 76:3 76:17 77:2
**Killings** [1] 83:17
**Kills** [1] 67:14
**Kind** [29] 6:3 15:24 15:24 23:5 23:22 24:24 35:25 40:12 45:14 47:25 48:22 65:9 65:9 80:6 84:16 87:4 87:16 87:18 91:24 92:9 94:5 102:1 104:9 108:24 119:24 129:20 137:9 149:7 152:13
**Kinds** [7] 16:7 66:6 74:19 76:1 79:1 98:1 152:12
**Kitchen** [1] 142:8
**Klutz** [1] 35:5
**Knee** [1] 87:24
**Knee-jerk** [1] 87:24
**Knife** [1] 53:4
**Knobloch** [2] 167:3 167:16
**Knowing** [4] 10:16 73:14 86:20 94:16
**Knowledge** [1] 50:18
**Known** [5] 4:16 34:21 59:8 100:18 121:19
**Knows** [2] 25:3 162:1
**Koppel** [1] 105:16
**Kurt** [5] 2:17 3:7 58:1 80:23 110:19

**L**

**Laboring** [3] 112:11 125:1 154:19
**Lack** [2] 97:25 108:1
**Ladies** [8] 110:22 111:9 123:10 128:22 157:13 158:10 160:5 162:12
**Lady** [1] 49:20
**Lane** [1] 125:4
**Large** [1] 5:12
**Last** [16] 25:24 35:22 42:15 50:7 57:7 65:17 65:18 84:25 92:4 99:7 102:19 124:8 150:2 154:12 154:14 156:10
**Lastly** [1] 148:2
**Late** [2] 165:1 165:2
**Latonya** [1] 162:11
**Law** [82] 3:19 3:21 14:1 15:1 20:4 24:15 34:1 35:24 36:10 36:12 39:9 45:11 46:12 46:23 47:3 47:5 47:7 47:8 47:12 47:12 47:14 47:16 49:1 21 50:18 50:19 55:2 57:11 68:18 68:22 74:7 75:11 75:23 75:24 78:6 80:13 80:14 81:6 81:6 81:6 81:22 83:18 91:24 92:8 100:13 100:13 117:2 119:1 119:6 119:9 119:16 119:25 120:17 120:19 120:20 120:22 120:23 121:4 121:22 122:13 123:9 128:12 128:23 129:4 129:4 129:6 129:7 130:1 133:20 136:7 136:7 136:10 137:7 137:10 137:16 138:24 138:25 143:4 146:5 146:11 152:14 160:11
**Laws** [2] 39:22 40:1
**Lawyer** [5] 50:22 82:5 82:16 120:4 135:9 135:10
**Lawyering** [1] 10:17
**Lawyers** [9] 40:8 102:7 112:5 112:6 112:9 141:15 152:24 157:14 157:17
**Laying** [2] 37:1 37:17
**Lead** [3] 51:14 93:23 103:16
**Leading** [2] 87:17 103:11
**League** [2] 92:23 106:2
**Learn** [1] 52:23

**Learned** [1] 113:9
**Learners** [1] 99:16
**Least** [9] 21:2 34:21 48:24 61:16 61:20 72:14 89:15 107:14 148:2
**Leave** [2] 32:23 154:8
**Leaving** [1] 156:2
**Led** [2] 87:17 94:13
**Left** [8] 49:22 112:14 151:13 155:3 155:14 155:16 156:9 157:15
**Leg** [1] 123:5
**Legal** [19] 7:9 26:25 27:1 27:2 27:10 27:10 28:2 28:3 29:6 31:10 31:11 33:24 51:18 57:19 64:20 77:1 82:25 83:2 86:22
**Legally** [2] 28:5 63:8
**Legislator** [1] 106:12
**Legislature** [2] 88:21 106:14
**Legitimate** [2] 32:15 33:7
**Lend** [1] 52:5
**Less** [1] 29:24
**Lessens** [1] 67:10
**Lesser** [2] 29:8 99:22
**Level** [9] 19:12 34:10 39:24 40:3 65:14 65:22 66:9 66:9 154:23
**Levels** [1] 62:21
**Lie** [1] 124:21
**Lies** [1] 124:5
**Life** [118] 5:18 8:18 9:4 9:21 12:7 12:19 12:22 13:5 13:9 17:14 18:12 19:14 20:20 20:25 21:3 21:10 23:2 23:13 24:8 24:9 24:14 24:14 25:24 26:12 26:14 26:24 27:10 29:5 29:16 29:22 30:15 30:24 31:10 31:13 31:15 32:7 32:11 40:25 42:13 43:18 43:18 47:18 48:14 48:15 51:15 51:16 52:5 53:16 54:1 56:1 56:7 57:10 61:16 61:19 61:20 65:1 66:17 66:20 67:6 75:1 75:3 76:3 76:25 79:16 82:25 83:4 83:9 84:22 84:24 86:6 86:14 86:19 87:9 87:16 88:20 89:1 94:3 96:8 96:13 97:1 98:15 98:25 99:22 99:25 100:4 100:6 100:19 100:19 100:24 100:19 100:24 101:5 106:21 107:2 107:3 108:4 121:13 122:12 122:19 123:24 131:6 134:7 134:15 145:23 143:18 144:8 144:10 146:22 146:25 147:5 148:8 148:12 148:20 149:18 149:19 154:23 165:4
**Lifestyle** [1] 104:19
**Lifetime** [1] 147:17
**Lightly** [2] 93:25 108:23
**Likely** [5] 15:7 62:1 65:5 96:5 96:9
**Likewise** [1] 153:20
**Limited** [1] 94:19
**Linda** [2] 162:10 162:23
**Line** [2] 76:2 158:4
**Lines** [3] 48:3 52:15 65:18
**List** [2] 160:10 161:10
**Listen** [10] 54:2 74:5 82:7 83:20 114:2 114:2 118:22 118:24 135:6 137:24
**Listened** [1] 78:10
**Listening** [3] 9:13 68:3 148:4
**Live** [6] 16:22 66:2 66:4 72:16 104:20 139:3 .
**Lived** [1] 30:15
**Lives** [8] 52:11 62:12 82:1 86:21 121:20 131:2 138:17 139:3

**Living** [1] 33:15
**Load** [1] 142:8
**Location** [3] 162:19 163:7 164:1
**Locked** [1] 111:17
**Logic** [2] 11:15 113:13
**Logical** [1] 113:17
**Look** [17] 13:17 13:18 55:22 56:11 56:14 65:11 65:17 66:21 67:22 76:16 86:9 93:3 98:7 98:18 99:5 100:5 109:4
**Looked** [2] 69:16 100:3
**Looking** [6] 22:2 57:9 69:1 87:23 98:16 109:1
**Lord** [1] 162:1
**Los** [1] 125:13
**Lose** [2] 17:11 104:7
**Lost** [2] 22:1 113:7
**Loud** [2] 158:7 158:8
**Loudly** [1] 158:1
**Love** [1] 30:22
**Loved** [1] 111:19
**Lump** [1] 58:16
**Lunch** [2] 165:2 165:3
**Lydia** [1] 164:5
**Lying** [1] 123:19
**Lyn** [5] 2:2 3:9 45:7 91:19 110:21

**M**

**Ma'am** [12] 91:19 101:9 111:1 111:6 150:22 150:25 151:18 155:11 156:10 158:12 164:12 164:21
**Machine** [2] 1:23 31:1
**Mad** [1] 75:3
**Magnitude** [1] 118:14
**Main** [1] 81:3
**Mamou** [13] 1:5 3:6 3:6 58:3 63:4 80:24 109:4 110:7 110:16 110:17 110:18 159:25 167:20
**Mamou's** [1] 58:17
**Man** [7] 31:13 73:9 96:6 96:12 96:23 96:24 102:12
**Man's** [1] 37:23
**Manner** [1] 76:5
**Manufacturing** [1] 139:24
**Maria** [1] 162:23
**Mark** [1] 61:3
**Marketing** [1] 139:24
**Married** [4] 30:22 60:15 101:21 101:25
**Mary** [1] 164:2
**Mason** [4] 125:6 125:11 125:12 128:17
**Mathews** [1] 162:24
**Matter** [18] 7:21 7:22 7:22 8:19 8:20 17:2 38:11 89:11 89:15 145:5 145:6 145:6 146:1 146:2 146:2 150:17 164:23
**Matthew** [1] 162:9
**Mature** [1] 56:3
**McClellan** [22] 2:2 3:9 45:2 45:4 45:6 45:7 58:8 71:8 71:9 71:11 81:3 82:23 90:18 91:13 91:14 91:18 91:19 109:24 109:25 110:21 111:4 159:19
**McClellan's** [1] 102:15
**Mean** [51] 5:13 14:2 14:3 14:4 14:5 14:6 14:8 14:9 14:11 15:9 18:3 18:4 34:25 40:9 42:5 42:24 44:4 50:20 51:5 56:24 60:9 65:3 74:23 76:14 79:21 79:25 87:2 89:11 93:7 93:21 93:24 94:14 94:24 95:7 95:8 96:18 99:25

101:5 103:13 104:3 104:7
108:23 121:25 122:15 147:25
152:12 156:17 161:6 161:7
161:8 162:4

**Meaning** [3] 33:11 61:16
117:21

**Means** [28] 11:22 12:19 14:
9 15:6 15:10 19:19 20:4 27:
1 27:3 36:3 36:5 51:25 61:
17 76:5 83:2 92:6 92:11 106:
4 112:25 124:12 124:21 132:
14 135:20 135:21 137:5 162:
6 165:2 165:10

**Meant** [1] 39:21

**Meat** [3] 142:3 142:4 142:5

**Mechanics** [1] 143:24

**Media** [1] 133:24

**Medical** [2] 17:18 109:17

**Meet** [2] 93:3 93:4

**Meetings** [1] 72:24

**Member** [3] 50:13 79:13
158:16

**Members** [2] 16:25 160:23

**Membership** [1] 106:5

**Memorize** [3] 5:25 6:5
117:8

**Memorizing** [1] 6:14

**Mental** [4] 22:5 55:13 97:
25 99:13

**Mentally** [1] 5:22

**Mention** [1] 69:17

**Mentioned** [4] 62:5 69:15
117:8 153:12

**Mercy** [1] 77:2

**Mess** [1] 162:1

**Michael** [1] 164:4

**Michka** [1] 163:10

**Middle** [2] 15:6 92:9

**Might** [49] 8:8 21:14 21:
15 21:20 21:25 22:6 22:7 22:
8 22:13 22:15 23:1 23:2 25:
22 30:15 30:17 36:24 39:17
46:24 62:25 66:7 67:9 78:20
78:21 85:8 85:11 103:5 103:
8 103:16 105:2 105:10 110:
14 114:19 116:12 116:12 116:
14 117:13 117:15 118:15 120:
8 120:10 132:8 133:22 134:2
136:2 136:14 147:13 147:23
148:8 149:22

**Mikle** [1] 162:25

**Military** [1] 59:18

**Mills** [2] 125:4 162:11

**Mind** [28] 33:8 36:18 41:21
42:21 43:20 45:19 46:23 56:
16 68:16 74:19 78:16 79:5
81:12 82:14 92:1 94:5 94:8
95:3 98:19 99:1 99:9 99:18
99:23 99:23 99:25 108:7 130:
17 147:18

**Mind's** [1] 147:22

**Minds** [2] 18:20 54:4

**Mine** [3] 61:7 70:23 73:1

**Minister** [1] 31:4

**Minnesota** [1] 125:25

**Minutes** [15] 11:1 39:12
39:15 80:25 81:20 102:9 125:
18 126:3 133:25 134:4 143:
14 152:24 157:21 165:10 165:
11

**Misdemeanor** [1] 93:6

**Misery** [1] 30:25

**Miss** [13] 3:10 70:14 71:12
80:23 81:20 87:7 91:9 101:
14 110:1 110:21 131:13 158:
11 158:14

**Missed** [1] 90:16

**Missing** [2] 46:18 49:18

**Mitigates** [2] 56:16 98:25

**Mitigating** [37] 8:17 20:
6 20:10 20:22 20:23 21:12

21:13 21:14 21:15 21:24 22:
7 22:14 23:7 23:9 23:11 51:
13 53:25 54:4 54:8 54:11 55:
22 55:25 66:22 68:9 68:12
87:14 87:19 89:17 98:14 98:
16 98:19 99:11 99:14 99:15
99:20 107:6 146:22

**Mitigation** [1] 53:23

**Mix** [1] 138:7

**Mom** [5] 101:16 139:11 142:
1 142:5 142:7

**Moment** [6] 52:20 58:2 87:
5 95:12 96:2 106:13

**Monday** [16] 40:2 153:4
153:10 153:15 153:20 154:5
154:11 154:25 155:1 156:13
156:16 162:7 162:20 163:18
163:25 164:8

**Month** [3] 24:18 24:18 50:9

**Months** [10] 123:14 125:9
126:20 126:24 127:1 127:4
127:6 127:10 127:12 127:15
145:16 149:13 149:22 150:7
150:13

**Morally** [1] 39:25

**Mores** [1] 104:23

**Morning** [19] 3:3 17:10 45:
25 46:5 63:15 69:6 69:25 71:
6 91:10 91:11 110:13 112:11
132:10 160:18 160:19 161:6
161:7 161:13 163:1

**Most** [14] 82:9 84:19 85:15
85:15 94:2 111:13 112:3 121:
5 121:18 124:25 129:21 129:
25 132:22 148:8

**Mother** [1] 73:1

**Motive** [1] 115:23

**Motor** [2] 43:3 43:3

**Move** [1] 31:18

**Moveable** [1] 38:21

**Moved** [2] 60:16 60:17

**Movement** [1] 88:16

**Multiple** [2] 8:8 34:2

**Murder** [132] 9:4 10:3 11:
24 12:1 12:7 13:14 18:23 22:
21 23:19 24:12 26:20 26:23
26:24 27:13 27:15 27:16 27:
18 27:22 27:24 28:4 28:7 28:
9 28:16 28:22 29:2 29:4 29:
10 29:10 29:14 29:17 29:20
30:7 31:9 31:21 31:23 31:25
32:19 32:20 32:21 38:3 40:
17 40:18 40:20 41:24 42:3
42:10 45:22 45:23 45:25 46:
2 46:10 46:14 46:17 46:18
46:19 46:21 46:25 47:1 51:5
51:17 51:23 51:25 51:25 54:
18 56:9 57:1 63:5 63:9 63:
20 63:21 64:13 67:6 67:16
73:15 73:15 74:23 75:7 75:7
75:9 75:11 75:14 75:17 75:
18 75:18 75:21 75:22 75:23
75:24 75:24 76:5 76:11 76:
13 76:23 76:24 76:24 77:9
77:15 78:15 78:19 79:10 79:
14 82:24 84:10 87:7 88:17
88:23 88:25 90:12 96:7 96:
13 96:14 96:25 97:2 97:13
99:4 99:17 103:1 103:6 106:
16 106:19 106:21 107:16 107:
19 111:16 120:14 123:12 134:
11 134:13 143:16 144:3 147:
3 147:4

**Murder-type** [1] 47:1

**Murdered** [2] 72:5 73:2

**Murders** [7] 15:21 16:3 16:
3 28:1 28:1 46:21 76:9

**Must** [14] 14:6 16:12 16:15
28:7 34:8 36:13 62:23 65:19
129:7 129:23 130:5 135:21
146:7 146:12

**N**

**Name** [15] 45:7 58:1 80:23

91:19 101:18 101:18 101:24
121:17 125:8 152:8 162:2
162:14 163:3 163:11 164:10

**Names** [3] 162:13 162:15
163:13

**Nasty** [2] 122:10 122:14

**Natural** [4] 25:24 138:16
138:18 143:8

**Nature** [1] 20:7

**Neatest** [1] 121:18

**Necessarily** [9] 18:20 18:
22 19:1 20:4 27:1 27:3 35:
13 115:14 121:25

**Necessary** [5] 95:25 128:
7 130:3 147:23 160:16

**Need** [7] 6:13 7:14 82:16
90:10 150:7 164:2 165:5

**Needed** [1] 156:15

**Needs** [2] 34:18 97:15

**Neglectful** [1] 100:24

**Neighbor** [1] 49:17

**Neighbors** [2] 16:25 85:9

**Never** [30] 7:23 9:1 9:7
17:23 18:24 19:3 19:22 22:
18 26:13 49:22 84:6 92:12
112:5 112:23 113:4 125:15
129:3 129:4 129:6 130:10
133:17 135:13 137:13 145:7
146:15 147:9 147:12 148:24
150:16 151:2

**New** [2] 12:5 42:22

**News** [3] 105:13 125:17 125:
18

**Newscast** [1] 125:19

**Newspaper** [2] 103:1 133:
24

**Next** [19] 3:6 23:10 24:4
44:1 50:9 59:16 70:19 93:7
109:14 113:24 121:17 140:5
152:11 153:15 154:25 156:13
156:25 157:13 163:6

**Nice** [2] 43:7 131:10

**Nicest** [1] 121:18

**Night** [5] 42:15 92:25 122:
6 125:17 125:24

**Nine** [2] 29:24 127:5

**Ninety** [1] 29:24

**Ninety-nine** [1] 29:24

**Nobody** [7] 37:24 84:9 100:
22 142:6 151:13 151:17 163:
18

**Nobody's** [2] 20:7 160:14

**Noe** [1] 163:8

**Nohemy** [1] 162:23

**Noise** [1] 158:2

**None** [1] 5:16

**Noon** [1] 165:2

**Normal** [2] 84:12 104:10

**Nothing** [10] 25:20 40:17
67:8 70:12 80:15 89:2 112:
13 118:20 121:20 163:23

**Notion** [2] 25:8 147:3 149:
20

**Nowhere** [1] 19:17

**Nuisance** [1] 30:5

**Number** [48] 8:1 10:7 10:9
20:5 23:20 23:21 28:17 28:
21 29:23 36:15 36:17 42:18
48:12 53:24 54:10 56:14 57:
2 59:7 60:24 62:25 64:23 66:
13 68:8 84:14 96:6 99:2 107:
17 107:25 108:5 108:9 108:
18 109:15 111:2 111:4 150:
20 150:22 151:11 151:19 151:
22 151:25 155:8 155:21 156:
1 157:6 160:14 160:14 162:
3 162:3

**Numbered** [2] 1:20 167:6

**Numbers** [6] 5:14 109:15
123:15 145:1 159:17 161:22

**O**

**O'clock** [3] 17:10 122:6
142:1

**Oath** [3] 47:7 47:14 114:22

**Object** [2] 38:18 38:21

**Objection** [5] 82:21 109:
24 149:14 150:8 150:15

**Obligated** [5] 15:16 25:5
28:15 29:1 149:1

**Obligation** [12] 28:19 41:
9 41:12 95:5 135:18 135:23
135:24 135:25 141:8 142:13
142:16 142:18

**Observations** [1] 124:22

**Obtain** [3] 15:13 28:6 128:
24

**Obviously** [13] 4:1 12:2
14:21 21:1 38:19 50:12 55:9
71:12 81:2 97:3 118:12 136:
4 152:18

**Occupation** [2] 109:18
119:23

**Occupied** [1] 50:25

**Occur** [3] 28:13 36:3 87:21

**Occurred** [6] 22:20 35:16
48:1 95:18 123:13 167:7

**Occurrence** [1] 128:7

**Occurs** [1] 67:18

**October** [8] 71:17 71:17
154:11 154:14 154:15 155:2
155:13 155:19

**Off-the-record** [1] 159:2

**Offense** [23] 8:3 21:9 29:
8 29:8 29:9 29:9 66:23 67:3
75:15 86:13 88:8 93:8 96:15
103:11 115:20 120:13 122:8
123:12 127:12 131:22 138:23
143:16 145:13

**Offer** [1] 106:25

**Office** [4] 50:2 50:12 50:
13 50:13

**Officer** [9] 74:6 76:2 120:
19 121:4 121:5 121:23 122:7
122:14 122:20

**Officers** [10] 74:4 74:5
74:10 120:16 120:17 120:17
120:20 120:24 126:23 127:3

**Official** [3] 167:3 167:
12 167:17

**Official/Deputy** [1]
167:3

**Often** [5] 16:23 76:20 78:
18 80:5 123:22

**Oftentimes** [2] 86:2 103:2

**Old** [13] 21:21 30:22 31:13
49:13 55:24 96:7 96:12 96:
24 96:25 125:6 139:6 139:8
147:12

**Older** [3] 48:8 56:2 140:14

**Once** [4] 11:25 17:14 62:12
152:21

**One** [159] 4:15 13:2 18:16
19:24 21:15 23:20 25:22 27:
15 27:25 28:1 28:3 28:13 31:
5 32:1 33:6 34:5 35:22 36:
19 37:12 39:21 41:13 41:18
41:19 42:22 42:25 48:21 49:
9 49:15 49:17 49:20 50:14
51:11 52:1 53:23 54:7 56:10
57:2 58:15 58:17 58:19 59:7
59:20 60:20 62:9 63:8 63:16
63:17 63:18 64:23 65:16 65:
25 66:22 67:2 68:7 69:20 71:
12 72:5 75:19 75:20 76:1 76:
7 76:8 76:9 76:10 76:17 77:
2 80:5 82:4 82:5 84:14 84:
15 85:24 86:11 86:21 88:13
88:22 89:9 89:10 89:11 89:
16 92:11 92:15 92:25 93:5
93:5 95:11 96:11 96:25 102:
11 102:16 104:20 105:25 106:
18 106:22 106:24 107:1 107:

17 107:25 108:9 108:25 117:
8 112:3 112:10 115:23 115:
24 116:11 116:12 117:24 117:
25 118:2 118:4 119:12 120:
12 121:12 124:2 124:9 125:
24 128:17 131:8 131:16 131:
19 134:15 135:15 138:17 139:
17 139:17 140:23 141:21 142:
5 142:5 142:6 143:17 143:17
143:18 146:17 146:18 148:8
148:19 150:6 151:18 152:19
152:19 153:13 154:13 154:13
154:24 159:15 161:5 161:25
162:14 163:14 163:16 163:17
163:18 165:17

**One's** [2] 8:10 35:4
**One-on-one** [1] 93:5
**Ones** [3] 93:14 111:19 120:
25
**Open** [5] 79:5 96:21 105:1
108:6 167:7
**Open-mindedly** [1] 109:3
**Operate** [1] 105:7
**Operates** [1] 57:13
**Opinion** [9] 45:15 48:21
50:11 57:14 57:19 60:3 93:
20 105:14 113:7
**Opinions** [6] 47:11 47:15
56:13 78:12 91:23 99:6
**Opportunity** [2] 81:11
108:22
**Opposed** [9] 45:23 47:19
51:15 52:6 54:1 56:18 57:11
98:15 99:22
**Option** [7] 32:16 33:7 42:
11 88:19 107:5 146:6 146:12
**Options** [3] 13:10 89:3 89:
6
**Order** [12] 8:25 11:7 12:
14 12:16 12:18 15:13 28:6
128:24 146:19 146:11 146:25
160:13
**Ordering** [1] 78:3
**Ordinarily** [7] 54:9 54:
12 56:2 132:10 153:18 153:
17 154:7
**Ordinary** [1] 152:16
**Otherwise** [2] 59:9 90:13
**Ought** [27] 8:22 19:13 23:
12 31:15 46:9 46:21 53:11
53:14 54:1 54:13 54:22 55:
19 56:7 74:20 78:23 80:10
94:7 95:24 99:21 100:10 130:
20 130:21 146:16 146:17 157:
19 162:4 162:6
**Ourselves** [1] 136:3
**Outcome** [3] 28:17 28:21
83:8
**Outset** [1] 154:17
**Outside** [3] 61:11 105:24
163:1
**Overcome** [4] 100:24 101:
8 102:19 149:16
**Overcomes** [1] 130:15
**Overlap** [1] 102:1
**Override** [1] 149:23
**Overview** [4] 6:15 6:15
114:19 148:19
**Own** [17] 22:24 45:15 55:6
58:18 58:25 61:6 68:25 83:1
85:22 93:19 96:8 96:13 97:1
121:13 129:21 129:25 137:10

## P

**Page** [1] 96:2
**Paid** [1] 167:11
**Pallbearer** [1] 113:20
**Pamela** [2] 167:3 167:16
**Panel** [10] 3:1 109:14 109:
10 110:12 110:18 153:22 153:
23 154:6 159:6 160:23
**Panel's** [1] 160:4
**Panelists** [1] 159:7

**Panels** [1] 49:15
**Paper** [2] 9:3 125:10
**Paragraph** [1] 51:24
**Paraphrasing** [1] 14:17
**Pardons** [3] 25:1 25:2 25:4
**Parent** [1] 50:3
**Parents** [2] 93:16 93:17
**Parole** [10] 24:16 24:16
24:23 25:6 25:18 25:20 25:
21 25:23 26:4 61:22
**Paroled** [1] 26:12
**Paroles** [3] 25:2 25:2 25:4
**Parrish** [1] 164:6
**Part** [20] 3:23 5:2 8:12 13:
4 17:17 56:4 63:24 67:2 69:
3 71:1 81:13 94:15 96:16 97:
15 104:15 106:7 115:1 144:
14 145:14 145:18
**Participate** [2] 77:25 78:
5
**Particular** [8] 21:17 68:
21 88:15 126:22 128:12 135:
13 148:10 159:6
**Particularly** [2] 21:23
112:7
**Parties** [6] 4:15 115:23
159:5 159:17 167:6 167:9
**Parts** [3] 3:23 33:17 115:1
**Pass** [3] 57:22 80:18 101:10
**Passed** [3] 37:6 132:4 154:
20
**Passing** [1] 37:2
**Past** [3] 42:18 122:19 153:8
**Patio** [1] 49:10
**Patricia** [1] 164:3
**Pattern** [1] 94:14
**Paul** [1] 125:25
**Pay** [3] 96:8 96:13 96:25
**Paying** [1] 161:23
**Peace** [1] 31:3
**Peculiar** [1] 10:17
**Peer** [2] 100:21 133:1
**Pen** [1] 33:2
**Penalty** [30] 19:13 42:5
45:16 47:19 51:6 57:5 61:19
65:7 66:19 68:11 74:16 74:
20 75:11 77:16 77:22 86:19
87:10 88:20 92:7 93:20 94:7
95:7 97:2 97:14 106:16 108:
2 148:25 150:14 150:16 152:
13
**Penitentiary** [10] 12:8
17:15 17:19 17:17 25:25 29:22
29:23 32:11 47:23 48:11
**People** [86] 6:20 9:17 10:
12 12:6 16:25 17:1 17:2 17:
17 30:10 30:11 30:12 34:1
34:2 37:11 38:3 46:9 46:19
46:20 52:1 54:16 54:20 55:9
55:10 55:11 55:22 56:11 56:
25 58:16 59:20 61:1 61:5 61:
10 61:13 62:22 75:19 76:1
76:17 77:14 77:21 77:24 83:
15 84:8 90:1 92:17 93:13 95:
1 97:10 99:3 99:5 99:16 100:
8 100:21 102:11 102:11 102:
19 103:1 103:4 104:8 104:9
104:10 104:13 106:18 106:20
110:25 113:15 115:5 125:14
130:19 133:3 133:4 133:8
133:9 146:18 157:24 159:9
159:10 159:11 161:16 162:9
163:1 165:23
**People's** [2] 86:21 159:17
**Percent** [2] 117:24 118:2
**Perception** [1] 128:12
**Perfectly** [5] 5:11 26:1
138:15 138:18 143:8
**Performing** [1] 62:19
**Perhaps** [10] 13:18 30:7

136:19 136:20 140:13 145:22
**Period** [5] 47:18 58:4 61:
11 61:23 123:24
**Peripherally** [1] 104:25
**Permit** [2] 119:16 150:16
**Permits** [1] 14:1
**Perry** [4] 125:6 125:11
125:12 128:17
**Person** [89] 5:4 7:13 11:
25 21:21 21:25 22:1 24:24
25:6 25:19 25:23 26:11 29:
13 29:16 29:20 29:21 50:19
51:6 51:16 52:4 52:24 53:3
53:4 53:6 54:1 55:23 55:23
55:24 56:7 56:17 57:4 58:23
62:11 62:13 62:22 63:15 63:
8 66:20 74:24 74:25 76:21
77:9 77:19 78:14 78:19 79:7
79:16 81:21 83:17 83:23 86:
5 86:14 86:18 86:21 87:16
87:18 87:23 88:20 88:23 95:
19 95:24 96:6 96:12 96:18
96:22 96:23 97:11 97:13 98:
3 98:10 99:11 104:5 105:5
107:19 108:5 115:13 122:10
118:24 129:22 133:6 136:1
143:15 143:15 146:22 158:1
160:21
**Person's** [23] 41:8 41:10
51:18 55:12 67:6 67:10 67:
20 76:3 76:25 82:25 86:7 86:
14 100:4 101:5 123:3 128:15
128:19 129:2 129:3 129:8
130:9 142:12 142:14
**Personal** [17] 8:6 8:7 22:
24 43:18 47:15 53:8 61:7 61:
8 66:24 68:5 78:12 78:13 81:
15 87:4 87:13 90:20 145:16
**Personalities** [1] 5:13
**Personality** [1] 108:24
**Personally** [2] 81:11 100:
20
**Personnel** [1] 17:18
**Persons** [2] 15:25 16:4
**Perspective** [8] 81:2 81:
14 81:14 86:3 86:16 86:17
102:16 124:22
**Persuades** [1] 6:23
**Phase** [42] 4:8 4:9 4:17 4:
18 4:22 5:6 6:20 7:11 8:4
10:2 11:9 11:12 11:16 11:24
12:20 12:21 20:15 20:15 32:
2 32:5 32:7 32:22 39:20 40:
19 41:25 63:12 64:17 115:7
115:19 115:10 115:15 115:19
116:1 116:1 116:5 116:17
116:21 116:22 116:25 143:25
144:4 144:17
**Phases** [2] 115:16 116:20
**Philosophical** [4] 149:
13 149:22 150:7 150:13
**Phone** [4] 2:9 2:16 2:21
72:22
**Phrase** [5] 11:2 11:21 19:
18 87:25 128:19
**Phrased** [1] 20:17
**Physical** [1] 34:14
**Pick** [3] 68:18 131:1 131:8
**Picked** [2] 71:13 92:15
**Picking** [1] 152:15
**Pie** [2] 29:13 29:13
**Piece** [9] 17:3 17:5 17:21
29:12 78:16 78:16 78:16 142:
4 157:25
**Pieces** [2] 142:3 142:5
**Pile** [2] 24:1 144:13
**Pinned** [1] 80:6
**Place** [12] 12:5 18:25 19:
14 83:17 102:5 103:20 113:
20 115:25 118:25 124:18 135:
12 135:13
**Placed** [3] 38:15 38:17

**Places** [2] 18:4 134:21
**Planned** [1] 52:21
**Platter** [3] 142:2 142:3
142:7
**Play** [23] 3:14 3:16 6:7 8:
7 10:5 10:20 18:15 26:6 29:
18 35:20 39:22 40:5 78:16
81:13 103:10 114:11 114:13
114:16 114:21 114:23 117:10
117:13 126:4
**Pleased** [1] 165:21
**Plug** [1] 31:2 31:6
**Plus** [3] 46:2 46:19 75:14
**Point** [20] 6:1 9:19 9:19
12:25 14:24 17:13 40:13 40:
9 43:9 48:16 64:2 66:14 68:
12 68:21 68:24 124:19 130:8
132:6 132:20 142:17
**Points** [2] 23:24 137:8
**Police** [16] 37:21 37:21
41:4 74:4 74:5 74:6 74:10
76:2 120:16 120:17 120:18
121:4 122:7 122:20 126:23
127:3
**Political** [1] 25:11
**Pool** [2] 153:22 153:23
**Poor** [4] 35:5 55:18 68:2
100:21
**Pops** [1] 12:5
**Porch** [1] 49:10 49:12
**Portion** [3] 4:3 4:5 154:15
**Portions** [1] 167:5
**Position** [1] 154:20
**Positive** [1] 60:23
**Possess** [4] 5:1 5:3 120:9
122:25
**Possession** [1] 48:18
**Possibilities** [1] 13:10
**Possibility** [15] 14:6 14:
19 14:23 15:10 17:22 17:23
18:14 29:2 29:3 29:19 43:25
69:15 84:23 100:3 138:3
**Possible** [27] 7:23 8:21
14:21 14:24 26:2 28:13 28:
13 28:17 28:21 38:25 39:22
66:8 88:7 103:23 129:14 132:
8 143:17 143:18 143:18 145:
8 146:3 148:22 149:1 149:15
150:9 152:14 165:1
**Possibly** [16] 14:7 14:7
24:4 46:14 48:2 52:10 52:14
63:9 63:19 68:23 124:1 126:
25 127:9 132:18 134:13 134:22
**Postponed** [1] 50:9
**Postpones** [1] 50:10
**Potentially** [1] 83:19
**Prayed** [1] 31:3
**Preacher** [2] 140:3 140:22
**Precinct** [1] 73:25
**Precise** [1] 5:20
**Precisely** [3] 145:3 148:
4 148:5
**Preciseness** [1] 143:22
**Preconceived** [2] 40:10
80:10
**Prefer** [2] 89:7 89:20
**Premeditated** [2] 86:12
95:14
**Preparation** [1] 167:11
**Preplanned** [1] 95:14
**Preposterous** [1] 17:15
**Present** [13] 3:9 7:8 13:5
15:22 86:17 94:21 94:23 113:
11 117:3 127:7 135:21 135:
22 138:5
**Presentation** [1] 105:16
**Presented** [13] 4:6 4:7
25:18 36:8 85:19 87:1 103:2
105:1 114:14 130:14 136:14
142:19 146:20

**Presenting** [1] 50:16

**Presents** [6] 136:1 136:16 136:23 136:24 138:4 141:10

**President** [2] 140:5 141:1

**Presiding** [2] 1:21 24:3

**Presume** [1] 43:5

**Presumed** [2] 12:6 137:18

**Presumption** [12] 12:1 12:4 12:5 12:5 13:3 13:4 130:15 137:12 137:13 137:14 137:16 137:21

**Preteen** [1] 60:16

**Pretty** [15] 5:20 5:20 49:6 50:24 65:10 66:7 78:17 78:24 90:17 102:5 106:9 111:14 134:13 150:3 165:21

**Prevented** [1] 161:1

**Previous** [3] 37:20 94:13 109:22

**Prime** [1] 105:13

**Principal** [1] 120:1

**Print** [2] 38:20 38:22

**Prison** [15] 24:24 60:1 60:21 60:25 61:4 61:10 61:13 61:14 87:9 88:20 89:1 105:6 105:9 105:16 106:22

**Prisoners** [1] 105:22

**Private** [1] 112:5

**Probability** [22] 7:19 13:23 13:23 13:25 14:2 14:5 14:13 15:6 15:6 15:9 15:11 15:15:11 15:11 15:7 64:22 64:24 65:2 98:11 107:20 129:5 144:23

**Probable** [1] 14:9

**Probation** [2] 92:19 101:23

**Problem** [11] 35:5 46:6 56:22 57:15 72:1 95:5 97:6 100:7 156:1 157:4 163:24

**Problems** [4] 43:15 56:23 68:17 76:20

**Proceed** [2] 84:6 84:12

**Proceedings** [4] 1:19 1:22 167:5 167:9

**Process** [21] 26:7 58:13 68:25 70:20 71:1 71:3 78:1 78:5 78:11 84:14 88:16 90:3 90:5 92:21 94:15 94:21 107:1 111:11 114:1 125:1 131:9

**Processes** [1] 80:2

**Produce** [1] 139:19

**Product** [2] 112:19 112:21

**Products** [1] 81:25

**Professional** [2] 43:18 50:18

**Progressively** [1] 107:24

**Projects** [1] 156:13

**Proof** [7] 36:6 64:18 94:22 129:22 129:23 130:3 130:6

**Proper** [4] 32:8 74:16 77:22 92:8

**Property** [3] 16:1 16:5 16:8

**Prosecuted** [2] 72:12 73:8

**Prosecution** [4] 84:11 88:17 129:13 129:16

**Prosecutor** [2] 80:18 125:7

**Prosecutors** [2] 13:5 82:12

**Prospect** [1] 89:6

**Prospective** [8] 3:4 69:8 79:10 83:12 84:18 87:23 90:22 110:15

**Protect** [1] 17:23

**Prove** [58] 11:7 11:10 11:22 11:12 11:13 14:15 14:19 15:2 15:14 15:16 15:20 16:12 19:20 19:23 19:25 20:2

**Presiding** ... 28:7 28:11 28:18 28:22 29:1 34:17 41:8 41:10 75:20 84:3 96:20 128:14 128:25 129:1 129:3 129:7 129:14 129:15 130:9 130:10 130:21 131:23 132:16 133:16 133:17 135:19 135:20 135:24 135:24 137:4 138:25 139:1 140:16 140:20 141:7 141:7 141:9 142:12 142:14 143:1 143:2

**Proved** [4] 31:25 117:19 138:8 140:14

**Proves** [2] 7:4 136:18

**Proving** [7] 6:25 128:15 133:4 133:9 133:10 133:11 141:5

**Pry** [1] 81:19

**PTO** [2] 140:5 141:1

**Public** [1] 73:21

**Pull** [2] 31:2 35:1

**Pulled** [3] 53:3 122:7 122:20

**Pulls** [1] 31:6

**Punch** [1] 158:4

**Punches** [1] 17:9

**Punish** [1] 115:5

**Punished** [2] 29:21 88:4

**Punishment** [41] 12:7 29:14 32:4 32:9 32:11 33:1 33:10 33:18 33:19 33:21 46:15 53:11 53:14 62:6 74:16 74:21 76:15 77:23 78:23 80:10 82:9 95:24 97:20 97:22 98:3 99:22 106:19 106:21 107:25 115:12 115:15 116:23 147:2 148:22 148:23 149:1 149:15 150:9 150:11 150:17 152:14

**Punishments** [4] 61:19 143:17 143:18 143:19

**Purely** [1] 38:3

**Purpose** [9] 9:24 26:17 30:3 39:20 82:9 82:12 109:13 115:16 144:15

**Purposes** [10] 6:16 7:12 8:16 13:19 66:16 132:12 134:8 134:18 153:22 165:8

**Put** [13] 20:7 24:19 38:20 38:22 41:1 49:11 57:20 62:20 66:1 81:1 87:3 124:24 138:6

**Putting** [1] 165:8

**Quality** [11] 6:22 7:3 7:3 7:7 12:3 12:22 120:7 121:7 122:24 138:1 143:9

**Quarrel** [4] 123:8 128:11 133:19 143:3

**Questionnaire** [17] 45:10 50:6 59:2 69:16 69:17 69:24 70:1 72:4 74:14 74:15 81:1 91:24 92:2 96:1 104:5 111:14 158:15

**Questions** [58] 5:5 7:14 7:15 7:16 8:24 9:1 9:2 9:7 9:25 10:1 10:23 10:25 12:16 12:25 18:16 18:24 23:16 23:16 23:16 24:2 24:7 24:13 25:16 26:14 26:19 33:21 39:10 44:23 59:7 64:7 69:13 71:4 71:5 77:5 88:19 90:7 91:9 91:25 92:4 98:6 102:15 104:5 109:14 144:18 144:14 146:20 146:10 146:19 147:9 148:14 148:21 149:11 149:16 149:25 162:14 164:9 164:20 165:25

**Quick** [1] 33:22

**Quickly** [5] 39:14 39:16 44:16 68:19 86:13

**Quite** [3] 16:23 55:11 66:14

**Race** [2] 74:11 120:24

**Raised** [2] 117:2 119:2

**Raises** [1] 91:25

**Raising** [3] 79:22 80:4 116:9

**Range** [2] 29:14 30:5

**Rapes** [1] 16:3

**Rate** [2] 124:25 126:16

**Rather** [2] 86:19 89:5

**Reach** [5] 32:14 33:5 40:11 41:16 119:8

**Reached** [1] 134:20

**React** [4] 114:2 114:4 116:12 116:14

**Reaction** [2] 87:24 102:22

**Read** [3] 96:11 102:25 125:9

**Reading** [2] 74:14 82:5

**Ready** [2] 117:9 140:4

**Real** [8] 63:3 64:25 65:8 85:5 85:6 94:14 113:24 125:8

**Reality** [1] 31:8

**Realized** [1] 84:25

**Realizing** [1] 85:2

**Really** [23] 10:14 19:9 19:9 39:7 48:22 59:20 62:24 64:15 66:8 69:5 81:20 85:5 92:9 94:16 108:10 113:21 113:18 113:22 119:15 125:23 134:18 139:25 165:20

**Realtor** [1] 134:25

**Reapplies** [1] 17:15

**Reason** [34] 4:15 5:11 5:18 6:4 8:11 9:8 10:14 13:14 13:14 20:18 20:24 21:12 57:16 60:20 68:7 70:8 70:9 75:7 10 83:11 98:13 111:21 113:7 119:24 116:10 117:7 117:7 119:24 120:22 121:11 123:7 126:6 129:18 130:25 134:2

**Reasonable** [51] 6:23 7:4 7:18 11:3 11:4 11:22 12:11 13:22 16:12 19:19 27:22 28:7 28:12 28:18 28:23 34:17 36:18 37:9 38:1 38:6 39:3 39:6 41:9 41:11 64:19 67:5 84:3 86:20 97:17 107:16 129:5 129:8 129:10 129:15 129:17 129:20 129:23 130:2 130:1 130:13 133:16 136:19 138:9 140:21 140:21 141:18 141:1 143:1 143:12 142:15 144:22 145:1

**Reasonably** [1] 68:19

**Reasons** [8] 54:1 56:17 58:7 62:25 87:5 98:13 99:20 159:10

**Receive** [13] 54:1 56:17 66:20 86:19 87:9 88:20 93:1 95:24 98:4 98:14 99:21 134:15 143:16

**Received** [2] 118:25 132:2

**Receives** [1] 51:6

**Recent** [1] 70:1

**Recently** [1] 49:13

**Recognize** [2] 112:9 120:23

**Recollect** [1] 47:21

**Recollection** [1] 131:3

**Recommendations** [2] 25:5 25:10

**Record** [6] 1:1 109:13 109:16 167:6 167:8 167:11

**Recovering** [1] 48:21

**Recovers** [1] 48:22

**Red** [1] 90:10

**Reduce** [1] 20:24

**Reeves** [1] 164:7

**Refer** [2] 53:25 87:24

**Referee** [1] 125:4

**Referred** [1] 93:12

**Reflect** [1] 109:17

**Reflects** [1] 167:9

**Refuse** [2] 32:15 39:4

**Regard** [1] 108:9

**Regardless** [2] 54:13 56:8

**Regards** [2] 67:20 101:1

**Regular** [1] 92:14

**Rehabilitation** [1] 17:22

**Reinforce** [1] 40:1

**Reject** [1] 122:23

**Related** [1] 101:20

**Relates** [1] 88:16

**Relationship** [2] 4:14 115:22

**Relatives** [1] 111:3

**Relax** [1] 91:21

**Released** [1] 48:7

**Relevant** [1] 97:22

**Religious** [4] 149:13 149:22 150:7 150:12

**Rely** [3] 107:9 107:14 129:24

**Remainder** [1] 153:8

**Remarkably** [6] 4:7 4:9 23:25 29:15 115:16 115:17

**Remember** [4] 92:24 125:6 131:7 131:24

**Remind** [1] 3:3

**Remorse** [1] 53:7

**Remorseful** [1] 95:19

**Render** [1] 47:8

**Repeat** [1] 65:16

**Repeating** [1] 38:10

**Rephrase** [1] 69:2

**Replace** [4] 20:20 23:13 140:2 140:22

**Reported** [3] 1:22 9:3 167:7

**Reporter** [2] 167:3 167:17

**Reporter's** [4] 1:1 167:6 167:8 167:11

**Reprehensible** [1] 67:15

**Represent** [3] 45:8 80:24 91:20

**Representative** [1] 88:15

**Representatives** [1] 88:14

**Represented** [3] 3:8 110:18 110:20

**Representing** [3] 88:6 90:11 106:13

**Request** [3] 110:9 158:8 160:1

**Requested** [1] 167:5

**Require** [7] 16:7 81:7 81:23 85:17 137:7 137:10 138:24

**Required** [14] 12:11 14:15:2 15:14 15:19 20:7 28:11 94:21 94:23 128:14 129:13 129:14 131:18 163:20

**Requirement** [2] 20:8 94:25

**Requires** [5] 26:23 130:1 139:1

**Residence** [1] 126:22

**Resistance** [1] 108:7

**Respect** [1] 121:21

**Respective** [1] 167:9

**Response** [4] 102:19 103:7 138:16 138:18

**Responsibility** [7] 8:7 51:9 64:22 82:14 96:17 128:15 145:17

**Responsible** [10] 54:13 54:22 55:8 55:19 56:7 83:18

96:18 96:19 100:10 100:14

**Rest** [3] 25:24 122:15 136:23

**Rests** [2] 136:15 138:4

**Result** [10] 28:13 32:14 33:5 40:10 41:16 52:21 73:14 78:2 95:13 118:25

**Results** [2] 28:13 148:7

**Retardation** [2] 22:5 22:9

**Retarded** [2] 112:10 22:11

**Retire** [1] 44:15

**Retired** [1] 106:4 140:3

**Retiring** [1] 140:23

**Retribution** [1] 82:10

**Return** [2] 114:5 142:16

**Returned** [1] 131:20

**Review** [1] 20:9

**Rhodes** [1] 15:4

**Ride** [1] 33:9

**Ridiculous** [1] 103:9

**Ring** [1] 125:4

**Rips** [1] 140:11

**Rise** [2] 19:12 66:9

**Rises** [4] 34:10 39:23 40:3 154:23

**Rita** [1] 163:9

**Road** [4] 40:12 49:16 56:11 158:9

**Roam** [1] 30:18

**Rob** [1] 34:24

**Robber** [1] 35:1

**Robberies** [1] 16:3

**Robbery** [6] 35:2 35:15 35:18 48:3 67:17 75:24

**Robbing** [1] 67:13

**Robert** [1] 164:4

**Roger** [1] 164:2

**Roland** [1] 163:9

**Role** [1] 103:10

**Room** [14] 6:10 26:10 30:18 31:18 67:13 67:17 109:20 111:18 117:5 117:11 121:12 121:13 139:16 157:23

**Rooms** [1] 9:15

**Round** [2] 123:15 144:25

**Row** [22] 150:18 151:8 151:10 151:13 151:17 151:18 151:18 151:24 152:4 152:2 155:3 155:11 155:14 155:15 155:16 156:8 156:9 156:10 156:10 156:21 156:22 156:23

**Rude** [2] 122:10 122:14

**Rule** [8] 26:18 36:14 40:4 119:12 119:14 119:15 119:16 133:3

**Rules** [25] 3:13 3:15 6:6 6:8 10:5 39:22 66:3 66:3 66:4 66:7 84:11 104:8 104:11 104:23 107:5 114:11 114:15 114:15 114:20 114:22 117:10 117:11 117:13 126:4 126:7

**Run** [3] 76:20 91:6 119:19

**Runs** [1] 35:2

## S

**Safety** [1] 22:25

**Salesman** [2] 43:2 120:4

**Salesmen** [1] 134:23

**San** [1] 167:18

**Satisfied** [3] 19:9 67:4 145:1

**Satisfies** [1] 133:13

**Satisfy** [2] 19:11 130:4

**Save** [1] 139:22

**Saved** [1] 22:23

**Saving** [1] 139:12

**Saw** [11] 22:22 36:3 36:22

37:7 37:20 37:21 44:14 48:1 58:11 61:26:11 61:26 61:7 24 124:3 124:10 124:20

**SBOT** [4] 2:3 2:5 2:13 2:18

**Scale** [1] 33:10

**Scars** [1] 101:2

**Scenario** [3] 76:11 78:15 88:6

**Scheduled** [5] 93:2 155:12 155:19 156:7 156:14

**Scholar** [1] 15:4

**School** [10] 10:20 17:7 17:8 39:10 55:10 62:17 63:1 97:13 120:1 161:21

**Screen** [1] 49:15

**Screened-in** [1] 49:10

**Screening** [1] 92:21

**Screwed** [1] 22:18

**Search** [3] 23:6 56:22 57:9

**Searching** [1] 49:19

**Seat** [2] 159:1 164:18

**Seated** [3] 3:1 3:6 110:12

**Second** [75] 4:3 4:5 4:18 4:22 5:6 6:4 7:11 8:13 10:2 11:9 11:16 11:24 12:21 18:9 18:18 18:19 18:21 19:3 19:5 19:7 19:15 19:17 19:18 20:1 20:3 20:8 20:12 20:15 21:13 22:8 26:21 31:20 32:3 32:5 32:7 32:22 40:6 40:19 40:22 41:25 42:7 43:12 51:24 63:12 64:17 84:6 89:10 89:16 107:1 111:12 115:7 115:10 116:1 116:5 116:16 116:22 117:25 130:23 132:1 137:1 144:4 144:12 144:17 145:11 145:18 145:19 146:5 151:8 151:10 153:11 154:16 155:14 155:15 156:23 158:12

**Secondly** [4] 19:1 38:16 137:11 146:21

**Seconds** [2] 111:10 124:8

**Secret** [3] 131:16 131:18 131:19

**See** [59] 8:14 9:2 11:21 14:17 14:25 17:3 19:18 20:10 20:11 23:6 23:17 27:20 30:17 33:10 33:22 35:16 37:3 37:7 37:8 37:18 37:25 39:23 42:12 54:3 56:11 56:15 57:9 58:15 59:17 64:10 69:17 70:24 82:6 86:10 87:4 87:22 88:11 93:5 94:14 99:4 99:17 105:15 124:13 124:14 124:15 124:16 127:18 140:4 143:8 145:5 146:14 146:21 155:3 155:14 155:15 155:16 156:9 161:7 165:11

**Sees** [4] 37:12 37:12 37:16 37:19

**Segregation** [1] 105:19

**Select** [1] 131:8

**Selected** [2] 109:19 128:8

**Selecting** [1] 111:12

**Self** [6] 27:2 28:4 51:19 67:7 83:11 161:24

**Self-defeating** [1] 161:24

**Self-defense** [7] 27:2 27:2 28:4 51:19 67:7 83:11 84:5

**Selling** [1] 104:6

**Sense** [12] 24:5 33:24 42:19 56:25 64:14 95:2 113:17 113:25 119:15 119:18 129:12 129:18

**Sent** [1] 25:1

**Sentence** [64] 8:18 8:19 9:4 9:5 9:20 9:22 12:14 12:19 12:22 13:7 18:12 18:15 19:14 20:19 20:21 20:24 21:1 21:22 22:23 23:2 23:14 24:8 24:10 24:14 24:16 24:17 26:12 26:14 31:13 31:15 32:7 40:25 41:1 42:13

42:14 42:18 50:1 61:1 61:2 61:7 21 66:20 86:19 88:24 89:1 93:23 98:25 134:15 134:15 145:23 145:25 146:7 146:12 146:18 148:25 147:5 147:7 148:12 148:13 148:20 148:20 148:22 149:12 149:18 149:19

**Sentenced** [2] 19:7 86:5

**Sentences** [1] 65:17

**Sentencing** [3] 13:10 32:16 33:7

**Separate** [3] 9:15 64:6 101:24

**Separation** [1] 60:17

**September** [8] 1:18 70:19 131:21 131:25 132:12 153:25 162:21 164:8

**Sequential** [1] 160:13

**Sequentially** [1] 161:20

**Series** [2] 87:20 92:4

**Serious** [8] 65:14 65:19 84:19 85:2 85:17 93:21 94:3 96:15

**Serve** [4] 70:9 88:12 108:20 134:11

**Served** [3] 24:17 60:1 113:5

**Service** [7] 3:4 48:1 48:7 92:23 110:15 113:3 131:15

**Serving** [1] 59:24 81:22

**Session** [1] 88:22

**Sessions** [3] 131:17 131:18 131:19

**Set** [13] 30:8 46:7 47:14 49:11 50:4 57:17 67:15 78:11 97:4 97:7 104:8 104:12 159:18

**Sets** [3] 49:5 74:24 92:5

**Setting** [1] 66:2

**Seven** [3] 72:11 142:2 142:5

**Seventeen** [4] 21:18 21:21 60:15 147:12

**Seventeen-year-old** [1] 147:12

**Seventy** [3] 30:21 31:13 140:19

**Seventy-five** [2] 30:21 139:20

**Seventy-five-cent** [1] 140:19

**Seventy-five-year-old** [1] 31:13

**Several** [3] 50:10 72:23 134:25

**Severe** [1] 94:10

**Severely** [1] 22:9

**Severity** [1] 101:6

**Sexual** [4] 75:25 78:23 78:24 131:22

**Shadow** [2] 128:19 129:1

**Shadows** [1] 128:20

**Shaking** [1] 43:8

**Shall** [4] 88:24 89:1 106:19 106:21

**Share** [1] 91:22

**Shared** [1] 48:17

**Sharing** [1] 44:13

**Shepherd** [2] 109:20 109:22

**Sheriff** [3] 131:11 131:14 132:3

**Sheriffs** [1] 120:18

**Shift** [2] 4:20 116:2

**Shoes** [1] 41:2

**Shoot** [3] 27:7 37:3 37:24

**Shooting** [2] 77:3 95:17

**Shop** [3] 134:21 134:24 136:10

**Shoplifting** [1] 93:5

**Shopping** [1] 135:3

**Short** [3] 49:22 61:11 62:5

**Shortly** [1] 109:15

**Shot** [1] 36:25

**Shots** [1] 37:18

**Shotwell** [1] 163:9

**Show** [6] 53:6 125:25 127:6 132:20 132:21 133:6

**Showed** [1] 53:7

**Shown** [2] 68:21 104:6

**Shows** [2] 125:11 128:17

**Shut** [1] 124:18

**Shutter** [1] 164:7

**Sic** [2] 130:23 130:25

**Side** [17] 14:25 41:13 41:13 43:10 85:24 85:25 94:21 94:22 95:5 101:10 109:2 109:24 122:4 138:15 138:17 141:21 159:12

**Sides** [10] 85:23 85:24 92:16 95:2 95:4 102:17 109:1 136:3 137:1 142:10

**Significant** [1] 131:6

**Significantly** [1] 22:11

**Silence** [1] 157:20

**Simple** [1] 10:14

**Simply** [23] 8:14 9:23 13:12 15:5 18:2 20:13 23:25 26:17 29:15 30:13 34:15 35:24 38:23 42:15 115:5 117:13 119:16 119:22 120:8 123:6 124:23 137:19 148:11

**Single** [6] 20:14 121:12 134:5 144:7 144:9 144:15

**Singular** [4] 34:22 127:8 127:12 127:15

**Sister** [2] 140:15 140:17

**Sit** [8] 33:12 58:14 68:16 83:20 84:18 91:21 109:6 157:20

**Sits** [1] 81:4

**Sitting** [9] 78:3 79:15 85:11 87:8 88:12 102:8 102:12 102:13 108:15

**Situation** [7] 26:3 38:24 79:22 79:24 85:13 95:17 157:22

**Situations** [1] 136:22

**Six** [10] 44:11 49:5 76:7 76:8 139:6 147:14 162:7 162:8 162:13 162:14

**Six-time** [1] 147:14

**Six-year-old** [1] 139:6

**Sixty** [9] 39:15 124:5 124:10 152:19 152:20 159:9 159:10 159:11 161:17

**Sixty-five** [2] 139:22 139:25 140:20

**Size** [1] 140:24

**Slightly** [1] 81:2

**Slip** [1] 55:4

**Sloppy** [1] 41:4

**Slow** [1] 99:16

**Slower** [2] 62:21 62:21

**Smaller** [1] 29:8

**Smart** [1] 90:12

**Smarter** [1] 55:9

**Smith** [2] 164:3 164:4

**Snippet** [1] 125:20

**So-and-so** [1] 135:9

**Sobering** [4] 84:21 84:21 84:24 85:3

**Social** [1] 132:24

**Society** [23] 7:21 14:17 14:20 14:22 15:3 16:17 16:18 16:21 16:24 17:3 17:5 17:17:21 18:3 42:2 64:2 65:12 65:20 66:11 104:10 107:21 144:25

**Society's** [1] 63:5

**Sole** [1] 81:9

**Solely** [1] 34:5

**Someone** [18] 51:20 52:2 55:4 57:1 71:23 73:8 74:24 75:9 77:15 83:3 84:24 92:11 97:12 98:14 99:21 100:8 100:18 100:20

**Sometime** [5] 22:7 50:9 122:19 161:6 161:7

**Sometimes** [21] 9:3 9:5 22:6 24:9 38:7 58:15 62:9 66:1 67:9 67:25 68:22 78:18 118:15 124:1 130:19 134:1 141:16 141:19 147:11 147:15 147:15

**Somewhere** [1] 121:15

**Son** [1] 164:16

**Sons** [1] 73:2

**Sony** [6] 69:9 70:14 71:12 80:23 81:20 87:8

**Soon** [1] 142:4

**Sorry** [6] 48:5 59:13 61:3 65:16 155:17 163:16

**Sort** [7] 21:4 34:23 58:22 114:18 118:6 135:1 137:8

**Sorts** [2] 30:10 134:18

**Soul** [1] 157:19

**Sound** [3] 60:22 79:3 103:7

**Sounds** [2] 88:1 88:2

**Source** [3] 34:10 34:13 35:10

**Sources** [1] 94:19

**Southwest** [1] 2:14

**Speaking** [2] 113:3 113:4

**Special** [6] 5:5 53:24 55:11 64:23 66:13 68:4

**Specific** [8] 5:20 15:15 16:14 27:12 30:8 33:19 100:2 131:2

**Specifically** [3] 106:1 152:16 159:25

**Spectacular** [1] 102:5

**Speculate** [1] 142:21

**Spend** [10] 5:8 7:15 41:19 111:25 114:8 114:10 134:3 135:17 143:20 154:1

**Spending** [2] 126:6 139:11

**Spills** [1] 137:14

**Split** [1] 15:5

**Spouse** [1] 135:3

**Spur** [2] 52:20 95:12

**St** [1] 125:25

**Stabbed** [1] 53:4

**Stabbing** [1] 95:17

**STACIE** [1] 91:1

**Stacy** [1] 108:19

**Stage** [7] 70:19 83:25 84:6 97:20 98:2 107:25 108:8

**Staged** [1] 124:7

**Stand** [4] 59:5 110:17 118:22 123:20

**Standard** [1] 123:6

**Standards** [1] 104:12

**Standing** [1] 37:16

**Standpoint** [4] 11:6 17:4 22:3 82:17

**Stands** [2] 85:25 123:11

**Start** [8] 6:21 10:24 13:2 40:9 69:14 117:12 126:2 160:17

**Started** [5] 112:24 132:23 133:1 150:3 161:4

**Starting** [5] 7:1 11:23 129:11 130:11 136:2

**Starts** [6] 11:1 11:13 11:17 12:20 12:21 130:12

**State** [50] 1:10 2:10 3:5

3:7 7:11 12:10 14:15 14:19 15:1 15:13 15:16 15:19 16:12 19:20 19:25 25:7 25:8 25:9 28:6 29:13 29:20 31:9 45:8 82:21 83:14 84:2 84:19 91:20 110:16 110:19 128:16 128:24 129:7 133:10 133:11 135:21 136:13 136:14 136:15 136:23 138:4 138:8 139:1 141:5 141:10 143:15 146:15 167:1 167:4

**State's** [27] 6:22 7:2 7:5 11:6 11:9 11:14 11:18 11:22 12:22 15:22 28:11 31:25 81:1 83:6 86:16 128:14 130:9 130:15 132:21 133:9 133:16 135:18 135:24 136:18 137:23 143:1 143:10

**Statement** [4] 102:20 102:22 103:8 103:9

**Statements** [1] 96:3

**Status** [1] 106:4

**Stay** [4] 6:21 71:19 158:7 161:25

**Stayed** [1] 35:4

**Stays** [1] 130:13

**Steering** [2] 43:4 43:4

**Still** [22] 37:20 42:10 49:25 54:21 55:7 55:19 56:7 57:6 57:7 60:16 60:18 76:11 76:18 77:10 78:19 100:10 100:14 101:16 105:11 136:16 143:6 143:11

**Stone** [1] 157:20

**Stop** [2] 11:3 78:18

**Stoplight** [1] 112:15

**Stopped** [1] 122:7

**Stops** [2] 67:10 158:4

**Stories** [1] 124:11

**Storm** [1] 22:17

**Story** [2] 138:15 143:6

**Strange** [3] 60:22 102:22 113:7

**Street** [1] 22:22

**Strength** [1] 136:17

**Strikes** [2] 71:15 80:4

**Stringent** [1] 66:4

**Strong** [4] 97:8 107:8 149:15 149:23

**Strongly** [2] 71:2 100:25

**Student** [2] 55:18 68:18

**Students** [1] 55:11

**Stuff** [14] 4:16 5:20 9:16 23:5 30:9 68:21 84:9 113:3 114:6 114:9 116:18 116:18 144:11 144:11

**Stupid** [1] 62:20

**Subcultures** [1] 105:2

**Substantial** [1] 120:10

**Substitute** [1] 41:6

**Substituted** [1] 19:14

**Suddenly** [1] 67:17

**Suffering** [1] 30:25

**Sufficient** [8] 7:4 8:17 22:14 23:3 23:11 56:19 98:13 145:22

**Suggest** [4] 29:1 55:16 77:7 138:22

**Suggested** [1] 40:21

**Suggesting** [1] 141:21

**Suggestion** [1] 142:24

**Suggests** [1] 40:23

**Suicide** [2] 59:12 73:11

**Support** [3] 30:24 35:7 39:25

**Supporting** [1] 34:9

**Supposed** [15] 63:16 125:21 162:16 162:16 162:17 163:3 163:4 163:12 163:12 164:10 164:19 164:20 165:12 165:

13 166:1

**Surgery** [1] 156:7

**Surprise** [1] 117:14

**Surrounding** [1] 36:6

**Swear** [1] 163:15

**Sworn** [3] 44:18 69:10 91:2

**Sympathize** [1] 70:13

**System** [13] 34:24 57:17 57:18 57:20 57:20 97:4 97:7 97:9 105:9 105:17 119:13 133:7 143:24

---

**T**

**T.D.C.** [1] 164:17

**Table** [2] 142:1 142:7

**Tables** [1] 61:25

**Talks** [5] 16:1 53:24 82:8 93:17 112:5

**Taylor** [1] 162:9

**Teacher** [4] 17:7 62:17 62:22 89:25

**Teachers** [1] 17:18

**Teaches** [1] 17:8

**Ted** [1] 105:16

**Teens** [1] 60:13

**Television** [3] 38:10 125:1 133:24

**Ten** [6] 56:10 112:25 123:14 152:24 153:5 157:21

**Tend** [5] 21:20 34:18 35:17 36:8 163:20

**Tendency** [1] 58:16

**Tending** [1] 35:9

**Tends** [3] 21:24 34:10 35:6

**Term** [6] 7:9 10:16 13:9 44:25 62:5 130:2

**Terminate** [1] 124:8

**Terms** [3] 7:10 114:4 121:21

**Terrified** [1] 111:16

**Test** [1] 15:22

**Testified** [6] 44:18 69:10 91:2 118:12 119:18 137:24

**Testifies** [6] 119:25 120:3 124:19 137:9 137:11 137:15

**Testify** [17] 37:4 74:4 74:5 120:22 122:22 123:4 123:23 137:2 137:4 137:5 137:18 137:20 138:20 138:24 142:23 142:25 148:5

**Testifying** [3] 117:23 118:1 118:13

**Testimony** [54] 3:16 3:20 6:7 7:7 9:14 19:10 20:6 20:14 22:5 28:25 32:13 32:13 33:4 34:6 34:9 35:7 36:11 37:25 38:14 91:20 105:16 106:14 110:16 110:19 123:13 126:21 131:11 131:16 146:15 167:1 167:4 167:16 167:16 167:17 167:18

**Theirs** [1] 125:25

**Themselves** [6] 26:11 46:22 96:20 98:2 105:24 113:11

**Theoretical** [1] 29:19

**Theoretically** [1] 35:16 38:25 152:18

**Therefore** [8] 3:20 28:4

17:14 119:5 120:24 129:22 141:6 142:25

**Thereof** [1] 97:25

**They've** [7] 30:15 49:12 56:9 77:17 77:17 86:9 134:20

**Thinking** [1] 61:24 67:24 78:15 78:17 79:23 84:16 99:19 99:20 111:17 123:18 126:2

**Thinks** [3] 62:17 62:22 157:19

**Third** [19] 29:1 29:3 37:18 42:25 43:10 43:12 43:13 63:18 108:3 112:1 118:3 138:3 149:6 151:13 151:17 155:16 156:8 156:9 156:9

**Thirds** [1] 108:2

**Thirteen** [1] 163:15

**Thirty** [15] 165:10 165:11

**Thirty-four** [2] 161:18 165:12

**Thought-out** [1] 95:14

**Thoughts** [4] 70:14 78:13 96:10 101:1

**Thread** [1] 132:24

**Threat** [17] 7:21 13:6 14:17 14:20 15:3 16:16 18:6 51:2 52:4 57:3 64:2 65:12 65:20 66:10 98:11 107:21 144:25

**Threatening** [1] 83:4

**Threats** [1] 14:22

**Three** [29] 5:16 14:21 23:17 23:23 28:13 28:21 35:21 37:1 37:4 37:11 41:18 42:23 67:2 73:1 73:10 92:6 92:6 92:6 92:6 92:13 92:14 93:1 108:6 114:1 124:2 125:18 128:4 128:7 140:24

**Throughout** [1] 131:3

**Throw** [1] 5:22 87:24

**Thrown** [1] 139:15

**Throws** [1] 112:16

**Thumbs** [2] 108:17 108:17

**Thursday** [3] 157:1 163:19 163:22

**Tickets** [1] 127:22

**Today** [27] 5:9 6:1 6:2 6:12 25:16 40:2 42:22 44:21 47:10 50:7 85:10 107:12 109:21 123:18 124:25 124:25 126:21 126:24 126:25 127:4 127:9 127:11 127:14 130:24 131:16 131:19 165:6

**Today's** [1] 96:15

**Together** [5] 8:10 28:10 34:2 134:7 134:8 135:4 152:25 157:18

**Tomorrow** [2] 163:16 163:17

**Took** [8] 52:10 67:5 74:25 79:16 83:17 103:20 112:15 124:6

**Tooling** [1] 160:22

**Topic** [1] 85:12

**Tore** [1] 49:15

**Torn** [1] 49:16

**Torture** [1] 52:14

**Torture-type** [1] 52:14

**Total** [1] 167:10

**Totality** [1] 6:11

**Totally** [2] 77:4 84:11

**Touched** [2] 26:22 35:14

**Toured** [1] 102:4

**Towards** [2] 56:1 98:25

**Town** [11] 109:21 113:7 154:8 155:5 155:19 155:19 155:24 155:25 156:2 156:6 163:20

**Traci** [1] 162:24

**Traditionally** [1] 132:9

**Traffic** [3] 122:8 122:8

127:22
**Transaction** [1] 27:18
**Transcription** [1] 167:5
**Transcription/stenogra
ph** [1] 1:23
**Treated** [1] 88:1
**Tremendous** [1] 93:24
**Tremendously** [2] 30:23
48:15
**Trial** [113] 1:3 3:14 3:22
3:23 4:4 4:5 4:8 4:10 4:17
4:18 4:22 4:25 5:2 5:7 6:20
7:12 8:4 9:4 10:2 11:9 11:
12 11:16 11:25 15:17 19:24
20:15 20:16 21:17 21:18 22:
16 22:21 25:16 31:23 31:25
32:3 32:22 34:11 35:23 36:8
37:13 38:2 39:20 40:19 41:
25 42:1 49:1 50:5 52:16 54:
6 58:12 58:13 58:19 58:21
58:25 63:12 64:17 70:16 78:
4 79:15 83:13 83:25 84:6 84:
12 97:20 98:18 98:22 108:8
114:12 114:24 114:25 115:1
115:7 115:9 115:11 115:19
116:1 116:2 116:6 116:8 116:
17 116:19 116:19 116:25 117:
17 117:18 117:19 118:9 124:
24 127:7 127:19 128:6 128:
10 130:11 130:14 133:22 133:
22 134:2 134:12 137:15 141:
15 143:25 144:4 144:7 144:
12 144:12 144:14 144:17 145:
14 145:18 148:24 154:12 154:
13 154:16
**Trials** [2] 114:25 148:7
**Triangle** [2] 23:23 23:24
**Tried** [2] 103:2 150:2
**Trigger** [1] 53:3
**Trouble** [3] 22:18 55:10
86:9
**True** [3] 47:8 56:7 167:4
**Truly** [1] 167:9
**Trust** [1] 7:8
**Trustworthy** [1] 121:19
**Truth** [6] 17:2 38:11 74:8
137:16 137:18 137:22
**Truthfully** [1] 66:14
**Try** [13] 7:10 59:3 62:16
81:19 87:22 102:9 102:9 117:
8 123:23 135:2 135:4 165:22
165:25
**Trying** [8] 39:7 39:18 43:
14 87:8 97:17 113:8 142:17
164:25
**Tuesday** [5] 153:6 154:25
162:18 162:20 163:1
**Turn** [2] 87:7 91:12
**Turned** [1] 49:12
**Turns** [1] 37:16
**TV** [1] 105:13
**Twelve** [1] 116:13
**Twenty** [5] 37:19 81:20
102:9 124:8 153:8
**Twenty-seven** [1] 36:20
**Twenty-six** [3] 159:9 159:
11 165:13
**Twenty-three** [1] 105:23
**Twins** [2] 49:6 49:12
**Two** [94] 3:8 3:23 5:5 5:5
7:14 7:14 7:23 8:1 8:21 9:
24 14:2 23:18 23:21 27:13
27:17 28:12 28:17 33:22 34:
1 35:22 39:21 42:9 42:18 42:
24 43:9 44:9 44:10 49:5 49:
12 51:13 52:1 53:18 53:24
56:14 61:18 63:13 64:6 65:
17 65:18 68:5 73:2 75:19 75:
21 76:1 76:4 76:9 76:17 79:
22 83:14 85:23 86:21 88:19
88:21 89:2 89:4 89:6 89:8
92:5 98:12 99:5 106:14 106:
20 111:3 114:25 115:16 116:

20 117:8 117:9 126:8 126:8
126:24 127:1 127:4 127:6
127:10 127:12 127:15 143:17
144:16 145:7 146:3 146:10
146:19 149:11 154:1 154:14
155:1 155:17 155:18 158:22
**Two-thirds** [1] 108:2
**Type** [29] 36:16 36:17 45:
19 47:1 52:13 52:14 53:21
58:11 58:12 62:6 62:7 74:16
77:4 77:19 77:23 78:5 78:6
79:7 81:21 84:4 84:19 87:12
90:4 90:17 95:23 97:11 105:
2 108:5 113:3
**Types** [4] 35:22 74:16 77:
23 92:16

## U

**Ultimately** [4] 81:8 85:
18 108:4 108:16
**Unanimously** [3] 19:5 31:
22 31:24
**Unbeknownst** [1] 55:6
**Under** [9] 37:25 66:3 76:3
76:4 86:18 103:20 112:11
125:1 154:19
**Underperform** [1] 63:1
**Understood** [3] 44:24 45:
22 46:5
**Unfair** [2] 14:18 15:1
**Unfold** [1] 116:20
**Unfortunately** [3] 59:25
70:12 72:1
**Uniform** [2] 122:18 122:22
**Unique** [3] 19:12 21:5 21:9
**Uniqueness** [4] 32:12 33:
4 148:10 148:14
**Unit** [2] 139:20 139:22
**Units** [1] 105:20
**Unjust** [1] 33:11
**Unless** [7] 6:22 12:22 77:
11 89:24 112:24 130:13 162:1
**Unlikely** [1] 90:1
**Unpleasant** [1] 122:11
**Up** [69] 5:22 7:6 7:7 7:8 9:
24 10:15 11:14 18:21 18:21
19:4 21:19 22:18 30:15 33:9
35:1 40:24 40:25 41:15 41:
23 42:22 45:10 46:7 56:5 56:
12 57:17 68:18 71:24 71:25
77:5 78:11 80:3 82:11 87:5
87:17 90:11 92:10 93:1 93:
23 94:13 95:3 97:4 97:7 99:
6 106:25 108:17 108:19 110:
11 111:17 119:7 121:16 121:
16 123:5 125:25 131:11 139:
23 139:24 140:9 141:13 141:
24 142:8 148:15 156:24 158:
8 158:11 159:15 162:1 162:5
163:1 163:21
**Upbringing** [2] 82:1 103:4
**Upset** [1] 53:7
**Usage** [1] 10:22

## V

**Vacation** [1] 155:12
**Vacuum** [1] 103:18
**Valid** [1] 102:21
**Validity** [1] 103:8
**Valuable** [1] 147:17
**Value** [2] 33:13 33:14
**Variables** [2] 25:13 26:5
**Variance** [1] 161:15
**Various** [3] 134:21 156:13
159:10
**Vary** [5] 9:6 9:6 9:7 9:8 9:
8
**Vehicle** [1] 16:10
**VENIREPERSON** [53] 13:2
43:23 44:4 44:8 111:2 111:5
111:7 143:5 143:11 150:19

151:5 151:7 151:9 151:12
151:14 151:16 151:19 151:21
151:23 152:1 152:3 152:5
152:7 152:9 152:10 155:5
152:5 155:9 155:12 155:18
155:22 155:25 156:4 156:6
156:12 156:17 156:20 156:24
157:2 157:4 157:7 157:10
158:20 158:22 158:24 164:11
164:13 164:16 164:22
**Verdict** [12] 7:1 8:19 11:
15 40:16 42:4 47:8 114:5
142:16 142:18 144:16 145:24
148:9
**Verdicts** [5] 9:6 9:8 9:
16 42:9 148:7
**Verse** [1] 110:16
**Versus** [5] 3:5 85:10 85:
13 86:12 104:9
**Vicious** [1] 30:9
**Victim** [9] 8:20 21:8 37:3
37:25 53:20 79:13 79:14 145:
7 146:2
**Victim's** [1] 147:16
**Victims** [1] 9:10
**Vietnam** [2] 22:17 59:15
**Viewed** [1] 84:18
**Viewing** [2] 22:3 85:13
**Views** [2] 13:11 85:7
**Violate** [1] 66:6
**Violating** [1] 104:11
**Violence** [21] 7:20 15:12
15:24 15:25 16:2 16:4 16:5
16:15 17:12 17:24 18:1 18:6
51:12 57:4 65:11 65:18 65:
22 65:24 66:10 98:12 144:24
**Virtually** [1] 36:25
**Visit** [9] 3:4 80:25 85:9
102:8 110:14 111:10 143:14
160:11 160:12
**Visitation** [1] 157:5
**Visiting** [1] 143:21
**Visualize** [1] 18:20
**Voir** [15] 1:15 44:19 45:5
56:24 57:24 69:11 71:10 78:
10 80:21 91:3 91:17 92:15
97:4 101:12 159:7
**Volker** [1] 163:9
**Volume** [2] 1:2 167:6
**VOLUMES** [1] 1:2
**Voluntary** [2] 55:2 100:14
**Volunteer** [4] 92:19 92:
23 106:3 106:6
**Volunteers** [1] 93:10
**Vote** [11] 89:2 89:7 89:8
89:9 89:9 89:10 89:19 89:19
89:20 106:22 140:5
**Voted** [2] 23:13 88:14
**Voting** [2] 19:6 89:5
**VS** [1] 1:8

## W

**Wait** [4] 22:8 79:4 165:7
165:14
**Walk** [2] 90:3 105:24
**Walked** [1] 126:23
**Walking** [3] 37:12 37:14
37:18
**Walks** [1] 31:6 122:21
**Walls** [5] 17:4 17:8 17:10
17:17 25:25
**Wants** [4] 27:6 57:11 65:3
134:17
**Wardens** [1] 17:19
**Warranted** [1] 93:22
**Waste** [3] 112:19 112:20
153:12
**Watch** [5] 79:14 125:11
125:17 125:17 125:19

**Watched** [1] 42:15
**Wavelength** [1] 84:17
**Wayne** [5] 2:12 3:7 58:2
80:23 110:19
**Ways** [2] 75:22 112:3
**Weapons** [1] 52:13
**Wear** [1] 88:11
**Wednesday** [6] 153:7 153:
25 154:1 154:25 156:25 163:6
**Week** [25] 22:19 24:18 24:
18 44:1 50:7 50:7 93:1 111:
12 153:9 153:14 153:15 153:
25 154:13 154:13 154:14 154:
15 154:16 154:25 155:20 156:
13 156:16 163:16 163:17 163:
18 164:8
**Weeks** [7] 43:24 44:9 44:
11 44:11 111:19 154:14 155:1
**Weigh** [4] 54:3 68:25 98:
18 99:9
**Weight** [6] 117:20 118:7
118:9 118:18 121:10 136:6
**Weighted** [1] 118:16
**Wentz** [12] 2:17 3:7 57:23
57:25 58:1 59:5 59:7 80:24
110:5 110:6 110:19 159:23
**Wesley** [1] 162:25
**Whatsoever** [1] 163:24
**Wheel** [2] 43:4 43:5
**Wheels** [1] 43:5
**Wherein** [1] 150:9
**Whichever** [4] 7:24 13:10
22:12 145:9
**Whisper** [1] 37:2
**Whole** [17] 5:17 22:7 23:4
23:5 23:15 29:13 35:5 42:15
84:8 87:20 97:14 100:6 117:
5 122:12 123:19 130:12 165:
22
**Widget** [3] 139:19 139:22
140:19
**Wife** [4] 30:23 49:11 49:17
50:23
**Wildest** [1] 132:18
**William** [1] 162:25
**Williams** [4] 158:11 158:
14 162:22 164:4
**Willing** [3] 108:20 129:24
130:6
**Wind** [2] 40:24 40:25
**Winds** [1] 141:13
**Windshield** [1] 16:9
**Wise** [1] 55:18
**Wish** [4] 42:21 135:14 138:
11
**Withdraw** [5] 20:19 22:14
23:12 89:7 89:20
**Withdrawn** [1] 19:13
**Withhold** [1] 121:3
**Witness** [25] 34:13 36:19
37:18 37:20 80:18 117:22
117:23 117:24 117:25 118:2
118:3 118:5 118:22 119:22
118:20 121:4 123:20 124:2
124:2 124:2 136:24 137:23
147:21 148:1 167:12
**Witnesses** [28] 36:13 36:
15 36:17 36:20 114:3 114:4
117:20 118:7 118:8 118:12
118:18 118:21 119:2 119:6
119:14 119:17 119:18 123:18
136:6 136:9 136:25 137:24
138:4 138:5 147:20 147:24
148:1 148:5
**Witnesses'** [1] 119:4
**Woman** [5] 17:6 96:7 96:12
96:23 96:24
**Won** [1] 125:15
**Wonder** [2] 125:10 125:22
**Wonderful** [4] 38:12 43:4
127:5 135:15

**Word** [14] 13:23 13:24 14:9
14:13 16:18 16:21 16:21 20:
23 21:12 76:22 82:15 82:18
94:8 94:12

**Words** [21] 9:1 10:7 10:10
10:19 10:21 10:21 10:25 19:
8 22:10 45:15 55:4 63:17 64:
18 65:11 83:1 84:15 93:19
105:7 147:10 147:22 147:25

**Workday** [3] 17:13 132:9
132:13

**Worker** [1] 43:23

**Workers** [1] 72:17

**Works** [1] 122:1

**World** [10] 10:11 12:9 17:
14 114:6 114:8 117:17 126:
19 135:9 148:9 161:5

**Worry** [4] 6:14 71:22 143:
22 162:4

**Worse** [2] 61:1 61:5

**Worst** [1] 63:5

**Wound** [1] 41:23

**Writing** [4] 6:8 116:25
117:11 167:5

**Written** [4] 6:10 6:13 77:
17 117:4

## Y

**Y'all** [2] 72:21 154:21

**Yards** [1] 37:19

**Year** [13] 24:18 24:19 24:
20 25:7 30:22 31:13 39:9 60:
14 61:23 102:4 106:6 139:6
147:12

**Year's** [1] 140:5

**Year-old** [1] 30:22

**Years** [31] 21:21 24:17 24:
25 25:14 25:19 25:23 26:3
26:6 26:13 26:15 29:23 30:
22 32:24 33:2 48:9 48:12 48:
23 49:13 56:10 61:21 62:2
62:7 72:11 73:5 92:24 92:25
122:5 122:13 130:24 131:1
140:24

**Yesterday** [4] 42:21 43:7
109:18 165:6

**Yogi** [1] 42:16

**Young** [12] 22:1 49:6 55:
24 56:1 56:4 60:12 60:15 96:
7 96:12 96:23 96:24 99:12

**Younger** [3] 48:9 59:24
111:8

**Youngest** [1] 49:11

**Yourself** [15] 8:16 19:11
32:24 40:7 41:1 41:6 43:11
65:4 65:9 121:8 130:4 131:
15 138:8 140:11 145:21

**Yourselves** [6] 5:21 20:
16 132:8 135:8 138:10 138:13

**Youthfulness** [1] 21:22

## Z

**Zone** [1] 134:19