REPORTER'S RECORD
VOLUME (4)  OF  (25)  VOLUMES
TRIAL COURT CAUSE NO. 800112

**73708**

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT OF |
| VS. | ) | HARRIS COUNTY, T E X A S |
| CHARLES MAMOU, JR. | ) | 179TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**VOIR DIRE EXAMINATION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 9th day of September, 1999, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Bob Burdette, Judge
Presiding, held in Houston, Harris County, Texas.

Proceedings reported by machine shorthand.

WENDY WILKERSON
Deputy Official Court Reporter
179th District Court
Harris County, Texas

**FILED IN
COURT OF CRIMINAL APPEALS**

MAR 2 1 2000

ORIGINAL

Troy C. Bennett, Jr., Clerk

1                         A P P E A R A N C E S:

2


3       **MR. LYN MCCLELLAN**
        SBOT NO.  13396100
4
        **MS. CLAIRE CONNORS**
5       SBOT NO.  0470500

6       Assistant District Attorneys
        1201 Franklin, Ste 600
7       Houston, Texas   77002
        (713) 755-5800
8
        **ATTORNEYS FOR THE STATE OF TEXAS**
9


10      **MR. WAYNE HILL**
        SBOT NO. 59656300
11      4515 Southwest Freeway
        Houston, Texas,  77027
12      (713) 623-8312

13      **MR. KURT WENTZ**
        SBOT NO. 21179300
14      5629 W FM 1960
        Houston, Texas 77069
15      (281) 587-0088

16      **ATTORNEYS FOR THE DEFENDANT**

17

18

19

20

21

22

23

24

25

1

CHRONOLOGICAL INDEX

PAGE

2

**VOLUME 4**  (1-233)

3

September 9, 1999

4

**VOIR DIRE EXAMINATION**

5

Appearances  - - - - - - - - - - - - - - - - - -   i

6     Proceedings at the Bench - - - - - - - - - - - -   3
      Prospective Juror No. 9, Eric Hernandez  - - - - - -   4

7     Prospective Juror No. 18, Jerri McGraw Tinnemeyer- -   6

8     General Voir Dire by the Court - - - - - - - - - -   10

9     Prospective Juror No. 8, Ruben Cardenas
      (Defense Challenge granted.)

10    Prospective Juror No. 9, Eric Hernandez
      (Defense Challenge granted.)

11    Prospective Juror No. 12, Brenda Wagy  - - - - - - -   48
      (Exemption granted.)

12

**VENIRE PERSONS:**                 COURT     STATE     DEFENSE

13    **GEORGE PENA**                       51        53        73
      (Accepted into jury pool.)

14

15    **JOYCE SCOTT**                        88
      (Defense Challenge granted.)

16    **FRANCES HASHAGEN**                   92        95        112
      (Accepted into jury pool.)

17

18    **ALEJANDRA SOLANO AMIE**             130       133        152
      (Accepted into jury pool.)

19    **JERRIE MCGRAW TINNEMEYER**          167       170        184
      (Accepted into jury pool.)

20

21    **RAMIE COLLEEN COOKSEY**             191
      (Excused by agreement.)

22    **STACIE MARIE SIBLEY**               198       202        217
      (Accepted into jury pool.)

23

24    Court adjourned - - - - - - - - - - - - - - - - -   232
      Court Reporter's Certificate  - - - - - - - - - -   233

25

## ALPHABETICAL INDEX

| | COURT | STATE | DEFENSE | VOL. |
|---|---|---|---|---|
| AMIE, ALEJANDRA SOLANO | 130 | 133 | 152 | 4 |
| CARDENAS, RUBEN | 45 | | | 4 |
| COOKSEY, RAMIE COLLEEN | 191 | | | 4 |
| HERNANDEZ, ERIC | 4 | | | 4 |
| PENA, GEORGE | 51 | 53 | 73 | 4 |
| SCOTT, JOYCE | 88 | | | 4 |
| SIBLEY, STACIE MARIE | 198 | 202 | 217 | 4 |
| TINNEMEYER, JERRI MCGRAW | 6,167 | 170 | 184 | 4 |
| WAGY, BRENDA | 48 | | | 4 |

## EXHIBIT INDEX

(There are no exhibits for this volume.)

```
========================
    P R O C E E D I N G S
========================
```

VOLUME 4   (1-233)

September 9, 1999

          THE COURT:   Okay.   For the purposes of the
record, we're back in Cause No. 800112.   State of
Texas versus Charles Mamou.   The time of the clock on
the courtroom wall is about 8:22 a.m.

          Before beginning the voir dire individually,
as I understand it, earlier this morning Venire Person
No. 12 who travels by the name of Brenda Wagy,
W-A-G-Y, called the courtroom and it is my
understanding that Mr. McClellan, the prosecutor who
simply happened to be here, picked up the phone
having no idea who the caller was and it was indeed
Ms. Wagy.   And without going into that, I understand
Mr. McClellan, you talked to her firsthand.   What did
you say, please?

          MR. MCCLELLAN:   First of all, I answered the
phone as "capital" and she asked for the 179th
District Court and I said this is 179 Capital Court
and she identified herself as being a juror who was
selected yesterday and identified herself as No. 12,

```
 1        Ms. Wagy.  She said she should have brought it up
 2        yesterday she has a 5-year-old kindergartner that she
 3        takes care of.
 4               She was able to get somebody to watch the
 5        child or make arrangements for the child to get to
 6        kindergarten the other day.  Today they were unable
 7        to do so.  And she said:  "I should have claimed my
 8        child exemption when I had the opportunity," and she
 9        was not going to be able to be here and she doesn't
10        know whether she could be here during any of the
11        trial.
12               She said she wanted to be a juror before,
13        would like to be a juror, but this appeared to be a
14        problem she couldn't work around.  I told her she
15        needed to call back at 8:20 and talk to you, Judge.
16               THE COURT:  It's 8:24, and my recollection
17        is Ms. Wagy is blond.  She's not called back, yet.
18        Each is accurate.  The questionnaire she had filled
19        out does show she has a 5-year-old child that goes to
20        school.  And while I'm not speaking for Ms. Wagy,
21        Mr. McClellan did not use the magic words thus of the
22        problem is that she wishes to claim her exception.
23               Mr. Hill, any objection to that claim?
24               MR. HILL:  Judge, all I would ask since her
25        number is 12 and not going to be getting to her, I'm
```

1    probably not going to have any objection.  She did

2    indicate she would call back to the court.  Perhaps

3    you could just visit with her for a moment since we're

4    just talking about several minutes.

5         If we get to her and she hasn't called, I'll

6    certainly address the Court.  Is that all right?

7         THE COURT:  That's a deal.  Now don't -- off

8    the record.

9         (Off the record discussion.)

10        THE COURT:  Gentlemen, would you come up,

11   please, for a second.  No. 9 and 18.

12        MR. MCCLELLAN:  The other person I saw was

13   not in the pool.  That was maybe somebody else.

14        THE COURT:  Okay.  So two.  Would you come

15   up just a second before you leave.

16        (Bench conference not recorded.)

17        THE COURT:  Ladies and gentlemen, good

18   morning to you.  And before we begin, there is a

19   matter that I need to attend to.  And, please, I hope

20   that you don't think that anything out of the ordinary

21   is going on; but there are a couple of you I need to

22   invite up to ask you a couple of questions

23   individually.  So, please don't think you've done

24   anything wrong because you certainly haven't.  It's

25   just something I need to attend to.

```
 1                    Mr. Hernandez, where are you, sir?  If you
 2       would come up, please.  This is Mr. Eric Hernandez,
 3       Venire Person No. 9.  Mr. Hernandez, before we
 4       begin the process that we discussed yesterday, earlier
 5       this morning while you and a number of the other
 6       folks -- not all of them -- the prospective jurors
 7       were seated in the hallway, did you have occasion to
 8       see anything?  What did you have occasion to hear?
 9       Any conversation related to this defendant in this
10       case?
11                    VENIRE PERSON HERNANDEZ:  No, sir.
12                    THE COURT:  Did you see anything that you
13       took to be out of the ordinary related to this
14       defendant that in any way involved what the case is
15       about, sir?
16                    VENIRE PERSON HERNANDEZ:  No, sir.
17                    THE COURT:  All right.  Mr. McClellan, any
18       questions?
19                    MR. MCCLELLAN:  No.
20                    THE COURT:  Mr. Hill, from you, sir?
21                    MR. HILL:  Could you ask Mr. Hernandez if
22       he saw Mr. Mamou at all and if so --
23                    THE COURT:  Did -- earlier out in the
24       hallway before we brought you in here, did you have
25       occasion to see the defendant, Mr. Mamou, out in the
```

5

```
1    hallway?

2                 VENIRE PERSON HERNANDEZ:  I saw him pass by

3    with the guard

4                 THE COURT:  Okay.  What was there, if

5    anything, at all about seeing him that caught your

6    eye?

7                 VENIRE PERSON HERNANDEZ:  Just the way he

8    was dressed up.

9                 THE COURT:  And how was he dressed, sir?

10               VENIRE PERSON HERNANDEZ:  In an orange

11   outfit.  That was it sir.

12               THE COURT:  Okay.

13               VENIRE PERSON HERNANDEZ:  He was cuffed.

14   I think he was cuffed.

15               THE COURT:  That was a conclusion?

16               VENIRE PERSON HERNANDEZ:  I think I saw

17   him --

18               THE COURT:  Mr. Hernandez, what if anything

19   at all do you think as a result of seeing what you

20   saw?  What result or what affect, if anything at all,

21   would that have upon your ability to be a juror in

22   this case?

23               VENIRE PERSON HERNANDEZ:  Nothing, sir.

24               THE COURT:  Would it in any way interfere

25   with what we had discussed yesterday, that is to say,
```

1        the defendant's presumption of innocence?

2                    VENIRE PERSON HERNANDEZ:  I'm not sure.

3                    THE COURT:  Okay.  Mr. Hill?

4                    MR. HILL:  Yes, sir.

5                    THE COURT:  Thank you.  Mr. Hernandez, have

6        a seat, sir.  Do you have a motion?

7                    MR. HILL:  Yes, Your Honor.

8                    THE COURT:  It's granted.  Ms. Tinnemeyer,

9        if you would please come up, ma'am.  Ms. Tinnemeyer, I

10       want to ask you some questions about this morning

11       while you and perhaps all -- at least many of the

12       other panelists were out in the hallway before the

13       process began.  Did you have occasion anytime this

14       morning in the hallway to see the defendant in this

15       case, Mr. Mamou?

16                    VENIRE PERSON TINNEMEYER:  (Nods head.)

17                    THE COURT:  Please talk out.

18                    VENIRE PERSON TINNEMEYER:  I'm sorry.  No,

19       I didn't.

20                    THE COURT:  You shook your head no.  She

21       needs to take it down.

22                    VENIRE PERSON TINNEMEYER:  Okay.

23                    THE COURT:  Were you privy to any

24       conversation from any source whether it was another

25       venire person, whether it was somebody else about

1    Mr. Mamou, the defendant in this case, at all this

2    morning?

3              VENIRE PERSON TINNEMEYER:   No.   People were

4    just talking about why someone out of jail, they

5    shouldn't be in jail.   I'm not quite sure what they

6    were talking about.

7              THE COURT:   And relate that to me again,

8    please, what you heard.

9              VENIRE PERSON TINNEMEYER:   Somebody said,

10   "Why is a capital murderer out and why aren't they in

11   jail?"

12             THE COURT:   And was there a response to that

13   rhetorical question?   I guess it was rhetorical.

14             VENIRE PERSON TINNEMEYER:   I don't know.   My

15   response was, "I don't know if he is or he is not."

16   You see what I'm saying?

17             THE COURT:   It was asked of you?

18             VENIRE PERSON TINNEMEYER:   Yeah.

19             THE COURT:   Okay.   I see.   That was the end

20   of it from your standpoint as far as you know?

21             VENIRE PERSON TINNEMEYER:   I'm trying to

22   think.   Yes, it was mostly about getting here at 8:00

23   o'clock, I mean --

24             THE COURT:   I've heard that from all these

25   guys.

```
 1              VENIRE PERSON TINNEMEYER:  And everybody

 2      thought 8:30.  We're not supposed to be here today,

 3      supposed to be here tomorrow.  Ya'll don't do me that

 4      way.  I remember we were talking about figuring out

 5      the forms.  They were long.

 6              THE COURT:  Just general socializing.  Okay.

 7      Mr. McClellan, any questions?

 8              MR. MCCLELLAN:  So, you did not see

 9      Mr. Mamou come into the -- coming to court today?

10              VENIRE PERSON TINNEMEYER:  No.

11              MR. MCCLELLAN:  Okay.

12              THE COURT:  Mr. Hill.

13              MR. HILL:  I guess the only question I would

14      have is if this potential juror could identify for us

15      the people that were making the comment about why a

16      person charged with capital murder is not in jail.  I

17      mean, you don't need to turn around.  And if you could

18      look at the panel and tell the Court where they're

19      seated, that would be helpful to us.

20              VENIRE PERSON TINNEMEYER:  No. 3.

21              THE COURT:  From the right front row?

22              VENIRE PERSON TINNEMEYER:  Uh-huh.  Chair

23      one, two, three.  Chair three.

24              THE COURT:  Young man, tall young man?

25              VENIRE PERSON TINNEMEYER:  Got to be the
```

```
 1        third one.
 2                    MR. HILL:  It would be No. 6, right?
 3                    THE COURT:  What direction?
 4                    VENIRE PERSON TINNEMEYER:  I'm coming from
 5        right here.  One, two, three.
 6                    MR. HILL:  She's got me turned around.
 7                    VENIRE PERSON TINNEMEYER:  I tend to turn
 8        people around.
 9                    THE COURT:  Well, that wouldn't be the same.
10                    MR. HILL:  First three would get to three.
11                    MR. MCCLELLAN:  Don't worry about me.
12                    MR. HILL:  I'm -- just a couple more.  Are
13        you counting from the closest to the Judge here?
14                    VENIRE PERSON TINNEMEYER:  Uh-huh.
15                    MR. HILL:  Okay.  One, two, three.  The
16        gentleman that's wearing a beige shirt.
17                    THE COURT:  The kind of tall young man?
18                    VENIRE PERSON TINNEMEYER:  Uh-huh.  I mean
19        if you're asking was anything said directly, no, I
20        don't think so.  It was just -- I think we were
21        questioning --
22                    THE COURT:  Let me also tell you and assure
23        you no one thinks there was any nefarious activity.
24        That's the point of this.  There are some things we
25        need to explore to make certain we do understand the
```

1    depth of what did occur because, quite frankly,

2    through the fault of absolutely nobody here, there was

3    some administrative snafu this morning that may have

4    opened up the potential for a problem.

5            Is there anything else?

6            MR. HILL:  No.

7            THE COURT:  Ladies and gentlemen, please

8    this is just certainly remarkably unusual, there is a

9    telephone call.  I never go to telephone calls.  If

10   you'll remember yesterday, we invited 10.  And look

11   around.  You'll see nine.  No. 10 is on the phone.  I

12   need to attend to it.  I need to take these gentlemen

13   with me.

14            (Recess taken.)

15            THE COURT:  Ladies and gentlemen, now there

16   should only be nine of you.  Let the record reflect

17   that the 20-minute after 8:00 o'clock phone call to

18   us occurred at 20 minutes of 9:00.  Let's don't hold

19   these folks up.  We'll pick that up.

20            Ladies and gentlemen, this is the first

21   day; and, I guess, first days quite frequently breed

22   confusion.  If that is the case they ordinarily do,

23   today is no exception.  I want to spend a couple of

24   minutes to talk with you about what we did not talk

25   about yesterday.

1          And, quite frankly, the reason we didn't

2     talk about them yesterday is because of the size of

3     the crowd.  And what we're going to talk about we

4     could have made no headway because we don't know who's

5     going to be in the group.  And I want to have it that

6     way so we're sure we understand what's on the table so

7     to speak.

8          We talked yesterday about the case that's

9     involved.  We talked about the defendant over here,

10    Mr. Charles Mamou, who's represented by his two

11    attorneys, Mr. Wayne Hill and Mr. Kurt Wentz, who is

12    out running errands and will be along shortly.  The

13    State of Texas' two Assistant District Attorneys, Lynn

14    McClellan and Claire Connors.

15         We talked about the defendant in this case

16    is charged with the offense of capital murder.

17    Specifically, it is alleged to have occurred in Harris

18    County, Texas, on the 7th day of December, 1998.

19         We talked about if the defendant is found

20    guilty of the offense of capital murder, the State is

21    going to request the jury to answer the two special

22    issues, the two questions we talked about, in such a

23    way that obligates the Court to assess the punishment

24    at death.

25         Before we go any further I would like to

1    spend some time with you talking about a couple of

2    concepts.  First off, in the State of Texas there are

3    about a dozen different types of conduct that if

4    alleged by a Grand Jury's indictment and if proved

5    beyond a reasonable doubt would warrant a conviction

6    for the offense of capital murder.

7            For example, the intentional murder of a

8    police officer or law enforcement officer when the

9    person doing the killing knows that the person is a

10   law enforcement officer.  Same with a fireman, murder

11   for hire, intentional murder of more than one person

12   during the course of the same criminal transaction,

13   the intentional murder during the course of robbery,

14   during the course of aggravated rape, during the

15   course of kidnapping, during the course of burglary.

16           There are just a number of different types

17   of conduct.  About a dozen in all.  We are confronted

18   in our case with two of those types.  Type one in

19   paragraph one of the indictment, the allegation is

20   that there was an intentional killing of a woman by

21   the name of Mary Carmouche while the defendant was in

22   the course of committing the offense of kidnapping.

23           If that were to be proved beyond a

24   reasonable doubt, that would cause a jury to return a

25   verdict of guilty of capital murder.  Also alleged

1   within the same indictment is another type of capital

2   murder that is to say the intentional taking of life

3   without justification or excuse of more than one

4   person during the course of the same criminal episode.

5           Specifically, it is claimed this defendant

6   intentionally caused the death of a person named

7   Terrance Gibson and a person named Mary Carmouche.

8   That if proved beyond a reasonable doubt would

9   justify a jury finding the defendant guilty of

10  capital murder.

11          So there are two different types of

12  capital murder alleged to have been committed in

13  the indictment.  And if the jury finds the defendant

14  beyond a reasonable doubt to be guilty of either one

15  of them or both of them, you'd find the defendant

16  guilty of capital murder.

17          What the other 10 different types of

18  conduct are, we don't care about because they're not

19  involved in our case.  And when the trial is all over

20  with if you have an interest and want to know what

21  they are, I'll tell you.  We don't want to muddy up

22  the water now.  So any questions right now?

23          We talked about how the case is broken into

24  two parts.  The first part of the trial the jury is

25  only concerned with whether the defendant is or isn't

1    guilty.  Defendant not guilty, case over.  Defendant

2    guilty, we have a second phase of trial which we get

3    off the evidence relating to the crime that was

4    committed because you'd already convicted the

5    defendant of that crime or we wouldn't have a second

6    phase.

7            And instead the second phase the focus of

8    the evidence is upon the character, background -- the

9    character or the reputation and background and the

10   personal moral responsibility of the defendant on

11   trial for the offense that occurred that can be --

12   come in.  And when you have three or four people

13   involved in the same crime, a jury might want to know

14   who's more responsible, more blamable in the conduct.

15           That's what that's about.  So you take all

16   the information that you hear from both sides -- from

17   both sides -- I didn't mean that, from both portions

18   of the trial, use it all and come up with what you

19   think is the right answer to the two questions that

20   are over here on this easel.

21           And we're going to spend time this morning

22   talking about these two questions.  We take for

23   Question No. 1 -- and please look at them.  It helps

24   to talk about them.  Question No. 1 asks:  Do you find

25   from the evidence beyond a reasonable doubt that there

1       is a probability that the defendant would commit

2       criminal acts of violence that would constitute a

3       continuing threat to society?

4            As we said yesterday no matter who the

5       defendant, no matter what the evidence, no matter

6       who the victim, no matter what the case, there's never

7       two possible answers to that question.  Yes, we do, or

8       no, we don't.  You answer the question the way in

9       which the evidence takes you.

10           Question No. 2 asks:  Taking into

11      consideration all of the evidence including the

12      circumstances of the offense -- that's going to be

13      what you heard in the first part of the trial --

14      including the character, background, the personal

15      moral culpability, same as responsibility, that's

16      going to be what you heard the second half of the

17      trial.

18           The first half of the second question

19      simply tells you go back over all the evidence of

20      the case for the purpose of asking yourself this

21      question:  Within the evidence in this case, is there

22      any mitigating circumstances that is sufficient in

23      our minds to cause us to believe that because of the

24      uniqueness of that mitigating circumstance, a life

25      sentence would be a more appropriate verdict in this

1    case than the death sentence.

2           Again no matter who the defendant, no matter

3    what the evidence, no matter who the victim, no matter

4    what the case, there's never but two possible answers,

5    yes or no.  You answer whichever way you think

6    appropriate based upon the evidence.

7           If you answer "yes" to No. 1 and "no" to

8    Question No. 2, the law says I have no choice, I have

9    no option, I have absolutely no discretion I must

10   sentence the defendant to death and that's what will

11   occur.  If you should answer those questions in any

12   way other than yes and no in this order, again, the

13   law says I have no other choice, I have no option, I

14   have no discretion I must sentence the defendant to

15   life, and that's exactly what I will do.

16           So, what we're saying is yes and no in that

17   order means death.  A no to the first question means

18   you don't ever get to the second question because a no

19   to the first question is different than a yes or no.

20   Excuse me.  Yes and no.  Which means if you answer no

21   to the first question there's no way you can answer

22   the second question and ever get the death penalty

23   back in the case.

24           A no to the first question a is life

25   sentence.  A answer of yes to each of those two

1    questions is a life sentence.  A yes and no is a

2    death sentence.  Any questions about the machinery?

3    Okay.

4              Let's talk about the content, the verbiage

5    contained within the questions.  First off, you can

6    see the first phrase in the first question starts off:

7    Do you find from the evidence beyond a reasonable

8    doubt.  Now, we talked about the reasonable doubt

9    business yesterday.

10             It is exactly the same thing here.  What

11   that means to you is that the State's got to prove to

12   you what the answer to this first question should be.

13   We know that because any time something has to be

14   proved to you beyond a reasonable doubt that means the

15   State's got to prove it to you.

16             That's why starting off a case, all

17   defendants are innocent and they remain innocent,

18   unless or until the State's evidence proves beyond a

19   reasonable doubt that the defendant is in fact guilty.

20   So starting off a case at the first phase, a

21   defendant's always not guilty and stays not guilty

22   unless the State's evidence proves to the contrary,

23   that is that he is guilty.

24             So, it is at the second phase, starting off

25   the second phase of the trial the answer to that first

1    question is no.  It's the same logic as starting off

2    the first phase being not guilty.  The answer to that

3    first question starts off being no and stays no unless

4    the State's evidence proves beyond a reasonable doubt

5    that the answer should be yes.

6              So, what have we learned so far?  What we

7    have learned is this:  At the first phase of a

8    criminal trial, there is always the presumption of

9    innocence that the defendant on trial is innocent.

10   That presumption certainly can be overcome by

11   quality evidence that establishes in a jury's mind

12   beyond a reasonable doubt the defendant is not

13   innocent, in fact, based upon the evidence the

14   defendant is guilty.

15             At the beginning of the punishment phase

16   in a capital murder case wherein a person had been

17   found guilty of the offense of capital murder, the

18   presumption of being innocent probably had been erased

19   by the evidence presented in the first phase.  But

20   now a new presumption pops up in its place.

21             And the presumption that pops up in the

22   beginning of the second phase of a capital murder

23   trial is that it is presumed that for all people

24   convicted of capital murder, the appropriate

25   punishment should be life.

1          Now, how do we know that?  Well, we know

2     because starting off on this first question the answer

3     is no, unless the State proves beyond a reasonable

4     doubt the answer should be yes.  We know from our

5     conversation that a no answer to the first question

6     means a life sentence because that's different than

7     yes or no in that order.

8          So, starting off at the second phase of a

9     trial wherein a person being convicted of capital

10    murder, it's presumed the appropriate punishment

11    should be life, unless the State's evidence proves

12    beyond a reasonable doubt the answer to the first

13    question should be yes.

14          Anybody have any questions how I got to

15    that point?  Okay.  So back to the verbiage.  It

16    starts as:  Do you find from the evidence beyond a

17    reasonable doubt there's a probability -- let's talk

18    about probability.  Now, in the Court's charge --

19    you'll get it at the end of evidence in the first

20    phase and get a charge at the end of evidence of

21    the second phase, if there is a second phase.

22          There are going to be a lot of definitions

23    for you.  There are going to be a lot of instructions

24    for you.  There are going to be words, however, that

25    are not going to be defined for you.  And if you say

1       to yourself, "How in the world do we know what it

2       mean?  How are you going to define it for you?"

3            It's simple.  If we're going to use a term

4       peculiar to the law and business there is no reason we

5       should expect you to know what that term is.  We're

6       going to define it for you.  If we're going to be

7       using a term we all use in home, work, friends, family

8       everyday, we're not going to define that for you.

9            Probability is one of those words we're not

10      going to define for you because you use that term all

11      the time.  What probability means to you that's your

12      call.  There are -- and I'm not permitted to define it

13      for you or instruct you as to what it means but I am

14      permitted to tell you by comparison that whatever

15      the word probability does mean to you, there are two

16      things it can't mean.

17            First off, whatever the word probability

18      means to you in your mind, it must mean something more

19      than a possibility.  Anything could possibly happen.

20      Just cause something could possibly happen doesn't

21      mean it's probably going.

22            Flipping it over, whatever the word

23      probability means to you it can't mean something such

24      as a certainty.  Simply because something could

25      probably happen does not mean that it's certain to

1    happen.  And you know that because if you went to your

2    baker today and told him you're going to win the 14

3    million dollar lottery or probably going to win the

4    14 million dollars -- just give me seven and you can

5    have the rest of it -- and see what he says.

6         So we know that whatever probability

7    means, it's not going to mean something more than a

8    possibility but can't mean something greater than a

9    certainty.  Why is that an issue?  It's an issue

10   for this reason:  The State has to prove beyond a

11   reasonable doubt the existence of a probability of

12   future acts of violence.

13        Can you see how grossly unfair it would be

14   to a defendant if the law only required the State to

15   prove beyond a reasonable doubt the existence of a

16   possibility that the person on trial could commit

17   future acts of violence?

18        Or to take the same thing and turn it

19   around.  Can you see how unfair it would be to the

20   State to require them to prove beyond a reasonable

21   doubt a certainty of the existence of future acts of

22   violence?

23        So that's why we chose the middle ground

24   probably.  If the word probably to you means something

25   that's more likely to happen than likely not to happen

1     that's a deal.  Probability is, well, football season

2     started.  On a football game the higher the odds the

3     less the probability.

4               You talk to some weather man -- talk to a

5     weather man on television.  One of them says 20 one

6     of them says 40, 60.  The greater the probability

7     progressing, that's your call.  I do want you to know

8     whatever the word probability means to you it's got to

9     be something independent and different from the word

10    possibility and certainty.

11              Any questions about that?  Back to the

12    question.  Do you find from the evidence beyond a

13    reasonable doubt there's a probability that the

14    defendant would commit criminal acts of violence?

15              When we talk about criminal acts of violence

16    we mean a term most generic sense keeping in mind

17    it's the State's obligation to prove the answer to

18    this question should be yes.  It's not required that

19    the State prove the existence of a probability that

20    the defendant would commit additional capital murder

21    in the future.

22              Certainly if that testimony -- that evidence

23    exists they are entitled to present it to the jury.

24    But the State is required to prove the existence of

25    the probability of the commission of criminal acts

```
 1        of violence.  Criminal acts of violence -- murders,

 2        robberies, rapes, assaults, attempted murders,

 3        kidnappings.

 4              Those are all criminal acts of violence

 5        towards persons.  Criminal acts of violence can

 6        include acts of violence as to property, the burning

 7        down of somebody's building, or automobile, or so on.

 8        The certain kind of burglaries that require a breaking

 9        to get either onto land or into a building.  The

10        beating in of somebody's windshield or automobile with

11        a brick.

12              All of those are criminal acts of violence

13        as to property but they are criminal acts of violence.

14        And it is that generic type circumstances that the

15        State is required to prove to you that the defendant

16        on trial would commit.  There's a probability he would

17        commit additional acts of violence.

18              Criminal acts of violence.  Any questions

19        about that?  And these criminal acts of violence if

20        they were proved to you, must rise to the level that

21        they constitute a continuing threat to society.

22              Now, I want to spend just a couple of

23        seconds talking with you about the word "society"

24        because ordinarily when we think of society, we think

25        of people kind of like the same boat we are.  We think
```

1     about the people we see in our neighborhood.

2              We think about the people we see at work.

3     We think about the people we come into contact with.

4     We don't think about those others, for example, when

5     we think about society, we almost never think about

6     the people who are confined within the walls of the

7     penitentiary.  They also are a piece of society.

8              I'd ask you to consider -- the word society

9     is not going to be defined for you, but I would ask

10    you to consider making a distinction in your mind if

11    you feel comfortable with the distinction between the

12    word community and society.

13             We all live in different communities, but

14    we're all a piece of the same society.  And these

15    criminal acts of violence must be such that constitute

16    a continuing threat to society.  We know society must

17    necessarily include those people behind the

18    penitentiary walls because if they didn't, that means

19    that the nice lady who teaches school to the inmates

20    in the penitentiary system when she checks in to do

21    her work everyday at 8:00 o'clock, she does not

22    lose her right to be free from criminal acts of

23    violence while doing her job and get back to her life

24    when she punches out at the end of the day.

25             That's preposterous.  And it's the same

```
 1    with nurses, same with medical personnel, same with

 2    wardens, and same with inmates.  They also have the

 3    right to be free from criminal acts of violence.

 4              So, what I'm saying is that I believe that

 5    the word society can mean all people all the time

 6    everywhere because if it didn't, that question would

 7    say criminal acts of violence that constitute a

 8    continuing threat to the citizens of Harris County,

 9    Texas and it does not say that.

10              So, that's the first question.  Does anybody

11    have any questions about the first question?  Okay.

12    Again, if you answer no to the first question, you'll

13    stop right there.  Case closed.  Because there's no

14    answer you can come up with to the second question

15    that will be consistent with yes and no because the

16    death penalty is imposed.  The death sentence will be

17    imposed at that time.

18              If you do answer the first question yes,

19    then you proceed to the second question; and the

20    second question is pretty unique compared with other

21    aspects of our law.  The first thing that we can see

22    about the first question is that the phrase, "Do you

23    find from the evidence beyond a reasonable doubt," is

24    not in that question.

25              Now, that means this is going to be the very
```

1    first time that you, the jury, is going to be asked to

2    make a decision wherein the State's not required to

3    prove to you what the answer to that question should

4    be.   And we know they're not required to prove it to

5    you because the phrase, "Do you find from the evidence

6    beyond a reasonable doubt," is not there.

7          Well, where in the world does that leave us?

8    Because if the State's not required to prove to you

9    what the answer to that first question -- that second

10   question should be, and they're not, and we know from

11   our conversation yesterday the defendant's never

12   required to prove anything.

13         So, if the defendant's not required to prove

14   to you what the answer to that second question should

15   be, and they're not, then where does that leave us if

16   nobody is required to prove to us what the answer to

17   it should be?

18         It leaves us perfectly simply in this

19   posture.   The law recognizes there may be many cases

20   wherein there is absolutely no evidence of a

21   mitigating circumstance because nobody is required

22   to put that evidence into the case.

23         So, all we're simply saying is at the outset

24   there is no obligation of either side -- on either

25   side to supply any evidence of a mitigating

1    circumstance.   The only obligation that exists is on

2    the jury to go back over all the evidence in the case

3    when you get to this question to see if there's any

4    mitigating evidence in the case, not that there be

5    any, but that you see.   Double check yourself.

6            Basically this is a safety valve.   Are you

7    satisfied that based upon the uniqueness of the case,

8    the death sentence is really what you want to do.   If

9    you get to the second question, then you're going to

10    do it unless you take it away with a no answer -- I

11    mean a yes answer.   That is to say you find a

12    mitigating circumstance.

13            Any questions about that?   I'm going fast

14    and this is a little precise but please stop me if you

15    have a question.   And, frankly, the only reason I'm

16    doing this is to make an attempt, as feeble as it may

17    be, to just simply try to make you feel comfortable.

18            This is not a hocus pocus operation.   It's

19    pretty logical.   You don't get that from television

20    but it truly is, and I want you to feel comfortable

21    with yourself.   The word "mitigating" is not going to

22    be a word that's going to be defined for you in the

23    Court's charge.

24            Mitigating, however, as we're using it here

25    means is there anything any facet of some defendant's

28

1      background, their life, the circumstances of the case

2      that make you think they ought to have a second

3      chance?  That's my phraseology, but that's basically

4      it.  You think they're salvageable, think they ought

5      to have a life sentence.

6              There is a question -- there is a next

7      question in the second question which says is that

8      mitigating circumstance sufficient?  So what we're

9      asking you to do if you find any mitigating

10     circumstances in the case, what we're saying to you is

11     this:  Take that circumstance whatever it is or those

12     circumstances whatever they are and put them up

13     against and compare them to all the bad things you

14     heard about in this case and do these nice qualities

15     about the defendant rise to the level to overcome all

16     the bad things in the case.

17             If your answer to that question is yes, yes

18     is the whole answer to the question.  If you answer no

19     your whole answer is no.  Now what a mitigating

20     circumstance might be to one of you another one might

21     think exactly the opposite of you.  That's your call.

22             For example, sometimes people might think

23     that comparative youthfulness might be a mitigating

24     circumstance.  That is to say a person of some tender

25     years they're not developed and mature enough

1    emotionally to make intelligent, rational, logical

2    decisions.

3         Some other people might take that same

4    information and say:  Well, a person this young is

5    already this mean blow them up.  See, it is the same

6    piece of information you react to it differently.

7         Sometimes people might think if there's any

8    evidence in the case about history that a defendant

9    might have of mental retardation some people might

10   think that tends to be mitigating.  Other people might

11   tend to think it's not.

12        A whole different group of people may say:

13   Well, doesn't make a difference as to how retarded the

14   person is; a little bit, quite a bit, just some, a

15   lot.  Now, if I knew the answer to that question --

16   may be mitigating may not be so.  I'm just simply

17   saying these are things we're going to ask you just to

18   take into consideration.

19        Nobody is ever going to try and commit you

20   as to how you're going to evaluate it.  But we do need

21   to commit you to the proposition that you would take

22   everything into account, reject that stuff that you

23   don't think is worthy of your consideration, that's

24   your call.

25        But consider everything and before the

1  trial ever begins, don't refuse to consider something

2  because you might hear exactly the right words that

3  would be meaningful to you to come up with a

4  particular verdict.

5  But those correct words may very well be

6  delivered by a witness who -- where you place

7  absolutely no credibility.  And so that's why we go

8  not only by the message, we also go by the messenger.

9  And how you react to that, that's your call; but we

10  ask you to not preclude anything from your

11  consideration.

12  Those are the two questions and, as I say,

13  they come into play in the second phase of the trial

14  only and that's only if a person is convicted of

15  capital murder.  You might say to yourself, "Well, why

16  are we talking about the punishment phase of the trial

17  when we haven't heard the first phase?"

18  I'm going to tell you the answer to that.

19  It is the only time we're ever going to be able to

20  explore with you and explain to you and talk to you

21  about the laws that applies, can apply and whether or

22  not you have any agreement or dispute with the law.

23  Can you see that if we didn't talk about

24  the second phase before the trial ever began and we

25  talked to you about the first phase, picked the

1    jury, put on all the testimony, couple of weeks go by,

2    jury comes back with a verdict of guilty.  We come

3    back this time to get to punishment phase of the

4    trial, explain to you what the law is; and some juror

5    says, "I disagree with that.  I couldn't possibly

6    follow that law."

7         That means we have to excuse that juror.

8    That means we don't have 12.  That means we have a

9    mistrial.  We wasted our time.  We do it up front.  I

10   want you to know the reason for doing it up front

11   has -- nobody is presuming this defendant to be

12   guilty.

13        Right now we are all presuming to the

14   absolute contrary that he's not guilty.  But we have

15   to have a mechanism to be able to talk about all

16   aspects of trial and this is why we're doing it this

17   way, and I hope you can understand it.  Any questions

18   so far?

19        Okay.  Briefly, I'll tell you the types

20   of capital murder that we got here are:  The

21   intentional murder of somebody during the course of

22   the commission of another felony.  One paragraph

23   commission of the other felony is kidnapping.  In

24   another paragraph the commission of other felony is

25   another murder.  Two murders and a murder kidnapping.

1      In order for the State to obtain a

2  conviction for the offense of capital murder, they

3  must prove the existence of those two features either

4  the murder during the course of kidnapping or the

5  murder during the course of murder.

6      Anytime the State's required to prove two

7  things beyond a reasonable doubt, there are three

8  possible outcomes that can occur.  Possible outcome

9  No. 1 is they can -- they do prove both features

10  beyond a reasonable doubt.  And if that's the case,

11  the jury's obligation would be to find the defendant

12  guilty of capital murder.

13      Possible outcome No. 2, the State cannot

14  prove beyond a reasonable doubt the existence of

15  either of those two features.  That is to say the

16  intentional murder and other felony.  If that's the

17  case, the jury's obligation would be to find the

18  defendant not guilty.

19      Possible outcome No. 3 may be the State

20  in some hypothetical case, some imaginary case can

21  prove beyond a reasonable doubt the existence of the

22  murder but not be able to prove that it was committed

23  during the course of the other felony.

24      If that were to be the case -- and I'm

25  certainly not claiming that it's going to be.  I'm

1   saying there is a logical progression of events.  It

2   can happen.  I would be obligated to give you a third

3   verdict or possible you'd had guilty and not guilty of

4   capital murder.

5           Third possibility would be guilty of murder.

6   That is to say not capital murder but murder, the

7   taking of a life or the intentional taking of the life

8   of a person without any legal justification, without

9   any legal excuse; but one that was committed not

10  during the course of another felony.

11          What we're talking about is carving out a

12  lessor crime out of a greater crime.  Murder is a

13  lessor crime carved out of the greater crime of

14  capital murder.  We know that the punishment for

15  capital murder is life or death.  The range of

16  punishment for murder, however, is just simply

17  remarkably different.

18          The range of punishment if a person is

19  convicted of murder in the State of Texas can be by

20  confinement in the penitentiary for life or by a

21  confinement in the penitentiary for any number of

22  years as long as that number is not less than five and

23  as long as it's not greater than 99.  And in addition

24  to confinement a jury can, if they think it does

25  anything, impose a fine in some amount as long as the

1    amount doesn't exceed $10,000.

2         You may say to yourself, "That's just

3    everybody.  I mean that range is so broad.  How --

4    why's it so broad?"  Well, because you hear about the

5    murders on the television because they're the ones

6    that sell title.  And you might say to yourself -- and

7    many of them are awfully vicious, awfully brutal,

8    awfully random, awfully wanton and there are others

9    that aren't so.

10         And nobody is going to supply you or commit

11   you to what the value of a dead body is.  Even

12   insurance companies don't do that.  They say that

13   every dead body is worth something different and you

14   know that because you pay different premiums.  Younger

15   people going to be paying less premiums than older

16   ones.

17         The probability you're going to live.  Now

18   in a criminal world, criminal case, the background of

19   the person who's deceased might have a bearing.  The

20   background of the person on trial might have a

21   bearing.  We want you to have room to be able to do

22   what you think is appropriate based upon the

23   circumstances of the case.

24         If you have a nice husband and wife been

25   married 50 years and 70 years of age; the wife is

1      critically ill.  She's going to die.  Everybody knows

2      it.  He loves her; she loves him.  He doesn't want to

3      see her suffer.  She's on a life support system.  They

4      discuss it.  By her request and his agreement, he

5      pulls the plug so she won't suffer.  She dies.

6              Without getting into the morality of that,

7      in this State that's murder.  But he didn't kill her

8      out of anger, didn't kill her out of hate, didn't kill

9      her out of revenge.  He killed her out of love.  Maybe

10     you wouldn't think that would be a life in the

11     penitentiary case.

12             Then you got the kind of cases you see on

13     television.  Maybe you think there that's a deal.

14     Then you got the kind of cases you perhaps probably

15     never thought of.  How about the 18-year-old boy who

16     is the only person trying to raise his little sister

17     who's 14, and he's doing the very best he can with

18     what limited tools he is supplied with.

19             And every morning he makes sure before he

20     goes to work she gets up, gets dressed and goes down

21     to the junior high school.  And he comes home one day

22     and he finds out that there has been this guy, this

23     adult selling dope to his little sister and he goes

24     down there with a gun and kills him.

25             Now maybe you think that wasn't a life case,

1    maybe you would. That would be your call. All

2    we're simply saying is that we're giving you room, so

3    to speak. And after all of the evidence in the case

4    has been presented to you, you supply what you think

5    is the right punishment based upon that evidence in

6    that case.

7            So my question to you is this -- and it's

8    back to what we touched on yesterday about the fact

9    that the lawyers for both sides have the right to have

10   jurors -- folks who will consider the entire range of

11   punishment.

12           I don't want you to think we're trying to

13   commit you now as to what you're going to do before

14   you ever heard anything. That's not the point. But

15   the point is we want to commit to the notion you're

16   available to do anything within the range depending

17   upon wherever the facts lead you in the case.

18           So, let me ask you this: Let's think about

19   the fact you're a juror in some imaginary capital

20   murder case. Your jury has heard all the evidence in

21   the case. Your jury goes on in and your jury

22   deliberates and your jury unanimously finds that

23   whoever this defendant is that's on trial in this

24   capital murder case is not guilty of capital murder,

25   but you do find beyond a reasonable doubt that that

1     defendant on trial is in fact guilty of murder, you

2     come back and you have the second phase, the

3     punishment phase.  Whatever the evidence was presented

4     to you there doesn't make any difference.  Let's say

5     at the conclusion of that evidence the second phase

6     of this case that started out to be a capital murder

7     case by your verdict is a murder, is there anybody

8     here who could not consider assessing that imaginary

9     defendant's punishment at confinement in the

10    penitentiary for life if you thought based upon

11    however you evaluate it, whatever information was

12    presented to you in that case, that that was the right

13    result to reach.

14          Anybody here who would refuse to consider

15    that as a sentencing option if you thought it to be

16    appropriate based upon the facts?  Okay.  I take it

17    you would take it into account; and, again, I'm not

18    trying to ask you would you do it.  I'm simply asking

19    if you were able to if you thought it was right.

20          I'm going to take that same question and

21    flip it over.  Same jury in same imaginary capital

22    case and heard all the evidence in the capital murder

23    case and the jury finds the defendant not guilty of

24    capital murder but your jury unanimously does find the

25    defendant guilty of murder.  You come back.  You hear

1      the evidence of the second phase of trial, whatever

2      this evidence might be.  You go out to deliberate your

3      verdict.

4            Is there anybody here who would refuse

5      to consider assessing that imaginary defendant's

6      punishment at confinement in the penitentiary for

7      five years if you thought, based upon whatever the

8      evidence was that was presented to you in that case

9      and your evaluation of that evidence, that that was

10     the right result to reach?

11           Anybody here who would refuse to take five

12     years into consideration as a legitimate sentencing

13     option if you thought it was the right thing to do

14     based upon the facts?  Okay.  I take it that you

15     would.  So what you're telling me is you're wide open

16     to the range of punishment of five years to life,

17     anything in between and whatever decision you reach.

18     If this ever came to play in the trial, you would

19     reach this decision based upon wherever the evidence

20     lead you.

21           And evidence in trial is supposed to be, I

22     guess, considered to be something like the leash on a

23     dog.  We're the dog; the evidence is the leash.  And

24     we go wherever in terms of result where that leash,

25     being the evidence, takes us:  Guilty, not guilty,

1    life, death, 5, 99, 50, 12, 18, whatever.

2              I'm not saying that's going to come into

3    play in this case.  I'm simply saying that I know that

4    is a theoretical possibility.  Any questions about

5    that?

6              One other aspect I want to touch on briefly

7    is that we have a rule and I'm going to talk about

8    the concept without trying to be just really legally

9    precise but give you an idea what I'm talking about.

10   If you have a bunch of people committing crime, they

11   agree to commit it.  They know that's what happened.

12             If you participate in a crime our law in the

13   State of Texas says that a person who is involved in

14   that conspiracy, so to speak, cannot be convicted upon

15   the uncorroborated testimony of one of the other

16   co-conspirators.  There has to be instead some other

17   evidence from some independent  source other than the

18   conspirator that tends to connect the defendant on

19   trial to the commission of the crime.

20             An example:  You got two people who get

21   together.  They agree to go rob a bank.  One guy's

22   the getaway; driver the other guy the bank robber.

23   They both do their jobs.  Guy drives up, guy robs

24   bank.  Backing off they both get arrested.  There is

25   absolutely no evidence on the getaway man except for

1      what the guy who actually went into the bank did.

2              What I'm saying is if the only testimony

3      that exists in the trial of the getaway driver is

4      the testimony from the bank robber and there is

5      absolutely no other -- absolutely no other evidence

6      from any independent source that tends to connect the

7      defendant to the commission of that crime, then the

8      getaway driver cannot be convicted.

9              Eyewitness says, "Yeah, I saw that person."

10     That's evidence that tends to connect the defendant

11     fingerprints, connection, all sorts of things that

12     tend to connect the defendant to the crime.  There has

13     to be some other evidence other than the evidence of

14     an accomplice.  That's the legal term.

15             Anybody here find that absolutely alarming

16     or objectionable or offensive to where you couldn't

17     follow that law?  I don't know what's going to happen

18     in this case.  Theoretically I could -- have I omitted

19     anything other than the things we had talked about?

20             MR. MCCLELLAN:  The 40.

21             THE COURT:  I'm sorry.  Thank you.  We

22     talked earlier about persons convicted of capital

23     murder what that means life or death -- excuse me --

24     the punishment for persons convicted of capital murder

25     depending on how the questions are answered, life or

1   death.  What does death mean?  Well, that's pretty
2   obvious, not going to get into that.

3           Sometimes we have a confusion as to what
4   a life sentence means.  I'm going to attempt to
5   eliminate confusion.  And I will tell you that in this
6   case if this defendant is convicted of the offense of
7   capital murder and if these two questions are answered
8   in such a way, the law obligates me to sentence the
9   defendant to life.  A life sentence means in this case
10  that the defendant can't become eligible for parole
11  until he, the defendant, has actually served 40
12  calendar years.

13          There is no acute way of counting in
14  penitentiary.  Twenty-seven is going to come after 28;
15  32 is going to come after 31.  I mean it's 40 years,
16  and that means 2039.  And that means when the
17  defendant can become eligible for parole
18  consideration.  A person's eligibility for parole
19  consideration has absolutely nothing to do with
20  whether they will or will not be awarded parole or
21  when they will if they are awarded parole after 40
22  years because decisions made about awarding parole
23  will be made by prison authorities.

24          They'll make evaluations of a person's
25  conduct during the 40-year stay they've been here.

1      Those evaluations will be sent to the Board of Pardons

2      and Paroles.   The Board of Pardons and Paroles will

3      make those evaluations and make recommendations to

4      the Governor of the State of Texas.

5             I haven't the foggiest idea who the governor

6      in Texas is going to be in 2039.   Whoever he or she is

7      is entitled to either follow those recommendations or

8      reject those recommendations or make just simply

9      absolute object political decisions.

10            We don't know what's going to happen.   The

11     point of it is, however, I do want you to know at the

12     conclusion of a trial wherein a defendant has been

13     found guilty of capital murder and a life sentence

14     has been assessed, it is just perfectly possible

15     that defendant on trial would spend the rest of

16     natural living life in the penitentiary.

17            It is also equally possible that at the

18     conclusion of 40 years, another hypothetical defendant

19     might be awarded parole.   What is going to happen in

20     this case we don't know.   And, therefore, what I'm

21     going to tell you is what might happen in the event of

22     a life sentence in terms of parole can't in any way

23     interfere or be a consideration of yours in how you

24     answer either one of those two questions.

25            Those two questions must be based upon the

1    evidence presented in the case not upon speculation as

2    to what might happen in the future.  But I want

3    you to know what a life sentence means.  Anybody have

4    in questions about that?

5                VENIRE PERSON:  Sir, when you say "40

6    years," you mean he's going to stay 40 years, not good

7    behavior before 15 years, 10 years.

8                THE COURT:  I said about as clearly as I

9    could 2039.  Now, again, what happens at that point,

10   don't know.  That's where the variables start coming

11   into play.  That is no availability for 40 years.

12               Anybody else?  You folks have just completed

13   your first year in law school.  Is there anybody that

14   has any questions at all about anything that we've

15   touched on to this point?

16               Okay.  Let me say this to you, we're going

17   to, in just a couple of seconds, visit with you

18   individually.  Please, before we start this process, I

19   want you to know that -- and I didn't say this to you

20   yesterday.  Frankly, I forgot it.  We're never going

21   to talk to you about the facts of this case ever.

22               And you might say to yourself, "That's

23   pretty stupid.  If I'm going to be a juror in this

24   case why don't we talk about that case?  Well, because

25   of this:  Any one of the four lawyers -- I've known

```
 1          them all for years and trust all of them -- and you
 2          pick any one of these four, pick all four, and you say
 3          to yourself, "If any of these lawyers told me the
 4          third witness in this case is going to testify to A,
 5          B, C and D, I'm going to tell you right now exactly
 6          what I would do because I just trust these lawyers
 7          that much.
 8                    So, sure enough the trial comes rolling
 9          around.  The third witness gets on the stand and
10          testifies exactly as was predicted; A, B, C and D.
11          But because it's your job to evaluate the credibility
12          and believability of the witness, you might say to
13          yourself, "This third witness, I wouldn't believe a
14          single word that person said."
15                    So, that's why we're never going to talk
16          about the facts.  That's why we're never going to talk
17          about the evidence.  That's why we're never going to
18          try and commit you as to what result you will reach.
19          We are going to make everyone, however, commit that
20          you will follow the law.  That you'll listen to
21          everything.  Take everything into account in terms of
22          consideration.  Reject that you think should be,
23          accept that you think should be and come up with what
24          you think is the right result to reach.
25                    But when the lawyers are talking to you
```

1    individually, please don't think that they're going to

2    try and commit you to anything in this case because

3    they're not.  They just want to be sure that if you're

4    a juror in this case, you're going to sit in one of

5    those chairs, going to sit back and going to drink in

6    every single bit of testimony.  Use it all.  Evaluate

7    it how you see fit; and come up with what you think is

8    the right verdict, based upon how you evaluate the

9    information that they supply it.  Their job is to

10   supply it.  Your job is to use it.

11            Any questions?  Okay.  Before we go any

12   further, there was a time when I knew what this number

13   was.  Mr. Cardenas, if you would stay and the other

14   folks would retire to the hallway.  We'll get you back

15   in here as quickly as we possibly can.

16            (Prospective jury panel retired except for

17   Prospective Juror No. 8, Mr. Ruben Cardenas.)

18            THE COURT:  Mr. Cardenas, come on up, sir.

19   First off, sir, please don't feel you're being singled

20   out.  Please don't feel that you're on the spot

21   because you're not.  I just need to ask you a couple

22   of questions along the lines some questions I asked

23   some other folks.

24            Frankly, I wanted to get into the process

25   before I went into this specifically with you.  This

1    morning before the folks -- all of you were brought in

2    here and while you were out in the hallway, was there

3    a time this morning where you saw the defendant,

4    Mr. Mamou.

5            VENIRE PERSON CARDENAS:  No.

6            THE COURT:  And talk out.  She's writing

7    down what is being said.

8            VENIRE PERSON CARDENAS:  No.

9            THE COURT:  Was there a time you ever had a

10   conversation with anybody regarding Mr. Mamou and the

11   offense and whether he was or wasn't in custody or

12   anything like that?

13           VENIRE PERSON CARDENAS:  Yes.

14           THE COURT:  Do you recall with whom that you

15   had that conversation?  I realize that you just met

16   these folks and maybe don't know their names.  Do you

17   remember who it was that you talked with?  Was it more

18   than one person?

19           VENIRE PERSON CARDENAS:  No, just the lady

20   in the blue.

21           THE COURT:  Okay.  The one that was up here?

22           VENIRE PERSON CARDENAS:  Uh-huh.

23           THE COURT:  And can you tell us please, sir,

24   about that conversation, what was said, not that

25   anything said was wrong.  We just need to be sure.

```
 1              VENIRE PERSON CARDENAS:  I was asking what
 2     was capital murder.  I don't know what capital murder
 3     means, and she was talking to me.  So, I don't know,
 4     maybe he killed somebody, a sheriff deputy.  And going
 5     that route says, "Well, why do you want to kill him
 6     for?"  I mean the other people in jail, what's the
 7     difference between him and other people in jail now?
 8     And basically that was it.
 9              THE COURT:  Okay.  So your comments were
10     more a conceptual thing not a specific thing in
11     question.
12              VENIRE PERSON CARDENAS:  No, I was asking
13     what was it.
14              THE COURT:  Mr. McClellan, any questions?
15              MR. MCCLELLAN:  No, Your Honor.
16              THE COURT:  Mr. Hill, Mr. Wentz.
17              MR. WENTZ:  The question -- you had a
18     conversation?
19              VENIRE PERSON CARDENAS:  No, just asking
20     her what capital murder is and she knew.
21              MR. WENTZ:  And for your purposes you asked
22     killing a police.
23              VENIRE PERSON CARDENAS:  No, I'm just asking
24     what is capital murder.  Why is -- what is capital
25     murder.  I didn't know.
```

1          MR. WENTZ:   Okay.   And what else did you say

2      in the course of your conversation?

3          VENIRE PERSON CARDENAS:   What was capital

4      murder.   And she didn't know either.   We were just

5      here.   Didn't know what time we had to be here, 8:30

6      or 8:00 o'clock, 8:30 or outside.

7          MR. WENTZ:   You didn't see the defendant?

8          VENIRE PERSON CARDENAS:   No.

9          MR. WENTZ:   I'm through.

10         THE COURT:   All right.   Thank you very much.

11     Step outside, sir, please.   Mr. Hill, did we ever get

12     on the record about Ms. Wagy?

13        MR. MCCLELLAN:   No.

14        THE COURT:   For the purposes of the record

15     perhaps at the time we left the record the idea as to

16     Ms. -- No. 12, Ms. Wagy was that if she did call and

17     claimed her exemption, Mr. Hill would have no

18     objection to her based upon what we provided the

19     record with earlier, have no objections to her

20     claiming exemption.   And if we got to her and haven't

21     heard from her in the ordinary course of business, he

22     would have no objection.

23        We did hear from her, did talk to her on the

24     phone personally in my presence, on my end of the line

25     Mr. McClellan and Mr. Hill, and I informed them at the

```
 1     time that Ms. Wagy specifically did say that because

 2     of her five-and-a-half-year-old child she was now

 3     requesting the exemption she had been entitled to

 4     because she had a sitter or caretaker when she came

 5     but lost that ability to do that any longer.

 6              MR. MCCLELLAN:  Okay.

 7              MR. HILL:  No objection.

 8              THE COURT:  Ms. Wagy's exemption has been

 9     honored.  She has been excused.  There was somebody

10     else, Mr. Hernandez, was that correct?

11              MR. HILL:  Yes, Your Honor.

12              THE COURT:  And you because of his

13     conversation earlier requested that he be excused.

14              MR. HILL:  Yes, Your Honor.

15              THE COURT:  That request is granted as to

16     No. 9.  What about Mr. Cardenas?

17              MR. HILL:  Well, I'm basing my concern on

18     him based on what the other Juror 18 told us that he

19     made the comments about why a person charged with

20     capital murder is not in jail and that was Ms.

21     Tinnemeyer.  I guess maybe question him a little bit

22     more.

23              THE COURT:  You have based upon the record

24     as it exist now, you have no position?

25              MR. HILL:  Well, my position would be he
```

1    should be excused based on what Tinnemeyer said

2    because she came up here and was candid about what

3    was being said in the hallway.  Mr. Cardenas doesn't

4    recall making that statement.  I don't know.  I'm not

5    real comfortable with him.  I would ask -- I'm

6    challenging him.  Going to ask the Court to excuse

7    him.

8                THE COURT:  Mr. McClellan, I tell you my

9    best guess probably, based upon the record, really not

10   there.  I refuse on the first day to have a case

11   reversed.

12               MR. MCCLELLAN:  So the second day to

13   reverse.

14               THE COURT:  We'll take that up on the second

15   day.  Hopefully, administratively, we won't have the

16   problems again.  If that's your request and motion,

17   it's granted.

18               MR. MCCLELLAN:  What number is he, Your

19   Honor?

20               THE COURT:  No. 8 and No. 9, each

21   challenges, each are granted.  Okay.  Is there

22   anything I need to add to this business?

23               MR. MCCLELLAN:  Nope.

24               THE COURT:  Okay.  Are we ready for

25   Mr. Pena?

```
1              MR. HILL:  Yes.

2              THE COURT:  All right.  Mr. Pena, please.

3              (Prospective Juror No. 2, Mr. George Pena

4      entered the courtroom.)

5              THE COURT:  Hi, Mr. Pena.  Walk straight

6      across this way and come over here and have a seat and

7      make yourself as comfortable as you can be.  And how

8      are you today, sir?

9              VENIRE PERSON PENA:  All right.

10             THE COURT:  Well, Mr. Pena, first off let me

11     ask you this.

12             VENIRE PERSON PENA:  Uh-huh.

13             THE COURT:  Taking into account yesterday

14     and the things we talked about yesterday adding to

15     that this morning and the things we talked about this

16     morning out of everything that we have talked about so

17     far, do you have any questions at all for me?

18             VENIRE PERSON PENA:  No, sir.

19             THE COURT:  Is there anything, Mr. Pena,

20     that up to this point we have not yet talked about

21     that you feel as though we should talk about because

22     it might have some bearing on your ability to be a

23     juror in this case?

24             VENIRE PERSON PENA:  No.

25             THE COURT:  Is there anything at all,
```

```
 1        Mr. Pena whether it be something, for example, about
 2        your personal life whether it be something, for
 3        example, about your job whether be it something, for
 4        example, about your health or be about something else
 5        that you think would in any way interfere with your
 6        ability to be a juror in this case during the time
 7        frame that we've talked about?
 8                    VENIRE PERSON PENA:  No, sir.  No problem.
 9                    THE COURT:  The lawyers in just a second,
10        sir, are going to ask you some questions; and I want
11        you to know that whatever the questions they ask you,
12        they are not in any way meant to pry into your
13        personal life or to in any way embarrass you.  That's
14        the last thing any of them want to do.
15                    All the questions boil down to is this:
16        They just want to be satisfied you can be air to
17        the State, listen to everybody, do what you think you
18        ought to do based on the evidence and calling them --
19        call it down the middle as you saw it.  And your job
20        is not to make either side happy or the other said
21        happy or both sides happy or to make me happy.
22                    Your job is five years from now Mr. Pena
23        wakes up and says to himself, "No, sir, I did the
24        right thing."  That's the only person who needs to be
25        happy.  Before we begin, any questions for me?
```

1        VENIRE PERSON PENA:  No, sir.

2        THE COURT:  Thank you, sir.  Mr. McClellan.

3        MR. MCCLELLAN:  Thank you, Your Honor.

4

5                    **GEORGE PENA**

6    having been sworn as a prospective juror testified as

7    follows:

8

9                    **EXAMINATION**

10   **QUESTIONS BY MR. MCCLELLAN:**

11   Q    Mr. Pena, my name is Lynn McClellan.  Along with

12   Claire Connors, we represent the State of Texas in this

13   case.  I want you to sit back and relax.  I'm going to ask

14   you to share with us, if you will relax -- you're probably

15   saying, "How could I relax up there on the witness stand?"

16            You have to realize you know the answers.

17   And we're going to get you to share with us what you know,

18   your opinions.  We've never met you before.  Never had the

19   opportunity to know you.  We want to find out a little bit

20   about you in a short period of time.

21            You filled out the questionnaire the other

22   day and come to listen to the Judge yesterday and again

23   today.  Since that period of time have you had any

24   thoughts, change your mind about anything as far as your

25   answers to the questionnaire or say, "I should have put

1    something down I didn't think about."

2    A    No, sir.

3    Q    Okay.  Can you tell me in your own words what kind of

4    cases come to mind when you think of cases where you think

5    the death penalty ought to be available as one of the

6    forms of punishment, what kind of crimes?

7    A    Just various -- just depends on a particular crime.

8    Q    Okay.

9    A    I mean, like the Judge was saying it's a broad

10   spectrum.

11   Q    Okay.  So, obviously, some cases you think it's

12   appropriate for and some may not be appropriate for?

13   A    Correct.

14   Q    Capital murder as the Court told you is murder plus

15   some aggravated circumstance.  In a capital murder case,

16   you're always going to have a murder, always going to be

17   someone who's intentionally killed.  And by murder we're

18   talking about the intentional taking of another person's

19   life without any legal justification.

20              We're not talking about killing someone

21   in self-defense because that's not murder, that's

22   justification.  We're not talking about intentionally

23   killing someone.  We're talking about capital murder

24   where someone intends to take someone's life and does some

25   act that effectuates that by taking life, it's their

1    intent to kill the person.  Then it must be coupled with

2    the commission of some other crime.

3            And we have alleged in the indictment two

4    different ways.  Murder during a kidnapping or in the

5    course of kidnapping or murder during the course of

6    another murder.  Capital murder in the State of Texas,

7    though, includes murder during robbery, murder during

8    burglary, killing a police officer in the line of duty,

9    killing a child under a certain age.

10           All these kind of cases are those the kind

11   of cases you think the death penalty ought to be available

12   for in certain circumstances?

13   A    Yes.

14   Q    Okay.  Now, for the offense of murder itself, the

15   death penalty is not available.  I could go up and down

16   the street and pull up to someone and pull a gun out and

17   shoot them, you know, square in the head point blank and

18   laugh and drive off.  That is murder not capital murder

19   because I didn't do some other crime.

20           Now, if I take their billfold, that would

21   be capital murder because it would be a robbery.  If I

22   were to kidnap them, take them to another location that

23   could be capital murder.  It's murder during a kidnapping.

24   But just intentionally and horribly and violently killing

25   someone without any other associated felony, it's murder

56

1    which is as the Judge told you has a range of punishment

2    as low as five years to as high as 99 years or life.

3                    When I say murder, that's probably something

4    comes into your mind someone intentionally killing

5    someone.  As the Judge told you there are thousands upon

6    thousands of fact situations that can fit within the

7    content of murder.

8                    I mean you could have a mercy killing on

9    one end or a drive-by shooting of a kid on a bicycle on

10   another.  Obviously, ought to receive different

11   punishments in a murder case not talking about capital

12   murder.

13                   Now, in a murder case would you keep your

14   mind open to the full range of punishment as low as five

15   years or as high as 99 years or life and wait until you

16   heard all the evidence before you decided what punishment

17   ought to be received?

18   A    Yes, I could.

19   Q    Okay.  So you have eliminated one end of the spectrum?

20   A    No, sir.

21   Q    You're fully open to the full deal?

22   A    (Nods head.)

23   Q    All right.  I want to go over a couple of things in

24   the questionnaire.  It shows in here you watch Court TV.

25   Asked about any articles you read or watched concerning

57

```
1    the death penalty.  Have you watched any death penalty

2    type cases on Court TV?

3    A    I just basically watch.

4    Q    Just watch Court TV?

5    A    Basically we have a satellite and flip through the

6    channels.  And every once in a while something will catch

7    my attention and we stop.

8    Q    Anything you've seen on Court TV affect your ability

9    to be a juror?

10   A    All it is is a show.

11   Q    Okay.  All right.  You indicate also you have an aunt

12   that works in the Harris County jail.

13   A    Yes, sir.

14   Q    She works over here.  Does she work Franklin or in

15   701 whatever it is?

16   A    Franklin.

17   Q    Franklin.

18   A    1301 Franklin.

19   Q    Okay.  Do you ever talk to her about what goes on in

20   jail or other stuff?

21   A    No, basically we're just family type deal.  Our jobs

22   don't interfere with each other.  I don't get into her

23   business.

24   Q    Right.  Okay.  So, nothing about that relationship

25   with somebody who works in the jail will affect your being
```

1     a juror in this case?

2     A    No.

3     Q    It says:  What are your feelings about the death

4     penalty?  You said a person taking a life and has no

5     regret, you put "possibly."  Okay.

6     A    No remorse.

7     Q    No remorse.  You're saying then it might be possible

8     to have a death penalty.  What do you think would be the

9     deciding factor that made you go from possible to yeah

10    this is -- this is the type of case?

11    A    Extenuating circumstances it was committed in.

12    Q    Okay.  Facts of the case.  And I'm -- all the

13    situations all the facts you hear about what happened

14    before, during and after the commission of the crime?

15    A    Right.

16    Q    That's what you get to hear about in trial.  You know

17    ahead of time whether before spur-of-the-moment crime,

18    premeditated or well-thought out crime.

19    A    Correct.

20    Q    What happened during the crime, how the killing may

21    have happened, what happened after the crime, did the

22    person show remorse or braggadocios, going around having a

23    good time, whatever.

24    A    Correct.

25    Q    You think all those factors kind of help make that

1    decision?

2    A    Definitely.

3    Q    All right.  And I didn't talk about the best argument

4    against the death penalty that you'd have to be absolutely

5    sure without a doubt the person did the crime.  And I

6    think you also mentioned that in another place that no

7    reasonable doubt.  Of course that is the burden of the

8    State and always stays with us.

9              I often though wonder if sometime people

10   they think beyond a reasonable doubt is beyond all doubt.

11   I mean I can tell you right now I can never prove any

12   case, and I've been a DA more than 18 years.  I can never

13   prove a case beyond all doubt because to do that I think

14   you had to be a witness to a crime.

15             If you were a witness, then you couldn't be

16   a juror in this case; and what you have to do is rely upon

17   people who were witnesses who come in and tell you what

18   they saw happened.  And so there'll always be some area in

19   judging whether that person is telling the truth or you

20   may have questions about I wonder why this happened.

21             Well, in the indictment you're never going

22   to see anything about where our proof is as to why

23   something happened.  Always going to be questions at the

24   end of a perfect trial, if you will.  So a lot of

25   questions may be raised.

1          Now, the issue is:  Have I proven all of the

2     elements set out in the indictment beyond a reasonable

3     doubt.  After you sit there and listen to all the evidence

4     if you feel that I, the State, has proven this case beyond

5     a reasonable doubt, then you return a verdict of guilty.

6          If you think we have not, you have a

7     reasonable doubt about the elements that are in the

8     indictment, then you find him not guilty.  Now, you may

9     have other questions that are unanswered.  If they don't

10    relate to the elements in the indictment, I don't have to

11    prove those because that's -- the indictment tells us what

12    we have to prove.

13         Any problem with that aspect of the law?

14    A    No, sir.

15    Q    You've never been a juror before; is that correct?

16    A    Correct.

17    Q    All right.  In this questionnaire there's also this

18    area of agree, disagree, and had a bunch of statements.

19    Do you likely disagree or agree with these statements?

20    One statement says:  Life imprisonment is more effective

21    than the death penalty.  And you checked that you agree

22    with that.

23         Can you tell me what you thought about why

24    life imprisonment is more effective?

25    A    You would have to take into consideration the history

1    of the defendant or the criminal, whatever the case may

2    be, how we did, how he's going to do, predict possibly

3    what his future is going to be, if he's worth striving for

4    something, you want to help him as much as you can.

5    Q    If he's worth saving, if there's a possibility of

6    saving?

7    A    Yes.  You can always turn somebody around.

8    Q    Do you think though -- and say I agree with you on

9    that -- well, I agree with anybody can be turned around.

10   Do you think it kind of depends whether they want to be

11   turned around?

12   A    Yes, sir.  Correct.  I mean, you want to but they

13   don't want to accept them or what's going on.  They think

14   that's the only choice to get out of it.  It's not worth

15   it.

16   Q    Now, there's another question that says the death

17   penalty is always justified for intentional murder; and

18   you checked that you agreed with that.

19   A    Yes.

20   Q    Now intentional murder as we talked about -- first

21   of all, murders in Texas are intentional.  That's a

22   requirement for it to be murder.  It has to be intentional

23   taking of another person's life.

24             So, not knowing that's what the definition

25   is, I mean, it would seem to say -- read in the question-

1    naire you believe that everybody who commits murder ought

2    to receive the death penalty in filling out this

3    questionnaire.  I don't think you believe that.

4    A    Yeah.  Correct.

5    Q    That's because capital murder is murder plus some

6    aggravated circumstance.  Do you believe that everybody

7    who intentionally kills somebody ought to receive the

8    death penalty?

9    A    If it's premeditated, that's a possibility.

10   Q    A possibility not a certainty?

11   A    Not certainty, no, sir.

12   Q    There are no -- there is no one case -- there is no

13   one case in the law that I know of anywhere in the United

14   States where if you commit this crime, you automatically

15   get the death penalty.  There is no automatic death

16   penalty.

17            Instead, the Legislature set up these two

18   questions here -- and let my see if I can finagle this

19   around there so you can see it better.  And the decision

20   on life and death is determined by answering those

21   questions.  And I don't want to jump too far ahead yet

22   because there are two parts to the trial.

23            First is guilt-innocence.  You have to

24   determine has the State proven beyond a reasonable doubt

25   that the defendant intentionally took the life of a

63

1    certain person during the course of a kidnapping or as the

2    other paragraph that he intentionally killed one person

3    after having intentionally killed another person, okay,

4    during the one criminal episode.

5    A    Okay.

6    Q    So you'd had to have found either or both of those

7    before you found -- you'd had to have found the defendant

8    guilty of either or both of those before you'd ever get to

9    the punishment stage of the trial.

10                  By the punishment stage of trial, you have

11   a lot of evidence.  You have evidence what happened

12   before, during and after the commission of crime.  You

13   have to decide whether this evidence proves to you the

14   defendant is guilty of capital murder as charged in the

15   indictment.  Either murder kidnapping or murder during

16   murder.

17                  Okay.  You then go to the punishment stage

18   of the trial where you may hear additional information

19   about a defendant's criminal background, criminal history

20   or lack thereof, mental disability, any evidence about him

21   at this stage.

22                  Your decision now is what punishment should

23   the person we have found guilty receive for the crime we

24   have found him guilty of, okay.  And you decide that not

25   by voting life or death, but by answering the questions.

1    And depending upon how the questions are answered, depends

2    upon what punishment the Judge assesses.

3                    The fact -- just for a moment, do you have

4    any doubts about your ability to participate in a process

5    whereby you would be called upon to answer these questions

6    knowing if you answered them a yes and no, then this Judge

7    would order the execution of the defendant sitting over

8    here on trial if that's what the law and the evidence

9    called for.

10   A    If that's what the law calls for, yes, I agree with

11   it.

12   Q    Okay.  Some people come in and say:  Well, I believe

13   in the death penalty and I think it's proper but I could

14   never make that type of decision.  That's what the law and

15   evidence called for and calls for those answers to be

16   answered in such a way that death would result.  You could

17   do that if that's what the law and evidence calls for?

18   A    If that's what the law calls for.

19   Q    Okay.  Now, after you've heard the evidence about the

20   crime and after the punishment stage you hear evidence

21   about the individual, you begin to answer these questions.

22   And, as I say, there's not any situation where it's an

23   automatic death penalty.

24                    In fact, the first question is automatically

25   answered no, unless we prove beyond a reasonable doubt

1    that the answer ought to be yes.  Just like he's

2    automatically presumed to be innocent right now until we

3    prove, if we do, beyond a reasonable doubt that he's

4    guilty.  If you're to vote right now whether Mr. Mamou is

5    guilty or not guilty of capital murder, you find him not ·

6    guilty because you heard no evidence.

7              So, if I ask you to answer Issue No. 1

8    right now, to Issue No. 1 you answer no because you

9    haven't heard any evidence.  Okay.

10   A    Correct.

11   Q    Now, Issue No. 1 says:  Do you find from the evidence

12   beyond a reasonable doubt there's a probability that the

13   defendant would commit criminal acts of violence that

14   would constitute a continuing threat to society?

15             It talks about first of all a probability.

16   As the Judge said it's not a possibility because

17   anything's possible.  It's possible you could have won the

18   lottery last night on Wednesday night, possible win to it

19   on Saturday.  Not probably either one of those things

20   going to happen.

21   A    Really.

22   Q    So, it's not just a possibility because things are

23   possible; and it's not a hundred percent certainty.

24   Otherwise, you would say there's beyond a reasonable doubt

25   that the defendant would.  It wouldn't say probably it

1    would just say that he would.

2            Probably says something more than a

3    possibility and something less than a certainty, somewhere

4    in between that.  "More likely than not" is a phrase

5    commonly used to describe probability.  If I find based on

6    the evidence I heard more likely than not this person

7    would commit criminal acts of violence that would

8    constitute a continuing threat to society.

9            It used the words criminal acts of violence

10   not capital murder or murder, though if a person commit

11   them those are obviously acts of criminal violence.  Could

12   be a robbery, burglary, shooting someone and missing,

13   hitting someone with fist as hard as you can, knock them

14   out or cause serious injury to them, anything that is

15   criminal and violent in nature.

16          So basically this is a continuing threat

17   question.  And the question is as the defendant sits

18   before you that day you make the decision, do you find

19   from the evidence you heard beyond a reasonable doubt

20   there's a probability that he would commit criminal acts

21   of violence that would constitute a continuing threat to

22   society.

23          And if you believe that beyond a reasonable

24   doubt, you answer yes.  If you don't, you answer no.

25   Okay.  Some people say:  Well, if I find a person guilty

1    of capital murder I will -- I'm always going to believe

2    there's a probability they'd commit criminal acts in the

3    future.  Maybe so maybe not.

4              I mean the facts of the case itself may give

5    you enough to answer this question yes.  In some cases and

6    other cases, it may not.  I mean, you could have a person

7    you may have found out committed capital murder; but

8    they've never been in trouble with the law.

9              They are the Eagle Scout, choir boy,

10   straight A student.  In other words, what they did was a

11   total aberration from the rest of their life.  You may

12   say:  Well, based on that I don't believe he'll be a

13   continuing threat to acts of criminal violence.

14             On the other side you may find a person in

15   and out of trouble all their life, been a constant

16   skipping in and out not necessarily going to the

17   penitentiary being convicted but someone in trouble all

18   around.  You may think that person is a continuing threat.

19   Okay.

20   A    Okay.

21   Q    So, are you open to answer that question either yes or

22   no having already found a person guilty of capital murder?

23   Are you still open to answer yes or no depending on what

24   the evidence shows relating to that issue?

25   A    Yes, depending on what the evidence shows.

1    Q    Now, if you answer that question yes, the defendant's

2    going to receive the death penalty unless on Issue No. 2

3    you find there is a reason or reasons why he should not.

4    Issue No. 2 doesn't say beyond a reasonable doubt.

5              Instead it asks you:  Do you find that after

6    taking into consideration all of the evidence including

7    the circumstances of the offense, the defendant's

8    character and background and his personal moral

9    culpability, I like to refer to it as his personal moral

10   responsibility for his crime, there are such mitigating

11   circumstance or circumstances, I like to refer to it as

12   sufficient reasons why this person should receive life as

13   opposed to death.

14              It gives you an opportunity to -- in fact,

15   I demand you go back and look through all the evidence.

16   It says to look at the evidence, the circumstances of the

17   offense.   In other words, look back at the evidence about

18   the crime, the defendant's character and background that

19   would be what you heard at the punishment stage of trial

20   and then his personal moral responsibility.

21              Was he personally, morally responsible for

22   the commission of the crime, or was he a getaway driver,

23   you know.   And then determine is there a sufficient

24   mitigating circumstance or circumstances, sufficient

25   reasons why this person ought to receive life as opposed

1    to death because the stage you're at when you get to that

2    question if you find him guilty of capital murder, you had

3    to have because you wouldn't find capital murder anyway,

4    and find he's a continuing threat to commit further acts

5    of violence he's going to get unless you find there is a

6    reason or reasons he should receive life as opposed to

7    death.

8             It gives you the opportunity to make that

9    last determination:  Is he deserving of the death penalty

10   for all the things we know about him.

11   A    Okay.

12   Q    And if you think he's deserving of a life sentence,

13   you make that decision -- you answer that yes.  I mean,

14   you answer that yes answer that question -- start over.

15   A    It's yes or no.

16   Q    Yes.  There are sufficient mitigating circumstances,

17   right.  And then if you find there's not a sufficient

18   mitigating circumstance you answer that no.  If you answer

19   the first question yes and second no receive death

20   penalty -- first one yes and second one yes, he would

21   receive life in the penitentiary.

22             Do you think that's a good system we have

23   set up to make this determination?

24   A    At that time -- that's probably our best system at

25   this time.

1    Q   Now, let me give you an idea what Issue No. 2 is about

2    when looking at mitigation.  Basically, my concept is it

3    requires you to go back and look at all the evidence and

4    decide whether or not that's mitigating.

5                In other words, does it give any reason

6    whether this person receive life not death.  You may have

7    heard the defendant was high on drugs and alcohol when he

8    committed the crime.  Somebody may say:  Well, they think

9    that mitigates towards a life sentence.  High on drugs or

10   alcohol, you do things you ordinarily wouldn't do.

11               Juror No. 2 may say:  Wait a second.  You

12   get high on drugs or alcohol, you still ought to be

13   responsible for your crime and may not get high on alcohol

14   or drugs and do something like this again.  That's why I

15   don't think it's mitigating.

16               That's okay because the two people looked

17   at the evidence and come up with their own decision.  They

18   waited and determined whether it's mitigating or not to

19   make that determination.  The age of a person.  This

20   person appears to be a young man.  I say that I believe

21   that's mitigating.  When you're young you do stupid things

22   and irrational things and when you grow older you don't do

23   those anymore.

24               Wait, a juror may say:  A person this age

25   already done capital murder, the worse crime in the

1    system, no telling what he'll do 10, 15 years down the

2    road.  I don't think it mitigates towards a life sentence.

3                Mental ability.  Maybe there's evidence a

4    person is borderline mentally retarded or slow learner.

5    Well, I think that mitigates towards a life sentence.

6    Someone may say:  I know people of his mental capacity in

7    work and neighborhood, church, everything, school,

8    whatever, they don't go out and commit capital murder.

9                I don't see why that has any affect on him

10   and whether or not that ought to mitigate towards his

11   case.  I don't think that caused him to do what he did

12   okay.  So, basically it asks you to go back and look at

13   the evidence and determine what affect it would have.

14               Just because there's mitigating

15   circumstances doesn't mean you answer yes.  They should

16   be sufficiently mitigating whether you think life or

17   death is appropriate.  Any questions about that?

18   A    No, sir.

19   Q    There are as I see it possibly --

20               MR. MCCLELLAN:  I have two minutes left or

21        do I have any?

22               THE COURT:  Go ahead.

23   Q    (By Mr. McClellan)  There are three types of evidence.

24   Direct evidence says you're an eyewitness.  I saw this

25   happen.  "Confession," somebody admits to the police or

1    someone else they committed the crime.  And, three,

2    circumstantial evidence that tends to connect the

3    defendant to the commission of the crime.

4           Though it's not an eyewitness situation but

5    the law says they're are all evidence and can be weighed

6    by you as being of the same level.  Direct evidence is not

7    giving any greater weight than confession evidence or

8    circumstantial evidence.

9           They all can be either good evidence or they

10   cannot be good evidence.  You have to be the judge of

11   that, obviously.  There can be circumstantial evidence.

12   Could be a situation where a person -- someone's house is

13   burglarized, a person found dead in the house and there's

14   a bloody fingerprint left.

15           That bloody fingerprint comes back to the

16   defendant.  That's circumstantial evidence.  And the print

17   in the blood of the victim, that's circumstantial evidence

18   that the person committed the crime not direct evidence.

19   Nobody saw it.  Not a confession.  Nobody confessed to it.

20   It's evidence.

21           Is that evidence you can consider

22   circumstantial evidence, that you would?

23   A    Yes.

24   Q    Would be able to consider and weigh --

25   A    Yes.

1    Q    Okay.  My time is up and I appreciate your attention

2    and answering my questions and pass you to the other side.

3              THE COURT:  Thank you.  Mr. Hill.

4

5                           **EXAMINATION**

6    **QUESTIONS BY MR. HILL:**

7    Q    Thank you, Judge.  Mr. Pena, I'm going to sit up here

8    because this thing is in the way and I don't want to have

9    you having to keep peering over and have to keep sitting

10   up in the chair.

11   A    Okay.

12   Q    First thing, I think you'll realize in terms of the

13   difference how I talk with you is that Mr. McClellan

14   obviously has to educate jurors as to the aspects of law

15   and the Judge has done that, also.  I'm interested in you

16   educating me.

17              I'm going to speak with you about 20, 25

18   minutes and ultimately you'll be placed on a larger panel

19   of jurors and come back some point at the end of September

20   and select 12 people from that group of people.

21              This is my only opportunity to visit with

22   you.  And, I guess, the thing to understand more than

23   anything is I hope you embrace what the Judge has said

24   to you during this presentation, especially the comments

25   that he made to you about we want to make sure that the

1   only person that is comfortable is you because in five

2   years down the road you're sitting there going, "Boy, you

3   know, I don't think that I've really made the right

4   decision," or "I don't feel like I answered the questions

5   as honestly as I could have."  Then what have we

6   accomplished here?

7              Okay.  We've all seen shows on TV where

8   something comes up 10 years later and jurors, you know --

9   television crews go back to the jurors 10 years later:  If

10  you had known about that or known about this what would

11  your verdict have been.

12             I assure you the 12 people that sit on these

13  cases always feel very comfortable at the time with the

14  verdict.  We want to make sure in arriving at that

15  verdict you've had the opportunity to express whatever's

16  on your mind no matter what the State would needs or

17  defense.  That's the only way going way we're going to be

18  able to get 12 people here who will really listen to

19  everything and not prejudge it.  Okay.

20             What did you think about coming down here

21  Monday filling out questionnaires knowing you were going

22  to come back on a case like that?  What goes through your

23  mind?

24  A   Basically until you go into -- get on a jury you

25  really can't take anything serious.  I mean, all you can

1    do is listen, pay attention and sort it out whichever way

2    you want to do it.  You can't get nothing serious because

3    you don't have a decision to make at the time.

4    Q    I hope you realize this is probably the most important

5    of cases as far as the attorneys are concerned because

6    we --

7    A    Yeah.

8    Q    -- we are given an opportunity to evaluate you and

9    then you ultimately evaluate the case.  We use these

10   questionnaires to hopefully give you an opportunity to

11   express some thoughts you have and give us an opportunity

12   to look through them ahead of time so we don't have to sit

13   here an hour and a half and ask you all these questions.

14             I want to ask you something, there was a

15   question maybe our environment which a child is raised

16   greatly influences how that person is developed and you

17   indicated you agree with that.  What do you mean by that?

18   A    All I can take is consideration.  I've got three kids

19   of my own, okay.  I can tell you the difference between my

20   oldest and my youngest, and there's a big age difference.

21   Q    Right.

22   A    Goes from 16 to 1-year-old.  But what you show one you

23   have to adopt to that environment that the child is in.  I

24   mean, I've got my middle child, my daughter that's in

25   honor society, in everything.  So, I have to treat her a

```
 1    little different and go into her environment because she's

 2    much smarter than my oldest one which was an only child

 3    three years.

 4                    A learning experience knowing which way to

 5    go and which way and taking everybody, grandmothers' and

 6    uncles' opinions which way you should raise your child.

 7    Q    Let me ask you what do you think your wife -- you and

 8    your wife have done in terms of raising a child makes a

 9    difference?

10    A    Yes.

11    Q    You're not afraid to claim credit for how your kids

12    come up?

13    A    I have to claim for my wife and I.

14    Q    Okay.  Good.  Also there was a question in your

15    opinion how illegal drugs affect a person, affect their

16    whole way of life mentally and physically.

17    A    Uh-huh.

18    Q    Personal experience or family members that have

19    suffered through those type of circumstances?

20    A    I used to work at an oil refinery back a number of

21    years.  I'm -- I have a medical retirement from this

22    place.  I used to make gasoline.  I was involved with

23    toulene which is thinner basically.  All that I seen how

24    it affected me when I used to eat food.

25                    At that time I lost my taste buds,
```

1    basically.  And I know it affected me in some ways going

2    through many operations and things like that, coming back

3    where I used to dump salt and pepper to taste it.  It's

4    only a little bit because my taste buds have come back.

5              Yes, I know drugs mess you up.  I've seen it

6    in my work atmosphere.  I work at a dealership and I deal

7    with a lot of people and I see the attitudes change.  And

8    you can tell when people bring in cars say I need this

9    work done to my vehicle and in the car you can smell

10   they've been smoking a reefer cigarette.

11             Smoking is bad for you.  I've gone through

12   being a real bad smoker.  I can't stand it.  So, you know,

13   but I've seen it.  I've had a friend of mine get killed at

14   the refinery because of this stuff.  Totally thrown them

15   in a new world.  I lost one of my best buddies out there.

16   Q    Okay.  Okay.  Let me approach something right away.

17   You read about this in newspapers, hear about it on TV and

18   almost invariably the comment made by the jury after the

19   case is over having to do with this defendant was trying

20   to give the excuse he had a bad upbringing and bad

21   childhood.

22             People are real tired of hearing that in the

23   context that's somehow supposed to excuse what somebody

24   did.  Would you agree that there's only so much you can

25   attribute to childhood?  Doesn't necessarily mean you're

1    going to commit murder.  Doesn't mean you're going to do a

2    lot of things.  I mean, do you have control over your

3    destiny?

4    A    I believe everyone needs love, okay.  And whether it

5    starts at the family, starts at the immediate family; but

6    it doesn't eliminate it to that particular atmosphere.  I

7    mean you can get it from anybody.

8    Q    But if there was evidence -- let me fast forward a

9    little bit here.  Obviously, there are a number of

10   different factors that the jury, I should say, may be

11   called upon to answer.  Would -- we're going to assume

12   for purposes of this discussion between you and me that

13   you have already made the finding that a person committed

14   capital murder one way or the other as it's alleged.

15                 I guess the question a defense lawyer would

16   be concerned about is are you going to enter the penalty

17   phase of the trial feeling like, hey, there's nothing

18   anybody is going to show me about this particular

19   defendant that's going to cause me to feel like a life

20   sentence would ever be appropriate for somebody that's

21   committed capital murder.

22                 I think that's kind of the most succinct

23   way to put it.  Do you feel those kind of feelings

24   starting out?  You committed capital murder.  They killed

25   two people in the course of one transaction or kidnapped

1    somebody or attempted to kidnap somebody and caused the

2    death of that person, just doesn't deserve to live.

3    A    No, I can't agree with that.  No, I've seen it.  I

4    used to do a lot of volunteer work for the United Way.

5    I've seen things like that.

6    Q    Okay.  Are you comfortable that in the event you

7    found that individual guilty of capital murder and you

8    now know that life in prison doesn't mean mandatory life

9    without parole, we only need to know whether you feel like

10   that would in any way affect your ability to answer these

11   two questions?

12              In other words, you'd answer those two

13   questions based on the evidence presented or not

14   presented to you.

15   A    Correct.

16   Q    You know there's going to be in any case the State

17   has a theory of their prosecution.  None of us were

18   present at any alleged crime scene.  If we were -- just

19   as Mr. McClellan told you, if you were you would be in

20   the witness stand talking to the 12 jurors.

21   A    Correct.

22   Q    Right.  So, how do you think the State's theory of

23   the case develops?  How do you think the prosecution

24   develops on a case like this?  Just your general thoughts.

25   A    They have to present the evidence.  They're the ones

1    that got to prove their point more than anybody else.

2    Q    Okay.  Are you comfortable with sitting on a jury and

3    making a decision that could possibly have less to do with

4    finding the truth and more to do with the -- determining

5    whether the State has proven their case beyond a

6    reasonable doubt?

7              In other words, you could be sitting here

8    with 11 other people saying, you know, I feel like this

9    guy's probably involved in something.  I feel like the

10   State has come real close, and I'm not liking the

11   defendant.  I don't like anything I'm hearing.

12             But the question is not have you arrived at

13   the truth.  The question is:  Has the State proven this

14   case beyond a reasonable doubt based on all the evidence?

15   A    If they supplied all the information, and I didn't

16   make a conscious decision of that, but you can't take

17   that into consideration not present at the time.

18   Q    Right.  Do you think that it would be a little bit

19   unfair for a juror to be sitting in these seats and

20   saying, you know, it just seems like they presented so

21   much evidence, called a hundred witnesses but, gosh, you

22   know something inside of me tells me they have not proven

23   this case that this defendant is guilty beyond a

24   reasonable doubt?

25             Are you going to be able to sit in judgment

1   of somebody and live with a decision like that even if you

2   have kind of thought there was evidence to suggest

3   somebody did do something wrong?

4   A   I have to make a decision I have to live with.

5   Whatever goes through here I have to live with.  Ya'll are

6   gone.  I don't have to answer to ya'll.  I got to live

7   with it.

8   Q   That's right.  Are you comfortable being able to make

9   a decision if the evidence didn't satisfy you that the

10  State had proven the case beyond a reasonable doubt, would

11  you be able to find an individual not guilty even though

12  you heard  horrible evidence about people dying and all

13  the surrounding circumstances?

14  A   If they didn't prove their point, in my opinion I

15  would say it's open to suggestion.  I mean, I would have

16  to answer no.

17  Q   Even if you didn't feel like you had ultimately

18  arrived at the pure truth of the matter?

19  A   You have to consider everything that was presented.

20  It doesn't make any difference what I think of any --

21  either one of ya'll.  Just because I don't like you that

22  means I'm going against you.  I can't do that.

23  Q   Right.

24  A   It's not moral.

25  Q   Okay.  How -- would there be any difficulty on your

1    part listening to police testimony and calling it the way

2    you see it if you felt like a police officer was shading

3    the truth a little bit to butter the State's case and you

4    really didn't observe  what he said or padding things a

5    little bit, are you going to hesitate to disbelieve that

6    officer?

7    A    If it sounds a little fishy, then you can't consider

8    it.

9    Q    Would that apply to any witness?

10   A    Any witness.

11   Q    Would it make any difference if the witness was called

12   by the State's lawyers or the defense lawyers?

13   A    No, no difference.

14   Q    Are we going to start out with a disadvantage if we

15   should call witnesses, offer testimony which we're not

16   required to do -- if we were to call witnesses, are you

17   the kind of individual going to say:  Well, you know

18   they're defense witnesses.  We can anticipate what they're

19   going to say?

20   A    No.

21   Q    Any more than you would say:  Well, they're police

22   witnesses.  We can anticipate what they're going to say.

23   A    Basically you have to supply the evidence no matter

24   where it comes from.

25   Q    You strike me as an individual pretty comfortable

```
1    making a decision?

2    A    Yes.

3    Q    You deal with people day in and day out?

4    A    Correct.

5    Q    What type of information do you think is important

6    for you personally to judge a person's believability or

7    their credibility?  What kind of things do you take into

8    consideration?

9    A    Basically I try to find out personality wise where

10   they sit, where they're coming from, how they talk, are

11   they comfortable talking to me.

12   Q    Even if they're just yes and no answers, can you pull

13   any other information out?

14   A    That's my job.  I mean, that's the way I do it.  I

15   run -- basically I run a Toyota division over there.

16   That's my job.  I'm in customer relations.  What's the

17   problem?  Why are you so mad?  One person in particular

18   may have a bad day.  Everything has to go into

19   consideration.

20   Q    What's the worse days, Monday?

21   A    Usually Fridays.

22   Q    Friday.  Everybody trying to get something done by

23   the end of the week and not enough time to do it?

24   A    Well, everyday's bad when you're not there.  I'm the

25   only certified one that knows all the ropes.  When I'm
```

84

```
1    gone, other people are doing my job.  I have to go back

2    and straighten it out.  Puts me busy which is good.

3              But I mean I get to find out more

4    information about people because I have to call them back

5    and ask what went on, were you okay with it, did you have

6    a problem, and that's how I got to know people and that's

7    how you get to know people and solve problems.

8    Q   What do you think about the idea you could sit through

9    a trial, however long it takes, and the State presents

10   evidence and sitting on the edge of the chair and at some

11   point Mr. McClellan or Ms. Connors says the State rests.

12             How do you feel about the prospect not even

13   hearing from the defendant or any witnesses from the

14   defense and having to decide a case just based on what the

15   State has shown to you?

16   A   They have the point to prove.

17   Q   Okay.

18   A   According to the law he's innocent if they don't prove

19   evidence enough to change my mind.  They're ain't no

20   and's, if's, but's about it.

21   Q   I'm looking over to Mr. Wentz to see what he wants me

22   to ask since we're so far apart.  Do you have any

23   questions of me?

24   A   No, sir.  You got a job to do.  I know what your job

25   is just like they have over there.
```

```
 1    Q    Okay.

 2    A    And this is the best way to get it done is through --

 3    Q    Are you -- only you know who you are, what makes you

 4    tick.  Although I think we got a pretty good feel.  Is

 5    there anything about you that I need to know that if I

 6    were to tell Judge Burdette we would like to have

 7    Mr. Pena return in a couple of weeks from now to be

 8    considered for the final 12 people, is there anything

 9    I've missed?

10              Is there anything I need to know that tells

11    me, "Hey, Wayne you're making a mistake putting him on the

12    panel?"

13    A    As far as anything in particular?

14    Q    Anything.

15    A    I've gone through mostly everything from one extreme

16    to another.  I've seen -- how can I say it?  I've seen

17    good and bad.  I used to do a lot of volunteer work for

18    United Way.  I coached baseball, coached football.  I've

19    coached girls and boys and seen kids broken homes and all

20    need tender love and care.  Everything can be better if

21    everyone gets involved.

22    Q    Fair enough.  Any questions for me?

23    A    No, sir.

24    Q    Thank you, sir.

25              THE COURT:  Thank you, Mr. Pena.  In just a
```

1    second I'm going to excuse you.  Before I do, I will

2    tell you we want you back here on Wednesday, the 29th

3    of September.  I'm going to give you a piece of paper

4    about that in a second.

5          Between now and I guess it was three weeks

6    from yesterday when we get together, don't alter your

7    life one bit.  Do your work things like you ordinarily

8    do them.  Do your personal things like you ordinarily

9    do them.  Even if you have a chance to leave, take the

10   chance and go.

11         The only thing that I ask of you between

12   now and the next time we see you is this:  Please do

13   not talk about this case with anybody.  Please do not

14   permit anybody to talk about this case with you.  If

15   there should be any news media treatment about this

16   case, avoid it.

17         If there's anything about the case on

18   television, refuse to watch anything about this case.

19   If there's anything on the radio, refuse to hear it.

20   Anything about this case in the newspaper, refuse to

21   read it.

22         Mr. Pena, the reason for each of those five

23   restrictions is for the purposes of accomplishing the

24   same single common objective and that's this:  To make

25   sure if you do become a juror in this case, the

1  decision that you do reach in this case whatever that

2  decision winds up being is based exclusively upon the

3  information that you received here within the

4  courtroom and not be affected in any way or

5  influenced by anything you might hear about the case

6  outside the courtroom.

7           Before you leave, sir, have you any

8  questions at all for me?

9           VENIRE PERSON PENA:  No, sir.

10          THE COURT:  For the two weeks -- if someone

11 needs to know where you've been the three days you've

12 been with us that will take care of this.  This is a

13 note to remind you where we want you to be and when we

14 want you to be here.  And we want you to be right

15 outside the door in the morning by 9:30 on Wednesday,

16 the 29th of September.

17          Any questions?

18          VENIRE PERSON PENA:  No, sir.

19          THE COURT:  Thank you very much, sir.  With

20 that you're excused.

21          VENIRE PERSON:  Free to go?

22          THE COURT:  Yes, sir.  Thank you for your

23 time.

24          MR. MCCLELLAN:  Thank you.

25          MS. CONNERS:  Thank you.

1          MR. HILL:  Thank you, sir.

2          THE COURT:  Ms. Scott.  Mr. Hill gave you

3     back your five extra minutes.

4          (Prospective Juror No. 4, Ms. Joyce Scott

5     entered the courtroom.)

6          THE COURT:  Come on in Ms. Scott.  How are

7     you today, Ms. Scott?

8          VENIRE PERSON SCOTT:  Just fine.

9          THE COURT:  Please have a seat and make

10     yourself just as comfortable as you can be.

11     Ms. Scott, before we begin I'd ask you to remember

12     back to yesterday and those things we talked about

13     yesterday and add to that the things we talked about

14     this morning.

15          Out of everything that we have talked

16     about up to this point, do you find that you have any

17     questions at all for me?

18          VENIRE PERSON SCOTT:  No.

19          THE COURT:  Is there anything up to this

20     point, Ms. Scott, that we have not yet touched upon or

21     talked about that you feel as though we should because

22     it might have some bearing on your ability to be a

23     juror in this case?

24          VENIRE PERSON SCOTT:  Not right now, no.

25          THE COURT:  And if you would, please, ma'am,

1    when I'm asking the questions, it's a natural thing

2    for you to answer my questions I'm asking but these

3    other folks have to hear your answer.  Keep your voice

4    up loud enough for them.

5              Is there anything, Ms. Scott, that you can

6    think of about your personal life, whether it might be

7    something about your professional life or might be

8    something about your health or something else that you

9    can think of that would in any way interfere with your

10   ability to be a juror in this case during the time

11   frame that we've talked about?

12             VENIRE PERSON SCOTT:  No.

13             THE COURT:  Before we begin is there

14   anything at all that you would like to raise, any

15   questions you have, any comments you would like to

16   make?

17             VENIRE PERSON SCOTT:  No.

18             THE COURT:  I see that one of your three

19   favorite television shows is "Judge Judy."

20             VENIRE PERSON SCOTT:  Yes.

21             THE COURT:  Very well.  I'll just turn the

22   page.  Can you see how and why this is a little bit

23   different?

24             VENIRE PERSON SCOTT:  Yes.

25             THE COURT:  And I got to tell you the

 1      truth, Ms. Scott, my father is 83 years old and

 2      watches Judge Judy.  It amazes him a son which he

 3      has spent so much on education can't get things done

 4      in 16 minutes like Judge Judy.  It slightly drives him

 5      crazy.

 6              Ms. Scott, the questionnaire you filled

 7      out and we all recognize you filled them out before

 8      you ever talked to anybody about the case, before we'd

 9      ever had a chance to visit; and therefore you, since

10      that time, have become aware of more of the rules

11      that.  Exists you're aware of the pitfalls of filling

12      out the questionnaire.

13              And I say that for this reason.  Maybe some

14      of the questions you were given in the questionnaire

15      the answer now might change because of what we have

16      talked about to this point, maybe they would not

17      change.  Doesn't make any difference whether they

18      would or wouldn't.  I want you to understand you

19      possess more information than you did when you filled

20      out the questionnaire.

21              And I ask and say that for this reason:  On

22      Page 12, Question No. 58, the question asks:  What are

23      your feelings about the death penalty?  And your

24      answer was:  If a person is found guilty, he or she

25      should get the death penalty.

1          Can you see based upon the conversations

2    that we have had, Ms. Scott, that death penalty is

3    simply an optional punishment?

4          VENIRE PERSON SCOTT:  Yes.

5          THE COURT:  Along with life sentence?

6          VENIRE PERSON SCOTT:  Yes.

7          THE COURT:  It is not a required punishment

8    according to the law.

9          VENIRE PERSON SCOTT:  Yes.

10         THE COURT:  Now, it may very well be you

11   might think to yourself if I were a juror in this case

12   and I found somebody guilty of capital murder, I would

13   answer those questions there in such a way the death

14   penalty be imposed.

15         If that's the way you feel, that's the deal,

16   nothing wrong with that.  But I got to know if you

17   feel that way.

18         VENIRE PERSON SCOTT:  If applying to these

19   questions --

20         THE COURT:  Ms. Scott, you found somebody

21   guilty of capital murder for that reason would you

22   answer the questions in such a way that the death

23   penalty would be imposed?

24         VENIRE PERSON SCOTT:  Always.

25         THE COURT:  Thank you very much.

1     Challenging Ms. Scott?

2              MR. HILL:  Yes, Your Honor.

3              THE COURT:  You're excused.  Thank you very

4     much.  Thank you, ma'am.  Hashagen, something like

5     that Neil.  Frances.

6              (Prospective Juror No. 6 Ms. Frances

7     Hashagen entered the courtroom.)

8              THE COURT:  If you will come straight

9     through there and walk over here.  Pronounce your

10    last name.  .

11             VENIRE PERSON HASHAGEN:  Hashagen.

12             THE COURT:  I didn't know if it was Has or

13    Hash.  Have a seat please, Ms. Hashagen.  To begin,

14    let me ask you this:  Out of everything we've talked

15    about yesterday as well as this morning, do you find

16    you have any questions for me?

17             VENIRE PERSON HASHAGEN:  No.

18             THE COURT:  Is there anything to this

19    point we have not yet talked about that you would

20    like for us to talk about because it might be

21    something -- might have some bearing on your ability

22    to be a juror in this case?

23             VENIRE PERSON HASHAGEN:  Everything you've

24    brought up and discussed was very clear and open; so,

25    I think, you know, I have no problem.

1      THE COURT:  Good.  Is there anything at all

2    that you're aware of now, something may be about your

3    professional life, personal life, health or anything

4    you could think of that in any way might interfere

5    with your ability to be a juror in this case during

6    the time frame we've discussed?

7      VENIRE PERSON HASHAGEN:  No, I don't see

8    anything.

9      THE COURT:  In just a second the lawyers

10   are going to ask you some questions.  Before they do,

11   there is a question that I have regarding your

12   questionnaire and you were asked the question on

13   Page 5 and was Question 5:  Is there anything that

14   would prevent you from giving this case your full

15   attention if to last 10 days working, beginning

16   October 4, 1999?

17      You checked yes.  As I took the question I

18   just now asked you, your answer was no, and I'm

19   assuming that your answer to the question in the

20   questionnaire has been resolved?

21      VENIRE PERSON HASHAGEN:  Yeah.

22      THE COURT:  Okay.  Taken care of your

23   grandchildren?

24      VENIRE PERSON HASHAGEN:  Uh-huh.

25      THE COURT:  Okay.  The lawyers in just a

```
 1        second are going to visit with you, and they're going

 2        to ask you some questions.  They may very well want

 3        to talk about some things with the State, and the

 4        defense may very well talk about some other things.

 5               Keep in mind, Ms. Hashagen, they're not

 6        trying to commit you to anything, how you'll vote or

 7        what you'll do or react.  They're just -- these are

 8        my words -- they just want to be satisfied that you're

 9        armed with the information about the rules that can

10        come into play during the course of a trial like this

11        and that you'll play fair.  Those are my words.

12        That's basically all it is.

13               VENIRE PERSON HASHAGEN:  Yeah.

14               THE COURT:  That you'll take everything into

15        account, all the testimony, all the evidence because

16        there's nothing that's automatic.

17               VENIRE PERSON HASHAGEN:  No.

18               THE COURT:  And you evaluate the evidence

19        however you see fit; but that you'll give everybody a

20        legitimate shot, judgement, logic and common sense.

21               Okay.  With that, Mr. McClellan.

22               MR. MCCLELLAN:  Thank you, Your Honor.

23

24

25
```

1          **FRANCES D. HASHAGEN**

2     having been sworn as a prospective juror testified as

3     follows:

4

5                          **EXAMINATION**

6     **QUESTIONS BY MR. MCCLELLAN:**

7     Q   Ms. Hashagen, my name is Lynn McClellan.  Along with

8     Claire Conners, we represent the State of Texas in this

9     case.  I want to just let you sit back and relax.  I'm

10    going to ask you to share with us some of your opinions

11    and beliefs about certain aspects of the law and to find

12    out something you put in the questionnaire and get a

13    better chance to know you, what your thoughts are.

14               It says in here you work for the Harris

15    County clerk's office, I guess, for a number of years?

16    A   Right.

17    Q   Did you work in a --

18    A   I was in probate.

19    Q   Probate.

20    A   Probate.

21    Q   You never worked in criminal?

22    A   No.  No.

23    Q   Okay.  There's also a question in here about you made

24    mention your niece had been killed by her ex-husband?

25    A   Uh-huh.  Correct.

1    Q    How long ago was that?

2    A    About three or four years.

3    Q    All right.  And was he prosecuted for that?

4    A    Yes, he was.  That's over and done with.  My

5    sister-in-law didn't want to get involved; so, I don't

6    know too much about the case.  I know he was convicted,

7    and I think he got 35 years or something like that.

8    Q    Okay.  Do you think he was handled properly or not or

9    do you have an opinion?

10   A    I don't have an opinion because I really don't know.

11   Q    Nothing then, I guess, would affect your ability to

12   serve as a juror in a case like this?

13   A    No.

14   Q    All right.  Let me go to another area of the

15   questionnaire where it says -- gives you choices about

16   assume that you're a juror to determine the sentence for

17   a defendant who's been convicted of capital murder.  The

18   law gives you a choice of death or life imprisonment.

19   Which of the five you would choose, and you chose No. 2.

20             There are some kinds of cases in which I

21   know I could not vote for the death penalty even if the

22   law allowed me to but there are others which I'd be

23   willing to consider voting for it.  Okay.

24   A    Uh-huh.

25   Q    In answering that question can you tell me what kind

1    of cases can you think of, anything in particular?

2    A    No.

3    Q    What kind of cases where you could not vote for the

4    death penalty even if the law allowed you to?

5    A    No, depends on whatever I would be going against or

6    whatever.

7    Q    If the law and evidence calls for the death penalty

8    regardless what type of crime was presented to you that

9    being -- assuming it was a crime that carried the death

10   penalty as an option, are you saying if the law and

11   evidence calls for the death penalty, that you could do

12   that regardless of the type of crime?

13   A    Yeah.   If the law required it, I think I could do

14   that.

15   Q    What kind of cases come to your mind when you think

16   of cases where you think the death penalty ought to be

17   available as one of the forms of punishment?

18   A    I think the killing of innocent people that have done

19   nothing on their part to cause this result.

20   Q    Okay.   Now, as the Court told you, capital murder is

21   murder plus some aggravated circumstance.

22   A    Uh-huh.

23   Q    What we have alleged in the indictment is murder

24   during the kidnapping in one paragraph and murder during

25   the course of committing another murder in another

1    paragraph.  Those are two types of capital murder.

2    A   Uh-huh.

3    Q   If a person is found guilty of capital murder,

4    there's only two punishments.  That's life or death.  But

5    for the offense of murder, that is, the intentional

6    taking --

7    A   Uh-huh.

8    Q   -- of someone's life without any legal justification

9    for that.  I mean it's not in self defense, not an

10   accident, and not connected with some other crime.

11   A   Right.

12   Q   For the intentional -- for a murder, death penalty

13   does not apply.  The ex-husband killing his wife, the

14   death penalty doesn't apply unless it was also a burglary,

15   robbery, sexual assault, whatever the case may be.

16   A   Right.

17   Q   For those kind of cases where someone intentionally

18   killed someone but doesn't commit another felony to make

19   it capital the range of punishment as the Judge indicated

20   is five years to 99 years or life.

21           Are you able to keep your mind open in a

22   murder case not a capital murder case?

23   A   Uh-huh.

24   Q   But a murder case the full range of punishment is as

25   low as five years to as high as 99 years or life and wait

1    until you hear the evidence before determining what the

2    appropriate punishment should be?

3    A    Yes.

4    Q    Murder as I said then becomes capital murder when

5    it's connected with something else.  What we have alleged

6    here is murder during the course of kidnapping or murder

7    during the course of another murder.

8              Do you have any doubts about your ability

9    to participate in a process whereby you would be called

10   upon to make decisions that you knew would result -- could

11   result in this Judge ordering the execution of the

12   defendant sitting over here on trial if that's what the

13   law and the evidence called for?

14   A    I'd have no problem with that.

15   Q    All right.  Some people come in and say:  Well, I

16   believe in the death penalty; but I could never make that

17   type of decision, you know.  I not only don't want to be

18   put in the decision, I could never make a life or death

19   decision.  I just couldn't live with myself if I did that.

20             I assume you don't fall into that category?

21   A    No.  No.

22   Q    If that's what the law and evidence called for, you'd

23   do whatever the appropriate answer was whatever the law

24   and evidence showed?

25   A    I would, yeah.

1    Q   Okay.  There's a question in here that asks if you

2    more likely agree or disagree -- and it says in here

3    that's not a question it's a statement and you check more

4    likely agree with this statement or disagree with it.

5            It says the death penalty is always

6    justified for intentional murder.  Well, intentional

7    murder is the only kind of murder there is.  There is no

8    unintentional murder.  You intend to murder.  That's the

9    definition:  You intend to kill someone without any legal

10   justification.  That is murder.

11           And for the murder you know now the death

12   penalty doesn't apply only 5 years, 99 years, or life and

13   death penalty only applies when it's murder plus some

14   other aggravated circumstance.

15           Do you still believe that the death penalty

16   ought to be available or that everybody who commits murder

17   ought to get the death penalty or do you believe that?

18   A   I guess not everybody.

19   Q   Okay.

20   A   It depends.

21   Q   Depends on the circumstance and what the evidence

22   showed?

23   A   Right.

24   Q   Okay.  Now, there are people who come in and say:

25   Well, I think they ought to expand it.  I think the death

1   penalty ought to apply to murder.  That's not what the law

2   says.  Now, what we're concerned about is setting aside

3   your personal opinion what you think the law ought to be

4   and can you follow it.  Now, can you do that?

5   A    Right.

6   Q    Set aside any personal opinion and follow what the

7   law is now.

8   A    Definitely.

9   Q    All right.  Because the bottom line is this:  You're

10  going to be asked to take an oath to a true verdict render

11  according to the law and evidence.  And what you'll be

12  taking an oath to do is whatever the law and evidence lead

13  you to do.  That's what you'd do.

14             If it leads you to find somebody not

15  guilty because the State didn't prove their case beyond

16  a reasonable doubt, you find them not guilty.  If the

17  evidence leads you to guilty and leads you to answer the

18  questions in such a way death results or answer the

19  questions in such a way death does not result but life

20  imprisonment, do that, follow whatever the law and

21  evidence leads you.

22             Any reason you could not do that?

23  A    No.

24  Q    Let me talk to you for a moment then about the

25  punishment stage of a capital murder case, keeping in mind

1    before you get to the punishment stage of a capital murder

2    case, you would have already decided that the person on

3    trial is guilty of capital murder.  Otherwise, you don't

4    get to the punishment stage of trial.

5    A    Right.

6    Q    Okay.  The person is not guilty, everybody goes home.

7    So, before you get to the punishment stage of a capital

8    murder trial, you would have had to find someone guilty of

9    capital murder in this case.  Then you would have found

10   the defendant intentionally took the life of someone

11   during a kidnapping.

12              Okay.  Intentionally killed someone during

13   committing the offense of murder or killing two or more

14   people during one criminal episode.  If you find those to

15   be true and find the defendant guilty of either one or the

16   other, you'll be giving basically this verdict:  We find

17   the defendant guilty as in the indictment.

18              Some people may think guilty of kidnapping

19   murder.  Some people may think guilty of killing two

20   people in one criminal episode.  They believe how the

21   indictment reads.  Guilty of capital murder.

22              So, you could have six believe one way and

23   six believe another way, still guilty.  Two different ways

24   alleged committing it.

25   A    Uh-huh.

1    Q    And if he committed one or both that way beyond a

2    reasonable doubt, he's guilty of capital murder.  Any

3    problem with that aspect of the law?

4    A    No.

5    Q    If you find a person guilty of capital murder though,

6    you don't know what the punishment is going to be until

7    you go and answer these questions because there are no

8    cases -- there is no time if we find a person guilty of

9    that crime they automatically get the death penalty.

10   There is no automatic death penalty.

11             Instead you answer the questions and the

12   answers tell what the punishment ought to be.  So,

13   hypothetically you could find somebody guilty of capital

14   murder, intentionally taking the life of another person

15   without any legal justification during the course of

16   kidnapping because of the answer to the questions, he may

17   get a life sentence as opposed to death.

18             Any problem with that?

19   A    No.

20   Q    Issue No. 1 will be the first question you get to.

21   You get to this question only after the opportunity to

22   hear more evidence at guilt-innocence, the first stage

23   of trial, when you decide if a person is guilty or not

24   guilty  -- before you determine if he was guilty.

25   Otherwise, you don't get to punishment.  You'll hear what

1    happened before, during and after the commission of the

2    crime at the punishment stage.

3              Now, you're going to be talking about the

4    individual who committed this crime and what punishment

5    he should receive for having committed that.  You'll hear

6    evidence about the defendant's character, his background,

7    his criminal history, lack thereof, his mental abilities

8    or disabilities, his educational level, the kind of family

9    he grew up in, all kinds of evidence about that individual

10   to help you answer these questions.

11             So, what the answer ought to be, Issue No. 1

12   says:  Now, if you find from the evidence beyond a

13   reasonable doubt -- that, of course, means the burden on

14   us to prove beyond a reasonable doubt that there's a

15   probability that the defendant would commit criminal acts

16   of violence that would constitute a continuing threat the

17   society.

18             They didn't use the word "probably" because

19   anything is possible.  It's possible I might win the

20   lottery on Saturday but very unlikely.  Didn't use the

21   word "certainty" because nothing could have -- but it

22   didn't use the word "certainty" which means a hundred

23   percent certain going to happen.  It uses the word

24   "probability," between possibility -- something more than

25   possibility, less than certainty.  Kind of more likely

1    than not.

2              So, the question is:  Do you find from the

3    evidence beyond a reasonable doubt that it's more likely

4    than not that the defendant would commit criminal acts of

5    violence?  That doesn't mean another murder or capital

6    murder.  Those are, of course, acts of violence.  But

7    hitting someone with your fist so hard causing bodily

8    injury, shooting someone and missing, doing a burglary,

9    robbery, sexual, anything that's criminal and violent in

10   nature.

11             So, the question is this:  Now having heard

12   the guilt or innocence and the punishment, do you find

13   from all that evidence that there's a probability, more

14   likely than not, this person as he sits here today, that

15   day --

16   A    Uh-huh.

17   Q    -- would commit criminal acts of violence that would

18   be  a continuing threat to society?  And if you believe

19   that the evidence proves that beyond a reasonable doubt,

20   you answer yes.  If we didn't prove beyond a reasonable

21   doubt, you answer no.

22             Any problem with that aspect?  Keep your

23   mind open, answering it yes or no?

24   A    Uh-huh.

25   Q    Some people come up and say:  If I have found someone

```
1    guilty of capital murder, the intentional taking of
2    someone's life during a kidnapping or killing someone
3    during a criminal episode, I'd always believe there's a
4    probability they'd be a continuing threat to commit
5    criminal acts of violence, be a continuing threat to
6    society.
7              Well, and that may be in certain cases.
8    A    Right.
9    Q    But there may be other cases where you find out the
10   person was a straight A student, a boy scout, alter boy,
11   you know pillar -- I mean the boy's a great kid, whatever
12   the situation, pillar of the community.  They did a
13   capital murder.  They did a horrible thing.  But this act
14   they did was totally an aberration from the rest of their
15   life.
16   A    Right.
17   Q    You say there's nothing to indicate this person would
18   be a continuing threat and I'm going to answer it, no, he
19   won't be a continuing threat and receive a life sentence.
20   He doesn't make it go back and get to go there by
21   answering it no just means he doesn't get the death
22   penalty.
23             If on the other hand you find someone
24   committed capital murder been in and out of trouble, this
25   guy is a total waste.  Sure, I mean there's not only
```

1    probably, there's a likelihood this guy will go out and

2    commit criminal acts of violence.  It needs to be answered

3    based upon what the evidence may show.  And can you see

4    it's conceivable to find someone guilty of capital murder

5    and still find he's not probability to be --

6    A    Right.

7    Q    -- a continued threat based upon what the evidence

8    may show about background and character.  Do you

9    understand that?

10   A    Yeah.

11   Q    Now, if you answer Issue No. 1 yes, then the person is

12   going to receive the death penalty unless on Issue No. 2

13   you determine he should not receive that.  It doesn't have

14   a beyond a reasonable doubt standard.

15            It says:  Do you find that after taking

16   into consideration all the evidence including the

17   circumstances of the offense, that's what you heard about

18   in guilt or innocence, the defendant's character and

19   background; that's what you heard about in the punishment

20   stage of trial and his personal moral culpability, I like

21   to refer to it as personal responsibility, was he

22   personally responsible for the death that resulted?

23            Do you find then there are sufficient

24   mitigating circumstance or circumstances, I like to refer

25   to it as sufficient reasons why this person ought to

1    receive life as opposed to death; and if you find there

2    are reasons there and you find it is sufficient, you can

3    change your vote from death to life.

4                   So, it gives you that opportunity to go

5    back and make sure the decision that you arrived at before

6    is the decision you want to stay with, gives you a chance

7    to give mitigation to him and leniency to him and give a

8    life sentence if you think it's appropriate if you think

9    sufficient evidence is there to do that.

10                  Okay.   Any problem with that aspect of the

11   law?

12   A    No.

13   Q    Let me give you an example of how it works:   A

14   defendant high on alcohol or drugs when he committed the

15   crime.   A juror may say when you're high on drugs and

16   alcohol you do things you ordinarily wouldn't do.   That

17   mitigates.   Juror No. 2 says:   Wait a second.   I don't

18   think it is.   A lot of people get high on drugs and

19   alcohol and don't get capital murder.   I don't see a

20   connection between capital murder and alcohol and drugs.

21   I don't think it's mitigating.

22                  Two people come up with different opinions.

23   That's okay.   Look at it, weigh it in your mind and decide

24   what affect to give that piece of evidence.   If you think

25   it's mitigating, find it mitigating.   If you think it's

1    not say it's not.  Okay.

2    A    Uh-huh.

3    Q    Same thing with a person who's mental ability.  Maybe

4    he's a slow learner.  I think that mitigates towards a

5    life sentence.  Some people say:  Wait a second.  I know

6    some people who have the same mental ability in church,

7    neighborhood, work, school, whatever, they don't go out

8    and commit capital murder.  I don't see a connection

9    between that and the commission of capital murder.  I

10   don't think that's a factor that ought to be considered in

11   determining whether or not he ought to receive life or

12   death.

13            So, two people again disagree; but they're

14   doing what the law requires which is weighing it in their

15   own minds and determining what affect to give him.  Any

16   problem with that aspect of the law?

17   A    No.

18   Q    Can you see that?  Are you open to the concept that

19   having found someone guilty of capital murder and then

20   having gone up to Issue No. 1 and found they're a

21   continuing threat to commit criminal acts of violence

22   that constitute a continuing threat to society, that you

23   still have to go through the process in Issue No. 2 and

24   look for mitigating evidence.  I mean you may not find

25   any.

1    A    Uh-huh.

2    Q    But you got to commit to the process of looking.  And

3    whether you do or don't find it, I don't know.  That will

4    be for you to decide.  And then if you do find it, is it

5    sufficient to change your vote.  That's for you to decide

6    but you have to be able to go through this process and are

7    you open to that process?

8    A    Yes.

9    Q    Somebody may say:  Well, how could you find something

10   mitigating if you found a person guilty and found they're

11   going to be a continuing threat?  What in the world could

12   ever be mitigating?

13                I don't know the reasons for that.  I don't

14   know that anybody does.  They have to look through

15   everything heard and see if there's something.  And if

16   there is, then give affect to it.  If there's not, don't

17   give affect.

18                That's basically what the question is

19   asking you to do.  Any problem there?

20   A    No.

21   Q    You understand that there is no automatic death

22   penalty.  Just because you find someone guilty of capital

23   murder, you don't automatically give them the death

24   penalty.  You have to answer the questions based upon the

25   evidence.

1      You have to reexamine the evidence because

2  at one time you're examining the evidence to determine did

3  he commit the crime as alleged in the indictment.  Did

4  they prove all these elements yes or no.  Yes, they did,

5  he's guilty.

6      Issue No. 2 doesn't say that:  Now, do you

7  find that after you heard all that plus additional stuff,

8  you find there are reasons that you believe this person

9  would be a continuing threat or not, is there a

10  probability he'll be a continuing threat?

11      So, it's a different type maybe examining

12  some of the same evidence, look at it in a different

13  perspective.  Any problem with that aspect?

14  A   No.

15  Q   If I told you the defendant is guilty of capital

16  murder, can you tell me what punishment he should receive?

17  That's the only thing you know he's guilty of capital

18  murder.

19  A   No, I'd have to listen and then you'd tell me.

20  Q   I'm not going to tell you anything else.  He's guilty

21  of capital murder based on the law and the way it's set

22  up.  Can you tell me what the punishment is going to be?

23  A   No.

24  Q   Because you have to know what the evidence is or the

25  facts?

1    A    Right.

2    Q    They could all be different.

3    A    Right.

4    Q    And not every capital murder case is the same like

5    every murder case is not the same.  A mercy killing in

6    one case versus a drive-by shooting of a teenager on a

7    bicycle.  Way different types of facts.

8    A    Right.

9    Q    You'd have to wait.  Are you the type of person who

10   can wait and listen to the evidence and make your decision

11   upon the law and evidence?

12   A    Yes.  I don't see how you could make a decision

13   without knowing that.

14   Q    You shouldn't be able to.  Some people may be able to.

15   But you know you really shouldn't be able to.  Do you have

16   any questions of me?

17   A    No.

18   Q    Okay.  I appreciate your time, and I'll pass you to

19   Mr. Hill.

20              THE COURT:  Mr. Hill.

21

22                      **EXAMINATION**

23   **QUESTIONS BY MR. HILL:**

24   Q    Good morning, ma'am.  I sit up here because that

25   thing is in the way.  This gives us a chance to look at

1     each other --

2     A    Okay.

3     Q    -- and talk.   One of the first things that I want to

4     talk about, probably the most important thing to talk

5     about is for you to understand that this process helps all

6     of us determine whether or not you proceed from today to

7     some time in the future and actually make the jury.

8     A    Uh-huh.

9     Q    You're not on the jury, yet.

10    A    Right.

11    Q    We want to make sure that as jurors you understand

12    that it's done this way.   It's done privately,

13    confidentially to ensure those people tell us how they

14    feel about anything that could affect the case.

15                 You could imagine what it would be like

16    sitting in this chair Mr. Mamou is sitting in having to

17    look at stranger after stranger that comes up and explains

18    how they feel about things not knowing whether this person

19    has shared everything they have to tell us, whether

20    they're holding anything back, whether they feel maybe a

21    little bit of subtle pressure to pass the test.

22                 We're not here for you to pass the test.

23    We're here for you to express honestly how you feel about

24    any topic that may come up.   Of course, a lot of the time

25    people -- and you said it a couple of times -- whatever

1    the law requires.

2              The law requires nothing of you except to

3    tell us how you honestly feel and if there are topics

4    especially sensitive for you, things you think you might

5    feel strongly about.  All we can ask is you share it with

6    us, okay.

7    A    Uh-huh.

8    Q    There is no commitment to the process.  There is no

9    commitment that you have to answer these two questions if

10   you feel as though you're unable to or if there's anything

11   that kind of causes you to feel like there are automatic

12   answers, okay.

13             What do you think about sitting in the

14   jury assembly room filling out a questionnaire, knowing

15   that you're going to be called back on a case that

16   obviously the allegations against Mr. Mamou is he

17   committed capital murder.  What goes through your mind as

18   a prospective juror?  What are you thinking about?

19   A    Some of the questions what relevance it has to the

20   particular case, you know, like the personal questions of

21   your favorite TV programs and I'm not a TV buff.  I fall

22   asleep watching TV in most cases.  I do enjoy reading

23   trial cases being that I worked in Probate Court.  So,

24   that sort of stimulates and just to see how the different

25   characters evolve.

```
 1    Q    Did you ever sit in and watch the trials over there
 2    where you're the courtroom clerk?
 3    A    Yes.
 4    Q    What was the best case you had?
 5    A    Golly, been retired for, what, since '95 and --
 6    Q    Did you deal with De Part Nova case?  Was that one?
 7    (Phonetically.)
 8    A    That always came up periodically.
 9    Q    Still there?
10    A    Yeah, we had that one and then, golly, the old
11    millionaire senile who had the young movie star wife, now
12    the buxom and the oilman.
13    Q    Buxom one.
14    A    Everybody went crazy over that, yeah.
15    Q    She's reinvented herself recently.
16    A    Yeah.
17    Q    When Mr. McClellan was trying to talk to you and
18    distinguish capital murder from what is not capital
19    murder -- I don't want to say it's ordinary murder because
20    it's obviously very serious -- and he asked you about the
21    situation where your niece was killed.
22    A    Uh-huh.
23    Q    How do you feel about sitting on a jury potentially
24    and judging a case like this?  Does that make you feel a
25    little uneasy, uncomfortable?  Is it something that you
```

1    hope you will be able to do?  And, I mean, "I hope that I

2    can make that jury?"

3                What are your feelings?

4    A    Well, I feel, yeah, it's a part of the process that I

5    came down to be a juror and if I'm picked, I'm picked.

6    And then I have to do what the law requires me to do and

7    to listen and to pass judgment how I feel everything's

8    been presented that should be.

9    Q    Are you comfortable with that?

10   A    Yes.

11   Q    Good.  We wouldn't want people that are uncomfortable

12   or feel too nervous about it.  Some people are not in any

13   position to judge another human being.  That's left to a

14   higher authority.

15               You're comfortable judging people and making

16   a decision based on everything that's presented to you?

17   A    Right.

18   Q    Okay.  Are there any types of cases that come to your

19   mind that you feel that you could not sit and judge fairly

20   maybe just because of the nature of the type of case?

21   A    Offhand I couldn't.

22   Q    Okay.  Because as Mr. McClellan was talking with you,

23   you know you said the law requires you to set aside your

24   personal beliefs or opinions.  And I always wondered where

25   people put those personal beliefs or opinions.  You're

1    products of your upbringing, work, relationships.  And I

2    always wonder why people are so quick to agree with that

3    to say:  Yes, I can set that aside.

4              And I like to ask people whether or not

5    there's a particular type of case so horrible they really

6    would say:  You put me with a child rapist or something I

7    don't think I could be fair.  Just going to have too much

8    of a feeling because of the alleged victim.  I just

9    couldn't sit in judgement.

10             So, you don't have any of those kinds of

11   feelings?

12   A    I don't think I do.

13   Q    Okay.  I feel you know best.  We don't know you.  We

14   take 20 minutes to visit with you a little bit and try to

15   figure out what makes you tick and decide whether or not

16   you get the recall to come back in a couple of weeks from

17   now.

18             One of the reasons we use the questionnaire

19   and probably are some questions there that really tend not

20   to be relevant maybe not for you maybe for the next juror

21   that comes along and answered that particular question

22   that may be relevant.  I went through and there's a couple

23   I want to visit with you.

24   A    Sure.

25   Q    First one is -- first we have talks about anyone come

1    from a neglectful or abusive childhood and please circle.

2    Your response, generally disagree.  What did you mean by

3    that?

4    A    If they have the desire to, they can overcome.  But

5    if they -- if somewhere in their background somebody

6    hasn't reached them with something --

7    Q    Right.

8    A    -- to maybe put something in their mind that, hey,

9    there is a light that I can change if I make an effort to.

10   This is the way I feel that you still have this ultimate

11   choice.

12   Q    But if a person's upbringing is such they've not been

13   giving any clues or signals, would that be reflected in

14   your statement that you generally disagree that anyone who

15   comes from a neglectful or abusive childhood?

16   A    Right.

17   Q    Okay.  Let me clear something up right away because

18   the way that question is phrased some jurors will likely

19   tell us:  Oh, so what the defense is relying on here is

20   the kid had a bad upbringing and that's going to explain

21   everything and excuse everything that may have happened,

22   and that's not what's asked in this question.

23                   And I want to ask you in all fairness what

24   is your response when you see things on the news or read

25   in the newspaper that the defense has offered testimony in

1    a trial for a jury's consideration that a person had a bad

2    upbringing, are you offended by that?

3                 Do you think that has nothing to do with

4    the case?  Either a person does something or don't do it.

5    Doesn't matter what they did or brought them to the point,

6    you either did it or don't do it.  How do you feel?

7    A    I think each case is individual and you'd have to --

8    Q    Got to look at all the factors?

9    A    Yeah.  Yeah.

10   Q    Okay.  Do you agree there can be cases that a great

11   deal of violence can occur?  People can be killed, but the

12   circumstances of how the killings took place play a big

13   part in the ultimate decision we make.

14   A    Uh-huh.

15   Q    Do you think that especially can be important if you

16   believe beyond a reasonable doubt that the person should

17   be held responsible for capital murder?  And then you get

18   to the punishment stage of trial.  Do you still think the

19   circumstances of how a particular capital murder was

20   committed could play a big role in your decision-making

21   process at the punishment stage?

22   A    Definitely.

23   Q    So, you're not one of these people that, hey, somebody

24   takes the life of two people intending to kill them,

25   there's no hope for that person ever getting a life

1   sentence out of me based on my answers to questions.

2   You're not like that?

3   A    Uh-huh.

4   Q    Now, it's necessary I ask questions that are perhaps

5   a little bit more probing.  The State wants to make sure

6   you can follow the law.  I have no question you could

7   follow the law.  You would have thrown the jury summons

8   away if you didn't want to follow the law.

9                  I don't want to apologize for asking the

10  questions.  I hope you understand why I do it.  I hope

11  you're again sitting in Mr. Mamou's chair, you would want

12  somebody to be asking some questions thoughtful questions

13  in asking that you kind of think things through a little

14  bit before answering questions.

15                 Okay.  One of the other questions that was

16  asked is:  In your opinion how do illegal drugs affect a

17  person?  You said they change personality and character.

18  Have you seen people that you've personally known or just

19  being down at the court system?  Is that kind of pretty

20  obvious to you?

21  A    Yeah.

22  Q    And another question asks:  Would an individual's use

23  or sell of drugs prevent them from relying on any defense

24  available to other members of society?  You put no.  So,

25  you do not believe that if there was evidence presented

1   that a person either was a drug user or sold drugs, that

2   that would preclude them or prevent them from having

3   certain defenses available to them in this particular type

4   of case?

5   A    Uh-huh.  I think we're all entitled to that.

6   Q    Okay.  This is not the circumstances here.  We're not

7   talking about this case.  But would you agree with me the

8   general proposition -- this is one of the bell ringers --

9   people hear these kind of things and usually get them

10  pretty upset.  Could you imagine a situation where a

11  person was a five-time ex-con, most terrible person in the

12  world and finally released on parole still possibly having

13  to rely upon self-defense in that case?

14               In other words, the fact that a person had

15  been in all sorts of trouble, do you think you could sit

16  as a juror and evaluate whether or not a particular case

17  in history that person actually acted in self-defense?  In

18  other words, he shouldn't be convicted of this crime

19  because he legitimately had a defense.

20               Do you think you could?

21  A    I think so.

22  Q    You see how when you put the preface to it is a

23  horrible person?

24  A    Right

25  Q    Been in all sorts of trouble and here he is trying

1    to tell us it's self-defense.  A jury might be called upon

2    to make this decision; and if the jury believes a person

3    acted in self-defense, it's the law to find the person not

4    guilty because the State didn't prove the case beyond a

5    reasonable doubt.

6    A   Right.  Right.

7    Q   Now, here's one that bothers me:  In your opinion what

8    is the best argument for death penalty in our society?

9    And your response was:  If you take another's life, you

10   should be prepared to lose yours.

11   A   Well, it's responsibility of your actions.

12   Q   All right.  Does that necessarily mean that if you

13   take another person's life, you must always forfeit your

14   life in return?

15   A   No.  No, just that you're aware that you're

16   responsible for your actions.

17   Q   Correct.

18   A   And whatever comes down comes down.

19   Q   And in terms of whatever comes down it could be

20   anywhere from life in prison to the death penalty if it's

21   capital murder.  And as the Judge pointed out if you

22   believe that something less than what the State has

23   attempted to prove to you in a case of capital murder is

24   proven, murder or maybe that proof there was a kidnapping

25   but not a murder.

1 A Uh-huh.

2 Q Okay.  You're comfortable with being able to evaluate

3 each case on its own facts, on its own information?

4 A Uh-huh.

5 Q And you would not automatically rule out a particular

6 punishment?

7 A No.

8 A You know that Mr. McClellan and Ms. Conners are

9 sitting there saying:  Well, if we don't satisfy a jury

10 beyond a reasonable doubt that the defendant committed

11 capital murder, and now this jury is deciding punishment,

12 let's say, on a lessor charge of murder, you know, is she

13 telling us she would never consider 99 years or life and

14 clearly your answer is, no, you would consider that full

15 range.

16     I'm sitting on the other end of the table.

17 Are you already predisposed to saying, hey, if this is a

18 murder case, I'm never going to even consider -- not that

19 you have to give it -- not even going to consider the low

20 range of the punishment.  You're comfortable considering

21 everything?

22 A Uh-huh.

23 Q Okay.  The last question that sent a little chill up

24 my back, and I hope you don't mind me visiting with you

25 like this.

```
1     A    No.   No.

2     Q    I want you to understand because I'm ultimately going

3     to ask you a question that causes you to tell me exactly

4     what I should do with regard to asking you to come back or

5     not.

6              The question was:  Do you believe that

7     mitigating evidence concerning a capital murder

8     defendant's background should be considered in deciding

9     whether or not he or she should receive the death penalty.

10    And you answered no.

11              Okay.  And I guess I'll ask you this:  Do

12    you have -- what is your feeling or what is your thought

13    process when you hear the words mitigating evidence?  What

14    does that really mean to you personally?

15    A    Evidence that's been presented or that they're handing

16    out.

17    Q    Okay.  Is there another word you would like to

18    substitute for mitigating?  Different jurors use different

19    words they're a little more comfortable with.

20    "Mitigating" is really a legal phrase.  Is there a word

21    that comes to your mind?

22    A    What was the question again?  Reread that.

23              MR. HILL:  May I approach the juror?

24    Q    (By Mr. Hill)  Might I show you the questionnaire?

25    A    Yes.  I think at this point I was just ready to get
```

1   the whole thing done and out.

2   Q   Okay.  That's fine.  And if you feel like that answer

3   does not exactly reflect what you feel --

4   A   Yeah, I just don't know --

5   Q   Okay.

6   A   -- what I would feel on that.

7   Q   Okay.  Because you understand that's when

8   Mr. McClellan was talking to you, he was asking you on

9   Question No. 2 here, the penalty stage whether or not you

10   would take into consideration any mitigating evidence.

11   Obviously, in reading this answer on your questionnaire --

12   A   Right.

13   Q   -- it seemed to conflict with what you said in court.

14   A   Right.  I agree with -- I guess I don't have the true

15   definition of mitigating.

16   Q   Okay.  That's why we want to make sure you do

17   understand it because you could understand, I hope --

18   A   Definitely.

19   Q   -- that from reading this answer right here you're

20   telling me I'm not going to consider mitigating evidence

21   if I consider life or death.  So what did -- what would be

22   the point of me serving on the jury.

23   A   That is not a true answer for me.

24   Q   Good.  That's fine.  Because I do want you to

25   understand that when we are talking about capital

```
 1    murder --

 2    A    Uh-huh.

 3    Q    -- we are not talking about a situation where somebody

 4    has acted in self-defense.  We are not talking about an

 5    accidental killing because --

 6    A    Right.

 7    Q    -- because if any of those circumstances exists and

 8    you believed they existed, your responsibility under oath

 9    would be to find the person not guilty.  So, we want you

10    to be fully aware that if you're at this stage of trial

11    answering these two questions, you already found the

12    person guilty of capital murder.

13    A    Right.  Uh-huh.

14    Q    State asked you whether or not you believe that when

15    you talk about society, you include prison society; and

16    the Judge even mentioned it may not be community that

17    which live in part of overall society.

18    A    Right.

19    Q    Do you believe that that society in prison is the same

20    as your society that you live in?  In other words, do you

21    think the same rules apply in prison society that apply in

22    your free society?

23    A    To a certain degree I guess they do.

24    Q    Are there certain rules that are very different about

25    prison society in terms of what a person can do?
```

1    A    Yes.

2    Q    It's very restricted?

3    A    Yeah.

4    Q    Very restricted.  Have you ever watched any television

5    shows or specials regarding the Texas Prison System in

6    particular?

7    A    I don't think so.

8    Q    Okay.  Do you have a general feel about the Texas

9    prison system good, bad or indifferent?

10   A    Don't really know.  Haven't had the occasion to.

11   Q    Never visited there on a personal basis?

12   A    No.  No.

13   Q    Okay.  I'm going to ask you this one question, unless

14   Mr. Wentz has anything specific he would like to ask you,

15   Mr. Wentz and I are going to be called upon to decide

16   whether this woman is an individual that we should trust

17   to sit in judgment of our client just like the State's

18   asking themselves the same question.

19              Only you can tell us if there's anything,

20   whether in the deepest recesses of your mind or something

21   we completely missed because, quite frankly, if it's not

22   shared with us now and you get on the jury and pops up for

23   the first time back there when you're deliberating, it's

24   too late to do anything about it.

25   A    Uh-huh.

```
 1    Q    I always ask jurors if there's anything at all that
 2    you could tell me about yourself that would dissuade me
 3    from saying we would like you to come back at the end of
 4    the month.  Is there anything at all you can think of?
 5    A    No.
 6    Q    Do you have any questions of me?
 7    A    No.
 8    Q    Okay.  I hope the process wasn't too painful for you.
 9    A    No, it really wasn't.
10              THE COURT:  Okay.  Ma'am, in just a second
11         I'm going to excuse you.  Before I do, I will tell you
12         we want you back on Wednesday, September 29th at 9:30.
13         I will give you a paper about that in just a second.
14              Between now and when we see you again which
15         I believe to be three weeks from yesterday, please
16         don't alter your lifestyle one bit for us.  You do
17         whatever it is you ordinarily do.  Do it exactly the
18         same as you ordinarily do it.  If you have a chance
19         even between now and when we get together again to
20         leave town take the chance and go.
21              The only thing we ask of you between now
22         and when we see you next is this:  Please do not talk
23         about this case with anybody.  Do not permit anybody
24         to talk about this case with you.  If there is any
25         news media treatment regarding this case, please avoid
```

```
 1    it.
 2                Anything about this case on the television,
 3    refuse to watch it.  Anything about this case on the
 4    radio, refuse to hear it.  Anything about this case
 5    in the newspaper, refuse to read it.
 6                And the reason for each of those five
 7    restrictions is for this purpose:  If you do become
 8    a juror in this case, the decision that you reach --
 9    whatever this decision winds up being -- must be based
10    exclusively upon the information you receive from
11    within the courtroom and cannot be in anyway affected
12    or influenced by anyone outside the courtroom.
13                That's why we try to keep these, as you
14    know, pristine as we possibly can.  The rules are a
15    little bit different here.  If Mr. Hashagen needs to
16    know where you been, that will take care of that.  If
17    you need a reminder of where and when we want you to
18    be next Wednesday -- that's not true, Wednesday the
19    29th at 9:30, just right out here where you were this
20    morning and that day.  My best guess if we get started
21    on time we ought to be through by 12:00.
22                VENIRE PERSON HASHAGEN:  And this will be
23    finished?
24                THE COURT:  Everybody will know for certain
25    whether or not you're a juror.
```

```
 1              VENIRE PERSON HASHAGEN:  Okay.  Thank you.
 2      That sounds good.
 3              THE COURT:  I knew just as soon as I said
 4      that -- just don't know why.
 5              Ms. Amie.  I think that is the
 6      pronunciation.
 7              (Prospective Juror No. 10, Alejandra Solano
 8      Amie entered the courtroom.)
 9              THE COURT:  Ms. Amie, if you would please,
10      come right over here and have a seat.  Please make
11      yourself comfortable, and did I pronounce your last
12      name correctly?
13              VENIRE PERSON AMIE:  Amie.
14              THE COURT:  Amie?
15              VENIRE PERSON AMIE:  That's correct.
16              THE COURT:  Okay.  Ms. Amie, before we
17      begin I would ask you to remember back to yesterday
18      and all of the things we talked about yesterday.  To
19      that add the things we talked about this morning; and
20      out of the collection of everything that we have
21      talked about to this point, do you have any questions
22      at all for me?
23              VENIRE PERSON AMIE:  No.
24              THE COURT:  Is there anything, ma'am, that
25      up to this point that we have not yet talked about,
```

1      you feel as though we should talk about that we should

2      talk about because it might have some bearing or

3      influence on your ability to be a juror in this case?

4                    VENIRE PERSON AMIE:  Not that I could think

5      of.

6                    THE COURT:  Is there anything at all, ma'am,

7      that you're aware of now that could, whether it be

8      something about your personal life, professional life,

9      your health of something else that you feel in any way

10     would interfere with your ability to be a juror in

11     this case during the time frame that we've talked

12     about?

13                   VENIRE PERSON AMIE:  No.

14                   THE COURT:  Can you see from our

15     conversations yesterday and today that in this

16     process there is nothing that is automatic?  Because

17     one thing occurs that does not automatically lead to

18     another conclusion.  For example, because someone is

19     found guilty of capital murder, that does not mean

20     they should receive capital punishment.

21                   VENIRE PERSON AMIE:  Right.

22                   THE COURT:  May very well be because of

23     facts of the case, that would be a case-by-case

24     basis.  And life is an option in a capital murder case

25     just as the death penalty.  Guilty and not guilty are

1    equally options at the outset.

2              And do you have any questions at all about

3    that process or anything that we've covered so far?

4              VENIRE PERSON AMIE:  No.

5              THE COURT:  Okay.  The lawyers are going

6    to visit with you for a while.  And quite honestly,

7    ma'am, all they're going to be interested in is being

8    satisfied with themselves that you are satisfied

9    with yourself that based upon what you know, you could

10   take any one of those 12 chairs and listen to the

11   testimony in this case listen to all the testimony

12   and evaluate it however you see fit and just play fair

13   and come up with what you think is the right result

14   understanding that your job isn't to please either

15   side.

16             Your job isn't to please me.  Your job is to

17   be satisfied five years from now when you wake up one

18   morning and say, "I did the right thing," whatever

19   that may be.  Does that sound like you?

20             VENIRE PERSON AMIE:  Yes, I think so.

21             THE COURT:  Mr. McClellan, if you would

22   please.

23

24

25

1           **ALEJANDRA SOLANO AMIE,**

2      called as a prospective juror testified as follows:

3

4                           **EXAMINATION**

5      **QUESTIONS BY MR. MCCLELLAN:**

6      Q   Ms. Amie, my name is Lynn McClellan.  Along with

7      Claire Connors, we represent the State of Texas in this

8      case.   I am -- I want to you sit back and relax and I

9      want to ask you to share with us, if you will, certain

10     beliefs about aspects of the law.

11                  I want to go through a couple of questions

12     and go through your questionnaire and ask you some more

13     about some of your answers there.  First of all, though,

14     what kind of cases come to mind or crimes come to mind

15     when you think of cases you believe the death penalty

16     ought to be available as one of the forms of punishment?

17     A   I guess the first ones come to mind those cases

18     extremely violent where there was a lot of maliciousness

19     and the way the person died.  You know, not just an

20     accidental shooting or shooting out of passion but

21     something almost evil, I guess, or mean-hearted.

22     Q   Right.  Right.  The Court told you that capital murder

23     in the State of Texas is murder plus some aggravated

24     circumstance.  For the offense of murder without any

25     aggravating circumstance, the range of punishment is from

1    five years to 99 years or life.

2              Now, murder is the intentional taking of

3    another person's life without any legal justification, not

4    self-defense, not accidental.  When you intend to kill

5    someone and you do so for no reason, the offense it's

6    without any other crime being committed at the same time,

7    the death penalty does not apply.

8              Instead, you have the range of punishment

9         from five years to 99 years or life.

10   A    Right.

11   Q    For the offense of murder, can you keep your mind open

12   to the full range of punishment from five years to 99

13   years or life and wait until you hear the evidence and

14   decide where within that range the penalty ought to be

15   assessed?

16   A    Yes.

17   Q    Okay.  Now murder becomes capital murder when it's

18   connected with something else.  We have alleged in the

19   indictment murder during the course of kidnapping,

20   kidnapped someone and kills them during the process.

21             Also alleged murder during the course of

22   committing another murder, killing two or more people

23   during one criminal episode.

24             Okay.  Other types of capital murder are

25   murder during a robbery, murder during a burglary,

1   murder during a sexual assault, killing a police

2   officer in the line of duty, killing a child under a

3   certain age are the kind of cases Legislature said the

4   death penalty ought to be available for.

5           Do you agree that those kinds of cases the

6   death penalty ought to be available as one of the forms of

7   punishment for those types of cases?

8   A    You mean as far as it applies to capital murder?

9   Q    In other words the law says -- the reason I'm using

10  the word "available" is because there is no crime where

11  the death penalty is automatic.  It's not automatic for

12  anything.  It's only one of two possible punishments,

13  life in prison or death penalty and only available when

14  there's murder plus some other crime being committed.

15          Do you have any problem with that aspect

16  of the law?

17  A    No.  Just kind of seems strange that stipulation.  I

18  didn't realize that until the Judge mentioned it this

19  morning.

20  Q    Right.  Some people think it ought to be included in

21  murder, it's without during a burglary, without doing --

22  just a murder itself ought to have available the death

23  penalty as one of the forms of punishment depending upon

24  the facts of that particular murder.

25          Is that the way you feel?

```
1    A    I would tend to agree with that.

2    Q    You understand that's not what the law is?

3    A    Right.  Right.

4    Q    What you do as a juror is take an oath to a true

5    verdict render based upon the law and evidence.

6    A    Right.

7    Q    And if I were to be able to prove a murder and didn't

8    prove the underlying aggravated kidnapping or prove a

9    murder but only didn't prove the underlying murder find a

10   person not guilty of capital murder and guilty on the

11   murder?

12   A    Right.

13   Q    And you would be able to do that?

14   A    Right.

15   Q    Now, do you have any doubts about your ability to

16   participate in a process whereby you would be called

17   upon to make decisions?  In other words, answer these

18   questions over here knowing that in answering those

19   questions you would be ordering this Judge to order the

20   execution of the defendant sitting over here on trial if

21   that's what the law and evidence called for?

22   A    I would think I would not have that problem.

23   Certainly never been in this position before and not the

24   kind of thing you think about that you'd have to do.  But

25   just over the course of the last few days, you know, I'm
```

1    comfortable that I could go into what was presented to me

2    and decide accordingly and keep everything else out of it.

3    Q    Can you do that?

4    A    Yes.

5    Q    Some people come in and say:  There's nothing wrong

6    with that.  I believe the death penalty is proper

7    punishment in certain types of crimes.  But I've thought

8    about it.  I, myself, I could never make that type of

9    decision.

10              I couldn't live with myself having to make

11   that decision or my religious beliefs conflict with me

12   making that type of decision or my personal moral or

13   ethical beliefs keep me from making that type of decision.

14   I'm not saying we shouldn't have it.  I'm saying I'm not

15   the person to make that decision.

16              My question to you:  If that's what the law

17   and evidence called for -- if that's what you believe you

18   know the evidence and law called to happen, could you

19   participate in making that type of decision?

20   A    Yes.

21   Q    All right.  I want to talk to you for a little bit

22   about some of your answers in the questionnaire and kind

23   of feel out some of that.  You're asking about articles

24   that you may have read or TV that you watched relating to

25   death penalty and you indicated you like to read, I guess,

1    true crime books?

2    A    Not necessarily true crime books but crime books.

3    Q    Courtroom type books, stuff like that.  What is --

4    what are some of the books you read?  Do you recall any of

5    the names?

6    A    I think the last one I read was called Messiah.  It's

7    about a serial killer.  I read books by Allan Folsom wrote

8    The Day After Tomorrow something an arch bishop.

9    Q    Anything about that interest or anything in reading

10   that you think would have an affect on you being a juror

11   in this case?

12   A    No, I just like to read them.  The time goes fast and

13   can't wait to see what happens.

14   Q    Okay.  You also indicated that your brother-in-law

15   works in the Sheriff's Department?

16   A    Uh-huh.

17   Q    Is he a patrolman or do you know what he does?

18   A    To be honest with you we're not too close.  I don't

19   know what he does.

20   Q    Nothing about that affect your ability to be a juror

21   in this case?

22   A    No.

23   Q    You said you think your husband may have applied for

24   a law enforcement job some years ago.  Did you ever go

25   ask him about that over the night?

1    A    No.   And when I said that on the questionnaire, it was

2    weird, he just mentioned it the other day something about

3    he had applied.   But, I guess, he backed out or something,

4    I don't know.

5    Q    You'd been on a jury once before, is that correct, on

6    a prostitution -- solicitation of prostitution case?

7    A    Uh-huh.

8    Q    Do you recall what court that was in?

9    A    No.

10   Q    Okay.   And you indicated you reached a verdict and

11   the judge assessed punishment?

12   A    Right.   We had been dismissed to give -- come up with

13   a verdict at punishment stage, and he come in and said it

14   had been taken care of.

15   Q    Pled it out while deliberating?

16   A    Yeah.

17   Q    Anything about that case -- was that a good

18   experience, bad experience or --

19   A    Well, that was my first time having gone -- been

20   selected for a juror or been called so it was -- it was

21   interesting because it lasted all day long and it was

22   just an experience that -- I mean it was fascinating, I

23   guess.

24   Q    Right.   Right.

25   A    You know the process.

1    Q    Okay.  Did the defendant testify in that case?

2    A    No.

3    Q    You understand the defendant has a right not to

4    testify and in that case they didn't and I assume you

5    didn't use that against him.  You relied upon the evidence

6    that was presented?

7    A    Right.

8    Q    There's a question here that says:  Would an

9    individual's use or sell of drugs prevent them from

10   relying on any defense available to other members of

11   society?  And you checked yes.  And you said if you deal

12   drugs then you have money that buys you the best defense.

13   If you use drugs then you're probably poor and can't

14   afford a lawyer.

15            I think the question was designed to ask

16   you a question about this:  Let's say I'm out dealing

17   drugs.

18   A    Uh-huh.

19   Q    And someone you know -- I'm standing on the street

20   corner -- someone comes up and wants to buy drugs.  I sell

21   them drugs and the comes up and pulls a gun to rob me.

22   The law says I have a right to defend myself.  Do you

23   believe because I'm a dope dealer, I don't have a right to

24   defend myself?  Do you think I'm entitled to the same

25   rights the law provides to everybody else or think I give

1    those up because I'm a dope dealer?

2    A    Well, no, you still have the right to defend yourself.

3    Q    I think that's what the question was asking.

4    A    Okay.

5    Q    Also there's a question in here says:  What are your

6    feelings about the death penalty?  It says sometimes it's

7    warranted.  You know what in your mind makes the case --

8    one case is warranted and another maybe is not.  In your

9    mind what do you think the different factors apply to make

10   it warranted or not warranted?

11   A    I think the first thing that came to my mind, you

12   know, was situations where children have been killed, you

13   know.  Or family murdered.  Something, just, I guess

14   something of that nature.

15   Q    Okay.  All right.  There's another question:  What is

16   the best argument for the death penalty?  And you said an

17   eye for an eye but you put a question mark and said people

18   who are without a doubt guilty and show no remorse or who

19   would commit another crime why would I want to keep them

20   in jail housed and fed?

21              You know some people believe in eye for an

22   eye.  You take someone's life, you forfeit your life.

23   That's not the way the system is defined.  Do you believe

24   in eye for eye, if you kill someone, you also ought to

25   forfeit your life?

```
 1    A    Not necessarily.  That's why I put the question mark

 2    there.  That's a phrase I thought of at the time.

 3    Certainly if a person exhibits no remorse or no

 4    forgiveness or no sense of having done any wrong --

 5    Q    Right.

 6    A    -- I would tend to feel that person deserves the death

 7    penalty more than --

 8    Q    A lot of factors to be taken into consideration?

 9    A    Right.

10    Q    And that's what the law provides for and taking a lot

11    of other information into consideration.

12    A    Right.

13    Q    Another question says do you -- I'll get into that

14    here in a minute.  Let me talk to you for a moment about

15    the punishment stage of a capital murder trial.  We talked

16    about the difference between murder and capital murder.

17              And the first duty of the jury just like you

18    know from the prostitution case, the first job you had was

19    to determine guilt or innocence.  Has the State's proven

20    its case beyond a reasonable doubt?  Is the defendant

21    guilty as charged?

22              If you find he is, then you go to the

23    punishment stage where ya'll were at when the judge came

24    in, interrupted you, said we pled the case or agreed to

25    the punishment case.
```

```
 1            At the punishment stage of a capital murder

 2    case is a lot different.  Punishment stage of kind of case

 3    you were on because there you had a range of punishment --

 4    A    Uh-huh.

 5    Q    -- for a number of days in jail or number of dollars

 6    in fine and that kind of stuff.  Here there's two

 7    punishments, life or death.  And you decide those not by

 8    voting in favor of life or death you answer the questions.

 9            There is no way where there's an automatic

10    death penalty.  No question.  No such thing as automatic

11    death penalty.  Instead you find somebody guilty of

12    capital murder.  If you do go to punishment stage of trial

13    there, you may hear additional evidence.

14            You know guilt or innocence you heard about

15    the crime itself, what happened before, during and after

16    the crime because you're trying to determine has the State

17    proven all the elements that on a certain date in Harris

18    County, Texas the defendant kidnapped a certain person

19    caused their death or killed one person in the process of

20    the same criminal episode killed another person.

21            You're trying to find out whether we met

22    those elements.  If we do, find him guilty of capital

23    murder.  If you find him not guilty, everybody goes home,

24    no more trial.

25            If they're found guilty you go to the
```

144

```
 1    punishment stage of trial where you may have additional
 2    evidence about the defendant's character, his background,
 3    his criminal history or lack thereof, his mental ability
 4    or disability because you're hearing information about
 5    the individual because your job is to determine what
 6    punishment should this individual receive for the crime
 7    we have found he has committed, okay, and a lot of things
 8    may factor in there.
 9              You may have a person who's never, never
10    been in trouble with the law before, straight A student,
11    choir boy, Eagle Scout, whole nine yards.  What happened
12    was a horrible crime but it just stuck up like a sore
13    thumb.  In the plan of life it was a total aberration.
14    He'd never done anything before.
15              Another case you may have somebody who
16    commits capital murder, you see throughout life been in
17    and out of trouble all the time, been delinquent, been
18    truant, all kinds of problems in school, trouble with the
19    law and all kinds of other stuff, okay.
20    A    Uh-huh.
21    Q    So you have to kind of determine what the facts are
22    in determining what the punishment may be.  Issue No. 1
23    says:  Do you find from the evidence beyond a reasonable
24    doubt there's a probability that the defendant would
25    commit criminal acts of violence and would constitute a
```

```
1    continuing threat to society?

2              Your job there is to determine beyond a

3    reasonable doubt.  So the automatic answer to that is no

4    unless we prove it is true beyond a reasonable doubt just

5    like the automatic verdict is not guilty unless we prove

6    beyond a reasonable doubt he's guilty.

7              You have to determine have we proven beyond

8    a reasonable doubt there's a probability and the Judge

9    told you that doesn't mean possibility and doesn't mean

10   certainty.

11   A    Uh-huh.

12   Q    It means probability, kind of more likely than not.

13   So, the question is:  Is it more likely than not this

14   person we found guilty would commit criminal acts of

15   violence?  That could be anything from hitting someone

16   with a fist to killing somebody, anything criminal and

17   violent in nature, okay, that would constitute a

18   continuing threat to society.

19             So, your duty is to determine as the

20   defendant sits there that day do you believe it's more

21   likely than not he would be a continuing threat to commit

22   future acts of violence and then have to rely upon the

23   facts of the case any evidence you heard about the

24   defendant's character and background and his criminal

25   history or lack thereof, all of this.
```

```
 1                    On Issue No. 1 are you open to answering
 2       that either yes or no depending on what the evidence
 3       shows?
 4       A    Yes, uh-huh.
 5       Q    Okay.  Some people may come and tell us if I have
 6       found him guilty of capital murder the intentional taking
 7       of another person's life without any legal justification
 8       during the course of kidnapping, I'll always believe
 9       there's a probability that he'd be a continuing threat to
10       commit future acts of violence.
11                    As I said in the punishment stage of trial
12       you may hear evidence about the defendant's character and
13       background and may decide that's not true.  May have
14       found, as I say, an Eagle Scout, alter boy, no trouble
15       with the law, a total aberration.  Or you may find on the
16       other hand been in trouble all the time.
17                    Are you open then on Issue No. 1 to answer
18       that either yes or no depending upon what all the evidence
19       shows?
20       A    Yes, I am.
21       Q    Can you assure me that you wouldn't answer yes just
22       because you found a person guilty of capital murder?
23       A    I'm sorry.
24       Q    In other words, can you assure me just because you
25       found somebody guilty of capital murder which you had to
```

1    do in order to get to this question just because of that

2    you would not always answer that question yes I mean take

3    that into consideration but there is no automatic answer.

4                    Do you understand that?

5    A    Right.  Right.  I understand.

6    Q    Any problem?

7    A    No.

8    Q    If you answer that question yes, the defendant's going

9    to receive the death penalty unless on Issue No. 2 you

10   decide that he does not.  Issue No. 2 doesn't have a

11   burden of proof instruction.

12                    Instead it says:  Do you find that taking

13   into consideration all of the evidence including the

14   circumstances of the events, that is the crime itself,

15   what you heard at guilt or innocence, the defendant's

16   character and background, that's what you heard in

17   punishment about his character and background and his

18   moral personal moral culpability, what I like to refer

19   to as personal responsibility for commission of the crime?

20                    In other words, did he pull the trigger or

21   stab the person or do whatever or was he a getaway driver?

22   Do you find there's a sufficient mitigating circumstance

23   or circumstances -- I like to refer to it as reasons --

24   sufficient reasons why this person should receive life as

25   opposed to death?

```
 1              What you do is go back and look through all
 2    the evidence.  Is there evidence we have heard that in our
 3    minds -- in my mind because this is an individual decision
 4    to you -- that in my mind makes me believe this person
 5    should receive life as opposed to death.
 6              For example, you may go back and look
 7    through all the evidence, see if there's anything you
 8    believe to be mitigating.  If there is, then you consider
 9    if it's sufficient to change your vote from death to life.
10    That's what you think.  If it's not sufficient, you don't
11    change your vote, okay.
12    A    Okay.
13    Q    To give you an example how this works, let's say you
14    may have heard evidence during the trial the defendant was
15    high on drugs or alcohol during the crime.  One juror may
16    say:  I believe that mitigates towards a life sentence.
17    When you're high on drugs and alcohol you don't do things.
18              Or Juror two may say:  Wait a second.  I
19    know people that get high on drugs and alcohol and don't
20    commit capital murder.  I don't see the connection of
21    committing a crime.  If they get high on drugs and alcohol
22    again, they'll commit capital murder again.  So, they
23    don't think it's mitigating.
24              You see two people look at the same
25    evidence.  One finds it mitigating, one not.  That's what
```

1    you're asked to do.  And you weigh in your mind and decide

2    what affect it ought to be given.  You may hear evidence

3    he was a slow learner.  Not a very good student.  Some

4    people say that mitigates towards a life sentence.

5              Then someone may say I know people with the

6         same type of mental problems this guy has, they don't

7         go out and commit capital murder.  And I don't think

8         there's a connection between mental capability and

9         what he did in the crime.  I don't think it's

10        mitigating. .

11             Again, two people look at the same evidence

12   and came up with different answers.  That's okay.  You're

13   going through the right process.  The age of defendant.

14   Some may say he's a very young man that committed a stupid

15   mistake when young.  When you get older you don't make

16   that mistake.  I think that mitigates towards a life

17   sentence.

18             Somebody else may say if they've already

19   committed this crime at this age no telling what they do

20   10, 15 years down the road.

21   A    Uh-huh.

22   Q    So, they don't think it's mitigating.  So, you see how

23   this process works.  Go back and evaluate the evidence and

24   determine if there's any evidence that's mitigating.  If

25   there is, is it sufficiently mitigating to give the person

1     life as opposed to death.

2              It gives you the option to change what was

3     otherwise going to be a death sentence.

4     A    Yes, I see.

5     Q    Any problem with that?

6     A    No.

7     Q    Now the questionnaire.  Before we get an opportunity

8     to talk about what mitigating is -- and I dare say most

9     people when you say mitigating don't really -- I mean,

10    it's the kind of term I don't know where it came from.

11    It's probably not well understood by a lot of people.

12              There's a question here, 68, says:  Do you

13    believe that mitigating -- and it's underlined -- evidence

14    concerning a capital murder defendant's background should

15    be considered in deciding whether or not he/she should

16    receive the death penalty?  And you checked no.

17              Now, do you understand though that what the

18    law says in Issue No. 2 is that you shall look for

19    mitigation and if you find it you determine what affect

20    it's to be given.  And it may result in you changing your

21    mind and give a life sentence and then again it may not.

22    A    Right.  When I answered that I didn't realize there

23    was a process.  And I thought that when you impose a

24    verdict that all that was taken under one umbrella and

25    included in there not like this step and this step and

1   this step.

2   Q    And it is a fair step process as we talk about guilt

3   or innocence stage then there's the issue of punishment

4   and all this process and all we need to know is just to

5   make sure that you would go through the process because I

6   don't know if you'll find anything mitigating or not.

7            Maybe you may look through all the evidence

8   and everything and not find anything mitigating.  That's

9   entirely possible.  What the question does is commit you

10  to looking, to the certainty of searching.

11            Any problem with that?

12  A    No.

13  Q    And I guess another way of asking that question is

14  this:  If you had found someone guilty of capital murder

15  and then in Issue No. 1, if you determine that beyond a

16  reasonable doubt there's a probability more likely than

17  not that the person on trial who you had convicted of

18  capital murder would commit criminal acts of violence and

19  would constitute a continuing threat to society, are you

20  still open on Issue No. 2, that going through and looking

21  for mitigating evidence and if you find it weigh and

22  determining what effect that you have?

23  A    Yes.

24  Q    See some people say might say:  If I find them guilty

25  and find they're a continuing threat, nothing will ever be

```
 1    mitigating.  They may be right there may be nothing.  You
 2    have to committed the search and looking for it and
 3    following the instructions of that issue.
 4                    Any problem with that?
 5    A    No.
 6                    MR. MCCLELLAN:  How much time?
 7                    THE COURT:  None.
 8                    MR. MCCLELLAN:  Thank you very much, ma'am.
 9        I'll pass.
10                    THE COURT:  Do you have any more questions?
11                    MR. MCCLELLAN:  No, that's fine.
12                    THE COURT:  Mr. Hill.
13
14                         EXAMINATION
15    QUESTIONS BY MR. HILL:
16    Q    Hi, Ms. Amie, how are you?  My name is Wayne Hill.
17    And Kurt Wentz is the other lawyer representing Mr. Mamou
18    on this case.  I sit up here because that ledge kind of
19    jutes out and blocks our view.  And so rather than you
20    having to look over there it's easier to sit here.
21                    I want to give you the opportunity to
22    express yourself.  Mr. McClellan asked you a whole series
23    of questions, told you what the law requires this, that
24    you're not going to do anything automatically.  And there
25    are certain buzz phrases that are kind of used to get
```

```
 1    people to sit up on the edge of their chair and figure --
 2    answer one way or the other where they may seem to be
 3    saying they're a fair and impartial juror.
 4              This is the only opportunity we get to
 5    speak with prospective jurors to determine whether or not
 6    they can sit on a case like this, okay.  Not everybody can
 7    for any number of reasons.  The State would not want to
 8    have people sitting up here that says, "In every case
 9    where the person is found guilty of capital murder, I
10    could never give the death penalty."
11              I think you'd agree that would be unfair to
12    the State, right?
13    A    Right.
14    Q    And I think you'd also agree it would be, you know, a
15    little unfair to the defendant if everybody that sat up
16    there says, "I always believe in the death penalty,"
17    right?
18    A    Right.
19    Q    Well, in Texas in order to serve on a jury, the 12
20    people have to say they believe in the death penalty
21    because if their ability to serve is impaired by their
22    belief that the death penalty should never be applied,
23    they don't get to serve.
24              So, the Defense starts right out with a
25    group of 12 people who believe in the death penalty.  The
```

```
 1    question is how strong do they feel that.  And this is the
 2    only time to express it.  It's not a Physics test.  No
 3    right or wrong answers.
 4              What we don't want to have people doing is
 5    feeling like they got to fit in with what the law says.
 6    If you're picked on this jury and figure out two months
 7    from now or however long trying the case, I really should
 8    have said something about this, I really have strong
 9    feelings, it's too late.
10              This is why we go through the exercise and
11    this is -- there were some answers you gave that suggest
12    you have strong feelings about the death penalty.  We want
13    to judge whether or not you are really feeling an
14    obligation one way or the other, okay.
15              I hope you don't feel like that's too
16    invasive or trying to pick on you or anything.
17    Mr. McClellan kept using the scenario of aberration.  You
18    might find somebody guilty of capital murder or find
19    they're a choir boy or straight A student and then he asks
20    you could you find that that's maybe mitigating or
21    wouldn't find it mitigating and he never gave you an
22    opportunity to talk about what you think.
23              I want your honest feeling about sitting on
24    a case where you have just found somebody guilty of
25    capital murder.  In this case it is alleged in two
```

1    different ways that Mr. Mamou either caused one person's

2    death either while or after he kidnapped the person, it

3    was a female; or alternatively that Mr. Mamou killed both

4    a female and male during the same criminal transaction,

5    killing two people without self-defense without any legal

6    justification.  It was no accident.  He meant for two

7    people to die and he did so.

8              I want to know honestly now how you feel

9    about sitting on a case like that and then coming and

10   answering these two questions, okay.

11   A    Uh-huh.

12   Q    Tell me what kind of comes to your mind first when he

13   asks you whether there's a probability this person you

14   just found guilty in a hypothetical capital murder would

15   likely be a threat to society, you feel like you have some

16   feelings already developed based on finding someone guilty

17   of capital murder?

18   A    You mean as far as being able to answer that?

19   Q    Yeah.

20   A    Well, to me it makes it -- it makes it easier.  Like

21   I said, you know I envisioned having to find someone

22   guilty and by a vote of hands.  However it's done I'm not

23   really clear.

24   Q    Right.

25   A    And that person would automatically get the death

1    sentence.

2    Q    Okay.

3    A    This to me having the two issues makes it easier

4    because you're having to put some more thought into it

5    other than just the guilty part and put other things into

6    it and, you know, make -- based on what I heard, I'll say

7    I don't believe that this has any bearing on this or

8    whatever.  But it makes it easier in the process to have

9    that to guide you.

10   Q    Right.  My question, I guess, goes a little beyond

11   that.  And I'll ask you or tell you a little bit about

12   the process.  I think it's fair if we ask you to show on

13   the jury, show by hands.  Does it work?  The State gets

14   to present all the evidence they have.  They're trying to

15   prove their theory of cases that Mr. Mamou took the life

16   of two people specifically or that he killed this woman

17   while he was kidnapping her, okay.

18            At the end of their presentation of the

19   evidence, we can present evidence if we want.  We don't

20   have to.  Mr. Mamou doesn't have to say a single thing.

21   Then the jury will decide based on instructions the Court

22   gives you whether their case -- the State has proven their

23   case beyond a reasonable doubt.

24            It takes a 12 unanimous decision if the

25   State has in fact proven the capital murder beyond a

```
 1    reasonable doubt.  In other words you excluded any other
 2    explanation.  It wasn't self-defense.  It wasn't an
 3    accident.  He meant for two people to be killed and he
 4    did so or he meant for this woman to die while he was
 5    kidnapping her and he did so.  Then you come to the
 6    questions.
 7                      And so my question now that you have
 8    a little better understanding of what the process is, you
 9    already found the person guilty, do you feel as though in
10    answering Question No. 1 you pretty much already have that
11    answer because you're allowed to consider the facts of the
12    case, okay?
13                      That's -- I mean, that's what's being asked
14    of you to consider the evidence that's presented to you.
15    Assume for our purposes of discussion the only evidence
16    you have is all the evidence that you heard at the guilt
17    stage.  In other words, you're now having to apply all
18    this evidence to answering question No. 1.
19                      Do you feel that in all likelihood you would
20    have to answer that question yes because you had just
21    found the person guilty of this capital murder knowing
22    what that is?
23    A    No, because I mean it would depend on what the
24    evidence is or what -- what you had learned about the
25    crime to be able to say.
```

1    Q    What are some of the type of factors -- not that you

2    will necessarily be bound by any of these -- what are some

3    of the type of factors you might think are important how a

4    crime is committed that could help you to answer that

5    question no?

6                   In other words, you know at this point,

7    Ms. Amie that you've just found somebody guilty of

8    committing capital murder.

9    A    Uh-huh.

10   Q    What are some of the circumstances that might be

11   important to your decision-making process or maybe reasons

12   would be a better way?

13   A    Maybe past incident of that kind.

14   Q    Okay.

15   A    You say this is a murder kidnapping, maybe he had

16   abducted someone before, maybe not.

17   Q    Okay.

18   A    Maybe it was a relationship between that person and

19   that other person that caused it or --

20   Q    Let's talk a little bit about that, the relationship

21   of the parties.  How would that factor in?  What would be

22   important for you to know about or why would that be a

23   factor?

24   A    I guess you look at whether this is a stranger to

25   this person or whether they were friends.  Whether they

1   were, you know, boyfriend girlfriend.  Was it, you know,

2   someone he had something against.  You know one might

3   lead, I guess, when you're thinking someone he knows, it's

4   more involved than just picking a stranger.  Makes it

5   more, I guess, for lack of a better word personal.

6   Q   Okay.  Let me ask you if this makes sense to you

7   because you understand you could very well find a person

8   guilty of capital murder even though it was more involved

9   that the persons knew each other maybe the circumstances

10  of how a crime was committed shows that it was not you

11  know somebody that premeditated or randomly just come up

12  to somebody and said you're going to be my victim today.

13              Do you feel as though it would be important

14  to your decision-making process either Question No. 1 or

15  Question No. 2?  Quite frankly, there was some type of

16  relationship, maybe whether it be a business transaction

17  or business dealing between people or they knew one

18  another for some reason and then something occurred which

19  caused an individual to commit capital murder because you

20  would clearly find he did commit capital murder; but do

21  you think those circumstances surrounding how the crime

22  came about could be an important factor in deciding either

23  of those questions?

24  A   I would think so.

25  Q   Okay.  You know if you look at question No. 2, it's

1   interesting.  It asks you:  Do you find that taking into

2   consideration all of the evidence, and then it basically

3   breaks that evidence into three areas and says, the

4   circumstances of the offense the defendant's character and

5   background and the personal moral culpability of the

6   defendant.

7                So, I see there are kind of three areas it

8   directs you to.  Is there any one of those three more

9   important to you answering that question than any other,

10  or do they all have equally kind of share 33 and a third

11  each?

12  A    Well, I think the most important to me would be the

13  circumstances.

14  Q    Okay.  Would it be a fair statement -- I want to know

15  whether I'm interpreting or reading what you're telling me

16  correctly -- would the cold-blooded murder, somebody goes

17  into the 7-Eleven and just guns everybody down to steal

18  the money.  That would be a circumstance of the crime that

19  I assume you would find very offensive and would probably,

20  all other things being equal, probably tell you somebody's

21  going to get the death penalty.

22                On the other side person goes to the grocery

23  store or convenience store to rob it and something happens

24  while they're inside there.  A person panics.  A person is

25  in a situation that he feels even though he wrongfully

1    feels that it's either him or somebody else and he shoots

2    people killing them.

3              Does that -- is that a distinguishable set

4    of circumstances than that of the cold-blooded murder, his

5    whole purpose to go in and wipe people out and take money?

6    A    Yes.

7    Q    Okay.  Can you tell me why?

8    A    Well, because in the first one you have somebody

9    intending to do that, you know.  Obviously, someone goes

10   into a store with that intention, his frame of mind.

11   Someone who goes into a burglary and all of a sudden -- I

12   can see where something goes wrong, like you said, and

13   panics:  What do I do?  And you're going to make a

14   dramatic mistake.  It's not the same as going in with that

15   intent or purpose in mind.  You know, you started out

16   small wanting to rob $20 and ended up killing someone.

17   Q    You understand in either of those situations that

18   person is guilty of capital murder.  You can do an act

19   intentionally because Texas requires that an intentional

20   act if I had a handgun and I shot at Mr. Mamou right now

21   and caused his death I committed murder.  If I was doing

22   another felony during the course of it, it would be

23   capital murder.

24             I want to make sure you're comfortable

25   with evaluating all this evidence and give it a real close

1    look at when the State uses phrases like you wouldn't

2    automatically do something, that kind of makes people feel

3    nervous.  I don't do anything automatically.  I want to

4    reason carefully before I make a decision.

5                    Do you think that the only circumstances

6    or the only situation that you could think of where a

7    person may not be a continuing threat to society would

8    be that choir boy, straight A student example or do you

9    think there are a whole lot of people that don't measure

10   up to that standard by the facts of the case and the

11   evidence that's submitted to you might not suggest the

12   answer to Question No. 1 might be yes?

13   A    I'm not sure I understood what you asked me.

14   Q    Okay.  The State gives you extreme examples of the

15   choir boy, straight A student.  You may be gun down a

16   hundred people and be a straight A student and not think

17   they're going to be a threat to society.  I don't know

18   whether you agree with that proposition.

19   A    No.

20   Q    Or if your thought process is it don't matter if he's

21   a choir boy, if he committed capital murder there's always

22   going to be a probability he's going to be a threat.

23   A    Right, I agree.

24   Q    Is that how you feel?

25   A    Yes, I agree.

1    Q    So, let me go back and ask this question:  Do you feel

2    that in all cases no matter what the nature of the capital

3    murder that if you had found beyond a reasonable doubt a

4    person is guilty of capital murder, do you believe that

5    the answer to Question No. 1 would always have to be, yes,

6    there's at least a probability that the defendant would

7    commit criminal acts of violence that would constitute a

8    continuing threat to society?

9    A    Okay.  You're saying because I found somebody guilty

10   of capital murder would the answer to No. 1 always be yes?

11   Q    Correct.  You used that same evidence.

12   A    No.

13   Q    Okay.  Do you hesitate at all in answering that?

14   A    No, I'm thinking it through.

15   Q    Okay.  Because I thought the State gave you an example

16   that kind of made it seem like the pillar of the

17   community, therefore, why would you not think that this

18   guy may have been just an aberration.

19        I just want to make sure you realize that

20   nobody -- everybody that walks in this courtroom is going

21   to be able to produce evidence they're straight A student

22   and choir boy, okay.

23            What I want to know about you, if anything,

24   is that when I go and talk to Mr. Wentz and Mr. Mamou

25   tells me I shouldn't invite you back here for the 29th of

 1   September, is there anything that you can think of that

 2   you would want to say to me, "Mr. Hill, you know you

 3   really don't want me sitting listening to this case?"

 4   A    No.   I guess you probably know more about me since I

 5   filled out this questionnaire.

 6   Q    I'll turn it around.   Is there anything you would

 7   want to tell me, "Mr. Hill, this is specifically why you

 8   would want to have me on this case."   Something about your

 9   background.   Something about what you do.   Something that

10   gives me insight to tell me this is just the type of juror

11   I would want on the case, listening to a case this

12   serious?

13   A    I mean, I'm just a pretty average person.

14   Q    Okay.

15   A    I like to give people the benefit of the doubt.   As a

16   parent, you know, my husband and I have discussions about

17   what my son did this and he did it because of this or

18   that.   Don't always tend to agree.   And I can see raising

19   a child, there's always two sides to it.   And we can see

20   the same child going and have two totally different

21   appearances about him.

22   Q    Right.

23   A    And I would like to think I give everybody a fair

24   chance and treat them accordingly.

25   Q    Okay.   Do you ever read any of Patricia Cromwell

1    novels?

2    A    No.

3    Q    Okay.  Thanks.

4    A    You're welcome.

5              THE COURT:  Ms. Amie, in just a second I'm

6    going to excuse you.  Before I do, I will tell you

7    that we want you back Wednesday, the 29th of

8    September, at 9:30.  I will give you a piece of paper

9    about that in just a second which I believe to be

10   three weeks from yesterday.

11             Between now and the next time we get

12   together, don't you change your lifestyle one bit for

13   us.  You do your family things just exactly like you

14   would do.  And do your personal things and your

15   business things like you would do them.

16             If you even have a chance between now and

17   the next time we get together to leave for an extended

18   trip, take the chance and go.  All we ask of you

19   between now and then is this:  Please do not talk

20   about this case with anybody.  Please do not permit

21   anybody to talk about this case with you.

22             In the event there is any media publicity

23   about this case, avoid it.  Anything about the case on

24   the television, refuse to watch it.  Anything about

25   the case on the radio, refuse to hear it.  Anything

1    about the case in the newspaper, refuse to read it.

2             And Ms. Amie, the reason for each of those

3    five restrictions is for the purpose of accomplishing

4    the same common objective and that's this:  If you do

5    become a juror in this case, the decision that you

6    reach, whatever that decision winds up being, must be

7    based exclusively upon the information you receive

8    from within the courtroom.  And your decision can't in

9    any way be influenced or affected by any outside the

10   courtroom information.

11             That's why we try to keep that apart.  When

12   we get together on Wednesday the 29th if we get

13   started on time by about the noon hour we'll be

14   through.  And everybody will know that day -- will

15   leave here knowing specifically whether they're a

16   juror or not a juror on the case.

17             If a person is selected as a juror on the

18   Wednesday the 29th, they will begin on the following

19   Monday the 4th.  If you need something for anybody at

20   work to show them where you have been, that will take

21   care of it.

22             This is the reminder note of where and when

23   we want you to be right outside the door where you

24   were waiting this morning 9:30, Wednesday, September

25   the 29th.  Before you leave have you any questions

1     for me?

2            VENIRE PERSON AMIE:  No.

3            THE COURT:  Okay.  Thank you very much for

4     being with us.  We look forward to seeing you the

5     next couple of weeks.  Anybody need anything?  Okay.

6            Ms. Tinnemeyer, please.

7            (Prospective Juror No. 18, Jerri McGraw

8     Tinnemeyer entered the courtroom.)

9            THE COURT:  Come on in here and have a seat,

10    please, ma'am.  Been a long time since we've seen you.

11    Have a seat, please.  Are you holding up okay?

12           VENIRE PERSON TINNEMEYER:  Yes.

13           THE COURT:  All right.  Good.

14    Ms. Tinnemeyer, first off let me ask you to remember

15    back to yesterday and the things we talked about

16    yesterday, add to it this morning the things we talked

17    about this morning and I'm talking about this morning

18    is when the group as a whole was together, out of

19    everything we have talked about up to this point, do

20    you have any questions at all for me?

21           VENIRE PERSON TINNEMEYER:  No.

22           THE COURT:  Now, I'm asking the questions

23    and the natural thing for you to do is answer me.

24    These folks have to hear your answer to my question.

25    If you would please keep your voice up.  Is there

```
 1      anything to this point that we have not yet touched

 2      on that we haven't yet talked about that you feel as

 3      though would be a good idea to talk about that might

 4      have some influence or bearing on you being a juror in

 5      this case?

 6                  VENIRE PERSON TINNEMEYER:  Not that I would

 7      be aware of, no.

 8                  THE COURT:  Don't suppress secret

 9      information, do you?

10                  VENIRE PERSON TINNEMEYER:  No.

11                  THE COURT:  Is there anything at all that

12      you can think of, something about your personal life

13      whether it be something about your professional life

14      or whether it be something about your health or

15      whether it be something else that you feel could in

16      any way interfere with your ability to be a juror in

17      this case during the time frame that we've talked

18      about?

19                  VENIRE PERSON TINNEMEYER:  No, sir.

20                  THE COURT:  In just a second the lawyers are

21      going to visit with you.  All this process is about, I

22      think, is to make sure as best we can to explain to

23      you what the rules are that can come into play during

24      the course of trial.

25                  First of all, can you follow it?  And what
```

```
 1        you heard so far your answer would be what?

 2                  VENIRE PERSON TINNEMEYER:  Yes.

 3                  THE COURT:  Nothing that you've heard so

 4        far so personally repulsive and so offensive you'd not

 5        be able to abide by it?

 6                  VENIRE PERSON TINNEMEYER:  No.

 7                  THE COURT:  Second thing, I think this

 8        process is meant to accomplish and to make sure the

 9        lawyers make sure for and you to make sure with

10        yourself that if you were a juror in this case you

11        could sit back in any one of those 12 chairs and

12        listen to every single shred of evidence the lawyers

13        give and tell them how you feel appropriate and based

14        upon how you evaluate the information they give to you

15        come up with what you think is the right result to

16        reach.

17                  Does that sound like you?

18                  VENIRE PERSON TINNEMEYER:  Yes.

19                  THE COURT:  The idea being your job is not

20        to please one side or the other.  Your job is

21        certainly not to please me.  Your job is to make

22        certain five years from now when Ms. Tinnemeyer wakes

23        up in the morning she can look in the mirror and say,

24        "You know five years ago in this case I did exactly

25        the right thing."
```

```
 1                    Your job is to satisfy yourself whatever the
 2         result is.  And are you open to the whole concept of
 3         guilty, not guilty, life, death?  That's because a
 4         person is found guilty of capital murder for that
 5         reason and that reason only, does not require these
 6         questions be answered any specific way.
 7                    VENIRE PERSON TINNEMEYER:  (Nods head.)
 8                    THE COURT:  The evidence is what might
 9         require it?
10                    VENIRE PERSON TINNEMEYER:  Yes, sir.
11                    THE COURT:  Do you have any questions of me
12         before we begin?
13                    VENIRE PERSON TINNEMEYER:  I think I
14         understand everything that we talked about in the last
15         two or three days.  Yes, I do understand.
16                    THE COURT:  Mr. McClellan.
17                    MR. MCCLELLAN:  Thank you, Your Honor.
18
19                    JERRI MCGRAW TINNEMEYER,
20         having been sworn as a prospective juror, testified as
21         follows:
22
23                              EXAMINATION
24         QUESTIONS BY MR. MCCLELLAN:
25         Q   My name is Lyn McClellan.  Along with Claire Connors,
```

```
 1    we represent the State of Texas in this case.  I want you

 2    to sit back and relax.  I'm going to ask you to share with

 3    us, if you will, your opinions and beliefs about certain

 4    aspects of the law.  I got about 20 minutes to talk to

 5    you, and Mr. Hill will have about 20 minutes to make fun

 6    of what questions I ask of you which is ardently --

 7                    MR. HILL:  Thank you.

 8    Q    (By Mr. McClellan)  Let me ask you, first of all, you

 9    indicated you used to oppose the death penalty?

10    A    Yes.

11    Q    And have you now changed your mind?  Tell us how that

12    occurred.

13    A    I don't know exactly how it occurred; but I do know

14    that anybody would mention it, I'd say no, no, no and --

15    Q    What period in your life was that?

16    A    Probably college.

17    Q    Okay.

18    A    Maybe right when I first got married.

19    Q    Okay.

20    A    And then, you know, I'm 35, too.  Life experiences

21    itself tell you, yes, there are certain situations

22    that --

23    Q    What kind of situations come to your mind when you

24    think of situations where I think the death penalty may be

25    appropriate as being available as one of the forms of
```

```
 1    punishment?

 2    A    A specific kind?

 3    Q    Just what comes to your mind?

 4    A    Anyone who would murder.  My first thought that comes

 5    to mind why I'm hesitant anyone who would murder a child.

 6    Q    Murder a child, okay.

 7    A    Or murder anybody.  But that one is the one that jumps

 8    out of me.

 9    Q    We get that answer quite often.  Murder of children.

10    For murder, of course, in the State of Texas the death

11    penalty doesn't apply unless it's a child under a certain

12    age.  To murder someone intentionally take someone's life

13    without any justification.

14    A    Correct.

15    Q    Not self-defense, not accident.

16    A    Correct.

17    Q    Intend to kill someone and do so, that's the kind of

18    range the Judge talked about from five years to 99 years

19    or life.  Capital murder is murder plus some other

20    aggravated circumstance, murder kidnapping, what we have

21    alleged here and murder during a murder, killing two or

22    more people during one criminal episode are the kinds of

23    cases the Legislature have said the death penalty is

24    available.

25                 There's no automatic death penalty for any
```

```
 1    crime.  It's available.  Do you agree it ought to be

 2    available for those types of crimes that the Legislature

 3    set out ought to be available for that is murder plus some

 4    other aggravated circumstance.

 5              Do you think they should allow for that?

 6    A    Yes.  Yes.

 7    Q    If you were the governess, if you were putting how to

 8    be -- would you keep the death penalty available on the

 9    books as punishment for certain types of crimes?

10    A    Yes.

11    Q    You say you're a Special Programs Counselor at

12    Pasadena ISD.  What does that entail?

13    A    I coordinate the Advance Placement Program for the

14    gifted and talented, the program for the At-risk Program

15    our credit redemption students who have failed.  We try to

16    get them back on track with their peers.  I coordinate

17    with CIS drug-free safe schools.  I write the campus

18    improvement book.  I'm on the Campus Improvement team.  I

19    coordinate that.

20    Q    What does everybody else do?

21    A    I ask the same question.  Does anybody else have -- is

22    anybody else doing anything but me?

23    Q    Do you ever deal with Special Ed students or that

24    area?

25    A    We have a Special Education counselor.  I do sit in on
```

```
 1     order if I have to, if I'm required to for a specific

 2     purpose or if there's someone that's --

 3     Q    I'm sorry, I didn't mean to interrupt.  What is the

 4     At-risk Program?

 5     A    These are students who have failed one or more classes

 6     one or more school years have failed one or more parts of

 7     TAAS.  And I know you're familiar with that.  Be all over

 8     school right now.

 9     Q    Do you have deal with alternative schools if they

10     have --

11     A    Yes, we do.

12     Q    And would people who have disciplinary problems on a

13     regular basis be sent to an alternative school?

14     A    Those are students are more likely to be assigned to

15     me.  I have a group of what we refer to as rollback 9th

16     graders.  And it is my job to see each one of those and I

17     don't know everytime, you know, I've gotten a chance.

18     I've worked on their graduation plan.  And what we found

19     is if we can get that 9th grader who has failed the first

20     time to either be in summer school in 7th period the

21     credit redemption courses if we can get that child to get

22     back on track with his or her peers, then they're more apt

23     to go ahead and graduate.

24                 So, I work really hard with that grade of

25     students.  It's about 200.
```

1    Q    And this is a tough question, I know, but do you ever

2    see kids that basically just in your own personal

3    evaluation, thought process that you have, that he'll be

4    down at the courthouse you know before long?  I know you

5    try to help.

6    A    If intervention isn't done, yes, I do because many of

7    students come to me on parole; and we have parole

8    officers.  And, again, you know I don't look at it is the

9    student going to end up back here?  I look at it can I

10   intervene and keep the students in school.

11   Q    Okay.  Do you think this reforming process has more to

12   do with the program that's being given or the attitude of

13   the person who's going to be in it or accepted into it?

14   A    Probably the attitude of the student.

15   Q    If they want to, it's available there and they can do

16   it.  If they don't want to, it's going to be hard to make

17   them?

18   A    Yeah.  I also know as 9th graders a lot of them want

19   to do as their peers do.

20   Q    Right.

21   A    So, if I can get in there and coerce them, let's go,

22   won't you go this time for your mom, dad, whoever I get in

23   touch with, then a lot of them once you can get them to a

24   certain degree they tend to pick up -- a motivation may

25   come back.  I've seen that not as often as I would like,

1    but to the best of my ability, yes.

2    Q    This is something that crosses my mind.  My wife's a

3    Special Ed teacher and done that for 15 years or so.

4    Someone's who dedicated in their profession to helping

5    others who is called upon to be a juror where they have

6    to make a decision of someone committing a crime that

7    shouldn't be a problem if the State proved its case or

8    not.  They did.

9              Then what's to be the punishment for that

10   person.  And when there's only two possibilities in a

11   capital case being life or death.  Death says they are

12   giving up and basically saying this person is beyond

13   redemption by answering those questions.  And that's going

14   to be the appropriate deal.  Life means, well, he does 40

15   years day for day and see what happens after that.

16             Based upon you and your life choice and your

17   life service of trying to help people, are you going to be

18   more inclined to try to find -- say there's something

19   there that can be saved versus if the evidence calls for

20   the death penalty, gee, just something about me we needed

21   to do something else?

22   A    With students that I have to decide whether or not

23   they can say stay at my school or do they need to go to

24   CEEP.  Granted the analogy is not on the same level.  If

25   we have done what -- everything we could do and that child

1      is not going to function there I do not -- and again,

2      we'll go through and I probably overdo this.  I go through

3      every nook and cranny.

4                    Can I make this decision, yes.

5      Q   Here's what I'm looking at here.  You're going to

6      have someone on trial who you didn't have an opportunity

7      to deal with, you didn't have an opportunity to counsel or

8      may see records they should have done this, done that and

9      should have done this and didn't do that because your life

10     choice and profession where you are going to be more

11     inclined to figure out ways -- are you going to always be

12     the one to say, "Yeah, well we can still try something

13     else.  Don't need to go to death.  We can always try

14     something else.  There's always the chance this person

15     will go straight.  And regardless of the crime, regardless

16     what the evidence might say, I still think we ought to go

17     with the idea of giving this guy one more chance."

18     A   I would probably say -- well, I'd have to know --

19     Q   Sure.

20     A   -- the circumstances on that.  I couldn't answer that

21     yes or no.

22     Q   Okay.  There's a question in here:  Obedience and

23     reasons for authority are the most important virtues

24     children should learn.  And you said you generally

25     disagree.  Can you tell me what your thoughts are on

1      that?

2      A    I think those are two children should know.

3      Q    What do you think is most important?

4      A    Love, caring, responsibility.

5      Q    Okay.

6      A    You know, becoming productive members of society.

7      Q    Okay.  You mentioned in here Carla Faye Tucker and

8      Ronald Clark O'Brien.  Carla Faye Tucker.  What was your

9      position about that she received the death penalty, had a

10     religious conversion, and the Governor eventually decided

11     not to commute her and she was eventually executed.

12                 Do you think the Governor did the right or

13     wrong thing?

14     A    At the time I thought he did the right thing, but

15     then after that because that one I did follow as close

16     as I could --

17     Q    You followed it from the time it came up in the

18     beginning, the pick ax?

19     A    No, I'm not sure I was even living in Texas at the

20     time.

21     Q    Right.  Okay.

22     A    I had watched it on one of the TV shows and studied

23     that but I thought the crime was severe, however you want

24     to call it.

25     Q    Right.

```
 1    A    But then you turn around and right after that he
 2    gave --
 3    Q    I know what you're --
 4    A    Stay of execution for the person following right
 5    behind that.  I thought well what did that person do that
 6    Carla Faye Tucker did not do.
 7    Q    What about Ronald Clark O'Brien that happened out in
 8    Pasadena.
 9    Q    I knew him.  I went to high school with him.
10    Q    Is that right?
11    A    Uh-huh.
12    Q    Did you think that the death penalty was appropriate
13    in his case?
14    A    Yes.
15    Q    How long after high school was it that this occurred?
16    A    His older brothers and I were in the same grade and
17    Ronald was a couple of years behind us, and this happened
18    probably 15 years after we were out of high school.
19    Q    Okay.  So, 15 years out of high school you believe in
20    the death penalty?
21    A    Yes, now.  I mean, who had not heard of, you know,
22    someone at Halloween -- I mean, that one was just --
23    Q    What did you think about the Dead Men Walking movie?
24    A    That one got me.  I think it got to me.
25    Q    How so?
```

1    A    I could almost feel that knowing that that person was

2    going to die.

3    Q    How did that make you feel?

4    A    Uncomfortable.

5    Q    Uncomfortable?

6    A    Well, for her.

7    Q    For the lawyer?

8    A    Uh-huh.

9    Q    Knowing you could be called upon to put another in

10   that position, do you think you could make that decision

11   if that's what the law and evidence called for?

12   A    Yes.

13   Q    You were in an assault case about three years ago?

14   A    Yes.

15   Q    Was that a felony or misdemeanor?  Do you remember if

16   it was 12 people or 6?

17   A    Twelve.

18   Q    And what kind of assault was it?

19   A    It was --

20   Q    Weapon?

21   A    It was -- do I tell you about the case?

22   Q    Sure.

23   A    The gentlemen took his truck and ran into another man

24   at the filling station off of I-10 and tried to run him

25   down was what the one person said the other one did and

1    we agreed that, yes, that is what happened.

2    Q    And did ya'll assess punishment?  What punishment did

3    you assess, do you recall?

4    A    It was that one, three strikes and you're out.

5    Q    He was out?

6    A    Uh-huh.

7    Q    Okay.

8    A    I wasn't exactly sure.

9    Q    Probably 25 years or life.

10   A    Yes.

11   Q    Do you remember what you gave him, 25 or life?  Did

12   you give 25 or did you give life?

13   A    I think we went with 25.

14   Q    Do you think you would have similar empathy you might

15   have experienced in Dead Man Walking for the person who

16   was -- for the defendant who was getting ready to be

17   executed and maybe the lawyer trying to keep him from it?

18                Do you think you would have a similar type

19   empathy for the victim of the crime if they portrayed any

20   victim?  In trial you're going to hear about the victim of

21   crime, someone who's been killed.

22   A    Correct.

23   Q    And their family.

24   A    Would I have empathy, definitely.

25   Q    Which of those do you think you would override if they

1    could, the family?

2    A    Are you talking about the family as opposed to the

3    lawyer?

4    Q    Well, I'm talking about the, I guess, the defendant

5    versus the victim.

6    A    Okay, yeah.

7    Q    See I sometimes tend to overanalyze things.  Tell me

8    what you would do.

9    A    Okay.  In the programs I was listing that I put

10   together, you know, I hire the teachers.  I recruit

11   teachers.  I hire teachers.  And everyone says they want

12   to teach a session.  And I go through and, you know, I put

13   them down where they want to teach a session two only,

14   three, four, and five only.

15              And everybody said just give them a session.

16   Or if something comes up with students and I have to sit

17   and counsel with them I don't want to say yes without

18   hearing everything.  I want somebody -- the student to

19   tell me and I want to hear it from the other side.  You

20   don't come in and just say get this kid out of my class.

21   I need to have more information.  I can't make those

22   decisions without so.  And, yes, I do tend to over-

23   analyze.

24   Q    And I guess the only thing that strikes me about the

25   overanalyze is I guess I can conceive of a case pretty

```
1    straight forward and somebody say:  Well, you know must be

2    something there I'm not seeing because it appears to be

3    open and shut.  And, is that right, looking for things

4    that are -- may not be there?

5    A   I possibly could.  I couldn't say.  I wouldn't if it's

6    very straightforward.  Then I usually -- I will say I feel

7    I can make that decision if it's straightforward; but if

8    we got some, you know, gray area, then I really do have to

9    sit back and think about it.

10   Q   I think we could find in any criminal case there's

11   going to be gray area.

12   A   Right.

13   Q   The burden is on us to prove beyond a reasonable doubt

14   the elements of the offense.  There's lots of other gray

15   area outside the elements of the offense you may never

16   know or know --

17   A   Right.

18   Q   -- what happened or didn't happen.  But the elements

19   of the offense is what the burden is proved.  And if we do

20   that, that other gray area may have to remain gray.  I

21   don't know.

22   A   Right.  If indeed you're prosecuting or defending

23   then you pretty well would answer the gray area and it's

24   up to me at that point to decide.

25   Q   Right.
```

```
 1    A    You know how.  But I think you said, Judge, do you

 2    believe or not believe, you know -- do you understand

 3    what I'm saying?

 4              THE COURT:  That's fine.  Mr. McClellan.

 5    A    I would have to make the decision.

 6    Q    Thank you much, ma'am.

 7              MR. MCCLELLAN:  Pass the venireman.

 8              THE COURT:  Mr. Hill.

 9              MR. HILL:  Thank you, Judge.

10

11                       EXAMINATION

12    QUESTIONS BY MR. HILL:

13    Q    How are you today?  In all fairness, going to sit back

14    there and taking undue advantage of Mr. McClellan sitting

15    up there.  Satiable relationship is important.  So, I just

16    want to talk with you a little bit about some of the

17    things you said in response to Mr. McClellan's questions.

18              And I tell you something, when you came up

19    earlier this morning and were candid with the Judge about

20    what you may have heard somebody say that said everything

21    about who you were because I tell you a lot of people when

22    they're brought up especially out of the group and the

23    Judge starts asking questions most people start feeling

24    real uncomfortable and feel like somebody did something

25    wrong and I better not rat out on the other potential
```

```
 1     jurors.
 2                    And you said what you had to say.  That
 3     gave me a real comfort level.  You're somebody that will
 4     say what you really feel about things.  Now, that being
 5     said, if I were trying to evaluate as I am right now
 6     whether you should be somebody that gets invited back at
 7     the end of September to be a part of a larger pool of
 8     jurors from which 12 will be selected, what would you tell
 9     me on the one hand to say don't pick me; and then flip
10     side of that, what would you tell me to say you should
11     pick me?
12                    What kind of self-evaluation?  There are things I
13     need to know that ring out in your mind, I'm not a good
14     juror from defense perspective on jury like this?
15     A    From the defense?
16     Q    Uh-huh.
17     A    I guess one would be don't pick me I could think this
18     was the worse thing I ever heard of.
19     Q    Right.
20     A    And the other be you would have to hear all the facts.
21     Q    That was one of the things I noted when you were just
22     relating the circumstances -- you said that when
23     Mr. McClellan asked you about overanalyzing the other
24     side, you like to hear the other side.  This obviously
25     creates a problem, potentially creates a problem.
```

```
 1              From criminal trial law -- you've watched
 2     "The Practice."  You understand that sometimes the
 3     defendant does not take the witness stand.
 4     A    Correct.
 5     Q    Are you comfortable if you're sitting here in a few
 6     weeks from now sitting as a juror, State calls a bunch of
 7     witnesses, all testify and presumably they're all going to
 8     say things at least on direct that are harmful to
 9     Mr. Mamou.
10     A    Right.
11     Q    I will then and Mr. Wentz get a chance to
12     cross-examine them.  You may have a different feeling
13     after you hear our cross-examination or maybe you feel
14     exactly the way you did after direct.  In any event, at
15     some point the State is going to stand up and say, "We
16     have no further questions, Judge.  We're going to rest."
17              How comfortable are you with your ability
18     to actually sit in judgement of somebody where you may not
19     hear a word from Mr. Mamou or any witnesses being called
20     at that stage of trial; Mr. Mamou or Mr. Wentz or I?
21     A    How comfortable I am with the decision I would make?
22     Q    Correct.
23     A    I would be comfortable with whatever I came up with.
24     Q    And why would that be?  What is it that you're
25     judging?
```

1    A    I can't say, human nature.  I'm judging from all of

2    my life experiences.

3    Q    Right.

4    A    You know everything I've been through and things I've

5    heard, seen, done and you can't just stay on the fence. .

6    You got to make a decision, even leap sometimes.

7    Q    But you're ultimately called upon to question and

8    evaluate the strength of what evidence they present.

9    A    Correct.

10   Q    If they have not convinced you and 11 others beyond

11   a reasonable doubt, would it make a world of difference

12   any difference at all that Mr. Mamou never got out of the

13   chair and walked towards the witness stand?

14   A    No, it would not.

15   Q    So, you told me a couple of things that would be bad

16   or reasons why I shouldn't pick you.  Why should I pick

17   you?

18   A    Why should you pick me?  The only thing I can tell you

19   is I'm honest.  I do listen.  I do not take anything

20   lightly.

21   Q    And I don't think anybody would want you to take a

22   case like this lightly.

23   A    I was fixing to say I have no desire to be off my job

24   or anything else like that.

25   Q    Right.

1    A    I think I'm a good person and I think I can evaluate

2    on that.

3    Q    Sure.   Okay.   See it's not necessarily put you through

4    the ringer.   Sometimes people get up and say all the right

5    things and it's clear to everybody, you know, that they

6    should be invited back to sit on the larger pool.

7                Do you have any questions of me?

8    A    No, I don't think so.   I think I understand

9    everything.   Should I have?   Let -- yeah, I do.   Should I

10   have any questions?

11   Q    That's up to the individual, you know.   If there was

12   something Mr. McClellan sometimes he slurs his words,

13   drinks too much the coffee.

14   A    I will ask one question:   When I went through all

15   this, you know, this deal and put did anybody not find it

16   funny, the TV shows?

17   Q    Yeah.

18   A    I couldn't believe because I was the last one to

19   finish and I went through, if you notice, I underlined

20   words I thought very important and I looked at that I

21   don't believe I put those because I don't -- we do not

22   have lawyers in the family.   But --

23   Q    So you are -- you're a lucky family then.

24   A    I just thought it was funny those are -- were the top

25   two.

1    Q    Thank you very much.

2              THE COURT:   Thank your, sir.

3         Ms. Tinnemeyer, in just a second I'm going to excuse

4         you.   Before I do, I'll tell you we want you back on

5         Wednesday the 29th of September.  And in a second I'll

6         give you a piece of paper about it.

7              Between now and when we get together again,

8         do not alter your lifestyle one bit for us.  Do your

9         professional things just like you ordinarily do them.

10        Your personal things just like you ordinarily do.

11             If between now and then you even have a

12        chance to leave town for an extended period, take the

13        chance and go.  All we ask of you between the time we

14        see you and next is this:  Please do not talk about

15        that case with anybody.

16             Please do no permit anybody to talk about

17        that case with you.  If between now and when we see

18        you on the 29th there should be any news media

19        coverage about this case, avoid it.  Anything about

20        this case on the television, refuse to watch it.

21             Anything on the radio, refuse to hear about

22        it.  Anything in the newspaper, refuse to read it.

23        For each of the five restrictions the purpose of

24        hopefully accomplishing the objective that's this:  If

25        you do become a juror in the case, the decision you

```
 1        reach whatever this decision happens to be must be
 2        based exclusively upon the information you receive
 3        from here within the courtroom and cannot be in any
 4        way influenced or affected by any outside the
 5        courtroom information.
 6              VENIRE PERSON TINNEMEYER:  Okay.
 7              THE COURT:  If we can get started on the
 8        29th on time, we ought to be out of here about the
 9        noon hour.  Everybody when we leave here on the
10        29th -- everybody will leave here definitely knowing
11        whether they are or are not a juror in this case.
12              If you need something for folks to show
13        where you've been the three days you've been with us
14        that would suffice.  And this is a reminder notice as
15        to where and when we want you to be back right outside
16        the doorway on the 29th of September at 9:30.  I
17        believe three weeks from yesterday.
18              Before you leave, have you any questions for
19        me?
20              VENIRE PERSON TINNEMEYER:  No, I think I'm
21        okay.
22              THE COURT:  With that, thank you very much.
23        Look forward to seeing you in a couple of weeks.
24              Ms. Cooksey seems to pose a greater problem
25        in the questionnaire than she posed as a juror.  I
```

```
 1        don't know which is going to win, but let's

 2        investigate Ms. Cooksey.

 3                  (Prospective Juror No. 19, Ms. Ramie Colleen

 4        Cooksey entered the courtroom.)

 5                  THE COURT:  Hi, Ms. Cooksey.  Come on in,

 6        please, right over here.  When you make this corner

 7        you'll find a chair, I hope.  Please sit down.  Relax

 8        and make yourself comfortable.  Are you holding up

 9        okay?

10                  VENIRE PERSON COOKSEY:  Okay.

11                  THE COURT:  Ms. Cooksey, you have a very

12        pleasant and soft voice.  These people out here are

13        going to have to also hear what you say.  Please

14        project your voice and move the microphone around if

15        you feel you need to.

16                  Ms. Cooksey, first of all, let me ask you

17        to -- I'd like you to remember back to yesterday and

18        the things we talked about yesterday add to them today

19        this morning and the things we talked about this

20        morning.  Out of everything we have talked about up

21        to this point, do you have any questions at all for

22        me?

23                  VENIRE PERSON COOKSEY:  (Nods head.)

24                  THE COURT:  Okay.  Now --

25                  VENIRE PERSON COOKSEY:  No.
```

```
 1              THE COURT:  All right.  That's a deal.

 2      Moving along, is there anything to this point that we

 3      have not yet talked about that you feel as though we

 4      should talk about because it might have some bearing

 5      or influence on you as a juror?

 6              VENIRE PERSON COOKSEY:  No.

 7              THE COURT:  Is there anything at all

 8      perhaps something about your personal life, perhaps

 9      something about your professional life, perhaps

10      something about your health, perhaps something

11      relating to something else, do you feel in any way

12      would interfere with your ability to be a juror in

13      this case during the time frame we talked about?

14              VENIRE PERSON COOKSEY:  No, I don't.

15              THE COURT:  Ms. Cooksey, we have the benefit

16      of your questionnaire and we know when you filled out

17      the questionnaire you had not yet heard us talk about

18      any principles of law anything at all that applies to

19      the -- can apply to a case like this.

20              Now, perhaps if you were given your

21      questionnaire to complete again perhaps some of

22      your answers would change based upon what you know

23      presently perhaps then again you may keep the same

24      answers.  Doesn't make any difference what you say.

25      I'm not trying to talk you into or out of anything.
```

```
 1              I want to ask you some questions about

 2      your answers you placed on your questionnaire.

 3      Specifically, I'll start off with Page No. 12,

 4      Question No. 58.  The question was:  What are your

 5      feelings about the death penalty?  And your answer

 6      was:  If you are found guilty of killing someone life

 7      in malice and not self-protection the death penalty

 8      should be enforced, if I'm reading that correctly.

 9              Let me say first off and we see this quite

10      frequently to be honest with you.  Self-defense is not

11      a crime.  It is not a crime to take the life of

12      somebody if you are legitimately defending your life

13      or the life of another.  So, let's eliminate self-

14      defense as a thought about the death penalty.  It is

15      simply not even a crime.

16              And I go from there to Question No. 59

17      which says -- I don't feel like your opinion -- what

18      is the best argument for the death penalty in our

19      society?  You don't feel like supporting killers.

20              Tell me now that you know that a life

21      sentence is theoretically as equally an option as --

22      equal sentencing option as the death sentence for a

23      person convicted of capital murder and taking into

24      account your thoughts that you have given us as to

25      your answer to these two questions, are you saying
```

1     that you would be more likely to answer these special

2     issues that we talked about over here today in

3     such a way that the death penalty would be imposed

4     over a life sentence because if you answer them such a

5     way the life sentence imposed, you would be supporting

6     the killers.  You see what I'm asking?

7              VENIRE PERSON COOKSEY:  Yeah, I understand.

8              THE COURT:  Well, what's your thought and

9     there's no right answer or wrong answer we just --

10             VENIRE PERSON COOKSEY:  If I feel they're

11    guilty --

12             THE COURT:  If you found somebody guilty

13    of capital murder, let's assume that some imaginary

14    case has progressed to that point, whatever the facts

15    were let's not worry ourselves?

16             VENIRE PERSON COOKSEY:  Violence not what

17    I'm saying.

18             THE COURT:  No, you found somebody guilty

19    of capital murder you, let's say, somebody being

20    abused a teenager and they kill their parents because

21    they don't want to be about abused anymore?

22             VENIRE PERSON COOKSEY:  I would go for life

23    imprisonment.  No for guilty do something else if

24    they walked in and blown you away or done something

25    violent, the death penalty.

```
 1              THE COURT:  Can we assume ordinarily you'd
 2      think two or more people were killed during the same
 3      criminal transaction that that was violence?
 4              VENIRE PERSON COOKSEY:  I can't assume that.
 5              THE COURT:  You can't assume that.  Let me·
 6      get to one other question.  Page 14 and Question
 7      No. 4.  And this isn't so much a question but a list
 8      of things to agree with or disagree.  And you're asked
 9      to check whether you agree with a particular
10      statement or disagree with them. ·
11              Statement No. 4 says:  Any person man or
12      woman young or old who is guilty of capital murder
13      should pay with their own life and you answered that
14      you agreed with that and wrote in unless self-defense.
15              VENIRE PERSON COOKSEY:  (Nods head.)
16              THE COURT:  I guess there are several ways,
17      frankly, a person can read that question.  One of them
18      would be any person, man or woman young or old who is
19      guilty of capital murder, that means every child
20      should pay with that life.  Or the way it could be
21      read is everybody should receive the death penalty
22      who are guilty of capital murder.
23              Did you read the question that way?  And
24      here, please feel free look at it.  And please don't
25      feel uncomfortable.  Nobody is challenging you.
```

1        VENIRE PERSON COOKSEY:  When I read this I

2    took as capital murder as a violent crime.  So, I

3    still stick with yes.

4        THE COURT:  So, my question to you is this:

5    Perhaps I didn't  ask it articulably.  I'm satisfied·

6    I didn't.  Now that you possess more information about

7    the sentencing alternatives that are available and if

8    you were asked to answer that same question again

9    taking into account the additional information that

10   you presently possess, would your answer to that

11   question always or be that if you always found

12   somebody guilty of capital murder and it wasn't

13   self-defense that you'd always answer these two

14   questions in such a way the death penalty would be

15   imposed?

16        VENIRE PERSON COOKSEY:  I can't say that I

17   always would.

18        THE COURT:  Are you then saying everybody's

19   case would be different?

20        VENIRE PERSON COOKSEY:  Aren't you supposed

21   to judge everybody case?

22        THE COURT:  Yes, ma'am.  And what I'm

23   getting at is now you know that.  When you filled this

24   out you did not.  So, I'm just trying to see which

25   wins your thoughts now that you possess more

1    information than on the questionnaire when you didn't

2    possess any.

3              VENIRE PERSON COOKSEY:  Now.

4              THE COURT:  Okay.  That's all I'm interested

5    in.  Mr. McClellan.

6              MR. MCCLELLAN:  Can I have just a moment?  I

7    think we reached an agreement to excuse Ms. Cooksey.

8              THE COURT:  Ms. Cooksey, thank you very much

9    for being with us.  I'm going to excuse you.  If you

10   need anything for work to show where you've been

11   three days.  You don't need to worry about you coming

12   back until you get another notice in the mail like you

13   did last week.

14             (Prospective Juror No. 19, Ms. Ramie Colleen

15   Cooksey is excused by agreement.)

16             THE COURT:  Now, I understand there's an

17   agreement by and between the parties that No. 19,

18   Ms. Ramie Colleen Cooksey may be excused.

19             Mr. McClellan.

20             MR. MCCLELLAN:  Yes.

21             THE COURT:  Ms. Connors.

22             MS. CONNORS:  Yes.

23             THE COURT:  Mr. Hill.

24             MR. HILL:  Yes.

25             THE COURT:  Mr. Wentz.

```
 1              MR. WENTZ:  Yes, sir.

 2              THE COURT:  Mr. Mamou, is that your

 3    agreement, also?

 4              THE DEFENDANT:  Yes, sir.

 5              THE COURT:  And specifically, sir, you agree

 6    Ms. Cooksey be excused?

 7              THE DEFENDANT:  Yes, sir.

 8              THE COURT:  Very well.  Ms. Cooksey is

 9    excused.

10              (Prospective Juror No. 21, Ms. Stacie Marie

11    Sibley entered the courtroom.)

12              THE COURT:  Right here, Ms. Sibley.  Make

13    that corner hoping you find a chair right there.  How

14    are you today?

15              VENIRE PERSON SIBLEY:  Fine.

16              THE COURT:  I want you to know Ms. Sibley

17    at the outset we're as happy to see you as you are to

18    see us.  Before we begin, let me ask you to remember

19    back to yesterday some of the things we talked about

20    yesterday, add to them this morning the things we

21    talked about this morning and out of everything we

22    have talked about up to this point, do you have any

23    questions at all for me?

24              VENIRE PERSON SIBLEY:  No.

25              THE COURT:  Anything, Ms. Sibley, to this
```

1    point we have not yet talked about you feel as though

2    we should talk about might have some bearing on your

3    ability to be a juror in this case?

4              VENIRE PERSON SIBLEY:   No.

5              THE COURT:   Is there anything at all

6    Ms. Sibley whether it be something perhaps about your

7    personal life, perhaps something about your

8    professional life, perhaps something about your

9    health or something some other things that you could

10   think of that would anyway interfere with your ability

11   to be juror in this case during the time frame we

12   talked about?

13             VENIRE PERSON SIBLEY:   No, sir.

14             THE COURT:   We spent some time talking

15   about the rules that may come into play during the

16   course of a trial like this.  And we talked about the

17   fact whatever result a jury reaches in a case must

18   always depend upon how that jury evaluated whatever

19   evidence is presented in this particular case.

20             That's why everything is always so unique

21   each case to all of the others because no defendant is

22   the same.  No facts are the same.  No victim is the

23   same.  And no jury is the same.  Everything is

24   variables are all there.

25             But I think that there are two primary

1    purposes meant to be accomplished going through this

2    process presently.  And first purpose is to visit with

3    you and explain to you to the best of our ability the

4    rules that can come into play during the course of the

5    trial like this for the purposes, as I say, can the

6    prospective juror -- is the prospective juror, I

7    should say, willing to follow those rules.

8            And what we have talked about to this point,

9    anything you've heard, anything we've talked about or

10   discussed that you have a disagreement that rises to

11   the level that would cause you to not be able to

12   follow the law?

13           VENIRE PERSON SIBLEY:  No, sir.

14           THE COURT:  I think that the second aspect

15   of what this is about, this phase, is for the lawyers

16   to satisfy themselves and for particularly you to

17   satisfy yourself if you were juror and took any one of

18   those 12 chairs out there in jury box you would be

19   willing to listen to every single piece of information

20   given to you, evaluate it all however you see fit, and

21   come up with what you think is the right decision to

22   reach based upon how you evaluate the information

23   these lawyers have given to you.

24           Does that sound like something you could

25   and would do?

```
 1              VENIRE PERSON SIBLEY:  Oh, yes.

 2              THE COURT:  Keeping in mind, Ms. Sibley, it

 3      is not your job to try to make one side happy or both

 4      sides happy.  It's not your job to try to make me

 5      happy.  Your job is to call it like you see it because

 6      the only person who actually has to be happy is you

 7      when five years from now you wake up some morning and

 8      look in the mirror and say, "You know, I'm still

 9      satisfied after five years what I did was absolutely

10      the right thing."

11              VENIRE PERSON SIBLEY:  Okay.

12              THE COURT:  And so it is trying to give you

13      the freedom to acquire a comfort zone what this is

14      about.  So, the lawyers are going to visit with you

15      and they're going to ask you some general questions.

16      Their going to ask you probably about some things we

17      talked about and I'm sure ask you about some things we

18      haven't talked about.

19              But the root of it is to try to get the

20      depth of your satisfaction with your ability to be

21      able to sit as a juror in a case like this and that's

22      what we're doing.

23              VENIRE PERSON SIBLEY:  Okay.

24              THE COURT:  Mr. McClellan.

25              MR. MCCLELLAN:  Thank you, Your Honor.
```

**STACIE MARIE SIBLEY,**

1

2 having been sworn as a prospective juror, testified as

3 follows:

4

5 **EXAMINATION**

6 QUESTIONS BY MR. MCCLELLAN:

7 Q   Ma'am, is your last name Sibley or Risky?

8 A   Actually it's Risky.  Sibley's my maiden name.

9 Q   I think it was on the short sheet it was Sibley and

10 the long sheet it was Risky.

11 A   They were calling me Sibley.  I just signed it all

12 the way.

13 Q   Okay.  So Ms. Risky, my name is Lyn McClellan.  Along

14 with Claire Connors, we represent the State of Texas in

15 this case.  I want to ask you some questions in general

16 and kind of go over your questionnaire and go over some of

17 those questions.

18        You obviously filled the questionnaire out

19 before you had an opportunity to hear the Judge's voir

20 dire both yesterday and today and there may be some

21 different answers you might have put in there as a result

22 of hearing that prior to filling out the questionnaire.

23        Did you really know what capital murder was

24 or the distinction between murder and capital murder and

25 capital murder requires murder plus some other crime.

1    A    No, I did not know.

2    Q    You did not.  Most people don't and there's not much

3    reason for them to know that.  And, of course, the Court

4    talked to you about murder which is the intentional taking

5    of another person's life.  Not self-defense.  Not an

6    accident.

7    A    Right.

8    Q    When you intend to kill someone the range of

9    punishment for that type of crime is five years to 99

10   years or life.  You have no problem with that?

11   A    No.

12   Q    The capital murder then the death penalty applies or

13   life imprisonment applies.  Those are the only two issues

14   and difference between murder and capital murder.  Capital

15   murder has murder plus something else.

16              What we've alleged is capital murder during

17   kidnapping.  The law says murder during robbery, assault,

18   killing police officers in the line of duty and killing a

19   child under the age of five.  Also alleged is murder or

20   killing two or more people during one criminal episode.

21              Are those the kinds of cases, the ones the

22   Legislature set out are capital cases that you think the

23   death penalty ought to believe available for?

24   A    I believe so, yes.

25   Q    Okay.  Some people think the death penalty ought to

1    be available for murder without those other aggravating

2    circumstances, and that's okay.  But the law doesn't law

3    for that, okay.  What kind of cases come to your mind when

4    you think of cases where you believe a person ought to

5    be eligible to receive the death penalty for committing

6    that crime?

7    A    I think serial killers.

8    Q    Okay.  We mentioned that the first time.

9    A    And also people that would kill somebody just out of

10   cold blood, no remorse, no reasoning for it.

11   Q    Okay.  All right.  And do you understand though now

12   there are no crimes whether it be a serial killer who's

13   killed hundreds of people --

14   A    Uh-huh.

15   Q    -- or whether it be somebody who killed someone in

16   cold blood, there's no crime where you automatically get

17   the death penalty.  Instead the death penalty is

18   determined by answering these questions that the jury has

19   to answer.

20               Do you understand that?

21   A    Right.  The questions on the -- yes.

22   Q    That are right over there on the side.

23   A    Yes, I understand that.

24   Q    Right.  Right.  Do you agree with that's the way it

25   ought to be?  We ought to have these questions and go

```
 1     through this process and literally go step down by step

 2     down the row or automatically assign the death penalty

 3     for crime?

 4     A   I do believe after hearing the Judge discuss and

 5     explain the questions I see now, yes, why it's necessary

 6     to go by that.

 7     Q   Okay.

 8     A   Because you want to have the facts before you want

 9     to have somebody's life ended, you know.  So, I definitely

10     would agree with that.

11     Q   There are a lot of safety guards in place.  And you

12     have to go through a lot of different things in order to

13     get, if you ever do, a person should receive death.

14     A   Exactly.

15     Q   And you think that's the way it ought to be?

16     A   Right.  I don't think all of a sudden say, "Well,

17     they killed somebody; yes, you deserve to die too because

18     there's a lot of reasons why -- what could or could not

19     have caused that.

20     Q   Right.  Like some people come in and say:  Well, I

21     don't think five years is too long for that.  Well, the

22     murder they're thinking about maybe they don't know what

23     all the things they might hear.

24     A   Exactly.

25     Q   Might make it justified on some other case.
```

1    A    Exactly.

2    Q    Well, that's what the law asks you to do.  You're

3    going to take an oath to a true verdict render according

4    to the law the Court gives you and the evidence you hear

5    in the courtroom.  And all we're looking for are people

6    who will a true verdict render on the law and evidence.

7    A    Right.

8    Q    If the law and evidence leads you to not guilty, so

9    be it.  And find guilty, that's fine.  Answer these

10   questions death, so be it.  If it leads you to answer no,

11   he gets life, so be it.  But just take that oath and go

12   where the evidence and law leads me and do my job as a

13   juror.

14             Any problem with that aspect?

15   A    No.

16   Q    Do you have any doubts about your ability to

17   participate in this type process and make these type of

18   decisions knowing a decision you might make if that's what

19   the law and evidence called for would result in this Judge

20   ordering the execution of this defendant over here on

21   trial if that's what the law and evidence call for?

22             Are you comfortable with making those type

23   of decisions and participating in that type process?

24   A    Yes, I am.

25   Q    All right.  You've not been on a jury before; is that

```
 1    correct?

 2    A    Correct, I have not.

 3    Q    All right.  Let me talk to you for a little bit about

 4    the punishment stage of a capital murder case.  First of

 5    all, as you know the Judge told you that by referring to

 6    the indictment that we've alleged the defendant in this

 7    case committed capital murder in two ways:  One,

 8    intentionally taking the life of another person in Harris

 9    County, Texas during the course of kidnapping.  And, two,

10    intentionally taking the life of another person, two

11    people, during one criminal episode also in Harris County,

12    Texas.

13              A jury can find and may have both paragraphs

14    submitted to them.  Maybe six jurors could find he's

15    guilty of kidnapping murder and six could find he's guilty

16    of killing two people during one criminal episode.  And

17    your verdict would be:  We, the jury, find the defendant

18    as guilty as charged in the indictment of capital murder.

19              You, in other words, don't have to agree

20    which method was done as long as you agree capital murder

21    was committed.  Or you might find him not guilty.  That

22    will be up to ya'll.  If you find someone guilty of

23    capital murder then you go to punishment stage of trial.

24              Then you have an opportunity to hear

25    additional evidence that you didn't hear at guilt-
```

1    innocence because it wasn't relevant whether or not he

2    committed the crime.  Guilt or innocence, you're

3    determining did we meet all the elements of the offense

4    shown in the indictment.

5         If we prove beyond a reasonable doubt he did

6    it, say yes.  Then you go to punishment stage.  There you

7    may hear evidence about the defendant's character, his

8    background, his criminal history or lack thereof, mental

9    ability or disability, type of family life he had, where

10   he grow up, all kinds of things about the person himself

11   because you're deciding what punishment this person should

12   receive for the crime you have found him guilty of.

13        Let's say -- there's no crime ever that I

14   know of where you automatically get the death penalty

15   because you have to answer these questions and there's not

16   an automatic saying the answers are death penalty.  It

17   depends on the evidence shown.  I mean the evidence show

18   wide extremes.

19        Somebody could be in and out of the

20   penitentiary all his life.  That's one extreme.  Somebody

21   could have been never been arrested before, that's another

22   extreme.  Ya'll have to decide from looking at his

23   character and background and how that will apply in

24   answering all these questions.

25        Special Issue No. 1 says:  Do you find from

```
 1    the evidence beyond a reasonable doubt there's a
 2    probability the defendant would commit criminal acts of
 3    violence that would constitute a continuing threat to
 4    society?
 5              First of all, let's talk about a
 6    probability.  It doesn't say possibility.  It doesn't
 7    say a certainty.  I mean, it's a probability I could win
 8    the lottery Saturday but not likely.  Probably, I suggest,
 9    means a more likely than a possibility less than a 100
10    percent certainty.
11              More likely than not that the defendant
12    would commit criminal acts of violence.  Doesn't say
13    another murder or capital murder.  Those are obviously
14    acts of criminal violence.  Could be a robbery, a
15    burglary, could be a sexual assault, could be
16    hitting someone so hard with their fist knocking them
17    out causing personal injury could be criminal and violent
18    in nature.
19              What that question is asking you to do is
20    look at the crime itself, the evidence you heard at guilt
21    or innocence, look at the evidence you heard in punishment
22    about the defendant's character, background, criminal
23    history, mental abilities, all that, and do you believe
24    now beyond a reasonable doubt there is a probability that
25    it's more likely than not that the defendant would commit
```

1    criminal acts of violence that constitute a continuing

2    threat to society.

3                If you believe the answer is yes, you answer

4    yes.  If you believe the answer is no, we have failed to

5    prove it a yes, you answer no.  Okay.  Now some people

6    say:  Well, if I have found somebody guilty of capital

7    murder, I would always find there's a probability they'd

8    be a continuing threat to commit future acts of violence

9    but that may not be the case when you look at background,

10   his character, how he's brought up, all these other

11   things.

12               You may see areas in here and say:  Hey,

13   this is somebody I would not expect to commit this crime

14   let alone another one.  We know he committed this crime

15   but I wouldn't expect him to be a continuing threat.

16               Several years ago, I think it's South

17   Carolina, Susan Smith, the lady who had two kids in the

18   back of the car and road it off into the lake and claimed

19   somebody abducted her car and killed her two kids; she was

20   charged with capital murder, was found guilty and given a

21   life sentence.

22               I don't know if they have issues or not.

23   They may have decided she wouldn't be a continuing threat

24   to commit future violent acts even though horrible, she's

25   not going to be robbing a bank or any other.  That might

1    be an area.

2    A    Right.

3    Q    You see, it depends upon the facts or circumstances.

4    That's why you have to wait until you hear everything to

5    make the decision.   If you answer Issue No. 1 yes, then

6    the person is going to receive the death penalty unless

7    you determine on Issue No. 2 there are reason or reasons

8    he should not.

9             It says:  Do you find that after taking into

10   consideration all of the evidence and goes on to tell you

11   what is the circumstances of the offense, the defendant's

12   character and background, his personal moral culpability,

13   I like to refer to it as personal responsibility for the

14   crime, is he the person who caused the death or getaway

15   driver or just a party to the offense, and then do you

16   find there is a sufficient mitigating circumstance or

17   circumstances, I like to refer it to as sufficient reasons

18   why this person should receive life as opposed to death.

19            What it asks you to do basically is go back

20   and look at all the evidence you heard and see if any of

21   the evidence mitigates towards a life sentence.   For

22   example, you may have heard during the course of trial the

23   defendant was high on drugs or alcohol when he committed

24   the crime.

25            One juror might say:  Well, in my mind that

1    mitigates towards a life sentence.  When you're high on

2    drugs or alcohol you do things you wouldn't do.  You're

3    not in your right mind.  Somebody else may say:  Wait a

4    second.  I know a lot of people who get high on drugs and

5    alcohol and don't go out and commit capital murder.  I

6    don't see a connection of getting high on drugs or alcohol

7    that causes a person to commit capital murder and get high

8    on drugs or alcohol.

9           Again, that could be a real problem and

10   thinks that's not mitigating.  That's okay.  Two people

11   look at the same evidence and came up with different

12   opinions.  That's okay.  What the process asks you to do

13   is for you to examine the witnesses, for you to weigh it

14   in your mind and determine what affect to give it.  Is it

15   mitigating or not.

16           Same thing about mental ability.  May be a

17   slow learner or Special Ed student.  Somebody may say that

18   mitigates towards a life sentence.  Somebody may say, no,

19   it doesn't.  I know people that have that kind of problem

20   all along in neighborhood, church, work, school and they

21   don't -- they're not a threat or anything, I see.  And so

22   I don't think that has any affect on it being a mitigating

23   factor.

24           Somebody else may think it is the age of a

25   person.  Say he's a real young man.  When you're young you

```
 1    do stupid things.  Done things wish you hadn't.  When you
 2    grow older you mature.  Somebody thinks this is
 3    mitigating.  Somebody may say it's not mitigating.  When
 4    related to age, that's not a factor.
 5                  So, it just asks you to go back and look
 6    through the evidence to see if there's anything mitigating
 7    or not.  If there is, set it aside and weigh it see if
 8    it's sufficiently mitigating to change your answer from
 9    death to life.  If it is, you do; or if it's not, you
10    don't.
11                  There's a question about mitigation in here.
12    Let me see.  Okay.  You indicated you believe the
13    mitigating evidence should be considered in deciding those
14    issues.  Sometimes I don't know that everybody understands
15    what the word mitigation means.
16    A    I didn't.  To be honest with you, I didn't know.
17    Q    And I don't think anybody does except for a few
18    lawyers who sit around here and talk about that.  It's
19    not a word we use everyday.  We're talking about evidence
20    that tends to give you a reason to give somebody a break,
21    if you will, to give them a life sentence as opposed to
22    death.
23                  That's what issue No. 2 does.  When you've
24    already decided -- when you get there you've already
25    decided capital murder, already decided a continuing
```

```
 1    threat to commit future acts of violence.  You're deciding

 2    is there a reason or reasons this person we have a life

 3    sentence as opposed to death.  Maybe had something to with

 4    background or whatever.  Had something to do with

 5    anything.  It's your decision to make and you're alone.

 6              Every individual person has to make their

 7    own decision.  And it gives you that opportunity to make

 8    sure.  Basically, it's another way of saying are you sure

 9    that you want him to get the death penalty, gives you an

10    opportunity to give him life as opposed to death if you

11    find there are reasons and sufficient ones, okay.

12              Any problem with the way that process is

13    settled?

14    A   No.  Nothing.

15    Q   Any reason that you know of that you wouldn't be able

16    to go through this type of process and go through those

17    decisions?

18    A   No.

19    Q   Okay.  There's a question in here more likely to agree

20    or disagree with statements.  One of them says:  The death

21    penalty is always justified for intentional murder.  I

22    guess someone may interpret always meaning everytime.  Of

23    course, the only murder is intentional because murder --

24    there's not accidental murder, not unintentional murder.

25              So, what you would be saying if you agreed
```

| | |
|---|---|
| 1 | with that, now you learned all the stuff the Judge said |
| 2 | through voir dire, is the death penalty applies to anybody |
| 3 | who kills.  Anybody always be given to somebody else.  You |
| 4 | know that's a process that doesn't apply to everybody who |
| 5 | kills somebody.  In fact, just the killing alone and |
| 6 | intentional murder doesn't even apply at all. |
| 7 | Is that the way you still believe?  And if |
| 8 | it does, that's fine.  Just you -- |
| 9 | A   Okay.  So, ask this question again.  I want to make |
| 10 | sure my answer is correct. |
| 11 | Q   Just answer if you more likely disagree with this |
| 12 | statement. |
| 13 | A   Which number is it? |
| 14 | Q   It's 14 and 14.  Page 14 No. 14. |
| 15 | A   Okay.  I'm sorry. |
| 16 | Q   Death penalty is always justified for intentional |
| 17 | murder. |
| 18 | A   Meaning that anytime somebody is murdered the death |
| 19 | penalty should apply? |
| 20 | Q   That would be how one person views it, yes. |
| 21 | A   Okay.  Again, I'm unsure -- I mean, going by that then |
| 22 | they wouldn't necessarily always be put to death. |
| 23 | Q   That's right. |
| 24 | A   How long they got some sort of punishment.  Then going |
| 25 | by that, then I guess -- |

```
 1    Q    By that you mean the questions?

 2    A    Right.  Because yes and then no would mean death or

 3    yes and yes or any other way I understand that it would be

 4    life imprisonment.  As long as -- because without knowing

 5    the evidence you don't know the reason for the murder, how

 6    it came about.  So, I don't want to say you kill somebody

 7    just because they killed somebody because you don't know

 8    the circumstances or the evidence.

 9                    Now, if it's something like that and they

10    had as long as they need to be punished period, I felt

11    that way.

12    Q    And you know there's nothing -- no two punishments.

13    A    Exactly.

14    Q    Life or death.  You find somebody guilty of capital

15    murder and going to get to decide looking at the questions

16    and looking at everything that's available.

17    A    Right.

18    Q    And so there is no, you killed somebody you die.  You

19    have to go through all this process.

20    A    Right.  Right.  Then I would disagree with that

21    because I don't -- I understand a little more clearly now.

22    Q    And, sure, that's the reason we go through all this

23    process.  And even if you still thought you got the death

24    penalty, that's fine, just as long as you're able to set

25    that aside and follow your oath as a juror.
```

1    A    Right.

2    Q    Which is going to mean it doesn't apply anymore.

3    A    Right.

4    Q    I have to do what the law and evidence says.

5    A    Exactly.  What makes more sense to me.

6    Q    Any questions you have of me?

7    A    None.

8    Q    I thank you very much and going to pass you to

9    Mr. Wentz.

10              THE COURT:  Thank you.  Mr. Wentz.

11

12                         **EXAMINATION**

13   **QUESTIONS BY MR. WENTZ:**

14   Q    Morning -- good afternoon.  How are you?

15   A    Fine.

16              MR. WENTZ:  Your Honor, is there a copy

17        of her questionnaire she could look at?

18              THE COURT:  If it's agreeable I have a

19        copy I have not written on.

20              MR. WENTZ:  Certainly.

21   Q    (By Mr. Wentz)  For about the next 20 minutes I

22   would like to talk to you basically about who you are

23   and what you think and what you feel because, ultimately,

24   12 people are going to sit in judgment of a case brought

25   by the State of Texas and it's always been my thought that

1    when it comes time to make real important decisions it's

2    the values and beliefs that each person has that go into

3    the or the shaping of how they come to the decision they

4    do and influence the decision that they do.

5            So, as we talk I would like, if you would,

6    to share with me your thoughts and feelings you might have

7    about the subjects that we're talking about.  And you said

8    something -- I'm going to start off maybe by insulting

9    you.

10   A    That's fine.

11   Q    You said something I want to make sure you answer

12   the question correctly.  When you were visiting with

13   Mr. McClellan -- there are no right or wrong answers only

14   what you feel or think and that's all that I care about.

15   A    Sure.

16   Q    On Page 6 of the questionnaire you're asked to answer

17   a few series of agree/disagree statements.  And one of

18   them is:  Obedience and respect for authority are the most

19   important virtues children should learn.  And you said

20   that you strongly agree with that.  Can you tell me the

21   reason that you answered in that respect?

22   A    Was it No. 12?

23   Q    No. 12, yes.

24   A    Okay.  I'm going to answer it how I interpreted the

25   question.  I might have did it wrong.  To me I was

```
 1    thinking the question was asking that children their
 2    virtues as them growing up the way they turn out is going
 3    to reflect on them from the way they were brought up as
 4    opposed to obedience.
 5                To me when I think of that where are they
 6    corrected as a child?  Did they get away with anything
 7    they wanted were they taught to respect certain people in
 8    positions as far as what is wrong and right.
 9                Those two obedience and respect as far as
10    the virtues of children should -- I think they should
11    learn that in order for them to make strong decisions,
12    right decisions as they're older.  Not be -- messed that
13    all up, I did.  That's what I thought it to be.
14    Q   Don't worry at all.  But I think from what you're
15    telling me is that you do feel the environment in which
16    children is raised is important in terms of how they
17    ultimately grow up.
18    A   Definitely, I do.
19    Q   And this question talks about obedience and respect
20    for authority.  Do you think that love and respecting
21    others are important values also that children should be
22    taught?
23    A   Oh, yes.
24    Q   And these children are absolute -- there's a little
25    bit of unfairness built into them.  I would like for you,
```

1    if you could, to turn towards the end of the questionnaire

2    where you were asked some questions about feelings about

3    the death penitentiary at this point.  And you asked these

4    questions before you had this elaborate explanation given

5    to you.

6                     And basically off the top of your head what

7    do you think about the death penalty?

8    A    Meaning what?

9    Q    In other words --

10   A    How I feel about another person's ending towards

11   that?

12   Q    Yes, somebody doing something that society feels

13   that the death penalty is an option for if they did that

14   thing wrong.

15   A    Okay.  Almost kind of like I answered earlier, I do

16   believe in the death penalty.  I do believe that in some

17   cases not knowing what lead up to that moment or what's

18   happened, I don't believe that all people -- I guess it's

19   kind of -- I don't want to contradict myself but --

20   Q    You're not.

21   A    I do believe in the death penalty, yes.  I guess in

22   order for me to say I don't have a problem with serial

23   killers that kill several people, I don't have a problem

24   with that.  I mean, because they've killed more than one

25   person over and over.  That's a role they're taking on.

1                  If a person just killed, you know, one

2      person, depending on what the evidence was or

3      circumstances, what that could be a whole knew, I mean,

4      reasoning.  I mean, I would think before I would sit there

5      and decide, yes, a person put to death.  If I was a juror

6      in that case, I would really have to know the evidence

7      truly factual before ending a person's life.

8      Q    You know that one of the allegations contained in the

9      State's case is that Mr. Mamou allegedly took two people's

10     lives in the course of the same transaction.

11     A    I understand that.

12     Q    In your mind does that make him a serial killer, just

13     that allegation?

14     A    No, because I don't know what the evidence is, what

15     happened or what lead up to that moment.

16     Q    Okay.  One of the things that jurors have to do is

17     decide whether or not the State's met its burden of proof

18     and it's beyond a reasonable doubt.  Now, this is your

19     first experience as a juror, correct?

20     A    Correct.

21     Q    And you've had some conversations with the Judge

22     already about reasonable doubt.  Do you recall some of

23     those words he mentioned to you that proof beyond a

24     reasonable doubt must be proof of such a convincing

25     character that you would be willing to rely and act

```
 1    upon it without hesitation in the most important of
 2    your own affairs.
 3                    So, you're going to actually get a
 4    definition for it.  Did you understand that?
 5    A    Right.  That I might be the one putting --  if the
 6    person was guilty, yes and no, I believe it was, I don't
 7    have a problem putting somebody to death, I mean --
 8    Q    Why not?
 9    A    Well, one of the questions in here asked:  Do you
10    believe in like an eye for an eye or something else.  And
11    I didn't pick an eye for eye because I don't always
12    believe in that.  I guess I may can go two ways, I don't
13    know.
14                    I believe if a person kills somebody else,
15    murders somebody else, depending on the reason for it,
16    would they do it again?  Why did they do it.
17    Q    So, let's turn from those concerns that you have about
18    somebody who might commit a capital murder and look at
19    Special No. 1.  That's right to your left.  And you
20    understand that when it comes time to answer that special
21    issue you will have at least at the very, very least the
22    evidence of the crime itself because all this guilt or
23    innocence evidence will come forward into punishment
24    evidence.
25                    And at that point you've already made a
```

1    pretty important determination this person has committed

2    society's most horrible crime.  You believe it beyond a

3    reasonable doubt and you believe that the death was done

4    intentionally.  And when you look at that question it asks

5    you to determine a couple of things; and one is there's a

6    probability that the defendant would commit criminal acts

7    of violence in the future.

8                    Isn't that exactly the type of person that

9    you would expect to do wrong things in the future, someone

10   who would commit a murder?

11   A    Yes and no.  I -- you mean if somebody -- if the State

12   was able to show -- prove evidence that, yes, he was

13   guilty of the murder and he did the murder; well then we

14   already know that No. 1 would be, yes, he's guilty.

15                   And then the next one would be:  Well, do

16   you think he would do it again?  I don't know.  I mean

17   it's different on each person, I guess, because I don't

18   know him.  I don't know anything about the case.  I don't

19   know.  I haven't read nothing in the papers.  I don't know

20   anything.  And every individual person is different to me.

21   Q    And you know though in answering Special Issue No. 1

22   it's just not a possibility he might do it, it's more

23   likely than not.  In other words, it has a more than a 50

24   percent chance at the very least?

25   A    Right.

224

```
1    Q    And you get to determine for yourself what those
2    words mean to you.  And it asks you to look at his future
3    behavior not just in terms of would he do something wrong
4    but would it be a wrong of such a magnitude that it would
5    be a criminal act of violence that would constitute a
6    continuing threat to society; which is, I think, a step
7    above many types of criminal acts.
8                      Would you agree with me?
9    A    Right, I do.
10   Q    Have you ever thought about what it would be like to
11   spend 40 years in prison?
12   A    Honestly, no, I have not.
13   Q    Certainly a substantial amount of time --
14   A    Can I say one thing though --
15   Q    Please.
16   A    I thought about it to a degree whereas and I think I
17   put on here in some cases where someone commits murder
18   depending on the individual, I think sometimes it's better
19   for a person to receive life imprisonment because
20   depending on that person the death penalty -- how can I
21   say this -- giving them the death penalty, well that would
22   be like a way out for somebody in some cases.
23                      And other persons that if they have like
24   morals and they care what about they did are remorseful
25   for what they did that they have this 40 years to think
```

1    about what they did.

2    Q    And that's at least 40 years could conceivably be

3    more.

4    A    Exactly.  And that 40 years, I mean that's something

5    they have to live with the rest of their life and nobody

6    can make them feel any differently about it.

7    Q    The Judge was speaking to you about prison this

8    morning.  Had you ever thought about prison being our

9    society?

10   A    What do you mean?  Oh, yes, whenever somebody says

11   the community or society I think of everybody.  I really

12   never thought about it any other way.

13   Q    So prison as you see it is a part of our society?

14   A    Uh-huh.

15   Q    I'm sure you appreciate that living in prison is a

16   whole lot different than living in the world you and I

17   live in.  Basically behind bars.

18   A    Right.

19   Q    Around policeman but certainly there are a lot of the

20   guards and they live under different rules and regulations

21   you and I live under.  What may be a prison offense is

22   what we might do everyday of the week and nothing happens

23   to us.

24   A    Right.

25   Q    Do you think prison can change people?

1    A    Depending on the person, possibly.  I really don't

2    know.

3    Q    I think you stated on Page 14 you were given prison

4    makes convicted people worse and you disagree with that.

5    Do you see it, No. 16?

6    A    Uh-huh.  I see.  Okay.  Prison making convicted people

7    worse?  I don't see, I guess.  No, I do disagree.

8    Q    In what way?

9    A    Meaning if a person is in prison for committing a

10   crime such as murder I don't know how it can make a

11   person any worse if they're not out to do it again other

12   than if they can't.  I don't know, I'm just --

13   Q    You're doing fine.  Don't worry.

14   A    I'm just saying I don't know.  It's hard for me

15   because I'm not in their shoes.  I don't know.  I'm just

16   trying to assume what a person would feel.  You're asking

17   me questions -- I filled this out trying to imagine

18   myself.

19                  Would it make any worse?  I don't know.  It

20   would depend on each individual person.  Some people it

21   may, some people it may not.

22   Q    Have you ever heard of cases where somebody is found

23   guilty of something actually punished for a crime and it

24   was later determined that they were not guilty of crime

25   and they were released?  Have you ever heard of that

1    happening?  Comes up in the news every now and then.

2    A    I'm sure I have.  I can't think right off the top of

3    my head.  I don't -- I can't think of anything.

4    Q    Look at Special Issue No. 2, and I think that issue

5    comes at the tailend of this process and it gives you the

6    opportunity to rethink everything that's gone before you,

7    the finding of guilty whether or not the person is going

8    to be a future danger to society.

9              And it gives you as a member of society one

10   last chance to look at that person and decide if this is

11   really the right decision and you find there is a

12   circumstance or circumstances that warrant life you can

13   say so at that point.

14             You sort of indicated when you were filling

15   out the questionnaire in Question 68 you really didn't

16   understand or fully think about mitigating evidence when

17   you answered it.  Do you have a better idea about that

18   now?

19   A    Somewhat from what I understand they were saying.

20   Q    Basically it's saying that you may see in terms of the

21   person the crime or all of the evidence put together that

22   leads you to believe that life is really the proper thing

23   for the person even though he may be a murderer, even

24   though in your mind he may be a future danger; there's

25   something about the case, something about the person that

1    warrants him living forever.

2              How do you feel about answering that type

3    of question?

4    A    Well --

5    Q    Do you think you can answer the question?

6    A    Well, I'm going to because if I was picked as a juror

7    that's the question that may come up that I would have to

8    answer depending on what that part of the trial would be.

9    I do believe that there's a lot that you have to look at,

10   a lot of the evidence that you have to know that's factual

11   and believe in, as I said earlier, before you would want

12   to make a decision I mean --

13   Q    The question asks you to look at the case and --

14   A    Right.

15   Q    -- as well as the person.  And you may find from

16   looking at the case there's something that may bother you

17   about the case, something that is still a lingering

18   problem.  Do you think in that circumstance you could say,

19   okay, fine, I do believe that's something I'm not

20   satisfied and that person should receive a life sentence

21   because of my uncertainty in this area?

22   A    You mean during trial could I?

23   Q    Oh, yes.

24   A    If that came -- I mean if I believe in something

25   differently I don't have -- I will disagree if I disagree

1    with other people.  If I believe something or if I see it

2    another way I'll speak up and say this is why I think that

3    and it's different I will, yeah.

4    Q    And I think that's always a concern with young people

5    because they may be surrounded by people who are older

6    than themselves.  Is that what you're telling us?

7    A    I would not be intimidated by someone that was older

8    and telling --

9    Q    And you wouldn't change your mind?

10   A    Not if I believe in something.

11   Q    One of -- the State has to do is provide you evidence

12   and comes from witnesses.  Have you ever thought a witness

13   might lie?  Have you ever thought that a witness would

14   lie?

15   A    I'm sure.

16   Q    Yes.  And you realize sometimes that the case could

17   conceivably be hinged on whether or not you believe a

18   witness that you thought was lying.  This morning the

19   Judge says you not only have to look at the message but

20   look at the messenger.  Would you be able to do that?  A

21   Oh, yes.

22   Q    What things do you think are important for me to know

23   about you as my last question to you this afternoon?

24   A    I'll just tell you a few things.  I really don't know.

25   I know that I am nervous.  I mean, like I said I've never

1    done anything like that.  I'm an honest person.  I'm out-

2    spoken.  I'll speak my mind if I don't understand some-

3    thing.  I'll be the first to say it if I disagree, I'll

4    say it.  I'm a family-oriented person.  I do have a

5    family.  I mean, I don't know what else.

6    Q   This is all very unfair you're sharing so much of

7    yourself with us and we're not revealing very much about

8    ourselves.  I would like to thank you very much for being

9    so forthcoming and talking with me.

10   A    Sure.  No problem.

11               THE COURT:  Thank you, sir.  Ms. Risky, in

12        just a second I'm going to excuse you.  Before I do, I

13        will tell you we want you back on Wednesday the 29th

14        of September, which I believe to have been three weeks

15        from yesterday.  In just a second I'll give you a

16        reminder and where we want you to be.

17               First off, I want to tell you between now

18        and when we do see you again, please don't you alter

19        your lifestyle one bit for us.  You do your family

20        things, personal things just exactly as the way you

21        ordinarily do them.  Do your work things just like you

22        ordinarily do.

23               If you have a chance to leave town for a

24        time, take a chance and go.  The only thing I do ask

25        of you between now and when we see you again is this:

1      Please do not talk about this case with anybody.

2      Please do not let anybody talk about this case with

3      you.

4              Now when I say talk about the case I'm not

5      talking about going back and making arrangements for

6      being down here.  I'm talking about the details of the

7      case.  Between now and when we see you again if

8      there's any news media coverage regarding this case,

9      avoid it.  If there's any television, refuse to watch

10     it.  In the newspaper, refuse to read it.  On the

11     radio, refuse to hear it.

12              And the reason, Ms. Risky, for each of those

13     five restrictions is for the purpose of accomplishing

14     the same objective and that's this:  If you do become

15     a juror in this case the decision that you wind up

16     reaching whatever that decision happens to be must be

17     based exclusively upon the information you receive

18     from within the courtroom.

19              VENIRE PERSON SIBLEY:  Right.

20              THE COURT:  And can't in any way be

21     affected or influenced by any outside the courtroom

22     information.  So, it is for this reason we try to make

23     this as pristine an operation as possible.  If you

24     need something for the folks at work to show them

25     where you have been for what is it now the last three

```
1    days with us this is the reminder note that where we

2    want you to be and when we want you to be here

3    Wednesday, September 29th, right outside the door at

4    9:30.

5            Now we're going to have, I guess, right at

6    50 people.  If we can get everybody here on time and

7    if we can get started on time everybody will be out of

8    here by noon.  Everybody will leave on this day

9    knowing definitely whether they are or are not a

10   juror in the case.

11           Before you leave, do you have any questions

12   at all for me?

13           VENIRE PERSON SIBLEY:  No, sir.

14           THE COURT:  With that you're excused.

15   Thank you very much.  Look forward to seeing you.

16           MR. MCCLELLAN:  Thank you, ma'am.

17           THE COURT:  This is off the record.

18

19

20

21

22           (Court adjourned for the day.)

23

24

25
```

THE STATE OF TEXAS)
                  )
COUNTY OF HARRIS  )


        I, Wendy Wilkerson, Deputy Official Court Reporter
in and for the 179th District Court of Harris County,
State of Texas, do hereby certify that the above and
foregoing pages contain a true and correct transcription
of all portions of evidence and other proceedings
requested in writing by counsel for the parties to be
included in this volume of the Reporter's Record, in the
above-styled and numbered cause, all of which occurred in
open Court or in chambers and were reported by me.


        I further certify that this Reporter's Record of
the proceedings truly and correctly reflects the exhibits,
if any, admitted by the respective parties.


        WITNESS MY OFFICIAL HAND this the 17th day of
March, 2000.



                    _Wendy Wilkerson_____
                    WENDY WILKERSON, Texas CSR
                    Deputy Official Court Reporter
                    179th District Court
                    Number 5744
                    CSR Expiration:  12/31/99
                    Business Address:
                    4314 Piney Creek Lane
                    Houston, Texas 77388
                    (281) 353-9717
                    Cause No._____800112_____