TRIAL COURT CAUSE NO. 800112

CHARLES MAMOU, JR.          )          IN THE DISTRICT COURT

      Appellant          )

                  )

VS.          )          HARRIS COUNTY, TEXAS

                  )

THE STATE OF TEXAS          )

      Appellee          )          179TH JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOIR DIRE EXAMINATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 20th day of September, 1999, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bob Burdette, Judge Presiding, held in Houston, Harris County, Texas:

Proceedings reported by computer aided FILED IN
COURT OF CRIMINAL APPEALS
transcription/stenograph machine.

MAR 2 1 2000

**ORIGINAL**

Troy C. Bennett, Jr., Clerk

```
 1              A P P E A R A N C E S

 2      MR. LYN MCCLELLAN

 3      SBOT NO. 13396100

 4      MS. CLAIRE CONNORS

 5      SBOT NO. 0470500

 6      Assistant District Attorneys

 7      201 Fannin

 8      Houston, Texas 77002

 9      Phone:  713.755.5800

10      ATTORNEYS FOR THE STATE OF TEXAS

11

12      MR. WAYNE HILL

13      SBOT NO. 59656300

14      4615 Southwest Freeway

15      Houston, Texas 77027

16      PHONE:  713.623.8312

17      MR. KURT WENTZ

18      SBOT NO. 21179300

19      5629 W FM 1960

20      Houston, Texas 77069

21      PHONE:  281.587.0088

22      ATTORNEYS FOR THE DEFENDANT
23

24

25
```

# INDEX

## VOLUME 11 OF 25

|  | PAGE | VOL. |
|---|---|---|
| September 20, 1999    Voir Dire Examination |  | 11 |
| Panel Voir Dire | 4 | 11 |

| Venirepersons | Court | State | Defense | | VOL. |
|---|---|---|---|---|---|
| Glen Dinkins | 46 | 48 | 56 | | 11 |
| Matthew Taylor | 67 | 71 | | | 11 |
| Linda Kay Cook | 73 | 75 | 90 | | 11 |
| Judith Lynne Barnett | 103 | 105 | 116 | | 11 |
| Latonya Harris | 123 | 127 | 135 | | 11 |

| | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 141 | 11 |
| Court Reporter's Certificate | 142 | 11 |

1          THE COURT:  Do I understand there is an
2    agreement by and between the parties of Venireperson No.
3    103, that being Cynthia Kay Mills, the agreement of all
4    concerned that she be excused.
5          MR. MCCLELLAN:  Yes, Your Honor.
6          MS. CONNORS:  Yes, Your Honor.
7          THE COURT:  Mr. Wentz?
8          MR. WENTZ:  Yes, Your Honor.
9          THE COURT:  Mr. Wentz, is it Mr. Hills'?
10         MR. WENTZ:  It is.
11         THE COURT:  Mr. Mamou, is that your
12   agreement?
13         THE DEFENDANT:  It is.
14         THE COURT:  Do you specifically request
15   Miss Mills be excused?
16         THE DEFENDANT:  Yes, sir.
17         MR. MCCLELLAN:  We're also going to agree
18   on 111.
19         THE COURT:  And the same for Venireperson
20   No. 111, that being Maria Elizabeth Brooks?
21         MR. MCCLELLAN:  Yes.
22         THE COURT:  Ms. Connors?
23         MS. CONNORS:  Yes, sir.
24         THE COURT:  Mr. Wentz?
25         MR. WENTZ:  Yes.

1          THE COURT:  Is it Mr. Hills' request,
2    also?
3          MR. WENTZ:  Yes.
4          THE COURT:  And yours?
5          THE DEFENDANT:  Yes, sir.
6          THE COURT:  You asking she be excused?
7          THE DEFENDANT:  Yes, sir.
8          (Panel brought in.)
9          THE COURT:  Good morning, ladies and
10   gentlemen.  You sound about as lively as I feel.  We're
11   going to spend some time talking about some things this
12   morning that we didn't talk about the other day.  And
13   the reason we didn't talk about them the other day is,
14   frankly, because we're going to be detailed enough.  We
15   could have made no headway dealing with sixty folks.
16         To remind you, this is a case the State of
17   Texas versus Charles Mamou.  Mr. Mamou is represented by
18   his attorney, Mr. Kurt Wentz, who's present, and
19   Mr. Wayne Hill, who is at the moment not with us.  The
20   State of Texas is represented by two of her Assistant
21   District Attorneys, Mr. Lyn McClellan, Miss Claire
22   Connors.
23         Mr. Mamou is charged by indictment with
24   the offense of capital murder.  It's alleged to have
25   occurred in Harris County, Texas, on or about December

1    7, 1998.  We talked the other day about the fact that
2    this being a capital murder case, it can come in two
3    parts.  The first part of the trial, the jury's only
4    concern is going to be to decide whether the defendant
5    is or is not guilty.  If the defendant is not guilty,
6    the case is over with.
7          If the defendant is found guilty, we come
8    back and we can hear more evidence relating to the
9    punishment phase of the trial.  That's given to you for
10   the purposes of assisting you in answering two questions
11   or Special Issues that we very generally talked about
12   last Friday.  We're going to talk more about them today.
13         We're going to talk about a couple of
14   other things this morning before we get started.  And
15   before we do get started, let me say this to you:  I
16   know this:  We're going to talk about things that you
17   have never in your life thought about before, and there
18   is no reason that you ever should have.  Because it's
19   different, you may find it's very detailed; but please,
20   don't get frustrated with me.  Don't throw up your arms
21   to yourself and say, I can't possibly do this.  It's too
22   hard.  Because the truth of the matter is, it isn't.
23         Those things we're going to talk about
24   today -- these rules we're going to talk about, if they
25   do come into play, they're going to be given to you in

1    writing in the Court's charge.  You're going to have the
2    Court's charge with you back in the jury room during the
3    whole time you're deliberating.  So you're going to have
4    in writing what we're talking about today, and there is
5    no reason why you would have to feel like you have to
6    memorize it.  I'm just trying to give you an idea as to
7    what can come about, kind of like forewarned is
8    forearmed.
9          Past that, there is nothing complicated
10   about it at all.  But the idea is to give you as much of
11   a comfort zone as I can possibly give you to let you see
12   how these things can come into play and, in some
13   instances, why they exist.
14         We talked the other day about the Court's
15   charge.  We talked about the fact that in the Court's
16   charge -- at the conclusion of the evidence at each
17   phase of the trial, the Court's charge will be given to
18   you.  And within the Court's charge will be all of the
19   rules that will have come into play based upon whatever
20   the testimony was that was presented in the case.
21   Whether the rules themselves come into play will depend
22   upon what portions of the testimony you view to be the
23   credible portions, because we talked the other day about
24   the fact that that's the jury's job.
25         You are the exclusive judges of the facts

1  proved, the credibility of the witnesses, and the weight
2  to be given their testimony. My job has to do with
3  listening to all of it and giving you the law that is
4  brought into play as a result of the testimony that's
5  presented. Out of all of that testimony that's
6  presented you, you take that portion of it you view to
7  be credible and take -- and extract out of the Court's
8  charge the laws that are applied to the credible
9  testimony as you see it. But within the Court's charge
10 there are going to be lots of terms defined for you, and
11 there are going to be some terms that are not going to
12 be defined for you.
13        If you say to yourselves, well, how do you
14 guys down here decide when you're going to define a word
15 for us and when you're not. The answer to that question
16 is perfectly simple. We have no justifiable reason to
17 expect you to come down here knowing ahead of time what
18 lawyering words are, and what they mean, and why we use
19 them. So, those words we're going to define for you in
20 the Court's charge. When we're dealing with words that
21 aren't peculiar to the lawyering business, we're not
22 going to define them; because you use those words all
23 the time, so that's how we make that distinction. And
24 we're going to talk about some of those words with each
25 side.

1         We talked about the first phase of the
2  trial, the focus of the evidence is going to be on the
3  offense that was committed; the who's, the where's, the
4  how's, the when's of the crime. Who did it? That's
5  what you're going to hear at the first phase of the
6  trial. If the jury finds the defendant guilty, at the
7  second phase of the trial the focus of the evidence will
8  shift; and it will get off the decision -- get off of
9  the focus of who committed the crime. And instead, the
10 focus will be on the person who did commit the crime.
11        So, at the second phase of the trial,
12 basically you can hear about every single good thing
13 some defendant's ever done before in his or her life.
14 You could hear basically about every single bad thing.
15 You take all that good stuff and all that bad stuff you
16 hear at the second part of the trial, and you pile it
17 onto all that information you heard about how the crime
18 was committed in the first part of the trial, and you
19 use every single bit of it to help you arrive at
20 whatever decision you reach as to how those two
21 questions, those two Special Issues, get answered.
22        Those questions are over here on the
23 board. We're going to talk about it. If you need to
24 look at it while we're talking about it, please do that.
25 Question Number One that you'll be asked to answer in

1  the event the defendant is found guilty of capital
2  murder is this: Do you find from the evidence beyond a
3  reasonable doubt that there is a probability that the
4  defendant would commit criminal acts of violence that
5  would constitute a continuing threat to society? No
6  matter what the case, no matter who the victim, no
7  matter who the defendant, there is never but two
8  possible answers to that question, either yes or no.
9         Question Number Two asks: Taking into
10 consideration all of the evidence, including the
11 circumstances of the offense -- that's going to be what
12 you heard at the first part of the trial -- also
13 including the character, the background, as well as the
14 personal moral culpability or personal moral
15 responsibility or involvement -- that's going to be what
16 you heard at the second part of the trial.
17        So what you can see is the very first half
18 of the second question instructs the jury to go back
19 over all of the evidence in the case. That's all it
20 says. Could have been a whole lot simpler to go back
21 over all the evidence in the case. But we're lawyers.
22 We didn't do it that way. For the purpose of asking
23 yourself this question: Is there a sufficient
24 mitigating circumstance or circumstances that make you
25 think that a life sentence would be a more appropriate

1  verdict than a death sentence? Again, no matter what
2  the case, no matter who the victim, there's not but two
3  possible answers, yes or no.
4         If the jury should answer yes to that
5  first question and if the jury should answer no to that
6  second question, the law says that I have no choice, I
7  have no option, no discretion. I must sentence the
8  defendant to death. If the jury should answer those two
9  questions in any way other than yes and no, in that
10 order, for example, yes and yes, or no to the first
11 question, then again, the law says I have no choice, and
12 I have no option, and I have no discretion. I must
13 sentence the defendant to life. And that's exactly what
14 I'll do.
15        So, first off, you can see -- first off,
16 you can see that juries don't sentence defendants in the
17 State of Texas to life. Juries don't sentence them to
18 death. What juries do is they answer two questions; and
19 as a result of how you answer those questions, you are
20 entitled to know what sentence the law requires. I know
21 that you've seen and heard of capital murder trials
22 where at the conclusion of them, sometimes a life
23 sentence was imposed, sometimes the death sentence was
24 imposed.
25        Every single case is different, kind of

**11**

1   like a fingerprint. We're different from "Perry Mason"
2   shows and everything. Fingerprints, DNA now is a little
3   more specific; but that's a new phenomenon. The
4   fingerprint is the most reliable, specific, identifying
5   feature that a person possesses. We all know that. No
6   two people possess the same fingerprint. Every trial is
7   also equally individualistic in that all defendants are
8   always different. All offenses are always committed
9   differently. All victims are always different. The
10  witnesses who see things are always different. And the
11  jurors that hear the testimony are always different.
12          For example, we could have in this
13  courtroom four juries listening to exactly the same
14  evidence at exactly the same time from exactly the same
15  witnesses and go out in four separate jury deliberation
16  rooms, and we can come up with four entirely different
17  verdicts because of the way a jury reacts to the
18  testimony of the witnesses, as well as the way the
19  witnesses present the testimony.
20          So, that's why at the conclusion of some
21  trials, these questions are answered in such a way that
22  a life sentence is imposed. And that may very well be
23  the most appropriate verdict in the world. Sometimes
24  the questions are answered in such a away that a death
25  sentence is imposed. And sometimes that may very well

**12**

1   be the most appropriate verdict for that specific,
2   unique trial that's been had.
3          But the one constant, the standard that
4   never changes is these questions, the order in which
5   they're asked and the words that are contained within
6   the questions. They never change. They are always
7   exactly the same. The thing that causes a different
8   result is the evaluation of the evidence that was
9   presented during the course of a specific trial.
10         So, with that in mind, let's talk for just
11  a couple of minutes about the questions themselves more
12  specifically, talk about what they mean. Question
13  Number One asks -- and it starts off with the phrase, Do
14  you find from the evidence beyond a reasonable doubt?
15  Understand, if you recall on Friday we talked about the
16  term reasonable doubt. We defined it, and we talked
17  about it Friday from the standpoint of that's how much
18  evidence the State must present in order for the jury to
19  find somebody guilty of the offense.
20         Starting out at trial, all defendants are
21  starting out not guilty. They stay not guilty. They
22  never change unless or until the evidence presented by
23  the State rises to the level that it overcomes that
24  presumption of innocence and persuades the jury beyond a
25  reasonable doubt that the defendant is guilty. If a

**13**

1   defendant is found guilty of capital murder, obviously
2   the presumption of being innocent has been erased by the
3   quality of the strength of the State's evidence.
4          At the beginning of the second phase of a
5   capital murder trial there is a whole new presumption
6   that pops into place, and that new presumption is this:
7   It is always presumed that the appropriate punishment
8   for a person convicted of capital murder is life, unless
9   the State's evidence proves beyond a reasonable doubt
10  that the answer to this first question should be yes.
11         Now whenever we see the phrase, Do you
12  find from the evidence beyond a reasonable doubt, that
13  simply means the State's got to present proof to you to
14  show what the verdict should be. In other words, the
15  State's got to prove that the verdict should be bumped
16  up a notch. The first phase of the trial, the jury's
17  verdict starts off not guilty, unless the State's
18  evidence shows beyond a reasonable doubt the defendant
19  is guilty. And the evidence, therefore, bumps up a
20  notch that verdict from not guilty to guilty.
21         Starting off at the second phase of the
22  trial the answer to this question starts off being no,
23  unless the State's evidence shows beyond a reasonable
24  doubt the answer should be bumped up a notch, from no to
25  yes. We understand already from our conversation this

**14**

1   morning that a no answer to that first question means a
2   life sentence; because no to that first question is
3   different than yes and no, in that order. There is no
4   way -- after a no answer to that first question, that
5   means you can't answer the second question in any way --
6   that the death penalty will ever come back into play.
7          So, that's why it's presumed at the
8   beginning of the punishment phase of a capital murder
9   case that the appropriate verdict is life. Because it's
10  presumed that the answer to that first question should
11  be no. Obviously, that's a presumption that can be
12  overcome by the quality of the State's evidence. But
13  then again, there are cases where it's not overcome; and
14  that presumption remains the result based upon the lack
15  of quality in the State's evidence.
16         But the term beyond a reasonable doubt
17  means the State's got to prove to you what the
18  verdict -- what your verdict should be. If they don't
19  prove it to you, your verdict is not guilty at the first
20  phase. If they don't prove it, your answer to the first
21  question is no at the second phase. Any questions about
22  the term, Do you find from the evidence beyond a
23  reasonable doubt? Okay. Again, that term will be
24  defined for you in the Court's charge.
25         Do you find from the evidence beyond a

**15**

1 reasonable doubt there is a probability? Let's talk
2 about the word probability, because that word is not
3 going to be defined for you. The reason it's not going
4 to be defined is because that's a word that we all use
5 all the time; work, home, whatever we're doing. I am
6 not permitted to define the term for you. I am,
7 however, permitted by comparison to tell you what the
8 word probability does not mean.
9       There are two things it cannot mean.
10 Whatever probability means to you, it must mean
11 something more than a possibility. Anything could
12 possibly happen. Because it could possibly happen does
13 not mean it's probably going to. Whatever the word
14 probably means to you, it cannot mean as much as a
15 certainty; because something could possibly happen does
16 not mean that it's certain to happen.
17       Now let's talk about the context within
18 which we're using this word probability. In order to
19 get a yes answer to this question, the State's evidence
20 must prove beyond a reasonable doubt the probability
21 that a defendant would commit future acts of criminal
22 violence. Can you see how grossly unfair it would be to
23 the defendant if the State was only required to prove a
24 possibility that a defendant would commit future acts of
25 victim criminal violence? Because all of us could

**16**

1 probably do that.
2       On the other hand, can you see how grossly
3 unfair it would be to the State to require them to prove
4 to a certainty every criminal act of violence in the
5 future? Because you can't ever prove that. So what we
6 did was we simply split the baby, took the middle road,
7 probability. If probability means to you something
8 being more likely to happen than likely not to happen,
9 that's a deal. If it means something different, that's
10 just fine, too, as long as whatever probability means to
11 you, it means something more than possibility, but not
12 something as great as certainty. Any questions about
13 the word probability?
14       Probability that the defendant would
15 commit criminal acts of violence. In order to obtain a
16 yes answer to this question, the State's evidence must
17 show you beyond a reasonable doubt that the defendant on
18 trial would commit criminal acts of violence in the
19 future. Not a specific crime. They are not -- they,
20 being the State -- are not required to show the
21 existence of a probability that a defendant on trial
22 would commit future capital murders.
23       Certainly, if that evidence exists, the
24 State's entitled to present it to you. But the State's
25 not entitled -- not required, I should say, to prove a

**17**

1 certain crime being committed in the future. They are,
2 however, required to prove a certain category of crimes,
3 that category being a crime that's a crime of violence.
4 And as you can see by the question, the crime of
5 violence can be either as to persons or as to property;
6 because the question doesn't specify.
7       Certainly, capital murder is a crime of
8 violence as to persons, as are murders, as are assaults,
9 as are rapes, as are robberies, as are kidnappings. All
10 criminal acts of violence as to persons. Criminal acts
11 of violence as to property; arsons, the burning of
12 somebody's building or automobile, certain kinds of
13 burglaries that require breaking into to get into a
14 building, into a house, the taking of a bat and beating
15 the windshield in an automobile. All of those are
16 criminal acts of violence as to property. And there
17 are, I'm sure, hundreds more.
18       But it is that category of criminal
19 conduct the State must prove the existence of the
20 probability the defendant committed, not a specific
21 crime within that broad category of conduct. And that
22 category of conduct to that crime must rise to the level
23 that it constitutes a continuing threat to do so.
24       Now the word society is not going to be
25 defined for you. But I would ask you to consider making

**18**

1 a distinction, if you feel comfortable with a
2 distinction, between the words community and society.
3 We all live in different communities, but all of our
4 communities are a piece of society. I say that for this
5 reason: Sometimes when we think of the word society, we
6 think ordinarily about the people with whom we have
7 contact, with our neighbors, family, coworkers, people
8 we see during the course of the day.
9       Ordinarily we don't think, for example,
10 about people behind the walls of the penitentiary. But
11 they also have the right to be free from criminal acts
12 of violence. Because if they didn't, that would mean
13 that the lady who teaches school to the inmates in the
14 penitentiary system, and when she punches in at 8:00
15 o'clock in the morning to go behind the walls to do her
16 job for the day, if she successfully lives through the
17 day and escapes with her life and punches out at 4:00
18 o'clock, she doesn't reacquire her right to be free from
19 criminal acts of violence from the outside after having
20 lost them on the inside. That's preposterous, and
21 that's not the case.
22       So the point is that the people inside the
23 penitentiary system also have the right to be free from
24 criminal acts of violence. We're talking about teaching
25 people. We're talking about medical personnel. We're

19

1 talking about prison officials, wardens, administrators,
2 guards, whoever they might be. And we're also talking
3 about inmates; because we hope that the accomplishments
4 of the prison system might be rehabilitation. Obviously
5 that's never going to happen if the inmates aren't
6 entitled to be free, also, from criminal acts of
7 violence.
8 So we know we're not talking about a
9 community. We're talking about something larger than
10 that. Because if we were talking about a community,
11 that question would read, Criminal acts of violence that
12 would constitute a continuing threat to the citizens of
13 Harris County, Texas. And it doesn't say that. It says
14 to society. So within this context, the word society
15 could mean all the people all the time in all the
16 places. That's the first question that you'll be asked
17 to answer if the defendant is found guilty of capital
18 murder. Does anybody have any questions about the first
19 question?
20 Okay. Next we'll go to Question Number
21 Two. Before we get to Question Two, let's think for
22 just a second about where a jury would necessarily have
23 to be. This is to say, what would they necessarily have
24 had to have done in order to get to the second question?
25 Well, first off, necessarily the jury would have had to

20

1 have found the defendant guilty of capital murder.
2 Because if they had not, we would never get to these
3 questions.
4 Secondly, necessarily, a defendant -- a
5 jury would have had to have answered unanimously
6 Question Number One yes. Because if they had answered
7 no, we know we wouldn't get to the second question;
8 because a no answer to the first question is a life
9 sentence. So, what we're saying when a jury gets to the
10 second question is this: The jury necessarily would
11 have had to have consistently and unanimously voted in
12 such a way that the defendant's going to get the death
13 penalty, unless the jury determines that because of some
14 unique feature that exists within the case, if there is
15 one, that unique feature rises to the level that makes
16 you think that you should pull down the death penalty
17 and substitute in its place a life sentence.
18 If that feature exists, the second
19 question is where you handle it. We talked about the
20 question. We talked about the first half of the second
21 question. It's just simply an instruction to the jury
22 to go back over all the evidence in the case for the
23 purposes of asking yourselves -- and these are my words,
24 not words of the questions. What the question is asking
25 is this: Is there a sufficient reason in this case, is

21

1 there a good enough reason, why a life sentence instead
2 of the death sentence should be imposed. Because the
3 death sentence is going to be imposed, because you found
4 him guilty of capital murder and you found he's a future
5 danger. So he's on his way to getting a death penalty
6 unless you pull it down.
7 Now, let's talk about the question more
8 specifically. As you see in the second question, there
9 is no phrase, Do you find from the evidence beyond a
10 reasonable doubt? That phrase does not exist within
11 that question, so that means the State does not have to
12 prove to you what the answer to that question should be.
13 Well, we know from our conversation the other day that
14 the defendant never has to prove anything because he's
15 the defendant.
16 So if the State doesn't have to prove to
17 you what the answer to that second question should be
18 and they don't answer -- I don't know what I said. I
19 said if the State doesn't -- that's what I meant to say.
20 The State doesn't have to prove to you what the answer
21 to the second question should be. And if the defendant
22 doesn't have to prove to you what the answer to that
23 second question should be and they don't, where does
24 that leave us?
25 Well, that leaves us in the posture of

22

1 understanding that the law recognizes that there might
2 be many cases where there is no reason in the case why a
3 death sentence should be taken down and a life sentence
4 substituted in its place. And we understand the law
5 recognizes that, because nobody is required to put that
6 reason in the case. The only requirement presented by
7 the second question is that the jury go back over the
8 case to reevaluate all the information to determine
9 whether there is or is not a sufficient reason why a
10 life sentence should be imposed as opposed to a death
11 sentence.
12 Now we use the word in the second
13 question, mitigating. The word mitigating is not going
14 to be defined for you. The reason it's not going to be
15 defined for you is because what it might mean to one
16 juror, it might mean exactly the opposite to another
17 juror. That's your call.
18 For example, sometimes in some cases some
19 folks might tend to think that if you have a defendant
20 on trial who is seventeen years old, that the
21 comparative youthfulness of the defendant on trial might
22 be mitigating in the sense that he has a lack of mature
23 judgment, unable to make decisions as maturely as people
24 older would.
25 Some people hearing exactly that same

1 evidence might say, I don't agree with that; because
2 anybody who's seventeen that commits a crime that bad at
3 that early age, we've lost them anyway. Two people
4 looking at exactly the same evidence and coming up with
5 the same conclusion. You might have in some
6 hypothetical case testimony about perhaps a
7 defendant's -- there being a history of mental
8 retardation. Sometimes some folks might think mental
9 retardation would be mitigating. Other people might
10 not, their idea being there is no way to cure mental
11 retardation. It is the way it's always going to be
12 forever. Another group of people in that same jury
13 might say, Wouldn't it depend on how severe the
14 retardation was? Was it minimal? Was it significant?
15 Would it make a difference as to why a life sentence
16 should be given as opposed to a death sentence? That's
17 your call.
18 But what I'm getting at is the same
19 evidence can be viewed by opposite ends by the people on
20 the jury. So for that reason, the word mitigating is
21 not going to be defined. But when we talk about
22 mitigating, as we're using in this second question,
23 we're just talking about reducing the punishment from
24 death to life. We're not talking about excusing
25 conduct. We're not talking about justifying conduct.

1 Obviously the conduct wasn't justified,
2 wasn't excused; because you found him guilty of the
3 offense, and the very least that's going to happen is
4 he's going to get a life sentence. Mitigating evidence
5 might also be, a jury might find something to be
6 mitigating as to have specific circumstances or traits
7 within a defendant's character.
8 You might find a week before the defendant
9 was -- the capital murder was committed, the defendant
10 on trial was driving down the street, saw an apartment
11 fire, stopped his car, ran inside and saved a couple of
12 people at the risk of his own life. You might find that
13 to be mitigating to such a degree that it warrants
14 thinking of considering a life sentence should be
15 substituted as opposed to a death sentence.
16 You might, in other cases, have testimony
17 about somebody being a perfectly marvelous citizen
18 before they went into the service. They went to
19 Vietnam, went to Desert Storm, got all screwed up, and
20 never been able to get their lives back again as a
21 result of having served their country. Sometimes people
22 might think that's mitigating to the degree that it
23 warrants a life sentence. Others might not.
24 The point being, it's not important how
25 you evaluate the evidence; but the commitment we need to

1 get from you is you will go back over all of the
2 evidence and look at it from the standpoint of asking
3 yourself, is there a feature that exists within this
4 case to a sufficient degree that it's unique enough to
5 make me think a life sentence would be more appropriate
6 than a death sentence. If your answer to that question
7 is yes, then your answer to that whole question is yes.
8 If your answer to the question is no, then your answer
9 to that whole question is no. That's the second
10 question. Does anybody have any questions about the
11 second question?
12 Let me say this to you, and I'm going to
13 try for just a second to put myself into your shoes.
14 And now knowing what it is we know, my question to
15 myself, if I were in one of your chairs, would be this:
16 Let's see if I got this right. If the State proves
17 beyond a reasonable doubt the defendant's guilty of
18 capital murder, then it's my job to find him guilty.
19 And that's -- what if the State's job is to prove beyond
20 a reasonable doubt that the answer to Special Issue
21 Number One should be yes, and if I find they have proved
22 that and I answer that question yes, that means I have
23 found a defendant guilty of having committed a horrible
24 crime. That means I also find the defendant's future
25 danger. And you're still telling me that even though I

1 make those two findings, it might not be proper in a
2 case for the death penalty to be imposed. And the
3 answer to that question is, yes, it might not be.
4 Because you have to take the second question into
5 account, too.
6 Now whether you do find in a given case
7 that there is any mitigating evidence, there can be --
8 maybe there is; maybe there is not. The next thing is
9 if there is -- maybe you'll find that that mitigating
10 evidence is not sufficient to combat or to overcome all
11 the evidence that you heard to find a person guilty and
12 all the evidence you heard to answer Question Number One
13 yes. That may very well be the case. But the only
14 commitment that we're entitled to get from you is that
15 you will give legitimate consideration to the second
16 question, go back and look over all the evidence in the
17 case, see what there is or what there isn't.
18 The other night there was a deal on
19 television about Yogi Berra. It ain't over till it's
20 over. And when you get through with Question Number
21 One, it ain't over. It's not over till you get through
22 with Question Number Two. Because these three decisions
23 that you will make -- that being, is he guilty? The
24 answer to Question One and the answer to Question Two,
25 those three decisions, in my mind, are kind of like the

27

1    three points of a trial.
2           Every piece of information you're going to
3    use to make your decision as to those three questions
4    comes from the evidence within that trial, but each
5    question is being asked of you from such a different
6    perspective that every time you're asked a question, you
7    have to go back into that body of evidence.
8           What I'm saying is, no matter how you
9    answer one question, that answer to that question does
10    not dictate what the answer to the next question should
11    be; because is he guilty is a whole different question
12    than is he a future danger? And is he a future danger
13    is a whole different question than is there some unique
14    reason in this case why a life sentence should be
15    imposed as opposed to a death sentence? So, each of
16    those three questions is completely independent from the
17    other. And that's why we have to wait till we get all
18    the way to the end, through the second question being
19    answered, before we know what the appropriate verdict
20    should be in the case.
21           So, what I'm saying is -- or what I'm
22    hoping is that I have conveyed the understanding that
23    even though a capital murder verdict is returned by a
24    jury, even though a yes answer is returned by a jury to
25    Question Number One, that does not foreclose the

28

1    possibility that a life sentence may be the appropriate
2    verdict based upon some unique aspects that may exist in
3    the case. And if it doesn't exist, obviously a life
4    sentence is not appropriate; but if it does exist, a
5    life sentence is appropriate.
6           And this second question is just simply
7    the jury's way to have the opportunity to satisfy
8    themselves that the death penalty really is the verdict
9    we want to return in this case. And if the death
10    penalty is the verdict that you want to return, your
11    answer to that second question is no. If the death
12    penalty is not the verdict you want to return, you
13    answer that second question yes. And either answer, yes
14    or no, must be based upon the evidence that exists in
15    the case. Anybody have any questions about that?
16           Okay. The possible punishments, life and
17    death. We know what death is. No reason to go into
18    that. But sometimes we have a misunderstanding. Some
19    folks have a misunderstanding about what a life sentence
20    means. I will tell you in this case, in the event these
21    questions -- in the event he's found guilty of capital
22    murder, and in the event these questions are answered in
23    such a way that a death sentence -- I'm sorry -- these
24    questions are answered in such a way that a life
25    sentence is imposed.

29

1           The law says that the defendant cannot
2    be -- this defendant, in this trial, cannot become
3    eligible for parole consideration until he has actually
4    served forty years in the penitentiary. Forty years
5    means forty years, day for day, week for week, month for
6    month, year for year. Forty years in this case means
7    2039, the Year 2039. What happens at the conclusion of
8    forty years? Frankly, it's anybody's guess.
9           But at the conclusion of forty years, that
10    is the first time that the defendant would become
11    eligible for parole consideration. Eligibility for
12    parole consideration has absolutely nothing to do with
13    determining or deciding whether parole will be or will
14    not be granted. Eligibility for parole consideration
15    simply means that there will be evaluations made by
16    prison people evaluating that person's forty-year stay
17    with them.
18           Those evaluations will be sent to the
19    Board of Pardons and Paroles, made up of whoever they're
20    going to -- where it's going to be made up at that time.
21    The Board of Pardons and Paroles can accept those
22    evaluations. They can completely reject them and come
23    up with their own recommendations. They will send their
24    recommendations to the governor of the State of Texas,
25    whoever he or she is in 2039. And the governor of the

30

1    State of Texas will make a decision, accepting the
2    evaluations, the recommendations, rejecting them and
3    coming up with a political decision. Don't know what
4    will happen.
5           The point being that these two questions
6    deserve to be answered on the basis of the evidence
7    contained within the case on trial in 1999. They are
8    not to be answered on the basis of speculating as to
9    what might happen in the Year 2039. It is perfectly
10    consistent with the notion that in 2039, one
11    hypothetical defendant who got a life sentence for
12    capital murder may very well spend the rest of his
13    natural life drawing every single breath he ever drew
14    after the conclusion of forty years in the penitentiary
15    and dies there. That's perfectly possible.
16           It's also possible that another defendant,
17    at the conclusion of forty years, would be considered
18    for parole eligibility and be granted parole. Don't
19    know what's going to happen in this case. But as I
20    said, eligibility for parole does not have anything to
21    do with whether parole will or will not be granted. It
22    just becomes a time when the evaluation process begins.
23    But I did want you to know what the rule is about how
24    long the defendant would be required to stay in the
25    penitentiary.

**31**

1    That forty-year period cannot be used to
2  answer these questions.  These questions must be based
3  upon the evidence in the case.  But I did not want to
4  run the risk that somebody on a jury might say to
5  themselves or to other jurors in the jury room, well, I
6  understand that people who get life sentences can be
7  paroled after forty years -- I mean, paroled after five
8  years; therefore, I'm never going to answer these
9  questions in such a way that a life sentence is imposed.
10  I'm going to always answer in such a way the death
11  penalty is imposed, because I'm not going to run the
12  risk of having them back in five years.  I'm telling
13  you, there is no risk.  It's simply not going to happen.
14  Now anybody have any questions about that?
15    Okay.  Let's get off the capital murder
16  business for just a second, and let's get on to a couple
17  of other things briefly.  First off, we're talking about
18  capital murder.  And capital murder -- I say we're going
19  to get off it.  Now I'm talking about it, using this as
20  a starting point.  Capital murder necessarily means the
21  intentional taking of the life of another human being
22  without there being any legal excuse or without there
23  being any legal justification and that it was committed
24  during the course of another major felony.
25    In this case the allegation is a

**32**

1  kidnapping, and there is a second allegation of
2  murdering two people during the course of the same
3  criminal transaction; so, a murder during a murder; a
4  murder during a kidnapping.  Those are two major
5  felonies, an intentional taking of the life of another
6  human being without any legal justification or excuse,
7  during a kidnapping or another murder.
8    If the State proves beyond a reasonable
9  doubt the existence of each of those features, the
10  intentional murder and the other felony, the jury's
11  obligation is to find the defendant guilty of capital
12  murder.  Anytime the State's required to prove three
13  things -- anytime the State's required to prove the
14  existence of two things, three possible outcomes can
15  occur.
16    Possible outcome number one is they can.
17  If they do, the jury's got to find the defendant guilty
18  of capital murder.  Possible outcome number two, they
19  can't prove either one of them.  If that's the case, the
20  jury's obligation is to find the defendant not guilty.
21  Possible outcome number three, they can prove the
22  existence of the intentional murder without
23  justification or excuse, but they can't prove in the
24  jury's mind that it was committed during the course of
25  the kidnapping, for example.

**33**

1    If that were to be the case, I'd be
2  obligated to give you a third possible verdict.  You
3  would have had guilty of capital murder.  You would have
4  had not guilty of anything.  Third possible verdict is
5  guilty of murder.  So what we're talking about is an
6  intentional murder, taking the life -- intentionally
7  taking the life of another human being without there
8  being any legal justification or any legal excuse, which
9  is exactly the definition for capital murder, except in
10  the murder it's not done during the course of another
11  felony as it is in the capital murder.
12    So capital murder is the greater of the
13  crime, and we're talking about carving out a lesser
14  crime.  That being a murder being carved out of an
15  allegation of capital murder, piece of the pie out of
16  the whole pie.  And when we talk about the intentional
17  taking of the life of another human being without there
18  being any legal justification, without there being any
19  legal excuse, we are never talking about self-defense;
20  because self-defense is a legal justification.  It is
21  simply not murder.  We are not talking about accident,
22  because accident isn't intentional.  So if you think of
23  those two things, those two things are not and can never
24  be murder; because there is a legal justification and
25  it's not intentional.

**34**

1    But at any rate, we know the range of
2  punishment for the person convicted of capital murder is
3  life and death.  The range of punishment for murder is
4  something more broad.  A person convicted of the offense
5  of murder in the State of Texas can be punished by
6  confinement in the penitentiary for life or by
7  confinement in the penitentiary for any number of years,
8  as long as that number is not less than five or not
9  greater than ninety-nine.  And in addition to the
10  confinement, a fine not to exceed $10,000 could also be
11  imposed by a jury.
12    But you can see that the range of
13  punishment is simply so remarkably broad.  And as I said
14  the other day, I know that most of you are concerned of
15  what you think goes on at the courthouse or what you
16  hear on television.  And if you hear about a murder,
17  there is a specific thing that comes into your mind.
18  And it possibly is an absolutely awful, horrible,
19  heinous offense.  And certainly, those do exist.  But
20  they aren't all of the same magnitude.
21    We are not going to be of the mind to tell
22  you -- ask you to give up your time, ask you to serve as
23  jurors, and then tell you exactly what the value is for
24  every dead body that turns up in Harris County, Texas.
25  Because the values are all different.  And they're

**35**

1 different because of the circumstances of the offense.
2 They're different because of the quality of the life of
3 the victim. And they're different because of the
4 quality of the life of the defendant.
5     You might have exactly the same set of
6 circumstances. I mean, precisely the same crime,
7 precisely the same witnesses. One crime is committed by
8 a forty-five-year-old, six-time ex-convict, who the
9 evidence showed you during the course of the trial makes
10 his life as a career criminal. The other crime you
11 might see being committed by a seventeen-year-old girl,
12 who has never before been in any trouble before in her
13 life and just goes out and does something in aberration
14 to the way she's lived her whole life.
15     Maybe you would think those two crimes
16 should be punished differently. Maybe you wouldn't,
17 either. But that's your call. But if you did think so,
18 we've got to give you the room so you can run up and
19 down the scale of punishment. The facts of a different
20 case ought to be in terms of punishment.
21     You might have, for example, an
22 eighty-five-year-old couple, married for fifty years.
23 The Mrs. is critically ill. She's on life support.
24 She's not going to live. He knows it. Her husband
25 knows it. She talks to him. She doesn't want

**36**

1 something -- she certainly doesn't want to go through
2 the indignity to have her life supported by mechanical
3 means, and she talks to her husband. Please fix this.
4 He prays and talks to the preacher and frets about it
5 several days. Finally, not wanting to watch his wife go
6 through this misery, this indignation any longer, he
7 goes across, pulls the plug, and she dies.
8     Without going into the morality of that,
9 in this state that's murder. That's the intentional
10 taking of the life of another human being without there
11 being any legal justification and without there being
12 any excuse. Now maybe that's not the kind of case
13 wherein you think that seventy-five-year-old man should
14 get a life sentence, because he didn't kill her out of
15 anger, not out of hate, not out of revenge. He actually
16 did this out of love. The point being, if you didn't
17 think the crime in that specific instance was worth a
18 life sentence, we've got to make room for you to go up
19 and down the scale of punishments to where we let you
20 take the evidence to where you think it should be on
21 that scale.
22     So, that's why the range is so broad, to
23 give the opportunity to let you arrive at the punishment
24 you think is appropriate, depending upon the
25 circumstances of the offense, and the character and

**37**

1 background of the defendant, as well as the victim. So,
2 my question to you is this: Imagine, if you would, that
3 you're a juror in some imaginary capital murder case.
4 And your jury has heard all of the evidence about the
5 crime itself, first phase of the trial. And your jury
6 goes out and deliberates, and your jury unanimously
7 determines that the defendant on trial is not guilty of
8 capital murder. But your jury unanimously agrees that
9 the defendant is, in fact, guilty of murder.
10     Your jury comes back to the second phase
11 of the trial, and you hear additional evidence about the
12 character and background of the defendant on trial,
13 whatever that evidence was. And you go out and you
14 deliberate as to what should be the appropriate
15 punishment. My question to you is this: Is there
16 anybody here who would not consider in that imaginary
17 case assessing that imaginary defendant's punishment at
18 confinement in the penitentiary for life if you thought
19 based upon whatever the evidence was in that particular
20 case, that that was the right result to reach? Is there
21 anybody here who -- I guess what I'm saying is, is there
22 anybody here who would refuse to consider life as an
23 appropriate sentencing option if you thought the facts
24 of the case warranted it? I see no indication to the
25 contrary, so I'm going to assume you can consider that.

**38**

1     Take the same question and flip it around.
2 Capital murder jury finds the defendant -- unanimously
3 finds the defendant not guilty of capital murder, but
4 you can unanimously determine the defendant's guilty of
5 murder. You come back and hear the second phase of the
6 trial, again, relating the character and background of
7 the defendant on trial, whatever that evidence was.
8 Your jury goes out. Is there anybody here who could not
9 consider assessing that imaginary defendant's punishment
10 at confinement in the penitentiary for five years if you
11 thought, based upon the uniqueness of the evidence that
12 existed in that particular case, that that was the right
13 result to reach?
14     Again, is there anybody who would refuse,
15 before the trial ever began, to consider five years as a
16 legitimate sentencing option if the circumstances of the
17 case made you believe it was the appropriate option? I,
18 again, see nothing to indicate that you wouldn't. So
19 the point of it, you could consider the whole range of
20 punishment. It's the same thing we've been asking about
21 the capital murder business. Can you consider the whole
22 range of punishment? Can you consider yes and no
23 answers? Can you consider guilty or not guilty?
24     Whatever result you reach, would you reach
25 that result because, in your opinion, after having heard

1 all the evidence, that's where that evidence led you, to
2 that result, and not because before the trial ever began
3 you had an opinion as to what result you were going to
4 reach? That's all we're trying to talk about, is
5 starting the case off at ground zero and you go wherever
6 the evidence takes you. Anybody have any questions so
7 far?
8     Two other quick things. One thing -- and
9 I'm not going to do this from a legal standpoint. I'm
10 trying to convey the thought of a concept. We have in
11 the State of Texas a concept, a piece of our law that
12 says, if you have two or more people who get together,
13 agree, conspire to commit a crime; and they do commit
14 the crimes. A conviction as to one of those
15 coconspirators cannot be had solely and exclusively upon
16 the testimony of one of the other coconspirators.
17 Instead, there must be some additional evidence from
18 some independent source, independent of the
19 coconspirators, that tends to connect the defendant on
20 trial to the commission of the offense. The independent
21 evidence itself does not have to be within itself
22 sufficient to prove the defendant's guilt beyond a
23 reasonable doubt. It only has to be sufficient that it
24 tends to connect the defendant to the commission of a
25 crime.

1     For example, another guy and I agree to
2 rob a bank. I'm going to be the driver of the getaway
3 car, and he's the bank robber. I pull up, he gets the
4 bag, runs in, comes out, hops in the car, off we go.
5 Well, there is a arrest that occurs. I got this all
6 planned. I didn't go in the bank, so nobody can
7 identify me. He gets arrested. He starts to point to
8 me. I'm not the only -- I can't be convicted solely and
9 exclusively upon that testimony if there is no other
10 evidence independent of him that tends to connect me to
11 the commission of a crime. But because he is arrested,
12 they find the bank bag; and on the bank bag are my
13 fingerprints. That is evidence independent of his
14 testimony that does tend to connect to the commission of
15 the crime. So, it could be eyewitness evidence; it
16 could be circumstantial evidence. It doesn't make any
17 difference, just some evidence independent of the
18 evidence -- the coconspirators' testimony that tends to
19 connect me to the crime that was committed. Anybody
20 here have any disagreements with that aspect of the law
21 that rises to the level -- and I don't know if it's
22 going to come into play, but -- I don't have the
23 faintest idea -- but I know the law exists and it could.
24 Anybody have any disagreement with that facet of our
25 law?

1     One last area. We have two kinds of
2 evidence that exist in trials. We have direct evidence,
3 and we have circumstantial evidence. Direct evidence
4 means eyewitness testimony; somebody saw something
5 happen. Or in a criminal case it could also mean the
6 confession of a defendant, and we know the defendant
7 can't be required to testify against himself. But there
8 are some instances wherein a confession, if lawfully
9 taken, can be admitted.
10     Circumstantial evidence means any other
11 kind of evidence. It means evidence of a particular
12 circumstance involved in conduct, taken and intertwined
13 with other circumstances presented to a jury, would be
14 sufficient to establish a defendant's guilt. Sometimes
15 we hear people say down here, oh, I couldn't find
16 anybody guilty on circumstantial evidence. And they
17 really don't know what it is they're saying.
18     The law doesn't care whether evidence in a
19 case is circumstantial or direct. The law only cares
20 that the evidence rises to the level that it proves a
21 person's guilt beyond a reasonable doubt. The law
22 doesn't care whether there is one witness in a case or
23 twenty-seven witnesses in the case. The law only cares,
24 does that witness or do those witnesses' testimony show
25 a person's guilt beyond a reasonable doubt?

1     Every week in this building there are
2 people who are found guilty based upon the testimony of
3 one witness. And when that happens, that's because that
4 one witness' testimony is believed beyond a reasonable
5 doubt. And there are weeks in this building where
6 defendants are found not guilty, even upon the testimony
7 of a half a dozen eyewitnesses, because the jury does
8 not believe beyond a reasonable doubt those
9 eyewitnesses' testimony. So, the number of witnesses
10 makes no difference. Whether it's direct or
11 circumstantial evidence makes no difference. It is the
12 quality of the testimony; and thus, it establishes a
13 person's guilt beyond a reasonable doubt.
14     For example, down here next to where
15 they're building the Enron Field, we could have two
16 drunks out there one day just on the verge of passing
17 out. And they see some old guy down there, and somebody
18 shoots him and kills him. They drag those three drunks
19 into trial. Six months later they testify, and they all
20 testify exactly what it was they claim they saw. And
21 each one of them is perfectly honest. They say, I've
22 been drinking wine all day. I'm on my third paper bag,
23 and I'm getting ready to pass out, and I'm drunker than
24 Cooter Brown, but that's what I saw. Can you see how a
25 jury may very well not find beyond a reasonable doubt

1 those witnesses to be credible?  They may find that
2 hypothetical defendant not guilty, even though the
3 testimony was direct, even though it came from three
4 eyewitnesses.
5          On the other hand, at exactly the same
6 time, same circumstance, you have one guy who's a pillar
7 of the community, who happens to be walking by and sees
8 the person who turns up being the defendant with a gun
9 in his hand. He doesn't see him do anything. He walks
10 away, and fifteen seconds later he hears a gunshot.
11 Another guy, also a pillar of the community, hears the
12 gunshot, turns around, doesn't see it fired but sees the
13 victim laying on the ground, sees the defendant standing
14 over the victim with a gun in his hands.  A third person
15 doesn't see the shooting, either, but sees -- about
16 fifteen seconds after he hears the gunshot, sees the
17 defendant walking away with a gun in his hands, calls
18 the police. The police arrest the defendant. Nobody
19 has seen the gunshot fired, and the gun that is seized
20 from the defendant at the time of his arrest is
21 ballistically determined to have been the weapon that
22 fired the projectile that went in the body of the victim
23 to cause his death. Nothing but circumstantial
24 evidence. But can you see how someone might view that
25 evidence in such a way that it would, beyond a

1 reasonable doubt, show the defendant on trial to be
2 guilty? No eyewitness testimony, but circumstantial.
3 We think of fingerprints as being such great
4 identifiers, and certainly they are.  But fingerprints
5 are circumstantial evidence; because even if a
6 fingerprint exists on some object, there is no way to
7 know when the print was placed there.  There is no way
8 to know when the object -- when the print was placed
9 there.
10          Now if it's a nonmoveable object,
11 obviously that's not going to be hard to figure out.
12 But if it were a pistol, you would never know where the
13 pistol was or when it was that the person's print was
14 placed on that pistol.  That's why it's circumstantial.
15 But my question to you is this:  If you were a juror in
16 some hypothetical capital murder case, and at the
17 conclusion of all the evidence in the case -- and let's
18 just say for purposes of this conversation, all the
19 evidence was circumstantial -- is there anybody here who
20 would refuse to find the defendant on trial guilty of
21 capital murder just because the evidence was
22 circumstantial and not direct, even though you believe
23 all that evidence beyond a reasonable doubt?  Is there
24 anybody here who would refuse to do that?
25          Okay.  You've just finished your first

1 year in law school. Anybody have any questions?  The
2 whole point of this exercise is really pretty simple.
3 One, we want to run the laws by you, the rules by you
4 that can come into play; because we're going to want to
5 see if you were a juror in the case, could you, A,
6 follow the rules, and B, enforce them?  Because that's
7 what you'd have to do as a juror.  Anybody here who's
8 heard anything that causes them such a degree of
9 discomfort that they would be unwilling, unable to
10 follow any of these rules we talked about?
11          Second aspect of what this is about, I
12 think, is for you to be satisfied with yourself, for the
13 lawyers to be satisfied with you, that if you were a
14 juror in the case, you could take one of those chairs in
15 the jury box and just listen to all the information as
16 presented, evaluate it however you see fit, and come up
17 with what you think is the right decision to reach based
18 upon the evidence in the case and how you evaluate it.
19 Is there anybody here who feels as though they couldn't
20 do that?  Anybody have any questions?
21          Okay.  If you would, retire to the
22 hallway.  We'll bring you in one at a time and get you
23 on your way as quickly as we can.
24
25

1                    GLEN DINKINS,
2 having been first duly sworn, testified as follows:
3                 VOIR DIRE EXAMINATION
4 BY THE COURT:
5     Q.  Mr. Dinkins, first off, going back to Friday
6 and this morning, about everything we talked about up to
7 now, do you have any questions at all for me?
8     A.  I believe not.
9     Q.  Okay.  Is there anything to this point that we
10 have not yet addressed that you feel as though we should
11 talk about it because it might have some bearing on your
12 service as a juror in this case?
13     A.  Not that comes to mind right now.
14     Q.  Is there anything at all, sir, that you're
15 aware of presently about your personal life, your
16 professional life, your health, or anything else for
17 that matter, that you can think of that would in any way
18 interfere with your ability to be a juror in this case
19 during the time frame we've discussed?
20     A.  If it's like ten days, is that what you're
21 saying?
22     Q.  We're saying more than five, but not as much as
23 ten.
24     A.  I don't believe so.
25     Q.  The idea that I was trying to convey about how

47

1  each of the juror's verdicts is independent from the
2  other verdicts. Does that make sense in any way?
3      A.  Yes, sir.
4      Q.  Each thing must be viewed on the basis of its
5  own question that it's asking. And can you conceive --
6  and I'm not going to ask you to tell me what they might
7  be. That's not fair to you. But are you open to the
8  notion that even though a juror found a defendant guilty
9  of capital murder, for example, and even though a juror
10  may have answered yes to Question Number One, that is to
11  say, found the defendant to be a future danger, that
12  there may very well be circumstances that do exist
13  wherein that same juror in that same case would believe
14  there was a sufficient reason to answer that second
15  question yes, therefore, giving a defendant a life
16  sentence as opposed to a death sentence?
17      A.  Yes, I believe that possibility exists.
18      Q.  And you would be willing to search through the
19  case to see if that existed in a case if you were a
20  juror?
21      A.  Yes.
22      Q.  Before we begin, have you any questions for me?
23      A.  Not right now.
24      Q.  Thank you, sir.
25          THE COURT:  Miss Connors.

48

1              VOIR DIRE EXAMINATION
2  BY MS. CONNORS:
3      Q.  Mr. Dinkins, I'm Claire Connors. And Lynn
4  McClellan will be sitting with me in a few minutes, and
5  we're going to be the prosecutors in this case. If at
6  any point I explain something to you that you don't
7  understand, please stop me, because it's very important
8  that you understand the concepts. We're not going to
9  give a test, and you don't have to memorize them just to
10  understand the concepts. When do you think the death
11  penalty should be available, like, in what type of
12  cases?
13      A.  Most definitely in capital murder cases.
14      Q.  Capital murders involving what type of facts?
15  Can you think of any?
16      A.  I'm not sure.
17      Q.  Okay. You understand that capital murder's an
18  intentional killing, plus another certain other crime?
19  For example, murder plus an aggravated kidnapping equals
20  capital murder. Do you have any problem with that?
21      A.  No, ma'am.
22      Q.  If you find the defendant guilty of capital
23  murder in this case, then we go to the next part of the
24  trial. And you have to answer two questions. And the
25  first question is: Do you find from the evidence beyond

49

1  a reasonable doubt that there is a probability that the
2  defendant would commit criminal acts of violence that
3  would constitute a threat to society?
4          Just because you found him guilty of
5  capital murder, it doesn't mean this question is
6  automatically answered yes. Okay. There may be
7  circumstances where you think that person -- you hear
8  facts when they were violent between -- with someone
9  they knew. That was the only time they were ever
10  violent in their life, and you may believe they would
11  never commit some type of violent act in the future.
12  Okay. And you understand the acts of violence could be
13  either against property or some type of burglary,
14  violence against a person. If I punch you, that would
15  be a type of violence. So if you answer that question
16  yes, then he gets the death penalty. All right?
17          The way to get around that is you go to
18  Question Number Two. You can decide, I don't want him
19  to get the death penalty, and you answer that
20  question -- if there was sufficient evidence, you answer
21  that question no. Okay. But before you would do that,
22  you have to look at all the evidence. You look at the
23  facts of the case you would consider at the first part
24  of the trial. You look at the defendant's background,
25  his character, his moral culpability or responsibility.

50

1  What part did a particular defendant play in the case?
2  Were they in the getaway car and they were not present
3  when the murder occurred, or did they actually -- were
4  they involved in the murder? Were they actually the
5  shooter in the particular case? Okay. You also look at
6  the personal moral culpability of the defendant,
7  responsibility. Was he responsible for this particular
8  crime? What was his responsibility? And then you
9  say, is there a sufficient mitigating circumstance or
10  circumstances that would warrant a life sentence rather
11  than a death sentence? It overrides. The law says that
12  you have to look for that type of evidence. Doesn't
13  mean you have to find it, but you have to honestly look.
14  Could you do that?
15      A.  Yes, sir -- yes, ma'am.
16      Q.  In your questionnaire you talked about certain
17  things I'd like to ask you about. You said that your
18  son had been involved -- I think he was shot in a
19  drive-by shooting; is that correct?
20      A.  Yes, ma'am.
21      Q.  Can you tell us what happened in that case?
22      A.  He was at school, playing basketball with a
23  group of his friends; and a carload of kids come by and
24  randomly started firing guns.
25      Q.  And what was the extent of his injuries?

## 51

1    A.  He got shot in his right arm.  He has no use of
2  that right arm at all.
3    Q.  And you understand the man on trial had nothing
4  to do with that particular case?
5    A.  No doubt.
6    Q.  And could you put that aside and just consider
7  the facts and the evidence in this particular case when
8  you make your determination?
9    A.  Yes, I can.  That's been five years ago.
10    Q.  You also wrote in there that you had been the
11  victim of a home robbery.
12    A.  Yes.  Several years ago we were burglarized.
13    Q.  When you say burglarized, were you present when
14  the people came in?
15    A.  No, ma'am.
16    Q.  Before we started, did you know what mitigating
17  evidence meant when the Judge spoke to you?
18    A.  Not as thoroughly as I do now know.
19    Q.  One of the questions you were asked, do you
20  believe that mitigating evidence concerning a capital
21  murder defendant's background should be considered in
22  deciding whether he or she receives the death penalty?
23  And you said no.  And you understand that you must
24  consider any mitigating evidence if there is any?
25    A.  Yes, ma'am.

## 52

1    Q.  And you understand, Mr. Dinkins, that
2  mitigating evidence can be, for one person something is
3  mitigating, for another person it's not mitigating?
4    A.  Would mitigating be where a person comes from?
5  I guess that's where I was confused.  Their upbringing?
6    Q.  If you thought --
7    A.  The reason why I answered that question that
8  way is because the kids that shot my son come from very
9  affluent families.  They were very well to do, and
10  that's -- I was just saying that where they come from,
11  their background and stuff, I didn't consider that
12  important.
13    Q.  That's information that you would learn?
14    A.  Right.
15    Q.  For example, if somebody were intoxicated on
16  alcohol or drugs and they committed a capital murder,
17  you may think, well, they intentionally chose to be
18  intoxicated on alcohol or drugs and I do not think
19  that's mitigating.  All right.  The juror next to you
20  may say, well, golly, when they took the alcohol or the
21  drugs, they weren't thinking as clearly when they
22  committed a capital murder as they would have had they
23  not be drinking or not taking drugs; and therefore, I
24  think that that is mitigating.  Same evidence.  Two
25  different people view it the same way.  Understand that?

## 53

1    A.  Yes.
2    Q.  I'm sorry.  The two different people view it
3  different ways.
4      With respect to someone's age, you may
5  have someone young, a teenager, who commits a capital
6  murder, a seventeen-year-old.  And you may think that at
7  this age, at seventeen, they have committed a capital
8  murder.  Obviously, they're a very serious dangerous
9  criminal at seventeen that they could do this.  Someone
10  else may say, at seventeen, they haven't fully
11  developed.  They really aren't the same person as they
12  might be at twenty-five.  Therefore, I think that's
13  mitigating evidence.  So, the same evidence; two
14  different people see it two different ways.  Do you
15  understand that?
16    A.  I do.
17    Q.  You were talking about the people that had shot
18  your son.  I think you said they were rich kids,
19  basically?
20    A.  They were from affluent families.
21    Q.  And you understand there are people, perhaps,
22  that commit capital murders that are not from affluent
23  families?
24    A.  Yes, I do.
25    Q.  Could you keep an open mind and consider

## 54

1  someone's background, if they came from a poor family or
2  they had a very bad upbringing?  Could you consider --
3  keep an open mind to consider whether or not that was
4  mitigating?
5    A.  I will; but just in my opinion, that things
6  happen, different people and, you know, different walks
7  of life.  But that -- yeah, I could consider it.
8    Q.  That's just it.  It's different people,
9  different upbringings.  And all we're asking you to do
10  is not make a decision right now, keep an open mind, and
11  consider all of the evidence before you decide what the
12  punishment should be.
13    A.  Yes.
14    Q.  You couldn't tell me right now whether or not
15  you're going to find this defendant guilty, right?
16    A.  Absolutely not.
17    Q.  You couldn't tell me what the answer to these
18  questions are, right?
19    A.  Absolutely not.
20    Q.  That's just it.  That's why we're asking you to
21  keep an open mind before you make the decisions, and you
22  make the decisions after you've heard all the evidence.
23  Could you do that?
24    A.  Yes.
25    Q.  When you were asked about your feelings about

55

1  the death penalty, you answered, I'm for it if the crime
2  merits this extreme.  What crimes merit this extreme, in
3  your opinion?
4      A.  Well, a capital murder, brutality, total lack
5  of concern for human lives.
6      Q.  And you understand, Mr. Dinkins, that not every
7  capital murder is a death penalty case?
8      A.  Yes, ma'am.
9      Q.  Because if you found a defendant guilty of
10  capital murder, it doesn't automatically mean he gets
11  the death penalty.  You understand that, right?  And you
12  would be open to waiting and basing your answers to
13  Question Number One and Question Number Two until you've
14  heard all the evidence; is that correct?
15      A.  Yes, ma'am.
16      Q.  And could you assure both me and Mr. Wentz that
17  you're willing to do that, to keep an open mind?
18      A.  Yes.  I have no problem with it.
19      Q.  Why do you think you would be a good juror?
20      A.  Because I would be open-minded.  I would give
21  it everything I had and make sure I come to the right
22  decisions.
23      Q.  If you found a defendant guilty of capital
24  murder, okay, and you found that that person was a
25  future danger, would you still keep an open mind and

56

1  tell us that you would search to see whether or not
2  there was mitigating evidence sufficient enough that you
3  would give a life sentence.  Would you still do that?
4      A.  You're saying if I said yes to the first
5  question --
6      Q.  Right, would you still keep an open mind and
7  look for any evidence that might be mitigating?
8      A.  Definitely.
9      Q.  Thank you very much, sir.  Do you have any
10  questions of me?
11      A.  No.
12      Q.  Your last chance.
13          MS. CONNORS:  I'll pass the witness, Your
14  Honor.
15          THE COURT:  Mr. Wentz.
16              VOIR DIRE EXAMINATION
17  BY MR. WENTZ:
18      Q.  Good morning.
19      A.  Hi.
20      Q.  For the next, oh, fifteen minutes or so, I'd
21  like to talk to you about -- basically, I want to talk
22  to you about you.  And I'd like for you, if you would,
23  to begin to do something you began to do this morning,
24  and that's tell me the reasons why you answered the
25  questions that I put to you in the manner in which you

57

1  do.  It's quite obvious from the questionnaire.  You've
2  listened to the Judge.  You've listened to Claire.
3  You're going to be able to answer any questions I put to
4  you.  And if you really probably tried, you could answer
5  it in the way you think I might want to hear that answer
6  come back.
7          But for, as I said, about the next fifteen
8  minutes, the only thing I want to hear is what you truly
9  believe.  Because when twelve people come to judge this
10  case, it's always my thought that the values and the
11  beliefs that make each one of us a unique person really
12  come into play and help shape the decision they come up
13  with.  How do you feel about that?
14      A.  I agree with that totally.
15      Q.  This is a very individualized process.  That's
16  why we're talking to you, personally, individually, and
17  by yourself.  There is only one person on trial in this
18  case, and that's Charles Mamou.  We sometimes come down
19  here and we lump people into categories; attorneys,
20  defendants, jurors.  Well, each one of us is unique.
21  You think you could judge Charles' case on its own
22  individual merits with the guilt/innocence and, if you
23  should find him guilty, at the punishment phase?
24      A.  Yes.
25      Q.  How do you feel about the prospect of becoming

58

1  a juror in this case?
2      A.  Well, I have -- this is the first time I've
3  ever been involved in anything like this.  I've been on
4  a civil trial before.  I've got a lot of mixed feelings
5  about it, some positive and some negative.
6      Q.  Tell me the positive and tell me the negative.
7      A.  The negative is facing the traffic, getting
8  down here every morning.  I live in Kingwood.  The
9  parking.  The positive is it's a learning experience.  I
10  find it interesting.
11      Q.  What things have you learned so far?
12      A.  Just what we're going through right now, it's
13  all a learning experience.  I've never done it before.
14  I didn't know this is the way jurors were picked for
15  this type of case.  I didn't know it was one on one, so
16  everything we're going through right now is a learning
17  experience.
18      Q.  Now one of the things we've been told is that
19  when it comes to the second part of the trial -- and I'm
20  going to jump to this.  We're going to maybe come back
21  to the first part.  You get to answer these Special
22  Issues.  And the first Special Issue asks you to decide
23  whether or not the State's proven to you something
24  beyond a reasonable doubt.  And each of those words in
25  the Special Issues, except for reasonable doubt, are

1 going to mean whatever they mean to you. There is no
2 legal definition, as the Judge told you. How do you
3 feel about the prospect of, in a sense, determining
4 whether or not somebody is going to receive the death
5 penalty based on your ability to predict what they're
6 going to do in the future?
7     A. Well, you just have to weigh everything that
8 was presented to you. You can't predict what a person
9 is going to do; but you could have a feeling inside, a
10 strong feeling one way or another, I'm sure, by the time
11 it's all over with.
12     Q. And I think that when you were -- the Judge was
13 talking with you, he talked about it not being just a
14 strong feeling. Well, I don't think he used that word,
15 although I think I understood what you're saying. He
16 was talking about, is there a probability?
17     A. Right.
18     Q. And it always seems to me that we hear
19 evidence; we hear things, and we form judgments about
20 what we hear. And you know by the time you get to the
21 Special Issue Number One, you're going to have decided
22 that person is a capital murderer, which basically is a
23 pretty condemning definition of a person. And you look
24 at this Special Issue Number One and say, well, is that
25 person possibly going to be a future danger to society?

1 Can you tell me what -- you know, you used this word, a
2 strong feeling, not so strong feeling. What are you
3 telling me when you use those words?
4     A. Basically, I guess you'd look back at the
5 previous things that have happened to them before, what
6 their, you know, reputation was and develop your
7 feelings from that, I guess.
8     Q. Okay. All right. One of the things that the
9 Judge told you is that prison is part of our society.
10 And if I'm not mistaken, in your questionnaire there was
11 a question -- I think it's Number 33 -- says your
12 mother-in-law's husband was sent to prison. It's on
13 page 9.
14     A. Right.
15     Q. Can you tell me a little bit about that,
16 please?
17     A. We weren't -- we're not close, but I know it
18 was drug-related. It was -- that's basically all I
19 know.
20     Q. How long did he stay in prison, if you know?
21     A. I don't know.
22     Q. You don't even know if he's in or out at this
23 time?
24     A. He's out.
25     Q. Do you know if that was a good experience for

1 him in the sense that he may have learned something from
2 it, or it's just he went and became a repeat offender?
3     A. I have no idea.
4     Q. Okay. Do you think that it's possible that
5 prison actually could be a good thing for somebody? In
6 other words, they are found to have done something
7 wrong. They are punished. They are sent away and at
8 some point conceivably released, hopefully, a different
9 person. Do you believe that's a possibility?
10     A. Well, I consider that one of the reasons to
11 send someone to prison, with the hope they would come
12 out a better person.
13     Q. Okay. With Special Issue Number Two, had you
14 ever thought about things that might lessen a person's
15 punishment before in the context that we're talking
16 about? And I'm just talking about, just generally
17 speaking.
18     A. Have I thought about it before?
19     Q. Yeah.
20     A. Not really, no.
21     Q. So that basically, when you were going through
22 the questionnaire and you got to Number 68 and you were
23 asked, do you believe mitigating evidence concerning a
24 capital murder defendant's background should be
25 considered in whether or not they received the death

1 penalty? You, at that time, said no.
2     A. Right, and I really didn't understand the
3 question now that -- right. I was thinking about
4 backgrounds, their upbringing, where they come from,
5 this, that, and the other. That's why I answered no on
6 that one.
7     Q. Can you see, though, that in Special Issue
8 Number Two, that that's exactly what Special Issue
9 Number Two asks you to do, is to actually go back and
10 look at that background, look at that case that you've
11 already determined, look at the character of the
12 defendant and his background, and then decide whether or
13 not there is something that might warrant him to receive
14 a life sentence.
15     So, basically, Special Issue Number Two
16 asked you to do something that I think you've indicated
17 to me you didn't -- weren't aware of when you answered
18 Special --
19     A. That's true.
20     Q. How do you feel about having to do that?
21     A. You mean, the mitigating part?
22     Q. Yeah, to have to go back and look through the
23 case again, look through the person's background again.
24     A. I don't have a problem with it. I think that's
25 very important.

63

1    Q.   Why?
2    A.   To establish the severity of the punishment.
3    Q.   Do you consider life imprisonment a severe
4  punishment?
5    A.   Yes, I do.
6    Q.   One of the things that a case -- the Special
7  Issue asks you to do is look at the case itself.  And
8  you know that basically by -- if you get to Special
9  Issue Number Two, you basically have a life or death
10  decision to make.  It's overwhelming.  Have you ever
11  heard of a case where somebody had been found guilty of
12  a crime and some time had passed, and it was determined
13  later through things that had come up that the person
14  actually had not done the crime?
15    A.   That has happened, yes.  I can't think of any
16  specifics but yes.
17    Q.   How did you feel about that when you heard
18  about it?
19    A.   I felt like something was definitely wrong.
20  Something was done wrong.  Something slipped through
21  that shouldn't have.
22    Q.   Basically, I think that's in a guilt/innocence
23  phase; but Special Issue Number Two allows you to
24  reconsider whether or not the death penalty should be
25  the appropriate punishment.  It gives you a second

64

1  screening or third screening, if you will, to determine
2  what the punishment should be.
3        As I've talked to you, I've tried to get
4  to know a little bit more about you.  And obviously, I
5  do.  And in talking about the death penalty, you
6  raised -- I think you're very justifiably concerned
7  with -- I think it's in No. 65, if I'm not mistaken.
8  What things do you consider to be important in deciding
9  whether somebody should receive the death penalty or
10  life?  And you talk about the brutality of the crime.
11  I don't want to be insensitive; but we know that in all
12  of these cases, somebody has lost their life, and they
13  shouldn't have lost their life.  And their life has been
14  taken, at least in one sense, in a brutal fashion.  The
15  person was shot, or the person was stabbed, or something
16  like that.  What did you mean by brutality, if you
17  could?
18    A.   Well, to me, there is a difference.  A death is
19  a death is a death.  But to me, in my mind, someone
20  shooting someone one time and he dies, that's -- as
21  opposed to somebody sitting there running off sixty
22  rounds or something in somebody, that's --
23    Q.   I wasn't sure what you meant.
24    A.   That's what I'm saying.
25    Q.   Okay.  One of the things -- I'm going to jump

65

1  to the first part of the trial.  The Judge talked to you
2  about what are called lesser included offenses.  And
3  basically, I've always thought that a juror's job was to
4  define conduct.  In other words, they listen to
5  witnesses and they hear all this evidence, and from that
6  evidence they decide what they think happened.
7        In other words, the State has alleged
8  capital murder; but that doesn't necessarily mean that a
9  capital murder occurred.  Maybe some other form of
10  wrongdoing occurred.  Maybe they say there is a capital
11  murder where somebody's life was taken in the course of
12  a kidnapping.  A juror might be able to listen to the
13  evidence and say, well, yes, there was a kidnapping.  I
14  understand that; but I don't see where this person is
15  responsible for that murder.  That person might be
16  actually guilty of the kidnapping and not the murder.
17  Or conceivably, somebody could listen to the evidence --
18    A.   You're saying somebody was killed in the act of
19  kidnapping?
20    Q.   I'm saying that's what the allegation is.  But
21  as you sit there and you listen to the evidence that
22  comes in, you're satisfied beyond a reasonable doubt
23  that the person kidnapped the person but you're not
24  satisfied beyond a reasonable doubt that they're
25  actually responsible for killing the person, so that

66

1  that person would obviously be guilty of the kidnapping
2  and aggravated kidnapping but maybe not a capital
3  murder.
4        That's why I say the jurors define
5  conduct.  You know what the allegations are, but do you
6  believe beyond a reasonable doubt that the State has
7  proved to you all of the allegations?  It's just like
8  there is an allegation that two people's lives are
9  taken in the course of the same transaction.  It's quite
10  possible that you may say, well, look, I see how two
11  lives were taken; but I don't believe it was in the
12  course of the same transaction.
13        Sometimes we think -- we've just heard
14  about the tragedy in Fort Worth, and that's --
15  obviously, those young people lost their life in the
16  course of the same transaction.  But there may be a
17  situation where the taking of the lives was not so
18  closely connected in time and circumstances.  They
19  weren't -- and you followed the chain of events, so this
20  may not be the same transaction.  It may be two
21  different tragedies, and they would be guilty of murder.
22  Do you see how that can come into play for the people
23  who listen to the evidence?
24    A.   Seems that possibility would exist, yes.
25    Q.   Do you have any questions of me?

1    A.  Nothing comes to mind right now.

2    Q.  Last chance.  After you walk out the door, it's

3 too late.

4    A.  No, I can't think of nothing right now.

5    Q.  My one last chance to ask you something.

6    A.  Sure.

7    Q.  Thank you.

8          THE COURT:  Mr. Dinkins, in just a second

9 I'm going to excuse you.  Before I do, I will tell you

10 we want you back a week from this coming Wednesday.

11          (Court admonishes prospective juror.)

12            MATTHEW TAYLOR,

13 having been first duly sworn, testified as follows:

14          VOIR DIRE EXAMINATION

15 BY THE COURT:

16    Q.  How are you this morning?

17    A.  Good.  How are you?

18    Q.  I'm well.  What are you reading?

19    A.  Mystery.

20    Q.  Who did it?

21    A.  I don't know yet.

22    Q.  And that's just exactly what this case is like.

23 Mr. Taylor, before we begin, I'd ask you -- before we

24 begin, I'd ask you to remember back to Friday, the

25 things we talked about on Friday.  Add to it this

1 morning.  Out of everything we have talked about so far,

2 do you have any questions at all for me?

3    A.  No, I understand.

4    Q.  Is there anything up to this point, sir, that

5 we have not yet put on the table that you feel as though

6 we should talk about because it might have some bearing

7 on your service as a juror in this case?

8    A.  To some extent, yes.  It's not necessarily

9 about the case.  It's more the length of the case.

10    Q.  Let's talk.

11    A.  All right.  My veterinarian practice, I'm sole

12 practitioner.  I do have an associate I just hired.  She

13 graduated this last spring.  The practice that I have is

14 a fairly small practice, but it requires a lot of work.

15 And I'm -- I have not taken two weeks off for myself

16 since I began, so that's a concern that I have.

17    Q.  I'm interrupting, and I apologize.  But let me

18 ask you this question:  And I just tell you, my personal

19 thought is, I don't think anybody ought to offer

20 themselves as a juror and recognize going in that

21 they're going to be financially punished for having done

22 so.  That's not what this is about.

23    A.  I understand.

24    Q.  So with that in mind, my thought again -- I'm

25 speaking just for myself -- is that you're pretty much

1 in control of your destiny, because I'm going to ask you

2 some questions.

3    A.  Uh-huh.

4    Q.  And however you answer the questions are going

5 to influence what result occurs.

6    A.  Of course.

7    Q.  But my question to you is this, Dr. Taylor:

8 Let's assume just a second the time frame, as we talked

9 about, it will begin October 4th and last into the week

10 of October the 11th, but not to that Friday, not past

11 that Friday, which is whatever date that is.

12    A.  Right.

13    Q.  If you were a juror in the case, would that

14 cause you financial problems and business problems?

15    A.  I fear that it would.  I don't know that for

16 certain.

17    Q.  And we're talking basically ten to five, in

18 terms of being here.

19    A.  Correct, yeah.

20    Q.  Would the potential of those problems and the

21 existence -- potential existence of those problems be

22 such that would detract from your ability to concentrate

23 on what you were doing here?

24    A.  That's what I'm afraid of.

25    Q.  Because I know you can see how both sides are

1 relying on having the attention span of the twelve

2 people who are going to be making decisions.

3    A.  Of course.

4    Q.  And your thought is that that might be a

5 problem?

6    A.  That could be a problem.

7    Q.  Is your thought that because of the anticipated

8 length of time that both the State, as well as the

9 defense -- because it would apply equally to them --

10 would be better off if you were not a juror in a case --

11 magnitude is not the issue; it's the anticipated

12 duration?

13    A.  That's correct.

14    Q.  And you think each would be better off if you

15 were not a juror for this period of time that?

16    A.  May be the case, yep.

17    Q.  And if you did become a juror, let's just

18 say -- let's take it from the other side.  Would you be

19 able to set the concerns that you have that you

20 discussed with us aside and concentrate on the testimony

21 in the case?

22    A.  I would do my absolute best.

23    Q.  Other than that that we've talked about -- and

24 I don't mean to minimize what we talked about in any

25 way -- is there anything at all other than that that you

1   can think of about your personal life, professional
2   life, or health, or anything else for that matter, that
3   you feel like would in any way interfere with your
4   ability to be a juror in this case during the time frame
5   we talked about?
6     A.  No, sir.
7     Q.  Do you have any questions before we begin this
8   process?  Do you have any questions for me, sir?
9     A.  Not that I can think of.
10         THE COURT:  Mr. McClellan.
11         VOIR DIRE EXAMINATION
12   BY MR. MCCLELLAN:
13     Q.  Mr. Taylor, just to follow up on that, Mr.
14   Wentz and I've been talking.
15     A.  Sure.
16     Q.  Can you assure us that if you were selected as
17   a juror that there would be no distractions, or are you
18   able to assure us that?
19     A.  There would be no distractions?
20     Q.  Right.  In other words, we need somebody who
21   can give their full attention to this as if this is
22   their job.
23     A.  I understand.  If my associate had been with me
24   longer, I think I could pretty well assure you.  She's
25   quite competent.  However, she's not been out long, does

1   not have the experience that makes me comfortable.
2     Q.  So you think that you still would have a
3   concern that might affect your ability to give your full
4   concentration to this end?
5     A.  I have concerns, yes.
6         MR. MCCLELLAN:  I think we have an
7   agreement, Judge.
8         THE COURT:  As I understand, there is an
9   agreement by and between the parties that Venireperson
10   Number 49, Dr. Matthew Taylor, by the agreement of all
11   concerned, may be excused.  Mr. McClellan, is that your
12   agreement?
13         MR. MCCLELLAN:  Yes.
14         THE COURT:  Ms. Connors?
15         MS. CONNORS:  Yes, Your Honor.
16         MR. WENTZ:  Yes, Your Honor.
17         THE COURT:  Is it Mr. Hill's, also?
18         MR. WENTZ:  Yes, Your Honor.
19         THE COURT:  Mr. Mamou?
20         THE DEFENDANT:  Yes, sir.
21         THE COURT:  Is it your request that the
22   doctor be excused?
23         THE DEFENDANT:  Yes, it is.
24         THE COURT:  All right.  He's excused.
25

1              LINDA KAY COOK,
2   having been first duly sworn, testified as follows:
3         VOIR DIRE EXAMINATION
4   BY THE COURT:
5     Q.  Miss Cook, first off, let me ask you this:  I
6   ask you to remember back to Friday, the things we talked
7   about on Friday; add to them this morning the things we
8   talked about this morning.  Out of everything that we
9   have talked about to this point, do you have any
10   questions at all for me?
11     A.  No, not so far.
12     Q.  Is there anything up to now that we have not
13   yet addressed that you feel as though we should talk
14   about because it might have some bearing or some
15   influence on your service as a juror in this case?
16     A.  No.
17     Q.  Anything at all that you can think of that
18   you're aware of presently that might have something to
19   do with your personal life, your professional life, or
20   health, or anything else for that matter, that you feel,
21   at any rate, would interfere with your service as a
22   juror in this case for the time frame we've talked
23   about?
24     A.  No, sir.
25     Q.  The laws that we have talked about, do you find

1   any of them objectionable to the degree that if you were
2   a juror you could not follow, as well as enforce it?
3     A.  No, sir.
4     Q.  You understand about being wide open to coming
5   up with whatever you think you ought to come up with
6   before the trial ever begins, but coming up with the
7   answer based upon the evidence that's presented in the
8   case?  Does that sounds like you?
9     A.  Say that again.
10     Q.  I don't blame you.  I heard that question
11   myself.
12     A.  You're going wide open.
13     Q.  I asked it, and I don't even know what it was.
14   Right now, before the evidence begins, are you wide open
15   to come up with any answer?  Whatever answer you do come
16   up with will be based upon whatever evidence you do hear
17   in the course of the trial?
18     A.  Yes.
19     Q.  You've got a legal background?
20     A.  Yes, sir.
21     Q.  Anything about this -- and I'm gathering it's
22   civil?
23     A.  Yes, sir.
24     Q.  Anything about this process or from what you've
25   seen so far that just causes you any problems?

```
1       A.  No, sir.
2       Q.  Discomfort?
3       A.  No.
4       Q.  Allergies?
5       A.  I take shots.
6       Q.  Okay.  With that in mind, I give you
7    Mr. McClellan.
8            MR. MCCLELLAN:  Thank you, Your Honor.
9                    VOIR DIRE EXAMINATION
10   BY MR. MCCLELLAN:
11      Q.  Miss Cook, my name is Lyn McClellan.  And with
12   Claire Conners, we represent the State of Texas in this
13   case.  I want to go over your questionnaire, follow up
14   on some of your answers there and talk to you about
15   certain aspects that apply -- of the law that apply in a
16   case like this and see what your opinions are about
17   those.
18           First of all, can you kind of tell me in
19   your own words, what is your opinion about --
20      A.  About the death penalty.
21      Q.  Yes, ma'am.
22      A.  I think it's necessary in some instances, but
23   it depends on what the circumstances are.
24      Q.  Right.  What kinds of cases come to your mind
25   when you think of cases where you think the death
```

```
1    penalty ought to be available as a possible punishment?
2       A.  What kind?  You mean, you want me to give you
3    some examples?
4       Q.  Something that may come to your mind.  What
5    kinds of cases?
6       A.  If it's intentional, to maliciously hurt
7    someone.  For instance, the lady that was on death row,
8    the first woman that was killed.
9       Q.  Carla Faye Tucker?
10      A.  Yes.  I didn't remember her name.  I think she
11   deserved the death penalty.
12      Q.  Some people come and tell us that they are in
13   favor of the death penalty as a form of punishment for
14   certain types of crime.  Certain other people come and
15   tell us that and go further and say they don't believe
16   they could participate, though, in a process whereby
17   they would be called upon to make decisions to answer
18   these questions over here, knowing that in doing so,
19   they would be ordering this Judge to order the execution
20   of this defendant sitting over here on trial.  Do you
21   have any doubts about your ability to participate in
22   that type of process and make that type of decision if
23   that's what the law and the evidence called for?
24      A.  I don't have a problem with it, no.
25      Q.  Okay.  You talked about the type of cases you
```

```
1    think the death penalty ought to be available for would
2    be intentional type crimes, of course.  You now know
3    that murder in the State of Texas is the intentional
4    taking of another person's life without any legal
5    justification.  By that I mean, by legal justification,
6    it's not self-defense.  It's not an accident.  Because
7    those wouldn't be murder.
8            Murder is when you intend to kill somebody
9    and do something to carry out the intent to do it.  And
10   for the offense of murder, as the Judge told you, the
11   death penalty doesn't apply unless there is some other
12   crime committed along with it.
13      A.  Uh-huh.
14      Q.  We have alleged in this case murder during a
15   kidnapping.  There are other kinds of cases the
16   Legislature says the death penalty applies to; and that
17   would be murder during a robbery, murder during a
18   burglary, murder during a sexual assault, killing a
19   police officer in the line of duty, killing a child
20   under a certain age are the kinds of cases the
21   legislature says the death penalty ought to be available
22   for.  There is no provision in the State of Texas where
23   you automatically get the death penalty upon being
24   convicted of that crime.  Are those the kinds of cases
25   you think the death penalty ought to be available as one
```

```
1    form of punishment?
2       A.  Yes, I do.
3       Q.  In your questionnaire, also, we asked you --
4    let me see if I can find the questionnaire up here and
5    let you look at the copy.  If you would, turn to Page
6    13.  There was two lists of groups of five.  And the
7    first one said, Check the statement which best
8    summarizes your general views about the death penalty.
9    And you checked, I'm opposed to the death penalty except
10   in a few cases where it might be appropriate.
11           One of the other options in Number Three
12   is, I'm generally not opposed or generally in favor of
13   the death penalty.  You chose No. 2 out of all the five
14   that are available.  And that, quite frankly, indicates
15   to me that there is some possible opposition to the
16   death penalty.  I don't know.  I'm just trying to find
17   out what you were --
18      A.  It depends.  I have to hear all the facts.
19   I've been in a lot of trials.  And I have to hear both
20   sides, and then I can make my decision.
21      Q.  All right.  So you think if you heard evidence
22   sufficient to convince you that the questions ought to
23   be answered in such a way that death results, you could
24   do that?
25      A.  Yes, sir.
```

79

1    Q.  And you said -- made a point, which is common,
2  and a lot of people talk about it -- I need to hear both
3  sides.  Of course, on the civil side you always get to
4  hear both sides.
5    A.  Right.
6    Q.  Criminal side you don't always get to hear both
7  sides.  Defendant has a right not to testify.
8    A.  Right.
9    Q.  I couldn't call him if I wanted to.
10    A.  Right.
11    Q.  They'll make that decision, whether or not he
12  does or does not testify.  But you'll be instructed by
13  the Court as to whether he does or doesn't, you shall
14  not consider that as any evidence of his guilt if he
15  refuses -- not if he refuses -- but if he elects not to
16  testify.  Okay?
17    A.  Uh-huh.
18    Q.  Any problem with following that aspect?
19    A.  No.
20    Q.  So, you understand you may be called upon to
21  make your decision based upon just hearing the evidence
22  presented by the State.  Now that doesn't mean the
23  defense won't attack that by cross-examination and other
24  means.  I mean, they have no burden to produce any
25  evidence at all.  Not only his testimony they don't have

80

1  to present, they don't have to call any witnesses to do
2  anything.  They can just rely upon cross-examining the
3  State's witnesses and thinking that that created
4  reasonable doubt that would prevent a jury from finding
5  the defendant guilty.
6    Same applies to the punishment stage of
7  the trial.  You may look at Issue Number Two, where it
8  talks about mitigating circumstances.  In other words,
9  reasons why someone should receive life as opposed to
10  death.  And logic would dictate that you expect this
11  side over there to come forward with evidence to
12  convince a jury -- try to convince them to give him life
13  as opposed to death, but there is no burden to do that.
14  The burden always lies with the State of Texas.  It
15  never shifts.  Any problem with that aspect?
16    By the same token, we have a different
17  burden of proof over here.  We have proof beyond a
18  reasonable doubt.  Sometimes I think people confuse that
19  by thinking we have to have one hundred percent
20  certainty and all that.  Well, I can tell you right now
21  I could never prove anything a hundred percent
22  certainty.  I suggest you'd have to be a witness in
23  order to be satisfied to that extent.  You have to make
24  your decision.
25    Just like on the civil side, where people

81

1  take the stand and they testify about things they heard,
2  what they saw, things they did.  They have experiments.
3  They may have conducted scientific evidence, whatever.
4    A.  Right.
5    Q.  And you'll have to make your decision based
6  upon that, and you'll never be 100 percent certain on
7  that situation, as well as on this side you have an
8  indictment that alleges the elements of the offense.
9  You have to prove those beyond a reasonable doubt.
10  There may be lots of other questions about what went on
11  around the situation.  If they're not elements of the
12  offense, it doesn't matter what you said about those.
13  It's about the elements of the offense.
14    Two stages of trial.  Guilt/innocence.
15  First part of the trial we had to prove what's in the
16  indictment beyond a reasonable doubt.  If you do so, you
17  find the defendant guilty.  If you don't do so, you find
18  him not guilty.  It's basically kind of a checklist,
19  going through and checking if we prove that the
20  defendant on a certain date, in Harris County, Texas,
21  took the life of a certain person during the course of a
22  kidnapping.  If you prove all those beyond a reasonable
23  doubt, check off that list, then he's guilty of capital
24  murder.
25    But that doesn't tell you what punishment

82

1  he's going to receive, because then you have to go to
2  the punishment stage of a trial where you're given
3  questions.  And before you get to the decision at the
4  punishment stage of the trial, you may hear additional
5  evidence, additional evidence that was not relevant to
6  whether or not the defendant committed the crime,
7  whether or not he committed murder on a certain date, in
8  Harris County, Texas, during the course of a kidnapping,
9  but evidence about a defendant's character, their
10  background, their criminal history, or their mental
11  abilities or disabilities, all the things about the
12  individual's family, how he grew up, and all kinds of
13  things about his upbringing.
14    Because the emphasis -- and punishment is
15  punishment this defendant should receive for the crime
16  we've already found him guilty of.  So that's why the
17  concentration on the individual defendant who is on
18  trial, because then that helps answer these questions.
19  So in answering these questions at punishment, you get
20  to use two bodies of knowledge.  One, the crime itself,
21  which you heard at guilt/innocence.  Then the character,
22  background, and that kind of information that you hear
23  at the punishment stage of trial.  Okay?
24    A.  Uh-huh.
25    Q.  Some people might say -- like on Issue Number

1 One it says: Do you find from the evidence beyond a
2 reasonable doubt -- and there again, still the same.
3 The burden's on me that there was a probability that the
4 defendant would be a continuing threat to commit future
5 acts of violence.
6         Some people might say, if I found him
7 guilty of capital murder, I always believe there is at
8 least a probability that he would be a continuing threat
9 to commit other acts of violence. That may or may not
10 be the case; because at the punishment stage of the
11 trial, you may hear background, character. You may hear
12 the person is a Boy Scout, straight-A student, altar
13 boy, never been in trouble with the law before in his
14 life. This act of capital murder, which has no doubt
15 happened, you found beyond a reasonable doubt was a
16 total aberration from the rest of his life. And by
17 finding he is not going to be a continuing threat
18 doesn't make him not guilty. That doesn't undo it. It
19 just decides what punishment he's going to receive.
20         On the other extreme, you may find a
21 person that's been in and out of trouble all of their
22 life and a constant sore to society's side. So, there
23 again, you have to wait until you hear all the evidence
24 to make up your mind. Any problem with that aspect.
25     A. No.

1     Q. If you found Issue Number One to be yes, then
2 you go to Issue Number Two. It basically asks you to
3 stop and evaluate everything you've heard so far. It
4 says: Taking into consideration the circumstances of
5 the offense -- which would be what you heard at guilt or
6 innocence -- the defendant's character and background --
7 that would be what you heard at punishment -- and
8 whether or not you consider his personal moral
9 culpability -- I'd like to refer to it as his personal
10 responsibility for the commission of the crime -- and do
11 you find there is sufficient mitigating circumstance or
12 circumstances -- I'd like to refer to it as sufficient
13 reasons why this person ought to receive life as opposed
14 to death.
15         For example, what you're asked to do is go
16 back and listen to all the evidence in the trial and
17 weigh it in your mind. Was it mitigating? And if it
18 was, is it sufficiently mitigating for me to change my
19 vote from death to life? And the reason it's that way
20 is because if you've already found him guilty, which you
21 had to to get to the punishment stage --
22     A. Right.
23     Q. -- if you found on Issue Number One he's a
24 continuing threat, he's going to get the death penalty
25 unless you decide in Issue Number Two there is some

1 reason or reasons why he should not.
2     A. Right.
3     Q. So, you might look back to the evidence. And
4 you might, say, remember hearing evidence in the trial
5 the defendant was high on drugs or alcohol when he
6 committed a crime. Juror Number 1 would say, I think
7 that was a life sentence; because if you're high on
8 drugs and alcohol, you do things you wouldn't ordinarily
9 do. Juror Number 2 may say, I don't think it's
10 mitigating at all, because I know people on drugs or
11 alcohol who don't commit capital murders. I don't see
12 the connection between those factors.
13         So, two people have looked at the very
14 same evidence and came up with different opinions. And
15 that's okay, because this is what the question asks you
16 to do. It's for you, yourself, to look back at the
17 evidence and you, yourself, decide what effect it ought
18 to be given. Okay?
19         Same thing about the age of the defendant.
20 Some people may say, He was a young man. And when
21 you're young, you make stupid decisions. Get older,
22 you're more mature. I think that mitigates a life
23 sentence. Another juror may say, I don't think it
24 mitigates at all. At this age the boy committed the
25 most heinous crime. No telling what he's going to be

1 doing ten or fifteen years down the road. Again, two
2 people looked at the same evidence but came up with
3 different opinions. But that's okay.
4         Same thing about a person's mental
5 abilities or disabilities. Maybe there is evidence that
6 he's a slow learner or special ed student, or maybe he
7 couldn't get out of high school. One person may say, I
8 think that's mitigation towards a life sentence.
9 Another person may say, I know all kinds of people who
10 didn't get out of high school and went on to have
11 productive lives. They don't go out and commit capital
12 murder. I don't see any connection there between the
13 two.
14         What it asks you to do is to go back and
15 look at all the evidence, and you weigh it in your mind
16 and make up your mind. Any problem with that?
17     A. No, sir.
18     Q. The law says that if you -- that voluntary
19 intoxication is not a defense. In other words, if I go
20 out and get high on some substance or whatever, go out
21 to commit a crime, I'm still held responsible for that
22 crime. Do you agree with that aspect of the law?
23     A. Yes. I mean, you voluntarily did it. You did
24 it to yourself.
25     Q. Right. It's different. That's why it says

1  voluntary intoxication. It's different if somebody
2  slips something in your drink and causes you to go off
3  on a binge or whatever. Anything that you have thought
4  of or that comes to your mind since we've been talking
5  about this or since you have gone through this process
6  that you say, well, if I ever heard evidence of this,
7  whatever that might be, that would always be mitigating
8  in my mind to such a degree that I would think a life
9  sentence is the appropriate punishment. Anything you
10  thought of or comes to your mind?
11  A. No. Every person is different. You have to
12  consider the factors for that one person in that
13  incident.
14  Q. After having filled out this questionnaire and
15  listened to the Judge's voir dire and had over the
16  weekend to think about it, what is your thought about
17  the prospect of being a juror in a capital murder case
18  where you're called upon to make a decision that a
19  person may have to forfeit their life for a crime you
20  may find they're guilty of?
21  A. I thought I would already have been struck by
22  one of y'all, personally.
23  Q. Why? You may still yet be.
24  A. Well, I know; but because I am in the legal
25  profession, and even though it's the civil side, I don't

1  know. I just thought I would. I've never been
2  through -- I've been on jury duty before, but I've
3  always been struck. It's been years since I served, and
4  I kind of thought I was overdue to serve.
5  Q. Now if, let's say, you were a juror in a case,
6  you're going to be given instructions from the Court,
7  the law. You have to judge the facts yourself. Is
8  there anything about your legal background that you
9  think would make you better equipped or less equipped?
10  A. No. It's just that I kind of understand the
11  process probably more, the way things work in the
12  courtroom.
13  Q. Okay. All right. Obviously, both of us are
14  going to be faced with a decision as to whether or not
15  to accept you or not.
16  A. Right.
17  Q. Can you give me a reason why I should take you
18  as a juror?
19  A. I'm a very fair person. I always try to see
20  both sides. And that's one of the things that my
21  friends tell me about me is that, you always look at
22  both sides.
23  Q. Okay.
24  A. I may have an opinion, but I always weigh both
25  sides.

1  Q. Can you give me some reason why I should not
2  want you as a juror?
3  A. I don't know.
4  Q. Okay. You were a witness to a robbery; is that
5  correct?
6  A. Uh-huh.
7  Q. So you were inside the store when somebody came
8  in and robbed the store?
9  A. Yes.
10  Q. Was that person ever prosecuted?
11  A. I don't know. When the police came, we left.
12  I was with some people from Scotland, and they didn't
13  want to hang around and be detained here to be
14  witnesses.
15  Q. Right, okay. How did that make you feel,
16  seeing a robbery go down?
17  A. Well, I reacted -- I was surprised, because it
18  was kind of scary.
19  Q. Were you the object of the affection of the
20  robber?
21  A. No, no, no. We were in the store, and this guy
22  had been in and left. And we were, you know, on one of
23  the rows where they couldn't really see us. So the guy
24  comes back in, and he knocked everything off the
25  counter. So I said, Get down. And then he --

1  Q. Get down, you're in Houston?
2  A. Right. So the guys got behind, and he ran out
3  the store. And the storekeeper ran after him, and then
4  we went and called 911. And when the police got there,
5  we left.
6  Q. You also indicated you had a friend that had
7  been murdered.
8  A. That was in 1989.
9  Q. Was anybody prosecuted for that offense?
10  A. To this day, no.
11  Q. Was that in Houston?
12  A. She lived in Houston. She was taken from her
13  home, and she was left in Fort Bend County.
14  Q. Okay. Anything about that that would affect
15  your --
16  A. That doesn't have anything to do with this
17  trial.
18  Q. All right. Thank you very much, Miss Cook. I
19  appreciate your time, and I want to pass you to the
20  Court.
21      THE COURT: Mr. Wentz.
22          VOIR DIRE EXAMINATION
23  BY MR. WENTZ:
24  Q. Good morning.
25  A. Morning.

91
1    Q.  As you've been told, my name is Kurt Wentz.
2  And along with Wayne Hill, we're representing Charles
3  Mamou.  And you have your questionnaire with you?
4    A.  Yes, I do.
5    Q.  I'd like to go over it a little bit more, if I
6  might.
7    A.  Okay.  I got kind of tired of completing it
8  near the end.
9    Q.  That's okay.  My questions are going to be at
10  the beginning.
11    A.  Okay.
12    Q.  But before I get there, as you said, you're
13  involved with the legal process.  You know, you come
14  down here quite sophisticated about what's going on in
15  trials and things like that.  You know about the Carla
16  Faye Tucker case, so you know something about capital
17  murder.
18    A.  Well, I don't know all about that case.  I just
19  know what I heard when she was executed from TV.  I
20  didn't follow the case when it happened.
21    Q.  Were you aware that our capital murder cases
22  are handled in the manner that the Judge has outlined
23  for us, or for you?
24    A.  No.  I was very surprised at the jury selection
25  and everything else.  I didn't know that.

92
1    Q.  Did you know anything about the Special Issues
2  that you'd have to answer?
3    A.  Not really, no.  I was in the courtroom during
4  a murder trial in 1993 in Ted Poe's court.
5    Q.  Could you tell us why you were there?
6    A.  My -- it was Billy Ray Clure, who shot his
7  father in one of those health care facilities.  He had
8  gone into a coma.  And my sister is married to Billy's
9  brother, so I was there just for support of the family
10  and to bring family members to and from the court.  But
11  he was acquitted, so --
12    Q.  Did you feel okay being there for this person?
13    A.  Yes.
14    Q.  Did you feel it was the right thing to do?
15    A.  Yes, I did.
16    Q.  Did you feel that -- you indicated he was
17  acquitted.  Did you feel that was the right thing?
18    A.  Under -- there were mitigating circumstances,
19  yes, and I feel it was the right thing to do.
20    Q.  And I think that one of the things you've told
21  us already is that, basically, you look at the person,
22  you look at the circumstances, and then you basically
23  make your judgments and form your opinions.
24    A.  Uh-huh.
25    Q.  Early in the questionnaire, you were asked a

93
1  series of questions; agree, disagree, strongly,
2  whatever.  They're on Page 6; and they're 11, 12, and
3  13.  And basically, you said you generally agree to all
4  of those propositions.  Can you tell me overall why you
5  chose that particular response to the --
6    A.  Because you have to look at that individual and
7  their circumstances.  I didn't grow up the same way you
8  did or the court reporter and the Judge.  We all have
9  different environments we live in even today.  So I
10  think the -- how you live, you know, affects what you
11  do.
12    Q.  One of the things that probably come up in the
13  way that some people live is their exposure to drugs.
14  It may be less.  It may be more.  It probably is an
15  individual matter.  And you're asked a series of
16  questions that touch on the subject of the drugs.  And
17  on Page 10, Question 46, you're asked:  Would an
18  individual's use or sale of drugs prevent them from
19  relying on any defense available to other members of the
20  society?  And you say yes.  You give an explanation.  I
21  was wondering if you could talk with me a little bit
22  about that.
23    A.  Well, in the firm that I work in, we just had a
24  secretary that was a cocaine addict.  She had a child,
25  and she's just had that child taken away from her.  She

94
1  went for rehab for the third or fourth time, but she's
2  had a relapse.  And I used to go in my office every day
3  and close the door.  So, I didn't know what she was
4  going through, what was going on.  But she knew, because
5  she had been on crack cocaine before.  But she still
6  went back after being on it for three years.  I knew she
7  knew that and what it would do to her body and what it
8  could possibly do to her child.
9         I mean, if people -- there is all this
10  stuff today on TV.  People know.  I mean, it's in
11  programs on TV.  It's in the paper.  It's in magazines.
12  It's on billboards.  I mean, it's the law that certain
13  drugs are illegal.  It's not -- unless you were probably
14  somebody foreign that came here and could not read or
15  write, maybe you wouldn't know.  I mean, it's pretty out
16  there.
17    Q.  I think one of the things that this question
18  might have been directed to ask is whether or not if
19  somebody used or sold drugs that they could have
20  available to them at their trial some of the defenses
21  that you or your friends at your law firm might have.
22  In other words, self-defense for an example.  If
23  somebody were, let us say, a drug -- somebody who sold
24  drugs, and they were held up at gunpoint or they were
25  threatened; a gun was put in his face.  Would that

1   person have the right to rely on the self-defense?
2     A. If someone was trying to harm them with a gun,
3   they should have a defense. Even though what they were
4   doing was illegal, no one else has the right to come and
5   shoot them or hurt them.
6     Q. I think that's generally what the question was
7   going to say, but I appreciate you sharing with us what
8   happened with your coworker.
9         In Question Number 68, which is, I think,
10  on Page 13, there is a question about mitigating
11  evidence. And when you were answering that question,
12  what did mitigating evidence mean to you?
13    A. Mitigating, I would have to hear all the facts
14  about that. What happened? Why did they get to this
15  point in their life to get -- for this event to occur?
16    Q. Essentially, the things that are talked about
17  in Special Issue Number Two.
18    A. Right.
19    Q. Okay. Actually, that mitigating evidence can
20  also be taken into consideration, if you think it's
21  appropriate, in Special Issue Number One, if you think
22  it goes to helping you answer Special Issue Number One,
23  as well as how it can come into play in both situations.
24    A. Right.
25    Q. But certainly, Special Issue Number Two, it is

1   given primary importance; because at that point, you're
2   put in the position of essentially answering that life
3   or death question.
4     A. That's pretty serious, too. That's a serious
5   question.
6     Q. I'm going to talk with you about the Special
7   Issues now. One of the things that I've had is we
8   sometimes arrive at decisions about people. And after
9   we come to that decision or that opinion about the
10  person, we're apt to make a lot of other assumptions
11  about the person, and they may not be right.
12    A. Uh-huh.
13    Q. The example that I used the other day was the
14  kid who goes to school, and he does real bad on one of
15  those standardized tests; or he gets to school, and he's
16  just not performing well, and the teacher assigns him to
17  the slower classes. And, you know, the kids say, well,
18  you're in the slow class. You're probably dumb. And
19  people begin to treat him as he's not very bright. But
20  in fact, he may be quite bright. And it's all based on
21  that one initial decision.
22     When you get to Special Issue Number One,
23  you've already formed a pretty important decision in
24  your mind. You've found somebody, a fellow citizen,
25  guilty of capital murder. And having come to that

1   conclusion, it's quite possible for you to look at those
2   Special Issues and say, Hey, these are pretty easy.
3   Somebody who's guilty of a capital murder is going to be
4   a future danger to society. Look what they already have
5   done. How do you feel about that.
6     A. Well, when you get to the Special Issues,
7   that's the punishment phase.
8     Q. Exactly. I'm just saying, at guilt/innocence
9   you've come to this decision that the person is guilty
10  of society's worst crime. And you take that evidence,
11  you take that opinion with you into the punishment
12  phase. And obviously, you're supposed to be starting
13  all over. But, you know, at the very least you've got
14  the evidence of the crime.
15    A. You've already got that in your mind, right.
16    Q. As you've just said, you've already got that in
17  your mind. How do you see Special Issue Number One? Is
18  this something that's already been answered for you, or
19  is this based on your initial decision? You begin to
20  start all over again and look at that question and
21  evidence.
22    A. Well, knowing me, I'd probably look at it when
23  I hear additional information about that person. And
24  that would affect how I answered Number Two. If I'm not
25  going to know his past, you know, if he's been convicted

1   of a crime, drug use, child abuse, if he was abused as a
2   child, what happened to him, then you know, I'd have to
3   take that into consideration. Because I would want that
4   same thing to happen to me if I was in his place. I
5   would want the people to look at all the facts and weigh
6   that, because it's a pretty heavy decision.
7     Q. And I think the Judge told you these decisions
8   that you make are independent of each other. The
9   guilt/innocence decision was its decision. Special
10  Issue Number One is its decision. Special Issue Number
11  Two is its decision.
12    A. Right.
13    Q. And when you look at Special Issue Number One,
14  all of the words in that Special Issue are going to be
15  what they mean to you, except for the definition of
16  proof beyond a reasonable doubt. And the Court's going
17  to give you that definition.
18    A. Right.
19    Q. It's going to be the same definition that you
20  get in the guilt/innocence phase. I'm not sure if they
21  had the definition in 1993. But the words that are
22  defined are the following words: Proof beyond a
23  reasonable doubt, therefore, must be proof of such a
24  convincing character that you would be willing to rely
25  and act upon it without hesitation in the most important

1 of your own affairs.
2        There are some other words; but that
3 certainly, in my opinion, is the crux of it. How do you
4 feel about having to predict somebody's future in terms
5 of whether or not that person is to receive the death
6 penalty?
7    A.  How do I feel about it?  I take it pretty
8 seriously.
9    Q.  Why?  I mean, is it the fact that you're called
10 upon to predict somebody's future?  Is it the
11 consequences?
12    A.  It's a little of both.  It's a little of both,
13 because you have -- I mean, that's going to affect
14 what's going to happen to him.  And I would want, you
15 know, the same considerations for me or somebody that I
16 cared about.  So, I take it very seriously.
17    Q.  I've got no doubt that you would.  In Special
18 Issue Number Two, they talk not only about -- well, they
19 talk about mitigating circumstances; and they say they
20 can come from three different areas; the nature of the
21 crimes, the circumstances of the offense, the
22 defendant's character and background, and his personal
23 moral culpability.  Can you see a circumstance of a
24 crime being mitigating?
25        Let me give you an example.  Somebody goes

1 into a store, just like you said, only the person's
2 crime is a whole lot more aggravated than what you had
3 to witness and experience.  And they go in with the
4 intention of actually shooting the person, and indeed
5 they do.  Therefore, you would have a capital murder.
6        Another person may go into the store not
7 quite with that intention.  They go in to rob the store;
8 but in the course of what happens, guns go off.  I use
9 the example, there is almost a fire fight between
10 different people having guns.  And lo and behold, the
11 same horrible result occurs.  You had the same result,
12 but you have it happening in different circumstances.
13 That might be something that you would consider in terms
14 of the circumstances of the offense, the person who does
15 go in with the intent to kill initially as opposed to
16 one who, ultimately, that happens; and there is no
17 justifying it because it happens in a different way or
18 circumstantially.
19        There may be some aspects of self-defense
20 that doesn't reach the level of finding the person not
21 guilty; but clouds are hanging over your decision, and
22 you think that it might warrant this person to receive
23 life imprisonment.  You see how the circumstances of the
24 crime can come into play?  I'm not saying they would,
25 but could come into play in answering Special Issue

1 Number Two.
2    A.  Yes, I do.
3    Q.  Because I think sometimes there is all this
4 focus on background; but the mitigating evidence could
5 come from other sources, as well.  I'm searching for
6 things to ask you; and I don't want to, you know,
7 belabor your time and, you know, take advantage of your
8 sitting there.  Is there something you think I should
9 ask you?
10    A.  Well, no.  I've never gone through this
11 process, so I don't know what you're supposed to ask me.
12 I do want to make this comment, though:  I do know that
13 even today, that no matter what your age is, you can go
14 out sometime and be in a situation and something could
15 happen to make that life threatening.  Or like kids can
16 go out, you know, and be just going out and be
17 somewhere.  And then a group of kids can come, or some
18 more criminal element.  I'm not saying they're
19 criminals; but things can happen, and things can get to
20 a bad situation when the evening didn't start out that
21 way.  And things do happen; and you can find yourself
22 like that, like that night we were in that store.  We
23 were there just to get some stuff for their hotel room
24 and leave; but, you know, I wasn't ever really that
25 afraid, because the guy didn't have a knife and he

1 didn't have a gun.  So I didn't really think he was
2 going to hurt us.  But, you know, we started out
3 innocent; but we got involved in something that we had
4 no idea it was going to happen.
5    Q.  One of the things that Mr. McClellan mentioned
6 is this thing called the burden of proof, and he was
7 very accurate in saying the defense does not have the
8 burden of proof at guilt/innocence.  We don't have the
9 burden of proof with regards to special Issue Number
10 One, and we're not required to bring you evidence that
11 would prove that there is mitigating circumstances.
12        And I know that you've heard this thing
13 called the defendant's Fifth Amendment right not to
14 testify.  And you understand that also applies at the
15 punishment phase of the trial, because very frequently
16 people will expect to hear feelings of remorse come from
17 the accused on trial and figure that that's very
18 important.  But if you have a Fifth Amendment right and
19 you exercise that right, then obviously you're not going
20 to be expressing those feelings for the jurors.
21    A.  Right.
22    Q.  You wouldn't hold that against a defendant,
23 would you?
24    A.  No, I would not.  I have that right, also; and
25 so do you.

103

1    Q.   Thank you very much.
2         THE COURT:  Thank you, sir.
3         (Court admonishes juror.)
4              JUDITH LYNNE BARNETT,
5    having been first duly sworn, testified as follows:
6              VOIR DIRE EXAMINATION
7    BY THE COURT:
8    Q.   Miss Barnett, how are you this morning?
9    A.   I'm fine, thank you.
10   Q.   Good.  Miss Barnett, at the outset, let me ask
11   you this:  Going back to the things we talked about on
12   Friday, add to them this morning and the things we
13   talked about.  Out of everything we have talked about to
14   this point, do you have any questions at all for me?
15   A.   No.
16   Q.   Is there anything, any topic that we have not
17   yet addressed that you feel as though we need to talk
18   about because it might have some bearing or some
19   influence on your ability to be a juror in this case?
20   A.   No.
21   Q.   Is there anything at all, whether it might be
22   something about your personal life, your professional
23   life, your health, or anything at all for that matter,
24   that you can think of that might in any way interfere
25   with your ability to be a juror in this case during the

104

1    time frame we've talked about?
2    A.   No.
3    Q.   The rules that we've talked about, anything
4    that you've heard so far that causes you some
5    disagreement?
6    A.   No.
7    Q.   The whole idea, I think I said earlier, was
8    just to make sure that starting off the case, everybody
9    recognizes they're going to have to be led to whatever
10   result they reach on the basis of how they evaluate
11   whatever evidence was presented to them.  Does that
12   sound --
13   A.   Yes.
14   Q.   The questions we talked about and the possible
15   verdict, can you see how each question that the jury
16   resolves is independent of how the next question should
17   be answered?
18   A.   Yes, I do.
19   Q.   Any questions of me?
20   A.   No.
21   Q.   Thank you.
22        THE COURT:  Miss Connors.
23
24
25

105

1              VOIR DIRE EXAMINATION
2    BY MS. CONNORS:
3    Q.   Miss Barnett, I'm going to ask you some
4    questions; but I just want you to just relax.  We just
5    want to know how you feel.  Okay.  It's not a test or
6    anything.  What is your opinion of the death penalty?
7    A.   My opinion of the death penalty?
8    Q.   Yes, ma'am.
9    A.   I think it's warranted in certain cases.
10   Q.   And what type of cases would those be?
11   A.   I would think grievous and heinous crimes
12   deserve the death penalty.
13   Q.   You said something in your questionnaire about
14   the things that are important in deciding whether a
15   person should be sentenced to the death penalty or life
16   imprisonment.  And you said, nature of the crime/
17   mitigating circumstances.  What would be the mitigating
18   circumstances in your mind?  What things would be
19   mitigating?
20   A.   A large degree of mental retardation probably.
21   I can't think of anything right offhand, but that one
22   comes to mind.  I'm sure there are others.
23   Q.   You worked for the Texas Department of Human
24   Services for a very long time?
25   A.   Uh-huh.

106

1    Q.   What did you do for them?
2    A.   I started as a case worker and ended up as
3    regional -- deputy regional administrator.
4    Q.   Why did you decide to leave them?
5    A.   I opened my own business here in Houston.
6    Q.   As a case worker, who did you deal with?
7    A.   I dealt with persons applying for Aid to
8    Families with Dependent Children and food stamps.
9    Q.   And throughout the time you worked as a case
10   worker, is that what you dealt with?
11   A.   Yes.
12   Q.   You heard the Judge talk.  And you know that if
13   you find this defendant guilty of capital murder, then
14   there is a choice as to what the punishment should be.
15   And you have to decide Issue Number One.  And Issue
16   Number One is:  Do you find from the evidence beyond a
17   reasonable doubt that a person would commit criminal
18   acts of violence that would constitute a continuing
19   threat to society?
20   A.   Uh-huh.
21   Q.   Do you believe that there are circumstances
22   where you could answer yes, that someone was guilty of
23   capital murder, and also believe that they would not
24   commit criminal acts of violence in the future?
25   A.   Yes.

1    Q.   There is a probability -- I'm sorry.  I used
2  the word probability, because you will never know a
3  hundred percent whether someone --
4    A.   Right.
5    Q.   So the law says, is there a probability that
6  someone would commit criminal acts of violence in the
7  future?  And as the Judge explained to you, you
8  understand probability means more than possibility
9  but --
10    A.   Less than certainty.
11    Q.   -- less than certainty, and more likely than
12  not.  So you understand there would be circumstances
13  where you could say yes, someone was guilty of capital
14  murder, and answer no to the first question?
15    A.   Yes.
16    Q.   Do you also understand that criminal acts of
17  violence could be violence against both persons and
18  property?
19    A.   Yes.
20    Q.   For example, any type of burglary, or some type
21  of perhaps assaultive offense where I punch someone.
22  That would be an act of violence.  And that you believed
23  that a person would -- there is a probability they would
24  commit criminal acts of violence in the future.  If you
25  answer yes to that question, then the defendant would

1  to their heinous, brutal nature.  What did you mean by
2  heinous, brutal nature?
3    A.   That means some crimes are so indescribable in
4  their brutality, in the fact that there is no reason for
5  them other than rage or whatever, that as a punishment,
6  there is only one form of punishment for a certain --
7  for that certain kind of crime, and that is death.
8    Q.   If you believe that the facts of a particular
9  case were of a heinous and brutal nature and you found
10  someone guilty of capital murder, would you wait and
11  listen to the evidence at the second part of the trial
12  before you answered Question Number One?
13    A.   No.
14    Q.   Are you saying that you would always answer
15  that question yes? --
16    A.   Number One?
17    Q.   -- if you found someone guilty of capital
18  murder, or would you wait until you heard the evidence
19  at the punishment stage of the trial before you made
20  that decision?
21    A.   I would wait.
22    Q.   And with respect to the second question, it
23  talks about whether you're going to get a life sentence,
24  basically override the death sentence and give him a
25  life sentence.  And it talks about mitigating evidence.

1  get the death penalty unless -- and the way to get out
2  of that or get around it is your answer to Number Two.
3    A.   Right.
4    Q.   And the law is, there is nothing in there that
5  the State has to prove the answer to you beyond a
6  reasonable doubt to that question.  So what you need to
7  do is look at the facts of the case.  You need to look
8  at the defendant's character and his background, his
9  culpability, involvement, responsibility in the crime,
10  and decide whether all that together warrants that you
11  give a life sentence rather than a death sentence.
12  Could you do that?
13    A.   Yes.
14    Q.   We asked you whether you ever had a different
15  opinion concerning the death penalty, and you said yes.
16    A.   Yes.
17    Q.   What did your opinion used to be?
18    A.   I did not believe that it was warranted under
19  any circumstances.
20    Q.   And what made you change?
21    A.   Life experiences probably, maturity perhaps.
22    Q.   When do you think you made that change?
23    A.   I'd say twenty years ago.
24    Q.   You said, with respect to that sentence, I feel
25  that some crimes should result in the death penalty due

1  And some people think that -- for example, you said if
2  someone was severely retarded, then you might not be
3  able to give the death penalty to someone like that; is
4  that correct?
5    A.   That's correct.
6    Q.   Some other person may think if someone were
7  retarded that they were always going to be that way and
8  the facts wouldn't change, and they may not see that as
9  mitigating.  Someone might think if a person drank to
10  the point where they were drunk and they went out and
11  committed a crime, that's not mitigating because they
12  intentionally got drunk and they committed the crime.
13  Someone else may say, well, they wouldn't have done that
14  had they not been drunk; therefore, in my mind, that's
15  mitigating.  So do you see where different
16  circumstances, people can see the same set of facts and
17  somebody may say it's mitigating and some may say it's
18  not?
19    A.   Absolutely.
20    Q.   Let's talk about a situation where someone is
21  shot one time versus five times or twenty-five times.
22  In your mind, is this a heinous, brutal crime?
23    A.   Well, it's certainly a grave crime, but I --
24  that would not fit my personal definition of heinous.
25    Q.   So I don't know if you followed the case that

1  was tried just last week where someone was stabbed, I
2  believe, over fifty times. Is that something that would
3  be heinous and brutal, in your mind?
4      A.  I assume they died?
5      Q.  Yes, ma'am.
6      A.  That kind of brutality would come close to my
7  definition.
8      Q.  So what I hear you saying, almost, is there has
9  to be extreme brutality before you could consider giving
10  someone the death penalty?
11      A.  No, not -- I think what I meant was that in
12  terms of the death penalty, that it is certainly
13  warranted in those circumstances, heinous, brutal
14  crimes. The law, however, is the law. And whatever the
15  circumstances of a case were, you apply the law, I
16  assume, regardless of my personal definition.
17      Q.  That's right. And could you do that?
18      A.  Yes.
19      Q.  What if it's a senseless crime and the victim
20  is just innocent, totally innocent; but perhaps the
21  facts of the case -- maybe there is one stab wound, one
22  shot. Do you think you could consider the death penalty
23  in that type of crime?
24      A.  Sure.
25      Q.  And you understand that if you answer that he's

1  a continuing -- that there is a probability that he
2  would commit criminal acts of violence in the future
3  yes, and you answer the second question no, that the
4  Judge will then impose a death penalty?
5      A.  Yes.
6      Q.  And you understand. Can you honestly be a part
7  of that process?
8      A.  Yes. I've thought about it in the last few
9  days.
10      Q.  What were your thoughts when you were thinking
11  about it?
12      A.  I have very conflicting situations -- I mean,
13  emotions about it.
14      Q.  Tell me about those, please.
15      A.  It is one thing to be philosophically or
16  theoretically in agreement with something and another
17  thing to raise your hand and actually vote to put
18  somebody to death. However, I have great respect for
19  the law. The situation I find myself in is a grave
20  responsibility, but it is my duty to follow whatever the
21  law is.
22      Q.  Is it a situation that you would rather not be
23  placed in?
24      A.  I think, yes.
25      Q.  So, you would rather not be on the jury?

1      A.  Yes. But it's just, I mean, that's a very
2  honest answer. I can't imagine anybody saying, yes, I
3  would love to do this.
4      Q.  Did you talk to anybody about your feelings
5  this weekend when you were thinking about it?
6      A.  No, not really.
7      Q.  When you say you're a liberal socially, what
8  does that mean?
9      A.  That means that I have no problem with my tax
10  money being spent on programs that uplift and educate
11  people who normally might not have that available to
12  them.
13      Q.  Did you ever work as a social worker?
14      A.  As a case worker, but not as a licensed social
15  worker.
16      Q.  How about your psychology minor in college?
17  Did you ever follow up on that?
18      A.  No.
19      Q.  Do you think you would give any more credence
20  to a psychologist or a psychiatrist than you would to a
21  normal person?
22      A.  I guess it depends on what they were testifying
23  to.
24      Q.  Would you automatically believe everything they
25  said?

1      A.  No, ma'am.
2      Q.  Do you know people that have gone to
3  psychologists or psychiatrists?
4      A.  Yes.
5      Q.  Have you ever gone to one?
6      A.  No.
7      Q.  You talked about a friend of yours who --
8  former business associate -- was convicted of sexual
9  assault on a minor.
10      A.  Uh-huh.
11      Q.  Did you think that person was treated fairly?
12      A.  Yes.
13      Q.  And do you know what his sentence was?
14      A.  Two life terms, I think.
15      Q.  Did you follow the case or --
16      A.  No, just through hearsay, I mean, the office
17  gossip and things.
18      Q.  Was that the Texas Department of Human
19  Services?
20      A.  No.
21      Q.  Where was that?
22      A.  It was A.H.A.N. Home Care.
23      Q.  Miss Burnett, do you know two women, one's name
24  is Risqui, R-I-S-Q-U-I, and the other one is Suzette
25  Barr? She's an auditor for Continental?

1    A.  No, I don't.  I've only been there a short
2  time.
3    Q.  Did you follow the Karla Faye Tucker case?  She
4  was asking the governor to overturn her death sentence?
5    A.  Right, I remember the name; and I don't think
6  it was --
7    Q.  Did you ever have any feelings about that?
8    A.  No.  Now, I remember she was the one that got
9  reformed or --
10    Q.  Right.  What did you think about that?  Did you
11  think the governor should change the death penalty to
12  the life sentence?
13    A.  No, I don't think I did think that.
14    Q.  Why not?
15    A.  I think she had been tried and convicted
16  fairly, and she was guilty; and the sentence was
17  probably prudent.
18    Q.  Why do you think I would want you on this jury?
19    A.  Because I guess I'm in agreement with the death
20  penalty.  I can't think of another reason.
21    Q.  I'm just asking; because obviously, I need to
22  know that.  And I don't want to put your situation
23  where, you know, you couldn't do something.  It's one
24  thing, like you said, to say out here, I believe in all
25  the laws and I could follow the law.  It's another thing

1  to sit in the back of the jury room and make that
2  decision.  So I want to honestly know, if you were in my
3  situation, would you put yourself on the jury?
4    A.  Would I put myself on the jury?
5    Q.  Yes, ma'am.
6    A.  Yes, ma'am, yes, I would.
7    Q.  Do you have any questions?  This is your last
8  chance to ask me questions if you get on this jury until
9  it's over.
10    A.  No.
11    Q.  Thanks, Miss Barnett.  Appreciate your honesty.
12        THE COURT:  Thank you.
13        Mr. Wentz.
14        VOIR DIRE EXAMINATION
15  BY MR. WENTZ:
16    Q.  Good morning.
17    A.  Good morning.
18    Q.  As you've been told, my name is Kurt Wentz.
19  And along with Wayne Hill, we represent Charles Mamou.
20  I'd like, if I could, to give you a copy of your form
21  and maybe go over it just a little bit as we talk.  And,
22  you know, I look at this.  I sort of wonder if you had
23  the benefit of the Judge's talk before you answered it,
24  because everything is extremely logical and follows what
25  you were told this morning, I think.

1        Miss Connors asked you a question.  I
2  think it was her last one.  Would you have any
3  reservations about her putting you on the jury?
4  Something like that.  Why did you answer the question
5  the way that you did?
6    A.  I answered that because, I am very confident in
7  my ability to make fair and impartial judgments.  Also,
8  I'm capable of understanding what's presented to me and
9  coming to a decision.
10    Q.  Okay.  One of the things I noticed in your
11  questionnaire on Page 12 and Page 13, you, on your own,
12  are using the term, mitigating circumstances or
13  nonmitigating crime.
14    A.  Uh-huh.
15    Q.  When you were using that word, what did it mean
16  to you as you used it back when you filled out the
17  questionnaire?
18    A.  Meant to me that there were no circumstances
19  surrounding the commitment of the crime that either, in
20  terms of -- well, I guess the person who committed the
21  crime, that would take away from his or her guilt in
22  terms of -- this is hard.  I'm not very articulate this
23  morning.  In terms of looking at something and saying,
24  this person has only the reasoning level of a
25  four-year-old, for instance.  That would be a mitigating

1  circumstance to me.
2    Q.  Okay.
3    A.  That's the best way to describe it.
4    Q.  As I talk to you, I'm going to talk to you
5  basically about these Special Issues in the death
6  penalty.  But because I do so, I do not want you to
7  think that guilt/innocence is not an issue.  I'm sure if
8  you become a juror in this case, you'll see it's going
9  to be very hotly contested.
10        So just jump forward with me, and let's
11  assume that we are at the punishment phase of a capital
12  murder case.  And when you get to the Special Issues, as
13  the Judge told you, most of the words that you're going
14  to define for yourself.  And you're going to define
15  basically for us, although you're not necessarily going
16  to tell us what they mean, but for your verdict
17  conceivably, with the exception of proof beyond a
18  reasonable doubt.  And this is your first jury
19  experience?
20    A.  Uh-huh.
21    Q.  You get a definition of proof beyond a
22  reasonable doubt.  And one of the paragraphs is -- or it
23  says that proof beyond a reasonable doubt must be proof
24  of such a convincing character that you would be willing

**119**

1   to rely and act upon it without hesitation in the most
2   important of your own affairs. There is more to it; but
3   in my mind, that's the very heart of the definition.
4   And you know that that's the State's burden when it
5   comes to Special Issue Number One.
6           And when you were talking to us about
7   mitigating evidence, you use the obvious. And I don't
8   mean to belittle you, but you said the explanation of
9   mental retardation. Sometimes people will talk about a
10  person's background as conceivably being mitigating.
11  Something about the character can conceivably being
12  mitigating. Something about the crime itself could be
13  mitigating.
14          And obviously, Special Issue Number Two
15  asks you to take that into consideration; but you can
16  also use it in answering Special Issue Number One in
17  terms of whether or not you think that person is going
18  to be a future danger to society. How do you feel about
19  the idea, in essence, determining whether or not
20  somebody might receive the death penalty based on your
21  ability to predict how they're going to act in the
22  future? Because I think that that's exactly what that's
23  asking. How do you feel about that?
24      A.  I'm not particularly comfortable with that
25  responsibility.

**120**

1       Q.  Okay. And, you know, one of the things the
2   District Attorney spoke to you about, you've already
3   reached an incredibly important decision in finding
4   somebody guilty of capital murder. And you then come to
5   this second -- or the first Special Issue; and you're
6   asked, is that person going to be a future danger? You
7   have no -- you've already committed society's worst
8   crime. Are you open then -- and I guess you've told us
9   that that Special Issue isn't necessarily going to be
10  answered yes, is it?
11      A.  No.
12      Q.  When you're thinking about the Special Issue,
13  you're asked to consider the probability of something
14  happening in the future. And you have had it generally
15  spoken to by the Judge this morning. You know it's not
16  a chance, because that would obviously be unfair. And
17  certainly, it's not a certainty, either. But what that
18  word probability means to you is something that could
19  cover a very large area. You would want to be very
20  certain that somebody's going to commit these acts
21  before they would be receiving the death penalty. But
22  what it means to you is what is the most important
23  thing.
24          And as the Judge told you, it's just not
25  any criminal act. It's acts of violence that constitute

**121**

1   a continuing threat to society. One of the things I
2   think we sometimes overlook is the fact that the
3   alternative punishment in these cases is life
4   imprisonment. Do you think people might act differently
5   in prison than they do in the street environment in
6   which they might have committed the crime.
7       A.  Yes.
8       Q.  Would you agree that they would be under a lot
9   more close scrutiny by guards and the rules the prison
10  has that might limit their ability to be a bad person,
11  if you will?
12      A.  Uh-huh.
13      Q.  One of the things that sometimes happens is
14  when you're placed in a prison environment, or even,
15  let's say, a structured institutional environment, you
16  may violate some of the institution's rules. But they
17  may -- those violations may not ascend to the level of
18  an act of criminal violence.
19          Let's say, for example, it might be a
20  crime within T.D.C. to have sugar or something like
21  that. It might be a controlled substance. But in our
22  daily life it's -- we have sugar around our homes. And
23  that's a silly example, but you can see how violating a
24  prison rule might not necessarily be a criminal act of
25  violence.

**122**

1           When you were going over Special Issue
2   Number Two with the Judge and considering this thing
3   called mitigating circumstances, did you ever think of
4   the circumstances of the offense being grounds for this
5   person to be getting a life sentence? And let me -- go
6   ahead.
7       A.  Well, I mean, no, I didn't.
8       Q.  In your mind, could you see how the
9   circumstances of an offense might be such that it would
10  entitle the person to receive a life sentence?
11      A.  Uh-huh, yes.
12      Q.  In other words, there might be some cloud over
13  what happened. And certainly you're convinced and you
14  feel comfortable with the person being found guilty of
15  capital murder, but there might be something about the
16  way the crime unfolded that would cause you to feel that
17  life is the appropriate punishment for that person.
18      A.  Yes.
19      Q.  Is there a question I should be asking you that
20  I haven't?
21      A.  I can't imagine. You're the expert.
22      Q.  Okay. If you told me one, I'd be happy to ask
23  it of you, because I really don't have anything more I'm
24  going to ask you.
25      A.  Okay.

123
```
1    Q.  Okay?
2    A.  Yes.
3    Q.  Thank you.
4         THE COURT:  Thank you.
5         (Court admonishes juror.)
6              LATONYA HARRIS,
7    having been first duly sworn, testified as follows:
8              VOIR DIRE EXAMINATION
9    BY THE COURT:
10   Q.  Miss Harris, how are you feeling?
11   A.  Better.
12   Q.  Miss Harris, there was some stuff that we
13   talked about Friday that we didn't get to visit with you
14   about.  You heard some stuff this morning.  Out of what
15   you have heard so far, do you have any questions for me?
16   A.  No, not really.
17   Q.  We talked -- well, when you say not really,
18   don't suppress them if you have them.
19   A.  I don't have any questions.
20   Q.  We talked -- one of the things that you don't
21   know was, you don't know -- you might have on the
22   questionnaire -- is that if you are selected as a juror,
23   we're going to begin the evidence in the case on Monday,
24   October the 4th.  Everybody, the lawyers for both sides,
25   are satisfied that the whole case will take more than
```

124
```
1    one work week, but no more than two.  So if my -- I'm
2    thinking, in my mind, that's no later than the 15th of
3    October, which is a Friday.  So that's the anticipated
4    duration.
5         I see from your questionnaire that you
6    have a thirteen-month-old.
7    A.  Uh-huh.
8    Q.  Any problems that tending to the child would
9    cause you by being a juror for two weeks?
10   A.  No.  I mean, if I was at work, he would be at
11   daycare, so --
12   Q.  Recognizing that inconvenience perhaps would be
13   different, but nothing that you couldn't overcome?
14   A.  No.
15   Q.  This process that we're in, Miss Harris, I
16   think -- and this is just my notion -- we're trying to
17   set out all of the laws -- not all of them -- but the
18   primary laws that do come into play during the course of
19   a trial like this.  Whether a law does come into play or
20   not will depend upon the testimony presented in the
21   case.
22        We had mentioned the other day, the jury's
23   job is that you determine the credibility of the
24   witnesses.  My job is not to do that.  My job is to
25   listen to what they say.  And it makes no difference
```

125
```
1    whether I believe him or not; but on the basis of what
2    they say, my job is to arm you in the Court's charge
3    with all of the rules that come into play as a result of
4    their testimony.  So out of all those rules that will be
5    in the Court's charge, they're going to be there because
6    of what witnesses said.  But your job, as a juror, is to
7    extract the believable portions of what the witnesses
8    say and, therefore, the laws that are applicable to the
9    believable portions of the testimony and use them in the
10   verdict that you reach.  Have you ever been a juror
11   before?
12   A.  No.
13   Q.  I cut you off before you answered my question
14   about that.
15   A.  No.
16   Q.  The punishment business that we talk about
17   today, you might find it's a little peculiar or a little
18   curious as to why we spent so much time talking about
19   the punishment phase of the trial when I've already told
20   you that if the defendant's not found guilty, we never
21   get to the punishment phase.  So we're talking about it
22   before a determination of guilt is made, and the reason
23   for that is this:  This is the only chance we'll have to
24   talk to you, and we can't talk to you about just the
25   guilt phase and the rules that can come into play, and
```

126
```
1    if you then find the defendant guilty of capital murder,
2    then talk to the jury about the punishment phase;
3    because a juror might say, well, I didn't know that was
4    going to be a rule at this punishment phase.  I'm
5    telling you right now, Judge, I can't follow that rule.
6    That means I'd have to excuse that juror.  That means
7    we'd only have eleven of them.  I got to have twelve.
8    That means it would be a mistrial, and everything we had
9    done would have been a total waste of time.  So that's
10   why we put everything up front.
11        Don't read into the fact we're talking
12   about punishment today before the trial ever starts as
13   being an indication that the defendant's going to wind
14   up pleading guilty, because he's not, or that we've all
15   thrown in the towel on his presumption of innocence,
16   because we have not.
17        This is the only time you'll know how a
18   prospective juror feels from the beginning to the end.
19   With that additional piece of information that you
20   missed the other day, do you have any questions of me so
21   far?
22   A.  Not so far.
23   Q.  Well, I'm going to turn you over to the nice
24   lawyers.  If you have any questions for them, ask them.
25   Okay?
```

127

1    A.   Okay.
2         THE COURT:  Mr. McClellan.
3              VOIR DIRE EXAMINATION
4    BY MR. MCCLELLAN:
5    Q.   Miss Harris, my name is Lyn McClellan.  Along
6    with Claire Connors, we represent the State of Texas in
7    this case.  I want to kind of go over your questionnaire
8    and follow up on some of your answers you had there.  In
9    order to make that a little easier, let me see if I can
10   get a copy of your questionnaire and let you look at
11   Page 11, at the bottom.  It says:  Do you have any
12   religious, moral, ethical considerations that would
13   prevent you from sitting in judgment of another person.
14   See that question?
15   A.   Uh-huh.
16   Q.   And you checked yes and then said, God is the
17   ultimate Judge; so no matter what one thinks, he has the
18   last word.  If that means as a juror, or jury, he
19   decides your fate, then so be it.  Can you tell me what
20   your -- what your thoughts are about that?
21   A.   Well, basically, I feel that we're all put here
22   for a reason.  And if being a juror means that you
23   ultimately have to decide someone's fate, as far as the
24   death penalty or life imprisonment, then that's the way
25   it is.  He's the ultimate Judge, God is.  I'm saying

128

1    that if a prisoner or a person has life imprisonment or
2    the death penalty, regardless of what he does do or how
3    the outcome is, his ultimate fate is not decided by us
4    anyways, so --
5    Q.   Right.  I understand that.  And a lot of people
6    go and say -- some people come and say, I don't think we
7    ought to be judging, because it's not for me to judge.
8    God's going to judge.  God's going to ultimately take
9    care of that situation, so what we do here is of little
10   or no moment.  Do you have -- what is your church's
11   position on the death penalty?  Do you know?
12   A.   Right now I'm not involved in the church.  I'm
13   seeking a new church home, but I'm not currently
14   involved in the church.
15   Q.   What is your position on the death penalty,
16   based on your religious teachings and upbringing?
17   A.   My position is like I stated.  I mean,
18   everything is here for a reason.  It's kind of, in my
19   mind, a way of checks and balance maybe.  I mean, life
20   is just that way.  I mean, the world has become in a way
21   that people do things that cause certain reactions.
22   Q.   Right.
23   A.   And they have to be responsible for their
24   actions.
25   Q.   Now, in that questionnaire it says:  Do you

129

1    have any religious, moral, or ethical considerations
2    that would prevent you from sitting in judgment of
3    another person?  Do you?  You checked yes.
4    A.   I checked yes, only because I truly believe
5    that no matter what we say as individuals -- because we
6    all are critical of one another in a sense -- God is
7    still the ultimate judger.  I mean, regardless of what
8    we'd choose or think that's right for a person, he still
9    controls your destiny and faith.  That's why I checked
10   yes.
11   Q.   Do you mean that whatever is going to happen to
12   the defendant on trial is in God's hands, or do you mean
13   that whatever decision I'm going to make is in God's
14   hands, or both?
15   A.   Kind of both.
16   Q.   Okay.  All right.  I'm trying to get a feeling
17   for what your thoughts are.  So, your position is the
18   outcome of this case is, God possibly already knows what
19   it is.  Would that be right or wrong?
20   A.   That's a positive in my -- the way I would
21   feel.
22   Q.   That's what you would feel.  Okay.  And that
23   whenever going through this process, we're going through
24   the process and God is going to decide and direct
25   everybody.  And that's how it's going to end up.  Is

130

1    that the way --
2    A.   Well, I mean, I just feel that, personally, all
3    of our destiny and faith has been chosen.  So if we are
4    here to say whether he gets the death penalty or life
5    imprisonment, that's the way it's set.  I mean, I can't
6    say that's fair or unfair.  It's just the way it should
7    be.
8    Q.   How does that relate to, if it does, your
9    ability to be on a jury and listen to evidence and make
10   your decision based on the evidence that you hear and
11   the law given to you by the Court?  Would you be able to
12   go through that type process?  In other words, the law
13   says you have to take an oath to be a juror, to a true
14   verdict render based on the law given to you by the
15   Court and the evidence from the witness stand.
16        Somebody else might say, well, I'm going
17   to be guided by what God tells me to do, and I'm really
18   not concerned about these other things.  I'm just trying
19   to get a feel for where you are in this relationship.
20   A.   I think, given the evidence or the testimony in
21   the case and the laws, I think -- I guess with
22   everything stated as facts, I could say whether or not
23   this person deserves or does not deserve the death
24   penalty.
25   Q.   Okay.  Do you think the death penalty is an

1 appropriate punishment for certain types of crimes?
2    A.  For certain types of crimes, yes, I do.
3    Q.  What kinds of cases or types of crimes do you
4 think it's proper for?
5    A.  I would think it would be proper in a case such
6 as someone who has no regard for human life; cannot,
7 will not, refuses, is not even open to the thought of
8 being rehabilitated.  So something like that, yes, I
9 would think they would deserve it.
10    Q.  How do you think you would know whether someone
11 is open to be rehabilitated?  What do you think would be
12 helpful in making that determination?
13    A.  I guess if I had information on that person, as
14 far as what their life was like previously, the
15 circumstances involving the incident.
16    Q.  Page 12, Question Number 58, it says:  What are
17 your feelings about the death penalty?  You said, It is
18 a form of checks and balance system that sometimes is
19 given justly and sometimes not.  What comes to mind when
20 you think of where it's not given justly?  Do you have
21 some things in mind or cases in mind you've heard about?
22    A.  Well, I mean, you hear about people being
23 wrongly accused of things.  And before we got DNA
24 evidence and certain things like that, people were
25 executed wrongly.  So sometimes it was given unjustly

---

1 and sometimes it was --
2    Q.  How does that square with God is the ultimate
3 determiner?  I mean, God ultimately guides and directs
4 us the way we're going.
5    A.  That's my personal thought on it, I mean; but
6 ultimately, if that's your fate, that's your fate.  If
7 my fate is to walk out from this building, then get hit
8 by a car, that's my fate.  So I can't say --
9    Q.  Do you think you have any control over your
10 fate?  Anything you can do to change that or alter that,
11 cause it to be?
12    A.  Yes.
13    Q.  Okay.  What control do you think you have?
14    A.  I think, given your inner sense, that you can
15 tell wrong from right.  You know, you can keep yourself
16 out of a lot of problems.
17    Q.  You indicated, also, on Page 9 about, ever had
18 someone, a friend or family member, convicted of a
19 crime?  You said your brother was convicted of a felony,
20 but it was dismissed after the whole truth came out?
21    A.  Uh-huh.
22    Q.  What felony was he convicted of?
23    A.  I think it was some harmful endangerment to a
24 child.
25    Q.  Injury to a child?

---

1    A.  Injury to a minor, something like that.
2    Q.  And you say he was convicted of it.  Was he
3 convicted or charged with it?
4    A.  He actually went to jail for it.  And he stayed
5 in jail for a year before, I guess, his case came back
6 up.  And when all the evidence was presented, at that
7 time they dismissed the charges completely.
8    Q.  What came back?  What came up that changed?
9    A.  Because at the time his now wife, but
10 girlfriend at the time, didn't tell the whole truth
11 about the story.  And, of course, when the child was
12 involved, it was like no question the child was injured
13 in the act; but my brother didn't purposely injure the
14 child.
15    Q.  What injury did the child sustain?
16    A.  Well, it involved gasoline.  And I guess the
17 baby, at the time, went into -- he started throwing up
18 and suffered inhalation.
19    Q.  Is the child okay now?
20    A.  Yeah, he's fine.
21    Q.  How old was the child at the time?
22    A.  Possibly a couple of months old.
23    Q.  Anything in your life experiences or anything
24 in your beliefs that would keep you from being a juror
25 in a case like this?

---

1    A.  I really don't -- I mean, I've heard some of
2 the things that was said about the case; but I really
3 don't know the gist of the whole case.  I mean, I don't
4 think there is anything that would prevent me from being
5 a juror.
6    Q.  You understand the jurors would be called upon
7 to make decisions that, in answer to those questions,
8 could result in the death penalty being imposed?  Some
9 people come and say, well, I don't think I could ever
10 make that type of life or death decision.  I don't think
11 it's my position.  I don't think I could ever get
12 evidence that would ever convince me sufficiently to
13 make that type of decision.
14        Other people say, well, I'd have to hear
15 what they have to say.  How do you feel?
16    A.  I honestly couldn't tell you.  I couldn't tell
17 you until I was -- I knew everything.  I couldn't say
18 one way or the other that I could make that decision or
19 not.
20    Q.  One last thing is the burden of proof on the
21 State is beyond a reasonable doubt.  We must prove our
22 case beyond a reasonable doubt.  That's the same burden
23 in every criminal case throughout, whether it be child
24 endangerment, whether it be theft, whether it be capital
25 murder, or whatever.  Some people would say, because in

1  a death penalty case, seeking the actual punishment,
2  that they would require a higher burden of proof because
3  we're seeking a higher level of punishment.
4          If we're just trying to decide whether or
5  not to send somebody to the penitentiary or how much
6  time they spend in jail, that would be one thing; but
7  we're talking about taking their life. They would
8  require a higher amount of evidence. Even though the
9  law says the burden is the same, they would still
10  require more to make that life and death type decision.
11  How do you feel about that?
12      A.  I think it should be the same.
13      Q.  Thank you, ma'am.
14          MR. MCCLELLAN:  And I'll pass the
15  venireman.
16          THE COURT:  Thank you.
17          Mr. Wentz.
18          VOIR DIRE EXAMINATION
19  BY MR. WENTZ:
20      Q.  Good morning.
21      A.  Good morning.
22      Q.  As you've been told, my name is Kurt Wentz.
23  This is Charles Mamou. And Wayne Hill will also be
24  representing Charles in the case. You have a copy of
25  the questionnaire with you, and I'm going to go over

1  that with you in just a little bit. But as we started,
2  I think you've told us a lot of important things about
3  you. And I think you basically, to sum up, you are a
4  person who has a great deal of faith in God, and
5  religion is very important to you; but you've told us
6  that you could sit here and listen to the evidence and
7  make a decision based on the evidence and the law that
8  is given to you by the Judge. Does that pretty well sum
9  up what you've told us?
10      A.  Yes.
11      Q.  And that's at the guilt/innocence phase, and at
12  the punishment phase, also. I'm going to do something
13  that's maybe a little bit backwards, so excuse me for
14  doing it in this backwards way. I'm going to talk to
15  you mostly about the punishment phase of a capital
16  murder case. But I don't want you to think that I'm in
17  any way conceding Charles' guilt or innocence in this
18  particular case. Because if you become a juror, I think
19  you will find that it will be hotly contested, if you
20  will. Okay?
21          You understand from the Judge's
22  explanation that these Special Issues each are to be
23  answered independently of one another. In other words,
24  they have their own answer. There is nothing automatic
25  about them. In other words, sometimes there is a

1  problem. If somebody feels they're guilty of capital
2  murder, that the answers to those Special Issues are
3  pretty well answered already, that somebody who would be
4  guilty of capital murder would necessarily be a future
5  danger to society, or somebody who is guilty of capital
6  murder, there is no reason why they should ever get a
7  life sentence. And I think that you can understand from
8  the explanation that that's not really the way this
9  whole process works. You take the evidence and you
10  apply it to each situation independently. Would you
11  agree?
12      A.  Yes.
13      Q.  And I think one of the things that is so
14  important is the Special Issues that you have to decide,
15  they're based in words that we don't have any definition
16  for, as attorneys, except for proof beyond a reasonable
17  doubt. So what the words mean for you is what they mean
18  for you. You use the word probability, quite
19  conceivably, in your daily life fairly frequently. And
20  I think the Judge has indicated to you in this
21  situation, in this context, it means certainly more than
22  a chance, but not necessarily a hundred percent
23  certainty. But when you look at it in the context of
24  what we're doing, deciding whether or not somebody might
25  lose their life, I think you can understand why it has a

1  certain magnitude to it, a certain importance. Would
2  you agree?
3      A.  Yes.
4      Q.  And it certainly is, at the very least, more
5  likely than not. Would you agree?
6      A.  Yes.
7      Q.  In Special Issue Number Two, had you thought or
8  used the word mitigating before in terms of thinking
9  about how you might punish somebody for what they had
10  done?
11      A.  No.
12      Q.  Do you understand how the word is used in this
13  context for answering the Special Issues, in a sense,
14  punishing somebody?
15      A.  After listening to the Judge, yes.
16      Q.  And one of the things that's possible is to
17  listen to the facts of the case, the circumstances of
18  the offense, the way it's put in Special Issue Number
19  Two, and consider whether or not there is something that
20  in and of itself might warrant somebody receiving a life
21  sentence. Do you think there could conceivably be
22  something in the case itself that might warrant somebody
23  receiving a life sentence?
24      A.  Yes.
25      Q.  And sometimes we talk about the character and

**139**

1   background of somebody. And when it comes out of a
2   lawyer's mouth, it comes out as some cheap cliche. We
3   don't intend it as a cheap cliche. We go, oh, he's got
4   a bad background. And here comes the bad background
5   excuse everyone. Here it comes. Could you honestly
6   consider somebody's background in answering Special
7   Issue Number Two, or is it, as I demeaningly referred to
8   it as, a cheap cliche?
9       A.  I think I would have to consider their
10  background.
11      Q.  Do you understand why I make that negative --
12  and I don't mean to be insulting, but sometimes he
13  didn't get what he wanted as a child; therefore, you
14  know, give him everything he asks for as an adult?
15      A.  I understand what you're saying with that; but
16  I mean, when you say background, I'm thinking, has this
17  person committed serious crimes before? What was the
18  severity of the crime? That kind of thing. I'm not
19  thinking of --
20      Q.  Did he get cake for his birthday?
21      A.  Yeah, that kind of thing.
22      Q.  Could you see sometimes somebody's background,
23  how they were raised in their family circumstance could
24  actually also be a mitigating circumstance?
25      A.  Yes, I can.

**140**

1       Q.  Let me just look at your questionnaire for a
2   second or two. You're asked on Page 6 to agree or
3   disagree with some statements. And one of them, No. 13,
4   is: Anyone can overcome a neglectful and abusive
5   childhood. And you said you generally agree with that.
6   Can you tell me why you formed that opinion or why you
7   believe that?
8       A.  Because sometimes abuse and neglect can be so
9   severe that, mentally, they can't overcome it. It's
10  just no way of unlocking all of that in the mind, and
11  that's why I say I generally agree.
12      Q.  Okay. On Page 17 you're asked: Do you believe
13  that mitigating evidence should be used? And you very
14  honestly put undecided when you filled the questionnaire
15  out. Can you tell me why you answered that question in
16  that particular manner?
17      A.  On Page 13?
18      Q.  Yes, on Question 68.
19      A.  Because at that time I didn't clearly
20  understand what mitigating, in that sense, meant.
21      Q.  And is there anything about you that you think
22  I should know and Charles should know before we make up
23  our mind in deciding whether or not you should be on
24  this jury?
25      A.  Anything like -

**141**

1       Q.  Anything you want to tell us, anything you
2   think we should know.
3       A.  Covers such a broad --
4       Q.  I'm phrasing it as broadly as possible.
5       A.  Well, I mean --
6       Q.  I've giving you as many options as I can.
7       A.  I don't know. I mean, I don't know what you're
8   asking.
9       Q.  I'm just asking you, is there something you
10  would like to tell me about yourself you think I should
11  know about you before I sit down and not ask anymore
12  questions?
13      A.  That I'm a sincere person. A lot of things I
14  believe, I believe strongly in my heart. So if I
15  believe it, it's just --
16      Q.  Just that?
17      A.  Just that.
18      Q.  Do you think somebody can be rehabilitated even
19  if they've committed a serious crime?
20      A.  Yes, I do.
21      Q.  Thank you very much.
22              THE COURT:
23              (Court admonishes juror.)
24
25

**142**

1   THE STATE OF TEXAS  )
2   COUNTY OF HARRIS    )
3           I, Pamela Kay Knobloch, Official/Deputy
    Official Court Reporter in and for the 179th District
4   Court of Harris County, State of Texas, do hereby certify
    that the above and foregoing contains a true and correct
5   transcription of all portions of evidence and other
    proceedings requested in writing by counsel for the
6   parties to be included in this volume of the Reporter's
    Record, in the above-styled and numbered cause, all of
7   which occurred in open court or in chambers and were
    reported by me.
8
        I further certify that this Reporter's Record
9   of the proceedings truly and correctly reflects the
    exhibits, if any, admitted by the respective parties.
10
    I further certify that the total cost for the
11  preparation of this Reporter's Record is $_____ and
    was paid by Harris County.
12
        WITNESS MY OFFICIAL HAND this the _____ day of
13  _____, 2000.
14
15
16  Pamela Kay Knobloch, Texas CSR No. 1650
    Expiration date: 12/31/2000
17  Official Court Reporter, 179th District Court
    Harris County, Texas
18  301 San Jacinto
    Houston, Texas 77002
19  713.755.6340
20  APPELLANT:  CHARLES MAMOU, JR.
                CAUSE NO. 800112
21
22
23
24
25

## $

**$10,000** [1] 34:10
**$_____** [1] 142:11

## 0

**0470500** [1] 2:5

## 1

**1** [1] 85:6
**10** [1] 93:17
**100** [1] 81:6
**103** [1] 3:3
**11** [3] 1:2 93:2 127:11
**111** [2] 3:18 3:20
**11th** [1] 69:10
**12** [3] 93:2 117:11 131:16
**12/31/2000** [1] 142:16
**13** [6] 78:6 93:3 95:10 117:1 140:3 140:17
**13396100** [1] 2:3
**15th** [1] 124:2
**1650** [1] 142:16
**17** [1] 140:12
**179th** [3] 1:11 142:3 142:17
**1960** [1] 2:19
**1989** [1] 90:8
**1993** [2] 92:4 98:21
**1998** [1] 5:1
**1999** [2] 1:18 30:7

## 2

**2** [2] 78:13 85:9
**2000** [1] 142:13
**201** [1] 2:7
**2039** [5] 29:7 29:7 29:25 30:9 30:10
**20th** [1] 1:18
**21179300** [1] 2:18
**25** [1] 1:2
**281.587.0088** [1] 2:21

## 3

**301** [1] 142:18
**33** [1] 60:11

## 4

**46** [1] 93:17
**4615** [1] 2:14
**49** [1] 72:10
**4:00** [1] 18:17
**4th** [2] 69:9 123:24

## 5

**5629** [1] 2:19
**58** [1] 131:16
**59656300** [1] 2:13

## 6

**6** [2] 93:2 140:2
**65** [1] 64:7
**68** [3] 61:22 95:9 140:18

## 7

**7** [1] 5:1
**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 142:19
**77002** [2] 2:8 142:18
**77027** [1] 2:15
**77069** [1] 2:20

## 8

**800112** [1] 1:3 142:20
**8:00** [1] 18:14

## 9

**9** [2] 60:13 132:17
**911** [1] 90:4

**_____** [1] 142:12

**_____**
**_____**
**_____** [1] 142:15

## A

**A.H.A.N.** [1] 114:22
**Aberration** [2] 35:13 83:16
**Abilities** [2] 82:11 86:5
**Ability** [12] 46:18 59:5 69:22 71:4 72:3 76:21 103:19 103:25 117:7 119:21 121:10 130:9
**Able** [7] 24:20 57:3 65:12 70:19 71:18 110:3 130:11
**Above-entitled** [1] 1:19
**Above-styled** [1] 142:6
**Absolute** [1] 70:22
**Absolutely** [5] 29:12 34:18 54:16 54:19 110:19
**Abuse** [2] 98:1 140:8
**Abused** [1] 98:1
**Abusive** [1] 140:4
**Accept** [2] 29:21 88:15
**Accepting** [1] 30:1
**Accident** [3] 33:21 33:22 77:6
**Accomplishments** [1] 19:3
**Account** [1] 26:5
**Accurate** [1] 102:7
**Accused** [2] 102:17 131:23
**Acquitted** [2] 92:11 92:17
**Act** [13] 16:4 49:11 65:18 83:14 98:25 107:22 119:1 119:21 120:25 121:4 121:18 121:24 133:13
**Actions** [1] 128:24
**Acts** [25] 9:4 15:21 15:24 16:15 16:18 17:10 17:10 17:16 18:11 18:19 18:24 19:6 19:11 49:2 49:12 83:5 83:9 106:18 106:24 107:6 107:16 107:24 112:12 120:20 120:25
**Actual** [1] 135:1
**Addict** [1] 93:24
**Addition** [1] 34:9
**Additional** [6] 37:11 39:17 82:4 82:5 97:23 126:19
**Addressed** [3] 46:10 73:13 103:17
**Administrator** [1] 106:3
**Administrators** [1] 19:1
**Admitted** [2] 41:9 142:9
**Admonishes** [4] 67:11 103:3 123:5 141:23
**Adult** [1] 139:14
**Advantage** [1] 101:7
**Affairs** [2] 99:1 119:2
**Affect** [4] 72:3 90:14 97:24 99:13
**Affection** [1] 89:19
**Affects** [1] 93:10
**Affluent** [3] 52:9 53:20 53:22

**Afraid** [2] 69:24 101:25
**Age** [7] 23:3 53:4 53:7 77:20 85:19 85:24 101:13
**Aggravated** [3] 48:19 66:2 100:2
**Ago** [15] 51:9 51:12 108:23
**Agree** [15] 3:17 23:1 39:13 40:1 57:14 86:22 93:1 93:3 121:8 131:11 138:2 138:5 140:2 140:5 140:11
**Agreement** [9] 3:2 3:3 3:12 72:7 72:9 72:10 72:12 112:16 115:19
**Agrees** [1] 37:8
**Ahead** [2] 7:17 122:6
**Aid** [1] 106:7
**Aided** [1] 1:22
**Ain't** [2] 26:19 26:21
**Alcohol** [6] 52:16 52:18 52:20 85:5 85:8 85:11
**Allegation** [5] 31:25 32:1 33:15 65:20 66:8
**Allegations** [2] 66:5 66:7
**Alleged** [3] 4:24 65:7 77:14
**Alleges** [1] 81:8
**Allergies** [1] 75:4
**Allows** [1] 63:23
**Almost** [2] 100:9 111:8
**Altar** [1] 83:12
**Alter** [1] 132:12
**Alternative** [1] 121:3
**Amendment** [2] 102:13 102:18
**Amount** [1] 135:8
**Anger** [1] 36:15
**Answer** [74] 7:15 8:25 10:4 10:5 10:8 10:18 10:19 13:10 13:22 13:24 14:1 14:4 14:5 14:10 14:20 15:19 16:16 19:17 20:8 21:12 21:17 21:18 21:20 21:22 25:6 25:7 25:8 25:20 25:22 26:3 26:12 26:24 26:24 27:9 27:9 27:10 27:24 28:11 28:13 28:13 31:2 31:8 31:10 47:14 48:24 49:15 49:19 49:20 54:17 57:3 57:4 57:5 58:21 69:4 74:7 74:15 74:15 76:17 82:18 92:2 95:22 106:22 107:14 107:25 108:2 108:5 109:14 111:25 112:3 113:2 117:4 134:7 136:24
**Answered** [29] 8:21 11:21 11:24 20:5 20:6 27:19 28:22 28:24 30:6 30:8 47:10 49:6 52:7 55:1 56:24 62:5 62:17 78:23 97:18 97:24 104:17 109:12 116:23 117:6 120:10 125:13 136:23 137:3 140:15
**Answering** [8] 5:10 82:19 95:11 96:2 100:25 119:16 138:13 139:6
**Answers** [7] 9:8 10:3 38:23 55:15 75:14 127:8 137:2
**Anticipated** [3] 70:7 70:11 124:3
**Anytime** [2] 32:12 32:13
**Anyway** [1] 23:3
**Anyways** [1] 128:4
**Apartment** [1] 24:10
**Apologize** [1] 68:17
**Appellant** [2] 1:6 142:20
**Appellee** [1] 1:11
**Applicable** [1] 125:8
**Applied** [1] 7:8
**Applies** [3] 77:16 80:6 102:14
**Apply** [6] 70:9 75:15 75:15 77:11 111:15 137:10
**Applying** [1] 106:7

**Appreciate** [3] 90:19 95:7 116:11
**Appropriate** [20] 9:25 11:23 12:1 13:7 14:9 25:5 27:19 28:1 28:4 28:5 36:24 37:14 37:23 38:17 63:25 78:10 87:9 95:21 122:17 131:1
**Apt** [1] 96:10
**Area** [2] 41:1 120:19
**Areas** [1] 99:20
**Arm** [3] 51:1 51:2 125:2
**Arms** [1] 5:20
**Arrest** [3] 40:5 43:18 43:20
**Arrested** [2] 40:7 40:11
**Arrive** [3] 8:19 36:23 96:8
**Arsons** [1] 17:11
**Articulate** [1] 117:22
**Ascend** [1] 121:17
**Aside** [1] 51:6 70:20
**Aspect** [6] 40:20 45:11 79:18 80:15 83:24 86:22
**Aspects** [3] 28:2 75:15 100:19
**Assault** [2] 77:18 114:9
**Assaultive** [1] 107:21
**Assaults** [1] 17:8
**Assessing** [2] 37:17 38:9
**Assigns** [1] 96:16
**Assistant** [2] 2:6 4:20
**Assisting** [1] 5:10
**Associate** [3] 68:12 71:23 114:8
**Assume** [5] 37:25 69:8 111:4 111:16 118:11
**Assumptions** [1] 96:10
**Assure** [4] 55:16 71:16 71:18 71:24
**Attack** [1] 79:23
**Attention** [2] 70:1 71:21
**Attorney** [2] 4:18 120:2
**Attorneys** [6] 2:6 2:10 2:22 4:21 51:19 138:14
**Auditor** [1] 114:25
**Automatic** [1] 136:24
**Automatically** [4] 49:6 55:10 77:23 113:24
**Automobile** [2] 17:12 17:15
**Available** [9] 48:11 76:1 77:1 77:21 77:25 78:14 93:9 94:20 113:11
**Aware** [4] 46:15 62:17 73:18 91:21
**Awful** [1] 34:18

## B

**Baby** [2] 16:6 133:17
**Background** [29] 9:13 37:1 37:12 38:6 49:24 51:21 52:22:23 74:19 82:10 82:23 83:11 84:6 88:8 99:22 100:1 108:8 119:10 139:1 139:4 139:4 139:6 139:10 139:16 139:22
**Backgrounds** [1] 62:4
**Backwards** [2] 136:13 136:14
**Bad** [9] 8:14 8:15 23:2 54:2 96:14 101:20 121:10 139:4 139:4
**Bag** [4] 40:4 40:12 40:12 42:22
**Balance** [2] 128:19 131:18
**Ballistically** [1] 43:21
**Bank** [5] 40:2 40:3 40:6 40:12 40:12
**Barnett** [5] 103:4 103:8

103:10 105:3 116:11
**Barr** [1] 114:25
**Based** [22] 6:19 14:14 28:
2 28:14 31:2 37:19 38:11 42:
2 45:17 59:5 74:7 74:16 79:
21 81:5 96:20 97:19 119:20
128:16 130:10 130:14 136:7
137:15
**Basing** [1] 55:12
**Basis** [5] 30:6 30:8 47:4
104:10 125:1
**Basketball** [1] 50:22
**Bat** [1] 17:14
**Bearing** [4] 46:11 68:6 73:
14 103:18
**Beating** [1] 17:14
**Became** [1] 61:2
**Become** [6] 29:2 29:10 70:
17 118:8 128:20 136:18
**Becomes** [1] 30:22
**Becoming** [1] 57:25
**Began** [4] 38:15 39:2 56:
23 68:16
**Begin** [9] 47:22 56:23 67:
23 67:24 69:9 71:7 96:19 97:
12 123:23
**Beginning** [4] 13:4 14:8
91:10 126:18
**Begins** [3] 30:22 74:6 74:
14
**Behind** [3] 18:10 18:15 90:
2
**Behold** [1] 100:10
**Belabor** [1] 101:7
**Beliefs** [2] 57:11 133:24
**Believable** [2] 125:7 125:
9
**Belittle** [1] 119:8
**Bend** [1] 90:13
**Benefit** [1] 116:23
**Berra** [1] 26:19
**Best** [3] 70:22 78:7 118:3
**Better** [5] 61:12 70:10 70:
14 88:9 123:11
**Between** [7] 3:2 18:2 49:8
72:9 85:12 86:12 100:9
**Beyond** [46] 9:2 12:14 12:
24 13:9 13:12 13:18 13:23
14:16 14:22 14:25 15:20 16:
21 17:25 17:25 19:21 32:8 39:
2 41:21 41:25 42:4 42:8 42:
13 42:25 43:25 44:23 48:25
58:24 65:22 65:24 66:6 80:
17 81:9 81:16 81:22 83:1 83:
5 98:16 98:22 106:16 108:5
118:18 118:22 118:24 134:21
134:22 137:16
**Billboards** [1] 94:12
**Billy** [1] 92:6
**Billy's** [1] 92:8
**Binge** [1] 87:3
**Birthday** [1] 139:20
**Bit** [8] 8:19 60:15 64:4 91:
5 93:21 116:21 136:1 136:13
**Blame** [1] 74:10
**Board** [3] 8:23 29:19 29:21
**Bob** [1] 1:20
**Bodies** [1] 82:20
**Body** [4] 27:7 34:24 43:22
94:7
**Bottom** [1] 127:11
**Box** [1] 45:15
**Boy** [3] 83:12 83:13 85:24
**Breaking** [1] 17:13
**Breath** [1] 30:13
**Briefly** [1] 31:17
**Bright** [2] 96:19 96:20
**Bring** [3] 45:22 92:10 102:
10

**Broad** [5] 17:21 34:4 34:
13 36:22 141:3
**Broadly** [1] 141:4
**Brooks** [1] 3:20
**Brother** [3] 92:9 132:19
133:13
**Brought** [2] 4:8 7:4
**Brown** [1] 42:24
**Brutal** [7] 64:14 109:1
109:2 109:9 110:22 111:3
111:13
**Brutality** [6] 55:4 64:10
64:16 109:4 111:6 111:9
**Building** [6] 17:12 17:14
42:1 42:5 42:15 132:7
**Bumped** [2] 13:15 13:24
**Bumps** [1] 13:19
**Burden** [12] 79:24 80:13
80:14 80:17 102:6 102:8 102:
9 119:4 134:20 134:22 135:2
135:9
**Burden's** [1] 83:3
**Burdette** [1] 1:20
**Burglaries** [1] 17:13
**Burglarized** [2] 51:12 51:
13
**Burglary** [3] 49:13 77:18
107:20
**Burnett** [1] 114:23
**Burning** [1] 17:11
**Business** [7] 7:21 31:16
38:21 69:14 106:5 114:8 125:
16

## C

**Cake** [1] 139:20
**Cannot** [7] 15:9 15:14 29:
1 29:2 31:1 39:15 131:6
**Capable** [1] 117:8
**Capital** [85] 4:25 5:2 9:1
10:21 13:1 13:5 13:8 14:8
16:22 17:7 19:17 20:1 21:4
24:9 25:18 27:23 28:21 30:
12 31:15 31:18 31:18 31:20
32:11 32:18 33:3 33:9 33:11
33:12 33:15 34:2 37:3 37:8
38:2 38:3 38:21 44:16 44:21
47:9 48:13 48:14 48:17 48:
20 48:22 49:5 51:20 52:16
52:22 53:5 53:7 53:22 55:4
55:7 55:10 55:23 59:2 61:
24 65:8 65:9 65:10 66:2 81:
23 83:7 83:14 85:11 86:11
87:17 91:16 91:21 96:25 97:
3 100:5 106:13 106:23 107:
13 109:10 109:17 118:11 120:
4 122:15 126:1 134:24 136:
15 137:1 137:4 137:5
**Car** [5] 24:11 40:3 40:4 50:
2 132:8
**Care** [5] 41:18 41:22 92:7
114:22 128:9
**Cared** [1] 99:16
**Career** [1] 35:10
**Cares** [2] 41:19 41:23
**Carla** [2] 76:9 91:15
**Carload** [1] 50:23
**Carry** [1] 77:9
**Carved** [1] 33:14
**Carving** [1] 33:13
**Case** [134] 4:16 5:2 5:6 6:
20 9:6 9:19 9:21 10:2 10:25
14:9 18:21 20:14 20:22 20:
25 22:2 22:6 22:8 23:6 25:4
26:2 26:6 26:13 26:17 27:14
27:20 28:3 28:9 28:15 28:20
29:6 30:7 30:19 31:3 32:15
32:19 33:1 35:20 36:12 37:3
37:17 37:20 37:24 38:12 38:
17 39:5 41:5 41:19 41:22 41:
23 44:16 44:17 45:5 45:14
45:18 46:12 46:18 47:13 47:
19 47:19 48:5 48:23 49:23

50:1 50:5 50:21 51:4 51:7
55:7 57:10 57:18 57:21 58:1
58:15 62:10 62:23 63:6 63:7
63:11 67:22 68:7 68:9 68:9
69:13 70:10 70:16 70:21 71:
4 73:15 73:22 74:8 75:13 75:
16 77:14 83:10 87:17 88:5
91:16 91:18 91:20 103:19
103:25 104:8 106:2 106:6
106:9 108:7 109:9 110:25
111:15 111:21 113:14 114:15
115:3 118:8 118:12 123:23
123:25 124:21 127:7 129:18
130:21 131:5 133:4 133:25
134:2 134:3 134:22 134:23
135:1 135:24 136:16 136:18
138:17 138:22
**Cases** [21] 14:13 22:2 22:
18 24:16 48:12 48:13 64:12
75:24 75:25 76:5 76:25 77:
15 77:20 77:24 78:10 91:21
105:9 105:10 121:3 131:3
131:21
**Categories** [1] 57:19
**Category** [5] 17:2 17:3
17:18 17:21 17:22
**Causes** [2] 12:7 45:8 74:
25 87:2 104:4
**Certain** [26] 15:16 17:1
17:2 17:12 48:18 50:16 69:
16 75:15 76:14 76:14 77:20
81:6 81:20 81:21 82:7 94:12
105:9 109:6 109:7 120:20
128:21 131:1 131:2 131:24
138:1 138:1
**Certainly** [13] 16:23 17:
7 34:19 36:1 44:4 95:25 99:
3 110:23 111:12 120:17 122:
17 137:23 138:23
**Certainty** [9] 15:15 16:4
16:12 80:20 80:22 107:10
107:11 120:17 137:23
**Certify** [3] 142:4 142:8
142:10
**Chain** [1] 66:19
**Chairs** [2] 25:15 45:14
**Chambers** [1] 142:7
**Chance** [7] 56:12 67:2 67:
5 116:8 120:16 125:23 137:22
**Change** [8] 12:6 12:22 84:
18 108:20 108:22 110:8 115:
11 132:10
**Changed** [1] 133:8
**Changes** [1] 12:4
**Character** [17] 9:13 24:7
36:25 37:12 38:6 49:25 62:
11 82:9 82:21 83:11 84:6 98:
24 99:22 108:8 109:8 111:9
111:18 138:25
**Charge** [12] 6:1 6:2 6:15
6:16 6:17 6:18 7:8 7:9 7:20
14:24 125:2 125:5
**Charged** [2] 4:23 133:3
**Charges** [1] 133:7
**Charles** [9] 1:5 4:17 57:
18 91:2 116:19 135:23 135:
24 140:22 142:20
**Charles'** [2] 57:21 136:17
**Cheap** [3] 139:2 139:3 139:
8
**Check** [2] 78:7 81:23
**Checked** [5] 78:9 127:16
129:3 129:4 129:9
**Checking** [1] 81:19
**Checklist** [1] 81:18
**Checks** [2] 128:19 131:18
**Child** [17] 77:19 93:24 93:
25 94:8 98:1 98:2 124:8 132:
24 132:25 133:11 133:12 133:
14 133:15 133:19 133:21 134:
23 139:13
**Childhood** [1] 140:5
**Children** [1] 106:8
**Choice** [3] 10:6 10:11 106:

14
**Choose** [1] 129:8
**Chose** [3] 52:17 78:13 93:5
**Chosen** [1] 130:3
**Church** [3] 128:12 128:12
128:14
**Church's** [1] 128:10
**Circumstance** [9] 9:24
41:12 43:6 50:9 84:11 99:23
118:1 139:23 139:24
**Circumstances** [40] 9:11
9:24 24:6 35:1 35:6 36:25
38:16 41:13 47:12 49:7 50:
10 66:18 75:23 80:8 84:4 84:
12 92:18 92:22 93:7 99:19
99:21 100:12 100:14 100:23
102:11 105:17 105:18 106:21
107:12 108:19 110:16 111:13
111:15 117:12 117:18 122:3
122:4 122:9 131:15 138:17
**Circumstantial** [12] 40:
16 41:3 41:10 41:16 41:19
42:11 43:23 44:2 44:5 44:14
44:19 44:22
**Circumstantially** [1]
100:18
**Citizen** [2] 24:17 96:24
**Citizens** [1] 19:12
**Civil** [5] 58:4 74:22 79:3
80:25 87:25
**Claim** [1] 42:0
**Claire** [6] 2:4 4:21 48:3
57:2 75:12 127:6
**Class** [1] 96:18
**Classes** [1] 96:17
**Clearly** [2] 52:21 140:19
**Cliche** [3] 139:2 139:3
139:8
**Close** [4] 60:17 94:3 111:
6 121:9
**Closely** [1] 66:18
**Cloud** [1] 122:12
**Clouds** [1] 100:21
**Clure** [1] 92:6
**Cocaine** [2] 93:24 94:5
**Coconspirators** [3] 39:
15 39:16 39:19
**Coconspirators'** [1] 40:
18
**College** [1] 113:16
**Coma** [1] 92:8
**Combat** [1] 26:10
**Comfort** [1] 6:11
**Comfortable** [4] 18:1 72:
1 119:24 122:14
**Coming** [6] 23:4 30:3 67:
10 74:4 74:6 117:9
**Comment** [1] 101:12
**Commission** [5] 39:20 39:
24 40:11 40:14 84:10
**Commit** [23] 8:10 9:4 15:
21 15:24 16:15 16:18 16:22
39:13 39:13 49:2 49:11 53:
22 83:4 83:9 85:11 86:11 86:
21 106:17 106:24 107:6 107:
24 112:2 120:20
**Commitment** [3] 24:25 26:
14 117:19
**Commits** [2] 3:22 53:5
**Committed** [28] 8:3 8:9 8:
18 11:8 17:1 17:20 24:9 25:
23 31:23 32:24 35:7 35:11
40:19 52:16 52:22 53:7 77:
12 82:6 82:7 85:6 85:24 110:
11 110:12 117:20 120:7 121:
6 139:17 141:19
**Common** [1] 79:1
**Communities** [2] 18:3 18:4
**Community** [5] 18:2 19:9
19:10 43:7 43:11
**Comparative** [1] 22:21

**Comparison** [1] 15:7
**Competent** [1] 71:25
**Completely** [2] 27:16 29:22 133:7
**Completing** [1] 91:7
**Complicated** [1] 6:9
**Computer** [1] 1:22
**Conceding** [1] 136:17
**Conceivably** [7] 61:8 65:17 118:18 119:10 119:11 137:19 138:21
**Conceive** [1] 47:5
**Concentrate** [2] 69:22 70:20
**Concentration** [2] 72:4 82:17
**Concept** [2] 39:10 39:11
**Concepts** [2] 48:8 48:10
**Concern** [4] 5:4 55:5 68:16 72:3
**Concerned** [5] 3:4 34:14 64:6 72:11 130:18
**Concerning** [3] 51:20 61:23 108:15
**Concerns** [2] 70:19 72:5
**Conclusion** [6] 6:16 10:22 11:20 23:5 29:7 29:9 30:14 30:17 44:17 97:1
**Condemning** [1] 59:23
**Conduct** [9] 17:19 17:21 17:22 23:25 23:25 24:1 41:12 65:4 66:5
**Conducted** [1] 81:3
**Confession** [2] 41:6 41:8
**Confident** [1] 117:6
**Confinement** [5] 34:6 34:7 34:10 37:18 38:10
**Conflicting** [1] 112:12
**Confuse** [1] 80:18
**Confused** [1] 52:5
**Connect** [5] 39:19 39:24 40:10 40:14 40:19
**Connected** [1] 66:18
**Connection** [2] 85:12 86:12
**Conners** [1] 75:12
**Connors** [15] 2:4 3:6 3:22 3:23 4:22 47:25 48:2 48:3 56:13 72:14 72:15 104:22 105:2 117:1 127:6
**Consequences** [1] 99:11
**Consider** [32] 17:25 37:16 37:22 37:25 38:9 38:15 38:19 38:21 38:22 38:23 49:23 51:6 51:24 52:11 53:25 54:2 54:3 54:7 54:11 61:10 63:3 64:8 79:14 84:8 87:12 100:13 111:9 111:22 120:13 138:19 139:6 139:9
**Consideration** [10] 9:10 26:15 29:3 29:11 29:12 29:14 88:4 95:20 98:3 119:15
**Considerations** [3] 99:15 127:12 129:1
**Considered** [3] 30:17 51:21 65:25
**Considering** [2] 24:14 122:2
**Consistent** [1] 30:10
**Consistently** [1] 20:11
**Conspire** [1] 39:13
**Constant** [2] 12:3 83:22
**Constitute** [5] 9:5 19:12 49:3 106:18 120:25
**Constitutes** [1] 17:23
**Contact** [1] 18:7
**Contained** [2] 12:5 30:7
**Contains** [1] 142:4
**Contested** [2] 118:9 136:

19
**Context** [6] 15:17 19:14 61:15 137:21 137:23 138:13
**Continental** [1] 114:25
**Continuing** [10] 9:5 17:23 19:12 83:4 83:8 83:17 84:24 106:18 112:1 121:1
**Contrary** [1] 37:25
**Control** [3] 69:1 132:9 132:13
**Controlled** [1] 121:21
**Controls** [1] 129:9
**Conversation** [3] 13:25 21:13 44:18
**Convey** [2] 39:10 46:25
**Conveyed** [1] 27:22
**Convict** [1] 35:8
**Convicted** [13] 13:8 34:2 34:4 40:8 77:24 97:25 114:8 115:15 132:18 132:19 132:22 133:2 133:3
**Conviction** [1] 39:14
**Convince** [4] 78:22 80:12 80:12 134:12
**Convinced** [1] 122:13
**Convincing** [2] 98:24 118:25
**Cook** [4] 73:1 73:5 75:11 90:18
**Cooter** [1] 42:24
**Copy** [4] 78:5 116:20 127:10 135:24
**Correct** [8] 50:19 55:14 69:19 70:13 89:5 110:4 110:5 142:4
**Correctly** [1] 142:9
**Cost** [1] 142:10
**Counsel** [1] 142:5
**Counter** [1] 89:25
**Country** [1] 24:21
**County** [12] 1:8 1:21 4:25 19:13 34:24 81:20 82:8 90:13 142:2 142:4 142:11 142:17
**Couple** [6] 5:13 12:11 24:11 31:16 35:22 133:22
**Course** [21] 12:9 18:8 31:24 32:2 32:24 33:10 35:9 65:11 66:9 66:12 66:16 69:10 70:3 74:17 77:2 79:3 81:21 82:8 100:8 124:18 133:11
**Court** [54] 1:3 1:5 3:1 3:7 3:9 3:11 3:14 3:19 3:22 3:24 4:1 4:4 4:6 4:9 46:4 47:25 56:15 67:8 67:11 67:15 71:10 72:8 72:14 72:17 72:19 72:21 72:24 73:4 79:13 88:6 90:20 90:21 92:4 92:10 93:8 103:2 103:3 103:7 104:22 116:12 123:4 123:5 123:9 127:2 130:11 130:15 135:16 141:22 141:23 142:3 142:4 142:7 142:17 142:17
**Court's** [13] 6:1 6:2 6:14 6:15 6:17 6:18 7:7 7:9 7:20 14:24 98:16 125:2 125:5
**Courthouse** [1] 34:15
**Courtroom** [3] 11:13 88:12 92:3
**Cover** [1] 120:19
**Covers** [1] 141:3
**Coworker** [1] 95:8
**Coworkers** [1] 18:7
**Crack** [1] 94:5
**Created** [1] 80:3
**Credence** [1] 113:19
**Credibility** [2] 7:1 124:23
**Credible** [4] 6:23 7:7 7:8 43:1
**Crime** [70] 8:4 8:9 8:10 8:17 16:19 17:1 17:3 17:17

4 17:7 17:21 17:22 23:2 25:24 33:13 33:14 35:6 35:7 35:10 36:17 37:5 39:13 39:25 40:11 40:15 40:19 48:18 50:8 55:1 63:12 63:14 64:10 76:14 77:12 77:24 82:6 82:15 82:20 84:10 85:6 85:25 86:21 86:22 87:19 97:10 97:14 98:1 99:24 100:2 100:24 105:16 108:9 109:7 110:11 110:12 110:20 110:23 111:19 111:23 117:13 117:19 117:21 119:12 120:8 121:6 121:20 122:16 132:19 139:18 141:19
**Crimes** [14] 17:2 35:15 39:14 55:2 77:2 99:21 105:11 108:25 109:3 111:14 131:1 131:2 131:3 139:17
**Criminal** [33] 9:4 15:21 15:25 16:4 16:15 16:18 17:10 17:10 17:16 17:18 18:17 18:19 18:24 19:6 19:11 32:3 35:10 41:5 49:2 53:9 79:6 82:10 101:18 106:17 106:24 107:6 107:16 107:24 112:2 120:25 121:18 121:24 134:23
**Criminals** [1] 101:19
**Critical** [1] 129:6
**Critically** [1] 35:23
**Cross-examination** [1] 79:23
**Cross-examining** [1] 80:2
**Crux** [1] 99:3
**CSR** [1] 142:16
**Culpability** [6] 9:14 49:25 50:6 84:9 99:23 108:9
**Cure** [1] 23:10
**Curious** [1] 125:18
**Cut** [1] 125:13
**Cynthia** [1] 3:3

# D

**Daily** [2] 121:22 137:19
**Danger** [11] 21:5 25:25 27:12 27:12 47:11 55:25 59:25 97:4 119:18 120:6 137:5
**Dangerous** [1] 53:8
**Date** [4] 69:11 81:20 82:7 142:16
**Daycare** [1] 124:11
**Days** [3] 36:5 46:20 112:9
**Dead** [1] 34:24
**Deal** [4] 16:9 26:16 106:6 136:4
**Dealing** [2] 4:15 7:20
**Dealt** [2] 106:7 106:10
**Death** [103] 10:1 10:8 10:18 10:23 11:24 14:6 20:12 20:16 21:2 21:3 21:5 22:3 22:10 23:16 23:24 24:15 25:6 26:2 27:15 28:8 28:9 28:11 28:17 28:17 28:23 31:10 34:3 43:23 47:16 48:10 49:16 49:19 50:11 51:22 55:1 55:7 55:11 59:4 61:25 63:9 63:24 64:5 64:9 64:18 64:19 64:19 75:20 75:25 76:7 76:1 76:13 77:1 77:11 77:16 77:21 77:23 77:25 78:8 78:9 78:13 78:16 78:23 80:10 80:13 84:14 84:19 84:24 96:3 99:5 105:6 105:7 105:12 105:15 108:1 108:15 108:18 109:24 110:3 111:1 111:12 111:22 112:4 112:18 115:4 115:11 115:19 118:5 119:20 121:25 137:24 130:2 128:11 128:15 130:4 130:23 130:25 131:17 134:8 134:10 135:1 135:10
**December** [1] 4:25
**Decide** [16] 5:4 7:14 49:18 54:11 58:22 62:12 65:6 84:25 85:17 106:4 106:15

108:10 127:23 129:24 135:4 137:14
**Decided** [2] 59:21 128:3
**Decides** [2] 83:19 127:19
**Deciding** [6] 29:13 51:22 64:8 105:14 137:24 140:23
**Decision** [40] 8:8 8:20 27:3 30:1 30:3 45:17 54:10 57:12 63:10 76:22 78:20 79:1 79:11 79:21 80:24 81:5 82:3 87:18 88:14 96:9 96:21 96:23 97:9 97:19 98:6 98:9 98:9 98:10 98:11 100:21 109:20 116:2 117:9 120:3 129:13 130:10 134:10 134:13 134:18 135:10 136:7
**Decisions** [12] 22:23 26:22 26:25 54:21 54:22 55:22 70:2 76:17 85:21 96:8 98:7 134:7
**Defendant** [93] 2:22 3:13 3:16 4:5 4:7 5:4 5:5 5:7 8:6 9:1 9:4 9:7 10:8 10:13 12:25 13:1 13:18 15:21 15:23 15:24 16:14 16:17 16:21 17:20 19:17 20:1 20:4 21:14 21:15 21:21 22:19 22:21 24:8 24:9 25:23 29:1 29:2 29:10 30:11 30:16 30:24 32:11 32:17 32:20 35:4 37:1 37:7 37:9 37:12 38:2 38:3 38:7 39:19 39:24 41:6 41:6 43:2 43:8 43:13 43:17 43:18 43:20 44:1 44:20 47:8 47:11 47:15 48:22 49:2 50:1 50:6 54:15 55:9 55:23 62:12 72:20 72:23 76:20 79:7 80:15 81:7 81:20 82:6 82:15 82:17 83:4 85:5 85:19 102:22 106:13 107:25 126:1 129:12
**Defendant's** [21] 8:13 20:12 23:7 24:7 25:17 25:24 37:17 38:4 38:9 39:22 41:14 49:24 51:21 61:24 82:9 84:6 99:22 102:13 108:8 125:20 126:13
**Defendants** [5] 10:16 11:7 12:10 42:6 57:20
**Defense** [7] 33:19 70:9 77:6 79:23 86:19 93:19 95:1 95:3 102:7
**Defenses** [1] 94:20
**Define** [8] 7:14 7:19 7:22 15:6 65:4 66:4 118:15 118:15
**Defined** [11] 7:10 7:12 12:16 14:24 15:3 15:4 17:25 22:14 22:15 23:21 98:22
**Definitely** [3] 48:13 56:8 63:19
**Definition** [13] 33:9 59:2 59:23 98:15 98:17 98:19 98:21 100:24 111:7 111:16 118:22 119:3 137:15
**Degree** [7] 24:13 24:22 25:4 45:8 74:1 87:8 105:20
**Deliberate** [1] 37:14
**Deliberates** [1] 37:6
**Deliberating** [1] 6:3
**Deliberation** [1] 11:15
**Demeaningly** [1] 139:7
**Department** [2] 105:23 114:18
**Dependent** [1] 106:8
**Deputy** [1] 106:3
**Describe** [1] 118:3
**Desert** [1] 24:19
**Deserve** [4] 30:6 105:12 130:23 131:9
**Deserved** [1] 76:11
**Deserves** [1] 130:23
**Destiny** [3] 69:1 129:9 130:3
**Detailed** [2] 4:14 5:19
**Detained** [1] 89:13

**Determination** [3] 51:8 125:22 131:12
**Determine** [4] 22:8 38:4 64:1 124:23
**Determined** [3] 43:21 62:11 63:12
**Determiner** [1] 132:3
**Determines** [2] 20:13 37:7
**Determining** [3] 29:13 59:3 119:19
**Detract** [1] 69:22
**Develop** [1] 60:6
**Developed** [1] 53:11
**Dictate** [2] 27:10 80:10
**Died** [1] 111:4
**Dies** [3] 30:15 36:7 64:20
**Difference** [6] 23:15 40:17 42:10 42:11 64:18 124:25
**Different** [45] 5:19 10:25 11:1 11:8 11:9 11:10 11:11 11:16 12:7 14:3 16:9 18:3 27:5 27:11 27:13 34:25 35:1 35:2 35:3 35:19 52:25 53:2 53:3 53:14 53:14 54:6 54:1 54:8 54:9 61:8 66:21 80:16 85:14 86:3 86:25 87:1 87:11 93:9 99:20 100:10 100:12 100:17 108:14 110:15 124:13
**Differently** [3] 11:9 35:16 121:4
**Dinkins** [6] 46:1 46:5 48:3 52:1 55:6 67:8
**Dire** [16] 1:15 46:3 48:1 56:16 67:14 71:11 73:3 75:9 87:15 90:22 103:6 105:1 116:14 123:8 127:3 135:18
**Direct** [7] 41:2 41:3 41:19 42:10 43:3 44:22 129:24
**Directed** [1] 94:18
**Directs** [1] 132:3
**Disabilities** [2] 82:11 86:5
**Disagree** [2] 93:1 140:3
**Disagreement** [2] 40:24 104:5
**Disagreements** [1] 40:20
**Discomfort** [2] 45:9 75:2
**Discretion** [2] 10:7 10:12
**Discussed** [2] 46:19 70:20
**Dismissed** [2] 132:20 133:7
**Distinction** [3] 7:23 18:1 18:2
**Distractions** [2] 71:17 71:19
**District** [7] 1:5 1:11 2:6 4:21 120:2 142:3 142:17
**DNA** [1] 11:2 131:23
**Doctor** [1] 72:22
**Done** [12] 8:13 19:24 33:10 58:13 61:6 63:14 63:20 68:21 97:5 110:13 126:9 138:10
**Door** [2] 67:2 94:3
**Doubt** [52] 9:3 12:14 12:16 12:25 13:9 13:12 13:18 13:24 14:16 14:23 15:1 15:20 16:17 21:10 25:17 25:20 32:9 39:23 41:21 41:25 42:5 42:8 42:13 42:25 44:1 44:23 49:1 51:5 58:24 58:25 65:22 65:24 66:6 80:4 80:18 81:9 81:16 81:23 83:2 83:14 83:1 98:16 98:23 99:17 106:17 108:6 118:19 118:23 118:24 134:21 134:22 137:17
**Doubts** [1] 76:21
**Down** [19] 7:14 7:17 20:16 21:6 22:3 24:10 35:19 36:19 41:15 42:14 42:17 57:18 58:8 86:1 89:16 89:25 90:1 91:14 141:11
**Dozen** [1] 42:7

**Dr** [2] 69:7 72:10
**Drag** [1] 42:18
**Drank** [1] 110:9
**Drawing** [1] 30:13
**Drew** [1] 30:13
**Drink** [1] 87:2
**Drinking** [2] 42:22 52:23
**Drive-by** [1] 50:19
**Driver** [1] 40:2
**Driving** [1] 24:10
**Drug** [2] 60:18 94:23 98:1
**Drug-related** [1] 60:18
**Drugs** [13] 52:16 52:18 52:21 52:23 85:5 85:8 85:10 93:13 93:16 93:18 94:13 94:19 94:24
**Drunk** [3] 110:10 110:12 110:14
**Drunker** [1] 42:23
**Drunks** [2] 42:16 42:18
**Due** [1] 108:25
**Duly** [5] 46:2 67:13 73:2 103:5 123:7
**Dumb** [1] 96:18
**Duration** [2] 70:12 124:4
**During** [22] 6:2 12:9 18:8 31:24 32:2 32:3 32:4 32:7 32:24 33:10 35:9 46:19 71:4 77:14 77:17 77:17 77:18 81:21 82:8 92:3 103:25 124:18
**Duty** [3] 77:19 88:2 112:20

---

## E

**Early** [2] 23:3 92:25
**Easier** [1] 127:9
**Easy** [1] 97:2
**Ed** [1] 86:6
**Educate** [1] 113:10
**Effect** [1] 85:17
**Eighty-five-year-old** [1] 35:22
**Either** [9] 9:8 17:5 28:13 32:19 35:17 43:15 49:13 117:19 120:17
**Elects** [1] 79:15
**Element** [1] 101:18
**Elements** [3] 81:8 81:11 81:13
**Eleven** [1] 126:7
**Eligibility** [4] 29:11 29:14 30:18 30:20
**Eligible** [2] 29:3 29:11
**Elizabeth** [1] 3:20
**Emotions** [1] 112:13
**Emphasis** [1] 82:14
**End** [5] 27:18 72:4 91:8 126:18 129:25
**Endangerment** [2] 132:23 134:24
**Ended** [1] 106:2
**Ends** [1] 23:19
**Enforce** [2] 45:6 74:2
**Enron** [1] 42:15
**Entirely** [1] 11:16
**Entitle** [1] 122:10
**Entitled** [5] 10:20 16:24 16:25 19:6 26:14
**Environment** [3] 121:5 121:14 121:15
**Environments** [1] 93:9
**Equally** [2] 11:7 70:9
**Equals** [1] 48:19
**Equipped** [2] 88:9 88:9
**Erased** [1] 13:2
**Escapes** [1] 18:17
**Essence** [1] 119:19

**Essentially** [2] 95:16 96:2
**Establish** [2] 41:14 63:2
**Establishes** [1] 42:12
**Ethical** [2] 127:12 129:1
**Evaluate** [5] 24:25 45:16 45:18 84:3 104:10
**Evaluating** [1] 29:16
**Evaluation** [2] 12:8 30:22
**Evaluations** [4] 29:15 29:18 29:22 30:2
**Evening** [1] 101:20
**Event** [5] 9:1 28:20 28:21 28:22 95:15
**Events** [1] 66:19
**Evidence** [159] 5:8 6:16 8:2 8:7 9:2 9:10 9:19 9:21 11:14 12:8 12:14 12:18 12:22 13:3 13:9 13:12 13:18 13:19 13:23 14:12 14:15 14:22 14:25 15:19 16:16 16:23 20:22 21:9 23:1 23:4 23:19 24:4 24:25 25:2 26:7 26:10 26:11 26:12 26:16 27:4 27:7 28:14 30:6 31:3 35:9 36:20 37:4 37:11 37:13 37:19 38:7 38:11 39:1 39:1 39:6 39:17 39:20 41:0 40:13 40:15 40:16 40:17 40:18 41:2 41:2 41:3 41:3 41:10 41:11 41:11 41:16 41:18 41:20 42:11 43:24 43:25 44:5 44:17 44:19 44:20 49:22 50:12 51:7 51:17 51:21 50 51:24 52:2 52:24 53:13 53:13 54:11 54:22 55:14 56:2 56:7 59:19 61:23 65:5 65:6 65:13 65:17 65:21 66:23 74:7 74:14 74:16 76:23 78:21 79:14 79:21 79:25 80:11 81:3 82:5 82:5 82:9 83:1 83:3 84:16 85:3 85:4 85:14 85:17 86:2 86:5 86:15 87:6 95:17 97:21 101:4 102:10 104:11 106:16 109:11 109:18 109:25 119:7 123:23 130:9 130:10 130:15 130:20 131:24 133:6 134:12 135:8 136:6 136:7 137:9 140:13 142:5
**Ex** [1] 35:8
**Ex-convict** [1] 35:8
**Exactly** [17] 10:13 11:13 11:14 11:14 12:7 22:16 22:25 23:4 33:9 34:23 35:5 42:20 43:5 62:8 67:22 97:8 119:22
**EXAMINATION** [15] 1:15 46:3 48:1 56:16 67:14 71:11 73:3 75:9 90:22 103:6 105:1 116:14 123:8 127:3 135:18
**Example** [20] 10:10 11:12 18:9 22:13 22:25 35:21 40:1 42:14 47:9 48:19 52:15 84:15 94:22 96:13 99:25 100:9 107:20 110:1 121:19 121:23
**Examples** [1] 76:3
**Exceed** [1] 34:10
**Except** [5] 33:9 58:25 78:9 98:15 137:16
**Exception** [1] 118:18
**Exclusive** [1] 6:25
**Exclusively** [2] 39:15 40:9
**Excuse** [10] 31:22 32:6 32:23 33:8 33:19 36:12 67:9 126:6 136:13 139:5
**Excused** [7] 3:4 3:15 4:6 24:2 72:11 72:22 72:24
**Excusing** [1] 23:24
**Executed** [2] 91:19 131:25
**Execution** [1] 76:19
**Exercise** [2] 45:2 102:19
**Exhibits** [1] 142:9

**Exist** [9] 6:13 21:10 28:2 28:3 28:4 34:19 41:2 47:12 66:24
**Existed** [2] 38:12 47:11
**Existence** [7] 16:21 17:19 32:9 32:14 32:22 69:21 69:21
**Exists** [8] 16:23 20:14 20:18 25:3 28:14 40:23 44:6 47:17
**Expect** [3] 7:17 80:10 102:16
**Experience** [7] 58:9 58:13 58:17 60:25 72:1 100:3 118:20
**Experiences** [1] 108:21 133:23
**Experiments** [1] 81:2
**Expert** [1] 122:21
**Expiration** [1] 142:16
**Explain** [1] 48:6
**Explained** [1] 107:7
**Explanation** [4] 93:20 119:8 136:22 137:8
**Exposure** [1] 93:13
**Expressing** [1] 102:20
**Extent** [3] 50:25 68:8 80:23
**Extract** [2] 7:7 125:7
**Extreme** [4] 55:2 55:2 83:20 111:9
**Extremely** [1] 116:24
**Eyewitness** [3] 40:15 41:4 44:2
**Eyewitnesses** [2] 42:7 43:4
**Eyewitnesses'** [1] 42:9

---

## F

**Face** [1] 94:25
**Faced** [1] 88:14
**Facet** [1] 40:24
**Facilities** [1] 92:7
**Facing** [1] 58:7
**Fact** [9] 5:1 6:15 6:24 37:9 96:20 99:9 109:4 121:2 126:11
**Factors** [2] 85:12 87:12
**Facts** [18] 6:25 35:19 37:23 48:14 49:8 49:23 51:7 78:18 88:7 95:13 98:5 108:7 109:8 110:8 110:16 111:21 130:22 138:17
**Faintest** [1] 40:23
**Fair** [4] 47:7 88:19 117:7 130:6
**Fairly** [4] 68:14 114:11 115:16 137:19
**Faith** [3] 129:9 130:3 136:4
**Families** [4] 52:9 53:20 53:23 106:8
**Family** [7] 10:7 54:1 82:12 92:9 92:10 132:18 139:23
**Fannin** [1] 2:7
**Far** [12] 39:7 58:11 68:1 73:11 74:25 84:3 104:4 123:15 126:21 126:22 127:23 131:14
**Fashion** [1] 64:14
**Fate** [8] 127:19 127:23 128:3 132:6 132:6 132:7 132:8 132:10
**Father** [1] 92:7
**Favor** [2] 76:13 78:12
**Faye** [3] 76:9 91:16 115:3
**Fear** [1] 69:15
**Feature** [11] 11:5 20:14 20:15 20:18 25:3

**Features** [1] 32:9
**Feelings** [8] 54:25 58:4 60:7 102:16 102:20 113:4 115:7 131:17
**Fellow** [1] 96:24
**Felonies** [1] 32:5
**Felony** [5] 31:24 32:10 33:11 132:19 132:22
**Felt** [1] 63:19
**Few** [3] 48:4 78:10 112:8
**Field** [1] 42:15
**Fifteen** [5] 43:10 43:16 56:20 57:7 86:1
**Fifth** [2] 102:13 102:18
**Fifty** [2] 35:22 111:2
**Fight** [1] 100:9
**Figure** [2] 44:11 102:17
**Filled** [3] 87:14 117:16 140:14
**Finally** [1] 36:5
**Financial** [1] 69:14
**Financially** [1] 68:21
**Findings** [1] 26:1
**Fine** [4] 16:10 34:10 103:9 133:20
**Fingerprint** [4] 11:1 11:4 11:6 44:6
**Fingerprints** [4] 11:2 40:13 44:3 44:4
**Finished** [1] 44:25
**Fire** [2] 24:11 100:9
**Fired** [3] 43:12 43:19 43:22
**Firing** [1] 50:24
**Firm** [2] 93:23 94:21
**First** [48] 5:3 8:1 8:5 8:18 9:12 9:17 10:5 10:10 10:15 10:15 13:10 13:16 14:1 14:2 14:4 14:10 14:19 14:20 19:16 19:18 19:25 20:8 20:20 29:10 31:17 37:5 44:25 46:2 46:5 48:25 49:23 56:4 58:2 58:21 58:22 65:1 67:13 73:2 73:5 75:18 76:8 78:7 81:15 103:5 107:14 118:19 120:5 123:7
**Fit** [2] 45:16 110:24
**Five** [14] 31:7 31:12 34:8 35:8 36:13 38:10 38:15 46:22 51:9 53:12 69:17 78:6 78:13 110:21
**Fix** [1] 36:3
**Flip** [1] 38:1
**FM** [1] 2:19
**Focus** [5] 8:2 8:7 8:9 8:10 101:4
**Folks** [4] 4:15 22:19 23:8 28:19
**Follow** [13] 45:6 45:10 71:1 74:2 75:13 91:20 112:20 113:17 114:15 115:3 115:25 126:5 127:8
**Followed** [2] 66:19 110:25
**Following** [3] 1:18 79:18 98:22
**Follows** [6] 46:2 67:13 73:2 103:5 116:24 123:7
**Food** [1] 106:8
**Forearmed** [1] 6:8
**Foreclose** [1] 27:25
**Foregoing** [1] 142:4
**Foreign** [1] 94:14
**Forever** [1] 23:12
**Forewarned** [1] 6:7
**Forfeit** [1] 87:19
**Form** [8] 59:19 65:9 76:13 78:1 92:23 109:6 116:20 131:18
**Formed** [2] 96:23 140:6

**Former** [1] 114:8
**Fort** [1] 66:14 90:13
**Forty** [12] 29:4 29:4 29:5 29:6 29:8 29:9 29:16 30:14 30:17 31:1 31:7 35:8
**Forty-five-year-old** [1] 35:8
**Forty-year** [1] 29:16 31:1
**Forward** [2] 80:11 118:10
**Four** [4] 11:13 11:15 11:16 117:25
**Four-year-old** [1] 117:25
**Fourth** [1] 94:1
**Frame** [5] 46:19 69:8 71:4 73:22 104:1
**Frankly** [3] 4:14 29:8 78:14
**Free** [4] 18:11 18:18 18:23 19:6
**Freeway** [1] 2:14
**Frequently** [2] 102:15 137:19
**Frets** [1] 36:4
**Friday** [5] 5:12 12:15 12:17 46:5 67:24 67:25 69:10 69:11 73:6 73:7 103:12 123:13 124:3
**Friend** [3] 90:6 114:7 132:18
**Friends** [3] 50:23 88:21 94:21
**Front** [1] 126:10
**Frustrated** [1] 5:20
**Full** [2] 71:21 72:3
**Fully** [1] 53:10
**Future** [28] 15:21 15:24 16:5 16:19 16:22 17:1 21:4 25:24 27:12 27:12 47:11 49:11 55:25 59:6 59:25 83:14 97:4 99:1 99:10 106:24 107:7 107:24 112:2 119:18 119:22 120:6 120:14 137:4

## G

**Gasoline** [1] 133:16
**Gathering** [1] 74:21
**General** [1] 78:8
**Generally** [9] 5:11 61:16 78:12 78:12 93:3 95:6 120:14 140:5 140:11
**Gentlemen** [1] 4:10
**Getaway** [2] 40:2 50:2
**Girl** [1] 35:11
**Girlfriend** [1] 133:10
**Gist** [1] 134:3
**Given** [18] 5:9 5:25 6:17 7:2 23:16 26:6 82:2 85:18 88:6 96:1 130:11 130:14 130:20 131:19 131:24 132:14 136:8
**GLEN** [1] 46:1
**God** [9] 127:16 127:25 129:6 129:18 129:24 130:17 132:2 132:3 136:4
**God's** [4] 128:8 128:8 129:1 129:1 132:12 129:13
**Golly** [1] 52:20
**Gossip** [1] 114:17
**Governor** [4] 29:24 29:25 115:4 115:11
**Graduated** [1] 68:13
**Granted** [3] 29:14 30:18 30:21
**Grave** [2] 110:23 112:19
**Great** [4] 16:12 44:3 112:18 136:4
**Greater** [2] 33:12 34:9
**Grew** [1] 82:12
**Grievous** [1] 105:11

**Grossly** [2] 15:22 16:2
**Ground** [2] 39:5 43:13
**Grounds** [1] 122:4
**Group** [3] 23:12 50:23 101:17
**Groups** [1] 78:6
**Grow** [1] 93:7
**Guards** [2] 19:2 121:9
**Guess** [13] 29:8 37:21 52:5 60:4 60:7 113:22 115:19 117:20 120:8 130:21 131:13 133:5 133:16
**Guided** [1] 130:17
**Guides** [1] 132:3
**Guilt** [11] 39:22 41:14 41:21 41:25 42:13 79:14 84:5 117:21 125:22 125:25 136:17
**Guilt/innocence** [10] 57:22 63:22 81:14 82:21 97:8 98:9 98:20 98:20 102:8 118:7 136:11
**Guilty** [82] 5:5 5:5 5:7 8:6 9:1 12:19 12:21 12:21 12:25 13:1 13:17 13:19 13:20 13:20 14:19 19:17 20:1 21:4 24:2 25:17 25:18 25:23 26:11 26:23 27:11 28:21 32:11 32:17 32:20 33:3 33:4 33:5 37:7 37:9 38:3 38:4 38:23 38:23 41:16 42:2 42:6 43:2 44:2 44:20 47:8 48:22 49:4 54:15 55:9 55:23 57:23 63:11 65:16 66:11 66:21 80:5 81:17 81:18 81:23 82:16 83:7 83:18 84:20 87:20 96:25 97:3 97:9 100:21 106:13 106:22 107:19 109:10 109:17 115:16 120:4 122:14 125:20 126:1 126:14 137:1 137:4 137:5
**Gun** [7] 43:8 43:14 43:17 43:19 94:25 95:2 102:1
**Gunpoint** [1] 94:24
**Guns** [5] 50:24 100:8 100:10
**Gunshot** [4] 43:10 43:12 43:16 43:19
**Guy** [7] 40:1 42:17 43:6 43:11 89:21 89:23 101:25
**Guys** [2] 7:14 90:2

## H

**Half** [3] 9:17 20:20 42:7
**Hallway** [1] 45:22
**Hand** [5] 16:2 43:5 43:9 112:17 142:12
**Handle** [1] 20:19
**Handled** [1] 91:22
**Hands** [4] 43:14 43:17 129:12 129:14
**Hang** [1] 89:13
**Hanging** [1] 100:21
**Happy** [1] 122:22
**Hard** [5] 5:22 44:11 117:22
**Harm** [1] 95:2
**Harmful** [1] 132:23
**Harris** [16] 1:8 1:21 4:25 19:13 34:24 81:20 82:8 123:6 123:10 123:12 124:15 127:5 142:2 142:4 142:11 142:17
**Hate** [1] 36:15
**Headway** [1] 4:15
**Health** [5] 46:16 71:2 73:20 92:7 103:23
**Hear** [36] 5:8 8:5 8:12 8:14 8:16 11:11 34:16 34:16 37:11 38:5 41:15 49:7 57:5 57:8 59:18 59:19 59:20 62:8 74:16 78:18 78:19 79:2 79:4 79:6 82:4 82:22 83:11 83:11 83:13 97:23 102:16 111:8 130:10 131:22 134:14
**Heard** [32] 1:19 8:17 9:12 9:16 10:21 26:11 26:12 37:4

**38:25** 45:8 54:22 55:14 63:11 63:17 66:13 74:10 78:21 81:1 82:21 84:3 84:5 84:7 87:6 91:19 102:12 104:4 106:12 109:18 123:14 123:15 131:21 134:1
**Hearing** [3] 22:25 79:21 85:4
**Hears** [3] 43:10 43:11 43:16
**Hearsay** [1] 114:16
**Heart** [3] 119:3 141:14
**Heavy** [1] 98:6
**Heinous** [10] 34:19 85:25 105:11 109:1 109:2 109:9 110:22 110:24 111:3 111:13
**Held** [3] 1:21 86:21 94:24
**Help** [2] 8:19 57:12
**Helpful** [1] 131:12
**Helping** [1] 95:22
**Helps** [1] 82:18
**Hereby** [1] 143:1
**Hesitation** [2] 98:25 119:1
**Hi** [1] 56:19
**High** [5] 85:5 85:7 86:7 86:10 86:20
**Higher** [3] 135:2 135:3 135:8
**Hill** [5] 2:12 4:19 91:2 116:19 135:23
**Hill's** [1] 72:17
**Hills'** [3] 3:9 4:1
**Himself** [1] 41:7
**Hired** [1] 68:12
**History** [2] 23:7 82:10
**Hit** [1] 132:7
**Hold** [1] 102:22
**Home** [5] 15:5 51:11 90:13 114:22 128:13
**Homes** [1] 121:22
**Honest** [2] 42:21 113:2
**Honestly** [6] 50:13 112:6 116:2 134:16 139:5 140:14
**Honesty** [1] 116:11
**Honor** [8] 3:5 3:6 3:8 56:14 72:15 72:16 72:18 75:8
**Honorable** [1] 1:20
**Hope** [2] 19:3 61:11
**Hopefully** [1] 61:8
**Hoping** [1] 27:22
**Hops** [1] 40:4
**Horrible** [3] 25:23 34:18 100:11
**Hotel** [1] 101:23
**Hotly** [2] 118:9 136:19
**House** [1] 17:14
**Houston** [9] 1:21 2:8 2:15 2:20 90:1 90:11 90:12 106:5 142:18
**Human** [9] 31:21 32:6 33:7 33:17 36:10 55:5 105:23 114:18 131:6
**Hundred** [4] 80:19 80:21 107:3 137:22
**Hundreds** [1] 17:17
**Hurt** [3] 76:6 95:5 102:2
**Husband** [3] 35:24 36:3 60:12
**Hypothetical** [4] 23:6 30:11 43:2 44:16

## I

**Idea** [9] 6:6 6:10 23:10 40:23 46:25 61:3 102:14 105:7 119:19
**Identifiers** [1] 44:4
**Identify** [1] 40:7

Identifying [1] 11:4
Ill [1] 35:23
Illegal [2] 94:13 95:4
Imaginary [4] 37:3 37:16 37:17 38:9
Imagine [3] 37:2 113:2 122:21
Impartial [1] 117:7
Importance [2] 96:1 138:1
Important [15] 24:24 48:7 52:12 62:25 64:8 96:23 98:25 102:18 105:14 119:2 120:3 120:22 136:2 136:5 137:14
Impose [1] 112:4
Imposed [14] 10:23 10:24 11:22 11:25 21:2 21:3 22:10 26:2 27:15 28:25 31:9 31:11 34:11 134:8
Imprisonment [7] 63:3 100:23 105:16 121:4 127:24 128:1 130:5
Incident [2] 87:13 131:15
Included [2] 65:2 142:6
Including [2] 9:10 9:13
Inconvenience [1] 124:12
Incredibly [1] 120:3
Indeed [1] 100:4
Independent [10] 27:16 39:18 39:18 39:20 40:10 40:13 40:17 47:1 98:8 104:16
Independently [2] 136:23 137:10
Indescribable [1] 109:3
Indicate [1] 38:18
Indicated [5] 62:16 90:6 92:16 132:17 137:20
Indicates [1] 78:14
Indication [2] 37:24 126:13
Indictment [3] 4:23 81:8 81:16
Indignation [1] 36:6
Indignity [1] 36:2
Individual [4] 57:22 82:17 93:6 93:15
Individual's [2] 82:12 93:18
Individualistic [1] 11:7
Individualized [1] 57:15
Individually [1] 57:16
Individuals [1] 129:5
Influence [3] 69:5 73:15 103:19
Information [9] 8:17 22:8 27:2 45:15 52:13 82:22 97:23 126:19 131:13
Inhalation [1] 133:18
Initial [2] 96:21 97:19
Injure [1] 133:13
Injured [1] 133:12
Injuries [1] 50:25
Injury [3] 132:25 133:1 133:15
Inmates [3] 18:13 19:3 19:5
Inner [1] 132:14
Innocence [4] 12:24 84:6 126:15 136:17
Innocent [4] 13:2 102:3 111:20 111:20
Insensitive [1] 64:11
Inside [5] 18:20 18:22 24:1 59:9 89:7
Instance [3] 36:17 76:7 117:25
Instances [3] 6:13 41:8 75:22
Instead [3] 8:9 21:1 39:17

Institution's [1] 121:16
Institutional [1] 121:15
Instructed [1] 79:12
Instruction [1] 20:21
Instructions [1] 88:6
Instructs [1] 9:18
Insulting [1] 139:12
Intend [2] 77:8 139:3
Intent [2] 77:9 100:15
Intention [2] 100:4 100:7
Intentional [13] 31:21 32:5 32:10 32:22 33:6 33:16 33:22 33:25 36:9 48:18 76:6 77:2 77:3
Intentionally [1] 33:6
52:17 110:12
Interesting [1] 58:10
Interfere [4] 46:18 71:3 73:21 103:24
Interrupting [1] 68:17
Intertwined [1] 11:1
Intoxicated [2] 52:15 52:18
Intoxication [2] 86:19 87:1
Involved [10] 41:12 50:4 50:18 58:3 91:13 102:3 128:12 128:14 133:12 133:16
Involvement [2] 9:15 108:9
Involving [2] 48:14 131:15
Issue [44] 25:20 58:22 59:21 59:24 61:13 62:7 62:8 62:15 63:7 63:9 63:23 70:11 80:7 82:25 84:1 84:2 84:23 84:25 95:17 95:21 95:22 95:25 96:22 97:17 98:10 98:10 98:13 98:14 99:18 100:25 102:9 106:15 106:15 118:7 119:5 119:14 119:16 120:5 120:9 120:12 122:1 138:7 138:18 139:7
Issues [15] 5:11 8:21 58:22 58:25 92:1 96:7 97:2 97:6 118:5 118:12 118:14 136:22 137:2 137:14 138:13
Itself [8] 37:5 39:21 39:21 63:7 82:20 119:12 138:20 138:22

## J

Jacinto [1] 142:18
Jail [3] 133:4 133:5 135:6
Job [12] 6:24 7:2 18:16 25:18 25:19 65:3 71:22 124:23 124:24 124:24 125:2 125:6
JR [2] 1:5 142:20
Judge [31] 1:20 51:17 57:2 57:9 57:21 59:2 59:12 60:9 65:1 72:7 76:19 77:10 88:7 91:22 93:8 98:7 106:12 107:7 112:4 118:13 120:15 120:24 122:2 126:5 127:17 127:25 128:7 128:8 136:8 137:20 138:15
Judge's [3] 87:15 116:23 136:21
Judger [1] 129:7
Judges [1] 6:25
Judging [1] 128:7
Judgment [2] 22:23 127:13 129:2
Judgments [3] 59:19 92:23 117:7
JUDICIAL [1] 1:11
JUDITH [1] 103:4
Jump [3] 58:20 64:25 118:10
Juries [1] 10:16 10:17 10:18 11:13
Juror [55] 22:16 22:17 37:

3 44:15 44:15 45:5 45:7 45:14 46:12 46:18 47:8 47:9 47:13 47:20 52:19 55:19 58:1 65:12 67:11 68:7 68:20 69:13 70:10 70:15 70:17 71:4 71:17 73:15 73:22 74:2 85:6 85:9 85:23 87:17 88:5 88:18 89:2 103:3 103:19 103:25 118:8 123:5 123:22 124:9 125:6 125:10 126:3 126:6 126:18 127:18 127:22 130:13 133:24 134:5 136:18 141:23
Juror's [2] 47:1 65:3
Jurors [8] 11:11 31:5 34:23 57:20 58:14 66:4 102:20 134:6
Jury [54] 6:2 8:6 9:18 10:4 10:5 10:8 11:5 11:17 12:18 12:24 19:22 19:25 20:5 20:9 20:10 20:13 20:21 22:7 23:12 23:20 24:5 27:24 27:24 31:4 31:5 34:11 37:4 37:5 37:6 37:8 37:10 38:2 38:8 41:13 42:7 42:25 45:15 80:4 80:12 88:2 91:24 104:15 112:25 115:18 116:1 116:3 116:4 116:8 117:3 118:19 126:2 127:18 139:9 140:24
Jury's [9] 5:3 6:24 13:16 28:7 32:10 32:17 32:20 32:24 124:22
Justifiable [1] 7:16
Justifiably [1] 64:6
Justification [10] 31:23 32:6 32:23 33:8 33:18 33:20 33:24 36:11 77:5 77:5
Justified [1] 24:1
Justifying [1] 23:25 100:17
Justly [2] 131:19 131:20

## K

Karla [1] 115:3
Kay [4] 3:3 73:1 142:3 142:16
Keep [9] 53:25 54:3 54:10 54:21 55:17 55:25 56:6 132:15 133:24
Kid [1] 96:14
Kidnapped [1] 65:23
Kidnapping [14] 32:1 32:4 32:7 32:25 48:19 65:12 65:13 65:16 65:19 66:1 66:2 77:15 81:22 82:8
Kidnappings [1] 17:9
Kids [6] 50:23 52:8 53:18 96:17 101:15 101:17
Kill [3] 36:14 77:8 100:15
Killed [2] 65:18 76:8
Killing [4] 48:18 65:25 77:18 77:19
Kills [1] 42:18
Kind [20] 6:7 10:25 26:25 36:12 41:11 75:18 76:2 81:18 82:22 88:4 88:10 89:18 91:7 109:7 111:6 127:7 128:18 129:15 139:18 139:21
Kinds [10] 17:12 41:1 75:24 76:5 77:15 77:20 77:24 82:12 86:9 131:3
Kingwood [1] 58:8
Knife [1] 101:25
Knobloch [2] 142:3 142:16
Knocked [1] 89:24
Knowing [4] 7:17 25:14 76:18 97:22
Knowledge [1] 82:20
Knows [3] 35:24 35:25 129:18
Kurt [5] 2:17 4:18 91:1 116:18 135:22

## L

Lack [3] 14:14 22:22 55:4
Ladies [1] 4:9
Lady [2] 18:13 76:7
Large [2] 105:20 120:19
Larger [1] 19:9
Last [13] 5:12 41:1 56:12 67:2 67:5 68:13 69:9 111:1 112:8 116:7 117:2 127:18 134:20
Late [1] 67:3
LATONYA [1] 123:6
Law [39] 7:3 10:6 10:11 10:20 22:1 22:4 29:1 39:11 40:20 40:23 40:25 41:18 41:19 41:21 41:23 45:1 50:11 75:15 76:23 83:13 86:18 86:22 88:7 94:12 94:21 107:5 108:4 111:14 111:14 111:15 112:19 112:21 115:25 124:19 130:1 130:12 130:14 135:9 136:7
Lawfully [1] 41:8
Laws [8] 7:8 45:3 73:25 115:25 124:17 124:18 125:8 130:21
Lawyer's [1] 139:2
Lawyering [2] 7:18 7:21
Lawyers [9] 9:21 45:13 123:24 126:24
Laying [1] 43:13
Learn [1] 52:13
Learned [2] 58:11 61:1
Learner [1] 86:6
Learning [3] 58:9 58:13 58:16
Least [5] 24:3 64:14 83:8 97:13 138:4
Leave [3] 21:24 101:24 106:4
Leaves [1] 21:25
Led [2] 39:1 104:9
Left [4] 89:11 89:22 90:5 90:13
Legal [18] 31:22 31:23 32:6 33:8 33:18 33:19 33:20 33:24 36:11 39:9 59:2 74:19 77:4 77:5 87:24 88:8 91:13
Legislature [2] 77:16 77:21
Legitimate [2] 26:15 38:16
Length [2] 68:9 70:8
Less [5] 34:8 88:9 93:14 107:10 107:11
Lessen [1] 61:14
Lesser [2] 33:13 65:2
Level [9] 12:23 17:22 20:15 40:21 41:20 100:20 117:24 121:17 135:3
Liberal [1] 113:7
Licensed [1] 113:14
Lies [1] 80:14
Life [120] 5:17 8:13 9:25 10:13 10:17 10:22 11:22 13:8 14:2 14:9 18:17 20:8 20:17 21:1 22:3 22:10 23:15 23:24 24:4 24:12 24:14 24:23 25:5 27:14 28:1 28:3 28:5 28:16 28:19 28:24 30:11 30:13 31:6 31:9 31:21 32:5 33:6 33:7 33:17 34:3 34:6 35:2 35:4 35:10 35:13 35:14 35:23 36:2 36:10 36:14 36:18 37:18 37:22 46:15 46:16 47:15 49:10 50:10 54:7 56:3 62:14 63:3 63:9 64:10 64:12 64:13 64:13 65:11 66:15 71:1 71:2 73:19 73:19 77:4 80:9 80:12 81:21 83:14 83:16 83:22 84:13 84:19 85:7 85:22

86:8 87:8 87:19 95:15 96:2
100:23 101:15 103:22 103:23
105:15 108:11 108:21 109:23
109:25 114:14 115:12 121:3
121:22 122:5 122:10 122:17
127:24 128:1 128:19 130:4
131:6 131:14 133:23 134:10
135:7 135:10 137:7 137:19
137:25 138:20 138:23

**Likely** [4] 16:8 16:8 107:
11 138:5

**Limit** [1] 121:10

**LINDA** [1] 73:1

**Line** [1] 77:19

**List** [1] 81:23

**Listen** [12] 45:15 65:4 65:
12 65:17 65:21 66:23 84:16
109:11 124:25 130:9 136:6
138:17

**Listened** [3] 57:2 57:2
87:15

**Listening** [3] 7:3 11:13
138:15

**Lists** [1] 78:6

**Live** [6] 18:3 35:24 58:8
93:9 93:10 93:13

**Lived** [2] 35:14 90:12

**Lively** [1] 4:10

**Lives** [7] 18:16 24:20 55:
5 66:8 66:11 66:17 86:11

**Lo** [1] 100:10

**Logic** [1] 80:10

**Logical** [1] 116:24

**Look** [40] 8:24 25:2 26:16
49:22 49:22 49:24 50:5 50:
12 50:13 56:7 59:23 60:4 62:
10 62:10 62:11 62:22 62:23
63:7 66:10 78:5 80:7 85:3
85:16 86:15 88:21 92:21 92:
22 93:6 97:1 97:4 97:20 97:
22 98:5 98:13 108:7 116:7
116:22 127:10 137:23 140:1

**Looked** [2] 85:13 86:2

**Looking** [2] 23:4 117:23

**Lose** [1] 137:25

**Lost** [5] 18:20 23:3 64:12
64:13 66:15

**Love** [2] 36:16 113:3

**Lump** [1] 57:19

**Lyn** [4] 2:2 4:21 75:11 127:
5

**Lynn** [1] 48:3

**LYNNE** [1] 103:4

## M

**Ma'am** [14] 48:21 50:15 50:
20 51:15 51:25 55:8 55:15
75:21 105:8 111:5 114:1 116:
5 116:6 135:13

**Machine** [1] 1:23

**Magazines** [1] 94:11

**Magnitude** [3] 34:20 70:
11 138:1

**Major** [2] 31:24 32:4

**Maliciously** [1] 76:6

**Mamou** [11] 1:5 3:11 4:17
4:17 4:23 57:18 72:19 91:3
116:19 135:23 142:20

**Man** [3] 36:13 51:3 85:20

**Manner** [3] 56:25 91:22
140:16

**Maria** [1] 3:20

**Married** [2] 35:22 92:8

**Marvelous** [1] 24:17

**Mason** [1] 11:1

**Matter** [16] 5:22 9:6 9:6
9:7 10:1 10:2 27:8 46:17 71:
2 73:20 81:12 93:15 101:13
103:23 127:17 129:5

**Matthew** [2] 67:12 72:10

**Mature** [2] 22:22 85:22

**Maturely** [1] 22:23

**Maturity** [1] 108:21

**McClellan** [20] 2:2 3:5 3:
17 3:21 4:21 48:4 71:10 71:
12 72:6 72:11 72:13 75:7 75:
8 75:10 75:11 102:5 127:2
127:4 127:5 135:14

**Mean** [66] 7:18 12:12 15:8
15:9 15:10 15:13 15:14 15:
18 15:19 15:21 15:22 16:18
31:7 35:6 41:5 49:5 50:13
55:10 59:1 59:1 62:21 64:16
65:8 70:24 76:2 77:5 79:22
79:24 86:23 94:9 94:10 94:
12 94:15 95:12 98:15 99:9
99:13 109:1 112:12 113:1
113:8 114:16 117:15 118:17
119:8 122:7 124:10 128:17
128:19 128:20 129:1 129:11
129:12 130:2 130:5 131:22
132:3 132:5 134:1 134:3 137:
17 137:17 139:12 139:16 141:
5 141:7

**Means** [34] 13:13 14:1 14:
5 14:17 15:10 15:14 16:7 16:
9 16:10 16:11 21:11 25:22
25:24 28:20 29:5 29:6 29:15
31:20 36:3 41:4 41:10 41:11
79:24 107:8 109:3 113:9 120:
18 120:22 126:6 126:6 126:8
127:18 127:22 137:21

**Meant** [6] 21:19 51:17 64:
23 111:11 117:18 140:20

**Mechanical** [1] 36:2

**Medical** [1] 18:25

**Member** [1] 132:18

**Members** [2] 92:10 93:19

**Memorize** [2] 6:6 48:9

**Mental** [3] 23:7 23:8 23:
10 82:10 86:4 105:20 119:9

**Mentally** [1] 140:9

**Mentioned** [2] 102:5 124:
22

**Merit** [1] 55:2

**Merits** [2] 55:2 57:22

**Middle** [1] 16:6

**Might** [76] 19:2 19:4 22:1
22:15 22:16 22:19 22:21 23:
1 23:5 23:8 23:9 23:13 24:5
24:5 24:8 24:12 24:16 24:22
24:23 26:1 26:3 30:9 31:4
35:5 35:11 35:21 43:24 46:
17 47:6 53:12 56:7 57:5 61:
14 62:13 65:12 65:15 68:6
70:4 72:3 73:14 73:18 78:10
82:25 83:6 85:3 85:4 87:7
91:6 94:18 94:21 100:13 100:
22 103:18 103:21 103:24 110:
2 110:9 113:11 119:20 121:4
121:6 121:10 121:19 121:21
121:24 122:9 122:12 122:15
123:21 125:17 126:3 130:16
137:24 138:19 138:20 138:22

**Mills** [2] 3:3 3:15

**Mind** [43] 12:10 26:25 32:
24 34:17 34:21 46:13 53:25
54:3 54:10 54:21 55:17 55:
25 56:6 64:19 67:1 68:24 75:
6 75:24 76:4 83:24 84:17 86:
15 86:16 87:4 87:18 87:19
89:2 95:16 97:17 105:18 105:
22 110:14 110:22 111:3 119:
3 122:8 124:2 128:19 131:19
131:21 131:21 140:10 140:23

**Minded** [1] 55:20

**Minimal** [1] 23:14

**Minimize** [1] 70:24

**Minor** [3] 113:16 114:9
133:1

**Minutes** [4] 12:11 48:4 56:
20 57:8

**Misery** [1] 36:6

**Miss** [17] 3:15 4:21 47:25
73:5 75:11 90:18 103:8 103:
10 104:22 105:3 114:23 116:

11 117:1 123:10 123:12 124:
15 127:5

**Missed** [1] 126:20

**Mistaken** [2] 60:10 64:7

**Mistrial** [1] 126:8

**Misunderstanding** [2]
28:18 28:19

**Mitigates** [2] 85:22 85:24

**Mitigating** [63] 9:24 22:
13 22:13 22:22 23:9 23:20
23:22 24:4 24:6 24:13 24:22
26:7 26:9 50:9 51:16 51:20
51:24 52:2 52:3 52:3 52:4
52:19 52:24 53:13 54:4 56:2
56:7 61:23 62:21 80:8 84:11
84:17 84:18 85:10 87:7 92:
18 95:10 95:12 95:13 95:19
99:19 99:24 101:4 102:11
105:17 105:17 105:19 109:25
110:9 110:11 110:15 110:17
117:12 117:25 119:7 119:10
119:11 119:13 122:3 138:8
139:24 140:13 140:20

**Mitigation** [1] 86:8

**Mixed** [1] 58:4

**Moment** [4] 4:19 128:10

**Monday** [1] 123:23

**Money** [1] 113:10

**Month** [3] 29:5 29:6 124:6

**Months** [2] 42:19 133:22

**Moral** [8] 9:14 9:14 49:25
50:6 84:8 99:23 127:12 129:1

**Morality** [1] 36:8

**Morning** [25] 4:9 4:12 5:
14 14:1 18:15 46:6 56:18 56:
23 58:8 67:16 68:1 73:7 73:
8 90:24 90:25 103:8 109:12
116:16 116:17 116:25 117:23
120:15 123:14 135:20 135:21

**Most** [10] 11:4 11:23 12:1
34:14 48:13 85:25 98:25 118:
13 119:1 120:22

**Mostly** [1] 136:15

**Mother-in-law's** [1] 60:
12

**Mouth** [1] 139:2

**Murder** [113] 4:24 5:2 9:2
10:21 13:1 13:5 13:8 14:8
17:7 19:18 20:1 21:2 24:22
25:18 27:23 28:22 30:12 31:
15 31:18 31:18 31:20 32:3
32:3 32:4 32:7 32:10 32:12
32:18 32:22 33:3 33:5 33:6
33:9 33:10 33:11 33:12 33:
14 33:15 33:21 33:24 34:2
34:3 34:5 34:16 36:9 37:3
37:8 37:9 38:2 38:3 38:5 38:
21 44:16 44:21 47:9 48:13
48:19 48:20 48:23 49:5 50:3
50:4 51:21 52:16 52:22 53:6
53:8 55:4 55:7 55:10 55:24
61:24 65:8 65:9 65:11 65:15
65:16 66:3 66:21 77:3 77:7
77:8 77:10 77:14 77:17 77:
17 77:18 81:24 82:7 83:7 83:
1 86:12 87:17 91:17 91:21
92:4 96:25 97:3 100:5 106:
13 106:23 107:14 109:10 109:
18 118:12 120:4 122:15 126:
1 134:25 136:16 137:2 137:4
137:6

**Murder's** [1] 48:17

**Murdered** [1] 90:7

**Murderer** [1] 59:22

**Murdering** [1] 32:2

**Murders** [5] 16:22 17:8 48:
14 53:22 85:11

**Must** [16] 10:7 10:12 12:18
15:10 15:20 16:16 17:19 17:
22 28:14 31:2 39:17 47:4 51:
23 98:23 118:24 134:21

**Mystery** [1] 67:19

## N

**Name** [8] 75:11 76:10 91:1

114:23 115:5 116:18 127:5
135:22

**Natural** [1] 30:13

**Nature** [5] 99:20 105:16
109:1 109:2 109:9

**Near** [1] 91:8

**Necessarily** [13] 19:22
19:23 19:25 20:4 20:10 31:
20 65:8 68:8 118:16 120:9
121:24 137:4 137:22

**Necessary** [1] 75:22

**Need** [8] 8:23 24:25 71:20
79:2 103:17 108:6 108:7 115:
21

**Negative** [4] 58:5 58:6
58:7 139:11

**Neglect** [1] 140:8

**Neglectful** [1] 140:4

**Neighbors** [1] 18:7

**Never** [24] 5:17 9:7 12:4
12:6 12:22 19:5 20:2 21:14
24:20 31:8 33:19 33:23 35:
12 44:12 49:11 58:13 80:15
80:21 81:6 83:13 88:1 101:
10 107:2 125:20

**New** [4] 11:3 13:5 13:6 128:
13

**Next** [9] 19:20 26:8 27:10
42:14 48:23 52:19 56:20 57:
7 104:16

**Nice** [1] 126:23

**Night** [2] 36:18 101:22

**Nine** [1] 34:9

**Ninety** [1] 34:9

**Ninety-nine** [1] 34:9

**Nobody** [3] 22:5 40:6 43:18

**Nonmitigating** [1] 117:13

**Nonmoveable** [1] 44:10

**Normal** [1] 113:21

**Normally** [1] 113:11

**Notch** [3] 13:16 13:20 13:
24

**Nothing** [10] 6:9 29:12 38:
18 43:23 51:3 67:1 67:4 108:
4 124:13 136:24

**Noticed** [1] 117:10

**Notion** [3] 30:10 47:8 124:
16

**Number** [67] 8:25 9:9 12:
13 19:20 20:6 25:21 26:12
26:20 26:22 27:25 32:16 32:
18 32:21 34:7 34:8 42:9 47:
10 49:18 55:13 55:13 59:21
59:24 60:11 61:13 61:22 62:
8 62:9 62:15 63:9 63:23 72:
10 78:11 80:7 82:25 84:1 84:
2 84:23 84:25 85:6 85:9 95:
9 95:17 95:21 95:22 95:25
96:22 97:17 97:24 98:10 98:
10 98:13 99:18 101:1 102:9
106:15 106:16 108:2 109:12
109:16 119:15 119:16 119:16
122:2 131:16 138:7 138:18
139:7

**Numbered** [2] 1:20 142:6

## O

**O'clock** [2] 18:15 18:18

**Oath** [1] 130:13

**Object** [4] 44:6 44:8 44:
10 89:19

**Objectionable** [1] 74:1

**Obligated** [1] 33:2

**Obligation** [2] 32:11 32:
20

**Obtain** [1] 16:15

**Obvious** [2] 57:1 119:7

**Obviously** [16] 13:1 14:
11 19:4 24:1 28:3 44:11 53:
8 64:4 66:1 66:15 88:13 97:
12 102:19 115:21 119:14 120:
16

Occur [2] 32:15 95:15
Occurred [5] 4:25 50:3 65:9 65:10 142:7
Occurs [3] 40:5 69:5 100:11
October [4] 69:9 69:10 123:24 124:3
Offender [1] 61:2
Offense [22] 4:24 8:3 9:11 12:19 24:3 34:4 34:19 35:1 36:25 39:20 77:10 81:8 81:12 81:13 84:5 90:9 99:21 100:14 107:21 122:4 122:9 138:18
Offenses [2] 11:8 65:2
Offer [1] 68:19
Offhand [1] 105:21
Office [2] 94:2 114:16
Officer [1] 77:19
Official [3] 142:3 142:12 142:17
Official/Deputy [1] 142:3
Officials [1] 19:1
Old [10] 22:20 35:8 35:11 36:13 42:17 53:6 117:25 124:6 133:21 133:22
Older [2] 22:24 85:21
One [115] 8:25 12:3 12:13 20:6 20:15 22:15 25:15 25:21 26:12 26:21 26:24 27:9 27:25 30:10 32:16 32:19 35:7 39:8 39:14 39:16 41:1 41:22 42:3 42:4 42:16 42:21 43:6 45:3 45:14 45:22 47:10 51:1 52:2 55:13 57:11 57:17 57:20 58:15 58:15 58:18 59:10 59:21 59:24 60:8 61:10 62:6 63:6 64:14 64:20 64:25 67:5 77:25 78:7 78:11 80:19 82:20 83:1 84:1 84:23 86:7 87:12 87:22 88:20 89:22 92:1 92:20 93:12 94:17 95:4 95:21 95:22 96:7 96:14 96:21 96:22 97:17 98:10 98:13 100:16 102:5 102:10 105:21 106:15 106:16 109:6 109:12 109:16 110:21 111:21 111:21 112:5 114:5 114:24 115:8 115:23 117:2 117:10 118:23 119:5 119:16 120:5 121:1 121:13 122:22 123:20 124:1 127:17 129:6 134:18 134:20 135:6 136:23 137:13 138:16 140:3
One's [1] 114:23
Open [17] 47:7 53:25 54:3 54:10 54:21 55:12 55:17 55:20 55:25 56:6 74:4 74:12 74:14 120:8 131:7 131:11 142:7
Open-minded [1] 55:20
Opened [1] 106:5
Opinion [14] 38:25 39:3 54:5 55:3 75:19 88:24 96:9 97:11 99:3 105:6 105:7 108:15 108:17 140:6
Opinions [4] 75:16 85:14 86:3 92:23
Opportunity [2] 28:7 36:23
Opposed [12] 22:10 23:16 24:15 27:15 47:16 64:21 78:9 78:12 80:9 80:13 84:13 100:15
Opposite [2] 22:16 23:19
Opposition [1] 78:15
Option [5] 10:7 10:12 37:23 38:16 38:17
Options [2] 78:11 141:6
Order [15] 6:11 12:4 12:18 14:3 15:18 16:15 19:24 76:19 80:23 127:9
Ordering [1] 76:19
Ordinarily [3] 18:6 18:9 85:8

Ought [11] 35:20 68:19 74:5 76:1 77:1 77:21 77:25 78:22 84:13 85:17 128:7
Outcome [2] 32:16 32:18 32:21 128:3 129:18
Outcomes [1] 32:14
Outlined [1] 91:22
Outset [1] 103:10
Outside [1] 18:19
Overall [1] 93:4
Overcome [6] 14:12 14:13 26:10 124:13 140:4 140:9
Overcomes [1] 122:3
Overdue [1] 88:4
Overlook [1] 121:2
Override [1] 109:24
Overrides [1] 50:11
Overturn [1] 115:4
Overwhelming [1] 63:10
Own [10] 24:12 29:23 47:5 57:21 75:19 99:1 106:5 117:1 119:2 136:24

**P**

Page [13] 60:13 78:5 93:2 93:17 95:10 117:11 117:11 127:11 131:16 132:17 140:2 140:12 140:17
Paid [1] 142:11
Pamela [2] 142:3 142:16
Panel [1] 4:8
Paper [2] 42:22 94:11
Paragraphs [1] 118:23
Pardons [2] 29:19 29:21
Parking [1] 58:9
Parole [9] 29:3 29:11 29:12 29:13 29:14 30:18 30:18 30:20 30:21
Paroled [2] 31:7 31:7
Paroles [2] 29:19 29:21
Part [16] 5:3 8:16 8:18 9:12 9:16 48:23 49:23 50:1 58:19 58:21 60:9 62:21 65:1 81:15 109:11 112:6
Participate [2] 76:16 76:21
Particular [12] 37:19 38:12 41:11 50:1 50:5 50:7 51:4 51:7 93:5 109:8 136:18 140:16
Particularly [1] 119:24
Parties [4] 3:2 72:9 142:6 142:9
Parts [1] 5:3
Pass [4] 42:23 56:13 90:19 135:14
Passed [1] 63:12
Passing [1] 42:16
Past [3] 6:9 69:10 97:25
Peculiar [2] 7:21 125:17
Penalty [64] 14:6 20:13 20:16 21:5 26:2 28:8 28:10 28:12 31:11 48:11 49:16 49:19 51:22 55:1 55:9 55:11 55:9 62:1 63:24 64:5 64:9 75:20 76:1 76:11 76:13 77:1 77:11 77:16 77:21 77:23 77:25 78:8 78:9 78:13 78:16 84:24 99:6 105:6 105:7 105:12 105:15 108:15 108:25 110:7 110:10 111:12 112:22 112:25 112:25 124:18 129:22 130:4 130:24 130:25 131:13 131:17 131:8 135:1
Penitentiary [11] 18:10 18:14 18:23 29:4 30:14 30:25 34:6 34:7 37:18 38:10 135:5
People [69] 11:6 18:6 18:7 18:10 18:22 18:25 19:15

22:23 22:25 23:3 23:9 23:12 23:19 24:12 24:21 29:16 31:5 32:2 39:12 41:15 42:2 51:14 52:25 53:2 53:14 53:17 53:21 54:6 54:8 57:9 57:19 66:15 66:22 70:2 76:12 76:14 79:2 80:18 80:25 82:25 83:6 85:10 85:13 85:20 86:2 86:9 89:12 93:13 94:9 94:10 96:8 96:19 98:5 100:10 102:16 110:1 110:16 113:11 114:2 119:9 121:4 128:5 128:6 128:21 131:22 131:24 134:9 134:14 134:25
People's [1] 66:8
Percent [5] 80:19 80:21 81:6 107:3 137:22
Perfectly [5] 7:16 24:17 30:9 30:15 42:21
Performing [1] 96:16
Perhaps [6] 23:6 53:21 107:21 108:21 111:20 124:12
Period [2] 31:1 70:15
Permitted [2] 15:6 15:7
Perry [1] 101:1
Person [81] 8:10 11:5 13:8 26:11 34:2 34:4 43:8 43:14 49:7 49:14 52:2 52:3 52:4 53:11 55:24 57:11 57:17 59:8 59:22 59:23 59:25 61:9 61:12 63:13 64:15 64:15 65:14 65:15 65:23 65:23 66:1 81:21 83:12 83:21 84:13 86:7 86:9 87:11 87:12 87:19 88:19 89:10 92:12 92:21 95:1 96:10 96:11 97:9 97:23 99:5 100:4 100:6 100:14 100:20 100:22 105:15 106:17 107:23 110:6 110:9 113:21 114:11 117:20 117:24 119:17 120:6 121:10 122:5 122:10 122:12 122:17 127:13 128:1 129:8 130:23 131:13 134:4 139:17 141:13
Person's [11] 29:16 41:21 41:25 42:13 44:13 61:14 62:23 77:4 86:4 100:1 119:10
Personal [14] 9:14 9:14 46:15 50:6 68:18 71:1 73:19 84:8 84:9 99:22 103:22 110:24 111:16 132:5
Personally [3] 57:16 87:22 130:2
Personnel [1] 18:25
Persons [5] 17:5 17:8 17:10 106:7 107:17
Perspective [1] 27:6
Persuades [1] 12:24
Phase [30] 5:9 6:17 8:1 8:5 8:7 8:11 13:4 13:16 13:21 14:8 14:20 14:21 37:5 37:10 38:5 57:23 63:23 97:7 97:12 98:20 100:15 118:11 125:19 125:21 125:25 126:2 126:4 136:11 136:12 136:15
Phenomenon [1] 11:3
Philosophically [1] 112:15
Phone [3] 2:9 2:16 2:21
Phrase [4] 12:13 13:11 21:9 21:10
Phrasing [1] 141:4
Picked [1] 58:14
Pie [3] 33:15 33:16
Piece [5] 18:4 27:2 33:15 39:11 126:19
Pile [1] 8:16
Pillar [2] 43:6 43:11
Pistol [3] 44:12 44:13 44:14
Place [4] 13:6 20:17 22:4 98:4
Placed [5] 44:7 44:8 44:14 112:23 121:14

Places [1] 19:16
Planned [1] 40:6
Play [18] 5:25 6:12 6:19 6:21 7:4 14:6 40:22 45:4 50:1 57:12 66:22 95:23 100:24 100:25 124:18 124:19 125:3 125:25
Playing [1] 50:22
Pleading [1] 126:14
Plug [1] 36:7
Plus [2] 48:18 48:19
Poe's [1] 92:4
Point [18] 18:22 24:24 30:5 31:20 36:16 38:19 40:7 45:2 46:9 48:6 61:8 68:4 73:9 79:1 95:15 96:1 103:14 110:10
Points [1] 27:1
Police [5] 43:18 43:18 77:19 89:11 90:4
Political [1] 30:3
Poor [1] 54:1
Pops [1] 13:6
Portion [1] 7:6
Portions [5] 6:22 6:23 125:7 125:9 142:5
Position [6] 96:2 128:11 128:15 128:17 129:17 134:11
Positive [4] 58:5 58:6 58:9 129:20
Possess [1] 11:6
Possesses [1] 11:5
Possibility [8] 15:15 24:16:11 28:1 47:17 61:9 66:24 107:8
Possible [19] 9:8 10:3 28:16 30:15 30:16 32:14 32:16 32:18 32:21 33:2 33:4 61:4 66:10 76:1 78:15 97:1 104:14 138:16 141:4
Possibly [10] 5:21 6:11 15:12 15:12 15:15 34:18 59:25 94:8 129:18 139:22
Posture [1] 21:25
Potential [2] 69:20 69:21
Practice [3] 68:11 68:13 68:14
Practitioner [1] 68:12
Prays [1] 36:4
Preacher [1] 36:4
Precisely [2] 35:6 35:7
Predict [5] 59:5 59:8 99:4 99:10 119:21
Preparation [1] 142:11
Preposterous [1] 18:20
Present [8] 4:18 11:19 12:18 13:13 16:24 50:2 51:13 80:1
Presented [15] 6:20 7:5 7:6 12:9 12:22 22:6 41:13 45:16 59:8 74:7 79:22 104:11 117:8 124:20 133:6
Presently [2] 46:15 73:18
Presiding [1] 1:21
Presumed [3] 13:7 14:7 14:10
Presumption [7] 12:24 13:2 13:5 13:6 14:11 14:14 126:15
Pretty [12] 45:2 59:23 68:25 71:24 94:15 96:4 96:23 97:2 98:6 99:7 136:8 137:3
Prevent [5] 80:4 93:18 127:13 129:2 134:4
Previous [1] 60:5
Previously [1] 131:14
Primary [2] 96:1 124:18
Print [3] 44:7 44:8 44:13
Prison [12] 19:1 19:4 29:16 60:9 60:12 60:20 61:5 61:5

11 121:5 121:9 121:14 121:24

**Prisoner** [1] 128:1

**Probability** [27] 9:3 15:1 15:2 15:8 15:10 15:18 15:20 16:7 16:7 16:10 16:13 16:14 16:21 17:20 49:1 59:16 83:3 83:8 107:1 107:2 107:5 107:8 107:23 112:1 120:13 120:18 137:18

**Problem** [12] 48:20 55:18 62:24 70:5 70:6 76:24 79:18 80:15 83:24 86:16 113:9 137:1

**Problems** [7] 69:14 69:14 69:20 69:21 74:25 124:8 132:16

**Proceedings** [4] 1:19 1:22 142:5 142:9

**Process** [16] 30:22 57:15 71:8 74:24 76:16 76:22 87:5 88:11 91:13 101:11 112:7 124:15 129:23 129:24 130:12 137:9

**Produce** [1] 79:24

**Productive** [1] 86:11

**Profession** [1] 87:25

**Professional** [4] 46:16 71:1 73:19 103:22

**Programs** [2] 94:11 113:10

**Projectile** [1] 43:22

**Proof** [16] 13:13 80:17 80:17 98:16 98:22 98:23 102:6 102:8 102:9 118:18 118:22 118:24 118:24 134:20 135:2 137:16

**Proper** [3] 26:1 131:4 131:5

**Property** [5] 17:5 17:11 17:16 49:13 107:18

**Propositions** [1] 93:4

**Prosecuted** [2] 89:10 90:9

**Prosecutors** [1] 48:5

**Prospect** [2] 57:25 59:3 87:17

**Prospective** [2] 67:11 126:18

**Prove** [31] 13:15 14:17 14:19 14:20 15:20 15:23 16:3 16:5 16:25 17:2 17:19 21:12 21:14 21:16 21:20 21:23 29:12 32:12 32:13 32:19 32:21 32:23 39:22 80:21 81:9 81:15 81:19 81:22 102:11 108:5 134:21

**Proved** [3] 7:1 25:21 66:7

**Proven** [1] 58:23

**Proves** [4] 13:9 25:16 32:8 41:20

**Provision** [1] 77:22

**Prudent** [1] 115:17

**Psychiatrist** [1] 113:20

**Psychiatrists** [1] 114:3

**Psychologist** [1] 113:20

**Psychologists** [1] 114:3

**Psychology** [1] 113:16

**Pull** [3] 20:16 21:6 40:3

**Pulls** [1] 36:7

**Punch** [2] 49:14 107:21

**Punches** [2] 18:14 18:17

**Punish** [1] 138:9

**Punished** [4] 34:5 35:16 61:7 68:21

**Punishing** [1] 138:14

**Punishment** [59] 5:9 13:7 14:8 23:23 34:2 34:3 34:13 35:19 35:20 36:23 37:15 37:18 39:9 38:20 38:22 54:12 57:23 61:15 63:2 63:4 63:25 64:2 76:1 76:13 78:17 80:6 81:25 82:2 82:4 82:14 82:15 82:19 82:23 83:10 83:19 84:7 84:21 87:9 97:7 97:11 102:

15 106:14 109:5 109:6 109:19 118:11 121:3 122:17 125:16 125:19 125:21 126:12 126:4 126:12 131:1 135:1 135:3 136:12 136:15

**Punishments** [2] 28:16 36:19

**Purpose** [1] 9:22

**Purposely** [1] 133:13

**Purposes** [3] 5:10 20:23 44:18

**Put** [16] 22:5 25:13 51:6 56:25 57:3 68:5 94:25 96:2 112:17 115:22 116:3 116:4 126:10 127:21 138:18 140:14

**Putting** [1] 117:3

## Q

**Quality** [6] 13:3 14:12 14:15 35:2 35:4 42:17

**Questionnaire** [21] 50:16 57:1 60:10 61:22 75:13 78:3 78:4 87:14 91:3 92:25 105:13 117:11 117:17 123:22 124:5 127:7 127:10 128:25 135:25 140:1 140:14

**Questions** [67] 5:10 8:21 8:22 10:9 10:18 10:19 11:21 11:24 12:4 12:6 12:11 14:21 16:12 19:18 20:3 20:24 25:10 27:3 27:16 28:15 28:21 28:22 28:24 30:5 31:2 31:2 31:9 31:14 39:6 45:1 45:20 46:7 47:22 48:24 51:19 54:18 56:10 56:25 57:3 66:25 68:2 69:2 69:4 71:7 71:8 73:10 76:18 78:22 81:10 82:3 82:18 82:19 91:9 93:1 93:16 103:14 104:14 104:19 105:4 106:7 116:8 123:15 123:19 126:20 126:24 134:7 141:12

**Quick** [1] 39:8

**Quickly** [1] 45:23

**Quite** [9] 57:1 66:9 71:25 78:14 91:14 96:20 97:1 100:7 137:18

## R

**Rage** [1] 109:5

**Raise** [1] 112:17

**Raised** [2] 64:6 139:23

**Ran** [3] 24:11 90:2 90:3

**Randomly** [1] 50:24

**Range** [6] 34:1 34:3 34:12 36:22 38:19 38:22

**Rapes** [1] 17:9

**Rate** [2] 34:1 73:21

**Rather** [4] 50:10 108:11 112:22 112:25

**Ray** [1] 92:6

**Reach** [10] 8:20 37:20 38:13 38:24 38:24 39:4 45:17 100:20 104:10 125:10

**Reached** [1] 120:3

**Reacquire** [1] 18:18

**Reacted** [1] 89:17

**Reactions** [1] 128:21

**Reacts** [1] 11:17

**Read** [3] 19:11 94:14 126:11

**Reading** [1] 67:18

**Ready** [1] 42:23

**Real** [1] 36:7

**Really** [20] 28:8 41:17 45:2 53:11 57:4 57:11 61:20 62:2 89:23 92:3 101:24 102:1 113:6 122:23 123:16 123:17 130:17 134:1 134:2 137:18

**Reason** [27] 4:13 5:18 6:5 7:16 15:3 18:5 20:25 21:1 22:2 22:6 22:9 22:14 23:20 27:14 28:17 47:14 52:7 84:19 85:1 88:17 89:1 109:4

**Reasonable** [49] 9:3 12:12 13:19 13:23 13:9 13:12 13:18 13:23 14:16 14:23 15:1 15:20 16:17 21:10 25:17 25:20 32:8 39:23 41:21 41:25 42:4 42:8 42:13 42:25 44:1 44:23 49:1 58:24 58:25 65:22 65:24 66:6 80:18 81:1 9 81:16 81:22 83:2 83:15 98:1 98:23 106:17 108:6 118:19 118:23 118:24 134:21 134:22 137:6

**Reasoning** [1] 117:24

**Reasons** [5] 56:24 61:10 80:9 84:13 85:1

**Receive** [12] 59:4 62:13 64:9 80:9 82:1 82:15 83:19 84:13 99:5 100:22 119:20 122:10

**Received** [1] 61:25

**Receives** [1] 51:22

**Receiving** [3] 120:21 138:20 138:23

**Recognize** [1] 68:20

**Recognizes** [3] 22:1 22:5 104:9

**Recognizing** [1] 124:12

**Recommendations** [3] 29:23 29:24 30:2

**Reconsider** [1] 63:24

**Record** [4] 1:1 142:6 142:8 142:11

**Reducing** [1] 23:23

**Reevaluate** [1] 22:8

**Refer** [2] 84:9 84:12

**Referred** [1] 139:7

**Reflects** [1] 142:9

**Reformed** [1] 139:9

**Refuse** [4] 37:22 38:14 44:20 44:24

**Refuses** [3] 79:15 79:15 131:1

**Regard** [1] 131:6

**Regardless** [3] 111:16 128:2 129:7

**Regards** [1] 102:9

**Regional** [2] 106:3 106:3

**Rehab** [1] 94:1

**Rehabilitated** [3] 131:8 131:11 141:18

**Rehabilitation** [1] 19:4

**Reject** [1] 29:12

**Rejecting** [1] 30:2

**Relapse** [1] 94:2

**Relate** [1] 130:8

**Related** [1] 60:18

**Relating** [2] 5:8 38:6

**Relationship** [1] 130:19

**Relax** [1] 105:4

**Released** [1] 61:8

**Relevant** [1] 82:5

**Reliable** [1] 11:4

**Religion** [1] 136:5

**Religious** [2] 137:12 128:16 129:11

**Rely** [4] 80:2 95:1 98:24 119:1

**Relying** [2] 70:1 93:19

**Remains** [1] 14:14

**Remarkably** [1] 34:13

**Remember** [6] 67:24 73:6 76:10 85:4 115:5 115:8

**Remind** [1] 4:16

**Remorse** [1] 102:16

**Render** [1] 130:14

**Repeat** [1] 61:2

**Reported** [2] 1:22 142:7

**Reporter** [3] 93:8 142:3 142:17

**Reporter's** [4] 1:1 142:6 142:8 142:11

**Represent** [3] 75:12 116:19 127:6

**Represented** [2] 4:17 4:20

**Representing** [2] 91:2 135:24

**Reputation** [1] 60:6

**Request** [3] 3:14 4:1 72:21

**Requested** [1] 142:5

**Require** [5] 16:3 17:13 135:2 135:8 135:10

**Required** [10] 15:23 16:20 16:25 17:2 22:5 30:24 32:12 32:13 41:7 102:10

**Requirement** [1] 22:6

**Requires** [2] 10:20 68:14

**Reservations** [1] 117:3

**Resolves** [1] 104:16

**Respect** [4] 53:4 108:24 109:22 112:18

**Respective** [1] 142:9

**Response** [1] 93:5

**Responsibility** [8] 9:15 49:25 50:7 50:8 84:10 108:9 112:20 119:25

**Responsible** [5] 50:7 65:15 65:25 86:21 128:23

**Rest** [2] 30:12 83:16

**Result** [18] 7:4 10:19 12:8 14:14 24:21 37:20 38:13 38:24 38:25 39:2 39:3 69:5 100:11 100:11 104:10 108:25 125:3 134:8

**Results** [1] 78:23

**Retardation** [6] 23:8 23:9 23:11 23:14 105:20 119:9

**Retarded** [2] 110:2 110:7

**Retire** [1] 45:21

**Return** [3] 28:9 28:10 28:12

**Returned** [2] 27:23 27:24

**Revenge** [1] 36:15

**Rich** [1] 53:18

**Rise** [1] 17:22

**Rises** [2] 12:23 20:15 40:21 41:20

**Risk** [4] 24:12 31:4 31:12 31:13

**Risqui** [2] 114:24 114:24

**Road** [2] 16:6 86:1

**Rob** [2] 40:2 100:7

**Robbed** [1] 89:8

**Robber** [2] 40:3 89:20

**Robberies** [1] 17:9

**Robbery** [4] 51:11 77:17 89:4 89:16

**Room** [6] 6:2 31:5 35:18 36:18 101:23 116:1

**Rooms** [1] 11:16

**Rounds** [1] 64:22

**Row** [1] 76:7

**Rows** [1] 89:23

**Rule** [4] 30:23 121:24 126:4 126:5

**Rules** [12] 5:24 6:19 6:21 45:3 45:6 45:10 104:3 121:9 121:16 125:3 125:4 125:25

**Run** [3] 31:4 31:11 35:18 45:3

**Running** [1] 64:21

**Runs** [1] 40:4

## S

**Sale** [1] 93:18

San [1] 142:18
Satisfied [6] 45:12 45:13 65:22 65:24 80:23 123:25
Satisfy [1] 28:7
Saved [1] 24:11
Saw [5] 24:10 41:4 42:20 42:24 81:2
SBOT [4] 2:3 2:5 2:13 2:18
Scale [3] 35:19 36:19 36:21
Scary [1] 89:18
School [7] 18:13 45:1 50:22 86:7 86:10 96:14 96:15
Scientific [1] 81:3
Scotland [1] 89:12
Scout [1] 83:12
Screening [2] 64:1 64:1
Screwed [1] 24:19
Scrutiny [1] 121:9
Search [2] 47:18 56:1
Searching [1] 101:5
Second [47] 8:7 8:11 8:16 9:16 9:18 10:6 13:4 13:21 14:5 14:21 19:22 19:24 20:7 20:10 20:18 20:20 21:8 21:17 21:21 21:23 22:7 22:12 23:22 25:9 25:11 25:13 26:4 26:15 27:18 28:6 28:11 28:13 31:16 32:1 37:10 38:5 45:11 47:14 58:19 63:25 67:8 69:8 109:11 109:22 112:3 120:5 140:2
Secondly [1] 20:4
Seconds [2] 43:10 43:16
Secretary [1] 93:24
See [55] 6:11 7:9 9:17 10:15 10:16 11:10 13:11 15:22 16:2 17:14 18:8 21:8 25:16 26:17 34:12 35:11 37:24 38:19 42:17 42:24 43:9 43:12 43:15 43:24 45:5 45:16 47:19 53:14 56:1 62:7 65:14 66:1 66:22 69:25 75:16 78:4 85:11 86:12 88:19 89:23 97:7 99:23 100:23 104:15 110:8 110:15 110:16 118:8 118:12 121:23 122:8 124:5 127:9 127:14 139:22
Seeing [1] 89:16
Seeking [3] 128:13 135:1 135:3
Sees [5] 43:7 43:12 43:13 43:15 43:16
Seized [1] 43:19
Selected [2] 71:16 123:22
Selection [1] 91:24
Self [3] 33:19 77:6 95:1
Self-defense [6] 33:19 33:20 77:6 94:22 95:1 100:19
Send [3] 29:23 61:11 135:5
Sense [9] 22:22 47:2 59:3 61:1 64:14 129:6 132:14 138:13 140:20
Senseless [1] 111:19
Sent [3] 29:18 60:12 61:7
Sentence [66] 9:25 10:1 10:7 10:13 10:16 10:17 10:20 10:23 10:23 11:22 15:14:2 20:9 20:17 21:1 21:2 21:3 22:3 22:13 22:10 22:11 23:15 23:16 24:4 24:14 24:24:23 25:5 25:6 27:14 27:15 28:1 28:4 28:5 28:19 28:23 28:25 30:11 31:9 36:14 36:18 47:16 47:16 50:10 50:11 56:3 62:14 85:7 85:23 86:8 87:9 108:11 108:11 108:24 109:23 109:24 109:25 114:13 115:4 115:12 115:16 122:15 122:10 137:7 138:21 138:23
Sentenced [1] 105:15
Sentences [1] 31:6

Sentencing [2] 37:23 38:16
Separate [1] 11:15
September [1] 1:18
Series [2] 93:1 93:15
Serious [5] 53:8 96:4 96:4 139:17 141:19
Seriously [2] 99:8 99:16
Serve [2] 34:22 88:4
Served [2] 24:21 29:4 88:3
Service [5] 24:18 46:12 68:7 73:15 73:21
Services [2] 105:24 114:19
Set [5] 35:5 70:19 110:16 124:17 130:5
Seventeen [7] 22:20 23:2 35:11 53:6 53:7 53:9 53:10
Seventeen-year-old [2] 35:11 53:6
Seventy [1] 36:13
Seventy-five-year-old [1] 36:13
Several [2] 36:5 51:12
Severe [3] 23:13 63:3 140:9
Severely [1] 110:2
Severity [6] 63:2 139:18
Sexual [2] 77:18 114:8
Shall [1] 79:13
Shape [1] 57:12
Sharing [1] 95:7
Shift [1] 8:8
Shifts [1] 80:15
Shoes [1] 25:13
Shoot [1] 95:5
Shooter [1] 50:5
Shooting [4] 43:15 50:19 64:20 100:4
Shoots [1] 42:18
Short [1] 115:1
Shot [8] 50:18 51:1 52:8 53:17 64:15 92:6 110:21 111:22
Shots [1] 75:5
Show [5] 13:14 16:17 16:20 41:24 44:1
Showed [1] 35:9
Shows [3] 11:2 13:18 13:23
Side [9] 7:25 70:18 79:3 79:6 80:11 80:25 81:7 83:22 87:25
Sides [3] 69:25 78:20 79:3 79:4 79:7 88:20 88:22 88:25 123:24
Significant [1] 23:14
Silly [1] 121:23
Simple [2] 7:16 45:2
Simpler [1] 9:20
Simply [8] 13:13 16:6 20:21 28:6 29:15 31:13 33:21 34:13
Sincere [1] 141:13
Single [5] 8:12 8:14 8:19 10:25 30:13
Sister [1] 91:4
Sit [4] 65:21 116:1 136:6 141:11
Sitting [6] 48:4 64:21 76:2 101:8 127:13 129:2
Situation [13] 66:17 81:7 81:11 101:14 101:20 110:20 112:19 112:22 115:22 116:3 128:9 137:10 137:21
Situations [2] 95:23 112:12
Six [2] 35:8 42:19
Six-time [1] 35:8

Sixty [2] 4:15 64:21
Slipped [1] 63:20
Slips [1] 87:2
Slow [2] 86:6 96:18
Slower [1] 96:17
Small [1] 68:14
Social [2] 113:13 113:14
Socially [1] 113:7
Society [16] 9:5 17:24 18:2 18:4 18:5 19:14 19:14 49:3 59:25 60:9 93:20 97:4 106:19 119:18 121:1 137:5
Society's [3] 83:22 97:10 120:7
Sold [2] 94:19 94:23
Sole [1] 68:11
Solely [2] 15:15 40:8
Someone [28] 43:24 49:8 53:5 53:9 61:11 64:19 64:20 76:7 80:9 95:2 106:22 107:3 107:6 107:13 107:21 109:10 109:17 110:2 110:3 110:6 110:9 110:13 110:20 111:1 111:10 131:6 131:10 132:18
Sometime [1] 101:14
Sometimes [27] 10:22 10:23 11:23 11:25 18:5 22:18 23:8 24:21 28:18 41:14 57:18 66:13 80:18 96:8 101:3 119:9 121:2 121:13 131:18 131:19 131:25 132:1 136:25 138:25 139:12 139:22 140:8
Somewhere [1] 101:17
Son [3] 50:18 52:8 53:18
Sophisticated [1] 91:14
Sore [1] 83:22
Sorry [3] 28:23 53:2 107:1
Sort [1] 116:22
Sound [2] 4:10 104:12
Sounds [1] 74:8
Source [1] 39:18
Sources [1] 101:5
Southwest [1] 2:14
Span [1] 70:1
Speaking [2] 61:17 68:25
Special [51] 5:11 8:21 25:20 58:21 58:22 58:25 59:21 59:24 61:13 62:7 62:8 62:15 62:18 63:6 63:8 63:23 86:6 92:1 95:17 95:21 95:22 95:25 96:6 96:22 97:2 97:6 97:17 99:9 98:10 98:13 98:14 99:17 100:25 102:9 118:5 118:12 118:14 119:5 119:14 119:16 120:5 120:9 120:12 122:1 136:22 137:2 137:14 138:7 138:13 138:18 139:14
Specific [9] 11:3 11:4 12:1 12:9 16:19 17:20 24:6 34:17 36:17
Specifically [3] 3:14 12:12 21:8
Specifics [1] 63:16
Specify [1] 17:6
Speculating [1] 30:8
Spend [4] 4:11 30:12 135:6
Spent [2] 113:10 125:18
Split [1] 16:6
Spoken [1] 120:15
Spring [1] 68:13
Square [1] 132:2
Stab [1] 111:21
Stabbed [2] 64:15 111:1
Stage [7] 80:6 82:2 82:4 82:23 83:10 84:21 109:19
Stages [1] 81:14
Stamps [1] 106:8
Stand [2] 81:1 130:15
Standard [1] 12:3

Standardized [1] 96:15
Standing [1] 43:13
Standpoint [3] 12:17 25:2 39:9
Start [2] 97:20 101:20
Started [8] 5:14 5:15 50:24 51:16 102:2 106:2 133:17 136:1
Starting [7] 12:20 12:21 13:21 31:20 39:5 97:12 104:8
Starts [5] 12:13 13:17 13:22 40:7 126:12
State [35] 1:10 2:10 4:16 4:20 10:17 12:18 12:23 15:23 16:3 16:20 17:19 21:11 21:16 21:19 21:20 25:16 29:24 30:1 32:8 34:5 36:9 39:11 65:7 66:6 70:9 75:12 77:3 77:22 79:22 80:14 100:5 127:6 134:21 142:1 142:4
State's [19] 13:3 13:9 13:13:15 13:17 13:23 14:12 14:15 14:17 15:19 16:16 16:24 16:24 25:19 32:12 32:13 58:23 80:3 119:4
Statement [1] 78:7
Statements [1] 140:3
Stay [4] 12:21 29:16 30:24 60:20
Stayed [1] 133:4
Still [12] 25:25 55:25 56:3 56:6 72:2 83:2 86:21 87:23 94:5 129:7 129:18 135:9
Stop [2] 48:7 84:3
Stopped [1] 24:11
Store [8] 89:7 89:8 89:21 90:3 100:1 100:6 100:7 101:22
Storekeeper [1] 90:3
Storm [1] 24:19
Story [1] 133:11
Straight-A [1] 83:12
Street [2] 24:10 121:5
Strength [1] 13:3
Strong [4] 59:10 59:14 60:2 60:2
Strongly [2] 93:1 141:14
Struck [2] 87:21 88:3
Structured [1] 121:15
Student [2] 83:12 86:6
Stuff [7] 8:15 8:15 52:11 94:10 101:23 123:12 123:14
Stupid [1] 85:21
Subject [1] 93:16
Substance [2] 86:20 121:21
Substitute [1] 20:17
Substituted [2] 22:4 24:15
Successfully [1] 18:16
Suffered [1] 133:18
Sufficient [15] 9:23 20:25 22:9 25:4 26:10 39:22 39:23 41:14 47:14 49:20 50:9 56:2 78:22 84:11 84:12
Sufficiently [2] 84:18 134:12
Sugar [2] 121:20 121:22
Suggest [1] 80:22
Sum [2] 136:3 136:8
Summarizes [1] 78:8
Support [2] 35:23 92:9
Supported [1] 36:2
Supposed [2] 97:12 101:11
Suppress [1] 123:18
Surprised [2] 89:17 91:24
Surrounding [1] 117:19
Sustain [1] 133:15
Suzette [1] 114:24

**Sworn** [5] 46:2 67:13 73:2 103:5 123:7
**System** [4] 18:14 18:23 19:4 131:18

## T

**T.D.C.** [1] 121:20
**Table** [1] 68:5
**Talks** [6] 35:25 36:3 36:4 80:8 109:23 109:25
**Tax** [1] 113:9
**Taylor** [5] 67:12 67:23 69:7 71:13 72:10
**Teacher** [1] 96:16
**Teaches** [1] 18:13
**Teaching** [1] 18:24
**Teachings** [1] 128:16
**Ted** [1] 92:4
**Teenager** [1] 53:5
**Television** [2] 26:19 34:16
**Ten** [4] 46:20 46:23 69:17 86:1
**Tend** [2] 22:19 40:14
**Tending** [1] 124:8
**Tends** [4] 39:19 39:24 40:10 40:18
**Term** [6] 12:16 14:16 14:22 14:23 15:6 117:12
**Terms** [13] 7:10 7:11 35:20 69:18 99:4 100:13 111:12 114:14 117:20 117:22 117:23 119:17 138:8
**Test** [2] 48:9 105:5
**Testified** [5] 46:2 67:13 73:2 103:5 123:7
**Testify** [8] 41:7 42:19 42:20 79:7 79:12 79:16 81:1 102:14
**Testifying** [1] 113:22
**Testimony** [30] 6:20 6:22 7:2 7:4 7:5 7:9 11:11 11:18 11:19 23:6 24:16 39:16 40:9 40:14 40:18 41:4 41:24 42:2 42:4 42:6 42:9 42:12 43:3 44:2 70:20 79:25 124:20 125:4 125:9 130:20
**Tests** [1] 96:15
**Texas** [31] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 4:17 4:20 4:25 10:17 19:13 29:24 30:1 34:5 34:24 39:11 75:12 77:3 77:22 80:14 81:20 82:8 105:23 114:18 127:6 142:1 142:4 142:16 142:17 142:18
**Theft** [1] 134:24
**Themselves** [5] 6:21 12:11 28:8 31:5 68:20
**Theoretically** [1] 112:16
**Therefore** [10] 13:19 31:8 47:15 52:23 53:12 98:23 100:5 110:14 125:8 139:13
**They've** [1] 141:19
**Thinking** [12] 24:14 52:21 62:3 80:3 80:19 112:10 113:5 120:12 124:2 138:8 139:16 139:19
**Thinks** [1] 127:17
**Third** [6] 33:2 33:4 42:22 43:14 64:1 94:1
**Thirteen** [1] 124:6
**Thirteen-month-old** [1] 124:6
**Thoroughly** [1] 51:18
**Thoughts** [3] 112:10 127:20 129:17
**Threat** [10] 9:5 17:23 19:12 49:3 83:4 83:8 83:17 84:24 106:19 121:1
**Threatened** [1] 94:25
**Threatening** [1] 101:15

**Three** [13] 26:22 26:25 27:1 27:3 27:16 32:12 32:14 32:21 42:18 43:3 78:11 94:6 99:20
**Throughout** [2] 106:9 134:23
**Throw** [1] 5:20
**Throwing** [1] 133:17
**Thrown** [1] 126:15
**Tired** [1] 91:7
**Today** [8] 5:12 5:24 6:4 93:9 94:10 101:13 125:17 126:12
**Together** [2] 39:12 108:10
**Token** [1] 80:16
**Took** [3] 16:6 52:20 81:21
**Topic** [1] 103:16
**Total** [4] 55:4 83:16 126:9 142:10
**Totally** [2] 57:14 111:20
**Touch** [1] 93:16
**Towards** [1] 86:8
**Towel** [1] 126:15
**Traffic** [1] 58:7
**Tragedies** [1] 66:21
**Tragedy** [1] 66:14
**Traits** [1] 24:6
**Transaction** [5] 32:3 66:9 66:12 66:16 66:20
**Transcription** [1] 142:5
**Transcription/stenograph** [1] 1:23
**Treat** [1] 96:19
**Treated** [1] 114:11
**Trial** [72] 1:3 5:3 5:9 6:17 8:2 8:6 8:7 8:11 8:16 8:18 9:12 9:16 11:6 12:2 12:9 12:20 13:5 13:16 13:22 16:8 16:16 16:21 22:20 22:21 24:10 27:1 27:4 29:2 30:7 35:9 35:7 5 37:7 37:11 37:12 38:6 38:7 38:15 39:2 39:20 42:19 44:1 44:20 48:24 49:24 51:3 57:1 58:4 58:19 65:1 74:6 74:17 76:20 80:7 81:14 81:15 82:2 82:4 82:18 82:23 83:11 84:16 85:4 90:17 92:4 94:20 102:15 102:17 109:11 109:19 124:19 125:19 126:12 129:12
**Trials** [5] 10:21 11:21 41:1 2 78:19 91:15
**Tried** [4] 57:4 64:3 111:1 115:15
**Trouble** [3] 35:12 83:13 83:21
**True** [3] 62:19 130:13 142:4
**Truly** [3] 57:8 129:4 142:9
**Truth** [5] 5:22 132:20 133:10
**Try** [3] 25:13 80:12 88:17
**Trying** [10] 6:6 39:4 39:10 46:25 78:16 95:2 124:16 129:16 130:18 135:4
**Tucker** [3] 76:9 91:16 115:3
**Turn** [2] 78:5 126:23
**Turns** [3] 34:24 43:8 43:12
**TV** [3] 91:19 94:10 94:11
**Twelve** [1] 57:9 70:1 126:7
**Twenty** [2] 53:12 108:23
**Twenty-five** [2] 53:12 110:21
**Twenty-seven** [1] 41:23
**Two** [73] 4:20 5:2 5:10 8:20 8:21 9:7 9:9 10:2 10:8 10:18 11:6 15:9 19:21 19:21 23:3 26:1 26:22 26:24 30:5 32:2 32:4 32:14 32:18 33:2 33:23 35:15 39:8 39:12 41:1 42:15 48:24 49:18 52:24 53:

2 53:13 53:14 55:13 61:13 62:8 62:9 62:15 63:9 63:23 66:8 66:10 66:20 68:15 78:6 80:7 81:14 82:20 84:2 84:25 85:13 86:1 86:13 95:17 95:25 97:24 98:11 99:18 101:1 108:2 114:14 114:23 119:14 122:2 124:1 124:9 138:7 138:19 139:7 140:2
**Type** [19] 48:11 48:14 49:11 49:13 49:15 50:12 58:15 72:22 76:22 76:25 77:2 105:10 107:20 107:20 111:23 130:12 134:10 134:13 135:10
**Types** [4] 76:14 131:1 131:2 131:3

## U

**Ultimate** [5] 127:17 127:25 128:3 129:7 132:2
**Ultimately** [5] 100:16 127:23 128:8 132:3 132:6
**Unable** [2] 22:23 45:9
**Unanimously** [6] 20:5 20:17 37:6 37:8 38:2 38:4
**Undecided** [1] 140:14
**Under** [4] 77:20 92:18 108:18 121:8
**Understood** [1] 59:15
**Undo** [1] 83:18
**Unfair** [4] 15:22 16:3 120:16 130:6
**Unfolded** [1] 122:16
**Unique** [8] 12:2 20:14 20:15 25:4 27:13 28:2 57:11 57:20
**Uniqueness** [1] 38:11
**Unjustly** [1] 131:25
**Unless** [10] 12:22 13:8 13:17 13:23 20:13 21:6 77:11 84:25 94:13 108:1
**Unlocking** [1] 140:10
**Unwilling** [1] 45:9
**Up** [51] 5:20 11:16 13:16 13:19 13:24 24:19 29:19 29:20 29:23 30:3 34:22 34:24 35:18 36:18 40:3 43:8 44:6 57:12 63:13 68:4 71:13 73:12 74:5 74:5 74:6 74:15 74:16 75:13 78:4 82:2 83:24 85:14 86:2 86:16 93:7 93:12 94:24 106:2 113:7 126:10 126:14 127:8 129:25 133:6 133:8 133:17 136:3 136:9 140:22
**Upbringing** [5] 52:5 54:2 62:4 82:13 128:16
**Upbringings** [1] 54:9
**Uplift** [1] 113:10

## V

**Value** [1] 34:23
**Values** [2] 34:25 57:10
**Venireman** [1] 135:15
**Venireperson** [3] 3:2 3:19 72:9
**Verdict** [23] 10:1 11:23 12:1 13:14 13:15 13:17 13:20 14:9 14:18 14:18 14:19 27:19 27:23 28:2 28:8 28:10 28:12 33:2 33:4 104:15 118:17 125:10 130:14
**Verdicts** [3] 11:17 47:1 47:2
**Verge** [1] 42:16
**Versus** [4] 4:17 110:21
**Veterinarian** [1] 68:11
**Victim** [10] 9:6 10:2 15:25 35:3 37:1 43:13 43:14 43:22 51:11 111:19
**Victims** [1] 11:9
**Vietnam** [1] 24:19

**View** [5] 6:22 7:6 43:24 52:25 53:2
**Viewed** [2] 23:19 47:4
**Views** [1] 78:8
**Violate** [1] 121:16
**Violating** [1] 121:23
**Violations** [1] 121:17
**Violence** [34] 9:4 15:22 15:25 16:4 16:15 16:18 17:3 17:5 17:8 17:10 17:11 17:16 18:12 18:19 18:24 19:7 19:11 49:2 49:12 49:14 49:15 83:5 83:9 106:18 106:24 107:6 107:17 107:17 107:22 107:24 112:21 112:25 121:18 121:25
**Violent** [3] 49:8 49:10 49:11
**Visit** [1] 123:13
**Voir** [16] 1:15 46:3 48:1 56:16 67:14 71:11 73:3 75:9 87:15 90:22 103:16 105:1 116:14 123:8 127:13 135:18
**Volume** [2] 1:2 142:6
**VOLUMES** [1] 1:2
**Voluntarily** [1] 86:23
**Voluntary** [2] 86:18 87:1
**Vote** [2] 84:19 112:17
**Voted** [1] 20:11
**VS** [1] 1:8

## W

**Wait** [5] 27:17 83:23 109:10 109:18 109:21
**Waiting** [1] 55:12
**Walk** [2] 67:2 132:7
**Walking** [2] 43:7 43:17
**Walks** [2] 43:9 54:6
**Walls** [2] 18:10 18:15
**Wardens** [1] 19:1
**Warrant** [5] 50:10 62:13 100:22 138:20 138:22
**Warranted** [4] 37:24 105:9 108:18 111:13
**Warrants** [3] 24:13 24:23 108:10
**Waste** [1] 126:9
**Watch** [1] 36:5
**Wayne** [5] 2:12 4:19 91:2 116:19 135:23
**Ways** [2] 53:3 53:14
**Weapon** [1] 43:21
**Wednesday** [1] 67:10
**Week** [8] 24:8 29:5 29:5 42:1 67:10 69:9 111:1 124:1 1
**Weekend** [2] 87:16 113:5
**Weeks** [3] 42:5 68:15 124:9
**Weigh** [1] 59:7 84:17 86:15 88:24 98:5
**Weight** [1] 7:1
**Wentz** [24] 2:17 3:7 3:8 3:9 3:10 3:24 3:25 4:3 4:18 55:16 56:15 56:17 71:14 72:16 72:18 90:21 90:23 91:1 116:13 116:15 116:18 135:17 135:19 135:22
**Whereby** [1] 76:16
**Wherein** [3] 36:13 41:8 47:13
**Whole** [19] 6:3 9:20 13:5 25:7 25:9 27:11 27:13 33:16 35:14 38:19 38:21 45:2 100:2 104:7 123:25 132:20 133:10 134:3 137:9
**Wide** [3] 74:4 74:12 74:14
**Wife** [2] 36:5 133:9
**Willing** [4] 47:18 55:17 98:24 118:25
**Wind** [1] 126:13

**Windshield** [1] 17:15

**Wine** [1] 42:22

**Witness** [9] 41:22 41:24
42:3 56:13 80:22 89:4 100:3
130:15 142:12

**Witness'** [1] 42:4

**Witnesses** [16] 7:1 11:10
11:15 11:18 11:19 35:7 41:
23 42:9 43:1 65:5 80:1 80:3
89:14 124:24 125:6 125:7

**Witnesses'** [1] 41:24

**Woman** [1] 76:8

**Women** [1] 114:23

**Wonder** [1] 116:22

**Wondering** [1] 93:21

**Word** [23] 7:14 15:2 15:2
15:4 15:8 15:13 15:18 16:13
17:24 18:5 19:14 22:12 22:
13 23:20 59:14 60:1 107:2
117:15 120:18 127:18 137:18
138:8 138:12

**Words** [32] 7:18 7:19 7:20
7:22 7:24 12:5 13:14 18:2
20:23 20:24 58:24 60:3 61:6
65:4 65:7 71:20 75:19 80:8
86:19 94:22 98:14 98:21 98:
22 99:2 118:13 118:14 122:
12 130:12 136:23 136:25 137:
15 137:17

**Worker** [6] 106:2 106:6
106:10 113:13 113:14 113:15

**Works** [1] 137:9

**World** [2] 11:23 128:20

**Worst** [2] 97:10 120:7

**Worth** [2] 36:17 66:14

**Wound** [1] 111:21

**Write** [1] 94:15

**Writing** [3] 6:1 6:4 142:5

**Wrongdoing** [1] 65:10

**Wrongly** [2] 131:23 131:25

**Wrote** [1] 51:10

## Y

**Y'all** [1] 87:22

**Year** [13] 29:6 29:6 29:7
29:16 30:9 31:1 35:8 35:11
36:13 45:1 53:6 117:25 133:5

**Years** [22] 22:20 29:4 29:
4 29:5 29:6 29:8 29:9 30:14
30:17 31:7 31:8 31:12 34:7
35:22 38:10 38:15 51:9 51:
12 86:1 88:3 94:6 108:23

**Yogi** [1] 26:19

**Young** [4] 53:5 66:15 85:
20 85:21

**Yourself** [14] 5:21 9:23
25:3 45:12 57:17 85:16 85:
17 86:24 88:7 101:21 116:3
118:15 132:15 141:10

**Yourselves** [2] 7:13 20:23

**Youthfulness** [1] 22:21

## Z

**Zero** [1] 39:5

**Zone** [1] 6:11

1       REPORTER'S RECORD

2       VOLUME 12 OF 25 VOLUMES

3       TRIAL COURT CAUSE NO. 800112

4

5    CHARLES MAMOU, JR.        )    IN THE DISTRICT COURT

6          Appellant          )

7                             )

8    VS.                      )    HARRIS COUNTY, TEXAS

9                             )

10   THE STATE OF TEXAS        )

11         Appellee           )    179TH JUDICIAL DISTRICT

12

13

14            * * * * * * * * * * * * * * * * * * *

15            VOIR DIRE EXAMINATION

16            * * * * * * * * * * * * * * * * * * *

17

18       On the 21st day of September, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Bob Burdette, Judge

21   Presiding, held in Houston, Harris County, Texas:

22       Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

```
 1           A P P E A R A N C E S

 2     MR. LYN MCCLELLAN

 3     SBOT NO. 13396100

 4     MS. CLAIRE CONNORS

 5     SBOT NO. 0470500

 6     Assistant District Attorneys

 7     201 Fannin

 8     Houston, Texas 77002

 9     Phone:  713.755.5800

10     ATTORNEYS FOR THE STATE OF TEXAS

11

12     MR. WAYNE HILL

13     SBOT NO. 59656300

14     4615 Southwest Freeway

15     Houston, Texas 77027

16     PHONE:  713.623.8312

17     MR. KURT WENTZ

18     SBOT NO. 21179300

19     5629 W FM 1960

20     Houston, Texas 77069

21     PHONE:  281.587.0088

22     ATTORNEYS FOR THE DEFENDANT
23

24

25
```

INDEX

VOLUME 12 OF 25

|  | PAGE | VOL. |
|---|---|---|
| September 21, 1999    Voir Dire Examination |  | 12 |
| Panel Voir Dire | 3 | 12 |

| Venirepersons | Court | State | Defense | | VOL. |
|---|---|---|---|---|---|
| Houston Norman Hamilton | 49,79 | 51 | 67,84 | | 12 |
| Joyce Stoner Williams | 86,97 105 | 91,100 | 110 | | 12 |
| Nohemy Bonilla | 111 | 115 | 125 | | 12 |
| Linda Deaton | 131 | 133 | 140 | | 12 |
| Traci Lee Karam | 149 | 151 | 169 | | 12 |
| Joseph Michael Mathews | 182 | 188 | 197 | | 12 |
| William Glenn Kelly | 210 | 214 | 224 | | 12 |
| Wesley Dwayne Mikle | 231 | 234 | 243 | | 12 |

|  | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 246 | 12 |
| Court Reporter's Certificate | 247 | 12 |

1    THE COURT: As I understand, there is an
2 agreement by and between the parties that Venireperson
3 Number 104, that being Miss Janet Johnson, and
4 Venireperson Number 107, that being Craig Baker, for
5 various reasons may be excused.
6        Mr. McClellan, is that your agreement?
7    MR. MCCLELLAN: Yes, Your Honor.
8    THE COURT: Is it also Miss Connors'?
9    MR. MCCLELLAN: Yes, Your Honor.
10    THE COURT: Yours, Mr. Hill?
11    MR. HILL: Yes, Your Honor.
12    THE COURT: Yours, Mr. Wentz?
13    MR. WENTZ: Yes, Your Honor.
14    THE COURT: And yours, Mr. Mamou?
15    THE DEFENDANT: Yes, Your Honor.
16    THE COURT: Is it your request that each
17 of these be excused?
18    THE DEFENDANT: Yes, sir.
19    THE COURT: Very well. They'll be
20 excused.
21        (Jury panel brought in.)
22    THE COURT: Good morning, ladies and
23 gentlemen. To remind you, we're here visiting about
24 your prospective service as a juror in the case of State
25 of Texas versus Charles Mamou, Jr.  Mr. Mamou is

1 represented by his attorneys, Mr. Wayne Hill, who just
2 went through one of these doors, Mr. Kurt Wentz. The
3 State of Texas is represented by two of her Assistant
4 District Attorneys, Mr. Lyn McClellan, Miss Claire
5 Connors.
6        As we discussed the other day, this
7 defendant stands charged by indictment with the offense
8 of capital murder that is alleged to have occurred in
9 Harris County, Texas, on or about the 7th day of
10 December of 1998. I want to spend some time visiting
11 with you today about some things other than what we
12 talked about the other day when the whole group was
13 together.
14        Before we start, let me say this: I know
15 that we're going to talk about things that you have
16 never before in your life thought about, and there is no
17 reason in the world why you ever should have. Please
18 don't get frustrated if you feel that what we're talking
19 about is confusing. Please don't throw your hands up in
20 the air to yourself, so to speak. Don't get frustrated
21 with yourself about what we're going to talk about.
22 Don't feel that you need to commit to memory what we're
23 talking about, because you don't.
24        And the reason that you don't is this: At
25 the conclusion of the evidence at each phase of the

1 trial, if we do have both phases, I'll give you -- or
2 you'll be given in writing in the Court's charge all of
3 the rules that have come into play during the course of
4 the trial. You'll have the Court's charge with you back
5 in the jury room in writing throughout the whole time
6 you're deliberating. So for that reason, you can see
7 that you don't need to memorize what it is we're talking
8 about here today.
9        I want, however, you to feel more
10 comfortable with what can go on during the course of a
11 trial like this. Kind of like the better prepared you
12 are, the better you can play, so to speak. So it's for
13 that reason we're going to talk about some things. We
14 talked the other day about the fact that a trial like
15 this, actually any criminal trial for that matter, can
16 come in two parts. The first part of the trial, the
17 jury's only concern is going to be with deciding whether
18 the defendant is or is not guilty of the offense. If
19 the jury finds the defendant to be not guilty, the case
20 is over with and that's the end of that.
21        If the jury finds the defendant guilty, we
22 come back and we have a second stage of the trial. At
23 the second stage of the trial, additional evidence can
24 be presented to you for the purposes of assisting you in
25 answering two Special Issues or two questions that we

1 touched on very briefly the other day. We're going to
2 talk about that in detail in just a little bit. And
3 it's how the jury answers those two questions that
4 determines what punishment the law requires that I
5 impose.
6        So since the purpose for the testimony in
7 each phase of the trial is different -- that is to say,
8 your verdict is going to be, is he guilty on the one
9 hand or not? And on the other hand, if he is guilty,
10 what is the appropriate punishment? Therefore, the
11 focus of the evidence is going to be different.
12        At the first phase of the trial, the
13 evidence is going to focus on the crime that was
14 committed. Who did it? Where was it done? How was it
15 done? When was it done? What were the circumstances?
16 What was the prior relationship of the parties, if there
17 was a prior relationship? What was the motive for
18 having done it, if the motive is known? Those are all
19 things you'll hear at the first phase of the trial.
20        If the jury finds the defendant guilty, at
21 the second phase of the trial the focus of the evidence
22 is going to shift; and the focus of the evidence at the
23 second stage of the trial is going to be on the
24 character and the background and the personal moral
25 responsibility of the defendant involved in the

1  commission of the crime, meaning, you know about the
2  crime.
3        Now we want you to know about the person
4  who did it. Might be a whole lot of good traits. Might
5  be a lot of bad traits. Might be some of each. But we
6  want you to be able to take the defendant on trial, add
7  to it the facts of the case so that you'll be armed with
8  information as to how to answer the questions that we're
9  going to ask you.
10       The questions we're going to be asking you
11 are over here on this board, and we're going to talk
12 about that in a couple of minutes. First off, I'll tell
13 you the questions are going to be asked in the order in
14 which they appear on the board. The words which are on
15 the board are the words that are going to be used in the
16 question. So this is specifically what you're going to
17 be asked to decide in the event you find the defendant
18 guilty of the offense of capital murder.
19       Please follow along with me if you care
20 to. It might make this a little bit simpler. The first
21 question will ask you: Do you find from the evidence
22 beyond a reasonable doubt that there is a probability
23 that the defendant would commit criminal acts of
24 violence that would constitute a continuing threat to
25 society? Can you see no matter who the defendant is, no

1  matter what case it is, no matter who the victim was,
2  there's never ever but two possible answers to that
3  question, either yes or no? And the answer to that
4  question, yes or no, is whichever way you believe the
5  evidence indicates.
6        The second question that you'll be asked
7  to answer is this: Taking into consideration all of the
8  evidence, including the circumstances of the offense --
9  now, you see, that's going to be what you heard at the
10 first half of the trial about the crime -- also
11 including the defendant's character and background and
12 his personal moral culpability, which is the same as
13 responsibility. That's going to be what you heard at
14 the second part of the trial. And the personal moral
15 responsibility of what we're talking about is if there
16 is a situation, if there is one where there are multiple
17 defendants involved in a particular crime. What was the
18 comparative blameworthiness of this defendant on trial
19 as compared to the other ones whose trials will be held
20 separately from this one?
21       So -- also taking into account the
22 defendant's character and background, the personal moral
23 culpability. So you can see that the first half of the
24 second question does absolutely nothing more than
25 instruct the jury to go back over all of the evidence in

1  the case for the purpose of asking yourself this
2  question: Is there a sufficient mitigating
3  circumstance, or perhaps circumstances, that make you
4  believe that a life sentence would be a more appropriate
5  verdict than a death sentence?
6        Again, no matter who the defendant is, no
7  matter what the case is, no matter who the victim was,
8  there's never but two possible answers to that question,
9  yes or no. Again, you'll answer that question the way
10 that you feel the evidence dictates. If the jury should
11 answer yes to that first question, and if the jury
12 should answer no to that second question, the law says I
13 have no choice, I have no option, and I have no
14 discretion. I must sentence the defendant to death, and
15 that's exactly what I'll do.
16       If the jury should answer those two
17 questions in any way other than yes and no, in that
18 order, once again, the law says I have no choice, I have
19 no option, I have no discretion. I must sentence the
20 defendant to life, and that's exactly what I'll do.
21       So, first off, you can see the juries in
22 the State of Texas don't go out and sentence this person
23 to life, that person to death. What jurors do is take
24 the evidence that exists in the case and answer those
25 two questions. And you're entitled to know what the

1  effect of your answers is going to be and what kind of
2  sentence I'll pass. And you're entitled to know that a
3  yes and a no answer is a death sentence. A no answer to
4  the first question is a life sentence. A yes answer to
5  the first question and a yes answer to the second
6  question is a life sentence.
7        So you can see -- I know that you have
8  probably read about, heard about cases, capital murder
9  cases, where a person's convicted of capital murder; and
10 in some cases a life sentence is imposed, some cases a
11 death sentence is imposed. And the reason there are
12 different sentences imposed is because there is
13 different evidence in each case. These questions never
14 change. This is the standardized process. The words
15 never change. The questions never change. The order in
16 which the questions are asked never changes.
17       What always does change is every defendant
18 is different from every other defendant. In one
19 imaginary case you might have a seventeen-year-old girl
20 as a defendant, who's never done anything wrong in her
21 life. In another imaginary case you might have a
22 forty-five-year-old, six-time ex-convict who spent his
23 life killing people. All the facts are different. All
24 the circumstances are different. All the victims are
25 always different. All the witnesses who testify are

1 always different. And all the juries are always
2 different.
3          For example, we could have in this
4 courtroom, if we could fit them in here, four juries
5 listening at exactly the same time to exactly the same
6 testimony from exactly the same witnesses and have all
7 four of those juries go out in four different jury
8 deliberation rooms, and we'll come up with four
9 different verdicts; because those twelve people on one
10 jury evaluate the testimony differently than the other
11 twelve people.
12          So, that's why every single case is as
13 unique as an individual's fingerprint. There are no two
14 cases that are ever alike, because the witnesses are
15 changed. The defendant's are changed. The victims are
16 changed. The facts are changed, and the jury. That's a
17 jury's decision, and a life sentence may be imposed.
18 That may very well be the absolute most appropriate
19 verdict in the world for that particular case.
20          In another capital murder case, when these
21 Issues are answered in such a way that the defendant's
22 sentence is imposed, that also may be the absolutely
23 most appropriate verdict that could ever be returned in
24 that case because of the uniqueness of the circumstances
25 in that case.

1          So can you see that every case starts off
2 being absolutely different than anything else? It has
3 its own personality and own identity. Let's talk about
4 these questions in a little more detail. And before we
5 do, let me tell you that we're going to spend some time
6 today talking with you now, as well as with you
7 individually, about things that are going to occur, or
8 can occur, I should say, at the punishment phase of the
9 trial if a defendant is found guilty of capital murder.
10          You may say to yourself, well, why in the
11 world are you all talking about the punishment phase of
12 a trial when you told us yesterday, just the other day,
13 before the trial begins and during the course of the
14 trial, all defendants are presumed to be not guilty. So
15 why do we talk about the punishment phase of the trial?
16 And that's a good question.
17          The reason is this: If we don't talk to
18 you about the punishment phase now, about the law that
19 can come into play, we're never going to be able to talk
20 to you about it. For example, if we picked a jury,
21 talked to them only about the laws that can come into
22 play at the first phase of the trial, and if a jury
23 finds that imaginary defendant guilty of capital murder,
24 and if we come back and we get the jury together and we
25 talk about the laws that could come into play in the

1 second phase of the trial, and if a juror says, well,
2 wait just a second. I didn't know that that particular
3 rule was a piece of the deal in this case. I'm going to
4 tell you right now, I'm going to refuse to follow that
5 law, because I simply don't believe in it. That means
6 I'd have to excuse that juror. That means I only have
7 eleven jurors. I need to have twelve. If I don't have
8 twelve, I have to declare a mistrial, excuse the eleven
9 that I do have, start the case all over again, and
10 everything we would have done would have been a total
11 waste of time. So that's why we have to talk about
12 everything that can come into play now, before the trial
13 begins. So please don't think that because we're
14 talking about the punishment phase now, the defendant's
15 getting ready to plead guilty, because he's not. Please
16 don't believe that Mr. Hill and Mr. Wentz are getting
17 ready to throw in the towel and are committed to the
18 notion the jury's going to find the defendant guilty,
19 because they're not. Please don't think we've given up
20 on the defendant's presumption of being innocent or
21 being not guilty at the beginning of trial, because
22 we're not. The only time we're ever going to get to
23 talk to you about this stuff is before the trial ever
24 begins. So keep that -- there is nothing nefarious or
25 tricky about this going on at all.

1          Now having said that, in the Court's
2 charge that you're going to be given at the second phase
3 of the trial are the rules that have been raised by the
4 testimony that was presented. There are going to be a
5 lot of terms defined for you, and there are going to be
6 a lot of terms that aren't going to be defined for you.
7 And if your question is, well, how do you people decide
8 what words you're going to define for us and what words
9 you aren't, I'm telling you the answer is really simple.
10 And the answer goes just like this: There is no
11 justifiable reason why we ought to expect you folks to
12 give of your time, make yourselves available for jury
13 service, and be armed with legal definitions as to what
14 words are being used by lawyers during the course of the
15 lawyering business.
16          So if we're going to be using some word,
17 some term that's peculiar to the lawyering business,
18 we're going to define it for you. If we're going to be
19 using a word that you use, we're not going to tell you
20 what those words mean; because you already know what it
21 means. That's how we make that decision. And if I go
22 back to what I said at the beginning last Friday,
23 whenever it was, this really is not complicated. Don't
24 try to make it into something it's really not. It's
25 perfectly simple.

1       All this is about is listening to what the
2   witnesses say, evaluate what the witnesses say, and
3   react to what the witnesses say.  React in terms of
4   coming up with a verdict based upon how you evaluate the
5   testimony of the witnesses.  That's all this is about.
6       So let's talk -- is there something wrong?
7   Let's talk a couple of seconds about the words that are
8   contained in these two questions.  First off, in the
9   first question, first thing we see is:  Do you find from
10  the evidence beyond a reasonable doubt?  We talked
11  about a reasonable doubt the other day.  We talked about
12  the definition that you'll be given for that word.  We
13  talked about it from the standpoint of the fact that
14  it's up to the State to prove a person's guilt beyond a
15  reasonable doubt.  We talked about the fact that up
16  until the time they do prove a person's guilt beyond a
17  reasonable doubt, the defendant is not guilty.  So at
18  the beginning of the trial, the jury's verdict starts
19  off being not guilty, unless the State's evidence proves
20  beyond a reasonable doubt that that verdict should be
21  bumped up, so to speak, from not guilty bumped up to
22  guilty.
23       At the second phase of the trial, in order
24  to get the death penalty imposed, we know the answer to
25  this first question has got to be yes; because it takes

1   a yes and a no, in that order.  We see from the phrase
2   at the beginning of the question:  Do you find from the
3   evidence beyond a reasonable doubt?  That means every
4   time we see the phrase, do you find from the evidence
5   beyond a reasonable doubt -- that means the State has to
6   prove what the answer to that question should be.  Just
7   like at the guilt phase, the defendant starts off being
8   not guilty unless the State's evidence proves he is
9   guilty.
10       At the second phase, this first question
11  starts off being answered no unless the State's evidence
12  proves that the answer to that question should be bumped
13  up to a yes.  That means that at the beginning of the
14  second phase in every capital murder case where a
15  defendant has been found guilty of capital murder, it is
16  presumed that the appropriate punishment should always
17  be life.  And how do you get that?  Well, because it's
18  presumed starting out that that first question should be
19  answered no.  We understand from our conversation that a
20  no answer to that first question means a life sentence
21  is going to be imposed, because a no answer to the first
22  question is different than yes and no.  And that's what
23  it takes for a death sentence.  So, starting out, that
24  first question gets a no answer unless or until the
25  State's evidence proves beyond a reasonable doubt that

1   the answer should be yes.  Does anybody have any
2   questions about that?  Anybody doesn't see how I got to
3   the point that I got?
4       Okay.  Let's continue with the first
5   question.  Do you find from the evidence beyond a
6   reasonable doubt that there is a probability?  Now the
7   word probability is not going to be defined for you,
8   because you folks use that word all the time yourselves.
9   Whatever it is, I can't tell you or give you a
10  definition of the word probability.  I am permitted to,
11  by comparison, tell you that whatever the word
12  probability does mean to you, there are two things that
13  it can't mean.  One of them is this:  Whatever the word
14  probability means to you, it must be something that is
15  more than a possibility.  Anything could possibly
16  happen.  Because it could possibly happen does not mean
17  it's probably going to.
18       On the other hand, whatever the word
19  probable means to you, it cannot mean something you have
20  as a certainty.  Because something is probably going to
21  happen does not mean it's certain to happen.  Now let's
22  take in context the word probability, as used in this
23  question.  The State's got to prove the existence of a
24  probability that a defendant will commit future acts of
25  criminal violence.  Can you see how grossly unfair it

1   would be if the State only had to prove that a defendant
2   would possibly commit future acts of violence?  Because
3   anything is possible to happen.  It's possible that the
4   eight of you and myself could commit criminal acts of
5   violence in the future, so we had to put a stronger
6   burden on it than that.  On the other hand, can you see
7   how grossly unfair it would be to the State to require
8   them to prove the existence of a certainty that a
9   defendant would commit future acts of criminal violence?
10  Because nobody can prove that, so what we simply did was
11  we split the baby.  We took something greater than
12  possibility, something not as great as certainty, and
13  required the State to prove beyond a reasonable doubt
14  the existence of a probability that a defendant on trial
15  would commit future acts of criminal violence.
16       So if probability means to you something
17  that is more likely to happen than more likely not to
18  happen, that's a deal.  If it means something else to
19  you, that's just fine, too.  That's your call, as long
20  as probability means something more than a possibility,
21  and as long as probability doesn't mean as much as a
22  certainty.  Anybody have any questions about that?
23  Continuing with the question -- probability that the
24  defendant would commit criminal acts of violence?
25       In order to obtain a yes answer to this

**19**

1   question, it is not necessary that the State prove to a
2   probability that a defendant would commit a specific
3   crime in the future. The State, in order to get a yes
4   answer to this question, is not required to prove
5   existence of a probability that a defendant on trial
6   would commit future capital murders. Certainly if that
7   proof exists, they're entitled to present it to the
8   jury.
9           But in order to get a yes answer to this
10  question, the State is not required to prove a specific
11  crime. The State is required to prove the existence of
12  a probability that a defendant on trial would commit a
13  certain class of crimes, category of crimes, and that
14  category of crime is the one that's a criminal act of
15  violence. And because the question doesn't limit it,
16  the criminal acts of violence can be either as to
17  persons or as to property. Certainly capital murders
18  are criminal acts of violence as to persons, as are
19  murders, as are assaults, as are rapes, as are
20  robberies, as are kidnappings. All criminal acts of
21  violence as to people.
22          Criminal acts of violence as to property.
23  Arson is the burning of somebody's vehicle, home, and
24  certain kinds of burglaries that require break-ins to
25  get into a building or to break into an automobile, the

**20**

1   taking of a brick bat, so to speak, and beating in the
2   windshield of an automobile. All those are criminal
3   acts of violence. There's probably a hundred other
4   examples, but it is that type of conduct generally that
5   the State is required to prove the future probability
6   that a defendant would commit a particular crime within
7   that category. And the criminal acts of violence must
8   be such, according to the first question, that
9   constitute a continuing threat to society.
10          Now the word society is not going to be
11  defined for you. I would, however, ask you to consider
12  making the distinction if you feel comfortable with the
13  distinction. The word society and community. We all
14  live in different communities, but all our communities
15  are a piece of society. I say that for this reason,
16  most of the time when we think of society, we think of
17  people that we come into contact with; family members,
18  people we work with, people in the neighborhood, people
19  we come in contact with. We don't often think of those
20  specific individuals that we never have any association
21  with.
22          For example, we don't think of people
23  ordinarily, when we think of society, that are behind
24  the walls of the penitentiary; but those people can also
25  be a piece of society. For example, if we had a lady

**21**

1   who was a schoolteacher behind the penitentiary walls,
2   goes in and punches in at 8:00 o'clock in the morning to
3   go behind the walls with inmates to do her job, she does
4   not lose her right to be free from criminal acts of
5   violence while she's back there doing her job. And then
6   if at the end of the workday she escapes with her life,
7   gets her card punched, and gets to leave the walls of
8   the penitentiary, she does not forfeit her right to be
9   free from criminal acts of violence once she gets back
10  in the outside world. That's preposterous. That's not
11  the case.
12          The point being, behind the walls of the
13  penitentiary, medical personnel, doctors, nurses, prison
14  guards, administrators, wardens, school teachers, all
15  the folks who there are, as well as all the inmates, all
16  have the right to be free from criminal acts of
17  violence. And we know inmates do, also; because if we
18  hope that one of the aspects of the punishment would be
19  to rehabilitate, there's never going to be any hope of
20  rehabilitation if you don't make an effort to keep the
21  inmates safe from each other.
22          So when we talked about criminal acts of
23  violence constituting a continuing threat to society,
24  we're talking about all the people, all the time,
25  everywhere. Because if we were not talking about that,

**22**

1   and if we were talking about a community, then this
2   question would read: Do the criminal acts of violence
3   constitute a continuing threat to the citizens of Harris
4   County. And the question does not say that. It says a
5   continuing threat to society. Is there any questions
6   about the first question?
7           If you answer that question no, then the
8   whole case is over because a life sentence is going to
9   be imposed. Because a no answer to the first question
10  is different than yes and no, and that's what it takes
11  to get a death sentence. And there is no answer you can
12  give to the second question after a no answer to the
13  first question that's ever going to make the death
14  penalty a possibility in this case ever again. Anybody
15  have any questions?
16          Let's go to the second question. Before
17  we take up the second question, specifically, let's talk
18  about where, in a jury's job, you necessarily would be
19  before you take up that question. Necessarily, the jury
20  would have had to have unanimously found the defendant
21  to be guilty of capital murder; because if you hadn't,
22  we'd never have these questions. Necessarily, a jury
23  would have had to have found yes, unanimously, to
24  Question Number One; because if you had found no, we'd
25  never get to Question Number Two.

**23**

1 So what we're saying is that when a jury
2 gets to Question Number Two, they would have
3 unanimously, necessarily, consistently voted in such a
4 way that the death penalty is going to be imposed.
5 Second question exists for the purposes of making the
6 jury satisfied that based upon the evidence in that
7 case, the death sentence is what they want. Or the
8 second question is there for the purposes of, if there
9 is something that exists in the case that makes the jury
10 believe that a life sentence would be more appropriate
11 than the death sentence, then this is their chance to
12 substitute that decision. So, the second question
13 exists as a safety valve for the jury's comfort. That's
14 it.
15 Let's get into the second question. We
16 talked awhile ago about the first half of the second
17 question, and it's absolutely nothing more than an
18 instruction to the jury to go over all the evidence in
19 the case. That's all the first half of the second
20 question said. Go back over all the evidence in the
21 case for the purposes of asking yourselves this
22 question. And these are going to be my words. They
23 aren't the words in the question, but I believe that's
24 what it asks. For the purpose of asking yourself this
25 question: Is there a good enough reason why we ought to

**24**

1 pull down this death sentence that right now exists and
2 replace it with a life sentence? If you answer that
3 question yes, there is, then you're answering that whole
4 question yes. If your answer to that question is no,
5 there is not a good enough reason, then your answer to
6 that whole question is no.
7 Now let's talk about the second question.
8 The first thing we can see in the second question is
9 nowhere in that question do we see the phrase, Do you
10 find from the evidence beyond a reasonable doubt? That
11 phrase does not exist in that question, and that means
12 the State is not required to prove to you what the
13 answer to that question should be. We know from our
14 conversation the other day that the defendant never has
15 to prove anything, so the defendant doesn't have to
16 prove to you what the answer to that second question
17 should be.
18 Well, now where does that leave us?
19 Well, it leaves us in this posture. If the State
20 doesn't have to prove to you what the answer to that
21 question should be and they don't, and if the defense
22 doesn't have to prove to you what the answer to that
23 question should be and they don't, that means the law
24 presumes there are going to be a number of cases where
25 there is no evidence whatsoever in a case as to a

**25**

1 mitigating circumstance. And the law makes that
2 presumption, because the law doesn't obligate either
3 side to put that evidence in the case.
4 The only obligation that exists out of the
5 second question is for the jury to go back over all the
6 evidence in the case to see if there is any mitigating
7 evidence in there. If there is, is that mitigating
8 evidence sufficient in your mind, compared with all the
9 bad information in the case, to make you believe that it
10 overcomes that bad information and makes you think that
11 a life sentence would be more appropriate than a death
12 sentence?
13 Now, the word mitigating is not going to
14 be defined for you, because what might be mitigating to
15 one of you may very well not be mitigating to the other.
16 When we use the word mitigating, we're not talking about
17 is there something that excuses some kind of conduct or
18 that justifies some kind of conduct; because the conduct
19 is never going to be excused. It's never going to be
20 justified, because you wouldN'T have found him guilty of
21 having committed the crime. When we're using the word
22 mitigating, we're simply talking about this question.
23 Is there something, some unique feature within the case,
24 that makes you think that the death sentence should be
25 reduced to a life sentence?

**26**

1 In some cases, sometimes some people might
2 tend to think if the defendant on trial, let's say a
3 seventeen-year-old person, maybe comparative
4 youthfulness might be mitigating to some jurors, the
5 idea being the defendant's mind is not mature enough to
6 make judgment -- sound and logical judgments.
7 Other people might take that exact same
8 piece of evidence and view it from a different
9 perspective and say, well, wait just a second. If you
10 have a seventeen-year-old who goes off and commits a
11 crime as horrible as capital murder to begin with and
12 they're only seventeen, then we've lost them anyway.
13 Two people looking at exactly the same circumstances,
14 but viewing it from a different perspective.
15 In some cases you might have testimony
16 about there being a history or evidence, I should say,
17 of mental retardation as to a defendant. Some people on
18 the jury might say that would be mitigating. Other
19 people might say, well, no, it's not mitigating; because
20 there is no way you can cure mental retardation. It is
21 the same as it's going to be for the rest of that
22 person's life. Other people on the jury might have a
23 third thought and they might say, well, wouldn't it make
24 a difference as to how bad the retardation was? Was it
25 minimum? Was it severe? The more severe, the more

1 likely it might be sufficient mitigation to make you
2 think a life sentence is more appropriate than a death
3 sentence.
4     The point is, it's your call. The only
5 requirement, again, is that you go back over all of the
6 evidence in the case. And it may not be anything in a
7 case that has to do with age or retardation. It could
8 be something entirely different. You may have in one
9 case testimony about the week before the crime occurred
10 for which you had found a defendant guilty of capital
11 murder.
12     There may be testimony at the second phase
13 of the trial that shows that a defendant was driving
14 down the street in a residential area in his vehicle,
15 saw an apartment house on fire, or a house on fire. At
16 the risk of his own life, ran into the house, saved the
17 life of two kids that surely would have died but for his
18 efforts. Maybe you would think that conduct is
19 indicative of a character that's not worth executing,
20 that deserves consideration for a life sentence. Maybe
21 you ultimately would not. That's your call, and that's
22 why this question exists.
23     You might have testimony about somebody
24 who had been in the service, been in Vietnam, been in
25 Desert Storm. Perfectly good person before they went

1 into the service and got themselves all screwed up
2 because of being in combat and never have recovered from
3 it. You might think, and there is some circumstances,
4 that that would be a mitigating circumstance that would
5 be worthy of your consideration of giving that guy a
6 life sentence. Maybe ultimately that wouldn't be your
7 decision, but somewhere you have the chance to explore
8 those sentencing options.
9     Again, the second question exists for the
10 purposes of committing the jury that they will go back
11 over all of the evidence in the case. You go back over
12 the evidence to see, is there a reason why we ought to
13 undo this death sentence, which heretofore you would
14 have done by finding him guilty of capital murder in
15 answer to the first question, and replacing it with
16 life, if there is a reason in the case to do that?
17     Your next decision is: Is it a sufficient
18 reason? Is it a reason that we think is worthy of
19 withdrawing the death sentence and replacing it with a
20 life sentence? Does anybody have any questions at all
21 about the first question or the second question? Okay.
22 The point being that a life sentence for a person having
23 been found guilty of capital murder before the trial
24 begins is every bit an equal option as a death sentence
25 is for a person charged with capital murder before the

1 trial ever begins.
2     So, what I'm saying is this, and this
3 would be my thought if I was in the chair of one of you
4 eight folks: I might say to myself, well, you know, I
5 got this right. What we're saying is this: If I find
6 somebody guilty of capital murder and then we come
7 back -- we, the jury -- and we hear testimony, and the
8 testimony is such that it makes me believe that the
9 answer to that first question should be yes, that means
10 I found somebody guilty of having committed a capital
11 murder. And not only that, but I also find there is a
12 probability that they're going to be a future danger.
13     If you answer those two questions in such
14 a way that they're guilty and they're a future danger,
15 are you telling me that there is still a possibility
16 that the defendant could receive a life sentence? And
17 the answer to that question is, yes, there is a
18 possibility. The possibility would be if you believe in
19 the case there is some feature, something we've talked
20 about, something entirely different that we haven't
21 talked about. Good enough reason to undo the death
22 sentence and replace it with a life sentence.
23     It's kind of like the old Yogi Berra
24 saying; it ain't over till it's over. And just because
25 you've answered the first two questions in such a way

1 that the death penalty is going to be imposed, it's not
2 going to be imposed until you have concluded your
3 research over the evidence in the case and answer the
4 third question yes.
5     Each of these questions, each of the three
6 decisions that the jury makes in a case, guilty of
7 capital murder or not guilty, yes or no to question one,
8 yes or no to question two, three decisions -- each of
9 the three decisions a jury makes in a case are
10 independent of the other two. Just because you have
11 found somebody guilty of capital murder, for that reason
12 and that reason only, does not dictate how these
13 questions should be answered. Because can you see that
14 the question of, is he guilty, the question of, is he a
15 future danger, and the question of, is there a good
16 enough reason why we ought to get life, are all
17 absolutely different questions, completely different
18 questions. It's like asking somebody, how old are you?
19 What size shoes do you wear? And do you have any
20 brothers and sisters? They are completely different
21 questions.
22     Now if we talk -- if you thought in the
23 concept about those three decisions that the jury makes
24 being points to a triangle, and inside the triangle is
25 all the evidence in the case that you're going to use to

**31**

1  answer those three questions, that's about what we've
2  got. Because when you answer one question, you move
3  along to the next point in the triangle. And it asks
4  you something completely different than the last
5  question did, but you go to that same body of evidence
6  for the purposes of getting your answer. You make that
7  second decision. You go to the third question. That
8  asks you again something different, but you go back to
9  the same body of information to get the answer to that
10  third question.
11        So what I'm saying is, each decision that
12  you make is independent of the next decision you're
13  called upon to make. And because you have answered one
14  question one way, because you have come up with one
15  verdict, does not have anything to do, in and of itself,
16  how you should answer the next question. Instead, you
17  go back to the pool of evidence that exists and answer
18  the question based upon whatever evidence is there in
19  that pool.
20        So what I'm saying is that starting off,
21  before the trial ever begins, a not guilty and a guilty
22  are both equal options. What influences you, leads you
23  to whatever verdict you reach, has got to be the
24  evidence in the case. If you find somebody guilty of
25  capital murder, a no answer to that first question is

**32**

1  what's presumed to be the right answer, unless or until
2  the State's evidence shows you that the answer to that
3  first question should be yes. Then, even if you do
4  answer it yes, that does not mean there is going to be a
5  death sentence in the case; because you're going to have
6  to look over the evidence in the case again to see, is
7  there a sufficient reason why we ought to withdraw this
8  death sentence and replace it with a life sentence?
9        So can everybody see how each phase is
10  different? That's why nothing is automatic. I mean, if
11  you find somebody guilty of capital murder and they --
12  the questions ought to be answered in such a way the
13  death sentence is going to be imposed, why in the world
14  would we ask the questions? It would be no reason to.
15  The questions exist for the purposes of giving the jury
16  a second independent verdict you might come up with
17  based upon the evidence in the case. Those are the
18  questions and the results those questions can bring.
19  Does anybody have any questions about the questions?
20        Okay. We have talked about the possible
21  punishments; that being life and death. I want to spend
22  a couple of minutes talking to you about what a life
23  sentence means. No reason to talk about what a death
24  sentence means. We can all pretty well figure that out.
25  But sometimes we have different thoughts about a life

**33**

1  sentence; and sometimes people come in with an idea
2  about a life sentence might mean this, when they're
3  wrong. But at any rate, I'm going to tell you exactly
4  what a life sentence means for the purposes of this
5  case.
6        In this case, if this defendant is found
7  guilty of capital murder, and if these questions are
8  answered in such a way that I'm obligated to sentence
9  this defendant to life, I'll tell you in the Court's
10  charge and I'll tell you now that this defendant cannot
11  be considered for parole until he has actually served
12  forty years of his sentence, forty years, hour for hour,
13  day for day, week for week, month for month, year for
14  year. Forty years means the Year 2039. When the Year
15  2039 comes around, and if the defendant had received a
16  life sentence, that means that the defendant then
17  becomes eligible for parole consideration.
18        Parole consideration eligibility has
19  absolutely nothing to do with whether parole will be or
20  will not be granted. Being eligible for parole means at
21  that point that there will be evaluations made by prison
22  authorities. How was the defendant during his
23  forty-year stay here? Those evaluations will be sent
24  to the Board of Pardons and Paroles, who will make
25  recommendations maybe on those evaluations sent by the

**34**

1  prison. Maybe they'll reject those evaluations. We
2  don't know. But they will make recommendations, the
3  Board of Pardons and Paroles, to the governor of the
4  State of Texas. And I haven't the foggiest who the
5  governor of the State of Texas is going to be in the
6  Year 2039. The governor may reject them, and maybe it's
7  absolutely nothing but a political decision about
8  whether to parole or refuse to parole somebody.
9        The point of it is this: These two
10  questions deserve to be answered on the basis of the
11  evidence that exists in the case when the case is tried
12  in the Year 1999. They are not to be answered,
13  speculating what decision will be made about a person's
14  parole forty years from now. It is perfectly possible
15  that one of the persons having been sentenced to life
16  for capital murder may very well, after forty years, may
17  spend the rest of their natural life, breathing every
18  single life breath they ever breathe in the
19  penitentiary, and never be paroled. That's perfectly
20  possible.
21        It's also perfectly possible that
22  somebody, at the conclusion of the fortieth year, may be
23  awarded parole. We just don't know what's going to
24  happen. But I did not want you to think that -- or have
25  somebody say, well, I've heard of people that got a life

35
1  sentence before, and they were out in five years.  So
2  what I'm going to do is always answer these questions in
3  such a way that the death sentence is imposed, because I
4  don't want somebody out of the penitentiary in five
5  years.  What I'm telling you is that's not possible.
6  It's not going to happen.  And a life sentence means a
7  minimum of forty years in the penitentiary from right
8  now.  Does anybody have any questions about that?
9          Okay.  We have talked about the defendant
10  being charged with the offense of capital murder.
11  Capital murder means the intentional taking of a life of
12  some human being without there being any legal
13  justification and without there being any legal excuse,
14  and that it was done during the commission of some other
15  major felony.
16          In this case one of the allegations is
17  that it was done during the course of kidnapping.  One
18  allegation is that it was during the course of another
19  intentional murder; murder during a murder, murder
20  during a kidnapping.  If that's proved beyond a
21  reasonable doubt, that's a capital murder.  Now we talk
22  about it always requires the intentional taking of the
23  life of another human being without any legal
24  justification, without any legal excuse.
25          When we talk about intentional, we know

36
1  that we want results to be caused and we sought out how
2  to cause that result.  We talked about no legal
3  justification, no legal excuse.  That means we're not
4  talking about self-defense.  Self-defense is not murder.
5  Self-defense is not a crime.  Self-defense is a legal
6  justification for taking somebody else's life.  The
7  self-defense being they were unlawfully attacking you,
8  your life.
9          When we talk about intentional murder,
10  we're not talking about an accident.  If you didn't
11  intend to do something, you're not doing it
12  intentionally.  So we're not talking about those things
13  when we're talking about murder.  But anytime the
14  State's required to prove an intentional murder during
15  the course of another felony, they have to prove both of
16  them beyond a reasonable doubt in order to obtain a
17  conviction for capital murder.  And anytime the State's
18  required to prove two things, there are three possible
19  results that could come of that.
20          Possible outcome number one is:  They are
21  able to prove beyond a reasonable doubt the existence of
22  both of those murders and the other felony; and in that
23  case, the jury's obligation is to find the defendant
24  guilty of capital murder.  Possible outcome number two:
25  They cannot prove beyond a reasonable doubt the

37
1  existence of either the intentional murder or the other
2  felony.  And if that's the case, the jury's obligation
3  is to find the defendant not guilty.  Possible outcome
4  number three:  Maybe they can prove beyond a reasonable
5  doubt the existence of the intentional murder, but they
6  cannot prove that it occurred during the course of
7  kidnapping.
8          If that were to be the case, the law says
9  I'd have to give you a third option.  Guilty of capital
10  murder would be one of the options you'd have.  Not
11  guilty would be another option.  The third option would
12  be guilty of murder.  Not guilty of capital murder, the
13  intentional murder during a kidnapping, but guilty of
14  the intentional murder.  It is a lesser crime.  The
15  murder is a lesser crime carved out of the greater
16  crime, the greater crime being the capital murder.
17          Intentional murder in another felony.
18  Intentional murder only is a lesser crime of murder.  We
19  know the punishment for capital murder is life or death.
20  The range of punishment for murder is simply remarkably
21  different.  If a person in the State of Texas is
22  convicted of murder, they can be punished by confinement
23  in the penitentiary for life, or for any number of years
24  not less than five, or not more than ninety-nine.  In
25  addition, the jury can fine a defendant not more than

38
1  $10,000.
2          The point being, most of the time when we
3  think of a murder, we're thinking about some specific
4  thing, a specific way that a crime was committed,
5  perhaps by a specific kind of person.  And we know
6  they're all different.  If we're going to ask you to
7  make a decision on the basis of how you evaluate a crime
8  and how you evaluate the person who committed it, we've
9  got to give you room to roam up and down the range of
10  punishment for the purpose of plugging the specific case
11  in where you think it's appropriate.
12          For example, you might have, as we talked
13  earlier, on the one hand, a seventeen-year-old girl
14  who's never done anything wrong in her whole life, you
15  may tend to treat her differently than a person who is a
16  forty-five-year-old, six-time ex-convict, who's made his
17  living as a career criminal.  Even though both of them
18  committed exactly the same crime, maybe because of the
19  way they are, you might want to treat them differently.
20  I don't know.  Maybe you would want to treat them
21  exactly the same.  That would be your call.  But can you
22  see if you wanted to treat them differently, we've got
23  to give you the room to be able to treat them
24  differently?
25          You might have all sorts of different

1 kinds of victims in a case. You might have, for
2 example, a seventy-five-year-old couple, been married
3 fifty years. They love each other dearly. The Mrs. is
4 in a hospital. She's on a life support system. She's
5 going to die. Everybody knows it. She does not want to
6 go through the misery or suffering. She does not want
7 to go through the indignity of the being kept alive by a
8 machine. She talks to her husband, who spends hours
9 with her every day and loves her dearly. She asks him,
10 please put me out of this misery. He prays about it.
11 He thinks about it. And finally, one day, he just gets
12 up -- she's asleep -- walks over to the wall, pulls out
13 the plug, and she dies.
14        Without getting into the morality of that,
15 in this state that's murder. That is the intentional
16 taking of the life of another human being without there
17 being any legal justification and without there being
18 any legal excuse. Now you can also see that that murder
19 was not done out of hate, not done out of anger, not
20 done out of revenge. It was done out of love, not
21 wanting his wife to suffer. Maybe you would think that
22 seventy-five-year-old gentleman, under those
23 circumstances, should receive a life sentence. On the
24 other hand, maybe you think he shouldn't. But can you
25 see if you didn't think he should, we've got to give

1 you the room to go up and down the range of punishment
2 and come up with what you think is the right punishment,
3 taking into account all the features in the case? The
4 features being the defendant; the features being the
5 offense; the features being the witnesses; the features
6 being the victim.
7        So, my question to you is this: Assume
8 with me for just a second that you're a juror in some
9 imaginary capital murder case. Your jury hears all the
10 evidence about the crime. Your jury goes out and
11 deliberates. And your jury unanimously determines that
12 the defendant on trial is not guilty of capital murder.
13 But your jury unanimously determines that the defendant
14 on trial is, in fact, guilty of murder. Your jury comes
15 back, and your jury hears evidence at the second phase
16 of the trial regarding the character and the background
17 and so forth of the defendant on trial. And whatever
18 that evidence is doesn't make any difference. But your
19 jury goes on out, and you deliberate about what
20 punishment you're going to impose.
21        My question to you is this: Under those
22 circumstances, is there anybody here who could not
23 consider assessing that imaginary defendant's punishment
24 at confinement in the penitentiary for life if you
25 thought, based upon whatever the circumstances were of

1 that case, that that was the right result to reach?
2 I'm not asking you would you sentence him to life. I'm
3 asking you if you thought the right circumstances
4 existed, would a life sentence be a legitimate
5 sentencing option to you? Nobody's indicated anything
6 to the contrary, so I'm going to assume it would.
7        And I'm going to take exactly that same
8 question, and I'm going to flip it over. You're a
9 juror. You found the defendant not guilty of capital
10 murder, but you found him guilty of murder. You come
11 back and you hear evidence at the second phase of the
12 trial regarding the character and background of the
13 defendant on trial, whoever he or she was. Doesn't make
14 any difference what that evidence was; but you go out
15 and you evaluate the question, decide what punishment
16 should we impose? Is there anybody here who, if after
17 having heard all that evidence, whatever it was in that
18 imaginary case, could not consider assessing that
19 imaginary defendant's punishment at confinement in the
20 penitentiary for five years if you thought, based upon
21 that evidence, whatever it was, that that was the right
22 result to reach. Again, not would you give them five
23 years, but would five years be a legitimate sentencing
24 option to you if you thought the circumstances in the
25 case helped you? And I gather that you would.

1        The whole point of all of that is really
2 very simple. Wouldn't it be offensive if we asked you
3 to give your time and come down here, sit as a juror,
4 and dictate to you what the value was for every dead
5 body that turned up? We don't. We want to give you
6 the opportunity to come up with what you think the
7 appropriate punishment should be, taking into account
8 the circumstances of the case, the witnesses who
9 testified, the crime in the case, and the defendant, all
10 the information you've got, and plug it into where in
11 this range of punishment you think is appropriate. Five
12 years minimum, life at the maximum, or anything in
13 between. Anybody have any questions about that?
14        Two last areas real quick. First off, I'm
15 not going to go into the legalese about this. I'm going
16 to try to communicate a concept. We have a concept in
17 our law that says if you have two or more people who get
18 together, cocospire to commit a crime, and if they do,
19 in fact, commit that crime, one of those cocospirators
20 cannot be convicted solely, exclusively, and only on the
21 testimony of another cocospirator and with no other
22 evidence other than that. Meaning, that if there is no
23 evidence other than the testimony of the cocospirator,
24 a conviction cannot be had unless there is some other
25 evidence from some other independent source -- that is

1  to say, something or someone other than the
2  coconspirator -- that tends to connect the defendant on
3  trial to the commission of the crime.
4           Now that other evidence does not have to
5  be, in its own right, sufficient to prove a person's
6  guilt beyond a reasonable doubt.  It only has to tend to
7  connect the defendant on trial to the commission of the
8  crime.  For example, I'm a driver in a getaway car.  The
9  other guy and I agree to rob a bank.  I drive.  That's
10  my job.  The guy jumps out, robs the bank, does his job.
11  Well, the people in the bank saw him.  They didn't see
12  me.  He gets arrested.  He says, Wait just a second.  I
13  didn't do this by myself.  The other one did it, too.
14  Me.  I can't be convicted only on his testimony unless
15  there is some other evidence that corroborates his
16  testimony, that tends to connect me to the commission of
17  the crime.
18           Now that other evidence could be another
19  person.  It could be something else.  For example, what
20  if they arrested him with that bag that was taken during
21  the course of a robbery, and on that bank bag there was
22  my fingerprint?  That would be other evidence from an
23  independent source that tends to connect me to the
24  commission of the crime.
25           So I just use -- so, I don't know if this

1  is going to come into play in this case or not, but my
2  question to you is this:  Is there anybody here to whom
3  that truly you find objectionable and to the degree you
4  wouldn't follow it if it were to come into play in this
5  case?  And I don't have any idea whether it will.  Okay.
6  I'll take it that you can.
7           One last area.  There are two kinds of
8  evidence that can exist during the course of a trial.
9  The first kind is direct evidence.  The second kind is
10  circumstantial evidence.  Direct evidence means somebody
11  saw something happen.  Circumstantial evidence means
12  that nobody saw something happen; but they're testifying
13  as to a circumstance in a case that, when taken and
14  interwoven with other circumstances that are testified
15  to about the case, tend to show the person is guilty of
16  the offense charged.
17           Now the law doesn't care whether in a case
18  testimony or evidence is direct.  The law doesn't care
19  whether testimony or evidence in a case is
20  circumstantial.  Just like the law doesn't say you've
21  got to have "X" number of witnesses before a person is
22  convicted.  We have people all the time that get
23  convicted on the basis of one witness' testimony when
24  that witness is believed beyond a reasonable doubt.  We
25  have people all the time who are found not guilty even

1  though the testimony is based on five people who claim
2  they did see something, and the reason is because their
3  testimony was not believed beyond a reasonable doubt.
4  So the law doesn't care about the number of witnesses.
5  The law cares that the testimony rises to the level that
6  it proved a person's guilt beyond a reasonable doubt.
7  However many witnesses that takes is however many it
8  takes.
9           Likewise, the law doesn't care if
10  testimony or evidence in a case is direct or
11  circumstantial.  The law also cares that testimony is
12  strong enough that shows a person's guilt beyond a
13  reasonable doubt.  We sometimes have a notion -- and I
14  know I've heard it down here, and perhaps you have, too.
15  Some people say, well, I never could find somebody
16  guilty based on circumstantial evidence.  And they have
17  no idea what they're saying; because the single greatest
18  feature that identifies people, individualizes people is
19  a fingerprint.  But a fingerprint is circumstantial
20  evidence; because there is no way to tell when a
21  fingerprint was placed on an object, and there is no way
22  to tell where that object was when that fingerprint was
23  placed on it.
24           Now if it's an immoveable object,
25  obviously you know where it's been; but you don't know

1  when the print was put there.  The point being, it's not
2  whether it's direct evidence or circumstantial.  The
3  question is, does the evidence prove a person's guilt
4  beyond a reasonable doubt?  You might have down here
5  where they're building Enron Field, somebody shoots
6  somebody else with a gun just right there.  And there
7  are three drunks laying down there, and they're about to
8  pass out, and they're drunker than Cooter Brown.  And
9  they come up here and testify about what they saw, and
10  they claim the defendant was the one that did it.  And
11  they also claimed they were drunk as they could be, and
12  also testified that they were getting ready to pass out
13  and did, in fact, pass out.  Can you see that if the
14  jury hears testimony from those three people how it
15  might be difficult to find that imaginary defendant
16  guilty of murder?  Because the evidence doesn't
17  establish to the jury beyond a reasonable doubt that the
18  defendant was the one that did it because of the
19  intoxication of the witnesses.  On the other hand --
20  even though they saw it.
21           On the other hand, you might have three
22  people, nobody who sees the murder.  One guy sees the
23  defendant with a handgun in his hands fifteen seconds
24  before the shot is fired but doesn't see the shot fired.
25  Another guy doesn't see the shot fired, but after the

**47**

1 shot is fired sees the defendant (sic) laying on the
2 ground with the defendant and a gun in his hand. A
3 third person, thirty seconds after the shot is fired, he
4 doesn't see the shot fired. But thirty seconds later he
5 sees the defendant walking away with a gun in his hands,
6 calls the police. The police come arrest the defendant.
7 Defendant's got the gun on him, and the gun has gone on
8 and ballistically shown to be the one that went in the
9 body, causing the person to die. Can you see every
10 single aspect of that testimony is circumstantial? That
11 might be more reliable than those three drunks, and a
12 jury might very well have an easier time deciding a
13 person's guilt beyond a reasonable doubt in the second
14 example than they would in the first. The point being,
15 direct, circumstantial, makes no difference. The
16 question is: Does it rise to the level of proving that
17 person's guilt beyond a reasonable doubt?
18     Now my question is this: If you were a
19 juror in a case, and after having heard all the evidence
20 in the case, and the evidence was exclusive only to
21 circumstantial, is there anybody here who would refuse
22 to find that imaginary defendant guilty simply and only
23 because the evidence was circumstantial, even though
24 you've -- you believe that evidence beyond a reasonable
25 doubt? I gather then that nobody would.

**48**

1     All right. We've just finished our first
2 year in law school. What questions do you have for me?
3 The whole idea, I think, of this exercise is to give you
4 an idea about what rules, what things can occur during
5 the course of a trial just simply to eliminate the
6 surprises and for you to be satisfied with yourself that
7 if you did become a juror in the case and if these rules
8 did come into play -- and we wouldn't know that till we
9 hear the testimony, because the testimony is what's
10 going to cause the law to apply or not. But if these
11 rules did come into play, as a juror, would you be
12 willing to both follow and to enforce these rules? Is
13 there anybody here who has heard anything that rises to
14 the level that would cause us to refuse to support any
15 of these rules if they did come into play? I gather
16 that you would.
17     The next thing is we want you to be
18 satisfied with yourself, certainly the lawyers to be
19 satisfied, that if you did become a juror in the case,
20 you would be willing to sit in any one of those chairs,
21 listen to every single piece of information that's
22 presented to you, evaluate it however you see fit, and
23 make whatever decision you make based upon where you
24 thought the evidence in the case led you. That is to
25 say, at the outset I have no idea about what result you

**49**

1 would reach, what result you should reach, but take
2 every step of the process as it comes.
3     The first question: Is he guilty or not
4 guilty? If he is guilty, we get to the punishment
5 phase; and these two questions get answered. Answer
6 them however you're going to answer them, but answer
7 them on the basis of the evidence in the case and not
8 for any other purpose. Anybody here who feels that
9 doesn't apply to them, or that's not the way they could
10 do it?
11     Okay. If you would, please retire to the
12 hallway. We'll call you back in one at a time. We'll
13 get you out of here as fast as we can.
14         HOUSTON NORMAN HAMILTON,
15 having been first duly sworn, testified as follows:
16         VOIR DIRE EXAMINATION
17 BY THE COURT:
18     Q. Mr. Hamilton, to begin with, let me ask you to
19 think back to the things we talked about Monday when the
20 whole group was together, and add to them the things we
21 talked about today. And out of everything we have
22 talked about, do you have any questions at all from me?
23     A. No, sir.
24     Q. Is there anything at this point, Mr. Hamilton,
25 that we have not yet addressed that you feel as though

**50**

1 we should talk about because it might have some bearing
2 on your service as a juror in this case?
3     A. No.
4     Q. Is there anything at all, sir, whether it might
5 be something about your personal life, whether it might
6 be something about your professional life, whether it
7 might be something about your health, or anything else
8 for that matter, that you can think of that would in any
9 way interfere with your ability to be a juror in this
10 case during the time frame that we've talked about?
11     A. At this moment, I'm missing an appointment at
12 the V.A. Hospital. And as far as October the 4th, the
13 week of October the 4th, I have no problem.
14     Q. We'll take care of whatever comes up then.
15     A. I feel like we're the ones on trial, this jury
16 panel. We've been down here twice, so I'm not sure --
17 it didn't used to take this long. I don't know why.
18     Q. You've done this before?
19     A. I've been on panels before.
20     Q. Have you been on a panel for a capital murder
21 case before?
22     A. No, sir, not, capital murder, no, sir.
23     Q. Well, Mr. Hamilton, we're going to give you a
24 chance. Why don't you give us one?
25         Mr. McClellan.

51

1        MR. MCCLELLAN: Thank you, Your Honor.
2                VOIR DIRE EXAMINATION
3   BY MR. MCCLELLAN:
4       Q.  Mr. Hamilton, my name is Lyn McClellan.  Along
5   with Claire Connors, we represent the State of Texas in
6   this case.  I want to go over your questionnaire.  I
7   want to go over some of your thoughts and concerns and
8   address some of those issues that you have.  As you say,
9   you've been down here twice, and there is a likelihood
10  you'll be down here a third time; and if you're on the
11  jury, maybe a fourth time.
12              Capital murder jury selection is very
13  special.  It sets out in the law how it has to occur.
14  There must be individual voir dire.  I assume in your
15  prior jury service you've never been in a situation
16  where you were brought in one at a time like you are now
17  and subjected to questions from both sides; is that
18  right?
19      A.  That's correct.
20      Q.  And this is the way the law is set up that we
21  have to do it, and we're following the law in that
22  respect.  I understand it's troublesome and burdensome
23  to a lot of people, but we don't have any control over
24  that.  Anything about that that you think would affect
25  your service as a juror, the fact you had to come down

52

1   numerous times.
2               Some people just say, well, I'm fed up
3   with this deal.  Let's go ahead and make a decision and
4   go home.  We're looking for people who will give their
5   full attention for however long the trial lasts, because
6   it's very important to our side they do that; it's very
7   important to their side they do that.  Are you the type
8   of person that can do that?
9       A.  I'm not volunteering.  But if I am pressed into
10  it.
11      Q.  I understand.
12      A.  -- I will do the very best job that I know how
13  to do, because some day I may need another juror to do
14  the same for me.
15      Q.  That's exactly right.  And we don't get many
16  volunteers to do this type of job.  This will probably
17  be the most important decision you'll make in your life,
18  because you're going to be making a life and death-type
19  decision in regards to an individual who's here in the
20  courtroom.
21              From reading your questionnaire, I
22  assume -- and you correct me if I'm wrong anywhere along
23  the line when I make these statements about what I think
24  your beliefs are.  My reading this questionnaire and
25  being in this business for a while, I read from here

53

1   that you believe in the death penalty as a proper
2   punishment for certain types of crimes; is that right?
3       A.  Yes.
4       Q.  Some people who come, though, into jury service
5   believing in the death penalty as a proper punishment
6   for certain types of crimes -- some go on to tell us,
7   though, that they don't, themselves, believe that they
8   could ever participate in a process -- that is, be on a
9   jury -- where they would be called upon to make
10  decisions -- in other words, to answer these
11  questions -- knowing that in doing so, they could be
12  ordering this Judge to order the execution of the
13  defendant sitting over here on trial.  Do you have any
14  doubts about your ability to participate in that process
15  and make that type of decision if that's what the law
16  and the evidence called for?
17      A.  Certainly, I can do that.
18      Q.  All right.  Now I want to talk to you about
19  your service as a juror.  You've been on panels before.
20  You've never been on a jury before, have you?
21      A.  No, sir.
22      Q.  If you become a juror, you will take an oath,
23  along with the twelve or eleven other jurors, to a true
24  verdict render based on the law and the evidence.  Okay.
25  That may sound simple to do, but I would suggest to you

54

1   that the law given to you by the Court might, in some
2   instances, contradict or conflict with what your
3   personal opinion and beliefs are.  You would have to
4   then be able to follow the law given to you by the Court
5   and set aside what your personal opinion or belief may
6   be if you became juror.  Can you do that?
7       A.  Yeah, I can do that.
8       Q.  All right.  The Court will give you the law,
9   and it will be in the form of a charge, and it will set
10  out the elements of the offense that we've alleged.  It
11  will tell what -- give definitions of certain aspects of
12  the case.  It will define murder, define capital murder,
13  and define reasonable doubt.  It will give all kinds of
14  definitions, and that will be the law that you apply in
15  the case to the evidence you hear from the witness
16  stand.  And you'll be the judge of the credibility of
17  the witnesses.  You'll be able to say, I believe some, I
18  believe none, or I believe all of what any particular
19  witness may say.  You're the judge of that.  You take
20  that evidence that you believe, and you apply the law
21  the Court gives you, and that's how you arrive at a
22  verdict.  Any problem with that aspect of the law?
23      A.  No.
24      Q.  Let me give you an example of what I'm talking
25  about.  In your questionnaire we asked a question in

55

1  here, and you shared with us your opinion about the
2  question. It's Question Number 46, on Page 10 on this.
3  Says would an individual's use or sale of drugs prevent
4  them from relying on a defense that is available to
5  other members of society? And you checked, Yes, they
6  were outside the law when breaking the law, and defense
7  should not apply. Okay.
8       I will suggest to you that the law given
9  to you by the Court will be contrary to that. In other
10 words, if I'm standing on the street corner selling dope
11 and someone comes up and pulls a gun and says, give me
12 all your money, you S.O.B., then obviously someone is
13 putting me in fear of serious bodily injury or death;
14 and I have a right to defend myself even though I'm a
15 dope dealer.
16      Let's say I'm a convicted child molester,
17 and let's say I'm driving down the street. Somebody
18 pulls up and demands me to get out of the car. They're
19 going to take my car. I suggest to you even though I'm
20 a convicted child molester, I'm still entitled to
21 self-defense. In other words, the law does not say, now
22 if you find from the evidence -- let's say concerning
23 the law of self-defense or some other aspect. The law
24 won't ever say that, well, if you find they're doing
25 this, it doesn't mean that, or it doesn't apply; or if

56

1  you find they're convicted of this, it doesn't apply.
2  Can you assure me that even though you may personally
3  believe that a specific defense shouldn't be available
4  if you're breaking the law, if the law that the Court
5  gives you says that it's still available, can you still
6  follow that law and apply it there?
7       A. Well, I'm not going to like it.
8       Q. Yeah, I understand.
9       A. Your first example, I stand by my yes. And
10 your second example, the man was convicted, that's
11 something that happened in the past. He is not in the
12 act of child molesting.
13      Q. I understand. I understand. So that's a yes.
14 But my question is: Let's say -- I'm trying to pick an
15 example where you disagree with what the law says. And
16 the test is, are you going to do what you believe, or
17 are you going to follow the law given to you by the
18 Court, which is what your oath as a juror says?
19      A. I must follow the law and do all the bitching I
20 want.
21      Q. I understand. You know, could be a situation
22 where we have to prove each and every element of the
23 offense in a capital murder case. We've got to prove
24 that on a certain date, in Harris County, Texas, the
25 defendant intentionally took the life of a certain

57

1  person during the course of a kidnapping. We have to
2  prove each and every one of those elements beyond a
3  reasonable doubt.
4       For example, though, let's say in a trial
5  you're a juror on, we fail to prove that it happened in
6  Harris County, Texas. You know it happened in Harris
7  County, Texas, because it happened about five blocks
8  from where you live; but no one testified in the Court
9  that it happened in Harris County, Texas. You can't
10 judge their case on what you've heard outside the
11 courtroom, only on testimony that you heard under oath
12 from the witness stand. And thus, you would have to
13 follow the law. You would have to find someone not
14 guilty, who you otherwise believed to be guilty, if you
15 follow the law that says we have to prove each and every
16 element beyond a reasonable doubt. I don't expect you
17 to like it, but we want you to be able to follow it. If
18 you can't follow that law and do that if that's what
19 happened to have occurred -- can you do that?
20      A. Yes, sir.
21      Q. All right. And you make good points in the
22 fact you say you may not like it, or did you say do your
23 bitching about it later? And it may be my fault that we
24 didn't prove that up, because it would be easy to prove
25 up. And you can go across to Johnny Holmes and demand

58

1  my resignation, and you'll possibly get it. So I'll be
2  fired, but you'll probably get that. But in the
3  courtroom and in that trial, you'd have to follow
4  whatever the law the Court gave you and whatever the
5  evidence was from the witness stand. And can you do
6  that?
7       A. Yes.
8       Q. Okay. A lot of people say that -- now you've
9  learned a lot. I assume you've learned a lot during the
10 Judge's voir dire about how a capital murder trial
11 progresses. A lot of people might think that, you know,
12 well, when you find someone guilty of capital murder,
13 that's pretty well the end of the inquiry. That means
14 he gets death, doesn't it? A lot of people, before they
15 listened to the Judge's voir dire, never thought about
16 that.
17      Now, you know finding someone guilty of
18 capital murder allows you to then go to the punishment
19 stage of a trial, where you're given questions. And the
20 answer to those questions tells the Judge what
21 punishment must be assessed. There is no case, no type
22 of crime in the State of Texas where someone
23 automatically receives death as a result of having
24 committed that crime. Understand that?
25      A. I didn't know that. I understand.

59
1    Q.   You understand now?
2    A.   Yes.
3    Q.   So, just because you find someone guilty of
4 capital murder does not tell you, in and of itself, what
5 the punishment is going to be.  You have to go and look
6 at the other evidence that you hear at the punishment
7 stage abut a defendant's character, background, criminal
8 history, or lack thereof, mental abilities or
9 disabilities, all kinds of information about the
10 individual himself that is not necessarily relevant to
11 whether or not he committed the crime, but is entirely
12 relevant as to what punishment he should receive for the
13 crime you've already found that he is guilty of.
14        Okay.  Keep in mind that the answer to
15 these questions never goes back and undoes the finding
16 of guilty.  He's still always guilty of capital murder.
17 And there is only two punishments, life or death.  And
18 you now know that life means forty years, day for day.
19 So if a person commits a crime and is convicted in 1999,
20 it will be 2039 before they would ever be eligible for
21 release, even if they were to receive a life sentence.
22 And the decision on life or death is going to depend
23 upon your answer to these questions up here.  Again,
24 just like in guilt/innocence, the burden of proof in
25 guilt/innocence is on the State.  If we fail to prove

60
1 our case beyond a reasonable doubt, you find the
2 defendant not guilty.  Any problem with this aspect of
3 the law?
4    A.   No.
5    Q.   Now let me just cover a couple of other things
6 while we're talking about guilt/innocence.  The
7 defendant doesn't have to testify.  If he doesn't
8 testify, you can't consider that as any evidence against
9 him.  Anything wrong with that aspect?
10    A.   No.
11    Q.   Defendant's presumed to be innocent.  If you
12 had to vote right this very minute as to whether or not
13 Charles Mamou, Jr. is guilty or not guilty of capital
14 murder, you would have to vote that he's not guilty
15 because you've heard no evidence.  Anything wrong with
16 this aspect of the law?
17    A.   No.
18    Q.   That burden of proof carries on into the
19 punishment stage of trial, at least to the first issue.
20 Keep in mind that before you get to that punishment
21 stage of the trial, you would had to have found someone
22 guilty of capital murder, heard additional evidence that
23 might be available by the individual, himself,
24 character, background, that kind of stuff.
25        Then you're asked to answer these

61
1 questions.  And in answering those questions, you can
2 rely upon bodies of knowledge.  You can go back and
3 consider what you heard at guilt/innocence, and you can
4 also consider what you heard at punishment.  And the
5 first question is:  Do you find from the evidence beyond
6 a reasonable doubt that there is a probability that the
7 defendant would commit criminal acts of violence that
8 would constitute a continuing threat to society?  It
9 doesn't ask you, is it a certainty that he would?
10 Doesn't ask you, is it a possibility?  Anything is
11 possible.  It asks you more than a possibility.  It asks
12 a probability.  I suggest to you more likely than not.
13 Do you see a distinction between probability meaning
14 more than possibility?
15    A.   Yes.
16    Q.   That the defendant would commit criminal acts
17 of violence.  Some people say, well, if I have found
18 someone guilty of capital murder, intentionally taking
19 the life of another person without any legal
20 justification -- by that I mean, not self-defense, not
21 accident.  If you intend to kill someone and do so
22 during the course of a kidnapping, I would always answer
23 Issue Number One yes, that they're a continuing threat,
24 at least to a probability, to commit future acts of
25 violence.

62
1        But I suggest to you that there may be
2 facts and circumstances, and you won't know that answer
3 until you look at all those facts and circumstances.
4 Because when you look at the punishment stage of the
5 trial and hear about a defendant's character and
6 background, you may hear the person's been a model
7 citizen all his life.  This crime that he committed is
8 horrible.  No doubt about that.  He'll be punished for
9 it.  No doubt about that.  But it doesn't indicate to
10 you he'll be a continuing threat to go on and commit
11 acts of violence again.  There may have been some reason
12 or something that caused him to do it that you may think
13 will never occur again; and thus, you might think he's
14 not a continuing threat to commit acts of violence.
15        On the other hand, there may be a person
16 who's been in and out of trouble all their life and you
17 think this is a stepping stone along the way.  So my
18 question to you is:  On Issue Number One, having found
19 someone guilty of capital murder -- because you don't
20 get there unless you do -- are you still open to
21 answering that question either yes or no, depending upon
22 what the facts show?
23    A.   Yes.
24    Q.   Okay.  So, again, there is not an automatic
25 answer.  But if there was an automatic answer to Issue

1   Number One, it would be no, which means he gets a life
2   sentence; because the burden of proof is on us. And if
3   we fail to prove beyond a reasonable doubt he's a
4   continuing threat to commit future acts of violence, you
5   would have to vote no. Any problem with that?
6           Now the next issue then comes about if you
7   found -- if you answer Number One yes. If you answer
8   Number One no, that's the end of the trial; and he gets
9   a life sentence. But if you answer it yes, you're then
10  asked to look back through all the evidence and
11  determine, are there any reason or reasons, what they
12  call mitigating circumstances, as to why this person
13  ought to receive life as opposed to death? I don't know
14  if you find any or not but you're committed to going
15  back and looking. Okay.
16          So, by that, when I say look back at all
17  the evidence, let's say you may have heard evidence
18  during the trial the defendant was high on drugs or
19  alcohol when he committed the offense. Juror Number 1
20  over there may say, well, I think that mitigates towards
21  a life sentence. That's a reason for me to give him
22  life as opposed to death; because when you're high on
23  drugs or alcohol, you do things you wouldn't ordinarily
24  do.
25          Juror Number 2 may say, I don't think

1   that's right at all. I know people that get high on
2   drugs or alcohol, and they don't commit capital murder.
3   Plus, I don't think there is any connection there. And
4   they find it's not mitigating. That's okay, because
5   what that question asks you to do is for you to look
6   back at the evidence, you weigh it in your mind, and you
7   determine whether or not it's mitigating. And if it is,
8   is it sufficiently mitigating to change your vote from
9   death to life? Any problem with this aspect of the
10  law?
11      A.  No.
12      Q.  You can look back through all kinds of
13  situations, the age of a person, mental retardation, all
14  kinds of information, weigh it in your mind. Does it
15  mitigate? Does it give me a reason why a person ought
16  to receive life as opposed to death? If it does, it's
17  sufficient in your mind, you change your vote to life
18  and he will receive a life sentence. If it doesn't,
19  you vote the way it is and answer that question no and
20  he receives a death penalty.
21          Now some people have come to us and said,
22  well, now, if I have found someone guilty of capital
23  murder, and then further on Issue Number One determine
24  there is a probability he would be a continuing threat
25  to commit future acts of violence that would be a

1   continuing threat, isn't that who the death penalty is
2   designed for? Why in the world would I go out and
3   answer Issue Number Two that there is some reason to
4   give him life as opposed to death? And I don't know
5   what you would do or what you wouldn't do, or evidence
6   that you may hear or not hear.
7           Question Number Two commits you to
8   looking, commits you to examining the evidence for that
9   burden of proof. And are you open to doing that?
10      A.  Yes.
11      Q.  Okay. Obviously, you won't always find
12  mitigating every time; or if you did, no one would ever
13  receive the death penalty. But it commits you to
14  looking for that evidence. Commits you to examine it.
15  And if your mind's still open after you found someone
16  guilty of capital murder, and if you find that he's a
17  continuing threat to commit future acts of violence, is
18  your mind still open to examining that evidence and
19  fairly weighing it in your mind as to what effect that
20  would be given as to whether or not you ought to change
21  your vote from death to life?
22      A.  Yes, I can do that.
23      Q.  All right. Sometimes people say, well, you
24  know, it's easy to say you'll follow the law; but you
25  know, you come up with certain opinions and beliefs that

1   you've grown up with all your life and dump those over
2   and take control when you get in a situation like this.
3   And all I need is a commitment from you that you search
4   yourself and determine whether you can make this
5   commitment, that you can take an oath to be a juror to a
6   true verdict render based upon the law and the evidence
7   and go where the law and the evidence leads you,
8   understanding that it may lead you to someplace you
9   might otherwise -- without the law being given to you --
10  you might have gone another direction. But are you the
11  type of person that can follow the law and the evidence
12  even if it leads you to somewhere where you think, I
13  can't believe I'm doing this, but that's what the law
14  and the evidence calls for; and thus, I'm going to
15  follow my oath? Are you the type person that could do
16  that even though it might conflict with some of your
17  personal opinions if you were just making your decision
18  on personal opinion?
19      A.  Yes.
20      Q.  All right. As you say, you're not volunteering
21  for the job; but if you're selected, would you be able
22  to do that job to the best of your ability and be fair
23  to both sides?
24      A.  Yes, sir.
25      Q.  Okay. Thank you very much, sir, and I'm going

1 to pass you to the other side.
2       THE COURT: Thank you.
3       Mr. Hill.
4       VOIR DIRE EXAMINATION
5 BY MR. HILL:
6   Q. Mr. Hamilton, my name is Wayne Hill. Kurt
7 Wentz and I both represent Mr. Mamou in this case. And
8 I am, quite frankly, more interested in hearing you
9 express yourself than propounding a question to you and
10 saying, will you follow the law, yes or no?
11       At the beginning you seemed to have had
12 some pretty strong feelings about some things about
13 being here. And obviously, I think it's in everybody's
14 best interest to know how strongly you do feel about
15 things. If you feel so strongly about a particular area
16 of the law that you don't honestly feel comfortable
17 sitting in a case like this, or you feel like if you
18 were sitting in this chair and you were hearing yourself
19 talk, then maybe this wouldn't be the ideal case for you
20 to sit on, we need to know that now. Because obviously,
21 if you're selected, with eleven other people, it's too
22 late if we find out there is some issues we should have
23 addressed to you way back here.
24       You feel a sense of resentment being down
25 here and how many times you've had to come back?

1   A. Yes, some, yeah.
2   Q. Okay. And that's fine. I just want you to
3 express it to us. I don't want you to feel constrained
4 in having to feel like, you know, when Mr. McClellan was
5 talking to you -- and if I'm correct, it was my
6 understanding that you said that if a person was dealing
7 dope out on the street corner, in that situation, you
8 don't feel like you could afford the right to
9 self-defense even if that were an issue in the case.
10 Did I --
11   A. I think I did say that, yeah.
12   Q. All right. So let me ask you --
13   A. Sounds a little different when you say it,
14 though.
15   Q. Right. Do you feel like I'm trying to trick
16 you?
17   A. No.
18   Q. I want you to tell me exactly how you feel,
19 because -- well, let me put it to you this way: You're
20 a member of the N.R.A., right? You're a gun owner?
21   A. Yeah.
22   Q. Tell me if you think you would be comfortable
23 in having a trial -- I'm sitting with you. You're
24 charged with carrying a weapon. The twelve people
25 sitting in that box are anti gun people. Do you think

1 that it would be fair to you, as the defendant on trial,
2 to have twelve people who have already told you that
3 they don't think anybody should have guns in the first
4 place? You can see how that would place an unbearable
5 burden on those twelve people to really give you a fair
6 trial over carrying a weapon, because maybe they have a
7 strong feeling about the issue of gun ownership in the
8 first place?
9   A. To me, they can have all the feelings they
10 want. If they're chosen as a juror, they're going to
11 have to follow the law and the evidence. It's not a
12 matter of you get to pick what you agree with. I don't
13 know what you guys are going to come up with.
14   Q. Right.
15   A. But if I have to leave certain things at the
16 doorstep, I'm fifty-eight years old. I've been around
17 enough. You're not scaring me, okay.
18   Q. Do you think I'm trying to scare you?
19   A. No. All I'm telling you is I'm not going to do
20 a yes, yes, yes, sir, just because I'm intimidated. I
21 feel like that if I am called to set my prejudices
22 aside, that some of those might be about this: If
23 you're outside the law, you shouldn't have the
24 protection of the law.
25   Q. Right.

1   A. If that's not what the law says, then I'm going
2 to have to set that aside and deal with it in another
3 way. Yes, if it were me, a gun carrier, probably
4 antigunners in the jury box, yes, I would feel
5 uncomfortable. I sure would. But still, it's their
6 duty to put that aside for the length of that trial.
7   Q. Okay.
8   A. Now if they can swear an oath and they can go
9 to sleep after making whatever decision they make, then
10 I need to abide by their decision.
11   Q. And that's the critical inquiry; because you
12 don't get on the jury unless you can tell the Court, in
13 all fairness, look, I'm comfortable enough with all of
14 these issues that you're discussing. Self-defense if
15 you're a dope dealer. The State forgets to ask somebody
16 whether it's in Harris County. And you're swearing that
17 if you're on that jury and that's the kind of
18 circumstances you're presented with, you'll find a
19 person not guilty.
20       There is some people that come in here and
21 say, look, that's asking a little too much of me;
22 because I certainly have a strong enough feeling that if
23 those were the facts presented to me, I think it's
24 ludicrous. I think it's absolutely ridiculous that you
25 can expect somebody to say, I'm going to find somebody

1  not guilty simply because it wasn't proven it was in
2  Harris County. That's why we ask the questions now,
3  because you're not a juror yet. So if you're
4  comfortable with your abilities and the strength of your
5  commitment to being able to make those kinds of findings
6  despite any strong feelings that you have, that's fine.
7  If you're not, you feel that is a little too close, just
8  let us know; because that's all we ask you to do. You
9  don't have any problem with applying a law of
10  self-defense to an individual if you felt like they were
11  breaking the law selling dope, let's say?
12     A. I have a problem, yes, I have a problem with
13  that. But if I am told, here's the law and here's the
14  evidence and you're going to have to go by that law, I
15  don't -- I disagree with a lot of laws, and I disagree
16  with the way they're applied in a lot of cases, too.
17     Q. Tell me some of the ones you have the biggest
18  disagreement with.
19     A. One that really sets me on fire is something
20  along the lines of, we forgot to ask if it happened in
21  Harris County. Now, that's just ridiculous to me. I'm
22  kind of stuck on that example, because that really got
23  my attention.
24     Q. That's the one prosecutor gave you.
25     A. And I have heard all these things about, they

1  get life and they're out in three years. I don't know
2  where that comes from, but that's certainly the
3  perception of most of us out there on the street.
4     Q. I think that's true. But if you're not down
5  here on a day-to-day basis, don't see what the law is,
6  you wouldn't have any reason to know different. I'll be
7  honest with you. I don't have a problem talking with
8  you, although some of the questions I ask you, I hope
9  they don't offend you.
10     I think if you were sitting here with me
11  and you were reading the questionnaire, you would want
12  to at least ask some questions. You said you don't have
13  a very strong opinion or very good feeling about defense
14  lawyers, in response to one of the questions that was
15  asked of you here, Number 48(b). That's on Page 11,
16  sir.
17     A. Surely. I'm very consistent in fairly applying
18  my opinion of attorneys to both the defense and the
19  prosecution.
20     Q. It says, What is your opinion about
21  prosecutors? You said, Okay. And you said of defense
22  lawyers, very low. So I see that as a distinction.
23     A. I can see a distinction. And I recall that,
24  from what I hear and my life experience tells me, that
25  many times defense lawyers will go to outrageous lengths

1  to call upon technicalities to get their client off.
2     Q. What personal experiences have caused you to
3  have that opinion?
4     A. I don't know that I can tell you one. I do
5  know that there are cases, as you suggested while ago,
6  if you don't prove it's in Harris County. I know what
7  would -- they come in and they mistyped the man's name.
8  They mistyped the man's name on the paper. They didn't
9  get a chance to go fix it. It was just -- I think it
10  was thrown out.
11     Q. Was that a case that you were a juror on?
12     A. No, I've not been a juror before.
13     Q. Did you read that in the paper?
14     A. No. I was down here when that was going on.
15  Is that true? I mean, if you make a typographical
16  error, it just blows the whole case?
17     Q. Maybe.
18     A. I think that's kind of sad. I think many times
19  maybe we've gone so far in favor of the defendant that
20  maybe justice is not being served.
21     Q. So how do you feel looking at Mr. Mamou right
22  now, what he's charged with? Any thoughts come to your
23  mind about this case and him sitting here?
24     A. No. It's a capital murder case.
25     Q. Right.

1     A. And quite frankly, son, I look at it all and
2  say, how in the world could you have gotten yourself
3  here?
4     Q. Well --
5     A. Breaks my heart.
6     Q. What do you think brought him here?
7     A. He has committed a murder while he was
8  committing some other crime.
9     Q. Right. And do you --
10     A. Or that's what he's charged with.
11     Q. Right. But you used the words, he committed a
12  murder while he was committing another crime. Now those
13  words came easy to your lips. You've got to tell us
14  now, because it's too late to find out later. Do you
15  feel like that's probably what occurred, as he's sitting
16  here? He just didn't get picked up off the streets and
17  placed in this chair.
18     A. That's true. And my choice of words is
19  suspect there, but I don't have a problem with it. He's
20  going to have to prove it. They will have to prove each
21  and every thing that they want to stick. I don't know.
22  I'd rather not be a juror, but all I'm telling you is
23  that I'll just have to do it the way it's supposed to.
24     Q. Why would you rather not be a juror?
25     A. It's an inconvenience to my life. It's a hell

1  of an imposition on my time. Have you ever tried to get
2  here at 8:30 from Katy? You got to have to leave by
3  5:30 in the morning.
4      Q.  Yeah, it's tough.
5      A.  And if you ever had to try to get an
6  appointment at the V.A. Hospital and find out today
7  you're not going to make it, you're going to be another
8  thirty days before you can get another shot at this man,
9  okay. But I've never been on a jury. So, you know, it
10  would be a whole lot better than you calling on me once
11  every six months to serve, and I suppose that's possible
12  you could do that.
13      Q.  All right. So, let me ask you this: Setting
14  aside what the law tells you you got to do, because you
15  know what? The law doesn't tell you you got to do a
16  darn thing. The law says if you take the oath of a
17  juror, then you're supposed to follow the law that's
18  given to you by the Judge. All right. Again, going
19  back to what your feelings are, because I learn more
20  about people when they tell me what their feelings are
21  than when they tell me, I can follow the law. You're
22  faced with a situation. And I want you to think about
23  your answer, because Mr. McClellan answered to you in a
24  certain way (sic).
25          And I want to pose this question to you:

1  Are you telling us that in a situation where you had
2  found, based on the evidence beyond a reasonable doubt,
3  that a person caused the death of two people
4  intentionally -- in other words, it was their specific
5  intent to cause the death of these two people, and they
6  did so -- it was not done in self-defense. It was not
7  an accident. There was no legal justification that
8  causes you to return a not guilty verdict; and
9  therefore, you return a guilty finding.
10          And at that point you're called upon to
11  answer Question Number One. Can you honestly say that
12  based on the evidence that you had used to find that
13  the person committed two intentional murders, that you
14  can honestly look at a question like that and ever find
15  that that answer should be no? If you use just the
16  evidence which you're allowed to hear during the trial
17  of the case and you know that a person at counsel table
18  committed two intentional murders, would it be a fair
19  statement to say that based upon that very evidence,
20  somebody causing two intentional deaths, that there
21  would always be proof beyond a reasonable doubt that
22  that person was probably going to be a threat to society
23  in the future?
24          In other words, you're not just asked to
25  answer that question based on your feelings. You're

1  asked to answer based on the evidence. And I'm saying,
2  in a situation where you had found somebody guilty for
3  killing two people already, wouldn't you agree with me
4  that that question would always have to be answered yes?
5      A.  Yes, I agree. I agree with you. That's my
6  first reaction to what -- you've just set me up into a
7  situation. If I'm going to find someone guilty of
8  capital murder, I'm not sure I know of an example that
9  would allow me to say no.
10          THE COURT:  Mr. Hamilton, can you see that
11  it's not necessary for you to know of a example? It is,
12  however, necessary for you to be open to the notion that
13  an example could exist.
14          VENIREPERSON:  Well, now that's -- that, I
15  have no problem with.
16      Q.  (BY MR. HILL) But you said if you find them
17  guilty of killing two, you would exclude those
18  possibilities?
19      A.  I can't exclude any of these possibilities.
20  I'm just saying that maybe in that particular situation,
21  I start from a yes answer and have to be moved to a no
22  answer.
23      Q.  So you would agree with me, then, that you
24  couldn't presume the answer to Question Number One
25  should be no? Was that your statement, that you presume

1  that the answer is going to be yes, unless you're moved
2  to a no answer?
3      A.  I think that's where I get to. I think I do --
4      Q.  All right.
5      A.  -- if I have already said that they are guilty
6  of the capital murder.
7      Q.  And you understand you don't get to Question
8  Number One --
9      A.  Unless --
10      Q.  -- unless you had found somebody guilty of
11  capital murder?
12      A.  Yes, sir.
13      Q.  And is that your feeling, and is that your
14  belief? Me telling you what the law is, Judge, the
15  prosecutor, anybody telling you what the law is, that's
16  how you honestly feel?
17      A.  That's how I honestly feel.
18      Q.  And that's how you would have to look at a case
19  like that, Special Issue Number Two; because you
20  understand that before you get there, you've already
21  found the person guilty beyond a reasonable doubt of
22  capital murder?
23      A.  I can only tell you that I would start from
24  that one answer and work to the other.
25      Q.  And the first answer would be presumed to be

1 yes unless you were convinced that the answer should be
2 no to Question Number One?
3    A.  Yes, that is correct.
4    MR. HILL:  Judge, I'd like to submit him
5 for cause.
6                VOIR DIRE EXAMINATION
7 BY THE COURT:
8    Q.  Mr. Hamilton, let me ask you a couple of
9 questions. I want to know -- I don't care so much what
10 your answers are. That's your business. But I do need
11 to satisfy my own self that I understand the depth of
12 your commitment. We had talked earlier while we were
13 sitting there, y'all were sitting in the jury box, about
14 the fact it's presumed the answer to that first question
15 should be no; because it starts off with the phrase, do
16 you find from the evidence beyond a reasonable doubt?
17 That means the State has to prove that the answer should
18 be yes. And the question says, is there a probability
19 that the defendant on trial would, in the future, commit
20 acts of criminal violence that would rise to the level
21 of being a continuing threat to society?
22       Can you see, Mr. Hamilton -- and if your
23 answer is no, I can't see it, that's fair. I understand
24 that. But can you see that there could be a set of
25 circumstances wherein two people were killed during the

1 course of a single criminal transaction that would
2 warrant a jury finding a defendant guilty of capital
3 murder. But the uniqueness of that situation as to that
4 defendant on trial, those two people that he did
5 intentionally kill, there may be no other two people in
6 the world that he would kill. He may not commit any act
7 of criminal violence in the future, and a jury may be
8 perfectly satisfied over that. Can you see how that
9 might be a possibility?
10    A.  I can see how that might be a possibility.
11    Q.  There was, a couple of years ago, a trial in
12 South Carolina. And I know you keep up with this stuff;
13 so maybe you're aware of it, where a woman was convicted
14 of capital murder for running her two children off into
15 a lake in the backseat of a car and they drowned. You
16 remember that?
17    A.  Uh-huh.
18    Q.  And she was convicted of capital murder, got a
19 life sentence. Maybe the idea there was certainly her
20 children were in danger, but she had no children left.
21 She had never done anything wrong in the past. It
22 wasn't anticipated she'd be a threat to society,
23 generally, in the future. I don't know if they had
24 these same questions or not, but I'm going to use that
25 as an example.

1       I'll go back to my first question. Would
2 you, if you found somebody guilty of capital murder,
3 start off with the presumption that the answer to that
4 first question should be yes, or would you require the
5 State to prove it to you all over again that the answer
6 to the question should be yes? They proved to you the
7 person is guilty; but that, in and of itself, doesn't
8 prove they're going to be a continuing threat to
9 society. It proves they did something in the past.
10 Doesn't prove what they're going to do in the future at
11 all, necessarily. And there was a question.
12    A.  The question was, could I do it?
13    Q.  Yes, sir. And as I say, your answer is your
14 personal answer; and I'm not trying to influence you one
15 way or the other, but I do need to know.
16    A.  I think I could do it, okay; but here again is
17 a situation where I maybe disagree with how things go.
18    Q.  That's fair.
19    A.  But particularly if you get to this point in
20 the proceedings and it comes down to, we're going to
21 charge you to answer this Question Number One. Surely,
22 you're going to tell us again, you know, that, okay,
23 guys, you're going to have to have it proved. He's got
24 a default answer. You're going to have to put all that
25 stuff away. The thing that is most dangerous, in my

1 opinion, about preconceived notions is that they are
2 followed and put into effect in many cases without even
3 realizing that they are preconceived, okay. It just
4 comes to you as an answer. You have got a situation,
5 okay. Here's the answer. But if you look at the thing,
6 then take it apart, maybe that was just a preconceived
7 answer. If you were stumped, just wait. Just don't
8 answer. Just go back, you know, here's what you're
9 going to have to do. Yes, that can be done. It can be
10 done, but it takes a conscious effort.
11    Q.  And you have recognized that and hit the nail
12 on the head, I think. And would you make that conscious
13 effort?
14    A.  Yes, I can do that.
15    Q.  Did the conscious efforts, specifically being
16 if you found somebody guilty of capital murder, you
17 would make a conscious effort to follow the law and
18 require the State to prove that the answer to that first
19 question should be yes and not assume it should be yes,
20 simply and only because you found the defendant guilty
21 of capital murder?
22    A.  Yes.
23    Q.  Can we make that deal?
24    A.  And that Number One issue seems to hone in only
25 on whether or not you would think the defendant is

1  likely to commit future problems.  So does that mean,
2  then, that anyone who has a clean record to date can
3  commit capital murder and get a pass on the death
4  penalty?
5      Q.  What it does mean -- that exact question --
6  what it does mean is that the jury needs to look at all
7  the evidence in the case to see if their clean record
8  alone rises to the level where it's worthy of that, or
9  are the facts of a given case so bad that the clean
10  record alone gives way to the facts of the case?
11      A.  Yes.
12      Q.  But at any rate, am I understanding accurately
13  that if you found somebody guilty of capital murder,
14  which is what they did do in the past, that that, in and
15  of itself, does not necessarily always show you what it
16  is they're going to do in the future?
17      A.  I agree with that, sir.
18      Q.  Can you see that the first question, which is
19  going to be asking you to decide is he guilty, has to do
20  with having a past?  This question has to do with what's
21  probably going to happen in the future?  Okay.
22          All right.
23          MR. HILL:  Were you done?
24          THE COURT:  Yes.
25          MR. HILL:  I just have one question, if I

1  may.
2          THE COURT:  Sure.
3              VOIR DIRE EXAMINATION
4  BY MR. HILL:
5      Q.  The Judge used the example of Susan Smith in
6  South Carolina, the lady that ran her two kids into the
7  lake to drown.  What's your take on that?  What were
8  your feelings about that?  Do you think somebody like
9  that is not going to be a future threat to anybody in
10  the future just because she killed her two kids?  What's
11  your honest feeling about somebody like Susan Smith,
12  since that's a real life case that's already been
13  decided?
14      A.  My honest opinion is the nature of what she did
15  was just so unbearable for me to even think, on this she
16  should have received the death penalty --
17      Q.  Right.
18      A.  -- for that one act.
19      Q.  Okay.  I don't want you to struggle to have to
20  stay on this jury if that's not where you need to be,
21  and I do intend to ask you questions that try to get an
22  absolute commitment about how you're going to feel about
23  things; but that's all we can judge our decision making
24  on.  How do you really feel?  How do you really react?
25          Somebody telling you what the law is or

1  that you have to follow the law doesn't mean that you're
2  a hundred percent comfortable with that.  And if you do
3  have what you refer to as preconceived notions, we just
4  need to know that now.
5          My last question to you is this:  Think
6  for a moment that you've heard all the evidence in the
7  case.  That evidence has convinced you that the person
8  is guilty of capital murder, however it's alleged.  That
9  evidence also convinces you that person is a future
10  threat to society.  You have just answered Question
11  Number One in the affirmative; yes, I find beyond a
12  reasonable doubt that there is a probability that this
13  person would commit criminal acts of violence that would
14  constitute a continuing threat to society.
15          Can you honestly tell me that having found
16  those two answers, that you could then honestly ever
17  consider answering Special Issue Number Two in a way
18  that the person would receive a life sentence; or do you
19  think at that point, in all fairness, anybody that
20  commits capital murder and is a future threat to
21  society, it doesn't matter about where the person came
22  from, what their makeup is, whatever, that person should
23  get the death penalty?  Is that how you feel?
24      A.  Quite honestly, yes, I think I would feel that
25  way.

1      Q.  It doesn't do enough and --
2          THE COURT:  That's fine.
3          Mr. Hamilton, thank you very much.  We're
4  going to excuse you.
5          Mr. Hill, your challenge is granted.
6          JOYCE STONER WILLIAMS,
7  having been first duly sworn, testified as follows:
8              VOIR DIRE EXAMINATION
9  BY THE COURT:
10      Q.  How are you today?
11      A.  Fine.
12      Q.  Please have a seat and make yourself
13  comfortable.  Ms. Williams, first off let me ask you, do
14  you remember back to Monday and the things we talked
15  about when the whole group was together?  Add to it this
16  morning the things we talked about.
17      A.  We didn't come Monday, did we?
18      Q.  Friday, I'm sorry.  But whatever day it was,
19  the things we talked about that day, add to them this
20  morning, the things we talked about this morning.  Out
21  of everything that we have talked about so far, do you
22  have any questions at all for me?
23      A.  (Nods negatively.)
24      Q.  Is there anything up to now that we have not
25  addressed that you feel as though we ought to talk about

1 because it might have some bearing on your service as a
2 juror?
3    A. No.
4    Q. Anything about any of these rules we've talked
5 about that you have any disagreement with?
6    A. No.
7    Q. You had indicated in your questionnaire in
8 response to a question on Page 12, question being Number
9 56, question asked: Do you have any religious, moral,
10 or personal beliefs that would prevent you from
11 returning a verdict which would result in the execution
12 of another human being? You checked yes. You said, I
13 don't believe in the death penalty. God is the ultimate
14 judge of any person. Remember having put that in your
15 questionnaire?
16    A. Uh-huh.
17    Q. Do you remember our conversation both last
18 Friday, as well as today, that the death penalty is a
19 possible punishment if a person is convicted of capital
20 murder?
21    A. Uh-huh.
22    Q. You have to use words.
23    A. Yes, I'm sorry.
24    Q. How does what you put, in terms of your answer
25 on the questionnaire -- you see, it's inconsistent with

1 it being a possible punishment if you were a juror in a
2 case.
3    A. I couldn't accept -- I couldn't do the death
4 penalty.
5    Q. Never, ever, ever?
6    A. The prosecution would really have to prove --
7    Q. Ma'am, answer my question.
8    A. Well, I'm trying.
9    Q. Never, ever, ever?
10    A. I don't think so.
11    Q. Okay.
12       THE COURT: Should I go any further?
13       MR. HILL: You should.
14    Q. (BY THE COURT) Let me ask you this: And the
15 whole idea behind this, Miss Williams, is really pretty
16 simple. Both sides have the right to have as jurors
17 people who will give legitimate consideration to all the
18 possible punishments and come up with what you think is
19 the right punishment to impose if you found somebody
20 guilty based upon all the evidence in the case.
21       If I'm hearing you correctly -- -- and you
22 tell me if I am or if I'm not. If I'm hearing you
23 correctly, you're telling me that no matter what the
24 evidence was, you could never answer these questions, as
25 a juror, in such a way that I would be required to

1 sentence the defendant to death. Now is that an
2 accurate statement?
3    A. I guess. I guess so.
4    Q. Don't guess with me.
5    A. I need to explain something.
6    Q. Go ahead.
7    A. If the prosecution -- and maybe this is not
8 what you want to hear, but this is what I feel. If the
9 prosecution could really make me see that, you know,
10 that he should be sentenced to death, you know, then
11 maybe I would have a change of heart; but at this point
12 I don't. And maybe if it actually happened to me, with
13 my family, then maybe I would feel different; but right
14 now I just don't.
15    Q. Well, let me ask you some questions. First
16 off, we know it's not going to happen to your family;
17 because if that were the case, you couldn't be a juror.
18 So that's not going to be a possibility. But when you
19 say right now you just don't, do you mean right now in
20 the sense that you've heard no evidence?
21    A. No, not that I haven't heard any evidence.
22 It's just that I don't believe -- you know, I don't
23 believe in the death penalty. I just don't.
24    Q. All right. Go back to my question again.
25 Are you saying that if you were a juror in a capital

1 murder case, and if your jury, you and the other eleven
2 folks, found that imaginary defendant guilty of capital
3 murder, you came back and you heard additional evidence
4 at the second part of the trial for the purposes of
5 answering these two questions, and you knew if you
6 answered Question Number One yes and you knew if you
7 answered Question Number Two no, that I'd sentence the
8 defendant to death. Would you answer that first
9 question yes if you thought, based upon the evidence,
10 that's what the answer should be?
11    A. Yes.
12    Q. Would you answer that second question no if you
13 thought, based upon the evidence in the case, that
14 that's what the answer should be?
15    A. Yes.
16    Q. And you understand that?
17    A. Yes.
18    Q. If you answer them yes and no, I would be
19 required to sentence the defendant to death --
20    A. Yes.
21    Q. -- not you. Would you answer those questions
22 yes and no, understanding I'd have to sentence the
23 defendant to death if you thought, based upon the
24 evidence in the case, those were the right answers to
25 give?

91

1      A.   Yes.
2      Q.   Do you have any questions for me before we
3  start?
4      A.   No.
5            THE COURT:  Mr. McClellan.
6            MR. MCCLELLAN:  Thank you, Your Honor.
7                  VOIR DIRE EXAMINATION
8  BY MR. MCCLELLAN:
9      Q.   Miss Williams, my name is Lyn McClellan.  Along
10  with Claire Connors, we represent the State of Texas in
11  this case.  I want to kind of go back to that same
12  issue.  You filled out in the questionnaire that you're
13  opposed to the death penalty, okay.  There was a
14  question on Page 13.
15            MR. MCCLELLAN:  Do we have a copy there,
16  Your Honor?
17            THE COURT:  Yes, we do.
18      Q.   (BY MR. MCCLELLAN) Question No. 70, Page 13,
19  you checked, I could not vote for the death penalty
20  regardless of the facts and circumstances of the case.
21  Is that how you feel?
22      A.   Well, after hearing what he explained, I can
23  understand.
24      Q.   Well, tell me what you think.  Can you
25  conceive of yourself ever voting in such a way that

92

1  death would result?  I mean, not just, well, maybe a
2  wild, wild possibility, when you go -- the person you
3  are, I assume, is the person that's in this
4  questionnaire?
5      A.   Yes.
6      Q.   I don't believe in the death penalty, don't
7  think it's a proper type punishment and that you
8  basically said only God can judge?
9      A.   Yes.
10      Q.   And should make that type of decision?
11      A.   Yes.
12      Q.   We're going to be asking people to do that
13  judging instead of God.  That conflicts with, I assume,
14  your personal, religious, and moral beliefs; is that
15  right?
16      A.   Yes.
17      Q.   What we don't want to do is put jurors in a
18  position to where their job as a juror would do violence
19  to their conscience.  Obviously, if you had to make a
20  decision and it turns out you made a decision that death
21  would result, that might do violence to your conscience.
22  That goes against your religious beliefs or your
23  personal and moral beliefs as you express them in the
24  questionnaire; is that right?
25      A.   I don't really -- I hope I don't have a problem

93

1  with my conscience.  Because of my religious belief, I
2  just pray that God would, you know, help me to deal with
3  the decision.  You know, as far as I'm concerned, the
4  decision has already been made by a higher being, as far
5  as I'm concerned.
6      Q.   I understand.  Do you understand how I can't
7  rely upon that?
8      A.   I understand that.
9      Q.   And you know we're seeking the death penalty.
10  No doubt about that.  We'll be seeking to have people
11  and we're looking for people that can give us a fair
12  trial.  First thing you started to say up there to the
13  Judge was, the prosecutor would really, really have to,
14  you know, prove this case.
15      A.   Uh-huh.
16      Q.   The burden in a capital murder case is beyond a
17  reasonable doubt.  That's the same burden that's in a
18  shoplifting case.  Some people come and say, well,
19  you're going to have to prove to me more than that.  If
20  you're asking for me to give the ultimate penalty, that
21  being death, for me to vote in such a way that death
22  would result, you're not only going to have to prove to
23  me beyond a reasonable doubt, I'm going to have to be
24  one hundred percent certain.  Is that the way you feel?
25      A.   Yes.

94

1      Q.   I can never prove to you 100 percent certainty.
2  I promise you that.  One hundred percent certain is not
3  the level of proof that I'm required.  I'm not trying to
4  take you out of it.  I'm just telling you what the law
5  is.  And some people say, well, I'm going to hold you to
6  a higher burden of proof.  Because of my personal
7  feelings, because of my religious feelings and beliefs,
8  that in order for me to make that type of decision, I'm
9  going to have to be even more sure than what the law
10  says I have to be sure, because it's me making this
11  decision.  That may be fine for these other people; but
12  for me to make a life and death decision, I'm going to
13  have to be one hundred percent certain.  Is that the way
14  you feel?
15      A.   I don't really have to be one hundred percent,
16  but you would have to really show me, prove to me.
17      Q.   Would you require -- would you expect more
18  proof in a case where the State's going to seek the
19  death penalty than you would in a case where the State's
20  going to ask for a fine and jail time?
21      A.   I would hope it would --
22      Q.   Wouldn't you demand more proof in a death
23  penalty case than you would in any other type of case?
24      A.   Yes.
25      Q.   That's how you really believe, isn't it?

1  A.  Yes.

2  Q.  I'm not trying to --

3  A.  I understand.

4  Q.  I'm just trying to get what your feelings are.

5  A.  Yes, I understand.

6  Q.  All right.  So you would, in effect, be saying

7  that you're demanding more proof than just beyond a

8  reasonable doubt; because that's the burden of proof in

9  every criminal case, and that doesn't make it bad or

10  anything.  That's just how you feel.  Is that the way

11  you feel?

12  A.  It wouldn't have to be 100 percent, but --

13  Q.  But it would have to be more than beyond a

14  reasonable doubt?

15  A.  Yes.

16  Q.  More than the type of proof you would expect in

17  a non death case?

18  A.  No, not necessarily.

19  Q.  Well, I mean, you tell me that you want to be a

20  hundred percent certain, and then you tell me you don't

21  want to be a hundred percent.

22  A.  I want to be certain.

23  Q.  I understand.  My question:  Would you require

24  more proof in a death penalty case than in any other

25  type of case?  And you said yes.  Is that the way you

1  feel?

2  A.  Yeah, especially when somebody's life is at

3  stake, yeah.

4  Q.  Nothing wrong with that.

5  A.  Yes.

6  Q.  Don't believe me?

7  A.  Yes.

8  Q.  Now when you say that, can you see how you're

9  saying that you would require more proof than just

10  beyond a reasonable doubt?  Because that's what is

11  required in all cases.

12  A.  Yes.

13  Q.  You see the logic of how that works?

14  A.  Yes.

15  Q.  So are you telling me and are you comfortable

16  with that fact that you would require me to prove our

17  case more than just beyond a reasonable doubt?  Because

18  that's what's required in the other non death cases.

19  A.  Yes.

20  Q.  So you would require more proof in a death

21  case?

22  A.  Yes.

23  Q.  And you believe -- or you tell me -- that you

24  could not vote to assess the death penalty, regardless

25  of the facts and circumstances, unless I prove that to

1  that higher level of proof --

2  A.  Yes.

3  Q.  -- is that correct?

4  A.  Yes.

5  Q.  I would submit the juror --

6  THE COURT:  Don't read this as a ruling,

7  but do you have any other questions for Miss Williams?

8  MR. MCCLELLAN:  Yes, I do.  Depends on

9  that ruling.

10  THE COURT:  No.  I said don't take this as

11  a ruling.

12  MR. MCCLELLAN:  Right.

13  VOIR DIRE EXAMINATION

14  BY THE COURT:

15  Q.  Miss Williams, let me ask you a couple of

16  questions please.  Before I ask, I want you to know it's

17  not important to me what your answer is.  It is

18  important to me that I understand your answer and that

19  you answer consistently.  Because you see, if you give

20  us different answers, then I have no idea where we are.

21  Now we've talked Friday and today about

22  the State being required to prove a person's guilt

23  beyond a reasonable doubt.  We talked today about the

24  State having to prove the answer to that first question

25  at the second phase of the trial, if there is one.  The

1  State has to prove to you that the answer to this

2  question should be yes beyond a reasonable doubt.  Did

3  you tell Mr. McClellan that you would require him to

4  prove it more than that?  Is that what you told him?

5  A.  Yes.

6  Q.  How much more?

7  A.  I really don't know.

8  Q.  You remember when we talked to you earlier

9  today about the difference between probability and

10  certainty?  Just because something could possibly happen

11  doesn't mean it's certain to happen.  Can you see how

12  the State would never prove with an absolute certainty

13  that something would happen?  Does that make sense to

14  you?

15  A.  Yes.

16  Q.  Would you require them to prove to a certainty

17  that something happened to a certainty?

18  A.  Yes.

19  Q.  Would you require them to prove to a certainty

20  that something happened?

21  A.  Yes.

22  Q.  You just told me you understood that nobody

23  could.  And I'm not trying to trick you, but you see

24  your answers aren't necessarily the same.  And my

25  question to you is this:  I understand the difference

1 between a juror wanting to be perfectly satisfied that
2 the decision they're reaching is the accurate decision.
3 I understand that. But I also understand that a jury
4 could be perfectly satisfied that they are reaching the
5 right decision by deciding a person's guilt or by
6 answering that first question if the State proves it
7 beyond a reasonable doubt. Can you see what I'm saying?
8 A. If they prove beyond a reasonable doubt that
9 this happened, then I guess I would have to say yes.
10 Q. That's my question.
11 A. I wouldn't have to, but --
12 Q. But I want to know, would you?
13 A. Yes, uh-huh.
14 Q. So can you see now -- if I'm hearing you
15 correctly, you're telling me that you're not going to
16 make the State prove something to a greater burden than
17 beyond a reasonable doubt?
18 A. Oh, no, I wouldn't expect them -- you know,
19 maybe I didn't understand the way it was worded or
20 something, but I wouldn't -- like you said, I wouldn't
21 expect them to go beyond the limits of what he felt he
22 would have to do. If he could prove to me that this is
23 what happened, then I would say yes, you know; but it
24 would have to be with no doubt.
25 Q. Now you said something, Miss Williams, and I

1 recognize you're in a place where you're not used to
2 being. You said, he would have to prove it. He doesn't
3 have to prove it, according to the law, beyond a
4 reasonable doubt. Now the question really boils down to
5 this: Can you see that while he's perfectly willing to
6 abide by the law and accept a challenge to prove a
7 person's guilty beyond a reasonable doubt? Can you see
8 how unfair it would be if a juror ignored the law and
9 said, no matter what the law said, I'm going to make you
10 prove it to me more?
11 A. Oh, yeah, I understand. I can see that.
12 Q. Would you do that? Would you make him prove a
13 case more than what the law required?
14 A. No, not more than what the law requires, no.
15 THE COURT: Go ahead, sir.
16 VENIREPERSON: I'm sorry.
17 VOIR DIRE EXAMINATION
18 BY MR. MCCLELLAN:
19 Q. Miss Williams, I'm not concerned about what
20 other jurors are required to do. I'm not concerned
21 about what other jurors will do or whatever. I'm
22 concerned about what you would do. You've told me that
23 you oppose the death penalty; is that right?
24 A. Yes.
25 Q. Don't think it's a proper type punishment --

1 A. No.
2 Q. -- for crimes that we ought to have?
3 A. No.
4 Q. If you could do away with it, you would do away
5 with it?
6 A. If I had my way, yes.
7 Q. And you know that forty years -- if a person
8 gets a life sentence, he gets forty years day for day;
9 and that's a lot of time.
10 A. Yes.
11 Q. You've indicated on here that you could not
12 vote for the death penalty regardless of the facts and
13 circumstances; isn't that right?
14 A. That's what I put on here. But after having it
15 explained just a little clearer --
16 Q. You told me that you would require me to prove
17 my case because we're seeking death. You understand how
18 serious it is; because you oppose death as punishment,
19 right?
20 A. Yes.
21 Q. And before you would ever be comfortable in
22 assessing the death penalty, you've told me, and I
23 assume you're telling me -- correct me if I'm wrong --
24 that you would require more proof than you would expect
25 in any other type of case, because we're seeking the

1 death penalty?
2 A. Not after -- not after the Judge and I talked.
3 I can see clearer now.
4 Q. You can see to where it's now changed your
5 mind?
6 A. Yes.
7 Q. You're now for the death penalty?
8 A. No, I'm not for the death penalty; but you
9 don't have to go --
10 Q. You could assess that in the proper case? You
11 could sit in judgment, sign a jury verdict that says
12 this person receives death in a proper case, if that's
13 what you're comfortable doing?
14 A. If you proved it.
15 Q. And would I have to prove it more than I would
16 any other type case?
17 A. No, not after the explanation.
18 Q. Okay. All right. So on that questionnaire, on
19 Page 13 there, what would you check then if you don't
20 believe in Number One, I could not vote to assess the
21 death penalty regardless of the circumstances, what
22 would you choose there?
23 A. Probably Number 3, more so now.
24 Q. Okay. That you could consider all the penalty
25 provided by law and the facts and circumstances of the

**103**

1 case?

2    A. Yes.

3    Q. But going in, you still oppose the death

4 penalty?

5    A. Yes.

6    Q. But you could vote to assess it and go back and

7 tell the people at your church or whatever that you

8 heard a case and you voted to assess the death penalty?

9    A. I would have to if I chose Number 3.

10    Q. Okay. My question is: You don't have to do

11 anything. I'm just checking. Now, more or less, can

12 see where the death penalty --

13    A. Yes.

14    Q. -- is a problem?

15    A. Yes.

16    Q. While ago you said you would do away with it if

17 you could. Would you still do away with it?

18    A. I think so, yes.

19    Q. Don't you think that would always cause you

20 to -- you're leaning against the death penalty? Would

21 that be right?

22    A. Oh, yes.

23    Q. Very strong?

24    A. No.

25    Q. When you get down here, and let's say you found

---

**104**

1 someone guilty of capital murder. Let's say you answer

2 Issue Number One that he's a continuing threat to commit

3 future acts of violence. If the answer is yes, you know

4 he's going to receive the death penalty. And then Issue

5 Number Two says: Do you find there are any reasons or

6 circumstances that this person ought to receive life as

7 opposed to death? In other words, it gives the option

8 of deciding life as opposed to death, under any

9 circumstances, that would convince me he ought to get

10 life as opposed to death.

11       Based upon your beliefs, would you always

12 then answer that question in such a way that life would

13 result -- there is no burden there. There is no

14 requirement of proof. It says, taking into

15 consideration all of the evidence, including the

16 circumstance of the crime, the offense, the defendant's

17 character and background, and his personal moral

18 culpability of the defendant, there is sufficient

19 mitigating circumstance or circumstances -- I like to

20 refer to it as sufficient reasons -- why this person

21 here would warrant a sentence of life imprisonment as

22 opposed to death because of your beliefs, because of

23 your leaning against the death penalty?

24       In that Issue Number Two, would you always

25 find there are circumstances such that life would be the

---

**105**

1 appropriate penalty?

2    A. Yes.

3    Q. You will?

4    A. Yes.

5    Q. Regardless of what, you know, that tells you to

6 go back and look at everything.

7    A. Uh-huh.

8    Q. And when you went back and looked at the crime,

9 whatever it might be, when you looked at the character

10 and background of the defendant, whatever that may be,

11 when you look at his responsibility for the crime,

12 whatever that may be, you would always find there is

13 sufficient circumstances that life as opposed to death

14 ought to apply, because that's what you think, knowing

15 it's forty years, day for day, that's a long time, that

16 would always be -- your vote would always be such that

17 it would be life as the punishment?

18    A. Yes.

19       MR. MCCLELLAN: I submit --

20       VOIR DIRE EXAMINATION

21 BY THE COURT:

22    Q. Miss Williams, you're back to me again. Can

23 you see how we've come the full circle, Miss Williams,

24 that we've -- that when you started out with the fact

25 you could never give the death penalty to the fact that

---

**106**

1 you could, if you believe beyond a reasonable doubt,

2 vote for the death penalty to where the second question,

3 you would always take that death penalty away? Because

4 the way I heard you answer Mr. McClellan's question was

5 if you found -- I'm not talking about this defendant,

6 but any defendants -- if you found them guilty of

7 capital murder, if you answered that first question yes,

8 that you did find them to be a future danger, we know

9 that up to then, the death penalty is going to be

10 imposed.

11    A. Yes.

12    Q. And it depends on what the punishment to be

13 assessed is, how the jury answers that second question.

14    A. Yes.

15    Q. Mr. McClellan asked you would you always answer

16 that second question, because of your feelings against

17 the death penalty in such a way that death penalty would

18 be taken away and a life sentence would be substituted

19 for it? And I thought I understood you to say, yes, you

20 would always answer it yes so that a life sentence would

21 always be imposed assessed.

22    A. I guess it would all depend on, in the second

23 question, whether the circumstances would warrant life

24 in prison.

25    Q. Well, I agree. Do the circumstances warrant a

1  life sentence, or do they not?
2      A.  It would all depend upon the circumstances.
3      Q.  But the way I heard you answer Mr. McClellan is
4  you would -- you would always say the circumstances did
5  warrant it?
6      A.  You make it clearer than I did.
7      Q.  Well, but you see --
8      A.  I understand.
9      Q.  I'm asking it the second time, and you've
10  already been through it once.  And I just want to be
11  sure.  Are you saying you would not always or you would
12  always answer one way or the other?
13      A.  No, it depends on the circumstances.
14      Q.  Ma'am, on that second issue, there is no burden
15  of proof.  It is a stopgap.  It gives the jurors the
16  opportunity to make a decision on the life or death of
17  this person.  There is no decision until you get to
18  Number Two.  You have found a person guilty.  You found
19  he would be a continuing threat to commit future acts of
20  violence, but that doesn't mean he gets death.  Because
21  you couldn't get death unless all questions are answered
22  in a certain way.  So the second question still has to
23  be answered.
24          And my question to you is -- because
25  you're going back and saying, this is an opportunity.

1  This is what Issue No. 2 gives the jurors -- not only
2  just you, but all the jurors -- an opportunity to
3  basically save that person's life, give them a life
4  sentence as opposed to death.  And I would assume, if
5  someone is opposed to the death penalty, thinks we
6  shouldn't have it, thinks that this is not the type of
7  penalty I would have if I were making the laws, that
8  that person when leaning towards -- against the death
9  penalty, would then choose to answer this in such a way
10  that life would result, knowing that it's going to be
11  forty years, day for day; it will be 2039 before someone
12  would even be eligible for parole.  And if that's the
13  way you feel, you would be leaning that way and do that,
14  that's what I need to know.
15      A.  I don't think I could answer this now, until I
16  heard the case.
17      Q.  So even after, you think you could still answer
18  that question in such a way that death would result?
19      A.  Yes, but I'd have to hear the case first.
20      Q.  There's an area that I need to go into because
21  of certain requirements to serve as jurors in Texas.
22  And you may remember the case several years ago of the
23  cheerleader mom, or whatever, somebody who hired someone
24  to kill a girl who was trying out for cheerleader, and
25  she was tried.  You don't remember that case?

1      A.  Very vaguely.
2      Q.  But that case was reversed or thrown out,
3  because somebody was on the jury who had a conviction
4  for an offense, okay.  The law says if someone is
5  convicted of theft, they cannot serve as a juror in any
6  criminal or civil case.  Now in June of this year, did
7  you have an occasion to go to court in Brazoria County?
8      A.  No.
9      Q.  You're Joyce Ann Williams; is that right?
10      A.  Yes.
11      Q.  And your date of birth is what?
12      A.  6-27-50.
13      Q.  Okay.  And we have -- we have to check the
14  records of all the people, and your name came up as
15  having been convicted of theft in Brazoria County on a
16  theft by check case.
17      A.  Really?  That's news to me.
18      Q.  So you never went to court in Brazoria County?
19      A.  No.  Where is Brazoria County?
20      Q.  I guess it's Angleton.
21      A.  I have no business there.
22      Q.  Okay.  So that's not you?
23      A.  No, it's not.  And I'd like, if I could have a
24  copy of that, to try and find out about it.
25      Q.  Well, we'll do some more checking on that to

1  see if, in fact, it is -- comes back to you or whether
2  it's some other person with the same name or whatever.
3      A.  I'd really like to know about that.
4      Q.  Okay.  Back to the issue on the death penalty.
5  Knowing your opinions and beliefs about the death
6  penalty, do you think you could be fair to the State of
7  Texas in this case?
8      A.  Yes.
9          MR. MCCLELLAN:  I'll pass the witness.
10          THE COURT:  Mr. Hill, do you have any
11  questions?
12              VOIR DIRE EXAMINATION
13  BY MR. HILL:
14      Q.  I just have one question, because you've spent
15  a lot of time up there.  Is there anything about you,
16  about how you feel or whatever, whatever makes you tick
17  and whatever makes you who you are -- I'm sitting here
18  representing with Mr. Wentz Charles Mamou.  Is there any
19  reason at all that we should not feel comfortable
20  selecting you to sit on this jury in this case?
21      A.  No.
22      Q.  Thank you, ma'am.
23          THE COURT:  Miss Williams, in just a
24  second I'm going to excuse you.  Before I do, may I get
25  that back from you, please?

111
1                (Prospective juror dismissed.)
2                    NOHEMY BONILLA,
3  having been first duly sworn, testified as follows:
4                VOIR DIRE EXAMINATION
5  BY THE COURT:
6      Q.  Miss Bonilla, before I begin, let me ask you a
7  couple of questions.  First question I'm going to ask is
8  to remember back to last Friday, when everybody was
9  together here, and this morning and the conversation we
10  had this morning.  Out of everything we talked about up
11  to now, do you have any questions at all for me?
12      A.  Not really.
13      Q.  When you say not really, that means to me that
14  you do have some but you don't want to ask them.
15      A.  No.
16      Q.  No means you don't have any.
17      A.  Okay, no.
18      Q.  Is there anything up to this point, Miss
19  Bonilla, that we have not touched on that you feel like
20  we ought to talk about because it might have some
21  bearing on your service as a juror?
22      A.  No -- well, how long is this going to last?
23      Q.  Well, as we said last Friday, we're talking to
24  you today.  There is a chance we may get you back here
25  on September the 29th, which is a week from tomorrow;

112
1  because what we're doing is talking to people one at a
2  time to create a panel of about forty-five people.  We
3  get all forty-five people in here next Wednesday.  And
4  out of that forty-five on that day, we'll decide who the
5  jurors are.  I won't, but the lawyers will.
6          The evidence in the case, if you're
7  selected as a juror, will begin on Monday, October the
8  4th, which is two weeks from yesterday.
9      A.  Okay.
10      Q.  The trial, we know, will last for more than one
11  week, but we don't believe it will last longer than two
12  weeks.
13      A.  Okay; because if it's December, I'm due in
14  December.
15      Q.  No, no, no.  We'll all be -- you'll long since
16  have forgotten us by December.  Now -- and I was going
17  to ask you about your circumstance, because you're
18  pregnant.  And if you're due in December, you're a
19  little over six months?
20      A.  Six months.
21      Q.  Is this your first?
22      A.  Yes.
23      Q.  Tell me, Miss Bonilla, do you feel that your
24  physical circumstance is such that it would in any way
25  interfere with your ability to be a juror in this case

113
1  for maybe, at the most, two weeks?
2      A.  Depends, because you know, with this --
3      Q.  Now I'm asking the questions.  It's perfectly
4  natural for you to answer me, but these folks have to
5  also hear your answer.
6      A.  Well, depends; because right now -- it's like,
7  right now I feel like I can come to this and everything.
8  But what happens if something happened to me?  You never
9  know, because I'm pregnant right now and the doctor said
10  it might come early or later.
11      Q.  Well, we're figuring the trial's going to be
12  over with by October the 15th.  Now there is no way --
13  have you had any difficulty with your pregnancy up to
14  now?
15      A.  Not yet.
16      Q.  So there is nothing that has occurred that
17  makes you believe you are going to have any difficulty;
18  is that correct?
19      A.  Yes.
20      Q.  Well, let me say this:  If anything does come
21  up, obviously we're going to get you taken care of.
22      A.  Uh-huh.
23      Q.  So with that in mind, are you saying that as
24  far as you know, your pregnancy would not prevent you
25  from being a juror for the two weeks the first of

114
1  October?
2      A.  No.
3      Q.  Okay.  Is there anything at all that you can
4  think of, whether it be something -- are you still
5  working?
6      A.  Yes, I work.
7      Q.  Anything at all about your job, anything at all
8  about your family life, anything at all about your
9  health, or anything else you feel would interfere with
10  your service as a juror?
11      A.  No, sir.
12      Q.  Can you see, based upon the conversation we've
13  had up to now, Miss Bonilla, in terms of being sworn in,
14  all we're trying to do is to make sure whoever the
15  twelve jurors are in a case, whoever they are, they
16  won't require either side to do anything that the law
17  doesn't require of them; everybody that's a juror is
18  open to listening to all of the evidence, find him
19  guilty if that's what you think you should do based upon
20  the evidence, find him not guilty if that's what you
21  think you should do based upon the evidence.  Can you do
22  either one of those things?
23      A.  Yes, sir.
24      Q.  Can you, also, if you find a person guilty of
25  capital murder, answer these questions knowing if you

1 answer them in one way, I'm going to sentence the
2 defendant to death; but if you answer them a different
3 way, I'm going to sentence the defendant to life. Are
4 you open to answering these questions either way?
5     A. Yes, sir.
6     Q. But depends upon the evidence in the case?
7     A. Yes, sir.
8     Q. Before we begin, do you have any questions for
9 me?
10     A. No, sir.
11     Q. Okay. Thank you.
12         THE COURT: Mr. McClellan.
13         MR. MCCLELLAN: Thank you, Your Honor.
14             VOIR DIRE EXAMINATION
15 BY MR. MCCLELLAN:
16     Q. Miss Bonilla, my name is Lyn McClellan. Along
17 with Claire Connors, we represent the State of Texas in
18 this case. Tomorrow is Wednesday. We want to know what
19 the numbers are for the Lotto tomorrow so we can win.
20 You can't give it to us?
21     A. I wish I could.
22     Q. You would probably keep it for yourself?
23     A. Yes.
24     Q. I thought I'd try. Let me ask you, if I can,
25 just to tell us in your own words what your opinion is

1 about the death penalty.
2     A. Depends, because I think it's -- nobody has the
3 right to take somebody else's life.
4     Q. Do you think the death penalty is a proper type
5 punishment in certain types of cases?
6     A. Yes, depends how the murder was committed.
7     Q. Some people come to us and say they believe in
8 the death penalty; but they do not believe that they,
9 themselves, could ever participate in a process whereby
10 they would be called upon to make decisions that they
11 knew would result in this Judge ordering the execution
12 of this defendant sitting over here on trial. Do you
13 have any doubts about your ability to participate in
14 that type process and make that type decision if that's
15 what the law and the evidence called for?
16     A. Well, I can be agreeable about the death
17 penalty; but I don't think I can, like, decide somebody
18 else's destiny in that way.
19     Q. So you don't think you could ever serve as a
20 juror to make those type decisions? Is that what you're
21 saying?
22     A. Yes, sir.
23     Q. Okay. And that is because of your religious
24 beliefs, or personal beliefs, or what?
25     A. It's not because of religious. It's just, it's

1 because I don't feel like -- I mean, like I say, I don't
2 have the right to decide, like, if he's going to be
3 committed to death or a life sentence. That's -- I
4 don't know.
5     Q. Okay. Now, of course, the law says you do have
6 the right. And you're saying you, personally, don't
7 believe that you have that right?
8     A. Yes.
9     Q. All right. Would that prevent you, then, from
10 listening to evidence and deciding that someone should
11 receive the death penalty if that's what the evidence
12 called for?
13     A. Well, if he committed a crime, you have to pay
14 for it. I understand that right.
15     Q. And that's what we're talking about. And we're
16 talking, though, about your ability to sit over here and
17 making that type of decision. Can you do that?
18     A. I think I can.
19     Q. All right. And if the answers to the questions
20 were in such a way that the death penalty would result,
21 can you vote for that to occur?
22     A. Yes, sir.
23     Q. Now you said while ago that you had some
24 concern about, who are you to decide if someone dies?
25     A. Yes, well --

1     Q. But you now understand that's what this process
2 is about?
3     A. Yes.
4     Q. Now some people have religious beliefs that
5 prevent them from sitting in judgment of another person.
6 Do you have any religious beliefs that would keep you
7 from being a juror?
8     A. No, sir.
9     Q. You believe in the death penalty, right?
10     A. Yes.
11     Q. For certain types of crime?
12     A. Uh-huh.
13     Q. And if the crime was, quote, "bad enough," you
14 think you could vote for the death penalty if that's
15 what the evidence showed?
16     A. Yes, sir.
17     Q. You understand this is a capital murder case;
18 obviously, someone has died?
19     A. Uh-huh.
20     Q. You're obviously going to see pictures or
21 photographs of dead people or person or persons. You
22 may see evidence of blood in that kind of situation.
23 Because of your condition of being pregnant, do you
24 think that would affect you, or would you still be able
25 to sit there and listen to that type of evidence and

119
1  make the type of decision that the evidence called for?
2  Only you know that. That's why I'm asking you.
3      A.  Well, I never -- I don't know; because, I mean,
4  I never been like this. You know, you see that on TV,
5  but not actually living that.
6      Q.  You don't have any reason to believe, do you,
7  that that would keep you from serving as a juror, do
8  you?
9      A.  No, sir.
10     Q.  In other words, you will be able to see
11  photographs and all kinds of evidence that you're given
12  and make a decision based upon the evidence that you
13  got, could you not? You -- let me just give you some of
14  these statements and see if you can tell me whether you
15  agree or disagree with the.
16         The death penalty is absolutely justified.
17  Do you agree with that or disagree?
18     A.  I agree.
19     Q.  Okay. We must have the death penalty for some
20  crimes. Do you agree?
21     A.  Yes, sir.
22     Q.  What kind of crimes do you think we ought to
23  have the death penalty for?
24     A.  For sexual harassment, or any kind of abuse
25  about kids, or any person.

120
1      Q.  Death penalty is just and necessary?
2      A.  Sometimes it is.
3      Q.  Okay. Death penalty gives a criminal what he
4  deserves?
5      A.  Well, sometimes.
6      Q.  The death penalty is always justified for
7  intentional murder. By intentional murder, you're
8  talking about if you intentionally go out and take
9  someone's life, that basically you should have to pay
10  with your own life.
11     A.  Yes, sir.
12     Q.  Do you agree with that?
13     A.  Yes, sir.
14     Q.  The death penalty should be available as
15  punishment for more crimes than it is now.
16     A.  Yes.
17     Q.  Do you think we have a crime problem in Harris
18  County?
19     A.  Yes, sir.
20     Q.  You, as a young woman, do you think crime is --
21  do you fear crime could possibly affect you or your
22  family?
23     A.  Yes. It could happen to anybody.
24     Q.  Have you ever known someone who has been the
25  victim of any type of violent crime?

121
1      A.  No, sir.
2      Q.  In a capital murder case we have to believe the
3  defendant intentionally took the life of another person
4  without any legal justification during the course of the
5  kidnapping, okay. If we prove that someone killed
6  someone during the kidnapping, intentionally did that
7  act, prove that beyond a reasonable doubt, you would
8  have to find someone guilty of capital murder.
9      A.  Yes, sir.
10     Q.  And I assume you could do that?
11     A.  Yes, sir.
12     Q.  If you found someone guilty of capital murder,
13  then you're asked to answer these questions over here on
14  the board. Issue Number One says: Do you find from the
15  evidence -- don't let me jump ahead too fast. At the
16  punishment stage of a trial, you may hear more evidence
17  than you already heard at guilt or innocence. You may
18  hear evidence about a defendant's character, his
19  background or criminal history, or lack thereof, without
20  the individual himself; because you're making a decision
21  as to what punishment the person should receive for the
22  crime that he's committed. If you found someone guilty
23  of capital murder, intentionally taking the life of
24  someone without any legal justification, do you have a
25  thought as to what the punishment should be for that

122
1  type of crime?
2      A.  Depends how the murder was committed, how he
3  did it or, you know --
4      Q.  Circumstances of the crime --
5      A.  Yes.
6      Q.  -- would help in determining as to whether or
7  not he ought to receive death or life?
8      A.  Yes, sir.
9      Q.  Issue Number One then asks you to determine
10  whether or not you believe that the person on trial --
11  there is a probability that that person would be a
12  continuing threat to commit future acts of violence,
13  okay? You've already found him guilty of capital
14  murder, committing an act of violence where you took
15  someone's life during a kidnapping. You're then asked
16  to determine whether or not you think that person would
17  be a continuing threat to commit future acts of
18  violence. What kind of information do you think would
19  be helpful in making that type of decision?
20     A.  If he committed anything else before this.
21     Q.  And, of course, there again, we don't have to
22  show -- when it talks about criminal acts of violence,
23  we're not talking about whether or not he's likely to
24  commit another murder or capital murder; because
25  criminal acts of violence could be any criminal act that

123
1 is violent. It could be robbery, could be burglary,
2 could be sexual assault. Could be any type of thing
3 where you intentionally inflict harm on someone.
4        Okay. Do you think you would be open to
5 listening to the evidence and determining whether or not
6 you thought that person, who you already found guilty of
7 capital murder, would, in fact, commit criminal acts of
8 violence that would be a continuing threat?
9    A.   Yes, sir.
10   Q.   There is a question on your questionnaire where
11 it says -- you checked this statement as agree with it.
12 There are some kinds of cases in which I know I could
13 not vote for the death penalty even if the law allowed
14 me to, but others which I would be willing to consider
15 voting for it. Can you think of any kinds of cases
16 where you would not vote for the death penalty even if
17 the law allows you to?.
18   A.   Well, depends, like again, how he committed the
19 murder or whatever he did. And then it depends, like,
20 how he felt at that time, too; because some people -- I
21 heard them. You know, that's the news. They get
22 excited when they kill. Somebody like that, he deserves
23 that death penalty.
24   Q.   I didn't hear that last part.
25   A.   Well, depends how he felt at the time.

124
1    Q.   Whether he's remorseful or not?
2    A.   Yes.
3    Q.   Okay. Some people might be remorseful for what
4 they did, thinking they did something wrong and think,
5 oh, my gosh, why did I do that? And somebody else,
6 though, might brag to people what they did.
7    A.   Yes.
8    Q.   Do you think that would be a factor?
9    A.   Uh-huh.
10   Q.   But is there any particular type of crime that
11 you think, if I heard capital murder, murder plus some
12 other crime, anything you can think of that you would
13 say, well, in those kind of cases, I could never give
14 the death penalty?
15   A.   No.
16   Q.   You know we've alleged here a murder during a
17 kidnapping. If the circumstances of the case called for
18 the death penalty, is that the kind of case you could
19 give the death penalty if that's what the facts
20 dictated?
21   A.   Yes, sir.
22   Q.   You know you're in a situation where, in a few
23 months, you're going to be giving life, giving birth to
24 someone. You're now being asked to potentially sit on a
25 jury where you may have to take someone's life; but

125
1 based upon what they have done and the fact they would
2 be a continuing threat to the future, would that put you
3 in an uncomfortable situation?
4    A.   Yes.
5    Q.   Could you -- how could you resolve that?  Talk
6 to me about how that makes you feel or whatever.
7    A.   Because some people spend some time in jail.
8 They get out and do the same thing again or do worse
9 things than what they did before. You never know if
10 he's going to -- somebody's going to get out of jail and
11 shoot and kill your family.
12   Q.   So the fact that you're about to give birth to
13 someone, are you saying that wouldn't affect your
14 ability to serve as a juror and, if the evidence called
15 for it, to vote for the death penalty? If that's what
16 the evidence called for, you could still do that?
17   A.   Yes, sir.
18   Q.   Thank you, Miss Bonilla. I appreciate your
19 time.
20           VOIR DIRE EXAMINATION
21 BY MR. HILL:
22   Q.   Miss Bonilla, would it be easier if I sat up
23 there?
24   A.   No.
25   Q.   I'll sit over there. This really blocks my

126
1 view of you. I'm just going to ask you a few questions,
2 okay. When I look at the questionnaire that's filled
3 out by the prospective jurors, I try to see things and
4 kind of zero in on things that might cause me concern.
5 And I find usually when I talk to people and I ask them
6 what they were thinking when they wrote out an answer
7 and they explain their answer, it usually gives me a
8 much better feeling of what they're thinking.
9           Now one of the questions asks you, what is
10 your opinion about -- and it asks you about prosecutors.
11 And you say, they try to make the law work. And when
12 asked about defense lawyers, they will defend you
13 whether you're guilty or not. Can you explain that
14 answer a little bit more fully, representing somebody
15 whether they're guilty or not?
16   A.   To me, the defense is somebody that's going to
17 try to do the best for you if you commit any crime. I
18 mean, they're going to try to make your sentence less
19 than what somebody else would do.
20   Q.   Okay. Do you assume when you start out on a
21 case that the person that is sitting at the counsel
22 table and is named the defendant must have done
23 something serious, or can you presume, as the Judge
24 instructs you to do, that that person is not guilty
25 unless and until the State proves to your satisfaction

127
1  and twelve -- eleven other people that that person
2  committed a crime?
3      A.  Yes, sir.
4      Q.  See, I think you can read that answer several
5  different ways.  If I read that answer to mean you
6  assume that everybody is guilty, then we probably don't
7  have much of a chance of having a fair trial, you see.
8  But if what you're saying is you would expect a lawyer
9  that represents somebody accused of a crime to do the
10 best he or she can do to represent their clients, I'm
11 comfortable with that.  Is that more like what you're
12 saying?
13     A.  Yes, sir.
14     Q.  Well, Mr. McClellan asked you the question
15 about the Lotto.  He wanted to know the winning numbers.
16 Let me ask you this:  Have there ever been any big
17 winners there at Fiesta?
18     A.  Yes, sir.
19     Q.  What was the biggest one?
20     A.  Like, three years ago.
21     Q.  Was it like --
22     A.  Fourteen million.
23     Q.  All right.  Here's another question that's
24 asked of you.  It has to do with the -- what is the best
25 way to achieve the purpose of meting out punishment for

128
1  a crime?  And basically it says, whatever the defendant
2  did, they should get, in terms of their punishment, kind
3  of an eye for an eye type of statement.
4          You now know, based on what the Judge has
5  told you, that in Texas, before the death penalty can be
6  assessed, it is necessary for the jury to make several
7  different findings.  Obviously, you would have to find
8  the person guilty of capital murder before you would
9  ever even be presented with the issue of the death
10 penalty.  Are you the type of individual -- because you
11 have your background, your upbringing, everything that
12 makes you who you are -- are you okay with the idea that
13 if you found somebody guilty of capital murder and you
14 didn't believe that was a case that required the death
15 penalty that would you be able to vote for life in
16 prison and be comfortable with that?
17     A.  Yes, sir.
18     Q.  Because the only other question I have for you
19 is when you answered one of the questions about, do you
20 think that life in prison is a severe penalty, you put
21 no.  Now was that before you understood what life in
22 prison in Texas in this case actually means?
23     A.  Yes, sir.
24     Q.  Prior to the Judge explaining it to you -- and
25 everybody that's come here has different views.  Could

129
1  you tell me prior to the Judge telling you what it
2  really is what your views about what a life sentence
3  was?  Did you have some number of years throwing around
4  that you thought somebody might serve before they were
5  released?
6      A.  Yes.
7      Q.  How many years?
8      A.  Probably ten.
9      Q.  You understand that, just as the Judge told
10 you, if a jury finds Mr. Mamou guilty of capital murder,
11 if that jury then returns a finding of life in prison,
12 there is no way that he even is considered, under any
13 circumstances, for release on parole prior to the Year
14 2039, forty years from now.  In other words, you're
15 twenty-three?
16     A.  Yes.
17     Q.  Your twenty-three years, add seventeen more to
18 it.  So when you're forty years old, seventeen years
19 from now, that would be -- I'm sorry -- that's how many
20 years we'd be talking about, forty full years.
21 Obviously, if you were to give a life sentence on this
22 case, it would be the Year 2039.  Are you comfortable
23 with that, and would your answer to life, being severe
24 or not severe, change?
25          In other words, do you think life in

130
1  prison -- knowing it's a mandatory forty years, day for
2  day, do you now think life is a severe punishment?
3      A.  Yes, sir.
4      Q.  Do you have any questions of me?
5      A.  No, sir.
6      Q.  Because this is the only chance you get to ask
7  us questions.
8      A.  No.
9      Q.  Do you think you would like to serve on this
10 jury?
11     A.  Yes, sir.
12     Q.  You think both sides would get a fair trial out
13 of you?
14     A.  Yes.
15     Q.  Okay.  Thanks.
16          (Court admonishes juror.)
17          (Prospective Juror brought back in.)
18          THE COURT:  May I ask you a question?
19          VENIREPERSON:  Yes.
20          THE COURT:  Before I do, let me take a
21 look at something.  Where were you born?
22          VENIREPERSON:  El Salvador.
23          THE COURT:  Are you a citizen of the
24 United States?
25          VENIREPERSON:  Yes.

131

1    THE COURT: Thank you very much.
2                    LINDA DEATON,
3    having been first duly sworn, testified as follows:
4              VOIR DIRE EXAMINATION
5    BY THE COURT:
6        Q.    How are you today?
7        A.    Fine.
8        Q.    Good. Miss Deaton, first off, let me ask you
9    to remember back to last Friday, when the whole group
10   was together, and the things we talked about that day.
11   Add to it this morning, what we talked about this
12   morning. And out of everything we have talked about so
13   far, do you have any questions at all for me?
14       A.    No.
15       Q.    Is there anything to this point, Miss Deaton,
16   that we have not yet addressed that you feel as though
17   we should talk about because it might have some bearing
18   on your ability to be a juror in this case?
19       A.    I don't think so.
20       Q.    Is there anything at all that you can think
21   about, personally, whether it be something about your
22   personal life, or your health, whether it be anything
23   else for that matter, that you can think of that would
24   in any way interfere with your ability to be a juror in
25   this case during the time frame we've discussed?

132

1        A.    No.
2        Q.    As I said this morning, Miss Deaton, I think
3    this phase of the trial is primarily meant to accomplish
4    two objectives. The first one being to share with the
5    jurors the rules that can come into play during the
6    course of a trial such as this. And in terms of what we
7    have talked about so far, in terms of the rules, are
8    there any of them that you find you have any objection
9    to?
10       A.    No.
11       Q.    So, then, if I'm hearing you correctly, are you
12   saying if you were a juror in the case, if any of these
13   rules we have talked about do come into play, as a
14   juror, you would be willing to both follow and enforce
15   them?
16       A.    Yes.
17       Q.    The second thing, Miss Deaton, is for everybody
18   to make certain, certainly with yourself and the
19   lawyers, too -- make certain if you do become a juror in
20   the case, you would base your decision on how you
21   evaluate whatever evidence was presented. Does that
22   sound like you?
23       A.    Yes.
24       Q.    Idea being you're just as likely to reach one
25   verdict as you are another. Do you have, before the

133

1    trial begins, any preconceived idea about what verdict
2    you should reach?
3        A.    No.
4        Q.    You're just wide open to doing whatever you
5    think the evidence in the case warrants?
6        A.    Right.
7        Q.    Can you also see, Miss Deaton, from our
8    conversation this morning how each of the three
9    decisions the jury could be called upon to make that,
10   being the question of guilty, and if he is guilty of
11   capital murder, answers to these two questions. Each
12   decision is independent then of what the next question
13   asks of you.
14       A.    Yes.
15       Q.    So, therefore, your decision as to one aspect
16   does not dictate, in and of itself, what the next answer
17   should be. And you're comfortable with that?
18       A.    Yes.
19       Q.    Before we begin, have you any questions for me?
20       A.    No.
21       Q.    Just relax, and you'll be out of here before
22   long.
23              THE COURT: Miss Connors.
24                   VOIR DIRE EXAMINATION
25   BY MS. CONNORS:

134

1        Q.    My name is Claire Connors, and this is Lyn
2    McClellan; and we represent the State of Texas. Are you
3    nervous at all?
4        A.    Yes.
5        Q.    Try not to be. Just because I'm going to
6    explain some concepts to you, I want you to have some
7    questions for us. And obviously, you know how we feel
8    about certain things. How do you feel about the death
9    penalty?
10       A.    I think it's a necessary evil.
11       Q.    When you say evil, what do you mean?
12       A.    I think it's a very tragic thing that would
13   have to have happened to someone.
14       Q.    Did you ever have a different opinion about the
15   death penalty?
16       A.    No.
17       Q.    Do you believe that you could sit over here in
18   one of these chairs as a juror and decide whether or not
19   someone should get the death penalty?
20       A.    Yes.
21       Q.    And you understand that Mr. McClellan and I,
22   after the close of the evidence, we will ask the jury to
23   sentence this defendant to the death penalty?
24       A.    Yes.
25       Q.    Miss Deaton, what type of cases do you think

```
135
1   are appropriate for someone to get the death penalty?
2       A.  I think if you take another person's life that
3   it could be appropriate.
4       Q.  In your questionnaire, when you were asked
5   about your feelings about the death penalty you said,
6   only for severe acts.  What did you mean by that?
7       A.  Murder, possibly rape.
8       Q.  And do you understand now that the death
9   penalty applies -- there is basically two crimes
10  oftentimes?  Murder's the intentional taking of another
11  without a legal reason, and in this case aggravated
12  kidnapping.  There is aggravated rape -- I'm sorry --
13  rape, burglary, killing a police officer, killing a
14  child under six.  There's different circumstances when
15  the death penalty applies.  You understand that now,
16  right?
17      A.  Uh-huh.
18      Q.  Did you know that before you filled out your
19  questionnaire?
20      A.  No.
21      Q.  And you understand the burden of proof is on
22  the State, and we have to prove to you beyond a
23  reasonable doubt that this man is guilty of capital
24  murder.  And you understand that beyond a reasonable
25  doubt is not so that you're a hundred percent sure,
```

```
136
1   because you would be a witness.  Then you couldn't sit
2   on the jury.  Do you understand that?
3       A.  Yes.
4       Q.  Would you hold Mr. McClellan and I to the
5   standard of beyond a reasonable doubt?
6       A.  Yes.
7       Q.  If you found this defendant guilty of capital
8   murder, intentional killing while kidnapping, then we
9   would reach the punishment stage of the trial.  Do you
10  understand that the first issue there, you would have to
11  listen to the evidence at the punishment stage of the
12  trial and consider the evidence at the guilt stage of
13  the trial and decide whether or not this man would
14  probably commit criminal acts of violence in the future
15  that would be a continuing threat to society?  Do you
16  understand that?
17      A.  Yes.
18      Q.  Do you understand, Miss Deaton, that because
19  you found a person guilty of capital murder, that
20  doesn't automatically mean that that person will
21  probably be a continuing threat to society.  You
22  understand that?
23      A.  Yes.
24      Q.  Could you wait till the punishment stage of the
25  trial and decide whether or not that question is
```

```
137
1   answered yes or no?
2       A.  Yes.
3       Q.  Miss Deaton, in your mind, probability -- what
4   is your definition of probability?
5       A.  Well, it would be that he would likely commit
6   another, or that he would more likely.
7       Q.  And do you understand that the criminal acts of
8   violence could be violence either to property, for
9   example, a burglary, or some type of assaultive offense
10  to a person?  You understand that?
11      A.  Yes.
12      Q.  If you answer that you could believe a
13  defendant will be a continuing threat to society, a
14  probability a defendant will be a continuing threat to
15  society, you answer that question yes, you understand a
16  defendant will get the death penalty, right?  You
17  understand that.  Unless you get to Special Issue Number
18  Two and you answer that question that there is
19  sufficient evidence to warrant that, that overrides the
20  death penalty in the first question.  You understand
21  that?
22      A.  Yes.
23      Q.  It's kind of like the out for the jury.  If
24  they decide they don't want to give the death penalty,
25  then they can answer this question in such a way the
```

```
138
1   death penalty is not opposed by the Judge.  Do you
2   understand that?
3       A.  Yes.
4       Q.  Can you promise me you would answer that
5   question based on everything you heard and not just how
6   you feel?  Would you do that?
7       A.  Yes.
8       Q.  Do you understand in answering these questions,
9   you have to look at the facts of the case?  You have to
10  look at the defendant's character and background, his
11  culpability, responsibility?  Did he stay home and help
12  plan out the crime, or was he an active participant?
13  Did he stab someone or shoot someone, or was he the
14  getaway driver?  What was his participation or
15  responsibility in the crime?  And, also, was there
16  sufficient circumstance or circumstances that would
17  warrant the jury deciding that this person would get a
18  life sentence?
19      A.  Yes.
20      Q.  Could you consider all that before you made
21  your decision?
22      A.  Yes.
23      Q.  When it said, What is the best argument for the
24  death penalty in our society, you said, Repeat
25  offenders.  What did you mean by repeat offenders?
```

**139**

1    A.  Well, people that you feel would be a threat.

2    Q.  Did you mean necessarily that someone would

3 have had to commit another murder before they committed

4 this murder?

5    A.  No.

6    Q.  Would you like to serve as a juror on this

7 case?

8    A.  Not really.

9    Q.  Why is that?

10    A.  Well, it's a very heavy burden.

11    Q.  Have you been thinking about it since you were

12 here last week, I guess, when we asked you to come back

13 here?

14    A.  Yes.

15    Q.  Any reason why Mr. McClellan and I would not

16 want you to serve as a juror?

17    A.  I don't think so.

18    Q.  Is there any reason why the defense wouldn't

19 want you to serve as a juror?

20    A.  I don't think so.

21    Q.  Do you consider yourself an open-minded`

22 person?

23    A.  Yes.

24    Q.  Do you consider yourself as someone who can

25 make a decision -- listen and make a decision after

---

**140**

1 they've heard all the facts?

2    A.  Yes.

3    Q.  If you found someone guilty of capital murder,

4 first stage of the trial, what would the punishment be?

5    A.  I don't know.

6    Q.  Why is that?

7    A.  Well, because I wouldn't know the

8 circumstances.

9    Q.  Thank you, ma'am.

10         MS. CONNORS:  I have no further questions.

11         THE COURT:  Mr. Hill.

12         MR. HILL:  Thank you, Judge.

13           VOIR DIRE EXAMINATION

14 BY MR. HILL:

15    Q.  Hi, Miss Deaton. My name is Wayne Hill. Kurt

16 Wentz and I both represent Mr. Mamou in this case. I

17 just got a few questions for you. Maybe you could take

18 a few moments to talk with me, not like an attorney

19 questioning a prospective juror, but somebody you maybe

20 met over in the jury assembly room. And rather than

21 worry about the legalities of what we're doing and how

22 these questions come into play, just talk to me like if

23 I met you over there and we were just conversing about

24 topics while we were waiting to come over here, okay? I

25 think that makes it a little easier for people to

---

**141**

1 express themselves.

2        I always feel like people are under the

3 gun to give the right answers, and there aren't any

4 right or wrong answers. We get a wide variety of

5 responses to the questions we ask. And all we're trying

6 to do, frankly, is in a short period of time, evaluate

7 whether you should sit up there with eleven other people

8 and judge the case.

9        Miss Connors asked you whether or not

10 there was any reason that you wouldn't be a good juror

11 for the State or for the defense. I want to ask it in a

12 slightly different way. Understand that as a defense

13 attorney, I am going to do everything I can to convey to

14 a jury of twelve people that the State has not proven

15 their case beyond a reasonable doubt. I will

16 necessarily ask a great deal of questions of the State's

17 witnesses and will try to establish for the jury the

18 State has not proven their case beyond a reasonable

19 doubt. Okay?

20        Knowing that, I'd like for you to think

21 for a moment. There are a couple of reasons, couple of

22 things about you, in particular, that would cause me to

23 feel a little bit more comfortable having you sit on

24 this jury than maybe the State would feel comfortable.

25    A.  Well, I don't know why you would feel more

---

**142**

1 comfortable with me than anyone else.

2    Q.  Are you the type of individual that prejudges

3 things?

4    A.  No, I try not to. I try to always be

5 open-minded.

6    Q.  What does that concept mean to you, to be

7 open-minded?

8    A.  To listen to both sides.

9    Q.  Okay. Now you realize that the defense doesn't

10 actually have any burden to produce any evidence? In

11 other words, the Judge had explained to you that if the

12 State of Texas presented -- they could present a hundred

13 witnesses, all sorts of documents, all sorts of physical

14 evidence. But if the jury ultimately was not convinced

15 beyond a reasonable doubt, the case would end right

16 there. It wouldn't be necessary for the defense to

17 either call the defendant to the witness stand or to

18 call any witnesses at all in order to show, quote, "the

19 other side of the story." How comfortable are you with

20 that, even given the fact this is a capital murder case?

21    A.  Well, the only thing I can say is I have

22 children. I have a son, and I'm glad it's not my son

23 here. But I would want people to give him the benefit

24 of the doubt.

25    Q.  You know, we always ask people whether they're

143

1  comfortable or whether they feel like their commitment
2  is such that we can rely upon it before we choose the
3  other eleven people that are going to be sitting there
4  with you if you're one of them.  So we really put it in
5  terms of your comfort level.  If you were sitting here
6  in place of Mr. Mamou, you were my client right now.
7  And I'm talking with you as a client, and we have the
8  mirror image of Linda Deaton up on the witness stand.
9  Is there anything at all that you would be whispering in
10 my ear to say, yes, take her, or no, don't take her?
11 Because we're not going to know you in a brief period of
12 time.
13   A.  I don't know what I'd do.
14   Q.  Have you ever had any experiences with the
15 criminal justice system?
16   A.  No.
17   Q.  You did say that you had read some articles
18 regarding the death penalty, or maybe seen articles on
19 TV.  Can you recall what they were and what they focused
20 on?
21   A.  No.  I just read and watch what's on, you know.
22 I don't make it a point to watch it.
23   Q.  You don't dwell on it, but you've seen articles
24 about it?
25   A.  Right.

144

1    Q.  One of the last questions we asked is for you
2  to tell us what your neighbors would think about you or
3  how they would describe you.  And you put, Caring and
4  loving.  Are you real close with a lot of your
5  neighbors?
6    A.  Well, in all honesty, I thought about that
7  question; and I think it would depend upon who you ask,
8  what day.
9    Q.  Fair enough.  Have you lived in the same area
10 for a long time?
11   A.  Yes.
12   Q.  And the neighbors that you have are fairly
13 well-established people that lived in the same community
14 for a long time?
15   A.  Some of them are.
16   Q.  So what exactly do you do as an expediter for
17 aircraft parts?  Is this where you're sitting out back
18 and something goes wrong and you have to pull the plane
19 back?
20   A.  Well, yes and no.  I don't work now.  I don't
21 know if I wrote it that way.
22   Q.  I'm sorry.  I missed something.
23   A.  I left Continental Airlines in '91, when they
24 had the big layoff in expediting.  I worked at Hobby
25 Airport, and my job is to keep tabs on all the airplane

145

1  parts at our fingers and keep them coming and keep the
2  mechanics out in the garage supplied, and I had to keep
3  parts moving.
4    Q.  Is this a fairly challenging job?
5    A.  I enjoyed it.  I talked to a lot of people, a
6  lot of places; so it was a rewarding job.  I liked it.
7    Q.  And what do you do with your time now?  Mostly
8  you do some gardening?
9    A.  I just wake up everyday and decide what I'm
10 going to do today.
11   Q.  Must be nice.
12   A.  It is.
13   Q.  You prefer that to the usual grind?
14   A.  Well, I may get bored and I may decide to do
15 something else.  Last year I chose to pick up a grandson
16 every day from school, and I enjoyed it.  Now this year
17 my husband is retired, so we're going to do something
18 different.
19   Q.  Have any plans?  Are you going to travel at
20 all?
21   A.  We're going to travel some.  And my husband
22 plays golf.  I don't.  But we're just going to wake up
23 every day and decide what we're going to do.  We haven't
24 started yet.
25   Q.  Really my last questions are probably the most

146

1  serious.  One of the things Miss Connors said to you
2  when she first started on her discussion with you, she
3  said, At the end of the evidence, we're going to be
4  asking you to assess the death penalty.  Of course, that
5  presupposes a jury has found Mr. Mamou guilty at all;
6  and we're doing this part of the voir dire, or the jury
7  selection, to really concentrate on the death penalty
8  issue.  Because as the Judge told you, if we don't think
9  about it now, somebody gets on the jury and has a
10 feeling one way or the other, that doesn't give both
11 sides a fair trial.  It's all for naught.  So that's why
12 we're only concentrating on that issue.
13      You'll be brought back on the 28th, I
14 believe, and we'll have a brief discussion with you
15 about maybe some other topics or other issues.  But
16 that's why we're spending so much time on this.  But I
17 want to ask you to think for a moment what we're asking
18 you to do if you sit on this jury and if the State does
19 convince you beyond a reasonable doubt that this
20 individual committed capital murder.  Again, your
21 comfort level his important to us.
22      Are you comfortable with the scheme that
23 the Legislature has given you, as a jury, to determine
24 whether or not a person received the death penalty or
25 life in prison?  In other words, these two questions

147

1  that are given to you --
2      A.  Yes.
3      Q.  -- if you were in the Legislature and you were
4  able to cast a vote to change the system, to do away
5  with perhaps the system that we currently have and
6  replace it with a different type of system, would you do
7  that?
8      A.  I would have to study long and hard on that.
9      Q.  All right.  Would you be the type of
10 individual, hypothetically, if you were in the
11 Legislature and you only had two choices -- one was that
12 everybody convicted of capital murder receives a
13 mandatory death penalty, or everybody that's convicted
14 of capital murder receives a mandatory life prison
15 sentence -- which of those two would you likely choose
16 if you were having to vote on either of those two?
17     A.  Well, if it had to be mandatory, I don't know.
18 I probably would lean more towards a life sentence.
19     Q.  Why do you think that might be?
20     A.  Well, I would hate to not have a choice.
21     Q.  What is it about the choice that makes you feel
22 perhaps more comfortable?
23     A.  Well, it would be a less drastic action to
24 take.
25     Q.  We want to make sure a jury understands two

148

1  very important factors.  Number One, you understand
2  fully if a person were to receive a life sentence for
3  capital murder, mandatory day for day, forty years of
4  their life, before they even become eligible for parole,
5  as the Judge said, that's 2039.
6          The other thing is, it's important for me
7  to just see how you feel about, I guess, the prospect of
8  you actually having to sit in a case like this.  This is
9  kind of the hypothetical.  It's quiet.  We do it
10 individually.  Is there anything at all that we need to
11 know that would cause us to be uncomfortable with you
12 taking a seat with eleven other people and ultimately
13 deciding a case of this magnitude?  Anything at all you
14 are the least bit uncomfortable with in terms of your
15 ability to make the decisions, whatever they are, time
16 constraints that you have, anything?  It's that global
17 question we always try to ask prospective jurors to give
18 them a fair opportunity to say, hey, you didn't ask me
19 this; and I think either one of you should know about it
20 before deciding whether I stay or go.
21     A.  I don't know of anything.
22     Q.  Do you have any questions of me?
23     A.  No.
24     Q.  Okay.  Thank you.
25          (Court admonishes juror.)

149

1          (Lunch recess.)
2              TRACI LEE KARAM,
3  having been first duly sworn, testified as follows:
4              VOIR DIRE EXAMINATION
5  BY THE COURT:
6      Q.  I have a question.  It is my perception that
7  the name, Karam, is not that common a name.  Are you any
8  relation to George --
9      A.  No.
10     Q.  -- who's a lawyer in town?  He's a friend of
11 all of ours.
12     A.  No.
13     Q.  Well, then we like you even better.  Miss
14 Karam, before we begin, let me ask you to remember back
15 to Friday and the things we talked about that day, and
16 to this morning, what we talked about.  Out of
17 everything we have talked about so far, do you have any
18 questions at all from me?
19     A.  No.
20     Q.  Anything so far that we have not addressed that
21 you feel as though we should talk about because it might
22 have some bearing on your service as a juror in this
23 case?
24     A.  No.
25     Q.  Anything about your personal life, your

150

1  professional life, or health, or any other thing for
2  that matter, that you can think of that might in any way
3  interfere with your ability to be a juror in this case
4  during the time frame we've talked about?
5      A.  No.
6      Q.  The rules we talked about that potentially
7  could come into play, out of what you heard to this
8  point, do you have any disagreement with any of the
9  rules we talked about?
10     A.  No.
11     Q.  So if you were a juror, then, if I'm hearing
12 correctly, you could both follow, as well as enforce
13 those rules?
14     A.  Yes.
15     Q.  We spent some period of time this morning on --
16 or hopefully, we did -- for the purposes of
17 accomplishing the notion or the understanding that each
18 of the decisions that a jury makes is independent of
19 this decision that they just previously made; meaning,
20 however, the way you answer one question does not, in
21 and of itself, dictate what the answer to the next
22 question should be.  Instead, you always go back to the
23 body of evidence when you view the evidence from the
24 standpoint of what that particular question asks of you.
25 Does that make sense to you?

151

1    A.  Yes.

2    Q.  The idea being that starting off a trial, a

3 guilty verdict, not guilty verdict, they're both

4 equally -- both equal options. Whichever one it would

5 be would have to depend upon the evidence in the case

6 and how a jury evaluates it.

7          Likewise, at the second phase of the

8 trial, the concept is that life and death are both

9 available sentencing options, whichever one is

10 appropriate. The jury, we assume -- we hope that you

11 would select whichever one is appropriate based on how

12 you viewed the evidence in the case. And some cases

13 deserve life; some cases deserve death. Which this one

14 deserves, we'll never know till after all the testimony

15 is in. Does that make sense?

16    A.  Yes.

17    Q.  Before we begin, do you have any questions of

18 me?

19    A.  No.

20    Q.  Well, just relax. We're not going to be much

21 longer.

22          THE COURT: Mr. McClellan.

23            VOIR DIRE EXAMINATION

24 BY MR. MCCLELLAN:

25    Q.  Miss Karam, my name is Lyn McClellan. Along

---

152

1 with Claire Connors, we represent the State of Texas in

2 this case. I want to go over your questionnaire and

3 some of your answers that you gave there and follow up

4 on some of those answers, and then I want to talk to you

5 about how certain aspects of the law may apply in this

6 case and see what your thoughts are about that.

7          First of all, you filled out this

8 questionnaire several days ago. You've had some time

9 over the weekend to be thinking about it. Whether you

10 did or not, I don't know. But have you thought -- any

11 of your thoughts changed, that you know of, having

12 thought about being a juror, or anything --

13    A.  No.

14    Q.  -- that we need to know about?

15    A.  No.

16    Q.  From reading your questionnaire, it appears

17 that you're the type of person who believes the death

18 penalty is appropriate for certain kinds of cases?

19    A.  Yes.

20    Q.  What kinds of cases come to your mind when you

21 think of cases where the death penalty ought to be

22 available as a form of punishment?

23    A.  Cases where the criminal has shown to have no

24 remorse, and it's been a case where a criminal has

25 killed somebody without any kind of remorse, or somebody

---

153

1 who does it intentionally. Also, if it's also been

2 several crimes where this has happened, if they've been

3 a convict, ex-convict that comes back out again, or just

4 somebody who has been involved in criminal activity for

5 a while.

6    Q.  Now you know from listening to the Judge's voir

7 dire that murder is the intentional taking of another

8 person's life without any legal justification. By that

9 I mean, it's not someone who acts in self-defense. It's

10 not someone who does it by accident. It's when you

11 intend to kill someone and do so.

12          And for the offense of murder today, the

13 death penalty does not apply unless it's during the

14 course of committing some other type of crime. What we

15 have alleged here is murder during the course of a

16 kidnapping. There are other crimes, also, that could

17 constitute the offense of capital murder. But just for

18 the offense of murder itself, the death penalty doesn't

19 apply in our state. Some people think it shouldn't.

20 Some people think it ought to be expanded. We're trying

21 to get what your feelings and thoughts are.

22          If you become a juror, though, you -- you

23 may have, depending on what your thoughts and opinions

24 are, to set aside certain of your opinions and beliefs

25 and what the law says and what the evidence is in the

---

154

1 case. Every juror must take an oath that they will a

2 true verdict render based on the law that's given to

3 them by the Court in the form of a written charge. It

4 will be a several-page document that will set out the

5 elements of the offense, define certain terms, tell you

6 what murder is, tell you possibly about self-defense,

7 talk about beyond a reasonable doubt and the definition

8 thereof, and then take that law and apply it to the

9 evidence that you're the judge of; because you'll get to

10 listen to all the witnesses. And you can believe all,

11 part, or none of what a witness says. You take those

12 two things and put them together and make your decision.

13 It might be a different decision than that, if we had

14 not given the law, that you might have arrived at, okay;

15 because the law will set out certain guidelines and

16 restrictions.

17          For example, some people say -- and I know

18 you put that down as a good argument for the death

19 penalty -- that basically, if you take another person's

20 life, you ought to also give your life, an eye for an

21 eye deal. And that's a philosophy some people have.

22 And you put that down as the best argument for the death

23 penalty.

24          But you now know from the way the system

25 is set up that we don't have any kind of crime in the

1 State of Texas where you automatically get the death
2 penalty for having committed that crime. Instead, there
3 is two parts of a trial. There is guilt/innocence. Did
4 they commit the crime? And then the punishment stage.
5 What punishment should they get for the crime we have
6 found they committed? And there is not anything
7 automatic for the death penalty. So the eye for an eye
8 situation, if you believe in that, you have to set that
9 aside if you're a juror, if you can, and a true verdict
10 render based on the law and the evidence. Are you the
11 type of person that could, if you have that opinion, set
12 it aside and follow the law?
13    A. Yes. This is a real learning experience for me
14 just these past couple of days, all that stuff I had
15 never even thought of before, so yes.
16    Q. And you would have no reason to, because that's
17 something that, unless you're in a jury situation, you
18 wouldn't know about. And I think the reason a lot of
19 people come up with they believe in an eye for an eye is
20 because when they think of capital murder or when they
21 think of murder, they're thinking then of a very heinous
22 situation.
23       As the Judge told you, there could be
24 thousands of fact situations that could constitute
25 murder or thousands of fact situations that could

1 constitute capital murder. And they're not all equal,
2 and that's why the law is set up with those questions.
3 If we're just sitting there as everyday citizens, we
4 think it's something horrible and say, well, if they do
5 that, they ought to get this. But you're applying that
6 to certain facts.
7       Here we know -- now know to be a juror,
8 you have to wait till you hear the facts. And
9 repeating, are you the type of person that could keep
10 your mind open until you hear the facts?
11    A. Yes.
12    Q. I want to talk about the punishment stage of a
13 capital murder case, because this is the only time we
14 get an opportunity to do that. And I don't mean to
15 slight the guilt/innocence stage, but the punishment
16 stage is uniquely different than any other punishment
17 stage in any other type of crime.
18       Before you get to the punishment stage of
19 the trial, though, you would have first had to have
20 found someone guilty of capital murder. Otherwise, you
21 don't get there. Find him not guilty, we go home. But
22 finding someone guilty of capital murder means, in fact,
23 you would have found that whoever was on trial that
24 you're sitting in judgment of intentionally took the
25 life of another person without any legal justification

1 during the course of kidnapping. If we prove this
2 beyond a reasonable doubt, you find the defendant
3 guilty.
4       The second stage of the trial, the
5 punishment stage, you may now hear additional evidence
6 over and above what you heard about the crime itself;
7 because you're going to hear evidence about the
8 individual that was not necessarily relevant to whether
9 or not he committed the crime. It would be entirely
10 relevant to what punishment he should receive for the
11 crime you have found him guilty of. So that's where you
12 get to hear about the background, character, criminal
13 history, or lack thereof, mental abilities or
14 disabilities, all kinds of things about the individual,
15 himself, to aid you in answering these Special Issues so
16 when you finish with all the evidence, you'll have two
17 bodies of knowledge.
18       One is the facts of the crime itself that
19 you can use in answering these issues, and then the
20 facts about the individual that you can use in answering
21 this question. Issue Number One then -- and keep in
22 mind you never get there until you've found someone
23 guilty of capital murder.
24    A. Uh-huh.
25    Q. Issue Number One says: Do you find from the

1 evidence beyond a reasonable doubt? Well, that's a clue
2 right there that it's an automatic answer, if there is
3 one, and that the reason is that unless we prove to you
4 beyond a reasonable doubt that there is a probability of
5 him being a continuing threat to commit future acts of
6 violence, you answer no, just like the automatic answer
7 being at guilt/innocence was not guilty unless and until
8 we prove to you beyond a reasonable doubt that he's
9 guilty. Okay. And that's the only kind of automatics
10 that are going to be. The automatic of fact is always
11 going to be to the benefit of the defendant.
12       So, the burden of proof is on us to prove
13 beyond a reasonable doubt that there is a probability.
14 Doesn't say a possibility, because anything is possible.
15 It's possible to win the lottery tomorrow night. It's
16 very unlikely, but it's possible. And it doesn't say
17 certainty. It says probable, which is more likely than
18 not.
19       So, is there a probability, or more likely
20 than not, that this person who we've found guilty of
21 capital murder, and after having heard about his
22 criminal history, or lack thereof, and his character and
23 background, is there a likelihood that he would commit
24 criminal acts of violence? Doesn't have to be another
25 murder or capital murder. Could be anything criminal in

159

1  nature that constitutes a continuing threat to society.
2       Some people say, well, if I found a person
3  guilty of capital murder, I would always think, every
4  time, that he would be a continuing threat to commit
5  future acts of violence. Well, I suggest to you that,
6  first of all, you know that's not what the law says;
7  because the law says it's for us to prove beyond a
8  reasonable doubt. And the facts of the case itself may,
9  in certain circumstances, prove -- in addition to his
10  guilt -- may also prove he was a continuing threat.
11       There may be the other cases where the
12  facts prove he was guilty of capital murder, but don't
13  prove he was a continuing threat to society. Could be
14  the first time the person's ever been in trouble with
15  the law. Could have been a choirboy, straight-A
16  student, Boy Scout-type situation. This is a total
17  aberration from his life, what he did in that case.
18       On the other extreme, as you say, maybe
19  people who go in and out of the penitentiary, kind of a
20  treadmill. They get worse and worse as we go along. So
21  you have to wait and hear all the facts and
22  circumstances not only about the crime, but of the
23  individual; because that could be very influential in
24  deciding the answer to Issue Number One. Do you have
25  any problem with that?

160

1       A.  No.
2       Q.  So if I were to tell you someone is guilty of
3  capital murder, can you tell me what punishment they are
4  going to receive?
5       A.  If they're guilty, it could be either life or
6  death.
7       Q.  Right; and that's correct, either life or
8  death. And that would depend upon not only the facts of
9  the crime, but about the individual here. If you answer
10  that question yes, Issue Number One yes, then the
11  defendant is going to receive the death penalty. In
12  Issue Number Two, this question does not start out, Do
13  you find from the evidence beyond a reasonable doubt?
14  There is no burden. It asks you to stop now, since
15  you've already found him guilty, found he's going to be
16  a continuing threat to commit future acts of violence,
17  and reevaluate everything we've had so far. Because it
18  asks you to take into consideration the facts of the
19  crime, the defendant's character and background.
20       The facts of the crime would be what you
21  heard at guilt/innocence. Character and background
22  would be what you heard at punishment, and the
23  defendant's personal, moral culpability. I like to
24  refer to it as his personal responsibility. Was he a
25  getaway driver in this situation, or was he the actual

161

1  person who might have killed someone?
2       And then the term, Are there sufficient
3  mitigating circumstance or circumstances -- sufficient
4  reasons, if you will -- why this person ought to receive
5  life as opposed to death? Now what its asks you to do
6  then is go back and evaluate all the evidence, think of
7  it in your mind. You weigh it as to whether or not you
8  think it's mitigating; in other words, give life as
9  opposed to death.
10       And then you determine if it's mitigating.
11  Is it sufficiently mitigating to change my answer? If
12  it is, you change your answer. Answer that question
13  yes, and he receives a life sentence. If you don't
14  think the mitigating factors are sufficient, you answer
15  no and he receives the death penalty. Any problem with
16  that aspect?
17       A.  No.
18       Q.  To give you an idea of what they're asking on
19  Issue Number One, it asks you to go back and examine all
20  the evidence. Well, you may recall then,
21  hypothetically, that you had a case where you might have
22  said, well, I remember hearing during the course of the
23  crime that we found him guilty of, he was high on drugs
24  or alcohol.
25       Juror Number 1 may say, I think that's

162

1  mitigation towards a life sentence; because when you get
2  high on drugs or alcohol, you do things you wouldn't
3  ordinarily do. Juror Number 2 says, I don't think it
4  should have that effect; because when you get high on
5  drugs or alcohol, you might go out and commit that same
6  crime again. Or I've known people high on drugs or
7  alcohol before, and they didn't go out and commit
8  capital murder. So what caused this guy to do that?
9  Must be something more to it than that.
10       Two people looked at the very same
11  evidence and came up with different opinions. That's
12  okay; because that's what that question asks you to do,
13  is for you to look at the evidence, you know, weigh it
14  in your mind, and you decide what effects it should be.
15  Any problem with that aspect.
16       A.  No.
17       Q.  Going back, you say, well, the evidence shows
18  the person on trial was a young man. I think age ought
19  to be a mitigating factor. Somebody else may say, I
20  don't think age has anything to do with it. But you're
21  examining it and weighing it in your mind and
22  determining what effects. Same thing about a person's
23  mental abilities. Maybe he's a special ed student.
24  Some people think that's mitigating. Some people say, I
25  know lots of people that are special ed students, and

```
163
1   they don't go out and commit capital murder.
2       All it's asking you to do is go back and
3   look through all the evidence.  It gives you the
4   opportunity to change the vote from death to life if you
5   think it's warranted by sufficient mitigating
6   circumstances.  If you don't think it's warranted, then
7   you don't change.  Any problem with that aspect?
8       A.  No.
9       Q.  As you know, there is no crime where you
10  automatically get the death penalty.  You've got to go
11  through and make this type of analysis.  And even though
12  the extent -- let's say, okay, you've found someone
13  guilty of capital murder.  Let's say you found on Issue
14  Number One they're a continuing threat to commit future
15  acts of violence.  Somebody may say, that sounds like
16  the purpose of the death penalty.
17      But you still have to go to Issue Number
18  Two.  Are there reason or reasons that this person
19  should receive life as opposed to death?  You're
20  committed to go through and look and see if it's there.
21  If it is, give effect to it, whatever effect you think
22  it should have.  Any problem?
23      A.  No, I understand that more now than what I did
24  before.
25      Q.  So, even if someone is found guilty of capital
```

```
164
1   murder, and even if you find Number One, he's a
2   continuing threat to commit future acts of violence, are
3   you saying you're still open to Issue Number 2 in going
4   back and examining that evidence fairly and accurately
5   and making your decision?
6       A.  Yes.
7       Q.  Now you indicated, also, you had a brother in
8   law enforcement?
9       A.  Yes.
10      Q.  Harris County or somewhere else?
11      A.  He was with Montgomery County and with Conroe
12  Police.
13      Q.  Is he still in law enforcement?
14      A.  No.
15      Q.  Anything about having a brother in law
16  enforcement that makes you feel akin to the State or
17  that would keep you from being fair to the defendant?
18      A.  No.
19      Q.  You also indicated and shared with us that
20  you've had panic disorders before?
21      A.  Yes.
22      Q.  And we have a friend of ours that's a D.A. who
23  suffers from the same situation; and under medication,
24  that's not a problem.  And that's what I understand
25  through your questionnaire, that treated with
```

```
165
1   medication, it does not create problems?
2       A.  I never took medication.  I went to counseling
3   for two years, and I got it under control that way.
4       Q.  Being in a situation on a capital murder jury,
5   you're asked to make a very, very important decision,
6   probably the most important decision you're going to be
7   asked to make in your life.  Any concern on your part
8   that would ever cause any kind of a problem?
9       A.  No, because it wasn't circumstances like that
10  that would set it off.  It's totally different.
11      Q.  Very good.  When you go back to the
12  questionnaire and you were asked to fill out the
13  questionnaire, there was some agree/disagree statements.
14  One of the things said, Any person, man or woman, young
15  or old, who's guilty of capital murder should pay with
16  their own life.  You checked that you agreed with that.
17      Now, somebody could read that and say, any
18  person -- well, we're all either a man or a woman, and
19  we're all either young or old.  So that means everybody
20  that's guilty of capital murder should pay with their
21  own life.  Somebody else might read it to be, it doesn't
22  make me a whole lot of difference whether it's a man or
23  a woman, if they're young or old, the crime deserves it;
24  that's what ought to happen to it?
25      A.  Yep.
```

```
166
1       Q.  What is your thought?
2       A.  The second one, it doesn't matter; male,
3   female, young, old.  After going through the process, I
4   think whatever the circumstances are --
5       Q.  Right.  There was another that said, Do you
6   feel that the death penalty is used too often or too
7   seldom?  You said, Too seldom.  Too many murders get a
8   life sentence, which usually gets them out of prison in
9   twenty years or less.
10      Now you know the Judge told you it's forty
11  years, day for day.  So if this defendant, or any other
12  defendant, would be sentenced to life imprisonment for
13  capital murder, it would be 2039 before they would be
14  eligible to be considered for parole.  I assume now that
15  you know it's not going to be twenty years, that that
16  would not affect your decision on any of these
17  questions.
18      A.  No.
19      Q.  And, of course, there is a question there that
20  says, The death penalty is appropriate for every
21  intentional murder.  Of course, that's the only kind of
22  murders there is, intentional murders.  There is not an
23  accidental murder or self-defense murder; but you know
24  now for the offense of murder, the death penalty is not
25  applicable.  It's murder plus some other type of crime.
```

167
1  Any problem following that aspect of it?
2      A.  No.
3      Q.  Let's say I were to ask you, tell me a reason
4  why I would want you to be -- being the State of Texas
5  is seeking the death penalty -- why I would want you as
6  a juror?
7      A.  I wouldn't say just you.  I would say I think
8  I'm very impartial and I'm open, and I won't come into a
9  trial and presume somebody's guilty.  I think it's the
10  job of the defense to give the person a right to a fair
11  trial and the prosecutor to find out the truth for the
12  truth to come out.
13     Q.  Okay.  Two things in that regard.  You're
14  right.  It is the defense's job to give the defendant a
15  fair trial, and I thought you were going to say to prove
16  something.  And you didn't say that, but it brings up a
17  point.  The burden never shifts to this side of the
18  table.
19          Now you might go to this second question,
20  Issue Number Two, reasons why the defendant ought to
21  receive life as opposed to death.  And logic would
22  indicate to me, I would expect logically they're going
23  to come up and try to convince me of that, that he ought
24  to get life as opposed to death.  But the law doesn't
25  require me producing that evidence.  That evidence might

168
1  have come from all kinds of things.  May come from
2  medical records we introduced into evidence.  It may
3  come from school records.  It could come from anything.
4          There is no burden for them to present
5  evidence, and there is no burden for them to do
6  anything.  The burden is always on us.  And if we don't
7  meet our burden, you would have to follow the
8  appropriate aspect of the law.  If we do meet our
9  burden, you have to follow the appropriate aspects of
10  the law.  But you need to understand, there is no burden
11  on their side to call witnesses.  Defendant doesn't have
12  to testify.  They don't have to bring anyone in.  If
13  they do, you have to weigh it like you would any other
14  evidence.
15          Now our burden is to prove the case beyond
16  a reasonable doubt.  I suggest to you I could never
17  prove a case beyond all doubt or a hundred percent
18  certainty.  I just can't do that.  And there will always
19  be questions in someone's mind, almost in every criminal
20  case, that may not get resolved.  The issue is, has the
21  State proven beyond a reasonable doubt that the
22  defendant is guilty, as charged in the indictment?  If
23  that is proven beyond a reasonable doubt, you find the
24  defendant guilty.  Do you have any question why a
25  defendant doesn't testify?  Because as long as you don't

169
1  use that evidence or talk about it in considering your
2  deliberations, there still may be something in your
3  mind.
4          Or you may ask, Why didn't the State call
5  this witness that I'd like to have heard from?  Well,
6  it's fine.  You may have wondered about that.  But if
7  the State proves its case beyond a reasonable doubt, if
8  we did, you'd have to find the person guilty.  I
9  understand it's a search for the truth, but there may
10  still be some unanswered questions.  There is going to
11  be some unanswered questions that will go on for a time.
12  The issue is, did we prove our case beyond a reasonable
13  doubt?  Any problem with that aspect?
14     A.  Nope.
15     Q.  Thank you, ma'am.  I appreciate your time.
16  I'll pass you.
17          THE COURT:  Mr. Hill.
18              VOIR DIRE EXAMINATION
19  BY MR. HILL:
20     Q.  I can't see you.  As I'm looking at your
21  questionnaire, a couple of things pop out at me that I
22  think I should touch base on with you.  Number 46 asks
23  whether a person's use or sale of drugs would prevent
24  them from having defenses commonly relied upon by other
25  people that might not be using drugs.  And you said,

170
1  Everyone has a right to a fair trial.  What does that
2  mean to you, personally?  And why would it be important
3  for everyone to have a fair trial?
4      A.  Well, because you have to be proven by somebody
5  else, just like it's the State's -- that's what they
6  have to prove that you did something.  You don't have to
7  be the one that says he is -- you don't have to come out
8  and say, I didn't do it.  But as far as everybody,
9  that's the way our country is run.  You have a right to
10  come out and try to show your innocence, if you are
11  innocent.
12     Q.  Let me ask you something.  What about cases
13  that you hear about?  And maybe you're hearing about
14  them as the case is being shown on TV or something.
15  But think of the most horrific case you can think of.
16  Have there ever been times when you thought, why is this
17  person then having a trial?  Why even have a trial?
18  The facts are so obvious, the facts are so heinous.
19  Would it still be important in those kinds of cases to
20  have a fair trial?
21     A.  Yes, or there would be too many people being
22  thrown in jail and stuff for something they might not
23  have committed.  I think there has to be something.
24     Q.  You're comfortable then with the concept that
25  the State has the burden of proof, and that if you and

1   eleven other people sit, you have to listen to all of
2   the evidence. If you don't believe the State has met
3   their burden, would you be comfortable entering into a
4   finding with eleven other people that says the defendant
5   is not guilty?
6     A. Yes.
7     Q. You mentioned about that the State should be
8   seeking the truth or be able to establish the truth. Is
9   there a difference in your mind between a person being
10   found not guilty and a person being innocent, or are the
11   two the same thing?
12     A. That's kind of enough.
13     Q. I'm not trying to trick you. I'm trying to
14   make some distinction that a jury might have to be
15   called upon to make.
16     A. Right.
17     Q. Innocence, to me, is really a moral term. If a
18   person is truly innocent, that means they had nothing to
19   do with the committing of a crime, whatever that crime
20   might be. Either they weren't there; or if they were
21   there, they had absolutely nothing to do with it. Guilt
22   beyond a reasonable doubt is a legal phrase or legal
23   term that places the burden on the State. So you could
24   have cases where the State has presented a lot of
25   evidence, and the jury may have a considerable dispute

1   as to whether or not the State has proven a case beyond
2   a reasonable doubt.
3     Some people may be saying, I think he was
4   involved in this. It's not a question of, quote,
5   "innocence." It's the question of, has the State proven
6   their case beyond a reasonable doubt? And I always want
7   to ask you, are you uncomfortable? Jurors are
8   uncomfortable with the probability, the possibility, the
9   likelihood of having to serve on a jury and maybe make
10   those kinds of distinctions. Are you okay with that?
11     A. Yes.
12     Q. When I read your questionnaire -- I realize we
13   ask you a lot of questions in a vacuum. You don't know
14   what the process is, but it usually gives you a feel for
15   a person's first reaction to the situation. It says,
16   what are the best arguments for the death penalty? An
17   eye for an eye. If you take someone's life, not by
18   accident but premeditated, you should be sent to your
19   death for payment.
20     My next question is: It said, what are
21   the best arguments against the death penalty? And you
22   said, none. Is there any kind of argument you could
23   make if you were being called upon to make arguments
24   against the death penalty, or do you just have a very
25   strong feeling about the appropriateness of the death

1   penalty in today's society?
2     A. Well, I think the mitigating circumstances that
3   we've talked about would come into play, as far as we
4   talked about the mental problems, or maybe abusive
5   parents, or something like that, different circumstances
6   that might come into play. Now that would maybe help
7   you to understand why this happened, why this person
8   killed somebody, that, you know, they need to be
9   punished for it. They need to pay their price. But
10   maybe life isn't the best answer for that at all, you
11   know; meaning, to take their life isn't the best answer.
12     Q. You know, many times we hear people getting
13   quite upset when they read in the paper about the
14   punishment stage of a capital murder trial. And the
15   defense lawyer might be producing evidence about a
16   person's background, a person's upbringing, whatever the
17   facts might be, whatever the circumstances might be.
18     And people say, oh, yeah, he had a bad
19   childhood. That excuses him from killing somebody. Do
20   you understand if you were at the punishment stage of a
21   capital murder trial, you have not excused the conduct.
22   You have found them guilty of capital murder. And what
23   do you think is the best thing that could happen at that
24   point, having been found guilty? What is the best
25   possible outcome?

1     A. For the person?
2     Q. For the defendant at that point? To get life
3   in prison, it's not going to get any better than that.
4   And the only option to the jurors would be life or
5   death.
6     A. Right.
7     Q. A lot of jurors have come thinking that, well,
8   if a person, you know, is found guilty of capital murder
9   and doesn't get the death penalty, maybe they're going
10   to get ten years; maybe they're going to be on
11   probation; it's automatic. If a jury and eleven --
12   twelve of you say, We, the jury, find the defendant
13   guilty of capital murder, as charged in the indictment,
14   that person has a life sentence unless you decide to
15   give him the death penalty. Nothing better happens.
16   We want to make sure the jury understands that so there
17   is no misconception. We don't want people, quite
18   frankly, going back in the jury room and speculating as
19   to what might have happened. You know, going in,
20   that's why the Judge told you life for capital murder is
21   forty years, day for day; no good time, no early
22   release, nothing like that.
23     A. Uh-huh.
24     Q. And Mr. McClellan asked you -- because in your
25   questionnaire you put, They usually get twenty years and

1  they're out?

2     A.  Uh-huh.

3     Q.  He said, Now knowing that it's forty years, is

4  that okay?

5     A.  Uh-huh.

6     Q.  Do you still feel like forty years is not a

7  significant amount of time, or would that impact at all

8  on your decision in answering those two questions?

9     A.  No, I think that makes things a lots more clear

10  to me.  And, also, I would say before I came to this

11  that I would be more of a proponent for the death

12  penalty than what I am right now.

13     Q.  Let's make you a legislator for a day.  I don't

14  know if you've ever been interested if politics.  You're

15  out there and your constituency, and they're wanting to

16  know what type of laws you could pass in Texas to

17  address capital murder cases.

18     A.  Uh-huh.

19     Q.  And you're going to try to tell them every

20  person that's convicted of capital murder gets the death

21  penalty, or every person that's convicted of capital

22  murder gets life in prison automatically, or something

23  else.  Which of those three positions would feel most

24  comfortable to you, now knowing how the system works?

25  Would you change the system?  Would you make it

1  mandatory one way or the other, or do you feel okay with

2  the way it is?

3     A.  I feel okay with the way it is.

4     Q.  You think it gives you sufficient discretion --

5     A.  Yes.

6     Q.  -- as a member of the jury, to consider

7  everything?

8     A.  Yes.

9     Q.  One of the things that you point out in your

10  questionnaire is if a person didn't show any remorse.

11  How might that manifest itself?  How might somebody show

12  remorse, having been found guilty of taking a life

13  intentionally?  How did you -- help me to understand in

14  some ways how that would be reflected to you.

15     A.  As far as being on a jury?

16     Q.  Yeah, as you're sitting there looking at the

17  facts, you're listening to witnesses.  And obviously, if

18  remorse is coming into it, we're talking about the

19  punishment stage of the trial.

20     A.  Right.

21     Q.  So if a person is found guilty of capital

22  murder, you found they intentionally killed someone.

23  How would remorse kind of show itself?  Do your best.

24  How would a person show remorse?

25     A.  Somebody possibly crying would be the first

1  thing, somebody showing emotion.

2     Q.  Let me ask you about this situation.  Is it

3  possible that a person could have remorse for events

4  having occurred, yet they maintain they didn't feel they

5  were responsible for the events?  Example, you could

6  have a case where the issue of self-defense comes up.

7     The Judge told you, clearly, if you found

8  the person acted in self-defense, even if he took

9  another person's life, that's justified.  You have a

10  right to self-defense.  If you're walking out to your

11  car this afternoon, somebody comes up and takes a knife

12  out, says, give me your car, and you happen to have a

13  gun or something and you use it to kill that person,

14  you're justified.  If by chance you should get charged

15  with some offense of murder, you would have a right to

16  rely upon self-defense.

17     A.  Uh-huh.

18     Q.  What happens in those cases where the facts are

19  a little bit muddled, there is maybe an imperfect

20  self-defense.  It's close, but the jury ultimately

21  doesn't feel the person did act in self-defense.  Do you

22  see where somebody might be trying to express to the

23  jury that they felt they were justified in acting the

24  way they did, but the jury ultimately concluded that

25  they were not, that under the law, the jury didn't feel

1  self-defense was an issue.  Would a person have to

2  express some type of remorse in that situation?  In

3  other words, for the circumstances to be --

4     A.  I think if somebody was in a situation where if

5  he had acted in self-defense, but if they were charged

6  in capital murder, if they weren't the one that actually

7  killed the person, you would still think you would show

8  some kind of remorse.  Because I think if somebody had

9  been around somebody and you saw them die, you saw them

10  get killed, you would still feel sorry that you were a

11  part of it in some way.

12     Q.  That's my whole point.  Can you feel sorry you

13  were part of it, but not offend the jury and say, I felt

14  like I was justified in taking the person's life?

15     A.  I understand what you're saying, and it would

16  have to be what would come up in the trial, all the

17  evidence that would come up in the trial to point that

18  way.  I can see if you saw that somebody did seem to act

19  in self-defense, they're possibly not going to be as

20  emotional; they're not going to show that much remorse,

21  because they're thinking, I didn't do anything.

22     Q.  That holds them criminally responsible, and the

23  jury rejects that position.

24     A.  Right.

25     Q.  Says, no, we've listened to everything, and we

1  don't think you have that right. Let me go back to this
2  question about that. We asked whether or not if a
3  person uses drugs or sells drugs, do they lose their
4  right to rely upon certain defenses? And that's where
5  you write, Everybody has a right to a fair trial. Do
6  you have any difficulty with that? Would that be
7  something you feel should not be extended to a
8  defendant? In other words, if somebody were using or
9  selling drugs -- in other words, they're violating one
10  law.
11    A. Uh-huh.
12    Q. But the circumstances of a situation show they
13  were entitled to rely upon self-defense, accident,
14  whatever the legal issue might be. Are you okay with
15  the fact somebody could be violating one law, yet it
16  doesn't take away their right to rely upon other --
17    A. Yes, it's totally separate.
18    Q. For some people, it's real cut and dried. For
19  them, if you're doing anything wrong, you don't get to
20  rely on any defense. So tell me, the learning
21  experience you reflected on, was it a good learning
22  experience a bad one?
23    A. I think it's bad. I'm going to be
24  thirty-eight, and I've never been called on jury duty
25  before, so --

1    Q. I want to ask this question. But if it's
2  something that is too personal to answer, that's fine.
3  But obviously, twelve people are going to be sitting
4  here. It could be a very stressful situation to go
5  through jury service. And you indicated at one time you
6  had some panic attack disorders. Is there anything we
7  need to know? Because obviously, I'm sitting here
8  going, well, I'm trying to figure out what it is that
9  could have set them off, if it was something personal,
10  if you had ever been involved in a situation where you
11  had been the victim of a crime or something where this
12  is going to trigger something, being on a jury like
13  this?
14    A. No, it was never anything like that.
15    Q. You don't think it has anything to do with your
16  ability to sit on this case?
17    A. No.
18    Q. You indicated -- you said you were married to a
19  Muslim at one time. Now you just believe in God, not a
20  certain religion. That suggests you lead kind of a
21  moral life, right from wrong, and you do everything
22  you're supposed to do. You don't go out of your way to
23  offend the law, right? How long ago were you married to
24  your husband? How long ago did you divorce?
25    A. I've been divorced seven years.

1    Q. Was there ever any discussion between you and
2  him about the difference between Muslim law and other
3  aspects?
4    A. Yes.
5    Q. Was Muslim law a lot more strict?
6    A. Yes.
7    Q. And absolute?
8    A. Yes.
9    Q. Are you more comfortable outside of that type
10  of religious feeling --
11    A. Yes.
12    Q. -- than you would have been? Well, the
13  prosecutor's asked you questions about what -- you know,
14  whether or not it would be a good choice for them to
15  choose you as a juror; and we'll give you a opportunity
16  to tell us whether or not there is anything at all you
17  can think of, because I can't hope to know you as well
18  as I'd like in fifteen or twenty minutes. But is there
19  anything I haven't asked you, something you say, Look,
20  Mr. Hill, I believe everybody is entitled to a fair
21  trial. And this is a piece of information about me, or
22  who I am, that you should know about before you make a
23  decision of whether I should sit here with eleven other
24  people?
25    A. I can't really think of anything on the spot.

1  I know I've always been impartial. I've never taken one
2  side to anything without knowing first of the facts, you
3  know. And I don't like to prejudge people.
4    Q. Okay. If this is your first go round on a
5  jury, you're going to be getting the brass ring the
6  first time around. Is there anything at all about that
7  that is uncomfortable to you? And you recognize the
8  magnitude of the kinds of decisions you're going to be
9  making?
10    A. Uh-huh.
11    Q. You feel pretty comfortable both sides would be
12  well-suited in having you sit on this case?
13    A. Yes.
14    Q. Do you have any questions of me?
15    A. No.
16      (Court admonishes juror.)
17      JOSEPH MICHAEL MATHEWS,
18  having been first duly sworn, testified as follows:
19      VOIR DIRE EXAMINATION
20  BY THE COURT:
21    Q. Mr. Mathews, thank you for bearing with us. I
22  know it's been a long day for you, and it has been for
23  us, too. I'd ask you, Mr. Mathews, to remember back to
24  last Friday, the things we talked about then, and to
25  this morning, the things we talked about. Out of

1  everything that we have talked about so far, do you have
2  any questions at all for me?
3     A.  No.
4     Q.  Is there anything to this point, sir, that we
5  have not yet addressed that you feel as though we ought
6  to spend some time talking about because it might have
7  some bearing on your service as a juror?
8     A.  I guess one thing I was going to ask you, I
9  guess, when we got to this point or whatever, I'm a tax
10  accountant. And in particular, I do estate taxes. This
11  is definitely prime time for me. I'm at a new job,
12  first year. I've got seven contractors under me that
13  have never worked under my supervision. Is there any
14  way I could get out of service by that being an excuse,
15  not being able to serve on this jury, but maybe on
16  another one?
17     Q.  I recognize, and all of us recognize, quite
18  honestly, Mr. Mathews, that sometimes some things simply
19  don't fit; and had it been six months later, they would
20  have fit perfectly. We all recognize that. But bottom
21  line question is, as I view it, is going to be this:
22  You will know from what we said that we're going to
23  spend today. After today we may ask you back a week
24  from tomorrow, because it's on that day we would have
25  created our pool. And on that day the lawyers will

1  determine, within that pool of the forty-five or
2  forty-eight people, who the twelve jurors are going to
3  be. So right there, you see, you only have one chance
4  out of four being a juror. Might not be the best
5  chance. And I'm not predicting or projecting. That's
6  up to the lawyers.
7       But if you do become a juror, we're going
8  to start the testimony in the case on Monday, October
9  the 4th. It's going to basically be about a 10:00 to
10  5:00 operation. We know it will last for a week. We're
11  satisfied it won't last for as much as two weeks. Now
12  with that in mind, and recognizing also that you have
13  your own interests to accommodate, too, is it something
14  you feel you can juggle?
15     A.  Yeah, I think so.
16     Q.  I mean, it might be an inconvenience. But can
17  you overcome the inconvenience, and are you willing to
18  make the effort?
19     A.  Oh, I am, I am. I mean, 10:00 to 5:00, that's
20  workable.
21     Q.  We're not going to turn this into an endurance
22  contest; because if we did that, we couldn't get your
23  best work product. The bottom line is going to be, if
24  you did become a juror, would you devote your conscious
25  effort to listening to the testimony and sorting

1  through, deciding for yourself, what's believable and
2  what's not --
3     A.  Right.
4     Q.  -- and evaluate the evidence and come up with
5  what you think, intellectually, is honestly the best
6  answer to come up with based upon the answers?
7     A.  I guess my question there is, I'd have at least
8  a week's notice that I would be on the jury?
9     Q.  You will know next Wednesday, and you wouldn't
10  have to start till the following Monday.
11     A.  That's fine. That would be plenty of time.
12     Q.  And we did it that way because for a week-long
13  trial, people need to make adjustments.
14     A.  Got you. Not a problem.
15     Q.  Anything at all about your personal life -- we
16  talked about your job -- anything about health or any
17  circumstance you can think of that would interfere with
18  your ability to be a juror in this case?
19     A.  No.
20     Q.  We talked about the laws that can come into
21  play during the course of a trial like this. Whether
22  they do or don't will depend upon whether the evidence
23  and the testimony raises them. But have you heard about
24  anything so far that causes you to such a degree of
25  alarm or discomfort that if you were a juror, you would

1  refuse to follow?
2     A.  No.
3     Q.  We talked about the fact that before the trial
4  ever begins, all we're looking for -- I believe I can
5  speak for the lawyers -- is people who will start the
6  trial off having no preconceived notions and simply
7  receive the evidence and evaluate it as you see fit and,
8  after having sorted through, come up with the answer you
9  think is the right answer to reach based on the
10  information the lawyers have given to you. Does that
11  sound like you?
12     A.  Uh-huh.
13     Q.  Idea being, at the outset, a not guilty verdict
14  and guilty verdict are absolutely equally available
15  options. And whichever one is chosen by the jury, that
16  decision will be based upon whatever is presented in the
17  case.
18     A.  Yes.
19     Q.  Likewise, if a person is found guilty of
20  capital murder, there are two questions to be answered.
21  And you know, depending upon how those questions are
22  answered, a life sentence is going to be imposed or a
23  death sentence is going to be imposed. Are you
24  available to answering those two questions at the
25  punishment phase --

1  A.  Yes.

2  Q.  -- based upon how the evidence dictates in your

3  mind without regard to what result that could cause?

4  A.  Right.

5  Q.  You spent some time this morning, Mr. Mathews,

6  trying to find out that the three decisions the jury can

7  be called upon to make in a capital murder case is, is

8  the person guilty?  If they are guilty, what's the

9  answer to Question Number One?  And what's the answer to

10  Question Number Two?  Each of those decisions are

11  independent from the other.  That is to say, because you

12  find somebody guilty of capital murder, that doesn't, in

13  and of itself, dictate to the jury what the answer to

14  those Special Issues should be.  You have evidence in

15  the case.

16       Likewise, if you answer yes to Question

17  Number One, that doesn't tell you what the answer to

18  Question Number Two should be.  Because Question Number

19  Two is asking you something absolutely different than

20  what Question Number One did.  Is he guilty?  That's

21  what he did in the past.  Is he a future danger?

22  That's what you think he might do in the future.  And

23  the third question is, even with all that, is there a

24  sufficient reason why a life sentence should be imposed

25  rather than the death sentence?  Can you see how each is

1  remarkably different from the other?  That's why once

2  one question is answered, it's back to the other, as far

3  as sifting through it or, as the lawyers say, rooting

4  through it and finding out what it is.  Is that

5  agreeable?

6       MR. MCCLELLAN:  I'm ready, Judge.

7       THE COURT:  Go ahead.

8            VOIR DIRE EXAMINATION

9  BY MR. MCCLELLAN:

10  Q.  Mr. Mathews, my name is Lyn McClellan.  Along

11  with Claire Connors, we represent the State of Texas in

12  this case.  I think we were talking about you need

13  advance notice about being on the jury.  If I were you,

14  I would go ahead and start making my plans.  You filled

15  out the questionnaire, and you kind of go right down the

16  middle of the road.  We call it a three-three.  In

17  Questions 1 through 5, you answered three on both.  And

18  those are the kind of people who usually end up on the

19  jury unless you say something really outrageous during

20  the time I talk with you.  So now is your chance to get

21  off.

22       Now, seriously, I need to talk to you

23  about a couple of things in your questionnaire.  You

24  indicated that while your chosen religion opposed the

25  death penalty, being Catholic, you, personally, don't

1  oppose the death penalty.  Can you kind of share some of

2  your thoughts with regards to that?

3  A.  I think it's related to the facts.  I mean,

4  there is reasons.  I mean, I couldn't stand here and

5  say, yes or no, I oppose it.  That's just me.

6  Q.  It would be dictated by the facts.  So you're

7  open to the concept that if the crime deserves the

8  punishment, you can assess that type of punishment for

9  that type of crime, if that's what the law and evidence

10  showed you?

11  A.  Right.

12  Q.  We get a lot of Catholics who come through and

13  fill out the questionnaire.  Some people don't know the

14  Catholic church opposes it, and some of them do.  And

15  some of them say, well, that's going to be my personal

16  call, and my religion is not going to control that, and

17  I respect that.  So you don't think that would cause you

18  any problem?

19  A.  No.

20  Q.  What we're looking for is people who can listen

21  to the law and the evidence.  The Court's going to give

22  you a charge at the end of the trial on guilt or

23  innocence.  It will set out the law and tell you what

24  the State has alleged in the indictment, the definition

25  of murder, the definition of intentional, the definition

1  of beyond a reasonable doubt.

2       Take that law.  You've heard the evidence

3  from the witness stand, much like where you're sitting

4  right now.  You'll hear evidence from the other

5  witnesses.  You can believe all, some, or none of what a

6  witness says, take that evidence, apply it to that law,

7  come up with your decision.  You find a person guilty of

8  capital murder, then that's just the first part, if you

9  will.

10       Then you go to the punishment stage of

11  trial if you found someone guilty.  If you don't find

12  him guilty, everybody goes home.  That's the end of the

13  inquiry.  At the punishment stage of the trial, you may

14  hear additional evidence about a defendant's character,

15  his background, his criminal history or lack thereof,

16  his mental abilities or disabilities, the kind of

17  society he was raised in, the kind of surroundings he

18  was raised up in, his relationship with people that

19  raised him, and stuff like that, information about the

20  individual.

21       Because at that stage of the trial, the

22  focus is on what punishment this individual should

23  receive for the crime you've already found that he's

24  guilty of committing.  Okay.  That evidence would not

25  have been relevant to whether or not he committed the