1

**73708**

REPORTER'S RECORD

VOLUME 11 OF 25 VOLUMES

TRIAL COURT CAUSE NO. 800112

CHARLES MAMOU, JR.          )     IN THE DISTRICT COURT

      Appellant          )

                  )

VS.          )     HARRIS COUNTY, TEXAS

                  )

THE STATE OF TEXAS          )

      Appellee          )     179TH JUDICIAL DISTRICT

 

 

                \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

                  VOIR DIRE EXAMINATION

                \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

 

On the 20th day of September, 1999, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Bob Burdette, Judge

Presiding, held in Houston, Harris County, Texas:

    Proceedings reported by computer aided **FILED IN**
**COURT OF CRIMINAL APPEALS**

transcription/stenograph machine.

MAR 2 1 2000

**ORIGINAL**

Troy C. Bennett, Jr., Clerk

```
 1                  A P P E A R A N C E S

 2        MR. LYN MCCLELLAN

 3        SBOT NO. 13396100

 4        MS. CLAIRE CONNORS

 5        SBOT NO. 0470500

 6        Assistant District Attorneys

 7        201 Fannin

 8        Houston, Texas 77002

 9        Phone:  713.755.5800

10        ATTORNEYS FOR THE STATE OF TEXAS

11

12        MR. WAYNE HILL

13        SBOT NO. 59656300

14        4615 Southwest Freeway

15        Houston, Texas 77027

16        PHONE:  713.623.8312

17        MR. KURT WENTZ

18        SBOT NO. 21179300

19        5629 W FM 1960

20        Houston, Texas 77069

21        PHONE:  281.587.0088

22        ATTORNEYS FOR THE DEFENDANT
23

24

25
```

i

INDEX

VOLUME 11 OF 25

|                                      |       |       |         | PAGE | VOL. |
|--------------------------------------|-------|-------|---------|------|------|
| September 20, 1999   Voir Dire Examination |  |   |         |      | 11   |
| Panel Voir Dire                      |       |       |         | 4    | 11   |
| Venirepersons                        | Court | State | Defense |      |      |
| Glen Dinkins                         | 46    | 48    | 56      |      | 11   |
| Matthew Taylor                       | 67    | 71    |         |      | 11   |
| Linda Kay Cook                       | 73    | 75    | 90      |      | 11   |
| Judith Lynne Barnett                 | 103   | 105   | 116     |      | 11   |
| Latonya Harris                       | 123   | 127   | 135     |      | 11   |
| Proceedings concluded                |       |       |         | 141  | 11   |
| Court Reporter's Certificate         |       |       |         | 142  | 11   |

3

```
 1                THE COURT:  Do I understand there is an
 2   agreement by and between the parties of Venireperson No.
 3   103, that being Cynthia Kay Mills, the agreement of all
 4   concerned that she be excused.
 5                MR. MCCLELLAN:  Yes, Your Honor.
 6                MS. CONNORS:  Yes, Your Honor.
 7                THE COURT:  Mr. Wentz?
 8                MR. WENTZ:  Yes, Your Honor.
 9                THE COURT:  Mr. Wentz, is it Mr. Hills'?
10                MR. WENTZ:  It is.
11                THE COURT:  Mr. Mamou, is that your
12   agreement?
13                THE DEFENDANT:  It is.
14                THE COURT:  Do you specifically request
15   Miss Mills be excused?
16                THE DEFENDANT:  Yes, sir.
17                MR. MCCLELLAN:  We're also going to agree
18   on 111.
19                THE COURT:  And the same for Venireperson
20   No. 111, that being Maria Elizabeth Brooks?
21                MR. MCCLELLAN:  Yes.
22                THE COURT:  Ms. Connors?
23                MS. CONNORS:  Yes, sir.
24                THE COURT:  Mr. Wentz?
25                MR. WENTZ:  Yes.
```

4

```
 1                THE COURT:  Is it Mr. Hills' request,
 2   also?
 3                MR. WENTZ:  Yes.
 4                THE COURT:  And yours?
 5                THE DEFENDANT:  Yes, sir.
 6                THE COURT:  You asking she be excused?
 7                THE DEFENDANT:  Yes, sir.
 8                (Panel brought in.)
 9                THE COURT:  Good morning, ladies and
10   gentlemen.  You sound about as lively as I feel.  We're
11   going to spend some time talking about some things this
12   morning that we didn't talk about the other day.  And
13   the reason we didn't talk about them the other day is,
14   frankly, because we're going to be detailed enough.  We
15   could have made no headway dealing with sixty folks.
16                To remind you, this is a case the State of
17   Texas versus Charles Mamou.  Mr. Mamou is represented by
18   his attorney, Mr. Kurt Wentz, who's present, and
19   Mr. Wayne Hill, who is at the moment not with us.  The
20   State of Texas is represented by two of her Assistant
21   District Attorneys, Mr. Lyn McClellan, Miss Claire
22   Connors.
23                Mr. Mamou is charged by indictment with
24   the offense of capital murder.  It's alleged to have
25   occurred in Harris County, Texas, on or about December
```

5

```
 1   7, 1998.  We talked the other day about the fact that
 2   this being a capital murder case, it can come in two
 3   parts.  The first part of the trial, the jury's only
 4   concern is going to be to decide whether the defendant
 5   is or is not guilty.  If the defendant is not guilty,
 6   the case is over with.
 7                If the defendant is found guilty, we come
 8   back and we can hear more evidence relating to the
 9   punishment phase of the trial.  That's given to you for
10   the purposes of assisting you in answering two questions
11   or Special Issues that we very generally talked about
12   last Friday.  We're going to talk more about them today.
13                We're going to talk about a couple of
14   other things this morning before we get started.  And
15   before we do get started, let me say this to you:  I
16   know this:  We're going to talk about things that you
17   have never in your life thought about before, and there
18   is no reason that you ever should have.  Because it's
19   different, you may find it's very detailed; but please,
20   don't get frustrated with me.  Don't throw up your arms
21   to yourself and say, I can't possibly do this.  It's too
22   hard.  Because the truth of the matter is, it isn't.
23                Those things we're going to talk about
24   today -- these rules we're going to talk about, if they
25   do come into play, they're going to be given to you in
```

6

```
 1   writing in the Court's charge.  You're going to have the
 2   Court's charge with you back in the jury room during the
 3   whole time you're deliberating.  So you're going to have
 4   in writing what we're talking about today, and there is
 5   no reason why you would have to feel like you have to
 6   memorize it.  I'm just trying to give you an idea as to
 7   what can come about, kind of like forewarned is
 8   forearmed.
 9                Past that, there is nothing complicated
10   about it at all.  But the idea is to give you as much of
11   a comfort zone as I can possibly give you to let you see
12   how these things can come into play and, in some
13   instances, why they exist.
14                We talked the other day about the Court's
15   charge.  We talked about the fact that in the Court's
16   charge -- at the conclusion of the evidence at each
17   phase of the trial, the Court's charge will be given to
18   you.  And within the Court's charge will be all of the
19   rules that will have come into play based upon whatever
20   the testimony was that was presented in the case.
21   Whether the rules themselves come into play will depend
22   upon what portions of the testimony you view to be the
23   credible portions, because we talked the other day about
24   the fact that that's the jury's job.
25                You are the exclusive judges of the facts
```

**7**

```
 1   proved, the credibility of the witnesses, and the weight
 2   to be given their testimony.  My job has to do with
 3   listening to all of it and giving you the law that is
 4   brought into play as a result of the testimony that's
 5   presented.  Out of all of that testimony that's
 6   presented you, you take that portion of it you view to
 7   be credible and take -- and extract out of the Court's
 8   charge the laws that are applied to the credible
 9   testimony as you see it.  But within the Court's charge
10   there are going to be lots of terms defined for you, and
11   there are going to be some terms that are not going to
12   be defined for you.
13           If you say to yourselves, well, how do you
14   guys down here decide when you're going to define a word
15   for us and when you're not.  The answer to that question
16   is perfectly simple.  We have no justifiable reason to
17   expect you to come down here knowing ahead of time what
18   lawyering words are, and what they mean, and why we use
19   them.  So, those words we're going to define for you in
20   the Court's charge.  When we're dealing with words that
21   aren't peculiar to the lawyering business, we're not
22   going to define them; because you use those words all
23   the time, so that's how we make that distinction.  And
24   we're going to talk about some of those words with each
25   side.
```

**8**

```
 1           We talked about the first phase of the
 2   trial, the focus of the evidence is going to be on the
 3   offense that was committed; the who's, the where's, the
 4   how's, the when's of the crime.  Who did it?  That's
 5   what you're going to hear at the first phase of the
 6   trial.  If the jury finds the defendant guilty, at the
 7   second phase of the trial the focus of the evidence will
 8   shift; and it will get off the decision -- get off of
 9   the focus of who committed the crime.  And instead, the
10   focus will be on the person who did commit the crime.
11           So, at the second phase of the trial,
12   basically you can hear about every single good thing
13   some defendant's ever done before in his or her life.
14   You could hear basically about every single bad thing.
15   You take all that good stuff and all that bad stuff you
16   hear at the second part of the trial, and you pile it
17   onto all that information you heard about how the crime
18   was committed in the first part of the trial, and you
19   use every single bit of it to help you arrive at
20   whatever decision you reach as to how those two
21   questions, those two Special Issues, get answered.
22           Those questions are over here on the
23   board.  We're going to talk about it.  If you need to
24   look at it while we're talking about it, please do that.
25   Question Number One that you'll be asked to answer in
```

**9**

```
 1   the event the defendant is found guilty of capital
 2   murder is this:  Do you find from the evidence beyond a
 3   reasonable doubt that there is a probability that the
 4   defendant would commit criminal acts of violence that
 5   would constitute a continuing threat to society?  No
 6   matter what the case, no matter who the victim, no
 7   matter who the defendant, there is never but two
 8   possible answers to that question, either yes or no.
 9           Question Number Two asks:  Taking into
10   consideration all of the evidence, including the
11   circumstances of the offense -- that's going to be what
12   you heard at the first part of the trial -- also
13   including the character, the background, as well as the
14   personal moral culpability or personal moral
15   responsibility or involvement -- that's going to be what
16   you heard at the second part of the trial.
17           So what you can see is the very first half
18   of the second question instructs the jury to go back
19   over all of the evidence in the case.  That's all it
20   says.  Could have been a whole lot simpler to go back
21   over all the evidence in the case.  But we're lawyers.
22   We didn't do it that way.  For the purpose of asking
23   yourself this question:  Is there a sufficient
24   mitigating circumstance or circumstances that make you
25   think that a life sentence would be a more appropriate
```

**10**

```
 1   verdict than a death sentence?  Again, no matter what
 2   the case, no matter who the victim, there's not but two
 3   possible answers, yes or no.
 4           If the jury should answer yes to that
 5   first question and if the jury should answer no to that
 6   second question, the law says that I have no choice, I
 7   have no option, no discretion.  I must sentence the
 8   defendant to death.  If the jury should answer those two
 9   questions in any way other than yes and no, in that
10   order, for example, yes and yes, or no to the first
11   question, then again, the law says I have no choice, and
12   I have no option, and I have no discretion.  I must
13   sentence the defendant to life.  And that's exactly what
14   I'll do.
15           So, first off, you can see -- first off,
16   you can see that juries don't sentence defendants in the
17   State of Texas to life.  Juries don't sentence them to
18   death.  What juries do is they answer two questions; and
19   as a result of how you answer those questions, you are
20   entitled to know what sentence the law requires.  I know
21   that you've seen and heard of capital murder trials
22   where at the conclusion of them, sometimes a life
23   sentence was imposed, sometimes the death sentence was
24   imposed.
25           Every single case is different, kind of
```

**11**

1  like a fingerprint. We're different from "Perry Mason"
2  shows and everything. Fingerprints, DNA now is a little
3  more specific; but that's a new phenomenon. The
4  fingerprint is the most reliable, specific, identifying
5  feature that a person possesses. We all know that. No
6  two people possess the same fingerprint. Every trial is
7  also equally individualistic in that all defendants are
8  always different. All offenses are always committed
9  differently. All victims are always different. The
10  witnesses who see things are always different. And the
11  jurors that hear the testimony are always different.
12        For example, we could have in this
13  courtroom four juries listening to exactly the same
14  evidence at exactly the same time from exactly the same
15  witnesses and go out in four separate jury deliberation
16  rooms, and we can come up with four entirely different
17  verdicts because of the way a jury reacts to the
18  testimony of the witnesses, as well as the way the
19  witnesses present the testimony.
20        So, that's why at the conclusion of some
21  trials, these questions are answered in such a way that
22  a life sentence is imposed. And that may very well be
23  the most appropriate verdict in the world. Sometimes
24  the questions are answered in such a away that a death
25  sentence is imposed. And sometimes that may very well

**12**

1  be the most appropriate verdict for that specific,
2  unique trial that's been had.
3        But the one constant, the standard that
4  never changes is these questions, the order in which
5  they're asked and the words that are contained within
6  the questions. They never change. They are always
7  exactly the same. The thing that causes a different
8  result is the evaluation of the evidence that was
9  presented during the course of a specific trial.
10        So, with that in mind, let's talk for just
11  a couple of minutes about the questions themselves more
12  specifically, talk about what they mean. Question
13  Number One asks -- and it starts off with the phrase, Do
14  you find from the evidence beyond a reasonable doubt?
15  Understand, if you recall on Friday we talked about the
16  term reasonable doubt. We defined it, and we talked
17  about it Friday from the standpoint of that's how much
18  evidence the State must present in order for the jury to
19  find somebody guilty of the offense.
20        Starting out at trial, all defendants are
21  starting out not guilty. They stay not guilty. They
22  never change unless or until the evidence presented by
23  the State rises to the level that it overcomes that
24  presumption of innocence and persuades the jury beyond a
25  reasonable doubt that the defendant is guilty. If a

**13**

1  defendant is found guilty of capital murder, obviously
2  the presumption of being innocent has been erased by the
3  quality of the strength of the State's evidence.
4        At the beginning of the second phase of a
5  capital murder trial there is a whole new presumption
6  that pops into place, and that new presumption is this:
7  It is always presumed that the appropriate punishment
8  for a person convicted of capital murder is life, unless
9  the State's evidence proves beyond a reasonable doubt
10  that the answer to this first question should be yes.
11        Now whenever we see the phrase, Do you
12  find from the evidence beyond a reasonable doubt, that
13  simply means the State's got to present proof to you to
14  show what the verdict should be. In other words, the
15  State's got to prove that the verdict should be bumped
16  up a notch. The first phase of the trial, the jury's
17  verdict starts off not guilty, unless the State's
18  evidence shows beyond a reasonable doubt the defendant
19  is guilty. And the evidence, therefore, bumps up a
20  notch that verdict from not guilty to guilty.
21        Starting off at the second phase of the
22  trial the answer to this question starts off being no,
23  unless the State's evidence shows beyond a reasonable
24  doubt the answer should be bumped up a notch, from no to
25  yes. We understand already from our conversation this

**14**

1  morning that a no answer to that first question means a
2  life sentence; because no to that first question is
3  different than yes and no, in that order. There is no
4  way -- after a no answer to that first question, that
5  means you can't answer the second question in any way --
6  that the death penalty will ever come back into play.
7        So, that's why it's presumed at the
8  beginning of the punishment phase of a capital murder
9  case that the appropriate verdict is life. Because it's
10  presumed that the answer to that first question should
11  be no. Obviously, that's a presumption that can be
12  overcome by the quality of the State's evidence. But
13  then again, there are cases where it's not overcome; and
14  that presumption remains the result based upon the lack
15  of quality in the State's evidence.
16        But the term beyond a reasonable doubt
17  means the State's got to prove to you what the
18  verdict -- what your verdict should be. If they don't
19  prove it to you, your verdict is not guilty at the first
20  phase. If they don't prove it, your answer to the first
21  question is no at the second phase. Any questions about
22  the term, Do you find from the evidence beyond a
23  reasonable doubt? Okay. Again, that term will be
24  defined for you in the Court's charge.
25        Do you find from the evidence beyond a

15

1  reasonable doubt there is a probability?  Let's talk
2  about the word probability, because that word is not going
3  to be defined for you.  The reason it's not going
4  to be defined is because that's a word that we all use
5  all the time; work, home, whatever we're doing.  I am
6  not permitted to define the term for you.  I am,
7  however, permitted by comparison to tell you what the
8  word probability does not mean.
9          There are two things it cannot mean.
10  Whatever probability means to you, it must mean
11  something more than a possibility.  Anything could
12  possibly happen.  Because it could possibly happen does
13  not mean it's probably going to.  Whatever the word
14  probably means to you, it cannot mean as much as a
15  certainty; because something could possibly happen does
16  not mean that it's certain to happen.
17          Now let's talk about the context within
18  which we're using this word probability.  In order to
19  get a yes answer to this question, the State's evidence
20  must prove beyond a reasonable doubt the probability
21  that a defendant would commit future acts of criminal
22  violence.  Can you see how grossly unfair it would be to
23  the defendant if the State was only required to prove a
24  possibility that a defendant would commit future acts of
25  victim criminal violence?  Because all of us could

16

1  probably do that.
2          On the other hand, can you see how grossly
3  unfair it would be to the State to require them to prove
4  to a certainty every criminal act of violence in the
5  future?  Because you can't ever prove that.  So what we
6  did was we simply split the baby, took the middle road,
7  probability.  If probability means to you something
8  being more likely to happen than likely not to happen,
9  that's a deal.  If it means something different, that's
10  just fine, too, as long as whatever probability means to
11  you, it means something more than possibility, but not
12  something as great as certainty.  Any questions about
13  the word probability?
14          Probability that the defendant would
15  commit criminal acts of violence.  In order to obtain a
16  yes answer to this question, the State's evidence must
17  show you beyond a reasonable doubt that the defendant on
18  trial would commit criminal acts of violence in the
19  future.  Not a specific crime.  They are not -- they,
20  being the State -- are not required to show the
21  existence of a probability that a defendant on trial
22  would commit future capital murders.
23          Certainly, if that evidence exists, the
24  State's entitled to present it to you.  But the State's
25  not entitled -- not required, I should say, to prove a

17

1  certain crime being committed in the future.  They are,
2  however, required to prove a certain category of crimes,
3  that category being a crime that's a crime of violence.
4  And as you can see by the question, the crime of
5  violence can be either as to persons or as to property;
6  because the question doesn't specify.
7          Certainly, capital murder is a crime of
8  violence as to persons, as are murders, as are assaults,
9  as are rapes, as are robberies, as are kidnappings.  All
10  criminal acts of violence as to persons.  Criminal acts
11  of violence as to property; arsons, the burning of
12  somebody's building or automobile, certain kinds of
13  burglaries that require breaking into to get into a
14  building, into a house, the taking of a bat and beating
15  the windshield in an automobile.  All of those are
16  criminal acts of violence as to property.  And there
17  are, I'm sure, hundreds more.
18          But it is that category of criminal
19  conduct the State must prove the existence of the
20  probability the defendant committed, not a specific
21  crime within that broad category of conduct.  And that
22  category of conduct to that crime must rise to the level
23  that it constitutes a continuing threat to do so.
24          Now the word society is not going to be
25  defined for you.  But I would ask you to consider making

18

1  a distinction, if you feel comfortable with a
2  distinction, between the words community and society.
3  We all live in different communities, but all of our
4  communities are a piece of society.  I say that for this
5  reason:  Sometimes when we think of the word society, we
6  think ordinarily about the people with whom we have
7  contact, with our neighbors, family, coworkers, people
8  we see during the course of the day.
9          Ordinarily we don't think, for example,
10  about people behind the walls of the penitentiary.  But
11  they also have the right to be free from criminal acts
12  of violence.  Because if they didn't, that would mean
13  that the lady who teaches school to the inmates in the
14  penitentiary system, and when she punches in at 8:00
15  o'clock in the morning to go behind the walls to do her
16  job for the day, if she successfully lives through the
17  day and escapes with her life and punches out at 4:00
18  o'clock, she doesn't reacquire her right to be free from
19  criminal acts of violence from the outside after having
20  lost them on the inside.  That's preposterous, and
21  that's not the case.
22          So the point is that the people inside the
23  penitentiary system also have the right to be free from
24  criminal acts of violence.  We're talking about teaching
25  people.  We're talking about medical personnel.  We're

19

1    talking about prison officials, wardens, administrators,
2    guards, whoever they might be. And we're also talking
3    about inmates; because we hope that the accomplishments
4    of the prison system might be rehabilitation. Obviously
5    that's never going to happen if the inmates aren't
6    entitled to be free, also, from criminal acts of
7    violence.
8         So we know we're not talking about a
9    community. We're talking about something larger than
10   that. Because if we were talking about a community,
11   that question would read, Criminal acts of violence that
12   would constitute a continuing threat to the citizens of
13   Harris County, Texas. And it doesn't say that. It says
14   to society. So within this context, the word society
15   could mean all the people all the time in all the
16   places. That's the first question that you'll be asked
17   to answer if the defendant is found guilty of capital
18   murder. Does anybody have any questions about the first
19   question?
20        Okay. Next we'll go to Question Number
21   Two. Before we get to Question Two, let's think for
22   just a second about where a jury would necessarily have
23   to be. This is to say, what would they necessarily have
24   had to have done in order to get to the second question?
25   Well, first off, necessarily the jury would have had to

20

1    have found the defendant guilty of capital murder.
2    Because if they had not, we would never get to these
3    questions.
4         Secondly, necessarily, a defendant -- a
5    jury would have had to have answered unanimously
6    Question Number One yes. Because if they had answered
7    no, we know we wouldn't get to the second question;
8    because a no answer to the first question is a life
9    sentence. So, what we're saying when a jury gets to the
10   second question is this: The jury necessarily would
11   have had to have consistently and unanimously voted in
12   such a way that the defendant's going to get the death
13   penalty, unless the jury determines that because of some
14   unique feature that exists within the case, if there is
15   one, that unique feature rises to the level that makes
16   you think that you should pull down the death penalty
17   and substitute in its place a life sentence.
18        If that feature exists, the second
19   question is where you handle it. We talked about the
20   question. We talked about the first half of the second
21   question. It's just simply an instruction to the jury
22   to go back over all the evidence in the case for the
23   purposes of asking yourselves -- and these are my words,
24   not words of the questions. What the question is asking
25   is this: Is there a sufficient reason in this case, is

21

1    there a good enough reason, why a life sentence instead
2    of the death sentence should be imposed. Because the
3    death sentence is going to be imposed, because you found
4    him guilty of capital murder and you found he's a future
5    danger. So he's on his way to getting a death penalty
6    unless you pull it down.
7         Now, let's talk about the question more
8    specifically. As you see in the second question, there
9    is no phrase, Do you find from the evidence beyond a
10   reasonable doubt? That phrase does not exist within
11   that question, so that means the State does not have to
12   prove to you what the answer to that question should be.
13   Well, we know from our conversation the other day that
14   the defendant never has to prove anything because he's
15   the defendant.
16        So if the State doesn't have to prove to
17   you what the answer to that second question should be
18   and they don't answer -- I don't know what I said. I
19   said if the State doesn't -- that's what I meant to say.
20   The State doesn't have to prove to you what the answer
21   to the second question should be. And if the defendant
22   doesn't have to prove to you what the answer to that
23   second question should be and they don't, where does
24   that leave us?
25        Well, that leaves us in the posture of

22

1    understanding that the law recognizes that there might
2    be many cases where there is no reason in the case why a
3    death sentence should be taken down and a life sentence
4    substituted in its place. And we understand the law
5    recognizes that, because nobody is required to put that
6    reason in the case. The only requirement presented by
7    the second question is that the jury go back over the
8    case to reevaluate all the information to determine
9    whether there is or is not a sufficient reason why a
10   life sentence should be imposed as opposed to a death
11   sentence.
12        Now we use the word in the second
13   question, mitigating. The word mitigating is not going
14   to be defined for you. The reason it's not going to be
15   defined for you is because what it might mean to one
16   juror, it might mean exactly the opposite to another
17   juror. That's your call.
18        For example, sometimes in some cases some
19   folks might tend to think that if you have a defendant
20   on trial who is seventeen years old, that the
21   comparative youthfulness of the defendant on trial might
22   be mitigating in the sense that he has a lack of mature
23   judgment, unable to make decisions as maturely as people
24   older would.
25        Some people hearing exactly that same

23

1   evidence might say, I don't agree with that; because
2   anybody who's seventeen that commits a crime that bad at
3   that early age, we've lost them anyway.  Two people
4   looking at exactly the same evidence and coming up with
5   the same conclusion.  You might have in some
6   hypothetical case testimony about perhaps a
7   defendant's -- there being a history of mental
8   retardation.  Sometimes some folks might think mental
9   retardation would be mitigating.  Other people might
10  not, their idea being there is no way to cure mental
11  retardation.  It is the way it's always going to be
12  forever.  Another group of people in that same jury
13  might say, Wouldn't it depend on how severe the
14  retardation was?  Was it minimal?  Was it significant?
15  Would it make a difference as to why a life sentence
16  should be given as opposed to a death sentence?  That's
17  your call.
18          But what I'm getting at is the same
19  evidence can be viewed by opposite ends by the people on
20  the jury.  So for that reason, the word mitigating is
21  not going to be defined.  But when we talk about
22  mitigating, as we're using in this second question,
23  we're just talking about reducing the punishment from
24  death to life.  We're not talking about excusing
25  conduct.  We're not talking about justifying conduct.

24

1          Obviously the conduct wasn't justified,
2   wasn't excused; because you found him guilty of the
3   offense, and the very least that's going to happen is
4   he's going to get a life sentence.  Mitigating evidence
5   might also be, a jury might find something to be
6   mitigating as to have specific circumstances or traits
7   within a defendant's character.
8          You might find a week before the defendant
9   was -- the capital murder was committed, the defendant
10  on trial was driving down the street, saw an apartment
11  fire, stopped his car, ran inside and saved a couple of
12  people at the risk of his own life.  You might find that
13  to be mitigating to such a degree that it warrants
14  thinking of considering a life sentence should be
15  substituted as opposed to a death sentence.
16          You might, in other cases, have testimony
17  about somebody being a perfectly marvelous citizen
18  before they went into the service.  They went to
19  Vietnam, went to Desert Storm, got all screwed up, and
20  never been able to get their lives back again as a
21  result of having served their country.  Sometimes people
22  might think that's mitigating to the degree that it
23  warrants a life sentence.  Others might not.
24          The point being, it's not important how
25  you evaluate the evidence; but the commitment we need to

25

1   get from you is you will go back over all of the
2   evidence and look at it from the standpoint of asking
3   yourself, is there a feature that exists within this
4   case to a sufficient degree that it's unique enough to
5   make me think a life sentence would be more appropriate
6   than a death sentence.  If your answer to that question
7   is yes, then your answer to that whole question is yes.
8   If your answer to the question is no, then your answer
9   to that whole question is no.  That's the second
10  question.   Does anybody have any questions about the
11  second question?
12          Let me say this to you, and I'm going to
13  try for just a second to put myself into your shoes.
14  And now knowing what it is we know, my question to
15  myself, if I were in one of your chairs, would be this:
16  Let's see if I got this right.  If the State proves
17  beyond a reasonable doubt the defendant's guilty of
18  capital murder, then it's my job to find him guilty.
19  And that's -- what if the State's job is to prove beyond
20  a reasonable doubt that the answer to Special Issue
21  Number One should be yes, and if I find they have proved
22  that and I answer that question yes, that means I have
23  found a defendant guilty of having committed a horrible
24  crime.  That means I also find the defendant's future
25  danger.  And you're still telling me that even though I

26

1   make those two findings, it might not be proper in a
2   case for the death penalty to be imposed.  And the
3   answer to that question is, yes, it might not be.
4   Because you have to take the second question into
5   account, too.
6          Now whether you do find in a given case
7   that there is any mitigating evidence, there can be --
8   maybe there is; maybe there is not.  The next thing is
9   if there is -- maybe you'll find that that mitigating
10  evidence is not sufficient to combat or to overcome all
11  the evidence that you heard to find a person guilty and
12  all the evidence you heard to answer Question Number One
13  yes.  That may very well be the case.  But the only
14  commitment that we're entitled to get from you is that
15  you will give legitimate consideration to the second
16  question, go back and look over all the evidence in the
17  case, see what there is or what there isn't.
18          The other night there was a deal on
19  television about Yogi Berra.  It ain't over till it's
20  over.  And when you get through with Question Number
21  One, it ain't over.  It's not over till you get through
22  with Question Number Two.  Because these three decisions
23  that you will make -- that being, is he guilty?  The
24  answer to Question One and the answer to Question Two,
25  those three decisions, in my mind, are kind of like the

27

1  three points of a trial.
2           Every piece of information you're going to
3  use to make your decision as to those three questions
4  comes from the evidence within that trial, but each
5  question is being asked of you from such a different
6  perspective that every time you're asked a question, you
7  have to go back into that body of evidence.
8           What I'm saying is, no matter how you
9  answer one question, that answer to that question does
10 not dictate what the answer to the next question should
11 be; because is he guilty is a whole different question
12 than is he a future danger?  And is he a future danger
13 is a whole different question than is there some unique
14 reason in this case why a life sentence should be
15 imposed as opposed to a death sentence?  So, each of
16 those three questions is completely independent from the
17 other.  And that's why we have to wait till we get all
18 the way to the end, through the second question being
19 answered, before we know what the appropriate verdict
20 should be in the case.
21          So, what I'm saying is -- or what I'm
22 hoping is that I have conveyed the understanding that
23 even though a capital murder verdict is returned by a
24 jury, even though a yes answer is returned by a jury to
25 Question Number One, that does not foreclose the

28

1  possibility that a life sentence may be the appropriate
2  verdict based upon some unique aspects that may exist in
3  the case.  And if it doesn't exist, obviously a life
4  sentence is not appropriate; but if it does exist, a
5  life sentence is appropriate.
6           And this second question is just simply
7  the jury's way to have the opportunity to satisfy
8  themselves that the death penalty really is the verdict
9  we want to return in this case.  And if the death
10 penalty is the verdict that you want to return, your
11 answer to that second question is no.  If the death
12 penalty is not the verdict you want to return, you
13 answer that second question yes.  And either answer, yes
14 or no, must be based upon the evidence that exists in
15 the case.  Anybody have any questions about that?
16          Okay.  The possible punishments, life and
17 death.  We know what death is.  No reason to go into
18 that.  But sometimes we have a misunderstanding.  Some
19 folks have a misunderstanding about what a life sentence
20 means.  I will tell you in this case, in the event these
21 questions -- in the event he's found guilty of capital
22 murder, and in the event these questions are answered in
23 such a way that a death sentence -- I'm sorry -- these
24 questions are answered in such a way that a life
25 sentence is imposed.

29

1           The law says that the defendant cannot
2  be -- this defendant, in this trial, cannot become
3  eligible for parole consideration until he has actually
4  served forty years in the penitentiary.  Forty years
5  means forty years, day for day, week for week, month for
6  month, year for year.  Forty years in this case means
7  2039, the Year 2039.  What happens at the conclusion of
8  forty years?  Frankly, it's anybody's guess.
9           But at the conclusion of forty years, that
10 is the first time that the defendant would become
11 eligible for parole consideration.  Eligibility for
12 parole consideration has absolutely nothing to do with
13 determining or deciding whether parole will be or will
14 not be granted.  Eligibility for parole consideration
15 simply means that there will be evaluations made by
16 prison people evaluating that person's forty-year stay
17 with them.
18          Those evaluations will be sent to the
19 Board of Pardons and Paroles, made up of whoever they're
20 going to -- where it's going to be made up at that time.
21 The Board of Pardons and Paroles can accept those
22 evaluations.  They can completely reject them and come
23 up with their own recommendations.  They will send their
24 recommendations to the governor of the State of Texas,
25 whoever he or she is in 2039.  And the governor of the

30

1  State of Texas will make a decision, accepting the
2  evaluations, the recommendations, rejecting them and
3  coming up with a political decision.  Don't know what
4  will happen.
5           The point being that these two questions
6  deserve to be answered on the basis of the evidence
7  contained within the case on trial in 1999.  They are
8  not to be answered on the basis of speculating as to
9  what might happen in the Year 2039.  It is perfectly
10 consistent with the notion that in 2039, one
11 hypothetical defendant who got a life sentence for
12 capital murder may very well spend the rest of his
13 natural life drawing every single breath he ever drew
14 after the conclusion of forty years in the penitentiary
15 and dies there.  That's perfectly possible.
16          It's also possible that another defendant,
17 at the conclusion of forty years, would be considered
18 for parole eligibility and be granted parole.  Don't
19 know what's going to happen in this case.  But as I
20 said, eligibility for parole does not have anything to
21 do with whether parole will or will not be granted.  It
22 just becomes a time when the evaluation process begins.
23 But I did want you to know what the rule is about how
24 long the defendant would be required to stay in the
25 penitentiary.

31

1       That forty-year period cannot be used to
2   answer these questions. These questions must be based
3   upon the evidence in the case. But I did not want to
4   run the risk that somebody on a jury might say to
5   themselves or to other jurors in the jury room, well, I
6   understand that people who get life sentences can be
7   paroled after forty years -- I mean, paroled after five
8   years; therefore, I'm never going to answer these
9   questions in such a way that a life sentence is imposed.
10  I'm going to always answer in such a way the death
11  penalty is imposed, because I'm not going to run the
12  risk of having them back in five years. I'm telling
13  you, there is no risk. It's simply not going to happen.
14  Now anybody have any questions about that?
15      Okay. Let's get off the capital murder
16  business for just a second, and let's get on to a couple
17  of other things briefly. First off, we're talking about
18  capital murder. And capital murder -- I say we're going
19  to get off it. Now I'm talking about it, using this as
20  a starting point. Capital murder necessarily means the
21  intentional taking of the life of another human being
22  without there being any legal excuse or without there
23  being any legal justification and that it was committed
24  during the course of another major felony.
25      In this case the allegation is a

32

1   kidnapping, and there is a second allegation of
2   murdering two people during the course of the same
3   criminal transaction; so, a murder during a murder; a
4   murder during a kidnapping. Those are two major
5   felonies, an intentional taking of the life of another
6   human being without any legal justification or excuse,
7   during a kidnapping or another murder.
8       If the State proves beyond a reasonable
9   doubt the existence of each of those features, the
10  intentional murder and the other felony, the jury's
11  obligation is to find the defendant guilty of capital
12  murder. Anytime the State's required to prove three
13  things -- anytime the State's required to prove the
14  existence of two things, three possible outcomes can
15  occur.
16      Possible outcome number one is they can.
17  If they do, the jury's got to find the defendant guilty
18  of capital murder. Possible outcome number two, they
19  can't prove either one of them. If that's the case, the
20  jury's obligation is to find the defendant not guilty.
21  Possible outcome number three, they can prove the
22  existence of the intentional murder without
23  justification or excuse, but they can't prove in the
24  jury's mind that it was committed during the course of
25  the kidnapping, for example.

33

1       If that were to be the case, I'd be
2   obligated to give you a third possible verdict. You
3   would have had guilty of capital murder. You would have
4   had not guilty of anything. Third possible verdict is
5   guilty of murder. So what we're talking about is an
6   intentional murder, taking the life -- intentionally
7   taking the life of another human being without there
8   being any legal justification or any legal excuse, which
9   is exactly the definition for capital murder, except in
10  the murder it's not done during the course of another
11  felony as it is in the capital murder.
12      So capital murder is the greater of the
13  crime, and we're talking about carving out a lesser
14  crime. That being a murder being carved out of an
15  allegation of capital murder, piece of the pie out of
16  the whole pie. And when we talk about the intentional
17  taking of the life of another human being without there
18  being any legal justification, without there being any
19  legal excuse, we are never talking about self-defense;
20  because self-defense is a legal justification. It is
21  simply not murder. We are not talking about accident,
22  because accident isn't intentional. So if you think of
23  those two things, those two things are not and can never
24  be murder; because there is a legal justification and
25  it's not intentional.

34

1       But at any rate, we know the range of
2   punishment for the person convicted of capital murder is
3   life and death. The range of punishment for murder is
4   something more broad. A person convicted of the offense
5   of murder in the State of Texas can be punished by
6   confinement in the penitentiary for life or by
7   confinement in the penitentiary for any number of years,
8   as long as that number is not less than five or not
9   greater than ninety-nine. And in addition to the
10  confinement, a fine not to exceed $10,000 could also be
11  imposed by a jury.
12      But you can see that the range of
13  punishment is simply so remarkably broad. And as I said
14  the other day, I know that most of you are concerned of
15  what you think goes on at the courthouse or what you
16  hear on television. And if you hear about a murder,
17  there is a specific thing that comes into your mind.
18  And it possibly is an absolutely awful, horrible,
19  heinous offense. And certainly, those do exist. But
20  they aren't all of the same magnitude.
21      We are not going to be of the mind to tell
22  you -- ask you to give up your time, ask you to serve as
23  jurors, and then tell you exactly what the value is for
24  every dead body that turns up in Harris County, Texas.
25  Because the values are all different. And they're

35

1  different because of the circumstances of the offense.
2  They're different because of the quality of the life of
3  the victim. And they're different because of the
4  quality of the life of the defendant.
5       You might have exactly the same set of
6  circumstances. I mean, precisely the same crime,
7  precisely the same witnesses. One crime is committed by
8  a forty-five-year-old, six-time ex-convict, who the
9  evidence showed you during the course of the trial makes
10 his life as a career criminal. The other crime you
11 might see being committed by a seventeen-year-old girl,
12 who has never before been in any trouble before in her
13 life and just goes out and does something in aberration
14 to the way she's lived her whole life.
15       Maybe you would think those two crimes
16 should be punished differently. Maybe you wouldn't,
17 either. But that's your call. But if you did think so,
18 we've got to give you the room so you can run up and
19 down the scale of punishment. The facts of a different
20 case ought to be in terms of punishment.
21       You might have, for example, an
22 eighty-five-year-old couple, married for fifty years.
23 The Mrs. is critically ill. She's on life support.
24 She's not going to live. He knows it. Her husband
25 knows it. She talks to him. She doesn't want

36

1  something -- she certainly doesn't want to go through
2  the indignity to have her life supported by mechanical
3  means, and she talks to her husband. Please fix this.
4  He prays and talks to the preacher and frets about it
5  several days. Finally, not wanting to watch his wife go
6  through this misery, this indignation any longer, he
7  goes across, pulls the plug, and she dies.
8       Without going into the morality of that,
9  in this state that's murder. That's the intentional
10 taking of the life of another human being without there
11 being any legal justification and without there being
12 any excuse. Now maybe that's not the kind of case
13 wherein you think that seventy-five-year-old man should
14 get a life sentence, because he didn't kill her out of
15 anger, not out of hate, not out of revenge. He actually
16 did this out of love. The point being, if you didn't
17 think the crime in that specific instance was worth a
18 life sentence, we've got to make room for you to go up
19 and down the scale of punishments to where we let you
20 take the evidence to where you think it should be on
21 that scale.
22       So, that's why the range is so broad, to
23 give the opportunity to let you arrive at the punishment
24 you think is appropriate, depending upon the
25 circumstances of the offense, and the character and

37

1  background of the defendant, as well as the victim. So,
2  my question to you is this: Imagine, if you would, that
3  you're a juror in some imaginary capital murder case.
4  And your jury has heard all of the evidence about the
5  crime itself, first phase of the trial. And your jury
6  goes out and deliberates, and your jury unanimously
7  determines that the defendant on trial is not guilty of
8  capital murder. But your jury unanimously agrees that
9  the defendant is, in fact, guilty of murder.
10       Your jury comes back to the second phase
11 of the trial, and you hear additional evidence about the
12 character and background of the defendant on trial,
13 whatever that evidence was. And you go out and you
14 deliberate as to what should be the appropriate
15 punishment. My question to you is this: Is there
16 anybody here who would not consider in that imaginary
17 case assessing that imaginary defendant's punishment at
18 confinement in the penitentiary for life if you thought
19 based upon whatever the evidence was in that particular
20 case, that that was the right result to reach? Is there
21 anybody here who -- I guess what I'm saying is, is there
22 anybody here who would refuse to consider life as an
23 appropriate sentencing option if you thought the facts
24 of the case warranted it? I see no indication to the
25 contrary, so I'm going to assume you can consider that.

38

1       Take the same question and flip it around.
2  Capital murder jury finds the defendant -- unanimously
3  finds the defendant not guilty of capital murder, but
4  you can unanimously determine the defendant's guilty of
5  murder. You come back and hear the second phase of the
6  trial, again, relating the character and background of
7  the defendant on trial, whatever that evidence was.
8  Your jury goes out. Is there anybody here who could not
9  consider assessing that imaginary defendant's punishment
10 at confinement in the penitentiary for five years if you
11 thought, based upon the uniqueness of the evidence that
12 existed in that particular case, that that was the right
13 result to reach?
14       Again, is there anybody who would refuse,
15 before the trial ever began, to consider five years as a
16 legitimate sentencing option if the circumstances of the
17 case made you believe it was the appropriate option? I,
18 again, see nothing to indicate that you wouldn't. So
19 the point of it, you could consider the whole range of
20 punishment. It's the same thing we've been asking about
21 the capital murder business. Can you consider the whole
22 range of punishment? Can you consider yes and no
23 answers? Can you consider guilty or not guilty?
24       Whatever result you reach, would you reach
25 that result because, in your opinion, after having heard

39

```
 1   all the evidence, that's where that evidence led you, to
 2   that result, and not because before the trial ever began
 3   you had an opinion as to what result you were going to
 4   reach?  That's all we're trying to talk about, is
 5   starting the case off at ground zero and you go wherever
 6   the evidence takes you.  Anybody have any questions so
 7   far?
 8            Two other quick things.  One thing -- and
 9   I'm not going to do this from a legal standpoint.  I'm
10   trying to convey the thought of a concept.  We have in
11   the State of Texas a concept, a piece of our law that
12   says, if you have two or more people who get together,
13   agree, conspire to commit a crime; and they do commit
14   the crimes.  A conviction as to one of those
15   coconspirators cannot be had solely and exclusively upon
16   the testimony of one of the other coconspirators.
17   Instead, there must be some additional evidence from
18   some independent source, independent of the
19   coconspirators, that tends to connect the defendant on
20   trial to the commission of the offense.  The independent
21   evidence itself does not have to be within itself
22   sufficient to prove the defendant's guilt beyond a
23   reasonable doubt.  It only has to be sufficient that it
24   tends to connect the defendant to the commission of a
25   crime.
```

40

```
 1            For example, another guy and I agree to
 2   rob a bank.  I'm going to be the driver of the getaway
 3   car, and he's the bank robber.  I pull up, he gets the
 4   bag, runs in, comes out, hops in the car, off we go.
 5   Well, there is a arrest that occurs.  I got this all
 6   planned.  I didn't go in the bank, so nobody can
 7   identify me.  He gets arrested.  He starts to point to
 8   me.  I'm not the only -- I can't be convicted solely and
 9   exclusively upon that testimony if there is no other
10   evidence independent of him that tends to connect me to
11   the commission of a crime.  But because he is arrested,
12   they find the bank bag; and on the bank bag are my
13   fingerprints.   That is evidence independent of his
14   testimony that does tend to connect to the commission of
15   the crime.  So, it could be eyewitness evidence; it
16   could be circumstantial evidence.  It doesn't make any
17   difference, just some evidence independent of the
18   evidence -- the coconspirators' testimony that tends to
19   connect me to the crime that was committed.   Anybody
20   here have any disagreements with that aspect of the law
21   that rises to the level -- and I don't know if it's
22   going to come into play, but -- I don't have the
23   faintest idea -- but I know the law exists and it could.
24   Anybody have any disagreement with that facet of our
25   law?
```

41

```
 1            One last area.  We have two kinds of
 2   evidence that exist in trials.  We have direct evidence,
 3   and we have circumstantial evidence.  Direct evidence
 4   means eyewitness testimony; somebody saw something
 5   happen.  Or in a criminal case it could also mean the
 6   confession of a defendant, and we know the defendant
 7   can't be required to testify against himself.  But there
 8   are some instances wherein a confession, if lawfully
 9   taken, can be admitted.
10            Circumstantial evidence means any other
11   kind of evidence.  It means evidence of a particular
12   circumstance involved in conduct, taken and intertwined
13   with other circumstances presented to a jury, would be
14   sufficient to establish a defendant's guilt.  Sometimes
15   we hear people say down here, oh, I couldn't find
16   anybody guilty on circumstantial evidence.  And they
17   really don't know what it is they're saying.
18            The law doesn't care whether evidence in a
19   case is circumstantial or direct.  The law only cares
20   that the evidence rises to the level that it proves a
21   person's guilt beyond a reasonable doubt.  The law
22   doesn't care whether there is one witness in a case or
23   twenty-seven witnesses in the case.  The law only cares,
24   does that witness or do those witnesses' testimony show
25   a person's guilt beyond a reasonable doubt?
```

42

```
 1            Every week in this building there are
 2   people who are found guilty based upon the testimony of
 3   one witness.  And when that happens, that's because that
 4   one witness' testimony is believed beyond a reasonable
 5   doubt.  And there are weeks in this building where
 6   defendants are found not guilty, even upon the testimony
 7   of a half a dozen eyewitnesses, because the jury does
 8   not believe beyond a reasonable doubt those
 9   eyewitnesses' testimony.  So, the number of witnesses
10   makes no difference.  Whether it's direct or
11   circumstantial evidence makes no difference.  It is the
12   quality of the testimony; and thus, it establishes a
13   person's guilt beyond a reasonable doubt.
14            For example, down here next to where
15   they're building the Enron Field, we could have two
16   drunks out there one day just on the verge of passing
17   out.  And they see some old guy down there, and somebody
18   shoots him and kills him.  They drag those three drunks
19   into trial.  Six months later they testify, and they all
20   testify exactly what it was they claim they saw.  And
21   each one of them is perfectly honest.  They say, I've
22   been drinking wine all day.  I'm on my third paper bag,
23   and I'm getting ready to pass out, and I'm drunker than
24   Cooter Brown, but that's what I saw.  Can you see how a
25   jury may very well not find beyond a reasonable doubt
```

**43**

1  those witnesses to be credible?  They may find that
2  hypothetical defendant not guilty, even though the
3  testimony was direct, even though it came from three
4  eyewitnesses.
5        On the other hand, at exactly the same
6  time, same circumstance, you have one guy who's a pillar
7  of the community, who happens to be walking by and sees
8  the person who turns up being the defendant with a gun
9  in his hand.  He doesn't see him do anything.  He walks
10  away, and fifteen seconds later he hears a gunshot.
11  Another guy, also a pillar of the community, hears the
12  gunshot, turns around, doesn't see it fired but sees the
13  victim laying on the ground, sees the defendant standing
14  over the victim with a gun in his hands.  A third person
15  doesn't see the shooting, either, but sees -- about
16  fifteen seconds after he hears the gunshot, sees the
17  defendant walking away with a gun in his hands, calls
18  the police.  The police arrest the defendant.  Nobody
19  has seen the gunshot fired, and the gun that is seized
20  from the defendant at the time of his arrest is
21  ballistically determined to have been the weapon that
22  fired the projectile that went in the body of the victim
23  to cause his death.  Nothing but circumstantial
24  evidence.  But can you see how someone might view that
25  evidence in such a way that it would, beyond a

**44**

1  reasonable doubt, show the defendant on trial to be
2  guilty?  No eyewitness testimony, but circumstantial.
3  We think of fingerprints as being such great
4  identifiers, and certainly they are.  But fingerprints
5  are circumstantial evidence; because even if a
6  fingerprint exists on some object, there is no way to
7  know when the print was placed there.  There is no way
8  to know when the object -- when the print was placed
9  there.
10        Now if it's a nonmoveable object,
11  obviously that's not going to be hard to figure out.
12  But if it were a pistol, you would never know where the
13  pistol was or when it was that the person's print was
14  placed on that pistol.  That's why it's circumstantial.
15  But my question to you is this:  If you were a juror in
16  some hypothetical capital murder case, and at the
17  conclusion of all the evidence in the case -- and let's
18  just say for purposes of this conversation, all the
19  evidence was circumstantial -- is there anybody here who
20  would refuse to find the defendant on trial guilty of
21  capital murder just because the evidence was
22  circumstantial and not direct, even though you believe
23  all that evidence beyond a reasonable doubt?  Is there
24  anybody here who would refuse to do that?
25        Okay.  You've just finished your first

**45**

1  year in law school.  Anybody have any questions?  The
2  whole point of this exercise is really pretty simple.
3  One, we want to run the laws by you, the rules by you
4  that can come into play; because we're going to want to
5  see if you were a juror in the case, could you, A,
6  follow the rules, and B, enforce them?  Because that's
7  what you'd have to do as a juror.  Anybody here who's
8  heard anything that causes them such a degree of
9  discomfort that they would be unwilling, unable to
10  follow any of these rules we talked about?
11        Second aspect of what this is about, I
12  think, is for you to be satisfied with yourself, for the
13  lawyers to be satisfied with you, that if you were a
14  juror in the case, you could take one of those chairs in
15  the jury box and just listen to all the information as
16  presented, evaluate it however you see fit, and come up
17  with what you think is the right decision to reach based
18  upon the evidence in the case and how you evaluate it.
19  Is there anybody here who feels as though they couldn't
20  do that?  Anybody have any questions?
21        Okay.  If you would, retire to the
22  hallway.  We'll bring you in one at a time and get you
23  on your way as quickly as we can.
24
25

**46**

1              GLEN DINKINS,
2  having been first duly sworn, testified as follows:
3              VOIR DIRE EXAMINATION
4  BY THE COURT:
5    Q.  Mr. Dinkins, first off, going back to Friday
6  and this morning, about everything we talked about up to
7  now, do you have any questions at all for me?
8    A.  I believe not.
9    Q.  Okay.  Is there anything to this point that we
10  have not yet addressed that you feel as though we should
11  talk about it because it might have some bearing on your
12  service as a juror in this case?
13    A.  Not that comes to mind right now.
14    Q.  Is there anything at all, sir, that you're
15  aware of presently about your personal life, your
16  professional life, your health, or anything else for
17  that matter, that you can think of that would in any way
18  interfere with your ability to be a juror in this case
19  during the time frame we've discussed?
20    A.  If it's like ten days, is that what you're
21  saying?
22    Q.  We're saying more than five, but not as much as
23  ten.
24    A.  I don't believe so.
25    Q.  The idea that I was trying to convey about how

47

1 each of the juror's verdicts is independent from the
2 other verdicts. Does that make sense in any way?
3     A. Yes, sir.
4     Q. Each thing must be viewed on the basis of its
5 own question that it's asking. And can you conceive --
6 and I'm not going to ask you to tell me what they might
7 be. That's not fair to you. But are you open to the
8 notion that even though a juror found a defendant guilty
9 of capital murder, for example, and even though a juror
10 may have answered yes to Question Number One, that is to
11 say, found the defendant to be a future danger, that
12 there may very well be circumstances that do exist
13 wherein that same juror in that same case would believe
14 there was a sufficient reason to answer that second
15 question yes, therefore, giving a defendant a life
16 sentence as opposed to a death sentence?
17     A. Yes, I believe that possibility exists.
18     Q. And you would be willing to search through the
19 case to see if that existed in a case if you were a
20 juror?
21     A. Yes.
22     Q. Before we begin, have you any questions for me?
23     A. Not right now.
24     Q. Thank you, sir.
25         THE COURT: Miss Connors.

48

1         VOIR DIRE EXAMINATION
2 BY MS. CONNORS:
3     Q. Mr. Dinkins, I'm Claire Connors. And Lynn
4 McClellan will be sitting with me in a few minutes, and
5 we're going to be the prosecutors in this case. If at
6 any point I explain something to you that you don't
7 understand, please stop me, because it's very important
8 that you understand the concepts. We're not going to
9 give a test, and you don't have to memorize them just to
10 understand the concepts. When do you think the death
11 penalty should be available, like, in what type of
12 cases?
13     A. Most definitely in capital murder cases.
14     Q. Capital murders involving what type of facts?
15 Can you think of any?
16     A. I'm not sure.
17     Q. Okay. You understand that capital murder's an
18 intentional killing, plus another certain other crime?
19 For example, murder plus an aggravated kidnapping equals
20 capital murder. Do you have any problem with that?
21     A. No, ma'am.
22     Q. If you find the defendant guilty of capital
23 murder in this case, then we go to the next part of the
24 trial. And you have to answer two questions. And the
25 first question is: Do you find from the evidence beyond

49

1 a reasonable doubt that there is a probability that the
2 defendant would commit criminal acts of violence that
3 would constitute a threat to society?
4         Just because you found him guilty of
5 capital murder, it doesn't mean this question is
6 automatically answered yes. Okay. There may be
7 circumstances where you think that person -- you hear
8 facts when they were violent between -- with someone
9 they knew. That was the only time they were ever
10 violent in their life, and you may believe they would
11 never commit some type of violent act in the future.
12 Okay. And you understand the acts of violence could be
13 either against property or some type of burglary,
14 violence against a person. If I punch you, that would
15 be a type of violence. So if you answer that question
16 yes, then he gets the death penalty. All right?
17         The way to get around that is you go to
18 Question Number Two. You can decide, I don't want him
19 to get the death penalty, and you answer that
20 question -- if there was sufficient evidence, you answer
21 that question no. Okay. But before you would do that,
22 you have to look at all the evidence. You look at the
23 facts of the case you would consider at the first part
24 of the trial. You look at the defendant's background,
25 his character, his moral culpability or responsibility.

50

1 What part did a particular defendant play in the case?
2 Were they in the getaway car and they were not present
3 when the murder occurred, or did they actually -- were
4 they involved in the murder? Were they actually the
5 shooter in the particular case? Okay. You also look at
6 the personal moral culpability of the defendant,
7 responsibility. Was he responsible for this particular
8 crime? What was his responsibility? And then you
9 say, is there a sufficient mitigating circumstance or
10 circumstances that would warrant a life sentence rather
11 than a death sentence? It overrides. The law says that
12 you have to look for that type of evidence. Doesn't
13 mean you have to find it, but you have to honestly look.
14 Could you do that?
15     A. Yes, sir -- yes, ma'am.
16     Q. In your questionnaire you talked about certain
17 things I'd like to ask you about. You said that your
18 son had been involved -- I think he was shot in a
19 drive-by shooting; is that correct?
20     A. Yes, ma'am.
21     Q. Can you tell us what happened in that case?
22     A. He was at school, playing basketball with a
23 group of his friends; and a carload of kids come by and
24 randomly started firing guns.
25     Q. And what was the extent of his injuries?

51

1      A.  He got shot in his right arm.  He has no use of
2   that right arm at all.
3      Q.  And you understand the man on trial had nothing
4   to do with that particular case?
5      A.  No doubt.
6      Q.  And could you put that aside and just consider
7   the facts and the evidence in this particular case when
8   you make your determination?
9      A.  Yes, I can.  That's been five years ago.
10     Q.  You also wrote in there that you had been the
11  victim of a home robbery.
12     A.  Yes.  Several years ago we were burglarized.
13     Q.  When you say burglarized, were you present when
14  the people came in?
15     A.  No, ma'am.
16     Q.  Before we started, did you know what mitigating
17  evidence meant when the Judge spoke to you?
18     A.  Not as thoroughly as I do now know.
19     Q.  One of the questions you were asked, do you
20  believe that mitigating evidence concerning a capital
21  murder defendant's background should be considered in
22  deciding whether he or she receives the death penalty?
23  And you said no.  And you understand that you must
24  consider any mitigating evidence if there is any?
25     A.  Yes, ma'am.

52

1      Q.  And you understand, Mr. Dinkins, that
2   mitigating evidence can be, for one person something is
3   mitigating, for another person it's not mitigating?
4      A.  Would mitigating be where a person comes from?
5   I guess that's where I was confused.  Their upbringing?
6      Q.  If you thought --
7      A.  The reason why I answered that question that
8   way is because the kids that shot my son come from very
9   affluent families.  They were very well to do, and
10  that's -- I was just saying that where they come from,
11  their background and stuff, I didn't consider that
12  important.
13     Q.  That's information that you would learn?
14     A.  Right.
15     Q.  For example, if somebody were intoxicated on
16  alcohol or drugs and they committed a capital murder,
17  you may think, well, they intentionally chose to be
18  intoxicated on alcohol or drugs and I do not think
19  that's mitigating.  All right.  The juror next to you
20  may say, well, golly, when they took the alcohol or the
21  drugs, they weren't thinking as clearly when they
22  committed a capital murder as they would have had they
23  not be drinking or not taking drugs; and therefore, I
24  think that that is mitigating.  Same evidence.  Two
25  different people view it the same way.  Understand that?

53

1      A.  Yes.
2      Q.  I'm sorry.  The two different people view it
3   different ways.
4          With respect to someone's age, you may
5   have someone young, a teenager, who commits a capital
6   murder, a seventeen-year-old.  And you may think that at
7   this age, at seventeen, they have committed a capital
8   murder.  Obviously, they're a very serious dangerous
9   criminal at seventeen that they could do this.  Someone
10  else may say, at seventeen, they haven't fully
11  developed.  They really aren't the same person as they
12  might be at twenty-five.  Therefore, I think that's
13  mitigating evidence.  So, the same evidence; two
14  different people see it two different ways.  Do you
15  understand that?
16     A.  I do.
17     Q.  You were talking about the people that had shot
18  your son.  I think you said they were rich kids,
19  basically?
20     A.  They were from affluent families.
21     Q.  And you understand there are people, perhaps,
22  that commit capital murders that are not from affluent
23  families?
24     A.  Yes, I do.
25     Q.  Could you keep an open mind and consider

54

1   someone's background, if they came from a poor family or
2   they had a very bad upbringing?  Could you consider --
3   keep an open mind to consider whether or not that was
4   mitigating?
5      A.  I will; but just in my opinion, that things
6   happen, different people and, you know, different walks
7   of life.  But that -- yeah, I could consider it.
8      Q.  That's just it.  It's different people,
9   different upbringings.  And all we're asking you to do
10  is not make a decision right now, keep an open mind, and
11  consider all of the evidence before you decide what the
12  punishment should be.
13     A.  Yes.
14     Q.  You couldn't tell me right now whether or not
15  you're going to find this defendant guilty, right?
16     A.  Absolutely not.
17     Q.  You couldn't tell me what the answer to these
18  questions are, right?
19     A.  Absolutely not.
20     Q.  That's just it.  That's why we're asking you to
21  keep an open mind before you make the decisions, and you
22  make the decisions after you've heard all the evidence.
23  Could you do that?
24     A.  Yes.
25     Q.  When you were asked about your feelings about

55

1 the death penalty, you answered, I'm for it if the crime
2 merits this extreme. What crimes merit this extreme, in
3 your opinion?
4 A. Well, a capital murder, brutality, total lack
5 of concern for human lives.
6 Q. And you understand, Mr. Dinkins, that not every
7 capital murder is a death penalty case?
8 A. Yes, ma'am.
9 Q. Because if you found a defendant guilty of
10 capital murder, it doesn't automatically mean he gets
11 the death penalty. You understand that, right? And you
12 would be open to waiting and basing your answers to
13 Question Number One and Question Number Two until you've
14 heard all the evidence; is that correct?
15 A. Yes, ma'am.
16 Q. And could you assure both me and Mr. Wentz that
17 you're willing to do that, to keep an open mind?
18 A. Yes. I have no problem with it.
19 Q. Why do you think you would be a good juror?
20 A. Because I would be open-minded. I would give
21 it everything I had and make sure I come to the right
22 decisions.
23 Q. If you found a defendant guilty of capital
24 murder, okay, and you found that that person was a
25 future danger, would you still keep an open mind and

56

1 tell us that you would search to see whether or not
2 there was mitigating evidence sufficient enough that you
3 would give a life sentence. Would you still do that?
4 A. You're saying if I said yes to the first
5 question --
6 Q. Right, would you still keep an open mind and
7 look for any evidence that might be mitigating?
8 A. Definitely.
9 Q. Thank you very much, sir. Do you have any
10 questions of me?
11 A. No.
12 Q. Your last chance.
13 MS. CONNORS: I'll pass the witness, Your
14 Honor.
15 THE COURT: Mr. Wentz.
16 VOIR DIRE EXAMINATION
17 BY MR. WENTZ:
18 Q. Good morning.
19 A. Hi.
20 Q. For the next, oh, fifteen minutes or so, I'd
21 like to talk to you about -- basically, I want to talk
22 to you about you. And I'd like for you, if you would,
23 to begin to do something you began to do this morning,
24 and that's tell me the reasons why you answered the
25 questions that I put to you in the manner in which you

57

1 do. It's quite obvious from the questionnaire. You've
2 listened to the Judge. You've listened to Claire.
3 You're going to be able to answer any questions I put to
4 you. And if you really probably tried, you could answer
5 it in the way you think I might want to hear that answer
6 come back.
7 But for, as I said, about the next fifteen
8 minutes, the only thing I want to hear is what you truly
9 believe. Because when twelve people come to judge this
10 case, it's always my thought that the values and the
11 beliefs that make each one of us a unique person really
12 come into play and help shape the decision they come up
13 with. How do you feel about that?
14 A. I agree with that totally.
15 Q. This is a very individualized process. That's
16 why we're talking to you, personally, individually, and
17 by yourself. There is only one person on trial in this
18 case, and that's Charles Mamou. We sometimes come down
19 here and we lump people into categories; attorneys,
20 defendants, jurors. Well, each one of us is unique.
21 You think you could judge Charles' case on its own
22 individual merits with the guilt/innocence and, if you
23 should find him guilty, at the punishment phase?
24 A. Yes.
25 Q. How do you feel about the prospect of becoming

58

1 a juror in this case?
2 A. Well, I have -- this is the first time I've
3 ever been involved in anything like this. I've been on
4 a civil trial before. I've got a lot of mixed feelings
5 about it, some positive and some negative.
6 Q. Tell me the positive and tell me the negative.
7 A. The negative is facing the traffic, getting
8 down here every morning. I live in Kingwood. The
9 parking. The positive is it's a learning experience. I
10 find it interesting.
11 Q. What things have you learned so far?
12 A. Just what we're going through right now, it's
13 all a learning experience. I've never done it before.
14 I didn't know this is the way jurors were picked for
15 this type of case. I didn't know it was one on one, so
16 everything we're going through right now is a learning
17 experience.
18 Q. Now one of the things we've been told is that
19 when it comes to the second part of the trial -- and I'm
20 going to jump to this. We're going to maybe come back
21 to the first part. You get to answer these Special
22 Issues. And the first Special Issue asks you to decide
23 whether or not the State's proven to you something
24 beyond a reasonable doubt. And each of those words in
25 the Special Issues, except for reasonable doubt, are

59

1  going to mean whatever they mean to you.  There is no
2  legal definition, as the Judge told you.  How do you
3  feel about the prospect of, in a sense, determining
4  whether or not somebody is going to receive the death
5  penalty based on your ability to predict what they're
6  going to do in the future?
7       A.  Well, you just have to weigh everything that
8  was presented to you.  You can't predict what a person
9  is going to do; but you could have a feeling inside, a
10  strong feeling one way or another, I'm sure, by the time
11  it's all over with.
12      Q.  And I think that when you were -- the Judge was
13  talking with you, he talked about it not being just a
14  strong feeling.  Well, I don't think he used that word,
15  although I think I understood what you're saying.  He
16  was talking about, is there a probability?
17      A.  Right.
18      Q.  And it always seems to me that we hear
19  evidence; we hear things, and we form judgments about
20  what we hear.  And you know by the time you get to the
21  Special Issue Number One, you're going to have decided
22  that person is a capital murderer, which basically is a
23  pretty condemning definition of a person.  And you look
24  at this Special Issue Number One and say, well, is that
25  person possibly going to be a future danger to society?

60

1  Can you tell me what -- you know, you used this word, a
2  strong feeling, not so strong feeling.  What are you
3  telling me when you use those words?
4       A.  Basically, I guess you'd look back at the
5  previous things that have happened to them before, what
6  their, you know, reputation was and develop your
7  feelings from that, I guess.
8       Q.  Okay.  All right.  One of the things that the
9  Judge told you is that prison is part of our society.
10  And if I'm not mistaken, in your questionnaire there was
11  a question -- I think it's Number 33 -- says your
12  mother-in-law's husband was sent to prison.  It's on
13  page 9.
14      A.  Right.
15      Q.  Can you tell me a little bit about that,
16  please?
17      A.  We weren't -- we're not close, but I know it
18  was drug-related.  It was -- that's basically all I
19  know.
20      Q.  How long did he stay in prison, if you know?
21      A.  I don't know.
22      Q.  You don't even know if he's in or out at this
23  time?
24      A.  He's out.
25      Q.  Do you know if that was a good experience for

61

1  him in the sense that he may have learned something from
2  it, or it's just he went and became a repeat offender?
3       A.  I have no idea.
4       Q.  Okay.  Do you think that it's possible that
5  prison actually could be a good thing for somebody?  In
6  other words, they are found to have done something
7  wrong.  They are punished.  They are sent away and at
8  some point conceivably released, hopefully, a different
9  person.  Do you believe that's a possibility?
10      A.  Well, I consider that one of the reasons to
11  send someone to prison, with the hope they would come
12  out a better person.
13      Q.  Okay.  With Special Issue Number Two, had you
14  ever thought about things that might lessen a person's
15  punishment before in the context that we're talking
16  about?  And I'm just talking about, just generally
17  speaking.
18      A.  Have I thought about it before?
19      Q.  Yeah.
20      A.  Not really, no.
21      Q.  So that basically, when you were going through
22  the questionnaire and you got to Number 68 and you were
23  asked, do you believe mitigating evidence concerning a
24  capital murder defendant's background should be
25  considered in whether or not they received the death

62

1  penalty?  You, at that time, said no.
2       A.  Right, and I really didn't understand the
3  question now that -- right.  I was thinking about
4  backgrounds, their upbringing, where they come from,
5  this, that, and the other.  That's why I answered no on
6  that one.
7       Q.  Can you see, though, that in Special Issue
8  Number Two, that that's exactly what Special Issue
9  Number Two asks you to do, is to actually go back and
10  look at that background, look at that case that you've
11  already determined, look at the character of the
12  defendant and his background, and then decide whether or
13  not there is something that might warrant him to receive
14  a life sentence.
15          So, basically, Special Issue Number Two
16  asked you to do something that I think you've indicated
17  to me you didn't -- weren't aware of when you answered
18  Special --
19      A.  That's true.
20      Q.  How do you feel about having to do that?
21      A.  You mean, the mitigating part?
22      Q.  Yeah, to have to go back and look through the
23  case again, look through the person's background again.
24      A.  I don't have a problem with it.  I think that's
25  very important.

63

1   Q.   Why?
2   A.   To establish the severity of the punishment.
3   Q.   Do you consider life imprisonment a severe
4   punishment?
5   A.   Yes, I do.
6   Q.   One of the things that a case -- the Special
7   Issue asks you to do is look at the case itself.  And
8   you know that basically by -- if you get to Special
9   Issue Number Two, you basically have a life or death
10  decision to make.  It's overwhelming.  Have you ever
11  heard of a case where somebody had been found guilty of
12  a crime and some time had passed, and it was determined
13  later through things that had come up that the person
14  actually had not done the crime?
15  A.   That has happened, yes.  I can't think of any
16  specifics but yes.
17  Q.   How did you feel about that when you heard
18  about it?
19  A.   I felt like something was definitely wrong.
20  Something was done wrong.  Something slipped through
21  that shouldn't have.
22  Q.   Basically, I think that's in a guilt/innocence
23  phase; but Special Issue Number Two allows you to
24  reconsider whether or not the death penalty should be
25  the appropriate punishment.  It gives you a second

64

1   screening or third screening, if you will, to determine
2   what the punishment should be.
3        As I've talked to you, I've tried to get
4   to know a little bit more about you.  And obviously, I
5   do.  And in talking about the death penalty, you
6   raised -- I think you're very justifiably concerned
7   with -- I think it's in No. 65, if I'm not mistaken.
8   What things do you consider to be important in deciding
9   whether somebody should receive the death penalty or
10  life?  And you talk about the brutality of the crime.
11  I don't want to be insensitive; but we know that in all
12  of these cases, somebody has lost their life, and they
13  shouldn't have lost their life.  And their life has been
14  taken, at least in one sense, in a brutal fashion.  The
15  person was shot, or the person was stabbed, or something
16  like that.  What did you mean by brutality, if you
17  could?
18  A.   Well, to me, there is a difference.  A death is
19  a death is a death.  But to me, in my mind, someone
20  shooting someone one time and he dies, that's -- as
21  opposed to somebody sitting there running off sixty
22  rounds or something in somebody, that's --
23  Q.   I wasn't sure what you meant.
24  A.   That's what I'm saying.
25  Q.   Okay.  One of the things -- I'm going to jump

65

1   to the first part of the trial.  The Judge talked to you
2   about what are called lesser included offenses.  And
3   basically, I've always thought that a juror's job was to
4   define conduct.  In other words, they listen to
5   witnesses and they hear all this evidence, and from that
6   evidence they decide what they think happened.
7        In other words, the State has alleged
8   capital murder; but that doesn't necessarily mean that a
9   capital murder occurred.  Maybe some other form of
10  wrongdoing occurred.  Maybe they say there is a capital
11  murder where somebody's life was taken in the course of
12  a kidnapping.  A juror might be able to listen to the
13  evidence and say, well, yes, there was a kidnapping.  I
14  understand that; but I don't see where this person is
15  responsible for that murder.  That person might be
16  actually guilty of the kidnapping and not the murder.
17  Or conceivably, somebody could listen to the evidence --
18  A.   You're saying somebody was killed in the act of
19  kidnapping?
20  Q.   I'm saying that's what the allegation is.  But
21  as you sit there and you listen to the evidence that
22  comes in, you're satisfied beyond a reasonable doubt
23  that the person kidnapped the person but you're not
24  satisfied beyond a reasonable doubt that they're
25  actually responsible for killing the person, so that

66

1   that person would obviously be guilty of the kidnapping
2   and aggravated kidnapping but maybe not a capital
3   murder.
4        That's why I say the jurors define
5   conduct.  You know what the allegations are, but do you
6   believe beyond a reasonable doubt that the State has
7   proved to you all of the allegations?  It's just like
8   there is an allegation that two people's lives are
9   taken in the course of the same transaction.  It's quite
10  possible that you may say, well, look, I see how two
11  lives were taken; but I don't believe it was in the
12  course of the same transaction.
13       Sometimes we think -- we've just heard
14  about the tragedy in Fort Worth, and that's --
15  obviously, those young people lost their life in the
16  course of the same transaction.  But there may be a
17  situation where the taking of the lives was not so
18  closely connected in time and circumstances.  They
19  weren't -- and you followed the chain of events, so this
20  may not be the same transaction.  It may be two
21  different tragedies, and they would be guilty of murder.
22  Do you see how that can come into play for the people
23  who listen to the evidence?
24  A.   Seems that possibility would exist, yes.
25  Q.   Do you have any questions of me?

67

1   A.   Nothing comes to mind right now.

2   Q.   Last chance.  After you walk out the door, it's

3   too late.

4   A.   No, I can't think of nothing right now.

5   Q.   My one last chance to ask you something.

6   A.   Sure.

7   Q.   Thank you.

8        THE COURT:  Mr. Dinkins, in just a second

9   I'm going to excuse you.  Before I do, I will tell you

10  we want you back a week from this coming Wednesday.

11       (Court admonishes prospective juror.)

12       MATTHEW TAYLOR,

13  having been first duly sworn, testified as follows:

14       VOIR DIRE EXAMINATION

15  BY THE COURT:

16  Q.   How are you this morning?

17  A.   Good.  How are you?

18  Q.   I'm well.  What are you reading?

19  A.   Mystery.

20  Q.   Who did it?

21  A.   I don't know yet.

22  Q.   And that's just exactly what this case is like.

23  Mr. Taylor, before we begin, I'd ask you -- before we

24  begin, I'd ask you to remember back to Friday, the

25  things we talked about on Friday.  Add to it this

68

1   morning.  Out of everything we have talked about so far,

2   do you have any questions at all for me?

3   A.   No, I understand.

4   Q.   Is there anything up to this point, sir, that

5   we have not yet put on the table that you feel as though

6   we should talk about because it might have some bearing

7   on your service as a juror in this case?

8   A.   To some extent, yes.  It's not necessarily

9   about the case.  It's more the length of the case.

10  Q.   Let's talk.

11  A.   All right.  My veterinarian practice, I'm sole

12  practitioner.  I do have an associate I just hired.  She

13  graduated this last spring.  The practice that I have is

14  a fairly small practice, but it requires a lot of work.

15  And I'm -- I have not taken two weeks off for myself

16  since I began, so that's a concern that I have.

17  Q.   I'm interrupting, and I apologize.  But let me

18  ask you this question:  And I just tell you, my personal

19  thought is, I don't think anybody ought to offer

20  themselves as a juror and recognize going in that

21  they're going to be financially punished for having done

22  so.  That's not what this is about.

23  A.   I understand.

24  Q.   So with that in mind, my thought again -- I'm

25  speaking just for myself -- is that you're pretty much

69

1   in control of your destiny, because I'm going to ask you

2   some questions.

3   A.   Uh-huh.

4   Q.   And however you answer the questions are going

5   to influence what result occurs.

6   A.   Of course.

7   Q.   But my question to you is this, Dr. Taylor:

8   Let's assume just a second the time frame, as we talked

9   about, it will begin October 4th and last into the week

10  of October the 11th, but not to that Friday, not past

11  that Friday, which is whatever date that is.

12  A.   Right.

13  Q.   If you were a juror in the case, would that

14  cause you financial problems and business problems?

15  A.   I fear that it would.  I don't know that for

16  certain.

17  Q.   And we're talking basically ten to five, in

18  terms of being here.

19  A.   Correct, yeah.

20  Q.   Would the potential of those problems and the

21  existence -- potential existence of those problems be

22  such that would detract from your ability to concentrate

23  on what you were doing here?

24  A.   That's what I'm afraid of.

25  Q.   Because I know you can see how both sides are

70

1   relying on having the attention span of the twelve

2   people who are going to be making decisions.

3   A.   Of course.

4   Q.   And your thought is that that might be a

5   problem?

6   A.   That could be a problem.

7   Q.   Is your thought that because of the anticipated

8   length of time that both the State, as well as the

9   defense -- because it would apply equally to them --

10  would be better off if you were not a juror in a case --

11  magnitude is not the issue; it's the anticipated

12  duration?

13  A.   That's correct.

14  Q.   And you think each would be better off if you

15  were not a juror for this period of time that?

16  A.   May be the case, yep.

17  Q.   And if you did become a juror, let's just

18  say -- let's take it from the other side.  Would you be

19  able to set the concerns that you have that you

20  discussed with us aside and concentrate on the testimony

21  in the case?

22  A.   I would do my absolute best.

23  Q.   Other than that that we've talked about -- and

24  I don't mean to minimize what we talked about in any

25  way -- is there anything at all other than that that you

**71**

1  can think of about your personal life, professional
2  life, or health, or anything else for that matter, that
3  you feel like would in any way interfere with your
4  ability to be a juror in this case during the time frame
5  we talked about?
6      A.  No, sir.
7      Q.  Do you have any questions before we begin this
8  process?  Do you have any questions for me, sir?
9      A.  Not that I can think of.
10          THE COURT:  Mr. McClellan.
11              VOIR DIRE EXAMINATION
12  BY MR. MCCLELLAN:
13      Q.  Mr. Taylor, just to follow up on that, Mr.
14  Wentz and I've been talking.
15      A.  Sure.
16      Q.  Can you assure us that if you were selected as
17  a juror that there would be no distractions, or are you
18  able to assure us that?
19      A.  There would be no distractions?
20      Q.  Right.  In other words, we need somebody who
21  can give their full attention to this as if this is
22  their job.
23      A.  I understand.  If my associate had been with me
24  longer, I think I could pretty well assure you.  She's
25  quite competent.  However, she's not been out long, does

**72**

1  not have the experience that makes me comfortable.
2      Q.  So you think that you still would have a
3  concern that might affect your ability to give your full
4  concentration to this end?
5      A.  I have concerns, yes.
6          MR. MCCLELLAN:  I think we have an
7  agreement, Judge.
8          THE COURT:  As I understand, there is an
9  agreement by and between the parties that Venireperson
10  Number 49, Dr. Matthew Taylor, by the agreement of all
11  concerned, may be excused.  Mr. McClellan, is that your
12  agreement?
13          MR. MCCLELLAN:  Yes.
14          THE COURT:  Ms. Connors?
15          MS. CONNORS:  Yes, Your Honor.
16          MR. WENTZ:  Yes, Your Honor.
17          THE COURT:  Is it Mr. Hill's, also?
18          MR. WENTZ:  Yes, Your Honor.
19          THE COURT:  Mr. Mamou?
20          THE DEFENDANT:  Yes, sir.
21          THE COURT:  Is it your request that the
22  doctor be excused?
23          THE DEFENDANT:  Yes, it is.
24          THE COURT:  All right.  He's excused.
25

**73**

1                  LINDA KAY COOK,
2  having been first duly sworn, testified as follows:
3              VOIR DIRE EXAMINATION
4  BY THE COURT:
5      Q.  Miss Cook, first off, let me ask you this:  I
6  ask you to remember back to Friday, the things we talked
7  about on Friday; add to them this morning the things we
8  talked about this morning.  Out of everything that we
9  have talked about to this point, do you have any
10  questions at all for me?
11      A.  No, not so far.
12      Q.  Is there anything up to now that we have not
13  yet addressed that you feel as though we should talk
14  about because it might have some bearing or some
15  influence on your service as a juror in this case?
16      A.  No.
17      Q.  Anything at all that you can think of that
18  you're aware of presently that might have something to
19  do with your personal life, your professional life, or
20  health, or anything else for that matter, that you feel,
21  at any rate, would interfere with your service as a
22  juror in this case for the time frame we've talked
23  about?
24      A.  No, sir.
25      Q.  The laws that we have talked about, do you find

**74**

1  any of them objectionable to the degree that if you were
2  a juror you could not follow, as well as enforce it?
3      A.  No, sir.
4      Q.  You understand about being wide open to coming
5  up with whatever you think you ought to come up with
6  before the trial ever begins, but coming up with the
7  answer based upon the evidence that's presented in the
8  case?  Does that sounds like you?
9      A.  Say that again.
10      Q.  I don't blame you.  I heard that question
11  myself.
12      A.  You're going wide open.
13      Q.  I asked it, and I don't even know what it was.
14  Right now, before the evidence begins, are you wide open
15  to come up with any answer?  Whatever answer you do come
16  up with will be based upon whatever evidence you do hear
17  in the course of the trial?
18      A.  Yes.
19      Q.  You've got a legal background?
20      A.  Yes, sir.
21      Q.  Anything about this -- and I'm gathering it's
22  civil?
23      A.  Yes, sir.
24      Q.  Anything about this process or from what you've
25  seen so far that just causes you any problems?

75

1    A.  No, sir.

2    Q.  Discomfort?

3    A.  No.

4    Q.  Allergies?

5    A.  I take shots.

6    Q.  Okay.  With that in mind, I give you

7  Mr. McClellan.

8         MR. MCCLELLAN:  Thank you, Your Honor.

9              VOIR DIRE EXAMINATION

10 BY MR. MCCLELLAN:

11   Q.  Miss Cook, my name is Lyn McClellan.  And with

12 Claire Conners, we represent the State of Texas in this

13 case.  I want to go over your questionnaire, follow up

14 on some of your answers there and talk to you about

15 certain aspects that apply -- of the law that apply in a

16 case like this and see what your opinions are about

17 those.

18        First of all, can you kind of tell me in

19 your own words, what is your opinion about --

20   A.  About the death penalty.

21   Q.  Yes, ma'am.

22   A.  I think it's necessary in some instances, but

23 it depends on what the circumstances are.

24   Q.  Right.  What kinds of cases come to your mind

25 when you think of cases where you think the death

76

1  penalty ought to be available as a possible punishment?

2    A.  What kind?  You mean, you want me to give you

3  some examples?

4    Q.  Something that may come to your mind.  What

5  kinds of cases?

6    A.  If it's intentional, to maliciously hurt

7  someone.  For instance, the lady that was on death row,

8  the first woman that was killed.

9    Q.  Carla Faye Tucker?

10   A.  Yes.  I didn't remember her name.  I think she

11 deserved the death penalty.

12   Q.  Some people come and tell us that they are in

13 favor of the death penalty as a form of punishment for

14 certain types of crime.  Certain other people come and

15 tell us that and go further and say they don't believe

16 they could participate, though, in a process whereby

17 they would be called upon to make decisions to answer

18 these questions over here, knowing that in doing so,

19 they would be ordering this Judge to order the execution

20 of this defendant sitting over here on trial.  Do you

21 have any doubts about your ability to participate in

22 that type of process and make that type of decision if

23 that's what the law and the evidence called for?

24   A.  I don't have a problem with it, no.

25   Q.  Okay.  You talked about the type of cases you

77

1  think the death penalty ought to be available for would

2  be intentional type crimes, of course.  You now know

3  that murder in the State of Texas is the intentional

4  taking of another person's life without any legal

5  justification.  By that I mean, by legal justification,

6  it's not self-defense.  It's not an accident.  Because

7  those wouldn't be murder.

8         Murder is when you intend to kill somebody

9  and do something to carry out the intent to do it.  And

10 for the offense of murder, as the Judge told you, the

11 death penalty doesn't apply unless there is some other

12 crime committed along with it.

13   A.  Uh-huh.

14   Q.  We have alleged in this case murder during a

15 kidnapping.  There are other kinds of cases the

16 Legislature says the death penalty applies to; and that

17 would be murder during a robbery, murder during a

18 burglary, murder during a sexual assault, killing a

19 police officer in the line of duty, killing a child

20 under a certain age are the kinds of cases the

21 legislature says the death penalty ought to be available

22 for.  There is no provision in the State of Texas where

23 you automatically get the death penalty upon being

24 convicted of that crime.  Are those the kinds of cases

25 you think the death penalty ought to be available as one

78

1  form of punishment?

2    A.  Yes, I do.

3    Q.  In your questionnaire, also, we asked you --

4  let me see if I can find the questionnaire up here and

5  let you look at the copy.  If you would, turn to Page

6  13.  There was two lists of groups of five.  And the

7  first one said, Check the statement which best

8  summarizes your general views about the death penalty.

9  And you checked, I'm opposed to the death penalty except

10 in a few cases where it might be appropriate.

11        One of the other options in Number Three

12 is, I'm generally not opposed or generally in favor of

13 the death penalty.  You chose No. 2 out of all the five

14 that are available.  And that, quite frankly, indicates

15 to me that there is some possible opposition to the

16 death penalty.  I don't know.  I'm just trying to find

17 out what you were --

18   A.  It depends.  I have to hear all the facts.

19 I've been in a lot of trials.  And I have to hear both

20 sides, and then I can make my decision.

21   Q.  All right.  So you think if you heard evidence

22 sufficient to convince you that the questions ought to

23 be answered in such a way that death results, you could

24 do that?

25   A.  Yes, sir.

79

1    Q.  And you said -- made a point, which is common,
2  and a lot of people talk about it -- I need to hear both
3  sides.  Of course, on the civil side you always get to
4  hear both sides.
5    A.  Right.
6    Q.  Criminal side you don't always get to hear both
7  sides.  Defendant has a right not to testify.
8    A.  Right.
9    Q.  I couldn't call him if I wanted to.
10    A.  Right.
11    Q.  They'll make that decision, whether or not he
12  does or does not testify.  But you'll be instructed by
13  the Court as to whether he does or doesn't, you shall
14  not consider that as any evidence of his guilt if he
15  refuses -- not if he refuses -- but if he elects not to
16  testify.  Okay?
17    A.  Uh-huh.
18    Q.  Any problem with following that aspect?
19    A.  No.
20    Q.  So, you understand you may be called upon to
21  make your decision based upon just hearing the evidence
22  presented by the State.  Now that doesn't mean the
23  defense won't attack that by cross-examination and other
24  means.  I mean, they have no burden to produce any
25  evidence at all.  Not only his testimony they don't have

80

1  to present, they don't have to call any witnesses to do
2  anything.  They can just rely upon cross-examining the
3  State's witnesses and thinking that that created
4  reasonable doubt that would prevent a jury from finding
5  the defendant guilty.
6        Same applies to the punishment stage of
7  the trial.  You may look at Issue Number Two, where it
8  talks about mitigating circumstances.  In other words,
9  reasons why someone should receive life as opposed to
10  death.  And logic would dictate that you expect this
11  side over there to come forward with evidence to
12  convince a jury -- try to convince them to give him life
13  as opposed to death, but there is no burden to do that.
14  The burden always lies with the State of Texas.  It
15  never shifts.  Any problem with that aspect?
16        By the same token, we have a different
17  burden of proof over here.  We have proof beyond a
18  reasonable doubt.  Sometimes I think people confuse that
19  by thinking we have to have one hundred percent
20  certainty and all that.  Well, I can tell you right now
21  I could never prove anything a hundred percent
22  certainty.  I suggest you'd have to be a witness in
23  order to be satisfied to that extent.  You have to make
24  your decision.
25        Just like on the civil side, where people

81

1  take the stand and they testify about things they heard,
2  what they saw, things they did.  They have experiments.
3  They may have conducted scientific evidence, whatever.
4    A.  Right.
5    Q.  And you'll have to make your decision based
6  upon that, and you'll never be 100 percent certain on
7  that situation, as well as on this side you have an
8  indictment that alleges the elements of the offense.
9  You have to prove those beyond a reasonable doubt.
10  There may be lots of other questions about what went on
11  around the situation.  If they're not elements of the
12  offense, it doesn't matter what you said about those.
13  It's about the elements of the offense.
14        Two stages of trial.  Guilt/innocence.
15  First part of the trial we had to prove what's in the
16  indictment beyond a reasonable doubt.  If you do so, you
17  find the defendant guilty.  If you don't do so, you find
18  him not guilty.  It's basically kind of a checklist,
19  going through and checking if we prove that the
20  defendant on a certain date, in Harris County, Texas,
21  took the life of a certain person during the course of a
22  kidnapping.  If you prove all those beyond a reasonable
23  doubt, check off that list, then he's guilty of capital
24  murder.
25        But that doesn't tell you what punishment

82

1  he's going to receive, because then you have to go to
2  the punishment stage of a trial where you're given
3  questions.  And before you get to the decision at the
4  punishment stage of the trial, you may hear additional
5  evidence, additional evidence that was not relevant to
6  whether or not the defendant committed the crime,
7  whether or not he committed murder on a certain date, in
8  Harris County, Texas, during the course of a kidnapping,
9  but evidence about a defendant's character, their
10  background, their criminal history, or their mental
11  abilities or disabilities, all the things about the
12  individual's family, how he grew up, and all kinds of
13  things about his upbringing.
14        Because the emphasis -- and punishment is
15  punishment this defendant should receive for the crime
16  we've already found him guilty of.  So that's why the
17  concentration on the individual defendant who is on
18  trial, because then that helps answer these questions.
19  So in answering these questions at punishment, you get
20  to use two bodies of knowledge.  One, the crime itself,
21  which you heard at guilt/innocence.  Then the character,
22  background, and that kind of information that you hear
23  at the punishment stage of trial.  Okay?
24    A.  Uh-huh.
25    Q.  Some people might say -- like on Issue Number

83

1   One it says: Do you find from the evidence beyond a
2   reasonable doubt -- and there again, still the same.
3   The burden's on me that there was a probability that the
4   defendant would be a continuing threat to commit future
5   acts of violence.
6        Some people might say, if I found him
7   guilty of capital murder, I always believe there is at
8   least a probability that he would be a continuing threat
9   to commit other acts of violence. That may or may not
10  be the case; because at the punishment stage of the
11  trial, you may hear background, character. You may hear
12  the person is a Boy Scout, straight-A student, altar
13  boy, never been in trouble with the law before in his
14  life. This act of capital murder, which has no doubt
15  happened, you found beyond a reasonable doubt was a
16  total aberration from the rest of his life. And by
17  finding he is not going to be a continuing threat
18  doesn't make him not guilty. That doesn't undo it. It
19  just decides what punishment he's going to receive.
20       On the other extreme, you may find a
21  person that's been in and out of trouble all of their
22  life and a constant sore to society's side. So, there
23  again, you have to wait until you hear all the evidence
24  to make up your mind. Any problem with that aspect.
25       A.   No.

84

1        Q.   If you found Issue Number One to be yes, then
2   you go to Issue Number Two. It basically asks you to
3   stop and evaluate everything you've heard so far. It
4   says: Taking into consideration the circumstances of
5   the offense -- which would be what you heard at guilt or
6   innocence -- the defendant's character and background --
7   that would be what you heard at punishment -- and
8   whether or not you consider his personal moral
9   culpability -- I'd like to refer to it as his personal
10  responsibility for the commission of the crime -- and do
11  you find there is sufficient mitigating circumstance or
12  circumstances -- I'd like to refer to it as sufficient
13  reasons why this person ought to receive life as opposed
14  to death.
15       For example, what you're asked to do is go
16  back and listen to all the evidence in the trial and
17  weigh it in your mind. Was it mitigating? And if it
18  was, is it sufficiently mitigating for me to change my
19  vote from death to life? And the reason it's that way
20  is because if you've already found him guilty, which you
21  had to to get to the punishment stage --
22       A.   Right.
23       Q.   -- if you found on Issue Number One he's a
24  continuing threat, he's going to get the death penalty
25  unless you decide in Issue Number Two there is some

85

1   reason or reasons why he should not.
2        A.   Right.
3        Q.   So, you might look back to the evidence. And
4   you might, say, remember hearing evidence in the trial
5   the defendant was high on drugs or alcohol when he
6   committed a crime. Juror Number 1 would say, I think
7   that was a life sentence; because if you're high on
8   drugs and alcohol, you do things you wouldn't ordinarily
9   do. Juror Number 2 may say, I don't think it's
10  mitigating at all, because I know people on drugs or
11  alcohol who don't commit capital murders. I don't see
12  the connection between those factors.
13       So, two people have looked at the very
14  same evidence and came up with different opinions. And
15  that's okay, because this is what the question asks you
16  to do. It's for you, yourself, to look back at the
17  evidence and you, yourself, decide what effect it ought
18  to be given. Okay?
19       Same thing about the age of the defendant.
20  Some people may say, He was a young man. And when
21  you're young, you make stupid decisions. Get older,
22  you're more mature. I think that mitigates a life
23  sentence. Another juror may say, I don't think it
24  mitigates at all. At this age the boy committed the
25  most heinous crime. No telling what he's going to be

86

1   doing ten or fifteen years down the road. Again, two
2   people looked at the same evidence but came up with
3   different opinions. But that's okay.
4        Same thing about a person's mental
5   abilities or disabilities. Maybe there is evidence that
6   he's a slow learner or special ed student, or maybe he
7   couldn't get out of high school. One person may say, I
8   think that's mitigation towards a life sentence.
9   Another person may say, I know all kinds of people who
10  didn't get out of high school and went on to have
11  productive lives. They don't go out and commit capital
12  murder. I don't see any connection there between the
13  two.
14       What it asks you to do is to go back and
15  look at all the evidence, and you weigh it in your mind
16  and make up your mind. Any problem with that?
17       A.   No, sir.
18       Q.   The law says that if you -- that voluntary
19  intoxication is not a defense. In other words, if I go
20  out and get high on some substance or whatever, go out
21  to commit a crime, I'm still held responsible for that
22  crime. Do you agree with that aspect of the law?
23       A.   Yes. I mean, you voluntarily did it. You did
24  it to yourself.
25       Q.   Right. It's different. That's why it says

87

1  voluntary intoxication. It's different if somebody
2  slips something in your drink and causes you to go off
3  on a binge or whatever. Anything that you have thought
4  of or that comes to your mind since we've been talking
5  about this or since you have gone through this process
6  that you say, well, if I ever heard evidence of this,
7  whatever that might be, that would always be mitigating
8  in my mind to such a degree that I would think a life
9  sentence is the appropriate punishment. Anything you
10 thought of or comes to your mind?
11    A. No. Every person is different. You have to
12 consider the factors for that one person in that
13 incident.
14    Q. After having filled out this questionnaire and
15 listened to the Judge's voir dire and had over the
16 weekend to think about it, what is your thought about
17 the prospect of being a juror in a capital murder case
18 where you're called upon to make a decision that a
19 person may have to forfeit their life for a crime you
20 may find they're guilty of?
21    A. I thought I would already have been struck by
22 one of y'all, personally.
23    Q. Why? You may still yet be.
24    A. Well, I know; but because I am in the legal
25 profession, and even though it's the civil side, I don't

88

1  know. I just thought I would. I've never been
2  through -- I've been on jury duty before, but I've
3  always been struck. It's been years since I served, and
4  I kind of thought I was overdue to serve.
5     Q. Now if, let's say, you were a juror in a case,
6  you're going to be given instructions from the Court,
7  the law. You have to judge the facts yourself. Is
8  there anything about your legal background that you
9  think would make you better equipped or less equipped?
10    A. No. It's just that I kind of understand the
11 process probably more, the way things work in the
12 courtroom.
13    Q. Okay. All right. Obviously, both of us are
14 going to be faced with a decision as to whether or not
15 to accept you or not.
16    A. Right.
17    Q. Can you give me a reason why I should take you
18 as a juror?
19    A. I'm a very fair person. I always try to see
20 both sides. And that's one of the things that my
21 friends tell me about me is that, you always look at
22 both sides.
23    Q. Okay.
24    A. I may have an opinion, but I always weigh both
25 sides.

89

1     Q. Can you give me some reason why I should not
2  want you as a juror?
3     A. I don't know.
4     Q. Okay. You were a witness to a robbery; is that
5  correct?
6     A. Uh-huh.
7     Q. So you were inside the store when somebody came
8  in and robbed the store?
9     A. Yes.
10    Q. Was that person ever prosecuted?
11    A. I don't know. When the police came, we left.
12 I was with some people from Scotland, and they didn't
13 want to hang around and be detained here to be
14 witnesses.
15    Q. Right, okay. How did that make you feel,
16 seeing a robbery go down?
17    A. Well, I reacted -- I was surprised, because it
18 was kind of scary.
19    Q. Were you the object of the affection of the
20 robber?
21    A. No, no, no. We were in the store, and this guy
22 had been in and left. And we were, you know, on one of
23 the rows where they couldn't really see us. So the guy
24 comes back in, and he knocked everything off the
25 counter. So I said, Get down. And then he --

90

1     Q. Get down, you're in Houston?
2     A. Right. So the guys got behind, and he ran out
3  the store. And the storekeeper ran after him, and then
4  we went and called 911. And when the police got there,
5  we left.
6     Q. You also indicated you had a friend that had
7  been murdered.
8     A. That was in 1989.
9     Q. Was anybody prosecuted for that offense?
10    A. To this day, no.
11    Q. Was that in Houston?
12    A. She lived in Houston. She was taken from her
13 home, and she was left in Fort Bend County.
14    Q. Okay. Anything about that that would affect
15 your --
16    A. That doesn't have anything to do with this
17 trial.
18    Q. All right. Thank you very much, Miss Cook. I
19 appreciate your time, and I want to pass you to the
20 Court.
21          THE COURT: Mr. Wentz.
22             VOIR DIRE EXAMINATION
23 BY MR. WENTZ:
24    Q. Good morning.
25    A. Morning.

91

1      Q.  As you've been told, my name is Kurt Wentz.
2  And along with Wayne Hill, we're representing Charles
3  Mamou.  And you have your questionnaire with you?
4      A.  Yes, I do.
5      Q.  I'd like to go over it a little bit more, if I
6  might.
7      A.  Okay.  I got kind of tired of completing it
8  near the end.
9      Q.  That's okay.  My questions are going to be at
10  the beginning.
11      A.  Okay.
12      Q.  But before I get there, as you said, you're
13  involved with the legal process.  You know, you come
14  down here quite sophisticated about what's going on in
15  trials and things like that.  You know about the Carla
16  Faye Tucker case, so you know something about capital
17  murder.
18      A.  Well, I don't know all about that case.  I just
19  know what I heard when she was executed from TV.  I
20  didn't follow the case when it happened.
21      Q.  Were you aware that our capital murder cases
22  are handled in the manner that the Judge has outlined
23  for us, or for you?
24      A.  No.  I was very surprised at the jury selection
25  and everything else.  I didn't know that.

92

1      Q.  Did you know anything about the Special Issues
2  that you'd have to answer?
3      A.  Not really, no.  I was in the courtroom during
4  a murder trial in 1993 in Ted Poe's court.
5      Q.  Could you tell us why you were there?
6      A.  My -- it was Billy Ray Clure, who shot his
7  father in one of those health care facilities.  He had
8  gone into a coma.  And my sister is married to Billy's
9  brother, so I was there just for support of the family
10  and to bring family members to and from the court.  But
11  he was acquitted, so --
12      Q.  Did you feel okay being there for this person?
13      A.  Yes.
14      Q.  Did you feel it was the right thing to do?
15      A.  Yes, I did.
16      Q.  Did you feel that -- you indicated he was
17  acquitted.  Did you feel that was the right thing?
18      A.  Under -- there were mitigating circumstances,
19  yes, and I feel it was the right thing to do.
20      Q.  And I think that one of the things you've told
21  us already is that, basically, you look at the person,
22  you look at the circumstances, and then you basically
23  make your judgments and form your opinions.
24      A.  Uh-huh.
25      Q.  Early in the questionnaire, you were asked a

93

1  series of questions; agree, disagree, strongly,
2  whatever.  They're on Page 6; and they're 11, 12, and
3  13.  And basically, you said you generally agree to all
4  of those propositions.  Can you tell me overall why you
5  chose that particular response to the --
6      A.  Because you have to look at that individual and
7  their circumstances.  I didn't grow up the same way you
8  did or the court reporter and the Judge.  We all have
9  different environments we live in even today.  So I
10  think the -- how you live, you know, affects what you
11  do.
12      Q.  One of the things that probably come up in the
13  way that some people live is their exposure to drugs.
14  It may be less.  It may be more.  It probably is an
15  individual matter.  And you're asked a series of
16  questions that touch on the subject of the drugs.  And
17  on Page 10, Question 46, you're asked:  Would an
18  individual's use or sale of drugs prevent them from
19  relying on any defense available to other members of the
20  society?  And you say yes.  You give an explanation.  I
21  was wondering if you could talk with me a little bit
22  about that.
23      A.  Well, in the firm that I work in, we just had a
24  secretary that was a cocaine addict.  She had a child,
25  and she's just had that child taken away from her.  She

94

1  went for rehab for the third or fourth time, but she's
2  had a relapse.  And I used to go in my office every day
3  and close the door.  So, I didn't know what she was
4  going through, what was going on.  But she knew, because
5  she had been on crack cocaine before.  But she still
6  went back after being on it for three years.  I knew she
7  knew that and what it would do to her body and what it
8  could possibly do to her child.
9          I mean, if people -- there is all this
10  stuff today on TV.  People know.  I mean, it's in
11  programs on TV.  It's in the paper.  It's in magazines.
12  It's on billboards.  I mean, it's the law that certain
13  drugs are illegal.  It's not -- unless you were probably
14  somebody foreign that came here and could not read or
15  write, maybe you wouldn't know.  I mean, it's pretty out
16  there.
17      Q.  I think one of the things that this question
18  might have been directed to ask is whether or not if
19  somebody used or sold drugs that they could have
20  available to them at their trial some of the defenses
21  that you or your friends at your law firm might have.
22  In other words, self-defense for an example.  If
23  somebody were, let us say, a drug -- somebody who sold
24  drugs, and they were held up at gunpoint or they were
25  threatened; a gun was put in his face.  Would that

95

1  person have the right to rely on the self-defense?
2      A.  If someone was trying to harm them with a gun,
3  they should have a defense.  Even though what they were
4  doing was illegal, no one else has the right to come and
5  shoot them or hurt them.
6      Q.  I think that's generally what the question was
7  going to say, but I appreciate you sharing with us what
8  happened with your coworker.
9          In Question Number 68, which is, I think,
10 on Page 13, there is a question about mitigating
11 evidence.  And when you were answering that question,
12 what did mitigating evidence mean to you?
13     A.  Mitigating, I would have to hear all the facts
14 about that.  What happened?  Why did they get to this
15 point in their life to get -- for this event to occur?
16     Q.  Essentially, the things that are talked about
17 in Special Issue Number Two.
18     A.  Right.
19     Q.  Okay.  Actually, that mitigating evidence can
20 also be taken into consideration, if you think it's
21 appropriate, in Special Issue Number One, if you think
22 it goes to helping you answer Special Issue Number One,
23 as well as how it can come into play in both situations.
24     A.  Right.
25     Q.  But certainly, Special Issue Number Two, it is

96

1  given primary importance; because at that point, you're
2  put in the position of essentially answering that life
3  or death question.
4      A.  That's pretty serious, too.  That's a serious
5  question.
6      Q.  I'm going to talk with you about the Special
7  Issues now.  One of the things that I've had is we
8  sometimes arrive at decisions about people.  And after
9  we come to that decision or that opinion about the
10 person, we're apt to make a lot of other assumptions
11 about the person, and they may not be right.
12     A.  Uh-huh.
13     Q.  The example that I used the other day was the
14 kid who goes to school, and he does real bad on one of
15 those standardized tests; or he gets to school, and he's
16 just not performing well, and the teacher assigns him to
17 the slower classes.  And, you know, the kids say, well,
18 you're in the slow class.  You're probably dumb.  And
19 people begin to treat him as he's not very bright.  But
20 in fact, he may be quite bright.  And it's all based on
21 that one initial decision.
22         When you get to Special Issue Number One,
23 you've already formed a pretty important decision in
24 your mind.  You've found somebody, a fellow citizen,
25 guilty of capital murder.  And having come to that

97

1  conclusion, it's quite possible for you to look at those
2  Special Issues and say, Hey, these are pretty easy.
3  Somebody who's guilty of a capital murder is going to be
4  a future danger to society.  Look what they already have
5  done.  How do you feel about that.
6      A.  Well, when you get to the Special Issues,
7  that's the punishment phase.
8      Q.  Exactly.  I'm just saying, at guilt/innocence
9  you've come to this decision that the person is guilty
10 of society's worst crime.  And you take that evidence,
11 you take that opinion with you into the punishment
12 phase.  And obviously, you're supposed to be starting
13 all over.  But, you know, at the very least you've got
14 the evidence of the crime.
15     A.  You've already got that in your mind, right.
16     Q.  As you've just said, you've already got that in
17 your mind.  How do you see Special Issue Number One?  Is
18 this something that's already been answered for you, or
19 is this based on your initial decision?  You begin to
20 start all over again and look at that question and
21 evidence.
22     A.  Well, knowing me, I'd probably look at it when
23 I hear additional information about that person.  And
24 that would affect how I answered Number Two.  If I'm not
25 going to know his past, you know, if he's been convicted

98

1  of a crime, drug use, child abuse, if he was abused as a
2  child, what happened to him, then you know, I'd have to
3  take that into consideration.  Because I would want that
4  same thing to happen to me if I was in his place.  I
5  would want the people to look at all the facts and weigh
6  that, because it's a pretty heavy decision.
7      Q.  And I think the Judge told you these decisions
8  that you make are independent of each other.  The
9  guilt/innocence decision was its decision.  Special
10 Issue Number One is its decision.  Special Issue Number
11 Two is its decision.
12     A.  Right.
13     Q.  And when you look at Special Issue Number One,
14 all of the words in that Special Issue are going to be
15 what they mean to you, except for the definition of
16 proof beyond a reasonable doubt.  And the Court's going
17 to give you that definition.
18     A.  Right.
19     Q.  It's going to be the same definition that you
20 get in the guilt/innocence phase.  I'm not sure if they
21 had the definition in 1993.  But the words that are
22 defined are the following words:  Proof beyond a
23 reasonable doubt, therefore, must be proof of such a
24 convincing character that you would be willing to rely
25 and act upon it without hesitation in the most important

99

1   of your own affairs.
2           There are some other words; but that
3   certainly, in my opinion, is the crux of it.  How do you
4   feel about having to predict somebody's future in terms
5   of whether or not that person is to receive the death
6   penalty?
7       A.  How do I feel about it?  I take it pretty
8   seriously.
9       Q.  Why?  I mean, is it the fact that you're called
10  upon to predict somebody's future?  Is it the
11  consequences?
12      A.  It's a little of both.  It's a little of both,
13  because you have -- I mean, that's going to affect
14  what's going to happen to him.  And I would want, you
15  know, the same considerations for me or somebody that I
16  cared about.  So, I take it very seriously.
17      Q.  I've got no doubt that you would.  In Special
18  Issue Number Two, they talk not only about -- well, they
19  talk about mitigating circumstances; and they say they
20  can come from three different areas; the nature of the
21  crimes, the circumstances of the offense, the
22  defendant's character and background, and his personal
23  moral culpability.  Can you see a circumstance of a
24  crime being mitigating?
25          Let me give you an example.  Somebody goes

100

1   into a store, just like you said, only the person's
2   crime is a whole lot more aggravated than what you had
3   to witness and experience.  And they go in with the
4   intention of actually shooting the person, and indeed
5   they do.  Therefore, you would have a capital murder.
6           Another person may go into the store not
7   quite with that intention.  They go in to rob the store;
8   but in the course of what happens, guns go off.  I use
9   the example, there is almost a fire fight between
10  different people having guns.  And lo and behold, the
11  same horrible result occurs.  You had the same result,
12  but you have it happening in different circumstances.
13  That might be something that you would consider in terms
14  of the circumstances of the offense, the person who does
15  go in with the intent to kill initially as opposed to
16  one who, ultimately, that happens; and there is no
17  justifying it because it happens in a different way or
18  circumstantially.
19          There may be some aspects of self-defense
20  that doesn't reach the level of finding the person not
21  guilty; but clouds are hanging over your decision, and
22  you think that it might warrant this person to receive
23  life imprisonment.  You see how the circumstances of the
24  crime can come into play?  I'm not saying they would,
25  but could come into play in answering Special Issue

101

1   Number Two.
2       A.  Yes, I do.
3       Q.  Because I think sometimes there is all this
4   focus on background; but the mitigating evidence could
5   come from other sources, as well.  I'm searching for
6   things to ask you; and I don't want to, you know,
7   belabor your time and, you know, take advantage of your
8   sitting there.  Is there something you think I should
9   ask you?
10      A.  Well, no.  I've never gone through this
11  process, so I don't know what you're supposed to ask me.
12  I do want to make this comment, though:  I do know that
13  even today, that no matter what your age is, you can go
14  out sometime and be in a situation and something could
15  happen to make that life threatening.  Or like kids can
16  go out, you know, and be just going out and be
17  somewhere.  And then a group of kids can come, or some
18  more criminal element.  I'm not saying they're
19  criminals; but things can happen, and things can get to
20  a bad situation when the evening didn't start out that
21  way.  And things do happen; and you can find yourself
22  like that, like that night we were in that store.  We
23  were there just to get some stuff for their hotel room
24  and leave; but, you know, I wasn't ever really that
25  afraid, because the guy didn't have a knife and he

102

1   didn't have a gun.  So I didn't really think he was
2   going to hurt us.  But, you know, we started out
3   innocent; but we got involved in something that we had
4   no idea it was going to happen.
5       Q.  One of the things that Mr. McClellan mentioned
6   is this thing called the burden of proof, and he was
7   very accurate in saying the defense does not have the
8   burden of proof at guilt/innocence.  We don't have the
9   burden of proof with regards to special Issue Number
10  One, and we're not required to bring you evidence that
11  would prove that there is mitigating circumstances.
12          And I know that you've heard this thing
13  called the defendant's Fifth Amendment right not to
14  testify.  And you understand that also applies at the
15  punishment phase of the trial, because very frequently
16  people will expect to hear feelings of remorse come from
17  the accused on trial and figure that that's very
18  important.  But if you have a Fifth Amendment right and
19  you exercise that right, then obviously you're not going
20  to be expressing those feelings for the jurors.
21      A.  Right.
22      Q.  You wouldn't hold that against a defendant,
23  would you?
24      A.  No, I would not.  I have that right, also; and
25  so do you.

103

1    Q.  Thank you very much.
2        THE COURT:  Thank you, sir.
3        (Court admonishes juror.)
4            JUDITH LYNNE BARNETT,
5    having been first duly sworn, testified as follows:
6            VOIR DIRE EXAMINATION
7    BY THE COURT:
8    Q.  Miss Barnett, how are you this morning?
9    A.  I'm fine, thank you.
10   Q.  Good.  Miss Barnett, at the outset, let me ask
11   you this:  Going back to the things we talked about on
12   Friday, add to them this morning and the things we
13   talked about.  Out of everything we have talked about to
14   this point, do you have any questions at all for me?
15   A.  No.
16   Q.  Is there anything, any topic that we have not
17   yet addressed that you feel as though we need to talk
18   about because it might have some bearing or some
19   influence on your ability to be a juror in this case?
20   A.  No.
21   Q.  Is there anything at all, whether it might be
22   something about your personal life, your professional
23   life, your health, or anything at all for that matter,
24   that you can think of that might in any way interfere
25   with your ability to be a juror in this case during the

104

1    time frame we've talked about?
2    A.  No.
3    Q.  The rules that we've talked about, anything
4    that you've heard so far that causes you some
5    disagreement?
6    A.  No.
7    Q.  The whole idea, I think I said earlier, was
8    just to make sure that starting off the case, everybody
9    recognizes they're going to have to be led to whatever
10   result they reach on the basis of how they evaluate
11   whatever evidence was presented to them.  Does that
12   sound --
13   A.  Yes.
14   Q.  The questions we talked about and the possible
15   verdict, can you see how each question that the jury
16   resolves is independent of how the next question should
17   be answered?
18   A.  Yes, I do.
19   Q.  Any questions of me?
20   A.  No.
21   Q.  Thank you.
22       THE COURT:  Miss Connors.
23
24
25

105

1            VOIR DIRE EXAMINATION
2    BY MS. CONNORS:
3    Q.  Miss Barnett, I'm going to ask you some
4    questions; but I just want you to just relax.  We just
5    want to know how you feel.  Okay.  It's not a test or
6    anything.  What is your opinion of the death penalty?
7    A.  My opinion of the death penalty?
8    Q.  Yes, ma'am.
9    A.  I think it's warranted in certain cases.
10   Q.  And what type of cases would those be?
11   A.  I would think grievous and heinous crimes
12   deserve the death penalty.
13   Q.  You said something in your questionnaire about
14   the things that are important in deciding whether a
15   person should be sentenced to the death penalty or life
16   imprisonment.  And you said, nature of the crime/
17   mitigating circumstances.  What would be the mitigating
18   circumstances in your mind?  What things would be
19   mitigating?
20   A.  A large degree of mental retardation probably.
21   I can't think of anything right offhand, but that one
22   comes to mind.  I'm sure there are others.
23   Q.  You worked for the Texas Department of Human
24   Services for a very long time?
25   A.  Uh-huh.

106

1    Q.  What did you do for them?
2    A.  I started as a case worker and ended up as
3    regional -- deputy regional administrator.
4    Q.  Why did you decide to leave them?
5    A.  I opened my own business here in Houston.
6    Q.  As a case worker, who did you deal with?
7    A.  I dealt with persons applying for Aid to
8    Families with Dependent Children and food stamps.
9    Q.  And throughout the time you worked as a case
10   worker, is that what you dealt with?
11   A.  Yes.
12   Q.  You heard the Judge talk.  And you know that if
13   you find this defendant guilty of capital murder, then
14   there is a choice as to what the punishment should be.
15   And you have to decide Issue Number One.  And Issue
16   Number One is:  Do you find from the evidence beyond a
17   reasonable doubt that a person would commit criminal
18   acts of violence that would constitute a continuing
19   threat to society?
20   A.  Uh-huh.
21   Q.  Do you believe that there are circumstances
22   where you could answer yes, that someone was guilty of
23   capital murder, and also believe that they would not
24   commit criminal acts of violence in the future?
25   A.  Yes.

107

```
1        Q.  There is a probability -- I'm sorry.  I used
2   the word probability, because you will never know a
3   hundred percent whether someone --
4        A.  Right.
5        Q.  So the law says, is there a probability that
6   someone would commit criminal acts of violence in the
7   future?  And as the Judge explained to you, you
8   understand probability means more than possibility
9   but --
10       A.  Less than certainty.
11       Q.  -- less than certainty, and more likely than
12  not.  So you understand there would be circumstances
13  where you could say yes, someone was guilty of capital
14  murder, and answer no to the first question?
15       A.  Yes.
16       Q.  Do you also understand that criminal acts of
17  violence could be violence against both persons and
18  property?
19       A.  Yes.
20       Q.  For example, any type of burglary, or some type
21  of perhaps assaultive offense where I punch someone.
22  That would be an act of violence.  And that you believed
23  that a person would -- there is a probability they would
24  commit criminal acts of violence in the future.  If you
25  answer yes to that question, then the defendant would
```

108

```
1   get the death penalty unless -- and the way to get out
2   of that or get around it is your answer to Number Two.
3        A.  Right.
4        Q.  And the law is, there is nothing in there that
5   the State has to prove the answer to you beyond a
6   reasonable doubt to that question.  So what you need to
7   do is look at the facts of the case.  You need to look
8   at the defendant's character and his background, his
9   culpability, involvement, responsibility in the crime,
10  and decide whether all that together warrants that you
11  give a life sentence rather than a death sentence.
12  Could you do that?
13       A.  Yes.
14       Q.  We asked you whether you ever had a different
15  opinion concerning the death penalty, and you said yes.
16       A.  Yes.
17       Q.  What did your opinion used to be?
18       A.  I did not believe that it was warranted under
19  any circumstances.
20       Q.  And what made you change?
21       A.  Life experiences probably, maturity perhaps.
22       Q.  When do you think you made that change?
23       A.  I'd say twenty years ago.
24       Q.  You said, with respect to that sentence, I feel
25  that some crimes should result in the death penalty due
```

109

```
1   to their heinous, brutal nature.  What did you mean by
2   heinous, brutal nature?
3        A.  That means some crimes are so indescribable in
4   their brutality, in the fact that there is no reason for
5   them other than rage or whatever, that as a punishment,
6   there is only one form of punishment for a certain --
7   for that certain kind of crime, and that is death.
8        Q.  If you believe that the facts of a particular
9   case were of a heinous and brutal nature and you found
10  someone guilty of capital murder, would you wait and
11  listen to the evidence at the second part of the trial
12  before you answered Question Number One?
13       A.  No.
14       Q.  Are you saying that you would always answer
15  that question yes? --
16       A.  Number One?
17       Q.  -- if you found someone guilty of capital
18  murder, or would you wait until you heard the evidence
19  at the punishment stage of the trial before you made
20  that decision?
21       A.  I would wait.
22       Q.  And with respect to the second question, it
23  talks about whether you're going to get a life sentence,
24  basically override the death sentence and give him a
25  life sentence.  And it talks about mitigating evidence.
```

110

```
1   And some people think that -- for example, you said if
2   someone was severely retarded, then you might not be
3   able to give the death penalty to someone like that; is
4   that correct?
5        A.  That's correct.
6        Q.  Some other person may think if someone were
7   retarded that they were always going to be that way and
8   the facts wouldn't change, and they may not see that as
9   mitigating.  Someone might think if a person drank to
10  the point where they were drunk and they went out and
11  committed a crime, that's not mitigating because they
12  intentionally got drunk and they committed the crime.
13  Someone else may say, well, they wouldn't have done that
14  had they not been drunk; therefore, in my mind, that's
15  mitigating.  So do you see where different
16  circumstances, people can see the same set of facts and
17  somebody may say it's mitigating and some may say it's
18  not?
19       A.  Absolutely.
20       Q.  Let's talk about a situation where someone is
21  shot one time versus five times or twenty-five times.
22  In your mind, is this a heinous, brutal crime?
23       A.  Well, it's certainly a grave crime, but I --
24  that would not fit my personal definition of heinous.
25       Q.  So I don't know if you followed the case that
```

111

1 was tried just last week where someone was stabbed, I
2 believe, over fifty times. Is that something that would
3 be heinous and brutal, in your mind?
4 A. I assume they died?
5 Q. Yes, ma'am.
6 A. That kind of brutality would come close to my
7 definition.
8 Q. So what I hear you saying, almost, is there has
9 to be extreme brutality before you could consider giving
10 someone the death penalty?
11 A. No, not -- I think what I meant was that in
12 terms of the death penalty, that it is certainly
13 warranted in those circumstances, heinous, brutal
14 crimes. The law, however, is the law. And whatever the
15 circumstances of a case were, you apply the law, I
16 assume, regardless of my personal definition.
17 Q. That's right. And could you do that?
18 A. Yes.
19 Q. What if it's a senseless crime and the victim
20 is just innocent, totally innocent; but perhaps the
21 facts of the case -- maybe there is one stab wound, one
22 shot. Do you think you could consider the death penalty
23 in that type of crime?
24 A. Sure.
25 Q. And you understand that if you answer that he's

112

1 a continuing -- that there is a probability that he
2 would commit criminal acts of violence in the future
3 yes, and you answer the second question no, that the
4 Judge will then impose a death penalty?
5 A. Yes.
6 Q. And you understand. Can you honestly be a part
7 of that process?
8 A. Yes. I've thought about it in the last few
9 days.
10 Q. What were your thoughts when you were thinking
11 about it?
12 A. I have very conflicting situations -- I mean,
13 emotions about it.
14 Q. Tell me about those, please.
15 A. It is one thing to be philosophically or
16 theoretically in agreement with something and another
17 thing to raise your hand and actually vote to put
18 somebody to death. However, I have great respect for
19 the law. The situation I find myself in is a grave
20 responsibility, but it is my duty to follow whatever the
21 law is.
22 Q. Is it a situation that you would rather not be
23 placed in?
24 A. I think, yes.
25 Q. So, you would rather not be on the jury?

113

1 A. Yes. But it's just, I mean, that's a very
2 honest answer. I can't imagine anybody saying, yes, I
3 would love to do this.
4 Q. Did you talk to anybody about your feelings
5 this weekend when you were thinking about it?
6 A. No, not really.
7 Q. When you say you're a liberal socially, what
8 does that mean?
9 A. That means that I have no problem with my tax
10 money being spent on programs that uplift and educate
11 people who normally might not have that available to
12 them.
13 Q. Did you ever work as a social worker?
14 A. As a case worker, but not as a licensed social
15 worker.
16 Q. How about your psychology minor in college?
17 Did you ever follow up on that?
18 A. No.
19 Q. Do you think you would give any more credence
20 to a psychologist or a psychiatrist than you would to a
21 normal person?
22 A. I guess it depends on what they were testifying
23 to.
24 Q. Would you automatically believe everything they
25 said?

114

1 A. No, ma'am.
2 Q. Do you know people that have gone to
3 psychologists or psychiatrists?
4 A. Yes.
5 Q. Have you ever gone to one?
6 A. No.
7 Q. You talked about a friend of yours who --
8 former business associate -- was convicted of sexual
9 assault on a minor.
10 A. Uh-huh.
11 Q. Did you think that person was treated fairly?
12 A. Yes.
13 Q. And do you know what his sentence was?
14 A. Two life terms, I think.
15 Q. Did you follow the case or --
16 A. No, just through hearsay, I mean, the office
17 gossip and things.
18 Q. Was that the Texas Department of Human
19 Services?
20 A. No.
21 Q. Where was that?
22 A. It was A.H.A.N. Home Care.
23 Q. Miss Burnett, do you know two women, one's name
24 is Risqui, R-I-S-Q-U-I, and the other one is Suzette
25 Barr? She's an auditor for Continental?

115

1    A.  No, I don't.  I've only been there a short
2  time.
3    Q.  Did you follow the Karla Faye Tucker case?  She
4  was asking the governor to overturn her death sentence?
5    A.  Right, I remember the name; and I don't think
6  it was --
7    Q.  Did you ever have any feelings about that?
8    A.  No.  Now, I remember she was the one that got
9  reformed or --
10    Q.  Right.  What did you think about that?  Did you
11  think the governor should change the death penalty to
12  the life sentence?
13    A.  No, I don't think I did think that.
14    Q.  Why not?
15    A.  I think she had been tried and convicted
16  fairly, and she was guilty; and the sentence was
17  probably prudent.
18    Q.  Why do you think I would want you on this jury?
19    A.  Because I guess I'm in agreement with the death
20  penalty.  I can't think of another reason.
21    Q.  I'm just asking; because obviously, I need to
22  know that.  And I don't want to put your situation
23  where, you know, you couldn't do something.  It's one
24  thing, like you said, to say out here, I believe in all
25  the laws and I could follow the law.  It's another thing

116

1  to sit in the back of the jury room and make that
2  decision.  So I want to honestly know, if you were in my
3  situation, would you put yourself on the jury?
4    A.  Would I put myself on the jury?
5    Q.  Yes, ma'am.
6    A.  Yes, ma'am, yes, I would.
7    Q.  Do you have any questions?  This is your last
8  chance to ask me questions if you get on this jury until
9  it's over.
10    A.  No.
11    Q.  Thanks, Miss Barnett.  Appreciate your honesty.
12        THE COURT:  Thank you.
13        Mr. Wentz.
14            VOIR DIRE EXAMINATION
15  BY MR. WENTZ:
16    Q.  Good morning.
17    A.  Good morning.
18    Q.  As you've been told, my name is Kurt Wentz.
19  And along with Wayne Hill, we represent Charles Mamou.
20  I'd like, if I could, to give you a copy of your form
21  and maybe go over it just a little bit as we talk.  And,
22  you know, I look at this.  I sort of wonder if you had
23  the benefit of the Judge's talk before you answered it,
24  because everything is extremely logical and follows what
25  you were told this morning, I think.

117

1        Miss Connors asked you a question.  I
2  think it was her last one.  Would you have any
3  reservations about her putting you on the jury?
4  Something like that.  Why did you answer the question
5  the way that you did?
6    A.  I answered that because, I am very confident in
7  my ability to make fair and impartial judgments.  Also,
8  I'm capable of understanding what's presented to me and
9  coming to a decision.
10    Q.  Okay.  One of the things I noticed in your
11  questionnaire on Page 12 and Page 13, you, on your own,
12  are using the term, mitigating circumstances or
13  nonmitigating crime.
14    A.  Uh-huh.
15    Q.  When you were using that word, what did it mean
16  to you as you used it back when you filled out the
17  questionnaire?
18    A.  Meant to me that there were no circumstances
19  surrounding the commitment of the crime that either, in
20  terms of -- well, I guess the person who committed the
21  crime, that would take away from his or her guilt in
22  terms of -- this is hard.  I'm not very articulate this
23  morning.  In terms of looking at something and saying,
24  this person has only the reasoning level of a
25  four-year-old, for instance.  That would be a mitigating

118

1  circumstance to me.
2    Q.  Okay.
3    A.  That's the best way to describe it.
4    Q.  As I talk to you, I'm going to talk to you
5  basically about these Special Issues in the death
6  penalty.  But because I do so, I do not want you to
7  think that guilt/innocence is not an issue.  I'm sure if
8  you become a juror in this case, you'll see it's going
9  to be very hotly contested.
10        So just jump forward with me, and let's
11  assume that we are at the punishment phase of a capital
12  murder case.  And when you get to the Special Issues, as
13  the Judge told you, most of the words that you're going
14  to define for yourself.  And you're going to define
15  basically for us, although you're not necessarily going
16  to tell us what they mean, but for your verdict
17  conceivably, with the exception of proof beyond a
18  reasonable doubt.  And this is your first jury
19  experience?
20    A.  Uh-huh.
21    Q.  You get a definition of proof beyond a
22  reasonable doubt.  And one of the paragraphs is -- or it
23  says that proof beyond a reasonable doubt must be proof
24  of such a convincing character that you would be willing

119

1  to rely and act upon it without hesitation in the most
2  important of your own affairs.  There is more to it; but
3  in my mind, that's the very heart of the definition.
4  And you know that that's the State's burden when it
5  comes to Special Issue Number One.
6         And when you were talking to us about
7  mitigating evidence, you use the obvious.  And I don't
8  mean to belittle you, but you said the explanation of
9  mental retardation.  Sometimes people will talk about a
10  person's background as conceivably being mitigating.
11  Something about the character can conceivably being
12  mitigating.  Something about the crime itself could be
13  mitigating.
14         And obviously, Special Issue Number Two
15  asks you to take that into consideration; but you can
16  also use it in answering Special Issue Number One in
17  terms of whether or not you think that person is going
18  to be a future danger to society.  How do you feel about
19  the idea, in essence, determining whether or not
20  somebody might receive the death penalty based on your
21  ability to predict how they're going to act in the
22  future?  Because I think that that's exactly what that's
23  asking.  How do you feel about that?
24     A.  I'm not particularly comfortable with that
25  responsibility.

120

1     Q.  Okay.  And, you know, one of the things the
2  District Attorney spoke to you about, you've already
3  reached an incredibly important decision in finding
4  somebody guilty of capital murder.  And you then come to
5  this second -- or the first Special Issue; and you're
6  asked, is that person going to be a future danger?  You
7  have no -- you've already committed society's worst
8  crime.  Are you open then -- and I guess you've told us
9  that that Special Issue isn't necessarily going to be
10  answered yes, is it?
11     A.  No.
12     Q.  When you're thinking about the Special Issue,
13  you're asked to consider the probability of something
14  happening in the future.  And you have had it generally
15  spoken to by the Judge this morning.  You know it's not
16  a chance, because that would obviously be unfair.  And
17  certainly, it's not a certainty, either.  But what that
18  word probability means to you is something that could
19  cover a very large area.  You would want to be very
20  certain that somebody's going to commit these acts
21  before they would be receiving the death penalty.  But
22  what it means to you is what is the most important
23  thing.
24         And as the Judge told you, it's just not
25  any criminal act.  It's acts of violence that constitute

121

1  a continuing threat to society.  One of the things I
2  think we sometimes overlook is the fact that the
3  alternative punishment in these cases is life
4  imprisonment.  Do you think people might act differently
5  in prison than they do in the street environment in
6  which they might have committed the crime.
7     A.  Yes.
8     Q.  Would you agree that they would be under a lot
9  more close scrutiny by guards and the rules the prison
10  has that might limit their ability to be a bad person,
11  if you will?
12     A.  Uh-huh.
13     Q.  One of the things that sometimes happens is
14  when you're placed in a prison environment, or even,
15  let's say, a structured institutional environment, you
16  may violate some of the institution's rules.  But they
17  may -- those violations may not ascend to the level of
18  an act of criminal violence.
19         Let's say, for example, it might be a
20  crime within T.D.C. to have sugar or something like
21  that.  It might be a controlled substance.  But in our
22  daily life it's -- we have sugar around our homes.  And
23  that's a silly example, but you can see how violating a
24  prison rule might not necessarily be a criminal act of
25  violence.

122

1         When you were going over Special Issue
2  Number Two with the Judge and considering this thing
3  called mitigating circumstances, did you ever think of
4  the circumstances of the offense being grounds for this
5  person to be getting a life sentence?  And let me -- go
6  ahead.
7     A.  Well, I mean, no, I didn't.
8     Q.  In your mind, could you see how the
9  circumstances of an offense might be such that it would
10  entitle the person to receive a life sentence?
11     A.  Uh-huh, yes.
12     Q.  In other words, there might be some cloud over
13  what happened.  And certainly you're convinced and you
14  feel comfortable with the person being found guilty of
15  capital murder, but there might be something about the
16  way the crime unfolded that would cause you to feel that
17  life is the appropriate punishment for that person.
18     A.  Yes.
19     Q.  Is there a question I should be asking you that
20  I haven't?
21     A.  I can't imagine.  You're the expert.
22     Q.  Okay.  If you told me one, I'd be happy to ask
23  it of you, because I really don't have anything more I'm
24  going to ask you.
25     A.  Okay.

123

1     Q.   Okay?
2     A.   Yes.
3     Q.   Thank you.
4          THE COURT:   Thank you.
5          (Court admonishes juror.)
6                LATONYA HARRIS,
7     having been first duly sworn, testified as follows:
8                VOIR DIRE EXAMINATION
9     BY THE COURT:
10    Q.   Miss Harris, how are you feeling?
11    A.   Better.
12    Q.   Miss Harris, there was some stuff that we
13    talked about Friday that we didn't get to visit with you
14    about.  You heard some stuff this morning.  Out of what
15    you have heard so far, do you have any questions for me?
16    A.   No, not really.
17    Q.   We talked -- well, when you say not really,
18    don't suppress them if you have them.
19    A.   I don't have any questions.
20    Q.   We talked -- one of the things that you don't
21    know was, you don't know -- you might have on the
22    questionnaire -- is that if you are selected as a juror,
23    we're going to begin the evidence in the case on Monday,
24    October the 4th.  Everybody, the lawyers for both sides,
25    are satisfied that the whole case will take more than

124

1     one work week, but no more than two.  So if my -- I'm
2     thinking, in my mind, that's no later than the 15th of
3     October, which is a Friday.  So that's the anticipated
4     duration.
5          I see from your questionnaire that you
6     have a thirteen-month-old.
7     A.   Uh-huh.
8     Q.   Any problems that tending to the child would
9     cause you by being a juror for two weeks?
10    A.   No.  I mean, if I was at work, he would be at
11    daycare, so --
12    Q.   Recognizing that inconvenience perhaps would be
13    different, but nothing that you couldn't overcome?
14    A.   No.
15    Q.   This process that we're in, Miss Harris, I
16    think -- and this is just my notion -- we're trying to
17    set out all of the laws -- not all of them -- but the
18    primary laws that do come into play during the course of
19    a trial like this.  Whether a law does come into play or
20    not will depend upon the testimony presented in the
21    case.
22         We had mentioned the other day, the jury's
23    job is that you determine the credibility of the
24    witnesses.  My job is not to do that.  My job is to
25    listen to what they say.  And it makes no difference

125

1     whether I believe him or not; but on the basis of what
2     they say, my job is to arm you in the Court's charge
3     with all of the rules that come into play as a result of
4     their testimony.  So out of all those rules that will be
5     in the Court's charge, they're going to be there because
6     of what witnesses said.  But your job, as a juror, is to
7     extract the believable portions of what the witnesses
8     say and, therefore, the laws that are applicable to the
9     believable portions of the testimony and use them in the
10    verdict that you reach.  Have you ever been a juror
11    before?
12    A.   No.
13    Q.   I cut you off before you answered my question
14    about that.
15    A.   No.
16    Q.   The punishment business that we talk about
17    today, you might find it's a little peculiar or a little
18    curious as to why we spent so much time talking about
19    the punishment phase of the trial when I've already told
20    you that if the defendant's not found guilty, we never
21    get to the punishment phase.  So we're talking about it
22    before a determination of guilt is made, and the reason
23    for that is this:  This is the only chance we'll have to
24    talk to you, and we can't talk to you about just the
25    guilt phase and the rules that can come into play, and

126

1     if you then find the defendant guilty of capital murder,
2     then talk to the jury about the punishment phase;
3     because a juror might say, well, I didn't know that was
4     going to be a rule at this punishment phase.  I'm
5     telling you right now, Judge, I can't follow that rule.
6     That means I'd have to excuse that juror.  That means
7     we'd only have eleven of them.  I got to have twelve.
8     That means it would be a mistrial, and everything we had
9     done would have been a total waste of time.  So that's
10    why we put everything up front.
11         Don't read into the fact we're talking
12    about punishment today before the trial ever starts as
13    being an indication that the defendant's going to wind
14    up pleading guilty, because he's not, or that we've all
15    thrown in the towel on his presumption of innocence,
16    because we have not.
17         This is the only time you'll know how a
18    prospective juror feels from the beginning to the end.
19    With that additional piece of information that you
20    missed the other day, do you have any questions of me so
21    far?
22    A.   Not so far.
23    Q.   Well, I'm going to turn you over to the nice
24    lawyers.  If you have any questions for them, ask them.
25    Okay?

127

```
 1        A.  Okay.
 2              THE COURT:  Mr. McClellan.
 3              VOIR DIRE EXAMINATION
 4  BY MR. MCCLELLAN:
 5        Q.  Miss Harris, my name is Lyn McClellan.  Along
 6  with Claire Connors, we represent the State of Texas in
 7  this case.  I want to kind of go over your questionnaire
 8  and follow up on some of your answers you had there.  In
 9  order to make that a little easier, let me see if I can
10  get a copy of your questionnaire and let you look at
11  Page 11, at the bottom.  It says:  Do you have any
12  religious, moral, ethical considerations that would
13  prevent you from sitting in judgment of another person.
14  See that question?
15        A.  Uh-huh.
16        Q.  And you checked yes and then said, God is the
17  ultimate Judge; so no matter what one thinks, he has the
18  last word.  If that means as a juror, or jury, he
19  decides your fate, then so be it.  Can you tell me what
20  your -- what your thoughts are about that?
21        A.  Well, basically, I feel that we're all put here
22  for a reason.  And if being a juror means that you
23  ultimately have to decide someone's fate, as far as the
24  death penalty or life imprisonment, then that's the way
25  it is.  He's the ultimate Judge, God is.  I'm saying
```

128

```
 1  that if a prisoner or a person has life imprisonment or
 2  the death penalty, regardless of what he does do or how
 3  the outcome is, his ultimate fate is not decided by us
 4  anyways, so --
 5        Q.  Right.  I understand that.  And a lot of people
 6  go and say -- some people come and say, I don't think we
 7  ought to be judging, because it's not for me to judge.
 8  God's going to judge.  God's going to ultimately take
 9  care of that situation, so what we do here is of little
10  or no moment.  Do you have -- what is your church's
11  position on the death penalty?  Do you know?
12        A.  Right now I'm not involved in the church.  I'm
13  seeking a new church home, but I'm not currently
14  involved in the church.
15        Q.  What is your position on the death penalty,
16  based on your religious teachings and upbringing?
17        A.  My position is like I stated.  I mean,
18  everything is here for a reason.  It's kind of, in my
19  mind, a way of checks and balance maybe.  I mean, life
20  is just that way.  I mean, the world has become in a way
21  that people do things that cause certain reactions.
22        Q.  Right.
23        A.  And they have to be responsible for their
24  actions.
25        Q.  Now, in that questionnaire it says:  Do you
```

129

```
 1  have any religious, moral, or ethical considerations
 2  that would prevent you from sitting in judgment of
 3  another person?  Do you?  You checked yes.
 4        A.  I checked yes, only because I truly believe
 5  that no matter what we say as individuals -- because we
 6  all are critical of one another in a sense -- God is
 7  still the ultimate judger.  I mean, regardless of what
 8  we'd choose or think that's right for a person, he still
 9  controls your destiny and faith.  That's why I checked
10  yes.
11        Q.  Do you mean that whatever is going to happen to
12  the defendant on trial is in God's hands, or do you mean
13  that whatever decision I'm going to make is in God's
14  hands, or both?
15        A.  Kind of both.
16        Q.  Okay.  All right.  I'm trying to get a feeling
17  for what your thoughts are.  So, your position is the
18  outcome of this case is, God possibly already knows what
19  it is.  Would that be right or wrong?
20        A.  That's a positive in my -- the way I would
21  feel.
22        Q.  That's what you would feel.  Okay.  And that
23  whenever going through this process, we're going through
24  the process and God is going to decide and direct
25  everybody.  And that's how it's going to end up.  Is
```

130

```
 1  that the way --
 2        A.  Well, I mean, I just feel that, personally, all
 3  of our destiny and faith has been chosen.  So if we are
 4  here to say whether he gets the death penalty or life
 5  imprisonment, that's the way it's set.  I mean, I can't
 6  say that's fair or unfair.  It's just the way it should
 7  be.
 8        Q.  How does that relate to, if it does, your
 9  ability to be on a jury and listen to evidence and make
10  your decision based on the evidence that you hear and
11  the law given to you by the Court?  Would you be able to
12  go through that type process?  In other words, the law
13  says you have to take an oath to be a juror, to a true
14  verdict render based on the law given to you by the
15  Court and the evidence from the witness stand.
16              Somebody else might say, well, I'm going
17  to be guided by what God tells me to do, and I'm really
18  not concerned about these other things.  I'm just trying
19  to get a feel for where you are in this relationship.
20        A.  I think, given the evidence or the testimony in
21  the case and the laws, I think -- I guess with
22  everything stated as facts, I could say whether or not
23  this person deserves or does not deserve the death
24  penalty.
25        Q.  Okay.  Do you think the death penalty is an
```

131

1  appropriate punishment for certain types of crimes?
2      A.  For certain types of crimes, yes, I do.
3      Q.  What kinds of cases or types of crimes do you
4  think it's proper for?
5      A.  I would think it would be proper in a case such
6  as someone who has no regard for human life; cannot,
7  will not, refuses, is not even open to the thought of
8  being rehabilitated.  So something like that, yes, I
9  would think they would deserve it.
10     Q.  How do you think you would know whether someone
11 is open to be rehabilitated?  What do you think would be
12 helpful in making that determination?
13     A.  I guess if I had information on that person, as
14 far as what their life was like previously, the
15 circumstances involving the incident.
16     Q.  Page 12, Question Number 58, it says:  What are
17 your feelings about the death penalty?  You said, It is
18 a form of checks and balance system that sometimes is
19 given justly and sometimes not.  What comes to mind when
20 you think of where it's not given justly?  Do you have
21 some things in mind or cases in mind you've heard about?
22     A.  Well, I mean, you hear about people being
23 wrongly accused of things.  And before we got DNA
24 evidence and certain things like that, people were
25 executed wrongly.  So sometimes it was given unjustly

132

1  and sometimes it was --
2      Q.  How does that square with God is the ultimate
3  determiner?  I mean, God ultimately guides and directs
4  us the way we're going.
5      A.  That's my personal thought on it, I mean; but
6  ultimately, if that's your fate, that's your fate.  If
7  my fate is to walk out from this building, then get hit
8  by a car, that's my fate.  So I can't say --
9      Q.  Do you think you have any control over your
10 fate?  Anything you can do to change that or alter that,
11 cause it to be?
12     A.  Yes.
13     Q.  Okay.  What control do you think you have?
14     A.  I think, given your inner sense, that you can
15 tell wrong from right.  You know, you can keep yourself
16 out of a lot of problems.
17     Q.  You indicated, also, on Page 9 about, ever had
18 someone, a friend or family member, convicted of a
19 crime?  You said your brother was convicted of a felony,
20 but it was dismissed after the whole truth came out?
21     A.  Uh-huh.
22     Q.  What felony was he convicted of?
23     A.  I think it was some harmful endangerment to a
24 child.
25     Q.  Injury to a child?

133

1      A.  Injury to a minor, something like that.
2      Q.  And you say he was convicted of it.  Was he
3  convicted or charged with it?
4      A.  He actually went to jail for it.  And he stayed
5  in jail for a year before, I guess, his case came back
6  up.  And when all the evidence was presented, at that
7  time they dismissed the charges completely.
8      Q.  What came back?  What came up that changed?
9      A.  Because at the time his now wife, but
10 girlfriend at the time, didn't tell the whole truth
11 about the story.  And, of course, when the child was
12 involved, it was like no question the child was injured
13 in the act; but my brother didn't purposely injure the
14 child.
15     Q.  What injury did the child sustain?
16     A.  Well, it involved gasoline.  And I guess the
17 baby, at the time, went into -- he started throwing up
18 and suffered inhalation.
19     Q.  Is the child okay now?
20     A.  Yeah, he's fine.
21     Q.  How old was the child at the time?
22     A.  Possibly a couple of months old.
23     Q.  Anything in your life experiences or anything
24 in your beliefs that would keep you from being a juror
25 in a case like this?

134

1      A.  I really don't -- I mean, I've heard some of
2  the things that was said about the case; but I really
3  don't know the gist of the whole case.  I mean, I don't
4  think there is anything that would prevent me from being
5  a juror.
6      Q.  You understand the jurors would be called upon
7  to make decisions that, in answer to those questions,
8  could result in the death penalty being imposed?  Some
9  people come and say, well, I don't think I could ever
10 make that type of life or death decision.  I don't think
11 it's my position.  I don't think I could ever get
12 evidence that would ever convince me sufficiently to
13 make that type of decision.
14         Other people say, well, I'd have to hear
15 what they have to say.  How do you feel?
16     A.  I honestly couldn't tell you.  I couldn't tell
17 you until I was -- I knew everything.  I couldn't say
18 one way or the other that I could make that decision or
19 not.
20     Q.  One last thing is the burden of proof on the
21 State is beyond a reasonable doubt.  We must prove our
22 case beyond a reasonable doubt.  That's the same burden
23 in every criminal case throughout, whether it be child
24 endangerment, whether it be theft, whether it be capital
25 murder, or whatever.  Some people would say, because in

135

1  a death penalty case, seeking the actual punishment,
2  that they would require a higher burden of proof because
3  we're seeking a higher level of punishment.
4        If we're just trying to decide whether or
5  not to send somebody to the penitentiary or how much
6  time they spend in jail, that would be one thing; but
7  we're talking about taking their life. They would
8  require a higher amount of evidence. Even though the
9  law says the burden is the same, they would still
10 require more to make that life and death type decision.
11 How do you feel about that?
12     A.  I think it should be the same.
13     Q.  Thank you, ma'am.
14          MR. MCCLELLAN:  And I'll pass the
15 venireman.
16          THE COURT:  Thank you.
17          Mr. Wentz.
18               VOIR DIRE EXAMINATION
19 BY MR. WENTZ:
20     Q.  Good morning.
21     A.  Good morning.
22     Q.  As you've been told, my name is Kurt Wentz.
23 This is Charles Mamou. And Wayne Hill will also be
24 representing Charles in the case. You have a copy of
25 the questionnaire with you, and I'm going to go over

136

1  that with you in just a little bit. But as we started,
2  I think you've told us a lot of important things about
3  you. And I think you basically, to sum up, you are a
4  person who has a great deal of faith in God, and
5  religion is very important to you; but you've told us
6  that you could sit here and listen to the evidence and
7  make a decision based on the evidence and the law that
8  is given to you by the Judge. Does that pretty well sum
9  up what you've told us?
10     A.  Yes.
11     Q.  And that's at the guilt/innocence phase, and at
12 the punishment phase, also. I'm going to do something
13 that's maybe a little bit backwards, so excuse me for
14 doing it in this backwards way. I'm going to talk to
15 you mostly about the punishment phase of a capital
16 murder case. But I don't want you to think that I'm in
17 any way conceding Charles' guilt or innocence in this
18 particular case. Because if you become a juror, I think
19 you will find that it will be hotly contested, if you
20 will. Okay?
21          You understand from the Judge's
22 explanation that these Special Issues each are to be
23 answered independently of one another. In other words,
24 they have their own answer. There is nothing automatic
25 about them. In other words, sometimes there is a

137

1  problem. If somebody feels they're guilty of capital
2  murder, that the answers to those Special Issues are
3  pretty well answered already, that somebody who would be
4  guilty of capital murder would necessarily be a future
5  danger to society, or somebody who is guilty of capital
6  murder, there is no reason why they should ever get a
7  life sentence. And I think that you can understand from
8  the explanation that that's not really the way this
9  whole process works. You take the evidence and you
10 apply it to each situation independently. Would you
11 agree?
12     A.  Yes.
13     Q.  And I think one of the things that is so
14 important is the Special Issues that you have to decide,
15 they're based in words that we don't have any definition
16 for, as attorneys, except for proof beyond a reasonable
17 doubt. So what the words mean for you is what they mean
18 for you. You use the word probability, quite
19 conceivably, in your daily life fairly frequently. And
20 I think the Judge has indicated to you in this
21 situation, in this context, it means certainly more than
22 a chance, but not necessarily a hundred percent
23 certainty. But when you look at it in the context of
24 what we're doing, deciding whether or not somebody might
25 lose their life, I think you can understand why it has a

138

1  certain magnitude to it, a certain importance. Would
2  you agree?
3      A.  Yes.
4      Q.  And it certainly is, at the very least, more
5  likely than not. Would you agree?
6      A.  Yes.
7      Q.  In Special Issue Number Two, had you thought or
8  used the word mitigating before in terms of thinking
9  about how you might punish somebody for what they had
10 done?
11     A.  No.
12     Q.  Do you understand how the word is used in this
13 context for answering the Special Issues, in a sense,
14 punishing somebody?
15     A.  After listening to the Judge, yes.
16     Q.  And one of the things that's possible is to
17 listen to the facts of the case, the circumstances of
18 the offense, the way it's put in Special Issue Number
19 Two, and consider whether or not there is something that
20 in and of itself might warrant somebody receiving a life
21 sentence. Do you think there could conceivably be
22 something in the case itself that might warrant somebody
23 receiving a life sentence?
24     A.  Yes.
25     Q.  And sometimes we talk about the character and

139

1   background of somebody.  And when it comes out of a
2   lawyer's mouth, it comes out as some cheap cliche.  We
3   don't intend it as a cheap cliche.  We go, oh, he's got
4   a bad background.  And here comes the bad background
5   excuse everyone.  Here it comes.  Could you honestly
6   consider somebody's background in answering Special
7   Issue Number Two, or is it, as I demeaningly referred to
8   it as, a cheap cliche?
9       A.  I think I would have to consider their
10  background.
11      Q.  Do you understand why I make that negative --
12  and I don't mean to be insulting, but sometimes he
13  didn't get what he wanted as a child; therefore, you
14  know, give him everything he asks for as an adult?
15      A.  I understand what you're saying with that; but
16  I mean, when you say background, I'm thinking, has this
17  person committed serious crimes before?  What was the
18  severity of the crime?  That kind of thing.  I'm not
19  thinking of --
20      Q.  Did he get cake for his birthday?
21      A.  Yeah, that kind of thing.
22      Q.  Could you see sometimes somebody's background,
23  how they were raised in their family circumstance could
24  actually also be a mitigating circumstance?
25      A.  Yes, I can.

141

1       Q.  Anything you want to tell us, anything you
2   think we should know.
3       A.  Covers such a broad --
4       Q.  I'm phrasing it as broadly as possible.
5       A.  Well, I mean --
6       Q.  I've giving you as many options as I can.
7       A.  I don't know.  I mean, I don't know what you're
8   asking.
9       Q.  I'm just asking you, is there something you
10  would like to tell me about yourself you think I should
11  know about you before I sit down and not ask anymore
12  questions?
13      A.  That I'm a sincere person.  A lot of things I
14  believe, I believe strongly in my heart.  So if I
15  believe it, it's just --
16      Q.  Just that?
17      A.  Just that.
18      Q.  Do you think somebody can be rehabilitated even
19  if they've committed a serious crime?
20      A.  Yes, I do.
21      Q.  Thank you very much.
22          THE COURT:
23          (Court admonishes juror.)
24
25

140

1       Q.  Let me just look at your questionnaire for a
2   second or two.  You're asked on Page 6 to agree or
3   disagree with some statements.  And one of them, No. 13,
4   is:  Anyone can overcome a neglectful and abusive
5   childhood.  And you said you generally agree with that.
6   Can you tell me why you formed that opinion or why you
7   believe that?
8       A.  Because sometimes abuse and neglect can be so
9   severe that, mentally, they can't overcome it.  It's
10  just no way of unlocking all of that in the mind, and
11  that's why I say I generally agree.
12      Q.  Okay.  On Page 17 you're asked:  Do you believe
13  that mitigating evidence should be used?  And you very
14  honestly put undecided when you filled the questionnaire
15  out.  Can you tell me why you answered that question in
16  that particular manner?
17      A.  On Page 13?
18      Q.  Yes, on Question 68.
19      A.  Because at that time I didn't clearly
20  understand what mitigating, in that sense, meant.
21      Q.  And is there anything about you that you think
22  I should know and Charles should know before we make up
23  our mind in deciding whether or not you should be on
24  this jury?
25      A.  Anything like -

142

1   THE STATE OF TEXAS  )
2   COUNTY OF HARRIS    )
3        I, Pamela Kay Knobloch, Official/Deputy
    Official Court Reporter in and for the 179th District
4   Court of Harris County, State of Texas, do hereby certify
    that the above and foregoing contains a true and correct
5   transcription of all portions of evidence and other
    proceedings requested in writing by counsel for the
6   parties to be included in this volume of the Reporter's
    Record, in the above-styled and numbered cause, all of
7   which occurred in open court or in chambers and were
    reported by me.
8
     I further certify that this Reporter's Record
9   of the proceedings truly and correctly reflects the
    exhibits, if any, admitted by the respective parties.
10
     I further certify that the total cost for the
11  preparation of this Reporter's Record is $_____ and
    was paid by Harris County.
12
     WITNESS MY OFFICIAL HAND this the _____ day of
13  _____, 2000.
14
15  _____
16  Pamela Kay Knobloch, Texas CSR No. 1650
    Expiration date:  12/31/2000
17  Official Court Reporter, 179th District Court
    Harris County, Texas
18  301 San Jacinto
    Houston, Texas 77002
19  713.755.6340
20  APPELLANT:  CHARLES MAMOU, JR.
              CAUSE NO. 800112
21
22
23
24
25

**$**

**$10,000** [1] 34:10
**$** ___ [1] 142:11

**0**

**0470500** [1] 2:5

**1**

**1** [1] 85:6
**10** [1] 93:17
**100** [1] 81:6
**103** [1] 3:3
**11** [3] 1:2 93:2 127:11
**111** [2] 3:18 3:20
**11th** [1] 69:10
**12** [3] 93:2 117:11 131:16
**12/31/2000** [1] 142:16
**13** [6] 78:6 93:3 95:10 117:1 140:3 140:17
**13396100** [1] 2:3
**15th** [1] 124:2
**1650** [1] 142:16
**17** [1] 140:12
**179th** [3] 1:11 142:3 142:17
**1960** [1] 2:19
**1989** [1] 90:8
**1993** [2] 92:4 98:21
**1998** [1] 5:1
**1999** [2] 1:18 30:7

**2**

**2** [2] 78:13 85:9
**2000** [1] 142:13
**201** [1] 2:7
**2039** [5] 29:7 29:7 29:25 30:9 30:10
**20th** [1] 1:18
**21179300** [1] 2:18
**25** [1] 1:2
**281.587.0088** [1] 2:21

**3**

**301** [1] 142:18
**33** [1] 60:11

**4**

**46** [1] 93:17
**4615** [1] 2:14
**49** [1] 72:10
**4:00** [1] 18:17
**4th** [2] 69:9 123:24

**5**

**5629** [1] 2:19
**58** [1] 131:16
**59656300** [1] 2:13

**6**

**6** [2] 93:2 140:2
**65** [1] 64:7
**68** [3] 61:22 95:9 140:18

**7**

**7** [1] 5:1
**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 142:19
**77002** [2] 2:8 142:18
**77027** [1] 2:15
**77069** [1] 2:20

**8**

**800112** [2] 1:3 142:20
**8:00** [1] 18:14

**9**

**9** [2] 60:13 132:17
**911** [1] 90:4

___ [1] 142:12

___
___ [1] 142:15

**A**

**A.H.A.N.** [1] 114:22
**Aberration** [2] 35:13 83:16
**Abilities** [2] 82:11 86:5
**Ability** [12] 46:18 59:5 69:22 71:4 72:3 76:21 103:19 103:25 117:7 119:21 121:10 130:9
**Able** [7] 24:20 57:3 65:12 70:19 71:18 110:3 130:11
**Above-entitled** [1] 1:19
**Above-styled** [1] 142:6
**Absolute** [1] 70:22
**Absolutely** [5] 29:12 34:18 54:16 54:19 110:19
**Abuse** [2] 98:1 140:8
**Abused** [1] 98:1
**Abusive** [1] 140:4
**Accept** [2] 29:21 88:15
**Accepting** [1] 30:1
**Accident** [3] 33:21 33:22 77:6
**Accomplishments** [1] 19:3
**Account** [1] 26:5
**Accurate** [1] 102:7
**Accused** [2] 102:17 131:23
**Acquitted** [2] 92:11 92:17
**Act** [13] 16:4 49:11 65:18 83:14 98:25 107:22 119:1 119:21 120:25 121:4 121:18 121:24 133:13
**Actions** [1] 128:24
**Acts** [25] 9:4 15:21 15:24 16:15 16:18 17:10 17:10 17:16 18:11 18:19 18:24 19:6 19:11 49:2 49:12 83:5 83:9 106:18 106:24 107:6 107:16 107:24 120:12 120:20 120:25
**Actual** [1] 135:1
**Add** [3] 67:25 73:7 103:12
**Addict** [1] 93:24
**Addition** [1] 34:9
**Additional** [6] 37:11 39:17 82:4 82:5 97:23 126:19
**Addressed** [3] 46:10 73:13 103:17
**Administrator** [1] 106:3
**Administrators** [1] 19:1
**Admitted** [2] 41:9 142:9
**Admonishes** [4] 67:11 103:3 123:5 141:23
**Adult** [1] 139:14
**Advantage** [1] 101:7
**Affairs** [2] 99:1 119:2
**Affect** [4] 72:3 90:14 97:24 99:13
**Affection** [1] 89:19
**Affects** [1] 93:10
**Affluent** [3] 52:9 53:20 53:22

**Afraid** [2] 49:24 120:25
**Age** [7] 23:3 53:4 53:7 77:20 85:19 85:24 101:13
**Aggravated** [3] 48:19 66:2 100:2
**Ago** [3] 9:9 51:12 108:23
**Agree** [15] 3:17 23:1 39:13 40:1 57:14 86:22 93:1 93:3 121:8 137:11 138:2 138:5 140:2 140:5 140:11
**Agreement** [9] 3:2 3:3 3:12 72:7 72:9 72:10 72:12 112:16 115:19
**Agrees** [1] 37:8
**Ahead** [2] 7:17 122:6
**Aid** [1] 106:7
**Aided** [1] 1:22
**Ain't** [2] 26:19 26:21
**Alcohol** [6] 52:16 52:18 52:20 85:5 85:8 85:11
**Allegation** [5] 31:25 32:1 33:15 65:20 66:8
**Allegations** [2] 66:5 66:7
**Alleged** [3] 4:24 65:7 77:14
**Alleges** [1] 81:8
**Allergies** [1] 75:4
**Allows** [1] 63:23
**Almost** [2] 100:9 111:8
**Altar** [1] 83:12
**Alter** [1] 132:16
**Alternative** [1] 121:3
**Amendment** [2] 102:13 102:18
**Amount** [1] 135:8
**Anger** [1] 36:15
**Answer** [74] 7:15 8:25 10:4 10:5 10:8 10:18 10:19 13:10 13:22 13:24 14:1 14:4 14:5 14:10 14:20 15:19 16:16 19:17 20:8 21:12 21:17 21:18 21:20 21:22 25:6 25:7 25:8 25:8 25:20 25:22 26:3 26:12 26:24 26:24 27:9 27:9 27:10 27:24 28:11 28:13 28:13 31:2 31:8 31:10 47:14 48:24 49:15 49:19 49:20 54:17 57:3 57:4 57:5 58:21 69:4 74:7 74:15 74:15 76:17 82:18 92:2 95:22 106:22 107:14 107:25 108:2 108:5 109:14 111:25 112:3 113:2 117:4 134:7 136:24
**Answered** [29] 8:21 11:21 11:24 20:5 20:6 27:19 28:22 28:24 30:6 30:8 47:10 49:6 52:7 55:1 56:24 62:5 62:17 78:23 97:18 97:24 104:17 109:12 116:23 117:6 120:10 125:13 136:23 137:3 140:15
**Answering** [8] 5:10 82:19 95:11 96:2 100:25 119:16 138:13 139:6
**Answers** [7] 9:8 10:3 38:23 55:12 75:14 127:8 137:2
**Anticipated** [3] 70:7 70:11 124:3
**Anytime** [2] 32:12 32:13
**Anyway** [1] 23:3
**Anyways** [1] 128:4
**Apartment** [1] 24:10
**Apologize** [1] 68:17
**Appellant** [2] 1:6 142:20
**Appellee** [1] 1:11
**Applicable** [1] 125:8
**Applied** [1] 7:8
**Applies** [3] 77:16 80:6 102:14
**Apply** [6] 70:9 75:15 75:15 77:11 111:15 137:10
**Applying** [1] 106:7

**Appreciate** [3] 90:19 95:7 116:11
**Appropriate** [20] 9:25 11:23 12:1 13:7 14:9 25:5 27:19 28:1 28:4 28:5 36:24 37:14 37:23 38:17 63:25 78:10 87:9 95:21 122:17 131:1
**Apt** [1] 96:10
**Area** [2] 41:1 120:19
**Areas** [1] 99:20
**Arm** [3] 51:1 51:2 125:2
**Arms** [1] 5:20
**Arrest** [3] 40:5 43:18 43:20
**Arrested** [2] 40:7 40:11
**Arrive** [3] 8:19 36:23 96:8
**Arsons** [1] 17:11
**Articulate** [1] 117:22
**Ascend** [1] 121:17
**Aside** [2] 51:6 70:20
**Aspect** [6] 40:20 45:11 79:18 80:15 83:24 86:22
**Aspects** [3] 28:2 75:15 100:19
**Assault** [2] 77:18 114:9
**Assaultive** [1] 107:21
**Assaults** [1] 17:8
**Assessing** [2] 37:17 38:9
**Assigns** [1] 96:16
**Assistant** [2] 2:6 4:20
**Assisting** [1] 5:10
**Associate** [2] 68:12 71:23 114:8
**Assume** [5] 37:25 69:8 111:4 111:16 118:11
**Assumptions** [1] 96:10
**Assure** [4] 55:16 71:16 71:18 71:24
**Attack** [1] 79:23
**Attention** [2] 70:1 71:21
**Attorney** [2] 4:18 120:2
**Attorneys** [6] 2:6 2:10 2:22 4:21 57:19 137:16
**Auditor** [1] 114:25
**Automatic** [1] 136:24
**Automatically** [4] 49:6 55:10 77:23 113:24
**Automobile** [2] 17:12 17:15
**Available** [9] 48:11 76:1 77:1 77:21 77:25 78:14 93:1 93:9 94:20 113:11
**Aware** [4] 46:15 62:17 73:18 91:21
**Awful** [1] 34:18

**B**

**Baby** [2] 16:6 133:17
**Background** [29] 9:13 37:1 37:12 38:6 49:24 51:21 52:11 54:1 61:24 62:10 62:12 62:23 74:19 82:10 82:22 83:11 84:6 88:9 99:22 101:4 108:8 119:10 139:1 139:4 139:4 139:6 139:10 139:16 139:22
**Backgrounds** [1] 62:4
**Backwards** [2] 136:13 136:14
**Bad** [9] 8:14 8:15 23:2 54:2 96:14 101:20 121:10 139:4 139:4
**Bag** [3] 40:4 40:12 40:12 42:22
**Balance** [2] 128:19 131:18
**Ballistically** [1] 43:21
**Bank** [5] 40:2 40:3 40:6 40:12 40:12
**Barnett** [5] 103:4 103:8

103:10 105:3 116:11

**Barr** [1] 114:25

**Based** [22] 6:19 14:14 28:2 28:14 31:2 37:19 38:11 42:2 45:17 59:5 74:7 74:16 79:21 81:5 96:20 97:19 119:20 128:16 130:10 130:14 136:7 137:15

**Basing** [1] 55:12

**Basis** [5] 30:6 30:8 47:4 104:10 125:1

**Basketball** [1] 50:22

**Bat** [1] 17:14

**Bearing** [4] 46:11 68:6 73:14 103:18

**Beating** [1] 17:14

**Became** [1] 61:2

**Become** [6] 29:2 29:10 70:17 118:8 128:20 136:18

**Becomes** [1] 30:22

**Becoming** [1] 57:25

**Began** [4] 38:15 39:2 56:23 68:16

**Begin** [9] 47:22 56:23 67:23 67:24 69:9 71:7 96:19 97:19 123:23

**Beginning** [4] 13:4 14:8 91:10 126:18

**Begins** [3] 30:22 74:6 74:14

**Behind** [3] 18:10 18:15 90:2

**Behold** [1] 100:10

**Belabor** [1] 101:7

**Beliefs** [2] 57:11 133:24

**Believable** [2] 125:7 125:9

**Belittle** [1] 119:8

**Bend** [1] 90:13

**Benefit** [1] 116:23

**Berra** [1] 26:19

**Best** [3] 70:22 78:7 118:3

**Better** [5] 61:12 70:10 70:14 88:9 123:11

**Between** [7] 3:2 18:2 49:8 72:9 85:12 86:12 100:9

**Beyond** [46] 9:2 12:14 12:24 13:9 13:12 13:18 13:23 14:16 14:22 14:25 15:20 16:17 21:9 25:17 25:19 32:8 39:2 41:21 41:25 42:4 42:8 42:13 42:25 43:25 44:23 48:25 58:24 65:22 65:24 66:6 80:17 81:9 81:16 81:22 83:1 83:1 98:16 98:22 106:16 108:5 118:18 118:22 118:24 134:21 134:22 137:16

**Billboards** [1] 94:12

**Billy** [1] 92:6

**Billy's** [1] 92:8

**Binge** [1] 87:3

**Birthday** [1] 139:20

**Bit** [8] 8:19 60:15 64:4 91:5 93:21 116:21 136:1 136:13

**Blame** [1] 74:10

**Board** [3] 8:23 29:19 29:21

**Bob** [1] 1:20

**Bodies** [1] 82:20

**Body** [4] 27:7 34:24 43:22 94:7

**Bottom** [1] 127:11

**Box** [1] 45:15

**Boy** [3] 83:12 83:13 85:24

**Breaking** [1] 17:13

**Breath** [1] 30:13

**Briefly** [1] 31:17

**Bright** [2] 96:19 96:20

**Bring** [3] 45:22 92:10 102:10

**Broad** [5] 17:21 34:4 34:13 36:22 141:3

**Broadly** [1] 141:4

**Brooks** [1] 3:20

**Brother** [3] 92:9 132:19 133:13

**Brought** [2] 4:8 7:4

**Brown** [1] 42:24

**Brutal** [7] 64:14 109:1 109:2 109:9 110:22 111:3 111:13

**Brutality** [6] 55:4 64:10 64:16 109:4 111:6 111:9

**Building** [6] 17:12 17:14 42:1 42:5 42:15 132:7

**Bumped** [2] 13:15 13:24

**Bumps** [1] 13:19

**Burden** [12] 79:24 80:13 80:14 80:17 102:6 102:8 102:9 119:4 134:20 134:22 135:2 135:9

**Burden's** [1] 83:3

**Burdette** [1] 1:20

**Burglaries** [1] 17:13

**Burglarized** [2] 51:12 51:13

**Burglary** [3] 49:13 77:18 107:20

**Burnett** [1] 114:23

**Burning** [1] 17:11

**Business** [7] 7:21 31:16 38:21 69:14 106:5 114:8 125:16

---

## C

**Cake** [1] 139:20

**Cannot** [7] 15:9 15:14 29:1 29:2 31:1 39:15 131:6

**Capable** [1] 117:8

**Capital** [85] 4:25 5:2 9:1 10:21 13:1 13:5 13:8 14:8 16:22 17:7 19:17 20:1 21:4 24:9 25:18 27:23 28:21 30:12 31:15 31:18 31:18 31:20 32:11 32:18 33:3 33:9 33:11 33:12 33:15 34:2 37:3 37:8 38:2 38:3 38:21 44:16 44:21 47:9 48:13 48:14 48:17 48:20 48:22 49:5 51:20 52:16 52:22 53:5 53:7 53:22 55:4 55:7 55:10 55:23 59:22 61:2 61:24 65:8 65:9 65:10 66:2 81:1 23 83:7 83:14 85:11 86:11 87:17 91:16 91:21 96:25 97:3 100:5 106:13 106:23 107:13 109:10 109:17 118:11 120:4 122:15 126:1 134:24 136:15 137:17 137:4 137:5

**Car** [5] 24:11 40:3 40:4 50:2 132:8

**Care** [5] 41:18 41:22 92:7 114:22 128:9

**Cared** [1] 99:16

**Career** [1] 35:10

**Cares** [2] 41:19 41:23

**Carla** [1] 76:9 91:15

**Carload** [1] 50:23

**Carry** [1] 77:9

**Carved** [1] 33:14

**Carving** [1] 33:13

**Case** [134] 4:16 5:2 5:6 6:20 9:6 9:19 9:21 10:2 10:25 14:9 18:21 20:14 20:22 20:25 22:2 22:6 22:8 23:6 25:4 26:2 26:6 26:13 26:17 27:14 27:20 28:3 28:9 28:15 28:20 29:6 30:7 30:19 31:3 31:25 32:19 33:11 33:20 36:12 37:3 37:17 37:20 37:24 38:12 38:1 37 39:5 41:5 41:19 41:22 41:1 43 44:16 44:17 45:5 45:14 45:18 46:12 46:18 47:13 47:9 47:19 48:5 48:23 49:23

**Child** [17] 77:19 93:24 93:25 94:8 98:1 98:2 124:8 132:24 132:25 133:11 133:12 133:13 134:13 135:15 133:19 133:21 134:23 139:13

**Childhood** [1] 140:5

**Children** [1] 106:8

**Choice** [3] 10:6 10:11 106:9

**55:7 57:10 57:18 57:21 58:1 58:15 62:10 62:23 63:6 63:7 63:11 67:22 68:7 68:9 68:9 69:13 70:10 70:16 70:21 71:4 73:15 73:22 74:8 75:13 75:16 77:14 83:10 87:17 88:5 91:16 91:18 91:20 103:19 103:25 104:8 106:2 106:6 106:9 108:7 109:9 110:25 111:15 111:21 113:14 114:15 115:3 118:8 118:12 123:23 123:25 124:21 127:7 129:18 130:21 131:5 133:5 133:25 134:2 134:3 134:22 134:23 135:1 135:24 136:16 136:18 138:17 138:22

**Cases** [21] 14:13 22:2 22:18 24:16 48:12 48:13 64:12 75:24 75:25 76:5 76:25 77:15 77:20 77:24 78:10 91:21 105:9 105:10 121:3 131:3 131:21

**Categories** [1] 57:19

**Category** [5] 17:2 17:3 17:18 17:21 17:22

**Causes** [5] 12:7 45:8 74:25 87:2 104:4

**Certain** [26] 15:16 17:1 17:2 17:12 48:18 50:16 69:16 75:15 76:14 76:14 77:20 81:6 81:20 81:21 82:7 94:12 96:20 96:9 109:7 120:20 128:21 131:1 131:2 131:24 138:1 138:1

**Certainly** [13] 16:23 17:7 34:19 36:1 44:4 95:25 99:3 110:23 111:12 120:17 122:17 137:21 138:1

**Certainty** [9] 15:15 16:4 16:12 80:20 80:22 107:10 107:11 120:17 137:23

**Certify** [3] 142:4 142:8 142:10

**Chain** [1] 66:19

**Chairs** [2] 25:15 45:14

**Chambers** [1] 142:7

**Chance** [5] 56:12 67:2 67:5 116:8 120:16 125:23 137:22

**Change** [12] 12:6 12:22 84:18 108:20 108:22 110:8 115:11 132:10

**Changed** [1] 133:8

**Changes** [1] 12:4

**Character** [17] 9:13 24:7 36:25 37:12 38:6 49:25 62:11 82:9 82:21 83:11 84:6 98:24 99:22 100:8 108:24 109:1 138:25

**Charge** [12] 6:1 6:2 6:15 6:16 6:17 6:18 7:8 7:9 7:20 14:24 125:2 125:5

**Charged** [2] 4:23 133:3

**Charges** [1] 133:7

**Charles** [9] 1:5 4:17 57:18 91:2 116:19 135:23 135:24 140:22 142:20

**Charles'** [2] 57:21 136:17

**Cheap** [3] 139:2 139:3 139:8

**Check** [2] 78:7 81:23

**Checked** [5] 78:9 127:16 129:3 129:4 129:9

**Checking** [1] 81:19

**Checklist** [1] 81:18

**Checks** [2] 128:19 131:18

---

**Choose** [1] 129:8

**Chose** [3] 52:17 78:13 93:5

**Chosen** [1] 130:3

**Church** [3] 128:12 128:13 128:14

**Church's** [1] 128:10

**Circumstance** [9] 9:24 41:12 43:6 50:9 84:11 99:23 118:1 139:23 139:24

**Circumstances** [40] 9:11 9:24 24:6 35:1 35:6 36:25 38:16 41:13 47:12 49:7 50:10 66:18 75:23 80:8 84:4 84:12 92:18 92:22 93:7 99:19 99:21 100:12 100:14 100:23 102:11 105:17 105:18 106:21 107:12 108:19 110:16 111:13 111:15 117:12 117:18 122:3 122:4 122:9 131:15 138:17

**Circumstantial** [12] 40:16 41:3 41:10 41:16 41:19 42:11 43:23 44:2 44:5 44:14 44:19 44:22

**Circumstantially** [1] 100:18

**Citizen** [2] 24:17 96:24

**Citizens** [1] 19:12

**Civil** [5] 58:4 74:22 79:3 80:25 87:25

**Claim** [1] 42:20

**Claire** [6] 2:4 4:21 48:3 57:2 75:12 127:6

**Class** [1] 96:18

**Classes** [1] 96:17

**Clearly** [5] 52:21 140:19

**Cliche** [3] 139:2 139:3 139:8

**Close** [4] 60:17 94:3 111:6 121:9

**Closely** [1] 66:18

**Cloud** [1] 122:12

**Clouds** [1] 100:21

**Clure** [1] 92:6

**Cocaine** [3] 93:24 94:5

**Coconspirators** [3] 39:15 39:16 39:19

**Coconspirators'** [1] 40:18

**College** [1] 113:16

**Coma** [1] 92:8

**Combat** [1] 26:10

**Comfort** [1] 6:11

**Comfortable** [4] 18:1 72:1 119:24 122:14

**Coming** [6] 23:4 30:3 67:10 74:4 74:6 117:9

**Comment** [1] 101:12

**Commission** [5] 39:20 39:24 40:11 40:14 84:10

**Commit** [23] 8:10 9:4 15:21 15:24 16:15 16:18 16:22 39:13 39:13 49:2 49:11 53:22 83:4 83:9 85:11 86:11 86:21 106:17 106:24 107:6 107:24 112:2 120:20

**Commitment** [3] 24:25 26:14 117:19

**Commits** [2] 3:2 53:5

**Committed** [28] 8:3 8:9 8:11 8:17 17:20 24:9 25:23 31:23 32:24 35:7 35:11 40:19 52:16 52:22 53:7 77:12 82:6 82:7 85:6 85:24 110:11 110:12 117:20 120:7 121:6 139:17 141:19

**Common** [1] 79:1

**Communities** [2] 18:3 18:4

**Community** [5] 18:2 19:9 19:10 43:7 43:11

**Comparative** [1] 22:21

**Comparison** [1] 15:7
**Competent** [1] 71:25
**Completely** [2] 27:16 29:22 133:7
**Completing** [1] 91:7
**Complicated** [1] 6:9
**Computer** [1] 1:22
**Conceding** [1] 136:17
**Conceivably** [7] 61:8 65:17 118:18 119:10 119:11 137:19 138:21
**Conceive** [1] 47:5
**Concentrate** [2] 69:22 70:20
**Concentration** [2] 72:4 82:17
**Concept** [2] 39:10 39:11
**Concepts** [2] 48:8 48:10
**Concern** [4] 5:4 55:5 68:16 72:3
**Concerned** [5] 3:4 34:14 64:6 72:11 130:18
**Concerning** [3] 51:20 61:23 108:15
**Concerns** [2] 70:19 72:5
**Conclusion** [6] 6:16 10:22 11:20 23:5 29:7 29:9 30:14 30:17 44:17 97:1
**Condemning** [1] 59:23
**Conduct** [9] 17:19 17:21 17:22 23:25 23:25 24:1 41:12 65:4 66:5
**Conducted** [1] 81:3
**Confession** [2] 41:6 41:8
**Confident** [1] 117:6
**Confinement** [5] 34:6 34:7 34:10 37:18 38:10
**Conflicting** [1] 112:12
**Confuse** [1] 80:18
**Confused** [1] 52:5
**Connect** [5] 39:19 39:24 40:10 40:14 40:19
**Connected** [1] 66:18
**Connection** [2] 85:12 86:12
**Conners** [1] 75:12
**Connors** [15] 2:4 3:6 3:22 3:23 4:22 47:25 48:2 48:3 56:13 72:14 72:15 104:22 105:2 117:1 127:6
**Consequences** [1] 99:11
**Consider** [32] 17:25 37:16 37:22 37:25 38:9 38:15 38:19 38:21 38:22 38:23 49:23 51:6 51:24 52:11 53:25 54:2 54:3 54:7 54:11 61:10 63:3 64:8 79:14 84:8 87:12 100:13 111:9 111:22 120:13 138:19 139:6 139:9
**Consideration** [10] 9:10 26:15 29:3 29:11 29:12 29:14 84:4 95:20 98:3 119:15
**Considerations** [3] 99:15 127:12 129:1
**Considered** [3] 30:17 51:21 65:25
**Considering** [2] 24:14 122:2
**Consistent** [1] 30:10
**Consistently** [1] 20:11
**Conspire** [1] 39:13
**Constant** [2] 12:3 83:22
**Constitute** [5] 9:5 19:12 49:3 106:18 120:25
**Constitutes** [1] 17:23
**Contact** [1] 18:7
**Contained** [2] 12:5 30:7
**Contains** [1] 142:4
**Contested** [2] 118:9 136:

**Context** [6] 15:17 19:14 61:15 137:21 137:23 138:13
**Continental** [1] 114:25
**Continuing** [10] 9:5 17:23 19:12 83:4 83:8 83:17 84:24 106:18 112:1 121:1
**Contrary** [1] 37:25
**Control** [3] 69:1 132:9 132:13
**Controlled** [1] 121:21
**Controls** [1] 129:9
**Conversation** [3] 13:25 21:13 44:18
**Convey** [2] 39:10 46:25
**Conveyed** [1] 27:22
**Convict** [1] 35:8
**Convicted** [13] 13:8 34:2 34:4 40:8 77:24 97:25 114:8 115:15 132:18 132:19 132:22 133:2 133:3
**Conviction** [1] 39:14
**Convince** [4] 78:22 80:12 80:12 134:12
**Convinced** [1] 122:13
**Convincing** [2] 98:24 118:25
**Cook** [4] 73:1 73:5 75:11 90:18
**Cooter** [1] 42:24
**Copy** [4] 78:5 116:20 127:10 135:24
**Correct** [8] 50:19 55:14 69:19 70:13 89:5 110:4 110:5 142:4
**Correctly** [1] 142:9
**Cost** [1] 142:10
**Counsel** [1] 142:5
**Counter** [1] 89:25
**Country** [1] 24:21
**County** [12] 1:8 1:21 4:25 19:13 34:24 81:20 82:8 90:13 142:2 142:4 142:11 142:17
**Couple** [6] 5:13 12:11 24:11 31:16 35:22 133:22
**Course** [21] 12:9 18:8 31:24 32:2 32:24 33:10 35:9 65:11 66:9 66:12 66:16 69:6 70:3 74:17 77:2 79:3 81:21 82:8 100:8 124:18 133:11
**Court** [54] 1:3 1:5 3:1 3:7 3:9 3:11 3:14 3:19 3:22 3:24 4:1 4:4 4:6 4:9 46:4 47:25 56:15 67:8 67:11 67:15 71:10 72:8 72:14 72:17 72:19 72:21 72:24 73:4 79:13 88:6 90:20 90:21 92:4 92:10 93:8 103:2 103:3 103:7 104:22 116:12 123:4 123:5 123:9 127:2 130:11 130:15 135:16 141:22 141:23 142:3 142:4 142:7 142:17 142:17
**Court's** [13] 6:1 6:2 6:14 6:15 6:17 6:18 7:7 7:9 7:20 14:24 98:16 125:2 125:5
**Courthouse** [1] 34:15
**Courtroom** [3] 11:13 88:12 92:3
**Cover** [1] 120:19
**Covers** [1] 141:3
**Coworker** [1] 95:8
**Coworkers** [1] 18:7
**Crack** [1] 94:5
**Created** [1] 80:3
**Credence** [1] 113:19
**Credibility** [2] 7:1 124:23
**Credible** [4] 6:23 7:7 7:8 43:1
**Crime** [70] 8:4 8:9 8:10 8:17 16:19 17:1 17:3 17:3 17:

4:17 17:21 17:22 23:2 25:7 24:33 13 33:14 35:6 35:7 35:10 36:17 37:5 39:13 39:25 40:11 40:15 40:19 48:18 50:8 55:1 63:12 63:14 64:10 76:14 77:12 77:24 82:6 82:15 82:20 84:10 85:6 85:25 86:21 86:22 87:19 97:10 97:14 98:1 99:24 100:2 100:24 105:16 108:9 109:7 110:11 110:23 117:13 117:19 117:21 119:12 120:8 121:6 121:20 122:16 132:19 139:18 141:25
**Crimes** [14] 17:2 35:15 39:14 55:2 77:2 99:21 105:11 108:25 109:3 111:14 131:1 131:2 131:3 139:17
**Criminal** [33] 9:4 15:21 15:25 16:4 16:15 16:18 17:10 17:10 17:16 17:18 18:11 18:19 18:24 19:6 19:11 32:3 35:10 41:5 49:2 53:9 79:6 82:10 101:18 106:17 106:24 107:6 107:16 107:24 112:2 120:25 121:18 121:24 134:23
**Criminals** [1] 101:19
**Critical** [1] 129:6
**Critically** [1] 35:23
**Cross-examination** [1] 79:23
**Cross-examining** [1] 80:2
**Crux** [1] 99:3
**CSR** [1] 142:16
**Culpability** [6] 9:14 49:25 50:6 84:9 99:23 108:9
**Cure** [1] 23:10
**Curious** [1] 125:18
**Cut** [1] 125:13
**Cynthia** [1] 3:3

**D**

**Daily** [2] 121:22 137:19
**Danger** [11] 21:5 25:25 27:12 27:12 47:11 55:25 59:25 97:4 119:18 120:6 137:5
**Dangerous** [1] 53:8
**Date** [4] 69:11 81:20 82:7 142:16
**Daycare** [1] 124:11
**Days** [3] 36:5 46:20 112:9
**Dead** [1] 34:24
**Deal** [4] 16:9 26:18 106:6 136:4
**Dealing** [2] 4:15 7:20
**Dealt** [2] 106:7 106:10
**Death** [103] 10:1 10:8 10:18 10:23 11:24 14:6 20:12 20:16 21:2 21:3 21:5 22:3 22:10 23:16 23:24 24:15 25:6 26:2 27:15 28:8 28:9 28:11 28:17 28:17 28:23 31:10 34:3 43:23 47:16 48:10 49:16 49:19 50:11 51:22 55:1 55:7 55:11 59:4 61:25 63:9 63:24 64:5 64:9 64:18 64:19 64:19 75:20 75:25 76:7 76:1 76:13 77:1 77:11 77:16 77:21 77:23 77:25 78:8 78:9 78:13 78:16 78:23 80:10 80:13 84:14 84:19 84:24 96:3 99:5 105:6 105:7 105:12 105:15 108:1 108:18 108:15 108:19 109:24 110:3 111:11 111:12 111:24 112:4 112:18 115:4 115:11 115:19 118:5 119:20 121:21 127:24 130:2 128:11 128:15 130:4 130:23 130:25 131:17 134:8 134:10 135:1 135:10
**December** [1] 4:25
**Decide** [16] 5:4 7:14 49:18 54:11 58:22 62:12 65:6 84:25 85:17 106:4 106:15

**Decided** [2] 59:21 128:3
**Decides** [2] 83:19 127:19
**Deciding** [6] 29:13 51:22 64:8 105:14 137:24 140:23
**Decision** [40] 8:8 8:20 27:3 30:1 30:3 45:17 54:10 57:12 63:10 76:22 78:20 79:1 79:21 80:24 81:5 82:3 87:18 88:14 96:9 96:21 96:23 97:9 97:19 98:6 98:9 98:9 98:10 98:11 100:21 109:20 116:2 117:9 120:3 129:13 130:10 134:10 134:13 134:18 135:10 136:7
**Decisions** [12] 22:23 26:22 26:25 54:21 54:22 55:22 70:2 76:17 85:21 96:8 98:7 134:7
**Defendant** [93] 2:22 3:13 3:16 4:5 4:7 5:4 5:5 5:7 8:6 9:1 9:4 9:7 10:8 10:13 12:25 13:1 13:18 15:21 15:23 15:24 16:14 16:17 16:21 17:20 19:17 20:1 20:4 21:14 21:15 21:21 22:19 22:21 24:8 24:9 25:23 29:1 29:2 29:10 30:11 30:16 30:24 32:11 32:17 32:20 35:4 37:1 37:7 37:9 37:12 38:2 38:3 38:7 39:19 39:24 41:6 41:6 43:2 43:8 43:13 43:17 43:18 43:20 44:1 44:20 47:8 47:11 47:15 48:22 49:2 50:1 50:6 54:15 55:9 55:23 62:12 72:20 72:23 76:20 79:7 80:5 81:17 81:20 82:6 82:15 82:17 83:4 85:5 85:19 102:22 106:13 107:25 126:1 129:12
**Defendant's** [21] 8:13 20:12 23:7 24:7 25:17 25:24 37:17 38:4 38:9 39:22 41:14 49:24 51:21 61:24 82:9 84:6 99:22 102:13 108:8 125:20 126:13
**Defendants** [5] 10:16 11:7 12:20 42:6 57:20
**Defense** [9] 33:19 70:9 77:6 79:23 86:19 93:19 95:1 95:3 102:7
**Defenses** [1] 94:20
**Define** [8] 7:14 7:19 7:22 15:6 65:4 66:4 118:15 118:15
**Defined** [11] 7:10 7:12 12:16 14:24 15:3 15:4 17:25 22:14 22:15 23:21 98:22
**Definitely** [3] 48:13 56:8 63:19
**Definition** [13] 33:9 59:2 59:23 98:15 98:17 98:19 98:21 110:24 111:7 111:16 118:22 119:3 137:15
**Degree** [7] 24:13 24:22 25:4 45:8 74:1 87:8 105:20
**Deliberate** [1] 37:14
**Deliberates** [1] 37:6
**Deliberating** [1] 6:3
**Deliberation** [1] 11:15
**Demeaningly** [1] 139:7
**Department** [2] 105:23 114:18
**Dependent** [1] 106:8
**Deputy** [1] 106:3
**Describe** [1] 118:3
**Desert** [1] 24:19
**Deserve** [4] 30:6 105:12 130:23 131:9
**Deserved** [1] 76:11
**Deserves** [1] 130:23
**Destiny** [3] 69:1 129:9 130:3
**Detailed** [2] 4:14 5:19
**Detained** [1] 89:13

**Determination** [3] 51:8 125:22 131:12
**Determine** [4] 22:8 38:4 64:1 124:23
**Determined** [3] 43:21 62:11 63:12
**Determiner** [1] 132:3
**Determines** [2] 20:13 37:7
**Determining** [3] 29:13 59:3 119:19
**Detract** [1] 69:22
**Develop** [1] 60:6
**Developed** [1] 53:11
**Dictate** [2] 27:10 80:10
**Died** [1] 111:4
**Dies** [3] 30:15 36:7 64:20
**Difference** [6] 23:15 40:17 42:10 42:11 64:18 124:25
**Different** [45] 5:19 10:25 11:1 11:8 11:9 11:10 11:11 11:16 12:7 14:3 16:9 18:3 27:5 27:11 27:13 34:25 35:1 35:2 35:3 35:19 52:25 53:4 54:8 54:14 53:14 54:6 54:6 54:8 54:9 61:8 66:21 80:16 85:14 86:3 86:25 87:1 87:11 93:9 99:20 100:10 100:12 100:17 108:14 110:15 124:13
**Differently** [3] 11:9 35:16 121:4
**Dinkins** [6] 46:1 46:5 48:3 52:1 55:6 67:8
**Dire** [16] 1:15 46:3 48:1 56:16 67:14 71:11 73:3 75:9 87:15 90:22 103:6 105:1 116:14 123:8 127:3 135:18
**Direct** [7] 41:2 41:3 41:9 42:10 43:3 44:22 129:24
**Directed** [1] 94:18
**Directs** [1] 132:3
**Disabilities** [2] 82:11 86:5
**Disagree** [2] 93:1 140:3
**Disagreement** [2] 40:24 104:5
**Disagreements** [1] 40:20
**Discomfort** [2] 45:9 75:2
**Discretion** [2] 10:7 10:12
**Discussed** [2] 46:19 70:20
**Dismissed** [2] 132:20 133:7
**Distinction** [3] 7:23 18:1 18:2
**Distractions** [2] 71:17 71:19
**District** [7] 1:5 1:11 2:6 4:21 120:2 142:3 142:17
**DNA** [2] 11:2 131:23
**Doctor** [1] 72:22
**Done** [12] 8:13 19:24 33:10 58:13 61:6 63:14 63:20 68:21 97:5 110:13 126:9 138:10
**Door** [2] 67:2 94:3
**Doubt** [52] 9:3 12:14 12:16 12:25 13:9 13:12 13:18 13:24 14:16 14:23 15:1 15:20 16:17 21:10 25:17 25:20 32:9 39:23 41:21 41:25 42:5 42:8 42:13 42:25 44:1 44:23 49:1 51:5 58:24 58:25 65:22 65:24 66:6 80:4 80:18 81:9 81:16 81:23 83:2 83:14 83:1 85:1 95:18 98:16 98:23 99:17 106:17 108:6 118:19 118:23 118:24 134:21 134:22 137:17
**Doubts** [1] 76:21
**Down** [19] 7:14 7:17 20:16 21:6 22:3 24:10 35:19 36:19 41:15 42:14 42:17 57:18 58:8 86:1 89:16 89:25 90:1 91:14 141:11
**Dozen** [1] 42:7

**Dr** [2] 69:7 72:10
**Drag** [1] 42:18
**Drank** [1] 110:9
**Drawing** [1] 30:13
**Drew** [1] 30:13
**Drink** [1] 87:2
**Drinking** [2] 42:22 52:23
**Drive-by** [1] 50:19
**Driver** [1] 40:2
**Driving** [1] 24:10
**Drug** [3] 60:18 94:23 98:1
**Drug-related** [1] 60:18
**Drugs** [13] 52:16 52:18 52:21 52:23 85:5 85:8 85:10 93:13 93:16 93:18 94:13 94:19 94:24
**Drunk** [3] 110:10 110:12 110:14
**Drunker** [1] 42:23
**Drunks** [2] 42:16 42:18
**Due** [1] 108:25
**Duly** [5] 46:2 67:13 73:2 103:5 123:7
**Dumb** [1] 96:18
**Duration** [2] 70:12 124:4
**During** [22] 6:2 12:9 18:8 31:24 32:2 32:3 32:4 32:7 32:24 33:10 35:9 46:19 71:4 77:14 77:17 77:17 77:18 81:21 82:8 92:3 103:25 124:18
**Duty** [3] 77:19 88:2 112:20

## E

**Early** [4] 23:3 92:25
**Easier** [1] 127:9
**Easy** [1] 97:2
**Ed** [1] 86:6
**Educate** [1] 113:10
**Effect** [1] 85:17
**Eighty-five-year-old** [1] 35:22
**Either** [9] 9:8 17:5 28:13 32:19 35:17 43:15 49:13 117:19 120:17
**Elects** [1] 79:15
**Element** [1] 101:18
**Elements** [3] 81:8 81:11 81:13
**Eleven** [1] 126:7
**Eligibility** [4] 29:11 29:14 30:18 30:20
**Eligible** [2] 29:3 29:11
**Elizabeth** [1] 3:20
**Emotions** [1] 112:13
**Emphasis** [1] 82:14
**End** [5] 27:18 72:4 91:8 126:18 129:25
**Endangerment** [2] 132:23 134:24
**Ended** [1] 106:2
**Ends** [1] 23:19
**Enforce** [2] 45:6 74:2
**Enron** [1] 42:15
**Entirely** [1] 11:16
**Entitle** [1] 122:10
**Entitled** [5] 10:20 16:24 16:25 19:6 26:14
**Environment** [3] 121:5 121:14 121:15
**Environments** [1] 93:9
**Equally** [2] 11:7 70:9
**Equals** [1] 48:19
**Equipped** [2] 88:9 88:9
**Erased** [1] 13:2
**Escapes** [1] 18:17
**Essence** [1] 119:19

**Essentially** [2] 95:16 96:2
**Establish** [2] 41:14 63:2
**Establishes** [1] 42:12
**Ethical** [2] 127:12 129:1
**Evaluate** [5] 24:25 45:16 45:18 84:3 104:10
**Evaluating** [1] 29:16
**Evaluation** [2] 12:8 30:22
**Evaluations** [4] 29:15 29:18 29:22 30:2
**Evening** [1] 101:20
**Event** [5] 9:1 28:20 28:21 28:22 95:15
**Events** [1] 66:19
**Evidence** [159] 5:8 6:16 8:2 8:7 9:2 9:10 9:19 9:21 11:14 12:8 12:14 12:18 12:22 13:3 13:9 13:12 13:18 13:19 13:23 14:12 14:15 14:22 14:25 15:19 16:16 16:23 20:22 21:9 23:1 23:4 23:19 24:4 24:25 25:2 26:7 26:10 26:11 26:12 26:16 27:4 27:7 28:14 30:6 31:3 35:9 36:20 37:4 37:11 37:13 37:19 38:7 38:11 39:1 39:1 39:6 39:17 39:20 41:10 40:13 40:15 40:16 40:17 40:18 41:2 41:2 41:3 41:3 41:10 41:11 41:11 41:16 41:18 41:20 42:11 43:24 43:25 44:5 44:17 44:19 44:21 44:23 45:18 48:25 49:20 49:22 50:12 51:7 51:17 51:51 20 51:24 52:2 52:24 53:13 53:13 54:11 54:22 55:14 56:2 56:7 59:19 61:23 65:5 65:6 65:13 65:17 65:21 66:23 74:7 74:14 74:16 76:23 78:21 79:14 79:21 79:25 80:11 81:3 82:5 82:5 82:9 83:1 83:1 83:24 84:16 85:3 85:4 85:14 85:17 86:2 86:5 86:15 87:6 95:14 97:21 101:4 102:10 104:11 106:16 109:11 109:18 109:25 119:7 123:23 130:9 130:10 130:15 130:20 131:24 133:6 134:12 135:9 136:6 136:7 137:9 140:13 142:5
**Ex** [1] 35:8
**Ex-convict** [1] 35:8
**Exactly** [17] 10:13 11:13 11:14 11:14 12:7 22:16 22:25 23:4 33:9 34:23 35:5 42:20 43:5 62:8 67:22 97:8 119:22
**EXAMINATION** [15] 1:15 46:3 68:1 56:16 67:14 71:11 73:3 75:9 90:22 103:6 105:1 116:14 123:8 127:3 135:18
**Example** [20] 10:10 11:12 18:9 22:18 32:25 35:21 40:1 42:14 47:9 48:19 52:15 84:15 94:22 96:13 99:25 100:9 107:20 110:1 121:19 121:23
**Examples** [1] 76:3
**Exceed** [1] 34:10
**Except** [5] 33:9 58:25 78:9 98:15 137:16
**Exception** [1] 118:18
**Exclusive** [1] 6:25
**Exclusively** [2] 39:15 40:9
**Excuse** [10] 31:22 32:6 32:23 33:8 33:19 36:12 67:9 126:6 136:13 139:5
**Excused** [7] 3:4 3:15 4:6 24:2 72:11 72:22 72:24
**Excusing** [1] 23:24
**Executed** [2] 91:19 131:25
**Execution** [1] 76:19
**Exercise** [5] 45:2 102:19
**Exhibits** [1] 142:9

**Exist** [9] 6:13 21:10 28:2 28:3 28:4 34:19 41:2 47:12 66:24
**Existed** [2] 38:12 47:19
**Existence** [7] 16:21 17:19 32:9 32:14 32:22 69:21 69:21
**Exists** [8] 16:23 20:14 20:18 25:3 28:14 40:23 44:6 47:17
**Expect** [3] 7:17 80:10 102:16
**Experience** [7] 58:9 58:13 58:17 60:25 72:1 100:3 118:20
**Experiences** [2] 108:21 133:23
**Experiments** [1] 81:2
**Expert** [1] 122:21
**Expiration** [1] 142:16
**Explain** [1] 48:6
**Explained** [1] 107:7
**Explanation** [4] 93:20 119:8 136:22 137:8
**Exposure** [1] 93:13
**Expressing** [1] 102:20
**Extent** [3] 50:25 68:8 80:23
**Extract** [2] 7:7 125:7
**Extreme** [4] 55:2 55:2 83:20 111:9
**Extremely** [1] 116:24
**Eyewitness** [3] 40:15 41:4 44:2
**Eyewitnesses** [2] 42:7 43:4
**Eyewitnesses'** [1] 42:9

## F

**Face** [1] 94:25
**Faced** [1] 88:14
**Facet** [1] 40:24
**Facilities** [1] 92:7
**Facing** [1] 58:7
**Fact** [9] 5:1 6:15 6:24 37:9 96:20 99:9 109:4 121:2 126:11
**Factors** [2] 52:12 87:12
**Facts** [18] 6:25 35:19 37:23 48:14 49:8 49:23 51:7 78:18 88:7 95:13 98:5 108:7 109:8 110:8 110:16 111:21 130:22 138:17
**Faintest** [1] 47:23
**Fair** [4] 80:19 117:7 130:6
**Fairly** [4] 68:14 114:11 115:16 137:19
**Faith** [3] 129:9 130:3 136:4
**Families** [4] 52:9 53:20 53:23 106:8
**Family** [7] 10:7 54:1 82:12 92:9 92:10 132:18 139:23
**Fannin** [1] 2:7
**Far** [12] 39:7 58:11 68:1 73:11 74:25 84:3 104:4 123:15 126:21 126:22 127:23 131:14
**Fashion** [1] 64:14
**Fate** [8] 127:19 127:23 128:3 132:6 132:6 132:7 132:8 132:10
**Father** [1] 92:7
**Favor** [2] 76:13 78:12
**Faye** [3] 76:9 91:16 115:3
**Fear** [1] 69:15
**Feature** [5] 11:5 20:14 20:15 20:18 25:3

**Features** [1] 32:9

**Feelings** [8] 54:25 58:4 60:7 102:16 102:20 113:4 115:7 131:17

**Fellow** [1] 96:24

**Felonies** [1] 32:5

**Felony** [5] 31:24 32:10 33:11 132:19 132:22

**Felt** [1] 63:19

**Few** [3] 48:4 78:10 112:8

**Field** [1] 42:15

**Fifteen** [5] 43:10 43:16 56:20 57:7 86:1

**Fifth** [2] 102:13 102:18

**Fifty** [2] 35:22 111:2

**Fight** [1] 100:9

**Figure** [2] 44:11 102:17

**Filled** [3] 87:14 117:16 140:14

**Finally** [1] 36:5

**Financial** [1] 69:14

**Financially** [1] 68:21

**Findings** [1] 26:1

**Fine** [4] 16:10 34:10 103:9 133:20

**Fingerprint** [4] 11:1 11:4 11:6 44:6

**Fingerprints** [4] 11:2 40:13 44:3 44:4

**Finished** [1] 44:25

**Fire** [2] 24:11 100:9

**Fired** [3] 43:12 43:19 43:22

**Firing** [1] 50:24

**Firm** [2] 93:23 94:21

**First** [48] 5:3 8:1 8:5 8:18 9:12 9:17 10:5 10:10 10:15 10:15 13:10 13:16 14:1 14:2 14:4 14:14 14:19 14:20 19:16 19:18 19:25 20:8 20:1 20:23 29:10 31:17 37:5 44:25 46:2 46:5 48:25 49:23 56:4 58:2 58:21 58:22 65:1 67:13 73:2 73:5 75:18 76:8 78:7 81:15 103:5 107:14 118:19 120:5 123:7

**Fit** [2] 45:16 110:24

**Five** [14] 31:7 31:12 34:8 35:8 36:13 38:10 38:15 46:22 51:9 53:12 69:17 78:6 78:13 110:21

**Fix** [1] 36:3

**Flip** [1] 38:1

**FM** [1] 2:19

**Focus** [5] 8:2 8:7 8:9 8:10 101:4

**Folks** [4] 4:15 22:19 23:8 28:19

**Follow** [13] 45:6 45:10 71:13 74:2 75:13 91:20 112:20 113:17 114:15 115:3 115:25 126:5 127:8

**Followed** [2] 66:19 110:25

**Following** [3] 1:18 79:18 98:22

**Follows** [6] 46:2 67:13 73:2 103:5 116:24 123:7

**Food** [1] 106:8

**Forearmed** [1] 6:8

**Foreclose** [1] 27:25

**Foregoing** [1] 142:4

**Foreign** [1] 94:14

**Forever** [1] 23:12

**Forewarned** [1] 6:7

**Forfeit** [1] 87:19

**Form** [8] 59:19 65:9 76:13 78:1 92:23 109:6 116:20 131:18

**Formed** [2] 96:23 140:6

**Former** [1] 114:8

**Fort** [1] 66:14 90:13

**Forty** [5] 29:4 29:4 29:5 29:6 29:8 29:9 29:16 30:14 30:17 31:1 31:7 35:8

**Forty-five-year-old** [1] 35:8

**Forty-year** [1] 29:16 31:1

**Forward** [2] 80:11 118:10

**Four** [4] 11:13 11:15 11:16 117:25

**Four-year-old** [1] 117:25

**Fourth** [1] 94:1

**Frame** [5] 46:19 69:8 71:4 73:22 104:1

**Frankly** [3] 4:14 29:8 78:14

**Free** [4] 18:11 18:18 18:23 19:6

**Freeway** [1] 2:14

**Frequently** [2] 102:15 137:19

**Frets** [1] 36:4

**Friday** [5] 5:12 12:15 12:17 46:5 67:24 67:25 69:10 69:11 73:6 73:7 103:12 123:13 124:3

**Friend** [3] 90:6 114:7 132:18

**Friends** [3] 50:23 88:21 94:21

**Front** [1] 126:10

**Frustrated** [1] 5:20

**Full** [2] 71:21 72:3

**Fully** [1] 53:10

**Future** [28] 15:21 15:24 16:5 16:19 16:22 17:1 21:4 25:24 27:12 27:12 47:11 49:11 55:25 59:6 59:25 83:14 97:4 99:4 99:10 106:24 107:7 107:24 112:2 119:18 119:22 120:6 120:14 137:4

**G**

**Gasoline** [1] 133:16

**Gathering** [1] 74:21

**General** [1] 78:8

**Generally** [9] 5:11 61:16 78:12 78:12 93:3 95:6 120:14 140:5 140:11

**Gentlemen** [1] 4:10

**Getaway** [2] 40:2 50:2

**Girl** [1] 35:11

**Girlfriend** [1] 133:10

**Gist** [1] 134:3

**Given** [8] 5:9 5:25 6:17 7:2 23:16 26:6 82:2 85:18 88:6 96:1 130:11 130:14 130:20 131:19 131:25 132:14 136:8

**GLEN** [1] 46:1

**God** [9] 127:16 127:25 129:6 129:18 129:24 130:17 132:2 132:3 136:4

**God's** [4] 128:8 128:8 129:12 129:13

**Golly** [1] 52:20

**Gossip** [1] 114:17

**Governor** [4] 29:24 29:25 115:4 115:11

**Graduated** [1] 68:13

**Granted** [3] 29:14 30:18 30:21

**Grave** [2] 110:23 112:19

**Great** [4] 16:12 44:3 112:18 136:4

**Greater** [2] 33:12 34:9

**Grew** [1] 82:12

**Grievous** [1] 105:11

**Grossly** [2] 15:22 16:2

**Ground** [2] 39:5 43:13

**Grounds** [1] 122:4

**Group** [3] 23:12 50:23 101:17

**Groups** [1] 78:6

**Grow** [1] 93:7

**Guards** [2] 19:2 121:9

**Guess** [13] 29:8 37:21 52:5 60:4 60:7 113:22 115:19 117:20 120:8 130:21 131:13 133:5 133:16

**Guided** [1] 130:17

**Guides** [1] 132:3

**Guilt** [11] 39:22 41:14 41:21 41:25 42:13 79:14 84:5 117:21 125:22 125:25 136:17

**Guilt/innocence** [10] 57:22 63:22 81:14 82:21 97:8 98:9 98:20 102:8 118:7 136:11

**Guilty** [82] 5:5 5:5 5:7 8:6 9:1 12:19 12:21 12:21 12:25 13:1 13:17 13:19 13:20 13:20 14:19 19:17 20:11 21:4 24:2 25:17 25:18 25:23 26:11 26:23 27:11 28:21 32:11 32:17 32:20 33:3 33:4 33:5 37:7 37:9 38:3 38:4 38:23 38:23 41:16 42:2 42:6 43:2 44:2 44:20 47:8 48:22 49:4 54:15 55:9 55:23 57:23 63:1 65:16 66:1 66:21 80:5 81:17 81:18 81:23 82:16 83:7 83:18 84:20 87:20 96:25 97:3 97:9 100:21 106:13 106:22 107:13 109:10 109:17 115:16 120:4 122:14 125:20 126:1 126:14 137:1 137:4 137:5

**Gun** [7] 43:8 43:14 43:17 43:19 94:25 95:2 102:1

**Gunpoint** [1] 94:24

**Guns** [5] 50:24 100:8 100:10 43:16 43:19

**Gunshot** [4] 43:10 43:12 43:16 43:19

**Guy** [7] 40:1 42:17 43:6 43:11 89:21 89:23 101:25

**Guys** [2] 7:14 90:2

**H**

**Half** [3] 9:17 20:20 42:7

**Hallway** [1] 45:22

**Hand** [5] 16:2 43:5 43:9 112:17 142:12

**Handle** [1] 20:19

**Handled** [1] 91:22

**Hands** [4] 43:14 43:17 129:12 129:14

**Hang** [1] 89:13

**Hanging** [1] 100:21

**Happy** [1] 122:22

**Hard** [5] 5:22 44:11 117:22

**Harm** [1] 95:2

**Harmful** [1] 132:23

**Harris** [16] 1:8 1:21 4:25 19:13 34:21 82:20 82:8 123:6 123:10 123:12 124:15 127:5 142:2 142:4 142:11 142:17

**Hate** [1] 36:15

**Headway** [1] 4:15

**Health** [5] 46:16 71:2 73:20 92:7 103:23

**Hear** [36] 5:8 8:5 8:12 8:14 8:16 11:11 34:16 34:16 37:11 38:5 41:15 49:7 57:5 74:16 78:18 78:19 79:2 79:4 79:6 82:4 82:22 83:11 83:11 83:13 97:23 102:16 111:8 130:10 131:22 134:14

**Heard** [32] 1:19 8:17 9:12 9:16 10:21 26:11 26:12 37:4

**Grossly** [2] 15:22 16:2

**Hearing** [3] 22:25 79:21 85:4

**Hears** [3] 43:10 43:11 43:16

**Hearsay** [1] 114:16

**Heart** [3] 119:3 141:14

**Heavy** [1] 98:6

**Heinous** [10] 34:19 85:25 105:11 109:1 109:2 109:9 110:22 110:24 111:3 111:13 110:22 110:24 111:3 111:13

**Held** [3] 1:21 86:21 94:24

**Help** [8] 8:19 57:12

**Helpful** [1] 131:12

**Helping** [1] 95:22

**Helps** [1] 82:18

**Hereby** [1] 142:11

**Hesitation** [2] 98:25 119:1

**Hi** [1] 56:19

**High** [5] 85:5 85:7 86:7 86:10 86:20

**Higher** [3] 135:2 135:3 135:8

**Hill** [5] 2:12 4:19 91:2 116:19 135:23

**Hill's** [1] 72:17

**Hills'** [2] 3:9 4:1

**Himself** [1] 41:7

**Hired** [1] 68:12

**History** [2] 23:7 82:10

**Hit** [1] 132:7

**Hold** [1] 102:22

**Home** [5] 15:5 51:11 90:13 114:22 128:13

**Homes** [1] 121:22

**Honest** [2] 42:21 113:2

**Honestly** [6] 50:13 112:6 116:2 134:16 139:5 140:14

**Honesty** [1] 116:11

**Honor** [8] 3:5 3:6 3:8 56:14 72:15 72:16 72:18 75:8

**Honorable** [1] 1:20

**Hope** [2] 19:3 61:11

**Hopefully** [1] 61:8

**Hoping** [1] 77:22

**Hops** [1] 40:4

**Horrible** [3] 25:23 34:18 100:11

**Hotel** [1] 101:23

**Hotly** [2] 118:9 136:19

**House** [1] 17:14

**Houston** [9] 1:21 2:8 2:15 2:20 90:1 90:11 90:12 106:5 142:18

**Human** [9] 31:21 32:6 33:7 33:17 36:10 55:5 105:23 114:18 131:6

**Hundred** [4] 80:19 80:21 107:3 137:22

**Hundreds** [1] 17:17

**Hurt** [3] 76:6 95:5 102:2

**Husband** [3] 35:24 36:3 60:12

**Hypothetical** [4] 23:6 30:11 43:2 44:16

**I**

**Idea** [9] 6:6 6:10 23:10 40:23 46:25 61:3 102:4 107:7 119:19

**Identifiers** [1] 44:4

**Identify** [1] 40:7

**Identifying** [1] 11:4
**Ill** [1] 35:23
**Illegal** [2] 94:13 95:4
**Imaginary** [4] 37:3 37:16 37:17 38:9
**Imagine** [3] 37:2 113:2 122:21
**Impartial** [1] 117:7
**Importance** [2] 96:1 138:1
**Important** [15] 24:24 48: 25 102:18 105:14 119:2 120: 3 120:22 136:2 136:5 137:14
**Impose** [1] 112:4
**Imposed** [14] 10:23 10:24 11:22 11:25 21:2 21:3 22:10 26:2 27:15 28:25 31:9 31:11 34:11 134:8
**Imprisonment** [7] 63:3 100:23 105:16 121:4 127:24 128:1 130:5
**Incident** [2] 87:13 131:15
**Included** [2] 65:2 142:6
**Including** [2] 9:10 9:13
**Inconvenience** [1] 124:12
**Incredibly** [1] 120:3
**Indeed** [1] 100:4
**Independent** [10] 27:16 39:18 39:18 39:20 40:10 40: 13 40:17 47:1 98:8 104:16
**Independently** [2] 136: 23 137:10
**Indescribable** [1] 109:3
**Indicate** [1] 38:18
**Indicated** [5] 62:16 90:6 92:16 132:17 137:20
**Indicates** [1] 78:14
**Indication** [2] 37:24 126: 13
**Indictment** [3] 4:23 81:8 81:16
**Indignation** [1] 36:6
**Indignity** [1] 36:2
**Individual** [4] 57:22 82: 17 93:6 93:15
**Individual's** [2] 82:12 93:18
**Individualistic** [1] 11: 7
**Individualized** [1] 57:15
**Individually** [1] 57:16
**Individuals** [1] 129:5
**Influence** [3] 69:5 73:15 103:19
**Information** [9] 8:17 22: 8 27:2 45:15 52:13 82:22 97: 23 126:19 131:13
**Inhalation** [1] 133:18
**Initial** [2] 96:21 97:19
**Injure** [1] 133:13
**Injured** [1] 133:12
**Injuries** [1] 50:25
**Injury** [3] 132:25 133:1 133:15
**Inmates** [3] 18:13 19:3 19: 5
**Inner** [1] 132:14
**Innocence** [4] 12:24 84:6 126:15 136:17
**Innocent** [4] 13:2 102:3 111:20 111:20
**Insensitive** [1] 64:11
**Inside** [5] 18:20 18:22 24: 11 59:9 89:7
**Instance** [3] 36:17 76:7 117:25
**Instances** [3] 6:13 41:8 75:22
**Instead** [3] 8:9 21:1 39:17

**Institution's** [1] 121:11
**Institutional** [1] 121:15
**Instructed** [1] 79:12
**Instruction** [1] 20:21
**Instructions** [1] 88:6
**Instructs** [1] 9:18
**Insulting** [1] 139:12
**Intend** [2] 77:8 139:3
**Intent** [2] 77:9 100:15
**Intention** [2] 100:4 100:7
**Intentional** [13] 31:21 32:5 32:10 32:22 33:6 33:16 33:22 33:25 36:9 48:18 76:6 77:2 77:3
**Intentionally** [3] 33:6 52:17 110:12
**Interesting** [1] 58:10
**Interfere** [4] 46:18 71:3 73:21 103:24
**Interrupting** [1] 68:17
**Intertwined** [1] 141:22
**Intoxicated** [2] 52:15 52: 18
**Intoxication** [2] 86:19 87:1
**Involved** [10] 41:12 50:4 50:18 58:3 91:13 102:3 128: 12 128:14 133:12 133:16
**Involvement** [2] 9:15 108: 9
**Involving** [2] 48:14 131: 15
**Issue** [44] 25:20 58:22 59: 21 59:24 61:13 62:7 62:8 62: 15 63:7 63:9 63:23 70:11 80: 7 82:25 84:1 84:2 84:23 84: 25 95:17 95:21 95:22 95:25 96:22 97:17 98:10 98:10 98: 13 98:14 99:18 100:25 102:9 106:15 106:15 118:7 119:5 119:14 119:16 120:5 120:9 120:12 122:1 138:7 138:18 139:7
**Issues** [15] 5:11 8:21 58: 22 58:25 92:1 96:7 97:2 97: 6 118:5 118:12 118:14 136: 22 137:2 137:14 138:13
**Itself** [8] 37:5 39:21 39: 21 63:7 82:20 119:12 138:20 138:22

**Jacinto** [1] 142:18
**Jail** [3] 133:4 133:5 135:6
**Job** [12] 6:24 7:2 18:16 25: 18 25:19 65:3 71:22 124:23 124:24 124:24 125:2 125:6
**JR** [2] 1:5 142:20
**Judge** [31] 1:20 51:17 57: 2 57:9 57:21 59:2 59:12 60: 9 65:1 72:7 76:19 77:10 88: 7 91:22 93:8 98:7 106:12 107:7 112:4 118:13 120:15 120:24 122:2 126:5 127:17 127:25 128:7 128:8 136:8 137:20 138:15
**Judge's** [3] 87:15 116:23 136:21
**Judger** [1] 129:7
**Judges** [1] 6:25
**Judging** [1] 128:7
**Judgment** [2] 22:23 127: 13 129:2
**Judgments** [3] 59:19 92: 23 117:7
**JUDICIAL** [1] 1:11
**JUDITH** [1] 103:4
**Jump** [3] 58:20 64:25 118:10
**Juries** [1] 10:16 10:17 10: 18 11:13
**Juror** [55] 22:16 22:17 37:

3 44:15 45:5 45:7 45:14 46: 12 46:18 47:8 47:9 47:13 47: 20 52:19 55:19 58:1 65:12 67:11 68:7 68:20 69:13 70: 10 70:15 70:17 71:4 71:17 73:15 73:22 74:2 85:6 85:9 85:23 87:17 88:5 88:18 89:2 103:3 103:19 103:25 118:8 123:5 123:22 124:9 125:6 125:10 126:3 126:6 126:18 127:18 127:22 130:13 133:24 134:5 136:18 141:23
**Juror's** [2] 47:1 65:3
**Jurors** [8] 11:11 31:5 34: 23 57:20 58:14 66:4 102:20 134:6
**Jury** [54] 6:2 8:6 9:18 10: 4 10:5 10:8 11:5 11:17 12: 18 12:24 19:22 19:25 20:5 20:9 20:10 20:13 20:21 22:7 23:12 23:20 24:5 27:24 27: 24 31:4 31:5 34:11 37:4 37: 5 37:6 37:8 37:10 38:2 38:8 43:13 42:7 42:25 45:15 80:4 80:12 88:2 91:24 104:15 112: 25 115:18 116:1 116:3 116:4 116:8 117:3 118:19 126:2 127:18 130:9 140:24
**Jury's** [9] 5:3 6:24 13:16 28:7 32:10 32:17 32:20 32: 24 124:22
**Justifiable** [1] 7:16
**Justifiably** [1] 64:6
**Justification** [10] 31: 23 32:6 32:23 33:8 33:18 33: 20 33:24 36:11 77:5 77:5
**Justified** [1] 24:1
**Justifying** [1] 23:25 100: 17
**Justly** [1] 131:19 131:20

**Karla** [1] 115:3
**Kay** [4] 3:3 73:1 142:3 142: 16
**Keep** [9] 53:25 54:3 54:10 54:21 55:17 55:25 56:6 132: 15 133:24
**Kid** [1] 96:14
**Kidnapped** [1] 65:23
**Kidnapping** [14] 32:1 32: 4 32:7 32:25 48:19 65:12 65: 13 65:16 65:19 66:1 66:2 77: 15 81:22 82:8
**Kidnappings** [1] 17:9
**Kids** [6] 50:23 52:8 53:18 96:17 101:15 101:17
**Kill** [3] 36:14 77:8 100:15
**Killed** [2] 65:18 76:8
**Killing** [4] 48:18 65:25 77:18 77:19
**Kills** [1] 42:18
**Kind** [20] 6:7 10:25 26:25 36:12 41:11 75:18 76:2 81: 18 82:22 88:4 88:10 89:18 91:7 109:7 111:6 127:7 128: 18 129:15 139:18 139:21
**Kinds** [10] 17:12 41:1 75: 24 76:5 77:15 77:20 77:24 82:12 86:9 131:3
**Kingwood** [1] 58:8
**Knife** [1] 101:25
**Knobloch** [2] 142:3 142:16
**Knocked** [1] 89:24
**Knowing** [4] 7:17 25:14 76: 18 97:22
**Knowledge** [1] 82:20
**Knows** [3] 35:24 35:25 129: 18
**Kurt** [5] 2:17 4:18 91:1 116:18 135:22

**L**

**Lack** [3] 14:14 22:22 55:4
**Ladies** [1] 4:9
**Lady** [2] 18:13 76:7
**Large** [2] 105:20 120:19
**Larger** [1] 19:9
**Last** [13] 5:12 41:1 56:12 67:2 67:5 68:13 69:9 111:1 112:8 116:7 117:2 127:18 134:20
**Late** [1] 67:3
**LATONYA** [1] 123:6
**Law** [39] 7:3 10:6 10:11 10: 20 22:1 22:4 29:1 39:11 40: 20 40:23 40:25 41:18 41:19 41:21 41:23 45:1 50:11 75: 15 76:23 83:13 86:18 86:22 88:7 94:12 94:21 107:5 108: 4 111:14 111:14 111:15 112: 19 112:21 115:25 124:19 130: 11 130:12 130:14 136:6 136:7
**Lawfully** [1] 41:8
**Laws** [8] 7:8 45:3 73:25 115:25 124:17 124:18 125:8 130:21
**Lawyer's** [1] 139:2
**Lawyering** [2] 7:18 7:21
**Lawyers** [4] 9:21 45:13 123:24 126:24
**Laying** [1] 43:13
**Learn** [1] 52:13
**Learned** [2] 58:11 61:1
**Learner** [1] 86:6
**Learning** [3] 58:9 58:13 58:16
**Least** [5] 24:3 64:14 83:8 97:13 138:4
**Leave** [3] 21:24 101:24 106:4
**Leaves** [1] 21:25
**Led** [2] 39:1 104:9
**Left** [4] 89:11 89:22 90:5 90:13
**Legal** [18] 31:22 31:23 32: 6 33:8 33:8 33:18 33:19 33: 20 33:24 36:11 39:9 59:2 74: 19 77:4 77:5 87:24 88:8 91: 13
**Legislature** [2] 77:16 77: 21
**Legitimate** [2] 26:15 38: 16
**Length** [2] 68:9 70:8
**Less** [5] 34:8 88:9 93:14 107:10 107:11
**Lessen** [1] 61:14
**Lesser** [2] 33:13 65:2
**Level** [9] 12:23 17:22 20: 15 40:21 41:20 100:20 117: 24 121:17 135:3
**Liberal** [1] 113:7
**Licensed** [1] 113:14
**Lies** [1] 80:14
**Life** [120] 5:17 8:13 9:25 10:13 10:17 10:22 11:22 13: 8 14:2 14:9 18:17 20:8 20: 17 21:1 22:3 22:10 23:15 23: 24 24:4 24:12 24:14 24:23 25:5 27:14 28:1 28:3 28:5 28:16 28:19 28:24 30:11 30: 13 31:6 31:19 32:5 33:1 33: 6 33:7 33:17 34:3 34:6 35:2 35:4 35:10 35:13 35:14 35: 23 36:2 36:10 36:14 36:18 37:18 37:22 46:15 46:16 47: 15 49:10 50:10 54:7 56:3 62: 14 63:3 63:9 64:10 64:12 64: 13 64:13 65:11 66:15 71:1 71:2 73:19 73:19 77:4 80:9 80:21 81:21 83:14 83:16 83: 22 84:13 84:19 85:7 85:22

86:8 87:8 87:19 95:15 96:2 100:23 101:15 103:22 103:23 105:15 108:11 108:21 109:23 109:25 114:14 115:12 121:3 121:22 122:5 122:10 122:17 127:24 128:1 128:19 130:4 131:6 131:14 133:23 134:10 135:7 135:10 137:7 137:19 137:25 138:20 138:23

**Likely** [4] 16:8 16:8 107: 11 138:5

**Limit** [1] 121:10

**LINDA** [1] 73:1

**Line** [1] 77:19

**List** [1] 81:23

**Listen** [12] 45:15 65:4 65: 12 65:17 65:21 66:23 84:16 109:11 124:25 130:9 136:6 138:17

**Listened** [3] 57:2 57:2 87:15

**Listening** [3] 7:3 11:13 138:15

**Lists** [1] 78:6

**Live** [6] 18:3 35:24 58:8 93:9 93:10 93:13

**Lived** [2] 35:14 90:12

**Lively** [1] 4:10

**Lives** [7] 18:16 24:20 55: 5 66:8 66:11 66:17 86:11

**Lo** [1] 100:10

**Logic** [1] 80:10

**Logical** [1] 116:24

**Look** [40] 8:24 25:2 26:16 49:22 49:22 49:24 50:5 50: 12 50:13 56:7 59:23 60:4 62: 10 62:10 62:11 62:22 62:23 63:7 66:10 78:5 80:7 85:3 85:16 86:15 88:21 92:21 92: 22 93:6 97:1 97:4 97:20 97: 22 98:5 98:13 108:7 108:7 116:22 127:10 137:23 140:1

**Looked** [2] 85:13 86:2

**Looking** [2] 23:4 117:23

**Lose** [1] 137:25

**Lost** [5] 18:20 23:3 64:12 64:13 66:15

**Love** [2] 36:16 113:3

**Lump** [1] 57:19

**Lyn** [4] 2:2 4:21 75:11 127: 5

**Lynn** [1] 48:3

**LYNNE** [1] 103:4

## M

**Ma'am** [14] 48:21 50:15 50: 20 51:15 51:25 55:8 55:15 75:21 105:8 111:5 114:1 116: 5 116:6 135:13

**Machine** [1] 1:23

**Magazines** [1] 94:11

**Magnitude** [1] 34:20 70: 11 138:1

**Major** [2] 31:24 32:4

**Maliciously** [1] 76:6

**Mamou** [11] 1:5 3:11 4:17 4:17 4:23 57:18 72:19 91:3 116:19 135:23 142:20

**Man** [3] 36:13 51:3 85:20

**Manner** [3] 56:25 91:22 140:16

**Maria** [1] 3:20

**Married** [2] 35:22 92:8

**Marvelous** [1] 24:17

**Mason** [1] 11:1

**Matter** [16] 5:22 9:6 9:6 9:7 10:1 10:2 27:8 46:17 71: 2 73:20 81:12 93:15 101:13 103:23 127:17 129:5

**Matthew** [2] 67:12 72:10

**Mature** [2] 22:22 85:22

**Maturely** [1] 22:23

**Maturity** [1] 108:21

**McClellan** [20] 2:2 3:5 3: 17 3:21 4:21 48:4 71:10 71: 12 72:6 72:11 72:13 75:7 75: 8 75:10 75:11 102:5 127:2 127:4 127:5 135:14

**Mean** [66] 7:18 12:12 15:8 15:9 15:10 15:13 15:14 15: 19 15:15 15:25 22:16 31:7 35:6 41:5 49:5 50:13 55:10 59:1 59:1 62:21 64:16 65:8 70:24 76:2 77:5 79:22 79:24 86:23 94:9 94:10 94: 12 94:15 95:12 98:15 99:9 99:13 109:1 112:12 113:1 113:8 114:16 117:15 118:17 119:8 122:7 124:10 128:17 128:19 128:20 129:7 129:11 129:12 130:2 130:5 131:22 132:3 132:5 134:1 134:3 137: 17 137:17 139:12 139:16 141: 5 141:7

**Means** [34] 13:13 14:1 14: 5 14:17 15:10 15:14 16:7 16: 9 16:10 16:11 21:11 25:22 25:24 28:20 29:5 29:6 29:15 31:20 36:3 41:4 41:10 41:11 79:24 107:8 109:3 113:9 120: 18 120:22 126:6 126:6 126:8 127:18 127:22 137:21

**Meant** [6] 21:19 51:17 64: 23 111:11 117:18 140:20

**Mechanical** [1] 36:2

**Medical** [1] 18:25

**Member** [1] 132:18

**Members** [2] 92:10 93:19

**Memorize** [2] 6:6 48:9

**Mental** [2] 23:7 23:8 23: 10 82:10 86:4 105:20 119:9

**Mentally** [1] 140:9

**Mentioned** [2] 102:5 124: 22

**Merit** [1] 55:2

**Merits** [2] 55:2 57:22

**Middle** [1] 16:6

**Might** [76] 19:2 19:4 22:1 22:15 22:16 22:19 22:21 23: 1 23:5 23:8 23:9 23:13 24:5 24:5 24:8 24:12 24:16 24:22 24:23 26:1 26:3 30:9 31:4 35:5 35:11 35:21 43:24 46: 11 47:6 53:12 56:7 57:5 61: 14 62:13 65:12 65:15 68:6 70:4 72:3 73:14 73:18 78:10 82:25 83:6 85:3 85:4 87:7 91:6 94:18 94:21 100:13 100: 22 103:18 103:21 103:24 110: 2 110:9 111:13 119:20 121:4 121:6 121:10 121:19 121:21 121:24 122:9 122:12 122:15 123:21 125:17 126:3 130:16 137:24 138:9 138:20 138:22

**Mills** [2] 3:3 3:15

**Mind** [43] 12:10 26:25 32: 24 34:17 34:21 46:13 53:25 54:3 54:10 54:21 55:17 55: 25 56:6 64:19 67:1 68:24 75: 6 75:24 76:4 83:24 84:17 86: 15 86:16 87:4 87:18 87:10 90:25 91:17 105:18 105: 22 110:14 110:22 111:3 119: 3 122:8 124:2 128:19 131:19 131:21 131:21 140:10 140:23

**Minded** [1] 55:20

**Minimal** [1] 23:14

**Minimize** [1] 70:24

**Minor** [3] 113:16 114:9 133:1

**Minutes** [4] 12:11 48:4 56: 20 57:8

**Misery** [1] 36:6

**Miss** [17] 3:15 4:21 47:25 73:5 75:11 90:18 103:8 103: 10 104:22 105:3 114:23 116:

11 117:1 123:10 123:12 124: 15 127:5

**Missed** [1] 126:20

**Mistaken** [2] 60:10 64:7

**Mistrial** [1] 126:8

**Misunderstanding** [2] 28:18 28:19

**Mitigates** [2] 85:22 85:24

**Mitigating** [63] 9:24 22: 13 22:13 22:22 23:9 23:20 23:22 24:4 24:6 24:13 24:22 26:7 26:9 50:9 51:16 51:20 51:24 52:2 52:3 52:3 52:4 52:19 52:24 53:13 54:4 56:2 56:7 61:23 62:21 80:8 84:11 84:17 84:18 85:10 87:7 92: 18 95:10 95:12 95:13 95:19 99:19 99:24 101:4 102:11 105:17 105:17 105:19 110:25 110:9 110:11 110:15 110:17 117:12 117:25 119:7 119:10 119:12 119:13 122:3 138:8 139:24 140:13 140:20

**Mitigation** [1] 86:8

**Mixed** [1] 58:4

**Moment** [2] 4:19 128:10

**Monday** [1] 123:23

**Money** [1] 113:10

**Month** [3] 29:5 29:6 124:6

**Months** [2] 42:19 133:22

**Moral** [8] 9:14 9:14 49:25 50:6 84:8 99:23 127:12 129:1

**Morality** [1] 36:8

**Morning** [25] 4:9 4:12 5: 14 14:1 18:15 46:6 56:18 56: 23 58:8 67:16 68:1 73:7 73: 8 90:24 90:25 103:8 103:12 116:16 116:17 116:25 117:23 120:15 123:14 135:20 135:21

**Most** [10] 11:4 11:23 12:1 34:14 48:13 85:25 98:25 118: 13 119:1 120:22

**Mostly** [1] 136:15

**Mother-in-law's** [1] 60: 12

**Mouth** [1] 139:2

**Murder** [113] 4:24 5:2 9:2 10:21 13:1 13:5 13:8 14:8 17:7 19:18 20:1 21:4 24:9 25:18 27:23 28:22 30:12 31: 15 31:18 31:18 31:20 32:3 32:3 32:4 32:7 32:10 32:12 32:18 32:22 33:3 33:5 33:6 33:9 33:10 33:11 33:12 33: 14 33:15 33:21 34:24 34:2 34:3 34:5 34:16 36:9 37:3 37:8 37:9 38:2 38:3 38:5 38: 21 44:16 44:21 47:9 48:13 48:19 48:20 48:23 49:5 50:3 50:4 51:21 52:16 52:22 53:6 53:8 55:4 55:7 55:10 55:24 61:24 65:8 65:9 65:11 65:15 65:16 66:3 66:21 77:3 77:7 77:8 77:10 77:14 77:17 77: 17 77:18 81:24 82:7 83:7 83: 14 86:12 87:7 91:17 91:21 92:4 96:25 97:3 100:5 106: 13 106:23 107:14 109:10 109: 18 118:12 120:4 122:15 126: 1 134:25 136:16 137:2 137:4 137:6

**Murder's** [1] 48:17

**Murdered** [1] 90:7

**Murderer** [1] 59:22

**Murdering** [1] 32:2

**Murders** [5] 16:22 17:8 48: 14 53:22 85:11

**Must** [16] 10:7 10:12 12:18 15:10 15:20 16:16 17:19 17: 22 28:14 31:2 39:17 47:4 51: 23 98:23 118:24 134:21

**Mystery** [1] 67:19

## N

**Name** [8] 75:11 76:10 91:1

114:23 115:5 116:18 127:5 135:22

**Natural** [1] 30:13

**Nature** [5] 99:20 105:16 109:1 109:2 109:9

**Near** [1] 91:8

**Necessarily** [13] 19:22 19:23 19:25 20:4 20:10 31: 20 65:8 68:8 118:16 120:9 121:24 137:4 137:22

**Necessary** [1] 75:22

**Need** [8] 8:23 24:25 71:20 79:2 103:17 108:6 108:7 115: 21

**Negative** [4] 58:5 58:6 58:7 139:11

**Neglect** [1] 140:8

**Neglectful** [1] 140:4

**Neighbors** [1] 18:7

**Never** [24] 5:17 9:7 12:4 12:6 12:22 19:5 20:2 21:14 24:20 31:8 33:19 33:23 35: 12 44:12 49:11 58:13 80:15 80:21 81:6 83:13 88:1 101: 10 107:2 125:20

**New** [4] 11:3 13:5 13:6 128: 13

**Next** [9] 19:20 26:8 27:10 42:14 48:23 52:19 56:20 57: 7 104:16

**Nice** [1] 126:23

**Night** [2] 26:18 101:22

**Nine** [1] 34:9

**Ninety** [1] 34:9

**Ninety-nine** [1] 34:9

**Nobody** [3] 22:5 40:6 43:18

**Nonmitigating** [1] 117:13

**Nonmoveable** [1] 44:10

**Normal** [1] 113:21

**Normally** [1] 113:11

**Notch** [3] 13:16 13:20 13: 24

**Nothing** [10] 6:9 29:12 38: 18 43:23 51:3 67:1 67:4 108: 4 124:13 136:24

**Noticed** [1] 117:10

**Notion** [3] 30:10 47:8 124: 16

**Number** [67] 8:25 9:9 12: 13 19:20 20:6 25:21 26:12 26:20 26:22 27:25 32:16 32: 18 32:21 34:7 34:8 42:9 47: 10 49:18 55:13 55:13 59:21 59:24 60:11 61:13 61:22 62: 8 62:9 62:15 63:9 63:23 72: 10 78:11 80:7 82:25 84:1 84: 2 84:23 84:25 85:6 85:9 95: 9 95:17 95:21 95:22 95:25 96:22 97:17 97:24 98:10 98: 10 98:13 99:18 101:1 102:9 106:15 106:16 108:2 109:12 109:16 119:5 119:14 119:16 122:2 131:16 138:7 138:18 139:7

**Numbered** [2] 1:20 142:6

## O

**O'clock** [2] 18:15 18:18

**Oath** [1] 130:13

**Object** [4] 44:6 44:8 44: 10 89:19

**Objectionable** [1] 74:1

**Obligated** [1] 33:2

**Obligation** [2] 32:11 32: 20

**Obtain** [1] 16:15

**Obvious** [2] 57:1 119:7

**Obviously** [16] 13:1 14: 11 19:4 24:1 28:3 44:11 53: 8 64:4 66:1 66:15 88:13 97: 12 102:19 115:21 119:14 120: 16

**Occur** [2] 32:15 95:15
**Occurred** [5] 4:25 50:3 65:9 65:10 142:7
**Occurs** [3] 40:5 69:5 100:11
**October** [4] 69:9 69:10 123:24 124:3
**Offender** [1] 61:2
**Offense** [22] 4:24 8:3 9:11 12:19 24:3 34:4 34:19 35:1 36:25 39:20 77:10 81:8 81:12 81:13 84:5 90:9 99:21 100:14 107:21 122:4 122:9 138:18
**Offenses** [2] 11:8 65:2
**Offer** [1] 68:19
**Offhand** [1] 105:21
**Office** [2] 94:2 114:16
**Officer** [1] 77:19
**Official** [3] 142:3 142:12 142:17
**Official/Deputy** [1] 142:3
**Officials** [1] 19:1
**Old** [10] 22:20 35:8 35:11 36:13 42:17 53:6 117:25 124:6 133:21 133:22
**Older** [2] 22:24 85:21
**One** [115] 8:25 12:3 12:13 20:6 20:15 22:15 25:15 25:1 26:12 26:21 26:24 27:9 27:25 30:10 32:16 32:19 35:7 39:8 39:14 39:16 41:1 41:22 42:3 42:4 42:16 42:21 43:6 45:3 45:14 45:22 47:10 51:1 52:2 55:13 57:11 57:17 57:20 58:15 58:15 58:18 59:10 59:21 59:24 60:8 61:10 62:6 63:6 64:14 64:20 64:25 67:5 77:25 78:7 78:11 80:19 82:20 83:1 84:1 84:23 86:7 87:12 87:22 88:20 89:22 92:1 92:20 93:12 94:17 95:4 95:21 95:22 96:7 96:14 96:21 96:22 97:17 98:10 98:13 100:16 102:5 102:10 105:21 106:15 106:16 109:6 109:12 109:16 110:21 111:21 111:21 112:5 114:5 114:24 115:8 115:23 117:2 117:10 118:23 119:5 119:16 120:1 121:1 121:13 122:22 123:20 124:1 127:17 129:6 134:18 134:20 135:6 136:23 137:13 138:16 140:3
**One's** [1] 114:23
**Open** [17] 47:7 53:25 54:3 54:10 54:21 55:12 55:17 55:20 55:25 56:6 74:4 74:12 74:14 120:8 131:7 131:11 142:7
**Open-minded** [1] 55:20
**Opened** [1] 106:5
**Opinion** [14] 38:25 39:3 54:5 55:3 75:19 88:24 96:9 97:11 99:3 105:6 105:7 108:15 108:17 140:6
**Opinions** [4] 75:16 85:14 86:3 92:23
**Opportunity** [2] 28:7 36:23
**Opposed** [12] 22:10 23:16 24:15 27:15 47:16 64:21 78:9 78:12 80:9 80:13 84:13 100:15
**Opposite** [2] 22:16 23:19
**Opposition** [1] 78:15
**Option** [5] 10:7 10:12 37:23 38:16 38:17
**Options** [2] 78:11 141:6
**Order** [10] 10:10 12:4 12:18 14:3 15:18 16:15 19:24 76:19 80:23 127:9
**Ordering** [1] 76:19
**Ordinarily** [3] 18:6 18:9 85:8

---

**Ought** [11] 35:20 68:19 74:5 76:1 77:1 77:21 77:25 78:22 84:13 85:17 128:7
**Outcome** [5] 32:16 32:18 32:21 128:3 129:18
**Outcomes** [1] 32:14
**Outlined** [1] 91:22
**Outset** [1] 103:10
**Outside** [1] 18:19
**Overall** [1] 93:4
**Overcome** [6] 14:12 14:13 26:10 124:13 140:4 140:9
**Overcomes** [1] 12:23
**Overdue** [1] 88:4
**Overlook** [1] 121:2
**Override** [1] 109:24
**Overrides** [1] 50:11
**Overturn** [1] 115:4
**Overwhelming** [1] 63:10
**Own** [10] 24:12 29:23 47:5 57:21 75:19 99:1 106:5 117:1 119:2 136:24

---

# P

**Page** [13] 60:13 78:5 93:2 93:17 95:10 117:11 117:11 127:11 131:16 132:17 140:2 140:12 140:17
**Paid** [1] 142:11
**Pamela** [2] 142:3 142:16
**Panel** [1] 4:8
**Paper** [2] 42:22 94:11
**Paragraphs** [1] 118:23
**Pardons** [2] 29:19 29:21
**Parking** [1] 58:9
**Parole** [9] 29:3 29:11 29:12 29:13 29:14 30:18 30:18 * 30:20 30:21
**Paroled** [2] 31:7 31:7
**Paroles** [2] 29:19 29:21
**Part** [16] 5:3 8:16 8:18 9:12 9:16 48:23 49:23 50:1 58:1 58:21 60:9 62:21 65:1 81:15 109:11 112:6
**Participate** [2] 76:16 76:21
**Particular** [12] 37:19 38:12 41:11 50:1 50:5 50:7 51:4 51:7 93:5 109:8 136:18 140:16
**Particularly** [1] 119:24
**Parties** [4] 3:2 72:9 142:6 142:9
**Parts** [1] 5:3
**Pass** [4] 42:23 56:13 90:19 135:14
**Passed** [1] 63:12
**Passing** [1] 42:16
**Peculiar** [2] 7:21 125:17
**Penalty** [64] 14:6 20:13 20:16 21:5 26:2 28:8 28:10 28:12 31:11 48:11 49:16 49:1 19 51:22 55:1 55:7 55:11 59:5 62:1 63:24 64:5 64:9 75:20 76:1 76:11 76:13 77:1 77:1 77:17 77:16 77:21 77:23 77:25 78:8 78:9 78:13 78:16 84:24 99:6 105:6 105:7 105:12 105:112:4 115:10 111:12 112:12 112:4 115:11 115:20 118:6 119:20 121:24 127:24 128:22 128:11 128:15 130:4 130:24 130:25 131:17 134:8 135:1
**Penitentiary** [11] 18:10 18:14 18:23 29:4 30:14 30:25 34:6 34:7 37:18 38:10 135:5
**People** [69] 11:6 18:6 18:7 8:10 18:22 18:25 19:15

---

**22:23 22:25 23:3 23:9 23:12 23:19 24:12 24:21 29:16 31:6 32:2 39:12 41:15 42:2 51:14 52:25 53:2 53:14 53:17 53:21 54:6 54:8 57:9 57:19 66:15 66:22 70:2 76:12 76:14 79:2 80:18 80:25 82:25 83:6 85:10 85:13 85:20 86:2 86:9 89:12 93:13 94:9 94:10 96:8 96:19 98:5 100:10 102:16 110:1 110:16 113:11 114:2 119:9 121:4 128:5 128:6 128:21 131:22 131:24 134:9 134:14 134:25**
**People's** [1] 66:8
**Percent** [5] 80:19 80:21 81:6 107:3 137:22
**Perfectly** [5] 7:16 24:17 30:9 30:15 42:21
**Performing** [1] 96:16
**Perhaps** [6] 23:6 53:21 107:21 108:21 110:20 124:12
**Period** [2] 31:1 70:15
**Permitted** [2] 15:6 15:7
**Perry** [1] 11:1
**Person** [81] 8:10 11:5 13:8 26:11 34:2 34:4 43:8 43:14 49:7 49:14 52:2 52:3 52:4 53:11 55:24 57:11 57:17 59:8 59:22 59:23 59:25 61:9 61:12 63:13 64:15 64:15 65:14 65:15 65:23 65:25 66:1 81:21 83:12 83:21 84:13 86:7 86:9 87:11 87:12 87:19 88:19 89:10 92:12 92:21 95:1 96:10 96:11 97:9 97:23 99:5 100:4 100:6 100:14 100:20 100:22 105:15 106:17 107:23 110:6 110:9 113:21 114:1 117:20 117:24 119:17 120:6 121:10 122:5 122:10 122:6 122:17 127:13 128:1 129:3 129:8 130:23 131:13 136:4 139:17 141:13**
**Person's** [11] 29:16 41:21 41:25 42:13 44:13 61:14 62:23 77:4 86:4 100:1 119:10 120:6 122:17 128:1 129:3 129:8 130:23 131:13 136:4 139:17 141:13**
**Personal** [14] 9:14 9:14 46:15 50:6 68:18 71:1 73:19 84:8 84:9 99:22 103:22 110:24 111:16 132:5
**Personally** [3] 57:16 87:22 130:2
**Personnel** [1] 18:25
**Persons** [5] 17:5 17:8 17:10 106:7 107:17
**Perspective** [1] 27:6
**Persuades** [1] 12:24
**Phase** [30] 5:9 6:17 8:1 8:5 8:7 8:11 13:4 13:16 13:21 14:8 14:20 14:21 37:5 37:10 38:5 57:23 63:23 97:7 97:12 98:20 102:15 118:11 125:19 125:21 125:25 126:2 126:4 136:11 136:12 136:15
**Phenomenon** [1] 11:3
**Philosophically** [1] 112:15
**Phone** [3] 2:9 2:16 2:21
**Phrase** [4] 12:13 13:11 21:9 21:10
**Phrasing** [1] 141:4
**Picked** [1] 58:14
**Pie** [1] 33:15 33:16
**Piece** [5] 18:4 27:3 33:15 39:11 126:19
**Pile** [1] 8:16
**Pillar** [2] 43:6 43:11
**Pistol** [3] 44:12 44:13 44:14
**Place** [3] 13:6 20:17 22:4 98:4
**Placed** [5] 44:7 44:8 44:14 112:23 121:14

---

**Places** [1] 19:16
**Planned** [1] 40:6
**Play** [18] 5:25 6:12 6:19 6:21 7:4 14:6 40:22 45:4 50:1 57:12 66:22 95:23 100:24 100:25 124:18 124:19 125:3 125:25
**Playing** [1] 50:22
**Pleading** [1] 126:14
**Plug** [1] 36:7
**Plus** [2] 48:18 48:19
**Poe's** [1] 92:4
**Point** [18] 18:22 24:24 30:5 31:20 36:16 38:19 40:7 45:2 46:9 48:6 61:8 68:4 73:9 79:1 95:15 96:1 103:14 110:10
**Points** [1] 27:1
**Police** [5] 43:18 43:18 77:19 89:11 90:4
**Political** [1] 30:3
**Poor** [1] 54:1
**Pops** [1] 13:6
**Portion** [1] 7:6
**Portions** [5] 6:22 6:23 125:7 125:9 142:5
**Position** [6] 96:2 128:11 128:15 128:17 129:17 134:11
**Positive** [4] 58:5 58:6 58:9 129:20
**Possess** [1] 11:6
**Possesses** [1] 11:5
**Possibility** [8] 115:11 15:24 16:11 28:1 47:17 61:9 66:24 107:8
**Possible** [19] 9:8 10:3 28:16 30:15 30:16 32:14 32:16 32:18 32:21 33:2 33:4 61:4 66:10 76:1 78:15 97:1 104:14 138:16 141:4
**Possibly** [10] 5:21 6:11 15:12 15:12 15:15 34:18 59:25 94:8 129:18 139:22
**Posture** [1] 21:25
**Potential** [2] 69:20 69:21
**Practice** [3] 68:11 68:13 68:14
**Practitioner** [1] 68:12
**Prays** [1] 36:4
**Preacher** [1] 36:4
**Precisely** [2] 35:6 35:7
**Predict** [5] 59:5 59:8 99:4 99:10 119:21
**Preparation** [1] 142:11
**Preposterous** [1] 18:20
**Present** [8] 4:18 11:19 12:18 13:13 16:24 50:2 51:13 80:1
**Presented** [15] 6:20 7:5 7:6 12:9 12:22 22:6 41:13 45:16 59:8 74:7 79:22 104:11 117:8 124:20 133:6
**Presently** [2] 46:15 73:18
**Presiding** [1] 1:21
**Presumed** [3] 13:7 14:7 14:10
**Presumption** [7] 12:24 13:2 13:5 13:6 14:11 14:14 126:15
**Pretty** [12] 45:2 59:23 68:25 71:24 94:15 96:4 96:23 97:2 98:6 99:7 136:8 137:3
**Prevent** [5] 80:4 93:18 127:13 129:2 134:4
**Previous** [1] 60:5
**Previously** [1] 131:14
**Primary** [2] 96:1 124:18
**Print** [3] 44:7 44:8 44:13
**Prison** [12] 19:1 19:4 29:16 60:9 60:12 60:20 61:5 61:

11 121:15 121:9 121:4 121:24

**Prisoner** [1] 128:1

**Probability** [27] 9:3 15:1 15:2 15:8 15:10 15:18 15:20 16:7 16:7 16:10 16:13 16:14 16:21 17:20 49:1 59:16 83:3 83:8 107:1 107:2 107:5 107:8 107:23 112:1 120:13 120:18 137:18

**Problem** [12] 48:20 55:18 62:24 70:5 70:6 76:24 79:18 80:15 83:24 86:16 113:9 137:1

**Problems** [7] 69:14 69:14 69:20 69:21 74:25 124:8 132:16

**Proceedings** [4] 1:19 1:22 142:5 142:9

**Process** [16] 30:22 57:15 71:8 74:24 76:16 76:22 87:5 88:11 91:13 101:11 112:7 124:15 129:23 129:24 130:12 137:9

**Produce** [1] 79:24

**Productive** [1] 86:11

**Profession** [1] 87:25

**Professional** [4] 46:16 71:1 73:19 103:22

**Programs** [2] 94:11 113:10

**Projectile** [1] 43:22

**Proof** [16] 13:13 80:17 80:17 98:16 98:22 98:23 102:6 102:8 102:9 118:18 118:22 118:24 118:24 134:20 135:2 137:16

**Proper** [3] 26:1 131:4 131:5

**Property** [5] 17:5 17:11 17:16 49:13 107:16

**Propositions** [1] 93:4

**Prosecuted** [2] 89:10 90:9

**Prosecutors** [1] 48:5

**Prospect** [2] 57:25 59:3 87:17

**Prospective** [2] 67:11 126:18

**Prove** [31] 13:15 14:17 14:19 14:20 15:20 15:23 16:3 16:5 16:25 17:2 17:19 21:12 21:14 21:16 21:20 21:25 29:12 32:12 32:13 32:19 32:21 32:23 39:22 80:21 81:9 81:5 81:19 81:22 102:11 108:5 134:21

**Proved** [3] 7:1 25:21 66:7

**Proven** [1] 58:23

**Proves** [4] 13:9 25:16 32:8 41:20

**Provision** [1] 77:22

**Prudent** [1] 115:17

**Psychiatrist** [1] 113:20

**Psychiatrists** [1] 114:3

**Psychologist** [1] 113:20

**Psychologists** [1] 114:3

**Psychology** [1] 113:16

**Pull** [3] 20:16 21:6 40:3

**Pulls** [1] 36:7

**Punch** [2] 49:14 107:21

**Punches** [2] 18:14 18:17

**Punish** [1] 138:9

**Punished** [4] 34:5 35:16 61:7 68:21

**Punishing** [1] 138:14

**Punishment** [59] 5:9 13:7 14:8 23:23 34:2 34:3 34:13 35:19 35:20 36:23 37:15 37:18 39:8 38:20 38:22 54:12 57:23 61:15 63:2 63:4 63:25 64:2 76:1 76:13 78:17 80:6 81:25 82:2 82:4 82:14 82:15 82:19 82:23 83:10 83:19 84:7 84:21 87:7 97:7 97:11 102:

15 104:11 109:5 109:6 109:19 118:11 121:3 122:17 125:16 125:19 125:21 126:2 126:4 126:12 131:1 135:1 135:3 136:12 136:15

**Punishments** [2] 28:16 36:19

**Purpose** [1] 9:22

**Purposely** [1] 133:13

**Purposes** [3] 5:10 20:23 44:18

**Put** [16] 22:5 25:13 51:6 56:25 57:3 68:5 94:25 96:2 112:17 115:22 116:3 116:4 126:10 127:21 138:18 140:14

**Putting** [1] 117:3

---

## Q

**Quality** [6] 13:3 14:12 14:15 35:2 35:4 42:21

**Questionnaire** [21] 50:16 57:1 60:10 61:22 75:13 78:3 78:4 87:14 91:3 92:25 105:13 117:11 117:17 123:22 124:5 127:7 127:10 128:25 135:25 140:1 140:14

**Questions** [67] 5:10 8:21 8:22 10:9 10:18 10:19 11:21 11:24 12:4 12:6 12:11 14:21 16:12 19:18 20:3 20:24 25:10 27:3 27:16 28:15 28:21 28:22 28:24 30:5 31:2 31:2 31:9 31:14 39:6 45:1 45:20 46:7 47:22 48:24 51:19 54:18 56:10 56:25 57:3 66:25 68:2 69:2 69:4 71:7 71:8 73:10 76:18 78:22 81:10 82:3 82:18 82:19 91:9 93:1 93:16 103:14 104:14 104:19 105:4 116:7 116:8 123:15 123:19 126:20 126:24 134:7 141:12

**Quick** [1] 39:8

**Quickly** [1] 45:23

**Quite** [9] 57:1 66:9 71:25 78:14 91:14 96:20 97:1 100:7 137:18

---

## R

**Rage** [1] 109:5

**Raise** [1] 112:17

**Raised** [2] 64:6 139:23

**Ran** [3] 24:11 90:2 90:3

**Randomly** [1] 50:24

**Range** [4] 34:1 34:3 34:12 36:22 38:19 38:22

**Rapes** [1] 17:9

**Rate** [2] 34:1 73:21

**Rather** [4] 50:10 108:11 112:22 112:25

**Ray** [1] 92:6

**Reach** [10] 8:20 37:20 38:13 38:24 38:24 39:4 45:17 100:20 104:10 125:10

**Reached** [1] 120:3

**Reacquire** [1] 18:18

**Reacted** [1] 89:17

**Reactions** [1] 128:21

**Reacts** [1] 11:17

**Read** [3] 19:11 94:14 126:11

**Reading** [1] 67:18

**Ready** [1] 42:23

**Real** [1] 96:17

**Really** [20] 28:8 41:17 45:2 53:11 57:4 57:11 61:20 62:2 89:23 92:3 101:24 102:1 113:6 122:23 123:16 123:17 130:17 134:1 134:2 137:8

**Reason** [27] 4:13 5:18 6:5 7:16 15:3 18:5 20:25 21:1 22:2 22:6 22:9 22:14 23:20 27:14 28:17 47:14 52:7 84:19 85:1 88:17 89:1 109:4

**Reasonable** [49] 9:3 12:13:8 13:12 13:18 13:23 14:16 14:23 15:1 15:20 16:17 21:10 25:17 25:20 32:8 39:23 41:21 41:25 42:4 42:8 42:13 42:25 44:1 44:23 49:1 58:24 58:25 65:22 65:24 66:6 80:18 81:9 81:16 81:22 83:2 83:15 98:1 9 81:16 81:22 83:2 83:15 98:16 98:23 106:17 108:6 118:19 118:23 118:24 134:21 134:22 137:6

**Reasoning** [1] 117:24

**Reasons** [5] 56:24 61:10 80:9 84:13 85:1

**Receive** [12] 59:4 62:13 64:9 80:9 82:1 82:15 83:19 84:13 99:5 100:22 119:20 122:10

**Received** [1] 61:25

**Receives** [1] 51:22

**Receiving** [3] 120:21 138:20 138:23

**Recognize** [1] 68:20

**Recognizes** [3] 22:1 22:5 104:9

**Recognizing** [1] 124:12

**Recommendations** [3] 29:23 29:24 30:2

**Reconsider** [1] 63:24

**Record** [4] 1:1 142:6 142:8 142:11

**Reducing** [1] 23:23

**Reevaluate** [1] 22:8

**Refer** [2] 84:9 84:12

**Referred** [1] 139:7

**Reflects** [1] 142:9

**Reformed** [1] 138:3

**Refuse** [4] 37:22 38:14 44:20 44:24

**Refuses** [3] 79:15 79:15 131:7

**Regard** [1] 131:6

**Regardless** [3] 111:16 128:2 129:7

**Regards** [1] 102:9

**Regional** [2] 106:3 106:3

**Rehab** [1] 94:1

**Rehabilitated** [3] 131:8 131:11 141:18

**Rehabilitation** [1] 19:4

**Reject** [1] 29:22

**Rejecting** [1] 30:2

**Relapse** [1] 94:2

**Relate** [1] 130:8

**Related** [1] 60:18

**Relating** [2] 5:8 38:6

**Relationship** [1] 130:19

**Relax** [1] 105:4

**Released** [1] 61:8

**Relevant** [1] 82:5

**Reliable** [1] 11:4

**Religion** [1] 136:5

**Religious** [3] 127:12 128:16 129:1

**Rely** [4] 80:2 95:1 98:24 119:1

**Relying** [2] 70:1 93:19

**Remains** [1] 14:14

**Remarkably** [1] 34:13

**Remember** [6] 67:24 73:6 76:10 85:4 115:5 115:8

**Remind** [1] 4:16

**Remorse** [1]¹⁰²:16

**Render** [1] 130:14

**Repeat** [1] 61:2

**Reported** [1] 1:22 142:7

**Reporter** [3] 93:8 142:3 142:17

**Reporter's** [4] 1:1 142:6 142:8 142:11

**Represent** [3] 75:12 116:19 127:6

**Represented** [2] 4:17 4:20

**Representing** [2] 91:2 135:24

**Reputation** [1] 60:6

**Request** [3] 3:14 4:1 72:21

**Requested** [1] 142:5

**Require** [5] 16:3 17:13 135:2 135:8 135:10

**Required** [10] 15:23 16:20 16:25 17:2 22:5 30:24 32:12 32:13 41:7 102:10

**Requirement** [1] 22:6

**Requires** [2] 10:20 68:14

**Reservations** [1] 117:3

**Resolves** [1] 104:16

**Respect** [4] 53:4 108:24 109:22 112:18

**Respective** [1] 142:9

**Response** [1] 93:5

**Responsibility** [8] 9:15 49:25 50:7 50:8 84:10 108:9 112:20 119:25

**Responsible** [5] 50:7 65:15 65:25 86:21 128:23

**Rest** [2] 30:12 83:16

**Result** [18] 7:4 10:19 12:8 14:14 24:21 37:20 38:13 38:24 38:25 39:2 39:3 69:5 100:11 100:11 104:10 108:25 125:3 134:8

**Results** [1] 78:23

**Retardation** [6] 23:8 23:9 23:11 23:14 105:20 119:9

**Retarded** [2] 110:2 110:7

**Retire** [1] 45:21

**Return** [3] 28:9 28:10 28:12

**Returned** [2] 27:23 27:24

**Revenge** [1] 36:15

**Rich** [1] 53:18

**Rise** [1] 17:22

**Rises** [2] 12:23 20:15 40:21 41:20

**Risk** [4] 24:12 31:4 31:12 31:13

**Risqui** [2] 114:24 114:24

**Road** [2] 16:6 86:1

**Rob** [2] 40:2 100:7

**Robbed** [1] 89:8

**Robber** [2] 40:3 89:20

**Robberies** [1] 17:9

**Robbery** [4] 51:11 77:17 89:4 89:16

**Room** [6] 6:2 31:5 35:18 36:18 101:23 116:1

**Rooms** [1] 11:16

**Rounds** [1] 64:22

**Row** [1] 76:7

**Rows** [1] 89:23

**Rule** [5] 30:23 121:24 126:4 126:5

**Rules** [12] 5:24 6:19 6:21 45:3 45:6 45:10 104:3 121:9 121:16 125:3 125:4 125:25 45:3

**Run** [4] 31:4 31:11 35:18 45:3

**Running** [1] 64:21

**Runs** [1] 40:4

---

## S

**Sale** [1] 93:18

San [1] 142:18
Satisfied [6] 45:12 45:13 65:22 65:24 80:23 123:25
Satisfy [1] 28:7
Saved [1] 24:11
Saw [5] 24:10 41:4 42:20 42:24 81:2
SBOT [4] 2:3 2:5 2:13 2:18
Scale [3] 35:19 36:19 36:21
Scary [1] 89:18
School [7] 18:13 45:1 50:22 86:7 86:10 96:14 96:15
Scientific [1] 81:3
Scotland [1] 89:12
Scout [1] 83:12
Screening [2] 64:1 64:1
Screwed [1] 24:19
Scrutiny [1] 121:9
Search [2] 47:18 56:1
Searching [1] 101:5
Second [47] 8:7 8:11 8:16 9:16 9:18 10:6 13:4 13:21 14:5 14:21 19:22 19:24 20:7 20:10 20:18 20:20 21:8 21:17 21:21 21:23 22:7 22:12 23:22 25:9 25:11 25:13 26:4 26:15 27:18 28:6 28:13 31:13 36:12 37:10 38:5 45:11 47:14 58:19 63:25 67:8 69:8 109:11 109:22 112:3 120:5 140:2
Secondly [1] 20:4
Seconds [2] 43:10 43:16
Secretary [1] 93:24
See [55] 6:11 7:9 9:17 10:15 10:16 11:10 13:11 15:22 16:2 17:4 18:8 21:8 25:16 26:17 34:12 35:11 37:24 38:18 42:17 42:24 43:9 43:12 43:15 43:24 45:5 45:16 47:19 53:14 56:1 62:7 65:14 66:1 66:22 69:25 75:16 78:4 85:11 86:12 88:19 89:23 97:17 99:23 100:23 104:15 110:8 110:15 110:16 118:8 118:13 121:23 122:8 124:5 127:9 127:14 139:22
Seeing [1] 89:16
Seeking [3] 128:13 135:1 135:3
Sees [5] 43:7 43:12 43:13 43:15 43:16
Seized [1] 43:19
Selected [2] 71:16 123:22
Selection [1] 91:24
Self [3] 33:19 77:6 95:1
Self-defense [6] 33:19 33:20 77:6 94:22 95:1 100:19
Send [3] 29:23 61:11 135:5
Sense [9] 22:22 47:2 59:3 61:1 64:14 129:6 132:14 138:13 140:20
Senseless [1] 111:19
Sent [3] 29:18 60:12 61:7
Sentence [66] 9:25 10:1 10:7 10:13 10:16 10:17 10:20 10:23 10:23 11:22 15:24:2 20:9 20:17 21:1 21:2 21:3 22:3 22:13 22:10 22:11 23:15 23:16 24:4 24:14 24:23 25:5 25:6 27:14 27:15 28:1 28:4 28:5 28:19 28:23 28:25 30:11 31:9 36:14 36:18 47:16 47:16 50:10 50:11 56:3 62:14 85:7 85:23 86:8 87:9 108:11 108:11 108:24 109:23 109:24 109:25 114:13 115:4 115:12 115:16 122:15 122:10 137:7 138:21 138:23
Sentenced [1] 105:15
Sentences [1] 31:6

Sentencing [2] 37:23 38:16
Separate [1] 11:15
September [1] 1:18
Series [2] 93:1 93:15
Serious [5] 53:8 96:4 96:4 139:17 141:19
Seriously [2] 99:8 99:16
Serve [2] 34:22 88:4
Served [2] 24:21 29:4 88:3
Service [5] 24:18 46:12 68:7 73:15 73:21
Services [2] 105:24 114:19
Set [5] 35:5 70:19 110:16 124:17 130:5
Seventeen [7] 22:20 23:2 35:11 53:6 53:7 53:9 53:10
Seventeen-year-old [2] 35:11 53:6
Seventy [1] 36:13
Seventy-five-year-old [1] 36:13
Several [2] 36:5 51:12
Severe [3] 23:13 63:3 140:9
Severely [1] 110:2
Severity [2] 63:2 139:18
Sexual [2] 77:18 114:8
Shall [1] 79:13
Shape [1] 57:12
Sharing [1] 95:7
Shift [1] 8:8
Shifts [1] 80:15
Shoes [1] 25:13
Shoot [1] 95:5
Shooter [1] 50:5
Shooting [4] 43:15 50:19 64:20 100:4
Shoots [1] 42:18
Short [1] 115:1
Shot [8] 50:18 51:1 52:8 53:17 64:15 92:6 110:21 111:22
Shots [1] 75:5
Show [5] 13:14 16:17 16:20 41:24 44:1
Showed [1] 35:9
Shows [3] 11:2 13:18 13:23
Side [9] 7:25 70:18 79:3 79:6 80:11 80:25 81:7 83:22 87:25
Sides [3] 69:25 78:20 79:3 79:4 79:7 88:20 88:22 88:25 123:24
Significant [1] 23:14
Silly [1] 121:23
Simple [2] 7:16 45:2
Simpler [1] 9:20
Simply [8] 13:13 16:6 20:21 28:6 29:15 31:13 33:21 34:13
Sincere [1] 141:13
Single [5] 8:12 8:14 8:19 10:25 30:13
Sister [1] 92:8
Sit [4] 65:21 116:1 136:6 141:11
Sitting [6] 48:4 64:21 76:20 101:8 127:13 129:2
Situation [13] 66:17 81:7 81:11 101:14 101:20 110:20 112:19 112:22 115:22 116:3 128:9 137:10 137:21
Situations [2] 95:23 112:12
Six [2] 35:8 42:19
Six-time [1] 35:8

Sixty [2] 4:15 64:21
Slipped [1] 63:20
Slips [1] 87:2
Slow [2] 86:6 96:18
Slower [1] 96:17
Small [1] 68:14
Social [2] 113:13 113:14
Socially [1] 113:7
Society [16] 9:5 17:24 18:2 18:4 18:5 19:14 19:14 49:3 59:25 60:9 93:20 97:4 106:19 119:18 121:1 137:5
Society's [3] 83:22 97:10 120:7
Sold [2] 94:19 94:23
Sole [1] 68:11
Solely [3] 15:15 40:8 53:5 53:9 61:1 64:19 64:20 76:7 80:9 95:2 106:22 107:3 107:6 107:13 107:21 109:10 109:17 110:2 110:3 110:6 110:9 110:13 110:20 111:1 111:10 131:6 131:10 132:18
Sometime [1] 101:14
Sometimes [27] 10:22 10:23 11:23 11:25 18:5 22:18 23:8 24:21 28:18 41:14 57:5 58 66:13 80:18 96:8 101:3 119:9 121:2 121:13 131:18 131:19 131:25 132:1 136:25 138:25 139:12 139:22 140:8
Somewhere [1] 101:17
Son [3] 50:18 52:8 53:18
Sophisticated [1] 91:14
Sore [1] 83:22
Sorry [3] 28:23 53:2 107:1
Sort [1] 116:22
Sound [2] 4:10 104:12
Sounds [1] 74:8
Source [1] 39:18
Sources [1] 101:5
Southwest [1] 2:14
Span [1] 70:1
Speaking [2] 61:17 68:25
Special [51] 5:11 8:21 25:20 58:21 58:22 58:25 59:21 59:24 61:13 62:7 62:8 62:15 62:18 63:6 63:8 63:23 86:6 92:1 95:17 95:21 95:22 95:25 96:6 96:22 97:2 97:6 97:17 99:9 98:10 98:13 98:14 99:17 100:25 102:9 118:5 118:12 118:14 119:5 119:14 119:16 120:5 120:9 120:12 122:1 136:22 137:2 137:14 138:7 138:13 138:18 139:6
Specific [9] 11:3 11:4 12:1 12:9 16:19 17:20 24:6 34:17 36:17
Specifically [3] 3:14 12:12 21:8
Specifics [1] 63:16
Specify [1] 17:6
Speculating [1] 30:8
Spend [4] 4:11 30:12 135:6
Spent [2] 113:10 125:18
Split [1] 16:6
Spoken [1] 120:15
Spring [1] 68:13
Square [1] 132:2
Stab [1] 111:21
Stabbed [2] 64:15 111:1
Stage [7] 80:6 82:2 82:4 82:23 83:10 84:21 109:19
Stages [1] 81:14
Stamps [1] 106:8
Stand [2] 81:1 130:15
Standard [1] 12:3

Standardized [1] 96:15
Standing [1] 43:13
Standpoint [3] 12:17 25:2 39:9
Start [2] 97:20 101:20
Started [8] 5:14 5:15 50:24 51:16 102:2 106:2 133:17 136:1
Starting [7] 12:20 12:21 13:21 31:20 39:5 97:12 104:8
Starts [5] 12:13 13:17 13:22 40:7 126:12
State [35] 1:10 2:10 4:16 4:20 10:17 12:18 12:23 15:23 16:3 16:20 17:19 21:11 21:16 21:19 21:20 25:16 29:24 30:1 32:8 34:5 36:9 39:11 65:7 66:6 70:8 75:12 77:3 77:22 79:22 80:14 108:5 127:6 134:21 142:1 142:4
State's [19] 13:3 13:9 13:13:15 13:17 13:23 14:12 14:15 14:17 15:19 16:16 16:24 16:24 25:19 32:12 32:13 58:23 80:3 119:4
Statement [1] 78:7
Statements [1] 140:3
Stay [4] 12:21 29:16 30:24 60:20
Stayed [1] 133:4
Still [12] 25:25 55:25 56:3 56:6 72:2 83:2 86:21 87:23 94:5 129:7 129:8 135:9
Stop [2] 48:7 84:3
Stopped [1] 24:11
Store [8] 89:7 89:8 89:21 90:3 100:1 100:6 100:7 101:22
Storekeeper [1] 90:3
Storm [1] 24:19
Story [1] 133:11
Straight-A [1] 83:12
Street [2] 24:10 121:5
Strength [1] 13:3
Strong [4] 59:10 59:14 60:2 60:2
Strongly [2] 93:1 141:14
Struck [2] 87:21 88:3
Structured [1] 121:15
Student [2] 83:12 86:6
Stuff [7] 8:15 8:15 52:11 94:10 101:23 123:12 123:14
Stupid [1] 85:21
Subject [1] 93:16
Substance [2] 86:20 121:21
Substitute [1] 20:17
Substituted [2] 22:4 24:15
Successfully [1] 18:16
Suffered [1] 133:18
Sufficient [15] 9:23 20:25 22:9 25:4 26:10 39:22 39:23 41:14 47:14 49:20 50:9 56:2 78:22 84:11 84:12
Sufficiently [2] 84:18 134:12
Sugar [2] 121:20 121:22
Suggest [1] 80:22
Sum [2] 136:3 136:8
Summarizes [1] 78:8
Support [2] 35:23 92:9
Supported [1] 36:2
Supposed [2] 97:12 101:11
Suppress [1] 123:18
Surprised [2] 89:17 91:24
Surrounding [1] 117:19
Sustain [1] 133:15
Suzette [1] 114:24

**Sworn** [3] 46:2 67:13 73:2 103:5 123:7
**System** [4] 18:14 18:23 19:4 131:18

## T

**T.D.C.** [1] 121:20
**Table** [1] 68:5
**Talks** [6] 35:25 36:3 36:4 80:8 109:23 109:25
**Tax** [1] 113:9
**Taylor** [5] 67:12 67:23 69:7 71:13 72:10
**Teacher** [1] 96:16
**Teaches** [1] 18:13
**Teaching** [1] 18:24
**Teachings** [1] 128:16
**Ted** [1] 92:4
**Teenager** [1] 53:5
**Television** [2] 26:19 34:16
**Ten** [4] 46:20 46:23 69:17 86:1
**Tend** [2] 22:19 40:14
**Tending** [1] 124:8
**Tends** [4] 39:19 39:24 40:10 40:18
**Term** [6] 12:16 14:16 14:22 14:23 15:6 117:12
**Terms** [13] 7:10 7:11 35:20 69:18 99:4 100:13 111:12 114:14 117:20 117:22 117:23 119:17 138:8
**Test** [2] 48:9 105:5
**Testified** [5] 46:2 67:13 73:2 103:5 123:7
**Testify** [8] 41:7 42:19 42:20 79:7 79:12 79:16 81:1 102:14
**Testifying** [1] 113:22
**Testimony** [30] 6:20 6:22 7:2 7:4 7:5 7:9 11:11 11:18 11:19 23:6 24:16 39:16 40:9 40:14 40:18 41:4 41:24 42:2 42:4 42:6 42:9 42:12 43:3 44:2 70:20 79:25 124:20 125:4 125:9 130:20
**Tests** [1] 96:15
**Texas** [31] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 4:17 4:20 4:25 10:17 19:13 29:24 30:1 34:5 34:24 39:11 75:12 77:3 77:22 80:14 81:20 82:8 105:23 114:18 127:6 142:1 142:4 142:16 142:17 142:18
**Theft** [1] 134:24
**Themselves** [5] 6:21 12:11 28:8 31:5 68:20
**Theoretically** [1] 112:16
**Therefore** [10] 13:19 31:8 47:15 52:23 53:12 98:23 100:5 110:14 125:8 139:13
**They've** [1] 141:19
**Thinking** [12] 24:14 52:21 62:3 80:3 80:19 112:10 113:5 120:12 124:2 138:8 139:16 139:19
**Thinks** [1] 127:17
**Third** [6] 33:2 33:4 42:22 43:14 64:1 94:1
**Thirteen** [1] 124:6
**Thirteen-month-old** [1] 124:6
**Thoroughly** [1] 51:18
**Thoughts** [3] 112:10 127:20 129:17
**Threat** [10] 9:5 17:23 19:12 49:3 83:4 83:8 83:17 84:24 106:19 121:1
**Threatened** [1] 94:25
**Threatening** [1] 101:15

**Three** [13] 26:22 26:25 27:1 27:3 27:16 32:12 32:14 32:21 42:18 43:3 78:11 94:6 99:20
**Throughout** [2] 106:9 134:23
**Throw** [1] 5:20
**Throwing** [1] 133:17
**Thrown** [1] 126:15
**Tired** [1] 91:7
**Today** [8] 5:12 5:24 6:4 93:9 94:10 101:13 125:17 126:12
**Together** [2] 39:12 108:10
**Token** [1] 80:16
**Took** [3] 16:6 52:20 81:21
**Topic** [1] 103:16
**Total** [4] 55:4 83:16 126:9 142:10
**Totally** [2] 57:14 111:20
**Touch** [1] 93:16
**Towards** [1] 86:8
**Towel** [1] 126:15
**Traffic** [1] 58:7
**Tragedies** [1] 66:21
**Tragedy** [1] 66:14
**Traits** [1] 24:6
**Transaction** [5] 32:3 66:9 66:12 66:16 66:20
**Transcription** [1] 142:5
**Transcription/stenograph** [1] 1:23
**Treat** [1] 96:19
**Treated** [1] 114:11
**Trial** [72] 1:3 5:3 5:9 6:17 8:2 8:6 8:7 8:11 8:16 8:18 9:12 9:16 11:6 12:2 12:9 12:20 13:5 13:16 13:22 16:16 16:21 22:20 22:21 24:10 27:1 27:4 29:2 30:7 35:9 37:5 37:7 37:11 37:12 38:6 38:7 38:15 39:2 39:20 42:19 44:1 44:20 48:24 49:24 51:3 57:17 58:4 58:19 65:1 74:6 74:17 76:20 80:7 81:14 81:15 82:2 82:14 82:18 82:23 83:11 84:16 85:4 90:17 92:4 94:20 102:15 102:17 109:11 109:19 124:19 125:19 126:12 129:12
**Trials** [5] 10:21 11:21 41:2 78:19 91:15
**Tried** [4] 57:4 64:3 111:1 115:15
**Trouble** [3] 35:12 83:13 83:21
**True** [3] 62:19 130:13 142:4
**Truly** [3] 57:8 129:4 142:9
**Truth** [5] 5:22 132:20 133:10
**Try** [3] 25:13 80:12 88:19
**Trying** [10] 6:6 39:4 39:10 46:25 78:16 95:2 124:16 129:16 130:18 135:4
**Tucker** [3] 76:9 91:16 115:3
**Turn** [2] 78:5 126:23
**Turns** [3] 34:24 43:8 43:12
**TV** [3] 91:19 94:10 94:11
**Twelve** [3] 57:9 70:1 126:7
**Twenty** [3] 52:12 108:23
**Twenty-five** [2] 53:12 110:21
**Twenty-seven** [1] 41:23
**Two** [73] 4:20 5:2 5:10 8:20 8:21 9:7 9:9 10:2 10:8 10:18 11:6 15:9 19:21 19:21 23:3 26:1 26:22 26:24 30:5 32:2 32:4 32:14 32:18 33:2 33:23 35:15 39:8 39:12 41:1 42:15 48:24 49:18 52:24 53:

**U**

**Ultimate** [5] 127:17 127:25 128:3 129:7 132:2
**Ultimately** [5] 100:16 127:23 128:8 132:3 132:6 132:6
**Unable** [2] 22:23 45:9
**Unanimously** [6] 20:5 20:11 37:6 37:8 38:2 38:4
**Undecided** [1] 140:14
**Under** [4] 77:20 92:18 108:18 121:8
**Understood** [1] 59:15
**Undo** [1] 83:18
**Unfair** [4] 15:22 16:3 120:16 130:6
**Unfolded** [1] 122:16
**Unique** [8] 12:2 20:14 20:15 25:4 27:13 28:2 57:11 57:20
**Uniqueness** [1] 38:11
**Unjustly** [1] 131:25
**Unless** [10] 12:22 13:8 13:17 13:23 20:13 21:6 57:11 84:25 94:13 108:1
**Unlocking** [1] 140:10
**Unwilling** [1] 45:9
**Up** [51] 5:20 11:16 13:16 13:19 13:24 23:4 24:19 29:19 29:20 29:23 30:3 34:22 34:24 35:18 36:18 40:3 43:8 46:6 57:12 63:13 68:4 71:13 73:12 74:5 74:5 74:6 74:15 74:16 75:13 78:4 82:23 84:15 86:2 86:16 93:7 93:12 94:24 106:2 113:7 126:10 126:14 127:8 129:25 133:18 133:17 136:3 136:9 140:22
**Upbringing** [5] 52:5 54:2 62:4 82:13 128:16
**Upbringings** [1] 54:9
**Uplift** [1] 113:10

**V**

**Value** [1] 34:23
**Values** [2] 34:25 57:10
**Venireman** [1] 135:15
**Venireperson** [3] 3:2 3:19 72:9
**Verdict** [23] 10:1 11:23 12:1 13:14 13:15 13:17 13:20 14:9 14:18 14:18 14:19 27:19 27:23 28:2 28:8 28:10 28:12 33:2 33:4 104:15 118:7 125:10 130:19
**Verdicts** [3] 11:17 47:1 47:2
**Verge** [1] 42:16
**Versus** [2] 4:17 110:21
**Veterinarian** [1] 68:11
**Victim** [10] 9:6 10:2 15:25 35:3 37:1 43:13 43:14 43:22 51:11 111:19
**Victims** [1] 11:9
**Vietnam** [1] 24:19

**View** [5] 6:22 7:6 43:24 52:25 53:2
**Viewed** [2] 23:19 47:4
**Views** [1] 78:8
**Violate** [1] 121:16
**Violating** [1] 121:23
**Violations** [1] 121:17
**Violence** [34] 9:4 15:22 15:25 16:4 16:15 16:18 17:3 17:5 17:8 17:10 17:11 17:16 18:12 18:19 18:24 19:7 19:11 19:22 49:12 49:14 49:15 83:5 83:9 106:18 106:24 107:6 107:17 107:17 107:22 107:24 112:21 120:25 121:18 121:25
**Violent** [3] 49:8 49:10 49:11
**Visit** [1] 123:13
**Voir** [16] 1:15 46:3 48:1 56:16 67:14 71:11 73:3 75:9 87:15 90:22 103:16 105:1 116:14 123:8 127:3 135:18
**Volume** [2] 1:2 142:6
**VOLUMES** [1] 1:2
**Voluntarily** [1] 86:23
**Voluntary** [2] 86:18 87:1
**Vote** [2] 84:19 112:17
**Voted** [1] 20:11
**VS** [1] 1:8

**W**

**Wait** [5] 27:17 83:23 109:10 109:18 109:21
**Waiting** [1] 55:12
**Walk** [2] 67:2 132:7
**Walking** [2] 43:7 43:17
**Walks** [2] 43:9 54:6
**Walls** [2] 18:10 18:15
**Wardens** [1] 19:1
**Warrant** [5] 50:10 62:13 100:22 138:20 138:22
**Warranted** [4] 37:24 105:9 108:18 111:13
**Warrants** [3] 24:13 24:23 108:10
**Waste** [1] 126:9
**Watch** [1] 36:5
**Wayne** [5] 2:12 4:19 91:2 116:19 135:23
**Ways** [2] 53:3 53:14
**Weapon** [1] 43:21
**Wednesday** [1] 67:10
**Week** [8] 24:8 29:5 29:5 42:1 67:10 69:9 111:1 124:1
**Weekend** [2] 87:16 113:5
**Weeks** [3] 42:5 68:15 124:9
**Weigh** [5] 59:7 84:17 86:15 88:24 98:5
**Weight** [1] 7:1
**Wentz** [24] 2:17 3:7 3:8 3:9 3:10 3:24 3:25 4:3 4:18 55:16 56:15 56:17 71:14 72:16 72:18 90:21 90:23 91:1 116:13 116:15 116:18 135:17 135:19 135:22
**Whereby** [1] 76:16
**Wherein** [3] 36:13 41:8 47:13
**Whole** [19] 6:3 9:20 13:5 25:7 25:9 27:11 27:13 33:16 35:14 38:19 38:21 45:2 100:2 104:7 123:25 132:20 133:10 134:3 137:9
**Wide** [3] 74:4 74:12 74:14
**Wife** [3] 36:5 133:9
**Willing** [4] 47:18 55:17 98:24 118:25
**Wind** [1] 126:13

**Windshield** [1] 17:15
**Wine** [1] 42:22
**Witness** [9] 41:22 41:24
42:3 56:13 80:22 89:4 100:3
130:15 142:12
**Witness'** [1] 42:4
**Witnesses** [16] 7:1 11:10
11:15 11:18 11:19 35:7 41:
23 42:9 43:1 65:5 80:1 80:3
89:14 124:24 125:6 125:7
**Witnesses'** [1] 41:24
**Woman** [1] 76:8
**Women** [1] 114:23
**Wonder** [1] 116:22
**Wondering** [1] 93:21
**Word** [23] 7:14 15:2 15:2
15:4 15:8 15:13 15:18 16:13
17:24 18:5 19:14 22:12 22:
13 23:20 59:14 60:1 107:2
117:15 120:18 127:18 137:18
138:8 138:12
**Words** [32] 7:18 7:19 7:20
7:22 7:24 12:5 13:14 18:2
20:23 20:24 58:24 60:3 61:6
65:4 65:7 71:20 75:19 80:8
86:19 94:22 98:14 98:21 98:
22 99:2 118:13 118:14 122:
12 130:12 136:23 136:25 137:
15 137:17
**Worker** [6] 106:2 106:6
106:10 113:13 113:14 113:15
**Works** [1] 137:9
**World** [2] 11:23 128:20
**Worst** [2] 97:10 120:7
**Worth** [2] 36:17 66:14
**Wound** [1] 111:21
**Write** [1] 94:15
**Writing** [3] 6:1 6:4 142:5
**Wrongdoing** [1] 65:10
**Wrongly** [2] 131:23 131:25
**Wrote** [1] 51:10

## Y

**Y'all** [1] 87:22
**Year** [13] 29:6 29:6 29:7
29:16 30:9 31:1 35:8 35:11
36:13 45:1 53:6 117:25 133:5
**Years** [22] 22:20 29:4 29:
4 29:5 29:6 29:8 29:9 30:14
30:17 31:7 31:8 31:12 34:7
35:22 38:10 38:15 51:9 51:
12 86:1 88:3 94:6 108:23
**Yogi** [1] 26:19
**Young** [4] 53:5 66:15 85:
20 85:21
**Yourself** [14] 5:21 9:23
25:3 45:12 57:17 85:16 85:
17 86:24 88:7 101:21 116:3
118:15 132:15 141:10
**Yourselves** [2] 7:13 20:23
**Youthfulness** [1] 22:21

## Z

**Zero** [1] 39:5
**Zone** [1] 6:11

1

1    REPORTER'S RECORD

2    VOLUME 12 OF 25 VOLUMES

3    TRIAL COURT CAUSE NO. 800112

4

5    CHARLES MAMOU, JR.        )    IN THE DISTRICT COURT

6         Appellant           )

7                             )

8    VS.                       )    HARRIS COUNTY, TEXAS

9                             )

10   THE STATE OF TEXAS        )

11        Appellee            )    179TH JUDICIAL DISTRICT

12

13

14              * * * * * * * * * * * * * * * * * * *

15              VOIR DIRE EXAMINATION

16              * * * * * * * * * * * * * * * * * * *

17

18        On the 21st day of September, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Bob Burdette, Judge

21   Presiding, held in Houston, Harris County, Texas:

22        Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

```
 1              A P P E A R A N C E S

 2      MR. LYN MCCLELLAN

 3      SBOT NO. 13396100

 4      MS. CLAIRE CONNORS

 5      SBOT NO. 0470500

 6      Assistant District Attorneys

 7      201 Fannin

 8      Houston, Texas 77002

 9      Phone:  713.755.5800

10      ATTORNEYS FOR THE STATE OF TEXAS

11

12      MR. WAYNE HILL

13      SBOT NO. 59656300

14      4615 Southwest Freeway

15      Houston, Texas 77027

16      PHONE:  713.623.8312

17      MR. KURT WENTZ

18      SBOT NO. 21179300

19      5629 W FM 1960

20      Houston, Texas 77069

21      PHONE:  281.587.0088

22      ATTORNEYS FOR THE DEFENDANT
23

24

25
```

i

INDEX

VOLUME 12 OF 25

|  | | PAGE | VOL. |
|---|---|---|---|
| September 21, 1999    Voir Dire Examination | | | 12 |
| Panel Voir Dire | | 3 | 12 |

| Venirepersons | Court | State | Defense | | VOL. |
|---|---|---|---|---|---|
| Houston Norman Hamilton | 49,79 | 51 | 67,84 | | 12 |
| Joyce Stoner Williams | 86,97 105 | 91,100 | 110 | | 12 |
| Nohemy Bonilla | 111 | 115 | 125 | | 12 |
| Linda Deaton | 131 | 133 | 140 | | 12 |
| Traci Lee Karam | 149 | 151 | 169 | | 12 |
| Joseph Michael Mathews | 182 | 188 | 197 | | 12 |
| William Glenn Kelly | 210 | 214 | 224 | | 12 |
| Wesley Dwayne Mikle | 231 | 234 | 243 | | 12 |

|  | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 246 | 12 |
| Court Reporter's Certificate | 247 | 12 |

3

1          THE COURT: As I understand, there is an
2  agreement by and between the parties that Venireperson
3  Number 104, that being Miss Janet Johnson, and
4  Venireperson Number 107, that being Craig Baker, for
5  various reasons may be excused.
6          Mr. McClellan, is that your agreement?
7          MR. MCCLELLAN: Yes, Your Honor.
8          THE COURT: Is it also Miss Connors'?
9          MR. MCCLELLAN: Yes, Your Honor.
10          THE COURT: Yours, Mr. Hill?
11          MR. HILL: Yes, Your Honor.
12          THE COURT: Yours, Mr. Wentz?
13          MR. WENTZ: Yes, Your Honor.
14          THE COURT: And yours, Mr. Mamou?
15          THE DEFENDANT: Yes, Your Honor.
16          THE COURT: Is it your request that each
17  of these be excused?
18          THE DEFENDANT: Yes, sir.
19          THE COURT: Very well. They'll be
20  excused.
21          (Jury panel brought in.)
22          THE COURT: Good morning, ladies and
23  gentlemen. To remind you, we're here visiting about
24  your prospective service as a juror in the case of State
25  of Texas versus Charles Mamou, Jr.   Mr. Mamou is

4

1  represented by his attorneys, Mr. Wayne Hill, who just
2  went through one of these doors, Mr. Kurt Wentz. The
3  State of Texas is represented by two of her Assistant
4  District Attorneys, Mr. Lyn McClellan, Miss Claire
5  Connors.
6          As we discussed the other day, this
7  defendant stands charged by indictment with the offense
8  of capital murder that is alleged to have occurred in
9  Harris County, Texas, on or about the 7th day of
10  December of 1998. I want to spend some time visiting
11  with you today about some things other than what we
12  talked about the other day when the whole group was
13  together.
14          Before we start, let me say this: I know
15  that we're going to talk about things that you have
16  never before in your life thought about, and there is no
17  reason in the world why you ever should have. Please
18  don't get frustrated if you feel that what we're talking
19  about is confusing. Please don't throw your hands up in
20  the air to yourself, so to speak. Don't get frustrated
21  with yourself about what we're going to talk about.
22  Don't feel that you need to commit to memory what we're
23  talking about, because you don't.
24          And the reason that you don't is this: At
25  the conclusion of the evidence at each phase of the

5

1  trial, if we do have both phases, I'll give you -- or
2  you'll be given in writing in the Court's charge all of
3  the rules that have come into play during the course of
4  the trial. You'll have the Court's charge with you back
5  in the jury room in writing throughout the whole time
6  you're deliberating. So for that reason, you can see
7  that you don't need to memorize what it is we're talking
8  about here today.
9          I want, however, you to feel more
10  comfortable with what can go on during the course of a
11  trial like this. Kind of like the better prepared you
12  are, the better you can play, so to speak. So it's for
13  that reason we're going to talk about some things. We
14  talked the other day about the fact that a trial like
15  this, actually any criminal trial for that matter, can
16  come in two parts. The first part of the trial, the
17  jury's only concern is going to be with deciding whether
18  the defendant is or is not guilty of the offense. If
19  the jury finds the defendant to be not guilty, the case
20  is over with and that's the end of that.
21          If the jury finds the defendant guilty, we
22  come back and we have a second stage of the trial. At
23  the second stage of the trial, additional evidence can
24  be presented to you for the purposes of assisting you in
25  answering two Special Issues or two questions that we

6

1  touched on very briefly the other day. We're going to
2  talk about that in detail in just a little bit. And
3  it's how the jury answers those two questions that
4  determines what punishment the law requires that I
5  impose.
6          So since the purpose for the testimony in
7  each phase of the trial is different -- that is to say,
8  your verdict is going to be, is he guilty on the one
9  hand or not? And on the other hand, if he is guilty,
10  what is the appropriate punishment? Therefore, the
11  focus of the evidence is going to be different.
12          At the first phase of the trial, the
13  evidence is going to focus on the crime that was
14  committed. Who did it? Where was it done? How was it
15  done? When was it done? What were the circumstances?
16  What was the prior relationship of the parties, if there
17  was a prior relationship? What was the motive for
18  having done it, if the motive is known? Those are all
19  things you'll hear at the first phase of the trial.
20          If the jury finds the defendant guilty, at
21  the second phase of the trial the focus of the evidence
22  is going to shift; and the focus of the evidence at the
23  second stage of the trial is going to be on the
24  character and the background and the personal moral
25  responsibility of the defendant involved in the

**7**

1  commission of the crime, meaning, you know about the
2  crime.
3       Now we want you to know about the person
4  who did it. Might be a whole lot of good traits. Might
5  be a lot of bad traits. Might be some of each. But we
6  want you to be able to take the defendant on trial, add
7  to it the facts of the case so that you'll be armed with
8  information as to how to answer the questions that we're
9  going to ask you.
10      The questions we're going to be asking you
11 are over here on this board, and we're going to talk
12 about that in a couple of minutes. First off, I'll tell
13 you the questions are going to be asked in the order in
14 which they appear on the board. The words which are on
15 the board are the words that are going to be used in the
16 question. So this is specifically what you're going to
17 be asked to decide in the event you find the defendant
18 guilty of the offense of capital murder.
19      Please follow along with me if you care
20 to. It might make this a little bit simpler. The first
21 question will ask you: Do you find from the evidence
22 beyond a reasonable doubt that there is a probability
23 that the defendant would commit criminal acts of
24 violence that would constitute a continuing threat to
25 society? Can you see no matter who the defendant is, no

**8**

1  matter what case it is, no matter who the victim was,
2  there's never ever but two possible answers to that
3  question, either yes or no? And the answer to that
4  question, yes or no, is whichever way you believe the
5  evidence indicates.
6       The second question that you'll be asked
7  to answer is this: Taking into consideration all of the
8  evidence, including the circumstances of the offense --
9  now, you see, that's going to be what you heard at the
10 first half of the trial about the crime -- also
11 including the defendant's character and background and
12 his personal moral culpability, which is the same as
13 responsibility. That's going to be what you heard at
14 the second part of the trial. And the personal moral
15 responsibility of what we're talking about is if there
16 is a situation, if there is one where there are multiple
17 defendants involved in a particular crime. What was the
18 comparative blameworthiness of this defendant on trial
19 as compared to the other ones whose trials will be held
20 separately from this one?
21      So -- also taking into account the
22 defendant's character and background, the personal moral
23 culpability. So you can see that the first half of the⁻
24 second question does absolutely nothing more than
25 instruct the jury to go back over all of the evidence in

**9**

1  the case for the purpose of asking yourself this
2  question: Is there a sufficient mitigating
3  circumstance, or perhaps circumstances, that make you
4  believe that a life sentence would be a more appropriate
5  verdict than a death sentence?
6       Again, no matter who the defendant is, no
7  matter what the case is, no matter who the victim was,
8  there's never but two possible answers to that question,
9  yes or no. Again, you'll answer that question the way
10 that you feel the evidence dictates. If the jury should
11 answer yes to that first question, and if the jury
12 should answer no to that second question, the law says I
13 have no choice, I have no option, and I have no
14 discretion. I must sentence the defendant to death, and
15 that's exactly what I'll do.
16      If the jury should answer those two
17 questions in any way other than yes and no, in that
18 order, once again, the law says I have no choice, I have
19 no option, I have no discretion. I must sentence the
20 defendant to life, and that's exactly what I'll do.
21      So, first off, you can see the juries in
22 the State of Texas don't go out and sentence this person
23 to life, that person to death. What jurors do is take
24 the evidence that exists in the case and answer those
25 two questions. And you're entitled to know what the

**10**

1  effect of your answers is going to be and what kind of
2  sentence I'll pass. And you're entitled to know that a
3  yes and a no answer is a death sentence. A no answer to
4  the first question is a life sentence. A yes answer to
5  the first question and a yes answer to the second
6  question is a life sentence.
7       So you can see -- I know that you have
8  probably read about, heard about cases, capital murder
9  cases, where a person's convicted of capital murder; and
10 in some cases a life sentence is imposed, some cases a
11 death sentence is imposed. And the reason there are
12 different sentences imposed is because there is
13 different evidence in each case. These questions never
14 change. This is the standardized process. The words
15 never change. The questions never change. The order in
16 which the questions are asked never changes.
17      What always does change is every defendant
18 is different from every other defendant. In one
19 imaginary case you might have a seventeen-year-old girl
20 as a defendant, who's never done anything wrong in her
21 life. In another imaginary case you might have a
22 forty-five-year-old, six-time ex-convict who spent his
23 life killing people. All the facts are different. All
24 the circumstances are different. All the victims are
25 always different. All the witnesses who testify are

11

1    always different. And all the juries are always
2    different.
3            For example, we could have in this
4    courtroom, if we could fit them in here, four juries
5    listening at exactly the same time to exactly the same
6    testimony from exactly the same witnesses and have all
7    four of those juries go out in four different jury
8    deliberation rooms, and we'll come up with four
9    different verdicts; because those twelve people on one
10   jury evaluate the testimony differently than the other
11   twelve people.
12           So, that's why every single case is as
13   unique as an individual's fingerprint. There are no two
14   cases that are ever alike, because the witnesses are
15   changed. The defendant's are changed. The victims are
16   changed. The facts are changed, and the jury. That's a
17   jury's decision, and a life sentence may be imposed.
18   That may very well be the absolute most appropriate
19   verdict in the world for that particular case.
20           In another capital murder case, when these
21   Issues are answered in such a way that the defendant's
22   sentence is imposed, that also may be the absolutely
23   most appropriate verdict that could ever be returned in
24   that case because of the uniqueness of the circumstances
25   in that case.

12

1            So can you see that every case starts off
2    being absolutely different than anything else? It has
3    its own personality and own identity. Let's talk about
4    these questions in a little more detail. And before we
5    do, let me tell you that we're going to spend some time
6    today talking with you now, as well as with you
7    individually, about things that are going to occur, or
8    can occur, I should say, at the punishment phase of the
9    trial if a defendant is found guilty of capital murder.
10           You may say to yourself, well, why in the
11   world are you all talking about the punishment phase of
12   a trial when you told us yesterday, just the other day,
13   before the trial begins and during the course of the
14   trial, all defendants are presumed to be not guilty. So
15   why do we talk about the punishment phase of the trial?
16   And that's a good question.
17           The reason is this: If we don't talk to
18   you about the punishment phase now, about the law that
19   can come into play, we're never going to be able to talk
20   to you about it. For example, if we picked a jury,
21   talked to them only about the laws that can come into
22   play at the first phase of the trial, and if a jury
23   finds that imaginary defendant guilty of capital murder,
24   and if we come back and we get the jury together and we
25   talk about the laws that could come into play in the

13

1    second phase of the trial, and if a juror says, well,
2    wait just a second. I didn't know that that particular
3    rule was a piece of the deal in this case. I'm going to
4    tell you right now, I'm going to refuse to follow that
5    law, because I simply don't believe in it. That means
6    I'd have to excuse that juror. That means I only have
7    eleven jurors. I need to have twelve. If I don't have
8    twelve, I have to declare a mistrial, excuse the eleven
9    that I do have, start the case all over again, and
10   everything we would have done would have been a total
11   waste of time. So that's why we have to talk about
12   everything that can come into play now, before the trial
13   begins. So please don't think that because we're
14   talking about the punishment phase now, the defendant's
15   getting ready to plead guilty, because he's not. Please
16   don't believe that Mr. Hill and Mr. Wentz are getting
17   ready to throw in the towel and are committed to the
18   notion the jury's going to find the defendant guilty,
19   because they're not. Please don't think we've given up
20   on the defendant's presumption of being innocent or
21   being not guilty at the beginning of trial, because
22   we're not. The only time we're ever going to get to
23   talk to you about this stuff is before the trial ever
24   begins. So keep that -- there is nothing nefarious or
25   tricky about this going on at all.

14

1            Now having said that, in the Court's
2    charge that you're going to be given at the second phase
3    of the trial are the rules that have been raised by the
4    testimony that was presented. There are going to be a
5    lot of terms defined for you, and there are going to be
6    a lot of terms that aren't going to be defined for you.
7    And if your question is, well, how do you people decide
8    what words you're going to define for us and what words
9    you aren't, I'm telling you the answer is really simple.
10   And the answer goes just like this: There is no
11   justifiable reason why we ought to expect you folks to
12   give of your time, make yourselves available for jury
13   service, and be armed with legal definitions as to what
14   words are being used by lawyers during the course of the
15   lawyering business.
16           So if we're going to be using some word,
17   some term that's peculiar to the lawyering business,
18   we're going to define it for you. If we're going to be
19   using a word that you use, we're not going to tell you
20   what those words mean; because you already know what it
21   means. That's how we make that decision. And if I go
22   back to what I said at the beginning last Friday,
23   whenever it was, this really is not complicated. Don't
24   try to make it into something it's really not. It's
25   perfectly simple.

15

1      All this is about is listening to what the
2 witnesses say, evaluate what the witnesses say, and
3 react to what the witnesses say. React in terms of
4 coming up with a verdict based upon how you evaluate the
5 testimony of the witnesses. That's all this is about.
6      So let's talk -- is there something wrong?
7 Let's talk a couple of seconds about the words that are
8 contained in these two questions. First off, in the
9 first question, first thing we see is: Do you find from
10 the evidence beyond a reasonable doubt? We talked
11 about a reasonable doubt the other day. We talked about
12 the definition that you'll be given for that word. We
13 talked about it from the standpoint of the fact that
14 it's up to the State to prove a person's guilt beyond a
15 reasonable doubt. We talked about the fact that up
16 until the time they do prove a person's guilt beyond a
17 reasonable doubt, the defendant is not guilty. So at
18 the beginning of the trial, the jury's verdict starts
19 off being not guilty, unless the State's evidence proves
20 beyond a reasonable doubt that that verdict should be
21 bumped up, so to speak, from not guilty bumped up to
22 guilty.
23      At the second phase of the trial, in order
24 to get the death penalty imposed, we know the answer to
25 this first question has got to be yes; because it takes

16

1 a yes and a no, in that order. We see from the phrase
2 at the beginning of the question: Do you find from the
3 evidence beyond a reasonable doubt? That means every
4 time we see the phrase, do you find from the evidence
5 beyond a reasonable doubt -- that means the State has to
6 prove what the answer to that question should be. Just
7 like at the guilt phase, the defendant starts off being
8 not guilty unless the State's evidence proves he is
9 guilty.
10      At the second phase, this first question
11 starts off being answered no unless the State's evidence
12 proves that the answer to that question should be bumped
13 up to a yes. That means that at the beginning of the
14 second phase in every capital murder case where a
15 defendant has been found guilty of capital murder, it is
16 presumed that the appropriate punishment should always
17 be life. And how do you get that? Well, because it's
18 presumed starting out that that first question should be
19 answered no. We understand from our conversation that a
20 no answer to that first question means a life sentence
21 is going to be imposed, because a no answer to the first
22 question is different than yes and no. And that's what
23 it takes for a death sentence. So, starting out, that
24 first question gets a no answer unless or until the
25 State's evidence proves beyond a reasonable doubt that

17

1 the answer should be yes. Does anybody have any
2 questions about that? Anybody doesn't see how I got to
3 the point that I got?
4      Okay. Let's continue with the first
5 question. Do you find from the evidence beyond a
6 reasonable doubt that there is a probability? Now the
7 word probability is not going to be defined for you,
8 because you folks use that word all the time yourselves.
9 Whatever it is, I can't tell you or give you a
10 definition of the word probability. I am permitted to,
11 by comparison, tell you that whatever the word
12 probability does mean to you, there are two things that
13 it can't mean. One of them is this: Whatever the word
14 probability means to you, it must be something that is
15 more than a possibility. Anything could possibly
16 happen. Because it could possibly happen does not mean
17 it's probably going to.
18      On the other hand, whatever the word
19 probable means to you, it cannot mean something you have
20 as a certainty. Because something is probably going to
21 happen does not mean it's certain to happen. Now let's
22 take in context the word probability, as used in this
23 question. The State's got to prove the existence of a
24 probability that a defendant will commit future acts of
25 criminal violence. Can you see how grossly unfair it

18

1 would be if the State only had to prove that a defendant
2 would possibly commit future acts of violence? Because
3 anything is possible to happen. It's possible that the
4 eight of you and myself could commit criminal acts of
5 violence in the future, so we had to put a stronger
6 burden on it than that. On the other hand, can you see
7 how grossly unfair it would be to the State to require
8 them to prove the existence of a certainty that a
9 defendant would commit future acts of criminal violence?
10 Because nobody can prove that, so what we simply did was
11 we split the baby. We took something greater than
12 possibility, something not as great as certainty, and
13 required the State to prove beyond a reasonable doubt
14 the existence of a probability that a defendant on trial
15 would commit future acts of criminal violence.
16      So if probability means to you something
17 that is more likely to happen than more likely not to
18 happen, that's a deal. If it means something else to
19 you, that's just fine, too. That's your call, as long
20 as probability means something more than a possibility,
21 and as long as probability doesn't mean as much as a
22 certainty. Anybody have any questions about that?
23 Continuing with the question -- probability that the
24 defendant would commit criminal acts of violence?
25      In order to obtain a yes answer to this

**19**

1   question, it is not necessary that the State prove to a
2   probability that a defendant would commit a specific
3   crime in the future.  The State, in order to get a yes
4   answer to this question, is not required to prove
5   existence of a probability that a defendant on trial
6   would commit future capital murders.  Certainly if that
7   proof exists, they're entitled to present it to the
8   jury.
9         But in order to get a yes answer to this
10  question, the State is not required to prove a specific
11  crime.  The State is required to prove the existence of
12  a probability that a defendant on trial would commit a
13  certain class of crimes, category of crimes, and that
14  category of crime is the one that's a criminal act of
15  violence.  And because the question doesn't limit it,
16  the criminal acts of violence can be either as to
17  persons or as to property.  Certainly capital murders
18  are criminal acts of violence as to persons, as are
19  murders, as are assaults, as are rapes, as are
20  robberies, as are kidnappings.  All criminal acts of
21  violence as to people.
22        Criminal acts of violence as to property.
23  Arson is the burning of somebody's vehicle, home, and
24  certain kinds of burglaries that require break-ins to
25  get into a building or to break into an automobile, the

**20**

1   taking of a brick bat, so to speak, and beating in the
2   windshield of an automobile.  All those are criminal
3   acts of violence.  There's probably a hundred other
4   examples, but it is that type of conduct generally that
5   the State is required to prove the future probability
6   that a defendant would commit a particular crime within
7   that category.  And the criminal acts of violence must
8   be such, according to the first question, that
9   constitute a continuing threat to society.
10        Now the word society is not going to be
11  defined for you.  I would, however, ask you to consider
12  making the distinction if you feel comfortable with the
13  distinction.  The word society and community.  We all
14  live in different communities, but all our communities
15  are a piece of society.  I say that for this reason,
16  most of the time when we think of society, we think of
17  people that we come into contact with; family members,
18  people we work with, people in the neighborhood, people
19  we come in contact with.  We don't often think of those
20  specific individuals that we never have any association
21  with.
22        For example, we don't think of people
23  ordinarily, when we think of society, that are behind
24  the walls of the penitentiary; but those people can also
25  be a piece of society.  For example, if we had a lady

**21**

1   who was a schoolteacher behind the penitentiary walls,
2   goes in and punches in at 8:00 o'clock in the morning to
3   go behind the walls with inmates to do her job, she does
4   not lose her right to be free from criminal acts of
5   violence while she's back there doing her job.  And then
6   if at the end of the workday she escapes with her life,
7   gets her card punched, and gets to leave the walls of
8   the penitentiary, she does not forfeit her right to be
9   free from criminal acts of violence once she gets back
10  in the outside world.  That's preposterous.  That's not
11  the case.
12        The point being, behind the walls of the
13  penitentiary, medical personnel, doctors, nurses, prison
14  guards, administrators, wardens, school teachers, all
15  the folks who there are, as well as all the inmates, all
16  have the right to be free from criminal acts of
17  violence.  And we know inmates do, also; because if we
18  hope that one of the aspects of the punishment would be
19  to rehabilitate, there's never going to be any hope of
20  rehabilitation if you don't make an effort to keep the
21  inmates safe from each other.
22        So when we talked about criminal acts of
23  violence constituting a continuing threat to society,
24  we're talking about all the people, all the time,
25  everywhere.  Because if we were not talking about that,

**22**

1   and if we were talking about a community, then this
2   question would read:  Do the criminal acts of violence
3   constitute a continuing threat to the citizens of Harris
4   County.  And the question does not say that.  It says a
5   continuing threat to society.  Is there any questions
6   about the first question?
7        If you answer that question no, then the
8   whole case is over because a life sentence is going to
9   be imposed.  Because a no answer to the first question
10  is different than yes and no, and that's what it takes
11  to get a death sentence.  And there is no answer you can
12  give to the second question after a no answer to the
13  first question that's ever going to make the death
14  penalty a possibility in this case ever again.  Anybody
15  have any questions?
16        Let's go to the second question.  Before
17  we take up the second question, specifically, let's talk
18  about where, in a jury's job, you necessarily would be
19  before you take up that question.  Necessarily, the jury
20  would have had to have unanimously found the defendant
21  to be guilty of capital murder; because if you hadn't,
22  we'd never have these questions.  Necessarily, a jury
23  would have had to have found yes, unanimously, to
24  Question Number One; because if you had found no, we'd
25  never get to Question Number Two.

23

1       So what we're saying is that when a jury
2   gets to Question Number Two, they would have
3   unanimously, consistently voted in such a
4   way that the death penalty is going to be imposed.
5   Second question exists for the purposes of making the
6   jury satisfied that based upon the evidence in that
7   case, the death sentence is what they want.  Or the
8   second question is there for the purposes of, if there
9   is something that exists in the case that makes the jury
10  believe that a life sentence would be more appropriate
11  than the death sentence, then this is their chance to
12  substitute that decision.  So, the second question
13  exists as a safety valve for the jury's comfort.  That's
14  it.
15      Let's get into the second question.  We
16  talked awhile ago about the first half of the second
17  question, and it's absolutely nothing more than an
18  instruction to the jury to go over all the evidence in
19  the case.  That's all the first half of the second
20  question said.  Go back over all the evidence in the
21  case for the purposes of asking yourselves this
22  question.  And these are going to be my words.  They
23  aren't the words in the question, but I believe that's
24  what it asks.  For the purpose of asking yourself this
25  question:  Is there a good enough reason why we ought to

24

1   pull down this death sentence that right now exists and
2   replace it with a life sentence?  If you answer that
3   question yes, there is, then you're answering that whole
4   question yes.  If your answer to that question is no,
5   there is not a good enough reason, then your answer to
6   that whole question is no.
7       Now let's talk about the second question.
8   The first thing we can see in the second question is
9   nowhere in that question do we see the phrase, Do you
10  find from the evidence beyond a reasonable doubt?  That
11  phrase does not exist in that question, and that means
12  the State is not required to prove to you what the
13  answer to that question should be.  We know from our
14  conversation the other day that the defendant never has
15  to prove anything, so the defendant doesn't have to
16  prove to you what the answer to that second question
17  should be.
18      Well, now where does that leave us?
19  Well, it leaves us in this posture.  If the State
20  doesn't have to prove to you what the answer to that
21  question should be and they don't, and if the defense
22  doesn't have to prove to you what the answer to that
23  question should be and they don't, that means the law
24  presumes there are going to be a number of cases where
25  there is no evidence whatsoever in a case as to a

25

1   mitigating circumstance.  And the law makes that
2   presumption, because the law doesn't obligate either
3   side to put that evidence in the case.
4       The only obligation that exists out of the
5   second question is for the jury to go back over all the
6   evidence in the case to see if there is any mitigating
7   evidence in there.  If there is, is that mitigating
8   evidence sufficient in your mind, compared with all the
9   bad information in the case, to make you believe that it
10  overcomes that bad information and makes you think that
11  a life sentence would be more appropriate than a death
12  sentence?
13      Now, the word mitigating is not going to
14  be defined for you, because what might be mitigating to
15  one of you may very well not be mitigating to the other.
16  When we use the word mitigating, we're not talking about
17  is there something that excuses some kind of conduct or
18  that justifies some kind of conduct; because the conduct
19  is never going to be excused.  It's never going to be
20  justified, because you wouldN'T have found him guilty of
21  having committed the crime.  When we're using the word
22  mitigating, we're simply talking about this question.
23  Is there something, some unique feature within the case,
24  that makes you think that the death sentence should be
25  reduced to a life sentence?

26

1       In some cases, sometimes some people might
2   tend to think if the defendant on trial, let's say a
3   seventeen-year-old person, maybe comparative
4   youthfulness might be mitigating to some jurors, the
5   idea being the defendant's mind is not mature enough to
6   make judgment -- sound and logical judgments.
7       Other people might take that exact same
8   piece of evidence and view it from a different
9   perspective and say, well, wait just a second.  If you
10  have a seventeen-year-old who goes off and commits a
11  crime as horrible as capital murder to begin with and
12  they're only seventeen, then we've lost them anyway.
13  Two people looking at exactly the same circumstances,
14  but viewing it from a different perspective.
15      In some cases you might have testimony
16  about there being a history or evidence, I should say,
17  of mental retardation as to a defendant.  Some people on
18  the jury might say that would be mitigating.  Other
19  people might say, well, no, it's not mitigating; because
20  there is no way you can cure mental retardation.  It is
21  the same as it's going to be for the rest of that
22  person's life.  Other people on the jury might have a
23  third thought and they might say, well, wouldn't it make
24  a difference as to how bad the retardation was?  Was it
25  minimum?  Was it severe?  The more severe, the more

27

1  likely it might be sufficient mitigation to make you
2  think a life sentence is more appropriate than a death
3  sentence.
4         The point is, it's your call.  The only
5  requirement, again, is that you go back over all of the
6  evidence in the case.  And it may not be anything in a
7  case that has to do with age or retardation.  It could
8  be something entirely different.  You may have in one
9  case testimony about the week before the crime occurred
10 for which you had found a defendant guilty of capital
11 murder.
12        There may be testimony at the second phase
13 of the trial that shows that a defendant was driving
14 down the street in a residential area in his vehicle,
15 saw an apartment house on fire, or a house on fire.  At
16 the risk of his own life, ran into the house, saved the
17 life of two kids that surely would have died but for his
18 efforts.  Maybe you would think that conduct is
19 indicative of a character that's not worth executing,
20 that deserves consideration for a life sentence.  Maybe
21 you ultimately would not.  That's your call, and that's
22 why this question exists.
23        You might have testimony about somebody
24 who had been in the service, been in Vietnam, been in
25 Desert Storm.  Perfectly good person before they went

28

1  into the service and got themselves all screwed up
2  because of being in combat and never have recovered from
3  it.  You might think, and there is some circumstances,
4  that that would be a mitigating circumstance that would
5  be worthy of your consideration of giving that guy a
6  life sentence.  Maybe ultimately that wouldn't be your
7  decision, but somewhere you have the chance to explore
8  those sentencing options.
9         Again, the second question exists for the
10 purposes of committing the jury that they will go back
11 over all of the evidence in the case.  You go back over
12 the evidence to see, is there a reason why we ought to
13 undo this death sentence, which heretofore you would
14 have done by finding him guilty of capital murder in
15 answer to the first question, and replacing it with
16 life, if there is a reason in the case to do that?
17        Your next decision is:  Is it a sufficient
18 reason?  Is it a reason that we think is worthy of
19 withdrawing the death sentence and replacing it with a
20 life sentence?  Does anybody have any questions at all
21 about the first question or the second question?  Okay.
22 The point being that a life sentence for a person having
23 been found guilty of capital murder before the trial
24 begins is every bit an equal option as a death sentence
25 is for a person charged with capital murder before the

29

1  trial ever begins.
2         So, what I'm saying is this, and this
3  would be my thought if I was in the chair of one of you
4  eight folks:  I might say to myself, well, you know, I
5  got this right.  What we're saying is this:  If I find
6  somebody guilty of capital murder and then we come
7  back -- we, the jury -- and we hear testimony, and the
8  testimony is such that it makes me believe that the
9  answer to that first question should be yes, that means
10 I found somebody guilty of having committed a capital
11 murder.  And not only that, but I also find there is a
12 probability that they're going to be a future danger.
13        If you answer those two questions in such
14 a way that they're guilty and they're a future danger,
15 are you telling me that there is still a possibility
16 that the defendant could receive a life sentence?   And
17 the answer to that question is, yes, there is a
18 possibility.  The possibility would be if you believe in
19 the case there is some feature, something we've talked
20 about, something entirely different that we haven't
21 talked about.  Good enough reason to undo the death
22 sentence and replace it with a life sentence.
23        It's kind of like the old Yogi Berra
24 saying; it ain't over till it's over.  And just because
25 you've answered the first two questions in such a way

30

1  that the death penalty is going to be imposed, it's not
2  going to be imposed until you have concluded your
3  research over the evidence in the case and answer the
4  third question yes.
5         Each of these questions, each of the three
6  decisions that the jury makes in a case, guilty of
7  capital murder or not guilty, yes or no to question one,
8  yes or no to question two, three decisions -- each of
9  the three decisions a jury makes in a case are
10 independent of the other two.  Just because you have
11 found somebody guilty of capital murder, for that reason
12 and that reason only, does not dictate how these
13 questions should be answered.  Because can you see that
14 the question of, is he guilty, the question of, is he a
15 future danger, and the question of, is there a good
16 enough reason why we ought to get life, are all
17 absolutely different questions, completely different
18 questions.  It's like asking somebody, how old are you?
19 What size shoes do you wear?   And do you have any
20 brothers and sisters?   They are completely different
21 questions.
22        Now if we talk -- if you thought in the
23 concept about those three decisions that the jury makes
24 being points to a triangle, and inside the triangle is
25 all the evidence in the case that you're going to use to

31

1    answer those three questions, that's about what we've
2    got.  Because when you answer one question, you move
3    along to the next point in the triangle.  And it asks
4    you something completely different than the last
5    question did, but you go to that same body of evidence
6    for the purposes of getting your answer.  You make that
7    second decision.  You go to the third question.  That
8    asks you again something different, but you go back to
9    the same body of information to get the answer to that
10   third question.
11         So what I'm saying is, each decision that
12   you make is independent of the next decision you're
13   called upon to make.  And because you have answered one
14   question one way, because you have come up with one
15   verdict, does not have anything to do, in and of itself,
16   how you should answer the next question.  Instead, you
17   go back to the pool of evidence that exists and answer
18   the question based upon whatever evidence is there in
19   that pool.
20         So what I'm saying is that starting off,
21   before the trial ever begins, a not guilty and a guilty
22   are both equal options.  What influences you, leads you
23   to whatever verdict you reach, has got to be the
24   evidence in the case.  If you find somebody guilty of
25   capital murder, a no answer to that first question is

32

1    what's presumed to be the right answer, unless or until
2    the State's evidence shows you that the answer to that
3    first question should be yes.  Then, even if you do
4    answer it yes, that does not mean there is going to be a
5    death sentence in the case; because you're going to have
6    to look over the evidence in the case again to see, is
7    there a sufficient reason why we ought to withdraw this
8    death sentence and replace it with a life sentence?
9         So can everybody see how each phase is
10   different?  That's why nothing is automatic.  I mean, if
11   you find somebody guilty of capital murder and they --
12   the questions ought to be answered in such a way that the
13   death sentence is going to be imposed, why in the world
14   would we ask the questions?  It would be no reason to.
15   The questions exist for the purposes of giving the jury
16   a second independent verdict you might come up with
17   based upon the evidence in the case.  Those are the
18   questions and the results those questions can bring.
19   Does anybody have any questions about the questions?
20         Okay.  We have talked about the possible
21   punishments; that being life and death.  I want to spend
22   a couple of minutes talking to you about what a life
23   sentence means.  No reason to talk about what a death
24   sentence means.  We can all pretty well figure that out.
25   But sometimes we have different thoughts about a life

33

1    sentence; and sometimes people come in with an idea
2    about a life sentence might mean this, when they're
3    wrong.  But at any rate, I'm going to tell you exactly
4    what a life sentence means for the purposes of this
5    case.
6         In this case, if this defendant is found
7    guilty of capital murder, and if these questions are
8    answered in such a way that I'm obligated to sentence
9    this defendant to life, I'll tell you in the Court's
10   charge and I'll tell you now that this defendant cannot
11   be considered for parole until he has actually served
12   forty years of his sentence, forty years, hour for hour,
13   day for day, week for week, month for month, year for
14   year.  Forty years means the Year 2039.  When the Year
15   2039 comes around, and if the defendant had received a
16   life sentence, that means that the defendant then
17   becomes eligible for parole consideration.
18         Parole consideration eligibility has
19   absolutely nothing to do with whether parole will be or
20   will not be granted.  Being eligible for parole means at
21   that point that there will be evaluations made by prison
22   authorities.  How was the defendant during his
23   forty-year stay here?  Those evaluations will be sent
24   to the Board of Pardons and Paroles, who will make
25   recommendations maybe on those evaluations sent by the

34

1    prison.  Maybe they'll reject those evaluations.  We
2    don't know.  But they will make recommendations, the
3    Board of Pardons and Paroles, to the governor of the
4    State of Texas.  And I haven't the foggiest who the
5    governor of the State of Texas is going to be in the
6    Year 2039.  The governor may reject them, and maybe it's
7    absolutely nothing but a political decision about
8    whether to parole or refuse to parole somebody.
9         The point of it is this:  These two
10   questions deserve to be answered on the basis of the
11   evidence that exists in the case when the case is tried
12   in the Year 1999.  They are not to be answered,
13   speculating what decision will be made about a person's
14   parole forty years from now.  It is perfectly possible
15   that one of the persons having been sentenced to life
16   for capital murder may very well, after forty years, may
17   spend the rest of their natural life, breathing every
18   single life breath they ever breathe in the
19   penitentiary, and never be paroled.  That's perfectly
20   possible.
21         It's also perfectly possible that
22   somebody, at the conclusion of the fortieth year, may be
23   awarded parole.  We just don't know what's going to
24   happen.  But I did not want you to think that -- or have
25   somebody say, well, I've heard of people that got a life

35

1    sentence before, and they were out in five years.  So
2    what I'm going to do is always answer these questions in
3    such a way that the death sentence is imposed, because I
4    don't want somebody out of the penitentiary in five
5    years.  What I'm telling you is that's not possible.
6    It's not going to happen.  And a life sentence means a
7    minimum of forty years in the penitentiary from right
8    now.  Does anybody have any questions about that?
9              Okay.  We have talked about the defendant
10   being charged with the offense of capital murder.
11   Capital murder means the intentional taking of a life of
12   some human being without there being any legal
13   justification and without there being any legal excuse,
14   and that it was done during the commission of some other
15   major felony.
16             In this case one of the allegations is
17   that it was done during the course of kidnapping.  One
18   allegation is that it was during the course of another
19   intentional murder; murder during a murder, murder
20   during a kidnapping.  If that's proved beyond a
21   reasonable doubt, that's a capital murder.  Now we talk
22   about it always requires the intentional taking of the
23   life of another human being without any legal
24   justification, without any legal excuse.
25             When we talk about intentional, we know

36

1    that we want results to be caused and we sought out how
2    to cause that result.  We talked about no legal
3    justification, no legal excuse.  That means we're not
4    talking about self-defense.  Self-defense is not murder.
5    Self-defense is not a crime.  Self-defense is a legal
6    justification for taking somebody else's life.  The
7    self-defense being they were unlawfully attacking you,
8    your life.
9              When we talk about intentional murder,
10   we're not talking about an accident.  If you didn't
11   intend to do something, you're not doing it
12   intentionally.  So we're not talking about those things
13   when we're talking about murder.  But anytime the
14   State's required to prove an intentional murder during
15   the course of another felony, they have to prove both of
16   them beyond a reasonable doubt in order to obtain a
17   conviction for capital murder.  And anytime the State's
18   required to prove two things, there are three possible
19   results that could come of that.
20             Possible outcome number one is:  They are
21   able to prove beyond a reasonable doubt the existence of
22   both of those murders and the other felony; and in that
23   case, the jury's obligation is to find the defendant
24   guilty of capital murder.  Possible outcome number two:
25   They cannot prove beyond a reasonable doubt the

37

1    existence of either the intentional murder or the other
2    felony.  And if that's the case, the jury's obligation
3    is to find the defendant not guilty.  Possible outcome
4    number three:  Maybe they can prove beyond a reasonable
5    doubt the existence of the intentional murder, but they
6    cannot prove that it occurred during the course of
7    kidnapping.
8              If that were to be the case, the law says
9    I'd have to give you a third option.  Guilty of capital
10   murder would be one of the options you'd have.  Not
11   guilty would be another option.  The third option would
12   be guilty of murder.  Not guilty of capital murder, the
13   intentional murder during a kidnapping, but guilty of
14   the intentional murder.  It is a lesser crime.  The
15   murder is a lesser crime carved out of the greater
16   crime, the greater crime being the capital murder.
17             Intentional murder in another felony.
18   Intentional murder only is a lesser crime of murder.  We
19   know the punishment for capital murder is life or death.
20   The range of punishment for murder is simply remarkably
21   different.  If a person in the State of Texas is
22   convicted of murder, they can be punished by confinement
23   in the penitentiary for life, or for any number of years
24   not less than five, or not more than ninety-nine.  In
25   addition, the jury can fine a defendant not more than

38

1    $10,000.
2              The point being, most of the time when we
3    think of a murder, we're thinking about some specific
4    thing, a specific way that a crime was committed,
5    perhaps by a specific kind of person.  And we know
6    they're all different.  If we're going to ask you to
7    make a decision on the basis of how you evaluate a crime
8    and how you evaluate the person who committed it, we've
9    got to give you room to roam up and down the range of
10   punishment for the purpose of plugging the specific case
11   in where you think it's appropriate.
12             For example, you might have, as we talked
13   earlier, on the one hand, a seventeen-year-old girl
14   who's never done anything wrong in her whole life, you
15   may tend to treat her differently than a person who is a
16   forty-five-year-old, six-time ex-convict, who's made his
17   living as a career criminal.  Even though both of them
18   committed exactly the same crime, maybe because of the
19   way they are, you might want to treat them differently.
20   I don't know.  Maybe you would want to treat them
21   exactly the same.  That would be your call.  But can you
22   see if you wanted to treat them differently, we've got
23   to give you the room to be able to treat them
24   differently?
25             You might have all sorts of different

**39**

1    kinds of victims in a case. You might have, for
2    example, a seventy-five-year-old couple, been married
3    fifty years. They love each other dearly. The Mrs. is
4    in a hospital. She's on a life support system. She's
5    going to die. Everybody knows it. She does not want to
6    go through the misery or suffering. She does not want
7    to go through the indignity of the being kept alive by a
8    machine. She talks to her husband, who spends hours
9    with her every day and loves her dearly. She asks him,
10   please put me out of this misery. He prays about it.
11   He thinks about it. And finally, one day, he just gets
12   up -- she's asleep -- walks over to the wall, pulls out
13   the plug, and she dies.
14         Without getting into the morality of that,
15   in this state that's murder. That is the intentional
16   taking of the life of another human being without there
17   being any legal justification and without there being
18   any legal excuse. Now you can also see that that murder
19   was not done out of hate, not done out of anger, not
20   done out of revenge. It was done out of love, not
21   wanting his wife to suffer. Maybe you would think that
22   seventy-five-year-old gentleman, under those
23   circumstances, should receive a life sentence. On the
24   other hand, maybe you think he shouldn't. But can you
25   see if you didn't think he should, we've got to give

**40**

1    you the room to go up and down the range of punishment
2    and come up with what you think is the right punishment,
3    taking into account all the features in the case? The
4    features being the defendant; the features being the
5    offense; the features being the witnesses; the features
6    being the victim.
7          So, my question to you is this: Assume
8    with me for just a second that you're a juror in some
9    imaginary capital murder case. Your jury hears all the
10   evidence about the crime. Your jury goes out and
11   deliberates. And your jury unanimously determines that
12   the defendant on trial is not guilty of capital murder.
13   But your jury unanimously determines that the defendant
14   on trial is, in fact, guilty of murder. Your jury comes
15   back, and your jury hears evidence at the second phase
16   of the trial regarding the character and the background
17   and so forth of the defendant on trial. And whatever
18   that evidence is doesn't make any difference. But your
19   jury goes on out, and you deliberate about what
20   punishment you're going to impose.
21         My question to you is this: Under those
22   circumstances, is there anybody here who could not
23   consider assessing that imaginary defendant's punishment
24   at confinement in the penitentiary for life if you
25   thought, based upon whatever the circumstances were of

**41**

1    that case, that that was the right result to reach?
2    I'm not asking you would you sentence him to life. I'm
3    asking you if you thought the right circumstances
4    existed, would a life sentence be a legitimate
5    sentencing option to you? Nobody's indicated anything
6    to the contrary, so I'm going to assume it would.
7          And I'm going to take exactly that same
8    question, and I'm going to flip it over. You're a
9    juror. You found the defendant not guilty of capital
10   murder, but you found him guilty of murder. You come
11   back and you hear evidence at the second phase of the
12   trial regarding the character and background of the
13   defendant on trial, whoever he or she was. Doesn't make
14   any difference what that evidence was; but you go out
15   and you evaluate the question, decide what punishment
16   should we impose? Is there anybody here who, if after
17   having heard all that evidence, whatever it was in that
18   imaginary case, could not consider assessing that
19   imaginary defendant's punishment at confinement in the
20   penitentiary for five years if you thought, based upon
21   that evidence, whatever it was, that that was the right
22   result to reach. Again, not would you give them five
23   years, but would five years be a legitimate sentencing
24   option to you if you thought the circumstances in the
25   case helped you? And I gather that you would.

**42**

1          The whole point of all of that is really
2    very simple. Wouldn't it be offensive if we asked you
3    to give your time and come down here, sit as a juror,
4    and dictate to you what the value was for every dead
5    body that turned up? We don't. We want to give you
6    the opportunity to come up with what you think the
7    appropriate punishment should be, taking into account
8    the circumstances of the case, the witnesses who
9    testified, the crime in the case, and the defendant, all
10   the information you've got, and plug it into where in
11   this range of punishment you think is appropriate. Five
12   years minimum, life at the maximum, or anything in
13   between. Anybody have any questions about that?
14         Two last areas real quick. First off, I'm
15   not going to go into the legalese about this. I'm going
16   to try to communicate a concept. We have a concept in
17   our law that says if you have two or more people who get
18   together, cospire to commit a crime, and if they do,
19   in fact, commit that crime, one of those coconspirators
20   cannot be convicted solely, exclusively, and only on the
21   testimony of another coconspirator and with no other
22   evidence other than that. Meaning, that if there is no
23   evidence other than the testimony of the coconspirator,
24   a conviction cannot be had unless there is some other
25   evidence from some other independent source -- that is

43

1    to say, something or someone other than the
2    coconspirator -- that tends to connect the defendant on
3    trial to the commission of the crime.
4            Now that other evidence does not have to
5    be, in its own right, sufficient to prove a person's
6    guilt beyond a reasonable doubt.  It only has to tend to
7    connect the defendant on trial to the commission of the
8    crime.  For example, I'm a driver in a getaway car.  The
9    other guy and I agree to rob a bank.  I drive.  That's
10   my job.  The guy jumps out, robs the bank, does his job.
11   Well, the people in the bank saw him.  They didn't see
12   me.  He gets arrested.  He says, Wait just a second.  I
13   didn't do this by myself.  The other one did it, too.
14   Me.  I can't be convicted only on his testimony unless
15   there is some other evidence that corroborates his
16   testimony, that tends to connect me to the commission of
17   the crime.
18           Now that other evidence could be another
19   person.  It could be something else.  For example, what
20   if they arrested him with that bag that was taken during
21   the course of a robbery, and on that bank bag there was
22   my fingerprint?  That would be other evidence from an
23   independent source that tends to connect me to the
24   commission of the crime.
25           So I just use -- so, I don't know if this

44

1    is going to come into play in this case or not, but my
2    question to you is this:  Is there anybody here to whom
3    that truly you find objectionable and to the degree you
4    wouldn't follow it if it were to come into play in this
5    case?  And I don't have any idea whether it will.  Okay.
6    I'll take it that you can.
7            One last area.  There are two kinds of
8    evidence that can exist during the course of a trial.
9    The first kind is direct evidence.  The second kind is
10   circumstantial evidence.  Direct evidence means somebody
11   saw something happen.  Circumstantial evidence means
12   that nobody saw something happen; but they're testifying
13   as to a circumstance in a case that, when taken and
14   interwoven with other circumstances that are testified
15   to about the case, tend to show the person is guilty of
16   the offense charged.
17           Now the law doesn't care whether in a case
18   testimony or evidence is direct.  The law doesn't care
19   whether testimony or evidence in a case is
20   circumstantial.  Just like the law doesn't say you've
21   got to have "X" number of witnesses before a person is
22   convicted.  We have people all the time that get
23   convicted on the basis of one witness' testimony when
24   that witness is believed beyond a reasonable doubt.  We
25   have people all the time who are found not guilty even

45

1    though the testimony is based on five people who claim
2    they did see something, and the reason is because their
3    testimony was not believed beyond a reasonable doubt.
4    So the law doesn't care about the number of witnesses.
5    The law cares that the testimony rises to the level that
6    it proved a person's guilt beyond a reasonable doubt.
7    However many witnesses that takes is however many it
8    takes.
9            Likewise, the law doesn't care if
10   testimony or evidence in a case is direct or
11   circumstantial.  The law also cares that testimony is
12   strong enough that shows a person's guilt beyond a
13   reasonable doubt.   We sometimes have a notion -- and I
14   know I've heard it down here, and perhaps you have, too.
15   Some people say, well, I never could find somebody
16   guilty based on circumstantial evidence.  And they have
17   no idea what they're saying; because the single greatest
18   feature that identifies people, individualizes people is
19   a fingerprint.  But a fingerprint is circumstantial
20   evidence; because there is no way to tell when a
21   fingerprint was placed on an object, and there is no way
22   to tell where that object was when that fingerprint was
23   placed on it.
24           Now if it's an immoveable object,
25   obviously you know where it's been; but you don't know

46

1    when the print was put there.  The point being, it's not
2    whether it's direct evidence or circumstantial.  The
3    question is, does the evidence prove a person's guilt
4    beyond a reasonable doubt?  You might have down here
5    where they're building Enron Field, somebody shoots
6    somebody else with a gun just right there.  And there
7    are three drunks laying down there, and they're about to
8    pass out, and they're drunker than Cooter Brown.  And
9    they come up here and testify about what they saw, and
10   they claim the defendant was the one that did it.  And
11   they also claimed they were drunk as they could be, and
12   also testified that they were getting ready to pass out
13   and did, in fact, pass out.  Can you see that if the
14   jury hears testimony from those three people how it
15   might be difficult to find that imaginary defendant
16   guilty of murder?   Because the evidence doesn't
17   establish to the jury beyond a reasonable doubt that the
18   defendant was the one that did it because of the
19   intoxication of the witnesses.  On the other hand --
20   even though they saw it.
21           On the other hand, you might have three
22   people, nobody who sees the murder.  One guy sees the
23   defendant with a handgun in his hands fifteen seconds
24   before the shot is fired but doesn't see the shot fired.
25   Another guy doesn't see the shot fired, but after the

47

1   shot is fired sees the defendant (sic) laying on the
2   ground with the defendant and a gun in his hand.  A
3   third person, thirty seconds after the shot is fired, he
4   doesn't see the shot fired.  But thirty seconds later he
5   sees the defendant walking away with a gun in his hands,
6   calls the police.  The police come arrest the defendant.
7   Defendant's got the gun on him, and the gun has gone on
8   and ballistically shown to be the one that went in the
9   body, causing the person to die.  Can you see every
10  single aspect of that testimony is circumstantial?  That
11  might be more reliable than those three drunks, and a
12  jury might very well have an easier time deciding a
13  person's guilt beyond a reasonable doubt in the second
14  example than they would in the first.  The point being,
15  direct, circumstantial, makes no difference.  The
16  question is:  Does it rise to the level of proving that
17  person's guilt beyond a reasonable doubt?
18              Now my question is this:  If you were a
19  juror in a case, and after having heard all the evidence
20  in the case, and the evidence was exclusive only to
21  circumstantial, is there anybody here who would refuse
22  to find that imaginary defendant guilty simply and only
23  because the evidence was circumstantial, even though
24  you've -- you believe that evidence beyond a reasonable
25  doubt?  I gather then that nobody would.

48

1              All right.  We've just finished our first
2   year in law school.  What questions do you have for me?
3   The whole idea, I think, of this exercise is to give you
4   an idea about what rules, what things can occur during
5   the course of a trial just simply to eliminate the
6   surprises and for you to be satisfied with yourself that
7   if you did become a juror in the case and if these rules
8   did come into play -- and we wouldn't know that till we
9   hear the testimony, because the testimony is what's
10  going to cause the law to apply or not.  But if these
11  rules did come into play, as a juror, would you be
12  willing to both follow and to enforce these rules?  Is
13  there anybody here who has heard anything that rises to
14  the level that would cause us to refuse to support any
15  of these rules if they did come into play?  I gather
16  that you would.
17              The next thing is we want you to be
18  satisfied with yourself, certainly the lawyers to be
19  satisfied, that if you did become a juror in the case,
20  you would be willing to sit in any one of those chairs,
21  listen to every single piece of information that's
22  presented to you, evaluate it however you see fit, and
23  make whatever decision you make based upon where you
24  thought the evidence in the case led you.  That is to
25  say, at the outset I have no idea about what result you

49

1   would reach, what result you should reach, but take
2   every step of the process as it comes.
3              The first question:  Is he guilty or not
4   guilty?  If he is guilty, we get to the punishment
5   phase; and these two questions get answered.  Answer
6   them however you're going to answer them, but answer
7   them on the basis of the evidence in the case and not
8   for any other purpose.  Anybody here who feels that
9   doesn't apply to them, or that's not the way they could
10  do it?
11             Okay.  If you would, please retire to the
12  hallway.  We'll call you back in one at a time.  We'll
13  get you out of here as fast as we can.
14             HOUSTON NORMAN HAMILTON,
15  having been first duly sworn, testified as follows:
16             VOIR DIRE EXAMINATION
17  BY THE COURT:
18  Q.  Mr. Hamilton, to begin with, let me ask you to
19  think back to the things we talked about Monday when the
20  whole group was together, and add to them the things we
21  talked about today.  And out of everything we have
22  talked about, do you have any questions at all from me?
23  A.  No, sir.
24  Q.  Is there anything at this point, Mr. Hamilton,
25  that we have not yet addressed that you feel as though

50

1   we should talk about because it might have some bearing
2   on your service as a juror in this case?
3   A.  No.
4   Q.  Is there anything at all, sir, whether it might
5   be something about your personal life, whether it might
6   be something about your professional life, whether it
7   might be something about your health, or anything else
8   for that matter, that you can think of that would in any
9   way interfere with your ability to be a juror in this
10  case during the time frame that we've talked about?
11  A.  At this moment, I'm missing an appointment at
12  the V.A. Hospital.  And as far as October the 4th, the
13  week of October the 4th, I have no problem.
14  Q.  We'll take care of whatever comes up then.
15  A.  I feel like we're the ones on trial, this jury
16  panel.  We've been down here twice, so I'm not sure --
17  it didn't used to take this long.  I don't know why.
18  Q.  You've done this before?
19  A.  I've been on panels before.
20  Q.  Have you been on a panel for a capital murder
21  case before?
22  A.  No, sir, not, capital murder, no, sir.
23  Q.  Well, Mr. Hamilton, we're going to give you a
24  chance.  Why don't you give us one?
25        Mr. McClellan.

51

1         MR. MCCLELLAN:  Thank you, Your Honor.

2            VOIR DIRE EXAMINATION

3  BY MR. MCCLELLAN:

4    Q.  Mr. Hamilton, my name is Lyn McClellan.  Along

5  with Claire Connors, we represent the State of Texas in

6  this case.  I want to go over your questionnaire.  I

7  want to go over some of your thoughts and concerns and

8  address some of those issues that you have.  As you say,

9  you've been down here twice, and there is a likelihood

10  you'll be down here a third time; and if you're on the

11  jury, maybe a fourth time.

12         Capital murder jury selection is very

13  special.  It sets out in the law how it has to occur.

14  There must be individual voir dire.  I assume in your

15  prior jury service you've never been in a situation

16  where you were brought in one at a time like you are now

17  and subjected to questions from both sides; is that

18  right?

19    A.  That's correct.

20    Q.  And this is the way the law is set up that we

21  have to do it, and we're following the law in that

22  respect.  I understand it's troublesome and burdensome

23  to a lot of people, but we don't have any control over

24  that.  Anything about that that you think would affect

25  your service as a juror, the fact you had to come down

52

1  numerous times.

2         Some people just say, well, I'm fed up

3  with this deal.  Let's go ahead and make a decision and

4  go home.  We're looking for people who will give their

5  full attention for however long the trial lasts, because

6  it's very important to our side they do that; it's very

7  important to their side they do that.  Are you the type

8  of person that can do that?

9    A.  I'm not volunteering.  But if I am pressed into

10  it.

11    Q.  I understand.

12    A.  -- I will do the very best job that I know how

13  to do, because some day I may need another juror to do

14  the same for me.

15    Q.  That's exactly right.  And we don't get many

16  volunteers to do this type of job.  This will probably

17  be the most important decision you'll make in your life,

18  because you're going to be making a life and death-type

19  decision in regards to an individual who's here in the

20  courtroom.

21         From reading your questionnaire, I

22  assume -- and you correct me if I'm wrong anywhere along

23  the line when I make these statements about what I think

24  your beliefs are.  My reading this questionnaire and

25  being in this business for a while, I read from here

53

1  that you believe in the death penalty as a proper

2  punishment for certain types of crimes; is that right?

3    A.  Yes.

4    Q.  Some people who come, though, into jury service

5  believing in the death penalty as a proper punishment

6  for certain types of crimes -- some go on to tell us,

7  though, that they don't, themselves, believe that they

8  could ever participate in a process -- that is, be on a

9  jury -- where they would be called upon to make

10  decisions -- in other words, to answer these

11  questions -- knowing that in doing so, they could be

12  ordering this Judge to order the execution of the

13  defendant sitting over here on trial.  Do you have any

14  doubts about your ability to participate in that process

15  and make that type of decision if that's what the law

16  and the evidence called for?

17    A.  Certainly, I can do that.

18    Q.  All right.  Now I want to talk to you about

19  your service as a juror.  You've been on panels before.

20  You've never been on a jury before, have you?

21    A.  No, sir.

22    Q.  If you become a juror, you will take an oath,

23  along with the twelve or eleven other jurors, to a true

24  verdict render based on the law and the evidence.  Okay.

25  That may sound simple to do, but I would suggest to you

54

1  that the law given to you by the Court might, in some

2  instances, contradict or conflict with what your

3  personal opinion and beliefs are.  You would have to

4  then be able to follow the law given to you by the Court

5  and set aside what your personal opinion or belief may

6  be if you became juror.  Can you do that?

7    A.  Yeah, I can do that.

8    Q.  All right.  The Court will give you the law,

9  and it will be in the form of a charge, and it will set

10  out the elements of the offense that we've alleged.  It

11  will tell what -- give definitions of certain aspects of

12  the case.  It will define murder, define capital murder,

13  and define reasonable doubt.  It will give all kinds of

14  definitions, and that will be the law that you apply in

15  the case to the evidence you hear from the witness

16  stand.  And you'll be the judge of the credibility of

17  the witnesses.  You'll be able to say, I believe some, I

18  believe none, or I believe all of what any particular

19  witness may say.  You're the judge of that.  You take

20  that evidence that you believe, and you apply the law

21  the Court gives you, and that's how you arrive at a

22  verdict.  Any problem with that aspect of the law?

23    A.  No.

24    Q.  Let me give you an example of what I'm talking

25  about.  In your questionnaire we asked a question in

**55**

1  here, and you shared with us your opinion about the
2  question. It's Question Number 46, on Page 10 on this.
3  Says would an individual's use or sale of drugs prevent
4  them from relying on a defense that is available to
5  other members of society? And you checked, Yes, they
6  were outside the law when breaking the law, and defense
7  should not apply. Okay.
8          I will suggest to you that the law given
9  to you by the Court will be contrary to that. In other
10  words, if I'm standing on the street corner selling dope
11  and someone comes up and pulls a gun and says, give me
12  all your money, you S.O.B., then obviously someone is
13  putting me in fear of serious bodily injury or death;
14  and I have a right to defend myself even though I'm a
15  dope dealer.
16          Let's say I'm a convicted child molester,
17  and let's say I'm driving down the street. Somebody
18  pulls up and demands me to get out of the car. They're
19  going to take my car. I suggest to you even though I'm
20  a convicted child molester, I'm still entitled to
21  self-defense. In other words, the law does not say, now
22  if you find from the evidence -- let's say concerning
23  the law of self-defense or some other aspect. The law
24  won't ever say that, well, if you find they're doing
25  this, it doesn't mean that, or it doesn't apply; or if

**56**

1  you find they're convicted of this, it doesn't apply.
2  Can you assure me that even though you may personally
3  believe that a specific defense shouldn't be available
4  if you're breaking the law, if the law that the Court
5  gives you says that it's still available, can you still
6  follow that law and apply it there?
7      A.  Well, I'm not going to like it.
8      Q.  Yeah, I understand.
9      A.  Your first example, I stand by my yes. And
10  your second example, the man was convicted, that's
11  something that happened in the past. He is not in the
12  act of child molesting.
13      Q.  I understand. I understand. So that's a yes.
14  But my question is: Let's say -- I'm trying to pick an
15  example where you disagree with what the law says. And
16  the test is, are you going to do what you believe, or
17  are you going to follow the law given to you by the
18  Court, which is what your oath as a juror says?
19      A.  I must follow the law and do all the bitching I
20  want.
21      Q.  I understand. You know, could be a situation
22  where we have to prove each and every element of the
23  offense in a capital murder case. We've got to prove
24  that on a certain date, in Harris County, Texas, the
25  defendant intentionally took the life of a certain

**57**

1  person during the course of a kidnapping. We have to
2  prove each and every one of those elements beyond a
3  reasonable doubt.
4          For example, though, let's say in a trial
5  you're a juror on, we fail to prove that it happened in
6  Harris County, Texas. You know it happened in Harris
7  County, Texas, because it happened about five blocks
8  from where you live; but no one testified in the Court
9  that it happened in Harris County, Texas. You can't
10  judge their case on what you've heard outside the
11  courtroom, only on testimony that you heard under oath
12  from the witness stand. And thus, you would have to
13  follow the law. You would have to find someone not
14  guilty, who you otherwise believed to be guilty, if you
15  follow the law that says we have to prove each and every
16  element beyond a reasonable doubt. I don't expect you
17  to like it, but we want you to be able to follow it. If
18  you can't follow that law and do that if that's what
19  happened to have occurred -- can you do that?
20      A.  Yes, sir.
21      Q.  All right. And you make good points in the
22  fact you say you may not like it, or did you say do your
23  bitching about it later? And it may be my fault that we
24  didn't prove that up, because it would be easy to prove
25  up. And you can go across to Johnny Holmes and demand

**58**

1  my resignation, and you'll possibly get it. So I'll be
2  fired, but you'll probably get that. But in the
3  courtroom and in that trial, you'd have to follow
4  whatever the law the Court gave you and whatever the
5  evidence was from the witness stand. And can you do
6  that?
7      A.  Yes.
8      Q.  Okay. A lot of people say that -- now you've
9  learned a lot. I assume you've learned a lot during the
10  Judge's voir dire about how a capital murder trial
11  progresses. A lot of people might think that, you know,
12  well, when you find someone guilty of capital murder,
13  that's pretty well the end of the inquiry. That means
14  he gets death, doesn't it? A lot of people, before they
15  listened to the Judge's voir dire, never thought about
16  that.
17          Now, you know finding someone guilty of
18  capital murder allows you to then go to the punishment
19  stage of a trial, where you're given questions. And the
20  answer to those questions tells the Judge what
21  punishment must be assessed. There is no case, no type
22  of crime in the State of Texas where someone
23  automatically receives death as a result of having
24  committed that crime. Understand that?
25      A.  I didn't know that. I understand.

59

1    Q.  You understand now?

2    A.  Yes.

3    Q.  So, just because you find someone guilty of

4    capital murder does not tell you, in and of itself, what

5    the punishment is going to be.  You have to go and look

6    at the other evidence that you hear at the punishment

7    stage abut a defendant's character, background, criminal

8    history, or lack thereof, mental abilities or

9    disabilities, all kinds of information about the

10   individual himself that is not necessarily relevant to

11   whether or not he committed the crime, but is entirely

12   relevant to what punishment he should receive for the

13   crime you've already found that he is guilty of.

14        Okay.  Keep in mind that the answer to

15   these questions never goes back and undoes the finding

16   of guilty.  He's still always guilty of capital murder.

17   And there is only two punishments, life or death.  And

18   you now know that life means forty years, day for day.

19   So if a person commits a crime and is convicted in 1999,

20   it will be 2039 before they would ever be eligible for

21   release, even if they were to receive a life sentence.

22   And the decision on life or death is going to depend

23   upon your answer to these questions up here.  Again,

24   just like in guilt/innocence, the burden of proof in

25   guilt/innocence is on the State.  If we fail to prove

60

1    our case beyond a reasonable doubt, you find the

2    defendant not guilty.  Any problem with this aspect of

3    the law?

4    A.  No.

5    Q.  Now let me just cover a couple of other things

6    while we're talking about guilt/innocence.  The

7    defendant doesn't have to testify.  If he doesn't

8    testify, you can't consider that as any evidence against

9    him.  Anything wrong with that aspect?

10   A.  No.

11   Q.  Defendant's presumed to be innocent.  If you

12   had to vote right this very minute as to whether or not

13   Charles Mamou, Jr. is guilty or not guilty of capital

14   murder, you would have to vote that he's not guilty

15   because you've heard no evidence.  Anything wrong with

16   this aspect of the law?

17   A.  No.

18   Q.  That burden of proof carries on into the

19   punishment stage of trial, at least to the first issue.

20   Keep in mind that before you get to that punishment

21   stage of the trial, you would had to have found someone

22   guilty of capital murder, heard additional evidence that

23   might be available by the individual, himself,

24   character, background, that kind of stuff.

25        Then you're asked to answer these

61

1    questions.  And in answering those questions, you can

2    rely upon bodies of knowledge.  You can go back and

3    consider what you heard at guilt/innocence, and you can

4    also consider what you heard at punishment.  And the

5    first question is:  Do you find from the evidence beyond

6    a reasonable doubt that there is a probability that the

7    defendant would commit criminal acts of violence that

8    would constitute a continuing threat to society?  It

9    doesn't ask you, is it a certainty that he would?

10   Doesn't ask you, is it a possibility?  Anything is

11   possible.  It asks you more than a possibility.  It asks

12   a probability.  I suggest to you more likely than not.

13   Do you see a distinction between probability meaning

14   more than possibility?

15   A.  Yes.

16   Q.  That the defendant would commit criminal acts

17   of violence.  Some people say, well, if I have found

18   someone guilty of capital murder, intentionally taking

19   the life of another person without any legal

20   justification -- by that I mean, not self-defense, not

21   accident.  If you intend to kill someone and do so

22   during the course of a kidnapping, I would always answer

23   Issue Number One yes, that they're a continuing threat,

24   at least to a probability, to commit future acts of

25   violence.

62

1        But I suggest to you that there may be

2    facts and circumstances, and you won't know that answer

3    until you look at all those facts and circumstances.

4    Because when you look at the punishment stage of the

5    trial and hear about a defendant's character and

6    background, you may hear the person's been a model

7    citizen all his life.  This crime that he committed is

8    horrible.  No doubt about that.  He'll be punished for

9    it.  No doubt about that.  But it doesn't indicate to

10   you he'll be a continuing threat to go on and commit

11   acts of violence again.  There may have been some reason

12   or something that caused him to do it that you may think

13   will never occur again; and thus, you might think he's

14   not a continuing threat to commit acts of violence.

15        On the other hand, there may be a person

16   who's been in and out of trouble all their life and you

17   think this is a stepping stone along the way.  So my

18   question to you is:  On Issue Number One, having found

19   someone guilty of capital murder -- because you don't

20   get there unless you do -- are you still open to

21   answering that question either yes or no, depending upon

22   what the facts show?

23   A.  Yes.

24   Q.  Okay.  So, again, there is not an automatic

25   answer.  But if there was an automatic answer to Issue

63

1  Number One, it would be no, which means he gets a life
2  sentence; because the burden of proof is on us. And if
3  we fail to prove beyond a reasonable doubt he's a
4  continuing threat to commit future acts of violence, you
5  would have to vote no. Any problem with that?
6      Now the next issue then comes about if you
7  found -- if you answer Number One yes. If you answer
8  Number One no, that's the end of the trial; and he gets
9  a life sentence. But if you answer it yes, you're then
10  asked to look back through all the evidence and
11  determine, are there any reason or reasons, what they
12  call mitigating circumstances, as to why this person
13  ought to receive life as opposed to death? I don't know
14  if you find any or not but you're committed to going
15  back and looking. Okay.
16      So, by that, when I say look back at all
17  the evidence, let's say you may have heard evidence
18  during the trial the defendant was high on drugs or
19  alcohol when he committed the offense. Juror Number 1
20  over there may say, well, I think that mitigates towards
21  a life sentence. That's a reason for me to give him
22  life as opposed to death; because when you're high on
23  drugs or alcohol, you do things you wouldn't ordinarily
24  do.
25      Juror Number 2 may say, I don't think

64

1  that's right at all. I know people that get high on
2  drugs or alcohol, and they don't commit capital murder.
3  Plus, I don't think there is any connection there. And
4  they find it's not mitigating. That's okay, because
5  what that question asks you to do is for you to look
6  back at the evidence, you weigh it in your mind, and you
7  determine whether or not it's mitigating. And if it is,
8  is it sufficiently mitigating to change your vote from
9  death to life? Any problem with this aspect of the
10  law?
11      A.  No.
12      Q.  You can look back through all kinds of
13  situations, the age of a person, mental retardation, all
14  kinds of information, weigh it in your mind. Does it
15  mitigate? Does it give me a reason why a person ought
16  to receive life as opposed to death? If it does, it's
17  sufficient in your mind, you change your vote to life
18  and he will receive a life sentence. If it doesn't,
19  you vote the way it is and answer that question no and
20  he receives a death penalty.
21      Now some people have come to us and said,
22  well, now, if I have found someone guilty of capital
23  murder, and then further on Issue Number One determine
24  there is a probability he would be a continuing threat
25  to commit future acts of violence that would be a

65

1  continuing threat, isn't that who the death penalty is
2  designed for? Why in the world would I go out and
3  answer Issue Number Two that there is some reason to
4  give him life as opposed to death? And I don't know
5  what you would do or what you wouldn't do, or evidence
6  that you may hear or not hear.
7      Question Number Two commits you to
8  looking, commits you to examining the evidence for that
9  burden of proof. And are you open to doing that?
10      A.  Yes.
11      Q.  Okay. Obviously, you won't always find
12  mitigating every time; or if you did, no one would ever
13  receive the death penalty. But it commits you to
14  looking for that evidence. Commits you to examine it.
15  And if your mind's still open after you found someone
16  guilty of capital murder, and if you find that he's a
17  continuing threat to commit future acts of violence, is
18  your mind still open to examining that evidence and
19  fairly weighing it in your mind as to what effect that
20  would be given as to whether or not you ought to change
21  your vote from death to life?
22      A.  Yes, I can do that.
23      Q.  All right. Sometimes people say, well, you
24  know, it's easy to say you'll follow the law; but you
25  know, you come up with certain opinions and beliefs that

66

1  you've grown up with all your life and dump those over
2  and take control when you get in a situation like this.
3  And all I need is a commitment from you that you search
4  yourself and determine whether you can make this
5  commitment, that you can take an oath to be a juror to a
6  true verdict render based upon the law and the evidence
7  and go where the law and the evidence leads you,
8  understanding that it may lead you to someplace you
9  might otherwise -- without the law being given to you --
10  you might have gone another direction. But are you the
11  type of person that can follow the law and the evidence
12  even if it leads you to somewhere where you think, I
13  can't believe I'm doing this, but that's what the law
14  and the evidence calls for; and thus, I'm going to
15  follow my oath? Are you the type person that could do
16  that even though it might conflict with some of your
17  personal opinions if you were just making your decision
18  on personal opinion?
19      A.  Yes.
20      Q.  All right. As you say, you're not volunteering
21  for the job; but if you're selected, would you be able
22  to do that job to the best of your ability and be fair
23  to both sides?
24      A.  Yes, sir.
25      Q.  Okay. Thank you very much, sir, and I'm going

67

1  to pass you to the other side.
2         THE COURT:  Thank you.
3         Mr. Hill.
4         VOIR DIRE EXAMINATION
5  BY MR. HILL:
6    Q.  Mr. Hamilton, my name is Wayne Hill.  Kurt
7  Wentz and I both represent Mr. Mamou in this case.  And
8  I am, quite frankly, more interested in hearing you
9  express yourself than propounding a question to you and
10 saying, will you follow the law, yes or no?
11       At the beginning you seemed to have had
12 some pretty strong feelings about some things about
13 being here.  And obviously, I think it's in everybody's
14 best interest to know how strongly you do feel about
15 things.  If you feel so strongly about a particular area
16 of the law that you don't honestly feel comfortable
17 sitting in a case like this, or you feel like if you
18 were sitting in this chair and you were hearing yourself
19 talk, then maybe this wouldn't be the ideal case for you
20 to sit on, we need to know that now.  Because obviously,
21 if you're selected, with eleven other people, it's too
22 late if we find out there is some issues we should have
23 addressed to you way back here.
24       You feel a sense of resentment being down
25 here and how many times you've had to come back?

68

1    A.  Yes, some, yeah.
2    Q.  Okay.  And that's fine.  I just want you to
3  express it to us.  I don't want you to feel constrained
4  in having to feel like, you know, when Mr. McClellan was
5  talking to you -- and if I'm correct, it was my
6  understanding that you said that if a person was dealing
7  dope out on the street corner, in that situation, you
8  don't feel like you could afford the right to
9  self-defense even if that were an issue in the case.
10 Did I --
11   A.  I think I did say that, yeah.
12   Q.  All right.  So let me ask you --
13   A.  Sounds a little different when you say it,
14 though.
15   Q.  Right.  Do you feel like I'm trying to trick
16 you?
17   A.  No.
18   Q.  I want you to tell me exactly how you feel,
19 because -- well, let me put it to you this way:  You're
20 a member of the N.R.A., right?  You're a gun owner?
21   A.  Yeah.
22   Q.  Tell me if you think you would be comfortable
23 in having a trial -- I'm sitting with you.  You're
24 charged with carrying a weapon.  The twelve people
25 sitting in that box are anti gun people.  Do you think

69

1  that it would be fair to you, as the defendant on trial,
2  to have twelve people who have already told you that
3  they don't think anybody should have guns in the first
4  place?  You can see how that would place an unbearable
5  burden on those twelve people to really give you a fair
6  trial over carrying a weapon, because maybe they have a
7  strong feeling about the issue of gun ownership in the
8  first place?
9    A.  To me, they can have all the feelings they
10 want.  If they're chosen as a juror, they're going to
11 have to follow the law and the evidence.  It's not a
12 matter of you get to pick what you agree with.  I don't
13 know what you guys are going to come up with.
14   Q.  Right.
15   A.  But if I have to leave certain things at the
16 doorstep, I'm fifty-eight years old.  I've been around
17 enough.  You're not scaring me, okay.
18   Q.  Do you think I'm trying to scare you?
19   A.  No.  All I'm telling you is I'm not going to do
20 a yes, yes, yes, sir, just because I'm intimidated.  I
21 feel like that if I am called to set my prejudices
22 aside, that some of those might be about this:  If
23 you're outside the law, you shouldn't have the
24 protection of the law.
25   Q.  Right.

70

1    A.  If that's not what the law says, then I'm going
2  to have to set that aside and deal with it in another
3  way.  Yes, if it were me, a gun carrier, probably
4  antigunners in the jury box, yes, I would feel
5  uncomfortable.  I sure would.  But still, it's their
6  duty to put that aside for the length of that trial.
7    Q.  Okay.
8    A.  Now if they can swear an oath and they can go
9  to sleep after making whatever decision they make, then
10 I need to abide by their decision.
11   Q.  And that's the critical inquiry; because you
12 don't get on the jury unless you can tell the Court, in
13 all fairness, look, I'm comfortable enough with all of
14 these issues that you're discussing.  Self-defense if
15 you're a dope dealer.  The State forgets to ask somebody
16 whether it's in Harris County.  And you're swearing that
17 if you're on that jury and that's the kind of
18 circumstances you're presented with, you'll find a
19 person not guilty.
20       There is some people that come in here and
21 say, look, that's asking a little too much of me;
22 because I certainly have a strong enough feeling that if
23 those were the facts presented to me, I think it's
24 ludicrous.  I think it's absolutely ridiculous that you
25 can expect somebody to say, I'm going to find somebody

71

1   not guilty simply because it wasn't proven it was in
2   Harris County.  That's why we ask the questions now,
3   because you're not a juror yet.  So if you're
4   comfortable with your abilities and the strength of your
5   commitment to being able to make those kinds of findings
6   despite any strong feelings that you have, that's fine.
7   If you're not, you feel that is a little too close, just
8   let us know; because that's all we ask you to do.  You
9   don't have any problem with applying a law of
10  self-defense to an individual if you felt like they were
11  breaking the law selling dope, let's say?
12      A.  I have a problem, yes, I have a problem with
13  that.  But if I am told, here's the law and here's the
14  evidence and you're going to have to go by that law, I
15  don't -- I disagree with a lot of laws, and I disagree
16  with the way they're applied in a lot of cases, too.
17      Q.  Tell me some of the ones you have the biggest
18  disagreement with.
19      A.  One that really sets me on fire is something
20  along the lines of, we forgot to ask if it happened in
21  Harris County.  Now, that's just ridiculous to me.  I'm
22  kind of stuck on that example, because that really got
23  my attention.
24      Q.  That's the one the prosecutor gave you.
25      A.  And I have heard all these things about, they

72

1   get life and they're out in three years.  I don't know
2   where that comes from, but that's certainly the
3   perception of most of us out there on the street.
4       Q.  I think that's true.  But if you're not down
5   here on a day-to-day basis, don't see what the law is,
6   you wouldn't have any reason to know different.  I'll be
7   honest with you.  I don't have a problem talking with
8   you, although some of the questions I ask you, I hope
9   they don't offend you.
10          I think if you were sitting here with me
11  and you were reading the questionnaire, you would want
12  to at least ask some questions.  You said you don't have
13  a very strong opinion or very good feeling about defense
14  lawyers, in response to one of the questions that was
15  asked of you here, Number 48(b).  That's on Page 11,
16  sir.
17      A.  Surely.  I'm very consistent in fairly applying
18  my opinion of attorneys to both the defense and the
19  prosecution.
20      Q.  It says, What is your opinion about
21  prosecutors?  You said, Okay.  And you said of defense
22  lawyers, very low.  So I see that as a distinction.
23      A.  I can see a distinction.  And I recall that,
24  from what I hear and my life experience tells me, that
25  many times defense lawyers will go to outrageous lengths

73

1   to call upon technicalities to get their client off.
2       Q.  What personal experiences have caused you to
3   have that opinion?
4       A.  I don't know that I can tell you one.  I do
5   know that there are cases, as you suggested while ago,
6   if you don't prove it's in Harris County.  I know what
7   would -- they come in and they mistyped the man's name.
8   They mistyped the man's name on the paper.  They didn't
9   get a chance to go fix it.  It was just -- I think it
10  was thrown out.
11      Q.  Was that a case that you were a juror on?
12      A.  No, I've not been a juror before.
13      Q.  Did you read that in the paper?
14      A.  No.  I was down here when that was going on.
15  Is that true?  I mean, if you make a typographical
16  error, it just blows the whole case?
17      Q.  Maybe.
18      A.  I think that's kind of sad.  I think many times
19  maybe we've gone so far in favor of the defendant that
20  maybe justice is not being served.
21      Q.  So how do you feel looking at Mr. Mamou right
22  now, what he's charged with?  Any thoughts come to your
23  mind about this case and him sitting here?
24      A.  No.  It's a capital murder case.
25      Q.  Right.

74

1       A.  And quite frankly, son, I look at it all and
2   say, how in the world could you have gotten yourself
3   here?
4       Q.  Well --
5       A.  Breaks my heart.
6       Q.  What do you think brought him here?
7       A.  He has committed a murder while he was
8   committing some other crime.
9       Q.  Right.  And do you --
10      A.  Or that's what he's charged with.
11      Q.  Right.  But you used the words, he committed a
12  murder while he was committing another crime.  Now those
13  words came easy to your lips.  You've got to tell us
14  now, because it's too late to find out later.  Do you
15  feel like that's probably what occurred, as he's sitting
16  here?  He just didn't get picked up off the streets and
17  placed in this chair.
18      A.  That's true.  And my choice of words is
19  suspect there, but I don't have a problem with it.  He's
20  going to have to prove it.  They will have to prove each
21  and every thing that they want to stick.  I don't know.
22  I'd rather not be a juror, but all I'm telling you is
23  that I'll just have to do it the way it's supposed to.
24      Q.  Why would you rather not be a juror?
25      A.  It's an inconvenience to my life.  It's a hell

75

1  of an imposition on my time. Have you ever tried to get
2  here at 8:30 from Katy? You got to have to leave by
3  5:30 in the morning.
4      Q. Yeah, it's tough.
5      A. And if you ever had to try to get an
6  appointment at the V.A. Hospital and find out today
7  you're not going to make it, you're going to be another
8  thirty days before you can get another shot at this man,
9  okay. But I've never been on a jury. So, you know, it
10 would be a whole lot better than you calling on me once
11 every six months to serve, and I suppose that's possible
12 you could do that.
13     Q. All right. So, let me ask you this: Setting
14 aside what the law tells you you got to do, because you
15 know what? The law doesn't tell you you got to do a
16 darn thing. The law says if you take the oath of a
17 juror, then you're supposed to follow the law that's
18 given to you by the Judge. All right. Again, going
19 back to what your feelings are, because I learn more
20 about people when they tell me what their feelings are
21 than when they tell me, I can follow the law. You're
22 faced with a situation. And I want you to think about
23 your answer, because Mr. McClellan answered to you in a
24 certain way (sic).
25         And I want to pose this question to you:

76

1  Are you telling us that in a situation where you had
2  found, based on the evidence beyond a reasonable doubt,
3  that a person caused the death of two people
4  intentionally -- in other words, it was their specific
5  intent to cause the death of these two people, and they
6  did so -- it was not done in self-defense. It was not
7  an accident. There was no legal justification that
8  causes you to return a not guilty verdict; and
9  therefore, you return a guilty finding.
10         And at that point you're called upon to
11 answer Question Number One. Can you honestly say that
12 based upon the evidence that you had used to find that
13 the person committed two intentional murders, that you
14 can honestly look at a question like that and ever find
15 that that answer should be no? If you use just the
16 evidence which you're allowed to hear during the trial
17 of the case and you know that a person at counsel table
18 committed two intentional murders, would it be a fair
19 statement to say that based upon that very evidence,
20 somebody causing two intentional deaths, that there
21 would always be proof beyond a reasonable doubt that
22 that person was probably going to be a threat to society
23 in the future?
24         In other words, you're not just asked to
25 answer that question based on your feelings. You're

77

1  asked to answer based on the evidence. And I'm saying,
2  in a situation where you had found somebody guilty for
3  killing two people already, wouldn't you agree with me
4  that that question would always have to be answered yes?
5      A. Yes, I agree. I agree with you. That's my
6  first reaction to what -- you've just set me up into a
7  situation. If I'm going to find someone guilty of
8  capital murder, I'm not sure I know of an example that
9  would allow me to say no.
10        THE COURT: Mr. Hamilton, can you see that
11 it's not necessary for you to know of a example? It is,
12 however, necessary for you to be open to the notion that
13 an example could exist.
14        VENIREPERSON: Well, now that's -- that, I
15 have no problem with.
16     Q. (BY MR. HILL) But you said if you find them
17 guilty of killing two, you would exclude those
18 possibilities?
19     A. I can't exclude any of these possibilities.
20 I'm just saying that maybe in that particular situation,
21 I start from a yes answer and have to be moved to a no
22 answer.
23     Q. So you would agree with me, then, that you
24 couldn't presume the answer to Question Number One
25 should be no? Was that your statement, that you presume

78

1  that the answer is going to be yes, unless you're moved
2  to a no answer?
3      A. I think that's where I get to. I think I do --
4      Q. All right.
5      A. -- if I have already said that they are guilty
6  of the capital murder.
7      Q. And you understand you don't get to Question
8  Number One --
9      A. Unless --
10     Q. -- unless you had found somebody guilty of
11 capital murder?
12     A. Yes, sir.
13     Q. And is that your feeling, and is that your
14 belief? Me telling you what the law is, Judge, the
15 prosecutor, anybody telling you what the law is, that's
16 how you honestly feel?
17     A. That's how I honestly feel.
18     Q. And that's how you would have to look at a case
19 like that, Special Issue Number Two; because you
20 understand that before you get there, you've already
21 found the person guilty beyond a reasonable doubt of
22 capital murder?
23     A. I can only tell you that I would start from
24 that one answer and work to the other.
25     Q. And the first answer would be presumed to be

79

1  yes unless you were convinced that the answer should be
2  no to Question Number One?
3      A.  Yes, that is correct.
4          MR. HILL:  Judge, I'd like to submit him
5  for cause.
6              VOIR DIRE EXAMINATION
7  BY THE COURT:
8      Q.  Mr. Hamilton, let me ask you a couple of
9  questions.  I want to know -- I don't care so much what
10  your answers are.  That's your business.  But I do need
11  to satisfy my own self that I understand the depth of
12  your commitment.  We had talked earlier while we were
13  sitting there, y'all were sitting in the jury box, about
14  the fact it's presumed the answer to that first question
15  should be no; because it starts off with the phrase, do
16  you find from the evidence beyond a reasonable doubt?
17  That means the State has to prove that the answer should
18  be yes.  And the question says, is there a probability
19  that the defendant on trial would, in the future, commit
20  acts of criminal violence that would rise to the level
21  of being a continuing threat to society?
22          Can you see, Mr. Hamilton -- and if your
23  answer is no, I can't see it, that's fair.  I understand
24  that.  But can you see that there could be a set of
25  circumstances wherein two people were killed during the

80

1  course of a single criminal transaction that would
2  warrant a jury finding a defendant guilty of capital
3  murder.  But the uniqueness of that situation as to that
4  defendant on trial, those two people that he did
5  intentionally kill, there may be no other two people in
6  the world that he would kill.  He may not commit any act
7  of criminal violence in the future, and a jury may be
8  perfectly satisfied over that.  Can you see how that
9  might be a possibility?
10      A.  I can see how that might be a possibility.
11      Q.  There was, a couple of years ago, a trial in
12  South Carolina.  And I know you keep up with this stuff;
13  so maybe you're aware of it, where a woman was convicted
14  of capital murder for running her two children off into
15  a lake in the backseat of a car and they drowned.  You
16  remember that?
17      A.  Uh-huh.
18      Q.  And she was convicted of capital murder, got a
19  life sentence.  Maybe the idea there was certainly her
20  children were in danger, but she had no children left.
21  She had never done anything wrong in the past.  It
22  wasn't anticipated she'd be a threat to society,
23  generally, in the future.  I don't know if they had
24  these same questions or not, but I'm going to use that
25  as an example.

81

1          I'll go back to my first question.  Would
2  you, if you found somebody guilty of capital murder,
3  start off with the presumption that the answer to that
4  first question should be yes, or would you require the
5  State to prove it to you all over again that the answer
6  to the question should be yes?  They proved to you the
7  person is guilty; but that, in and of itself, doesn't
8  prove they're going to be a continuing threat to
9  society.  It proves they did something in the past.
10  Doesn't prove what they're going to do in the future at
11  all, necessarily.  And there was a question.
12      A.  The question was, could I do it?
13      Q.  Yes, sir.  And as I say, your answer is your
14  personal answer; and I'm not trying to influence you one
15  way or the other, but I do need to know.
16      A.  I think I could do it, okay; but here again is
17  a situation where I maybe disagree with how things go.
18      Q.  That's fair.
19      A.  But particularly if you get to this point in
20  the proceedings and it comes down to, we're going to
21  charge you to answer this Question Number One.  Surely,
22  you're going to tell us again, you know, that, okay,
23  guys, you're going to have to have it proved.  He's got
24  a default answer.  You're going to have to put all that
25  stuff away.  The thing that is most dangerous, in my

82

1  opinion, about preconceived notions is that they are
2  followed and put into effect in many cases without even
3  realizing that they are preconceived, okay.  It just
4  comes to you as an answer.  You have got a situation,
5  okay.  Here's the answer.  But if you look at the thing,
6  then take it apart, maybe that was just a preconceived
7  answer.  If you were stumped, just wait.  Just don't
8  answer.  Just go back, you know, here's what you're
9  going to have to do.  Yes, that can be done.  It can be
10  done, but it takes a conscious effort.
11      Q.  And you have recognized that and hit the nail
12  on the head, I think.  And would you make that conscious
13  effort?
14      A.  Yes, I can do that.
15      Q.  Did the conscious efforts, specifically being
16  if you found somebody guilty of capital murder, you
17  would make a conscious effort to follow the law and
18  require the State to prove that the answer to that first
19  question should be yes and not assume it should be yes,
20  simply and only because you found the defendant guilty
21  of capital murder?
22      A.  Yes.
23      Q.  Can we make that deal?
24      A.  And that Number One issue seems to hone in only
25  on whether or not you would think the defendant is

83

1    likely to commit future problems. So does that mean,
2    then, that anyone who has a clean record to date can
3    commit capital murder and get a pass on the death
4    penalty?
5        Q.   What it does mean -- that exact question --
6    what it does mean is that the jury needs to look at all
7    the evidence in the case to see if their clean record
8    alone rises to the level where it's worthy of that, or
9    are the facts of a given case so bad that the clean
10   record alone gives way to the facts of the case?
11       A.   Yes.
12       Q.   But at any rate, am I understanding accurately
13   that if you found somebody guilty of capital murder,
14   which is what they did do in the past, that that, in and
15   of itself, does not necessarily always show you what it
16   is they're going to do in the future?
17       A.   I agree with that, sir.
18       Q.   Can you see that the first question, which is
19   going to be asking you to decide is he guilty, has to do
20   with having a past? This question has to do with what's
21   probably going to happen in the future?  Okay.
22            All right.
23            MR. HILL:  Were you done?
24            THE COURT:  Yes.
25            MR. HILL:  I just have one question, if I

84

1    may.
2            THE COURT:  Sure.
3              VOIR DIRE EXAMINATION
4    BY MR. HILL:
5        Q.   The Judge used the example of Susan Smith in
6    South Carolina, the lady that ran her two kids into the
7    lake to drown. What's your take on that?  What were
8    your feelings about that?  Do you think somebody like
9    that is not going to be a future threat to anybody in
10   the future just because she killed her two kids? What's
11   your honest feeling about somebody like Susan Smith,
12   since that's a real life case that's already been
13   decided?
14       A.   My honest opinion is the nature of what she did
15   was just so unbearable for me to even think, on this she
16   should have received the death penalty --
17       Q.   Right.
18       A.   -- for that one act.
19       Q.   Okay. I don't want you to struggle to have to
20   stay on this jury if that's not where you need to be,
21   and I do intend to ask you questions that try to get an
22   absolute commitment about how you're going to feel about
23   things; but that's all we can judge our decision making
24   on. How do you really feel? How do you really react?
25            Somebody telling you what the law is or

85

1    that you have to follow the law doesn't mean that you're
2    a hundred percent comfortable with that. And if you do
3    have what you refer to as preconceived notions, we just
4    need to know that now.
5            My last question to you is this:  Think
6    for a moment that you've heard all the evidence in the
7    case. That evidence has convinced you that the person
8    is guilty of capital murder, however it's alleged. That
9    evidence also convinces you that person is a future
10   threat to society. You have just answered Question
11   Number One in the affirmative; yes, I find beyond a
12   reasonable doubt that there is a probability that this
13   person would commit criminal acts of violence that would
14   constitute a continuing threat to society.
15           Can you honestly tell me that having found
16   those two answers, that you could then honestly ever
17   consider answering Special Issue Number Two in a way
18   that the person would receive a life sentence; or do you
19   think at that point, in all fairness, anybody that
20   commits capital murder and is a future threat to
21   society, it doesn't matter about where the person came
22   from, what their makeup is, whatever, that person should
23   get the death penalty?  Is that how you feel?
24       A.   Quite honestly, yes, I think I would feel that
25   way.

86

1        Q.   It doesn't do enough and --
2            THE COURT:  That's fine.
3            Mr. Hamilton, thank you very much. We're
4    going to excuse you.
5            Mr. Hill, your challenge is granted.
6              JOYCE STONER WILLIAMS,
7    having been first duly sworn, testified as follows:
8              VOIR DIRE EXAMINATION
9    BY THE COURT:
10       Q.   How are you today?
11       A.   Fine.
12       Q.   Please have a seat and make yourself
13   comfortable. Ms. Williams, first off let me ask you, do
14   you remember back to Monday and the things we talked
15   about when the whole group was together?  Add to it this
16   morning the things we talked about.
17       A.   We didn't come Monday, did we?
18       Q.   Friday, I'm sorry. But whatever day it was,
19   the things we talked about that day, add to them this
20   morning, the things we talked about this morning. Out
21   of everything that we have talked about so far, do you
22   have any questions at all for me?
23       A.   (Nods negatively.)
24       Q.   Is there anything up to now that we have not
25   addressed that you feel as though we ought to talk about

87

1  because it might have some bearing on your service as a
2  juror?
3      A.  No.
4      Q.  Anything about any of these rules we've talked
5  about that you have any disagreement with?
6      A.  No.
7      Q.  You had indicated in your questionnaire in
8  response to a question on Page 12, question being Number
9  56, question asked: Do you have any religious, moral,
10 or personal beliefs that would prevent you from
11 returning a verdict which would result in the execution
12 of another human being?  You checked yes.  You said, I
13 don't believe in the death penalty.  God is the ultimate
14 judge of any person.  Remember having put that in your
15 questionnaire?
16     A.  Uh-huh.
17     Q.  Do you remember our conversation both last
18 Friday, as well as today, that the death penalty is a
19 possible punishment if a person is convicted of capital
20 murder?
21     A.  Uh-huh.
22     Q.  You have to use words.
23     A.  Yes, I'm sorry.
24     Q.  How does what you put, in terms of your answer
25 on the questionnaire -- you see, it's inconsistent with

88

1  it being a possible punishment if you were a juror in a
2  case.
3      A.  I couldn't accept -- I couldn't do the death
4  penalty.
5      Q.  Never, ever, ever?
6      A.  The prosecution would really have to prove --
7      Q.  Ma'am, answer my question.
8      A.  Well, I'm trying.
9      Q.  Never, ever, ever?
10     A.  I don't think so.
11     Q.  Okay.
12         THE COURT:  Should I go any further?
13         MR. HILL:  You should.
14     Q.  (BY THE COURT) Let me ask you this:   And the
15 whole idea behind this, Miss Williams, is really pretty
16 simple.  Both sides have the right to have as jurors
17 people who will give legitimate consideration to all the
18 possible punishments and come up with what you think is
19 the right punishment to impose if you found somebody
20 guilty based upon all the evidence in the case.
21         If I'm hearing you correctly -- -- and you
22 tell me if I am or if I'm not.  If I'm hearing you
23 correctly, you're telling me that no matter what the
24 evidence was, you could never answer these questions, as
25 a juror, in such a way that I would be required to

89

1  sentence the defendant to death.  Now is that an
2  accurate statement?
3      A.  I guess.  I guess so.
4      Q.  Don't guess with me.
5      A.  I need to explain something.
6      Q.  Go ahead.
7      A.  If the prosecution -- and maybe this is not
8  what you want to hear, but this is what I feel.  If the
9  prosecution could really make me see that, you know,
10 that he should be sentenced to death, you know, then
11 maybe I would have a change of heart; but at this point
12 I don't.  And maybe if it actually happened to me, with
13 my family, then maybe I would feel different; but right
14 now I just don't.
15     Q.  Well, let me ask you some questions.  First
16 off, we know it's not going to happen to your family;
17 because if that were the case, you couldn't be a juror.
18 So that's not going to be a possibility.  But when you
19 say right now you just don't, do you mean right now in
20 the sense that you've heard no evidence?
21     A.  No, not that I haven't heard any evidence.
22 It's just that I don't believe -- you know, I don't
23 believe in the death penalty.  I just don't.
24     Q.  All right.  Go back to my question again.
25 Are you saying that if you were a juror in a capital

90

1  murder case, and if your jury, you and the other eleven
2  folks, found that imaginary defendant guilty of capital
3  murder, you came back and you heard additional evidence
4  at the second part of the trial for the purposes of
5  answering these two questions, and you knew if you
6  answered Question Number One yes and you knew if you
7  answered Question Number Two no, that I'd sentence the
8  defendant to death.  Would you answer that first
9  question yes if you thought, based upon the evidence,
10 that's what the answer should be?
11     A.  Yes.
12     Q.  Would you answer that second question no if you
13 thought, based upon the evidence in the case, that
14 that's what the answer should be?
15     A.  Yes.
16     Q.  And you understand that?
17     A.  Yes.
18     Q.  If you answer them yes and no, I would be
19 required to sentence the defendant to death --
20     A.  Yes.
21     Q.  -- not you.  Would you answer those questions
22 yes and no, understanding I'd have to sentence the
23 defendant to death if you thought, based upon the
24 evidence in the case, those were the right answers to
25 give?

91

1    A. Yes.
2    Q. Do you have any questions for me before we
3 start?
4    A. No.
5           THE COURT: Mr. McClellan.
6           MR. MCCLELLAN: Thank you, Your Honor.
7           VOIR DIRE EXAMINATION
8 BY MR. MCCLELLAN:
9    Q. Miss Williams, my name is Lyn McClellan. Along
10 with Claire Connors, we represent the State of Texas in
11 this case. I want to kind of go back to that same
12 issue. You filled out in the questionnaire that you're
13 opposed to the death penalty, okay. There was a
14 question on Page 13.
15           MR. MCCLELLAN: Do we have a copy there,
16 Your Honor?
17           THE COURT: Yes, we do.
18    Q. (BY MR. MCCLELLAN) Question No. 70, Page 13,
19 you checked, I could not vote for the death penalty
20 regardless of the facts and circumstances of the case.
21 Is that how you feel?
22    A. Well, after hearing what he explained, I can
23 understand.
24    Q. Well, tell me what you think. Can you
25 conceive of yourself ever voting in such a way that

92

1 death would result? I mean, not just, well, maybe a
2 wild, wild possibility, when you go -- the person you
3 are, I assume, is the person that's in this
4 questionnaire?
5    A. Yes.
6    Q. I don't believe in the death penalty, don't
7 think it's a proper type punishment and that you
8 basically said only God can judge?
9    A. Yes.
10    Q. And should make that type of decision?
11    A. Yes.
12    Q. We're going to be asking people to do that
13 judging instead of God. That conflicts with, I assume,
14 your personal, religious, and moral beliefs; is that
15 right?
16    A. Yes.
17    Q. What we don't want to do is put jurors in a
18 position to where their job as a juror would do violence
19 to their conscience. Obviously, if you had to make a
20 decision and it turns out you made a decision that death
21 would result, that might do violence to your conscience.
22 That goes against your religious beliefs or your
23 personal and moral beliefs as you express them in the
24 questionnaire; is that right?
25    A. I don't really -- I hope I don't have a problem

93

1 with my conscience. Because of my religious belief, I
2 just pray that God would, you know, help me to deal with
3 the decision. You know, as far as I'm concerned, the
4 decision has already been made by a higher being, as far
5 as I'm concerned.
6    Q. I understand. Do you understand how I can't
7 rely upon that?
8    A. I understand that.
9    Q. And you know we're seeking the death penalty.
10 No doubt about that. We'll be seeking to have people
11 and we're looking for people that can give us a fair
12 trial. First thing you started to say up there to the
13 Judge was, the prosecutor would really, really have to,
14 you know, prove this case.
15    A. Uh-huh.
16    Q. The burden in a capital murder case is beyond a
17 reasonable doubt. That's the same burden that's in a
18 shoplifting case. Some people come and say, well,
19 you're going to have to prove to me more than that. If
20 you're asking for me to give the ultimate penalty, that
21 being death, for me to vote in such a way that death
22 would result, you're not only going to have to prove to
23 me beyond a reasonable doubt, I'm going to have to be
24 one hundred percent certain. Is that the way you feel?
25    A. Yes.

94

1    Q. I can never prove to you 100 percent certainty.
2 I promise you that. One hundred percent certain is not
3 the level of proof that I'm required. I'm not trying to
4 take you out of it. I'm just telling you what the law
5 is. And some people say, well, I'm going to hold you to
6 a higher burden of proof. Because of my personal
7 feelings, because of my religious feelings and beliefs,
8 that in order for me to make that type of decision, I'm
9 going to have to be even more sure than what the law
10 says I have to be sure, because it's me making this
11 decision. That may be fine for these other people; but
12 for me to make a life and death decision, I'm going to
13 have to be one hundred percent certain. Is that the way
14 you feel?
15    A. I don't really have to be one hundred percent,
16 but you would have to really show me, prove to me.
17    Q. Would you require -- would you expect more
18 proof in a case where the State's going to seek the
19 death penalty than you would in a case where the State's
20 going to ask for a fine and jail time?
21    A. I would hope it would --
22    Q. Wouldn't you demand more proof in a death
23 penalty case than you would in any other type of case?
24    A. Yes.
25    Q. That's how you really believe, isn't it?

95

1     A. Yes.
2     Q. I'm not trying to --
3     A. I understand.
4     Q. I'm just trying to get what your feelings are.
5     A. Yes, I understand.
6     Q. All right. So you would, in effect, be saying
7 that you're demanding more proof than just beyond a
8 reasonable doubt; because that's the burden of proof in
9 every criminal case, and that doesn't make it bad or
10 anything. That's just how you feel. Is that the way
11 you feel?
12     A. It wouldn't have to be 100 percent, but --
13     Q. But it would have to be more than beyond a
14 reasonable doubt?
15     A. Yes.
16     Q. More than the type of proof you would expect in
17 a non death case?
18     A. No, not necessarily.
19     Q. Well, I mean, you tell me that you want to be a
20 hundred percent certain, and then you tell me you don't
21 want to be a hundred percent.
22     A. I want to be certain.
23     Q. I understand. My question: Would you require
24 more proof in a death penalty case than in any other
25 type of case? And you said yes. Is that the way you

96

1 feel?
2     A. Yeah, especially when somebody's life is at
3 stake, yeah.
4     Q. Nothing wrong with that.
5     A. Yes.
6     Q. Don't believe me?
7     A. Yes.
8     Q. Now when you say that, can you see how you're
9 saying that you would require more proof than just
10 beyond a reasonable doubt? Because that's what is
11 required in all cases.
12     A. Yes.
13     Q. You see the logic of how that works?
14     A. Yes.
15     Q. So are you telling me and are you comfortable
16 with that fact that you would require me to prove our
17 case more than just beyond a reasonable doubt? Because
18 that's what's required in the other non death cases.
19     A. Yes.
20     Q. So you would require more proof in a death
21 case?
22     A. Yes.
23     Q. And you believe -- or you tell me -- that you
24 could not vote to assess the death penalty, regardless
25 of the facts and circumstances, unless I prove that to

97

1 that higher level of proof --
2     A. Yes.
3     Q. -- is that correct?
4     A. Yes.
5     Q. I would submit the juror --
6     THE COURT: Don't read this as a ruling,
7 but do you have any other questions for Miss Williams?
8     MR. MCCLELLAN: Yes, I do. Depends on
9 that ruling.
10     THE COURT: No. I said don't take this as
11 a ruling.
12     MR. MCCLELLAN: Right.
13     VOIR DIRE EXAMINATION
14 BY THE COURT:
15     Q. Miss Williams, let me ask you a couple of
16 questions please. Before I ask, I want you to know it's
17 not important to me what your answer is. It is
18 important to me that I understand your answer and that
19 you answer consistently. Because you see, if you give
20 us different answers, then I have no idea where we are.
21     Now we've talked Friday and today about
22 the State being required to prove a person's guilt
23 beyond a reasonable doubt. We talked today about the
24 State having to prove the answer to that first question
25 at the second phase of the trial, if there is one. The

98

1 State has to prove to you that the answer to this
2 question should be yes beyond a reasonable doubt. Did
3 you tell Mr. McClellan that you would require him to
4 prove it more than that? Is that what you told him?
5     A. Yes.
6     Q. How much more?
7     A. I really don't know.
8     Q. You remember when we talked to you earlier
9 today about the difference between probability and
10 certainty? Just because something could possibly happen
11 doesn't mean it's certain to happen. Can you see how
12 the State would never prove with an absolute certainty
13 that something would happen? Does that make sense to
14 you?
15     A. Yes.
16     Q. Would you require them to prove to a certainty
17 that something happened to a certainty?
18     A. Yes.
19     Q. Would you require them to prove to a certainty
20 that something happened?
21     A. Yes.
22     Q. You just told me you understood that nobody
23 could. And I'm not trying to trick you, but you see
24 your answers aren't necessarily the same. And my
25 question to you is this: I understand the difference

99

1   between a juror wanting to be perfectly satisfied that
2   the decision they're reaching is the accurate decision.
3   I understand that. But I also understand that a jury
4   could be perfectly satisfied that they are reaching the
5   right decision by deciding a person's guilt or by
6   answering that first question if the State proves it
7   beyond a reasonable doubt. Can you see what I'm saying?
8       A. If they prove beyond a reasonable doubt that
9   this happened, then I guess I would have to say yes.
10      Q. That's my question.
11      A. I wouldn't have to, but --
12      Q. But I want to know, would you?
13      A. Yes, uh-huh.
14      Q. So can you see now -- if I'm hearing you
15  correctly, you're telling me that you're not going to
16  make the State prove something to a greater burden than
17  beyond a reasonable doubt?
18      A. Oh, no, I wouldn't expect them -- you know,
19  maybe I didn't understand the way it was worded or
20  something, but I wouldn't -- like you said, I wouldn't
21  expect them to go beyond the limits of what he felt he
22  would have to do. If he could prove to me that this is
23  what happened, then I would say yes, you know; but it
24  would have to be with no doubt.
25      Q. Now you said something, Miss Williams, and I

100

1   recognize you're in a place where you're not used to
2   being. You said, he would have to prove it. He doesn't
3   have to prove it, according to the law, beyond a
4   reasonable doubt. Now the question really boils down to
5   this: Can you see that while he's perfectly willing to
6   abide by the law and accept a challenge to prove a
7   person's guilty beyond a reasonable doubt? Can you see
8   how unfair it would be if a juror ignored the law and
9   said, no matter what the law said, I'm going to make you
10  prove it to me more?
11      A. Oh, yeah, I understand. I can see that.
12      Q. Would you do that? Would you make him prove a
13  case more than what the law required?
14      A. No, not more than what the law requires, no.
15              THE COURT: Go ahead, sir.
16              VENIREPERSON: I'm sorry.
17              VOIR DIRE EXAMINATION
18  BY MR. MCCLELLAN:
19      Q. Miss Williams, I'm not concerned about what
20  other jurors are required to do. I'm not concerned
21  about what other jurors will do or whatever. I'm
22  concerned about what you would do. You've told me that
23  you oppose the death penalty; is that right?
24      A. Yes.
25      Q. Don't think it's a proper type punishment --

101

1       A. No.
2       Q. -- for crimes that we ought to have?
3       A. No.
4       Q. If you could do away with it, you would do away
5   with it?
6       A. If I had my way, yes.
7       Q. And you know that forty years -- if a person
8   gets a life sentence, he gets forty years day for day;
9   and that's a lot of time.
10      A. Yes.
11      Q. You've indicated on here that you could not
12  vote for the death penalty regardless of the facts and
13  circumstances; isn't that right?
14      A. That's what I put on here. But after having it
15  explained just a little clearer --
16      Q. You told me that you would require me to prove
17  my case because we're seeking death. You understand how
18  serious it is; because you oppose death as punishment,
19  right?
20      A. Yes.
21      Q. And before you would ever be comfortable in
22  assessing the death penalty, you've told me, and I
23  assume you're telling me -- correct me if I'm wrong --
24  that you would require more proof than you would expect
25  in any other type of case, because we're seeking the

102

1   death penalty?
2       A. Not after -- not after the Judge and I talked.
3   I can see clearer now.
4       Q. You can see to where it's now changed your
5   mind?
6       A. Yes.
7       Q. You're now for the death penalty?
8       A. No, I'm not for the death penalty; but you
9   don't have to go --
10      Q. You could assess that in the proper case? You
11  could sit in judgment, sign a jury verdict that says
12  this person receives death in a proper case, if that's
13  what you're comfortable doing?
14      A. If you proved it.
15      Q. And would I have to prove it more than I would
16  any other type case?
17      A. No, not after the explanation.
18      Q. Okay. All right. So on that questionnaire, on
19  Page 13 there, what would you check then if you don't
20  believe in Number One, I could not vote to assess the
21  death penalty regardless of the circumstances, what
22  would you choose there?
23      A. Probably Number 3, more so now.
24      Q. Okay. That you could consider all the penalty
25  provided by law and the facts and circumstances of the

103

1  case?
2      A.  Yes.
3      Q.  But going in, you still oppose the death
4  penalty?
5      A.  Yes.
6      Q.  But you could vote to assess it and go back and
7  tell the people at your church or whatever that you
8  heard a case and you voted to assess the death penalty?
9      A.  I would have to if I chose Number 3.
10     Q.  Okay.  My question is:  You don't have to do
11  anything.  I'm just checking.  Now, more or less, can
12  see where the death penalty --
13     A.  Yes.
14     Q.  -- is a problem?
15     A.  Yes.
16     Q.  While ago you said you would do away with it if
17  you could.  Would you still do away with it?
18     A.  I think so, yes.
19     Q.  Don't you think that would always cause you
20  to -- you're leaning against the death penalty?  Would
21  that be right?
22     A.  Oh, yes.
23     Q.  Very strong?
24     A.  No.
25     Q.  When you get down here, and let's say you found

104

1  someone guilty of capital murder.  Let's say you answer
2  Issue Number One that he's a continuing threat to commit
3  future acts of violence.  If the answer is yes, you know
4  he's going to receive the death penalty.  And then Issue
5  Number Two says:  Do you find there are any reasons or
6  circumstances that this person ought to receive life as
7  opposed to death?   In other words, it gives the option
8  of deciding life as opposed to death, under any
9  circumstances, that would convince me he ought to get
10  life as opposed to death.
11          Based upon your beliefs, would you always
12  then answer that question in such a way that life would
13  result -- there is no burden there.  There is no
14  requirement of proof.  It says, taking into
15  consideration all of the evidence, including the
16  circumstance of the crime, the offense, the defendant's
17  character and background, and his personal moral
18  culpability of the defendant, there is sufficient
19  mitigating circumstance or circumstances -- I like to
20  refer to it as sufficient reasons -- why this person
21  here would warrant a sentence of life imprisonment as
22  opposed to death because of your beliefs, because of
23  your leaning against the death penalty?
24          In that Issue Number Two, would you always
25  find there are circumstances such that life would be the

105

1  appropriate penalty?
2      A.  Yes.
3      Q.  You will?
4      A.  Yes.
5      Q.  Regardless of what, you know, that tells you to
6  go back and look at everything.
7      A.  Uh-huh.
8      Q.  And when you went back and looked at the crime,
9  whatever it might be, when you looked at the character
10  and background of the defendant, whatever that may be,
11  when you look at his responsibility for the crime,
12  whatever that may be, you would always find there is
13  sufficient circumstances that life as opposed to death
14  ought to apply, because that's what you think, knowing
15  it's forty years, day for day, that's a long time, that
16  would always be -- your vote would always be such that
17  it would be life as the punishment?
18     A.  Yes.
19          MR. MCCLELLAN:  I submit --
20              VOIR DIRE EXAMINATION
21  BY THE COURT:
22     Q.  Miss Williams, you're back to me again.  Can
23  you see how we've come the full circle, Miss Williams,
24  that we've -- that when you started out with the fact
25  you could never give the death penalty to the fact that

106

1  you could, if you believe beyond a reasonable doubt,
2  vote for the death penalty to where the second question,
3  you would always take that death penalty away?  Because
4  the way I heard you answer Mr. McClellan's question was
5  if you found -- I'm not talking about this defendant,
6  but any defendants -- if you found them guilty of
7  capital murder, if you answered that first question yes,
8  that you did find them to be a future danger, we know
9  that up to then, the death penalty is going to be
10  imposed.
11     A.  Yes.
12     Q.  And it depends on what the punishment to be
13  assessed is, how the jury answers that second question.
14     A.  Yes.
15     Q.  Mr. McClellan asked you would you always answer
16  that second question, because of your feelings against
17  the death penalty in such a way that death penalty would
18  be taken away and a life sentence would be substituted
19  for it?  And I thought I understood you to say, yes, you
20  would always answer it yes so that a life sentence would
21  always be imposed assessed.
22     A.  I guess it would all depend on, in the second
23  question, whether the circumstances would warrant life
24  in prison.
25     Q.  Well, I agree.  Do the circumstances warrant a

107

1  life sentence, or do they not?
2      A.  It would all depend upon the circumstances.
3      Q.  But the way I heard you answer Mr. McClellan is
4  you would -- you would always say the circumstances did
5  warrant it?
6      A.  You make it clearer than I did.
7      Q.  Well, but you see --
8      A.  I understand.
9      Q.  I'm asking it the second time, and you've
10  already been through it once.  And I just want to be
11  sure.  Are you saying you would not always or you would
12  always answer one way or the other?
13      A.  No, it depends on the circumstances.
14      Q.  Ma'am, on that second issue, there is no burden
15  of proof.  It is a stopgap.  It gives the jurors the
16  opportunity to make a decision on the life or death of
17  this person.  There is no decision until you get to
18  Number Two.  You have found a person guilty.  You found
19  he would be a continuing threat to commit future acts of
20  violence, but that doesn't mean he gets death.  Because
21  you couldn't get death unless all questions are answered
22  in a certain way.  So the second question still has to
23  be answered.
24          And my question to you is -- because
25  you're going back and saying, this is an opportunity.

108

1  This is what Issue No. 2 gives the jurors -- not only
2  just you, but all the jurors -- an opportunity to
3  basically save that person's life, give them a life
4  sentence as opposed to death.  And I would assume, if
5  someone is opposed to the death penalty, thinks we
6  shouldn't have it, thinks that this is not the type of
7  penalty I would have if I were making the laws, that
8  that person when leaning towards -- against the death
9  penalty, would then choose to answer this in such a way
10  that life would result, knowing that it's going to be
11  forty years, day for day; it will be 2039 before someone
12  would even be eligible for parole.  And if that's the
13  way you feel, you would be leaning that way and do that,
14  that's what I need to know.
15      A.  I don't think I could answer this now, until I
16  heard the case.
17      Q.  So even after, you think you could still answer
18  that question in such a way that death would result?
19      A.  Yes, but I'd have to hear the case first.
20      Q.  There's an area that I need to go into because
21  of certain requirements to serve as jurors in Texas.
22  And you may remember the case several years ago of the
23  cheerleader mom, or whatever, somebody who hired someone
24  to kill a girl who was trying out for cheerleader, and
25  she was tried.  You don't remember that case?

109

1      A.  Very vaguely.
2      Q.  But that case was reversed or thrown out,
3  because somebody was on the jury who had a conviction
4  for an offense, okay.  The law says if someone is
5  convicted of theft, they cannot serve as a juror in any
6  criminal or civil case.  Now in June of this year, did
7  you have an occasion to go to court in Brazoria County?
8      A.  No.
9      Q.  You're Joyce Ann Williams; is that right?
10      A.  Yes.
11      Q.  And your date of birth is what?
12      A.  6-27-50.
13      Q.  Okay.  And we have -- we have to check the
14  records of all the people, and your name came up as
15  having been convicted of theft in Brazoria County on a
16  theft by check case.
17      A.  Really?  That's news to me.
18      Q.  So you never went to court in Brazoria County?
19      A.  No.  Where is Brazoria County?
20      Q.  I guess it's Angleton.
21      A.  I have no business there.
22      Q.  Okay.  So that's not you?
23      A.  No, it's not.  And I'd like, if I could have a
24  copy of that, to try and find out about it.
25      Q.  Well, we'll do some more checking on that to

110

1  see if, in fact, it is -- comes back to you or whether
2  it's some other person with the same name or whatever.
3      A.  I'd really like to know about that.
4      Q.  Okay.  Back to the issue on the death penalty.
5  Knowing your opinions and beliefs about the death
6  penalty, do you think you could be fair to the State of
7  Texas in this case?
8      A.  Yes.
9          MR. MCCLELLAN:  I'll pass the witness.
10          THE COURT:  Mr. Hill, do you have any
11  questions?
12              VOIR DIRE EXAMINATION
13  BY MR. HILL:
14      Q.  I just have one question, because you've spent
15  a lot of time up there.  Is there anything about you,
16  about how you feel or whatever, whatever makes you tick
17  and whatever makes you who you are -- I'm sitting here
18  representing with Mr. Wentz Charles Mamou.  Is there any
19  reason at all that we should not feel comfortable
20  selecting you to sit on this jury in this case?
21      A.  No.
22      Q.  Thank you, ma'am.
23          THE COURT:  Miss Williams, in just a
24  second I'm going to excuse you.  Before I do, may I get
25  that back from you, please?

111

1   (Prospective juror dismissed.)
2               NOHEMY BONILLA,
3   having been first duly sworn, testified as follows:
4               VOIR DIRE EXAMINATION
5   BY THE COURT:
6       Q.  Miss Bonilla, before I begin, let me ask you a
7   couple of questions.  First question I'm going to ask is
8   to remember back to last Friday, when everybody was
9   together here, and this morning and the conversation we
10  had this morning.  Out of everything we talked about up
11  to now, do you have any questions at all for me?
12      A.  Not really.
13      Q.  When you say not really, that means to me that
14  you do have some but you don't want to ask them.
15      A.  No.
16      Q.  No means you don't have any.
17      A.  Okay, no.
18      Q.  Is there anything up to this point, Miss
19  Bonilla, that we have not touched on that you feel like
20  we ought to talk about because it might have some
21  bearing on your service as a juror?
22      A.  No -- well, how long is this going to last?
23      Q.  Well, as we said last Friday, we're talking to
24  you today.  There is a chance we may get you back here
25  on September the 29th, which is a week from tomorrow;

112

1   because what we're doing is talking to people one at a
2   time to create a panel of about forty-five people.  We
3   get all forty-five people in here next Wednesday.  And
4   out of that forty-five on that day, we'll decide who the
5   jurors are.  I won't, but the lawyers will.
6           The evidence in the case, if you're
7   selected as a juror, will begin on Monday, October the
8   4th, which is two weeks from yesterday.
9       A.  Okay.
10      Q.  The trial, we know, will last for more than one
11  week, but we don't believe it will last longer than two
12  weeks.
13      A.  Okay; because if it's December, I'm due in
14  December.
15      Q.  No, no, no.  We'll all be -- you'll long since
16  have forgotten us by December.  Now -- and I was going
17  to ask you about your circumstance, because you're
18  pregnant.  And if you're due in December, you're a
19  little over six months?
20      A.  Six months.
21      Q.  Is this your first?
22      A.  Yes.
23      Q.  Tell me, Miss Bonilla, do you feel that your
24  physical circumstance is such that it would in any way
25  interfere with your ability to be a juror in this case

113

1   for maybe, at the most, two weeks?
2       A.  Depends, because you know, with this --
3       Q.  Now I'm asking the questions.  It's perfectly
4   natural for you to answer me, but these folks have to
5   also hear your answer.
6       A.  Well, depends; because right now -- it's like,
7   right now I feel like I can come to this and everything.
8   But what happens if something happened to me?  You never
9   know, because I'm pregnant right now and the doctor said
10  it might come early or later.
11      Q.  Well, we're figuring the trial's going to be
12  over with by October the 15th.  Now there is no way --
13  have you had any difficulty with your pregnancy up to
14  now?
15      A.  Not yet.
16      Q.  So there is nothing that has occurred that
17  makes you believe you are going to have any difficulty;
18  is that correct?
19      A.  Yes.
20      Q.  Well, let me say this:  If anything does come
21  up, obviously we're going to get you taken care of.
22      A.  Uh-huh.
23      Q.  So with that in mind, are you saying that as
24  far as you know, your pregnancy would not prevent you
25  from being a juror for the two weeks the first of

114

1   October?
2       A.  No.
3       Q.  Okay.  Is there anything at all that you can
4   think of, whether it be something -- are you still
5   working?
6       A.  Yes, I work.
7       Q.  Anything at all about your job, anything at all
8   about your family life, anything at all about your
9   health, or anything else you feel would interfere with
10  your service as a juror?
11      A.  No, sir.
12      Q.  Can you see, based upon the conversation we've
13  had up to now, Miss Bonilla, in terms of being sworn in,
14  all we're trying to do is to make sure whoever the
15  twelve jurors are in a case, whoever they are, they
16  won't require either side to do anything that the law
17  doesn't require of them; everybody that's a juror is
18  open to listening to all of the evidence, find him
19  guilty if that's what you think you should do based upon
20  the evidence, find him not guilty if that's what you
21  think you should do based upon the evidence.  Can you do
22  either one of those things?
23      A.  Yes, sir.
24      Q.  Can you, also, if you find a person guilty of
25  capital murder, answer these questions knowing if you

115

1   answer them in one way, I'm going to sentence the
2   defendant to death; but if you answer them a different
3   way, I'm going to sentence the defendant to life.  Are
4   you open to answering these questions either way?
5       A.  Yes, sir.
6       Q.  But depends upon the evidence in the case?
7       A.  Yes, sir.
8       Q.  Before we begin, do you have any questions for
9   me?
10      A.  No, sir.
11      Q.  Okay.  Thank you.
12          THE COURT:  Mr. McClellan.
13          MR. MCCLELLAN:  Thank you, Your Honor.
14              VOIR DIRE EXAMINATION
15  BY MR. MCCLELLAN:
16      Q.  Miss Bonilla, my name is Lyn McClellan.  Along
17  with Claire Connors, we represent the State of Texas in
18  this case.  Tomorrow is Wednesday.  We want to know what
19  the numbers are for the Lotto tomorrow so we can win.
20  You can't give it to us?
21      A.  I wish I could.
22      Q.  You would probably keep it for yourself?
23      A.  Yes.
24      Q.  I thought I'd try.  Let me ask you, if I can,
25  just to tell us in your own words what your opinion is

116

1   about the death penalty.
2       A.  Depends, because I think it's -- nobody has the
3   right to take somebody else's life.
4       Q.  Do you think the death penalty is a proper type
5   punishment in certain types of cases?
6       A.  Yes, depends how the murder was committed.
7       Q.  Some people come to us and say they believe in
8   the death penalty; but they do not believe that they,
9   themselves, could ever participate in a process whereby
10  they would be called upon to make decisions that they
11  knew would result in this Judge ordering the execution
12  of this defendant sitting over here on trial.  Do you
13  have any doubts about your ability to participate in
14  that type process and make that type decision if that's
15  what the law and the evidence called for?
16      A.  Well, I can be agreeable about the death
17  penalty; but I don't think I can, like, decide somebody
18  else's destiny in that way.
19      Q.  So you don't think you could ever serve as a
20  juror to make those type decisions?  Is that what you're
21  saying?
22      A.  Yes, sir.
23      Q.  Okay.  And that is because of your religious
24  beliefs, or personal beliefs, or what?
25      A.  It's not because of religious.  It's just, it's

117

1   because I don't feel like -- I mean, like I say, I don't
2   have the right to decide, like, if he's going to be
3   committed to death or a life sentence.  That's -- I
4   don't know.
5       Q.  Okay.  Now, of course, the law says you do have
6   the right.  And you're saying you, personally, don't
7   believe that you have that right?
8       A.  Yes.
9       Q.  All right.  Would that prevent you, then, from
10  listening to evidence and deciding that someone should
11  receive the death penalty if that's what the evidence
12  called for?
13      A.  Well, if he committed a crime, you have to pay
14  for it.  I understand that right.
15      Q.  And that's what we're talking about.  And we're
16  talking, though, about your ability to sit over here and
17  making that type of decision.  Can you do that?
18      A.  I think I can.
19      Q.  All right.  And if the answers to the questions
20  were in such a way that the death penalty would result,
21  can you vote for that to occur?
22      A.  Yes, sir.
23      Q.  Now you said while ago that you had some
24  concern about, who are you to decide if someone dies?
25      A.  Yes, well --

118

1       Q.  But you now understand that's what this process
2   is about?
3       A.  Yes.
4       Q.  Now some people have religious beliefs that
5   prevent them from sitting in judgment of another person.
6   Do you have any religious beliefs that would keep you
7   from being a juror?
8       A.  No, sir.
9       Q.  You believe in the death penalty, right?
10      A.  Yes.
11      Q.  For certain types of crime?
12      A.  Uh-huh.
13      Q.  And if the crime was, quote, "bad enough," you
14  think you could vote for the death penalty if that's
15  what the evidence showed?
16      A.  Yes, sir.
17      Q.  You understand this is a capital murder case;
18  obviously, someone has died?
19      A.  Uh-huh.
20      Q.  You're obviously going to see pictures or
21  photographs of dead people or person or persons.  You
22  may see evidence of blood in that kind of situation.
23  Because of your condition of being pregnant, do you
24  think that would affect you, or would you still be able
25  to sit there and listen to that type of evidence and

119

1    make the type of decision that the evidence called for?
2    Only you know that. That's why I'm asking you.
3        A.   Well, I never -- I don't know; because, I mean,
4    I never been like this. You know, you see that on TV,
5    but not actually living that.
6        Q.   You don't have any reason to believe, do you,
7    that that would keep you from serving as a juror, do
8    you?
9        A.   No, sir.
10       Q.   In other words, you will be able to see
11   photographs and all kinds of evidence that you're given
12   and make a decision based upon the evidence that you
13   got, could you not? You -- let me just give you some of
14   these statements and see if you can tell me whether you
15   agree or disagree with the.
16           The death penalty is absolutely justified.
17   Do you agree with that or disagree?
18       A.   I agree.
19       Q.   Okay. We must have the death penalty for some
20   crimes. Do you agree?
21       A.   Yes, sir.
22       Q.   What kind of crimes do you think we ought to
23   have the death penalty for?
24       A.   For sexual harassment, or any kind of abuse
25   about kids, or any person.

120

1        Q.   Death penalty is just and necessary?
2        A.   Sometimes it is.
3        Q.   Okay. Death penalty gives a criminal what he
4    deserves?
5        A.   Well, sometimes.
6        Q.   The death penalty is always justified for
7    intentional murder. By intentional murder, you're
8    talking about if you intentionally go out and take
9    someone's life, that basically you should have to pay
10   with your own life.
11       A.   Yes, sir.
12       Q.   Do you agree with that?
13       A.   Yes, sir.
14       Q.   The death penalty should be available as
15   punishment for more crimes than it is now.
16       A.   Yes.
17       Q.   Do you think we have a crime problem in Harris
18   County?
19       A.   Yes, sir.
20       Q.   You, as a young woman, do you think crime is --
21   do you fear crime could possibly affect you or your
22   family?
23       A.   Yes. It could happen to anybody.
24       Q.   Have you ever known someone who has been the
25   victim of any type of violent crime?

121

1        A.   No, sir.
2        Q.   In a capital murder case we have to believe the
3    defendant intentionally took the life of another person
4    without any legal justification during the course of the
5    kidnapping, okay. If we prove that someone killed
6    someone during the kidnapping, intentionally did that
7    act, prove that beyond a reasonable doubt, you would
8    have to find someone guilty of capital murder.
9        A.   Yes, sir.
10       Q.   And I assume you could do that?
11       A.   Yes, sir.
12       Q.   If you found someone guilty of capital murder,
13   then you're asked to answer these questions over here on
14   the board. Issue Number One says: Do you find from the
15   evidence -- don't let me jump ahead too fast. At the
16   punishment stage of a trial, you may hear more evidence
17   than you already heard at guilt or innocence. You may
18   hear evidence about a defendant's character, his
19   background or criminal history, or lack thereof, without
20   the individual himself; because you're making a decision
21   as to what punishment the person should receive for the
22   crime that he's committed. If you found someone guilty
23   of capital murder, intentionally taking the life of
24   someone without any legal justification, do you have a
25   thought as to what the punishment should be for that

122

1    type of crime?
2        A.   Depends how the murder was committed, how he
3    did it or, you know --
4        Q.   Circumstances of the crime --
5        A.   Yes.
6        Q.   -- would help in determining as to whether or
7    not he ought to receive death or life?
8        A.   Yes, sir.
9        Q.   Issue Number One then asks you to determine
10   whether or not you believe that the person on trial --
11   there is a probability that that person would be a
12   continuing threat to commit future acts of violence,
13   okay? You've already found him guilty of capital
14   murder, committing an act of violence where you took
15   someone's life during a kidnapping. You're then asked
16   to determine whether or not you think that person would
17   be a continuing threat to commit future acts of
18   violence. What kind of information do you think would
19   be helpful in making that type of decision?
20       A.   If he committed anything else before this.
21       Q.   And, of course, there again, we don't have to
22   show -- when it talks about criminal acts of violence,
23   we're not talking about whether or not he's likely to
24   commit another murder or capital murder; because
25   criminal acts of violence could be any criminal act that

123

1  is violent. It could be robbery, could be burglary,
2  could be sexual assault. Could be any type of thing
3  where you intentionally inflict harm on someone.
4  Okay. Do you think you would be open to
5  listening to the evidence and determining whether or not
6  you thought that person, who you already found guilty of
7  capital murder, would, in fact, commit criminal acts of
8  violence that would be a continuing threat?
9  A. Yes, sir.
10  Q. There is a question on your questionnaire where
11  it says -- you checked this statement as agree with it.
12  There are some kinds of cases in which I know I could
13  not vote for the death penalty even if the law allowed
14  me to, but others which I would be willing to consider
15  voting for it. Can you think of any kinds of cases
16  where you would not vote for the death penalty even if
17  the law allows you to?
18  A. Well, depends, like again, how he committed the
19  murder or whatever he did. And then it depends, like,
20  how he felt at that time, too; because some people -- I
21  heard them. You know, that's the news. They get
22  excited when they kill. Somebody like that, he deserves
23  that death penalty.
24  Q. I didn't hear that last part.
25  A. Well, depends how he felt at the time.

124

1  Q. Whether he's remorseful or not?
2  A. Yes.
3  Q. Okay. Some people might be remorseful for what
4  they did, thinking they did something wrong and think,
5  oh, my gosh, why did I do that? And somebody else,
6  though, might brag to people what they did.
7  A. Yes.
8  Q. Do you think that would be a factor?
9  A. Uh-huh.
10  Q. But is there any particular type of crime that
11  you think, if I heard capital murder, murder plus some
12  other crime, anything you can think of that you would
13  say, well, in those kind of cases, I could never give
14  the death penalty?
15  A. No.
16  Q. You know we've alleged here a murder during a
17  kidnapping. If the circumstances of the case called for
18  the death penalty, is that the kind of case you could
19  give the death penalty if that's what the facts
20  dictated?
21  A. Yes, sir.
22  Q. You know you're in a situation where, in a few
23  months, you're going to be giving life, giving birth to
24  someone. You're now being asked to potentially sit on a
25  jury where you may have to take someone's life; but

125

1  based upon what they have done and the fact they would
2  be a continuing threat to the future, would that put you
3  in an uncomfortable situation?
4  A. Yes.
5  Q. Could you -- how could you resolve that? Talk
6  to me about how that makes you feel or whatever.
7  A. Because some people spend some time in jail.
8  They get out and do the same thing again or do worse
9  things than what they did before. You never know if
10  he's going to -- somebody's going to get out of jail and
11  shoot and kill your family.
12  Q. So the fact that you're about to give birth to
13  someone, are you saying that wouldn't affect your
14  ability to serve as a juror and, if the evidence called
15  for it, to vote for the death penalty? If that's what
16  the evidence called for, you could still do that?
17  A. Yes, sir.
18  Q. Thank you, Miss Bonilla. I appreciate your
19  time.
20  VOIR DIRE EXAMINATION
21  BY MR. HILL:
22  Q. Miss Bonilla, would it be easier if I sat up
23  there?
24  A. No.
25  Q. I'll sit over there. This really blocks my

126

1  view of you. I'm just going to ask you a few questions,
2  okay. When I look at the questionnaire that's filled
3  out by the prospective jurors, I try to see things and
4  kind of zero in on things that might cause me concern.
5  And I find usually when I talk to people and I ask them
6  what they were thinking when they wrote out an answer
7  and they explain their answer, it usually gives me a
8  much better feeling of what they're thinking.
9  Now one of the questions asks you, what is
10  your opinion about -- and it asks you about prosecutors.
11  And you say, they try to make the law work. And when
12  asked about defense lawyers, they will defend you
13  whether you're guilty or not. Can you explain that
14  answer a little bit more fully, representing somebody
15  whether they're guilty or not?
16  A. To me, the defense is somebody that's going to
17  try to do the best for you if you commit any crime. I
18  mean, they're going to try to make your sentence less
19  than what somebody else would do.
20  Q. Okay. Do you assume when you start out on a
21  case that the person that is sitting at the counsel
22  table and is named the defendant must have done
23  something serious, or can you presume, as the Judge
24  instructs you to do, that that person is not guilty
25  unless and until the State proves to your satisfaction

127

1  and twelve -- eleven other people that that person
2  committed a crime.
3      A.  Yes, sir.
4      Q.  See, I think you can read that answer several
5  different ways.  If I read that answer to mean you
6  assume that everybody is guilty, then we probably don't
7  have much of a chance of having a fair trial, you see.
8  But if what you're saying is you would expect a lawyer
9  that represents somebody accused of a crime to do the
10 best he or she can do to represent their clients, I'm
11 comfortable with that.  Is that more like what you're
12 saying?
13     A.  Yes, sir.
14     Q.  Well, Mr. McClellan asked you the question
15 about the Lotto.  He wanted to know the winning numbers.
16 Let me ask you this:  Have there ever been any big
17 winners there at Fiesta?
18     A.  Yes, sir.
19     Q.  What was the biggest one?
20     A.  Like, three years ago.
21     Q.  Was it like --
22     A.  Fourteen million.
23     Q.  All right.  Here's another question that's
24 asked of you.  It has to do with the -- what is the best
25 way to achieve the purpose of meting out punishment for

128

1  a crime?  And basically it says, whatever the defendant
2  did, they should get, in terms of their punishment, kind
3  of an eye for an eye type of statement.
4          You now know, based on what the Judge has
5  told you, that in Texas, before the death penalty can be
6  assessed, it is necessary for the jury to make several
7  different findings.  Obviously, you would have to find
8  the person guilty of capital murder before you would
9  ever even be presented with the issue of the death
10 penalty.  Are you the type of individual -- because you
11 have your background, your upbringing, everything that
12 makes you who you are -- are you okay with the idea that
13 if you found somebody guilty of capital murder and you
14 didn't believe that was a case that required the death
15 penalty that would you be able to vote for life in
16 prison and be comfortable with that?
17     A.  Yes, sir.
18     Q.  Because the only other question I have for you
19 is when you answered one of the questions about, do you
20 think that life in prison is a severe penalty, you put
21 no.  Now was that before you understood what life in
22 prison in Texas in this case actually means?
23     A.  Yes, sir.
24     Q.  Prior to the Judge explaining it to you -- and
25 everybody that's come here has different views.  Could

129

1  you tell me prior to the Judge telling you what it
2  really is what your views about what a life sentence
3  was?  Did you have some number of years throwing around
4  that you thought somebody might serve before they were
5  released?
6      A.  Yes.
7      Q.  How many years?
8      A.  Probably ten.
9      Q.  You understand that, just as the Judge told
10 you, if a jury finds Mr. Mamou guilty of capital murder,
11 if that jury then returns a finding of life in prison,
12 there is no way that he even is considered, under any
13 circumstances, for release on parole prior to the Year
14 2039, forty years from now.  In other words, you're
15 twenty-three?
16     A.  Yes.
17     Q.  Your twenty-three years, add seventeen more to
18 it.  So when you're forty years old, seventeen years
19 from now, that would be -- I'm sorry -- that's how many
20 years we'd be talking about, forty full years.
21 Obviously, if you were to give a life sentence on this
22 case, it would be the Year 2039.  Are you comfortable
23 with that, and would your answer to life, being severe
24 or not severe, change?
25          In other words, do you think life in

130

1  prison -- knowing it's a mandatory forty years, day for
2  day, do you now think life is a severe punishment?
3      A.  Yes, sir.
4      Q.  Do you have any questions of me?
5      A.  No, sir.
6      Q.  Because this is the only chance you get to ask
7  us questions.
8      A.  No.
9      Q.  Do you think you would like to serve on this
10 jury?
11     A.  Yes, sir.
12     Q.  You think both sides would get a fair trial out
13 of you?
14     A.  Yes.
15     Q.  Okay.  Thanks.
16          (Court admonishes juror.)
17          (Prospective Juror brought back in.)
18          THE COURT:  May I ask you a question?
19          VENIREPERSON:  Yes.
20          THE COURT:  Before I do, let me take a
21 look at something.  Where were you born?
22          VENIREPERSON:  El Salvador.
23          THE COURT:  Are you a citizen of the
24 United States?
25          VENIREPERSON:  Yes.

131

1    THE COURT: Thank you very much.
2                    LINDA DEATON,
3    having been first duly sworn, testified as follows:
4                VOIR DIRE EXAMINATION
5    BY THE COURT:
6    Q.  How are you today?
7    A.  Fine.
8    Q.  Good. Miss Deaton, first off, let me ask you
9    to remember back to last Friday, when the whole group
10   was together, and the things we talked about that day.
11   Add to it this morning, what we talked about this
12   morning. And out of everything we have talked about so
13   far, do you have any questions at all for me?
14   A.  No.
15   Q.  Is there anything to this point, Miss Deaton,
16   that we have not yet addressed that you feel as though
17   we should talk about because it might have some bearing
18   on your ability to be a juror in this case?
19   A.  I don't think so.
20   Q.  Is there anything at all that you can think
21   about, personally, whether it be something about your
22   personal life, or your health, whether it be anything
23   else for that matter, that you can think of that would
24   in any way interfere with your ability to be a juror in
25   this case during the time frame we've discussed?

132

1    A.  No.
2    Q.  As I said this morning, Miss Deaton, I think
3    this phase of the trial is primarily meant to accomplish
4    two objectives. The first one being to share with the
5    jurors the rules that can come into play during the
6    course of a trial such as this. And in terms of what we
7    have talked about so far, in terms of the rules, are
8    there any of them that you find you have any objection
9    to?
10   A.  No.
11   Q.  So, then, if I'm hearing you correctly, are you
12   saying if you were a juror in the case, if any of these
13   rules we have talked about do come into play, as a
14   juror, you would be willing to both follow and enforce
15   them?
16   A.  Yes.
17   Q.  The second thing, Miss Deaton, is for everybody
18   to make certain, certainly with yourself and the
19   lawyers, too -- make certain if you do become a juror in
20   the case, you would base your decision on how you
21   evaluate whatever evidence was presented. Does that
22   sound like you?
23   A.  Yes.
24   Q.  Idea being you're just as likely to reach one
25   verdict as you are another. Do you have, before the

133

1    trial begins, any preconceived idea about what verdict
2    you should reach?
3    A.  No.
4    Q.  You're just wide open to doing whatever you
5    think the evidence in the case warrants?
6    A.  Right.
7    Q.  Can you also see, Miss Deaton, from our
8    conversation this morning how each of the three
9    decisions the jury could be called upon to make that,
10   being the question of guilty, and if he is guilty of
11   capital murder, answers to these two questions. Each
12   decision is independent then of what the next question
13   asks of you.
14   A.  Yes.
15   Q.  So, therefore, your decision as to one aspect
16   does not dictate, in and of itself, what the next answer
17   should be. And you're comfortable with that?
18   A.  Yes.
19   Q.  Before we begin, have you any questions for me?
20   A.  No.
21   Q.  Just relax, and you'll be out of here before
22   long.
23                THE COURT: Miss Connors.
24                VOIR DIRE EXAMINATION
25   BY MS. CONNORS:

134

1    Q.  My name is Claire Connors, and this is Lyn
2    McClellan; and we represent the State of Texas. Are you
3    nervous at all?
4    A.  Yes.
5    Q.  Try not to be. Just because I'm going to
6    explain some concepts to you, I want you to have some
7    questions for us. And obviously, you know how we feel
8    about certain things. How do you feel about the death
9    penalty?
10   A.  I think it's a necessary evil.
11   Q.  When you say evil, what do you mean?
12   A.  I think it's a very tragic thing that would
13   have to have happened to someone.
14   Q.  Did you ever have a different opinion about the
15   death penalty?
16   A.  No.
17   Q.  Do you believe that you could sit over here in
18   one of these chairs as a juror and decide whether or not
19   someone should get the death penalty?
20   A.  Yes.
21   Q.  And you understand that Mr. McClellan and I,
22   after the close of the evidence, we will ask the jury to
23   sentence this defendant to the death penalty?
24   A.  Yes.
25   Q.  Miss Deaton, what type of cases do you think

135

1 are appropriate for someone to get the death penalty?
2      A. I think if you take another person's life that
3 it could be appropriate.
4      Q. In your questionnaire, when you were asked
5 about your feelings about the death penalty you said,
6 only for severe acts. What did you mean by that?
7      A. Murder, possibly rape.
8      Q. And do you understand now that the death
9 penalty applies -- there is basically two crimes
10 oftentimes? Murder's the intentional taking of another
11 without a legal reason, and in this case aggravated
12 kidnapping. There is aggravated rape -- I'm sorry --
13 rape, burglary, killing a police officer, killing a
14 child under six. There's different circumstances when
15 the death penalty applies. You understand that now,
16 right?
17      A. Uh-huh.
18      Q. Did you know that before you filled out your
19 questionnaire?
20      A. No.
21      Q. And you understand the burden of proof is on
22 the State, and we have to prove to you beyond a
23 reasonable doubt that this man is guilty of capital
24 murder. And you understand that beyond a reasonable
25 doubt is not so that you're a hundred percent sure,

136

1 because you would be a witness. Then you couldn't sit
2 on the jury. Do you understand that?
3      A. Yes.
4      Q. Would you hold Mr. McClellan and I to the
5 standard of beyond a reasonable doubt?
6      A. Yes.
7      Q. If you found this defendant guilty of capital
8 murder, intentional killing while kidnapping, then we
9 would reach the punishment stage of the trial. Do you
10 understand that the first issue there, you would have to
11 listen to the evidence at the punishment stage of the
12 trial and consider the evidence at the guilt stage of
13 the trial and decide whether or not this man would
14 probably commit criminal acts of violence in the future
15 that would be a continuing threat to society? Do you
16 understand that?
17      A. Yes.
18      Q. Do you understand, Miss Deaton, that because
19 you found a person guilty of capital murder, that
20 doesn't automatically mean that that person will
21 probably be a continuing threat to society. You
22 understand that?
23      A. Yes.
24      Q. Could you wait till the punishment stage of the
25 trial and decide whether or not that question is

137

1 answered yes or no?
2      A. Yes.
3      Q. Miss Deaton, in your mind, probability -- what
4 is your definition of probability?
5      A. Well, it would be that he would likely commit
6 another, or that he would more likely.
7      Q. And do you understand that the criminal acts of
8 violence could be violence either to property, for
9 example, a burglary, or some type of assaultive offense
10 to a person? You understand that?
11      A. Yes.
12      Q. If you answer that you could believe a
13 defendant will be a continuing threat to society, a
14 probability a defendant will be a continuing threat to
15 society, you answer that question yes, you understand a
16 defendant will get the death penalty, right? You
17 understand that. Unless you get to Special Issue Number
18 Two and you answer that question that there is
19 sufficient evidence to warrant that, that overrides the
20 death penalty in the first question. You understand
21 that?
22      A. Yes.
23      Q. It's kind of like the out for the jury. If
24 they decide they don't want to give the death penalty,
25 then they can answer this question in such a way the

138

1 death penalty is not opposed by the Judge. Do you
2 understand that?
3      A. Yes.
4      Q. Can you promise me you would answer that
5 question based on everything you heard and not just how
6 you feel? Would you do that?
7      A. Yes.
8      Q. Do you understand in answering these questions,
9 you have to look at the facts of the case? You have to
10 look at the defendant's character and background, his
11 culpability, responsibility? Did he stay home and help
12 plan out the crime, or was he an active participant?
13 Did he stab someone or shoot someone, or was he the
14 getaway driver? What was his participation or
15 responsibility in the crime? And, also, was there
16 sufficient circumstance or circumstances that would
17 warrant the jury deciding that this person would get a
18 life sentence?
19      A. Yes.
20      Q. Could you consider all that before you made
21 your decision?
22      A. Yes.
23      Q. When it said, What is the best argument for the
24 death penalty in our society, you said, Repeat
25 offenders. What did you mean by repeat offenders?

139

1    A.  Well, people that you feel would be a threat.
2    Q.  Did you mean necessarily that someone would
3  have had to commit another murder before they committed
4  this murder?
5    A.  No.
6    Q.  Would you like to serve as a juror on this
7  case?
8    A.  Not really.
9    Q.  Why is that?
10    A.  Well, it's a very heavy burden.
11    Q.  Have you been thinking about it since you were
12  here last week, I guess, when we asked you to come back
13  here?
14    A.  Yes.
15    Q.  Any reason why Mr. McClellan and I would not
16  want you to serve as a juror?
17    A.  I don't think so.
18    Q.  Is there any reason why the defense wouldn't
19  want you to serve as a juror?
20    A.  I don't think so.
21    Q.  Do you consider yourself an open-minded`
22  person?
23    A.  Yes.
24    Q.  Do you consider yourself as someone who can
25  make a decision -- listen and make a decision after

140

1  they've heard all the facts?
2    A.  Yes.
3    Q.  If you found someone guilty of capital murder,
4  first stage of the trial, what would the punishment be?
5    A.  I don't know.
6    Q.  Why is that?
7    A.  Well, because I wouldn't know the
8  circumstances.
9    Q.  Thank you, ma'am.
10        MS. CONNORS:  I have no further questions.
11        THE COURT:  Mr. Hill.
12        MR. HILL:  Thank you, Judge.
13            VOIR DIRE EXAMINATION
14  BY MR. HILL:
15    Q.  Hi, Miss Deaton.  My name is Wayne Hill.  Kurt
16  Wentz and I both represent Mr. Mamou in this case.  I
17  just got a few questions for you.  Maybe you could take
18  a few moments to talk with me, not like an attorney
19  questioning a prospective juror, but somebody you maybe
20  met over in the jury assembly room.  And rather than
21  worry about the legalities of what we're doing and how
22  these questions come into play, just talk to me like if
23  I met you over there and we were just conversing about
24  topics while we were waiting to come over here, okay?  I
25  think that makes it a little easier for people to

141

1  express themselves.
2        I always feel like people are under the
3  gun to give the right answers, and there aren't any
4  right or wrong answers.  We get a wide variety of
5  responses to the questions we ask.  And all we're trying
6  to do, frankly, is in a short period of time, evaluate
7  whether you should sit up there with eleven other people
8  and judge the case.
9        Miss Connors asked you whether or not
10  there was any reason that you wouldn't be a good juror
11  for the State or for the defense.  I want to ask it in a
12  slightly different way.  Understand that as a defense
13  attorney, I am going to do everything I can to convey to
14  a jury of twelve people that the State has not proven
15  their case beyond a reasonable doubt.  I will
16  necessarily ask a great deal of questions of the State's
17  witnesses and will try to establish for the jury the
18  State has not proven their case beyond a reasonable
19  doubt.  Okay?
20        Knowing that, I'd like for you to think
21  for a moment.  There are a couple of reasons, couple of
22  things about you, in particular, that would cause me to
23  feel a little bit more comfortable having you sit on
24  this jury than maybe the State would feel comfortable.
25    A.  Well, I don't know why you would feel more

142

1  comfortable with me than anyone else.
2    Q.  Are you the type of individual that prejudges
3  things?
4    A.  No, I try not to.  I try to always be
5  open-minded.
6    Q.  What does that concept mean to you, to be
7  open-minded?
8    A.  To listen to both sides.
9    Q.  Okay.  Now you realize that the defense doesn't
10  actually have any burden to produce any evidence?  In
11  other words, the Judge had explained to you that if the
12  State of Texas presented -- they could present a hundred
13  witnesses, all sorts of documents, all sorts of physical
14  evidence.  But if the jury ultimately was not convinced
15  beyond a reasonable doubt, the case would end right
16  there.  It wouldn't be necessary for the defense to
17  either call the defendant to the witness stand or to
18  call any witnesses at all in order to show, quote, "the
19  other side of the story."  How comfortable are you with
20  that, even given the fact this is a capital murder case?
21    A.  Well, the only thing I can say is I have
22  children.  I have a son, and I'm glad it's not my son
23  here.  But I would want people to give him the benefit
24  of the doubt.
25    Q.  You know, we always ask people whether they're

143

1  comfortable or whether they feel like their commitment
2  is such that we can rely upon it before we choose the
3  other eleven people that are going to be sitting there
4  with you if you're one of them. So we really put it in
5  terms of your comfort level. If you were sitting here
6  in place of Mr. Mamou, you were my client right now.
7  And I'm talking with you as a client, and we have the
8  mirror image of Linda Deaton up on the witness stand.
9  Is there anything at all that you would be whispering in
10 my ear to say, yes, take her, or no, don't take her?
11 Because we're not going to know you in a brief period of
12 time.
13     A.  I don't know what I'd do.
14     Q.  Have you ever had any experiences with the
15 criminal justice system?
16     A.  No.
17     Q.  You did say that you had read some articles
18 regarding the death penalty, or maybe seen articles on
19 TV. Can you recall what they were and what they focused
20 on?
21     A.  No. I just read and watch what's on, you know.
22 I don't make it a point to watch it.
23     Q.  You don't dwell on it, but you've seen articles
24 about it?
25     A.  Right.

144

1      Q.  One of the last questions we asked is for you
2  to tell us what your neighbors would think about you or
3  how they would describe you. And you put, Caring and
4  loving. Are you real close with a lot of your
5  neighbors?
6      A.  Well, in all honesty, I thought about that
7  question; and I think it would depend upon who you ask,
8  what day.
9      Q.  Fair enough. Have you lived in the same area
10 for a long time?
11     A.  Yes.
12     Q.  And the neighbors that you have are fairly
13 well-established people that lived in the same community
14 for a long time?
15     A.  Some of them are.
16     Q.  So what exactly do you do as an expediter for
17 aircraft parts? Is this where you're sitting out back
18 and something goes wrong and you have to pull the plane
19 back?
20     A.  Well, yes and no. I don't work now. I don't
21 know if I wrote it that way.
22     Q.  I'm sorry. I missed something.
23     A.  I left Continental Airlines in '91, when they
24 had the big layoff in expediting. I worked at Hobby
25 Airport, and my job is to keep tabs on all the airplane

145

1  parts at our fingers and keep them coming and keep the
2  mechanics out in the garage supplied, and I had to keep
3  parts moving.
4      Q.  Is this a fairly challenging job?
5      A.  I enjoyed it. I talked to a lot of people, a
6  lot of places; so it was a rewarding job. I liked it.
7      Q.  And what do you do with your time now? Mostly
8  you do some gardening?
9      A.  I just wake up everyday and decide what I'm
10 going to do today.
11     Q.  Must be nice.
12     A.  It is.
13     Q.  You prefer that to the usual grind?
14     A.  Well, I may get bored and I may decide to do
15 something else. Last year I chose to pick up a grandson
16 every day from school, and I enjoyed it. Now this year
17 my husband is retired, so we're going to do something
18 different.
19     Q.  Have any plans? Are you going to travel at
20 all?
21     A.  We're going to travel some. And my husband
22 plays golf. I don't. But we're just going to wake up
23 every day and decide what we're going to do. We haven't
24 started yet.
25     Q.  Really my last questions are probably the most

146

1  serious. One of the things Miss Connors said to you
2  when she first started on her discussion with you, she
3  said, At the end of the evidence, we're going to be
4  asking you to assess the death penalty. Of course, that
5  presupposes a jury has found Mr. Mamou guilty at all;
6  and we're doing this part of the voir dire, or the jury
7  selection, to really concentrate on the death penalty
8  issue. Because as the Judge told you, if we don't think
9  about it now, somebody gets on the jury and has a
10 feeling one way or the other, that doesn't give both
11 sides a fair trial. It's all for naught. So that's why
12 we're only concentrating on that issue.
13         You'll be brought back on the 28th, I
14 believe, and we'll have a brief discussion with you
15 about maybe some other topics or other issues. But
16 that's why we're spending so much time on this. But I
17 want to ask you to think for a moment what we're asking
18 you to do if you sit on this jury and if the State does
19 convince you beyond a reasonable doubt that this
20 individual committed capital murder. Again, your
21 comfort level his important to us.
22         Are you comfortable with the scheme that
23 the Legislature has given you, as a jury, to determine
24 whether or not a person received the death penalty or
25 life in prison? In other words, these two questions

147

1   that are given to you --
2       A.  Yes.
3       Q.  -- if you were in the Legislature and you were
4   able to cast a vote to change the system, to do away
5   with perhaps the system that we currently have and
6   replace it with a different type of system, would you do
7   that?
8       A.  I would have to study long and hard on that.
9       Q.  All right.  Would you be the type of
10  individual, hypothetically, if you were in the
11  Legislature and you only had two choices -- one was that
12  everybody convicted of capital murder receives a
13  mandatory death penalty, or everybody that's convicted
14  of capital murder receives a mandatory life prison
15  sentence -- which of those two would you likely choose
16  if you were having to vote on either of those two?
17      A.  Well, if it had to be mandatory, I don't know.
18  I probably would lean more towards a life sentence.
19      Q.  Why do you think that might be?
20      A.  Well, I would hate to not have a choice.
21      Q.  What is it about the choice that makes you feel
22  perhaps more comfortable?
23      A.  Well, it would be a less drastic action to
24  take.
25      Q.  We want to make sure a jury understands two

148

1   very important factors.  Number One, you understand
2   fully if a person were to receive a life sentence for
3   capital murder, mandatory day for day, forty years of
4   their life, before they even become eligible for parole,
5   as the Judge said, that's 2039.
6           The other thing is, it's important for me
7   to just see how you feel about, I guess, the prospect of
8   you actually having to sit in a case like this.  This is
9   kind of the hypothetical.  It's quiet.  We do it
10  individually.  Is there anything at all that we need to
11  know that would cause us to be uncomfortable with you
12  taking a seat with eleven other people and ultimately
13  deciding a case of this magnitude?  Anything at all you
14  are the least bit uncomfortable with in terms of your
15  ability to make the decisions, whatever they are, time
16  constraints that you have, anything?  It's that global
17  question we always try to ask prospective jurors to give
18  them a fair opportunity to say, hey, you didn't ask me
19  this; and I think either one of you should know about it
20  before deciding whether I stay or go.
21      A.  I don't know of anything.
22      Q.  Do you have any questions of me?
23      A.  No.
24      Q.  Okay.  Thank you.
25          (Court admonishes juror.)

149

1                   (Lunch recess.)
2                 TRACI LEE KARAM,
3   having been first duly sworn, testified as follows:
4                VOIR DIRE EXAMINATION
5   BY THE COURT:
6       Q.  I have a question.  It is my perception that
7   the name, Karam, is not that common a name.  Are you any
8   relation to George --
9       A.  No.
10      Q.  -- who's a lawyer in town?  He's a friend of
11  all of ours.
12      A.  No.
13      Q.  Well, then we like you even better.  Miss
14  Karam, before we begin, let me ask you to remember back
15  to Friday and the things we talked about that day, and
16  to this morning, what we talked about.  Out of
17  everything we have talked about so far, do you have any
18  questions at all from me?
19      A.  No.
20      Q.  Anything so far that we have not addressed that
21  you feel as though we should talk about because it might
22  have some bearing on your service as a juror in this
23  case?
24      A.  No.
25      Q.  Anything about your personal life, your

150

1   professional life, or health, or any other thing for
2   that matter, that you can think of that might in any way
3   interfere with your ability to be a juror in this case
4   during the time frame we've talked about?
5       A.  No.
6       Q.  The rules we talked about that potentially
7   could come into play, out of what you heard to this
8   point, do you have any disagreement with any of the
9   rules we talked about?
10      A.  No.
11      Q.  So if you were a juror, then, if I'm hearing
12  correctly, you could both follow, as well as enforce
13  those rules?
14      A.  Yes.
15      Q.  We spent some period of time this morning on --
16  or hopefully, we did -- for the purposes of
17  accomplishing the notion or the understanding that each
18  of the decisions that a jury makes is independent of
19  this decision that they just previously made; meaning,
20  however, the way you answer one question does not, in
21  and of itself, dictate what the answer to the next
22  question should be.  Instead, you always go back to the
23  body of evidence when you view the evidence from the
24  standpoint of what that particular question asks of you.
25  Does that make sense to you?

151

1    A.  Yes.
2    Q.  The idea being that starting off a trial, a
3    guilty verdict, not guilty verdict, they're both
4    equally -- both equal options.  Whichever one it would
5    be would have to depend upon the evidence in the case
6    and how a jury evaluates it.
7         Likewise, at the second phase of the
8    trial, the concept is that life and death are both
9    available sentencing options, whichever one is
10   appropriate.  The jury, we assume -- we hope that you
11   would select whichever one is appropriate based on how
12   you viewed the evidence in the case.  And some cases
13   deserve life; some cases deserve death.  Which this one
14   deserves, we'll never know till after all the testimony
15   is in.  Does that make sense?
16   A.  Yes.
17   Q.  Before we begin, do you have any questions of
18   me?
19   A.  No.
20   Q.  Well, just relax.  We're not going to be much
21   longer.
22        THE COURT:  Mr. McClellan.
23             VOIR DIRE EXAMINATION
24   BY MR. MCCLELLAN:
25   Q.  Miss Karam, my name is Lyn McClellan.  Along

152

1    with Claire Connors, we represent the State of Texas in
2    this case.  I want to go over your questionnaire and
3    some of your answers that you gave there and follow up
4    on some of those answers, and then I want to talk to you
5    about how certain aspects of the law may apply in this
6    case and see what your thoughts are about that.
7         First of all, you filled out this
8    questionnaire several days ago.  You've had some time
9    over the weekend to be thinking about it.  Whether you
10   did or not, I don't know.  But have you thought -- any
11   of your thoughts changed, that you know of, having
12   thought about being a juror, or anything --
13   A.  No.
14   Q.  -- that we need to know about?
15   A.  No.
16   Q.  From reading your questionnaire, it appears
17   that you're the type of person who believes the death
18   penalty is appropriate for certain kinds of cases?
19   A.  Yes.
20   Q.  What kinds of cases come to your mind when you
21   think of cases where the death penalty ought to be
22   available as a form of punishment?
23   A.  Cases where the criminal has shown to have no
24   remorse, and it's been a case where a criminal has
25   killed somebody without any kind of remorse, or somebody

153

1    who does it intentionally.  Also, if it's also been
2    several crimes where this has happened, if they've been
3    a convict, ex-convict that comes back out again, or just
4    somebody who has been involved in criminal activity for
5    a while.
6         Q.  Now you know from listening to the Judge's voir
7    dire that murder is the intentional taking of another
8    person's life without any legal justification.  By that
9    I mean, it's not someone who acts in self-defense.  It's
10   not someone who does it by accident.  It's when you
11   intend to kill someone and do so.
12        And for the offense of murder today, the
13   death penalty does not apply unless it's during the
14   course of committing some other type of crime.  What we
15   have alleged here is murder during the course of a
16   kidnapping.  There are other crimes, also, that could
17   constitute the offense of capital murder.  But just for
18   the offense of murder itself, the death penalty doesn't
19   apply in our state.  Some people think it shouldn't.
20   Some people think it ought to be expanded.  We're trying
21   to get what your feelings and thoughts are.
22        If you become a juror, though, you -- you
23   may have, depending on what your thoughts and opinions
24   are, to set aside certain of your opinions and beliefs
25   and what the law says and what the evidence is in the

154

1    case.  Every juror must take an oath that they will a
2    true verdict render based on the law that's given to
3    them by the Court in the form of a written charge.  It
4    will be a several-page document that will set out the
5    elements of the offense, define certain terms, tell you
6    what murder is, tell you possibly about self-defense,
7    talk about beyond a reasonable doubt and the definition
8    thereof, and then take that law and apply it to the
9    evidence that you're the judge of; because you'll get to
10   listen to all the witnesses.  And you can believe all,
11   part, or none of what a witness says.  You take those
12   two things and put them together and make your decision.
13   It might be a different decision than that, if we had
14   not given the law, that you might have arrived at, okay;
15   because the law will set out certain guidelines and
16   restrictions.
17        For example, some people say -- and I know
18   you put that down as a good argument for the death
19   penalty -- that basically, if you take another person's
20   life, you ought to also give your life, an eye for an
21   eye deal.  And that's a philosophy some people have.
22   And you put that down as the best argument for the death
23   penalty.
24        But you now know from the way the system
25   is set up that we don't have any kind of crime in the

155

1  State of Texas where you automatically get the death
2  penalty for having committed that crime. Instead, there
3  is two parts of a trial. There is guilt/innocence. Did
4  they commit the crime? And then the punishment stage.
5  What punishment should they get for the crime we have
6  found they committed? And there is not anything
7  automatic for the death penalty. So the eye for an eye
8  situation, if you believe in that, you have to set that
9  aside if you're a juror, if you can, and a true verdict
10  render based on the law and the evidence. Are you the
11  type of person that could, if you have that opinion, set
12  it aside and follow the law?
13      A. Yes. This is a real learning experience for me
14  just these past couple of days, all that stuff I had
15  never even thought of before, so yes.
16      Q. And you would have no reason to, because that's
17  something that, unless you're in a jury situation, you
18  wouldn't know about. And I think the reason a lot of
19  people come up with they believe in an eye for an eye is
20  because when they think of capital murder or when they
21  think of murder, they're thinking then of a very heinous
22  situation.
23          As the Judge told you, there could be
24  thousands of fact situations that could constitute
25  murder or thousands of fact situations that could

156

1  constitute capital murder. And they're not all equal,
2  and that's why the law is set up with those questions.
3  If we're just sitting there as everyday citizens, we
4  think it's something horrible and say, well, if they do
5  that, they ought to get this. But you're applying that
6  to certain facts.
7          Here we know -- now know to be a juror,
8  you have to wait till you hear the facts. And
9  repeating, are you the type of person that could keep
10  your mind open until you hear the facts?
11      A. Yes.
12      Q. I want to talk about the punishment stage of a
13  capital murder case, because this is the only time we
14  get an opportunity to do that. And I don't mean to
15  slight the guilt/innocence stage, but the punishment
16  stage is uniquely different than any other punishment
17  stage in any other type of crime.
18          Before you get to the punishment stage of
19  the trial, though, you would have first had to have
20  found someone guilty of capital murder. Otherwise, you
21  don't get there. Find him not guilty, we go home. But
22  finding someone guilty of capital murder means, in fact,
23  you would have found that whoever was on trial that
24  you're sitting in judgment of intentionally took the
25  life of another person without any legal justification

157

1  during the course of kidnapping. If we prove this
2  beyond a reasonable doubt, you find the defendant
3  guilty.
4          The second stage of the trial, the
5  punishment stage, you may now hear additional evidence
6  over and above what you heard about the crime itself;
7  because you're going to hear evidence about the
8  individual that was not necessarily relevant to whether
9  or not he committed the crime. It would be entirely
10  relevant to what punishment he should receive for the
11  crime you have found him guilty of. So that's where you
12  get to hear about the background, character, criminal
13  history, or lack thereof, mental abilities or
14  disabilities, all kinds of things about the individual,
15  himself, to aid you in answering these Special Issues so
16  when you finish with all the evidence, you'll have two
17  bodies of knowledge.
18          One is the facts of the crime itself that
19  you can use in answering these issues, and then the
20  facts about the individual that you can use in answering
21  this question. Issue Number One then -- and keep in
22  mind you never get there until you've found someone
23  guilty of capital murder.
24      A. Uh-huh.
25      Q. Issue Number One says: Do you find from the

158

1  evidence beyond a reasonable doubt? Well, that's a clue
2  right there that it's an automatic answer, if there is
3  one, and that the reason is that unless we prove to you
4  beyond a reasonable doubt that there is a probability of
5  him being a continuing threat to commit future acts of
6  violence, you answer no, just like the automatic answer
7  being at guilt/innocence was not guilty unless and until
8  we prove to you beyond a reasonable doubt that he's
9  guilty. Okay. And that's the only kind of automatics
10  that are going to be. The automatic of fact is always
11  going to be to the benefit of the defendant.
12          So, the burden of proof is on us to prove
13  beyond a reasonable doubt that there is a probability.
14  Doesn't say a possibility, because anything is possible.
15  It's possible to win the lottery tomorrow night. It's
16  very unlikely, but it's possible. And it doesn't say
17  certainty. It says probable, which is more likely than
18  not.
19          So, is there a probability, or more likely
20  than not, that this person who we've found guilty of
21  capital murder, and after having heard about his
22  criminal history, or lack thereof, and his character and
23  background, is there a likelihood that he would commit
24  criminal acts of violence? Doesn't have to be another
25  murder or capital murder. Could be anything criminal in

159

1  nature that constitutes a continuing threat to society.
2        Some people say, well, if I found a person
3  guilty of capital murder, I would always think, every
4  time, that he would be a continuing threat to commit
5  future acts of violence.  Well, I suggest to you that,
6  first of all, you know that's not what the law says;
7  because the law says it's for us to prove beyond a
8  reasonable doubt.  And the facts of the case itself may,
9  in certain circumstances, prove -- in addition to his
10 guilt -- may also prove he was a continuing threat.
11        There may be the other cases where the
12 facts prove he was guilty of capital murder, but don't
13 prove he was a continuing threat to society.  Could be
14 the first time the person's ever been in trouble with
15 the law.  Could have been a choirboy, straight-A
16 student, Boy Scout-type situation.  This is a total
17 aberration from his life, what he did in that case.
18        On the other extreme, as you say, maybe
19 people who go in and out of the penitentiary, kind of a
20 treadmill.  They get worse and worse as we go along.  So
21 you have to wait and hear all the facts and
22 circumstances not only about the crime, but of the
23 individual; because that could be very influential in
24 deciding the answer to Issue Number One.  Do you have
25 any problem with that?

160

1    A.  No.
2    Q.  So if I were to tell you someone is guilty of
3  capital murder, can you tell me what punishment they are
4  going to receive?
5    A.  If they're guilty, it could be either life or
6  death.
7    Q.  Right; and that's correct, either life or
8  death.  And that would depend upon not only the facts of
9  the crime, but about the individual here.  If you answer
10 that question yes, Issue Number One yes, then the
11 defendant is going to receive the death penalty.  In
12 Issue Number Two, this question does not start out, Do
13 you find from the evidence beyond a reasonable doubt?
14 There is no burden.  It asks you to stop now, since
15 you've already found him guilty, found he's going to be
16 a continuing threat to commit future acts of violence,
17 and reevaluate everything we've had so far.  Because it
18 asks you to take into consideration the facts of the
19 crime, the defendant's character and background.
20        The facts of the crime would be what you
21 heard at guilt/innocence.  Character and background
22 would be what you heard at punishment, and the
23 defendant's personal, moral culpability.  I like to
24 refer to it as his personal responsibility.  Was he a
25 getaway driver in this situation, or was he the actual

161

1  person who might have killed someone?
2        And then the term, Are there sufficient
3  mitigating circumstance or circumstances -- sufficient
4  reasons, if you will -- why this person ought to receive
5  life as opposed to death?  Now what its asks you to do
6  then is go back and evaluate all the evidence, think of
7  it in your mind.  You weigh it as to whether or not you
8  think it's mitigating; in other words, give life as
9  opposed to death.
10        And then you determine if it's mitigating.
11 Is it sufficiently mitigating to change my answer?  If
12 it is, you change your answer.  Answer that question
13 yes, and he receives a life sentence.  If you don't
14 think the mitigating factors are sufficient, you answer
15 no and he receives the death penalty.  Any problem with
16 that aspect?
17    A.  No.
18    Q.  To give you an idea of what they're asking on
19 Issue Number One, it asks you to go back and examine all
20 the evidence.  Well, you may recall then,
21 hypothetically, that you had a case where you might have
22 said, well, I remember hearing during the course of the
23 crime that we found him guilty of, he was high on drugs
24 or alcohol.
25        Juror Number 1 may say, I think that's

162

1  mitigation towards a life sentence; because when you get
2  high on drugs or alcohol, you do things you wouldn't
3  ordinarily do.  Juror Number 2 says, I don't think it
4  should have that effect; because when you get high on
5  drugs or alcohol, you might go out and commit that same
6  crime again.  Or I've known people high on drugs or
7  alcohol before, and they didn't go out and commit
8  capital murder.  So what caused this guy to do that?
9  Must be something more to it than that.
10        Two people looked at the very same
11 evidence and came up with different opinions.  That's
12 okay; because that's what that question asks you to do,
13 is for you to look at the evidence, you know, weigh it
14 in your mind, and you decide what effects it should be.
15 Any problem with that aspect.
16    A.  No.
17    Q.  Going back, you say, well, the evidence shows
18 the person on trial was a young man.  I think age ought
19 to be a mitigating factor.  Somebody else may say, I
20 don't think age has anything to do with it.  But you're
21 examining it and weighing it in your mind and
22 determining what effects.  Same thing about a person's
23 mental abilities.  Maybe he's a special ed student.
24 Some people think that's mitigating.  Some people say, I
25 know lots of people that are special ed students, and

163

1   they don't go out and commit capital murder.
2       All it's asking you to do is go back and
3   look through all the evidence. It gives you the
4   opportunity to change the vote from death to life if you
5   think it's warranted by sufficient mitigating
6   circumstances. If you don't think it's warranted, then
7   you don't change. Any problem with that aspect?
8       A. No.
9       Q. As you know, there is no crime where you
10  automatically get the death penalty. You've got to go
11  through and make this type of analysis. And even though
12  the extent -- let's say, okay, you've found someone
13  guilty of capital murder. Let's say you found on Issue
14  Number One they're a continuing threat to commit future
15  acts of violence. Somebody may say, that sounds like
16  the purpose of the death penalty.
17      But you still have to go to Issue Number
18  Two. Are there reason or reasons that this person
19  should receive life as opposed to death? You're
20  committed to go through and look and see if it's there.
21  If it is, give effect to it, whatever effect you think
22  it should have. Any problem?
23      A. No, I understand that more now than what I did
24  before.
25      Q. So, even if someone is found guilty of capital

164

1   murder, and even if you find Number One, he's a
2   continuing threat to commit future acts of violence, are
3   you saying you're still open to Issue Number 2 in going
4   back and examining that evidence fairly and accurately
5   and making your decision?
6       A. Yes.
7       Q. Now you indicated, also, you had a brother in
8   law enforcement?
9       A. Yes.
10      Q. Harris County or somewhere else?
11      A. He was with Montgomery County and with Conroe
12  Police.
13      Q. Is he still in law enforcement?
14      A. No.
15      Q. Anything about having a brother in law
16  enforcement that makes you feel akin to the State or
17  that would keep you from being fair to the defendant?
18      A. No.
19      Q. You also indicated and shared with us that
20  you've had panic disorders before?
21      A. Yes.
22      Q. And we have a friend of ours that's a D.A. who
23  suffers from the same situation; and under medication,
24  that's not a problem. And that's what I understand
25  through your questionnaire, that treated with

165

1   medication, it does not create problems?
2       A. I never took medication. I went to counseling
3   for two years, and I got it under control that way.
4       Q. Being in a situation on a capital murder jury,
5   you're asked to make a very, very important decision,
6   probably the most important decision you're going to be
7   asked to make in your life. Any concern on your part
8   that would ever cause any kind of a problem?
9       A. No, because it wasn't circumstances like that
10  that would set it off. It's totally different.
11      Q. Very good. When you go back to the
12  questionnaire and you were asked to fill out the
13  questionnaire, there was some agree/disagree statements.
14  One of the things said, Any person, man or woman, young
15  or old, who's guilty of capital murder should pay with
16  their own life. You checked that you agreed with that.
17      Now, somebody could read that and say, any
18  person -- well, we're all either a man or a woman, and
19  we're all either young or old. So that means everybody
20  that's guilty of capital murder should pay with their
21  own life. Somebody else might read it to be, it doesn't
22  make me a whole lot of difference whether it's a man or
23  a woman, if they're young or old, the crime deserves it;
24  that's what ought to happen to it?
25      A. Yep.

166

1       Q. What is your thought?
2       A. The second one, it doesn't matter; male,
3   female, young, old. After going through the process, I
4   think whatever the circumstances are --
5       Q. Right. There was another that said, Do you
6   feel that the death penalty is used too often or too
7   seldom? You said, Too seldom. Too many murders get a
8   life sentence, which usually gets them out of prison in
9   twenty years or less.
10      Now you know the Judge told you it's forty
11  years, day for day. So if this defendant, or any other
12  defendant, would be sentenced to life imprisonment for
13  capital murder, it would be 2039 before they would be
14  eligible to be considered for parole. I assume now that
15  you know it's not going to be twenty years, that that
16  would not affect your decision on any of these
17  questions.
18      A. No.
19      Q. And, of course, there is a question there that
20  says, The death penalty is appropriate for every
21  intentional murder. Of course, that's the only kind of
22  murders there is, intentional murders. There is not an
23  accidental murder or self-defense murder; but you know
24  now for the offense of murder, the death penalty is not
25  applicable. It's murder plus some other type of crime.

167

1  Any problem following that aspect of it?
2      A.  No.
3      Q.  Let's say I were to ask you, tell me a reason
4  why I would want you to be -- being the State of Texas
5  is seeking the death penalty -- why I would want you as
6  a juror?
7      A.  I wouldn't say just you.  I would say I think
8  I'm very impartial and I'm open, and I won't come into a
9  trial and presume somebody's guilty.  I think it's the
10  job of the defense to give the person a right to a fair
11  trial and the prosecutor to find out the truth for the
12  truth to come out.
13      Q.  Okay.  Two things in that regard.  You're
14  right.  It is the defense's job to give the defendant a
15  fair trial, and I thought you were going to say to prove
16  something.  And you didn't say that, but it brings up a
17  point.  The burden never shifts to this side of the
18  table.
19          Now you might go to this second question,
20  Issue Number Two, reasons why the defendant ought to
21  receive life as opposed to death.  And logic would
22  indicate to me, I would expect logically they're going
23  to come up and try to convince me of that, that he ought
24  to get life as opposed to death.  But the law doesn't
25  require me producing that evidence.  That evidence might

168

1  have come from all kinds of things.  May come from
2  medical records we introduced into evidence.  It may
3  come from school records.  It could come from anything.
4          There is no burden for them to present
5  evidence, and there is no burden for them to do
6  anything.  The burden is always on us.  And if we don't
7  meet our burden, you would have to follow the
8  appropriate aspect of the law.  If we do meet our
9  burden, you have to follow the appropriate aspects of
10  the law.  But you need to understand, there is no burden
11  on their side to call witnesses.  Defendant doesn't have
12  to testify.  They don't have to bring anyone in.  If
13  they do, you have to weigh it like you would any other
14  evidence.
15          Now our burden is to prove the case beyond
16  a reasonable doubt.  I suggest to you I could never
17  prove a case beyond all doubt or a hundred percent
18  certainty.  I just can't do that.  And there will always
19  be questions in someone's mind, almost in every criminal
20  case, that may not get resolved.  The issue is, has the
21  State proven beyond a reasonable doubt that the
22  defendant is guilty, as charged in the indictment?  If
23  that is proven beyond a reasonable doubt, you find the
24  defendant guilty.  Do you have any question why a
25  defendant doesn't testify?  Because as long as you don't

169

1  use that evidence or talk about it in considering your
2  deliberations, there still may be something in your
3  mind.
4          Or you may ask, Why didn't the State call
5  this witness that I'd like to have heard from?  Well,
6  it's fine.  You may have wondered about that.  But if
7  the State proves its case beyond a reasonable doubt, if
8  we did, you'd have to find the person guilty.  I
9  understand it's a search for the truth, but there may
10  still be some unanswered questions.  There is going to
11  be some unanswered questions that will go on for a time.
12  The issue is, did we prove our case beyond a reasonable
13  doubt?  Any problem with that aspect?
14      A.  Nope.
15      Q.  Thank you, ma'am.  I appreciate your time.
16  I'll pass you.
17          THE COURT:  Mr. Hill.
18              VOIR DIRE EXAMINATION
19  BY MR. HILL:
20      Q.  I can't see you.  As I'm looking at your
21  questionnaire, a couple of things pop out at me that I
22  think I should touch base on with you.  Number 46 asks
23  whether a person's use or sale of drugs would prevent
24  them from having defenses commonly relied upon by other
25  people that might not be using drugs.  And you said,

170

1  Everyone has a right to a fair trial.  What does that
2  mean to you, personally?  And why would it be important
3  for everyone to have a fair trial?
4      A.  Well, because you have to be proven by somebody
5  else, just like it's the State's -- that's what they
6  have to prove that you did something.  You don't have to
7  be the one that says he is -- you don't have to come out
8  and say, I didn't do it.  But as far as everybody,
9  that's the way our country is run.  You have a right to
10  come out and try to show your innocence, if you are
11  innocent.
12      Q.  Let me ask you something.  What about cases
13  that you hear about?  And maybe you're hearing about
14  them as the case is being shown on TV or something.
15  But think of the most horrific case you can think of.
16  Have there ever been times when you thought, why is this
17  person then having a trial?  Why even have a trial?
18  The facts are so obvious, the facts are so heinous.
19  Would it still be important in those kinds of cases to
20  have a fair trial?
21      A.  Yes, or there would be too many people being
22  thrown in jail and stuff for something they might not
23  have committed.  I think there has to be something.
24      Q.  You're comfortable then with the concept that
25  the State has the burden of proof, and that if you and

171

1    eleven other people sit, you have to listen to all of
2    the evidence.  If you don't believe the State has met
3    their burden, would you be comfortable entering into a
4    finding with eleven other people that says the defendant
5    is not guilty?
6        A.  Yes.
7        Q.  You mentioned about that the State should be
8    seeking the truth or be able to establish the truth.  Is
9    there a difference in your mind between a person being
10   found not guilty and a person being innocent, or are the
11   two the same thing?
12       A.  That's kind of enough.
13       Q.  I'm not trying to trick you.  I'm trying to
14   make some distinction that a jury might have to be
15   called upon to make.
16       A.  Right.
17       Q.  Innocence, to me, is really a moral term.  If a
18   person is truly innocent, that means they had nothing to
19   do with the committing of a crime, whatever that crime
20   might be.  Either they weren't there; or if they were
21   there, they had absolutely nothing to do with it.  Guilt
22   beyond a reasonable doubt is a legal phrase or legal
23   term that places the burden on the State.  So you could
24   have cases where the State has presented a lot of
25   evidence, and the jury may have a considerable dispute

172

1    as to whether or not the State has proven a case beyond
2    a reasonable doubt.
3            Some people may be saying, I think he was
4    involved in this.  It's not a question of, quote,
5    "innocence."  It's the question of, has the State proven
6    their case beyond a reasonable doubt?  And I always want
7    to ask you, are you uncomfortable?  Jurors are
8    uncomfortable with the probability, the possibility, the
9    likelihood of having to serve on a jury and maybe make
10   those kinds of distinctions.  Are you okay with that?
11       A.  Yes.
12       Q.  When I read your questionnaire -- I realize we
13   ask you a lot of questions in a vacuum.  You don't know
14   what the process is, but it usually gives you a feel for
15   a person's first reaction to the situation.  It says,
16   what are the best arguments for the death penalty?  An
17   eye for an eye.  If you take someone's life, not by
18   accident but premeditated, you should be sent to your
19   death for payment.
20           My next question is:  It said, what are
21   the best arguments against the death penalty?  And you
22   said, none.  Is there any kind of argument you could
23   make if you were being called upon to make arguments
24   against the death penalty, or do you just have a very
25   strong feeling about the appropriateness of the death

173

1    penalty in today's society?
2        A.  Well, I think the mitigating circumstances that
3    we've talked about would come into play, as far as we
4    talked about the mental problems, or maybe abusive
5    parents, or something like that, different circumstances
6    that might come into play.  Now that would maybe help
7    you to understand why this happened, why this person
8    killed somebody, that, you know, they need to be
9    punished for it.  They need to pay their price.  But
10   maybe life isn't the best answer for that at all, you
11   know; meaning, to take their life isn't the best answer.
12       Q.  You know, many times we hear people getting
13   quite upset when they read in the paper about the
14   punishment stage of a capital murder trial.  And the
15   defense lawyer might be producing evidence about a
16   person's background, a person's upbringing, whatever the
17   facts might be, whatever the circumstances might be.
18           And people say, oh, yeah, he had a bad
19   childhood.  That excuses him from killing somebody.  Do
20   you understand if you were at the punishment stage of a
21   capital murder trial, you have not excused the conduct.
22   You have found them guilty of capital murder.  And what
23   do you think is the best thing that could happen at that
24   point, having been found guilty?  What is the best
25   possible outcome?

174

1        A.  For the person?
2        Q.  For the defendant at that point?  To get life
3    in prison, it's not going to get any better than that.
4    And the only option to the jurors would be life or
5    death.
6        A.  Right.
7        Q.  A lot of jurors have come thinking that, well,
8    if a person, you know, is found guilty of capital murder
9    and doesn't get the death penalty, maybe they're going
10   to get ten years; maybe they're going to be on
11   probation; it's automatic.  If a jury and eleven --
12   twelve of you say, We, the jury, find the defendant
13   guilty of capital murder, as charged in the indictment,
14   that person has a life sentence unless you decide to
15   give him the death penalty.  Nothing better happens.
16   We want to make sure the jury understands that so there
17   is no misconception.  We don't want people, quite
18   frankly, going back in the jury room and speculating as
19   to what might have happened.  You know, going in,
20   that's why the Judge told you life for capital murder is
21   forty years, day for day; no good time, no early
22   release, nothing like that.
23       A.  Uh-huh.
24       Q.  And Mr. McClellan asked you -- because in your
25   questionnaire you put, They usually get twenty years and

175

1  they're out?
2      A.  Uh-huh.
3      Q.  He said, Now knowing that it's forty years, is
4  that okay?
5      A.  Uh-huh.
6      Q.  Do you still feel like forty years is not a
7  significant amount of time, or would that impact at all
8  on your decision in answering those two questions?
9      A.  No, I think that makes things a lots more clear
10 to me.  And, also, I would say before I came to this
11 that I would be more of a proponent for the death
12 penalty than what I am right now.
13     Q.  Let's make you a legislator for a day.  I don't
14 know if you've ever been interested if politics.  You're
15 out there and your constituency, and they're wanting to
16 know what type of laws you could pass in Texas to
17 address capital murder cases.
18     A.  Uh-huh.
19     Q.  And you're going to try to tell them every
20 person that's convicted of capital murder gets the death
21 penalty, or every person that's convicted of capital
22 murder gets life in prison automatically, or something
23 else.  Which of those three positions would feel most
24 comfortable to you, now knowing how the system works?
25 Would you change the system?  Would you make it

176

1  mandatory one way or the other, or do you feel okay with
2  the way it is?
3      A.  I feel okay with the way it is.
4      Q.  You think it gives you sufficient discretion --
5      A.  Yes.
6      Q.  -- as a member of the jury, to consider
7  everything?
8      A.  Yes.
9      Q.  One of the things that you point out in your
10 questionnaire is if a person didn't show any remorse.
11 How might that manifest itself?  How might somebody show
12 remorse, having been found guilty of taking a life
13 intentionally?  How did you -- help me to understand in
14 some ways how that would be reflected to you.
15     A.  As far as being on a jury?
16     Q.  Yeah, as you're sitting there looking at the
17 facts, you're listening to witnesses.  And obviously, if
18 remorse is coming into it, we're talking about the
19 punishment stage of the trial.
20     A.  Right.
21     Q.  So if a person is found guilty of capital
22 murder, you found they intentionally killed someone.
23 How would remorse kind of show itself?  Do your best.
24 How would a person show remorse?
25     A.  Somebody possibly crying would be the first

177

1  thing, somebody showing emotion.
2      Q.  Let me ask you about this situation.  Is it
3  possible that a person could have remorse for events
4  having occurred, yet they maintain they didn't feel they
5  were responsible for the events?  Example, you could
6  have a case where the issue of self-defense comes up.
7      The Judge told you, clearly, if you found
8  the person acted in self-defense, even if he took
9  another person's life, that's justified.  You have a
10 right to self-defense.  If you're walking out to your
11 car this afternoon, somebody comes up and takes a knife
12 out, says, give me your car, and you happen to have a
13 gun or something and you use it to kill that person,
14 you're justified.  If by chance you should get charged
15 with some offense of murder, you would have a right to
16 rely upon self-defense.
17     A.  Uh-huh.
18     Q.  What happens in those cases where the facts are
19 a little bit muddled, there is maybe an imperfect
20 self-defense.  It's close, but the jury ultimately
21 doesn't feel the person did act in self-defense.  Do you
22 see where somebody might be trying to express to the
23 jury that they felt they were justified in acting the
24 way they did, but the jury ultimately concluded that
25 they were not, that under the law, the jury didn't feel

178

1  self-defense was an issue.  Would a person have to
2  express some type of remorse in that situation?  In
3  other words, for the circumstances to be --
4      A.  I think if somebody was in a situation where if
5  he had acted in self-defense, but if they were charged
6  in capital murder, if they weren't the one that actually
7  killed the person, you would still think you would show
8  some kind of remorse.  Because I think if somebody had
9  been around somebody and you saw them die, you saw them
10 get killed, you would still feel sorry that you were a
11 part of it in some way.
12     Q.  That's my whole point.  Can you feel sorry you
13 were part of it, but not offend the jury and say, I felt
14 like I was justified in taking the person's life?
15     A.  I understand what you're saying, and it would
16 have to be what would come up in the trial, all the
17 evidence that would come up in the trial to point that
18 way.  I can see if you saw that somebody did seem to act
19 in self-defense, they're possibly not going to be as
20 emotional; they're not going to show that much remorse,
21 because they're thinking, I didn't do anything.
22     Q.  That holds them criminally responsible, and the
23 jury rejects that position.
24     A.  Right.
25     Q.  Says, no, we've listened to everything, and we

179

1  don't think you have that right.  Let me go back to this
2  question about that.  We asked whether or not if a
3  person uses drugs or sells drugs, do they lose their
4  right to rely upon certain defenses?  And that's where
5  you write, Everybody has a right to a fair trial.  Do
6  you have any difficulty with that?  Would that be
7  something you feel should not be extended to a
8  defendant?  In other words, if somebody were using or
9  selling drugs -- in other words, they're violating one
10  law.
11     A.  Uh-huh.
12     Q.  But the circumstances of a situation show they
13  were entitled to rely upon self-defense, accident,
14  whatever the legal issue might be.  Are you okay with
15  the fact somebody could be violating one law, yet it
16  doesn't take away their right to rely upon other --
17     A.  Yes, it's totally separate.
18     Q.  For some people, it's real cut and dried.  For
19  them, if you're doing anything wrong, you don't get to
20  rely on any defense.  So tell me, the learning
21  experience you reflected on, was it a good learning
22  experience a bad one?
23     A.  I think it's bad.  I'm going to be
24  thirty-eight, and I've never been called on jury duty
25  before, so --

181

1     Q.  Was there ever any discussion between you and
2  him about the difference between Muslim law and other
3  aspects?
4     A.  Yes.
5     Q.  Was Muslim law a lot more strict?
6     A.  Yes.
7     Q.  And absolute?
8     A.  Yes.
9     Q.  Are you more comfortable outside of that type
10  of religious feeling --
11     A.  Yes.
12     Q.  -- than you would have been?  Well, the
13  prosecutor's asked you questions about what -- you know,
14  whether or not it would be a good choice for them to
15  choose you as a juror; and we'll give you a opportunity
16  to tell us whether or not there is anything at all you
17  can think of, because I can't hope to know you as well
18  as I'd like in fifteen or twenty minutes.  But is there
19  anything I haven't asked you, something you say, Look,
20  Mr. Hill, I believe everybody is entitled to a fair
21  trial.  And this is a piece of information about me, or
22  who I am, that you should know about before you make a
23  decision of whether I should sit here with eleven other
24  people?
25     A.  I can't really think of anything on the spot.

180

1     Q.  I want to ask this question.  But if it's
2  something that is too personal to answer, that's fine.
3  But obviously, twelve people are going to be sitting
4  here.  It could be a very stressful situation to go
5  through jury service.  And you indicated at one time you
6  had some panic attack disorders.  Is there anything we
7  need to know?  Because obviously, I'm sitting here
8  going, well, I'm trying to figure out what it is that
9  could have set them off, if it was something personal,
10  if you had ever been involved in a situation where you
11  had been the victim of a crime or something where this
12  is going to trigger something, being on a jury like
13  this?
14     A.  No, it was never anything like that.
15     Q.  You don't think it has anything to do with your
16  ability to sit on this case?
17     A.  No.
18     Q.  You indicated -- you said you were married to a
19  Muslim at one time.  Now you just believe in God, not a
20  certain religion.  That suggests you lead kind of a
21  moral life, right from wrong, and you do everything
22  you're supposed to do.  You don't go out of your way to
23  offend the law, right?  How long ago were you married to
24  your husband?  How long ago did you divorce?
25     A.  I've been divorced seven years.

182

1  I know I've always been impartial.  I've never taken one
2  side to anything without knowing first of the facts, you
3  know.  And I don't like to prejudge people.
4     Q.  Okay.  If this is your first go round on a
5  jury, you're going to be getting the brass ring the
6  first time around.  Is there anything at all about that
7  that is uncomfortable to you?  And you recognize the
8  magnitude of the kinds of decisions you're going to be
9  making?
10     A.  Uh-huh.
11     Q.  You feel pretty comfortable both sides would be
12  well-suited in having you sit on this case?
13     A.  Yes.
14     Q.  Do you have any questions of me?
15     A.  No.
16         (Court admonishes juror.)
17         JOSEPH MICHAEL MATHEWS,
18  having been first duly sworn, testified as follows:
19         VOIR DIRE EXAMINATION
20  BY THE COURT:
21     Q.  Mr. Mathews, thank you for bearing with us.  I
22  know it's been a long day for you, and it has been for
23  us, too.  I'd ask you, Mr. Mathews, to remember back to
24  last Friday, the things we talked about then, and to
25  this morning, the things we talked about.  Out of

183

1 everything that we have talked about so far, do you have
2 any questions at all for me?
3     A.  No.
4     Q.  Is there anything to this point, sir, that we
5 have not yet addressed that you feel as though we ought
6 to spend some time talking about because it might have
7 some bearing on your service as a juror?
8     A.  I guess one thing I was going to ask you, I
9 guess, when we got to this point or whatever, I'm a tax
10 accountant.  And in particular, I do estate taxes.  This
11 is definitely prime time for me.  I'm at a new job,
12 first year.  I've got seven contractors under me that
13 have never worked under my supervision.  Is there any
14 way I could get out of service by that being an excuse,
15 not being able to serve on this jury, but maybe on
16 another one?
17     Q.  I recognize, and all of us recognize, quite
18 honestly, Mr. Mathews, that sometimes some things simply
19 don't fit; and had it been six months later, they would
20 have fit perfectly.  We all recognize that.  But bottom
21 line question is, as I view it, is going to be this:
22 You will know from what we said that we're going to
23 spend today.  After today we may ask you back a week
24 from tomorrow, because it's on that day we would have
25 created our pool.  And on that day the lawyers will

184

1 determine, within that pool of the forty-five or
2 forty-eight people, who the twelve jurors are going to
3 be.  So right there, you see, you only have one chance
4 out of four being a juror.  Might not be the best
5 chance.  And I'm not predicting or projecting.  That's
6 up to the lawyers.
7         But if you do become a juror, we're going
8 to start the testimony in the case on Monday, October
9 the 4th.  It's going to basically be about a 10:00 to
10 5:00 operation.  We know it will last for a week.  We're
11 satisfied it won't last for as much as two weeks.  Now
12 with that in mind, and recognizing also that you have
13 your own interests to accommodate, too, is it something
14 you feel you can juggle?
15     A.  Yeah, I think so.
16     Q.  I mean, it might be an inconvenience.  But can
17 you overcome the inconvenience, and are you willing to
18 make the effort?
19     A.  Oh, I am, I am.  I mean, 10:00 to 5:00, that's
20 workable.
21     Q.  We're not going to turn this into an endurance
22 contest; because if we did that, we couldn't get your
23 best work product.  The bottom line is going to be, if
24 you did become a juror, would you devote your conscious
25 effort to listening to the testimony and sorting

185

1 through, deciding for yourself, what's believable and
2 what's not --
3     A.  Right.
4     Q.  -- and evaluate the evidence and come up with
5 what you think, intellectually, is honestly the best
6 answer to come up with based upon the answers?
7     A.  I guess my question there is, I'd have at least
8 a week's notice that I would be on the jury?
9     Q.  You will know next Wednesday, and you wouldn't
10 have to start till the following Monday.
11     A.  That's fine.  That would be plenty of time.
12     Q.  And we did it that way because for a week-long
13 trial, people need to make adjustments.
14     A.  Got you.  Not a problem.
15     Q.  Anything at all about your personal life -- we
16 talked about your job -- anything about your health or any
17 circumstance you can think of that would interfere with
18 your ability to be a juror in this case?
19     A.  No.
20     Q.  We talked about the laws that can come into
21 play during the course of a trial like this.  Whether
22 they do or don't will depend upon whether the evidence
23 and the testimony raises them.  But have you heard about
24 anything so far that causes you to such a degree of
25 alarm or discomfort that if you were a juror, you would

186

1 refuse to follow?
2     A.  No.
3     Q.  We talked about the fact that before the trial
4 ever begins, all we're looking for -- I believe I can
5 speak for the lawyers -- is people who will start the
6 trial off having no preconceived notions and simply
7 receive the evidence and evaluate it as you see fit and,
8 after having sorted through, come up with the answer you
9 think is the right answer to reach based on the
10 information the lawyers have given to you.  Does that
11 sound like you?
12     A.  Uh-huh.
13     Q.  Idea being, at the outset, a not guilty verdict
14 and guilty verdict are absolutely equally available
15 options.  And whichever one is chosen by the jury, that
16 decision will be based upon whatever is presented in the
17 case.
18     A.  Yes.
19     Q.  Likewise, if a person is found guilty of
20 capital murder, there are two questions to be answered.
21 And you know, depending upon how those questions are
22 answered, a life sentence is going to be imposed or a
23 death sentence is going to be imposed.  Are you
24 available to answering those two questions at the
25 punishment phase --

187

1    A.  Yes.
2    Q.  -- based upon how the evidence dictates in your
3    mind without regard to what result that could cause?
4    A.  Right.
5    Q.  You spent some time this morning, Mr. Mathews,
6    trying to find out that the three decisions the jury can
7    be called upon to make in a capital murder case is, is
8    the person guilty?  If they are guilty, what's the
9    answer to Question Number One?  And what's the answer to
10   Question Number Two?  Each of those decisions are
11   independent from the other.  That is to say, because you
12   find somebody guilty of capital murder, that doesn't, in
13   and of itself, dictate to the jury what the answer to
14   those Special Issues should be.  You have evidence in
15   the case.
16       Likewise, if you answer yes to Question
17   Number One, that doesn't tell you what the answer to
18   Question Number Two should be.  Because Question Number
19   Two is asking you something absolutely different than
20   what Question Number One did.  Is he guilty?  That's
21   what he did in the past.  Is he a future danger?
22   That's what you think he might do in the future.  And
23   the third question is, even with all that, is there a
24   sufficient reason why a life sentence should be imposed
25   rather than the death sentence?  Can you see how each is

188

1    remarkably different from the other?  That's why once
2    one question is answered, it's back to the other, as far
3    as sifting through it or, as the lawyers say, rooting
4    through it and finding out what it is.  Is that
5    agreeable?
6        MR. MCCLELLAN:  I'm ready, Judge.
7        THE COURT:  Go ahead.
8            VOIR DIRE EXAMINATION
9    BY MR. MCCLELLAN:
10   Q.  Mr. Mathews, my name is Lyn McClellan.  Along
11   with Claire Connors, we represent the State of Texas in
12   this case.  I think we were talking about you need
13   advance notice about being on the jury.  If I were you,
14   I would go ahead and start making my plans.  You filled
15   out the questionnaire, and you kind of go right down the
16   middle of the road.  We call it a three-three.  In
17   Questions 1 through 5, you answered three on both.  And
18   those are the kind of people who usually end up on the
19   jury unless you say something really outrageous during
20   the time I talk with you.  So now is your chance to get
21   off.
22       Now, seriously, I need to talk to you
23   about a couple of things in your questionnaire.  You
24   indicated that while your chosen religion opposed the
25   death penalty, being Catholic, you, personally, don't

189

1    oppose the death penalty.  Can you kind of share some of
2    your thoughts with regards to that?
3    A.  I think it's related to the facts.  I mean,
4    there is reasons.  I mean, I couldn't stand here and
5    say, yes or no, I oppose it.  That's just me.
6    Q.  It would be dictated by the facts.  So you're
7    open to the concept that if the crime deserves the
8    punishment, you can assess that type of punishment for
9    that type of crime, if that's what the law and evidence
10   showed you?
11   A.  Right.
12   Q.  We get a lot of Catholics who come through and
13   fill out the questionnaire.  Some people don't know the
14   Catholic church opposes it, and some of them do.  And
15   some of them say, well, that's going to be my personal
16   call, and my religion is not going to control that, and
17   I respect that.  So you don't think that would cause you
18   any problem?
19   A.  No.
20   Q.  What we're looking for is people who can listen
21   to the law and the evidence.  The Court's going to give
22   you a charge at the end of the trial on guilt or
23   innocence.  It will set out the law and tell you what
24   the State has alleged in the indictment, the definition
25   of murder, the definition of intentional, the definition

190

1    of beyond a reasonable doubt.
2        Take that law.  You've heard the evidence
3    from the witness stand, much like where you're sitting
4    right now.  You'll hear evidence from the other
5    witnesses.  You can believe all, some, or none of what a
6    witness says, take that evidence, apply it to that law,
7    come up with your decision.  You find a person guilty of
8    capital murder, then that's just the first part, if you
9    will.
10       Then you go to the punishment stage of
11   trial if you found someone guilty.  If you don't find
12   him guilty, everybody goes home.  That's the end of the
13   inquiry.  At the punishment stage of the trial, you may
14   hear additional evidence about a defendant's character,
15   his background, his criminal history or lack thereof,
16   his mental abilities or disabilities, the kind of
17   society he was raised in, the kind of surroundings he
18   was raised up in, his relationship with people that
19   raised him, and stuff like that, information about the
20   individual.
21       Because at that stage of the trial, the
22   focus is on what punishment this individual should
23   receive for the crime you've already found that he's
24   guilty of committing.  Okay.  That evidence would not
25   have been relevant to whether or not he committed the

191

1   crime, but it's entirely relevant as to what punishment
2   he should receive.  Just because you find someone guilty
3   of capital murder does not tell me what the punishment
4   is going to be.  You don't know until you hear all the
5   evidence, character, background, criminal history, that
6   kind of stuff.  Use that, along with the evidence about
7   guilt or innocence, about the crime itself, in
8   determining what the answers are to the questions,
9   themselves, up there on the board.  There is no crime in
10  the State of Texas that you would automatically get the
11  death penalty for, so you have to go through this entire
12  process in every case.  And it's open to either way,
13  either life or death, depending on what the facts show.
14  Any problem with that aspect.
15      A.  No, none whatsoever.
16      Q.  Some people come to us and say, I believe in
17  the death penalty.  They think it's a proper type
18  punishment for certain types of crimes.  Some go further
19  and say they do not believe they, themselves, could ever
20  participate in a process of being on a jury where they
21  would be called upon to make decisions such as answering
22  these questions, knowing that in doing so you would be
23  ordering this Judge -- he would order the execution of
24  the defendant sitting over here on trial.  Do you have
25  any doubts about your ability to sit and participate in

192

1   that type process and make that decision if that's what
2   the law and the evidence calls for?
3       A.  No.
4       Q.  Can you take just a moment and tell me about
5   the life and times of Joseph Mathews, where you grew up,
6   went to school?
7       A.  Born and raised in Garland.  I went to school
8   in Nacogdoches.  Moved here in Houston seven years ago.
9   Been working as an accountant ever since.
10      Q.  You're married.  How long you been married?
11      A.  Six years.
12      Q.  Were you raised in the Catholic church?
13      A.  Yes, I was.
14      Q.  You indicated you applied for the FBI when in
15  college, and they were not hiring at that time?
16      A.  Hiring freeze.
17      Q.  Decided to go and do something else?
18      A.  Right.
19      Q.  Anything about that that would affect your
20  ability to make you pro law enforcement?  Somebody ought
21  to be concerned about that?
22      A.  No.  Actually, I was looking to what they get
23  into, the white crimes, the bank frauds, things like
24  that.  Something to do with C.P.A.
25      Q.  Believe it or not, I used to also work for

193

1   Ernst & Young a long time ago.
2               MR. HILL:  When did you get fired?
3               MR. MCCLELLAN:  I quit.
4       Q.  (BY MR. MCCLELLAN)  On your questionnaire it
5   says, What are your feelings about the death penalty?
6   You said, An unfortunate tool of the current justice
7   system.  Why do you call it an unfortunate tool?
8       A.  Well, first and above, it's -- you lose a life.
9   But nobody likes to be punished, but it is just a tool
10  that's out there.
11      Q.  Okay, all right.  You answered, also, about the
12  death penalty, you said, Too often.  You said, Instead
13  of trying to fix the problems in cases, the criminal
14  acts, society focuses on the effect.  In other words,
15  instead of going back and figuring out what causes a
16  person to get where he is today, we're trying to figure
17  it out; and we don't address the front end.  Because we
18  don't address that front end, do you think there is some
19  reason we shouldn't address the other?
20      A.  No, I don't think so.
21      Q.  Now there is one question on your questionnaire
22  at the very back, agree/disagree.  There is a question
23  that says, Any person, man or woman, young or old, who's
24  guilty of capital murder should pay with their own life.
25  And you checked you more likely agree with that than

194

1   disagree.
2               That can be read two different ways.  One
3   is that -- doesn't matter if you're a man or woman,
4   young or old, if they did the type of offense that
5   deserves the death penalty, they ought to get it.
6   Another way some people are interpreting it -- it says,
7   Any person, man or woman -- we're all man or woman --
8   young or old -- we're all young or old -- so that means
9   everybody ought to get the death penalty for committing
10  capital murder.  What were you thinking about when you
11  checked agree?
12      A.  I didn't see it the second way you just said
13  it.  I saw it the first way.  It's basically that you
14  should get it no matter who you are.
15      Q.  It ought to be race neutral, gender neutral,
16  that type of thing?
17      A.  Right.
18      Q.  One other thing it says, the execution of
19  criminals is a disgrace to civilized society.  You
20  agreed with that.  What was your thoughts in that
21  regard?
22      A.  Like I said earlier, it's a loss of a life.
23  That's, you know --
24      Q.  Comes back to that unfortunate tool you were
25  talking about that you may have to use?

195

1      A.   Right.
2      Q.   Judge spent a lot of time explaining to you the
3  way the system is set up.  First part is
4  guilt/innocence.  Second part is the answering of these
5  two questions, depending upon what the evidence shows.
6  You'll have the crime itself to look at.  That might be
7  sufficient, in and of itself, to prove the person would
8  be a continuing threat to commit future acts of
9  violence.  In other cases, it might not be.  You'll also
10 hear additional evidence about criminal background,
11 history, all these other things; and they can also be
12 used in answering those questions.
13          If you find him guilty of capital murder
14 and if you determine the person a threat to commit
15 criminal acts of violence that would be a continuing
16 threat to society, Issue Number Two gives you an
17 opportunity to go back through all the evidence and
18 think in your mind what effect it might have.  In other
19 words, if we should change our vote from death to life,
20 gives you an opportunity to stop, reevaluate.  If you
21 think a life sentence is now the most appropriate
22 punishment for that crime, that allows you to do that.
23 Or do you think the death penalty still should be the
24 punishment, if you answer guilty and answer Issue Number
25 One yes he's guilty, to get death.  Answer Number Two,

196

1  he's not.  Gives you an opportunity to go back and make
2  that decision.  Any problem with that aspect?
3      A.   No.
4      Q.   The law says that if you're high on drugs or
5  alcohol, if you're voluntarily intoxicated, high on
6  drugs or alcohol, that is not a defense to the
7  commission of a crime.
8      A.   I agree it's not a good defense.
9      Q.   The law says as long as you're seventeen or
10 over, you're to be tried as an adult and that your
11 biological age is not a defense to crime or punishment.
12 Below seventeen, it doesn't apply.  Seventeen and older,
13 you're an adult.  The death penalty does come into play.
14 Do you agree with that?
15     A.   Yeah, I agree.
16     Q.   The law says as long as you know the difference
17 between right and wrong -- in other words, we talk about
18 someone's mental abilities -- they say they're insane;
19 they don't know the difference between right and wrong.
20 Then you're not held responsible.  But if you do know
21 the difference between right and wrong, mental
22 disability does not prevent you from being held
23 responsible for your crime, as long as you know the
24 difference between right and wrong and you're able to
25 function with that one.  Any problem with this aspect?

197

1      A.   No.
2      Q.   Anything I ought to know about Mr. Mathews that
3  will affect my decision, or you think if you were
4  sitting in my position you would like to know about you
5  in making a decision as to whether or not you ought to
6  be a juror in a case like this?
7      A.   Not that I can think of.
8      Q.   Thank you very much.  I'm going to pass you?
9          THE COURT:  Mr. Wentz.
10         MR. WENTZ:  May I, Your Honor?
11         THE COURT:  Please.
12             VOIR DIRE EXAMINATION
13 BY MR. WENTZ:
14     Q.   Good afternoon.
15     A.   Good afternoon.
16     Q.   As you've been told, my name is Kurt Wentz, and
17 this is Wayne Hill.  And we're representing Charles
18 Mamou, and I'd like to visit with you for about fifteen
19 minutes, twenty minutes maybe, and get to know you a
20 little bit better.  And as you can tell, this is a very
21 informal process.  There is some kidding that goes on
22 back and forth.  You feel the need to take part in it,
23 please go right ahead.  You've already begun to do
24 something that I really appreciate you doing as you and
25 I talk, and that's giving explanations for the answers

198

1  that you give.  And as you and I visit, I'd really be as
2  interested in your explanation for your answer as the
3  answers themselves.
4          MR. WENTZ:  And, Your Honor, could
5  Mr. Mathews be provided a copy of this?
6      Q.   (BY MR. WENTZ)  You're asked on Page 4, Do you
7  consider yourself liberal, conservative, moderate?  And
8  you give us your two answers.  And I was wondering if
9  you could elaborate a little more about your upbringing
10 and your schooling and how they factor into your
11 response there.
12     A.   You're referring to "G", right?
13     Q.   "G", yes.
14     A.   Just elaborate more on myself?
15     Q.   Yeah, what about your upbringing?  What about
16 your schooling?
17     A.   I was one of five kids in a Catholic family.  I
18 went to Catholic school all my life, twelve years.  I
19 was in the Boy Scouts.  I mean, I don't want to paint a
20 picture perfect scene.  It wasn't that great; but I
21 guess for the most part, it was a good childhood.  I
22 mean, you know.
23     Q.   One of the things you mentioned again is you
24 were raised Catholic.  You've indicated -- we know your
25 religion's position on the death penalty; however, you,

199

1    in good conscience, can say, yes, I understand that;
2    however, I can depart from it.  And I also see a listing
3    of the people you admire most.  You list at the very
4    top, the pope.
5        A.  Right.
6        Q.  Can you tell me about how that factors in, and
7    the people you respect the most, and your upbringing?
8    And you do have the ability, apparently to disagree.
9        A.  I guess I misunderstood your question.  Why do
10   I respect the pope?
11       Q.  Uh-huh.
12       A.  Well, one thing, the guy's in a very stressful
13   job, I think.  He takes it upon himself, I guess, a lot
14   of responsibility to provide direction for people where
15   sometimes people won't step up.  They won't step up to
16   the plate, per se.  And I think he's done an excellent
17   job, just as George Bush.  You know, he was one of them
18   like George Bush.  I think he takes a proactive approach
19   in trying to solve a problem.  I listed Jimmy Carter as
20   one person.  I think he's doing a better job outside the
21   presidency than he did in the presidency, because he's
22   gone out -- in all his humanitarian efforts, he's trying
23   to better the position of the people and not necessarily
24   trying to better his position at the same time.
25       Q.  A lot of what you're saying, you seem to be

200

1    saying one of the things that's important to you is the
2    sense of the betterment of the community as a whole, I
3    think, from --
4        A.  Right.
5        Q.  On Page 6 you're asked about three questions
6    that have to do with family and upbringing, and they're
7    a series of agree/disagree.  And the Questions 11, 12,
8    and 13, looking at your response, I was wondering if you
9    could tell me why you answered them the way you did.
10       A.  Number 1(b)(1), I think I strongly agree with
11   number 1(b)(1), because I think the environment is very
12   important.  And all children should have two parents,
13   although they can't always have two parents.  But I
14   think the way you're brought up definitely influences
15   the way you grow up, the way you think, regardless of
16   authority.  I generally agree with that one.  I think
17   the Judge pointed out you can have a cop, and just
18   because he's a cop doesn't make him a really good
19   person.  That's just his job.
20       Q.  Anybody can overcome neglect?
21       A.  I think at a point someone can, but it's always
22   in the back of your mind.  You can always conjure up
23   those thoughts.  You may not want to, but it can always
24   still be there.  So that's why I checked on 13,
25   generally agree.

201

1        Q.  In terms of the death penalty, were you aware
2    of the Special Issues, when it inquired about the death
3    penalty, when you were filling out these questionnaires?
4    The questions on the board over there, your general
5    impressions that you were responding to the
6    questionnaire about, did you know they existed when you
7    were answering the questionnaire?
8        A.  I guess I don't understand your question.
9        Q.  Well, this morning and throughout Mr.
10   McClellan's talk with you, he's made reference to the
11   Special Issues and how they come into play at the
12   punishment phase of a capital murder case.  Were you
13   aware that that's now how a capital murder scheme worked
14   in Texas?
15       A.  Yes.
16       Q.  You were aware of that before you got here?
17   You were aware of that when you went -- were answering
18   the questions?
19       A.  I couldn't have quoted it as One and Two, but I
20   did know -- to a small degree, I knew how the system
21   worked.
22       Q.  Can you tell me where you obtained that?
23       A.  I guess indirectly through school; but, also, I
24   guess, through movies and television shows and things
25   like that, documentaries like The Learning Channel,

202

1    Discovery Channel.  I do like to watch the detective
2    shows -- or not the detective shows, the forensic
3    science, things like that.
4        Q.  Okay.  Do you think it's a good scheme?
5        A.  Do I think it's a good scheme?  I think it's
6    possibly the most useful scheme we have right now, until
7    we can devise a different one that we can all agree on.
8        Q.  If you had the ability to change it, could you
9    see any changes that you think should be made in it?
10       A.  No.  I think they -- it's one way -- I mean, I
11   think it's probably the best way to address the issues.
12   I do think so.
13       Q.  Why is it the best way?
14       A.  I guess partly from my lack of knowledge of the
15   law.  I've never studied the law, so I've never
16   experienced the law.  So I wouldn't know a whole lot
17   more than what I've learned today and through the past
18   last week.
19       Q.  As you look at the Special Issues, I think you
20   can sometimes ask, Why are they there?  And I think the
21   Judge has told you, you're asked to make three
22   independent decisions.  One does not relate to the
23   other, even though they're all in the same scheme of
24   things.  And you don't get to the Special Issues until
25   you've made one rather compelling, telling conclusion, a

203

1 legal and moral conclusion, the way I see it, that
2 somebody is guilty of society's most egregious crime,
3 capital murder. And you look at the Special Issues, and
4 I suggest to you that there are some reasons why they
5 might exist. Who might be worthy of the death penalty?
6 Somebody who is a danger to society.
7         And Special Issue Number Two. Well,
8 having gotten to this point, is there anything you've
9 heard that says the death penalty shouldn't be the
10 punishment? How do you see the two Special Issues
11 functioning?
12    A. I think it all depends on the case and facts.
13 It's very facts-oriented. That's where the second issue
14 comes into play.
15    Q. I think you indicated the evidence -- I think
16 it's 65 on Page 13. What things do you think are
17 important in deciding whether or not you think somebody
18 should receive the death penalty?
19    A. The testimony and evidence against them.
20    Q. One of the things that I -- and I've used this
21 example before. Sometimes we come to major conclusions
22 or major judgments about people. And once we make those
23 judgments and conclusions, certain other suppositions
24 follow from that that are easy to make. And I've used
25 an example, the kid in school that's seen by his first

204

1 grade or kindergarten teacher as being slow or not
2 really with it. And he's placed in the lower grade.
3 The kids see him. Gosh, you're in special ed. You may
4 be dumb. And certainly people conclude he's not very
5 smart when, in fact, that may not necessarily be true.
6         In fact, you look at Special Issue Number
7 One. And if you're going to believe that somebody is a
8 capital murderer, does that mean he's always going to be
9 a future danger? This one obviously can follow from the
10 other; but at the same time, it calls for you to make a
11 whole independent judgment.
12    A. All right.
13    Q. I guess what I'm saying is, we sometimes have a
14 body of evidence, the guilt/innocence evidence. At
15 guilt/innocence, you're told to look at it one way. Has
16 the case been proven to you beyond a reasonable doubt?
17         Then you get to punishment, and you step
18 back and look at the evidence a different way. Is the
19 person always going to be a future danger to society?
20 Is that Special Issue always answered that easily?
21    A. No, it's definitely upon the facts. Just
22 because you did something one day doesn't make it the
23 same way all the time, but then I think that's a hard
24 question to answer unless you've gone through the whole
25 fact pattern.

205

1    Q. Do you feel comfortable knowing whether or not
2 somebody might receive the death penalty based on your
3 ability to predict how they're going to act in the
4 future. Because as I look at it, it is sort of a
5 prediction question. Are they probably going to be a
6 future danger in the future?
7    A. I could go through the facts, if that's what
8 you're asking. Yeah, I could make that decision. I'm
9 glad to see it's not just me; it's twelve people.
10 Because I also have my opportunity to go over the facts
11 with eleven other people.
12    Q. Let me ask you: You mentioned being part of a
13 group. If you did become part of this group and you
14 came to a conclusion, would Charles have the benefit of
15 your own independent judgment if that's the way it
16 should be?
17    A. Oh, yes. I don't believe anybody should run
18 roughshod over everybody else. It should be twelve
19 separate opinions to come to the decision.
20    Q. How do you see Special Issue Number Two
21 functioning in this murder scheme? Special Issue Number
22 Two is to the benefit -- I think it's really to Number
23 One, also -- it's related to the facts or evidence?
24    A. No. I've lost my train of thought, because I
25 was trying to tie the two together.

206

1    Q. I think you said you felt they were together?
2    A. They are connected in a way. I mean, like, you
3 can't get to Issue Number Two without answering Issue
4 Number One. So, I guess, in a way -- I've forgotten
5 what you were asking me, technically.
6    Q. My question was, how do you see Special Issue
7 Number Two functioning in the capital murder scheme?
8 How do you, personally, see it functioning?
9    A. I guess I'm still lost. I know what the issue
10 is, but I --
11    Q. The question is phrased badly. Let me address
12 your question to the question. Question 68, you're
13 asked this thing about mitigating evidence. Do you
14 believe mitigating evidence should be considered in
15 forming the decision on punishment in a capital murder
16 case? And you checked no.
17    A. I'll be honest with you. At the time I did not
18 know a good definition of mitigating.
19    Q. Now that you know that or have a definition to
20 work with, would your answer be different? And if so,
21 how?
22    A. I would have checked yes then.
23    Q. Because I think that Special Issue Number Two
24 allows you to take that into consideration. And, in
25 fact, I would submit that Special Issue Number One also

207

1    asks for you to take mitigating evidence into
2    consideration in determining whether or not somebody
3    might be a future danger.  And if you look at the
4    Special Issue Number Two, you're told that you can look
5    at that type of evidence in one of three places; the
6    circumstances of the offense, the person's background or
7    character, and this thing called his moral culpability.
8    If you have a question, please --
9        A.  No.  I was going to say, then, I guess
10   really -- no was really my answer then; because I think
11   the death penalty should be related to the offense, more
12   or less.  Just because you had a good or bad
13   relationship doesn't mean -- that may have played some
14   part in the offense, but I think the offense is going to
15   decide whether he should receive the death penalty.
16   Well, it's a combination of both.  I guess I'm having a
17   hard time answering the question, because I don't know
18   the whole situation.  That's my take on it, really.
19       Q.  You could -- and I don't mean to be
20   presumptuous.  If you look at the Special Issue, they
21   use this term, mitigating circumstance or circumstances.
22   And they ask you to look for it in one of these places
23   to decide if this person is a capital murderer, going to
24   be a future danger to society.  It's something jurors
25   are to look for.  And they look for it one of these

208

1    three places:  And I think you've indicated that your
2    primary focus and the way you see it, you would focus on
3    the crime itself, if I'm not mistaken, in terms of
4    guilt/innocence, Special Issue Number One.
5            But in terms of Special Issue Number One,
6    you might look at the circumstances of the offense.  But
7    when it came to background or character or moral
8    culpability, you simply didn't see --
9        A.  I wouldn't give it as much weight as the
10   offense.  I guess it is part of the situation.  You
11   can't escape it.  But it is definitely part of the
12   situation.  I'd have to weigh -- I would weigh it less
13   than I would the offense, right.
14       Q.  You laid a lot of importance on No. 1, 12, and
15   13, in terms of how you're raised.  And when it comes to
16   Special Issue Number Two, you look at it in terms of not
17   giving it much weight.  Can you tell me why you're
18   responding in that way or why your feelings are directed
19   in that way?
20       A.  Well, I guess I'm a little turned around now.
21   I think your background is important, and it may cause
22   you to lead you in one direction.  But I think anybody
23   can commit an offense, given the right circumstances.
24   Does that answer your question, or am I being too vague
25   on that?

209

1        Q.  No.  I'm going to ask one more question.  When
2    we talk about those, 11, 12, and 13 that relate to,
3    basically, how you're raised.  And I think you indicated
4    it's rather important to you from your own experience;
5    but when you look at Special Issue Number Two, you don't
6    feel you would give that type of question as much
7    weight, particularly Number Two.  And I think you said
8    yes.  Can you tell me why?
9        A.  I'm sorry.  I'm getting mixed up in the way
10   you're asking the question.  Going to have to ask you to
11   rephrase it.
12       Q.  Okay.  I think you've indicated that this
13   personal background, this personal background type of
14   evidence is not something you give a great deal of
15   weight to or would give a great deal of weight to in
16   answering Special Issue Number Two?
17       A.  Right.
18       Q.  Why?
19       A.  I'll give you a for instance, such as I went
20   through Catholic grade school with about the same set of
21   classmates.  It was a small school.  And now we're all
22   in the work world.  We all had the same benefit of going
23   through the same school and same teachers.  And I know
24   some that more or less dropped out of high school and
25   really aren't doing anything with themselves and I know

210

1    another one that has gone on to be a lawyer and another
2    a pilot.  They've been really successful.  One is now in
3    Hollywood doing acting.  It's a broad span.  So I think
4    we all had a good base to build on, but I think what you
5    do with this base is up to you.  If you choose to commit
6    crime, or let's just say that's your field of work and
7    you've chosen to commit a crime.  Then that has more
8    weight whether you were part of the good old gang.  Does
9    that help answer that?
10       Q.  Your answers are all I'm interested in, and I'm
11   going to try to be true to my word.  I'd like to thank
12   you very much.
13           (Off-the-record discussion.)
14              WILLIAM GLENN KELLY,
15   having been first duly sworn, testified as follows:
16              VOIR DIRE EXAMINATION
17   BY THE COURT:
18       Q.  Mr. Kelly, make yourself comfortable.
19   Mr. Kelly, first off I'd ask you to remember back to
20   Friday when the whole group of us were together.  Add to
21   it this morning, the things we talked about this
22   morning.  And out of everything that we have talked
23   about so far, do you have any questions at all for me?
24       A.  No.
25       Q.  Is there anything to this point that we have

211

1  not yet addressed that you feel as though we should talk
2  about because it might have some bearing on your ability
3  to be a juror in this case?
4      A.  I don't think so.
5      Q.  Is there anything at all, sir, whether it be
6  something perhaps about your personal life, or whether
7  it be something perhaps about your professional life, or
8  your health, or anything else for that matter, that you
9  can think of that would in any way interfere with your
10 ability to be a juror in this case during the time frame
11 we've discussed?
12     A.  Well, there is certainly other things I'd
13 rather be doing than this, but --
14     Q.  I bet you that applies to everybody in this
15 room.
16     A.  I can't think of anything that would keep me
17 from doing it.
18     Q.  Well, as I said the other day, we will not
19 abuse your time.  Now you may not think that after
20 having spent the day on that bench, but we have made
21 progress.  As I said this morning, I think this phase is
22 to make you accomplish two primary objectives.  And one
23 is to expose prospective jurors to the rules that can
24 come into play during the course of a trial such as
25 this.  And out of what you have heard so far, do you

212

1  find yourself in any disagreement with any of those
2  rules?
3      A.  No.
4      Q.  So as a juror, if I'm understanding correctly,
5  you would be willing to both follow, as well as enforce
6  those rules if they did come into play?
7      A.  Yes.
8      Q.  The second aspect of what this is about is for
9  you to be able to satisfy yourself and for the lawyers
10 to be satisfied that if you did become a juror in the
11 case, you could take any one of those twelve chairs,
12 listen to all the evidence in the case, evaluate it
13 however you see it, and based upon your evaluation of
14 the information they give, no matter what you think is
15 the right decision to reach, no matter what your
16 decision is, does that sound right to you?
17     A.  Yes.
18     Q.  We talked this morning and spent some time this
19 morning on understanding a guilty and a not guilty at
20 the outset are equally available options?
21     A.  Yes.
22     Q.  If a defendant is found guilty, these questions
23 come into play.  If he's found guilty of capital murder,
24 these questions come into play to be available to be
25 answered in such a way that the death penalty is imposed

213

1  or a life sentence.  We're hoping that the jurors will
2  answer the questions based upon how they view the
3  strength of the evidence in the case.  Does that sound
4  like you?
5      A.  Yes.
6      Q.  We talked, also, about the fact that it's three
7  decisions the jury has to make.  That being a question
8  of whether the defendant is guilty.  If he is guilty,
9  answer to Special Issue Number One, and the answer to
10 Special Issue Number Two.  Those three decisions are all
11 independent of one another.
12         The question of guilt, for example, that's
13 a decision to make on past conduct.  The question of
14 whether there is a probability that a person would be a
15 threat in the future, that's a projection of future
16 conduct.  Obviously, arguably, different spectrums.
17         Next question.  Okay.  After taking in all
18 of that, even though they're guilty and even though it's
19 not a life sentence, I think a life verdict is a better
20 verdict in this case than the death sentence.  Are you
21 comfortable with the scheme as it's set up in what
22 they're asking you to do?
23     A.  I understand it, yes.  I take it that it's a
24 grave responsibility.
25     Q.  And I did not mean comfortable in a sense of

214

1  taking it lightly.  I mean, comfort in a sense that you
2  don't have any objection to it.
3      A.  That's true.
4      Q.  Before we begin, do you have any questions of
5  me?
6          THE COURT:  Mr. McClellan.
7          MR. MCCLELLAN:  Thank you, Your Honor.
8              VOIR DIRE EXAMINATION
9  BY MR. MCCLELLAN:
10     Q.  Mr. Kelly, my name is Lyn McClellan.  Along
11 with Claire Connors, we represent the State of Texas in
12 this case.  I wanted to go over some of your answers in
13 the questionnaire and get a better feel for what you
14 feel about your answers, talk to you about certain
15 aspects of the law.
16         First of all, let me just ask you what, in
17 your own words, your feelings are about the death
18 penalty?
19     A.  Well, as I indicated to you, it's appropriate
20 in many instances; but there is also a grave
21 responsibility to issue a decision like that.
22     Q.  Okay.
23     A.  There is always risks involved that you don't
24 know of and all the circumstances of the facts, and
25 there is a risk that you could make a wrong decision.

**215**

```
 1        Q.  How do you think you would resolve all those
 2   issues?
 3        A.  You just pray about it and do the best you can.
 4        Q.  I don't think any jurors can ever be asked to
 5   be held responsible for making a decision they didn't
 6   have facts on.  In other words, we hear about cases from
 7   time to time where some other evidence is discovered at
 8   another time.  Case is reviewed on appeal.  Well, if a
 9   jury didn't know about it, they can't be responsible.
10   They have to make a decision, based upon the evidence
11   that they're given, to do the best job they can.  Do you
12   agree with that?
13        A.  Yes, I do.
14        Q.  Do you think the death penalty is an
15   appropriate punishment for certain types of crimes?
16        A.  Yes, I do.
17        Q.  Some people come to us and say they believe in
18   the death penalty; it's a proper-type punishment for
19   certain types of crimes.  But some people go further and
20   say they could never put themselves in a situation to
21   make decisions that they knew could result in this Judge
22   ordering the execution of the defendant sitting over
23   here on trial.  Do you have any doubts about your
24   ability to participate in that type process and make
25   that type decision if that's what the law and the
```

**216**

```
 1   evidence calls for?
 2        A.  I've given this a great deal of thought,
 3   because this is the closest I've come to having to make
 4   a decision like that.  And I think I can perform the
 5   function.
 6        Q.  So from the time you filled out the
 7   questionnaire the other day and from the time of the
 8   Judge's voir dire, I guess, on Friday, you've given this
 9   a lot of thought?
10        A.  Yes.
11        Q.  And you talk about it a couple of places here;
12   and that's what I'm going to ask about, you know, the
13   chance.  And there is always a chance of making the
14   wrong decision.  This system is set up with a lot of
15   checks and balances in it.  There is no automatic death
16   penalty in the State of Texas.  We have to prove, first
17   of all, the defendant's guilty beyond a reasonable
18   doubt.  If we fail to do that, that's the end of
19   inquiry.  Everybody goes home.
20            Then if we did that, we have to prove
21   Issue Number One beyond a reasonable doubt that he's a
22   continuing threat and, to a probability, would commit
23   criminal acts of violence.
24            Then on Issue Number Two, there is no
25   evidence to convince the jury that there really was no
```

**217**

```
 1   mitigating circumstances that warranted a life sentence
 2   as opposed to death.  So those three decisions have to
 3   be made by twelve different people; and they have to all
 4   be unanimous all the way through, or the death penalty
 5   never does come into effect.  That's one of the checks
 6   and balances and the fact we have, at the punishment
 7   stage of the trial, different questions to be answered.
 8   Talking about a person's threat in the future and
 9   talking about whether there was any reason for the
10   benefit of a life sentence as opposed to death.  You
11   look back again and consider that evidence all over
12   again and search for it.  So, there is lots of checks
13   and balances there.  Do you have any problem with the
14   way the system is set up?
15        A.  No.
16        Q.  Okay.  Have you ever been on a jury before of
17   any kind?
18        A.  No, I have not.
19        Q.  Anything about your religious beliefs that you
20   think will affect your ability to serve on a case like
21   this?
22        A.  No.
23        Q.  Let me just go briefly, real fast if I can,
24   through the system that there is set up.  First of all,
25   it's guilt/innocence.  We must prove beyond a reasonable
```

**218**

```
 1   doubt to the satisfaction of the jurors that the
 2   defendant is guilty, as charged in the indictment, as
 3   alleged in the indictment, that he intentionally took a
 4   life of another person without legal justification --
 5   it's not self-defense; it's not accident -- during the
 6   course of the kidnapping, and they prove that beyond a
 7   reasonable doubt he's guilty of capital murder.
 8            You know that capital murder, from the
 9   Judge's voir dire, is murder plus some other crime.  And
10   what we've alleged here is murder during the course of
11   kidnapping.  If you found someone guilty of capital
12   murder, then the punishment stage of a trial you may now
13   hear additional evidence over and above the evidence you
14   heard at the guilt/innocence about a defendant's
15   character, his background, his criminal history or lack
16   thereof, his mental abilities or disabilities, all kinds
17   of information about the individual himself; because at
18   that stage, you're making a decision as to what
19   punishment should be given this individual, who you have
20   already determined is guilty of capital murder.
21            After hearing all that evidence, you'll be
22   able to rely upon both bodies of knowledge, evidence of
23   guilt innocence, evidence of punishment, evidence about
24   the type of offense at guilt/innocence, evidence about
25   the individual at the punishment stage, relying upon
```

219

1  that in answering these questions.
2         First question says: Do you find from the
3  evidence beyond a reasonable doubt that -- this is the
4  burden on us -- that there is a probability that the
5  defendant would commit criminal acts of violence that
6  would be a continuing threat to society? It doesn't say
7  probably. Possibility, anything could happen. Doesn't
8  say certainty, meaning it's going to happen. It says
9  possibly, which I suggest would be more likely than not.
10        So, basically, the question is, as the
11 defendant sits there that day in court, do you believe
12 from all the evidence you heard there is a probability,
13 more likely than not, if found guilty of capital murder,
14 he would commit criminal acts of violence that would be
15 a continuing threat to society. Doesn't mean another
16 murder or capital murder. Those are obviously acts of
17 violence. Could be a murder, a robbery, shooting
18 someone with a gun and missing, or it could be hitting
19 someone with your fist so hard you knock them out,
20 anything that is criminal in a violating nature. And
21 again, the burden is for the State to prove the burden
22 beyond a reasonable doubt. Otherwise, the answer is no.
23 But if with we prove it beyond a reasonable doubt, the
24 answer to that is yes. Any problem with that aspect?
25    A.  No.

220

1     Q.  What type of evidence do you think would be
2  helpful in determining whether or not a person would be
3  a continuing threat?
4     A.  Past history of criminal defendant.
5     Q.  All right. And that would be the type of
6  evidence that you would be able to hear now, while I
7  say, just because you find someone guilty of capital
8  murder doesn't mean you answer this question any
9  particular way. I don't mean to imply that you can't
10 consider the facts of that crime itself in determining
11 whether a person would be a continuing threat to commit
12 criminal acts of violence. You may have a crime that,
13 by itself -- you heard what happened before, during, and
14 after the commission of the crime. Before, was it a
15 spur-of-the-moment crime, or was it something that was
16 preplanned? What happened during the commission of the
17 crime? How did this person go about taking the life of
18 another person? What happened after the crime? Did he
19 show remorse, or is he braggadocious about what he was
20 doing? Those facts, in and of themselves, in certain
21 situations prove to you that he's a continuing threat
22 just on the facts itself. Other cases might not. You
23 can end up listening to not only that evidence, but
24 evidence you hear at the punishment stage of a trial.
25    A.  Yes.

221

1     Q.  If you decide the answer to Issue Number One is
2  yes, the defendant's going to receive the death penalty,
3  unless on Issue Number Two you determine he shall not.
4  Now Two asks you to you determine -- doesn't have a
5  burden of proof; but instead, it asks you, taking into
6  consideration all of the evidence, including the
7  circumstance of the offense, the defendant's character
8  and background, and the personal moral culpability -- I
9  like to refer to it as responsibility. You see whether
10 he was a getaway driver. You find there is sufficient
11 mitigating circumstance or circumstances -- I like to
12 refer to it as sufficient reasons -- why this person
13 should receive a life sentence as opposed to death?
14        So, basically, the reason it's giving you
15 the time to change your answers is because if you found
16 him guilty of capital murder, if you found he's a
17 continuing threat on Issue Number One to commit criminal
18 acts of violence to a probability, he would be a
19 continuing threat to society. He's going to receive the
20 death penalty, unless in your Number Two, after you
21 consider all that evidence again you find there are
22 reason or reasons you should not.
23        I ask you to go back and look at all the
24 evidence and be sure. Reevaluate everything you've
25 heard so far. If you find there are reasons in his

222

1  background, or the circumstances of the crime, or the
2  conduct of the crime that suggests to you this is more
3  of a life sentence that's appropriate for that, that
4  gives you the opportunity. If after looking through all
5  that, you don't think there is any reason or reasons why
6  he should receive life as opposed to death, then you
7  answer that question no. Then he receives the death
8  penalty. Any problem with that aspect of the law?
9     A.  No. Let me ask you a question.
10    Q.  Yes, sure.
11    A.  If he's convicted and we determine he's not a
12 continuing threat --
13    Q.  That's the end of the inquiries. He receives a
14 life sentence. Don't go any further. In order to go to
15 Issue Number Two, you had to answer Issue Number One
16 yes. So if you decide he's not a continuing threat, he
17 receives a life sentence. Is there any other questions
18 you have?
19    A.  No, I really don't have much more to ask you.
20    Q.  I just want to make sure I'm on the same page.
21 And we all realize there is a chance that a mistake can
22 be made. Would that prevent you from making a decision
23 if you thought the law and evidence called for it?
24    A.  No.
25    Q.  There was a question there that asked, What

223

1  factors do you think are important in deciding whether a
2  person should be sentenced to the death penalty or life
3  imprisonment?  You put, Age, magnitude of crime,
4  circumstances surrounding the event.  By age, what did
5  you mean by age?  I mean, did you have something in
6  particular in mind?
7      A.  I think the Judge has used a seventeen-year-old
8  as an example.
9      Q.  Okay.  The law says if you're age seventeen or
10  above, you're treated as an adult; and the death penalty
11  could be one of the options there.  If you're below
12  seventeen, the death penalty is not applicable.  Did you
13  agree with the prospect that age seventeen and above is
14  a situation where a person -- where the death penalty
15  ought to be available for those type of crimes, or do
16  you think there is an age; it ought to be even higher
17  than age seventeen?
18      A.  I can't argue with that.
19      Q.  Of course, you'll be able to see -- there are a
20  lot of people who may be seventeen years of age
21  biologically; but street smart, they may be a lot
22  further down the road.  By the same token, they may be
23  twenty-five years old biologically, but operating with a
24  sixteen-year-old mind.  I assume you can weigh all those
25  factors and make your decision appropriately?

224

1      A.  Yes.
2      Q.  Okay.  I know you put down that you were
3  working with a situation you were concerned about and
4  all that.  Can you assure us that if selected as a
5  juror -- we're talking about October the 4th, for a
6  period of maybe no more than ten working days, probably
7  less than that amount of time -- that you can give us
8  your full attention if you were selected to be a juror?
9      A.  If I'm selected, I will do that.
10      Q.  Okay.  Thank you very much.
11          MR. MCCLELLAN:  I'll pass.
12          THE COURT:  Thank you.
13          Mr. Hill.
14              VOIR DIRE EXAMINATION
15  BY MR. HILL:
16      Q.  Hi, Mr. Kelly.  My name is Wayne Hill.  Kurt
17  Wentz and I both represent Mr. Mamou in this case.  What
18  goes through a person's mind -- you, in particular --
19  when you're filling out a questionnaire like that and
20  you realize you're possibly going to be serving on a
21  case involving a capital murder allegation?  Anything
22  that goes through your mind that we should know about?
23      A.  The thing that goes through my mind, went
24  through my mind, is that this is way more than I
25  intended to be faced with when I came down here.

225

1      Q.  Okay.
2      A.  That there may be another person's life at
3  stake.  I'd rather not be doing this, but I have a duty
4  as a citizen to do it.
5      Q.  There is some people that, when they say they'd
6  rather not be doing it, they are upset with the fact
7  they have to be here doing it.  There are others that,
8  while they don't want to volunteer, are okay with that
9  and say, that's up to everybody here is to decide
10  whether I and eleven other people are going to sit in
11  judgment of a case.  Do I assume you fall into the
12  latter category and not the former?  You're not angry
13  about being here?
14      A.  No.
15      Q.  I notice that you have been with Blue
16  Cross/Blue Shield about fourteen years.  Is dealing with
17  provider information, hospital contracting, you deal
18  with the health care provider of the services as opposed
19  to dealing with the patients and interacting with the
20  patients?
21      A.  Yes.
22      Q.  And --
23      A.  I have, in the past, had some relationships
24  with patients; because I was a hospital administrator
25  before.

226

1      Q.  That's always been your profession.  You've
2  always been a hospital administrator in one facet or
3  another?
4      A.  For a good, long time, yes.
5      Q.  Okay.  Things have really changed in the health
6  care field.
7      A.  By the minute, particularly with my company,
8  and one of the stresses I pointed down there.  We are
9  in the process of acquiring another company, and there
10  are a lot of great unknowns as to how that's going to
11  shake out, how it's going to affect my work, how it's
12  going to affect the work of others.
13      Q.  Might that happen?  Do you have any clue as to
14  when that's about to happen?  Is it happening now?
15      A.  It occurred last week, or it was announced last
16  week.  And we were told within two weeks to thirty days
17  that we would take control of the company; so this is
18  maybe a week off.
19      Q.  Is this going to impact on your position, in
20  particular?
21      A.  Yes.
22      Q.  Do you know how?
23      A.  I don't know how.
24      Q.  That's the uncertainty?
25      A.  Yeah.

227

1        Q.   Well, obviously, we all want to know.  And I'm
2    sure the Judge does, too.  Is there anything at all
3    about your situation, the uncertainty of your situation,
4    that will cause you to not be able to give your full
5    attention to this case?
6        A.   Well, as I said before, if I'm selected, I will
7    be made available.  The company allowed me to come, and
8    I'll do the best I can.
9        Q.   And I don't know if Mr. McClellan asked you
10   this question or not, because he changes up his
11   questioning from prospective juror to prospective juror.
12   Did you indicate what position, if you know, Church of
13   Christ takes with regard to the death penalty?
14       A.   I don't know that the church takes a position.
15       Q.   It's not like the Catholic Church that has a
16   formalized position?
17       A.   No.  The Church of Christ is an independent
18   entity of its own.  It follows the tenets of the Bible,
19   and that's all they're bound by.  A lot of folks -- one
20   of my coworkers is a minister, Methodist minister who
21   would say that he would not be in the position I am now,
22   because he would say he was opposed to the death
23   penalty.  But nothing my church teaches would prevent me
24   from serving on this case.
25       Q.   Okay.  I think your first response, when I

228

1    asked you what goes through your mind when you're
2    filling out that questionnaire, thinking about it,
3    probably framing your thoughts and your present state of
4    mind.  That is, you recognize this as an extremely
5    important decision-making process, one that carries a
6    great deal of weight with it, but one that I assume,
7    again, to borrow the Judge's phrase, you're comfortable
8    with that?  The process about how we go about deciding
9    these kinds of cases is one that you're okay with?
10       A.   Yeah.  And I hesitate with the word
11   comfortable.  I'm resigned to it.
12       Q.   If you had it within your power to change
13   certain aspects of the law regarding capital murder and
14   the potential punishments that could be levied against
15   somebody that's found guilty of capital murder, would
16   you make any changes?
17       A.   I thought about that just this afternoon, how
18   the death penalty is a costly process and that it might
19   be cheaper to incarcerate people for the rest of their
20   lives, life without parole, than to go through the
21   appeals process for people who are convicted and
22   subjected to the death penalty.  Has no bearing on the
23   decisions we're faced with here.
24       Q.   Let me ask you how you feel about -- because a
25   lot of people, when they're talking about life in prison

229

1    as an option that's given to them, certainly through the
2    answers they give to these questions -- a lot of people
3    have said, well, but life doesn't really mean life.  It
4    means you get five years, and then you're on probation.
5            The Judge has explained that, in no
6    uncertain terms, that life in a capital murder case --
7    and this in particular -- if you were to find the
8    defendant guilty of that capital murder and set his
9    punishment at life, it would be the Year 2039 before he
10   would become eligible for parole.  What do you think
11   about that, as far as the mandatory forty-year time
12   period?  Does that give people a greater degree of
13   comfort, if you will, with assessing a life sentence as
14   opposed to how maybe a misconception people might have
15   as to what life means?
16       A.   If this gentleman was subjected to forty years
17   in prison, his life would be hereafter changed.  Forty
18   years in prison is a significant portion of a person's
19   life.
20       Q.   One of the answers you gave to a question that
21   said, Anyone can overcome a neglectful or abusive
22   childhood.  You said disagree.  What do you mean by
23   that?
24       A.   I realize there are people that have difficult
25   circumstances growing up that influence their lives that

230

1    are beyond their ability to change those circumstances.
2        Q.   Are there any type situations that come to mind
3    when you think about a question like that?  Is there a
4    particular area of a person's background that might
5    shape them forever into the future?
6        A.   I'm sorry.  Are there --
7        Q.   Is there a particular area that you think of
8    when you're thinking of an answer to that question?
9        A.   First five years, I think, are the most
10   important years of a person's life.
11       Q.   If I had to -- if I had to ask you to give me a
12   couple or three reasons why a criminal defense attorney
13   sitting here trying to evaluate in a very short period
14   of time whether you would be ideally suited to sit with
15   eleven other people and hear this case and make all the
16   decisions you're called upon to make, what reasons could
17   you give me?
18       A.   As to why I should be selected?
19       Q.   Yes.  In other words, a reason that I would
20   turn to Mr. Mamou and Mr. Wentz and say, here are the
21   three reasons, from talking to Mr. Kelly, we should
22   accept him as a juror?
23       A.   Here's my opportunity to throw out the reasons,
24   I suppose, that would allow me to go home for the rest
25   of the day and the week.

231

1    Q.  If you wanted to do that, too; but I think the
2   statement --
3    A.  I don't want to be here, and I've told you
4   that; but the law requires that citizens serve in
5   judgment of others.  I don't know this young man.  I
6   don't know the names of the other two people on the
7   questionnaire, except the name Carmouche is familiar to
8   me for some reason.  I can listen to what you have to
9   say and give a fair decision.
10    Q.  Okay.  I don't think anybody can offer any more
11   than that.  Is there any reason you could think of why I
12   shouldn't accept you as a juror in this case, other than
13   the first one for which you keep telling us you don't
14   want to be here?
15    A.  No, I cannot.
16    Q.  Okay.  Thank you, sir.
17         (Court admonishes prospective juror.)
18              WESLEY DWAYNE MIKLE,
19   having been first duly sworn, testified as follows:
20              VOIR DIRE EXAMINATION
21   BY THE COURT:
22    Q.  First off, all of us want to thank you for your
23   patience.  It's been a long day for all of us.  Mr.
24   Mikle, before we begin, let me tell you this:  I've read
25   your questionnaire, and I see in it that you're a fan of

232

1   Judge Judy, and you have heard me talk about her.  I
2   withdraw all those comments.  Can you see how our
3   business is a little bit different than hers?
4    A.  Yes, sir.
5    Q.  I haven't convinced my father that I can come
6   up with decisions in fourteen minutes like she can; but
7   at any rate, having said that, let me ask you this:
8   Remember back to last Friday when the big group was
9   together and everything we talked about.  Add to it this
10   morning, the stuff we talked about this morning.  Out of
11   everything we have talked about, do you have any
12   questions at all for me?
13    A.  No, sir.
14    Q.  Any of these rules that we have set out that
15   you find that you have any disagreement with?
16    A.  No, sir.
17    Q.  So if you were a juror in the case, are you
18   saying if these rules did come into play, as a juror,
19   you would be willing to both follow those rules, as well
20   as to enforce them?
21    A.  Yes, sir.
22    Q.  Is there anything at this point, Mr. Mikle, we
23   have not yet talked about that you feel as though we
24   should because it might have some influence or some
25   bearing on your being a juror in this case?

233

1    A.  No, sir.
2    Q.  Anything at all, sir, that you can think of at
3   the present -- might have something to do with your
4   personal life, your professional life, your health, or
5   might have something to do with something else that you
6   think in any way would interfere with your ability to be
7   a juror in this case during the time frame we talked
8   about?
9    A.  No, sir; because the only thing I know is my
10   job, and I know you can handle that.
11    Q.  Okay.  Anything about that -- and I don't
12   want -- before I get too far into what we're doing, we
13   have talked and we're convinced that -- and talked to
14   you about the idea this trial is going to last for at
15   least one week, but probably not -- not as much as two
16   weeks, probably somewhere in between.  Is that something
17   that, job-wise, that you can work out?
18    A.  Yes, sir; because like I said, coming back to
19   you, all I got to do is give them your phone number.
20    Q.  All right.  That's a deal.  I'll sure talk to
21   them if they call.  The things we talked about this
22   morning, can you see, Mr. Mikle, that every decision a
23   jury makes in a capital murder trial has got to be based
24   upon the evidence in that given case?
25    A.  Yes, sir.

234

1    Q.  You might have -- well, each decision the jury
2   makes is independent of the other decisions.  Depends
3   upon the evidence.  A person is either guilty or not
4   guilty.  If a jury finds the defendant guilty of capital
5   murder, then these two questions can come into play.
6   And sometimes, depending upon the evidence, these
7   questions might be answered in such a way by the jury
8   that the death penalty is imposed.  Other times these
9   same questions might be answered the opposite way so
10   that a life sentence is imposed, the idea being that we
11   want the jury to be able to answer these questions
12   whichever way they think is right, depending upon the
13   evidence in that given case.  And does that sound like
14   something you could and would be willing to do?
15    A.  Yes, sir.
16    Q.  Before we begin, do you have any questions at
17   all for me?
18    A.  No, sir.
19    Q.  Okay.  Thank you.
20         THE COURT:  Mr. McClellan.
21         MR. MCCLELLAN:  Thank you, Your Honor.
22              VOIR DIRE EXAMINATION
23   BY MR. MCCLELLAN:
24    Q.  Is it Mikle?
25    A.  Mikle.

235

1    Q.  Mikle.  Mr. Mikle, my name is Lyn McClellan.
2  Along with Claire Connors, we represent the State of
3  Texas in this case.  I want to talk to you about some of
4  the answers in your questionnaire and talk to you about
5  certain aspects of the law and get a better feel for
6  what your thoughts are.  First of all, can you kind of
7  tell me in your own words what your thoughts are about
8  the death penalty?
9    A.  Well, like you had in the questionnaire
10  already, I think it's reasonable for the death penalty
11  being enforced or not enforced.  To me, it all depends
12  on the type of the crime that is being committed.
13    Q.  Right.  What types of crimes do you think the
14  death penalty ought to be available for?
15    A.  Well, like you say, for instance, murder;
16  that's intending to commit murder.
17    Q.  Right.
18    A.  I wouldn't say, like -- I just leave it at
19  that.
20    Q.  Intended to commit murder?
21    A.  Yeah.
22    Q.  Of course, murder is the intentional taking of
23  another person's life without any legal justification.
24  In other words, we're not talking self-defense or
25  accident.  They intend to kill somebody, and they do so.

236

1    A.  Right.
2    Q.  Some people kind of say, well, if you take
3  someone else's life, your life ought to also be taken,
4  kind of an eye for an eye, a tooth for a tooth.  What do
5  you think about that?
6    A.  I don't look at it like that.
7    Q.  Okay.  What factors do you think then are
8  important in determining whether or not someone
9  intentionally took someone's life?  What factors do you
10  think are important in deciding what punishment a person
11  should receive?
12    A.  First of all, the type of evidence that's being
13  presented in that type of case.
14    Q.  By the type of evidence, you're talking about
15  what?
16    A.  If you have witnesses, for one, and you got
17  evidence that he committed it for some other offense
18  than for his own good, like for drugs or for money.
19    Q.  So if the person commits a crime for drugs, you
20  think that might mean the death penalty should be
21  available; or do you think that may mean it's not
22  available?  In other words, he's got some reason for
23  doing it.  You think that makes the death penalty less
24  likely, or just does it for no reason?
25    A.  Well, it's hard to say right there; because I

237

1  wouldn't want to see someone die just because he had
2  taken someone else's life for drugs.  Now it's up to the
3  jury to find him guilty.
4    Q.  Right.
5    A.  But if the offense is committed -- if he
6  committed the offense to provide himself or whoever
7  associated with him for their personal reason --
8    Q.  Right.
9    A.  -- like money, to show he can get away with it
10  or stuff like that, then I don't think he should be
11  given a life sentence.  I look at it that he did it
12  intentionally, because he tried to get hisself ahead,
13  you know, by --
14    Q.  Do you think in that kind of crime the death
15  penalty ought to be proper?
16    A.  Oh, yeah.
17    Q.  Punishment?  Is that what you're saying?
18    A.  Uh-huh.
19    Q.  What kind of cases do you think where a person
20  ought to receive life?
21    A.  Well, like an accident.  He wasn't trying to do
22  it.  Falsely accused, or the evidence points towards him
23  like, fingerprints, witnesses, that he was associated
24  with the person that did it.
25    Q.  I didn't follow the part about fingerprints.

238

1    A.  Like if he committed a crime and you got
2  evidence of fingerprints from the weapon that he used,
3  or a witness that was there to see he was in the area to
4  commit that kind of crime --
5    Q.  Okay.
6    A.  -- then I would go along with a life sentence,
7  even if it's his first offense.
8    Q.  Especially if it's his first time to kill
9  somebody?
10    A.  Yeah.
11    Q.  Do you think that -- in a murder case --
12  that -- could you conceive of finding someone guilty of
13  murder when the weapon was never recovered?
14    A.  My sole belief, myself, yeah, I could go along
15  with that; because you don't necessarily have to have
16  the weapon, as long as you know the crime has been
17  committed and you got proof that he did it, evidence of
18  the gun or whatever he did do it with.
19    Q.  The Judge talked to you about circumstantial
20  evidence.  In other words, where there is not an
21  eyewitness to the commission of the crime.  Do you think
22  you could ever convict someone of capital murder where
23  it was based just on circumstantial evidence?
24    A.  It's a possibility.
25    Q.  Okay.  Do you think eyewitness testimony,

239

1  though, would be better?
2      A.  It would help the case a lot better, but not
3  necessarily.  Because like I say, you've got to have
4  evidence.
5      Q.  There was a question in here that says, Do you
6  consider life imprisonment a severe penalty?  And you
7  checked yes, that you do.  Says you then went on to add,
8  The person that gets life imprisonment cannot be a
9  threat to society.  In other words, if they spend the
10  rest of their life in the penitentiary, they won't be a
11  threat to society.
12     A.  Right.
13     Q.  Issue Number One says -- now it is at the
14  punishment stage of a trial.  You wouldn't get to that
15  until you got to punishment.  Says, Do you find from the
16  evidence beyond a reasonable doubt that there is a
17  probability that the defendant would commit criminal
18  acts of violence that would constitute a continuing
19  threat to society.  Is it your thoughts if a person got
20  a life sentence, then that question would be answered
21  there because he wouldn't be a continuing threat to
22  society?
23     A.  That's right.
24     Q.  Because he's going to be doing life in the
25  penitentiary?

240

1      A.  Right.
2      Q.  Talked about, do you think mitigating evidence
3  concerning a capital murder defendant's background
4  should be considered in deciding whether or not he or
5  she should receive the death penalty?  And you said yes.
6  What kinds of evidence do you think about a defendant's
7  character or background would be helpful in mitigating,
8  meaning evidence that would cause you to give a person a
9  lesser punishment, give life as opposed to death?  What
10  do you think is mitigating in those types of cases, if
11  anything?
12     A.  Well, again, like you say, if the weapon is not
13  being presented at the trial.
14     Q.  All right.  And depending on what type of
15  background, like if it's his first offense?
16     A.  Right.
17     Q.  Has he been in trouble before?  When you talk
18  about first offense, are you talking about the first
19  time he's ever done a violent-type crime?
20     A.  Yeah, right.
21     Q.  You think that pretty well indicates a life
22  sentence as opposed to death?
23     A.  Right.
24     Q.  There is a question on the agree/disagree part
25  back here.  It says, Life imprisonment is more effective

241

1  than the death penalty.  And you checked that you agree
2  with that.  Is that because you think if you get a life
3  sentence, he won't be a threat anymore?
4      A.  That's the way I was looking at it.
5      Q.  On the questionnaire it said -- it gave you a
6  list of five things to choose from about your opinion
7  about -- it said, Assume you're on a jury to determine
8  the sentence for a defendant who has been convicted of
9  capital murder.  Which of these best expresses your
10  opinion?
11          In other words, you've already found
12  someone guilty of capital murder.  Now we're trying to
13  decide the punishment.  And you said this is what you
14  mostly agreed with.  There are some kinds of cases in
15  which I know I could not vote for the death penalty even
16  if the law allowed me to, but others which I would be
17  willing to consider to vote for.
18          Are you saying, some capital murder cases,
19  even though the law allows me to give the death penalty,
20  I wouldn't give it?  Some other cases I would give it?
21  Anything come to mind there of the cases that you would
22  or you wouldn't?
23     A.  I mean, what I was thinking about, like -- that
24  is like he committed a murder case where he just still
25  shooting someone, done cut them up.

242

1      Q.  Decapitated them?
2      A.  Right.
3      Q.  And did all that?
4      A.  Right.
5      Q.  But there are some cases you say you could not
6  vote for the death penalty even if the law allowed you.
7  What kind of cases come to mind there?
8      A.  Like he wasn't intending to kill no one.
9      Q.  That will be decided.  By you finding him
10  guilty, that would have already been decided.
11     A.  Right, okay.  Repeat that question again.
12     Q.  There are some kinds of cases which I know I
13  could not vote for the death penalty even if the law
14  allowed me to.
15     A.  The way I looked at that question is that the
16  severeness of the crime that he did --
17     Q.  If there was decapitating, cutting the body up,
18  things like that, that would be the kind of case you
19  would feel comfortable with.  But if it didn't have that
20  kind of severity, that type of brutality, you wouldn't
21  feel comfortable?
22     A.  Right.
23     Q.  Thank you, sir.  I appreciate your time, and
24  I'm going to pass you to the other side.
25          THE COURT:  Do you have any questions?

243

```
1              MR. HILL:  Just have a few.
2              VOIR DIRE EXAMINATION
3   BY MR. HILL:
4       Q.  Hi, Mr. Mikle, my name is Wayne Hill.  How are
5   you today?
6       A.  Okay.
7       Q.  I just want to ask you a couple of things.
8   State's covered a lot of ground with you.  You've been
9   here all day.  So no need to belabor the point with you.
10  I'm sure everybody will appreciate it if I speak less
11  and listen more.  Strongly disagree with the proposition
12  that everybody can overcome a neglectful or abusive
13  childhood.  Tell me what you mean by that.  Question
14  asks -- it says, agree or disagree?  Anyone can overcome
15  a neglectful or abusive childhood.  And you said,
16  strongly disagree.
17      A.  That all depends.  The way I look at that
18  question was the type of parenting that he had coming
19  up.  Who was there in the time of need, you know, raised
20  the right way to do the things they're supposed to do
21  and not let him just wander off and do things that he
22  wasn't supposed to do as a kid.  That's the way I was
23  looking at the question.
24      Q.  You've got four children.  I take it you've
25  been very involved with the kids?
```

244

```
1       A.  Every chance I get, I'm there.
2       Q.  You take some credit for how they've come out?
3       A.  Yes, sir.
4       Q.  All right.  Let me just ask you this:  Where
5   were you raised?  Where did you grow up?
6       A.  I grew up in Cleveland, Texas.
7       Q.  In another city.  You worked for the post
8   office for twenty-five years, so you were around
9   twenty-five when you went to work for them?
10      A.  Yes, sir.
11      Q.  Had you worked in any other capacity prior to
12  going to work for the postal service?
13      A.  Came out of the military into the postal
14  service.
15      Q.  I was going to ask you what branch you were in?
16      A.  In the army.
17      Q.  How long were you in the army?
18      A.  I stayed in there three years.
19      Q.  Did you see service in Vietnam?
20      A.  Yes, sir.
21      Q.  What -- I'm sitting here.  I'm a defense
22  lawyer.  I'm representing that man right there, Mr.
23  Mamou.  Mr. Wentz and I, in a couple of moments we're
24  going to sit down and have a little conversation.  We're
25  going to say, Mr. Mikle presented himself to us.  He
```

245

```
1   answered our questions.  What do you say?  Do you think
2   we should invite him back?  Should we have him come
3   back and possibly sit with eleven other people to judge
4   this case?  I'm not going to know you in fifteen or
5   twenty minutes even after hearing your conversation with
6   Mr. McClellan or the Judge.  I can only ask you to look
7   inside yourself and tell me whether or not I would be
8   making any kind of mistake in having you come back and
9   sit in judgment of that man charged with capital murder.
10             In other words, if I said I'd like for you
11  to come back and sit in one of these chairs, would I be
12  making a mistake in asking you to come back?
13      A.  Are you asking me that now?
14      Q.  Yes.
15      A.  Not that -- no, sir, you wouldn't.
16      Q.  You're the kind of person that if you
17  had to go on trial for something, you're the kind of
18  juror that you would want sitting in your own case?
19      A.  Yes, sir, sure would.
20      Q.  Fair enough.  Got any questions of me?  You get
21  to ask if you want to.
22      A.  No, sir.
23      Q.  Any comments you'd like to make about having to
24  wait around all day?
25      A.  No.  I just like the -- I liked the way the
```

246

```
1   Judge handled it and explained things.
2       Q.  Okay.  All right.  Thank you, sir.
3             (Juror admonished.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

247

1  THE STATE OF TEXAS  )

2  COUNTY OF HARRIS    )

3          I, Pamela Kay Knobloch, Official/Deputy
   Official Court Reporter in and for the 179th District
4  Court of Harris County, State of Texas, do hereby certify
   that the above and foregoing contains a true and correct
5  transcription of all portions of evidence and other
   proceedings requested in writing by counsel for the
6  parties to be included in this volume of the Reporter's
   Record, in the above-styled and numbered cause, all of
7  which occurred in open court or in chambers and were
   reported by me.

8          I further certify that this Reporter's Record
9  of the proceedings truly and correctly reflects the
   exhibits, if any, admitted by the respective parties.

10         I further certify that the total cost for the
11 preparation of this Reporter's Record is $_____ and
   was paid by Harris County.

12         WITNESS MY OFFICIAL HAND this the _____ day of
13 _____, 2000.

14

15 _____

16 Pamela Kay Knobloch, Texas CSR No. 1650
   Expiration date:  12/31/2000
17 Official Court Reporter, 179th District Court
   Harris County, Texas
18 301 San Jacinto
   Houston, Texas 77002
19 713.755.6340

20 APPELLANT:  CHARLES MAMOU, JR.
               CAUSE NO. 800112

21

22
23
24
25

**$**

**$10,000** [1] 38:1
**$** _____ [1] 247:11

**'**

**'91** [1] 144:23

**0**

**0470500** [1] 2:5

**1**

**1** [4] 63:19 161:25 188:17 208:14
**1(b) (1** [2] 200:10 200:11
**10** [1] 55:2
**100** [2] 94:1 95:12
**104** [1] 3:3
**107** [1] 3:4
**10:00** [2] 184:9 184:19
**11** [3] 72:15 200:7 209:2
**12** [5] 1:2 87:8 200:7 208:14 209:2
**12/31/2000** [1] 247:16
**13** [8] 91:14 91:18 102:19 200:8 200:24 203:16 208:15 209:2
**13396100** [1] 2:3
**15th** [1] 113:12
**1650** [1] 247:16
**179th** [3] 1:11 247:3 247:17
**1960** [1] 2:19
**1998** [1] 4:10
**1999** [3] 1:18 34:12 59:19

**2**

**2** [4] 63:25 108:1 162:3 164:3
**2000** [1] 247:13
**201** [1] 2:7
**2039** [10] 33:14 33:15 34:6 59:20 108:11 129:14 129:22 148:5 166:13 229:9
**21179300** [1] 2:18
**21st** [1] 1:18
**25** [1] 1:2
**281.587.0088** [1] 2:21
**28th** [1] 146:13
**29th** [1] 111:25

**3**

**3** [2] 102:23 103:9
**301** [1] 247:18

**4**

**4** [1] 198:6
**46** [2] 55:2 169:22
**4615** [1] 2:14
**48(b** [1] 72:15
**4th** [5] 50:12 50:13 112:8 184:9 224:5

**5**

**5** [1] 188:17
**56** [1] 87:9
**5629** [1] 2:19
**59656300** [1] 2:13
**5:00** [2] 184:10 184:19
**5:30** [1] 75:3

**6**

**6** [1] 200:5
**6-27-50** [1] 109:12
**65** [1] 203:16

**68** [1] 206:12

**7**

**70** [1] 91:18
**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 247:19
**77002** [2] 2:8 247:18
**77027** [1] 2:15
**77069** [1] 2:20
**7th** [1] 4:9

**8**

**800112** [2] 1:3 247:20
**8:00** [1] 21:2
**8:30** [1] 75:2

**____**

____ [1] 247:12

**____**

____ [1] 247:15

**A**

**Aberration** [1] 159:17
**Abide** [2] 70:10 100:6
**Abilities** [7] 59:8 71:4 157:13 162:23 190:16 196:18 218:16
**Ability** [24] 50:9 53:14 66:22 112:25 116:13 117:16 124:5 131:18 131:24 148:15 150:3 180:16 185:18 191:25 192:20 199:8 202:8 205:3 211:2 211:10 215:24 217:20 230:1 233:6
**Able** [22] 7:6 12:19 36:21 38:23 54:4 54:17 57:17 66:21 71:5 118:24 119:10 128:5 147:4 171:8 183:15 196:4 212:9 218:22 220:6 223:19 227:4 234:11
**Above-entitled** [1] 1:19
**Above-styled** [1] 247:6
**Absolute** [4] 11:18 84:22 98:12 181:7
**Absolutely** [12] 8:24 11:22 12:2 23:17 30:17 33:19 34:7 70:24 119:16 171:21 186:14 187:19
**Abuse** [2] 119:24 211:19
**Abusive** [4] 173:4 229:21 243:12 243:15
**Abut** [1] 59:7
**Accept** [4] 88:3 100:6 230:22 231:12
**Accident** [9] 36:10 61:21 76:7 153:10 172:18 179:13 218:5 235:25 237:21
**Accidental** [1] 166:23
**Accommodate** [1] 184:13
**Accomplish** [2] 132:3 211:22
**Accomplishing** [1] 150:17
**According** [2] 20:8 100:3
**Account** [3] 8:21 40:3 42:7
**Accountant** [2] 183:10 192:9
**Accurate** [2] 89:2 99:2
**Accurately** [2] 83:12 164:4
**Accused** [2] 127:9 237:22
**Achieve** [1] 127:25
**Acquiring** [1] 226:9
**Act** [10] 19:14 56:12 60:6 84:18 121:7 122:14 122:25 177:21 178:18 205:3
**Acted** [2] 177:8 178:5

**Acting** [2] 177:23 210:3
**Action** [1] 147:23
**Active** [1] 138:12
**Activity** [1] 153:4
**Acts** [55] 7:23 17:24 18:2 18:4 18:9 18:15 18:24 19:16 19:18 19:20 19:22 20:3 20:7 21:4 21:9 21:16 21:22 22:2 61:7 61:16 61:24 62:11 62:1 14 63:4 64:25 65:17 79:20 85:13 104:3 107:19 122:12 122:17 122:22 122:25 123:7 123:16 134:16 137:7 153:9 158:5 158:24 159:5 160:16 163:15 164:2 193:14 195:8 195:15 216:23 219:5 219:14 219:16 220:12 221:18 239:18
**Actual** [1] 160:25
**Add** [9] 7:6 49:20 86:15 86:19 129:17 131:11 210:20 232:9 239:7
**Addition** [2] 37:25 159:9
**Additional** [5] 5:23 60:22 90:3 157:5 190:14 195:10 218:13
**Address** [7] 51:8 175:17 193:17 193:18 193:19 202:11 206:11
**Addressed** [7] 49:25 67:23 86:25 131:16 149:20 183:5 211:1
**Adjustments** [1] 185:13
**Administrator** [2] 225:24 226:2
**Administrators** [2] 21:14 226:5
**Admire** [1] 199:3
**Admitted** [1] 247:9
**Admonished** [1] 246:3
**Admonishes** [4] 130:16 148:25 182:16 231:17
**Adult** [3] 196:10 196:13 223:10
**Advance** [1] 188:13
**Affect** [10] 51:24 118:24 120:21 155:13 166:16 192:19 197:3 217:20 221:16 226:12
**Afford** [1] 68:8
**Afternoon** [4] 177:11 197:14 197:15 228:17
**Age** [13] 27:7 64:13 162:18 162:20 196:11 223:3 223:4 223:5 223:9 223:13 223:16 223:17 223:20
**Aggravated** [2] 135:11 135:12
**Ago** [12] 23:16 73:5 80:11 103:16 108:22 117:23 127:20 152:8 180:23 180:24 192:8 193:1
**Agree** [27] 43:9 69:12 77:3 77:5 77:5 77:23 83:17 106:25 119:15 119:17 119:18 120:20 122:12 123:11 193:25 194:11 196:8 196:14 196:15 200:12 200:16 200:25 202:7 215:12 223:13 241:1 243:14
**Agree/disagree** [4] 165:13 193:22 200:7 240:24
**Agreeable** [2] 116:16 188:5
**Agreed** [3] 165:16 194:20 241:14
**Agreement** [2] 3:2 3:6
**Ahead** [8] 52:3 89:6 100:15 121:15 188:7 188:14 197:23 237:12
**Aid** [1] 157:15
**Aided** [1] 1:22
**Ain't** [1] 29:24
**Air** [1] 4:20
**Aircraft** [1] 144:17
**Airlines** [1] 144:23

**Airplane** [1] 144:25
**Airport** [1] 144:25
**Akin** [1] 164:16
**Alarm** [1] 185:25
**Alcohol** [9] 63:19 63:23 64:2 161:24 162:2 162:5 162:7 196:5 196:6
**Alike** [1] 11:14
**Alive** [1] 39:7
**Allegation** [2] 35:18 224:21
**Allegations** [1] 35:16
**Alleged** [8] 4:8 54:10 85:8 124:16 153:15 189:24 218:3 218:10
**Allow** [2] 77:9 230:24
**Allowed** [6] 76:16 123:13 227:7 241:16 242:6 242:14
**Allows** [5] 58:18 123:17 195:22 206:24 241:19
**Almost** [1] 168:19
**Alone** [2] 83:8 83:10
**Amount** [2] 175:7 224:7
**Analysis** [1] 163:11
**Anger** [1] 39:19
**Angleton** [1] 109:20
**Angry** [1] 225:12
**Ann** [1] 109:9
**Announced** [1] 226:15
**Answer** [180] 7:8 8:3 8:7 9:9 9:11 9:12 9:16 9:24 10:3 10:3 10:4 10:5 14:9 14:10 15:24 16:6 16:12 16:20 16:21 16:24 17:1 18:19 19:1 19:22 22:9 22:11 22:12 24:24 24:14 24:5 24:13 24:16 24:20 24:22 28:15 29:9 29:13 29:17 30:3 31:1 31:2 31:6 31:9 31:16 31:17 31:25 32:1 32:2 32:4 35:2 49:5 49:6 53:10 58:20 59:14 59:23 60:25 61:22 62:2 62:25 62:25 63:7 63:7 63:9 64:19 65:3 75:23 76:11 76:15 76:25 77:1 77:21 77:22 77:24 78:1 78:2 78:24 78:25 79:11 79:14 79:17 79:23 81:3 81:5 81:13 81:14 81:21 81:24 82:4 82:5 82:7 82:8 82:18 87:24 88:7 88:24 90:8 90:10 90:12 90:14 90:18 90:21 97:17 97:18 97:19 97:24 98:11 104:1 104:12 106:4 106:15 106:5 106:7 107:3 107:12 108:9 108:10 108:17 113:4 113:5 114:25 115:1 115:2 121:13 126:6 126:7 126:14 127:4 127:5 129:23 133:16 137:12 137:15 137:18 137:25 138:4 150:20 150:21 158:2 158:6 158:6 159:24 160:9 161:11 161:12 161:12 161:14 173:10 173:11 180:2 185:6 186:8 186:9 187:9 187:9 187:13 187:16 187:17 195:24 195:24 195:25 198:2 204:24 206:20 207:10 208:24 210:9 213:2 213:9 213:9 219:22 219:24 220:8 222:1 222:7 222:15 230:8 234:11
**Answered** [34] 11:21 16:11 16:19 29:25 30:13 31:13 32:12 33:8 34:10 34:12 49:5 75:23 77:4 85:10 90:6 90:7 106:7 107:21 107:23 128:19 137:1 186:20 186:22 188:2 188:17 193:11 200:9 204:20 212:25 217:7 234:7 234:9 239:20 245:1
**Answering** [23] 5:25 24:3 61:1 62:21 85:17 90:5 99:6 115:4 138:8 157:15 157:19 157:20 175:8 186:24 191:21 195:4 195:12 201:17 201:17 206:3 207:17 209:16 219:1
**Answers** [28] 6:3 8:2 9:8 10:1 79:10 85:16 90:24 97:

20 98:24 106:13 117:19 133:11 141:3 141:4 152:3 152:4 185:6 191:8 197:25 198:3 198:8 210:10 214:12 214:14 221:15 229:2 229:20 235:4

**Anti** [1] 68:25
**Anticipated** [1] 80:22
**Antigunners** [1] 70:4
**Anytime** [2] 36:13 36:17
**Anyway** [1] 26:12
**Apart** [1] 82:6
**Apartment** [1] 27:15
**Appeal** [1] 215:8
**Appeals** [1] 228:21
**Appear** [1] 7:14
**Appellant** [2] 1:6 247:20
**Appellee** [1] 1:11
**Applicable** [2] 166:25 223:12
**Applied** [2] 71:16 192:14
**Applies** [1] 135:9 135:15 211:14
**Apply** [15] 48:10 49:9 54:14 54:20 55:7 55:25 56:1 56:6 105:14 152:5 153:13 153:19 154:8 190:6 196:12
**Applying** [3] 71:9 72:17 156:5
**Appointment** [2] 50:11 75:6
**Appreciate** [5] 125:18 169:15 197:24 242:23 243:10
**Approach** [1] 199:18
**Appropriate** [24] 6:10 9:4 11:18 11:23 16:16 23:10 25:11 27:2 38:11 42:7 42:11 105:1 135:1 135:3 151:10 151:11 152:18 166:20 168:8 168:9 195:21 214:19 215:15 222:3
**Appropriately** [1] 223:25
**Appropriateness** [1] 172:25
**Area** [8] 27:14 44:7 67:15 108:20 144:9 230:4 230:7 238:3
**Areas** [1] 42:14
**Arguably** [1] 213:16
**Argue** [1] 223:18
**Argument** [4] 138:23 154:18 154:22 172:22
**Arguments** [3] 172:16 172:21 172:23
**Armed** [2] 7:7 14:13
**Army** [2] 244:16 244:17
**Arrest** [1] 47:6
**Arrested** [2] 43:12 43:20
**Arrive** [1] 54:21
**Arrived** [1] 154:14
**Arson** [1] 19:23
**Articles** [3] 143:17 143:18 143:23
**Aside** [8] 54:5 69:22 70:2 70:6 75:14 153:24 155:9 155:12
**Asleep** [1] 39:12
**Aspect** [20] 47:10 54:22 55:23 60:2 60:9 60:16 64:9 133:15 161:16 162:15 163:7 167:1 168:8 169:13 191:14 196:2 196:25 212:8 219:24 222:8
**Aspects** [8] 21:18 54:11 152:5 168:9 181:3 214:15 228:13 235:5
**Assault** [1] 123:2
**Assaultive** [1] 137:9
**Assaults** [1] 19:19
**Assembly** [1] 140:20
**Assess** [7] 96:24 102:10

102:20 103:6 103:8 146:4 189:8
**Assessed** [4] 58:21 106:13 106:21 128:6
**Assessing** [4] 40:23 41:18 101:22 229:13
**Assistant** [2] 2:6 4:3
**Assisting** [1] 5:24
**Associated** [2] 237:7 237:23
**Association** [1] 20:20
**Assume** [19] 40:7 41:6 51:14 52:22 58:9 82:19 92:3 92:3 101:23 108:4 121:10 126:20 127:6 151:10 166:14 223:2 225:11 228:6 241:7
**Assure** [2] 56:2 224:4
**Attack** [1] 180:6
**Attacking** [1] 36:7
**Attention** [4] 52:5 71:23 224:8 227:5
**Attorney** [3] 140:18 141:13 230:12
**Attorneys** [2] 2:6 2:10 2:22 4:1 4:4 72:18
**Authorities** [1] 33:22
**Authority** [1] 200:16
**Automatic** [9] 32:10 62:24 62:25 155:7 158:2 158:6 158:10 174:11 216:15
**Automatically** [6] 58:23 136:20 155:1 163:10 175:22 191:10
**Automatics** [1] 158:9
**Automobile** [1] 19:25
**Available** [17] 14:12 55:4 56:3 56:5 60:23 120:14 151:9 152:22 186:14 186:24 212:20 212:24 223:15 227:7 235:14 236:21 236:22
**Awarded** [1] 34:23
**Aware** [5] 80:13 201:1 201:13 201:16 201:17
**Awhile** [1] 23:16

**B**

**Baby** [1] 18:11
**Background** [33] 6:24 8:11 8:22 40:16 41:12 59:7 60:24 62:6 104:17 105:10 121:19 128:11 138:10 157:12 138:3 160:19 160:21 173:16 190:15 191:5 195:10 207:6 208:7 208:21 209:13 209:13 218:15 221:8 222:1 230:4 240:3 240:7 240:15
**Backseat** [1] 80:15
**Bad** [11] 7:5 25:9 25:10 26:24 83:9 95:9 118:13 173:18 179:22 179:23 207:12
**Badly** [1] 206:11
**Bag** [2] 43:20 43:21
**Baker** [1] 3:4
**Balances** [3] 216:15 217:6 217:13
**Ballistically** [1] 47:8
**Bank** [5] 43:9 43:10 43:11 43:21 192:23
**Base** [4] 132:20 169:22 210:4 210:5
**Based** [45] 15:4 23:6 31:18 32:17 40:25 41:20 45:1 45:16 48:23 53:24 66:6 76:2 76:12 76:19 76:25 77:1 88:20 90:9 90:13 90:23 104:11 114:12 114:19 114:21 119:12 125:1 128:4 138:5 151:11 154:2 155:10 185:6 186:9 186:16 187:2 205:2 212:13 213:2 215:10 233:23 238:23
**Basis** [5] 34:10 38:7 44:23 49:7 72:5

**Bat** [1] 20:1
**Bearing** [10] 50:1 87:1 111:21 131:17 149:22 182:21 183:7 211:2 228:22 232:25
**Beating** [1] 20:1
**Became** [1] 54:6
**Become** [11] 48:7 48:19 53:22 132:19 148:4 153:22 184:7 184:24 205:13 212:10 229:10
**Becomes** [1] 33:17
**Begin** [5] 26:11 49:18 111:6 112:7 115:8 133:19 149:14 151:17 214:4 234:16
**Beginning** [6] 13:21 14:22 15:18 16:2 16:13 67:11
**Begins** [8] 13:13 13:13 24:28:24 29:1 31:21 133:1 186:4
**Begun** [1] 197:23
**Behind** [5] 20:23 21:1 21:3 21:12 88:15
**Belabor** [1] 243:9
**Belief** [4] 54:5 78:14 93:1 238:14
**Beliefs** [17] 52:24 54:3 65:25 87:10 92:14 92:22 92:23 94:7 104:11 104:22 110:5 116:24 116:24 118:4 118:6 153:24 217:19
**Believable** [1] 185:1
**Believes** [1] 152:17
**Below** [2] 196:12 223:11
**Bench** [1] 211:20
**Benefit** [6] 142:23 158:11 205:14 205:22 209:22 217:10
**Berra** [1] 29:23
**Best** [24] 52:12 66:22 67:14 126:17 127:10 127:24 138:23 154:22 172:16 172:21 173:0 173:11 173:23 173:24 174:23 184:4 184:23 185:5 202:1 202:13 215:3 215:11 227:8 241:9
**Bet** [1] 211:14
**Better** [16] 5:11 5:12 75:10 126:8 149:13 174:3 174:15 197:20 199:20 199:23 199:24 213:19 214:13 235:5 239:1 239:2
**Betterment** [1] 200:2
**Between** [13] 3:2 42:13 61:13 98:9 99:1 171:9 181:1 181:2 196:17 196:19 196:21 196:24 233:16
**Beyond** [87] 7:22 15:10 15:14 15:16 15:20 16:3 16:5 16:25 17:5 18:13 24:10 35:20 36:16 36:21 36:25 37:4 43:6 44:24 45:3 45:6 45:12 46:4 46:17 47:13 47:17 47:24 57:2 57:16 60:1 61:5 63:3 76:2 76:21 78:21 79:16 85:11 93:16 93:23 95:7 95:13 96:10 96:17 97:23 98:2 99:7 99:8 99:17 99:21 100:3 100:7 106:1 121:7 135:22 135:24 136:5 141:15 141:18 142:15 146:19 154:7 157:2 158:1 158:4 158:6 158:17 158:21 160:13 168:15 168:17 168:21 168:23 169:7 169:12 171:22 172:1 172:6 190:1 204:16 216:17 216:21 217:25 218:6 219:3 219:22 219:23 230:1 239:16
**Bible** [1] 227:18
**Big** [3] 127:16 144:24 232:8
**Biggest** [2] 71:17 127:19
**Biological** [1] 196:11
**Biologically** [2] 223:21 223:23
**Birth** [3] 109:11 124:23 125:12

**Bit** [9] 6:2 7:20 28:24 126:14 121:23 148:14 177:19 197:20 232:3
**Bitching** [2] 56:19 57:23
**Blameworthiness** [1] 8:18
**Blocks** [2] 57:7 125:25
**Blood** [1] 118:22
**Blows** [1] 73:16
**Blue** [1] 225:15
**Board** [8] 7:11 7:14 7:15 33:24 34:3 121:14 191:9 201:4
**Bob** [1] 1:20
**Bodies** [3] 61:2 157:17 218:22
**Bodily** [1] 55:13
**Body** [7] 31:5 31:9 42:5 47:9 150:23 204:14 242:17
**Boils** [1] 100:4
**Bonilla** [8] 111:2 111:6 111:19 112:23 114:13 115:16 125:18 125:22
**Bored** [1] 145:14
**Born** [2] 130:21 192:7
**Borrow** [1] 228:7
**Bottom** [2] 183:20 184:23
**Bound** [1] 227:19
**Box** [3] 68:25 70:4 79:13
**Boy** [2] 159:16 198:19
**Brag** [1] 124:6
**Braggadocious** [1] 220:19
**Branch** [1] 244:15
**Brass** [1] 182:5
**Brazoria** [4] 109:7 109:15 109:18 109:19
**Break** [2] 19:24 19:25
**Break-ins** [1] 19:24
**Breaking** [3] 55:6 56:4 71:11
**Breaks** [1] 74:5
**Breath** [1] 34:18
**Breathe** [1] 34:18
**Breathing** [1] 34:17
**Brick** [1] 20:1
**Brief** [2] 143:11 146:14
**Briefly** [2] 6:1 217:23
**Bring** [2] 32:18 168:12
**Brings** [1] 167:16
**Broad** [1] 210:3
**Brother** [2] 164:7 164:15
**Brothers** [1] 30:20
**Brought** [6] 3:21 51:16 74:6 130:17 146:13 200:14
**Brown** [1] 46:8
**Brutality** [1] 242:20
**Build** [1] 210:4
**Building** [2] 19:25 46:5
**Bumped** [3] 15:21 15:21 16:12
**Burden** [33] 18:6 59:24 60:18 63:2 65:9 69:5 93:16 93:17 94:6 95:8 99:16 104:13 107:14 135:21 139:10 142:10 158:12 160:14 167:17 168:4 168:5 168:6 168:7 168:9 168:10 168:15 170:25 171:3 171:23 219:4 219:21 219:21 221:5
**Burdensome** [1] 51:22
**Burdette** [1] 1:20
**Burglaries** [1] 19:24
**Burglary** [2] 123:1 135:13 137:9
**Burning** [1] 19:23
**Bush** [2] 199:17 199:18
**Business** [6] 14:15 14:17 52:25 79:10 109:21 232:3

# C

**C.P.A.** [1] 192:24

**Cannot** [9] 17:19 33:10 36:25 37:6 42:20 42:24 109:5 231:15 239:8

**Capacity** [1] 244:11

**Capital** [166] 4:8 7:18 10:8 10:9 11:20 12:9 12:23 16:14 16:15 19:6 19:17 22:21 26:11 27:10 28:14 28:23 28:25 29:6 29:10 30:7 30:11 31:5 32:11 33:7 34:16 35:10 35:11 35:21 36:17 36:24 37:9 37:12 37:16 37:19 40:9 40:12 41:9 50:20 50:22 51:12 54:12 56:23 58:10 58:12 58:19 59:4 59:16 60:13 60:22 61:18 62:19 64:2 64:22 65:16 73:24 77:8 78:6 78:11 78:22 80:2 80:14 80:18 81:2 82:16 82:21 83:3 83:13 85:8 85:20 87:19 89:25 90:2 93:16 104:1 106:7 114:25 118:17 121:2 121:8 121:12 121:23 122:13 122:24 123:7 124:11 128:8 128:13 129:10 133:11 135:23 136:7 136:19 140:3 142:20 146:20 147:12 147:14 148:3 153:17 155:20 156:1 158:20 156:22 156:22 157:23 158:21 158:25 159:3 159:12 160:3 162:8 163:1 163:13 163:25 165:4 165:15 165:20 166:13 173:14 173:21 173:22 174:8 174:13 174:20 175:17 175:20 175:21 176:21 178:6 186:20 187:7 187:12 190:8 191:3 193:24 194:10 195:13 201:12 201:13 203:3 204:8 206:7 206:15 207:23 212:23 218:7 218:8 218:11 218:20 219:13 219:16 220:7 221:16 224:21 228:13 228:15 229:6 229:8 233:23 234:4 238:22 240:3 241:9 241:12 241:18 245:9

**Car** [6] 43:8 55:18 55:19 80:15 177:11 177:12

**Card** [1] 21:7

**Care** [10] 7:19 44:17 44:18 45:4 45:9 50:14 79:9 113:21 225:18 226:6

**Career** [1] 38:17

**Cares** [2] 45:5 45:11

**Caring** [1] 144:3

**Carmouche** [1] 231:7

**Carolina** [2] 80:12 84:6

**Carrier** [1] 70:3

**Carries** [2] 60:18 228:5

**Carrying** [2] 68:24 69:6

**Carter** [1] 199:19

**Carved** [1] 37:15

**Case** [233] 3:24 5:19 7:7 8:1 9:1 9:7 9:24 10:13 10:19 10:21 11:12 11:19 11:20 11:24 11:25 12:1 13:3 13:9 16:14 21:11 22:8 22:14 23:7 23:3 23:19 23:21 24:25 25:3 25:6 25:9 25:23 27:6 27:7 27:9 28:11 28:16 29:19 30:3 30:6 30:9 30:25 31:24 32:5 32:6 32:17 33:5 33:6 34:11 34:11 35:16 36:23 37:2 37:8 38:10 39:1 40:3 40:9 41:1 41:18 41:25 42:4 42:9 44:1 44:5 44:13 44:15 44:17 44:19 44:25 46:20 47:6 47:25 47:6 50:2 50:10 50:21 51:6 54:12 54:15 56:23 57:10 58:21 60:1 67:7 67:17 67:9 68:9 73:11 73:16 73:23 73:24 76:17 78:18 83:7 83:9 89:17 90:1 90:13 90:24 91:1 91:20 93:14 93:16 93:18 94:18 94:19 94:23 94:23 95:9 95:17 95:24 95:25 96:17 96:21 100:13 101:17 101:25 102:10 102:12 102:16 103:1 103:8 108:16 108:19 108:22 108:25 109:2 109:6 109:16 110:7 110:20 112:6 112:25 114:15 115:16 115:18 118:17 121:2 124:17 124:18 126:21 128:14 128:22 129:22 131:18 131:25 132:12 132:20 133:5 135:11 138:9 139:7 140:16 141:8 141:15 141:18 142:15 142:20 148:8 148:13 149:23 150:3 151:5 151:12 152:2 152:6 152:24 154:1 156:13 159:8 159:17 161:21 168:15 168:17 168:20 169:7 169:12 170:14 170:15 172:1 172:6 177:6 180:16 182:12 184:0 185:18 186:17 187:7 187:15 188:12 191:12 197:6 201:12 203:12 204:16 206:16 211:3 211:10 212:11 212:12 213:3 213:20 214:12 215:8 217:20 224:17 224:21 225:11 227:5 227:24 229:6 230:15 231:12 232:7 232:25 233:7 233:24 234:13 233:3 236:13 238:11 239:2 241:18 242:4 242:7 242:12 245:4 245:18

**Cast** [1] 147:4

**Category** [4] 19:13 19:14 20:7 225:12

**Catholic** [8] 188:25 189:14 192:12 198:17 198:18 198:24 209:20 227:15

**Catholics** [1] 189:12

**Caused** [5] 36:1 62:12 73:2 76:3 162:8

**Causes** [3] 76:8 185:24 193:15

**Causing** [2] 47:9 76:20

**Certain** [41] 17:21 19:13 19:24 53:2 53:6 54:11 56:24 56:25 65:25 69:15 75:24 93:24 94:2 94:13 95:20 95:22 98:11 107:22 108:21 116:5 118:11 132:18 132:19 134:8 152:5 152:18 153:24 154:5 154:15 156:6 159:9 179:4 160:20 191:18 203:23 214:14 215:15 215:19 220:20 228:13 235:5

**Certainly** [11] 19:6 19:17 48:18 53:17 70:22 72:2 80:19 132:18 204:4 211:12 229:1

**Certainty** [14] 17:20 18:8 18:12 18:22 61:9 94:1 98:1 98:12 98:16 98:17 98:19 158:17 168:18 219:8

**Certify** [3] 247:4 247:8 247:10

**Chair** [3] 29:3 67:18 74:17

**Chairs** [4] 48:20 134:18 212:11 245:11

**Challenge** [2] 86:5 100:6

**Challenging** [1] 145:4

**Chambers** [1] 247:7

**Chance** [15] 23:11 28:7 50:24 73:9 111:24 127:7 130:6 177:14 184:3 184:5 188:20 216:13 216:13 222:21 244:1

**Change** [20] 10:14 10:15 10:15 10:17 64:8 64:17 65:20 89:11 129:24 147:4 161:1 161:12 163:4 163:7 175:25 195:19 202:8 221:15 228:12:20 231:4

**Changed** [8] 11:15 11:15 11:16 11:16 102:4 152:11 226:5 229:17

**Changes** [4] 10:16 202:9 227:10 228:16

**Channel** [2] 201:25 202:1

**Character** [24] 6:24 8:11 8:22 27:19 40:16 41:12 59:7 60:24 62:5 104:17 105:9 121:8 138:10 157:12 158:22 160:2 160:21 190:14 191:5 207:7 208:7 218:15 218:19 218:19 222:1

**Charge** [8] 5:2 5:4 14:2 33:10 54:9 81:21 154:3 189:22

**Charged** [13] 4:7 28:25 35:10 44:16 68:24 73:22 74:10 168:22 174:13 177:14 178:5 218:2 245:9

**Charles** [7] 1:5 3:25 60:13 110:18 197:17 205:14 247:20

**Cheaper** [1] 228:19

**Check** [3] 102:19 109:13 109:16

**Checked** [12] 55:5 87:12 91:19 123:11 165:16 193:25 194:11 200:24 206:16 206:22 239:7 241:1

**Checking** [2] 103:11 109:25

**Checks** [3] 216:15 217:5 217:12

**Cheerleader** [2] 108:23 108:24

**Child** [4] 55:16 55:20 56:12 135:14

**Childhood** [5] 173:19 198:21 229:22 243:13 243:15

**Children** [6] 80:14 80:20 80:20 142:22 200:12 243:24

**Choice** [4] 9:13 9:18 74:18 147:20 147:21 181:14

**Choices** [1] 147:11

**Choirboy** [1] 159:15

**Choose** [7] 102:22 108:9 143:2 147:15 181:15 210:15 241:6

**Chose** [2] 103:9 145:15

**Chosen** [4] 69:10 186:15 188:24 210:7

**Christ** [2] 227:13 227:17

**Church** [8] 103:7 189:14 192:12 227:12 227:14 227:15 227:17 227:23

**Circle** [1] 105:23

**Circumstance** [14] 9:3 25:1 28:4 44:13 104:16 104:19 112:17 112:24 138:16 161:3 185:17 207:21 221:7 221:11

**Circumstances** [62] 6:15 8:8 9:3 10:24 26:13 28:3 39:23 40:22 40:25 41:3 41:24 42:8 44:14 62:2 62:3 63:12 70:18 79:25 91:20 96:25 101:13 102:21 102:25 104:6 104:9 104:19 104:25 105:13 106:23 106:25 107:2 107:5 107:13 122:4 124:17 129:13 135:14 138:18 140:8 159:9 159:22 161:3 163:6 165:9 166:4 173:2 173:5 173:17 178:3 179:12 207:6 207:21 208:6 208:23 214:24 217:1 221:11 222:1 223:4 229:25 230:1

**Circumstantial** [13] 44:10 44:11 44:20 45:11 45:16 45:19 46:2 47:10 47:15 47:17 47:23 238:19 238:23

**Citizen** [3] 62:7 130:23 225:4

**Citizens** [3] 22:3 156:3

**City** [1] 244:7

**Civil** [1] 109:6

**Civilized** [1] 194:19

**Claim** [2] 45:1 46:10

**Claimed** [1] 46:11

**Claire** [10] 2:4 4:4 51:5 91:10 115:17 134:1 152:1 188:11 214:11 235:2

**Class** [1] 19:13

**Classmates** [1] 209:21

**Clean** [2] 83:2 83:7 83:9

**Clear** [1] 175:9

**Clearer** [3] 101:15 102:3 107:6

**Clearly** [1] 177:7

**Cleveland** [1] 244:6

**Client** [3] 73:1 143:6 143:7

**Clients** [1] 127:10

**Close** [4] 71:7 134:22 144:4 177:20

**Closest** [1] 216:3

**Clue** [2] 158:1 226:13

**Coconspirator** [3] 42:21 42:23 43:2

**Coconspirators** [1] 42:19

**Coconspire** [1] 42:18

**College** [1] 192:15

**Combat** [1] 28:2

**Combination** [1] 207:16

**Comfort** [5] 23:13 143:5 146:21 214:1 229:13

**Comfortable** [36] 5:10 20:12 67:16 68:22 70:13 71:4 85:2 86:13 96:15 101:21 102:13 110:19 127:11 128:16 129:22 133:17 141:23 141:24 142:1 142:19 143:1 146:22 147:22 170:24 171:3 175:24 181:9 182:11 205:1 210:18 213:21 213:25 228:7 228:11 242:19 242:21

**Coming** [5] 15:4 145:1 176:18 233:18 243:18

**Comments** [2] 232:2 245:23

**Commission** [10] 7:1 35:14 43:3 43:7 43:16 43:24 196:7 220:14 220:16 238:21

**Commit** [62] 4:22 7:23 17:24 18:2 18:4 18:9 18:15 18:19 19:2 19:6 19:12 20:6 42:10 42:19 61:7 61:16 61:24 62:10 62:14 63:4 64:2 64:25 65:17 79:19 80:6 83:1 83:3 85:13 104:2 107:19 122:12 122:17 122:24 123:7 126:17 136:14 137:5 139:3 155:4 158:5 158:23 159:4 160:16 162:5 162:7 163:1 163:14 164:2 195:8 195:14 208:23 210:5 210:7 216:22 219:5 219:14 220:11 221:17 235:16 235:20 238:4 239:17

**Commitment** [6] 66:3 66:5 71:5 79:12 84:22 143:1

**Commits** [8] 26:10 59:19 65:7 65:8 65:13 65:14 85:20 236:19

**Committed** [39] 6:14 13:17 25:21 29:10 38:4 38:8 38:18 58:24 59:11 62:7 63:14 63:19 74:7 74:11 76:13 76:18 116:6 117:3 117:13 121:22 122:2 122:20 123:18 127:2 139:3 146:20 155:2 155:6 157:9 163:20 170:23 190:25 235:12 236:17 237:6 238:3 238:17 241:24

**Committing** [8] 28:10 74:8 74:12 122:14 153:14 171:19 190:24 194:9

**Common** [1] 149:7

**Commonly** [1] 169:24

**Communicate** [1] 42:16

**Communities** [2] 20:14 20:14

**Community** [4] 20:13 22:1 144:13 200:2

**Company** [4] 226:7 226:9 226:17 227:7

**Comparative** [2] 8:18 26:3

**Compared** [2] 8:19 25:8

**Comparison** [1] 17:11

**Compelling** [1] 202:25

**Completely** [3] 30:17 30:20 31:4

**Complicated** [1] 14:23

**Computer** [1] 1:22

**Conceive** [2] 91:25 238:12

**Concentrate** [1] 146:7

**Concentrating** [1] 146:12

**Concept** [7] 30:23 42:16 42:16 142:6 151:8 170:24 189:7

**Concepts** [1] 134:6

**Concern** [4] 5:17 117:24 126:4 165:7

**Concerned** [7] 93:3 93:5 100:19 100:20 100:22 192:21 224:3

**Concerning** [2] 55:22 240:3

**Concerns** [1] 51:7

**Conclude** [1] 204:4

**Concluded** [2] 30:2 177:24

**Conclusion** [5] 4:25 34:22 202:25 203:1 205:14

**Conclusions** [2] 203:21 203:23

**Condition** [1] 118:23

**Conduct** [9] 20:4 25:17 25:18 25:18 27:18 173:21 213:13 213:16 222:2

**Confinement** [3] 37:22 40:24 41:19

**Conflict** [2] 54:2 66:16

**Conflicts** [1] 92:13

**Confusing** [1] 4:19

**Conjure** [1] 200:22

**Connect** [4] 43:2 43:7 43:16 43:23

**Connected** [1] 206:2

**Connection** [1] 64:3

**Connors** [15] 2:4 4:5 51:5 91:10 115:17 133:23 133:25 134:1 140:10 141:9 146:1 152:1 188:11 214:11 235:2

**Connors'** [1] 3:8

**Conroe** [1] 164:11

**Conscience** [4] 92:19 92:21 93:1 199:1

**Conscious** [5] 82:10 82:12 82:15 82:17 184:24

**Conservative** [1] 198:7

**Consider** [20] 20:11 40:23 41:18 60:8 61:3 61:4 85:17 102:24 123:14 136:12 138:20 139:21 139:24 176:6 198:7 217:11 220:10 221:21 239:6 241:17

**Considerable** [1] 171:25

**Consideration** [11] 8:7 20:20 28:5 33:17 33:18 88:17 104:15 160:18 206:24 207:2 221:6

**Considered** [5] 33:11 129:12 166:14 206:14 240:4

**Considering** [1] 169:1

**Consistent** [1] 72:17

**Consistently** [2] 23:3 97:19

**Constituency** [1] 175:15

**Constitute** [9] 7:24 20:9 22:3 61:8 85:14 153:17 155:24 156:1 239:18

**Constitutes** [1] 159:1

**Constituting** [1] 21:23

**Constrained** [1] 68:3

**Constraints** [1] 148:16

**Contact** [2] 20:17 20:19

**Contained** [1] 15:8

**Contains** [1] 247:4

**Contest** [1] 184:22

**Context** [1] 17:22

**Continental** [1] 144:23

**Continue** [1] 17:4

**Continuing** [49] 7:24 18:23 20:9 21:23 22:3 22:5 61:6 61:23 62:10 62:14 63:4 64:24 65:1 65:17 79:21 81:8 85:14 104:2 107:19 122:12 122:17 123:8 125:2 136:15 136:17 137:13 137:14 158:5 159:1 159:4 159:10 159:13 160:16 163:14 164:2 195:8 195:15 216:22 219:6 219:15 220:3 220:11 220:21 221:17 221:19 222:12 222:16 239:18 239:21

**Contracting** [1] 225:17

**Contractors** [1] 183:12

**Contradict** [1] 54:2

**Contrary** [2] 41:6 55:9

**Control** [5] 51:23 66:2 165:3 189:16 226:17

**Conversation** [8] 16:19 24:14 87:17 111:9 114:12 133:8 244:24 245:5

**Conversing** [1] 140:23

**Convey** [1] 141:13

**Convict** [3] 38:16 153:3 238:22

**Convicted** [23] 10:9 37:22 42:20 43:14 44:22 44:23 55:16 55:20 56:1 56:10 59:19 80:13 80:18 87:19 109:5 109:15 147:12 147:13 175:20 175:21 222:11 228:21 241:8 24 109:3

**Convince** [4] 104:9 146:7 167:23 216:25

**Convinced** [5] 79:1 85:7 142:14 232:5 233:13

**Convinces** [1] 85:9

**Cooter** [1] 46:8

**Cop** [2] 200:17 200:18

**Copy** [3] 91:15 109:24 198:5

**Corner** [2] 55:10 68:7

**Correct** [9] 51:19 52:22 68:5 79:3 97:3 101:23 113:18 160:7 247:4

**Correctly** [7] 88:21 88:23 99:15 132:11 150:12 212:4 247:9

**Corroborates** [1] 43:15

**Cost** [1] 247:10

**Costly** [1] 228:18

**Counsel** [3] 76:17 126:21 247:5

**Counseling** [1] 165:2

**Country** [1] 170:9

**County** [23] 1:8 1:21 4:9 22:4 56:24 57:6 57:7 57:9 70:16 71:2 71:21 73:6 109:7 109:15 109:18 109:19 120:18 164:10 164:11 247:2 247:4 247:11 247:17

**Couple** [18] 7:12 15:7 32:22 39:2 60:5 79:8 80:11 97:15 111:7 141:21 141:21 155:14 169:21 188:23 216:11 230:12 244:23 244:23

**Course** [31] 5:3 5:10 12:13 14:14 35:17 35:18 36:15 37:6 43:21 44:8 48:5 57:1 61:22 80:1 117:5 121:4 122:21 132:6 146:4 153:14 153:15 157:1 161:22 166:19 166:21 185:21 211:24 218:6 218:10 223:19 235:22

**Court** [74] 1:3 1:5 3:1 3:8 3:10 3:12 3:14 3:16 3:19 3:22 49:17 54:1 54:4 54:8 54:21 55:9 56:4 56:18 57:8 58:4 67:2 70:12 77:10 79:7 83:24 84:2 86:2 86:9 88:12 88:14 91:5 91:17 97:6 97:10 97:14 100:15 105:21 109:7 109:18 110:10 110:23 111:5 115:12 130:16 130:18 130:20 130:23 131:1 131:5 133:23 140:11 148:25 149:5 151:22 154:3 169:17 182:16 182:20 188:7 197:9 197:13 210:17 214:6 219:11 224:12 231:17 231:21 234:20 242:25 247:3 247:4 247:7 247:17 247:17

**Court's** [5] 5:2 5:4 14:1 33:9 189:21

**Courtroom** [4] 11:4 52:20 57:11 58:3

**Cover** [1] 60:5

**Covered** [1] 243:8

**Coworkers** [1] 227:20

**Craig** [1] 3:4

**Create** [2] 112:2 165:1

**Created** [1] 183:25

**Credibility** [1] 54:16

**Credit** [1] 244:2

**Crime** [114] 6:13 7:1 7:2 8:10 8:17 19:3 19:11 19:14 20:6 25:21 26:11 27:9 36:5 37:14 37:15 37:16 37:16 37:18 38:4 38:7 38:18 40:10 42:9 42:18 42:19 43:3 43:8 43:17 43:24 58:22 58:24 59:11 59:13 59:19 62:7 74:8 74:12 104:16 105:8 105:11 117:13 118:11 118:13 120:17 120:20 120:21 120:25 122:11 122:1 122:4 124:10 124:12 126:17 127:2 127:9 128:1 138:12 138:15 153:14 154:25 155:2 155:4 155:5 156:17 157:6 157:9 157:11 157:18 159:22 160:9 160:19 160:20 161:23 162:6 163:9 165:23 166:25 171:19 171:19 180:11 189:7 189:9 190:23 191:1 191:7 191:9 195:6 195:22 196:7 196:11 196:23 203:2 208:3 220:6 210:7 218:9 220:10 220:12 220:14 220:15 220:17 220:18 222:1 222:2 223:3 235:12 236:19 237:14 238:1 238:4 238:16 238:21 240:19 242:16

**Crimes** [17] 19:13 19:13 53:2 53:6 101:2 119:20 119:22 120:15 135:9 153:2 153:6 161:18 192:23 215:15 215:19 223:15 235:13

**Criminal** [61] 5:15 7:23 17:25 18:4 18:9 18:16 18:24 19:14 19:16 19:18 19:20 19:22 20:2 20:7 21:4 21:9 21:16 21:22 22:2 38:17 59:7 61:7 61:16 79:20 80:1 80:7 85:1 93:5 95:9 109:6 120:3 121:19 122:22 122:25 122:25 123:7 136:14 137:7 143:15 152:23 152:24 153:4 157:12 158:22 158:24 158:25 168:19 190:15 191:5 193:13 195:10 195:15 216:23 218:15 219:5 219:14 230:12 239:17

**Criminally** [1] 178:22

**Criminals** [1] 194:19

**Critical** [1] 70:11

**Cross/Blue** [1] 225:16

**Crying** [1] 176:25

**CSR** [1] 247:16

**Culpability** [8] 8:12 8:23 104:18 138:11 160:23 207:7 208:8 221:8

**Cure** [1] 26:20

**Current** [1] 193:6

**Cut** [2] 179:18 241:25

**Cutting** [1] 242:17

## D

**D.A.** [1] 164:22

**Danger** [12] 29:12 29:14 30:15 80:20 106:8 187:21 203:6 204:9 204:19 205:6 207:3 207:24

**Dangerous** [1] 81:25

**Darn** [1] 75:16

**Date** [4] 56:24 83:2 109:11 247:16

**Day-to-day** [1] 72:5

**Days** [5] 75:8 152:8 155:14 224:6 226:16

**Dead** [2] 42:4 118:21

**Deal** [14] 13:3 18:18 52:3 70:2 82:23 93:2 141:16 154:21 209:14 209:15 216:2 225:17 228:6 233:20

**Dealer** [2] 55:15 70:15

**Dealing** [3] 68:6 225:16 225:19

**Dearly** [2] 39:3 39:9

**Death** [254] 9:5 9:14 9:23 10:3 10:11 15:24 16:23 22:12 22:13 23:4 23:7 23:11 24:1 25:11 25:24 27:2 28:13 28:19 28:24 29:21 30:1 32:5 32:8 32:13 32:21 32:23 35:3 37:1 39:52:18 53:1 53:5 55:13 58:14 58:23 59:17 59:22 63:13 63:22 64:9 64:16 64:20 65:1 65:4 65:13 65:21 76:3 76:5 83:3 84:16 85:23 87:13 87:18 88:3 89:1 89:10 89:23 90:1 90:19 90:23 91:13 91:19 92:1 92:6 92:20 93:9 93:21 93:21 94:12 94:19 94:22 95:17 95:24 96:18 96:20 96:24 100:23 101:12 101:17 101:18 101:22 102:1 102:7 102:8 102:12 102:21 103:3 103:8 103:12 103:20 104:4 104:7 104:8 104:10 104:22 104:23 105:13 105:25 106:2 106:3 106:9 106:17 106:17 107:16 107:20 107:21 108:4 108:5 108:8 108:18 110:4 110:5 115:2 116:1 116:4 116:8 116:16 117:3 117:11 117:20 118:9 118:14 119:16 119:19 119:23 120:1 120:3 120:6 120:14 122:7 123:13 123:16 123:23 124:14 124:18 124:19 125:15 128:5 128:9 128:14 134:8 134:15 134:19 134:23 135:1 135:5 135:8 135:15 137:16 137:20 137:24 138:1 138:24 143:18 146:4 146:7 146:24 147:13 151:8 151:13 152:17 152:21 153:13 153:18 154:18 154:22 155:1 155:7 160:6 160:8 160:11 161:5 161:9 161:15 163:14 163:10 163:16 163:19 166:6 166:20 166:24 167:5 167:21 167:24 172:16 172:19 172:21 172:24 172:25 174:5 174:9 174:15 175:11 175:20 186:23 187:25 188:25 189:1 191:11 191:13 191:17 193:5 193:12 194:5 194:9 195:19 195:23 195:25 196:13 198:25 201:1 201:2 203:5 203:9 203:18 205:2 207:11 207:15 212:25 213:20 214:17

215:14 215:18 216:15 217:2
217:4 217:10 221:2 221:13
221:20 222:6 222:7 223:2
223:10 223:12 223:14 227:13
227:22 228:18 228:22 234:8
235:8 235:10 235:14 236:20
236:23 237:14 240:5 240:9
240:22 241:1 241:15 241:19
242:6 242:13

**Death-type** [1] 52:18

**Deaths** [1] 76:20

**Deaton** [11] 131:2 131:8
131:15 132:2 132:17 133:7
134:25 136:18 137:3 140:15
143:8

**Decapitated** [1] 242:1

**Decapitating** [1] 242:17

**December** [5] 4:10 112:13
112:14 112:16 112:18

**Decide** [23] 7:17 14:7 41:
15 83:19 112:4 116:17 117:2
117:24 118:14 136:13 136:25
137:24 145:9 145:14 145:23
162:14 174:14 207:15 207:23
221:1 222:16 225:9 241:13

**Decided** [4] 84:13 192:17
242:9 242:10

**Deciding** [15] 5:17 47:12
99:5 104:8 117:10 138:17
148:13 148:20 159:24 185:1
203:17 223:1 228:8 236:10
240:4

**Decision** [81] 11:17 14:
21 23:12 28:7 28:17 31:7 31:
11 31:12 34:7 34:13 38:7 48:
22 52:3 52:17 52:19 53:15
59:22 66:17 70:9 70:10 84:
23 92:10 92:20 92:20 93:3
93:4 94:8 94:11 94:12 99:2
99:2 99:5 107:16 107:17 116:
14 117:17 119:1 119:12 121:
20 122:19 132:20 133:12 133:
15 138:21 139:25 139:25 150:
19 154:12 154:13 164:5 165:
5 165:6 166:16 175:8 181:23
186:16 190:7 192:1 196:2
197:3 197:5 205:8 205:19
206:15 212:15 212:16 213:13
214:21 214:25 215:5 215:10
215:25 216:4 216:14 218:18
222:22 223:25 228:5 231:9
233:22 234:1

**Decision-making** [1]
228:5

**Decisions** [23] 30:6 30:8
30:9 30:22 53:10 116:10 116:
20 133:9 148:15 150:18 182:
8 187:6 187:10 191:21 202:
22 213:7 213:10 215:21 217:
2 228:23 230:16 232:6 234:2

**Declare** [1] 13:8

**Default** [1] 81:24

**Defend** [2] 55:14 126:12

**Defendant** [133] 2:22 3:
15 3:18 4:7 5:18 5:19 5:21
6:20 6:25 7:6 7:17 7:23 7:
25 8:18 9:6 9:14 9:20 10:17
10:18 10:20 12:9 12:23 13:
18:1 18:9 18:14 18:24 19:2
19:5 19:12 20:6 22:20 24:14
24:15 26:2 26:17 27:10 27:
13 29:16 33:6 33:9 33:10 33:
15 33:16 33:22 35:9 36:23
37:3 37:25 40:4 40:12 40:13
40:17 41:9 41:13 42:9 43:2
43:7 46:10 46:15 46:18 46:
23 47:1 47:2 47:5 47:6 47:
7 61:16 63:18 69:1 73:19 79:
19 80:2 80:4 82:20 82:25 89:
1 90:2 90:8 90:19 90:23 104:
18 105:10 106:5 115:2 115:3
116:12 121:3 126:22 128:1
134:23 136:7 137:13 137:14
137:16 142:17 157:2 158:11
160:11 164:17 166:11 166:12
167:14 167:20 168:11 168:22
168:24 168:25 171:4 174:2

**Defendant's** [25] 8:11 8:
22 11:15 11:21 13:14 13:20
26:5 40:23 41:19 47:7 59:7
60:11 62:5 104:16 121:18
138:10 160:19 160:23 190:14
216:17 218:14 221:2 221:7
240:3 240:6

**Defendants** [3] 8:17 12:
14 106:6

**Defense** [37] 24:21 36:4
55:4 55:6 55:21 56:3 61:20
72:13 72:18 72:21 72:25 76:
6 126:12 126:16 139:18 141:
11 141:12 142:9 142:16 153:
9 154:6 167:10 173:15 177:8
177:10 177:20 177:21 178:5
178:19 179:13 179:20 196:6
196:8 196:11 218:5 230:12
244:21

**Defense's** [1] 167:14

**Defenses** [2] 169:24 179:4

**Define** [6] 14:8 14:18 54:
12 54:12 54:13 154:5

**Defined** [5] 14:5 14:6 17:
7 20:11 25:14

**Definitely** [4] 183:11
200:14 204:21 208:11

**Definition** [9] 15:12 17:
10 137:4 154:7 189:24 189:
25 189:25 206:18 206:19

**Definitions** [3] 14:13 54:
11 54:14

**Degree** [4] 44:3 185:24
201:20 229:12

**Deliberate** [1] 40:19

**Deliberates** [1] 40:11

**Deliberating** [1] 5:6

**Deliberation** [1] 11:8

**Deliberations** [1] 169:2

**Demand** [2] 57:25 94:22

**Demanding** [1] 95:7

**Demands** [1] 55:18

**Depart** [1] 199:2

**Depth** [1] 79:11

**Describe** [1] 144:3

**Desert** [1] 27:25

**Deserve** [3] 34:10 151:13
151:13

**Deserves** [7] 27:20 120:4
123:22 151:14 165:23 189:7
194:5

**Designed** [1] 65:2

**Despite** [1] 71:6

**Destiny** [1] 116:18

**Detail** [2] 6:2 12:4

**Detective** [2] 202:1 202:2

**Determine** [14] 63:11 64:
7 64:23 66:4 122:9 122:16
146:23 161:10 184:1 195:14
221:3 221:4 222:11 241:7

**Determined** [1] 218:20

**Determines** [3] 6:4 40:11
40:13

**Determining** [8] 122:6
123:5 162:22 191:8 207:2
220:2 220:10 236:8

**Devise** [1] 202:7

**Devote** [1] 184:24

**Dictate** [5] 30:12 42:4
133:16 150:21 187:13

**Dictated** [2] 124:20 189:6

**Dictates** [2] 9:10 187:2

**Die** [4] 39:5 47:9 178:9
237:1

**Died** [2] 27:17 118:18

**Dies** [2] 39:13 117:24

**Difference** [13] 26:24 40:

174:12 179:8 191:24 212:22
213:8 215:22 218:2 219:5
219:11 220:4 229:8 234:4
239:17 241:8

**Different** [58] 6:7 6:11
10:12 10:13 10:18 10:23 10:
24 10:25 11:1 11:2 11:7 11:
9 12:2 16:22 20:14 22:10 26:
8 26:14 27:8 29:20 30:17 30:
17 30:20 31:4 31:8 32:10 32:
25 37:21 38:6 38:25 68:13
72:6 89:13 97:20 115:2 127:
5 128:7 128:25 134:14 135:
14 141:12 145:18 147:6 154:
156:16 162:11 165:10 173:
5 187:19 188:1 194:2 202:7
204:18 206:20 213:16 217:3
217:7 232:3

**Differently** [5] 11:10 38:
15 38:19 38:22 38:24

**Difficult** [2] 46:15 229:
24

**Difficulty** [3] 113:13
113:17 179:6

**Dire** [37] 1:15 49:16 51:2
51:14 58:10 58:15 67:4 79:6
84:3 86:8 91:7 97:13 100:17
105:20 110:12 111:4 115:14
125:20 131:4 133:24 140:13
146:6 149:4 151:23 153:7
169:18 182:19 188:18 197:12
210:16 214:8 216:8 218:9
224:14 231:20 234:22 243:2

**Direct** [6] 4:9 44:10 44:
18 45:10 46:2 47:15

**Directed** [1] 208:18

**Direction** [3] 66:10 199:
14 208:22

**Disabilities** [4] 59:9
157:14 190:16 218:16

**Disability** [1] 196:22

**Disagree** [12] 56:15 71:
15 71:15 81:17 119:15 119:
17 194:1 199:8 229:22 243:
11 243:14 243:16

**Disagreement** [5] 71:18
87:5 150:8 212:1 232:15

**Discomfort** [1] 185:25

**Discovered** [1] 215:7

**Discovery** [1] 202:1

**Discretion** [3] 9:14 9:19
176:4

**Discussed** [3] 4:6 131:25
211:11

**Discussing** [1] 70:14

**Discussion** [4] 146:2 146:
14 181:1 210:13

**Disgrace** [1] 194:19

**Dismissed** [1] 111:1

**Disorders** [2] 164:20 180:
6

**Dispute** [1] 171:25

**Distinction** [6] 20:12 20:
13 61:13 72:22 72:23 171:14

**Distinctions** [1] 172:10

**District** [6] 1:5 1:1 1:2:
6 4:4 247:3 247:17

**Divorce** [1] 180:24

**Divorced** [1] 180:25

**Doctor** [1] 113:9

**Doctors** [1] 21:13

**Document** [1] 154:4

**Documentaries** [1] 201:25

**Documents** [1] 142:13

**Done** [25] 6:14 6:15 6:15 6:
18 10:20 13:10 28:14 35:14
35:17 38:14 39:19 39:19 39:
20 39:20 50:18 76:6 80:21
82:9 82:10 83:23 125:1 126:
22 199:16 240:19 241:25

**Doors** [1] 4:2

**Doorstep** [1] 69:16

**Dope** [5] 55:10 55:15 68:7

18:11 44:17 47:15 98:9 98:25
165:22 171:9 181:2 196:16
196:19 196:21 196:22

**Doubt** [92] 7:22 15:10 15:
11 15:15 15:17 15:20 16:3
16:5 16:25 17:6 18:13 24:10
35:21 36:16 36:21 36:25 37:
5 43:6 44:24 45:3 45:6 45:
13 46:4 46:17 47:13 47:17
47:25 54:13 57:3 57:16 60:1
61:6 62:8 62:9 63:3 76:2 76:
21 78:21 79:16 85:12 93:10
93:17 93:23 95:8 95:14 96:
10 96:17 97:23 98:2 99:7 99:
8 99:17 99:24 100:4 100:7
106:1 121:7 135:23 135:25
136:5 141:15 141:19 142:15
142:24 146:19 154:7 157:2
158:1 158:4 158:8 158:13
159:8 160:13 168:16 168:17
168:21 168:23 169:7 169:13
171:22 172:2 172:6 190:1
204:16 216:18 216:21 218:1
218:7 219:3 219:22 219:23
239:16

**Doubts** [4] 53:14 116:13
191:25 215:23

**Down** [27] 24:1 27:14 38:9
40:1 42:3 45:14 46:4 46:7
50:16 51:9 51:10 51:25 55:
17 67:24 72:4 73:14 81:20
100:4 103:25 154:18 154:22
188:15 223:22 224:2 224:25
226:8 244:24

**Drastic** [1] 147:23

**Dried** [1] 179:18

**Drive** [1] 43:9

**Driver** [4] 43:8 138:14
160:25 221:10

**Driving** [2] 27:13 55:17

**Dropped** [1] 209:24

**Drown** [1] 84:7

**Drowned** [1] 80:15

**Drugs** [18] 55:3 63:18 63:
23 64:2 161:23 162:2 162:5
162:6 169:23 169:25 179:3
179:3 179:9 196:4 196:6 236:
18 236:19 237:2

**Drunk** [1] 46:11

**Drunker** [1] 46:8

**Drunks** [2] 46:7 47:11

**Due** [2] 112:13 112:18

**Duly** [8] 49:15 86:7 111:3
131:3 149:3 182:18 210:15
231:19

**Dumb** [1] 204:4

**Dump** [1] 66:1

**During** [43] 5:3 5:10 12:
13 14:14 33:22 35:14 35:17
35:18 35:19 35:20 36:14 37:
6 37:13 43:20 44:8 48:4 50:
10 57:1 58:9 61:22 63:18 76:
16 79:25 121:4 121:6 122:15
124:16 131:25 132:5 150:4
153:13 153:15 157:1 161:22
185:21 188:19 211:10 211:24
218:5 218:10 220:13 220:16
233:7

**Duty** [3] 70:6 179:24 225:3

**DWAYNE** [1] 231:18

**Dwell** [1] 143:23

---

**E**

**Ear** [1] 143:10

**Early** [2] 113:10 174:21

**Easier** [3] 47:12 125:22
140:25

**Easily** [1] 204:20

**Easy** [4] 57:24 65:24 74:13
203:24

**Ed** [3] 162:23 162:25 204:3

**Effect** [10] 10:1 65:19 82:
2 95:6 162:4 163:21 163:21
193:14 195:18 217:5

**Effective** [1] 240:25

**Effects** [2] 162:14 162:22

**Effort** [6] 21:20 82:10 82:7 13 82:17 184:18 184:25
**Efforts** [3] 27:18 82:15 199:22
**Egregious** [1] 203:2
**Eight** [3] 18:4 29:4 179:24
**Either** [20] 8:3 19:16 25:2 37:1 62:21 114:16 114:22 115:4 137:8 142:17 147:16 148:19 160:5 160:7 165:18 165:19 171:20 191:12 191:13 234:3
**El** [1] 130:22
**Elaborate** [2] 198:9 198:14
**Element** [2] 56:22 57:16
**Elements** [3] 54:10 57:2 154:5
**Eleven** [17] 13:7 13:8 53:23 67:21 90:1 127:1 141:7 143:3 148:12 171:1 171:4 174:11 181:23 205:11 225:10 230:15 245:3
**Eligibility** [1] 33:18
**Eligible** [7] 33:17 33:20 59:20 108:12 148:4 166:14 229:10
**Eliminate** [1] 48:5
**Emotion** [1] 177:1
**Emotional** [1] 178:20
**End** [14] 5:20 21:6 58:13 63:8 142:15 146:3 188:18 189:22 190:12 193:17 193:18 216:18 220:23 222:13
**Endurance** [1] 184:21
**Enforce** [5] 48:12 132:14 150:12 212:5 232:20
**Enforced** [2] 235:11 235:11
**Enforcement** [4] 164:8 164:13 164:16 192:20
**Enjoyed** [2] 145:5 145:16
**Enron** [1] 46:5
**Entering** [1] 171:3
**Entire** [1] 191:11
**Entirely** [5] 27:8 29:20 59:11 157:9 191:1
**Entitled** [6] 9:25 10:2 19:7 55:20 179:13 181:20
**Entity** [1] 227:18
**Environment** [1] 200:11
**Equal** [4] 28:24 31:22 151:4 156:1
**Equally** [3] 151:4 186:14 212:20
**Ernst** [1] 193:1
**Error** [1] 73:16
**Escape** [1] 208:11
**Escapes** [1] 21:6
**Especially** [2] 96:2 238:8
**Establish** [3] 46:17 141:17 171:8
**Estate** [1] 183:10
**Evaluate** [14] 11:10 15:2 15:4 38:7 38:8 41:15 48:22 132:21 141:6 161:6 185:4 186:7 212:12 230:13
**Evaluates** [1] 11:5
**Evaluation** [1] 212:13
**Evaluations** [4] 33:21 33:23 33:25 34:1
**Event** [2] 7:17 223:4
**Events** [2] 177:3 177:5
**Everyday** [2] 145:9 156:3
**Everywhere** [1] 21:25
**Evidence** [251] 4:25 5:23 6:11 6:13 6:21 6:22 7:21 8:5 8:8 8:25 9:10 9:24 10:13 15:10 15:19 16:3 16:4 16:8 16:11 16:25 17:5 23:6 23:18

**Excused** [5] 3:5 3:17 3:20 25:19 173:21
**Excuses** [2] 25:17 173:19
**Executing** [1] 27:19
**Execution** [6] 53:12 87:11 116:11 191:23 194:18 215:22
**Exercise** [1] 48:3
**Exhibits** [1] 247:9
**Exist** [5] 24:11 32:15 44:8 77:13 203:5
**Existed** [2] 41:4 201:6
**Existence** [8] 17:23 18:8 18:14 19:5 19:11 36:21 37:1 37:5
**Exists** [11] 9:24 19:7 23:5 23:9 23:13 24:1 25:4 27:22 28:9 31:17 34:11
**Expanded** [1] 153:20
**Expect** [10] 14:11 57:16 70:25 94:17 95:16 99:18 99:21 101:24 127:8 167:22
**Expediter** [1] 144:16
**Expediting** [1] 144:24
**Experience** [5] 72:24 155:13 179:21 179:22 209:4
**Experienced** [1] 202:16
**Experiences** [2] 73:2 143:14
**Expiration** [1] 247:16
**Explain** [4] 89:5 126:7 126:13 134:6
**Explained** [5] 91:22 101:15 142:11 229:5 246:1
**Explaining** [2] 128:24 195:2
**Explanation** [2] 102:17 198:2
**Explanations** [1] 197:25
**Explore** [1] 28:7
**Expose** [1] 211:23
**Express** [6] 67:9 68:3 92:23 141:1 177:22 178:2
**Expresses** [1] 241:9
**Extended** [1] 179:7
**Extent** [1] 163:12
**Extreme** [1] 159:18
**Extremely** [1] 228:4
**Eye** [12] 128:3 128:3 154:20 154:21 155:7 155:7 155:19 155:19 172:17 172:17 236:4 236:4
**Eyewitness** [2] 238:21 238:25

## F

**Faced** [3] 75:22 224:25 228:23
**Facet** [1] 226:2
**Fact** [30] 5:14 15:13 15:15 40:14 42:19 46:13 51:25 57:22 79:14 96:16 105:24 105:25 110:1 123:7 125:1 125:12 155:24 155:25 156:22 158:10 179:15 186:3 204:5 204:6 204:25 206:25 213:6 217:6 225:6
**Factor** [3] 124:8 162:19 198:10
**Factors** [7] 148:1 161:14 199:6 223:1 223:25 236:7 236:9
**Facts** [47] 7:7 10:23 11:16 62:2 62:3 62:22 70:23 83:9 83:10 91:20 96:25 101:12 102:19 130:17 138:3 140:1 156:6 156:8 156:10 157:18 157:20 159:8 159:12 159:21 160:8 160:18 160:20 170:18

**Facts-oriented** [1] 203:13
**Fail** [4] 57:5 59:25 63:3 216:18
**Fair** [23] 66:22 69:1 69:5 76:18 79:23 81:18 93:11 110:6 127:7 130:12 144:9 146:11 148:18 164:17 167:10 167:15 170:1 170:3 170:20 179:5 181:20 231:9 245:20
**Fairly** [5] 65:19 72:17 144:12 145:4 164:4
**Fairness** [2] 70:13 85:19
**Fall** [1] 225:11
**Falsely** [1] 237:22
**Familiar** [1] 231:7
**Family** [8] 20:17 89:13 89:16 114:8 120:22 125:11 198:17 200:6
**Fan** [1] 231:25
**Fannin** [1] 2:7
**Far** [22] 50:12 73:19 86:21 93:3 93:4 113:24 131:13 132:7 149:17 149:20 160:17 170:8 173:3 176:15 183:1 185:24 188:2 210:23 211:25 221:25 229:11 233:12
**Fast** [3] 49:13 121:15 217:23
**Father** [1] 232:5
**Fault** [1] 57:23
**Favor** [1] 73:19
**FBI** [1] 192:14
**Fear** [2] 55:13 120:21
**Feature** [3] 25:23 29:19 45:18
**Features** [5] 40:3 40:4 40:4 40:5 40:5
**Fed** [1] 52:2
**Feelings** [16] 67:12 69:9 71:6 75:19 75:20 76:25 84:8 94:7 94:7 95:4 106:16 135:5 153:21 193:5 208:18 214:17
**Felony** [5] 35:15 36:15 36:22 37:2 37:17
**Felt** [7] 71:10 99:21 123:20 123:25 177:23 178:13 206:1
**Female** [1] 166:3
**Few** [5] 124:22 126:1 140:17 140:18 243:1
**Field** [3] 46:5 210:6 226:6
**Fiesta** [1] 127:17
**Fifteen** [4] 46:23 181:18 197:18 245:4
**Fifty** [1] 39:3
**Fifty-eight** [1] 69:16
**Figure** [3] 32:24 180:8 193:16
**Figuring** [2] 113:11 193:15
**Fill** [2] 165:12 189:13
**Filled** [6] 91:12 126:2 135:18 152:7 188:14 216:6
**Filling** [3] 201:3 224:19 228:2
**Finally** [1] 39:11
**Findings** [2] 71:5 128:7
**Fine** [12] 18:19 37:25 68:2 71:6 86:2 86:11 94:11 94:20 131:7 169:6 180:2 185:11
**Fingerprint** [11] 11:13 43:22 45:19 45:19 45:21 45:22
**Fingerprints** [3] 237:23 237:25 238:2
**Fingers** [1] 145:1

**Either** [20] ...

**Effort** ...

**Egregious**

(continued column from far left at top)
...35:24 58:5 58:18 66:4 73:24 183:14

**Excused** [5] 3:5 3:17 3:20 25:19 173:21

**Finish** [1] 157:16

**Finished** [1] 48:1

**Fire** [3] 27:15 27:15 71:19

**Fired** [8] 46:24 46:24 46:25 47:1 47:3 47:4 58:2 193:2

**First** [108] 5:16 6:12 6:19 7:12 7:20 8:10 8:23 9:11 9:21 10:4 10:5 12:22 15:8 15:9 15:9 15:25 16:10 16:18 16:20 16:21 16:24 17:4 20:8 22:6 22:9 22:13 23:16 23:19 24:8 28:15 28:21 29:9 29:25 31:25 32:3 42:14 44:9 47:14 48:1 49:3 49:15 56:9 60:19 61:5 69:3 69:8 77:6 78:25 79:14 81:1 81:4 82:18 83:18 86:7 86:13 89:15 90:8 93:12 97:24 99:6 106:7 108:19 111:3 111:7 112:21 113:25 131:3 131:8 132:4 136:10 137:20 140:4 146:2 149:3 152:7 156:1 159:6 159:14 172:15 176:25 182:2 182:4 182:6 182:10 183:12 190:8 193:8 194:13 195:3 203:25 210:15 210:19 214:16 216:16 217:24 219:2 227:25 230:9 231:13 231:19 231:22 235:6 236:12 238:7 238:8 240:15 240:18 240:18

**Fist** [1] 219:19

**Fit** [5] 11:4 48:22 183:19 183:20 186:7

**Five** [15] 10:22 35:1 35:4 37:24 38:16 41:20 41:22 41:23 42:11 45:1 57:7 198:17 229:4 230:9 241:6

**Fix** [2] 73:9 193:13

**Flip** [1] 41:8

**FM** [1] 2:19

**Focus** [7] 6:11 6:13 6:21 6:22 190:22 208:2 208:2

**Focused** [1] 143:19

**Focuses** [1] 193:14

**Foggiest** [1] 34:4

**Folks** [7] 14:11 17:8 21:15 29:4 90:2 113:4 227:19

**Follow** [34] 7:19 13:4 44:4 48:12 54:4 56:6 56:17 56:1 59:5 57:13 57:15 57:17 57:18 58:3 65:24 66:11 66:15 67:10 69:11 75:17 75:21 82:17 85:1 132:14 150:12 152:3 155:12 168:7 168:9 186:1 203:24 204:9 212:5 232:19 237:25

**Followed** [1] 82:2

**Following** [4] 1:18 51:21 167:1 185:10

**Follows** [9] 49:15 86:7 111:3 131:3 149:3 182:18 210:15 227:18 231:19

**Foregoing** [1] 247:4

**Forensic** [1] 202:2

**Forever** [1] 230:5

**Forfeit** [1] 21:8

**Forgets** [1] 70:15

**Forgot** [1] 71:20

**Forgotten** [2] 112:16 206:4

**Form** [3] 54:9 152:22 154:3

**Formalized** [1] 227:16

**Former** [1] 225:12

**Forming** [1] 206:15

**Forth** [2] 40:17 197:22

**Fortieth** [1] 34:22

**Forty** [26] 10:22 33:12 33:12 33:14 33:23 34:14 34:16 35:7 38:16 59:18 101:7 101:8 105:15 108:11 129:14 129:18 129:20 130:1 148:3 166:10 174:21 175:3 175:6 229:1 229:25 229:17

**Forty-eight** [1] 184:2

**Forty-five** [4] 112:2 112:3 112:4 184:1

**Forty-five-year-old** [2] 10:22 38:16

**Forty-year** [2] 33:23 229:11

**Four** [6] 11:4 11:7 11:7 11:8 184:4 243:24

**Fourteen** [3] 127:22 225:16 232:6

**Fourth** [1] 51:11

**Frame** [5] 50:10 131:25 150:4 211:10 233:7

**Framing** [1] 228:3

**Frankly** [4] 67:8 74:1 141:6 174:18

**Frauds** [1] 192:23

**Free** [3] 21:4 21:9 21:16

**Freeway** [1] 2:14

**Freeze** [1] 192:16

**Friday** [12] 14:22 86:18 87:18 97:21 111:8 111:23 131:9 149:15 182:24 210:20 216:8 232:8

**Friend** [2] 149:10 164:22

**Front** [2] 193:17 193:18

**Frustrated** [2] 4:18 4:20

**Full** [5] 52:5 105:23 129:20 224:8 227:4

**Fully** [2] 126:14 148:2

**Function** [2] 196:25 216:5

**Functioning** [1] 203:11 205:21 206:7 206:8

**Future** [53] 17:24 18:2 18:5 18:9 18:15 19:3 19:6 20:5 29:12 29:14 30:15 61:24 63:4 64:25 65:17 76:23 79:19 80:7 80:23 81:10 83:1 83:16 83:21 84:9 84:10 85:9 85:20 104:3 106:8 107:19 122:12 122:17 125:2 136:14 158:5 159:5 160:16 163:14 164:2 187:21 187:22 195:8 204:9 200:19 205:4 205:6 205:6 207:3 207:24 213:15 213:15 217:8 230:5

## G

**Gang** [1] 210:8

**Garage** [1] 145:2

**Gardening** [1] 145:8

**Garland** [1] 192:7

**Gather** [3] 41:25 47:25 48:2

**Gender** [1] 194:15

**General** [1] 201:4

**Generally** [4] 20:4 80:23 200:16 200:25

**Gentleman** [2] 39:22 229:16

**Gentlemen** [1] 3:23

**George** [3] 149:8 199:17 199:18

**Getaway** [4] 43:8 138:14 160:25 221:10

**Girl** [3] 10:19 38:13 108:24

**Given** [29] 5:2 13:19 14:2 15:12 54:1 54:4 55:8 56:17 58:19 65:20 66:9 75:18 83:9 119:11 142:20 146:23 147:1 154:2 154:14 186:10 208:23 215:11 216:2 216:8 218:19 229:1 233:24 234:13 237:11

**Glad** [2] 142:22 205:9

**GLENN** [1] 210:14

**Global** [1] 148:16

**God** [5] 87:13 92:8 92:13 93:2 180:19

**Golf** [1] 145:22

**Gosh** [2] 124:5 204:3

**Governor** [3] 34:3 34:5 34:6

**Grade** [3] 204:1 204:2 209:20

**Grandson** [1] 145:15

**Granted** [2] 33:20 86:5

**Grave** [2] 213:24 214:20

**Great** [8] 18:12 141:16 198:20 209:14 209:15 216:2 226:10 228:6

**Greater** [5] 38:11 37:15 37:16 99:16 229:12

**Greatest** [1] 45:17

**Grew** [2] 192:5 244:6

**Grind** [1] 145:13

**Grossly** [2] 17:25 18:7

**Ground** [2] 47:2 243:8

**Group** [8] 4:12 49:20 86:15 131:9 205:13 205:13 210:20 232:8

**Grow** [2] 200:15 244:5

**Growing** [1] 229:25

**Grown** [1] 66:1

**Guards** [1] 21:14

**Guess** [26] 89:3 89:3 89:4 99:9 106:22 109:20 139:12 148:7 183:8 183:9 185:7 198:21 199:9 199:13 201:8 201:23 201:24 202:14 204:13 206:4 206:9 207:9 207:16 208:10 208:20 216:8

**Guidelines** [1] 154:15

**Guilt** [15] 15:14 15:16 16:7 43:6 45:6 45:12 46:3 47:13 47:17 97:22 99:5 121:17 136:12 159:10 171:21 189:22 191:7 213:12 218:22 218:24

**Guilt/innocence** [15] 59:24 59:25 60:6 61:3 155:3 156:15 158:7 160:21 195:4 204:14 204:15 208:4 217:25 218:14 218:24

**Guilty** [193] 5:18 5:19 5:21 6:8 6:9 6:20 7:18 12:9 21 15:17 15:19 15:21 15:22 16:8 16:9 16:15 23:20 25:20 27:10 28:14 28:23 29:6 29:10 29:14 30:6 30:7 30:11 30:14 31:21 31:21 31:24 32:11 33:7 36:24 37:3 37:9 37:11 37:12 37:12 37:13 40:12 40:14 41:9 41:10 44:15 44:25 45:16 46:14 47:22 49:3 49:4 49:4 57:14 57:14 58:12 58:17 59:3 59:13 59:16 59:16 60:2 60:13 60:13 60:14 60:22 61:18 62:19 64:22 65:16 70:19 71:1 76:8 76:9 77:2 77:7 77:17 78:5 78:10 78:21 80:2 81:2 81:7 82:16 82:20 83:13 83:19 85:8 88:20 90:2 100:7 104:1 106:6 107:18 114:19 114:20 114:24 121:8 121:12 121:22 122:13 123:6 126:13 126:15 126:24 127:6 128:9 128:13 129:10 133:10 133:10 135:23 136:7 136:19 140:3 146:5 151:3 151:3 156:20 156:21 156:22 157:3 157:1 157:23 158:7 158:9 158:160:15 159:12 160:2 160:5 160:15 161:23 163:13 163:25 165:15 165:20 167:9 168:22 168:24 169:8 171:5 171:10 173:22 173:24 174:8 174:13 186:19 187:8 187:8 187:12 187:20 190:7 190:11 190:12 190:24 191:2 193:24 195:13 195:24 195:25 203:2 212:19 212:19 212:22 212:23 213:8 213:8 213:18 218:2 218:11 220:23 225:9 225:8 220:21 228:5 234:3 234:4 234:4 237:3 238:12 241:12 242:10

**Gun** [14] 46:1 46:2 47:2 47:5 47:7 55:11 68:20 68:25 69:7 70:3 141:3 177:13 219:18 238:18

**Guns** [1] 69:3

**Guy** [6] 28:5 43:9 43:10 46:22 46:25 162:8

**Guys** [2] 69:13 81:23

## H

**Half** [4] 8:10 8:23 23:16 23:19

**Hallway** [1] 49:12

**Hamilton** [10] 49:14 49:18 49:24 50:23 51:4 67:6 77:10 79:8 79:22 86:3

**Hand** [11] 6:9 6:9 17:18 18:6 38:13 39:24 46:19 46:21 47:2 62:15 247:12

**Handgun** [1] 46:23

**Handle** [1] 233:10

**Handled** [1] 246:1

**Hands** [3] 4:19 46:23 47:5

**Harassment** [1] 119:24

**Hard** [5] 147:8 204:23 207:17 219:19 236:25

**Harm** [1] 123:3

**Harris** [18] 1:8 1:21 4:9 22:3 56:24 57:6 57:6 57:9 70:16 71:2 71:21 73:6 102:17 164:10 247:2 247:4 247:11 247:17

**Hate** [2] 39:19 147:20

**Head** [9] 50:7 114:9 131:22 150:1 185:16 211:8 225:18 226:5 233:4

**Hear** [35] 6:19 29:7 41:11 48:9 54:15 59:6 62:5 62:6 65:6 65:6 72:24 76:16 89:8 108:19 113:5 121:16 121:18 123:24 156:8 156:10 157:5 157:7 157:12 159:21 170:13 173:12 190:4 190:14 191:4 195:10 215:6 218:13 220:6 220:24 230:15

**Heard** [45] 1:19 8:9 8:13 10:8 34:25 41:17 45:14 47:19 48:13 57:10 57:11 60:15 60:22 61:3 61:4 63:17 71:25 85:6 89:20 89:21 90:3 103:8 106:4 107:3 108:16 121:17 123:21 124:11 138:5 140:1 150:7 157:6 158:21 160:21 163:9 169:5 185:23 190:2 203:9 211:25 218:14 219:12 220:13 221:25 232:1

**Hearing** [12] 67:8 67:18 88:21 88:22 91:22 99:14 132:11 150:11 161:22 170:13 218:21 245:5

**Hears** [3] 40:9 40:15 46:14

**Heart** [2] 74:5 89:11

**Heavy** [1] 139:10

**Heinous** [2] 155:21 170:18

**Held** [5] 1:21 8:19 196:20 196:22 215:5

**Hell** [1] 74:25

**Help** [7] 93:2 122:6 138:11 173:6 176:13 210:9 239:2

**Helped** [1] 41:25

**Helpful** [3] 122:19 220:2 240:7

**Hereafter** [1] 229:17

**Hereby** [1] 247:4

**Heretofore** [1] 28:13

**Hesitate** [1] 228:10

**Hi** [3] 140:15 224:16 243:4

**High** [10] 63:18 63:22 64:1 161:23 162:2 162:4 162:6 196:4 196:5 209:24

**Higher** [4] 93:4 94:6 97:1

223:16

**Hill** [33] 2:12 3:10 3:11 4:1 13:16 67:3 67:5 67:6 77:16 79:4 83:23 83:25 84:4 86:5 88:13 110:10 110:13 125:21 140:11 140:12 140:14 140:15 169:17 169:19 181:20 193:2 197:17 224:13 224:15 224:16 243:1 243:3 243:4
**Himself** [8] 59:10 60:23 121:20 157:15 199:13 218:17 237:6 244:25
**Hired** [1] 108:23
**Hiring** [2] 192:15 192:16
**Hisself** [1] 237:12
**History** [10] 26:16 59:8 121:19 157:13 158:22 190:15 191:5 195:11 218:15 220:4
**Hit** [1] 82:11
**Hitting** [1] 219:18
**Hobby** [1] 144:24
**Hold** [2] 94:5 136:4
**Holds** [1] 178:22
**Hollywood** [1] 210:3
**Holmes** [1] 57:25
**Home** [7] 19:23 52:14 138:11 156:21 190:12 216:19 230:24
**Hone** [1] 82:24
**Honest** [4] 72:7 84:11 84:14 206:17
**Honestly** [10] 67:16 76:1 76:14 78:16 78:17 85:15 85:16 85:24 183:18 185:5
**Honesty** [1] 144:6
**Honor** [13] 3:7 3:9 3:11 3:13 3:15 51:1 91:6 91:16 115:1 197:10 198:4 214:7 234:21
**Honorable** [1] 1:20
**Hope** [7] 21:18 21:19 72:8 92:25 94:21 151:10 181:17
**Hopefully** [1] 150:16
**Hoping** [1] 213:1
**Horrible** [3] 26:11 62:8 156:4
**Horrific** [1] 170:15
**Hospital** [6] 39:4 50:12 75:6 225:17 225:24 226:2
**Hour** [2] 33:12 33:12
**Hours** [1] 39:8
**House** [3] 27:15 27:15 27:16
**Houston** [7] 1:21 2:8 2:15 2:20 49:14 192:8 247:18
**Human** [4] 35:12 35:23 39:16 87:12
**Humanitarian** [1] 199:22
**Hundred** [11] 20:3 85:2 93:24 94:2 94:13 94:15 95:20 95:21 135:25 142:12 168:17
**Husband** [4] 39:8 145:17 145:21 180:24
**Hypothetical** [1] 148:9
**Hypothetically** [2] 147:10 161:21

## I

**Idea** [18] 26:5 33:1 44:5 45:17 48:3 48:4 48:25 80:19 88:15 97:20 128:12 132:24 133:1 151:2 161:18 186:13 233:14 234:10
**Ideal** [1] 67:19
**Ideally** [1] 230:14
**Identifies** [1] 45:18
**Identity** [1] 12:3
**Ignored** [1] 100:8
**Image** [1] 143:8
**Imaginary** [10] 10:19 10:21 12:23 40:9 40:23 41:18 41:19 46:15 47:22 90:2

**Immoveable** [1] 45:24
**Impact** [2] 175:7 226:19
**Impartial** [2] 167:8 182:1
**Imperfect** [1] 177:19
**Imply** [1] 220:9
**Importance** [1] 208:14
**Important** [22] 52:6 52:7 52:17 97:17 97:18 146:21 148:1 148:6 165:5 165:6 170:2 170:19 200:1 200:12 203:17 208:21 209:4 223:1 228:5 230:10 236:8 236:10
**Impose** [4] 6:5 40:20 41:16 88:19
**Imposed** [21] 10:10 10:11 10:12 11:17 11:22 15:24 16:21 22:9 23:4 30:1 30:2 32:13 35:3 106:10 106:21 186:22 186:23 187:24 212:25 234:8 234:10
**Imposition** [1] 75:1
**Impressions** [1] 201:5
**Imprisonment** [6] 104:21 166:12 223:3 239:6 239:8 240:25
**Incarcerate** [1] 228:19
**Included** [1] 247:6
**Including** [8] 8:8 8:11 104:15 221:6
**Inconsistent** [1] 87:25
**Inconvenience** [3] 74:25 184:16 184:17
**Independent** [14] 30:10 31:12 32:16 42:25 43:23 133:12 150:18 187:11 202:22 204:11 205:15 213:11 227:17 234:2
**Indicate** [3] 62:9 167:22 227:12
**Indicated** [15] 41:5 87:7 101:11 164:7 164:19 180:5 180:18 188:24 192:14 198:24 203:15 208:1 209:3 209:12 214:19
**Indicates** [2] 8:5 240:21
**Indicative** [1] 27:19
**Indictment** [6] 4:7 168:22 174:13 189:24 218:2 218:3
**Indignity** [1] 39:7
**Indirectly** [1] 201:23
**Individual** [20] 51:14 52:1 59:10 60:23 71:10 121:20 128:10 142:2 146:20 147:10 157:8 157:14 157:20 159:23 160:9 190:20 190:22 218:17 218:19 218:25
**Individual's** [2] 11:13 55:3
**Individualizes** [1] 45:18
**Individually** [2] 12:7 148:10
**Individuals** [1] 20:20
**Inflict** [1] 123:3
**Influence** [3] 81:14 229:25 232:24
**Influences** [2] 31:22 200:14
**Influential** [1] 159:23
**Informal** [1] 197:21
**Information** [15] 7:8 25:9 25:10 31:9 42:10 48:21 59:9 64:14 122:18 181:21 186:10 190:19 212:14 218:17 225:17
**Injury** [1] 55:13
**Inmates** [4] 21:3 21:15 21:17 21:21
**Innocence** [7] 121:17 170:10 171:17 172:5 189:23 191:7 218:23
**Innocent** [5] 13:20 60:11

170:11 171:10 171:18
**Inquired** [1] 201:2
**Inquiries** [1] 222:13
**Inquiry** [4] 58:13 70:11 190:13 216:19
**Insane** [1] 196:18
**Inside** [3] 30:24 245:7
**Instance** [2] 209:19 235:15
**Instances** [2] 54:2 214:20
**Instead** [7] 31:16 92:13 150:22 155:2 193:12 193:15 221:5
**Instruct** [1] 8:25
**Instruction** [1] 23:18
**Instructs** [1] 126:24
**Intellectually** [1] 185:5
**Intend** [5] 36:11 61:21 84:21 153:11 235:25
**Intended** [2] 224:25 235:20
**Intending** [2] 235:16 242:8
**Intent** [1] 76:5
**Intentional** [25] 35:11 35:19 35:22 35:25 36:9 36:14 37:1 37:5 37:13 37:14 37:17 37:18 39:15 76:13 76:18 76:20 120:7 120:7 135:10 136:8 153:7 166:21 166:22 189:25 235:22
**Intentionally** [17] 36:12 56:25 61:18 76:4 80:5 120:8 121:3 121:6 121:23 123:3 153:1 156:24 176:13 176:22 218:3 236:9 237:12
**Interacting** [1] 225:19
**Interest** [1] 67:14
**Interested** [4] 67:8 175:14 198:2 210:10
**Interests** [1] 184:13
**Interfere** [8] 50:9 112:25 114:9 131:24 150:3 185:17 211:9 233:6
**Interpreting** [1] 194:6
**Interwoven** [1] 44:14
**Intimidated** [1] 69:20
**Intoxicated** [1] 196:5
**Intoxication** [1] 46:19
**Introduced** [1] 168:2
**Invite** [1] 245:2
**Involved** [7] 6:25 8:17 153:4 172:4 180:10 214:23 243:25
**Involving** [1] 224:21
**Issue** [73] 60:19 61:23 62:18 62:25 63:6 64:23 65:3 68:9 69:7 78:19 82:24 85:17 91:12 104:2 104:4 104:24 107:1 108:1 110:4 121:14 122:9 128:9 136:10 137:17 146:8 146:12 157:21 157:25 159:24 160:10 160:12 161:19 163:13 163:17 164:3 167:20 168:20 169:12 177:6 178:1 179:14 195:16 195:24 203:7 203:13 204:6 204:20 205:20 205:21 206:3 206:3 206:6 206:9 206:23 206:23 207:4 207:20 208:4 208:5 208:16 209:5 209:16 213:9 213:10 214:21 216:21 216:24 221:1 221:3 221:17 222:15 222:15 239:13
**Issues** [17] 5:25 11:21 51:5 8:67:22 70:14 146:15 157:15 157:19 187:14 201:2 201:11 202:11 202:19 202:24 203:3 203:10 215:2
**Itself** [20] 31:15 59:4 81:7 83:15 133:16 150:21 153:18 157:6 157:18 159:8 176:16 176:23 187:13 191:7 195:6 195:7 208:3 220:10 220:13

170:14 171:11 171:18
226:22

## J

**Jacinto** [1] 247:18
**Jail** [4] 94:20 125:7 125:10 170:22
**Janet** [1] 3:3
**Jimmy** [1] 199:19
**Job** [25] 21:3 21:5 22:18 43:10 43:10 52:12 52:16 66:21 66:22 92:18 114:7 144:25 145:4 145:6 167:10 167:14 183:11 185:16 199:13 199:17 199:20 200:19 215:11 233:10 233:17
**Job-wise** [1] 233:17
**Johnny** [1] 57:25
**Johnson** [1] 3:3
**Joseph** [2] 182:17 192:5
**Joyce** [2] 86:6 109:9
**Jr** [4] 1:5 3:25 60:13 247:20
**Judge** [46] 1:20 53:12 54:16 54:19 57:10 58:20 75:18 78:14 79:4 84:5 84:23 87:14 92:8 93:13 102:2 116:11 126:23 128:4 128:24 129:1 129:9 138:1 140:12 141:8 142:11 146:8 148:5 154:9 155:23 166:10 174:20 177:7 188:6 191:23 195:2 200:17 202:21 215:21 223:7 227:2 229:5 232:1 238:19 245:3 245:6 246:1
**Judge's** [6] 58:10 58:15 153:6 216:8 218:9 228:7
**Judging** [1] 92:13
**Judgment** [9] 26:6 102:11 118:5 156:24 204:11 205:15 225:11 231:5 245:9
**Judgments** [3] 26:6 203:22 203:23
**JUDICIAL** [1] 1:11
**Judy** [1] 232:1
**Juggle** [1] 184:14
**Jump** [1] 121:15
**Jumps** [1] 43:10
**June** [1] 109:6
**Juries** [4] 9:21 11:1 11:4 11:7
**Juror** [101] 3:24 13:1 13:6 40:8 41:9 42:3 47:19 48:7 48:11 48:19 50:2 50:9 51:25 52:13 53:19 53:22 54:6 56:18 57:5 63:19 63:25 66:5 69:10 71:3 73:11 73:12 74:22 74:24 75:17 87:2 88:1 88:25 89:17 89:25 92:18 97:5 99:1 100:8 109:5 111:1 111:21 112:7 112:25 113:25 114:10 114:17 116:20 118:7 119:7 125:14 130:16 130:17 131:18 131:24 132:12 132:14 132:19 134:18 139:6 139:16 139:19 140:19 141:10 148:25 149:22 150:3 150:11 152:12 153:22 154:1 155:9 156:7 161:25 162:3 167:6 181:15 182:16 183:7 184:4 184:7 184:24 185:18 185:25 197:6 211:3 211:10 212:4 212:10 224:5 224:8 227:11 227:11 230:22 231:12 231:17 232:17 232:18 232:25 233:7 245:18 246:3
**Jurors** [26] 9:23 13:7 26:4 53:23 88:16 92:17 100:20 100:21 107:15 108:1 108:2 108:21 112:5 114:15 126:3 132:5 148:17 172:7 174:4 174:7 184:2 207:24 211:23 213:1 215:4 218:1
**Jury** [130] 3:21 5:5 5:19 5:21 6:3 6:20 8:25 9:10 9:11 9:16 11:7 11:10 11:16 12:20 12:22 12:24 14:12 19:8 22:

19 22:22 23:1 23:9 23:
18 25:5 26:18 26:22 28:10
29:7 30:6 30:9 30:23 32:15
37:25 40:9 40:10 40:11 40:
13 40:14 40:15 40:19 46:14
46:17 47:12 50:15 51:11 51:
12 51:15 53:4 53:9 53:20 70:
4 70:12 70:17 75:9 79:13 80:
2 80:7 83:6 84:20 90:1 99:3
102:11 106:13 109:3 110:20
124:25 128:6 129:10 129:11
130:10 133:9 134:22 136:2
137:23 138:17 140:20 141:14
141:17 141:24 142:14 146:5
146:6 146:9 146:18 146:23
147:25 150:18 151:6 151:10
155:17 165:4 171:1 171:25
172:9 174:11 174:12 174:16
174:18 176:6 176:15 177:20
177:23 177:24 177:25 178:13
178:23 179:24 180:5 180:12
182:5 183:15 185:8 186:15
187:6 187:13 188:13 188:19
191:20 213:7 215:9 216:25
217:16 233:23 234:1 234:4
234:7 234:11 237:3 241:7

**Jury's** [8] 5:17 11:17 13:
18 15:18 22:18 23:13 36:23
37:2

**Justice** [3] 73:20 143:15
193:6

**Justifiable** [1] 14:11

**Justification** [13] 35:
13 35:24 36:3 36:6 39:17 61:
20 76:7 121:4 121:24 153:8
156:25 218:4 235:23

**Justified** [7] 25:20 119:
16 120:6 177:9 177:14 177:
23 178:14

**Justifies** [1] 25:18

## K

**Karam** [4] 149:2 149:7 149:
14 151:25

**Katy** [1] 75:2

**Kay** [2] 247:3 247:16

**Keep** [17] 13:24 21:20 59:
14 60:20 80:12 115:22 118:6
119:7 144:25 145:1 145:1
145:2 156:9 157:21 164:17
211:16 231:13

**Kelly** [6] 210:14 210:18
210:19 214:10 224:16 230:21

**Kept** [3] 39:7

**Kid** [2] 203:25 243:22

**Kidding** [1] 197:21

**Kidnapping** [16] 35:17 35:
20 37:7 37:13 57:1 61:22
121:5 121:6 122:15 124:17
135:12 136:8 153:16 157:1
218:6 218:11

**Kidnappings** [1] 19:20

**Kids** [7] 27:17 84:6 84:10
119:25 198:17 204:3 243:25

**Kill** [11] 61:21 80:5 80:6
108:24 123:22 125:11 153:11
177:13 235:25 238:8 242:8

**Killed** [9] 79:25 84:10
121:5 152:25 161:1 173:8
176:22 178:7 178:10

**Killing** [7] 10:23 77:3 77:
17 135:13 135:13 136:8 173:
19

**Kind** [53] 5:11 10:1 25:17
25:18 29:23 38:5 44:9 44:9
60:24 70:17 71:22 73:10 91:
11 118:22 119:22 119:24 122:
18 124:13 124:18 126:4 128:
2 137:23 148:9 152:25 154:
25 158:9 159:19 165:8 166:
11 171:12 172:22 176:23 178:
1 190:16 190:17 191:6 217:
11 235:6 236:2 236:4 237:14
237:19 238:4 242:7 242:18
242:20 245:8 245:16 245:17

**Kindergarten** [1] 204:1

**Kinds** [23] 19:21 39:1 44:
7 54:13 59:9 64:12 64:14 71:
5 119:11 123:12 123:15 152:
18 152:20 157:14 168:1 170:
19 172:10 182:8 218:16 228:
9 240:6 241:14 242:12

**Knife** [1] 177:11

**Knobloch** [2] 247:3 247:16

**Knock** [1] 219:19

**Knowing** [12] 53:11 105:14
108:10 110:5 114:25 130:1
141:20 175:3 175:24 182:2
191:22 205:1

**Knowledge** [4] 61:2 157:
17 202:14 218:22

**Known** [3] 6:18 120:24 162:
6

**Knows** [1] 39:5

**Kurt** [6] 2:17 4:2 67:6 140:
15 197:16 224:16

## L

**Lack** [7] 59:8 121:19 157:
13 158:22 190:15 202:14 218:
15

**Ladies** [1] 3:22

**Lady** [2] 20:25 84:6

**Laid** [1] 208:14

**Lake** [2] 80:15 84:7

**Last** [25] 14:22 31:4 42:14
44:7 85:5 87:17 111:8 111:
22 111:23 112:10 112:11 123:
24 131:9 139:12 144:1 145:
15 145:25 182:24 184:10 184:
11 202:18 226:15 226:15 232:
8 233:14

**Lasts** [1] 52:5

**Late** [2] 67:22 74:14

**Latter** [1] 225:12

**Law** [141] 6:4 9:12 9:18 12:
18 13:5 24:23 25:1 25:3 37:
8 42:17 44:17 44:18 44:20
45:4 45:5 45:9 45:11 48:2
48:10 51:13 51:20 51:21 53:
15 53:24 54:1 54:4 54:8 54:
14 54:20 54:22 55:6 55:6 55:
8 55:21 55:23 55:23 56:4 56:
6 56:6 56:15 56:17 56:19 57:
13 57:15 57:18 58:4 60:3 60:
16 64:10 65:24 66:6 66:7 66:
9 66:11 66:13 67:10 67:16
69:11 69:23 69:24 70:1 71:9
71:11 71:13 71:14 72:5 75:
14 75:15 75:16 75:17 75:21
78:14 78:15 82:17 84:25 85:
1 94:4 94:9 100:3 100:6 100:
8 100:9 100:13 100:14 102:
15 109:4 114:16 116:15 117:
5 123:13 123:17 126:11 152:
5 153:25 154:2 154:8 154:14
154:15 155:10 155:12 156:2
159:6 159:7 159:15 164:8
164:13 164:15 167:24 168:8
168:10 177:25 179:10 179:15
180:23 181:2 181:5 189:9
189:21 189:23 190:2 190:6
192:2 192:20 196:4 196:9
196:16 202:15 202:15 202:16
214:15 215:25 222:8 222:23
223:9 228:13 231:4 235:5
241:16 241:19 242:6 242:13

**Laws** [6] 12:21 12:25 71:15
108:7 175:16 185:20

**Lawyer** [5] 127:8 149:10
173:15 210:1 244:22

**Lawyering** [2] 14:15 14:17

**Lawyers** [14] 14:14 48:18
32:14 72:22 72:25 112:5 126:
12 132:19 183:25 184:6 186:
5 186:10 188:3 212:9

**Laying** [2] 46:7 47:1

**Layoff** [1] 144:24

**Lead** [3] 66:8 180:20 208:22

**Leads** [3] 31:22 66:7 -66:12

**Lean** [1] 147:18

**Leaning** [4] 103:20 104:23
108:8 108:13

**Learn** [1] 75:19

**Learned** [3] 58:9 58:9 202:
17

**Learning** [4] 155:13 179:
20 179:21 201:25

**Least** [6] 60:19 61:24 72:
12 148:14 185:7 233:15

**Leave** [5] 21:7 24:18 69:
15 75:2 235:18

**Leaves** [1] 24:19

**Led** [1] 48:24

**LEE** [1] 149:2

**Left** [2] 80:20 144:23

**Legal** [23] 14:13 35:12 35:
13 35:23 35:24 36:2 36:3 36:
5 39:17 39:18 61:19 76:7
121:4 121:24 135:11 153:8
156:25 171:22 171:22 179:14
203:1 218:4 235:23

**Legalese** [1] 42:15

**Legalities** [1] 140:21

**Legislator** [1] 175:13

**Legislature** [3] 146:23
147:3 147:11

**Legitimate** [3] 41:4 41:
23 88:17

**Length** [1] 70:6

**Lengths** [1] 72:25

**Less** [11] 37:24 103:11 126:
18 147:23 166:9 207:12 208:
12 209:24 224:7 236:23 243:
10

**Lesser** [3] 37:14 37:15 37:
18 240:9

**Level** [9] 45:5 47:16 48:
14 79:20 83:8 94:3 97:1 143:
5 146:21

**Levied** [1] 228:14

**Liberal** [1] 198:7

**Life** [229] 4:16 9:4 9:20 9:
23 10:4 10:6 10:10 10:21 10:
23 11:17 16:17 16:20 21:6
22:8 23:10 24:2 25:11 25:25
26:22 27:2 27:16 27:17 27:
20 28:6 28:16 28:20 28:22
29:16 29:22 30:16 32:8 32:
21 32:22 32:25 33:2 33:4 33:
9 33:16 34:15 34:17 34:18
34:25 35:6 35:11 35:23 36:6
36:8 37:19 37:23 38:14 39:4
39:16 39:23 40:24 41:2 41:4
42:12 50:5 50:6 52:17 52:18
56:25 59:17 59:18 59:21 59:
9 63:13 63:21 63:22 64:9 64:
16 64:17 64:18 65:4 65:21
66:1 72:1 72:24 74:25 80:19
84:12 85:18 94:12 96:2 101:
8 104:6 104:8 104:10 104:12
104:21 104:25 105:13 105:17
106:18 106:20 106:23 107:1
107:16 108:3 108:3 108:10
114:8 115:3 116:3 117:3 120:
9 120:10 121:3 121:23 122:7
125:15 124:23 124:25 128:15
128:20 128:21 129:2 129:11
129:21 129:23 129:25 130:2
131:22 135:2 138:18 146:25
147:14 147:18 148:2 148:4
149:25 150:1 151:18 151:13
153:8 154:20 154:20 156:25
159:17 160:5 160:7 161:5
161:8 161:13 162:1 163:4
163:16 165:7 165:16 165:21
166:8 166:12 167:21 167:24
172:17 173:10 173:11 175:22
174:4 174:14 174:20 175:22
176:12 177:9 178:14 180:21
185:15 186:22 187:24 191:13
192:5 193:8 193:24 194:22
195:19 195:21 198:18 211:6
211:7 213:1 213:19 213:19
217:1 217:10 218:4 220:17
221:13 222:3 222:6 222:14

**Levels** [16] 18:17 18:17
27:1 61:12 83:1 122:23 132:
24 137:5 137:6 147:15 158:
17 158:19 193:25 219:9 219:
13 236:24

**Likewise** [4] 45:9 151:7
186:19 187:16

**Limit** [1] 19:15

**Limits** [1] 99:21

**Linda** [2] 131:2 143:8

**Line** [3] 52:23 183:21 184:
23

**Lines** [1] 71:20

**Lips** [1] 74:13

**List** [2] 199:3 241:6

**Listed** [1] 199:19

**Listen** [11] 48:21 118:25
136:11 139:25 142:8 154:10
171:1 189:20 212:12 231:8
243:11

**Listened** [2] 58:15 178:25

**Listening** [11] 5 15:1
114:18 117:10 123:5 153:6
176:17 184:25 220:23

**Listing** [1] 199:2

**Live** [2] 20:14 57:8

**Lived** [2] 144:9 144:13

**Lives** [2] 228:20 229:25

**Living** [2] 38:17 119:5

**Logic** [2] 96:13 167:21

**Logical** [1] 26:6

**Logically** [1] 167:22

**Look** [47] 32:6 59:5 62:3
62:4 63:10 63:16 64:5 64:12
70:13 70:21 74:1 76:14 78:
18 82:5 83:6 105:6 105:11
126:2 130:21 138:9 138:10
162:13 163:3 163:20 181:19
195:6 202:19 203:3 204:6
204:15 204:18 205:4 207:3
207:4 207:20 207:22 207:25
207:25 208:6 208:16 209:5
217:11 221:23 236:6 237:11
243:17 245:6

**Looked** [4] 105:8 105:9
162:10 242:15

**Looking** [16] 26:13 52:4
63:15 65:8 65:14 73:21 93:
11 169:20 176:16 186:4 189:
20 192:22 200:8 222:4 241:4
243:23

**Lose** [3] 21:4 179:3 193:8

**Loss** [1] 194:22

**Lost** [3] 26:12 205:24 206:9

**Lottery** [1] 158:15

**Lotto** [2] 115:19 127:15

**Love** [2] 39:3 39:20

**Loves** [1] 39:9

**Loving** [1] 144:4

**Low** [1] 72:22

**Lower** [1] 204:2

**Ludicrous** [1] 70:24

**Lunch** [1] 149:1

**Lyn** [10] 2:2 4:4 51:4 91:9
115:16 134:1 151:25 188:10
214:10 235:1

## M

**Ma'am** [5] 88:7 107:14 110:

22 140:9 169:15
**Machine** [2] 1:23 39:8
**Magnitude** [3] 148:13 182:8 223:3
**Maintain** [1] 177:4
**Major** [3] 35:15 203:21 203:22
**Makeup** [1] 85:22
**Male** [1] 166:2
**Mamou** [17] 1:5 3:14 3:25 3:25 60:13 67:7 73:21 110:18 129:10 140:16 143:6 146:5 197:18 224:17 230:20 244:23 247:20
**Man** [15] 56:10 75:8 135:23 136:13 162:18 165:14 165:18 165:22 193:23 194:3 194:7 194:7 231:5 244:22 245:9
**Man's** [2] 73:7 73:8
**Mandatory** [7] 130:1 147:13 147:14 147:17 148:3 176:1 229:11
**Manifest** [1] 176:11
**Married** [5] 39:2 180:18 180:23 192:10 192:10
**Mathews** [9] 182:17 182:21 182:23 183:18 187:5 188:10 192:5 197:2 198:5
**Matter** [20] 5:15 7:25 8:1 8:1 9:6 9:7 9:7 50:8 69:12 85:21 88:23 100:9 131:23 150:2 166:2 194:3 194:14 211:8 212:14 212:15
**Mature** [1] 26:5
**Maximum** [1] 42:12
**McClellan** [54] 2:2 3:6 3:7 3:9 4:4 50:25 51:1 51:3 51:4 68:4 75:23 91:5 91:6 91:8 91:9 91:15 91:18 97:8 97:12 98:3 100:18 105:19 106:15 107:3 110:9 115:12 115:13 115:15 115:16 127:14 134:2 134:21 136:4 139:15 151:22 151:24 151:25 174:24 188:6 188:9 188:10 193:3 193:4 214:6 214:7 214:9 214:10 224:11 227:9 234:20 234:21 234:23 235:1 245:6
**McClellan's** [2] 106:4 201:10
**Mean** [59] 14:20 17:12 17:13 17:16 17:19 17:21 18:21 32:10 33:2 55:25 61:20 73:15 83:1 83:5 83:6 85:1 89:19 92:1 95:19 98:11 107:20 117:1 119:3 126:18 127:5 134:11 135:6 136:20 138:25 139:2 142:6 153:9 156:14 170:2 184:16 184:19 189:3 189:4 198:19 198:22 202:10 204:8 206:2 207:13 207:19 213:25 214:1 219:15 220:8 220:9 223:5 223:5 229:3 229:22 236:20 236:21 241:23 243:13
**Meaning** [7] 7:1 42:22 61:1 150:19 173:11 219:8 240:8
**Means** [39] 13:5 13:6 14:21 16:3 16:5 16:13 16:20 17:14 17:19 18:16 18:18 18:20 24:11 24:23 29:9 32:23 32:24 33:4 33:14 33:16 33:20 35:6 35:11 36:3 44:10 44:11 50:13 59:18 63:1 79:17 111:3 111:16 128:22 156:2 165:19 171:18 194:8 229:4 229:15
**Meant** [1] 132:3
**Mechanics** [1] 145:2
**Medical** [2] 21:13 168:2
**Medication** [3] 164:23 165:1 165:2
**Meet** [2] 168:7 168:8
**Member** [2] 68:20 176:6
**Members** [2] 20:17 55:5
**Memorize** [1] 5:7

**Memory** [1] 4:22
**Mental** [11] 26:17 26:20 59:8 64:13 157:13 162:23 173:4 190:16 196:18 196:21 218:16
**Mentioned** [3] 171:7 198:23 205:12
**Met** [3] 140:20 140:23 171:2
**Methodist** [1] 227:20
**Meting** [1] 127:25
**MICHAEL** [1] 182:17
**Middle** [1] 188:16
**Might** [103] 7:4 7:4 7:5 7:20 10:19 10:21 25:14 26:1 26:4 26:7 26:15 26:18 26:19 26:22 26:23 27:1 27:23 28:3 29:4 32:16 33:2 38:12 38:19 38:25 39:1 46:4 46:15 46:21 47:11 47:12 50:1 50:4 50:5 50:7 54:1 58:11 60:23 62:13 66:9 66:10 66:16 69:22 80:9 80:10 87:1 92:21 105:9 111:20 113:10 124:3 124:6 126:4 129:4 131:17 147:19 149:21 150:2 154:13 154:14 161:1 161:21 162:5 165:21 167:19 167:25 169:25 170:22 171:14 171:20 173:6 173:15 173:17 173:17 174:19 176:11 176:11 177:22 179:14 183:6 184:4 184:16 187:22 195:6 195:9 195:18 203:5 203:5 205:2 207:3 208:6 211:2 220:22 221:13 228:18 229:14 230:4 232:24 233:3 233:5 234:1 234:7 234:9 236:20
**Mikle** [10] 231:18 231:24 232:22 233:22 234:24 234:25 235:1 235:1 243:4 244:25
**Military** [1] 244:13
**Million** [1] 127:22
**Mind** [37] 25:8 26:5 59:14 60:20 64:6 64:14 64:17 65:18 65:19 73:23 102:5 113:23 137:3 152:20 156:10 157:22 161:7 162:14 162:21 168:19 169:3 171:9 184:12 187:3 195:18 200:22 223:6 223:24 224:18 224:22 224:23 224:24 228:1 228:4 230:2 241:21 242:7
**Mind's** [1] 65:15
**Minded** [2] 139:21 142:7
**Minimum** [3] 26:25 35:7 42:12
**Minister** [2] 227:20 227:20
**Minute** [2] 60:12 226:7
**Minutes** [7] 7:12 32:22 181:18 197:19 197:19 232:6 245:5
**Mirror** [1] 143:8
**Misconception** [2] 174:17 229:14
**Misery** [2] 39:6 39:10
**Miss** [33] 3:3 3:4 4:4 88:15 91:9 97:7 97:15 99:25 100:19 105:22 105:23 110:23 111:6 111:18 112:23 114:13 115:16 125:18 125:22 131:8 131:15 132:2 132:17 133:7 133:23 134:25 136:18 137:3 140:15 141:9 146:1 149:13 151:25
**Missed** [1] 144:22
**Missing** [2] 50:11 219:18
**Mistake** [3] 222:21 245:8 245:12
**Mistaken** [1] 208:3
**Mistrial** [1] 13:8
**Mistyped** [2] 73:7 73:8
**Misunderstood** [1] 199:9
**Mitigate** [1] 64:15
**Mitigates** [1] 63:20

**Mitigating** [38] 9:2 25:11 25:9 25:7 25:13 25:14 25:15 25:16 25:22 26:4 26:18 26:19 28:4 63:12 64:4 64:7 64:8 65:12 104:19 161:3 161:8 161:10 161:11 161:14 162:19 162:24 163:5 173:2 206:11 206:14 206:18 207:1 207:17 217:1 221:11 240:2 240:7 240:10
**Mitigation** [2] 27:1 162:1
**Mixed** [1] 209:9
**Model** [1] 62:6
**Moderate** [1] 198:7
**Molester** [2] 55:16 55:20
**Molesting** [1] 56:12
**Mom** [1] 108:23
**Moment** [6] 50:11 85:6 141:21 146:17 192:4 220:15
**Moments** [2] 140:18 244:23
**Monday** [6] 49:19 86:14 86:17 112:7 184:8 185:10
**Money** [3] 55:12 236:18 237:9
**Montgomery** [1] 164:11
**Month** [2] 33:13 33:13
**Months** [5] 75:11 112:19 112:20 124:23 183:19
**Moral** [15] 6:24 8:12 8:14 8:22 87:9 92:14 92:23 104:7 160:23 171:17 180:21 203:1 207:7 208:7 221:8
**Morality** [1] 39:14
**Morning** [25] 3:22 21:2 75:3 86:16 86:20 86:20 111:9 111:10 131:11 131:12 132:2 133:8 149:16 150:15 182:25 187:5 201:9 210:21 210:22 211:21 212:18 212:19 232:10 232:10 233:22
**Most** [19] 11:18 11:23 20:16 38:2 52:17 72:3 81:25 113:1 145:25 165:6 170:15 175:23 195:21 198:21 199:3 199:7 202:6 203:2 230:9
**Mostly** [2] 145:7 241:14
**Motive** [2] 6:17 6:18
**Move** [1] 31:2
**Moved** [2] 77:21 78:1 192:8
**Movies** [1] 201:24
**Moving** [1] 145:3
**Muddled** [1] 177:19
**Multiple** [1] 8:16
**Murder** [229] 4:8 7:18 10:8 10:9 11:20 12:9 12:23 16:14 16:15 22:21 26:11 27:11 28:14 28:23 28:25 29:6 29:11 30:7 30:11 31:25 32:11 34:7 34:16 35:10 35:11 35:19 35:19 35:19 35:19 35:21 36:4 36:9 36:14 36:16 36:17 36:24 37:1 37:5 37:10 37:12 37:12 37:13 37:14 37:15 37:16 37:17 37:18 37:18 37:19 37:20 37:22 38:3 39:15 39:19 40:9 40:12 40:14 41:10 41:10 46:16 46:22 50:20 50:22 51:12 54:12 54:12 56:23 58:10 58:12 58:18 59:4 59:16 60:14 60:22 61:18 62:19 64:2 64:23 65:16 73:24 74:7 74:12 77:8 78:6 78:11 78:22 80:3 80:14 80:18 81:2 82:16 82:21 83:3 83:13 85:8 85:20 87:20 90:1 90:3 93:16 104:1 106:7 114:25 116:6 118:17 120:7 120:7 121:2 121:8 121:12 121:23 122:2 122:14 122:24 122:24 123:7 123:8 128:1 124:12 124:16 128:8 128:13 129:10 133:11 135:7 135:14 136:19 139:3 139:4 140:3 142:20 146:20 147:12 147:14 148:3 153:7 153:12 153:15 153:17 153:18 154:6

**155:20** 155:21 155:25 156:1 156:13 156:20 156:22 157:23 158:21 158:25 150:25 159:3 159:12 160:3 162:8 163:1 163:13 164:1 165:4 165:15 166:23 166:24 166:21 166:23 166:23 166:24 166:25 173:14 173:21 173:22 174:8 174:13 174:20 175:17 175:20 175:22 176:22 177:15 178:6 186:20 187:7 187:12 189:25 190:8 191:3 193:24 194:10 195:13 201:12 201:13 203:3 205:21 206:7 206:15 212:23 218:7 218:19 218:9 218:10 218:12 218:20 219:13 219:16 219:16 219:17 220:8 221:16 224:21 228:13 228:15 229:6 229:8 233:23 234:5 235:15 235:16 235:20 235:22 238:11 238:13 238:22 240:3 241:9 241:12 241:18 241:24 245:9
**Murder's** [1] 135:10
**Murderer** [2] 204:8 207:23
**Murders** [9] 19:6 19:17 19:19 36:22 76:13 76:18 166:7 166:22 166:22
**Muslim** [3] 180:19 181:2 181:5
**Must** [13] 9:14 9:19 17:14 20:7 51:14 56:19 58:21 119:9 126:22 145:11 154:1 162:9 217:25

**N**

**Nacogdoches** [1] 192:8
**Nail** [2] 82:11
**Name** [20] 51:4 67:6 73:7 73:8 91:9 109:14 110:2 115:16 134:1 140:15 149:7 149:7 151:25 188:10 197:16 214:10 224:16 231:7 235:1 243:4
**Named** [1] 126:22
**Names** [1] 231:6
**Natural** [2] 34:17 113:4
**Nature** [3] 84:14 159:1 219:20
**Naught** [1] 146:11
**Necessarily** [16] 22:18 22:19 22:22 23:3 59:10 81:11 83:15 95:18 98:24 139:2 141:16 157:8 199:23 204:5 238:15 239:3
**Necessary** [7] 19:1 77:11 77:12 120:1 128:6 134:10 142:16
**Need** [26] 4:22 5:7 13:7 52:13 66:3 67:20 70:10 79:10 81:15 84:20 85:4 89:5 108:14 108:20 148:10 152:14 168:10 173:8 173:9 180:7 185:13 188:12 188:22 197:22 243:9 243:19
**Needs** [1] 83:6
**Nefarious** [1] 13:24
**Negatively** [1] 86:23
**Neglect** [1] 200:20
**Neglectful** [3] 229:21 243:12 243:15
**Neighborhood** [1] 20:18
**Neighbors** [3] 144:2 144:5 144:12
**Nervous** [1] 134:3
**Neutral** [2] 194:15 194:15
**Never** [54] 4:16 8:2 9:8 10:13 10:15 10:15 10:16 10:20 12:19 20:20 21:19 22:22 22:25 24:14 25:19 25:19 28:2 34:19 38:14 44:15 51:15 53:20 58:15 59:15 62:13 75:9 80:21 88:5 88:9 88:24 94:1 98:12 105:25 109:18 113:8 119:3 119:4 124:13 125:9 151:14 155:15 157:22 165:2 167:17 168:16 179:24 180:14

**182:**1 183:13 202:15 215:20 217:5 238:13

**New** [1] 183:11

**News** [2] 109:17 123:21

**Next** [13] 28:17 31:3 31:12 31:16 48:17 63:6 112:3 133:12 133:16 150:21 172:20 185:9 213:17

**Nice** [1] 145:11

**Night** [1] 158:15

**Nine** [1] 37:24

**Ninety** [1] 37:24

**Ninety-nine** [1] 37:24

**Nobody** [7] 18:10 44:12 46:22 47:25 98:22 116:2 193:9

**Nobody's** [1] 41:5

**NOHEMY** [1] 111:2

**Non** [2] 95:17 96:18

**None** [5] 54:18 154:11 172:22 190:5 191:15

**NORMAN** [1] 49:14

**Nothing** [13] 8:24 13:24 23:17 32:10 33:19 34:7 96:4 113:16 171:18 171:21 174:15 174:22 227:23

**Notice** [3] 185:8 188:13 225:15

**Notion** [4] 13:18 45:13 77:12 150:17

**Notions** [3] 82:1 85:3 186:6

**Nowhere** [1] 24:9

**NRA** [1] 68:20

**Number** [102] 3:3 3:4 22:24 22:25 23:2 24:24 36:20 36:24 37:4 37:23 44:21 45:4 55:2 61:23 62:18 63:1 63:7 63:8 63:19 63:25 64:23 65:3 65:7 72:15 76:11 77:24 78:8 78:19 79:2 81:21 82:24 85:11 85:17 87:8 90:6 90:7 102:20 102:23 103:9 104:2 104:5 104:24 107:18 121:14 122:9 129:3 137:17 148:1 157:21 157:25 159:24 160:10 160:12 161:19 161:25 162:3 163:14 163:17 164:1 164:3 167:20 169:22 187:9 187:10 187:17 187:18 187:18 187:20 195:16 195:24 195:25 200:10 200:11 203:7 204:6 205:20 205:21 205:22 206:3 206:4 206:7 206:23 206:25 207:4 208:4 208:5 208:16 209:5 209:7 209:16 213:9 213:10 216:21 216:24 221:1 221:3 221:17 221:20 222:15 222:15 233:19 239:13

**Numbered** [1] 1:20 247:6

**Numbers** [2] 115:19 127:15

**Numerous** [1] 52:1

**Nurses** [1] 21:13

---

**O**

**O'clock** [1] 21:2

**Oath** [8] 53:22 56:18 57:11 66:5 66:15 70:8 75:16 154:1

**Object** [3] 45:21 45:22 45:24

**Objection** [2] 132:8 214:2

**Objectionable** [1] 44:3

**Objectives** [2] 132:4 211:22

**Obligate** [1] 25:2

**Obligated** [1] 33:8

**Obligation** [3] 25:4 36:23 37:2

**Obtain** [2] 18:25 36:16

**Obtained** [1] 201:22

**Obvious** [1] 170:18

**Obviously** [19] 45:25 55:12 65:11 67:13 67:20 92:19

**113:**21 118:18 118:20 128:7 129:21 134:7 176:17 180:3 180:7 204:9 213:16 219:16 227:1

**Occasion** [1] 109:7

**Occur** [6] 12:7 12:8 48:4 51:13 62:13 117:21

**Occurred** [9] 4:8 27:9 37:6 57:19 74:15 113:16 177:4 226:15 247:7

**October** [7] 50:12 50:13 112:7 113:12 114:1 184:8 224:5

**Off-the-record** [1] 210:13

**Offend** [3] 72:9 178:13 180:23

**Offenders** [2] 138:25 138:25

**Offense** [36] 4:7 5:18 7:18 8:8 35:10 40:5 44:16 54:137:9 153:12 153:17 153:18 154:5 166:24 177:15 194:4 207:6 207:11 207:14 207:14 208:6 208:10 208:13 208:23 218:24 221:7 236:17 237:5 237:6 238:7 240:15 240:18

**Offensive** [1] 42:2

**Offer** [1] 231:10

**Office** [1] 244:8

**Officer** [1] 135:13

**Official** [3] 247:3 247:12 247:17

**Official/Deputy** [1] 247:3

**Often** [2] 20:19 166:6 193:12

**Oftentimes** [1] 135:10

**Old** [19] 10:22 26:3 29:23 30:18 38:16 69:16 129:18 165:15 165:19 165:23 166:3 193:23 194:4 194:8 194:8 210:8 223:7 223:23 223:24

**Older** [1] 196:12

**Once** [6] 9:18 21:9 75:10 107:10 188:1 203:22

**One** [182] 4:2 6:8 8:16 8:20 10:18 11:9 17:13 19:14 21:18 22:24 25:15 27:8 29:3 30:7 31:2 31:13 31:14 31:14 34:15 35:16 35:17 36:20 37:10 38:13 39:11 42:19 43:13 44:7 44:23 46:10 46:18 46:22 47:8 48:20 49:12 50:24 51:16 57:2 57:8 61:23 62:18 63:1 63:7 63:8 64:23 65:12 71:19 71:24 72:14 73:4 76:11 77:24 78:8 78:24 79:2 81:14 81:21 82:24 83:25 84:18 85:11 90:6 93:24 94:2 94:13 94:15 97:25 102:20 104:2 107:12 110:14 112:1 112:10 114:22 115:11 121:14 122:9 126:9 127:19 128:19 132:4 132:24 133:15 134:18 143:4 144:1 146:1 146:10 147:11 148:1 148:19 150:20 151:4 151:9 151:11 151:13 157:18 157:21 157:25 158:3 159:24 160:10 161:19 163:19 179:15 179:22 180:5 180:19 182:1 183:8 183:16 184:3 186:15 187:9 187:17 187:20 188:2 193:21 194:2 194:18 195:25 196:25 198:17 198:23 199:12 199:17 199:20 200:1 200:16 201:19 202:7 202:10 202:22 202:25 203:20 204:7 204:9 204:15 204:22 205:23 206:4 206:25 207:5 207:22 207:25 208:4 208:5 208:22 209:1 210:1 210:2 211:22 212:11 213:9 213:11 216:21 217:5 221:1 221:17 222:15 223:11 226:22 226:8 227:19 228:5

**228:**6 228:9 229:20 231:13 233:15 236:16 239:13 242:8 245:11

**Ones** [3] 8:19 50:15 71:17

**Open** [17] 62:20 65:9 65:15 65:18 77:12 114:18 115:4 123:4 133:4 139:21 142:7 156:10 164:3 167:8 189:7 191:12 247:7

**Open-minded** [3] 139:21 142:5 142:7

**Operating** [1] 223:23

**Operation** [1] 184:10

**Opinion** [16] 54:3 54:5 55:7 72:6 72:13 72:18 72:20 73:3 82:1 84:14 115:25 126:10 134:14 155:11 241:6 241:10

**Opinions** [7] 65:25 66:17 110:5 153:23 153:24 162:11 205:19

**Opportunity** [14] 42:6 107:16 107:25 108:2 148:18 156:14 163:4 181:15 195:17 195:20 196:1 205:10 222:4 230:23

**Oppose** [5] 100:23 101:18 103:3 189:1 189:5

**Opposed** [28] 63:13 63:22 64:16 65:4 91:13 104:7 104:8 104:10 104:22 105:13 108:4 108:5 138:1 161:5 161:9 161:16 167:21 167:24 188:24 217:2 217:10 221:13 222:6 225:18 227:22 229:14 240:9 240:22

**Opposes** [1] 189:14

**Opposite** [1] 234:9

**Option** [11] 9:13 9:19 28:24 37:9 37:11 37:11 41:5 41:24 104:7 174:4 229:1

**Options** [8] 28:8 31:22 37:10 151:4 151:9 186:15 212:20 223:11

**Order** [14] 7:13 9:18 10:15 15:23 16:1 18:25 19:3 19:9 36:16 53:12 94:8 142:18 191:23 222:14

**Ordering** [4] 53:12 116:11 191:23 215:22

**Ordinarily** [3] 20:23 63:23 162:3

**Oriented** [1] 203:13

**Otherwise** [4] 57:14 66:9 156:20 219:22

**Ought** [39] 14:11 23:25 28:12 30:16 32:7 32:12 63:13 64:15 65:20 86:25 101:2 104:6 104:9 105:14 111:20 119:22 122:7 132:21 153:20 154:6 156:5 161:4 162:18 165:14 167:10 167:23 183:5 192:20 194:5 194:9 194:15 197:2 197:5 223:15 223:16 235:14 236:3 237:15 237:20

**Outcome** [4] 36:20 36:24 37:3 173:25

**Outrageous** [2] 72:25 188:19

**Outset** [3] 48:25 186:13 212:20

**Outside** [6] 21:10 55:6 57:10 69:23 181:9 199:20

**Overcome** [5] 184:17 200:20 229:21 243:12 243:14

**Overcomes** [1] 25:10

**Overrides** [1] 137:19

**Own** [18] 12:3 12:3 27:16 43:5 79:11 115:25 120:10 165:16 165:21 184:13 193:24 205:15 209:4 214:17 227:18 235:7 236:18 245:18

**Owner** [1] 68:20

**Ownership** [1] 69:7

---

**P**

**Page** [10] 55:2 72:15 87:8 91:14 91:18 102:19 198:6 200:5 203:16 222:20

**Paid** [1] 247:11

**Paint** [1] 198:19

**Pamela** [2] 247:3 247:16

**Panel** [3] 3:21 50:16 50:20 112:2

**Panels** [2] 50:19 53:19

**Panic** [2] 164:20 180:6

**Paper** [3] 73:8 73:13 173:13

**Pardons** [2] 33:24 34:3

**Parenting** [1] 243:18

**Parents** [3] 173:5 200:12 200:13

**Parole** [15] 33:11 33:17 33:18 33:19 33:20 34:8 34:14 34:23 108:12 129:13 148:4 166:14 228:20 229:10

**Paroled** [1] 34:19

**Paroles** [2] 33:24 34:3

**Part** [22] 5:16 8:14 90:4 123:24 146:6 154:11 165:7 178:11 178:13 190:8 195:3 195:4 197:22 198:21 205:12 205:13 207:14 208:10 208:11 210:8 237:25 240:24

**Participant** [1] 138:12

**Participate** [7] 53:8 53:14 116:9 116:13 191:20 191:25 215:24

**Participation** [1] 138:14

**Particular** [18] 8:17 11:19 13:2 20:6 54:18 67:15 77:20 124:10 141:22 150:24 183:10 220:9 223:6 224:18 226:20 229:7 230:4 230:7

**Particularly** [3] 81:19 209:7 226:7

**Parties** [3] 3:2 6:16 247:6 247:9

**Partly** [1] 202:14

**Parts** [5] 5:16 144:17 145:1 145:3 155:3

**Pass** [12] 10:2 46:8 46:12 46:13 67:1 83:3 110:9 169:16 175:16 197:8 224:11 242:24

**Past** [11] 56:11 80:21 81:9 83:14 83:20 155:14 187:21 202:17 213:13 220:4 225:23

**Patience** [1] 231:23

**Patients** [3] 225:19 225:20 225:24

**Pattern** [1] 204:25

**Pay** [6] 117:13 120:9 165:15 165:20 173:9 193:24

**Payment** [1] 172:19

**Peculiar** [1] 14:17

**Penalty** [169] 15:24 22:14 23:4 30:1 53:1 53:5 64:20 65:1 65:13 83:4 84:16 85:23 87:13 87:18 88:4 89:23 91:13 91:19 92:6 93:9 93:20 94:19 94:23 95:24 96:24 100:23 101:12 101:22 102:1 102:7 102:8 102:21 102:24 103:4 103:8 103:12 103:20 104:4 104:23 105:1 105:20 106:2 106:3 106:9 106:17 106:17 108:5 108:7 108:9 110:4 110:6 116:1 116:4 116:8 116:17 117:11 117:20 118:9 118:14 119:16 119:19 119:23 120:1 120:3 120:6 120:14 123:13 123:16 123:23 124:14 124:18 124:25 125:5 128:5 128:10 128:15 128:20 134:9 134:15 135:9 135:13 137:16 137:20

137:24 138:1 138:24 143:18 146:4 146:7 146:24 147:13 152:18 152:21 153:13 153:18 154:19 154:23 155:2 155:7 160:11 161:15 163:10 163:16 166:6 166:20 166:24 167:5 172:16 172:21 172:24 173:1 174:9 174:15 175:12 175:21 188:25 189:1 191:11 191:17 193:5 193:12 194:5 194:9 195:23 196:13 198:25 201:1 201:3 203:5 203:9 203:18 205:2 207:11 207:15 212:25 214:18 215:14 215:18 216:16 217:4 221:2 221:20 222:8 223:2 223:10 223:12 223:14 227:13 227:23 228:18 228:22 235:8 235:10 235:14 236:20 236:23 237:15 239:6 240:5 241:1 241:15 241:19 242:6 242:13

**Penitentiary** [13] 20:24 21:1 21:8 21:13 34:19 35:4 35:7 37:23 40:24 41:20 159:19 239:10 239:25

**People** [145] 10:23 11:9 11:11 14:7 19:21 20:17 20:18 20:18 20:18 20:22 20:24 21:24 26:1 26:7 26:13 26:17 26:19 26:22 33:1 34:25 42:1 43:11 44:22 44:25 45:1 45:15 45:18 45:18 46:14 46:22 51:23 52:2 52:4 53:4 58:1 58:11 58:14 61:17 64:1 64:1 65:23 67:21 68:24 68:25 69:2 69:5 70:20 75:20 76:3 76:5 77:3 79:25 80:4 80:5 88:17 92:12 93:10 93:11 93:19 94:5 94:11 103:7 109:14 112:1 112:12 112:3 116:7 118:4 118:21 123:20 124:3 124:6 125:7 126:5 127:1 139:1 140:25 141:2 141:7 141:14 142:23 142:25 143:3 144:13 145:5 148:12 153:19 153:20 154:17 154:21 155:19 159:2 159:9 162:6 162:10 162:24 162:24 162:25 169:25 170:21 171:1 171:4 172:3 173:12 173:18 174:17 179:18 180:3 181:24 182:3 184:2 185:13 186:5 188:18 189:13 189:20 190:18 191:16 194:6 199:3 199:7 199:14 199:15 199:23 203:22 204:4 205:9 205:11 215:17 215:19 217:3 223:20 225:5 225:10 228:19 228:21 228:25 229:2 229:12 229:14 229:24 230:15 231:6 236:2 245:3

**Per** [1] 199:16

**Percent** [11] 85:2 93:24 94:1 94:2 94:13 94:15 95:12 95:20 95:21 135:25 168:17

**Perception** [2] 72:3 149:6

**Perfect** [1] 198:20

**Perfectly** [11] 14:25 27:25 34:14 34:19 34:21 80:8 99:1 99:4 100:5 113:3 183:20

**Perform** [1] 216:4

**Perhaps** [7] 9:3 38:5 45:14 147:5 147:22 211:6 211:7

**Period** [6] 141:6 143:11 150:15 224:6 229:12 230:13

**Permitted** [1] 17:10

**Person** [137] 7:3 9:22 9:23 26:3 27:25 28:22 28:25 37:21 38:5 38:8 38:15 43:19 44:15 44:21 47:3 47:9 52:8 57:1 59:19 61:19 62:15 63:1 62 64:13 64:15 66:11 66:15 68:6 70:19 76:3 76:13 76:17 76:22 78:21 81:7 85:7 85:9 85:13 85:18 85:21 85:22 87:14 87:19 92:2 92:3 101:7 102:12 104:6 104:20 107:17 107:18 108:8 110:2 114:24 115:5 118:21 119:25 121:3 121:21 122:10 122:11 122:16 123:6 126:21 126:24 127:1 128:8 136:19 136:20 137:10

138:17 139:22 146:24 148:2 152:17 155:11 156:9 156:25 158:20 159:2 161:1 161:4 162:18 163:18 165:14 165:18 167:10 169:8 170:17 171:9 171:10 171:18 173:7 174:1 174:8 174:14 175:20 175:21 176:10 176:21 176:24 177:3 177:8 177:13 177:21 178:1 178:7 179:3 186:19 187:8 190:7 193:16 193:23 194:7 195:7 195:14 199:20 200:19 204:19 207:23 213:14 218:4 220:2 220:11 220:17 220:18 221:12 223:2 223:14 234:3 236:10 236:19 237:19 237:24 239:8 239:19 240:8 245:16

**Person's** [35] 10:9 15:14 15:16 26:22 34:13 43:5 45:6 45:12 46:3 47:15 47:17 62:6 97:22 99:5 100:7 100:3 135:1 2 153:8 154:19 159:14 162:1 22 169:23 172:15 173:16 173:16 177:9 178:14 207:6 217:8 224:18 225:2 229:18 230:4 230:10 235:23

**Personal** [31] 6:24 8:12 8:14 8:22 50:5 54:3 54:5 66:17 66:18 73:2 81:14 87:10 92:14 92:23 94:6 104:17 116:24 131:22 149:25 160:23 160:24 180:2 180:9 185:15 189:15 209:13 209:13 211:6 221:8 233:4 237:7

**Personality** [1] 12:3

**Personally** [6] 56:2 117:6 131:21 170:2 188:25 206:8

**Personnel** [1] 21:13

**Persons** [4] 19:17 19:18 34:15 118:21

**Perspective** [2] 26:9 26:14

**Phase** [28] 4:25 6:7 6:12 6:19 6:21 12:8 12:11 12:15 12:18 12:22 13:1 13:14 14:2 15:23 16:7 16:10 16:14 27:12 32:9 40:15 41:11 49:5 97:25 132:3 151:7 186:25 201:12 211:21

**Phases** [1] 5:1

**Philosophy** [1] 154:21

**Phone** [4] 2:9 2:16 2:21 233:19

**Photographs** [2] 118:21 119:11

**Phrase** [7] 16:1 16:4 24:9 24:11 79:15 171:22 228:7

**Phrased** [1] 206:11

**Physical** [2] 112:24 142:13

**Pick** [3] 56:14 69:12 145:15

**Picked** [2] 12:20 74:16

**Picture** [1] 198:20

**Pictures** [1] 118:20

**Piece** [6] 13:3 20:15 20:25 26:8 48:21 181:21

**Pilot** [1] 210:2

**Place** [5] 69:4 69:4 69:8 100:1 143:6

**Placed** [4] 45:21 45:23 74:17 204:2

**Places** [6] 145:6 171:23 207:5 207:22 208:1 216:11

**Plan** [1] 138:12

**Plane** [1] 144:18

**Plans** [2] 145:19 188:14

**Plate** [1] 199:16

**Play** [27] 5:3 5:12 12:19 12:22 12:25 13:12 44:1 44:4 48:8 48:11 48:15 132:5 132:13 140:22 150:7 173:3 173:6 185:21 196:13 201:11 203:14 211:24 212:6 212:23 212:24 232:18 234:5

**Played** [1] 207:13

**Plays** [1] 145:22

**Plead** [1] 13:15

**Plenty** [1] 185:11

**Plug** [2] 39:13 42:10

**Plugging** [1] 38:10

**Plus** [4] 64:3 124:11 166:25 218:9

**Point** [33] 17:3 21:12 27:4 28:22 31:3 33:21 34:9 38:2 42:1 46:1 47:14 49:24 76:1 81:19 85:19 89:11 111:18 131:15 143:22 150:8 167:17 173:24 174:2 176:9 178:12 178:17 183:4 183:9 200:21 203:8 210:25 232:22 243:9

**Pointed** [2] 200:17 226:8

**Points** [3] 30:24 57:21 237:22

**Police** [4] 47:6 47:6 135:13 164:12

**Political** [1] 34:7

**Politics** [1] 175:14

**Pool** [4] 31:17 31:19 183:25 184:1

**Pop** [1] 169:21

**Pope** [2] 199:4 199:10

**Portion** [1] 229:18

**Portions** [1] 247:5

**Pose** [1] 75:25

**Position** [11] 92:18 178:23 197:4 198:25 199:23 199:24 226:19 227:12 227:14 227:16 227:21

**Positions** [1] 175:23

**Possibilities** [2] 77:18 77:19

**Possibility** [18] 17:15 18:12 18:20 22:14 29:15 29:18 29:18 61:10 61:11 61:14 80:9 80:10 89:18 92:2 158:14 172:8 219:7 238:24

**Possible** [23] 8:2 9:8 18:3 18:3 32:20 34:14 34:20 34:21 35:5 36:18 36:20 36:24 37:3 61:11 75:11 87:19 88:1 88:18 158:14 158:15 158:16 173:25 177:3

**Possibly** [14] 17:15 17:16 18:2 58:1 98:10 120:21 135:7 154:6 176:25 178:19 202:6 219:9 224:20 245:3

**Post** [1] 244:7

**Postal** [2] 244:12 244:13

**Posture** [1] 24:19

**Potential** [1] 228:14

**Potentially** [2] 124:24 150:6

**Power** [1] 228:12

**Pray** [2] 93:2 215:3

**Prays** [1] 39:10

**Preconceived** [6] 82:1 82:3 82:6 85:3 133:1 186:6

**Predict** [1] 205:3

**Predicting** [1] 184:5

**Prediction** [1] 205:5

**Prefer** [1] 145:13

**Pregnancy** [2] 113:13 113:24

**Pregnant** [3] 112:18 113:9 118:23

**Prejudge** [1] 182:3

**Prejudges** [1] 142:2

**Prejudices** [1] 69:21

**Premeditated** [1] 172:18

**Preparation** [1] 247:11

**Prepared** [1] 5:11

**Preplanned** [1] 220:16

**Preposterous** [1] 21:10

**Present** [5] 19:7 142:12

**Presented** [13] 5:24 14:4 48:22 70:18 70:23 128:9 132:21 142:12 171:24 186:16 236:13 240:13 244:25

**Presidency** [2] 199:21 199:21

**Presiding** [1] 1:21

**Pressed** [1] 52:9

**Presume** [4] 77:24 77:25 126:23 167:9

**Presumed** [7] 12:14 16:16 16:18 32:1 60:11 78:25 79:14

**Presumes** [1] 24:24

**Presumption** [3] 13:20 25:2 81:3

**Presumptuous** [1] 207:20

**Presupposes** [1] 146:5

**Pretty** [6] 32:24 58:13 67:12 88:15 182:11 240:21

**Prevent** [9] 55:3 87:10 113:24 117:9 118:5 169:23 196:22 222:22 227:23

**Previously** [1] 150:19

**Price** [1] 173:9

**Primarily** [1] 132:3

**Primary** [2] 208:2 211:22

**Prime** [1] 183:11

**Print** [1] 46:1

**Prison** [17] 21:13 33:21 34:1 106:24 128:16 128:20 128:22 129:11 130:1 146:25 147:14 166:8 174:3 175:22 228:25 229:17 229:18

**Pro** [1] 192:20

**Proactive** [1] 199:18

**Probability** [40] 7:22 17:6 17:7 17:10 17:12 17:14 17:22 17:24 18:14 18:16 18:20 18:21 18:23 19:2 19:5 19:12 20:5 29:12 61:6 61:12 61:13 61:24 64:24 79:18 85:12 98:9 122:11 137:3 137:4 137:14 158:7 158:13 158:19 172:8 213:14 216:22 219:4 219:12 221:18 239:17

**Probable** [2] 17:19 158:17

**Probation** [2] 174:11 229:4

**Problem** [32] 50:13 54:22 60:2 63:5 64:9 71:9 71:12 71:12 72:7 74:19 77:15 92:25 103:14 120:17 159:25 161:15 162:15 163:7 163:22 164:24 165:8 167:1 169:13 185:18 189:18 191:14 196:2 196:25 199:19 217:13 219:24 222:8

**Problems** [4] 83:1 165:1 173:4 193:13

**Proceedings** [5] 1:19 1:22 81:20 247:5 247:9

**Process** [9] 10:14 49:2 53:8 53:14 116:9 116:14 118:1 166:3 172:14 191:12 191:20 192:1 197:21 215:24 226:9 228:5 228:8 228:18 228:21

**Produce** [1] 142:10

**Producing** [2] 167:25 173:15

**Product** [1] 184:23

**Profession** [1] 226:1

**Professional** [4] 50:6 150:1 211:7 233:4

**Progress** [1] 211:21

**Progresses** [1] 58:11

**Projecting** [1] 184:5

**Projection** [1] 213:15

**Promise** [2] 94:2 138:4

**Proof** [25] 19:7 59:24 60:18 63:2 65:9 76:21 94:3 94:6 94:18 94:22 95:7 95:8 95:

16 95:24 96:9 96:20 97:1 101:24 104:14 107:15 135:21 158:12 170:25 221:5 238:17
**Proper** [10] 53:1 53:5 92:7 100:25 102:10 102:12 116:4 191:17 215:18 237:15
**Proper-type** [1] 215:18
**Property** [3] 19:17 19:22 137:8
**Proponent** [1] 175:11
**Proposition** [1] 243:11
**Propounding** [1] 67:9
**Prosecution** [4] 72:19 88:6 89:7 89:9
**Prosecutor** [4] 71:24 78:15 93:13 167:11
**Prosecutor's** [1] 181:13
**Prosecutors** [2] 72:21 126:10
**Prospect** [2] 148:7 223:13
**Prospective** [10] 3:24 111:1 126:3 130:17 140:19 148:17 211:23 227:11 227:11 231:17
**Protection** [1] 69:24
**Prove** [94] 15:14 15:16 16:6 17:23 18:1 18:8 18:10 18:13 19:1 19:4 19:10 19:11 20:5 24:12 24:15 24:16 24:20 24:22 36:14 36:15 36:18 36:21 36:25 37:4 37:6 43:5 46:3 56:22 56:23 57:2 57:5 57:15 57:24 57:24 59:25 63:3 73:6 74:20 74:20 79:17 81:5 81:8 81:10 82:18 88:6 93:14 93:19 93:22 94:1 94:16 96:16 96:25 97:22 97:24 98:1 98:4 98:12 98:16 98:19 99:8 99:16 99:22 100:2 100:3 100:6 100:10 100:12 101:16 102:12 121:5 121:7 135:22 157:11 158:3 158:8 158:12 159:7 159:9 159:10 159:12 159:13 167:15 168:15 168:17 169:12 170:6 195:7 216:16 216:20 217:25 218:6 219:21 219:23 220:21
**Proved** [5] 35:20 45:6 81:6 81:23 102:14
**Proven** [9] 71:1 141:14 141:18 168:21 168:23 170:4 172:1 172:5 204:16
**Proves** [8] 15:19 16:8 16:12 16:25 81:9 99:6 126:25 169:7
**Provide** [2] 199:14 237:6
**Provided** [2] 102:25 198:5
**Provider** [2] 225:17 225:18
**Proving** [1] 47:16
**Pull** [2] 24:1 144:18
**Pulls** [3] 39:12 55:11 55:18
**Punched** [1] 21:7
**Punches** [1] 21:2
**Punished** [4] 37:22 62:8 173:9 193:9
**Punishment** [97] 6:4 6:10 12:8 12:11 12:15 12:18 13:14 16:16 21:18 37:19 37:20 38:10 40:1 40:2 40:20 40:23 41:15 41:19 42:7 42:11 49:4 53:2 53:5 58:18 58:21 59:5 59:6 59:12 60:19 60:20 61:4 62:4 87:19 88:1 88:19 92:7 100:25 101:18 105:17 106:12 116:5 120:15 121:16 121:21 121:25 127:25 128:2 130:2 136:9 136:11 136:24 140:4 152:22 155:4 155:5 156:12 157:18 160:3 160:22 173:14 173:20 176:19 186:25 189:8 189:8 190:10 190:13 190:22 191:1 191:3 191:18 195:22

195:24 196:11 201:12 203:10 204:17 206:15 215:15 215:18 217:6 218:12 218:19 218:23 218:25 220:24 229:9 236:10 237:17 239:14 239:15 240:9 241:13
**Punishments** [4] 32:21 59:17 88:18 228:14
**Purpose** [7] 6:6 9:1 23:24 38:10 49:8 127:25 163:16
**Purposes** [10] 5:24 23:5 23:8 23:21 28:10 31:6 32:15 33:4 90:4 150:16
**Put** [23] 18:5 25:3 39:10 46:1 68:19 70:6 81:24 82:2 87:14 87:24 92:17 101:14 125:2 128:20 143:4 144:3 154:12 154:18 154:22 174:25 215:20 223:3 224:2
**Putting** [1] 55:13

## Q

**Questioning** [2] 140:19 227:11
**Questionnaire** [42] 51:6 52:21 52:24 54:25 72:11 87:7 87:15 87:25 91:12 92:4 92:24 102:18 123:10 126:2 135:4 135:19 152:2 152:8 152:16 164:25 165:12 165:13 169:21 172:12 174:25 176:10 188:15 188:23 189:13 193:4 193:21 201:6 201:7 214:13 216:7 224:19 228:2 231:7 231:25 235:4 235:9 241:5
**Questionnaires** [1] 201:3
**Questions** [135] 5:25 6:3 7:8 7:10 7:13 9:17 9:25 10:13 10:15 10:16 12:4 15:8 17:2 18:22 22:5 22:15 22:22 28:20 29:13 29:25 30:5 30:13 30:17 30:18 30:21 31:1 32:12 32:14 32:15 32:18 32:18 32:19 32:19 33:7 34:10 35:2 35:8 42:13 48:2 49:5 49:22 51:17 53:11 58:19 58:20 59:15 59:23 61:1 61:1 71:2 72:8 72:12 72:14 79:9 80:24 84:21 86:22 88:24 89:15 90:5 90:21 91:2 97:7 97:16 107:12:13 126:11 111:7 111:11 113:3 114:25 115:4 115:8 117:19 121:13 126:1 126:9 128:19 130:4 130:17 131:13 133:11 133:19 134:7 138:8 140:10 140:17 140:22 141:5 141:16 144:1 145:25 146:25 148:22 149:18 151:17 156:2 166:17 168:19 169:10 169:11 172:13 175:8 181:13 182:14 183:2 186:20 186:21 186:24 188:17 191:8 191:22 195:5 195:12 200:5 200:7 201:4 201:18 210:23 212:22 212:24 213:2 214:4 217:7 219:1 222:17 229:2 232:12 234:5 234:7 234:9 234:11 234:16 242:25 245:1 245:20
**Quick** [1] 42:14
**Quiet** [1] 148:9
**Quit** [1] 193:3
**Quite** [6] 67:8 74:1 85:24 173:13 174:17 183:17
**Quote** [3] 118:13 142:18 172:4
**Quoted** [1] 201:19

## R

**Race** [1] 194:15
**Raised** [11] 14:3 190:17 190:18 190:19 192:7 192:12 198:24 208:15 209:3 243:19 244:5
**Raises** [1] 185:23
**Ran** [2] 27:16 84:6
**Range** [4] 37:20 38:9 40:1 42:11

**Rape** [3] 135:7 135:12 135:13
**Rapes** [1] 19:19
**Rate** [3] 33:3 83:12 232:7
**Rather** [9] 74:22 74:24 140:20 187:25 202:25 209:4 211:13 225:3 225:6
**Reach** [10] 31:23 41:1 41:22 49:1 49:1 132:24 133:2 136:9 186:9 212:15
**Reaching** [2] 99:2 99:4
**React** [3] 15:3 15:3 84:24
**Reaction** [2] 77:6 172:15
**Read** [15] 10:8 22:2 52:25 73:13 97:6 127:4 127:5 143:17 143:21 165:17 165:21 172:12 173:13 194:2 231:24
**Reading** [4] 52:21 52:24 72:11 152:16
**Ready** [4] 13:15 13:17 46:12 188:6
**Real** [6] 42:14 84:12 144:4 155:13 179:18 217:23
**Realize** [5] 142:9 172:12 222:21 224:20 229:24
**Realizing** [1] 82:3
**Really** [47] 14:9 14:23 14:24 42:1 69:5 71:19 71:22 84:24 84:24 88:6 88:15 89:9 92:25 93:13 93:13 94:15 94:16 94:25 98:7 100:4 109:17 110:3 111:12 111:13 125:25 129:2 139:8 143:4 145:25 146:7 171:17 181:25 188:19 197:24 198:1 200:18 204:2 205:22 207:10 207:11 208:19 209:25 229:3
**Reason** [51] 4:17 4:24 5:6 5:13 10:11 12:17 14:11 20:15 23:25 24:5 28:12 28:16 28:18 28:18 29:21 30:11 30:12 30:16 32:7 32:14 32:23 45:2 62:11 63:11 63:21 64:16 65:3 72:6 110:19 119:6 135:11 139:15 139:18 141:10 155:16 155:18 158:3 163:18 167:3 187:24 193:19 217:9 221:14 221:22 222:5 230:19 231:8 231:11 236:22 236:24 237:7
**Reasonable** [87] 7:22 15:10 15:11 15:15 15:17 15:20 16:3 16:5 16:25 17:6 18:13 24:10 35:21 36:16 36:21 36:25 37:4 43:6 44:24 45:3 45:6 45:13 46:4 46:17 47:13 47:17 47:24 54:13 57:3 57:16 60:1 61:6 63:3 76:2 76:21 78:21 79:16 85:12 93:17 93:23 95:8 95:14 96:10 96:17 97:23 98:2 99:7 99:8 99:17 100:4 100:7 106:1 121:7 135:23 135:24 136:5 141:15 141:18 142:15 146:19 154:7 157:2 158:1 158:4 158:8 158:13 159:8 160:13 168:16 168:21 168:23 169:7 169:12 171:22 172:2 172:6 190:1 204:16 216:17 216:21 217:25 218:7 219:3 219:22 219:23 235:10 239:16
**Reasons** [18] 3:5 63:11 104:5 104:20 141:21 161:4 163:18 167:20 189:4 203:4 230:12 221:12 221:25 222:5 230:12 230:16 230:21 230:23
**Receive** [34] 29:16 39:23 59:12 59:21 63:13 64:16 64:16 65:13 85:18 104:4 106:4 117:11 121:21 122:7 148:2 157:10 160:4 160:12 161:4 163:19 167:21 186:7 190:23 191:2 203:18 205:2 207:15 221:2 221:13 221:19 222:6 236:11 237:20 240:5
**Received** [3] 33:15 84:16 146:24

**Receives** [10] 58:23 64:20 102:12 147:12 147:14 161:13 161:15 222:7 222:13 222:17
**Recess** [1] 149:1
**Recognize** [6] 100:1 182:7 183:17 183:17 183:20 228:4
**Recognized** [1] 82:11
**Recognizing** [1] 184:12
**Recommendations** [2] 33:25 34:2
**Record** [7] 1:1 83:2 83:7 83:10 247:6 247:8 247:11
**Records** [3] 109:14 168:2 168:3
**Recovered** [2] 28:2 238:13
**Reduced** [1] 25:25
**Reevaluate** [3] 160:17 195:20 221:23
**Refer** [5] 85:3 104:20 160:24 221:9 221:12
**Reference** [1] 201:10
**Referring** [1] 198:12
**Reflected** [2] 176:14 179:21
**Reflects** [1] 247:9
**Refuse** [5] 13:4 34:8 47:21 48:14 186:1
**Regard** [4] 167:13 187:3 194:21 227:13
**Regarding** [4] 40:16 41:12 143:18 228:13
**Regardless** [6] 91:20 96:24 101:12 102:21 105:5 200:15
**Regards** [2] 52:19 189:2
**Rehabilitate** [1] 21:19
**Rehabilitation** [1] 21:20
**Reject** [2] 34:1 34:6
**Rejects** [1] 178:23
**Relate** [2] 202:22 209:2
**Related** [3] 189:3 205:23 207:11
**Relation** [1] 149:8
**Relationship** [4] 6:16 6:17 190:18 207:13
**Relationships** [1] 225:23
**Relax** [2] 133:21 151:20
**Release** [3] 59:21 129:13 174:22
**Released** [1] 129:5
**Relevant** [6] 59:10 59:12 157:8 157:10 190:25 191:1
**Reliable** [1] 47:11
**Relied** [1] 169:24
**Religion** [3] 180:20 188:24 189:16
**Religion's** [1] 198:25
**Religious** [11] 87:9 92:14 92:22 93:1 94:7 116:23 116:25 118:4 118:6 181:10 217:19
**Rely** [9] 61:2 93:7 143:2 177:16 179:4 179:13 179:16 179:20 218:22
**Relying** [2] 55:4 218:25
**Remarkably** [2] 37:20 188:1
**Remember** [14] 80:16 86:14 87:14 87:17 98:8 108:22 108:25 111:8 131:9 149:14 161:22 182:23 210:19 232:8
**Remind** [1] 3:23
**Remorse** [12] 152:24 152:25 176:10 176:12 176:18 176:23 176:24 177:3 178:2 178:8 178:20 220:19
**Remorseful** [2] 124:1 124:3
**Render** [4] 53:24 66:6 154:

2 155:10
**Repeat** [3] 138:24 138:25 242:11
**Repeating** [1] 156:9
**Rephrase** [1] 209:11
**Replace** [4] 24:2 29:22 32:8 147:6
**Replacing** [2] 28:15 28:19
**Reported** [1] 1:22 247:7
**Reporter** [2] 247:3 247:17
**Reporter's** [4] 1:1 247:6 247:8 247:11
**Represent** [12] 51:5 67:7 91:10 115:17 127:10 134:2 140:16 152:1 188:11 214:11 224:17 235:2
**Represented** [2] 4:1 4:3
**Representing** [4] 110:18 126:14 197:17 244:22
**Represents** [1] 127:9
**Request** [1] 3:16
**Requested** [1] 247:5
**Require** [17] 18:7 19:24 81:4 82:18 94:17 95:23 96:9 96:16 96:20 98:3 98:16 98:19 101:16 101:24 114:16 114:17 167:25
**Required** [17] 18:13 19:4 19:10 19:11 20:5 24:12 36:14 36:18 88:25 90:19 94:3 96:11 96:18 97:22 100:13 100:20 128:14
**Requirement** [2] 27:5 104:14
**Requirements** [1] 108:21
**Requires** [4] 6:4 35:22 100:14 231:4
**Research** [1] 30:3
**Resentment** [1] 67:24
**Residential** [1] 27:14
**Resignation** [1] 58:1
**Resigned** [1] 228:11
**Resolve** [2] 125:5 215:1
**Resolved** [1] 168:20
**Respect** [4] 51:22 189:17 199:7 199:10
**Respective** [1] 247:9
**Responding** [2] 201:5 208:18
**Response** [5] 72:14 87:8 198:11 200:8 227:25
**Responses** [1] 141:5
**Responsibility** [11] 6:25 8:13 8:15 105:11 138:11 138:15 160:24 199:14 213:24 214:21 221:9
**Responsible** [6] 177:5 178:22 196:20 196:23 215:5 215:9
**Rest** [5] 26:21 34:17 228:19 230:24 239:10
**Restrictions** [1] 154:16
**Result** [17] 36:2 41:1 41:22 48:25 49:1 58:23 87:11 92:1 92:21 93:22 104:13 108:10 108:18 116:11 117:20 187:3 215:21
**Results** [3] 32:18 36:1 36:19
**Retardation** [5] 26:17 26:20 26:24 27:7 64:13
**Retire** [1] 49:11
**Retired** [1] 145:17
**Return** [2] 76:8 76:9
**Returned** [1] 11:23
**Returning** [1] 87:11
**Returns** [1] 129:11
**Revenge** [1] 39:20
**Reversed** [1] 109:2
**Reviewed** [1] 215:8

**Rewarding** [1] 145:6
**Ridiculous** [2] 70:24 71:21
**Ring** [1] 182:5
**Rise** [2] 47:16 79:20
**Rises** [3] 45:5 48:13 83:8
**Risk** [2] 27:16 214:25
**Risks** [1] 214:23
**Road** [2] 188:16 223:22
**Roam** [1] 38:9
**Rob** [1] 43:9
**Robberies** [1] 19:20
**Robbery** [3] 43:21 123:1 219:17
**Robs** [1] 43:10
**Room** [7] 5:5 38:9 38:23 40:1 140:20 174:18 211:15
**Rooms** [1] 11:8
**Rooting** [1] 188:3
**Roughshod** [1] 205:18
**Round** [1] 182:4
**Rule** [1] 13:3
**Rules** [20] 5:3 14:3 48:4 48:7 48:11 48:12 48:15 87:4 132:5 132:7 132:13 150:6 150:9 150:13 211:23 212:2 212:6 232:14 232:18 232:19
**Ruling** [5] 97:6 97:9 97:11
**Run** [2] 170:9 205:17
**Running** [1] 80:14

**S**

**Sad** [1] 73:18
**Safe** [1] 21:21
**Safety** [1] 23:13
**Sale** [2] 55:3 169:23
**Salvador** [1] 130:22
**San** [1] 247:18
**Sat** [1] 125:22
**Satisfaction** [2] 126:25 218:1
**Satisfied** [9] 23:6 48:6 48:18 48:19 80:8 99:1 99:4 184:11 212:10
**Satisfy** [2] 79:11 212:9
**Save** [1] 108:3
**Saved** [1] 27:16
**Saw** [10] 27:15 43:11 44:11 44:12 46:9 46:20 178:9 178:9 178:18 194:13
**SBOT** [4] 2:3 2:5 2:13 2:18
**Scare** [1] 69:18
**Scaring** [1] 69:17
**Scene** [1] 198:20
**Scheme** [9] 146:22 201:13 202:4 202:5 202:6 202:23 205:21 206:7 213:21
**School** [13] 21:14 48:2 145:16 168:3 192:6 192:7 198:18 201:23 203:25 209:20 209:21 209:23 209:24
**Schooling** [2] 198:10 198:16
**Schoolteacher** [1] 21:1
**Science** [1] 202:3
**Scout** [1] 159:16
**Scout-type** [1] 159:16
**Scouts** [1] 198:19
**Screwed** [1] 28:1
**Se** [1] 199:16
**Search** [6] 66:3 169:9 217:12
**Seat** [2] 86:12 148:12
**Second** [12] 5:22 5:23 6:21 6:23 8:6 8:14 8:24 9:12 10:5 13:1 13:2 14:2 15:23 16:10 16:14 22:12 22:16 22:

17 23:15 23:18 23:12 23:17 16:23:19 24:7 24:8 24:16 25:7 26:9 27:12 28:9 28:21 31:7 32:16 40:8 40:15 41:11 43:12 44:9 47:13 56:10 90:4 90:12 97:25 106:2 106:13 106:16 106:22 107:9 107:14 107:22 110:24 132:17 151:7 157:4 166:2 167:19 194:12 195:4 203:13 212:8
**Seconds** [4] 15:7 46:23 47:3 47:4
**See** [102] 5:6 7:25 8:9 8:23 9:21 10:7 12:1 15:9 16:1 16:4 17:2 17:25 18:6 24:8 24:9 25:6 28:12 30:13 32:6 32:9 38:22 39:18 39:25 43:11 45:2 46:13 46:24 46:25 47:4 47:9 48:22 61:13 69:4 72:5 72:22 72:23 77:10 79:22 79:23 79:24 80:8 80:10 83:7 83:18 87:25 89:9 96:8 96:13 97:19 98:11 98:23 99:7 99:14 100:5 100:7 100:11 102:3 102:4 103:12 105:23 107:7 110:1 114:12 118:20 118:22 119:4 119:10 119:14 126:3 127:4 127:7 133:7 148:7 152:6 163:20 169:20 177:2 178:18 184:3 186:7 187:2 195:14 199:2 202:9 203:1 203:10 204:3 205:9 205:20 206:6 206:8 208:2 208:8 212:13 221:9 223:19 231:25 232:2 233:22 237:1 238:3 244:19
**Seek** [1] 94:18
**Seeking** [6] 93:9 93:10 101:17 101:25 167:5 171:8
**Seem** [2] 178:18 199:25
**Sees** [4] 46:22 46:22 47:1 47:5
**Seldom** [2] 166:7 166:7
**Select** [1] 151:11
**Selected** [8] 66:21 67:21 112:7 224:4 224:8 224:9 227:6 230:18
**Selecting** [1] 110:20
**Selection** [2] 51:12 146:7
**Self** [15] 36:4 55:21 61:20 76:6 79:11 153:9 154:6 177:8 177:10 177:20 177:21 178:5 178:19 179:13 218:5
**Self-defense** [27] 36:4 36:4 36:5 36:5 36:7 55:21 55:23 61:20 68:9 70:14 71:10 76:6 153:9 154:6 166:23 177:6 177:8 177:10 177:16 177:20 177:21 178:1 178:5 178:19 179:13 218:5 235:24
**Selling** [3] 55:10 71:11 179:9
**Sells** [1] 179:3
**Sense** [8] 67:24 89:20 98:13 150:25 151:15 200:2 213:9 214:1
**Sent** [3] 33:23 33:25 172:18
**Sentence** [110] 9:4 9:5 9:14 9:19 9:22 10:2 10:3 10:4 10:6 10:10 10:11 11:11 12:16:20 16:23 22:8 22:11 23:7 23:10 23:11 24:1 24:2 25:11 25:12 25:24 25:25 27:2 27:3 27:20 28:6 28:13 28:19 28:20 28:22 28:24 29:16 29:22 29:22 32:5 32:8 32:8 32:13 32:23 32:24 33:1 33:2 33:4 33:8 33:12 33:16 35:1 35:3 35:6 39:23 41:2 41:4 59:21 63:2 63:9 63:21 64:18 80:19 85:18 89:1 90:7 90:19 90:22 101:8 104:21 106:18 106:20 107:1 108:4 115:1 115:3 117:3 126:18 129:2 129:11 124:23 138:18 147:15 147:18 148:2 161:13 162:1 166:8 174:14 186:22 186:23 187:24 187:25 195:21 213:1 213:19 213:20 217:1 217:10

229:13 234:10 237:11 238:6 239:20 240:22 241:3 241:8
**Sentenced** [4] 34:15 89:10 166:12 223:2
**Sentences** [1] 10:12
**Sentencing** [4] 28:8 41:5 41:23 151:9
**Separate** [2] 179:17 205:19
**Separately** [1] 8:11
**September** [1] 1:18 111:25
**Series** [1] 200:7
**Serious** [4] 55:13 101:18 126:23 146:1
**Seriously** [1] 188:22
**Serve** [14] 75:11 108:21 109:5 116:19 125:14 129:4 130:9 139:6 139:16 139:19 172:9 183:15 217:20 231:4
**Served** [2] 33:11 73:20
**Service** [19] 3:24 14:13 27:24 28:1 50:2 51:15 51:25 53:4 53:19 87:1 111:21 114:10 149:22 180:5 183:7 183:14 244:12 244:14 244:19
**Services** [1] 225:18
**Serving** [3] 119:7 224:20 227:24
**Set** [25] 51:20 54:5 54:9 69:21 70:2 77:6 79:24 153:24 154:4 154:15 154:25 155:8 155:11 156:2 165:10 180:9 189:23 195:3 209:20 213:21 216:14 217:14 217:24 229:8 232:14
**Sets** [2] 51:13 71:19
**Setting** [1] 75:13
**Seven** [3] 180:25 183:12 192:8
**Seventeen** [13] 26:3 26:12 129:17 129:18 196:9 196:12 196:12 223:7 223:9 223:12 223:13 223:17 223:20
**Seventeen-year-old** [5] 10:19 26:3 34:10 38:3 223:7
**Seventy-five-year-old** [2] 39:2 39:22
**Several** [5] 108:22 127:4 128:6 152:8 153:2
**Several-page** [1] 154:4
**Severe** [8] 26:25 26:25 128:20 129:23 129:24 130:2 135:6 239:6
**Severeness** [1] 242:16
**Severity** [1] 242:20
**Sexual** [2] 119:24 123:2
**Shake** [1] 226:11
**Shall** [1] 221:3
**Shape** [1] 230:5
**Share** [2] 132:4 189:1
**Shared** [2] 55:1 164:19
**Shield** [1] 225:16
**Shift** [1] 6:22
**Shifts** [1] 167:17
**Shoes** [1] 30:19
**Shoot** [2] 125:11 138:13
**Shooting** [2] 219:17 241:25
**Shoots** [1] 46:5
**Shoplifting** [1] 93:18
**Short** [2] 16:6 230:13
**Shot** [7] 46:24 46:24 46:25 47:1 47:3 47:4 75:8
**Show** [17] 44:15 62:22 83:15 94:16 122:22 142:18 170:10 176:10 176:11 176:23 176:24 178:7 178:20 179:12 191:13 220:19 237:9
**Showed** [2] 118:15 189:10

**Showing** [1] 177:1

**Shown** [3] 47:8 152:23 170:14

**Shows** [8] 27:13 32:2 45:12 162:17 195:5 201:24 202:2 202:2

**Sic** [2] 47:1 75:24

**Side** [10] 25:3 52:6 52:7 67:1 114:16 142:19 167:17 168:11 182:2 242:24

**Sides** [7] 51:17 66:23 88:16 130:12 142:8 146:11 182:11

**Sifting** [1] 188:3

**Sign** [1] 102:11

**Significant** [2] 175:7 229:18

**Simple** [5] 14:9 14:25 42:2 53:25 88:16

**Simpler** [1] 7:20

**Simply** [11] 13:5 18:10 25:22 37:20 47:22 48:5 71:1 82:20 183:18 186:6 208:8

**Single** [6] 11:12 34:18 45:17 47:10 48:21 80:1

**Sisters** [1] 30:20

**Sit** [26] 42:3 48:20 67:20 102:11 110:20 117:16 118:25 124:24 125:25 134:17 136:1 141:7 141:23 146:18 148:8 171:1 180:16 181:23 182:12 191:25 225:10 230:14 244:24 245:3 245:9 245:11

**Sits** [1] 219:11

**Sitting** [29] 53:13 67:17 67:18 68:23 68:25 72:10 73:23 74:15 79:13 79:13 110:17 116:12 118:5 126:21 143:3 143:5 144:17 156:3 156:24 176:16 180:3 180:7 190:3 191:24 197:4 215:22 230:13 244:21 245:18

**Situation** [38] 8:16 51:15 56:21 66:2 68:7 75:22 76:1 77:2 77:7 77:20 80:3 81:1 82:4 118:22 124:22 125:3 155:8 155:17 155:22 159:16 160:25 164:23 165:4 172:15 172:2 178:2 178:4 179:12 180:4 180:10 207:18 208:10 208:12 215:20 223:14 224:3 227:3 227:3

**Situations** [5] 64:13 155:24 155:25 220:11 230:2

**Six** [7] 10:22 75:11 112:19 112:20 135:14 183:19 192:11

**Six-time** [1] 10:22 38:16

**Sixteen** [1] 223:24

**Sixteen-year-old** [1] 223:24

**Size** [1] 30:19

**Sleep** [1] 70:9

**Slight** [1] 156:15

**Slightly** [1] 141:12

**Slow** [1] 204:1

**Small** [2] 201:20 209:21

**Smart** [2] 204:5 223:21

**Smith** [2] 84:5 84:11

**SOB** [1] 55:12

**Society** [41] 7:25 20:9 20:10 20:13 20:15 20:16 20:23 20:25 21:23 22:5 55:5 61:8 76:22 79:21 80:22 81:9 85:10 85:14 85:21 136:15 136:21 137:13 137:15 138:24 159:1 159:13 173:1 190:17 193:14 194:19 195:16 203:6 204:19 207:24 219:6 219:15 221:19 239:9 239:11 239:19 239:22

**Society's** [1] 203:2

**Sole** [1] 238:14

**Solely** [1] 42:20

**Solve** [1] 199:19

**Someone** [67] 43:1 55:11 55:12 57:13 58:12 58:17 58:22 59:3 60:21 61:18 61:21 62:19 64:22 65:15 77:7 104:1 108:5 108:11 108:23 109:4 117:10 117:24 118:18 120:24 121:5 121:6 121:8 121:12 121:22 121:24 123:3 124:24 125:13 134:13 134:19 135:1 138:13 138:13 139:2 139:24 140:3 153:9 153:10 153:11 156:20 156:22 157:22 160:2 161:1 163:12 163:25 176:22 190:11 191:2 200:21 218:11 219:18 219:19 220:7 236:3 236:8 237:1 237:2 238:12 238:22 241:12 241:25

**Someplace** [1] 66:8

**Sometimes** [18] 26:1 32:25 33:1 45:13 65:23 120:2 120:5 183:18 199:15 202:20 203:21 204:13 234:6

**Somewhere** [4] 28:7 66:12 164:10 233:16

**Son** [3] 74:1 142:22 142:22

**Sorry** [10] 86:18 87:23 100:16 129:19 135:12 144:22 178:10 178:12 209:9 230:6

**Sort** [1] 205:4

**Sorted** [1] 186:8

**Sorting** [1] 184:25

**Sorts** [3] 38:25 142:13 142:13

**Sought** [1] 36:1

**Sound** [7] 26:6 53:25 132:22 186:11 212:16 213:3 234:13

**Sounds** [2] 68:13 163:15

**Source** [2] 42:25 43:23

**South** [2] 80:12 84:6

**Southwest** [1] 2:14

**Span** [1] 210:3

**Special** [33] 5:25 51:13 78:19 85:17 137:17 157:15 162:23 162:25 187:14 201:2 201:11 202:19 202:24 203:3 203:7 203:10 204:3 204:6 204:20 205:20 205:21 206:6 206:23 206:25 207:4 207:20 208:4 208:5 208:16 209:5 209:16 213:9 213:10

**Specific** [9] 19:2 19:10 20:20 38:3 38:4 38:5 38:10 56:3 76:4

**Specifically** [3] 7:16 22:17 82:15

**Spectrums** [1] 213:16

**Speculating** [2] 34:13 174:18

**Spend** [8] 4:10 12:5 32:21 34:17 125:7 183:6 183:23 239:9

**Spending** [1] 146:16

**Spends** [1] 39:8

**Spent** [7] 10:22 110:14 150:15 187:5 195:2 211:20 212:18

**Split** [1] 18:11

**Spot** [1] 181:25

**Spur** [1] 220:15

**Spur-of-the-moment** [1] 220:15

**Stab** [1] 138:13

**Stage** [34] 5:22 5:23 6:23 58:19 59:7 60:19 60:21 62:4 121:16 136:9 136:11 136:12 136:24 140:4 155:4 156:12 156:15 156:16 156:17 156:18 157:4 157:15 173:4 173:20 176:19 190:10 190:13 190:21 217:7 218:12 218:18 218:25 220:24 239:14

**Stake** [2] 96:3 225:3

**Stand** [8] 54:16 56:9 57:12 58:5 142:17 143:8 189:4 190:3

**Standard** [1] 136:5

**Standardized** [1] 10:14

**Standing** [1] 55:10

**Standpoint** [2] 15:13 150:24

**Stands** [1] 4:7

**Start** [12] 4:14 13:9 77:21 78:23 81:3 91:3 126:20 160:12 184:8 185:10 186:5 188:14

**Started** [4] 93:12 105:24 145:24 146:2

**Starting** [4] 16:18 16:23 31:20 151:2

**Starts** [5] 12:1 15:18 16:7 16:11 79:15

**State** [71] 1:10 2:10 3:24 4:3 9:22 15:14 16:5 18:1 18:7 18:13 19:1 19:3 19:10 19:11 20:5 24:12 24:19 34:4 34:5 37:21 39:15 51:5 58:22 59:25 70:15 79:17 81:5 82:18 91:10 97:22 97:24 98:1 98:12 99:6 99:16 110:6 115:17 126:25 134:2 135:22 141:11 141:14 141:18 141:24 142:12 146:18 152:1 153:19 155:1 164:16 167:4 168:21 169:4 169:7 170:25 171:2 171:7 171:21 171:24 172:1 172:5 188:11 189:24 191:10 214:11 216:16 219:21 228:3 235:2 247:1 247:4

**State's** [13] 15:19 16:8 16:11 16:25 17:23 32:2 36:14 36:17 94:18 94:19 141:16 170:5 243:8

**Statement** [6] 76:19 77:25 89:2 123:11 128:3 231:2

**Statements** [5] 52:23 119:14 165:13

**States** [1] 130:24

**Stay** [4] 33:23 84:20 138:14 140:20

**Stayed** [1] 244:18

**Step** [4] 49:2 199:15 199:15 204:17

**Stepping** [1] 62:17

**Stick** [1] 74:21

**Still** [29] 15:15 55:20 56:5 56:5 59:16 62:20 65:15 65:18 70:5 103:3 103:17 107:22 108:17 114:4 118:24 125:16 163:17 164:3 164:13 169:2 169:10 170:19 175:6 178:7 178:10 195:23 200:24 206:9 241:24

**Stone** [1] 62:17

**STONER** [1] 86:6

**Stop** [2] 160:14 195:20

**Stopgap** [1] 107:15

**Storm** [1] 27:25

**Story** [1] 142:19

**Straight** [1] 159:15

**Straight-A** [1] 159:15

**Street** [6] 27:14 55:10 55:17 68:7 72:3 223:21

**Streets** [1] 74:16

**Strength** [2] 71:4 213:3

**Stresses** [1] 226:8

**Stressful** [2] 180:4 199:12

**Strict** [1] 181:5

**Strong** [8] 45:12 67:12 69:7 70:22 71:6 72:13 103:23 172:25

**Stronger** [1] 18:5

**Strongly** [5] 67:14 67:15 200:10 243:11 243:16

**Struggle** [1] 84:19

**Stuck** [1] 71:22

**Student** [2] 159:16 162:23

**Students** [1] 162:25

**Studied** [1] 202:15

**Study** [1] 147:8

**Stuff** [10] 13:8 60:24 80:12 81:25 155:14 170:22 190:19 191:6 232:10 237:10

**Stumped** [1] 82:7

**Subjected** [3] 51:17 228:22 229:16

**Submit** [4] 79:4 97:5 105:19 206:25

**Substitute** [1] 23:12

**Substituted** [1] 106:18

**Successful** [1] 210:2

**Suffer** [1] 39:21

**Suffering** [1] 39:6

**Suffers** [1] 164:23

**Sufficient** [21] 9:2 25:8 27:1 28:17 32:7 43:5 64:17 104:18 104:20 105:13 137:19 138:16 161:2 161:3 161:14 163:5 176:4 187:24 195:7 221:10 221:12

**Sufficiently** [2] 64:8 161:11

**Suggest** [9] 53:25 55:8 55:19 61:12 62:1 155:9 168:16 203:4 219:9

**Suggested** [1] 73:5

**Suggests** [2] 180:20 222:2

**Suited** [1] 230:14

**Supervision** [1] 183:13

**Supplied** [1] 145:2

**Support** [2] 39:4 48:14

**Suppose** [2] 75:11 230:24

**Supposed** [5] 74:23 75:17 180:22 243:20 243:22

**Suppositions** [1] 203:23

**Surely** [3] 27:17 72:17 81:21

**Surprises** [1] 48:6

**Surrounding** [1] 223:4

**Surroundings** [1] 190:17

**Susan** [2] 84:5 84:11

**Suspect** [1] 74:19

**Swear** [1] 70:8

**Swearing** [1] 70:16

**Sworn** [9] 49:15 86:7 111:3 114:13 131:3 149:3 182:18 210:15 231:19

**System** [14] 39:4 143:15 147:4 147:5 147:6 154:24 175:24 175:25 193:7 195:3 201:20 216:14 217:14 217:24

**T**

**Table** [3] 76:17 126:22 167:18

**Tabs** [1] 144:25

**Talks** [2] 39:8 122:22

**Tax** [1] 183:9

**Taxes** [1] 183:10

**Teacher** [1] 204:1

**Teachers** [2] 21:14 209:23

**Teaches** [1] 227:23

**Technicalities** [1] 73:1

**Technically** [1] 206:5

**Television** [1] 201:24

**Ten** [3] 129:8 174:10 224:6

**Tend** [4] 26:2 38:15 43:6 44:15

**Tends** [3] 43:2 43:16 43:23

**Tenets** [1] 227:18

**Term** [5] 14:17 161:2 171:

17 171:23 207:21

**Terms** [17] 14:5 14:6 15:3 87:24 114:13 128:2 132:6 132:7 143:5 148:14 154:5 201:1 208:3 208:5 208:15 208:16 229:6

**Test** [1] 56:16

**Testified** [12] 42:9 44:14 46:12 49:15 57:8 86:7 111:3 131:3 149:3 182:18 210:15 231:19

**Testify** [6] 10:25 46:9 60:7 60:8 168:12 168:25

**Testifying** [1] 44:12

**Testimony** [34] 6:6 11:6 11:10 14:4 15:5 26:15 27:9 27:12 27:23 29:7 29:8 42:21 42:23 43:14 43:16 44:18 44:19 44:23 45:1 45:3 45:5 45:10 45:11 46:14 47:10 48:9 48:9 57:11 151:14 184:8 184:25 185:23 203:19 238:25

**Texas** [44] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 3:25 4:3 4:9 9:22 34:4 34:5 37:21 51:5 56:24 57:6 57:7 57:9 58:22 91:10 108:21 110:7 115:7 128:5 128:22 134:2 142:12 152:1 155:1 167:4 175:16 188:11 191:10 201:14 214:11 216:16 235:3 244:6 247:1 247:4 247:16 247:17 247:18

**Theft** [3] 109:5 109:15 109:16

**Themselves** [10] 28:1 53:7 116:9 141:1 191:9 191:19 198:3 209:25 215:20 220:20

**Therefore** [3] 6:10 76:9 133:15

**Thereof** [7] 59:8 121:19 154:8 157:13 158:22 190:15 218:16

**They've** [4] 140:1 153:2 210:2 244:2

**Thinking** [13] 38:3 124:4 126:6 126:8 139:11 152:9 155:21 174:7 178:21 194:10 228:2 230:8 241:23

**Thinks** [3] 39:11 108:5 108:6

**Third** [9] 26:23 30:4 31:7 31:10 37:9 37:11 47:3 51:10 187:23

**Thirty** [5] 47:3 47:4 75:8 179:24 226:16

**Thirty-eight** [1] 179:24

**Thoughts** [14] 32:25 51:7 73:22 152:6 152:11 153:21 153:23 189:2 194:20 200:23 228:3 235:6 235:7 239:19

**Thousands** [2] 155:24 155:25

**Threat** [60] 7:24 20:9 21:23 22:3 22:5 61:8 61:23 62:10 62:14 63:4 64:24 65:1 65:7 76:22 79:21 80:22 81:8 84:9 85:10 85:14 85:20 104:2 107:19 122:12 122:17 123:8 125:2 136:15 136:21 137:13 137:14 139:1 158:5 159:1 159:4 159:10 159:13 160:16 163:14 164:2 195:8 195:14 195:16 213:15 216:22 217:8 219:6 219:15 220:3 220:11 220:21 221:17 221:19 222:12 222:16 239:9 239:11 239:19 239:21 241:3

**Three** [29] 30:5 30:8 30:9 30:23 31:1 36:18 37:4 46:7 46:14 46:21 47:11 72:1 127:20 133:8 175:23 187:6 188:16 188:16 188:17 200:5 202:21 207:5 208:1 213:6 213:10 217:2 230:12 230:21 244:18

**Three-three** [1] 188:16

**Throughout** [2] 5:5 201:9

**Throw** [5] 4:19 13:17 230:23

**Throwing** [1] 129:3

**Thrown** [3] 73:10 109:2 170:22

**Tick** [1] 110:16

**Tie** [1] 205:25

**Today** [19] 4:11 5:8 12:6 49:21 75:6 86:10 87:18 97:21 97:23 98:9 111:24 131:6 145:10 153:12 183:23 183:23 193:16 202:17 243:5

**Today's** [1] 173:1

**Together** [12] 4:13 12:24 42:18 49:20 86:15 111:9 131:10 154:12 205:25 206:1 210:20 232:9

**Token** [1] 223:22

**Tomorrow** [5] 111:25 115:18 115:19 158:15 183:24

**Took** [9] 18:11 56:25 121:3 122:14 156:24 165:2 177:8 218:3 236:9

**Tool** [4] 193:6 193:7 193:9 194:24

**Tooth** [2] 236:4 236:4

**Top** [1] 199:4

**Topics** [2] 140:24 146:15

**Total** [3] 13:10 159:16 247:10

**Totally** [2] 165:10 179:17

**Touch** [1] 169:22

**Touched** [2] 6:1 111:19

**Tough** [1] 75:4

**Towards** [5] 63:20 108:8 147:18 162:1 237:22

**Towel** [1] 13:17

**Town** [1] 149:10

**TRACI** [1] 149:2

**Tragic** [1] 134:12

**Train** [1] 205:24

**Traits** [2] 7:4 7:5

**Transaction** [1] 80:1

**Transcription** [1] 247:5

**Transcription/stenograph** [1] 1:23

**Travel** [2] 145:19 145:21

**Treadmill** [1] 159:20

**Treat** [3] 38:15 38:19 38:20 38:22 38:23

**Treated** [2] 164:25 223:10

**Trial** [128] 1:3 5:1 5:4 5:11 5:14 5:15 5:16 5:22 5:23 6:7 6:12 6:19 6:21 6:23 7:6 8:10 8:14 8:18 12:9 12:12 12:13 12:14 12:15 12:22 13:1 13:12 13:21 13:23 14:3 15:18 15:23 18:14 19:5 19:12 26:2 27:13 28:23 29:1 31:21 40:12 40:14 40:16 40:17 41:12 41:13 43:3 43:7 44:8 48:5 50:15 52:5 53:13 57:4 58:3 58:10 58:19 60:19 60:21 62:5 63:8 63:18 68:23 69:1 69:6 70:6 76:16 79:19 80:4 80:11 90:4 93:12 97:25 112:10 116:12 122:10 122:17 127:7 130:12 132:3 132:6 133:1 136:9 136:12 136:13 136:25 140:4 146:11 151:2 151:8 155:3 156:19 156:23 157:4 162:18 167:9 167:11 167:15 170:1 170:3 170:17 170:20 173:14 173:21 176:19 178:16 178:17 179:5 181:21 185:13 185:21 186:3 186:6 189:22 190:11 190:13 190:21 191:24 211:24 215:23 217:7 218:12 220:24 233:14 233:23 239:14 240:13 245:17

**Trial's** [1] 113:11

**Trials** [1] 8:19

**Triangle** [3] 30:24 30:24

31:3

**Trick** [3] 68:15 98:23 171:13

**Tricky** [1] 13:25

**Tried** [5] 34:11 75:1 108:25 196:10 237:12

**Trigger** [1] 180:12

**Trouble** [3] 62:16 159:14 240:17

**Troublesome** [1] 51:22

**True** [11] 53:23 66:6 72:4 73:15 74:18 154:2 155:9 204:5 210:11 214:3 247:4

**Truly** [3] 44:3 171:18 247:9

**Truth** [5] 167:11 167:12 169:9 171:8 171:8

**Try** [19] 14:24 42:16 75:5 84:21 109:24 115:24 126:3 126:11 126:17 126:18 134:5 141:17 142:4 142:4 148:17 167:23 170:10 175:19 210:11

**Trying** [27] 56:14 68:15 69:18 81:14 88:8 94:3 95:2 95:4 98:23 108:24 114:14 141:5 153:20 171:13 171:13 177:22 180:8 187:6 193:13 193:16 199:19 199:22 199:24 205:25 230:13 237:21 241:12

**Turn** [2] 184:21 230:20

**Turned** [2] 42:5 208:20

**Turns** [1] 92:20

**TV** [3] 119:4 143:19 170:14

**Twelve** [19] 11:9 11:11 13:7 13:8 53:23 68:24 69:2 69:5 114:15 127:1 141:14 174:12 180:3 184:2 198:18 205:9 205:18 212:11 217:3

**Twenty** [6] 166:9 166:15 174:25 181:18 197:19 245:5

**Twenty-five** [3] 223:23 244:8 244:9

**Twenty-three** [2] 129:15 129:17

**Twice** [2] 50:16 51:9

**Two** [113] 4:3 5:16 5:25 5:25 6:3 8:2 9:8 9:25 11:15:18 17:12 22:25 23:2 26:13 27:17 29:13 29:25 30:8 30:10 34:9 36:18 36:24 42:14 42:17 44:7 49:5 59:17 65:3 65:7 76:3 76:5 76:13 76:18 76:20 77:3 77:17 78:19 79:25 80:4 80:5 80:14 84:6 84:10 85:16 85:17 90:5 90:7 104:5 104:24 107:18 112:8 112:11 113:1 113:25 132:4 133:11 135:9 137:18 146:25 147:11 147:15 147:16 147:25 154:12 155:3 157:16 160:12 162:10 163:18 165:3 167:13 207:11 171:15 8 184:11 186:20 186:24 187:10 187:18 187:19 194:2 195:5 195:16 195:25 198:8 200:12 200:13 201:19 203:7 203:10 205:20 205:22 205:25 206:3 206:7 206:23 207:4 208:16 209:5 209:7 209:16 211:22 213:10 216:24 221:3 221:4 221:20 222:15 226:16 231:6 233:15 234:5

**Type** [73] 20:4 52:7 52:16 52:18 53:15 58:21 66:11 66:15 92:7 92:10 94:8 94:23 95:16 95:25 100:25 101:25 102:16 108:6 116:4 116:14 116:11 116:20 117:17 118:25 119:1 120:25 122:1 122:19 123:2 124:10 128:3 128:10 134:25 137:9 142:2 147:6 147:9 152:7 153:14 155:11 156:9 156:16 159:16 163:11 166:25 175:16 178:7 181:9 189:9 189:9 191:17 192:1 194:4 194:16 207:5 209:6 209:13 215:18 215:24 215:25 218:24 220:1

**Trick** ...

220:15 223:15 230:2 235:12 236:12 236:13 236:14 240:14 240:19 242:20 243:18

**Types** [9] 53:2 53:6 116:5 118:11 191:18 215:15 215:19 235:13 240:10

**Typographical** [1] 73:15

**U**

**Ultimate** [2] 87:13 93:20

**Ultimately** [6] 27:21 28:6 142:14 148:12 177:20 177:24

**Unanimous** [1] 217:4

**Unanimously** [5] 22:20 22:23 23:3 40:11 40:13

**Unanswered** [2] 169:10 169:11

**Unbearable** [2] 69:4 84:15

**Uncertain** [1] 229:6

**Uncertainty** [2] 226:24 227:3

**Uncomfortable** [7] 70:5 125:3 148:11 148:14 172:7 172:8 182:7

**Under** [12] 39:22 40:21 57:11 104:8 129:12 135:14 141:2 164:23 165:3 177:25 183:12 183:13

**Understood** [3] 98:22 106:19 128:21

**Undo** [2] 28:13 29:21

**Undoes** [1] 59:15

**Unfair** [3] 17:25 18:7 100:8

**Unfortunate** [3] 193:6 193:7 194:24

**Unique** [2] 11:13 25:23

**Uniquely** [1] 156:16

**Uniqueness** [1] 11:24 80:3

**United** [1] 130:24

**Unknowns** [1] 226:10

**Unlawfully** [1] 36:7

**Unless** [26] 15:19 16:8 16:11 16:24 32:1 42:24 43:14 62:20 70:12 78:1 78:9 78:10 79:1 96:25 107:21 126:25 137:17 153:13 155:17 158:3 158:7 174:14 188:19 204:24 221:3 221:20

**Unlikely** [1] 158:16

**Up** [95] 4:19 11:8 13:19 15:4 15:14 15:15 15:21 15:21 16:13 22:17 22:19 28:1 31:14 32:16 38:9 39:12 40:1 40:2 42:5 42:6 46:9 50:14 51:20 52:2 55:11 55:18 57:24 57:25 59:23 65:25 66:1 69:13 74:16 77:6 80:12 86:24 88:18 93:12 106:9 109:14 110:15 111:10 111:18 113:13 113:21 114:13 125:22 141:7 143:8 145:9 145:15 145:22 152:3 154:25 155:19 156:2 162:11 167:16 167:23 177:6 177:11 178:16 178:17 184:6 185:4 185:6 186:8 188:18 190:7 190:18 191:9 192:5 195:3 195:15 199:15 200:14 200:15 200:22 209:9 210:5 213:21 216:14 217:14 217:24 220:23 225:9 227:10 229:25 232:6 237:2 241:25 242:17 243:19 244:5 244:6

**Upbringing** [6] 128:11 173:16 198:9 198:15 199:7 200:6

**Upset** [2] 173:13 225:6

**Useful** [1] 202:6

**Uses** [1] 179:3

**Usual** [1] 145:13

## V

**V.A.** [2] 50:12 75:6
**Vacuum** [1] 172:13
**Vague** [1] 208:24
**Vaguely** [1] 109:1
**Value** [1] 42:4
**Valve** [1] 23:13
**Variety** [1] 141:4
**Various** [1] 3:5
**Vehicle** [1] 19:23 27:14
**Venireperson** [7] 3:2 3:
4 77:14 100:16 130:19 130:
22 130:25
**Verdict** [26] 6:8 9:5 11:
19 11:23 15:4 15:18 15:20
31:15 31:23 32:16 53:24 54:
22 66:6 76:8 87:11 102:11
132:25 133:1 151:3 151:3
154:2 155:9 186:13 186:14
213:19 213:20
**Verdicts** [1] 11:9
**Versus** [1] 3:25
**Victim** [5] 8:1 9:7 40:6
120:25 180:11
**Victims** [3] 10:24 11:15
39:1
**Vietnam** [2] 27:24 244:19
**View** [5] 26:8 126:1 150:23
183:21 213:2
**Viewed** [1] 151:12
**Viewing** [1] 26:14
**Views** [2] 128:25 129:2
**Violating** [3] 179:9 179:
15 219:20
**Violence** [58] 7:24 17:25
18:2 18:5 18:9 18:15 18:24
19:15 19:16 19:18 19:21 19:
22 20:3 20:7 21:5 21:9 21:
17 21:23 22:2 61:7 61:17 61:
25 62:11 62:14 63:4 64:25
65:17 79:20 80:7 85:13 92:
18 92:21 104:3 107:20 122:
12 122:14 122:18 122:22 122:
25 123:8 136:14 137:8 137:8
158:6 158:24 159:5 160:16
163:15 164:2 195:9 195:15
216:23 219:5 219:14 219:17
220:12 221:18 239:18
**Violent** [3] 120:25 123:1
240:19
**Violent-type** [1] 240:19
**Visit** [2] 197:18 198:1
**Visiting** [2] 3:23 4:10
**Voir** [37] 1:15 49:16 51:2
51:14 58:10 58:15 67:4 79:6
84:3 86:8 91:7 97:13 100:17
105:20 110:12 111:4 115:14
125:20 131:4 133:24 140:13
146:6 149:4 151:23 153:6
169:18 182:19 188:8 197:12
210:16 214:8 216:8 218:9
224:14 231:20 234:22 243:2
**Volume** [2] 1:2 247:6
**VOLUMES** [1] 1:2
**Voluntarily** [1] 196:5
**Volunteer** [1] 225:8
**Volunteering** [2] 52:9
66:20
**Volunteers** [1] 52:16
**Vote** [29] 60:12 60:14 63:5
64:8 64:17 64:19 65:21 91:
19 93:21 96:24 101:12 102:
20 103:6 105:16 106:2 117:
21 118:14 123:13 123:16 125:
18 125:18 147:4 147:16 163:
4 195:19 241:15 241:17 242:
6 242:13
**Voted** [2] 23:3 103:8
**Voting** [2] 91:25 123:15
**VS** [1] 1:8

## W

**Wait** [8] 13:2 26:9 43:12
82:7 136:24 156:8 159:21
245:24
**Waiting** [1] 140:24
**Wake** [2] 145:9 145:22
**Walking** [2] 47:5 177:10
**Walks** [1] 39:12
**Wall** [1] 39:12
**Walls** [5] 20:24 21:1 21:3
21:7 21:12
**Wander** [1] 243:21
**Wardens** [1] 21:14
**Warrant** [7] 80:2 104:21
106:23 106:25 107:5 137:19
138:17
**Warranted** [2] 163:5 163:
6 217:1
**Warrants** [1] 133:5
**Waste** [1] 13:11
**Watch** [3] 143:21 143:22
202:1
**Wayne** [7] 2:12 4:1 67:6
140:15 197:17 224:16 243:4
**Ways** [3] 127:5 176:14 194:2
**Weapon** [6] 68:24 69:6 238:
2 238:13 238:16 240:12
**Wear** [1] 30:19
**Wednesday** [3] 112:3 115:
18 185:9
**Week** [16] 27:9 33:13 33:13
50:13 111:25 112:11 139:12
183:23 184:10 185:12 202:18
226:15 226:16 226:18 230:25
233:15
**Week's** [1] 185:8
**Week-long** [1] 185:12
**Weekend** [1] 152:9
**Weeks** [7] 112:8 112:12
113:1 113:25 184:11 226:16
233:16
**Weigh** [8] 64:6 64:14 161:
7 162:13 168:13 208:12 208:
12 223:24
**Weighing** [2] 65:19 162:21
**Weight** [7] 208:9 208:17
209:7 209:15 209:15 210:8
228:6
**Well-established** [1]
144:13
**Well-suited** [1] 182:12
**Wentz** [17] 2:17 3:12 3:13
4:2 13:16 67:7 110:18 140:
16 197:9 197:10 197:13 197:
16 198:4 198:6 224:17 230:
20 244:23
**WESLEY** [1] 231:18
**Whatsoever** [2] 24:25 191:
15
**Whereby** [1] 116:9
**Wherein** [1] 79:25
**Whichever** [6] 8:4 151:4
151:9 151:11 186:15 234:12
**Whispering** [1] 143:9
**White** [1] 192:23
**Whole** [23] 4:12 5:5 7:4
22:8 24:3 24:6 38:14 42:1
48:3 49:20 73:16 75:10 86:
15 88:15 131:9 165:22 178:
12 200:2 202:16 204:11 204:
24 207:18 210:20
**Wide** [2] 133:4 141:4
**Wife** [1] 39:21
**Wild** [2] 92:2 92:2
**WILLIAM** [1] 210:14
**Williams** [12] 86:6 86:13
88:15 91:9 97:7 97:15 99:25
100:19 105:22 105:23 109:9
110:23

**Willing** [10] 48:12 48:20
100:5 123:14 132:14 184:17
212:5 232:19 234:14 241:17
**Win** [1] 115:19 158:15
**Windshield** [1] 20:2
**Winners** [1] 127:17
**Winning** [1] 127:15
**Wise** [1] 233:17
**Wish** [1] 115:21
**Withdraw** [2] 32:7 232:2
**Withdrawing** [1] 28:19
**Witness** [15] 44:24 54:15
54:19 57:12 58:5 110:9 136:
1 142:17 143:8 154:11 169:5
190:3 190:6 238:3 247:12
**Witness'** [1] 44:23
**Witnesses** [23] 10:25 11:
6 11:14 15:2 15:2 15:3 15:5
40:5 42:8 44:21 45:4 45:7
46:19 54:17 141:17 142:13
142:18 154:10 168:11 176:17
190:5 236:16 237:23
**Woman** [9] 80:13 120:20
165:14 165:18 165:23 193:23
194:3 194:7 194:7
**Wondered** [1] 169:6
**Wondering** [2] 198:8 200:8
**Word** [17] 14:16 14:19 15:
12 17:7 17:8 17:10 17:11 17:
13 17:18 17:22 20:10 20:13
25:13 25:16 25:21 210:11
228:10
**Worded** [1] 99:19
**Words** [43] 7:14 7:15 10:
14 14:8 14:8 14:14 14:20 15:
7 23:22 23:23 53:10 55:10
55:21 74:11 74:13 74:18 76:
4 76:24 87:22 104:7 115:25
119:10 129:14 129:25 142:11
146:25 161:8 178:3 179:8
179:9 193:14 195:19 196:17
234:17 215:6 230:19 235:7
235:24 236:22 238:20 239:9
241:11 245:10
**Workable** [1] 184:20
**Workday** [1] 21:6
**Works** [2] 96:13 175:24
**World** [9] 4:17 11:19 12:
11 21:10 32:13 65:2 74:2 80:
6 209:22
**Worry** [1] 140:21
**Worse** [3] 125:8 159:20
159:20
**Worth** [1] 27:19
**Worthy** [4] 28:5 28:18 83:
8 203:5
**Write** [1] 179:5
**Writing** [3] 5:2 5:5 247:5
**Written** [1] 154:3
**Wrote** [2] 126:6 144:21

## Y

**Y'all** [1] 79:13
**Year** [22] 10:22 26:3 33:13
33:14 33:14 33:14 33:23 34:
6 34:12 34:22 38:16 48:2
109:6 129:13 129:22 145:15
145:16 183:12 223:7 223:24
229:9 229:11
**Years** [57] 33:12 33:12 33:
14 34:14 34:16 35:1 35:5 35:
7 37:23 39:3 41:20 41:23 41:
23 42:12 59:18 69:16 72:1
80:11 101:7 101:8 105:15
108:11 108:22 127:20 129:3
129:7 129:14 129:17 129:18
129:18 129:20 129:20 130:1
148:3 165:3 166:9 166:11
166:15 174:10 174:21 174:25
175:3 175:6 180:25 192:8
192:11 198:18 223:20 223:23
225:16 229:4 229:16 229:18
230:9 230:10 244:8 244:18

**Yesterday** [2] 12:12 112:8
**Yogi** [1] 29:23
**Young** [12] 120:20 162:18
165:14 165:19 165:23 166:3
193:1 193:23 194:4 194:8
194:8 231:5
**Yourself** [23] 4:20 4:21
9:1 12:10 13:24 48:6 48:18
66:4 67:9 67:18 74:2 86:12
91:25 115:22 132:18 139:21
139:24 185:1 198:7 210:18
212:1 212:9 245:7
**Yourselves** [3] 14:12 17:
8 23:21
**Youthfulness** [1] 26:4

## Z

**Zero** [1] 126:4

```
 1                    REPORTER'S RECORD

 2                 VOLUME 13 OF 25 VOLUMES

 3              TRIAL COURT CAUSE NO. 800112

 4

 5   CHARLES MAMOU, JR.      )    IN THE DISTRICT COURT

 6           Appellant       )

 7                           )

 8   VS.                      )    HARRIS COUNTY, TEXAS

 9                           )

10   THE STATE OF TEXAS       )

11           Appellee        )    179TH JUDICIAL DISTRICT

12

13

14              * * * * * * * * * * * * * * * * * * * *

15                 VOIR DIRE EXAMINATION

16              * * * * * * * * * * * * * * * * * * * *

17

18       On the 22nd day of September, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Bob Burdette, Judge

21   Presiding, held in Houston, Harris County, Texas:

22       Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25
```

```
 1              A P P E A R A N C E S

 2   MR. LYN MCCLELLAN

 3   SBOT NO. 13396100

 4   MS. CLAIRE CONNORS

 5   SBOT NO. 0470500

 6   Assistant District Attorneys

 7   201 Fannin

 8   Houston, Texas 77002

 9   Phone:  713.755.5800

10   ATTORNEYS FOR THE STATE OF TEXAS

11

12   MR. WAYNE HILL

13   SBOT NO. 59656300

14   4615 Southwest Freeway

15   Houston, Texas 77027

16   PHONE:  713.623.8312

17   MR. KURT WENTZ

18   SBOT NO. 21179300

19   5629 W FM 1960

20   Houston, Texas 77069

21   PHONE:  281.587.0088

22   ATTORNEYS FOR THE DEFENDANT

23

24

25
```

i

# INDEX

## VOLUME 13 OF 25

|  |  |  |  | PAGE | VOL. |
|---|---|---|---|---|---|
| September 22, 1999   Voir Dire Examination |  |  |  |  | 13 |
| Panel Voir Dire |  |  |  | 3 | 13 |
| Venirepersons | Court | State | Defense |  |  |
| Rita Frame Shotwell | 44 | 45 | 61 |  | 13 |
| Roland Thomas Volker | 68 | 70 | 82 |  | 13 |
| Evelyn Michka | 93 | 95 | 107 |  | 13 |
| Proceedings concluded |  |  |  | 119 | 13 |
| Court Reporter's Certificate |  |  |  | 120 | 13 |

3

1          THE COURT:  As I understand it, there is
2  an agreement by and between the parties.  Venireperson
3  No. 119 is Carolyn Balfoort, Venireperson No. 121,
4  Mr. Noe DeLeon, for various reasons by all concerned,
5  may be excused.  Mr. McClellan, your agreement, sir?
6          MR. MCCLELLAN:  That's correct.
7          THE COURT:  Is it Miss Connors'.
8          MR. MCCLELLAN:  Yes, it is.
9          MR. HILL:  Yes, it is.
10          THE COURT:  Mr. Wentz?
11          MR. WENTZ:  Yes, Your Honor.
12          THE COURT:  Yours, Mr. Mamou?
13          THE DEFENDANT:  Yes, Your Honor.
14          THE COURT:  Is it your request they
15  specifically be excused?
16          THE DEFENDANT:  Yes, it is.
17          (Prospective jurors are seated.)
18              VOIR DIRE EXAMINATION
19  BY THE COURT:
20          Good morning.  To remind you, this is the
21  case of the State of Texas versus Charles Mamou.
22  Mr. Mamou has been charged with the offense of capital
23  murder.  He's represented by his two attorneys,
24  Mr. Wayne Hill and Mr. Kurt Wentz.  The State of Texas
25  is represented by two of her Assistant District

4

1  Attorneys, Mr. Lyn McClellan, who is present now, Miss
2  Claire Connors, who will be along in a couple of
3  minutes.
4          We talked the other day, Friday when the
5  group was together, about some general principles of law
6  that come into play during the course of all criminal
7  trials.  I want to spend a couple of minutes visiting
8  with you about some things in addition to what we talked
9  about the other day.  And we didn't talk about the other
10  day what we're going to talk about now, because our
11  group was so large we could have made absolutely no
12  headway.  We're going to talk about some things, and my
13  best guess is none of the three of you have ever before
14  thought about it.  And there is absolutely no reason why
15  you should have.
16          You might think that these things we're
17  going to talk about are very detailed.  They truly
18  aren't.  But the point I'm trying to get at is please
19  don't feel that you need to memorize what we're talking
20  about or what we talked about last Friday; because these
21  rules that we're going to go over, if they come into
22  play at all, will be given to you in the Court's
23  charge.  The Court's charge will be in writing.  You
24  will have the Court's charge with you in the jury room
25  during the entirety of your deliberations.  So, you can

5

1  see there is no reason to try to memorize this at all.
2          I just want to give you an overview as to
3  what can occur.  It just kind of takes the surprise out
4  of it.  We talked the other day about the fact the trial
5  can come in two parts.  The first part of the trial is,
6  the jury's only concern is going to be with deciding
7  whether the defendant is or is not guilty.  If the
8  defendant finds -- jury finds the defendant not guilty,
9  the case is over.  If they find the defendant guilty of
10  capital murder, we come back and have a second phase of
11  the trial.
12          The second phase of the trial, additional
13  testimony can be presented to the jury for the purposes
14  of assisting you, giving you more background information
15  about the defendant on trial for the purposes of
16  answering the two questions that we talked about very,
17  very briefly last Friday.  And we talked about the fact
18  that it's how those questions are answered that dictates
19  what sentence I'm obligated to impose.
20          At the first phase of the trial all
21  defendants start off being not guilty.  They stay not
22  guilty.  That never changes unless or until the State's
23  evidence overcomes that presumption of being not guilty
24  and establishes the defendant's guilt beyond a
25  reasonable doubt.  Because at the first phase of the

6

1  trial focus is on the question of guilt, the testimony,
2  the evidence in the case is going to focus on the crime
3  that was committed.  Who did it?  Where was it done?
4  When was it done?  How was it done?  What were the
5  circumstances?  What was the relationship of the
6  parties, if it's known?  What was the motive for doing
7  the crime, if that's known?
8          At the second phase of the trial, if there
9  is a conviction, the focus gets off the crime itself.
10  You've already heard this.  And instead, it gets on to
11  the defendant on trial.  What's that person like?
12  Because that's also a piece of information you want in
13  order to arrive at a well-informed verdict.  At the
14  second phase of a capital murder trial you can hear
15  about every single good thing, about every single bad
16  thing some defendant's ever done before in his or her
17  life.  You take everything you hear at the second phase,
18  add it to everything you heard at the first phase, and
19  use every single bit of it for the purposes of helping
20  you answer those two Special Issues, those two
21  questions.  We're going to talk in just a second about
22  those two questions.  In fact, we're going to spend a
23  good deal of time talking to you today about the
24  second, or the punishment phase of a capital murder
25  trial.

7

```
1            You may say to yourselves, well, why are
2   we talking about the second phase of the trial when
3   we've heard absolutely no evidence about whether the
4   defendant is guilty or not.  And that's a good question.
5   The answer to that question is this:  This is the only
6   time we'll ever be able to have a chance to visit with
7   you, to explore your ideas, your thoughts about the laws
8   that can come into play during the course of a trial
9   such as this.  Can you see that if we only talked to you
10  about the laws that can come into play during the guilt
11  phase of the trial and if a jury, after having heard all
12  the evidence, finds a defendant guilty of capital
13  murder, if we were to come back then and talk to you
14  about the laws that can come into play at the second
15  phase of the trial, and if a juror said, oh, I can't
16  possibly follow that law.  I disagree with that.  And I
17  would never ever, ever follow that law, nor would I ever
18  enforce it.  That means we'd have to excuse that juror.
19  That means we'd only have eleven.  I have to have
20  twelve, so I'd have to declare a mistrial.  That means
21  that everything we have done would have been a total
22  waste of time.  So we talk about everything that can
23  occur up front.
24          We talked the other day about the fact
25  that whether these rules do come into play or not
```

8

```
1   depends upon the testimony in a case, the evidence
2   that's presented.  So perhaps some of what we're talking
3   about never will be applied; but we're playing a game of
4   what ifs, so to speak.  That's the only purpose for
5   this.  It's to give you perhaps a broader comfort zone
6   in doing the job that is ahead of you.  So, I guess what
7   I'm saying is please don't read into the fact we're
8   talking about the punishment phase of a case that this
9   defendant is getting ready to plead guilty because he's
10  not.  Don't think Mr. Hill and Mr. Wentz are getting
11  ready to throw in the towel and they're committed to the
12  notion the defendant's going to be found guilty.
13  Absolutely, that's not the case, either.  And don't
14  think for a second that the State, itself, or anybody
15  else have given up on the defendant's right to be
16  presumed to be not guilty.  That's not the case, either.
17  The case is if we don't talk about it now, we never can.
18  So, there is nothing nefarious about what we're doing.
19          So at the punishment phase of a capital
20  murder trial, if a defendant is found guilty of a
21  capital murder, we have the two questions we talked
22  about the other day.  The questions are over here on the
23  board.  Please feel free to watch them as we go through
24  them.  That may make it easier for you to follow.
25          Question Number One will ask you:  Do you
```

9

```
1   find from the evidence beyond a reasonable doubt that
2   there is a probability that the defendant would commit
3   criminal acts of violence that would constitute a
4   continuing threat to society?  Can you see that, no
5   matter who the defendant is, no matter who the victim
6   was, no matter what the case is, no matter who the jury
7   is made up of, there's never but two possible answers to
8   that question, either yes or no.  And we anticipate the
9   jury will answer the question whichever way they believe
10  the evidence takes them.
11          Question Number Two asks:  Taking into
12  consideration all of the evidence, including the
13  circumstances of the offense -- that's going to be what
14  you heard the first half of the trial -- including the
15  character and the background of the defendant, as well
16  as the defendant's personal moral culpability or
17  personal moral responsibility.
18          Now that personal moral culpability can
19  come into play, for example, if you have multiple
20  defendants committing a crime.  The question there is:
21  What role, comparatively speaking with the others, did
22  the one on trial warrant?  If there were three people
23  robbing a bank, the person on trial's at home and never
24  went to the bank.  Was that the person in the bank
25  robbery?  Where does that one fit in on the grand scheme
```

10

```
1   of things?
2           So you can see that the first half of the
3   second question, the character and background or the
4   personal moral culpability is going to be presented at
5   the second phase of the trial.  So the first half of the
6   second question is simply an instruction to the jury to
7   go back over all of the evidence in the case.  That's
8   all that first half of that second question asks you to
9   do for the purposes of asking yourself, is there a
10  sufficient mitigating circumstance or circumstances that
11  cause you to believe that a life sentence would be more
12  appropriate than a death sentence?  In other words, is
13  there a good enough reason why we ought to withdraw the
14  death sentence and replace it with a life sentence?
15  Again, no matter who the defendant, no matter who the
16  victim, no matter what the evidence, there's never but
17  two possible answers to that question, either yes or no.
18          If the jury should answer yes to the first
19  question and if the jury should answer no to the second
20  question, the law says that I have no choice, no option,
21  no discretion.  I must sentence the defendant to death.
22  That's exactly what I'm doing.  If the jury should
23  answer those questions in any way other than yes and no,
24  in that order, the law once again says I have no choice,
25  no option, no discretion.  I must sentence the defendant
```

11

1   to life.  And that's exactly what I'm doing.  So what
2   we're saying is a yes and a no is different.  A no to
3   the first question is life.  A yes to the first question
4   and a yes to the second question is life.
5           Now what we can see so far is that a jury
6   in the State of Texas never sentences a defendant to
7   life, never sentences a defendant to death.  What a jury
8   does is takes all the evidence in the case and applies
9   it to the questions that are being asked.  Now you are
10  entitled to know what the result of your answers is
11  going to cause me to do, but the jury doesn't
12  subjectively go out and say, well, we think in this case
13  we'll give that one life, and in this case we think
14  we'll give that one death.  But the juries don't
15  sentence.  That's my obligation.  You answer the
16  questions based on the evidence.
17          These questions, they never change.  The
18  words never change.  The order in which they're asked
19  never changes, but I know you've seen, read, or heard
20  about capital murder cases where at the conclusion of
21  the case some person -- these questions are answered in
22  such a way that a life sentence is imposed.  In other
23  cases, these questions are answered in such a way that
24  the death sentence is imposed.
25          And the reason for that is this:  Every

12

1   single defendant is different.  Some of them are
2   seventeen-year-old girls who have never been in trouble
3   before.  Some of them are fifty-year-old men who spent
4   their whole life in the penitentiary.  That alone may
5   cause different answers to these questions.  All the
6   facts in the case, all the circumstance, are always
7   different.  All the victims are always different.  We've
8   got nice people, and we've got bad people.  Sometimes
9   they're defendants, and sometimes they're victims.
10  We've got all sorts of different kinds of witnesses.
11          You might have a witness who says
12  absolutely the most perfect words that you would ever
13  want to hear in order to justify in your mind finding
14  somebody guilty of a crime.  But while the words they
15  use are absolutely perfect from your standpoint, you
16  don't believe the witness.  So you see, we go by not
17  only the witnesses, but we also go by the messenger.
18  And lastly but not leastly, the thing that's always
19  different are the twelve people that are the jurors.  We
20  could have four juries in the courtroom listening to
21  exactly the same testimony from exactly the same
22  witnesses at exactly the same time, send each of the
23  juries out to their own deliberations to deliberate.
24  We'd have four different verdicts.  Groups of people
25  react differently from other people.  So that's why at

13

1   the conclusion of some capital murder cases there is a
2   life sentence, and that may very well be the most
3   appropriate verdict in the world in that case.
4   Sometimes it doesn't.  Might be the most appropriate
5   verdict in the world in that case because of the
6   difference in defendants, victims, witnesses, jurors,
7   and facts.
8           So let's talk a couple of seconds about
9   these two questions in a little more detail.  We talked
10  the other day about the fact that at the conclusion of
11  the evidence at the first phase of the trial and at the
12  conclusion of the evidence of the second phase of the
13  trial, I'll give you what's called the Court's charge.
14  And the Court's charge will contain in writing all of
15  the rules that will have been raised by the testimony
16  presented in the case.  There are going to be a number
17  of terms, a number of words that are going to be defined
18  for you; and there are going to be a lot of them that
19  aren't going to be.  And if you say to yourselves, how
20  in the world do you people decide whether you're going
21  to define something for yourselves and when you're not,
22  the answer to that is perfectly simple.  We have
23  absolutely no justifiable reason to expect you folks to
24  give up your time, come down here, and be armed with
25  information about what lawyering terms we use all the

14

1   time; because that's not what you do.  So anytime we're
2   going to be using a word that's peculiar to the
3   lawyering business, we're going to define that for you.
4   If we're going to be using words you guys use all the
5   time at your home, your work, your family, and friends,
6   we're not going to define those.  We're going to find in
7   these two questions we've got some of each, so let's
8   start off with the first question.
9           First question starts off with the phrase,
10  Do you find from the evidence beyond a reasonable doubt?
11  We talked the other day about the term, reasonable
12  doubt.  We talked about the definition as to what that
13  term means.  We talked about that term from the
14  standpoint of the first phase of the trial, that being
15  that's the amount of evidence the State is obligated to
16  present to a jury before a jury would be warranted in
17  finding a defendant guilty of an offense.
18          Now that same amount of evidence beyond a
19  reasonable doubt that you've got to present in a capital
20  murder trial, it's the same amount of evidence that has
21  to be presented in a shoplifting trial.  The quality of
22  the evidence never changes.  It has got to rise to the
23  level that it remorseful every reasonable doubt
24  concerning the accused's guilt, no matter what the
25  offense charged is.

15

1        We also know at the first phase of the
2   trial there is a presumption of innocence. That
3   presumption can be overcome if the State establishes
4   beyond a reasonable doubt a defendant's guilt. Well, at
5   the conclusion of the first phase of a capital murder
6   trial, if a defendant is found guilty, obviously the
7   presumption of innocence has been erased by the quality
8   of the evidence presented. That would have been the
9   jury's finding.
10        Before the second phase of a capital
11  murder trial begins there is a brand-new presumption
12  that creeps into the case to replace the presumption of
13  innocence, and that brand-new presumption is this: It
14  is presumed for all people convicted of capital murder
15  the appropriate punishment should be life. And that
16  presumption remains unless or until the State's evidence
17  proved in the first question beyond a reasonable doubt
18  that the answer to that question should be yes. Anytime
19  we see the phrase, do you find from the evidence beyond
20  a reasonable doubt, that means that the law requires the
21  State to prove to you what the answer to that question
22  should be. And, also, if they do prove it to you beyond
23  a reasonable doubt, the verdict of the jury is the
24  lowest possible verdict that can be returned.
25        For example, at the first phase of the

16

1   trial the defendant starts off being not guilty. The
2   State's job is to prove his guilt beyond a reasonable
3   doubt. If they fail to do that, the jury's verdict
4   continues to be not guilty. At the second phase of a
5   capital murder trial, we know there are only two
6   punishments for a person convicted of capital murder;
7   life or death. Starting out, the answer to that first
8   question is no. The answer to that first question stays
9   no unless or until the State's evidence proves beyond a
10  reasonable doubt that the answer to that question should
11  be bumped up a notch from no to yes. You understand
12  from our conversation today that in order for the death
13  penalty to be possible, it has to be a yes answer and a
14  no answer, in that order.
15        Starting out, the answer to that
16  first question is no. A no answer to that first
17  question means a life sentence, because there is no
18  answer you could get in the second question that would
19  ever bring the death penalty back into play in the case.
20  So, like there is a presumption not being guilty at the
21  beginning, there is a presumption of the life sentence
22  at the second half. The presumption on the answer had
23  been no unless the State's evidence proves beyond a
24  reasonable doubt the answer should be yes. Any
25  questions about that?

17

1        Do you find from the evidence beyond a
2   reasonable doubt that there is a probability? Let's
3   talk about the word probability, because that's a word
4   that will not be defined for you. Whatever the word
5   probability means to you is your call, but there are
6   two -- but by comparison, I can tell you whatever
7   probability does mean to you, there is two things it
8   cannot mean.
9        First off, whatever the word probability
10  means to you, it must mean something more than a
11  possibility. Anything could possibly happen. Because
12  it could possibly happen does not mean it's probably
13  going to. Whatever the word probable means to you, on
14  the other hand, it cannot mean something as great as a
15  certainty. Because something could probably happen does
16  not mean it's certain to happen.
17        So, let's take the word probability and
18  talk about the context within which we're using it in
19  this question. We're requiring the State to prove the
20  existence of a probability that the defendant on trial
21  would commit future acts of criminal violence. Can you
22  see how grossly unfair it would be to the defendant if
23  the question said, is there a possibility that he would
24  commit future acts? Of course, it's possible. It's
25  possible for the three of you, for me, for all of us to

18

1   do it; but that doesn't make it likely.
2        On the other hand, can you see how grossly
3   unfair it would be to the State if we require them to
4   prove that certainly the defendant would commit criminal
5   acts of violence? So, what we did was we cut the baby
6   in half, and we chose the word probability. If
7   probability means to you something that's more likely to
8   happen more than not to happen, that's a deal. If it
9   means something different, that's fine, too, as long as
10  whatever probability means to you, it means something
11  more than a possibility, but something less than a
12  certainty, somewhere in between. Any questions about
13  that?
14        Probability that the defendant would
15  commit criminal acts of violence. In order to obtain a
16  yes answer to this question, it is not necessary that
17  the State prove the existence of a probability that a
18  defendant on trial would commit a specific crime in the
19  future. It is, however, required that the State prove
20  the defendant would probably commit a certain type of
21  crime in the future, and the type of crime being a
22  criminal act of violence.
23        The criminal act of violence can be
24  violence as to a person, it can be violence as to
25  property; because the question doesn't specify which.

19

1  Certainly, capital murders are criminal acts of
2  violence. Murders, or assaults, or rapes, or robberies,
3  or kidnappings, all criminal acts of violence to
4  persons.
5         Criminal acts of violence as to property
6  are the burning of somebody's building, vehicle.
7  Certain kinds of burglaries that require breaking to get
8  into a building. The taking of a club and beating in
9  the windshield of an automobile. All criminal acts of
10 violence. Probably a hundred other examples as to each
11 of them, but it is that general category of conduct that
12 the State must prove the existence that a defendant on
13 trial would probably commit in the future, not a
14 specific crime within that general category. And the
15 criminal acts of violence must rise to the level that
16 they constitute a continuing threat to society.
17        The word society is not going to be
18 defined for you. But I would encourage you to consider
19 making a distinction, if you feel comfortable with
20 making a distinction, between the words community and
21 society. We all live in different communities, but all
22 of our communities are a piece of society. I say that
23 because sometimes when we think of society, we tend to
24 focus on those people that we see as neighbors, friends,
25 coworkers, people we come in contact with. Ordinarily,

20

1  we don't think of society as being people behind
2  penitentiary walls.
3         For example, if you had a woman who was a
4  school teacher in the penitentiary and she gets her card
5  and punches in at 10:00 o'clock in the morning to teach
6  the inmates, you know, she doesn't lose her right to be
7  free from criminal acts of violence. She does not lose
8  her right to be free from criminal acts of violence when
9  she's back there behind the penitentiary wall. And if
10 at the end of the day if she's able to escape with her
11 life and she punches out and gets back outside in the
12 free world, she doesn't thereafter regain her right to
13 be free from criminal acts of violence. She has it the
14 whole time, as do all prison workers, as do all prison
15 inmates.
16        We hope that rehabilitation comes out of
17 punishment. Then we've got to also protect the inmates
18 from criminal acts of violence. So when we talk about
19 the word society, we're talking about all the people in
20 all the places. If we weren't, then that question would
21 read criminal acts of violence that would constitute a
22 continuing threat to the citizens of Harris County,
23 Texas. But it doesn't. It says continuing threat to
24 society. Any questions about the first question?
25        If the jury answers no to that question,

21

1  case is over. That means a life sentence, and that's
2  that. If a jury answers yes to that question, you'll
3  move along to the second question. Before we take up
4  the second question, let's talk for just a second about
5  where a jury necessarily would have to be in the conduct
6  of their business before they take up their
7  deliberations as to the second question.
8         First off, the jury necessarily would have
9  had to have unanimously found the defendant to be guilty
10 of capital murder; because if we had not, these
11 questions would never have come into play. Secondly, a jury
12 would have necessarily unanimously answered yes to
13 Question Number One; because if they have not, Question
14 Number Two would never have come into play.
15        So what we're saying is when a jury takes
16 up Question Number Two, they would have unanimously and
17 consistently returned verdicts that's going to cause
18 this defendant to receive the death sentence unless they
19 determine -- they, being the jury -- that there is
20 something about that case that makes them think that a
21 life sentence would be a more appropriate verdict than a
22 death sentence. And this second question is where that
23 comes into play. It gives the jury a second chance to
24 either reinforce their position they want the death
25 sentence to be imposed or to reevaluate their position

22

1  and they want a life sentence to be imposed.
2         Now the second question, the first thing
3  we can see about that second question is nowhere in that
4  second question do we see the phrase, do you find from
5  the evidence beyond a reasonable doubt? That means the
6  State does not have to prove to you what the answer to
7  that second question should be. We know from our
8  conversation last Friday that the defendant on trial
9  never has to prove anything at all.
10        So if the State doesn't have to prove to
11 you what the answer to that second question should be
12 and they do not -- and the defendant doesn't have to
13 prove to you what the answer to that second question
14 should be and they do not, what does that mean? Well,
15 it means that the law presumes there may be a lot of
16 cases where there is absolutely no evidence of a
17 mitigating circumstance, because nobody is required to
18 put it there. The only requirement posed by the second
19 question is that the jury look over all the evidence in
20 the case to see if there is any mitigating evidence in
21 the case. And if they do believe there is any
22 mitigating evidence in the case, is it sufficient to
23 cause you to withdraw the death sentence and replace it
24 with a life sentence.
25        In the first half of the second question,

23

1   as we said earlier, all it does is instruct you to go
2   over all the evidence in the case to see -- and these
3   are my words, not the words in the question -- is there
4   a good reason why we ought to replace the death sentence
5   and order a life sentence?  Now mitigating, as used in
6   that second question, is not going to be defined for
7   you.  And the reason it's not defined is because what is
8   mitigating to one person may not be mitigating to
9   another.
10          Mitigating, as we're using that word here,
11  is something that ought to lessen the punishment from
12  death to life.  Obviously, the conduct is not excusable
13  or justifiable, because you wouldn't have found him
14  guilty of committing the act.  And at the very least, if
15  the defendant has the very best day in the world, the
16  very best that's going to happen to him is he's going to
17  get a life sentence.  We're talking about anything in
18  the case that you believe to be a sufficient reason to
19  sentence the defendant to life instead of death.
20          For example, sometimes some folks tend to
21  think that comparative youthfulness might be mitigating
22  if you have a seventeen-year-old girl who is a defendant
23  in a case.  Sometimes some people might think being that
24  age, they aren't mature enough to make sound judgements
25  and good decisions; and that might be a mitigating

24

1   factor.
2           That same jury -- other jurors hearing
3   exactly the same evidence might say, I don't think
4   that's mitigating; because if you have somebody that's
5   that young and that mean already, we've lost them
6   forever.  They heard the exact same evidence, just
7   reacted to it differently.  That's your call.  Sometimes
8   people may think if there is testimony in a given case
9   about mental retardation, some jurors might think that's
10  mitigating.  Others may not.  Those that don't, they say
11  to themselves, well, if a person is mentally retarded,
12  there is no way to fix it.  They're the way they're
13  always going to be.
14          And the third group of jurors in the same
15  case might say, doesn't that make a difference as to how
16  much retardation there is?  Is there just a little bit,
17  or is it a whole lot?  That might make a difference as
18  to whether or not to undo the death sentence and convert
19  it to a life sentence.  Maybe has nothing to do with
20  that.  It may be a specific act or conduct or a
21  character trait as opposed to some physical
22  circumstances or mental circumstances.
23          For example, you might have in some
24  imaginary case that a week before the crime was
25  committed for which you found the defendant guilty of

25

1   capital murder, the testimony is presented and the jury
2   believes the testimony that the defendant was driving
3   down the street in his automobile, middle of the day,
4   sees an apartment fire, at the risk of his own life goes
5   in to save two or three kids.  But for his act of
6   heroism, that house would have perished.  That might
7   warrant you undoing the death sentence and replacing it
8   with a life sentence.  Maybe you wouldn't.
9           That's the kind of stuff we're talking
10  about.  You might have evidence in some other case that
11  somebody spent some time in the military, Desert Storm.
12  They were perfectly fine before they went in.  And after
13  they went in, seeing combat service as members of the
14  armed forces, they've never been the same.  Maybe some
15  folks thinks that's sufficient to mitigate.  Others may
16  not.  But the point of it all is nobody can tell you
17  what's mitigating.  That's your call.  And nobody can
18  tell you whether it's sufficient to cause you to undo
19  the death sentence and replace it with a life sentence.
20  All that we can do is attempt to commit you to the
21  notion that you'll look over all the evidence in the
22  case to see if there is a reason why the life sentence
23  should be imposed instead of the death sentence, and is
24  that reason sufficient to cause you to do that?  Any
25  questions about the two questions?  Sir?

26

1           VENIREPERSON:  As far as the second
2   question, does it have to be unanimous.
3           THE COURT:  In order for the death
4   sentence to be imposed in these two questions in the
5   first phase of the trial, a finding of guilt, finding of
6   yes to the second question, finding of no to the second
7   question, it has to be unanimous.  In order to vote in
8   such a way that a life sentence is imposed, the second
9   question can be answered no, as long as at least ten
10  jurors believe it should be no.
11          The second question can be answered yes,
12  as long as at least ten jurors answer the question yes.
13  So it does not take a unanimous verdict to answer in
14  such a way that a life sentence is imposed, but it does
15  require you to make a unanimous verdict to make sure the
16  death penalty is imposed.
17          Now let's stop for just a second and let
18  me inject myself into your conclusion for a second.  If
19  I were a person who was beaten down by the news media
20  all the time by dead bodies, if I came down here and if
21  I went through the process that you folks have gone
22  through and if I would be sitting here right now, I'd be
23  saying to myself, let me see if I have this right.  Is
24  what you're telling me is that if I was a juror in a
25  capital murder case and if after having heard all the

27

1  evidence at the first phase of the trial, if I found the
2  defendant guilty of capital murder and we came back to
3  the second phase of the trial and we heard additional
4  evidence, and if I find out based on all of the evidence
5  in the case and I believe beyond a reasonable doubt that
6  the answer to that first question should be yes, that
7  means I found him guilty of having committed capital
8  murder; and I also found beyond a reasonable doubt that
9  that person is a future danger. That's basically what
10 it amounts to. Are you telling me -- I'm saying to
11 myself -- that means that the death penalty doesn't
12 necessarily apply? And that's exactly what I'm telling
13 you. It may be that I think it should based upon the
14 facts of a given case. Maybe it doesn't based upon the
15 facts of a given case. Because what we're doing, if you
16 think about it for a second, the decisions that a jury
17 makes, guilty or not guilty, and the first question, and
18 the second question.
19     Those questions ask for remarkably
20 different information. The first one, is he guilty or
21 not? That means, what did he do in the past?
22 Question Number One asks you to decide, what do you
23 think he's probably going to do in the future? And
24 Question Number Three is asking something even different
25 than that. Do you think there is anything about the

28

1  case, anything about the victim in the case, anything
2  about the defendant in the case, anything about the
3  circumstances of the case that make you think that a
4  life sentence, on the whole, would be more appropriate
5  than a death sentence? And if you say to yourselves, I
6  don't see how in the world I could ever do that, I don't
7  see how I could be open to do that. I don't see how --
8  if he could be a future danger -- how a life sentence
9  would be more appropriate than a death sentence. And I
10 ask you to consider it. The conduct of the defendant,
11 the circumstances of the offense, the existence of the
12 relationship, if there was one, between a defendant and
13 a victim, they all may be factors that, when taken
14 together, may very well cause you to believe, on the
15 whole, because of the uniqueness of this case, a life
16 sentence is a better verdict. I'm not saying that it
17 is. I'm just asking you to commit to the notion that
18 you won't say that there isn't such a thing possible
19 until after you've heard all the evidence in a case.
20 Does that sound fair?
21     We've talked about the only two possible
22 punishments are life or death. Death, you can figure
23 that out. I'm going to spend a couple of minutes
24 talking to you about what a life sentence means. I will
25 tell you that in this case, if this defendant is found

29

1  guilty of capital murder, and if the jury should answer
2  these two questions in such a way that a life sentence
3  is imposed, that means that this defendant cannot
4  possibly be considered for parole unless he has actually
5  served forty years of his sentence. Forty years means
6  hour for hour, day for a day, week for week, month for
7  month, year for year. It means, for purposes of our
8  conversation, the Year 2039.
9      Now when the year 2039 gets here, what's
10 going to happen to this defendant? We have no idea
11 what the mechanics could or would be. That means for
12 the first time that the defendant would become eligible
13 for parole consideration, meaning that the prison
14 authorities would make evaluations of the defendant.
15 What was he like during these forty years here? Those
16 evaluations would be sent to the Board of Pardons and
17 Paroles, who could either accept those evaluations or
18 reject them completely.
19     But the Board of Pardons and Paroles will
20 make recommendations to the governor of the State of
21 Texas. I haven't the foggiest who the governor is going
22 to be in the Year 2039, but he or she is going to follow
23 those recommendations or disregard them completely and
24 make his own decisions. The point being, what's going
25 to happen at the conclusion of forty years is out of the

30

1  control of any of us here.
2      If you remember back to your civics class,
3  government. Broke it into three branches; government,
4  legislature, and judicial. This is obviously the
5  Judicial Branch. Pardons and Paroles is the Executive
6  Branch. So whatever they do, that's what they do. But
7  I want you to know that being eligible for parole
8  consideration has nothing to do with whether parole will
9  or will not be awarded to the person.
10     It's perfectly conceivable that one
11 hypothetical defendant, at the conclusion of forty
12 years, he would be denied parole for the rest of his
13 life. Every single breath he ever breathes is inside
14 the wall. It's also possible that another hypothetical
15 defendant could very well be paroled at the conclusion
16 of forty years. We can't, however, let that dictate to
17 us what the answers to these two questions should be.
18     These two questions deserve to be answered
19 on the basis of the testimony that exists in the case as
20 it is evaluated by the jury, 1999, not by what happened
21 in the Year 2039. But I want you to know that a life
22 sentence means, at the very least, forty years; because
23 I don't want somebody on a jury to go back into the jury
24 room and say, well, I've heard of being on life
25 sentences, being released after five years. I don't

31

1  want that to happen; therefore, I'm never going to
2  answer the questions in such a way that a life sentence
3  is imposed. Anybody have any questions about that?
4       Okay. Let's talk for just a second -- we
5  talked about capital murder. Capital murder simply is
6  the intentional taking of the life of another human
7  being without there being any justifiable excuse or any
8  justification -- without any legal justification or
9  legal excuse, is what I'm trying to say. That means --
10  excuse me. That's what murder is.
11       In order to make murder capital murder, it
12  takes exactly that same conduct, the intentional taking
13  of the life of another human being without a legal
14  justification or excuse; plus it was done during the
15  commission of another felonious act. In this case it's
16  claimed during the course of a kidnapping. That would
17  make it a capital murder if the State proved beyond a
18  reasonable doubt the existence of the intentional taking
19  of a life and it was during a kidnapping.
20       It's alleged -- also alleged there were
21  two murders, both of them intentional. One murder was
22  committed during the course of the same conduct the
23  other murder was committed in. Intentional murder
24  during a felony. One felony alleged is kidnapping. The
25  other felony alleged is murder. The State has to prove

32

1  beyond a reasonable doubt the existence of each of
2  those; that is to say, intentional murder and the other
3  felony.
4       Now when we talk about murder being the
5  intentional taking of the life of another human being
6  without there being any legal justification or excuse,
7  that means we are not talking about self-defense.
8  Self-defense is justifiable, is a legal justification.
9  If a person kills somebody in self-defense, it is simply
10  not a crime because it is legally justifiable. We have
11  the right to defend ourself from any unlawful, deadly
12  attack by somebody else. When we talk about murder,
13  we're not talking about some accidental killing. If it
14  was an accidental killing, it wasn't done intentionally.
15       So, intentional means you want to cause
16  the result and you do something for the purposes of
17  causing it. Anytime the State's required to prove two
18  things, there are three possible results that can occur.
19  One, they can prove both of them beyond a reasonable
20  doubt. If that's been the case, the jury's obligated to
21  find the defendant guilty of capital murder. Possible
22  outcome number two, they cannot prove beyond a
23  reasonable doubt either the intentional murder or that
24  it was done during the kidnapping. If that's the case,
25  the jury's obligation is to find the defendant not

33

1  guilty of anything. Possible outcome number three,
2  maybe in some imaginary case they can prove beyond a
3  reasonable doubt the intentional murder, but they cannot
4  prove beyond a reasonable doubt to the jury that it was
5  done during the course of a kidnapping.
6       Well, if that were to be the case, then
7  the law says I'd have to give you a third charge. You
8  already had a possible verdict of guilty of capital
9  murder, a possible verdict of not guilty of anything.
10  The third possible verdict I give you is, is he guilty
11  of murder? That is to say, not capital murder, not
12  intentional murder during a kidnapping, but is he guilty
13  of only the intentional murder being a lesser crime
14  carved out of the greater crime, the greater crime being
15  an intentional murder during another felony. And if you
16  didn't believe the other felony, you would have the
17  option of finding him guilty of the intentional murder.
18       The range of punishment for murder in the
19  State of Texas is just remarkably broad, and it's so
20  remarkably different from capital murder. Capital
21  murder is life and death. In Texas murder -- if a
22  person in Texas commits murder, the range of punishment
23  is by confinement in the penitentiary for life, or for
24  any number of years not less than five, or more than
25  ninety-nine; and in addition to the confinement, a jury

34

1  can also impose a fine in any amount, as long as the
2  amount is not more than $10,000, if they think that's
3  going to accomplish anything. But can you see the five
4  years to life, everybody fits if there?
5       And that's the whole point of it, because
6  all sorts of different kinds of defendants, all sorts of
7  different kinds of victims, all sorts of different kinds
8  of circumstances. And ordinarily when we think of a
9  murder, we think of a specific thing, whatever it might
10  be; but there are all sorts of different things.
11       For example, seventeen-year-old girl who's
12  never been in trouble in her life commits exactly the
13  same crime as a fifty-year-old male who's been in the
14  penitentiary six times in his life. Even though the
15  conduct is exactly the same, perhaps you would want to
16  treat those two defendants differently. I don't know.
17  Maybe you would want to treat them just the same. That
18  would be your business. But if -- can you see if you
19  want to treat them differently, we've got to give you
20  room to roam. Because it would be perfectly arrogant on
21  our part to come down here on your time and be a juror
22  in the case and determine whether a person is guilty and
23  then tell you the value of every dead body that exists
24  in the City of Houston, Harris County, Texas is the
25  same. Because even insurance companies say the value of

**35**

1  people is different.  And the evidence in the case might
2  also show you that, too.
3       So, all we're simply doing is providing
4  you with the opportunity to roam up and down that range
5  of punishment.  And after having heard all the evidence
6  about the offense that was committed, how it was
7  committed, the defendant who committed it, and the
8  victim in the case, just make the decision to what you
9  think is the right decision in that range of punishment.
10       So, my question to each of you is this:
11  Assume with me for just a second that you're on a jury
12  in a capital murder case, and your jury has heard all of
13  the evidence in that case.  And your jury goes out to
14  deliberate, and your jury unanimously determines the
15  defendant on trial is not guilty of capital murder, but
16  your jury unanimously does determine that the defendant
17  on trial is guilty of a murder.
18       You come back and you hear the second
19  phase of the trial, again, relating to the character and
20  background of the defendant on trial, whatever that
21  evidence might have been.  But the jury goes out when
22  you deliberate.  My question to you is this:  Is there
23  anybody here who would not consider assessing that
24  imaginary defendant's punishment at confinement in the
25  penitentiary for life if, after having heard all the

**36**

1  evidence in the case, you thought that was an
2  appropriate punishment to reach.
3       And I guess what I'm saying is not would
4  you give somebody life, but would you consider that as a
5  legitimate sentencing option if you thought the
6  circumstances of the case did warrant that?  Take the
7  same question and flip it.  You're the same juror,
8  capital murder case.  Jury finds a defendant not guilty
9  of capital murder, but not of murder.  You come back
10  here in the second phase of the trial.  Whatever the
11  evidence was there doesn't make any difference, but you
12  begin your deliberations.  Is there anybody here who
13  would not consider, who would refuse to consider,
14  assessing that imaginary defendant's punishment at
15  confinement in the penitentiary for five years if, after
16  having heard all the evidence in the case, you thought
17  that was the right result?
18       And again, what we're saying is, would you
19  consider the five years, also, as a legitimate
20  sentencing option if you thought the circumstance of the
21  case deserved it?  And can you see what we're getting
22  at is this:  Would you let the evidence in the case
23  dictate to you what result you reach and be wide open to
24  going either way or all possible ways, have a completely
25  open mind at the outset and just be driven by the

**37**

1  evidence?  That's all we ask.  Anybody have any
2  questions about that?
3       Two other real quick things.  The first
4  thing I want to touch on -- and I don't want to talk
5  about it from the lawyers' standpoint.  I'm trying to
6  communicate a thought or concept, and that's this:  We
7  have an aspect of our law in the State of Texas that
8  says if you have two people, or more than one person --
9  let's say you have two people get together, and they
10  conspire together to commit a crime.  One of those two
11  people cannot be convicted of that crime that was
12  committed solely, exclusively, and only on the other
13  conspirator in the case and not any other evidence.
14  What we're saying is this:   That a person can be
15  convicted on the testimony of a coconspirator, as long
16  as that coconspirator's testimony is corroborated by
17  some other evidence from some independent source that at
18  least tends to connect the defendant on trial to the
19  commission of the trial.
20       For example, if another guy and I agree to
21  rob a bank, he's the robber and I'm the getaway driver.
22  He goes in the bank.  I'm in the back in the car.  He
23  goes in.  And if he gets arrested and he says, well, I'm
24  not the only one in this deal; Burdette was in it, too,
25  I can't be convicted solely, exclusively, and only

**38**

1  relying on his testimony, unless there is some other
2  evidence from some source independent from the
3  coconspirator that tends to connect me to the commission
4  of the crime.
5       For example, having not gone into the
6  bank, nobody saw me.  But when the other guy, the
7  robber, was arrested and he's got the bank bag and my
8  fingerprints are on the bank bag, that would be evidence
9  from an independent source that tends to connect me to
10  the commission of a crime.  It corroborates what the
11  coconspirator says.  My question -- I have no idea if
12  that's what's going to come into play or not.  That's
13  the law that exists.  If the circumstances were right,
14  it would.  Is there anybody here that has any
15  disagreement?
16       One last area.  We have two types of
17  evidence.  We have direct evidence and we have
18  circumstantial evidence.  Direct evidence means somebody
19  saw something happen.  Somebody saw a crime occur.
20  Circumstantial evidence means nobody saw the crime being
21  committed, but they did see circumstances during the
22  course of conduct that if taken with other circumstances
23  that are testified to in the course of the trial when
24  intertwined within each other tends to show the
25  defendant did do the crime.

39

1      Excuse me.  For example, the law doesn't
2 care whether testimony in a case or evidence in a case
3 is circumstantial or direct, just like the law doesn't
4 care how many witnesses there are.  The law only cares
5 about the quality of the evidence, not the quantity not
6 the type of.  The law cares that the evidence in the
7 case winds up being believed by the jury beyond a
8 reasonable doubt.
9      We have people down here all time being
10 convicted on the basis of the testimony of one person
11 when a jury believes that testimony beyond a reasonable
12 doubt.  We have people down here being found not guilty
13 all the time on the testimony of five eyewitnesses
14 because the juries don't believe those eyewitnesses
15 beyond a reasonable doubt.  So, the numbers don't make a
16 difference.  It's the quality of the information.
17 Likewise, whether it's an eyewitness' testimony or
18 circumstantial testimony makes no difference, as long as
19 the testimony is believed beyond a reasonable doubt.
20      For example, we could have down here by
21 the new ballpark a murder.  The guy gets shot with a
22 gun, falls down dead on the ground.  There were three
23 witnesses.  They're all drunks.  They're laying out
24 there behind bulldozers and so forth, getting ready to
25 pass out.  And they come down here and testify what they

40

1 saw.  They tell you, We were drunker than goats.  And
2 they were.
3      Can you see how a jury in that
4 hypothetical situation may have had difficulty believing
5 them beyond a reasonable doubt that whoever the
6 defendant was on trial in that case actually committed
7 that murder, even though it was eyewitness testimony,
8 direct testimony?  But you might have three other
9 witnesses with exactly the same circumstances, one
10 witness being a person who saw, twenty seconds before
11 the gunshot was fired, the defendant with the gun.
12 Never saw him fire the gun.  Then he heard gunshot fire.
13 And another witness who didn't see the gunshots being
14 fired, turns around and sees the victim laying on the
15 ground, and the defendant is standing there with a gun
16 in his hand.  A third witness, two minutes later, sees
17 the defendant a hundred yards from where the shooting
18 was with a gun in his hands, calls the police.  The
19 police arrest the defendant, gun's taken from him.  The
20 gun taken from the defendant is ballistically determined
21 to have fired the shot into the person who was killed
22 and was the cause of death.
23      Can you see that even though there is
24 absolutely no direct evidence, it's every bit
25 circumstantial because nobody saw the gun fire.  That

41

1 testimony in that case may very well convince a jury of
2 a person's guilt beyond a reasonable doubt even though
3 it's circumstantial?  What I'm asking is this:  Is there
4 anybody -- and we all hear these -- down here these
5 people saying, oh, I could never find somebody guilty on
6 circumstantial evidence.  And they don't have any idea
7 what circumstantial evidence is.
8      For example, a fingerprint, one of the
9 world's great individual identifiers.  A fingerprint is
10 circumstantial evidence even though there is no question
11 who left the fingerprint.  And it's circumstantial,
12 because there is no way to know when the fingerprint was
13 left and there is no way to know where the object was
14 when the crime was going on.  Now, obviously, you -- if
15 it's a nonmoveable object, you figure it was wherever
16 it's going to be.  But if it's a desktop table and you
17 don't know where the gun was when it was put there,
18 that's circumstantial.  So my question to you is this:
19 Is there anybody here who, after having heard all the
20 evidence in the case, and even if the evidence was
21 circumstantial but you did believe that circumstantial
22 evidence beyond a reasonable doubt, is there anybody
23 here who would refuse to find the defendant guilty based
24 upon circumstantial evidence?  I gather then that you
25 would base your decision on the quality of the testimony

42

1 and not whether it was direct or circumstance.
2      And now you've finished your first year in
3 law school.  What questions do you have of me?  Honestly
4 and truly, this is not difficult stuff.  All we're just
5 asking you to do is cut it down the middle.
6      VENIREPERSON:  All the information that
7 you've given us, as far as definitions and those kinds
8 of things, will be in the jury room?
9      THE COURT:  If the testimony raises them.
10      VENIREPERSON:  If necessary?
11      THE COURT:  Yes, sir, exactly.  Because as
12 we said at the outset, your job is to determine the
13 credibility of witnesses, and that's not my job.  My job
14 is to give you all of the law that is raised by the
15 testimony, because I have to give you the circumstances
16 from which you can determine the credibility and the
17 applicable law.  So there may be lots of things in the
18 Court's charge that, after determining the credibility
19 of the witnesses, they don't apply; and they don't
20 apply, because you don't believe the witnesses who
21 testified raised that particular point of law.  And
22 everything will be in writing, and don't worry about
23 memorizing it.  And then there is no test.  Never ever,
24 ever going to be a test.  Any questions about anything
25 we've talked about?  Any reason we talked about?

43

```
 1              Quite honestly, it is perfectly simple.
 2   As a juror, it's going to be your job to follow these
 3   rules.  So we want you to know what they are, just see
 4   if any of this puts you in disagreement that rises to
 5   the level that you couldn't consider it if it came into
 6   play.  The second aspect of what that is about is for
 7   you to be satisfied with yourself, certainly the lawyers
 8   to be satisfied, that if you were a juror in a case,
 9   you'd just listen to all the evidence, come up with what
10   you thought was the right result.
11              Because these three questions we talked
12   about are the three decisions the jury can be called
13   upon -- sometimes I think of them as like being the
14   three points of a trial.  Every piece of information
15   that you're going to use to answer those three
16   questions, you're going to take from the evidence which
17   was introduced in the trial.  But as you move along to
18   each of those three corners of the triangle, the
19   questions ask you to draw from that information pool.
20   They are so remarkably different from each other that
21   once you answer one, that never dictates what the next
22   answer should be.  You go back to square one and look at
23   it all over again, because each of these decisions is
24   independent of the last one.
25              Once that one is over with, all that's
```

44

```
 1   behind you.  It is never an indication as to what the
 2   next answer should be.  Because the first question is,
 3   what did he do in the past?  Next question is, what is
 4   he going to do in the future?  Next question is, is
 5   there anything else in the case that should make any
 6   difference?  Any questions of me?
 7                    RITA FRAME SHOTWELL,
 8   having been first duly sworn, testified as follows:
 9                  VOIR DIRE EXAMINATION
10   BY THE COURT:
11      Q.  How are you this morning?
12      A.  I'm fine, thank you.
13      Q.  Miss Shotwell, before we begin, let me ask you,
14   where is Glenville?
15      A.  It's in West Virginia, central part, about
16   ninety miles from Charleston.
17      Q.  Okay.  Remember back to last Friday, the things
18   we talked about Friday, the things we talked about this
19   morning.  Out of everything that we have talked about so
20   far, do you have any questions at all for me?
21      A.  I don't think so.
22      Q.  Is there anything to this point that we have
23   not yet addressed that you feel as though we should talk
24   about because it might have some bearing on your service
25   as a juror in this case?
```

45

```
 1      A.  No.
 2      Q.  Is there anything at all that you can think of
 3   that might exist presently about your personal life, or
 4   health, family, job, whatever, that might interfere in
 5   any way with your being a juror in this case during the
 6   time frame we talked about?
 7      A.  No, I don't think so.
 8      Q.  Can you see from our conversation this morning
 9   about the questions that can come into play, how the
10   fact you answer one question one way, in and of itself,
11   does not dictate what the answer to the next question
12   should be?
13      A.  Yes.
14      Q.  Go back to the pool of evidence.  Before we
15   begin, have you any questions at all for me?
16      A.  I don't think so.
17      Q.  Thank you.
18              THE COURT:  Mr. McClellan.
19                  VOIR DIRE EXAMINATION
20   BY MR. MCCLELLAN:
21      Q.  Miss Shotwell, my name is Lyn McClellan.
22   Along with Claire Connors, we represent the State of
23   Texas in this case.  I want to go over your
24   questionnaire and talk to you, and I want to go over
25   certain aspects of the law that applies in a case like
```

46

```
 1   this and get a better feeling about your thoughts.
 2              First of all, can you kind of tell me in
 3   your own words what you think about the death penalty?
 4   What's your opinion?
 5      A.  Well, my opinion is, I think with each
 6   situation, you have to look at it differently.
 7      Q.  Okay.
 8      A.  Personally, I don't believe that I could say I
 9   agree with it or disagree with it without knowing the
10   story, knowing the situation, knowing the people --
11      Q.  Right.
12      A.  -- I think sometimes it's warranted.
13      Q.  Okay.
14      A.  And I think there are times when it is not
15   warranted.
16      Q.  Okay.  And that's kind of what your
17   questionnaire indicates.  You fall in the middle of the
18   road deal.  If the case calls for it and it's
19   appropriate, that's okay.  If the case doesn't call for
20   it and it's not appropriate, that's okay.
21      A.  Right.
22      Q.  Some people come to us and say they're in favor
23   of the death penalty for certain types of cases; but
24   some of those same people go further and tell us that
25   they don't believe they, themself, could ever
```

47

1   participate in a process such as serving as a juror
2   where they will be called upon to make decisions such as
3   answering these questions, knowing that in doing so, it
4   could result in this Judge ordering the execution of
5   this defendant sitting over here on trial.  Do you have
6   any doubts about your ability to participate in that
7   type process and make that type of decision if that's
8   what the law and the evidence called for?
9       A.  I think if that's what the law called for and
10  the evidence was proven to that point, I would not have
11  a problem, because I didn't commit the crime.  I was
12  just looking at the evidence.
13      Q.  Right.  And so, you can envision yourself,
14  hypothetically, as being a juror in a capital murder
15  case.  And let's say the State proves the case of
16  capital murder beyond a reasonable doubt.  You could
17  find the defendant guilty if I met that burden?
18      A.  Yes.
19      Q.  If we proved the answer to Issue Number One
20  ought to be yes, that he's a continuing threat to commit
21  future acts of violence, could you answer that question
22  yes?
23      A.  I could.
24      Q.  On Issue Number Two, if you look at all the
25  evidence and reexamine everything and try to determine

48

1   are there any mitigating circumstances, in other words,
2   reasons why a person should receive life as opposed to
3   death, you looked through all that evidence and you did
4   not find any reasons that were given to you a sufficient
5   reason to change your vote from death to life, if you
6   answer that question no, knowing by doing that, that
7   that would result in this Judge ordering the execution
8   of the defendant on trial?
9       A.  I could do that.
10      Q.  You indicated on your questionnaire about
11  publicity, that you think you may have heard about the
12  case, but you weren't sure.   You've had some time to
13  think about it since then.  I don't know whether you did
14  or not, but what do you think you may have heard about
15  the case, or do you recall?
16      A.  I wasn't sure if I knew the name.  And till
17  today, I still don't remember.  I thought maybe it might
18  have been with the gentleman that supposedly committed
19  several crimes and was caught in Mexico and brought
20  back.
21      Q.  Okay.  It's not that case.
22      A.  Not the same one, so I don't think I know
23  anything.
24      Q.  The names that were mentioned in here were
25  Charles Mamou, Jr., Terrence Gibson, and Marie

49

1   Carmouche.  None of those strikes you?
2       A.  No.
3       Q.  You indicated that you were a teacher, I guess
4   in Pasadena, right?
5       A.  Right.
6       Q.  Is that correct?
7       A.  I am not teaching this year.
8       Q.  But when you were teaching, what did you teach?
9       A.  I taught several things.  I've taught first
10  grade.  I've taught sixth, seventh, and eighth grade.
11  English for the resource department.  I taught sixth
12  grade English for the regular and honor classes.  I've
13  taught seventh grade history.  I have also taught ninth,
14  tenth, eleventh, twelfth grade English for the Special
15  Ed Department.
16      Q.  When you say the resource department, that is
17  kind of akin to special ed?
18      A.  Right, it's the same thing as special ed.
19      Q.  In the questionnaire there is a question that
20  said, Do you feel the death penalty is used too often
21  and/or too seldom?  And you said, Too often.  And it
22  says, in some cases they should have been helped long
23  before the murder happened, okay.  Obviously, there are
24  cases where you may hear of people that committed crimes
25  and you say, Well, if something could have been done

50

1   earlier in that person's life, maybe they would not have
2   turned out like that.  But once they did turn out like
3   that, do you think the death penalty is an appropriate
4   punishment or not?
5       A.  I think each case is different, you know.  It's
6   hard for me to make a blanket statement with that
7   question; because I think many, many times we, as
8   parents, fail; and we, as families, fail our children
9   when we do not give them the environment they need and
10  the support they need and guidance.  And they start
11  getting in trouble at school, and then in the
12  neighborhood, and it just progresses.  And no one
13  realizes that sometimes when these young people are
14  doing these things, they're saying, Help me.  I need
15  some help.  And we're not catching them in time.
16      Q.  And I don't think there is any doubt about
17  that, and I don't think we address the front end of the
18  problem nearly as much as they need to be addressed.
19  But once we get to the point where you are in a
20  situation where a person, let's say, you've found guilty
21  of committing capital murder, we're not going to be able
22  to go back there and re --
23      A.  Right.
24      Q.  What do we do now?
25      A.  I think if the evidence proves this person did

51

1 it, then yes, yes, you -- or the juror -- needs to be
2 able to say guilty of the crime they committed. But I
3 think we can look at -- go from that point and look at
4 our young people today. What can we do to help them not
5 to get to this place?
6 Q. Right. Then when you look at these Special
7 Issues, Number One says, Do you believe this person, to
8 a probability beyond a reasonable doubt, would be a
9 continuing threat to commit future acts of violence?
10 How do you think you determine the answer to that
11 question?
12 A. I think you have to look at the past. What
13 have we done in the past? And characteristics of, did
14 we just start acting this way or have we done this all
15 the way along?
16 Q. Right.
17 A. And is the evidence strong enough to prove to
18 us that, yes, more than likely this person will continue
19 in this line of behavior?
20 Q. All right. I think that's exactly what you
21 have to look at. Let's say you answered that question
22 yes. Now the person is going to receive of death
23 penalty unless on Issue Number Two you decide there are
24 reason or reasons he should not. State does not have a
25 burden of proof. It says, Do you find that, taking into

52

1 consideration all of the evidence, and I guess to
2 specify, including the circumstances of the offense --
3 that would be what you heard about at guilt/innocence --
4 the defendant's character and background -- that would
5 be what you heard about in the punishment stage of
6 trial, where you may hear additional evidence that
7 wasn't relevant to guilt/innocence, but it was relevant
8 to the punishment because it's about the individual who
9 you have found guilty.
10 And then you look at the personal moral
11 culpability. I like to refer to it as his
12 responsibility for the commission of the crime. Was he
13 responsible for this crime, or was he a getaway driver
14 or lookout person as opposed to the actual triggerman or
15 choker, or whatever the manner and means of death may
16 have been. Might be you determine there is sufficient
17 mitigating circumstance or circumstances. I like to
18 refer to it as sufficient reasons why we should give
19 this person life as opposed to death. That's why you go
20 back and look at all the evidence, the facts of the
21 case, the background and character, the personal moral
22 culpability, all of those things.
23 Now, in doing that, obviously you're going
24 to hear evidence about a person's life, how he was
25 raised, what kind of family life he had, what kind of

53

1 family support or lack he had, kind of student he was,
2 kind of worker, help they tried to give him in school,
3 or maybe they didn't do anything in school. Is your
4 thought that we may fail someone early on, and that may
5 be why they are where they're at? Obviously, that can
6 be considered as a mitigating factor.
7 My question to you is, is it because of
8 your background, your teaching and dealing with people
9 that are -- when you deal with special ed or resource
10 people, a lot of times -- my wife deals in that area --
11 you deal with a lot of emotional instability, too, a lot
12 of people that are having problems that have come from
13 the environment they come from. Okay. So when you find
14 those situations, how do you treat that on this Special
15 Issue Number Two?
16 A. I think you have to look at all the evidence
17 and decide, is the background such that it negated that
18 behavior? Was it so atrocious that that's what pushed
19 this person over the edge, or did that person choose and
20 make this choice on their own?
21 Q. Okay.
22 A. Because at the same time, even though a person
23 has emotional or mental problems, I still think they
24 need to be held responsible for their actions.
25 Q. Right. And you know, having dealt with a

54

1 number of people over the years you've dealt with that,
2 there is lots of people that fall within this category,
3 as special ed, or resource-type, or emotional
4 instability. And I assume you may know just by
5 circumstance that not every one of them turned out to be
6 a capital murderer. Maybe one of them did. So there
7 has to possibly be some other factor involved in there
8 that puts someone over the edge in that situation.
9 Would that be right?
10 A. That's true.
11 Q. Let me ask about how that relates to some other
12 questions that you had, or answers you had over here.
13 There was some agree/disagree, strongly agree. Says,
14 obedience or respect for authority are the most
15 important virtues children should learn. You said you
16 strongly disagree.
17 A. I put strongly disagree with that?
18 Q. Strongly disagree.
19 A. Well, I think it is very important. I wouldn't
20 say it's the most important thing, but I think the most
21 important thing children need to learn is they need to
22 learn to live life the way God intended them to and have
23 their faith and live according to that.
24 Q. All right. Another statement was that, Anyone
25 can overcome a neglectful or abusive childhood. And you

55

1  put you strongly disagree on that. Is that kind of what
2  your thoughts were?
3      A.  Right, some people cannot overcome it. Some
4  people have been abused so much that, yes, you can make
5  strides and you can get a little better. But to
6  overcome it, you may never completely overcome it.
7      Q.  Okay. All right. Did you ever get with
8  students in situations where you may have said something
9  like this to yourself, they're going to be seeing this
10  kid down at the courthouse as soon as he gets old enough
11  to get down there?
12      A.  Uh-huh.
13      Q.  Just by the way they're acting and doing --
14  acting out, in your situation?
15      A.  Yes, I've seen those kids.
16      Q.  Have you ever followed up or heard about any of
17  the outcome of any of the kids that you dealt with,
18  meaning, how they did later in their life or anything?
19  You ever get any feedback in that regard?
20      A.  I've heard of some students that have gotten in
21  trouble with the law because of gang activity. I've had
22  a couple of students that were in trouble with the law
23  because of drug dealings. And there was one where maybe
24  it was the people that he hung out with. You can see
25  they're not making good choices of their friends and

56

1  their behavior. And even with counseling, it helped a
2  little bit. But some it changed; some it didn't.
3      Q.  So some people it works for?
4      A.  And some it doesn't.
5      Q.  One of the questions was, What things do you
6  think are important in deciding whether a person should
7  be sentenced to the death penalty or life in prison?
8  And the first thing you put down was, The mental state
9  of the person, and are they a continuing threat to
10  society? By the mental state of the person, what do
11  you mean there?
12      A.  Mental state; do they have the thinking ability
13  to make good, wise, choices; or are they on such a level
14  that they can't make a simple choice?
15      Q.  All right. The law basically says that
16  regardless of mental abilities or disabilities, that you
17  would be held responsible for your conduct as long as
18  you know the difference between right and wrong.
19      A.  Uh-huh.
20      Q.  You know the difference between right and
21  wrong, and you can be held responsible for your conduct.
22  If you don't, you're not going to be held responsible
23  for your conduct. Do you agree with that aspect?
24      A.  Yes, I do.
25      Q.  Do you think people can -- everybody can be

57

1  rehabilitated?
2      A.  I think everyone that wants to be can be.
3      Q.  You think it's more the individual's choice
4  than it is the --
5      A.  I wouldn't necessarily say that it's more, but
6  I think that has something to do with it. I mean, you
7  can take and train and train and train. And if I don't
8  want to learn something or if I don't want to change a
9  behavior, then more than likely I'm not going to.
10      Q.  You're right. Have you ever been called down
11  for jury duty before? You've not been on a jury before?
12      A.  No, I have never been called before.
13      Q.  This is the first time you've been called for
14  jury duty?
15      A.  Yes.
16      Q.  Can you tell me, what would be a reason I would
17  want you as a juror in a case like this?
18      A.  Well, I think, knowing myself and my value
19  system, I'm willing to listen to the evidence. I'm
20  willing to be honest about it. And my faith is such
21  that any time I make a major decision, I really pray
22  about it and consider all the aspects. I don't make a
23  quick, rash decision.
24      Q.  Would there be a reason I would not want you;
25  you could say, well, Mr. McClellan, here's a reason you

58

1  might not want me as a juror?
2      A.  You may not want me because I'm real picky. I
3  mean, you really have to prove to the nth degree with
4  me.
5      Q.  What do you mean, the nth degree?
6      A.  I can't have any doubt. If I have the
7  slightest doubt, I'm going to go the other way.
8      Q.  Well, I'm telling you now, I can't prove it to
9  that level.
10      A.  Then you may not want me as your juror.
11      Q.  I understand. Law says I have to prove my case
12  beyond a reasonable doubt. Not beyond all doubt. Not
13  beyond a shadow of a doubt, because I suggest I could
14  never do that unless you were a witness. Now obviously,
15  there is a lot of people on death row in Texas and lot
16  of people getting convicted in Harris County. So beyond
17  a reasonable doubt is a sufficient burden for some
18  people. Other people may want more. I understand that.
19  I don't have any problem with that. I just need to know
20  up front when you're going to want more than what the
21  law says I'm required to do.
22      A.  Well, I consider reasonable doubt as being that
23  there was not going to be this huge gap in there that's
24  going to make --
25      Q.  Huge gap and no doubt are a lot different to

59

1   me.  It won't be a huge gap.  If there is a huge gap, I
2   haven't even come close.  All I want to know is --
3   because there is always going to be questions in your
4   mind.  You're not going to hear any case in the criminal
5   court system where you don't have a question, well, I
6   wonder what about this?   The question is, did we prove
7   all the elements of the offense beyond a reasonable
8   doubt, that in Harris County, Texas, on a certain day,
9   the defendant took the life of a certain person during
10  the course of a kidnapping?  Did we do it or not?  Is
11  this yes or no?  If you believe beyond a reasonable
12  doubt -- not that every question about how it happened,
13  when it happened, why it happened -- I can't tell you
14  why somebody -- it may come out in the evidence why
15  somebody did, but I can't tell you why a person goes out
16  and kills somebody.  You'd have to ask them, and you
17  don't always get to hear from them.  And then they may
18  not tell you the truth anyway.  So, there are going to
19  always be issues that will be unresolved, you know.  If
20  you're uncomfortable with this, in making a decision
21  based on the evidence that is given to you, if it proves
22  to you that you're comfortable in your decision process
23  that that person is guilty of capital murder, as charged
24  in the indictment, even though you have a lot of other
25  questions, that's fine.  But if you say, I've got to

60

1   answer all these other questions, too, that's fine.
2       A.  I need to be very comfortable.
3       Q.  Okay.  Do you think you would hold me to a
4   higher burden than what the law provides?  Do you think
5   you, as an individual, would require more proof because
6   we're seeking the ultimate penalty; that is, death?  The
7   law says we have to prove beyond a reasonable doubt, and
8   you've used the words -- a lot of people would use the
9   words, beyond all doubt.  And as I say, I'm telling you,
10  I've never been able to prove any case in my life beyond
11  all doubt, and I don't ever think this is going to be
12  the one to start it.  Because my position is, unless
13  you're a witness, you'll never have all doubt removed.
14  Are you comfortable with what the burden of proof is the
15  law provides, or do you think you're the type of person
16  that you would require more than what the law says is
17  required?
18      A.  I think in a situation such as the death
19  penalty, I believe in our justice system and I think it
20  works very well.
21      Q.  Okay.
22      A.  As long as I feel comfortable with the evidence
23  that has been provided, and then I can make that
24  decision on that evidence.
25      Q.  Because, you know, the Judge was talking about

61

1   circumstantial evidence and direct.  So, depending upon
2   the believability of the witness, if you had an
3   eyewitness to a crime, that might be pretty strong
4   evidence.  Of course, if you had an eyewitness and the
5   person didn't believe them, that wouldn't be evidence at
6   all?
7       A.  No.
8       Q.  There may be certain cases where you don't have
9   eyewitnesses, but all the circumstances are pointing
10  towards it.  There is a lot of ballistics evidence,
11  fingerprint evidence, all the other stuff; but nobody
12  actually saw the commission of the crime, other than the
13  person that was killed and the person who did the
14  killing.  You're not going to hear from either one of
15  them.  Are you still comfortable making that type of
16  decision based on circumstantial?
17      A.  Yes.
18      Q.  Thank you very much.  I appreciate it.
19          THE COURT:  Thank you.
20          Mr. Hill.
21               VOIR DIRE EXAMINATION
22  BY MR. HILL:
23      Q.  Hi, Miss Shotwell.  This is Kurt Wentz, and we
24  both represent Mr. Mamou.  I guess in keeping with the
25  way Mr. McClellan was asking questions and giving you an

62

1   opportunity to tell us how you really feel, I'd like to
2   follow up on a couple of questions myself.  It won't
3   take very long.
4       A.  Okay.
5       Q.  In reading your juror information, I notice you
6   seem to place a considerable amount of emphasis on
7   family responsibility, how a child is brought up.  We're
8   just sitting here, not talking like a lawyer and
9   prospective juror, but two people discussing raising
10  families.  I've got three children, and you've got
11  children.  What's your take on the whole situation in
12  terms of how kids grow up and how parents influence
13  their children's upbringing?
14      A.  Well, I have two daughter's, and I believe with
15  all my heart God gave me those daughters.  And he also
16  instructed me that I need to raise them in an atmosphere
17  that's teaching them right from wrong.  And I hold them
18  accountable for their behavior.  But at the same time,
19  I'm an example to them, that they can see what's right
20  and what's wrong.  I should not tell them to do thing if
21  I live another way.
22          For example, I don't watch R-rated movies
23  because my children can't.  I don't smoke because my
24  children don't smoke.  It's that kind of thing.  If I
25  tell my children, don't smoke, but I pick up a pack of

63

1   cigarettes in front of them, what am I telling them?
2       Q.   Right, you don't ascribe to the do as I say,
3   not as I do approach?
4       A.   Right.
5       Q.   Well, at what point do you think children, as
6   they're growing up, catch on to what you, as a parent,
7   were trying to instill in them?   Do you think there is
8   a certain chronological age where it either kicks in or
9   they rebel to the point where it's not going to stick?
10  And how does a parent go about changing that so that the
11  child does ascribe to the parents' teachings?
12      A.   I really think each child is different, because
13  we're all different.  I think for some people who -- for
14  example, my sixteen-year-old, now she'll be seventeen in
15  December.  She went through a rebellious stage at, like,
16  ten; because she's very advanced mentally, and she
17  wanted to write the rules.  She does not really mean it
18  when she says, I'm not going to the school dance,
19  because I did this.
20      Q.   Right.
21      A.   Whereas my thirteen-year-old, she really hasn't
22  pressed any of the issues yet.  Not that she's not as
23  advanced mentally.  It's just that I believe she's seen
24  the way I did it with Sarah.  And she said, well, hey,
25  mom really means it.  And if I do it, I've cut my own

64

1   throat.  I'm not going to do it.  Now the older one
2   is -- not resentful in a bad way.  She sees herself as
3   the one that happened to be the test case; and the
4   younger sibling gets the benefit, because the younger
5   one figures out and kind of watches how the reaction
6   goes.
7       Q.   You responded --
8       A.   Uh-huh.
9       Q.   You responded to one of the questions about the
10  death penalty and its imposition, that it should be used
11  with discretion.
12      A.   Yes.
13      Q.   Again, tell me what you're thinking about what
14  you're responding to a question like that.
15      A.   I think anytime you look at taking someone's
16  life, you need to weigh all of the evidence.  You need
17  to look at every area that you can possibly look at;
18  because it's not something you should do lightly, and
19  it's not something you should quickly say, oh, well,
20  let's just say yes to this and get it over with.
21           I mean, this person has a life that's
22  valued just as much as my life is valued.  And if I were
23  on the other end of the spectrum, I would want someone
24  to take time and look at it and not just say, oh, well,
25  just because.

65

1       Q.   Oftentimes when we talk about the death penalty
2   and how it's imposed, people focus on the defendant and
3   what that person has done or not done in their lives.
4   Question Number Two talks about the circumstances of the
5   case, also.  And I'd like to find out from you whether
6   or not you think that that could play an important role
7   in how you decide the issue of whether a person receives
8   the death penalty or life in prison.
9            In other words, you know already that you
10  have found the person guilty beyond a reasonable doubt
11  of committing a crime.  And you've gone to Question
12  Number Two.  You have been satisfied that the person is
13  likely to be a continuing threat to society.  What type
14  of circumstances do you think would be important for
15  you, as a juror, to consider about the actual case that
16  the person was convicted of?  What are some of the
17  circumstances that would help you in answering that
18  question, if you can think of any?
19      A.   I would think that if a person commits a
20  horrific murder, one that was very torturous.  I'm not
21  saying when you take a life it's not torturous; but I
22  mean, something really bizarre, then that would tend to
23  help me to say we need the death penalty.
24      Q.   Would the circumstances or the relationship of
25  the parties have anything to do with it?  By that I

66

1   mean, if someone committed a horrific crime and one
2   that's premeditated, somebody has the intent to kill in
3   the moment they decide they're going to get together
4   with this person; their plan, if you will, is to execute
5   that person, as opposed to a situation where two people
6   knowing each other come together, and some event
7   occurred which causes the death to occur?
8            In other words, there may be issues
9   presented to you about self-defense.  You, as a juror,
10  ultimately are going to have to decide whether or not
11  that is, in fact, an issue in the case or not.  Some
12  cases a jury could decide that self-defense is not an
13  issue; that the defendant, his conduct in causing a
14  person's death, should not be legally excused.  In other
15  words, you should not find the person not guilty.  But
16  do you believe that those same facts surrounding how the
17  case occurred could have an important role in answering
18  the second question?
19      A.   I would think if Person A said, I'm going to
20  kill Person B, and they've got the whole plan laid out,
21  this is exactly what I'm going to do, that would
22  influence the way I answered those second questions.
23      Q.   And certainly, I would expect that would
24  influence you in a way you would find there would be no
25  mitigating circumstance?

**67**

1    A.  Right.

2    Q.  That's pretty bad.  The flip side of that is if

3  you were kind of -- if you had some mixed emotions about

4  whether self-defense really was there, but in the final

5  analysis you went with the State and just said, well, I

6  don't feel comfortable enough that it was really

7  self-defense, I see how there was a lot going on and

8  everything, do you think that evidence could help you in

9  answering Question Number Two, as well?

10   A.  I would think so.

11   Q.  Well, Mr. McClellan asked you what kind of, I

12  guess, decision making process he would be doing if he

13  chose you as a juror?  Look at it from our standpoint.

14  We're representing this man who's charged,

15  alternatively, with killing one individual at the

16  kidnapping episode.  Alternatively, it's the same

17  circumstance, killing two individuals at the same time.

18  That's a bad situation we would be facing.  We have to

19  evaluate whether Miss Shotwell should sit in one of

20  those twelve chairs.  This is the only time we're going

21  to have to talk with you about these questions and

22  respond.  If you're chosen you sit and listen to the

23  evidence and call it the way you see it, is there

24  anything that Mr. Wentz and I should know about you, who

25  you are, that would signal to us that, wait a minute, we

**68**

1  should not make the decision to seat you along with

2  eleven others?

3    A.  Well, I can just tell you I'm an open person

4  and I'm willing to listen to the evidence.  And I value

5  his life as much as I do my own, but I would have to

6  look at the evidence to make a decision.  So, you know,

7  it's a real hard call for me to say, yeah, you put me

8  over there.  Because I'm thinking this is a big

9  responsibility.  It's an awesome responsibility to be

10  over in that box.

11   Q.  Do you have any questions of me?

12   A.  I don't think so.

13   Q.  Thank you, ma'am.

14       (Court admonishes juror.)

15          ROLAND THOMAS VOLKER,

16  having been first duly sworn, testified as follows:

17            VOIR DIRE EXAMINATION

18  BY THE COURT:

19   Q.  How are you today?

20   A.  Very good, thank you.

21   Q.  Mr. Volker, make yourself comfortable.  Let me

22  ask you this:  Remember in your mind, if you would, back

23  to last Friday, the things we talked about then, and add

24  to them this morning, the things we talked about this

25  morning.  And after everything we have talked about, do

**69**

1  you have any questions at all for me?

2    A.  No, sir.

3    Q.  Is there anything to this point that we have

4  not yet addressed that you feel as though we should

5  because it might have some bearing on your service as a

6  juror in this case?

7    A.  No, I can't think of anything.

8    Q.  Is there anything at all, sir, whether it be

9  something perhaps about your personal life, something

10  perhaps about your professional life, something perhaps

11  about your health, or something else that you feel in

12  any way would interfere with your ability to be a juror

13  in this time frame we discussed?

14   A.  The time frame being October 4th, for ten days?

15   Q.  Yes.

16   A.  No.

17   Q.  All right.  The rules that we've talked about,

18  any of them that causes you any discomfort or any

19  objection to which you have that you couldn't follow

20  them if you were a juror in the case and if they came

21  into play?

22   A.  No objection.

23   Q.  Can you see the distinction that we have spent

24  some time trying to make about potentially as many as

25  three decisions that a jury could be called upon to make

**70**

1  and how those decisions are all based upon the same

2  bodies of evidence; the answer to one question does not

3  dictate what the answer to the following question should

4  be?  Does that make sense?

5    A.  I understood.

6    Q.  As a juror, it's my best guess you call it down

7  the middle.  And what I have told folks before is your

8  job is not to satisfy the lawyers; it's certainly not

9  to satisfy me.  But five years from now when you get up

10  in the morning and go shave you can say, you know what?

11  What I did in 1999, what I did was absolutely the right

12  thing.

13   A.  That's what I would want done to me.

14   Q.  Any questions of me?

15   A.  No.

16       THE COURT:  Mr. McClellan.

17       MR. MCCLELLAN:  Thank you, Your Honor.

18            VOIR DIRE EXAMINATION

19  BY MR. MCCLELLAN:

20   Q.  My name is Lyn McClellan.  And along with

21  Claire Connors, we represent the State of Texas in this

22  case.  I want to go over your questionnaire and ask you

23  some -- about some of your answers and get your feelings

24  about how that would affect your service as a juror?

25  And keep in mind we're looking for people who can take

71

1  an oath and a true verdict render based upon the law and
2  the evidence, potentially two different times.
3          The law at guilt or innocence, you get a
4  charge. And it will tell you definitions and tell you
5  what is applicable to the case. And you've heard the
6  evidence. You'll be the judge of the credibility of the
7  witnesses, and you make your decision based on the law
8  and the evidence. You don't just sit back and say,
9  after hearing all the evidence, what you think ought to
10 happen. You're guided by the law and the evidence. Any
11 problem with this aspect?
12     A.  No.
13     Q.  At the punishment stage of the trial, you have
14 more or less the same thing. You may hear additional
15 evidence. There you may hear evidence about the
16 defendant's character and background, criminal history
17 or lack thereof, mental abilities or disabilities,
18 information that's not relevant to whether or not he
19 committed the particular crime that you found him guilty
20 of on guilt/innocence, but information that is relevant
21 as to what punishment he ought to receive for the crime
22 you've already convicted him of.
23          You hear all that evidence, and you get
24 another charge to the jury. It will tell you what these
25 questions are and talk about the proof that's required

72

1  and how to answer -- not how to answer, but like the
2  burden of proof on Issue Number One is on the State.
3  And Issue Number Two, there is no burden of proof. And
4  then you go back and answer those questions. Can you
5  tell me in your own words what your opinion is of the
6  death penalty?
7      A.  What my opinion of what?
8      Q.  The death penalty.
9      A.  I think it's necessary in certain situations.
10     Q.  Okay. You understand, I assume, from voir dire
11 the Court has given to you and listening to the Court
12 there is not one crime in the State of Texas where the
13 death penalty is an automatic punishment?
14     A.  Uh-huh.
15     Q.  It's never automatic. It's always going to
16 depend upon your determination of the facts and
17 circumstances in answering the questions that are on the
18 board. Some people come to us and say they're in favor
19 of the death penalty for certain types of cases. I
20 think it's a proper type law. We ought to have it on
21 our books.
22          Some of those same people would go further
23 and say they don't believe they, themselves, could ever
24 participate in a process where they would be called upon
25 to make decisions to answer these questions, knowing in

73

1  doing so the result could be they will order this Judge
2  to order the execution of this defendant on trial. Do
3  you have any doubts about your ability to participate in
4  that type process and make those type decisions if
5  that's what the law and the evidence called for?
6          Okay. If I were to say you have found a
7  defendant in a case guilty of capital murder, can you
8  tell me what punishment he would receive?
9      A.  No. Right now?
10     Q.  Right.
11     A.  No.
12     Q.  Why not?
13     A.  Because I don't have the answers to the two
14 other questions.
15     Q.  You don't have the answers to the questions, so
16 you don't have what?
17     A.  I don't have the additional evidence.
18     Q.  Don't have any evidence to make that decision
19 on, and that's basically how this system works. I mean,
20 it may sound like a stupid question. It may have been a
21 stupid question. But a lot of people will come and say,
22 if I find someone guilty of capital murder, death,
23 that's what I'll do. Because it's common for people,
24 when they think about murder, when they think about
25 capital murder, they're thinking about the most horrible

74

1  thing they can think about. They're not thinking about
2  situations where there may be reasons why a person ought
3  to receive life versus death.
4          So, as the Judge told you, you could be --
5  a person could be seventeen years of age, never in
6  trouble with the law before, commits capital murder,
7  maybe been a total aberration in their life. They could
8  be whatever age and have been in and out of the
9  penitentiary all their life. So, it depends on the
10 facts and circumstances. So, are you the type of person
11 that can wait until you heard all the facts and
12 circumstances before you make your decision --
13     A.  Yes, I believe I am.
14     Q.  -- until you kind of go through the process of
15 how this works? Just briefly, the first part of the
16 trial is to determine whether or not the defendant is
17 guilty of capital murder. We must prove to a jury
18 beyond a reasonable doubt that the defendant, on a
19 certain day, in Harris County, Texas, intentionally took
20 the life of another person during the course of a
21 kidnapping. If we prove that beyond a reasonable doubt,
22 you find the defendant guilty of capital murder. If we
23 don't prove it beyond a reasonable doubt, you find him
24 not guilty and everybody goes home.
25          If you found someone guilty of capital

75

1  murder, then we go to the punishment stage of the trial,
2  which is a place where you can hear additional evidence,
3  as I said, about the defendant's character, background,
4  criminal history, or family life he grew up in, all of
5  those kinds of things; because the emphasis there is on
6  what punishment this defendant should receive for the
7  crime that you have found him guilty of, capital murder.
8  That information was not necessarily relevant to whether
9  or not he committed the crime, but it's very relevant as
10  to what this individual should receive for the crime you
11  found him guilty of.
12      A.  Right.
13      Q.  After you hear all that evidence, then you go
14  back and answer these questions.  Issue Number One says,
15  Do you find from the evidence beyond a reasonable doubt?
16  So, that means the burden of proof is on the State.
17  When it says beyond a reasonable doubt -- just like the
18  automatic answer to that Issue Number One is going to be
19  no, unless we prove beyond a reasonable doubt that it's
20  yes.  Just like at guilt/innocence, the automatic answer
21  is he's not guilty.  He's presumed to be innocent,
22  unless and until the State proves beyond a reasonable
23  doubt that he's guilty.
24      Okay.  It says, Do you find from the
25  evidence beyond a reasonable doubt that there is a

76

1  probability -- doesn't say possibility, like possible
2  someone -- for me to win the lottery if I don't play,
3  but very unlikely.  Doesn't say a certainty.  I mean,
4  something's going to happen.  It says a probability,
5  which I suggest is more likely than not that the
6  defendant would commit criminal acts of violence.
7  Doesn't say another murder or capital murder.  Says
8  criminal acts of violence, which could be a burglary, a
9  robbery; could be shooting someone; could be hitting
10  someone with your fist so hard it would cause permanent
11  injury.
12      So the question is, after hearing all that
13  evidence, could you believe the State has proven beyond
14  a reasonable doubt that there is a probability that the
15  person, as they sit there that day, would be a
16  continuing threat to commit future acts of violence that
17  would be a continuing threat to society?  What kinds of
18  information do you think would be helpful in making that
19  type of decision?
20      A.  Other convictions, like their past, family
21  interactions, other experiences that they've been
22  involved in.
23      Q.  Okay.  And you can use that, and you can also
24  use the facts of the crime itself.  There may be cases
25  where the facts of the crime are so bad that they, in

77

1  and of themselves, constitute a continuing threat to
2  commit future acts of violence.  There may be other
3  cases that, even though you found him guilty, that
4  doesn't indicate to you whether they would be a
5  continuing threat or not.  So you're able to look at all
6  that punishment evidence, as well as the guilt/innocence
7  evidence, in making your decision.
8      If you determine the answer to Issue
9  Number One is going to be yes, then the defendant is
10  going to receive the death penalty, unless on Issue
11  Number Two you decide there are reason or reasons why
12  this person should not.  And that is because you have
13  found a person guilty of capital murder.  Issue Number
14  One, you found there is continuing threat to commit
15  criminal acts of violence that would be a continuing
16  threat to society.  And now you're asked to determine,
17  are there sufficient reason or reasons, what they call
18  mitigating circumstances, that would give you some
19  reason to find someone on -- give someone life as
20  opposed to death?
21      It tells you to basically stop and
22  reevaluate everything you've heard so far.  And are
23  there reasons there that would cause you to believe a
24  life sentence is more appropriate for this crime than
25  the death sentence?  If you find there is sufficient

78

1  reasons there, you answer this question yes and he
2  receives life.  If you find there is not sufficient
3  reasons to change your vote, you answer no and he
4  receives death.  Okay.
5      Now some people say, wait a second.  If I
6  have already found him guilty of capital murder, which
7  you have to do to even get there, and then if I found
8  there was a probability that he would be a continuing
9  threat to commit future acts of violence, isn't that
10  exactly who the death penalty is made for?  And my
11  answer, I guess, would be, yeah, it is.
12      The question in Issue Number Two is
13  this -- not a question -- what you have to do in
14  Question Number Two is this:  Looking back through all
15  that evidence, are there reason or reasons -- mitigating
16  circumstances, I call them -- that give me a reason to
17  give this person life as opposed to death?  And there
18  may be things that are there, whether it be his
19  background, his character, the family life he grew up
20  in, or whatever else.  It could be evidence that comes
21  from us.  There is no burden on our side to convince you
22  or present any evidence.  The burden never shifts to
23  that side.  You may find it's from something that you
24  hear in the evidence.
25      My question is:  Are you open, even after

79

1  having found someone guilty of capital murder and found
2  they're a continuing threat to society -- are you still
3  open on Issue Number Two to look back at that evidence
4  to see if there is anything that's mitigating, that
5  would justify in your mind a life sentence as opposed to
6  death?
7      A.  Yes, I believe so.
8      Q.  Some people might come up and say, if I've
9  already found those first two things, then school's out,
10  I'm not going to ever go back and do that.  What that
11  asks you to do -- I don't know if you'll ever find
12  mitigating reasons or not.  It asks you to look for
13  them, to weigh it in your mind.  It's an individual
14  decision.  I think you asked during voir dire, does that
15  have to be unanimous?  And the answer to all those
16  questions we talked about, guilt/innocence, One and Two,
17  all have to be unanimous.  It's got to be twelve to zero
18  votes for someone to ever get the death penalty.  Okay.
19  So it's got to be 12-0 on guilt or innocence, 12-0 on
20  Issue Number One, a 12-0 on Issue Number Two.
21      A.  To get the death penalty?
22      Q.  Yeah, to get the death penalty.  And it's your
23  individual decision each time.  You have twelve people
24  up here and you act as a jury, but you make your own
25  individual decision.  Any problem with that aspect?

80

1      A.  No.
2      Q.  Do you think it's a fair system we have set up?
3      A.  Yeah, it sounds good.
4      Q.  Let me talk to you about the difference between
5  life and death.  Life means forty years, day for day.
6  That means if someone is convicted of capital murder
7  today and given a life sentence, it would be the Year
8  2039 before they would be eligible to be considered for
9  parole.  I just happened to notice what you said, that
10  you kind of, in my mind, maybe feel a little bit like,
11  yeah, right.  That's what I interpreted.  I don't know.
12      There has been a lot of change in the last
13  few years.  And there is a lot of people that think if
14  somebody gets a life sentence and they get out at three,
15  four, five, six, seven, eight years, that's not the way
16  it is in a capital murder case.  But by the same token,
17  that's not a factor in making a determination of your
18  answer to any of these questions.  Someone shouldn't
19  say, well, forty years is enough, day for day.  This guy
20  will be forty times whatever, plus whatever his age is
21  now.  So we don't even need to consider the death
22  penalty.
23      Somebody else might say, well, he might
24  get out after forty years, and thus, go out and do
25  something again.  We shouldn't -- we ought to give him

81

1  death because of the possibility he might get out after
2  forty years.  That should not be a consideration.  The
3  Court's told you that just to give you information.  So
4  nobody goes back -- in fact, you're going to be
5  instructed, while you're told what it is, not to talk
6  about that or consider what effects it will have.  We
7  don't know what the Parole Board will do after forty
8  years.  Maybe they'll let him out.  Maybe they'll keep
9  them in there forever.  We really don't know.
10      But when you look at these Issues One and
11  Two, you're not going to find an issue there where it's
12  plugged in to answer this question.  It's not any
13  evidence.  Can you assure me that that won't affect your
14  decision on any of these issues, the fact about whether
15  somebody serves forty years or get out after forty
16  years.
17      A.  Okay.
18      Q.  There is one question in here that kind of
19  capsulizes a lot of things.  It says, What is the best
20  way to achieve the purpose of punishment?  Question
21  above it was, What do you believe is the most important
22  purpose of punishment in a criminal case.  You said
23  deterrence.  It said, What is the best way to achieve
24  that purpose?  And you said, Depends on the
25  circumstances; sometimes a fine, sometimes imprisonment,

82

1  sometimes the death penalty.  In other words, it always
2  is going to depend on the facts and circumstances of the
3  case as to what the proper punishment ought to be?
4      A.  I believe it is.
5      Q.  And do you understand that every capital
6  murder -- no capital murder gets automatically the death
7  penalty; but every time someone is convicted of capital
8  murder, that doesn't mean they get the death penalty.
9  There is two possible punishments, and you have to wait
10  till you hear the evidence to make that decision.
11      A.  I understand.
12      Q.  Any reason why you could not serve as a juror
13  in a case like this?
14      A.  None that I can think of, no.
15      Q.  Thank you very much, sir.  I'll pass you.
16          THE COURT:  Thank you.
17          Mr. Hill.
18          MR. HILL:  Thank you, Judge.
19              VOIR DIRE EXAMINATION
20  BY MR. HILL:
21      Q.  Hi, Mr. Volker, my name is Wayne Hill.  Kurt
22  Wentz and I both represent Mr. Mamou.  I'll just make a
23  statement to you at the outset.  I think we do a
24  disservice to people, when they come down here as
25  prospective jurors, if we read their questionnaires and

83

1    we try to label them and we try to kind of pigeonhole
2    them.  Is this guy going to be a real conservative guy?
3    Is he going to be real liberal?  It doesn't give you an
4    opportunity to express yourself.  Someone looks at me
5    and all they know is I'm a criminal defense attorney.
6    They're not going to know anything about the fact I used
7    to be prosecutor, got three kids, been married for
8    twenty-five years, what my feelings are.
9            So, I want to hear from you.  I don't
10   really want to know anything except what you want to
11   tell me.  Okay.  When we come down here, obviously this
12   is a very important case for a lot of different people
13   involved, and I don't know if we ever really think about
14   this in a real sense.  It's one thing to be sitting
15   around the kitchen table, reading the newspaper.  We
16   comment upon cases we hear and see in the news.  It's
17   different when you sit with eleven others in these
18   chairs and make this kind of decision.  So I just want
19   to you give me an opportunity to know you a little bit
20   better.
21           If there is a question I ask of you that
22   you think is either too personal or none of my business,
23   just tell me so.  When I do look through the
24   questionnaire, there are certain questions that kind of
25   key into some of your thought processes that you have.

84

1    One of the things that I notice when it asks you whether
2    or not you believe mitigating evidence should be
3    considered by the jury in their assessing whether life
4    or death should be the proper punishment, you actually
5    circled the word consider and said, Why?  I'm just
6    wondering whether or not there was any particular
7    emphasis that you placed on that in circling the word
8    consider, and maybe just describe for me what you're
9    thinking.
10       A.  It's just probably clarifying the question.  I
11   wouldn't look at this as a test, but I was --
12       Q.  It's not.
13       A.  I know it's not, but I was just trying to
14   understand the meaning of the question; and
15   consideration -- or consider was a key word to me in
16   there, so, yes.
17       Q.  You're comfortable with the process as it is
18   right now.  In fact, I think you were starting to say,
19   It sounds good; and Mr. McClellan may not have heard
20   that you were trying to respond.  I'm interested in
21   hearing what the rest of that statement was going to be.
22   Are you comfortable with this process?  You said, Sounds
23   good.  And I thought maybe there was more there.
24       A.  I've never been close to anything like this
25   before, just what you hear about it on the news.  You

85

1    get news reports and never really even discussed it with
2    anybody.  But having gotten this close to it, I was just
3    curious as far as how the death penalty is considered.
4    And my comment to that gentleman was that the questions
5    that are defined here that are asked seem to be fairly
6    clear and pointing the direction of the death penalty.
7        Q.  Prior to coming down here and actually being
8    told by the Judge how the process works, what was your
9    understanding about how a capital murder case proceeded
10   and what kinds of issues?
11       A.  To be very frank with you, I didn't have one.
12   I honestly have never paid that close of attention to
13   the process itself.  So I just, you know, like anybody
14   else, you go and watch "The Practice," or something like
15   that.  And you see these people go in there, but I
16   understand that's TV fiction and places a doubt on
17   credibility, I think, and didn't really spend a whole
18   lot of time in pondering.
19       Q.  When it asked the question about whether you
20   felt life in prison was a severe punishment, you
21   indicated you didn't think that was severe?
22       A.  I did not?
23       Q.  Right.  Let me make sure I'm reading it
24   correctly.  It says, Do you consider life imprisonment a
25   severe penalty?  You put, No.  Please explain.  Not if

86

1    the crime justifies removal from society.  So, I guess
2    in all fairness, you qualified that by saying, Life is
3    not appropriate in a situation where you felt the death
4    penalty was appropriate."
5        A.  Right, that's what I was trying --
6        Q.  Remove that element for a moment.  And let's
7    concentrate on the issue of whether life imprisonment is
8    a severe punishment, in and of itself, especially
9    knowing now, as the Judge has explained, a person
10   doesn't see the light of day for forty years,
11   potentially, in a capital murder context.  How do you
12   feel about that?  Does that make you feel a little bit
13   more comfortable with life being a severe punishment
14   versus what you may have thought before?
15       A.  Yeah, it does.  I mean, perhaps my thought
16   process wasn't what the prosecutor indicated it might
17   have been; but in the context of knowing that forty
18   years is really forty years, yes, I feel comfortable
19   that that is a severe punishment.  Now there are
20   situations that may warrant going beyond that.
21       Q.  Sure.  I think one of the things, hopefully, if
22   nothing else, you walk away with the understanding that
23   the system really has changed dramatically.  People are
24   very concerned about victims' rights, and oftentimes you
25   hear technicalities and these types of things.  We want

87

1  to make sure in this case that a jury is fully informed
2  of the effect of their answers. And I think you can
3  understand. Trade places for a second with Mr. Mamou.
4  You're sitting there, and a jury is back in that room
5  deliberating your fate. And there may be one or more
6  people in there that have misinformation about what life
7  means, and there may be a heated debate about whether
8  the end result should be life or death.
9        And all of a sudden people say, Well, I
10  know because I've heard about this. I've read about it.
11  I've seen it in the news, that there was a guy given a
12  life sentence, and he got out in ten years. You can
13  imagine how that would invade the process; and, yet, we
14  wouldn't know that sitting out here. We're not going to
15  know, because your deliberations are private. Does that
16  seem like an appropriate thing for you to know going in
17  so that you're not either misguided or maybe relying
18  upon --
19      A.  Absolutely.
20      Q.  -- old information that turns out to be bad
21  information?
22      A.  Right, absolutely.
23      Q.  I notice that you got a daughter up at U.T.
24  She's the same age as my son that's up there. What is
25  she studying up there?

88

1      A.  Communications.
2      Q.  How does she like it up there?
3      A.  She likes it a lot. She's --
4      Q.  Is she having a lot of fun up there?
5      A.  Yeah, she is.
6      Q.  Mr. McClellan has got a daughter up there, too.
7      A.  You guys are going to parents' weekend?
8      Q.  October 2nd.
9      A.  Got an extra football ticket?
10         THE COURT:  You ought to go play Baylor.
11  It's a sure win.
12      Q.  (BY MR. HILL)  They talk about past conduct
13  being a good indicator of future conduct. Do you think
14  that there are situations where a person can commit very
15  serious crimes -- and obviously, we're talking about
16  capital murder -- and have had a history, whatever that
17  might be, good or bad, and you could still believe that
18  if the person was incarcerated that they will not be a
19  threat to society, that maybe their existence in a
20  prison society could change that person? Or are you of
21  the opinion that once you've been shown to have
22  committed the most serious crime imaginable, you're not
23  going to change? There is just no hope that person
24  could ever alter their response situations?
25      A.  I believe anyone can change given the right

89

1  situation and circumstances.
2      Q.  I think a lot of it has to do with the person's
3  desire to change.
4      A.  Yes.
5      Q.  Is it -- would it be all right or acceptable to
6  you that perhaps the reason for a person wanting to
7  change maybe had to do with the fact they finally got
8  caught, you know, and they were held responsible because
9  a jury, in finding a person guilty of capital murder, is
10  holding them responsible for it? Automatically that
11  person gets a life sentence. It's not going to get any
12  better for that person. The only thing that could
13  happen beyond that is the jury determines to give them
14  the death penalty. But do you feel like it's an
15  acceptable reason for a person wanting to change, that
16  maybe they've never been held responsible by a jury?
17  But finally, they're stopped in their tracks and say,
18  Okay, you're going to be serving the rest of your life
19  in prison; and you felt that after listening to all the
20  evidence, that that possibly was going to motivate the
21  person not to be a threat to society. Do you think
22  that's possible?
23      A.  It's possible.
24      Q.  Which -- and when you talk about Question
25  Number Two, it asks you to consider whether or not there

90

1  is a mitigating circumstance or circumstances; and it
2  basically breaks the question down into three areas. It
3  asks you to consider the circumstances of the offense,
4  the defendant's character and background, and the
5  personal moral culpability of the defendant.
6        As I see it, it basically kind of directs
7  you at three different topics, if you will. Do you have
8  one of those that might be more important to your
9  decision making process on Question Number Two, or do
10  you think they're all equally important?
11      A.  At this point I'd probably weigh them all
12  fairly equal.
13      Q.  Okay. Do you feel like the circumstances of a
14  case, even in a situation where you found somebody
15  guilty of capital murder, about how the crime evolved,
16  how it happened, what all of the circumstances were of
17  that crime itself, do you think those would be important
18  factors for you to know about in evaluating what your
19  answer to these questions should be?
20      A.  Yes.
21      Q.  As Mr. McClellan pointed out, a lot of times
22  when people think of capital murder, they're thinking of
23  the worst scenario. They're thinking of the
24  premeditated, planned killing. You know, you're going
25  to execute somebody, or maybe you're going to commit a

**91**

1  more horrific crime because of the manner in which you
2  caused the person's death. People have gotten up there
3  and talked about just like a really brutal or
4  savage-type killing. But do you know -- do you see that
5  there are circumstances of how a crime evolved and how a
6  death occurs that could be an important factor in your
7  evaluation of the case?
8     A.  Yes.
9     Q.  It may not rise to the level of legal
10  justification. You could be dealing with a situation
11  where you've heard all the evidence as a juror, and
12  maybe there was a question in your mind whether or not
13  the person on trial was justified in causing a person's
14  death. In other words, they may have been acting in
15  self-defense or defense of a third person. But in the
16  final analysis you concluded, well, I feel more
17  comfortable finding them guilty of capital murder; I
18  just don't feel like what was going on at that time
19  really rose to the level of self-defense -- do you think
20  that in evaluating the questions now at the punishment
21  stage, that very evidence could be very helpful in
22  deciding whether those questions are answered in such a
23  way as life or death is imposed?
24     A.  Yes.
25     Q.  The self-test that we give to people usually

**92**

1  comes at the end of the questioning, so that's -- I'm
2  signaling to you, you're near the end of the questioning
3  process, which could be good news. You know yourself
4  better than anybody. I'm not going to know you in
5  fifteen or twenty minutes of talking to you, nor is the
6  State.
7        As the defense attorney representing this
8  man charged with capital murder, are there any things
9  that only you would know about who you are, or what
10  you've experienced, or anything at all that you would
11  communicate to me to say, You might want to take a
12  second thought about asking me to serve on this jury,
13  and here's why I want you to know this. You do with the
14  information what you want. If you think it says I
15  shouldn't be on the jury, so be it. If you think I'm
16  still going to be the person you want, that's fine, too.
17  But is there anything at all you can think of that you
18  would want to tell us.
19     A.  Nope.
20     Q.  Okay. How do you think it would be serving on
21  a jury like this? What do you think the experience
22  might be like?
23     A.  Very weighty, very serious, just a very sober
24  experience. It's not going to be fun. I don't think
25  that for a minute. But I think if it's ten business

**93**

1  days, if it's contained within that length of time, I
2  think you can pretty much put up with anything for that
3  length of time.
4     Q.  Okay. Do you have any questions of me?
5     A.  No.
6     Q.  No, I don't have an extra ticket.
7     A.  He saved that till the end.
8        THE COURT:  Mr. Volker, in just a second
9  I'm going to excuse you.
10        (Court admonishes juror.)
11        EVELYN MICHKA,
12  having been first duly sworn, testified as follows:
13        VOIR DIRE EXAMINATION
14  BY THE COURT:
15     Q.  Miss Michka, I ask you to remember back to last
16  Friday when the big group was together, what we talked
17  about that day. Add to it this morning what we talked
18  about this morning. Out of everything we have talked
19  about so far, do you have any questions for me?
20     A.  No.
21     Q.  Is there anything to this point that we have
22  not yet addressed that you feel as though we should,
23  because it might have some bearing on your service as a
24  juror in this case?
25     A.  No.

**94**

1     Q.  Is there anything at all about your personal
2  life, your health, anything else that you could think of
3  that, in your mind, would in any way interfere with your
4  being a juror in this case during the time frame we've
5  talked about?
6     A.  No.
7     Q.  In terms of the rules that we've spent some
8  time visiting about, are there any of them you find
9  yourself in disagreement with?
10     A.  No.
11     Q.  So that if you were a juror, not only would you
12  follow it, but you would enforce it if it came to that?
13     A.  Yes.
14     Q.  We spent some time talking about each decision
15  the jury makes is independent from the other decisions
16  that they make.
17     A.  Yes.
18     Q.  That is to say, how you answer one of these
19  questions does not dictate how you answer the next
20  question. Can you see how each question asked is
21  remarkably different stuff, and how a previous question
22  is answered doesn't influence the following answer?
23  Does that make sense?
24     A.  Yes.
25     Q.  Before we begin, do you have any questions for

95

1  me?
2      A.  No.
3          THE COURT:  Mr. McClellan, sir.
4          MR. MCCLELLAN:  Thank you, Your Honor.
5                  VOIR DIRE EXAMINATION
6  BY MR. MCCLELLAN:
7      Q.  Ms. Michka, my name is Lyn McClellan.  And with
8  Claire Connors, we represent the State of Texas in this
9  case.  I want to go through the questionnaire and follow
10 up on some of your responses in the questionnaire, and
11 then I want to talk to you about certain aspects of the
12 law that you apply in a case like this and get a better
13 feel for what your thoughts are about that.
14     A.  Okay.
15     Q.  You filled out the questionnaire the other day.
16 You had a chance to listen to the Judge's voir dire on
17 Friday, I guess it was, and then today on a different
18 topic.  You've had plenty of time to think about
19 being -- the possibility of being a juror in a capital
20 murder case where you know the State of Texas is seeking
21 the death penalty.  What have your thoughts been about
22 the prospect of being a juror in a case like this?
23     A.  I guess nobody possibly really wants to do
24 this.
25     Q.  Don't get many volunteers.

96

1      A.  But I feel like if I am chosen, then it's my
2  responsibility to do it.
3      Q.  Okay.  I notice that you listed your pastor as
4  one of the people you most admire.  Anything about
5  religious beliefs that affects your ability to sit on a
6  case like this?
7      A.  No, sir.
8      Q.  You indicated you're retired.  Can you tell me,
9  did you work outside the home?
10     A.  Yes, sir.
11     Q.  What kind of work did you do?
12     A.  Well, my first job I worked for a packing
13 house, Armour & Company.  I worked sixteen years for
14 them.  It was a packing house.  Then I worked twelve
15 years for Safeway in the warehouse.  I was an order
16 selector.
17     Q.  So you had quite a bit of experience working
18 outside the home?
19     A.  Yes, sir.  I had three kids to raise.  I had to
20 work.
21     Q.  That's a full-time job in and of itself.  I
22 assume your kids are grown and out of the house.  Where
23 do they live now, and what do they do?
24     A.  My oldest daughter, she works -- she's working
25 for a new company.  And this is terrible to say this,

97

1  but I don't know the name of it.  She just went to work
2  for them, and she's going all around the United States,
3  and she's -- she's a trainer for the kind of work that
4  she does.  And then my other son, he works for T.D.C.
5  He's a guard.  And my middle son, he's a floor
6  installer.  He works for hisself.
7      Q.  What unit at T.D.C. does your son work for?
8      A.  In Huntsville.
9      Q.  Does he ever talk about his work or whatever?
10     A.  Not too much.
11     Q.  Anything about him being a T.D.C. guard you
12 think would affect your ability to serve as a juror in a
13 case like this?
14     A.  I don't think so.
15     Q.  Now you indicated you had been on felony jury
16 duty before?
17     A.  Yes, sir.
18     Q.  Felony case.  Do you remember what kind of case
19 that was?
20     A.  It was theft.
21     Q.  You indicated y'all reached a verdict.  Did
22 y'all assess punishment in that case?
23     A.  No.  We just reached a verdict as guilty, but
24 we didn't do the punishment.
25     Q.  And the Judge did the punishment then?

98

1      A.  Yes, sir.
2      Q.  How long ago was that that you were on?
3      A.  It's possibly been about four years.
4      Q.  Anything about that jury service that you
5  thought was bad or good or indifferent?
6      A.  It was kind of different.
7      Q.  Anything that causes you concern about it?
8      A.  No, not now.  It did then, but not now.
9      Q.  What caused you concern then?
10     A.  Well, I just didn't agree.  And then after we
11 kept talking about it, I did agree; but at first I
12 didn't agree.
13     Q.  At first you thought he might have been not
14 guilty?
15     A.  Yes, sir, I did.
16     Q.  During deliberations you changed your mind?
17     A.  The foreman kind of led me to believe he was
18 guilty, but it was just different.
19     Q.  Now thinking back on it, do you have any
20 problem with the decision that you had arrived at?
21     A.  No, sir.
22     Q.  Did the defendant testify in that case?
23     A.  No, sir, he didn't.
24     Q.  And the questionnaire asks you, What are your
25 feelings about the death penalty?  And you say, Mixed.

99

1    What are your feelings?  Can you tell me what your
2    thoughts are?
3        A.  Well, I think it would have to be proven
4    without a doubt before I could do that.
5        Q.  What kinds of cases do you think the death
6    penalty is appropriate for?
7        A.  If you take a life and you intend to do it.
8        Q.  Right.
9        A.  If it's an accident, then I believe it's
10   different.
11       Q.  In fact, the law would state it was an
12   accident, or it was self-defense, that it's not even a
13   crime.
14       A.  Yes, sir.
15       Q.  And capital murder is the intentional taking of
16   someone's life while committing another crime.  What
17   we've alleged here is murder during the course of a
18   kidnapping.  Okay.  You said you would want it to be
19   proven beyond all doubt, and a lot of people say that.
20   Let me tell you, the burden of proof, as you know from
21   being on a jury before, is beyond a reasonable doubt.
22       A.  Yes.
23       Q.  I could never prove any case beyond all doubt.
24   Unless you were a witness, I don't think you'd ever have
25   all doubt removed in your mind.  The issue is, did I

100

1    prove all of the elements of the offense?  That is, that
2    on a certain date, in Harris County, Texas, that the
3    person on trial intentionally took the life of another
4    person during the course of a kidnapping.  If I prove
5    that beyond a reasonable doubt, not beyond all doubt,
6    not to a one hundred percent certainty, but beyond a
7    reasonable doubt, then the jury should return a verdict
8    of guilty, as charged in the indictment.  Would you have
9    any problem doing that?
10       A.  No, sir.
11       Q.  You understand there are always going to be
12   some unanswered questions about things.  As long as
13   those unanswered questions aren't about the elements of
14   the offense, and who did it, how it was done, and who it
15   was done to, it was done during the course of a
16   kidnapping, we prove those.  There may be as to why
17   somebody may have done it.  That doesn't relate to that.
18       A.  Yes, sir, I understand.
19       Q.  There may be all kinds of other peripheral
20   issues that are unresolved; how this happened, or how
21   that happened.  As long as we prove the elements beyond
22   a reasonable doubt, is that sufficient for you?
23       A.  Yes, sir.
24       Q.  It asks here, What's the most important purpose
25   of punishment in a criminal case?  You say, Retribution.

101

1    That is to punish the accused and make him pay for his
2    crime.  Sometimes people refer to it as an eye for an
3    eye.  Now in the State of Texas, we don't have any cases
4    where you automatically get the death penalty just
5    because you found someone guilty of capital murder.
6        A.  Yes, sir.
7        Q.  Instead, it depends upon the answer to the
8    questions up there.  Do you have any problem with that
9    aspect of the law?
10       A.  No, sir.
11       Q.  If you found someone guilty of capital murder,
12   at the punishment stage of the trial you may hear
13   additional evidence about a defendant's character, their
14   background, their criminal history or lack thereof.  And
15   that can be used along with the facts of the case itself
16   in answering these special issues over here.
17           Okay.  First Special Issue says:  Do you
18   find from the evidence beyond a reasonable doubt there
19   is a probability that the defendant would commit
20   criminal acts of violence that would be a continuing
21   threat to society?  What type of evidence do you think
22   would be helpful in making that type of decision as to
23   whether or not someone probably would commit criminal
24   acts of violence that would be a continuing threat to
25   society?

102

1        A.  I don't think I understand the question.
2        Q.  The question is:  After you found someone
3    guilty of capital murder --
4        A.  Yes.
5        Q.  -- you found they intentionally took the life
6    of another person during the course of a kidnapping.
7    They are guilty of capital murder, guilty as charged in
8    the indictment, okay, just like you found the person
9    guilty of theft.
10       A.  Yes, sir.
11       Q.  Now you go to the punishment stage.  What's
12   going to happen to that person now for having committed
13   the crime that you have found him guilty of?  And the
14   answer to that is going to be made by answering these
15   questions, okay?
16       A.  Yes.
17       Q.  Question Number One says:  Do you find from the
18   evidence beyond a reasonable doubt that there is a
19   probability -- it's more likely than not -- that the
20   person we have found guilty, the defendant, would commit
21   criminal acts of violence -- that is, there are some
22   other criminal acts that are violent in nature -- that
23   would constitute a continuing threat to society?
24       A.  Okay.
25       Q.  What kinds of information do you think would be

103

1  helpful in determining, in your mind, whether or not
2  someone would be a threat to society in the future?
3      A.  Oh, I believe it would be like his background
4  and what happened in his life.
5      Q.  Okay?
6      A.  And I think it would be just totally on that,
7  on his background --
8      Q.  All right.
9      A.  -- and his life.
10     Q.  The law would also say you can also look at the
11 facts of the crime itself that you found him guilty of.
12 In other words, when you hear the facts of the crime,
13 you're going to find out what happened before, during,
14 and after the commission of the crime.
15     A.  Yes, sir.
16     Q.  You may find this was a premeditated,
17 preplanned crime.  You may find it was a spur of the
18 moment crime.
19     A.  Yes, sir.
20     Q.  What happened during the crime?  You would find
21 out the evidence as to how this crime was committed.
22 Were people shot?  Were people stabbed?  Were people
23 choked?  What was the situation?  What happened after
24 the crime?  Did the person show remorse, or was he
25 running around bragging to people about what he had

104

1  done?
2      A.  Yes, ma'am.
3      Q.  So the facts of the crime itself, in certain
4  situations, may be so bad that they would, in and of
5  themselves, indicate to you a person would be a
6  continuing threat?
7      A.  Yes, sir.
8      Q.  Even if his background had been that he had
9  never been in trouble with the law before, never had any
10 other cases where the facts of the case itself don't
11 indicate that.  But when you look at his background and
12 other stuff, does it indicate he would be a continuing
13 threat?
14     A.  Yes, sir.
15     Q.  And there are those cases that you don't have
16 enough evidence to find he's a continuing threat.
17     A.  Yes.
18     Q.  Any problem with that aspect of the law?
19     A.  No, sir.
20     Q.  Issue Number Two then says, if you found
21 someone guilty and you found he's a continuing threat,
22 you're then asked to determine are there any reasons why
23 this person should receive life as opposed to death?
24 Are there any circumstances about the crime,
25 circumstances about his background, that you believe

105

1  merit him receiving life as the appropriate punishment
2  for the crime he committed as opposed to death?  And it
3  asks you to go back and look at all the evidence to see
4  if there is anything there that would cause you to
5  change your vote from death to life?  See how that
6  works?
7      A.  Yes, sir.
8      Q.  Anything that comes to your mind when you think
9  about mitigating circumstances or what you think about
10 reasons why someone should receive a lesser punishment?
11 Anything that comes to your mind?  And you say, Well, if
12 I heard evidence of this, that would always be
13 mitigating in my mind.  Anything?
14     A.  No, sir.
15     Q.  Law says that if a person is high on drugs or
16 alcohol when they commit a crime, they are still
17 criminally responsible for their conduct, as long as
18 they -- if they voluntarily get drunk, get high on
19 drugs, they still ought to be held responsible for the
20 conduct.  Do you agree or disagree with that?
21     A.  I agree.
22     Q.  The law says that anyone over the age of
23 seventeen is treated as an adult and ought to be held
24 responsible for their conduct up to and including the
25 death penalty if it's the appropriate type case.  Do you

106

1  have any problem with that?
2      A.  No, sir.
3      Q.  The law also says that a person's mental status
4  is not relevant to the punishment in one respect, in
5  that as long he -- if a person knows the difference
6  between right and wrong, they ought to be held
7  responsible for their conduct.  If they don't know the
8  difference between right and wrong, they're insane,
9  they're not being held responsible.  Any problem with
10 that aspect of the law?
11     A.  No, sir.
12     Q.  Now, you may look at a person's mental
13 abilities; and that may be a factor in determining some
14 of these answers to these questions.  I'm not telling
15 you that's the way it is.  It is allowed.  But do you
16 think, as long as someone knows the difference between
17 right and wrong, they ought to still be held responsible
18 for whatever criminal conduct they may have done?
19     A.  Yes.
20     Q.  Do you think the death penalty is necessary?
21     A.  Yes, sir, in some cases.
22     Q.  Why do you think it's necessary?
23     A.  Well, I think if a person takes another
24 person's life and they intend to do that, then I don't
25 think they should live.

107

1  Q.  Okay.  All right.  Is it Michka?

2  A.  Michka.

3  Q.  Miss Michka, I appreciate your time, and I'll

4  pass you to the other side?

5        THE COURT:  Thank you.

6        Mr. Wentz.

7        VENIREPERSON:  I feel like I'm on trial.

8        THE COURT:  Well, you're not guilty.

9  Don't worry about it.  We're halfway there.

10       Mr. Wentz, go ahead.

11             VOIR DIRE EXAMINATION

12  BY MR. WENTZ:

13  Q.  You're not the only one who has said that, by

14  the way, so try to relax.  I know you're going to be

15  able to answer every question I give to you.  And I'd

16  like for you to do one thing as I talk to you, and

17  that's give me the reasons or the explanations for why

18  you're answering the questions that I put to you in the

19  manner that you do.  In other words, I'm really

20  interested in your feelings about the things we talked

21  about, and I really appreciate you sharing them with me.

22  You've told us what you did.  Your husband is retired,

23  also.  What did he do?

24  A.  He worked for Texas Instruments for

25  twenty-eight years, and then he worked for Compaq for

108

1  five.

2  Q.  Are you enjoying your retirement?

3  A.  I love it.

4  Q.  Your church and your religion and God are very

5  important to you?

6  A.  Yes, sir.

7  Q.  Does your church have any particular attitude

8  or rules relating to the death penalty?  Is it something

9  that's open with each member of the congregation?

10  A.  I don't think so.

11  Q.  You've indicated that your son works at T.D.C.

12  How long has he been there?

13  A.  Six years.

14  Q.  Does he enjoy his work?

15  A.  I think he likes it.

16  Q.  Does he live up in Huntsville?

17  A.  Yes.

18  Q.  Have you talked to him about what it's like up

19  there?

20  A.  Well, I think it's the job.  My kids kind of

21  tend to keep their work and stuff, that kind of thing to

22  theirself.  None of my family really talks to me about

23  their line of work.  I don't believe they do.  They

24  don't share that with me.

25  Q.  How do you feel about the prospect of becoming

109

1  a juror in this case?

2  A.  I don't believe I really want to, but I believe

3  it's my responsibility as a citizen to do it if I'm

4  chosen.

5  Q.  You're sort of in a unique position; because

6  you know if somebody is found guilty of capital murder,

7  there are only going to be two possible punishments.

8  One is obviously the death penalty, and the other is at

9  least forty years incarceration.  And it's always seemed

10  to me that when somebody is found guilty of capital

11  murder, that that's an awful big decision to make.

12  A.  I believe that, too.

13  Q.  And I believe it for a couple of reasons.  One,

14  it's a real important legal decision; because it's

15  signaling to the community, to you, to everyone, that

16  this person is legally guilty of this horrible crime;

17  and it will label him.  But I think when we make that

18  decision legally along the way, we also make some other

19  sort of personal judgment about that person.  I'm not

20  going to say what personal judgment you might make, or

21  if you would make any at all.  But certainly if you

22  found somebody guilty of capital murder, you might think

23  they were a bad person.  You might think they might be a

24  threat in the future.  These are little side opinions

25  that you might draw from making that decision.

110

1        You have a son who works in the prison

2  system.  You would be sentencing -- conceivably

3  sentencing somebody.  How do you think your son might --

4  do you feel there would be any problem there for you?

5  A.  I don't really know.  At first I did stand up

6  and tell the Judge, but I don't know if that would be a

7  problem for me or not.  I really hadn't -- I pray a lot,

8  and I've prayed about this.  I really hope I'm not

9  chosen because of my son.  But like I said, I have a

10  responsibility, and I don't want not to do that for

11  myself.

12  Q.  Could you tell me a little bit more about why

13  you hope you're not chosen because of your son?

14  A.  Well, like you said, if the defendant would

15  have to go there, I would feel -- I think I would have

16  mixed feelings about him being there.  You understand?

17  Because my son would be there, you know.  I don't want

18  to endanger my son's life or anything.  I just don't

19  know.  I have mixed feelings about it.  See, I don't

20  know if he's guilty or not guilty, really; so I don't

21  know that he'll go there really.  But if he did, I just

22  think -- I would worry about my son.  I've always

23  worried about my family.

24  Q.  I can tell that from what you've told us so

25  far.  I guess what I'm trying to explore with you -- and

111

1  there are no right or wrong answers.  You're a mother.
2      A.  I'm always going to be a mother first.
3      Q.  Do you think that if you find somebody guilty
4  of capital murder, that because of the situation
5  involving your son, you would be more apt to answer
6  these special issues in a way in which the defendant
7  would receive the death penalty as opposed to life
8  because you feel that way?
9      A.  No, I would never do that, no.
10     Q.  One of the things you've told us in the
11 questionnaire, and I think you've told us again today,
12 is you believe the death penalty is justified for people
13 who intentionally take somebody else's life?
14     A.  Yes.
15     Q.  I think when you were addressed by the Judge
16 the other day, you were told that capital murder
17 actually involves something more than just the
18 intentional taking of somebody else's life.  It requires
19 a second crime to be committed along with that
20 intentional taking.
21         In other words, in one situation where
22 there might be an intentional taking of somebody else's
23 life in the course of a kidnapping, that would be a
24 capital murder.  There might be the possibility of there
25 being two people's lives that were taken in the course

112

1  of the same criminal transaction.  In other words, the
2  taking of the lives were somewhat joined in terms of the
3  times in which they were taken.
4          And you look at Oklahoma City.  Obviously,
5  the most classic example of people's lives being taken
6  in the course of the same transaction would be the
7  horrible bombing that occurred there.  But you may look
8  at the evidence and say, well, gosh, these deaths were
9  taken not so closely together.  They were taken in
10 different places, apart geographically.  So it may not
11 be the same criminal transaction.  And where you don't
12 have both of these things in the same transaction, the
13 deaths or the kidnapping and the death, you have not a
14 capital murder, but a regular murder.
15         And it's up to the jurors to listen to all
16 of the evidence and to decide for themselves and be sure
17 for themselves what type of crime actually took place.
18 Because just because there is an intentional murder
19 doesn't mean there is a capital murder.  And you may be
20 asked to make that decision.  Was there a kidnapping?
21 Is the person who is responsible for the kidnapping the
22 same person who's responsible for the death?  Were the
23 deaths -- did they occur in the course of the same
24 transaction?
25         You may say, I understand how two people's

113

1  lives were taken, but it's not the same transaction.
2  One happened one day.  One happened another day.  One
3  happened in one location, and one happened in a
4  different location.  Do you see how that could come
5  about for a juror to decide?
6      A.  Yes, sir.
7      Q.  And when you were a juror before, I think you
8  indicated that as you went into the jury room, you felt
9  the person might be not guilty.  But as you talked to
10 him, you came around and you considered that evidence
11 that he was guilty and you were satisfied in that.  Did
12 you feel the foreman pressured you in any way?
13     A.  No, sir.  I believe I really didn't understand
14 about the way they were presenting it.  And then after I
15 understood the whole thing, he was guilty; but I had to
16 really dig down deep to understand it.
17     Q.  Uh-huh.  When you were talking, as you've been
18 talking with me --
19         MR. WENTZ:  May I stand, Your Honor?
20         THE COURT:  Yes, sir.
21         MR. WENTZ:  I'm more comfortable.
22     Q.  (BY MR. WENTZ)  I'm sorry.
23     A.  It's all right.
24     Q.  You've told us that you feel that the death
25 penalty is appropriate for whenever there is the

114

1  intentional taking of somebody's life, and you know now
2  that that's not necessarily what capital murder is.  So
3  I'd like for you, if you would, to just assume with me
4  that you've become satisfied beyond a reasonable doubt
5  that a capital murder did occur; and the person you're
6  deciding the case about is guilty of that crime.
7          And then you come to these Special Issues.
8  When you thought about the death penalty before, did you
9  think about these Special Issues?  Did you know them, or
10 did you more or less make that up in your mind on who
11 deserves the death penalty on the crime itself?
12     A.  Well, I didn't really understand all this till
13 I come in here and was listening to the Judge.
14     Q.  Okay.  And one of the things the Judge told you
15 is that these Special Issues are independent of each
16 other.
17     A.  Yes, sir.
18     Q.  Each one deserves to be answered on its own.
19     A.  Yes.
20     Q.  And one thing I need for you to help me with,
21 if you would -- and I think you can understand why I'm
22 going to ask you this -- you've said to me, anyone who I
23 believe -- the death penalty is justified for somebody
24 who intentionally takes somebody else's life.  And when
25 it comes to, like, answering Special Issue Number One,

115

1  you know, this question is supposed to be answered all
2  by itself. And if you could just talk with me, are you
3  going to answer this Special Issue Number One yes just
4  because somebody answered --
5      A.  No. I have to listen, and I'm going to do
6  everything on my own.
7      Q.  And you understand that this Special Issue is
8  asking you to predict how somebody's going to act in the
9  future to determine whether or not they receive the
10  death penalty. Do you feel comfortable predicting how
11  people are going to act in the future?
12      A.  I'd have to hear all the evidence.
13      Q.  I know, but let me ask you: Predicting how
14  somebody is going to act in the future, do you find
15  that's something that's easy to do?
16      A.  No, that's hard.
17      Q.  And again, when you come to Special Issue
18  Number One, you've got to be satisfied with the State's
19  proof. And it's their burden of proof beyond a
20  reasonable doubt to convince you that this person is
21  going to be a future danger to society? And it's not
22  that we have this word, probability -- and the Judge has
23  talked to you about that this morning and saying, well,
24  it's not just a chance or a possibility, and it's not a
25  certainty. It's somewhere in between. But it seems to

116

1  me if you're going to put somebody in a position where
2  they may lose their life and receive the death penalty,
3  then that probability should be pretty darn big. How do
4  you feel about that?
5      A.  It would have to be overwhelming evidence to me
6  for that to be yes.
7      Q.  And again, you understand it's proof beyond a
8  reasonable doubt?
9      A.  Yes.
10      Q.  The crime -- the level of acts they must
11  threaten our society with and threaten you have to be
12  acts of violence that would constitute a continuing
13  threat to society. It's not just any criminal acts.
14  It's pretty standard.
15      A.  Yes, sir.
16      Q.  In your questionnaire it asked something -- I
17  believe it was on Page -- on Question 68: Do you
18  believe mitigating evidence should be considered in
19  determining whether or not somebody receives the death
20  penalty? And when you answered the questionnaire, you
21  checked the no box.
22      A.  I might have done it wrong.
23      Q.  That's a fair answer. Can you tell me now why
24  you answered that question?
25      A.  I'm going to tell you something. That day I

117

1  did that, I broke my glasses and I had some glasses that
2  wasn't real good. I should have told him.
3      Q.  Are you satisfied with the Judge's explanation
4  of mitigating evidence? Do you understand what it is
5  now? It's the kind of thing that can allow you to step
6  back and say, yes, the crime is bad; yes, the person did
7  it; yes, he may be a danger. But there is something
8  there about him, the case, his background, that allows
9  me to feel that life in prison is the right thing in
10  that particular case.
11      A.  Yes, I understand that.
12      Q.  And one of the things that we're doing here --
13  this is a very individualized process. That's why we're
14  talking to you as we do, by yourself. And there is no
15  one else on trial here but Charles Mamou. You know,
16  sometimes we fall into a trap of lumping people into
17  certain groups or classes. This is a very personal
18  thing, and it's going to be personal obviously with
19  regards to Charles.
20          One of the things they talk about in
21  Special Issue Number Two is whether or not you see
22  anything in the case itself that might justify a person
23  receiving a life sentence? And we're talking about
24  intentionally taking somebody's life. And that means,
25  also, no accident at all. And it also means there is no

118

1  self-defense. In other words, if you act in
2  self-defense, you're not going to be found -- or you
3  shouldn't be found guilty of the murder.
4          But sometimes as you consider what
5  happened in the case, you might find something or feel
6  something that's there that says, well, look, it didn't
7  quite get there in terms of self-defense or accident;
8  but there is sort of a cloud hanging over, and I think a
9  life sentence where somebody does forty years will be
10  appropriate. Do you see how that could factor in?
11      A.  Yes, sir.
12      Q.  And there is two points that come with that.
13  Sometimes people often want remorse to be shown to them.
14  In other words, the person expresses their sorrow over
15  what happened and what they did. And I think that's a
16  real natural thing for people to want. People say the
17  remorse the people showed would be real important for
18  them in determining whether or not they're going to
19  answer the Special Issues yes and no. But sometimes,
20  because the way a case unfolds, the way events unfold, a
21  person may not feel as remorseful under one set of
22  circumstances as they might under another set of
23  circumstances.
24          In other words, if somebody took
25  somebody's life and there was some aspect of

119
1  self-defense, they felt threatened, they may not feel as
2  remorseful as somebody who's driving down the street and
3  kills a pedestrian with their car --
4      A.  Yes.
5      Q.  -- just because of the very nature of what was
6  going on.  In one instance the person took an innocent
7  pedestrian, and in the other instance the person was
8  under some type of threat themselves.  Do you see how --
9  the way in which somebody can react to a case and be
10 remorseful about the case can be colored by what
11 happened?
12     A.  Yes, sir, I understand.
13     Q.  Believe it or not, your time is almost over.
14 Is there anything that you would like to tell me about
15 yourself that you think I should know before I sit down?
16 Anything at all?
17     A.  I don't think so.
18     Q.  And since I said I was only going to ask one
19 thing, that's it.  Thank you.
20             (Court admonishes prospective juror.)
21
22
23
24
25

120
1  THE STATE OF TEXAS              )
2  COUNTY OF HARRIS               )
3             I, Pamela Kay Knobloch, Official/Deputy
   Official Court Reporter in and for the 179th District
4  Court of Harris County, State of Texas, do hereby
   certify that the above and foregoing contains a true and
5  correct transcription of all portions of evidence and
   other proceedings requested in writing by counsel for
6  the parties to be included in this volume of the
   Reporter's Record, in the above-styled and numbered
7  cause, all of which occurred in open court or in
   chambers and were reported by me.
8
          I further certify that this Reporter's
9  Record of the proceedings truly and correctly reflects
   the exhibits, if any, admitted by the respective
10 parties.
11     I further certify that the total cost for the
   preparation of this Reporter's Record is $_____ and
12 was paid by Harris County.
13     WITNESS MY OFFICIAL HAND this the _____ day of
   _____, 2000.
14
15
16 _____
   Pamela Kay Knobloch, Texas CSR No. 1650
17 Expiration date:  12/31/2000
   Official Court Reporter, 179th District Court
18 Harris County, Texas
   301 San Jacinto
19 Houston, Texas 77002
   713.755.6340
20
   APPELLANT:    CHARLES MAMOU, JR.
21               CAUSE NO. 800112
22
23
24
25

**$**

**$10,000** [1] 34:2
**$** [1] 120:11

**0**

**0470500** [1] 2:5

**1**

**10:00** [1] 20:5
**119** [1] 3:3
**12-0** [3] 79:19 79:19 79:20
**12/31/2000** [1] 120:17
**121** [1] 3:3
**13** [1] 1:2
**13396100** [1] 2:3
**1650** [1] 120:16
**179th** [3] 1:11 120:3 120:17
**1960** [1] 2:19
**1999** [3] 1:18 30:20 70:11

**2**

**2000** [1] 120:13
**201** [1] 2:7
**2039** [5] 29:8 29:9 29:22 30:21 80:8
**21179300** [1] 2:18
**22nd** [1] 1:18
**25** [1] 1:2
**281.587.0088** [1] 2:21
**2nd** [1] 88:8

**3**

**301** [1] 120:18

**4**

**4615** [1] 2:14
**4th** [1] 69:14

**5**

**5629** [1] 2:19
**59656300** [1] 2:13

**6**

**68** [1] 116:17

**7**

**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 120:19
**77002** [2] 2:8 120:19
**77027** [1] 2:15
**77069** [1] 2:20

**8**

**800112** [2] 1:3 120:21

**_____**

**[1] 120:13

**_____**

**[1] 120:16

**A**

**Aberration** [1] 74:7
**Abilities** [3] 56:16 71:17 106:13
**Ability** [6] 47:6 56:12 69:12 73:3 96:5 97:12
**Able** [7] 7:6 20:10 50:21 51:2 60:10 77:5 107:15
**Above-entitled** [1] 1:19
**Above-styled** [1] 120:6

**Absolutely** [12] 4:11 4:7 14 7:3 8:13 12:12 12:15 13:23 22:16 40:24 70:11 87:19 87:22
**Abused** [1] 55:4
**Abusive** [1] 54:25
**Accept** [1] 29:17
**Acceptable** [2] 89:5 89:15
**Accident** [4] 99:9 99:12 117:25 118:7
**Accidental** [2] 32:13 32:14
**Accomplish** [1] 34:3
**According** [1] 54:23
**Accountable** [1] 62:18
**Accused** [1] 101:1
**Accused's** [1] 14:24
**Achieve** [2] 81:20 81:23
**Act** [11] 18:22 18:23 23:14 24:20 25:5 31:15 79:24 115:8 115:11 115:14 118:1
**Acting** [4] 51:14 55:13 55:14 91:14
**Actions** [1] 53:24
**Activity** [1] 55:21
**Acts** [30] 9:3 17:21 17:24 18:5 18:15 19:1 19:3 19:5 19:9 19:15 20:7 20:8 20:13 20:18 20:21 47:21 51:9 76:6 76:8 76:16 77:2 77:15 78:9 101:20 101:24 102:21 102:22 116:10 116:12 116:13
**Actual** [2] 52:14 65:15
**Add** [3] 6:18 68:23 93:17
**Addition** [1] 4:8 33:25
**Additional** [7] 5:12 27:3 52:6 71:14 73:17 75:2 101:13
**Address** [1] 50:17
**Addressed** [5] 44:23 50:18 69:4 93:22 111:15
**Admire** [1] 96:4
**Admitted** [1] 120:9
**Admonishes** [3] 68:14 93:10 119:20
**Adult** [1] 105:23
**Advanced** [2] 63:16 63:23
**Affect** [2] 70:24 81:13 97:12
**Affects** [1] 96:5
**Age** [7] 23:24 63:8 74:5 74:8 80:20 87:24 105:22
**Ago** [1] 98:2
**Agree** [9] 37:20 46:9 54:13 56:23 98:10 98:11 98:12 105:20 105:21
**Agree/disagree** [1] 54:13
**Agreement** [2] 3:2 3:5
**Ahead** [2] 8:6 107:10
**Aided** [1] 1:22
**Akin** [1] 49:17
**Alcohol** [1] 105:16
**Alleged** [5] 31:20 31:20 31:24 31:25 99:17
**Allow** [1] 117:5
**Allowed** [1] 106:15
**Allows** [1] 117:8
**Almost** [1] 119:13
**Alone** [1] 12:4
**Alter** [1] 88:24
**Alternatively** [2] 67:15 67:16
**Amount** [4] 14:15 14:18 14:20 34:1 34:2 62:6
**Amounts** [1] 27:10
**Analysis** [2] 67:5 91:16
**Answer** [67] 6:20 7:5 9:9 10:18 10:19 10:23 11:15 13:22 15:18 15:21 16:7 16:8 16:

**Authority** [4] 54:14
**Automatic** [4] 72:13 72:15 75:18 75:20
**Automatically** [3] 82:6 89:10 101:4
**Automobile** [2] 19:9 25:3
**Awarded** [1] 30:9
**Awesome** [1] 68:9
**Awful** [1] 109:11

**B**

**Baby** [1] 18:5
**Background** [19] 5:14 9:15 10:3 35:20 52:4 52:21 53:8 53:17 71:16 75:3 78:19 90:4 101:14 103:3 103:7 104:8 104:11 104:25 117:8
**Bad** [12] 6:15 12:8 64:2 67:2 67:18 76:25 87:20 88:17 98:5 104:4 109:23 117:6
**Bag** [2] 38:7 38:8
**Balfoort** [1] 3:3
**Ballistically** [1] 40:20
**Ballistics** [1] 61:10
**Ballpark** [1] 3:24
**Bank** [8] 9:23 9:24 9:24 37:21 37:22 38:6 38:7 38:8
**Base** [1] 41:25
**Based** [10] 11:16 27:4 27:13 27:14 41:23 59:21 61:16 70:1 71:1 71:7
**Basis** [2] 30:19 39:10
**Baylor** [1] 88:10
**Bearing** [3] 44:24 69:5 93:23
**Beaten** [1] 26:19
**Beating** [1] 19:8
**Become** [2] 29:12 114:4
**Becoming** [1] 108:25
**Begin** [4] 36:12 44:13 45:15 94:25
**Beginning** [1] 16:21
**Begins** [1] 15:11
**Behavior** [5] 51:19 53:18 56:1 57:9 62:18
**Behind** [4] 20:1 20:9 39:24 44:1
**Beliefs** [1] 96:5
**Believability** [1] 61:2
**Believes** [2] 25:2 39:11
**Benefit** [1] 64:4
**Best** [6] 4:13 23:15 23:16 70:6 81:19 81:23
**Better** [7] 28:16 46:1 55:5 83:20 89:12 92:4 95:12
**Between** [1] 3:2 18:12 19:20 28:12 56:18 56:20 80:4 106:6 106:18 106:16 115:25
**Beyond** [63] 5:24 9:1 14:10 14:18 15:17 15:19 15:22 16:2 16:9 16:23 17:1 22:5 27:5 27:8 31:17 32:1 32:19 32:22 33:2 33:4 39:7 39:11 39:15 39:19 40:5 41:2 41:22 47:16 51:8 58:12 58:12 58:13 58:16 59:7 59:11 60:7 60:9 60:10 65:10 74:18 74:21 74:23 75:15 75:17 75:19 75:22 75:25 76:13 86:20 89:13 99:19 99:21 99:23 100:5 100:5 100:6 100:21 101:18 102:18 114:4 115:19 116:7
**Big** [4] 68:8 93:16 109:11 116:3
**Bit** [9] 6:19 24:16 40:24 56:2 80:10 83:19 86:12 96:17 110:12
**Bizarre** [1] 65:22
**Blanket** [1] 50:6
**Board** [5] 8:23 29:16 29:

**Absolutely** (middle column continued)
**Answered** [16] 5:18 11:21 11:23 21:12 26:9 26:11 30:18 51:21 66:22 91:22 94:22 114:18 115:1 115:4 116:20 116:24
**Answering** [10] 5:16 47:3 65:17 66:17 67:9 72:17 101:16 102:14 107:18 114:25
**Answers** [14] 9:7 10:17 11:10 12:5 20:25 21:2 30:17 54:12 70:23 73:13 73:15 87:2 106:14 111:1
**Anticipate** [1] 9:8
**Anytime** [4] 14:1 1:16 32:17 64:15
**Anyway** [1] 59:18
**Apart** [1] 112:10
**Apartment** [1] 25:4
**Appellant** [2] 1:6 120:20
**Appellee** [1] 1:11
**Applicable** [2] 42:17 71:5
**Applied** [1] 8:3
**Applies** [1] 11:8 45:25
**Apply** [4] 27:12 42:19 42:20 95:12
**Appreciate** [3] 61:18 107:3 107:21
**Approach** [1] 63:3
**Appropriate** [20] 10:12 13:3 13:4 15:15 21:21 28:4 28:9 36:2 46:19 46:20 50:3 77:24 86:3 86:4 87:16 99:6 105:1 105:25 113:25 118:10
**Apt** [1] 111:5
**Area** [3] 38:16 53:10 64:17
**Areas** [1] 90:2
**Armed** [2] 13:24 25:14
**Armour** [1] 96:13
**Arrest** [1] 40:19
**Arrested** [2] 37:23 38:7
**Arrive** [1] 6:13
**Arrived** [1] 98:20
**Arrogant** [1] 34:20
**Ascribe** [2] 63:2 63:11
**Aspect** [3] 37:7 43:6 56:23 71:11 79:25 101:9 104:18 106:10 118:25
**Aspects** [3] 45:25 57:22 95:11
**Assaults** [1] 19:2
**Assess** [1] 97:22
**Assessing** [3] 35:23 36:14 84:3
**Assistant** [2] 2:6 3:25
**Assisting** [1] 5:14
**Assume** [5] 35:11 54:4 72:10 96:22 114:3
**Assure** [1] 81:13
**Atmosphere** [1] 62:16
**Atrocious** [1] 53:18
**Attack** [1] 32:12
**Attempt** [1] 34:20
**Attention** [1] 85:12
**Attitude** [2] 108:7
**Attorney** [3] 83:5 92:7
**Attorneys** [5] 2:6 2:10 2:22 3:23 4:1
**Authorities** [1] 29:14

19 72:18 81:7

**Bob** [1] 1:20
**Bodies** [2] 26:20 70:2
**Body** [1] 34:23
**Bombing** [1] 112:7
**Books** [1] 72:21
**Box** [2] 68:10 116:21
**Bragging** [1] 103:25
**Branch** [2] 30:5 30:6
**Branches** [1] 30:3
**Brand-new** [2] 15:11 15:13
**Breaking** [1] 19:7
**Breaks** [1] 90:2
**Breath** [1] 30:13
**Breathes** [1] 30:13
**Briefly** [2] 5:17 74:15
**Bring** [1] 16:19
**Broad** [1] 33:19
**Broader** [1] 8:5
**Broke** [2] 30:3 117:1
**Brought** [2] 48:19 62:7
**Brutal** [1] 91:3
**Building** [2] 6:9 19:8
**Bulldozers** [1] 39:24
**Bumped** [1] 16:11
**Burden** [12] 47:17 51:25 58:17 60:4 60:14 72:2 72:3 75:16 78:21 78:22 99:20 115:19
**Burdette** [2] 1:20 37:24
**Burglaries** [1] 19:7
**Burglary** [1] 76:8
**Burning** [1] 19:6
**Business** [5] 14:3 21:6 34:18 83:22 92:25

## C

**Cannot** [7] 17:8 17:14 29:3 32:22 33:3 37:11 55:3
**Capital** [81] 3:22 5:10 6:14 6:24 7:12 8:19 8:21 11:20 13:1 14:19 15:5 15:10 15:14 16:5 16:6 19:1 21:10 25:1 26:25 27:2 27:7 29:1 31:5 31:5 31:11 31:17 32:21 33:8 33:11 33:20 33:20 35:12 35:15 36:8 36:9 47:14 47:16 50:21 54:6 59:23 73:7 73:22 73:25 74:6 74:17 74:22 74:25 75:7 76:7 77:13 78:6 79:1 80:6 80:16 82:5 82:6 82:7 85:9 86:11 88:16 89:9 90:15 90:22 91:17 92:8 95:19 99:15 101:5 101:11 102:3 102:7 109:6 109:10 109:22 111:4 111:16 111:24 112:14 112:19 114:2 114:5
**Capsulizes** [1] 81:19
**Car** [2] 37:22 119:3
**Card** [1] 20:4
**Care** [2] 39:2 39:4
**Cares** [2] 39:4 39:6
**Carmouche** [1] 49:1
**Carolyn** [1] 3:3
**Carved** [1] 33:14
**Case** [132] 3:21 5:9 6:2 8:1 8:8 8:13 8:16 8:17 9:6 10:7 11:8 11:12 11:13 11:21 12:6 13:3 13:5 13:16 15:12 16:19 21:1 21:20 22:20 22:21 22:22 23:3 23:18 23:23 24:8 24:15 24:24 25:10 25:22 26:25 27:5 27:14 27:15 28:1 28:1 28:2 28:3 28:15 28:19 28:25 30:19 31:15 32:20 32:24 33:2 33:6 34:22 35:1 35:8 35:12 35:13 36:1 36:6 36:8 36:16 36:21 36:22 37:13 39:2 39:2 39:7 40:6 41:1 41:20 43:8 44:5 44:25 45:5 45:23 45:25 46:18 46:19 47:15 47:

15 48:12 48:15 48:21 50:5 52:21 57:17 58:11 59:4 60:10 64:3 65:5 65:15 66:11 66:17 69:6 69:20 70:22 71:5 73:7 80:11 81:22 82:3 82:13 83:12 85:9 87:1 90:14 91:7 93:24 94:4 95:9 95:12 95:20 95:22 96:6 97:13 97:18 97:18 97:22 98:22 99:23 100:25 101:15 104:10 105:25 109:1 114:6 117:8 117:10 117:22 118:5 118:20 119:9 119:10
**Cases** [18] 11:20 11:23 13:1 22:16 46:23 49:22 49:24 61:8 66:12 72:19 76:24 77:3 83:13 99:5 101:3 104:10 104:15 106:21
**Catch** [1] 63:6
**Catching** [1] 50:15
**Category** [3] 19:11 19:14 54:2
**Caught** [2] 48:19 89:8
**Caused** [2] 91:2 98:9
**Causes** [3] 66:7 69:18 98:7
**Causing** [3] 32:17 66:13 91:13
**Central** [1] 44:15
**Certain** [17] 17:16 18:20 19:7 45:15 46:23 59:8 59:9 61:8 63:8 72:9 72:19 74:19 83:24 95:11 100:2 104:3 117:17
**Certainly** [6] 18:4 19:1 43:7 66:23 70:8 109:21
**Certainty** [5] 17:15 18:12 76:3 100:6 115:25
**Certify** [2] 120:4 120:8 120:11
**Chairs** [2] 67:20 83:18
**Chambers** [1] 120:7
**Chance** [4] 7:6 21:23 95:16 115:24
**Change** [13] 11:17 11:18 48:5 57:8 78:3 80:12 88:20 88:23 88:25 89:3 89:7 89:15 105:5
**Changed** [3] 56:2 86:23 98:16
**Changes** [3] 5:22 11:19 14:22
**Changing** [1] 63:10
**Character** [11] 9:15 10:3 24:21 35:19 52:4 52:21 71:16 75:3 78:19 90:4 101:13
**Characteristics** [1] 51:13
**Charge** [9] 4:23 4:23 4:24 13:13 13:14 33:7 42:18 71:4 71:24
**Charged** [7] 3:22 14:25 59:23 67:14 92:8 100:8 102:7
**Charles** [6] 1:5 3:21 48:25 117:15 117:19 120:20
**Charleston** [1] 44:16
**Checked** [1] 116:21
**Child** [3] 62:7 63:11 63:12
**Childhood** [1] 54:25
**Children** [9] 50:8 54:15 54:21 62:10 62:11 62:23 62:24 62:25 63:5
**Children's** [1] 62:13
**Choice** [5] 10:20 10:24 53:20 56:14 57:3
**Choices** [2] 55:25 56:13
**Choked** [1] 103:23
**Choker** [1] 52:15
**Choose** [1] 53:19
**Chose** [2] 18:6 67:13
**Chosen** [5] 67:22 96:1 109:4 110:9 110:13
**Chronological** [1] 63:8
**Church** [2] 108:4 108:7

**Cigarettes** [1] 63:7
**Circled** [1] 84:5
**Circling** [1] 84:7
**Circumstance** [10] 10:10 12:6 22:17 36:20 42:1 52:17 54:5 66:25 67:17 90:1
**Circumstances** [40] 6:5 9:13 10:10 24:22 24:22 28:3 28:11 34:8 36:6 38:13 38:21 38:23 40:9 42:15 48:1 52:2 52:17 61:9 65:4 65:14 65:17 65:24 72:17 74:10 74:12 77:18 78:16 81:25 82:2 89:7 90:1 90:3 90:13 90:16 91:5 104:24 104:25 105:9 118:22 118:23
**Circumstantial** [16] 38:18 38:20 39:3 39:18 40:25 41:3 41:6 41:7 41:10 41:11 41:18 41:21 41:21 41:24 61:1 61:16
**Citizen** [1] 109:3
**Citizens** [1] 20:22
**City** [2] 34:24 112:4
**Civics** [1] 30:2
**Claimed** [1] 31:16
**Claire** [5] 2:4 4:2 45:22 70:21 95:8
**Clarifying** [1] 84:10
**Class** [1] 30:2
**Classes** [2] 49:12 117:17
**Classic** [1] 112:5
**Clear** [1] 85:6
**Close** [4] 59:2 84:24 85:2 85:12
**Closely** [1] 112:9
**Cloud** [1] 118:8
**Club** [1] 19:8
**Coconspirator** [3] 37:15 38:3 38:11
**Coconspirator's** [1] 37:16
**Colored** [1] 119:10
**Combat** [1] 25:13
**Comfort** [1] 8:5
**Comfortable** [15] 19:19 59:22 60:2 60:14 60:22 61:15 67:6 68:21 84:17 84:22 86:13 86:18 91:17 113:21 115:10
**Coming** [1] 85:7
**Comment** [2] 83:16 85:4
**Commission** [7] 31:15 37:19 38:3 38:10 52:12 61:12 103:14
**Commit** [25] 9:2 17:21 17:24 18:4 18:15 18:18 18:20 19:13 25:20 28:17 37:10 47:1 47:20 51:9 76:6 76:16 77:2 77:14 78:9 88:14 90:25 101:19 101:23 102:20 105:16
**Commits** [4] 33:22 34:12 65:19 74:6
**Committed** [23] 6:3 8:11 24:25 27:7 31:22 31:23 35:6 35:7 35:7 37:12 38:21 40:6 48:18 49:24 51:2 66:1 71:19 75:9 88:22 102:12 103:21 105:2 111:19
**Committing** [5] 9:20 23:14 50:21 65:11 99:16
**Common** [1] 73:23
**Communicate** [2] 37:6 92:11
**Communications** [1] 88:1
**Communities** [1] 19:21 19:22
**Community** [2] 19:20 109:15.
**Companies** [1] 34:25
**Company** [2] 96:13 96:25

**Compaq** [1] 107:25
**Comparative** [1] 23:21
**Comparatively** [1] 9:21
**Comparison** [1] 17:6
**Completely** [4] 29:18 29:23 36:24 55:6
**Computer** [1] 1:22
**Conceivable** [1] 30:10
**Conceivably** [1] 110:2
**Concentrate** [1] 86:7
**Concept** [1] 37:6
**Concern** [3] 5:6 98:7 98:9
**Concerned** [2] 3:4 86:24
**Concerning** [1] 14:24
**Concluded** [1] 91:16
**Conclusion** [9] 11:20 13:1 13:10 13:12 15:5 26:18 29:25 30:11 30:15
**Conduct** [20] 19:11 21:5 23:12 24:20 28:10 31:12 31:22 34:15 38:22 56:17 56:21 56:23 66:13 88:12 88:13 105:17 105:20 105:24 106:7 106:18
**Confinement** [4] 33:23 33:25 35:24 36:15
**Congregation** [1] 108:9
**Connect** [3] 37:18 38:3 38:9
**Connors** [5] 2:4 4:2 45:22 70:21 95:8
**Connors'** [1] 3:7
**Conservative** [1] 83:2
**Consider** [20] 19:18 28:10 35:23 36:4 36:13 36:13 36:19 43:5 57:22 58:22 65:1 80:21 81:6 84:5 84:8 84:15 85:24 89:25 90:3 118:4
**Considerable** [1] 62:6
**Consideration** [6] 9:12 29:13 30:8 52:1 81:22 84:15
**Considered** [7] 29:4 53:6 80:8 84:3 85:3 113:10 116:18
**Consistently** [1] 21:17
**Conspirator** [1] 37:13
**Conspire** [1] 37:10
**Constitute** [6] 9:3 19:16 20:21 77:1 102:23 116:12
**Contact** [1] 19:25
**Contain** [1] 13:14
**Contained** [1] 93:1
**Contains** [1] 120:4
**Context** [3] 17:18 86:11 86:17
**Continue** [1] 51:18
**Continues** [1] 16:4
**Continuing** [24] 9:4 19:16 20:22 20:23 47:20 51:9 56:9 65:13 76:16 76:17 77:1 77:5 77:14 77:15 76:8 79:2 101:20 101:24 102:23 104:6 104:12 104:16 104:21 116:12
**Control** [1] 30:1
**Conversation** [4] 16:12 22:8 29:8 45:8
**Convert** [1] 24:18
**Convicted** [11] 15:14 16:6 37:11 37:15 37:25 39:10 58:16 65:16 71:22 80:6 82:7
**Conviction** [1] 6:9
**Convictions** [1] 76:20
**Convince** [3] 41:1 78:21 115:20
**Corners** [1] 43:18
**Correct** [3] 3:6 49:6 120:5
**Correctly** [2] 85:24 120:9
**Corroborated** [1] 37:16
**Corroborates** [1] 38:10

**Cost** [1] 120:11

**Counsel** [1] 120:5

**Counseling** [1] 56:1

**County** [12] 1:8 1:21 20:
22 34:24 58:16 59:8 74:19
100:2 120:2 120:4 120:12
120:18

**Couple** [7] 4:2 4:7 13:8
28:23 55:22 62:2 109:13

**Course** [19] 4:6 7:8 17:24
31:16 31:22 33:5 38:22 38:
23 59:10 61:4 74:20 99:17
100:4 100:15 102:6 111:23
111:25 112:6 112:23

**Court** [35] 1:3 1:5 3:1 3:
7 3:10 3:12 3:14 3:19 26:3
4:9 42:1 44:10 45:18 59:5
61:19 68:14 68:18 70:16 72:
11 72:11 82:16 88:10 93:8
93:10 93:14 95:3 107:5 107:
8 113:20 119:20 120:4 120:4
120:7 120:17 120:17

**Court's** [7] 4:22 4:23 4:
24 13:13 13:14 42:18 81:3

**Courthouse** [1] 55:10

**Courtroom** [1] 12:20

**Coworkers** [1] 19:25

**Credibility** [5] 42:13 42:
16 42:18 71:6 85:17

**Creeps** [1] 15:12

**Crime** [69] 6:2 6:7 6:9 9:
20 12:14 18:18 18:21 18:21
19:14 24:24 32:10 33:13 33:
14 33:14 36:4 37:11 37:11
38:4 38:10 38:19 38:20 38:
25 41:14 47:11 51:2 52:12
52:13 61:3 61:12 65:11 66:1
71:19 71:21 72:12 75:7 75:9
75:10 76:24 76:25 77:24 86:
1 88:22 90:15 90:17 91:1 91:
5 99:13 99:16 101:2 102:13
103:11 103:12 103:14 103:17
103:18 103:20 103:21 103:24
104:3 104:24 105:2 105:16
109:16 111:19 112:17 114:6
114:11 116:10 117:6

**Crimes** [3] 48:19 49:24 88:
15

**Criminal** [35] 4:6 9:3 17:
21 18:4 18:15 18:22 18:23
19:1 19:3 19:5 19:9 19:15
20:7 20:8 20:13 20:18 20:21
59:4 71:16 75:4 76:6 76:8
77:15 81:22 83:5 100:25 101:
14 101:20 101:23 102:21 102:
22 106:18 112:1 112:11 116:
13

**Criminally** [1] 105:17

**CSR** [1] 120:16

**Culpability** [6] 9:16 9:
18 10:4 52:11 52:22 90:5

**Curious** [1] 85:3

**Cut** [3] 18:5 42:5 63:25

**D**

**Dance** [1] 63:18

**Danger** [4] 27:9 28:8 115:
21 117:7

**Darn** [1] 116:3

**Date** [2] 100:2 120:17

**Daughter** [3] 87:23 88:6
96:24

**Daughter's** [1] 62:14

**Daughters** [1] 62:15

**Days** [2] 69:14 93:1

**Dead** [3] 26:20 34:23 39:22

**Deadly** [1] 32:11

**Deal** [6] 6:23 18:8 37:24
46:18 53:9 53:11

**Dealing** [2] 53:8 91:10

**Dealings** [1] 55:23

**Deals** [1] 53:10

**Dealt** [3] 53:25 54:1 55:17

**Death** [102] 10:12 10:14
10:21 11:7 11:14 11:24 16:7
16:12 16:19 21:18 21:22 21:
24 22:23 23:4 23:12 23:19
24:18 25:7 25:19 25:23 26:3
26:16 27:11 28:5 28:9 28:22
28:22 33:21 40:22 46:3 46:
23 48:3 48:5 49:20 50:3 51:
22 52:15 52:19 56:7 58:15
60:6 60:18 64:10 65:1 65:8
65:23 66:7 66:14 72:6 72:8
72:13 72:19 73:22 74:3 77:
10 77:20 77:25 78:4 78:10
78:17 79:6 79:18 79:21 79:
22 80:5 80:21 81:1 82:1 82:
6 82:8 84:4 85:3 85:6 86:3
87:8 89:14 91:2 91:6 91:14
91:23 95:21 98:25 99:5 101:
4 104:23 105:2 105:5 105:25
106:20 108:8 109:8 111:7
111:12 112:13 112:22 113:24
114:8 114:11 114:23 115:10
116:2 116:19

**Deaths** [3] 112:8 112:13
112:23

**Debate** [1] 87:7

**December** [1] 63:15

**Decide** [11] 13:20 27:22
51:23 53:17 65:7 66:3 66:10
66:12 77:11 112:16 113:5

**Deciding** [4] 5:6 56:6 91:
22 114:6

**Decision** [33] 35:8 35:9
41:25 47:7 57:21 57:23 59:
20 59:22 60:24 61:16 67:12
68:1 68:6 71:7 73:18 74:12
76:19 77:7 79:14 79:23 79:
25 81:14 82:10 83:18 90:9
94:14 98:20 101:22 109:11
109:14 109:18 109:25 112:20

**Decisions** [11] 23:25 27:
16 29:24 43:12 43:23 47:2
69:25 70:1 72:25 73:4 94:15

**Declare** [1] 7:20

**Deep** [1] 113:16

**Defend** [1] 32:11

**Defendant** [88] 2:22 3:13
3:16 5:7 5:8 5:8 5:9 5:15 6:
11 7:4 7:12 8:9 8:20 9:2 9:
5 9:15 10:15 10:21 10:25 11:
6 11:17 12:1 14:17 15:6 16:1
17:20 17:22 18:14 18:14 18:
18 18:20 19:12 21:9 21:18
22:8 22:12 23:15 23:19 23:
24 24:25 25:2 27:2 28:2 28:
10 28:12 28:25 29:3 29:10
29:12 29:14 30:11 30:15 32:
21 32:25 35:7 35:15 35:16
35:20 36:8 37:18 38:25 40:6
40:11 40:15 40:17 40:19 40:
20 41:23 47:5 47:17 48:8 59:
9 65:2 66:13 73:2 73:7 74:
16 74:18 74:22 75:6 76:6 77:
9 90:5 98:22 101:19 102:20
110:14 111:6

**Defendant's** [13] 5:24 6:
16 8:12 8:15 9:16 15:4 35:
24 36:14 52:4 71:16 75:3 90:
4 101:13

**Defendants** [6] 5:21 9:20
12:9 13:6 34:6 34:16

**Defense** [11] 32:7 32:9 66:
9 67:7 83:5 91:15 92:7 99:
12 118:1 118:2 119:1

**Define** [3] 13:21 14:3 14:6

**Defined** [3] 13:17 17:4 19:
18 23:6 23:7 85:5

**Definition** [1] 14:12

**Definitions** [2] 42:7 71:4

**Degree** [2] 58:3 58:5

**DeLeon** [1] 3:4

**Deliberate** [3] 12:23 35:
14 35:22

**Deliberating** [1] 87:5

**Deliberations** [6] 4:25
12:23 21:7 36:12 87:15 98:16

**Denied** [1] 30:12

**Department** [3] 49:11 49:
15 49:16

**Describe** [1] 84:8

**Desert** [1] 25:11

**Deserve** [1] 30:18

**Deserved** [1] 36:21

**Deserves** [2] 114:11 114:
15

**Desire** [1] 89:3

**Desktop** [1] 41:16

**Detail** [1] 13:9

**Detailed** [1] 4:17

**Determination** [2] 72:16
80:17

**Determine** [13] 21:19 34:
22 35:16 42:12 42:16 47:25
51:10 52:16 74:16 77:8 77:
16 104:22 115:9

**Determined** [1] 40:20

**Determines** [2] 35:14 89:
13

**Determining** [5] 42:18
103:1 106:13 116:19 118:18

**Deterrence** [1] 81:23

**Dictate** [5] 30:16 36:23
45:11 70:3 94:19

**Dictates** [2] 5:18 43:21

**Difference** [13] 13:6 24:
15 24:17 36:11 39:16 39:18
44:6 56:18 56:20 80:4 106:5
106:8 106:16

**Different** [34] 11:2 12:1
12:5 12:7 12:7 12:10 12:19
12:24 18:9 19:21 27:20 27:
24 33:20 34:6 34:7 34:7 34:
12 35:1 43:20 50:5 58:25 63:
12 63:13 71:2 83:12 83:17
90:7 94:21 95:17 98:6 98:18
99:10 112:10 113:4

**Differently** [5] 12:25 24:
7 34:16 34:19 46:6

**Difficult** [1] 42:4

**Difficulty** [1] 40:4

**Dig** [1] 113:16

**Dire** [14] 1:15 3:18 44:9
45:19 61:21 68:17 70:18 72:
10 79:14 82:19 93:13 95:5
95:16 107:11

**Direct** [7] 38:17 38:18 39:
3 40:8 40:24 42:1 61:1

**Direction** [1] 85:6

**Directs** [1] 90:6

**Disabilities** [2] 56:16
71:17

**Disagree** [7] 7:16 46:9
54:16 54:17 54:18 55:1 105:
20

**Disagreement** [3] 38:15
43:4 94:9

**Discomfort** [1] 69:18

**Discretion** [3] 10:21 10:
25 64:11

**Discussed** [2] 69:13 85:1

**Discussing** [1] 62:9

**Disregard** [1] 29:23

**Disservice** [1] 82:24

**Distinction** [3] 19:19 19:
20 69:23

**District** [6] 1:5 1:11 2:
6 3:25 120:3 120:17

**Done** [22] 6:3 6:4 6:4 6:16
7:21 31:14 32:14 32:24 33:5
49:25 51:13 51:14 65:3 65:3
70:13 100:14 100:15 100:15
100:17 104:1 106:18 116:22

**Doubt** [72] 5:25 9:1 14:10
14:12 14:19 14:23 15:4 15:
17 15:20 15:23 16:3 16:10
16:24 17:2 22:5 27:5 27:8
31:18 32:1 32:20 32:23 33:3

**Department** [3] 49:11 49:

**Door** [3] 39:18 39:12 39:15 39:19
40:5 41:2 41:22 47:16 50:16
51:8 58:6 58:7 58:12 58:12
58:13 58:17 58:22 58:25 59:
8 59:12 60:7 60:9 60:11 60:
13 65:10 74:18 74:21 74:23
75:15 75:17 75:19 75:23 75:
25 76:14 85:16 99:4 99:19
99:21 99:23 99:25 100:5 100:
5 100:7 100:22 101:18 102:
18 114:4 115:20 116:8

**Doubts** [2] 47:6 73:3

**Down** [25] 13:24 25:3 26:19
26:20 34:21 35:4 39:9 39:12
39:20 39:22 39:25 41:4 42:5
55:10 55:11 56:8 57:10 70:6
82:24 83:11 85:7 90:2 113:
16 119:2 119:15

**Dramatically** [1] 86:23

**Draw** [2] 43:19 109:25

**Driven** [1] 36:25

**Driver** [2] 37:21 52:13

**Driving** [2] 25:2 119:2

**Drug** [1] 55:23

**Drugs** [2] 105:15 105:19

**Drunk** [1] 105:18

**Drunker** [1] 40:1

**Drunks** [1] 39:23

**Duly** [2] 44:8 68:16 93:12

**During** [27] 4:6 4:25 7:8
7:10 29:15 31:14 31:16 31:
19 31:22 31:24 32:24 33:5
33:12 33:15 38:21 45:5 59:9
74:20 79:14 94:4 98:16 99:
17 100:4 100:15 102:6 103:
13 103:20

**Duty** [3] 57:11 57:14 97:16

**E**

**Early** [1] 53:4

**Easier** [1] 8:24

**Easy** [1] 115:15

**Ed** [5] 49:15 49:17 49:18
53:9 54:3

**Edge** [2] 53:19 54:8

**Effect** [1] 87:2

**Effects** [1] 81:6

**Eight** [1] 80:15

**Eighth** [1] 49:10

**Either** [12] 8:13 8:16 9:8
10:17 21:24 29:17 32:23 36:
24 61:14 63:8 83:22 87:17

**Element** [1] 86:6

**Elements** [4] 59:7 100:1
100:13 100:21

**Eleven** [3] 7:19 68:2 83:17

**Eleventh** [1] 49:14

**Eligible** [3] 29:12 30:7
80:8

**Emotional** [3] 53:11 53:
23 54:3

**Emotions** [1] 67:3

**Emphasis** [3] 62:6 75:5
84:7

**Encourage** [1] 19:18

**End** [7] 20:10 50:17 64:23
87:8 92:1 92:2 93:7

**Endanger** [1] 110:18

**Enforce** [2] 7:18 94:12

**English** [3] 49:11 49:12
49:14

**Enjoy** [1] 108:14

**Enjoying** [1] 108:2

**Entirety** [1] 4:25

**Entitled** [1] 11:10

**Environment** [2] 50:9 53:
13

**Envision** [1] 47:13

**Episode** [1] 67:16

Equal [1] 90:12
Equally [1] 90:10
Erased [1] 15:7
Escape [1] 20:10
Especially [1] 86:8
Establishes [2] 5:24 15:3
Evaluate [1] 67:19
Evaluated [1] 30:20
Evaluating [2] 90:18 91:20
Evaluation [1] 91:7
Evaluations [3] 29:14 29:16 29:17
EVELYN [1] 93:11
Event [1] 66:6
Events [1] 118:20
Evidence [144] 5:23 6:2 7:3 7:12 8:1 9:1 9:10 9:12 10:7 10:16 11:8 11:16 13:11 13:12 14:10 14:15 14:18 14:20 14:22 15:8 15:16 15:19 16:9 16:23 17:1 22:5 22:16 22:19 22:20 22:22 23:2 24:3 24:6 25:10 25:21 27:1 27:4 27:4 28:19 35:1 35:5 35:13 35:21 36:1 36:11 36:16 36:32 37:1 37:13 37:17 38:2 38:8 38:17 38:17 38:18 38:18 38:20 39:2 39:5 39:6 40:24 41:6 41:7 41:10 41:20 41:20 41:22 41:24 43:9 43:16 45:1 45:14 47:8 47:10 47:12 47:25 48:3 50:25 51:17 52:1 52:6 52:20 52:24 53:16 57:19 59:14 59:21 60:22 60:24 61:1 61:1 61:5 61:10 61:11 64:16 67:8 67:23 68:4 68:6 70:2 71:2 71:6 71:8 71:9 71:10 71:15 71:15 71:23 73:5 73:17 73:18 75:2 75:13 75:15 75:25 76:13 77:6 77:7 78:15 78:20 78:22 78:24 79:3 81:1 82:10 84:2 89:20 91:11 91:21 101:13 101:18 101:21 102:18 103:21 104:16 105:3 105:12 112:8 112:16 113:10 115:12 115:6 116:18 117:4 120:5
Evolved [2] 90:15 91:5
Exact [1] 24:6
Exactly [15] 10:22 11:1 12:21 12:21 12:22 24:3 27:12 31:12 34:12 34:15 40:9 42:11 51:20 66:21 78:10
EXAMINATION [11] 1:15 3:18 44:9 45:19 61:21 68:17 70:18 82:19 93:13 95:5 107:11
Example [15] 9:19 15:25 20:3 23:20 24:23 34:11 37:20 38:5 39:1 39:20 41:8 62:1 62:22 63:14 112:5
Examples [1] 19:10
Except [1] 83:10
Exclusively [2] 37:12 37:25
Excusable [1] 23:12
Excuse [8] 7:18 31:7 31:9 31:10 31:14 32:6 39:1 93:9
Excused [3] 3:5 3:15 66:14
Execute [2] 66:4 90:25
Execution [3] 47:4 48:7 73:2
Executive [1] 30:5
Exhibits [1] 120:9
Exist [1] 45:3
Existence [7] 17:20 18:17 19:12 28:11 31:18 32:1 88:19
Exists [3] 30:19 34:23 38:13
Expect [2] 13:23 66:23
Experience [3] 92:21 92:

24 96:17
Experienced [2] 92:10
Experiences [1] 76:21
Expiration [1] 120:17
Explain [1] 85:25
Explained [1] 86:9
Explanation [1] 117:3
Explanations [1] 107:17
Explore [2] 7:7 110:25
Express [1] 83:4
Expresses [1] 118:14
Extra [2] 88:9 93:6
Eye [2] 101:2 101:3
Eyewitness [3] 40:7 61:3 61:4
Eyewitness' [1] 39:17
Eyewitnesses [3] 39:13 39:14 61:9

F

Facing [1] 67:18
Fact [14] 5:4 5:17 6:22 7:24 8:7 13:10 45:10 66:11 81:4 81:14 83:6 84:18 89:7 99:11
Factor [7] 24:1 53:6 54:7 80:17 91:6 106:13 118:10
Factors [2] 28:13 90:18
Facts [17] 12:6 13:7 27:14 27:15 52:20 66:16 72:16 74:10 74:11 76:24 76:25 82:2 101:15 103:11 103:12 104:2 104:10
Fail [4] 16:3 50:8 50:8 53:4
Fair [3] 28:20 80:2 116:23
Fairly [2] 85:5 90:12
Fairness [1] 86:2
Faith [2] 54:23 57:20
Fall [3] 46:17 54:2 117:16
Falls [1] 39:22
Families [2] 50:8 62:10
Family [10] 14:5 45:4 52:25 53:1 62:7 75:4 76:20 78:19 108:22 110:23
Fannin [1] 2:7
Far [8] 11:5 26:1 42:7 44:20 77:22 85:3 93:19 110:25
Fate [1] 87:5
Favor [2] 46:22 72:18
Feedback [1] 55:19
Feelings [7] 70:23 83:8 98:25 99:1 107:20 110:16 110:19
Felonious [1] 31:15
Felony [8] 31:24 31:24 31:25 32:3 33:15 33:16 97:15 97:18
Felt [5] 85:20 86:3 89:19 113:8 119:1
Few [1] 80:13
Fiction [1] 85:16
Fifteen [1] 92:5
Fifty-year-old [2] 12:3 34:13
Figure [2] 22:22 41:15
Figures [1] 64:5
Filled [1] 95:15
Final [1] 67:4 91:16
Finally [1] 89:7 89:17
Fine [8] 18:9 25:12 34:1 44:12 59:25 60:1 81:25 92:16
Fingerprint [5] 41:8 41:9 41:11 41:12 61:11
Fingerprints [1] 38:8
Finished [1] 42:2
Fire [4] 25:4 40:12 40:12

40:25
Fired [3] 40:11 40:14 40:21
First [52] 5:5 5:20 5:25 6:18 9:14 10:2 10:5 10:8 10:18 11:3 11:3 13:11 14:8 14:14 14:15 14:15:1 15:5 15:17 15:25 16:7 16:8 16:16 16:16 17:9 20:24 21:8 22:2 22:25 26:5 27:1 27:6 27:17 27:20 29:12 37:3 42:2 44:2 44:6 49:9 56:8 57:13 68:16 74:15 79:9 93:12 96:12 98:11 98:13 101:17 105:5 111:2
Fist [1] 76:10
Fit [1] 9:25
Fits [1] 34:4
Five [9] 30:25 33:24 34:3 36:15 36:19 39:13 70:9 80:15 108:1
Fix [1] 24:12
Flip [2] 36:7 67:2
Floor [1] 97:5
FM [1] 2:19
Focus [5] 6:1 6:2 6:9 19:24 65:2
Foggiest [1] 29:21
Folks [5] 13:23 23:20 25:15 26:21 70:7
Follow [9] 7:16 7:17 8:24 29:22 43:2 62:2 69:19 94:12 95:9
Followed [1] 55:16
Following [3] 1:18 70:3 94:22
Follows [3] 44:8 68:16 93:12
Football [1] 88:9
Forces [1] 25:14
Foregoing [1] 120:4
Foreman [2] 98:17 113:12
Forever [2] 24:6 81:9
Forth [1] 39:24
Forty [20] 29:5 29:5 29:15 29:25 30:11 30:16 30:22 80:5 80:19 80:20 80:24 81:2 81:7 81:15 81:15 86:10 86:17 86:18 109:9 118:9
Four [12] 12:20 12:24 80:15 98:3
Frame [5] 44:7 45:6 69:13 69:14 94:4
Frank [1] 85:11
Free [5] 8:23 20:7 20:8 20:12 20:13
Freeway [1] 2:14
Friday [9] 4:4 4:20 5:17 22:8 44:17 44:18 68:23 93:16 95:17
Friends [3] 14:5 19:24 55:25
Front [4] 7:23 50:17 58:20 63:1
Full-time [1] 96:21
Fully [1] 87:1
Fun [2] 88:4 92:24
Future [21] 17:21 17:24 18:19 18:21 19:13 27:9 27:23 20:8 44:4 47:21 51:9 76:16 77:2 78:9 88:13 103:2 109:24 115:9 115:11 115:14 115:21

G

Game [1] 8:3
Gang [1] 55:21
Gap [4] 58:23 58:25 59:1 59:1
Gather [1] 41:24
General [3] 4:5 19:11 19:14

Gentleman [2] 48:18 85:4
Geographically [1] 112:10
Getaway [2] 37:21 52:13
Gibson [1] 48:25
Girl [2] 23:22 34:11
Girls [1] 12:2
Given [12] 4:22 8:15 24:8 27:14 27:15 42:7 48:4 59:21 72:11 80:7 87:11 88:25
Glasses [2] 117:1 117:1
Glenville [1] 44:14
Goats [1] 40:1
God [3] 54:22 62:15 108:4
Gosh [1] 112:8
Government [2] 30:3 30:3
Governor [2] 29:20 29:21
Grade [5] 49:10 49:10 49:12 49:13 49:14
Grand [1] 9:25
Great [2] 17:14 41:9
Greater [2] 33:14 33:14
Grew [2] 75:4 78:19
Grossly [1] 17:22 18:2
Ground [2] 39:22 40:15
Group [4] 4:5 4:11 24:14 93:16
Groups [2] 12:24 117:17
Grow [1] 62:12
Growing [1] 63:6
Grown [1] 96:22
Guard [2] 97:5 97:11
Guess [13] 4:13 8:6 36:3 49:3 52:1 61:24 67:12 70:6 78:11 86:1 95:17 95:23 110:25
Guidance [1] 50:10
Guided [1] 71:10
Guilt [10] 5:24 6:1 7:10 14:24 15:4 16:2 26:5 41:2 71:3 79:19
Guilt/innocence [6] 52:3 52:7 71:20 75:20 77:6 79:16
Guilty [93] 5:7 5:8 5:9 5:21 5:22 5:23 7:4 7:12 8:9 8:12 8:16 8:20 12:14 14:17 15:6 16:1 16:4 16:20 21:9 23:1 24:24:25 27:2 27:7 27:17 27:17 27:20 29:1 32:21 33:1 33:8 33:9 33:10 33:12 33:17 34:22 35:15 35:17 36:8 39:12 41:5 41:23 47:17 50:20 51:2 52:9 59:23 65:10 66:15 71:19 73:7 73:22 74:17 74:22 74:24 74:25 75:7 75:11 75:21 75:23 77:3 77:13 78:6 79:1 89:9 90:15 91:17 97:23 98:14 98:18 100:8 101:5 101:11 102:3 102:7 102:17 102:9 102:13 102:20 103:11 104:21 107:8 109:6 109:10 109:16 109:22 110:20 110:20 111:3 113:9 113:11 113:15 114:6 118:3
Gun [8] 39:22 40:11 40:12 40:15 40:18 40:20 40:25 41:17
Gun's [1] 40:19
Gunshot [2] 40:11 40:12
Gunshots [1] 40:13
Guy [7] 37:20 38:6 39:21 80:19 83:2 83:2 87:11
Guys [1] 14:4 88:7

H

Half [7] 9:14 10:2 10:5 10:8 16:22 18:6 22:25
Halfway [1] 107:9
Hand [3] 17:14 18:2 40:16 120:13

**Hands** [1] 40:18

**Hanging** [1] 118:8

**Hard** [4] 50:6 68:7 76:10 115:16

**Harris** [12] 1:8 1:21 20: 22 34:24 58:16 59:8 74:19 100:2 120:2 120:4 120:12 120:18

**Headway** [1] 4:12

**Health** [3] 45:4 69:11 94:2

**Hear** [25] 6:14 6:17 12:13 35:18 41:4 49:24 52:6 52:24 59:4 59:17 61:14 71:14 71: 15 71:23 75:2 75:13 78:24 82:10 83:9 83:16 84:25 86: 25 101:12 103:15 115:12

**Heard** [31] 1:19 6:10 6:18 7:3 7:11 9:14 11:19 24:6 26: 25 27:3 28:19 30:24 35:5 35: 12 35:25 36:16 40:12 41:19 48:11 48:14 52:3 52:5 55:16 55:20 71:5 74:11 77:22 84: 19 87:10 91:11 105:12

**Hearing** [4] 24:2 71:9 76: 12 84:21

**Heart** [1] 62:15

**Heated** [1] 87:7

**Held** [12] 1:21 53:24 56:17 56:21 56:22 89:8 89:16 105: 19 105:23 106:6 106:9 106:17

**Help** [8] 50:14 50:15 51:4 53:2 65:17 65:23 67:8 114:20

**Helped** [2] 49:22 56:1

**Helpful** [4] 76:18 91:21 101:22 103:1

**Helping** [1] 6:19

**Hereby** [1] 120:4

**Heroism** [1] 25:6

**Herself** [1] 64:2

**Hi** [2] 61:23 82:21

**High** [2] 105:15 105:18

**Higher** [1] 60:4

**Hill** [11] 2:12 3:9 3:24 8: 10 61:20 61:22 82:17 82:18 82:20 82:21 88:12

**Hisself** [1] 97:6

**History** [5] 49:13 71:16 75:4 88:16 101:14

**Hitting** [1] 76:9

**Hold** [2] 60:3 62:17

**Holding** [1] 89:10

**Home** [5] 9:23 14:5 74:24 96:9 96:18

**Honest** [1] 57:20

**Honestly** [3] 42:3 43:1 85:12

**Honor** [6] 3:11 3:13 49:12 70:17 95:4 113:19

**Honorable** [1] 1:20

**Hope** [4] 20:16 88:23 110:8 110:13

**Hopefully** [1] 86:21

**Horrible** [3] 73:25 109: 16 112:7

**Horrific** [3] 65:20 66:1 91:1

**Hour** [2] 29:6 29:6

**House** [4] 25:6 96:13 96: 14 96:22

**Houston** [6] 1:21 2:8 2:15 2:20 34:24 120:19

**Huge** [4] 58:23 58:25 59:1 59:1

**Human** [3] 31:6 31:13 32:5

**Hundred** [3] 19:10 40:17 100:6

**Hung** [1] 55:24

**Huntsville** [2] 97:8 108: 16

**Husband** [1] 107:22

**Hypothetical** [3] 30:11 30:14 40:4

**Hypothetically** [1] 47:14

## I

**Idea** [3] 29:10 38:11 41:6

**Ideas** [1] 7:7

**Identifiers** [1] 41:9

**Ifs** [1] 8:4

**Imaginable** [1] 88:22

**Imaginary** [4] 24:24 33:2 35:24 36:14

**Imagine** [1] 87:13

**Important** [18] 54:15 54: 19 54:20 54:21 56:6 65:6 65: 14 66:17 81:21 83:12 90:8 90:10 90:17 91:6 100:24 108: 5 109:14 118:17

**Impose** [2] 5:19 34:1

**Imposed** [13] 11:22 11:24 21:25 22:1 25:23 26:4 26:8 26:14 26:16 29:3 31:3 65:2 91:23

**Imposition** [1] 64:10

**Imprisonment** [3] 81:25 85:24 86:7

**Incarcerated** [1] 88:18

**Incarceration** [1] 109:9

**Included** [1] 120:6

**Including** [4] 9:12 9:14 52:2 105:24

**Independent** [6] 37:17 38: 2 38:9 43:24 94:15 114:15

**Indicate** [1] 77:4 104:5 104:11 104:12

**Indicated** [9] 48:10 49:3 85:21 86:16 96:8 97:15 97: 21 108:11 113:8

**Indicates** [1] 46:17

**Indication** [1] 44:1

**Indicator** [1] 88:13

**Indictment** [3] 59:24 100: 8 102:8

**Indifferent** [1] 98:5

**Individual** [8] 41:9 52:8 60:5 61:15 75:10 79:13 79: 23 79:25

**Individual's** [1] 57:3

**Individualized** [1] 117: 13

**Individuals** [1] 67:17

**Influence** [4] 62:12 66: 22 66:24 94:22

**Information** [18] 5:14 6: 12 13:25 27:20 39:16 42:6 43:14 43:19 62:5 71:18 71: 20 75:8 76:18 81:3 87:20 87: 21 92:14 102:25

**Informed** [2] 6:13 87:1

**Inject** [1] 26:18

**Injury** [1] 76:11

**Inmates** [3] 20:6 20:15 20: 17

**Innocence** [5] 15:2 15:7 15:13 71:3 79:19

**Innocent** [2] 75:21 119:6

**Insane** [1] 106:8

**Inside** [1] 30:13

**Instability** [2] 53:11 54: 1

**Installer** [1] 97:6

**Instance** [1] 119:6 119:7

**Instead** [4] 6:10 23:19 25: 23 101:7

**Instill** [1] 63:7

**Instruct** [1] 23:1

**Instructed** [2] 62:16 81:5

**Instruction** [1] 10:6

**Instruments** [1] 107:24

**Insurance** [1] 34:25

**Intend** [2] 99:7 106:24

**Intended** [1] 54:22

**Intent** [1] 66:2

**Intentional** [20] 31:6 31: 12 31:18 31:21 31:23 32:2 32:5 32:15 32:23 33:3 33:12 33:13 33:15 33:17 99:15 111: 18 111:20 111:22 112:18 114: 1

**Intentionally** [7] 32:14 74:19 100:3 102:5 111:13 114:24 117:24

**Interactions** [1] 76:21

**Interested** [2] 84:20 107: 20

**Interfere** [3] 45:4 69:12 94:3

**Interpreted** [1] 80:11

**Intertwined** [1] 38:24

**Introduced** [1] 43:17

**Invade** [1] 87:13

**Involved** [3] 54:7 76:22 83:13

**Involves** [1] 111:17

**Involving** [1] 111:5

**Issue** [28] 47:19 47:24 51: 23 53:15 65:7 66:11 66:13 72:2 72:3 75:14 75:18 77:8 77:10 77:13 78:12 79:3 79: 20 79:20 81:11 86:7 99:25 101:17 104:20 114:25 115:3 115:7 115:17 117:21

**Issues** [15] 6:20 51:7 59: 19 63:22 66:8 81:10 81:14 85:10 100:20 101:16 111:6 114:7 114:9 114:15 118:19

**Itself** [15] 6:9 8:14 45: 10 76:24 85:13 86:8 90:17 96:21 101:15 103:11 104:3 104:10 114:11 115:2 117:22

## J

**Jacinto** [1] 120:18

**Job** [11] 8:6 16:2 42:12 42: 13 42:13 43:2 45:4 70:8 96: 12 96:21 108:20

**Joined** [1] 112:2

**Jr** [3] 1:5 48:25 120:20

**Judge** [16] 1:20 47:4 48:7 60:25 71:6 73:1 74:4 82:18 85:8 86:9 97:25 110:6 111: 15 114:13 114:14 115:22

**Judge's** [2] 95:16 117:3

**Judgements** [1] 23:24

**Judgment** [2] 109:19 109: 20

**Judicial** [3] 1:11 30:4 30:5

**Juries** [4] 11:14 12:20 12: 23 39:14

**Juror** [39] 7:15 7:18 26: 24 34:21 36:7 43:2 43:8 44: 25 45:5 47:1 47:14 51:1 57: 17 58:1 58:10 62:5 65:15 65:16 66:9 67:13 68:14 69:6 69: 12 69:20 70:6 70:24 82:12 91:11 93:10 93:24 94:4 94: 11 95:19 95:22 97:12 109:1 113:5 113:7 119:20

**Jurors** [10] 3:17 12:19 13: 6 24:2 24:9 24:14 26:10 26: 12 82:25 112:15

**Jury** [70] 4:24 5:8 5:13 7: 11 9:6 9:9 10:6 10:18 10:19 10:22 11:5 11:7 11:11 14:16 14:16 15:23 20:25 21:2 21:5 21:8 21:11 21:15 21:19 21: 23 22:19 24:2 25:1 27:16 29: 1 30:20 30:23 30:23 33:4 33: 25 35:11 35:12 35:13 35:14 35:16 35:21 36:8 39:7 39:11 40:3 41:1 42:8 43:12 57:11

**Insurance** [1] 34:25

57:11 57:14 66:12 69:25 71: 24 74:17 79:24 84:3 87:1 87: 4 89:9 89:13 89:16 92:12 92: 15 92:21 94:15 97:15 98:4 99:21 100:7 113:8

**Jury's** [5] 5:6 15:9 16:3 32:20 32:25

**Justice** [1] 60:19

**Justifiable** [5] 13:23 23: 13 31:7 32:8 32:10

**Justification** [6] 31:8 31:8 31:14 32:6 32:8 91:10

**Justified** [3] 91:13 111: 12 114:23

**Justifies** [1] 86:1

**Justify** [3] 11:13 79:5 117:22

## K

**Kay** [2] 120:3 120:16

**Keep** [3] 70:25 81:8 108:21

**Keeping** [1] 61:24

**Kept** [1] 98:11

**Key** [2] 83:25 84:15

**Kicks** [1] 63:8

**Kid** [1] 55:10

**Kidnapping** [17] 31:16 31: 19 31:24 32:24 33:5 33:12 59:10 67:16 74:21 99:18 100: 4 100:16 102:6 111:23 112: 13 112:20 112:21

**Kidnappings** [1] 19:3

**Kids** [8] 25:5 55:15 55:17 62:12 83:7 96:19 96:22 108: 20

**Kill** [2] 66:2 66:20

**Killed** [2] 40:21 61:13

**Killing** [7] 32:13 32:14 61:14 67:15 67:17 90:24 91:4

**Kills** [3] 32:9 59:16 119:3

**Kind** [29] 5:3 25:9 46:2 46: 16 49:17 52:25 52:25 53:1 53:2 55:1 62:24 64:5 67:3 67:11 74:14 80:10 81:18 83: 1 83:18 83:24 90:6 96:11 97: 3 97:18 98:6 98:17 108:20 108:21 117:5

**Kinds** [12] 12:10 19:7 34: 6 34:7 34:7 42:7 75:5 76:17 85:10 99:5 100:19 102:25

**Kitchen** [1] 83:15

**Knobloch** [2] 120:3 120:16

**Knowing** [10] 46:9 46:10 46:10 47:3 48:6 57:18 66:6 72:25 86:9 86:17

**Known** [2] 6:6 6:7

**Knows** [2] 106:5 106:16

**Kurt** [4] 2:17 3:24 61:23 82:21

## L

**Label** [2] 83:1 109:17

**Lack** [3] 52:13 71:17 101:14

**Laid** [1] 66:20

**Large** [1] 4:11

**Last** [9] 4:20 5:17 22:8 38: 16 43:24 44:17 68:23 80:12 93:15

**Lastly** [1] 12:18

**Law** [47] 4:5 7:16 7:17 10: 20 10:24 15:20 22:15 33:7 37:7 38:13 39:1 39:3 39:4 39:6 42:3 42:14 42:17 42:21 42:25 47:8 47:9 55:21 55:22 56:15 58:11 58:21 60:4 60:7 60:15 60:16 71:1 71:3 71:7 71:10 72:20 73:5 74:6 95:12 99:11 101:9 103:10 104:9 104:18 105:15 105:22 106:3 106:10

**Laws** [3] 7:7 7:10 7:14

**Lawyer** [1] 62:8
**Lawyering** [2] 13:25 14:3
**Lawyers** [2] 43:7 70:8
**Lawyers'** [1] 37:5
**Laying** [2] 39:23 40:14
**Learn** [4] 54:15 54:21 54:22 57:8
**Least** [6] 23:14 26:9 26:12 30:22 37:18 109:9
**Leastly** [1] 12:18
**Led** [1] 98:17
**Left** [2] 41:11 41:13
**Legal** [7] 31:8 31:9 31:13 32:6 32:8 91:9 109:14
**Legally** [4] 32:10 66:14 109:16 109:18
**Legislature** [1] 30:4
**Legitimate** [2] 36:5 36:19
**Length** [2] 93:1 93:3
**Less** [4] 18:11 33:24 71:14 114:10
**Lessen** [1] 23:11
**Lesser** [2] 33:13 105:10
**Level** [8] 14:23 19:15 43:5 56:13 58:9 91:9 91:19 116:10
**Liberal** [1] 83:3
**Life** [123] 6:17 10:11 10:14 11:1 11:3 11:4 11:7 11:13 11:22 12:4 13:2 15:15 16:7 16:17 16:21 20:11 21:1 21:23 22:14 23:5 23:12 23:19 23:19 24:19 25:4 25:8 25:19 25:22 26:8 26:14 28:4 28:8 28:15 28:22 28:24 29:30 13 30:21 30:24 31:2 31:6 31:13 31:19 32:5 33:21 33:23 34:4 34:12 34:14 35:25 36:4 45:3 48:2 48:5 50:1 52:19 52:24 52:25 54:22 55:18 56:7 59:9 60:10 64:16 64:21 64:25 66:8 65:21 68:5 69:9 69:10 74:3 74:7 74:9 74:20 75:4 77:19 77:24 78:2 78:17 78:19 79:5 80:5 80:5 80:7 80:14 84:3 85:20 85:24 86:2 86:7 86:13 87:6 87:8 87:12 89:1 89:18 91:23 94:2 97:9 99:16 100:3 102:5 103:4 103:9 104:25 105:5 106:24 110:18 111:7 111:13 111:18 111:23 114:1 114:24 116:2 117:9 117:23 117:24 118:7 118:25
**Light** [1] 86:10
**Lightly** [1] 64:18
**Likely** [7] 18:1 18:7 51:18 57:9 65:13 76:5 107:3
**Likewise** [1] 39:17
**Line** [2] 51:19 108:23
**Listed** [1] 96:3
**Listen** [7] 43:9 57:19 67:22 68:4 95:16 112:15 115:5
**Listening** [4] 12:20 72:11 89:19 114:13
**Live** [7] 19:21 54:22 54:23 62:21 96:23 106:25 108:16
**Lives** [5] 65:3 111:25 112:2 112:5 113:1
**Location** [2] 113:3 113:4
**Look** [32] 22:19 25:21 43:22 46:6 47:24 51:3 51:3 51:6 51:12 51:21 52:10 52:20 53:16 64:15 64:17 64:17 64:24 67:13 68:6 77:5 79:3 79:12 81:10 83:23 84:11 103:10 104:11 105:3 106:12 112:4 112:7 118:6
**Looked** [1] 48:3
**Looking** [3] 47:12 70:25 78:14
**Lookout** [1] 52:14
**Looks** [1] 83:4

**Lose** [3] 20:6 20:7 116:2
**Lost** [1] 24:5
**Lottery** [1] 76:2
**Love** [1] 108:3
**Lowest** [1] 15:24
**Lumping** [1] 117:16
**Lyn** [5] 2:2 4:1 45:21 70:20 95:7

## M

**Ma'am** [2] 68:13 104:2
**Machine** [1] 1:23
**Major** [1] 57:21
**Male** [1] 34:13
**Mamou** [10] 1:5 3:12 3:21 3:22 48:25 61:24 82:22 87:3 117:15 120:20
**Man** [2] 67:14 92:8
**Manner** [3] 52:15 91:1 107:19
**Marie** [1] 48:25
**Married** [1] 83:7
**Matter** [8] 9:5 9:5 9:6 9:6 10:15 10:15 10:16 14:24
**Mature** [1] 23:24
**McClellan** [22] 2:2 3:5 3:6 3:8 4:1 45:18 45:20 45:21 57:25 61:25 67:11 70:16 70:17 70:19 70:20 84:19 88:6 90:21 95:3 95:4 95:6 95:7
**Mean** [2] 17:7 17:8 17:10 17:12 17:14 17:16 22:14 24:5 56:11 57:6 58:3 58:5 63:17 64:21 65:22 66:1 73:19 76:3 82:8 86:15 112:19
**Meaning** [3] 29:13 55:18 84:14
**Means** [38] 7:18 7:19 7:20 14:13 15:20 16:17 17:5 17:10 17:13 18:7 18:19 18:10 18:10 21:1 22:5 22:15 27:7 27:11 27:21 28:24 29:3 29:5 29:7 29:11 30:22 31:9 32:7 32:15 38:18 38:20 52:15 63:25 75:16 80:5 80:6 87:7 117:24 117:25
**Mechanics** [1] 29:11
**Media** [1] 26:19
**Member** [1] 108:9
**Members** [1] 25:13
**Memorize** [2] 4:19 5:1
**Memorizing** [1] 42:23
**Men** [1] 12:3
**Mental** [10] 24:9 24:22 53:23 56:8 56:10 56:12 56:16 71:17 106:3 106:12
**Mentally** [3] 24:11 63:16 63:23
**Mentioned** [1] 48:24
**Merit** [1] 105:1
**Messenger** [1] 12:17
**Met** [1] 47:17
**Mexico** [1] 48:19
**Michka** [6] 93:11 93:15 95:7 107:1 107:2 107:3
**Middle** [5] 25:3 42:5 46:17 70:7 97:5
**Might** [49] 4:16 12:11 13:4 23:21 23:23 23:25 24:3 24:9 24:15 24:17 24:23 25:6 25:10 34:9 35:1 35:21 40:8 44:24 45:3 45:4 48:17 52:16 58:1 61:3 69:5 79:8 80:23 80:23 81:1 86:16 88:17 90:8 92:1 91:22 93:23 98:13 109:20 109:22 109:23 109:23 109:25 110:3 111:22 111:24 113:9 116:22 117:22 118:5 118:22
**Miles** [1] 44:16
**Military** [1] 25:11
**Mind** [17] 12:13 36:25 59:4

**Minute** [1] 67:25 92:25
**Minutes** [5] 4:3 4:7 28:23 40:16 92:5
**Misguided** [1] 87:17
**Misinformation** [1] 87:6
**Miss** [8] 3:7 4:1 44:13 45:21 61:23 67:19 93:15 107:3
**Mistrial** [1] 7:20
**Mitigate** [1] 25:15
**Mitigating** [27] 10:10 22:17 22:20 22:22 23:5 23:8 23:9 23:10 23:21 23:25 24:4 24:10 25:17 48:1 52:17 53:6 66:25 77:18 78:15 79:4 79:12 84:2 90:1 105:9 105:13 116:18 117:4
**Mixed** [4] 67:3 98:25 110:16 110:19
**Mom** [1] 63:25
**Moment** [1] 29:6 29:7
**Month** [2] 66:3 86:6 103:18
**Moral** [7] 9:16 9:17 9:18 10:4 52:10 52:21 90:5
**Morning** [1] 3:20 20:5 44:11 44:19 45:8 68:24 68:25 70:10 93:17 93:18 115:23
**Most** [12] 12:12 13:2 13:4 54:14 54:20 54:22 73:25 81:21 88:22 96:4 100:24 112:5
**Mother** [2] 111:1 111:2
**Motivate** [1] 89:20
**Motive** [1] 6:6
**Move** [2] 21:3 43:17
**Movies** [1] 62:22
**Multiple** [1] 9:19
**Murder** [111] 3:23 5:10 6:16 6:24 7:13 8:20 8:21 11:20 13:1 14:20 15:5 15:11 15:14 16:5 16:6 21:10 25:1 26:25 27:2 27:8 29:1 31:5 31:5 31:10 31:11 31:11 31:17 31:21 31:23 31:23 31:25 32:2 32:4 32:12 32:21 32:23 33:3 33:9 33:11 33:11 33:12 33:13 33:15 33:17 33:19 33:20 33:21 33:21 33:22 34:9 35:12 35:15 35:17 36:8 36:9 36:9 39:21 40:7 41:14 47:16 49:23 50:21 59:23 65:20 73:7 73:22 73:24 73:25 74:6 74:17 74:22 75:1 75:7 76:7 76:7 77:13 78:6 79:1 80:6 80:16 82:6 82:6 82:8 85:9 86:11 88:16 89:9 90:15 90:22 91:17 92:8 95:20 99:15 99:17 101:5 101:11 109:22 111:4 111:6 111:24 112:14 112:14 112:18 112:19 114:2 114:5 118:3
**Murderer** [1] 54:6
**Murders** [3] 19:1 19:2 31:21
**Must** [7] 10:21 10:25 17:10 19:12 19:15 74:17 116:10

## N

**Name** [5] 45:21 48:16 70:20 82:21 95:7 97:1
**Names** [1] 48:24
**Natural** [1] 118:16
**Nature** [2] 102:22 119:5
**Near** [1] 92:2
**Nearly** [1] 50:18
**Necessarily** [7] 21:5 21:8 21:12 27:12 57:5 75:8 114:2
**Necessary** [5] 18:16 42:

**Need** [16] 4:19 50:9 50:10 50:14 50:18 53:24 54:21 54:21 58:19 60:2 62:16 64:16 64:16 65:23 80:21 114:20
**Needs** [1] 51:1
**Nefarious** [1] 8:18
**Negated** [1] 53:17
**Neglectful** [1] 54:25
**Neighborhood** [1] 50:12
**Neighbors** [1] 19:24
**Never** [41] 5:22 7:17 8:3 8:17 9:7 9:23 10:16 11:6 11:7 11:17 11:18 11:19 12:2 14:22 21:11 21:14 22:9 25:14 31:1 34:12 40:12 41:5 42:23 43:21 44:1 55:6 57:12 58:14 60:10 60:13 72:15 74:5 78:22 84:24 85:1 85:12 89:16 99:23 104:9 104:9 111:9
**New** [2] 39:21 96:25
**News** [6] 26:19 83:16 84:25 85:1 87:11 92:3
**Newspaper** [1] 83:15
**Next** [8] 43:21 44:2 44:3 44:4 45:11 94:19
**Nice** [1] 12:8
**Nine** [1] 33:25
**Ninety** [2] 33:25 44:16
**Ninety-nine** [1] 33:25
**Ninth** [1] 49:13
**Nobody** [9] 22:17 25:16 25:17 38:6 38:20 40:25 61:11 81:4 95:23
**Noe** [1] 3:4
**None** [5] 4:13 49:1 82:14 83:22 108:22
**Nonmoveable** [1] 41:15
**Notch** [1] 16:11
**Nothing** [4] 8:18 24:19 30:8 86:22
**Notice** [5] 62:5 80:9 84:1 87:23 96:3
**Notion** [3] 8:12 25:21 28:17
**Nowhere** [1] 22:3
**Nth** [2] 58:3 58:5
**Number** [41] 8:25 9:11 13:16 13:17 21:13 21:14 21:16 27:22 27:24 32:22 33:1 33:24 47:19 47:24 51:7 51:23 53:15 54:1 65:4 65:12 67:9 72:2 72:3 75:14 75:18 77:9 77:11 77:13 78:12 78:14 79:3 79:20 79:20 89:25 90:9 102:17 104:20 114:25 115:3 115:18 117:21
**Numbered** [2] 1:20 120:6
**Numbers** [1] 39:15

## O

**O'clock** [1] 20:5
**Oath** [1] 71:1
**Obedience** [1] 54:14
**Object** [2] 41:13 41:15
**Objection** [2] 69:19 69:22
**Obligated** [3] 5:19 14:15 32:20
**Obligation** [2] 11:15 32:25
**Obtain** [1] 18:15
**Obviously** [13] 15:6 23:12 30:4 41:14 49:23 52:23 53:5 58:14 83:11 88:15 109:8 112:4 117:18
**Occur** [7] 5:3 7:23 32:18 38:19 66:7 112:23 114:5
**Occurred** [4] 66:7 66:17 112:7 120:7
**Occurs** [1] 91:6

**October** [2] 69:14 88:8

**Offense** [11] 3:22 9:13 14: 17 14:25 28:11 35:6 52:2 59: 7 90:3 100:1 100:14

**Official** [3] 120:3 120: 13 120:17

**Official/Deputy** [1] 120:3

**Often** [3] 49:20 49:21 118: 13

**Oftentimes** [2] 65:1 86:24

**Oklahoma** [1] 112:4

**Old** [4] 55:10 63:14 63:21 87:20

**Older** [1] 64:1

**Oldest** [1] 96:24

**Once** [6] 10:24 43:21 43:25 50:2 50:19 88:21

**One** [91] 8:25 9:22 9:25 11: 13 11:14 21:13 23:8 27:20 27:22 28:12 30:10 31:21 31: 24 32:19 37:8 37:10 37:24 38:16 39:10 40:9 41:8 43:21 43:22 43:24 43:25 45:10 45: 10 47:19 48:22 50:12 51:7 54:5 54:6 55:23 56:5 60:12 61:14 64:1 64:3 64:5 64:9 65:20 66:1 67:15 67:19 70:2 72:2 72:12 75:14 75:18 77:9 77:14 79:16 79:20 81:10 81: 18 83:14 84:1 85:11 86:21 87:5 90:8 94:18 96:4 100:6 102:17 106:4 107:13 107:16 109:8 109:13 111:10 111:21 113:2 113:2 113:2 113:2 113: 3 113:3 114:14 114:18 114: 20 114:25 115:3 115:18 117: 12 117:15 117:20 118:21 119: 6 119:18

**Open** [8] 28:7 36:23 36:25 68:3 78:25 79:3 108:9 120:7

**Opinion** [5] 46:4 46:5 72: 5 72:7 88:21

**Opinions** [1] 109:24

**Opportunity** [4] 35:4 62: 1 83:4 83:19

**Opposed** [11] 24:21 48:2 52:14 52:19 66:5 77:20 78: 17 79:5 104:23 105:2 111:7

**Option** [5] 10:20 10:25 33: 17 36:5 36:20

**Order** [14] 6:13 10:24 11: 12 12:13 16:12 16:14 18:15 23:5 26:3 26:7 31:11 73:1 73:2 96:15

**Ordering** [2] 47:4 48:7

**Ordinarily** [2] 19:25 34:8

**Ought** [15] 10:13 23:4 23: 11 47:20 71:9 71:21 72:20 74:2 80:25 82:3 88:10 105: 105:23 106:6 106:17

**Ourself** [1] 32:11

**Outcome** [3] 32:22 33:1 55: 17

**Outset** [3] 36:25 42:12 82: 23

**Outside** [3] 20:11 96:9 96: 18

**Overcome** [5] 15:3 54:25 55:3 55:6 55:6

**Overcomes** [1] 5:23

**Overview** [1] 5:2

**Overwhelming** [1] 116:5

**Own** [11] 12:23 25:4 29:24 46:3 53:20 63:25 68:5 72:5 79:24 114:18 115:6

## P

**Pack** [1] 62:25

**Packing** [2] 96:12 96:14

**Page** [1] 116:17

**Paid** [2] 85:12 120:12

**Pamela** [2] 120:3 120:16

**Pardons** [3] 29:16 29:19 30:5

**Parent** [2] 63:6 63:10

**Parents** [2] 50:8 62:12

**Parents'** [2] 63:11 88:7

**Parole** [7] 29:4 29:13 30: 7 30:8 30:12 80:9 81:7

**Paroled** [1] 30:15

**Paroles** [3] 29:17 29:19 30:5

**Part** [4] 5:5 34:21 44:15 74:15

**Participate** [4] 47:1 47: 6 72:24 73:3

**Particular** [5] 42:21 71: 19 84:6 108:7 117:10

**Parties** [5] 3:2 6:6 65:25 120:6 120:10

**Parts** [1] 5:5

**Pasadena** [1] 49:4

**Pass** [3] 39:25 82:15 107:4

**Past** [6] 27:21 44:3 51:12 51:13 76:20 88:12

**Pastor** [1] 96:3

**Pay** [1] 101:1

**Peculiar** [1] 14:2

**Pedestrian** [2] 119:3 119: 7

**Penalty** [51] 16:13 16:19 26:16 27:11 46:3 46:23 49: 20 50:3 51:23 56:7 60:6 60: 19 64:10 65:1 65:8 65:23 72: 6 72:8 72:13 72:19 77:10 78: 10 79:18 79:21 79:22 80:22 82:1 82:7 82:8 85:3 85:6 85: 25 86:4 89:14 95:21 98:25 99:6 101:4 105:25 106:20 108:8 109:8 111:7 111:12 113:25 114:8 114:11 114:23 115:10 116:2 116:20

**Penitentiary** [9] 12:4 20:2 20:4 20:9 33:23 34:14 35:25 36:15 74:9

**People** [78] 9:22 12:8 12: 8 12:19 12:24 12:25 13:20 15:14 19:24 19:25 20:1 20: 19 23:23 24:8 35:1 37:8 37: 9 37:11 39:9 39:12 41:5 46: 10 46:22 46:24 49:24 50:13 51:4 53:8 53:10 53:12 54:1 54:2 55:3 55:4 55:24 56:3 56:25 58:15 58:16 58:18 58: 18 60:8 62:9 63:13 65:2 66: 5 70:25 72:18 72:22 73:21 73:23 78:5 79:8 79:23 80:13 82:24 83:12 85:15 86:23 87: 6 87:9 90:22 91:2 91:25 96: 4 99:19 101:2 103:22 103:22 103:22 103:25 111:12 115:11 117:16 118:13 118:16 118:16 118:17

**People's** [3] 111:25 112: 5 112:25

**Percent** [1] 100:6

**Perfect** [2] 12:12 12:15

**Perfectly** [5] 13:22 25: 12 30:10 34:20 43:1

**Perhaps** [8] 8:2 8:5 34:15 69:9 69:10 69:10 86:15 89:6

**Peripheral** [1] 100:19

**Perished** [1] 25:6

**Permanent** [1] 76:10

**Person** [101] 6:11 9:23 9: 24 11:21 16:6 18:24 23:8 24: 11 26:19 27:9 30:9 32:9 33: 22 34:22 37:8 37:14 39:10 40:10 40:21 48:2 50:20 50: 25 51:7 51:18 51:22 52:14 52:19 53:19 53:19 53:22 56: 6 56:9 56:10 59:9 59:19 59: 23 60:15 61:5 61:13 61:13 64:21 65:3 65:7 65:10 65:12 65:16 65:19 66:4 66:5 66:5 66:19 66:25 68:3 74:2 74:5

74:10 74:20 76:15 77:12 77: 13 78:17 86:9 88:14 88:18 88:20 88:23 89:6 89:9 89:11 89:12 89:15 89:21 91:13 91: 15 92:16 100:3 100:4 102:6 102:8 102:12 102:20 103:24 104:5 104:23 105:15 106:5 106:23 109:16 109:19 109:23 112:21 112:22 113:9 114:5 115:10 117:6 117:22 118:14 118:21 119:6 119:7

**Person's** [10] 41:2 50:1 52:24 56:14 89:2 91:2 91:13 106:3 106:12 106:24

**Personal** [15] 9:16 9:17 9:18 10:4 45:3 52:10 52:21 69:9 83:22 90:5 94:1 109:19 109:20 117:17 117:18

**Personally** [1] 46:8

**Persons** [1] 19:4

**Phase** [28] 5:10 5:12 5:20 5:25 6:8 6:14 6:17 6:18 6: 24 7:2 7:11 7:15 8:8 8:19 10:5 13:11 13:12 14:14 15:1 15:5 15:10 15:25 16:4 26:5 27:1 27:3 35:19 36:10

**Phone** [3] 2:9 2:16 2:21

**Phrase** [3] 14:9 15:19 22:4

**Physical** [1] 24:21

**Pick** [1] 62:25

**Picky** [1] 58:2

**Piece** [3] 6:12 19:22 43:14

**Pigeonhole** [1] 83:1

**Place** [4] 51:5 62:6 75:2 112:17

**Placed** [1] 84:7

**Places** [4] 20:20 85:16 87: 3 112:10

**Plan** [2] 66:4 66:20

**Planned** [1] 90:24

**Play** [18] 4:6 4:22 7:8 7: 10 7:14 7:25 9:19 16:19 21: 11 21:14 21:23 38:12 43:6 45:9 65:6 69:21 76:2 88:10

**Playing** [1] 8:3

**Plead** [1] 8:9

**Plenty** [1] 95:18

**Plugged** [1] 81:12

**Plus** [2] 31:14 80:20

**Point** [14] 4:18 25:16 29: 24 34:5 42:21 44:22 47:10 50:19 51:3 63:5 63:9 69:3 90:11 93:21

**Pointed** [1] 90:21

**Pointing** [2] 61:9 85:6

**Points** [2] 43:14 118:12

**Police** [2] 40:18 40:19

**Pondering** [1] 85:18

**Pool** [2] 43:19 45:14

**Portions** [1] 120:5

**Posed** [1] 22:18

**Position** [5] 21:24 21:25 60:12 109:5 116:1

**Possibility** [8] 17:11 17: 23 18:11 76:1 81:1 95:19 111:24 115:24

**Possible** [21] 9:7 10:17 15:24 16:13 17:24 17:25 28: 18 28:21 30:14 32:18 32:21 33:1 33:8 33:9 33:10 36:24 76:1 82:9 99:2 109:23 109:7

**Possibly** [9] 7:16 17:11 17:12 29:4 54:7 64:17 89:20 95:23 98:3

**Potentially** [5] 69:24 71: 2 86:11

**Practice** [1] 85:14

**Pray** [2] 57:21 110:7

**Prayed** [1] 110:8

**Predict** [1] 115:8

**Predicting** [2] 115:10

115:13

**Premeditated** [3] 66:2 90:24 103:16

**Preparation** [1] 120:11

**Preplanned** [1] 103:17

**Present** [4] 4:1 14:16 14: 19 78:22

**Presented** [8] 5:13 8:2 10:4 13:16 14:21 15:8 25:1 66:9

**Presenting** [1] 113:14

**Presently** [1] 45:3

**Presiding** [1] 1:21

**Pressed** [1] 63:22

**Pressured** [1] 113:12

**Presumed** [3] 8:16 15:14 75:21

**Presumes** [1] 22:15

**Presumption** [11] 5:23 15: 2 15:3 15:7 15:11 15:12 15: 13 15:16 16:20 16:21 16:22

**Pretty** [5] 61:3 67:2 93:2 116:3 116:14

**Previous** [1] 94:21

**Principles** [1] 4:5

**Prison** [10] 20:14 20:14 29:13 56:7 65:8 85:20 88:20 89:19 110:1.117:9

**Private** [1] 87:15

**Probability** [22] 9:2 17: 2 17:3 17:5 17:7 17:9 17:17 17:20 18:6 18:7 18:10 18:14 18:17 51:8 76:1 76:4 76:14 78:8 101:19 102:19 115:22 116:3

**Probable** [1] 17:13

**Problem** [13] 47:11 50:18 58:19 71:11 79:25 98:20 100: 9 101:8 104:18 106:1 106:9 110:4 110:7

**Problems** [2] 53:12 53:23

**Proceeded** [1] 85:9

**Proceedings** [4] 1:19 1: 22 120:5 120:9

**Process** [17] 26:21 47:1 47:7 59:22 67:12 72:24 73:4 74:14 84:17 84:22 85:8 85: 13 86:16 87:13 90:9 92:3 117:13

**Processes** [1] 83:25

**Professional** [1] 69:10

**Progresses** [1] 50:12

**Proof** [11] 51:25 60:5 60: 14 71:25 72:2 72:3 75:16 99: 20 115:19 115:19 116:7

**Proper** [3] 72:20 82:3 84:4

**Property** [2] 18:25 19:5

**Prosecutor** [2] 83:7 86:16

**Prospect** [2] 95:22 108:25

**Prospective** [4] 3:17 62: 9 82:25 119:20

**Protect** [1] 20:17

**Prove** [34] 15:21 15:22 16: 2 17:19 18:14 18:17 18:19 19: 12 22:6 22:9 22:10 22:23 31: 25 32:17 32:19 32:22 33:2 33:4 51:17 58:3 58:8 58:11 59:6 60:7 60:10 74:17 74:21 74:23 75:19 99:20 100:1 100: 4 100:16 100:21

**Proved** [3] 15:17 31:17 47: 19

**Proven** [4] 47:10 76:13 99: 3 99:19

**Proves** [6] 16:9 16:23 47: 15 50:25 59:21 75:22

**Provided** [1] 60:23

**Provides** [2] 60:4 60:15

**Providing** [1] 35:3

**Publicity** [1] 48:11

**Punches** [2] 20:5 20:11

**Punish** [1] 101:1
**Punishment** [41] 6:24 8:8 8:19 15:15 20:17 23:11 33: 18 33:22 35:5 35:9 35:24 36:2 36:14 50:4 52:5 52:8 71: 13 71:21 72:13 73:8 75:1 75: 6 77:6 81:20 81:22 82:3 84: 4 85:20 86:8 86:13 86:19 91: 20 97:22 97:24 97:25 100:25 101:12 102:11 105:1 105:10 106:4
**Punishments** [4] 16:6 28: 22 82:9 109:7
**Purpose** [5] 8:4 81:20 81: 22 81:24 100:24
**Purposes** [6] 5:13 5:15 6: 19 10:9 29:7 32:16
**Pushed** [1] 53:18
**Put** [10] 22:18 41:17 54:17 55:1 56:8 68:7 85:25 93:2 107:18 116:1
**Puts** [2] 43:4 54:8

**Q**

**Qualified** [1] 86:2
**Quality** [5] 14:21 15:7 39: 5 39:16 41:25
**Quantity** [1] 39:5
**Questioning** [2] 92:1 92:2
**Questionnaire** [13] 45: 24 46:17 48:10 49:19 70:22 83:24 95:9 95:10 95:15 98: 24 111:11 116:16 116:20
**Questionnaires** [2] 82:25 95:22
**Questions** [76] 5:16 5:18 6:21 6:22 8:21 8:22 10:23 11:9 11:16 11:17 11:21 11: 23 12:5 13:9 14:7 16:25 18: 12 20:24 21:11 25:25 25:25 26:4 27:19 29:2 30:17 30:18 31:2 31:3 37:2 42:3 42:24 43:11 43:16 43:19 44:6 44: 20 45:9 45:15 47:3 54:12 56: 5 59:3 59:25 60:1 61:25 62: 2 64:9 66:22 67:21 68:11 69: 1 70:14 71:25 72:14 72:17 72: 25 73:14 73:15 75:14 79:16 80:18 83:24 85:4 90:19 91: 20 91:22 93:4 93:19 94:19 94:25 100:12 100:13 101:8 102:15 106:14 107:18
**Quick** [2] 37:3 57:23
**Quickly** [1] 64:19
**Quite** [3] 43:1 96:17 118:7

**R**

**R-rated** [1] 62:22
**Raise** [2] 62:16 96:19
**Raised** [4] 13:15 42:14 42: 21 52:25
**Raises** [1] 42:9
**Raising** [1] 62:9
**Range** [4] 33:18 33:22 35: 4 35:9
**Rapes** [1] 19:2
**Rash** [1] 57:23
**Rated** [1] 62:22
**Re** [1] 50:22
**Reach** [2] 36:2 36:23
**Reached** [2] 97:21 97:23
**React** [2] 12:25 119:9
**Reacted** [1] 24:7
**Reaction** [1] 64:5
**Read** [5] 8:7 11:19 20:21 82:25 87:10
**Reading** [3] 62:5 83:15 85: 23
**Ready** [3] 9:8 11:1 39:24
**Real** [10] 37:3 58:2 68:7 83:2 83:3 83:14 109:14 117: 2 118:16 118:17

**Realizes** [1] 50:13
**Really** [32] 57:21 58:3 62: 1 63:12 63:21 63:25 63:25 65:22 67:4 67:6 81:9 83:10 83:13 85:1 85:17 86:18 86: 23 91:3 91:19 95:23 107:19 107:21 108:22 109:2 110:5 110:7 110:8 110:20 110:21 113:13 113:16 114:12
**Reason** [24] 4:14 5:1 10: 11 11:25 13:23 23:4 23:7 23: 18 25:22 25:24 42:25 48:5 51:24 57:16 57:24 57:25 77: 11 77:17 77:19 78:15 78:16 82:12 89:6 89:15
**Reasonable** [57] 5:25 9:1 14:10 14:11 14:19 14:23 15: 4 15:17 15:20 15:23 16:2 16: 10 16:24 17:2 22:5 27:5 27: 8 31:18 32:1 32:19 32:23 33: 3 33:4 39:8 39:11 39:15 39: 19 40:5 41:2 41:22 47:16 51: 8 58:12 58:17 58:22 59:7 59: 11 60:7 65:10 74:18 74:21 74:23 75:15 75:17 75:19 75: 22 75:25 76:14 99:21 100:5 100:7 100:22 101:18 102:18 114:4 115:20 116:8
**Reasons** [17] 3:4 48:2 48: 4 51:24 52:18 74:2 77:11 77: 17 77:23 78:1 78:3 78:15 79: 12 104:22 105:10 107:17 109: 13
**Rebel** [1] 63:9
**Rebellious** [1] 63:15
**Receive** [14] 21:18 48:2 51:22 71:21 73:8 74:3 75:6 75:10 77:10 104:23 105:10 111:7 115:9 116:2
**Receives** [4] 65:7 78:2 78:4 116:19
**Receiving** [2] 105:1 117: 23
**Recommendations** [2] 29: 20 29:23
**Record** [4] 1:1 120:6 120: 9 120:11
**Reevaluate** [1] 21:25 77: 22
**Reexamine** [1] 47:25
**Refer** [3] 52:11 52:18 101: 2
**Reflects** [1] 120:9
**Refuse** [2] 36:13 41:23
**Regain** [1] 20:12
**Regard** [1] 55:19
**Regardless** [1] 56:16
**Regards** [1] 117:19
**Regular** [2] 49:12 112:14
**Rehabilitated** [1] 57:1
**Rehabilitation** [1] 20:16
**Reinforce** [1] 21:24
**Reject** [1] 29:18
**Relate** [1] 100:17
**Relates** [1] 54:11
**Relating** [2] 35:19 108:8
**Relationship** [3] 6:5 28: 12 65:24
**Relax** [1] 107:14
**Released** [1] 30:25
**Relevant** [7] 52:7 52:7 71:18 71:20 75:8 75:9 106:4
**Religion** [1] 108:4
**Religious** [1] 96:5
**Relying** [2] 38:1 87:17
**Remains** [1] 15:16
**Remarkably** [5] 27:19 33: 19 33:20 43:20 94:21
**Remember** [6] 30:2 44:17 48:17 68:22 93:15 97:18
**Remind** [1] 3:20

**Remorse** [3] 103:24 118:13 118:17
**Remorseful** [4] 14:23 118: 21 119:2 119:10
**Removal** [1] 86:1
**Remove** [1] 86:6
**Removed** [2] 60:13 99:25
**Render** [1] 71:1
**Replace** [5] 10:14 15:12 22:23 23:4 25:19
**Replacing** [1] 25:7
**Reported** [2] 1:22 120:7
**Reporter** [2] 120:3 120:17
**Reporter's** [4] 1:1 120:6 120:8 120:11
**Reports** [1] 85:1
**Represent** [5] 45:22 61: 24 70:21 82:22 95:8
**Represented** [2] 3:23 3:25
**Representing** [2] 67:14 92:7
**Request** [1] 3:14
**Requested** [1] 120:5
**Require** [5] 18:3 19:7 26: 15 60:5 60:16
**Required** [6] 18:19 22:17 32:17 58:21 60:17 71:25
**Requirement** [1] 22:18
**Requires** [2] 15:20 111:18
**Requiring** [1] 17:19
**Resentful** [1] 64:2
**Resource** [4] 49:11 49:16 53:9 54:3
**Resource-type** [1] 54:3
**Respect** [2] 54:14 106:4
**Respective** [1] 120:9
**Respond** [2] 67:22 84:20
**Responded** [2] 64:7 64:9
**Responding** [1] 64:14
**Response** [1] 88:24
**Responses** [1] 95:10
**Responsibility** [8] 9:17 52:12 62:7 68:9 68:9 96:2 109:3 110:10
**Responsible** [16] 52:13 53:24 56:17 56:21 56:22 89: 8 89:10 89:16 105:17 105:19 105:24 106:7 106:9 106:11 112:21 112:22
**Rest** [9] 30:12 84:21 89:18 89:18 107:22 107:23 108:8 108:8 110:19
**Result** [9] 11:10 32:16 36: 17 36:23 43:10 47:4 48:7 73: 1 87:8
**Results** [1] 32:18
**Retardation** [2] 24:9 24: 16
**Retarded** [1] 24:11
**Retired** [2] 96:8 107:22
**Retirement** [1] 108:2
**Retribution** [1] 100:25
**Return** [1] 100:7
**Returned** [2] 15:24 21:17
**Rights** [1] 86:24
**Rise** [3] 14:22 19:15 91:9
**Rises** [1] 43:4
**Risk** [1] 25:4
**RITA** [1] 44:7
**Road** [1] 46:18
**Roam** [2] 34:20 35:4
**Rob** [1] 37:21
**Robber** [3] 37:21 38:7
**Robberies** [1] 19:2
**Robbery** [2] 9:25 76:9
**Robbing** [1] 9:23
**ROLAND** [1] 68:15
**Role** [3] 9:21 65:6 66:17

**Room** [6] 4:24 30:24 34:20 42:8 87:4 113:8
**Rose** [1] 91:19
**Row** [1] 58:15
**Rules** [8] 4:21 7:25 13:15 43:3 63:17 69:17 94:7 108:8
**Running** [1] 103:25

**S**

**Safeway** [1] 96:15
**San** [1] 120:18
**Sarah** [1] 63:24
**Satisfied** [7] 43:7 43:8 65:12 113:11 114:4 115:18 117:3
**Satisfy** [1] 70:8 70:9
**Savage** [1] 91:4
**Savage-type** [1] 91:4
**Save** [1] 25:5
**Saved** [1] 93:7
**Saw** [9] 38:6 38:19 38:19 38:20 40:1 40:10 40:12 40: 25 61:12
**SBOT** [4] 2:3 2:5 2:13 2:18
**Scenario** [1] 90:23
**Scheme** [1] 9:25
**School** [6] 20:4 42:3 50: 11 53:2 53:3 63:18
**School's** [1] 79:9
**Seat** [1] 68:1
**Seated** [1] 3:17
**Second** [58] 5:10 5:12 6:8 6:14 6:17 6:21 6:24 7:2 7: 14 8:14 10:3 10:5 10:6 10:8 10:19 11:4 13:12 15:10 16:4 16:18 16:22 21:3 21:4 21:4 21:7 21:22 21:23 22:2 22:3 22:4 22:7 22:11 22:13 22:18 22:25 23:6 26:1 26:6 26:6 26:8 26:11 26:7 26:18 27:3 27:16 27:18 31:4 35:11 35: 18 36:10 43:6 66:18 66:22 78:5 87:3 92:12 93:8 111:19
**Secondly** [1] 21:11
**Seconds** [2] 13:8 40:10
**See** [47] 5:1 7:9 9:4 10:2 11:5 12:16 15:19 17:22 18:2 19:24 22:3 22:4 22:20 23:2 25:22 26:23 28:6 28:7 28:7 34:3 34:18 36:21 38:21 40:3 40:13 40:23 43:3 45:8 55:24 62:19 67:7 67:23 69:23 79:4 83:16 85:15 86:10 90:6 91:4 94:20 105:3 105:5 110:19 113:4 117:21 118:10 119:8
**Seeing** [2] 25:13 55:9
**Seeking** [2] 60:6 95:20
**Seem** [3] 62:6 85:5 87:16
**Sees** [4] 25:4 40:14 40:16 64:2
**Seldom** [1] 49:21
**Selector** [1] 96:16
**Self** [9] 32:7 32:9 66:9 67: 7 91:25 99:12 118:1 118:2 119:1
**Self-defense** [14] 32:7 32:8 32:9 66:9 66:12 67:4 67:7 91:15 91:19 99:12 118: 1 118:2 118:7 119:1
**Self-test** [1] 91:25
**Send** [1] 12:22
**Sense** [3] 70:4 83:14 94:23
**Sent** [1] 29:16
**Sentence** [55] 5:19 10:11 10:12 10:14 10:14 10:21 10: 25 11:15 11:22 11:24 13:2 16:17 16:21 21:1 21:18 21: 21 21:22 21:25 22:21 22:23 22:24 23:4 23:5 23:17 23:19 24:18 24:19 25:7 25:8 25:19 25:19 25:22 25:23 26:1 26:3

26:14 28:4 28:5 28:8 28:9
28:16 28:24 29:2 29:5 30:22
31:2 77:24 77:25 79:5 80:7
80:14 87:12 89:11 117:23
118:9

**Sentenced** [1] 56:7

**Sentences** [3] 11:6 11:7
30:25

**Sentencing** [4] 36:5 36:
20 110:2 110:3

**September** [1] 1:18

**Serious** [3] 88:15 88:22
92:23

**Serve** [3] 82:12 92:12 97:
12

**Served** [1] 29:5

**Serves** [1] 81:15

**Service** [6] 25:13 44:24
69:5 70:24 93:23 98:4

**Serving** [3] 47:1 89:18 92:
20

**Set** [3] 80:2 118:21 118:22

**Seven** [1] 80:15

**Seventeen** [3] 63:14 74:5
105:23

**Seventeen-year-old** [3]
12:2 23:22 34:11

**Seventh** [2] 49:10 49:13

**Several** [2] 48:19 49:9

**Severe** [6] 85:20 85:21 85:
25 86:8 86:13 86:19

**Shadow** [1] 58:13

**Share** [1] 108:24

**Sharing** [1] 107:21

**Shave** [1] 70:10

**Shifts** [1] 78:22

**Shooting** [2] 40:17 76:9

**Shoplifting** [1] 14:21

**Shot** [3] 39:21 40:21 103:22

**Shotwell** [5] 44:7 44:13
45:21 61:23 67:19

**Show** [3] 35:2 38:24 103:24

**Showed** [1] 118:17

**Shown** [2] 88:21 118:13

**Sibling** [1] 64:4

**Side** [5] 67:2 78:21 78:23
107:4 109:24

**Signal** [1] 67:25

**Signaling** [2] 92:2 109:15

**Simple** [3] 13:22 43:1 56:
14

**Simply** [4] 10:6 31:5 32:9
35:3

**Single** [5] 6:15 6:15 6:19
12:1 30:13

**Sit** [7] 67:19 67:22 71:8
76:15 83:17 96:5 119:15

**Sitting** [6] 26:22 47:5 62:
8 83:14 87:4 87:14

**Situation** [17] 40:4 46:6
46:10 50:20 54:8 55:14 60:
18 62:11 66:5 67:18 86:3 89:
1 90:14 91:10 103:23 111:4
111:21

**Situations** [8] 53:14 55:
6 72:9 74:2 86:20 88:14 88:
24 104:4

**Six** [3] 34:14 80:15 108:13

**Sixteen** [2] 63:14 96:13

**Sixteen-year-old** [1]
63:14

**Sixth** [2] 49:10 49:11

**Slightest** [1] 58:7

**Smoke** [2] 62:23 62:24 62:
25

**Sober** [1] 92:23

**Society** [25] 9:4 19:16 19:
17 19:21 19:22 19:23 20:1
20:19 20:24 56:10 65:13 76:

14:19 56:17 56:18 59:16 76:
20 89:21 101:21 101:25 102:
23 103:2 115:21 116:11 116:
13

**Solely** [2] 37:12 37:25

**Someone** [25] 53:4 54:8 64:
23 66:1 73:22 74:25 76:2 76:
9 76:10 77:19 77:19 79:1 79:
18 80:6 80:18 82:7 83:4 101:
5 101:11 101:23 102:2 103:2
104:21 105:10 106:16

**Something's** [1] 76:4

**Sometimes** [18] 12:8 12:9
13:4 19:23 23:20 23:23 24:7
43:13 46:12 50:13 81:25 81:
25 82:1 101:2 117:16 118:4
118:13 118:19

**Somewhat** [1] 112:2

**Somewhere** [2] 18:12 115:
25

**Son** [12] 87:24 97:4 97:5
97:7 108:11 110:1 110:3 110:
9 110:13 110:17 110:22 111:5

**Son's** [1] 110:18

**Soon** [1] 55:10

**Sorrow** [1] 118:14

**Sorry** [1] 113:22

**Sort** [3] 109:5 109:19 118:8

**Sorts** [5] 12:10 34:6 34:6
34:7 34:10

**Sound** [3] 23:24 28:20 73:
20

**Sounds** [3] 80:3 84:19 84:
22

**Source** [3] 37:17 38:2 38:9

**Southwest** [1] 2:14

**Speaking** [1] 9:21

**Special** [20] 6:20 49:14
49:17 49:18 51:6 53:9 53:14
54:3 101:16 101:17 111:6
114:7 114:9 114:15 114:25
115:3 115:7 115:17 117:21
118:19

**Specific** [4] 18:18 19:14
24:20 34:9

**Specifically** [1] 3:15

**Specify** [2] 18:25 52:2

**Spectrum** [1] 64:23

**Spend** [4] 4:7 6:22 28:23
85:17

**Spent** [5] 12:3 25:11 69:
23 94:7 94:14

**Spur** [1] 103:17

**Square** [1] 43:22

**Stabbed** [1] 103:22

**Stage** [7] 52:5 63:15 71:
13 75:1 91:21 101:12 102:11

**Stand** [2] 110:5 113:19

**Standard** [1] 116:14

**Standing** [1] 40:15

**Standpoint** [4] 12:15 14:
14 37:5 67:13

**Start** [5] 5:21 14:8 50:10
51:14 60:12

**Starting** [3] 16:7 16:15
84:18

**Starts** [2] 14:9 16:1

**State** [41] 1:10 2:10 3:21
3:24 8:14 11:6 14:15 15:3
15:21 17:19 18:3 18:17 18:
19 19:12 22:6 22:10 29:20
31:17 31:25 33:19 37:7 45:
22 47:15 51:24 56:8 56:10
56:12 67:5 70:21 72:2 72:12
75:16 75:22 76:13 92:6 95:8
95:20 99:11 101:3 120:1 120:
4

**State's** [7] 5:22 15:16 16:
2 16:9 16:23 32:17 115:18

**Statement** [4] 50:6 54:24
82:23 84:21

**States** [1] 97:2

**Status** [1] 106:3

**Stay** [1] 5:21

**Stays** [1] 16:8

**Step** [1] 117:5

**Stick** [1] 63:9

**Still** [9] 48:17 53:23 61:
15 79:2 88:17 92:16 105:16
105:19 106:17

**Stop** [2] 26:17 77:21

**Stopped** [1] 89:17

**Storm** [1] 25:11

**Story** [1] 46:10

**Street** [2] 25:3 119:2

**Strides** [1] 55:5

**Strikes** [1] 49:7

**Strong** [2] 51:17 61:3

**Strongly** [5] 54:13 54:16
54:17 54:18 55:1

**Student** [1] 53:1

**Students** [3] 55:8 55:20
55:22

**Studying** [1] 87:25

**Stuff** [6] 25:9 42:4 61:11
94:21 104:12 108:21

**Stupid** [2] 73:20 73:21

**Subjectively** [1] 11:12

**Sudden** [1] 87:9

**Sufficient** [14] 10:10 22:
22 23:18 25:15 25:18 25:24
48:4 52:16 52:18 58:17 77:
17 77:25 78:2 100:22

**Suggest** [2] 58:13 76:5

**Support** [2] 50:10 53:1

**Supposed** [1] 115:1

**Supposedly** [1] 48:18

**Surprise** [1] 5:3

**Surrounding** [1] 66:16

**Sworn** [3] 44:8 68:16 93:12

**System** [7] 57:19 59:5 60:
19 73:19 80:2 86:23 110:2

---

## T

**T.D.C.** [4] 97:4 97:7 97:
11 108:11

**Table** [2] 41:16 83:15

**Talks** [2] 65:4 108:22

**Taught** [4] 49:9 49:9 49:
10 49:11 49:13 49:13

**Teach** [2] 20:5 49:8

**Teacher** [2] 20:4 49:3

**Teaching** [4] 49:7 49:8
53:8 62:17

**Teachings** [1] 63:11

**Technicalities** [1] 86:25

**Ten** [6] 26:9 26:12 63:16
69:14 87:12 92:25

**Tend** [4] 19:23 23:20 65:22
108:21

**Tends** [4] 37:18 38:3 38:9
38:24

**Tenth** [1] 49:14

**Term** [3] 14:11 14:13 14:13

**Terms** [6] 13:17 13:25 62:
12 94:7 112:2 118:7

**Terrence** [1] 48:25

**Terrible** [1] 96:25

**Test** [5] 42:23 42:24 64:3
84:11 91:25

**Testified** [5] 38:23 42:
21 44:8 68:16 93:12

**Testify** [2] 39:25 98:22

**Testimony** [25] 5:13 6:1
8:1 12:21 13:15 24:8 25:1
25:2 30:19 37:15 37:16 38:1
39:2 39:10 39:11 39:13 39:
17 39:18 39:19 40:7 40:8 41:
1 41:25 42:9 42:15

**Texas** [33] 1:8 1:10 1:21
2:8 2:10 2:15 2:20 3:21 3:
24 11:6 20:23 29:21 33:19
33:21 33:22 34:24 37:7 45:
23 58:15 59:8 70:21 72:12
74:19 95:8 95:20 100:2 101:
3 107:24 120:1 120:4 120:18
120:18 120:19

**Theft** [2] 97:20 102:9

**Theirself** [1] 108:22

**Themself** [1] 46:25

**Themselves** [7] 24:11 72:
23 77:1 104:5 112:16 112:17
119:8

**Thereafter** [1] 20:12

**Therefore** [1] 31:1

**Thereof** [2] 71:17 101:14

**They've** [4] 25:14 66:20
76:21 89:16

**Thinking** [9] 56:12 64:13
68:8 73:25 74:1 84:9 90:22
90:23 98:19

**Thinks** [1] 25:15

**Third** [5] 24:14 33:7 33:
10 40:16 91:15

**Thirteen** [1] 63:21

**Thirteen-year-old** [1]
63:21

**THOMAS** [1] 68:15

**Thoughts** [6] 7:7 46:1 55:
2 95:13 95:21 99:2

**Threat** [29] 9:4 19:16 20:
22 20:23 47:20 51:9 56:9 65:
13 76:16 76:17 77:1 77:5 77:
14 77:16 78:9 79:2 88:19 89:
21 101:21 101:24 102:23 103:
2 104:6 104:13 104:16 104:
21 109:24 116:13 119:8

**Threaten** [2] 116:11 116:
11

**Threatened** [1] 119:1

**Three** [22] 4:13 9:22 17:
25 25:5 27:24 30:3 32:18 33:
1 39:22 40:8 43:11 43:12 43:
14 43:15 43:18 62:10 69:25
80:14 83:7 90:2 90:7 96:19

**Throat** [1] 64:1

**Throw** [1] 8:11

**Ticket** [2] 88:9 93:6

**Today** [6] 6:23 16:12 48:
17 51:4 68:19 80:7 95:17
111:11

**Together** [8] 4:5 28:14
37:9 37:10 66:3 66:6 93:16
112:9

**Token** [1] 80:16

**Took** [7] 59:9 74:19 100:3
102:5 112:17 118:24 119:6

**Topic** [1] 95:18

**Topics** [1] 90:7

**Torturous** [2] 65:20 65:21

**Total** [3] 7:21 74:7 120:11

**Totally** [1] 103:6

**Touch** [1] 37:4

**Towards** [1] 61:10

**Towel** [1] 8:11

**Tracks** [1] 89:17

**Trade** [1] 87:3

**Train** [3] 57:7 57:7 57:7

**Trainer** [1] 97:3

**Trait** [1] 24:21

**Transaction** [6] 112:1
112:6 112:11 112:12 112:24
113:1

**Transcription** [1] 120:5

**Transcription/stenogra
ph** [1] 1:23

**Trap** [1] 117:16

**Treat** [3] 34:16 34:17 34:
19 53:14

**Treated** [1] 105:23

**Trial** [60] 1:3 5:4 5:5 5: 11 5:12 5:15 5:20 6:1 6:8 6: 11 6:14 6:25 7:2 7:8 7:11 7: 15 8:20 9:14 9:22 10:5 13: 11 13:13 14:14 14:20 14:21 15:2 15:6 15:11 16:1 16:5 17:20 18:18 19:13 22:8 26:5 27:1 27:3 35:15 35:17 35:19 35:20 36:10 37:18 37:19 38: 23 40:6 43:14 43:17 47:5 48: 6:20 71:13 73:2 74:16 75: 1 91:13 100:3 101:12 107:7 117:15

**Trial's** [1] 9:23

**Trials** [1] 4:7

**Triangle** [1] 43:18

**Tried** [1] 53:2

**Triggerman** [1] 52:14

**Trouble** [7] 12:2 34:12 50: 11 55:21 55:22 74:6 114:9

**True** [3] 54:10 71:1 120:4

**Truly** [3] 4:17 42:4 120:9

**Truth** [1] 59:18

**Try** [5] 5:1 47:25 83:1 83: 1 107:14

**Trying** [9] 4:18 31:9 37:5 63:7 69:24 84:13 84:20 86:5 110:25

**Turn** [1] 50:2

**Turned** [2] 50:2 54:5

**Turns** [2] 40:14 87:20

**TV** [1] 85:16

**Twelfth** [1] 49:14

**Twelve** [6] 7:20 12:19 67: 20 79:17 79:23 96:14

**Twenty** [2] 40:10 92:5

**Twenty-eight** [1] 107:25

**Twenty-five** [1] 83:8

**Two** [65] 3:23 3:25 5:5 5: 16 6:20 6:20 6:22 8:21 9:7 9:11 10:17 13:9 14:7 16:5 17:6 17:7 21:14 21:16 25:5 25:25 26:4 28:21 29:2 30:17 30:18 31:21 32:17 32:22 34: 16 37:3 37:8 37:9 37:10 38: 14 40:16 47:24 51:23 53:15 62:9 62:14 65:4 65:12 66:5 67:9 67:17 71:2 72:3 73:13 77:11 78:12 78:14 79:3 79:9 79:16 79:20 81:11 82:9 89: 25 90:9 104:20 109:7 111:25 112:25 117:21 118:12

**Type** [20] 18:20 18:21 39:6 47:7 47:7 54:3 60:15 61:15 65:13 72:20 73:4 73:4 74:10 76:19 91:4 101:21 101:22 105:25 112:17 119:8

**Types** [4] 38:16 46:23 72: 19 86:25

## U

**U.T.** [1] 87:23

**Ultimate** [1] 60:6

**Ultimately** [1] 66:10

**Unanimous** [6] 26:2 26:7 26:13 26:15 79:15 79:17

**Unanimously** [5] 21:9 21: 12 21:16 35:14 35:16

**Unanswered** [2] 100:12 100:13

**Uncomfortable** [1] 59:20

**Under** [3] 118:21 118:22 119:8

**Understood** [2] 70:5 113: 15

**Undo** [2] 24:18 25:18

**Undoing** [1] 25:7

**Unfair** [2] 17:22 18:3

**Unfold** [1] 118:20

**Unfolds** [1] 118:20

**Unique** [1] 109:5

**Uniqueness** [1] 28:15

**Unit** [1] 97:7

**United** [1] 97:2

**Unlawful** [1] 32:11

**Unless** [14] 5:22 15:16 16: 9 16:23 21:18 29:4 38:1 51: 23 58:14 60:12 75:19 75:22 77:10 99:24

**Unlikely** [1] 76:3

**Unresolved** [2] 59:19 100: 20

**Up** [40] 7:23 8:15 9:7 13: 24 16:11 21:3 21:6 21:16 35: 4 39:7 43:9 55:16 58:20 62: 7 62:7 62:12 62:25 63:6 70: 9 75:4 78:19 79:8 79:24 80: 2 87:23 87:24 87:25 88:2 88: 4 88:6 91:2 93:2 95:10 101: 8 105:24 108:16 108:18 110: 5 112:15 114:10

**Upbringing** [1] 62:13

## V

**Value** [4] 34:23 34:25 57: 18 68:4

**Valued** [2] 64:22 64:22

**Various** [1] 3:4

**Vehicle** [1] 19:6

**Venireperson** [6] 3:2 3: 3 26:1 42:6 42:10 107:7

**Verdict** [17] 6:13 13:3 13: 5 15:23 15:24 16:3 21:21 26: 13 26:15 28:16 33:8 33:9 33: 10 71:1 97:21 97:23 100:7

**Verdicts** [2] 12:24 21:17

**Versus** [3] 3:21 74:3 86:14

**Victim** [6] 9:5 10:16 28:1 28:13 35:8 40:14

**Victims** [4] 12:7 12:9 13: 6 34:7

**Victims'** [1] 86:24

**Violence** [30] 9:3 17:21 18:5 18:15 18:22 18:23 18: 24 18:24 19:2 19:3 19:5 19: 10 19:15 20:7 20:8 20:13 20: 18 20:21 47:21 51:9 76:6 76: 8 76:16 77:2 77:15 78:9 101: 20 101:24 102:21 116:12

**Violent** [1] 102:22

**Virginia** [1] 44:15

**Virtues** [1] 54:15

**Visit** [1] 7:6

**Visiting** [2] 4:7 94:8

**Voir** [14] 1:15 3:18 44:9 45:19 61:21 68:17 70:18 72: 10 79:14 82:19 93:13 95:5 95:16 107:11

**Volker** [4] 68:15 68:21 82: 21 93:8

**Volume** [1] 1:2 120:6

**VOLUMES** [1] 1:2

**Voluntarily** [1] 105:18

**Volunteers** [1] 95:25

**Vote** [4] 26:7 48:5 78:3 105:5

**Votes** [1] 79:18

**VS** [1] 1:8

## W

**Wait** [4] 67:25 74:11 78:5 82:9

**Walk** [1] 86:22

**Wall** [2] 20:9 30:14

**Walls** [1] 20:2

**Wants** [2] 57:2 95:23

**Warehouse** [1] 96:15

**Warrant** [4] 9:22 25:7 36: 86:20

**Warranted** [1] 14:16 46:

**Waste** [1] 7:22

**Watch** [3] 8:23 62:22 85:14

**Watches** [1] 64:5

**Wayne** [3] 2:12 3:24 82:21

**Ways** [1] 36:24

**Week** [3] 24:24 29:6 29:6

**Weekend** [1] 88:7

**Weigh** [3] 64:16 79:13 90: 11

**Weighty** [1] 92:23

**Well-informed** [1] 6:13

**Wentz** [14] 2:17 3:10 3:11 3:24 8:10 61:23 67:24 82:22 107:6 107:10 107:12 113:19 113:21 113:22

**West** [1] 44:15

**Whereas** [1] 63:21

**Whichever** [1] 9:9

**Whole** [10] 12:4 20:14 24: 17 28:4 28:15 34:5 62:11 66: 20 85:17 113:15

**Wide** [1] 36:23

**Wife** [1] 53:10

**Willing** [3] 57:19 57:20 68:4

**Win** [2] 76:2 88:11

**Winds** [1] 39:7

**Windshield** [1] 19:9

**Wise** [1] 56:13

**Withdraw** [2] 10:13 22:23

**Witness** [10] 12:11 12:16 40:10 40:13 40:16 58:14 60: 13 61:2 99:24 120:13

**Witnesses** [11] 12:10 12: 17 12:22 13:6 39:4 39:23 40: 9 42:13 42:19 42:20 71:7

**Woman** [1] 20:3

**Wonder** [1] 59:6

**Wondering** [1] 84:6

**Word** [15] 14:2 17:3 17:3 17:4 17:9 17:13 17:17 18:6 19:17 20:19 23:10 84:5 84:7 84:15 115:22

**Words** [26] 10:12 11:18 12: 12 12:14 13:17 14:4 19:20 23:3 23:3 46:3 48:1 60:8 60: 9 65:9 66:8 66:15 72:5 82:1 91:14 103:12 107:19 111:21 112:1 118:14 118:24

**Worker** [1] 53:2

**Workers** [1] 20:14

**Works** [11] 56:3 60:20 73: 19 74:15 85:8 96:24 97:4 97: 6 105:6 108:11 110:1

**World** [6] 13:3 13:5 13:20 20:12 23:15 28:6

**World's** [1] 41:9

**Worried** [1] 110:23

**Worry** [3] 42:22 107:9 110: 22

**Worst** [1] 90:23

**Write** [1] 63:17

**Writing** [4] 4:23 13:14 42: 22 120:5

## Y

**Y'all** [2] 97:21 97:22

**Yards** [1] 40:17

**Year** [11] 29:7 29:7 29:8 29:9 29:22 30:21 42:2 49:7 63:14 63:21 80:7

**Years** [36] 29:5 29:5 29: 15 29:25 30:12 30:16 30:22 30:25 33:24 34:4 36:15 36: 19 54:1 70:9 74:5 80:2 80: 13 80:15 80:19 80:24 81:2 81:8 81:15 81:16 83:8 86:10 86:18 86:18 87:12 96:13 96: 15 98:3 107:25 108:13 109:9

**Young** [3] 24:5 50:13 51:4

**Younger** [2] 64:4 64:4

**Yourself** [10] 10:9 43:7 47:13 55:9 68:21 83:4 92:3 94:9 117:14 119:15

**Yourselves** [4] 7:1 13:19 13:21 28:5

**Youthfulness** [1] 23:21

## Z

**Zero** [1] 79:17

**Zone** [1] 8:5

1

1      REPORTER'S RECORD

2      VOLUME 14 OF 25 VOLUMES

3      TRIAL COURT CAUSE NO. 800112

4

5    CHARLES MAMOU, JR.       )    IN THE DISTRICT COURT

6           Appellant        )

7                            )

8    VS.                      )    HARRIS COUNTY, TEXAS

9                            )

10   THE STATE OF TEXAS       )

11          Appellee          )    179TH JUDICIAL DISTRICT

12

13

14              * * * * * * * * * * * * * * * * * * *

15              VOIR DIRE EXAMINATION

16              * * * * * * * * * * * * * * * * * * *

17

18      On the 27th day of September, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Bob Burdette, Judge

21   Presiding, held in Houston, Harris County, Texas:

22      Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

```
 1              A P P E A R A N C E S

 2       MR. LYN MCCLELLAN

 3       SBOT NO. 13396100

 4       MS. CLAIRE CONNORS

 5       SBOT NO. 0470500

 6       Assistant District Attorneys

 7       201 Fannin

 8       Houston, Texas 77002

 9       Phone:  713.755.5800

10       ATTORNEYS FOR THE STATE OF TEXAS

11

12       MR. WAYNE HILL

13       SBOT NO. 59656300

14       4615 Southwest Freeway

15       Houston, Texas 77027

16       PHONE:  713.623.8312

17       MR. KURT WENTZ

18       SBOT NO. 21179300

19       5629 W FM 1960

20       Houston, Texas 77069

21       PHONE:  281.587.0088

22       ATTORNEYS FOR THE DEFENDANT
23

24

25
```

INDEX

VOLUME 14 OF 25

|  |  |  |  | PAGE | VOL. |
|---|---|---|---|---|---|
| September 27, 1999   Voir Dire Examination |  |  |  |  | 14 |
|  |  |  |  |  |  |
| Panel Voir Dire |  |  |  | 4 | 14 |
|  |  |  |  |  |  |
| Venirepersons | Court | State | Defense |  | 14 |
| Brenda Dixon | 46 | 48 | 63 |  | 14 |
| Roger Baumgarten | 73 | 75 | 89 |  | 14 |
| Mary Jones Smith | 99 | 101 | 114 |  | 14 |
| Michael Lee Smith | 124 |  |  |  | 14 |
| Dale Hauck | 127 | 130 | 139 |  | 14 |
| John Reeves | 144 | 147 | 149 |  | 14 |
|  |  |  |  |  |  |
| Proceedings concluded |  |  |  | 153 | 14 |
|  |  |  |  |  |  |
| Court Reporter's Certificate |  |  |  | 154 | 14 |

**3**

```
 1            THE COURT:  As I understand it, there is a
 2   agreement by and between the parties the following five
 3   venirepersons out of today's group of thirteen may each,
 4   prior to the individual voir dire, be excused for
 5   various reasons; those being No. 132, that being Joseph
 6   Brasic; Venireperson 134, Patricia Hawley; Venireperson
 7   136, Robert Williams; Venireperson 140, Lydia Hernandez;
 8   Venireperson 145, Carol Shutter.
 9            Mr. McClellan, is that your agreement?
10            MR. MCCLELLAN:  Yes, Your Honor.
11            THE COURT:  Are you satisfied it's Miss
12   Connors' agreement?
13            MR. MCCLELLAN:  Yes, sir.
14            THE COURT:  Mr. Hill?
15            MR. HILL:  Yes, sir.
16            THE COURT:  Are you satisfied it's Mr.
17   Wentz'?
18            MR. HILL:  Yes, sir.
19            THE COURT:  Mr. Mamou, is it yours?
20            THE DEFENDANT:  Yes, sir.
21            THE COURT:  Is it your request that each
22   of those be excused?
23            THE DEFENDANT:  Yes, sir.
24            THE COURT:  Very well.  Each of those will
25   be excused.
```

**4**

```
 1            (Panel brought in and seated.)
 2            THE COURT:  Thank you.  Good morning,
 3   ladies and gentlemen.  I want to spend a couple of
 4   minutes visiting with you about some things that we did
 5   not talk about the other day.  And frankly, the reason
 6   we didn't talk about them was because our group was so
 7   large, we could have made no headway.  But I want to
 8   remind you, because it's been a week since we were
 9   together last, this is the case of the State of Texas
10   versus Charles Mamou.  Mr. Mamou is seated here next to
11   his attorneys, Mr. Wayne Hill, Mr. Kurt Wentz.  The
12   State of Texas is represented by two of her Assistant
13   District Attorneys, Mr. Lyn McClellan, who's present
14   right now, and Miss Claire Connors, who will be in in a
15   couple of minutes.
16            We talked the other day about the fact
17   this defendant is charged with the offense of capital
18   murder.  It's alleged to have occurred in Harris County,
19   Texas, on or about December the 7th, 1998.  When we
20   talked the other day, we talked about the fact that a
21   trial like this can come in two parts.  The first part
22   of the trial, the jury's only concern is going to be
23   with deciding whether the defendant is or is not guilty.
24   If the jury finds the defendant not guilty, obviously
25   the case is over with.
```

**5**

```
 1            If the jury should find the defendant
 2   guilty, we come back.  And we can have a second stage
 3   where additional evidence can be presented to you for
 4   the purposes of aiding the jury in answering two Special
 5   Issues or two questions at the conclusion of the
 6   evidence of the second stage of the trial.  We talked
 7   very briefly about those questions the other day, but
 8   it's how the jury answers those two questions that
 9   determines what punishment will be imposed in this
10   particular case, any capital murder case, for that
11   matter.
12            So since the first phase of the trial the
13   jury's only concern is going to be with deciding whether
14   the defendant is guilty or not guilty, the focus of the
15   evidence, therefore, is going to be on the offense
16   itself.  Who committed it?  How was it committed?
17   What were the circumstances?  When and where was it
18   committed?  What was the prior relationship of the
19   parties, if it was one?  What was the motive in the
20   case?  All those things are things about the crime or
21   things that you can hear at the first phase of the
22   trial.
23            Since in just about everything we do in
24   our lives we want to know about all aspects of the
25   circumstances, the second phase of the trial, the focus
```

**6**

```
 1   of the evidence is going to get off the crime itself,
 2   because you've already heard all there is to hear about
 3   that.  There is no way to create more evidence than what
 4   you can get at the first phase.
 5            But at the second phase of the trial, the
 6   focus of the evidence will shift and it will get off the
 7   crime itself and will, instead, focus on the defendant;
 8   because we know what a person did in the past, the crime
 9   itself.  Now we want to know what kind of a person we're
10   dealing with.  So at the second phase of the trial, you
11   get to hear evidence about the character, the background
12   of the defendant, every single good thing he's ever
13   before done in his life, every single bad thing he's
14   ever done before in his life, if there are any bad
15   things, as well as his personal moral culpability, or
16   his own personal responsibility in the commission of the
17   crime.  That can become an issue in the event we have
18   multiple defendants who committed an offense.  What part
19   of the offense did the person on trial play?
20            For example, of course, there were three
21   people charged with having committed a murder.  Was the
22   person on trial the triggerman, or was the person on
23   trial the driver of the getaway car, or was the person
24   on trial just simply somebody who supplied the weapon
25   and never was at the scene?  Those are things you'll
```

7

1    want to know to help you answer those two questions.
2             We talked about the fact at the beginning
3    of every single trial, every defendant charged with a
4    crime is presumed to be not guilty.  He starts off being
5    not guilty.  Stays not guilty unless or until the
6    State's evidence proves beyond a reasonable doubt that,
7    in fact, he is guilty.
8             Now at each phase of the trial -- at the
9    conclusion, I should say, of each phase of the trial,
10   I'll give you what is called the Court's charge.  And
11   the Court's charge will consist of a number of pages of
12   legal definitions and instructions that are going to be
13   given to you for the purposes of assisting you during
14   the course of your deliberations.  Within the Court's
15   charge is going to be contained all of the rules that
16   will have come into play, that will have been raised by
17   the testimony that was presented.
18            If you'll remember the other day, we
19   talked about the fact that your job as a juror is to
20   determine the believability, the credibility of the
21   witnesses.  My job as a Judge has nothing to do with
22   that.  My job as a Judge has to do with listening to
23   everything the witnesses say.  Whether I believe them
24   makes absolutely no difference.  But on the basis of
25   what they say, my job is, through the Court's charge, to

8

1    arm you with all of the law that comes into play on the
2    basis of what the witnesses say.   So some of that law
3    in the Court's charge may never be used by you; because
4    if you don't find the witness who raised that particular
5    point of law to be credible, then that point of law is
6    not going to apply.  So we take your decision as to
7    who's believable, the applicable law, put them both
8    together, come up with what you think is the right
9    verdict to reach.
10            We're going to spend some time this
11   morning talking about the second phase of a capital
12   murder trial.  You may say to yourself, well, that's
13   pretty silly.  How can we talk about the second phase
14   when we haven't heard anything about the first phase?
15   And the answer to that question is this:  All the
16   talking that's ever going to be done about explaining to
17   you the law that can come into play during the course of
18   a trial like this must occur before the trial ever
19   begins.
20            For example, can you see if we only talked
21   to you now about the law that would come into play in
22   the first phase of a capital murder trial, and if a jury
23   went out at the conclusion of all the evidence and
24   determined that this imaginary defendant is guilty of
25   capital murder, if we were to bring you back before the

9

1    second phase of the trial begins to talk to you about
2    the law that applies during the second phase of the
3    trial and if a juror, or perhaps several jurors, said,
4    well, I can't possibly follow that aspect of the law, I
5    don't agree with it, I don't believe it, I would never
6    follow it as a juror, that means we would have to excuse
7    that juror from the panel.  That means we'd only have
8    eleven.  I have to have twelve.  That means I'd have to
9    declare a mistrial.  That means everything we would have
10   done up to that point would have been a total waste of
11   time.
12            So all the talking that's ever going to
13   occur about the law that can come into play during a
14   trial like this must be done before the trial ever
15   starts.  I want you to know that, because I don't want
16   you to think there is anything nefarious going on.  I
17   wouldn't want you to think the defendant's getting ready
18   to plead guilty.  That's not going to happen.  I don't
19   want you to think Mr. Hill and Mr. Wentz are going to
20   throw in the towel.  That is not the case.  I don't want
21   you to think Mr. McClellan and Miss Connors are giving
22   up on the presumption -- I don't want you to think that
23   Mr. McClellan and Miss Connors are giving up on the
24   defendant's presumption of being not guilty.  That's not
25   the case at all.

10

1             Next we're going to be talking about some
2    specific things that I'm sure you have never before in
3    your life have thought about.  There is no reason you
4    ever should have.  Please don't try to commit to memory
5    what it is we're talking about.  That's not the point.
6    And if any of these rules ever do come into play, as we
7    said, they're going to be in writing.  They're going to
8    be in the Court's charge.  You'll have the Court's
9    charge with you back in the jury room during the entire
10   time you're deliberating, so there is absolutely no
11   reason for you to try to memorize this.  I just want to
12   give you an idea of what you can anticipate, to be
13   forewarned.  The more information you have, the broader
14   your comfort zone perhaps.
15            So with that in mind, let's talk about --
16   let's put ourselves in some imaginary position.  Let's
17   just say you're jurors in some imaginary capital murder
18   case.  Your jury has found the defendant guilty of
19   capital murder.  Means the State's evidence has proved
20   beyond a reasonable doubt that the defendant is guilty.
21   Your jury has found them guilty.
22            You come back and you hear a second phase
23   of the capital murder trial.  You hear evidence at the
24   second phase about the character and background, the
25   personal involvement of the defendant on trial.  And

11

1  your jury goes out to begin to deliberate using all the
2  information at both phases of the trial for the purposes
3  of answering those two questions we talked about
4  briefly.
5          Those questions are over here on this
6  board.  Please feel free to watch them, read along with
7  me as we go through them.  Question Number One will ask
8  you this:  Do you find from the evidence beyond a
9  reasonable doubt that there is a probability that the
10 defendant would commit criminal acts of violence that
11 would constitute a continuing threat to society?   Now
12 can you see no matter who the defendant is, no matter
13 who the victim was, no matter what the evidence in the
14 case, there is never ever, ever going to be but two
15 possible answers to that question; either yes, we do, or
16 no, we don't.  And the jury will answer whichever way
17 they think the evidence dictates.
18         Question Number Two asks:  Taking into
19 consideration all the evidence, including the
20 circumstances of the offense -- now that's going to be
21 what you heard at the first half of the trial -- also
22 including the defendant's character, background, and
23 personal moral culpability, which is the same as
24 responsibility.  That's going to be what you heard at
25 the second part of the trial.  So you can see that the

12

1  first half of the second question just simply instructs
2  the jury to go back and review all the evidence in the
3  case from beginning to end for the purposes of asking
4  yourself this question:  Is there a sufficient
5  mitigating circumstance or circumstances that make you
6  think that a life sentence is a more appropriate verdict
7  than a death sentence?
8          Again, no matter who the defendant, no
9  matter who the victim, no matter what the evidence,
10 never but two possible answers to that question.  Again,
11 you'll answer that question whichever way you believe
12 the evidence dictates.  If the jury should answer yes to
13 that first question and if the jury should answer no to
14 that second question, the law says I have no choice, I
15 have no option, I have no discretion.  I must sentence
16 the defendant to death, and that's exactly what I'll do.
17         If the jury should answer those two
18 questions in any way other than yes and no, in that
19 order, the law again says I have no choice, no
20 discretion, no option.  I must sentence the defendant to
21 life, and that's exactly what I'll do.  So what we can
22 see first off is a yes and a no, in that order, is
23 death.  A yes and a yes is life.  A no to the first
24 question shuts off consideration of the second question,
25 because a no to the first question is a life sentence;

13

1  because no to the first question is different than yes
2  and no, in that order.  If you got a no to the first
3  question, there is no way in the world you can answer
4  that second question to cause the death sentence to come
5  back into play.  So if you answer no to the first
6  question, case is over, life sentence.  If you answer
7  yes to the first question yes to the second question, a
8  life sentence.  But if you answer yes to the first
9  question, no to the second question, death sentence.
10 Any question about the mechanics?
11         So what we can see about this so far is
12 this:  In the State of Texas, juries don't sentence
13 somebody to death.  Juries don't go out and subjectively
14 say, I think in this case we'll give this one a life
15 sentence.  I think in that case we'll give that one the
16 death sentence.  We don't do it that way.  Instead, what
17 we do is we ask jurors to review all the evidence in the
18 case for the purposes of answering these two questions.
19 Now you are entitled to know what the answers to these
20 two questions is going to bring about.  A yes and no is
21 death.  Anything else is life.
22         I'm sure you have heard -- I'm sure you
23 have read about capital murder cases where at the
24 conclusion of some of them, these questions are answered
25 in such a way that a death sentence is imposed.  And

14

1  some of them -- I'm sure you've heard about these
2  questions -- are answered in such a way that a life
3  sentence is imposed.
4          Let's talk about that for a second.  These
5  questions are our standardized process.  These questions
6  never change.  The words never change.  The order in
7  which the questions are asked never changes.  The thing
8  that is always different is always the case itself.
9  Every case is as distinctive as a fingerprint.  There
10 are no two of them that are ever the same, because all
11 defendants are always different.
12         You might have in one case a
13 seventeen-year-old female who's never done anything
14 wrong.  Another case you might have a
15 forty-five-year-old six-time ex-convict and a whole
16 bunch of people in between.  You might -- all victims
17 are different.  Some of them during their lifetime were
18 better people than others were.  All different sets of
19 circumstances as to why and how a crime was committed
20 are always different.  All the witnesses who see crimes
21 committed and who testify are always different.
22         You might say to yourself, well, if
23 somebody testified, whatever it might be, whatever in
24 your mind might be the absolute sufficient amount of
25 evidence to cause you to find somebody guilty, there

15

1   might be a witness who would use those precise words;
2   but because you are the exclusive judges of the
3   credibility of the witnesses and the weight to be given
4   their testimony, it may be that you don't believe that
5   witness at all.  So while the message was right, the
6   messenger was wrong.
7           And lastly, certainly not leastly, all
8   jurors are always different.  We could have four juries
9   in this courtroom listening to exactly the same
10  witnesses testify at exactly the same time and have all
11  four juries go out and begin their deliberations in
12  separate jury rooms, and we can have four different
13  verdicts; because everybody reacts differently to every
14  witness, to their testimony, to the circumstances, to
15  the victim, and to the defendant.
16          And that's why at the conclusion of some
17  cases where a life sentence is imposed, that may very
18  well be the most appropriate verdict there ever could
19  have been.  And in other cases where these questions are
20  answered in such a way that the death penalty is
21  imposed, likewise, it could be under that particular set
22  of circumstances the most appropriate verdict there
23  could have been.  So that's how it determines in some
24  cases life over here, death over there, by how the jury
25  answers these questions.  Does anybody have any

16

1   questions so far?
2           Okay.  Let's talk for a couple of minutes
3   about the questions specifically.  We had mentioned that
4   in the Court's charge there are going to be some terms
5   defined for you.  I'm going to also tell you there are
6   going to be some terms that are not defined.  And if
7   your question is, how do you guys down at the courthouse
8   decide when you're going to define a word for us and
9   when you're not, the answer to that question is very
10  simple.  If we're going to be using a word that's a word
11  peculiar to the lawyering business, we have no right to
12  expect you to come down here, give of your time, or
13  reschedule your job when you don't know what our words
14  are.  So we're going to define those words for you in
15  the charge.  If we're going to be using words just like
16  you guys do away from here, we're not going to define
17  those words for you; because you already know what they
18  are.
19          So, we're going to find in these questions
20  here that some of those -- each of these kinds of words
21  we're going to talk about.  First off, in the first
22  question it starts off with the phrase, Do you find from
23  the evidence beyond a reasonable doubt?  Now if you'll
24  recall last Monday, we talked about the term, reasonable
25  doubt.  We gave you the definition that we're going to

17

1   give to you in the Court's charge.  It is exactly the
2   same definition that applies to this first question.
3           Although when we talked about reasonable
4   doubt the other day, we talked about it from the
5   standpoint of the first phase of the trial. We talked
6   about it from the standpoint that everybody starting out
7   at trial is not guilty.  They stay not guilty unless or
8   until the State's evidence erases that presumption of
9   being not guilty and proves beyond a reasonable doubt
10  that, in fact, they were guilty.
11          So what we're saying is the presumption of
12  innocence, the presumption of being not guilty, can be
13  overcome; and it can be overcome by the strength, the
14  quality of the State's evidence.  If the State's
15  evidence is not of sufficient strength or quality to
16  prove a person's guilt beyond a reasonable doubt, the
17  presumption of innocence, the presumption of being not
18  guilty, is not erased.  That's the result.  That's the
19  verdict.  So anytime we see the phrase, do you find from
20  the evidence beyond a reasonable doubt, that means the
21  State has to prove to you what the answer to that
22  question should be.  So starting out, the answer to
23  these questions -- the answer, first off, at the first
24  phase of the trial is not guilty, until and unless the
25  State proves beyond a reasonable doubt guilty.  Are we

18

1   altogether on that?
2           Likewise, at the second phase of the
3   trial, in order to get a death sentence, we know the
4   State's got to prove beyond a reasonable doubt the
5   answer to the first question should be answered yes.
6   That means starting out, the answer to that first
7   question is no, unless or until the State's evidence
8   proves beyond a reasonable doubt the answer should be
9   yes.  So starting off, it's not guilty.  It's no unless
10  the State's evidence is strong enough that it bumps it
11  up a notch to guilty and to yes.  And strong enough
12  means their evidence has to show beyond a reasonable
13  doubt that the person is guilty.  Got to show beyond a
14  reasonable doubt the answer to the first question is
15  yes.  Any questions so far?
16          So what we're necessarily saying is this:
17  It is presumed that every person convicted of capital
18  murder should receive a life sentence, because it's
19  presumed that that Question Number One should be
20  answered no.  That presumption remains in effect unless
21  or until the State's evidence establishes beyond a
22  reasonable doubt that the answer to that first question
23  should be yes.  Any questions about that?
24          Okay.  So back to the first question.  Do
25  you find from the evidence beyond a reasonable doubt

19

1 that there is a probability?  Let's talk for a second
2 about the word probability.  That's a word that will not
3 be defined for you, because you use that word all the
4 time.  So while I am not permitted to define the word
5 probability for you, I am permitted by comparison to
6 tell you that whatever the word probability does mean to
7 you, there are two things it cannot mean.
8 First off, whatever the word probability
9 means to you it must mean something more than a
10 possibility.  Anything could possibly occur.  Because it
11 could possibly occur does not mean it's probably going
12 to.  On the flip side, whatever the word probability
13 means to you, it must mean something less than a
14 certainty.  Because something is probably going to
15 happen does not mean it's certain to happen.  And let's
16 keep in context how we're using the word probability.
17 The State's got to show you beyond a reasonable doubt
18 that it existed.
19 So the fact that there is a probability
20 that the defendant would commit criminal acts of
21 violence in the future, can you see how grossly unfair
22 it would be if all the State was required to do was to
23 show the existence of a possibility that a defendant was
24 going to commit criminal acts of violence in the future?
25 On the other hand, it would be grossly unfair to the

20

1 State if we made them prove the existence of a certainty
2 that somebody would commit criminal acts in the future.
3 Because that's not possible, so we just simply split the
4 baby.
5 So if you find beyond a reasonable doubt
6 there is a probability, if probability means to you
7 something more likely to happen than likely not to
8 happen, that's just fine.  If it means something
9 different than that, that is just fine, too, as long as
10 whatever the word probability means to you, it means
11 something more than a possibility, but something not as
12 high as a certainty.  Somewhere in between.  Anybody
13 have any questions about that?
14 Probability that the defendant would
15 commit criminal acts of violence.  In order to get a yes
16 answer to this question, the State has to show to you
17 beyond a reasonable doubt the existence of a
18 probability, a defendant would commit certain types of
19 crimes, not a certain particular crime in the future.
20 The State, for example, to get a yes answer to this
21 question, is not required to prove beyond a reasonable
22 doubt the existence of a probability that the defendant
23 would commit future capital murders.  Certainly if that
24 evidence exists, the State's entitled to present it to
25 the jury.  But they're not limited to a particular crime

21

1 in terms of their proof.  They are, instead, required to
2 prove a certain type of conduct.  And the type of
3 conduct could be a criminal act that amounts to a crime
4 of violence.
5 The crime of violence can be a crime of
6 violence as to persons or as to property, because it
7 doesn't say in the question which one.  So, certainly
8 capital murders are criminal acts of violence.  As to
9 murders, or rapes, or robberies, or attempted murders,
10 or kidnappings, they are all criminal acts of violence
11 as to persons.
12 Criminal acts of violence as to property.
13 Arsons; the burning of somebody's vehicle, home, or
14 property, certain kinds of burglaries that require
15 breaking in to get into a building or on the premises,
16 the taking of a club and beating in the windshield of an
17 automobile.  Those are all criminal acts of violence as
18 to property.  And there are a hundred more examples I'm
19 sure you can think of.  But it is that general type of
20 conduct that the State must prove; not a particular
21 crime within that type of conduct.  And these criminal
22 acts of violence must be such that they constitute a
23 continuing threat to society.
24 The word society is not going to be
25 defined for you.  I would, however, ask you to consider

22

1 making a distinction, if you feel comfortable with the
2 distinction, between the words community and society.
3 We all live in different communities, but all our
4 communities are a piece of one society.  I say that
5 because oftentimes when we think of society, we think of
6 people with whom we have contact; neighbors, coworkers,
7 family members, friends.  We don't ordinarily, for
8 example, when we think of society, think of people
9 behind penitentiary bars.  But they also have the right
10 to be free from criminal acts of violence.
11 For example, the schoolteacher who teaches
12 behind the walls of the penitentiary.  When she clocks
13 in in the morning at 8:00 o'clock to go behind the walls
14 to do her work, she does not lose her right to be free
15 from criminal acts of violence while she's back behind
16 the walls doing her job.  And if at the conclusion of
17 the day, if she's able to escape with her life and punch
18 out outside the walls, she doesn't regain her right to
19 be free from criminal acts of violence.  That's
20 preposterous, and that's not the case.  So what we're
21 saying is people behind the penitentiary walls,
22 likewise, are a part of society.  The teachers, the
23 medical personnel, the nurses, doctors, so forth, and
24 the prison staff, the guards, the wardens, and who all's
25 involved in that, as well as the inmates, themselves,

**23**

1   all have a right to be free from criminal acts of
2   violence. If we ever hope that rehabilitation can come
3   from incarceration, it's not going to come if we don't
4   protect the prisoners. So when we use the word society,
5   we mean all the people, all the time, everywhere.
6           The question doesn't ask, would these
7   crimes constitute a continuing threat to the citizens of
8   Harris County, Texas? It says, to all of society. Any
9   questions about the first question? If the jury should
10  answer yes to the first question, you'll go along to the
11  second question. If you answer no to the first
12  question, the case is over and you don't go any further.
13          Now let's assume for the purposes of our
14  conversation here that you have answered yes to the
15  first question, and you're taking up the second
16  question. Let's back off for just a second and get an
17  overview of where a jury necessarily must have to be in
18  their job before they start to take up the second
19  question. So, necessarily, the jury would have had to
20  have found the defendant guilty of capital murder.
21  Because if they hadn't, these questions would never come
22  into play.
23          Secondly, the jury necessarily would have
24  had to have answered yes to Question Number One.
25  Because if they answered no to Question One, you never

**24**

1   would have gotten to Number Two. So what that means is
2   that consistently and unanimously the jury has returned
3   a verdict possibly in a way in which the death penalty
4   is going to be imposed. The second question is: Does
5   that mean that's really what the jury wants to do, based
6   upon the uniqueness of this case -- and I say
7   uniqueness; because every case is unique to every other
8   case, just like a fingerprint.
9           So, we talked earlier about the first half
10  of that second question just being an opportunity for
11  the jury so go over all the evidence in the case. And
12  the question itself asks you in street terms, everyday
13  talk, is there a good enough reason to undo the death
14  sentence in this case and replace it with a life
15  sentence? That's what the question is here. Some
16  cases you might think there is. Some cases you might
17  think there is not. That's your call.
18          Now let's talk about the question itself
19  for a second. First off, you can see that that phrase
20  that we've always been dealing with, do you find from
21  the evidence beyond a reasonable doubt, is not in that
22  question. That means the State is not required to prove
23  to you what the answer to that second question should
24  be. We know from our conversation last week that the
25  defendant is never required to prove anything. Well,

**25**

1   where in the world does that leave us? Because if the
2   State's not required to prove what the answers to that
3   second question should be -- and they're not -- if the
4   defendant, defense, is not required to prove to you what
5   the answer to this second question should be -- and
6   they're not -- that means that the law recognizes there
7   may be many, many cases where there is absolutely no
8   evidence of a mitigating nature contained within the
9   case, because nobody's required to put it there.
10          The requirement that the second question
11  imposes on the jury is to research the case to see if
12  it's there. Are we together so far that when we use the
13  word mitigating here, that that's a word that will not
14  be defined for you? Because what it might mean to one
15  of you, it might mean something entirely different to
16  another. When we use the word mitigating here, we are
17  not using something that justifies the conduct.
18  Obviously, the conduct wasn't justified; because if it
19  had been, you couldn't have found him guilty. The law
20  wouldn't permit it. Obviously, we're not talking about
21  something that excuses conduct; because if the conduct
22  were excusable, again, you couldn't find the defendant
23  guilty. We're talking about mitigating in the sense of,
24  is there something in the evidence that's a good enough
25  reason to cause you to reduce the sentence from death to

**26**

1   life? That's what we mean.
2           Some folks might think comparative
3   youthfulness of a defendant on trial might be
4   mitigating. The idea some people think of, if you have
5   a seventeen-year-old who's convicted of capital murder,
6   that their thought processes or their emotional
7   stability or maturity has not risen to the level that a
8   fully grown adult would have. Sometimes some folks
9   think that's mitigating. Some other folks might hear
10  exactly that same testimony and might say to themselves,
11  that's not a bit mitigating; because if somebody does
12  something that bad at that young age, we've lost him
13  forever. Exactly the same evidence, just viewed
14  differently by two people. Sometimes some folks might
15  hear testimony in a case about mental retardation in a
16  particular defendant on trial. Some folks might think
17  mental retardation to be mitigating. Other folks might
18  not. The idea being mental retardation is not something
19  that can be fixed. Whatever it is is the way it's going
20  to be in a particular person for the rest of their life.
21  Other folks might say, having heard exactly the same
22  evidence, might say, well, wouldn't it depend upon the
23  severity of the retardation? Is the retardation
24  minimum? Is it severe? And the more severe, the more
25  mitigating it might be.

27

1    So I'm just simply saying that the law
2    asks the jury to make these decisions; and each juror
3    might have their own view, their own read, their own
4    take on a particular piece of evidence.  It might not be
5    anything about a defendant's physical makeup.  It might
6    be, for example, you found out in one case a defendant,
7    the week before the offense occurs for which a jury has
8    found the defendant guilty, a defendant may have been
9    driving down the street and sees a house on fire,
10   stopped his car, runs in at the risk of his own life to
11   save the life of a couple of kids that surely would have
12   perished in the fire but for his act of bravery.  A jury
13   might view that to be mitigating to a degree, might
14   cause a life sentence to be more appropriate than the
15   death sentence.  Maybe not, but you have to consider it.
16       You might have another person who went off
17   in the service, Vietnam, Desert Storm, was a perfectly
18   fine person before they went and got themselves just
19   hopelessly screwed up as a result of their service to
20   the country and have never been able to function and
21   perform appropriately in society ever since.  Sometimes
22   some folks might view that to be mitigating.  Others
23   might not.
24       The point of it is, it's your call as to
25   whether it is or is not mitigating.  But the requirement

28

1    that the law puts on the question is not that you find
2    it is sufficiently mitigating for a good enough reason.
3    The law does, however, require you go back over all the
4    evidence in the case to see if there is a good enough
5    reason.  If there is a good enough reason to answer that
6    question just enough to take down the death sentence,
7    replacing it with a life sentence, then your answer to
8    that question is yes.  If there is not a good enough
9    reason, then your answer to that question is no.  Any
10   questions about the two questions?
11       Now, let me for just a second try to put
12   myself in your seats.  A thought of mine right now would
13   be, let's see if I got this right.  Are you telling me
14   if I find somebody guilty of capital murder, the
15   evidence is so strong that I'm satisfied beyond a
16   reasonable doubt that they are guilty of capital murder,
17   and after that if I'm satisfied beyond a reasonable
18   doubt that the person is going to be a future threat --
19   that's paraphrasing that first question -- I answer that
20   first question yes, I find out they committed capital
21   murder and that they're a future threat to society --
22   are you telling me that that still doesn't mean that the
23   death penalty is going to be imposed?  And that's
24   exactly right.  It means it's not going to be imposed
25   until you have taken up question Number Two.  Because

29

1    can you see that each of the three decisions that a jury
2    could be asked to make in a capital murder trial -- that
3    is to say, is the defendant guilty?  Is he a future
4    threat?  And is there good enough reason why a life
5    sentence should be substituted for a death sentence?
6    All asks you, the jury, three remarkably different
7    questions.  The first issue, first decision, what did he
8    do in the past?  That's a capital murder.  Second
9    decision, which is Special Issue Number One, asks you,
10   What do you think he's going to do in the future?
11       Now the third question says, Now putting
12   all that aside, the uniqueness in this case, if there is
13   any, do you think a life sentence would be a more
14   appropriate verdict than a death sentence?  So what I'm
15   saying is, my view of the three decisions a jury can
16   make -- and it's only mine -- is kind of like three
17   points of a triangle.  All of the evidence in the case
18   is inside the triangle.  Every time you get to a point
19   there is a decision to be made, you have to look at
20   what's inside of the triangle.  But once you have made
21   that decision and you move along to the next point of
22   the triangle, you're looking at the same body of
23   information, the evidence, for the purposes of answering
24   an entirely different question.  So no matter how you
25   answer one question, that does not dictate how the next

30

1    question should be answered.  The body of evidence, the
2    information pool, is exactly the same.  But how you
3    answer one question doesn't dictate the next question,
4    nor does it dictate the third.  Instead, each decision
5    .is independent of the other questions in the case.  And
6    it's kind of like the old Yogi Berra.  It ain't over
7    till it's over.
8        And on guilt of capital murder and a yes
9    to Number One, it ain't over till you take up Number
10   Two.  And Number Two simply asks you, Is there a good
11   enough reason why a life sentence should be substituted
12   and be the appropriate verdict as opposed to a death
13   sentence?  And all that we're asking is, please don't
14   commit yourself to what you're going to do, how you're
15   going to handle it, what verdict you're going to reach
16   as to Question Number Two until after you get to it.  It
17   would be like giving you three witnesses in a
18   five-witness case and saying, We're going to give you
19   three witnesses.  Make up your mind what you're going to
20   do without considering the other two.  Just keep your
21   mind open to the case itself, to the notion that there
22   could be conceivably in a case a good enough reason why,
23   even though you found somebody guilty of capital murder
24   and answered yes to One, that you could answer yes to
25   Number Two if you thought it was the right thing to do

**31**

1  based upon the uniqueness of that particular case,
2  whatever that unique feature might be.  Anybody here
3  have any disagreement, quarrel, conversation, discussion
4  with the questions at all?  Anybody doesn't feel they
5  could be open to doing that, to take each question one
6  at a time, evaluating the evidence in the case as it
7  relates to the decision that you're being confronted
8  with; that is to say, guilty or not guilty?  Yes or no
9  as to One?  Yes or no as to Two?
10  Okay.  We know that a person convicted of
11  capital murder can receive one of two punishments; life
12  or death.  Death, we're not going to talk about that.
13  But sometimes people have erroneous notions about what a
14  life sentence can be.  I will tell you in this case, and
15  in the event this defendant is found guilty of capital
16  murder, and in the event these questions are answered in
17  such a way that a life sentence is imposed, this
18  defendant cannot become eligible for parole
19  consideration until he has actually served forty years
20  of his sentence.  Now that's hour for hour, day for day,
21  week for week, month for month, year to year.  We're
22  talking about the Year 2039.  What happens then?  I
23  haven't the foggiest, nor do you.  That's anybody's
24  guess.  But what I do know is prior to that, a defendant
25  cannot become eligible for parole consideration.  Can't

**32**

1  be paroled.
2  Now at the conclusion of forty years, what
3  will happen is the prison authorities will make
4  recommendations -- excuse me -- make evaluations of the
5  person.  What were they like during their forty years
6  here?  They'll send those recommendations to the Board
7  of Pardons and Paroles.  The Board of Pardons and
8  Paroles may follow those evaluations.  Maybe they'll
9  reject them.  The Board of Pardons and Paroles will make
10  recommendations to the governor of the State of Texas.
11  I have no idea who the governor of the State of Texas is
12  going to be in the Year 2039, but he or she can follow
13  those recommendations made by the Board of Pardons and
14  Paroles or reject them completely and make an absolute
15  political decision.  What's going to happen?  I don't
16  know.  It is equally conceivable that somebody who gets
17  a life sentence, having been convicted of capital
18  murder, could spend -- after they serve forty years,
19  could spend every breath of the rest of their living
20  years, whether it's five years or twenty years, in the
21  penitentiary.
22  It's also conceivable that somebody could
23  be paroled at the conclusion of forty years.  The point
24  is, these questions deserve to be answered on the basis
25  of the testimony in the case itself, not on projecting

**33**

1  and speculating what might occur forty years from now.
2  But I do want you to know what the rule is, because I
3  don't want to run the risk that somebody back in the
4  jury room might say, well, I heard of a case once where
5  somebody got life and they got paroled in five years.
6  That's not going to happen.  And they say, therefore,
7  because in five years they might get out, I'm going to
8  always answer these questions in such a way that the
9  death penalty would be imposed.  I'm telling you, it's
10  not going to happen.
11  So, while I want you to know what the rule
12  is, I want you to know it for your comfort zone.  And
13  I'm going to tell you that the law will not permit you
14  to apply that rule to the answers to these two
15  questions.  These two questions deserve to be answered
16  on the basis of the evidence in the case, not because of
17  what might happen forty years from now.  Anybody have
18  any conversation, discussion, or disagreement with that?
19  Okay.
20  Let's get off our capital murder business
21  for just a second, except to this extent.  When we're
22  talking about capital murder, we're talking about the
23  intentional taking of the life of another human being
24  without there being any legal justification and without
25  there being any legal excuse.  We're talking about

**34**

1  somebody who wants to cause a result and intentionally
2  causes that result, being the death of somebody, and not
3  being any legal excuse or any legal justification.  And
4  that's the same as a murder.  Murder and capital murder
5  are exactly the same thing, exactly the same definition.
6  The only difference is that capital murder must be that
7  same intentional murder committed during the course of
8  the commission of another major felony.
9  In the case that we have before us, it's
10  alleged that there are two of them.  One is a
11  kidnapping.  Intentional murder during the course of a
12  kidnapping, if proved beyond a reasonable doubt, is a
13  capital murder.  It's also alleged that there was the
14  killing of another, intentional killing, or the murder
15  of another person, a murder during the course of another
16  murder, also a capital murder.
17  Now in order for the State to obtain a
18  verdict of guilty of capital murder, they must prove
19  beyond a reasonable doubt the existence of two things.
20  One, the intentional murder.  Two, during the course of
21  the other felony.  For example, during the course of a
22  kidnapping.  Now when we talk about intentional murder,
23  we are not talking about self-defense; because
24  self-defense is a legal, justifiable reason to take
25  somebody's life.  We have the right to defend ourselves

35

1   from some unlawful deadly attack. When we talk about
2   murder, we are not talking about accident; because an
3   accident isn't intentional. So let's eliminate those
4   two thoughts from our mind when we're talking about
5   murder or capital murder.
6         But anytime the State is required to prove
7   the existence of two things, for example, intentional
8   murder during the kidnapping, there are three possible
9   outcomes that can occur. Maybe they can't. If they do,
10  you've got to find the defendant guilty of capital
11  murder. Maybe they can't prove the existence of either
12  one of them. If that's the way, you've got to find the
13  defendant not guilty of anything.
14        Maybe in some hypothetical case they may
15  be able to prove the existence of the intentional
16  murder, but not be able to prove that it was committed
17  during of the course of a kidnapping. Well, if that
18  were to happen, the law would require -- the law would
19  require that I, in the third charge, give you that
20  option. You would have a guilty of capital murder
21  option, an option of not guilty, and the third option is
22  just murder, not capital murder.
23        We've talked about a lesser included
24  offense, a smaller offense carved out of a greater
25  alleged offense, the greater alleged offense being

36

1   intentional murder and kidnapping. The smaller offense
2   would be intentional murder. The punishment for a
3   person in the State of Texas convicted of murder is
4   remarkably broad. A person convicted of murder in the
5   State of Texas can be punished by confinement in the
6   penitentiary for life, or for any number of years not
7   less than five, or more than ninety-nine; and a jury
8   can, if they think it accomplishes anything, impose a
9   fine in any amount, as long as it doesn't exceed
10  $10,000.
11        Now, that's just an awfully wide range of
12  punishment. And the reason why is because we wanted to
13  give the jury the opportunity to make the punishment fit
14  the crime. The crime is not only the conduct, but the
15  person who committed the conduct; because that's a
16  feature you'll also want to take into account. If you
17  had two people committing exactly the same set of
18  circumstances, one being a seventeen-year-old girl who's
19  never been in trouble before in her whole life, and one
20  being a six-time ex-convict maybe you would want to
21  treat those two people differently. I don't know.
22  Maybe you'd want to treat them exactly the same. That's
23  your business. But if you did want to treat them
24  differently, then we've got to give you room to roam up
25  and down the punishment scale so you can do that.

37

1         All victims are different. You get some
2   of them who are better than some of the others. That
3   makes an issue. There is all sorts of circumstances.
4   When we think of murder, we oftentimes have a particular
5   thought in our mind as to a murder. It might be the
6   last body we saw roll down Channel 13 last night on the
7   news. At any rate, maybe to you, in that particular
8   thought process, a life sentence would be absolutely the
9   most appropriate thing in the world; but there are all
10  sort of vague notions about that, all sorts of different
11  circumstances.
12        For example, you might have a
13  seventy-five-year-old couple who's been married for
14  fifty years. They love each other. They treasure each
15  other. The Mrs. is sick. She's on a life support
16  system. She's not going to get better. Doctors have
17  explained it to everybody. Everybody knows it. There
18  is no hope of being any kind of a change. She doesn't
19  want to suffer. She does not want to go through the
20  indignity of being hooked up to a machine. She talked
21  to her husband, who is by her bedside constantly. She
22  wants him to take her out of her misery. He prays about
23  it, thinks about it. After a couple of days, while she
24  was asleep one afternoon, he walked over to the wall,
25  pulled out the plug.

38

1         Without getting into the morality of it,
2   in this state that's murder. That is the intentional
3   taking of the life of another human being without there
4   being any legal justification, without there being any
5   legal excuse. Now that's not the kind of case where you
6   think that particular gentleman ought to get a life
7   sentence; because he didn't do it out of hate, didn't do
8   it out of anger, didn't do it out of revenge. Truth
9   about it, he was doing it out of love.
10        All I'm trying to point out is this: The
11  range is so broad, because we want the jury to have the
12  opportunity to make the punishment fit the evidence that
13  you heard in the case. So it would be very arrogant of
14  us to ask you to come down here and tell you the value
15  of every dead body that comes up. We want you to make
16  that decision, and we want you to be able to make that
17  decision on the basis of the evidence in the whole case,
18  as well as the character, background, and whoever the
19  defendant is in the case.
20        So, my question to each of you is this:
21  Assume with me for just a second that you're a juror in
22  some imaginary capital murder case, and your jury has
23  heard all the evidence in that case. Your jury goes out
24  to determine whether the defendant is guilty or not
25  guilty. Your jury unanimously determines that the

39

1  defendant on trial in this case is not guilty of capital
2  murder, but your jury does unanimously determine that
3  the defendant on trial is guilty of murder.
4        You come back, and you hear additional
5  evidence relating to the character and background of the
6  defendant on trial, whatever that evidence might have
7  been. You go back to deliberate the issue as to
8  punishment. Is there anybody here who could not
9  consider in that imaginary set of circumstances
10 assessing that imaginary defendant's punishment at
11 confinement in the penitentiary for life if you thought,
12 based upon all the evidence in the case, that was the
13 right result to reach? Is there anybody here who would
14 refuse to take a life sentence into consideration as a
15 legitimate sentencing option if you thought the
16 circumstances called for it? I gather that you would.
17 I'm not asking you, would you do it? But I'm asking
18 you, is it a legitimate consideration of yours if things
19 are right?
20        Take that same question and reverse it.
21 You can imagine in a capital murder case, you find the
22 defendant not guilty of capital murder, but you find him
23 guilty of murder. You come back and hear evidence at
24 the punishment phase of the trial relating to the
25 character and background of the defendant on trial,

40

1  whatever evidence might be. Your jury goes out,
2  deliberating as to the punishment in the case. Is there
3  anybody here who could not consider assessing this
4  imaginary defendant's punishment at confinement in the
5  penitentiary for five years if you thought, based upon
6  the uniqueness of the testimony in the case, that that
7  was the right result to reach? Again, not would you do
8  it? But are you open to the idea that five years might
9  be a legitimate sentencing option if the facts and
10 circumstances justify it in your mind? Anybody have any
11 disagreement with that at all? And obviously, anything
12 in between. The lawyers for both sides are entitled to
13 have those jurors, folks who will consider the whole
14 range of punishment. And that's why we spend some time
15 talking about capital murder, life or death. That range
16 is very short. But we want you to also be available to
17 consider that life is -- such a way that life is imposed
18 is every bit as legitimate a sentencing option as to
19 whether the death sentence is imposed. We want the
20 questions answered whichever way you think the evidence
21 dictates. Any questions about that law?
22        Two other brief areas. This one -- and
23 I'm not going to get into the lawyering aspect of this
24 with you. I'm just trying to communicate a concept.
25 We have a principle in our law that says, if you have a

41

1  couple of people, two or three -- if you have at least
2  two people who conspire and actually do it, one of those
3  people cannot be convicted of that crime solely and
4  exclusively on the testimony of the other conspirator.
5  There, instead, must be not only coconspirator
6  testimony, but there must be some other evidence that
7  exists from an independent source -- that is to say,
8  independent of the coconspirator -- that rises to the
9  level that connects the defendant to the commission of
10 the crime.
11        In other words, there has got to be some
12 corroborating evidence. Now the corroborating evidence
13 does not, in and of itself, have to be such that it
14 shows the person's guilt beyond a reasonable doubt.
15 Doesn't have to be that much at all. It simply has to
16 tend to connect the defendant to the commission of the
17 crime. For example, another guy and I get together. We
18 agree we're going to rob a bank. I pull up front or in
19 the back, he goes in and robs the bank, comes out, jumps
20 in the car with bank money.
21        Two days later he gets arrested, because
22 they've all seen him. They haven't seen me. I've been
23 in the car. He said, Wait just a second. I wasn't the
24 only one. They say, Who else did it? He says,
25 Burdette. So they arrest me. My trial comes. I cannot

42

1  be convicted solely and only on his testimony, unless
2  there is some independent evidence that tends to connect
3  me to the commission of the crime that corroborates him.
4        For example, let's say the bank bag he had
5  when he was arrested has my fingerprint on it. Nobody
6  has seen me, but my print's on that bank bag. That is
7  independent evidence that tends to connect me to the
8  commission of the crime. So, my question to you is
9  this: And I don't know whether this will come into play
10 in this case or not, but I know it's an aspect of our
11 law. Is there anybody here who has any quarrel,
12 dispute, or disagreement with that facet of our law to
13 the level that you would refuse to follow it if it came
14 into play during the course of this trial? I take it
15 nobody has a feeling to that degree.
16        One last thing. We have two different
17 types of evidence that exist during the course of a
18 trial. We have direct evidence, and we have
19 circumstantial evidence. And sometimes folks have a
20 misconception about circumstantial evidence. Direct
21 evidence means somebody saw somebody do something, and
22 they get on the witness stand and talk about it.
23 Circumstantial evidence necessarily means that nobody
24 saw somebody do something; but they get on the witness
25 stand and testify about a circumstance surrounding

43

1　certain conduct that, when taken together with perhaps
2　seven or eight other circumstances surrounding conduct,
3　tend to show the defendant committed the conduct.
4　　　　　　The law doesn't care whether testimony in
5　a case is direct evidence. The law doesn't care whether
6　it's circumstantial evidence. Just like the law doesn't
7　care, is there one witness in a case or is there five
8　witnesses in a case. The law doesn't care about the
9　number of witnesses. The law cares that the quality of
10　the testimony be such that's proves a person's guilt
11　beyond a reasonable doubt. The law doesn't care about
12　in terms of the number of witnesses.  Likewise, the law
13　doesn't care if testimony is circumstantial or direct.
14　Is it sufficient to prove that person's guilt beyond a
15　reasonable doubt?
16　　　　　　Sometimes we hear people say, oh, I
17　couldn't ever find somebody guilty on circumstantial
18　evidence. And they really have no idea what they're
19　saying. For example, a fingerprint, just till recently
20　with DNA -- but until then, a fingerprint was
21　universally, or claimed to be the single finest
22　identifier, as to a human being in the whole world.
23　Nothing was better. Nobody ever has the same two
24　fingerprints. But even as specific an identifying
25　feature as a fingerprint is, it's circumstantial

44

1　evidence; and it's circumstantial evidence because
2　nobody can ever prove when a fingerprint was placed on
3　that item, and nobody can ever prove where an item was
4　when the fingerprint was placed on it.
5　　　　　　Now, obviously, if it's an immoveable
6　item, that's different. But if you're talking about the
7　pistol, and my prints were on the pistol, when I put it
8　there, we don't know. The pistol could have been in my
9　home, perfectly legitimately possessed. The point
10　being, you could have testimony from live witnesses as
11　direct evidence that claims they saw something; and you
12　might very well not believe their credibility at all.
13　You might have testimony of circumstantial evidence in
14　the case that is so strong that causes you to believe
15　beyond a reasonable doubt the defendant's guilt.
16　　　　　　So, my question to you is this:  Is there
17　anybody here that if you heard testimony in a case --
18　and again, I don't know if that's going to apply in this
19　case. I just know this rule exists. Is there anybody
20　here who, if you were a juror in the case, and after
21　having heard all the evidence in the case you were
22　satisfied beyond a reasonable doubt that the defendant
23　was guilty, even though the only evidence in the case
24　was circumstantial -- is there anybody here who would
25　refuse to find that defendant guilty, even though the

45

1　evidence was circumstantial?  Is there anybody here for
2　whom that is an issue?
3　　　　　　Because I can take you down the street
4　here, commit a crime in front of three drunks, bring
5　them in here, and have them testify for you till the
6　moon fell out of the sky. But I can take you down here
7　and commit that same crime and you'd see different
8　aspects, because I have one person's testimony
9　interwoven in the two. There is no way you would find
10　him not guilty. He's there. It's not direct or
11　circumstantial that's in issue. It's do you believe it
12　beyond a reasonable doubt? Anybody here have a quarrel
13　or dispute with that aspect of the law? Okay. You're
14　now lawyers. Whether you want to be or not, I don't
15　know.
16　　　　　　Let me ask you this:  Anybody here have
17　any questions at all about what we're talking about or
18　what we're trying to get to. And what we're trying to
19　get to is just simply getting twelve people who can sit
20　in those chairs, listen to all the information the
21　lawyers present to you, and now you weigh that
22　information however you think best. That's your job.
23　But be open to arrive at any verdict possible before the
24　trial ever starts. After you heard all the evidence,
25　you're going to be committed to what you think you ought

46

1　to do, and that's the whole point of it. But before
2　hearing the evidence, we don't want you to be committed
3　to what you're going to do; because that necessarily
4　means you're not going to give something a fair shake.
5　Is there anybody here who has any questions, any
6　discussion, any comments at all? Anything we've talked
7　about up to this point, or anything we've haven't?
8　　　　　　Okay.  If you would, please retire to the
9　hallway. We're going to get you in one at a time.
10　　　　　　　　　　BRENDA DIXON,
11　having been first duly sworn, testified as follows:
12　　　　　　　　VOIR DIRE EXAMINATION
13　BY THE COURT:
14　　Q.　How are you today?
15　　A.　Fine.
16　　Q.　Miss Dixon, I'd ask you to remember back to
17　last Monday -- and I recognize that's been some time
18　ago -- but the things we talked about on that day.  Add
19　to it this morning the things we talked about this
20　morning. Out of everything that we have talked about to
21　this point, do you have any questions at all for me?
22　　A.　Not really.
23　　Q.　Are you a little nervous?
24　　A.　No, not really.
25　　Q.　Okay.  Well, that's good, Miss Dixon. Is there

47

1  anything that we have not at this point talked about
2  that you think we should?
3      A.  Well, we can't discuss the situation in any
4  more further detail?
5      Q.  You mean the facts of the case?
6      A.  Yes.
7      Q.  No, we can't get into that.  And the reason we
8  can't is for a pretty good reason.  If you're going to
9  be a juror deciding who is and who isn't believable, one
10 of these lawyers might say, there's a witness in a case
11 that's going to testify to ABC.  And you say, I know
12 exactly what I'll do.  Then but that third witness comes
13 along and testifies to ABCD, and you -- but you don't
14 believe that witness.  So we're never going to be
15 talking about facts of the case.  I was talking about
16 anything about you that you feel would interfere with
17 your ability to be a juror in this case.
18     A.  No, no, I don't think so.
19     Q.  Nothing about your personal life, nothing about
20 your professional life, nothing about your health, or
21 anything else for that matter, that you can think of
22 that would in any way interfere with your ability to be
23 a juror in this case during the time frame we've talked
24 about?
25     A.  No.

48

1      Q.  Before we begin, do you have any questions at
2  all from me?
3      A.  No.
4      Q.  Can you see how each of the three decisions
5  that a jury can be called upon to make in a capital
6  murder case, each of those decisions, or none of those
7  decisions, I should say, dictate what the other result
8  should be, that whether a person committed a crime or
9  not has absolutely nothing to do, in and of itself, with
10 whether the answer to that first question should be yes.
11 And even if it is yes, has nothing to do with whether or
12 not the second question must be answered no.  Each
13 question must be dealt with individually.  You
14 comfortable with that?
15     A.  Yes.
16          THE COURT:  Mr. McClellan.
17          VOIR DIRE EXAMINATION
18 BY MR. MCCLELLAN:
19     Q.  Miss Dixon, my name is Lyn McClellan.  Along
20 with Claire Connors, we represent the State of Texas in
21 this case.  I want you to sit back and relax.  We're
22 going to ask you to you share with us, if you will, some
23 of your opinions and certain beliefs about certain
24 aspects of the law.  I want to go over some of your
25 questions and ask you -- on your questionnaire -- and

49

1  ask you some follow-up questions about your answers to
2  the questionnaire.  And you're going to need to speak
3  up, because we're going to need to hear you over here.
4  You're very soft spoken, but we need to hear what you
5  have to say.
6          All right.  You filled out this
7  questionnaire the other day.  You've heard the Judge's
8  voir dire with the group, and now you've heard the
9  individual voir dire the Judge gave you about the death
10 penalty today.  This is the first time, I see, you've
11 been called as a juror in a capital murder case.  What
12 are your thoughts about this?  What's going on?
13     A.  Well, this is the first time I've been called
14 as a juror in any case at all.
15     Q.  In any case?
16     A.  Right.
17     Q.  Any thoughts about the prospect of being a
18 juror that might be called upon to make a life and
19 death-type decision?
20     A.  The only thoughts that I have are to be as
21 open-minded as possible.
22     Q.  Okay.  Let me ask you this:  What's your
23 opinion of the death penalty?  Kind of put it in your
24 own words.
25     A.  It's not something that I like.  I don't think

50

1  anybody likes it.
2      Q.  All right.
3      A.  If there was an alternative, I would always be
4  open to that.  On the other hand, I don't know what
5  we're supposed to do with our society anymore with
6  certain aspects of criminal activity.
7      Q.  Do you think there is some cases the death
8  penalty -- some cases, you know, where someone -- the
9  crimes a person commits where the death penalty is the
10 appropriate punishment for that type of crime?
11     A.  I do.
12     Q.  What kinds of cases come to your mind when you
13 think of cases where you think the death penalty is an
14 appropriate type punishment?
15     A.  If there is a history, you know, of repeating
16 themself or that they're going to repeat themselves,
17 that there is a high probability they are going to be a
18 serious danger to someone else and there is no other
19 alternative.
20     Q.  You used that twice, there is no other
21 alternative.  There is always the alternative of life in
22 the penitentiary.  I mean, that's a decision jurors have
23 to make, is whether the crime deserves the death penalty
24 or a life sentence.  So there's always that option of a
25 life sentence.  Are you the type person that would

51

1    always go with that option so you wouldn't have to make
2    the difficult decision about that?
3        A.  No, I'm not always going to go with one thing
4    or another anytime.  I mean, that's not the kind of
5    person that I am at all.
6        Q.  Okay.  So if you heard the evidence and you
7    believe that the questions ought to be answered in such
8    a way that death resulted, you would be able to do that?
9        A.  I've never been faced with this altogether.
10   Until that moment came, I really can't say.  I don't
11   know anything that I could say.
12       Q.  Well, let me phrase it a different way.  Some
13   people come in here and say they are in favor of the
14   death penalty as an appropriate punishment for certain
15   types of crimes.  Some of those same people go further
16   and say they, though, don't believe they, themselves,
17   could ever participate in a process such as being on a
18   jury where they would be called upon to make a decision
19   such as answer these questions, knowing that in doing so
20   it would result in this Judge ordering the execution of
21   the defendant sitting over here on trial.  Do you have
22   any doubts about your ability to participate in that
23   type of process and make that type decision if that's
24   what the law and the evidence called for?
25       A.  No.

52

1        Q.  So you would be able to do that if that's what
2    the law and the evidence called for?
3        A.  If that's what the law and evidence called for.
4        Q.  Okay.  Are there any kinds of cases that you've
5    heard of over the years where someone received the death
6    penalty, and you thought that was an inappropriate
7    punishment?
8        A.  I'm sure that I've heard about some cases.  I
9    don't know anything specific.  Where, for example, a
10   wife is being abused by a husband, and finally she
11   retaliates.
12       Q.  I understand.
13       A.  In some situation like that.
14       Q.  That's probably not going to be a capital
15   murder.  I guess, hypothetically, you could think of
16   something that might put it there, but there is -- it
17   was a question in here.  Do you feel the death penalty
18   is used to often or too seldom?  You checked, Too often,
19   and said it should be used only in the most significant
20   cases where there is no other option.  Then you come
21   back with the, no other option.
22           You know there are two options now,
23   through the voir dire, in a capital murder case; either
24   life in the penitentiary, which the Judge has said means
25   forty years, day for day, or the death penalty.  Knowing

53

1    in that case life means forty years day for day, it
2    doesn't mean five years or ten years or whatever, do you
3    think that would always be sufficient for any crime you
4    might hear?
5        A.  Well, no, not necessarily.
6        Q.  Okay.  You understand where I'm -- my big
7    concern?
8        A.  Yes, I do.
9        Q.  If you're looking for an option, that's a
10   pretty big option.  If a person is twenty years old
11   today and they've got forty years to do, they're going
12   to be sixty years old to become eligible to get out.
13   Somebody may say, well, the death penalty is such a last
14   resort that in sixty years, a person being sixty years
15   old when they possibly get out would just be always good
16   enough for me.  I'm trying to look for people who won't
17   follow that path of reasoning, but will decide, one, are
18   they a continuing threat to commit criminal acts of
19   violence?  And they answer that yes if we prove it
20   beyond a reasonable doubt.
21           And then two, after looking at all the
22   evidence, if they determine there was no mitigating
23   circumstances, there is no reason why we should give
24   this person life as opposed to death, that they could
25   follow that aspect of the law.  Is there -- could you do

54

1    that?
2        A.  Yes.
3        Q.  Did you follow the case that was just this last
4    week here in Harris County, where an officer's son shot
5    and killed an officer?  Did you follow that case at all?
6        A.  No, I didn't.
7        Q.  Have you followed any recent capital murder
8    cases that come to mind that have happened in Harris
9    County?  Is there -- have you followed any of those?
10       A.  Not in Harris County.
11       Q.  If a person is found guilty of capital
12   murder -- that is the intentional taking of another
13   person's life without any legal justification.  The
14   Judge said it's not self-defense; it's not accident.  If
15   you felt someone intentionally took someone's life
16   during the kidnapping, as we have alleged in that
17   indictment, intended to kill someone and did so, if you
18   find that beyond a reasonable doubt, you find the
19   defendant guilty, as charged in the indictment, of
20   capital murder.
21           If the jury reaches that decision, then
22   you'll go to the punishment stage of the trial.  There
23   you may hear additional evidence about the defendant's
24   character, background, criminal history, or lack
25   thereof, mental abilities, disabilities, kind of

**55**

1  neighborhood he grew up in, parenting, whatever
2  information it may be, all kinds of evidence and
3  information about the defendant, himself. Because the
4  concern now is what punishment this individual should
5  receive for the crime you have found him guilty of.
6          After you hear all that evidence, the
7  facts in the case, as well as the information about the
8  defendant's character and background, you're asked to
9  answers these questions up here. And the first one
10  says: Do you find from the evidence beyond a reasonable
11  doubt there is a probability that the defendant would
12  commit criminal acts of violence that would constitute a
13  continuing threat to society?
14          Now when it said a probability, doesn't
15  mean a certainty or doesn't mean a possibility. It
16  means more likely than not. More likely than not this
17  person we found guilty of capital murder would commit
18  criminal acts of violence. Doesn't say they would go
19  out and commit another murder or capital murder, but
20  anything that is a criminal act of violence. Could be a
21  burglary. Could be a robbery. Could be shooting at
22  someone and missing someone, hitting someone so hard
23  with your fist you knock them out and cause serious
24  bodily injury to that person. Anything that is criminal
25  and violent in nature. Okay? Do you think you would be

**56**

1  able to determine from the evidence you hear about
2  whether there is a probability that the person you had
3  found guilty would be a continuing threat to commit
4  future acts of violence?
5      A.  I don't think so.
6      Q.  What kind of information do you think would be
7  helpful in making that determination?
8      A.  I would say his history, his background.
9      Q.  What he had done in the past. Okay. You also
10  get to look at the crime that you have found him guilty
11  of. May help you in deciding whether or not -- in
12  deciding whether or not he's a continuing threat for
13  acts of violence. Concerning the crime itself, you get
14  to hear what happened before, during, and after the
15  commission of the crime. Before the crime, was this an
16  act, an idea that was a spur of the moment; or was it
17  something planned out, thought out ahead of time? That
18  might be important to a decision. How the crime
19  was committed. You know, was he the person that
20  actually did the shooting, or the stabbing, or whatever
21  means of death; or was he a getaway driver? What
22  happened after the commission of the crime? Did the
23  person show remorse, or were they out bragging about
24  what they had done? All that information can be used in
25  answering Issue Number One. Do you think those kinds of

**57**

1  factors are important in deciding the answer to Issue
2  One?
3      A.  Absolutely.
4      Q.  Okay. As well as we talked about the fact
5  about the defendant's character, his background, what he
6  had done in the past or whatever. Do you think in order
7  to determine that a person would be a continuing threat
8  to commit criminal acts of violence that you would
9  always have to find that he had a prior criminal
10  history, that he had done violent acts in the past?
11      A.  No.
12      Q.  If you find that a person is a continuing
13  threat, to a probability, to commit future acts of
14  violence -- in other words, you would be answering Issue
15  Number One yes. Then you would go to Issue Number Two,
16  where it basically asks you to stop now and reevaluate
17  everything you've heard so far. Talks about looking at
18  the circumstances of the offense, the defendant's
19  character and background, certain things of the
20  offense -- that's what you heard at guilt/innocence --
21  character and background -- that's what you heard at
22  punishment -- and the defendant's moral culpability.
23  I'd like to refer to it as his personal responsibility
24  for the commission of the crime. Was he the person that
25  pulled the trigger, that fired the gun; or was he a

**58**

1  getaway driver, or lookout, or whatever the case may be?
2  How was he personally responsible, if he was, as to the
3  commission of this crime?
4          Do you find -- then the question goes
5  on -- that there are such mitigating circumstances --
6  I'd like to refer to it as sufficient reasons -- why
7  this person should receive life as opposed to death? It
8  gives you the option to stop and reevaluate everything
9  you've heard and determine, is life a more appropriate
10  response to the crime and the person; or is death more
11  appropriate there? So it gives you a chance to
12  basically, you know, in effect, change your mind.
13  Because if you found him guilty and if you answered he's
14  a continuing threat to commit future acts of violence,
15  he's going to receive the death penalty, unless on this
16  last question you find there are reason or reasons why
17  you should not. Okay? So that's why I keep being
18  concerned about if there is any other option. This is a
19  chance that the jurors have to determine, is there
20  another option? Is this a proper response to the person
21  and to the crime? And if you find that the
22  circumstances tell you that they should get life, then
23  that's how you're supposed to go. But if you find there
24  are not sufficient circumstance to merit changing your
25  vote, then you have to answer it in such way that you

59

1  would answer it no; and he wouldn't receive the death
2  penalty. Are you open to answering that either way?
3      A. Yes.
4      Q. To give an example of how that might work, you
5  may, when you go back and examine the evidence to
6  determine what effect, or whether there is any
7  mitigating circumstances, any reasons why he should get
8  life as opposed to death, you may remember back and say,
9  well, I remember that there was evidence that the person
10  was high on drugs or alcohol when they committed the
11  crime. Juror Number 1 may say, I think that mitigates
12  towards a life sentence; because when you get high on
13  drugs or alcohol, you do things you wouldn't ordinarily
14  do. Juror Number 12 says, wait a minute. I don't think
15  that's mitigating at all; because I know people who go
16  out and get high on drugs or alcohol, and they don't
17  commit capital murders. And if he does, there's a
18  likelihood to get high again and do the same thing
19  again. But that's two people looking at the very same
20  evidence and they're looking at different opinions.
21  That's okay, but that's what the law asks you to do for
22  yourself, to look at those issues and determine if there
23  is anything mitigating. And if there is, you determine
24  what weight it should be given. And if it's sufficient,
25  you change your answer. If it's not sufficient, you

60

1  don't. Any problem with that?
2      A. No.
3      Q. Another example about looking back at evidence,
4  you may consider the age. Someone may consider the age
5  of the defendant to be mitigating. You know, people
6  make stupid decisions when you're younger. Some people
7  say at this age, no telling where he may go ten or
8  fifteen years down the road. Again, two people look
9  through the very same evidence, come up with different
10  opinions. But that's how you're supposed to do it. And
11  then you evaluate it. Is it somebody -- think about a
12  mental status; he's a special ed student, not quite as
13  bright as someone else. Somebody may think that's
14  mitigating. Somebody may say, well, I know people that
15  have the same disability he has. They don't go out and
16  commit capital murder. So, there again, two people come
17  up with the same evidence and different opinions. But
18  they're doing it like they're supposed to. Any problem
19  with that process?
20      A. No.
21      Q. Anything that in your mind that you say, well,
22  if I ever heard evidence of this, whatever it may be, I
23  would always believe that would give me a reason to give
24  someone life as opposed to death?
25      A. No.

61

1      Q. We're seeking the death penalty in this case.
2  The State hopes to prove to the twelve members of the
3  jury -- we hope the jury will find the defendant guilty
4  of capital murder. After doing that, we hope the answer
5  to Issue Number One is yes and no to Number two; and the
6  death penalty would be imposed. Is there any reason to
7  be concerned about your ability to listen to the
8  evidence, and if you believe the law and the evidence
9  called for the answers to be guilty, yes, and no, which
10  means the death penalty would result, that you would be
11  able to do that? Any reason I ought to be concerned
12  about putting you on the jury to ask you to do that?
13      A. I can't think of any.
14      Q. If you could think of some reason, if you could
15  say, Mr. McClellan, here's one reason you may not want
16  me to be a juror, what would that reason be? Is there
17  anything you can think of? Anything? Is there
18  anything, one reason you can think of, why I may want
19  you as a juror?
20      A. Not specifically, no.
21      Q. Thank you. If you had a loved one who was the
22  victim of a capital murder crime, your loved one had
23  killed by someone who had committed capital murder in
24  doing that; they were on trial for their life, and
25  you're the -- related to the victim in the case, would

62

1  you be comfortable having someone sit on that jury who
2  has your mind-set and your background?
3      A. Yes.
4      Q. If you had a relative who was being tried for
5  capital murder, their life was on the line, would you
6  also feel comfortable having someone with your mind-set
7  sitting on the jury and making that type decision?
8      A. Yes, I would.
9      Q. Anything, Miss Dixon, you think I need to know
10  before we make our decision on whether or not to accept
11  you as a juror? And that's not going to happen right
12  now; but we're going to do it this Wednesday, and
13  they're getting ready to talk to you in a few minutes.
14  This will be my last chance to talk to you. Anything I
15  need to know?
16      A. I try to see every aspect that I can of
17  anything that's put in front of me. That's possibly the
18  most significant thing you need to know about me.
19      Q. Thank you very much, and I'll pass you to the
20  other side.
21          THE COURT: Thank you.
22          Mr. Hill.
23
24
25

63

1                    VOIR DIRE EXAMINATION
2    BY MR. HILL:
3        Q.  Hi, Miss Dixon.
4        A.  Hi.
5        Q.  I'm only going to take a few minutes to visit
6    with you.
7             MR. HILL:  Judge, could Miss Dixon get her
8    questionnaire?  Thank you.
9        Q.  (BY MR. HILL)  There is a couple of questions
10   I'm going to refer you to so that you might take a look
11   at them.  Question Number 4, which is on Page 10, if you
12   could just read that to yourself and read your answer to
13   yourself, I'd like to ask you a couple of questions.
14       A.  Okay.
15       Q.  Okay.  Explain what you meant when you answered
16   the question that way.  Just talk to me a little bit
17   about what was going through your mind.
18       A.  They affect the cognitive and emotional
19   stability of the person, creating a negative for that
20   situation, for that person to exist.
21       Q.  What does that mean to you?  How does that
22   affect somebody?
23       A.  Drugs?
24       Q.  Uh-huh.
25       A.  They affect your mental reasoning.

64

1        Q.  Right.
2        A.  They can affect your emotional state of mind.
3        Q.  Okay.
4        A.  A negative situation.
5        Q.  Yeah, that's what I'm kind of focusing on, the
6    negative situation for that person to exist.  Are you
7    talking about for the trial they're using the drugs?  Do
8    you think it's a longer term situation, the type of drug
9    culture they're in?
10       A.  Well, it would depend on the situation.  If it
11   was a first time, then I would say it would be a
12   negative situation, because they're jeopardizing
13   themselves with the law.  That's a negative situation.
14   They're injuring their brain cells.
15       Q.  Their health?
16       A.  Depending on the drug that was jeopardizing
17   them so much, and that's very negative to me.  If it's a
18   continuing situation, then it's an encompassing,
19   negative situation around their whole life.
20       Q.  Okay.  Do you think people, whether they use
21   the drugs, or whether they're in the business of selling
22   the drugs, whether or not that has certain negative
23   situations inherent in it?
24       A.  I don't see how anything that can put you in
25   jeopardy and being in trouble with the law can be

65

1    positive.
2        Q.  Okay.  All right.  Do you know of anyone that
3    you've known, or family members or anything that have
4    been involved in anything involving drugs that would
5    give you any firsthand knowledge of something like that?
6        A.  I mean, you know, not other than just teenagers
7    and, you know, not anything in any serious legal aspect
8    where they were in trouble with the law.
9        Q.  One of the questions that we ask is Number 68,
10   and it appears on Page 13.  And this question has
11   already been asked of you, I think specifically by Mr.
12   McClellan.  It asks you if mitigating evidence
13   concerning a capital murder defendant's background
14   should be considered in deciding whether he should
15   receive the death penalty.  Why do you think it would be
16   important?  And what does mitigating mean to you,
17   personally?
18       A.  Means reasons.  I guess for some people it can
19   mean excuses.
20       Q.  I want to avoid the use of an excuse only for
21   this reason:  You remember when Judge Burdette was
22   talking to you about self-defense or accident?  Those
23   are things that constitute, in a sense, legal excuses
24   for conduct that occurred.  And sometimes when we hear
25   about capital murder cases, we hear about situations

66

1    where the defense attorney has offered some evidence for
2    a jury's consideration about a person's background,
3    their childhood.
4             And a lot of people react, oh, God, here's
5    the excuse coming that the kid had a bad background;
6    therefore, we should excuse what he did.  I want to make
7    sure you appreciate and understand if we're at the
8    punishment stage of a capital murder trial, you have not
9    excused anybody if you can find that person guilty of
10   capital murder.  The only question is, does he live or
11   die?  Why would it be important to have mitigating
12   evidence considered by you and eleven other people
13   before you decide this case and whether the person were
14   to live or die?
15       A.  I guess it's just part of all of the evidence
16   taken into consideration in deciding someone's fate, and
17   that's pretty big.
18       Q.  What do you think would be important about it
19   if you were ever in a position where you were on trial
20   for something?  Do you think it would be important for
21   the jury to know as much about you as possible?  How do
22   you think that would help the jury make a decision, if
23   it does?
24       A.  You know, in my situation I just would have to
25   be different; because I just feel like you need to take

67

1  responsibility for your actions, and that's how I live
2  my life. So my circumstances in the past, I wouldn't
3  probably consider them necessarily. So, I mean, I would
4  just have to be responsible for my actions.
5      Q. Would you want a jury to know who you are,
6  though, before they make the ultimate decision of what
7  your punishment should be?
8      A. Yeah, I guess I would.
9      Q. I mean, I would assume there is more positive
10  about you than negative. There is nothing on this sheet
11  of paper that suggests you've been in trouble before.
12  You've raised two children. You've worked full-time.
13  You do a whole lot. And it would seem to me you're
14  somebody that's had a very positive life. Would you
15  want the jury to know any of the accomplishments that
16  you have in terms of raising children and working and
17  leading a life like that?
18      A. I'm sure I would if I was in that situation,
19  because I would probably be panicked and trying to do
20  everything I could to survive.
21      Q. Right.
22      A. So, yes, I probably would. I also feel
23  strongly that, you know, we're responsible for our
24  actions.
25      Q. Let me ask you this: Because the Legislature

68

1  has spoken to that issue by giving a jury only two
2  options. Understanding when we're talking about a
3  person has to be responsible for their actions, do you
4  think that you would agree that that has more to do
5  initially with the first part of the trial? In other
6  words, the actions that you've taken in committing a
7  crime? A jury would find that person responsible for
8  that by finding them guilty of the crime, okay? And I'm
9  not saying it doesn't have anything to do with the
10  second phase of the trial. But are you comfortable with
11  the fact that the Legislature has only given you two
12  options when it comes to holding a person responsible
13  for committing the crime of capital murder; one being
14  life, one being death? Do you think that's a fair
15  method of meting out punishment for somebody that has
16  committed the most serious crime in Texas?
17      A. Well, it's the law. And it's not up to me to
18  change it, whether I think it's fair or not.
19      Q. I want to know whether you think it's fair,
20  because this is the only time we get a chance to talk to
21  you. And a lot of people sit there and say, well, it's
22  the law and I'll follow the law. We're more interested
23  in knowing what you feel about the law, because it helps
24  us to understand what your feelings are. I understand
25  that you'd follow the law, but how do you feel about the

69

1  law?
2      A. I don't think it's always fair, and I don't
3  think it's always not fair.
4      Q. Please don't feel like this is a civics test or
5  something, or I'm trying to put you on the spot. I'm
6  not going to get to know you in twenty minutes the way I
7  would if I had been your neighbor for twenty years. I'm
8  just trying to get a gut feeling for your thought
9  process, as the State can when they question you, so we
10  can have a better understanding of who Miss Dixon is,
11  and should she sit here with eleven other people?
12          I'll put this to you: Let's imagine just
13  a moment you're in the Texas Legislature, and there are
14  two bills that are going to be voted on regarding
15  capital murder. One bill said that for every person
16  convicted of capital murder, the automatic punishment
17  shall be death. The second bill said for every person
18  convicted of capital murder, the automatic punishment
19  shall be life in prison. If you only had to vote for
20  one of those bills, which do you think you would feel
21  more comfortable voting for?
22      A. That's not a fair question.
23      Q. Okay. Well, in fairness to you, why is that
24  not a fair question?
25      A. Because I don't think you can always have

70

1  something one way or the other. I just don't see it as
2  always one way or another.
3      Q. Okay. But see, that answers a lot and that
4  tells me a lot about your thinking. And I'm not
5  offended, and I hope you're not offended by my posing
6  that question to you this way. I wanted to try and give
7  you an opportunity to express yourself; because
8  otherwise, I'm going to be sitting here not knowing
9  whether or not you're comfortable with the Legislature's
10  decision that we have here that allows you to consider
11  life and death; or are you one of those people that
12  ultimately says, well, I'm real big on holding somebody
13  responsible; and ultimately, that possibly means the
14  person gets the death penalty.
15          The State was very concerned that you're
16  somebody that might not be able to give the death
17  penalty. I wanted to make sure that you're not the type
18  of individual that, when push comes to shove, would
19  always give the death penalty. So you can see how both
20  sides have different questions that we want to ask you?
21      A. I'm not always going to do one thing or the
22  other. I mean --
23      Q. Okay. Did you think of anything between last
24  week when you filled out this questionnaire and having
25  to come down here today to finish up before you were

71

1   either brought back or let go?  Did anything go through
2   your mind, talk to your kids about the type of process
3   you're involved in at all?
4       A.  I talked to my daughters about it, and I told
5   them it was very surreal, the whole thing.
6       Q.  How so?  What makes it surreal?
7       A.  Just the whole process.  I mean, you know,
8   spending all this time and listening to metaphors; so
9   you know, it's just very surreal to someone from the
10  outside.
11      Q.  Do you think it's a good way to go about trying
12  to select twelve people to sit in judgment of somebody
13  and to decide a case this important?
14      A.  Well, I don't know of another alternative.
15      Q.  Some people are very bothered, and we've
16  realized -- because we're down here, day in and day out,
17  doing this.  But we realize from prospective jurors that
18  it's a major inconvenience.  I always like to ask
19  whether or not it has gone beyond the point of being an
20  inconvenience, and people come down here feeling angry
21  over the fact they're having to go through this, and now
22  having to sit here and listen to the questions by me,
23  who you don't even know.  What is your comfort level, if
24  you will, having to go through this process?
25      A.  Traffic is a nightmare getting here, being here

72

1   exactly at 8:30, which I was -- but it's just a hassle
2   getting here, so that's not comfortable.  But now, as
3   far as being here and being questioned -- I mean, I
4   understand this is as civic duty, and this is just part
5   of what has to be done.
6       Q.  Okay.  Mr. McClellan asked you whether or not
7   there was a reason that he should take you as a juror or
8   any reason he shouldn't, so I'll give you the
9   opportunity to respond to my question the same way.  It
10  will be my last question I'll give you.  You know, you
11  know you the best.  You know what makes you tick and who
12  you are.  Is there any reason that Mr. Wentz and I, when
13  we confer with Mr. Mamou, Gee, Miss Dixon is the person
14  we want with eleven others, or she's not the person we
15  want with eleven others.  Is there something that comes
16  to your mind?
17      A.  I don't know what you're looking for.  I'm not
18  trying to be something, with all due respect, to make
19  either one of you happy.  I'm just trying to answer your
20  questions to the best of my ability.  I don't know if I
21  would be a good juror or not.  All I can tell you is
22  that through my life, I try to see every aspect of any
23  scenario that I can.
24      Q.  Okay.  Anything else?
25      A.  No.

73

1       Q.  Thanks.
2           (Court admonishes juror.)
3              ROGER BAUMGARTEN,
4   having been first duly sworn, testified as follows:
5              VOIR DIRE EXAMINATION
6   BY THE COURT:
7       Q.  How are you today?
8       A.  Pretty good, sir.
9       Q.  Mr. Baumgarten, first off, let me ask you this:
10  Remembering back to Monday of last week, the things we
11  talked about then.  Add to it this morning, the things
12  we talked about this morning.  Out of everything that we
13  have talked about so far, do you have any questions at
14  all for me?
15      A.  None at this time.
16      Q.  Is there anything, sir, to this point that we
17  have not yet addressed that you feel as though we should
18  touch on because it might have some bearing or some
19  effect on your ability to be a fair juror in this case?
20      A.  No, sir.
21      Q.  Is there anything at all you can personally
22  think of, whether it be something about your personal
23  life, or professional life, or health, or anything else
24  for that matter, that causes you to believe that you
25  might not be able to serve as a juror in this case

74

1   during the time frame we've talked about?
2       A.  During the time frame, no, sir.
3       Q.  Can you see, as we talked this morning, how the
4   decisions that a jury makes in a case like this are
5   necessarily independent from the other decisions?  That
6   is to say, whatever you decide as to a person's guilt
7   does not, in and of itself, dictate what the punishment
8   should be.
9           Instead, each of these questions are going
10  to be asked.  And how you answer those questions are
11  going to dictate what punishment is imposed.  Are we
12  together?
13      A.  Yes, sir.
14      Q.  Nothing is automatic.  Just because you answer
15  guilty and yes to that first question does not mean the
16  death sentence is going to be imposed.  And that's what
17  I'm trying to get at, how each answer is independent of
18  the previous answers.  Do you have any questions at all
19  for me about the process?
20      A.  You have been very clear.
21      Q.  Thank you.  He doesn't think so.
22          MR. MCCLELLAN:  And I don't count, either.
23          THE COURT:  If you have no questions, I'll
24  turn you over to Mr. McClellan.
25          MR. MCCLELLAN:  Thank you, Your Honor.

75

1                    VOIR DIRE EXAMINATION
2    BY MR. MCCLELLAN:
3         Q.   Mr. Baumgarten, my name is Lyn McClellan.
4    Along with Claire Connors, we represent the State of
5    Texas in this case.  Basically, I want to go over your
6    questionnaire, some of your answers that you were so
7    kind to give us.  And I want to cover a lot of stuff I
8    want to talk about.  The Judge has done a good job of
9    telling you what the responsibility of jurors are and
10   how the process works.
11             I know you've been on two prior juries
12   before, but I assume that was a little different in that
13   capital murder, at the punishment stage anyway, is a lot
14   different than the punishment stage in a regular case.
15   Can you tell me in your own words what your opinion is
16   about the death penalty, just kind of what your thoughts
17   are?
18        A.   I would have to say emphatically that I believe
19   in it, whether it's a state law or whether it's
20   biblically.  It's in the fourth chapter of the Old
21   Testament.  In Numbers, it's about sixteen verses in
22   there that I also believe in.  It does not cover
23   Question Number Two, which is where I would come in.
24   But as far as Number One, it does cover it and I would
25   have to believe in the death penalty.

76

1         Q.   Okay.  When you say it doesn't cover Question
2    Number Two, that's where you come in, what do you mean
3    by that?
4         A.   Discerning character.
5         Q.   Mitigation, those type things?
6         A.   Yes.
7         Q.   Reason why someone ought to be punished one way
8    or the other?
9         A.   Correct.
10        Q.   In the questionnaire they had a list of five
11   agree/disagree.  You checked on this one series -- says,
12   I'm in favor of the death penalty except in a few cases
13   where it may not be appropriate, where it may be
14   inappropriate.  And then on the second group you said,
15   There are some kinds of cases which I know I could not
16   vote for the death penalty even if the law allowed me
17   to, but others which I would be willing to consider
18   voting for it.  Are there kinds of cases that come to
19   your mind where you could not vote for the death penalty
20   even if the law allows you to?
21        A.   I think it would bear on Question Number Two.
22        Q.   Okay.  All right.  In other words, there may be
23   circumstances that you hear about after you've heard all
24   the evidence that might indicate to you a life sentence
25   is more appropriate than a death penalty for that

77

1    particular crime?
2         A.   That is correct.
3         Q.   And that's what Question Number Two is designed
4    to do.  Some people come and say they are in favor of
5    the death penalty for certain types of cases.  Some
6    people go further, though, and say they do not believe
7    that they, themselves, could ever participate in a
8    process such as being on a jury where they would be
9    called upon to make decisions such as answering these
10   questions in which they knew they would be involved in
11   that would result in this Judge ordering the execution
12   of the defendant sitting over here on trial.  Do you
13   have any doubts about your ability to participate in
14   that type process and make that type of decision if
15   that's what the law and the evidence calls for?
16        A.   No, I would not.
17        Q.   So you would be able to make that type decision
18   if the law and evidence called for that type decision?
19        A.   I would possibly think so.
20        Q.   You were on a murder case before, you say,
21   about ten years ago.  Do you remember what the facts of
22   that particular case was?
23        A.   Yes, sir, I do.
24        Q.   Okay.  And y'all reached a verdict and assessed
25   punishment.  Do you remember what punishment you

78

1    assessed?
2         A.   I think we had three choices; and we took the
3    third choice, which was assault with a deadly weapon.
4         Q.   So you didn't find him guilty of murder; you
5    found him guilty of a lesser included offense?
6         A.   Lesser.
7         Q.   And do you recall what punishment they received
8    for that?
9         A.   Some type of a probated sentence and a fine, as
10   I recall.
11        Q.   All right.  What were the facts of the case?
12   Do you recall?
13        A.   It was a long story about the wife of the
14   defendant had a lover on the side that the husband did
15   not know about, came to the door one night, knocked on
16   the door to get in.  He had not previously known
17   anything about it, and he thought the man was breaking
18   in.  He went to the door with his weapon to scare the
19   man off, shot through the screen, and the guy had come
20   up the steps and it resulted in death.
21             The wife, I think, screamed, He's got a
22   gun.  But all of that happened so quickly.  There is
23   testimony that she hit the screen door with this elbow,
24   or hit something, and caused him to shoot; but it seemed
25   pretty clear in the case that he was trying to scare the

79

1    guy away and didn't know that the lover was trying to
2    come in.  The lover didn't know he was at home.  He had
3    gone to the Astro's game and come home early.  That may
4    be sketchy, but that's the best I can remember.  May be
5    over ten years ago.
6         Q.  And you say you were on a rape case, also.
7    Was that a not guilty in the rape case?
8         A.  Yes, sir.
9         Q.  Can you tell us what the facts were of that
10   situation?
11        A.  Happened at night.  And I think the defendant
12   (sic) was simply unclear in the identification of the
13   person that took her to the house in the dark.  Picked
14   her up on a dark street.
15        Q.  Now was this an abduction-type situation, or
16   was it somebody she knew?
17        A.  It was an abduction.
18        Q.  And she was not clear, in your mind, on who the
19   person was?
20        A.  That's correct.
21        Q.  Did you positively identify him in court or --
22        A.  That goes back some time, too.  But they
23   brought someone into the courtroom later that was
24   already held in jail on the same charges that we were
25   not told about, but it looked like a cousin and they

80

1    looked alike.
2         Q.  Okay.
3         A.  I don't know whether that's an answer to your
4    question or not.
5         Q.  Did the defendant testify in that case, in
6    either one of these cases?
7         A.  The defendant in the rape case did.  It was a
8    female, yes, she testified.
9         Q.  The defendant in the rape case was a female?
10        A.  Yes.
11        Q.  Okay.  Person on trial was a female?
12        A.  Yes.
13        Q.  Okay.  And in the murder case?
14        A.  No, I'm sorry.  The defendant (sic) was a
15   female.  Person on trial did not testify.
16        Q.  Defendant is the person on trial.
17        A.  Maybe I'm using the wrong word.
18        Q.  Person on trial would be a defendant in the
19   case.
20        A.  Yes, I'm sorry.
21        Q.  So the person on trial, did they testify --
22        A.  No.
23        Q.  -- in the rape case?
24        A.  No.
25        Q.  And in the murder case?

81

1         A.  No, sir.
2         Q.  I believe you indicated that your son had been
3    convicted of D.W.I., and his case is pending on appeal.
4    Anything about that case that would affect your ability
5    to be a juror in a case like this?
6         A.  That's questionable.  Yes, I have been on an
7    emotional roller coaster for about eight months over
8    that.
9         Q.  Okay.
10        A.  Prior to that, I probably could be a little
11   less jarred by what's going on.
12        Q.  Tell me how that would affect you, if it would.
13        A.  At this time, at the time he was convicted, I
14   was very angry at the court system; because I felt there
15   were circumstances that led up to -- their group had a
16   going away party for his boss.  That should have been
17   taken into consideration.
18             In this case, in my son's case, there was
19   a drug that was intended for a female that was at the
20   party.  And I think it got to my son in error; and he
21   was really not legally drunk, .07, but they ruled all
22   the circumstantial evidence out as noncircumstantial.
23        Q.  His trial was about a month ago or so?
24        A.  August 23rd.
25        Q.  All right.  Here in Harris County, right?

82

1         A.  Yes.
2         Q.  Was it in a misdemeanor court or a felony
3    court?  Do you know?
4         A.  It was in a felony court, Judge Helm, H-E-L-M.
5         Q.  That's a misdemeanor court.
6         A.  Oh, it is?
7         Q.  Yes.  This is the first time he's been charged
8    with D.W.I.?
9         A.  Yes.
10        Q.  Can't get to felony court on that.
11        A.  Okay.
12        Q.  Who was his lawyer?
13        A.  Scott Shearer, S-H-E-A-R-E-R.
14        Q.  Your question about your -- what your opinion
15   is of prosecutors and defense attorneys, is that how
16   that was arrived at, because of the reactions in that
17   case or --
18        A.  Yes, very much so.
19        Q.  Relating back to your jury service in the other
20   cases, did you have those thoughts about prosecutors and
21   defense lawyers prior to this time?
22        A.  No, sir.
23        Q.  Okay.  Can you set that aside or not?  I mean,
24   obviously, our office is the one prosecuting the D.W.I.
25   case a month ago.  The D.A's Office was prosecuting your

83

1  son. And now you're asked to sit in judgment in a
2  capital murder case, and the D.A.'s going to be
3  presenting evidence. You can look at me and say, you
4  sorry, you know whatever you are. And I'm just one of
5  the guys down here or whatever. Have I got a fair shot
6  or not? I need to know.
7      A.  I think you certainly have a fair shot from a
8  rational mind, but I think my emotions play in there
9  somewhere. And I'm now facing an appeals process I know
10  nothing about.
11      THE COURT: Mr. Baumgarten, just answer
12  the question. You can see, I know, intellectually that
13  this defendant, his attorneys, the State, their
14  attorneys, have the right to have people make a decision
15  in the case, whatever decision they make, solely and
16  exclusively upon the evidence that exists in that trial,
17  not on something that has occurred before in our lives,
18  whether it was a pleasant thing or an unpleasant thing.
19  Can you take the circumstances regarding your son, for
20  example, and set them aside and just listen to the
21  evidence, evaluate it however you see fit, and based
22  upon that evidence, come up with what you view to be the
23  appropriate verdict in the case?
24      VENIREPERSON: My answer to that would be
25  yes.

84

1      Q.  (BY MR. MCCLELLAN) Okay. Do you think the
2  death penalty is necessary for us to have?
3      A.  All my many years I have said yes to that
4  question, because I think it was originally intended to
5  be a deterrent. And I question the fact that it is a
6  deterrent for so many crimes where the defendant, the
7  person committing the crime, takes their own life in the
8  process. There is no fear of death in many cases. I
9  may be in another realm of that.
10      Q.  You said the person takes their own life. What
11  do you mean?
12      A.  Well, the person in Fort Worth in the church
13  goes and shoots all these innocent people and then
14  killed himself.
15      Q.  Right.
16      A.  Now when a Court does it and the person behind
17  the gun didn't do it at the time he committed the
18  murder --
19      Q.  Right.
20      A.  -- then it becomes the Court to decide. There
21  is a question there of, I guess, fear of death --
22      Q.  Okay.
23      A.  -- and God-fearing things.
24      Q.  How do you think that would -- if you sat on a
25  case and you heard facts and circumstances that

85

1  convinced you beyond a reasonable doubt a person was
2  guilty of capital murder, could you find him guilty of
3  capital murder?
4      A.  Yes, I could.
5      Q.  And after hearing that evidence, if you thought
6  that was evidence presented that would be, at least to a
7  probability, a continuing threat to commit criminal acts
8  of violence -- in other words, they sat there that day
9  in court after you've made your decision, you thought if
10  they had the opportunity, they would be a continuing
11  threat to commit criminal acts of violence -- could you
12  answer that question yes?
13      A.  Yes, I could.
14      Q.  Okay. And if you answer that question yes,
15  when you went to the last question, if you looked at all
16  the evidence, looked at all the circumstances, looked at
17  all the background, looked at the defendant, crime, all
18  the facts and evidence about everything you had to hear,
19  and if you thought that death was the appropriate
20  response to that crime, that individual, and those
21  circumstances, could you vote that way, that death would
22  result?
23      A.  I could vote that way, yes.
24      Q.  Okay. If you were -- if you had a loved one
25  that was on trial for capital murder, someone charged

86

1  with the offense of capital murder, would you want
2  someone of your mindset sitting in judgment of that type
3  case?
4      A.  Yes, sir.
5      Q.  If your loved one had been the victim of a
6  capital murder, the State was seeking the death penalty,
7  your loved one had been killed in a capital murder, and
8  a person was on trial for having taken your loved one's
9  life, would you want someone in your mind-set sitting as
10  one of the twelve people over here to make the decision
11  on whether or not the person who killed your loved one
12  ought to receive life or death?
13      A.  I would think that I would choose myself in
14  this case. I think I'm in my right mind to discern.
15      Q.  Okay. One place in the questionnaire, it said,
16  Life imprisonment is more effective than the death
17  penalty, and asks you to either agree or disagree with
18  that. And you checked that you agreed that life
19  imprisonment is more effective than the death penalty.
20  Can you tell me what your thoughts were in that regard?
21      A.  There is time for rehabilitation during
22  incarceration in many times, in many cases. Not always.
23      Q.  So do you think that would always cause you
24  then to vote in such a way that life resulted, so there
25  would always be the opportunity for rehabilitation?

87

1    A. I'll have to allude to one of those answers on
2  the question there, that I think time is a major factor.
3  If it's ten or fifteen years after the crime was
4  committed, a person is on death row, they've had all
5  that time to rehabilitate whether it's life or death.
6  Then I don't see fifteen years later doing the death
7  penalty, but you're not asking me that question.
8    Q. You will never be deciding that, unless you get
9  on the Board of Pardons and Paroles I guess. You
10  mentioned in the Karla Faye Tucker case --
11    A. Yes.
12    Q. -- you thought she should have been pardoned
13  and let her get a life sentence, because she
14  rehabilitated herself while she was in the pen?
15    A. That's right. I thought she could have done
16  some good and stayed in prison.
17    Q. Let me bring you back to the time she was on
18  trial for capital murder. Are you familiar with the
19  facts of the case, the pickax case, where she allegedly
20  pickaxed someone to death?
21    A. Yes.
22    Q. Did you believe that the punishment was
23  appropriate at that time --
24    A. Yes.
25    Q. -- based upon the law you knew?

88

1    A. Yes. I thought maybe death would be imminent;
2  but that's not the way the system works, and we're not
3  discussing that.
4    Q. Right. Are you still open, then, if you hear
5  facts where you think the death penalty is proper,
6  that's going to be your decision here; that is, here in
7  Harris County, that you could vote in such a way, or
8  because you think there is always a chance of
9  rehabilitation, are you always going to go with a life
10  sentence?
11    A. I guess that's the toughest question you can
12  ask me.
13    THE COURT: Think about the word always.
14  Are you always going to go one way or always go the
15  other way, or are you going to let the circumstances of
16  the case dictate?
17    VENIREPERSON: I think I'd definitely let
18  the circumstance dictate.
19    Q. (BY MR. MCCLELLAN) So even --
20    A. I'm not biased one way or the other.
21    Q. So if you hear facts that relate to you that
22  the answer to the questions ought to be answered in such
23  a way, based on the law and the evidence, that death
24  results, you're capable of doing that, even knowing
25  that, well, if I vote for life, there is a chance the

89

1  person might be rehabilitated?
2    A. I could go either way.
3    Q. Thank you, sir. I appreciate your time. I'm
4  going to pass you.
5    THE COURT: Thank you.
6    Mr. Hill.
7    VOIR DIRE EXAMINATION
8  BY MR. HILL:
9    Q. Mr. Baumgarten, my name is Wayne Hill. Kurt
10  Wentz and I both represent Mr. Mamou. I'm going to ask
11  you just a few questions. You've had an opportunity to
12  express a bunch of ideas and stuff to Mr. McClellan, and
13  you've heard the Judge give you the other view of the
14  system. I guess at the outset, I'd like to make a
15  comment. I think it's unfair, or it's a disservice to
16  prospective jurors, if either side really tries to
17  pigeonhole the jurors as either pro State or pro
18  defense.
19    Because a lot of the times you read these
20  questionnaires, and it seems to suggest strong leanings
21  one way, and yet when you take the time to listen to
22  people talk, you find out that they're a little bit more
23  open than what the answers might suggest on these
24  things. And I'll be the first to tell you, when I read
25  through your questionnaire, I got the sense of somebody

90

1  that is very strongly in favor of the death penalty,
2  that probably sees it more as a mandatory penalty than
3  what I'm hearing in response to questions that were
4  asked.
5    Okay. Let me ask you this, because there
6  are several questions that were asked of you that cause
7  me to want to follow up and ask some additional
8  questions. One of the things that was asked of you had
9  to do with the person's use of drugs and how that
10  affects people. And the question was, Are illegal drugs
11  a problem in our society? You indicated, Yes. And the
12  question followed up, If yes, what should be done about
13  that problem? And your answer was, Dealers and drug
14  lords should face mandatory death penalties. Let's
15  start there.
16    You understand that a person that is
17  charged with selling drugs, or is head of a cartel, or
18  however you define drug lord, the death penalty is not
19  available for them in the State of Texas. First of all,
20  how do you feel about that?
21    A. That right there is probably just my ignorance
22  of the law. It's just a personal anger toward the drug
23  situation that we encounter day to day.
24    Q. Okay.
25    A. But it's driving some of our crime, maybe a lot

**91**

1  of it.

2     Q.  Okay. How do you feel about a situation where
3  you now come to find out that the death penalty is only
4  available in the State of Texas for an individual that
5  commits capital murder? And the Judge went through a
6  series of what capital murder might be. But in other
7  words, a person has to intentionally take the life of
8  another person either while they're committing another
9  felony offense, such as kidnapping, or capital murder in
10  the context of our case could be committed where you've
11  killed two people intentionally at the same time.

12       Okay. Do you feel as though the death
13  penalty statute that we have here in Texas is perhaps
14  too restrictive, that it should be expanded to include
15  additional crimes outside of murder.

16     A.  I don't feel that I'm capable of or qualified
17  to pass judgment on a wider scale.

18     Q.  Okay.

19     A.  It's probably more based on personal feeling.

20     Q.  Okay. Well -- go ahead.

21     A.  Just like I said before, just out of anger.

22     Q.  Okay.

23     A.  You read the news. And, you know, you just
24  want to do something. That's probably the first
25  response.

**92**

1     Q.  Okay. Mr. McClellan asked you a couple of
2  questions about your son's situation. And I think
3  everybody could understand how he might be concerned
4  that if Mr. Baumgarten sits on this jury along with
5  eleven other people, is the situation with your son that
6  you've gone through and are continuing to go through
7  going to affect your ability to judge the case that they
8  present?

9       Flip that around for a moment and
10  understand our perspective. Do you feel so strongly
11  about drug culture, do you feel so strongly about what
12  you read in the newspaper about cases, that we should be
13  concerned at all, that you're the kind of individual
14  that wouldn't give us a fair trial, knowing what it is
15  that Mr. Mamou is charged with.

16     A.  Can you restate that a little more simply?

17     Q.  Sure. Is there any reason that you can think
18  of that, as I'm sitting here talking to you,
19  understanding that I represent Mr. Mamou; he's charged
20  with capital murder -- is there anything that I should
21  be concerned about in terms of your own ability to give
22  him a fair trial?

23     A.  No, sir.

24     Q.  What do you think it was that made a difference
25  in Karla Faye Tucker's life, having done a very heinous

**93**

1  type of capital murder, the nature of how the crime was
2  committed, was possibly one of the worst that we've
3  heard -- what do you think happened to that individual
4  that changed her?

5     A.  The intense Christian counselors that -- I'll
6  have to allude to my daughter -- has been involved in.
7  There may be an answer on there to that, going into
8  prison and -- I'll keep to the question, to Karla Faye.

9     Q.  You answer the question however you want.
10  Don't worry about constraining.

11     A.  My daughter, while in school in Fort Worth, was
12  going into the prison behind the walls and visiting with
13  at-risk children of incarcerated parents as part of her
14  social work degree that she has now gotten a master's
15  degree in. But as far as Karla Faye, it's just
16  one-on-one, men and women, going in to see her and visit
17  with her and asking her for a personal commitment to
18  God. And over time, she found -- I feel -- found her
19  Lord and Master, her God or Supreme Being that she did
20  not have at the time she committed it.

21     Q.  One of the questions asks you, Do you believe
22  that teenagers and young adults will change as they grow
23  older? And you said, Yes. Says, If yes, please
24  explain. You are responsible, as law-abiding citizens,
25  but only with a parent, friend, or church influence to

**94**

1  do what's right. Okay. You figure that the way a
2  person is brought up, the parents, the extended family
3  that they have, their church involvement, makes a
4  difference one way or the other in the way that person
5  is raised?

6     A.  Most definitely.

7     Q.  What does it mean to you, or what do you think
8  the probable outcome would be in most cases? We realize
9  there are always extremes; but in most cases, what do
10  you think the outcome is for somebody that's raised in a
11  family that doesn't have a mother and father in the home
12  and perhaps is kind of left to their own devices to make
13  ends meet. Do you think there is a general thought
14  process you would have about how that person comes out?

15     A.  I feel like they would make a lot of wrong
16  choices and probably a lot of mistakes, and somewhere
17  there could be enough fear to turn them around. But
18  there may not be, depending on peer pressure, et cetera.

19     Q.  Do you think there is a higher probability if a
20  person has gone through an extended period of time
21  having to kind of do things on their own, and even if
22  they engage in wrongdoing -- because that's their means
23  of achieving money or stature in the community -- do you
24  think that carries over even after a certain
25  chronological age? Do you think a person just becomes

95

1  enmeshed in that type of culture, that type of society
2  for themselves?
3      A.  There should be -- there is always an out.
4  There is ways to break from that.  It just would depend
5  on the person in that environment that was so, as you
6  say, enmeshed, so full of temptation and wrong choices.
7      Q.  Okay.  You know, you're one of the few people
8  that didn't try to answer Question Number 68, which
9  asked you whether or not you felt -- do you believe that
10  mitigating evidence concerning a capital murder
11  defendant's background should be considered in deciding
12  whether it's life or death?  You said, I need a
13  dictionary for mitigation.  Everybody else answers the
14  question.  And I ask them, What is mitigation?  And they
15  say, Well, I don't know.  So you tell me, after you've
16  heard what we've all talked about, what would you think
17  mitigation means to you?
18      A.  A reduced sentence based on evidence.
19      Q.  Okay.  Based on evidence?
20      A.  Yes.
21      Q.  All right.  Now I will tell you one thing that
22  you said that concerns me, okay, and I don't -- I hope
23  you're not offended by me being forthright with you;
24  because I've got an awesome responsibility, to defend
25  this man.  And if I'm going to have you sitting there

96

1  with eleven other people and I haven't at least given
2  you an opportunity to talk with me about this, I'm not
3  doing my job for him.
4          You know, when Mr. McClellan was asking
5  you about these two questions, okay, remembering that
6  these two issues that are on this board here are not
7  even asked of the jury unless they have found somebody
8  guilty of capital murder -- in other words, we're now at
9  the punishment stage of the trial, okay?  You said that
10  the first question is Biblical.  You said the first
11  question, if I'm understanding you correctly, that that
12  question is basically a Biblical origin.  The second
13  question is where you come in with regard to mitigation?
14      A.  That is what I said, yes.
15      Q.  Help me to understand or to interpret whether
16  that means that in all cases where Mr. Baumgarten were
17  to sit on a capital murder case, having found a person
18  guilty of capital murder, would Mr. Baumgarten, in every
19  case, have to find that a person is going to be at least
20  a probability of being a future threat to society?
21          In other words, if you find a person
22  guilty of capital murder, will Question Number One
23  always have to be answered yes, in your opinion?
24      A.  The answer would be no, if they were not a
25  continuing threat.

97

1      Q.  Okay.  Do you see --
2      A.  There is a second part to that, and I possibly
3  answered it all as one.
4      Q.  Okay.  Do you see how I could be concerned
5  about if -- because if you're going to answer that
6  Question Number One yes in every case, then we're not
7  being given an opportunity to have you fairly assess
8  whether the answer should be yes or no.  Okay?
9      A.  Yes.
10      Q.  You understand why I asked you that question?
11      A.  Yes.
12      Q.  Okay.  Or when your son had his trial, did you
13  testify at the trial?
14      A.  No, sir.
15      Q.  Were there any witnesses called on his behalf
16  regarding the facts, in other words, that he was not
17  guilty and here's why?
18      A.  I think people from his work only that were
19  present the night of the party.
20      Q.  The party for the boss?
21      A.  Yes.
22      Q.  How is it that the substance got into your son?
23  You said somebody slipped him something?
24      A.  That's the hard part.  It's unprovable.  It's
25  simply unprovable.

98

1      Q.  But they gave him a breath test, and there was
2  some alcohol in his system?  What -- did they also claim
3  he was doing some type of drugs, as well?
4      A.  That was never claimed.  But the fact that he
5  was weaving all over the road, they said it was strictly
6  alcohol, when he felt sick and felt like -- he had never
7  felt that way before.
8      Q.  He knew it wasn't alcohol?
9      A.  He knew it wasn't alcohol, and he tried to eat
10  something and that didn't work.  And then I guess the
11  wrong choice was to get in his vehicle and try and drive
12  home, but I have never seen him drunk before or come
13  home drunk before.
14      Q.  And he's never been in that type of trouble
15  before?
16      A.  That is correct.
17      Q.  So it was a very unusual, unique situation?
18      A.  Very unusual, unique situation.
19      Q.  What type of sentence did he receive?  You
20  mentioned you're in the appellate process.
21      A.  That is correct.
22      Q.  Did he receive probation?
23      A.  He received probation, yes.
24      Q.  What questions do you have of me?  You've
25  obviously been through this on a very firsthand basis.

99

1  You've also sat as a juror. You seem to be a very
2  involved person in your church. You have a real clear
3  understanding of what that process is all about. The
4  only question I can ask you is whether or not, if you're
5  sitting here with eleven other people, you know, are we
6  going to get a fair shake, as well? That's the bottom
7  line in all these questions. That's what it leads to, I
8  should say.
9      A.  Why not? I don't know why you cannot.
10     Q.  Do you have any questions of me?
11     A.  Not at this time.
12     Q.  Well, this is the only time you get to ask.
13 Thank you.
14              (Court admonishes prospective juror.)
15              MARY JONES SMITH,
16 having been first duly sworn, testified as follows:
17              VOIR DIRE EXAMINATION
18 BY THE COURT:
19     Q.  Miss Smith, first off, I'd ask you to remember
20 back to last Monday, when the group was out here
21 together, the things we talked about that day.
22     A.  I wasn't here that Monday. I was here Thursday
23 and Friday of the previous week.
24     Q.  I don't even remember that.
25     A.  It was on Friday.

100

1      Q.  Okay. That's a better day. Pick this day
2  then. You're absolutely right. Well, the things we
3  talked about that day. Add to them the things we talked
4  about today. Out of everything that we have talked
5  about so far, do you have any questions at all for me?
6      A.  No.
7      Q.  Is there anything up to this point, Miss Smith,
8  that we have not yet addressed that you feel as though
9  we should touch on because it might have some bearing on
10 your service as a juror in this case?
11     A.  (Nods negatively.)
12     Q.  Is there anything at all that you can think of
13 at the present, whether it be something perhaps about
14 your personal life, something perhaps about your
15 professional life, something maybe about your health, or
16 anything else for that matter, that you feel in any way
17 would interfere with your being a juror in this case
18 during the time frame we talked about?
19     A.  No.
20     Q.  The way it's decided how a person is guilty or
21 not guilty, does that make sense to you?
22     A.  Yes.
23     Q.  The way it's decided whether these questions
24 get answered yes or no, does that make sense to you?
25     A.  Yes.

101

1      Q.  Are you equally as open to answering these
2  questions in such a way that the death penalty is
3  imposed as in your answering in such a way that the life
4  sentence is imposed?
5      A.  Yes.
6      Q.  That you answer -- whatever way you answer, you
7  answer them on the basis of the evidence?
8      A.  Yes, sir.
9      Q.  You're going to have to speak up more loudly.
10     A.  Yes.
11     Q.  Do you have any questions of me before we
12 begin?
13     A.  No, sir.
14     Q.  Thank you.
15              THE COURT:  Mr. McClellan.
16              MR. MCCLELLAN:  Thank you, Your Honor.
17              VOIR DIRE EXAMINATION
18 BY MR. MCCLELLAN:
19     Q.  Miss Smith, my name is Lyn McClellan. Along
20 with Claire Connors, we represent the State of Texas in
21 this case. I want to go over your questionnaire and
22 follow up on some of your answers that you had there and
23 talk to you about aspects of the law that might apply in
24 a case like this and get what your feelings are about
25 those.

102

1      A.  Okay.
2      Q.  I see that you were on a jury. In fact, you
3  were the foreman of the jury, I guess, in a drug case?
4      A.  Yes.
5      Q.  You say maybe -- I thought you said thirty
6  years, but three or four years ago. Was that here in
7  Harris County, I assume?
8      A.  Yes.
9      Q.  Was it a possession of controlled substance, or
10 sale, or --
11     A.  Possession with intent to distribute.
12     Q.  And y'all reached a verdict in this case, but
13 you said you did not assess punishment?
14     A.  No.
15     Q.  What happened in that case?
16     A.  He preferred to let the Judge sentence him.
17     Q.  Do you recall what sentence that he received?
18     A.  No, sir, we did not stay in the courtroom.
19 They dismissed the jury before the Judge imposed
20 sentence.
21     Q.  All right. And do you remember what court that
22 was in or anything about that?
23     A.  No, sir, I can't remember.
24     Q.  I assume it was a felony jury, though, with
25 twelve people?

103

1    A.   Yes.
2    Q.   Anything about that case that would affect your
3 ability to be a juror in a case like this?
4    A.   No, sir.
5    Q.   Have you ever known anyone who had been falsely
6 accused of a crime?
7    A.   No, sir.
8    Q.   You shared with us the fact that you had been
9 charged with criminal mischief and had to do community
10 service hours or whatever?
11    A.   Uh-huh.
12    Q.   Can you tell us something about that?
13    A.   It was illegal discharge of a firearm within
14 the city limits on New Year's Eve.
15    Q.   And they charged criminal mischief?
16    A.   I don't know how it came about.  A friend of
17 mine was the one who was at my house, who actually fired
18 the gun.  The neighbors called the police.  When the
19 police arrived, they wanted to know who the gun belonged
20 to.  It belonged to me, so I was arrested.  And that was
21 the final charge, criminal mischief.
22    Q.   Did you tell them, I didn't fire the gun?
23    A.   Yes.  I explained to them that I did not fire
24 the gun.  But like I said, the gun was registered in my
25 name.

104

1    Q.   When you came to court, did you have a lawyer?
2    A.   Yes, I had an attorney.  And I just pleaded --
3 I guess it was no contest or something, and they gave me
4 the community service.  And after I finished the
5 community service, I was allowed to get my gun back.
6    Q.   Okay.  Who was your lawyer?
7    A.   He was a Court-appointed attorney.
8    Q.   Do you think you were treated fairly in that
9 case or not?
10    A.   Yes.
11    Q.   Can you tell me, what is your opinion about the
12 death penalty?
13    A.   I'm not sure what you mean.  How do I feel
14 about it?
15    Q.   Yes.  What are your thoughts about it?
16    A.   The only thing I can say about the death
17 penalty, as far as I know, is -- as far as I'm
18 concerned -- is how can someone be sentenced to death,
19 and thirteen years later they're still on death row?
20 That's the only question I have about the death penalty.
21    Q.   Do you think it's a proper-type punishment for
22 certain types of crime?
23    A.   Yes.
24    Q.   What kinds of cases do you think it's
25 appropriate for?

105

1    A.   You walk into a house to rob it, and you kill
2 five people and you get the death penalty.
3    Q.   What if you kill one?
4    A.   Depending on the circumstances.  If you have to
5 walk in to one person, you're more than likely to
6 confront one person than you are five people.  One
7 person, you probably end up fighting each other.  That's
8 a different question.  But when you just walk in and
9 kill five people, you kill five people.
10    Q.   Okay.  Do you think the death penalty is only
11 appropriate for multiple murders?
12    A.   No.
13    Q.   The law says capital murder is murder during
14 the course of another felony; murder during a robbery,
15 murder during a burglary, what I described, murder
16 during a kidnapping, you kidnap someone.  And that's
17 what we've alleged in this case.  Murder during a sexual
18 assault, killing a child under a certain age, killing a
19 police officer in the line of duty.  Are those the kind
20 of cases -- are you in agreement the law says the death
21 penalty should be available for those?  There is no case
22 that it automatically applies to, but it's available for
23 those.  Are you in agreement with the law that it ought
24 to be available for those types of cases?
25    A.   Yes.

106

1    Q.   Do you think there is some cases it ought to be
2 expanded to be available to?
3    A.   I'm not quite sure how to answer that.
4    Q.   Some people -- some people come in here and say
5 they are in favor of the death penalty.  They feel it's
6 a proper punishment in certain types of crimes.  Some
7 people go further and say they, themselves, could never
8 participate in a process such as being on a jury where
9 they would be called upon to make decisions such as
10 answering these questions, knowing that in doing so,
11 they would be ordering this Judge to order the execution
12 of the defendant sitting over here on trial.  Do you
13 have any doubts about your ability to participate in
14 that type process and make that type decision if that's
15 what the law and the evidence called for?
16    A.   I could make that decision.
17    Q.   Have you ever heard of cases where you thought
18 the death penalty was inappropriate, but it was given?
19 But you thought it was an inappropriate penalty for the
20 crime?
21    A.   No, sir.
22    Q.   What did you think about the movie, "Dead Man
23 Walking"?  You say you saw that?
24    A.   All they proved was that he was guilty of the
25 crime.  And, you know, her option was like to reform,

107

1  is more of a spiritual than anything to do with the
2  death penalty.
3      Q.  You've indicated you've been a victim of a
4  mugging at the apartment complex?
5      A.  Yes, I was.
6      Q.  How long ago was that?
7      A.  I'd say approximately almost nine years ago.
8      Q.  Was anybody ever prosecuted for that?
9      A.  No.
10     Q.  It was a stranger?
11     A.  A complete stranger.
12     Q.  So nobody was able to identify?
13     A.  I could not identify anyone.
14     Q.  There is a question in here that says, Would an
15  individual's use or sale of drugs prevent them from
16  relying on a defense available to other members of
17  society?  Well, I think it was talking about, let's say
18  I'm out selling drugs and someone comes up and robs me.
19  And they're holding a gun on me, and I'm fearful they're
20  going to shoot me.
21          The law would say if someone is using
22  unlawful deadly force against me, even if I'm selling
23  drugs, and if I fear that it's immediately necessary to
24  protect myself, I'm entitled to use deadly force to
25  protect myself, if I'm not able to retreat to safety.

108

1  Do you think a person who's breaking the law ought to
2  still be allowed to rely upon that issue that's called
3  self-defense if those circumstances existed in the case?
4      A.  Yes.
5      Q.  So just because someone is selling drugs, you
6  don't think they give up the right to protect themselves
7  or whatever?
8      A.  No.
9      Q.  Do you think if -- I'm going to ask you, what's
10  the biggest problem, crime-wise, in our society?  What
11  crime do you think you might pick?
12     A.  It would have to be drugs.
13     Q.  Okay.  What's the solution to that, you know?
14     A.  Tougher laws, tougher sentences.
15     Q.  So you think we don't sentence drug people
16  seriously enough or severely enough?
17     A.  Severely enough.
18     Q.  You indicated in the questionnaire that you're
19  of the Catholic religion, and the Catholic religion
20  opposes the death penalty?
21     A.  Catholic religion -- I was born and raised in
22  Catholic schools.  And as far as Catholic goes, I
23  believe in the Catholic religion to a certain extent;
24  but I also deal in reality in life.  There is some
25  things the church has to change, they possibly never

109

1  will.
2      Q.  You grew up where in Louisiana?
3      A.  Lake Charles, Louisiana.
4      Q.  Whereabouts?
5      A.  Lake Charles.
6      Q.  Do you know where Sunset, Louisiana is?
7      A.  No, sir.
8      Q.  And you moved here when?
9      A.  I moved here in '72, November of '72.
10     Q.  Okay.  And why did you move to Houston?
11     A.  Well, really, primarily because my parents had
12  moved here to begin with.  Then I moved here after they
13  did.
14     Q.  Any brothers or sisters?
15     A.  I have one sister.
16     Q.  Does she live in this area?
17     A.  Yeah, she lives here.  She's in Texas.
18     Q.  Do your parents still live here in Houston?
19     A.  Yes, they do.
20     Q.  Prior to being with the job you have now as
21  assistant manager of Dairy Queen --
22     A.  Uh-huh.
23     Q.  -- you worked with I.C.C. Oil Company?
24     A.  Intercontinental Consolidated.
25     Q.  And how long did you work for them?

110

1      A.  I was with them for six years.
2      Q.  Who else have you worked for prior to that?
3      A.  That's it.  I work for myself during the
4  daytime.  I clean houses off 1960.
5      Q.  Okay.  And do you have any children?
6      A.  I have one son.  He's twenty-seven years old.
7      Q.  What does he do?
8      A.  He's in the United States Navy.
9      Q.  Is he going to make that a career?
10     A.  I'm not sure.  He hasn't decided yet.
11     Q.  And did he grow up here in Houston or --
12     A.  Yes, he grew up here.
13     Q.  What schools did he go to?
14     A.  He went to Aldine High School, and he returned
15  to Louisiana and attended McNeese State University.
16     Q.  Do you have any questions about the way the
17  system is set up?  As the Judge explained to you, first
18  order of business is whether or not the State can prove
19  beyond a reasonable doubt a person is guilty of capital
20  murder.  If you prove someone guilty of capital murder,
21  then you go to answer these questions up here.  What do
22  you think would be helpful in determining whether or not
23  a person would be a continuing threat to commit criminal
24  acts of violence?  What kinds of information you think
25  helps to make that decision?

111

1      A.   It would have to be the nature of the crime,
2  the person's background, character witnesses.
3      Q.   You get to consider all those things --
4      A.   Yes.
5      Q.   -- in making that decision.  And are you
6  comfortable with making a decision as to whether or not
7  there is a probability that the person you had found
8  guilty would be a continuing threat to commit criminal
9  acts of violence, either yes or no?
10     A.   Yes.
11     Q.   Comfortable making that type decision?
12     A.   Yes.
13     Q.   Then it asks you on Issue Number Two, are there
14 any reasons why this person should receive life as
15 opposed to death?  And the reason it asks that is
16 because if you found him guilty and if you answer Issue
17 Number One yes, then the person is going to receive
18 death, unless you decide there are a reason or reasons
19 why this person should receive life as opposed to death?
20     A.   Uh-huh.
21     Q.   Go back and look at the evidence.  Something
22 there that tells you the proper punishment for the crime
23 this person has committed, based upon all of the
24 evidence, really ought to be life as opposed to death.
25 If you find those circumstances exist, it allows you to

112

1  make that choice.  If you find there are no
2  circumstances which cause you to change your mind from
3  death to life, then you don't change your mind and you
4  answer that question no.  Any problem with this aspect?
5      A.   No.
6      Q.   Do you think a person who is high on drugs or
7  alcohol when they commit a crime ought to still be held
8  responsible for the crime they commit?
9      A.   No.
10     Q.   So if you're high on drugs or alcohol, you
11 think what ought to happen?
12     A.   Should be presented maybe in a different way
13 than the knowledge --
14         THE COURT:  Do you think they should be
15 found guilty of whatever crime they committed?
16         VENIREPERSON:  They would have to go back
17 to the evidence, how it was presented.
18     Q.   (BY MR. MCCLELLAN)  But you said they should be
19 treated differently --
20     A.   Yeah.
21     Q.   -- if I heard you correctly.  Would that -- are
22 you thinking about punishment?
23     A.   About finding her guilty?  I'm sorry.  Maybe I
24 didn't understand his question.
25     Q.   My question is, if you found, based on the

113

1  evidence, the person went out and let's say, you know,
2  robbed a bank.
3      A.   Uh-huh.
4      Q.   The evidence showed that they were high on
5  drugs or alcohol when they robbed a bank.  Some people
6  may say, well, they shouldn't be held responsible,
7  because they didn't know what they were doing.  Somebody
8  else may say, well, I don't care if they're on drugs or
9  alcohol.  If you committed the crime, you still have to
10 be held responsible.
11     A.   I don't know if I could do that.
12         MR. HILL:  If he could, if he could
13 specify whether on punishment or guilt.
14         VENIREPERSON:  If I would be able to find
15 him guilty?  If they presented the evidence to show he
16 was guilty, whether he was high or not, it wouldn't
17 matter.
18     Q.   (BY MR. MCCLELLAN)  All right.  A person's --
19 different people may have different mental abilities.
20 Some people may be real smart.  Some people may be
21 borderline mentally retarded.  The law says as long as
22 they know the difference between right and wrong,
23 they're to be held responsible for their conduct.  Do
24 you agree with that aspect?
25     A.   Yes.

114

1      Q.   Do you think someone, as long as they are the
2  age of an adult -- that is, the law says if you're
3  seventeen years of age or older, you ought to be held
4  responsible as an adult for your crimes that you may
5  commit, up to and including the death penalty.  Do you
6  think that's a proper way of treating that, or do you
7  think it ought to be changed?
8      A.   It's a proper way to treat it.
9      Q.   Have you ever known anyone that's used or
10 abused a controlled substance during your life?
11     A.   No.
12     Q.   No?
13     A.   None I can think of.
14     Q.   All right, ma'am.  I appreciate your time.  I'm
15 going to pass you.
16         THE COURT:  Mr. Hill.
17         MR. HILL:  Thank you.
18              VOIR DIRE EXAMINATION
19 BY MR. HILL:
20     Q.   Hi, Miss Smith.  My name is Wayne Hill.  Kurt
21 Wentz and I represent Mr. Mamou.  I'm only going to ask
22 you a few questions.  Obviously, Mr. McClellan has asked
23 you a series of questions from the prosecutor's
24 standpoint, wanting to see whether or not you're the
25 type of individual he would want on a jury.  Obviously,

115

1    I'll do the same from a slightly different perspective.
2          One of the things I want to ask you, as
3    you're sitting here today, let's assume for a moment
4    that the incidents that occurred earlier in your life on
5    New Year's Eve were to happen again right now. Your
6    friend takes a weapon, fires it into the air New Year's
7    Eve. Police come. You get charged again. What would
8    your decision be in terms of how that case comes out?
9    Would it be exactly the same?
10       A.  No.
11       Q.  Would you fight the case?
12       A.  It would be the same.
13       Q.  Let me ask you, when the police came out there,
14   was your friend still there?
15       A.  Yes.
16       Q.  You explained to the police that you had not
17   discharged the weapon?
18       A.  Yes.
19       Q.  They basically didn't believe you, or they
20   ignored what you said?
21       A.  He said it was not -- really, what it boiled
22   down to was the fact that it was my gun; they were at my
23   house. Regardless of who discharged it, the weapon was
24   mine.
25       Q.  Did your attorney tell you that's what the law

116

1    was, that, in fact, you should be held responsible?
2        A.  No.  He decided -- the Court-appointed attorney
3    was saying, like, maybe if I would decide to go ahead
4    and get my own attorney and fight it.  But it was like,
5    I just didn't -- to be honest with you, I just did not
6    have the time to do that, okay.  It was just a simple --
7    it happened.  It was my fault, so it was really no one
8    to blame but myself; because I did not have to give him
9    a gun.
10       Q.  Okay.  Did you know that he was going to fire
11   the gun?
12       A.  Yes, I knew that.
13       Q.  Perhaps that's how they came about finding you
14   should be held responsible.
15       A.  Yeah, because I'm the one that gave it to him.
16       Q.  I was curious, because it didn't sound to me
17   like it was a situation where you would have been
18   responsible for it.
19       A.  But it was my gun, and I'm the one who gave it
20   to him.
21       Q.  Well, that explains the situation.
22       A.  Yeah, that's what happened.
23       Q.  Mr. McClellan was asking you about questions
24   regarding the death penalty and whether a person should
25   be held responsible.  And in a situation where you had

117

1    found somebody guilty of capital murder, you know,
2    obviously you would have the decision-making authority,
3    along with eleven other people, to decide whether a
4    person lives or dies.  And if I'm correct, you said
5    something along the lines that it would depend upon the
6    circumstances of the crime?
7        A.  Of the crime.
8        Q.  Okay.  Talk to me a little bit about what you
9    meant.  What are some of the circumstances of how a
10   crime is committed that could help you decide a life
11   versus a death question?
12       A.  I don't know.  If you -- like I said earlier,
13   if you go into someone's home and there are five people
14   there, no one -- you enter the home to rob it, and all
15   five people are cooperating.  Okay.  Take what you want
16   and just leave.  Okay.  You decide to take what you
17   want.  And all of a sudden, you decide to turn around
18   and just kill off five people.  That's a horrible
19   situation.
20       Q.  And that's one where you're not going to have
21   too much difficulty finding a person guilty?
22       A.  Yeah, finding that person guilty.  But now, you
23   break into a building, you think it's empty, and all of
24   a sudden, someone shows up out of nowhere, and you get
25   into a tussle over that.  And in the tussle or hassle or

118

1    whatever, you end up killing that person.  That would be
2    under different circumstances.
3        Q.  Can you even see from your own experience years
4    ago that if a person -- let's say you had gone to a jury
5    trial, and the jury had listened to the facts and
6    circumstances of the case.  If all they knew was the
7    allegation, somebody said that Miss Smith is charged
8    with criminal mischief, damaging somebody's property by
9    firing a gun, your mind can kind of run wild as to what
10   may have happened.
11          I can take a gun and aim it above the
12   Judge's head and shoot seven times above that wall,
13   damaging that wall.  And that would be one situation you
14   are just firing up in the air one time.  There are
15   differences about the circumstances that would tell you
16   a lot about the crime that was committed.  How do you
17   feel about the Texas Legislature giving you only two
18   options for those people who are convicted of capital
19   murder?
20          In other words, you sit on the jury,
21   listen to all the evidence that the State brings you.
22   You and eleven others are convinced beyond a reasonable
23   doubt that the defendant is guilty of capital murder.
24   You now go to the second stage of the trial, or the
25   punishment stage.  And you know that in evaluating all

119

1  the evidence, how the case occurred, the person that's
2  on trial, everything that you can hear about the case,
3  the only options you have are life in prison or death.
4  There is no number of years.  It's either going to be
5  life or death.  How do you feel about that process or
6  that system being the only two choices you, as a juror,
7  have?
8      A.  It doesn't bother me.
9      Q.  Doesn't bother you.  Okay.  If you were in the
10  Legislature, would you change the system at all to make
11  one or the other option the only one available?  In
12  other words, would you say for everybody convicted of
13  capital murder, they always get the death penalty; or
14  for everybody convicted of capital murder, they always
15  get a life sentence?
16      A.  I like --
17      Q.  You like it the way it is?
18      A.  The way it is, one or the other.
19      Q.  What do you think it gives you, as a juror,
20  those automatic situations wouldn't give you?
21      A.  It gives me -- how can I put it -- it gives me
22  an option because of the evidence that's presented, like
23  you all in phase two.  We could decide whether he would
24  be a threat again or whether he would just spend life in
25  prison.

120

1      Q.  Okay.  You know that by answering the
2  questions, if you find a person guilty of capital murder
3  and if you find that the evidence that's been presented
4  to you suggests there is a probability that the person
5  would be a continuing threat and you answer that
6  question yes, you're basically one step away from
7  assessing the death penalty.  You look at everything,
8  the circumstances of how the crime was committed, a
9  person's upbringing, their background, whatever, that's
10  your last opportunity to determine that the person
11  should get the life sentence rather than the death
12  penalty.
13      A.  Yes.
14      Q.  Do you feel that that is a good way to go about
15  evaluating a case such as this?
16      A.  Yes.
17      Q.  What do you think -- if you were on trial today
18  for some crime, what type of things would you want a
19  jury to know about you before they determined your case?
20  What kind of things about Miss Smith should they know
21  about?
22      A.  My background, what I've done so far in my
23  life.
24      Q.  Do you think that's fair for a jury to know a
25  little bit about the person --

121

1      A.  Yes.
2      Q.  -- feel more comfortable?  One of the questions
3  that you answered -- and I'll tell you this right up
4  front, that caused me a little bit of concern.  Was it
5  asked, Do you consider life imprisonment a severe
6  penalty?  And your answer was no.  It said, Please
7  explain.  Says, Chance of parole in some cases.
8          Now the Judge has explained to you, and
9  the reason the Judge tells you exactly what a life
10  sentence means is because you know the laws have changed
11  drastically.  We don't want jurors coming in here
12  thinking about, oh, I read a story five years ago about
13  somebody that did six years and got out.  I think you
14  can see where I'm going with my questioning.  You
15  indicated before you knew what life means, that parole
16  was a concern of yours, okay?
17      A.  Yes.
18      Q.  Talk to me specifically about a case like this.
19  Is that going to be a concern of yours when you're
20  evaluating whether a person should receive a life
21  sentence or not?
22      A.  No.
23      Q.  Because as the Judge has told you, you're not
24  allowed to think of it.
25      A.  Because my understanding, as far as chance of

122

1  parole, is you do twenty-five years, okay, and you're
2  out.
3      Q.  That was what?
4      A.  That was my understanding at the time I filled
5  out the questionnaire.
6      Q.  Okay.
7      A.  And he's explained it's like what, forty years?
8      Q.  So, am I comfortable that if you were sitting
9  here with eleven other people and you had to make the
10  decision to answer these two questions, you would not go
11  back in the jury room and say, Wait a second.  I kind of
12  have a problem with the State really proving all these
13  things, but you know what?  If we give him a life
14  sentence, forty years from now he could possibly be out;
15  so, therefore, I'm going to answer these questions in a
16  way that the death penalty would result?
17      A.  No, I couldn't do it.
18      Q.  Any questions of me, questions that you have of
19  me about the process, maybe a question about how this
20  whole process works, that hasn't been answered to your
21  satisfaction yet?
22      A.  No, sir.
23      Q.  So if I sit there with Mr. Wentz and talk to
24  Mr. Mamou in a moment or two and say, well, do we want
25  to ask Miss Smith back or do we want to tell her to go

123

1  on home today, what decision should I make from that
2  side of the table?
3      A.  I cannot make that decision for you.  That
4  would be entirely up to you.
5      Q.  You can't come up with a reason why I shouldn't
6  ask you back?
7      A.  No.
8      Q.  Thank you.
9          (Court admonishes prospective juror.)
10         THE COURT:  If I understand, there is an
11  agreement on the table by and between the parties that
12  Venireperson Number 142, Charlsie Hendrix, and Darrell
13  Parrish.  By the agreement of all concerned, for perhaps
14  various reasons, but nevertheless, they may be excused.
15         Mr. McClellan, your agreement?
16         MR. MCCLELLAN:  Yes, sir.
17         THE COURT:  Yours, Miss Connors?
18         MS. CONNORS:  Yes, Your Honor.
19         THE COURT:  Yours, Mr. Hill?
20         MR. HILL:  Yes, Your Honor.
21         THE COURT:  Yours, Mr. Wentz?
22         MR. WENTZ:  Yes, Your Honor.
23         THE COURT:  Mr. Mamou?
24         THE DEFENDANT:  Yes.
25         THE COURT:  Is it your request that each

124

1  be excused?
2          THE DEFENDANT:  Yes, sir.
3          THE COURT:  Very well.  Each is excused.
4              MICHAEL LEE SMITH,
5  having been first duly sworn, testified as follows:
6              VOIR DIRE EXAMINATION
7  BY THE COURT:
8      Q.  First off, let me ask you, sir, to remember
9  back to last Friday when the big group was here.  Add to
10  it this morning and the things we talked about this
11  morning.  And out of everything we have talked about to
12  this point, do you have any questions at all for me?
13     A.  No, sir.
14     Q.  Nothing comes to your mind?
15     A.  No.
16     Q.  Is there anything to this point, for example,
17  something that we have not yet addressed, that you feel
18  as though we should because it might have some bearing
19  on your service as a juror in this case?
20     A.  No, sir.
21     Q.  Is there anything at all, sir, that you can
22  think of that, whether it be something about your
23  personal life, whether it be something about your
24  professional life, perhaps something about your health,
25  or anything else that you can think of, that would in

125

1  any way interfere with your ability to be a juror in
2  this case during the time frame we've talked about?
3      A.  Yes, sir.  I'm the only one in the household
4  that works, and I'm paid strictly on commission.  Being
5  off a week or whatever for a trial --
6      Q.  Well, we were going by your questionnaire, and
7  maybe -- did you say that in your questionnaire?
8      A.  I believe it asked, yes, sir.
9      Q.  Obviously, I just missed it.  Is there anything
10  going on in your life or work that would prevent you
11  from you giving this case your full attention if the
12  case were to last ten working days, beginning October 4,
13  1999?  And I think you checked no.
14         Well, it doesn't make any difference
15  whether you did or didn't.  My notion is, I don't think
16  anybody ought to be a juror if they're going to be
17  financially punished for having been one.  But by the
18  same token, we need to have folks such as yourself to be
19  available as a juror.  My question to you is going to be
20  this:  If we were -- if you were to be a juror beginning
21  Monday, October 4th, we have -- we've satisfied
22  ourselves the case is going to last a little longer than
23  a week, won't last for as long as two weeks.  If you did
24  become a juror, would you give us your attention?
25     A.  Yes, sir.

126

1      Q.  And I don't mean that to sound in any way
2  coercing.  I don't mean that at all.  But the deal is --
3  sounds like Ross Perot -- what we're doing is talking to
4  folks individually, and we're going to bring back
5  forty-five or so on Wednesday.  We're going to have
6  twelve jurors, so that means roughly three out of four
7  aren't going to be picked.  Where you're going to fit
8  into that, I haven't the faintest idea.  And my guess is
9  right now the lawyers don't have any idea, but the
10  probabilities of your not becoming a juror are greater
11  than your probabilities of becoming a juror.
12         And my question to you is this:  If you
13  came back Wednesday and if we visit with you, and if by
14  the luck of the draw, so to speak, you did become a
15  juror in that case, knowing we start October the 4th, on
16  Wednesday, finish up, say, Tuesday or Wednesday of the
17  following week, would you be able to give us your time,
18  your attention, your judgment, and decide what you think
19  is the right result to reach in the case?  Or would your
20  work circumstance weigh so heavily that it would
21  interfere with that ability?  And I don't care what
22  answer you give me, as long as you give me one.
23     A.  I would be concerned of my finances.
24         THE COURT:  Do I need to go any further?
25         MR. MCCLELLAN:  Probably not.

127

1          THE COURT:  Do I understand there is an
2    agreement on Venireperson 138, Mike Smith?  May he be
3    excused, Mr. McClellan?
4          MR. MCCLELLAN:  Yes, Your Honor.
5          THE COURT:  Is this your agreement, Miss
6    Connors?
7          MS. CONNORS:  Yes, Your Honor.
8          THE COURT:  And yours, Mr. Hill?
9          MR. HILL:  Yes, Your Honor.
10         THE COURT:  Mr. Wentz?
11         MR. WENTZ:  Oh, yes.
12         THE COURT:  And yours, Mr. Mamou?
13         THE DEFENDANT:  It is.
14         THE COURT:  And is it your request,
15   Mr. Mamou?
16         THE DEFENDANT:  It is.
17         (Juror excused.)
18              DALE HAUCK,
19   having been first duly sworn, testified as follows:
20              VOIR DIRE EXAMINATION
21   BY THE COURT:
22     Q.  How are you today?
23     A.  Very fine, thank you.  And you?
24     Q.  I'm fine.  Mr. Hauck, I recall -- I think I do
25   recall that we had some sort of a communication problem.

128

1    We had the big group here last Friday.  You were not
2    with us on that day; is that correct?
3      A.  That is correct.
4      Q.  So today, the things we talked about today,
5    Mr. Hauck, maybe -- well, let me take a look at
6    something here.  You have not before served as a juror?
7      A.  Correct.
8      Q.  The things we've talked about so far, do you
9    have any questions at all for me, sir, about what we
10   have talked about?
11     A.  I don't believe so.  I thought you were quite
12   clear.
13     Q.  Is there anything to this point that we have
14   not yet addressed that you feel as though we should
15   because it might have some bearing on your service as a
16   juror in this case?
17     A.  Not that I'm aware of.
18     Q.  What we have talked about here is the process.
19   More specifically, and to back up a little bit, what we
20   did not talk about today, but we did talk about the
21   other day, is this phase of a trial.  Because the death
22   penalty is a possible punishment if the defendant is
23   found guilty.  Whether it's the proper punishment or
24   not, that's why we have the jury to make that decision.
25   But because the death penalty is a possible punishment

129

1    at this phase of the proceedings, we are obligated to
2    talk to the prospective jurors individually.
3          And what we're doing is getting a group
4    together.  We create a panel or a pool and have
5    everybody back in here on Wednesday.  We've got 41 as of
6    now.  And on Wednesday we'll spend a couple of hours, if
7    that much, talking to everybody in a group; because at
8    that point we can get the group back together for the
9    purposes of deciding who will the jurors be in the case.
10         The trial of the case is going to begin
11   one week from today, Monday, October the 4th.  We're
12   satisfied that the entire trial, if it runs its full
13   course, will last a little bit longer than one working
14   week, but not as long as two.  So sometime during the
15   week of the 11th, the 11th through the 15th of October,
16   the case will have concluded.
17         That being our schedule, Mr. Hauck, is
18   there anything at all going on in your life, whether it
19   be anything about your personal life, or your health, or
20   anything else for that matter, that you can envision at
21   that point that would interfere with your being able to
22   be a juror in our case during that time frame?
23     A.  Not that I'm aware of.
24     Q.  Okay.  I guess the single most succinct thing I
25   can say to sum up our conversation to this point is that

130

1    no trial is ever automatic.  It has its own individual
2    personality; that is to say, the evidence in the case.
3    All we're seeking is to have as jurors folks who will
4    commit to us, not what result they will reach.  Because
5    they can't possibly know, without having heard anything.
6    But we are attempting to extract a commitment from
7    everybody that they will give full attention to
8    everything, weigh both sides, and call it like they see
9    it.  The idea being there, a juror's job is not to
10   please the prosecution, not to please the defense
11   lawyer, and certainly not to please me.  The juror's job
12   is to be satisfied three or four years from now when you
13   think about this again, if you do become a juror in the
14   case, you're satisfied that the thing you did in 1999
15   was, in fact, the right thing to do based upon the
16   information which you were presented.  Does that sound
17   like you?
18     A.  That's the way I would approach it.
19     Q.  Before we start, do you have any questions of
20   me?
21     A.  No.
22     Q.  Thank you, sir.
23         THE COURT:  Mr. McClellan.
24         MR. MCCLELLAN:  Thank you, Your Honor.
25              VOIR DIRE EXAMINATION

131

1  BY MR. MCCLELLAN:

2  Q.  Is it Hauck?

3  A.  Hauck.

4  Q.  Mr. Hauck, my name is Lyn McClellan.  Along

5  with Claire Connors, we represent the State of Texas in

6  this case.  I want to go over your questionnaire and ask

7  you some follow-up questions on that and get your

8  feelings for how you think about certain aspects of the

9  law.  First of all, can you kind of tell me in your own

10  words what your opinion is of the death penalty?

11  A.  Well, I would hope it's a last resort.

12  Q.  Okay.

13  A.  But it appears to be a necessary part of our

14  society.

15  Q.  When you say a last resort, are you talking

16  about, let's say, a person who was on trial you have

17  found guilty of capital murder, does that mean the State

18  would have to show that we've tried everything else and

19  nothing has worked?  Or you may be faced with a

20  situation where a person had not previously committed

21  any other crimes, but this crime was so bad that the

22  answers to the questions ought to be answered in such a

23  way that death would result.  So, I'm trying to figure

24  out how this last resort concept fits in.

25  A.  Well, I just want to say that I am not an

132

1  activist proponent of the death penalty.

2  Q.  Okay.

3  A.  But if that would seem to be the appropriate

4  decision, I would be pleased to be part of it.

5  Q.  Okay.  Some people come to us -- and that kind

6  of followed my next question.  Some people come in here

7  and say they think the death penalty is an appropriate

8  punishment for certain types of crimes.  Some of those

9  same people, though, go further and say they don't

10  believe that they, themselves, could ever participate in

11  a process whereby they would be called upon to make

12  decisions.  In other words, answer these questions

13  knowing that in answering these questions, they would be

14  ordering this Judge to order the execution of the

15  defendant sitting over here on trial.  Do you have any

16  doubts about your ability to participate in this type

17  process and make that decision if that's what the law

18  and the evidence called for?

19  A.  No, I would have no qualms.

20  Q.  Okay.  There is a question in here about

21  whether or not you think the death penalty is used too

22  often or too seldom.  You say you're not qualified to

23  make that type of decision or qualified to know.

24  A.  Excuse me.  What was it?

25  Q.  The question was, do you think the death

133

1  penalty is used too often or too seldom?

2  A.  I have no idea.  I mean, I don't even know how

3  often it's used.

4  Q.  Okay.  All right.  What kind of cases come to

5  mind when you think of cases where you think the death

6  penalty ought to be available as a form of punishment?

7  A.  Well, certainly the one that's been in the news

8  lately, the dragging death of this gentleman.  That

9  seems appropriate.

10  Q.  Okay.  Go ahead.

11  A.  I really haven't studied and attempted to

12  maintain a record of death penalty offenses.

13  Q.  Right.

14  A.  So I would just guess I would hope that would

15  sum up pretty much my view.

16  Q.  Did you follow the case that was last week here

17  in Harris County of the young man who was charged with

18  killing Officer Kincaid and this young man who was on

19  trial, his father was also a fires, arson officer?

20  A.  I did not follow that.

21  Q.  You did not follow that case.  Okay.  Are you

22  familiar with the Karla Faye Tucker case?

23  A.  No, I'm not.

24  Q.  Okay.

25  A.  But in the news, there are so many prevalent

134

1  coverages of this that I often switch the news off.

2  Q.  Try to avoid all that's not necessarily good

3  news, right?

4  A.  Well --

5  Q.  In the questionnaire it asks you to pick an

6  area that you more likely agree with, or choose a

7  statement that best summarizes your views.  And you

8  picked a statement that said, I am opposed to the death

9  penalty except in a few cases where it may be

10  appropriate.  You know the law says that the death

11  penalty is available for murder plus some other crime;

12  murder during a kidnapping, murder during a burglary, or

13  during a robbery, or during a sexual assault, killing

14  two or more people during one criminal episode, killing

15  a police officer in the line of duty, or a child under a

16  certain age are kinds of cases the Legislature says the

17  death penalty is available for.  Do you agree with those

18  type of cases the law has set out?

19  A.  I believe so.

20  Q.  If the State proved to you beyond a reasonable

21  doubt that a person was guilty of capital murder, that

22  they intentionally took the life of another person

23  without any legal justification -- by that, I mean not

24  in self-defense, not an accident, but intending to kill

25  someone, and did so during the course of a kidnapping,

135

1  would you find someone guilty of capital murder if we
2  prove that to you beyond a reasonable doubt?
3      A.  I would, yes.
4      Q.  Go further.  Let's say you found a person
5  guilty of capital murder.  Now at the second stage of
6  the trial, the punishment stage, you may get to hear
7  additional evidence about the character, the background,
8  criminal history of a defendant, or lack thereof, all
9  kinds of information about the individual.  You can then
10  rely on that information, plus the crime itself, the
11  evidence you heard in the crime to answer these
12  questions up here on the board.  And Question Number One
13  says:  Do you find from the evidence beyond a reasonable
14  doubt that there is a probability that the defendant
15  would commit criminal acts of violence that would
16  constitute a continuing threat to society?  If the State
17  proved to you that there is a probability that the
18  person you had found guilty of capital murder would
19  commit criminal acts of violence that would be a
20  continuing threat to society, would you be able to
21  answer that question yes?
22      A.  Yes.
23      Q.  Then you go to Issue Number Two, which
24  basically asks you to look back at all the evidence and
25  determine are there any reason or reasons that we've

136

1  heard from the evidence that indicates this person
2  should receive life as opposed to death as the
3  appropriate punishment for this crime?  That puts a lot
4  of discretion in each individual juror.  They look back
5  at the evidence.  They weigh in their minds everything
6  they've heard.  They say, is there anything there that
7  would change my mind?  Because when you get to that
8  question, you would have already found he's guilty of
9  capital murder and he would be a continuing threat.  So
10  he's going to receive death unless you find some reason
11  or reasons he should not on Issue Number Two.  So you're
12  looking back through all of the evidence to see if there
13  is anything there that would give me a reason to give
14  this person a life sentence as the appropriate
15  punishment as opposed to death?  Okay.  Would you be
16  able to go through all that evidence and look and see if
17  there was anything there?
18      A.  Yes.
19      Q.  And if there was not anything sufficient to
20  change your mind from death to life, would you answer
21  that question no, knowing in doing so that the death
22  penalty would result?
23      A.  Yes.
24      Q.  On Issue Number Two, as I say, it leaves a lot
25  in your hands there.  And here's my only concern.  You

137

1  say the death penalty ought to be used as a last resort.
2  And if you mean by that, it ought to be reserved for
3  certain types of crimes that deserve that type of
4  punishment, I don't have a problem.  But if the idea is
5  I'm always going to -- there is always the option in a
6  death penalty case of life as a punishment.
7          Life means forty years, day for day.  So a
8  person twenty years of age, convicted of capital murder,
9  given a life sentence, they would be sixty before they
10  would be eligible to be considered for parole.  Some
11  people say, that's a choice I would then always make,
12  because I don't have to worry about the concept of
13  whether or not they should or should not receive that.  I
14  always want to go with that other one.  And it's only
15  those very, very, very rare cases that I would even
16  consider the death penalty.  Do you think the fact a
17  person would serve forty years, day for day, would sway
18  you to give a life sentence even though you thought the
19  answers ought to be such a way that death would result.
20      A.  Would you phrase that again, please?
21      Q.  Okay.  When you get back to Issue Number Two,
22  it's going to be up to you to decide whether there are
23  mitigating factors or not.  Some person may say, well,
24  an easy way to resolve this is to vote for life.  Say,
25  there are mitigating factors.  He's going to do forty

138

1  years anyway, day for day.  That's a lot of punishment,
2  and I don't have to really be burdened with determining
3  whether or not this is really the case for the death
4  penalty.  And I just want to make sure somebody doesn't
5  take the easy way out.
6      A.  No, I don't think I would take the easy way
7  out.  There could be some mitigating factors in there
8  that might be important.
9      Q.  Right.
10      A.  I don't know what they would be.
11      Q.  Anything come to your mind?
12      A.  No.
13      Q.  Anything you can think of?  But you would be
14  open to look at it and weigh it, and if there weren't
15  mitigation, you're comfortable with answering the
16  questions in such a way that death results?  If it was
17  mitigating, you're comfortable with answering the
18  questions such that life results?
19      A.  That's true.
20      Q.  Any reason why we would not want you to sit in
21  judgment in a case like this, us being the State, who's
22  seeking the death penalty?
23      A.  I can't think of any.  If I did, since I'm over
24  seventy, I wouldn't be here.
25      Q.  You've got an exemption you could take.  You

139

1  wouldn't have to be bothered.  Do you want to be a juror
2  in a case like this?
3      A.  I would be pleased to.
4      Q.  Okay.
5      A.  I think I could do the job.
6      Q.  Thank you very much.  I'm going to pass you to
7  the other side?
8          THE COURT:  Thank you.
9          Mr. Hill.
10              VOIR DIRE EXAMINATION
11 BY MR. HILL:
12     Q.  Sir, my name is Wayne Hill.  This is Kurt
13 Wentz.  We both represent Mr. Mamou in this case.  Your
14 stay here, although it's spanning several days, will be
15 brief now that we're at that point; because we're just
16 about done.  And in all likelihood, you'll be returning
17 on Wednesday for one final appearance before determining
18 whether or not you come back yet another time.  So we
19 appreciate your perseverance and the fact you're willing
20 to come down here; because a lot of people, when they
21 get the jury notice, right in the garbage, and we never
22 see those people.
23          Couple of things on your questionnaire
24 that I want to just visit with you about if I may.  One
25 of the questions that was asked of the prospective

140

1  jurors has to do with a suggestion or a statement.
2  Anyone can overcome a neglectful or abusive childhood.
3  And we give you several options.  The one that you chose
4  was, you generally disagree with that proposition.  What
5  does that mean to you?  Or talk to me a little bit about
6  your answer in that area.
7      A.  Well, it seems to me that we are responsible
8  for whatever act we become involved with.  And I don't
9  know that it's totally involved in what my background
10 is.  You know, no matter what my background is, I am
11 responsible to society, the way I act.
12     Q.  Okay.  Let me ask you a general proposition,
13 recognizing that there are exceptions to every rule.  Do
14 you think that, generally speaking, the way a person is
15 raised has an influence on how they live their life
16 later on?
17     A.  Oh, absolutely.
18     Q.  And understanding that people can come from an
19 abused or neglected childhood, and there are those that
20 pull themself up and go on to do great things.  There
21 are others that kind of stay behind in that kind of
22 subculture, if you will, and go on to do bad things.
23 You can see that could happen?
24     A.  Yes.
25     Q.  When you were answering Mr. McClellan's

141

1  questions about answering these questions in such a way
2  that a life sentence would be assessed, you responded,
3  well, I wouldn't take the easy way out.  In other words,
4  you wouldn't answer these questions in a way just to
5  give life so that you wouldn't really have to sift
6  through there and sift through the evidence and make
7  that tougher call.  Am I evaluating your answer
8  correctly, that, in other words, you wouldn't just say,
9  okay, let's give him life; we're done with it; now we
10 all can go home?
11     A.  I would hope I wouldn't do that.
12     Q.  Would it be a fair statement for me to say that
13 you also wouldn't think that you would want to take the
14 easy way out, going the other route?  In other words,
15 just say, let's give him the death penalty and that's
16 it; we're out of here?
17     A.  Certainly not.
18     Q.  What -- it's interesting, as I looked over your
19 questionnaire, it said, Name three people that you
20 respect the most.  And they were all family members;
21 your wife, your children, your grandchildren.  To me,
22 obviously, you must have a very tight-knit family, very
23 close-knit, very loving family.  Is that a fair
24 statement?
25     A.  Very true.

142

1      Q.  Okay.  What difference do you think you and
2  your wife had in raising the children that you have?
3  How do you think you influenced their upbringing in
4  their life?
5      A.  The difference between my wife and myself?
6      Q.  Yeah, if you'd like to distinguish between the
7  two.  I was meaning, generally together, how did you and
8  your wife influence the kids?  But let's take you, for
9  instance.  How do you think you influenced the kids?
10     A.  By setting an example, by being there when they
11 needed consoling, and also making some hard-nosed
12 decisions during their teenage years.
13     Q.  I would assume -- I've got three teenagers
14 right now.  And I'm going to assume that there were
15 times when you made those hard-nosed decisions, that
16 your children didn't necessarily agree with those
17 decisions?
18     A.  Oh, absolutely.
19     Q.  Now looking back, they have children
20 themselves, have they ever shared with you that, you
21 know, it's a strange thing?  Now that we have children,
22 we find ourselves saying and doing the same things that
23 you and mom did when we were younger?
24     A.  I think so.  Maybe not directly; but I can feel
25 that they condone, basically, what we did.  You want an

143

1  example?
2     Q.  Sure.
3     A.  Okay.  I had a middle daughter, who was very
4  much into band in high school, so on, so forth.  And a
5  mother of one of her friends said she would accompany
6  them to a rock concert of some type at a ranch up in --
7  near Austin, as long as my daughter could go.  Well, she
8  couldn't go, you know.  And there was a little bit of
9  pressure there, but she didn't go.  And -- but I think
10  things like that are common occurrences in most
11  families.
12     Q.  So, how did your wife influence the kids?  I
13  heard you say how you did.  Did your wife in a similar
14  way?
15     A.  We were together, yes.
16     Q.  Worked as a pretty good team together?
17     A.  Great.
18     Q.  Didn't let the kids do the, you know, end
19  around, where they come to you after mom, or vice versa,
20  where one said no and they tried to get the yes out of
21  the other?
22     A.  Oh, I'm sure they tried.
23     Q.  What goes through your mind -- this is my last
24  question -- what goes -- what went through your mind
25  after you read this questionnaire, you answered the

144

1  questions, and you thought about coming to town here
2  today to visit a little bit more about this case?  I
3  mean, are you thinking about anything in particular
4  about potentially serving on a case like this, or
5  anything that goes through your mind?
6     A.  Well, I kind of thought that I could do it as
7  well as anybody.
8     Q.  Okay.  Any reason that, as Mr. Wentz and I sit
9  here and we talk to Mr. Mamou, that we should have any
10  hesitation asking you to sit with eleven other people
11  and judge this case?
12     A.  No.
13     Q.  Thank you, sir.
14         THE COURT:  Thank you.
15         (Court admonishes venireman.)
16           JOHN REEVES,
17  having been first duly sworn, testified as follows:
18         VOIR DIRE EXAMINATION
19  BY THE COURT:
20     Q.  How are you today?
21     A.  I'm doing fine.  And you?
22     Q.  I'm well, thank you.  Mr. Reeves, first off,
23  I'd ask you to remember back to Friday a week ago, when
24  the big group was here, and the things we talked about
25  that day.  Add to it this morning, the things we talked

145

1  about this morning.  And out of everything we have
2  talked about so far, do you have any questions at all
3  for me?
4     A.  No, I can't think of any.
5     Q.  Is there anything to this point that we have
6  not yet addressed that you feel as though we should talk
7  about, because it might have some bearing on your
8  service as on juror in this case?
9     A.  During the course of the trial, is it usually
10  8:30 to 5:00.
11     Q.  Roughly 10:00 to 5:00.
12     A.  Okay.  That's really my only question.
13     Q.  And it will not be turned into an endurance
14  contest.
15     A.  That's a good thing.
16     Q.  Is there anything at all that you can think of
17  that might exist presently that you feel would in any
18  way interfere with your ability to serve as a juror
19  during the time frame we've talked about?
20     A.  It's roughly two weeks, maybe one week.
21     Q.  We know a little bit longer than one week, but
22  not longer than two.
23     A.  For the whole --
24     Q.  Worst case, Mr. Reeves, anything you can think
25  about?

146

1     A.  Two weeks, I think that's fine.
2     Q.  The answer is no?
3     A.  No.
4     Q.  Can you see when we talked this morning about
5  how each of the decisions a jury makes is independent of
6  all the other decisions a jury makes?  For example, you
7  find a defendant guilty of capital murder.  That, in and
8  of itself, does not dictate how you should answer these
9  questions.  Are you with me there?
10     A.  Oh, yeah.
11     Q.  The whole idea being, whatever you do is
12  independent of the next thing you do.
13     A.  Oh, sure.
14     Q.  Anything at all about the process that we
15  talked about that you have any questions?
16     A.  No, you covered it.
17     Q.  Thank you.
18         THE COURT:  Mr. McClellan.
19         MR. MCCLELLAN:  Thank you, Your Honor.
20
21
22
23
24
25

147

```
              VOIR DIRE EXAMINATION
 1
 2   BY MR. MCCLELLAN:
 3       Q.  Mr. Reeves, my name is Lynn McClellan.  Along
 4   with Claire Connors, we represent the State of Texas in
 5   this case.  Mr. Hill has told me I only have five
 6   questions I can ask.  Kind of tell me in your own words
 7   what your opinion is about the death penalty.
 8       A.  In general?
 9       Q.  Yes.
10       A.  Okay.  I know that here in Texas, there is an
11   awful lot -- I don't really have an opinion about it.  I
12   know it's there.  I don't know that -- I don't know that
13   its solves much of anything at all.  That's really my
14   sole opinion.  I don't think that solves anything.
15       Q.  Okay.  Do you have any doubts about your
16   ability to make a decision like it's been outlined here
17   in the process that could result in this Judge ordering
18   the execution of the defendant on trial?
19       A.  No.
20       Q.  Is there any reason why you could not sit and
21   listen to all the evidence, and if the evidence
22   convinced you that a person was guilty of capital
23   murder -- that is, they intentionally took the life of
24   another person without any legal justification.  That
25   means it was not in self-defense -- the defendant killed
```

148

```
 1   someone and did so during the course of a kidnapping.
 2   Would you then be able to find that person guilty of
 3   capital murder?
 4       A.  If everything points that way.
 5       Q.  Okay.  If you found them guilty of capital
 6   murder, and if the State proved to you that the Issue
 7   Number One was -- the answer was to be yes; in fact,
 8   there was a probability that that person would be a
 9   continuing threat to commit criminal acts of violence,
10   would you be able to answer that question yes?
11       A.  Uh-huh, yes.
12       Q.  That means then that the person is going to
13   receive the death penalty, unless on Issue Number Two
14   you find there is some reason or reasons why you ought
15   to change your vote from death to life.  Gives you the
16   opportunity to look at all the evidence, see if there is
17   some reason why you ought to change your vote.  You
18   think you ought to -- you're allowed to change it.  You
19   think you ought to answer no and the person receives the
20   death penalty?
21       A.  No, I understand all that.
22       Q.  Any reason why you could not serve as a juror
23   and be a fair juror to our side, knowing that we're
24   seeking the death penalty, and a fair juror to this
25   side, knowing they're trying to have their client found
```

149

```
 1   not guilty and not get --
 2       A.  I can't see a reason.
 3       Q.  Okay.  Thank you very much.
 4            THE COURT:  Mr. Hill.
 5               VOIR DIRE EXAMINATION
 6   BY MR. HILL:
 7       Q.  Mr. Reeves, one of the questions asks you
 8   whether or not you believe that mitigating evidence
 9   should be allowed and considered by the jury in
10   determining the answers to these two questions, and you
11   answered, Yes.  I just want you to explain to me in your
12   own words why you think that would be important for the
13   determination of a life versus death sentence?
14       A.  Let's see.  Could you read the question one
15   more time?
16       Q.  Sure.  One of the questions that was asked of
17   you in the juror information thing, asked whether or not
18   you believe that mitigating evidence should be admitted
19   and considered during the punishment phase of a capital
20   murder trial.  You indicated yes, you did think that
21   that would be important.  And I just wanted you to share
22   with me your thoughts on that.  Why do you think it's
23   important?  Why do you think it should be considered?
24       A.  So we are very well informed, to be a
25   well-informed jury.
```

150

```
 1       Q.  If you were on the Legislature -- you've now
 2   become a member of the House of Representatives in the
 3   State of Texas.  Governor Bush calls you into session.
 4   There are two bills and only two bills that you get to
 5   vote on.  One bill says for all people convicted of
 6   capital murder, the automatic punishment shall be death.
 7   The other bill says for all people convicted of capital
 8   murder, the automatic punishment shall be life in
 9   prison.  Which do you cast your vote on?
10       A.  I would say life in that situation.
11       Q.  My third question, which we're keeping track,
12   would be, why that vote?
13       A.  Because I can't understand why everyone on
14   death row should be put to death.  Just plain and simple
15   as that.  It's not so absolute.
16       Q.  You understand that if a person is found guilty
17   of capital murder, the very best that that person has to
18   look forward to is being sentenced to life, which
19   essentially happens automatically unless the jury
20   determines the death penalty be imposed.  You understand
21   that is the process that we have?
22       A.  Yes, I do.
23       Q.  As I sit here with Mr. Wentz -- we've reviewed
24   your juror questionnaire information sheet and
25   everything, and it gives us a lot of information.  And
```

151

1  there is only one thing I want to ask you.  You
2  indicated in the questionnaire that your employer, your
3  boss, had been assaulted in the parking lot, apparently
4  beaten up.  Would you please share that with me and tell
5  me how, if any, that's going to affect your being able
6  to sit on this kind of case, since this is a criminal
7  case?
8      A.  I think that that's something -- pretty much at
9  this point, violence is fairly random; so I don't think
10 that one instance has much bearing.  I mean, here it has
11 a bearing to me, walking to my car at night after work,
12 but that's it.
13     Q.  Just tell me what happened to your boss.  What
14 were the circumstances?
15     A.  Oh, it was over at the River Oaks Shopping
16 Center on West Gray.  And he was walking out to his car
17 during holiday shopping season, and he was assaulted.
18     Q.  Do you have any questions for any of us?
19     A.  No, I don't.
20     Q.  Thank you.
21         (Court admonishes venireperson.)
22         THE COURT:  For the purposes of the
23 record -- and the record will indicate that Juror Number
24 53, who became Panelist Number 17, that being Mr. Donald
25 Nelson, was questioned by the State and by the defense

152

1  on September 15th.  He was ultimately accepted as a
2  panelist, Panelist Number 17, with the provisory, as the
3  record reflects, that Mr. Nelson, between the 15th of
4  September and the 29th of September, that being when the
5  big group was going to get together, was anticipating a
6  final determination as to what should be done regarding
7  his diagnosis of cancer -- not his diagnosis, but the
8  diagnosis on his personal body, of cancer.  And it is my
9  understanding -- and we all -- I say we all -- I think I
10 speak for both the State and defense, that we all
11 recognize in the event Mr. Nelson -- the diagnosis came
12 back, that Mr. Nelson was going to have to have an
13 operation, certainly he would be excused from the jury
14 panel.  As I understand it, Mr. Nelson has written a
15 letter to Judge Wilkinson, that being the real Judge of
16 the 179th District Court, wherein he, Mr. Nelson, or
17 Mr. Nelson's doctor, or perhaps both, have set forth
18 that Mr. Nelson does, in fact, request both through Mr.
19 Nelson, himself, as well as his doctor, that he be
20 excused from any further jury service.
21         Mr. McClellan, Mr. Hill, have I been
22 accurate in setting forth -- anything that you can think
23 of?
24         MR. MCCLELLAN:  No, sir.
25         MR. HILL:  No, sir.

153

1          THE COURT:  Anything in addition that you
2  want to add?  And I guess the bottom line question, is
3  it agreeable with all concerned that Mr. Nelson be
4  excused?
5          MR. MCCLELLAN:  Yes, Your Honor.
6          THE DEFENSE ATTORNEY:  Yes, your Honor.
7          MS. CONNORS:  Yes, Your Honor.
8          MR. WENTZ:  Yes, Your Honor.
9          THE DEFENDANT:  Yes, Your Honor.
10         THE COURT:  Mr. Mamou, the usual question,
11 is that your request?
12         THE DEFENDANT:  Yes, sir.
13         THE COURT:  Mr. Nelson is excused.
14
15
16
17
18
19
20
21
22
23
24
25

154

1   THE STATE OF TEXAS    )
2   COUNTY OF HARRIS      )
3           I, Pamela Kay Knobloch, Official/Deputy
    Official Court Reporter in and for the 179th District
4   Court of Harris County, State of Texas, do hereby certify
    that the above and foregoing contains a true and correct
5   transcription of all portions of evidence and other
    proceedings requested in writing by counsel for the
6   parties to be included in this volume of the Reporter's
    Record, in the above-styled and numbered cause, all of
7   which occurred in open court or in chambers and were
    reported by me.
8
            I further certify that this Reporter's Record
9   of the proceedings truly and correctly reflects the
    exhibits, if any, admitted by the respective parties.
10
            I further certify that the total cost for the
11  preparation of this Reporter's Record is $_____ and
    was paid by Harris County.
12
            WITNESS MY OFFICIAL HAND this the _____ day of
13  _____, 2000.
14
15          _____
16  Pamela Kay Knobloch, Texas CSR No. 1650
    Expiration date:  12/31/2000
17  Official Court Reporter, 179th District Court
    Harris County, Texas
18  301 San Jacinto
    Houston, Texas 77002
19  713.755.6340
20  APPELLANT:  CHARLES MAMOU, JR.
            CAUSE NO. 800112
21
22
23
24
25

## $

**$10,000** [1] 36:10
**$** [1] 154:11

## '

**'72** [2] 109:9 109:9

## 0

**0470500** [1] 2:5
**07** [1] 81:21

## 1

**1** [1] 59:11
**10** [1] 63:11
**10:00** [1] 145:11
**11th** [2] 129:15 129:15
**12** [1] 59:14
**12/31/2000** [1] 154:16
**13** [2] 37:6 65:10
**132** [1] 3:5
**13396100** [1] 2:3
**134** [1] 3:6
**136** [1] 3:7
**138** [1] 127:2
**14** [1] 1:2
**140** [1] 3:7
**142** [1] 123:12
**145** [1] 3:8
**15th** [3] 129:15 152:1 152:3
**1650** [1] 154:16
**17** [2] 151:24 152:2
**179th** [4] 1:11 152:16 154:3 154:17
**1960** [2] 2:19 110:4
**1998** [1] 4:19
**1999** [3] 1:18 125:13 130:14

## 2

**2000** [1] 154:13
**201** [1] 2:7
**2039** [2] 31:22 32:12
**21179300** [1] 2:18
**23rd** [1] 81:24
**25** [1] 1:2
**27th** [1] 1:18
**281.587.0088** [1] 2:21
**29th** [1] 154:4

## 3

**301** [1] 154:18

## 4

**4** [2] 63:11 125:12
**41** [1] 129:5
**4615** [1] 2:14
**4th** [3] 125:21 126:15 129:11

## 5

**53** [1] 151:24
**5629** [1] 2:19
**59656300** [1] 2:13
**5:00** [2] 145:10 145:11

## 6

**68** [2] 65:9 95:8

## 7

**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 154:19
**77002** [2] 2:8 154:18
**77027** [1] 2:15

**77069** [1] 2:20
**7th** [1] 4:19

## 8

**800112** [2] 1:3 154:20
**8:00** [1] 22:13
**8:30** [2] 72:1 145:10

_____ [1] 154:12

_____ [1] 154:15

## A

**ABC** [1] 47:11
**ABCD** [1] 47:13
**Abduction** [2] 79:15 79:17
**Abduction-type** [1] 79:15
**Abilities** [2] 54:25 113:19
**Ability** [17] 47:17 47:22 51:22 61:7 72:20 73:19 77:13 81:4 92:7 92:21 103:3 106:13 125:1 126:21 132:16 145:18 147:16
**Able** [22] 22:17 27:20 35:15 35:16 38:16 51:8 52:1 56:1 61:11 70:16 73:25 77:17 107:12 107:25 113:14 126:17 129:21 135:20 136:16 148:2 148:10 151:5
**Above-entitled** [1] 1:19
**Above-styled** [1] 154:6
**Absolute** [3] 14:24 32:14 150:15
**Absolutely** [9] 7:24 10:25 37:8 48:9 57:3 100:2 140:17 142:18
**Abused** [3] 52:10 114:10 140:19
**Abusive** [1] 140:2
**Accept** [1] 62:10
**Accepted** [1] 152:1
**Accident** [3] 35:2 35:3 54:14 65:22 134:24
**Accompany** [1] 143:5
**Accomplishes** [1] 36:8
**Accomplishments** [1] 67:15
**Account** [1] 36:16
**Accurate** [1] 152:22
**Accused** [1] 103:6
**Achieving** [1] 94:23
**Act** [6] 21:3 27:12 55:20 56:16 140:8 140:11
**Actions** [5] 67:1 67:4 67:24 68:3 68:6
**Activist** [1] 132:1
**Activity** [1] 50:6
**Acts** [30] 11:10 19:20 19:24 20:2 20:15 21:8 21:10 21:12 21:17 21:22 22:10 22:15 22:19 23:1 53:18 55:12 55:18 56:4 56:13 57:8 57:10 57:13 58:14 85:7 85:11 110:24 111:9 115:15 135:19 148:9
**Add** [6] 46:18 73:11 100:3 124:9 144:25 153:2
**Addition** [1] 153:1
**Additional** [6] 5:3 39:4 54:23 90:7 91:15 135:7
**Addressed** [5] 73:17 100:8 124:17 128:14 145:6
**Admitted** [2] 149:18 154:9
**Admonishes** [5] 73:2 99:14 123:9 144:15 151:21
**Adult** [3] 26:8 114:2 114:4
**Adults** [1] 93:22

**Affect** [9] 63:18 63:22 63:24 65:24 81:4 81:12 92:7 103:2 151:5
**Affects** [1] 90:10
**Afternoon** [1] 37:24
**Age** [10] 26:12 60:4 60:4 60:7 94:25 105:18 114:2 114:3 134:16 137:8
**Ago** [11] 46:18 77:21 79:5 81:23 82:25 106:2 107:6 107:7 118:4 121:12 144:23
**Agree** [8] 9:5 41:18 68:4 86:17 113:24 134:6 134:17 142:16
**Agree/disagree** [1] 76:11
**Agreeable** [1] 153:3
**Agreed** [1] 86:18
**Agreement** [10] 3:2 3:9 3:12 105:20 123:11 123:13 123:15 127:2 127:5
**Ahead** [4] 56:17 91:20 116:3 133:10
**Aided** [1] 1:22
**Aiding** [1] 5:4
**Aim** [1] 118:11
**Ain't** [2] 30:6 30:9
**Air** [2] 115:6 118:14
**Alcohol** [11] 59:10 59:13 59:16 98:2 98:6 98:8 98:9 112:7 112:10 113:5 113:9
**Aldine** [1] 110:14
**Alike** [1] 80:1
**All's** [1] 22:24
**Allegation** [1] 118:7
**Alleged** [7] 4:18 34:10 34:13 35:25 35:25 54:16 105:17
**Allegedly** [1] 87:19
**Allowed** [6] 76:16 104:5 108:2 121:24 148:18 149:9
**Allows** [3] 70:10 76:20 111:25
**Allude** [2] 87:1 93:6
**Almost** [1] 107:7
**Alternative** [5] 50:3 50:19 50:21 50:21 71:14
**Altogether** [2] 18:1 51:9
**Amount** [2] 14:24 36:9
**Amounts** [1] 21:3
**Anger** [3] 38:8 90:22 91:21
**Angry** [2] 71:20 81:14
**Answer** [84] 7:1 8:15 11:16 12:11 12:12 12:13 12:17 13:3 13:5 13:6 13:8 16:9 17:21 17:22 17:23 18:5 18:6 18:8 18:14 18:22 20:16 20:20 23:10 23:11 24:23 25:5 28:5 28:7 28:9 28:19 29:25 30:3 30:24 33:8 48:10 51:19 53:19 57:1 58:20 59:1 59:25 61:4 63:12 72:19 74:10 74:14 74:17 80:3 83:11 83:24 85:12 85:14 88:22 90:13 93:7 93:9 95:8 96:24 97:5 97:8 101:6 101:6 101:7 106:3 110:1 111:16 112:4 120:5 121:6 122:10 122:15 126:22 132:12 135:11 135:21 136:20 140:6 141:4 141:7 146:2 146:8 148:7 148:10 148:19
**Answered** [17] 13:24 14:2 15:20 18:5 18:20 23:3 24:23 25:30:1 30:24 31:16 32:24 33:15 40:20 48:12 51:7 58:13 63:15 88:22 96:23 97:3 100:24 121:3 122:20 131:22 143:25 149:11
**Answering** [17] 5:4 11:3 13:18 29:23 56:25 57:14 59:7 97:9 101:1 101:3 106:10 120:1 132:13 138:15 138:17 140:25 141:1
**Answers** [20] 5:8 11:15 12:

**Affect** (cont.) 16:13 17:18 25:8 25:2 25:25 33:14 49:1 55:9 61:9 70:3 74:18 75:6 87:1 89:23 95:13 101:22 131:22 137:19 149:10
**Anticipate** [1] 10:12
**Anticipating** [1] 152:5
**Anytime** [3] 17:19 35:6 51:4
**Anyway** [2] 75:13 138:1
**Apartment** [1] 107:4
**Appeal** [1] 81:3
**Appeals** [1] 83:9
**Appearance** [1] 139:17
**Appellant** [2] 1:6 154:20
**Appellate** [1] 98:20
**Appellee** [1] 1:11
**Applicable** [1] 8:7
**Applies** [3] 9:2 17:2 105:22
**Apply** [4] 8:6 33:14 44:18 101:23
**Appreciate** [4] 66:7 89:3 114:14 139:19
**Approach** [1] 130:18
**Appropriate** [25] 12:6 15:18 15:22 27:14 29:14 30:12 37:9 50:10 50:14 51:14 58:9 58:11 76:13 76:25 83:23 85:19 87:23 104:25 105:11 132:3 132:7 133:9 134:10 136:3 136:14
**Appropriately** [1] 27:21
**Area** [3] 109:16 134:6 140:6
**Areas** [1] 40:22
**Arm** [1] 8:1
**Arrest** [1] 41:25
**Arrested** [3] 41:21 42:5 103:20
**Arrive** [1] 45:23
**Arrived** [2] 82:16 103:19
**Arrogant** [1] 38:13
**Arson** [1] 133:19
**Arsons** [1] 21:13
**Aside** [3] 29:12 82:23 83:20
**Asleep** [1] 72:14
**Aspect** [10] 9:4 40:23 42:10 45:13 53:25 62:16 65:7 72:22 112:4 113:24
**Aspects** [6] 5:24 45:8 48:24 50:6 101:23 131:8
**Assault** [3] 78:3 105:18 134:13
**Assaulted** [2] 151:3 151:17
**Assess** [2] 97:7 102:13
**Assessed** [3] 77:24 78:1 141:2
**Assessing** [3] 39:10 40:3 120:7
**Assistant** [3] 2:6 4:12 109:21
**Assisting** [1] 7:13
**Assume** [9] 23:13 38:21 67:9 75:12 102:7 102:24 115:3 142:13 142:14
**Astro's** [1] 79:3
**At-risk** [1] 93:13
**Attack** [1] 35:1
**Attempted** [2] 21:9 133:11
**Attempting** [1] 130:6
**Attended** [1] 110:15
**Attention** [4] 125:11 125:24 126:18 130:7
**Attorney** [4] 66:1 104:2 104:7 115:16 116:4 153:6
**Attorneys** [8] 2:6 2:10 2:22 4:11 4:13 82:15 83:13 83:

14

**August** [1] 81:24
**Austin** [1] 143:7
**Authorities** [1] 32:3
**Authority** [1] 117:2
**Automatic** [2] 69:16 69:
18 74:14 119:20 130:1 150:6
150:8
**Automatically** [2] 105:
22 150:19
**Automobile** [1] 21:17
**Available** [13] 40:16 90:
19 91:4 105:21 105:22 105:
24 106:2 107:16 119:11 125:
19 133:6 134:11 134:17
**Avoid** [2] 65:20 134:2
**Aware** [2] 128:17 129:23
**Awesome** [1] 95:24
**Awful** [1] 147:11
**Awfully** [1] 36:11

**B**

**Baby** [1] 20:4
**Background** [24] 6:11 10:
24 11:22 38:18 39:5 39:25
54:24 55:8 56:8 57:5 57:19
57:21 62:2 65:13 66:2 66:5
85:17 95:11 111:2 120:9 120:
22 135:7 140:9 140:10
**Bad** [6] 6:13 6:14 26:12 66:
5 131:21 140:22
**Bag** [2] 42:4 42:6
**Band** [1] 143:4
**Bank** [7] 41:18 41:19 41:20
42:4 42:6 113:2 113:5
**Bars** [1] 22:9
**Based** [13] 24:5 31:1 39:
12 40:5 83:21 87:25 88:23
91:19 95:18 95:19 111:23
112:25 130:15
**Basis** [7] 7:24 8:2 32:24
33:16 38:17 98:25 101:7
**Baumgarten** [8] 73:3 73:9
75:3 83:11 89:9 92:4 96:16
96:18
**Bear** [1] 76:21
**Bearing** [7] 73:18 100:9
124:18 128:15 145:7 151:10
151:11
**Beaten** [1] 151:4
**Beating** [1] 21:16
**Became** [1] 151:24
**Become** [9] 6:17 31:18 31:
25 53:12 125:24 126:14 130:
13 140:8 150:2
**Becomes** [2] 84:20 94:25
**Becoming** [2] 126:10 126:
11
**Bedside** [1] 37:21
**Begin** [6] 11:1 15:11 48:1
101:12 109:12 129:10
**Beginning** [4] 7:2 12:3
125:12 125:20
**Begins** [2] 8:19 9:1
**Behalf** [1] 97:15
**Behind** [8] 22:9 22:12 22:
13 22:15 22:21 84:16 93:12
140:21
**Beliefs** [1] 48:23
**Believability** [1] 7:20
**Believable** [2] 8:7 47:9
**Belonged** [2] 103:19 103:
20
**Berra** [1] 30:6
**Best** [6] 45:22 72:11 72:20
79:4 134:7 150:17
**Better** [6] 14:18 37:2 37:
16 43:23 69:10 100:1
**Between** [11] 3:2 14:16 20:

**Beyond** [39] 7:6 10:20 11:
8 16:23 17:14 17:16 17:20 17:
25 18:4 18:8 18:12 18:13 18:
21 18:25 19:17 20:5 20:17
20:21 24:21 28:15 28:17 34:
12 34:19 41:14 43:11 43:14
44:15 44:22 45:12 53:20 54:
18 55:10 71:19 85:1 110:19
118:22 134:20 135:2 135:13
**Biased** [1] 88:20
**Biblical** [2] 96:10 96:12
**Biblically** [1] 75:20
**Big** [8] 53:6 53:10 66:17
70:12 124:9 128:1 144:24
152:5
**Biggest** [1] 108:10
**Bill** [5] 69:15 69:17 150:5
150:7
**Bills** [4] 69:14 69:20 150:
4 150:4
**Bit** [13] 26:11 40:18 63:16
89:22 117:8 120:25 121:4
128:19 129:13 140:5 143:8
144:2 145:21
**Blame** [1] 116:8
**Board** [8] 11:6 32:6 32:7
32:9 32:13 87:9 96:6 135:12
**Bob** [1] 1:20
**Bodily** [1] 55:24
**Body** [5] 29:22 30:1 37:6
38:15 152:8
**Boiled** [1] 115:21
**Borderline** [1] 113:21
**Born** [1] 108:21
**Boss** [4] 81:16 97:20 151:3
151:13
**Bother** [2] 119:8 119:9
**Bothered** [2] 71:15 139:1
**Bottom** [2] 99:6 153:2
**Bragging** [1] 56:23
**Brain** [1] 64:14
**Brasic** [1] 3:6
**Bravery** [1] 27:12
**Break** [2] 95:4 117:23
**Breaking** [3] 21:15 78:17
108:1
**Breath** [2] 32:19 98:1
**BRENDA** [1] 46:10
**Brief** [2] 40:22 139:15
**Briefly** [2] 5:7 11:4
**Bright** [1] 60:13
**Bring** [5] 8:25 13:20 45:4
87:17 126:4
**Brings** [1] 118:21
**Broad** [2] 36:4 38:11
**Broader** [1] 10:13
**Brothers** [1] 109:14
**Brought** [4] 4:1 71:1 79:
23 94:2
**Building** [2] 21:15 117:23
**Bumps** [1] 18:10
**Bunch** [2] 14:16 89:12
**Burdened** [1] 138:2
**Burdette** [3] 1:20 41:25
65:21
**Burglaries** [1] 21:14
**Burglary** [3] 55:21 105:
15 134:12
**Burning** [1] 21:13
**Bush** [1] 150:3
**Business** [5] 16:11 33:20
36:23 64:21 110:18

**C**

**Cancer** [2] 152:7 152:8
**Cannot** [7] 19:7 31:18 31:

**25** 41:3 41:25 99:9 123:3
**Capable** [2] 88:24 91:16
**Capital** [106] 4:17 5:10 8:
11 8:22 8:25 10:17 10:19 10:
23 13:23 18:17 20:23 21:8
23:20 26:5 28:14 28:16 28:
20 29:2 29:8 30:8 30:23 31:
11 31:15 32:17 33:20 33:22
34:4 34:6 34:13 34:16 34:18
35:5 35:10 35:20 35:22 38:
2 39:1 39:21 39:22 40:15
48:5 49:11 52:14 52:23 54:7
54:11 54:20 55:17 55:19 59:
17 60:16 61:4 61:22 61:23
62:5 65:13 65:25 66:8 66:10
68:13 69:15 69:16 69:18 75:
13 83:2 85:2 85:3 85:25 86:
1 86:6 86:7 87:18 91:5 91:6
91:9 92:20 93:1 95:10 96:8
96:17 96:18 96:22 105:13
110:19 110:20 117:1 118:18
118:23 119:13 119:14 120:2
131:17 134:21 135:1 135:5
135:18 136:9 137:8 146:7
147:22 148:3 148:5 149:19
150:6 150:7 150:17
**Car** [6] 6:23 27:10 41:20
41:23 151:11 151:16
**Care** [8] 43:4 43:5 43:7 43:
8 43:11 43:13 113:8 126:21
**Career** [1] 110:9
**Cares** [1] 43:9
**Carol** [1] 3:8
**Carries** [1] 94:24
**Cartel** [1] 90:17
**Carved** [1] 35:24
**Case** [177] 4:9 4:25 5:10 5:
10 5:20 9:20 9:25 10:18 11:
12 12:3 13:6 13:14 13:15 13:
18 14:8 14:9 14:12 14:14 22:
20 23:12 24:6 24:7 24:8 24:
11 24:14 25:9 25:11 26:15
27:6 28:4 29:12 29:17 30:5
30:18 30:21 30:22 31:1 31:6
31:14 32:25 33:4 33:16 34:9
35:14 38:5 38:13 38:17 38:
19 38:22 38:23 39:1 39:12
39:21 40:2 40:6 42:10 43:5
43:7 43:8 44:14 44:17 44:19
44:20 44:21 44:23 47:5 47:
10 47:15 47:17 47:23 48:6
48:21 49:11 49:14 49:15 52:
2 53:1 54:3 54:5 55:7 58:1
61:1 61:25 66:13 71:13 73:
3 73:25 74:4 75:5 75:14 77:
20 77:22 78:11 78:25 79:6
79:7 80:5 80:7 80:9 80:13
80:19 80:23 80:25 81:3 81:4
81:5 81:18 81:18 82:17 82:
25 83:2 83:15 83:23 84:25
86:3 86:14 87:10 87:19 87:
19 88:16 91:10 92:7 96:17
96:19 97:6 100:10 100:17
101:21 101:24 102:3 102:12
102:15 103:2 103:3 104:9
105:17 105:21 108:3 115:8
115:11 118:6 119:1 119:2
120:15 120:19 121:18 124:19
125:2 125:11 125:12 125:22
126:15 126:19 128:16 129:9
133:22 137:6 138:3 138:21
139:2 139:13 144:2 144:4
144:11 145:8 145:24 147:5
151:6 151:7
**Cases** [40] 13:23 15:17 15:
19 15:24 24:16 24:16 25:7
50:7 50:8 50:12 50:13 52:4
52:8 52:20 54:8 65:25 76:12
76:15 76:18 77:5 80:6 82:20
84:8 86:22 92:12 94:8 94:9
96:16 104:24 105:20 105:24
106:16 116:7 121:7 133:4
133:5 134:9 134:16 134:18
**Cast** [1] 150:9
**Catholic** [6] 108:19 108:
19 108:21 108:22 108:22 108:

**Caused** [2] 78:24 121:4
**Causes** [3] 34:2 44:14 73:
24
**Cells** [1] 64:14
**Center** [1] 151:16
**Certain** [22] 19:15 20:18
20:19 21:2 21:14 43:1 48:23
48:23 50:6 51:14 57:19 64:
22 77:5 94:24 104:22 105:18
106:6 108:23 131:8 132:8
134:16 137:3
**Certainly** [8] 15:7 20:23
21:7 83:7 130:11 133:7 141:
17 152:13
**Certainty** [4] 19:14 20:1
20:12 55:15
**Certify** [3] 154:4 154:8
154:10
**Cetera** [1] 94:18
**Chairs** [1] 45:20
**Chambers** [1] 154:7
**Chance** [8] 58:11 58:19 62:
14 68:20 88:8 88:25 121:7
121:25
**Change** [16] 14:6 14:6 37:
18 58:12 59:25 68:18 93:22
108:25 112:2 112:3 119:10
136:7 136:20 148:15 148:17
148:18
**Changed** [3] 93:4 114:7
121:10
**Changes** [1] 14:7
**Changing** [1] 58:24
**Channel** [1] 37:6
**Chapter** [1] 75:20
**Character** [14] 6:11 10:
24 11:22 38:18 39:5 39:25
54:24 55:8 57:5 57:15 57:21
76:4 111:2 135:7
**Charge** [12] 7:10 7:11 7:
15 7:25 8:3 10:8 10:9 16:4
16:15 17:1 35:19 103:21
**Charged** [14] 4:17 6:21 7:
3 54:19 82:7 85:25 90:17 92:
15 92:19 103:9 103:15 115:7
118:7 133:17
**Charges** [1] 79:24
**Charles** [5] 1:5 4:10 109:
3 109:5 154:22
**Charlsie** [1] 123:12
**Checked** [4] 52:18 76:11
86:18 125:13
**Child** [2] 105:18 134:15
**Childhood** [3] 66:3 140:2
140:19
**Children** [9] 67:12 67:16
93:13 110:5 141:21 142:2
142:16 142:19 142:21
**Choice** [6] 12:14 12:19 78:
3 98:11 112:1 137:11
**Choices** [4] 78:2 94:16 95:
6 119:6
**Choose** [2] 86:13 134:6
**Chose** [1] 140:3
**Christian** [1] 93:5
**Chronological** [1] 94:25
**Church** [5] 84:12 93:25 94:
3 99:2 108:25 .
**Circumstance** [5] 12:5
42:25 58:24 88:18 126:20
**Circumstances** [38] 5:17
5:25 11:20 12:5 14:19 15:14
15:22 36:18 37:3 37:11 39:9
39:16 40:10 43:2 53:23 57:
18 58:5 58:22 59:7 67:2 76:
23 81:15 83:19 84:25 85:16
85:21 88:15 105:4 108:3 111:
25 112:2 117:6 117:9 118:2
118:6 118:15 120:8 151:14
**Circumstantial** [13] 42:
19 42:20 42:23 43:6 43:13

43:17 43:25 44:1 44:13 44:
24 45:1 45:11 81:22
**Citizens** [2] 23:7 93:24
**City** [1] 103:14
**Civic** [1] 72:4
**Civics** [1] 69:4
**Claim** [1] 98:2
**Claimed** [2] 43:21 98:4
**Claims** [1] 44:11
**Claire** [7] 2:4 4:14 48:20
75:4 101:20 131:5 147:4
**Clean** [1] 110:4
**Clear** [5] 74:20 78:25 79:
18 99:2 128:12
**Client** [1] 148:25
**Clocks** [1] 22:12
**Close** [1] 141:23
**Close-knit** [1] 141:23
**Club** [1] 21:16
**Coaster** [1] 81:7
**Coconspirator** [2] 41:5
41:8
**Coercing** [1] 126:2
**Cognitive** [1] 63:18
**Comfort** [3] 10:14 33:12
71:23
**Comfortable** [14] 22:1 48:
14 62:1 62:6 68:10 69:21 70:
9 72:2 111:6 111:11 121:2
122:8 138:15 138:17
**Coming** [3] 66:5 121:11
144:1
**Comment** [1] 89:15
**Comments** [1] 46:6
**Commission** [11] 6:16 34:
8 41:9 41:16 42:3 42:8 56:
15 56:22 57:24 58:3 125:4
**Commit** [32] 10:4 11:10 19:
20 19:24 20:2 20:15 20:18
20:23 30:14 45:4 45:7 53:18
55:12 55:17 55:19 56:3 57:8
57:13 58:14 59:17 60:16 85:
7 85:11 110:23 111:8 112:7
112:8 114:5 130:4 135:15
135:19 148:9
**Commitment** [2] 93:17 130:
6
**Commits** [2] 50:9 91:5
**Committed** [31] 5:16 5:16
5:18 6:18 6:21 14:19 14:21
28:20 34:7 35:16 36:15 43:3
45:25 46:2 48:8 56:19 59:10
61:23 68:16 84:17 87:4 91:
10 93:2 93:20 101:23 112:15
113:9 117:10 118:16 120:8
131:20
**Committing** [5] 36:17 68:
6 68:13 84:7 91:8
**Common** [1] 143:10
**Communicate** [1] 40:24
**Communication** [1] 127:25
**Communities** [2] 22:3 22:4
**Community** [5] 22:2 94:23
103:9 104:4 104:5
**Company** [1] 109:23
**Comparative** [1] 26:2
**Comparison** [1] 19:5
**Complete** [1] 107:11
**Completely** [1] 32:14
**Complex** [1] 107:4
**Computer** [1] 1:22
**Conceivable** [2] 32:16 32:
22
**Conceivably** [1] 30:22
**Concept** [3] 40:24 131:24
137:12
**Concern** [8] 4:22 5:13 53:
7 55:4 121:4 121:16 121:19
136:25
**Concerned** [12] 58:18 61:

7:6 11 70:15 92:3 92:13 92:
21 97:4 104:18 123:13 126:
23 153:3
**Concerning** [3] 56:13 65:
13 95:10
**Concerns** [1] 95:22
**Concert** [1] 143:6
**Concluded** [1] 129:16
**Conclusion** [8] 5:5 7:9 8:
23 13:24 15:16 22:16 32:2
32:23
**Condone** [1] 142:25
**Conduct** [15] 21:2 21:3 21:
20 21:21 25:17 25:18 25:21
25:21 36:14 36:15 43:1 43:2
43:3 65:24 113:23
**Confer** [1] 72:13
**Confinement** [3] 36:5 39:
11 40:4
**Confront** [1] 105:6
**Confronted** [1] 31:7
**Connect** [3] 41:16 42:2 42:
7
**Connects** [1] 41:9
**Connors** [14] 2:4 4:14 9:
21 9:23 48:20 75:4 101:20
123:17 123:18 127:6 127:7
131:5 147:4 153:7
**Connors'** [1] 3:12
**Consider** [14] 21:25 27:
15 39:9 40:3 40:13 40:17 60:
4 60:4 67:3 70:10 76:17 111:
3 121:5 137:16
**Consideration** [9] 11:19
12:24 31:19 31:25 39:14 39:
18 66:2 66:16 81:17
**Considered** [7] 65:14 66:
12 95:11 137:10 149:9 149:
19 149:23
**Considering** [1] 30:20
**Consist** [1] 7:11
**Consistently** [1] 24:2
**Consolidated** [1] 109:24
**Consoling** [1] 142:11
**Conspirator** [1] 41:4
**Conspire** [1] 41:2
**Constantly** [1] 37:21
**Constitute** [6] 11:11 21:
22 23:7 55:12 65:23 135:16
**Constraining** [1] 93:10
**Contact** [1] 22:6
**Contained** [2] 7:15 25:8
**Contains** [1] 154:4
**Contest** [2] 104:3 145:14
**Context** [2] 19:16 91:10
**Continuing** [22] 11:11 21:
23 23:7 53:18 55:13 56:3 56:
12 57:7 57:12 58:14 64:18
85:7 85:10 92:6 96:25 110:
23 111:8 120:5 135:16 135:
20 136:9 148:9
**Controlled** [2] 102:9 114:
10
**Conversation** [5] 23:14
24:24 31:3 33:18 129:25
**Convicted** [18] 18:17 26:
5 31:10 32:17 36:3 36:4 41:
3 42:1 69:16 69:18 81:3 81:
13 118:18 119:12 119:14 137:
8 150:5 150:7
**Convinced** [3] 85:1 118:
22 147:22
**Cooperating** [1] 117:15
**Correct** [10] 76:9 77:2 79:
20 98:16 98:21 117:4 128:2
128:3 128:7 154:4
**Correctly** [4] 96:11 112:
21 141:8 154:9
**Corroborates** [1] 42:3
**Corroborating** [2] 41:12
41:12

37 57:22
**Cost** [1] 154:10
**Counsel** [1] 154:5
**Counselors** [1] 93:5
**Count** [1] 74:22
**Country** [1] 27:20
**County** [15] 1:8 1:21 4:18
23:8 54:4 54:9 54:10 81:25
88:7 102:7 133:17 154:2 154:
4 154:11 154:17
**Couple** [12] 4:3 4:15 16:2
27:11 37:13 37:23 41:1 63:9
63:13 92:1 129:6 133:23
**Course** [16] 6:20 7:14 8:
17 34:7 34:11 34:15 34:20
34:21 35:17 42:14 42:17 105:
14 129:13 134:25 145:9 148:1
**Court** [71] 1:3 1:5 3:1 3:
11 3:14 3:16 3:19 3:21 3:24
4:2 46:13 48:16 62:21 73:2
73:6 74:23 79:21 81:14 82:2
82:3 82:4 82:25 82:10 83:11
84:16 84:20 85:9 88:13 89:5
99:14 99:18 101:15 102:21
104:1 112:14 114:16 123:9
123:10 123:19 123:19 123:21
123:23 123:25 124:3 124:7
126:24 127:1 127:5 127:8
127:10 127:12 127:14 127:21
130:23 139:8 144:14 144:15
144:19 146:18 149:4 151:21
151:22 152:16 153:1 153:10
153:13 154:3 154:4 154:7
154:14 154:17
**Court's** [9] 7:10 7:11 7:
14 7:25 8:13 10:8 10:8 16:4
17:1
**Court-appointed** [1]
104:7 116:2
**Courthouse** [1] 16:7
**Courtroom** [3] 15:9 79:23
102:18
**Cousin** [1] 79:25
**Cover** [4] 75:7 75:22 75:
24 76:1
**Coverages** [1] 134:1
**Covered** [1] 146:16
**Coworkers** [1] 22:6
**Create** [2] 6:3 129:4
**Creating** [1] 63:19
**Credibility** [3] 7:20 15:
3 44:12
**Credible** [1] 8:5
**Crime** [73] 5:20 6:1 6:7 6:
8 6:17 7:4 14:19 20:19 20:
25 21:3 21:5 21:5 21:21 36:
14 36:14 41:3 41:10 41:17
42:3 42:8 45:4 45:7 48:8 50:
10 50:23 53:3 55:5 56:10 56:
13 56:15 56:15 56:18 56:22
57:24 58:3 58:10 58:16 59:
1 61:22 68:7 68:8 68:13 68:
16 77:1 84:7 85:17 85:20 87:
3 90:25 93:1 103:6 104:22
106:20 106:25 108:10 108:11
111:1 111:22 112:7 112:8
112:15 113:9 117:6 117:7
117:10 118:16 120:18 120:18
131:21 134:11 135:10 135:11
136:3
**Crime-wise** [1] 108:10
**Crimes** [5] 14:20 20:19
23:7 50:9 51:15 84:6 91:15
106:6 114:4 131:21 132:8
137:3
**Criminal** [38] 11:10 19:
20 19:24 20:2 20:15 21:3 21:
8 21:10 21:15 22:19 23:1 50:6
53:18 54:24 55:12 55:18 55:
20 55:24 57:8 57:9 85:7 85:
11 103:9 103:15 103:21 110:
23 111:8 118:8 134:14 135:8
135:15 135:19 148:9 151:6
**CSR** [1] 154:16 -
**Culpability** [3] 6:15 11:

37 57:22
**Culture** [3] 64:9 92:11 95:
1
**Curious** [1] 116:16

## D

**D.A's** [1] 82:25
**D.A.'s** [1] 83:2
**D.W.I.** [2] 82:8 82:24
**Dairy** [1] 109:21
**DALE** [1] 127:18
**Damaging** [2] 118:8 118:13
**Danger** [1] 50:18
**Dark** [2] 79:13 79:14
**Darrell** [1] 123:12
**Date** [1] 154:16
**Daughter** [4] 93:6 93:11
143:3 143:7
**Daughters** [1] 71:4
**Days** [4] 37:23 41:21 125:
12 139:14
**Daytime** [1] 110:4
**Dead** [2] 38:15 106:22
**Deadly** [4] 35:1 78:3 107:
22 107:24
**Deal** [2] 108:24 126:2
**Dealers** [1] 90:13
**Dealing** [2] 6:10 24:20
**Dealt** [1] 48:13
**Death** [153] 12:7 12:16 12:
23 13:4 13:9 13:13 13:16 13:
21 13:25 15:10 15:24 18:3
24:3 24:13 25:25 27:15 28:6
28:23 29:5 29:14 30:12 31:
12 31:12 33:9 34:2 40:15 40:
19 49:9 49:19 49:23 50:7 50:
9 50:13 50:23 51:8 51:14 52:
5 52:17 52:25 53:13 53:24
56:21 58:7 58:10 58:15 59:1
59:8 60:24 61:1 61:6 61:10
65:15 68:14 69:17 70:11 70:
14 70:16 70:19 74:16 75:16
75:25 76:12 76:16 76:19 76:
25 77:5 78:20 84:2 84:8 84:
21 85:19 85:21 86:6 86:12
86:16 86:19 87:4 87:5 87:6
87:20 88:1 88:5 88:23 90:1
90:14 90:18 91:3 91:12 95:
12 101:2 104:12 104:16 104:
18 104:19 104:20 105:2 105:
10 105:20 106:5 106:18 107:
2 108:20 111:15 111:18 111:
11 111:24 112:3 114:5 116:
24 117:11 119:3 119:5 119:
13 120:7 120:11 122:16 128:
21 128:25 131:10 131:23 132:
1 132:7 132:21 132:25 133:5
133:8 133:12 134:8 134:10
134:17 136:2 136:10 136:15
136:20 136:21 137:1 137:6
137:16 137:19 138:3 138:16
138:22 141:15 147:7 148:13
148:15 148:20 148:24 149:13
150:6 150:14 150:14 150:20
**Death-type** [1] 49:19
**December** [1] 4:19
**Decide** [15] 16:8 53:17 66:
13 71:13 74:6 84:20 111:18
116:3 117:3 117:10 117:16
117:17 119:23 126:18 137:22
**Decided** [4] 100:20 100:23
110:10 116:2
**Deciding** [11] 4:23 5:13
47:9 56:11 56:12 57:1 65:14
66:16 87:8 95:11 129:9
**Decision** [46] 8:6 29:7
29:9 29:19 29:21 30:4 31:7
32:15 38:16 38:17 49:19 50:
22 51:2 51:18 51:23 54:21
56:18 62:7 62:10 66:22 67:6
70:10 77:14 77:17 77:18 83:
14 83:15 85:9 86:10 88:6
106:14 106:16 110:25 111:5
111:6 111:11 115:8 117:2

122:10 123:1 123:3 128:24
132:4 132:17 132:23 147:16
**Decision-making** [1]
117:2
**Decisions** [17] 27:2 29:1
29:15 48:4 48:6 48:7 60:6
74:4 74:5 77:9 106:9 132:12
142:12 142:15 142:17 146:5
146:6
**Declare** [1] 9:9
**Defend** [2] 34:25 95:24
**Defendant** [86] 2:22 3:20
3:23 4:17 4:23 4:24 5:1 5:
14 6:7 6:12 7:3 8:24 10:18
10:20 10:25 11:10 11:12 12:
8 12:16 12:20 15:15 19:20
19:23 20:14 20:18 20:22 23:
20 24:25 25:4 25:22 26:3 26:
16 27:6 27:8 27:8 29:3 31:
15 31:18 31:24 35:10 35:13
38:19 38:24 39:1 39:3 39:6
39:22 39:25 41:9 41:16 43:3
44:22 44:25 51:21 54:19 55:
5 55:11 60:5 61:3 77:12 78:
14 79:11 80:5 80:7 80:9 80:
14 80:16 80:18 83:13 84:6
85:17 106:12 118:23 123:24
124:2 127:13 127:16 128:22
132:15 135:8 135:14 146:7
147:18 147:25 153:9 153:12
**Defendant's** [14] 9:17 9:
24 11:22 27:5 39:10 40:4 44:
15 54:23 55:8 57:5 57:18 57:
22 65:13 95:11
**Defendants** [2] 6:18 14:11
**Defense** [24] 25:4 34:23
54:14 65:22 66:1 82:15 82:
21 89:18 107:16 130:10 134:
24 151:25 152:10 153:6
**Define** [5] 16:8 16:14 16:
16 19:4 90:18
**Defined** [5] 16:5 16:6 19:
3 21:25 25:14
**Definitely** [2] 88:17 94:6
**Definition** [3] 16:25 17:
2 34:5
**Definitions** [1] 7:12
**Degree** [4] 27:13 42:15 93:
14 93:15
**Deliberate** [2] 11:1 39:7
**Deliberating** [2] 10:10
40:2
**Deliberations** [2] 7:14
15:11
**Described** [1] 105:15
**Desert** [1] 27:17
**Deserve** [3] 32:24 33:15
137:3
**Deserves** [1] 50:23
**Designed** [1] 77:3
**Detail** [1] 47:4
**Determination** [3] 56:7
149:13 152:6
**Determine** [13] 7:20 38:
24 39:2 53:22 56:1 57:7 58:
9 58:19 59:6 59:22 59:23
120:10 135:25
**Determined** [2] 8:24 120:
19
**Determines** [4] 5:9 15:23
38:25 150:20
**Determining** [4] 110:22
138:2 139:17 149:10
**Deterrent** [2] 84:5 84:6
**Devices** [1] 94:12
**Diagnosis** [4] 152:7 152:
7 152:8 152:11
**Dictate** [3] 29:25 30:3 30:
4 48:7 74:7 74:11 88:16 88:
18 146:8
**Dictates** [3] 11:17 12:12
40:21
**Dictionary** [1] 95:13

**Die** [2] 66:11 66:14
**Dies** [1] 117:4
**Difference** [8] 7:24 34:6
92:24 94:4 113:22 125:14
142:1 142:5
**Differences** [1] 118:15
**Different** [33] 13:1 14:8
14:11 14:17 14:18 14:20 14:
21 15:8 15:12 20:9 22:3 25:
15 29:6 29:24 37:1 37:10 42:
16 44:6 45:7 51:12 59:20 60:
9 60:17 66:25 70:20 75:12
75:14 105:8 112:12 113:19
113:19 115:1 118:2
**Differently** [5] 15:13 26:
14 36:21 36:24 112:19
**Difficult** [1] 51:2
**Difficulty** [1] 117:21
**Dire** [21] 1:15 3:4 46:12
48:17 49:8 49:9 52:23 63:1
73:5 75:1 89:7 99:17 101:17
114:18 124:6 127:20 130:25
139:10 144:18 147:1 149:5
**Direct** [6] 42:10 42:20 43:
5 43:13 44:11 45:10
**Directly** [1] 142:24
**Disabilities** [1] 54:25
**Disability** [1] 60:15
**Disagree** [2] 86:17 140:4
**Disagreement** [4] 31:3
33:18 40:11 42:12
**Discern** [1] 86:14
**Discerning** [1] 76:4
**Discharge** [1] 103:13
**Discharged** [2] 115:17
115:23
**Discretion** [2] 12:15 12:
20 136:4
**Discuss** [1] 47:3
**Discussing** [1] 88:3
**Discussion** [3] 31:3 33:
18 46:6
**Dismissed** [1] 102:19
**Dispute** [2] 42:12 45:13
**Disservice** [1] 89:15
**Distinction** [2] 22:1 22:2
**Distinctive** [1] 14:9
**Distinguish** [1] 142:6
**Distribute** [1] 102:11
**District** [7] 1:5 1:11 2:
6 4:13 152:16 154:3 154:17
**Dixon** [9] 46:10 46:16 46:
25 48:19 62:9 63:3 63:7 69:
10 72:13
**DNA** [1] 43:20
**Doctor** [2] 152:17 152:19
**Doctors** [2] 22:23 37:16
**Donald** [1] 151:24
**Done** [19] 6:13 6:14 8:16 9:
10 9:14 11:13 56:9 56:24 57:
6 57:10 72:5 75:8 87:15 90:
12 92:25 120:22 139:16 141:
9 152:6
**Door** [4] 78:15 78:16 78:18
78:23
**Doubt** [40] 7:6 10:20 11:9
16:23 16:25 17:4 17:9 17:16
17:20 17:25 18:4 18:8 18:13
18:14 18:22 18:25 19:17 20:
5 20:17 20:22 24:21 28:16
28:18 34:12 34:19 41:14 43:
11 43:15 44:15 44:22 45:12
53:20 54:18 55:11 85:1 110:
19 118:23 134:21 135:2 135:
14
**Doubts** [5] 51:22 77:13
106:13 132:16 147:15
**Down** [16] 16:7 16:12 27:9
28:6 36:25 37:6 38:14 45:3
45:6 60:8 70:25 71:16 71:20
83:5 115:22 139:20

**Dragging** [1] 133:8
**Drastically** [1] 121:11
**Draw** [1] 126:14
**Drive** [1] 98:11
**Driver** [6] 6:23 56:21 58:1
**Driving** [2] 27:9 90:25
**Drug** [6] 64:8 64:16 81:19
90:13 90:18 90:22 92:11 102:
3 108:15
**Drugs** [21] 59:10 59:13 59:
16 63:23 64:7 64:21 64:22
65:4 90:9 90:10 90:17 98:3
107:15 107:18 107:23 108:5
108:12 112:6 112:10 113:5
113:8
**Drunk** [3] 81:21 98:12 98:
13
**Drunks** [1] 45:4
**Due** [1] 72:18
**Duly** [6] 46:11 73:4 99:16
124:5 127:19 144:17
**During** [45] 7:13 8:17 9:2
9:13 10:9 14:17 32:5 34:7
34:11 34:15 34:20 34:21 35:
8 35:17 42:14 42:17 47:23
54:6 56:14 74:1 74:2 86:21
100:18 105:13 105:14 105:15
125:2 129:14 129:22 134:12
134:13 134:13 134:13 134:14
134:25 142:12 145:9 145:19
148:1 149:19 151:17
**Duty** [3] 72:4 105:19 134:15
**DWI** [1] 81:3

### E

**Early** [1] 79:3
**Easy** [5] 137:24 138:5 138:
6 141:3 141:14
**Eat** [1] 98:9
**Ed** [1] 60:12
**Effect** [4] 18:20 58:12 59:
6 73:19
**Effective** [2] 86:16 86:19
**Eight** [2] 43:2 81:7
**Either** [15] 11:15 35:11
52:23 59:2 71:1 72:19 74:22
80:6 86:17 89:2 89:16 89:17
91:8 111:9 119:4
**Elbow** [1] 78:23
**Eleven** [12] 9:8 66:12 69:
11 72:14 72:15 92:5 96:1 99:
5 117:3 118:22 122:9 144:10
**Eligible** [4] 31:18 31:25
53:12 137:10
**Eliminate** [1] 35:3
**Emotional** [4] 26:6 63:18
64:2 81:7
**Emotions** [1] 83:8
**Emphatically** [1] 75:18
**Employer** [1] 151:2
**Empty** [1] 117:23
**Encompassing** [1] 64:18
**Encounter** [1] 90:23
**End** [4] 12:3 105:7 118:1
143:18
**Ends** [1] 94:13
**Endurance** [1] 145:13
**Engage** [1] 94:22
**Enmeshed** [2] 95:1 95:6
**Enter** [1] 117:14
**Entire** [2] 10:9 129:12
**Entirely** [3] 25:15 29:24
123:4
**Entitled** [4] 13:19 20:24
40:12 107:24
**Environment** [1] 95:5
**Envision** [1] 129:20
**Episode** [1] 134:14

**Equally** [2] 32:16 101:1
**Erased** [1] 17:18
**Erases** [1] 17:8
**Erroneous** [1] 31:13
**Error** [1] 81:20
**Escape** [1] 22:17
**Essentially** [1] 150:19
**Establishes** [1] 18:21
**Et** [1] 94:18
**Evaluate** [2] 60:11 83:21
**Evaluating** [3] 31:6 118:
25 120:15 121:20 141:7
**Evaluations** [2] 32:4 32:8
**Eve** [3] 103:14 115:5 115:7
**Event** [6] 6:17 31:15 31:
16 152:11
**Everyday** [1] 24:12
**Everywhere** [1] 23:5
**Evidence** [145] 5:3 5:6 5:
15 6:1 6:3 6:6 6:11 7:6 8:
23 10:19 10:23 11:8 11:13
11:17 11:19 12:2 12:9 12:12
13:17 14:25 16:23 17:8 17:
14 17:15 17:20 18:7 18:10
18:12 18:21 18:25 20:24 24:
11 24:21 25:8 25:24 26:13
26:22 27:4 28:4 28:15 29:17
29:23 30:1 31:6 31:16 38:12
38:17 38:23 39:5 39:6 39:12
39:23 40:1 40:20 41:6 41:12
41:12 42:2 42:7 42:17 42:18
42:19 42:20 42:21 42:23 43:
5 43:6 43:18 44:1 44:1 44:
11 44:13 44:21 44:23 45:1
45:24 46:2 51:6 51:24 52:2
52:3 53:22 54:23 55:6 55:6
55:10 56:1 59:5 59:9 59:20
60:3 60:9 60:17 60:22 61:8
61:8 65:12 66:1 66:12 66:15
76:24 77:15 77:18 81:22 83:
3 83:16 83:21 83:22 85:5 85:
6 85:16 85:18 88:23 95:10
95:18 95:19 101:7 106:15
111:21 111:24 112:17 113:1
113:4 113:15 118:21 119:1
119:22 120:3 130:2 132:18
135:7 135:11 135:13 135:24
136:1 136:5 136:12 136:16
141:6 147:21 147:21 148:16
149:8 149:18 154:5
**Ex-convict** [2] 14:15 36:
20
**Exactly** [18] 12:16 12:21
15:9 15:10 17:1 26:10 26:13
26:21 28:24 30:2 34:5 34:5
36:17 36:22 47:12 72:1 115:
9 121:9
**EXAMINATION** [17] 1:15 46:
12 48:17 63:1 73:5 75:1 89:
7 99:17 101:17 114:18 124:6
127:20 130:25 139:10 144:18
147:1 149:5
**Examine** [1] 59:5
**Example** [20] 6:20 8:20 20:
20 22:8 22:11 27:6 34:21 35:
7 37:12 41:17 42:4 43:19 52:
9 59:4 60:3 83:20 124:16
142:10 143:1 146:6
**Examples** [1] 21:18
**Exceed** [1] 36:9
**Except** [3] 33:21 76:12
134:9
**Exceptions** [1] 140:13
**Exclusive** [1] 15:2
**Exclusively** [2] 41:4 83:
16
**Excusable** [1] 45:22
**Excuse** [9] 9:6 32:4 33:25
34:3 38:5 65:20 66:5 66:6
132:24
**Excused** [13] 3:4 3:2 3:
25 66:9 123:14 124:1 124:3
127:3 127:17 152:13 152:20
153:4 153:13

**Excuses** [3] 25:21 65:19 65:23
**Execution** [5] 51:20 77: 11 106:11 132:14 147:18
**Exemption** [1] 138:25
**Exhibits** [1] 45:6
**Exist** [5] 42:17 63:20 64: 6 111:25 145:17
**Existed** [2] 19:18 108:3
**Existence** [8] 19:23 20:1 20:17 20:22 34:19 35:7 35: 11 35:15
**Exists** [4] 20:24 41:7 44: 19 83:16
**Expanded** [2] 91:14 106:2
**Expect** [1] 16:12
**Experience** [1] 118:3
**Expiration** [1] 154:16
**Explain** [4] 63:15 93:24 121:7 149:11
**Explained** [5] 37:17 103: 23 110:17 115:16 121:8 122:7
**Explaining** [1] 8:16
**Explains** [1] 116:21
**Express** [2] 70:7 89:12
**Extended** [2] 94:2 94:20
**Extent** [2] 33:21 108:23
**Extract** [1] 130:6
**Extremes** [1] 94:9

**F**

**Face** [1] 90:14
**Faced** [2] 51:9 131:19
**Facet** [1] 42:12
**Facing** [1] 83:9
**Fact** [21] 4:16 4:20 7:2 7: 7 7:19 17:10 19:19 57:4 68: 11 71:21 84:5 98:4 102:2 103:8 115:22 116:1 130:15 137:16 139:19 148:7 152:18
**Factor** [1] 87:2
**Factors** [4] 57:1 137:23 137:25 138:7
**Facts** [14] 40:9 47:5 47: 55 5:7 77:21 78:11 79:9 84: 25 85:18 87:19 88:5 88:21 97:16 118:5
**Faintest** [1] 126:8
**Fair** [19] 46:4 68:14 68:18 68:19 69:2 69:3 69:22 69:24 73:19 83:5 83:7 92:14 92:22 99:6 120:24 141:12 141:23 148:23 148:24
**Fairly** [3] 97:7 104:8 151: 9
**Fairness** [1] 69:23
**Falsely** [1] 103:5
**Familiar** [2] 87:18 133:22
**Families** [1] 143:11
**Family** [7] 22:7 65:3 94:2 94:11 141:20 141:22 141:23
**Fannin** [1] 2:7
**Far** [17] 13:11 16:1 18:15 25:12 57:17 72:3 73:13 75: 24 93:15 100:5 104:17 104: 17 108:22 120:22 121:25 128: 8 145:2
**Fate** [1] 66:16
**Father** [2] 94:11 133:19
**Fault** [1] 116:7
**Favor** [5] 51:13 76:12 77: 4 90:1 106:5
**Faye** [5] 87:10 92:25 93:8 93:15 133:22
**Fear** [4] 84:8 84:21 94:17 107:23
**Fearful** [1] 107:19
**Fearing** [1] 84:23
**Feature** [3] 31:2 36:16 43:

25
**Feelings** [3] 68:24 101: 24 131:8
**Fell** [1] 45:6
**Felony** [8] 34:8 34:21 82: 2 82:4 82:10 91:9 102:24 105:14
**Felt** [6] 54:15 81:14 95:9 98:6 98:6 98:7
**Female** [4] 14:13 80:8 80: 9 80:11 80:15 81:19
**Few** [7] 62:13 63:5 76:12 89:11 95:7 114:22 134:9
**Fifteen** [3] 60:8 87:3 87:6
**Fifty** [1] 37:14
**Fight** [1] 115:11 116:7
**Fighting** [1] 105:7
**Figure** [2] 94:1 131:23
**Filled** [3] 49:6 70:24 122: 4
**Final** [3] 103:21 139:17 152:6
**Finally** [1] 52:10
**Finances** [1] 126:23
**Financially** [1] 125:17
**Fine** [10] 20:8 20:9 27:18 36:9 46:15 78:9 127:23 127: 24 144:21 146:1
**Finest** [1] 131:18
**Fingerprint** [8] 14:9 24: 8 42:5 43:19 43:20 43:25 44: 2 44:4
**Fingerprints** [1] 43:24
**Finish** [2] 70:25 126:16
**Finished** [1] 104:4
**Fire** [5] 27:9 27:12 103:22 103:23 116:10
**Firearm** [1] 103:13
**Fired** [2] 57:25 103:17
**Fires** [2] 115:6 133:19
**Firing** [2] 118:9 118:14
**First** [64] 4:21 5:12 5:21 6:4 8:14 8:22 11:21 12:1 12: 13 12:22 12:23 12:25 13:1 13:2 13:5 13:7 13:8 16:21 16:21 17:2 17:5 17:23 17:23 18:5 18:6 18:14 18:22 18:24 19:8 23:9 23:10 23:11 23:15 24:9 24:19 28:19 28:20 29:7 29:7 46:11 48:10 49:10 49: 13 55:9 64:11 68:5 73:4 73: 9 74:15 82:7 89:24 90:19 91: 24 96:10 96:10 96:16 99:19 110:17 124:5 124:8 127:19 131:9 144:17 144:22
**Firsthand** [2] 65:5 98:25
**Fist** [1] 55:23
**Fit** [4] 36:13 38:12 83:21 126:7
**Fits** [1] 131:24
**Five** [20] 3:2 30:18 32:20 33:5 33:7 36:7 40:5 40:8 43: 7 53:2 76:10 105:2 105:6 105:9 105:9 117:13 117:15 117:18 121:12 147:5
**Five-witness** [1] 30:18
**Fixed** [1] 26:19
**Flip** [2] 19:12 92:9
**FM** [1] 2:19
**Focus** [4] 5:14 5:25 6:6 6: 7
**Focusing** [1] 64:5
**Foggiest** [1] 31:23
**Folks** [13] 26:2 26:8 26:9 26:14 26:16 26:17 26:21 27: 22 40:13 42:19 125:18 126:4 130:3
**Follow** [16] 9:4 9:6 32:8 32:12 42:13 53:17 53:25 54: 3 54:5 68:22 68:25 90:7 101: 22 133:16 133:20 133:21

**Follow-up** [2] 49:1 131:7
**Followed** [4] 54:7 54:9 90:12 132:6
**Following** [3] 1:18 3:2 126:17
**Follows** [6] 46:11 73:4 99: 16 124:5 127:19 144:17
**Force** [2] 107:22 107:24
**Foregoing** [1] 154:4
**Foreman** [1] 102:3
**Forever** [1] 26:13
**Forewarned** [1] 10:13
**Form** [1] 133:6
**Fort** [2] 84:12 93:11
**Forth** [4] 22:23 143:4 152: 17 152:22
**Forthright** [1] 95:23
**Forty** [15] 31:19 32:2 32: 5 32:18 32:23 33:1 33:17 52: 25 53:1 53:11 122:7 122:14 137:7 137:17 137:25
**Forty-five** [1] 126:5
**Forty-five-year-old** [1] 14:15
**Forward** [1] 150:18
**Four** [6] 15:8 5:11 15:12 102:6 126:6 130:12
**Fourth** [1] 75:20
**Frame** [7] 47:23 74:1 74:2 100:18 125:2 129:22 145:19
**Frankly** [1] 4:5
**Free** [5] 11:6 22:10 22:14 22:19 23:1
**Freeway** [1] 2:14
**Friday** [5] 99:23 99:25 124:9 128:1 144:23
**Friend** [4] 93:25 103:16 115:6 115:14
**Friends** [2] 22:7 143:5
**Front** [4] 41:18 45:4 62: 17 121:4
**Full** [5] 67:12 95:6 125:11 129:12 130:7
**Full-time** [1] 67:12
**Fully** [1] 26:8
**Function** [1] 27:20
**Future** [13] 19:21 19:24 20:2 20:19 20:23 28:18 28: 21 29:3 29:10 56:4 57:13 58: 14 96:20

**G**

**Game** [1] 79:3
**Garbage** [1] 139:21
**Gather** [1] 39:16
**Gee** [1] 72:13
**General** [4] 21:19 94:13 140:12 147:8
**Generally** [3] 140:4 140: 14 142:7
**Gentleman** [2] 38:6 133:8
**Gentlemen** [1] 1:2
**Getaway** [3] 6:23 56:21 58: 1
**Girl** [1] 36:18
**Given** [8] 7:13 15:3 59:24 68:11 96:1 97:7 106:18 137:9
**God** [4] 66:4 84:23 93:18 93:19
**God-fearing** [1] 84:23
**Governor** [3] 32:10 32:11 150:3
**Grandchildren** [1] 141:21
**Gray** [1] 151:16
**Great** [2] 140:20 143:17
**Greater** [3] 35:24 35:25 126:10
**Grew** [3] 55:1 109:2 110:12

**Grossly** [2] 19:21 19:25
**Group** [13] 3:3 4:6 49:8 76:14 81:15 99:20 124:9 128: 1 129:3 129:7 129:8 144:24 152:5
**Grow** [2] 93:22 110:11
**Grown** [1] 26:8
**Guards** [1] 22:24
**Guess** [16] 31:24 52:15 65: 18 66:15 67:8 84:21 87:9 88: 11 89:14 98:10 102:3 104:3 126:8 129:24 133:14 153:2
**Guilt** [8] 17:16 30:8 41: 14 43:10 43:14 44:15 74:6 113:13
**Guilt/innocence** [1] 57: 20
**Guilty** [103] 4:23 4:24 5: 2 5:14 5:14 7:4 7:5 7:5 7:7 8:24 9:18 9:24 10:18 10:20 10:21 14:25 17:7 17:7 17:9 17:10 17:12 17:18 17:24 17: 25 18:9 18:11 18:13 23:20 25:19 25:23 27:8 28:14 28: 16 29:3 30:23 31:8 31:8 31: 15 34:18 35:10 35:13 35:20 35:21 38:24 38:25 39:1 39:3 39:22 39:23 43:17 44:23 44: 25 45:10 54:11 54:19 55:5 55:17 56:3 56:10 58:13 61:3 61:9 66:9 68:8 74:15 78:4 78:5 79:7 85:2 85:2 96:8 96: 18 96:22 97:17 100:20 100: 21 106:24 110:19 110:20 111: 8 111:16 112:15 112:23 113: 15 113:16 117:1 117:21 117: 22 118:23 120:2 128:23 131: 17 134:21 135:1 135:5 135: 18 136:8 146:7 147:22 148:2 148:5 149:1 150:16
**Gun** [16] 57:25 78:22 84:17 103:18 103:19 103:22 103:24 103:24 104:5 107:19 115:22 116:9 116:11 116:19 118:9 118:11
**Gut** [1] 69:8
**Guy** [3] 41:17 78:19 79:1
**Guys** [3] 16:7 16:16 83:5

**H**

**Half** [3] 11:21 12:1 24:9
**Hallway** [1] 46:9
**Hand** [3] 19:25 50:4 154:12
**Handle** [1] 30:15
**Hands** [1] 136:25
**Happy** [1] 72:19
**Hard** [5] 55:22 97:24
**Hard-nosed** [2] 142:11 142:15
**Harris** [15] 1:8 1:21 4:18 23:8 54:4 54:8 54:10 81:25 88:7 102:7 133:17 154:2 154: 4 154:11 154:17
**Hassle** [2] 72:1 117:25
**Hate** [1] 38:7
**Hauck** [7] 127:18 127:24 128:5 129:17 131:2 131:3 131:4
**Hawley** [1] 3:6
**Head** [2] 90:17 118:12
**Headway** [1] 4:7
**Health** [6] 47:20 64:15 73: 23 100:15 124:24 129:19
**Hear** [25] 5:21 6:2 6:11 10: 22 10:23 26:9 26:15 39:4 39: 23 43:16 49:3 49:4 53:4 54: 23 55:6 56:1 56:14 65:24 65: 25 76:23 85:18 88:4 88:21 119:2 135:6
**Heard** [36] 1:19 6:2 8:14 11:21 11:24 13:22 14:1 16: 21 33:4 38:13 38:23 44:17 42:1 45:24 49:7 49:8 51:6 52:5 52:8 57:17 57:20 57:21

58:9 60:22 76:23 84:25 89:
13 93:3 95:16 106:17 112:21
130:5 135:11 136:1 136:6
143:13
**Hearing** [3] 46:2 85:5 90:3
**Heavily** [1] 126:20
**Heinous** [1] 92:25
**Held** [10] 1:21 79:24 112:7
113:6 113:10 113:23 114:3
116:1 116:14 116:25
**Helm** [2] 82:4 82:4
**Help** [5] 7:1 56:11 66:22
96:15 117:10
**Helpful** [2] 56:7 110:22
**Helps** [2] 68:23 110:25
**Hendrix** [1] 123:12
**Hereby** [1] 154:4
**Hernandez** [1] 3:7
**Herself** [1] 87:14
**Hesitation** [1] 144:10
**Hi** [3] 63:3 63:4 114:20
**High** [12] 20:12 50:17 59:
10 59:12 59:16 59:18 110:14
112:6 112:10 113:4 113:16
143:4
**Higher** [1] 94:19
**Hill** [30] 2:12 3:14 3:15 3:
18 4:11 9:19 62:22 63:2 63:
7 63:9 89:6 89:8 89:9 113:
12 114:16 114:17 114:19 114:
20 123:19 123:20 127:8 127:
9 139:9 139:11 139:12 147:5
149:4 149:6 152:21 152:25
**Himself** [3] 55:3 84:14
152:19
**History** [5] 50:15 54:24
56:8 57:10 135:8
**Hit** [2] 78:23 78:24
**Hitting** [1] 55:22
**Holding** [3] 68:12 70:12
107:19
**Holiday** [1] 151:17
**Home** [11] 21:13 44:9 79:2
79:3 94:11 98:12 98:13 117:
13 117:14 123:1 141:10
**Honest** [1] 116:5
**Honor** [16] 3:10 74:25 101:
16 123:18 123:20 123:22 127:
4 127:7 127:9 130:24 146:19
153:5 153:6 153:7 153:8 153:
9
**Honorable** [1] 1:20
**Hooked** [1] 37:20
**Hope** [9] 23:2 37:18 61:3
61:4 70:5 95:22 131:11 133:
14 141:11
**Hopelessly** [1] 27:19
**Hopes** [1] 61:2
**Horrible** [1] 117:18
**Hour** [2] 31:20 31:20
**Hours** [2] 103:10 129:6
**House** [6] 27:9 79:13 103:
17 105:1 115:23 150:2
**Household** [1] 125:3
**Houses** [1] 110:4
**Houston** [8] 1:21 2:8 2:15
2:20 109:10 109:18 110:11
154:18
**Human** [3] 33:23 38:3 43:22
**Hundred** [1] 21:18
**Husband** [3] 37:21 52:10
78:14
**Hypothetical** [1] 35:14
**Hypothetically** [1] 52:15

---

## I

**I.C.C.** [1] 109:23
**Idea** [13] 10:12 26:4 26:18
32:11 40:8 43:18 56:16 126:

---

8 126:9 130:9 133:2 137:4
146:11
**Ideas** [1] 89:12
**Identification** [1] 79:12
**Identifier** [1] 43:22
**Identify** [3] 79:21 107:
12 107:13
**Identifying** [1] 43:24
**Ignorance** [1] 90:21
**Ignored** [1] 115:20
**Illegal** [2] 90:10 103:13
**Imaginary** [7] 8:24 10:16
10:17 38:22 39:9 39:10 40:4
61:6 74:11 74:16 101:3 101:
4 102:19 150:20
**Imposes** [1] 25:11
**Imprisonment** [3] 86:16
86:19 121:5
**Inappropriate** [4] 52:6
76:14 106:18 106:19
**Incarcerated** [1] 93:13
**Incarceration** [2] 23:3
86:22
**Incidents** [1] 115:4
**Include** [1] 91:14
**Included** [3] 35:23 78:5
154:6
**Including** [3] 11:19 11:
22 114:5
**Inconvenience** [2] 71:18
71:20
**Independent** [9] 30:5 41:
7 41:8 42:2 42:7 74:5 74:17
146:5 146:12
**Indicate** [2] 76:24 151:23
**Indicated** [7] 81:2 90:11
107:3 108:18 121:15 149:20
151:2
**Indicates** [1] 136:1
**Indictment** [2] 54:17 54:
19
**Indignity** [1] 1:11
**Individual** [12] 3:4 49:9
55:4 70:18 85:20 91:4 92:13
93:3 114:25 130:1 135:9 136:
4
**Individual's** [1] 107:15
**Individually** [3] 48:13
126:4 129:2
**Influence** [4] 93:25 140:
15 142:8 143:12
**Influenced** [2] 142:3 142:
9
**Information** [18] 10:13
11:2 29:23 30:2 45:20 45:22
55:2 55:3 55:7 56:6 56:24
110:24 110:16 135:9 135:10
149:17 150:24 150:25
**Informed** [2] 149:24 149:
25
**Inherent** [1] 64:23
**Injuring** [1] 64:14
**Injury** [1] 55:24
**Inmates** [1] 22:25
**Innocence** [2] 17:12 17:17
**Innocent** [1] 84:13
**Inside** [2] 29:18 29:20
**Instance** [2] 142:9 151:10

---

**Instead** [6] 6:7 13:16 21:
1 30:4 41:5 74:9
**Instructions** [1] 7:12
**Instructs** [1] 12:1
**Intellectually** [1] 83:12
**Intended** [3] 54:17 81:19
84:4
**Intending** [1] 134:24
**Intense** [1] 93:5
**Intent** [1] 102:11
**Intentional** [13] 33:23
34:7 34:11 34:14 34:20 34:
22 35:3 35:7 35:15 36:1 36:
2 38:2 54:12
**Intentionally** [6] 34:1
54:15 91:7 91:11 134:22 147:
23
**Intercontinental** [1]
109:24
**Interested** [1] 68:22
**Interesting** [1] 141:18
**Interfere** [7] 47:16 47:
22 100:17 125:1 126:21 129:
21 145:18
**Interpret** [1] 96:15
**Interwoven** [1] 45:9
**Involved** [8] 22:25 65:4
71:3 77:10 93:6 99:2 140:8
140:9
**Involvement** [2] 10:25 94:
3
**Involving** [1] 65:4
**Issue** [22] 6:17 29:7 29:9
37:3 39:7 45:2 45:11 56:25
57:1 57:14 57:15 61:5 68:1
108:2 111:13 111:16 135:23
136:11 136:24 137:21 148:6
148:13
**Issues** [3] 5:5 59:22 96:6
**Item** [3] 44:3 44:3 44:6
**Itself** [15] 5:16 6:1 6:7
6:9 14:8 24:12 24:18 30:21
25:25 41:3 48:9 56:13 74:7
135:10 146:8

---

## J

**Jacinto** [1] 154:18
**Jail** [1] 79:24
**Jarred** [1] 81:11
**Jeopardizing** [2] 64:12
64:16
**Jeopardy** [1] 64:25
**Job** [14] 7:19 7:21 7:22 7:
25 16:13 22:16 23:18 45:22
75:8 96:3 109:20 130:9 130:
11 139:5
**JOHN** [1] 144:16
**JONES** [1] 99:15
**Joseph** [1] 3:5
**JR** [2] 1:5 154:20
**Judge** [27] 1:20 7:21 7:22
49:9 51:20 52:24 54:14 63:7
65:21 75:8 77:11 82:4 89:13
91:5 92:7 102:16 102:19 106:
11 110:17 121:8 121:9 121:
22 132:14 144:11 147:17 152:
15 152:15
**Judge's** [2] 49:7 118:12
**Judges** [1] 15:2
**Judgment** [6] 71:12 83:1
86:2 91:17 126:18 138:21
**JUDICIAL** [1] 1:11
**Jumps** [1] 41:19
**Juries** [5] 13:12 13:13 15:
8 15:11 75:11
**Juror** [56] 7:19 9:3 9:6 9:
7 27:2 38:21 44:24 47:9 47:
17 47:23 49:11 49:14 49:18
59:11 59:14 61:16 61:19 62:
11 72:7 72:21 73:2 73:19 73:
25 81:5 99:1 99:14 100:10

---

100:17 103:3 119:6 119:19
123:9 124:19 125:1 125:16
125:19 125:20 125:24 126:10
126:11 126:15 127:17 128:6
128:16 129:22 130:13 136:4
139:1 145:8 145:18 148:22
148:23 148:24 149:17 150:24
151:23
**Juror's** [2] 130:9 130:11
**Jurors** [17] 9:3 10:17 13:
17 15:8 40:13 50:22 58:19
71:17 75:9 89:16 89:17 121:
11 126:6 129:2 129:9 130:3
140:1
**Jury** [80] 4:24 5:1 5:4 5:8
8:22 10:9 10:18 10:21 11:1
11:16 12:2 12:12 12:13 12:
17 15:12 15:24 20:25 23:9
23:17 23:19 23:23 24:2 24:5
24:11 25:11 27:2 27:7 27:12
29:1 29:6 29:15 33:4 34:7
36:13 38:11 38:22 38:23 38:
25 39:2 40:1 48:5 51:18 54:
21 61:3 61:3 61:12 62:1 62:
7 66:21 66:22 67:5 67:15 68:
1 68:7 74:4 77:8 82:19 92:4
96:7 102:2 102:3 102:19 102:
24 106:8 114:25 118:4 118:5
118:20 120:19 120:24 122:11
128:24 139:21 146:5 146:6
149:9 149:25 150:19 152:13
152:20
**Jury's** [3] 4:22 5:13 66:2
**Justifiable** [1] 34:24
**Justification** [6] 33:24
34:3 38:4 54:13 134:23 147:
24
**Justified** [1] 25:18
**Justifies** [1] 25:17
**Justify** [1] 40:10

---

## K

**Karla** [5] 87:10 92:25 93:
8 93:15 133:22
**Kay** [2] 154:3 154:16
**Keep** [4] 19:16 30:20 58:17
93:8
**Keeping** [1] 150:11
**Kid** [1] 66:5
**Kidnap** [1] 105:16
**Kidnapping** [12] 34:11 34:
12 34:22 35:8 35:17 36:1 54:
19 91:9 105:16 134:12 134:
25 148:1
**Kidnappings** [1] 21:10
**Kids** [6] 27:11 71:2 142:8
142:9 143:12 143:18
**Kill** [7] 54:17 105:1 105:3
105:9 105:9 117:18 134:24
**Killed** [7] 54:5 61:23 84:
14 86:7 86:11 91:11 147:25
**Killing** [8] 34:14 34:14
105:18 105:18 118:1 133:18
134:13 134:14
**Kincaid** [1] 133:18
**Kind** [27] 6:9 29:16 30:6
37:18 38:5 49:23 51:4 54:25
56:6 64:5 75:7 75:16 92:13
94:12 94:21 105:19 118:9
120:20 122:11 131:9 132:5
133:4 140:21 140:21 144:6
147:6 151:6
**Kinds** [12] 16:20 21:14 50:
12 52:4 55:2 56:25 76:15 76:
18 104:24 110:24 134:25
**Knit** [2] 141:22 141:23
**Knobloch** [2] 154:3 154:16
**Knock** [1] 55:23
**Knocked** [1] 78:15
**Knowing** [12] 51:19 52:25
68:23 70:8 88:24 92:14 106:
10 126:15 132:13 136:21 148:
23 148:25

**Knowledge** [2] 65:5 112:13

**Known** [4] 65:3 78:16 103:5 114:9

**Knows** [1] 37:17

**Kurt** [5] 2:17 4:11 89:9 114:20 139:12

## L

**Lack** [2] 54:24 135:8

**Ladies** [1] 4:3

**Lake** [2] 109:3 109:5

**Large** [1] 4:7

**Last** [29] 4:9 16:24 24:24 37:6 37:6 42:16 46:17 53:13 54:3 58:16 62:14 70:23 72:10 73:10 85:15 99:20 120:10 124:9 125:12 125:22 125:23 128:1 129:13 131:11 131:15 131:24 133:16 137:1 143:23

**Lastly** [1] 15:7

**Lately** [1] 133:8

**Law** [70] 8:1 8:2 8:5 8:5 8:7 8:17 8:21 9:2 9:4 9:13 12:14 12:19 25:16 25:19 27:1 28:1 28:3 33:13 35:18 35:18 40:21 40:25 42:11 42:12 43:4 43:5 43:6 43:8 43:9 43:11 43:12 45:13 48:24 51:24 52:2 52:3 53:25 59:21 61:8 64:1 64:25 65:8 68:17 68:22 68:22 68:23 68:25 69:1 75:19 76:16 76:20 77:15 77:18 87:25 88:23 90:22 101:23 105:13 105:20 105:23 106:15 107:21 108:1 113:21 114:2 115:25 131:9 132:17 134:10 134:18

**Law-abiding** [1] 93:24

**Laws** [2] 108:14 121:10

**Lawyer** [4] 82:12 104:1 104:6 130:11

**Lawyering** [2] 16:11 40:23

**Lawyers** [6] 40:12 45:14 45:21 47:10 82:21 126:9

**Leading** [1] 67:17

**Leads** [1] 99:7

**Leanings** [1] 89:20

**Least** [4] 41:1 85:6 96:1 96:19

**Leastly** [1] 15:7

**Leave** [2] 25:1 117:16

**Leaves** [1] 136:24

**Led** [1] 81:15

**LEE** [1] 124:4

**Left** [1] 94:12

**Legal** [7] 7:12 33:24 33:25 34:3 34:3 34:24 38:4 38:5 54:13 65:7 65:23 134:23 147:24

**Legally** [1] 81:21

**Legislature** [7] 67:25 68:11 69:13 118:17 119:10 134:15 150:1

**Legislature's** [1] 70:9

**Legitimate** [4] 39:15 39:18 40:9 40:18

**Legitimately** [1] 44:9

**Less** [3] 19:13 36:7 81:11

**Lesser** [3] 35:23 78:5 78:6

**Letter** [1] 152:15

**Level** [4] 26:7 41:9 42:13 71:23

**Life** [136] 6:13 6:14 10:3 12:6 12:21 12:23 12:25 13:6 13:8 13:14 13:21 14:2 15:17 15:24 18:18 22:17 24:14 26:1 26:20 27:10 27:11 27:14 28:7 29:4 29:13 30:11 31:11 31:14 31:17 32:17 33:5 33:23 34:25 36:6 36:19 37:6 37:15 38:3 38:6 39:11 39:14 40:15 40:17 40:17 47:19 47:20

49:18 50:21 50:24 50:25 52:24 53:1 53:24 54:13 54:15 58:7 58:9 58:22 59:8 59:12 60:24 61:24 62:5 64:19 67:2 67:14 67:17 68:14 69:19 70:11 72:22 73:23 73:23 76:24 84:7 84:10 86:9 86:12 86:16 86:18 86:24 87:5 87:13 88:9 88:25 91:7 92:25 95:12 100:14 100:15 101:3 108:24 111:14 111:19 111:24 112:3 114:10 115:4 117:10 119:3 119:5 119:15 119:24 120:11 120:23 121:5 121:9 121:15 121:20 122:13 124:23 124:24 125:10 129:18 129:19 134:22 136:22 137:6 137:19 137:18 137:24 138:10 140:15 141:2 141:5 141:9 142:4 147:23 148:15 149:13 150:8 150:10 150:18

**Lifetime** [1] 14:17

**Likelihood** [2] 59:18 139:16

**Likely** [6] 20:7 20:7 55:16 55:16 105:5 134:6

**Likewise** [4] 15:21 18:2 22:22 43:12

**Limited** [1] 20:25

**Limits** [1] 103:14

**Line** [5] 62:5 99:7 105:19 134:15 153:2

**Lines** [1] 117:5

**List** [1] 76:10

**Listen** [5] 45:20 61:7 71:22 83:20 89:21 118:21 147:21

**Listened** [1] 118:5

**Listening** [3] 7:22 15:9 71:8

**Live** [8] 22:3 44:10 66:10 66:14 67:1 109:16 109:18 140:15

**Lives** [4] 5:24 83:17 109:17 117:4

**Living** [1] 32:19

**Look** [16] 29:19 53:16 56:10 59:22 60:8 63:10 83:3 111:21 120:7 128:5 135:24 136:4 136:16 138:14 148:16 150:18

**Looked** [7] 79:25 80:1 85:15 85:16 85:16 85:17 141:18

**Looking** [10] 29:22 53:9 53:21 57:17 59:19 59:20 60:3 72:17 136:12 142:19

**Lookout** [1] 58:1

**Lord** [2] 90:18 93:19

**Lords** [1] 90:14

**Lose** [1] 22:14

**Lost** [1] 26:12

**Loudly** [1] 101:9

**Louisiana** [4] 109:2 109:3 109:6 110:15

**Love** [2] 37:14 38:9

**Loved** [7] 61:21 61:22 85:24 86:5 86:7 86:8 86:11

**Lover** [3] 78:14 79:1 79:2

**Loving** [1] 141:23

**Luck** [1] 126:14

**Lydia** [1] 3:7

**Lyn** [6] 2:2 4:13 48:19 75:3 101:19 131:4

**Lynn** [1] 147:3

## M

**Ma'am** [1] 114:14

**Machine** [2] 1:23 37:20

**Maintain** [1] 133:12

**Major** [3] 34:8 71:18 87:2

**Makeup** [1] 27:5

**Mamou** [1] 1:5 3:19 4:10

4:10 72:13 89:10 92:15 92:19 114:21 122:24 123:23 127:12 127:15 139:13 144:9 153:10 154:20

**Man** [6] 78:17 78:19 95:25 106:22 133:17 133:18

**Manager** [1] 109:21

**Mandatory** [2] 90:2 90:14

**Married** [1] 37:13

**MARY** [1] 99:15

**Master** [1] 93:19

**Master's** [1] 93:14

**Matter** [14] 5:11 11:12 11:12 11:13 12:8 12:9 12:9 29:24 47:21 73:24 100:16 113:17 129:20 140:10

**Maturity** [1] 26:7

**McClellan** [47] 2:2 3:9 3:10 3:13 4:13 9:21 9:23 48:16 48:18 48:19 61:15 65:12 72:6 74:22 74:24 74:25 75:2 75:3 84:11 88:19 89:12 92:1 96:4 101:15 101:16 101:18 101:19 112:18 113:18 114:22 116:23 123:15 123:16 126:25 127:3 127:4 130:23 130:24 131:1 131:4 146:18 146:19 147:2 147:3 152:21 152:24 153:5

**McClellan's** [1] 140:25

**McNeese** [1] 110:15

**Mean** [24] 19:6 19:7 19:9 19:11 19:13 19:15 23:5 24:5 25:14 25:15 26:1 28:22 47:5 50:22 51:4 53:2 55:15 55:15 63:21 65:6 65:16 65:19 67:3 67:9 70:22 71:7 72:3 74:15 76:2 82:23 84:11 94:7 104:12 126:1 126:2 131:17 133:2 134:23 137:2 140:5 144:3 151:10

**Meaning** [1] 142:7

**Means** [37] 9:6 9:7 9:8 9:10 9:19 17:20 18:6 18:12 19:9 19:13 20:6 20:8 20:10 20:24:1 24:22 25:6 28:24 42:21 42:23 46:4 52:24 53:1 55:16 56:21 61:10 65:18 70:13 94:22 95:17 96:16 121:10 121:15 126:6 137:7 147:25 148:12

**Meant** [2] 63:15 117:9

**Mechanics** [1] 13:10

**Medical** [1] 22:23

**Meet** [1] 94:13

**Member** [1] 150:2

**Members** [5] 22:7 61:2 65:3 107:16 141:20

**Memorize** [1] 10:11

**Memory** [1] 10:4

**Men** [1] 93:16

**Mental** [26] 26:15 26:17 26:18 54:25 60:12 63:25 113:19

**Mentally** [1] 113:21

**Mentioned** [3] 16:3 87:10 98:20

**Merit** [1] 58:24

**Message** [1] 15:5

**Messenger** [1] 15:6

**Metaphors** [1] 71:8

**Method** [1] 68:15

**Meting** [1] 68:15

**MICHAEL** [1] 124:4

**Middle** [1] 143:3

**Might** [64] 14:12 14:14 14:16 14:22 14:23 14:24 15:1 24:16 24:16 25:14 25:15 26:2 26:3 26:9 26:10 26:14 26:16 26:17 26:21 26:22 26:25 27:3 27:4 27:5 27:13 27:13 27:16 27:22 27:23 31:2 33:1 35:23 37:4 37:5 37:12 39:6 40:1 40:18 44:12 44:13

47:10 49:18 52:16 53:4 56:18 59:4 63:10 70:16 73:18 73:25 76:24 89:1 89:23 91:6 92:3 100:9 101:23 108:11 124:18 128:15 138:8 145:7 145:17

**Mike** [1] 127:2

**Mind** [30] 10:15 14:24 30:19 30:21 35:4 37:5 40:10 50:12 54:8 58:12 60:21 63:17 64:2 71:2 72:16 76:19 79:18 83:8 86:14 112:2 112:3 118:9 124:14 133:5 136:7 136:20 138:11 143:23 143:24 144:5

**Mind-set** [3] 62:2 62:6 86:9

**Minds** [1] 136:5

**Mindset** [1] 86:2

**Mine** [4] 28:12 29:16 103:17 115:24

**Minimum** [1] 59:14

**Minute** [1] 59:14

**Minutes** [6] 4:4 4:15 16:2 62:13 63:5 69:6

**Mischief** [4] 103:9 103:15 103:21 118:8

**Misconception** [1] 42:20

**Misdemeanor** [2] 82:2 82:5

**Misery** [1] 37:22

**Miss** [21] 3:11 4:14 9:21 9:23 46:16 46:25 48:19 62:9 63:3 63:7 69:10 72:13 99:19 100:7 101:19 114:20 118:7 120:20 122:25 123:17 127:5

**Missed** [1] 125:9

**Missing** [1] 55:22

**Mistakes** [1] 94:16

**Mistrial** [1] 9:9

**Mitigates** [1] 59:11

**Mitigating** [31] 12:5 25:8 25:13 25:16 25:23 26:4 26:9 26:11 26:17 26:25 27:13 27:22 27:25 28:2 53:22 58:5 59:7 59:15 59:23 60:5 60:14 65:12 65:16 66:1 95:10 137:23 137:25 138:7 138:17 149:8 149:18

**Mitigation** [6] 76:5 95:13 95:14 95:17 96:13 138:15

**Mom** [2] 142:23 143:19

**Moment** [6] 51:10 56:16 69:13 92:9 115:3 122:24

**Monday** [9] 16:24 46:17 73:10 99:20 99:22 125:21 129:11

**Money** [2] 41:20 94:23

**Month** [4] 31:21 31:21 81:23 82:25

**Months** [1] 81:7

**Moon** [1] 45:6

**Moral** [6] 6:15 11:23 57:22

**Morality** [1] 38:1

**Morning** [13] 4:2 8:11 22:13 46:19 46:20 73:11 73:12 74:3 124:10 124:11 144:25 145:1 146:4

**Most** [12] 15:18 15:22 37:9 52:19 62:18 68:16 94:6 94:8 94:9 129:24 141:20 143:10

**Mother** [2] 94:11 143:5

**Motive** [1] 5:19

**Move** [2] 29:21 109:10

**Moved** [4] 90:8 109:9 109:12 109:12

**Movie** [1] 106:22

**Mugging** [1] 107:4

**Multiple** [2] 6:18 105:11

**Murder** [142] 4:18 5:10 6:21 8:12 8:22 8:25 10:17 10:19 10:23 13:23 18:18 23:20 26:5 28:14 28:16 28:21 29:2 29:8 30:8 30:23 31:11 31:16

32:18 33:20 33:22 34:4 34:4
34:4 34:6 34:7 34:11 34:13
34:14 34:15 34:16 34:16 34:
18 34:20 34:22 35:2 35:5 35:
5 35:8 35:11 35:16 35:20 35:
22 35:22 36:1 36:2 36:3 36:
4 37:4 37:5 38:2 38:22 39:2
39:3 39:21 39:22 39:23 40:
15 48:6 49:11 52:15 52:23
54:7 54:12 54:20 55:17 55:
19 55:19 60:16 61:4 61:22
61:23 62:5 65:13 65:25 66:8
66:10 68:13 69:15 69:16 69:
18 75:13 77:20 78:4 80:13
80:25 83:2 84:18 85:2 85:3
85:25 86:1 86:6 86:7 87:18
91:5 91:6 91:9 91:15 92:20
93:1 95:10 96:8 96:17 96:18
96:22 105:13 105:13 105:14
105:15 105:15 105:17 110:20
110:20 117:1 118:19 118:23
119:13 119:14 120:2 131:17
134:11 134:12 134:12 134:21
135:1 135:5 135:18 136:9
137:8 146:7 147:23 148:3
148:6 149:20 150:6 150:8
150:17

**Murders** [6] 20:23 21:8 21:
9 21:9 59:17 105:15

**Must** [16] 8:18 9:14 12:15
12:20 19:9 19:13 21:20 21:
22 23:17 34:6 34:18 41:5 41:
6 48:12 48:13 141:22

## N

**Name** [10] 48:19 75:3 89:9
101:19 103:25 114:20 131:4
139:12 141:19 147:3

**Nature** [4] 25:8 55:25 93:
1 111:1

**Navy** [1] 110:8

**Near** [1] 143:7

**Necessarily** [11] 18:16
23:17 23:19 23:23 42:23 46:
3 53:5 67:3 74:5 134:2 142:
16

**Necessary** [3] 84:2 107:
23 131:13

**Need** [11] 49:2 49:3 49:4
62:9 62:15 62:18 66:25 83:6
95:12 125:18 126:24

**Needed** [1] 142:11

**Nefarious** [1] 9:16

**Negative** [9] 63:19 64:4
64:6 64:12 64:13 64:17 64:
19 64:22 67:10

**Negatively** [1] 100:11

**Neglected** [1] 140:19

**Neglectful** [1] 140:2

**Neighbor** [1] 69:7

**Neighborhood** [1] 55:1

**Neighbors** [2] 22:6 103:18

**Nelson** [10] 151:25 152:3
152:11 152:12 152:14 152:16
152:18 152:19 153:3 153:13

**Nelson's** [1] 152:17

**Nervous** [1] 46:23

**Never** [25] 6:25 8:3 9:5
10:2 11:14 12:10 14:6 14:6
14:17 14:13 23:21 23:25 24:
25 27:20 36:19 47:14 51:9
87:8 98:4 98:6 98:12 98:14
106:7 108:25 139:21

**Nevertheless** [1] 123:14

**New** [3] 103:14 115:5 115:6

**News** [6] 37:7 91:23 133:7
133:25 134:1 134:3

**Newspaper** [1] 92:12

**Next** [7] 4:10 10:1 29:21
29:25 30:3 132:6 146:12

**Night** [5] 37:6 78:15 79:
11 97:19 151:11

**Nightmare** [1] 71:25

**Nine** [2] 36:7 107:7

**Ninety** [1] 36:7

**Ninety-nine** [1] 36:7

**Nobody** [7] 42:5 42:15 42:
23 43:23 44:2 107:12

**Nobody's** [1] 25:9

**Noncircumstantial** [1]
81:22

**None** [3] 48:6 73:15 114:13

**Notch** [1] 18:11

**Nothing** [12] 7:21 43:23
47:19 47:19 47:20 48:9 48:
11 67:10 74:14 83:10 124:14
131:19

**Notice** [1] 139:21

**Notion** [2] 30:21 125:15

**Notions** [2] 31:13 37:10

**November** [1] 109:9

**Nowhere** [1] 117:24

**Number** [47] 7:11 11:7 11:
18 18:19 23:24 24:1 28:25
29:9 30:9 30:9 30:10 30:16
30:25 36:6 43:9 43:12 56:25
57:15 57:15 59:11 59:14 61:
5 61:5 63:11 65:9 75:23 75:
24 76:2 76:21 77:3 95:8 96:
22 97:6 121:13 111:17 119:4
123:12 135:12 135:23 136:11
136:24 137:21 147:8 148:13
151:23 151:24 152:2

**Numbered** [2] 1:20 154:6

**Numbers** [1] 75:21

**Nurses** [1] 22:23

## O

**O'clock** [1] 22:13

**Oaks** [1] 151:15

**Obligated** [1] 129:1

**Obtain** [1] 34:17

**Obviously** [12] 4:24 25:
18 25:20 40:11 44:5 82:24
98:25 114:22 114:25 117:2
125:9 141:22

**Occur** [6] 8:18 9:13 19:10
19:11 33:1 35:9

**Occurred** [6] 4:18 65:24
83:17 115:4 119:1 154:7

**Occurrences** [1] 143:10

**Occurs** [1] 27:7

**October** [5] 125:12 125:21
126:15 129:11 129:15

**Offended** [3] 70:5 70:5
95:23

**Offense** [16] 4:17 5:15 6:
18 6:19 11:20 27:7 35:24 35:
24 35:25 35:25 36:1 57:18
57:20 78:5 86:1 91:9

**Offenses** [1] 133:12

**Offered** [1] 66:1

**Office** [2] 82:24 82:25

**Officer** [5] 54:5 105:19
133:18 133:19 134:15

**Officer's** [1] 54:4

**Official** [3] 154:3 154:
12 154:17

**Official/Deputy** [1]
154:3

**Often** [6] 52:18 52:18 132:
22 133:1 133:3 134:1

**Oftentimes** [2] 22:5 37:4

**Oil** [1] 109:23

**Old** [6] 30:6 53:10 53:12
53:15 75:20 110:6

**Older** [1] 93:23 114:3

**Once** [2] 29:20 33:4

**One** [127] 5:19 11:7 13:14
13:15 14:12 18:19 21:7 22:4
23:24 23:25 25:14 27:6 29:9
29:25 30:3 30:9 30:24 31:5
31:9 31:11 34:10 34:20 35:
12 36:18 36:19 37:24 40:22

41:2 41:14 42:16 43:7 45:8
46:9 47:9 51:3 53:17 55:9
56:25 57:2 57:15 61:5 61:15
61:18 61:21 61:22 65:9 68:
1 70:2 70:11 70:21 72:19 75:
24 83:4 85:24 86:5 86:7 86:
10 86:11 86:15 87:1 88:14
88:20 89:21 90:8 93:22 93:16
93:16 93:21 94:4 95:7 95:21
96:22 97:3 97:6 103:17 105:
3 105:5 105:6 105:6 109:15
110:6 111:17 115:2 116:7
116:15 116:19 117:14 117:20
118:3 118:14 119:11 119:11
119:18 120:6 121:2 125:3
133:7 134:14 135:12 137:14
139:17 139:24 140:3 143:5
143:20 145:20 145:21 148:7
149:7 149:14 149:16 150:5
151:1 151:10

**One's** [1] 86:8

**One-on-one** [1] 93:16

**Open** [11] 30:21 31:5 40:8
45:23 50:4 59:2 88:4 89:23
101:1 138:14 154:7

**Open-minded** [1] 49:21

**Operation** [1] 152:13

**Opinion** [9] 49:23 75:15
82:14 96:23 104:11 131:10
147:7 147:11 147:14

**Opinions** [4] 48:23 59:20
60:10 60:17

**Opportunity** [12] 24:10
16:13 38:12 70:7 72:9 85:10
86:25 89:11 96:2 97:7 120:
10 148:16

**Opposed** [11] 30:12 53:24
58:7 59:8 60:24 111:15 111:
19 111:24 134:8 136:2 136:15

**Opposes** [1] 108:20

**Option** [22] 12:15 12:20
35:20 35:21 35:21 35:21 39:
15 40:9 40:18 50:24 51:1 52:
20 52:21 53:9 53:10 58:8 58:
18 58:20 106:25 119:11 119:
22 137:5

**Options** [6] 52:22 68:2 68:
12 118:18 119:3 140:3

**Order** [11] 12:19 12:22 13:
2 14:6 18:3 20:15 34:17 57:
6 106:11 110:18 132:14

**Ordering** [5] 51:20 77:11
106:11 132:14 147:17

**Ordinarily** [2] 22:7 59:13

**Origin** [1] 96:12

**Originally** [1] 84:4

**Otherwise** [1] 70:8

**Ought** [25] 38:6 45:25 51:
7 61:11 76:7 86:12 88:22
105:23 106:1 108:1 111:24
112:7 112:11 114:3 114:7
125:16 131:22 133:6 137:1
137:2 137:19 148:14 148:17
148:18 148:19

**Ourselves** [4] 10:16 34:
25 125:22 142:22

**Outcome** [2] 94:8 94:10

**Outcomes** [1] 35:9

**Outlined** [1] 147:16

**Outset** [1] 89:14

**Outside** [3] 22:18 71:10
91:15

**Overcome** [3] 17:13 17:13
140:2

**Overview** [1] 23:17

**Own** [18] 6:16 27:3 27:3 27:
3 27:10 49:24 75:15 84:7 84:
10 92:21 94:12 94:21 116:4
118:3 130:1 131:9 147:6 149:
12

## P

**Page** [2] 63:11 65:10

**Pages** [1] 7:11

**Paid** [2] 125:4 154:11

**Pamela** [2] 152:3 154:16

**Panel** [4] 4:1 9:7 129:4
152:14

**Panelist** [3] 151:24 152:
2 152:2

**Panicked** [1] 67:19

**Paper** [1] 67:11

**Paraphrasing** [1] 28:19

**Pardoned** [1] 87:12

**Pardons** [5] 32:7 32:7 32:
9 32:13 87:9

**Parent** [1] 93:25

**Parenting** [1] 55:1

**Parents** [4] 93:13 94:2
109:11 109:18

**Parking** [1] 151:3

**Parole** [6] 31:18 31:25
121:7 121:15 122:1 137:10

**Paroled** [2] 32:1 32:23 33:
5

**Paroles** [5] 32:7 32:8 32:
9 32:14 87:9

**Parrish** [1] 123:13

**Part** [12] 4:21 6:18 11:25
22:22 66:15 68:5 72:4 93:13
97:2 97:24 131:13 132:4

**Participate** [8] 51:7 51:
22 77:7 77:13 106:8 106:13
132:10 132:14

**Particular** [16] 5:10 8:4
15:21 20:19 20:25 21:20 26:
16 26:20 27:4 31:1 37:4 37:
7 38:6 77:1 77:22 144:3

**Parties** [5] 3:2 5:19 123:
11 154:6 154:9

**Parts** [1] 4:21

**Party** [4] 81:16 81:20 97:
19 97:20

**Pass** [5] 62:19 89:4 91:17
114:15 139:6

**Past** [6] 6:8 29:8 56:9 57:
6 57:10 67:2

**Path** [1] 53:17

**Patricia** [1] 3:6

**Peculiar** [1] 16:11

**Peer** [1] 94:18

**Pen** [1] 87:14

**Penalties** [1] 90:14

**Penalty** [85] 15:20 24:3
28:23 33:9 49:10 49:23 50:8
50:9 50:13 52:3 52:13 52:6
52:17 52:25 53:13 58:15 59:
2 61:1 61:6 61:10 65:15 70:
14 70:17 70:19 75:16 75:25
76:12 76:16 76:19 76:25 77:
5 84:2 86:6 86:17 86:19 87:
7 88:5 90:1 90:2 90:18 91:3
91:13 101:2 104:12 104:17
104:20 105:2 105:10 105:21
106:5 106:18 106:19 107:2
108:20 114:5 116:24 119:13
120:7 120:12 121:6 121:16
128:22 128:25 131:10 132:1
132:7 132:21 133:1 133:6
133:12 134:9 134:11 134:17
136:22 137:1 137:6 137:16
138:4 138:22 141:15 147:7
148:13 148:20 148:24 150:20

**Pending** [1] 81:3

**Penitentiary** [9] 22:9
22:12 22:21 32:21 36:6 39:
11 40:5 50:22 52:24

**People** [81] 6:21 14:16 14:
18 22:6 22:8 22:21 23:5 26:
4 26:14 31:13 36:17 36:21
41:1 41:2 41:3 43:16 45:19
51:13 51:15 51:16 59:15 59:

19 60:5 60:6 60:8 60:14 60:
16 64:20 65:18 66:4 66:12
68:21 69:11 70:11 71:12 71:
15 71:20 77:4 77:6 83:14 84:
3 86:10 89:22 90:10 91:11
92:5 95:7 96:1 97:18 99:5
102:25 105:2 105:6 105:9
105:9 106:4 106:4 106:7 108:
15 113:5 113:19 113:20 113:
20 117:3 117:13 117:15 117:
18 118:18 122:9 132:5 132:6
132:9 134:14 137:11 139:20
139:22 140:18 141:19 144:10
150:5 150:7
**Perfectly** [2] 27:17 44:9
**Perform** [1] 27:21
**Perhaps** [11] 9:3 10:14 43:
1 91:13 94:12 100:13 100:14
116:13 123:13 124:24 152:17
**Period** [1] 94:20
**Perished** [1] 27:12
**Permit** [2] 25:20 33:13
**Permitted** [2] 19:4 19:5
**Perot** [1] 126:3
**Perseverance** [1] 139:19
**Person** [126] 6:8 6:9 6:19
6:22 6:22 6:23 18:13 18:17
26:20 27:16 27:18 28:18 31:
10 32:5 34:15 36:3 36:4 36:
15 48:8 50:9 50:25 51:5 53:
10 53:14 53:24 54:11 55:17
55:24 56:2 56:19 56:23 57:7
57:12 57:24 58:7 58:10 58:
20 59:9 63:19 63:20 64:6 66:
9 66:13 68:3 68:7 68:12 69:
15 69:17 70:14 72:13 72:14
79:13 79:19 80:11 80:15 80:
16 80:18 80:21 84:7 84:10
84:12 84:16 85:1 86:8 86:11
87:4 89:1 90:16 91:7 91:8
94:2 94:4 94:14 94:20 94:25
95:5 96:17 96:19 96:21 99:2
100:20 105:5 105:6 105:7
108:1 110:19 120:23 111:7
111:14 111:17 111:19 111:23
112:6 113:1 116:24 117:4
117:21 117:22 118:1 118:4
119:1 120:2 120:4 120:10
120:25 121:20 131:16 131:20
134:21 134:22 135:4 135:18
136:1 136:14 137:8 137:17
137:23 140:14 147:22 147:24
148:2 148:8 148:12 148:19
150:16 150:17
**Person's** [12] 17:16 41:
14 43:10 43:14 45:8 54:13
66:2 74:6 90:9 111:2 113:18
120:9
**Personal** [14] 6:15 6:16
10:25 11:23 47:19 57:23 73:
22 90:22 91:19 93:17 100:14
124:23 129:19 152:8
**Personality** [1] 130:2
**Personally** [3] 58:2 65:
17 73:21
**Personnel** [1] 22:23
**Persons** [2] 21:6 21:11
**Perspective** [2] 92:10
115:1
**Phase** [25] 5:12 5:21 5:25
6:4 6:5 6:10 7:8 7:9 8:11 8:
13 8:14 8:22 9:1 9:2 10:22
10:24 17:15 17:24 18:2 39:24
68:10 119:23 128:21 129:1
149:19
**Phases** [1] 11:2
**Phone** [3] 2:9 2:16 2:21
**Phrase** [5] 16:22 17:19 24:
19 51:12 137:20
**Physical** [1] 27:5
**Pick** [3] 100:1 108:11 134:5
**Pickax** [1] 87:19
**Pickaxed** [1] 87:20
**Picked** [3] 79:13 126:7
134:8
**Piece** [2] 22:4 27:4

**Pigeonhole** [1] 89:17
**Pistol** [3] 44:7 44:7 44:8
**Place** [1] 86:15
**Placed** [2] 44:2 44:4
**Plain** [1] 150:14
**Planned** [1] 56:17
**Play** [12] 6:19 7:16 8:1 8:
17 8:21 9:13 10:6 13:5 23:
22 42:9 42:14 83:8
**Plead** [1] 9:18
**Pleaded** [1] 104:2
**Pleasant** [1] 83:18
**Pleased** [2] 132:4 139:3
**Plug** [1] 37:25
**Plus** [2] 134:11 135:10
**Point** [26] 8:5 8:5 9:10
10:5 27:24 29:18 29:21 32:
23 38:10 44:9 46:1 46:7 46:
21 47:1 71:19 73:16 100:7
124:12 124:16 128:13 129:8
129:21 129:25 139:15 145:5
151:9
**Points** [2] 29:17 148:4
**Police** [7] 103:18 103:19
105:19 115:7 115:13 115:16
134:15
**Political** [1] 32:15
**Pool** [2] 30:2 129:4
**Portions** [1] 154:5
**Posing** [1] 70:5
**Position** [2] 10:16 66:19
**Positive** [3] 65:1 67:9
67:14
**Positively** [1] 79:21
**Possessed** [1] 44:9
**Possession** [2] 102:9 102:
11
**Possibility** [4] 19:10 19:
23 20:11 55:15
**Possible** [9] 11:15 12:10
20:3 35:8 45:23 49:21 66:21
128:22 128:25
**Possibly** [13] 9:4 19:10
19:11 24:3 53:15 62:17 70:
13 77:19 93:2 97:2 108:25
122:14 130:5
**Potentially** [1] 144:4
**Prays** [1] 37:22
**Precise** [1] 15:1
**Preferred** [1] 102:16
**Premises** [1] 21:15
**Preparation** [1] 154:11
**Preposterous** [1] 22:20
**Present** [6] 4:13 20:24 45:
21 92:8 97:19 100:13
**Presented** [9] 5:3 7:17
85:6 112:12 112:17 113:15
119:22 120:3 130:16
**Presenting** [1] 83:3
**Presently** [1] 145:17
**Presiding** [1] 1:21
**Pressure** [2] 94:18 143:9
**Presumed** [3] 7:4 18:17
18:19
**Presumption** [8] 9:22 9:
24 17:8 17:11 17:12 17:17
17:17 18:20
**Pretty** [9] 8:13 47:8 53:
10 66:17 73:8 78:25 133:15
143:16 151:8
**Prevalent** [1] 133:25
**Prevent** [2] 107:15 125:10
**Previous** [2] 74:18 99:23
**Previously** [2] 78:16 131:
20
**Primarily** [1] 109:11
**Principle** [1] 40:25
**Print's** [1] 42:6

**Prints** [1] 44:7
**Prison** [9] 22:24 32:3 69:
19 87:16 93:8 93:12 119:3
119:25 150:9
**Prisoners** [1] 23:4
**Pro** [2] 89:17 89:17
**Probabilities** [2] 126:
10 126:11
**Probability** [28] 11:9 19:
1 19:2 19:5 19:6 19:8 19:12
19:16 19:19 20:6 20:6 20:10
20:14 20:18 20:22 50:17 55:
11 55:14 56:2 57:13 85:7 94:
19 96:20 111:7 120:4 135:14
135:17 148:8
**Probable** [1] 94:8
**Probated** [1] 78:9
**Probation** [2] 98:22 98:23
**Problem** [9] 60:1 60:18 90:
11 90:13 108:10 112:4 122:
12 127:25 137:4
**Proceedings** [5] 1:19 1:
22 129:1 154:5 154:9
**Process** [29] 14:5 37:8 51:
17 51:23 60:19 69:9 71:2 71:
7 71:24 74:19 75:10 77:8 77:
14 83:9 84:8 94:14 98:20 99:
3 106:8 106:14 119:5 122:19
122:20 128:18 132:11 132:17
146:14 147:17 150:21
**Processes** [1] 26:6
**Professional** [4] 47:20
73:23 100:15 124:24
**Projecting** [1] 72:25
**Proof** [1] 21:1
**Proper** [8] 58:20 88:5 104:
21 106:6 111:22 114:6 114:8
128:23
**Proper-type** [1] 104:21
**Property** [5] 21:6 21:12
21:14 21:18 118:8
**Proponent** [1] 132:1
**Proposition** [2] 140:4
140:12
**Prosecuted** [1] 107:8
**Prosecuting** [2] 82:24 82:
25
**Prosecution** [1] 130:10
**Prosecutor's** [1] 114:23
**Prosecutors** [2] 82:15 82:
20
**Prospect** [1] 49:17
**Prospective** [6] 71:17 89:
16 99:14 123:9 129:2 139:25
**Protect** [4] 23:4 107:24
107:25 108:6
**Prove** [24] 17:16 17:21 18:
4 20:1 20:21 21:2 21:20 24:
22 24:25 25:2 25:4 34:18 35:
6 35:11 35:15 35:16 43:14
44:2 44:3 53:19 61:2 110:18
110:20 135:2
**Proved** [6] 10:19 34:12
106:24 134:20 135:17 148:6
**Proves** [5] 7:6 17:9 17:25
18:8 43:10
**Proving** [1] 122:12
**Provisory** [1] 152:2
**Pull** [2] 41:18 140:20
**Pulled** [2] 37:25 57:25
**Punch** [1] 22:17
**Punished** [3] 36:5 76:7
125:17
**Punishment** [54] 5:9 36:2
36:12 36:13 36:25 38:12 39:
8 39:10 39:24 40:2 40:4 40:
14 50:10 50:14 51:14 52:7
54:22 55:4 57:22 66:8 67:7
68:15 69:16 69:18 74:7 74:
11 75:13 75:14 77:25 77:25
78:7 87:22 96:9 102:13 104:
21 106:6 111:22 112:22 113:

1 118:25 128:22 128:23 128:
25 132:8 133:6 135:6 136:3
136:15 137:4 137:6 138:1
149:19 150:6 150:8
**Punishments** [1] 31:11
**Purposes** [5] 5:4 7:13 11:
2 12:3 13:18 23:13 29:23
129:9 151:22
**Push** [1] 70:18
**Put** [13] 8:7 10:16 25:9 28:
11 44:7 49:23 52:16 62:17
64:24 65:9 69:12 119:21 150:
14
**Puts** [2] 28:1 136:3
**Putting** [2] 29:11 61:12

**Q**

**Qualified** [3] 91:16 132:
22 132:23
**Quality** [3] 17:14 17:15
43:9
**Qualms** [1] 132:19
**Quarrel** [3] 31:3 42:11 45:
12
**Queen** [1] 109:21
**Questionable** [1] 81:6
**Questioned** [2] 72:3 151:
25
**Questioning** [1] 121:14
**Questionnaire** [21] 48:
25 49:2 49:7 63:8 70:24 75:
6 76:10 86:15 89:25 101:21
108:18 122:5 125:6 125:7
131:6 134:5 139:23 141:19
143:25 150:24 151:2
**Questionnaires** [1] 89:20
**Questions** [108] 5:5 5:7
5:8 7:1 11:3 11:5 12:18 13:
18 13:20 13:24 14:2 14:5 14:
5 14:7 15:19 15:25 16:1 16:
3 16:19 17:23 18:15 18:23
20:13 23:9 23:21 28:10 28:
10 29:7 30:5 31:4 31:16 32:
24 33:8 33:15 33:15 40:20
40:21 45:17 46:5 46:21 48:1
48:25 49:1 51:7 51:19 55:9
63:9 63:13 65:9 70:20 71:22
72:20 73:13 74:9 74:10 74:
18 74:23 77:10 88:22 89:11
90:3 90:5 90:8 92:2 93:21
96:5 98:24 99:7 99:10 100:5
100:23 101:2 101:11 106:10
110:16 110:21 114:22 114:23
116:23 120:2 121:2 122:10
122:15 122:18 122:18 124:12
128:9 130:19 131:7 131:22
132:12 132:13 133:16 138:16
138:18 139:25 141:1 141:11
141:4 144:1 145:2 146:9 146:
15 147:6 149:7 149:10 149:
16 151:10
**Quickly** [1] 78:22
**Quite** [3] 60:12 106:3 128:
11

**R**

**Raised** [7] 7:16 8:4 67:12
94:5 94:10 108:21 140:15
**Raising** [2] 67:16 142:2
**Ranch** [1] 143:6
**Random** [1] 151:9
**Range** [3] 36:11 38:11 40:
14 40:15
**Rape** [5] 79:6 79:7 80:7 80:
9 80:23
**Rapes** [1] 21:9
**Rare** [1] 137:15
**Rate** [1] 37:7
**Rather** [1] 120:11
**Rational** [1] 83:8
**Reach** [6] 8:9 30:15 39:13
40:7 126:19 130:4
**Reached** [2] 77:24 102:12

**Reaches** [1] 54:21

**React** [1] 66:4

**Reactions** [1] 82:16

**Reacts** [1] 15:13

**Read** [12] 11:6 13:23 27:3 63:12 63:12 89:19 89:24 91:23 92:12 121:12 143:25 149:14

**Ready** [2] 9:17 62:13

**Real** [4] 70:12 99:2 113:20 152:15

**Reality** [1] 108:24

**Realize** [2] 71:17 94:8

**Realized** [1] 71:16

**Really** [19] 24:5 43:18 46:22 46:24 51:10 81:21 89:16 109:11 111:24 115:21 116:7 122:12 133:11 138:2 138:3 141:5 145:12 147:11 147:13

**Realm** [1] 84:9

**Reason** [45] 4:5 10:3 10:11 24:13 25:25 28:2 28:5 28:5 28:9 29:4 30:11 30:22 34:24 36:12 47:7 47:8 53:23 58:16 60:23 61:6 61:11 61:14 61:15 61:16 61:18 65:21 72:7 72:8 72:12 76:7 92:17 111:15 111:18 121:9 123:5 135:25 136:10 136:13 138:20 144:8 147:20 148:14 148:17 148:22 149:2

**Reasonable** [40] 7:6 10:20 11:9 16:23 16:24 17:3 17:9 17:16 17:20 17:25 18:4 18:8 18:12 18:14 18:22 18:25 19:17 20:5 20:17 20:21 24:21 28:16 28:17 34:12 34:19 41:14 43:11 43:15 44:15 44:22 45:12 53:20 54:18 55:10 85:1 110:19 118:22 134:20 135:2 135:13

**Reasoning** [2] 53:17 63:25

**Reasons** [11] 3:5 50:6 58:16 59:7 65:18 111:14 111:18 123:14 135:25 136:11 148:14

**Receive** [18] 18:18 31:11 55:5 58:7 58:15 59:1 65:15 86:12 98:19 98:22 111:14 111:17 111:19 121:20 136:2 136:10 137:13 148:13

**Received** [4] 52:5 78:7 98:23 102:17

**Receives** [1] 148:19

**Recent** [1] 54:7

**Recently** [1] 43:19

**Recognize** [2] 46:17 152:11

**Recognizes** [1] 25:6

**Recognizing** [1] 140:13

**Recommendations** [4] 32:4 32:6 32:10 32:13

**Record** [8] 1:1 133:12 151:23 151:23 152:3 154:6 154:8 154:11

**Reduce** [1] 25:25

**Reduced** [1] 95:18

**Reevaluate** [2] 57:16 58:8

**Reeves** [5] 144:16 144:22 145:24 147:3 149:7

**Refer** [3] 57:23 58:6 63:10

**Reflects** [2] 152:3 154:9

**Reform** [1] 106:25

**Refuse** [3] 39:14 42:13 44:25

**Regain** [1] 22:18

**Regard** [2] 86:20 96:13

**Regarding** [5] 69:14 83:19 97:16 116:24 152:6

**Regardless** [1] 115:23

**Registered** [1] 103:24

**Regular** [1] 75:14

**Rehabilitate** [1] 87:5

**Rehabilitated** [2] 87:14 89:1

**Rehabilitation** [4] 23:2 86:21 86:25 88:9

**Reject** [2] 32:9 32:14

**Relate** [1] 88:21

**Related** [1] 61:25

**Relates** [1] 31:7

**Relating** [3] 39:5 39:24 82:19

**Relationship** [1] 5:18

**Relative** [1] 62:4

**Relax** [1] 48:21

**Religion** [4] 108:19 108:19 108:21 108:23

**Rely** [2] 108:2 135:10

**Relying** [1] 107:16

**Remains** [1] 18:20

**Remarkably** [2] 29:6 36:4

**Remember** [14] 7:18 46:16 59:8 59:9 65:21 77:21 77:25 79:4 99:19 99:24 102:21 102:23 124:8 144:23

**Remembering** [2] 73:10 96:5

**Remind** [1] 4:8

**Remorse** [1] 56:23

**Repeat** [1] 50:16

**Repeating** [1] 50:15

**Replace** [1] 24:14

**Replacing** [1] 28:7

**Reported** [1] 1:22 154:7

**Reporter** [2] 154:3 154:17

**Reporter's** [4] 1:1 154:6 154:8 154:11

**Represent** [9] 48:20 75:4 89:10 92:19 101:20 114:21 131:5 139:13 147:4

**Representatives** [1] 150:2

**Represented** [1] 4:12

**Request** [5] 3:21 123:25 127:14 152:18 153:11

**Requested** [1] 154:5

**Require** [4] 21:14 28:3 35:18 35:19

**Required** [9] 19:22 20:21 21:1 24:22 24:25 25:2 25:4 25:9 35:6

**Requirement** [2] 25:10 27:25

**Reschedule** [1] 16:13

**Research** [1] 25:11

**Reserved** [1] 137:2

**Resolve** [1] 137:24

**Resort** [5] 53:14 131:11 131:15 131:24 137:1

**Respect** [2] 72:18 141:20

**Respective** [1] 154:9

**Respond** [1] 72:9

**Responded** [1] 141:2

**Response** [5] 58:10 58:20 85:20 90:3 91:25

**Responsibility** [6] 6:16 11:24 57:23 67:1 75:9 95:24

**Responsible** [19] 58:2 67:4 67:23 68:3 68:7 68:12 70:13 93:24 112:8 113:6 113:10 113:23 114:4 116:1 116:14 116:18 116:25 140:7 140:11

**Rest** [2] 26:20 32:19

**Restate** [1] 92:16

**Restrictive** [1] 91:14

**Result** [18] 17:18 27:19 34:1 34:2 39:13 40:7 48:7 51:20 61:10 77:11 85:22 122:16 126:19 130:4 131:23 136:

22 137:19 147:17

**Resulted** [3] 51:8 78:20 86:24

**Results** [3] 88:24 138:16 138:18

**Retaliates** [1] 52:11

**Retardation** [5] 26:15 26:17 26:18 26:23 26:23

**Retarded** [1] 113:21

**Retire** [1] 46:8

**Retreat** [1] 107:25

**Returned** [2] 24:2 110:14

**Returning** [1] 139:16

**Revenge** [1] 38:8

**Reverse** [1] 39:20

**Review** [2] 12:2 13:17

**Reviewed** [1] 150:23

**Risen** [1] 26:7

**Rises** [1] 41:8

**Risk** [3] 27:10 33:3 93:13

**River** [1] 151:15

**Road** [2] 60:8 98:5

**Roam** [1] 36:24

**Rob** [3] 41:18 105:1 117:14

**Robbed** [2] 113:2 113:5

**Robberies** [1] 21:9

**Robbery** [3] 55:21 105:14 134:13

**Robert** [1] 3:7

**Robs** [2] 41:19 107:18

**Rock** [1] 143:6

**ROGER** [1] 73:3

**Roll** [1] 37:6

**Roller** [1] 81:7

**Room** [4] 10:9 33:4 36:24 122:11

**Rooms** [1] 15:12

**Ross** [1] 126:3

**Roughly** [3] 126:6 145:11 145:20

**Route** [1] 141:14

**Row** [3] 87:4 104:19 150:14

**Rule** [5] 33:2 33:11 33:14 44:19 140:13

**Ruled** [1] 81:21

**Rules** [2] 7:15 10:6

**Run** [2] 33:3 118:9

**Runs** [2] 27:10 129:12

**S**

**Safety** [1] 107:25

**Sale** [2] 102:10 107:15

**San** [1] 154:18

**Sat** [3] 84:24 85:8 99:1

**Satisfaction** [1] 122:21

**Satisfied** [9] 3:11 3:16 28:15 28:17 44:22 125:21 129:12 130:12 130:14

**Save** [1] 27:11

**Saw** [5] 37:6 42:21 42:24 44:11 106:23

**SBOT** [4] 2:3 2:5 2:13 2:18

**Scale** [2] 36:25 91:17

**Scare** [2] 78:18 78:25

**Scenario** [1] 72:23

**Scene** [1] 6:25

**Schedule** [1] 129:17

**School** [3] 93:11 110:14 143:4

**Schools** [2] 108:22 110:13

**Schoolteacher** [1] 22:11

**Scott** [1] 82:13

**Screamed** [1] 78:21

**Screen** [2] 78:19 78:23

**Screwed** [1] 27:19

**Season** [1] 151:17

**Seated** [2] 4:1 4:10

**Seats** [1] 28:12

**Second** [46] 5:2 5:6 5:25 6:5 6:10 8:11 8:13 9:1 9:2 10:22 10:24 11:25 12:1 12:14 12:24 13:4 13:7 13:9 14:4 18:2 19:1 23:11 23:15 23:16 23:18 24:4 24:10 24:19 24:23 25:3 25:5 25:10 28:11 29:8 33:21 38:21 41:23 48:12 68:10 69:17 76:14 96:12 97:2 118:24 122:11 135:5

**Secondly** [1] 23:23

**See** [42] 8:20 11:12 11:25 12:22 13:11 14:20 17:19 19:21 24:19 25:11 28:4 28:13 29:1 45:7 48:4 49:10 62:16 64:24 70:1 70:3 70:19 72:22 74:3 83:12 83:21 87:6 93:16 97:1 97:4 102:2 114:24 118:3 121:14 130:8 136:12 136:16 139:22 140:23 146:4 148:16 149:2 149:14

**Seeking** [5] 61:1 86:6 130:3 138:22 148:24

**Seem** [3] 67:13 99:1 132:3

**Sees** [2] 27:9 90:2

**Seldom** [3] 52:18 132:22 133:1

**Select** [1] 71:12

**Self** [4] 34:23 54:14 65:22 134:24

**Self-defense** [7] 34:23 34:24 54:14 65:22 108:3 134:24 147:25

**Selling** [5] 64:21 90:17 107:18 107:22 108:5

**Send** [1] 32:6

**Sense** [5] 25:23 65:23 89:25 100:21 100:24

**Sentence** [63] 12:6 12:7 12:15 12:20 12:25 13:4 13:6 13:8 13:9 13:12 13:15 13:16 13:25 14:3 15:17 18:3 18:18 24:14 24:15 25:25 27:14 27:15 28:6 28:7 29:5 29:5 29:13 29:14 30:11 30:13 31:14 31:17 31:20 32:17 37:8 38:7 39:14 40:19 50:24 50:25 59:12 74:16 76:24 78:9 87:13 88:10 95:18 98:19 101:4 102:16 102:17 102:20 108:15 119:15 120:11 121:10 121:21 122:14 136:14 137:9 137:18 141:2 149:13

**Sentenced** [2] 104:18 150:18

**Sentences** [1] 108:14

**Sentencing** [3] 39:15 40:9 40:18

**Separate** [1] 15:12

**September** [4] 1:18 152:1 152:4 152:4

**Series** [3] 76:11 91:6 114:23

**Serious** [4] 50:18 55:23 65:7 68:16

**Seriously** [1] 108:16

**Serve** [5] 32:18 73:25 137:17 145:18 148:22

**Served** [2] 31:19 128:6

**Service** [11] 27:17 27:19 82:19 100:10 103:10 104:4 104:5 124:19 128:15 145:8 152:20

**Serving** [1] 144:4

**Session** [1] 150:3

**Set** [8] 15:21 36:17 39:9 82:23 83:20 110:17 134:18 152:17

**Sets** [1] 14:18

**Setting** [2] 142:10 152:22

**Seven** [3] 43:2 118:12

**Seventeen** [1] 114:3

**Seventeen-year-old** [3] 14:13 26:5 36:18

**Seventy** [1] 138:24

**Seventy-five-year-old** [1] 37:13

**Several** [4] 9:3 90:6 139:14 140:3

**Severe** [3] 26:24 26:24 121:5

**Severely** [2] 108:16 108:17

**Severity** [1] 26:23

**Sexual** [2] 105:17 134:13

**Shake** [4] 46:4 99:6

**Shall** [4] 69:17 69:19 150:6 150:8

**Share** [3] 48:22 149:21 151:4

**Shared** [2] 103:8 142:20

**Shearer** [2] 82:13 82:13

**Sheet** [2] 67:10 150:24

**Shift** [1] 6:6

**Shoot** [3] 78:24 107:20 118:12

**Shooting** [2] 55:21 56:20

**Shoots** [1] 84:13

**Shopping** [2] 151:15 151:17

**Short** [1] 40:16

**Shot** [4] 54:4 78:19 83:5 83:7

**Shove** [1] 70:18

**Show** [9] 10:12 18:13 19:17 19:23 20:16 43:3 56:23 113:15 131:18

**Showed** [1] 113:4

**Shows** [2] 41:14 117:24

**Shuts** [1] 12:24

**Shutter** [1] 3:8

**Sic** [2] 79:12 80:14

**Sick** [2] 37:15 98:6

**Side** [8] 19:12 62:20 78:14 89:16 123:2 139:7 148:23 148:25

**Sides** [3] 40:12 70:20 130:8

**Sift** [2] 141:5 141:6

**Significant** [2] 52:19 62:18

**Silly** [1] 8:13

**Similar** [1] 143:13

**Simple** [3] 16:10 116:6 150:14

**Simply** [10] 6:24 12:1 20:3 27:1 30:10 41:15 45:19 79:12 92:16 97:25

**Single** [5] 6:12 6:13 7:3 43:21 129:24

**Sister** [1] 109:15

**Sisters** [1] 109:14

**Sit** [17] 45:19 48:21 62:1 68:21 69:11 71:12 71:22 83:1 96:17 118:20 122:23 138:20 144:8 144:10 147:20 150:23 151:6

**Sits** [1] 92:4

**Sitting** [13] 51:21 62:7 70:8 77:12 86:2 86:9 92:18 95:25 99:5 106:12 115:3 122:8 132:15

**Situation** [28] 47:3 52:13 63:22 64:4 64:16 64:8 64:10 64:12 64:13 64:18 64:19 66:24 67:18 79:10 79:15 90:3 91:2 92:2 92:5 98:17 98:1 116:17 116:21 116:25 117:19 118:13 131:20 150:10

**Situations** [3] 64:23 65:25 119:20

**Six** [3] 36:20 110:1 121:13

**Six-time** [2] 14:15 36:20

**Sixteen** [1] 75:21

**Sixty** [4] 53:12 53:14 53:14 137:9

**Sketchy** [1] 79:4

**Sky** [1] 45:6

**Slightly** [1] 115:1

**Slipped** [1] 97:23

**Smaller** [1] 35:24 36:1

**Smart** [1] 113:4

**Smith** [10] 99:15 99:19 100:7 101:19 114:20 118:7 120:20 122:25 124:4 127:2

**Social** [1] 93:14

**Society** [23] 11:11 21:23 21:24 22:2 22:4 22:5 22:8 22:22 23:4 23:8 27:21 28:21 50:5 55:13 90:11 95:1 96:20 107:17 108:10 131:14 135:16 135:20 140:11

**Soft** [1] 49:4

**Sole** [1] 147:14

**Solely** [3] 41:3 42:1 83:15

**Solution** [1] 108:13

**Solves** [2] 147:13 147:14

**Someone** [32] 50:8 50:18 52:5 54:15 54:17 55:22 55:22 55:22 60:4 60:13 60:24 61:23 62:1 62:6 71:9 76:7 79:23 85:25 86:2 86:9 87:20 104:18 105:16 107:18 107:21 108:5 110:20 114:1 117:24 134:25 135:1 148:1

**Sometime** [1] 129:14

**Sometimes** [7] 26:8 26:14 27:21 31:13 42:19 43:16 65:24

**Somewhere** [3] 20:12 83:9 94:16

**Son** [9] 54:4 81:2 81:20 83:1 83:19 92:5 97:12 97:22 110:6

**Son's** [2] 81:18 92:2

**Sorry** [4] 80:14 80:20 83:4 112:23

**Sort** [2] 37:10 127:25

**Sorts** [1] 37:3 37:10

**Sound** [3] 116:16 126:1 130:16

**Sounds** [1] 126:3

**Source** [1] 41:7

**Southwest** [1] 2:14

**Spanning** [1] 139:14

**Speaking** [1] 140:14

**Special** [3] 5:4 29:9 60:12

**Specific** [3] 10:2 43:24 52:9

**Specifically** [5] 16:3 61:20 65:11 121:18 128:19

**Specify** [1] 113:13

**Speculating** [1] 33:1

**Spend** [7] 4:3 8:10 32:18 32:19 40:14 119:24 129:6

**Spending** [1] 71:8

**Spiritual** [1] 107:1

**Split** [1] 20:3

**Spoken** [2] 49:4 68:1

**Spot** [1] 69:5

**Spur** [1] 56:16

**Stabbing** [1] 56:20

**Stability** [2] 26:7 63:19

**Staff** [1] 22:24

**Stage** [11] 5:2 5:6 54:22 66:8 75:13 75:14 96:9 118:24 118:25 135:5 135:6

**Stand** [3] 42:22 42:25

**Standardized** [1] 14:5

**Standpoint** [3] 17:5 17:6 114:24

**Start** [4] 23:18 90:15 126:15 130:19

**Starting** [4] 17:6 17:22 18:6 18:9

**Starts** [5] 7:4 9:15 16:22 45:24

**State** [49] 1:10 2:10 4:9 4:12 13:12 17:21 17:25 19:22 20:1 20:16 20:20 21:20 24:22 32:10 32:11 34:17 35:6 36:3 36:5 38:2 48:20 61:2 64:2 69:9 70:15 75:4 75:19 83:13 86:6 89:17 90:19 91:4 101:20 110:15 110:18 118:21 122:12 131:5 131:17 134:20 135:16 138:21 147:4 148:6 150:3 151:25 152:10 154:1 154:4

**State's** [12] 7:6 10:19 17:8 17:14 17:14 18:4 18:7 18:10 18:21 19:17 20:24 25:2

**Statement** [5] 134:7 134:8 140:1 141:12 141:24

**States** [1] 110:8

**Stature** [1] 94:23

**Status** [1] 60:12

**Statute** [1] 91:13

**Stay** [4] 17:7 102:18 139:14 140:21

**Stayed** [1] 87:16

**Stays** [1] 7:5

**Step** [1] 120:6

**Steps** [1] 78:20

**Still** [8] 28:22 88:4 104:19 108:2 109:18 112:7 113:9 115:14

**Stop** [2] 57:16 58:8

**Stopped** [1] 27:10

**Storm** [1] 27:17

**Story** [2] 78:13 121:12

**Strange** [1] 142:21

**Stranger** [2] 107:10 107:11

**Street** [4] 24:12 27:9 45:3 79:14

**Strength** [2] 17:13 17:15

**Strictly** [2] 98:5 125:4

**Strong** [5] 18:10 18:11 28:5 15 44:14 89:20

**Strongly** [4] 67:23 90:1 92:10 92:11

**Student** [1] 60:12

**Studied** [1] 133:11

**Stuff** [2] 75:7 89:12

**Stupid** [1] 60:6

**Subculture** [1] 140:22

**Subjectively** [1] 13:13

**Substance** [3] 97:22 102:9 114:10

**Substituted** [2] 29:5 30:11

**Succinct** [1] 129:24

**Sudden** [2] 117:17 117:24

**Suffer** [1] 37:19

**Sufficient** [10] 12:4 14:24 17:15 43:14 53:3 58:6 58:24 59:24 59:25 136:19

**Sufficiently** [1] 28:2

**Suggest** [2] 89:20 89:23

**Suggestion** [1] 140:1

**Suggests** [2] 67:11 120:4

**Sum** [2] 129:25 133:15

**Summarizes** [1] 134:7

**Sunset** [1] 109:6

**Supplied** [1] 6:24

**Support** [1] 37:15

**Supposed** [4] 50:5 58:23

**Supreme** [1] 93:19

**Surely** [1] 27:11

**Surreal** [3] 71:5 71:6 71:9

**Surrounding** [2] 42:25 43:2

**Survive** [1] 67:20

**Sway** [1] 137:17

**Switch** [1] 134:1

**Sworn** [6] 46:11 73:4 99:16 124:5 127:19 144:17

**System** [8] 37:16 81:14 88:2 89:14 98:2 110:17 119:6 119:10

---

**T**

**Table** [2] 123:2 123:11

**Talks** [1] 57:17

**Teachers** [1] 22:22

**Teaches** [1] 22:11

**Team** [1] 143:16

**Teenage** [1] 142:12

**Teenagers** [3] 65:6 93:22 142:13

**Temptation** [1] 95:6

**Ten** [6] 53:2 60:7 77:21 79:5 87:3 125:12

**Tend** [2] 41:16 43:3

**Tends** [2] 42:2 42:7

**Term** [2] 16:24 64:8

**Terms** [6] 16:4 16:6 21:1 24:12 43:12 67:16 92:21 115:8

**Test** [2] 69:4 98:1

**Testament** [1] 75:21

**Testified** [8] 14:23 46:11 73:4 80:8 99:16 124:5 127:19 144:17

**Testifies** [1] 47:13

**Testify** [9] 14:21 15:10 42:25 45:5 47:11 80:5 80:15 80:21 97:13

**Testimony** [18] 7:17 15:4 15:14 26:10 26:15 32:25 40:6 41:4 41:6 42:1 43:4 43:10 43:13 44:10 44:13 44:17 45:8 78:23

**Texas** [35] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 4:9 4:12 4:19 13:12 23:8 32:10 32:11 36:3 36:5 48:20 68:16 69:13 75:5 90:19 91:4 91:13 101:20 109:17 118:17 131:15 147:4 147:10 150:3 154:1 154:4 154:16 154:17 154:18

**Themself** [2] 50:16 140:20

**Themselves** [12] 22:25 26:10 27:18 50:16 51:16 64:13 77:7 95:2 106:7 108:6 132:10 142:20

**Therefore** [4] 5:15 33:6 66:6 122:15

**Thereof** [2] 54:25 135:8

**They've** [4] 41:22 53:11 87:4 136:6

**Thinking** [4] 70:4 112:22 121:12 144:3

**Thinks** [1] 37:23

**Third** [7] 29:11 30:4 35:19 35:21 47:12 78:3 150:11

**Thirteen** [2] 3:3 104:19

**Thirty** [1] 102:5

**Thoughts** [4] 35:4 49:12 49:17 49:20 75:16 82:20 86:20 104:15 149:22

**Threat** [25] 11:11 21:23 23:7 28:18 28:21 29:4 53:18 55:13 56:3 56:12 57:7 57:13 58:14 85:7 85:11 96:20 96:25 110:23 111:8 119:24 120:5 135:16 135:20 136:9 148:9

**Three** [17] 6:20 29:1 29:6 29:15 29:16 30:17 30:19 35:8 41:1 45:4 48:4 78:2 102:6 126:6 130:12 141:19 142:13

**Throw** [1] 9:20

**Thursday** [1] 99:22

**Tick** [1] 72:11

**Tight** [1] 141:22

**Tight-knit** [1] 141:22

**Today** [16] 46:14 49:10 53:11 70:25 73:7 100:4 115:3 120:17 123:1 127:22 128:4 128:4 128:20 129:11 144:2 144:20

**Today's** [1] 3:3

**Together** [13] 4:9 8:8 25:12 41:17 43:1 74:12 99:21 129:4 129:8 142:7 143:15 143:16 152:5

**Token** [1] 125:18

**Took** [5] 54:15 78:2 79:13 134:22 147:23

**Total** [2] 9:10 154:10

**Totally** [1] 140:9

**Touch** [2] 73:18 100:9

**Tougher** [3] 108:14 108:14 141:7

**Toughest** [1] 88:11

**Toward** [1] 90:22

**Towards** [1] 59:12

**Towel** [1] 9:20

**Town** [1] 144:1

**Track** [1] 150:11

**Traffic** [1] 71:25

**Transcription** [1] 154:5

**Transcription/stenograph** [1] 1:23

**Treasure** [1] 37:14

**Treat** [4] 36:21 36:22 36:23 114:8

**Treated** [2] 104:8 112:19

**Treating** [1] 114:6

**Trial** [86] 1:3 4:21 4:22 5:6 5:12 5:22 6:25 6:5 6:10 6:19 6:22 6:23 6:24 7:3 7:8 7:9 8:12 8:18 8:18 8:22 9:1 9:3 9:14 9:14 10:23 10:25 11:2 11:21 11:25 17:5 17:7 17:24 18:3 26:3 26:16 29:2 39:1 39:3 39:6 39:24 39:25 41:25 42:14 42:18 45:24 51:1 54:22 61:24 64:7 66:8 66:1 68:15 68:10 77:12 80:11 80:15 80:16 80:18 80:21 81:1 83 83:16 85:25 86:8 87:18 92:14 92:22 96:9 97:12 97:1 106:12 118:5 118:24 119:1 120:17 125:5 128:21 129:1 129:12 130:1 131:16 132:15 133:19 135:6 145:9 147:1 149:20

**Triangle** [4] 29:17 29:18 29:20 29:22

**Tried** [5] 62:4 98:9 131:18 143:20 143:22

**Tries** [1] 89:16

**Trigger** [1] 57:25

**Triggerman** [1] 6:22

**Trouble** [5] 36:19 64:25 65:8 67:11 98:14

**True** [3] 138:19 141:25 154:4

**Truly** [1] 154:9

**Truth** [1] 38:8

**Try** [9] 10:4 10:11 28:11 62:16 70:6 72:22 95:8 98:11 134:2

**Trying** [16] 38:10 40:24 45:18 45:18 53:16 67:19 69:5 69:8 71:11 72:18 72:19 74:17 78:25 79:1 131:23 148:25

**Tucker** [2] 87:10 133:22

**Tucker's** [1] 92:25

**Tuesday** [1] 126:16

**Turn** [3] 74:24 94:17 117:17

**Turned** [1] 145:13

**Tussle** [2] 117:25 117:25

**Twelve** [7] 9:9 45:19 61:2 71:12 86:10 102:25 126:6 6 69:7 137:8

**Twenty** [5] 32:20 53:10 69:1

**Twenty-five** [1] 122:1

**Twenty-seven** [1] 110:6

**Twice** [1] 50:20

**Two** [82] 4:12 4:21 5:4 5:5 5:8 7:11 11:3 11:14 11:18 12:10 12:17 13:18 13:20 14:10 19:7 24:1 26:14 28:10 28:25 30:10 30:10 30:16 30:20 30:25 31:9 31:11 33:14 33:15 34:10 34:19 34:20 35:4 35:7 36:17 36:21 40:22 41:1 41:2 41:21 42:16 43:23 45:9 52:22 53:21 57:15 59:19 60:8 60:16 65:1 67:12 68:1 68:11 69:14 75:11 75:23 76:2 76:21 77:3 91:11 96:5 96:6 111:13 118:17 119:6 119:23 122:10 122:24 125:23 129:14 134:14 135:23 136:11 136:24 137:21 142:7 145:20 145:22 146:1 148:13 149:10 150:4 150:4

**Type** [39] 21:2 21:2 21:19 21:21 49:19 50:10 50:14 50:5 51:23 51:23 62:7 64:8 70:17:2 76:5 77:14 77:14 77:77:18 78:9 79:15 86:2 93:1 95:1 95:1 98:3 98:14 98:104:21 106:14 106:14 111:11 114:25 120:18 132:16 122:23 134:18 137:3 143:6

**Types** [9] 20:18 42:17 51:15 77:5 104:22 105:24 106:6 132:8 137:3

**U**

**Ultimate** [1] 67:6

**Ultimately** [3] 70:12 70:13 152:1

**Unanimously** [3] 24:2 38:25 39:2

**Unclear** [1] 79:12

**Under** [4] 15:21 105:18 118:2 134:15

**Undo** [1] 24:13

**Unfair** [3] 19:21 19:25 89:15

**Unique** [4] 24:7 31:2 98:17 98:18

**Uniqueness** [5] 24:6 24:7 29:12 31:1 40:6

**United** [1] 110:8

**Universally** [1] 43:21

**University** [1] 110:15

**Unlawful** [2] 35:1 107:22

**Unless** [14] 7:5 17:7 17:24 18:7 18:9 18:20 42:1 58:15 87:8 96:7 111:18 136:10 148:13 150:19

**Unpleasant** [1] 83:18

**Unprovable** [2] 97:24 97:25

**Unusual** [2] 98:17 98:18

**Up** [57] 8:8 9:10 9:22 9:23 18:11 23:15 23:18 27:19 28:25 30:9 30:19 36:24 37:20 38:15 41:18 46:7 49:3 55:1 55:9 60:9 60:17 68:17 70:25 78:20 79:14 81:15 83:22 90:7 90:12 94:2 100:17 100:18 101:22 105:7 107:18 108:6 109:2 110:11 110:12 110:17 110:21 114:5 117:24 118:1 118:14 121:3 123:4 123:5

126:16 128:19 129:25 133:15 135:12 137:22 140:20 143:6 151:4

**Upbringing** [2] 120:9 142:3

**Usual** [1] 153:10

**V**

**Vague** [1] 37:10

**Value** [1] 38:14

**Various** [2] 3:5 123:14

**Vehicle** [2] 121:13 98:11

**Venireman** [1] 144:15

**Venireperson** [11] 3:6 3:6 3:7 3:8 83:24 88:17 112:16 113:14 123:12 127:2 151:21

**Venirepersons** [1] 3:3

**Verdict** [14] 8:9 12:6 15:18 15:22 17:19 24:3 29:14 30:12 30:15 34:18 45:23 77:24 83:23 102:12

**Verdicts** [1] 15:13

**Versa** [1] 143:19

**Verses** [1] 75:21

**Versus** [3] 4:10 117:11 149:13

**Vice** [1] 143:19

**Victim** [7] 11:13 12:9 15:15 61:22 65:25 86:5 107:3

**Victims** [2] 14:16 37:1

**Vietnam** [1] 27:17

**View** [7] 27:3 27:13 27:22 29:15 83:22 89:13 133:15

**Viewed** [1] 26:13

**Views** [1] 134:7

**Violence** [33] 11:10 19:21 19:24 20:15 21:4 21:5 21:6 21:8 21:10 21:12 21:17 21:22 22:10 22:15 22:19 23:2 24:4 56:13 57:8 57:14 58:14 85:8 85:11 100:24 111:9 135:15 135:19 148:9 151:9

**Violent** [2] 55:25 57:10

**Visit** [5] 63:5 93:16 126:13 139:24 144:2

**Visiting** [2] 4:4 93:12

**Voir** [21] 1:15 3:4 46:12 48:17 49:8 49:9 52:23 63:1 73:5 75:1 89:7 99:17 101:17 114:18 124:6 127:20 130:25 139:10 144:18 147:1 149:5

**Volume** [2] 1:2 154:6

**VOLUMES** [1] 1:2

**Vote** [15] 58:25 69:19 76:16 76:19 85:21 85:23 86:24 88:7 88:25 137:24 148:15 148:17 150:5 150:9 150:12

**Voted** [1] 69:14

**Voting** [2] 69:21 76:18

**VS** [1] 1:8

**W**

**Wait** [3] 41:23 59:14 122:11

**Walk** [3] 105:1 105:5 105:8

**Walked** [1] 37:24

**Walking** [3] 106:23 151:11 151:16

**Wall** [3] 37:24 118:12 118:13

**Walls** [6] 22:12 22:13 22:16 22:18 22:21 93:12

**Wants** [3] 24:5 34:1 37:22

**Wardens** [1] 22:24

**Waste** [1] 9:10

**Watch** [1] 11:6

**Wayne** [5] 2:12 4:11 89:9 114:20 139:12

**Ways** [1] 95:4

**Weapon** [6] 6:24 78:3 78:18 115:6 115:17 115:23

**Weaving** [1] 98:5

**Wednesday** [8] 62:12 126:5 126:13 126:16 126:16 129:5 129:6 139:17

**Week** [19] 4:8 24:24 27:7 31:21 31:21 54:4 70:24 73:10 99:23 125:5 125:23 126:17 129:11 129:14 129:15 133:16 144:23 145:20 145:21

**Weeks** [3] 125:23 145:20 146:1

**Weigh** [5] 45:21 126:20 130:8 136:5 138:14

**Weight** [2] 15:3 59:24

**Well-informed** [1] 149:25

**Wentz** [15] 2:17 4:11 9:19 72:12 89:10 114:21 122:23 123:21 123:22 127:10 127:11 139:13 144:8 150:23 153:8

**Wentz'** [1] 3:17

**West** [1] 151:16

**Whereabouts** [1] 109:4

**Whereby** [1] 132:11

**Wherein** [1] 152:16

**Whichever** [3] 11:16 12:11 40:20

**Whole** [13] 14:15 36:19 38:17 40:13 43:22 46:1 64:19 67:13 71:5 71:7 122:20 145:23 146:11

**Wide** [1] 36:11

**Wider** [1] 91:17

**Wife** [9] 52:10 78:13 78:21 141:21 142:2 142:5 142:8 143:12 143:13

**Wild** [1] 118:9

**Wilkinson** [1] 152:15

**Williams** [1] 3:7

**Willing** [2] 76:17 139:19

**Windshield** [1] 21:16

**Wise** [1] 108:10

**Witness** [12] 8:4 15:1 15:15:14 30:18 42:22 42:24 43:7 47:10 47:12 47:14 154:12

**Witnesses** [14] 7:21 7:23 8:2 14:20 15:3 15:10 30:17 30:19 43:8 43:9 43:12 44:10 97:15 111:2

**Women** [1] 93:16

**Word** [19] 16:8 16:10 16:10 19:2 19:2 19:3 19:4 19:6 19:8 19:12 19:16 20:10 21:24 23:4 25:13 25:13 25:16 80:17 88:13

**Words** [28] 14:6 15:1 16:13 16:14 16:15 16:17 16:20 22:2 41:11 49:24 57:14 68:6 75:15 76:22 85:8 91:7 96:8 96:21 97:16 118:20 119:12 131:10 132:12 141:3 141:8 141:14 147:6 149:14

**Works** [4] 75:10 88:2 122:20 125:4

**World** [4] 13:3 25:1 37:9 43:22

**Worry** [2] 93:10 137:12

**Worst** [2] 93:2 145:24

**Worth** [2] 84:12 93:11

**Writing** [2] 10:7 154:5

**Written** [1] 152:14

**Wrongdoing** [1] 94:22

**Y**

**Y'all** [2] 77:24 102:12

**Year** [4] 31:21 31:21 31:22 32:12

**Year's** [3] 103:14 115:5 115:6

**Years** [53] 31:19 32:2 32:
5 32:18 32:20 32:20 32:20
32:23 33:1 33:5 33:7 33:17
36:6 37:14 40:5 40:8 52:5
52:25 53:1 53:2 53:2 53:10
53:11 53:12 53:14 53:14 60:
8 69:7 77:21 79:5 84:3 87:3
87:6 102:6 102:6 104:19 107:
7 110:1 110:6 114:3 118:3
119:4 121:12 121:13 122:1
122:7 122:14 130:12 137:7
137:8 137:17 138:1 142:12

**Yogi** [1] 30:6

**Young** [4] 26:12 93:22 133:
17 133:18

**Younger** [2] 60:6 142:23

**Yourself** [9] 8:12 12:4
14:22 30:14 59:22 63:12 63:
13 70:7 125:18

**Youthfulness** [1] 26:3

## Z

**Zone** [2] 10:14 33:12

REPORTER'S RECORD

VOLUME 15 OF 25 VOLUMES

TRIAL COURT CAUSE NO. 800112


CHARLES MAMOU, JR.          )     IN THE DISTRICT COURT

      Appellant            )

                         )

VS.                        )     HARRIS COUNTY, TEXAS

                         )

THE STATE OF TEXAS         )

      Appellee             )     179TH JUDICIAL DISTRICT


*********************

VOIR DIRE EXAMINATION

*********************


    On the 29th day of September, 1999, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Bob Burdette, Judge
Presiding, held in Houston, Harris County, Texas:

    Proceedings reported by computer aided
transcription/stenograph machine.

2

```
 1              A P P E A R A N C E S

 2      MR. LYN MCCLELLAN

 3      SBOT NO. 13396100

 4      MS. CLAIRE CONNORS

 5      SBOT NO. 0470500

 6      Assistant District Attorneys

 7      201 Fannin

 8      Houston, Texas 77002

 9      Phone:  713.755.5800

10      ATTORNEYS FOR THE STATE OF TEXAS

11

12      MR. WAYNE HILL

13      SBOT NO. 59656300

14      4615 Southwest Freeway

15      Houston, Texas 77027

16      PHONE:  713.623.8312

17      MR. KURT WENTZ

18      SBOT NO. 21179300

19      5629 W FM 1960

20      Houston, Texas 77069

21      PHONE:  281.587.0088

22      ATTORNEYS FOR THE DEFENDANT
23

24

25
```

i

INDEX

VOLUME 15 OF 25

|                                                    | PAGE | VOL. |
| -------------------------------------------------- | ---- | ---- |
| September 29, 1999    Voir Dire Examination        |      | 15   |
| Jury selected                                      | 56   | 15   |
| Proceedings concluded                              | 66   | 15   |
| Court Reporter's Certificate                       | 67   | 15   |

3

1          (Panel is brought in and seated.)
2          THE COURT:  Good morning, ladies and
3     gentlemen.  I know that the weather is not conducive to
4     a nice, speedy trip downtown; and I don't know if when
5     you got here there was still elevator problems out there
6     or not, but it could have been a Monday.
7          To remind you, we're here to visit with
8     you to select a panel of jurors in the case of the State
9     of Texas versus Charles Mamou, Jr.  Mr. Mamou is seated
10    up here with his attorneys, Mr. Wayne Hill, Mr. Kurt
11    Wentz.  And the State of Texas is represented by two of
12    her Assistant District Attorneys, Mr. Lyn McClellan, Ms.
13    Claire Connors.
14          We spent some time visiting with each of
15    you individually, and today's process is going to move
16    along much more quickly.  But I want to spend just a
17    second; because from looking at my information, for
18    example, Mr. Pena, who is our Number 1 Panelist, it has
19    been since the 9th day of September since we visited
20    with him.  So I want to very quickly go back and cover
21    some of the things we talked about during the course of
22    our conversations.
23          We talk about that in this case, this
24    defendant stands charged by indictment with the offense
25    of capital murder.  We talked about the fact for the

---

4

1     offense -- for a person convicted, I should say, for the
2     offense of capital murder, there are only two possible
3     punishments.  One of those possible punishments is life.
4     One of those possible punishments is death.  Whichever
5     is the appropriate punishment in the jurors' minds is
6     something that nobody will know until all of the
7     evidence has been presented and you have gone back into
8     the jury room for the purposes of evaluating that
9     evidence, and then as to how the jury answers two
10    Special Issues, or two questions that dictate what
11    punishment I impose.  The answer to the question, yes
12    and no, in that order, a death sentence.  Answer any
13    other way in that order, then it's a life sentence.
14          But I want to get back to the first phase
15    of the trial and talk about and revisit just for the
16    purposes more of refreshing your memory than anything
17    else, revisit some of the things we talked about in
18    terms of the general rules that apply during the course
19    of a trial like this.
20          First off, we talked about your function,
21    what your function is and how it relates to my function.
22    Your function is to determine -- that you are the
23    exclusive, I should say, judges of the evidence, of the
24    facts proved, the credibility of the witnesses, and the
25    weight to be given their testimony.  That means that you

---

5

1     get to determine who you believe, how much of it you
2     believe, and how much weight, how important is their
3     testimony to the other testimony involved in the case?
4          The Judge's job, on the other hand, has
5     absolutely nothing to do with determining the
6     credibility of the answers.  The Judge's job is to
7     listen to everything that's said.  Whether the Judge
8     believes the defendant or not is completely immaterial.
9     But the Judge must listen to all of the testimony;
10    because in the Court's charge that you will receive at
11    the conclusion of the evidence at the first phase of the
12    trial, and also, we'll get a Court's charge at the
13    conclusion of the evidence at the second phase of the
14    trial, if there is one, we'll have all of the law in it
15    that applies as a result of all of the testimony that
16    has been presented.  And out of all of that testimony
17    that has been presented, you will extract from it what
18    you believe to be the credible aspects of that testimony
19    and apply those aspects of the law in the Court's charge
20    that are raised by the credible testimony.
21          So, you determine the believability of the
22    witnesses.  Judge gives you the law and the charge.  And
23    between putting the two things together, we come up with
24    what you think is the right verdict to reach based upon
25    the law and the evidence that exists in the case.

---

6

1          We talked about the fact that in every
2     criminal case, simply and only because somebody has been
3     arrested for an offense and charged with having
4     committed an offense or have been indicted for having
5     committed an offense, none of those three events, in and
6     of themselves, are any evidence that they, in fact,
7     committed that offense.  And my example to you was if
8     two months ago there was a burglary here in town, and if
9     right now a couple of police officers walk through that
10    door and arrest me today for having committed that
11    burglary, can't you see that because I was arrested
12    today can't possibly be any evidence that two months ago
13    I did that burglary?
14          Now because of the evidence that the
15    police may have accumulated through their investigation,
16    that evidence may very well support the notion that two
17    months ago I committed the burglary; but my arrest today
18    is not any evidence.  So the arrest, the charging, the
19    indictment, are all instances that must occur in order
20    to get a case into a courtroom so that a jury can listen
21    to the evidence in the case, determine the believability
22    of the witnesses, and decide whether the accusation is
23    or is not accurate.  That is to say, determine whether
24    the defendant is or is not guilty.  Everybody said that
25    you could follow that aspect of the law and that you did

7

1   agree with it.
2           Next we talked about the proving business.
3   Who's job is it to prove what it is?  We talked about
4   the fact that proving the defendant's guilt is always
5   upon the State of Texas.  They must always prove a
6   defendant's guilt beyond a reasonable doubt.  That, you
7   have heard before.  And I'm sure that you have the idea
8   of proving somebody's guilt beyond a shadow of a doubt.
9   And we don't know who dreamed up that phrase, who proved
10  somebody's guilt beyond all doubt or beyond every doubt.
11  That's not the rule in this country, never has been.  It
12  presently is not and probably never will be.
13          The rule in the country is the State must
14  prove -- the government must prove a person's guilt
15  beyond a reasonable doubt.  We talked about the
16  definition that you'll be given in the Court's charge as
17  to what a reasonable doubt is.  It is a doubt based upon
18  reason and common sense after a careful and impartial
19  consideration of all of the evidence in the case.  It is
20  the kind of doubt that would make a reasonable person
21  hesitate to act in the most important of his own
22  affairs.
23          Proof beyond a reasonable doubt,
24  therefore, must be proof of such a convincing character
25  that you would be willing to rely and act upon it

8

1   without hesitation in the most important of your own
2   affairs.  That is the obligation that exists on the
3   State of Texas before a jury would be warranted in
4   returning a verdict of guilt.  That is to say, the
5   State's evidence must exclude all reasonable doubt
6   concerning the defendant's guilt.
7           The flip side of that coin is this:
8   Starting off every case, every defendant starts off
9   being not guilty, stays not guilty up until the time
10  comes during the course of the trial, if the time ever
11  does come during the course of trial, when the State's
12  evidence, because of its strength, because of its
13  credibility, is viewed by the jury as being so strong
14  that it excludes all reasonable doubt concerning the
15  defendant's guilt.  If and when that does occur, the
16  presumption of being not guilty, the presumption of
17  being innocent, has simply been eroded away because of
18  the quality of the State's evidence.
19          But starting out, a defendant starts out
20  being not guilty, stays not guilty, unless or until the
21  State's evidence overcomes that presumption and
22  establishes guilt beyond a reasonable doubt.  The point
23  being, it is always, always the State's job to prove
24  that a defendant is guilty.  It is never ever, ever a
25  defendant's job to prove that he or she is not guilty;

9

1   because the State is bringing the accusation, and people
2   who do the accusing are the people who have to do the
3   proving.  State's doing the accusing, State's got to do
4   the proving.
5           How much proving does the State have to
6   prove?  I don't know, but I do know it's got to be at
7   least enough that excludes all reasonable doubt
8   concerning the defendant's guilt.  We talked about that
9   for a period of time when we were together, and each of
10  you said that you could -- that you did understand that
11  aspect of the law, that you could and would follow it,
12  as well as enforce it if you were a juror in the case.
13  Because the State's required to prove a defendant's
14  guilt, a defendant or the defense, themselves, the
15  defense side of the case, I should say, may present
16  evidence in a case, and perhaps they don't.
17          What's going to happen in this case, I
18  haven't the foggiest idea.  And it may very well be that
19  right now in this courtroom, before the trial begins, it
20  may be that nobody knows whether the defense will or
21  will not present evidence, whether the defendant,
22  himself, will or will not testify.  But the point of it
23  all is this:  Your decision as a juror must be based on
24  the testimony that you do hear.  Your decision as a
25  juror cannot in any way be influenced or affected by

10

1   what you don't hear.  The reason for that is really
2   pretty simple.  We always say, and we know that when we
3   think of being fair, we want to hear both sides, because
4   that's what we're conditioned to doing.  And the point
5   of it is, if you only hear one side of a case in a
6   courtroom, you may not believe that side.  Doesn't mean
7   the person's guilty, because you still were the
8   exclusive judge of the credibility of the witnesses and
9   the weight to be given to their testimony.
10          You might believe one side.  You may not
11  believe one side.  But the point of it is, if the
12  defendant does not testify, I'll tell you in the Court's
13  charge and I will tell you now, that is not a
14  circumstance, that is not an instance, that is not a
15  consideration that any jury can use to suggest, to
16  infer, or to insinuate that the defendant on trial is,
17  in fact, guilty of the offense; because your decision as
18  a juror in the case must be based upon the testimony,
19  the evidence that exists in the case, not based upon
20  things that you don't hear or things for which you have
21  a question as to why it was you didn't hear.
22          We all talked about that to a far greater
23  degree than we're talking about it now.  Everybody said
24  that they understood that aspect of the law.  Everybody
25  said as a juror, they would both, A, follow, as well as,

11

1    B, enforce that aspect of the law if it applied to the
2    circumstances of this particular case.
3          We talked about the fact that the
4    punishment phase of the trial, if the jury gets to
5    punishment in a capital murder case -- that is to say,
6    if they have found a defendant guilty of capital murder,
7    obviously the presumption of being innocent has eroded.
8    It's gone away, and it's gone away because of the
9    quality of the evidence the State presented.  In the
10   jury's mind, the evidence would have been of such a
11   quality.
12          At the beginning of a capital murder --
13   excuse me -- at the beginning of the punishment phase,
14   the second phase of a capital murder trial, since the
15   presumption of innocence has gone away and it has,
16   because of a finding of guilt, an entirely new
17   presumption pops into place.  And that new presumption
18   pops into place that for all people convicted of capital
19   murder, it is presumed that the appropriate punishment
20   in the case should be life.
21          It is up to the State to prove, again,
22   through the quality of their testimony beyond a
23   reasonable doubt, that the answer to the first question
24   that we talked about should be yes.  Just like the first
25   phase of the trial, we're starting off that the answer

12

1    to the jury's first verdict would be not guilty, unless
2    or until the State's evidence proves beyond a reasonable
3    doubt the defendant's guilt.
4          At the second phase of the trial, the
5    answer to the first question is no.  That is to say,
6    that being the question, if you recall, Do you find from
7    the evidence beyond a reasonable doubt there is a
8    probability that the defendant would commit criminal
9    acts of violence that would constitute a continuing
10   threat to society.  The answer to that question starts
11   off being no, unless or until the State's evidence
12   proves beyond a reasonable doubt the answer to that
13   question should be yes.
14          And even if a jury does find a defendant
15   guilty of capital murder, and even if a jury does answer
16   yes to Question Number One, there is still Question
17   Number Two to take up.  Question Number Two, if you will
18   recall during the course of our individual conversation,
19   had to do with the question of mitigation.  That is to
20   say -- and these are my words; these aren't the words of
21   the question -- looking over all of the evidence in the
22   case, do you believe there is a good enough reason why
23   you ought to pull down the death sentence in the case
24   and substitute a life sentence in its place?  The
25   requirement of the second question is to look through

13

1    the case to see if there is a good enough reason to
2    justify in your mind doing it.  Now those aren't the
3    words contained in the question.
4          We talked about the fact that in the
5    second question the mitigation question, if you will,
6    nobody is required to present evidence of a mitigating
7    nature.  The phrase, Do you find from the evidence
8    beyond a reasonable doubt, is not in that question.  So
9    the State doesn't have to prove to you what the answer
10   should be.  The defense never has to prove anything.  So
11   they don't have to prove what the answer should be, so
12   neither side is required to put evidence of a mitigating
13   nature on in the case.
14          The only requirement that exists through
15   the second question is the requirement that the jury go
16   back and consider all the evidence in the case to see if
17   there is any evidence of a mitigating nature that would
18   require telling us that a life sentence would be a more
19   appropriate verdict than a death sentence.  Because
20   consider when you get to the second question, you would
21   have done, up to that point, everything that the law
22   permits for you to do and be able to sentence the
23   defendant to death.  You would have found them guilty of
24   capital murder, or we wouldn't have gotten to the
25   questions at all.  You would have answered yes to

14

1    Question Number One, or we would never have gotten to
2    Question Number Two at all.
3          So, Question Number Two simply says, okay,
4    jury, the guy's going to get death.  Now before you
5    decide that that is exactly what you want to do, go back
6    through all the evidence in the case and see if there is
7    a good enough reason in all of that evidence why you
8    ought to pull down that death sentence that you're on
9    your way to doing and substitute in its place a life
10   sentence.  Again, the answer to that question is either
11   yes or no.
12          We talked about those questions.  We
13   talked about the words contained within the questions.
14   I'm not going to go through that all over again; but
15   everybody said they understood the questions, understood
16   the purpose for the questions, and also understood that
17   each of the jury's decisions in a capital murder case --
18   and there can be as many as three -- question of guilt
19   being one decision, the answer to Special Issue Number
20   Two -- answer to Special Issue Number One being the
21   second decision, the answer to Special Issue Number Two
22   being the third decision.
23          There can be three decisions that a jury
24   makes in a capital murder case, and we talked about the
25   fact that each of those decisions is independent of the

15

1   other decisions.  Just because you found one way to one
2   issue doesn't dictate how you're supposed to find the
3   other way.  Because think about it for a second.  If it
4   does, if a finding of guilt of capital murder dictates
5   that you should answer yes to Question Number One in all
6   cases, why would we ever have Question Number One?   We
7   wouldn't.
8              So the point being, maybe in some cases,
9   after reviewing all the evidence, you believe after
10  finding somebody guilty of capital murder that the
11  answer to Special Issue Number One ought to be yes.  If
12  that's your evaluation of the evidence, that's the
13  answer that we want out of you.  On the other hand,
14  there may very well be cases that after you've heard all
15  of the evidence, and even though you find a defendant
16  guilty of capital murder, you may believe that the
17  answer to Special Issue Number One should be no.  And if
18  that's your evaluation of the evidence, that's the
19  answer we want from the jury.
20             So the point being, each decision is
21  independent of the prior decision.  And for some of you,
22  you use the example the three decisions are kind of like
23  a point on a triangle.  All the evidence is going to be
24  in the middle of that triangle.  And after you make each
25  decision -- I must say, to make each decision, you'll

16

1   look at all that evidence that's contained within the
2   three points of that triangle.  Once you have made that
3   decision on point A, then you move along to the next
4   decision.  You look at exactly the same body of
5   evidence, but the question asks you something remarkably
6   different from what the previous question asked you.
7              For example, can you see that the question
8   of whether or not a person is guilty or not, that has to
9   do with something in the past?  If you find a person
10  guilty of capital murder, Question Number One, do you
11  think they're going to be a continuing threat to
12  society?  That has to do with something in the future.
13  You look at the same pool of evidence, but the questions
14  are just remarkably different.  What do you do in the --
15  that is, what do you think we're going to do in the
16  future?  Obviously, remarkably different.  And then the
17  third question, okay.  No matter how you answer those
18  first two questions, is there anything in that pool of
19  evidence that makes you think a life sentence would be a
20  better sentence in this case than a death sentence?
21             So we talked about that ad nauseam
22  perhaps, but everybody said they understood it.
23  Everybody said they could follow it.  Everybody said if
24  they were a juror, they would enforce it.  We talked
25  about the fact that capital murder -- for there to be a

17

1   capital murder, the conduct is exactly the same as for a
2   murder.  We talked about the fact that a murder is the
3   intentional taking of the life of another human being
4   without there being any legal justification or without
5   there being any legal excuse.
6              We talked about the fact that that
7   necessarily means self-defense is not murder, because
8   that is a legal justification.  We have the right to
9   protect ourselves from some unlawful deadly attack
10  that's being threatened against us.  We have that right,
11  so that can't possibly be murder.  We talked about the
12  fact that murder can't possibly ever be an accident;
13  because if it was an accident, it wasn't done
14  intentionally.
15             We talked about the fact that this is
16  exactly that crime, the intentional murder without
17  justification or excuse that it takes to be a capital
18  murder, except that in addition to the intentional
19  murder, it must be committed during the course of the
20  commission of another felony.  We talked about in this
21  case there are two different felonies alleged.  One of
22  them is a kidnapping.  One of them is another murder.
23  Murder during a murder, as long as they are both
24  intentional murders, a jury can -- if that would be
25  proved beyond a reasonable doubt would warrant a jury

18

1   finding a defendant guilty.
2              If the jury believes that to be the case
3   beyond a reasonable doubt, the jury would be warranted
4   in finding the defendant guilty of capital murder.  We
5   talked about the fact that anytime the State's required
6   to prove beyond a reasonable doubt the existence of two
7   crimes -- that is what it would take for capital murder,
8   of course; for example, murder during a kidnapping --
9   that anytime the State's required to prove the existence
10  of two crimes beyond a reasonable doubt, three possible
11  results can occur.  One possible result is maybe they
12  can.  And if they do, the jury's obligation would be to
13  find the defendant guilty of capital murder.  Possible
14  result number two:  They can't prove beyond a reasonable
15  doubt the existence.  If that's the case, the jury's
16  verdict would be not guilty of anything.  Possible
17  outcome number three might be, well, maybe they have
18  proven the existence of the intentional murder, but they
19  can't prove beyond a reasonable doubt to the jury, or do
20  not prove to the jury to a satisfaction beyond a
21  reasonable doubt that it occurred during the course of a
22  kidnapping.  If that's the case, I'd be obligated to
23  give you a third choice in the charge.  You would have
24  had the choice of guilty of capital murder.  You will
25  have had the choice of guilty of murder -- of not guilty

19

1  of anything.  The third choice, is he guilty of murder?
2          We talked about the range of punishment
3  for murder being life or by confinement in the
4  penitentiary not less than five years, or more than
5  ninety-nine years; and a jury can, if they think it
6  accomplishes anything, impose a fine, as long as the
7  amount of the fine does not exceed $10,000.  We talked
8  about the reason for there being such a wide range,
9  because there are all sorts of different circumstances.
10         And we talked about the hypothetical
11 circumstance.  And I'm not claiming it's going to apply
12 in this trial.  I'm just saying it is a theoretical
13 possibility.  We talked about the possibility of you --
14 hypothetical of you being a juror in a capital murder
15 case.  You heard all the evidence in the case, and you
16 go and your jury determines the defendant on trial is
17 not guilty of capital murder; but your jury unanimously
18 does determine that the defendant on trial is, in fact,
19 guilty of murder.
20         We talked about that hypothetical
21 situation, about you coming back and hearing evidence at
22 the second trial relating to the character and to the
23 background of the defendant that's on trial.  We talked
24 about that at the conclusion of that evidence, whatever
25 it might have been, if you went out and began your

21

1  circumstances of the offense, as well as the character
2  and the background and the personal involvement of the
3  defendant on trial.
4          Now we talked about the fact that -- what
5  a life sentence means.  We talked about the fact that a
6  person, if they are found guilty -- not a person, but
7  this defendant, more specific -- if he's found guilty of
8  capital murder, and if these two questions are answered
9  in such a way that a life sentence was imposed, that the
10 defendant would not become eligible for parole
11 consideration until he has actually served forty years
12 in the penitentiary.  That's the Year 2039.
13         We talked about the fact -- the reason I
14 bring this up is because we all have different notions
15 about what a life sentence means.  Some people tend to
16 think it means five years.  Some people say twenty
17 years.  And other people don't know.  They just know it
18 doesn't mean life.  So I want you to be certain that you
19 understand that this defendant cannot possibly become
20 eligible for parole consideration before the Year 2039.
21         Now having said that, what will happen in
22 2039 with this defendant, if this is the result of the
23 verdict of the jury, is anybody's guess.  But these two
24 questions that determine the sentence imposed in the
25 case deserve to be answered on the basis of the

20

1  deliberations, is there anybody here who could not
2  consider assessing some imaginary defendant's punishment
3  at confinement in the penitentiary for life if you
4  thought, based upon all of the evidence in the case,
5  that was the correct sentencing option to select?  You
6  all said that you could.
7          Likewise, you all said -- flip the
8  question over -- that you could also consider assessing
9  some defendant's punishment at confinement in the
10 penitentiary for five years if you thought, based upon
11 all of the circumstances in the case, that that was the
12 right sentencing option to select.  And we tried to make
13 sure that you understood that we weren't trying to
14 commit you as to which one of those two, life or death,
15 you would select, or where in the middle you would
16 select.  What we were trying to do is to commit you to
17 being able to make the full range of punishment
18 available to you and making the circumstances of the
19 case and the character and the background of the
20 defendant determine what sentence you would impose.
21         Then we talked about the fact that that
22 was exactly what we're trying to do with the capital
23 murder business, life or death.  The range is certainly
24 more restrictive; but we want you to answer the
25 questions based upon the evidence in the case, the

22

1  testimony and the evidence that exists in the case, not
2  on the basis of what may or may not happen in the
3  future.  We also said that because a person becomes
4  eligible for parole consideration in forty years, that
5  has nothing to do with whether parole will be or will
6  not be granted.  Everybody said they understood that
7  aspect of the law, said they had no questions about it.
8  As a juror, they would be willing, A, to follow, and B,
9  to enforce that aspect of our law.
10         We talked about the concept in our law of
11 accomplice witness testimony.  And we talked about from
12 the standpoint of, if two people get together and
13 conspire to commit a crime, go out and do, in fact,
14 commit the crime that they agreed to commit, conspired
15 to commit that, one of those conspirators cannot be
16 convicted solely, exclusively and only on the testimony
17 of the other coconspirator.  Instead, there must be, in
18 addition to the coconspirator's testimony, some
19 corroborating evidence from some independent source that
20 rises to the level that it tends to connect the
21 defendant on trial to the commission of the crime.
22         We used the example, I think, with all of
23 you, perhaps not, if another guy and I agree to go rob a
24 bank and I'm the wheel man, he goes in and robs the
25 bank, jumps in with the bank bag, jumps in the car, and

23

1  off we go.  Two or three days later he gets arrested.
2  The police question him about the robbery.  He says, I
3  didn't do it myself.  Old Burdette was there, and he was
4  the driver of the getaway car.  If the only testimony in
5  the case is -- if the only evidence, I should say, in
6  the case is the testimony of the coconspirator, I cannot
7  be convicted unless there is some other evidence
8  independent from the testimony of the coconspirator that
9  tends to connect me to the commission of the crime.
10        It does not have to be such that it
11  proves, in and of itself, beyond a reasonable doubt that
12  I committed that crime.  It simply has to tend to
13  connect me to the commission of the crime.  And the
14  example that I used was, let's just say that when the
15  other coconspirator was arrested a couple of days later,
16  they recovered the bank bag; and on the bank bag was my
17  fingerprint.  That would be evidence from an independent
18  source that tended to connect me to the commission of
19  that crime that corroborated that coconspirator's
20  testimony or, as we would call him in the Court's
21  charge, an accomplice witness.  But we didn't use that
22  term.  We talked about that as a concept.  Everybody
23  said they understood the concept.  Nobody said they had
24  any questions about it.  They said they could, A, follow
25  it, and B, then enforce that particular rule if it came

24

1  into play.  And I don't know if it will or won't.
2        The last thing we talked about was the
3  type of evidence that can exist in a case; there being
4  direct evidence, there being circumstantial evidence.
5  Direct evidence meaning somebody saw something happen.
6  Circumstantial evidence meaning exactly the opposite.
7  Somebody didn't see anything that happened.  Didn't see
8  the crime occur, I should say.  But they testify about a
9  circumstance that, when interwoven with other
10  circumstances that will be testified to or can be
11  testified to by other witnesses, when all those
12  circumstances are taken together, they tend to show,
13  conduce to show the guilt of the defendant.
14        We talked about the fact that the law
15  doesn't care whether in a case a conviction is had upon
16  direct evidence, or upon circumstantial evidence, or a
17  combination of the two.  The law simply does not care.
18  Just like the law does not care how many witnesses there
19  are in a case.  The only thing the law cares about is
20  the quality of the evidence, and as such that it
21  establishes a defendant's guilt beyond a reasonable
22  doubt.
23        We have people down here at this
24  courthouse everyday that get found not guilty on the
25  basis of five eyewitnesses' testimony; because those

25

1  eyewitnesses are, in the jury's minds, not credible.
2  And on those same days when we have people being found
3  not guilty on the basis of five eyewitnesses' testimony,
4  we have people being found guilty on the basis of one
5  eyewitness' testimony when the jury believes beyond a
6  reasonable doubt that one eyewitness' testimony.
7        So, the numbers make no difference.
8  Likewise, whether the testimony is direct or
9  circumstantial makes no difference.  It is when the
10  testimony has concluded, is the quality of that evidence
11  sufficient to eliminate every reasonable doubt in a
12  jury's mind and establishes -- establish a defendant's
13  guilt beyond a reasonable doubt?  Everybody said they
14  understood that.  And I specifically asked you if you
15  were a juror in the case, and if at the conclusion of
16  all of the evidence in the case the evidence was nothing
17  but circumstantial, that is to say, no eyewitness, but
18  you believe that circumstantial evidence beyond a
19  reasonable doubt, is there anybody here who would refuse
20  to find the defendant guilty of the offense of capital
21  murder because the evidence was not direct instead of
22  circumstantial, even though you believe the
23  circumstantial evidence beyond a reasonable doubt?
24  Nobody here said they wouldn't do that.  Everybody here
25  said they would do it; they could find somebody guilty

26

1  on the basis of circumstantial evidence if they believe
2  it beyond a reasonable doubt.
3        And we talked about the fact we all heard
4  people say they couldn't find somebody guilty on the
5  basis of the circumstantial evidence.  We talked about
6  the fact that a fingerprint is circumstantial evidence.
7  And it's circumstantial and it's not direct, even though
8  we all know there is only one person on the face of this
9  earth that could have put that fingerprint there.  It is
10  circumstantial because we don't know when they put that
11  fingerprint there.  And if the thing upon which that
12  thing was left was a movable object, we don't know where
13  that object was when the print was put there.  So even
14  though we're conditioned by television to believe that
15  fingerprints are the absolute best stuff in the world
16  before DNA, still that is circumstantial evidence.
17  Everybody said they could abide by that particular
18  aspect of our law.
19        That is the stuff that we covered with
20  each of you.  Some of the stuff we covered when the big
21  group was together, sixty of you.  Some of it we covered
22  when the group was over near the jury box.  And that's
23  what we covered.  Everybody said they could abide by
24  that aspect, or those aspects of the law, and whatever
25  questions that you have that were raised at the time

27

1   those questions were all answered.  And I assume they
2   were answered in such a way that they accommodated
3   whatever thought you had at the time.
4          Is there anybody here whose answer to any
5   of those questions today would be different than your
6   answers to those questions at the time we visited with
7   you?   Okay.  Is there anybody here who has a situation,
8   a circumstance that exists presently, that when we
9   visited with you individually was unknown to you then
10  that would in any way affect or interfere with your
11  ability to serve as a juror in this case, beginning next
12  Monday and going through, as said, at the very, very
13  most, the second week, probably less than that?
14         Yes?
15         VENIREPERSON:  My wife's going to have
16  surgery.
17         THE COURT:  What is your number?
18         VENIREPERSON:  33.
19         THE COURT:  All right.  We'll get back to
20  you.  Thank you.  Okay.  Before we go any further, you
21  are Mr. Mathews; is that correct?
22         VENIREPERSON:  Yes.
23         THE COURT:  Mr. Matthews, before we make
24  any decisions, we're all going to talk.  But I want to
25  run this string all the way through before we get to

28

1   that point.
2          Having said that, both sides have an
3   opportunity to visit with you, talk to you about some
4   things perhaps that we have talked about, talk to you
5   about some things we have not talked about.  They also
6   have the opportunity to not visit with you if that's
7   their call.  That's exclusively their call.
8          But at this time, Mr. McClellan, does the
9   State have anything they want to visit with the jury
10  about?
11         MR. MCCLELLAN:  We have nothing, Your
12  Honor.
13         THE COURT:  Mr. Hill, the defense?
14         MR. HILL:  Yes, Your Honor.
15         THE COURT:  All right.
16             VOIR DIRE EXAMINATION
17  BY MR. HILL:
18         Ladies and gentlemen, because the State
19  has announced its intent to the seek the death penalty
20  in the event a jury of twelve people convict of capital
21  murder, I'm given an opportunity to address you one last
22  time before we have testimony in the case.  We have gone
23  through quite a bit with each and every one of you.  You
24  have passed all the tests, so to speak, up to this
25  point.  And I just want to assure myself, along with Mr.

29

1   Wentz, that we have an opportunity to visit with you
2   about some things we may not have gone into great detail
3   about, just to make sure you're all comfortable with
4   aspects of the law that might come up in this case.
5          All we ask for is that you be candid with
6   us today, as you have been in the past; because
7   ultimately out of this group, twelve people will be
8   seated up here.  And you're going to listen to all the
9   facts and circumstances of this case, and you're going
10  to be called upon to make a very important decision.  So
11  that's all I ask.  We had an opportunity in court to
12  visit personally.  I hope the fact that we're together
13  as a group today is not in any way intimidating or
14  uncomfortable.  But please, understanding the
15  significance of this case, all I ask you to do is be
16  candid with us.  And if there is a question that I touch
17  upon that you feel is too personal for yourself, raise
18  your hand and we'll approach the bench so we don't have
19  to embarrass anybody.  Okay?
20         This is going to be the first opportunity,
21  when twelve people are selected, for Mr. Mamou to be
22  viewed by neutral fact finders.  The twelve of you who
23  are selected are going to be the ones that are entrusted
24  to make the decisions from this point forward.  We want
25  to make sure we've been given an opportunity to visit

30

1   with you about all the issues that could possibly arise.
2          The Judge has spent considerable time
3   talking to you about the presumption of innocence and
4   the burden of proof that's on the State.  I just want to
5   assure myself that everybody is truly comfortable with
6   those concepts.  Because if you look at it and you
7   perhaps understand why we have these principles, it
8   helps us to feel maybe a little more comfortable with
9   their usage in these types of trials.  I like to think
10  of them as rules that are in place that have to happen
11  before a person's liberty can be taken.
12         We're all presumed to be innocent if we're
13  charged with a crime.  The burden is always on the State
14  to come forward with all the evidence that they can to
15  try and satisfy twelve people together that they have
16  proven a case beyond a reasonable doubt.  And I think of
17  beyond a reasonable doubt as basically the best measure
18  that society has to ensure that an innocent person is
19  not convicted.  You think about that.  What is the --
20  why should there be rules?   Should the rules be able to
21  change from day to day, case to case, from defendant to
22  defendant?
23         Well, I think everybody -- let me ask:
24  Does anybody disagree with the fact the rules should be
25  the same before each type of case is tried?  The burden

31

1  would always be beyond a reasonable doubt, whether it's
2  a driving while intoxicated case, or in this situation,
3  the most serious, is beyond a reasonable doubt in a
4  capital murder case.  Is there anybody that has any
5  problem with that burden of proof being placed on the
6  State?   And by everybody's silence, I assume you're
7  comfortable.
8          The Judge says that the defendant has no
9  obligation to offer any testimony, to testify himself.
10  I think it should be self-evident to you, by entering a
11  plea of not guilty, the defendant is already telling you
12  that he did not commit the offense that's alleged.  It's
13  the State's burden to try and establish, if they can,
14  that an offense was committed, that it was committed
15  exactly the way they claim, and that this defendant is
16  the one that's responsible.  Is there anybody that's
17  uncomfortable with the State having to discharge all
18  those obligations.
19          How does the case start?  A case starts
20  with a theory, and it begins with police investigating
21  something.  Now I want to know if there is anybody here
22  that's of the opinion that a police investigation can
23  never be flawed from the beginning?  In other words,
24  does everybody take the position that simply because the
25  police investigate a crime that their investigation

33

1  Marie Carmouche, intentionally caused her death by
2  shooting her with a firearm.
3          There are several elements that the State
4  must prove, if they can.  And as the Judge told you
5  before, as you evaluate the evidence, you have to
6  determine whether or not the State can actually prove
7  any or all of those elements; because their failure to
8  prove some or all of them will result in drastically
9  different burdens.  On the one hand, if you don't
10  believe the defendant was in the course of committing or
11  attempting to commit a kidnapping, but you believe that
12  he intentionally caused somebody's death, in that
13  instance the correct verdict would be to find him guilty
14  of murder, not capital murder.
15          The flip side of that is if you believe
16  that the defendant was in the course of committing or
17  attempting to commit the kidnapping, but you don't
18  believe the person committed murder, then your verdict
19  would be to find him guilty of kidnapping.  Does
20  everybody see how, depending upon the quality and
21  quantity of proof, will determine what the proper
22  verdict is?  And all of these opportunities, or
23  different options, if you will, will be given to the
24  jury by the Judge, will be spelled out very
25  specifically.  And for lack of a better phrase, it's

32

1  necessarily is correct?  I take it by your silence that
2  everybody sees there are cases where if errors are made
3  at the beginning, they can carry through from the start
4  to the end.
5          Is there anybody here that's ever been
6  involved in any type of investigation?  Anybody had to
7  serve as a police officer or anything like that?  But
8  we have a group of, really, kind of middle-of-the-road,
9  neutral people that have not been in that situation
10  before.  Does everybody agree that there can be
11  situations where once a theory is developed, once the
12  police determine what their theory is, that they are
13  capable of narrowing their focus?  In other words, they
14  put blinders on, and evidence which might suggest an
15  alternative theory might be dismissed by the police.
16  Is there anybody that disagrees with that proposition,
17  that that's something you have to look out for in a case
18  where you're sitting on a jury?
19          The State has alleged in this indictment
20  two very specific and very different allegations of
21  capital murder, and I think it's important to take a few
22  moments to go over them to make sure what the jury's
23  understanding of those two allegations are.  One
24  allegation is that Mr. Mamou, while in the course of
25  attempting to commit or committing the kidnapping of

34

1  kind of like a road map that says, here is where you
2  start.  You consider all of the evidence and knowledge
3  you have to determine which branch or which fork in the
4  road the evidence takes you to.  So, will everybody make
5  a commitment?
6          And this is what I'm here talking to you
7  about today.  I want to make sure that before we select
8  twelve people to sit in this case, I'm comfortable
9  knowing that the commitments that you made individually,
10  as well as the commitments you made today by remaining
11  silent, agreeing with propositions that I'm talking to
12  you about, that we're able to rely upon those throughout
13  the trial, that there is not going to be any surprises
14  from the State or the defense with regard to people that
15  can sit in judgment in this case.
16          Because I'm sure the State would want to
17  know if there was somebody among you sitting there that
18  would have difficulty with some aspects of the law and
19  didn't disclose it.  And that's all we ask for, because
20  we have to rely on your candid nature and the
21  truthfulness of your responses so that we know we've got
22  everything possible to select twelve people who were
23  going to sit as neutral fact finders, who are going to
24  keep their minds open throughout the trial, not put
25  blinders on as the evidence starts.  Because as the

35

1  Judge told you, you're not called upon to make a
2  decision until the end of the trial. So I just want to
3  make sure I have that from you.
4           VENIREPERSON: I'm having a difficult --
5  as I've been waiting for this day to come, I'm having a
6  difficult time whether I can say I can give someone life
7  imprisonment or the death penalty.
8           THE COURT: We'll get to that later.
9           MR. HILL: So I talked a little bit about
10 the one paragraph that talks about committing a murder
11 during the course of a kidnapping. Let's talk a little
12 bit about the other type, which is basically a multiple
13 murder. It says that a person is responsible for taking
14 the life of two people during the same criminal episode
15 or same criminal transaction. We did talk at length
16 with one of the prospective jurors about the tragedy
17 that occurred a little more than a week ago at the
18 Baptist church. You can see how when thinking about
19 what is the same criminal transaction, what are we
20 talking about? Obviously, that would be a case that
21 would be, unfortunately, an example to use.
22          A person, same time, same place, same
23 location, goes in and commits several murders at the
24 same time. Your job as a jury will be to be called upon
25 to determine if there is evidence -- and we can

36

1  reasonably expect that the State is going to present
2  evidence to you in this case that's going to try to
3  support the allegation and the theory in this case. So
4  as they're talking to you today, I will make an
5  assumption that there is going to be evidence presented
6  to you to try and prove that.
7           Your job will be, among other things, to
8  determine whether, if you believe that the defendant is
9  responsible for taking two lives intentionally, also
10 determining whether or not it occurred during the same
11 criminal transaction. Because if you find they didn't
12 prove that they could have a reasonable doubt as to
13 that, the Judge again will instruct you as to what the
14 proper verdict would be. So that is one method that if
15 you listen to all the evidence -- and the Court's charge
16 tells you that you have to find certain elements, okay.
17 If they are unable to prove one of those elements, a
18 road map will tell you what option you have. Is
19 everybody comfortable?
20          We didn't spend a great deal of time on
21 that during the first individual voir dire. We were
22 talking mostly, as the Judge told you, about the
23 qualifications on the death penalty. And it seemed kind
24 of backwards probably to most of you that we spent so
25 much time talking about the death penalty, and we

37

1  haven't had a trial yet. And the Judge also said to
2  you, Let me assure you the fact we're talking about the
3  death penalty and the issue of whether or not you're
4  qualified to sit on the jury should not be taken as any
5  indication that the defense is throwing in the towel.
6  But I think the Judge very succinctly explained to you
7  that if we didn't talk to you about that and we were
8  just having today's discussion, never talked about the
9  death penalty at all, we choose twelve people to sit
10 there, and then either the defense or the State will
11 find out that they have twelve people that will always,
12 in a case, give the death penalty, or twelve people who
13 will never give the death penalty. That's why we're
14 going through some of these other things right now.
15          So in a multiple allegation, multiple
16 murders, what are some of the other ways that the State
17 does not -- or they're unable to prove the allegations?
18 Well, you could have a situation where after you
19 listened to all of the evidence, you might find that
20 defendant acted in self-defense as to one or more of
21 those. Self-defense is a long standing rule both in
22 this state and across the country. And I want to make
23 sure that everybody is comfortable with that, because we
24 want to make sure we have twelve individuals that will
25 follow the law if they believe that's what the evidence

38

1  shows. Will everybody do that? The Judge has asked
2  you, but I feel like it's real important for me to go
3  over one last time.
4           And the issue of self-defense is very
5  interesting, because it is not only a situation where
6  another individual has a weapon -- that's the one that
7  most clearly and commonly comes to our minds. Somebody
8  pulls a gun and is pointing at somebody. Clearly, the
9  person is threatened. They have a right to take that
10 person's life, but it also applies to the situation
11 where there is apparent danger.
12          And the Court's charge would instruct you
13 that if self-defense comes into play, you have to look
14 at the situation from the standpoint of the defendant
15 and consider whether or not this is reasonable in light
16 of the circumstances that are presented to you. We've
17 already addressed the criminal transaction. What if for
18 some reason you found that to be the case, but now
19 you're faced with a situation where you believe the
20 defendant acted in self-defense as to one or more of
21 those convictions.
22          The charge will instruct you that if
23 that's what you believe, you have a reasonable doubt
24 that the defendant committed it as alleged in the
25 indictment -- because the indictment is the framework.

39

1   That's what the State's burden is, to prove those
2   elements in the indictment exactly as it's alleged.
3   It's not, you know, we got kind of close to it and we'll
4   fill in the gaps. They've alleged it. They bring the
5   charge. Their obligation is to prove it. Is everybody
6   comfortable, now that I'm explaining it, with
7   circumstances where you can have somebody charged with
8   intentionally killing some people, but one of them is
9   justified?
10          As the Judge said, if you believe a person
11  acts in self-defense, that is what we call a legal
12  justification and that is not a crime. In that
13  instance, the Judge would allow you to consider whether
14  the person is still guilty of the murder of the other
15  person. But because you found one was self-defense and
16  the other is not, it is no longer a capital murder. So
17  these are the kinds of questions that a jury could be
18  presented, and it's going to be your obligation to sit
19  through the evidence and finally make those decisions.
20  Is everybody comfortable with their own abilities to
21  follow the law and enforce the law?
22          The element -- going back for a moment,
23  the element of kidnapping -- kidnapping, I think, is
24  pretty obvious. You take somebody against their will,
25  and you're taking them someplace. The State must prove

41

1   necessary. It's a necessity at that point.
2          You come to find out, as you drive off,
3   that there is a baby in the backseat, okay. But before
4   you are able to catch that other individual several
5   minutes later, the call has gone out to the police. The
6   police arrest you. You're there with the car and the
7   baby. I've just run away from a capital murder. The
8   person behind the counter is dead. Not looking too good
9   for you. And if for some reason that person were
10  charged with capital murder because of all the
11  circumstantial evidence that points to that individual
12  having caused the death of that store clerk, one of the
13  issues that might come up would be the necessity of
14  taking the car to explain why the circumstances were not
15  as they were first presented.
16          That's kind of an unusual set of
17  circumstances. But in twenty-two years down here, we
18  see cases that the common public who have not had to sit
19  through these cases don't see. Is there anybody here
20  that's uncomfortable with that aspect of the law that
21  we've described to you? There again, we want people to
22  keep an open mind. Don't start making decisions on the
23  case until such time as the Judge says to you, Ladies
24  and gentlemen, the evidence is closed in this case. The
25  State and defense have rested their cases. Now it

40

1   that the taking of the individual was done
2   intentionally. What if in a situation a person is not
3   aware of the existence of a person, or there is some
4   necessity that arises that causes the person to have to
5   move somebody for a period of time?
6          Let me give you kind of an example I'm
7   trying to come up with to explain how this works. Let's
8   say you walk into a convenience store,
9   pull --(inaudible) but there is somebody left in your
10  car. You go into the convenience store. As you're
11  standing there a robber comes in with a gun, holds up
12  the place, shoots and kills the clerk, turns to you,
13  Give me the keys and toss the keys. And you dive behind
14  the counter. The person shoots you. Person runs out,
15  jumps in your car, steals your car, and is getting away.
16          Just at that point you jump up, realizing
17  that somebody you care about is in the car, and you come
18  running out just about the time somebody else is pulling
19  up. That person is getting out of the car, and you grab
20  the person because you're frantic. You know if you
21  don't get after that person and be able to see where
22  they went, that person that was in your car might be
23  killed. You take somebody else's car. At this point
24  you are doing something. You're taking that other
25  individual's car in a situation that really is

42

1   becomes my obligation to give the Court's charge. It's
2   a road map. Can you make that promise to all of us?
3   Not just to me, but to Mr. McClellan, Miss Connors, the
4   Judge, the defendant, everybody who gets involved in
5   this case, that you will do that? Because that's really
6   what's essential, because otherwise you start narrowing
7   the scope. You start finding it easy not to listen to
8   all the evidence, not to hear cross-examination, not to
9   look at cross-examination, which might initially sound
10  very convincing.
11          One of the last things I'll touch upon is
12  witnesses. You, the twelve of you who are selected, are
13  going to be the sole judges of the credibility or the
14  believability of the people that come before you.
15  You're going to be given a charge by the Judge that says
16  you can believe all, none, or part of what a witness
17  tells you. And you're going to be the best judges of
18  whether or not a person is giving you the truth or
19  whether they're hiding something.
20          What's the reason for this person saying
21  the story they are? The Judge used the analogy, you
22  have the message and you have the messenger. And
23  sometimes the message, or what is said, sounds, you
24  know, very damning to somebody. But then you consider
25  who's saying it. Kind of like, consider the source. On

43

```
 1   the other hand, we have a situation where the messenger
 2   may not sound too good, but the evidence -- you have to
 3   make that call.  You have to make that decision.  And I
 4   hope the twelve of you, given the gravity of this case
 5   the seriousness of all the allegations that are made and
 6   all that's at stake, will do just that.
 7           Twelve of you are going to sit back there
 8   in that jury room at some point, collectively, and try
 9   to hash it all out and apply the standards that you
10   think are appropriate.  The Judge will give you the
11   legal instructions.  It's your job to figure out how the
12   facts fit or don't fit.  Then you'll have these
13   different charges or instructions the Judge gives you.
14           One thing I want to be sure you know, when
15   we hear the Judge talk about, there is circumstantial
16   evidence, there is direct evidence.  A phrase that comes
17   to mind right away and sounds like this very positive,
18   unequivocal type of testimony or evidence, is an
19   eyewitness, okay.  Right away, myself included, I'm
20   sitting there saying, well, that's going to be somebody
21   that's going to be able to tell us exactly what
22   happened, and they're going to be standing there viewing
23   it as it occurs.
24           I want to make sure that there is not one
25   person here that necessarily equates somebody being
```

44

```
 1   called an eyewitness with being a truth-teller, that you
 2   will apply the very same standards when evaluating that
 3   person's believability.  Does that, quote, "eyewitness"
 4   have some reason to testify the way he or she is doing?
 5   Okay.  Is everybody comfortable with that?  And that's
 6   an issue that I'm going to ask you to think about and
 7   make sure you all can discharge that responsibility, and
 8   I can rely upon that.
 9           When we hear the phrase, complainant, that
10   is not the same as the victim.  Who and under what
11   circumstance a person is thought of as a victim will be
12   your decision.  You have to determine whether or not the
13   State had established, with all of the evidence they
14   bring before you, that this gentleman, Mr. Charles
15   Mamou, committed any, all, or none of what they charged
16   him with.  I get the impression that everybody is
17   comfortable with that.
18           We spent a great deal of time talking to
19   you.  If there is something -- and I appreciate your
20   comments and the comment from Mr. Mathews, as well.
21   We'll take those individually.  If there is something
22   deep down inside that we just haven't figured out, I ask
23   you, you know, now will be the time; because otherwise,
24   twelve of you are going to be lucky or unlucky,
25   depending on how you look at it.  And you're going to be
```

45

```
 1   told this morning, you're going to be sitting up here
 2   although, we'll be in another court.
 3           Also, the thing I'm going to ask you is --
 4   at the end of this case, Mr. Wentz and I are going to
 5   ask you to hold the State to its burden, and at the
 6   conclusion ask you to find Mr. Mamou not guilty.  Okay.
 7           THE COURT:  Thank you, sir.
 8           Folks, would you come up for just a
 9   second, please?  Mr. Mathews, could you come up, please?
10           (At the bench:)
11           THE COURT:  Mr. Mathews, you mentioned at
12   the outset of the voir dire this morning that a
13   circumstance had arisen in your personal life that's
14   different than when we visited back on the 21st day of
15   September.  Specifically, you said that Mrs. Mathews is
16   to have surgery.  Can you tell us a little bit about
17   that?
18           VENIREPERSON:  It was actually scheduled
19   for yesterday, but her doctor was sick.  So now it's
20   been moved to next Thursday.  I had him write a note.
21           THE COURT:  What kind of surgery?
22           VENIREPERSON:  It's a laparoscopy.
23           THE COURT:  Mr. McClellan, do you have any
24   questions for Mr. Mathews?
25           MR. MCCLELLAN:  Would that prevent you
```

46

```
 1   from serving on this jury?
 2           VENIREPERSON:  I'd prefer to be there on
 3   Tuesday.  And if there is complications, we have to go
 4   back Wednesday.
 5           THE COURT:  Did you say Thursday or
 6   Tuesday?
 7           VENIREPERSON:  Tuesday, I'm sorry.
 8           MR. MCCLELLAN:  I have no --
 9           THE COURT:  Mr. Hill, do you have any
10   questions?
11           MR. HILL:  No, sir.
12           THE COURT:  Tell me what y'all want to do.
13           (Off-the-record discussion.)
14           THE COURT:  Ladies and gentlemen, what
15   we're going to do now is, quite frankly, we're going to
16   visit for just a couple of minutes for the purposes of
17   going through -- and we have to go through individually
18   each of the folks, you folks -- for the purposes of
19   determining who is and who is not a juror in the case.
20   This may take as much as fifteen minutes on the high
21   side.  My best guess is it's probably going to be closer
22   to ten minutes.  As I think we said before, when the big
23   group was in here on your first trip into the courtroom,
24   don't worry about being perfectly quiet.  That's not the
25   point.  But we would like for you to keep your seats,
```

47

1  because it's going to help sometimes for some of the
2  folks to look at their notes and look at your face to
3  make sure they have an accurate picture in mind as to
4  who it was that might have said whatever they said.  So,
5  bottom line of what I'm saying is, yes, we are telling
6  secrets.  We're not going to tell you what they are, but
7  you'll know before too long.
8        Okay.  First one we get to is Panelist
9  Number 1, who's Juror Number 2, that being Mr. George
10 Pena.  As to Mr. Pena, what says the State?
11       MR. MCCLELLAN:  State accepts.
12       The court:  Mr. Hill?
13       MR. HILL:  We accept.
14       THE COURT:  Mr. Pena becomes Juror Number
15 1.
16       Next we come to Panelist Number 2, Miss
17 Hashagen.  What says the State?
18       MR. MCCLELLAN:  State accepts.
19       MR. HILL:  Defense accepts.
20       THE COURT:  Miss Hashagen becomes Juror
21 Number 2.
22       THE COURT:  Next we come to Panelist
23 Number -- Venireperson Number 10, that being Panelist
24 Number 3, that being Alejandra Amie.  As to Miss Amie,
25 what says the State?

49

1  the State?
2        MR. MCCLELLAN:  State accepts.
3        THE COURT:  Mr. Hill?
4        MR. HILL:  Defense strikes.
5        THE COURT:  Venireperson Number 33, who is
6  Panelist Number 9, that being Lynne Warren Cantrell, as
7  to Miss Cantrell, what says the State?
8        MR. MCCLELLAN:  State accepts.
9        THE COURT:  Mr. Hill?
10       MR. HILL:  Defense strikes.
11       THE COURT:  Panelist Number 10, who is
12 Venireperson Number 36, that being Miss Katheryne
13 Stephens, what says the State?
14       MR. MCCLELLAN:  State accepts.
15       THE COURT:  Mr. Hill?
16       MR. HILL:  Defense strikes.
17       THE COURT:  We're through the first ten
18 panelists.  There are three jurors accepted.  The State
19 has exercised two of her peremptory challenges, and the
20 defendant has exercised five of his.  So we get to
21 Venireperson Number 38, that being Panelist Number 11,
22 Katherine Waller.  What says the State?
23       MR. MCCLELLAN:  State accepts.
24       THE COURT:  Mr. Hill?
25       MR. HILL:  Defense accepts.

48

1        MR. MCCLELLAN:  State accepts.
2        THE COURT:  Mr. Hill.
3        MR. HILL:  Defense strikes.
4        THE COURT:  Next we go to Panelist
5  Number -- Venireperson Number 18, Panelist Number 4,
6  that being Jerri Tinnemeyer.  As to Miss or Mrs. -- Miss
7  Tinnemeyer, what says the State?
8        MR. MCCLELLAN:  State strikes.
9        THE COURT:  Panelist Number -- I'm sorry.
10 Venireperson Number 21, Panelist Number 5, that being
11 Stacie Sibley.  As to Miss Sibley, what says the State?
12       MR. MCCLELLAN:  The State accepts.
13       MR. HILL:  Defense accepts.
14       THE COURT:  Next we come to Venireperson
15 Number 22, who is Panelist Number 6, that being Henry
16 Spencer, what says the State?
17       MR. MCCLELLAN:  State will accept.
18       THE COURT:  Mr. Hill?
19       MR. HILL:  Defense will strike.
20       THE COURT:  Panelist Number 7,
21 Venireperson Number 23, that being Miss Linda Wyatt,
22 what says the State?
23.      MR. MCCLELLAN:  State strikes.
24       THE COURT:  Venireperson Number 27, who is
25 Panelist Number 8, that being Raymond Russell, what says

50

1        THE COURT:  Miss Waller becomes the fourth
2  juror.  Venireperson Number 42, Panelist Number 12, Mr.
3  Michael Evans.  As to Mr. Evans, the State says?
4        MR. MCCLELLAN:  State accepts.
5        MR. HILL:  Defense accepts.
6        THE COURT:  Mr. Evans becomes Juror Number
7  5.  Next we come to Venireperson Number 13, who is
8  Panelist Number 13.  She goes by the name of Michele
9  Beasley.  Mr. McClellan, what says the State?
10       MR. MCCLELLAN:  State accepts.
11       THE COURT:  Mr. Hill?
12       MR. HILL:  Defense accepts.
13       THE COURT:  Miss Beasley becomes Juror
14 Number 6.  Venireperson Number 14, who is Panelist
15 Number 44, Miss Cecilia Fine.  As to Miss Fine, what
16 says the State, please?
17       MR. MCCLELLAN:  State accepts.
18       THE COURT:  Mr. Hill?
19       MR. HILL:  Defense accepts.
20       THE COURT:  Miss Fine becomes Juror Number
21 7.  Venireperson Number 48, who is Panelist Number 15,
22 Miss Vera Garcia.  As to Miss Garcia, what says the
23 State?
24       MR. MCCLELLAN:  State accepts.
25       THE COURT:  Mr. Hill?

51

1        MR. HILL:  Defense strikes.
2        THE COURT:  Miss Garcia becomes the sixth
3  peremptory strike exercised by the defendant.  Panelist
4  Number 50 -- I'm sorry -- Venireperson Number 50,
5  Panelist Number 16, Miss Rose Turner, as to Miss Turner
6  the State says what, please?
7        MR. MCCLELLAN:  State accepts.
8        THE COURT:  Mr. Hill?
9        MR. HILL:  Defense strikes.
10        THE COURT:  Miss Turner becomes the
11  seventh peremptory challenge.  Next we have Venireperson
12  Number 53, who is Panelist Number 17, that being
13  Mr. Donald Nelson.  The record will show he was hereto
14  excused by agreement of all concerned for a medical
15  disability.  We come to Panelist Number 72, who is
16  Venireperson Number 18, Miss Zenobia Prince.  As to Miss
17  Prince, what says the State?
18        MR. MCCLELLAN:  State will strike.
19        THE COURT:  Venireperson 77, who is
20  Panelist Number 19, Miss Suzette Barr, what says the
21  State?
22        MR. MCCLELLAN:  State accepts.
23        MR. HILL:  Defense strikes.
24        THE COURT:  Venireperson Number 78, who is
25  Panelist Number 20, Mr. Gilbert Cantu, the State says

52

1  what, please?
2        MR. MCCLELLAN:  State strikes.
3        THE COURT:  All right.  So, through the
4  first twenty panelists, we have seven jurors.  The State
5  has exercised four of her peremptory strikes, and the
6  defendant has exercised eight of his.
7        Venireperson Number 81, Panelist Number
8  21, Mr. Greg Adams.  As to Mr. Adams, what says the
9  State?
10        MR. MCCLELLAN:  State accepts.
11        THE COURT:  Mr. Hill?
12        MR. HILL:  Defense accepts.
13        THE COURT:  Venireperson Number 83, who is
14  Panelist Number 22, Charles Robert Gilbert, as to Mr.
15  Gilbert, what says the State?
16        MR. MCCLELLAN:  State will strike.
17        THE COURT:  Mr. Gilbert becomes the fifth
18  peremptory strike.  Venireperson Number 84, who's
19  Panelist Number 23, Miss Elyse Sony, Mr. McClellan,
20  State says what, please?
21        MR. MCCLELLAN:  State accepts.
22        THE COURT:  Mr. Hill?
23        MR. HILL:  Defense strikes.
24        THE COURT:  Miss Sony becomes the ninth
25  peremptory strike exercised.  We next come to

53

1  Venireperson Number 88, Panelist Number 24, Miss Stacie
2  Cokinos.  Mr. McClellan, State says what, please?
3        MR. MCCLELLAN:  State accepts.
4        THE COURT:  Mr. Hill?
5        MR. HILL:  Defense accepts.
6        THE COURT:  She becomes Juror Number 9.
7  We next come to Panelist Number 25, who is Venireperson
8  Number 93, Mr. Glen Dinkins.  As to Mr. Dinkins, what
9  says the State?
10        MR. MCCLELLAN:  State accepts.
11        THE COURT:  Mr. Hill?
12        MR. HILL:  Defense strikes.
13        THE COURT:  All right.  Through the first
14  twenty-five panel members, nine jurors have been
15  accepted.  Nine jurors have been accepted.  State has
16  exercised five strikes.  Defense has exercised ten.
17  I'm sorry.  That is right, because we let Mr. Nelson go.
18        Okay.  Next we get to Venireperson Number
19  95, who is Panelist Number 26, Miss Linda Kay Cook.  Mr.
20  McClellan?
21        MR. MCCLELLAN:  State strikes.
22        THE COURT:  Panelist Number 27,
23  Venireperson Number 99, Miss Judith Barnett.
24        MR. MCCLELLAN:  State strikes.
25        THE COURT:  We know about 28, Number 100.

54

1        MR. MCCLELLAN:  State strikes.
2        THE COURT:  Number 29, Venireperson Number
3  108, becomes the ninth panelist.  Number 30,
4  Venireperson Number 110, Miss Nohemy Bonilla.
5        MR. MCCLELLAN:  State accepts.
6        THE COURT:  Mr. Hill?
7        MR. HILL:  Defense accepts.
8        THE COURT:  All right.  Miss Bonilla
9  becomes the tenth juror.  So we have ten jurors, nine
10  strikes by the State, ten strikes by the defense.
11  Venireperson 112, Panelist Number 31, Linda Deaton.  As
12  to Miss Deaton?
13        MR. MCCLELLAN:  State accepts.
14        THE COURT:  Mr. Hill?
15        MR. HILL:  Defense accepts.
16        THE COURT:  Miss Deaton becomes the
17  eleventh juror.  Panelist Number 32, who's Venireperson
18  Number 113, Miss Traci Karam, as to Miss Karam, what
19  says the State?
20        MR. MCCLELLAN:  State accepts.
21        THE COURT:  Mr. Hill?
22        MR. HILL:  May we have just a moment,
23  Judge?  Defense accepts.
24        THE COURT:  We have concluded the jury.
25  Now each side has a strike as to the alternate.  And let

55

1  me ask you guys: The first possibility is Venireperson
2  Number 114, Panelist Number 33, Mr. Mathews, has the
3  spousal surgery circumstance. Since he is not going to
4  be in the body for the jury, does that alter anybody's
5  thought?
6          MR. HILL: I would agree to excuse him.
7          THE COURT: Now if he's going to be an
8  alternate and if we would excuse him -- if he said
9  Thursday, he'll possibly be gone anyway.
10         MR. MCCLELLAN: We'll agree to let him go.
11         THE COURT: If I understand correctly,
12 Panelist Number 33, who is Venireperson Number 114,
13 Mr. Joseph Mathews, because of matters that heretofore
14 have been agreed upon. Mr. McClellan, is that our
15 agreement?
16         MR. MCCLELLAN: Yes, Your Honor.
17         THE COURT: Ms. Connors?
18         MS. CONNORS: Yes, Your Honor.
19         THE COURT: Mr. Hill?
20         MR. HILL: Yes, sir, Your Honor.
21         THE COURT: Mr. Wentz?
22         MR. WENTZ: Yes, Your Honor.
23         THE COURT: Mr. Mamou, is that your
24 agreement?
25         MR. HILL: Yes, Your Honor, that is

56

1  Mr. Mamou's.
2          THE COURT: Okay. So the first vote on
3  the first potential is Venireperson Number 117, who's
4  Panelist Number 34, Mr. Kelly.
5          MR. MCCLELLAN: State accepts.
6          MR. HILL: Defense accepts.
7          THE COURT: Then Mr. Kelly becomes the
8  alternate. Can anybody think of any reason why we need
9  two?
10         All right. Ladies and gentlemen, if you
11 would, please, we have concluded the selection process.
12 Thirteen of you are going to be very, very, very
13 pleased. The remainder will be somewhat disappointed.
14 But in order to find out who those people are, Alice, if
15 you would, please.
16         THE CLERK: George Pena, Francis hash
17 /HAEUG again, Stacy Marie /SEUB /PWHREU, Katherine Marie
18 Waller, Michael Evans, Michele Beasley, Cecilia Fine,
19 Gregory Don Adams, Staci Cokinos, Nohemy Bonilla, Linda
20 Deaton, Traci Karam, and William Glenn Kelly.
21         THE COURT: All right. Where is
22 Mr. Kelly? Mr. Kelly, when you get up here, you'll be
23 able to plainly see we've used up all the chairs in the
24 jury box.
25         Ladies and gentlemen, for those of you who

57

1  have not been selected, I see some smiles out there.
2  All of us thank you very much for your time, for your
3  efforts, your participation, your help. I can assure
4  you that even though it has taken about three weeks to
5  get the jury, we could have not gotten the twelve or
6  thirteen we got without the help of each and every one
7  of you. In just a second you'll be given your excuses,
8  your hall passes, your work permits, or whatever you
9  want to call them, for anybody who just has a need to
10 know where you have been today; because you've had them
11 already up to today. So Neil will take those for you
12 out in the hallway. And if you'd walk through the door
13 and go out in the hallway to receive them, because that
14 way we can tend to our business here. And it being ten
15 after 11:00, with a little bit of good fortune, by 11:20
16 we can all be gone.
17         All right, ladies and gentlemen, I just
18 want to spend a couple of minutes with you to give you
19 an idea and a brief overview of what it is that you
20 might expect. First off, the gentleman right here,
21 Deputy Bernie Palmer, he is the bailiff for the 179th
22 District Court. In just a second I'm going to turn you
23 over to him. I have known him for many, many years; and
24 he's going to take you someplace. He's going to do it
25 in such a way that you'll know where you have been and

58

1  you'll know how to leave. But he is the bailiff of the
2  179th District Court. And the Judge of that court is
3  Judge Mike Wilkinson, who you will find to be just a
4  most delightful person. And the evidence will begin
5  Monday morning at 10:30 in his courtroom, which just
6  happens to be right next door to this.
7          So you're not going to be taken on some
8  big old trip, but I need to leave some messages with you
9  and some thoughts with you that will apply from now
10 certainly till Monday. Please keep in mind the routine
11 we have been through all along. Don't talk about this
12 case with anybody. Do not permit anybody to talk about
13 the case with you. I have no way of knowing if between
14 now and Monday morning there will be any news media
15 coverage regarding the case; but if there is, please
16 simply avoid it. If there is anything about the case on
17 the television, refuse to watch it; news, refuse to read
18 it; radio, refuse to listen to it. And quite frankly, I
19 don't know if I've told you this; but don't you talk to
20 anybody about the case, and don't let anybody talk about
21 it with you. The reason for each of those restrictions
22 is, I think I have said to most of you, if not all of
23 you before, is because now that you are a juror, the
24 decision you reach, whatever it winds up being, has got
25 to be based exclusively upon the information you receive

59

1  from inside the courtroom. And your decision cannot in
2  any way be influenced or affected by anything you might
3  hear outside the courtroom.
4       We have all spent a lot of time visiting
5  with you. I want you to know from this point forward,
6  Mr. Hill, Mr. Wentz, Mr. McClellan, Miss Connors, they
7  aren't going to talk to you anymore. I want you to know
8  that; because Monday morning when you come back into the
9  courtroom, if you get nothing from them other than a
10  hello or good morning, if you even get that, they are
11  not in any way being rude or impolite to you. It is,
12  however, that now that you have become jurors you, like
13  they, are officers of the court. And it is
14  impermissible for them to talk to you. It is
15  impermissible for you to talk to them. And I'm sure you
16  can see the reason for it. The people who are lawyering
17  in the case ought not be socializing with the people who
18  are deciding the facts in the case. So that's the
19  reason that we have that rule, but I want you to know
20  they're not being discourteous or impolite in any way.
21       At some point in time -- and it may be
22  very early in the trial -- you're going to start to hear
23  testimony about a geographical location, perhaps several
24  geographical locations within Harris County, Texas,
25  where something or some things are supposed to have

60

1  occurred. When you leave the court that day, after
2  having heard this testimony, please do not go to where
3  this location is or these locations are for the purposes
4  of conducting an inspection, for the purposes of
5  checking the place out, for the purposes of seeing what
6  it looks like. Your decision is going to have to be
7  based upon the descriptive accounts that are given by
8  the witnesses who are under oath, as well as any
9  physical items of evidence that might be admitted for
10  your consideration to assist you in that regard;
11  pictures, diagrams, whatever it might be.
12       The reason that's important is this: This
13  offense is supposed to have occurred, if it did occur,
14  back around December 7th of last year. So we're talking
15  about, in general terms, ten months ago. This premise,
16  this location, these premises, these locations, could
17  have dramatically changed their appearances between then
18  and now. And if you went there now for the purposes of
19  checking it out, you could get a horribly distorted and
20  completely inaccurate idea of what the place looked like
21  back at the time the things are suppose to have
22  occurred.
23       Likewise, although it's not permissible
24  for you to go by there and look at it, it's not
25  permissible for you to get an agent or a friend or a

61

1  family member for the purposes of going by and checking
2  it out and reporting to you what it looked like.
3  Because you can see that if you did that, that would be
4  just like talking to people, just like the media
5  exposure, you would be receiving information from
6  outside the courtroom that would necessarily -- you
7  would have requested it for the purposes of assisting
8  you -- that means influencing you -- in deciding the
9  verdict that you ultimately come up with. That is just
10  simply something that's not permissible to do.
11       Miss Connors, you would know the answer to
12  this perhaps better than anybody here. Judge Wilkinson
13  and note-taking, what's his thought?
14       MS. CONNORS: He allows them to take
15  notes.
16       THE COURT: Then you listen to Judge
17  Wilkinson about that, and the question was about taking
18  notes during the course of testimony. Everybody has
19  their own way of doing things. And frankly, I wasn't
20  aware of his. Trial will begin and it will end right
21  down the hallway. In terms of parking, please feel free
22  to park wherever it is you want to park. My best guess
23  is for most of you, if you're not familiar with the
24  courthouse area, continue to park where you were over in
25  the jury assembly room; because that's where you started

62

1  your business, and that may very well be where you feel
2  the most comfortable. If that's where you want to
3  continue to park, please do. If you want to park
4  someplace else around the courthouse area that's more
5  convenient to it, please do that, too. That's your
6  call.
7       I only want you to be aware of one thing.
8  Ordinarily you're not going to work late; but there may
9  come a time when Judge Wilkinson decides to work late,
10  if by working late that might mean the whole thing will
11  be over with. But you won't know that till after you
12  get here that particular day, if this does come into
13  play. We have a circumstance that exists around the
14  courthouse in Houston, Texas, and I'll swear does not
15  exist around any courthouse in any urban area in this
16  country that I'm aware of, and that's this:
17       We've got several different kinds of
18  parking lots. We've got the kind of parking lot where
19  you drive in, you pick a space with a number on it
20  sometimes, you park your car, you lock it up, and you
21  leave and you got your keys with you. Got another kind
22  of parking place that has an attendant. You drive in in
23  the morning. You leave your keys with the attendants;
24  because during the course of day, some cars will come
25  and go and they'll move them. And you don't get to keep

63

1 your keys. All these lots, every single one them,
2 claims they're going to close at a certain period of
3 time, and certainly they do. The problem with the kind
4 of lots where the attendants have your keys is that all
5 those parking lot attendants, every single one of them,
6 lives in El Campo or Wharton. So at the end of the day,
7 they take your keys with them to El Campo or Wharton.
8 You'll get them back the next day when you come back to
9 work. So that will do you no good that night. And I'm
10 not bad rapping these places. That's not the point. I
11 just wanted you to be aware that in the event that does
12 come up, if you do wind of working late, I want you to
13 be able to be in control of your own destiny. Wherever
14 you choose to park, that's your call. But keep that
15 thought in mind. If you have your keys, they can't
16 possibly take them from you. If you don't have your
17 keys, you may not be able to get them back that day.
18        Okay. Badges. I'm sure you've seen this.
19 You've got the badges with you right now. The reason
20 for those badges is extremely important. And you have
21 seen already how little room there is up here on this
22 eighth floor out here by the elevator bank. If we've
23 got three juries, that's thirty-six people, in round
24 numbers, milling around out there. And there may be
25 witnesses, there may be this, there may be that. The

64

1 point is, nobody knows who everybody else is. That's
2 why the badge wearing becomes very, very important, for
3 this reason:
4        We want folks to be able to know that you
5 are, right now, a juror presently and actively sitting
6 and hearing a criminal case that's ongoing. The idea
7 behind the wearing of those badges is to prevent
8 somebody, or at least minimize the chance, that somebody
9 might make some inadvertent slip of the lip, say
10 something in your presence that they never would have
11 said if they realized you were a juror. It may very
12 well be of such a magnitude that would cause us to
13 dismiss you, declare a mistrial, and start this all over
14 again. And I want you to know, these four lawyers and
15 myself, we pay at least as much in taxes as you do. The
16 real kick in the head is we five are going to have to go
17 through this again, and you twelve won't. That will be
18 annoying to some.
19        Please, from the time you get out of your
20 vehicle, your transportation in the morning, whatever it
21 is, to the time you get into it at the end of the day,
22 please wear those badges; because they really do
23 accomplish something. If you lose it, tell Deputy
24 Palmer. He'll Fed Ex you one. But wear the badges.
25        Mr. Kelly, for you, sir, let me spend a

65

1 couple of minutes visiting with you, specifically. You
2 are an alternate. If you have seen on television how
3 trials in California are suppose to go with alternates,
4 you're going to find that ours is completely different.
5 An alternate in the State of Texas means that you listen
6 just like -- to all the testimony just like all the
7 other twelve jurors. You endure the putting together,
8 the reading of the charge, and the attorneys arguments.
9 I don't mean endure this difficult time.
10        But through this process, also, and it is
11 when the jury goes out to begin their deliberations, as
12 to the question of whether the defendant is or is not
13 guilty. And if he is guilty of that -- that is, that in
14 the event something does not happen that is a legal
15 reason why a juror would be withdrawn from the jury, if
16 that does not happen, you would be excused at that time.
17 If it does happen, you will be notified and Judge
18 Wilkinson will say, Mr. Kelly, you are now Juror Number
19 So-and-so. I say that to you for this reason:
20        It's kind of like kids practicing football
21 that never got to play. They put in just as much time,
22 received just as much punishment as all the other kids
23 that did get to play. But when the game started, you
24 simply weren't called to play. And that's what is going
25 to happen here if no juror is excused for a good reason

66

1 that at present is not apparent. So please don't take
2 that as an affront, because it's not meant that way.
3        It's just that once the jury goes out and
4 begins their deliberations, the way our mechanism is set
5 up, the alternate is excused. But I want you to
6 understand there is a reason for it, and the reason is
7 simply the law requires it.
8        Mr. McClellan, is there anything you can
9 think of that I have omitted?
10        MR. McCLELLAN: No, Your Honor.
11        THE COURT: Mr. Hill, sir?
12        MR. HILL: No, Your Honor.
13        THE COURT: Ladies and gentlemen, any of
14 you have any questions for me that are of a nature I
15 would be legally permitted to answer? I'm going to
16 turn you over to the capable hands of Deputy Palmer. To
17 all, thank you very, very much. And I hope you find
18 this to be a good experience. With that, you're
19 excused.
20
21
22
23
24
25

67

1    THE STATE OF TEXAS   )

2    COUNTY OF HARRIS    )

3              I, Pamela Kay Knobloch, Official/Deputy
     Official Court Reporter in and for the 179th District
4    Court of Harris County, State of Texas, do hereby certify
     that the above and foregoing contains a true and correct
5    transcription of all portions of evidence and other
     proceedings requested in writing by counsel for the
6    parties to be included in this volume of the Reporter's
     Record, in the above-styled and numbered cause, all of
7    which occurred in open court or in chambers and were
     reported by me.

8              I further certify that this Reporter's Record
9    of the proceedings truly and correctly reflects the
     exhibits, if any, admitted by the respective parties.

10
              I further certify that the total cost for the
11   preparation of this Reporter's Record is $_____ and
     was paid by Harris County.

12
              WITNESS MY OFFICIAL HAND this the _____ day of
13   _____, 2000.

14

15   _____

16   Pamela Kay Knobloch, Texas CSR No. 1650
     Expiration date:  12/31/2000
17   Official Court Reporter, 179th District Court
     Harris County, Texas
18   301 San Jacinto
     Houston, Texas 77002
19   713.755.6340

20   APPELLANT:  CHARLES MAMOU, JR.
                 CAUSE NO. 800112
21

22
23
24
25

Case 4:14-cv-00403 Document 55-14 Filed on 8/11/14 in TXSD Page 250 of 377

**$**

$10,000 [1] 19:7
$_____ [1] 67:11

**/**

/HAEUG [1] 56:17
/PWHREU [1] 56:17
/SEUB [1] 56:17

**0**

0470500 [1] 2:5

**1**

1 [3] 3:18 47:9 47:15
10 [2] 47:23 49:11
100 [1] 53:25
108 [1] 54:3
10:30 [1] 58:5
11 [1] 49:21
110 [1] 54:4
112 [1] 54:11
113 [1] 54:18
114 [2] 55:2 55:12
117 [1] 56:3
11:00 [1] 57:15
11:20 [1] 57:15
12 [1] 50:2
12/31/2000 [1] 67:16
13 [2] 50:7 50:8
13396100 [1] 2:3
14 [1] 50:14
15 [1] 1:2 50:21
16 [1] 51:5
1650 [1] 67:16
17 [1] 51:12
179th [5] 1:11 57:21 58:2 67:3 67:17
18 [2] 48:5 51:16
19 [1] 51:20
1960 [1] 2:19
1999 [1] 1:18

**2**

2 [3] 47:9 47:16 47:21
20 [1] 51:25
2000 [1] 67:13
201 [1] 2:7
2039 [3] 21:12 21:20 21:22
21 [2] 48:10 52:8
21179300 [1] 2:18
21st [1] 45:14
22 [2] 48:15 52:14
23 [2] 48:21 52:19
24 [1] 53:1
25 [1] 1:2 53:7
26 [1] 53:19
27 [2] 48:24 53:22
28 [1] 53:25
281.587.0088 [1] 2:21
29 [1] 54:2
29th [1] 1:18

**3**

3 [1] 47:24
30 [1] 54:3
301 [1] 67:18
31 [1] 54:11
32 [1] 54:17
33 [4] 27:18 49:5 55:2 55:12
34 [1] 56:4
36 [1] 49:12

**38** [1] ... 29:18

**4**

4 [1] 48:5
42 [1] 50:2
44 [1] 50:15
4615 [1] 2:14
48 [1] 50:21

**5**

5 [2] 48:10 50:7
50 [2] 51:4 51:4
53 [1] 51:12
5629 [1] 2:19
59656300 [1] 2:13

**6**

6 [1] 48:15 50:14

**7**

7 [2] 48:20 50:21
713.623.8312 [1] 2:16
713.755.5800 [1] 2:9
713.755.6340 [1] 67:19
72 [1] 51:15
77 [1] 51:19
77002 [2] 2:8 67:18
77027 [1] 2:15
77069 [1] 2:20
78 [1] 51:24
7th [1] 60:14

**8**

8 [1] 48:25
800112 [1] 1:3 67:20
81 [1] 52:7
83 [1] 52:13
84 [1] 52:18
88 [1] 53:1

**9**

9 [2] 49:6 53:6
93 [1] 53:8
95 [1] 53:19
99 [1] 53:23
9th [1] 3:19

[1] 67:12

[1] 67:15

**A**

Abide [2] 26:17 26:23
Abilities [1] 39:20
Ability [1] 27:11
Able [3] 13:22 20:17 30:20 34:12 40:21 41:4 43:21 56:23 63:13 63:17 64:4
Above-entitled [1] 1:19
Above-styled [1] 67:6
Absolute [1] 26:15
Absolutely [1] 5:5
Accept [2] 47:13 48:17
Accepted [2] 49:18 53:15 53:15
Accepts [34] 47:11 47:18 47:19 48:1 48:12 48:13 49:2 49:8 49:14 49:23 49:25 50:4 50:5 50:10 50:12 50:17 50:19 50:24 51:7 51:22 52:10 52:12 52:21 53:3 53:5 53:10 54:5 54:7 54:13 54:15 54:20 54:23 56:5 56:6

Accident [2] 17:1 17:13
Accommodated [1] 27:2
Accomplice [2] 22:11 23:21
Accomplish [1] 64:23
Accomplishes [1] 19:6
Accounts [1] 60:7
Accumulated [1] 6:15
Accurate [2] 6:23 47:3
Accusation [2] 6:22 9:1
Accusing [1] 9:2 9:3
Act [2] 7:21 7:25
Acted [2] 37:20 38:20
Actively [1] 64:5
Acts [2] 12:9 39:11
Ad [1] 16:21
Adams [3] 52:8 52:8 56:19
Addition [2] 17:18 22:18
Address [1] 28:21
Addressed [1] 38:17
Admitted [2] 60:9 67:9
Affairs [2] 7:22 8:2
Affect [1] 27:10
Affected [2] 9:25 59:2
Affront [1] 66:2
Agent [1] 60:25
Ago [5] 6:8 6:12 6:17 35:17 60:15
Agree [5] 7:1 22:3 32:10 55:6 55:10
Agreed [2] 22:14 55:14
Agreeing [1] 34:11
Agreement [3] 51:14 55:15 55:24
Aided [1] 1:22
Alejandra [1] 47:24
Alice [1] 56:14
Allegation [2] 32:24 36:3 37:15
Allegations [4] 32:20 32:23 37:17 43:5
Alleged [6] 17:21 31:12 32:19 38:24 39:2 39:4
Allow [1] 39:13
Allows [1] 61:14
Alter [1] 55:4
Alternate [6] 54:25 55:8 56:8 65:2 65:5 66:5
Alternates [1] 65:3
Alternative [1] 32:15
Amie [2] 47:24 47:24
Amount [1] 19:7
Analogy [1] 42:11
Announced [1] 28:19
Annoying [1] 64:18
Answer [24] 4:11 4:12 11:23 11:25 12:5 12:10 12:12 12:15 13:9 13:11 14:10 14:19 14:20 14:21 15:5 15:11 15:13 15:17 15:19 16:17 20:24 27:4 61:11 66:15
Answered [5] 13:25 21:8 21:25 27:1 27:2
Answers [3] 4:9 5:6 27:6
Anytime [2] 18:5 18:9
Anyway [1] 55:9
Apparent [2] 38:11 66:1
Appearances [1] 60:17
Appellant [2] 1:6 67:20
Appellee [1] 1:11
Applied [1] 11:1
Applies [2] 5:15 38:10
Apply [6] 4:18 5:19 19:11 43:9 44:2 58:9
Appreciate [1] 44:19

Approach [1] 29:18
Appropriate [4] 4:5 11:19 13:19 43:10
Area [1] 61:24 62:4 62:5
Arguments [1] 65:8
Arise [1] 30:1
Arisen [1] 45:13
Arises [1] 40:4
Arrest [4] 6:10 6:17 6:18 41:6
Arrested [4] 6:3 6:11 23:1 23:15
Aspect [9] 6:25 9:11 10:24 11:1 22:7 22:9 26:18 26:24 41:20
Aspects [5] 5:18 5:19 26:24 29:4 34:18
Assembly [1] 61:25
Assessing [2] 20:2 20:8
Assist [1] 60:10
Assistant [2] 2:6 3:12
Assisting [1] 61:7
Assume [2] 27:1 31:16
Assumption [1] 36:5
Assure [4] 28:25 30:5 37:2 57:3
Attack [1] 17:9
Attempting [2] 32:25 33:11 33:17
Attendant [1] 62:22
Attendants [2] 62:23 63:4 63:5
Attorneys [6] 2:6 2:10 2:22 3:10 3:12 65:8
Available [1] 20:18
Avoid [1] 58:16
Aware [5] 40:3 61:20 62:7 62:16 63:11

**B**

Baby [2] 41:3 41:7
Background [1] 19:23 20:19 21:2
Backseat [1] 41:3
Backwards [1] 36:24
Bad [1] 63:10
Badge [1] 62:22
Badges [6] 63:18 63:19 63:20 64:7 64:22 64:24
Bag [3] 22:25 23:16 23:16
Bailiff [2] 57:21 58:1
Bank [6] 22:24 22:25 22:25 23:16 23:16 63:22
Baptist [1] 35:18
Barnett [1] 53:23
Barr [1] 51:20
Based [10] 5:24 7:17 9:23 10:18 10:19 20:4 20:10 20:25 58:25 60:7
Basis [7] 21:25 22:2 24:25 25:3 25:4 26:1 26:5
Beasley [2] 50:9 50:13 56:18
Become [3] 21:10 21:19 59:12
Becomes [18] 22:3 42:1 47:14 47:20 50:1 50:6 50:13 50:20 51:2 51:10 52:17 52:24 53:6 54:3 54:9 54:25 56:7 64:2
Began [1] 19:25
Begin [3] 58:4 61:20 65:11
Beginning [5] 11:12 11:13 27:11 31:23 32:3
Begins [3] 9:19 31:20 66:4
Behind [3] 40:13 41:8 64:7
Believability [4] 5:21 6:21 42:14 44:3

**Believes** [3] 5:8 18:2 25:5
**Bench** [2] 29:18 45:10
**Bernie** [1] 57:21
**Best** [5] 26:15 30:17 42:17 46:21 61:22
**Better** [3] 16:20 33:25 61:12
**Between** [3] 5:23 58:13 60:17
**Beyond** [30] 7:6 7:8 7:10 7:10 7:15 7:23 8:22 12:12 12:2 12:7 12:12 13:8 17:25 18:3 18:6 18:10 18:14 18:19 18:20 23:11 24:21 25:5 25: 30:17 31:1 31:3
**Big** [3] 26:20 46:22 50:8
**Bit** [5] 28:23 35:9 35:12 45:16 57:15
**Blinders** [2] 32:14 34:25
**Bob** [1] 1:20
**Body** [2] 16:4 55:4
**Bonilla** [3] 54:4 54:8 56:19
**Bottom** [1] 47:5
**Box** [2] 26:22 56:24
**Branch** [1] 34:3
**Brief** [1] 57:19
**Bring** [3] 21:14 39:4 44:14
**Bringing** [1] 9:1
**Brought** [1] 3:1
**Burden** [7] 30:4 30:13 30:25 31:5 31:13 39:1 45:5
**Burdens** [1] 33:9
**Burdette** [1] 1:20 23:3
**Burglary** [4] 6:8 6:11 6:13 6:17
**Business** [4] 7:2 20:23 57:14 62:1

## C

**California** [1] 65:3
**Campo** [2] 63:6 63:7
**Candid** [3] 29:5 29:16 34:20
**Cannot** [5] 9:25 21:19 22:15 23:6 59:1
**Cantrell** [2] 49:6 49:7
**Cantu** [1] 51:25
**Capable** [2] 32:13 66:16
**Capital** [34] 3:25 4:2 11:5 11:6 11:12 11:14 11:18 12:15 13:24 14:17 14:24 15:4 15:10 15:16 16:10 16:25 17:1 17:17 18:4 18:7 18:13 18:24 19:14 19:17 20:22 21:8 25:20 28:20 31:4 32:21 33:1 34:19 36:16 41:7 41:10
**Car** [13] 22:25 23:4 40:10 40:15 40:15 40:17 40:19 40: 22 40:23 40:25 41:6 41:14 62:20
**Care** [4] 24:15 24:17 24:18 40:17
**Careful** [1] 7:18
**Cares** [1] 24:19
**Carmouche** [1] 33:1
**Carry** [1] 32:3
**Cars** [1] 62:24
**Case** [82] 3:8 3:23 5:3 5: 25 6:2 6:20 6:21 7:19 8:8 9: 12 9:15 9:16 9:17 10:5 10: 10 10:19 11:2 11:5 11:20 12: 12 12:23 13:1 13:13 13:16 14:6 14:17 14:24 16:20 17: 21 18:2 18:15 18:22 19:15 19:15 20:4 20:11 20:19 20: 25 21:25 22:1 23:5 23:6 24: 3 24:15 24:19 25:15 25:16 27:11 28:22 29:4 29:9 29:15

30:16 30:21 30:25 31: 2 31:4 31:19 31:19 32:17 34: 8 34:15 35:20 36:2 36:3 37: 12 38:18 41:23 41:24 42:5 43:4 45:4 46:19 58:12 58:13 58:15 58:16 58:20 59:17 59: 18 64:6
**Cases** [7] 15:6 15:8 15:14 32:2 41:18 41:19 41:25
**Catch** [1] 41:4
**Caused** [3] 33:1 33:12 41:12
**Causes** [1] 40:4
**Cecilia** [2] 50:15 56:18
**Certain** [3] 21:18 36:16 63:2
**Certainly** [3] 20:23 58:10 63:3
**Certify** [3] 67:4 67:8 67:10
**Chairs** [1] 56:23
**Challenge** [1] 51:11
**Challenges** [1] 49:19
**Chambers** [1] 67:7
**Chance** [1] 64:8
**Change** [1] 30:21
**Changed** [1] 60:17
**Character** [4] 7:24 19:22 20:19 21:1
**Charge** [15] 5:10 5:12 5: 19 5:22 7:16 10:13 18:23 23: 21 36:15 38:12 38:22 39:5 42:1 42:15 65:8
**Charged** [6] 3:24 6:3 30:13 39:7 41:10 44:15
**Charges** [1] 43:13
**Charging** [1] 6:18
**Charles** [5] 1:5 3:9 44:14 57:20 67:20
**Checking** [3] 60:5 60:19 61:1
**Choice** [4] 18:23 18:24 18:25 19:1
**Choose** [2] 37:9 63:14
**Church** [1] 35:18
**Circumstance** [8] 10:14 19:11 24:9 27:8 44:11 45:13 55:3 62:13
**Circumstances** [12] 11:2 19:9 20:11 20:18 21:1 24:10 24:12 29:9 38:16 39:7 41:14 41:17
**Circumstantial** [16] 24: 4 24:6 24:16 25:9 25:17 25: 18 25:22 25:23 26:1 26:5 26: 6 26:7 26:10 26:16 41:11 43: 15
**Claim** [1] 31:15
**Claiming** [1] 19:11
**Claims** [1] 63:2
**Claire** [2] 2:4 3:13
**Clearly** [2] 38:7 38:8
**Clerk** [3] 40:12 41:12 56:16
**Close** [2] 39:3 63:2
**Closed** [1] 41:24
**Closer** [1] 46:21
**Coconspirator** [4] 22:17 23:6 23:8 23:15
**Coconspirator's** [2] 22:18 23:19
**Coin** [1] 8:7
**Cokinos** [2] 53:2 56:19
**Collectively** [1] 43:8
**Combination** [1] 24:17
**Comfortable** [12] 29:3 30: 5 30:8 31:7 34:8 36:19 37: 23 39:6 39:20 44:5 44:17 62:2
**Coming** [1] 19:21

**Comment** [1] 44:20
**Comments** [1] 44:20
**Commission** [5] 17:20 22: 21 23:9 23:13 23:18
**Commit** [11] 12:8 20:14 20: 16 22:13 22:14 22:14 22:15 31:12 32:25 33:11 33:17
**Commitment** [1] 34:5
**Commitments** [2] 34:9 34:10
**Commits** [1] 35:23
**Committed** [12] 6:4 6:5 6: 7 6:10 6:17 17:19 23:12 31: 14 31:14 33:18 38:24 44:15
**Committing** [4] 32:25 33:10 33:16 35:10
**Common** [2] 7:18 41:18
**Commonly** [1] 38:7
**Complainant** [1] 44:9
**Completely** [3] 5:8 60:20 65:4
**Complications** [1] 46:3
**Computer** [1] 1:22
**Concept** [3] 22:10 23:22 23:23
**Concepts** [1] 30:6
**Concerned** [1] 51:14
**Concerning** [3] 8:6 8:14 9:8
**Concluded** [3] 25:10 54:24 56:11
**Conclusion** [5] 5:11 5:13 19:24 25:15 45:6
**Conditioned** [2] 10:4 26:14
**Conduce** [1] 24:13
**Conducive** [1] 3:3
**Conduct** [1] 17:1
**Conducting** [1] 60:4
**Confinement** [3] 19:3 20:3 20:9
**Connect** [4] 22:20 23:9 23:13 23:18
**Connors** [8] 2:4 3:13 42:3 55:17 55:18 59:6 61:11 61:14
**Consider** [10] 13:16 13:20 20:2 20:8 34:2 38:15 39:13 42:24 42:25
**Considerable** [1] 30:2
**Consideration** [6] 7:19 10:15 21:11 21:20 22:4 60:10
**Conspirators** [1] 22:15
**Conspire** [1] 22:13
**Conspired** [1] 22:14
**Constitute** [1] 12:9
**Contained** [3] 13:3 14:13 16:1
**Contains** [1] 67:4
**Continue** [1] 61:24 62:3
**Continuing** [2] 12:9 60:11
**Control** [1] 63:13
**Convenience** [2] 40:8 40:10
**Convenient** [1] 62:5
**Conversation** [1] 12:18
**Conversations** [1] 3:22
**Convict** [1] 28:20
**Convicted** [5] 4:1 11:18 22:16 23:7 30:19
**Conviction** [1] 24:15
**Convictions** [1] 38:21
**Convincing** [2] 7:24 42:10
**Cook** [1] 53:19
**Correct** [5] 20:5 27:21 32:1 33:13 67:4
**Correctly** [2] 55:11 67:9
**Corroborated** [1] 23:19

**Corroborating** [1] 22:19
**Cost** [1] 67:10
**Counsel** [1] 67:5
**Counter** [2] 40:14 41:8
**Country** [4] 7:11 7:13 37:22 62:16
**County** [7] 1:8 1:21 59:24 67:2 67:4 67:17 67:17
**Couple** [5] 6:9 23:15 46:16 57:18 65:1
**Course** [14] 3:21 4:18 8:10 8:11 12:18 17:19 18:8 18:21 32:24 33:10 33:16 35:11 61:18 62:24
**Court** [90] 1:3 1:5 3:2 27:17 27:19 27:23 28:13 28:15 29:11 35:8 45:2 45:7 45:11 45:21 45:23 46:5 46:9 46:12 46:14 47:12 47:14 47:20 47:22 48:2 48:4 48:9 48:14 48:18 48:20 48:24 49:3 49:5 49:9 49:11 49:15 49:17 49:24 50:1 50:6 50:11 50:13 50:18 50:20 50:25 51:2 51:8 51:10 51:19 51:24 52:3 52:11 52:13 52:17 52:22 52:24 53:4 53:6 53:11 53:13 53:22 53:25 54:2 54:6 54:8 54:14 54:15 54:21 54:24 55:7 55:11 55:17 55:19 55:21 55:23 56:2 56:7 56:21 57:22 58:2 58:2 59:13 60:1 61:16 66:11 66:13 67:3 67:4 67:7 67:17 67:17
**Court's** [9] 5:10 5:12 5:19 7:16 10:12 23:20 36:15 38:12 42:1
**Courthouse** [5] 24:24 61:24 62:4 62:14 62:15
**Courtroom** [6] 6:20 9:19 10:6 46:23 58:5 59:1 59:3 59:9 61:6
**Cover** [1] 3:20
**Coverage** [1] 58:15
**Covered** [4] 26:19 26:20 26:21 26:23
**Credibility** [5] 4:24 5:6 8:13 10:8 42:13
**Credible** [3] 5:18 5:20 25:1
**Crime** [12] 17:16 22:13 22:14 22:21 23:9 23:12 23:13 23:19 24:8 30:13 31:25 39:12
**Crimes** [2] 18:7 18:10
**Criminal** [8] 6:2 12:8 35:14 35:15 35:19 36:11 38:17 64:6
**Cross** [2] 42:8 42:9
**Cross-examination** [2] 42:8 42:9
**CSR** [1] 67:16

## D

**Damning** [1] 42:24
**Danger** [1] 38:11
**Date** [1] 67:16
**Days** [3] 23:3 23:15 25:2
**Dead** [1] 41:8
**Deadly** [1] 17:9
**Deal** [2] 36:20 44:18
**Death** [21] 4:4 4:12 12:23 13:19 13:23 14:4 14:8 16:20 20:14 20:23 28:19 33:1 33:12 35:7 36:23 36:25 37:3 37:9 37:12 37:13 41:12
**Deaton** [4] 54:11 54:12 54:16 56:20
**December** [1] 60:14
**Decide** [2] 6:22 14:5
**Decides** [1] 62:9
**Deciding** [2] 59:18 61:8
**Decision** [19] 9:23 9:24

10:17 14:19 14:21 14:22 15:
20 15:21 15:25 15:25 16:3
16:4 29:10 35:2 43:3 44:12
58:24 59:1 60:6
**Decisions** [9] 14:17 14:·
23 14:25 15:1 15:22 27:24
29:24 39:19 41:22
**Declare** [1] 64:13
**Deep** [1] 44:22
**Defendant** [48] 2:22 3:24
5:8 6:24 8:8 8:19 8:24 9:14
9:21 10:12 10:16 11:6 12:8
12:14 13:23 15:15 18:1 18:4
18:13 19:16 19:18 19:23 20:
20 21:3 21:7 21:10 21:19 21:
22 22:21 24:13 25:20 30:21
30:22 31:8 31:11 31:15 33:
10 33:16 36:8 37:20 38:14
38:20 38:24 42:4 49:20 51:3
52:6 65:12
**Defendant's** [12] 7:4 7:6
8:6 8:15 8:25 9:8 9:13 12:3
20:2 20:9 24:21 25:12
**Defense** [34] 9:14 9:15 9:
20 13:10 28:13 34:14 37:5
37:10 39:11 41:25 47:19 48:
3 48:13 48:19 49:4 49:10 49:
16 49:25 50:5 50:12 50:19
51:1 51:9 51:23 52:12 52:23
53:5 53:12 53:16 54:7 54:10
54:15 54:23 56:6
**Definition** [1] 7:16
**Degree** [1] 10:23
**Deliberations** [3] 20:1
65:11 66:4
**Delightful** [1] 58:4
**Deputy** [3] 57:21 64:23 66:
16
**Described** [1] 41:21
**Descriptive** [1] 60:7
**Deserve** [1] 21:25
**Destiny** [1] 63:13
**Detail** [1] 29:2
**Determine** [15] 4:22 5:1
5:21 6:21 6:23 19:18 20:20
21:24 32:12 33:6 33:21 34:3
35:25 36:8 44:12
**Determines** [1] 19:16
**Determining** [3] 5:5 36:
10 46:19
**Developed** [1] 32:11
**Diagrams** [1] 60:11
**Dictate** [2] 4:10 15:2
**Dictates** [1] 15:4
**Difference** [2] 25:7 25:9
**Different** [14] 16:6 16:
14 16:16 17:21 19:9 21:14
27:5 32:20 33:9 33:23 43:13
45:14 62:17 65:4
**Difficult** [3] 35:4 35:6
65:9
**Difficulty** [1] 34:18
**Dinkins** [2] 53:8 53:8
**Dire** [4] 1:15 28:16 36:21
45:12
**Direct** [7] 24:4 24:5 24:
16 25:8 25:21 26:7 43:16
**Disability** [1] 51:15
**Disagree** [1] 30:24
**Disagrees** [1] 32:16 .
**Disappointed** [1] 56:13
**Discharge** [2] 31:17 44:7
**Disclose** [1] 34:19
**Discourteous** [1] 59:20
**Discussion** [2] 37:8 46:13
**Dismiss** [1] 64:13
**Dismissed** [1] 32:15
**Distorted** [1] 9:7
**District** [8] 1:5 1:11 2:
6 3:12 57:22 58:2 67:3 67:17
**Dive** [1] 40:13

**DNA** [1] 26:16
**Doctor** [1] 45:19
**Don** [1] 56:19
**Donald** [1] 51:13
**Done** [3] 13:21 17:13 40:1
**Door** [3] 6:10 57:12 58:6
**Doubt** [39] 7:6 7:8 7:10 7:
10 7:15 7:17 7:17 7:20 7:23
8:5 8:14 8:22 9:7 11:23 12:
3 12:7 12:12 13:8 17:25 18:
3 18:6 18:10 18:15 18:19 18:
21 23:11 24:22 25:6 25:11
25:13 25:19 25:23 26:2 30:
16 30:17 31:1 31:3 36:12 38:
23
**Down** [6] 12:23 14:8 24:23
41:17 44:22 61:21
**Downtown** [1] 3:4
**Dramatically** [1] 60:17
**Drastically** [1] 33:8
**Dreamed** [1] 7:9
**Drive** [3] 41:2 62:19 62:22
**Driver** [1] 23:4
**Driving** [1] 31:2
**During** [15] 3:21 4:18 8:
10 8:11 12:18 17:19 17:23
18:8 18:21 35:11 35:14 36:
10 36:21 61:18 62:24

---

### E

**Early** [1] 59:22
**Earth** [1] 26:9
**Easy** [1] 42:7
**Efforts** [1] 57:3
**Eight** [1] 52:6
**Eighth** [1] 63:22
**Either** [2] 14:10 37:10
**El** [2] 63:6 63:7
**Element** [2] 39:22 39:23
**Elements** [5] 33:3 33:7
36:16 36:17 39:2
**Elevator** [2] 3:5 63:22
**Eleventh** [1] 54:17
**Eligible** [3] 21:10 21:20
22:4
**Eliminate** [1] 25:11
**Elyse** [1] 52:19
**Embarrass** [1] 29:19
**End** [6] 32:4 35:2 45:4 61:
20 63:6 64:21
**Endure** [1] 65:7 65:9
**Enforce** [6] 9:12 11:1 16:
24 22:9 23:25 39:21
**Ensure** [1] 30:18
**Entering** [1] 31:10
**Entirely** [1] 11:16
**Entrusted** [1] 29:23
**Episode** [1] 35:14
**Equates** [1] 43:25
**Eroded** [2] 8:17 11:7
**Errors** [1] 32:2
**Essential** [1] 42:6
**Establish** [2] 25:12 31:13
**Established** [1] 44:13
**Establishes** [3] 8:22 24:
21 25:12
**Evaluate** [1] 33:5
**Evaluating** [2] 4:8 44:2
**Evaluation** [2] 15:12 15:
18
**Evans** [4] 50:3 50:3 50:6
56:18
**Event** [1] 28:20 63:11 65:
14
**Events** [1] 6:5
**Everyday** [1] 24:24
**Evidence** [94] 4:7 4:9 4:

23 5:11 5:13 5:25 6:6 6:12
6:14 6:16 6:18 6:21 7:19 8:
9 8:12 8:18 8:21 9:6 9:21
10:19 11:9 11:10 12:2 12:7
12:11 12:21 13:6 13:7 13:12
13:16 13:17 14:6 14:7 15:9
15:12 15:15 15:18 15:20 16:
1 16:5 16:13 16:16 19:15 19:
21 19:24 20:4 20:25 22:1 22:
19 23:5 23:7 23:17 24:3 24:
4 24:4 24:5 24:6 24:16 24:
16 24:20 25:10 25:16 25:16
25:18 25:21 25:23 26:1 26:5
26:6 26:16 30:14 32:14 33:5
34:2 34:4 34:25 35:25 36:2
36:5 36:15 37:19 37:25 39:
19 41:11 41:24 42:8 43:2 43:
16 43:16 43:18 44:13 58:4
60:9 67:5
**Ex** [1] 64:24
**Exactly** [9] 14:5 16:4 17:
1 17:16 20:22 24:6 31:15 39:
2 43:21
**Examination** [4] 1:15 28:
16 42:8 43:2
**Example** [9] 3:18 6:7 15:
22 16:7 18:8 22:22 23:14 35:
21 40:6
**Exceed** [1] 19:7
**Except** [1] 17:18
**Exclude** [1] 8:5
**Excludes** [2] 8:14 9:7
**Exclusive** [2] 4:23 10:8
**Exclusively** [3] 22:16 28:
7 58:25
**Excuse** [5] 11:13 17:5 17:
17 55:6 55:8
**Excused** [5] 51:14 65:16
65:25 66:5 66:19
**Excuses** [1] 57:7
**Exercised** [8] 49:19 49:
20 51:3 52:5 52:6 52:25 53:
16 53:16
**Exhibits** [1] 67:9
**Exist** [2] 24:3 62:15
**Existence** [5] 18:6 18:9
18:15 18:18 40:3
**Exists** [7] 5:25 8:2 10:19
13:14 22:1 27:8 62:13
**Expect** [2] 36:1 57:20
**Experience** [1] 66:18
**Expiration** [1] 67:16
**Explain** [2] 40:7 41:14
**Explained** [1] 37:6
**Explaining** [1] 39:6
**Exposure** [1] 61:5
**Extract** [1] 5:17
**Extremely** [1] 63:20
**Eyewitness** [4] 25:17 43:
19 44:1 44:3
**Eyewitness'** [2] 25:5 25:6
**Eyewitnesses** [1] 25:1
**Eyewitnesses'** [2] 24:25
25:3

---

### F

**Face** [2] 26:8 47:2
**Faced** [1] 38:19
**Fact** [28] 3:25 6:1 6:6 7:4
10:17 11:3 13:4 14:25 16:25
17:2 17:6 17:12 17:15 18:5
19:18 20:21 21:4 21:5 21:13
22:13 24:14 26:3 26:6 29:12
29:22 30:24 34:23 37:2
**Facts** [4] 4:24 29:9 43:12
59:18
**Failure** [1] 33:7
**Fair** [1] 10:3 ·
**Familiar** [1] 61:23
**Family** [1] 61:1
**Fannin** [1] 2:7

**Far** [1] 10:22
**Fed** [1] 64:24
**Felonies** [1] 17:21
**Felony** [1] 17:21
**Few** [1] 32:21
**Fifteen** [1] 46:20
**Fifth** [1] 52:17
**Figure** [1] 43:11
**Figured** [1] 44:22
**Fill** [1] 39:4
**Finally** [1] 39:19
**Finders** [2] 29:22 34:23
**Fine** [6] 19:6 19:7 50:15
50:15 50:20 56:18
**Fingerprint** [4] 23:17 26:
6 26:9 26:11
**Fingerprints** [1] 26:15
**Firearm** [1] 33:2
**First** [20] 4:14 4:20 5:11
11:23 11:24 12:1 12:5 16:18
29:20 36:21 41:15 46:23 47:
8 49:17 52:4 53:13 55:1 56:
2 56:3 57:20
**Fit** [2] 43:12 43:12
**Five** [8] 19:4 20:10 21:16
24:25 25:3 49:20 53:16 64:16
**Flawed** [1] 31:23
**Flip** [3] 8:7 20:7 33:15
**Floor** [1] 63:22
**FM** [1] 2:19
**Focus** [1] 32:13
**Foggiest** [1] 9:18
**Folks** [5] 45:8 46:18 46:
18 47:2 64:4
**Follow** [6] 6:25 9:11 10:
25 16:23 22:8 23:24 37:25
39:21
**Following** [1] 1:18
**Football** [1] 65:20
**Foregoing** [1] 67:4
**Fork** [1] 34:3
**Fortune** [1] 57:15
**Forty** [2] 21:11 22:4
**Forward** [3] 29:24 30:14
59:5
**Four** [2] 52:5 64:14
**Fourth** [1] 50:1
**Framework** [1] 38:25
**Francis** [1] 56:16
**Frankly** [3] 46:15 58:18
61:19
**Frantic** [1] 40:20
**Free** [1] 61:21
**Freeway** [1] 2:14
**Friend** [1] 60:25
**Full** [1] 20:17
**Function** [4] 4:20 4:21 4:
21 4:22
**Future** [3] 16:12 16:16 22:
3

---

### G

**Game** [1] 65:23
**Gaps** [1] 39:4
**Garcia** [3] 50:22 50:22 51:
2
**General** [2] 4:18 60:15
**Gentleman** [2] 44:14 57:20
**Gentlemen** [8] 3:3 28:18
41:24 46:14 56:10 56:25 57:
17 66:13
**Geographical** [2] 59:23
59:24
**George** [2] 47:9 56:16
**Getaway** [1] 23:4
**Gilbert** [4] 51:25 52:14

52:15 52:17

**Given** [10] 4:25 7:16 10:9 28:21 29:25 33:23 42:15 43: 4 57:7 60:7
**Glen** [1] 53:8
**Glenn** [1] 56:20
**Government** [1] 7:14
**Grab** [1] 40:19
**Granted** [1] 22:6
**Gravity** [1] 43:4
**Great** [3] 29:2 36:20 44:18
**Greater** [1] 10:22
**Greg** [1] 52:8
**Gregory** [1] 56:19
**Group** [6] 26:21 26:22 29: 7 29:13 32:8 46:23
**Guess** [5] 21:23 46:21 61: 22
**Guilt** [18] 7:4 7:6 7:8 7: 10 7:14 8:4 8:6 8:15 8:22 9: 8 9:14 11:16 12:3 14:18 15: 4 24:13 24:21 25:13
**Guilty** [43] 6:24 8:9 8:9 8:16 8:20 8:20 8:24 8:25 10: 7 10:17 11:6 12:1 12:15 13: 23 15:10 15:16 16:8 16:10 18:1 18:4 18:13 18:16 18:24 18:25 19:1 19:17 19:17 19: 19 21:6 21:7 24:24 25:3 25: 4 25:20 25:25 26:4 31:11 33: 13 33:19 39:14 45:6 65:13 65:13
**Gun** [2] 38:8 40:11
**Guy** [1] 22:23
**Guys** [1] 55:1

---

## H

**Hall** [1] 57:8
**Hallway** [3] 57:12 57:13 61:21
**Hand** [6] 5:4 15:13 29:18 33:9 43:1 67:12
**Hands** [1] 66:16
**Harris** [7] 1:8 1:21 59:24 67:2 67:4 67:11 67:17
**Hash** [3] 43:9 56:16
**Hashagen** [2] 47:17 47:20
**Head** [1] 64:16
**Hear** [11] 9:24 10:1 10:3 10:5 10:20 10:21 42:8 43:15 44:9 59:3 59:22
**Heard** [6] 1:19 7:7 15:14 19:15 26:3 60:2
**Hearing** [2] 19:21 64:6
**Held** [1] 1:21
**Hello** [1] 59:10
**Help** [3] 47:1 57:3 57:6
**Helps** [1] 30:8
**Henry** [1] 48:15
**Hereby** [1] 67:4
**Hereto** [1] 51:13
**Heretofore** [1] 55:13
**Hesitate** [1] 7:21
**Hesitation** [1] 8:1
**Hiding** [1] 42:19
**High** [1] 46:20
**Hill** [56] 2:12 3:10 28:13 28:14 28:17 35:9 46:9 46:11 47:12 47:13 47:19 48:2 48:3 48:13 48:18 48:19 49:3 49:4 49:9 49:10 49:15 49:16 49: 24 49:25 50:5 50:11 50:12 50:18 50:19 50:25 51:1 51:8 51:9 51:23 52:11 52:12 52: 22 52:23 53:4 53:5 53:11 53: 12 54:6 54:7 54:14 54:15 54: 21 54:22 55:6 55:19 55:20 55:25 56:6 59:6 66:11 66:12
**Himself** [2] 9:22 31:9
**Hold** [1] 45:5

---

**Holds** [1] 40:11
**Honor** [9] 28:12 28:14 55: 16 55:18 55:20 55:22 55:25 66:10 66:12
**Honorable** [1] 1:20
**Hope** [3] 29:12 43:4 66:17
**Horribly** [1] 60:19
**Houston** [6] 1:21 2:8 2:15 2:20 62:14 67:18
**Human** [1] 17:3
**Hypothetical** [3] 19:10 19:14 19:20

---

## I

**Idea** [5] 7:7 9:18 57:19 60: 20 64:6
**Imaginary** [1] 20:2
**Immaterial** [1] 5:8
**Impartial** [1] 7:18
**Impermissible** [2] 59:14 59:15
**Impolite** [2] 59:11 59:20
**Important** [9] 5:2 7:21 8: 1 29:10 32:21 38:2 60:12 63: 20 64:2
**Impose** [2] 4:11 19:6 20:20
**Imposed** [2] 21:9 21:24
**Impression** [1] 44:16
**Imprisonment** [1] 35:7
**Inaccurate** [1] 60:20
**Inadvertent** [1] 64:9
**Inaudible** [1] 40:9
**Included** [2] 43:19 67:6
**Independent** [5] 14:25 15: 21 22:19 23:8 23:17
**Indication** [1] 37:5
**Indicted** [1] 6:4
**Indictment** [6] 3:24 6:19 32:19 38:25 38:25 39:2
**Individual** [6] 12:18 36: 21 38:6 40:1 41:4 41:11
**Individual's** [1] 40:25
**Individually** [5] 3:15 27:9 34:9 44:21 46:17
**Individuals** [1] 37:24
**Infer** [1] 10:16
**Influenced** [2] 9:25 59:2
**Influencing** [1] 61:8
**Information** [3] 3:17 58: 25 61:5
**Innocence** [2] 11:15 30:3
**Innocent** [4] 8:17 11:7 30:12 30:18
**Inside** [2] 44:22 59:1
**Insinuate** [1] 10:16
**Inspection** [1] 60:4
**Instance** [3] 10:14 33:13 39:13
**Instances** [1] 6:19
**Instead** [2] 22:17 25:21
**Instruct** [3] 36:13 38:12 38:22
**Instructions** [2] 43:11 43:13
**Intent** [1] 28:19
**Intentional** [5] 17:3 17: 16 17:18 17:24 18:18
**Intentionally** [6] 17:14 33:1 33:12 36:9 39:8 40:2
**Interesting** [1] 38:5
**Interfere** [1] 27:10
**Interwoven** [1] 24:9
**Intimidating** [1] 29:13
**Intoxicated** [1] 31:2
**Investigate** [1] 31:25
**Investigating** [1] 31:20

---

**Investigation** [4] 6:15 31:22 31:25 32:6
**Involved** [3] 5:3 32:6 42: 4
**Involvement** [1] 21:2
**Issue** [9] 14:19 14:20 14: 21 15:2 15:11 15:17 37:3 38: 4 44:6
**Issues** [3] 4:10 30:1 41:13
**Items** [1] 60:9
**Itself** [1] 23:11

---

## J

**Jacinto** [1] 67:18
**Jerri** [1] 43:6
**Job** [8] 5:4 5:6 7:3 8:23 8: 25 35:24 36:7 43:11
**Joseph** [1] 55:13
**Jr** [1] 5:3 9:67:20
**Judge** [31] 1:20 5:7 5:9 5: 20 10:8 30:2 31:8 33:4 33: 24 35:1 36:13 36:22 37:1 37: 6 38:1 39:10 39:13 41:23 42: 4 42:15 42:21 43:10 43:13 43:15 54:23 58:2 58:3 61:12 61:16 62:9 65:17
**Judge's** [2] 5:4 5:6
**Judges** [1] 4:23 42:13 42: 17
**Judgment** [1] 34:15
**JUDICIAL** [1] 1:11
**Judith** [1] 53:23
**Jump** [1] 40:16
**Jumps** [3] 22:25 22:25 40: 15
**Juries** [1] 63:23
**Juror** [27] 9:12 9:23 9:25 10:18 10:25 16:24 19:14 22: 8 25:15 27:11 46:19 47:9 47: 14 47:20 50:2 50:6 50:13 50: 20 53:6 54:9 54:17 58:23 64: 5 64:11 65:15 65:18 65:23
**Jurors** [9] 3:8 35:16 49: 18 52:4 53:14 53:15 54:9 59: 12 65:7
**Jurors'** [1] 4:5
**Jury** [42] 4:8 4:9 6:20 8:3 8:13 10:15 11:4 12:14 12:15 13:15 14:4 14:23 15:19 18: 24 17:25 18:2 18:3 18:19 18: 20 19:5 19:16 19:17 21:23 25:5 26:22 28:9 28:20 32:18 33:24 35:24 37:4 39:17 43:8 46:1 54:24 55:4 56:24 57:5 61:25 65:11 65:15 66:3
**Jury's** [8] 11:10 12:1 14: 17 18:12 18:15 25:1 25:12 32:22
**Justification** [4] 17:4 17:8 17:17 39:12
**Justified** [1] 39:9
**Justify** [1] 13:2

---

## K

**Karam** [3] 54:18 54:18 56: 20
**Katherine** [2] 49:22 56:17
**Katheryne** [1] 49:12
**Kay** [2] 53:19 67:3 67:16
**Keep** [6] 34:24 41:22 46:25 58:10 62:25 63:14
**Kelly** [7] 56:4 56:7 56:20 56:22 56:22 64:25 65:18
**Keys** [9] 40:13 40:13 62:21 62:23 63:1 63:4 63:7 63:15 63:17
**Kick** [1] 64:16
**Kidnapping** [10] 17:22 18: 8 18:22 32:25 33:11 33:17 33:19 35:11 39:23 39:23
**Kids** [2] 65:20 65:22

---

**Killed** [1] 40:23
**Killing** [1] 39:8
**Kills** [1] 40:12
**Kind** [14] 7:20 15:22 32:8 34:1 36:23 39:3 40:6 41:16 42:25 45:21 62:18 62:21 63: 3 65:20
**Kinds** [2] 39:17 62:17
**Knobloch** [2] 67:3 67:16
**Knowing** [2] 34:9 58:13
**Knowledge** [1] 34:2
**Known** [1] 57:23
**Knows** [2] 9:20 64:1
**Kurt** [2] 2:17 3:10

---

## L

**Lack** [1] 33:25
**Ladies** [8] 3:2 28:18 41: 23 46:14 56:10 56:25 57:17 66:13
**Laparoscopy** [1] 45:22
**Last** [5] 24:2 28:21 38:3 42:11 60:14
**Late** [4] 62:8 62:9 62:10 63:12
**Law** [25] 5:14 5:19 5:22 5: 25 6:25 9:11 10:24 11:1 13: 21 22:7 22:9 22:10 24:14 24: 17 24:18 24:19 26:18 26:24 29:4 34:18 37:25 39:21 39: 21 41:20 66:7
**Lawyering** [1] 59:16
**Lawyers** [1] 64:14
**Least** [3] 9:7 64:4 64:15
**Leave** [5] 58:1 58:8 60:1 62:21 62:23
**Left** [2] 26:12 40:9
**Legal** [6] 17:4 17:5 17:8 39:11 43:11 65:14
**Legally** [1] 66:15
**Length** [1] 35:15
**Less** [2] 19:4 27:13
**Level** [1] 22:20
**Liberty** [1] 30:11
**Life** [20] 4:3 4:13 11:20 12:24 13:18 14:9 16:19 17:3 19:3 20:3 20:14 20:23 21:5 21:9 21:15 21:18 35:6 35:14 38:10 45:13
**Light** [1] 38:15
**Likewise** [3] 20:7 25:8 60:23
**Linda** [4] 48:21 53:19 54: 11 56:19
**Line** [1] 47:5
**Lip** [1] 64:9
**Listen** [9] 5:7 5:9 6:20 29:8 36:15 42:7 58:18 61:16 65:5
**Listened** [1] 37:19
**Lives** [2] 36:9 63:6
**Location** [4] 35:23 59:23 60:3 60:16
**Locations** [3] 59:24 60:3 60:16
**Lock** [1] 62:20
**Look** [12] 25 16:1 16:4 16:13 30:6 32:17 38:13 42:9 44:25 47:2 47:2 60:24
**Looked** [2] 60:20 61:2
**Looking** [3] 3:17 12:21 41: 8
**Looks** [1] 60:6
**Lose** [1] 64:23
**Lucky** [1] 44:24
**Lyn** [2] 2:2 3:12
**Lynne** [1] 49:6

## M

**Machine** [1] 1:23
**Magnitude** [1] 64:12
**Mamou** [9] 1:5 3:9 3:9 29: 21 32:24 44:15 45:6 55:23 67:20
**Mamou's** [1] 56:1
**Man** [1] 22:24
**Map** [3] 34:1 36:18 42:2
**Marie** [3] 33:1 56:17 56:17
**Mathews** [8] 27:21 44:20 45:9 45:11 45:15 45:24 55:2 55:13
**Matter** [1] 16:17
**Matters** [1] 55:13
**Matthews** [1] 27:23
**McClellan** [49] 2:2 3:12 28:8 28:11 42:3 45:23 45:25 46:8 47:11 47:18 48:1 48:8 48:12 48:17 48:23 49:2 49:8 49:14 49:23 50:4 50:9 50:10 50:17 50:24 51:7 51:18 51:21 52:2 52:12 52:10 52:16 52:19 52:21 53:2 53:3 53:10 53:20 53:21 53:24 54:1 54:5 54:13 54:20 55:10 55:14 55:16 56: 5 59:6 66:8 66:10
**Mean** [4] 10:6 21:18 62:10 65:9
**Meaning** [2] 24:5 24:6
**Means** [7] 4:25 17:7 21:5 21:15 21:16 61:8 65:5
**Meant** [1] 66:2
**Measure** [1] 30:17
**Mechanism** [1] 66:4
**Media** [2] 58:14 61:4
**Medical** [1] 51:14
**Member** [1] 61:1
**Members** [1] 53:14
**Memory** [1] 4:16
**Mentioned** [1] 45:11
**Message** [2] 42:22 42:23
**Messages** [1] 58:8
**Messenger** [2] 42:22 43:1
**Method** [1] 36:14
**Michael** [2] 50:3 56:18
**Michele** [2] 50:8 56:18
**Middle** [3] 15:24 20:15 32: 8
**Middle-of-the-road** [1] 32:8
**Might** [17] 10:10 18:17 19: 25 29:4 32:14 32:15 37:19 40:22 41:13 42:9 47:4 57:20 59:2 60:9 60:11 62:10 64:9
**Mike** [1] 58:3
**Milling** [1] 63:24
**Mind** [8] 11:10 13:2 25:12 41:22 43:17 47:3 58:10 63:15
**Minds** [4] 4:5 25:1 34:24 38:7
**Minimize** [1] 64:8
**Minutes** [6] 41:5 46:16 46: 20 46:22 57:18 65:1
**Miss** [37] 42:3 47:16 47:20 47:24 48:6 48:6 48:11 48:21 49:7 49:12 50:1 50:13 50:15 50:15 50:20 50:22 50:22 51: 2 51:5 51:5 51:10 51:16 51: 16 51:20 52:19 52:24 53:1 53:19 53:23 54:4 54:8 54:12 54:16 54:18 54:18 56:9 61:11
**Mistrial** [1] 64:13
**Mitigating** [3] 13:6 13: 12 13:17
**Mitigation** [2] 12:19 13:5
**Moment** [2] 39:22 54:22
**Moments** [1] 32:22

## N

**Name** [1] 50:8
**Narrowing** [2] 32:13 42:6
**Nature** [5] 13:7 13:13 13: 17 34:20 66:14
**Nauseam** [1] 16:21
**Near** [1] 26:22
**Necessarily** [4] 17:7 32: 1 43:25 61:6
**Necessary** [1] 41:1
**Necessity** [3] 40:4 41:1 41:13
**Need** [3] 56:8 57:9 58:8
**Neil** [1] 57:11
**Nelson** [2] 51:13 53:17
**Neutral** [3] 29:22 32:9 34: 23
**Never** [10] 7:11 7:12 8:24 13:10 14:1 31:23 37:8 37:13 64:10 65:21
**New** [2] 11:16 11:17
**News** [2] 58:14 58:17
**Next** [15] 7:2 16:3 27:11 45:20 47:16 47:22 48:4 48: 14 50:7 51:11 52:25 53:7 53: 18 58:6 63:8
**Nice** [1] 3:4
**Night** [1] 63:9
**Nine** [3] 53:14 53:15 54:9
**Ninety-nine** [1] 19:5
**Ninth** [2] 52:24 54:3
**Nobody** [4] 4:6 9:20 13:6 23:23 25:24 64:1
**Nohemy** [2] 54:4 56:19
**None** [3] 6:5 42:16 44:15
**Note** [2] 45:20 61:13
**Note-taking** [1] 61:18
**Notes** [3] 47:2 61:15 61:18
**Nothing** [5] 5:5 22:5 25: 16 28:11 59:9
**Notified** [1] 65:17
**Notion** [1] 6:16
**Notions** [1] 21:14
**Number** [96] 3:18 12:16 12: 17 12:17 14:1 14:2 14:3 14:

14:20 14:21 14:21 15:5 15:6 15: 19 15:15 16:10 18:14 18:17 27:17 47:9 47:9 47:14 47:16 47:21 47:23 47:23 47:24 48: 5 48:5 48:5 48:9 48:10 48: 10 48:15 48:15 48:20 48:21 48:24 48:25 49:5 49:6 49:11 49:12 49:21 49:21 50:2 50:2 50:6 50:7 50:8 50:14 50:14 50:20 50:21 50:21 51:5 51: 4 51:4 51:5 51:12 51:12 51: 51 51:19 51:20 51:24 51:25 52:7 52:7 52:13 52:14 52:18 52:19 53:1 53:1 53:6 53:7 53:8 53:18 53:19 53:22 53: 23 53:25 54:2 54:2 54:3 54: 4 54:11 54:17 54:18 55:2 55: 2 55:12 55:12 56:3 56:4 62: 19 65:18
**Numbered** [2] 1:20 67:6
**Numbers** [2] 25:7 63:24

## O

**Oath** [1] 60:8
**Object** [2] 26:12 26:13
**Obligated** [1] 18:22
**Obligation** [6] 8:2 18:12 31:9 39:5 39:18 42:1
**Obligations** [1] 31:18
**Obvious** [1] 39:24
**Obviously** [3] 11:7 16:16 35:20
**Occur** [5] 6:19 8:15 18:11 24:8 60:13
**Occurred** [7] 18:21 35:17 36:10 60:1 60:13 60:22 67:7
**Occurs** [1] 43:23
**Off-the-record** [1] 46:13
**Offense** [13] 3:24 4:1 4:2 6:3 6:4 6:5 6:7 10:17 21:1 25:20 31:12 31:14 60:13
**Offer** [1] 31:9
**Officer** [1] 32:7
**Officers** [2] 6:9 59:13
**Official** [3] 67:3 67:12 67:17
**Official/Deputy** [1] 67: 3
**Old** [2] 23:3 58:8
**Omitted** [1] 66:9
**Once** [4] 16:2 32:11 32:11 66:3
**One** [50] 4:3 4:4 5:14 10:5 10:10 10:11 12:16 14:1 14: 19 14:20 15:1 15:1 15:5 15: 15 15:15 15:17 16:10 17:21 17:22 18:11 20:14 22:15 25: 4 25:6 26:8 28:21 28:23 31: 16 32:23 33:9 35:10 35:16 36:14 36:17 37:20 38:3 38:6 38:20 39:8 39:15 41:12 42: 11 43:14 43:24 47:8 57:6 62: 7 63:1 63:5 64:24
**Ones** [1] 29:23
**Ongoing** [1] 64:6
**Open** [3] 34:24 41:22 67:7
**Opinion** [1] 31:22
**Opportunities** [1] 33:22
**Opportunity** [7] 28:3 28: 6 28:21 29:1 29:11 29:20 29: 25
**Opposite** [1] 24:6
**Option** [3] 20:5 20:12 36: 18
**Options** [1] 33:23
**Order** [4] 4:12 4:13 6:19 56:14
**Ordinarily** [1] 62:8
**Otherwise** [2] 42:6 44:23
**Ought** [4] 12:23 14:8 15: 11 59:17
**Ourselves** [1] 17:9

**Outcome** [1] 18:17
**Outset** [1] 45:12
**Outside** [2] 59:3 61:6
**Overcomes** [1] 8:21
**Overview** [1] 57:19
**Own** [5] 7:21 8:1 39:20 61: 19 63:13

## P

**Paid** [1] 67:11
**Palmer** [3] 57:21 64:24 66: 16
**Pamela** [2] 67:3 67:16
**Panel** [3] 3:1 3:8 53:14
**Panelist** [38] 3:18 47:8 47:16 47:22 47:23 48:4 48:5 48:9 48:10 48:15 48:20 48: 25 49:6 49:11 49:21 50:2 50: 8 50:14 50:21 51:3 51:5 51: 12 51:15 51:20 51:25 52:7 52:14 52:19 53:1 53:7 53:19 53:22 54:3 54:11 54:17 55:2 55:12 56:4
**Panelists** [2] 49:18 52:4
**Paragraph** [1] 35:10
**Park** [7] 61:22 61:22 61:24 62:3 62:3 62:20 63:14
**Parking** [5] 61:21 62:18 62:18 62:22 63:5
**Parole** [4] 21:10 21:20 22: 4 22:5
**Part** [1] 42:16
**Participation** [1] 57:3
**Particular** [4] 11:2 23: 25 26:17 62:12
**Parties** [2] 67:6 67:9
**Passed** [1] 28:24
**Passes** [1] 57:8
**Past** [2] 16:9 29:6
**Pay** [1] 64:15
**Pena** [5] 3:18 47:10 47:10 47:14 56:16
**Penalty** [8] 20:19 35:7 36: 23 36:25 37:3 37:9 37:12 37: 13
**Penitentiary** [4] 19:4 20:3 20:10 21:12
**People** [31] 9:1 9:2 11:18 21:15 21:16 21:17 22:12 24: 23 25:2 25:4 26:4 28:20 29: 7 29:21 30:15 32:9 34:8 34: 14 34:22 35:14 37:9 37:11 37:12 39:8 41:21 42:14 56: 14 59:16 59:17 61:4 63:23
**Peremptory** [6] 49:19 51: 3 51:11 52:5 52:18 52:25
**Perfectly** [1] 46:24
**Perhaps** [7] 9:16 16:22 22: 23 28:4 30:7 59:23 61:12
**Period** [3] 9:9 40:5 63:2
**Permissible** [3] 60:23 60: 25 61:10
**Permit** [1] 58:12
**Permits** [2] 13:22 52:9
**Permitted** [1] 66:15
**Person** [32] 4:1 7:20 16:8 16:9 21:6 21:6 22:3 26:8 30: 18 33:18 35:13 35:22 38:9 39:10 39:14 39:15 40:2 40:3 40:4 40:14 40:14 40:19 40: 20 40:21 40:22 41:8 41:9 42: 18 42:20 43:25 44:11 58:4
**Person's** [5] 7:14 10:7 30:11 38:10 44:3
**Personal** [3] 21:2 29:17 43:13
**Personally** [1] 29:12
**Phase** [8] 4:14 5:11 5:13 11:4 11:13 11:14 11:25 12:4
**Phone** [3] 2:9 2:16 2:21

**Phrase** [5] 7:9 13:7 33:25 43:16 44:9
**Physical** [1] 60:9
**Pick** [1] 62:19
**Picture** [1] 47:3
**Pictures** [1] 60:11
**Place** [10] 11:17 11:18 12: 24 14:9 30:10 35:22 40:12 60:5 60:20 62:22
**Placed** [1] 31:5
**Places** [1] 63:10
**Plainly** [1] 56:23
**Play** [6] 24:1 38:13 62:13. 65:21 65:23 65:24
**Plea** [1] 31:5
**Pleased** [1] 56:13
**Point** [21] 8:22 9:22 10:4 10:11 12:21 15:8 15:20 15: 23 16:3 28:1 28:25 29:24 40: 16 40:23 41:1 43:8 46:25 59: 5 59:21 63:10 64:1
**Pointing** [1] 38:8
**Points** [2] 16:2 41:11
**Police** [11] 6:9 6:15 23:2 31:20 31:22 31:25 32:7 32: 12 32:15 41:5 41:6
**Pool** [2] 16:13 16:18
**Pops** [2] 11:17 11:18
**Portions** [1] 67:5
**Position** [1] 31:24
**Positive** [1] 43:17
**Possibility** [3] 19:13 19: 13 55:1
**Possible** [8] 4:2 4:3 4:4 18:10 18:11 18:13 18:16 34: 22
**Possibly** [7] 6:12 17:11 17:12 21:19 30:1 55:9 63:16
**Potential** [1] 56:3
**Practicing** [1] 65:20
**Prefer** [1] 46:2
**Premise** [1] 60:15
**Premises** [1] 60:16
**Preparation** [1] 67:11
**Presence** [1] 64:10
**Present** [5] 9:15 9:21 13: 6 36:1 66:21
**Presented** [8] 4:7 5:16 5: 17 11:9 36:5 38:16 39:18 41: 15
**Presently** [3] 7:12 27:8 64:5
**Presiding** [1] 1:21
**Presumed** [2] 11:19 30:12
**Presumption** [8] 8:16 8: 16 8:21 11:7 11:15 11:17 11: 17 30:3
**Pretty** [2] 10:2 39:24
**Prevent** [2] 45:25 64:7
**Previous** [1] 16:6
**Prince** [2] 51:16 51:17
**Principles** [1] 30:7
**Print** [1] 26:13
**Probability** [1] 12:8
**Problem** [2] 31:5 63:3
**Problems** [1] 3:5
**Proceedings** [4] 1:19 1: 22 67:5 67:9
**Process** [3] 3:15 56:11 65: 10
**Promise** [1] 42:2
**Proof** [5] 7:23 7:24 30:4 31:5 33:21
**Proper** [2] 33:21 36:14
**Proposition** [1] 32:16
**Propositions** [1] 34:11
**Prospective** [1] 35:16

**Protect** [1] 17:9
**Prove** [27] 7:3 7:5 7:14 7: 14 8:23 8:25 9:9 9:13 11:21 13:9 13:10 18:9 18:16 18:9 18:14 18:19 18:20 33:4 33:6 33:8 36:6 36:12 36:17 37:17 39:1 39:5 39:25
**Proved** [4] 4:24 7:9 17:25
**Proven** [2] 18:18 30:16
**Proves** [2] 12:2 12:12 23: 11
**Proving** [6] 7:2 7:4 7:8 9: 3 9:4 9:5
**Public** [1] 41:18
**Pull** [3] 12:23 14:8 40:9
**Pulling** [1] 40:18
**Pulls** [1] 38:8
**Punishment** [11] 4:5 4:11 11:4 11:5 11:13 11:19 19:2 20:2 20:9 20:17 65:22
**Punishments** [2] 4:3 4:3 4:4
**Purpose** [1] 14:16
**Purposes** [10] 4:8 4:16 46:16 46:18 60:3 60:4 60:5 60:18 61:1 61:7
**Put** [7] 13:12 26:9 26:10 26:13 32:14 34:24 65:21
**Putting** [2] 5:23 65:7

---

**Q**

**Qualifications** [1] 36:23
**Qualified** [1] 37:4
**Quality** [7] 8:18 11:9 11: 11 11:22 24:20 25:10 33:20
**Quantity** [1] 33:21
**Questions** [21] 4:10 13: 25 14:12 14:13 14:15 14:16 16:13 16:18 20:25 21:8 21: 24 22:7 23:24 26:25 27:1 27: 5 27:6 39:17 45:24 46:10 66: 14
**Quickly** [2] 3:16 3:20
**Quiet** [1] 46:24
**Quite** [3] 28:23 46:15 58: 18
**Quote** [1] 44:3

---

**R**

**Radio** [1] 58:18
**Raise** [1] 29:17
**Raised** [2] 5:20 26:25
**Range** [4] 19:2 19:8 20:17 20:23
**Rapping** [1] 63:10
**Raymond** [1] 48:25
**Reach** [1] 5:24 58:24
**Read** [1] 58:17
**Reading** [1] 65:8
**Real** [2] 38:2 64:16
**Realized** [1] 64:11
**Realizing** [1] 40:16
**Really** [5] 10:1 32:8 40: 25 42:5 64:22
**Reason** [23] 7:18 10:1 12: 22 13:1 14:7 19:8 21:13 38: 18 41:9 42:20 44:4 56:8 58: 21 59:16 59:19 60:12 63:19 64:3 65:15 65:19 65:25 66:6 66:6
**Reasonable** [36] 7:6 7:15 7:17 7:20 7:23 8:5 8:14 8: 22 9:7 11:23 12:2 12:7 12: 12 13:8 17:25 18:3 18:6 18: 10:14 18:19 18:21 23:11 24:21 25:6 25:11 25:13 25: 19 25:23 26:2 30:16 30:17 31:1 31:3 36:12 38:15 38:23
**Reasonably** [1] 36:1
**Receive** [3] 5:10 57:13 58:

25
**Received** [1] 65:22
**Receiving** [1] 61:5
**Record** [5] 1:1 51:13 67:6 67:8 67:11
**Recovered** [1] 23:16
**Reflects** [1] 67:9
**Refreshing** [1] 4:16
**Refuse** [4] 25:19 58:17 58: 17 58:18
**Regard** [2] 34:14 60:10
**Regarding** [1] 58:15
**Relates** [1] 4:21
**Relating** [1] 19:22
**Rely** [4] 7:25 34:12 34:20 44:8
**Remainder** [1] 56:13
**Remaining** [1] 34:10
**Remarkably** [3] 16:5 16: 14 16:16
**Remind** [1] 3:7
**Reported** [1] 22:67:7
**Reporter** [2] 67:3 67:17
**Reporter's** [4] 1:1 67:6 67:8 67:11
**Reporting** [1] 61:2
**Represented** [1] 3:11
**Requested** [2] 61:7 67:5
**Require** [1] 13:18
**Required** [5] 9:13 13:6 13:12 18:15 58:9
**Requirement** [3] 12:25 13: 14 13:15
**Requires** [1] 66:7
**Respective** [1] 67:9
**Responses** [1] 34:21
**Responsibility** [1] 44:7
**Responsible** [3] 31:16 35: 13 36:9
**Rested** [1] 41:25
**Restrictions** [1] 58:21
**Restrictive** [1] 20:24
**Result** [5] 5:15 18:11 18: 14 21:22 33:8
**Results** [1] 18:11
**Returning** [1] 8:4
**Reviewing** [1] 15:9
**Revisit** [2] 4:15 4:17
**Rises** [1] 22:20
**Road** [5] 32:8 34:1 34:4 36: 18 42:2
**Rob** [1] 22:23
**Robber** [1] 40:11
**Robbery** [1] 23:2
**Robert** [1] 52:14
**Robs** [1] 22:24
**Room** [4] 4:8 43:8 61:25 63: 21
**Rose** [1] 51:5
**Round** [1] 63:23
**Routine** [1] 58:10
**Rude** [1] 59:11
**Rule** [5] 7:11 7:13 23:25 37:21 59:19
**Rules** [5] 4:18 30:10 30: 20 30:20 30:24
**Run** [2] 27:25 41:7
**Running** [1] 40:18
**Runs** [1] 40:14
**Russell** [1] 48:25

---

**S**

**San** [1] 67:18
**Satisfaction** [1] 18:20
**Satisfy** [1] 30:15

**Saw** [1] .24:5
**SBOT** [4] 2:3 2:5 2:13 2:18
**Scheduled** [1] 45:18
**Scope** [1] 42:7
**Seated** [3] 3:1 3:9 29:8
**Seats** [1] 46:25
**Second** [15] 3:17 5:13 11: 14 12:4 12:25 13:5 13:15 13: 20 14:21 15:3 19:22 27:13 45:9 57:7 57:22 /
**Secrets** [1] 47:6
**See** [16] 6:11 13:1 13:16 14:6 16:7 24:7 24:7 33:20 35:18 40:21 41:18 41:19 56: 23 57:1 59:16 61:3
**Seeing** [1] 60:5
**Seek** [1] 28:19
**Sees** [1] 32:2
**Select** [7] 3:8 20:5 20:12 20:15 20:16 34:7 34:22
**Selected** [4] 29:21 29:23 42:12 57:1
**Selection** [1] 56:11
**Self** [1] 39:11
**Self-defense** [8] 17:7 37:20 37:21 38:4 38:13 38: 20 39:11 39:15
**Self-evident** [1] 31:10
**Sense** [1] 7:18
**Sentence** [17] 4:12 4:13 12:23 12:24 13:18 13:19 13: 22 14:8 14:10 16:19 16:20 16:20 20:20 21:5 21:9 21:15 21:24
**Sentencing** [2] 20:5 20:12
**September** [3] 1:18 3:19 45:15
**Serious** [1] 31:3
**Seriousness** [1] 43:5
**Serve** [2] 27:11 32:7
**Served** [1] 21:11
**Serving** [1] 46:1
**Set** [2] 41:16 66:4
**Seven** [1] 52:4
**Seventh** [1] 51:11
**Several** [5] 33:3 35:23 41: 4 59:23 62:17
**Shadow** [1] 7:8
**Shooting** [1] 33:2
**Shoots** [2] 40:12 40:14
**Show** [3] 24:12 24:13 51:13
**Shows** [1] 38:1
**Sibley** [2] 48:11 48:11
**Sick** [1] 45:19
**Side** [10] 8:7 9:15 10:5 10: 6 10:10 10:11 13:12 33:15 46:21 54:25
**Sides** [2] 10:3 28:2
**Significance** [1] 29:15
**Silence** [2] 31:6 32:1
**Silent** [1] 34:11
**Simple** [1] 10:2
**Simply** [10] 6:2 8:17 14:3 23:12 24:17 31:24 58:16 61: 10 65:24 66:7
**Single** [2] 63:1 63:5
**Sit** [8] 34:8 34:15 34:23 37:4 37:9 39:18 41:18 43:7
**Sitting** [3] 32:18 34:17 43:20 45:1 64:5
**Situation** [12] 19:21 27: 7 31:2 32:9 37:18 38:5 38: 10 38:14 38:19 40:2 40:25 43:1
**Situations** [1] 32:11
**Sixth** [1] 51:2
**Sixty** [1] 26:21
**Slip** [1] 64:9

**Smiles** [1] 57:1
**So-and-so** [1] 65:19
**Socializing** [1] 59:17
**Society** [3] 12:10 16:12 30:18
**Sole** [1] 42:13
**Solely** [1] 22:16
**Someone** [1] 35:6
**Someplace** [3] 39:25 57:24 62:4
**Sometimes** [4] 42:23 47:1 62:20
**Somewhat** [1] 56:13
**Sony** [2] 52:19 52:24
**Sorry** [4] 46:7 48:9 51:4 53:17
**Sorts** [1] 19:9
**Sound** [2] 42:9 43:2
**Sounds** [2] 42:23 43:17
**Source** [3] 22:19 23:18 42:25
**Southwest** [1] 2:14
**Space** [1] 62:19
**Special** [6] 4:10 14:19 14:20 14:21 15:11 15:17
**Specific** [2] 21:7 32:20
**Specifically** [4] 25:14 33:25 45:15 65:1
**Speedy** [1] 3:4
**Spelled** [1] 33:24
**Spencer** [1] 48:16
**Spend** [4] 3:16 36:20 57:18 64:25
**Spent** [5] 3:14 30:2 36:24 44:18 59:4
**Spousal** [1] 55:3
**Staci** [1] 56:19
**Stacie** [2] 48:11 53:1
**Stacy** [1] 56:17
**Stake** [1] 43:6
**Standards** [2] 43:9 44:2
**Standing** [3] 37:21 40:11 43:22
**Standpoint** [2] 22:12 38:14
**Stands** [1] 3:24
**Start** [8] 31:19 32:3 34:2 41:22 42:6 42:7 59:22 64:13
**Started** [2] 61:25 65:23
**Starting** [3] 8:8 8:19 11:25
**Starts** [5] 8:8 8:19 12:10 31:19 34:25
**State** [94] 1:10 2:10 3:8 3:11 7:5 7:13 8:3 9:1 9:5 11:9 11:21 13:9 29:8 28:18 30:4 30:13 31:6 31:17 32:19 33:3 33:6 34:14 34:16 36:1 37:10 37:16 37:22 39:25 41:25 44:13 45:5 47:10 47:11 47:17 47:18 47:25 48:1 48:7 48:8 48:11 48:12 48:16 48:17 48:22 48:23 49:1 49:2 49:7 49:8 49:13 49:14 49:18 49:22 49:23 50:3 50:4 50:9 50:10 50:16 50:17 50:23 50:24 51:6 51:7 51:17 51:18 51:21 51:22 51:25 52:2 52:4 52:9 52:10 52:15 52:16 52:20 52:21 53:2 53:3 53:9 53:10 53:15 53:21 53:24 54:1 54:5 54:13 54:19 54:20 56:5 65:5 67:1 67:4
**State's** [14] 8:5 8:11 8:18 8:21 8:23 9:1 9:5 9:13 12:2 12:11 18:5 18:9 31:13 39:1
**Stays** [1] 8:9 8:20
**Steals** [1] 40:15
**Stephens** [1] 49:13

**Still** [5] 3:5 10:7 12:16 26:16 39:14
**Store** [3] 40:8 40:10 41:12
**Story** [1] 42:21
**Strength** [1] 8:12
**Strike** [7] 48:19 51:3 51:18 52:16 52:18 52:25 54:25
**Strikes** [19] 48:3 48:8 48:23 49:4 49:10 49:16 51:1 51:9 51:23 52:2 52:5 52:23 53:12 53:16 53:21 53:24 54:1 54:10 54:10
**String** [1] 27:25
**Strong** [1] 8:13
**Stuff** [3] 26:15 26:19 26:20
**Substitute** [2] 12:24 14:9
**Succinctly** [1] 37:6
**Sufficient** [1] 25:11
**Suggest** [2] 10:15 32:14
**Support** [2] 6:16 36:3
**Suppose** [2] 60:21 65:3
**Supposed** [3] 15:2 59:25 60:13
**Surgery** [4] 27:16 45:16 45:21 55:3
**Surprises** [1] 34:13
**Suzette** [1] 51:20
**Swear** [1] 62:14

### T

**Talks** [1] 35:10
**Taxes** [1] 64:15
**Television** [3] 26:14 58:17 65:2
**Teller** [1] 44:1
**Ten** [7] 46:22 49:17 53:16 54:9 54:10 57:14 60:15
**Tend** [4] 21:15 23:12 24:12 57:14
**Tended** [1] 23:18
**Tends** [2] 22:20 23:9
**Tenth** [1] 54:9
**Term** [1] 23:22
**Terms** [3] 4:18 60:15 61:21
**Testified** [2] 24:10 24:11
**Testify** [5] 9:22 10:12 24:8 31:9 44:4
**Testimony** [33] 4:25 5:3 5:3 5:9 5:15 5:16 5:18 5:20 9:24 10:9 10:18 11:22 22:1 22:11 22:16 22:18 23:4 23:6 23:8 23:20 24:25 25:3 25:5 25:6 25:8 25:10 28:22 31:9 43:18 59:23 60:2 61:18 65:6
**Tests** [1] 28:24
**Texas** [19] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 3:9 3:11 7:5 8:3 59:24 62:14 65:5 67:7:17 67:16 67:17 67:18
**Themselves** [2] 6:6 9:14
**Theoretical** [1] 19:12
**Theory** [5] 31:20 32:11 32:12 32:15 36:3
**Therefore** [1] 7:24
**They've** [1] 39:4
**Thinking** [1] 35:18
**Third** [4] 14:22 16:17 18:23 19:1
**Thirteen** [1] 56:12 57:6
**Thirty-six** [1] 63:23
**Thoughts** [1] 58:9
**Threat** [2] 12:10 16:11
**Threatened** [2] 17:10 38:9
**Three** [11] 6:5 14:18 14:23 15:22 16:2 18:10 18:17 23:1 49:18 57:4 63:23
**Throughout** [2] 34:12 34:

**24**
**Throwing** [1] 37:5
**Thursday** [3] 45:20 46:5 55:9
**Tinnemeyer** [2] 48:6 48:7
**Today** [11] 6:10 6:12 6:17 27:5 29:6 29:13 34:7 34:10 36:4 57:10 57:11
**Today's** [2] 3:15 37:8
**Together** [8] 5:23 9:9 22:12 24:12 26:21 29:12 30:15 65:7
**Toss** [1] 40:13
**Total** [1] 67:10
**Touch** [2] 29:16 42:11
**Towel** [1] 37:5
**Town** [1] 6:8
**Traci** [2] 54:18 56:20
**Tragedy** [1] 35:16
**Transaction** [4] 35:15 35:16 36:11 38:17
**Transcription** [1] 67:5
**Transcription/stenograph** [1] 1:23
**Transportation** [1] 64:20
**Trial** [26] 1:9 3:14 4:15 4:19 5:12 5:14 8:10 8:11 9:19 10:16 11:4 11:11 11:25 12:4 19:12 19:16 19:18 19:22 19:23 21:3 22:21 34:13 34:24 35:2 37:1 59:22 61:20
**Trials** [2] 30:9 65:3
**Triangle** [3] 15:23 15:24 16:2
**Tried** [2] 20:12 30:25
**Trip** [3] 3:4 46:23 58:8
**True** [1] 67:4
**Truly** [2] 30:5 67:9
**Truth** [2] 42:18 44:1
**Truth-teller** [1] 44:1
**Truthfulness** [1] 34:21
**Try** [5] 30:15 31:13 36:2 36:6 43:8
**Trying** [7] 20:13 20:16 20:22 40:7
**Tuesday** [3] 46:3 46:6 46:7
**Turn** [2] 57:22 66:16
**Turner** [3] 51:5 51:5 51:10
**Turns** [1] 40:12
**Twelve** [18] 28:20 29:7 29:21 29:22 30:15 34:8 34:22 37:9 37:11 37:12 37:24 42:12 43:4 43:7 44:24 57:5 64:17 65:7
**Twenty** [2] 21:16 52:4
**Twenty-five** [1] 53:14
**Twenty-two** [1] 41:17
**Two** [31] 3:11 4:2 4:9 4:10 5:23 6:8 6:12 6:16 12:17 12:17 14:2 14:3 14:20 14:21 16:17 18:10 18:14 18:19 20:14 21:8 21:23 22:12 23:1 24:17 32:20 32:23 35:14 36:9 49:19 56:9
**Type** [5] 24:3 30:25 32:6 35:12 43:18
**Types** [1] 30:9

### U

**Ultimately** [2] 29:7 61:9
**Unable** [2] 36:17 37:17
**Unanimously** [1] 19:17
**Uncomfortable** [3] 29:14 31:17 41:20
**Under** [2] 44:10 60:8
**Understood** [9] 10:24 14:15 14:15 14:16 16:22 20:13 22:6 23:23 25:14
**Unequivocal** [1] 43:18

**Unfortunately** [1] 35:21
**Unknown** [1] 27:9
**Unlawful** [1] 17:9
**Unless** [4] 8:20 12:1 12:11 23:7
**Unlucky** [1] 44:24
**Unusual** [1] 41:16
**Up** [28] 3:10 5:23 7:9 8:9 11:21 12:17 13:21 21:14 28:24 29:4 29:8 40:7 40:11 40:16 40:19 41:13 45:1 45:8 45:9 56:22 56:23 57:11 58:24 61:9 62:20 63:12 63:21 66:5
**Urban** [1] 62:15
**Usage** [1] 30:9

### V

**Vehicle** [1] 64:20
**Venireperson** [40] 27:15 27:18 27:22 35:4 45:18 45:22 46:2 46:7 47:23 48:5 48:10 48:14 48:21 48:24 49:5 49:12 49:21 50:2 50:7 50:14 51:4 51:11 51:16 51:19 51:24 52:7 52:13 52:18 53:1 53:7 53:18 53:23 54:2 54:4 54:11 54:17 55:1 55:12 56:3
**Vera** [1] 50:22
**Verdict** [17] 5:24 8:4 12:1 13:19 18:16 21:23 33:13 33:18 33:22 36:14 61:9
**Versus** [1] 3:9
**Victim** [2] 44:10 44:11
**Viewed** [2] 8:13 29:22
**Viewing** [1] 43:22
**Violence** [1] 12:9
**Visit** [8] 3:7 28:3 28:6 28:9 29:1 29:12 29:25 46:16
**Visited** [3] 3:19 27:6 27:9 45:14
**Visiting** [3] 3:14 59:4 65:1
**Voir** [4] 1:15 28:16 36:21 45:12
**Volume** [2] 1:2 67:6
**VOLUMES** [1] 1:2
**Vote** [1] 56:2
**VS** [1] 1:8

### W

**Waiting** [1] 35:5
**Walk** [3] 6:9 40:8 57:12
**Waller** [3] 49:22 50:1 56:18
**Warrant** [1] 17:25
**Warranted** [2] 8:3 18:3
**Warren** [1] 49:6
**Watch** [1] 58:17
**Wayne** [2] 2:12 3:10
**Ways** [1] 37:16
**Weapon** [1] 38:6
**Wear** [2] 64:22 64:24
**Wearing** [2] 64:2 64:7
**Weather** [1] 3:3
**Wednesday** [1] 46:4
**Week** [2] 27:13 35:17
**Weeks** [1] 57:4
**Weight** [3] 4:25 5:2 10:9
**Wentz** [7] 2:17 3:11 29:1 45:4 55:21 55:22 59:6
**Wharton** [2] 63:6 63:7
**Wheel** [1] 22:24
**Whichever** [1] 4:4
**Whole** [1] 62:10
**Wide** [1] 19:8
**Wife's** [1] 27:15
**Wilkinson** [5] 58:3 61:12

61:17 62:9 65:18

**William** [1] 56:20

**Willing** [2] 7:25 22:8

**Wind** [1] 63:12

**Winds** [1] 58:24

**Withdrawn** [1] 65:15

**Witness** [4] 22:11 23:21
42:16 67:12

**Witnesses** [9] 4:24 5:22
6:22 10:8 24:11 24:18 42:12
60:8 63:25

**Words** [6] 12:20 12:20 13:
3 14:13 31:23 32:13

**Works** [1] 40:7

**World** [1] 26:15

**Worry** [1] 46:24

**Write** [1] 45:20

**Writing** [1] 67:5

**Wyatt** [1] 48:21

## Y

**Y'all** [1] 46:12

**Year** [3] 21:12 21:20 60:14

**Years** [9] 19:4 19:5 20:10
21:11 21:16 21:17 22:4 41:
17 57:23

**Yesterday** [1] 45:19

**Yourself** [1] 29:17

## Z

**Zenobia** [1] 51:16

1                         REPORTER'S RECORD

2                     VOLUME 16 OF 25 VOLUMES

3                 TRIAL COURT CAUSE NO. 800112

4

5    CHARLES MAMOU, JR.        )    IN THE DISTRICT COURT

6           Appellant          )

7                              )

8    VS.                       )    HARRIS COUNTY, TEXAS

9                              )

10   THE STATE OF TEXAS        )

11          Appellee           )    179TH JUDICIAL DISTRICT

12

13

14                  * * * * * * * * * * * * * * * * * * *

15                   TRIAL-GUILT/INNOCENCE

16                  * * * * * * * * * * * * * * * * * * *

17

18       On the 4th day of October, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable Mike Wilkinson, Judge

21   Presiding, held in Houston, Harris County, Texas:

22       Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

```
 1                A P P E A R A N C E S

 2      MR. LYN MCCLELLAN

 3      SBOT NO. 13396100

 4      MS. CLAIRE CONNORS

 5      SBOT NO. 0470500

 6      Assistant District Attorneys

 7      201 Fannin

 8      Houston, Texas 77002

 9      Phone:  713.755.5800

10      ATTORNEYS FOR THE STATE OF TEXAS

11

12      MR. WAYNE HILL

13      SBOT NO. 59656300

14      4615 Southwest Freeway

15      Houston, Texas 77027

16      PHONE:  713.623.8312

17      MR. KURT WENTZ

18      SBOT NO. 21179300

19      5629 W FM 1960

20      Houston, Texas 77069

21      PHONE:  281.587.0088

22      ATTORNEYS FOR THE DEFENDANT
23

24

25
```

INDEX

VOLUME 16 OF 25

|  | PAGE | VOL. |
|---|---|---|
| October 4, 1999        Trial-Guilt/Innocence |  | 16 |
| Arraignment outside presence of Jury | 3 | 16 |
| Jury sworn | 4 | 16 |
| Arraignment with Jury present | 5 | 16 |
| Opening statement by Mr. McClellan | 5 | 16 |

| State's Witnesses | Direct | Cross | V. D. | |
|---|---|---|---|---|
| Kevin Walter | 19,37,62,152 | 77,163 | 36,61 | 16 |
| John Wayne McDonald | 170 | | | 16 |

|  | PAGE | VOL. |
|---|---|---|
| Proceedings concluded | 195 | 16 |
| Court Reporter's Certificate | 196 | 16 |

ALPHABETICAL INDEX

| State's Witnesses | Direct | Cross | V. D. | |
|---|---|---|---|---|
| McDonald, John Wayne | 170 | | | 16 |
| Walter, Kevin | 19,37,62,152 | 77,163 | 36,61 | 16 |

EXHIBITS

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---|---|---|---|---|
| Exhibit 1 | Photo | 185 | 185 | 16 |
| Exhibit 2 | Photo | 184 | 184 | 16 |
| Exhibit 3 | Photo | 184 | 184 | 16 |
| Exhibit 4 | Photo | 185 | 185 | 16 |

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---------|-------------|---------|----------|--------|
| Exhibit 11 | Photo | 185 | 185 | 16 |
| Exhibit 12 | Photo | 185 | 185 | 16 |
| Exhibit 13 | Photo | 185 | 185 | 16 |
| Exhibit 14 | Photo | 185 | 185 | 16 |
| Exhibit 15 | Photo | 185 | 185 | 16 |
| Exhibit 23 | Diagram | 181 | 181 | 16 |
| Exhibit 24 | Aerial photo | 54 | 55 | 16 |
| Exhibit 25 | Key Map diagram | 55 | 56 | 16 |
| Exhibit 43 | Chart | 39 | 39 | 16 |
| Exhibit 62 | Photo | 73 | 73 | 16 |
| Exhibit 76 | Photo | 23 | 23 | 16 |
| Exhibit 77 | Photo | 23 | 23 | 16 |
| Exhibit 78 | Aerial photo | 59 | 59 | 16 |
| Exhibit 80 | Photospread | 75 | 75 | 16 |
| Exhibit 81 | Photospread | 77 | 77 | 16 |
| Exhibit 82 | Photospread | 75 | 76 | 16 |
| Exhibit 83 | Photo | 22 | 22 | 16 |

3

1          (Jury out.)
2          MR. MCCLELLAN:  State's going to abandon
3    the second paragraph and proceed on the first.
4          (Off-the-record discussion.)
5          THE COURT:  Cause Number 801 -- strike
6    that.  Cause Number 800112, State of Texas versus
7    Charles Mamou, Jr.
8          Would you please arraign him as to
9    paragraph one outside the presence of the jury?
10         MR. MCCLELLAN:  State of Texas versus
11   Charles Mamou, Jr.  In the name and by the authority of
12   the State of Texas, the duly organized Grand Jury of
13   Harris County, Texas, presents in the District Court of
14   Harris County, Texas, that in Harris County, Texas,
15   Charles Mamou, Jr., hereafter styled the defendant, on
16   or about December 7, 1998, did then and there
17   unlawfully, while in the course of committing and
18   attempting to commit the kidnapping of Mary Carmouche,
19   intentionally cause the death of Mary Carmouche by
20   shooting Mary Carmouche with a deadly weapon, namely, a
21   firearm.
22         Against the peace and dignity of the
23   State.  Signed by the Foreman of the Grand Jury.
24         THE COURT:  To which the defendant pleads?
25         THE DEFENDANT:  Not guilty.

4

1          THE COURT:  All right.  Why don't you have
2    a seat, sir?
3          MR. MCCLELLAN:  One other thing, Your
4    Honor.
5          MR. WENTZ:  We had filed a motion to
6    disclose the experts.
7          THE COURT:  Is the Rule being invoked?
8          MR. HILL:  Yes, sir.
9          (Rule invoked.)
10         (Jury is brought in and seated.)
11         THE COURT:  Ladies and gentlemen in the
12   jury box, if you would, please raise your right hand and
13   be sworn as jurors in this case.
14         (Jury sworn.)
15         THE COURT:  Please be seated.  You don't
16   have to sit in the jury box in any particular order when
17   you come in and out.  If you really like that end box,
18   it would be helpful for us if you would be the first
19   person out of the door every time.  I don't know if
20   you're the alternate or not.  You don't have to sit in
21   that chair.  You can sit wherever you want to, but you
22   don't have to be in that chair because you're the
23   alternate.  All right.
24         Would you please arraign the defendant as
25   to paragraph one, paragraph two having been dismissed,

5

1    in Cause Number 800112?
2          MR. MCCLELLAN:  State of Texas versus
3    Charles Mamou, Jr.  In the name and by the authority of
4    the State of Texas, the duly organized Grand Jury of
5    Harris County, Texas, presents in the District Court of
6    Harris County, Texas, that in Harris County, Texas,
7    Charles Mamou, Jr., hereafter styled the defendant, on
8    or about December the 7th, 1998, did then and there
9    unlawfully, while in the course of committing and
10   attempting to commit the kidnapping of Mary Carmouche,
11   intentionally cause the death of Mary Carmouche by
12   shooting Mary Carmouche with a deadly weapon, namely, a
13   firearm.
14         Against the peace and dignity of the
15   State.  Signed by the Foreman of the Grand Jury.
16         THE COURT:  To which the defendant pleads?
17         THE DEFENDANT:  Not guilty, Your Honor.
18         THE COURT:  Please be seated.
19         OPENING STATEMENT OF THE STATE
20   BY MR. MCCLELLAN:
21         Ladies and gentlemen of the jury, the law
22   gives me the opportunity at this time to give you an
23   idea of what I anticipate the evidence will show in the
24   case.  I anticipate that you're going to hear evidence
25   in the case that will indicate that the early part -- or

6

1    the last part of November, the early part of December of
2    1998, a person by the name of Kevin Walter lived here in
3    Harris County, was contacted by a cousin from Louisiana
4    by the name of Timmy Thomas, and asked to come to Loop
5    610 South by the Astrodome to meet him.
6          I believe the evidence will show that
7    Kevin Walter, by himself, went back there down to Loop
8    610, met with his cousin, Timmy Thomas, and there he was
9    introduced to the defendant, Charles Mamou.  I believe
10   the evidence will indicate at that time Mr. Mamou asked
11   Mr. Walter, Do you know where I can buy some cocaine?
12   I'm looking for eight ounces.
13         I believe the evidence will show that
14   Kevin Walter indicated he didn't know where he could get
15   cocaine.  He didn't know anything about that.  I believe
16   the evidence will show that over the next week or so,
17   that Charles Mamou would continue to call Kevin Walter,
18   asking him, Did you find where I could get some cocaine?
19   Did you find where I could buy some cocaine?  Each and
20   every time he was told no.
21         I believe the evidence will show, though,
22   on December the 6th, 1998, a Sunday, that the defendant,
23   Charles Mamou, Jr., called Kevin Walter and says, I've
24   got $20,000 in cash.  I want to buy a kilo.  Kevin
25   Walter, at that time, didn't say no.  Kevin Walter said,

**7**

1  Let me check and I'll get back with you.
2          I believe the evidence will show then that
3  Kevin Walter went over and met up with two of his
4  friends, a guy named Dion Holley and a guy named
5  Terrence Gibson.  I believe that the plan was then
6  hatched that they were going to try to take that $20,000
7  from Charles Mamou, Jr.  He had twenty thousand in cash.
8  They didn't have any dope, but they were going to try to
9  trick him out of that money.
10          I believe the evidence will show then that
11  after Kevin Walter, Dion Holley, and Terrence Gibson
12  talked about that, they arranged to meet with Charles
13  Mamou over on Northline Mall near the Papa's Barbeque.
14  I believe the evidence will show that Sunday two cars
15  arrived at that location, Dion Holley driving his
16  parents Lexus, accompanied by Kevin Walter.
17          Met at the Northline near Papa's Barbeque
18  and met with the defendant, Charles Mamou, who was in a
19  car driven by Samuel Johnson.  Also present in the
20  vehicle was a person named Terrence Dodson, not to be
21  confused with Terrence Gibson.  So, I believe we have
22  three people; and they were in a red car.  And they met
23  with two people, Walters and Holley, in a blue car.
24          I believe the evidence will show that
25  Terrence Gibson was not at that location, but was at a

**8**

1  different location.  I believe the evidence will show
2  that the defendant, Mamou, gets out of the car and
3  approaches the car.  And in between the cars, Walter and
4  Holley meet with the defendant, Mamou.
5          I believe the evidence will show that
6  Mamou had a bag, which later you'll find out to be a
7  Victoria's Secret's bag that was kind of wrapped up,
8  like, this is my stash of money, $20,000.  They talked
9  about, Okay, where can we do the gig?  You've got the
10  dope.  We've got the money.  Walter and Holley wanted to
11  see the money.  Mamou wasn't going to show the money.
12          I believe the evidence will show then they
13  talked about the deal and said, Okay, let's go to
14  another location.  They left there and went to a
15  location off Cavalcade.  I believe it's going to be
16  Sing-On, a type of grocery store or something off
17  Cavalcade; and there, they met at that location.  And at
18  that location, Walter and Holley again get out; and
19  again, Mamou gets out.  Samuel Johnson never gets out.
20  He's the driver of the car.  And Terrence Dodson gets
21  out of the car then.  They again talk about the dope
22  deal.
23          Kevin Walter and Dion Holley are trying to
24  convince Mamou, Give me the money.  We'll go get the
25  dope and bring it back.  You've got to trust us.  Mamou

**9**

1  says, No, I can't do that.  He's asking them, Give --
2  show me the dope, and I'll give you the money.  They
3  say, No, I'm not going to do that.  So, basically,
4  negotiations break down.
5          I believe the evidence will show then they
6  left from that location, no deal having been done.  I
7  believe the evidence will show they all get together --
8  Kevin Walter, Dion Holley, Terrence Gibson -- in the
9  Lexus, which is Dion Holley's Lexus; and they're driving
10  around.  There is communications back and forth between
11  the parties by a cell phone.  That is the car driven by
12  Johnson, occupied by Mamou, and the car occupied by
13  these three people talking back and forth on the cell
14  phone.  Nothing comes of it.
15          I believe the evidence will show then that
16  Dion Holley called Mary Carmouche, a friend of his, and
17  asks her, said, Do you want to go out with us to eat?
18  I believe the evidence will show they went her house,
19  picked her up, and were going about their business when
20  the cell phone rings again.
21          I believe the evidence will show then that
22  the defendant, Charles Mamou, tells them, I've got my
23  money, man.  This guy, Dodson down here, is giving me
24  the money; so I've got complete control over it.  Let's
25  do the deal.

**10**

1          I believe the evidence will show that
2  Charles Mamou directed him to meet him at Bennigan's on
3  Loop 610, not far from Kirby.  I believe the evidence
4  will show they then arrived at that location -- that is,
5  Kevin Walter, Dion Holley, Terrence Gibson, and Mary
6  Carmouche -- in a blue vehicle, the Lexus, which is
7  Holley's, but is now being driven by Kevin Walter.
8          I believe the evidence will show they met
9  up with Johnson, Samuel Johnson, and Charles Mamou in
10  the red car, that Terrence Dodson has been left off and
11  is no longer going to be in the scene.  I believe the
12  evidence will show all six went into Bennigan's, where
13  these people, Walter, Holley, Gibson, and Carmouche, had
14  something to eat while Mamou and Johnson did not.
15          I believe the evidence will show that
16  while in that location that the defendant, Charles
17  Mamou, and Dion Holley left to go outside for a short
18  period of time.  I believe the evidence will show they
19  came back inside and that Charles Mamou then got the
20  keys to the car from Johnson and left by himself and was
21  gone for about fifteen minutes and came back.
22          I believe the evidence will show then when
23  they got back to the Bennigan's and got ready to leave,
24  that the car driven by Samuel Johnson, occupied by
25  Mr. Charles Mamou, that they told -- Charles Mamou told

11

1  them, Follow us, and that the car now driven by Kevin
2  Walter, with Terrence Gibson in the front seat and the
3  back being Dion Holley and Mary Carmouche, followed the
4  car driven by Johnson and occupied by Mamou.  I believe
5  they made more than one stop; but the last stop they
6  made was on Lantern Point Drive, between McNee and
7  Murworth, about a block from the Astrodome.
8        I believe the evidence will show that
9  that's a dark area at that time of night; and this was
10  about midnight, right around midnight, that there are no
11  streetlights, that the lots are vacant, that there are
12  trees and brush around, and it's not a very traveled
13  road.
14        I believe the evidence will show that as
15  this blue Lexus is following the car driven by Samuel
16  Johnson and occupied by Charles Mamou, that the red car
17  stops on Lantern Point Drive.  I believe the evidence
18  will show then that this red car then turns around and
19  comes back and faces the blue car, the Lexus, to where
20  the cars are now facing, face-to-face.
21        I believe the evidence will show that at
22  that point in time, in the red car here driven by Samuel
23  Johnson, that Charles Mamou gets out of the car, along
24  with the bag, and supposedly the money.  I believe the
25  evidence will show that Kevin Walter stays in the car,

12

1  Mary Carmouche stays in the car, Samuel Johnson stays in
2  the car, but that Dion Holley and Terrence Gibson get
3  out of the car.  And those three, Gibson, Holley, and
4  Car -- and Mamou go to the back of the Lexus.  And at
5  the back of the Lexus they're asking to see the money.
6  They want to see the money before they're going to turn
7  over the dope, dope they don't have.
8        I believe at that point in time, while
9  they're discussing seeing the money, at that point in
10  time, that's when Charles Mamou draws a gun, shoots,
11  close range, Terrence Gibson.  He falls right there and
12  dies.  I believe that Dion Holley then ran through the
13  field.  And the evidence will show that Charles Mamou
14  fired and shot and hit Dion Holley in his arm as he's
15  running away.
16        I believe the evidence will show then that
17  Charles Mamou comes around the side of the car where
18  Kevin Walter is, and while Kevin Walter is still in the
19  car with the windows up, he points, shoots, and breaks
20  the window, and shoots and hits Kevin Walter in the
21  chest.
22        I believe the evidence will show that
23  Charles Mamou then opens the door; and before Kevin
24  Walters could do anything else, he shoots him again.  I
25  believe the evidence will show that Kevin Walter then

13

1  exits that car, comes out and tries to rush at Charles
2  Mamou and knocks him back and was able to hit him but
3  then realized he can't get the gun; so he turns and
4  runs, and he is shot again as he's running away from the
5  car down to the center.
6        I believe the evidence will show at that
7  point in time, after having shot the three male
8  occupants of the blue Lexus, that Charles Mamou gets in
9  the car still occupied by Mary Carmouche in the backseat
10  and drives away, followed by the car driven by Samuel
11  Johnson.
12        I believe the evidence will show that when
13  they get to South Main and Loop 610, Mamou continues
14  straight on South Main and Samuel Johnson turns on 610
15  and goes back to his house.  I believe the evidence will
16  show that the last time Mary Carmouche was ever seen
17  alive was driving away from that scene in the company of
18  Charles Mamou, Jr.
19        I believe the evidence will show then that
20  security guards arrived at the location.  Security
21  guards arrived at the location, who were coming back
22  from a Jack In The Box, coming down Lantern Point Drive;
23  and they come upon a large man shot in the back, as well
24  as several other places, Kevin Walter.  They then see
25  another man coming out of the field, shot in the arm;

14

1  and they find another man laying further down, Terrence
2  Gibson, who's dead.
3        I believe the evidence will show that near
4  Kevin Walter, they also find a gun laying on the street.
5  That was a gun that had been in the possession of
6  Terrence Gibson.  I believe the evidence will show that
7  that gun, while loaded, did not have a round in the
8  chamber and had not been fired.
9        I believe the evidence will show that the
10  initial story that is given by the wounded people is
11  that they were helping someone who had car trouble,
12  giving them a boost.  They carjacked them and took the
13  car, as well as the girl.  I believe the evidence will
14  show that's a lie; because the evidence is going to show
15  that was a dope deal that was going down that was
16  participated in by Kevin Walter, Dion Holley, Terrence
17  Gibson, Charles Mamou, Samuel Johnson.
18        I believe the evidence will show that we
19  had -- because the evidence is going to show that found
20  at the scene is a Victoria's Secret bag, filled with
21  money?  No.  Filled with cut-up pieces of paper in the
22  size of U.S. currency.  I believe the evidence will show
23  that Charles Mamou had what he portrayed to be money,
24  was cut-up pieces of paper to use to rip them off of
25  their dope, them being Kevin Walter and Dion Holley.

15

1   Dion Holley and Kevin Walter didn't have any dope.  They
2   were trying to take the defendant's money.  He didn't
3   have any money.
4           I believe the evidence will show, though,
5   that after looking at the physical evidence, the police
6   find this idea of a good samaritan stopping to help
7   somebody give a boost that he doesn't know.  What's this
8   money doing there, this cut-up paper doing there?
9   These things don't compute.
10          I believe the evidence will show they
11  initially were looking for -- at the time they talked to
12  everybody, they were looking for a red Intrepid.  Turns
13  out not to be an Intrepid, but it's a red car.  The
14  evidence will show they're looking for a blue Lexus, and
15  the evidence will show they were looking for Mary
16  Carmouche.
17          I believe the evidence will show later the
18  next day they get information from Kevin Walter, which
19  really is on the 8th of December, on a Tuesday.  Kevin
20  Walter is in Intensive Care after multiple surgeries.  I
21  believe the evidence will show that Kevin Walter relates
22  to the police the name of the person who did the
23  shooting, a guy named Chucky, also known as Charles
24  Mamou, Jr.
25          I believe the evidence will show that they

16

1   also got a telephone number that Kevin Walter gave them.
2   The number is circled, a number saying, This is the
3   number I called, and I need to talk to the defendant,
4   Charles Mamou, Jr.  I believe the evidence will show
5   they then traced that number to a Robin and Howard
6   Scott, and they lived at 10800 Fondren.  They went to
7   that location to try to find Charles Mamou, but he was
8   not there.  But before going to that location at 10800
9   Fondren, the apartment complex, there was found the
10  abandoned blue Lexus.
11          I believe the evidence will further show
12  that's where Charles Mamou had stayed prior to and after
13  the shooting, 10800 Fondren, a location of the Lexus, a
14  location where -- the telephone number comes back to the
15  location where Howard Scott had let Charles Mamou spend
16  a few days at his house.  I believe the evidence will
17  show when they go to that location, that Charles Mamou
18  was gone.
19          I believe the evidence will show that the
20  police have reason to believe that Charles Mamou has
21  fled to Louisiana.  I believe the evidence will show
22  that upon talking to other people, they're able to
23  finally get in contact with Samuel Johnson, who is the
24  driver of the red car, who basically tells them in a
25  written statement everything about what had gone on,

17

1   about it was a dope deal that went bad, about how he
2   drove the car to the Northline location, as well as to
3   the other location.  And upon seeing the shooting, took
4   off after -- following Charles Mamou, Jr.
5           I believe the evidence will show that on
6   Tuesday, around noon or so, on Winchester Street in
7   Southwest Houston, the body of Mary Carmouche was found
8   in the backyard of the abandoned house up for sale and a
9   backyard behind the fence.
10          I believe the evidence will show that
11  retrieved from the body of Mary Carmouche is a spent
12  round, a bullet that killed her.  Removed from Terrence
13  Gibson is a bullet that killed him.  Removed from the
14  Lexus is a bullet that was shot into the Lexus.  And
15  recovered and removed from Dion Holley, in his arm, was
16  another bullet that was fired.
17          I believe the evidence will show that all
18  four bullets are 9 millimeter, that all four bullets
19  have similar rifling characteristics.  By that I mean,
20  when a bullet is shot out of a gun, there is a bore in
21  the barrel that puts a twist on the bullet and it puts
22  an impression on the bullet that when examined and
23  compared with other bullets, you can tell, was it fired
24  from the same firearm and/or similar firearms?
25          I believe the evidence will show that all

18

1   four bullets have a righthand twist.  I believe that the
2   evidence will show all four bullets have what's called
3   eight lands and grooves, the impressions that are made
4   as the bullet spirals through the barrel to keep it in a
5   straight line.  I believe the evidence will show they
6   were all 9 millimeter, and they were all metal jacketed
7   bullets.  They were all eight twists to the right, and
8   they all had eight lands and grooves.
9           I believe the evidence will show that the
10  defendant, Charles Mamou, abducted Mary Carmouche on
11  Lantern Point Drive while she was in the back of the
12  Lexus, drove her to the location on Winchester in
13  Southwest Houston, took her in the backyard of a vacant
14  house, where he then shot her one time in the chest,
15  causing her death.  You'll hear from multiple witnesses
16  that will establish this beyond any reasonable doubt.
17          THE COURT:  Call your next, please.
18          MR. MCCLELLAN:  State will call as its
19  first witness Kevin Walter.
20          THE COURT:  Proceed, please.
21
22
23  -
24
25

19

```
 1                KEVIN WALTER,
 2  having been first duly sworn, testified as follows:
 3                DIRECT EXAMINATION
 4  BY MR. MCCLELLAN:
 5      Q.  State your name for the record, please.
 6      A.  Kevin Walter.
 7      Q.  Okay.  Mr. Walter, you need to speak up so
 8  everybody can hear what you have to say.  Okay?
 9      A.  Yep.
10          THE COURT:  Just a second.
11      Q.  (BY MR. MCCLELLAN)  All right.  State your name
12  again, if you will.
13      A.  Kevin Walter.
14      Q.  You don't have to -- it will pick you up right
15  there.  How old are you, Kevin?
16      A.  Twenty-five.
17      Q.  All right.  How are you employed?
18      A.  Metro Transit Authority.
19      Q.  And how long have you worked for the Metro
20  Transit Authority?
21      A.  Three years.
22      Q.  Where did you go school?
23      A.  Kashmere.  I graduated in '94.
24      Q.  All right.  Do you know a person by the name of
25  Dion Holley?
```

20

```
 1      A.  Yes.
 2      Q.  How do you know Mr. Holley?
 3      A.  Since we was kids.
 4      Q.  You've known him since you were kids?
 5      A.  Through the neighborhood.
 6      Q.  Did y'all go to school together?
 7      A.  Yes.
 8      Q.  And do you know how old Dion Holley is?   Is he
 9  older than you, or do you know his actual age?
10      A.  No.
11      Q.  Is he older than you or younger?  Do you know?
12      A.  Younger.
13      Q.  Younger?
14      A.  Yeah.
15      Q.  All right.  Do you know -- did you know a
16  person by the name of Terrence Gibson?
17      A.  Yes.
18      Q.  Okay.  And how long had you known Terrence
19  Gibson?
20      A.  Six months to a year.
21      Q.  And did you come to know a person by the name
22  of Mary Carmouche?
23      A.  No.
24      Q.  Have you heard of a person by the name of Mary
25  Carmouche?
```

21

```
 1      A.  Yes.
 2      Q.  Was -- can you tell us when was the first time
 3  you ever saw a person that you later came to know as
 4  Mary Carmouche?
 5      A.  December the 6th.
 6      Q.  So, prior to December the 6th, did you not know
 7  her?
 8      A.  No, I did not.
 9      Q.  And do you know a person by the name of Charles
10  Mamou, Jr.?
11      A.  Yes.
12      Q.  What name did you know him as?
13      A.  Chucky.
14      Q.  How long had you known Chucky?
15      A.  Three weeks to a month.
16      Q.  And where did you first meet Chucky?
17      A.  I met him at Shoney's Inn, a hotel.
18      Q.  What part of town?
19      A.  Off of 610 and Kirby.
20      Q.  Do you recognize Charles Mamou here in the
21  courtroom today?
22      A.  Yes.
23      Q.  Could you point him out and briefly describe
24  something he's wearing today?
25      A.  He's sitting right over there.
```

22

```
 1      Q.  Could you tell me something he's wearing?
 2      A.  The white shirt, black coat.
 3          MR. MCCLELLAN:  Your Honor, may the record
 4  reflect that the witness identified the defendant?
 5          THE COURT:  It will.
 6          MR. MCCLELLAN:  May I approach the
 7  witness, Your Honor?
 8          THE COURT:  Yes.
 9      Q.  (BY MR. MCCLELLAN)  Let me show you what's been
10  marked as State's Exhibit No. 83.  Can you recognize who
11  that person is?
12      A.  Yes.
13      Q.  Who is that person?
14      A.  Dion Holley.
15      Q.  Okay.
16          MR. MCCLELLAN:  At this time, Your Honor,
17  State would offer into evidence State's Exhibit 83 and
18  tender to defense counsel for his examination.
19          MR. HILL:  No objection, Your Honor.
20          THE COURT:  State's 83 is admitted.
21      Q.  (BY MR. MCCLELLAN)  State's Exhibit No. 83 is
22  who?
23      A.  Dion Holley.
24      Q.  Let me show you what's been marked for
25  identification purposes only as State's Exhibit No. 76.
```

23

1   Can you recognize that person?
2       A.   That's Terrence.
3       Q.   What's his last name?
4       A.   Terrence Gibson.
5            MR. MCCLELLAN:   At this time, Your Honor,
6   State would offer into evidence State's Exhibit 76,
7   tender to defense counsel for his examination.
8            MR. HILL:   No objection.
9            THE COURT:   State's 76 is admitted.
10      Q.   (BY MR. MCCLELLAN)   Let me show you what's been
11  marked as State's Exhibit No. 77 and ask you if you can
12  identify who that person is?
13      A.   Yes, Mary.
14      Q.   Mary Carmouche?
15      A.   Yes.
16           MR. MCCLELLAN:   At this time, Your Honor,
17  State would offer into evidence State's Exhibit 77 and
18  tender to defense counsel for his examination.
19           MR. HILL:   No objection.
20           THE COURT:   State's 77 is admitted.
21      Q.   (BY MR. MCCLELLAN)   Had you ever met a person
22  by the name -- this is as of December the 6th, 1998.
23  Had you ever met, prior to that day, a person by the
24  name of Samuel Johnson?
25      A.   Yes.

24

1       Q.   You had met Samuel Johnson before December the
2   6th?
3       A.   No.
4       Q.   Had you met a person you came to know as
5   Terrence Dodson prior to or before December the 6th,
6   1998?
7       A.   No, I did not.
8       Q.   Did you meet those two people that day?
9       A.   Yes.
10      Q.   Directing your attention to -- when is the
11  first time that you met Charles Mamou, Jr.?
12      A.   Sometime in September -- I mean, sometime in
13  November.
14      Q.   Okay.  And you say you met him at a Shoney's
15  near Kirby?
16      A.   610 and Kirby.
17      Q.   How did you come about to meet him there?  What
18  events caused you to be there?
19      A.   My cousin.  Him and my cousin was together,
20  like, my cousin, Timmy, give me a phone call.
21      Q.   Your cousin, Timmy?
22      A.   Timmy.
23      Q.   And how are -- where does Timmy Thomas live?
24      A.   Louisiana, Sunset.
25      Q.   On the day that you went to Shoney's, did you

25

1   meet Timmy Thomas?
2       A.   Yes.
3       Q.   How long had you known Timmy Thomas?
4       A.   Probably about three years.  I met him three
5   years ago.
6       Q.   All right.  When you met Timmy Thomas, what
7   happened on that day?
8       A.   He told me he had a friend by the name of
9   Chucky looking for nine ounces of cocaine.
10      Q.   Did you meet this person that he referred to as
11  Chucky?
12      A.   Yes, he introduced him.
13      Q.   Can you tell me what the conversation between
14  you and the defendant was?
15      A.   Yes.  He asked me could I find him some
16  cocaine.  I told him I didn't know anyone.
17      Q.   Okay.  Any other discussion?  I mean, was it
18  that short, or did y'all talk about other things?
19      A.   He asked me could I get, like, cooked up into
20  rocks; and I told him I still don't know no one who have
21  it.
22      Q.   How long did your meeting take place there on
23  Loop 610?
24      A.   About fifteen, twenty minutes.
25      Q.   And how did you get there?

26

1       A.   A friend drove me there.
2       Q.   All right.  And after your meeting there, did
3   you ever hear from Chucky Mamou again?
4       A.   Yes.  That was like a phone conversation.
5       Q.   Did he call you, or did you call him?
6       A.   No, he called me.  Well, my cousin was at his
7   house.  Timmy called me from his house.
8       Q.   From whose house?
9       A.   From Chucky, back in Louisiana.
10      Q.   Did you talk to Charles Mamou, or did you just
11  talk to Timmy?
12      A.   I talked to Charles Mamou probably a couple of
13  days later.
14      Q.   How many times did Charles Mamou call you
15  between the time of the first meeting there in November
16  and the time of December the 6th?
17      A.   Several times.
18      Q.   Several?
19      A.   Yes.
20      Q.   And each conversation, was it about the same
21  thing or different?
22      A.   About the same, basically.  He was looking for
23  eighteen ounces of cocaine.
24      Q.   The amount went up?
25      A.   Amount went up.

27

1    Q.   What did you tell him about being able to find
2    eighteen ounces?
3    A.   I couldn't find it.
4    Q.   Did he call you about anything else?
5    A.   Oh, yes.
6    Q.   What else?
7    A.   Time went on, and he was down here one Sunday
8    and he called me looking for a whole kilo of cocaine.
9    Q.   Would this be December the 6th?
10   A.   Exactly.
11   Q.   And what did he tell you about looking for a
12   kilo?  What did he tell you?
13   A.   He told me he had $20,000 to spend.  He didn't
14   want to spend no more than 20,000.
15   Q.   So, what did you tell him then?
16   A.   Told him to come on with the $20,000.
17   Q.   What were you going to do?
18   A.   I was going to take his money.
19   Q.   How were you going to do that?
20   A.   See would he let me walk away with it.
21   Q.   After you had heard from Chucky, saying he had
22   20,000 and wants to buy a kilo, what did you do then?
23   A.   By that time, when I was at the park, when he
24   called me and Dion was shooting basketball.  And I
25   pulled Dion to the side.  I told him there is a boy down

28

1    here from Louisiana wanting a kilo of cocaine and he had
2    20,000.
3    Q.   So, what did y'all decide to do?
4    A.   I let him talk to Dion on the telephone.
5    Q.   Did Dion talk to him awhile on the telephone?
6    A.   Possibly about five minutes.
7    Q.   Where was Terrence Dodson at this time?  I
8    mean, Terrence Gibson?
9    A.   Terrence?  He was probably standing by.
10   Q.   All right.  How did Terrence Gibson get
11   involved?
12   A.   He heard the conversation and wanted in.
13   Q.   And what was the plan that y'all had developed?
14   A.   I told him to meet me at Northline.
15   Q.   Told who?
16   A.   Chucky Mamou.
17   Q.   All right.
18   A.   And he didn't know how to get there, so he had
19   a driver.
20   Q.   And what was the plan that you had developed
21   other than just meeting at Northline?
22   A.   The plan was we told Terrence to go to a spot,
23   a location that he was going to meet Chucky at.
24   Q.   Was he in a different car?
25   A.   Yes.

29

1    Q.   All right.  And did y'all go to Northline?
2    A.   Yes.
3    Q.   And who all went to Northline?
4    A.   Just me and Dion.
5    Q.   Whose car did you go in?
6    A.   Dion and I guess his parents' car.
7    Q.   What kind of car was it?
8    A.   It was a GS 300 Lexus.
9    Q.   What color?
10   A.   Blue.
11   Q.   And you and Dion went to Northline in a Lexus?
12   A.   Yes.
13   Q.   Who was driving the car?
14   A.   Dion.
15   Q.   And whereabouts were you?
16   A.   I was on the passenger side.
17   Q.   Terrence had been directed to look out at that
18   location?
19   A.   Go to the location.
20   Q.   And what role was Terrence Gibson going to
21   play?
22   A.   Like, make sure Mamou wasn't trying to rob us,
23   like take the Lexus away from us.
24   Q.   Now did you go to Northline then and meet
25   Charles Mamou?

30

1    A.   Yes.
2    Q.   What kind of car did Charles Mamou arrive in?
3    A.   A red Dodge.
4         MR. MCCLELLAN:  May I approach the
5    witness, Your Honor?
6         THE COURT:  Yes.
7    Q.   (BY MR. MCCLELLAN)  Let me show you what's been
8    marked for identification as State's Exhibits 40 and 41.
9    Does this appear to be a similar or same vehicle that
10   they arrived in at Northline?
11   A.   Similar.
12   Q.   Okay.  Similar to that?
13   A.   Yes.
14   Q.   Now when you arrived at Northline, whereabouts
15   did you meet at Northline?
16   A.   By Papa's Barbeque.
17   Q.   Okay.  Y'all arrived at Northline Mall, right?
18   A.   Yes.
19   Q.   And y'all were in what color car?
20   A.   Blue.
21   Q.   And they were in what color car?
22   A.   Red.
23   Q.   Can you come down -- step down for a moment,
24   and show me how the cars were situated.   If this is the
25   blue car, can you tell me -- let's say this is the

**31**

1   Northline Mall, the mall itself. Papa's Barbeque is
2   located where? Okay. Let's say Northline Mall is off
3   of what street?
4      A. I-45 and Crosstimbers.
5      Q. All right. Let's say this is I-45 right here,
6   and this is Northline. It's off to the side. Where is
7   Papa's Barbeque? Over here on the side, okay. Now,
8   whereabouts -- can you show me the configuration of the
9   two cars that were there, your car, the one you were in,
10  and their car? Can you put them on this? Your car is
11  parked like that, and where is the red car?
12     A. Over here.
13     Q. All right. Your car is parked like this?
14     A. Yes.
15     Q. And the red car is parked like this?
16     A. Yes.
17     Q. Now in the red car, who was driving? Excuse
18  me. In the blue car that you were in, who was driving?
19     A. Dion Holley.
20     Q. How many people were in the car total?
21     A. Two.
22     Q. So, Holley is driving; is that right?
23     A. Yes.
24     Q. And you are the passenger?
25     A. Uh-huh.

**32**

1     Q. Who was driving the red car? Who -- did you
2   later come to know the name of the person who you saw
3   driving the red car?
4     A. Yes, sir, Samuel.
5     Q. Samuel Johnson?
6     A. Samuel Johnson.
7     Q. And he was the driver of the red car, right?
8     A. Yes.
9     Q. And who was the passenger of the red car?
10    A. Charles Mamou.
11    Q. And was there anybody else in that car at that
12  time?
13    A. Yes, sir, Terrence Dodson.
14    Q. Was he in the backseat?
15    A. Yes.
16    Q. All right. You can go ahead and have your
17  seat.
18    A. (Witness resumes seat.)
19    Q. Now, whenever you arrived at Northline, was
20  their car already there or were you there first? How
21  did that happen?
22    A. No, they was already there.
23    Q. They were already there. Who was there first,
24  if you recall?
25    A. When?

**33**

1     Q. When you parked, who parked first?
2     A. We did.
3     Q. And then the red car parked?
4     A. Next.
5     Q. Next. Who got out of the car?
6     A. Me and Mamou.
7     Q. Okay. When you got out of the car, where did
8  you go?
9     A. Around to the back of the car.
10    Q. The back of the --
11    A. Blue car.
12    Q. Of the blue car?
13    A. Yes.
14    Q. And where did Mamou go?
15    A. He got out of the passenger seat and got in the
16  red car.
17    Q. And came to the front of --
18    A. To the back of the red car -- like the front of
19  the red --
20    Q. Come down here and show me. You get out of the
21  car and go where?
22    A. I exit and came to the back of the car.
23    Q. Back of the car?
24    A. Yes.
25    Q. On this side?

**34**

1     A. Yes.
2     Q. And where did Mamou go to?
3     A. He exited from the red car and walked in the
4  middle, and we met up.
5     Q. Right in here?
6     A. Yes.
7     Q. All right. Go ahead and have your seat. Did
8  Charles Mamou have anything in his possession at the
9  time he got out of the car?
10    A. Yes.
11    Q. What did he have?
12    A. He had a Victoria's Secret bag.
13    Q. And what was he doing with the bag?
14    A. He was trying to hand it to me; and I told him,
15  Oh, no. I told him, No, I don't know you, you know.
16    Q. What do you mean, I don't know you?
17    A. I don't know if you the laws or what. I don't
18  know you. Put the bag up. By that time the little
19  dude -- or Terrence Dodson, who was sitting in the
20  backseat, he jumped out the car and said, Hey, bring my
21  money here, man.
22    Q. You referred to him as a little dude?
23    A. I mean --
24    Q. He's not a little dude, though, is he?
25    A. No.

35

1    Q.  Is he about your size?

2    A.  Little smaller.

3    Q.  All right.  So, he got out of the backseat of

4  that car?

5    A.  Yes.

6    Q.  Of the red car?

7    A.  Yes.

8    Q.  And said what?

9    A.  Man, bring my money here.

10   Q.  What did Charles Mamou do then?

11   A.  He took him the bag.  He took him the

12  Victoria's Secret bag.

13   Q.  All right.  And at that time, where was Dion

14  Holley?

15   A.  Oh, he stepped out the car.

16   Q.  So, is he back there where you're at?

17   A.  Yes.

18   Q.  Okay.  Is he back there during all this

19  conversation?

20   A.  Yes.

21   Q.  So, you and Holley are both back here by the

22  car?

23   A.  Yes.  I introduced him, too.

24   Q.  You introduced Holley to who?

25   A.  Mamou.

---

36

1    Q.  Okay.  Did you ever get introduced to the guy

2  who said, Bring my money back?

3    A.  No.

4    Q.  Let me show you what's been marked as State's

5  Exhibit 31.  Is this the bag you saw Charles Mamou with?

6    A.  Yes.

7         MR. MCCLELLAN:  At this time, Your Honor,

8  State would offer into evidence State's Exhibit 31 and

9  its contents.

10        MR. HILL:  May I take the witness on voir

11  dire, Judge?

12        THE COURT:  Yes.

13        VOIR DIRE EXAMINATION

14  BY MR. HILL:

15   Q.  Mr. Walter, you and I have never spoken about

16  this case, have we?

17   A.  No.

18   Q.  You refused to answer any questions that I

19  wanted to ask you when I saw you last week over in the

20  D.A.'s Office, correct?

21   A.  Correct.

22   Q.  You say this is the exact bag that you saw

23  back -- out at the Northline Mall back on December 6th

24  of 1998?

25   A.  Well, I can't say the exact bag, but he had a

---

37

1  Victoria's Secret bag.

2    Q.  You don't know whether or not the contents

3  that's inside of State's Exhibit No. 31 is what was

4  inside of the bag that night on December 6th, when you

5  met at Northline Mall?

6    A.  No.

7         MR. HILL:  Judge, we object to the

8  introduction.

9         THE COURT:  Sustained at this time.

10        MR. HILL:  Thank you.

11        DIRECT EXAMINATION CONTINUED

12  BY MR. MCCLELLAN:

13   Q.  After you discussed it with Charles Mamou --

14  what did you discuss after he handed the money back to

15  the people in the car, or handed the bag back to people

16  in car?

17   A.  I told him to follow me, follow me.

18   Q.  Where were you going to go?

19   A.  I took him to a store that was closed.

20   Q.  What was the name of that store?

21   A.  Sing-On.

22   Q.  How do you spell Sing-On?

23   A.  S-I-N-G-O-N.

24   Q.  Why did you go to that location?

25   A.  We had Terrence Gibson there.

---

38

1    Q.  He was looking out at that location?

2    A.  Yes.

3    Q.  When you got to that location, what happened

4  then?

5    A.  Mamou wanted to buy a kilo, and we wanted to

6  look at the money; but he never showed the money, so --

7    Q.  Did you ask him to show the money?

8    A.  Yes.

9    Q.  What did he say when you asked him to show the

10  money?

11   A.  Oh, it belongs to his little cousin that went

12  to Terrence Dodson that was in the backseat.  So I told

13  him, I tell you what.  He told me so much money was

14  here, forty-five hundred.  I said, You get your

15  forty-five hundred, and we'll work a deal.

16   Q.  What did he say then?

17   A.  He still didn't want to do anything.

18   Q.  How long did y'all discuss the money and the

19  deal there at this other location?

20   A.  About fifteen or twenty minutes.

21   Q.  And was there ever a deal struck as to what was

22  going to happen?

23   A.  Yes.

24   Q.  What was that?

25   A.  Well, when we see the money, we're going to

39

1  take it.  I mean, we didn't just want to take a bag
2  because he had a bag in his hands.
3      Q.  Did you ever arrive at a -- did you ever get
4  the bag of money?
5      A.  No.
6      Q.  What did you ask him to do, as far as the money
7  is concerned, other than show it?  Did you ask him to do
8  anything other than just show it?
9      A.  Yeah, Let me walk away with this money.  I told
10 him the drugs were down the street at a friend's house.
11 Let me just walk down the street with the money, and you
12 sit right here.  I'll be right back.
13     Q.  Did he agree to do that?
14     A.  No.
15     Q.  Any other options that were talked about?
16     A.  No.
17     Q.  So, this that you put up here, let me mark this
18 as State's Exhibit No. 43?
19         MR. MCCLELLAN:  And at this time, Your
20 Honor, State would offer into evidence State's Exhibit
21 43.
22         MR. HILL:  No objection, Your Honor.
23         THE COURT:  State's 43 is admitted.
24     Q.  (BY MR. MCCLELLAN)  Now after negotiations
25 broke down, what did you do then?

40

1      A.  They left and we left.
2      Q.  What was the attitude of the parties when you
3  left?  Were they mad?  Were you mad?  What was the
4  situation?
5      A.  Yes, I was mad.
6      Q.  What was the attitude of Charles Mamou?
7      A.  He was disappointed, too.
8      Q.  After you left from this location, the Sing-On
9  store, whereabouts is that located?
10     A.  Northeast side of town.
11     Q.  On what street?  Do you know?
12     A.  Cavalcade.
13     Q.  So, after you left this Cavalcade location, did
14 you have anymore contact with Charles Mamou?
15     A.  Later on that night.
16     Q.  All right.  And what form did that contact
17 take?  Did you ever talk to him anymore that day?
18     A.  Oh, yes, over a cellular phone.
19     Q.  And how many times did you talk to him on the
20 cellular phone after leaving the Cavalcade location?
21     A.  Once.
22     Q.  Once?
23     A.  One time I talked to him.
24     Q.  Did other people in your presence talk to him?
25     A.  I think Holley spoke with him, yes.

41

1      Q.  And after you and Holley left the Cavalcade
2  location, where did y'all go?
3      A.  We met Terrence.
4      Q.  Whereabouts did you meet Terrence?
5      A.  At a Chevron gas station.
6      Q.  What did Terrence do then?
7      A.  We just probably got some gum, talked around.
8      Q.  Whose car was Terrence in?
9      A.  He was in my car.
10     Q.  What did you end up doing with your car after
11 y'all met up after leaving Cavalcade?
12     A.  We both put gas in the cars and sat around.
13 And after we left -- that's after we left Cavalcade.
14     Q.  And then after you left, where did you go then?
15 Where did Terrence take your car?
16     A.  After we left Chevron?
17     Q.  Yes.
18     A.  Terrence, I don't know where he went.  He had
19 to go do something, and me and Holley rode around.
20     Q.  Okay.  And how long did y'all ride around?
21     A.  Probably about forty-five minutes.
22     Q.  Okay.  And during any of that time, did you
23 have any contact with Charles Mamou?
24     A.  Yes, right after Mamou left, I say about five
25 minutes later he called me and asked him -- I answered

42

1  my cellular phone.  He called on the cellular phone.
2      Q.  And?
3      A.  And I told him, Hey, man, you sure made me look
4  bad.  Don't call on the phone no more.  So by that time,
5  he called Holley's phone; and Holley asked me, Hey, do
6  you know this phone number?  I was like, Yeah, I think
7  that's Chucky.  So, I grabbed the phone and I answered
8  his phone.  And I told him, say, Don't call his number
9  no more, man.
10     Q.  Did you have any conversation, or did you just
11 tell him not to call and hang up?
12     A.  I told him, Don't call up here, period.
13     Q.  What happened after that?
14     A.  Me and Holley rode down Homestead, and we went
15 all the way, like, to the end.  We was on our way back,
16 and we picked up Mary Carmouche.  Well, I got a phone
17 call.
18     Q.  Who all was in the car whenever you picked up
19 Mary Carmouche?
20     A.  Just me and Holley.
21     Q.  Okay.  So, Terrence Dodson wasn't in your car
22 then?  I mean, Terrence Gibson?
23     A.  No.
24     Q.  Did y'all meet up again with Terrence Gibson
25 sometime?

43

1    A.  Yes.
2    Q.  When?
3    A.  After we picked up Mary.  It was time to drop
4  me off; so I told him I had Holley to pick up Terrence,
5  so Terrence can bring my car.  So we met Terrence at a
6  little store by some apartments off Kirby.  And by that
7  time, Mamou had called.
8    Q.  All right.  And when Mamou called that time,
9  did you talk to him or did Holley talk to him?
10   A.  No, I probably gave the phone to Holley.
11   Q.  Well, do you know whether you talked to him or
12  Holley talked to him?
13   A.  No, I did not.
14   Q.  You didn't?
15   A.  No.
16   Q.  Does Holley talk to him?
17   A.  Yes.
18   Q.  Okay.  And what did he have to say?
19   A.  He told me --
20       MR. HILL:  Judge, I think I'm objecting to
21  hearsay.
22       THE COURT:  Sustained, I think.
23   Q.  (BY MR. MCCLELLAN) After Holley talked with
24  Mamou, did y'all go to another location?
25   A.  Yes.

44

1    Q.  Where did you go?
2    A.  To Bennigan's.
3    Q.  All right.  I'm still unclear as to where
4  Terrence Gibson got into the car.  Can you explain to me
5  how Terrence Gibson got into the car?
6    A.  Yes.  We met Terrence off Kirby Road, and we
7  took my car home; and me, Terrence, and Dion, and Mary
8  was in the car.
9    Q.  Now when you're going to Bennigan's, whose
10  suggestion was it, if you know, to go to Bennigan's?
11   A.  Holley -- no, Mamou wanted us to meet him at
12  Bennigan's.
13   Q.  All right.  Did Holley know how to get to
14  Bennigan's?
15   A.  No, he did not; so I drove.
16   Q.  Who drove the car?
17   A.  I did.
18   Q.  When you drove the car then, where was Holley,
19  For example, located within your -- that was in the
20  Lexus car?
21   A.  Holley jumped in the backseat.
22   Q.  Okay.  So, who was in the backseat as you're
23  going to Bennigan's?
24   A.  Holley and Mary.
25   Q.  Who else was in the front seat with you?

45

1    A.  Terrence Gibson.
2    Q.  Now, Bennigan's is located where?
3    A.  Off 610 and Kirby.
4    Q.  Was that anywhere near where you had met
5  Terrence -- Chucky Mamou back in November?
6    A.  Yes.
7    Q.  When you went to the Bennigan's, what did --
8  was the other car already there, or did you arrive
9  first?
10   A.  We arrived first.
11   Q.  Pardon?
12   A.  We arrived first.
13   Q.  You arrived first?
14   A.  Yes.
15   Q.  And when Charles Mamou arrived, what kind of
16  vehicle was he in?
17   A.  Red Dodge.
18   Q.  Is it the same vehicle that he had back at
19  Northline?
20   A.  Yes.
21   Q.  And who all was in the car, in the red car?
22   A.  Terrence -- I mean, Samuel Johnson was the
23  driver and Mamou was the passenger.
24   Q.  Now you say Samuel Johnson was the driver.
25  Back on December the 6th, 1998, did you know his name to

46

1  be Samuel Johnson?
2    A.  No, I did not.
3    Q.  You later learned that?
4    A.  Yes.
5    Q.  Were you, in fact, shown a photospread of ---
6  that contained a photograph of Samuel Johnson at one
7  time by the police?
8    A.  Yes.
9    Q.  Did you identify Samuel Johnson?
10   A.  Yes.
11   Q.  Now when you got to Bennigan's, what happened
12  then?
13   A.  We sat around at the table -- we sat around at
14  the table and ordered food.
15   Q.  Who all went inside?
16   A.  Everyone.
17   Q.  So you, Holley, Gibson, and Mary Carmouche?
18   A.  Yes.
19   Q.  And the defendant, Charles Mamou, and Samuel
20  Johnson?
21   A.  Yes.
22   Q.  During the time you're in Bennigan's, does
23  anybody leave the group and go outside?
24   A.  Yes, Holley and Mamou stepped outside.
25   Q.  And how long were they outside, if you know?

47

1    A.  Five to ten minutes.
2    Q.  After that did anybody else leave?
3    A.  Yes.
4    Q.  Who?
5    A.  Mamou left.
6    Q.  Okay.  And when he left, did he borrow
7  anybody's keys?
8    A.  Yes, he borrowed Samuel's keys.
9    Q.  And how long was Charles Mamou gone?
10   A.  For about twenty, twenty-five minutes.
11   Q.  After Charles Mamou arrived back at Bennigan's,
12 did y'all eventually leave the Bennigan's location?
13   A.  Yes.
14   Q.  When you got back into the Lexus, did people
15 get back in the same kind of positions?  Who was
16 driving?
17   A.  I was driving.  Terrence was in the front, in
18 the passenger.  Mary was sitting behind me.
19   Q.  Okay.
20   A.  And Holley was another passenger behind
21 Terrence.
22   Q.  And when you left Bennigan's, did you know
23 where you were going to go?
24   A.  No.  I was told to follow the red car that
25 Samuel was driving.

48

1    Q.  Who, then, drove in that red car?
2    A.  Sammy.
3    Q.  Who was the passenger in that red car?
4    A.  Mamou.
5    Q.  When you left Bennigan's, where did you go?
6    A.  So, went down North Main and we stopped at a
7  Fiesta.
8    Q.  When you say you stopped at a Fiesta, did you
9  go into the store?
10   A.  No.  We was at a Fiesta parking lot.
11   Q.  Okay.
12   A.  And --
13   Q.  And that's located where, if you know?
14   A.  North Main at -- I don't know the back streets.
15   Q.  Okay.  All right.  Was it near -- how close was
16 it to the location you left at Bennigan's?
17   A.  Some blocks, some blocks.
18   Q.  You say North Main.  Are you really talking,
19 though, about North Main?  North Main is near Interstate
20 10.
21   A.  South Main.
22   Q.  You went north on Main?  Is that what you're
23 saying?
24   A.  Yes.
25   Q.  When you stopped at that parking lot and where

49

1  the Fiesta was, who stopped first?
2    A.  They did.  We was -- I was following Samuel.
3    Q.  All right.  And did you then stop your cars?
4    A.  I rode, and then I stopped at -- it was like an
5  angle.
6    Q.  How close was your car to their car when you
7  stopped in the Fiesta parking lot?
8    A.  About five cars away.
9    Q.  Okay.  Let's say that you're in your car.  Is
10 it further than the back wall of this courtroom, or can
11 you tell me somewhere?
12   A.  Yes.
13   Q.  Is there a distance?
14   A.  It was a distance.
15   Q.  Further than that?
16   A.  Yes.
17   Q.  You say five car lengths away?  That's what you
18 said, was five car lengths away?
19   A.  Yes.
20   Q.  Okay.  And why did you park so far away from
21 where Mamou's car stopped?
22   A.  Just in case something went down and I can
23 drive off.
24   Q.  What do you mean, in case something went down?
25   A.  Just in case Mamou tried to rob us.

50

1    Q.  Now when you stopped in the Fiesta parking lot,
2  who got out of your car, if anyone?
3    A.  Terrence Gibson and Dion Holley.
4    Q.  Where did they go?
5    A.  They met Mamou halfway.
6    Q.  Okay.  Is Mamou the only one that got out of
7  the red car?
8    A.  Yes.
9    Q.  And they met halfway between the cars?
10   A.  Yes.
11   Q.  How long a conversation did they have?
12   A.  Probably two minutes.
13   Q.  Short?
14   A.  Yeah, real short.
15   Q.  Your parties -- I mean, Holley and Gibson come
16 back to your car?
17   A.  Yes.
18   Q.  After that -- he did that, without telling me
19 what they said, did they say something to you about what
20 had transpired?
21   A.  No location.  Not that location.
22   Q.  What did you do then?
23   A.  Followed Samuel and Mamou once again.
24   Q.  Where did you go then?
25   A.  To some buildings.

51

```
1     Q.  Okay.
2     A.  Back in that area.
3     Q.  Did you see any buildings back there that you
4  recognized?
5     A.  Yes.
6     Q.  Okay.  And what building would that -- what
7  type of building did you recognize?
8     A.  Around 610, where I usually go take my drug
9  test for my job.
10    Q.  You take a drug test how often?
11    A.  Random.
12    Q.  Random?
13    A.  Yeah.
14    Q.  Is that required by --
15         MR. HILL:  Judge, I'm going to object to
16  the relevance of the questioning.
17         THE COURT:  Overruled at this point.
18    Q.  (BY MR. MCCLELLAN)  Is that required by your
19  job?
20    A.  Yes.
21    Q.  You recognize the building as being one of the
22  buildings?
23    A.  Yes, because I always drove behind Bennigan's.
24    Q.  Now when you got to that location back where
25  the buildings are, who stopped first?
```

52

```
1     A.  They stopped.
2     Q.  Did you stop your car after they stopped their
3  car?
4     A.  No, I parked myself at a distance once again.
5     Q.  How far again was your car from their car?
6     A.  Maybe about four or five cars away.
7     Q.  Why did you park so far away?
8     A.  Just in case Charles Mamou tried to rob us.
9     Q.  Okay.  Did anybody get out of your car when
10  you stopped at this parking lot around the buildings?
11    A.  Yes.
12    Q.  Who got out of their car?
13    A.  Terrence Gibson and Dion Holley.
14    Q.  And anybody get out of the red car?
15    A.  Yes, Charles Mamou.
16    Q.  And did they meet anywhere?
17    A.  In the center.
18    Q.  How long did that meeting last?
19    A.  One or two minutes.
20    Q.  After that meeting, did you follow their car
21  again?
22    A.  Yes.
23    Q.  And where did you end up after you followed
24  this car this third time?
25    A.  We ended up on a street that curved.  I don't
```

53

```
1  know the name of the location.
2     Q.  All right.  And describe the conditions around
3  that street.
4     A.  A field on this side and a field on the left
5  and right sides.
6     Q.  Any buildings around?
7     A.  Nope.
8     Q.  Any streetlights?
9     A.  No.
10    Q.  Was it dark?
11    A.  Yes.
12    Q.  Now you or your car was following their car?
13    A.  Yes.
14    Q.  What happened as you're following their car on
15  this dark street?
16    A.  They stopped; and Mamou say, Play like we're
17  going to give each other a boost.
18    Q.  What happened then?
19    A.  So they went down and turned their car around.
20    Q.  They turned their car around?
21    A.  Yes.
22    Q.  And did what?
23    A.  Parked it in front of the blue car I was
24  driving.
25    Q.  All right.  Now have we been out to that
```

54

```
1  location since December the 6th, 1998?
2     A.  Yes.
3     Q.  And I've gone out to that location?
4     A.  Yes.
5     Q.  And your car was pointed what direction, if you
6  know?
7     A.  North.
8     Q.  And the street it was on, if you were to drive
9  north, what street would you run into?
10    A.  South Main.
11    Q.  Okay.  And you know what street that was down
12  to the south of it?
13    A.  No, I do not.
14    Q.  Okay.  But your car is pointed to the north;
15  isn't that right?
16    A.  That's right.
17    Q.  Okay.  Let me show you what's been marked as
18  State's Exhibit No. 24, which is an aerial photograph.
19  Does that photograph fairly and accurately depict the
20  area where y'all had stopped back on December the 6th,
21  1998?
22    A.  Yes, around up in here.
23    Q.  Does the photograph fairly and accurately
24  depict the area, yes or no?
25    A.  Yes.
```

**55**

1          MR. MCCLELLAN:  At this time, Your Honor,
2    we would offer into evidence State's Exhibit 24 and
3    tender to defense counsel for examination.
4          MR. HILL:  No objection.
5          THE COURT:  State's 24 is admitted.
6     Q.  (BY MR. MCCLELLAN)  Mr. Mamou, if you could,
7    step down for a moment.  You need to keep your voice up
8    and step down.
9          Now, I'm sorry.  Your name is Kevin
10   Walters (sic).  No wonder you didn't step down so fast.
11   If you'll step over here to the side.  In this
12   photograph, first of all, do you see the buildings where
13   you would have stopped -- you talked about stopping near
14   some buildings where you have your drug test.  Do you
15   see those buildings on that photograph?
16    A.  Where is 610?
17    Q.  610 is right there.
18    A.  Right over here.
19    Q.  The buildings are located where?
20    A.  Right here.
21    Q.  See these buildings here?
22    A.  Yes.
23    Q.  Let me show you another photograph, State's
24   Exhibit No. 25.  Does that fairly and accurately depict
25   the area we're talking about?

**56**

1     A.  Yes at this time.
2          MR. MCCLELLAN:  At this time Your Honor we
3    would offer State's Exhibit 25.
4          MR. HILL:  No objection.
5          THE COURT:  State's 25 is admitted.
6          MR. MCCLELLAN:  On State's Exhibit 25 is
7    that a closer photograph that shows the buildings, yes
8    or no?
9     A.  Yes.
10    Q.  Okay.  And do you see on there the photograph,
11   regardless of the building that -- or does it show in
12   there where you would have parked, or the area you had
13   been parking in when you met with Charles Mamou?
14    A.  Probably right up in here.
15    Q.  Pardon?
16    A.  Here.
17    Q.  Do you know which of the buildings it is where
18   you do your testing?
19    A.  No.
20    Q.  But was it in this area?
21    A.  Yes.
22    Q.  In this general area?  So where these
23   buildings are here in this area here?
24    A.  Yes.
25    Q.  Where y'all met in a parking lot?

**57**

1     A.  Yes.
2     Q.  Now does this photograph also show the
3    Bennigan's restaurant that y'all had been at?
4     A.  Yes, right here.
5     Q.  Right there.  Okay.  Is it there?  Place this
6    on it.  That's the Bennigan's?
7     A.  Yes.
8     Q.  Now on this photograph, can you also see the
9    street that you all ended up on?
10    A.  Yes.
11    Q.  Like up in here?
12    A.  Yes.
13    Q.  Okay.  Can you show us where that street is
14   again?
15    A.  (Pointing).
16    Q.  Right in there?  So y'all went from the
17   Bennigan's over to this area here?
18    A.  Yes.
19    Q.  Now the Fiesta store, is it shown on this or
20   not?
21    A.  No it's not.
22    Q.  Now State's Exhibit 24, where abouts was --
23   okay, remember, this is to the north.  This is looking
24   towards the north.  And the Bennigan's and the buildings
25   are back over here.  You said your car was headed

**58**

1    towards the north on the street?
2     A.  Yes.
3     Q.  And does it show the street on State's Exhibit
4    24, the street that y'all were on?  The question is,
5    does this photograph show the street that y'all were on?
6     A.  Oh, yes.
7     Q.  Lantern Point Drive?
8     A.  Yes.
9     Q.  Can you put -- tell us whereabouts your car was
10   on that street?
11    A.  Yeah.
12    Q.  All right.  Now I'm going to have an arrow
13   which is the red car.  Your car is pointing to the north
14   is that right?
15    A.  Right.
16    Q.  And this is to the north so if we turn it
17   around this is to the north and your car was pointing
18   this direction towards the north is that what you said?
19   On this street here?
20    A.  Move it around a little bit.
21    Q.  All right?
22    A.  Yeah, I was pointed to the south.
23          THE COURT:  She's not taking any of this
24   down.
25    Q.  (BY MR. MCCLELLAN)  Let me show you State's

59

1  Exhibit No. 78.  Does that also fairly and accurately
2  depict the road?
3      A.  Yes.
4          MR. MCCLELLAN:  At this time, Your Honor,
5  we would offer into evidence State's Exhibit 78.
6          MR. HILL:  We have no objection.  May I
7  have a moment with Mr. McClellan?
8          THE COURT:  Yes.  State's 78 is admitted.
9      Q.  (BY MR. MCCLELLAN)  Whenever you were -- you
10  were following their car, the red car; is that correct?
11      A.  Yes.
12      Q.  All right.  And I believe you testified that we
13  went out there the other day and we drove through that
14  location, right?
15      A.  Yes.
16      Q.  Okay.  And when we were driving through the
17  location -- you've already testified that your car was
18  pointing north?
19      A.  North.
20      Q.  Now stay with me.
21      A.  Yes.
22      Q.  This is north.  It may be upside down, but
23  that's north.  So if you're following them, you're
24  coming up through here is that correct?
25      A.  Yes, sir.

60

1      Q.  Now your car stopped behind their car?
2      A.  Yes.
3      Q.  Their car stops first?
4      A.  Yes.
5      Q.  Then is it their car that turns around to face
6  yours?
7      A.  Yes.
8      Q.  And when they turn their car around to face
9  yours, can you show me whereabouts on this diagram their
10  car would have been?  Right in there, okay.  And your
11  car is going to be facing this direction --
12      A.  Exactly.
13      Q.  -- is that right?
14      A.  Yes.
15      Q.  After you -- your car comes to a stop on
16  Lantern Point Drive, I believe you testified that Chucky
17  Mamou said, Let's turn the cars around so it looks like
18  we're giving you a boost?
19      A.  Yes.
20      Q.  And the red car is the one that turned around
21  and came back facing yours?
22      A.  Yes.
23      Q.  Now that would then put the -- that would then
24  put the cars --
25          MR. MCCLELLAN:  Well, let me mark that as

61

1  State's Exhibit 42 and offer into evidence State's
2  Exhibit 42.
3          MR. HILL:  Judge, may I take the witness
4  on voir dire?
5          THE COURT:  Yes.
6          VOIR DIRE EXAMINATION
7  BY MR. HILL:
8      Q.  Mr. Walter, was Terrence Dodson in the red
9  vehicle at the time we are talking about right now?
10      A.  No, he wasn't.
11          MR. HILL:  Okay.  Well, I have to object
12  to No. 42, Judge, because that's written on there.
13          THE COURT:  Can we take care of it by
14  either lining through his name or --
15          MR. MCCLELLAN:  No.
16          THE COURT:  -- doing the same thing on
17  another one?
18          MR. MCCLELLAN:  We'll do it on another
19  one.  I would still offer State's Exhibit 42.
20          MR. HILL:  My only objection goes to the
21  fact the jury might believe Mr. Dodson was there, since
22  it's written on that exhibit.
23          MR. MCCLELLAN:  I understand that.
24          MR. HILL:  So I continue to object to the
25  hearsay.

62

1          THE COURT:  That was what was used in the
2  opening statement, State's 42.  You're going to object
3  to 42 as it is?  He's going to use a different exhibit.
4          MR. MCCLELLAN:  State's Exhibit 42 still
5  describes the parties.
6          MR. HILL:  Earlier, but not at the time
7  Mr. Walter is talking about now.
8          MR. MCCLELLAN:  I understand.  That's why
9  we're putting a new board up.  State's Exhibit 44.
10          THE COURT:  42 is not admitted.
11          DIRECT EXAMINATION CONTINUED
12  BY MR. MCCLELLAN:
13      Q.  Is this the way the cars were positioned at
14  this time y'all stopped on that dark road?
15      A.  Yes, that's correct.
16      Q.  Okay.  At the time of that, in your car, you
17  were --
18      A.  Driving.
19      Q.  -- driving?  In the front with you was --
20      A.  Terrence Gibson.
21      Q.  In back behind you was who?
22      A.  Mary Carmouche.
23      Q.  And next to her was who?
24      A.  Dion Holley.
25      Q.  And in the red car, the driver was who?

63

1   A.  Samuel Johnson.
2   Q.  And the passenger was who?
3   A.  Charles Mamou.
4   Q.  Okay?
5       THE COURT:  Tell me the number of that
6   exhibit.
7       MR. MCCLELLAN:  44.
8       THE COURT:  Are you tendering it now?
9       MR. MCCLELLAN:  Not yet.
10  Q.  (BY MR. MCCLELLAN)  In State's Exhibit 44 then,
11  when you arrived at this location and after the cars
12  were facing each other -- and this would be in a
13  northerly direction -- who got out of your car?
14  A.  Gibson and Holley.
15  Q.  Okay.  And where did they go?
16  A.  To the back of the Lexus.
17  Q.  Who got out of the red car?
18  A.  Mamou.
19  Q.  Did you ever see Samuel Johnson get out of the
20  red car?
21  A.  No, I did not.
22  Q.  Did you ever see Mary Carmouche get out of the
23  blue car?
24  A.  No, I did not.
25  Q.  When Gibson and Holley got out of the blue car,

64

1   do you know where they went, what direction?
2   A.  Yes.
3   Q.  Where?
4   A.  They stepped to the back of the Lexus.
5   Q.  The back of the Lexus.  Okay.  Where did Mamou
6   go?
7   A.  He came -- he stepped out the passenger side,
8   passed by me.
9   Q.  He passed by you?
10  A.  Yes.
11  Q.  And went where?
12  A.  To behind, like, Mary.
13  Q.  Behind?
14  A.  To the back, yes.
15  Q.  Back of the Lexus, like where Mary is sitting?
16  A.  Yes.
17  Q.  All right.  Now how were you able to see, or
18  did you see what transpired behind you at the back of
19  the blue Lexus?
20  A.  No, I did not.
21  Q.  What was the first thing that drew your
22  attention to the back area?
23  A.  I heard gunshots.
24  Q.  Okay.  When you heard gunshots, what did you
25  do?

65

1   A.  I turned around, looked back.  It was dark.  I
2   didn't see no one, so I grabbed the steering wheel and I
3   was fixing to take off.  And by that time, Mamou passed
4   by and shot me in the shoulder.
5   Q.  Okay.  Was your door closed?
6   A.  Yes.
7   Q.  Was your window up?
8   A.  Yes.
9   Q.  When he shot you, did it go through the window?
10  A.  Yes, busted window.
11  Q.  And whereabouts were you shot then the first
12  time?
13  A.  On my left shoulder.
14  Q.  Okay.
15  A.  So by that time, my door light -- the light
16  inside the car came on.
17  Q.  Had you opened the door?
18  A.  No, I did not.
19  Q.  Okay.
20  A.  Charles Mamou opened the door.
21  Q.  When he opened the door, what happened then?
22  A.  He told me to pop the hood.
23  Q.  What did you tell him?
24  A.  I reached down there like I was opening the
25  hood.  And I was, like, Hey, let me get out of the car.

66

1   So about that time, I stepped out of the car.  As I was
2   stepping out, he shot me in my stomach.  So by that
3   time, when I turned toward him I said, Hey, whatever you
4   do, don't hurt the girl.  And he shot me in my chest, so
5   then I hit him in the nose.
6   Q.  How did you hit him in the nose?
7   A.  I threw my hands up in the air like this; and I
8   said, Hey, whatever you do, don't hurt the girl.  So
9   when he shot me in my chest, I came down and hit him in
10  the nose.  And I reached and tried to grab the gun out
11  of his hand; but I was trying to stay focused on him, so
12  I took off to the back of the car.
13  Q.  Okay.  When you took off to the back of the
14  car, what happened?
15  A.  As I was running, I heard several more shots.
16  Q.  Several more?
17  A.  Yeah.
18  Q.  Okay.
19  A.  And I got hit in the back one time; so I ran
20  past Terrence, and then I stopped once.  I saw Terrence
21  and I reached down and I grabbed the gun.
22  Q.  Where was the gun?
23  A.  Like, laying by Terrence's hand.
24  Q.  You reached down and grabbed the gun, and what
25  did you do then?

67

1   A.   When I looked up, Charles Mamou jumped in the
2   car and it was burning off.
3   Q.   Is that the last time you saw Mary Carmouche?
4   A.   Yes.
5   Q.   Was that the last time you saw Charles Mamou,
6   till today?
7   A.   Yes.
8   Q.   After the -- are you saying the Lexus left
9   first?
10  A.   No, huh-uh.  The red car backed up and took
11  off.
12  Q.   It also took off?
13  A.   Yes.
14  Q.   So both cars left?
15  A.   Yes.
16  Q.   Now had you left your car running?  During all
17  this period of time was it running?
18  A.   Oh, yes.
19  Q.   After you saw the gun laying there in the
20  street, did you pick the gun up?
21  A.   Exactly.  I picked it up.  I grabbed it.
22  Q.   What were you going to do?
23  A.   I was going to shoot him just in case he comes
24  to make sure I was dead.
25  Q.   Did you try to shoot after you picked the gun

68

1   up, or was he too far away?
2   A.   No, he was too far.  And if I would have shot,
3   I would have shot the back of the Lexus.
4   Q.   Where Mary Carmouche was?
5   A.   Exactly.
6   Q.   Now after the cars had left and y'all were left
7   there on the street, what did you do?
8   A.   Well, by that time I saw Holley walking over
9   and --
10  Q.   Where is he coming from?
11  A.   Down the street from the field.
12  Q.   Further down than where you had gone?
13  A.   Yes.
14  Q.   And had Holley been injured?
15  A.   Yes, he was hit in the arm one time, so we both
16  looked at Terrence.
17  Q.   Was Terrence still alive at the time you saw
18  him?
19  A.   Yes.
20  Q.   Did you say anything to Terrence or Terrence
21  say anything to you?
22  A.   No.  Holley said something.
23  Q.   Okay.  After where did you go, if you
24  recall?
25  A.   I took some steps, and I told Holley I was

69

1   fixing to lay down.  And Holley asked me, You think
2   you're going to make it?  I told him, Yeah, just hurry
3   up and get me some help.
4   Q.   And did some help arrive?
5   A.   Yes.
6   Q.   Okay.  Do you remember who arrived first?
7   A.   A security guard.
8   Q.   And at the time the security guard arrived, did
9   he ask you what had happened?
10  A.   As I can recall, no.
11  Q.   Okay.  You don't recall him asking you?
12  A.   No.  By that time I was going in, coming out,
13  going in, coming out.
14  Q.   You say you don't recall any conversations with
15  the security guard?
16  A.   No.  I was --
17  Q.   Going in and out?
18  A.   Yeah.  By that time I got real weak.
19  Q.   Are you saying you couldn't have had any
20  conversation with the security guard, or you just don't
21  remember?
22  A.   Oh, yes, I could have; because I remember one
23  time I said, Officer, what time is the ambulance coming?
24  And he said, I'm not an officer.  I'm a security guard.
25  And I was like, Well --

70

1   Q.   So you were saying some things out there?
2   A.   Yeah.
3   Q.   But you don't recall him asking you what
4   happened?
5   A.   No.
6   Q.   Do you recall him asking you anything about the
7   gun?
8   A.   No.
9   Q.   Now the gun had been in whose possession at the
10  time that y'all arrived at Lantern Point Drive?
11  A.   Terrence Gibson.
12  Q.   Now when you heard the shots at the back of the
13  car -- was there more than one shot that you heard at
14  the back of the car?
15  A.   Yes, but they was fast.
16  Q.   They were rapid?
17  A.   Yes.
18  Q.   Were you hosp -- do you remember what hospital
19  you were taken to?
20  A.   Yes, I was taken to Hermann.
21  Q.   And what condition were you in when you were at
22  Hermann Hospital?
23  A.   Critical.
24  Q.   Were you in the intensive care area for a
25  period of time?

71

1    A.   Yes.

2    Q.   All total, how long were you in the hospital

3    before you were finally released?

4    A.   Three weeks.  I went home for one week.  Then

5    they rushed me back to the hospital and I stayed another

6    week, so a month.

7    Q.   Immediately after arriving at the hospital,

8    were you able to talk?

9    A.   No.

10   Q.   And why is that?

11   A.   They had put me to sleep.  They was running

12   down the hallway.  It was like when I was in the

13   ambulance, they was cutting my clothes off of me and --

14   Q.   Did you have any tubes that were put in you?

15   A.   Yes.  I had two tubes in my nose running down

16   to my throat, and I had a tube in my mouth giving me

17   oxygen.

18   Q.   Now, do you recall the police coming by to talk

19   to you?

20   A.   Oh, yes.

21   Q.   And how were you able to communicate with the

22   police?

23   A.   Well, I couldn't talk.  I had to write

24   everything on pen and paper.

25   Q.   Okay.  And could you then also respond by

---

72

1    answering their questions either by nodding or whatever?

2    A.   No, I really -- no.

3    Q.   You just wrote on a piece of paper?

4    A.   Yes.

5    Q.   Was there a point in time then after getting

6    out of the hospital that you were able to relate to the

7    police the name of the person who had shot you?

8    A.   Yes.

9    Q.   And what name did you relate to them?

10   A.   Chucky.

11   Q.   And were you able to identify for them the

12   telephone number that you had used in calling Chucky

13   here in Houston?

14   A.   Yes.

15   Q.   And you gave them that number?

16   A.   Yes.  I had them go and get my cellular phone

17   and paper, and they brought it to me and I circled the

18   numbers.

19        MR. MCCLELLAN:  May I have just a moment,

20   Your Honor?

21        THE COURT:  Yes.

22        MR. MCCLELLAN:  May I approach the

23   witness, Your Honor?

24        THE COURT:  Yes.

25   Q.   (BY MR. MCCLELLAN)  Let me show you State's

---

73

1    Exhibit 62 and ask if you can identify that?

2    A.   Yes.

3    Q.   What is that?

4    A.   That's the Lexus I was driving.

5    Q.   Okay.

6        MR. MCCLELLAN:  At this time, Your, Honor

7    State, would offer into evidence State's Exhibit 62 to

8    defense counsel for examination.

9        MR. HILL:  No objection, Judge.

10       THE COURT:  State's 62 is admitted.

11   Q.   (BY MR. MCCLELLAN)  Were you, while in the

12   hospital, shown some photospreads by the police?

13   A.   Yes.

14   Q.   And were you able to identify people in those

15   photospreads?

16   A.   Yes.

17       THE COURT:  Would you approach for a

18   moment, please?

19       (Off-the-record discussion.)

20       THE COURT:  You're not to discuss anything

21   we've talked about till both sides have rested.

22       (Lunch recess.)

23       (Continuing after lunch:)

24       THE COURT:  Ladies and gentlemen, when we

25   recessed, this witness was on direct examination.

---

74

1                Continue, please.

2            DIRECT EXAMINATION CONTINUED

3    BY MR. MCCLELLAN:

4    Q.   Mr. Walter, can you tell the ladies and

5    gentlemen of the jury what type of shirt you were

6    wearing that night, on December the 6th, 1998?

7    A.   I was wearing a tan FUBU shirt, F-U-B-U.

8    Q.   Is that kind of like a football jersey?

9    A.   Yes.

10   Q.   And while you were in the hospital, several

11   days after the shooting incident, did the police show

12   you some photospreads to see if you could identify

13   people in the photospread that may be involved in this

14   case?

15   A.   Yes.

16       MR. MCCLELLAN:  May I approach the

17   witness, Your Honor?

18       THE COURT:  Yes.

19   Q.   (BY MR. MCCLELLAN)  Let me show you what's been

20   marked for identification purposes as State's Exhibit

21   No. 80.  Were you shown State's Exhibit 80 back on the

22   8th of December, 1998?

23   A.   Yes.

24   Q.   Were you able to identify someone in State's

25   Exhibit No. 80 who's involved in this incident?

75

1    A.   Yes.
2    Q.   Okay.
3    A.   No. 2, Charles Mamou.
4    Q.   All right.
5         MR. MCCLELLAN:  At this time, Your Honor,
6  the State would offer into evidence State's Exhibit No.
7  80 and tender to defense counsel for examination.
8         MR. HILL:  No objection, Judge.
9         THE COURT:  State's 80 is admitted.
10   Q.   (BY MR. MCCLELLAN) It's the person in the No. 2
11  position?
12   A.   Yes.
13   Q.   Were you also shown another photospread?
14   A.   Yes.
15   Q.   Let me show you what's been marked as State's
16  Exhibit No. 82.  Were you shown this photospread?
17   A.   Yes.
18   Q.   Okay.  And were you able to identify someone in
19  State's Exhibit No. 82?
20   A.   Yes, Samuel Jackson.
21   Q.   Samuel Jackson?
22   A.   Yes, the driver of the vehicle.
23   Q.   The driver of what vehicle?
24   A.   The Dodge, red Dodge.
25   Q.   Okay.

76

1         MR. MCCLELLAN:  At this time, Your Honor,
2  State would offer into evidence State's Exhibit No. 82,
3  tender to defense counsel for his examination.
4         THE COURT:  Do y'all mean Johnson?
5         MR. MCCLELLAN:  Yes.
6    Q.   (BY MR. MCCLELLAN) Can you tell us which one --
7  on State's Exhibit 82 -- which person, what number
8  person?
9    A.   No. 2.
10        MR. HILL:  No objection.
11        THE COURT:  State's 82 is admitted.
12   Q.   (BY MR. MCCLELLAN) And this was the driver of
13  the red car?
14   A.   Yes.
15   Q.   Were you also shown a third photospread?   Let
16  me show you State's Exhibit No. 81.  State's Exhibit No.
17  81 -- do you recognize anyone in State's Exhibit No. 81?
18   A.   Yes.
19   Q.   And who -- what number do you recognize?
20   A.   No. 2.
21   Q.   Okay.  And who do you recognize No. 2 to be?
22   A.   Terrence Dodson.
23   Q.   And where did you encounter Terrence Dodson?
24   A.   In the backseat of the red Dodge.
25   Q.   Okay.  And at what location was that?

77

1    A.   At Northline Mall.
2    Q.   All right.
3         MR. MCCLELLAN:  At this time, the State
4  would offer into evidence State's Exhibit 81, tender to
5  defense counsel for examination.
6         MR. HILL:  No objection.
7         THE COURT:  State's 81 is admitted.
8    Q.   (BY MR. MCCLELLAN) Is that the No. 2 person?
9    A.   Yes.
10   Q.   Now this person you identified as Terrence
11  Dodson, who was present at the Northline Mall, can you
12  tell us whether or not he was present at Bennigan's?
13   A.   No, he wasn't.
14   Q.   Other than Northline Mall, did you ever see
15  Terrence Dodson again?
16   A.   No, I didn't.
17        MR. MCCLELLAN:  I'll pass the witness,
18  Your Honor.
19             CROSS-EXAMINATION
20  BY MR. HILL:
21   Q.   Mr. Walter, my name is Wayne Hill.  I represent
22  Charles Mamou.  I just want to make sure you understand
23  that if I ever ask you a question that you don't
24  understand, you'll stop me and just say, I don't
25  understand.  And I'll try to rephrase the question for

78

1  you, okay?
2         Now, I asked you during a brief
3  questioning period earlier this morning whether or not
4  you refused to speak with me when I met you over in the
5  hallway of the District Attorney's Office last week.  Do
6  you recall me asking you that?
7    A.   Me and you had a conversation?
8    Q.   That's correct.  You remember that I was over
9  in the District Attorney's Office one day last week?
10   A.   Exactly.
11   Q.   You were with Mr. Al Rodriguez, the
12  investigator for the 179th District Court, correct?
13   A.   Yes.
14   Q.   And at that time Mr. Rodriguez basically
15  introduced me.  He said, This is Wayne Hill; he
16  represents Mr. Mamou, correct?
17   A.   Correct.
18   Q.   And at that point in time, you refused to speak
19  to me about the case and about your potential testimony
20  in the case; is that correct?
21   A.   Correct.
22   Q.   And, in fact, you had an opportunity back on
23  August 14th of 1999, to be contacted by an investigator
24  appointed by the Court by the name of Ernest Humberson,
25  did you not?

79

1     A.   Correct.

2     Q.   Did Mr. Humberson explain to you that he was an
3 investigator working for me and Mr. Wentz, representing
4 Mr. Mamou?

5     A.   That's right.

6     Q.   And do you recall having a conversation with
7 him?

8     A.   Small conversation.

9     Q.   Small conversation.  Where did that
10 conversation take place?

11    A.   At my house.

12    Q.   What was the location of your house?   Can you
13 please give us your address?

14    A.   3817 Bennington.

15    Q.   We'll get back to that discussion a little
16 later.  I just wanted to establish that you do recall
17 speaking to Mr. Humberson on that day.

18    A.   Yes.

19    Q.   How long did your meeting with Mr. Humberson
20 last?

21    A.   Not that long, once I found out who he was.

22    Q.   Well, he told you right away who he was,
23 correct?

24    A.   He sort of did.

25    Q.   Well, sort of how?  Did he say it?  Did he tell

---

80

1 you, My name is Ernest Humberson?  I work with
2 Management Consulting, Inc. of Houston, Texas?  Do you
3 recall him telling you that?

4     A.   No.

5     Q.   You do recall he was not an investigator that
6 you had ever met before in the course of your being
7 involved in this case, correct?

8     A.   Yes.

9     Q.   He was not one of the security guards that was
10 found at the scene on Lantern Point?

11    A.   Correct.

12    Q.   He was not one of the many homicide detectives
13 that spoke to you in this case, was he?

14    A.   Huh-uh.

15    Q.   He was not Mr. Al Rodriguez, an investigator
16 with the District Attorney's Office, correct?

17    A.   No, correct.

18    Q.   Tell me what it is he said to identify himself
19 to you.

20    A.   He told me he was called the cowboy.

21    Q.   He said, They call me the cowboy?

22    A.   Yeah, gave me a card with his name on it.

23    Q.   Did it say "cowboy" on the card?

24    A.   Yeah, it said "cowboy" on the card.

25    Q.   Do you have that card with you?

---

81

1     A.   Probably in the trash can.

2     Q.   What color was the card?

3     A.   A white card.

4     Q.   It wasn't a brown card?  Was it kind of an
5 off-brown color, beige color?

6     A.   To tell you the truth, I really wasn't paying
7 attention once he told me who he was.

8     Q.   So once he told you who he was, you knew he was
9 an investigator working with the defense in this case?

10    A.   Yes.

11    Q.   How long after you learned that he was a
12 defense investigator did the conversation last?

13    A.   Probably about five to seven minutes.

14    Q.   Okay.  You testified initially, when
15 Mr. McClellan was asking you your relationship with Dion
16 Holley and Terrence Gibson, that you had been lifelong
17 friends with Dion Holley, correct?

18    A.   Since we was kids growing up, yes.

19    Q.   And have you had a close relationship that
20 whole time?

21    A.   I guess after we got in high school.

22    Q.   You're how old now?

23    A.   Twenty-five.

24    Q.   How old is Dion?

25    A.   I don't know.

---

82

1     Q.   I mean, is he the same -- basically the same
2 age as you, twenty-four, twenty-five, twenty-six years
3 old?

4     A.   Probably twenty-three, I don't know.

5     Q.   What type of things would the two of you do
6 together over the last couple of three years?

7     A.   We never done nothing together.  We never
8 really ran together.  I knew him from school and around
9 the neighborhood.

10    Q.   Okay.  So, when was the last time you got
11 together with Dion Holley prior to roughly November of
12 1998, when all of this starts going forward?

13    A.   I don't know.  I probably saw him about -- at
14 the park somewhere.

15    Q.   You may have seen him at a park somewhere prior
16 to November of 1998?

17    A.   Yeah, we shot a lot of basketball.

18    Q.   Was there a particular park that you would go
19 to where you would see him?

20    A.   It was like three different parks in the
21 neighborhood.

22    Q.   All right.  Would you go out socially with him?

23    A.   No.

24    Q.   How was it that you came to just hook up with
25 Mr. Holley in November of 1998?

83

1    A.  Well, when he was shooting basketball, I just
2  asked him did he want to make some money.
3    Q.  Okay.  And I take it that Dion was not
4  surprised that you came and asked him if he wanted to
5  make some money?
6    A.  No.
7    Q.  And so, you presented to him what you referred
8  to as the plan, correct?
9    A.  Yes.
10   Q.  Now, who was present at the time that you first
11 see Dion Holley at the basketball courts?
12   A.  What you mean by present?  It was just me by
13 myself.
14   Q.  There was nobody else there?  Terrence Gibson
15 wasn't there?
16   A.  No, he was there.
17   Q.  Now, how did you happen to see Dion Holley at
18 the basketball court?  Did you call him on his cell
19 phone first?
20   A.  No, I was on my way there.  I was on my way to
21 the park.
22   Q.  Were you going to play basketball?
23   A.  Just to hang out.
24   Q.  What time of the day was it?
25   A.  It was around 5:45, 6:00.  It was later on in

84

1  the evening.
2    Q.  And that would have been in November of 1998,
3  correct?
4    A.  Yes.
5    Q.  And all of that came about -- in other words,
6  you were not going to go to the park to just hang out or
7  anything, but for the fact that your cousin, Timmy
8  Thomas from Sunset, Louisiana, had called you and said,
9  Hey, I got some guy that wants to do a deal in Houston?
10   A.  No.
11   Q.  That's not correct?
12   A.  That's not correct.
13   Q.  Had you received a call from Timmy Thomas?
14   A.  I received a call from Timmy Thomas back in
15 November.
16   Q.  That's what I'm talking about, sir.  I'm
17 talking about the latter part of November of 1998.  In
18 other words, you get the phone call from Timmy Thomas
19 before you go down to the park and see Dion?
20   A.  Them are two different days.
21   Q.  And they're spaced what, about a week,
22 week-and-a-half apart?
23   A.  Probably two or three weeks.
24   Q.  So, for about a two or three-week period, you,
25 Dion Holley, and Terrence Gibson are working on this

85

1  plan?
2    A.  No, no, they never knew nothing about this.
3  It's a one-day thing.
4    Q.  So, I want to make sure we're on the same page
5  here.  Let's go back to November of '98.  That's when
6  your cousin, Timmy, from Sunset, Louisiana, calls
7  you? --
8    A.  Right.
9    Q.  -- is that correct?
10   A.  Correct.
11   Q.  He tells you that he's got a person that,
12 coincidentally, lives three or four houses down from him
13 in Sunset, Louisiana, that wants to do a dope deal in
14 Houston, correct?
15   A.  Well, he did not tell me that over the phone.
16 He just introduced me to Chucky Mamou, and I talked to
17 Mamou personally.
18   Q.  And you first met Mamou at the Shoney's there
19 over on 610 Loop?
20   A.  Exactly.
21   Q.  And that's not too far from that Bennigan's on
22 610 Loop?
23   A.  Right.
24   Q.  Do you recall when that would have been that
25 you went to the Shoney's Inn?

86

1    A.  Sometime in November.
2    Q.  Around November 26th, November 27th?
3    A.  I can't recall.
4    Q.  Little bit after Thanksgiving?  Right around
5  Thanksgiving?
6    A.  I can't recall.
7    Q.  But you go there, understanding that you're
8  going to meet a guy that has indicated that he wants to
9  buy dope in Houston?
10   A.  No, he didn't talk on the phone.
11   Q.  Timmy said, There is a guy I'd like for you to
12 meet from Sunset, Louisiana, that's in Houston?
13   A.  I really come to see Timmy.  And when I got
14 there, that's when I got introduced to him.
15   Q.  So, you didn't know anything about there being
16 any kind of dope deal prior to getting into Shoney's
17 Inn, where your cousin, Timmy, was?
18   A.  No, I did not.
19   Q.  When you meet Timmy -- does Timmy come to
20 Houston a lot?
21   A.  No.
22   Q.  You said you've known him for three years.  Is
23 he just not a close cousin?
24   A.  That's why I went to Shoney's Inn, because he
25 did not know where I stay at.

87

1    Q.  I guess the answer was, you were not close to
2  your cousin, Tim?
3    A.  Not exactly.
4    Q.  How were you related to him?
5    A.  My dad's sister's son.
6    Q.  Who drove you over to Shoney's Inn that day?
7  You said a friend of yours?
8    A.  Say what?
9    Q.  You said on your direct examination that a
10  friend drove you over to the Shoney's Inn?
11    A.  Yeah.
12    Q.  Who was it?
13    A.  We call him Chili Red.
14    Q.  Who is Chili Red?
15    A.  I think his name is Andre.
16    Q.  Was Chili Red inside the room when you met your
17  cousin and Chucky Mamou?
18    A.  What you mean, inside the room?  Oh, in here?
19  No.
20    Q.  No.  When you go to see your cousin, Timmy, at
21  the Shoney's Inn, he introduces you to Charles Mamou,
22  correct?
23    A.  Yes.
24    Q.  My question is, did Chili Red go in the room
25  with you?

88

1    A.  No, we never did go in the room.
2    Q.  Where did you meet your cousin?
3    A.  In a lobby, a restaurant up at the front.
4    Q.  And at that point, is that when he introduces
5  you to Charles Mamou?
6    A.  Yes.
7    Q.  And you said earlier that your whole
8  conversation lasted only fifteen or twenty minutes?
9    A.  Correct.
10    Q.  And what is discussed with Mr. Mamou during
11  that fifteen or twenty minutes?  Is this the first time
12  you've ever met this man?
13    A.  Exactly.
14    Q.  It's the guy sitting over here with this sports
15  coat on?
16    A.  Exactly.
17    Q.  What do you or him talk about for that fifteen
18  or twenty minutes?
19    A.  We stepped outside as soon as they came down.
20  They was in the room, and we didn't want to go to the
21  room.  So we came down to Shoney's to the front lobby.
22  So, from there, we stepped outside; and he was looking
23  for nine ounces of cocaine.
24    Q.  What was the going price for nine ounces of
25  cocaine?

89

1    A.  I don't know.  And --
2    Q.  Did he seem a little surprised that you
3  wouldn't know what the going rate for nine ounces of
4  cocaine was?
5    A.  Really, he was looking for me to help find
6  someone; but that's not my job.
7    Q.  But ultimately, you did that, right?
8    A.  What you mean?
9    Q.  Put him in touch with somebody?
10    A.  No.
11    Q.  So fifteen or twenty minutes are spent with him
12  talking about wanting to buy nine ounces of cocaine?
13    A.  Basically.
14    Q.  How long does it take for you to say, I don't
15  know how to get nine ounces of cocaine; I can't help
16  you?
17    A.  Then we started talking about a car I was
18  riding in.
19    Q.  What kind of car were you riding in?
20    A.  A white Corvette.
21    Q.  And that would have been Chili Red's Corvette.
22    A.  Yes, either his or somebody in his family, one.
23    Q.  Was it an older model?  Was it a new model?
24  Was it souped up?
25    A.  Probably '85 -- or '95.

90

1    Q.  Did you or anybody else ever go back to that
2  Shoney's Inn after the first time you met Charles Mamou
3  there?
4    A.  No, we do not.
5    Q.  Do you know whether Chili Red ever went back to
6  that Shoney's Inn after that time you first met Charles
7  Mamou there?
8    A.  No, I did not.
9    Q.  Was Timmy still there at the time that you said
10  good-bye to Mr. Mamou there at the Shoney's Inn?
11    A.  Yes.
12    Q.  Did you then get together with your cousin
13  and --
14    A.  No.
15    Q.  The full extent of you seeing your cousin there
16  at the Holiday -- I'm sorry -- at the Shoney's Inn, he
17  introduced you to Chucky Mamou; and you didn't have any
18  other conversation with him?
19    A.  Oh, yeah.  I mean, I didn't have no
20  conversation, really, with Chucky after I found out what
21  he was really looking for.  So, I pulled my cousin to
22  the side and I asked him, What are you doing?  Are you
23  selling dope now?  He told me no, he was just riding
24  with him; because he say he going to give him a little
25  change or some money to ride from Louisiana to Houston.

91

1     Q.   Was it clear to you at the time, Mr. Walter,
2  that you met Chucky Mamou, that he was in Houston for
3  the express purpose of trying to score some dope?
4     A.   Not over the phone, I wasn't.
5     Q.   When you were at the Shoney's Inn?
6     A.   Oh, yes.
7     Q.   That's in November of '98?
8     A.   Yes.
9     Q.   What are you doing in between November of '98
10 and December 6th of 1998, regarding Mr. Mamou?
11    A.   Phone conversations.
12    Q.   How many conversations?
13    A.   Seven.  I mostly work graveyard, so like when
14 he come down here, like every three or four days.
15    Q.   He had your cell phone?
16    A.   Exact.
17    Q.   How did you contact him?
18    A.   From the caller I.D. on the cellular phone.
19    Q.   Where was he staying at?
20    A.   Basically, from Louisiana to Houston, Louisiana
21 to Houston.
22    Q.   So, you were calling him during that period of
23 time in Louisiana, as well as in Houston?
24    A.   Well, he paged me.
25    Q.   My question was, you call him in Louisiana, as

92

1  well as Houston?
2     A.   Yeah, I returned his phone call.
3     Q.   Why were you returning his phone call?
4     A.   Because my cousin beeped me from his house.
5     Q.   That would be Timmy Thomas?
6     A.   Exact (sic).  Called me from Mamou's, or
7  whoever they was at's house.
8     Q.   Go ahead.
9     A.   No, you say what you were saying.
10    Q.   So each time that you would call him back, he
11 would talk to you about wanting to score dope?
12    A.   Yeah, coming down there to party; but I'm not
13 no party pooper.
14    Q.   You're no party pooper?
15    A.   Exact.
16    Q.   So does your cousin, Timmy, come back with
17 Charles Mamou at all?
18    A.   No, he did not, once I got on him.
19    Q.   So you were upset with your cousin over being
20 involved with the likes of Charles Mamou and trying to
21 get you involved in a drug deal, right?
22    A.   Well, just told him -- I had asked what he was
23 doing.  He told me he have a newborn baby.  I told him,
24 Hey, if you get caught up the highway with him, you
25 locked up in jail, how are you going to take care of

93

1  your baby?
2     Q.   You were upset with the fact that Timmy would
3  be involved with any type of drug dealing?
4     A.   I can't say upset.  He's a grown man.  He make
5  his own choices.
6     Q.   How old is Timmy?
7     A.   I say about, probably twenty-four,
8  twenty-three.
9     Q.   So, when you're talking to Mr. Mamou, are you
10 always telling him you don't know how to get nine ounces
11 of cocaine, and telling him you don't know how to get
12 eighteen ounces of cocaine, and eventually telling him
13 you don't know how to get a kilo of cocaine?
14    A.   Exact (sic).  Well, he told me he had twenty
15 thousand.
16    Q.   That got you interested?
17    A.   I told him, Stay put.
18    Q.   What do you mean?
19    A.   Stay where you're at.  Don't find nobody.
20    Q.   Because you indicated to him you were going to
21 go ahead and put him together with a deal, right?
22    A.   Right.
23    Q.   Did you express to him that you had then found
24 cocaine or that you were going to find it for him?
25    A.   I'm going to find it.

94

1     Q.   For twenty grand, you would be involved in it?
2     A.   Yes.
3     Q.   But from the outset, I believe you testified
4  earlier that the plan was you were going to take his
5  money, to walk away with it, or whatever was necessary,
6  correct?
7     A.   Yeah, once we count the money and see the
8  money's in the bag.
9     Q.   Going to walk with it?
10    A.   Yeah.
11    Q.   Or whatever was necessary?
12    A.   I mean what I mean, whatever.
13    Q.   Well, what does whatever was necessary mean?
14    A.   If I had to take it.
15    Q.   And do what?
16    A.   What are you saying?
17    Q.   What do you mean by whatever was necessary?
18 Twenty grand is on the line there.  You're wanting that
19 twenty grand, right?
20    A.   Yeah.
21    Q.   Once he shows you the twenty grand, what are
22 you going to do to get it?
23    A.   Take his money.
24    Q.   Whatever was necessary?
25    A.   Take his money.

95

1    Q.    How many guns did you guys have when you ended
2    up over at Lantern Point?  Remember you spoke to
3    Mr. Humberson back on August 14th of 1999?
4    A.    Right.
5    Q.    How many guns did you have when you were out at
6    Lantern Point?
7    A.    I mean, I didn't have no gun.
8    Q.    How many guns did the three of you that took
9    Miss Carmouche out there have with you?
10    A.    None.
11    Q.    You didn't have any guns?
12    A.    One.
13    Q.    One gun?
14    A.    Exact (sic).
15    Q.    Terrence Gibson?
16    A.    Yes.
17    Q.    And that was going to take care of whatever was
18    necessary in terms of getting the $20,000 from Chucky
19    Mamou, correct?
20    A.    Correct.
21    Q.    Just the one gun?
22    A.    Yes.
23    Q.    You have several times on the 6th where you are
24    trying to execute your plan, correct, to take the money
25    from Charles Mamou, starting up at the Northline Mall;

96

1    is that accurate?
2    A.    Rephrase your sentence.
3    Q.    Sure.  You had several opportunities on
4    December 6th to take the money from Chucky Mamou?
5    A.    Oh, yes.
6    Q.    Let's back up for a second.  Tell me --
7    describe to the members of the jury, what was your plan?
8    Just tell them in your own words, what was the plan to
9    get the money?  Let them know.
10    A.    See the money, count the money, and see can I
11    walk away with the money.  That was my plan.
12    Q.    Okay.  What if he wasn't going to let you just
13    walk away with the money; because obviously, he's
14    wanting to see the dope, right?
15    A.    Right.
16    Q.    So then what?
17    A.    Well, that's his money, so we let him leave.
18    He left from Northline, and he left from --
19    Q.    But I believe you said you never saw the money?
20    A.    I saw a bag.  I wasn't trying to take nothing
21    then.
22    Q.    You wouldn't want to take anything unless you
23    actually knew there was money in the bag?
24    A.    Exact (sic).
25    Q.    Yet, at Northline Mall, you said he came up to

97

1    you with a Victoria's Secret bag and said, Here.  And
2    you said you don't want to be taking that; you might get
3    caught?
4    A.    Exact (sic).
5    Q.    So, in a public place, he was offering a bag to
6    you so you can see the money, correct?
7    A.    But at the same time, his friends jump out the
8    backseat, or his cousin.
9    Q.    And that would be Terrence, right, Dodson?
10    A.    Exact (sic).
11    Q.    You know him as Tator?
12    A.    Right.
13    Q.    His nickname is Tator?
14    A.    Right.
15    Q.    What's Tator say?
16    A.    That was a game; they was running a scam, which
17    I saw that.
18    Q.    Tator said, Come back here with my money,
19    right?
20    A.    Exactly.
21    Q.    He wasn't real keen on the idea that you were
22    out there and maybe Charles was going to be giving you
23    this money without seeing the dope first?
24    A.    Right.
25    Q.    I mean, it's kind of stupid in a dope deal for

98

1    one side to give it up without seeing the return,
2    correct?  If this is dope, it would be stupid for me to
3    come and say, Here it is, and I haven't seen your money
4    yet.  I don't know when you got the ability to close the
5    deal with me.
6    A.    No.
7    Q.    That would be stupid, right?
8    A.    Right.
9    Q.    When you use the phrase, I wanted to take his
10    money, be able to walk away with it, or whatever it
11    takes, how far were you willing to go?
12    A.    Leave him there.
13    Q.    Oh, just leave him there?
14    A.    Yeah.
15    Q.    How?
16    A.    What you mean, how?
17    Q.    How do you mean, just leave him there?
18    A.    Leave him sitting in the parking lot.
19    Q.    So if he didn't give you the money, you weren't
20    going to forcibly take it from him?
21    A.    No.
22    Q.    Tell me some of the elements of the plan to get
23    the money from him.  Where did you want this to happen?
24    This was your plan, right?
25    A.    It wasn't really no plan.  It was just

99

1  something, a little rush item.
2      Q.  A rush item.  It was a rush item; but yet you
3  involved Dion Holley, Terrence Gibson?
4      A.  Right.
5      Q.  So, that is little more involved than just some
6  rush idea, right?
7      A.  If that's what you want to say.
8      Q.  Well, that's what it was, right?
9      A.  Right.
10     Q.  And so, where is the ideal spot for you to
11 carry off your plan?
12     A.  At Sing-On.
13     Q.  At a grocery store that was closed in the Fifth
14 Ward?
15     A.  Yeah.
16     Q.  Up by Cavalcade?  Because the first time, the
17 first interaction you have is with Miss Carmouche with
18 regard to any bag or with regard to any kind of drug
19 dealings up at the Northline Mall.  He gets out, is
20 going to show you the bag.  And your response during
21 direct examination was, I don't want to be looking at
22 that.  And I think you were privately saying, He might
23 be a cop, right?
24         MR. MCCLELLAN:  I object to that being a
25 multifarious question.

100

1          THE COURT:  Sustained.
2      Q.  (BY MR. HILL)  Were you concerned that
3  Mr. Mamou was the police?
4      A.  Or a snitch, one.
5      Q.  Do you think your cousin would have introduced
6  to you Mr. Mamou, knowing he might have been a snitch?
7          MR. MCCLELLAN:  Calls for speculation.
8          THE COURT:  Sustained.
9      Q.  (BY MR. HILL)  Do you honestly believe he was a
10 police officer?
11     A.  At that point, these days it's hard to say.
12     Q.  Tell me what you thought.  Did you think
13 Mr. Mamou a snitch right then?
14     A.  Yes.
15     Q.  Yes or no?
16     A.  Yes.
17     Q.  Okay.  So when did your decision change over
18 the next several times when you kept trying to get
19 together?
20     A.  Whether he was a snitch or not, I take his
21 money.
22     Q.  So, even if he was working for the police
23 department, you would be willing to take his money from
24 him?
25     A.  Oh, no.

101

1      Q.  Whatever it takes?
2      A.  Oh, no.
3      Q.  If you knew he was police officer, you wouldn't
4  take his money from him?
5      A.  No.
6      Q.  I thought you said even if he was a snitch, you
7  would take his money from him?
8      A.  That don't mean the police was there.
9      Q.  So if the police weren't there, you would do
10 whatever it takes to take the money?  Fair statement?
11 This is all about you getting twenty grand, right?
12     A.  Right.
13     Q.  How were you going to divide it between you and
14 Holley and Gibson?
15     A.  I don't know.  Once we took the money, we would
16 divide it.
17     Q.  You worry about that later on; get the money
18 first?
19     A.  The main thing was to see the money, count the
20 money.
21     Q.  Take the money.  There was a third part to it,
22 right?  Right?  See the money, count the money, take the
23 money?
24     A.  Yeah.
25     Q.  I believe your testimony when Mr. McClellan was

102

1  talking to you was the plan was to rob the defendant,
2  Charles Mamou, correct?
3      A.  Correct.
4      Q.  All right.  And the first opportunity you had
5  to rob Mr. Mamou was at the Northline Mall?
6      A.  Correct.
7      Q.  And you were near a Pappa's barbeque place?
8      A.  Correct.
9      Q.  But that doesn't go off.  You've already
10 described why that didn't happen, because you thought he
11 was a snitch, right?
12     A.  No, not really.
13     Q.  Okay.  Why didn't it go off?
14     A.  Because I never saw the money.
15     Q.  But you told him you didn't want to see the
16 money when he offered it to you, right?  That was your
17 testimony this morning.
18     A.  But at the same time, the guy in the backseat
19 was jumping out the car.  I don't want to touch the bag.
20     Q.  How long a period of time was there between the
21 Northline Mall and you directing them to come into the
22 Fifth Ward on Cavalcade at the Signon store?  You tell
23 him to follow you there, right?
24     A.  Exact.
25     Q.  So, you're feeling comfortable that's where

103

1  you're going to rob him, at that store over there?
2      A.  Yeah, I feel more comfortable off Cavalcade.
3      Q.  I'm sorry.  In fact, when you were going up to
4  the Northline Mall, you had already spoken to Terrence
5  Gibson; and he was up there kind of watching things for
6  you, right?
7      A.  Right.
8      Q.  How did he get there?  What car did he drive
9  up there?
10     A.  He drove my vehicle.
11     Q.  Which is what?
12     A.  A Delta Eighty-eight Oldsmobile.
13     Q.  When did you give Terrence Gibson your Delta
14  Eighty-eight so he could be the lookout at Northline
15  Mall?
16     A.  From the park.
17     Q.  Okay.  So, this is not a rush thing; you're
18  having to give somebody the keys to your car, having to
19  let them know, we're going to try and set it up up here
20  at the Northline Mall.  And you've got to have some idea
21  as to where at the Northline Mall this thing is going to
22  take place, right?  Northline Mall is a pretty big
23  mall, isn't it?
24     A.  Yeah.
25     Q.  So, did you tell Terrence Gibson, We're going

104

1  to be meeting close to where the Papa's Barbeque is?
2      A.  No.
3      Q.  Where did you tell him to set up then?
4      A.  I just told him to go to Cavalcade to the
5  store.
6      Q.  Back up.  We're not there yet.  We're still
7  back at Northline Mall.  When you gave him the Delta
8  Eighty-eight, where did you tell him to go at the
9  Northline Mall to be the lookout?
10     A.  Terrence did not go to Northline Mall.
11     Q.  Okay.
12     A.  He never knew Terrence was with us.
13     Q.  You said on your direct examination, We told
14  Terrence to go to the Northline Mall.
15     A.  No.
16     Q.  You didn't say that?
17     A.  No.
18     Q.  You don't recall that?
19     A.  I told Terrence to go to Northline Mall?
20     Q.  Did you?
21     A.  No, he never went to Northline Mall.
22     Q.  But you call him on the cell phone to tell him
23  to meet us over at the store in the Fifth Ward?
24     A.  No, he does not have a cell phone.
25     Q.  So how did you communicate with him?

105

1      A.  I was face-to-face with him at the park.
2      Q.  Okay.  So when you're face-to-face with him at
3  the park, what did you tell him?
4      A.  Go to Sing-Onoff Cavalcade.  Be somewhere
5  around.
6      Q.  So when the first thing that happens at the
7  Northline Mall, you're not going to let it go down
8  there, because you don't have Terrence watching your
9  back?
10     A.  Exactly.  I don't have protection.
11     Q.  So the plan couldn't happen at Northline Mall,
12  because you didn't have somebody there to protect you?
13     A.  Exactly.
14     Q.  And you're thinking this whole time, on
15  December 6th, you're concerned that Chucky Mamou is
16  going to rob you, right?  You said that several times.
17     A.  Yes.
18     Q.  Truth of the matter is, your plan is to rob
19  him?
20     A.  Well, I know it goes both ways.
21     Q.  So we're done with Northline Mall.  It doesn't
22  happen there.  Your plan to rob is going to be over at
23  the store over in the Fifth Ward?
24     A.  Exact.
25     Q.  And when he asks to see the dope, it's part of

106

1  your plan to do what?  How do you respond?  What's your
2  plan?
3      A.  It's down the street.
4      Q.  And that was not true; you had no dope, right?
5      A.  Right.
6      Q.  You never had any intention of giving him any
7  dope?
8      A.  Right.
9      Q.  From start to finish, your plan is to rip him
10  off?
11     A.  Right.
12     Q.  At some point, when it's obvious to you that
13  twenty thousand is no longer an issue, according to your
14  testimony, and it's only forty-five hundred, you're
15  still wanting to rip him off even for the forty-five
16  hundred?
17     A.  Yeah.
18     Q.  When you get to that store on Cavalcade, he's
19  not buying the fact that he's going to give you the
20  money and you're just going to walk away and bring him
21  back the dope, right?
22     A.  Well, I told him all I had to do was make a
23  phone call.
24     Q.  Now at that point when you're at the store on
25  Cavalcade, it's you and Holley, right?

**107**

```
 1      A.   Right.
 2      Q.   You're in a blue Lexus?
 3      A.   Right.
 4      Q.   And Terrence Gibson has got your Delta
 5 Eighty-eight?
 6      A.   Right.
 7      Q.   Do you see Terrence there?
 8      A.   No.
 9      Q.   Does he show up, or are you looking around?
10 Where is he at?  Because he's your protection.  Don't
11 you want to make sure your protection is there before
12 you start trying to rip this guy off?
13      A.   I did not see him.
14      Q.   So, you didn't really feel like you needed to
15 have Terrence Gibson there to protect you, right?
16      A.   Right.
17      Q.   Okay.  So, I want to make sure it's you and
18 Dion Holley, right?
19      A.   Right.
20      Q.   And the purpose of having Terrence there, or on
21 Cavalcade, is to watch your back, to be protection,
22 right?
23      A.   Right.
24      Q.   And your testimony was earlier that the only
25 gun that ultimately ends up at Lantern Point is in the
```

**108**

```
 1 possession of Terrence, right?
 2      A.   Right.
 3      Q.   Are you telling this jury when you went to
 4 Cavalcade, neither you or Dion Holley had a gun?
 5      A.   Right.
 6      Q.   You're just going to go there and try to simply
 7 walk away with this man's money, pure and simple?
 8      A.   Or drive away, whatever.
 9      Q.   All right.  Where is the next place where your
10 plan to rob him is going to unfold now?  It doesn't
11 happen at the second location.  Where is the third
12 location going to be?
13      A.   It wasn't no third location.  It was just, they
14 left.  We left.  He say he was going to try to call back
15 and get the money, because he say the money wasn't his.
16      Q.   So you're still having the communication with
17 Mr. Mamou, and you're both talking about still getting
18 together yet again that day?
19      A.   The same night.
20      Q.   Correct.  Now what time was it -- you give me
21 your best approximation of what time of the day is it
22 you're in the Fifth Ward over there by the store where
23 this happened.
24      A.   Probably about 9:45, 10:00.  I don't know.
25      Q.   That's p.m., right?
```

**109**

```
 1      A.   Right.
 2      Q.   Fastforward with me, if you will, and tell me
 3 what time you go to the Bennigan's over on the 610 Loop?
 4      A.   Probably about 10:45, 11:00 o'clock.  I don't
 5 know.  I really don't want to lie to you.
 6      Q.   I don't want you to lie to me.  I just want you
 7 to give me your best approximation of the time.  Would
 8 you like to adjust that time backwards a little bit in
 9 the Fifth Ward?  Do you think that's a little too close
10 in time?  It wasn't as late at 9:45, 10:00 o'clock at
11 night, was it?
12      A.   I don't know.
13      Q.   Because when is the first time you get together
14 at Northline Mall?  Is that during the afternoon?
15      A.   No, it was dark.
16      Q.   7:00 o'clock?
17      A.   Approximately.
18      Q.   So if Northline Mall is at 7:00, isn't it more
19 likely that the situation over at Fifth Ward would have
20 been closer to 7:30, 8:00 o'clock?
21      A.   Yes.
22      Q.   Because you got a period of time where you go
23 and you pick up Marie Carmouche, right?
24      A.   Right.
25      Q.   So, is this when you go ahead and leave the
```

**110**

```
 1 Fifth Ward?  Have you seen Dion Holley at all at that
 2 point, after you start driving off?
 3      A.   Chucky and this other guy, Mr. Johnson, Samuel
 4 Johnson --
 5      Q.   Does Samuel have a nickname that you knew him
 6 by?
 7      A.   Samuel.
 8      Q.   Was he introduced to you as Bug?
 9      A.   Probably so.
10      Q.   Do you recall that now?
11      A.   Yes.
12      Q.   Bug Johnson, right?  He would have been the
13 driver of the red car that we've been talking about all
14 morning, right?
15      A.   Right.
16      Q.   You and Dion Holley are in the Lexus, the blue
17 Lexus, when you drive away from Fifth Ward?
18      A.   Yes.
19      Q.   Where do you first see Dion Holley after that?
20 How do you hook up with him?
21      A.   I was with him.
22      Q.   Where?
23      A.   In the car.
24      Q.   I'm sorry.  Terrence Gibson?  I apologize.
25      A.   A Chevron.
```

111

```
1      Q.  Do you just happen to meet there?  He doesn't
2   have a cell phone, right?
3      A.  Right.
4      Q.  And the only way you were able to tell him what
5   the plan was earlier in the day is because you saw him
6   at the basketball court?
7      A.  Well, we told -- we met him down the street at
8   the car wash, at Chevron.
9      Q.  Okay.  But my question is, you just happened to
10  run into him there; because the only plan that he knew
11  about was when you were at the basketball court you
12  said, I want you to meet me over by this store in the
13  Fifth Ward, because I want you to be protection for us?
14     A.  Right.
15     Q.  That was the only place you knew, because you
16  couldn't communicate with him by a cell phone or
17  otherwise?  He didn't have a pager?
18     A.  Yeah, he had a pager.
19     Q.  Would you oftentimes call his pager and leave
20  your cellular phone?
21     A.  I didn't know his beeper number.
22     Q.  So, the only way you could have seen Terrence
23  Gibson after you and Holley had gone to the store on
24  Cavalcade was to happen to run into him?
25     A.  No.
```

112

```
1      Q.  Explain.
2      A.  He knew exactly where we at.
3      Q.  How did he know exactly where you were at?
4      A.  We told him at the park.
5      Q.  After you -- the deal went down at Cavalcade,
6   you were then going to be going over to a car wash by
7   Chevron?
8      A.  Yeah.
9      Q.  So, obviously this is not some kind of rush
10  thing.  You've thought it out.  After we do that, the
11  next step is to go over here?
12     A.  Takes a second.
13     Q.  What?
14     A.  That don't take long to say where to meet at.
15     Q.  But you had already planned for everybody that
16  was going to meet after you had ripped off Chucky Mamou
17  of his money?
18     A.  Yes.
19     Q.  So when you get together at the car wash by the
20  Chevron station, what's the plan at that point?
21     A.  There wasn't no plan.
22     Q.  How soon after you meet do you all get together
23  in the Lexus and drive over to pick up Miss Carmouche?
24     A.  No, she never was thought of.  It was like
25  Terrence, he took my car, and I decided to ride with
```

113

```
1   Dion; and we were just riding and he received a phone
2   call, I guess.
3      Q.  Okay.  Terrence Gibson has your Delta
4   Eighty-eight; is that correct?
5      A.  Correct.
6      Q.  And you just drive with Dion?
7      A.  Yep.
8      Q.  And Dion gets a call from Chucky Mamou?
9      A.  Not right then and there.
10     Q.  Not right then and there.  But at some point
11  before you go over to pick up Miss Carmouche, was Dion
12  speaking to Chucky Mamou on the cell phone?
13     A.  No.
14     Q.  Is he talking to him at a pay phone?
15     A.  No.
16     Q.  Is he talking to him at all?
17     A.  No.
18     Q.  Do you remember testifying on direct
19  examination that -- you testified at some point Chucky
20  Mamou had spoken -- all right.  Maybe it was Mr. Gibson
21  he spoke to, and they decided to go on over to the
22  Bennigan's?
23     A.  That wasn't then.
24     Q.  I'm trying to close the gap in between the
25  Fifth Ward, which maybe is 8:00 o'clock at night; and
```

114

```
1   you say you went over to Bennigan's at 10:45, 11:00
2   o'clock at night.  That's about some two hours,
3   forty-five minutes of time we're trying to account for?
4      A.  I really don't know what time it was.
5      Q.  But you're just driving around with Dion?
6      A.  Yes.
7      Q.  And when do you go over and pick up Miss
8   Carmouche?
9      A.  Are you saying what time?
10     Q.  Yeah.
11     A.  About -- I don't know.
12     Q.  How long was she in the car before you go to
13  Bennigan's?
14     A.  Probably about twenty or twenty-five minutes.
15     Q.  Now she lives where?
16     A.  Off Homestead.
17     Q.  Which is where?  Tell us, geographically,
18  where is that in relation to the Northline Mall?
19     A.  Probably about fifteen minutes away.
20     Q.  Further north?
21     A.  From Northline Mall?
22     Q.  Yes.
23     A.  Yeah.
24     Q.  So it's a good ways from the Northline Mall?
25     A.  Not really.
```

115

1    Q.  I'm not that familiar with where Homestead is.
2  Some of the jurors may be.  How would you get to
3  Homestead very quickly if you were taking I-45 North?
4  So you and Dion go over and pick her up, and you're just
5  driving around?
6    A.  No.
7    Q.  Are you driving?
8    A.  No.
9    Q.  He's driving and Miss Carmouche is in the front
10  seat?
11    A.  No.
12    Q.  She's in the backseat?
13    A.  Yes.
14    Q.  You're in the front seat passenger side?
15    A.  Yes.
16    Q.  And you drive around for about twenty-five
17  minutes or so?
18    A.  No.
19    Q.  What?
20    A.  Say what?
21    Q.  What do you do?
22    A.  Then I had Dion page Terrence to see where my
23  car was at for I can go, and he paged Terrence.  We met
24  with Terrence.  And by that time --
25    Q.  Where did you meet Terrence?

116

1    A.  Off Curry -- off of a street called Curry Road.
2    Q.  Curry Road?
3    A.  Yeah, by the store.
4    Q.  By what store?
5    A.  I don't know the name.  By some apartments.  I
6  don't know.
7    Q.  What part of town?
8    A.  Same side as the store, northeast.
9    Q.  And so, then do you get back in your car?
10    A.  I was getting in my car.
11    Q.  And --
12    A.  Mamou called.
13    Q.  What does he say?
14    A.  He wondered how -- he wanted to talk to Dion
15  Holley.
16    Q.  So then, he has a telephone conversation with
17  Dion Holley?  The defendant does?
18    A.  Yeah, I pass him the phone.
19    Q.  So do you then leave your car right where it is
20  and get back into the Lexus?
21    A.  No.
22    Q.  Where do you drive to?
23    A.  I took it home.
24    Q.  Which is where?  On Bennington?
25    A.  Yes.

117

1    Q.  What side of town is Bennington?
2    A.  Northeast.
3    Q.  So Dion Holley, Terrence Gibson, and Mary
4  Carmouche follow you to your house?
5    A.  No.
6    Q.  Walk us through it.  How do you get from where
7  your car is to getting back in the Lexus?
8    A.  Terrence is in my car, and I rode with Holley
9  and Mary.
10    Q.  Okay.  How do you get -- or how does Terrence
11  get from your car into the Lexus?
12    A.  He followed us.
13    Q.  To your house?
14    A.  Exactly.  And I parked my car.
15    Q.  What, did you get out of your car to pull in to
16  park the car?
17    A.  Yes.
18    Q.  Where did you park the car?
19    A.  In the little garage.
20    Q.  You didn't think he could pull the car into the
21  garage?
22    A.  I wasn't worrying about that.  I pulled my own
23  car in my garage.
24    Q.  All of you -- now, I want to be sure that I
25  understand this.  When you are still away from your home

118

1  and you're by your Delta Eighty-eight, you say you get a
2  phone call from Chucky Mamou?
3    A.  Yes, sir.
4    Q.  You hand the phone to Dion Holley; Holley
5  speaks to Mamou, right?
6    A.  Right.
7    Q.  After that telephone conversation is done, the
8  four of you, in two different cars, drive over to your
9  house.  You then get in your car and park it in the
10  garage, and you get back into the Lexus?
11    A.  Exactly.
12    Q.  Then the four of you drive where?
13    A.  To 610 and Kirby.
14    Q.  That's to go to the Bennigan's?
15    A.  Exactly.
16    Q.  Do you go directly to the Bennigan's?
17    A.  Yes.
18    Q.  So you drive all the way from the northeast
19  side of town down to the Bennigan's, and Miss Carmouche
20  is with you at that time?
21    A.  Yes.
22    Q.  What is your plan at that point when you're
23  going to the Bennigan's?  Can you still see the money,
24  count the money, take the money?
25    A.  Exactly.

119

1    Q.  So you know, when you get to that location, all
2  four of you, that your plan is still to rip him off.
3  Now at this point, do you believe there is still $20,000
4  at stake?
5    A.  Yes.
6    Q.  Okay.  So before you go to Bennigan's you're
7  still thinking, Twenty grand is what I'm going to be
8  able to walk away from if I pull this off?
9    A.  Yes.
10    Q.  So you all drive to the Bennigan's.  You get
11  there.  All of you now, Bug, Chucky Mamou, you, Terrence
12  Dodson, Dion Holley, Mary Carmouche, all go into the
13  restaurant?
14    A.  Right.
15    Q.  The time is somewheres around 10:45 to 11:00
16  p.m.  That time might not be accurate, correct?
17    A.  Correct.
18    Q.  At some point Mr. Mamou steps out with who?
19    A.  The driver.
20    Q.  He steps out of the restaurant with Bug
21  Johnson?
22    A.  No, he stepped out of the restaurant with
23  Holley.
24    Q.  That's Dion Holley?
25    A.  Yes.

120

1    Q.  They stay outside for a while.  Then they both
2  come back inside?
3    A.  Yes.
4    Q.  What do you see Mr. Mamou do?
5    A.  Borrow the keys from Samuel.
6    Q.  Do you actually see Mr. Mamou drive off?
7    A.  No, I was sitting inside.
8    Q.  Did you speak to Mr. Mamou at all at the
9  Bennigan's?
10    A.  No.
11    Q.  Were you thinking at that point that you're
12  still going to pull this off, the plot to take his
13  money?
14    A.  Yes.
15    Q.  Your thing at that point, as you're sitting
16  there at the Bennigan's, is getting closer and closer;
17  we're finally going to be able to pull this off?
18    A.  Right, once we count the money.
19    Q.  Once you see the money, count the money, take
20  the money.  Now through this entire time, you indicated
21  to the jury earlier that you were afraid that this man
22  is going to rip you off, right?
23    A.  Right.
24    Q.  That's running through your mind the entire
25  time?

121

1    A.  No.
2    Q.  What?
3    A.  I'm listening.
4    Q.  Is that true?
5    A.  Yes.
6    Q.  And would it be a fair statement that the
7  places where the meetings were taking place up to that
8  point were public locations, open to the public?  People
9  could drive by, walk by, see what was going on?  Do you
10  understand my question?
11    A.  No, but I was just listening to you say afraid.
12  I never said I was scared.
13    Q.  You weren't afraid of Mr. Mamou?
14    A.  What you mean by afraid?
15    Q.  Well, what do you mean by afraid?
16    A.  I wasn't really scared.
17    Q.  You were just going to rip him off?
18    A.  That's what -- yeah.
19    Q.  So at some point Mr. Mamou comes back,
20  according to your testimony, after leaving.  And all of
21  you then start to drive off, correct?
22    A.  Correct.
23    Q.  Mr. Mamou is in a vehicle with Bug Johnson, and
24  the four of you are still in the Lexus?
25    A.  Yes.

122

1    Q.  And coincidentally, you drive over to a
2  building that's familiar to you, because you take random
3  drug tests there.  The area that we're talking about is
4  an area that you're pretty familiar with, correct?
5    A.  No, I'm not.
6    Q.  Knew how to drive there?
7    A.  Right.
8    Q.  Did you drive the Lexus over there?
9    A.  Correct.
10    Q.  And when you left Bennigan's, how do you drive
11  to this office complex where you take your tests?  What
12  road do you drive on?
13    A.  It's not a road.  You might just hit the top of
14  the -- you talking about the building?
15    Q.  Yeah.  When you get from the building, what
16  road do you take?
17    A.  I know there's a road that you can go straight
18  in back of Bennigan's.
19    Q.  What was the condition of that parking lot at
20  that time of night?  Were there lights on?
21    A.  No.  It was pretty dim.
22    Q.  You go there before going to the Fiesta parking
23  lot, right?
24    A.  No.
25    Q.  You go to the Fiesta parking lot first?

123

1      A.   Yes.
2      Q.   Now you said in your direct testimony that you
3  are always cautious; you're think he's going to try and
4  rip you off, so you park like four or five spaces away?
5      A.   Exactly.
6      Q.   So, would that indicate to you that you were a
7  little suspicious, perhaps a little frightened about
8  what Mr. Mamou might do?
9      A.   Yes.
10     Q.   Wanted to protect yourself, right?
11     A.   Right.
12     Q.   Did not want to take any chances of being
13 ripped off yourself, correct?
14     A.   Correct.
15     Q.   I mean, that wouldn't have been smart for you
16 to put yourself in a position where you could get ripped
17 off, right?
18     A.   Right.
19     Q.   So you drive to the Fiesta store, and that's
20 over on South Main near the Astrodome.  In fact, it's a
21 little further away from where the shootings ultimately
22 take place; isn't that correct?   From Bennigan's -- you
23 have a driveway from Bennigan's to get to the Fiesta
24 store, right?
25     A.   Right.

124

1      Q.   And in order to get to the location, Lantern
2  Point, where the shooting took place, you have to come
3  back towards the Bennigan's, right?
4      A.   Right.
5      Q.   So, when you go to the Fiesta store, what is it
6  that scares you off, that you don't like?   What is it
7  about the location, and who is there that you don't
8  like?
9      A.   That I don't like?
10     Q.   That anybody doesn't like.  Does Dion not like
11 the fact there are security guards riding around?
12     A.   Maybe Chucky didn't like it.
13     Q.   So you're thinking Chucky is probably concerned
14 about being at the Fiesta store to do the deal?
15     A.   Right.
16     Q.   Yet your testimony was you were following him
17 there?
18     A.   Exactly.
19     Q.   Because you've got him ready to go to all these
20 different locations.  Once you left the Fifth Ward,
21 everybody is saying what?  Chucky says, I want to meet
22 you here.  Now follow me here.  Isn't that the way
23 you're testifying in front of this jury?
24     A.   Well, when we failed his plan second go round.
25     Q.   Right, so you're following him to Fiesta?

125

1      A.   Correct.
2      Q.   And that falls apart.  You don't like that
3  location, right?   You don't want to do it there,
4  because it doesn't make a lot of sense that you would
5  try to rob somebody?
6           MR. MCCLELLAN:  I object to the
7  multifarious nature of the question.
8           THE COURT:  Rephrase it.
9      Q.   (BY MR. HILL)  You weren't going to try and rob
10 Mr. Mamou in the middle of the Fiesta store parking lot,
11 were you?
12     A.   Yes.  If he would have counted the money there,
13 we would have took it.
14     Q.   So, it did not concern you that there could
15 have been witnesses there?
16     A.   No.
17     Q.   Now when the thing doesn't work at the Fiesta
18 store, is it your testimony that Mr. Mamou then says,
19 Now follow me to another location?
20     A.   Yes, sir.
21     Q.   And is that when you get to ths building where
22 you used to have to take the drug tests?
23     A.   Yes.
24     Q.   And what is it about that location that you
25 don't like?

126

1      A.   I don't know.
2      Q.   Did Dion Holley not like that location?
3      A.   I don't know.  We never spoke about that.
4      Q.   How about Terrence Gibson?
5      A.   Who knows?
6      Q.   These are all locations that you say Mr. Mamou
7  has taken you to; yet, nobody's doing anything at those
8  locations, right?
9      A.   Right.
10     Q.   So now we've been through several failed
11 attempts to be able to rip him off, correct?
12     A.   Yeah.
13     Q.   And does he tell you, as the driver of the blue
14 Lexus, Follow me; we're going to go someplace else?
15 Just tell the jury how it is that you figured you were
16 going from that parking lot of that building, going to
17 some other location?
18     A.   No, because I always sit inside the car.  I
19 never got out.
20     Q.   So, people got out at these different
21 locations?
22     A.   Yes.
23     Q.   Who got out at the office building?  In your
24 car, who got out?
25     A.   Terrence and Holley.

127

1    Q.   Both of them?
2    A.   Yes, as I can recall.
3    Q.   And does Mr. Mamou get out of the vehicle
4  driven by him?
5    A.   Yes.
6    Q.   Your windows were up, so you could not hear
7  what was being said?
8    A.   Exactly, and I was a distance away from him.
9    Q.   Because you always wanted to park four or five
10 spots away, right?
11   A.   Exactly.
12   Q.   So you did that even when you went to that
13 office building?
14   A.   Yes.
15   Q.   So when these two guys, Holley and Gibson, get
16 back into your vehicle, do you recall anything?  That
17 is, now your plan is to go wherever Chucky Mamou drives,
18 and that's where you're going to rip him off?
19   A.   If we followed him, yes.
20   Q.   Always wanting to keep a safe distance; always
21 wanting to be concerned that you don't get ripped off,
22 correct?
23   A.   Correct.
24   Q.   So Mr. Mamou ends up coming onto this street
25 right here, which is called Lantern Point, correct?

128

1    A.   Correct.
2    Q.   So that the jury understands, you've been out
3  there with Mr. McClellan and Miss Connors, right?
4    A.   Right.
5    Q.   Took you out there last week after you spent
6  several hours in the office?
7    A.   Right.
8    Q.   Is this area -- I'm pointing to the area here
9  where it's all gray.  That's not the way that area was
10 back on December 6th of 1998, is it?
11   A.   I don't know.  I can't recall.
12   Q.   Do you recall that the area was just the way it
13 is on the other side of the road?  There was a lot of
14 brush, a lot of trees and everything.  This is recent
15 construction with a parking lot across from the
16 Astrodome?
17   A.   I can't recall.
18   Q.   Okay.  The other photographs there, you're not
19 sure if that's exactly the way it was back then?
20   A.   Dark.
21   Q.   It was very dark.  If you don't have any lights
22 on the car, can you see anything?
23   A.   You can see.
24   Q.   But there was no streetlights out in that
25 location, correct?

129

1    A.   No.
2    Q.   Look at this thing, and you see there are no
3  streetlights except for the extreme ends.  When you're
4  driving behind Mr. Mamou, are you having to put your
5  high beams on in order to see?
6    A.   No.
7    Q.   How far behind his car were you?
8    A.   I was driving close up on the back.  I don't
9  know.  I can't recall.
10   Q.   Were you pretty close to the red car?
11   A.   Not as I know of.
12   Q.   You said that the red car stopped, and Gibson
13 got out and walked up towards the car.  Who got out of
14 the car to go up and tell somebody in Mr. Mamou's car to
15 spin the car around?
16   A.   Mamou got out the red Dodge and come to us.
17   Q.   So, you're saying --
18   A.   He told Samuel to go turn around.
19   Q.   Why would he come out to tell Samuel to turn
20 around?
21   A.   Because we followed him.
22   Q.   Okay.  But your car is behind his?
23   A.   Exactly.
24   Q.   So he got out first, came -- and did you roll
25 your window down?

130

1    A.   I don't think so.
2    Q.   Because you stayed in the car, right?
3    A.   Yes.
4    Q.   So who gets out of the car and talks to Mamou?
5    A.   Terrence Gibson.  Then Holley stepped out the
6  car.
7    Q.   Do you see Mr. Mamou go back to Mr. Johnson's
8  red car?
9    A.   No.
10   Q.   So Johnson just goes ahead and turns the car
11 around by himself and points his vehicle in front of
12 your Lexus?
13   A.   No.  I believe Mamou got back in the car.
14 Either we pulled on the side --
15   Q.   Well, which is it?  Are you now saying your car
16 pulled alongside of Mamou's car?
17   A.   No, no, I was following him.
18   Q.   But you parked pretty far away from them,
19 right?  Because you were a little bit concerned about
20 them ripping you off?
21   A.   Not then.
22   Q.   No longer concerned Mamou is going to rip you
23 off?
24   A.   I'm not saying that.
25   Q.   So at some point, the cars are facing one

**131**

1   another?
2       A.   Yes.
3       Q.   You can't hear anything that's going on behind
4   your cars?
5       A.   Right.
6       Q.   How long a period of time are we talking about
7   between the time Bug Johnson pulls his car next to
8   yours, but the three guys are in the back of your seat?
9       A.   Probably a minute or two.
10      Q.   What are you saying to Mary Carmouche while
11  you're sitting in the vehicle?
12      A.   I didn't have any words.
13      Q.   You playing music?
14      A.   No.
15      Q.   You don't have the stereo on?
16      A.   No.
17      Q.   You see Bug Johnson in the other vehicle?
18      A.   I wasn't paying attention to him.
19      Q.   I believe your testimony was that after you
20  heard shots fired -- and there were several shots being
21  fired -- three guys were at the back of the vehicle,
22  Holley, Terrence, Chucky Mamou, all three of them were
23  in the back?
24      A.   Yes.
25      Q.   You see Mamou coming up to your side of the

**132**

1   car?
2       A.   That's kind of like him as a shadow.  It was
3   him, personally, shot through the window.
4       Q.   Shot through the window, hitting you in the
5   left shoulder?
6       A.   Left shoulder.
7       Q.   That would be your shoulder as you're sitting
8   there on the steering wheel, right?
9       A.   Right.
10      Q.   When you heard the shots, was it your testimony
11  that what you were thinking about then was to get out of
12  there as quickly as possible?
13      A.   Exact (sic).
14      Q.   So what do you do, put the car in gear?
15      A.   No.  I was trying, but about that time my door
16  opened up.  I saw the light come on.  It was light.  He
17  was standing there.
18      Q.   So at that very point, when the light comes on,
19  he's standing there; you've not put the car into gear
20  yet?
21      A.   No.
22      Q.   That's your left arm.  Your gear shifter is on
23  your right side, right, on the floor?  It's a stick?
24      A.   No.
25      Q.   Not a stick, but an automatic on the floor?

**133**

1       A.   Yeah.
2       Q.   So did you put it in gear?
3       A.   No, we never had time.
4       Q.   You got your foot on the brake?
5       A.   Probably stepped on the brake.
6       Q.   Why would you put your foot on the brake?
7       A.   You can't do that unless you step your foot on
8   the brake.
9       Q.   So if you put your foot on the brake, you're
10  trying to put your car into gear at that point?
11      A.   No.  You have time.
12      Q.   You see him there; and he shoots you a second
13  time in the stomach, correct?
14      A.   Yes, side of my stomach.
15      Q.   And you're yelling to him, Don't hurt the girl?
16      A.   No, no, no.  He tells me to pop the hood.  When
17  I opened the door --
18      Q.   After he shot you?
19      A.   Right, after he shot me in the shoulder.
20      Q.   After he shot you in the shoulder, he tells you
21  to pop the hood, where does he stand?
22      A.   Gunpoint range.  He's, you know, real close.
23      Q.   So, do you pop the hood?
24      A.   No.  I reached down there, but I didn't know
25  where it was at.  So I told him I got to get out of the

**134**

1   car to pop the hood.  So as I was getting out of the
2   car --
3       Q.   So you reached down with your left arm to try
4   and make like you were going to where?
5       A.   My right hand.  Well, I was trying to pay
6   attention to him, which I don't know.  Ain't nothing
7   there.  So as I was stepping out the car, he shot me in
8   my stomach.  So that made me move a little faster, so I
9   turned around to him and put my hands up in the air,
10  like, Turkey, what's up?  Don't hurt the girl.  And he
11  shot me in my chest.
12      Q.   That's the first thing that came to your mind?
13  You put your fists up and say, Don't hurt the girl?
14      A.   Yeah.
15      Q.   You don't say, Don't shoot me, man; I don't
16  have nothing?
17      A.   There is no time to beg.
18      Q.   But there is time make sure that you mention
19  that, Don't hurt the girl in the back?
20      A.   Yeah, she didn't have nothing to do with it.
21      Q.   She's sitting there with you guys as everybody
22  is discussing the dope deal?
23      A.   No, no.  She just -- she stepped to the side.
24      Q.   But everybody took her with them when they went
25  to do the dope dealing?

135

1 A. Correct, yeah.
2 Q. After you say that to Chucky and put your hands
3 up to Chucky, you say, What's up?  Then, Don't hurt the
4 girl.  And you ball up your fists and you punch him?
5 A. I hit him like this here in the nose.
6 Q. What happens to Chucky?
7 A. He started going back as I tried to grab his
8 arm.
9 Q. And --
10 A. By that time, I just took off running.
11 Q. Where?
12 A. To the back of the car.
13 Q. To get the gun?
14 A. Well, I really didn't know, so I ran back -- I
15 didn't run back towards the red car, because Sam and
16 them are that way; so, I didn't know what --
17 Q. Did he take off by you as you're running?
18 A. Who?
19 Q. The red car?
20 A. No.
21 Q. Well, you said you went back and got the gun.
22 You picked up the gun, which was right by Terrence's
23 hand, right, on the ground?
24 A. Right.
25 Q. You said you didn't shoot at the Lexus when it

136

1 drove over, because I was guess you were afraid you were
2 going to shoot Mary Carmouche, correct?
3 A. It was at a distance.  It was a distance, but
4 at this time I coughed up some blood.
5 Q. How long a distance are we talking about?
6 You're in the blue Lexus?
7 A. Right.
8 Q. Dion Holley and Terrence Gibson had walked to
9 the very back of the Lexus.  That's where this happened.
10 The gun is found right by the back of the Lexus, right
11 next to Terrence Gibson, correct?
12 A. Terrence most possibly took some steps.
13 Q. We're talking about three or four foot from the
14 back of the Lexus?
15 A. I don't know.
16 Q. You don't know?
17 A. I was just trying to get up out of there.
18 Q. You were trying to get the gun?  That was your
19 testimony earlier this morning.
20   MR. MCCLELLAN:  I object, Your Honor.
21 That was not his testimony, immediately after that point
22 in time.
23   THE COURT:  Rephrase it, please.
24 Q. (BY MR. HILL)  When did you pick up the gun?
25 A. Once I ran past the gun and I saw Terrence's

137

1 stuff.
2 Q. All right.  Then where was the blue Lexus at
3 the point you picked up the gun?
4 A. Taking off.
5 Q. Where was the red car?
6 A. Done took off.
7 Q. It had taken off before the blue car?
8 A. Yes.
9 Q. So it had to have come back this way; because
10 it was facing the other way, wasn't it?
11 A. No.
12 Q. Did it back up?
13 A. Burned rubber and burned rubber forward.
14   THE COURT:  I didn't hear.
15   MR. MCCLELLAN:  Burned rubber backwards
16 and burned rubber forward.
17   THE COURT:  Thank you.
18 Q. (BY MR. HILL)  Red car takes off first.  You
19 run, get the gun; and now the Lexus is driving off,
20 because it's a little bit too far away from you to
21 shoot; and maybe if you did shoot, it may have hit Miss
22 Carmouche?
23 A. Exactly.
24 Q. You said that after the incident took place,
25 you have the gun.  And at some point you decide to lay

138

1 down and just wait for help, right?
2 A. Right.
3 Q. You have your cell phone with you?
4 A. No, it's in the car.  It was.
5 Q. Do you know whether or not anybody else, either
6 Dion Holley -- do you know if Terrence had a cell phone
7 on him?
8 A. No.
9 Q. How long is it before the security guards get
10 over there?
11 A. I don't know.
12 Q. Pretty quick?
13 A. Don't make me lie to you.  I don't know.  By
14 that time, I started getting dizzy.
15 Q. Now we're talking about right around maybe
16 midnight of December 6th, 1998, or are we talking a
17 little bit before midnight of December 6, 1998, when
18 this shooting takes place?
19 A. At midnight.  I mean, it wasn't 12:00 o'clock.
20 Q. You figure it had to be on the 6th of December;
21 it hadn't made it over to Sunday morning, the 7th?
22 A. Right.
23 Q. And security guards come over.  They talked to
24 you, right?  Dion had walked away -- out of the brush
25 area by the woods, or this brushy area here, right?

**139**

1  That's where you saw him coming from?
2      A.  Really, either he was coming from there or down
3  the street.  I don't know.
4      Q.  My point is, at some point you saw Dion walking
5  in your direction, coming back towards you?
6      A.  What were you going to say?
7      Q.  I didn't want to interrupt you.  Go ahead and
8  finish what you were going to say.  You did not see what
9  Dion was doing?  You did not see what Terrence was doing
10  at the back of the vehicle, the back of the Lexus before
11  any number of shots were fired?
12      A.  Correct.
13      Q.  And you didn't see Dion Holley again until
14  after the Lexus had taken off and you saw him walking
15  towards you?
16      A.  Correct.
17      Q.  He had already been shot, correct?
18      A.  Correct.
19      Q.  Could you tell where he had been shot?
20      A.  No.
21      Q.  Now you go to the hospital.  And while you're
22  going there, do you talk to the ambulance driver or the
23  attendants in the back?
24      A.  Yes.
25      Q.  Let me ask you this:  Do you have a

**140**

1  conversation with Dion Holley at the scene here before
2  either security guards get there or before the ambulance
3  get there?
4      A.  No.
5      Q.  Do you have a conversation with him at any
6  point prior to being loaded into an ambulance to be
7  taken to the hospital?
8      A.  When he asked me, Do you think I'm going to
9  make it?  That's about the only conversation I remember.
10      Q.  Let me ask you this:  You said part of your
11  plan was to go ahead and rip off Chucky, that he had
12  already talked at the basketball court about watching my
13  back over at the store on Cavalcade in the Fifth Ward.
14  And after that took place, the plan was to go ahead and
15  meet at the car wash, at the Chevron station.  That much
16  was decided ahead of time.  When you're at the
17  Bennigan's, when you're driving down to the Bennigan's,
18  were you all discussing what kind of cover story -- are
19  you telling the guys what kind of cover story you're
20  going to have if the cops or somebody shows up while
21  this is going down?
22      A.  No.
23      Q.  But when you go to the hospital and the police
24  come and they interview you, you lie to them, correct?
25      A.  Yes, I guess.

**141**

1      Q.  And you lie to them over a several day period
2  of time, correct?
3      A.  No, I was full of more fear.
4      Q.  But at some point, you're clear thinking;
5  you're able to tell the police what took place, right?
6      A.  Not as I can recall.
7      Q.  You recall --
8      A.  I could not talk.
9      Q.  That's why you used the notes to write to the
10  police?
11      A.  I guess.
12      Q.  Then you would know.  Were you aware of what
13  you were writing when you wrote to the police?
14      A.  No.
15      Q.  So you weren't aware.  When is the first time
16  you told them about the good samaritan story?
17      A.  I don't remember saying that.
18      Q.  You don't recall telling the police that some
19  guys looked like they were broke down and y'all stopped
20  to help them?
21      A.  No.
22      Q.  Are you saying you never told the police that?
23      A.  I'm not saying that, either.
24      Q.  Now, was there a point in time when you decided
25  that it was okay to tell the police what had happened

**142**

1  once you realized you weren't going to be prosecuted for
2  anything, correct?
3      A.  Correct.
4      Q.  Is that what caused you to then come forward
5  and say, Here's how -- what I was going to do.  Once
6  some police detective shows you, tells you about how
7  we're not worried about you and this dope case; we're
8  interested in prosecuting this guy, and that's the first
9  time you've come forward with information, and you had
10  basically explained what you testified to on direct
11  examination?
12      A.  Right.
13              THE COURT:  Approach the bench for a
14  second, please.
15              (Off-the-record discussion.)
16              (Brief recess.)
17              (Jury in.)
18              THE COURT:  Proceed, Mr. Hill.
19      Q.  (BY MR. HILL)  Mr. Walter, let me ask you:  I
20  think where I left off, I want to pick up on one thing.
21  Do you recall telling -- and I'm using the phrase, "the
22  good samaritan story."  That's my phrase; but basically
23  saying you weren't involved in any drug dealing, that
24  you stopped to help somebody that was broken down.
25  That's what I'm referring to when I say "the good

143

1  samaritan story."  You understand what I'm saying?
2      A.  You're saying, do I recall?
3      Q.  No, no, no, that's what I'm saying.  That's
4  what I'm referring to when I say, "the good samaritan
5  story."  My question is this:  Do you recall telling the
6  good samaritan story to John Wayne McDonald, a security
7  guard that came over and found you there, and that you
8  said it in the presence of Dion Holley?
9      A.  No.
10      Q.  You don't recall that?
11      A.  No.
12      Q.  You're not saying that you didn't say it?
13      A.  I'm not saying I didn't.
14      Q.  You just don't recall?
15      A.  I don't recall.
16      Q.  When you struck Mr. Mamou, okay --
17      A.  All right.
18      Q.  -- you turn and you ran towards the back of the
19  Lexus?
20      A.  No.
21      Q.  I'm sorry?
22      A.  No, I did not.
23      Q.  Where did you run to?
24      A.  You're talking about when I struck him?  I ran
25  to the back of the Lexus.

144

1          MR. HILL:  Can the witness step off the
2  witness stand for a moment?
3          THE COURT:  Yes.
4      Q.  (BY MR. HILL) I'm going to be Mr. Mamou for a
5  second.  Which hand is the gun in?
6      A.  (Witness demonstrates.)
7      Q.  All right.  Where is the gun?  Use my arms, and
8  point the gun exactly as he was standing.  Is it like
9  this?  Like this?  Where is the door to the Lexus?
10  About like this?  The door is open, right?
11      A.  Right.
12      Q.  Okay.
13      A.  You need to slide over some more.
14      Q.  So here's the gun; and you say, What's up,
15  Chucky?
16      A.  What's up Chucky?  Don't hurt the girl.
17      Q.  And what did he do?
18      A.  Shot me in the chest.
19      Q.  Hit him in the nose, right, and he goes back?
20      A.  But I was falling, because he shot me.
21      Q.  Okay.  So does he land on the ground?
22      A.  No, I hit the car.
23      Q.  You hit the car, but what does Chucky do?
24      A.  He's dazed.
25      Q.  So is he turning around, or is he turning back

145

1  towards you?  At what point do you turn around and go to
2  the back of the Lexus where Terrence Gibson has the gun?
3          MR. MCCLELLAN:  Keep your voice up.
4          THE WITNESS:  Once I started running, I
5  ran towards the back of the Lexus.
6      Q.  (BY MR. HILL) Okay.  And you knelt down by
7  where Terrence Gibson is.  Do you kneel down by him and
8  see the gun?
9      A.  I ran past Terrence.
10      Q.  You ran past Terrence?
11      A.  Exactly.
12      Q.  What is Chucky doing at that point?
13      A.  I don't know.  I don't know.  I never look
14  back.
15      Q.  Do you hear the Lexus taking off?
16      A.  No.  He started back shooting.
17          MR. MCCLELLAN:  Your Honor, can I ask the
18  witness face the jury so they can hear?
19          MR. HILL:  He can take the witness stand.
20          THE WITNESS:  At that point I started
21  running.  I started hearing more gunshots, and I was hit
22  in the back one time.
23          THE COURT:  All right.  Go ahead and take
24  your seat.  Thank you.
25      Q.  (BY MR. HILL) How far were you from Terrence

146

1  when you got shot in the back?
2      A.  I don't know.
3      Q.  Pretty close to him?
4      A.  I don't know.  I don't exactly recall.
5      Q.  At some point, though, you go and you get the
6  gun that Terrence had, correct?
7      A.  Yes.
8      Q.  And when you pick up that gun, you look
9  forward.  And do you see the Lexus driving off?
10      A.  No.  I see the red car backing up, turning
11  around, driving off.
12      Q.  Where is Chucky at that very point in time?  Is
13  he outside the car?
14      A.  He jumped in the car.
15      Q.  That wasn't my question.  When you see the red
16  car, you hear the red car spinning, the tires backing
17  up, where is Chucky?
18      A.  In the car.
19      Q.  In the Lexus?
20      A.  Exactly.
21      Q.  Is the red car already driving forward at that
22  point, when you see Chucky in the car?  In other words,
23  have they already done like a 180 and it's now going
24  straight ahead?
25      A.  Yes.

147

1    Q.   And Chucky closes the door and drives off?
2    A.   Yes.
3    Q.   But you don't shoot at him?
4    A.   No.
5    Q.   Are you telling this jury you've never dealt
6    with Charles Mamou before?
7    A.   No.
8    Q.   Never had any drug deals with him before?
9    A.   Positive.
10   Q.   All right.  Never met with him at the Shoney's
11   after that first time?
12   A.   Exactly.
13   Q.   Okay.  And never been involved, other than the
14   incident you're talking about today in court, with any
15   type of relationship with Mr. Mamou?
16   A.   Phone conversations before face-to-face.
17   Q.   Never been to Sunset, Louisiana?
18   A.   Probably one or two times.
19   Q.   And how old would you have been?
20   A.   Approximately twenty-three or twenty-two.
21   Q.   It's within the last three years that you met
22   your cousin, Timmy Thomas, right?
23   A.   Yes.
24   Q.   And did you go there to see Timmy?
25   A.   No.  It was -- my family was having something.

148

1    Q.   What family?  What member of your family?
2    A.   My auntie.
3    Q.   What's her name?
4    A.   Mary, Mary Thomas.
5    Q.   Mary Thomas.  Does she live on Martin Luther
6    King?
7    A.   I don't know.
8    Q.   Does she live in a blue house, a light blue
9    house?
10   A.   I think so.
11   Q.   Is that where Timmy lives?
12   A.   I guess.  I guess he was living there at that
13   time.  It ain't like me and Timmy like this, you know.
14   Q.   Mr. McClellan showed you a series of
15   photographs with several people in them.  Did you
16   identify anybody else other than those three lineup
17   sheets where the number two person is, the person you
18   picked out in each one of them?  Was there a fourth or
19   fifth or sixth lineup sheet that was shown to you where
20   you identified, either positively or tentatively,
21   anybody else?
22   A.   No.
23   Q.   So you only saw three total photospreads?
24        MR. MCCLELLAN:  Your Honor, I object.
25   That isn't following from the answer.

149

1         THE COURT:  Do you understand the
2    question, sir?
3         THE WITNESS:  I identified the three guys,
4    yes.
5    Q.   (BY MR. HILL)  Right.  Were you presented any
6    more photospreads other than the three that you have
7    testified about in court today?
8    A.   No.
9    Q.   You don't recall having a fourth photospread
10   shown to you?
11   A.   Let me think.
12   Q.   Take your time.
13   A.   Yes.
14   Q.   Okay.  Do you recall whether or not you were
15   able to identify anybody in that fourth photospread, as
16   you call it?
17   A.   Yes.
18   Q.   And who was that person?
19   A.   Charles Mamou.
20   Q.   You saw four photospreads or only three?
21   A.   I saw three.  I guess it was four.  I don't
22   know, whoever had it in the hospital.
23   Q.   Okay.  Let me take you back to August 14th,
24   1999.  We're talking about when you met with Mr.
25   Humberson, the investigator.  Do you have a nickname?

150

1    A.   Yes.
2    Q.   Do you have a nickname?
3    A.   Fruit.
4    Q.   Fruit?
5    A.   F-R-U-I-T.
6    Q.   Do some people call you Big Fruity?
7    A.   No, man.
8    Q.   Not to your face.
9         MR. HILL:  May we approach the bench for a
10   moment?
11        (Off-the-record discussion.)
12        THE COURT:  Go ahead.
13   Q.   (BY MR. HILL)  Mr. Walter, have you ever used
14   any other names?
15   A.   Have I been called any other name?
16   Q.   Yeah.  Have you ever used another name, other
17   than Kevin Walter?
18   A.   Nope.
19   Q.   Okay.  I'm going to ask you a series of
20   questions.  I want you to listen carefully, and then
21   either say yes or no.  All right?  Because these are
22   going to be questions relating to the conversation you
23   had with Ernest Humberson on August 14th, 1999, when he
24   came to your home at 3817 Bennington, here in Houston,
25   okay?

151

1    A.  I'm listening.
2    Q.  Do you recall telling Mr. Humberson, when he
3  asked you about whether or not you guys had any dope,
4  that you responded --
5        MR. MCCLELLAN:  I'm going to object to
6  this line of questions as hearsay, Your Honor.
7        THE COURT:  Sustained.  You want to
8  approach, please?
9        (Off-the-record discussion.)
10   Q.  (BY MR. HILL)  Mr. Walter, do you recall
11 Mr. Humberson asking you a question that day of whether
12 you had any dope when you met with Mr. Mamou on December
13 6th of 1998?
14   A.  Who is Mr. Humberson?
15   Q.  The investigator.  That's Cowboy.
16   A.  Nope.
17   Q.  You don't recall him asking you that question?
18   A.  Probably, but I told him I have nothing to say
19 to him.
20   Q.  Well, let me ask you this question:  Do you
21 recall saying to him, We didn't have dope.  We were
22 going to jack him?
23   A.  He asked me what I was planning on doing.  I
24 said take the money.
25   Q.  My question is this:  Do you recall saying to

152

1  him, quote, "We didn't have dope.  We were going to jack
2  him"?
3    A.  No.
4    Q.  Do you recall telling Mr. Humberson that you
5  didn't want to go to the Bennigan's, but that your
6  friends convinced you to do so?
7    A.  I don't recall.
8        MR. MCCLELLAN:  Your Honor, may we
9  approach the bench again?
10        THE COURT:  Yes.
11        (Off-the-record discussion.)
12        THE COURT:  Ladies and gentlemen, please
13 go back in the jury room for a minute.
14        (Jury is brought in and seated.)
15        THE COURT:  Please be seated.
16        Mr. Hill, do you have anything?
17        MR. HILL:  That's all I have at this time,
18 Your Honor.
19        MR. MCCLELLAN:  May I proceed, Your Honor?
20        THE COURT:  Yes.
21        REDIRECT EXAMINATION
22 BY MR. MCCLELLAN:
23   Q.  Mr. Walters? --
24   A.  Yes.
25   Q.  -- now when you met with the defendant, Charles

153

1  Mamou, on the Cavalcade address after you had left
2  Northline, I believe you testified that you did not see
3  Terrence Gibson while you were at the Cavalcade address?
4    A.  No, I did not.
5    Q.  That doesn't prevent Terrence Gibson from
6  having seen you, does it?
7        MR. HILL:  Judge, I'm going to object.
8  That calls for speculation.
9        THE COURT:  Sustained.
10   Q.  (BY MR. MCCLELLAN)  Now when you left
11 Bennigan's, who was leading the way?
12   A.  Charles Mamou.
13   Q.  And whose -- how did you get to Fiesta?  Did
14 you drive to Fiesta, or did you follow?
15   A.  I followed to Fiesta.
16   Q.  When you got to Fiesta, who parked first or who
17 stopped first?
18   A.  Sammy parked first.
19   Q.  And when you get to that location, who got out
20 of your car?
21   A.  Holley and Gibson.
22   Q.  Who got out of the red car?
23   A.  Charles Mamou.
24   Q.  Then did Holley and Gibson come back to your
25 car?

154

1    A.  Yes.
2    Q.  Did they tell you anything when they got back
3  to your car about their conversation with the defendant,
4  Charles Mamou?
5    A.  No.
6    Q.  Okay.  How did you know what to do then?
7    A.  I was told to follow them.
8    Q.  Somebody must have told you about it, right?
9    A.  Right.
10   Q.  Who told you?
11   A.  Gibson, front seat driver -- I mean, front seat
12 passenger.
13   Q.  Front seat passenger?
14   A.  Yes.
15   Q.  Where did you follow Mr. Mamou's car then?
16   A.  After we left Fiesta, to some buildings.
17   Q.  That's the one you marked there on State's
18 Exhibit No. 24, with an arrow showing -- red arrow
19 showing the buildings?
20   A.  Yes.
21   Q.  And who stopped first?
22   A.  They stopped once again.
23   Q.  Who got out of your car, if anybody?
24   A.  Terrence Gibson and Dion Holley.
25   Q.  Who did they meet with, if anybody?

155

1    A.   Charles Mamou.
2    Q.   How long did that meeting last?
3    A.   One or two minutes.
4    Q.   And then what did you do after that?
5    A.   I was told to follow that car.
6    Q.   Okay.  Did you follow the car then?
7    A.   Yes.
8    Q.   To where you ended up on Lantern Point Drive?
9    A.   Yes.
10   Q.   Did you make the decision on any of these times
11   to leave, or were you just following the vehicle that
12   was ahead of you?
13   A.   I was just following the vehicle.
14   Q.   Mr. Hill was asking you about what you did when
15   you got out of the car after having been shot.
16   A.   Okay.
17   Q.   The first time you were shot, you were sitting
18   where?
19   A.   In the car.
20   Q.   Did that shot break your window?
21   A.   Yes, sir.
22   Q.   The second time you were shot, what was the
23   condition of the car?
24   A.   I was getting out of the car.
25   Q.   And you were shot where?

156

1    A.   In the stomach.
2    Q.   Then you were shot a third time?
3    A.   In the chest.
4    Q.   And that's when you were standing up?
5    A.   Yes.
6    Q.   Your hands up?
7    A.   Yes.
8    Q.   After that, is that when you hit Charles Mamou?
9    A.   Yes.
10   Q.   After you hit Charles Mamou, what did you do?
11   A.   I took off running to the back.
12   Q.   To the back of the car?
13   A.   Yes.
14   Q.   And what happened on your way running to the
15   back -- to the back of the car?
16   A.   I heard several more gunshots was hitting the
17   back.
18   Q.   You were hit the fourth time?
19   A.   Yes.
20   Q.   How far did you run down that road, if you
21   know?
22   A.   I don't know.  I was running.
23   Q.   What caused you to stop, if you know?
24   A.   I ran past Terrence; and when I turned around
25   to grab the gun, I saw them taking off.

157

1    Q.   You had run past Terrence?
2    A.   Yeah.
3    Q.   How far past Terrence?  Do you know?
4    A.   That, I don't know.  I didn't really know where
5    they went; so once I saw him, I turned around.
6    Q.   You knew where one of the two people was?
7    A.   Terrence.
8    Q.   You still didn't know where Holley was?
9    A.   No.
10   Q.   Okay.  Then could you hear the cars leaving
11   after you had ran past Terrence and after you had been
12   shot in the back?
13   A.   Yes.
14   Q.   Okay.  When you turned around to come back the
15   direction you had been running, could you see the cars
16   at that time?
17   A.   Yes.
18   Q.   Could you see Charles Mamou, or was he already
19   in the car once you turned around?
20   A.   He was already in the car.
21   Q.   And the cars were leaving?
22   A.   Yes.
23   Q.   What did you do then after you saw the cars
24   leaving?  What direction were you headed?
25   A.   Back towards --

158

1    Q.   Back towards where the cars were?
2    A.   Yes.  I looked at Terrence.
3    Q.   Back where Terrence was?
4    A.   Exactly.
5    Q.   Is that when you picked up a gun?
6    A.   No.
7    Q.   When was it that you picked up a gun?
8    A.   When I ran past Terrence, and then I grabbed a
9    gun.
10   Q.   So are you -- you grabbed the gun before you
11   were shot in the back?
12   A.   No, afterwards.
13   Q.   Afterwards?
14   A.   Yes.
15   Q.   Would you say, after you were shot in the back,
16   you continued to run for a ways, or did you stop after
17   you had been shot in the back?
18   A.   Three or four more steps.
19   Q.   Did you ever fall down?
20   A.   No.
21   Q.   When you came back then, when was it that you
22   got the gun?
23   A.   When I walked back to Terrence.
24   Q.   All right.  Did you get the gun before you
25   talked to Terrence to find out what his condition was?

159

1    A.   What you mean, before?
2    Q.   When you came back to where Terrence is,
3   Terrence is laying on the ground?
4    A.   Yes.
5    Q.   A gun is nearby?
6    A.   Yes.
7    Q.   Did you get the gun first, or did you check on
8   Terrence first?
9    A.   No, I grabbed the gun first.
10   Q.   And where were the cars at the time you grabbed
11  the gun?
12   A.   Leaving.
13   Q.   Did you ever try to fire the gun?
14   A.   No.
15   Q.   Did you keep the gun with you, though after you
16  grabbed the gun?
17   A.   Yes.
18   Q.   And then did you check on Terrence at that
19  time?
20   A.   Yes.  I never left his spot, really, until I
21  started getting weak.
22   Q.   That's when you started walking away and then
23  laid down?
24   A.   Yes.
25   Q.   You laid down the gun, also, at that time?

160

1    A.   I possibly laid down the gun first.
2    Q.   Now the meeting that had been arranged at
3   Bennigan's, was that your idea to meet at Bennigan's or
4   someone else's idea to meet at Bennigan's?
5    A.   Charles Mamou.
6    Q.   At the time of the meeting at Bennigan's, that
7   discussion where the discussion was between Charles
8   Mamou and either you or Dion Holley about meeting at
9   Bennigan's, was Mary Carmouche already in the car at the
10  time of the discussion about Bennigan's?
11   A.   Yes.
12   Q.   I mean, you didn't know about going to
13  Bennigan's and then go by and pick up Mary Carmouche?
14   A.   No.
15   Q.   She was already in the car?
16   A.   Yes.
17   Q.   While you were at Bennigan's, was there any
18  discussion there inside about the dope deal that was
19  going to go down?
20   A.   No.
21   Q.   Was it a topic of conversation there at the
22  table at Bennigan's when y'all were sitting around
23  there?
24   A.   Not that I recall, no.
25   Q.   Now your testimony was that Terrence was to

161

1   provide protection as a lookout at the Cavalcade
2   location?
3    A.   Yes.
4    Q.   Did you have a gun on December the 6th, 1998?
5    A.   No, I did not.
6    Q.   Did Dion Holley have a gun, to your knowledge,
7   December the 6th, 1998?
8    A.   No, he did not.
9    Q.   The only person that had a gun, was that
10  Terrence Gibson?
11   A.   Yes.
12   Q.   If the object was to rob Charles Mamou at the
13  Cavalcade location, why didn't Terrence Gibson pull a
14  gun and grab the money?
15       MR. HILL:  Judge, I object.  Calls for
16  speculation again.
17       THE COURT:  It's not clear from the
18  question that it does.
19   Q.   (BY MR. MCCLELLAN)  Was part of the plan to rob
20  Charles Mamou at gunpoint?
21   A.   No.
22   Q.   What was the plan?
23   A.   To take his money and --
24   Q.   How were you going to get him to give you the
25  money?

162

1    A.   Once we count the money, then we take the
2   money.
3    Q.   Just going to jump in the car and run?
4    A.   No.  It was at gunpoint, of course; but it
5   wasn't no plan.
6    Q.   Pardon?
7    A.   If it was going to be gunpoint, yes, of course,
8   once we count the money.
9    Q.   But Terrence Gibson wasn't there?
10   A.   No, no, he wasn't.  I didn't see him.
11   Q.   Did you have a gun?
12   A.   No.
13   Q.   Did Dion Holley have a gun?
14   A.   No.
15   Q.   How are you going to do it at gunpoint?
16   A.   I don't know.  I was going to see can I walk
17  away with the money.
18   Q.   Give me the money; I'll go get the dope?
19   A.   Yes.
20   Q.   He wouldn't buy that?
21   A.   No.
22   Q.   There was nothing to prevent Terrence Gibson,
23  though, if he had the gun, to pull a gun on him and take
24  the money, was there?
25   A.   No.

163

1      Q.  But the plan wasn't to do that, was it?  The
2  plan was to get him to give you the money to let you go
3  get the dope?
4      A.  Yes.
5          MR. MCCLELLAN:  Pass the witness, Your
6  Honor.
7               RECROSS-EXAMINATION
8  BY MR. HILL:
9      Q.  Sir, did you make a written statement to the
10  police regarding this investigation to the police or the
11  District Attorney's Office?
12      A.  Repeat yourself.
13      Q.  A written statement.  Did you ever sign a
14  statement or give a written version of the events you
15  testified to to the police department or to the District
16  Attorney's Office?
17      A.  No, not as I can recall, no.
18      Q.  All right.  Let me get this straight.  When
19  Mr. McClellan was just asking you a series of questions
20  regarding what the plan was, am I correct in assuming
21  that your statement was always the idea for you to get
22  the money, you know, see the money, count the money, and
23  you were going to take his money?
24      A.  Well, if he give it to me, exactly.
25      Q.  So the plan was for you to physically be able

164

1  to get money, $20,000, from Charles Mamou and just get
2  away from there?
3      A.  Yes.
4      Q.  All right.  And I believe your testimony was
5  that if it was at gunpoint, yes, of course, if it came
6  to that?
7      A.  Well, kind of got confused.
8      Q.  What?
9      A.  Got confused.
10      Q.  Got confused?
11      A.  Yes.
12      Q.  When Mr. McClellan was asking you whether or
13  not -- if it was necessary to have gunpoint, you were
14  confused?
15      A.  Well, Terrence wasn't there; so --
16      Q.  Your testimony was that if it was necessary at
17  some point to have a gunpoint to force the money, you
18  said that was okay, isn't it?
19      A.  Yes.
20      Q.  If the plan came to that, that was okay with
21  you?
22      A.  No, it was no plan.
23      Q.  But if it came to that, that was going to be
24  all right, if it meant you getting the $20,000, right?
25      A.  Yes.

165

1      Q.  All right.  Now you testified throughout that
2  the plan was for you to see the money, count the money,
3  take the money.  Yet, your testimony is you're the one
4  that's always inside the car when you have all these
5  meetings, right?
6      A.  Right.
7      Q.  So when were you going to get out and see the
8  money and take the money?
9      A.  When I was at the Sing-On store at Cavalcade, I
10  was going to walk away with his money, since he trusts
11  me so much.
12      Q.  Who trusts you so much?
13      A.  Charles Mamou.
14      Q.  The guy you just met?
15      A.  That's what he kept telling me.
16      Q.  And you believed him?
17      A.  I didn't believe him.  Didn't care.
18      Q.  You didn't believe him, and you didn't care?
19      A.  No.  That's why I would drive away with his
20  money.  Take your money and go.  He drove away.
21      Q.  State asked you whether or not -- you know, how
22  it was that Miss Carmouche is down there at the
23  Bennigan's, and you testified that there was no
24  discussion at all while y'all are sitting there at the
25  table about any kind of dope deal; is that correct?

166

1      A.  Correct.
2      Q.  What were y'all talking about?
3      A.  What was who talking about?
4      Q.  The six of you who were sitting there eating?
5      A.  We wasn't talking about anything.  Holley and
6  Mamou stepped outside to talk.
7      Q.  But they only stepped out for part of the time,
8  right?
9      A.  Yeah, then he left.
10      Q.  While the six of you -- Bug Johnson is still
11  inside, right?
12      A.  Right.
13      Q.  Dion Holley is there when he comes back inside?
14      A.  Yeah.
15      Q.  What do you all talk about?
16      A.  We ate our food.  I can't remember.
17      Q.  Just chitchat?
18      A.  Yeah.
19      Q.  You don't --- after it's obvious that you're
20  going to be going to Bennigan's, right, you don't let
21  Mary Carmouche off; you don't take her home, do you,
22  before going there?
23      A.  No.
24      Q.  You knew when you were up on the north side of
25  town that you were going to have to travel all the way

167

1   to the South Loop, right?
2       A.  Yes.
3       Q.  When you were at Bennigan's and it became
4   obvious after Chucky Mamou left, according to your
5   testimony, and then came back, you didn't leave Dion
6   Holley and Miss Carmouche at the Bennigan's so y'all
7   could go do your dope deal, did you?
8       A.  No.
9       Q.  When did you first see Terrence Gibson with a
10  gun?
11      A.  Early.
12      Q.  That doesn't tell us when.
13      A.  At the park.
14      Q.  All the way back at the very beginning, when
15  you go there and he's playing basketball, he's got a
16  gun, correct?
17      A.  Correct.
18      Q.  You see the gun?  That's a yes or no?
19      A.  Yes.
20      Q.  What kind of gun is it?
21      A.  I don't know.  I'm not a gun specialist.
22  Probably 945.
23      Q.  What do you mean, 945?
24      A.  Either a large .380, or a 945 or 9 millimeter
25  caliber pistol.

168

1       Q.  How does a 9 millimeter work?
2       A.  What you mean, how does it work?
3       Q.  Is it an automatic, revolver?  What type of gun
4   is it?
5       A.  Well, they have revolvers; they have
6   automatics.
7       Q.  What kind did he have?
8       A.  It was an automatic.
9       Q.  And you say you believe he picked up the gun?
10      A.  Exactly.
11      Q.  At least at the very end, right?
12      A.  Automatic.
13      Q.  And did he show the gun to anybody when y'all
14  were driving around?
15      A.  No.
16      Q.  But you knew that he had a gun?
17      A.  Yes.
18      Q.  And you knew that if it came to gunpoint, then
19  so be it, in terms of getting the $20,000 from Chucky
20  Mamou?
21      A.  Yes.
22      Q.  Do you know who gave him the gun?
23      A.  No.
24      Q.  Been having it for a long time?
25      A.  That, I don't know.  It might be registered to

169

1   him.  I don't know.
2       Q.  Did Holley see the gun at the park?
3           MR. MCCLELLAN:  I don't know how this
4   witness can testify --
5           MR. HILL:  I'll withdraw that question.
6       Q.  (BY MR. HILL)  Let me ask you this:  Where was
7   Dion Holley when you saw the gun?
8       A.  Probably playing basketball.  I don't know.
9   That's months ago.
10      Q.  So, Terrence Gibson came off the court?
11      A.  No, no, Terrence was not playing basketball.
12      Q.  So, where exactly were you?  How does Terrence
13  show you this 9 millimeter automatic weapon?  This is a
14  public park, right?
15      A.  Yeah.
16      Q.  Where are you when you actually see this
17  weapon?
18      A.  I was there.
19      Q.  Where?
20      A.  At the park.
21      Q.  Where at the park?  Are you inside the car or
22  standing?
23      A.  No, standing out.  We distanced ourselves away
24  from every one else.
25      Q.  For safety's sake?

170

1       A.  Me.
2       Q.  Just so nobody would see you with a gun?
3       A.  Well, I started to buy the gun.
4       Q.  You started to buy the gun?
5       A.  Yes.  I don't want no hot gun.
6       Q.  You don't want no what?
7       A.  Hot.  I think it was hot, so I looked at it.
8       Q.  So your first statement that you think it may
9   have been that he had that as a registered gun --
10      A.  Well, I don't know.
11          MR. HILL:  I have no further questions.
12          THE COURT:  Anything else?
13          MR. MCCLELLAN:  I have nothing.
14          THE COURT:  You may stand down.
15          Call your next.
16          MR. MCCLELLAN:  State would call John
17  McDonald.
18          THE COURT:  Ladies and gentlemen, this
19  witness was previously sworn.
20          THE COURT:  Proceed, please.
21          JOHN WAYNE MCDONALD,
22  having been first duly sworn, testified as follows:
23          DIRECT EXAMINATION
24  BY MR. MCCLELLAN:
25      Q.  State your name for the record, please.

171

1    A.    John Wayne McDonald.

2    Q.    Mr. McDonald, how are you employed?

3    A.    I'm employed as a commissioned security

4    officer.

5    Q.    Were you employed as a commissioned security

6    officer back on December 6th, 1998?

7    A.    Yes, sir, I was.

8    Q.    Did you work at a location here in Harris

9    County?

10    A.    Yes, I did.

11    Q.    Where were you a security officer at?

12    A.    At that time, I was a security officer at

13    Villages of Westridge, which is at 2401 Westridge.

14    Q.    And do you work -- what hours did you work back

15    on December the 6th?

16    A.    It was mostly a night shift; so it kind of

17    varied, anywhere between maybe 5:00, 7:00 p.m. till

18    anywhere between 3:00 to 6:00 a.m.

19    Q.    All right.  Were you working by yourself or

20    with someone back then?

21    A.    At this time, I did have a second officer out

22    there with me.  I had a partner by the name of Gunner.

23    Q.    What's his last name?

24    A.    That is his last name.

25    Q.    Last name is Gunner.  Okay.  And did you have

172

1    an occasion, then, on December 6th, 1998, to go -- after

2    you leave the apartments that you were security at --

3    and go to another location?

4    A.    You mean after I got off?

5    Q.    Did you leave the apartments to go somewhere on

6    December 6th, 1998?

7    A.    Yes, I did.

8    Q.    Where did you go?

9    A.    To Jack In The Box, which is right at South

10    Main.

11    Q.    Were you accompanied by someone?  Someone with

12    you?

13    A.    Yes, sir.

14    Q.    Who was with you?

15    A.    Officer Gunner.

16    Q.    And that's the security officer who was working

17    with you?

18    A.    Yes, sir.

19    Q.    Who was driving?

20    A.    He was.

21    Q.    While you were at the Jack In The Box, did you

22    hear anything unusual?

23    A.    Yes, we did.  While we were waiting for our

24    order, we heard two sets of shots.  If I'm not mistaken,

25    it was like three shots per set.  The exact array or

173

1    order, I can't really remember at this time.

2    Q.    Was there some separation, though, between the

3    two sets of shots?

4    A.    Yes, there was.

5    Q.    Now, did you have a feel for what direction the

6    shots had come from?

7    A.    Yes, we did.

8    Q.    And where was the direction you had the feeling

9    it came from?

10    A.    At the time we had our windows open, so we

11    could kind of tell the direction it was coming from.  It

12    was coming from a rear left, you know, area which would

13    be around the Lantern Point/McNee area.  And we looked

14    back over in that area where we heard it.

15    Q.    So was it coming from a direction you had

16    already been?

17    A.    Yes.  We just passed by that location, just not

18    even two minutes ago.

19    Q.    Uh-huh.  And after you heard the gunshots, what

20    did y'all do?

21    A.    The first set of shots we heard, it seemed like

22    it was very close.  Not just from that one direction,

23    but it seemed like it was very close.  So at the time we

24    did kind of -- it kind of caught us off guard, so we did

25    reach for our weapon; and we looked back, but we didn't

174

1    see anything.  We kind of went back about what we were

2    doing, talking, but then we heard the second series.

3    Q.    After you heard the second series of shots, did

4    y'all leave the Jack In The Box?

5    A.    Yes, we did.

6    Q.    After you left the Jack In The Box, where did

7    you go?

8    A.    Basically, we just did a backtrack of the way

9    we came back down.  We made a circle around Jack In The

10    Box and came back down the back driveway back onto

11    McNee.

12    Q.    All right.  You went down McNee, and what road

13    did you turn on?

14    A.    We turned on Lantern Point.

15    Q.    When you turned on Lantern Point, you turned

16    going south on Lantern Point?

17    A.    Yes, sir.

18    Q.    What did you see?

19    A.    When we made that righthand turn onto Lantern

20    Point, we noticed that there was one male, kind of

21    heavyset male, laid on the ground, northbound side of

22    the road.  So I yelled for my partner to stop the

23    vehicle.  At the time that he was stopping the vehicle,

24    we also observed a second person, a second male, which

25    was staggering towards the other male.

175

1    Q.  Could you tell whether that second male had
2    been shot or not?
3    A.  From the way that he was holding his arm and
4    staggering, we figured that he was shot, also.
5    Q.  And then what did you observe?
6    A.  After we stopped the vehicle, we got out.  Due
7    to us hearing the shots, we did get out the vehicle with
8    our weapons drawn at kind of a down angle.  We started
9    approaching.
10   Q.  What were you approaching first?
11   A.  Well, both of them were in the immediate area
12   of each other.  They were kind of in close proximity to
13   each other.
14   Q.  One was on the ground and one was standing?
15   A.  Yes.
16   Q.  The person that was on the ground, have you
17   seen him since that day?  Have you seen him here today?
18   A.  Yes, sir.
19   Q.  Where was he here today?
20   A.  He was on the stand.
21   Q.  So the person who testified right before you is
22   the person you first found laying on the ground?
23   A.  Yes, sir.
24   Q.  And did he tell you where he had been shot?
25   A.  He said he was shot in his back; and also, he

176

1    said something about his chest.  I really can't -- I'm
2    not really sure about the chest part.
3    Q.  What did you -- did you see him laying there?
4    A.  Yes, sir.
5    Q.  And you observed what else?
6    A.  Well, we were getting out, going to ask -- we
7    asked both of them at the same time were they all right.
8    And then the one that was staggering close to him, he
9    looked up, seen us, and he kind of made a quick motion
10   as far as going towards something.  He looked at me.  He
11   looked at the ground.  And he started going for
12   something, in which I looked down and seen a blue steel
13   9 millimeter Beretta.
14   Q.  What did you do then?
15   A.  At that time, when I seen him going for the
16   gun, I yelled "gun" to my partner so that he might see;
17   and I ran over and grabbed it and told him to lay down.
18   Q.  Okay.  Did he lay down?
19   A.  After having to telling him about two times,
20   two or three times, he did lay down.
21   Q.  What did you do with the gun when you picked it
22   up?
23   A.  After I picked up the gun, I told my partner
24   to, you know, just watch them.
25   Q.  The question was, what did you do with the gun

177

1    after you picked the gun up?
2    A.  Okay.  Basically, when I picked up the gun, I
3    chambered it, made it safe.
4    Q.  I don't understand that.
5    A.  I chambered the gun to make it safe.
6    Q.  What do you mean by chambered?
7    A.  I dropped a magazine and locked the slide open.
8    Q.  When you drop the magazine, what does that do?
9    A.  Basically, it's rereleasing the magazine out of
10   the firearm.
11   Q.  What did you say the second thing you did was?
12   A.  I locked the slide open, making sure that there
13   was no ammunition in the barrel.
14   Q.  Was there any ammunition in the barrel?
15   A.  No, there was not.
16   Q.  Are you familiar with -- what kind of gun was
17   it?
18   A.  It was a 9 millimeter Beretta, blue steel.
19   Q.  Are you familiar with 9 millimeter
20   semiautomatic weapons?
21   A.  Yes, sir, I am.
22   Q.  To fire the gun, does there have to be a round
23   in the chamber?
24   A.  Yes, sir, it does have to be one in the
25   chamber.

178

1    Q.  When you chamber the round or the -- what
2    terminology did you use?  I'm sorry.
3    A.  As far as --
4    Q.  Did you lock the mechanism back?
5    A.  Chambering the firearm.
6    Q.  Was there a round in the chamber?
7    A.  No, there was not.
8    Q.  If there had been, would it have ejected?
9    A.  Yes, it would have.
10   Q.  Was the magazine loaded?
11   A.  Yes, it was, fully loaded.
12   Q.  If the gun was in the condition that you had
13   found it, fully loaded in the magazine but no rounds in
14   the chamber, could it be fired without chambering a
15   round?
16   A.  No, it couldn't.
17           MR. MCCLELLAN:  May I approach the
18   witness, Your Honor?
19           THE COURT:  Yes.
20           THE BAILIFF:  This weapon is clear.
21   Q.  (BY MR. MCCLELLAN)  Let me show you what's been
22   marked as State's Exhibit No. 38.  Can you tell us
23   whether or not that is the weapon that you found there
24   at the location?
25   A.  Yes, sir, it is.

179

1    Q.   Okay.  Now it is a 9 millimeter Beretta?

2    A.   Yes, sir, it was.

3    Q.   Can you -- could you stand up right over here?
4    Okay.  The gun was laying on the ground when you picked
5    it up?

6    A.   Yes, sir.

7    Q.   Will you show the ladies and gentlemen of the
8    jury what you did to the gun after you picked up the
9    gun?  Let's step over here.  Show them what you did with
10   the gun as you picked it up.

11   A.   Basically, as I picked it up, I dropped the
12   magazine, which is this right here.  And then after I
13   took this out, I made sure, you know, I did see the
14   bullets in there and it was loaded.  At that time I put
15   it back behind my gun belt and my trouser to hold it
16   there.  After I did that, I locked this open to check
17   and see if there was any bullets or ammunition in the
18   barrel.

19   Q.   Was there?

20   A.   In which it was clear.

21   Q.   Okay.  After you had encountered those two
22   people, did you find anyone else at that location?

23   A.   Yes, sir, we did.

24   Q.   And where was that person?

25   A.   It was a little further down the road, kind of

180

1    at a -- it was around a curve, to where at the first
2    point, or where we were standing at the first point, we
3    could not see him exactly where we were until you come
4    down further in the street, in the middle of the street,
5    and look around the corner.

6    Q.   And what was he doing when you found this third
7    person?

8    A.   Basically, he was just laying there still, with
9    his eyes wide open, not moving, no pulse.

10   Q.   Did you go to that location, to where he was?

11   A.   Yes, sir, I did.  After I had my partner check
12   him, I went down there and checked him myself.

13   Q.   So your partner checked him first, and you
14   checked him after that?

15   A.   Yes, sir.

16   Q.   Did you find anything else at the location that
17   appeared to be unusual or out of place?

18   A.   Yes, sir, I did.  Really was two things that I
19   noticed.  The first was on the way down to the third
20   person, who in which at the time we figured he did not
21   have a pulse.  Right before you get to him, there was a
22   little gift bag.

23   Q.   Okay?

24   A.   And it was kind of tipped over; and it had some
25   shredded or cut-up loose papers, it looked to be, or

181

1    some kind of a paper that was cut up.

2    Q.   All right.

3    A.   That was the first thing.  Second thing was a
4    little further away from the body, in which was a busted
5    bottle of -- a busted bottle of Mrs. Butterworth's
6    syrup.  It was busted at the base, in which it wasn't
7    down there a couple of minutes before when we came
8    through.

9    Q.   Let me show you what's been marked for
10   identification purposes as State's Exhibit No. 23.  Have
11   you seen this diagram before?

12   A.   Yes, sir, I have.

13   Q.   Does that fairly and accurately depict the
14   layout of the streets in the area we're talking about?

15   A.   Yes, it does.

16        MR. MCCLELLAN:  At this time, Your Honor,
17   State would offer into evidence State's Exhibit 23,
18   tender it to defense counsel.

19        MR. HILL:  No objection.

20        THE COURT:  State's 23 is admitted.

21   Q.   (BY MR. MCCLELLAN)  Could you come down here a
22   moment, if you would?  Okay.  If you would, show us on
23   this diagram, if you can, where are the apartments that
24   you are the security for?

25   A.   This right here at Westridge and Lantern Point,

182

1    right at the end.

2    Q.   So these are the apartments?

3    A.   Yes, sir.

4    Q.   And when you left the apartments to go to the
5    Jack In The Box, can you tell the ladies and gentlemen
6    of the jury what -- show them the route you took.

7    A.   Basically, there is an exit gate, which is
8    right here at Lantern Point.

9    Q.   Okay.

10   A.   You come right out the exit gate, straight up
11   Lantern Point, past Murworth, onto McNee, where you make
12   a left on McNee, go up to McNee; and right before you
13   get to South Main, there is a little back driveway that
14   leads to Jack In The Box.

15   Q.   So, right here?  The Jack In The Box is located
16   at this location here? --

17   A.   Yes, sir.

18   Q.   -- is that right?  And when you left Jack In
19   The Box, you said you retraced your steps?

20   A.   Yes, sir.  Basically we just made a circle
21   around Jack In The Box, came out the driveway, came back
22   down the same way, came back down McNee, down Lantern
23   Point.

24   Q.   So the location of the scene is between McNee
25   and Murworth on Lantern Point Drive?

183

1    A.   Yes, sir.
2    Q.   Okay.  And is that better shown by State's
3    Exhibit No. 78?  Does that show -- is this the area,
4    then, that he -- what street is this?
5    A.   This is McNee right here.
6    Q.   McNee is here?
7    A.   This is Lantern Point.
8    Q.   This is what street here?
9    A.   This is Murworth.
10   Q.   Where are the apartments you were the security
11   for?
12   A.   Right here.
13   Q.   So y'all just went down here and down that
14   direction to Jack In The Box?
15   A.   Yes, sir, and made a turn right here.
16   Q.   And the -- it's at this location, between McNee
17   and Murworth, on State's Exhibit 78, where you found
18   first the large guy, and then you saw another person who
19   was shot in the arm, and then you found another third
20   person, and all the way down to even a busted syrup
21   bottle; is that right?
22   A.   Yes.
23   Q.   I want to show you a board that has several
24   photographs on it.  And while I'm not going to talk
25   about each photograph, I am going to talk about certain

184

1    ones on it.  State's Exhibit No. 3, Photograph No. 3 on
2    this board, can you tell us what that depicts?
3    A.   Yes, sir.  This is the shirt that the male that
4    was shot in the back was wearing at the time that -- of
5    the incident.
6    Q.   Okay.  And does State's Exhibit No. 2 show the
7    location of that shirt in relationship to the rest of
8    the road?
9    A.   Yes, sir.
10   Q.   And this would be the person who testified
11   right before you testified?
12   A.   Yes, sir.
13        MR. HILL:  Judge, I'm going to object
14   to -- object, unless he's offering it to the jury.
15        MR. MCCLELLAN:  Sorry, Your Honor, at this
16   time I'd offer State's Exhibit 2 and 3 and tender to
17   defense counsel for his examination.
18        MR. HILL:  No objection.
19        THE COURT:  State's 2 and 3 are admitted.
20   What are the other photographs on it?
21        MR. MCCLELLAN:  1 and 4.
22        MR. HILL:  He's going to tender them
23   later.
24        THE COURT:  Are you going to object now
25   since the jury's looking at them?

185

1                MR. HILL:  No.
2                MR. MCCLELLAN:  Why would you inquire?
3                THE COURT:  Are you tendering State's 1
4    and 4.
5                MR. MCCLELLAN:  Yes.
6                THE COURT:  Any objection?
7                MR. HILL:  No.
8                THE COURT:  State's 1 and 4 are admitted.
9                MR. MCCLELLAN:  Pardon me for trying to
10   follow the rules.  State would offer into evidence
11   State's --
12   Q.   (BY MR. MCCLELLAN)  Well, let me show you
13   State's Exhibits 11, 12, 13, 14, and 15.  Do these
14   fairly and accurately depict the scene as it appeared
15   out there back on December 6th, 1998?
16   A.   Yes, sir, it does.
17                MR. MCCLELLAN:  At this time I'd offer
18   into evidence State's Exhibits 11 through 15.
19                MR. HILL:  No objection.
20                THE COURT:  State's Exhibits 11 through 15
21   are admitted.
22   Q.   (BY MR. MCCLELLAN)  Now State's Exhibits 11 and
23   12, can you tell the ladies and gentlemen of the jury
24   what that shows?
25   A.   Basically, it is a gift bag that I was talking

186

1    about earlier with the cut-out paper in it.
2    Q.   Is that a closer-up photograph of that same
3    thing?
4    A.   Yes, it is.
5    Q.   And State's Exhibit No. 13, 14, does this
6    photograph relate to where the person that you found
7    that you determined was dead?
8    A.   Yes, sir.  What I'm saying, this is where the
9    guy that had no pulse was laying at.  And like I was
10   saying before, the gift bag is right before you get to
11   it.
12   Q.   And this is the what?
13   A.   That's the busted bottle of Mrs. Butterworth's
14   syrup.
15   Q.   So the top two photographs show the bag with
16   the cut-up pieces of paper.  The next two photographs
17   show the location where the body was found, the person
18   with no pulse, and the last is Mrs. Butterworth's syrup;
19   is that correct?
20   A.   Yes, sir.
21   Q.   Let me show you over here State's Exhibit No.
22   25.  On State's Exhibit No. 25, does it depict -- are
23   you familiar with where the Bennigan's is located on
24   Loop 610?
25   A.   Yes, I am.

187

1    Q.   And can you show us where that is?
2    A.   Right there.
3    Q.   All right.  And again, can you see from this
4  location, then, the street where you actually found the
5  people on?
6    A.   Yes, sir, I can.  This is Lantern Point right
7  here.
8    Q.   Goes all the way up through here?
9    A.   Yes.
10   Q.   All right.  Now at the time you arrived at the
11  location, were there any vehicles there?
12   A.   At the time that we arrived at the location,
13  there was no vehicles anywhere in sight.
14   Q.   Now what were the lighting conditions?
15   A.   Sir?
16   Q.   What were the lighting conditions there on
17  Lantern Point Drive?
18   A.   Well, the lighting conditions are real poor.
19  It's enough to see what you have to; but if it's
20  something that's not really just standing out, you're
21  not really going to notice it.
22   Q.   Now, are there any streetlights on that street?
23   A.   That I remember, no, it isn't.
24   Q.   And are -- back on December the 6th -- well,
25  the aerial photographs were taken at a time later than

188

1  December 6th.  Back on December the 6th, can you
2  describe the conditions on either side of Lantern Point
3  Drive, either side of McKnee and Murworth, as far as
4  were there any buildings there?  What was the condition?
5    A.   Between McNee and Murworth, there are no
6  buildings on either side of it.  It's just basically
7  fields and woods.
8    Q.   Okay.  When you got to that location, the first
9  person I think you say you encountered was the person
10  who was on the stand, turned out to be Kevin Walter?
11   A.   Yes, sir.
12   Q.   Now did you inquire of either Kevin Walter or
13  Dion Holley -- well, that was the only two people that
14  were able to talk while you were there at the location?
15   A.   Yes, sir.
16   Q.   Did you inquire from either of those two people
17  about what happened?
18   A.   Yes, I did.
19   Q.   Who did you inquire from, if you know?
20   A.   Well, I was kind of asking just throwing it out
21  there to see who would answer.
22   Q.   Okay.  Did anybody answer?
23   A.   Yes.  As far as when I was asking what was
24  going on, they kind of both threw in a little something
25  of their own, as far as -- I'm trying to remember which

189

1  one it was.  One of the two told me that they pulled
2  onto Lantern Point from McNee, and they seen the car
3  sitting there with the hood up.  Look like they needed
4  some help.  So he stopped to help them.  And when they
5  stopped to help, they were blocked in.  They blocked
6  them in.  That's the words they used with me.
7    Q.   Okay.  Did they tell how they got shot?
8    A.   Heavyset male, when I was talking to him about
9  his wounds, I asked him how did he get shot or whatever.
10  He said, basically, that he was trying to talk the guys
11  that was -- that he talked them into letting Mary out of
12  the car with them, let her go with them, and they
13  wouldn't let her out the car.  So, he hit the gun out of
14  one of their hands.  He reached for it to pick it up;
15  but before he could get to it, they shot him in the
16  back.
17   Q.   Was that his explanation for why the gun was
18  there at the location?
19   A.   Yes, sir, it is.
20   Q.   Did you -- so, obviously, did you ever -- you
21  did not talk to Terrence -- did not talk to the person
22  who was down there, further down in the pool of blood?
23   A.   No, sir, I didn't.
24   Q.   Were they able -- was anyone there able to tell
25  you the type of car or cars that were involved?

190

1    A.   Yes, sir, they did.  As far as that car, they
2  told me -- well, when I asked them about the car, they
3  said -- then finally they told me there was only one
4  car, in which I asked him, Are you sure?  They said yes.
5  As far as the car, it's shady right now.
6    Q.   You don't recall?
7    A.   No.
8    Q.   At the time you arrived at the scene, did you
9  know how many people were involved in this situation?
10   A.   At the time we arrived, no, we didn't.  That's
11  why we were kind of cautious when we got out, because we
12  didn't know if there were others around the area with
13  more weapons or something of the sort.
14   Q.   Did you notice any trail of blood while you
15  were there at the scene?
16   A.   Yes, sir, I did, while I was down there with
17  the male with no pulse.  This is after I did my initial
18  checkup, as far as pulse.  I went down there a second
19  time, just trying to see where evidence was so I could
20  make sure that nobody comes down that road messing up
21  any of the evidence.  I noticed closer to that male that
22  there was a trail kind of leading -- kind of zigzag
23  across the road, across Lantern Point.
24   Q.   Did you notice any blood going off in any other
25  direction?

191

1    A.   Yes, I did.  That same trail of blood that was
2   zigzagging across the road, I followed it to see where
3   it went, see if it was another person.  I followed it
4   into the wooded area or the field.  I seen it go in -- I
5   followed it into a field for a couple of feet.  After
6   that, I just went ahead and hurried up and ran back to
7   my man.  I let him know we have a blood trail leading
8   into the field or in the woods.  I don't know if we have
9   a fourth person here or not, but I need him to go get
10  his car and go get somebody quick.
11       Q.   So where did your partner go?
12       A.   I sent him to (inaudible), which is at 2525
13  Murworth.
14       Q.   And did police then eventually come to that
15  location?
16       A.   Yes, sir.  When he got there, he advised two or
17  three -- I think it was two -- Harris County Sheriff's
18  Deputies of the situation.  And they called for help;
19  and they also came down to assist us, as far as stopping
20  traffic or coming down to that area.
21       Q.   Did some people from the Houston Police
22  Department arrive?
23       A.   Yes, sir, they did.  They finally got there
24  ahead of the ambulance and fire department got there.
25       Q.   Okay.  Did you turn the gun that you recovered

192

1   from the location over to someone at the Houston Police
2   Department?
3        A.   Yes, sir, I did.
4        MR. MCCLELLAN:   I'll pass the witness,
5   Your Honor.
6        THE COURT:   Ladies and gentlemen, we're
7   going to break for the afternoon.  I don't know exactly
8   what may have been told you last week.  We are going to
9   break right now.  Tomorrow I anticipate we're going to
10  work probably not past 5:45 p.m.; so if you need to make
11  any kind of arrangements about child care or that kind
12  of thing, you might go ahead and do so.
13       Any requested admonitions or instructions
14  from the State or the defense?
15       All the previous admonitions are still in
16  effect.  You're not to discuss the case among yourselves
17  or with anyone else, including spouses.  You're not to
18  make any kind of independent investigation.  Don't go by
19  any scenes which may have been described to you.  I
20  haven't noticed there being coverage today, but there
21  may be media coverage.  I haven't seen anybody in the
22  media here today, but that's not unusual.  You'll see
23  something written about it the next day, and they
24  weren't even here.  So if you should come across
25  anything, a newspaper, set it aside don't look at it.

193

1   You have the best seats in the room right now, listening
2   to what's happening in this case.  It may be covered in
3   some kind of detail either on radio or television.  If
4   you see it coming on, turn it off, turn it down, change
5   the channel.
6        If you want to talk about this case, you
7   may do so later on, after the case is over.  You can
8   talk to anybody you want to about it after it's over,
9   but not while this case is pending, not while we're
10  putting on witnesses.  Again, do not make any kind of
11  independent investigation concerning anything about this
12  case.  The attorneys are being instructed not to engage
13  you in conversation.  Should they see you in the
14  hallways or elevator, they may nod in recognition; but
15  that's the extent of it.
16       If anybody attempts to talk to you about
17  the case, bring it to our attention immediately.  Tell
18  me or tell the police officer who has you in charge.
19  You're to wear your badges at all times about chest
20  pocket level.  It identifies you as a juror in a court,
21  the case is going on in this building, so people
22  hopefully aren't talking about cases in front of you.
23       We're going to ask that you return
24  tomorrow morning at 10:30 a.m.  And I don't know what
25  kind of instructions you were given last week, but

194

1   you're never to have a seat in the audience when you
2   come in, and you're not to have a seat in the jury box.
3   If you're wearing your badges, no matter what may be
4   going on out here with attorneys talking to witnesses,
5   or defense attorneys and prosecutors talking to each
6   other about other cases, and we have our regular docket
7   we have to take care of.  It won't be anything to do
8   with this case, but I don't want you to sit down and be
9   exposed to whatever may be going on in the courtroom.
10       Have your badges on.  Come directly
11  through the doors.  You already know to push a little
12  hard on that door, and watch your step and just have a
13  seat.  And about 10:30, the bailiff will go in and count
14  heads to make sure you're all here.  You're welcome to
15  bring reading materials, newspapers -- well, let's not
16  do newspapers while this case is going on -- magazines,
17  books.  There will be some down time, where you'll be
18  back there and you won't know what we're doing.
19       How many have cell phones?  You can have
20  your cell phones with you.  That's fine.  On break you
21  can use them.  We will take your cell phones up at the
22  time you go back to deliberate the case.  While you're
23  in deliberations, you do not have access to your
24  cell phones.  If you don't have a cell phone, you need
25  to use the phone on either of the breaks or at lunch,

195

1   you may have access to the phones.

2           One of the few perks you're going to get

3   while you're down here is while you're on this jury,

4   we're going to take you to lunch in a group and pay for

5   it.  Parking.  I don't care where you park, as long as

6   you retain your car keys.  Don't give up your car keys

7   to a parking lot attendant.  When you come in tomorrow

8   morning, the jury assembly room parking garage probably

9   will be full.  If you really need to park in covered

10  parking, there is another covered parking area behind us

11  bounded by Caroline, Congress, Preston, and Austin.  All

12  the other outlying lots are fine.

13          How many of you need Metro passes?  Do any

14  of you have any questions of me?  Anything y'all need to

15  bring to my attention?  Yes?

16          JUROR:  I'll talk to you later.

17          THE COURT:  In other words, who needs to

18  bring anything to my attention?  10:30 tomorrow morning,

19  wearing your badges, inside the jury room.

20

21

22

23

24

25

---

196

1   THE STATE OF TEXAS   )

2   COUNTY OF HARRIS     )

3           I, Pamela Kay Knobloch, Official/Deputy
    Official Court Reporter in and for the 179th District
4   Court of Harris County, State of Texas, do hereby certify
    that the above and foregoing contains a true and correct
5   transcription of all portions of evidence and other
    proceedings requested in writing by counsel for the
6   parties to be included in this volume of the Reporter's
    Record, in the above-styled and numbered cause, all of
7   which occurred in open court or in chambers and were
    reported by me.

8

9           I further certify that this Reporter's Record
    of the proceedings truly and correctly reflects the
    exhibits, if any, admitted by the respective parties.

10

11      I further certify that the total cost for the
    preparation of this Reporter's Record is $_____ and
    was paid by Harris County.

12

13      WITNESS MY OFFICIAL HAND this the _____ day of
    _____, 2000.

14

15

16  Pamela Kay Knobloch, Texas CSR No. 1650
    Expiration date:  12/31/2000
17  Official Court Reporter, 179th District Court
    Harris County, Texas
18  301 San Jacinto
    Houston, Texas 77002
19  713.755.6340

20  APPELLANT:  CHARLES MAMOU, JR.
               CAUSE NO. 800112

21

22
23
24
25

## $

**$20,000** [10] 6:24 7:6 8:8 27:13 27:16 95:18 119:3 164:1 164:24 168:19
**$** [1] 196:11

## '

**'85** [1] 89:25
**'94** [1] 19:23
**'95** [1] 89:25
**'98** [3] 85:5 91:7 91:9

## 0

**0470500** [1] 2:5

## 1

**1** [3] 184:21 185:3 185:8
**10** [1] 48:20
**10800** [3] 16:6 16:8 16:13
**10:00** [2] 108:24 109:10
**10:30** [3] 193:24 194:13 195:18
**10:45** [3] 109:4 114:1 119:15
**11** [4] 185:13 185:18 185:20 185:22
**11:00** [3] 109:4 114:1 119:15
**12** [2] 185:13 185:23
**12/31/2000** [1] 196:16
**12:00** [1] 138:19
**13** [2] 185:13 186:5
**13396100** [1] 2:3
**14** [2] 185:13 186:5
**14th** [4] 78:23 95:3 149:23 150:23
**15** [3] 185:13 185:18 185:20
**16** [1] 1:2
**1650** [1] 196:16
**179th** [4] 1:11 78:12 196:3 196:17
**180** [1] 146:23
**1960** [1] 2:19
**1998** [28] 3:16 5:8 6:2 6:22 23:22 24:6 36:24 45:25 54:1 54:21 74:6 74:22 82:12 82:16 82:25 84:2 84:17 91:10 128:10 138:16 138:17 151:13 161:4 161:7 171:6 172:1 172:6 185:15
**1999** [5] 1:18 78:23 95:3 149:24 150:23

## 2

**2** [9] 75:3 75:10 76:9 76:20 76:21 77:8 184:6 184:16 184:19
**20,000** [3] 27:14 27:22 28:2
**2000** [1] 196:13
**201** [1] 2:7
**21179300** [1] 2:18
**23** [3] 181:10 181:17 181:20
**24** [6] 54:10 55:2 55:5 57:22 58:4 154:18
**2401** [1] 171:13
**25** [7] 1:2 55:24 56:3 56:5 56:6 186:22 186:22
**2525** [1] 191:12
**26th** [1] 86:2
**27th** [1] 86:2
**281.587.0088** [1] 2:21

## 3

**3** [4] 184:1 184:1 184:16 184:19
**300** [1] 29:8

## 30

**30** [1] 196:18
**31** [3] 36:5 36:8 37:3
**38** [1] 178:22
**380** [1] 167:24
**3817** [2] 79:14 150:24
**3:00** [1] 171:18

## 4

**4** [3] 184:21 185:4 185:8
**40** [1] 30:8
**41** [1] 30:8
**42** [8] 61:1 61:2 61:12 61:19 62:2 62:3 62:4 62:10
**43** [3] 39:18 39:21 39:23
**44** [3] 62:9 63:7 63:10
**4615** [1] 2:14
**4th** [1] 1:18

## 5

**5629** [1] 2:19
**59656300** [1] 2:13
**5:00** [1] 171:17
**5:45** [2] 83:25 192:10

## 6

**6** [1] 138:17
**610** [17] 6:5 6:8 10:3 13:13 13:14 21:19 24:16 25:23 45:3 51:8 55:16 55:17 85:19 85:22 109:3 118:13 186:24
**62** [3] 73:1 73:7 73:10
**6:00** [2] 83:25 171:18
**6th** [32] 6:22 21:5 21:6 23:22 24:2 24:5 26:16 27:9 36:23 37:4 45:25 54:1 54:20 74:6 91:10 95:23 96:4 105:15 128:10 138:16 138:20 151:13 161:4 161:7 171:6 171:15 172:1 172:6 185:15 187:24 188:1 188:1

## 7

**7** [1] 3:16
**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 196:19
**76** [3] 22:25 23:6 23:9
**77** [3] 23:11 23:17 23:20
**77002** [2] 2:8 196:18
**77027** [1] 2:15
**77069** [1] 2:20
**78** [5] 59:1 59:5 59:8 183:3 183:17
**7:00** [3] 109:16 109:18 171:17
**7:30** [1] 109:20
**7th** [2] 5:8 138:21

## 8

**80** [5] 74:21 74:21 74:25 75:7 75:9
**800112** [4] 1:3 3:6 5:1 196:20
**801** [1] 3:5
**81** [5] 76:16 76:17 76:17 77:4 77:7
**82** [5] 75:16 75:19 76:2 76:7 76:11
**83** [4] 22:10 22:17 22:20 22:21
**8:00** [2] 109:20 113:25
**8th** [2] 15:19 74:22

## 9

**9** [9] 17:18 18:6 167:24 168:1 169:13 176:13 177:18 177:19 179:1

## 943

**943** [3] 167:2 167:3 167:7
**24**
**9:45** [2] 108:24 109:10

---

---

[1] 196:12

---

[1] 196:15

## A

**A.m.** [2] 171:18 193:24
**Abandon** [1] 3:2
**Abandoned** [2] 16:10 17:8
**Abducted** [1] 18:10
**Ability** [1] 98:4
**Able** [22] 13:2 16:22 27:1 64:17 71:8 71:21 72:6 72:11 73:14 74:24 75:18 98:10 111:4 119:8 120:17 126:11 141:5 149:15 163:25 188:14 189:24 189:24
**Abouts** [1] 57:22
**Above-entitled** [1] 1:19
**Above-styled** [1] 196:6
**Access** [2] 194:23 195:1
**Accompanied** [2] 7:16 172:11
**According** [1] 106:13 121:20 167:4
**Account** [1] 114:3
**Accurate** [2] 96:1 119:16
**Accurately** [6] 54:19 54:23 55:24 59:1 181:13 185:14
**Actual** [1] 20:9
**Address** [3] 79:13 153:1 153:3
**Adjust** [1] 109:8
**Admitted** [17] 22:20 23:9 23:20 39:23 55:5 56:5 59:8 62:10 73:10 75:9 76:11 77:7 181:20 184:19 185:8 185:21 196:9
**Admonitions** [2] 192:13 192:15
**Advised** [1] 191:16
**Aerial** [2] 54:18 187:25
**Afraid** [6] 120:21 121:11 121:13 121:14 121:15 136:1
**Afternoon** [2] 109:14 192:7
**Afterwards** [2] 158:12 158:13
**Age** [2] 20:9 82:2
**Ago** [3] 25:5 169:9 173:18
**Agree** [1] 39:13
**Ahead** [17] 32:16 34:7 92:8 93:21 109:25 130:10 139:7 140:11 140:14 140:16 145:23 146:24 150:12 155:12 191:6 191:24 192:12
**Aided** [1] 1:22
**Ain't** [2] 134:6 148:13
**Air** [2] 66:7 134:9
**Al** [2] 78:11 80:15
**Alive** [2] 13:17 68:17
**Alongside** [1] 130:16
**Alternate** [2] 4:20 4:23
**Ambulance** [6] 69:23 71:13 139:22 140:2 140:6 191:24
**Ammunition** [3] 177:13 177:14 179:17
**Amount** [2] 26:24 26:25
**Andre** [1] 87:15
**Angle** [2] 49:5 175:8
**Answer** [5] 36:18 87:1 148:25 188:21 188:22
**Answered** [2] 41:25 42:7

**Answering** [1] 72:1
**Anticipate** [3] 5:23 5:24 192:9
**Apart** [2] 84:22 125:2
**Apartment** [1] 16:9
**Apartments** [8] 43:6 116:5 172:2 172:5 181:23 182:2 182:4 183:10
**Apologize** [1] 110:24
**Appear** [1] 30:9
**Appeared** [2] 180:17 185:14
**Appellant** [2] 1:6 196:20
**Appellee** [1] 1:11
**Appointed** [1] 78:24
**Approach** [10] 22:6 30:4 72:22 73:17 74:16 142:13 150:9 151:8 152:9 178:17
**Approaches** [1] 8:3
**Approaching** [2] 175:9 175:10
**Approximation** [2] 108:21 109:7
**Area** [30] 11:9 51:2 54:20 54:24 55:25 56:12 56:20 56:22 56:23 57:17 64:22 70:24 122:3 122:4 128:8 128:8 128:9 128:12 138:25 138:25 173:12 173:13 173:14 175:11 181:14 183:3 190:12 191:4 191:20 195:10
**Arm** [9] 12:14 13:25 17:15 68:15 132:22 134:3 135:8 175:3 183:19
**Arms** [1] 144:7
**Arraign** [2] 3:8 4:24
**Arranged** [2] 7:12 160:2
**Arrangements** [2] 192:11
**Array** [1] 196:7
**Arrive** [5] 30:2 39:3 45:8 69:4 191:22
**Arrived** [21] 7:15 10:14 13:20 13:21 30:10 30:14 30:17 32:19 45:10 45:12 45:13 45:15 47:11 63:11 69:6 69:8 70:10 187:10 187:12 190:8 190:10
**Arriving** [1] 71:7
**Arrow** [3] 58:12 154:18 154:18
**Aside** [1] 192:25
**Assembly** [1] 195:8
**Assist** [1] 191:19
**Assistant** [1] 2:6
**Assuming** [1] 163:20
**Astrodome** [4] 6:5 11:7 123:20 128:16
**At's** [1] 92:7
**Ate** [1] 166:16
**Attempting** [2] 3:18 5:10
**Attempts** [2] 126:11 193:16
**Attendant** [1] 195:7
**Attendants** [1] 139:23
**Attention** [8] 24:10 64:22 81:7 131:18 134:6 193:17 195:15 195:18
**Attitude** [2] 40:2 40:6
**Attorney's** [5] 78:5 78:9 80:16 163:11 163:16
**Attorneys** [2] 2:6 2:10 2:22 193:12 194:4 194:5
**Audience** [1] 194:1
**August** [4] 78:23 95:3 149:23 150:23
**Auntie** [1] 148:2
**Austin** [1] 195:11
**Authority** [4] 3:11 5:3 19:18 19:20

Automatic [5] 132:25 168:7 3 168:8 168:12 169:13
Automatics [1] 168:6
Aware [2] 141:12 141:15
Awhile [1] 28:5

**B**

Baby [2] 92:23 93:1
Backed [1] 67:10
Backing [2] 146:10 146:16
Backseat [11] 13:9 32:14 34:20 35:3 38:12 44:21 44: 22 76:24 97:8 102:18 115:12
Backtrack [1] 174:8
Backwards [2] 109:8 137: 15
Backyard [3] 17:8 17:9 18:13
Bad [2] 17:1 42:4
Badges [4] 193:19 194:3 194:10 195:19
Bag [30] 8:6 8:7 11:24 14: 20 34:12 34:13 34:18 35:11 35:12 36:5 36:22 36:25 37:1 37:4 37:15 39:1 39:2 39:4 94:8 96:20 96:23 97:1 97:5 99:18 99:20 102:19 180:22 185:25 186:10 186:15
Bailiff [2] 178:20 194:13
Ball [1] 135:4
Barbeque [7] 7:13 7:17 30:16 31:1 31:7 102:7 104:1
Barrel [5] 17:21 18:4 177: 13 177:14 179:18
Base [1] 181:6
Basketball [12] 27:24 82: 17 83:1 83:11 83:18 83:22 111:6 111:11 140:12 167:15 169:8 169:11
Beams [1] 129:5
Became [1] 167:3
Beeped [1] 92:4
Beeper [1] 111:21
Beg [1] 134:17
Beginning [1] 167:14
Behind [15] 17:9 47:18 47: 20 51:23 60:1 62:21 64:12 64:13 64:18 129:4 129:7 129: 22 131:3 179:15 195:10
Beige [1] 81:5
Belongs [1] 38:11
Belt [1] 179:15
Bench [3] 142:13 150:9 152:9
Bennigan's [60] 10:2 10: 12 10:23 44:2 44:9 44:10 44: 12 44:14 44:23 45:2 45:7 46: 11 46:22 47:11 47:12 47:22 48:5 48:16 51:23 57:3 57:6 57:17 57:24 77:12 85:21 109: 3 113:22 114:1 114:13 118: 14 118:16 118:19 118:23 119: 6 119:10 120:9 120:16 122: 10 122:18 123:22 123:23 124: 3 140:17 140:17 152:5 153: 11 160:3 160:3 160:4 160:6 160:9 160:10 160:13 160:17 160:22 165:23 166:20 167:3 167:6 186:23
Bennington [4] 79:14 116: 24 117:1 150:24
Beretta [3] 176:13 177:18 179:1
Best [3] 108:21 109:7 193:1
Better [1] 183:2
Between [18] 8:3 9:10 11: 6 25:13 26:15 50:9 91:9 101: 13 102:20 113:24 131:7 160: 7 171:17 171:18 173:2 182: 24 183:16 188:5
Beyond [1] 18:16 -
Big [2] 103:22 150:6

Bit [8] 54:25 48:4 109:4
130:19 137:20 138:17
Black [1] 22:2
Block [1] 11:7
Blocked [2] 189:5 189:5
Blocks [2] 48:17 48:17
Blood [6] 136:4 189:22 190:14 190:24 191:1 191:7
Blue [27] 7:23 10:6 11:15 11:19 13:8 15:14 16:10 29: 10 30:20 30:25 31:18 33:11 33:12 53:23 63:23 63:25 64: 19 107:2 110:16 126:13 136: 6 137:2 137:7 148:8 148:8 176:12 177:18
Board [2] 62:9 183:23 184: 2
Body [4] 17:7 17:11 181:4 186:17
Books [1] 194:17
Boost [4] 14:12 15:7 53: 17 60:18
Bore [1] 17:20
Borrow [2] 47:6 120:5
Borrowed [1] 47:8
Bottle [4] 181:5 181:5 183:21 186:13
Bounded [1] 195:11
Box [16] 4:12 4:16 4:17 13: 22 172:9 172:21 174:4 174:6 174:10 182:5 182:14 182:15 182:19 182:21 183:14 194:2
Boy [1] 27:25
Brake [5] 133:4 133:5 133: 6 133:8 133:9
Break [5] 9:4 155:20 192: 7 192:9 194:20
Breaks [2] 12:19 194:25
Brief [2] 78:2 142:16
Briefly [1] 21:23
Bring [10] 8:25 34:20 35: 9 36:2 43:5 106:20 193:17 194:15 195:15 195:18
Broke [2] 39:25 141:19
Broken [1] 142:24
Brought [3] 4:10 72:17 152:14
Brown [1] 81:4 81:5
Brush [3] 11:12 128:14 138:24
Brushy [1] 138:25
Bug [8] 110:8 110:12 119: 11 119:20 121:23 131:7 131: 17 166:10
Building [12] 51:6 51:7 51:21 56:11 122:2 122:14 122:15 125:21 126:16 126:23 127:13 193:21
Buildings [19] 50:25 51: 3 51:22 51:25 52:10 53:6 55: 12 55:14 55:15 55:19 55:21 56:7 56:17 56:23 57:24 154: 16 154:19 188:4 188:6
Bullet [8] 17:12 17:13 17: 14 17:16 17:20 17:21 17:22 18:4
Bullets [8] 17:18 17:18 17:23 18:1 18:2 18:7 179:14 179:17
Burned [4] 137:13 137:13 137:15 137:16
Burning [1] 67:2
Business [1] 9:19
Busted [6] 65:10 181:4 181:5 181:6 183:20 186:12
Butterworth's [3] 181:5 186:13 186:18
Buy [10] 6:11 6:19 6:24 27: 22 38:5 86:9 89:12 162:20 170:3 170:4
Buying [1] 106:19

**C**

Caliber [1] 167:25
Caller [1] 91:18
Car [264] 7:19 7:22 7:23 8: 2 8:3 8:20 8:21 9:11 9:12 10:10 10:20 10:24 11:1 11:4 11:15 11:16 11:18 11:19 11: 22 11:23 11:25 12:1 12:2 12: 3 12:4 12:17 12:19 13:1 13: 13 16:24 17:2 28:24 29:5 29: 6 29:7 29:13 30:2 30:19 30: 21 30:25 31:9 31:10 31:10 31:11 31:13 31:15 31:17 31: 18 31:20 32:1 32:3 32:7 32: 9 32:11 32:20 33:3 33:5 33: 7 33:9 33:11 33:12 33:16 33: 18 33:21 33:22 33:23 34:3 34:9 34:20 35:4 35:6 35:15 35:22 37:15 37:16 41:8 41:9 41:10 41:15 42:18 42:21 43: 5 44:4 44:5 44:7 44:8 44:16 44:18 44:20 45:8 45:21 45: 21 47:24 48:1 48:3 49:6 49: 6 49:9 49:17 49:18 49:21 50: 2 50:7 50:16 52:2 52:3 52:5 52:5 52:9 52:12 52:14 52:20 52:24 53:12 53:12 53:14 53: 19 53:20 53:23 54:5 54:14 57:25 58:9 58:13 58:13 58: 17 59:10 59:10 59:17 60:1 60:1 60:3 60:5 60:8 60:10 60:11 60:15 60:20 62:16 62: 25 63:13 63:17 63:20 63:23 63:25 65:16 65:25 66:1 66: 12 66:14 67:2 67:10 67:16 70:13 70:14 76:13 89:17 89: 19 102:19 103:8 103:18 110: 13 110:23 111:8 112:6 112: 19 112:25 114:12 115:23 116: 9 116:10 116:19 117:7 117:8 117:18 117:20 117:23 118:9 126:18 126:24 128:22 129:7 129:10 129:12 129:13 129:14 130:4 130:6 130:10 130:10 130:13 130:15 130:16 131:7 132:1 132:14 132:19 133:10 133:14 134:2 134:7 135:12 135:15 135:19 137:15 137:7 137:18 138:4 140:15 144:22 144:23 146:10 146:13 146:14 146:16 146:16 146:18 146:21 146:22 153:20 153:22 153:25 154:3 154:15 154:23 155:5 155:6 155:15 155:19 155:23 155:24 156:12 156:15 157:19 157:20 160:9 160:15 162:3 165:4 169:21 169:2 189:12 189:13 189:25 190:1 190:2 190:4 190:5 191:10 195:6

Card [7] 80:22 80:23 80:24 80:25 81:2 81:3 81:4
Care [10] 15:20 61:13 70: 24 92:25 95:17 165:17 165: 18 192:11 194:7 195:5
Carefully [1] 150:20
Carjacked [1] 14:12
Carmouche [46] 3:18 3:19 3:20 5:10 5:11 5:12 9:16 10: 6 10:13 11:3 12:1 13:9 13: 16 15:16 17:7 17:11 18:10 20:22 20:25 21:4 23:14 42: 16 42:19 46:17 62:22 63:22 67:3 68:4 95:9 99:17 109:23 112:23 113:11 114:8 115:9 117:4 118:19 119:12 131:10 165:22 166:21 167:6
Caroline [1] 195:11
Carry [1] 99:11
Cars [26] 7:14 8:3 11:20 30:24 31:9 41:12 49:3 49:8 50:9 52:6 60:17 60:24 62:13 63:11 67:14 68:6 118:8 130: 21 157:10 157:10 157:15 189: 21 157:23 158:1 159:10 189:

Case [27] 4:13 5:24 5:25 36:16 49:22 49:24 49:25 52: 8 67:23 74:14 78:19 78:20 80:7 80:13 81:9 142:7 192: 16 192:3 193:6 193:7 193:9 193:12 193:17 193:21 194:8 194:16 194:22
Cases [2] 193:22 194:6
Cash [2] 6:24 7:7
Caught [3] 92:24 97:3 173: 24
Caused [3] 24:18 142:4 156:23
Causing [1] 18:15
Cautious [2] 123:3 190:11
Cavalcade [8] 25:8 15:17 40:12 40:13 40:20 41:1 41: 11 41:13 99:16 102:22 103:2 104:4 105:4 106:18 106:25 107:21 108:4 111:24 112:5 140:13 153:1 153:3 161:1 161:13 165:9
Cell [17] 9:11 9:13 9:20 83:18 91:15 104:22 104:24 111:2 111:16 113:12 138:3 138:6 194:19 194:20 194:21 194:24 194:24
Cellular [7] 40:18 40:20 42:1 42:1 72:16 91:18 111:20
Center [2] 13:5 52:17
Certain [1] 183:25
Certify [3] 196:4 196:8 196:10
Chair [2] 4:21 4:22
Chamber [6] 14:8 177:23 177:25 178:1 178:6 178:14
Chambered [3] 177:3 177: 5 177:6
Chambering [2] 178:5 178: 14
Chambers [1] 196:7
Chances [1] 123:12
Change [3] 90:25 100:17 193:4
Channel [1] 193:5
Characteristics [1] 17: 19
Charge [1] 193:18
Charles [94] 1:5 3:7 3:11 3:15 5:3 5:7 6:9 6:17 6:23 7:7 7:12 7:18 9:22 10:2 10: 9 10:16 10:19 10:25 10:25 11:16 11:23 12:10 12:13 12: 17 12:23 13:1 13:8 13:18 14: 17 14:23 15:23 16:4 16:7 16: 12 16:15 16:17 16:20 17:4 18:10 21:9 21:20 24:11 26: 20 26:12 26:14 29:25 30:2 32:10 34:8 35:10 36:5 37:13 40:6 40:14 41:23 45:15 46: 19 47:9 47:11 52:8 52:15 56: 13 63:3 65:20 67:1 67:5 75: 3 77:22 87:21 88:5 90:2 90: 6 92:17 92:20 95:25 152:25 153:12 153:23 154:4 155:1 156:8 156:10 157:18 160:5 160:7 161:12 161:20 164:1 165:13 196:20
Check [5] 7:1 159:7 159: 18 179:16 180:11
Checked [3] 180:12 180:13 180:14
Checkup [1] 190:18
Chest [10] 12:21 18:14 66: 4 66:9 134:11 144:18 156:3 176:1 176:2 193:19
Chevron [7] 41:5 41:16 110:25 111:8 112:7 112:20 140:15
Child [1] 192:11
Chili [6] 87:13 87:14 87: 16 87:24 89:21 90:5

**Chitchat** [1] 186:17

**Choices** [1] 93:5

**Chucky** [50] 15:23 21:13 21:14 21:16 25:9 25:11 26:3 26:9 27:21 28:16 28:23 42:7 45:5 60:16 72:10 72:12 85:16 87:17 90:17 90:20 91:2 95:18 96:4 105:15 110:3 112:16 113:8 113:12 113:19 118:2 119:11 124:12 124:13 124:21 127:17 131:22 135:2 135:3 135:6 140:11 144:15 144:16 144:23 145:12 146:12 146:17 146:22 147:1 167:4 168:19

**Circle** [2] 174:9 182:20

**Circled** [2] 16:2 72:17

**CLAIRE** [1] 2:4

**Clear** [5] 91:1 141:4 161:17 178:20 179:20

**Close** [18] 12:11 48:15 49:6 81:19 86:23 87:1 98:4 104:1 109:9 113:24 129:8 129:10 133:22 146:3 173:22 173:23 175:12 176:8

**Closed** [3] 37:19 65:5 99:13

**Closer** [6] 56:7 109:20 120:16 120:16 186:2 190:21

**Closer-up** [1] 186:2

**Closes** [1] 147:1

**Clothes** [1] 71:13

**Coat** [2] 22:2 88:15

**Cocaine** [18] 6:11 6:15 6:18 6:19 25:9 25:16 26:23 27:8 28:1 88:23 88:25 89:4 89:12 89:15 93:11 93:12 93:13 93:24

**Coincidentally** [1] 85:12 122:1

**Color** [6] 29:9 30:19 30:21 81:2 81:5 81:5

**Comfortable** [2] 102:25 103:2

**Coming** [20] 13:21 13:22 13:25 59:24 68:10 69:12 69:13 69:23 71:18 92:12 127:24 131:25 139:1 139:2 139:5 173:11 173:12 173:15 191:20 193:4

**Commissioned** [2] 171:3 171:5

**Commit** [2] 3:18 5:10

**Committing** [2] 3:17 5:9

**Communicate** [3] 71:21 104:25 111:16

**Communication** [1] 108:16

**Communications** [1] 9:10

**Company** [1] 13:17

**Compared** [1] 17:23

**Complete** [1] 9:24

**Complex** [2] 16:9 122:11

**Compute** [1] 15:9

**Computer** [1] 1:22

**Concern** [1] 125:14

**Concerned** [7] 39:7 100:2 105:15 124:13 127:21 130:19 130:22

**Concerning** [1] 193:11

**Condition** [6] 70:21 122:19 155:23 158:25 178:12 188:4

**Conditions** [5] 53:2 187:14 187:16 187:18 188:2

**Configuration** [1] 31:8

**Confused** [5] 7:21 164:7 164:9 164:10 164:14

**Congress** [1] 195:11

**Connors** [2] 2:4 128:3

**Construction** [1] 128:15

**Consulting** [1] 80:2

**Contact** [5] 16:23 40:14

**Contacted** [2] 6:3 78:23

**Contained** [1] 46:6

**Contains** [1] 196:4

**Contents** [2] 36:9 37:2

**Continue** [3] 6:17 61:24 74:1

**Continued** [4] 37:11 62:11 74:2 158:16

**Continues** [1] 13:13

**Continuing** [1] 73:23

**Control** [1] 9:24

**Conversation** [26] 25:13 26:4 26:20 28:12 35:19 42:10 50:11 69:20 78:7 79:6 79:8 79:9 79:10 81:12 88:8 90:18 90:20 116:16 118:7 140:1 140:5 140:9 150:22 154:3 160:21 193:13

**Conversations** [4] 69:14 91:11 91:12 147:16

**Convince** [1] 8:24

**Convinced** [1] 152:6

**Cooked** [1] 25:19

**Cop** [1] 99:23

**Cops** [1] 140:20

**Corner** [1] 180:5

**Correct** [76] 36:20 36:21 59:10 59:24 62:15 78:8 78:12 78:16 78:17 78:20 78:21 79:1 79:23 80:7 80:11 80:16 80:17 81:17 83:8 84:3 84:11 84:12 85:9 85:10 85:14 87:22 88:9 94:6 95:19 95:20 95:24 97:6 98:2 102:2 102:3 102:6 102:8 108:20 113:4 113:5 119:16 119:17 121:21 121:22 122:4 122:9 123:13 123:14 123:22 125:1 126:11 127:22 127:23 127:25 128:1 128:25 133:13 135:1 136:2 136:11 139:10 139:12 139:17 139:18 140:24 141:2 142:2 142:3 146:6 163:20 165:25 166:1 167:16 167:17 186:19 196:4

**Correctly** [1] 196:9

**Corvette** [2] 89:20 89:21

**Cost** [1] 196:10

**Coughed** [1] 136:4

**Counsel** [11] 22:18 23:7 23:18 55:3 73:8 75:7 76:3 77:5 181:18 184:17 196:5

**Count** [12] 94:7 96:10 101:19 101:22 118:24 120:18 120:19 162:1 162:8 163:22 165:2 194:13

**Counted** [1] 125:12

**County** [15] 1:8 1:21 3:13 3:14 3:14 5:5 5:6 5:6 6:3 171:9 191:17 196:2 196:4 196:11 196:17

**Couple** [4] 26:12 82:6 181:7 191:5

**Course** [6] 3:17 5:9 80:6 162:4 162:7 164:5

**Court** [96] 1:3 1:5 3:5 3:13 3:24 4:1 4:7 4:11 4:15 5:5 5:16 5:18 18:17 18:20 19:10 22:5 22:8 22:20 23:9 23:20 30:6 36:12 37:9 39:23 43:22 51:17 55:5 56:5 58:23 59:8 61:5 61:13 61:16 62:1 62:1 62:3 63:5 63:8 72:21 72:24 73:10 73:17 73:20 73:24 74:18 75:9 76:4 76:11 77:7 78:12 78:24 83:18 100:1 100:8 111:6 111:11 125:8 136:23 137:14 137:17 140:12 142:13 142:1 148:14 144:3 145:23 147:14 149:1 149:7 150:12 151:7 152:10 152:12 152:15 152:20 153:9 161:17 169:10 170:12 170:14 170:18 170:20 178:19 181:20 184:19 184:24 185:3 185:6

**Contact** (cont.)

**Contact** [...] 195:17 196:3 196:4 196:7 196:17 196:17

**Courtroom** [3] 21:21 49:10 194:9

**Courts** [1] 83:11

**Cousin** [25] 6:3 6:8 24:19 24:19 24:20 24:21 26:6 38:11 84:7 85:6 86:17 86:23 87:2 87:17 87:20 88:2 90:12 90:15 90:21 92:4 92:16 92:19 97:8 100:5 147:22

**Cover** [2] 140:18 140:19

**Coverage** [2] 192:20 192:21

**Covered** [3] 193:2 195:9 195:10

**Cowboy** [5] 80:20 80:21 80:23 80:24 151:15

**Critical** [1] 70:23

**CROSS-EXAMINATION** [1] 77:19

**Crosstimbers** [1] 31:4

**CSR** [1] 196:16

**Currency** [1] 14:22

**Curry** [3] 116:1 116:1 116:2

**Curve** [1] 180:1

**Curved** [1] 52:25

**Cut** [7] 14:21 14:24 15:8 180:25 181:1 186:1 186:16

**Cut-out** [1] 186:1

**Cut-up** [5] 14:21 14:24 15:8 180:25 186:16

**Cutting** [1] 71:13

**D**

**D.A.'s** [1] 36:20

**Dad's** [1] 87:5

**Dark** [8] 11:9 53:10 53:15 62:14 65:1 109:15 128:20 128:21

**Date** [1] 196:16

**Days** [6] 16:16 26:13 74:11 84:20 91:14 100:11

**Dazed** [1] 144:24

**Dead** [3] 14:2 67:24 186:7

**Deadly** [3] 3:20 5:12

**Deal** [22] 8:13 8:22 9:6 9:25 14:15 17:1 38:15 38:19 38:21 84:9 85:13 86:16 92:21 93:21 97:25 98:5 112:5 124:14 134:22 160:18 165:25 167:7

**Dealing** [3] 93:3 134:25 142:23

**Dealings** [1] 99:19

**Deals** [1] 147:8

**Dealt** [1] 147:5

**Death** [3] 3:19 5:11 18:15

**December** [37] 3:16 5:8 6:1 6:22 15:19 21:5 21:6 23:22 24:1 24:5 26:16 27:9 36:23 37:4 45:25 54:1 54:20 74:6 74:22 91:10 96:4 105:15 128:10 138:16 138:17 138:20 151:12 161:4 161:7 171:6 171:15 172:1 172:6 185:15 187:24 188:1 188:1

**Decide** [2] 28:3 137:25

**Decided** [4] 112:25 113:21 140:16 141:24

**Decision** [2] 100:17 155:10

**Defendant** [24] 2:22 3:15 3:24 3:25 4:24 5:7 5:16 5:17 6:9 6:22 7:18 8:2 8:4 9:22 10:16 16:3 18:10 22:4 25:14 46:19 102:1 116:17 152:25 154:3

**Defendant's** [1] 15:2

**Defense** [7] 4:9 22:18 23:7 23:18 55:3 73:8 75:7 76:3 77:5 81:9 81:12 181:18 184:17 192:14 194:5

**Deliberate** [1] 194:22

**Deliberations** [1] 194:23

**Delta** [3] 103:12 103:13 104:7 107:4 113:3 118:1

**Demonstrates** [1] 144:6

**Department** [5] 100:23 163:15 191:22 191:24 192:2

**Depict** [7] 54:19 54:24 55:24 59:2 181:13 185:14 186:22

**Depicts** [1] 184:2

**Deputies** [1] 191:18

**Describe** [8] 21:23 53:2 96:7 188:2

**Described** [2] 102:10 192:19

**Describes** [1] 62:5

**Detail** [1] 193:3

**Detective** [1] 142:6

**Detectives** [1] 80:12

**Determined** [1] 186:7

**Developed** [2] 28:13 28:20

**Diagram** [3] 60:9 181:11 181:23

**Dies** [1] 12:12

**Different** [9] 8:1 26:21 28:24 62:3 82:20 84:20 118:8 124:20 126:20

**Dignity** [2] 3:22 5:14

**Dim** [1] 122:21

**Dion** [81] 7:4 7:11 7:15 8:23 9:8 9:9 9:16 10:5 10:17 11:3 12:2 12:12 12:14 14:16 14:25 15:1 17:15 19:25 20:8 22:14 22:23 27:24 27:25 28:4 28:5 29:4 29:6 29:11 29:14 31:19 35:13 44:7 50:3 52:13 62:24 81:15 81:17 81:24 82:11 83:3 83:11 83:17 84:19 84:25 99:3 107:18 108:4 110:1 110:16 110:19 113:1 113:6 113:8 113:11 114:5 115:4 115:22 116:14 116:17 117:3 118:4 119:12 119:24 124:10 126:2 136:8 138:6 138:24 139:4 139:9 139:13 140:1 143:8 154:24 160:8 161:6 162:13 166:13 167:5 169:7 188:13

**Dire** [4] 36:11 36:13 61:4 61:6

**Direct** [12] 19:3 37:11 62:11 73:25 74:2 87:9 99:21 104:13 113:18 123:2 142:10 170:23

**Directed** [2] 10:2 29:17

**Directing** [2] 24:10 102:21

**Direction** [15] 54:5 58:18 60:11 63:13 64:1 139:5 157:15 157:24 173:5 173:8 173:11 173:15 173:22 183:14 190:25

**Directly** [2] 118:16 194:10

**Disappointed** [1] 40:7

**Disclose** [1] 4:6

**Discuss** [4] 37:14 38:18 73:20 192:16

**Discussed** [2] 37:13 88:10

**Discussing** [3] 12:9 134:22 140:18

**Discussion** [13] 3:4 25:17 73:19 79:15 142:15 150:11 151:9 152:11 160:7 160:7 160:10 160:18 165:24

**Dismissed** [1] 4:25

**Distance** [8] 49:13 49:14 52:4 127:8 127:20 136:3 136:

**Distanced** [1] 169:23

**District** [13] 1:5 1:11 2: 6 3:13 5:5 78:5 78:9 78:12 80:16 163:11 163:15 196:3 196:17

**Divide** [2] 101:13 101:16

**Dizzy** [1] 138:14

**Docket** [1] 194:6

**Dodge** [6] 30:3 45:17 75: 24 75:24 76:24 129:16

**Dodson** [18] 7:20 8:20 9: 23 10:10 24:5 28:7 32:13 34: 19 38:12 42:21 61:8 61:21 76:22 76:23 77:11 77:15 97: 9 119:12

**Done** [6] 9:6 82:7 105:21 118:7 137:6 146:23

**Door** [13] 4:19 12:23 65:5 65:15 65:17 65:20 65:21 132: 15 133:17 144:9 144:10 147: 1 194:12

**Doors** [1] 194:11

**Dope** [37] 7:8 8:10 8:21 8: 25 9:2 12:7 12:7 14:15 14: 25 15:1 17:1 85:13 86:9 86: 16 90:23 91:3 92:11 96:14 97:23 97:25 98:2 105:25 106: 4 106:7 106:21 134:22 134: 25 142:7 151:3 151:12 151: 21 152:1 160:18 162:18 163: 3 165:25 167:7

**Doubt** [1] 18:16

**Down** [96] 6:7 9:4 9:23 13: 5 13:22 14:1 14:15 27:7 27: 25 30:23 30:23 33:20 39:10 39:11 39:25 42:14 48:6 49: 22 49:24 53:19 54:11 55:7 55:8 55:10 58:24 59:22 65: 24 66:9 66:21 66:24 68:11 68:12 69:1 71:12 71:15 84: 19 85:12 88:19 89:21 91:14 92:12 105:7 106:3 111:7 112: 5 118:19 129:25 133:24 134: 3 138:1 139:2 140:17 140:21 141:19 142:24 145:6 145:7 156:20 158:19 159:23 159:25 160:1 160:19 165:22 170:14 174:9 174:10 174:12 175:8 176:12 176:17 176:18 176:20 179:25 180:4 180:12 180:19 181:7 181:21 182:22 182:22 182:22 183:13 183:13 183:20 189:22 189:22 190:16 190:18 190:20 191:19 191:20 193:4 194:8 194:17 195:3

**Drawn** [1] 175:8

**Draws** [1] 12:10

**Drew** [1] 64:21

**Drive** [35] 11:6 11:17 13: 22 18:11 49:23 54:8 58:7 60: 16 70:10 103:8 108:8 110:17 112:23 113:6 115:16 116:22 118:8 118:12 118:18 119:10 120:6 121:9 121:21 122:1 122:6 122:8 122:10 122:12 123:19 153:14 155:8 165:19 182:25 187:17 188:3

**Driven** [10] 7:19 9:11 10: 7 10:24 11:1 11:4 11:15 11: 22 13:10 127:4

**Driver** [15] 8:20 16:24 28: 19 32:7 45:23 45:24 62:25 75:22 75:23 76:12 110:13 119:19 126:13 139:22 154:11

**Drives** [3] 13:10 127:17 147:1

**Driveway** [4] 123:23 174: 10 182:13 182:21

**Driving** [31] 7:15 9:13 13: 17 29:13 31:17 31:18 31:22 32:1 32:3 47:16 47:17 47:25 53:24 59:16 62:18 62:19 73: 4 110:2 114:5 115:5 115:7 115:9 129:4 129:8 137:19 140:17 146:9 146:11 146:21 168:14 172:19

---

**Drop** [1] 43:3 177:8

**Dropped** [2] 177:7 179:11

**Drove** [14] 17:2 18:12 26: 1 44:15 44:16 44:18 48:1 51: 23 59:13 87:6 87:10 103:10 136:1 165:20

**Drug** [10] 51:8 51:10 55:14 92:21 93:3 99:18 122:3 125: 22 142:23 147:8

**Drugs** [1] 39:10

**Dude** [3] 34:19 34:22 34:24

**Due** [1] 175:6

**Duly** [4] 1:2 5:4 19:2 170: 22

**During** [9] 35:10 41:22 46: 22 67:16 78:2 88:10 91:22 99:20 109:14

---

## E

**Early** [3] 5:25 6:1 167:11

**Eat** [2] 9:17 10:14

**Eating** [1] 166:4

**Effect** [1] 192:16

**Eight** [8] 6:12 18:3 18:7 18:8 104:8 107:5 113:4 118:1

**Eighteen** [3] 26:23 27:2 93:12

**Eighty** [4] 104:8 107:5 113:4 118:1

**Eighty-eight** [6] 103:12 103:14 104:8 107:5 113:4 118:1

**Either** [19] 61:14 72:1 89: 22 130:14 138:5 139:2 140:2 141:23 148:20 150:21 160:8 167:24 168:2 188:3 188:6 188:12 188:16 193:3 194:25

**Ejected** [1] 178:8

**Elements** [1] 98:22

**Elevator** [1] 193:14

**Employed** [4] 19:17 171:2 171:3 171:5

**Encounter** [1] 76:23

**Encountered** [2] 179:21 188:9

**End** [6] 4:17 41:10 42:15 52:23 168:11 182:1

**Ended** [4] 52:25 57:9 95:1 155:8

**Ends** [3] 107:25 127:24 129: 3

**Engage** [1] 193:12

**Entire** [2] 120:20 120:24

**Ernest** [3] 78:24 80:1 150: 23

**Establish** [2] 18:16 79:16

**Evening** [1] 84:1

**Events** [2] 24:18 163:14

**Eventually** [3] 47:12 93: 12 191:14

**Evidence** [85] 5:23 5:24 6:6 6:10 6:13 6:16 6:21 7:2 7:10 7:14 7:24 8:1 8:5 8:12 9:5 9:7 9:15 9:18 9:21 10:1 10:3 10:8 10:12 10:15 10:18 10:22 11:8 11:14 11:17 11: 21 11:25 12:13 12:16 12:22 12:25 13:6 13:12 13:15 13: 19 14:3 14:6 14:9 14:13 14: 14 14:18 14:19 14:22 15:4 15:5 15:10 15:14 15:15 15: 17 15:21 15:25 16:4 16:11 16:16 16:19 16:21 17:5 17: 10 17:17 17:25 18:2 18:5 18: 9 22:17 23:6 23:17 36:8 39: 20 55:2 59:5 61:1 73:7 75:6 76:2 77:4 181:17 185:10 185: 18 190:17 190:21 196:5

**Exact** [14] 36:22 36:25 91: 16 92:6 92:15 93:14 95:14 96:24 97:4 97:10 102:24 105: 24 132:13 172:25

---

**Exactly** [16] 27:10 46:12 67:21 68:5 78:10 85:20 87:3 88:13 88:16 97:20 105:10 105:13 112:2 112:3 117:14 118:15 118:25 123:5 124:18 127:8 127:11 128:19 129:23 137:23 144:8 145:11 146:4 146:20 147:12 158:4 163:24 168:10 169:12 180:3 192:7

**Examination** [23] 19:3 22: 18 23:7 23:18 36:13 37:11 55:3 61:6 62:11 73:8 73:25 74:2 75:7 76:3 77:5 87:9 99: 21 104:13 113:19 142:11 152: 21 170:23 184:17

**Examined** [1] 17:22

**Example** [1] 44:19

**Except** [1] 129:3

**Excuse** [1] 31:17

**Execute** [1] 95:24

**Exhibit** [56] 22:10 22:17 22:21 22:25 23:6 23:11 23: 17 36:5 36:8 37:3 39:18 39: 20 54:18 55:2 55:24 56:3 56: 6 57:22 58:3 59:1 59:5 61:1 61:2 61:19 61:22 62:3 62:4 62:9 63:6 63:10 73:1 73:7 74:20 74:21 74:25 75:6 75: 16 75:19 76:2 76:7 76:16 76: 16 76:17 77:4 154:18 178:22 181:10 181:17 183:3 183:17 184:1 184:16 184:16 186:5 186:21 186:22

**Exhibits** [6] 30:8 185:13 185:18 185:20 185:22 196:9

**Exit** [3] 33:22 182:7 182:10

**Exited** [1] 34:3

**Exits** [1] 13:1

**Experts** [1] 4:6

**Expiration** [1] 196:16

**Explain** [3] 44:4 79:2 112: 1

**Explained** [1] 142:10

**Explanation** [1] 189:17

**Exposed** [1] 194:9

**Express** [2] 91:3 93:23

**Extent** [2] 90:15 193:15

**Extreme** [1] 129:3

**Eyes** [1] 180:9

---

## F

**Face** [6] 11:20 11:20 60:5 60:8 145:18 150:8

**Face-to-face** [4] 11:20 105:1 105:2 147:16

**Faces** [1] 11:19

**Facing** [6] 11:20 60:11 60: 21 63:12 130:25 137:10

**Fact** [9] 46:5 61:21 78:22 84:7 93:2 103:3 106:19 123: 20 124:11

**Failed** [2] 124:24 126:10

**Fair** [2] 101:10 121:6

**Fairly** [6] 54:19 54:23 55: 24 59:1 181:13 185:14

**Fall** [1] 158:19

**Falling** [1] 144:20

**Falls** [2] 12:11 125:2

**Familiar** [6] 115:1 122:2 122:4 177:16 177:19 186:23

**Family** [4] 89:22 147:25 148:1 148:1

**Fannin** [1] 2:7

**Far** [24] 10:3 39:6 49:20 52:5 52:7 68:1 68:2 85:21 98:11 129:7 130:18 137:20 145:25 156:20 157:3 176:40 173:8 188:3 188:23 188:25 190:1 190:5 190:18 191:19

**Fast** [2] 55:10 70:15

**Faster** [1] 134:8

---

**Fastforward** [1] 109:2

**Fear** [1] 141:3

**Feet** [1] 191:5

**Fence** [1] 17:9

**Few** [2] 16:16 195:2

**Field** [12] 12:13 13:25 53: 4 53:4 68:11 191:4 191:5 191:8

**Fields** [1] 188:7

**Fiesta** [21] 48:7 48:8 48: 10 49:1 49:7 50:1 57:19 122: 22 122:25 123:19 123:23 124: 5 124:14 124:25 125:10 125: 17 153:13 153:14 153:15 153: 16 154:16

**Fifteen** [8] 10:21 25:24 38:20 88:8 88:11 88:17 89: 11 114:19

**Fifth** [14] 99:13 102:22 104:23 105:23 108:22 109:9 109:19 110:1 110:17 111:13 113:25 124:20 140:13 148:19

**Figure** [1] 138:20

**Figured** [3] 126:15 175:4 180:20

**Filed** [1] 4:5

**Filled** [2] 14:20 14:21

**Finally** [5] 16:23 71:3 120:17 190:3 191:23

**Fine** [2] 194:20 195:12

**Finish** [2] 106:9 139:8

**Fire** [3] 159:13 177:22 191: 24

**Firearm** [5] 3:21 5:13 17: 24 177:10 178:5

**Firearms** [1] 17:24

**Fired** [8] 12:14 14:8 17: 16 17:23 131:20 131:21 139: 11 178:14

**First** [66] 3:3 4:18 18:19 19:2 21:2 21:16 24:11 26:15 32:20 32:23 33:1 45:9 45:10 45:12 45:13 49:1 51:25 55: 12 60:3 64:21 65:11 67:9 69: 6 83:10 83:19 85:18 88:11 90:2 90:6 97:23 99:16 99:17 101:18 102:4 105:6 109:13 110:19 122:25 129:24 134:12 137:18 141:15 142:8 147:11 153:16 153:17 153:18 154:21 155:17 159:7 159:8 159:9 160:1 167:9 170:8 170:22 173:21 175:10 175:22 180:1 180:2 180:13 180:19 181:3 183:18 188:8

**Fists** [2] 134:13 135:4

**Five** [11] 28:6 41:24 47:1 49:8 49:17 49:18 52:6 81:13 82:2 123:4 127:9

**Fixing** [2] 65:3 69:1

**Fled** [1] 16:21

**Floor** [2] 132:23 132:25

**FM** [1] 2:19

**Focused** [1] 66:11

**Follow** [16] 11:1 37:17 37: 17 47:24 52:20 102:23 117:4 124:22 125:19 126:14 153:14 154:7 154:15 155:5 155:6 185:10

**Followed** [11] 11:3 13:10 50:23 52:23 117:12 127:19 129:21 153:15 191:2 191:3 191:5

**Following** [14] 1:18 11: 15 17:4 49:2 53:12 53:14 59: 10 59:23 124:16 124:25 130: 17 148:25 155:11 155:13

**Follows** [2] 19:2 170:22

**Fondren** [3] 16:6 16:9 16: 13

**Food** [2] 46:14 166:16

**Foot** [5] 133:4 133:6 133:7 133:9 136:13

**Football** [1] 74:8
**Force** [1] 164:17
**Forcibly** [1] 98:20
**Foregoing** [1] 196:4
**Foreman** [2] 3:23 5:15
**Form** [1] 40:16
**Forth** [2] 9:10 9:13
**Forty-five** [6] 38:14 38:15 41:21 106:14 106:15 114:3
**Forward** [7] 82:12 137:13 137:16 142:4 142:9 146:9 146:21
**Four** [19] 17:18 17:18 18:1 18:2 52:6 82:2 85:12 91:14 93:7 118:8 118:12 119:2 121:24 123:4 127:9 136:13 149:20 149:21 158:18
**Fourth** [5] 148:18 149:9 149:15 156:18 191:9
**Freeway** [1] 2:14
**Friend** [5] 9:16 25:8 26:1 87:7 87:10
**Friend's** [1] 39:10
**Friends** [4] 7:4 81:17 97:7 152:6
**Frightened** [1] 123:7
**Front** [17] 11:2 33:17 33:18 44:25 47:17 53:23 62:19 88:3 88:21 115:9 115:14 124:23 130:11 154:11 154:11 154:13 193:22
**Fruit** [3] 150:3 150:4 150:5
**Fruity** [1] 150:6
**FUBU** [2] 74:7 74:7
**Full** [3] 90:15 141:3 195:9
**Fully** [2] 178:11 178:13

## G

**Game** [1] 97:16
**Gap** [1] 113:24
**Garage** [5] 117:19 117:21 117:23 118:10 195:8
**Gas** [2] 41:5 41:12
**Gate** [2] 182:7 182:10
**Gear** [5] 132:14 132:19 132:22 133:2 133:10
**General** [1] 56:22
**Gentlemen** [10] 4:11 5:21 73:24 74:5 152:12 170:18 179:7 182:5 185:23 192:6
**Geographically** [1] 114:17
**Gibson** [71] 7:5 7:11 7:21 7:25 9:8 10:5 10:13 11:2 12:2 12:13 12:11 14:2 14:6 14:17 17:13 20:16 20:19 23:4 28:8 28:10 29:20 37:25 42:22 42:24 44:4 44:5 45:1 46:17 50:3 50:15 52:13 62:20 63:14 63:25 70:11 81:16 83:1 84:25 95:15 99:3 101:14 103:5 103:13 103:25 107:4 107:15 110:24 111:23 113:3 113:20 117:3 126:4 127:15 129:12 130:5 136:8 136:11 145:2 145:7 153:3 153:5 153:21 153:24 154:11 154:24 161:10 161:13 162:9 162:22 167:9 169:10
**Gift** [3] 180:22 185:25 186:10
**Gig** [1] 8:9
**Girl** [9] 14:13 66:4 66:8 133:15 134:10 134:13 134:19 135:4 144:16
**Given** [2] 14:10 193:25
**Good-bye** [1] 90:10
**Grab** [4] 66:10 135:7 156:25 161:14
**Grabbed** [11] 42:7 65:2 66:21 66:24 67:21 158:8 158:10 159:9 159:10 159:16 176:17
**Graduated** [1] 19:23
**Grand** [10] 3:12 3:23 5:4 5:15 94:1 94:18 94:19 94:21 101:11 119:7
**Graveyard** [1] 91:13
**Gray** [1] 128:9
**Grocery** [2] 8:16 99:13
**Grooves** [2] 18:3 18:8
**Ground** [9] 135:23 144:21 159:3 174:21 175:14 175:16 175:22 176:11 179:4
**Group** [2] 46:23 195:4
**Growing** [1] 81:18
**Grown** [1] 93:4
**GS** [1] 29:8
**Guard** [8] 69:7 69:8 69:15 69:20 69:24 143:7 173:24
**Guards** [7] 13:20 13:21 80:9 124:11 138:9 138:23 140:2
**Guess** [10] 29:6 81:21 87:1 113:2 136:1 140:25 141:11 148:12 148:12 149:21
**Guilty** [2] 3:25 5:17
**Gum** [1] 41:7
**Gun** [98] 12:10 13:3 14:4 14:5 14:7 17:20 66:10 66:21 66:22 66:24 67:19 67:20 67:5 70:7 70:9 95:7 95:13 95:21 107:25 108:4 135:13 135:21 135:22 136:10 136:18 136:24 136:25 137:3 137:19 137:25 144:5 144:7 144:8 144:14 145:2 145:8 146:6 146:8 156:25 158:5 158:7 158:9 158:10 158:22 158:24 159:5 159:7 159:9 159:11 159:13 159:15 159:16 159:25 160:1 161:4 161:6 161:9 161:14 162:11 162:13 162:23 162:23 167:10 167:16 167:18 167:20 167:21 168:3 168:9 168:13 168:16 168:22 169:2 169:7 170:2 170:3 170:4 170:5 170:9 176:16 176:16 176:21 176:23 176:25 177:1 177:2 177:5 177:16 177:22 178:12 179:4 179:18 179:17 179:19 189:15 189:17 191:25
**Gunner** [3] 171:22 171:25 172:15
**Gunpoint** [9] 133:22 161:20 162:4 162:7 162:15 164:5 164:13 164:17 168:18
**Guns** [4] 95:1 95:5 95:8 95:11
**Gunshots** [5] 64:23 64:24 145:21 156:16 173:19
**Guy** [16] 7:4 7:4 9:23 15:23 36:1 84:9 86:8 86:11 88:14 102:18 107:12 110:3 142:8 165:14 183:18 186:9
**Guys** [10] 95:1 127:15 131:8 131:21 134:21 140:19 141:19 149:3 151:3 189:10

## H

**Halfway** [2] 50:5 50:9
**Hallway** [2] 71:12 78:5
**Hallways** [1] 193:14
**Hand** [9] 4:12 34:14 66:11 66:23 118:4 134:5 135:23 144:5 196:12
**Handed** [2] 37:14 37:15
**Hands** [6] 39:2 66:7 134:9 135:2 156:6 189:14
**Hang** [3] 42:11 83:23 84:6
**Hard** [2] 100:11 194:12
**Harris** [15] 1:8 1:21 3:13 3:14 3:14 5:5 5:6 5:6 6:3 171:8 191:17 196:2 196:4 196:11 196:17

**Hatched** [1] 7:6
**Headed** [2] 57:25 157:24
**Heads** [1] 194:14
**Hear** [5] 5:24 18:15 19:8 26:3 127:6 131:3 137:14 145:15 145:18 146:16 157:10 172:22
**Heard** [18] 1:19 20:24 27:21 28:12 64:23 64:24 66:15 70:12 70:13 131:20 132:10 156:16 172:24 173:14 173:19 173:21 174:2 174:3
**Hearing** [2] 145:21 175:7
**Hearsay** [3] 43:21 61:25 151:6
**Heavyset** [2] 174:21 189:8
**Held** [1] 1:21
**Help** [12] 15:6 69:3 69:4 89:5 89:15 138:1 141:20 142:24 189:4 189:4 189:5 191:18
**Helpful** [1] 4:18
**Helping** [1] 14:11
**Hereafter** [2] 3:15 5:7
**Hereby** [1] 196:4
**Hermann** [2] 70:20 70:22
**High** [2] 81:21 129:5
**Highway** [1] 92:24
**Hill** [60] 2:12 4:8 22:19 23:8 23:19 36:10 36:14 37:10 39:22 43:20 51:15 55:4 56:4 59:6 61:3 61:7 61:11 61:20 61:24 62:6 73:9 75:8 76:10 77:6 77:20 77:21 78:15 100:2 100:9 125:9 136:24 137:18 142:18 142:19 144:1 144:4 145:6 145:19 145:25 149:5 150:9 150:13 151:10 152:16 152:17 153:7 155:14 161:15 163:8 169:5 169:6 170:11 181:19 184:13 184:18 184:22 185:1 185:7 185:19
**Himself** [4] 6:7 10:20 80:18 130:11
**Hit** [18] 12:14 13:2 66:5 66:6 66:9 66:19 68:15 122:1 135:5 137:21 144:19 144:22 144:23 145:21 156:8 156:10 156:18 189:13
**Hits** [1] 12:20
**Hitting** [2] 132:4 156:16
**Hold** [1] 179:15
**Holding** [1] 175:3
**Holiday** [1] 90:16
**Holley** [111] 7:4 7:11 7:15 7:23 8:4 8:10 8:18 8:23 9:8 9:16 10:5 10:13 10:17 11:3 12:2 12:3 12:12 12:14 14:16 14:25 15:1 17:15 19:25 20:2 20:8 22:14 22:23 31:19 31:22 35:14 35:21 35:24 40:25 41:1 41:19 42:5 42:14 42:20 43:4 43:9 43:10 43:12 43:16 43:23 44:11 44:13 44:18 44:21 44:24 46:17 46:24 47:20 50:3 50:15 52:13 62:24 63:14 63:25 68:8 68:14 68:22 68:25 69:1 81:16 81:7 82:11 82:25 83:11 83:17 84:25 99:3 101:14 101:16 107:18 108:4 110:1 110:16 110:19 110:23 116:15 116:17 117:3 117:8 118:4 118:4 118:17 119:12 119:23 119:24 126:2 126:5 127:15 130:5 131:22 135:21 153:24 154:4 154:7 154:18 160:8 161:6 162:13 166:5 166:13 167:6 169:2 169:7 188:13
**Holley's** [3] 9:9 10:7 42:5
**Home** [6] 44:7 71:4 116:23 117:25 150:24 166:21
**Homestead** [4] 42:14 114:16 115:1 115:3

**Homicide** [1] 80:12
**Honestly** [1] 100:9
**Honor** [34] 4:4 5:17 22:3 22:7 22:16 22:19 23:5 23:16 30:5 36:7 39:20 39:22 55:1 56:2 59:4 72:20 72:23 73:6 74:17 75:5 76:1 77:18 136:20 145:17 148:24 151:6 152:8 152:19 163:6 178:18 181:16 184:15 192:5
**Honorable** [1] 1:20
**Hood** [5] 65:22 65:25 133:16 133:21 133:23 134:1 189:3
**Hook** [2] 82:24 110:20
**Hopefully** [1] 193:22
**Hosp** [1] 70:18
**Hospital** [12] 70:18 70:22 71:2 71:5 71:7 72:6 73:12 74:10 139:21 140:7 140:23 149:22
**Hot** [3] 170:5 170:7 170:7
**Hotel** [1] 21:17
**Hours** [3] 114:2 128:6 171:14
**House** [18] 9:18 13:15 16:16 17:8 18:14 26:7 26:7 26:8 39:10 79:11 79:12 92:4 92:7 117:4 117:13 118:9 148:8 148:9
**Houses** [1] 85:12
**Houston** [23] 1:21 2:8 2:15 2:20 17:7 18:13 72:13 80:2 84:9 85:14 86:9 86:12 86:20 90:25 91:2 91:20 91:21 91:23 92:1 196:18
**Howard** [2] 16:5 16:15
**Humberson** [12] 78:24 79:2 79:17 79:19 80:1 95:3 149:25 150:23 151:2 151:11 151:14 152:4
**Hundred** [4] 38:14 38:15 106:14 106:16
**Hurried** [1] 191:6
**Hurry** [1] 69:2
**Hurt** [8] 66:4 66:8 133:15 134:13 134:13 134:19 135:3 144:16

## I

**I-45** [3] 31:4 31:5 115:3
**I.D.** [1] 91:18
**Idea** [8] 5:23 15:6 97:21 99:6 103:20 160:3 160:4 163:21
**Ideal** [1] 99:10
**Identification** [4] 22:25 30:8 74:20 181:10
**Identified** [4] 22:4 77:10 148:20 149:3
**Identifies** [1] 193:20
**Identify** [11] 23:12 46:9 72:11 73:1 73:14 74:12 74:24 75:18 80:18 148:16 149:15
**Immediate** [1] 175:11
**Immediately** [1] 71:7 136:21 193:17
**Impression** [1] 17:22
**Impressions** [1] 18:3
**Inaudible** [1] 191:12
**Inc** [1] 80:2
**Incident** [5] 74:11 74:25 137:24 147:14 184:5
**Included** [1] 196:6
**Including** [1] 192:17
**Independent** [2] 192:18 193:11
**Indicate** [3] 5:25 6:10 123:6
**Indicated** [4] 6:14 86:8 93:20 120:20

**Information** [2] 15:18 142:9
**Initial** [2] 14:10 190:17
**Injured** [1] 68:14
**Inn** [12] 21:17 85:25 86:17 86:24 87:6 87:10 87:21 90:2 90:6 90:10 90:16 91:5
**Inquire** [4] 185:2 188:12 188:16 188:19
**Inside** [16] 10:19 37:3 37:4 46:15 65:16 87:16 87:18 120:2 120:7 126:18 160:18 165:4 166:11 166:13 169:21 195:19
**Instructed** [1] 193:12
**Instructions** [2] 192:13 193:25
**Intensive** [2] 15:20 70:24
**Intention** [1] 106:6
**Intentionally** [2] 3:19 5:11
**Interaction** [1] 99:17
**Interested** [2] 93:16 142:8
**Interrupt** [1] 139:7
**Interstate** [1] 48:19
**Interview** [1] 140:24
**Intrepid** [2] 15:12 15:13
**Introduced** [11] 6:9 25:12 35:23 35:24 36:1 78:15 85:16 86:14 90:17 100:5 110:8
**Introduces** [2] 87:21 88:4
**Introduction** [1] 37:8
**Investigation** [3] 163:10 192:18 193:11
**Investigator** [9] 78:12 78:23 79:3 80:5 80:15 81:9 81:12 149:25 151:15
**Invoked** [2] 4:7 4:9
**Involved** [14] 28:11 74:13 74:25 80:7 92:20 92:21 93:3 94:1 99:3 99:5 142:23 147:13 189:25 190:9
**Issue** [1] 106:13
**Item** [3] 99:1 99:2 99:2
**Itself** [1] 31:1

### J

**Jacinto** [1] 196:18
**Jack** [14] 13:22 151:22 152:1 172:9 172:21 174:4 174:6 174:9 182:5 182:14 182:15 182:18 182:21 183:14
**Jacketed** [1] 18:6
**Jackson** [2] 75:20 75:21
**Jail** [1] 92:25
**Jersey** [1] 74:8
**Job** [3] 51:9 51:19 89:6
**John** [4] 143:6 170:16 170:21 171:1
**Johnson** [38] 7:19 8:19 9:12 10:9 10:9 10:14 10:20 11:4 11:16 11:23 12:1 13:11 13:14 14:17 16:23 23:24 24:1 32:5 32:6 45:22 45:24 46:1 46:6 46:9 46:20 63:1 63:19 76:4 110:3 110:4 110:12 119:21 121:23 130:10 131:7 131:17 166:10
**Johnson's** [1] 130:7
**Jr** [15] 1:5 1:3 3:7 3:11 3:15 5:3 5:7 6:2 7:7 13:18 15:24 16:4 17:4 21:10 24:11 196:20
**Judge** [12] 1:20 36:11 37:7 43:20 51:15 61:3 61:12 73:7 75:8 153:7 161:15 184:13
**JUDICIAL** [1] 1:11
**Jump** [2] 97:7 162:3
**Jumped** [4] 34:20 44:21 67:1 146:1
**Jumping** [1] 102:19
**Juror** [2] 193:20 195:16
**Jurors** [2] 4:13 115:2
**Jury** [32] 3:1 3:9 3:12 3:23 4:10 4:12 4:14 4:16 5:4 5:15 5:21 61:21 74:5 96:7 126:8 126:21 124:23 126:15 128:2 142:17 145:18 147:5 152:13 152:14 179:8 182:6 184:14 185:23 194:2 195:3 195:8 195:19
**Jury's** [1] 184:25

### K

**Kashmere** [1] 19:23
**Kay** [2] 196:3 196:16
**Keen** [1] 97:21
**Keep** [5] 14:5 55:7 127:20 145:3 159:15
**Kept** [2] 100:18 165:15
**Kevin** [39] 6:2 6:7 6:14 6:17 6:23 6:24 6:25 7:3 7:11 7:16 8:23 9:8 10:5 10:7 11:1 11:25 12:18 12:18 12:20 12:23 12:25 13:24 14:4 14:16 14:25 15:1 15:18 15:19 15:21 16:1 18:19 19:1 19:6 19:13 19:15 55:9 150:17 188:10 188:12
**Keys** [7] 10:20 47:7 47:8 103:18 120:5 195:6 195:6
**Kidnapping** [2] 3:18 5:10
**Kids** [3] 20:3 20:4 81:18
**Killed** [2] 17:12 17:13
**Kilo** [7] 6:24 27:8 27:12 27:22 28:1 38:5 93:13
**Kind** [44] 8:7 29:7 30:2 45:15 47:15 74:8 81:4 86:16 89:19 97:25 99:18 103:5 112:9 132:2 140:18 140:19 164:7 165:25 167:20 168:7 171:16 173:11 173:24 173:24 174:1 174:20 175:8 175:12 176:9 177:16 179:25 180:24 181:1 188:20 188:24 190:11 190:22 190:22 192:11 192:18 193:3 193:10 193:25
**King** [1] 148:6
**Kirby** [8] 10:3 21:19 24:15 24:16 43:6 44:6 45:3 118:13
**Kneel** [1] 145:7
**Knelt** [1] 145:6
**Knobloch** [2] 196:3 196:16
**Knocks** [1] 13:2
**Knowing** [1] 100:6
**Knowledge** [1] 161:6
**Known** [6] 15:23 20:4 20:18 21:14 25:3 86:22
**Knows** [1] 126:5
**KURT** [1] 2:17

### L

**Ladies** [10] 4:11 5:21 73:24 74:4 152:12 170:18 179:7 182:5 185:23 192:6
**Laid** [4] 159:23 159:25 160:1 174:21
**Land** [1] 144:21
**Lands** [2] 18:3 18:8
**Lantern** [30] 11:6 11:17 13:22 18:11 58:7 60:16 70:10 80:10 95:2 95:6 107:25 124:1 127:25 155:8 173:13 174:14 174:15 174:16 174:19 181:25 182:8 182:11 182:22 182:25 183:7 187:6 187:17 188:2 189:2 190:23
**Large** [2] 13:23 167:24 183:18
**Last** [23] 6:1 11:5 13:16

**Jumping** section continued...

**Lasted** [1] 88:8
**Late** [1] 109:10
**Latter** [1] 84:17
**Law** [1] 5:21
**Laws** [1] 34:17
**Lay** [5] 69:1 137:25 176:17 176:18 176:22
**Laying** [10] 14:1 14:4 66:23 67:19 159:3 175:22 176:3 179:4 180:8 186:9
**Layout** [1] 181:14
**Leading** [3] 153:11 190:22 191:7
**Leads** [1] 182:14
**Learned** [2] 46:3 81:11
**Least** [1] 168:11
**Leave** [17] 10:23 46:23 47:2 47:12 96:17 98:12 98:13 98:17 98:18 109:25 111:19 116:19 155:11 167:5 172:2 172:5 174:4
**Leaving** [7] 40:20 41:11 121:20 157:10 157:21 157:24 159:12
**Left** [50] 8:14 9:6 10:10 10:17 10:20 40:1 40:1 40:3 40:8 40:13 41:1 41:13 41:13 41:14 41:16 41:24 47:5 47:6 47:22 48:5 48:16 53:4 65:13 67:8 67:14 67:16 68:6 68:6 96:18 96:18 108:14 108:14 122:10 124:20 132:5 132:6 132:22 134:3 142:20 153:1 153:10 154:16 159:20 166:9 167:4 173:12 174:6 182:4 182:12 182:18
**Lengths** [2] 49:17 49:18
**Letting** [1] 189:11
**Level** [1] 193:20
**Lexus** [57] 7:16 9:9 9:9 10:6 11:15 11:19 12:4 12:5 13:8 15:14 16:10 16:13 17:14 17:14 18:12 29:8 29:11 29:23 44:20 47:14 63:16 64:4 64:5 64:15 64:19 67:8 68:3 73:4 107:2 110:16 110:17 112:23 116:20 117:7 117:11 118:10 121:24 122:8 126:14 130:12 135:25 136:6 136:9 136:10 136:14 137:2 137:19 139:14 143:19 143:25 144:9 145:2 145:5 145:15 146:9 146:19
**Lie** [6] 14:14 109:5 109:6 138:13 140:24 141:1
**Lifelong** [1] 81:16
**Light** [6] 65:15 65:15 132:6 132:16 132:18 140:8
**Lighting** [3] 187:14 187:16
**Lights** [2] 122:20 128:21
**Likely** [1] 109:19
**Line** [3] 18:5 94:18 151:6
**Lineup** [2] 148:16 148:19
**Lining** [1] 61:14
**Listen** [1] 150:20
**Listening** [4] 121:3 121:11 151:1 193:1
**Live** [3] 24:23 148:5 148:8
**Lived** [2] 6:2 16:6
**Lives** [3] 85:12 114:15 148:11
**Living** [1] 148:12
**Loaded** [6] 14:7 140:6 178:10 178:11 178:13 179:14
**Lobby** [2] 88:3 88:21
**Located** [8] 31:2 40:9 44:25:3 36:19 52:18 67:3 87:5 78:5 78:9 79:20 81:12 82:6 82:10 128:5 147:21 155:2 171:23 171:24 171:25 186:18 192:8 193:25

**Location** [81] 7:15 7:25 8:1 8:14 8:15 8:17 8:19 9:6 10:4 10:16 13:20 13:21 16:7 16:8 16:13 16:14 16:15 16:17 17:2 17:3 18:12 28:23 29:18 29:19 37:24 38:1 38:3 38:9 40:8 40:13 40:20 41:2 43:3 24:47:12 48:16 50:21 50:21 51:24 53:1 54:1 54:3 59:14 59:17 63:11 76:25 79:12 108:11 108:12 108:13 119:1 124:1 124:7 125:3 125:19 125:24 126:2 126:17 128:25 153:19 161:2 161:13 171:8 172:3 171:17 178:24 179:22 180:10 180:16 180:16 182:24 183:16 184:7 186:17 187:4 187:11 187:12 188:8 188:14 189:18 191:15 192:1
**Locations** [5] 121:8 124:20 126:6 126:8 126:21
**Lock** [1] 178:4
**Locked** [4] 92:25 177:7 177:12 179:16
**Look** [29] 37:9 38:6 42:3 129:2 145:13 146:8 180:5 189:3 192:25
**Looked** [13] 65:1 67:1 68:6 141:19 158:2 170:7 173:13 173:25 176:9 176:10 176:11 176:12 180:25
**Looking** [18] 6:12 15:5 15:11 15:12 15:14 15:15 25:9 26:22 27:8 27:11 38:1 57:23 88:22 89:5 90:21 99:21 107:9 184:25
**Lookout** [3] 103:14 104:9 161:1
**Looks** [1] 60:17
**Loop** [10] 6:4 6:7 10:3 13:13 25:23 85:19 85:22 109:3 167:1 186:24
**Loose** [1] 180:25
**Louisiana** [15] 6:3 16:21 24:24 26:9 28:1 84:8 85:6 85:13 86:12 90:25 91:20 90:1 20 91:23 91:25 147:17
**Lunch** [4] 73:22 73:23 194:25 195:4
**Luther** [1] 148:5
**LYN** [1] 2:2

### M

**Machine** [1] 1:23
**Mad** [3] 40:3 40:3 40:5
**Magazine** [6] 177:7 177:8 177:9 178:10 178:13 179:12
**Magazines** [1] 194:16
**Main** [14] 13:13 13:14 48:6 48:14 48:18 48:19 48:19 48:21 48:22 54:10 101:19 123:20 172:10 182:12
**Male** [10] 13:7 174:20 174:21 174:24 174:25 175:1 184:9 189:8 190:17 190:21
**Mall** [35] 7:13 10:17 31:1 31:1 31:2 36:23 37:5 77:1 77:11 77:14 95:25 96:25 99:19 102:5 102:21 103:4 103:15 103:20 103:21 103:22 103:23 104:7 104:9 104:10 104:14 104:19 104:21 105:7 105:11 105:21 109:14 109:18 114:18 114:21 114:24
**Mamou** [191] 1:5 3:7 3:11 3:15 5:3 5:7 6:9 6:10 6:17 6:23 7:7 7:13 7:18 8:2 8:4 8:8 8:11 8:19 8:24 8:25 9:12 9:22 10:2 10:9 10:14 10:16 17:10:19 10:25 11:4 11:16 11:23 12:4 12:10 12:13 12:17 12:23 12:23 13:8 13:13 13:18 14:17 14:23 15:24 16:4 16:7 16:12 16:15 16:17

16:20 17:4 18:10 21:10 21:
20 24:11 26:3 26:10 26:12
26:14 28:16 29:22 29:25 30:
2 32:10 33:6 33:14 34:2 34:
8 35:10 35:25 36:5 37:13 38:
5 40:6 40:14 41:23 41:24 43:
7 43:8 43:24 44:11 45:5 45:
15 45:23 46:19 46:24 47:5
47:9 47:11 48:4 49:25 50:5
50:6 50:23 52:8 52:15 53:16
55:6 56:13 60:17 63:3 63:18
64:5 65:3 65:20 67:1 67:5
75:3 77:22 78:16 79:4 85:16
85:17 85:18 87:17 87:21 88:
5 88:10 90:2 90:7 90:10 90:
17 91:2 91:10 92:17 92:20
93:9 95:19 95:25 96:4 100:3
100:6 100:13 102:2 102:5
105:15 108:17 112:16 113:8
113:12 113:20 116:12 118:2
118:5 119:11 119:18 120:4
120:6 120:8 121:13 121:19
121:23 123:8 125:10 125:18
126:6 127:3 127:17 127:24
129:4 129:16 130:4 130:7
130:13 130:22 131:22 131:25
134:18 144:4 147:6 147:15
149:19 151:12 153:1 153:12
153:23 154:4 155:1 156:8
156:10 157:18 160:5 160:8
161:12 161:20 164:1 165:13
166:6 167:4 168:20 196:20

**Mamou's** [5] 49:21 92:6
129:14 130:16 154:15

**Man** [14] 9:23 13:23 13:25
14:1 34:21 35:9 42:3 42:9
88:12 93:4 120:21 134:15
150:7 191:7

**Man's** [1] 108:7

**Management** [1] 80:2

**Marie** [1] 109:23

**Mark** [2] 39:17 60:25

**Marked** [11] 22:10 22:24
23:11 30:8 36:4 54:17 74:20
75:15 154:17 178:22 181:9

**Martin** [1] 148:5

**Mary** [46] 3:18 3:19 3:20 5:
10 5:11 5:12 9:16 10:5 11:3
12:1 13:9 13:16 15:15 17:7
17:11 18:10 20:22 20:24 21:
4 23:13 23:14 42:16 42:19
43:3 44:7 44:24 46:17 47:18
62:22 63:22 64:12 64:15 67:
3 68:4 117:3 117:9 119:12
131:10 136:2 148:4 148:4
148:5 160:9 160:13 166:21
189:11

**Materials** [1] 194:15

**Matter** [2] 105:18 194:3

**McClellan** [99] 2:2 3:2 3:
10 4:3 5:2 5:20 18:18 19:4
19:11 22:3 22:6 22:9 22:16
22:21 23:5 23:10 23:16 23:
21 30:4 30:7 36:7 37:12 39:
19 39:24 43:23 51:18 55:1
55:6 56:2 56:6 58:25 59:4
59:7 59:9 60:25 61:15 61:18
61:23 62:4 62:8 62:12 63:7
63:9 63:10 72:19 72:22 72:
25 73:6 73:11 74:3 74:16 74:
17 75:5 75:10 76:1 76:5 76:
6 76:12 77:3 77:8 77:17 81:
15 99:24 100:7 101:25 125:6
128:3 136:20 137:15 145:3
145:17 148:14 148:24 151:5
152:8 152:19 152:22 153:10
161:19 163:5 163:19 164:12
169:3 170:13 170:16 170:24
178:17 178:21 181:16 181:21
184:15 184:21 185:2 185:5
185:9 185:12 185:17 185:22
192:4

**McDonald** [5] 143:6 170:
17 170:21 171:1 171:2

**McKnee** [1] 188:3

**McNee** [13] 11:6 174:11
174:12 182:12 182:12 182:
182:22 182:24 183:5 183:6
183:16 188:5 189:2

**Mean** [38] 17:19 24:12 25:
17 28:8 34:16 34:23 39:1 42:
22 45:22 49:24 50:15 76:4
82:1 83:12 87:18 89:8 90:19
93:18 94:12 94:12 94:13 94:
17 95:7 97:25 98:16 98:17
101:8 121:14 121:15 123:15
138:19 154:11 159:1 160:12
167:23 168:2 172:4 177:6

**Meant** [1] 164:24

**Mechanism** [1] 178:4

**Media** [2] 192:21 192:22

**Meet** [34] 6:5 7:12 8:4 10:
2 10:8 21:16 24:8 24:17 25:
1 25:10 28:14 28:23 29:24
30:15 41:4 42:24 44:11 52:
16 86:8 86:12 86:19 88:2
104:23 111:1 111:12 112:14
112:16 112:24 115:25 124:21
140:15 154:25 160:3 160:4

**Meeting** [12] 25:22 26:2
26:15 28:21 52:18 52:20 79:
19 104:1 155:2 160:2 160:6
160:8

**Meetings** [2] 121:7 165:5

**Member** [1] 148:1

**Members** [1] 96:7

**Mention** [1] 134:18

**Messing** [1] 190:20

**Met** [42] 6:8 7:3 7:17 7:18
7:22 8:17 21:17 23:21 23:23
24:1 24:4 24:11 24:14 25:4
25:6 34:4 37:5 41:3 41:11
43:5 44:6 45:4 50:5 50:9 56:
13 56:25 78:4 80:6 85:18 87:
16 88:12 90:2 91:18 111:
7 115:23 147:10 147:21 149:
24 151:12 152:25 165:14

**Metal** [1] 18:6

**Metro** [3] 19:18 19:19 195:
13

**Middle** [3] 34:4 125:10
180:4

**Midnight** [5] 11:10 11:10
138:16 138:17 138:19

**Might** [10] 61:21 97:2 99:
22 100:6 119:16 122:13 123:
8 168:25 176:16 192:12

**Mike** [1] 1:20

**Millimeter** [9] 17:18 18:
6 167:24 168:1 169:13 176:
13 177:18 177:19 179:1

**Mind** [2] 120:24 134:12

**Minute** [2] 131:9 152:13

**Minutes** [22] 10:21 25:24
28:6 38:20 41:21 41:25 47:1
47:10 50:12 52:19 81:13 88:
8 88:11 88:18 89:11 114:3
114:14 114:19 115:17 155:3
173:18 181:7

**Miss** [11] 95:9 99:17 112:
23 113:11 114:7 115:9 118:
19 128:3 137:21 165:22 167:6

**Mistaken** [1] 172:24

**Model** [8] 89:23 89:23

**Moment** [8] 30:23 55:7 59:
7 72:19 73:18 144:2 150:10
181:22

**Money** [112] 7:9 8:8 8:10
8:11 8:11 8:24 9:2 9:23 9:
24 11:24 12:5 12:6 12:9 14:
21 14:23 15:2 15:3 15:8 27:
18 34:21 35:9 36:2 37:14 38:
6 38:6 38:7 38:10 38:13 38:
18 38:25 39:4 39:6 39:9 39:
11 83:2 83:5 90:25 94:5 94:
7 94:23 94:25 95:1 96:4 96:
9 96:10 96:10 96:11 96:13
96:17 96:19 96:23 97:6 97:
18 97:23 98:3 98:10 98:19
98:23 100:21 100:23 101:4
101:7 101:10 101:15 101:17
101:19 101:20 101:21 101:22
101:23 102:14 102:16
106:20 108:17 108:15

**Money's** [1] 94:8

**Month** [2] 21:15 71:6

**Months** [2] 20:20 169:9

**Morning** [8] 78:3 102:17
110:14 136:19 138:21 193:24
195:8 195:18

**Most** [1] 136:12

**Mostly** [2] 91:13 171:16

**Motion** [2] 4:5 176:9

**Mouth** [1] 71:16

**Move** [2] 58:20 134:8

**Moving** [1] 180:9

**Multifarious** [2] 99:25
125:7

**Multiple** [2] 15:20 18:15

**Murworth** [8] 11:7 182:11
182:25 183:9 183:17 188:3
188:5 191:13

**Music** [1] 131:13

**Must** [1] 154:8

# N

**Name** [39] 3:11 5:3 6:2 6:4
15:22 19:5 19:11 19:24 20:
23:3 23:22 23:24 25:8 32:2
37:20 45:25 53:1 55:9 61:14
72:7 72:9 77:21 78:24 80:1
80:22 87:15 116:5 148:3 150:
15 150:16 170:25 171:22 171:
23 171:24 171:25

**Named** [4] 7:4 7:4 7:20 15:
23

**Namely** [2] 3:20 5:12

**Names** [1] 150:14

**Nature** [1] 125:7

**Near** [10] 7:13 7:17 14:3
24:15 45:4 48:15 48:19 55:
13 102:7 123:20

**Nearby** [1] 159:5

**Necessary** [8] 94:5 94:11
94:13 94:17 94:24 95:18 164:
13 164:16

**Need** [10] 16:3 19:7 55:7
144:13 191:9 192:10 194:24
195:9 195:13 195:14

**Needed** [2] 107:14 189:3

**Needs** [1] 195:17

**Negotiations** [2] 9:4 39:
24

**Neighborhood** [3] 20:5
82:9 82:21

**Never** [26] 8:19 36:15 38:
6 82:7 82:7 85:2 88:1 96:19
102:14 104:12 104:21 106:6
112:24 121:12 126:3 126:19
133:3 141:22 145:13 147:5
147:8 147:10 147:13 147:17
159:20 194:1

**New** [2] 62:9 89:23

**Newborn** [1] 92:23

**Newspaper** [1] 192:25

**Newspapers** [2] 194:15
194:16

**Next** [14] 6:16 15:18 18:17
33:4 33:5 62:23 100:18 108:
9 112:11 131:7 136:11 170:
15 186:16 192:23

**Nickname** [4] 97:13 110:5
149:25 150:2

**Night** [10] 11:9 37:4 40:
7 74:6 108:19 109:11 113:
25 114:2 122:20 171:16

**Nine** [7] 25:9 88:23 88:24
89:3 89:12 89:15 93:10

**Nobody** [4] 83:14 93:19
170:2 190:20

**Nobody's** [1] 126:7

**None** [1] 95:10

**Noon** [1] 17:6

**North** [23] 48:6 48:14 48:
18 48:19 48:19 48:22 54:7
54:9 54:14 57:23 57:24 58:1
58:13 58:16 58:17 58:18 59:
18 59:19 59:22 59:23 114:20
115:3 166:24

**Northbound** [1] 174:21

**Northeast** [4] 40:10 116:
8 117:2 118:18

**Northerly** [1] 63:13

**Northline** [49] 7:13 7:17
17:2 28:14 28:21 29:1 29:3
29:11 29:24 30:10 30:14 30:
15 30:17 31:1 31:2 31:6 32:
19 36:23 37:5 45:19 77:1 77:
11 77:14 95:25 96:18 96:25
99:19 102:5 102:21 103:4
103:14 103:20 103:21 103:22
104:7 104:9 104:10 104:14
104:19 104:21 105:7 105:11
105:21 109:14 109:18 114:18
114:21 114:24 153:2

**Nose** [6] 66:5 66:6 66:10
71:15 135:5 144:19

**Notes** [1] 141:9

**Nothing** [10] 9:14 82:7 85:
2 96:20 134:6 134:16 134:20
151:18 162:22 170:13

**Notice** [3] 187:21 190:14
190:24

**Noticed** [4] 174:20 180:19
190:21 192:20

**November** [16] 6:1 24:13
26:15 45:5 82:11 82:16 82:
25 84:2 84:15 84:17 85:5 86:
1 86:2 86:2 91:7 91:9

**Number** [19] 3:5 3:6 5:1
16:1 16:2 16:2 16:3 16:5 16:
14 42:6 42:8 63:5 72:12 72:
15 76:7 76:19 111:21 139:11
148:17

**Numbered** [2] 1:20 196:1

**Numbers** [1] 72:18

# O

**O'clock** [7] 109:4 109:10
109:16 109:20 113:25 114:2
138:19

**Object** [16] 37:7 51:15 61:
11 61:24 62:2 99:24 125:6
136:20 148:24 151:5 153:7
161:12 161:15 184:13 184:14
184:24

**Objecting** [1] 43:20

**Objection** [16] 22:19 23:
8 23:19 39:22 55:4 56:4 59:
6 61:20 73:9 75:8 76:10 77:
6 181:19 184:18 185:6 185:19

**Observe** [1] 175:5

**Observed** [2] 174:24 176:5

**Obvious** [3] 106:12 166:19
167:4

**Obviously** [3] 96:13 112:
9 189:20

**Occasion** [1] 172:1

**Occupants** [1] 13:8

**Occupied** [6] 9:12 9:12
10:24 11:4 11:16 13:9

**Occurred** [2] 196:7

**October** [1] 1:18

**Off-brown** [1] 81:5

**Off-the-record** [6] 3:4
73:19 142:15 150:11 151:9
152:11

**Offer** [18] 22:17 23:6 23:
17 36:8 39:20 55:2 56:3 59:

Case 4:14-cv-03253 Document 75-11 Filed on 04/11/17 in TXSD Page 318 of 377

5 61:7 77:4 181:17 184:16 185:10 185:17

**Offered** [1] 102:16

**Offering** [2] 97:5 184:14

**Office** [10] 36:20 78:5 78:9 80:16 122:11 126:23 127:13 128:6 163:11 163:16

**Officer** [12] 69:23 69:24 100:10 101:3 171:4 171:6 171:11 171:12 171:21 172:15 172:16 193:18

**Official** [3] 196:3 196:12 196:17

**Official/Deputy** [1] 196:3

**Often** [1] 51:10

**Oftentimes** [1] 111:19

**Old** [7] 19:15 20:8 81:22 81:24 82:3 93:6 147:19

**Older** [20] 9:20 20:11 89:23

**Oldsmobile** [1] 103:12

**Once** [24] 40:21 40:22 50:23 52:4 66:20 79:21 81:7 81:8 92:18 94:7 94:21 101:15 120:18 120:19 124:20 136:25 142:1 142:5 145:4 154:22 157:5 157:19 162:1 162:8

**One** [53] 3:9 4:3 4:25 11:5 18:14 25:20 27:7 31:9 40:23 46:6 50:6 51:21 52:19 60:20 61:17 61:19 65:2 66:19 68:15 69:22 70:13 71:4 76:6 78:9 80:9 80:12 89:22 95:12 95:13 95:21 98:1 100:4 130:25 142:20 145:22 147:18 148:18 154:17 155:3 157:6 165:3 169:24 173:22 174:20 175:14 175:14 176:8 177:24 189:1 189:1 189:14 190:3 195:2

**One-day** [1] 85:3

**Ones** [1] 184:1

**Open** [8] 121:8 144:10 173:10 177:7 177:12 179:16 180:9 196:7

**Opened** [5] 65:17 65:20 65:21 132:16 133:17

**Opening** [3] 5:19 62:2 65:24

**Opens** [1] 12:23

**Opportunities** [1] 96:3

**Opportunity** [3] 5:22 78:22 102:4

**Options** [1] 39:15

**Order** [5] 4:16 124:1 129:5 172:24 173:1

**Ordered** [1] 46:14

**Organized** [2] 3:12 5:4

**Otherwise** [1] 111:17

**Ounces** [11] 6:12 25:9 26:23 27:2 88:23 88:24 89:3 89:12 89:15 93:10 93:12

**Ourselves** [1] 169:23

**Outlying** [1] 195:12

**Outset** [1] 94:3

**Outside** [10] 3:9 10:17 46:23 46:24 46:25 88:19 88:22 120:1 146:13 166:6

**Overruled** [1] 51:17

**Own** [4] 93:5 96:8 117:22 188:25

**Oxygen** [1] 71:17

---

**P**

**P.m.** [2] 119:16 171:17

**Page** [2] 85:4 115:22

**Paged** [2] 91:24 115:23

**Pager** [3] 111:17 111:18 111:19

**Paid** [1] 196:11

**Pamela** [2] 196:3 196:16

---

**Papa** [1] 112:5

**Paper** [9] 14:21 14:24 15:8 71:24 72:3 72:17 181:1 186:1 186:16

**Papers** [1] 180:25

**Pappa's** [1] 102:7

**Paragraph** [4] 3:3 3:9 4:25 4:25

**Pardon** [4] 45:11 56:15 162:6 185:9

**Parents** [1] 7:16

**Parents'** [1] 29:6

**Park** [25] 27:23 49:20 52:7 82:14 82:15 82:18 83:21 84:6 84:19 103:16 105:1 105:3 112:4 117:16 117:18 118:9 123:4 127:9 167:13 169:2 169:14 169:20 169:21 195:5 195:9

**Parked** [13] 31:11 31:13 31:15 33:1 33:1 33:3 52:4 53:23 56:12 117:14 130:18 153:16 153:18

**Parking** [19] 48:10 48:25 49:7 50:1 52:10 56:13 56:25 98:18 122:19 122:22 122:25 125:10 126:16 128:15 195:5 195:7 195:8 195:10 195:17

**Parks** [1] 82:20

**Part** [12] 5:25 6:1 6:1 21:18 84:17 101:21 105:25 116:7 140:10 161:19 166:7 176:2

**Participated** [1] 14:16

**Particular** [2] 4:16 82:18

**Parties** [6] 9:11 40:2 50:15 62:5 196:6 196:9

**Partner** [7] 171:22 174:22 176:16 176:19 180:11 180:13 191:11

**Party** [3] 92:12 92:13 92:14

**Pass** [4] 77:17 116:18 163:5 192:4

**Passed** [4] 64:8 64:9 65:3 173:17

**Passenger** [13] 29:16 31:24 32:9 33:15 45:23 47:18 47:20 48:3 63:2 64:7 115:14 154:12 154:13

**Passes** [1] 195:13

**Past** [11] 66:20 136:25 145:9 145:10 156:24 157:1 157:3 157:11 158:8 182:11 192:10

**Pay** [3] 113:14 134:5 195:4

**Paying** [2] 81:6 131:18

**Peace** [2] 3:22 5:14

**Pen** [1] 71:24

**Pending** [1] 193:9

**People** [26] 7:22 7:23 9:13 10:13 14:10 16:22 24:8 31:20 37:15 37:15 40:24 47:14 73:14 74:13 121:8 126:20 148:15 150:6 157:6 179:22 187:5 188:13 188:16 190:9 191:21 193:21

**Per** [1] 172:25

**Perhaps** [1] 123:7

**Period** [11] 10:18 42:12 67:17 70:25 78:3 84:24 91:22 102:20 109:22 131:6 141:1

**Perks** [1] 195:2

**Person** [47] 4:19 6:2 7:20 15:22 19:24 20:16 20:21 20:24 21:3 21:9 22:11 22:13 23:1 23:12 23:21 23:23 24:4 25:10 32:2 72:7 75:10 76:7 76:1 8 77:8 77:10 85:11 148:17 148:17 149:18 161:9 174:24 176:15 175:21 175:22 179:24 180:7 180:20 183:18 183:20 184:10 186:6 186:17 188:9 188:9 189:21 191:9

---

**Personality** [2] 89:17 132:1

**Phone** [47] 2:9 2:16 2:21 9:11 9:14 9:20 24:20 26:4 40:18 40:20 42:1 42:1 42:4 42:5 42:6 42:7 42:8 42:16 43:10 72:16 83:19 84:18 85:15 86:10 91:4 91:11 91:15 91:18 92:2 92:3 104:22 104:24 106:23 111:2 111:16 111:21 20 113:1 113:12 113:14 116:1 118:12 118:4 138:3 138:6 147:16 194:24 194:25

**Phones** [5] 194:19 194:20 194:21 194:24 195:1

**Photograph** [16] 46:6 54:18 54:19 54:23 55:12 55:15 55:23 56:7 56:10 57:2 57:8 58:5 183:25 184:1 186:2 186:6

**Photographs** [7] 128:18 148:15 183:24 184:20 186:15 186:16 187:25

**Photospread** [7] 46:5 74:13 75:13 75:16 76:15 149:9 149:15

**Photospreads** [6] 73:12 73:15 74:12 148:23 149:6 149:20

**Phrase** [3] 98:9 142:21 142:22

**Physical** [1] 15:5

**Physically** [1] 163:25

**Pick** [13] 19:14 43:4 67:20 109:23 112:23 113:11 114:7 115:4 136:24 142:20 146:8 160:13 189:14

**Picked** [20] 9:19 42:16 42:18 43:3 67:21 67:25 135:22 137:3 148:18 158:5 158:7 168:9 176:21 176:23 177:1 177:2 179:4 179:8 179:10 179:11

**Piece** [1] 72:3

**Pieces** [3] 14:21 14:24 186:16

**Pistol** [1] 167:25

**Place** [16] 25:22 57:5 79:10 97:5 102:7 103:22 108:9 111:15 121:7 123:22 124:2 137:24 138:10 140:14 141:5 180:17

**Places** [2] 13:24 -121:7

**Plan** [43] 7:5 28:13 28:20 28:22 83:8 85:1 94:4 95:24 96:7 96:8 96:11 98:22 98:24 98:25 99:11 102:1 105:11 105:18 105:22 106:1 106:2 106:9 108:10 111:5 111:10 112:20 112:21 118:22 119:2 124:24 127:17 140:11 140:14 161:19 161:22 162:5 163:1 163:2 163:20 163:25 164:20 164:22 165:2

**Planned** [1] 112:15

**Planning** [1] 151:23

**Play** [3] 29:21 53:16 83:22

**Playing** [4] 131:13 167:15 169:8 169:11

**Pleads** [2] 3:24 5:16

**Plot** [1] 120:12

**PM** [2] 108:25 192:10

**Pocket** [1] 193:20

**Point** [73] 11:6 11:17 11:22 12:8 12:9 13:7 13:22 18:11 21:23 51:17 58:7 60:16 70:10 72:5 78:18 80:10 88:4 95:2 95:6 100:11 106:12 106:24 107:25 110:2 112:20 113:11 113:19 118:22 119:3 119:18 120:11 120:15 121:8 121:124:2 127:25 130:25 132:18 133:10 136:21 137:3 137:25 139:4 139:4 140:6 141:4 141:24 144:8 145:1 145:12

---

146:12 146:22 155:8 164:17 174:14 174:15 174:16 174:20 180:2 180:2 181:25 182:8 182:11 182:23 182:25 183:7 187:6 187:17 188:2 189:2 190:16

**Point/McNee** [1] 173:13

**Pointed** [3] 54:5 54:14 58:22

**Pointing** [5] 57:15 58:13 58:17 59:18 128:8

**Points** [2] 12:19 130:11

**Police** [30] 15:5 15:22 16:20 46:7 71:18 71:22 72:7 73:12 74:11 100:3 100:10 100:22 101:3 101:8 101:9 140:23 141:5 141:10 141:13 141:18 141:22 141:25 142:6 163:10 163:10 163:15 191:14 191:21 192:1 193:18

**Pool** [1] 189:22

**Pooper** [2] 92:13 92:14

**Poor** [1] 187:18

**Pop** [5] 65:22 133:16 133:21 133:23 134:1

**Portions** [1] 196:5

**Portrayed** [1] 14:23

**Position** [2] 75:11 123:16

**Positioned** [1] 62:13

**Positions** [1] 47:15

**Positive** [1] 147:9

**Positively** [1] 148:20

**Possession** [4] 14:5 34:8 70:9 108:1

**Possible** [1] 132:12

**Possibly** [3] 28:6 136:12 160:1

**Potential** [1] 78:19

**Preparation** [1] 196:11

**Presence** [3] 3:9 40:24 143:8

**Present** [5] 7:19 77:11 77:12 83:10 83:12

**Presented** [2] 83:7 149:5

**Presents** [2] 3:13 5:5

**Presiding** [1] 1:21

**Preston** [1] 195:11

**Pretty** [7] 103:22 122:4 122:21 129:10 130:18 138:12 146:3

**Prevent** [2] 153:5 162:22

**Previous** [1] 192:15

**Previously** [1] 170:19

**Price** [1] 88:24

**Privately** [1] 99:22

**Proceed** [5] 3:3 18:20 142:18 152:19 170:20

**Proceedings** [4] 1:19 1:22 196:5 196:9

**Prosecuted** [1] 142:1

**Prosecuting** [1] 142:8

**Prosecutors** [1] 194:5

**Protect** [3] 105:12 107:15 123:10

**Protection** [6] 105:10 107:10 107:11 107:21 111:13 161:1

**Provide** [1] 161:1

**Proximity** [1] 175:12

**Public** [4] 97:5 121:8 121:8 169:14

**Pull** [7] 117:15 117:20 119:8 120:12 120:17 161:13 162:23

**Pulled** [6] 27:25 90:21 117:22 130:14 130:16 189:1

**Pulls** [1] 131:7

**Pulse** [6] 180:9 180:21 186:9 186:18 190:17 190:18

**Punch** [1] 135:4
**Pure** [1] 108:7
**Purpose** [2] 91:3 107:20
**Purposes** [2] 22:25 74:22
181:10
**Push** [1] 194:11
**Put** [24] 31:10 34:18 39:17
41:12 58:9 60:23 60:24 71:
11 71:14 89:9 93:17 93:21
123:16 129:4 132:14 132:19
133:2 133:6 133:9 133:10
134:9 134:13 135:2 179:14
**Puts** [1] 17:21 17:21
**Putting** [2] 62:9 193:10

**Q**

**Questioning** [2] 51:16 78:
3
**Questions** [8] 36:18 72:1
150:20 150:22 151:6 163:19
170:11 195:14
**Quick** [3] 138:12 176:9
191:10
**Quickly** [2] 115:3 132:12
**Quote** [1] 152:1

**R**

**Radio** [1] 193:3
**Raise** [1] 4:12
**Ran** [15] 12:12 66:19 82:8
135:14 136:25 143:18 143:24
145:5 145:9 145:10 156:24
157:11 158:8 176:17 191:6
**Random** [3] 51:11 51:12
122:2
**Range** [2] 12:11 133:22
**Rapid** [1] 70:16
**Rate** [1] 89:3
**Reach** [1] 173:25
**Reached** [7] 65:24 66:10
66:21 66:24 133:24 134:3
189:14
**Reading** [1] 194:15
**Ready** [1] 10:23 124:19
**Real** [5] 50:14 69:18 97:21
133:22 187:18
**Realized** [2] 13:3 142:1
**Really** [28] 4:17 15:19 48:
18 72:2 81:6 82:8 86:13 89:
5 90:20 90:21 98:25 102:12
107:14 109:5 114:4 114:25
121:16 135:14 139:2 157:4
159:20 173:1 176:1 176:2
180:18 187:20 187:21 195:9
**Rear** [1] 173:12
**Reason** [1] 16:20
**Reasonable** [1] 18:16
**Received** [3] 84:13 84:14
113:1
**Recent** [1] 128:14
**Recess** [2] 73:22 142:16
**Recessed** [1] 73:25
**Recognition** [1] 193:14
**Recognize** [8] 21:20 22:
10 23:1 51:7 51:21 76:17 76:
19 76:21
**Recognized** [1] 51:4
**Record** [7] 1:1 19:5 22:3
170:25 196:6 196:8 196:11
**Recovered** [2] 17:15 191:
25
**RECROSS-EXAMINATION**
[1] 163:7
**Red** [61] 7:22 10:10 11:16
11:18 11:22 15:12 15:13 16:
24 30:3 30:22 31:11 31:15
31:17 32:1 32:3 32:7 32:9
33:3 33:16 33:18 33:19 34:3
35:6 45:17 45:21 47:24 48:1
48:3 50:7 52:14 58:13 59:10

60:20 61:8 62:25 63:17 63:
20 67:10 75:24 76:13 76:24
87:13 87:14 87:16 87:24 90:
5 110:13 129:10 129:12 129:
16 130:8 135:15 135:19 137:
5 137:18 146:10 146:15 146:
16 146:21 153:22 154:18
**Red's** [1] 89:21
**REDIRECT** [1] 152:21
**Referred** [2] 25:10 34:22
83:7
**Referring** [2] 142:25 143:
4
**Reflect** [1] 22:4
**Reflects** [1] 196:9
**Refused** [3] 36:18 78:4 78:
18
**Regard** [2] 99:18 99:18
**Regarding** [3] 91:10 163:
10 163:20
**Regardless** [1] 56:11
**Registered** [2] 168:25
170:9
**Regular** [1] 194:6
**Relate** [3] 72:6 72:9 186:6
**Related** [1] 87:4
**Relates** [1] 15:21
**Relating** [1] 150:22
**Relation** [1] 114:18
**Relationship** [4] 81:15
81:19 147:15 184:7
**Released** [1] 71:3
**Relevance** [1] 51:16
**Remember** [14] 57:23 69:6
69:21 69:22 70:18 78:8 95:2
113:18 140:9 141:17 166:16
173:1 187:23 188:25
**Removed** [3] 17:12 17:13
17:15
**Repeat** [1] 163:12
**Rephrase** [4] 77:25 96:2
125:8 136:23
**Reported** [2] 1:22 196:7
**Reporter** [2] 196:3 196:17
**Reporter's** [4] 1:1 196:6
196:8 196:11
**Represent** [1] 77:21
**Representing** [1] 79:3
**Represents** [1] 78:16
**Requested** [2] 192:13 196:
5
**Required** [2] 51:14 51:18
**Rereleasing** [1] 177:9
**Respective** [1] 196:9
**Respond** [2] 71:25 106:1
**Responded** [1] 151:4
**Response** [1] 99:20
**Rest** [1] 184:7
**Restaurant** [5] 57:3 80:3
119:13 119:20 119:22
**Rested** [1] 73:21
**Resumes** [1] 32:18
**Retain** [1] 195:6
**Retraced** [1] 182:19
**Retrieved** [1] 17:11
**Return** [2] 98:1 193:23
**Returned** [1] 92:2
**Returning** [1] 92:3
**Revolver** [1] 168:3
**Revolvers** [1] 168:5
**Ride** [3] 41:20 90:25 112:25
**Riding** [5] 89:18 89:19 90:
23 113:1 124:11
**Rifling** [1] 17:19
**Righthand** [2] 18:1 174:19
**Rings** [1] 9:20
**Rip** [12] 14:24 106:9 106:

15 107:12 119:2 120:22 121:
17 123:4 126:11 127:18 130:
22 140:11
**Ripped** [4] 112:16 123:13
123:16 127:21
**Ripping** [1] 130:20
**Road** [19] 11:13 44:6 59:2
62:14 116:1 116:2 122:12
122:13 122:16 122:17 128:13
156:20 174:12 174:22 179:25
184:8 190:20 190:23 191:2
**Rob** [4] 29:22 49:25 52:8
102:1 102:5 103:1 105:16
105:18 105:22 108:10 125:5
125:9 161:12 161:19
**Robin** [1] 16:5
**Rocks** [1] 25:20
**Rode** [4] 41:19 42:14 49:4
117:8
**Rodriguez** [3] 78:11 78:
14 80:15
**Role** [1] 29:20
**Roll** [1] 129:24
**Room** [10] 87:16 87:18 87:
24 88:1 88:20 88:21 152:13
192:1 195:8 195:19
**Roughly** [1] 82:11
**Round** [7] 14:7 17:12 124:
24 177:22 178:1 178:6 178:15
**Rounds** [1] 178:13
**Route** [1] 182:6
**Rubber** [4] 137:13 137:13
137:15 137:16
**Rule** [2] 4:7 4:9
**Rules** [1] 185:10
**Run** [10] 54:9 111:10 111:
24 135:15 137:19 143:23 156:
20 157:1 158:16 162:3
**Running** [17] 12:15 13:4
66:15 67:16 67:17 71:11 71:
15 97:16 120:24 135:10 135:
17 145:4 145:21 156:11 156:
14 156:22 157:15
**Runs** [1] 13:4
**Rush** [5] 13:1 99:1 99:2 99:
2 99:6 103:17 112:9
**Rushed** [1] 71:5

**S**

**Safe** [3] 127:20 177:3 177:5
**Safety's** [1] 169:25
**Sake** [1] 169:25
**Sale** [1] 17:8
**Sam** [1] 135:15
**Samaritan** [6] 15:6 141:
16 142:22 143:1 143:4 143:6
**Sammy** [2] 48:2 153:18
**Samuel** [35] 7:19 8:19 10:
9 10:24 11:15 11:22 12:1 13:
10 13:14 14:17 16:23 23:24
24:1 32:4 32:5 32:6 45:22
45:24 46:1 46:6 46:9 46:19
47:25 49:2 50:23 63:1 63:19
75:20 75:21 110:3 110:5 110:
7 120:5 129:18 129:19 **Samuel's** [1] 47:8
**San** [1] 196:18
**Sat** [3] 41:12 46:13 46:13
**Saw** [30] 21:3 32:2 36:5 36:
19 36:22 66:20 67:3 67:5 67:
19 68:8 68:17 82:13 96:19
96:20 97:17 102:14 111:5
132:16 136:25 139:1 139:4
139:14 148:23 149:20 149:21
156:25 157:5 157:23 169:7
183:18
**SBOT** [4] 2:3 2:5 2:13 2:18
**Scam** [1] 97:16
**Scared** [2] 121:12 121:16
**Scares** [1] 124:6
**Scene** [9] 10:11 13:17 14:

15 107:16 140:1 182:24 185:
14 190:8 190:15
**Scenes** [1] 192:19
**School** [4] 19:22 20:6 81:
21 82:8
**Score** [2] 91:3 92:11
**Scott** [2] 16:6 16:15
**Seat** [17] 4:2 11:2 32:17
32:18 33:15 34:7 44:25 115:
10 115:14 131:8 145:24 154:
11 154:11 154:13 194:1 194:
2 194:13
**Seated** [5] 4:10 4:15 5:18
152:14 152:15
**Seats** [1] 193:1
**Second** [19] 3:3 19:10 96:
6 108:11 112:12 124:24 133:
12 142:14 144:5 155:22 171:
21 174:2 174:3 174:24 174:
24 175:1 177:11 181:3 190:18
**Secret** [5] 14:20 34:12 35:
12 37:1 97:1
**Secret's** [1] 8:7
**Security** [21] 13:20 13:
20 69:7 69:8 69:15 69:20 69:
24 80:9 124:11 138:9 138:23
140:2 143:6 171:3 171:5 171:
11 171:12 172:2 172:16 181:
24 183:10
**See** [89] 8:11 12:5 12:6 13:
24 27:20 38:25 51:3 55:12
55:15 55:21 56:10 57:8 63:
19 63:22 64:17 64:18 65:2
74:12 77:14 82:19 83:11 83:
17 84:19 86:13 87:20 94:17
96:10 96:10 96:14 97:6 101:
19 101:22 102:15 105:25 107:
7 107:13 110:19 115:22 118:
23 120:4 120:6 120:19 121:9
128:22 128:23 129:2 129:5
130:7 131:17 131:25 133:12
139:8 139:9 139:13 145:8
146:9 146:10 146:15 146:22
147:24 153:2 157:15 157:18
162:10 162:16 163:22 165:2
165:7 167:9 167:18 169:2
169:16 170:2 174:1 174:18
176:3 176:16 179:13 179:17
180:3 187:3 187:19 188:21
190:19 191:2 191:3 192:22
193:4 193:13
**Seeing** [5] 12:9 17:3 90:
15 97:23 98:1
**Seem** [1] 89:2
**Selling** [1] 90:23
**Semiautomatic** [1] 177:20
**Sense** [1] 125:4
**Sent** [1] 191:12
**Sentence** [1] 96:2
**Separation** [1] 173:2
**September** [1] 24:12
**Series** [5] 148:14 150:19
163:19 174:2 174:3
**Set** [5] 103:19 104:3 172:
25 173:21 192:25
**Sets** [2] 172:24 173:3
**Seven** [2] 81:13 91:13
**Several** [17] 13:24 26:17
26:18 66:15 66:16 74:10 95:
23 96:3 100:18 105:16 126:
10 128:6 131:20 141:1 148:
15 156:16 183:23
**Shadow** [1] 132:2
**Shady** [1] 190:5
**Sheet** [1] 148:19
**Sheets** [1] 148:17
**Sheriff's** [1] 191:17
**Shift** [1] 171:16
**Shifter** [1] 132:22
**Shirt** [5] 22:2 74:5 74:7
184:3 184:7
**Shoney's** [17] 21:17 24:
14 24:25 85:18 85:25 86:16

86:24 87:16 87:21 88:15
21 90:2 90:6 90:10 90:16 91:
5 147:10

**Shoot** [8] 67:23 67:25 134:
15 135:25 136:2 137:21 137:
21 147:3

**Shooting** [11] 3:20 5:12
15:23 16:13 17:3 27:24 74:
11 83:1 124:2 138:18 145:16

**Shootings** [1] 123:21

**Shoots** [5] 12:10 12:19 12:
20 12:24 133:12

**Short** [4] 10:17 25:18 50:
13 50:14

**Shot** [50] 12:14 13:4 13:7
13:23 13:25 17:14 17:20 18:
14 65:4 65:9 65:11 66:2 66:
4 66:9 68:2 68:3 70:13 72:7
82:17 132:3 132:4 133:18
133:19 133:20 134:7 134:11
139:17 139:19 141:18 144:20
146:1 155:15 155:17 155:20
155:22 155:25 156:2 157:12
158:11 158:15 158:17 175:2
175:4 175:24 175:25 183:19
184:4 189:7 189:9 189:15

**Shots** [13] 66:15 70:12
131:20 131:20 132:10 139:11
172:24 172:25 173:3 173:6
173:21 174:3 175:7

**Shoulder** [7] 65:4 65:13
132:5 132:6 132:7 133:19
133:20

**Show** [110] 5:23 6:6 6:13 6:
16 6:21 7:2 7:10 7:14 7:24
8:1 8:5 8:11 8:12 9:2 9:5 9:
7 9:15 9:18 9:21 10:1 10:4
10:8 10:12 10:15 10:18 10:
22 11:8 11:14 11:18 11:21
11:25 12:13 12:16 12:22 12:
25 13:6 13:12 13:16 13:19
14:3 14:6 14:9 14:14 14:14
14:18 14:19 14:22 15:4 15:
10 15:14 15:15 15:17 15:21
15:25 16:4 16:11 16:17 16:
19 16:21 17:5 17:10 17:17
17:25 18:2 18:5 18:9 22:9
22:24 23:10 30:7 30:24 31:8
33:20 36:4 38:7 38:9 39:7
39:8 54:17 55:23 56:11 57:2
57:13 58:3 58:5 58:25 60:9
72:25 74:11 74:19 75:15 76:
16 99:20 107:9 168:13 169:
13 178:22 179:7 179:9 181:9
181:22 182:6 183:3 183:23
184:6 185:12 186:15 186:17
186:21 187:1

**Showed** [2] 38:6 148:14

**Showing** [2] 154:18 154:19

**Shown** [10] 46:5 57:19 73:
12 74:21 75:13 75:16 76:15
148:19 149:10 183:2

**Shows** [5] 56:7 94:21 140:
20 142:6 185:24

**Shredded** [1] 180:25

**Sic** [8] 55:10 92:6 93:14
95:14 96:24 97:4 97:10 132:
13

**Side** [27] 12:17 27:25 29:
16 31:6 31:7 33:25 40:10 53:
4 55:11 64:7 90:22 98:1 115:
14 116:8 117:1 118:19 128:
13 130:14 131:25 132:23 133:
14 134:23 166:24 174:21 188:
2 188:3 188:6

**Sides** [2] 53:5 73:21

**Sight** [1] 187:13

**Sign** [1] 163:13

**Signed** [2] 3:23 5:15

**Signon** [1] 102:22

**Similar** [5] 17:19 17:24
30:9 30:11 30:12

**Simple** [1] 108:7

**Simply** [1] 108:4

**Sing** [2] 8:16 37:22

**Sing-On** [6] 8:16 37:21 37:

**Sing-Onoff** [1] 105:4

**SINGON** [1] 37:23

**Sister's** [1] 87:5

**Sit** [6] 4:16 4:20 4:21 39:
12 126:18 194:8

**Sitting** [16] 21:25 34:19
47:18 64:15 88:14 98:18 120:
7 120:15 131:11 132:7 134:
21 155:17 160:22 165:24 166:
4 189:3

**Situated** [1] 30:24

**Situation** [4] 40:4 109:
19 190:9 191:18

**Six** [4] 10:12 20:20 166:4
166:10

**Sixth** [1] 148:19

**Size** [2] 14:22 35:1

**Sleep** [1] 71:11

**Slide** [3] 144:13 177:7
177:12

**Small** [2] 79:8 79:9

**Smaller** [1] 35:2

**Smart** [1] 123:15

**Snitch** [6] 100:4 100:6
100:13 100:20 101:6 102:11

**Socially** [1] 82:22

**Someone** [9] 14:11 74:24
75:18 89:6 160:4 171:20 172:
11 172:11 192:1

**Someplace** [1] 126:14

**Sometime** [4] 24:12 24:12
42:25 86:1

**Somewhere** [5] 49:11 82:
14 82:15 105:4 172:5

**Somewheres** [1] 119:15

**Son** [1] 87:5

**Soon** [2] 88:19 112:22

**Sorry** [7] 55:9 90:16 103:
3 110:24 143:21 178:2 184:15

**Sort** [3] 79:24 79:25 190:13

**Souped** [1] 89:24

**South** [12] 6:5 13:13 13:
14 48:21 54:10 54:12 58:22
123:20 167:1 172:9 174:16
182:13

**Southwest** [3] 2:14 17:7
18:13

**Spaced** [1] 84:21

**Spaces** [1] 123:4

**Speaking** [2] 79:17 113:12

**Speaks** [1] 118:5

**Specialist** [1] 167:21

**Speculation** [3] 100:7
153:8 161:16

**Spell** [1] 37:22

**Spend** [3] 16:15 27:13 27:
14

**Spent** [3] 17:11 89:11 128:
5

**Spin** [1] 129:15

**Spinning** [1] 146:16

**Spirals** [1] 18:4

**Spoken** [3] 36:15 103:4
113:20

**Sports** [1] 88:14

**Spot** [3] 28:22 99:10 159:20

**Spots** [1] 127:10

**Spouses** [1] 192:17

**Staggering** [3] 174:25
175:4 176:8

**Stake** [1] 119:4

**Stand** [7] 133:21 144:2
145:19 170:14 175:20 179:3
188:10

**Standing** [10] 28:9 132:
17 132:19 144:8 156:4 169:
22 169:23 175:14 180:2 187:

**Start** [4] 106:9 107:12
110:2 121:21

**Started** [13] 89:17 135:7
138:14 145:4 145:16 145:20
145:21 159:21 159:22 170:3
170:4 175:8 176:11

**Starting** [1] 95:25

**Starts** [1] 82:12

**Stash** [1] 8:8

**State** [30] 1:10 2:10 3:6
3:10 3:12 3:23 5:2 5:4 5:15
5:19 18:18 19:5 19:11 22:17
23:6 23:17 36:8 39:20 73:7
75:6 76:2 77:3 165:21 170:
16 170:25 181:17 185:10 192:
12 196:1 196:4

**State's** [76] 3:2 22:10 22:
17 22:20 22:21 22:25 23:6
23:9 23:11 23:17 23:20 30:8
36:4 36:8 37:3 39:18 39:20
39:23 54:18 55:2 55:5 55:23
56:3 56:5 56:6 57:22 58:3
58:25 59:5 59:8 61:1 61:1
61:19 62:2 62:4 62:9 63:10
72:25 73:7 73:10 74:20 74:
21 74:24 75:6 75:9 75:15 75:
19 76:2 76:7 76:11 76:16 76:
16 76:17 77:4 77:7 154:17
178:22 181:10 181:17 181:20
183:2 183:17 184:1 184:6
184:16 184:19 185:3 185:8
185:11 185:13 185:18 185:20
185:22 186:5 186:21 186:22

**Statement** [10] 5:19 16:
25 62:2 101:10 121:6 163:9
163:13 163:14 163:21 170:8

**Station** [3] 41:5 112:20
140:15

**Stay** [6] 59:20 66:11 86:25
93:17 93:19 120:1

**Stayed** [3] 16:12 71:5 130:
2

**Staying** [1] 91:19

**Stays** [3] 11:25 12:1 12:1

**Steel** [2] 176:12 177:18

**Steering** [2] 65:2 132:8

**Step** [10] 30:23 55:7 55:8
55:10 55:11 112:11 133:7
144:1 179:9 194:12

**Stepped** [13] 35:15 46:24
64:4 64:7 66:1 88:19 88:22
119:22 130:5 133:5 134:23
166:6 166:7

**Stepping** [2] 66:2 134:7

**Steps** [6] 68:25 119:18
119:20 136:12 158:18 182:19

**Stereo** [1] 131:15

**Stick** [2] 132:23 132:25

**Still** [24] 12:18 13:9 25:
20 38:17 44:3 61:19 62:4 68:
17 90:9 104:6 106:15 108:16
108:17 117:25 118:23 119:2
119:3 119:7 120:12 121:24
157:8 166:10 180:8 192:15

**Stomach** [5] 66:2 133:13
133:14 134:8 156:1

**Stop** [9] 11:5 11:5 49:3 52:
2 60:15 77:24 156:23 158:16
174:22

**Stopped** [27] 48:6 48:8 48:
25 49:1 49:4 49:7 49:21 50:
1 51:25 52:1 52:2 52:10 53:
14 54:20 55:13 60:1 62:14
66:20 129:12 141:19 142:24
153:17 154:21 154:22 175:6
189:4 189:5

**Stopping** [4] 15:6 55:13
174:23 191:19

**Stops** [2] 11:17 60:3

**Store** [29] 8:16 37:19 37:
20 40:9 43:6 48:9 57:19 99:
13 102:22 103:1 104:5 104:
23 105:23 106:18 106:24 108:
22 111:12 111:23 116:3 116:

123:24 124:5
124:14 125:10 125:18 140:13
165:9

**Story** [8] 14:10 140:18
140:19 141:16 142:22 143:1
143:5 143:6

**Straight** [6] 13:14 18:5
122:17 146:24 163:18 182:10

**Street** [34] 14:4 17:6 31:
3 39:10 39:11 40:11 52:25
53:3 53:15 54:8 54:9 54:11
57:9 57:13 58:1 58:3 58:4
58:5 58:10 58:19 67:20 68:7
68:11 106:3 111:7 116:1 127:
24 139:3 180:4 180:4 183:4
183:8 187:4 187:22

**Streetlights** [5] 11:11
53:8 128:24 129:3 187:22

**Streets** [2] 48:14 181:14

**Strike** [1] 3:5

**Struck** [3] 38:21 143:16
143:24

**Stuff** [1] 137:1

**Stupid** [3] 97:25 98:2 98:7

**Styled** [2] 3:15 5:7

**Suggestion** [1] 44:10

**Sunday** [4] 6:22 7:14 27:7
138:21

**Sunset** [6] 24:24 84:8 85:
6 85:13 86:12 147:17

**Supposedly** [1] 11:24

**Surgeries** [1] 15:20

**Surprised** [2] 83:4 89:2

**Suspicious** [1] 123:7

**Sustained** [6] 37:9 43:22
100:1 100:8 151:7 153:9

**Sworn** [5] 4:13 4:14 19:2
170:19 170:22

**Syrup** [4] 181:6 183:20
186:14 186:18

---

**T**

**Table** [4] 46:13 46:14 160:
22 165:25

**Talks** [1] 130:4

**Tan** [1] 74:7

**Tator** [4] 97:11 97:13 97:
15 97:18

**Telephone** [5] 1:1 16:14
28:4 28:5 72:12 116:16 118:7

**Television** [1] 193:3

**Ten** [1] 47:1

**Tender** [10] 22:18 23:7 23:
18 55:3 75:7 76:3 77:4 181:
18 184:16 184:22

**Tendering** [2] 63:8 185:3

**Tentatively** [1] 148:20

**Terminology** [1] 178:2

**Terms** [2] 95:18 168:19

**Terrence** [142] 7:5 7:11
7:20 7:21 7:25 8:20 9:8 10:
5 10:10 11:2 12:2 12:14 14:
1 14:6 14:16 17:12 20:16 20:
18 23:2 23:4 24:5 28:7 28:8
28:9 28:10 28:22 29:17 29:
20 32:13 34:19 37:25 38:12
41:3 41:4 41:6 41:8 41:15
41:18 42:21 42:22 42:24 43:
4 43:5 43:5 44:4 44:5 44:6
44:7 45:1 45:5 45:22 47:17
47:21 50:3 52:13 61:8 62:20
66:20 66:20 68:15 68:17 68:
20 68:20 70:11 76:22 76:23
77:10 77:15 81:16 83:14 84:
25 95:15 97:9 99:3 103:4
103:13 103:25 104:10 104:12
104:14 104:19 105:8 107:4
107:7 107:15 107:20 108:1
110:24 111:22 112:25 113:3
115:22 115:23 115:16 117:18
117:3 117:8 117:10 119:11
126:4 126:25 130:5 131:22
136:8 136:11 136:12 138:6

139:9 145:2 145:7 145:9 145:10 145:25 146:6 153:3 153:5 154:24 156:24 157:1 157:3 157:7 157:11 158:2 158:3 158:8 158:23 158:25 159:2 159:3 159:8 159:18 160:25 161:10 161:13 162:9 162:22 164:15 167:9 169:10 169:11 169:12 189:21

**Terrence's** [3] 66:23 135:22 136:25

**Test** [3] 51:9 51:10 55:14

**Testified** [17] 19:2 59:12 59:17 60:16 61:14 94:3 113:19 142:10 149:7 153:2 163:15 165:1 165:23 170:22 175:21 184:10 184:11

**Testify** [1] 169:4

**Testifying** [2] 113:18 124:23

**Testimony** [18] 78:19 101:25 102:17 106:14 107:24 121:20 123:2 124:16 125:18 131:19 132:10 136:19 136:21 160:25 164:4 164:16 165:3 167:5

**Testing** [3] 56:18

**Tests** [3] 122:3 122:11 125:22

**Texas** [24] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 3:6 3:10 3:12 3:13 3:14 3:14 5:2 5:4 5:5 5:6 5:6 80:2 196:1 196:4 196:16 196:17 196:18

**Thanksgiving** [2] 86:4 86:5

**Thinking** [6] 105:14 119:7 120:11 124:13 132:11 141:4

**Third** [9] 52:24 76:15 101:21 108:11 108:13 156:2 180:6 180:19 183:19

**Thomas** [14] 6:4 6:8 24:23 25:1 25:3 25:6 84:8 84:13 84:14 84:18 92:5 147:22 148:4 148:5

**Thousand** [3] 7:7 93:15 106:13

**Three** [32] 7:22 9:13 12:3 13:7 19:21 21:15 25:4 25:4 71:4 82:4 82:6 82:20 84:23 85:12 86:22 91:14 95:8 131:8 131:21 131:22 136:13 147:21 148:16 148:23 149:3 149:6 149:20 149:21 158:18 172:25 176:20 191:17

**Three-week** [1] 84:24

**Threw** [2] 66:7 188:24

**Throat** [1] 71:16

**Throughout** [1] 165:1

**Throwing** [1] 188:20

**Ths** [1] 125:21

**Tim** [1] 87:2

**Timmy** [31] 6:4 6:8 24:20 24:21 24:22 24:23 25:1 25:3 25:6 26:7 26:11 84:7 84:13 84:14 84:18 85:6 86:11 86:13 86:17 86:19 86:19 87:20 90:9 92:5 92:16 93:2 93:6 147:22 147:24 148:11 148:13

**Tipped** [1] 180:24

**Tires** [1] 146:16

**Today** [9] 21:21 21:24 67:6 147:14 149:7 175:17 175:19 192:20 192:22

**Together** [14] 9:7 20:6 24:19 82:6 82:7 82:8 82:11 90:12 93:21 100:19 108:18 109:13 112:19 112:22

**Tomorrow** [4] 192:9 193:24 195:7 195:18

**Took** [29] 14:12 17:3 18:13 35:11 35:11 37:19 44:7 66:12 66:13 67:10 67:12 68:25 95:8 101:15 112:25 116:23 124:2 125:13 128:5 134:24 135:10 136:12 137:6 137:24

140:14 141:5 156:11 179:15 182:6

**Top** [2] 122:13 186:15

**Topic** [1] 160:21

**Total** [4] 31:20 71:2 148:23 196:10

**Touch** [2] 89:9 102:19

**Toward** [1] 66:3

**Towards** [15] 57:24 58:1 58:18 124:3 129:13 135:15 139:5 139:15 143:18 145:1 145:5 157:25 158:1 174:25 176:10

**Town** [6] 21:18 40:10 116:7 117:1 118:19 166:25

**Traced** [1] 16:5

**Traffic** [1] 191:20

**Trail** [4] 190:14 190:22 191:1 191:7

**Transcription** [1] 196:5

**Transcription/stenograph** [1] 1:23

**Transit** [2] 19:18 19:20

**Transpired** [2] 50:20 64:18

**Trash** [1] 81:1

**Travel** [1] 166:25

**Traveled** [1] 11:12

**Trees** [2] 11:12 128:14

**TRIAL** [1] 1:3

**TRIAL-GUILT/INNOCENCE** [1] 1:15

**Trick** [1] 7:9

**Tried** [4] 49:25 52:8 66:10 135:7

**Tries** [1] 13:1

**Trouble** [1] 14:11

**Trouser** [1] 179:15

**True** [3] 106:4 121:4 196:4

**Truly** [1] 196:9

**Trust** [1] 8:25

**Trusts** [2] 165:10 165:12

**Truth** [2] 81:6 105:18

**Try** [13] 7:6 7:8 16:7 67:25 77:25 103:19 108:6 108:14 123:3 125:5 125:9 134:3 159:13

**Trying** [22] 8:23 15:2 29:22 34:14 66:11 91:3 92:20 95:24 96:20 100:18 107:12 113:24 114:3 132:15 133:10 134:5 136:17 136:18 185:9 188:25 189:10 190:19

**Tube** [1] 71:16

**Tubes** [2] 71:14 71:15

**Tuesday** [2] 15:19 17:6

**Turkey** [1] 134:10

**Turn** [14] 12:6 58:16 60:8 60:17 129:18 129:19 143:18 145:1 174:13 174:19 183:15 191:25 193:4 193:4

**Turned** [14] 53:19 53:20 60:20 65:1 66:3 134:9 156:24 157:5 157:14 157:19 174:14 174:15 174:15 188:10

**Turning** [3] 144:25 144:25 146:10

**Turns** [6] 11:18 13:3 13:14 15:12 60:5 130:10

**Twenty** [22] 7:7 25:24 38:20 47:10 82:2 82:2 82:4 88:8 88:11 88:18 89:11 93:7 93:14 94:1 94:18 94:19 94:21 101:11 106:13 114:14 119:7 147:20

**Twenty-five** [6] 19:16 47:10 81:23 82:2 114:14 115:16

**Twenty-four** [2] 82:2 93:7

**Twenty-six** [1] 82:2

**Twenty-three** [1] 82:4

93:8 147:20

**Twenty-two** [1] 147:20

**Twist** [2] 17:21 18:1

**Twists** [1] 18:7

**Two** [37] 4:25 7:3 7:14 7:23 24:8 31:9 31:21 50:12 52:19 71:15 82:5 84:20 84:23 84:24 114:2 118:8 127:15 131:9 147:18 147:20 148:17 155:3 157:6 172:24 173:3 173:18 176:19 176:20 179:21 180:18 186:15 186:16 188:13 188:16 189:11 191:16 191:17

**Type** [8] 8:16 51:7 74:5 82:5 93:3 147:15 168:3 189:25

## U

**U.S.** [1] 14:22

**Ultimately** [3] 89:7 107:25 123:21

**Unclear** [1] 44:3

**Unfold** [1] 108:10

**Unlawfully** [2] 3:17 5:9

**Unless** [3] 96:22 133:7 184:14

**Unusual** [3] 172:22 180:17 192:22

**Up** [130] 7:3 8:7 9:19 10:9 12:19 14:21 14:24 15:8 17:8 19:7 19:14 25:19 26:24 26:25 28:8 34:18 39:17 41:10 41:11 42:11 42:12 42:16 42:18 42:24 43:3 43:4 52:23 52:25 54:22 55:7 56:14 57:9 57:11 59:24 62:9 65:7 66:7 67:1 67:10 67:20 67:21 68:1 69:3 81:18 82:24 88:3 89:24 92:24 92:25 95:2 95:25 96:6 96:25 98:1 99:16 99:19 103:3 103:5 103:9 103:19 103:19 104:3 104:6 107:9 107:25 109:23 110:20 112:23 113:11 114:7 115:4 121:7 127:6 127:24 129:8 129:13 129:14 131:25 132:16 134:9 134:10 134:13 135:3 135:3 135:4 135:22 136:4 136:17 136:24 137:3 137:12 140:20 142:20 144:14 146:17 155:8 156:4 156:6 158:5 158:7 160:13 166:24 168:9 176:9 176:22 176:23 177:1 177:2 179:3 179:5 179:8 179:10 179:11 180:25 181:12 182:10 182:12 186:2 186:16 187:8 189:3 189:14 190:20 191:6 194:21 195:6

**Upset** [3] 92:19 93:2 93:4

**Upside** [1] 59:22

## V

**Vacant** [2] 11:11 18:13

**Varied** [1] 171:17

**Vehicle** [23] 7:20 10:6 30:9 45:16 45:18 61:9 75:22 75:23 103:10 121:23 127:3 127:16 130:11 131:11 131:17 131:21 139:10 155:11 155:13 174:23 174:23 175:6 175:7

**Vehicles** [2] 187:11 187:13

**Version** [1] 163:14

**Versus** [3] 3:6 3:10 5:2

**Victoria's** [6] 8:7 14:20 14:12 35:12 37:1 97:1

**Villages** [1] 171:13

**Voice** [2] 55:7 145:3

**Voir** [4] 36:10 36:13 61:4 61:6

**Volume** [2] 1:2 196:6

**VOLUMES** [1] 1:2

**VS** [1] 1:8

## W

**Wait** [1] 138:1

**Waiting** [1] 172:23

**Walk** [15] 27:20 39:9 39:11 94:5 94:9 96:11 96:13 98:10 106:20 108:7 117:6 119:8 121:9 162:16 165:10

**Walked** [5] 34:3 129:13 136:8 138:24 158:23

**Walking** [4] 68:8 139:4 139:14 159:22

**Wall** [1] 49:10

**Walter** [51] 6:2 6:7 6:11 6:14 6:17 6:23 6:25 6:25 7:3 7:11 7:16 8:3 8:10 8:18 8:23 9:8 10:5 10:7 10:13 11:2 11:25 12:18 12:18 12:20 12:25 13:24 14:4 14:16 14:25 15:1 15:18 15:20 15:21 16:1 18:19 19:1 19:6 19:7 19:13 36:15 61:8 62:7 74:4 77:21 91:1 142:19 150:13 150:17 151:10 188:10 188:12

**Walters** [4] 7:23 12:24 55:10 152:23

**Wants** [4] 27:22 84:9 85:13 86:8

**Ward** [13] 99:14 102:22 104:23 105:23 108:22 109:9 109:19 110:1 110:17 111:13 113:25 124:20 140:13

**Wash** [4] 111:8 112:6 112:19 140:15

**Watch** [3] 107:21 176:24 194:12

**Watching** [3] 103:5 105:8 140:12

**Wayne** [6] 2:12 77:21 78:15 143:6 170:21 171:1

**Ways** [3] 105:20 114:24 158:16

**Weak** [2] 69:18 159:21

**Weapon** [7] 3:20 5:12 169:13 169:17 173:25 178:20 178:23

**Weapons** [3] 175:8 177:20 190:13

**Wear** [1] 193:19

**Wearing** [7] 21:24 22:1 74:6 74:7 184:4 194:3 195:19

**Week** [10] 6:16 36:19 71:4 71:6 78:5 78:9 84:21 128:5 192:8 193:25

**Week-and-a-half** [1] 84:22

**Weeks** [3] 21:15 71:4 84:23

**Welcome** [1] 194:14

**Wentz** [3] 2:17 4:5 79:3

**Westridge** [3] 171:13 171:13 181:25

**Wheel** [2] 65:2 132:8

**Whereabouts** [8] 29:15 30:14 31:8 40:9 41:4 58:9 60:9 65:11

**White** [3] 22:2 81:3 89:20

**Whole** [4] 27:8 81:20 88:7 105:14

**Wide** [1] 180:9

**Wilkinson** [1] 1:20

**Willing** [2] 98:11 100:23

**Winchester** [2] 17:6 18:12

**Window** [8] 12:20 65:7 65:9 65:10 129:25 132:3 132:4 155:20

**Windows** [3] 12:19 127:6 173:10

**Withdraw** [1] 169:5

**Witness** [25] 18:19 22:4 22:7 30:5 32:18 36:10 61:3 72:23 73:25 74:17 77:17 144:1 144:2 144:6 145:4 145:18

145:1...145:20 149:3 169:10
169:4 170:19 178:18 192:4
196:12

**Witnesses** [4] 18:15 125:
15 193:10 194:4

**Wonder** [1] 55:10

**Wondered** [1] 116:14

**Wooded** [1] 191:4

**Woods** [3] 138:25 188:7
191:8

**Words** [7] 84:5 84:18 96:8
131:12 146:22 189:6 195:17

**Worried** [1] 142:7

**Worry** [1] 101:17

**Worrying** [1] 117:22

**Wounded** [1] 14:10

**Wounds** [1] 189:9

**Wrapped** [1] 8:7

**Write** [2] 71:23 141:9

**Writing** [2] 141:13 196:5

**Written** [7] 16:25 61:12
61:22 163:9 163:13 163:14
192:23

**Wrote** [2] 72:3 141:13

## Y

**Y'all** [34] 20:6 25:18 28:
3 28:13 29:1 30:17 30:19 38:
18 41:2 41:11 41:20 42:24
43:24 47:12 54:20 56:25 57:
3 57:16 58:4 58:5 62:14 68:
6 70:10 76:4 141:19 160:22
165:24 166:2 167:6 168:13
173:20 174:4 183:13 195:14

**Year** [1] 20:20

**Years** [7] 19:21 25:4 25:5
82:2 82:6 86:22 147:21

**Yelled** [2] 174:22 176:16

**Yelling** [1] 133:15

**Younger** [3] 20:11 20:12
20:13

**Yourself** [5] 123:10 123:
13 123:16 163:12 171:19

**Yourselves** [1] 192:16

## Z

**Zigzag** [1] 190:22

**Zigzagging** [1] 191:2

1      REPORTER'S RECORD

2      VOLUME 17 OF 25 VOLUMES

3      TRIAL COURT CAUSE NO. 800112

4

5      CHARLES MAMOU, JR.        )    IN THE DISTRICT COURT

6             Appellant         )

7                               )

8      VS.                      )    HARRIS COUNTY, TEXAS

9                               )

10     THE STATE OF TEXAS       )

11            Appellee          )    179TH JUDICIAL DISTRICT

12

13

14                    *******************

15                 TRIAL-GUILT/INNOCENCE

16                    *******************

17

18        On the 5th day of October, 1999, the following

19     proceedings came on to be heard in the above-entitled and

20     numbered cause before the Honorable Mike Wilkinson, Judge

21     Presiding, held in Houston, Harris County, Texas:

22        Proceedings reported by computer aided

23     transcription/stenograph machine.

24

25

```
 1              A P P E A R A N C E S

 2      MR. LYN MCCLELLAN

 3      SBOT NO. 13396100

 4      MS. CLAIRE CONNORS

 5      SBOT NO. 0470500

 6      Assistant District Attorneys

 7      201 Fannin

 8      Houston, Texas 77002

 9      Phone:  713.755.5800

10      ATTORNEYS FOR THE STATE OF TEXAS

11

12      MR. WAYNE HILL

13      SBOT NO. 59656300

14      4615 Southwest Freeway

15      Houston, Texas 77027

16      PHONE:  713.623.8312

17      MR. KURT WENTZ

18      SBOT NO. 21179300

19      5629 W FM 1960

20      Houston, Texas 77069

21      PHONE:  281.587.0088

22      ATTORNEYS FOR THE DEFENDANT
23

24

25
```

i

# INDEX

## VOLUME 17 OF 25

|  | | | | PAGE | VOL. |
|---|---|---|---|---|---|
| October 5, 1999 | Trial-Guilt/Innocence | | | | 17 |

| State's Witnesses | Direct | Cross | V. D. | | VOL. |
|---|---|---|---|---|---|
| John Wayne McDonald | 25,34 | 3,30 | | | 17 |
| Jeff Cruser | 36,68 | 55,70 | | | 17 |
| Oral L. Warren | 71 | 79 | | | 17 |
| Detective Ted Bloyd | 85,127 | 100,132 | | | 17 |
| Glen Riddle | 137,154 | 146,155 | | | 17 |

| | | | | PAGE | VOL. |
|---|---|---|---|---|---|
| Court concluded | | | | 156 | 17 |
| Court Reporter's Certificate | | | | 157 | 17 |

## ALPHABETICAL INDEX

| State's Witnesses | Direct | Cross | V. D. | VOL. |
|---|---|---|---|---|
| Bloyd, Detective Ted | 85,127 | 100,132 | | 17 |
| Cruser, Jeff | 36,68 | 55,70 | | 17 |
| McDonald, John Wayne | 25,35 | 3,30 | | 17 |
| Riddle, Glen | 137,154 | 146,155 | | 17 |
| Warren, Oral L. | 71 | 79 | | 17 |

## EXHIBITS

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---|---|---|---|---|
| Exhibit 20 | Photo | 47 | 47 | 17 |
| Exhibit 21 | Photo | 74 | 74 | 17 |
| Exhibit 22 | Diagram | 39 | 40 | 17 |
| Exhibit 26 | Fired cartridge casing | 41 | 41 | 17 |

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---------|-------------|---------|----------|--------|
| Exhibit 27 | Fired cartridge casing | 41 | 41 | 17 |
| Exhibit 28 | Fired cartridge casing | 41 | 41 | 17 |
| Exhibit 29 | Fired cartridge casing | 41 | 41 | 17 |
| Exhibit 30 | Fired cartridge casing | 41 | 41 | 17 |
| Exhibit 31 | Victoria's Secret bag | 43 | 43 | 17 |
| Exhibit 45 | Videotape | 52 | 52 | 17 |
| Exhibit 63 | Photo | 92 | 93 | 17 |
| Exhibit 64 | Photo | 92 | 93 | 17 |
| Exhibit 66 | Photo | 94 | 94 | 17 |
| Exhibit 67 | Photo | 139 | 139 | 17 |
| Exhibit 68 | Photo | 139 | 139 | 17 |
| Exhibit 69 | Photo | 139 | 139 | 17 |
| Exhibit 70 | Photo | 139 | 139 | 17 |
| Exhibit 71 | Photo | 139 | 139 | 17 |
| Exhibit 72 | Photo | 139 | 139 | 17 |
| Exhibit 73 | Photo | 139 | 139 | 17 |
| Exhibit 74 | Photo | 139 | 139 | 17 |
| Exhibit 75 | Photo | 139 | 139 | 17 |
| Exhibit 79 | Bullet fragment | 100 | 100 | 17 |
| Exhibit 84 | Fired bullet | 146 | 146 | 17 |

| DEFENSE | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---------|-------------|---------|----------|--------|
| Exhibit 1 | Diagram | 24 | 24 | 17 |
| Exhibit 2 | Drawing | 153 | 153 | 17 |

**3**

1    THE COURT:  Bring in the jury.
2        (Jury is brought in and seated.)
3    THE COURT:  Proceed, sir.  I believe when
4  we recessed yesterday afternoon, the State had passed
5  this witness.  By the way, could y'all take a look and
6  see if any witnesses are in the courtroom who were sworn
7  or need to be sworn?
8        Proceed, please.
9    MR. HILL:  Your Honor, may I approach the
10  witness for a moment?
11    THE COURT:  Yes.
12            CROSS-EXAMINATION
13  BY MR. HILL:
14    Q.  Mr. McDonald, Mr. McClellan just gave me a copy
15  of the statement you made to the Houston Police
16  Department.  If you would just take a moment to review
17  that, I'd like to ask you a couple of questions.
18    A.  All right.
19    Q.  Have you had a chance to review it?
20    A.  Yes.
21    Q.  Okay.  I'll ask you a couple of questions about
22  the report that you made in a few moments.  I'd like to
23  just kind of go back for a few moments and ask you, what
24  type of training did you receive in order to become
25  commissioned as a security officer?  What was required

**4**

1  for you to do that?
2    A.  First of all, I had went through National
3  Security Academy.  Instead of just getting my security
4  certification as a commissioned security officer, I also
5  went through level one training, private investigations,
6  bodyguard, bounty hunting, and several other things of
7  that nature.
8    Q.  Are there schools that you have to receive
9  instruction from in order to seek that certification?
10    A.  Yes, sir, it is.
11    Q.  How many hours of schooling did you have to
12  complete?
13    A.  Total, as far as what I've taken, I'm not even
14  sure.  It was -- I was going for several months.
15    Q.  You said you went for several months?
16    A.  Yes.
17    Q.  When did you start working as a commissioned
18  security guard?
19    A.  With this company or just period?
20    Q.  Well, starting with your entire employment with
21  security companies.
22    A.  Let me see.  I believe it was back in '96 or
23  '97.
24    Q.  So, either '96 or '97?
25    A.  Yes.

**5**

1    Q.  And you started working for the company where
2  you did security at Villages of Westridge when?
3    A.  When was I employed with them?
4    Q.  Yes.
5    A.  The beginning date, I'm not even sure.  It was
6  probably about exactly a year ago.
7    Q.  Okay.  Sometime around this time of '98,
8  October of '98?
9    A.  Yes; maybe a little sooner, yes.
10    Q.  Did you always work with Mr. Gunner as your
11  partner when you were doing the work at Villages of
12  Westridge?
13    A.  No, sir, no, I did not.
14    Q.  But on that particular evening, on December 6th
15  of '98, he happened to be who you were working with as a
16  partner?
17    A.  Yes, sir.  I'm one of the regular officers at
18  the site.  One of the other officers wasn't there, so he
19  fills in sometimes.
20    Q.  He's like a substitute?
21    A.  Yes.
22    MR. HILL:  Judge, could I have the witness
23  step down for a moment?  I'd like to have him use the
24  easel.
25    THE COURT:  Yes.

**6**

1    Q.  (BY MR. HILL)  What I'd like you to do,
2  Mr. McDonald, is if you would, draw just a small diagram
3  showing McNee Street and Murworth and Lantern Point,
4  just the area that you went to where you saw the scene,
5  okay?  Using the top portion, I guess, would be south
6  and this would be north; because that's the way it's
7  depicted on the diagrams that the State has used.  So if
8  you need to look at the diagram for a moment, give you
9  some orientation, where was it on State's Exhibit No.
10  24, the -- where you responded to?
11    A.  It was right here.
12    Q.  Okay.  All the way at the end by McNee?
13    A.  Closer, right here.
14    Q.  Okay.  Would you go ahead and concentrate on
15  that section then and draw that on the board here?  So,
16  this is  Murworth here?
17    A.  Yes, okay.
18    Q.  Okay.  Using the new magic marker, if you will
19  show me -- mark on there where the body of the
20  individual that had died would be; and make it kind of
21  small, because there is going to be several spots that
22  we want to address on this exhibit.  All right.  And you
23  came generally from this direction, down McNee and up
24  Lantern Point? --
25    A.  Yes.

7

1      Q.  -- correct?  Where was the individual -- and
2   if you would, use the red pen -- show us where the
3   individual that came walking up and was going towards
4   the gun was coming from.  And if you could, show us
5   where you first saw him; and make a couple of dashes to
6   where he was in relation to the gun.  Okay.  Now is this
7   mark here, is that supposed to be the gun?
8      A.  Yes.
9      Q.  So, can I put "gun" right here?
10     A.  Yes.
11     Q.  How far a distance is it?  Now this is the man
12  that is dead, correct?
13     A.  Yes.
14     Q.  How far a distance is it from that person to
15  the gun down here?
16     A.  Roughly, I'd say seventy-five, seventy-eight.
17     Q.  Seventy-five feet.  I'll put seventy-five feet
18  between that point and this point here, right?
19     A.  Yeah.
20     Q.  All right.  Now where was the individual that
21  had been shot in the stomach, in the chest, when you
22  came on the scene?  I tell you what.  Use the black one.
23  That way we can have some contrast.
24     A.  He would be laying right here close to the --
25  with his hand kind of lying in that direction.

8

1      Q.  Okay.  So when you come up McNee and turn onto
2   Lantern Point, this is basically what you see.  You see
3   a man that is standing in -- on Lantern Point?
4      A.  When we first pulled up, he was first standing
5   close to the curb.  And then he kind of gradually walked
6   over in the street, and then he looked up -- okay, first
7   he was standing close to the curb.  And when we were
8   pulling up, he more so came out towards the street.  And
9   when he got out the car and he looked up and seen us,
10  that's when he ran towards us, which is a little bit
11  further out into the street.
12     Q.  What type of vehicle are you two in?
13     A.  We were in a red Ford Ranger, if I'm not
14  mistaken.  It's a red smaller pickup truck.
15     Q.  Does it have any type of identifying signs on
16  it, security signs or anything?
17     A.  No.
18     Q.  As you're coming up the street, you're driving
19  the vehicle or is Gunner?
20     A.  Gunner is driving.
21     Q.  And you're in the passenger side.  Where does
22  your vehicle stop?
23     A.  It stopped right here.
24     Q.  Okay.  And then you get out and you see this
25  person here walking toward or running towards the gun?

9

1      A.  I come more so at an angle here, and Gunner
2   comes more so there.
3      Q.  And -- can I write Gunner here?
4      A.  Yes.
5      Q.  And this is you?
6      A.  Yes.
7      Q.  Tell the members of the jury again what you see
8   this individual doing with regard to the gun that's on
9   the ground.
10     A.  Okay.  Basically, when we got out the car, I
11  came across from the passenger side at kind of a curve,
12  trying to look around and survey the area to see if
13  there were any other persons around with any weapons, or
14  just anybody around.  While we're walking up, Gunner is
15  more so kind of walking towards the heavyset male shot
16  in the back.  And I kind of looked at both of them, but
17  I more so the guy that's staggering so I can check him
18  out to see why he's staggering.  I asked both of them if
19  they were all right.
20     Q.  Did they both respond to you?
21     A.  First he didn't say anything.  When I asked
22  that, he looks up, sees that, and that's when he starts
23  rushing towards the gun.  I see him.
24     Q.  Show what he -- show the jury what you -- what
25  you mean when you say rushing towards the gun.

10

1      A.  First he's slow staggering, holding his arm;
2   and while we were approaching, I asked if they were all
3   right.  First he just looked up.  The heavyset male did
4   not say anything, but he looked up at me.  The guy shot
5   in the arm looked up at me.  And at that point he looked
6   at me, and he looked down at the ground.  And when he
7   looked down at the ground, I also looked.  And I looked
8   back at him.  He started rushing real quick over towards
9   the gun.
10     Q.  And you saw the gun there?
11     A.  When I see the gun, that's when I yelled "gun"
12  to my partner, to Gunner.  And I ran over and hurry up,
13  picked it up, stepped over and told him to watch them
14  while I --
15     Q.  Okay.  Have a seat.  Do you recall when you
16  spoke to these two individuals what their names were,
17  or have you since learned what their names were?
18     A.  If I'm not mistaken, the heavier set male is
19  Mr. Walter.
20     Q.  That's the person that you're saying was on the
21  ground next to the gun here?
22     A.  Yes.
23     Q.  Want to make sure you see.  I'm going to put
24  Kevin Walter right there.
25     A.  Okay.

11

1    Q.  And this other individual here that was running
2  towards the gun, do you know what his name was?
3    A.  He told me at the time, but --
4    Q.  Is Dion Holley the name you remember him
5  giving?
6    A.  Possibly, I think that is the name, if I'm not
7  mistaken.
8    Q.  And that's this person here?
9    A.  Yes, sir.
10   Q.  All right.  After you kicked the gun away and
11 are able to pick it up, you indicated that you
12 immediately released the clip?
13   A.  Yes, sir.
14   Q.  Pulled back the slide, locked it so that there
15 was no ammo in the chamber?
16   A.  Yes, sir.
17   Q.  And I believe you testified yesterday that in
18 order for that particular weapon to fire, a person would
19 have to pull back the slide, which would then cause a
20 bullet to come out of the magazine or the storage area
21 into the chamber?
22   A.  Yes, sir.
23   Q.  Now, did you check the gun to see whether it
24 was in working order prior to releasing the clip from
25 the gun?

12

1    A.  Yes.  When you say working order --
2    Q.  Did you ever perform any tests to see whether
3  or not the clip would cause a round to come into the
4  chamber correctly?
5    A.  No, sir, I did not want any to go into the
6  chamber.  I was trying to do it the safest way possible
7  without firing that weapon.
8    Q.  Okay.  Now if a person had just put the clip in
9  the gun and not pulled the slide back yet, that would
10 have been the condition that the gun would be in, right?
11   A.  Yes, sir.
12   Q.  Now you have secured the scene essentially.
13 You have removed that weapon from the possession of
14 either Mr. Walter or Mr. Holley?
15   A.  Yes, sir.
16   Q.  Is Mr. Holley standing there when you talked to
17 him, or did you tell him to sit down?
18   A.  After I picked up the gun and got away from
19 him, whatever, I kept on yelling for him to lay down.
20 After telling him about two or three times, he finally
21 did eventually lay down.
22   Q.  Did you want him to sit down or lay down in
23 order to make sure that he could not be a threat to you
24 in any way?
25   A.  I did it for two reasons.  One was a safety

13

1  precaution for myself and my partner.  We didn't know if
2  he had any other weapons on him.  And also for the fact
3  I did see the blood on his arm and everything, and I was
4  trying to get him to calm down.  I didn't want him to go
5  into shock or anything else, so I was trying to do that
6  as a precaution for him, also.
7    Q.  What about Mr. Walter that initially is laying
8  on the ground?  Does he sit up at some point?
9    A.  He's kind of leaned back at an angle on his
10 elbow, on his right elbow, kind of laid at an angle on
11 his side.
12   Q.  As you're standing there, after you've said
13 "gun" and Gunner's watching and the scene is secure, do
14 they start relating to you what had just happened, or do
15 you have to ask questions?
16   A.  At that point I'm still kind of at a state
17 where I'm trying to still scan the area and make sure
18 there is nobody else that could be a threat to us or
19 anybody else that's injured, so I didn't really start
20 asking questions right away.  I waited until I was kind
21 of sure about anybody else being out there.
22   Q.  Had you already seen and discovered the body of
23 the dead man up a little bit closer to Murworth?
24   A.  No, we hadn't.
25   Q.  That comes later?

14

1    A.  Yes.
2    Q.  So does several minutes go by?  How long a
3  period of time?
4    A.  No, not several minutes.  After I had
5  Mr. Holley, I think it is, the one shot in the arm --
6    Q.  Yes, sir.
7    A.  -- after I had him lay down and while I was
8  scanning the area, there was a vehicle coming that just
9  turned off of McNee onto Lantern Point, and which I ran
10 down behind our truck to stop them and tell them to go
11 around and also get some help, we need some help, that
12 we have some people down over here, to please go call
13 the police or 911.  So they turned around.  Then I came
14 back; and at that point I didn't really see anybody
15 else, as far as any threats.
16        And plus, I also asked them if they had
17 any other weapons on them or anything that could harm us
18 or them, and they said no.  I said, Well, you don't mind
19 if I pat you real quick, just to be on the safe side.
20 They said no.  So I just kind of patted them down real
21 quick while they were sitting down on the ground, just
22 to make sure they didn't have any other weapons at that
23 point.  I told Gunner, just check around the area
24 quickly; see if there was anybody else around.  And
25 right before he was fixing to check the area, they asked

15

1    something about their partner.  Where is their partner
2    at, or something like that.
3       Q.  First thing they say to you is, Where is our
4    partner?
5       A.  Yes.
6       Q.  Is that the first you hear of another person
7    being there with them?
8       A.  Yes, sir.
9       Q.  And do they direct you in any direction to find
10   their partner?
11      A.  No, sir, they didn't.
12      Q.  Do they tell you his name at all?
13      A.  No, they don't.
14      Q.  Do you assume, or was it clear to you from
15   talking to them, that they were talking about a male
16   individual?
17      A.  Well, from the way that they were speaking.
18   Their exact words, I really can't remember.  But from
19   the way they were speaking, I did kind of figure that it
20   was possibly a male.
21      Q.  All right.  What was their demeanor?  By that,
22   I mean, were they acting real excited, or were they
23   calmed down, sitting there, one leaning on his elbows
24   the other sitting on the street while you're talking to
25   them?

16

1      A.  Mr. Walter was more so kind of -- he was a
2    little more calmer than Mr. Holley was.  He was just
3    kind of laying down, letting us know that his chest or
4    his stomach was burning.  He was asking how should he
5    lay, because it's hurting.  Basically, that's all he was
6    doing, while Mr. Holley, he was kind of more so in an
7    upset state.  Oh, man, I'm going to die.  I'm going to
8    die.  I'm in pain.  I'm going to die.  What should I do?
9    Just calm down, lay down.  But he was more so -- he was
10   more excited than Mr. Walter was.
11      Q.  At some point, as you're standing there talking
12   with him, does Mr. Holley make a statement to you about
13   stopping to help anyone?
14      A.  Yes, he made that statement after we found
15   the -- well, the third guy, the male without the pulse.
16      Q.  Tell the members of the jury how Mr. Holley
17   made a statement.  What type of demeanor did he reflect
18   at that point?  What did he do?
19      A.  Basically, when he did mention that I had asked
20   him -- I was asking him, you know, what happened.  And
21   he basically told me that they were turning off McNee
22   onto Lantern Point, and they seen a car stopped on the
23   side of the road with their hood up, and they stopped to
24   see if they could be of any help.  And when they stopped
25   to help and got out the car, they blocked them in.

17

1    That's what he said.  They blocked them in.  And I said,
2    What do you mean, they blocked you in?  He said, Well,
3    another car pulled up and blocked us in so we couldn't
4    get out.
5       Q.  So was he stating to you there were actually
6    three cars at that location?
7       A.  That's what he told me at first, yes.
8       Q.  And you don't know whether that was true or
9    not; you weren't there?
10      A.  No, sir.  As far as seeing any vehicles no, we
11   didn't.  When we came up to Jack In The Box, we heard
12   the shots.  We looked back to see if there were any
13   vehicles in the area so we could possibly see a
14   description; but we didn't see any headlights, no
15   vehicles leaving the area, or anything.
16      Q.  All right.  Which side of the street did he say
17   they had been parked on when this occurred?
18      A.  He said they were parked on the southbound side
19   of the road.  I mean -- excuse me -- the northbound side
20   of the road.
21      Q.  Which side would that be, if I'm pointing --
22   you tell me, is there a vehicle supposedly on this side?
23      A.  No.  They pulled up on the other side.
24      Q.  On this side?
25      A.  Yes.

18

1      Q.  Did they say where their car was pointed to?
2      A.  They didn't exactly say which way it was
3    pointing to.
4         MR. MCCLELLAN:  I object to being
5    nonresponsive then.
6         THE COURT:  Sustained.
7      Q.  (BY MR. HILL)  Okay.  But you're saying the car
8    was here?
9       A.  On that side of the road, roughly.
10      Q.  Do you recall -- if you will turn to your
11   statement.
12      A.  I think I might have left it where I was
13   sitting.
14      Q.  I want to distinguish the statements made by
15   the guy that was shot in the back that was lying there
16   that we identified as Kevin Walter and those statements
17   made by Dion Holley.
18      A.  Okay.
19      Q.  First off, who is the first one that explains
20   to you this story about stopping and being robbed, I
21   guess?
22      A.  They were both kind of throwing little bits and
23   pieces.  But for the most part, the person that was
24   doing most of the talking at that point was Mr. Holley.
25      Q.  Mr. Holley?

19

```
 1      A.  Yes.  He was doing most of the talking, because
 2  he was kind of keep cutting off Mr. Walter.
 3      Q.  Do you recall whether or not, when Mr. Holley
 4  was describing to you the fact that they had stopped to
 5  help somebody -- do you recall him laughing and saying,
 6  Man, that's the last time we're going to stop and help
 7  anybody?
 8      A.  Yes, sir, I do.
 9      Q.  And that was while he's standing there with his
10  arm bleeding?
11      A.  Well, laying there, yes.
12      Q.  And when is it that they first mention anything
13  about a girl?
14      A.  They first mentioned that when I asked them
15  where did the gun come from?  Whose gun was it?
16      Q.  And what did they respond?
17          MR. MCCLELLAN:  Object to they.  They
18  can't respond.
19          THE COURT:  Rephrase it.
20      Q.  (BY MR. HILL)  Who was responding to your
21  question?  Which one of the two?
22      A.  As far as the gun?
23      Q.  Yes, sir.
24      A.  Okay.  Mr. Walter.
25      Q.  Okay.  Would that appear on the bottom of your
```

20

```
 1  statement, on Page 2 of your statement?
 2      A.  Yes, sir.
 3      Q.  All right.  Do you recall Mr. Walter telling
 4  you that the gun at the scene, the 9 millimeter that you
 5  identified yesterday -- did Mr. Walter tell you that
 6  that gun actually belonged to one of the individuals
 7  that attempted to jack them, hold them up?
 8      A.  Yes, sir, he did.  After he did tell me, you
 9  know, how the gun got there.
10      Q.  He does not tell you that that gun belonged or
11  was with any of the three people, either him,
12  Mr. Gibson, or Mr. Holley, did he?
13      A.  No, sir.
14      Q.  He left you with the distinct impression that
15  that gun at the scene there belonged to one of the
16  people that, quote, was trying to jack him?
17      A.  Yes, sir.
18      Q.  Did he also describe for you the color of the
19  vehicle that drove off?  Now, obviously there was a
20  vehicle that they were in that you described as a blue
21  Lexus, but did he describe -- or who described for you
22  that vehicle?
23      A.  As far as who describes the vehicle, I can't
24  remember exactly which one it was; so, I believe it
25  might have been Mr. Holley, but I'm not exactly sure
```

21

```
 1  about that.
 2      Q.  What color and what type of car does that
 3  individual describe to you?
 4      A.  A red Dodge Intrepid.
 5      Q.  The area that you've reflected here on
 6  Defendant's Exhibit No. 1, what is the area like where
 7  Dion Holley was walking from?  In other words, can you
 8  describe the area over here in this area?
 9      A.  It's real rough, high grass that's over there
10  that covers the whole field.  Doesn't look like that
11  exactly now, but at the time it did.
12      Q.  That was going to be my next question.  The
13  exhibits the State has introduced into evidence,
14  especially Exhibit No. 24, it shows what appears to be
15  some new construction or grading of that area?
16      A.  Yes, sir.
17      Q.  Was that whole area, back on December 6th of
18  1998, like that or was it overgrown on the other side of
19  the street?
20      A.  No, sir, it was more so like the other area,
21  except it was a lot rougher and a lot more grass.
22      Q.  Kind of like a wild brush area?
23      A.  Yes.  That's why we couldn't go as far as -- I
24  didn't know exactly how far the blood went into the
25  wooded area.
```

22

```
 1      Q.  It was clear to you, though, that somebody had
 2  gone into that brush area?
 3      A.  Yes, sir.
 4      Q.  You don't know how many people?
 5      A.  Not -- I'm not sure how many people or exactly
 6  how far, so I really can't say how far in they went.  I
 7  just know exactly where the blood stopped at.
 8      Q.  How long were you there with these two
 9  individuals prior to any type of ambulance or other
10  medical personnel arriving?
11      A.  I'd say we were out there a good, roughly
12  forty, forty-five minutes.
13      Q.  Okay.  And have you testified today and
14  yesterday to the sum total of what you heard, either
15  Mr. Holley or Mr. Walter say while you were there in
16  their presence?
17      A.  Yes, sir.
18      Q.  Is there anything you've left out?  Any
19  additional information that either one of them said
20  while you were there with him?
21      A.  Just basically, when I did finally -- you know,
22  when I asked him when they would let me know about the
23  girl.  When I was asking about the gun, he told me about
24  the girl.  And when they told me about the girl, I kind
25  of asked more questions, trying to find out if we had a
```

23

1    female out there somewhere, also.
2         Q.   Right.
3         A.   I asked them her name and, you know, how old
4    she was, whatever, how she looked.
5         Q.   How old did you understand her to be?
6         A.   At the time he said she was about seventeen or
7    eighteen.
8         Q.   Did either of those two individuals indicate
9    they had some type of relationship with that girl?
10        A.   Yes, he did.  When I was asking him -- well,
11   and he was telling me about how the gun got there.  He
12   was saying, My girl, I was trying to get my girl out of
13   the car.  So, I figured it was his girlfriend.
14        Q.   And that would be Mr. Holley, or do you know?
15        A.   Well, Mr. Walter is the one that was telling me
16   about the gun; and that's what he was saying, My girl.
17   So I figured it was his girlfriend, because I didn't
18   hear too much from Holley about the girl.
19        Q.   Mr. Holley wasn't saying to much about the
20   girl; mostly Mr. Walters (sic)?
21        A.   Yes.
22        Q.   Again, for purposes of the jury, this is
23   Mr. Walter down here, the one that was closest to the
24   gun when you first drove up?
25        A.   Yes, sir.

24

1              MR. HILL:  Your Honor, at this time we'd
2    like to introduce Defendant's Exhibit No. 1.
3              MR. MCCLELLAN:  No objection.
4              THE COURT:  I'm sorry, No. 1?
5              MR. HILL:  1.
6              THE COURT:  Defense 1 is admitted.
7         Q.   (BY MR. HILL)  One last thing.  If I could have
8    you step down for a moment.  You described that you had
9    gone to the brush area.  Would you please show us in
10   relation to this where you actually went into the brush
11   area?  And use this blue pen.
12        A.   Okay.  When I first noticed the blood trail is
13   around the male with no pulse.  When I first noticed the
14   blood trail, it was around the guy with no pulse.  So
15   instead of going back this way, I first wanted to see if
16   it was leading to the male shot in the arm, Mr. Holley,
17   just to see if it was him that was leaving the blood
18   trail.  But as I was following it, I kind of lost it as
19   far as pertaining to where he was positioned at this
20   time.  So I figured it was possibly another person; so I
21   followed the blood trail back, kind of zigzagged across
22   the road and into the bush over here.
23        Q.   About how far in?  Do you know?
24        A.   I went in roughly about -- I kind of came at an
25   angle with the blood, came in to about here.

25

1         Q.   I'm sorry.  Okay.  How far in is that?
2         A.   I said roughly maybe fifteen or twenty feet
3    that I was able to follow it.
4         Q.   Fifteen, twenty feet?
5         A.   Yes, sir.
6         Q.   Thank you, sir.
7              MR. HILL:  I pass the witness.
8                   REDIRECT EXAMINATION
9    BY MR. MCCLELLAN:
10        Q.   Mr. McDonald, now you said you arrived in a red
11   Ford Ranger, which was a personal vehicle?
12        A.   Yes, a personal vehicle.
13        Q.   Didn't have any type of police officer markings
14   or security markings?
15        A.   No, sir.
16        Q.   No barred lights?
17        A.   No, sir.
18        Q.   And when you and your partner exited that
19   vehicle, you both had your guns drawn?
20        A.   We had it drawn at a down angle, kind of -- not
21   to really threaten anybody, but just to have it out.
22        Q.   The question was, did you have your guns drawn?
23        A.   Yes, we did.
24        Q.   And when you saw Mr. Holley coming towards
25   you -- coming towards you and towards where the gun was,

26

1    was your gun still drawn?
2         A.   At that time, it was still behind my leg, yes,
3    it was.
4         Q.   Okay.  Now did Mr. Holley say anything about
5    the gun, or is it just your impression that he was --
6    because of the rate of his coming towards you that he
7    was going for the gun?
8         A.   The way he looked up at me and looked down at
9    the gun and started rushing towards the gun, it was my
10   feeling that he was going for the gun; and I was in fear
11   of my safety, and also my partner.  That's why I did
12   what I did.
13        Q.   So when you picked up that gun, did you point
14   it at him and tell him to lay down?
15        A.   No, I didn't.
16        Q.   Did you point your other gun at him and tell
17   him to lay down?
18        A.   No, I didn't.  Right before I picked it up, I
19   reholstered mine and picked that one up.
20        Q.   Didn't have to point the gun at him, though?
21        A.   No, sir, I didn't.
22        Q.   Didn't fear enough for your safety you had to
23   point a gun at him?
24        A.   No.  At this time I was really basically trying
25   to get it away from him and, at the same time, trying to

27

1  look and see if he had anything else on him.
2      Q.  As he's coming towards the gun, you reached
3  down and picked up the gun?
4      A.  Yes, sir.
5      Q.  The first thing you do is drop the clip?
6      A.  Yes, sir.
7      Q.  And then bring back the slide?
8      A.  Yes, sir.
9      Q.  So you weren't trying -- I mean, that was going
10  to disable that gun.  So if he was trying to come after
11  you, you were going to be in pretty poor shape, weren't
12  you then?
13      A.  No.  When I yelled for the gun -- I yelled gun
14  for my partner.  He had his weapon.
15      Q.  Your partner had his weapon?
16      A.  Yes.
17      Q.  So is your partner pointing his weapon
18  and --
19      A.  No, he wasn't.  He had it out without pointing
20  it at anybody.
21      Q.  Would you say during the time you were there,
22  you patted down Kevin Walter and Dion Holley to see
23  whether or not they had any weapons on them?
24      A.  Yes, sir, I did.
25      Q.  Did you also pat down Mr. Gibson to see if he

28

1  had any weapons on him?
2      A.  Roughly, when I had checked for a pulse, I had
3  kind of raised the shirt, see if he was shot anywhere
4  else.
5      Q.  Okay.
6      A.  Just roughly.  I didn't see any weapon there.
7      Q.  Didn't seem to find any other weapons, other
8  than the one that was laying on the ground?
9      A.  No, sir, no, sir.
10      Q.  Now you said that somebody said, Where is our
11  partner?  Did they use the word "partner," or were they
12  saying the name of a person?
13      A.  No, that's what I was saying.  As far as -- I'm
14  not exactly sure of exactly -- the exact word, but they
15  were making mention of somebody else.
16      Q.  All right.  The question was, were they using
17  the word "partner"?
18      A.  No, sir.
19      Q.  They were just using the words of someone else?
20      A.  Yes -- well, not a name.  It wasn't a name.
21      Q.  What word were they using?  Do you know?
22      A.  That's what I'm saying, I can't really
23  remember.
24      Q.  But it wasn't partner?
25      A.  No, sir.

29

1      Q.  Now do you know -- where did you live at that
2  time?
3      A.  At that time I was living at 2401 Westridge,
4  the same apartments we were working at.
5      Q.  And the Westridge Apartments are located right
6  here at the end -- you can step down if you can't see,
7  or let me bring it over to you.  Can you show me where
8  the Westridge Apartments are located?
9      A.  It's going to be the apartments straight ahead,
10  right at the end of Lantern Point.
11      Q.  What is the address there for those apartments?
12      A.  2401 Westridge.
13      Q.  2401 Westridge?
14      A.  Yes, sir.
15      Q.  That address, wherever they lead into, leads
16  into the street?
17      A.  Yes, sir.
18      Q.  Dead-ends, 2401?
19      A.  Yes, sir.
20      Q.  Okay.  Do you know where 2600 Westridge is?
21      A.  Yes, sir, I do.
22      Q.  Which direction from 2401?   Where would 2600
23  Westridge be?
24      A.  It would be the apartments right here, this
25  whole area right here.

30

1      Q.  So 2600 Westridge would be the apartments?
2      A.  Across the street, catercorner from the
3  Villages.
4      Q.  Can you put a sticker on State's Exhibit No. 24
5  where 2600 Westridge is?
6      A.  Yes, sir, I can.  It's going to be right here.
7      Q.  Right there.  And that's 2600 Westridge?
8      A.  Yes, sir, it is.
9      Q.  Did you ever do security at 2600 Westridge?
10      A.  Yes, sir, I did.
11      Q.  Now on your diagram, is the measurements that
12  you have on there and all that, that's not to scale,
13  obviously; that's just your best estimate, right?
14      A.  Yes, sir.
15          MR. MCCLELLAN:  I have nothing further.
16              RECROSS-EXAMINATION
17  BY MR. HILL:
18      Q.  Mr. McDonald, during the forty-five minutes you
19  were there, are Mr. Holley and Mr. Walter in one
20  another's company?   In other words, they're right near
21  one another when they're talking to you?
22      A.  They were within a distance of roughly ten
23  feet.
24      Q.  About as far as you and I are from each other
25  or a little closer?

31

1    A.  Roughly about the same distance.
2    Q.  And do they ever get closer than that to one
3  another?
4    A.  No, sir, they don't.
5    Q.  When you're talking with them, are they using
6  this type of tone of voice?  Are they talking to you
7  like this?
8    A.  Yes, sir.
9    Q.  You can hear me without the aid of a
10 microphone, right?
11   A.  Yes, sir.
12   Q.  And you would have been standing where in
13 relation -- if you and I are Kevin Walter and Dion
14 Holley, where would you be standing?
15   A.  I would be standing right about where the jury
16 is, maybe a little closer.  I kind of kept going back
17 and forth, looking around to see if any vehicles were
18 coming.
19   Q.  Would it be more likely you were as close as
20 the gentleman with the plaid shirt right there in the
21 first seat?
22   A.  Yes, sir.  I just went from different
23 distances.
24   Q.  And when you're talking to them, are they
25 speaking coherently to you?

32

1    A.  Yes, sir, they were.
2    Q.  Are they understanding any questions you're
3  asking them?
4         MR. MCCLELLAN:  I object.  That calls for
5  a conclusion as to whether or not the person
6  understands.
7         THE COURT:  Rephrase it.
8    Q.  (BY MR. HILL)  Are you speaking clear to them?
9    A.  Yes, sir, I was.
10   Q.  When they responded to them with whatever they
11 said, was their speech clear enough for you to
12 understand what they said?
13   A.  Yes, sir, it was.
14   Q.  You mentioned yesterday that there was a
15 bottle, a Mrs. Butterworth's bottle of syrup on the
16 street?
17   A.  Yes, sir.
18   Q.  Could you tell from looking at that bottle -- I
19 take it you went up to it and looked at it?
20   A.  Yes, sir, I did.  I was looking at everything
21 around the area, as far as trying to preserve evidence.
22   Q.  Okay.  Didn't want to do anything to
23 contaminate the scene, correct?
24   A.  Yes, sir.
25   Q.  All right.

33

1         MR. HILL:  May I approach the witness,
2  Your Honor?
3         THE COURT:  Yes.
4    Q.  (BY MR. HILL)  Mr. McDonald, I'm going to show
5  you what's already been introduced into evidence as
6  State's Exhibit No. 15.  Is this the bottle you're
7  referring to?
8    A.  Yes, sir, it is.
9    Q.  Could you tell -- and tell us if you know
10 whether or not it appeared that that had been run over
11 by a car, or could you tell?
12   A.  As far as run over or dropped, I'm not really
13 sure.  I just know that it wasn't there before, just a
14 couple of minutes prior when we passed by; but it's
15 there, also.
16   Q.  So, you say you passed by that location just a
17 couple of minutes before.  And how long did it take for
18 you to get there once you heard the shots being fired?
19   A.  I wouldn't say not even two minutes, not even.
20   Q.  So, are we talking about a total time span of
21 maybe three, four, maybe five minutes at the most?
22   A.  As far as between the shots and from the time
23 we got there?
24   Q.  I'm sorry.  Between the time that you and your
25 partner drive down Lantern Point, there is nothing

34

1  there, you hear the shots and you're back there, and
2  this is the scene that you find?
3    A.  Yes, sir.
4    Q.  Total elapsed time, somewhere between three and
5  five minutes?
6    A.  Yes, sir.
7    Q.  Thank you, sir.
8         MR. HILL:  I have no further questions.
9         REDIRECT EXAMINATION
10 BY MR. MCCLELLAN:
11   Q.  Where is -- on the diagram, I don't believe you
12 have the bottle of syrup.  Where is the bottle of syrup
13 on Defendant's Exhibit 1?
14   A.  You want me to come up there?
15   Q.  Sure.
16   A.  If I'm not mistaken, I believe the bottle of
17 syrup is further up close, right around in here.
18   Q.  And the distance of the bottle of syrup to --
19 now this is the person who was dead, right?
20   A.  Yes, sir.
21   Q.  So the distance from the bottle of syrup to the
22 person that was dead was how far, about that same
23 fifteen to twenty feet down in here?
24   A.  Might possibly have been about -- well, roughly
25 about that same distance.

35

1    Q.  So from the body of the person to the bottle of
2  syrup is going to be the same -- about the same distance
3  you went out into the brush looking for the -- to follow
4  the trail of blood?
5    A.  Yes, sir.
6    Q.  All right.  You can have your seat.  And you
7  were -- now that area out there has a lot of trash
8  thrown on it from time to time, does it not, sir?  That
9  area out there has a lot of trash thrown on it from time
10 to time, does it not?
11   A.  Yes, sir, it does.
12   Q.  You still work security out in that area?
13   A.  Yes, sir, I do.
14   Q.  In fact, there is a couple of spare tires or
15 just tires laying around?
16   A.  Yes, sir.
17        MR. HILL:  Object to the relevance of
18 current conditions.
19        THE COURT:  All right.  Sustained.
20   Q.  (BY MR. MCCLELLAN)  Are you saying you were
21 looking on the road to see what was there and that
22 wasn't there as you're driving to go to Jack In The Box?
23   A.  Yes, I do; because I know to the fact that
24 there was a lot of trash out there.  And plus, also, a
25 lot of problems are found on that street; and they

36

1  are --
2    Q.  What do you mean, a lot of problems?
3    A.  There has been numbers of incidents from the
4  time I've been living over there and working over there
5  where people have been getting jacked on the street, or
6  robbed, and things of that sort; so, we kind of tend to
7  look around going down there.
8        MR. MCCLELLAN:  I have nothing further,
9  Your Honor.  I'll pass the witness.
10        MR. HILL:  No questions.
11        THE COURT:  You may stand down.
12        Call your next, please.
13        MR. MCCLELLAN:  Officer Cruser.
14             JEFF CRUSER,
15 having been first duly sworn, testified as follows:
16             DIRECT EXAMINATION
17 BY MR. MCCLELLAN:
18   Q.  State your name for the record, please.
19   A.  My name is Jeff Cruser.
20   Q.  Mr. Cruser, how are you employed?
21   A.  City of Houston Police Officer.
22   Q.  And how long have you been so employed?
23   A.  Almost seven years.
24   Q.  And what division are you currently assigned
25 to?

37

1    A.  I work in the homicide division.
2    Q.  And what are your duties in the homicide
3  division?
4    A.  I work in the Crime Scene Unit.
5    Q.  What is the Crime Scene Unit's responsibility?
6    A.  Generally, we go to murders, suicides, high
7  profile scenes; we recover the evidence, take
8  pictures, shoot videotapes, and recover evidence.
9    Q.  Okay.  Let me direct your attention back to
10 December the 6th of 1998 and December the 7th of 1998.
11 Did you have an occasion to go to a location on Lantern
12 Point Drive in Harris County, Texas?
13   A.  Yes, sir, I did.
14   Q.  Do you recall about what time you arrived at
15 that location?
16   A.  It was close to 1:00 o'clock in the morning.
17   Q.  That would be on the 7th of December?
18   A.  Yes, sir.
19   Q.  And when you arrived there, can you tell us who
20 was present at the scene?
21   A.  There was another H.P.D. Officer, a couple of
22 security guards, and I believe that was it.
23   Q.  Okay.  Had any people who had been shot at that
24 location -- were they still present, or had they been
25 removed by the time you arrived on Lantern Point Drive?

38

1    A.  They had already been taken to the hospital.
2    Q.  Okay.  The -- can you describe the condition of
3  the surroundings on Lantern Point Drive where you went
4  to this crime scene?
5    A.  It was a four-lane street with two lanes going
6  either way.  On either side there is an empty field and
7  some trees.
8    Q.  Are there any street lights in the area that
9  illuminate the street?
10   A.  There are none near us.
11   Q.  Okay.  How would you describe it as far as
12 visibility on that particular night?
13   A.  Dark.
14   Q.  When you arrived at the location, how do you
15 begin processing the scene?
16   A.  Generally, we try to find out what happens so
17 we know what we're looking for.  Then we conduct a
18 search for evidence.
19   Q.  So, in finding out what happened, you talk to
20 the people who are present at the scene?
21   A.  Yes, sir.
22   Q.  Get whatever information they have for you and
23 then begin your processing?
24   A.  Yes, sir.
25   Q.  In processing the scene, how do you preserve or

39

1  record whatever you see?
2      A.  Well, generally we'll take 35 millimeter
3  photographs of it.  We'll videotape it, document where
4  it is as far as measurement, and orient it with the
5  surroundings.
6      Q.  And as part of your process, do you also
7  prepare a diagram of the area that you go back and where
8  you go and look for evidence?
9      A.  Yes, sir.
10     Q.  Did you prepare a diagram in this case?
11     A.  Yes, sir, I did.
12         MR. MCCLELLAN:  May I approach the
13  witness, Your Honor?
14         THE COURT:  Yes, sir.
15     Q.  (BY MR. MCCLELLAN)  Let me show you what's been
16  marked as State's Exhibit 22 and ask you if you can
17  recognize that?
18     A.  Yes, sir.
19     Q.  Is that the diagram that you prepared in
20  relation to this scene?
21     A.  Yes, sir, it is.
22         MR. MCCLELLAN:  At this time, Your Honor,
23  State would offer into evidence State's Exhibit 22 and
24  tender to defense counsel for his examination.
25         MR. HILL:  No objection.

40

1          THE COURT:  State's 22 is admitted.
2      Q.  (BY MR. MCCLELLAN)  Now the diagram that you
3  prepared, which would be the northerly direction?
4      A.  Up.
5      Q.  Up?
6      A.  Yes, sir.
7      Q.  And I know this is cut off from the diagram you
8  prepared, but it goes a little further up.  What is the
9  street that is at the top of this diagram?
10     A.  It's a street called McNee.
11     Q.  And the street that is south, I think you have
12  listed down here as Murworth?
13     A.  Yes, sir.
14     Q.  And on the diagram, you have listed certain
15  items of evidence that you recovered; is that correct?
16     A.  Yes, sir.
17     Q.  First of all, did you look for and recover any
18  fired cartridge casings?
19     A.  Yes, sir.
20     Q.  And how many did you find?
21     A.  Five.
22     Q.  Let me show you what's been marked for
23  identification purposes as State's Exhibits 26 through
24  30 and ask if you can identify those?
25     A.  Yes, sir.

41

1      Q.  And were these the cartridge casings that you
2  recovered from the Lantern Point Drive location on
3  December 7th, 1998?
4      A.  Yes, sir, they are.
5      Q.  And each of these bags is marked 1 through 5.
6  And do they correspond with the numbers that are on your
7  diagram?
8      A.  Yes, sir, they do.
9          MR. MCCLELLAN:  At this time, Your Honor,
10  State would offer into evidence State's Exhibits 26, 27,
11  28, 29, and 30, and tender to defense counsel for
12  examination.
13         MR. HILL:  May I have a moment with
14  Mr. McClellan?
15         THE COURT:  Yes.
16         MR. HILL:  No objection.
17         THE COURT:  Tell me the numbers again.
18         MR. MCCLELLAN:  26, 27, 28, 29, and 30.
19         THE COURT:  State's Exhibits 26 through 30
20  are admitted.
21     Q.  (BY MR. MCCLELLAN)  Now, can you tell us what we
22  mean by fired cartridge case?
23     A.  It's the casing that is ejected from a
24  semiautomatic pistol after you fire the gun.
25     Q.  Okay.  A bullet is made up of what parts?

42

1      A.  It's made up of the casing right there, a
2  primer, which part of it is there, and the actual bullet
3  itself, which is fired out of the gun.
4      Q.  So, half a bullet is fired, what is left is the
5  casing, and the bullet is gone somewhere else, and what
6  you're left with is the casing?
7      A.  Yes, sir.
8      Q.  And a semiautomatic weapon, what happens to the
9  casing upon the firing of the weapon?
10     A.  It's kicked out of the gun.  It's ejected.
11     Q.  Let me show you State's Exhibit No. 38.  First
12  of all, is this a weapon that you recovered at the
13  scene?
14     A.  Yes, sir, it is.
15     Q.  Now, that weapon -- how did you come in
16  possession of that weapon?
17     A.  This weapon was given to me by another C.S.U.
18  that was at the scene, who had recovered it from the
19  patrol officer who was at the scene.
20     Q.  Okay.  All right.  And is it a -- the type of
21  weapon that would fire and leave cartridges like -- like
22  are in State's Exhibits 26 through 30?
23     A.  Yes, sir.
24     Q.  And so, when the weapon is fired, a cartridge
25  case is going to be ejected either to the left or

**43**

1  right, depending upon the type of weapon?
2      A.  Yes, sir.
3      Q.  Okay.  And cartridge cases that you found at
4  the scene, I believe you numbered them 1 through 5; and
5  do they correspond then with State's Exhibits 26 through
6  30?
7      A.  Yes, sir.
8      Q.  So, 1 would be State's Exhibit No. 26; 2 would
9  be 27; 3 would be 28; 4 would be 29; and 5 would be 30;
10 is that correct?
11     A.  Yes, sir.
12     Q.  So the No. 1, did you also find at the location
13 of the scene a bag with cut-up pieces of paper in it?
14     A.  Yes, sir, I did.
15     Q.  Let me show you what's been marked for
16 identification purposes as State's Exhibit No. 31 and
17 ask you, is that the bag with the cut-up paper that you
18 found at the scene?
19     A.  Yes, sir.
20     Q.  Okay.
21            MR. MCCLELLAN:  At this time, Your Honor,
22 the State would offer into evidence State's Exhibit 31
23 and tender to defense counsel.
24            MR. HILL:  No objection, Judge.
25            THE COURT:  State's 31 is admitted.

**44**

1      Q.  (BY MR. MCCLELLAN)  And State's Exhibit No. 31,
2  do you know where on the diagram do you have it listed?
3  No. 8 says Victoria's Secret bag.  Would that be the
4  location, then, where you found State's Exhibit 31?
5      A.  Yes, sir.
6      Q.  As you progressed through the scene, starting
7  on the north side where it intersects McNee, going to
8  the south side, do these State's Exhibits 1 through 4
9  depict the scene as it appeared out there that evening?
10     A.  Yes, sir.
11     Q.  Okay.  And are these -- State's Exhibit No.
12 1 --
13            MR. MCCLELLAN:  Could I have the witness
14 step down, Your Honor?
15            THE COURT:  Certainly.
16     Q.  (BY MR. MCCLELLAN)  Step over here a second.
17 State's Exhibit No. 1, can you tell me what direction
18 that is looking as you're taking the photograph?  Are
19 you taking the photograph to the south, or are you
20 taking it towards the north?
21     A.  I'm taking it towards the south.
22     Q.  Okay.  So, State's Exhibit No. 1 is a
23 photograph looking towards the south down this
24 direction?
25     A.  Yes.

**45**

1      Q.  Okay.  And is that what you then first see on
2  State's Exhibit No. 1 as you're looking to the south?
3      A.  Yes.
4      Q.  And as you progress further south, does State's
5  Exhibit No. 2 show the next item, and 3 and 4
6  progressing on down as you're heading towards the south?
7      A.  Yes, sir.
8      Q.  What is the first item you encounter in State's
9  Exhibit No. 3?   What is shown in State's Exhibit No. 3?
10     A.  This is a bloody shirt.
11     Q.  Okay.  And so, State's Exhibits 2, 3, and 4 are
12 just a progression going south from McNee; is that
13 correct?
14     A.  Yes, sir.
15     Q.  At the time you were there, though, there was
16 no person with that bloody shirt?
17     A.  No.
18     Q.  So, State's Exhibit No. 2 would be, again, a
19 photograph in this direction, again, looking to the
20 south?
21     A.  Yes, sir.
22     Q.  State's Exhibit No. 2 and State's Exhibit No.
23 3, you indicate here by an A and 7-A is what?
24     A.  That's an end of a blood trail, which was by
25 the shirt.

**46**

1      Q.  And 7 is what?
2      A.  Is the bloody shirt.
3      Q.  So State's Exhibit No. 3 shows the bloody shirt
4  that was there at the scene?
5      A.  Yes, sir.
6      Q.  And State's Exhibit No. 4 shows what?
7      A.  This is a small pager, and there is a quarter
8  laying next to it.
9      Q.  Okay.  Is there also a spot of blood on the
10 pavement there, too?
11     A.  Yes, sir.
12     Q.  And the pager was located where on this
13 diagram?
14     A.  It's going to be No. 6.
15     Q.  So, this then -- State's Exhibit No. 4 is a
16 photograph of the pager, as well as the small pool of
17 blood near the pager?
18     Q.  Now State's Exhibit No. 5 and State's Exhibit
19 No. 10, this shows what?  The top two photographs show
20 what?
21     A.  It shows the Victoria's Secret bag and some
22 broken glass.
23     Q.  Okay.  Whereabouts is the broken glass?  Can
24 you tell us where -- well, on the photograph first?
25     A.  Okay.  It's right here on the photograph.

47

1    Q.   Broken glass was there.  So it's located right
2  here?
3    A.   Yes, sir.
4    Q.   Were you able to recover some of that broken
5  glass?
6    A.   Yes, sir, I did.
7    Q.   Let me -- State's Exhibit No. 20, let me show
8  you.  Does that fairly and accurately depict the scene
9  as it appeared?
10    A.   Yes, sir.
11    Q.   Does that show the broken glass?
12    A.   Yes.
13        MR. MCCLELLAN:  State would offer into
14  evidence State's Exhibit No. 20.
15        MR. HILL:  No objection.
16        THE COURT:  State's 20 is admitted.
17    Q.   (BY MR. MCCLELLAN)  Have you seen broken car
18  glass window before?
19    A.   Yes, sir, many times.
20    Q.   Was this glass consistent with a broken car
21  glass window?
22    A.   Reasonably.
23    Q.   State's Exhibit No. 7 shows what?
24    A.   It shows a fired casing.
25    Q.   Okay.  And that is depicted -- that is depicted

48

1  where in 6?
2    A.   It's right here.
3    Q.   So, 7 is a close-up showing a casing that's
4  located in State's Exhibit No. 6.  So, where on the
5  diagram would State's Exhibit No. 7 be?
6    A.   It would be right here.
7    Q.   And the Victoria's Secret bag that's shown
8  in -- shown in State's Exhibit No. 5 was located where?
9  I'm sorry -- Victoria's Secret bag?
10    A.   It's right here.
11        THE COURT:  Which photo are you writing
12  on?
13        MR. MCCLELLAN:  5 and 10.
14    Q.   (BY MR. MCCLELLAN)  Was there a large pool of
15  blood located at the scene?
16    A.   Yes, sir, there was.
17    Q.   What distance was it from the Victoria's Secret
18  bag, if you know?
19    A.   I don't know the distance.
20    Q.   State's Exhibit No. 13 -- let me ask you:  Does
21  State's Exhibit No. 13 show both Victoria's Secret bag
22  and the large pool of blood?
23    A.   Yes, sir.
24    Q.   And State's Exhibit No. 14 is a closeup of the
25  large pool of blood?

49

1    A.   Yes, sir, it is.
2    Q.   State's Exhibit No. 14, a large pool of blood,
3  is depicted where on the diagram?
4    A.   That's going to be right here.
5    Q.   And the shattered glass that was depicted in
6  State's Exhibit No. 20 is depicted by No. 9 here?
7    A.   Yes, sir.
8    Q.   Did you notice a trail of blood when you went
9  through the scene?
10    A.   Yes, sir, I did.
11    Q.   And is that trail of blood pictured on your
12  diagram by the dotted line that starts up here and goes
13  down through over here?
14    A.   Yes.
15    Q.   So did the blood trail either start or end up
16  here where Number A is and either start or end where F
17  is?
18    A.   Yes, sir.
19    Q.   Now during the scene, did you also find a Mrs.
20  Butterworth's syrup bottle broken?
21    A.   Yes, sir, I did.
22    Q.   Is it marked down here by the word "syrup"?
23    A.   Yeah, it's right down here.
24    Q.   And it is a substantial distance, is it not,
25  from where the large pool of blood was located?

50

1    A.   Yes, sir.
2    Q.   Let me show you State's Exhibits 16 through 19.
3  And does that show the pool -- the blood trail as it
4  progressed to the south?
5    A.   Yes, sir, it does.
6    Q.   So, this trail is going in a southerly
7  direction?
8    A.   Yes, sir.
9    Q.   And these photographs, then, progress to the
10  south?
11    A.   Yes.
12    Q.   You can have your seat.  The cartridge casings
13  that were recovered from the scene, as well as the
14  firearms that was recovered from the scene, were they --
15  where were they submitted?
16    A.   They were submitted to the H.P.D. firearms lab.
17    Q.   And are you the person who made that
18  submission?
19    A.   Yes, sir, I am.
20    Q.   And did you record in your report the weapon
21  that was the serial number, et cetera, of the weapon
22  that was recovered and submitted?  Just yes or no,
23  really?
24    A.   Yes.
25    Q.   Okay.  Now the weapon -- can you tell us what

51

1   condition the weapon was in whenever you received the
2   weapon?
3      A.   I don't understand your question.
4      Q.   Was the clip inside the weapon or removed from
5   the weapon?
6      A.   It was in the weapon.
7      Q.   And you received it from another C.S.U.
8   Officer?
9      A.   Yes, sir.
10     Q.   Had you seen the weapon when it had been in the
11  possession of John McDonald, one of the security guards
12  there?
13     A.   No, I did not.
14     Q.   Did you submit the weapon and the cartridge to
15  the firearms?
16     A.   The magazine?
17     Q.   The magazine, I mean?
18     A.   Yes, sir.
19     Q.   And was the magazine loaded with rounds?
20     A.   Yes, sir.
21     Q.   If a weapon that is a semiautomatic that has a
22  magazine, does a particular weapon -- can it fire
23  different brands of 9 millimeter cartridges if it was a
24  9 millimeter weapon?
25     A.   Yes, sir.

52

1      Q.   And what are some of the brands of ammunition?
2      A.   There is Federal, Winchester, Spear, C.C.I., a
3   variety.
4      Q.   Is it possible for a weapon to function if it
5   is loaded with multiple types of cartridges?  In other
6   words, C.C.I., Remmington Peter's, Winchester, Smith &
7   Wesson, does it still function regardless of whatever
8   type of ammunition, assuming it's the right type of
9   ammunition?
10     A.   Yes, sir, assuming that.
11     Q.   Okay.  Did you prepare a scene video depicting
12  the scene as it appeared back on September -- back on
13  December the 7th, 1998?
14     A.   Yes, sir, I did.
15     Q.   Okay.  Let me show you what's been marked for
16  identification purposes as State's Exhibit No. 45 and
17  ask you if that is, in fact, the video that you prepared
18  of the scene on Lantern Point Drive?
19     A.   Yes, sir, this is a copy.
20          MR. MCCLELLAN:  At this time, Your Honor,
21  State would offer into evidence State's Exhibit 45 and
22  tender to defense counsel for examination.
23          MR. HILL:  No objection.
24          THE COURT:  State's 45 is admitted.
25          MR. MCCLELLAN:  At this time, Your Honor,

53

1   State would ask to play State's Exhibit 45.
2          THE COURT:  All right.  You're going to
3   have to wheel that around.  You're going to have to move
4   your chairs a little bit.
5          (Video playing.)
6      Q.   (BY MR. MCCLELLAN)  What are we looking at as
7   you're on the video?
8      A.   I'm going to have to move up, but I believe
9   it's just going to be a southward progression like the
10  pictures.
11     Q.   Why don't you sit down here?
12     A.   That's going to be the bloody shirt.
13     Q.   So you're coming from -- are you coming from
14  the McNee direction going towards Murworth?
15     A.   Yes, sir.  That's going to be the bloody shirt.
16     Q.   What is located there?
17     A.   When I get it in focus, it's going to be the
18  pager and the quarter.
19     Q.   What is located there?
20     A.   It's going to be the Victoria's Secret bag and
21  the newspaper clippings.
22     Q.   What is that?
23     A.   It's going to be the broken glass and a fired
24  casing.
25     Q.   What's that?

54

1      A.   That's another fired casing.
2      Q.   Is that the trail of blood?
3      A.   Yes, sir.
4      Q.   Is that the large pool of blood?  Is that a
5   casing there, also?
6      A.   Yes, it is.
7      Q.   What is that?
8      A.   It's another fired casing.
9      Q.   That yellow marker there, is that marking
10  anything other than the pool of blood?
11     A.   No.  These are just marking the trail of the
12  blood.
13          (Video concluded.)
14     Q.   (BY MR. MCCLELLAN)  The Victoria's Secret bag
15  that you recovered -- I believe it's State's Exhibit
16  31 -- where did you submit that?
17     A.   I submitted it to the H.P.D. latent print lab.
18     Q.   For them to attempt to try to raise
19  fingerprints from it?
20     A.   Yes, sir.
21     Q.   Is that the sum total of the evidence that you
22  recovered at the scene?
23     A.   Yes, sir, I believe it is.
24          MR. MCCLELLAN:  I'll pass the witness,
25  Your Honor.

55

CROSS-EXAMINATION

1    BY MR. HILL:
2        Q.  Officer Cruser, as a member of the Crime Scene
3    Unit, your responsibility is to determine the existence
4    of items which may have evidentiary value in a court of
5    law, correct?
6        A.  Yes, sir.
7        Q.  You're there to look at a scene, retrieve
8    items, preserve items so that they can be used in court
9    for a jury to determine their significance, correct?
10       A.  Yes, sir.
11       Q.  As to that, though, when you come to an
12   incident scene, you don't just get out of your Crime
13   Scene Unit and start going to the scene and collecting
14   things, correct?  There is a certain protocol you go
15   through?
16       A.  Sort of.
17       Q.  Okay.  Well, I believe you said when you first
18   got there, you spoke to individuals that were already
19   there at the scene?
20       A.  Just the primary officer that was there.
21       Q.  And the primary officer's name was?
22       A.  Officer Warren.
23       Q.  And he's with the Houston Police Department?
24       A.  Yes, sir.
25

56

1        Q.  Is he what is characterized as a patrol
2    officer?
3        A.  Yes, sir.
4        Q.  So he comes upon the scene; and it's his
5    responsibility to secure the scene so the area can't be
6    tampered with, correct?
7        A.  Yes, sir.
8        Q.  And once you arrive, do you take control of the
9    scene, for lack of a better description?
10       A.  Yes, sir.
11       Q.  Then it's your responsibility to make sure
12   nothing happens to tamper with or affect anything that's
13   there at the scene itself?
14       A.  Yes, sir, until the homicide investigators.
15       Q.  Now before you set out to look at items,
16   though, you have spoken to the primary officer; and he
17   has basically told you what he has up to that point,
18   right?
19       A.  Yes, sir.
20       Q.  And when you arrived there in the early morning
21   hours of December 7th, 1998, did you have a description
22   of what events had occurred or what information had been
23   supplied to Officer Warren?
24       A.  Only a very brief synopsis.
25       Q.  And can you tell us whether or not that

57

1    synopsis reflected that there was any type of drug
2    transaction that had taken place at that scene?
3        A.  No.
4        Q.  Was this the version of the events that you
5    were starting out in your investigation and your crime
6    scene evaluation based upon a theory that there was some
7    type of good samaritan that had been robbed at that
8    scene?
9        A.  Ask the question again, please.
10       Q.  Okay.  When you arrived there and you spoke to
11   Officer Warren, were you told that essentially some
12   individuals had stopped and were assisting other
13   motorists that had been broken down; and they, in turn,
14   were robbed?
15       A.  I don't remember exactly what I was told.
16       Q.  Okay.  Well, I believe you said, though, that
17   you tried to find out what had happened prior to
18   processing the scene?
19       A.  Right.  Basically, I was just told that several
20   people were shot.  A girl had been basically kidnapped,
21   and they drove away in their cars.
22       Q.  Did you know how many individuals were
23   supposedly involved in this incident --
24       A.  No.
25       Q.  -- based upon your conversation with Officer

58

1    Warren?
2        A.  No.
3        Q.  Did you know whether or not at the time you
4    arrived there, were there any bodies at the scene still?
5        A.  No.
6        Q.  The individual that ultimately was named as the
7    decedent, Terrence Gibson, his body was not there when
8    you arrived?
9        A.  No.  They had all been taken to the hospital.
10       Q.  Is it your responsibility and your job to
11   determine what items that you see at a particular scene
12   are significant to your investigation?
13       A.  No.
14       Q.  Who does?
15       A.  The homicide investigators that come after me.
16       Q.  So at 1:45, when your videotape reflects that
17   you're videotaping, have you already been there for
18   about forty-five minutes, looking at the scene with the
19   homicide detectives?
20       A.  I don't remember exactly what time they got
21   there, but yes.
22       Q.  So you would have already been through the
23   entire scene before you started the video?
24       A.  Yes, sir.
25       Q.  And that's why, when we look at the different

59

1  items, both your diagram, as well as the video, there
2  are certain, like, film canisters placed next to each of
3  the cartridge cases. Who places those there?
4      A.  I did.
5      Q.  And that's so when you're photographing, you're
6  able to see there is an item that you need to zoom in on
7  to see there is a cartridge casing or some other piece
8  of evidence?
9      A.  Yes, sir.
10     Q.  And there is nothing done to the scene from the
11 time you got there that would have disturbed the
12 location of any of these items?
13     A.  No.
14     Q.  Can you tell the members of the jury, as we
15 look at State's Exhibit No. 22, what were the
16 perimeters -- in other words, the borders -- of your
17 crime scene search to the north, to the south, east, and
18 west of this location? Tell us where your scene
19 started and where it ended.
20     A.  Generally, the street and the grass area to the
21 sides for a little bit.
22     Q.  When you say to the sides for a little bit,
23 what period or what area are we talking about? How
24 far?
25     A.  Fifteen or twenty feet. I don't recall

60

1  exactly.
2      Q.  How many other crime scene units are out there
3  other than you?
4      A.  There was another one with me.
5      Q.  What was that individual's name?
6      A.  His name is Joe Burrell.
7      Q.  How do you divide up the responsibility for
8  this particular scene?
9      A.  In that particular scene, I pretty much did
10 everything.
11     Q.  So, what was his responsibility?
12     A.  I was being trained at the time.
13     Q.  So was he instructing you to photograph,
14 videotape things as you walked along?
15     A.  Yes, sir.
16     Q.  So did you walk into the grassy area, field
17 area?
18     A.  A little bit, to look for more evidence, if
19 there was any.
20     Q.  What was the approximate distance from the top
21 of the Chart No. 22, where I guess A, which is the end
22 of the blood trail near the bloody shirt, and No. 7,
23 which is a bloody shirt, all the way down going towards
24 Murworth where there is a syrup bottle depicted in F?
25 How long a period are we talking about distance-wise?

61

1      A.  Probably about 320, 350 feet.
2      Q.  So that's more than the size of a football
3  field, correct?
4      A.  Yes, sir.
5      Q.  And you said you went fifteen or twenty feet
6  into the grassy area?
7      A.  Yes, sir.
8      Q.  So would you have walked through this entire
9  area on both sides looking for evidence?
10     A.  Yes, sir, I would have tried, yes.
11     Q.  And so is it your testimony today that you
12 spent time walking through this entire grassy area on
13 both sides looking for evidence?
14     A.  Not the entire; but yes, a little bit.
15     Q.  Where was it that you did look?
16     A.  I don't understand the question.
17     Q.  On your diagram, tell us where it was that you
18 looked in the grassy field area for any evidence.
19     A.  It's not listed on there.
20     Q.  Can you tell me, since this is your diagram,
21 where do you recall going into the grassy field area
22 that morning looking for evidence?
23     A.  I would have just walked along the curb.
24     Q.  So you would have actually been on the street,
25 walking, looking into the grassy area?

62

1      A.  I would have walked on the grass.
2      Q.  Okay.  I want to be clear as to the scope of
3  your examination of these areas.  You're not telling
4  this jury that you actually walked into the grassy area
5  for a distance of fifteen or twenty feet and walked
6  through this entire area on both sides, are you?
7      A.  No, that's what I'm saying.
8      Q.  That is what you're saying?
9      A.  Yeah.
10     Q.  How long did that take you?
11     A.  Not very long.
12     Q.  Tell us your best estimate; because that would
13 have been essentially almost seven hundred feet of
14 lineal feet that you had gone through, if it's 340 feet
15 on either side roughly?  That would be, what, 680 feet?
16 Plus, you have fifteen or twenty feet lateral on either
17 side.  So tell us how long it took for you to cover that
18 entire area.
19     A.  I don't remember.
20     Q.  How long were you at the scene?
21     A.  About three hours.
22     Q.  Okay.  And at what point did you conclude
23 walking through the field?  Prior to taking the video?
24     A.  Yes.
25     Q.  So by 1:45, when the video begins, you would

**63**

1 have already completed your review of the area; and now
2 you're ready to document for later use in court what you
3 could see?
4     A. Yes.
5     Q. Okay. Now would you agree with me, Officer
6 Cruser, that when you watched the video, or if you can
7 recall from your own independent observation, that it
8 was very dark out there?
9     A. Yes, sir, it was.
10    Q. I believe you said that when Mr. McClellan
11 asked you the lighting conditions, in order to
12 illuminate the area on the videotape, what is attached
13 to your video camera?
14    A. There is a floodlight.
15    Q. And so, would it be a fair statement to say
16 that the pictures we are seeing in the video camera do
17 not really accurately portray the lighting conditions
18 that were out there that night?
19    A. Correct.
20    Q. I mean, clearly, in order for you to get film,
21 you had to have some exterior lighting to be able to see
22 that?
23    A. Yes, sir.
24    Q. And do you recall as you were doing the video,
25 could you see without the aid of the light down to where

**64**

1 the other officers were? When you started up at the
2 northerly area and you were working your way south, your
3 patrol car is parked on the southern border of your
4 crime scene, right?
5     A. Yes.
6     Q. Were you able to see inside those vehicles?
7     A. I don't think so.
8     Q. And that would be accurately reflected in the
9 video you've just testified about, correct?
10    A. Yeah. I don't think I can see into them from
11 one end to the other.
12    Q. What about looking into the field? If you're
13 standing, looking into the street and you don't have the
14 light, are you able to see anything?
15    A. No.
16    Q. Would you tell me -- on State's Exhibit No. 22,
17 I believe that Item No. 9 is reflected. Can you see
18 that? --
19    A. Yes.
20    Q. -- as shattered glass? And that would be right
21 here?
22    A. Yes, sir.
23    Q. What would that reflect, in your opinion, as to
24 the position of the vehicle that the glass came from?
25 Can you tell us, showing that that's No. 9 right there,

**65**

1 the shattered glass, where would the vehicle had to have
2 been? What direction would it have been pointed, if
3 you know?
4     A. I don't know.
5     Q. Can you tell at all whether the vehicle was
6 pointed this way, to the -- that's to the south,
7 correct, and this is to the north?
8     A. Yes.
9     Q. You can't tell whether the vehicle is pointed
10 north or south based on where the glass is found?
11    A. No.
12    Q. Is it a fair statement to say that the trail of
13 blood -- and let me ask this: Is the trail of blood, in
14 your opinion -- does it start here at A and 7 -- that's
15 the most northern part of your diagram -- and proceed
16 some 300 feet down to F, which is the syrup bottle?
17    A. I don't know. I don't know which way it goes.
18    Q. Okay. Can you tell us whether or not beyond
19 F -- whether there was any blood going into the grassy
20 area? Did you detect any in there?
21    A. No.
22    Q. You didn't see anything in there when you went
23 in to search for it?
24    A. No, I didn't.
25    Q. Can you tell us whether or not you determined,

**66**

1 from your experience in crime scenes, how the bottle
2 came to rest there on the ground?
3     A. No, I don't know how it got there.
4     Q. Can you tell, in looking at the photograph,
5 whether or not the bottle appeared to be thrown some
6 particular direction? Here's State's Exhibit No. 15.
7     A. No, I can't tell.
8     Q. But State's Exhibit No. 15 is what we're
9 talking about?
10    A. Yep.
11    Q. The syrup bottle?
12    A. Yes, sir.
13    Q. When you recovered from the officer State's
14 Exhibit No. 38 and the magazine that was inserted into
15 it, can you tell me how many rounds were in this the
16 magazine?
17    A. I believe there were twelve.
18    Q. So that the members of the jury might
19 understand, for those that are not familiar with
20 weapons, a magazine is what holds the bullets on a
21 semiautomatic pistol, and that has to be inserted at the
22 base in order to load bullets into the chamber to be
23 fired?
24    A. Yes.
25    Q. And in order for this to be loaded --

**67**

1    MR. HILL: May I ask the officer to do a
2  demonstration, Judge?
3    THE COURT: Yes.
4    Q. (BY MR. HILL) Officer, if you would -- and
5  please confirm that that clip is empty and that that's a
6  clear weapon. Can you show us how -- how do you insert
7  the magazine into the handle of the gun?
8    A. You basically just --
9    Q. Why don't you stand up?
10    A. Basically, you just put it into the weapon.
11  Just put it in. It locks in.
12    Q. It's actually got to snap into position in
13  order for it to be available to actually load the
14  bullets into the chamber?
15    A. Properly, yes.
16    Q. Okay. Cartridges that were removed from
17  State's Exhibit 38, the magazine, what brand were they?
18    A. They're going to be R & B.
19    MR. HILL: May I approach the witness,
20  Your Honor?
21    THE COURT: Yes.
22    Q. (BY MR. HILL) I'm just going to show you a
23  package that was handed to me by Mr. McClellan and ask
24  whether or not those appear to be the ammunition that
25  was retrieved from State's Exhibit 38?

**68**

1    A. Yes, sir, these are 9 millimeter R & P.
2    Q. What do those initials stand for?
3    A. I believe it's Remmington Peters.
4    Q. And the five cartridge cases that were found on
5  the roadway, what type of ammunition was that?
6    A. They were marked "FC."
7    Q. What does that stand for?
8    A. I believe it's Federal, but I don't know for
9  sure.
10    Q. You indicated that you've been with the Houston
11  Police Department for seven years, and you're assigned
12  to the homicide division as a crime scene unit
13  investigator. How long have you actually done --
14  obviously, you were in training as of December of '98?
15    A. A year.
16    Q. So you had started your tour in October?
17    A. Halloween.
18    Q. Okay. Thank you, sir.
19    MR. HILL: No further questions.
20    MR. MCCLELLAN: I have just a couple, if I
21  might, Your Honor.
22    REDIRECT EXAMINATION
23  BY MR. MCCLELLAN:
24    Q. On the diagram you drew, showing the shattered
25  glass -- the shattered glass, I believe, is No. 9 on the

**69**

1  diagram?
2    A. Yes, sir.
3    Q. If a car was headed in a northerly direction
4  and if its driver's door window had been shot out, would
5  the car then be in this type of position? That is,
6  either in the lane going to the north closest to the
7  curb -- would that be in a position to where the
8  shattered glass would be consistent with a window having
9  been shot out of a car in a northerly direction in this
10  lane, the first lane next to the curb?
11    A. It could be possible.
12    Q. Okay. The only other way, if it was the
13  driver's window that was shot out, would be if the car
14  were going in a southerly direction in the outside near
15  the double lines?
16    A. If it was going the direction of the lanes,
17  yes.
18    Q. Well, regardless of whether it's going the
19  direction of the lanes -- I guess you're saying it could
20  be sideways or -- okay. All right. But if it was going
21  north, it would be consistent with being in the inside
22  lane and the driver's window being shot out?
23    A. Yes.
24    MR. MCCLELLAN: I'll pass the witness.
25

**70**

1    RECROSS-EXAMINATION
2  BY MR. HILL:
3    Q. Officer Cruser, I believe in response to the
4  question that was asked, your response was, It's
5  possible, right?
6    A. Yes.
7    Q. You've not had any training, have you,
8  regarding glass explosion and which way glass goes when
9  it's hit?
10    A. No.
11    Q. So you're just speculating that that is
12  something that could have happened, correct?
13    A. Yes.
14    Q. All right. Thank you.
15    MR. HILL: I'm sorry. Pass the witness.
16    THE COURT: Ladies and gentlemen, we're
17  going to take our lunch break. All the previous
18  admonitions are still in effect. Please go back in
19  the jury room.
20    (Lunch recess at 12:29 p.m.)
21    (Jury is brought in and seated.)
22    THE COURT: Proceed, please.
23
24
25

71

1                    ORAL R. WARREN,
2     having been first duly sworn, testified as follows:
3                   DIRECT EXAMINATION
4     BY MR. MCCLELLAN:
5         Q.  State your name for the record, please.
6         A.  It's Oral R. Warren.
7         Q.  Could you make sure that microphone is turned
8     on?  There is a switch there at the top.  Thank you.
9              Mr. Warren, how are you employed?
10        A.  Houston Police Department.
11        Q.  Okay.  And how long have you been employed with
12    the Houston Police Department?
13        A.  Fourteen years.
14        Q.  Fourteen.  And what division are you currently
15    assigned?
16        A.  I'm assigned to the southwest division.
17        Q.  All right.  And is that a patrol
18    responsibility?
19        A.  Yes, it is.
20        Q.  So we're back on December the 6th and 7th of
21    1998.  Were you assigned to that division then or a
22    different division?
23        A.  I was assigned to that division.
24        Q.  And does your patrol area include the Astrodome
25    area?

72

1         A.  Yes, it does.
2         Q.  Are you familiar with the streets, McNee and
3     Murworth?
4         A.  Yes, I am.
5         Q.  Is that in your patrol area?
6         A.  Yes, it is.
7         Q.  Directing your attention back to December the
8     6th of 1998, did you have an occasion to be called to a
9     location on Lantern Point Drive?
10        A.  Yes, I did.
11        Q.  Do you recall about what time you may have
12    received a call to that location?
13        A.  11:54 p.m. on the 6th.
14        Q.  Just before midnight on the 6th of December?
15        A.  That is correct.
16        Q.  How long did it take you to get to that
17    location?
18        A.  Five minutes.
19        Q.  When you got to that location, can you tell the
20    ladies and gentlemen of the jury what you saw?
21        A.  When I first arrived there, I noticed that
22    there was two H.F.D. ambulances there; and they were in
23    the process of treating the victims out there.
24        Q.  And how many people were at the scene who were
25    being treated?

73

1         A.  There were three.
2         Q.  Okay.  Were there any other people other than
3     the Houston Fire Department ambulance crew that were
4     there on the scene?
5         A.  Yes, there were.
6         Q.  And who was that?
7         A.  There were two security guards.
8         Q.  And did you talk to the security guards who
9     were there at that location?
10        A.  Yeah, I talked to John McDonald.
11        Q.  Did John McDonald ever turn anything over to
12    you that he had recovered there at the scene?
13        A.  That's correct, he did.  He turned a pistol
14    over to me.
15        Q.  What did you do with the pistol after he turned
16    it over to you?
17        A.  He handed me the pistol with the clip separate,
18    and then I immediately secured it in the trunk of my
19    vehicle.
20             MR. MCCLELLAN:  May I approach the
21    witness, Your Honor?
22             THE COURT:  Yes.
23        Q.  (BY MR. MCCLELLAN)  Let me show you what's been
24    marked for identification as State's Exhibit 21.  Does
25    that fairly and accurately depict the gun and the clip

74

1     that you recovered on that evening?
2         A.  Yes, it is.
3             MR. MCCLELLAN:  At this time, Your Honor,
4     the State would offer into evidence State's Exhibit 21,
5     tender to defense counsel for examination.
6             MR. HILL:  No objection, Your Honor.
7             THE COURT:  State's 21 is admitted.
8         Q.  (BY MR. MCCLELLAN)  Is this a photograph of the
9     gun in the trunk of your car?
10        A.  Yes, that's correct.
11        Q.  And the clip was fully loaded?
12        A.  Yes.
13        Q.  What was done with that weapon?
14        A.  After I secured it, when the Crime Scene Unit
15    arrived, it was turned over to the Crime Scene Unit.
16        Q.  All right.  Did you have an opportunity there
17    that -- first of all, what was your responsibility when
18    you arrived at the location?
19        A.  On a call like that, it's my understanding to
20    try to secure the area and try to get as much
21    information as I can from the victims before they're
22    transported to the hospital.  It's kind of -- in this
23    instance, it was kind of chaotic; because the
24    paramedics' main responsibility is to transport him, and
25    there is very little time involved.  So I try to get as

75

1 much information as I can.
2 Q. Do you, then, also call other divisions of the
3 Houston Police Department if they are needed to come out
4 to the location?
5 A. That is correct.
6 Q. Did you call other divisions of the Houston
7 Police Department to come out to that location?
8 A. Another unit -- two other units had checked by.
9 And as far as securing this street here, it was secured
10 on Mulworth and on McKnee Street.
11 Q. While you were there, did the Crime Scene Unit
12 people arrive?
13 A. Yes, they did.
14 Q. Were you present when the homicide people
15 arrived?
16 A. Yes, I was.
17 Q. You said there were three people that were
18 there at the scene when you arrived. Of those three
19 people, were you able to talk to any of the people prior
20 to them being transported to medical facilities?
21 A. Yes, I was.
22 Q. And how many different people were you able to
23 talk to?
24 A. Well, only Dion Holley I was able to talk to.
25 Q. Okay. And Dion Holley was the one that was

76

1 shot where, if you recall?
2 A. He was shot in the arm.
3 Q. And what did -- what did you inquire of
4 Mr. Holley?
5 A. I asked him what happened.
6 Q. Okay. And what did he tell you?
7 A. He told me they stopped to give two black males
8 a jump start, and the black males shot them.
9 Q. Did he tell you what kind of car he had been
10 in?
11 A. He said he was in his mother's '94 blue Lexus,
12 four-door, and he wasn't sure of the license plate
13 number.
14 Q. Now at the time you arrived at the scene, were
15 there any vehicles there other than fire department
16 ambulance and the vehicle that the security guards
17 arrived in?
18 A. No.
19 Q. Did he tell you about any other vehicle that
20 had been there at the scene?
21 A. Yeah. He said the two black males were in a
22 red Dodge Intrepid.
23 Q. Did he tell you about any other people that
24 might have been at the scene?
25 A. He also advised me that a female friend of his

77

1 named Mary was abducted from the location.
2 Q. Did he tell you anything else, any more
3 details?
4 A. Yeah. He described Mary as a black female;
5 seven -- eighteen, with a red shirt and jeans.
6 Q. Did he he give you any more detail about what
7 had happened, how they got shot, or any of those things?
8 A. No, he did not.
9 Q. How long a period of time did you have to talk
10 to him before he was transported?
11 A. Only a few minutes.
12 Q. Do you know where he was transported to?
13 A. I'm not sure. Either Ben Taub or Hermann. I
14 think they split the victims up. They took them to two
15 different locations.
16 Q. All right. Now can you describe for the ladies
17 and gentlemen of the jury the area of Lantern Point
18 Drive where this scene occurred?
19 A. Yeah, it's a real isolated area. It's dark.
20 There was shrubs on both sides and the trees. I mean,
21 there is no reason why, you know, anybody should be out
22 there at that time of the morning, I wouldn't think.
23 Q. And are there any streetlights up and down that
24 street?
25 A. No.

78

1 Q. State's Exhibit No. 24, does that show the area
2 of Lantern Point Drive?
3 A. Yes, it does.
4 Q. And this street that runs here would be -- I
5 guess, looking -- that would be to the south. This
6 street that runs here is what street?
7 A. That would be McNee.
8 Q. And then this street up here?
9 A. Would be Murworth.
10 Q. So the scene was between McNee and Murworth on
11 Lantern Point Drive?
12 A. That is correct.
13 Q. While State's Exhibit 24 shows the field kind
14 of cleared here in the area, was that the condition of
15 the field at that time?
16 A. No, it was not.
17 Q. It was still all overgrown like the other side?
18 A. That's correct.
19 Q. Other than recovering or receiving a weapon
20 that had been turned over to you by John McDonald, the
21 security guard, did you recover any evidence at the
22 scene?
23 A. No, I did not.
24 Q. Who has the responsibility of doing that?
25 A. That's the Crime Scene Unit's responsibility.

79

1            MR. MCCLELLAN: I pass the witness, Your
2 Honor.
3                CROSS-EXAMINATION
4 BY MR. HILL:
5    Q. Officer Warren, if you could, let's set some
6 time parameters here. You got the call at 11:54. You
7 arrived about midnight when you arrived?
8    A. That is correct.
9    Q. When does the Crime Scene Unit arrive in
10 relation to you being there?
11    A. I'm not sure exactly how long it was before he
12 got there.
13    Q. All right. The ambulances are there when you
14 roll up on the scene?
15    A. That's correct.
16    Q. Can I ask you to step down for just a moment?
17    A. Sure.
18    Q. Understanding that this Defense Exhibit No. 1
19 has already been admitted into evidence as a diagram, a
20 very rough diagram, not to scale -- and don't really pay
21 too much attention to the numbers here, they may or may
22 not be accurate. But could you show us -- first of all,
23 does this roughly look like the scene that you recall
24 that there was a dead body at this point closer to the
25 Murworth intersection, and then there were some other

80

1 individuals down here with the security guards?
2    A. Okay.
3    Q. Is that basically where they were when you
4 arrived?
5    A. Yes.
6    Q. Could you show me where the ambulances were?
7    A. Okay. They were in this area here -- this is
8 roughly, not exactly.
9    Q. Sure, I understand.
10    A. And this area here.
11    Q. Basically, close to the body of Terrence Gibson
12 and someplace closer to where the other individuals,
13 Dion Holley and Kevin Walter, were being attended to; is
14 that correct?
15    A. That's correct.
16    Q. And I'm going to put one of these for each one
17 of those. Okay. Go ahead and have your seat. So when
18 you arrived there, what is the first thing that you do?
19    A. Well, the first thing I did was I got out of my
20 vehicle; and that's when John McDonald came up to me
21 immediately and handed me that weapon.
22    Q. Was he wearing some kind of distinctive
23 uniform, showing he was some type of security officer?
24    A. Yes, plus I know John McDonald from working out
25 ther.

81

1    Q. So it didn't stun you when somebody approached
2 you, and you recognized him immediately?
3    A. Yes, I did.
4    Q. Did he say to you, I've got a piece of evidence
5 or a weapon I need to give to you?
6    A. Yeah. He said one of the victims was near that
7 pistol, and that's why he said he picked it up.
8    Q. Now as you're there and you're trying to talk
9 to Mr. Holley, where is Mr. Walter? Who is attending
10 to him?
11    A. H.F.D. personnel were attending to Mr. Walter.
12    Q. You go up to Mr. Holley, you introduce yourself
13 to him. I'm Officer Warren with the Houston Police
14 Department; tell me what happened?
15    A. No, I just asked him what happened. I didn't
16 introduce myself.
17    Q. And his response is this situation where, We
18 stopped to give two black males a jump start and they
19 shot us?
20    A. Basically, yes.
21    Q. Is there some more that he said that kind of
22 defined a little more fully what the story was?
23    A. Yeah. He said that, you know, he stopped and
24 they gave them a jump start. And he went further to
25 describe the vehicle that they were -- the red Dodge

82

1 Intrepid, and they also said they abducted a girlfriend
2 of mine named Mary; and he went on to describe her. And
3 that's when I put that information out for other units
4 to hear, where they could check the area or be on the
5 lookout for that certain vehicle.
6    Q. The blue Lexus?
7    A. Yeah, the '94 blue Lexus and the red Dodge
8 Intrepid.
9    Q. Was it clear to you, in talking to Mr. Holley,
10 that he said the individual described as Mary was in the
11 blue Lexus; or was she in the red Intrepid?
12    A. In the blue Lexus.
13    Q. Did he describe for you the two black men that
14 he said had come up and stopped -- or they looked like
15 they needed to be jumped?
16    A. No, he didn't.
17    Q. Didn't give any height or weight or --
18    A. We never got that far. I was trying to get any
19 information as ambulance people were trying to attend to
20 him and get him loaded. And like I said, it was pretty
21 chaotic under similar circumstances like this.
22 Follow-up is necessary. It's necessary for a unit to go
23 to the hospital and get more information.
24    Q. Would that necessarily fall within your realm
25 of responsibility to do the follow-up?

83

1    A.  Well, since one of the individuals had died, it
2  was homicide's responsibility.
3    Q.  So even if you had wanted to, it no longer
4  becomes your jurisdiction?
5    A.  No, I could not leave that scene till homicide
6  relieved me and said it was clear for me to leave.
7    Q.  Well, my question is, though, also, after
8  you're clear to leave, is it your responsibility to go
9  to the hospital and talk to Mr. Holley again?
10   A.  No, it's not.
11   Q.  Who does that?
12   A.  Well, under these circumstances, homicide.
13   Q.  I need to understand who it was that goes to
14 speak to him again at the hospital.
15   A.  Okay.
16   Q.  When Officer Cruser, I believe is his name,
17 from the Crime Scene Unit arrives there whenever he
18 does, do you share this information with him?
19   A.  Yeah, I explain --
20   Q.  You described to him the story that had been
21 given to you, which was that Mr. Holley and his friend
22 stopped on this dark sketch of road to give two black
23 males a jump start?
24   A.  That is correct.
25   Q.  Did you have an occasion to ask Mr. Holley why

84

1  he would stop at this location?
2    A.  No, I didn't.
3    Q.  How long do you think you were able to visit
4  with Mr. Holley there at the scene?  Excuse me?
5    A.  Just for a few minutes.
6    Q.  And you never speak to Mr. Walter, the other
7  gentleman?
8    A.  No, sir.
9    Q.  After you do the brief interview with Dion
10 Holley, is your responsibility to stay there until
11 homicide gets there?
12   A.  That's correct.
13   Q.  And you don't recover -- other than the weapon
14 that was given to you by Officer McDonald, you do not do
15 anything else with regards to that scene in terms of
16 processing evidence, or speaking to people, or anything
17 like that?
18   A.  That's correct.
19   Q.  So I take it then that you're only there from
20 the time you arrived at 12:00.  Homicide detectives get
21 there about what time?
22   A.  It took them a little while to get there.  You
23 have to check with him about what time they got there.
24   Q.  Thank you, sir.
25       MR. HILL:  I have no further questions.

85

1            MR. MCCLELLAN:  I have nothing further.
2            THE COURT:  Call your next.
3            MR. MCCLELLAN:  State would call Detective
4  Ted Bloyd.
5            THE COURT:  Proceed, please.
6            MR. MCCLELLAN:  Thank you.
7            DETECTIVE TED C. BLOYD,
8  having been first duly sworn, testified as follows:
9                DIRECT EXAMINATION
10 BY MR. MCCLELLAN:
11   Q.  State your name for the record, please.
12   A.  Ted C. Bloyd.
13   Q.  Mr. Bloyd, how are you employed?
14   A.  Houston Police.
15   Q.  How long have you been with homicide?
16   A.  Eighteen years.
17   Q.  Let me direct your attention back to December
18 of 1998.  Were you so employed with the homicide
19 division at that time?
20   A.  Yes, I was.
21   Q.  Did you have an occasion to be assigned to
22 investigate a shooting incident that occurred on Lantern
23 Point Drive in Harris County, Texas?
24   A.  Yes, I was.
25   Q.  Did you go to that location?

86

1    A.  I did.
2    Q.  And about what time, if you recall, did you
3  arrive at the location on Lantern Point Drive?
4    A.  It was about 2:30 in the morning.
5    Q.  At the time you arrived, were there other
6  members of the Houston Police Department already present
7  at the scene?
8    A.  Yes, sir, there were.
9    Q.  Do you recall what divisions or
10 responsibilities were there at the time?
11   A.  My partner, Bob King, was already there.  There
12 were two crime scene units, a patrol officer that had
13 been assigned to that call to secure the scene.
14   Q.  At the time you arrived -- what do you do first
15 when you arrive at the scene?
16   A.  First thing we do is talk to the patrol officer
17 at the scene and get some preliminary information from
18 him.  After that, my partner and I usually split up the
19 duties.  One of us usually interviews the witnesses
20 while the other handles the physical evidence and
21 description of the scene.
22   Q.  And your responsibility in this scene was to do
23 what?
24   A.  Mine was the scene part.
25   Q.  The physical evidence part?

87

1    A.   Yes.

2    Q.   Now at the time you arrived, did you have

3  information as to any vehicles that were being looked

4  for in relationship to this scene?

5    A.   Yes, sir, I did.

6    Q.   And what vehicles were those?

7    A.   It was a '95 blue Lexus, and then a reddish or

8  orange-colored Intrepid.

9    Q.   Did you have any information as to whether or

10 not there was someone -- other than the people who had

11 been removed by the ambulance at the scene -- someone

12 else involved in the scene?

13   A.   Yes, sir.

14   Q.   And who was that?

15   A.   A female.

16   Q.   Okay.  And did you -- at the location, can you

17 describe the conditions of -- at Lantern Point Drive?

18 What kind of scene is it, as far as buildings or what

19 the situation is, physical layout?

20   A.   Well, this is just a four-lane, concrete-paved

21 street that runs north and south.  On either side of it

22 are vacant lots, and this street is approximately one

23 block west of the Astrodome.  That 8200 block is bounded

24 on the North by McKnee Street and on the south by

25 Murworth Street.

88

1    Q.   Being responsible for the scene, did you walk

2  through that scene location between Murworth and McNee

3  and examine the physical evidence that might be there?

4    A.   Yes, I did.

5    Q.   Were there spent shell casings that were

6  present at the scene?

7    A.   We found five fired cartridges there.

8    Q.   Okay.  Let me show you what's been introduced

9  into evidence as State's Exhibit No. 31.  Did you see

10 this item at the scene?

11   A.   Yes, I did.

12   Q.   Additionally, was there, to your knowledge, a

13 weapon recovered from the scene?

14   A.   Yes, sir.

15   Q.   At the time, this being the early morning hours

16 of December the 7th, 1999, had you received information

17 as to what had occurred that caused the people to be

18 shot?

19   A.   Yes, sir.

20   Q.   Does that relate to the fact that there was

21 people stopped as a good samaritan and someone shot?

22   A.   That's correct.

23   Q.   At the scene did you find evidence that led you

24 to disbelieve that theory?

25   A.   Yes, sir.

89

1    Q.   What was that?

2    A.   Just the basic location.  It was such a remote

3  spot.  This bag with the cut-up newspaper inside of it,

4  the dark conditions out there.  There were no

5  streetlights.  It just didn't look right.

6    Q.   Later in the morning of December the 7th, 1998,

7  did you get further information as to who this person,

8  black female, that was missing from that location may

9  be?

10   A.   Yes, sir, I did.

11   Q.   Did you have an occasion that morning to talk

12 to Laticia Carmouche?

13   A.   Yes, sir, I did.

14   Q.   Based on what she said, did you get information

15 about who the person might be that they may be looking

16 for by the name of Mary?

17   A.   Yes, sir.

18   Q.   Later that same day of December the 7th, 1998,

19 did you accompany Officer King in going to the hospitals

20 where the people who had been shot had been taken?

21   A.   Yes, I did.

22   Q.   Did you have an occasion to go to Ben Taub

23 Hospital to try to interview a Dion Holley?

24   A.   Yes, sir.

25   Q.   Without saying what Dion Holley said, can you

90

1  tell us as to whether or not Mr. Holley was cooperative

2  with you in giving you information that you thought was

3  helpful in addressing the situation in this case?

4    A.   No, sir.

5    Q.   He was not helpful?

6    A.   He was not helpful.

7    Q.   Could you describe his demeanor or how he was

8  acting?

9    A.   Mr. Holley was being very evasive, tried to be

10 as nondescript as possible as to what happened out

11 there; and his description of persons and events were

12 just very vague.

13   Q.   Okay.  Did you ever confront Mr. Holley with

14 any inconsistencies between what you thought the

15 physical evidence showed and what his story had been to

16 the people at the scene?

17   A.   Yes, sir, I did.

18   Q.   At this interview, did you ever have an

19 occasion to talk to Mr. Holley about whether or not he

20 was in any kind of trouble for what may have occurred?

21   A.   I think we said several times to him that he

22 was not in trouble, that we were investigating a murder,

23 that we were not looking into or filing charges on

24 anyone for any kind of narcotics traffic.

25   Q.   Did that change Mr. Holley's attitude or

**91**

1 cooperation?

2    A. No, it did not.

3    Q. That same day, did you receive information --

4 well, first of all, did you go and try to talk to Kevin

5 Walker?

6    A. I think we made the attempt, but he was in

7 surgery at the time and was unable to be interviewed on

8 that particular day.

9    Q. Did there come a time when you received

10 information as to the name of a person who might be

11 responsible for the shooting?

12    A. Yes, sir.

13    Q. And how was that information obtained?

14    A. John Canon from our public information office

15 called and related a name that he had received from a

16 newspaper reporter who had gotten it from the father of

17 Kevin Walter.

18    Q. Okay. Later in the -- that day or the next

19 day -- later the next day, did you have an occasion to

20 go and talk to Kevin Walter?

21    A. Yes, sir, we did.

22    Q. Prior to going and talking to Kevin Walter, was

23 there other evidence that was discovered that you became

24 aware of that related to this case?

25    A. Yes, sir.

**92**

1    Q. And what was discovered?

2    A. The '94 blue Lexus was found late Monday

3 afternoon.

4    Q. Can you tell us what location the blue Lexus

5 was recovered at?

6    A. It was found at an apartment complex in the

7 10800 block of Fondren.

8    Q. And did you actually go to that location of

9 10800 fountain? --

10    A. Yes, I did.

11    Q. -- and observe the blue Lexus there?

12    A. Yes, sir.

13        MR. MCCLELLAN: May I approach the

14 witness, Your Honor?

15        THE COURT: Yes.

16    Q. (BY MR. MCCLELLAN) Let me show you what's been

17 marked as State's Exhibits 63 and 64 and ask you, does

18 that fairly and accurately depict the location where the

19 blue Lexus was recovered?

20    A. Yes, it does.

21    Q. Okay.

22        MR. MCCLELLAN: At this time, the State

23 would offer into evidence State's Exhibits 63 and 64 and

24 tender to defense counsel for examination.

25        MR. HILL: And I have no objection, Judge.

**93**

1        THE COURT: State's 63 and 64 are

2 admitted.

3    Q. (BY MR. MCCLELLAN) Was a Crime Scene Unit

4 called out to process this vehicle or have this vehicle

5 processed?

6    A. Yes, it was.

7    Q. Were you present at the time the Crime Scene

8 Unit came out, or had you already left?

9    A. No, sir, I was still there.

10    Q. Now the -- at 10800 Fondren, where the Lexus

11 was recovered, was there an indication at the scene that

12 the car may have been at one other location and moved to

13 another?

14    A. Yes, sir.

15    Q. And what type of evidence was there to indicate

16 that?

17    A. On the opposite side of that driveway from

18 where the car was found, there was some glass and some

19 trash debris. And then I also found a small picture of

20 Dion Holley laying on the ground there.

21    Q. Okay. You're talking about, on State's Exhibit

22 No. 64, does that show the area of where the State's

23 Exhibit No. 66 is a close-up of?

24    A. Yes, it does.

25    Q. Is -- okay. Does State's Exhibit 66 fairly and

**94**

1 accurately depict the scene as it appeared there back on

2 that day?

3    A. Yes, it does.

4        MR. MCCLELLAN: At this time, Your Honor,

5 State would offer into evidence State's Exhibit 66 and

6 tender to counsel for his examination.

7        MR. HILL: No objection, Your Honor.

8        THE COURT: State's Exhibit 66 is

9 admitted.

10    Q. (BY MR. MCCLELLAN) And I ask you to place on

11 State's Exhibit 64 a sticker to indicate where the glass

12 is that was observed, and then also to show where the

13 photograph was. And this is the area where the

14 photograph was?

15    A. Yes.

16    Q. And is that glass area -- place that sticker

17 there. I'll mark that glass and photo. And is State's

18 Exhibit 66a a close-up of that photo?

19    A. Yes, it is.

20    Q. On December the 8th, 1998, did you have an

21 occasion on that morning to go and see Kevin Walter in

22 the hospital?

23    A. Yes, we did.

24    Q. Can you tell us the condition of Kevin Walter

25 as to his physical condition, as well as his ability to

95

1    communicate at the time you saw him on December 8th?

2    A.  Mr. Walter was in the S.I.C. Unit. He had a

3  number of tubes coming out of his throat. He was in

4  obvious pain, but he was conscious at the time we spoke

5  to him.

6    Q.  And did you seek to ask Kevin Walter questions

7  there at that location at that time?

8    A.  Yes, we did.

9    Q.  And how was he able to communicate with you, if

10  he was?

11    A.  He began by just answering yes or no questions.

12  And then when that became too painful, my partner gave

13  him a pad to write notes on.

14    Q.  Okay. As a result of talking with Kevin Walter

15  on December the 8th, 1998, were you able to confirm a

16  name that you had previously been given as a person

17  responsible for the shootings on Lantern Point Drive?

18    A.  Yes, sir.

19    Q.  What name were you given?

20    A.  Charles Mamou.

21    Q.  Is there another name he was referred to as, in

22  addition to Charles Mamou?

23    A.  Yes, sir.

24    Q.  What was that?

25    A.  Chucky.

96

1    Q.  Was Mr. Walter able to give you a telephone

2  number that he had used in contacting Charles Mamou here

3  in Houston?

4    A.  Yes, he did.

5    Q.  Did you then record that number in your report?

6    A.  Yes, sir.

7    Q.  What, if anything, did you have done with that

8  number by asking other people in the homicide division

9  to help find anything out about that number?

10    A.  We were able to trace who that phone number

11  belonged to.

12    Q.  And who did that phone number come back to?

13    A.  Robin Scott.

14    Q.  Did you have other detectives who were

15  assisting you in the investigation of this case?

16    A.  Yes, we did.

17    Q.  Were any other -- was Robin Scott then located

18  here in the Houston area?

19    A.  Yes, she was.

20    Q.  Who went to see her, if you know?

21    A.  Sergeant Novak and Officer Chisolm.

22    Q.  As a result of their conversation with Robin

23  Scott, were you directed to any location in Harris

24  County?

25    A.  Yes, I was.

97

1    Q.  What location was that?

2    A.  10800 Fondren, at Fondren Court Apartments

3  there, Apartment Number 1402.

4    Q.  And did you go to that location?

5    A.  Yes, sir.

6    Q.  Prior to going directly to that location,

7  though, can you tell us what, if anything, you did in

8  relation to that -- you did in relation to that location

9  in Harris County?

10    A.  We called the dispatcher and asked for a patrol

11  unit from that area to go there and monitor who came and

12  went from that particular apartment.

13    Q.  Okay. Now this apartment was at 10800 Fondren?

14    A.  Yes, sir.

15    Q.  Is that the same address or physical location

16  that you had -- or where the Lexus was recovered?

17    A.  Yes, it is.

18    Q.  Did you go to the Apartment -- I think you

19  said --

20    A.  1402.

21    Q.  Eventually, did you go to that location?

22    A.  Yes, sir.

23    Q.  Who did you encounter at that location?

24    A.  Howard Scott.

25    Q.  Did you search the apartment to determine

98

1  whether or not Charles Mamou was at that location?

2    A.  Yes, we did.

3    Q.  Did you find Charles Mamou?

4    A.  No, sir.

5    Q.  And did Howard Scott cooperate by giving

6  homicide detectives a statement about what he knew?

7    A.  Yes, he did.

8    Q.  Did y'all receive a consent to search the

9  apartment from Robin and Howard Scott?

10    A.  Yes.

11    Q.  This all was occurring on December the 8th,

12  1998?

13    A.  That's going to be the 9th.

14    Q.  9th, okay?

15    A.  No, sir. I'm sorry. That is the 8th.

16    Q.  The 8th would have been on?

17    A.  Tuesday.

18    Q.  Tuesday. Okay. After talking with Howard

19  Scott at 10800 Fondren, did you receive information from

20  another law enforcement agency concerning a recovery of

21  a black female?

22    A.  Yes, we did.

23    Q.  And were officers assigned -- detectives

24  assigned to go to that location?

25    A.  Yes, sir.

99

1    Q. Do you recall what that location was?
2    A. That was 9227 Lynchester.
3    Q. Is that also in Harris County, Texas?
4    A. Yes, it is.
5    Q. Did you later determine the person that was
6    found at that location was, in fact, Mary Carmouche? --
7    A. Yes, we did.
8    Q. -- the person you had been looking for?
9    A. Yes, sir.
10   Q. On December the 9th, 1998, did you have an
11   occasion to go to Ben Taub Hospital to determine if any
12   ballistics evidence was present at the hospital that
13   needs to be turned over to the firearms lab?
14   A. Yes, sir.
15   Q. Did you recover any type of ballistics evidence
16   at Ben Taub Hospital on December the 9th, 1998?
17   A. Yes, I did.
18       MR. MCCLELLAN: May I approach the
19   witness, Your Honor?
20       THE COURT: Yes, sir.
21   Q. (BY MR. MCCLELLAN) Let me show you what's been
22   marked for identification purposes as State's Exhibit
23   No. 79 and ask you if you can identify that?
24   A. Yes, I can.
25   Q. And is this ballistics evidence that you

100

1    recovered from Ben Taub Hospital on December the 9th,
2    1998?
3    A. Yes, it is.
4        MR. MCCLELLAN: At this time, Your Honor,
5    the State would offer into evidence State's Exhibit No.
6    79 and tender to defense counsel for examination.
7        MR. HILL: No objection, Judge.
8        THE COURT: State's 79 is admitted.
9    Q. (BY MR. MCCLELLAN) And there are some pieces
10   of paper in here relating to a name of a person. Is
11   that the person who was being treated at Ben Taub
12   Hospital?
13   A. Yes, it is.
14   Q. This bullet fragment was recovered from Dion
15   Holley?
16   A. Yes, it was.
17       MR. MCCLELLAN: I'll pass the witness,
18   Your Honor.
19       CROSS-EXAMINATION
20   BY MR. HILL:
21   Q. Detective Bloyd, let me ask you, you said when
22   you arrived that your partner, Bob King was already
23   there. Do you know how long he had been at the scene on
24   Lantern Point before you arrived?
25   A. Yes, sir.

101

1    Q. How long had he been there, sir?
2    A. About twenty minutes.
3    Q. When you arrive at a scene, do you talk to
4    people first or do you kind of do a canvass of your own
5    with your partner to see what things look like? How
6    would you go about starting your investigation once you
7    roll up on the scene?
8    A. Well, the first thing I do is talk to the
9    primary unit to get the basics of what has occurred
10   already. He knows about what's going on. And if the
11   Crime Scene Unit is there, also to confer with them
12   about what evidence they might have found so far.
13   Q. Okay. The Crime Scene Unit is there expressly
14   for the purpose of kind of looking through things. And
15   if there is items that look like they're relevant to
16   your investigation, you may retrieve them, store them
17   for later use in court, correct?
18   A. That's correct.
19   Q. Do you direct the Crime Scene Unit as to what
20   items should be recovered, or is that something they
21   basically have at their responsibility?
22   A. We work kind of as a partnership on that;
23   however, I have the ultimate responsibility for that.
24   And if I see something that I feel needs to be
25   recovered, then I -- and that he hasn't done so far, I

102

1    will direct them to recover that evidence.
2    Q. Okay. So if your partner arrived there about
3    twenty minutes before you, that would put him arriving
4    at that scene somewhere around 2:00 o'clock or 2:10 in
5    the morning of December 7th? Is it clear to you,
6    Detective Bloyd, when you got there and you hear this
7    version of the events, if you will, the good samaritan
8    story, is it pretty obvious to you as you walk through
9    the scene that that's not going to be correct? You
10   have suspicions immediately when you go out there?
11   A. After seeing the paper money, that certainly
12   aroused my suspicions, yes.
13   Q. Okay. And were there other items that, as you
14   walked through the scene and investigated that early
15   morning hours, that confirmed in your mind, as a trained
16   investigator, that, in fact, that was probably not a
17   good samaritan situation, but rather some type of dope
18   deal gone bad?
19   A. Yes, sir.
20   Q. And with that information, then you have the
21   responsibility to follow up and try to speak with
22   potential witnesses, correct?
23   A. Yes, sir.
24   Q. Now you indicated normally you and your partner
25   break up or split up the duties. And I guess at some

103

1    point after you leave the scene, you're going to go to
2    Ben Taub to see Mr. Holley, as well as trying to see
3    Mr. Walter at Hermann hospital.  Does Officer King go
4    with you?  Are you together, or do you split that
5    responsibility, in terms of who goes to see who?
6        A.  No.  At that particular point of the day, he
7    and I are together when we interviewed Mr. Holley.
8        Q.  Okay.  And that's Dion Holley who is at Ben
9    Taub Hospital, right?
10       A.  Yes.
11       Q.  Approximately what time do you go see him?
12       A.  About 12:15 in the afternoon.
13       Q.  So we are roughly talking about twelve hours --
14   I'm sorry -- ten hours from the time you arrived at the
15   scene, you're now talking to Mr. Holley?
16       A.  Yes.
17       Q.  At the time that you met Mr. Holley, how do you
18   introduce yourself to him?  You tell him you're a
19   member of the Houston Homicide Police Department
20   Division (sic)?
21       A.  Yes, sir.
22       Q.  You tell him you're a police officer.  He knows
23   that, right?
24       A.  Yes.
25       Q.  He was conscious and he was alert?

104

1        A.  Yes.
2        Q.  He was not in the same type of condition, I
3    take it, that Mr. Walter was in when you later saw him?
4        A.  Not as serious.  He was experiencing some pain,
5    but he certainly was not as serious as Mr. Walter.
6        Q.  Mr. Holley's injury was localized to his arm,
7    correct?
8        A.  Yes.
9        Q.  Which arm was he shot in?
10       A.  The right arm.
11       Q.  All right.  After you introduced yourself to
12   Dion Holley, what do you say to him?  You tell him, I'm
13   investigating a homicide that took place on Lantern
14   Point?  Or what would you say to him as you first meet
15   him in the hospital?
16       A.  Well, that I had been assigned to investigate
17   it and, of course, one of the people there was dead and
18   the girl was missing.  I first asked him just to tell me
19   what happened in his own words.
20       Q.  And after you asked him to just tell you what
21   happened, I believe you indicated he was evasive and
22   basically not cooperative?
23       A.  That's correct.
24       Q.  Did he tell you what his relationship was with
25   the woman that was missing?

105

1            MR. MCCLELLAN:  I object.  That would be
2    calling for a hearsay response, Your Honor.
3            MR. HILL:  I believe the State has
4    elicited --
5            THE COURT:  I'm going to allow it.
6        Q.  (BY MR. HILL)  Did he indicate to you at that
7    time what his relationship with that woman was?
8        A.  We asked him if that was his girlfriend, and he
9    denied that was his girlfriend.
10       Q.  Did he, in fact, indicate that he barely knew
11   her?
12       A.  Yes, sir.
13       Q.  Did you, as a trained investigator, find that a
14   little unusual?
15       A.  Yes, sir.
16       Q.  Was that one of the pieces of information that
17   didn't seem to fit right with the way your investigation
18   was going?
19       A.  I found that to be uncooperative, yes.
20       Q.  When you are talking to Mr. Holley, do you give
21   him any type of legal warning before you speak with him?
22       A.  No, sir.
23       Q.  So he was not, in your mind, a suspect of any
24   crime at that point?
25       A.  This is not a custodian statement; so, no, he

106

1    was not under suspicion as to any particular crime.
2        Q.  But you were not there to investigate whether a
3    narcotics transaction had taken place, correct?
4        A.  That was not a priority now.
5        Q.  And that was not something you were trying to
6    develop as a homicide officer.  You were not interested
7    in trying to develop a case against Mr. Holley or a case
8    against Mr. Walter for any kind of conspiracy, were you?
9        A.  No, sir.
10       Q.  Your total focus is on trying to determine who
11   was responsible for the death of Terrence Gibson,
12   correct?  And then ultimately as your investigation
13   progressed, who was responsible for the death of Mary
14   Carmouche?
15       A.  My main concern at that point was to try and
16   locate Mary Carmouche, hoping that she was still alive.
17       Q.  So in terms of investigating the death of any
18   individual at that point, prior to discovering her body,
19   you're only investigating the death of Terrence Gibson?
20       A.  Yes.
21       Q.  Are you of the opinion, based upon your
22   communications with Mr. Holley, that he knew Mr. Gibson,
23   the deceased?
24       A.  The deceased, yes.
25       Q.  What inconsistencies did you confront

107

1    Mr. Holley with when he was evasive and nondescript and
2    generally not helpful?  What were the inconsistencies
3    that you confronted him with?
4        A.  The -- specifically, the paper money on the
5    ground there, the other weapon that was in here, just
6    the fact that he was trying to be evasive with us.
7        Q.  Did you say anything to him like, Look, Holley,
8    you're being evasive with me?  Come clean and tell me
9    what really happened?  How do you let him know that you,
10   as a detective, think he's being evasive with you?
11   What do you say to him?
12       A.  Just that, that he's not telling us the truth,
13   that, again, we reiterated that we were not trying to
14   bring any kind of charges against him, but his story was
15   obviously not true.
16       Q.  Okay.  You know he's lying to you at that
17   point?
18       A.  Yep.
19       Q.  Now what was it exactly, when I asked you to
20   tell me what the -- what did you confront him with?
21   What inconsistencies?  You said the paper money and the
22   gun.  What was it that was inconsistent about the gun?
23   Had he said something to you that caused you to think
24   his story was inconsistent?
25       A.  No, just the fact that you have one gun found

108

1    at the scene that was not used.  It did not appear to
2    have been fired.  Rounds from another gun there.
3        Q.  What does that tell you, as an investigator?
4        A.  That this was more than just a good samaritan
5    rip-off here.
6        Q.  Okay.  Even after Detective King makes sure to
7    Mr. Holley you are not interested in drug deals, you're
8    not interested in prosecuting them all for anything they
9    may have been doing, he doesn't share the information
10   with you, does he?
11       A.  No, sir.
12       Q.  And now this -- do you go see him a second
13   time?
14       A.  Yes.
15       Q.  And if I'm correct, the first time you see him
16   is at 12:15 p.m., and that would be on the 7th of
17   December?
18       A.  Yes.
19       Q.  When is the next time you go see him?
20       A.  Next morning.
21       Q.  December 8th?
22       A.  Approximately what time, if you recall?
23       A.  It was around 8:00, 8:30 in the morning.
24       Q.  Now in between 12:15 p.m. on the 7th and 8:30
25   in the morning on the 8th, what had you done in terms of

109

1    your investigation?
2        A.  The car had been located at that time.
3        Q.  Okay.  Had Mary Carmouche's body been found at
4    that point?
5        A.  No.
6        Q.  So 8:30 in morning, at the hospital again,
7    you're talking to Holley.  How do you reinitiate the
8    conversation with him?  What is your purpose in going
9    back there?  He's already told you the day before this
10   is a good samaritan situation?
11       A.  I don't know.
12       Q.  If he didn't come clean with you, what was your
13   purpose in going back the second day?
14       A.  Just to try again to see if he changed his mind
15   about telling the truth.
16       Q.  And what was the reaction that you got?
17       A.  When we told him that the car had been found,
18   he asked if it had been trashed out.
19       Q.  Did he explain to you what he meant by trashed
20   out?  I know that sounds stupid, but did he go into
21   specifics?  Did he ask you whether or not the
22   upholstery was torn up?  Did it look like somebody had
23   gone through there looking for something?
24       A.  No.
25       Q.  Your response, when he asked you if the car had

110

1    been trashed out, was just that it had a flat tire and
2    the window was busted out?  Did it appear to you that
3    the vehicle, other than what you have just described,
4    was in a state of disarray?
5        A.  Other than the bullet hole in the seat and a
6    little bit of blood, no, it was in good shape.
7        Q.  What about the trunk, condition of the trunk?
8        A.  Trunk was all right.
9        Q.  Were there items in the trunk?
10       A.  Yes.
11       Q.  And generally describe for the jury, if you
12   would, what was in the trunk?
13       A.  Some tennis shoes, articles of clothing.
14       Q.  Now after you tell him that the vehicle is
15   found and he asked you if it's trashed, what else do you
16   tell him?
17       A.  Again, we just asked him to tell us about what
18   happened out there, if he knew who it was that did it.
19       Q.  And he doesn't share that information with you
20   at that time?
21       A.  No, sir.
22       Q.  Now when you're talking to him, what kind of
23   tone of voice are you using when you're trying to get
24   him to cooperate?
25       A.  It's a normal tone of voice.

111

1    Q.  You don't raise your voice at all?  You don't
2  suggest to him that you're tired of him giving all these
3  lies to you?
4    A.  No, sir.
5    Q.  And are both you and King present at the second
6  meeting, as well as at the hospital?
7    A.  Yes.
8    Q.  During the time he's talking with you and
9  meeting with you, again, he's conscious; he's alert; he
10  may be in pain in his right arm, but he's otherwise okay
11  to talk with you?
12    A.  Yes.
13    Q.  It was clear to you that he understood what
14  your questioning was all about?
15    A.  Yes.
16    Q.  Does he ever inquire what happened when you
17  tell him that the car's window got busted out and there
18  is a flat tire?
19        MR. MCCLELLAN:  I object, calling for a
20  hearsay response.
21        THE COURT:  Sustained.
22    Q.  (BY MR. HILL)  Without telling us what he said,
23  what was his reaction when he found out he had a flat
24  tire and busted window?  Did he appear upset?
25    A.  Not too upset, no.

112

1    Q.  And at that point, of course, you had not yet
2  found out the circumstance surrounding Mary Carmouche?
3    A.  No, sir.
4    Q.  Let's go back for a moment to, I guess it's
5  going to be -- it's the 8th of December when the vehicle
6  is located over at the Fondren Court Apartments?
7    A.  No, sir, that's the 7th.
8    Q.  7th, in the morning, is when you're seen at
9  2:30, 2:15.  You're already at Ben Taub talking to
10  Holley.  Approximately what time is it that you're
11  called out to Fondren Court Apartments?
12    A.  Around 3:30 or 3:45.
13    Q.  P.m.?
14    A.  P.m., yes, sir.
15    Q.  When you go out there, you see this
16  vehicle -- it obviously matches the description of the
17  vehicle you're looking for, correct?
18    A.  Yes, sir.
19    Q.  And the vehicle that backed into a spot out
20  there at the apartment complex?
21    A.  Yes, sir.
22    Q.  What was the condition of the surrounding
23  ground right by the vehicle as it was parked?  Did you
24  look to see whether or not there was any grass there
25  outside on the ground?

113

1    A.  Yes, sir.
2    Q.  And was there any?
3    A.  Not that I recall.
4    Q.  Was there any item of significance to you where
5  the vehicle was parked -- and I'll move away from the
6  vehicle in a second -- but right where it was parked?
7    A.  As I recall, I had some kind of covering there
8  that was laying on the ground.
9    Q.  Would you like to look at that?  Let me just
10  show you these photographs.  They're State's 63, 64, and
11  66.  Take a look at those for a moment, if you would.
12  With regard to State's Exhibit No. 63, that depicts
13  where the Lexus was backed in underneath what appears to
14  be a carport, correct?
15    A.  Yes, sir.
16    Q.  Let me focus on that, if I can.  Was there
17  anything of any significance in that photograph close to
18  the area of the vehicle that you found?
19    A.  Yes, sir.
20    Q.  And what was that?
21    A.  This is the blood with the plastic back here at
22  the back of it.
23    Q.  And what is that plastic?  What was that
24  recovered for?
25    A.  It's like a car covering, as if the car had

114

1  been trying to be disguised.
2    Q.  Did you talk to anybody out there with regard
3  to how long that vehicle had been there?
4    A.  Officer King and I talked to the manager out
5  there.
6    Q.  Okay.  And you learned, obviously, that this
7  vehicle did not belong here?
8    A.  Correct.
9    Q.  Now as we move away from the vehicle, what is
10  depicted in State's Exhibit 64, that's where you have
11  marked the glass?
12    A.  Yes.
13    Q.  Could you please tell me, as you look at
14  Exhibit 64, if you want to take that for just a second,
15  what does that suggest in terms of how the vehicle was
16  parked at that location?
17    A.  Well, at some point it's -- the driver's window
18  there is broken out, so the driver's window would have
19  probably been next to that glass right there.
20    Q.  Okay.  But can you tell in which direction the
21  car would have been, whether the car would have been
22  backed in here, or would have been sideways,
23  perpendicular to that glass, or for that matter, whether
24  it was on that side?  There is three different locations
25  where that car could have been for that glass to have

115

1    been deposited there, correct?
2       A.   Correct.
3       Q.   And then the photograph, which you have the
4    little marker on, that was more fully described in right
5    here, correct?
6       A.   Yes.
7       Q.   Was that rock or stone on top of the
8    photograph, just the way it is there?
9       A.   No, sir.
10       Q.   Somebody placed that on there to keep it from
11    blowing away?
12       A.   Correct.
13       Q.   You were out there at the Fondren Court
14    Apartments; Crime Scene Unit comes out; they photograph
15    the vehicle; you talk to the manager of the complex,
16    correct?
17       A.   My partner did, yes.
18       Q.   Do you talk to anybody else out there? --
19       A.   No, sir.
20       Q.   -- at that time?
21       A.   No, sir.
22       Q.   So you're, at that point, recognizing that it's
23    the vehicle, making the observations that you do,
24    documenting them; you tell the Crime Scene Unit,
25    Photograph this, retrieve this evidentiary-wise?

116

1       A.   Pretty much.
2       Q.   Okay.  How long do you stay out there?
3       A.   We're there probably an hour.
4       Q.   At that time, do you make any effort to canvass
5    the area for potential witnesses, knock on doors or
6    anything to see if anybody can see the vehicle there?
7       A.   Yes, sir.
8       Q.   There was just nobody that was able to provide
9    any information to you at that time?
10       A.   No, sir.
11       Q.   Did you ultimately -- on that particular day
12    when you went out there, did you knock on Apartment
13    Number 1402, which ultimately was where Robin and Howard
14    Scott live?
15       A.   No, sir.
16       Q.   Where is their apartment in relation to where
17    the Lexus is located?
18       A.   It's north of that particular set of buildings.
19    It is north of the one that's in that picture there.
20       Q.   Approximately how far would that be?
21       A.   Fifty, a hundred yards.
22       Q.   Could you determine from looking at the Lexus
23    what caused the tires to deflate?
24       A.   No, sir.
25       Q.   Was that something you were interested in

117

1    getting an answer to?
2       A.   Yes, sir.
3       Q.   Did you subsequently follow up and see whether
4    or not there was some answer to why the tire was flat?
5       A.   Well, the car was taken to our vehicle
6    examination building to be examined for firearms
7    evidence, which we're looking at the tire to see if a
8    bullet had penetrated it; but no.
9       Q.   So is the answer, you never found out what
10    caused the tires to deflate?
11       A.   That's correct.
12       Q.   Just describe for the jury, if you would, how
13    you come to the conclusion that the photographs shown in
14    State's Exhibits 63, 64, and 66 reflect that the blue
15    Lexus had been at a different location in that parking
16    lot at one time?   How do you make that conclusion?
17       A.   That it had been on the opposite side of the
18    parking lot?
19       Q.   Yes, sir.
20       A.   Because of all the glass over there.
21       Q.   And that glass matched, I take it, the glass
22    that was found in the interior of the Lexus?
23       A.   Well, the glass and the combination with the
24    picture and other items there.
25       Q.   Okay.  Was that photograph taken to be

118

1    fingerprinted?
2       A.   No, sir.
3       Q.   At some point prior to you going back now to
4    the other hospital to see Kevin Walter, you already
5    received information that connects a telephone number
6    that was used by Walter to contact Mr. Mamou, correct?
7    Is that your testimony?
8       A.   Would you go over that again, please?
9       Q.   Sure.  Prior to going to see Kevin Walter at
10    the hospital, had you already received information -- I
11    believe you said there was a person -- was it the Public
12    Service section that had gotten information from perhaps
13    Mr. Walter's father?
14       A.   Yes.
15       Q.   So prior to going to see Mr. Walter and being
16    able to talk to him, you had already received
17    information that this was a telephone number where
18    Walter would contact Mr. Charles Mamou?
19       A.   No, sir.
20       Q.   When did you receive that information?
21       A.   The telephone number we got that following
22    morning.
23       Q.   Okay.  Please tell me which morning we're
24    talking about, because there is several days here.
25    We're talking about the 8th now?

119

1    A.  Yes, the morning of the 8th, when we -- we were
2  contacted by Kevin Walter's father --
3    Q.  Okay.
4    A.  -- who gave us, again, that name and phone
5  number.  The phone number did not come from the V.I.P.
6  office; just the name.
7    Q.  What was the telephone number you had?  Was
8  that the number that came back to Robin Scott's
9  apartment?
10    A.  Yes.
11    Q.  What number is that, please?
12    A.  713-773-3119.
13    Q.  So you get that on 12-8-98, at approximately
14  what time?  Was that in the morning?
15    A.  Yes, sir.
16    Q.  And is it after that point in time that you go
17  see Kevin in the hospital?
18    A.  No, sir.  That number that I just gave you we
19  got at the hospital from Kevin.  That was not the number
20  that Mr. Lewis gave us, also.
21    Q.  So what -- do you write it down on a slip of
22  paper, or was that a number he was able to tell you as
23  he was talking to you?
24    A.  He took the pen and wrote that on the paper.
25    Q.  Okay.  Did you -- you said initially you asked

120

1  him yes and no questions; and it became too painful for
2  him to respond, and that's when you went to the format
3  of using a piece of paper.  Did he, likewise, give the
4  same type of situation that Holley had given about a
5  good samaritan?
6    A.  When we first asked him about that, we
7  restricted the questions as to identifying the shooter;
8  and those were the yes or no questions.  If the person
9  that shot him was Charles Mamou, is he also known as
10  Chucky, and so on and so forth.  We did not go into
11  details as to actually how the shooting occurred.
12    Q.  Do you eventually go into detail about what the
13  circumstances were with him?
14    A.  Not this particular day, no.
15    Q.  At some point in the future, did he tell you
16  essentially the same story that Dion Holley had told you
17  about the good samaritan?
18    A.  No, sir.
19    Q.  He detours or goes away from that story and
20  tells you something different?
21    A.  Yes.
22    Q.  What day is that?
23        THE COURT:  Let's take a short break.
24  Ladies and gentlemen, if you would, please go back in
25  the jury room.

121

1        (Brief recess.)
2        (Jury is brought in and seated.)
3        THE COURT:  Please be seated.  When we
4  broke, we were on cross-examination by defense.
5        Please continue.
6        MR. HILL:  Thank you, Judge.
7            CROSS-EXAMINATION CONTINUED
8  BY MR. HILL:
9    Q.  Detective Bloyd, as you're working on this case
10  and it takes you out to that location on Fondren, 10800
11  Fondren -- and that's Fondren Park Apartments -- I'm
12  sorry, Fondren Court Apartments?
13    A.  Yes, sir.
14    Q.  That's where the Scotts live; is that correct?
15    A.  That's correct.
16    Q.  You indicated when you went out there that you
17  secured a consent to search, and you went into the
18  Scotts' apartment looking for Mr. Mamou and, I would
19  assume, any other evidence that you might find; is that
20  correct?
21    A.  That's correct.
22    Q.  And you found none?
23    A.  Correct.
24    Q.  At the time that you went out there prior to
25  securing the consent to search, did you share with them

122

1  that you believed that Mr. Mamou had been involved in a
2  homicide and that they were somehow concealing him or
3  hiding him?
4    A.  Now, I did not talk to Robin Scott.  Another
5  sergeant talked to her and obtained that consent to
6  search from her.
7    Q.  Would that have been Detective King who spoke
8  with her?
9    A.  No, Sergeant Novak.
10    Q.  Okay.  And in your presence, was either Howard
11  Scott or his wife, Robin Scott, read their legal
12  warnings?
13    A.  No.
14    Q.  Were there any other individuals there that you
15  spoke to that you felt were connected with your
16  investigation when you arrived there at the Scott's
17  apartment?
18    A.  No, sir.
19    Q.  Did you subsequently speak to any other
20  individuals that were involved in this investigation?
21  In other words, you spoke to Robin and Howard Scott.
22  You spoke to Dion Holley.  You had some communications
23  with Kevin Walter.  Were there other individuals that
24  you, personally, spoke with as part of your
25  investigation?

**123**

1    MR. MCCLELLAN: May we approach the bench,
2  Your Honor?
3    THE COURT: Yes.
4    (Off-the-record discussion.)
5    Q. (BY MR. HILL) Did you ever speak with Samuel
6  Johnson?
7    A. No, sir, I did not.
8    Q. At some point when you are meeting with
9  Mr. Holley at the hospital, do you present to him what
10  is commonly referred to as a photospread? Take a few
11  moments, if you would, and look through your report.
12  If you could, could you look at perhaps there is a
13  supplement dated January 4th concerning activities on
14  December 9th, 1998.
15    A. You talking about showing the photospread to
16  Dion Holley on the 9th?
17    Q. Yes. Do you recall doing that?
18    A. Yes.
19    Q. Who is it a photospread of?
20    A. Actually, we were not able to show that to
21  Mr. Holley at the time. He was in surgery.
22    Q. Okay.
23    A. However, that photospread contained pictures of
24  Terrence Dodson and Howard Scott.
25    Q. And was there ultimately some form of

**124**

1  identification made of either or both of those
2  individuals?
3    A. By Dion, on that particular day?
4    Q. When you showed it to him?
5    A. No, sir.
6    Q. Was there ever a time when you showed the same
7  type of photospread to Kevin Walter?
8    A. Kevin Walter made a tentative I.D. of Howard
9  Scott that day, but he was under the influence of
10  painkillers at that time and kind of slipped in and out
11  of consciousness as we spoke to him.
12    Q. Did he make any identifications of Mr. Mamou at
13  that time?
14    A. No.
15    Q. Were there any other photographic spreads
16  shown to him at that time?
17    A. No. The other photospreads were shown at a
18  later date.
19    Q. After he had made the tentative identification
20  of Howard Scott?
21    A. Yes.
22    Q. How many other individuals were in the
23  photospread along with Howard Scott?
24    A. There was -- the photospread contains six
25  photographs. One was Howard Scott, one was Terrence

**125**

1  Dobson, and the other were just four similar physical
2  characteristics.
3    Q. Nobody else connected with this case; only two
4  individuals whose names would be familiar to you about
5  this investigation?
6    A. Yes.
7    Q. Dodson and Scott?
8    A. Yes.
9    Q. Howard Scott. And what day was that?
10    A. That would have been the 9th, I believe.
11    Q. And what day do you get around to showing Kevin
12  Walter photographs of Mr. Mamou or any of the other
13  individuals?
14    A. That would have been -- let's see. I think
15  that's going to be Thursday, the 10th. And I didn't
16  show that photospread. Sergeant Novak and Officer
17  Chisolm showed that photograph.
18    Q. And those two individuals are also employed by
19  the Houston Police Department Homicide Division?
20    A. Yes.
21    Q. As part of your investigation into this case,
22  was it necessary for you to review cell phone records or
23  telephone records of individuals connected with the
24  case?
25    A. Yes, sir.

**126**

1    Q. Can you tell us the names of the individuals
2  whose records you evaluated?
3    A. We looked at records from Howard and Robin
4  Scott, and also, Kevin Walter.
5    Q. Now the numbers that you're referring to for
6  Robin and Howard Scott, would those be cell phone
7  numbers or traditional telephone that you find -- you
8  know, it's not a cell phone?
9    A. Well, of course we originally located their
10  name and address through the number that was given to us
11  by Kevin Walters (sic). The day at the apartment Howard
12  Scott allowed us to review his caller I.D. and Officer
13  King took a number -- a number of phone calls off his
14  caller I.D.
15    Q. All I'm trying to get at is the number that you
16  previously testified to, 773-3119, that's a traditional
17  telephone installed in the apartment complex?
18    A. Yes, it is.
19    Q. It's not a cell phone?
20    A. No, sir.
21    Q. That's all I was trying to establish. But the
22  telephone records of Kevin Walter -- I'm sorry -- the
23  records that you searched for Kevin Walter, those were
24  cell phone numbers?
25    A. I believe so, yes.

127

1    Q.   And those were the numbers that you looked on
2  the caller I.D. and confirmed there were a number of
3  telephone calls made from Kevin Walter's cell phone to
4  Robin Scott's apartment?
5    A.   Yes.
6    Q.   And what dates were those for?
7    A.   That was the date of 12-6 of '98.
8    Q.   And do you have a listing of the times that
9  were reflected on the caller I.D. as to when Kevin
10  Walter's cell phone was used to contact Robin Scott's
11  number?
12    A.   Yes, sir.
13    Q.   Would you just tell them to the jury, please?
14         MR. MCCLELLAN:  Your Honor, I object.
15  That would be hearsay.
16         THE COURT:  Sustained at this time.
17    Q.   (BY MR. HILL)  Did you observe the actual time
18  on the caller I.D.?
19    A.   No, sir.
20    Q.   Does your report reflect, however, that there
21  there are a total of six calls?
22    A.   Yes.
23         MR. HILL:  I'll pass the witness, Your
24  Honor.
25              REDIRECT EXAMINATION

128

1  BY MR. MCCLELLAN:
2    Q.   Detective Bloyd, you say you showed Kevin
3  Walter a photospread containing six photographs, which
4  included Terrence Dodson and Howard Scott?
5    A.   Yes, sir.
6    Q.   And that Kevin Walter made a tentative I.D. of
7  Howard Scott?
8    A.   Yes, sir.
9    Q.   Was that being shown to him as, can he identify
10  the shooter, or just can he identify anyone there, or --
11    A.   As to the second -- we believe there was two
12  people involved, and so he had already named Charles
13  Mamou.
14    Q.   Okay.
15    A.   And we were interested in finding out if there
16  was a second person.  We showed him the photospread and
17  asked him if he recognized anybody in that photospread.
18    Q.   If you ask somebody if they recognize anybody
19  in that photospread, was he told, do you recognize
20  anybody in that photospread who shot you, or do you just
21  recognize anybody in that photospread?
22    A.   Just, do you recognize anybody in the
23  photospread.
24    Q.   You're saying he made a tentative I.D. of the
25  fact that he recognized Howard Scott?

129

1    A.   Yes.
2    Q.   By tentative I.D., would that be sufficient for
3  you to do anything with, as far as -- let's say if he
4  had identified that person as doing something wrong,
5  would a tentative I.D. ever be sufficient for you then
6  to go forward and file charges?
7    A.   No, sir.
8    Q.   Was it made clear to Kevin Walter that -- are
9  you saying this is -- when he made the tentative I.D.,
10  did you follow up and say, how do you know him?  What do
11  you know him to do?  Or what did he do?  Or how --
12  anything -- any follow-up?
13    A.   Kevin Walter really was just fading in and out
14  of consciousness, and I can't really say for sure that
15  he understood what we were doing when he picked out that
16  picture.  We were not able to talk to him at length
17  because of him fading in and out of consciousness.
18    Q.   Now in relationship to the telephone records
19  that Mr. Hill was asking about, the cell phone, are you
20  saying the cell phone has a caller I.D. on the cell
21  phone?
22    A.   No, sir.
23    Q.   The only caller I.D. that you received numbers
24  for -- is this right?  Is the caller I.D. at Howard
25  Scott's apartment?

130

1    A.   Yes.
2    Q.   That caller I.D., the list of numbers that were
3  made by Detective King, do you know what dates they --
4  what was the latest date it went back to?  Let me ask
5  another question.  You indicated that there were records
6  that Kevin Walter had called the number where Howard
7  Scott -- the number you have for Howard Scott, the
8  number that he had given you, and you hadn't contacted
9  Charles Mamou.
10    A.   Yes.
11    Q.   That being Howard Scott's number?
12    A.   Yes.
13    Q.   You received information that he had made calls
14  to that location.  Now, was that information secured
15  from Kevin Walter's cell phone records?
16    A.   No, sir.
17    Q.   Okay.  What was it obtained from?
18    A.   The information that he gave us in the hospital
19  when he wrote that phone number down.
20    Q.   Right.
21    A.   Then we had that phone number checked through
22  the telephone company; and they supplied the subscriber
23  information, which was Robin Scott.
24    Q.   Right.  How did they provide subscriber
25  information?  They just tell you who the phone is

131

1   registered to, right?
2       A.   Yes.
3       Q.   If it's a regular residential phone, are you
4   saying there are records kept of every phone call I make
5   from my residence?   Did you have a record like that?
6       A.   No.
7       Q.   Every phone call made from that residence or
8   every phone call received to that residence?
9       A.   No, sir.
10      Q.   Those would only be toll calls, long distance
11  calls that would be recorded there?
12      A.   Yes, sir.
13      Q.   Now, were you able to examine some of Kevin
14  Walter's cell phone records?
15      A.   Yes, sir.
16      Q.   And is that where you got the information about
17  the calls to Howard Scott's number?
18      A.   No, sir.
19      Q.   During your investigation, did you ever
20  determine whether or not Charles Mamou had a cell phone
21  registered to him?
22      A.   No, sir.
23      Q.   Phone records that indicate one -- -- a call is
24  from one number to another number, does that tell you
25  who's talking?

132

1       A.   No, sir.
2       Q.   Blue plastic cover that is depicted in State's
3   Exhibit 63, that is next to the blue Lexus?
4       A.   Yes, sir.
5       Q.   Was there ever any -- did you have any
6   information that that blue plastic cover had been on the
7   car at the time the car was first located?
8       A.   Yes, sir, I think it was.
9       Q.   And that is information you had from what,
10  another officer?
11      A.   I believe so.
12      Q.   And was that blue plastic cover recovered, or
13  do you know?
14      A.   I think it was placed with the car, yes.
15           MR. MCCLELLAN:  I'll pass the witness.
16           RECROSS-EXAMINATION
17  BY MR. HILL:
18      Q.   If we'll go back to this blue cover that
19  Mr. McClellan asked you about.  When you saw it there,
20  did you physically inspect it?
21      A.   No, sir.
22      Q.   So you don't know whether there was any glass
23  in it or any other foreign substances?
24      A.   No, sir.
25      Q.   You say that it was placed with the car.  The

133

1   car is ultimately taken to the print stall and processed
2   for evidence, correct?
3       A.   Yes, sir.
4       Q.   Do you know whether or not that blue cover,
5   though, was taken into evidence and retained as evidence
6   in this case?
7       A.   I can't say what happened to that blue cover.
8       Q.   Okay.  Go back for just a moment.  When you're
9   talking about the photospread that included the picture
10  of Howard Scott and Terrence Dodson being shown to
11  Mr. Walter at the hospital, how long are you there with
12  him?
13      A.   Probably less than ten minutes.
14      Q.   And when you arrived there, do you start to
15  visit with him -- he understands the purpose of you
16  being there, doesn't he?
17           MR. MCCLELLAN:  Objection, calls for
18  speculation.
19           THE COURT:  Sustained.
20      Q.   (BY MR. HILL)  I'll take that back.  Did you
21  explain to him why you were there?
22      A.   We tried.
23      Q.   And you told him that you were a Houston Police
24  Department Detective?
25      A.   Yes.  I think he recognized us from --

134

1       Q.   You stayed there for approximately ten minutes.
2   Now you indicate that he's in and out of consciousness?
3       A.   Yes.
4       Q.   When did you show him the photospread?   At
5   what point do you show him the photospread?
6       A.   After coming up and speaking to him and getting
7   him to open his eyes, trying to realize we were there.
8       Q.   When is that in relation to the ten-minute time
9   line?
10      A.   After several minutes or so.
11      Q.   So, after three or four minutes, you feel like
12  he's awake enough to present him with the photospread?
13      A.   When he finally comes around and opens his eyes
14  and looks at us, it's obvious he recognized who we are,
15  yes, we show it to him.
16      Q.   Now just previously, though, you tried to
17  discount the tentative I.D. that he made by saying he
18  was in and out of consciousness, right?
19      A.   Yes.
20      Q.   So then you proceed to talk with him and try to
21  obtain information for another six or seven minutes,
22  ten-minute time line, three or four minutes you show him
23  the photospread, he tentatively identifies Howard Scott.
24  Then you talk to him for another six or seven
25  minutes? --

135

1    A.  Yes.
2    Q.  -- and obtain information from him?
3    A.  Trying to, yes.
4    Q.  Now when you indicated -- Mr. McClellan was
5 asking you, when you give a photospread, do you go to
6 somebody, Do you see somebody that shot you in this
7 photospread?  Or do you just say, Do you recognize
8 anybody?  When you're showing a photospread to someone,
9 you're making them aware of the fact that you're
10 investigating something, correct?
11    A.  Yes.
12    Q.  You just testified that he recognized you from
13 the day before?
14    A.  Yes.
15    Q.  He knew you were a police officer, and he knew
16 that you were connected with this investigation?
17    A.  Yes.
18    Q.  So when you showed him a series of photographs
19 and asked him whether or not he could identify anybody,
20 were you attempting to just ask him whether he just
21 recognized anybody in the universe or specifically with
22 regard to your investigation?
23    A.  With regard to the investigation.
24    Q.  When you met with Mary Carmouche's sister, you
25 spoke to her on December 7th, correct?

136

1    A.  Yes.
2    Q.  And were you attempting to determine who or
3 what member of the family had seen her last?
4    A.  She called me that morning.
5    Q.  Okay.  And in the course of conversing with
6 her, were you attempting to get information that would
7 aid you in your investigation?
8    A.  Yes.
9    Q.  As a result of speaking with her, was there any
10 particular identifying mark or tattoo that you were
11 looking to find in the event you found a body?
12    A.  Yes.
13    Q.  And would you describe that for the jury,
14 please?
15    A.  Mary was described as having two tattoos, a
16 butterfly on the left shoulder and then a star with the
17 word "superstar" on her left ankle.
18    Q.  Okay.  Were you able to determine, in speaking
19 with her sister, whether she had seen her the night
20 before?
21          MR. McCLELLAN:  I object.  It would be
22 calling for a hearsay response, Your Honor.
23          THE COURT:  Sustained.
24    Q.  (BY MR. HILL)  Did you ask her whether or not
25 she had seen her sister the day before?

137

1    A.  I don't think I had to ask.
2    Q.  Did you ask her whether or not she -- Laticia,
3 right?
4    A.  Yes.
5    Q.  Did you ask Laticia whether or not she had seen
6 her sister, Mary, with Dion Holley?
7    A.  No, sir, I did not have to ask that.
8    Q.  And did you ask Laticia whether or not Dion
9 Holley intended to go to a party at Bennington and
10 Curry?
11    A.  No, sir, I didn't have to ask that.
12    Q.  Thank you.
13          MR. HILL:  I have no further questions.
14          MR. McCLELLAN:  I have nothing further,
15 Your Honor.
16          THE COURT:  You may stand down.
17          Call your next, please.
18          MS. CONNORS:  Officer Riddle.
19              GLEN RIDDLE,
20 having been first duly sworn, testified as follows:
21            DIRECT EXAMINATION
22 BY MS. CONNORS:
23    Q.  Sir, could you introduce yourself to the jury?
24    A.  I'm Glen Riddle.  I'm a Houston Police Officer.
25    Q.  How long have you worked with H.P.D.?

138

1    A.  For seven years.
2    Q.  What particular division are you assigned?
3    A.  I'm assigned to the Homicide Division, Crime
4 Scene Unit.
5    Q.  Directing your attention back to December 8th,
6 1998, were you involved in the investigation of the
7 murder of Terrence Gibson and the disappearance of Mary
8 Carmouche?
9    A.  Yes, I was.
10    Q.  Back in December of 1998, what specific duties
11 did you perform for the Crime Scene Unit Office?
12    A.  At the time, my specific assignment within the
13 unit was with the department's vehicle examination
14 building, where vehicles that have been involved in
15 major crimes are examined and documented, checked for
16 physical evidence.
17    Q.  And back on December 8th, 1998, did you examine
18 a blue Lexus, '94?
19    A.  Yes, I did.
20    Q.  License Plate B42 CRC?
21    A.  That's correct.
22    Q.  Did you also take photographs of that blue
23 Lexus?
24    A.  Yes, I did.
25    Q.  Let me show you what's been marked for

139

1  identification purposes only as 67 through State's
2  Exhibit 75. Do you recognize those photographs?
3      A.  Yes, I do.
4      Q.  Do these fairly and accurately show the blue
5  Lexus when you photographed it back on December 8th,
6  1998?
7      A.  Yes, they do.
8          MS. CONNORS:  Your Honor, at this time I
9  tender to defense counsel State's Exhibits 67 through 75
10  and offer them into evidence.
11         MR. HILL:  We have no objection, Your
12  Honor.
13         THE COURT:  State's Exhibits 67 through 75
14  are admitted.
15     Q.  (BY MS. CONNORS)  Sir, when you examined the
16  inside of the blue Lexus, did you find any damage to the
17  car?
18     A.  Yes, I did note some damage to the car.
19     Q.  What did you find, sir?
20     A.  The first thing that caught my attention was
21  that the window to the front driver's side door was
22  broken out.
23     Q.  Did you find any other damage?
24     A.  Yes, I did.
25     Q.  What was that?

140

1      A.  I noticed that there was a bullet strike to the
2  front driver's seat, to the seat back, approximately
3  about a foot down from the top of the headrest.
4      Q.  And was there any other damage in the car?
5      A.  That particular bullet strike also exited the
6  back of the seat back and then penetrated the rear
7  passenger seat on the seat cushion.
8      Q.  Did you do anything -- perform any type of test
9  or experiment to try to determine what the path of that
10  bullet was when it entered the passenger -- ?
11     A.  Yes, I did.
12     Q.  What did you do?
13     A.  I took a metal trajectory rod and placed it
14  through the bullet strike, which showed the trajectory
15  of the bullet.
16     Q.  When you placed that rod, can you show the jury
17  where that trajectory of the path of the bullet went?
18     A.  Yes.  The path of the bullet was from the front
19  driver's side of the car towards the rear passenger side
20  of the car at a slight downwards angle that would be
21  consistent with being fired possibly outside the front
22  driver's side door.
23     Q.  Did you ultimately find a bullet after you
24  followed the trajectory of the trajectory rod?
25     A.  Yes, I did, underneath the rear passenger seat

141

1  side cushion.
2      Q.  Can you step down, Officer, please?
3      A.  Sure.
4      Q.  Can you tell the jury what State's Exhibit 67
5  shows?
6      A.  It's a general overall photograph of the
7  vehicle from the rear.
8      Q.  And that was taken at the --
9      A.  At the vehicle examination building, yes.
10     Q.  And State's Exhibit 68, sir, what does that
11  show?
12     A.  68 is a photograph of the front seat area,
13  front seat compartment of the vehicle.  Broken glass is
14  clearly shown on the floorboard.
15     Q.  State's Exhibit 69, sir, what does that show?
16     A.  69 is a picture of the -- of the front driver's
17  seat.  The bullet strike is visible on the top left
18  portion of the photograph.
19     Q.  Can you take this white dot and place it where
20  the entry of the bullet was that is shown on State's
21  Exhibit 69, right next to it so you don't cover it,
22  please?
23     A.  Just to the left of the dot.
24     Q.  Did you also find blood on the driver's seat?
25     A.  On the driver's seat, yes.

142

1      Q.  Where did you find the blood?
2      A.  That was on the outside portion of the seat,
3  and it was also some on the seat belt between the seat
4  and the door.
5      Q.  And is that what's shown right here?
6      A.  That's correct.
7      Q.  The seat belt.  Was that also blood lower down
8  on the seat belt?
9      A.  Yes, it is.
10     Q.  So the reddish color on the seat belt is what
11  you found?
12     A.  That's correct.
13     Q.  Blood; is that correct?
14     A.  That's correct.
15     Q.  State's Exhibit 70, sir, what does that show?
16     A.  That's a photograph of the front passenger seat
17  of the vehicle.
18     Q.  And does there also appear to be blood there?
19     A.  Yes, it does.
20     Q.  State's Exhibit 71, what does that show, sir?
21     A.  71 is a photograph looking into the front
22  driver's door of the vehicle after the trajectory rod
23  had been placed through the front driver's seat.
24     Q.  And can you place this white dot to show where
25  the trajectory rod -- next to the trajectory rod?

143

1     A.  The tip of the trajectory rod is just to the
2  left of the dot.
3     Q.  And State's Exhibit 72 and 73, what do they
4  show?
5     A.  State's Exhibit 73 shows the complete path of
6  the bullet.  72 is another photograph from the front
7  side of the front driver's seat.  73 shows the rear
8  compartment, showing the path of the bullet as it
9  penetrated the front driver's seat back and went on to
10  penetrate the seat cushion on the rear side of the
11  passenger vehicle.
12     Q.  State's Exhibit 74, sir, what does that show?
13     A.  Exhibit 74, that's a photograph of the
14  floorboard, driver's side floorboard of the vehicle.
15  This is the actual -- the post between the rear and the
16  front door.  You can see the broken glass on the floor.
17     Q.  Is that a close-up on 68 of the area you're
18  referring to on State's Exhibit 74?
19     A.  It would be right in this area here on 74.  The
20  seat is actually pulled forward somewhat.
21     Q.  And you're pointing to this State's Exhibit 68,
22  where you're holding the little white kind of piece of
23  paper?
24     A.  That's correct.
25     Q.  And what is that red substance?  What does it

144

1  appear to be, sir?
2     A.  Appears to be blood.
3     Q.  And that's on the driver's side; is that
4  correct?
5     A.  Yes.
6     Q.  And State's Exhibit 75, what does that show,
7  sir?
8     A.  75 is a photograph of the doorjamb area, the
9  front driver's door.  Appears to be some blood on the
10  doorjamb.
11     Q.  Can you show us where on State's Exhibit 68
12  that would be approximately?
13     A.  Approximately right in this area here.
14     Q.  Put State's Exhibit -- S-X-75 to show where
15  this photograph is a picture of on State's Exhibit 68.
16  When you followed the trajectory of the bullet, were you
17  able to find any ballistics evidence?
18     A.  Yes, I was.
19     Q.  And what did you find, sir?
20     A.  I recovered a fired bullet.
21     Q.  And where did you recover that fired bullet?
22     A.  That was recovered under the seat cushion of
23  the rear seat on the passenger side.  The bullet had
24  actually penetrated the seat all the way and then
25  penetrated a plastic cover for a wiring -- a wiring

145

1  harness underneath the seat, and the bullet was inside
2  of the cover for the wiring harness.
3     Q.  You put this little white dot that says "bullet
4  found" and put the approximate area.  You can't see it
5  in State's Exhibit 73, can you, sir?
6     A.  No.
7     Q.  So the bullet would have been found through
8  this seat, is that correct?  And underneath in a white
9  plastic covering where you said there was wiring, it was
10  covering some wiring; is that correct?
11     A.  Yes.
12     Q.  Officer Riddle, let me show you what's been
13  marked for identification purposes only as State's
14  Exhibit 84-A.  Is this what we call an evidence
15  envelope?
16     A.  Yes, it is.
17     Q.  Do you recognize State's Exhibit 84-A?
18     A.  Yes, I do.
19     Q.  Is that your handwriting with your name and
20  your employee number and a description of the property
21  inside, location of the offense, type of offense?
22     A.  Yes, it is.
23     Q.  Let me show you what's been marked for
24  identification purposes only as 84.  Do you recognize
25  State's Exhibit 84?

146

1     A.  Yes, I do.
2     Q.  How do you recognize it?
3     A.  I recognize it by my handwriting on the front
4  of the bag.  It's got the case number, my name and
5  employee number, and the location the bullet was
6  recovered.
7     Q.  And what is inside State's Exhibit 84?
8     A.  That's the fired bullet I recovered from the
9  Lexus.
10         MS. CONNORS:  At this time I tender to
11  defense counsel State's Exhibit 84 and offer into
12  evidence.
13         MR. HILL:  No objection, Your Honor.
14         THE COURT:  State's 84 is admitted.
15         MS. CONNORS:  I'll pass the witness, Your
16  Honor.
17         Thank you, sir.
18             CROSS-EXAMINATION
19  BY MR. HILL:
20     Q.  Officer Riddle, could I get you to step down
21  for a moment and approach the easel?  I'd like you to
22  do a diagram for me, if you would.
23     A.  This is not to scale or anything; but one is
24  going to be a blue car, which is going to represent the
25  Lexus, okay.  And this is kind of like the front seat;

147

1  and this is like the backseat, okay.  This other one
2  here is a red car front seat/backseat area.
3      Q.  First of all, if you would -- and I'll let you
4  draw the door area.  If this were the blue Lexus -- and
5  we're talking about the driver's side window that was
6  broken out -- could you show us where that would be just
7  in relation to the trajectory that ultimately -- excuse
8  me -- ultimately you found?
9      A.  The window was completely shattered out.
10     Q.  With a black pen, could you show us on this
11 diagram the trajectory of the bullet?  And I realize
12 this is not three dimensional.  You're initially showing
13 us the angle from front to back.  Okay.  This does not
14 account for the height of where the bullet would have
15 been fired?
16     A.  That's correct.
17     Q.  Can you tell us, from your evaluation of the
18 blue Lexus, at approximately what height would the gun
19 that fired this shot have been held?
20     A.  As I stated, the entry on the front of the
21 front driver's seat was approximately a foot down from
22 the top of the headrest.
23     Q.  Would this be the approximate height of the
24 seat inside the vehicle, do you think?
25     A.  Be a little higher.

148

1      Q.  A little bit higher.  If I were the individual
2  seated in the Lexus, where would the individual had to
3  have been that shot that caused the trajectory that you
4  found in the blue Lexus?
5      A.  Outside of the door, slightly to the front.
6      Q.  Could you position yourself in the position
7  that you feel would best show where the trajectory would
8  be?  Okay.  So, if I'm looking straight ahead, if this
9  is the steering wheel of the car, you're in that
10 direction?
11     A.  That's correct.
12     Q.  Where would your hand have to have been pointed
13 in order to create the trajectory that you found inside
14 the Lexus?
15     A.  Approximately right here.  The trajectory was
16 from the front driver's side to the rear passenger side.
17     Q.  Can you tell from your evaluation of the blue
18 Lexus how far away the person would have been that fired
19 the shot that caused the trajectory to be found?
20     A.  No, I could not ascertain that.
21     Q.  So the distance from the person is a variable?
22     A.  Yes.
23     Q.  Can you show us basically that the person that
24 fired this shot creating that trajectory would have had
25 to have been somewhere here?  I mean, if you carry out

149

1  the line, that would all be consistent with that
2  trajectory, right?
3      A.  That's correct.
4      Q.  But we don't know from this point right here
5  how far away the person is?
6      A.  That's correct.
7      Q.  If I could have the black marker for just a
8  second.  So, what we don't know is how far away the
9  person is, correct?
10     A.  Correct.
11     Q.  All right.  Do you -- this may have been
12 already asked.  You did not go out to the scene on
13 Lantern Point, correct?
14     A.  That's correct, did not respond to the scene.
15     Q.  The first opportunity that you have to evaluate
16 this piece of evidence, is there a particular name for
17 the location?
18     A.  The vehicle examination building.
19     Q.  And that's where you see it, and that's where
20 you do your investigation?
21     A.  Yes.
22     Q.  Now -- I'm sorry.  You can go ahead and have a
23 seat.  Thank you.  Do you do anything else with regard
24 to this Lexus to determine its condition?
25     A.  I photographed it to document its condition.

150

1      Q.  And those are all the photographs that were
2  depicted in these exhibits that were just introduced?
3      A.  Yes.
4      Q.  Can you tell me, from looking at the
5  photographs --
6          MR. HILL:  May I approach the witness,
7  Your Honor?
8          THE COURT:  Yes.
9      Q.  (BY MR. HILL)  I'll let you pick out whatever
10 photograph may answer this for me.  Photograph No. 71,
11 can you tell from that exhibit or any other exhibit that
12 you photographed whether the seat belts would have been
13 in a used position at the time that this bullet was
14 fired?
15     A.  Let me see.  I cannot tell for sure.
16     Q.  Did you try to make an evaluation or
17 determination of whether or not the passenger inside the
18 blue Lexus was wearing a seat belt at that time?
19     A.  The front seat passenger?
20     Q.  Yes, sir.
21     A.  No.
22     Q.  Did you recover any other items of evidence
23 from the blue Lexus?
24     A.  Yes, I did.
25     Q.  And what items were there?

151

1    A.   Collected two blood samples.  There was a blood
2  sample collected from the front passenger seat back and
3  from the headliner on the rear passenger side.
4    Q.   Were there any other items of physical evidence
5  that you documented either through photographs or
6  through actually retrieving the evidence?
7    A.   As far as actually collecting the evidence,
8  nothing else was collected by me other than blood
9  samples and the fired bullet.
10    Q.   Did you recover any live rounds from inside the
11  vehicle?
12    A.   There was a live round in the vehicle, but that
13  was left to be recovered by the latent print examiner.
14    Q.   Okay.  That's what I was getting at.  Your
15  investigation, your part in reviewing this at the
16  examination stall, you don't physically take things out
17  of the vehicle?
18    A.   It depends on the case.  In this situation
19  there was another employee that had that assignment
20  regarding the latent print evidence.
21    Q.   Where was the live round found?
22    A.   Live round was inside of the armrest door
23  pocket of the front passenger door.
24    Q.   I'm going to use a pink marker.  Would you just
25  tell me if I'm on the correct side?  Are we talking

152

1  about over here?
2    A.   That's correct.
3    Q.   I'm just going to make a little pink mark.
4  That's where a live round is found?
5    A.   Correct.
6    Q.   What caliber is that?
7    A.   I don't recall the caliber.
8    Q.   Is that documented anywhere in any photographs
9  that you took?
10    A.   Yes.
11    Q.   All right.  You took the photographs, though,
12  and it will be documented somewhere in the State's file?
13    A.   Yes, I took all the photographs.
14    Q.   Is it safe to assume that there is only one way
15  that this trajectory could have been accomplished, and
16  that is the bullet being fired from this angle going in
17  that direction?
18    A.   It's the most logical explanation, yes.
19    Q.   All right.  Can you tell from the condition of
20  the glass that is either inside or outside of a vehicle
21  from which direction a shot is fired?
22    A.   Sometimes you can.
23    Q.   What is the variable that determines that you
24  can always determine that?
25    A.   That you can always -- I'm familiar with the

153

1  glass in this vehicle.  The majority of the glass was on
2  the inside.  You will sometimes have glass -- a certain
3  amount of glass that kicks back, but most of the glass
4  would fall on the inside of the vehicle.
5    Q.   What I'm getting at is, would it be your
6  opinion that the shot that caused the glass to be found
7  inside the vehicle had to have come from outside?
8    A.   Yes.
9    Q.   And at a time when the window was up?
10    A.   Yes, that's correct.
11    Q.   What type of windows were on this particular
12  Lexus?
13    A.   Regular windows.  I believe they were -- I
14  don't recall if they were tinted or not, but regular
15  window glass.
16    Q.   Okay.  You don't recall the caliber of that,
17  right?
18    A.   I believe it was a 9 millimeter.
19        MR. HILL:  Judge, we'd like to introduce
20  Defense Exhibit No. 2 at this time.
21        MS. CONNORS:  No objection, Your Honor.
22        THE COURT:  Defense 2 is admitted.
23        MR. HILL:  Pass the witness.  Thank you.
24
25

154

1            REDIRECT EXAMINATION
2  BY MS. CONNORS:
3    Q.   Officer Riddle, you said you examined the
4  vehicle and you saw blood on the driver's seat; is that
5  correct?
6    A.   That's correct.
7    Q.   And also on the seat belt?
8    A.   Correct.
9    Q.   You saw blood, and it's shown on the pictures
10  on the driver's seat; is that correct?
11    A.   Correct.
12    Q.   You saw blood to the left of the driver's
13  doorjamb; is that correct?
14    A.   That's correct.
15    Q.   And you saw blood, some blood spatter, I
16  believe, on the headliner of the front passenger seat;
17  is that correct?
18    A.   Above the rear passenger seat.
19    Q.   Did you find any other blood in the car?
20    A.   The only other blood that I recall was on the
21  front of the front passenger side seat.  Front side of
22  the seat back is depicted in one of the photographs.  I
23  don't recall the exact exhibit.
24        MS. CONNORS:  I have no further questions.
25  I pass the witness.

155

1    MR. HILL:  May I have just a moment,
2  Judge?
3         THE COURT:  Yes.
4              RECROSS-EXAMINATION
5  BY MR. HILL:
6    Q.  Officer, when you examined the Lexus at the
7  stall there, did you determine whether or not any of the
8  tires were deflated or flattened?
9    A.  I noted that there was one tire that was
10 damaged, front driver's side tire.
11   Q.  When you say damaged, was it completely
12 flattened or was it just -- there was not as much air in
13 it?
14   A.  It was completely flattened and partially off
15 the rim.
16   Q.  Thank you.
17        MR. HILL:  I have no further questions.
18        MS. CONNORS:  No further questions, Your
19 Honor.
20        THE COURT:  Call your next.
21        MS. CONNORS:  May we approach, Your Honor?
22        THE COURT:  Ladies and gentlemen, would
23 you please go back in the jury room?
24        (Brief recess.)
25        (Jury is brought in and seated.)

156

1         THE COURT:  Please be seated.  Ladies and
2  gentlemen, we're going to recess for the day.  All the
3  previous admonitions are still in effect.  Again, do not
4  discuss anything having to do with this case among
5  yourselves or anybody else, including spouses.  If
6  anybody attempts to talk to you about the case, you're
7  to bring it to our attention immediately.  Again, do not
8  make any kind of independent investigation.
9         Does anybody have any particular problem
10 that you need to bring to my attention?  If you're not
11 comfortable talking with everybody about it, you can let
12 the bailiff know.  If there is a medication problem, you
13 need to take it at a certain time, anything like that,
14 let us know about it.  Tomorrow morning we're going to
15 ask you be back down here at 9:30.  Instead of 10:30
16 tomorrow morning, we're going to have you back here at
17 9:30.  Anybody have any problem with that?  Continue to
18 wear your badges at all times.
19         Any requested admonitions or instructions
20 from the State or the defense?
21         We're going to take you all down straight
22 to the elevator from the jury box in just a moment.
23 Everybody has their Metro passes?
24         (Court adjourned.)
25

157

1  THE STATE OF TEXAS  )
2  COUNTY OF HARRIS    )
3         I, Pamela Kay Knobloch, Official/Deputy
   Official Court Reporter in and for the 179th District
4  Court of Harris County, State of Texas, do hereby certify
   that the above and foregoing contains a true and correct
5  transcription of all portions of evidence and other
   proceedings requested in writing by counsel for the
6  parties to be included in this volume of the Reporter's
   Record, in the above-styled and numbered cause, all of
7  which occurred in open court or in chambers and were
   reported by me.
8
         I further certify that this Reporter's Record
9  of the proceedings truly and correctly reflects the
   exhibits, if any, admitted by the respective parties.
10
         I further certify that the total cost for the
11 preparation of this Reporter's Record is $_____ and
   was paid by Harris County.
12
         WITNESS MY OFFICIAL HAND this the _____ day of
13 _____, 2000.
14
15
16 _____
   Pamela Kay Knobloch, Texas CSR No. 1650
   Expiration date:  12/31/2000
17 Official Court Reporter, 179th District Court
   Harris County, Texas
18 301 San Jacinto
   Houston, Texas 77002
19 713.755.6340
20 APPELLANT:   CHARLES MAMOU, JR.
            CAUSE NO. 800112
21
22
23
24
25

## $

$ [1] 157:11

'94 [4] 76:11 82:7 92:2 138:18
'95 [1] 87:7
'96 [2] 4:22 4:24
'97 [2] 4:23 4:24
'98 [5] 5:7 5:8 5:15 68:14 127:7

## 0

0470500 [1] 2:5

## 1

1 [16] 21:6 24:2 24:4 24:5 24:6 34:13 41:5 43:4 43:8 43:12 44:8 44:12 44:17 44: 22 45:2 79:18
10 [2] 46:19 48:13
10800 [7] 92:7 92:9 93:10 97:2 97:13 98:19 121:10
10:30 [1] 156:15
10th [1] 125:15
11:54 [2] 72:13 79:6
12-6 [1] 127:7
12-8-98 [1] 119:13
12/31/2000 [1] 157:16
12:00 [1] 84:20
12:15 [3] 103:12 108:16 108:24
12:29 [1] 70:20
13 [2] 48:20 48:21
13396100 [1] 2:3
14 [2] 48:24 49:2
1402 [3] 97:3 97:20 116:13
15 [3] 33:6 66:6 66:8
16 [1] 50:2
1650 [1] 157:16
17 [1] 1:2
179th [1] 1:11 157:3 157:17
19 [1] 50:2
1960 [1] 2:19
1998 [22] 21:18 37:10 37:10 41:3 52:13 56:21 71:21 72:8 85:18 89:6 89:18 94:20 95:15 98:12 99:10 99:16 100:2 123:14 138:6 138:10 138:17 139:6
1999 [2] 1:18 88:16
1:00 [1] 37:16
1:45 [2] 58:16 62:25

## 2

2 [8] 20:1 43:8 45:5 45:11 45:18 45:22 153:20 153:22
20 [4] 47:7 47:14 47:16 49:6
2000 [1] 157:13
201 [1] 2:7
21 [3] 73:24 74:4 74:7
21179300 [1] 2:18
22 [6] 39:16 39:23 40:1 59:15 60:21 64:16
24 [5] 6:10 21:14 30:4 78:1 78:13
2401 [5] 29:3 29:12 29:13 29:18 29:22
25 [1] 1:2
26 [7] 40:23 41:10 41:18 41:19 42:22 43:5 43:8
2600 [5] 29:20 29:22 30:1 30:5 30:7 30:9
27 [3] 41:10 41:18 43:9

## 28

28 [3] 41:11 41:18 43:9
281.587.0088 [1] 2:21
29 [3] 41:11 41:18 43:9
2:00 [1] 102:4
2:10 [1] 102:4
2:15 [1] 112:9
2:30 [2] 86:4 112:9

## 3

3 [7] 43:9 45:5 45:9 45:9 45:11 45:23 46:3
30 [7] 40:24 41:11 41:18 41:19 42:22 43:6 43:9
300 [1] 65:16
301 [1] 157:18
31 [3] 43:16 43:22 43:25 44:1 44:4 54:16 88:9
320 [1] 61:1
340 [1] 61:4
35 [1] 39:2
350 [1] 61:1
38 [4] 42:11 66:14 67:17 67:25
3:30 [1] 112:12
3:45 [1] 112:12

## 4

4 [6] 43:9 44:8 45:5 45:11 46:6 46:15
45 [4] 52:16 52:21 52:24 53:1
4615 [1] 2:14
4th [1] 123:13

## 5

5 [6] 41:5 43:4 43:9 46:18 48:8 48:13
5629 [1] 2:19
59656300 [1] 2:13
5th [1] 1:18

## 6

6 [3] 46:14 48:1 48:4
63 [7] 92:17 92:23 93:1 113:10 113:12 117:14 132:3
64 [9] 92:17 92:23 93:1 93: 22 94:11 113:10 114:10 114: 14 117:14
66 [7] 93:23 93:25 94:5 94: 8 94:18 113:11 117:14
67 [4] 139:1 139:9 139:13 141:4
68 [6] 141:10 141:12 143: 17 143:21 144:11 144:15
680 [1] 62:15
69 [3] 141:15 141:16 141:21
6th [5] 5:14 21:17 37:10 71:20 72:8 72:13 72:14

## 7

7 [6] 46:1 47:23 48:3 48:5 60:22 65:14
7-A [1] 45:23
70 [1] 142:15
71 [3] 142:20 142:21 150:10
713-773-3119 [1] 119:12
713.623.8312 [1] 2:16
713.755.5800 [1] 2:9
713.755.6340 [1] 157:19
72 [2] 143:3 143:6
73 [4] 143:3 143:5 143:7 145:5
74 [4] 143:12 143:13 143: 18 143:19
75 [5] 139:2 139:9 139:13 144:6 144:8
77002 [2] 2:8 157:18

77027 [1] 2:15
77069 [1] 2:20
773-3119 [1] 126:16
79 [3] 100:6 100:8
7th [15] 37:10 37:17 41:3 52:13 56:21 71:20 88:16 89: 6 89:18 102:5 108:16 108:24 112:7 112:8 135:25

## 8

8 [1] 44:3
800112 [2] 1:3 157:21
8200 [1] 87:23
84 [5] 145:24 145:25 146:7 146:11 146:14
84-A [2] 145:14 145:15
8:00 [1] 108:23
8:30 [3] 108:23 108:24 109: 6
8th [14] 94:20 95:1 95:15 98:11 98:15 98:16 108:21 108:25 112:5 118:25 119:1 138:5 138:17 139:5

## 9

9 [9] 20:4 49:6 51:23 51: 24 64:17 64:25 68:1 68:25 153:18
911 [1] 14:13
9227 [1] 99:2
9:30 [2] 156:15 156:17
9th [4] 98:13 98:14 99:10 99:16 100:1 123:14 123:16 125:10

___ [1] 157:12
___ [1] 157:12
___ [1] 157:15

## A

Abducted [2] 77:1 82:1
Ability [1] 94:25
Able [23] 11:11 25:3 47:4 59:6 63:21 64:6 64:14 75:19 75:22 75:24 84:3 95:9 95:15 96:1 96:10 116:8 118:16 119: 22 123:20 129:16 131:13 136: 18 144:17
Above-entitled [1] 1:19
Above-styled [1] 157:6
Academy [1] 4:3
Accompany [1] 89:19
Accomplished [1] 152:15
Account [1] 147:14
Accurate [1] 79:22
Accurately [7] 47:8 63: 17 64:8 73:25 92:18 94:1 139:4
Acting [1] 15:22 90:8
Activities [1] 123:13
Actual [3] 42:2 127:17 143:15
Addition [1] 95:22
Additional [2] 22:19
Additionally [1] 88:12
Address [5] 6:22 29:11 29: 15 97:15 126:10
Addressing [1] 90:3
Adjourned [1] 156:24
Admitted [15] 24:6 40:1 41:20 43:25 47:16 52:24 74: 7 79:19 93:2 94:9 100:8 139: 14 146:14 147:3 147:4
Admonitions [3] 70:18 156:3 156:19
Advised [1] 76:25

Affect [1] 56:12
Afternoon [3] 3:4 92:3 103:12
Agency [1] 98:20
Ago [1] 5:6
Agree [1] 63:5
Ahead [5] 6:14 29:9 80:17 148:8 149:22
Aid [3] 31:9 63:25 136:7
Aided [1] 1:22
Air [1] 155:12
Alert [2] 103:25 111:9
Alive [1] 106:16
Allow [1] 105:5
Allowed [1] 126:12
Almost [2] 36:23 62:11
Ambulance [5] 22:9 73:3 76:16 82:19 87:11
Ambulances [3] 72:22 79: 13 80:6
Ammo [1] 11:15
Ammunition [5] 52:1 52:8 52:9 67:24 68:5
Amount [1] 153:3
Angle [8] 9:1 13:9 13:10 24:25 25:20 140:20 147:13 152:16
Ankle [1] 136:17
Another's [1] 30:20
Answer [4] 117:1 117:4 117:9 150:10
Answering [1] 95:11
Apartment [17] 92:6 97:3 97:12 97:13 97:18 97:25 98: 9 112:20 116:12 116:16 119: 9 121:18 122:17 126:11 126: 17 127:4 129:25
Apartments [13] 29:4 29: 5 29:8 29:9 29:24 30: 1 97:2 112:6 112:11 115:14 121:11 121:12
Appear [7] 19:25 67:24 108:1 110:2 111:24 142:18 144:1
Appeared [5] 31:10 44:9 47:9 52:12 66:5 94:1
Appellant [2] 1:6 157:20
Appellee [1] 1:11
Approach [3] 3:9 33:1 39:12 67:19 73:20 92:13 99: 18 123:1 146:21 150:6 155:21
Approached [1] 81:1
Approaching [1] 10:2
Approximate [3] 60:20 145:4 147:23
Area [72] 6:4 9:12 11:20 13:17 14:8 14:23 14:25 17: 17 17:15 21:5 21:6 21:8 21: 8 21:15 21:17 21:20 21:22 21:25 22:2 24:9 24:11 24:25 32:21 35:7 35:9 35:12 38:8 39:7 56:15 56:20 60:6 60:16 60:17 61:6 61:9 61:12 61:18 61:21 61:25 62:4 62:6 62:18 63:1 63:12 64:2 65:20 71:24 71:25 72:5 74:20 77:17 77: 19 78:1 78:14 80:7 80:10 82: 4 93:22 94:13 94:16 96:18 97:11 113:18 116:5 141:12 143:17 143:19 144:8 144:13 145:4 147:2 147:4
Areas [1] 62:3
Arm [11] 10:1 10:5 13:3 14: 5 19:10 24:16 76:2 104:6 104:9 104:10 111:10
Armrest [1] 151:22
Aroused [1] 102:12
Arrive [6] 56:8 75:12 79: 9 86:3 86:15 101:3
Arrived [30] 25:10 37:14 37:19 37:25 38:14 56:20 57:

10 58:4 58:6 72:21 74:15 74:7
18 75:15 75:18 76:14 76:17
79:7 79:7 80:4 80:18 84:20
86:5 86:14 87:2 100:22 100:
24 102:2 103:14 122:16 133:
14

**Arrives** [1] 83:17
**Arriving** [2] 22:10 102:3
**Articles** [1] 110:13
**Ascertain** [1] 148:20
**Assigned** [13] 36:24 68:
11 71:15 71:16 71:21 71:23
85:21 86:13 98:23 98:24 104:
16 138:2 138:3
**Assignment** [2] 138:12
151:19
**Assistant** [1] 2:6
**Assisting** [2] 57:12 96:15
**Assume** [3] 15:14 121:19
152:14
**Assuming** [2] 52:8 52:10
**Astrodome** [2] 71:24 87:23
**Attached** [1] 63:12
**Attempt** [2] 54:18 91:6
**Attempted** [1] 20:7
**Attempting** [3] 135:20
136:2 136:6
**Attempts** [1] 156:6
**Attend** [1] 82:19
**Attended** [1] 80:13
**Attending** [2] 81:9 81:11
**Attention** [8] 37:9 72:7
79:21 85:17 138:5 139:20
156:7 156:10
**Attitude** [1] 90:25
**Attorneys** [3] 2:6 2:10 2:
22
**Available** [1] 67:13
**Awake** [1] 134:12
**Aware** [2] 91:24 135:9

## B

**B42** [1] 138:20
**Backed** [3] 112:19 113:13
114:22
**Backseat** [1] 147:1
**Bad** [1] 102:18
**Badges** [1] 156:18
**Bag** [12] 43:13 43:17 44:3
46:21 48:7 48:9 48:18 48:21
53:20 54:14 89:3 146:4
**Bags** [1] 41:5
**Bailiff** [1] 156:12
**Ballistics** [4] 99:12 99:
15 99:25 144:17
**Barely** [1] 105:10
**Barred** [1] 25:16
**Base** [1] 66:22
**Based** [5] 57:6 57:25 65:
10 89:14 106:21
**Basic** [1] 89:2
**Basics** [1] 101:9
**Became** [3] 91:23 95:12
120:1
**Become** [1] 3:24
**Becomes** [1] 83:4
**Began** [1] 95:11
**Begin** [2] 38:15 38:23
**Beginning** [1] 5:5
**Begins** [1] 62:25
**Behind** [2] 14:10 26:2
**Belong** [1] 114:7
**Belonged** [4] 20:6 20:10
20:15 96:11
**Belt** [6] 142:3 142:7 142:8
142:10 150:18 154:7
**Belts** [1] 150:12.

**Ben** [9] 77:13 99:22 99:1
99:16 100:1 100:11 103:2
103:8 112:9
**Bench** [1] 123:1
**Bennington** [1] 137:9
**Best** [3] 30:13 62:12 148:7
**Better** [1] 56:9
**Between** [10] 7:18 33:22
33:24 34:4 78:10 88:2 90:14
108:24 142:3 143:15
**Beyond** [1] 65:18
**Bit** [9] 8:10 13:23 53:4 59:
21 59:22 60:18 61:14 110:6
148:1
**Bits** [1] 18:22
**Black** [12] 7:22 76:7 76:8
76:21 77:4 81:18 82:13 83:
22 89:8 98:21 147:10 149:7
**Bleeding** [1] 19:10
**Block** [3] 87:23 87:23 92:7
**Blocked** [4] 16:25 17:1 17:
2 17:3
**Blood** [48] 13:3 21:24 22:
7 24:12 24:14 24:17 24:21
24:25 35:4 45:24 46:9 46:17
48:15 48:22 48:25 49:2 49:8
49:11 49:15 49:25 50:3 54:2
54:4 54:10 54:12 60:22 65:
13 65:13 65:19 110:6 113:21
141:24 142:1 142:7 142:13
142:18 144:2 144:9 151:1
151:1 151:8 154:4 154:9 154:
12 154:15 154:15 154:19 154:
20
**Bloody** [8] 45:10 45:16 46:
2 46:3 53:12 53:15 60:22 60:
23
**Blowing** [1] 115:11
**Bloyd** [8] 85:4 85:7 85:12
85:13 100:21 102:6 121:9
128:2
**Blue** [31] 20:20 24:11 76:
11 82:6 82:7 82:11 82:12 87:
7 92:2 92:4 92:11 92:19 117:
14 132:2 132:3 132:6 132:12
132:18 133:4 133:7 138:18
138:22 139:4 139:16 146:24
147:4 147:18 148:4 148:17
150:10 150:23
**Board** [1] 6:15
**Bob** [2] 86:11 100:22
**Bodies** [1] 58:4
**Body** [9] 6:19 13:22 35:1
58:7 79:24 80:11 106:18 109:
3 136:11
**Bodyguard** [1] 4:6
**Border** [1] 64:3
**Borders** [1] 59:16
**Bottle** [16] 32:15 32:15
32:18 33:6 34:12 34:12 34:
16 34:18 34:21 35:1 49:20
60:24 65:16 66:1 66:5 66:11
**Bottom** [1] 19:25
**Bounded** [1] 87:23
**Bounty** [1] 4:6
**Box** [3] 17:11 35:22 156:22
**Brand** [1] 67:17
**Brands** [2] 51:23 52:1
**Break** [3] 70:17 102:25
120:23
**Brief** [4] 56:24 84:9 121:
1 155:24
**Bring** [6] 3:1 27:7 29:7
107:14 156:7 156:10
**Broke** [1] 121:4
**Broken** [15] 46:22 46:23
47:1 47:4 47:11 47:17 47:20
49:20 53:23 57:13 114:18
139:22 141:13 143:16 147:6
**Brought** [4] 3:2 70:21 121:
2 155:25
**Brush** [5] 21:22 22:2 24:9

**Building** [4] 117:6 138:
14 141:9 149:18
**Buildings** [2] 87:18 116:
18
**Bullet** [34] 11:20 41:25
42:2 42:4 42:5 100:14 110:5
117:8 140:1 140:5 140:10
140:14 140:15 140:17 140:18
140:23 141:17 141:20 143:6
143:16 144:20 144:21 144:21
144:23 145:1 145:3 145:7
145:6 146:8 147:11 147:14
150:13 151:9 152:16
**Bullets** [3] 66:20 66:22
67:14
**Burning** [1] 16:4
**Burrell** [1] 60:6
**Bush** [1] 24:22
**Busted** [3] 110:2 111:17
111:24
**Butterfly** [1] 136:6
**Butterworth's** [2] 32:15
49:20

## C

**C.S.U.** [2] 42:17 51:7
**Caliber** [3] 152:6 152:7
153:16
**Caller** [9] 126:12 126:14
127:2 127:9 127:18 129:20
129:23 129:24 130:2
**Calm** [2] 13:4 16:9
**Calmed** [1] 15:23
**Calmer** [1] 16:2
**Camera** [2] 63:13 63:16
**Canisters** [1] 59:2
**Cannot** [1] 150:15
**Canon** [1] 91:14
**Canvass** [2] 101:4 116:4
**Car** [44] 8:9 9:10 16:22 16:
25 17:3 18:1 18:7 21:2 23:
33 33:11 47:17 47:20 64:1
69:3 69:5 69:9 69:13 74:9
76:9 93:12 93:18 109:2 109:
17 109:25 113:25 113:25 114:
21 114:21 114:25 117:5 132:
7 132:7 132:14 132:25 133:1
139:17 139:18 140:4 140:19
140:20 146:24 147:2 148:9
154:19
**Car's** [1] 111:17
**Carmouche** [6] 89:12 99:6
106:14 106:16 112:2 138:8
**Carmouche's** [2] 109:3
135:24
**Carport** [1] 113:14
**Carry** [1] 148:25
**Cars** [2] 17:6 57:21
**Cartridge** [10] 40:18 41:
1 41:22 42:24 43:3 50:12 51:
14 59:3 59:7 68:14
**Cartridges** [5] 42:21 51:
23 52:5 67:16 88:7
**Case** [17] 39:10 41:22 42:
25 90:3 91:24 96:15 106:7
106:7 121:9 125:3 125:21
125:24 133:6 146:4 151:18
156:4 156:6
**Cases** [3] 43:3 59:3 68:4
**Casing** [4] 41:23 42:1 42:
5 42:6 42:9 47:24 48:3 53:
24 54:1 54:5 54:8 59:7
**Casings** [4] 40:18 41:1 50:
12 88:5
**Catercorner** [1] 30:2
**Caught** [1] 139:20
**Caused** [5] 88:17 107:23
116:23 117:10 118:4 148:19
153:6
**CCI** [2] 52:2 52:6
**Cell** [13] 125:22 126:6 126:

127:3 127:
10 129:19 129:20 129:20 130:
15 131:14 131:20
**Certain** [6] 40:14 55:15
59:2 82:5 153:2 156:13
**Certainly** [3] 44:15 102:
11 104:5
**Certification** [2] 4:4 4:
9
**Certify** [3] 157:4 157:8
157:10
**Cetera** [1] 50:21
**Chairs** [1] 53:4
**Chamber** [6] 11:15 11:21
12:4 12:6 66:22 67:14
**Chambers** [1] 157:7
**Chance** [1] 3:19
**Change** [1] 90:25
**Changed** [1] 109:14
**Chaotic** [2] 74:23 82:21
**Characteristics** [1]
125:2
**Characterized** [1] 56:1
**Charges** [3] 90:23 107:14
129:6
**Charles** [12] 1:5 95:20 95:
22 96:2 98:1 98:3 118:18
120:9 128:12 130:9 131:20
157:20
**Chart** [1] 60:21
**Check** [6] 9:17 11:23 14:
23 14:25 82:4 84:13
**Checked** [4] 28:2 75:8 130:
21 138:15
**Chest** [2] 7:21 16:3
**Chisolm** [2] 96:21 125:17
**Chucky** [2] 95:25 120:10
**Circumstance** [1] 112:2
**Circumstances** [2] 82:21
83:12 120:13
**City** [1] 36:21
**CLAIRE** [1] 2:4
**Clean** [2] 107:8 109:12
**Clear** [12] 15:14 22:1 32:
8 32:11 62:2 67:6 82:9 83:6
83:8 102:5 111:13 129:8
**Cleared** [1] 78:14
**Clearly** [2] 63:20 141:14
**Clip** [10] 11:12 11:24 12:3
12:8 27:5 51:4 67:5 73:17
73:25 74:11
**Clippings** [1] 53:21
**Close** [8] 7:24 8:5 8:7 31:
19 34:17 37:16 80:11 113:17
**Close-up** [4] 48:3 93:23
94:18 143:17
**Closer** [7] 6:13 13:23 30:
25 31:2 31:16 79:24 80:12
**Closest** [2] 23:23 69:6
**Closeup** [1] 48:24
**Clothing** [1] 110:13
**Coherently** [1] 31:25
**Collected** [3] 151:1 151:
2 151:8
**Collecting** [2] 55:14 151:
7
**Color** [3] 20:18 21:2 142:
10
**Colored** [1] 87:8
**Combination** [1] 117:23
**Comfortable** [1] 156:11
**Coming** [12] 7:4 8:10 14:8
25:24 25:25 26:6 27:2 31:18
53:13 53:13 95:3 134:6
**Commissioned** [3] 3:25 4:
4 4:17
**Commonly** [1] 123:10
**Communicate** [2] 95:1 95:9
**Communications** [2] 106:

22 122:22
**Companies** [1] 4:21
**Company** [4] 4:19 5:1 30:
20 130:22
**Compartment** [2] 141:13
143:8
**Complete** [2] 4:12 143:5
**Completed** [1] 63:1
**Completely** [3] 147:9 155:
11 155:14
**Complex** [4] 92:6 112:20
115:15 126:17
**Computer** [1] 1:22
**Concealing** [1] 122:2
**Concentrate** [1] 6:14
**Concern** [1] 106:15
**Concerning** [4] 98:20 123:
13
**Conclude** [1] 62:22
**Concluded** [1] 54:13
**Conclusion** [3] 32:5 117:
13 117:16
**Concrete** [1] 87:20
**Concrete-paved** [1] 87:20
**Condition** [12] 12:10 38:
2 51:1 78:14 94:24 94:25
104:2 110:7 112:22 149:24
149:25 152:19
**Conditions** [5] 35:18 63:
11 63:17 87:17 89:4
**Conduct** [1] 38:17
**Confer** [1] 101:11
**Confirm** [2] 67:5 95:15
**Confirmed** [2] 102:15 127:
2
**Confront** [3] 90:13 106:
25 107:20
**Confronted** [1] 107:3
**Connected** [4] 122:15 125:
3 125:23 135:16
**Connects** [1] 118:5
**CONNORS** [12] 2:4 137:18
137:22 139:8 139:15 146:10
146:15 153:21 154:2 154:24
155:18 155:21
**Conscious** [3] 95:4 103:
25 111:9
**Consciousness** [5] 124:
11 129:14 129:17 134:2 134:
18
**Consent** [4] 98:8 121:17
121:25 122:5
**Consistent** [5] 47:20 69:
8 69:21 140:21 149:1
**Conspiracy** [1] 106:8
**Construction** [1] 21:15
**Contact** [3] 118:6 118:18
127:10
**Contacted** [2] 119:2 130:8
**Contacting** [1] 96:2
**Contained** [1] 123:23
**Containing** [1] 128:3
**Contains** [2] 124:24 157:4
**Contaminate** [1] 32:23
**Continue** [2] 121:5 156:17
**CONTINUED** [1] 121:7
**Contrast** [1] 7:23
**Control** [1] 56:8
**Conversation** [3] 57:25
96:22 109:8
**Conversing** [1] 136:5
**Cooperate** [2] 98:5 110:24
**Cooperation** [1] 91:1
**Cooperative** [2] 90:1 104:
22
**Copy** [2] 3:14 52:19
**Correct** [86] 7:1 7:12 32:
23 40:15 43:10 45:13 55:6

55:11 55:15 56:6 61:3 63:19
64:9 65:7 70:12 72:15 73:13
74:10 75:5 78:12 78:18 79:8
79:15 80:14 80:15 83:24 84:
12 84:18 88:22 101:17 101:
18 102:9 102:22 104:7 104:
23 106:3 106:12 108:15 112:
17 113:14 114:8 115:1 115:2
115:5 115:12 115:16 117:11
118:6 121:14 121:15 121:20
121:21 121:23 133:2 135:10
135:25 138:21 142:6 142:12
142:13 142:14 143:24 144:4
143:8 145:10 147:16 148:11
149:3 149:6 149:9 149:10
149:12 149:14 151:25 152:2
152:5 153:10 154:5 154:6
154:8 154:10 154:11 154:13
154:14 154:17 157:4
**Correctly** [2] 12:4 157:9
**Correspond** [2] 41:6 43:5
**Cost** [1] 157:10
**Counsel** [7] 39:24 41:11
4:23 52:22 74:5 92:24 94:6
100:6 139:9 146:11 157:5
**County** [11] 1:8 1:21 37:
12 85:23 96:24 97:9 99:3
157:2 157:4 157:11 157:17
**Couple** [8] 3:17 3:21 7:5
33:14 33:17 35:14 37:21 68:
20
**Course** [4] 104:17 112:1
126:9 136:5
**Court** [70] 1:3 1:5 3:1 3:
3 3:11 5:25 18:6 19:19 24:4
24:6 32:7 33:3 35:19 36:11
39:14 40:1 41:15 41:17 41:
19 43:25 44:15 47:16 48:11
52:24 53:2 55:5 55:9 63:2
67:3 67:21 70:16 70:22 73:
22 74:7 85:2 85:5 92:15 93:
1 94:8 97:2 99:20 100:8 101:
17 105:5 111:21 112:6 112:
11 115:13 120:23 121:3 121:
12 123:3 127:16 133:19 136:
8 153:22 153:5 155:20 155:
22 156:1 156:24 157:3 157:4
157:7 157:17 157:17
**Courtroom** [1] 3:6
**Cover** [10] 62:17 132:2
132:6 132:12 132:18 133:4
133:7 141:21 144:25 145:2
**Covering** [4] 113:7 113:
25 145:9 145:10
**Covers** [1] 21:10
**CRC** [1] 138:20
**Create** [1] 148:13
**Creating** [1] 148:24
**Crew** [1] 73:3
**Crime** [29] 37:4 37:5 38:4
55:3 55:13 57:5 59:17 60:2
64:4 66:1 68:12 74:14 74:15
75:11 78:25 79:9 83:17 86:
12 93:3 93:7 101:11 101:13
101:19 105:24 106:1 115:14
115:24 138:3 138:11
**Crimes** [1] 138:15
**Cross-examination** [7]
3:12 55:1 79:3 100:19 121:4
121:7 146:18
**Cruser** [8] 36:13 36:14 36:
19 36:20 55:3 63:6 70:3 83:
16
**CSR** [1] 157:16
**Curb** [5] 8:5 8:7 61:23 69:
7 69:10
**Current** [1] 35:18
**Curry** [1] 137:10
**Curve** [1] 9:11
**Cushion** [4] 140:7 141:1
143:10 144:22
**Custodian** [1] 105:25
**Cut** [4] 40:7 43:13 43:17
89:3

**Cut-up** [3] 43:15 43:17 89:
2
**Cutting** [1] 19:2

---

# D

**Damage** [3] 139:16 139:18
139:23 140:4
**Damaged** [2] 155:10 155:11
**Dark** [5] 38:13 63:8 77:19
83:22 89:4
**Dashes** [1] 7:5
**Date** [5] 5:5 124:18 127:7
130:4 157:16
**Dated** [1] 123:13
**Dates** [2] 127:6 130:3
**Days** [1] 118:24
**Dead** [7] 7:12 13:23 29:18
34:19 34:22 79:24 104:17
**Dead-ends** [1] 29:18
**Deal** [1] 102:18
**Deals** [1] 102:17
**Death** [4] 106:11 106:13
106:17 106:19
**Debris** [1] 93:19
**Deceased** [2] 106:23 106:
24
**Decedent** [1] 58:7
**December** [33] 5:14 21:17
37:10 37:10 37:17 41:3 52:
13 56:21 68:14 71:20 72:7
72:14 85:17 88:16 89:6 89:
18 94:20 95:1 95:11 98:11
99:10 99:16 100:1 102:5 108:
17 108:21 112:5 123:14 135:
25 138:5 138:10 138:17 139:5
**DEFENDANT** [1] 2:22
**Defendant's** [3] 21:6 24:
2 34:13
**Defense** [15] 24:6 39:24
41:11 43:23 52:22 74:5 79:
18 92:24 100:6 121:4 139:9
146:11 153:20 153:22 156:20
**Defined** [1] 81:22
**Deflate** [2] 116:23 117:10
**Deflated** [1] 155:8
**Demeanor** [3] 15:21 16:17
90:7
**Demonstration** [1] 67:2
**Denied** [1] 105:9
**Department** [14] 3:16 55:
24 68:11 71:10 71:12 73:3
75:3 75:7 76:15 81:14 86:6
103:19 125:19 133:24
**Department's** [1] 138:13
**Depict** [5] 44:9 47:8 73:
25 92:18 94:1
**Depicted** [11] 6:7 47:25
47:25 49:3 49:5 49:6 60:24
114:10 132:2 150:2 154:22
**Depicting** [1] 52:11
**Depicts** [1] 113:12
**Deposited** [1] 115:1
**Describe** [15] 20:18 20:
21 21:3 21:8 38:2 38:11 77:
16 81:25 82:2 82:13 87:17
90:7 110:11 117:12 136:13
**Described** [9] 20:20 20:
21 24:8 77:4 82:10 83:20
110:3 115:4 136:15
**Describes** [1] 20:23
**Describing** [1] 19:4
**Description** [7] 17:14 56:
9 56:21 86:21 90:11 112:16
145:20
**Detail** [2] 77:6 120:12
**Details** [2] 77:3 120:11
**Detect** [1] 65:20
**Detective** [11] 85:3 85:7
100:21 102:6 107:10 108:6
121:9 122:7 128:2 130:3 133:

**Detectives** [5] 58:19 84:
20 96:14 98:6 98:23
**Determination** [1] 150:17
**Determine** [15] 55:4 55:
10 58:11 97:25 99:5 99:11
106:10 116:22 131:20 136:2
136:18 140:9 149:24 152:24
155:7
**Determined** [1] 65:25
**Determines** [1] 152:23
**Detours** [1] 120:19
**Develop** [2] 106:6 106:7
**Diagram** [27] 6:2 6:8 30:
11 34:11 39:7 39:10 39:19
40:2 40:7 40:9 40:14 41:7
44:2 46:13 48:5 49:3 49:12
59:1 61:17 61:20 65:15 68:
24 69:1 79:19 79:20 146:22
147:11
**Diagrams** [1] 6:7
**Die** [3] 16:7 16:8 16:8
**Died** [2] 6:20 83:1
**Different** [9] 31:22 51:
23 58:25 71:22 75:22 77:15
114:24 117:15 120:20
**Dimensional** [1] 147:12
**Dion** [21] 11:4 18:17 21:7
27:22 31:13 75:24 75:25 80:
13 84:9 89:23 89:25 93:20
100:14 103:8 104:12 120:16
122:22 123:16 124:3 137:6
137:8
**Direct** [9] 15:9 36:16 37:
9 71:3 85:9 85:17 101:19
102:1 137:21
**Directed** [1] 96:23
**Directing** [2] 72:7 138:5
**Direction** [21] 6:23 7:25
15:9 29:22 40:3 44:17 44:24
45:19 50:7 53:14 65:2 66:6
69:3 69:9 69:14 69:16 69:19
114:20 148:10 152:17 152:21
**Directly** [1] 97:6
**Disable** [1] 27:10
**Disappearance** [1] 138:7
**Disarray** [1] 110:4
**Disbelieve** [1] 88:24
**Discount** [1] 134:17
**Discovered** [3] 13:22 91:
23 92:1
**Discovering** [1] 106:18
**Discuss** [1] 156:4
**Discussion** [1] 123:4
**Disguised** [1] 114:1
**Dispatcher** [1] 97:10
**Distance** [16] 7:11 7:14
30:22 31:1 34:18 34:21 34:
25 35:2 48:17 48:19 49:24
60:20 60:25 62:5 131:10 148:
21
**Distance-wise** [1] 60:25
**Distances** [1] 31:23
**Distinct** [1] 20:14
**Distinctive** [1] 80:22
**Distinguish** [1] 18:14
**District** [5] 1:5 1:11 2:
6 157:3 157:17
**Disturbed** [1] 59:11
**Divide** [1] 60:7
**Division** [15] 36:24 37:1
37:3 68:12 71:14 71:16 71:
21 71:22 71:23 85:19 96:8
103:20 125:19 138:2 138:3
**Divisions** [3] 75:2 75:6
86:9
**Dobson** [1] 125:1
**Document** [3] 39:3 63:2
149:25
**Documented** [4] 138:15

**Documenting** [1] 115:24
**Dodge** [4] 21:4 76:22 81:25 82:7
**Dodson** [4] 123:24 125:7 128:4 133:10
**Done** [6] 59:10 68:13 74:13 96:7 101:25 108:25
**Door** [12] 69:4 76:12 139:21 140:22 142:4 142:22 143:16 144:9 147:4 148:5 151:22 151:23
**Doorjamb** [3] 144:8 144:10 154:13
**Doors** [1] 116:5
**Dope** [1] 102:17
**Dot** [5] 141:19 141:23 142:24 143:2 145:3
**Dotted** [1] 49:12
**Double** [1] 69:15
**Down** [59] 5:23 6:23 7:15 10:6 10:7 12:17 12:19 12:21 12:22 12:22 13:4 14:7 14:10 14:12 14:20 14:21 15:23 16:5 18:9 19:16 23:23 24:8 25:20 26:8 26:14 26:17 27:3 27:27 27:25 29:6 33:25 34:23 36:7 36:11 40:12 44:14 44:23 45:6 49:13 49:22 49:23 53:11 57:13 60:23 63:25 65:16 77:23 79:16 80:1 119:21 130:19 137:16 140:3 141:2 142:7 146:20 147:21 156:15 156:21
**Downwards** [1] 140:20
**Draw** [3] 6:2 6:15 147:4
**Drawn** [4] 25:19 25:20 25:22 26:1
**Drew** [1] 68:24
**Drive** [14] 33:25 37:12 37:25 38:3 41:2 52:18 72:9 77:18 78:2 78:11 85:23 86:3 87:1 95:17
**Driver's** [26] 69:4 69:13 69:22 114:17 114:18 139:21 140:2 140:19 140:22 141:16 141:24 141:25 142:22 142:23 143:7 143:9 143:14 144:3 144:9 147:5 147:21 148:16 154:4 154:10 154:12 155:10
**Driveway** [1] 93:17
**Driving** [3] 8:18 8:20 35:22
**Drop** [1] 27:5
**Dropped** [1] 33:12
**Drove** [3] 20:19 23:24 57:21
**Drug** [2] 57:1 108:7
**Duly** [4] 36:15 71:2 85:8 137:20
**During** [5] 27:21 30:18 49:19 111:8 131:19
**Duties** [4] 37:2 86:19 102:25 138:10

**E**

**Early** [3] 56:20 88:15 102:14
**Easel** [2] 5:24 146:21
**East** [1] 59:17
**Effect** [2] 70:18 156:3
**Effort** [1] 116:4
**Eighteen** [3] 23:7 77:5 85:16
**Either** [20] 4:24 12:14 20:11 22:14 22:19 23:8 38:6 38:6 42:25 49:15 49:16 62:15 62:16 69:6 77:13 87:21 122:10 124:1 151:5 152:20
**Ejected** [3] 41:23 42:10 42:25
**Elapsed** [1] 34:4

**Elbow** [2] 15:19 15:19
**Elbows** [1] 15:23
**Elevator** [1] 156:22
**Elicited** [1] 105:4
**Employed** [8] 5:3 36:20 36:22 71:9 71:11 85:13 85:18 125:18
**Employee** [3] 145:20 146:5 151:19
**Employment** [1] 4:20
**Empty** [2] 38:6 67:5
**Encounter** [2] 45:8 97:23
**End** [8] 6:12 29:6 29:10 45:24 49:15 49:16 60:21 64:11
**Ended** [1] 59:19
**Ends** [1] 29:18
**Enforcement** [1] 98:20
**Entered** [1] 140:10
**Entire** [7] 4:20 58:23 61:8 61:12 61:14 62:6 62:18
**Entry** [2] 141:20 147:20
**Envelope** [1] 145:15
**Especially** [1] 21:14
**Essentially** [4] 12:12 57:11 62:13 120:16
**Establish** [1] 126:21
**Estimate** [2] 30:13 62:12
**Et** [1] 50:21
**Evaluate** [1] 149:15
**Evaluated** [1] 126:2
**Evaluation** [4] 57:6 147:17 148:17 150:16
**Evasive** [6] 90:9 104:21 107:1 107:6 107:8 107:10
**Evening** [3] 5:14 44:9 74:1
**Event** [1] 136:11
**Events** [4] 56:22 57:4 90:11 102:7
**Eventually** [3] 12:21 97:21 120:12
**Evidence** [58] 21:13 32:21 33:5 37:7 37:8 38:18 39:8 39:23 40:15 41:10 43:22 47:14 52:21 54:21 59:8 60:18 61:9 61:13 61:18 61:22 74:4 78:21 79:19 81:4 84:16 86:20 86:25 88:3 88:9 88:23 90:15 91:23 92:23 93:15 94:5 99:12 99:15 99:25 100:5 101:12 102:1 117:7 121:19 133:2 133:5 133:5 138:16 139:10 144:17 145:14 146:12 149:16 150:22 151:4 151:6 151:7 151:20 157:5
**Evidentiary** [2] 55:5 115:25
**Evidentiary-wise** [1] 115:25
**Exact** [3] 15:18 28:14 154:23
**Exactly** [16] 5:6 18:2 20:24 20:25 21:11 21:24 22:5 22:7 28:14 28:14 57:15 58:20 60:1 79:11 80:8 107:19
**Examination** [22] 25:8 34:9 36:16 39:24 41:12 52:22 62:3 68:22 71:3 74:5 85:9 92:24 94:6 100:6 117:6 127:15 137:21 138:13 141:9 149:18 151:16 154:1
**Examine** [3] 88:3 131:13 138:17
**Examined** [5] 117:6 138:15 139:15 154:3 155:6
**Examiner** [1] 151:13
**Except** [1] 21:21
**Excited** [2] 15:22 16:10
**Excuse** [3] 17:19 84:4 147:7
**Exhibit** [99] 6:9 6:22 21:6 21:14 24:2 30:4 33:6 34:

**Elbow** 43:16 43:22 44:1 44:4 44:11 44:17 44:22 45:2 45:5 45:9 45:9 45:18 45:22 45:22 46:3 46:6 46:15 46:18 46:18 47:7 47:14 47:23 48:4 48:5 48:8 48:20 48:21 48:24 49:2 49:6 50:22 52:21 53:1 54:15 59:15 64:16 66:6 66:8 66:14 67:17 67:25 73:24 74:4 78:1 78:13 79:18 88:9 93:21 93:23 93:25 94:5 94:8 94:11 94:18 99:22 100:5 113:12 114:10 114:16 114:14 132:3 139:2 141:4 141:10 141:15 141:21 142:15 142:20 143:3 143:5 143:12 144:11 144:14 144:25 145:5 145:14 145:17 145:25 146:7 146:11 150:11 150:11 153:20 154:23
**Exhibits** [16] 21:13 40:23 41:10 41:19 42:22 43:5 44:8 45:11 50:2 92:17 92:23 117:14 139:19 139:13 150:2 157:9
**Existence** [1] 55:4
**Exited** [2] 25:18 140:5
**Experience** [1] 66:1
**Experiencing** [1] 104:4
**Experiment** [1] 140:9
**Expiration** [1] 157:16
**Explain** [3] 83:19 109:19 133:21
**Explains** [1] 18:19
**Explanation** [1] 152:18
**Explosion** [1] 70:8
**Expressly** [1] 101:13
**Exterior** [1] 63:21
**Eyes** [2] 134:7 134:13

**F**

**Facilities** [1] 75:20
**Fact** [13] 13:2 19:4 35:14 35:23 52:17 88:20 99:6 102:16 105:10 107:6 107:25 128:25 135:9
**Fading** [2] 129:13 129:17
**Fair** [2] 63:15 65:12
**Fairly** [5] 47:8 73:25 92:18 93:25 139:4
**Fall** [2] 82:24 153:4
**Familiar** [4] 66:19 72:2 125:4 152:25
**Family** [1] 136:3
**Fannin** [1] 2:7
**Far** [34] 4:13 7:11 7:14 14:17 17:10 19:22 20:23 21:23 21:24 22:6 22:16 24:19 24:23 25:1 28:13 30:24 32:21 33:12 33:22 38:11 39:4 59:24 75:9 82:18 87:18 101:2 101:25 116:20 129:3 148:18 149:5 149:8 151:7
**Father** [3] 91:16 118:13 119:2
**FC** [1] 68:6
**Fear** [2] 26:10 26:22
**Federal** [2] 52:2 68:8
**Feet** [16] 7:17 7:17 25:2 25:4 30:23 34:23 59:25 61:1 61:5 62:5 62:13 62:14 62:14 62:15 62:16 65:6
**Felt** [1] 122:15
**Female** [6] 23:1 76:25 77:4 87:15 89:8 98:21
**Few** [5] 3:22 3:23 77:11 84:5 123:10
**Field** [10] 21:10 38:6 60:16 61:3 61:16 61:21 62:23 64:12 78:13 78:15
**Fifteen** [7] 25:2 25:4 34:23 59:25 61:5 62:5 62:16

**Figure** [1] 15:19
**Figured** [3] 23:13 23:17 24:20
**File** [2] 129:6 152:12
**Filing** [1] 90:23
**Fills** [1] 5:19
**Film** [2] 59:2 63:20
**Finally** [3] 12:20 22:21 134:13
**Fingerprinted** [1] 118:1
**Fingerprints** [1] 54:19
**Fire** [5] 11:18 41:24 42:21 51:22 73:3 76:15
**Firearms** [5] 50:14 50:16 51:15 99:13 117:6
**Fired** [25] 33:18 40:18 41:22 42:3 42:4 42:24 47:24 53:23 54:1 54:8 66:23 88:7 108:2 140:21 144:20 144:21 146:8 147:15 147:19 148:18 148:24 150:14 151:9 152:16 152:21
**Firing** [2] 12:7 42:9
**First** [50] 4:2 7:5 8:4 8:4 8:6 9:21 10:1 10:3 15:3 15:6 17:7 18:19 18:19 19:12 19:14 23:24 24:12 24:13 24:15 27:5 31:21 36:15 40:17 42:11 45:1 45:8 46:24 55:18 69:10 71:2 72:21 74:17 79:22 80:18 80:19 85:8 86:14 86:16 91:4 101:4 101:8 104:14 104:18 108:15 120:6 132:7 137:20 139:20 147:3 149:15
**Fit** [1] 105:17
**Five** [7] 7:16 33:21 34:5 40:21 68:4 72:18 88:7
**Fixing** [1] 14:25
**Flat** [4] 110:1 111:18 111:23 117:4
**Flattened** [3] 155:8 155:12 155:14
**Floodlight** [1] 63:14
**Floor** [1] 143:16
**Floorboard** [3] 141:14 143:14 143:14
**FM** [1] 2:19
**Focus** [3] 53:17 106:10 113:16
**Follow** [7] 25:3 35:3 82:25 102:21 117:3 129:10 129:12
**Follow-up** [3] 82:22 82:25 129:12
**Followed** [3] 24:21 140:24 144:16
**Following** [3] 1:18 24:18 118:21
**Follows** [4] 36:15 71:2 85:8 137:20
**Fondren** [13] 92:7 93:10 97:2 97:2 97:13 98:19 112:6 112:11 115:13 121:10 121:11 121:11 121:12
**Foot** [2] 140:3 147:21
**Football** [1] 61:2
**Ford** [2] 8:13 25:11
**Foregoing** [1] 157:4
**Foreign** [1] 132:23
**Form** [1] 123:25
**Format** [1] 120:2
**Forth** [2] 31:17 120:10
**Forty** [1] 22:12
**Forty-five** [3] 22:12 30:18 58:18
**Forward** [2] 129:6 143:20
**Fountain** [1] 92:9
**Four** [6] 33:21 76:12 87:20 125:1 134:11 134:22

**Four-door** [1] 76:12
**Four-lane** [2] 38:5 87:20
**Fourteen** [2] 71:13 71:14
**Fragment** [1] 100:14
**Freeway** [1] 2:14
**Friend** [2] 76:25 83:21
**Front** [31] 139:21 140:2
140:18 140:21 141:12 141:13
141:16 142:16 142:21 142:23
143:6 143:7 143:9 143:16
144:9 146:3 146:25 147:2
147:13 147:20 147:21 148:5
148:16 150:19 151:2 151:23
154:16 154:21 154:21 154:21
155:10
**Fully** [3] 74:11 81:22 115:4
**Function** [2] 52:4 52:7
**Future** [1] 120:15

### G

**General** [1] 141:6
**Generally** [7] 6:23 37:6
38:16 39:2 59:20 107:2 110:11
**Gentleman** [2] 31:20 84:7
**Gentlemen** [6] 70:16 72:20 77:17 120:24 155:22 156:2
**Gibson** [8] 20:12 27:25 58:7 80:11 106:11 106:19 106:22 138:7
**Girl** [12] 19:13 22:23 22:24 22:24 23:9 23:12 23:12 23:16 23:18 23:20 57:20 104:18
**Girlfriend** [5] 23:13 23:17 82:1 105:8 105:9
**Given** [8] 42:17 83:21 84:14 45:16 95:19 120:4 126:10 130:8
**Glass** [42] 46:22 46:23 47:1 47:5 47:11 47:18 47:20 47:21 49:5 53:23 64:20 64:24 65:1 65:10 68:25 68:25 69:8 70:8 70:19 93:18 94:11 94:16 94:17 114:11 114:19 114:23 114:25 117:20 117:21 117:21 117:23 132:22 141:13 143:16 152:20 153:1 153:1 153:2 153:3 153:3 153:6 153:15
**Glen** [2] 137:19 137:24
**Grading** [1] 21:15
**Gradually** [1] 8:5
**Grass** [5] 21:9 21:21 59:20 62:1 112:24
**Grassy** [8] 60:16 61:6 61:12 61:18 61:21 61:25 62:4 65:19
**Ground** [13] 9:9 10:6 10:7 10:21 13:8 14:21 28:8 66:2 93:20 107:5 112:23 112:25 113:8
**Guard** [2] 4:18 78:21
**Guards** [6] 37:22 51:11 73:7 73:8 76:16 80:1
**Guess** [7] 6:5 18:21 60:21 69:19 78:5 102:25 112:4
**Gun** [61] 7:4 7:6 7:7 7:9 7:9 7:15 8:25 9:8 9:23 9:25 10:9 10:10 10:11 10:11 10:21 11:2 11:10 11:23 11:25 12:9 12:12 12:18 13:13 19:15 19:15 19:22 20:4 20:6 20:9 20:10 20:15 22:23 23:11 23:16 23:24 25:25 26:1 26:5 26:7 26:9 26:19 26:10 26:13 26:16 26:20 26:23 27:2 27:13 27:17 27:13 41:24 42:3 42:10 67:7 73:25 74:9 107:22 107:22 107+25 108:2 147:18
**Gunner** [8] 5:10 8:19 8:20 9:1 9:3 9:14 10:12 14:23
**Gunner's** [1] 13:13
**Guns** [2] 25:19 25:22

**Guy** [5] 9:17 10:4 16:15 18:15 24:14

### H

**H.F.D.** [2] 72:22 81:11
**H.P.D.** [3] 37:21 50:16 54:17
**Half** [1] 42:4
**Halloween** [1] 68:17
**Hand** [3] 7:25 148:12 157:12
**Handed** [6] 67:23 73:17 80:21
**Handle** [1] 67:7
**Handles** [1] 86:20
**Handwriting** [2] 145:19 146:3
**Harm** [1] 14:17
**Harness** [2] 145:1 145:2
**Harris** [11] 1:8 1:21 37:12 85:23 96:23 97:9 99:3 157:2 157:4 157:11 157:17
**Headed** [1] 69:3
**Heading** [1] 45:6
**Headlights** [1] 17:14
**Headliner** [2] 151:3 154:16
**Headrest** [2] 140:3 147:22
**Hear** [6] 15:6 23:18 31:9 34:1 82:4 102:6
**Heard** [4] 1:19 17:11 22:14 33:18
**Hearsay** [4] 105:2 111:20 127:15 136:22
**Heavier** [1] 10:18
**Heavyset** [2] 9:15 10:3
**Height** [4] 82:17 147:14 147:18 147:23
**Held** [2] 1:21 147:19
**Help** [8] 14:11 14:11 16:13 16:24 16:25 19:5 19:6 96:9 6 107:2
**Helpful** [4] 90:3 90:5 90:6 107:2
**Hereby** [1] 157:4
**Hermann** [2] 77:13 103:3
**Hiding** [1] 122:3
**High** [2] 21:9 37:6
**Higher** [2] 147:25 148:1
**Hill** [62] 2:12 3:9 3:13 5:22 6:1 18:7 19:20 24:1 24:5 24:7 25:7 30:17 32:8 33:1 33:4 34:8 35:17 36:10 39:25 41:13 41:16 43:24 47:15 52:2 55:2 67:1 67:4 67:19 67:22 68:19 70:2 70:15 74:6 79:4 84:25 92:25 94:7 100:7 100:20 105:3 105:6 111:22 121:6 121:8 123:5 127:17 127:23 129:19 132:17 133:20 136:24 137:13 139:11 146:13 146:19 150:6 150:9 153:19 153:23 155:1 155:5 155:17
**Hit** [1] 70:9
**Hold** [1] 20:7
**Holding** [2] 10:1 143:22
**Holds** [1] 66:20
**Hole** [1] 110:5
**Holley** [67] 11:4 12:14 12:16 14:5 16:2 16:6 16:12 16:18:17 18:24 18:25 19:3 20:12 20:25 21:7 22:15 23:24 23:18 23:19 24:16 25:24 26:4 27:22 30:19 31:14 75:24 75:25 76:4 80:13 81:9 81:12 82:9 83:9 83:21 83:25 84:4 84:10 89:23 89:25 90:1 90:9 90:13 90:19 93:20 100:15 103:2 103:7 103:8 103:15 103:17 104:12 105:20 106:7 106:22 107:1 107:7 108:7 109:7 112:10 120:4 120:16 122:22 123:9 123:16 123:21

137:6 137:9
**Holley's** [2] 90:25 104:6
**Homicide** [21] 37:1 37:2 56:14 58:15 58:19 68:12 75:14 83:5 83:12 84:11 84:20 85:15 85:18 96:8 98:6 103:19 104:13 106:6 122:2 125:19 138:3
**Homicide's** [1] 83:2
**Honor** [38] 3:9 24:1 33:2 36:9 39:13 39:22 41:9 43:21 44:14 52:20 52:25 54:25 67:20 68:21 73:21 74:3 74:6 79:2 92:14 94:4 94:7 99:19 100:4 100:18 105:2 123:2 127:14 127:24 136:22 137:15 139:8 139:12 146:13 146:16 150:7 153:21 155:19 155:21
**Honorable** [1] 1:20
**Hood** [1] 16:23
**Hoping** [1] 106:16
**Hospital** [25] 38:1 58:9 74:22 82:23 83:9 83:14 89:23 94:22 99:11 99:12 99:16 100:1 100:12 103:3 103:9 104:15 109:6 111:6 118:4 118:10 119:17 119:19 123:9 130:18 133:11
**Hospitals** [1] 89:19
**Hour** [1] 116:3
**Hours** [7] 4:11 56:21 62:21 88:15 102:15 103:13 103:14
**Houston** [23] 1:21 2:8 2:15 2:20 3:15 36:21 55:24 68:10 71:10 71:12 73:3 75:3 75:6 81:13 85:14 86:6 96:3 96:18:19 125:19 133:23 137:24 157:18
**Howard** [26] 97:24 98:5 98:9 98:18 116:13 122:10 122:21 123:24 124:8 124:20 124:23 124:25 125:9 126:3 126:6 128:14 128:7 128:25 129:24 130:6 130:7 130:11 131:17 133:10 134:23
**HPD** [1] 137:25
**Hundred** [2] 62:13 116:21
**Hunting** [1] 4:6
**Hurry** [1] 10:12
**Hurting** [1] 16:5

### I

**I.D.** [12] 124:8 126:12 126:14 127:2 127:9 128:6 128:24 129:5 129:20 129:23 129:24 134:17
**ID** [4] 127:18 129:2 129:9 130:2
**Identification** [10] 40:23 43:16 52:16 73:24 99:22 124:1 124:19 139:1 145:13 145:24
**Identifications** [1] 124:12
**Identified** [3] 18:16 20:5 129:4
**Identifies** [1] 134:23
**Identify** [5] 40:24 99:23 128:9 128:10 135:19
**Identifying** [3] 8:15 120:7 136:10
**Illuminate** [2] 38:9 63:12
**Immediately** [6] 11:12 73:18 80:21 81:2 102:10 156:7
**Impression** [2] 20:14 26:5
**Incident** [3] 55:13 57:23 85:22
**Incidents** [1] 36:3
**Include** [1] 71:24
**Included** [3] 128:4 133:9 157:6
**Including** [1] 156:5

**Inconsistencies** [4] 90:14 106:25 107:2 107:21
**Inconsistent** [2] 107:22 107:24
**Independent** [2] 63:7 156:8
**Indicate** [8] 23:8 45:23 93:15 94:11 105:6 105:10 131:23 134:2
**Indicated** [7] 11:11 68:10 102:24 104:21 121:16 130:5 135:4
**Indication** [1] 93:11
**Individual** [13] 6:20 7:1 7:3 7:20 9:8 11:1 15:16 21:1 3 58:6 82:10 106:18 148:1 148:2
**Individual's** [1] 60:5
**Individuals** [20] 10:16 20:6 22:9 23:8 55:19 57:12 57:22 80:1 80:12 83:1 122:25 122:24 123:2 124:2 124:22 25 125:4 125:13 125:18 125:23 126:1 1
**Influence** [1] 124:9
**Information** [42] 22:19 38:22 56:22 74:21 75:1 82:3 82:19 82:23 83:18 86:17 87:3 87:9 88:16 89:7 89:14 90:2 91:3 91:10 91:13 91:14 98:19 102:20 105:16 108:9 110:19 116:9 118:5 118:10 118:12 118:17 118:20 130:13 130:14 130:18 130:23 130:25 131:16 132:5 134:21 135:2 136:6
**Initials** [1] 68:2
**Injured** [1] 13:19
**Injury** [1] 104:6
**Inquire** [2] 76:3 111:16
**Insert** [1] 67:6
**Inserted** [2] 66:14 66:21
**Inside** [17] 51:4 64:6 69:21 89:3 139:16 145:1 145:21 146:7 147:24 148:13 150:17 151:10 151:22 152:20 153:2 153:4 153:7
**Inspect** [1] 132:20
**Installed** [1] 126:17
**Instance** [1] 74:23
**Instead** [3] 4:3 24:15 156:15
**Instructing** [1] 60:13
**Instruction** [1] 4:9
**Instructions** [1] 156:19
**Intended** [1] 137:9
**Interested** [5] 106:6 108:7 108:8 116:25 128:15
**Interior** [1] 117:22
**Intersection** [1] 79:25
**Intersects** [1] 44:7
**Interview** [3] 84:9 89:23 90:18
**Interviewed** [2] 91:7 103:7
**Interviews** [1] 86:19
**Intrepid** [6] 21:4 76:22 82:1 82:8 82:11 87:8
**Introduce** [6] 24:2 81:12 81:16 103:18 137:23 153:19
**Introduced** [5] 21:13 33:5 88:8 104:11 150:2
**Investigate** [3] 85:22 104:16 106:2
**Investigated** [1] 102:14
**Investigating** [5] 90:22 104:13 106:17 106:19 135:10
**Investigation** [22] 57:5 58:12 96:15 101:6 101:16 105:12 106:12 109:1 122:16 122:20 122:25 125:1 125:5 125:25

**131:**19 133:16 135:22 135:25
136:7 138:6 149:20 151:15
156:8
**Investigations** [1] 4:5
**Investigator** [4] 68:13
102:16 105:13 108:3
**Investigators** [2] 56:14
58:15
**Involved** [8] 57:23 74:25
87:12 122:1 122:20 128:12
138:6 138:14
**Isolated** [1] 77:19
**Item** [6] 45:5 45:8 59:6 64:
17 88:10 113:4
**Items** [16] 40:15 55:5 55:
9 55:9 56:18 58:11 59:1 59:
12 101:15 101:20 102:13 110:
9 117:24 150:22 150:25 151:4
**Itself** [2] 42:3 56:13

---

**J**

**Jacinto** [1] 157:18
**Jack** [4] 17:11 20:7 20:16
35:22
**Jacked** [1] 36:5
**January** [1] 123:13
**Jeans** [1] 77:5
**Jeff** [2] 36:14 36:19
**Job** [1] 58:10
**Joe** [1] 60:6
**John** [7] 51:11 73:10 73:11
78:20 80:20 80:24 91:14
**Johnson** [1] 123:6
**JR** [2] 1:5 157:20
**Judge** [9] 1:20 5:22 43:24
67:2 92:25 100:7 121:6 153:
19 155:2
**JUDICIAL** [1] 1:11
**Jump** [4] 76:8 81:18 81:24
83:23
**Jumped** [1] 82:15
**Jurisdiction** [1] 83:4
**Jury** [27] 3:1 3:2 9:7 9:24
16:16 23:22 31:15 55:10 59:
14 62:4 66:18 70:19 70:21
72:20 77:17 110:11 117:12
120:25 121:2 127:13 136:13
137:23 140:16 141:4 155:23
155:25 156:22

---

**K**

**Kay** [2] 157:3 157:16
**Keep** [2] 19:2 115:10
**Kept** [2] 12:19 31:16 131:4
**Kevin** [35] 10:24 18:16 27:
22 31:13 80:13 91:4 91:17
91:20 91:22 94:21 94:24 95:
6 95:14 118:4 118:9 119:2
119:17 119:19 122:23 124:7
124:8 125:11 126:4 126:11
126:22 126:23 127:3 127:9
128:2 128:6 129:8 129:13
130:6 130:15 131:13
**Kicked** [2] 11:10 42:10
**Kicks** [1] 153:3
**Kidnapped** [1] 57:20
**Kind** [47] 3:23 6:20 7:25 8:
5 9:11 9:15 9:16 13:9 13:10
13:16 13:20 14:20 15:19 16:
1 16:3 16:6 18:22 19:2 21:
22 22:24 24:18 24:21 24:24
25:20 28:3 31:16 36:6 74:22
74:23 76:9 78:13 80:22 81:
21 87:18 90:20 90:24 101:4
101:14 101:22 106:8 107:14
110:22 113:7 124:10 143:22
146:25 156:8
**King** [10] 86:11 89:19 100:
22 103:3 108:6 111:5 114:4
122:7 126:13 130:3
**Knobloch** [2] 157:3 157:16
**Knock** [2] 116:5 116:12

---

**Knowledge** [1] 88:12
**Known** [1] 120:9
**Knows** [2] 101:10 103:22
**KURT** [1] 2:17

---

**L**

**Lab** [3] 50:16 54:17 99:13
**Lack** [1] 56:9
**Ladies** [6] 70:16 72:20 77:
16 120:24 155:22 156:1
**Laid** [1] 13:10
**Lane** [5] 69:6 69:10 69:10
69:22 87:20
**Lanes** [3] 38:5 69:16 69:19
**Lantern** [24] 6:3 6:24 8:2
8:3 14:9 16:22 29:10 33:25
37:11 37:25 38:3 41:2 52:18
72:9 77:17 78:2 78:11 85:22
86:3 87:17 95:17 100:24 104:
13 149:13
**Large** [6] 48:14 48:22 48:
25 49:2 49:25 54:4
**Last** [3] 19:6 24:7 136:3
**Late** [1] 92:2
**Latent** [3] 54:17 151:13
151:20
**Lateral** [1] 62:16
**Latest** [1] 130:4
**Laticia** [4] 89:12 137:2
137:5 137:8
**Laughing** [1] 19:5
**Law** [2] 55:6 98:20
**Lay** [8] 12:19 12:21 12:22
14:7 16:5 16:9 26:14 26:17
**Laying** [9] 7:24 13:7 16:3
19:11 28:8 35:15 46:8 93:20
113:8
**Layout** [1] 87:19
**Lead** [1] 29:15
**Leading** [1] 24:16
**Leads** [1] 29:15
**Leaned** [1] 13:9
**Leaning** [1] 15:23
**Learned** [2] 10:17 114:6
**Leave** [5] 42:21 83:5 83:6
83:8 103:1
**Leaving** [2] 17:15 24:17
**Led** [1] 88:23
**Left** [14] 18:12 20:14 22:
18 42:4 42:6 42:25 93:8 136:
16 136:17 141:17 141:23 143:
2 151:13 154:12
**Leg** [1] 26:2
**Legal** [2] 105:21 122:11
**Length** [1] 129:16
**Less** [1] 133:13
**Letting** [1] 16:3
**Level** [1] 4:5
**Lewis** [1] 119:20
**Lexus** [36] 20:21 76:11 82:
6 82:7 82:11 82:12 87:7 92:
2 92:4 92:11 92:19 93:10 97:
16 113:13 116:17 116:22 117:
15 117:22 132:3 132:13 138:
23 139:5 139:16 146:9 146:
25 147:4 147:18 148:2 148:4
148:14 148:18 149:24 150:18
150:23 153:12 155:6
**License** [2] 76:12 138:20
**Lies** [1] 111:3
**Light** [2] 63:25 64:14
**Lighting** [3] 63:11 63:17
63:21
**Lights** [2] 25:16 38:8
**Likely** [1] 31:19
**Likewise** [1] 120:3
**Line** [4] 49:12 134:9 134:
22 149:1

---

**Lineal** [1] 88:12
**Lines** [1] 69:15
**List** [1] 130:2
**Listed** [4] 40:12 40:14 44:
2 61:19
**Listing** [1] 127:8
**Live** [8] 29:1 116:14 121:
14 151:10 151:12 151:21 151:
22 152:4
**Living** [1] 29:3 36:4
**Load** [2] 66:22 67:13
**Loaded** [5] 51:19 52:5 66:
25 74:11 82:20
**Localized** [1] 104:6
**Locate** [1] 106:16
**Located** [16] 29:5 29:8 46:
12 47:1 48:4 48:8 48:15 49:
25 53:16 53:19 96:17 109:2
112:6 116:17 126:9 132:7
**Location** [51] 17:6 33:16
37:11 37:15 37:24 38:14 41:
2 43:12 44:4 59:12 59:18 72:
9 72:12 72:17 72:19 73:9 74:
18 75:4 75:7 77:1 84:1 85:
25 86:3 87:16 88:2 89:2 89:
8 92:4 92:8 92:18 93:12 95:
7 96:23 97:1 97:14 97:6 97:18
97:15 97:21 97:23 98:1 98:
24 99:1 99:6 114:16 117:15
121:10 130:14 145:21 146:5
149:17
**Locations** [2] 77:15 114:
24
**Locked** [1] 11:14
**Locks** [1] 67:11
**Logical** [1] 152:18
**Look** [26] 3:5 6:8 9:12 21:
10 27:1 36:7 39:8 40:17 55:
8 56:15 58:25 59:15 60:18
61:15 79:23 89:5 101:5 101:
10 107:7 109:22 112:24 113:
9 113:11 114:13 123:11 123:
12
**Looked** [21] 8:6 8:9 9:16
10:3 10:4 10:5 10:5 10:6 10:
7 10:7 10:7 17:12 23:4 26:8
26:8 32:19 61:18 82:14 87:3
126:3 127:1
**Looking** [33] 31:17 32:18
32:20 35:3 35:21 38:17 44:
18 44:23 45:2 45:19 53:6 58:
18 61:9 61:13 61:22 61:25
64:12 64:14 64:16 78:5 89:15
90:23 99:8 101:14 109:23
112:17 116:22 117:7 121:18
136:11 142:21 148:8 150:4
**Lookout** [1] 82:5
**Looks** [2] 9:22 134:14
**Lost** [1] 24:18
**Lower** [1] 142:7
**Lunch** [2] 70:17 70:20
**Lying** [3] 7:25 18:15 107:
16
**LYN** [1] 2:2
**Lynchester** [1] 99:2

---

**M**

**Machine** [1] 1:23
**Magazine** [10] 11:20 51:
16 51:17 51:19 51:22 66:14
66:16 66:20 67:7 67:17
**Magic** [1] 6:18
**Main** [2] 74:24 106:15
**Major** [1] 138:15
**Majority** [1] 153:1
**Male** [8] 9:15 10:3 10:18
15:15 15:20 16:15 24:13 24:
16
**Males** [5] 76:7 76:8 76:21
81:18 81:23
**Mamou** [17] 1:5 95:20 95:
22 96:2 98:1 98:3 118:6 118:

---

**Man** [5] 7:11 8:3 13:23 16:
7 19:6
**Manager** [2] 114:4 115:15
**Mark** [5] 6:19 7:7 94:17
136:10 152:3
**Marked** [14] 39:16 40:22
41:5 43:15 49:22 52:15 68:6
73:24 92:17 99:22 114:11
138:25 145:13 145:23
**Marker** [5] 6:18 54:9 115:
4 149:7 151:24
**Marking** [2] 54:9 54:11
**Markings** [2] 25:13 25:14
**Mary** [14] 77:1 77:4 82:2
82:10 89:16 99:6 106:13 106:
16 109:3 112:2 135:24 136:
15 137:6 138:7
**Matched** [1] 117:21
**Matches** [1] 112:16
**Matter** [1] 14:23
**McClellan** [71] 2:2 3:14
18:4 19:17 24:3 25:9 30:15
32:4 34:10 35:20 36:8 36:13
36:17 39:12 39:15 39:22 40:
2 41:9 41:14 41:18 41:21 43:
21 44:1 44:13 44:16 47:13
47:17 48:13 48:14 52:20 52:
25 53:6 54:14 54:24 63:10
67:23 68:20 68:23 69:24 71:
4 73:20 73:23 74:3 74:8 79:
1 85:1 85:3 85:6 85:10 92:
13 92:16 92:20 93:3 94:4 94:
10 99:18 99:21 100:4 100:9
100:17 105:1 111:19 123:1
127:14 128:1 132:15 132:19
133:17 135:4 136:21 137:14
**McDonald** [12] 3:14 6:2
25:10 30:18 33:4 51:11 73:
10 73:11 78:20 80:20 80:24
84:14
**McKnee** [2] 75:10 87:24
**McNee** [14] 6:3 6:12 6:23
8:1 14:9 16:21 40:10 44:7
45:12 53:14 72:2 78:7 78:10
88:2
**Mean** [11] 9:25 15:22 17:2
17:19 27:9 36:2 41:22 51:17
63:20 77:20 148:25
**Meant** [1] 109:19
**Measurement** [1] 39:4
**Measurements** [1] 30:11
**Medical** [2] 22:10 75:20
**Medication** [1] 156:12
**Meet** [1] 104:14
**Meeting** [3] 111:6 111:9
123:8
**Member** [3] 55:3 103:19
136:3
**Members** [5] 9:7 16:16 59:
14 66:18 86:6
**Men** [1] 82:13
**Mention** [3] 16:19 19:12
28:15
**Mentioned** [2] 19:14 32:14
**Met** [2] 103:17 135:24
**Metal** [1] 140:13
**Metro** [1] 156:23
**Microphone** [2] 31:10 71:7
**Midnight** [2] 72:14 79:7
**Might** [11] 18:12 20:25 34:
24 66:18 68:21 76:24 88:3
89:15 91:10 101:12 121:19
**Mike** [1] 1:20
**Millimeter** [6] 20:4 39:2
51:23 51:24 68:1 153:18
**Mind** [4] 14:18 102:15 105:
23 109:14
**Mine** [3] 26:19 82:2 86:24
**Minutes** [22] 14:2 14:4 22:

12 30:18 33:14 33:17 33:19
33:21 34:5 58:18 72:18 77:
11 84:5 101:2 102:3 133:13
134:1 134:10 134:11 134:21
134:22 134:25
**Missing** [3] 89:8 104:18
104:25
**Mistaken** [4] 8:14 10:18
11:7 34:16
**Moment** [13] 3:10 3:16 5:
23 6:8 24:8 41:13 79:16 112:
4 113:11 133:8 146:21 155:1
156:22
**Moments** [3] 3:22 3:23 123:
11
**Monday** [1] 92:2
**Money** [3] 102:11 107:4
107:21
**Monitor** [1] 97:11
**Months** [2] 4:14 4:15
**Morning** [23] 37:16 56:20
61:22 77:22 86:4 88:15 89:6
89:11 94:21 102:5 102:15
108:20 108:23 108:25 109:6
112:8 118:22 118:23 119:1
119:14 136:4 156:14 156:16
**Most** [7] 18:23 18:24 19:1
33:21 65:15 152:18 153:3
**Mostly** [1] 23:20
**Mother's** [1] 76:11
**Motorists** [1] 57:13
**Move** [4] 53:3 53:8 113:5
114:9
**Moved** [1] 93:12
**Multiple** [1] 52:5
**Mulworth** [1] 75:10
**Murder** [2] 90:22 138:7
**Murders** [1] 37:6
**Murworth** [6] 6:3 6:16
13:23 40:12 53:14 60:24 72:
3 78:7 78:10 79:25 87:25 88:
2

---

**N**

**Name** [29] 11:2 11:4 11:6
15:12 23:3 28:12 28:20 28:
20 36:18 36:19 55:22 60:5
60:6 71:5 83:16 85:11 89:16
91:10 91:15 95:16 95:19 95:
21 100:10 119:4 119:6 126:
10 145:19 146:4 149:16
**Named** [4] 58:6 77:1 82:2
128:12
**Names** [4] 10:16 10:17 125:
4 126:1
**Narcotics** [2] 90:24 106:3
**National** [1] 4:2
**Nature** [1] 4:7
**Near** [5] 30:20 38:10 46:17
60:22 69:14 81:6
**Necessarily** [1] 82:24
**Necessary** [3] 82:22 82:
22 125:22
**Need** [8] 3:7 6:8 14:11 59:
6 81:5 83:13 156:10 156:13
**Needed** [2] 75:3 82:15
**Needs** [2] 99:13 101:24
**Never** [2] 82:18 84:6 117:9
**New** [2] 6:10 21:15
**Newspaper** [3] 53:21 89:3
91:16
**Next** [18] 10:21 21:12 36:
12 45:5 46:8 59:2 69:10 85:
2 91:18 91:19 108:19 108:20
114:19 132:3 137:17 141:21
142:25 155:20
**Night** [3] 38:12 63:18 136:
19
**Nobody** [3] 13:18 116:8
125:3
**Nondescript** [2] 90:10

---

107:1
**None** [2] 38:10 121:22
**Nonresponsive** [1] 18:5
**Normal** [1] 110:25
**Normally** [1] 102:24
**North** [12] 6:6 44:7 44:20
59:17 65:7 65:10 69:6 69:21
87:21 87:24 116:18 116:19
**Northbound** [1] 17:19
**Northerly** [4] 40:3 64:2
69:3 69:9
**Northern** [1] 65:15
**Note** [1] 139:18
**Noted** [1] 155:9
**Notes** [1] 95:13
**Nothing** [8] 30:15 33:25
36:8 56:12 59:10 85:1 137:
14 151:8
**Notice** [1] 49:8
**Noticed** [4] 24:12 24:13
72:21 140:1
**Novak** [3] 96:21 122:9 125:
16
**Number** [41] 49:16 50:21
76:13 95:3 96:2 96:5 96:8
96:9 96:10 96:12 97:3 116:
13 118:5 118:17 118:21 119:
5 119:5 119:7 119:8 119:11
119:18 119:19 119:22 126:10
126:13 126:15 126:15 127:2
127:11 130:6 130:7 130:8
130:11 130:19 130:21 131:17
131:24 131:24 145:20 146:4
146:5
**Numbered** [3] 1:20 43:4
157:6
**Numbers** [10] 36:3 41:6 41:
17 79:21 126:5 126:7 126:24
127:1 129:23 130:2

---

**O**

**O'clock** [2] 37:16 102:4
**Object** [8] 18:4 19:17 32:
4 35:17 105:1 111:19 127:14
136:21
**Objection** [14] 24:3 39:
25 41:16 43:24 47:15 52:23
74:6 92:25 94:7 100:7 133:
17 139:11 146:13 153:21
**Observation** [1] 63:7
**Observations** [1] 115:23
**Observe** [2] 92:11 127:17
**Observed** [1] 94:12
**Obtain** [2] 134:21 135:2
**Obtained** [3] 91:13 122:5
130:17
**Obvious** [3] 95:4 102:8
134:14
**Obviously** [6] 20:19 30:
13 68:14 107:15 112:16 114:6
**Occasion** [10] 37:11 72:8
83:25 85:21 89:11 89:22 90:
19 91:19 94:21 99:11
**Occurred** [9] 17:17 56:22
77:18 85:22 88:17 90:20 101:
9 120:11 157:7
**Occurring** [1] 98:11
**October** [3] 1:18 5:8 68:16
**Off-the-record** [1] 123:4
**Offense** [2] 145:21 145:21
**Offer** [11] 39:23 41:10 43:
22 47:13 52:21 74:4 92:23
94:5 100:5 139:10 146:11
**Office** [3] 91:14 119:6
138:11
**Officer** [45] 3:25 4:4 25:
13 36:13 36:21 37:21 42:19
51:8 55:3 55:21 55:23 56:2
56:16 56:23 57:11 57:25 63:
5 66:13 67:1 67:4 70:3 79:5
80:23 81:13 83:16 84:14 86:
12 86:16 89:19 96:21 103:3

---

103:22 106:6 114:4 129:16
126:12 132:10 135:15 137:18
137:24 141:2 145:12 146:20
154:3 155:6
**Officer's** [1] 55:22
**Officers** [4] 5:17 5:18
64:1 98:23
**Official** [3] 157:3 157:
12 157:17
**Official/Deputy** [1]
157:3
**Old** [2] 23:3 23:5
**Once** [3] 33:18 56:8 101:6
**One** [46] 4:5 5:17 5:18 7:
22 12:25 14:5 15:23 18:19
19:21 20:6 20:15 20:24 22:
19 23:15 23:23 24:7 26:19
28:8 30:19 30:21 31:2 51:11
60:4 64:11 75:25 80:16 80:
16 81:6 83:1 86:19 87:22 93:
12 104:17 105:16 107:25 116:
19 117:16 124:25 124:25 131:
23 131:24 146:23 147:1 152:
14 154:22 155:9
**Open** [2] 134:7 157:7
**Opens** [1] 134:13
**Opinion** [4] 64:23 65:14
106:21 153:6
**Opportunity** [2] 74:16
149:15
**Opposite** [2] 93:17 117:17
**Oral** [2] 71:1 71:6
**Orange** [1] 87:8
**Orange-colored** [1] 87:8
**Order** [12] 3:24 4:9 11:18
11:24 12:1 12:23 63:11 63:
20 66:22 66:25 67:13 148:13
**Orient** [1] 39:4
**Orientation** [1] 6:9
**Originally** [1] 126:9
**Otherwise** [1] 111:10
**Outside** [7] 69:14 112:25
140:21 142:2 148:5 152:20
153:7
**Overall** [1] 141:6
**Overgrown** [2] 21:18 78:17
**Own** [3] 63:7 101:4 104:19

---

**P**

**P.m.** [2] 72:13 108:24
**Package** [1] 67:23
**Pad** [1] 95:13
**Page** [1] 20:1
**Pager** [5] 46:7 46:12 46:
16 46:17 53:18
**Paid** [1] 157:11
**Pain** [4] 16:8 95:4 104:4
111:10
**Painful** [2] 95:12 120:1
**Painkillers** [1] 124:10
**Pamela** [2] 157:3 157:16
**Paper** [10] 43:13 43:17
100:10 102:11 107:4 107:21
119:22 119:24 120:3 143:23
**Paramedics'** [1] 74:24
**Parameters** [1] 79:6
**Park** [1] 121:11
**Parked** [7] 17:17 17:18 64:
3 112:23 113:5 113:6 114:6
**Parking** [2] 117:15 117:18
**Part** [9] 18:23 39:6 42:2
65:15 86:24 86:25 122:24
125:21 151:15
**Partially** [1] 155:14
**Particular** [22] 5:14 11:
18 38:12 51:22 58:11 60:8
60:9 66:6 91:8 97:12 103:6
106:1 116:11 116:18 120:14
124:3 136:10 138:2 140:5
149:16 153:11 156:9

---

**Parties** [2] 157:6 157:9
**Partner** [26] 5:11 5:16 10:
12 13:1 15:1 15:1 15:4 15:
10 25:18 26:11 27:14 27:15
27:17 28:11 28:11 28:17 28:
24 33:25 86:11 86:18 95:12
100:22 101:5 102:2 102:24
115:17
**Partnership** [1] 101:22
**Parts** [1] 41:25
**Party** [1] 137:3
**Pass** [12] 25:7 36:9 54:24
69:24 70:15 79:1 100:17 127:
23 132:15 146:15 153:23 154:
25
**Passed** [3] 3:4 33:14 33:16
**Passenger** [18] 8:21 9:11
140:7 140:10 140:19 140:25
142:16 143:11 144:23 148:16
150:17 150:19 151:2 151:3
151:23 154:16 154:18 154:21
**Passes** [1] 156:23
**Pat** [2] 14:19 27:25
**Path** [5] 140:9 140:17 140:
18 143:5 143:8
**Patrol** [9] 42:19 56:1 64:
3 71:17 71:24 72:5 86:12 86:
16 97:10
**Patted** [2] 14:20 27:22
**Paved** [1] 87:20
**Pavement** [1] 46:10
**Pay** [1] 79:20
**Pen** [4] 7:2 24:11 119:24
147:10
**Penetrate** [1] 143:10
**Penetrated** [5] 117:8 140:
6 143:9 144:24 144:25
**People** [29] 14:12 20:11
20:16 22:4 52:5 36:5 37:23
38:20 57:20 72:24 73:2 75:
12 75:14 75:17 75:19 75:19
75:22 76:23 82:19 84:16 87:
10 88:17 88:21 89:20 90:16
96:8 101:4 104:17 128:12
**Perform** [3] 12:2 138:11
140:8
**Perhaps** [2] 118:12 123:12
**Perimeters** [1] 59:16
**Period** [5] 4:19 14:3 59:
23 60:25 77:9
**Perpendicular** [1] 114:23
**Person** [33] 7:14 8:25 10:
20 11:8 11:18 12:8 15:6 18:
23 24:20 28:12 32:5 34:19
34:22 35:1 45:16 50:17 89:7
89:15 91:10 95:16 99:5 99:8
100:10 100:11 118:11 120:8
128:16 129:4 148:18 148:21
148:23 149:5 149:9
**Personal** [2] 25:11 25:12
**Personally** [1] 122:24
**Personnel** [2] 22:10 81:11
**Persons** [2] 9:13 90:11
**Pertaining** [1] 24:19
**Peter's** [1] 52:6
**Peters** [1] 68:3
**Phone** [29] 2:9 2:16 2:21
96:10 96:12 119:4 119:5 125:
22 126:6 126:8 126:13 126:
19 126:24 127:3 127:10 129:
19 129:20 129:21 130:15 130:
19 130:21 130:25 131:3 131:
4 131:7 131:8 131:14 131:20
131:23
**Photo** [3] 48:11 94:17 94:
18
**Photograph** [30] 44:18 44:
19 44:23 45:19 46:16 46:24
46:25 60:13 66:4~74:8 94:13
94:14 113:17 115:3 115:8
115:14 115:25 117:25 125:17
141:6 141:12 141:18 142:16
142:21 143:6 143:13 144:8

144:15 150:10 150:10
**Photographed** [3] 139:5 149:25 150:12
**Photographic** [1] 124:15
**Photographing** [1] 59:5
**Photographs** [18] 39:3 46:19 50:9 113:10 117:13 124:25 125:12 128:3 135:18 138:22 139:2 150:1 150:5 151:5 152:8 152:11 152:13 154:22
**Photospread** [23] 123:10 123:15 123:19 123:23 124:7 124:23 124:24 125:16 128:3 128:16 128:17 128:19 128:20 128:21 128:23 133:9 134:4 134:5 134:12 134:23 135:5 135:7 135:8
**Photospreads** [1] 124:17
**Physical** [10] 86:20 86:25 87:19 88:3 90:15 94:25 97:15 125:1 138:16 151:4
**Physically** [2] 132:20 151:16
**Pick** [2] 11:11 150:9
**Picked** [8] 10:13 12:18 26:13 26:18 26:19 27:3 81:7 129:15
**Pickup** [1] 8:14
**Picture** [7] 93:19 116:19 117:24 129:16 133:9 141:16 144:15
**Pictured** [1] 49:11
**Pictures** [5] 37:8 53:10 63:16 123:23 154:9
**Piece** [5] 59:7 81:4 120:3 143:22 149:16
**Pieces** [4] 18:23 43:13 100:9 105:16
**Pink** [2] 151:24 152:3
**Pistol** [6] 41:24 66:21 73:13 73:15 73:17 81:7
**Place** [7] 57:2 94:10 94:16 104:13 106:3 141:19 142:24
**Placed** [7] 59:2 115:10 132:14 132:25 140:13 140:16 142:23
**Places** [1] 59:3
**Plaid** [1] 31:20
**Plastic** [7] 113:21 113:23 132:2 132:6 132:12 144:25 145:9
**Plate** [2] 76:12 138:20
**Play** [1] 53:1
**Playing** [1] 53:5
**Plus** [4] 14:16 35:24 62:16 80:24
**PM** [4] 70:20 108:16 112:13 112:14
**Pocket** [1] 151:23
**Point** [57] 6:3 6:24 7:18 7:18 8:2 8:3 10:5 13:8 13:16 14:9 14:14 14:23 16:11 16:18 16:22 18:24 26:13 26:16 26:20 26:23 29:10 33:25 37:12 37:25 38:3 41:2 52:18 56:17 62:22 72:9 77:17 78:2 78:11 79:24 85:23 86:3 87:17 95:17 100:24 103:1 103:6 104:14 105:24 106:15 106:18 107:17 109:4 112:1 114:17 115:22 118:3 119:16 120:15 123:8 134:5 149:4 149:13
**Pointed** [5] 18:1 65:2 65:6 65:9 148:12
**Pointing** [5] 17:21 18:3 27:17 27:19 143:21
**Police** [19] 3:15 14:13 25:13 36:21 55:24 68:11 71:10 71:12 75:3 75:7 81:13 85:14 86:6 103:19 103:22 125:19 133:23 135:15 137:24
**Pool** [9] 46:16 48:14 48:22 48:25 49:2 49:25 50:3 54:4 54:10
**Poor** [1] 27:11
**Portion** [2] 6:5 141:18 142:2
**Portions** [1] 157:5
**Portray** [1] 63:17
**Position** [7] 64:24 67:12 69:5 69:7 148:6 148:6 150:13
**Positioned** [1] 24:19
**Possession** [3] 12:13 42:16 51:11
**Possible** [5] 12:6 52:4 69:11 70:5 90:10
**Possibly** [6] 11:6 15:20 17:13 24:20 34:24 140:21
**Post** [1] 143:15
**Potential** [2] 102:22 116:5
**Precaution** [2] 13:1 13:6
**Preliminary** [1] 86:17
**Preparation** [1] 157:11
**Prepare** [3] 39:7 39:10 52:11
**Prepared** [4] 39:19 40:3 40:8 52:17
**Presence** [2] 22:16 122:10
**Present** [11] 37:20 37:24 38:20 75:14 86:6 88:6 93:7 99:12 115:5 123:9 134:12
**Preserve** [3] 32:21 38:25 55:9
**Presiding** [1] 1:21
**Pretty** [5] 27:11 60:9 82:20 102:8 116:1
**Previous** [2] 70:17 156:3
**Previously** [3] 95:16 126:16 134:16
**Primary** [4] 55:21 55:22 56:16 101:9
**Primer** [1] 42:2
**Print** [4] 54:17 133:1 151:13 151:20
**Priority** [1] 106:4
**Private** [1] 4:5
**Problem** [3] 156:9 156:12 156:17
**Problems** [2] 35:25 36:2
**Proceed** [6] 3:3 3:8 65:15 70:22 85:5 134:20
**Proceedings** [4] 1:19 1:22 157:5 157:9
**Process** [3] 39:6 72:23 93:4
**Processed** [2] 93:5 133:1
**Processing** [5] 38:15 38:23 38:25 57:18 84:16
**Profile** [1] 37:7
**Progress** [2] 45:4 50:9
**Progressed** [3] 44:6 50:4 106:13
**Progressing** [1] 45:6
**Progression** [2] 45:12 53:9
**Properly** [1] 67:15
**Property** [1] 145:20
**Prosecuting** [1] 108:8
**Protocol** [1] 55:15
**Provide** [2] 116:8 130:24
**Public** [2] 91:14 118:11
**Pull** [1] 11:19
**Pulled** [6] 8:4 11:14 12:9 17:3 17:23 143:20
**Pulling** [1] 8:8
**Pulse** [6] 16:15 24:13 24:14 28:2
**Purpose** [4] 101:14 109:8 109:13 133:15
**Purposes** [8] 23:22 40:23 43:16 52:16 99:22 139:1 145:15 145:24
**Put** [13] 7:9 7:17 10:23 12:8 30:4 67:10 67:11 80:16 82:3 102:3 144:14 145:3 145:4

**Q**

**Quarter** [2] 46:7 53:18
**Questioning** [1] 111:14
**Questions** [19] 3:17 3:21 13:15 13:20 22:25 32:2 34:8 36:10 68:19 84:25 95:6 95:11 120:1 120:7 120:8 137:13 154:24 155:17 155:18
**Quick** [3] 10:8 14:19 14:21
**Quickly** [1] 14:24
**Quote** [1] 20:16

**R**

**Raise** [2] 54:18 111:1
**Raised** [1] 28:3
**Ran** [3] 8:10 10:12 14:9
**Ranger** [2] 8:13 25:11
**Rate** [1] 26:6
**Rather** [1] 102:17
**Reached** [1] 27:2
**Reaction** [2] 109:16 111:23
**Read** [1] 122:11
**Ready** [1] 63:2
**Real** [6] 10:8 14:19 14:20 15:22 21:9 77:19
**Realize** [2] 134:7 147:11
**Really** [14] 13:19 14:14 15:18 22:6 25:21 26:24 28:22 33:12 50:23 63:17 79:20 107:9 129:13 129:14
**Realm** [1] 82:24
**Rear** [11] 140:6 140:19 140:25 141:7 143:7 143:10 143:15 144:23 148:16 151:3 154:18
**Reason** [1] 77:21
**Reasonably** [1] 47:22
**Reasons** [1] 12:25
**Receive** [5] 3:24 4:8 91:3 98:8 98:19 118:20
**Received** [12] 51:1 51:7 72:12 88:16 91:9 91:15 118:5 118:16 118:19 129:23 130:13 131:8
**Receiving** [1] 78:19
**Recess** [4] 70:20 121:1 155:24 156:2
**Recessed** [1] 3:4
**Recognize** [11] 39:17 128:18 128:19 128:21 128:22 135:7 139:2 145:17 145:24 146:2 146:3
**Recognized** [7] 81:2 128:17 128:25 133:25 134:14 135:12 135:21
**Recognizing** [1] 115:22
**Record** [11] 1:11 36:18 39:1 50:20 71:5 85:11 96:5 131:5 157:6 157:8 157:11
**Recorded** [1] 131:11
**Records** [15] 125:22 125:23 126:2 126:3 126:22 126:23 129:18 130:5 130:15 131:4 131:14 131:23
**Recover** [11] 37:7 37:8 40:17 47:4 78:21 84:13 99:15 102:1 144:21 150:22 151:10
**Recovered** [28] 40:15 41:2 42:12 42:18 50:13 50:14 50:22 54:15 54:22 66:13 73:12 74:1 88:13 92:5 92:19 93:11 97:16 100:1 100:14 101:20 101:25 113:24 132:12 144:20 144:22 146:6 146:8 151:13
**Recovering** [1] 78:19
**Recovery** [1] 98:20
**RECROSS-EXAMINATION** [4] 30:16 70:1 132:16 155:4
**Red** [12] 7:2 8:13 8:14 21:4 25:10 76:22 77:5 81:25 82:7 82:11 143:25 147:2
**Reddish** [1] 87:7 142:10
**REDIRECT** [5] 25:8 34:9 68:22 127:25 154:1
**Referred** [2] 95:21 123:10
**Referring** [3] 33:7 126:5 143:18
**Reflect** [4] 16:17 64:23 117:14 127:20
**Reflected** [5] 21:5 57:1 64:8 64:17 127:9
**Reflects** [2] 58:16 157:9
**Regard** [6] 9:8 113:12 114:2 135:22 135:23 149:23
**Regarding** [2] 70:8 151:20
**Regardless** [2] 52:7 69:18
**Regards** [1] 84:15
**Registered** [2] 131:1 131:21
**Regular** [5] 5:17 131:3 153:13 153:14
**Reholstered** [1] 26:19
**Reinitiate** [1] 109:7
**Reiterated** [1] 107:13
**Relate** [1] 88:20
**Related** [2] 91:15 91:24
**Relating** [2] 13:14 100:10
**Relation** [10] 7:6 24:10 31:13 39:20 79:10 97:8 97:8 116:16 134:8 147:7
**Relationship** [5] 23:9 87:4 104:24 105:7 129:18
**Released** [1] 11:12
**Releasing** [1] 11:24
**Relevance** [1] 35:17
**Relevant** [1] 101:15
**Relieved** [1] 83:6
**Remember** [5] 11:4 15:18 20:24 28:23 57:15 58:20 62:19
**Remmington** [2] 52:6 68:3
**Remote** [1] 89:2
**Removed** [5] 12:13 37:25 51:4 67:16 87:11
**Rephrase** [2] 19:19 32:7
**Report** [5] 3:22 50:20 96:5 123:11 127:20
**Reported** [2] 1:22 157:7
**Reporter** [3] 91:16 157:3 157:17
**Reporter's** [4] 1:1 157:6 157:8 157:11
**Represent** [1] 146:24
**Requested** [2] 156:19 157:5
**Required** [1] 3:25
**Residence** [3] 131:5 131:7 131:8
**Residential** [1] 131:3
**Respective** [1] 157:9
**Respond** [5] 9:20 19:16 19:18 120:2 149:14
**Responded** [2] 6:10 32:10
**Responding** [1] 19:20
**Response** [7] 70:3 70:4 81:17 105:2 109:25 111:20 136:22
**Responsibilities** [1] 86:10
**Responsibility** [21] 37:5 55:4 56:5 56:11 58:10 60:

7 60:17 61:11 66:4 78:7
78:24 78:25 82:25 83:2 83:8
84:10 86:22 101:21 101:23
102:21 103:5

**Responsible** [5] 88:1 91:11 95:17 106:11 106:13

**Rest** [1] 66:2

**Restricted** [1] 120:7

**Result** [3] 95:14 96:22 136:9

**Retained** [1] 133:5

**Retrieve** [3] 55:8 101:16 115:25

**Retrieved** [1] 67:25

**Retrieving** [1] 151:6

**Review** [5] 3:16 3:19 63:1 125:22 126:12

**Reviewing** [1] 151:15

**Riddle** [6] 137:18 137:19 137:24 145:12 146:20 154:3

**Rim** [1] 155:15

**Rip** [1] 108:5

**Rip-off** [1] 108:5

**Road** [7] 16:23 17:19 17:20 18:9 24:22 35:21 83:22

**Roadway** [1] 68:5

**Robbed** [4] 18:20 36:6 57:7 57:14

**Robin** [14] 96:13 96:17 96:22 98:9 116:13 119:8 122:4 122:11 122:21 126:3 126:6 127:4 127:10 130:23

**Rock** [1] 115:7

**Rod** [7] 140:13 140:16 140:24 142:22 142:25 142:25 143:1

**Roll** [2] 79:14 101:7

**Room** [3] 70:19 120:25 155:23

**Rough** [2] 21:9 79:20

**Rougher** [1] 21:21

**Roughly** [14] 7:16 18:9 22:11 24:24 25:2 28:2 28:6 30:22 31:1 34:24 62:15 79:23 80:8 103:13

**Round** [5] 12:3 151:12 151:21 151:22 152:4

**Rounds** [4] 51:19 66:15 108:2 151:10

**Run** [2] 33:10 33:12

**Running** [2] 8:25 11:1

**Runs** [3] 78:4 78:6 87:21

**Rushing** [4] 9:23 9:25 10:8 26:9

## S

**S-X-75** [1] 144:14

**S.I.C.** [1] 95:2

**Safe** [2] 14:19 152:14

**Safest** [1] 12:6

**Safety** [3] 12:25 26:11 26:22

**Samaritan** [8] 57:7 88:21 102:7 102:17 108:4 109:10 120:5 120:17

**Sample** [1] 151:2

**Samples** [2] 151:1 151:9

**Samuel** [1] 123:5

**San** [1] 157:18

**Saw** [12] 6:4 7:5 10:10 25:24 72:20 95:1 104:3 132:19 154:4 154:9 154:12 154:15

**SBOT** [4] 2:3 2:5 2:13 2:18

**Scale** [3] 30:12 79:20 146:23

**Scan** [1] 13:17

**Scanning** [1] 14:8

**Scene** [124] 6:4 7:22 12:12 13:13 20:4 20:15 32:23

38:15 38:20 38:25 39:20 42:13 42:18 42:19 43:4 43:13 43:18 44:6 44:9 46:4 47:8 48:15 49:9 49:19 50:13 50:14 52:11 52:12 52:18 54:22 55:3 55:8 55:13 55:14 55:14 55:20 56:4 56:5 56:9 56:13 57:2 57:6 57:8 57:18 58:4 58:11 58:18 58:23 59:10 59:17 59:18 60:2 60:8 60:9 62:20 64:4 68:12 72:24 73:4 73:16:14 76:20 74:18 77:18 78:10 78:22 78:25 79:9 79:14 79:23 83:5 83:17 84:4 84:15 86:7 86:12 86:13 86:15 86:17 86:21 86:22 86:24 87:4 87:11 87:12 87:18 88:1 88:2 88:6 88:10 88:13 88:23 90:16 93:3 93:7 93:11 94:1 100:23 101:3 101:7 101:11 101:13 101:19 102:4 102:9 102:14 103:1 103:15 108:1 115:14 115:24 138:4 148:7 148:20 149:14

**Scenes** [2] 37:7 66:1

**Schooling** [1] 4:11

**Schools** [1] 4:8

**Scope** [1] 62:2

**Scott** [30] 96:13 96:17 96:23 97:24 98:5 98:9 98:19 116:14 122:4 122:11 122:21 122:21 123:24 124:9 124:20 124:23 124:25 125:7 125:9 126:4 126:6 126:12 128:4 128:7 128:25 130:7 130:17 130:20 130:23 133:10 134:23

**Scott's** [7] 119:8 122:16 127:4 127:10 129:25 130:11 131:17

**Scotts** [1] 121:14

**Scotts'** [1] 121:18

**Search** [8] 38:18 59:17 65:23 97:25 98:8 121:17 121:25 122:6

**Searched** [1] 126:23

**Seat** [49] 10:15 31:21 35:6 50:12 80:17 110:5 140:2 140:2 140:6 140:7 140:7 140:25 141:12 141:13 141:17 141:24 141:25 142:2 142:3 142:3 142:7 142:8 142:10 142:16 142:23 143:7 143:9 143:10 143:20 144:22 144:23 144:24 145:1 145:8 146:25 147:21 147:24 149:23 150:12 150:18 150:19 151:2 154:4 154:7 154:10 154:16 154:18 154:21 154:22

**Seat/backseat** [1] 147:2

**Seated** [7] 3:2 70:21 121:2 121:3 148:2 155:25 156:1

**Second** [4] 14:16 108:12 109:13 111:5 113:6 114:14 128:11 128:16 149:8

**Secret** [4] 44:3 46:21 48:7 48:9 48:17 48:21 53:20 54:14

**Section** [2] 6:15 118:12

**Secure** [4] 13:13 56:5 74:20 86:13

**Secured** [6] 12:12 73:18 74:14 75:9 121:17 130:14

**Securing** [2] 75:9 121:25

**Security** [19] 3:25 4:3 4:3 4:4 4:18 4:21 5:2 8:16 25:14 30:9 35:12 37:22 51:11 73:7 73:8 76:16 78:21 80:1 80:23

**See** [72] 3:6 4:22 8:2 8:2 8:24 9:7 9:12 9:18 9:23 10:11 10:23 11:23 12:2 13:3 14:14 14:24 16:24 17:12 17:14 17:14 24:15 24:17 27:1 27:22 27:25 28:3 28:6 29:6 31:17 35:21 39:1 45:11 48:8

**Seeing** [3] 17:10 63:16 102:11

**Seek** [2] 4:9 95:6

**Seem** [2] 28:7 105:17

**Sees** [1] 9:22

**Semiautomatic** [4] 41:24 42:8 51:21 66:21

**Separate** [1] 73:17

**September** [1] 52:12

**Sergeant** [4] 96:21 122:5 122:9 125:16

**Serial** [1] 50:21

**Series** [1] 135:18

**Serious** [2] 104:4 104:5

**Service** [1] 118:12

**Set** [4] 10:18 56:15 79:5 116:18

**Seven** [7] 36:23 62:13 68:11 77:5 134:21 134:24 138:1

**Seventeen** [1] 23:6

**Seventy** [1] 7:16

**Seventy-eight** [1] 7:16

**Seventy-five** [3] 7:16 7:17 7:17

**Several** [10] 4:6 4:14 4:15 6:21 14:2 14:4 57:19 90:21 118:24 134:10

**Shape** [2] 27:11 110:6

**Share** [4] 83:18 108:9 110:19 121:25

**Shattered** [7] 49:5 64:20 65:1 68:24 68:25 69:8 147:9

**Shell** [1] 88:5

**Shirt** [12] 28:3 31:20 45:10 45:16 45:25 46:2 46:3 53:12 53:15 60:22 60:23 77:5

**Shock** [1] 13:5

**Shoes** [1] 110:13

**Shoot** [1] 37:8

**Shooter** [2] 120:7 128:10

**Shooting** [3] 85:22 91:11 120:11

**Shootings** [1] 95:17

**Short** [1] 120:23

**Shot** [31] 7:21 9:15 10:4 14:5 18:15 24:16 28:3 37:23 57:20 69:4 69:9 69:13 69:22 76:1 76:2 76:8 77:7 81:19 88:18 88:21 89:20 104:9 120:9 128:20 135:6 147:19 148:3 148:19 148:24 152:21 153:4 153:5

**Shots** [4] 17:12 33:18 33:22 34:1

**Shoulder** [1] 136:16

**Show** [57] 6:19 7:2 7:4 9:24 9:24 24:9 29:7 33:4 39:15 40:22 42:11 43:15 45:5 46:19 47:7 47:11 48:21 50:2 50:3 52:15 67:6 67:22 73:23 78:1 79:22 80:6 88:8 92:16 93:22 94:12 99:21 113:10 123:20 125:16 134:4 134:5 134:15 134:22 138:25 139:4 142:16 141:11 141:15 142:15 142:20 142:24 143:4 143:12 144:6 144:11 144:14 145:12 145:23 147:6 147:10 148:7 148:23

**Showed** [8] 90:15 124:4 124:6 125:17 128:12 128:16 135:18 140:14

**Showing** [10] 6:3 48:3 64:25 68:24 80:23 123:15 125:

6 64:10 64:14 64:17 65:22 88:9 94:21 96:20 101:5 101:24 103:2 103:2 103:5 103:11 103:12 108:15 108:19 109:14 112:15 112:24 116:6 116:6 117:3 117:7 118:4 118:9 118:15 119:17 125:14 135:6 143:16 145:4 149:19 150:15

**Side** [42] 8:21 9:11 13:11 14:19 16:23 17:16 17:18 17:19 17:21 17:22 17:23 17:24 18:9 21:18 38:6 44:7 44:8 62:15 62:17 78:17 87:21 93:17 114:24 117:17 139:21 140:19 140:19 140:22 141:1 143:7 143:10 143:14 144:3 144:23 147:5 148:16 148:16 151:3 151:25 154:21 154:21 155:10

**Sides** [6] 59:21 59:22 61:9 61:13 62:6 77:20

**Sideways** [2] 69:20 114:22

**Significance** [3] 55:10 113:4 113:17

**Significant** [1] 58:12

**Signs** [2] 8:15 8:16

**Similar** [2] 82:21 125:1

**Sister** [4] 135:24 136:19 136:25 137:6

**Sit** [3] 12:17 12:22 13:8 53:11

**Site** [1] 5:18

**Sitting** [4] 14:21 15:23 15:24 18:13

**Situation** [7] 81:17 87:19 90:3 102:17 109:10 120:4 151:18

**Six** [5] 124:24 127:21 128:3 134:21 134:24

**Size** [1] 61:2

**Sketch** [1] 83:22

**Slide** [4] 11:14 11:19 12:9 27:7

**Slight** [1] 140:20

**Slightly** [1] 148:5

**Slip** [1] 119:21

**Slipped** [1] 124:10

**Slow** [1] 10:1

**Small** [5] 6:2 6:21 46:7 46:16 93:19

**Smaller** [1] 8:14

**Smith** [1] 52:6

**Snap** [1] 67:12

**Someone** [5] 28:19 87:10 87:11 88:21 135:8

**Someplace** [1] 80:12

**Sometime** [1] 5:7

**Sometimes** [3] 5:19 152:22 153:2

**Somewhat** [1] 143:20

**Somewhere** [6] 23:1 34:4 42:5 102:4 148:25 152:12

**Sooner** [1] 5:7

**Sorry** [10] 24:4 25:1 33:24 48:9 70:15 98:15 103:14 121:12 126:22 149:22

**Sort** [2] 36:6 55:17

**Sounds** [1] 109:20

**South** [20] 6:5 40:11 44:8 44:19 44:21 44:23 45:2 45:4 45:6 45:12 45:20 50:4 50:10 59:17 64:2 65:6 65:10 78:5 87:21 87:24

**Southbound** [1] 17:18

**Southerly** [2] 50:6 69:14

**Southern** [1] 64:3

**Southward** [1] 53:9

**Southwest** [2] 2:14 71:16

**Shown** [12] 45:9 48:7 48:8 117:13 124:16 124:17 128:9 133:10 141:14 141:20 142:5 154:9

**Shows** [11] 21:14 46:3 46:6 46:19 46:21 47:23 47:24 78:13 141:5 143:5 143:7

**Shrubs** [1] 77:20

**Sic** [3] 23:20 103:20 126:11

**Span** [1] 33:20
**Spare** [1] 35:14
**Spatter** [1] 154:15
**Speaking** [8] 15:17 15:19
31:25 32:8 84:16 134:6 136:
9 136:18
**Spear** [1] 52:2
**Specific** [2] 138:10 138:
12
**Specifically** [2] 107:4
135:21
**Specifics** [1] 109:21
**Speculating** [1] 70:1
**Speculation** [1] 133:18
**Speech** [1] 32:11
**Spent** [2] 61:12 88:5
**Split** [4] 77:14 86:18 102:
25 103:4
**Spoken** [1] 56:16
**Spot** [3] 46:9 89:3 112:19
**Spots** [1] 6:21
**Spouses** [1] 156:5
**Spreads** [1] 124:15
**Staggering** [3] 9:17 9:18
10:1
**Stall** [3] 133:1 151:16
155:7
**Stand** [5] 36:11 67:9 68:2
68:7 137:16
**Standing** [11] 8:3 8:4 8:
7 12:16 13:12 16:11 19:9 31:
12 31:14 31:15 64:13
**Star** [1] 136:16
**Start** [12] 4:17 13:14 13:
19 49:15 49:16 55:14 65:14
76:8 81:18 81:24 83:23 133:
14
**Started** [7] 5:1 10:8 26:9
58:23 59:19 64:1 68:16
**Starting** [4] 4:20 44:6
57:5 101:6
**Starts** [1] 9:22 49:12
**State** [26] 1:10 2:10 3:4
6:7 13:16 16:7 21:13 36:18
39:23 41:10 43:22 47:13 52:
21 53:1 71:5 74:4 85:3 85:
11 92:22 94:5 100:5 105:3
110:4 156:20 157:1 157:4
**State's** [110] 6:9 30:4 33:
6 39:16 39:23 40:1 40:23 41:
10 41:19 42:11 42:22 43:5
43:8 43:16 43:22 43:25 44:1
44:4 44:8 44:11 44:17 44:22
45:2 45:4 45:8 45:9 45:11
45:18 45:22 45:22 46:3 46:6
46:15 46:18 46:18 47:7 47:
14 47:16 47:23 48:4 48:5 48:
8 48:20 48:21 48:24 49:2 49:
6 50:2 52:16 52:21 52:24 53:
1 54:15 59:15 64:16 66:6 66:
8 66:13 67:17 67:25 73:24
74:4 74:7 78:1 78:13 88:9
92:17 92:23 93:1 93:21 93:
22 93:25 94:5 94:8 94:11 94:
17 99:22 100:5 100:8 113:10
113:12 114:10 117:7 139:12
139:1 139:9 139:13 141:4
141:10 141:15 141:20 142:15
142:20 143:3 143:5 143:12
143:18 143:21 144:6 144:11
144:14 144:15 145:5 145:13
145:17 145:25 146:7 146:11
146:14 152:12
**Statement** [11] 3:15 16:
12 16:14 16:17 18:11 20:1
20:1 63:15 65:12 98:6 105:25
**Statements** [2] 18:14 18:
16
**Stating** [1] 17:5
**Stay** [2] 84:10 116:2
**Stayed** [1] 134:1
**Steering** [1] 148:9
**Step** [8] 5:23 24:8 29:6 44:

14 44:16 79:16 141:2 146:20
**Stepped** [1] 10:13
**Sticker** [3] 30:4 94:11 94:
16
**Still** [13] 13:16 13:17 26:
1 26:2 35:12 37:24 52:7 58:
4 70:18 78:17 93:9 106:16
156:3
**Stomach** [2] 7:21 16:4
**Stone** [1] 115:7
**Stop** [4] 8:22 14:10 19:6
84:1
**Stopped** [13] 8:23 16:22
16:23 16:24 19:4 22:7 57:12
76:7 81:18 81:23 82:14 83:
22 88:21
**Stopping** [2] 16:13 18:20
**Storage** [1] 11:20
**Store** [1] 101:16
**Story** [9] 18:20 81:22 83:
20 90:15 102:8 107:14 107:
24 120:16 120:19
**Straight** [3] 29:9 148:8
156:21
**Street** [33] 6:3 8:6 8:8 8:
11 8:18 15:24 17:16 21:19
29:16 30:2 32:16 35:25 36:5
38:5 38:8 38:9 40:9 40:10
40:11 59:20 61:24 64:13 75:
9 75:10 77:24 78:4 78:6 78:
6 78:8 87:21 87:22 87:24 87:
25
**Streetlights** [1] 77:23
89:5
**Streets** [1] 72:2
**Strike** [4] 140:1 140:5
140:14 141:17
**Stun** [1] 81:1
**Stupid** [1] 109:20
**Submission** [1] 50:18
**Submit** [2] 51:14 54:16
50 50:22 54:17
**Subscriber** [2] 130:22
130:24
**Subsequently** [1] 117:3
122:19
**Substance** [1] 143:25
**Substances** [1] 132:23
**Substantial** [1] 49:24
**Substitute** [1] 5:20
**Sufficient** [2] 129:2 129:
5
**Suggest** [2] 111:2 114:15
**Suicides** [1] 37:6
**Sum** [2] 22:14 54:21
**Superstar** [1] 136:17
**Supplement** [1] 123:13
**Supplied** [2] 56:23 130:22
**Supposed** [1] 7:7
**Supposedly** [2] 17:22 57:
23
**Surgery** [2] 91:7 123:21
**Surrounding** [2] 112:2
112:22
**Surroundings** [2] 38:3
39:5
**Survey** [1] 9:12
**Suspect** [1] 105:23
**Suspicion** [1] 106:1
**Suspicions** [2] 102:10
102:12
**Sustained** [6] 14:6 35:19
111:21 127:16 133:19 136:23
**Switch** [1] 71:8
**Sworn** [6] 3:6 3:7 36:15
71:2 85:8 137:20
**Synopsis** [2] 56:24 57:1
**Syrup** [12] 32:15 34:12 34:

49:20 49:22 60:24 65:16 66:
11

### T

**Tamper** [1] 56:12
**Tampered** [1] 56:6
**Tattoo** [1] 136:10
**Tattoos** [1] 136:15
**Taub** [9] 77:13 89:22 99:11
99:16 100:1 100:11 103:2
103:9 112:9
**Ted** [8] 85:4 85:7 85:12
**Telephone** [12] 96:1 118:
5 118:17 118:21 119:7 125:
23 126:7 126:17 126:22 127:
3 129:18 130:22
**Ten** [4] 30:22 103:14 133:
13 134:1
**Ten-minute** [2] 134:8 134:
22
**Tend** [1] 36:6
**Tender** [10] 39:24 41:11
43:23 52:22 74:5 92:24 94:6
100:6 139:9 146:10
**Tennis** [1] 110:13
**Tentative** [8] 124:8 124:
19 128:6 128:24 129:2 129:5
129:9 134:17
**Tentatively** [1] 134:23
**Terms** [5] 84:15 103:5 106:
17 108:25 114:1
**Terrence** [9] 58:7 80:11
106:11 106:19 123:24 124:25
128:4 133:10 138:7
**Test** [1] 140:8
**Testified** [9] 11:17 22:
13 36:15 64:9 71:2 85:8 126:
15 135:12 137:20
**Testimony** [2] 61:11 118:7
**Tests** [1] 12:2
**Texas** [15] 1:8 1:10 1:21
2:8 2:10 2:15 2:20 37:12 85:
23 99:3 157:1 157:4 157:16
157:17 157:18
**Theory** [2] 57:6 88:24
**Ther** [1] 80:25
**Third** [1] 16:15
**Threat** [2] 12:23 13:18
**Threaten** [1] 25:21
**Threats** [1] 14:15
**Three** [13] 12:20 17:6 20:
11 33:21 34:4 62:21 73:1 75:
17 75:18 114:24 134:11 134:
22 147:12
**Throat** [1] 95:3
**Throwing** [1] 18:22
**Thrown** [3] 35:8 35:9 66:5
**Thursday** [1] 125:15
**Tinted** [1] 153:14
**Tip** [1] 143:1
**Tire** [7] 110:1 111:18 111:
24 117:4 117:7 155:9 155:10
**Tired** [1] 111:2
**Tires** [5] 35:14 35:15 116:
23 117:10 155:8
**Today** [2] 22:13 61:11
**Together** [2] 103:4 103:7
**Toll** [1] 131:10
**Tomorrow** [2] 156:14 156:
16
**Tone** [3] 31:6 110:23 110:25
**Took** [10] 62:17 77:14 84:
22 104:13 119:24 126:13 140:
13 152:9 152:11 152:13
**Top** [6] 6:5 40:9 46:19 60:
20 71:8 115:7 140:3 141:17
147:22
**Torn** [1] 109:22

**Total** [8] 4:13 22:14 33:
20 34:4 54:21 106:10 127:21
157:10
**Tour** [1] 68:16
**Toward** [1] 8:25
**Towards** [27] 7:3 8:8 8:10
8:25 9:15 9:23 9:25 10:8 11:
2 25:24 25:25 25:25 26:6 26:
9 27:2 44:20 44:21 44:23 45:
6 53:14 60:23 140:19
**Trace** [1] 96:10
**Traditional** [2] 126:7
126:16
**Traffic** [1] 90:24
**Trail** [16] 24:12 24:14 24:
18 24:21 35:4 45:24 49:8 49:
11 49:15 50:3 50:6 54:2 54:
11 60:22 65:12 65:13
**Trained** [3] 60:12 102:15
105:13
**Training** [4] 3:24 4:5 68:
14 70:7
**Trajectory** [20] 140:13
140:14 140:17 140:24 140:24
142:22 142:25 142:25 143:1
144:16 147:7 147:11 148:3
148:7 148:13 148:15 148:19
148:24 149:2 152:15
**Transaction** [2] 57:2 106:
3
**Transcription** [1] 157:5
**Transcription/stenograph** [1] 1:23
**Transport** [1] 74:24
**Transported** [4] 74:22 75:
20 77:10 77:12
**Trash** [4] 35:7 35:9 35:24
93:19
**Trashed** [4] 109:18 109:19
110:1 110:15
**Treated** [2] 72:25 100:11
**Treating** [1] 72:23
**Trees** [2] 38:7 77:20
**TRIAL** [1] 1:3
**TRIAL-GUILT/INNOCENCE** [1] 1:15
**Tried** [5] 57:17 61:10 90:
9 133:22 134:16
**Trouble** [2] 90:20 90:22
**Truck** [2] 8:14 14:10
**True** [3] 17:8 107:15 157:4
**Truly** [1] 157:9
**Trunk** [7] 73:18 74:9 110:
7 110:7 110:8 110:9 110:12
**Truth** [2] 107:12 109:15
**Try** [13] 38:16 54:18 74:20
74:20 74:25 89:23 91:4 102:
21 106:15 109:14 134:20 140:
9 150:16
**Trying** [28] 9:12 12:6 13:
4 13:5 13:17 20:16 22:25 23:
12 26:24 26:25 27:9 27:10
32:21 81:8 82:18 82:19 103:
2 106:5 106:7 106:10 107:6
107:13 110:23 114:1 126:15
126:21 134:7 135:3
**Tubes** [1] 95:3
**Tuesday** [2] 98:17 98:18
**Turn** [4] 8:1 18:10 57:13
73:11
**Turned** [8] 14:9 14:13 71:
7 73:13 73:15 74:15 78:20
99:13
**Turning** [1] 16:21
**Twelve** [2] 66:17 103:13
**Twenty** [9] 25:2 25:4 34:
23 59:25 61:5 62:5 62:16
101:2 102:3
**Two** [25] 8:12 10:16 12:20
12:25 19:21 22:8 23:8 33:19
38:5 46:19 72:22 73:7 75:8

76:7 76:21 77:14 81:18 82:
13 83:22 86:12 125:3 125:18
128:11 136:15 151:1
**Type** [28] 3:24 8:12 8:15
16:17 21:2 22:9 23:9 25:13
31:6 42:20 43:1 52:8 52:8
57:1 57:7 68:5 69:5 80:23
93:15 99:15 102:17 104:2
105:21 120:4 124:7 140:8
145:21 153:11
**Types** [1] 52:5

## U

**Ultimate** [1] 101:23
**Ultimately** [9] 58:6 106:
12 116:11 116:13 123:25 133:
1 140:23 147:7 147:8
**Unable** [1] 91:7
**Uncooperative** [1] 105:19
**Under** [5] 82:21 83:12 106:
1 124:9 144:22
**Underneath** [4] 113:13
140:25 145:1 145:8
**Understood** [2] 111:13
129:15
**Uniform** [1] 80:23
**Unit** [24] 37:4 55:4 55:14
68:12 74:14 74:15 75:8 75:
11 79:9 82:22 83:17 93:3 93:
8 95:2 97:11 101:9 101:11
101:13 101:19 115:14 115:24
138:4 138:11 138:13
**Unit's** [2] 37:5 78:25
**Units** [4] 60:2 75:8 82:3
86:12
**Universe** [1] 135:21
**Unusual** [1] 105:14
**Up** [68] 6:23 7:3 8:1 8:4 8:
6 8:8 8:9 8:18 9:14 9:22 10:
3 10:4 10:5 10:12 10:13 11:
11 12:18 13:8 13:23 16:23
17:3 17:11 17:23 20:7 23:24
26:8 26:13 26:18 26:19 27:3
32:19 34:14 34:17 40:4 40:5
40:8 41:25 42:1 43:13 43:17
49:12 49:15 53:8 56:17 60:7
64:1 67:9 77:14 77:23 78:8
79:14 80:20 81:7 81:12 82:
14 82:25 86:18 89:3 101:7
102:21 102:25 102:25 109:22
117:3 129:10 129:12 134:6
153:9
**Upholstery** [1] 109:22
**Upset** [3] 16:7 111:24 111:
25

## V

**V.I.P.** [1] 119:5
**Vacant** [1] 87:22
**Vague** [1] 90:12
**Value** [1] 55:5
**Variable** [2] 148:21 152:
23
**Variety** [1] 52:3
**Vehicle** [60] 8:12 8:19 8:
22 14:8 17:22 20:19 20:20
20:22 20:23 25:11 25:12 25:
19 64:24 65:1 65:5 65:9 73:
19 76:16 76:19 80:20 81:25
82:5 93:4 93:4 110:3 110:14
112:5 112:16 112:17 112:19
112:23 113:5 113:6 113:18
114:3 114:7 114:9 114:15
115:15 115:23 116:6 117:5
138:13 141:7 141:9 141:13
142:17 142:22 143:11 143:14
147:24 149:18 151:11 151:12
151:17 152:20 153:1 153:4
153:7 154:4
**Vehicles** [9] 17:10 17:13
17:15 31:17 64:6 76:15 87:3
87:6 138:14
**Version** [2] 57:4 102:7
**Victims** [4] 72:23 74:21

---

77:14 81:8
**Victoria's** [8] 44:3 46:
21 48:7 48:9 48:17 48:21 53:
20 54:14
**Video** [14] 52:11 52:17 53:
5 53:7 54:13 58:23 59:1 62:
23 62:25 63:6 63:13 63:16
63:24 64:9
**Videotape** [4] 39:3 58:16
60:14 63:12
**Videotapes** [1] 37:8
**Videotaping** [1] 58:17
**Villages** [3] 5:2 5:11 30:
3
**Visibility** [1] 38:12
**Visible** [1] 141:17
**Visit** [2] 84:3 133:15
**Voice** [4] 31:6 110:23 110:
25 111:1
**Volume** [1] 1:2 157:6
**VOLUMES** [1] 1:2
**VS** [1] 1:8

## W

**Waited** [1] 13:20
**Walk** [3] 60:16 88:1 102:8
**Walked** [8] 8:5 60:14 61:8
61:23 62:1 62:4 62:5 102:14
**Walker** [1] 91:5
**Walking** [8] 7:3 8:25 9:14
9:15 21:7 61:12 61:25 62:23
**Walter** [52] 10:19 10:24
12:14 13:7 16:1 16:10 18:16
19:2 19:24 20:3 20:5 22:15
23:15 23:23 27:22 30:19 31:
13 80:13 81:9 81:11 84:6 91:
17 91:20 91:22 94:21 94:24
95:2 95:6 95:14 96:1 103:3
104:3 104:5 106:8 118:4 118:
6 118:9 118:15 118:18 122:
23 124:7 124:8 125:12 126:4
126:22 126:23 128:3 128:6
129:8 129:13 130:6 133:11
**Walter's** [6] 118:13 119:
2 127:3 127:10 130:15 131:14
**Walters** [2] 23:20 126:11
**Warning** [1] 105:21
**Warnings** [1] 122:12
**Warren** [9] 55:23 56:23 57:
11 58:1 71:1 71:6 71:9 79:5
81:13
**Watch** [1] 10:13
**Watched** [1] 63:6
**Watching** [1] 13:13
**WAYNE** [1] 2:12
**Weapon** [39] 11:18 12:7 12:
13 27:14 27:15 27:17 28:6
42:8 42:9 42:12 42:15 42:16
42:17 42:21 42:24 43:1 50:
20 50:21 50:25 51:1 51:2 51:
4 51:5 51:6 51:10 51:14 51:
21 51:22 51:24 52:4 67:6 67:
10 74:13 78:19 80:21 81:5
84:13 88:13 107:5
**Weapons** [8] 9:13 13:2 14:
17 14:22 27:23 28:1 28:7 66:
20
**Wear** [1] 156:18
**Wearing** [2] 80:22 150:18
**Weight** [1] 82:17
**WENTZ** [1] 2:17
**Wesson** [1] 52:7
**West** [2] 59:18 87:23
**Westridge** [13] 5:2 5:12
29:3 29:5 29:8 29:12 29:13
29:20 29:23 30:1 30:5 30:7
30:9
**Wheel** [2] 53:3 148:9
**Whereabouts** [1] 46:23
**White** [5] 141:19 142:24
143:22 145:3 145:8

---

**Whole** [3] 21:10 21:17 29:
25
**Wife** [1] 122:11
**Wild** [1] 21:22
**Wilkinson** [1] 1:20
**Winchester** [2] 52:2 52:6
**Window** [16] 47:18 47:21
69:4 69:8 69:13 69:22 110:2
111:17 111:24 114:17 114:18
139:21 147:5 147:9 153:9
153:15
**Windows** [2] 153:11 153:13
**Wiring** [5] 144:25 144:25
145:2 145:9 145:10
**Wise** [2] 60:25 115:25
**Witness** [24] 3:5 3:10 5:
22 25:7 33:1 36:9 39:13 44:
13 54:24 67:19 69:24 70:15
73:21 79:1 92:14 99:19 100:
17 127:23 132:15 146:15 150:
6 153:23 154:25 157:12
**Witnesses** [4] 3:6 86:11
102:22 116:5
**Woman** [2] 104:25 105:7
**Wooded** [1] 21:25
**Word** [6] 28:11 28:14 28:17
28:21 49:22 136:17
**Words** [8] 15:18 21:7 28:
19 30:20 52:6 59:16 104:19
122:21
**Write** [3] 9:3 95:13 119:21
**Writing** [2] 48:11 157:5
**Wrote** [2] 119:24 130:19

## Y

**Y'all** [2] 3:5 98:8
**Yards** [1] 116:21
**Year** [2] 5:6 68:15
**Years** [36] 23:6 68:11 71:
13 85:16 138:1
**Yelled** [3] 10:11 27:13 27:
13
**Yelling** [1] 12:19
**Yellow** [1] 54:9
**Yesterday** [5] 3:4 11:17
20:5 22:14 32:14
**Yourself** [5] 81:12 103:
18 104:11 137:23 148:6
**Yourselves** [1] 156:5

## Z

**Zigzagged** [1] 24:21
**Zoom** [1] 59:6