123

1    A.   Met him several times before the incident.
2    Q.   Okay.
3    A.   Through a mutual friend.
4    Q.   And that being who?
5    A.   Shawn England.
6    Q.   Okay.  And how long before the incident did you
7  meet him?  Was it months, or weeks, or what?
8    A.   We had met a couple of times before.
9    Q.   Okay.
10   A.   Yes, sir.
11   Q.   And did you have an occasion to socialize with
12 Charles Mamou, go out on social events with him?
13   A.   We went out a few times social.
14   Q.   Before December the 6th, 1998, did Charles
15 Mamou ever stay at your house?
16   A.   No, sir.
17   Q.   On December the 6th, 1998, was Charles Mamou
18 staying at your house?
19   A.   Yes, sir.
20   Q.   And was that the first day he had stayed there,
21 or had he stayed there for a few days before?
22   A.   He stayed there a few days before.
23   Q.   Do you remember what day it was that he came to
24 stay at your house?
25   A.   I guess it was like a -- that Thursday.

124

1    Q.   Before the Sunday?
2    A.   Yes, sir.
3    Q.   And how was it that he came to stay at your
4  house?
5    A.   Just through a mutual friend, like we said.  He
6  asked could he stay there for a few days.
7    Q.   So did he stay there at the house at Fondren or
8  the apartment on Fondren?
9    A.   Yes, sir.
10   Q.   What was the apartment number on Fondren?
11   A.   1402.
12   Q.   Okay.  Where did -- where did Charles Mamou
13 stay inside the apartment?  Where did he sleep?
14   A.   He slept on the sofa.
15   Q.   Now directing your attention to December the
16 6th of 1998, which was a Sunday, was Charles Mamou
17 staying there at the -- your apartment on that day?
18   A.   Yes, sir.
19   Q.   Was there a time on Sunday, December the 6th,
20 that he left the apartment?
21   A.   Yes, sir.
22   Q.   Do you recall about what time he may have left?
23   A.   It had to be about after -- about 2:00 --
24 between 12:00 and 2:00.
25   Q.   Sometime between 12:00 and 2:00 on December the

125

1  6th, I assume you mean between 12:00 and 2:00 in the
2  afternoon?
3    A.   Yes, sir.
4    Q.   How long was he gone?
5    A.   For a few hours.
6    Q.   Did he come back at a point in time?
7    A.   Yes, sir, he came back.
8    Q.   Do you know what time he may have come back?
9    A.   Had to be about 7:00.
10   Q.   In the evening?
11   A.   Yes, sir, 7:00 that evening.
12   Q.   And did he -- how long did he stay then at that
13 time?
14   A.   He stayed for a few minutes until the phone
15 rang, and then he left again.
16   Q.   Was the phone for him?
17   A.   Yes, he made one phone call.
18   Q.   Okay.  During the time that he was there at
19 your house, did he use your phone and receive calls?
20   A.   Yes, sir.
21   Q.   Did you have a cell phone or just an installed
22 phone?
23   A.   Just a house phone.
24   Q.   Okay.  After -- about what time did you say he
25 left the second time?

126

1    A.   It had to be about 7:30, 8:00 o'clock.
2    Q.   And after he left at that time, did he -- did
3  he tell you where he was going?
4    A.   No, just he was leaving.
5    Q.   Okay.  Did he come back then to the apartment?
6    A.   Yes, sir, it was later on that night about --
7    Q.   About what time?
8    A.   About -- after 2:00, 2:30.
9    Q.   So that would be 2:00 or 2:30 the next day?
10   A.   Yes, sir.
11   Q.   When he left, did you see -- backtrack for a
12 moment.  When he left the first time, did you see him go
13 with anybody?
14   A.   He left with a friend, Bug, and he left --
15   Q.   Do you know Bug by any other name?
16   A.   That's it.
17   Q.   How long have you known Bug?
18   A.   Just a few years through -- like I said, I met
19 him through the same person, Shawn England.
20   Q.   Shawn England?
21   A.   Yes, sir.
22   Q.   The last time he left, did you see who he left
23 with or if he left with anyone?
24   A.   No, sir.
25   Q.   He came back then on Monday morning, you say,

127

1    around 2:00 or 2:30?
2        A.  Yes, sir.
3        Q.  Now you say the next day or later that morning,
4    which would be a Monday, did he stay at the apartment
5    all day or did he go somewhere?
6        A.  He left for a while to go shoot basketball,
7    left for a little while.
8        Q.  Back then, were you working then?
9        A.  No, sir.
10       Q.  So your responsibility was to --
11       A.  Take care of the child and the house.
12       Q.  Was your wife working?
13       A.  Yes, sir.
14       Q.  After he left on Monday to go shoot baskets or
15   whatever, did he come back later on Monday?
16       A.  Yes, sir, he did come back.
17       Q.  And did he stay there Monday night?
18       A.  Yes, sir.
19       Q.  Now going to Tuesday, which I guess is December
20   the 8th, did he stay there all day Tuesday, December the
21   8th?
22       A.  Yes, sir.  Well, not all day.  He left that
23   morning.  My wife had called and asked was he there.  He
24   was there, but he left after we received a phone call.
25       Q.  All right.  So on Tuesday morning, your wife

128

1    calls you from where?
2        A.  From work.
3        Q.  Did she inquire as to whether or not Charles
4    Mamou was there?
5        A.  Yes, sir.
6        Q.  After your conversation with your wife, did you
7    tell Charles Mamou anything?
8        A.  I told him he had to go.
9        Q.  Why did you tell him he had to go?
10       A.  Because from my wife's conversation, it seemed
11   like that something was wrong.  And, you know, and I
12   told him he had to go.  He left.
13       Q.  After he left, did anybody else come to your
14   apartment?
15       A.  Friend of mine, Reginald Bingham, he came.
16       Q.  Did anybody come after him?
17       A.  No, sir.
18       Q.  Well, did the police ever come there that day?
19       A.  Yes, sir.
20       Q.  And about how long after Charles Mamou left did
21   the police arrive?
22       A.  It had to be about an hour or an
23   hour-and-a-half or something.
24       Q.  And who were they looking for?
25       A.  Charles, Chucky.

129

1        Q.  Okay.  Did you allow them to look inside the
2    apartment?
3        A.  Yes, sir.
4        Q.  Was Chucky there?
5        A.  No, sir.
6        Q.  After he left that Tuesday -- was it in the
7    morning that he left?
8        A.  Yes, sir.
9        Q.  After he left that Tuesday morning, did you
10   ever see Charles Mamou again?
11       A.  No, sir.
12       Q.  Did you ever receive any phone calls from
13   Charles Mamou after he left?
14       A.  No, sir.
15           MR. MCCLELLAN:  I'll pass the witness,
16   Your Honor.
17                   CROSS-EXAMINATION
18   BY MR. HILL:
19       Q.  Mr. Scott, my name is Wayne Hill.  You and I
20   have not met, correct?
21       A.  No, sir.
22       Q.  You and I have not spoken on the phone?
23       A.  No, sir.
24       Q.  And you have not been willing to visit with a
25   defense investigator that attempted to speak to you,

130

1    correct?
2        A.  Yes, sir.
3        Q.  The only people that you've spoken to since
4    December 6th of 1998 are prosecutors and police
5    officers, correct?
6        A.  Yes, sir.
7        Q.  How many times have you met with the
8    prosecution in this case?
9        A.  Once.
10       Q.  When was that?
11       A.  I can't recall the date.  The date I was
12   subpoenaed.
13       Q.  Okay.  Let's go back a little bit.  Let me try
14   to understand the relationship that you have with Shawn
15   England.  Who is that?
16       A.  He's a mutual friend that I grew up in the
17   neighborhood with.
18       Q.  Did you both go to high school together?
19       A.  No, sir.
20       Q.  How long have you known him for?
21       A.  Since about '93.
22       Q.  About how old is Shawn?
23       A.  Shawn is about twenty-five, twenty-six now.
24       Q.  What does he do for a living?
25       A.  He works for Wal-Mart now.

131

1      Q.  Wal-Mart.  Okay.  How does he introduce you to
2   Mr. Mamou?  Kind of walk us through that, how you first
3   meet.
4      A.  First time we met, we was at his house and --
5      Q.  At Shawn's house?
6      A.  At Shawn's house.  And he told me, This is
7   Chucky from Louisiana.  And we just drank beers and just
8   got a feel of each other, you know.
9      Q.  What does that mean, you got a feel for one
10  another?  You talk to him about --
11     A.  Just casual conversation, talking and --
12     Q.  How long did you socialize for when you're
13  sitting around just drinking?
14     A.  Just a couple of hours or so.
15     Q.  When was that?
16     A.  The first time we met was -- I can't recall the
17  first time we met.
18     Q.  Try to use December 6th as a focal point and go
19  backwards.  Like, was it two weeks before December 6th
20  that you first met?  Was it months before?
21     A.  It was months before.  We had met months before
22  that.
23     Q.  And that's -- so the first time you meet
24  Mr. Mamou is months before December of 1998?
25     A.  Yes, sir.

132

1      Q.  So would that be, like, October of 1998, you
2   think?
3      A.  I couldn't exactly say.
4      Q.  Okay.  Couple of months?
5      A.  Yes, sir.
6      Q.  Did you meet him at Shawn's?
7      A.  Yes, sir.
8      Q.  From between that first time and December 6th,
9   how many other times do you meet him or see him?
10     A.  Just a few other times.  Like I said, at
11  Shawn's house we met.  You know, that's it.
12     Q.  So -- and this is before the time that he comes
13  and he stays at your house?
14     A.  Yes, sir.
15     Q.  Do you know whether or not Mr. Mamou was
16  actually spending the night at Shawn's house, if you
17  know?
18     A.  No, sir, I don't know.
19     Q.  Did you ever visit Mr. Mamou at any hotel?
20     A.  No, sir.
21     Q.  Did you ever drive anywhere with Mr. England to
22  go visit Mr. Mamou and pick him up at a hotel?
23     A.  No, sir.
24     Q.  So after seeing him several times, he appears
25  at your apartment on Fondren, around like the 3rd of

133

1   December?
2      A.  I guess you could say that Thursday before that
3   Sunday.
4      Q.  If December 6th is a Sunday --
5      A.  Yes, sir.
6      Q.  -- then that Thursday would have been the 3rd?
7      A.  3rd, yes, sir, that night.
8      Q.  Just tell the members of the jury how -- does
9   he just show up?  Does he knock on your door?  What does
10  he do?
11     A.  We had went out that evening.
12     Q.  We?  Who's we?
13     A.  Shawn, Todd, a couple of friends.  We all went
14  out, and she asked -- he asked could he stay at the
15  house.  And I gave him permission to stay, and he
16  stayed.
17     Q.  Okay.  Charles, you --
18     A.  Todd.
19     Q.  -- Todd, Shawn.  What's Todd's last name?
20     A.  Fish.
21     Q.  Has he got a nickname?
22     A.  No, sir, not that I know of.
23     Q.  The four of you?
24     A.  Yes, sir.
25     Q.  Where did you go?

134

1      A.  We went to a club.
2      Q.  Did you go to Foxy's?
3      A.  Yes.
4      Q.  Over on South Post Oak?
5      A.  Yes, sir.
6      Q.  How long did you stay there?
7      A.  We stayed there a few hours or so.
8      Q.  Foxy's is a topless club?
9      A.  Topless club.
10     Q.  Y'all sitting around drinking beer?
11     A.  Yes, sir.
12     Q.  While you were at Foxy's, Mr. Mamou's says,
13  Hey, you mind if I spend the night at your place?
14     A.  Well, it was right after we left.  You know,
15  after we left Foxy's, he didn't have nowhere to go.  So
16  I -- he asked could he stay at my house, and I let him
17  stay.
18     Q.  Did he ask Shawn if he could stay at Shawn's
19  house?
20     A.  I don't know.
21     Q.  Who all was driving with who?
22     A.  We were all in the same vehicle for a while.
23     Q.  Whose vehicle was it?
24     A.  I can't recall whose vehicle we was in.
25     Q.  So that's the first evening that he spends at

135

1   your place?
2       A.  Yes, sir.
3       Q.  When you come home, it's pretty early in the
4   morning?
5       A.  Late, yes, sir.
6       Q.  So, now we're talking about Friday morning by
7   the time you guys get home?
8       A.  Yes, sir.
9       Q.  Do you wake your wife up?
10      A.  No, she was already -- she gets up on her own,
11  and I walk her to the bus stop and puts her on the bus.
12      Q.  So you guys get home closer to 4:00 in the
13  morning?
14      A.  No, it was about 2:00 or 3:00 that morning.
15      Q.  Now your wife doesn't leave to go to the bus
16  stop till --
17      A.  4:30, 4:45.
18      Q.  So, did you just stay up that whole time?
19      A.  No, I went in the room with her for awhile, you
20  know, talk to her till she gets up.
21      Q.  And Mr. Mamou just spent the night on the
22  couch?
23      A.  Yes, sir.
24      Q.  Now is that a one or a two-bedroom apartment?
25      A.  It's a one -- two-bedroom.  It was a

136

1   two-bedroom.
2       Q.  And your child is how old?
3       A.  She was five at the time.
4       Q.  So she has her own bedroom?
5       A.  Yes, sir, she had her own room.
6       Q.  Now there was some effort on the part of you
7   and your wife not to be truthful with the police about
8   your relationship, correct?
9       A.  Yes, sir.
10      Q.  Because that apartment that you're staying in,
11  you're not supposed to be married if you're living
12  there, right?
13      A.  Due to the leasing agreement, I wasn't supposed
14  to be.
15      Q.  Okay.  But eventually, you explained to them
16  that you were husband and wife and not brother and
17  sister?
18      A.  Yes.
19      Q.  Now when Mr. Mamou gets up the next morning --
20  well, let me take that back.  You walk your wife to the
21  bus station?
22      A.  Yes, sir.
23      Q.  Chucky's there in the house and your child's
24  asleep in her room?
25      A.  Yes, sir.

137

1       Q.  You walk off, walk your wife, and then come
2   back.  Mr. Mamou still asleep?
3       A.  Yes, sir.
4       Q.  What time do you all get up?
5       A.  I had to get my daughter up about 7:00 for
6   school.
7       Q.  Okay.  Did she wake up?
8       A.  Yes, sir.
9       Q.  Was she okay that day, or was she ill?
10      A.  She was okay.
11      Q.  You walk her out to school?
12      A.  Walk her to school.
13      Q.  That's at A.A. Mills?
14      A.  A.A. Mills.
15      Q.  That's on Porter Street, right?
16      A.  Yes, sir.
17      Q.  That runs west of Fondren?
18      A.  Yes, sir.
19      Q.  You take her there.  You walk back.  Mr. Mamou
20  is still asleep?
21      A.  Yes, sir, basically.
22      Q.  At some point you guys -- does he wake up, or
23  does he come and wake you up?  Do you go to sleep at
24  that point?
25      A.  No, I just sit up.  Usually after I take her to

138

1   school, we sit up.
2       Q.  Okay.  Y'all sit around and talk?
3       A.  Yes, sir, basically.
4       Q.  Does he -- at some point, do you discuss a
5   possible drug deal?
6       A.  No, sir, not a particular, no, sir.
7       Q.  Okay.  And so, does he spend the whole day with
8   you?
9       A.  Yes, sir.
10      Q.  And again, this is on Friday?
11      A.  Yes, sir.
12      Q.  This would be the 4th of December?
13      A.  Yes, sir.
14      Q.  And you guys go and play basketball at that
15  point?
16      A.  No, he left.
17      Q.  He leaves?
18      A.  Yeah.
19      Q.  All right.  He doesn't have a cell phone with
20  him, as far as you know?
21      A.  No, sir, not that I know.
22      Q.  What is -- is he bringing an overnight bag with
23  him?  Is he wearing the clothes on his back?
24      A.  Clothes on his back.
25      Q.  What time does he come back?

139

1    A.  I can't recall what time he came back.
2    Q.  Okay.  But he comes back at some point?
3    A.  Yes, sir.
4    Q.  And you guys go out again that night, Friday
5  evening?
6    A.  No, sir.  I stayed in.  I don't recall going
7  back out Friday.
8    Q.  Does Mr. Mamou spend the night Friday night?
9    A.  Yes, sir.
10    Q.  At some point does your wife say to you, you
11  know, who's this guy that --
12    A.  She -- we all sat down and had a conversation
13  together.
14    Q.  Everybody was cool with it?
15    A.  It was fine.
16    Q.  So we get through Friday.  Now Saturday, are
17  there people coming over to your apartment while he's
18  there?
19    A.  Yes, sir, Shawn and, you know, just mutual
20  friends that come over from time to time.
21    Q.  Okay.  Who are some of the other mutual friends
22  between you and Shawn?
23    A.  Ken.
24    Q.  What is Ken's name?
25    A.  I just know him by Ken.  I just know him by

140

1  Ken.
2    Q.  Any nickname?
3    A.  No, sir.
4    Q.  How does he get around?
5    A.  By bicycle.  He stayed around the corner.  He
6  came over by bike.
7    Q.  Who else would have come over?
8    A.  Like Todd, and that's about it.
9    Q.  Did you ever meet a fellow by the name of
10  Terrence Dodson?
11    A.  No, sir.
12    Q.  You ever meet a fellow by the name of Samuel
13  Johnson?
14    A.  No, sir.
15    Q.  That's a person they're referring to as Bug?
16    A.  No, I know Bug.
17    Q.  Did you know Bug before you met Mr. Mamou?
18    A.  Yes, sir.
19    Q.  How you been knowing Bug?
20    A.  Through Shawn, the same person.
21    Q.  Would you socialize with Mr. Johnson?
22    A.  Yes, sir.  We would go out to movies and stuff,
23  all our family and stuff, kids and all.
24    Q.  All right.  Y'all live pretty close to one
25  another back then?

141

1    A.  Right across the street.
2    Q.  On Fondren?
3    A.  Yes, sir.
4    Q.  How long have you known Bug?
5    A.  I guess I known Bug for a few years.
6    Q.  Three or four years?
7    A.  You can say, I guess.  Like I said, I met him
8  through Shawn as mutual friends.
9    Q.  So the full day on Saturday, are you pretty
10  much alone with these other folks that come over?
11  You're pretty much with Mr. Mamou most of Saturday?
12    A.  Yes, sir, we were at the house all day
13  Saturday.
14    Q.  Is there a lot of phone activity back and
15  forth?
16    A.  Yes, sir, bunch of phone calls back and forth.
17    Q.  And the phone calls are coming in on your
18  telephone line?
19    A.  Yes, sir.
20    Q.  Which is not a cell phone; it's just a regular
21  phone hooked into the wall?
22    A.  Yes, sir.
23    Q.  Did you do anything Saturday night in terms of
24  going out or anything?
25    A.  No, sir, just hung around the house.

142

1    Q.  Sunday morning comes around.  What time do
2  y'all get up, if you recall?
3    A.  Me and my wife, we got up and went to church
4  about 9:00, 10:00.
5    Q.  Take your daughter with you?
6    A.  Yes, sir.
7    Q.  And Mr. Mamou is still asleep?
8    A.  Yes, sir.  Well, he was up, but he was still at
9  the house.
10    Q.  Okay.  And everybody's still cool?  He can just
11  stay there?  You guys going to go out?
12    A.  We went to church right across the street,
13  Braeswood Assembly.
14    Q.  Right there by Willowbend?
15    A.  Yes, sir.
16    Q.  So after you go to church and you come back, do
17  you all eat?  Do you go out for lunch or anything like
18  that?
19    A.  No, we stayed at the house and ate.
20    Q.  Get us through all of Saturday.  Fairly
21  uneventful; nothing special happening?
22    A.  No, sir.
23    Q.  Same people that might be coming by to visit
24  with you?
25    A.  Not in particular, no, sir.

143

1    Q.  All right.  So now we're on to Sunday?
2    A.  Yes, sir.
3    Q.  At some point, is there anything unusual
4  happening up to the point in time when Mr. Mamou leaves
5  with Bug?
6    A.  No, sir, just phone calls.
7    Q.  Phone calls.  Are you asking him, Man, how come
8  you're getting so many phone calls?
9    A.  No, sir.
10   Q.  Somebody just staying a couple of nights, this
11 is a lot?
12   A.  He stayed to hisself, basically.
13   Q.  And you didn't ask any questions?
14   A.  No, sir.
15   Q.  So as I understand your testimony, at about
16 somewhere between noon and 2:00 o'clock, does Bug come
17 over and pick up Mr. Mamou?
18   A.  Yes, sir.
19   Q.  Does he come knock on your door and say, Hey,
20 Chucky, we're ready to go?
21   A.  No.  We was kind of like on the porch, and he
22 pulls up and leaves.
23   Q.  So does your apartment overlook the swimming
24 pool?
25   A.  You can see the swimming pooling to the left

144

1  from the porch and parking lot to the right.
2    Q.  Okay.  And so, does he come up to your
3  apartment to get Mr. Mamou?
4    A.  I guess he goes down to the car, whatever.
5    Q.  Do you see him go down there and meet up with
6  Mr. Johnson?
7    A.  Yes, sir.
8    Q.  And they drove off together?
9    A.  Yes.
10   Q.  Did you know that Bug was coming over to pick
11 him up?
12   A.  I have -- not really.  I didn't know who was
13 coming to get him.  I knew he had a ride coming, though.
14   Q.  Did he say he was going to go take a ride with
15 someone?
16   A.  Yes, sir.
17   Q.  Did he ask you to come along?
18   A.  No, sir.
19   Q.  So, he leaves.  And during that time period
20 when he's gone, are you getting any phone calls?
21   A.  Phone still ringing, basically.
22   Q.  Who's calling?
23   A.  I don't know the guy.  Like I said, they called
24 and asked for Chucky, and you tell them, Chucky is not
25 here, and that would be the end of it.

145

1    Q.  Would you have any other number to give them to
2  try and contact Chucky?
3    A.  No, sir.
4    Q.  Can you tell me how many calls you think you
5  received?  Just an estimate?
6    A.  I can't sit up and give an estimate.
7    Q.  All right.  He comes back about 7:00 p.m.?
8    A.  Yes, sir.
9    Q.  It's dark out at this point, correct?
10   A.  Yes, sir.
11   Q.  Who all is with Bug and Chucky when they come
12 back at 7:00?
13   A.  Just Chucky and Bug, I guess.
14   Q.  Well, do they come up to the apartment and come
15 in for a beer or something?
16   A.  Yes, sir, they came upstairs and sat for a
17 minute; and made a few more phone calls.
18   Q.  Is Bug making any phone calls?
19   A.  No, sir.
20   Q.  Are you talking to -- the three of you talking
21 about what's going down?
22   A.  No, sir, we're just sitting outside, just
23 casual conversation, you know.
24   Q.  You never inquired why your friend, Bug, and
25 why Mr. Mamou was driving off and driving around?

146

1    A.  No, sir.
2    Q.  So they leave a few minutes later?
3    A.  Yes, sir.
4    Q.  And they're gone for how long?
5    A.  I guess for a few -- like I said, by the time
6  he came back, it was about 2:00 or 2:30.
7    Q.  So, we've got a long stretch of time here where
8  they're gone?
9    A.  Yes, sir.
10   Q.  This is very important.  Between 7:00 p.m.,
11 when Bug comes over to pick up Mr. Mamou, and the time
12 that you recall Mr. Mamou coming back, I want you to
13 tell me what you and your wife and other people that may
14 have been there were doing.
15   A.  Well, my wife was in the room watching TV.  I
16 was outside.
17   Q.  Hang on a second.  Your wife is watching TV.
18 Was she pretty much staying in the room watching TV most
19 of the night?
20   A.  Yes, sir, she stayed away from us.
21   Q.  She stayed away from whatever was happening?
22   A.  Company, yes, sir.
23   Q.  And does she ultimately fall asleep in there?
24   A.  Yes, sir.
25   Q.  You're where?

147

1    A.   We are outside on the front porch.
2    Q.   You said "we're."  Who is the group?
3    A.   It was me, Ken, Shawn, and that's it.
4    Q.   How about Germane?
5    A.   Who?
6    Q.   Was there a Germane there?
7    A.   No, sir.
8    Q.   Again, how does Ken get there?
9    A.   On the bike.
10   Q.   On the bike.  How does Shawn get there?
11   A.   He had a car, I guess.  He was out.
12   Q.   Did you see him come in a car?
13   A.   I didn't see him come in a car, but he came
14   with his kids that day.  He had brought his kids over
15   that day.
16   Q.   But his kids still weren't there late into the
17   night, right?
18   A.   No, sir, it wasn't late.  He had took them
19   home.
20   Q.   Did his wife come and take them home?
21   A.   No, he took them home.
22   Q.   When he came back to see you later in the night
23   without the kids, you don't know whether he had a car or
24   not, do you?
25   A.   No, sir.

148

1    Q.   What are y'all doing?
2    A.   Just sitting around chatting.
3    Q.   Okay.
4    A.   Just at the house.
5    Q.   Having a couple of beers or what?
6    A.   Just sitting around.
7    Q.   Are you outside on the patio?
8    A.   Kind of like back and forth, from the inside to
9    the porch, inside to the porch.
10   Q.   Any discussion going on between you and Shawn?
11   A.   No, sir.
12   Q.   Are you making any comments to any of the
13   people that -- your company there -- that Chucky and Bug
14   been gone for a long time?
15   A.   No, sir.
16   Q.   Not even entering your mind?
17   A.   No, sir.
18   Q.   Who do you see leave and at what time?
19   A.   Shawn left for -- he had to go pick his cousin
20   up from work; and then Ken left, and it was just me and
21   my wife at the house.
22   Q.   Okay.  And what time do you recall going to
23   bed?  Well, let me say, what time do you recall Shawn
24   leaving?
25   A.   I guess about 10:00, 11:00, something like

149

1    that, around that time.
2    Q.   And Ken?
3    A.   Ken left around about the same time.  The whole
4    house emptied around about the same time.
5    Q.   And at what time do you go to bed?
6    A.   I went right after that, I guess about 11:00 or
7    12:00.
8    Q.   I'm sorry?
9    A.   About 11:00 or 12:00, something like that.
10   Q.   Any phone calls coming in during the night?
11   A.   Same phone still just ringing, asking for
12   Chuck.
13   Q.   Get quite a few calls even while you're sitting
14   around with Ken and Shawn and your wife's watching TV in
15   the other room?
16   A.   Yes, sir.
17   Q.   And it never causes you to make any comment at
18   all to others or your wife that, Man, Chucky is getting
19   an awful lot of phone calls?
20   A.   No, sir.
21   Q.   Wonder what he's up to?
22   A.   No, sir.
23   Q.   So are you awoken, by telephone calls even
24   after you go to bed?
25   A.   No, sir, no more phone calls.  After awhile it

150

1    wasn't no more phone calls.
2    Q.   Is that because you pulled a plug out of the
3    phone or --
4    A.   No, it just stopped ringing.
5    Q.   What time do you remember Mr. Mamou coming to
6    your door?
7    A.   Later on that evening, about 2:30.
8    Q.   And did he say anything to you when he came in
9    at 2:30?
10   A.   No, sir.
11   Q.   Did you ask him where he had been?
12   A.   No, sir.
13   Q.   Was he alone?
14   A.   Yes, sir.
15   Q.   He didn't have a key to your place; he had to
16   knock on the door?
17   A.   Yes, sir.
18   Q.   After you let him in, did you then go back into
19   your bedroom?
20   A.   Yes.
21   Q.   Did you wake your wife or anything?
22   A.   She was already still asleep.  I just laid back
23   down.
24   Q.   And the next morning, later that morning, you
25   wake up again.  Were you going to take your wife to

151

1  work? Now this is Monday morning?
2      A.  Yes, sir.
3      Q.  Which would be the 7th of December?
4      A.  Yes, sir.
5      Q.  And you come out, and Mr. Mamou is asleep?
6      A.  Yes, sir.
7          MR. HILL:  May I have just a moment?
8      Q.  (BY MR. HILL)  Mr. Scott, you ever been
9  convicted of a felony in this state?
10     A.  Yes.
11     Q.  What type of charge is that?
12     A.  Unlawfully carrying a weapon on a liquor
13  license premises and possession of a controlled
14  substance.
15     Q.  And what type of controlled substance?
16     A.  PCP.
17     Q.  Is that angel dust?
18     A.  I guess that's what they call it.
19     Q.  And how long did you serve on those, or what
20  were your sentences?
21     A.  I had a seven-year probation and a five-year
22  probation.
23     Q.  And I take it they were revoked and you went to
24  the penitentiary?
25     A.  Yes, sir.

152

1      Q.  Never had any kind of misdemeanor involving
2  moral turpitude, like a theft or prostitution or
3  anything like that?
4      A.  No, sir.
5          MR. HILL:  No further questions.
6              REDIRECT EXAMINATION
7  BY MR. MCCLELLAN:
8      Q.  Mr. Scott, you talked about Shawn England being
9  there at your house with his kids for a while, and then
10  he left. When Shawn came back around midnight or a
11  little after, how long did he stay before he left again?
12     A.  I guess about thirty or forty minutes.
13     Q.  So he left again about 12:00, 12:45 or 1:00
14  o'clock?
15     A.  Yes, sir.
16         MR. MCCLELLAN:  Pass the witness, Your
17  Honor.
18              RECROSS-EXAMINATION
19  BY MR. HILL:
20     Q.  Well, see if I understand this, Mr. Scott;
21  because when I was asking you this, you said you went to
22  bed at 11:00 or 12:00; and the next thing you know when
23  you woke up was the defendant, about 2:30, coming home.
24  How did -- what was it that Shawn did that got your
25  attention after midnight to tell you that he was there?

153

1      A.  He just came back to the door, thinking that
2  everybody was still there. It wasn't nobody there, so
3  he left again.
4      Q.  And he was with Ken at the time?
5      A.  No. Ken was already gone, too.
6      Q.  Well, when Shawn is there, I mean, is it right
7  at midnight? Is it 1:00 o'clock? Do you know what time
8  it is?
9      A.  I can't recall the time.
10     Q.  Sometime before 2:30, when Mr. Mamou shows up?
11     A.  Yes, sir.
12     Q.  So it could have been anywhere from about
13  midnight to 2:30 in the morning?
14     A.  Yes, sir, could have been.
15     Q.  And when you say he then leaves, do you say
16  good-bye to him at your front door and you close the
17  door and go back to bed?
18     A.  Yes, sir.
19     Q.  So you don't actually see where he goes to at
20  that point? He's not inside your apartment?
21     A.  No, sir.
22     Q.  Thank you.
23         MR. HILL:  I have no further questions.
24
25

154

1              FURTHER REDIRECT EXAMINATION
2  BY MR. MCCLELLAN:
3      Q.  Do you recall giving a statement to the police?
4      A.  Yes, sir.
5      Q.  And on that statement, did you put down certain
6  times that you said Shawn England came back to the
7  apartment?
8      A.  Yes, sir.
9          MR. MCCLELLAN:  May I approach the
10  witness, Your Honor?
11             THE COURT:  Yes.
12             MR. HILL:  May we approach?
13             (Off-the-record discussion.)
14     Q.  (BY MR. MCCLELLAN)  Do you recognize this
15  three-page document?
16     A.  Yes.
17     Q.  The statement you gave?
18     A.  Yes.
19     Q.  And this statement was given back on December
20  9th?
21     A.  Yes, sir.
22     Q.  Let me direct your attention to the statement
23  where you've talking about Shawn coming back.
24     A.  Yes, sir.
25     Q.  Just read that to yourself.

155

1    A.   Shawn --
2    Q.   To yourself, not out loud.  Does that refresh
3    your memory as to what time Shawn came back?
4    A.   Yes, sir.
5    Q.   What time do you recall Shawn coming back to
6    your apartment?
7    A.   About 12:00.
8         MR. MCCLELLAN:  I'll pass the witness,
9    Your Honor.
10        MR. HILL:  May I approach the witness?
11        THE COURT:  Yes.
12            FURTHER RECROSS-EXAMINATION
13   BY MR. HILL:
14   Q.   Do you remember what you testified in terms of
15   when Ken left?
16   A.   Yes.
17   Q.   What was your testimony?
18   A.   It had to be about 12:00 o'clock.
19   Q.   Let me go ahead and show you the same document
20   that Mr. McClellan did.  And again, read it to yourself
21   quietly and silently?
22   A.   Yes.
23   Q.   Does that refresh your recollection as to what
24   time Ken left?
25   A.   Yes, sir.

156

1    Q.   What time would that be?
2    A.   About 12:30, 12:45.
3    Q.   Okay.  Well --
4    A.   12:45.
5    Q.   12:45?
6    A.   Yes, sir.
7    Q.   Okay.  So, Ken would have left after Shawn
8    left?
9    A.   I assume, yes, sir.
10   Q.   So when Ken was there until 12:45, what were
11   y'all doing?
12   A.   Just sitting around, just me and him, just
13   sitting around still chitchatting and talking and
14   drinking beer.
15   Q.   Okay.  I'm just going to ask you this, because
16   I know times are difficult to remember.
17   A.   Yes, sir.
18   Q.   But when I asked you earlier whether the time
19   could have been as early as midnight or up to sometime
20   before 2:30 when you say Mr. Mamou got there, does
21   reviewing that statement specifically refresh your
22   memory that it was 12:15 and 12:45?
23   A.   Yes.
24   Q.   Or could it have been later than that?
25   A.   That refreshed my memory to the time frame.

157

1    Q.   Okay.  So you're positive it couldn't have been
2    later than 12:45?
3    A.   No, sir.
4    Q.   Okay.  Thank you.
5         MR. HILL:  Pass the witness.
6         MR. MCCLELLAN:  I have nothing further,
7    Your Honor.
8         THE COURT:  Call your next, please.
9         MR. MCCLELLAN:  Call Thad Badeaux.
10            THAD BADEAUX,
11   having been first duly sworn, testified as follows:
12            DIRECT EXAMINATION
13   BY MR. MCCLELLAN:
14   Q.   State your name for the record, please.
15   A.   Thad Badeaux.
16   Q.   Mr. Badeaux, how are you employed?
17   A.   Lafayette Parish Sheriff's Office.
18   Q.   Be sure and speak up so everybody can hear what
19   you have to say.  I assume in Louisiana?
20   A.   Yes, sir.
21   Q.   How long have you been employed with the
22   sheriff's office?
23   A.   Eighteen years.
24   Q.   And what -- do you have a division you're
25   assigned to, or what is your rank or --

158

1    A.   Presently assigned to the crimes against
2    persons division.
3    Q.   Crimes against persons division?
4    A.   Yes, investigator with the sheriff's office.
5    Q.   All right.  Let me direct your attention, if I
6    can, back to December the 8th of 1998.  Did you have an
7    occasion to talk to a Detective Novak of the Houston
8    Police Department?
9    A.   Yes, I did.
10   Q.   And as a result of a conversation with him, did
11   he ask you to look in your jurisdiction to try to find a
12   certain person?
13   A.   Yes, he did.
14   Q.   Who were you asked to try to locate?
15   A.   Charles Harold Mamou, Jr., also known as
16   Chucky.
17   Q.   All right.  Did you begin trying to determine
18   whether or not there was a Charles Mamou, Jr. living in
19   the Lafayette Parish area?
20   A.   Yes, sir, I did.
21   Q.   And did you go to some locations in Louisiana
22   to try to find this Charles Mamou, Jr.?
23   A.   Not on the first day he contacted me.  I used
24   resources around the office, located the information on
25   a Harold, Charles Harold Mamou, Jr. that we had.

**159**

1  Sergeant Novak had also given me a telephone number on
2  the 8th day that originated from Lafayette, Louisiana.
3  That was calls made to Houston where the suspect might
4  be staying.
5      Q.  Did you go to the address where that telephone
6  number goes to?
7      A.  Yes, I did.  We located the person, and it was
8  a Shawntel, who was a former girlfriend of Mr. Mamou.
9      Q.  Did you locate Mr. Mamou at that location?
10     A.  No, sir, we did not.
11     Q.  The next day, on December 9th, 1998, did you
12 have an occasion to go to some other locations in
13 Louisiana to look for Charles Mamou?
14     A.  Yes, we did.
15     Q.  Where else did you go?
16     A.  Went to Sunset, Louisiana.
17     Q.  How far is that from Lafayette?
18     A.  About twenty-five minutes.
19     Q.  And where in Sunset, Louisiana, did you look?
20     A.  We had his last known address, which was -- I
21 think it's his mother's residence, at 8-something-45
22 Martin Luther King Drive.
23     Q.  Did you go to that location?
24     A.  Yes, we went to the residence.
25     Q.  And did you find Charles Mamou there?

**160**

1      A.  No, sir, we did not.
2      Q.  Did you go to any other location there in
3  Sunset?
4      A.  We went to a Timmy Thomas' residence to speak
5  to him in reference to attempting to locate Mr. Mamou,
6  but we had no success.
7      Q.  All right.
8      A.  A short time later, if I could just proceed a
9  little -- a short time later at the police station, we
10 received a phone call -- or I called Sergeant Novak
11 again, and he gave me another number --
12     Q.  Okay.
13     A.  -- which turned out to be a residence not far
14 from where we were.
15     Q.  Okay.
16     A.  That Mr. Mamou had used the phone and contacted
17 somebody here in Houston.
18     Q.  Whose residence was that?
19     A.  Mr. Dennis Dugas.
20     Q.  Did you eventually come in contact with a
21 Dennis Dugas --
22     A.  Yes, sir.
23     Q.  -- at that residence?
24     A.  Yes, sir.
25     Q.  Was that on the same day of December 9th, 1998?

**161**

1      A.  Right.
2      Q.  Did you talk to Mr. Dugas?
3      A.  Yes, we did.
4      Q.  Did you tell him why you were there?
5      A.  Yes, we did.
6      Q.  Did he cooperate with you?
7      A.  Yes, sir.  He was very cooperative.  He stated
8  that --
9          MR. HILL:  Judge, we object to hearsay.
10         THE COURT:  Sustained.
11     Q.  (BY MR. MCCLELLAN)  Did he give you a consent
12 to look around the house or the apartment, whatever it
13 was?
14     A.  Yes, sir, he gave permission to search; and he
15 signed a form, and we conducted a search.
16     Q.  You searched, then, that house where that was,
17 I guess, the residence of Dennis Dugas?
18     A.  Right.
19     Q.  And you were looking for who?
20     A.  Mr. Mamou.
21     Q.  Did you find Mr. Mamou?
22     A.  We did.
23     Q.  Where did you find Mr. Mamou?
24     A.  In a closet, a bedroom closet of the residence.
25     Q.  At that time, was he placed under arrest?

**162**

1      A.  He was.
2      Q.  Was he taken back to Lafayette?
3      A.  First he was taken to the Sunset police
4  station, booked there, and brought to the larger
5  facility in Lafayette.
6      Q.  In Lafayette.  Now where Mr. Dugas was, was
7  that a house or an apartment?
8      A.  It's a residence.
9          MR. MCCLELLAN:  I'll pass the witness,
10 Your Honor.
11         MR. HILL:  Just a couple of questions.
12             CROSS-EXAMINATION
13 BY MR. HILL:
14     Q.  The house belonging to Timmy Thomas, that's on
15 Martin Luther King in Sunset?
16     A.  Yes, I believe, also.
17     Q.  Do you recall that as a blue-colored house?  Do
18 you recall?
19     A.  I don't recall which house.
20     Q.  And that's just about six or seven houses down
21 from Mr. Mamou's mother's house, correct?
22     A.  Right.
23     Q.  Same side of the street?
24     A.  Right.
25     Q.  Now when you went to the Dugas residence, how

163

1   many officers were there to effectuate this arrest?
2       A.   It's in my report, if you let me count real
3   quick.
4       Q.   Sure, take a moment.
5       A.   Probably six of us, I believe.
6       Q.   Okay.  That's all I have.  Thank you.
7           MR. HILL:  Judge, pass the witness.
8           MR. MCCLELLAN:  May this witness be
9   excused?
10          THE COURT:  Any objection?
11          Call your next, please.
12          MR. MCCLELLAN:  May we approach?
13          THE COURT:  Yes.
14          Ladies and gentlemen, if you would, please
15  go back in the jury room.
16          (Brief recess.)
17          (Jury is brought in and seated.)
18          THE COURT:  Please be seated.
19          Call your next, please.
20          MR. MCCLELLAN:  State would call Terrence
21  Dodson.
22          THE COURT:  Proceed, please.
23
24
25

164

1                   TERRENCE DODSON,
2   having been first duly sworn, testified as follows:
3                  DIRECT EXAMINATION
4   BY MR. MCCLELLAN:
5       Q.   Mr. Dodson, I want you to speak so the ladies
6   and gentlemen of the jury can hear what your answers
7   are, okay?  You have to answer out, yes or no.
8       A.   All right.
9       Q.   Try to use the microphone there.  Mr. Dodson,
10  how old are you?
11      A.   Twenty-two.
12      Q.   And are you employed?
13      A.   Yes.
14      Q.   Where do you work?
15      A.   I'm a truck driver for M.S. Carriers.
16      Q.   Do you live here in Harris County?
17      A.   Yes.
18      Q.   Do you know the person, Charles Mamou, Jr.?
19      A.   Yes.
20      Q.   And how do you know him?
21      A.   Charles is my cousin.
22      Q.   Are you originally from Sunset, Louisiana?
23      A.   No, I'm not.
24      Q.   Do you have relatives there?
25      A.   Yes.

165

1       Q.   And how is the defendant -- you say he's your
2   first cousin?
3       A.   I'm not sure.  He's my cousin.
4       Q.   All right.  So how long have you known him?
5       A.   All my life.
6       Q.   Do you recognize Charles Mamou, Jr., in the
7   courtroom here today?
8       A.   Yes.
9       Q.   Could you point him out and briefly describe
10  something he's wearing today?
11      A.   The black suit jacket with the maroon shirt.
12          MR. MCCLELLAN:  Your Honor, may the record
13  reflect the witness has identified the defendant?
14          THE COURT:  It may.
15      Q.   (BY MR. MCCLELLAN)  Let me direct your
16  attention back to December the 6th of 1998.  Did you
17  have an occasion on that day to see Charles Mamou, Jr.?
18  It was a Sunday.
19      A.   I'm not sure about the date, but if it was his
20  birthday, yeah.
21      Q.   Was that a Sunday, or do you recall?
22      A.   I believe it was.
23      Q.   All right.  And where -- where did you see him,
24  or what time of day did you come in contact with him?
25      A.   It was in the morning.

166

1       Q.   And how did you get to come to meet him or be
2   with him that morning?
3       A.   Well, he gave me a call and told me that he had
4   a lick for a key.  So I said, Come get me.
5       Q.   What is a lick for a key?
6       A.   Someone that was willing to sell a key.
7       Q.   All right.  And so he came over to your house?
8       A.   Yes.
9       Q.   Where do you live?
10      A.   Southwest.
11      Q.   What area of the southwest?  I mean, what
12  street?
13      A.   Beechnut.
14      Q.   When he came over to get you, was he by himself
15  or with someone?
16      A.   He was with someone.
17      Q.   Okay.  What kind of car were they in?
18      A.   Like a red -- it looked like an Intrepid, but
19  it ain't an Intrepid.
20      Q.   Who all was in the car?
21      A.   Charles and the driver.
22      Q.   Were you introduced to the driver?
23      A.   Yes.
24      Q.   Okay.  Had you ever met the driver before?
25      A.   No.

167

1    Q.   And what did you come to know the driver's name
2  to be?
3    A.   Either Bud or Buck.
4    Q.   Bud or Buck?
5    A.   I'm not sure.
6    Q.   Let me show you what's been introduced into
7  evidence as State's Exhibit No. 87.  Have you seen that
8  person before?
9    A.   Yeah, that's him.
10   Q.   So is this the driver of the red car?
11   A.   Yes.
12   Q.   Okay.  This is the first time you had met this
13  person?
14   A.   Yes.
15   Q.   Now show you State's Exhibit No. 40.  Does that
16  look to be like the red car?
17   A.   Yes.
18   Q.   Okay.  After they picked you up at your house,
19  where did y'all go?
20   A.   Went to the convenience store, got some beer
21  and some newspaper.
22   Q.   Beer and newspaper?
23   A.   Yes.
24   Q.   What did you do after that?
25   A.   We started on our way to the north side.

168

1    Q.   Was there a period of time when you rode around
2  before you arrived on the north side?
3    A.   I can't really recall.
4    Q.   How long did it take you to get to the north
5  side?  Do you know?
6    A.   Roughly, about thirty minutes.
7    Q.   Whereabouts did you go on the north side?
8    A.   We pulled into the mall parking lot.  I believe
9  the mall is Northline.
10   Q.   Okay.
11   A.   I ain't sure.
12   Q.   Was it near a particular store or a restaurant?
13  Do you recall?
14   A.   Papa's Barbeque.
15   Q.   And there were three people in your car?
16   A.   Yes.
17   Q.   And did you meet another vehicle there?
18   A.   Yes.
19   Q.   What type of vehicle?
20   A.   Lexus.
21   Q.   What color?
22   A.   Blue.
23   Q.   How many people in that car?
24   A.   Two.
25   Q.   Let me show you what's been introduced into

169

1  evidence as State's Exhibits 86 and 83.  You seen these
2  two people before?
3    A.   That's them.
4    Q.   So these are the two people you met at
5  Northline?
6    A.   Yes.
7    Q.   And when you got to Northline, who got out of
8  your car, if anybody?
9    A.   Me and Charles got out.
10   Q.   Who did?
11   A.   Me and Charles.
12   Q.   All right.  And did anybody get out of the
13  Lexus?
14   A.   Them two got out.
15   Q.   The two people that were in --
16   A.   Yes.
17   Q.   Is that all that were in the Lexus, the two?
18   A.   Yes.
19   Q.   Where did y'all meet?
20   A.   At Papa's Barbeque.
21   Q.   Outside?
22   A.   Yes.
23   Q.   In between cars?
24   A.   Yes.
25   Q.   And what was discussed?

170

1    A.   The -- how much they wanted for it, and we
2  introduced each other.
3    Q.   How much they wanted for what, the kilo?
4    A.   Yes.
5    Q.   So y'all were going to buy a kilo from them?
6  That was the plan?
7    A.   Yes.
8    Q.   Did Charles Mamou have anything with him when
9  he got out?
10   A.   Cut-up newspaper.
11   Q.   Let me show you State's Exhibit No. 31.  Is
12  this the type of bag?
13   A.   Yes.
14   Q.   And the newspaper you had?  Was that the
15  money?  That was supposed to be the money?
16   A.   It was the newspaper, yes.
17   Q.   But it was newspaper?
18   A.   Yeah.
19   Q.   So did -- was a deal made right there?
20   A.   Nope.
21   Q.   Where did y'all go then?
22   A.   The driver of the Lexus kept talking about it
23  was too hot, so they told us follow them.  We followed
24  them.  We went to a Pigly Wiggly grocery store parking
25  lot.

171

1   Q.   Do you know what street that was on?
2   A.   I don't recall.
3   Q.   And was the store open or closed?
4   A.   Closed.
5   Q.   Is this during daylight or nighttime hours?
6   A.   It had just started turning dark.
7   Q.   And at this store, did y'all park in the
8   parking lot or what?
9   A.   Yes.
10  Q.   Who got out of the cars there?
11  A.   Charles got out first.  Then I got out.  Then
12  the two guys in the Lexus got out.
13  Q.   Same type of discussion about doing the dope
14  deal?
15  A.   Pretty much.
16  Q.   What were the two guys wanting you to do?
17  A.   Give them the money, let them go get the dope
18  on foot, and they want us to wait.
19  Q.   Didn't want to do that?
20  A.   No.
21  Q.   Any other plans that were kicked about?  They
22  just wanted to take the money and go and come back?  Is
23  that basically the only plan?
24  A.   That's basically it, yeah.
25  Q.   Did a deal happen there?

172

1   A.   No.
2   Q.   So, did y'all leave from that location?
3   A.   Yes.
4   Q.   Where did you go then?
5   A.   I made him drop me off home.
6   Q.   Why?
7   A.   Because I seen it wasn't happening.  It wasn't
8   going to work.
9   Q.   About what time did they drop you off home, if
10  you know?
11  A.   Roughly about 7:00 or 8:00.
12  Q.   Okay.  After they dropped you off, this would
13  be Sunday evening, right?
14  A.   Yes.
15  Q.   Did you see Charles Mamou or Bug anymore that
16  night?
17  A.   No.
18  Q.   The next morning was Monday?
19  A.   Yes.
20  Q.   Did you hear from Charles Mamou on Monday
21  morning?
22  A.   Yes.
23  Q.   And did he call you or what?
24  A.   Yes.
25  Q.   What did he ask?

173

1   A.   He told me that he told the other cousin,
2   Anthony, to come pick me up so we can pick him up off
3   Fondren.
4   Q.   And this Anthony is Anthony Trail?
5   A.   Yes.
6   Q.   So did Anthony come by and pick you up?
7   A.   Yes.
8   Q.   And y'all went where?
9   A.   Off Fondren.
10  Q.   And did you drive to a particular location to
11  pick him up or what?
12  A.   Met him at a Burger King.
13  Q.   How did he arrive at the Burger King?
14  A.   Well, when we was pulling up, he was walking
15  over.
16  Q.   Did he get in the car with you?
17  A.   Yes.
18  Q.   Did he say why he wanted y'all to pick him up
19  whenever he was talking to you?
20  A.   Just say, Come get him.
21  Q.   So this is Monday morning, then, you pick him
22  up at a location there at Burger King.  When he gets to
23  the car, what does he say?
24  A.   Told us he have a Lexus.
25  Q.   Did he show you anything?

174

1   A.   Some keys.
2   Q.   And were those supposedly the keys for the
3   Lexus?
4   A.   Yeah.
5   Q.   Did he tell you what type of Lexus or what
6   color or anything?
7   A.   Yeah, later on in detail, yeah.
8   Q.   What detail did he tell you?
9   A.   That he purchased the blue Lexus.
10  Q.   Okay.  Now prior to the time that you met
11  with -- you met with Charles on that Monday morning, had
12  you seen any news reports about anything that had
13  happened that night?
14  A.   You mean, did I see any news reports before I
15  picked him up?
16  Q.   Before you picked him up.
17  A.   No.
18  Q.   Okay.  Was there conversation between you and
19  Anthony and the defendant about this Lexus?
20  A.   Yes.
21  Q.   Did he describe the Lexus more than just the
22  color of the Lexus?  Did somebody ask him what color it
23  was?
24  A.   Yes.
25  Q.   Did he say what color it was?

175

1    A.  Yes.
2    Q.  Now do you know whether or not Anthony Trail
3  had seen any news coverage?
4    A.  Yes.
5        MR. HILL:  Judge, I object.  It calls for
6  speculation and hearsay.
7        THE COURT:  Well, I don't know how it came
8  about.  It is possible.
9        Could you rephrase it, please?
10   Q.  (BY MR. MCCLELLAN)  Well do you know whether or
11  not -- well, let me ask you this:  In the car, was there
12  a discussion about the news?
13   A.  Yes.
14   Q.  Did the defendant say in the car what color the
15  Lexus was?
16   A.  Yes, he did.
17   Q.  Did he say anything about the type of wheels
18  that it had?
19   A.  I don't recall.
20   Q.  What color did he say it was?
21   A.  Blue.
22   Q.  How long were you with the defendant on that
23  morning?
24   A.  After we picked him up, I got dropped off again
25  to the house.

176

1    Q.  Okay.  All right.  Where Anthony picked you up,
2  he just took you back?
3    A.  Yes.
4    Q.  Did Anthony and the defendant then leave in
5  Anthony's car?
6    A.  Yes.
7    Q.  After you were dropped off, did you, later that
8  day, see some news reports?
9    A.  Yes.
10   Q.  Did you talk with the defendant later that day
11  after he had been dropped off at the house?
12   A.  Little bits and pieces.
13   Q.  Bits and pieces?
14   A.  Yeah.
15   Q.  That means what?
16   A.  I just asked him, you know what I'm saying?
17  Where did he get the car?
18   Q.  Did he tell you where he got the car?
19   A.  He told me he purchased it.
20   Q.  Okay.  So did he call you sometime during that
21  day after you had been dropped off?
22   A.  No, I don't recall.
23   Q.  You don't recall him calling you?
24   A.  No.
25   Q.  Okay.  Do you recall the defendant -- well,

177

1  first of all, where was Anthony going to take the
2  defendant when he left with you?  Do you recall?
3    A.  They was going to eat at Anthony's house.
4    Q.  Do you recall whether or not you talked to the
5  defendant about him going back to Louisiana?
6    A.  Yes.
7    Q.  When was that?
8    A.  When they had came back from eating.  They had
9  came back to the house.
10   Q.  So this is still on Monday?
11   A.  Yes.
12   Q.  So Anthony and the defendant came back to your
13  house?
14   A.  Yes.
15   Q.  What was the defendant saying about going to
16  Louisiana?
17   A.  Just that he fixing to go back home.
18   Q.  And how was he going to get back there?
19   A.  The bus.
20   Q.  And who was going to take him?
21   A.  Anthony.
22   Q.  Pardon?
23   A.  Anthony.
24   Q.  Okay.  Did you later receive a call from the
25  defendant while he was in Louisiana?

178

1    A.  Yes.
2    Q.  Did he make any inquiries of you as to what was
3  being said in the news?
4    A.  No.  He was just asking me, What is the news
5  saying?  What's going on?
6    Q.  All right.  Was he asking about anything in
7  particular in the news?
8    A.  I don't recall.
9    Q.  Did you talk to him about the news reports
10  about a Lexus --
11   A.  Yes.
12   Q.  -- being taken?
13   A.  Yes.
14   Q.  About a girl missing?
15   A.  Yes.
16   Q.  And did he tell you about that incident?
17   A.  Yes.
18   Q.  Can you tell us what he told you about that
19  incident?
20   A.  He told me that it was a jack on a jack.
21   Q.  What does a jack on a jack mean?
22   A.  Robbery on a robbery.
23   Q.  Okay.
24   A.  That those guys didn't have a kilo.
25   Q.  Okay.

179

```
1      A.  They had a Bible wrapped up.
2      Q.  Okay.
3      A.  Shoot out happened, and he burned off.
4      Q.  And he burned off in what?
5      A.  In the Lexus, with the female.
6      Q.  With the girl in the car?
7      A.  Yes.
8      Q.  Now you say there was a shoot-out.  Did he tell
9  you whether or not anyone shot at that scene other than
10 him?
11     A.  I don't recall.  He didn't tell me, no.
12     Q.  Do you recall him telling you only he shot?
13     A.  I don't recall that, either.  I recall him
14 telling me he did some shooting.
15     Q.  In fact, he described to you the people that he
16 shot, did he not?  He described shooting the people?
17     A.  Yes.
18     Q.  And can you tell us what he said about shooting
19 the people?
20     A.  He said he shot one dude in the arm.
21     Q.  Okay.
22     A.  Shot another dude, if I'm not mistaken, I
23 believe it was three times.
24     Q.  Once in the back?
25     A.  Yeah.  When the dude got out to run, he shot
```

180

```
1  him in the back.  And he shot another guy.
2      Q.  Did he tell you how he left that scene of the
3  shooting, what kind of vehicle he left in?
4      A.  Yeah, he drove off in the Lexus.
5      Q.  Did he say where he went after he drove off in
6  the Lexus with the girl in the back?
7      A.  No.
8      Q.  Well, did he tell you about going to a --
9              MR. HILL:  Judge, I'm going to object to
10 the leading.
11             THE COURT:  I'm going to allow this
12 question so far.
13     Q.  (BY MR. MCCLELLAN)  Did he tell you about taking
14 the girl to a certain location?
15     A.  Not that I can recall.
16     Q.  Did he ever tell you what happened to the girl?
17     A.  Yes.
18     Q.  What did he tell you happened to the girl?
19     A.  He told me he shot her.
20     Q.  That he shot her?
21     A.  Yes.
22     Q.  Where?  Where were they -- where -- as far as
23 where, I mean the location?  Not a street address or
24 anything, but middle of the street?  Inside of an
25 apartment?  Where did he say the shooting occurred?
```

181

```
1      A.  All I remember was Sugar Land.
2      Q.  Do you remember about what he told you whether
3  it was the inside or outside?
4      A.  Inside, outside?
5      Q.  Outdoors or indoors?
6      A.  Outdoors.
7      Q.  Okay.  And did he tell you how many times he
8  shot her?
9      A.  No.  He just say, I shot her.
10     Q.  Did he tell you what the girl was doing at the
11 time he shot her?
12     A.  No, he didn't tell me what she was doing at the
13 time he shot her.
14     Q.  Did he tell you what the girl was doing before
15 he shot her?
16     A.  No, not before he shot her, neither.
17     Q.  Did he tell you why he shot her?
18     A.  I don't recall.
19     Q.  Do you recall making a statement to the Houston
20 Police Department, Sergeant Novak?
21     A.  Yes.
22     Q.  It was a videotaped statement?
23     A.  Yes.
24     Q.  Do you recall in that videotaped statement
25 telling Sergeant Novak -- do you recall telling Sergeant
```

182

```
1  Novak about the -- what the girl was doing at the time
2  she was shot?
3      A.  No, I don't recall that; but I recall what he
4  said the girl had did.
5      Q.  Okay.  What did he say the girl had did?
6      A.  That she performed oral sex on him.
7      Q.  That was prior to him shooting her?
8      A.  I'm not sure.
9      Q.  Did he tell you what he did with the gun?
10     A.  Yes.
11     Q.  And what did he tell you he did with the gun?
12     A.  Broke it down in three pieces and chunked it.
13     Q.  Again, do you recall telling Sergeant Novak why
14 Charles Mamou said that he shot the girl?
15     A.  Said because she was looking at him funny, like
16 she was going to tell.  She was scared.
17     Q.  She was going to tell?
18     A.  That's the impression she was giving him.
19     Q.  Okay.  Did Charles Mamou ask -- did he ever
20 call and ask you to get some information about a bus for
21 him?
22     A.  No, I don't really recall.
23     Q.  Did he ever ask you to check on the bus routes?
24     A.  Yeah, he asked me to check on the bus routes.
25     Q.  Where did he ask you to check on a bus route
```

183

1    to?
2    A.  If I'm not mistaken, I believe Mexico.
3    Q.  And did you tell him -- provide him a number he
4    could call?
5    A.  Yes.
6    Q.  And that was what?  What type of number was
7    that?
8    A.  The Greyhound bus line.
9    Q.  You said that the defendant told you that the
10   shooting occurred outside, and you said something about
11   Sugar Land.  Did he give you any type of description
12   about the location, as far as whether it was a house, an
13   apartment, whatever?
14   A.  He told me some abandoned houses.
15   Q.  After you learned this information from Charles
16   Mamou, did you talk with Anthony Trail --
17   A.  Yes.
18   Q.  -- and relate to him what Charles told you?
19   A.  Yes.
20   Q.  Now Anthony Trail, is he also a cousin?
21   A.  Yes.
22   Q.  Does he also have relatives in Sunset,
23   Louisiana?
24   A.  Yes.
25   Q.  Did the defendant tell you how the girl -- what

184

1    the girl was wearing that he shot, what color her top
2    was and --
3    A.  Yes.
4    Q.  What did he say?
5    A.  A red top with black pants.
6          MR. MCCLELLAN:  I'll pass the witness.
7          CROSS-EXAMINATION
8    BY MR. HILL:
9    Q.  Mr. Dodson, you and I have not spoken, correct?
10   A.  Correct.
11   Q.  How many times have you visited with
12   Mr. McClellan and other members of the prosecutor's
13   office in this case?
14   A.  Roughly, maybe three or four times.
15   Q.  Okay.  You ever go out to any of the scenes of
16   these alleged offenses?
17   A.  Did I ever go to what?
18   Q.  You ever drive out to Northline Mall with them
19   or anyplace else?
20   A.  No.
21   Q.  Okay.  And when you met with police officials,
22   had they placed you under arrest at that time?
23   A.  No, they didn't place me under arrest.
24   Q.  Were you a little concerned about the fact you
25   might be charged with some crime?

185

1    A.  Yes.
2    Q.  But you don't have that concern now, do you?
3    A.  No.
4    Q.  I mean, the only thing you had done was what,
5    take a drive to see about scoring a kilogram of cocaine;
6    but other than that --
7    A.  That was it.
8    Q.  -- that's it.  Let's back up and start over
9    with the events of December 6th, okay?
10   A.  All right.
11   Q.  How long you been knowing Bug Johnson?
12   A.  I told you that was my first time meeting him.
13   Q.  Never had seen him before?
14   A.  Never.
15   Q.  Who's Shawn England?
16   A.  I heard the name before, but I don't know him
17   personally.
18   Q.  You ever met him when you were out in Sunset,
19   Louisiana?
20   A.  I ain't ever meet him, but I know of him like
21   that, I say.
22   Q.  But would that have been at his mama's house
23   over in Sunset?
24   A.  No.
25   Q.  Here in Houston?

186

1    A.  No, it was in Sunset.
2    Q.  Okay.  What about Timmy Thomas?
3    A.  Yeah, I know Timmy.
4    Q.  Timmy your cousin, also?
5    A.  Not to my knowledge.
6    Q.  Was Timmy the one that was the driving force
7    behind putting this deal together on December 6th?
8    A.  Yes, to my knowledge, I heard, yeah, he was the
9    one that set it up.
10   Q.  You and Charles had those conversations, right?
11   A.  Yes.
12   Q.  And you were in for this deal; there wasn't any
13   reservation or hesitation on your part for being
14   involved in it, right?
15   A.  Yes.
16   Q.  What did you understand the deal to actually
17   come down to?  What did you think was actually going to
18   happen?
19   A.  That they was going to bring the kilo, we were
20   going to bring newspaper, and we was going to rob them.
21   Q.  What was your part going to be?
22   A.  My part in the robbery?
23   Q.  Right.
24   A.  To rob them.
25   Q.  With what?

187

1    A.   With a gun.
2    Q.   You had a gun?
3    A.   Yeah, I had it on me.
4    Q.   Okay.  What kind of gun did you have?
5    A.   25.
6    Q.   What kind of gun did Bug have?
7    A.   I never seen the gun that Bug had.
8    Q.   All right.  Did he have any other kind of
9  weapon?
10   A.   Bug?  Not to my knowledge.
11   Q.   Did you ever see him give Charles Mamou a
12  weapon?
13   A.   No.
14   Q.   How many shots in that .25 you got?
15   A.   Four.
16   Q.   It was loaded, ready to go at the time you went
17  on your journey over to Northline Mall?
18   A.   No.
19   Q.   So what is it that you're supposed to do, you,
20  personally?   What is your role on this jack on jack?
21  Of course, you're not knowing it's a jack on jack at
22  that point, are you?
23   A.   Exactly.
24   Q.   So what is your role?   What are you supposed
25  to do?

188

1    A.   Once I see the dope, I pull out my pistol and
2  take the dope.
3    Q.   What if there is more than one or two people
4  there?   Is that going to be a problem for you?
5    A.   No, not really.
6    Q.   You're comfortable going in a situation like
7  that with a gun; and if somebody shows you the dope, you
8  just going to take the dope?
9    A.   Pretty much.
10   Q.   Now it was clear that you guys were not there
11  to sell dope to them, right?
12   A.   Yeah, that's clear.
13   Q.   Was this a conversation that you had with both
14  you, Charles Mamou, and Bug Johnson?
15   A.   True.
16   Q.   Before the three of you set out to do this
17  deal, was it very clear in everybody's mind as to what
18  their roles were?
19   A.   True.
20   Q.   How was it that you got picked up?   Bug came
21  over to your place on Beechnut?
22   A.   True.
23   Q.   Was your sister, Stephanie, home at the time?
24   A.   Yes, she was.
25   Q.   Did you tell Stephanie you were going out to do

189

1  a dope deal?
2    A.   No.  I just left.
3    Q.   Did you discuss it on the telephone before they
4  came over to pick you up?  In other words, when they
5  showed up to pick you up at your apartment, did you
6  already know you were going to be involved in a dope
7  deal?
8    A.   Yes.
9    Q.   For how long before that did you know that?
10   A.   I didn't know it before that, until the call.
11   Q.   How long before they come over to pick you up
12  did you get the call that said, We're going to go do a
13  dope deal?
14   A.   I received a call.  About fifteen or twenty
15  minutes later, they picked me up.
16   Q.   Was it pretty quick?
17   A.   Yeah.
18   Q.   You ever go visit Charles over at the Shoney's
19  Inn over on the South Loop?
20   A.   Shoney's Inn?
21   Q.   Uh-huh, not necessarily on December 6th.
22   A.   Yes.
23   Q.   Was he in town for a couple of weeks there?
24   A.   Couple of weeks there?
25   Q.   Before December 6th of 1998, was Charles in

190

1  town?
2    A.   Yes.
3    Q.   Okay.  And you would go see him at the Shoney's
4  Inn?   This would be right around the first of December?
5    A.   I only seen him one time at Shoney's.
6    Q.   So they come and they pick you up.  Bug's
7  driving his red car; and as you drive over there, you
8  already know you're going to the Northline Mall, right?
9    A.   Yes.
10   Q.   And Bug drives up there.  And when you get
11  there, what are the guys in the blue Lexus saying to
12  you?
13   A.   Well, after we introduced each other, they was
14  telling us that it's too hot to do the transaction right
15  there, meaning --
16   Q.   Not talking about the temperature; you're
17  talking about --
18   A.   The laws and too many people around, et cetera.
19   Q.   So who was it that chose the Northline Mall
20  area?  Was that Mr. Mamou that planned that?
21   A.   I don't even know.
22   Q.   Okay.  It's obviously -- that's out in the wide
23  open for anybody to be doing a drug deal.  It wasn't
24  very bright, right?
25   A.   You're right.

191
```
 1      Q.  So what is it that Bug Johnson is doing right
 2  at that point?
 3      A.  While we're outside talking?
 4      Q.  Yeah.
 5      A.  Sitting in the car.
 6      Q.  Do you ever talk to him?
 7      A.  Nope.
 8      Q.  You never have any reason to go over and say
 9  anything to him?
10      A.  No, not at that time, no.
11      Q.  At some other time?
12      A.  When I was telling them to take me home.
13      Q.  And that's after the thing falls down at the
14  Pigly Wiggly?
15      A.  Yes.
16      Q.  So after you stay at the Northline Mall for a
17  while and you go over to Pigly Wiggly, how does that
18  scene compare to what you had seen up on the Northline
19  Mall?  What's different about it?
20      A.  That he still -- the driver of the Lexus was
21  still telling us that he still have to go get the kilo.
22      Q.  Are you starting to get a little bit pissed off
23  at the fact that these guys keep talking about wanting
24  to take the money --
25      A.  Yes.
```

192
```
 1      Q.  -- and walk off?  Why are you getting upset?
 2      A.  Because I knew it wouldn't work like that.
 3      Q.  How come?
 4      A.  He wants to take the bag of money, which is a
 5  newspaper, on foot and go get the kilo.
 6      Q.  Did Charles ever offer to give them that bag
 7  that's been marked as State's Exhibit No. 31 when they
 8  were at Northline Mall?
 9      A.  I don't recall.
10      Q.  When you say you don't recall, is that another
11  way of saying that that didn't happen?
12      A.  No, it ain't another way of saying it didn't
13  happen.  I don't remember.
14      Q.  Did you ever have that bag?
15      A.  Yeah, I grabbed it once when we got out the car
16  at Pappasito's.
17      Q.  What did you say?
18      A.  I told them get back in the car with the money.
19  Put the money back in the car.
20      Q.  Why did you do that?
21      A.  Just to do it.
22      Q.  Was that part of the plan?  Was that part of
23  the game you were playing?
24      A.  No.  I wanted to see the dope first.
25      Q.  Because you figured if you saw the dope, then
```

193
```
 1  you would pull out your gun and rob them?
 2      A.  Exactly.
 3      Q.  How long did you stay out at the Pigly Wiggly
 4  before you were heading home?
 5      A.  Roughly, about twenty minutes.
 6      Q.  Are you saying anything?  Are y'all talking as
 7  you go back to your apartment on Beechnut?  Is there
 8  any conversation that you're involved in with those
 9  three guys?
10      A.  What three guys?
11      Q.  You, Bug, and Charles Mamou -- I'm sorry -- the
12  other two guys?
13      A.  Well, pretty much, yeah.  I was saying that it
14  ain't going to happen.  They're on top of this.  Can't
15  get it.
16      Q.  What do you mean, they were on top of this?
17      A.  We wasn't ready for that.  We didn't have no
18  backup.
19      Q.  Did they seem to have outwitted you?
20      A.  Pretty much.
21      Q.  Were you concerned for your own safety at that
22  point?
23      A.  Pretty much, yeah.
24      Q.  Why?
25      A.  Because I knew that it wasn't going to happen
```

194
```
 1  like that.
 2      Q.  Did they seem to be pretty sharp in terms of
 3  figuring out they needed to be the ones walking with
 4  your money rather than you seeing any dope first?
 5      A.  Yeah.
 6      Q.  Seemed like they were experienced at what they
 7  were doing?
 8      A.  Pretty much.
 9          MR. MCCLELLAN:  I object.  Calls for a
10  conclusion on the part of the witness.
11          THE COURT:  Sustained.
12      Q.  (BY MR. HILL)  Now how much did you understand
13  that kilo was going to be going for?
14      A.  Twenty thousand.
15      Q.  Was that the going rate for a kilo back in
16  December of 1998?
17      A.  I don't know.
18      Q.  Now as I understand it, you get dropped off
19  somewhere between 7:00 and 8:00; and the next contact
20  you have with Charles is the following morning when --
21  does he call you, or do you get a call from Anthony
22  Trail?
23      A.  He calls me.
24      Q.  And tells you that he's already spoken to
25  Anthony and said that he was going to have Anthony pick
```

195

1    you up?
2        A.   Yes.
3        Q.   And that happens pretty quickly, also?
4        A.   Yes.
5        Q.   So where is it that you find Charles?   Where
6    are you going to?
7        A.   To the Burger King on Fondren.
8        Q.   Where?  Do you know where the intersection is?
9    What closest street is it?
10       A.   Fondren and Belfort.
11       Q.   That's not too far from where this guy, Bug
12   Johnson, lived, right?
13       A.   No, it's not too far, no.
14       Q.   Do you know where Bug lived?
15       A.   Off of Fondren.
16       Q.   Had you been there before?
17       A.   Yeah.
18       Q.   How many times?
19       A.   Once or twice.
20       Q.   Okay.  Did you know Howard Scott?
21       A.   The name sounds familiar; but no, don't ring a
22   bell.
23       Q.   What about his wife, Robin Scott?
24       A.   No.
25       Q.   How many other relatives do you have here in

196

1    Houston?   Do you have a big family here?
2        A.   Pretty much.
3        Q.   So you're not sure if Chucky's a first cousin,
4    but he's a cousin to you?
5        A.   Yes.
6        Q.   But you're not sure if Shawn is, Shawn England?
7        A.   I'm not sure.
8        Q.   Timmy Thomas is, though?
9        A.   I'm not even sure about him.
10       Q.   So describe, what is Charles like when he gets
11   into the vehicle that morning by the Burger King?
12       A.   His normal self.  He got in told us he got a
13   Lexus.
14       Q.   And did you ever see what he did with these
15   keys you say you saw?
16       A.   Yeah, he showed us the Lexus key.  That's it.
17       Q.   Did you bring up a conversation or say anything
18   about finding a place to get rid of the Lexus?
19       A.   Nope.
20       Q.   Did you ever talk about taking it to a chop
21   shop or anything?
22       A.   He was asking about a chop shop, but I ain't --
23   no.
24       Q.   You didn't say that to him?
25       A.   No, I didn't.

197

1        Q.   You didn't mention that in your direct
2    examination about that.
3        A.   I also didn't mention the part where -- part
4    where Anthony stated on -- that he seen a carjacking on
5    the Internet.
6        Q.   So there was actually something placed on the
7    Internet that there was a carjacking?
8        A.   Yes, in a blue Lexus.
9        Q.   You're talking about Lantern Point, right?
10       A.   I don't know exactly, but --
11       Q.   Do you know where Lantern Point Drive is?
12       A.   No, I don't.
13       Q.   You ever been over by that Astrodome area?
14       A.   Yes, I have.
15       Q.   So you're not familiar with any kind of
16   television broadcast regarding the case that we're in
17   trial for here prior to picking up Charles Mamou on
18   Monday morning?
19       A.   No.
20       Q.   When is the first time you see a TV report of
21   that?
22       A.   When they dropped me off home and they went to
23   go eat.
24       Q.   When you saw that, was it obvious to you that
25   maybe there was some connection there?   Did it concern

198

1    you there may have been a connection?
2        A.   Yes.
3        Q.   And Chucky had not said anything to you up to
4    that point, acknowledging that he had done anything
5    other than he had gotten a Lexus?
6        A.   That's it.
7        Q.   And he showed you some keys to a Lexus?
8        A.   That's it.
9        Q.   How long was Anthony gone with Chucky before
10   they came back and got you again?
11       A.   Roughly, about an hour.
12       Q.   Now when you're having this conversation with
13   the defendant later on -- says, Later on I spoke with
14   Charles -- are you face-to-face?
15       A.   Yes.
16       Q.   Where are you?
17       A.   On the porch.
18       Q.   Whose porch?
19       A.   Stephanie's porch, my sister.
20       Q.   Now you gave a whole lot of information in
21   response to the prosecutor's questions about
22   conversations you had with Charles and go into detail
23   about the jack on jack and these guys had a Bible.
24   There was a shoot-out and goes into detail about where
25   the people were shot and everything.  And then, also

199

1  talking about that the girl had been shot, that they had
2  been outside. And he asked you about talking with
3  Detective Novak, and she supposedly had performed oral
4  sex on him. When do you get that information? What
5  time is that?
6      A.  I don't really recall. I got, like I said,
7  bits and pieces in person.
8      Q.  So a lot of this information, bits and pieces,
9  is it coming from a different source other than Charles?
10     A.  No.
11     Q.  Everything that you said here in court today
12 you're attributing to him?
13     A.  Yeah, everything I said that was told to me was
14 told to me by him.
15     Q.  Is it one conversation or several?
16     A.  It was several.
17     Q.  Over what period of time?
18     A.  I don't really recall, a couple of days.
19     Q.  So it's not just Monday; it's Monday and
20 Tuesday?
21     A.  To the best of my knowledge, yeah.
22     Q.  Okay. Are you calling him?
23     A.  No.
24     Q.  And when he calls you, are you asking him
25 questions about the situation? Is he just volunteering,

200

1  I just need to tell you, cuz, I shot this girl?
2      A.  I'm asking.
3      Q.  So you're questioning him. Had you already
4  been seen by the police at that time?
5      A.  No.
6      Q.  When is the first time the police come to talk
7  to you?
8      A.  When they picked me up, after they picked him
9  up.
10     Q.  When was that?
11     A.  I don't remember exact date.
12     Q.  It would have been after the Monday or Tuesday?
13     A.  Yeah, it was after that.
14     Q.  And at that point in time, what exactly are you
15 thinking at the time that you were picked up by the
16 police? Is it clear to you that they are looking at you
17 as a suspect for capital murder?
18     A.  Yeah, it was clear to me.
19     Q.  Was that made real clear to you by the
20 detectives you were with?
21     A.  Not real clear, but --
22     Q.  Clear enough?
23     A.  In so many words, yeah.
24     Q.  So at that point, is it a fair statement to say
25 you're very concerned about your future and what might

201

1  happen to you?
2      A.  Yeah, it's a fair statement.
3      Q.  Was it also obvious to you that the
4  detective -- and we're talking about Novak, right?
5      A.  Correct.
6      Q.  Was it obvious to you that he was interested in
7  you giving any information you could about Charles
8  Mamou?
9      A.  That was obvious, plus the information of my
10 whereabouts at the time.
11     Q.  Okay. So he was trying to confirm where you
12 were at the time of the shootings, and he was interested
13 in you giving him information about your cousin?
14     A.  Yes.
15     Q.  Thank you.
16         MR. HILL:  Judge, I have no further
17 questions. Pass the witness.
18              REDIRECT EXAMINATION
19 BY MR. MCCLELLAN:
20     Q.  Mr. Dodson, during one of the conversations you
21 had with the defendant when he was calling back checking
22 what the news was saying, did he inquire about the
23 condition of the people that he had shot?
24     A.  Yes.
25     Q.  Did he tell you whether or not he thought he

202

1  had killed everybody there?
2      A.  I don't recall.
3      Q.  Did you tell him what the condition was of the
4  people that -- the fact that some people lived?
5      A.  Yes.
6      Q.  What was his reaction?
7      A.  He just asked me who lived.
8      Q.  Asked you which ones lived?
9      A.  Yeah.
10     Q.  I believe in response to Mr. Hill's question,
11 you said the police didn't come by to pick you up to
12 come down to give a statement until after the defendant
13 had been arrested?
14     A.  Correct.
15     Q.  Now you called the police, didn't you, or your
16 sister?
17     A.  I was told by my uncle.
18     Q.  Your uncle being who?
19     A.  Charles Mamou, Sr.
20     Q.  All right.
21     A.  That the homicide division had just left his
22 place with a mug shot of me and Chucky, Charles. I
23 asked him for Novak's number. When I called, he wasn't
24 in.
25     Q.  But did your -- did they call back?

203

1   A.   Yeah, they called back later on.
2   Q.   You left a message with a number you could be
3   reached at, right?
4   A.   No.
5   Q.   How did they know to call back to you?
6   A.   Through Anthony.
7   Q.   Who?
8   A.   Anthony.
9   Q.   Anthony Trail.  Do you know whether or not --
10  Stephanie Mamou is your sister, right?
11  A.   Correct.
12  Q.   Do you know whether or not Stephanie Mamou
13  called Sergeant Novak?
14  A.   Yes, she did.
15  Q.   And after that -- in fact, you asked people to
16  come over and pick you up and bring you down to make a
17  statement, right?
18  A.   Correct.
19  Q.   Did Stephanie go down with you?
20  A.   No.
21  Q.   Just you?
22  A.   And Anthony.
23  Q.   Because you didn't show -- did you show the
24  detectives where Baldy -- I mean, not Baldy, but where
25  Bug lived?

204

1   A.   Yes.
2   Q.   All right.  And did you make a call over to
3   Anthony's house?
4   A.   No.
5   Q.   Or did Anthony call you?
6   A.   No.
7   Q.   Did Anthony come down to make a statement about
8   the same time you came down?
9   A.   Yes.
10  Q.   Did y'all ride down together or different cars?
11  A.   Together.
12          MR. MCCLELLAN:  I'll pass the witness,
13  Your Honor.
14              RECROSS-EXAMINATION
15  BY MR. HILL:
16  Q.   Do you have any nicknames or other names you go
17  by?
18  A.   Yes.
19  Q.   What are they?
20  A.   Tator.
21  Q.   What does that stand for?
22  A.   It's just a nickname.
23  Q.   T-A-T-E-R?
24  A.   O-R.
25  Q.   Any other names you've ever gone by?

205

1   A.   That's it.
2   Q.   Thank you.
3          MR. HILL:  I have no further questions.
4          MR. MCCLELLAN:  Nothing further, Your
5   Honor.
6          THE COURT:  Call your next, please.
7          MR. MCCLELLAN:  State would call Anthony
8   Trail.
9          (Off-the-record discussion.)
10         THE COURT:  Ladies and gentlemen, we're
11  going to adjourn for the evening.  I didn't sit through
12  the voir dire examination; but I understand what was
13  told to you, you were told this case would not last more
14  than two weeks.  It's my understanding that that is
15  true.  We are going to work tomorrow evening until both
16  sides have rested and closed, till all the evidence is
17  in tomorrow, tomorrow evening, which means we may be
18  stopping at 3:30 or 4:00 o'clock, or it may be 8:00 p.m.
19  For whatever scheduling conflicts you may have, make
20  whatever arrangements you need to today or tonight or
21  tomorrow morning; because we're going to be here
22  tomorrow until we complete all the evidence in the case.
23         I'm not going to tell you about any kind
24  of scheduling conflicts, but we are not going to come in
25  on Monday.  You are not going to come in on Monday.  We

206

1   will be coming in on Monday.  We're going to argue this
2   case on Tuesday morning.  So, tomorrow you're going to
3   be here until everybody has closed.  Both sides have the
4   opportunity to put on anything they want to at that
5   point.  They'll rest.  They'll close.  That's the end of
6   the evidence in the case.  We're going to be working on
7   the Court's charge.
8          On Tuesday morning we'll come back in and
9   the case will be argued to you.  Nothing new will be
10  presented to you, just the arguments, reading of the
11  charge, and the arguments by both sides before you begin
12  deliberation.  And tomorrow I will give you some more
13  specific instructions as to exactly how that's going to
14  occur, but you don't need to know anything more about
15  that now.
16         We're going to ask you to return tomorrow
17  morning at 10:00 o'clock.  Again, wear your badges.  Be
18  seated in the jury room again.  Do not discuss this case
19  among yourselves or with anybody else, including
20  spouses.  You're not to discuss it among yourselves
21  until after both sides have argued the case to you and
22  twelve jurors are back deliberating the case sometime
23  Tuesday.  If anybody attempts to bring -- or talk to you
24  about the case, bring it to our attention immediately.
25  Do not make any kind of investigations, including scene

207

1  investigations.

2          I still haven't noticed members of the

3  media covering this.  And hopefully, we will get through

4  all the testimony before they discover we've been at

5  this, in case they want to cover it.  Anybody have any

6  special problems you need to bring to my attention?

7          JUROR:  I need a work slip for tomorrow.

8          THE COURT:  Okay.  You're aware that we

9  will give you one work slip that notifies your employer

10 of all the days and times you've been down here once the

11 trial is over, but you're working some kind of --

12         JUROR:  Well, right now -- I'm not working

13 right now because of this; but I go on to work the

14 weekend, though.

15         THE COURT:  What do you need your work

16 slip to say?

17         JUROR:  So they can pay me these days I'm

18 here.

19         THE COURT:  You just want it to say you've

20 been here all this week?  Anybody else have any special

21 problem?  Any requested admonishments or instructions

22 from the State or defense?

23         MR. HILL:  No, sir.

24         MR. MCCLELLAN:  No, sir, Your Honor.

25         (Court adjourned. )

---

208

1  THE STATE OF TEXAS   )

2  COUNTY OF HARRIS     )

3          I, Pamela Kay Knobloch, Official/Deputy
   Official Court Reporter in and for the 179th District
4  Court of Harris County, State of Texas, do hereby certify
   that the above and foregoing contains a true and correct
5  transcription of all portions of evidence and other
   proceedings requested in writing by counsel for the
6  parties to be included in this volume of the Reporter's
   Record, in the above-styled and numbered cause, all of
7  which occurred in open court or in chambers and were
   reported by me.

8

9          I further certify that this Reporter's Record
   of the proceedings truly and correctly reflects the
   exhibits, if any, admitted by the respective parties.

10

11         I further certify that the total cost for the
   preparation of this Reporter's Record is $_____ and
   was paid by Harris County.

12

13         WITNESS MY OFFICIAL HAND this the _____ day of
   _____, 2000.

14

15         _____

16 Pamela Kay Knobloch, Texas CSR No. 1650
   Expiration date:  12/31/2000
17 Official Court Reporter, 179th District Court
   Harris County, Texas
18 301 San Jacinto
   Houston, Texas 77002
19 713.755.6340

20 APPELLANT:  CHARLES MAMOU, JR.
             CAUSE NO. 800112

21

22
23
24
25

| | | | | |
|---|---|---|---|---|

**$9,000** [1] 68:22
**$** [1] 208:11

**'**

**'88** [1] 9:5
**'93** [1] 130:21
**'98** [1] 68:21

**0**

**0470500** [1] 2:5

**1**

**100** [1] 68:5
**10800** [2] 5:20 122:6
**10919** [2] 5:5 18:10
**10:00** [3] 142:4 148:25 206:17
**11:00** [4] 148:25 149:6 149:9 152:22
**12/31/2000** [1] 208:16
**12777** [1] 12:15
**12900** [1] 5:4
**12:00** [11] 19:3 60:23 124:24 124:25 125:1 149:7 149:9 152:13 152:22 155:7 155:18
**12:15** [1] 156:22
**12:30** [2] 60:23 156:2
**12:45** [7] 152:13 156:2 156:4 156:5 156:10 156:22 157:2
**13396100** [1] 2:3
**1402** [1] 124:11
**1650** [1] 208:16
**179th** [3] 1:11 208:3 208:17
**19** [1] 1:2
**1960** [1] 2:19
**1998** [25] 4:5 4:6 15:8 49:24 50:3 51:2 56:7 57:2 57:15 60:6 62:8 122:5 122:5 123:14 123:17 124:16 130:4 131:24 132:1 158:6 159:11 160:25 165:16 189:25 194:16
**1999** [1] 1:18
**1:00** [2] 152:13 153:7

**2**

**2** [2] 8:6 8:7
**200** [1] 54:16
**2000** [1] 208:13
**201** [1] 2:7
**21179300** [1] 2:18
**25** [3] 1:2 187:5 187:14
**2621** [1] 5:5
**281.587.0088** [1] 2:21
**28th** [4] 57:14 59:23 60:14 61:13
**2:00** [10] 124:23 124:24 124:25 125:1 126:8 126:9 127:1 135:14 143:16 146:6
**2:30** [10] 126:8 126:9 127:1 146:6 150:7 150:9 152:23 153:10 153:13 156:20

**3**

**30** [1] 59:16
**301** [1] 208:18
**31** [4] 23:20 38:14 170:11 192:7
**3:00** [14] 3:24 4:2 4:8 59:2 59:4 59:7 59:8 59:9 64:24 64:24 64:25 65:23 80:5 135:14
**3:30** [1] 205:18
**3rd** [3] 132:25 133:6 133:7

**4**

**40** [2] 19:23 167:15
**45** [7] 52:24 67:12 67:13 67:14 67:16 67:21 77:19
**4615** [1] 2:14
**4:00** [6] 3:24 4:2 4:8 64:25 135:12 205:18
**4:30** [1] 135:17
**4:45** [1] 135:17
**4th** [1] 138:12

**5**

**5629** [1] 2:19
**59** [8] 52:24 52:24 53:2 67:14 67:15 67:17 67:21 77:22
**59656300** [1] 2:13
**5:00** [6] 59:3 59:4 59:5 59:7 59:8 59:10

**6**

**6** [3] 9:20 10:3 10:6
**61** [3] 12:3 12:10 12:13
**610** [17] 31:18 31:19 31:21 43:5 43:6 43:8 43:11 67:16 77:19 77:19 85:1 85:8 85:12 86:5 114:5 114:15 114:18
**62** [1] 48:14
**6:30** [2] 3:20 117:16
**6th** [32] 15:8 20:2 49:24 50:3 51:2 56:7 57:5 59:25 60:6 60:14 61:13 62:8 62:13 62:25 71:21 117:3 118:25 123:14 123:17 124:16 124:19 125:1 130:4 131:18 131:19 132:8 133:4 165:16 185:9 186:7 189:21 189:25

**7**

**7** [3] 9:20 10:4 10:6
**713.623.8312** [1] 2:16
**713.755.5800** [1] 2:9
**713.755.6340** [1] 208:19
**76** [7] 32:21 37:23 37:25 104:20 104:22 107:4 108:14
**77** [1] 33:1
**77002** [2] 2:8 208:18
**77027** [1] 2:15
**77069** [1] 2:20
**7:00** [11] 3:20 59:6 117:17 125:9 125:11 137:5 145:7 145:12 146:10 172:11 194:19
**7:30** [1] 126:1
**7th** [2] 1:18 151:3

**8**

**8** [4] 9:20 10:4 10:6 68:22
**8-something-45** [1] 159:21
**800112** [2] 1:3 208:20
**83** [16] 27:16 27:22 27:24 32:15 33:25 34:1 34:3 37:23 37:25 40:21 47:23 89:8 104:16 104:22 107:7 169:1
**86** [9] 27:8 27:22 32:15 37:23 41:13 41:14 104:13 104:23 169:1
**87** [4] 11:8 11:12 11:15 167:7
**88** [11] 8:23 8:25 9:3 11:5 11:17 21:22 22:11 24:19 30:10 70:17 70:19
**8:00** [4] 126:1 172:11 194:19 205:18
**8th** [5] 4:5 127:20 127:21 158:6 159:2

**9**

**90** [1] 68:5

**9:00** [1] 142:4
**9th** [5] 4:6 117:13 154:20 159:11 160:25

[1] 208:12
_____
_____
[1] 208:15

**A**

**A.A.** [2] 137:13 137:14
**Abandoned** [1] 183:14
**Able** [9] 8:1 45:20 79:7 88:22 94:8 94:10 111:19 112:23 114:4
**Above-entitled** [1] 1:19
**Above-styled** [1] 208:6
**Accelerate** [2] 94:22 95:21
**Access** [1] 30:24
**Accident** [1] 96:17
**According** [2] 90:5 108:24
**Accurately** [1] 12:3
**Acknowledging** [1] 198:4
**Activity** [1] 141:14
**Addition** [1] 10:12
**Address** [6] 12:7 12:7 12:14 159:5 159:20 180:23
**Adjourn** [1] 205:11
**Adjourned** [1] 207:25
**Admitted** [7] 9:5 10:7 11:3 11:15 12:13 116:19 208:9
**Admonishments** [1] 207:21
**Admonitions** [1] 120:17
**Afternoon** [7] 3:21 3:23 3:25 4:2 65:23 80:5 125:2
**Aggravated** [1] 98:17
**Ago** [1] 56:2
**Agreement** [2] 69:1 136:13
**Ahead** [5] 97:13 105:8 109:6 112:18 155:19
**Aided** [1] 1:22
**Ain't** [6] 166:19 168:11 185:20 192:12 193:14 196:22
**Air-condition** [1] 73:1
**Air-conditioning** [1] 72:25
**Airport** [7] 53:9 55:11 55:11 55:12 55:12 55:21 57:23
**Alleged** [1] 184:16
**Allow** [3] 75:5 129:1 180:11
**Alone** [2] 141:10 150:13
**Alongside** [2] 110:18 111:21
**Amount** [1] 24:15
**Analysis** [1] 16:19
**Angel** [1] 151:17
**Animated** [1] 75:18
**Answer** [3] 71:12 75:6 164:7
**Answers** [1] 164:6
**Anthony** [30] 11:20 12:4 12:15 12:19 173:2 173:4 173:4 173:6 174:19 175:2 176:1 176:4 177:1 177:12 177:21 177:23 183:16 183:20 194:21 194:25 194:25 197:4 198:9 203:6 203:8 203:9 203:22 204:5 204:7 205:7
**Anthony's** [3] 176:5 177:3 204:3
**Anyplace** [1] 184:19
**Apart** [1] 94:10
**Apartment** [45] 5:5 5:7 5:

**16** 5:18 5:19
31:23 22:8 22:9 24:2 30:21
30:22 31:2 31:5 69:21 81:13
81:16 82:2 124:8 124:10 124:
13 124:17 124:20 126:5 127:
4 128:14 129:2 132:25 135:
24 136:10 139:17 143:23 144:
3 145:14 153:20 154:7 155:6
161:12 162:7 180:25 183:13
189:5 193:7
**Apartments** [4] 5:13 18:19 21:23 21:24
**Appear** [1] 48:15
**Appeared** [4] 8:5 8:7 22:10 80:6
**Appellant** [2] 1:6 208:20
**Appellee** [1] 1:11
**Applies** [1] 7:3
**Approach** [7] 8:19 9:15 89:4 154:9 154:12 155:10 163:12
**Area** [19] 13:1 28:14 51:16 51:17 51:18 54:18 55:5 70:3 78:15 81:24 88:22 91:6 94:18 97:11 100:16 158:19 166:1 190:20 197:13
**Argue** [1] 206:1
**Argued** [2] 206:9 206:21
**Arguments** [2] 206:10 206:11
**Arm** [2] 108:22 179:20
**Arrangements** [1] 205:20
**Arrest** [6] 116:10 117:25 161:25 163:1 184:22 184:23
**Arrested** [5] 53:15 98:13 117:10 117:11 202:13
**Arrive** [2] 128:21 173:13
**Arrived** [2] 58:9 168:2
**Ashford** [2] 12:15 13:4
**Asleep** [8] 115:13 136:24 137:2 137:20 142:7 146:23 150:22 151:5
**Assembly** [1] 142:13
**Assigned** [2] 157:25 158:1
**Assistant** [1] 2:6
**Associate** [1] 54:20
**Assume** [2] 125:1 156:9 157:19
**Astrodome** [6] 85:20 92:18 95:14 95:15 95:18 197:13
**Ate** [2] 30:20 142:19
**Attach** [2] 4:1 8:24
**Attaching** [1] 76:25
**Attempt** [3] 13:20 13:23 14:1
**Attempted** [1] 129:25
**Attempting** [3] 38:22 109:8 160:5
**Attempts** [1] 206:23
**Attention** [11] 15:7 91:12 91:17 122:4 124:15 152:25 154:22 158:5 165:16 206:24 207:6
**Attorney** [1] 117:5
**Attorneys** [3] 2:6 2:10 2:22
**Attributing** [1] 199:12
**Autopsy** [1] 9:13
**Awake** [1] 81:21
**Aware** [3] 116:1 118:11 207:8
**Awful** [1] 149:19
**Awhile** [3] 90:8 135:19 149:25
**Awoken** [1] 149:23

**B**

**Background** [1] 50:17
**Backing** [2] 113:12 113:14
**Backseat** [4] 24:21 28:6

29:17 29:18

**Backside** [2] 39:19 39:20
**Backtrack** [1] 126:11
**Backup** [1] 193:18
**Backwards** [1] 131:19
**Badeaux** [4] 157:9 157:10 157:15 157:16
**Badges** [1] 206:17
**Bag** [17] 23:16 23:22 26:19 26:20 29:25 38:12 80:8 80:9 80:11 80:14 80:16 80:17 138: 22 170:12 192:4 192:6 192:14
**Baldy** [2] 203:24 203:24
**Barbeque** [16] 22:22 22: 24 25:5 25:7 25:14 26:8 27: 23 69:24 82:9 83:5 83:6 83: 9 83:25 100:11 168:14 169:20
**Basic** [1] 72:7
**Basketball** [2] 127:6 138: 14
**Baskets** [1] 127:14
**Bayou** [1] 115:1
**Bear** [1] 112:24
**Beaumont** [1] 52:5
**Bed** [8] 115:16 115:18 115: 20 148:23 149:5 149:24 152: 22 153:17
**Bedroom** [6] 135:24 135:25 136:1 136:4 150:19 161:24
**Beechnut** [3] 166:13 188: 21 193:7
**Beeping** [1] 114:9
**Beer** [5] 134:10 145:15 156: 14 167:20 167:22
**Beers** [2] 131:7 148:5
**Begin** [3] 39:7 158:17 206: 11
**Beginning** [1] 54:3
**Behind** [10] 5:18 42:18 43: 1 78:25 96:9 96:19 96:20 96: 21 109:24 186:7
**Belfort** [4] 55:15 85:1 85: 3 195:10
**Belief** [2] 98:16 98:25
**Bell** [2] 85:5 195:22
**Belonging** [1] 162:14
**Beltway** [1] 55:24
**Bennigan's** [22] 31:8 31: 10 31:15 31:17 33:6 33:8 33: 16 35:2 35:4 84:13 84:18 84: 18 84:25 85:16 86:9 86:11 87:1 87:10 88:19 88:20 90: 24 92:15
**Best** [3] 3:15 50:5 199:21
**Between** [36] 4:8 24:25 31: 23 35:23 59:2 59:4 59:5 59: 7 59:7 59:9 60:4 60:14 61: 13 64:4 70:4 78:5 79:4 82: 19 82:20 82:21 83:9 91:6 94: 5 97:12 106:17 124:24 124: 25 125:1 132:8 139:22 143: 16 146:10 148:10 169:23 174: 18 194:19
**Bible** [2] 179:1 198:23
**Bicycle** [2] 100:24 140:5
**Big** [5] 94:7 105:3 112:6 112:8 196:1
**Bike** [3] 140:6 147:9 147:10
**Bingham** [1] 128:15
**Birthday** [1] 165:20
**Bit** [10] 54:6 78:16 80:23 81:1 81:12 101:14 109:14 121:7 130:13 191:22
**Bits** [4] 176:12 176:13 199: 7 199:8
**Black** [9] 12:17 16:13 16: 22 54:16 122:18 122:19 122: 20 165:11 184:5
**Block** [3] 5:9 5:20 35:5
**Blocks** [1] 5:9
**Blue** [21] 5:17 25:20 73:5

77:8 77:9 94:15 96:10 103: 103:10 103:14 106:2 109:4 113:18 118:21 119:21 162:17 168:22 174:9 175:21 190:11 197:8
**Blue-colored** [1] 162:17
**Body** [3] 9:25 20:7 20:7
**Booked** [1] 162:4
**Bought** [2] 22:17
**Boy** [1] 50:25
**Braes** [1] 115:1
**Braeswood** [9] 43:11 55: 17 67:16 86:2 86:4 114:18 114:21 114:25 142:13
**Brakes** [1] 96:14
**Break** [1] 49:7
**Brief** [2] 49:9 163:16
**Briefly** [3] 16:11 122:15 165:9
**Bright** [1] 190:24
**Brightly** [1] 100:16
**Bring** [8] 26:20 186:19 186:20 196:17 203:16 206:23 206:24 207:6
**Bringing** [1] 138:22
**Broadcast** [1] 197:16
**Broadway** [1] 53:8
**Broke** [1] 182:12
**Brother** [4] 61:3 61:9 63: 8 136:16
**Brother's** [1] 61:4
**Brothers** [1] 58:4
**Brought** [6] 3:1 49:10 120: 20 147:14 162:4 163:17
**Buck** [2] 167:3 167:4
**Bud** [2] 167:3 167:4
**Buffalo** [2] 92:22 92:25
**Bug** [37] 11:18 11:18 49:1 49:2 49:3 49:3 126:14 126: 15 126:17 140:15 140:16 140: 17 140:19 141:4 141:15 143:5 143:16 144:10 145:15 145:13 145:18 145:24 146:11 148:13 172:15 185:11 187:6 187:7 187:10 188:14 188:20 190:10 191:1 193:11 195:11 195:14 203:25
**Bug's** [1] 190:6
**Building** [4] 36:3 94:4 94:16 95:3
**Buildings** [9] 35:6 35:14 36:2 36:12 36:13 36:14 36: 15 93:6 94:19
**Bumped** [1] 90:24
**Bunch** [2] 98:10 141:16
**Burden** [1] 7:1
**Burger** [5] 173:12 173:13 173:22 195:7 196:11
**Burgers** [1] 90:12
**Burgundy** [1] 122:17
**Burned** [2] 179:3 179:4
**Bus** [10] 135:11 135:11 135: 15 136:21 177:19 182:20 182: 23 182:24 182:25 183:8
**Business** [6] 3:20 65:5 66:20 67:2 67:3 67:3
**Businesses** [1] 29:3
**Buy** [3] 24:6 68:15 170:5
**Buying** [1] 68:17

---

# C

**Calculate** [1] 85:24
**Cannot** [1] 7:22
**Capital** [2] 98:17 200:17
**Car** [173] 19:15 19:16 19: 20 19:20 19:25 20:1 20:4 20: 8 20:13 21:4 21:7 23:9 24: 19 26:3 26:12 26:18 26:20 26:23 27:1 28:7 29:14 29:22

36:3 32:4 33:18 33:19 34: 35:18 37:6 37:14 37:15 37: 17 38:4 38:5 38:8 38:9 38: 15 38:21 39:3 39:4 39:5 39: 15 39:15 39:18 40:2 40:4 40: 5 40:8 41:4 42:21 45:14 46: 5 46:14 46:16 48:5 48:6 48: 9 48:11 61:20 67:5 68:8 68: 9 69:21 69:25 70:1 70:2 72: 11 72:14 72:17 73:5 73:6 73: 8 73:8 73:9 73:13 76:4 76:5 76:7 76:9 76:16 76:19 76:20 76:21 76:22 77:6 77:8 78:2 78:3 78:5 78:7 79:7 80:25 81:2 86:17 89:11 89:1 91:8 91:9 91:11 91:13 93:8 93:10 94:3 94:9 94:9 94:13 96:10 96:21 97:19 98:1 99:3 99:23 101:2 101:3 101:4 101:13 102:10 102:11 102:12 104:19 104:20 104:23 104:25 105:2 105:4 105:5 105:12 106:15 106:16 106:20 106:20 106:24 108:8 109:8 109:18 110:10 110:11 110:15 110:9 110:21 110:24 111:11 111:25 112:6 112:20 113:21 114:3 114:4 144:4 147:11 147:12 147:13 147:23 166:17 166:20 167:10 167:16 168:16 168:23 169:8 173:16 173:23 175:11 175:14 176:5 176:17 176:18 179:6 190:7 191:5 192:15 192:18 192:19
**Care** [5] 13:11 13:17 13:18 67:3 127:11
**Careful** [1] 105:23
**Carjacking** [2] 197:4 197: 7
**Carmouche** [4] 9:25 10:14 10:22 15:18
**Carmouche's** [1] 10:20
**Carriers** [1] 164:15
**Carrying** [1] 151:12
**Cars** [12] 37:11 91:10 93: 16 100:13 100:23 101:18 106: 14 106:18 113:15 169:23 171: 10 204:10
**Case** [24] 7:5 7:18 7:19 8: 3 8:11 13:20 49:24 56:4 56: 9 56:12 117:6 130:8 184:13 197:16 205:13 205:22 206:2 206:6 206:9 206:18 206:21 206:22 206:24 207:5
**Casual** [2] 131:11 145:23
**Catch** [2] 67:15 114:4
**Caused** [2] 58:5 109:13
**Causes** [2] 112:22 149:17
**Cavalcade** [11] 28:14 28: 22 29:12 70:4 70:4 77:12 77: 15 77:21 79:4 83:7 83:9
**Ced** [2] 64:18 64:18
**Cell** [18] 23:4 23:6 23:8 25:1 31:1 82:7 82:8 82:11 83:10 83:14 83:16 83:24 93: 20 94:1 97:8 125:21 138:19 141:20
**Center** [7] 28:23 28:24 28: 25 29:3 29:11 77:25 83:10
**Certain** [4] 24:15 154:5 158:12 180:14
**Certainly** [1] 87:20
**Certify** [3] 208:4 208:8 208:10
**Cetera** [1] 190:18
**Chambers** [1] 208:7
**Characteristics** [1] 6:6
**Charge** [4] 112:8 151:11 206:7 206:11
**Charged** [6] 98:16 112:6 112:9 112:10 116:11 184:25
**Charles** [135] 1:5 3:10 8: 7 15:25 16:6 17:14 17:18 17: 18:24 19:5 20:12 20:14 21: 23 24:3 23:22 24:4 24:15 25:13 26:2 26:12 26:17

15:29:24 29:24
30:3 31:11 32:5 33:14 33:21
34:3 34:14 35:10 36:6 36:20
37:1 37:17 38:7 38:21 42:9
42:10 43:16 43:18 44:21 47:
11 48:19 57:12 58:1 59:25
62:9 69:25 70:23 74:5 74:19
75:3 75:25 76:7 76:9 76:19
76:21 79:20 80:1 80:4 96:5
96:6 97:8 97:10 106:8 108:
10 109:17 109:24 110:9 111:
2 111:20 111:24 112:2 112:
10 112:21 113:16 113:17 122:
10 122:25 123:12 123:14 123:
17 124:12 124:16 128:3 128:
7 128:20 128:25 129:10 129:
13 133:17 158:15 158:18 158:
22 158:25 159:13 159:25 164:
18 165:6 165:17 166:21 169:
9 169:11 170:8 171:11 172:
15 172:20 174:11 182:14 182:
19 183:15 183:18 186:10 187:
11 188:14 189:18 189:25 192:
6 193:11 194:20 195:5 196:
10 197:17 198:14 198:22 199:
9 201:7 202:19 202:22 208:20
**Charles'** [1] 29:20
**Chatting** [1] 148:2
**Check** [3] 182:23 182:24 182:25
**Checking** [1] 201:21
**Chicken** [1] 90:12
**Child** [7] 50:23 56:22 56: 22 56:23 61:10 127:11 136:2
**Child's** [1] 136:23
**Children** [3] 50:21 121: 23 122:2
**Chitchat** [1] 60:10
**Chitchatting** [1] 156:13
**Chop** [2] 196:20 196:22
**Chose** [1] 190:19
**Chronology** [1] 3:9
**Chrysler** [1] 19:17
**Chuck** [1] 149:12
**Chucky** [32] 16:3 17:4 22: 19 25:11 32:5 58:11 59:25 81:23 87:8 88:14 92:8 93:10 94:1 105:20 105:23 112:25 122:11 128:25 129:4 131:7 143:20 144:24 144:24 145:2 145:11 145:13 148:13 149:18 158:16 198:3 198:9 202:22
**Chucky's** [2] 136:23 196:3
**Chunked** [1] 182:12
**Church** [6] 61:11 64:25 95: 5 142:3 142:12 142:16
**Circled** [3] 35:5 37:7 37: 10
**City** [4] 4:14 51:14 51:15
**CLAIRE** [1] 2:4
**Classic** [3] 91:9 91:9 91: 13
**Clear** [9] 68:23 180:10 188:12 188:17 200:16 200:18 200:19 200:21 200:22
**Close** [12] 5:11 16:21 88: 24 100:23 109:4 113:20 119: 24 120:1 120:4 140:24 153: 16 205:5
**Closed** [8] 29:5 38:25 42:. 17 113:11 171:3 171:4 205: 16 206:3
**Closer** [1] 135:12
**Closest** [2] 55:10 195:9
**Closet** [2] 161:24 161:24
**Clothes** [3] 138:23 138:24
**Club** [3] 134:1 134:8 134:9
**Cocaine** [1] 185:5
**Coherent** [1] 13:25
**Collingsworth** [4] 28:13 28:22 29:12 70:4
**Color** [13] 6:6 16:16 16: 19 19:18 25:19 168:21 174:6

Colored [1] 162:17

Comfortable [1] 188:6

Coming [17] 39:16 52:5 73:9 139:17 141:17 142:23 144:10 144:13 144:13 146:12 149:10 150:5 152:23 154:23 155:5 199:9 206:1

Comment [1] 149:17

Comments [1] 148:12

Commonly [1] 55:5

Company [2] 146:22 148:13

Compare [1] 191:18

Complete [1] 205:22

Completely [1] 108:15

Complex [2] 5:10 5:14

Computer [1] 1:22

Concentrate [1] 71:21

Concern [4] 71:3 78:18 185:2 197:25

Concerned [13] 71:6 71:8 71:9 71:10 71:19 71:20 71:24 78:17 80:23 117:2 184:24 193:21 200:25

Concerning [1] 80:25

Conclusion [1] 194:10

Concord [2] 19:17 20:10

Condition [2] 201:23 202:3

Conduct [3] 69:2 69:6 69:8

Conducted [1] 161:15

Confirm [1] 201:11

Conflicts [2] 205:19 205:24

Connection [3] 17:22 197:25 198:1

CONNORS [1] 2:4

Conscious [1] 13:17

Consent [1] 161:11

Consider [1] 21:24

Consist [1] 51:16

Conspire [1] 68:24

Contact [5] 57:11 145:2 160:20 165:24 194:19

Contacted [2] 158:23 160:16

Contains [1] 208:4

Continually [1] 37:2

Continue [1] 79:7

Continued [3] 3:6 43:8 110:17

Continuing [1] 79:9

Control [3] 14:23 44:1 51:8

Controlled [2] 151:13 151:15

Convenience [1] 167:20

Conversation [14] 19:5 26:22 128:6 128:10 131:11 139:12 145:23 158:10 174:18 188:13 193:8 196:17 198:12 199:15

Conversations [5] 24:25 82:22 186:10 198:22 201:20

Convicted [1] 151:9

Cool [4] 65:18 86:14 139:14 142:10

Cooperate [1] 161:6

Cooperative [1] 161:7

Corner [2] 122:17 140:5

Correct [39] 4:12 4:16 4:19 5:3 7:17 7:20 7:24 8:2 9:9 10:17 12:8 49:16 49:25 50:14 55:13 55:15 55:17 69:9 85:3 98:13 102:12 110:2 110:23 114:24 114:25 119:18 129:20 130:1 130:5 136:8 145:9 162:21 184:9 184:10 201:5

Correctly [1] 208:9

Cost [1] 208:10

Couch [1] 135:22

Counsel [4] 11:1 11:13 12:11 208:5

Count [1] 163:2

County [12] 1:8 1:21 9:11 12:22 13:1 15:4 122:7 164:16 208:2 208:4 208:11 208:17

Couple [5] 5:21 46:17 57:2 58:19 58:22 84:3 96:11 96:12 123:8 131:14 132:4 133:13 143:10 148:5 162:11 189:23 189:24 199:18

Course [3] 61:15 85:9 187:21

Court [59] 1:3 1:5 3:2 4:20 4:23 5:12 7:4 8:21 9:5 9:7 9:17 10:6 11:3 11:15 12:13 13:15 14:8 14:12 16:16 16:20 16:24 17:2 49:6 49:11 50:12 66:24 74:24 75:5 89:6 102:19 119:1 120:15 120:21 120:25 122:23 154:11 155:11 157:8 161:10 163:10 163:13 163:18 163:22 165:14 175:7 180:11 194:11 199:11 205:6 205:10 207:8 207:15 207:19 207:25 208:3 208:4 208:7 208:17 208:17

Court's [1] 206:7

Courtroom [1] 16:8 122:13 165:7

Cousin [21] 21:10 21:11 26:2 29:15 29:20 30:9 69:23 69:25 70:6 76:13 77:1 148:19 164:21 165:2 165:3 173:1 183:20 186:4 196:3 196:4 201:13

Cover [1] 207:5

Coverage [1] 175:3

Covering [1] 207:3

Cream [1] 90:14

Crime [3] 7:15 98:18 184:25

Crimes [2] 158:1 158:3

Cross [1] 3:4

CROSS-EXAMINATION [5] 3:6 49:13 129:17 162:12 184:7

CSR [1] 208:16

Custody [2] 53:17 53:20 170:10

Cut [4] 23:14 23:17 29:25 170:10

Cut-up [3] 23:17 29:25 170:10

Cutting [4] 23:13 23:23 24:17 24:23

Cuz [1] 200:1

**D**

Daily [1] 65:3

Dark [9] 29:9 29:10 36:4 77:11 95:12 100:18 100:22 145:9 171:6

Darkness [1] 103:25

Date [10] 4:1 4:2 4:3 56:7 117:3 130:11 130:11 165:19 200:11 208:16

Daughter [2] 137:5 142:5

Daylight [1] 171:5

Days [8] 46:17 53:25 123:21 123:22 124:6 199:18 207:10 207:17

Deal [28] 24:9 30:7 45:21 72:5 79:10 79:14 81:8 82:24 86:23 87:13 87:18 90:19 98:5 98:6 99:5 105:16 138:5 170:19 171:14 171:25 186:7 186:12 186:16 188:17 189:1 189:7 189:13 190:23

Deals [1] 58:16

December [1] 4:1

7 17:5 20:2 49:24 50:3 51:2 56:6 57:2 57:5 57:13 57:17 59:25 60:6 60:14 61:13 62:8 62:13 62:24 68:21 71:21 117:3 117:13 118:25 122:4 122:5 123:14 123:17 124:15 124:19 124:25 127:19 127:20 130:4 131:18 131:19 131:24 132:8 133:1 133:4 138:12 151:3 154:19 158:6 159:11 160:25 165:16 185:9 186:7 189:21 189:25 190:4 194:16

Deep [1] 122:4

Defendant [23] 2:22 16:17 17:1 122:22 152:23 165:1 165:13 174:19 175:14 175:22 176:4 176:10 176:25 177:2 177:5 177:12 177:15 177:25 183:9 183:25 198:13 201:21 202:12

Defendant's [3] 9:20 10:3 10:6

Defense [6] 3:3 11:1 11:13 12:11 129:25 207:22

Deliberating [1] 206:22

Deliberation [1] 206:12

Dennis [3] 160:19 160:21 161:17

Department [2] 158:8 181:20

Depicted [1] 8:24

Depicts [1] 12:4

Describe [8] 16:11 36:9 54:15 77:24 122:15 165:9 174:21 196:10

Described [4] 106:1 118:19 179:15 179:16

Describing [1] 45:13

Description [1] 183:11

Detail [4] 174:7 174:8 198:22 198:24

Detective [10] 3:8 5:23 8:22 9:18 10:12 14:5 53:22 158:7 199:3 201:4

Detectives [3] 118:18 200:20 203:24

Detention [1] 53:24

Determine [1] 158:17

Diagram [1] 12:17

Dicky [4] 4:18 4:22 4:24 4:25

Different [7] 4:14 5:13 31:19 45:14 191:19 199:9 204:10

Difficult [1] 156:16

Dig [1] 51:11

Dinner [2] 81:15 81:17

Dion [4] 15:11 89:9 104:16

Dire [1] 205:12

Direct [16] 14:18 25:8 25:9 49:12 53:14 73:18 77:11 93:15 121:3 122:4 154:22 157:12 158:5 164:3 165:15 197:1

Directed [1] 25:10

Directing [2] 15:7 124:15

Direction [16] 39:12 39:13 40:1 40:7 40:11 40:13 42:19 42:22 73:22 73:22 92:12 95:18 110:17 110:23 111:25 112:3

Directly [1] 115:10

Discover [1] 207:4

Discuss [6] 58:15 63:23 138:4 189:3 206:18 206:20

Discussed [1] 169:25

Discussion [8] 7:13 87:13 97:12 148:10 154:13 171:13 175:12 205:9

Dispose [1] 15:1

Distance [4] 13:3 94:10 114:7 114:8

District [5] 1:5 1:11 2:6 208:3 208:17

Division [6] 13:9 117:21 157:24 158:2 158:3 202:21

Doctors [1] 9:12

Document [2] 154:15 155:19

Dodson [19] 3:12 3:18 3:22 4:3 4:9 8:17 9:1 11:5 11:6 15:21 26:13 70:11 140:10 163:21 164:1 164:5 164:9 184:9 201:20

Dome [1] 86:7

Done [6] 65:8 99:1 99:2 102:10 185:4 198:4

Door [34] 38:24 38:25 42:17 45:24 46:2 46:4 60:25 61:1 80:11 84:11 84:12 86:11 101:24 102:2 109:14 109:15 109:22 109:24 110:12 111:1 111:2 111:4 111:16 111:17 111:23 113:11 113:20 133:9 143:19 150:6 150:16 153:1 153:16 153:17

Doors [2] 91:6 91:7

Doorstep [2] 62:12 62:24

Dope [20] 24:6 24:12 79:10 86:22 87:4 87:8 87:13 171:13 171:17 188:1 188:2 188:7 188:8 188:11 189:1 189:6 189:13 192:24 192:25 194:4

Down [43] 14:12 27:4 28:10 30:7 33:10 33:11 46:7 46:10 46:22 51:17 53:9 55:20 72:5 79:24 81:9 85:1 85:3 87:11 87:18 90:3 90:19 90:20 94:20 106:1 115:7 117:21 139:12 144:4 144:5 145:21 150:23 154:5 162:20 182:12 186:7 191:13 202:12 203:16 203:19 204:7 204:8 204:10 207:10

Downstairs [1] 84:20

Downtown [4] 52:5 52:19 53:2 77:18

Drank [1] 131:7

Dreams [1] 107:14

Drinking [3] 131:13 134:10 156:14

Drive [22] 31:15 51:17 67:23 69:13 69:23 79:7 81:14 84:23 92:12 92:12 92:21 94:20 95:24 114:15 118:9 132:21 159:22 173:10 184:18 185:5 190:7 197:11

Driven [1] 67:21

Driver [32] 27:22 27:25 40:10 40:11 41:4 41:5 41:7 41:9 41:12 41:14 41:17 98:5 99:7 100:9 100:11 101:3 102:10 103:14 104:12 104:13 104:24 108:7 112:20 112:20 112:23 164:15 166:21 166:22 166:24 167:10 170:22 191:20

Driver's [11] 30:24 73:10 103:5 103:16 106:11 106:20 106:23 109:18 109:20 110:18 167:1

Drives [2] 113:21 190:10

Driving [30] 20:1 21:4 21:6 23:12 24:22 32:6 32:7 42:6 45:18 52:23 67:6 67:25 68:2 70:20 71:21 72:4 80:25 85:10 95:14 96:19 97:11 99:5 109:7 113:15 113:24 134:21 145:25 145:25 186:6 190:7

Drop [2] 172:5 172:9

Dropped [8] 81:13 172:12 175:24 176:7 176:11 176:21 194:18 197:22

Dropping [1] 79:4

Drove [10] 26:6 28:16 30:9 30:12 43:19 70:3 99:2 144:8 180:4 180:5

**Drug** [8] 58:16 72:5 81:8 82:24 99:5 105:16 138:5 190:23

**Drugs** [13] 68:15 68:17 69:18 79:19 79:20 80:2 80:6 80:21 80:24 81:2 81:5 81:9 81:10

**Dude** [3] 179:20 179:22 179:25

**Due** [3] 55:19 86:4 136:13

**Dugas** [6] 160:19 160:21 161:2 161:17 162:6 162:25

**Duly** [4] 14:17 121:2 157:11 164:2

**Dunvale** [1] 59:15

**During** [21] 9:12 11:19 13:9 21:6 23:1 26:25 33:16 37:3 50:8 53:14 61:16 65:4 77:10 82:22 101:19 125:18 144:19 149:10 171:5 176:20 201:20

**Dust** [1] 151:17

### E

**Early** [3] 57:13 135:3 156:19

**East** [6] 52:4 52:5 55:13 85:4 85:12 86:4

**Eat** [10] 33:12 33:14 63:14 84:4 90:4 90:5 90:9 142:17 177:3 197:23

**Eating** [1] 177:8

**Effect** [2] 6:10 120:18

**Effectuate** [1] 163:1

**Effort** [1] 136:6

**Eighteen** [1] 157:23

**Either** [5] 28:13 28:21 37:15 167:3 179:13

**Employed** [6] 14:22 14:23 121:9 157:16 157:21 164:12

**Employer** [1] 207:9

**Employment** [1] 52:12

**Emptied** [1] 149:4

**End** [3] 54:1 144:25 206:5

**Ended** [1] 77:22

**Engage** [2] 69:2 69:6

**England** [17] 8:14 17:11 17:12 17:14 54:6 54:11 64:4 120:9 123:5 126:19 126:20 130:15 132:21 152:8 154:6 185:15 196:6

**England's** [5] 17:24 57:21 60:5 62:9 65:19

**Ensure** [1] 71:16

**Entering** [1] 148:16

**Entire** [5] 21:6 51:17 74:10 101:19 102:2

**Estimate** [6] 50:5 82:14 101:15 101:17 145:5 145:6

**Estimated** [1] 57:6

**Estimating** [1] 85:22

**Et** [1] 190:18

**Evening** [18] 20:17 30:15 40:25 58:6 59:2 62:20 82:3 83:18 125:10 125:11 133:11 134:25 139:5 150:7 172:13 205:11 205:15 205:17

**Event** [1] 47:10

**Events** [3] 115:14 123:12 185:9

**Eventually** [6] 54:4 55:21 63:9 63:10 136:15 160:20

**Everyday** [2] 71:10 71:20

**Evidence** [12] 9:3 10:25 11:12 12:10 19:23 32:21 167:7 169:1 205:16 205:22 206:6 208:5

**Exact** [2] 41:22 200:11

**Exactly** [11] 68:13 70:24 79:13 88:3 102:9 132:3 187:

**Examination** [11] 10:10 14:18 77:11 121:3 152:6 154:1 157:12 164:3 197:2 201:18 205:12

**Examine** [2] 12:25 46:16

**Examined** [1] 46:17

**Exchange** [1] 35:22

**Exciting** [2] 115:14 115:15

**Excuse** [1] 6:21

**Excused** [1] 163:9

**Exhibit** [33] 8:23 8:25 9:3 10:19 10:25 11:5 11:8 11:12 12:3 12:10 19:23 21:17 21:22 22:11 23:20 24:19 27:8 27:16 30:10 32:15 32:21 33:1 33:22 37:23 38:14 48:10 104:8 107:4 108:14 167:7 167:15 170:11 192:7

**Exhibits** [2] 169:1 208:9

**Exit** [5] 77:21 77:23 85:16 95:3 114:19

**Experienced** [1] 194:6

**Expiration** [1] 208:16

**Explain** [4] 56:18 66:6 79:12 113:4

**Explained** [1] 136:15

**Explaining** [1] 6:24

**Explanatory** [1] 45:6

**Exposure** [1] 117:6

**Eye** [1] 74:12

**Eyes** [1] 74:10

### F

**Face** [3] 10:14 198:14 198:14

**Face-to-face** [1] 198:14

**Facedown** [1] 6:18

**Facial** [1] 6:6

**Facility** [1] 162:5

**Facing** [8] 37:13 40:8 42:19 42:22 95:25 96:4 97:19 100:13

**Fact** [10] 65:18 69:5 89:21 116:1 119:10 179:15 184:24 191:23 202:4 203:15

**Fair** [3] 117:15 200:24 201:2

**Fairly** [2] 12:3 142:20

**Fall** [8] 107:5 107:10 107:13 107:15 108:5 108:15 111:19 146:23

**Falls** [1] 191:13

**Familiar** [2] 4:20 23:20 48:15 64:20 195:21 197:15

**Family** [5] 58:2 58:3 84:5 140:23 196:1

**Fan** [1] 103:12

**Fannin** [1] 2:7

**Far** [22] 5:6 18:18 22:4 36:11 36:13 92:21 94:3 96:9 100:25 101:3 101:4 101:11 101:12 101:18 138:20 159:17 160:13 180:12 180:22 183:12 195:11 195:13

**Fast** [4] 43:2 111:17 111:18 112:12

**Fastforward** [1] 81:12

**Father** [2] 10:14 10:20

**Fazed** [1] 89:21

**Feeder** [1] 85:8

**Feet** [5] 54:16 96:11 96:12 101:9 101:16

**Fellow** [2] 140:9 140:12

**Felony** [2] 69:8 151:9

**Female** [1] 179:5

**Few** [15] 56:1 123:13 123:

**23** 193:2 197:10 200:14 206:7 13

**Examination** [11] 10:10 14:18 77:11 121:3 152:6 154:1 157:12 164:3 197:2 201:18 205:12

**Field** [7] 40:3 40:22 72:1 72:10 107:19 108:3 109:2 113:6

**Fields** [2] 107:8 108:16

**Fifteen** [6] 26:24 34:23 76:17 85:21 91:19 189:14

**Figure** [1] 12:18

**Figured** [1] 192:25

**Figuring** [1] 194:3

**Fill** [1] 6:5

**Fill-in** [1] 6:5

**Fine** [1] 139:15

**Finish** [2] 6:18 90:10

**Finishing** [1] 90:6

**Fired** [3] 107:4 110:5 110:6

**Firing** [1] 107:23

**First** [64] 3:14 3:19 6:1 14:17 17:3 22:13 24:18 27:11 37:14 40:16 42:7 44:9 50:4 64:5 67:9 67:21 73:4 78:22 78:23 80:18 80:19 86:10 94:13 102:6 106:9 107:9 107:12 108:14 117:23 118:24 119:9 119:16 119:20 121:2 122:24 123:20 126:12 131:2 131:4 131:16 131:17 131:20 131:23 132:8 134:25 157:11 158:23 162:3 164:2 165:2 167:12 171:11 177:1 185:12 190:4 192:24 194:4 196:3 197:20 200:6

**Fish** [1] 133:20

**Five** [13] 6:5 13:6 22:6 22:6 50:24 55:2 82:15 82:19 82:20 82:21 133:2 136:3 151:21

**Five-year** [1] 151:21

**Fixing** [2] 66:2 177:17

**FM** [1] 2:19

**Focal** [1] 131:18

**Folks** [2] 56:21 141:10

**Follow** [5] 13:24 42:24 43:4 77:6 170:23

**Follow-up** [1] 75:2

**Followed** [3] 28:20 43:1 170:23

**Following** [7] 1:18 3:21 35:12 37:2 114:13 114:14 194:20

**Follows** [4] 14:17 121:2 157:11 164:2

**Fondren** [31] 5:4 5:5 5:12 18:10 18:17 21:24 51:3 53:4 55:5 55:19 67:15 67:18 69:2 81:85:20 86:2 114:23 114:24 114:24 115:3 122:6 124:7 124:10 124:12 132:25 137:17 141:2 173:3 173:9 195:7 195:10 195:15

**Food** [3] 33:10 33:11 90:10

**Foot** [9] 39:4 39:4 42:4 42:4 61:22 111:16 111:17 171:8 192:5

**Football** [4] 19:3 54:8 63:1 92:5

**Force** [1] 186:6

**Foregoing** [1] 208:4

**Form** [1] 161:15

**Former** [1] 159:8

**Forth** [3] 141:15 141:16 148:8

**Forty** [1] 152:12

**Forty-five** [3] 22:25 31:3 84:8

**Forward** [2] 96:9 121:8

**Four** [19] 32:10 33:6 33:8 39:7 39:8 54:21 56:2 74:1 74:7 74:7 89:17 96:21 101:9 122:1 122:2 133:23 141:6

**14** 126:18 132:10 134:7 141:5 145:17 146:2 146:5 149:13

**Field** [7] 40:3 40:22 72:1 72:10 107:19 108:3 109:2 113:6

**Foxy's** [4] 134:2 134:8 134:12 134:15

**Frame** [2] 60:23 156:25

**Freeway** [4] 2:14 31:18 31:19 31:21

**Friday** [6] 135:6 138:10 139:4 139:7 139:8 139:16

**Friend** [11] 17:9 54:11 58:11 90:23 91:16 123:3 124:5 126:14 128:15 130:16 145:24

**Friend's** [1] 17:10

**Friends** [6] 64:13 119:24 133:13 139:20 139:21 141:8

**Fries** [1] 90:14

**Front** [17] 73:19 73:25 76:11 76:12 100:21 101:1 101:2 101:3 101:11 101:12 102:24 106:14 106:15 110:11 111:24 147:1 153:16

**Full** [2] 69:4 141:9

**Funny** [1] 182:15

**Future** [2] 58:16 200:25

### G

**Game** [7] 19:3 19:14 62:6 63:1 63:12 72:19 192:23

**Gap** [1] 94:7

**Gear** [1] 113:21

**General** [2] 7:3 12:19

**Generally** [1] 13:14

**Gentlemen** [7] 3:2 49:6 49:12 120:15 163:14 164:6 205:10

**Germane** [2] 147:4 147:6

**Gestures** [1] 75:12

**Gibson** [1] 15:15

**Girl** [20] 43:20 43:21 118:20 118:21 178:14 179:6 180:6 180:14 180:16 180:18 181:10 181:14 182:1 182:4 182:5 182:14 183:25 184:1 199:1 200:1

**Girlfriend** [1] 159:8

**Given** [3] 13:19 49:20 154:19 159:1

**Glasses** [2] 6:7 6:8

**God** [1] 114:11

**Golf** [1] 85:9

**Good-bye** [1] 153:16

**Grab** [1] 112:13

**Grabbed** [2] 192:15

**Grass** [1] 36:17

**Gray** [1] 25:20

**Grayish** [1] 25:20

**Grew** [1] 130:16

**Greyhound** [1] 183:8

**Grocery** [5] 22:12 22:16 22:20 22:23 170:24

**Group** [1] 147:2

**Guess** [18] 13:5 39:16 58:1 76:16 123:25 127:19 133:2 141:5 141:7 144:4 145:13 146:5 147:11 148:25 149:6 151:18 152:12 161:17

**Gum** [1] 14:24

**Gun** [14] 47:3 47:9 47:11 112:15 119:10 182:9 182:11 187:1 187:2 187:4 187:6 187:7 188:7 193:1

**Guns** [1] 47:9

**Gunshot** [3] 38:18 38:20 38:21

**Gunshots** [1] 107:23

**Guy** [43] 24:18 24:18 28:6 33:21 41:9 41:25 42:6 64:17 65:16 65:18 66:1 82:2 83:2 88:12 88:16 88:9 89:9 91:22 94:14 104:6 104:15 105:3 105:12 107:4 107:7 107:10

107:13 107:15 107:19 108:5
108:14 108:19 108:9 109:7
109:11 111:20 112:6 112:8
112:19 139:11 144:23 180:1
195:11

**Guys** [36] 26:6 29:13 31:13
33:23 33:24 37:16 37:19 37:
21 37:22 37:22 37:23 38:1
38:3 38:23 41:11 47:22 63:9
69:25 76:6 89:22 135:7 135:
12 137:22 138:14 139:4 142:
11 171:12 171:16 178:24 188:
10 190:11 191:23 193:9 193:
10 193:12 198:23

## H

**Hair** [4] 6:6 65:7 65:8 81:
16
**Halfway** [1] 39:1
**Hand** [4] 6:17 80:10 82:7
208:12
**Hands** [3] 75:12 75:15 112:
15
**Hang** [1] 146:17
**Harold** [3] 158:15 158:25
158:25
**Harris** [12] 1:8 1:21 9:11
12:22 13:1 15:4 122:7 164:
16 208:2 208:4 208:11 208:17
**Headed** [1] 31:8
**Heading** [5] 85:4 85:12
114:3 114:22 193:4
**Headlights** [1] 100:14
**Heads** [1] 113:22
**Hear** [16] 27:5 39:22 82:21
86:10 87:21 88:5 88:8 88:9
102:6 102:9 107:23 111:19
121:9 157:18 164:6 172:20
**Heard** [8] 1:19 38:18 39:2
39:13 39:23 93:25 185:16
186:8
**Hearing** [10] 38:20 38:20
39:24 40:15 107:10 107:12
118:24 119:19 119:16 119:20
**Hearsay** [2] 161:9 175:6
**Heating** [1] 72:25
**Heavily** [1] 13:19
**Height** [1] 6:8
**Held** [1] 1:21
**Hell** [3] 44:25 45:5 119:1
**Helped** [1] 116:21
**Hereby** [1] 208:4
**Hesitation** [1] 186:13
**Hidden** [1] 80:24
**High** [8] 17:15 54:8 54:9
54:10 90:23 91:22 113:25
130:18
**Highway** [1] 67:21
**Hill** [56] 2:12 3:5 3:7 4:
22 4:24 5:2 7:5 8:19 8:22 9:
4 9:6 9:8 9:19 9:25 10:10 10:
8 11:2 11:14 12:12 13:7 13:
12 14:6 14:11 49:14 49:15
66:25 74:25 75:6 89:4 89:7
102:20 102:21 120:13 129:18
129:19 151:7 151:8 152:5
152:19 153:23 154:12 155:10
155:13 157:5 161:9 162:11
162:13 163:7 175:5 180:9
184:8 194:12 201:16 204:15
205:3 207:23
**Hill's** [1] 202:10
**Himself** [2] 34:14 166:14
**Hisself** [1] 143:12
**Hit** [2] 55:21 103:15
**Hits** [1] 103:17
**Hobby** [1] 53:9
**Holding** [1] 108:22
**Holley** [5] 15:12 89:9 89:
14 104:16 105:25
**Home** [32] 3:22 43:13 43:14
56:17 57:21 57:22 61:8 62:3

64:25 65:2 79:2 81:14 83:14
83:14 83:25 86:16 114:14
115:10 135:3 135:7 135:12
147:19 147:20 147:21 152:23
172:5 172:9 177:17 188:23
191:12 193:4 197:22
**Homicide** [6] 13:9 14:4
53:22 56:15 117:21 202:21
**Honor** [21] 8:20 10:5 12:9
12:12 14:10 16:14 66:23 89:
5 102:15 120:14 122:21 129:
16 152:17 154:10 155:9 157:
7 160:12 165:12 204:13 205:
5 207:24
**Honorable** [1] 1:20
**Hood** [25] 38:22 38:23 47:
13 47:15 47:17 47:18 48:2
48:17 48:19 48:11 99:10 99:15
99:17 99:19 99:25 100:4 100:
6 100:8 101:22 102:22 103:
15 103:17 104:15 119:17 119:
21
**Hooked** [1] 141:21
**Hope** [3] 66:18 116:9 116:12
**Hopefully** [1] 207:3
**Horace** [2] 61:5 63:8
**Horn** [1] 114:9
**Hospital** [3] 13:11 52:18
**Hot** [2] 170:23 190:14
**Hotel** [2] 132:19 132:22
**Hour** [3] 61:8 128:22 198:11
**Hour-and-a-half** [1]
128:23
**Hours** [8] 58:19 58:22 59:
5 84:3 125:5 131:14 134:7
171:5
**House** [72] 12:18 18:8 18:
25 20:24 22:8 30:9 30:18 30:
19 54:25 55:10 56:16 58:7
60:5 60:6 60:10 60:20 61:10
61:19 62:10 62:13 65:11 65:
20 80:4 80:15 80:18 84:8 85:
1 116:2 117:20 123:15 123:
18 123:24 124:4 124:7 125:
9 125:23 127:11 131:4 131:
5 131:6 132:11 132:13 132:
16 133:15 134:16 134:19 136:
23 141:12 141:25 142:9 142:
19 148:4 148:21 149:4 152:9
161:12 161:16 162:7 162:14
162:17 162:19 162:21 166:7
167:18 175:25 176:11 177:3
177:9 177:13 183:12 185:22
204:3
**Houses** [2] 162:20 183:14
**Houston** [20] 1:21 2:8 2:
15 2:20 4:15 12:22 12:24 17:
16 17:18 51:3 53:3 54:18 55:
3 158:7 159:3 160:17 181:19
185:25 196:1 198:25
**Howard** [14] 5:8 18:11 18:
20 56:20 57:1 61:12 64:8 85:
19 115:23 119:25 120:23 121:
1 121:6 195:20
**Hug** [1] 112:24
**Hung** [1] 141:25
**Husband** [1] 136:16

## I

**Ice** [1] 90:14
**Idea** [4] 5:6 20:18 61:25
110:16
**Identification** [3] 6:11
7:10 10:16
**Identified** [9] 16:15 17:
1 32:14 39:10 41:8 42:10 70:
14 122:22 165:13
**Identify** [5] 6:14 6:19 8:
2 11:8 19:24
**Ill** [1] 137:9
**Illegal** [2] 69:2 69:6
**Illuminating** [1] 100:16
**Immediately** [1] 206:24
**Implicate** [1] 99:4

**Implicated** [1] 99:7
**Important** [4] 60:9 60:10
109:21 146:10
**Impression** [2] 118:17
182:18
**Incident** [6] 18:3 118:19
123:1 123:6 178:16 178:19
**Included** [1] 208:6
**Including** [4] 8:13 8:16
206:19 206:25
**Incoherent** [3] 7:20 7:22
13:9
**Incriminate** [1] 99:5
**Indicate** [1] 75:10
**Indicated** [2] 57:11 92:5
**Individual** [7] 6:4 6:11
6:12 6:25 8:4 59:24 88:23
**Individual's** [1] 6:10
**Individuals** [3] 6:7 13:
21 73:4
**Indoors** [1] 181:5
**Information** [11] 63:24
72:7 150:24 182:20 183:15
198:20 199:4 199:8 201:7
201:9 201:13
**Initial** [2] 13:23 13:25
**Initiates** [1] 88:10
**Inn** [3] 189:19 189:20 190:4
**Inner** [1] 91:7
**Inquire** [2] 128:3 201:22
**Inquired** [1] 145:24
**Inquiries** [2] 66:9 178:2
**Inside** [22] 30:3 30:20 32:
3 33:6 42:14 42:16 84:4 87:
10 90:1 99:23 104:25 105:2
105:3 105:5 124:19 125:1
148:8 148:9 153:20 180:24
181:3 181:4
**Installed** [1] 125:21
**Instead** [1] 100:18
**Instructions** [2] 206:13
207:21
**Intensive** [2] 13:11 13:16
**Interested** [4] 6:3 6:4
201:6 201:12
**Internet** [2] 197:5 197:7
**Interrupt** [2] 69:20 76:15
**Intersecting** [1] 114:25
**Intersection** [2] 86:1
195:8
**Interview** [4] 12:4 12:15
12:19 13:21
**Intrepid** [6] 20:5 20:7
45:16 45:18 166:18 166:19
**Introduce** [2] 10:3 65:13
131:1
**Introduced** [10] 19:22 32:
20 58:10 70:6 117:23 166:22
167:6 168:25 170:2 190:13
**Investigating** [1] 7:15
**Investigation** [1] 11:20
**Investigations** [2] 206:
25 207:1
**Investigator** [2] 129:25
158:4
**Investigators** [1] 49:21
**Invite** [2] 62:13 65:10
**Invited** [1] 62:3
**Involved** [7] 7:12 98:2
98:4 99:8 186:14 189:6 193:8
**Involving** [1] 152:1
**Item** [1] 3:9

## J

**Jacinto** [1] 208:18
**Jack** [10] 178:20 178:20
178:21 178:21 187:20 187:20
187:21 187:21 198:23 198:23
**Jacket** [1] 165:11

**Jail** [1] 46:18
**Jammed** [1] 96:14
**Janicka** [5] 4:18 4:22 4:
24 4:24 117:8
**Janitorial** [1] 121:16
**Jog** [1] 70:12
**Johnson** [15] 4:18 11:9 11:
16 14:15 14:16 14:21 14:22
61:5 140:13 140:21 144:6
185:11 188:14 191:1 195:12
**Johnson's** [2] 5:7 8:5
**Joseph** [2] 52:16 52:18
**Joseph's** [2] 52:22 53:5
**Journey** [1] 187:17
**Jr** [9] 1:5 158:15 158:18
158:22 158:25 164:18 165:6
165:17 208:20
**Judge** [11] 1:21 3:5 10:2
13:12 14:6 49:5 161:9 163:7
175:5 180:9 201:16
**JUDICIAL** [1] 1:11
**Jump** [1] 85:2
**Jumped** [1] 42:14
**Jumping** [1] 97:13
**Jumps** [1] 85:8
**Jurisdiction** [1] 158:11
**JUROR** [3] 207:7 207:12
207:17
**Jurors** [2] 5:6 206:22
**Jury** [17] 3:1 9:6 49:8 49:
10 67:8 67:20 68:13 69:19
75:24 79:12 106:7 120:20
133:8 163:15 163:17 164:6
206:18

## K

**Katty-corner** [3] 73:7
73:11 73:15
**Katy** [1] 52:2
**Kay** [2] 208:3 208:16
**Keep** [3] 74:10 86:16 191:23
**Keeping** [1] 74:12
**Keller** [3] 121:10 121:12
121:13
**Ken** [15] 139:23 139:25 140:
1 147:3 147:8 148:20 149:2
149:3 149:14 153:4 153:5
155:15 155:24 156:7 156:10
**Ken's** [1] 139:24
**Kept** [2] 43:7 170:22
**Kevin** [2] 15:8 64:15
**Key** [6] 12:25 150:15 166:4
166:5 166:6 196:16
**Keys** [7] 34:19 34:20 67:5
174:1 174:2 196:15 198:7
**Kicked** [1] 171:21
**Kids** [10] 57:9 58:23 59:12
59:19 140:23 147:14 147:14
147:16 147:23 152:9
**Killed** [2] 72:2 202:1
**Killing** [1] 118:8
**Kilo** [10] 68:20 68:21 170:
3 170:5 178:24 186:19 191:
21 192:5 194:13 194:15
**Kilogram** [1] 185:5.
**Kind** [32] 19:16 28:25 57:8
58:16 60:10 66:15 73:2 73:
19 91:5 91:21 94:4 95:10
103:11 105:8 112:24 113:21
116:21 120:8 121:8 131:2
143:21 148:8 152:1 166:17
180:3 187:4 187:6 187:8 197:
15 205:23 206:25 207:11
**King** [5] 159:22 162:15 173:
12 173:13 173:22 195:7 196:
11
**Kirby** [5] 31:23 31:23 85:
17 86:6 86:8
**Knobloch** [2] 208:3 208:16
**Knock** [6] 60:25 84:10 112:

15 133:9 143:19 150:16
**Knocked** [1] 61:1
**Knocks** [2] 84:12 86:11
**Knowing** [4] 54:13 140:19
185:11 187:21
**Knowledge** [5] 11:17 186:
5 186:8 187:10 199:21
**Known** [14] 11:16 17:6 17:
14 18:20 48:23 56:24 122:11
126:17 130:20 141:4 141:5
158:15 159:20 165:4
**Kroger's** [1] 85:4
**KURT** [2] 2:17

### L

**Laboratory** [1] 52:14
**Ladies** [7] 3:2 49:6 49:11
120:15 163:14 164:5 205:10
**Lady** [1] 118:12
**Lafayette** [7] 157:17 158:
19 159:2 159:17 162:2 162:5
162:6
**Laid** [1] 150:22
**Land** [2] 181:1 183:11
**Landmark** [1] 31:22
**Lantern** [3] 118:8 197:9
197:11
**Large** [3] 68:18 68:19 87:
23
**Larger** [1] 162:4
**Last** [9] 26:22 54:23 56:3
91:3 106:9 126:22 133:19
159:20 205:13
**Latch** [4] 48:3 48:4 48:7
99:23
**Late** [4] 43:15 135:5 147:
16 147:18
**Laws** [1] 190:18
**Leading** [1] 180:10
**Lean** [1] 121:7
**Learn** [2] 16:5 61:16
**Learned** [1] 183:15
**Leasing** [1] 136:13
**Least** [2] 7:14 101:7
**Leave** [25] 19:11 20:14 21:
2 31:7 34:12 34:14 34:18 36:
3 42:21 63:9 66:2 66:4 74:
19 74:19 75:1 75:2 75:7 75:
8 90:22 101:20 135:15 146:2
148:18 172:2 176:4
**Leaves** [9] 63:12 63:17 64:
1 78:22 138:17 143:4 143:22
144:19 153:15
**Leaving** [6] 66:7 70:23 78:
25 89:19 126:4 148:24
**Left** [78] 20:15 21:4 22:12
22:20 22:23 31:4 33:17 33:
20 35:2 35:4 35:21 39:16 39:
16 40:3 40:7 40:8 40:14 59:
23 63:10 69:4 73:17 73:22
74:17 85:3 85:7 89:18 92:14
95:5 95:16 100:21 113:16
113:21 113:14 124:20 124:22
125:15 125:25 126:2 126:11
126:14 126:14 126:14 126:22
126:22 126:23 127:6 127:7
127:12 127:22 127:24 128:12
128:13 128:20 129:6 129:7
129:9 129:13 134:14 134:15
138:16 143:25 148:19 148:20
149:3 152:10 152:11 152:13
153:3 155:15 155:24 156:7
156:8 177:2 180:2 180:3 189:
2 202:21 203:2
**Left-hand** [1] 115:5
**Length** [2] 78:3 78:5
**Lengths** [2] 96:21 100:24
**Lexus** [129] 5:17 25:18 25:
21 26:1 26:5 26:6 26:7 26:
16 27:14 27:20 27:23 28:3
28:20 29:12 31:14 31:25 32:
8 35:11 37:2 37:16 37:19 37:
22 37:24 38:1 38:6 38:10 38:

23 39:6 39:7 40:11 40:12 41:
2 41:5 41:7 41:9 41:12 41:
14 41:25 42:7 42:14 42:16
42:24 43:18 47:13 47:15 48:
11 48:12 48:17 70:1 73:5 73:
6 73:25 74:3 74:4 76:6 76:6
76:8 77:8 77:9 78:9 78:25
83:2 90:22 91:11 91:14 91:
18 94:3 97:5 99:14 100:9
101:1 101:4 101:12 102:13
102:14 102:17 102:18 102:25
103:1 103:3 103:4 103:8 103:
10 103:14 103:19 106:2 106:
5 106:12 106:15 108:7 108:
13 109:4 109:7 109:11 109:
21 110:18 111:23 111:24 112:
3 112:21 112:23 113:18 118:
22 119:21 168:20 169:13 169:
17 170:22 171:12 173:24 174:
3 174:5 174:9 174:19 174:21
174:22 175:15 178:10 179:5
180:4 180:6 190:11 191:20
196:13 196:16 196:18 197:8
198:5 198:7
**Lexus'** [2] 100:3 100:6
**License** [1] 151:13
**Lick** [2] 164:4 166:5
**Lie** [1] 47:7
**Lied** [3] 100:2 100:3 116:17
**Lies** [2] 98:10 98:12 116:21
**Life** [2] 115:14 165:5
**Lift** [1] 48:7
**Lifted** [2] 48:9 48:12
**Light** [7] 20:21 36:4 92:
22 92:23 92:24 92:24 105:5
**Lights** [5] 78:13 78:16 95:
12 95:13 96:25
**Likelihood** [1] 118:20
**Limit** [2] 68:1 68:3
**Line** [2] 141:18 183:8
**Liquor** [1] 151:12
**Listening** [2] 72:19 72:21
**Lit** [2] 78:15 100:20
**Live** [20] 15:4 18:9 18:16
51:5 52:8 53:4 53:7 53:11
54:18 55:1 55:20 85:19 115:
7 115:8 120:2 120:4 122:5
140:24 164:16 166:9
**Lived** [9] 4:9 18:7 18:18
195:12 195:14 202:4 202:7
202:8 203:25
**Living** [7] 51:3 52:21 55:
25 56:1 130:24 136:11 158:18
**Loaded** [1] 187:16
**Locate** [3] 158:14 159:9
160:5
**Located** [5] 12:23 28:24
28:25 158:24 159:7
**Location** [25] 4:17 5:2 5:
4 6:17 11:23 12:4 12:19 13:
4 13:4 24:7 31:24 41:8 41:
15 77:15 109:19 110:19 159:
9 159:23 160:2 172:2 173:10
173:22 180:14 180:23 183:12
**Locations** [3] 4:14 158:
21 159:12
**Look** [14] 6:20 13:1 23:20
73:12 94:8 94:10 97:13 111:
19 129:1 158:11 159:13 159:
19 161:12 167:16
**Looked** [2] 80:6 166:18
**Looking** [19] 16:20 39:14
39:14 39:15 40:4 52:25 73:
16 73:21 91:9 105:8 105:8
105:9 105:11 111:6 116:5
128:24 161:19 182:15 200:16
**Loop** [3] 85:14 86:5 189:19
**Looped** [1] 86:8
**Lose** [2] 103:24 104:1
**Loud** [3] 87:20 88:4 155:2
**Louisiana** [15] 17:20 17:
22 131:7 157:19 158:21 159:
2 159:13 159:16 159:19 164:
22 177:5 177:16 177:25 183:

**Lunch** [3] 120:17 120:19
142:17
**Luther** [2] 159:22 162:15
**Lying** [1] 116:19
**LYN** [1] 2:2
**Lynchester** [3] 9:9 13:1
13:4

### M

**Machine** [1] 1:23
**Main** [13] 31:23 35:5 43:5
43:6 43:8 86:6 92:14 92:16
92:17 92:20 92:21 92:23 114:
5
**Maintain** [1] 52:13
**Major** [1] 86:21
**Male** [6] 16:22 32:18 54:16
122:19 122:19 122:20
**Mall** [16] 67:11 69:14 69:
24 71:22 72:4 72:10 77:14
168:8 168:9 184:18 187:17
190:8 190:19 191:16 191:19
192:8
**Mama's** [1] 185:22
**Mamou** [132] 1:5 3:10 3:14
3:16 3:19 3:23 3:25 4:4 4:8
16:1 16:6 17:4 17:24 18:7
18:24 19:6 20:16 23:4 23:11
23:23 24:2 25:1 25:13 26:12
26:17 29:24 33:14 34:3 38:7
38:11 42:10 43:16 43:18 48:
19 57:12 57:20 58:10 58:12
58:18 59:25 60:4 60:15 61:
16 61:19 62:9 63:11 64:5 64:
22 65:2 65:10 68:9 69:1 75:
23 77:3 81:23 83:14 88:16
88:23 89:9 90:4 106:8 107:
10 122:25 123:12 123:15 123:
17 124:12 124:16 128:4 128:
7 128:20 129:10 129:13 131:
2 131:24 132:15 132:19 132:
22 135:21 136:19 137:2 137:
19 139:8 140:17 141:11 142:
7 143:4 143:17 144:3 145:25
146:11 146:12 150:5 151:5
153:10 156:20 158:15 158:18
158:22 158:25 159:8 159:9
161:20 161:21 161:23 164:18
165:6 165:17 170:8 172:15
172:20 182:14 182:19 183:16
187:11 188:14 190:20 193:11
197:17 201:8 202:19 203:10
203:12 208:20
**Mamou's** [3] 8:7 134:12
162:21
**Man** [10] 40:7 66:15 80:14
81:4 88:14 92:9 106:4 111:
9 143:7 149:18
**Map** [2] 12:25 52:25
**Marie** [1] 10:14
**Marked** [9] 8:23 9:19 10:
18 11:7 12:2 21:16 23:19 27:
7 192:7
**Maroon** [1] 165:11
**Married** [3] 50:19 121:19
136:11
**Mart** [1] 131:1
**Martin** [2] 159:22 162:15
**Mary** [4] 9:25 10:20 10:22
15:17
**McClellan** [85] 2:2 7:2 8:
23 9:2 10:5 10:11 10:24 11:
4 11:11 11:16 12:9 12:14 13:
22 14:9 14:14 14:19 16:14
16:18 16:24 17:3 17:5 19:4
66:22 74:22 75:4 94:9 99:9
102:15 116:16 119:6 119:13
120:12 120:23 121:4 122:21
122:24 129:15 152:7 152:16
154:2 154:9 154:14 155:8
155:20 157:6 157:9 157:13
161:11 162:9 163:8 163:12
163:20 164:4 165:12 165:15

**Mar** [6] 184:6 184:12
194:9 201:19 204:12 205:4
205:7 207:24
**Meal** [2] 90:6 90:7
**Mean** [23] 25:12 38:14 51:
10 51:16 60:17 68:19 88:4
94:23 96:14 100:18 108:2
110:8 113:24 125:1 131:9
153:6 166:1 174:14 178:21
180:23 185:4 193:16 203:24
**Meaning** [3] 52:1 76:19
190:15
**Means** [6] 68:24 102:24
106:13 106:17 176:15 205:17
**Meant** [2] 45:4 99:20
**Media** [1] 207:3
**Medication** [2] 13:19 14:2
**Meet** [23] 4:17 17:3 17:8
19:7 20:23 25:15 26:15 31:
13 62:19 62:20 84:13 123:7
131:3 131:23 132:6 132:9
140:9 140:12 144:5 166:1
168:17 169:19 185:20
**Meeting** [18] 8:7 60:4 70:
25 71:4 84:18 185:12
**Meetings** [1] 50:8
**Members** [10] 58:2 58:3 68:
13 69:19 75:24 79:12 106:7
133:8 184:12 207:2
**Memory** [4] 70:12 155:3
156:22 156:25
**Men** [1] 89:2
**Mention** [3] 86:22 197:1
197:3
**Mentioned** [1] 53:13
**Message** [1] 203:2
**Met** [32] 3:10 17:6 17:9 17:
24 49:16 50:2 57:1 57:19 60:
8 65:19 122:25 123:1 123:8
126:18 129:20 130:20 131:4
131:16 131:17 131:20 131:21
132:11 140:17 141:7 166:24
167:12 169:4 173:12 174:10
174:11 184:21 185:18
**Mexico** [1] 183:2
**Michael** [1] 1:20
**Microphone** [2] 121:8 164:
9
**Middle** [2] 39:15 180:24
**Midnight** [5] 152:10 152:
25 153:7 153:13 156:19
**Might** [9] 20:19 45:20 58:
16 87:4 121:7 142:23 159:3
184:25 200:25
**Miles** [5] 13:6 68:5 85:19
85:21 85:24
**Mills** [2] 137:13 137:14
**Mind** [5] 63:1 97:18 134:13
148:16 188:17
**Mine** [3] 58:11 90:23 128:15
**Mine's** [1] 17:9
**Minimal** [1] 7:13
**Minute** [6] 35:21 62:6 66:
2 66:4 107:3 145:17
**Minutes** [27] 22:6 22:7 22:
25 26:24 29:23 31:3 34:7 34:
23 35:3 55:2 63:13 64:2 67:
25 68:13 72:11 75:11 76:17
84:8 91:19 107:3 125:14 146:
2 152:12 159:18 168:6 189:
15 193:5
**Misdemeanor** [1] 152:1
**Missing** [1] 178:14
**Misstatement** [1] 102:16
**Mistaken** [2] 179:22 183:2
**Moment** [5] 97:23 97:24
126:12 151:7 163:4
**Monday** [22] 44:3 44:6 44:
9 44:12 126:25 127:4 127:14
127:15 127:17 151:1 172:18
172:20 173:21 174:11 177:10
197:18 199:19 199:19 200:12

205:25 205:25 206:1

**Money** [14] 24:14 24:15 79:
17 79:18 79:21 170:15 170:
15 171:17 171:22 191:24 192:
4 192:18 192:19 194:4

**Months** [10] 54:22 56:2 57:
2 57:4 123:7 131:20 131:21
131:21 131:24 132:4

**Moral** [1] 152:2

**Morgue** [1] 9:12

**Morning** [33] 3:21 44:7 44:
9 126:25 127:3 127:23 127:
25 129:7 129:9 135:4 135:6
135:13 135:14 136:19 142:1
150:24 150:24 151:1 153:13
165:25 166:2 172:18 172:21
173:21 174:11 175:23 194:20
196:11 197:18 205:21 206:2
206:8 206:17

**Most** [9] 26:24 31:3 34:23
63:13 84:9 85:21 91:20 141:
11 146:18

**Mother's** [2] 159:21 162:
21

**Mouth** [1] 14:24

**Move** [2] 10:3 37:6

**Moved** [1] 110:19

**Movie** [1] 81:18

**Movies** [8] 56:23 57:9 58:
6 58:24 59:12 59:15 140:7
140:22

**Moving** [2] 75:12 96:9

**Mug** [1] 202:22

**Murder** [2] 98:17 200:17

**Music** [1] 72:21

**Mutual** [6] 123:3 124:5
130:16 139:19 139:21 141:8

## N

**Name** [42] 4:20 5:13 8:24
11:17 11:20 14:20 15:8 15:
11 15:14 15:17 15:20 15:25
16:3 16:5 17:10 18:11 21:11
49:15 53:19 55:7 55:9 61:4
64:17 70:9 70:11 76:25 76:
25 91:1 91:3 117:8 121:5
122:10 126:15 129:19 133:19
139:24 140:9 140:12 157:14
167:1 185:16 195:21

**Named** [1] 58:11

**Names** [3] 53:13 204:16
204:25

**Nature** [1] 6:8

**Near** [3] 31:22 31:23 168:12

**Nearby** [1] 36:1

**Necessarily** [2] 106:17
189:21

**Need** [7] 66:19 200:1 205:
20 206:14 207:6 207:7 207:15

**Needed** [1] 194:3

**Neighborhood** [3] 3:24
13:6 130:17

**Never** [16] 13:22 17:6 49:
18 49:20 60:7 82:4 82:5 98:
19 99:7 145:24 149:17 152:1
185:13 185:14 187:7 191:8

**New** [1] 206:9

**News** [15] 45:11 45:13 118:
15 118:16 118:21 174:12 174:
14 175:3 175:12 176:8 178:3
178:4 178:7 178:9 201:22

**Newspaper** [10] 22:17 23:
12 167:21 167:22 170:10 170:
14 170:16 170:17 186:20 192:
5

**Next** [32] 3:13 3:17 14:13
17:25 20:16 41:3 42:13 43:
23 44:2 44:4 44:15 59:24 78:
2 88:25 91:8 91:11 92:24 94:
5 95:5 120:22 126:9 127:3
136:19 150:24 152:22 157:8
159:11 163:11 163:19 172:18
194:19 205:6

**NFL** [2] 60:22 62:15

**Nickname** [9] 11:18 48:23
48:25 64:18 64:20 70:7 133:
21 140:2 204:22

**Nicknames** [1] 204:16

**Night** [21] 44:6 59:6 101:
5 115:21 117:17 126:6 127:
17 132:16 133:7 134:13 135:
21 139:4 139:8 139:8 141:23
146:19 147:17 147:22 149:10
172:16 174:13

**Nights** [1] 143:10

**Nighttime** [2] 29:8 171:5

**Nineteen** [1] 61:7

**Nobody** [4] 75:21 93:14 97:
5 153:2

**Nobody's** [4] 81:6 87:20
89:21 93:20

**Nonchalant** [1] 24:24

**None** [1] 67:3

**Noon** [1] 143:16

**Normal** [3] 52:23 97:21
196:12

**Normally** [2] 6:16 13:17

**North** [14] 51:17 51:22 67:
15 67:17 69:13 70:3 71:2 77:
19 92:19 114:25 167:25 168:
2 168:4 168:7

**Northline** [17] 67:11 69:
14 69:23 71:22 72:4 72:10
77:14 168:9 169:5 169:7 184:
18 187:17 190:8 190:19 191:
16 191:18 192:8

**Nothing** [16] 60:16 69:17
69:18 70:21 74:13 78:22 86:
16 86:21 99:1 99:4 99:8 120:
13 142:21 157:6 205:4 206:9

**Notice** [2] 38:11 105:7

**Noticed** [2] 41:3 207:2

**Notifies** [1] 207:9

**Notwithstanding** [1] 69:
11

**Novak** [13] 3:8 9:18 10:12
158:7 159:1 160:10 181:20
181:25 182:1 182:13 199:3
201:4 203:13

**Novak's** [1] 202:23

**November** [4] 57:14 59:23
60:14 61:13

**Nowhere** [1] 134:15

**Number** [10] 104:8 124:10
145:1 159:1 159:6 160:11
183:3 183:6 202:23 203:2

**Numbered** [2] 1:20 208:6

**Numbers** [1] 41:22

**Numerous** [2] 41:21 50:4
50:5

**Nurse** [1] 13:18

## O

**O'clock** [15] 3:21 3:24 59:
6 59:8 64:24 65:23 80:5 117:
17 126:1 143:16 152:14 153:
7 155:18 205:18 206:17

**O-R** [1] 204:4

**Oak** [2] 85:2 134:4

**Object** [11] 7:2 13:12 14:
6 66:22 74:22 75:4 102:15
161:9 175:5 180:9 194:9

**Objection** [7] 9:4 10:5
11:2 11:14 12:12 13:13 163:
10

**Obligated** [1] 6:13

**Obligation** [1] 6:19

**Observe** [1] 23:11

**Observed** [1] 9:24

**Obvious** [4] 197:24 201:3
201:6 201:9

**Obviously** [2] 57:4 190:22

**Occasion** [7] 11:19 13:23

48:20 123:11 198:7 199:12
165:17

**Occupied** [1] 5:8

**Occur** [1] 206:14

**Occurred** [4] 107:2 180:
25 183:10 208:7

**October** [2] 1:18 132:1

**Odd** [4] 62:23 63:4 80:14
97:18

**Off-the-record** [2] 154:
13 205:9

**Offense** [1] 7:12

**Offenses** [1] 184:16

**Offer** [5] 9:2 10:25 11:12
12:10 192:6

**Offhand** [2] 55:8 117:12

**Office** [12] 35:6 35:14 93:
6 94:4 94:16 94:19 95:3 157:
17 157:22 158:4 158:24 184:
13

**Officer** [1] 53:19

**Officers** [7] 45:23 46:1
46:7 49:25 56:12 130:5 163:1

**Official** [3] 208:3 208:
12 208:17

**Official/Deputy** [1]
208:3

**Officials** [1] 184:21

**Old** [10] 15:2 50:17 50:23
61:6 91:8 91:21 121:17 130:
22 136:2 164:10

**Once** [8] 72:10 78:22 130:9
179:24 188:1 192:15 195:19
207:10

**One** [45] 3:8 6:2 27:13 27:
20 37:16 38:22 39:4 39:4 39:
25 42:4 42:4 48:19 50:22 56:
3 60:8 60:12 70:14 78:2 82:
20 82:21 86:6 87:15 94:5 97:
13 100:13 100:23 104:7 104:
10 104:13 114:15 116:16 120:
4 125:17 131:9 135:24 135:
25 140:24 179:20 186:6 186:
9 188:3 190:5 199:15 201:20
207:9

**Ones** [2] 194:3 202:8

**Open** [12] 29:3 38:22 38:25
39:1 51:20 101:24 102:3 109:
14 111:23 171:3 190:23 208:7

**Opened** [2] 102:2 115:20

**Opening** [3] 109:15 109:22
110:12

**Opens** [1] 111:1

**Opportunity** [1] 206:4

**Opposed** [1] 73:22

**Opposite** [1] 42:19

**Oral** [2] 182:6 199:3

**Order** [5] 5:25 52:21

**Ordered** [2] 33:10 33:11

**Originally** [1] 164:22

**Originated** [1] 159:2

**Orkin** [4] 14:23 44:1 51:7
52:10

**Outdoors** [2] 181:5 181:6

**Outer** [1] 91:6

**Outside** [34] 20:21 26:16
26:22 29:9 29:10 29:22 30:1
30:20 30:22 33:18 33:20 34:
4 34:6 39:6 39:8 40:19 88:
11 88:14 88:17 88:23 89:8
89:15 89:22 90:16 145:22
146:16 147:1 148:7 169:21
181:3 181:4 183:10 191:3
199:2

**Outwitted** [1] 193:19

**Overlook** [1] 143:23

**Overnight** [1] 138:22

**Overruled** [2] 13:15 66:24

**Own** [6] 66:15 95:24 135:10
136:4 136:5 193:21

46:20 123:11 186:7 159:12
165:17

## P

**P.m.** [1] 205:18

**Package** [1] 80:6

**Page** [1] 154:15

**Paid** [1] 208:11

**Pamela** [2] 208:3 208:16

**Pants** [1] 184:5

**Papa's** [20] 22:22 22:24
25:5 25:7 25:14 26:8 27:12
27:23 28:11 41:9 41:10 69:
24 82:9 83:4 83:6 83:9 83:
25 100:11 168:14 169:20

**Paper** [6] 23:17 23:23 23:
25 24:17 24:23 29:25

**Pappasito's** [1] 192:16

**Paranoid** [2] 42:1 114:12

**Pardon** [1] 177:22

**Parish** [2] 157:17 158:19

**Park** [1] 171:7

**Parked** [3] 32:3 40:2 73:7

**Parking** [8] 25:25 78:1 78:
15 94:16 144:1 168:8 170:24
171:8

**Part** [19] 5:10 12:22 13:5
22:2 24:19 39:18 52:7 99:10
99:10 109:10 136:6 186:13
186:21 186:22 192:22 192:22
194:10 197:3 197:3

**Particular** [10] 6:3 6:14
7:5 7:15 31:22 138:6 142:25
168:12 173:10 178:7

**Parties** [2] 208:6 208:9

**Party** [2] 33:17 91:11

**Pass** [13] 5:22 14:9 49:4
120:12 129:15 152:16 155:8
157:5 162:9 163:7 184:6 201:
17 204:12

**Passed** [1] 49:12

**Passenger** [24] 28:2 73:
10 73:11 73:16 73:18 76:7
76:10 76:12 76:13 76:14 76:
20 103:7 103:11 103:18 103:
22 106:2 106:8 106:11 106:
12 106:16 106:22 106:24 109:
20 111:21

**Passenger's** [1] 103:6

**Past** [4] 85:4 110:12 111:2
111:4

**Patio** [7] 30:23 30:25 81:
24 84:1 84:5 84:10 148:7

**Paused** [1] 35:21

**Pay** [1] 207:17

**Paying** [2] 91:12 91:17

**PCP** [1] 151:16

**Penitentiary** [1] 151:24

**People** [53] 13:8 19:8 25:
21 26:7 26:15 27:13 27:20
28:5 31:24 32:8 32:11 32:14
39:6 39:7 39:20 40:19 40:20
47:20 48:17 50:10 53:13 70:
25 71:4 73:24 74:1 74:2 74:
4 74:7 78:9 98:1 88:2 90:6
121:8 130:3 139:17 142:23
146:13 148:13 168:15 168:23
169:2 169:4 169:15 179:15
179:16 179:19 180:3 190:18
198:25 201:23 202:4 202:4
203:15

**Performed** [3] 9:12 182:6
199:3

**Perhaps** [1] 118:21

**Perimeter** [1] 51:19

**Perimeters** [1] 51:18

**Period** [4] 61:16 144:19
168:1 199:17

**Permission** [2] 133:15
161:14

**Person** [54] 6:2 6:25 7:12
8:14 8:21 11:20 15:8 15:11
15:14 15:17 15:20 15:25 16:
3 16:8 18:11 21:19 21:22 22:

4 22:10 27:8 27:11 27:3 87:5 90:
25 28:2 29:17 29:18 30:10
32:22 33:2 34:3 37:15 39:25
40:12 40:13 40:17 42:10 47:
24 49:23 70:14 77:1 90:11
93:10 106:1 122:10 122:13
126:19 140:15 140:20 158:12
159:7 164:18 167:8 167:13
199:7
**Personal** [1] 98:16
**Personally** [3] 72:3 185:
17 187:20
**Persons** [2] 158:2 158:3
**Pest** [3] 14:23 44:1 51:7
**Phone** [60] 2:9 2:16 2:21
4:5 23:4 23:6 23:8 25:1 30:
24 31:1 44:2 44:4 44:12 44:
17 49:18 82:7 82:8 82:10 82:
11 83:7 83:10 83:11 83:14
83:16 83:20 83:24 93:20 94:
1 97:8 125:14 125:16 125:17
125:19 125:21 125:22 125:23
127:24 129:12 129:22 138:19
141:14 141:16 141:17 141:20
141:21 143:6 143:7 143:8
144:20 144:21 145:17 145:18
149:10 149:11 149:19 149:25
150:1 150:3 160:10 160:16
**Photograph** [11] 3:22 6:
20 8:5 8:7 8:10 8:17 10:13
10:19 10:22 21:13 32:15
**Photographs** [10] 6:2 6:5
8:16 9:21 9:23 10:12 46:20
50:9 50:13 70:15
**Photospread** [18] 5:23 6:
1 6:9 6:13 6:15 6:18 6:21 6:
22 6:23 7:1 7:7 7:11 7:18 8:
6 8:13 13:10 13:24 14:1
**Photospreads** [3] 7:6 8:
5 13:8
**Phrase** [1] 62:18
**Pick** [26] 6:14 21:10 21:21
22:4 46:13 66:11 69:23 70:5
132:22 143:17 144:10 146:11
148:19 173:2 173:2 173:6
173:11 173:18 173:21 189:4
189:5 189:11 190:6 194:25
202:11 203:16
**Picked** [14] 21:19 22:10
24:18 30:12 167:18 174:15
174:16 175:24 176:1 188:20
189:15 200:8 200:8 200:15
**Picking** [2] 22:14 197:17
**Picture** [6] 29:13 29:15
88:13 88:17 104:6 106:1
**Pieces** [7] 23:14 29:25
176:12 176:13 182:12 199:7
199:8
**Pigly** [4] 170:24 191:14
191:17 193:3
**Pissed** [2] 30:6 191:22
**Pistol** [1] 188:1
**Place** [17] 3:19 6:17 57:5
64:23 65:5 70:24 81:14 94:
25 95:10 118:8 134:13 135:1
150:15 184:23 188:21 196:18
202:22
**Placed** [3] 161:25 184:22
197:6
**Placing** [1] 117:24
**Plan** [4] 90:18 170:6 171:
23 192:22
**Planned** [2] 58:7 190:20
**Plans** [1] 171:21
**Plastic** [1] 80:7
**Play** [1] 138:14
**Played** [3] 50:10 54:8 92:5
**Playing** [1] 192:23
**Plug** [1] 150:2
**Plus** [2] 33:8 201:9
**PM** [2] 145:7 146:10
**Point** [64] 12:15 13:4 16:
11 38:17 53:15 53:15 62:23
65:15 77:3 77:10 78:17 79:4

84:13 84:10 86:23 87:5 90:
17 92:8 92:18 93:11 93:21
94:6 94:22 95:24 96:22 97:
18 97:22 98:21 103:24 107:
21 107:24 108:1 108:2 110:
10 111:11 113:24 114:5 114:
16 115:23 118:9 118:11 122:
15 125:6 131:18 137:22 137:
24 138:4 138:15 139:2 139:
10 143:3 143:4 145:9 153:20
165:9 187:22 191:2 193:22
197:9 197:11 198:4 200:14
200:24 206:5
**Polaroid** [1] 10:13
**Police** [36] 45:2 45:23 46:
16 46:22 49:24 50:2 53:17
54:2 56:12 81:1 98:9 99:1
99:14 100:2 107:16 107:18
116:1 116:4 116:10 117:19
119:4 128:18 128:21 130:4
136:7 154:3 158:8 160:9 162:
3 181:20 184:21 200:4 200:6
200:16 202:11 202:15
**Pool** [1] 143:24
**Pooling** [1] 143:25
**Pop** [8] 38:23 48:3 48:4 48:
7 99:15 99:20 100:8 101:22
**Popped** [2] 100:6 100:7
**Popping** [1] 99:10
**Porch** [8] 143:21 144:1
147:1 148:9 148:9 198:17
198:18 198:19
**Porter** [1] 137:15
**Portions** [1] 208:5
**Position** [6] 6:3 8:6 8:8
37:11 37:11 114:2
**Positive** [1] 157:1
**Possession** [1] 151:13
**Possible** [2] 138:5 175:8
**Possibly** [11] 7:12 59:5
78:3 79:19 87:25 91:19 92:
10 96:20 97:24 101:9 113:6
**Post** [2] 85:2 134:4
**Potential** [1] 56:4
**Pounds** [1] 54:17
**Practice** [1] 14:4
**Precautions** [1] 71:14
**Premises** [1] 151:13
**Preparation** [1] 208:11
**Prepare** [1] 6:1
**Prepared** [2] 8:4 8:11
**Present** [2] 5:23 8:13
**Presented** [3] 8:14 50:14
206:10
**Presently** [1] 158:1
**Presiding** [1] 1:21
**Pretty** [22] 43:2 45:6 72:
7 100:16 100:19 115:14 119:
24 135:3 140:24 141:9 141:
11 146:18 171:15 188:9 189:
16 193:13 193:20 193:23 194:
2 194:8 195:3 196:2
**Previous** [1] 120:17
**Probation** [2] 151:21 151:
22
**Problem** [3] 62:21 188:4
207:21
**Problems** [1] 207:6
**Procedure** [3] 5:24 6:16
13:8
**Proceed** [4] 4:9 120:25
160:8 163:22
**Proceedings** [4] 1:19 1:
22 208:5 208:9
**Process** [3] 70:24 98:4 99:
8
**Promise** [1] 24:15
**Proof** [1] 7:1
**Prosecuted** [1] 116:24
**Prosecution** [1] 130:8
**Prosecutor's** [2] 184:12

198:21
**Prosecutors** [4] 49:25 50:
3 56:11 130:4
**Prospective** [3] 6:24 7:6
7:14
**Prostitution** [1] 152:2
**Protocol** [1] 5:24
**Provide** [1] 183:3
**Provider** [1] 13:18
**Proximity** [1] 5:11
**Pull** [9] 77:24 77:25 93:16
93:18 97:2 99:24 100:13 188:
1 193:1
**Pulled** [4] 81:1 81:6 150:
2 168:8
**Pulling** [1] 173:14
**Pulls** [4] 78:23 94:13 106:
9 143:22
**Purchased** [2] 174:9 176:
19
**Purpose** [3] 7:10 10:16 58:
23
**Purposes** [1] 9:19
**Pushed** [1] 102:3
**Pushing** [1] 112:25
**Put** [9] 6:4 23:16 81:5 95:
7 113:20 119:4 154:5 192:19
206:4
**Puts** [1] 135:11
**Putting** [2] 23:15 23:23
186:7

## Q

**Quantity** [1] 68:16
**Questioning** [3] 118:4
118:5 200:3
**Questions** [14] 5:21 10:8
14:11 50:9 50:16 84:17 143:
13 152:5 153:23 162:11 198:
21 199:25 201:17 205:3
**Quick** [2] 163:3 189:16
**Quickly** [3] 95:22 95:25
195:3
**Quietly** [1] 155:21
**Quite** [2] 56:1 149:13

## R

**Radio** [1] 72:19
**Raise** [4] 47:18 48:2 48:6
99:25
**Raised** [4] 47:13 47:15
119:17
**Ran** [8] 40:2 40:2 40:7 40:
17 40:20 40:23 107:8 108:3
**Rang** [1] 125:15
**Range** [1] 85:10
**Rank** [1] 157:25
**Rapidly** [1] 113:14
**Rate** [2] 113:25 194:15
**Rather** [1] 194:4
**Reached** [1] 203:3
**Reaction** [1] 202:6
**Read** [2] 154:25 155:20
**Reading** [1] 206:10
**Ready** [5] 21:1 120:7 143:
20 187:16 193:17
**Real** [6] 43:15 60:2 112:12
163:2 200:19 200:21
**Realized** [1] 69:8
**Really** [10] 16:20 60:9 88:
25 98:20 144:12 168:3 182:
22 188:5 199:6 199:18
**Reappears** [1] 64:5
**Reason** [1] 191:8
**Receive** [7] 3:11 44:2 44:
12 83:22 125:19 129:12 177:
24
**Received** [6] 44:4 44:17

**Receiving** [1] 4:7
**Recess** [3] 49:9 120:19
163:16
**Recessed** [2] 3:3 49:12
**Recognize** [4] 9:20 21:13
154:14 165:6
**Recognizes** [1] 7:11
**Recollection** [2] 3:15
155:23
**Record** [11] 1:1 14:20 16:
14 16:25 121:5 122:21 157:
14 165:12 208:6 208:8 208:11
**RECROSS-EXAMINATION**
[3] 152:18 155:12 204:14
**Red** [12] 16:13 16:17 19:19
68:8 94:3 101:2 110:21 166:
18 167:10 167:16 184:5 190:7
**REDIRECT** [4] 10:10 152:6
154:1 201:18
**Reference** [3] 118:20 118:
25 160:5
**Referred** [2] 55:5 57:23
**Referring** [1] 140:15
**Reflect** [4] 16:15 16:25
122:22 165:13
**Reflects** [1] 208:9
**Refresh** [3] 155:2 155:23
156:21
**Refreshed** [1] 156:25
**Regarding** [4] 5:22 50:17
58:15 197:16
**Reginald** [1] 128:15
**Regular** [5] 69:17 76:1 76:
1 86:20 141:20
**Relate** [2] 8:1 183:18
**Related** [1] 4:18
**Relation** [5] 5:16 55:1
110:9
**Relationship** [2] 130:14
136:8
**Relatives** [4] 17:19 164:
24 183:22 195:25
**Released** [2] 54:4 56:17
**Relevance** [1] 66:22
**Relevant** [1] 13:14
**Remain** [1] 101:18
**Remember** [18] 46:1 64:12
70:6 92:10 107:14 123:23
150:5 155:14 156:16 181:1
181:2 192:13 200:11
**Remembering** [1] 76:24
**Rephrase** [5] 7:4 102:19
175:9
**Report** [2] 163:2 197:20
**Reported** [1] 1:22 208:7
**Reporter** [2] 208:3 208:17
**Reporter's** [4] 1:1 208:6
208:8 208:11
**Reports** [6] 45:11 45:13
174:12 174:14 176:8 178:9
**Requested** [2] 207:21 208:
5
**Requesting** [1] 16:24
**Reservation** [1] 186:13
**Residence** [10] 159:21
159:24 160:4 160:13 160:18
160:23 161:17 161:24 162:8
162:25
**Residential** [1] 51:13
**Resources** [1] 158:24
**Respective** [1] 208:9
**Response** [4] 74:19 88:16
198:21 202:10
**Responsibility** [1] 127:
10
**Rest** [4] 30:14 64:2 91:10
206:5
**Restaurant** [1] 168:12

Rested [1] 205:16
Result [1] 158:10
Return [1] 206:16
Reviewing [1] 156:21
Revoked [1] 151:23
Rid [1] 196:18
Ride [9] 19:14 20:13 24:3 62:16 63:18 86:12 144:13 144:14 204:10
Riding [3] 23:2 23:3 65:25
Ring [1] 195:21
Ringing [3] 144:21 149:11 150:4
Road [7] 67:10 85:8 94:24 95:2 95:7 95:9 95:10
Roadway [1] 100:19
Rob [3] 186:20 186:24 193:1
Robbery [4] 98:17 178:22 178:22 186:22
Robert [2] 91:2 91:13
Robin [13] 5:8 5:18 5:19 18:14 18:20 56:20 57:1 64:10 85:19 115:23 119:25 121:22 195:23
Rode [1] 168:1
Role [4] 56:4 56:12 187:20 187:24
Roles [2] 50:10 188:18
Room [10] 49:8 120:16 135:19 136:5 136:24 146:15 146:18 149:15 163:15 206:18
Roughly [5] 168:6 172:11 184:14 193:5 198:11
Route [2] 52:23 182:25
Routes [2] 182:23 182:24
Run [10] 39:24 39:25 40:1 40:12 40:16 40:22 65:5 107:19 111:2 179:25
Running [7] 40:13 72:17 108:16 108:22 111:20 111:21 112:12
Runs [3] 55:13 114:25 137:17

S

Safety [8] 71:6 71:8 71:9 71:10 71:16 71:20 78:18 193:21
Salads [1] 90:12
Samuel [9] 4:18 5:7 8:5 11:9 11:16 14:14 14:16 14:21 140:12
San [1] 208:18
Sandwiches [1] 90:14
Sat [7] 33:10 33:10 58:22 62:6 98:25 139:12 145:16
Saturday [6] 139:16 141:9 141:11 141:13 141:23 142:20
Saw [15] 18:1 20:16 21:13 41:4 41:17 41:19 47:9 56:3 60:7 75:25 107:18 116:15 192:25 196:15 197:24
SBOT [4] 2:3 2:5 2:13 2:18
Scared [1] 182:16
Scene [5] 9:8 179:9 180:2 191:18 206:25
Scenes [1] 184:15
Scheduling [2] 205:19 205:24
School [11] 17:15 54:8 54:9 54:10 90:24 91:12 130:18 137:6 137:11 137:12 138:1
Scoring [1] 185:5
Scott [26] 5:8 5:19 5:19 18:12 18:14 18:21 56:20 57:1 61:12 61:15 64:8 64:10 85:19 115:23 120:24 121:1 121:6 121:7 121:9 121:22 129:19 151:8 152:8 152:20 195:20

Scott's [1] 115:8
Scotts [1] 119:24
Search [2] 161:14 161:15
Searched [1] 161:16
Seat [3] 103:11 106:8 106:24
Seated [3] 3:1 49:10 49:11 120:20 120:21 163:17 163:18 206:18
Second [5] 68:10 80:4 100:13 125:25 146:17
Secret [2] 80:14 80:16
Sedated [1] 13:19
See [89] 6:10 7:11 11:25 16:8 16:21 23:16 27:11 30:14 39:24 40:12 40:13 40:25 42:7 42:13 43:16 43:21 47:2 59:24 73:13 74:7 75:11 75:23 81:9 88:23 88:23 88:25 89:2 96:22 100:20 103:2 103:4 104:12 104:5 104:25 105:2 105:3 105:9 106:7 106:9 107:2 107:24 108:5 108:7 108:9 108:11 109:21 110:4 111:19 111:19 111:20 111:23 111:23 112:2 112:5 112:15 112:23 112:24 113:4 113:8 113:20 113:20 117:5 119:10 122:13 126:11 126:12 126:22 129:10 132:9 143:25 144:5 147:12 147:13 147:22 148:18 152:20 153:19 165:17 165:23 172:15 174:14 176:8 185:5 187:11 188:1 190:3 192:24 196:14 197:20
Seeing [11] 8:1 18:6 40:16 40:22 41:24 50:13 107:10 107:13 107:15 132:24 194:4
Seem [3] 97:21 193:19 194:2
Sees [1] 6:21
Self [2] 45:6 196:12
Self-explanatory [1] 45:6
Sell [4] 79:21 80:21 166:6 188:11
Selling [2] 79:19 80:2
Sentences [1] 151:20
Sergeant [7] 159:1 160:10 181:20 181:25 181:25 182:13 203:13
Serious [1] 98:18
Serve [1] 151:19
Service [1] 121:16
Set [2] 186:9 188:16
Setting [1] 82:24
Seven [2] 151:21 162:20
Seven-year [1] 151:21
Several [5] 53:13 123:1 132:24 199:15 199:16
Sex [2] 182:6 199:4
Sharing [1] 82:1
Sharp [1] 194:2
Shawn [53] 8:14 17:11 17:12 17:14 17:24 54:6 54:11 55:25 56:2 56:23 57:21 58:1 59:18 60:4 60:15 62:9 64:4 65:19 92:3 92:5 120:9 123:5 126:19 126:20 130:14 130:22 130:23 133:13 133:19 134:18 139:19 139:22 140:20 141:8 147:3 147:10 148:10 148:19 148:23 149:14 152:8 152:10 152:24 153:6 154:6 154:23 155:1 155:3 155:5 156:7 185:15 196:6 196:6
Shawn's [7] 58:1 131:5 131:6 132:6 132:11 132:16 134:18
Shawntel [1] 159:8
Sheriff's [3] 157:17 157:22 158:4
Shirt [4] 16:13 16:16 122:

Shoney's [4] 189:18 189:20 190:3 190:5
Shoot [6] 108:10 112:2 127:6 127:14 179:3 179:8
Shoot-out [2] 179:8 198:21
Shooting [16] 42:6 42:8 42:12 94:25 95:9 99:8 107:25 108:12 112:7 179:14 179:16 179:18 180:3 180:25 182:7 183:10
Shootings [1] 201:12
Shop [2] 196:21 196:22
Short [6] 49:7 89:24 114:7 114:8 160:8 160:9
Shot [40] 39:2 39:12 39:13 39:16 39:24 41:4 41:17 41:20 41:25 85:25 102:7 102:9 108:14 108:18 108:20 108:24 179:9 179:12 179:16 179:20 179:22 179:25 180:1 180:19 180:20 181:8 181:9 181:11 182:2 182:14 184:1 198:25 199:2 200:1 201:23 202:22
Shots [11] 39:22 39:23 40:15 41:2 41:19 41:21 107:4 110:5 110:6 111:19 187:14
Show [35] 6:13 7:6 7:18 7:19 7:21 7:25 8:22 9:6 9:19 11:18 11:7 12:2 13:8 13:20 13:23 14:1 19:22 21:16 23:19 27:7 32:20 48:14 79:20 104:9 116:1 133:9 155:9 167:6 167:15 168:25 170:11 173:25 203:23 203:23
Showed [13] 3:22 4:14 10:20 29:13 29:15 33:21 60:21 60:24 88:12 104:6 189:5 196:16 198:7
Shower [2] 115:17 115:18
Showing [3] 7:1 7:7 10:14
Shown [3] 30:5 50:8 88:17
Shows [11] 60:5 60:12 60:19 61:19 62:12 62:24 64:5 65:10 65:23 153:10 188:7
Shut [3] 44:25 45:5 119:1
Side [46] 21:23 21:25 22:3 40:15 51:22 51:25 52:1 52:4 65:16 69:13 70:3 71:2 73:10 73:10 73:11 73:16 73:18 76:10 76:13 76:14 78:5 78:5 88:2 88:5 103:5 103:6 103:7 103:15 103:16 103:18 103:22 106:2 106:11 106:11 106:20 106:22 106:23 109:18 109:20 110:18 111:21 162:23 167:25 168:2 168:5 168:7
Side-by-side [2] 78:4 78:5
Sides [4] 205:16 206:3 206:11 206:21
Sight [2] 103:24 104:1
Signed [1] 161:15
Silently [1] 155:21
Similar [4] 6:5 20:8 20:9 23:22
Sin [1] 64:18
Sister [4] 4:11 136:17 188:23 198:19 202:16 203:10
Sisters [1] 58:4
Sit [11] 58:12 58:18 84:4 88:10 89:17 90:3 137:25 138:1 138:2 145:6 205:11
Sitting [33] 24:24 38:15 40:4 40:10 42:1 60:22 72:11 72:14 73:5 73:6 76:9 81:17 87:11 87:24 88:1 88:22 99:13 101:2 101:12 106:2 106:2 111:4 111:11 111:11 111:13 134:10 145:22 148:2 148:7 106:16 152:12 156:13 191:5
Situation [3] 21:6 188:6 199:25

Six [9] 6:1 6:7 54:16 87:23 101:7 101:8 101:9 162:20 163:5
Six-two [3] 101:7 101:8 101:9
Size [1] 87:25
Skate [1] 45:20
Skin [2] 6:6 64:18
Slab [1] 108:15
Sleep [4] 115:16 115:19 124:13 137:23
Slept [1] 124:14
Slip [3] 207:7 207:9 207:16
Slowly [2] 109:10 112:12
Small [2] 70:21 86:20
Social [2] 123:12 123:13
Socialization [1] 120:8
Socialize [4] 120:6 123:11 131:12 140:21
Soda [1] 115:20
Sofa [1] 124:14
Someone [11] 13:10 14:1 25:1 25:8 47:17 47:18 48:1 144:15 166:6 166:15 166:16
Someplace [3] 63:2 63:18 77:4
Sometime [8] 17:5 57:13 59:2 124:25 153:10 156:19 176:20 206:22
Somewhere [11] 3:24 19:7 28:14 59:5 60:23 62:7 82:19 113:7 127:5 143:16 194:19
Son [2] 46:13 81:19
Sorry [10] 4:20 5:1 16:16 74:2 76:15 101:11 105:25 106:21 149:8 193:11
Sound [1] 82:24
Sounds [1] 195:21
Source [1] 199:9
South [26] 31:23 35:5 43:5 43:6 43:8 51:18 55:15 55:17 55:19 77:17 85:2 85:14 86:5 86:6 92:15 92:16 92:17 92:20 92:21 92:23 114:5 114:21 114:25 115:1 134:4 189:19
Southeast [2] 121:10 121:11
Southwest [13] 2:14 12:24 21:23 21:25 22:3 31:18 31:19 51:3 52:7 55:3 55:5 166:10 166:11
Space [4] 94:5 94:7 95:3 101:16
Special [5] 71:14 78:20 142:21 207:6 207:20
Specific [2] 60:2 206:13
Specifically [2] 71:18 156:21
Speculate [1] 14:7
Speculation [5] 74:23 75:4 175:6
Sped [3] 42:17 42:17 112:21
Speed [3] 67:25 68:2 113:25
Speedway [1] 92:23 92:25
Spell [1] 4:23
Spend [3] 134:13 138:7 139:8
Spending [1] 132:16
Spends [1] 134:25
Spent [1] 135:21
Spoken [10] 49:18 49:23 56:6 61:12 68:11 97:10 129:22 130:3 184:9 194:24
Sports [1] 58:20
Spot [1] 90:19
Spouses [1] 206:20
Spreads [1] 8:10
Spur [2] 97:23 97:24

**Square** [1] 53:6

**Sr** [4] 3:10 3:14 4:4 202:19

**St** [4] 52:16 52:18 52:22 53:5

**Stand** [2] 14:12 204:21

**Standing** [6] 73:24 73:25 75:13 75:14 110:9 111:13

**Start** [4] 50:16 62:14 67:5 185:8

**Started** [4] 113:12 117:18 167:25 171:6

**Starting** [1] 191:22

**State** [20] 1:10 2:10 5:22 9:2 10:3 10:24 11:11 12:10 14:14 14:20 49:12 120:23 121:5 151:9 157:14 163:20 205:7 207:22 208:1 208:4

**State's** [35] 8:23 8:24 9:9:5 10:18 10:25 11:3 11:4 11:7 11:12 11:15 12:2 12:10 12:13 13:13 19:23 21:17 21:1 22 22:11 23:19 24:19 27:8 27:16 30:10 32:15 32:21 33:1 37:23 38:14 48:14 167:7 167:15 169:1 170:11 192:7

**Statement** [22] 7:14 46:8 46:10 46:23 47:2 47:12 54:2 119:4 154:3 154:5 154:17 154:19 154:22 156:21 181:19 181:22 181:24 200:24 201:2 202:12 203:17 204:7

**Statements** [1] 49:20

**Station** [3] 136:21 160:9 162:4

**Stay** [29] 20:13 53:24 63:11 78:7 84:7 90:8 93:8 98:1 123:15 123:24 124:3 124:6 124:7 124:13 125:12 127:4 127:17 127:20 133:14 133:15 134:6 134:16 134:17 134:18 135:18 142:11 152:11 191:16 193:3

**Stayed** [19] 27:1 30:20 59:4 59:7 59:9 76:16 84:8 123:20 123:21 123:22 125:14 133:16 134:7 139:6 140:5 142:19 143:12 146:20 146:21

**Staying** [8] 63:21 64:1 123:18 124:17 136:10 143:10 146:18 159:4

**Stays** [1] 132:13

**Steady** [1] 112:7

**Step** [9] 65:15 69:20 69:20 90:16 101:24 108:11 108:11 108:12 108:12

**Step-by-step** [3] 69:20 108:11 108:12

**Stephanie** [9] 3:25 4:6 4:8 4:11 188:23 188:25 203:10 203:12 203:19

**Stephanie's** [1] 198:19

**Steps** [1] 81:24

**Still** [27] 20:21 38:15 42:2 42:3 51:5 54:18 54:20 61:17 73:21 78:11 120:17 137:2 137:20 142:7 142:8 142:10 144:21 147:16 149:11 150:22 153:2 156:13 177:10 191:20 191:21 191:21 207:2

**Stop** [10] 28:21 36:23 36:25 70:5 92:21 96:23 106:25 109:9 135:11 135:16

**Stopped** [10] 25:25 29:11 35:6 35:13 37:5 37:9 37:10 37:14 90:24 150:4

**Stopping** [1] 205:18

**Stops** [1] 97:2

**Store** [9] 22:12 22:16 22:20 22:24 167:20 168:12 170:24 171:3 171:7

**Stores** [1] 28:25

**Story** [4] 116:9 117:22 119:17 119:21

**Straight** [5] 39:14 43:7

**Stranger** [1] 65:22

**Street** [29] 18:19 28:13 36:1 36:7 36:9 36:10 36:16 36:18 36:23 37:5 41:14 55:7 55:9 55:12 78:1 94:17 94:20 94:24 95:21 97:22 137:15 141:1 142:12 162:23 166:12 171:1 180:23 180:24 195:9

**Streets** [2] 86:6 92:13

**Stretch** [2] 36:10 146:7

**Strike** [2] 63:4 80:14

**Strip** [7] 28:23 28:24 28:25 29:3 29:11 77:25 83:10 25 140:23

**Stuff** [4] 90:13 90:14 140:22 140:23

**Style** [2] 20:7 20:8

**Submitted** [1] 13:10

**Subpoenaed** [1] 130:12

**Substance** [2] 151:14 151:15

**Substantial** [1] 70:21

**Success** [1] 160:6

**Sugar** [2] 181:1 183:11

**Suit** [3] 16:13 122:18 165:11

**Sunday** [17] 18:2 18:3 18:25 20:2 44:6 60:21 62:25 124:1 124:16 124:19 133:3 133:4 142:1 143:1 165:18 165:21 172:13

**Sunset** [12] 17:20 17:22 159:16 159:19 160:3 162:3 162:15 164:22 183:22 185:18 185:23 186:1

**Supposed** [5] 136:11 136:13 170:15 187:19 187:24

**Supposedly** [2] 174:2 199:3

**Suspect** [3] 6:4 159:3 200:17

**Sustained** [3] 14:8 161:10 194:11

**Swimming** [2] 143:23 143:25

**Sworn** [4] 14:17 121:2 157:1 164:2

**T**

**Table** [2] 87:23 87:24

**Taco** [1] 85:5

**Tail** [1] 54:1

**Tall** [1] 101:6

**Tapped** [3] 47:17 99:17 104:15

**Tapping** [1] 99:19

**Taps** [1] 102:21

**TATER** [1] 204:23

**Tator** [4] 15:23 70:12 70:19 204:20

**Tattoos** [3] 9:24 10:13

**Technician** [1] 51:9

**Telephone** [8] 3:11 4:7 83:22 141:18 149:23 159:1 159:5 189:3

**Television** [1] 197:16

**Temperature** [1] 190:16

**Ten** [10] 13:6 22:6 34:7 55:2 57:4 76:17 82:17 82:19 85:21 101:16

**Tender** [3] 10:25 11:12 12:11

**Tendering** [1] 10:2

**Termite** [1] 51:9

**Termites** [1] 51:11

**Terms** [4] 57:5 141:23 155:14 194:2

**Terrence** [21] 3:11 3:22 8:17 9:1 11:5 11:6 15:14 15:20 26:13 70:11 74:5 74:20

**81:13 140:10 163:20 164:1**

**Testified** [5] 14:17 121:2 155:14 157:11 164:2

**Testify** [1] 119:10

**Testimony** [6] 53:14 93:15 113:17 143:15 155:17 207:4

**Texas** [15] 1:8 1:10 1:21 2:8 2:10 2:15 2:20 13:1 15:5 122:7 208:1 208:4 208:18 208:17 208:18

**Thad** [3] 157:9 157:10 157:15

**Theatre** [1] 59:16

**Theft** [1] 152:2

**Themselves** [1] 117:24

**Thinking** [3] 81:8 153:1 200:15

**Thirty** [8] 29:23 63:13 64:1 67:25 72:11 75:11 152:12 168:6

**Thirty-minute** [1] 69:13

**Thomas** [3] 162:14 186:2 196:8

**Thomas'** [1] 160:4

**Thousand** [1] 194:14

**Three** [24] 33:23 33:24 37:5 21 41:11 47:22 50:7 54:21 56:2 73:24 74:2 88:1 88:2 96:21 101:9 141:6 145:20 145:15 168:15 179:23 182:12 184:14 188:16 193:9 193:10

**Three-page** [1] 154:15

**Throughout** [3] 51:14 51:15 69:5

**Thursday** [3] 123:25 133:2 133:6

**Timmy** [7] 160:4 162:14 186:2 186:3 186:4 186:6 196:3

**Tinfoil** [1] 80:7

**Today** [15] 16:9 16:12 50:12 62:25 119:1 119:7 119:9 119:14 119:16 119:20 122:13 122:15 160:10 199:11 205:20

**Today's** [2] 56:7 117:3

**Todd** [4] 133:13 133:18 133:19 140:8

**Todd's** [1] 133:19

**Together** [10] 23:15 89:14 89:15 120:2 130:18 139:13 144:8 186:7 204:10 204:11

**Tomorrow** [5] 205:15 205:17 205:17 205:21 205:22 206:2 206:12 206:16 207:7

**Tonight** [1] 205:20

**Took** [14] 4:13 4:17 5:2 38:12 77:21 94:25 95:10 115:17 115:18 117:21 118:8 147:18 147:21 176:2

**Top** [4] 184:1 184:5 193:14 193:16

**Topless** [2] 134:8 134:9

**Total** [2] 65:22 208:10

**Touching** [1] 100:23

**Toward** [8] 35:5 43:11 73:7 92:14 95:4 102:14 109:18 1:23

**Towards** [13] 52:2 52:5 55:24 73:9 73:19 77:18 78:1 97:11 105:21 109:24 110:15 110:24 114:3

**Town** [10] 22:21 51:23 51:25 52:4 52:7 69:13 70:3 71:2 189:23 190:1

**Trail** [11] 11:21 12:5 12:15 12:20 173:4 175:2 183:16 183:20 194:22 203:9 205:8

**Trained** [1] 5:23

**Transaction** [1] 190:14

**Transcription** [1] 208:5

**Transcription/stenograph** [1] 1:23

**Traveled** [4] 51:22 51:25 52:4 52:7

**Treat** [1] 51:11

**Trial** [3] 1:3 197:17 207:11

**TRIAL-GUILT/INNOCENCE** [1] 1:15

**Trouble** [1] 98:21

**Truck** [1] 164:15

**True** [9] 47:5 99:10 99:11 119:22 188:15 188:19 188:22 205:15 208:4

**Truly** [1] 208:9

**Trunk** [1] 81:5

**Truth** [1] 116:13

**Truthful** [2] 46:23 136:7

**Try** [11] 6:6 6:7 60:2 79:9 130:13 131:18 145:2 158:11 158:14 158:22 164:9

**Trying** [9] 53:2 57:5 108:8 109:11 111:1 112:13 112:13 158:17 201:11

**Tuesday** [14] 44:5 44:14 44:15 48:20 127:19 127:20 127:25 129:16 129:19 200:12 202:6 206:2 206:6 206:23

**Turn** [9] 36:21 42:21 55:23 93:3 95:25 96:5 97:3 114:4 115:5

**Turned** [5] 42:25 43:7 43:10 96:3 160:13

**Turning** [3] 97:19 113:15 171:6

**Turpitude** [1] 152:2

**TV** [5] 146:15 146:17 146:18 149:14 197:20

**Twelve** [1] 206:22

**Twenty** [9] 29:23 34:23 35:3 72:11 75:11 130:23 189:14 193:5 194:14

**Twenty-five** [4] 68:3 69:12 130:23 159:18

**Twenty-nine** [1] 121:18

**Twenty-seven** [2] 15:3 50:18

**Twenty-six** [1] 130:23

**Twenty-two** [1] 164:11

**Twice** [1] 195:19

**Two** [52] 5:9 5:16 25:24 26:6 26:9 27:22 29:13 31:19 32:11 32:14 37:20 37:22 37:22 37:23 38:1 39:9 39:10 40:19 40:20 52:11 53:25 59:5 69:25 74:4 76:6 78:10 89:2 89:22 93:16 97:12 100:24 101:7 101:8 101:9 106:14 106:18 107:3 131:19 135:24 135:25 136:1 168:24 169:2 169:4 169:14 169:15 169:17 171:12 171:16 188:3 193:12 205:14

**Two-bedroom** [3] 135:24 135:25 136:1

**Type** [17] 13:19 20:4 25:17 51:7 52:12 69:2 69:6 98:17 151:11 151:15 168:19 170:12 171:13 174:5 175:17 183:6 183:11

**U**

**Ultimately** [1] 146:23

**Uncle** [2] 202:17 202:18

**Under** [6] 6:19 14:1 117:25 161:25 184:22 184:23

**Underneath** [2] 43:8 85:7

**Uneventful** [1] 142:21

**Unexpectedly** [1] 96:15

**Units** [1] 5:17

**Unlawfully** [1] 151:12

**Unusual** [1] 143:3

**Up** [148] 12:7 13:24 21:10
21:19 21:21 22:4 22:10 22:
14 23:13 23:14 23:17 23:23
24:17 24:18 25:15 27:6 29:
25 30:12 31:13 44:25 45:5
46:13 51:17 51:22 56:7 60:5
60:12 60:19 60:21 60:24 61:
19 62:12 62:24 64:5 65:10
65:23 66:11 67:10 67:15 67:
24 69:13 69:13 69:23 70:5
71:21 72:4 72:9 72:10 72:23
76:19 77:22 78:11 80:7 80:
10 82:24 83:13 85:8 86:5 89:
22 90:6 90:22 92:14 95:25
97:2 99:25 100:4 100:12 101:
14 102:21 110:18 111:21 112:
12 113:12 113:14 114:4 116:
1 117:3 119:1 119:17 119:21
130:16 132:22 133:9 135:9
135:10 135:18 135:20 136:19
137:4 137:5 137:7 137:22
137:23 137:25 138:1 142:2
142:3 142:8 143:4 143:17
143:22 144:2 144:5 144:11
145:6 145:14 146:11 148:20
149:21 150:25 152:23 153:10
156:19 157:18 167:18 170:10
173:2 173:2 173:6 173:11
173:14 173:18 173:22 174:15
174:16 175:24 176:1 179:1
185:8 186:9 188:20 189:4
189:5 189:5 189:11 189:15
190:6 190:10 191:18 195:1
196:17 197:17 198:3 200:8
200:9 200:15 202:11 203:16
**Upset** [1] 192:1
**Upstairs** [1] 145:16

### V

**Vehicle** [22] 25:15 25:17
28:20 29:18 84:21 90:17 90:
22 92:11 96:1 96:3 96:4 96:
6 96:22 97:2 113:22 134:22
134:23 134:24 168:17 168:19
180:3 196:11
**Victoria's** [2] 80:13 80:
15
**Videotaped** [2] 181:22
181:24
**Vision** [2] 72:13 73:14
**Visit** [5] 129:24 132:19
132:22 142:23 189:18
**Visited** [1] 184:11
**Visiting** [1] 91:13
**Voir** [1] 205:12
**Volume** [2] 1:2 208:6
**VOLUMES** [1] 1:2
**Volunteer** [1] 63:24
**Volunteered** [1] 82:5
**Volunteering** [1] 199:25
**VS** [1] 1:8

### W

**Wait** [1] 171:18
**Wake** [6] 135:9 137:7 137:
22 137:23 150:21 150:25
**Wal** [1] 131:1
**Wal-Mart** [2] 130:25 131:1
**Walk** [14] 89:14 89:15 89:
22 103:5 111:4 131:2 135:11
136:20 137:1 137:1 137:11
137:12 137:19 192:1
**Walked** [6] 105:20 106:13
106:15 106:17 106:19 110:23
**Walking** [6] 104:2 110:17
111:20 111:21 173:14 194:3
**Walks** [4] 103:7 103:18
105:25 106:1
**Wall** [1] 141:21
**Walter** [1] 15:9
**Wants** [1] 192:4
**Warm** [1] 73:2
**Watched** [1] 62:6
**Watching** [11] 58:20 60:

22 62:25 65:12 95:10 111:8
113:2 146:15 146:17 146:18
149:14
**Waving** [1] 111:6
**Wayne** [3] 2:12 49:15 129:
19
**Weapon** [3] 151:12 187:9
187:12
**Wear** [1] 206:17
**Wearing** [6] 16:12 61:24
122:16 138:23 165:10 184:1
**Wednesday** [2] 45:25 117:
12
**Week** [1] 207:20
**Weekend** [1] 207:14
**Weekends** [1] 56:23
**Weeks** [5] 123:7 131:19
189:23 189:24 205:14
**Well-lit** [2] 100:19 100:
20
**WENTZ** [1] 2:17
**West** [13] 51:25 52:1 55:11
55:12 55:12 55:13 55:15 55:
21 57:23 85:3 95:15 114:22
137:17
**Westheimer** [1] 59:16
**Westridge** [4] 93:1 93:7
95:4 95:5
**Wheels** [4] 98:6 98:7 98:
23 175:17
**Whereabouts** [6] 21:21 30:
22 51:12 55:1 168:7 201:10
**White** [1] 122:19
**Whole** [6] 100:16 113:2
135:18 138:7 149:3 198:20
**Wide** [2] 51:20 190:22
**Wife** [40] 19:15 45:9 46:6
46:11 46:11 56:14 56:18 59:
21 61:10 64:24 65:1 65:13
65:15 66:6 81:14 82:1 84:14
115:12 121:21 127:12 127:23
127:25 128:6 135:9 135:15
136:7 136:16 136:20 137:1
139:10 142:3 146:13 146:15
146:17 147:20 148:21 149:18
150:21 150:25 195:23
**Wife's** [4] 19:20 117:8
128:10 149:14
**Wiggly** [4] 170:24 191:14
191:17 193:3
**Wilkinson** [1] 1:20
**Willing** [2] 129:24 166:6
**Willowbend** [1] 142:14
**Winding** [1] 95:10
**Window** [6] 88:24 88:25 89:
1 110:5 110:7 112:3
**Windows** [6] 27:4 27:6 72:
23 76:18 78:11 88:19
**Witness** [31] 3:4 5:1 6:24
7:14 8:19 9:15 13:16 14:9
16:15 16:17 17:1 49:4 56:4
120:12 120:22 122:22 129:15
152:16 154:10 155:8 155:10
157:5 162:9 163:7 163:8 165:
13 184:6 194:10 201:17 204:
12 208:12
**Witnesses** [1] 7:7
**Woke** [1] 152:23
**Wonder** [1] 149:21
**Wondering** [4] 72:12 87:4
105:14 114:11
**Word** [2] 68:24 87:15
**Words** [5] 35:22 75:2 110:
14 189:4 200:23
**Works** [1] 130:25
**Worthing** [3] 54:10 92:1
92:6
**Wrapped** [3] 80:7 80:10
179:1
**Writing** [1] 208:5

### Y

**Y'all** [41] 19:11 21:2 21:
9 22:11 22:16 23:1 24:22 25:
25 28:12 30:8 30:17 31:7 32:
2 33:9 35:1 35:20 51:2 58:
20 62:5 68:14 69:16 84:20
86:22 88:10 89:17 134:10
138:2 140:24 142:2 148:1
156:11 167:19 169:19 170:5
170:21 171:7 172:2 173:8
173:18 193:6 204:10
**Year** [6] 18:22 56:25 57:3
57:7 151:21 151:21
**Year-and-a-half** [1] 53:
12
**Years** [7] 52:10 52:11 56:
1 126:18 141:5 141:6 157:23
**Yesterday** [1] 3:3
**Young** [2] 50:25 118:12
**Yourself** [4] 21:25 154:
25 155:2 155:20
**Yourselves** [2] 206:19
206:20

1                    REPORTER'S RECORD

2                VOLUME 20 OF 25 VOLUMES

3             TRIAL COURT CAUSE NO. 800112

4

5    CHARLES MAMOU, JR.        )    IN THE DISTRICT COURT

6            Appellant         )

7                              )

8    VS.                       )    HARRIS COUNTY, TEXAS

9                              )

10   THE STATE OF TEXAS        )

11           Appellee          )    179TH JUDICIAL DISTRICT

12

13

14              * * * * * * * * * * * * * * * * * * *

15              TRIAL-GUILT/INNOCENCE

16              * * * * * * * * * * * * * * * * * * *

17

18       On the 8th day of October, 1999, the following

19   proceedings came on to be heard in the above-entitled and

20   numbered cause before the Honorable J. Michael Wilkinson,

21   Judge Presiding, held in Houston, Harris County, Texas:

22       Proceedings reported by computer aided

23   transcription/stenograph machine.

24

25

```
 1              A P P E A R A N C E S

 2       MR. LYN MCCLELLAN

 3       SBOT NO. 13396100

 4       MS. CLAIRE CONNORS

 5       SBOT NO. 0470500

 6       Assistant District Attorneys

 7       201 Fannin

 8       Houston, Texas 77002

 9       Phone:  713.755.5800

10       ATTORNEYS FOR THE STATE OF TEXAS

11

12       MR. WAYNE HILL

13       SBOT NO. 59656300

14       4615 Southwest Freeway

15       Houston, Texas 77027

16       PHONE:  713.623.8312

17       MR. KURT WENTZ

18       SBOT NO. 21179300

19       5629 W FM 1960

20       Houston, Texas 77069

21       PHONE:  281.587.0088

22       ATTORNEYS FOR THE DEFENDANT
23

24

25
```

i

# INDEX

## VOLUME 20 OF 25

|  | | | | PAGE | VOL. |
|---|---|---|---|---|---|
| October 8, 1999 | Trial-Guilt/Innocence | | | | 20 |
| | | | | | |
| State's Witnesses | Direct | Cross | V. D. | | |
| Anthony Trail | 3,31,33 | 15,32,33 | | | 20 |
| Pat Gibson | 34 | 36 | | | 20 |
| James Martin Carmouche | 40 | 44 | | | 20 |
| Dr. Roger Milton | 49 | 65 | | | 20 |
| Ralph Saldivar | 78 | 93 | | | 20 |
| Robert Baldwin | 101,122 | 113 | | | 20 |
| | | | | | |
| State rests | | | | 128 | 20 |
| | | | | | |
| Motion for instructed verdict denied | | | | 129 | 20 |
| | | | | | |
| Defense Witnesses | Direct | Cross | V. D. | | |
| Roger Ruffcorn | 129,134,139 | 135,139 | 133 | | 20 |
| Charles Harold Mamou, Jr. | 140,247 | 158 | | | 20 |
| | | | | | |
| Defense rests | | | | 252 | |
| | | | | | |
| State's Witnesses | Direct | Cross | V. D. | | |
| Ted C. Bloyd | 252,263 | 255,266,273 | | | 20 |
| | 269,275 | | | | |
| | | | | | |
| State closes | | | | 275 | 20 |
| | | | | | |
| Defense closes | | | | 275 | 20 |
| | | | | | |
| Proceedings concluded | | | | 278 | 20 |
| | | | | | |
| Court Reporter's Certificate | | | | 279 | 20 |

## ALPHABETICAL INDEX

|  | Direct | Cross | V. D. | | |
|---|---|---|---|---|---|
| State's Witnesses | Direct | Cross | V. D. | | |
| | | | | | |
| Baldwin, Robert | 102,122 | 113 | | | 20 |

| State's Witnesses | Direct | Cross | V. D. | |
|---|---|---|---|---|
| Bloyd, Detective Ted | 252,263 269,275 | 255,266,273 | | 20 |
| Carmouche, James Martin | 40 | 44 | | 20 |
| Gibson, Pat | 34 | 36 | | 20 |
| Milton, Dr. Roger | 49 | 65 | | 20 |
| Saldivar, Ralph | 78 | 93 | | 20 |
| Trail, Anthony | 3,31,33 | 15,32,33 | | 20 |
| Defense Witnesses | | | | |
| Mamou, Charles, Jr. | 140,247 | 158 | | 20 |
| Ruffcorn, Roger | 129,134,139 | 135,139 | 133 | 20 |

## EXHIBITS

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
|---|---|---|---|---|
| Exhibit 38 | Gun | 127 | 128 | 20 |
| Exhibit 85 | Photo | 89 | 89 | 20 |
| Exhibit 90 | Fired bullet | 61 | 61 | 20 |
| Exhibit 93 | Newspaper clippings | 87 | 87 | 20 |
| Exhibit 94 | Photo | 101 | 101 | 20 |
| Exhibit 96 | Firearms chart | 127 | 127 | 20 |
| Exhibit 99 | Autopsy report | 60 | 60 | 20 |
| Exhibit 100 | Photo | 64 | 64 | 20 |
| Exhibit 101 | Photo | 64 | 64 | 20 |
| Exhibit 102 | Photo | 64 | 64 | 20 |

| STATE'S | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
| --- | --- | --- | --- | --- |
| Exhibit 103 | Autopsy report | 52 | 52 | 20 |
| Exhibit 104 | Photo | 53 | 53 | 20 |
| Exhibit 105 | Photo | 53 | 53 | 20 |
| Exhibit 106 | Photo | 53 | 53 | 20 |
| Exhibit 107 | Photo | 53 | 53 | 20 |
| Exhibit 108 | Photo | 53 | 53 | 20 |
| Exhibit 109 | Photo | 53 | 53 | 20 |
| Exhibit 110 | Photo | 53 | 53 | 20 |
| Exhibit 111 | Photo | 53 | 53 | 20 |
| Exhibit 112 | Probation revocation | 244 | 245 | 20 |
| DEFENSE | DESCRIPTION | OFFERED | ADMITTED | VOLUME |
| Exhibit 9 | Yellow Cab records | 132 | 134 | 20 |

3

```
1                    (Jury is brought in and seated.)
2              THE COURT:  Call your next, please.
3              MR. MCCLELLAN:  State would call Anthony
4    Trail.
5              THE COURT:  Proceed, please.
6                    ANTHONY TRAIL,
7    having been first duly sworn, testified as follows:
8                    DIRECT EXAMINATION
9    BY MR. MCCLELLAN:
10        Q.  State your name for the record, please.
11        A.  Anthony Trail.
12        Q.  Okay.  Mr. Trail, how are you employed?
13        A.  I'm a schoolteacher.
14        Q.  Okay.  And where do you teach school at?
15        A.  At Hilliard Elementary.
16        Q.  How long have you been doing that?
17        A.  Three years in education.
18        Q.  Do you live here in Harris County, Texas?
19        A.  Yes.
20        Q.  Okay.  At one point in time, back in December
21   of 1998, did you live at a location on Ashford Point?
22        A.  Sure, yes.
23        Q.  And what was the address there?   Do you
24   recall?
25        A.  1277 Ashford Point Drive.
```

4

```
1         Q.  And what part of town is that in?
2         A.  Southwest.
3         Q.  How far is your location where you live from
4    Sugar Land?
5         A.  Not far; about three miles or so, three or four
6    miles.
7         Q.  Now do you know a person by the name of Charles
8    Mamou, Jr.?
9         A.  Yes.
10        Q.  And what do you know him as?
11        A.  As?
12        Q.  What name do you know him by?
13        A.  Chucky.
14        Q.  And are you related in any way to --
15        A.  Yes, it's my cousin.
16        Q.  You've known him for a long time?
17        A.  We pretty much grew up together, same small
18   town in Sunset, Louisiana.
19        Q.  So, you're from Sunset originally?
20        A.  Yeah.
21        Q.  So you pretty much known him all his life?
22        A.  Well, throughout when I went to school, you
23   know, went to school, we kind of lost touch; but I've
24   been knowing him all my life, yeah.
25        Q.  Okay.  Now let me direct your attention to
```

5

```
1    December the 7th of 1998, which was a Monday.  Did you
2    have an occasion on that day to see Charles Mamou, Jr.?
3         A.  Yes.
4         Q.  Okay.  And how did it come about that you got
5    in contact with Charles Mamou on December the 7th?
6         A.  He called me up, called me on the telephone.
7         Q.  What did he ask you to do, if anything?
8         A.  He just told me he was hungry.  And I was
9    telling him about my mom had cooked, because she was
10   down there that weekend.
11        Q.  Okay.  Did you go over and pick him up?
12        A.  Yes.
13        Q.  Where did you go pick him up at?
14        A.  Off of Fondren.
15        Q.  All right.  Did you go pick anybody else up
16   first?
17        A.  Yes, I went and picked up Tator.
18        Q.  Tator?
19        A.  Yeah.
20        Q.  Terrence Dodson?
21        A.  Terrence Dodson, yeah.
22        Q.  He's the guy who testified right before you
23   yesterday evening?
24        A.  Yes.
25        Q.  And did y'all then meet up with the defendant,
```

6

```
1    Charles Mamou?
2         A.  Yes.
3         Q.  Okay.  Where were you going to take him?
4    Where were you going to take him?  He had asked you to
5    come pick him up.  Were you taking him to any particular
6    location?
7         A.  We just went back to my house.
8         Q.  Now when the defendant got in your car, does he
9    show anything to y'all?
10        A.  Well, he showed some keys, but --
11        Q.  Okay.  Did he say what they were keys to?
12        A.  No.  Tator -- Terrence Dodson told me that they
13   were keys --
14              MR. HILL:  Judge, I object.
15              THE COURT:  Sustained.
16        Q.  (BY MR. MCCLELLAN)  My question was, whenever
17   the defendant, Charles Mamou, got in your car, did he
18   show some keys?
19        A.  I think they were some keys, yes.
20        Q.  Did he pull some keys out and show them?
21        A.  Well, they were talking.  I was driving.  They
22   were talking.
23        Q.  Well, you were engaged in that conversation,
24   were you not?
25        A.  Yeah, yes, somewhat, yeah.
```

7

1    Q.   In fact, you were talking about the fact that
2 it was about a Lexus, were you not, that you had seen on
3 TV?
4    A.   Yes.
5    Q.   And did the defendant say whether or not those
6 keys were for a Lexus?
7    A.   Later, Terrence Dodson --
8    Q.   I didn't ask you what Terrence Dodson --
9         MR. HILL:  Object to being nonresponsive
10 and to the leading.
11        THE COURT:  Sustained.
12    Q.   (BY MR. MCCLELLAN)  Did you give a statement to
13 the police?
14    A.   Yes.
15    Q.   Okay.  And is what you told them true?
16        MR. HILL:  Judge, I'm going to object to
17 him trying to bring in a statement previously made.
18        THE COURT:  It's overruled.
19    Q.   (BY MR. MCCLELLAN)  Is what you told them true?
20    A.   Yes.
21        MR. MCCLELLAN:  May I approach the
22 witness, Your Honor?
23        THE COURT:  You may.
24    Q.   (BY MR. MCCLELLAN) Let me show you these four
25 pages.  Is this your statement?

8

1    A.   Well, I haven't read it; but yes, it is.
2    Q.   Well, go ahead and read it.
3         Is that your statement?
4    A.   Yes.
5    Q.   Now when Chucky got in the car, did he say
6 anything about the keys?
7    A.   He just said there were some keys to a car,
8 yes; and I remember, you know, him saying it was a
9 Lexus.
10    Q.   He said they were keys to a Lexus?
11    A.   Yes.
12    Q.   Did you make any inquiry about that?
13    A.   No.  I just told him I seen the news earlier
14 and that it was about some Lexus.  And I was telling
15 him, Hey, get away from there or, you know, get rid of
16 the keys or whatnot, if there was some keys to the
17 Lexus.  I was telling him to, you know, because I seen
18 it on the news.
19    Q.   You asked him what color the Lexus was that he
20 said he had keys to?  Look on the second page, second
21 paragraph.  Does that refresh your memory?
22    A.   Blue.
23    Q.   The question was, did you ask him what color
24 the Lexus was?
25    A.   Yes.

9

1    Q.   Did he tell you what color the Lexus was?
2    A.   Yes.
3    Q.   What color did he say it was?
4    A.   It was blue.
5    Q.   Did he say anything about any accessories the
6 Lexus had on it?
7    A.   He said they had some wheels on it, some mag
8 wheels.
9    Q.   What color?  What type?
10    A.   He didn't say.  It was just some mag wheels.
11 They were expensive.
12    Q.   Did you tell him what kind of wheels you saw --
13 that you heard on the news the Lexus had?
14    A.   I heard they had some, you know, wheels --
15 that's what kind of caught my eyes -- they had some
16 chrome wheels that were pretty expensive.
17    Q.   You say chrome wheels?
18    A.   Yes.
19    Q.   Now what was Chucky's attitude when he was
20 talking about the Lexus?
21    A.   What was his attitude?
22    Q.   What was his attitude?  How was he acting?
23    A.   I'm not sure I understand what you mean, as far
24 as how he was acting.
25    Q.   Was he joking about it?  Was he normal?  Was

10

1 he excited?  How would you describe his attitude?
2    A.   I don't know that it was abnormal.  I wouldn't
3 say it was abnormal.
4    Q.   Okay.  Now did you take Terrence Dodson
5 someplace?
6    A.   Yes.  Well, he rode with us.  When I picked
7 Charles up, he rode with us, you know; because I didn't
8 know how to get to where he was, so I picked up Tator.
9    Q.   We're already there.  He's already gotten in
10 your car.
11    A.   Okay.  We took Terrence back home.
12    Q.   And after you took Terrence back home, did --
13 where did you go?
14    A.   We went back toward my house.
15    Q.   That being on Ashford Point?
16    A.   Yes.
17    Q.   And this is you and the defendant?
18    A.   Yes.
19    Q.   And did he ask you to go to a certain location?
20    A.   Yes.
21    Q.   And what location was that?  Was that close to
22 your house or far away?
23    A.   Yes, it was right across from my house.
24    Q.   And describe the location where he asked you to
25 go.

11

1      A.  You turn off of Dairy Ashford.  You go all the
2  way down; and there is a dome, like a church.  I don't
3  know if it's a church, but it's like a big dome; and
4  there is a little dead-end street.
5      Q.  And did you take him to that dead-end street?
6      A.  Yeah.
7      Q.  Let me show you what's been introduced into
8  evidence as State's Exhibit No. 61 and ask you if this
9  diagram shows the location where your apartment is?
10     A.  Yeah.
11     Q.  All right.  Does it show on there the street
12  we're talking about?
13     A.  Yes.
14     Q.  Okay.  I'm going to ask you to take this arrow
15  and point it, if you will, at the street you took the
16  defendant to.  And is this street a through street, or
17  does it end somewhere?
18     A.  It's a dead-end.
19     Q.  What does it dead-end into?
20     A.  Ends to a stop sign.
21     Q.  Is there a bayou there?
22     A.  I'm not sure if there is one or not.
23     Q.  What did the defendant do when you got to that
24  location?
25     A.  He jumped out of the car.

12

1      Q.  All right.  Did he pick anything up?
2      A.  I think he picked something up.  I'm not sure
3  if he picked something up.  Or I know he jumped out and
4  picked something up, but I'm not sure what it was he
5  picked up.
6      Q.  Did he get back in the car?
7      A.  Yes.
8      Q.  Do you remember -- did you have some glasses or
9  frames?
10     A.  I don't remember.
11     Q.  On the second page, can you look at the third
12  full paragraph, read that to yourself?
13     A.  Okay.
14     Q.  Did he pick something up?
15     A.  I asked him what he picked up.  He told me that
16  it was some glasses that he dropped.
17     Q.  Okay.  Did you ask him why he had dropped some
18  glasses over on that street by your house?
19     A.  Yes.
20     Q.  At that time, as far as you know, did he know
21  where you lived?
22     A.  Yes.
23     Q.  He did know where you lived?
24     A.  Yes.
25     Q.  And did he tell you why he had left some

13

1  glasses there?
2      A.  He said that he was with a female.
3      Q.  And they were doing what?
4      A.  He just said that the female was giving him
5  oral sex.
6      Q.  Did he say why he left that location?
7      A.  No.
8      Q.  Is there a police substation close by where you
9  live?
10     A.  Sure.
11     Q.  He didn't say anything about seeing police cars
12  go by?
13     A.  No, he just -- I can't remember if he made a
14  comment about that or not.
15     Q.  After that, where did y'all go?
16     A.  We went to my house.
17     Q.  Was the defendant making any inquiries about
18  any news item that was going on that day?
19     A.  Well, the news was coming on; and it was just
20  flashing about the accident, about the Carmouche girl in
21  this case.
22     Q.  Did you look up on the Internet to see if there
23  is any information on the trial?
24     A.  Yeah.
25     Q.  I mean, on the case?

14

1      A.  Yes.
2      Q.  Did you find anything?
3      A.  Yes.
4      Q.  Did Chucky read that, what was on the Internet?
5      A.  Yes.
6      Q.  Was it that day or another day that you took
7  him to another location?
8      A.  It was that day.
9      Q.  That day.  Okay, where did you take him?
10     A.  Back on Fondren.
11     Q.  Okay.  And after you took him back on Fondren,
12  did you take him somewhere else that day?
13     A.  Yes.  I took him to the bus station.
14     Q.  Did you leave him there at the bus station?
15     A.  Yes.
16     Q.  After you left him at the bus station, did you
17  hear from him again by telephone?
18     A.  Yes.
19     Q.  That day or the next day --
20     A.  It was --
21     Q.  -- or both?
22     A.  Yeah, kind of sort of both.
23     Q.  You heard from him later that evening, as well
24  as the next day.  And while -- what was he asking about,
25  if anything, when he called?

15

1     A.  He was just asking me what I was doing.  Then,
2  you know, he asked me if I had heard anything about what
3  had -- you know, the news or anything.
4     Q.  He was asking questions about what had been on
5  the news about a missing person, Mary Carmouche?
6     A.  Yes.
7     Q.  Did you relate to him what was being said on
8  the news?
9     A.  I don't remember.
10            MR. MCCLELLAN:  I pass the witness, Your
11  Honor.
12            CROSS-EXAMINATION
13  BY MR. HILL:
14     Q.  Mr. Trail, my name is Wayne Hill.  I represent
15  your cousin, Chucky.  You and I have never spoken?
16     A.  That's correct.
17     Q.  You've never spoken to anybody associated with
18  the defense?
19     A.  That's correct.
20     Q.  How many times have you met with the
21  prosecution or the police officers in this case?
22     A.  Twice.
23     Q.  I notice -- on those occasions, did you
24  understand the express reason why you were meeting with
25  them is because they were going to call you as a witness

16

1  in this case?
2     A.  Yes.
3     Q.  Okay.  Yet, efforts at talking to you from our
4  perspective have failed, correct?
5     A.  Did you try to talk to me?
6     Q.  Yeah.
7     A.  You did?
8     Q.  Yeah.
9     A.  I didn't know.  My telephone number is in the
10  phone book.
11     Q.  Where is Hilliard Elementary?
12     A.  That's North Forest.
13     Q.  And you've been there as a school teacher for
14  three years?
15     A.  I've been there for a year.  This beginning of
16  the year was my first year there.
17     Q.  So when did you get certified as an elementary
18  schoolteacher?
19     A.  When did I?  I'm currently working on that.
20     Q.  So, you're not actually certified as a
21  schoolteacher.  Are you, like, in training?
22     A.  I'm on what they call a deficiency plan.
23     Q.  What is that?
24     A.  That's a plan to where you come in -- being
25  that I'm from Louisiana, the certifications are

17

1  different.  And you work -- they give you three years to
2  work on your certification.
3     Q.  Okay.  Who is Timmy Thomas?
4     A.  He's a friend.
5     Q.  Okay.  Is he related to you at all?
6     A.  No.
7     Q.  Where does he live?
8     A.  Sunset.
9     Q.  All right.  Do you know where in Sunset?
10     A.  Yes.
11     Q.  Whereabouts?
12     A.  Right across from my mom.
13     Q.  Is that right down the street from where
14  Charles' mother lives?
15     A.  Sure.
16     Q.  The blue house?  Is it a blue house?
17     A.  I'm not sure what color it is right now.
18     Q.  Do you go to and from Sunset on a regular basis
19  to see your mom?
20     A.  Yes.
21     Q.  Any other family there?
22     A.  Yes.
23     Q.  What about Shawn England?  Do you know Shawn?
24     A.  Shawn England.  I know a Shawn.  I'm not sure
25  if his last name is England or not.

18

1     Q.  Describe him, Shawn.
2     A.  He's a dark-skinned guy.
3     Q.  About six foot?
4     A.  Somewhere around there.
5     Q.  About 200 pounds, 190, 200 pounds?
6     A.  Somewhere around there.
7     Q.  Do you know Howard Scott?
8     A.  No.
9     Q.  The location that you took Charles Mamou back
10  to when Mr. McClellan was asking you if you took him
11  back to Fondren, where exactly did you take him to?
12     A.  Burger King.
13     Q.  Okay.  And that's where you had first met?
14     A.  Yes.
15     Q.  And the purpose for him calling you is to say
16  he wanted to get something to eat?
17     A.  Yes.
18     Q.  So you picked him up at Burger King?
19     A.  Yes.
20     Q.  You y'all didn't go inside the Burger King to
21  eat, though?
22     A.  No.
23     Q.  But before going to pick him up at the Burger
24  King, you had to go and pick up Tator?
25     A.  Right.

19

```
1    Q.  How close are you and Tator?
2    A.  Well --
3    Q.  Are y'all cousins?
4    A.  Yeah, we're cousins, also.
5    Q.  How close are you?
6    A.  I wouldn't say we're real close, but we're as
7  close as cousins can be.
8    Q.  See one another on a regular basis?
9    A.  I wouldn't say regular basis.  My schedule is
10 kind of different.
11   Q.  Okay.  Different than his schedule?
12   A.  Right.
13   Q.  When did you first come to Houston to live?
14   A.  1997, I think.
15   Q.  So, roughly two years ago?
16   A.  Yeah.
17   Q.  If I understand you correctly, you say that
18 about 8:30 in the morning on December 7th, which is a
19 Monday, that's when you hear from Chucky.  And he asked
20 you to come pick him up?
21   A.  Right.
22   Q.  Let's go back a few days and let me ask you,
23 what type of association are you having with Chucky
24 during the couple of three days before December 7th?
25 Did you see him at all?
```

20

```
1    A.  Yes.
2    Q.  Where are you seeing him?
3    A.  I seen him Thursday at Terrence Dodson's house.
4    Q.  What were y'all doing over at Terrence's on
5  Thursday?
6    A.  We were -- it's -- Terrence's sister had cooked
7  a gumbo, and we were eating gumbo.
8    Q.  Okay.  Did you go and pick Chucky up to take
9  him over to Terrence's?
10   A.  No.
11   Q.  Do you know how Chucky got over to Terrence's?
12   A.  No.  Well, I think he had a car at the time,
13 yes.
14   Q.  Chucky had a car?
15   A.  Yes.
16   Q.  What kind of car was he driving?
17   A.  I'm not sure.
18   Q.  Do you know if it was a rental car?
19   A.  I'm not sure.
20   Q.  And that would have been on Thursday, four days
21 before the Monday we talked about?
22   A.  Right.
23   Q.  Y'all sit around and talk about things when
24 you're over at Tator's eating gumbo?
25   A.  Yeah.
```

21

```
1    Q.  Okay.  Is there any discussion about doing any
2  kind of drug deal in the next several days?
3    A.  No, no.
4    Q.  Does Chucky get any telephone calls while
5  you're there sitting and eating gumbo?
6    A.  I don't remember.
7    Q.  Did Chucky have a cell phone?
8    A.  No.
9    Q.  Do you know if Tator had one?  Was Stephanie
10 home at the time y'all were over there?
11   A.  Yes.
12   Q.  Did anyone else come over?
13   A.  I don't think so.  I don't remember.  I don't
14 think so.  All I remember is just us being there.
15   Q.  How long do you stay there?
16   A.  We stayed there roughly, I would say, two or
17 three hours.
18   Q.  Okay.  Now if that's on the Thursday before
19 Monday, which is December 7th, what about anytime before
20 that, that week?
21   A.  No.
22   Q.  So the first time -- let's use December 1st as
23 our starting point.  Do you see him anytime -- Charles
24 Mamou -- do you see him anytime, starting around
25 December 1st through December 7th, other than on --
```

22

```
1    A.  December 1st is on what date?
2    Q.  I'll get out my calendar, and I'll tell you.
3  December 1st was a Tuesday.
4    A.  No.
5    Q.  Now were you -- okay.  So in between December
6  1st and that Thursday, which was December 3rd, you don't
7  see Charles.  You see him on the 3rd?
8    A.  On Thursday.
9    Q.  Now, are you working at Hilliard Elementary
10 school at that time?
11   A.  No.
12   Q.  Where were you working at that time?
13   A.  Let me see.  Where was I working?  I think I
14 was working for Schlumberger and Sepco, an oil drilling
15 company.
16   Q.  So, you didn't actually start as a
17 schoolteacher a year ago.  When did you actually start
18 your training at the North Forest Independence School
19 District?
20   A.  This year.
21   Q.  So would that have been September, late August?
22   A.  Yeah.
23   Q.  You go and you pick up Charles after you pick
24 up Tator.  Tator talk to you on the way to picking up
25 Charles?
```

23

1    A.  No.  I mean, we talked; but I don't think it
2  was anything pertaining to this.
3    Q.  Was there any discussion between the two of you
4  of any drug deal or anything?
5    A.  No.
6    Q.  That was in the works?
7    A.  Of course not.
8    Q.  Or that had happened?
9    A.  Nope.
10   Q.  Terrence didn't say anything to you at that
11 time, right?  And you said you picked Chucky up over on
12 Fondren at a Burger King.  And how far is it that you go
13 to where you ultimately drive?
14   A.  I say about twenty-five minutes or so.
15   Q.  And that's to take Terrence back home?
16   A.  Terrence back home.
17   Q.  And you're going to go eat at Terrence's house?
18   A.  No, eat at my house.
19   Q.  But you've got to drop Terrence off first?
20   A.  Right.
21   Q.  About what time is that?
22   A.  Man, I can't sit here and give you a specific
23 time, because I don't remember.  All I remember is it
24 was early in the morning time.
25   Q.  So, what was your work time on December 7th?

24

1    A.  I was off.
2    Q.  Just happened to be off on that Monday?
3    A.  Yeah.
4    Q.  And you happen to be off that Thursday before?
5    A.  Yeah.
6    Q.  The -- when you are making a statement to the
7  police, do you recall what day that's on?
8    A.  I can read it, but it says here Wednesday.
9  Well, no, it's been before that.
10   Q.  Was it December 9th, at approximately 6:39
11 p.m.?  Look at the top of your statement.  See if that
12 refreshes --
13   A.  Yeah, December 9th, Wednesday, I guess, yeah.
14   Q.  All right.  And do you recall how long you
15 were with the police that day making your statement?
16   A.  I'd say thirty or forty minutes or so.
17   Q.  And do you know whether or not -- did Tator go
18 with you down to the police headquarters?
19   A.  Yes.
20   Q.  Did you drive together?
21   A.  No.  They picked us up.
22   Q.  Okay.  They, being the police?
23   A.  The police.
24   Q.  Were you in the same vehicle together?
25   A.  Yes.

25

1    Q.  All right.  So were you and Tator in the back
2  of the patrol unit or an undercover car?
3    A.  Yes.
4    Q.  Which?
5    A.  I don't know.  Mr. McClellan's car, Lyn, yeah.
6  Well, the car he was in -- I can't say it's his car, the
7  car he was in.  They came over to my apartment and --
8    Q.  Picked you up and took you down to police
9  headquarters?
10   A.  Right, that's correct.
11   Q.  And that would have been back on December 9th?
12   A.  Yes.
13   Q.  Now at the time that you were brought into the
14 police station, were you concerned the police think
15 you're somehow involved in this?
16   A.  Definitely, yes.
17   Q.  Is that the impression given to you?
18   A.  Well, I'm not too familiar with the criminal
19 justice system.  And you come over to my house, and
20 they're knocking on the door.  I'm panicking.  And I was
21 kind of scared at the time.
22   Q.  And did Tator seem like he was concerned while
23 you were sitting in the car together driving over to the
24 police station?
25   A.  I don't know.  I don't know what he was

26

1  feeling.  He didn't tell me anything.
2    Q.  Did he look calm?  Was he sitting there kind
3  of slouched down in the back of the car?  Did he seem
4  fidgety?
5    A.  I don't know.
6    Q.  Without telling us what was said to Tator, were
7  the police talking to him while you were driving to the
8  police station?
9    A.  I can't recall.
10   Q.  Were they saying anything to you?
11   A.  Nope.  They wasn't asking any questions till we
12 got to where we were going.
13   Q.  Once you got there, was it very clear to you
14 that the purpose of them talking to you was to get
15 information about your cousin, Chucky?
16   A.  Yes.
17   Q.  Were the questions that were asked of you only
18 focused on Chucky?
19   A.  No.
20   Q.  In other words, since you were responding, were
21 those mostly asking questions about Charles Mamou?
22   A.  He was basically asking questions about, when
23 did I see him?  And, you know, asking what was going on,
24 you know, what had happened, the time that we came in
25 contact with each other.

27

1    Q.   Right.  So the content of the conversation you
2    had with the police all centered on Chucky?
3    A.   I would say somehow, yes.
4    Q.   They weren't mentioning other people to you and
5    asking you about whether you were with any other people
6    on a given day, were they?  I know you can't give me a
7    specific time, Mr. Trail.  But if you're putting 8:30 in
8    the morning as the time you're going by and picking
9    Chucky up at the Burger King, approximately what time do
10   you think you take him back to that location on Fondren?
11   A.   Somewhere around, I'd say 1:00, 12:00 or 1:00
12   o'clock.
13   Q.   12:00 or 1:00 o'clock?
14   A.   Yeah.
15   Q.   What time do you ultimately take him to the bus
16   station?
17   A.   Shortly after that.
18   Q.   Do you stay with him during that period of
19   time, in between?
20   A.   Yeah, we ate together.
21   Q.   You ate at the Burger King?
22   A.   No, we ate at Taco Bell.
23   Q.   Is that the Taco Bell up on Bissonnet and
24   Fondren?
25   A.   No, the Taco Bell across the street from the

28

1    bus station.
2    Q.   Okay.  That's the bus station downtown?
3    A.   Correct.
4    Q.   So you take him from the Burger King, and then
5    do you stay with him?  I'm trying to figure out where
6    you're driving to, yourself, in between the Burger King
7    and the bus station downtown.
8    A.   You trying to think of what route we took?
9    Q.   No.  I'm trying to figure out what you're
10   doing.  You take him -- instead of going to the bus
11   station, you take him to the Burger King on Fondren,
12   right?  That's where you take him back to?
13   A.   Yes.
14   Q.   All right.  Do you let him out of your vehicle?
15   A.   No, no.
16   Q.   All right.  So what do you do?
17   A.   We just -- he just -- you know, he was telling
18   me at the time he needed a ride to the bus station.  So
19   I just say, All right, I'll take you.
20   Q.   Now at the time that you are driving towards
21   Fondren, which is in Southwest Houston --
22   A.   Yeah.
23   Q.   -- he's not saying to you he needs to go to the
24   bus station?
25   A.   He was saying it; but I was trying to, you

29

1    know, in so many words, get out of it so I wouldn't kind
2    of --
3    Q.   So you wouldn't kind of what?
4    A.   In other words, I didn't feel like taking him
5    up there; but he was telling me he needed a ride.  I
6    knew if he was going to ask me twice, I possibly was
7    going to take him; because he needed a ride.
8    Q.   So you go to the Burger King; and you pull in
9    the parking lot and you have this conversation about,
10   Now I need to go to the bus station?
11   A.   Yeah.
12   Q.   So does he go anywhere in between Burger King
13   and the bus station?
14   A.   No.
15   Q.   You don't recall him going by any apartments or
16   anything on Fondren?
17   A.   No.
18   Q.   Do you know anybody that lives in any of those
19   apartments on Fondren?
20   A.   No.
21   Q.   Never been to one of those apartments on
22   Fondren?
23   A.   No.
24   Q.   And when you take him downtown, you said you
25   eat at the Taco Bell.  And the last you see of him is --

30

1    do you wait for him to board his bus?
2    A.   Yes.
3    Q.   And that would be the bus going back to Sunset
4    or Lafayette, Louisiana?
5    A.   I guess so.
6    Q.   Okay.  Well, you waited there for him to board
7    his bus, right?
8    A.   Yes.
9    Q.   You walk up with him when he bought his ticket?
10   A.   No, no, I didn't walk up with him; because I
11   had left shortly after that.
12   Q.   Did you give him money to buy the ticket?
13   A.   No.
14   Q.   Buy lunch?
15   A.   No, he bought lunch.
16   Q.   He bought your lunch?
17   A.   Yeah.
18   Q.   So, do you recall -- think about this.  You've
19   identified Thursday as the day that you were with him,
20   which is the 3rd of December.  And then you said you
21   were with him on the 7th, on Monday.  Do you recall --
22   if you have to look at your statement, do so -- but do
23   you recall being with him on Saturday, over at
24   Terrence's apartment, when you all were drinking beers?
25   A.   Yes, yes, yes.

31

1    Q.  Okay.  So you had forgotten that for a while?
2    A.  Yes, we did.  I remember.  Now that you bring
3  it up, I remember walking to the store.
4    Q.  How long were y'all there?
5    A.  I think an hour or so.  It wasn't long at all.
6    Q.  Thank you.
7          MR. HILL:  I have no further questions.
8  Pass the witness.
9          REDIRECT EXAMINATION
10 BY MR. MCCLELLAN:
11   Q.  Maybe I misunderstood, but did you say I picked
12 you up and took you to the police station?
13   A.  I meant you and the deputies.
14   Q.  No.
15   A.  Was it?
16   Q.  What is the first time you ever saw me?
17   A.  Let me make myself clear.  It wasn't you.  It
18 was the other detective.
19   Q.  I'm not a detective?
20   A.  Well --
21   Q.  Sergeant Novak, who's outside?
22   A.  Novak.
23   Q.  Are you saying I look like Novak?
24         MR. MCCLELLAN:  I have no further
25 questions.

32

1          MR. HILL:  May I have just one moment?
2          THE COURT:  Yes.
3          RECROSS-EXAMINATION
4  BY MR. HILL:
5    Q.  Was there ever a discussion between you and
6  Terrence, or you and anybody, for that matter,
7  regarding any kind of Crime Stoppers money or payments
8  of money being paid for testimony?
9    A.  Terrence discussed that.
10   Q.  When was that?
11   A.  I don't know.
12         MR. MCCLELLAN:  I object to hearsay, Your
13 Honor.
14         THE COURT:  When was the discussion, is
15 the question?
16   Q.  (BY MR. HILL)  Yes.  When was that discussion?
17   A.  I don't know.  It was somewhere at the
18 beginning of when we gave our statement.
19   Q.  Just before giving the statement?
20   A.  Yes.
21   Q.  So was that when you were driving down in the
22 car together, or do you recall?
23   A.  No, no.  It wasn't when we were driving the car
24 together.
25   Q.  Did you ever specifically mention an amount of

33

1  money to be paid for testifying?
2    A.  No.
3    Q.  Okay.  That's all I have.  Thank you.
4          REDIRECT EXAMINATION
5  BY MR. MCCLELLAN:
6    Q.  You never applied for any Crime Stoppers'
7  money?
8    A.  No.
9    Q.  Don't know of anybody that did, do you?
10   A.  No.
11         MR. MCCLELLAN:  No further questions.
12         RECROSS-EXAMINATION
13 BY MR. HILL:
14   Q.  Were there ever any discussions of receiving
15 funds other than Crime Stoppers' money?
16         MR. MCCLELLAN:  I object to being hearsay.
17 I don't know who the discussions are with.
18         THE COURT:  Rephrase it.
19   Q.  (BY MR. HILL)  Are you having a discussion with
20 Terrence Dodson about either of you receiving money --
21   A.  No.
22   Q.  -- for offering testimony?
23   A.  No.
24   Q.  So now you're saying you didn't have that
25 statement?

34

1    A.  We didn't have a discussion.  It was -- he was
2  just saying that --
3          MR. MCCLELLAN:  I object to what someone
4  else is saying.
5          THE COURT:  Sustained.
6          MR. HILL:  I have no further questions.
7          MR. MCCLELLAN:  I have nothing further.
8          THE COURT:  Stand down.
9          Call your next.
10         MS. CONNORS:  Trisha Gibson.
11             PAT GIBSON,
12 having been first duly sworn, testified as follows:
13         DIRECT EXAMINATION
14 BY MS. CONNORS:
15   Q.  Miss Gibson, could you please introduce
16 yourself to the jury?
17   A.  My name is Pat Gibson.
18   Q.  And how old are you, Miss Gibson?
19   A.  I'm sorry?
20   Q.  How old are you?
21   A.  I'm forty-six years old.
22   Q.  Are you married?
23   A.  Yes, ma'am, I am.
24   Q.  And how long have you been married?
25   A.  I've been married twenty-seven years.

35

```
1    Q.   What is your husband's name?
2    A.   My husband's name is Walter Gibson.
3    Q.   Miss Gibson, do you work?
4    A.   Yes, I do.
5    Q.   Where do you work?
6    A.   I'm a manager at the Houston Chronicle.
7    Q.   How long have you worked for the Houston
8  Chronicle?
9    A.   I've been there twenty-two years.
10   Q.   Does your husband work?
11   A.   No, ma'am, not currently right now.
12   Q.   Is he on some type of disability?
13   A.   Yes, yes, sir, yes, corroded disc in his back.
14   Q.   Prior to December 7th, 1998, how many children
15 did you have?
16   A.   I had three sons.
17   Q.   Was Terrence Gibson your son?
18   A.   Yes, he was.
19   Q.   What number was he in your family?
20   A.   He was my middle son, Number 2.
21   Q.   And how old was Terrence when he was killed?
22   A.   He was twenty-two.
23   Q.   Let me show you what's been marked as State's
24 Exhibit 76.  Is this a picture of your son?
25   A.   Yes, it is.
```

36

```
1    Q.   Where was that photograph taken?
2    A.   In mother's front yard.
3    Q.   Approximately when was that taken?
4    A.   That was probably about -- I'd say about 3:00
5  or 4:00 o'clock in the afternoon.
6    Q.   What year would it have been?
7    A.   This would have been '98.
8    Q.   Okay.  I'm going to show you a morgue photo of
9  your son, okay, and ask you if you can identify that.
10 Let me show you what's been marked as State's Exhibit
11 100.  Is that a photograph of your son, Terrence Gibson?
12   A.   Yes, it is.
13        MS. CONNORS:  I pass the witness, Your
14 Honor.
15             CROSS-EXAMINATION
16 BY MR. HILL:
17   Q.   Miss Gibson, I'm sure this is a very difficult
18 situation for you to have to go through.  You and I have
19 not spoken before, correct?
20   A.   That's correct.
21   Q.   Do you understand necessarily I'm going to have
22 to ask you some questions that may be painful for you to
23 answer?
24   A.   Yes, sir.
25   Q.   Okay.  I'm not trying to offend you.  I'm not
```

37

```
1  trying to make the pain any worse for you.  But I have
2  to ask you some things about your son, okay?
3    A.   Yes.
4    Q.   You say at the time of his death, Terrence was
5  twenty-two years old?
6    A.   That is correct.
7    Q.   What was -- was he working full-time at that
8  time?
9    A.   No, he was not.
10   Q.   Did you have an occasion to meet the people
11 that were his friends?
12   A.   Yes, I did.
13   Q.   And was he friends with Dion Holley?
14   A.   Yes.
15   Q.   And do you know whether or not he was friends
16 with any other individuals?
17   A.   I've not met any other, no.
18   Q.   Did you ever meet a young lady by the name of
19 Mary Carmouche?
20   A.   No.
21   Q.   Can you tell the members of the jury whether or
22 not you were aware of the fact that your son was
23 involved in some type of drug dealing?
24   A.   No, I was not aware.  Terrence was not at home
25 at the time.
```

38

```
1    Q.   When is the last time that Terrence had lived
2  in your home?
3    A.   As a matter of fact, Sunday before it happened.
4    Q.   Okay.
5    A.   That's always been -- after church on Sundays,
6  we always go to my mom's house; and he was there Sunday
7  afternoon.
8    Q.   That's his grandmother's house?
9    A.   That's correct, my mother's house.  We were
10 looking at pictures.
11   Q.   And had Terrence ever confided in you about
12 what he did in his spare time?
13   A.   No.
14   Q.   I assume that this came as an incredible shock
15 to you?
16   A.   Yes, sir.
17   Q.   Have you had an occasion to learn all of the
18 circumstances that -- why your son was where he was when
19 he was killed?
20   A.   I'm sorry?
21   Q.   Have you learned all of the circumstances of
22 how your son came to be where he was when he met his
23 death?
24   A.   No.
25   Q.   Have you had an occasion to visit with the
```

39

1   prosecutors and ask them how it was that your son was
2   killed?
3       A.   I met with them two weeks ago, and that was
4   just the first time that we met.
5       Q.   And that was to provide some photographs to
6   them?
7       A.   Right.
8       Q.   And basically, let you know that they were
9   going to ask you to come in and talk with the jury about
10  your son?
11      A.   Yes.
12      Q.   All right.   Were you -- are you familiar with
13  whether your son had any tattoos?
14      A.   Yes, I knew he had a tattoo.
15      Q.   Did you know him to only have one tattoo?
16      A.   That's all I recall.
17      Q.   Could you tell the members of the jury what one
18  you remember him having?
19      A.   It was one on his chest that I remember.
20      Q.   And what did it look like?   What was it a
21  picture of or a drawing of?
22      A.   There was a flower, I think it was, and it was
23  a picture of a gun, I think a flower and a gun.
24      Q.   A flower and a picture of a gun?
25      A.   Uh-huh.

40

1       Q.   Do you know how old he was when he received
2   that?
3       A.   I don't recall.
4            MR. HILL:   May we approach the bench for a
5   moment, Judge?
6            THE COURT:   Yes.
7            (Off-the-record discussion.)
8            THE COURT:   Ladies and gentlemen, if you
9   would, please go back in the jury room.
10           (Brief recess.)
11           (Jury is brought in and seated.)
12           THE COURT:   Proceed, please.
13           MR. HILL:   I have no further questions.
14           MS. CONNORS:   Judge, I have no further
15  questions.
16           THE COURT:   You may stand down.
17           Call your next.
18           MS. CONNORS:   James Carmouche, Your Honor.
19           THE COURT:   Proceed, please.
20           JAMES MARTIN CARMOUCHE,
21  having been first duly sworn, testified as follows:
22                DIRECT EXAMINATION
23  BY MS. CONNORS:
24      Q.   Sir, could you introduce yourself to the jury,
25  please?

41

1       A.   My name?   James Martin Carmouche.   I'm Mary's
2   father.
3       Q.   And how old a man are you, sir?
4       A.   Forty-one.
5       Q.   Are you married?
6       A.   Yes.
7       Q.   And how many children do you have?
8       A.   I had -- I have six now.   I had seven.
9       Q.   And how old is the oldest child?
10      A.   Nineteen.
11      Q.   And how old is the youngest?
12      A.   Seven.
13      Q.   And what type of work do you do?
14      A.   I'm self-employed.
15      Q.   And what type of work is that?
16      A.   We're in the construction business.
17      Q.   Are you a part owner of a construction company?
18      A.   Yes, ma'am.
19      Q.   Mr. Carmouche, directing your attention back to
20  December 8th, 1998, when you woke up that morning, did
21  you go to wake up your daughter, Mary?
22      A.   No.   I was getting ready to -- I was getting
23  myself ready to go to work.   And usually at around 5:00,
24  okay, I turn the TV on and watch the early news.   And as
25  I was walking out of the kitchen, I went and got a cup

42

1   of coffee and I heard the news going on about it was a
2   carjacking, shooting.   And then I just stopped to look
3   at it for a minute.   And when they started describing,
4   you know, the vehicles -- and I think one of the
5   reporters said, And a young girl was taken, and so --
6   and they thought her name was Mary, or one guy had said
7   Mary.   So I ran back to her room and looked, and then
8   that's when I --
9       Q.   Was there anybody in Mary's room?
10      A.   No, her room was empty.
11      Q.   What did you do at that point?
12      A.   I ran to my bedroom, woke up my wife, and woke
13  up -- went to my oldest daughter's room and woke her up.
14      Q.   What's her name?
15      A.   Leticia.
16      Q.   What did you tell Leticia to do?
17      A.   To find out if Mary had stayed the night with a
18  friend of hers down the street.   And she called there.
19  Mary wasn't there, so I told her to call the police
20  department and get some more information on that
21  incident.   And when we did that, that pretty much
22  confirmed it was her.
23      Q.   Let me stop you there.   When you went to Mary's
24  room, did you go anywhere in the house after finding
25  that Mary wasn't there?

43

1       A.   Leticia's room.  And I could see the boys'
2  room.  The door was open.
3       Q.   And you couldn't see Mary at all?
4       A.   Mary wasn't in the house.  She wasn't in the
5  living room.  I looked in the living room.  She wasn't
6  in there.
7       Q.   I'm going to have to show you, Mr. Carmouche, a
8  morgue photo that's labeled State's Exhibit 104.  Is
9  that a photograph of your daughter, Mary Carmouche?
10      A.   Yes.
11      Q.   How old was Mary when she was killed,
12 Mr. Carmouche?
13      A.   She was -- she had turned seventeen a couple of
14 months before that.
15      Q.   Okay.  And was she working when she was killed?
16      A.   Yes, ma'am, she was working at McDonald's.
17      Q.   Did she go to school?
18      A.   Yes, ma'am.
19      Q.   And where did she go to school?
20      A.   At Barbara Jordan High School.
21      Q.   What year was she in?
22      A.   She was in the 11th grade.  This was going to
23 be her senior year.
24      Q.   This would have been her senior year?
25      A.   Yes.

44

1       Q.   And State's Exhibit 77, that is a picture of
2  your daughter, Mary Carmouche?
3       A.   Yes, ma'am.
4       Q.   And where was that taken?
5       A.   That was at R.O.T.C.
6       Q.   Is that at Barbara Jordan?
7       A.   Yes, ma'am.
8       Q.   If she was killed in her junior year, when
9  would this picture have been taken, the year before?
10      A.   That year.
11      Q.   The year --
12      A.   Yes.
13      Q.   Okay.
14      A.   Let me see.
15      Q.   '96 to '97, it says?
16      A.   Right, that's it.  It was in '97.
17      Q.   Her sophomore year in high school?
18      A.   Yeah.
19           MS. CONNORS:  I pass the witness.
20                CROSS-EXAMINATION
21 BY MR. HILL:
22      Q.   Mr. Carmouche, my name is Wayne Hill.  You and
23 I have never met before, correct?
24      A.   That's correct.
25      Q.   I've got to ask you some questions, and I hope

45

1  that you'll bear with me.  I don't mean to offend you.
2  I don't mean to make your pain any worse than it already
3  is, but I want to ask you some questions about people
4  that Mary may have associated with, okay?  Did you know
5  her friend, Dion Holley?
6       A.   Never seen him before in my life.
7       Q.   Did you know an individual by the name of Kevin
8  Walter?
9       A.   I never met -- no, I've never met Kevin.
10      Q.   Did you know an individual by the name of
11 Terrence Gibson?
12      A.   No, sir.
13      Q.   Have you since come to learn that your daughter
14 was with those three individuals on the evening that she
15 was killed?
16      A.   Yes, sir.
17      Q.   All right.  When was the last time that you
18 actually saw Mary prior to waking up on the 8th and
19 seeing the news reports and realizing that it very well
20 could have been her they were talking about?
21      A.   That Sunday night around 8:30, 9:00 o'clock
22 that evening.
23      Q.   Okay.  What were the circumstances of your last
24 seeing her?
25      A.   Well, we were -- myself and my other two sons

46

1  and my little girl, we were watching TV.  Mary was in
2  the room, and I think they were playing a radio.  And
3  she was back and forth from her room to Leticia's room.
4       Q.   She was what?
5       A.   She was going back and forth from her room to
6  Leticia's room.  And I remember telling them, Turn the
7  music down.
8       Q.   All right.  And did you say good night to her
9  at some point, or that's kind of the last thing you
10 remember about having seen Mary, somewhere around 8:30,
11 9:00 o'clock on Sunday night?
12      A.   Yeah.  Before I went to bed, I told them again,
13 Turn the music down.
14      Q.   About what time did you go to bed?
15      A.   About 9:30.
16      Q.   When you went to bed at 9:30, was Mary dressed
17 or was she in a pair of shorts, getting ready for bed?
18 Can you describe what she was wearing?
19      A.   Well, I went into my bedroom; and my wife and
20 Mary went to the store, so if she was dressed --
21      Q.   Do you recall what she was wearing the last
22 time you saw her?
23      A.   Tennies and, like, a red pair of jeans.
24      Q.   As far as you know, did your wife and Mary both
25 come back from going to the store?  Do you recall?

**47**

1    A.  Yes, they did.
2    Q.  At some point after that, do you know how Mary
3  comes to leave the house?
4        MS. CONNORS:  I would object.  That would
5  be hearsay.  He said he went to sleep.
6        THE COURT:  That's not exactly what he
7  said.  Do you know of your own knowledge how she left
8  your house?
9        MS. CONNORS:  Not what someone told you.
10  Judge, the question is, did he see her leave the house?
11        THE COURT:  Rephrase your question,
12  please.
13    Q.  (BY MR. HILL)  When your wife and Mary came
14  home, you were still awake?
15    A.  Yeah.
16    Q.  Did you see how Mary left the house?
17    A.  No, I didn't.
18    Q.  Did you lock the front and back door before
19  going to bed?  Or after your wife and Mary got home, did
20  you lock the doors to the house?
21    A.  They -- the rear of the house was already
22  locked.  And I guess when they came in, they locked the
23  front door.  My wife checks all the doors every night,
24  so I know the front door was locked.
25    Q.  All right.  After they came home, did you see

**48**

1  how Mary left the house?
2    A.  No, sir.
3    Q.  Did you hear a horn or anything beeping out in
4  front of your house?
5    A.  No, sir.
6    Q.  Had you ever seen -- had anybody ever brought
7  your daughter home in a blue Lexus?
8    A.  I have seen the car.  I never seen the
9  occupants of the car.
10    Q.  Did you ever discuss with your daughter the
11  fact that she was with certain people in that car?
12    A.  Yes.
13    Q.  All right.  Was that a situation that you were
14  upset about?
15    A.  Very.
16    Q.  And the following morning after you see the TV
17  show and you're now returning to the back of your house
18  trying to see if Mary's home, do you look at all in the
19  bedroom she stays in?
20    A.  Yes.
21    Q.  Was there anything unusual that you saw when
22  you looked around the room?
23    A.  She wasn't in there.  Other than that,
24  everything was in place.
25    Q.  Did you look at the windows at all?

**49**

1    A.  No, sir.
2    Q.  Thank you, sir.
3        MR. HILL:  I have no further questions.
4        MS. CONNORS:  I have no further questions.
5        THE COURT:  You may stand down.
6        Call your next witness.
7        MS. CONNORS:  State would call Dr. Milton.
8        THE COURT:  Proceed, please.
9            DR. ROGER MILTON,
10  having been first duly sworn, testified as follows:
11            DIRECT EXAMINATION
12  BY MS. CONNORS:
13    Q.  Sir, could you introduce yourself to the jury,
14  please?
15    A.  My name is Dr. Roger Milton.
16    Q.  And where do you work, Doctor?
17    A.  I work at the Harris County Medical Examiner's
18  Office as an assistant medical examiner.
19    Q.  Can you tell the jury what your background and
20  training is that allows you to hold your present
21  position?
22    A.  I graduated from Howard University College of
23  Medicine.  I did a pathology residency at Howard
24  University, and a forensics pathology fellowship in
25  Baltimore, Maryland, and have been at the medical

**50**

1  examiner's office in Houston for about one year.
2    Q.  What is forensic pathology, Doctor?
3    A.  Forensic pathology is a subspecialty of the
4  overall study of pathology, which is the science of
5  diseases, the causation processes, ramifications, et
6  cetera.  Forensic pathology is the branch that deals
7  with determination of the causation and manner of death.
8    Q.  Is your medical license here on file in Harris
9  County, Texas?
10    A.  Yes, it is.
11    Q.  Doctor, as part of your duties as an assistant
12  medical examiner, do you perform autopsies?
13    A.  Yes.
14    Q.  Can you tell the jury what an autopsy is,
15  please?
16    A.  An autopsy is, in a nutshell, a scientific
17  exercise where we use observation skills, scientific
18  skills, and just a basic overall knowledge to determine
19  what the causation of a person's death would be.  We use
20  external examination, documenting all wounds, any
21  abnormalities on the external surfaces of the body, as
22  well as full examination of the organ systems, sometimes
23  microscopic examinations and just documentation of any
24  abnormalities that we uncover.
25    Q.  Doctor, on December 9th, 1998, did you perform

51

1 an autopsy on Mary Carmouche?
2    A. Yes.
3    Q. How did you go about dictating your findings
4 when you were examining the body of Mary Carmouche?
5    A. Well, at the time of autopsy, everything that
6 we observe, we document on a chart written, as well as a
7 verbal dictation into a cassette tape. So, as we
8 observe the appearance of the body externally, we
9 describe it on the tape and continue to describe the
10 entire autopsy. And that tape is later transcribed into
11 a typewritten report form.
12    Q. Let me show you what's been marked as State's
13 Exhibit 103. Is this the autopsy report for Mary
14 Carmouche?
15    A. Yes.
16    Q. Every time a person dies, does the medical
17 examiner's office perform an autopsy?
18    A. No.
19    Q. Is an autopsy report made in the normal course
20 of business of the medical examiner's office?
21    A. Yes.
22    Q. Is the information placed on the report made by
23 someone who has personal knowledge of what they're
24 observing? That would be you; is that correct?
25    A. Yes.

52

1    Q. You have personal knowledge. You dictate your
2 findings into a cassette recorder?
3    A. Correct.
4    Q. And it's transcribed?
5    A. Right.
6    Q. And after you dictate your findings and the
7 report is transcribed, do you review this report?
8    A. Yes.
9    Q. And as an assistant medical examiner, do you
10 have care, custody, and control of the records at the
11 medical examiner's office?
12    A. Yes.
13    MR. MCCLELLAN: Your Honor, at this time
14 I'd offer into evidence State's Exhibit 103.
15    MR. HILL: No objection, Your Honor.
16    THE COURT: State's 103 is admitted.
17    Q. (BY MS. CONNORS) Doctor, as part of your job
18 in doing the autopsy, part of the documentation process,
19 do you photograph the bodies and the findings, what you
20 see when you're performing the autopsy?
21    A. Yes.
22    Q. Let me show you what's been marked for
23 identification purposes only as State's Exhibits 104,
24 105, 106, 107, 108, 109, 110, and 111. Are these
25 photographs that you took of Mary Carmouche's body back

53

1 on December 9, 1998?
2    A. Yes.
3    MS. CONNORS: Your Honor, at this time I
4 tender to defense counsel all the numbers that I just
5 read into the record and ask they be admitted.
6    MR. HILL: No objection, Your Honor.
7    THE COURT: State's Exhibits 104 through
8 111 are admitted.
9    Q. (BY MS. CONNORS) Doctor, when you first
10 perform the autopsy, what do you first do?
11    A. Well, the first step of the autopsy is
12 documentation of the external appearance of the body.
13    Q. Can you describe the external appearance of
14 Mary Carmouche, please?
15    A. Yes. She was a well-developed, well-nourished,
16 young, black female in apparent good health. She had
17 multiple excoriations on her body, face, arms, and legs,
18 hands, that are consistent with postmortem insect
19 feeding.
20    Q. What is excoriation mean?
21    A. Excoriation is basically a sheering -- just an
22 absence of the external surface of the skin, the most
23 superficial layer. Her autopsy was remarkable for an
24 apparent gunshot wound to the right side of her chest.
25 And she had a linear superficial cut or scrape to her

54

1 right arm. And aside from that, the external appearance
2 was unremarkable.
3    Q. Can you describe the internal appearance of
4 Mary Carmouche?
5    A. The gunshot wound tract extended through the
6 right side of her chest in a front to back and downward,
7 slightly right to left trajectory. It penetrated the
8 fifth rib on the right side of the chest. Also went
9 through the right lung, the upper portion of the right
10 side of the heart, and the medial, which is the middle
11 portion of the liver; and we recovered a bullet from the
12 back muscle.
13    Q. Okay.
14    A. She had a significant amount of blood in the
15 right side of her chest, about 1100 millimeters; and she
16 also had blood surrounding the heart enclosed in the
17 pericardial sac, about seventy-five milliliters.
18    Q. Why was that blood there? What caused the
19 blood to be there?
20    A. The perforation of the heart.
21    Q. Did you remove a bullet from Mary Carmouche's
22 body?
23    A. Yes, I did.
24    Q. Where was that bullet removed from?
25    A. It was removed from the muscle of the central

55

1    portion of the right side of her back.
2    Q. Let me show you what's been marked for
3    identification purposes only as 9 -- State's Exhibit 91,
4    a manila envelope. Is that your writing on State's
5    Exhibit 91?
6    A. Yes, it is.
7    Q. Did you place your initials, name, Carmouche,
8    the date of the autopsy, December 9th, 1998, and the
9    medical legal number, Case No. 98-3385?
10   A. Yes, I did.
11   Q. And each time an autopsy report is done, is
12   there a specific number that is assigned to that
13   particular case?
14   A. Yes.
15   Q. And is that the case number that I just read
16   from in State's Exhibit 91?
17   A. Yes, it is.
18   Q. And is this the bullet you recovered from the
19   right back of Mary Carmouche on December 9th, 1998?
20   A. Yes.
21   Q. Did you also put your initials and the case
22   number on the plastic envelope that I removed from
23   State's Exhibit 91?
24   A. Yes, I did.
25   Q. What was the cause of death of Mary Carmouche?

56

1    A. The cause of death was a gunshot wound of the
2   chest.
3   Q. And what was the manner of death?
4   A. The manner of death was homicide.
5   Q. Doctor, can you step down and show the
6   photographs that you took of the body of Mary Carmouche
7   when you performed the autopsy? Keep your voice up and
8   explain to the jury what these photographs show, please.
9   Let me hand you State's Exhibit 104.
10   A. This is a photograph of the face of the
11   decedent, the excoriations that I described earlier,
12   this reddened area. The purple discoloration is what we
13   term lividity. It looks like a bruising; but in fact,
14   it's an actual settling of the blood. Since the victim
15   was found facedown, the blood tends to pool on the
16   anterior or front surface of the body, including the
17   face. So those are not bruises.
18   Q. And State's Exhibit 105, what does that show,
19   Doctor?
20   A. This is a relatively close shot of the gunshot
21   entrance wound to the right side of the chest.
22   Q. Was there any soot or stippling around that
23   wound?
24   A. I did not observe any.
25   Q. Let me show you what's been marked as State's

57

1    Exhibit 106. What does that show, Doctor?
2    A. This is a photograph of the right arm that
3   shows the multiple excoriations that I described that
4   are consistent with postmortem insect feeding.
5   Q. And State's Exhibit 107, what does that show,
6   sir?
7   A. This is more of the same on the left arm of the
8   postmortem insect activity, the reddish areas.
9   Q. And State's Exhibit 108 and 109?
10   A. These are the hands, and they show more of the
11   same.
12   Q. State's Exhibit 110, Doctor, what does that
13   show?
14   A. This is the scratch or scrape of the right arm.
15   Q. And State's Exhibit 111, sir, what does that
16   show?
17   A. This is just a closer shot of the scrape of the
18   right arm that I just showed.
19   Q. Could you tell whether or not this was a recent
20   scrape?
21   A. Yes, it's a recent scrape.
22   Q. Doctor, within approximately how many hours
23   does lividity fix?
24   A. Lividity, it fixes approximately twelve hours.
25   And it's -- that's an approximation. It depends on a

58

1    lot of factors; environmental temperature, et cetera,
2   the state of health of the individuals. It starts to
3   set in quickly after death. You can begin to see it
4   about maybe at one half to two hours. And it usually
5   becomes settled or what we term fixed at about twelve
6   hours.
7   Q. Can you tell us the angle of the gun with
8   respect to Mary Carmouche's shot of the chest at the
9   time she was shot?
10   A. Yes, I could say that the angle of the muzzle
11   of the gun at the time it was fired was above the point
12   of entry. It was pointing downwards and slightly toward
13   the midline.
14   Q. Doctor, as part of the autopsy report, is a
15   toxicological report done with the examination of the
16   bodily fluids to determine whether there is any drugs in
17   the person's system?
18   A. Yes.
19   Q. Was there an analysis done to determine whether
20   there were drugs in Mary Carmouche's system?
21   A. Yes, there was.
22   Q. Did Mary Carmouche have any type of alcohol or
23   drugs in her system?
24   A. She did not.
25   Q. Doctor, did you also perform the autopsy on

59

1 Terrence Gibson?
2    A. Yes, I did.
3    Q. Could you tell us the cause of death of
4 Terrence Gibson?
5    A. Mr. Gibson died of a gunshot wound of the
6 chest.
7    Q. Can you tell the jury what path the bullet
8 traveled?
9    A. The path the bullet traveled was from the front
10 to the back, from the left to the right side of the
11 chest, and downward. The bullet entered the far lateral
12 upper aspect of the left side of the chest, just
13 anterior or to the front of the armpit on the left side.
14 It went through the space between the fifth and sixth
15 ribs, went through the lung, the diaphragm, penetrated
16 the thoracic and abdominal aorta, which is a very large
17 blood vessel that runs along the anterior aspects of the
18 backbone, and fixed in the 11th vertebrae of the
19 backbone, and also penetrated the liver.
20    Q. Did you remove a bullet from Mr. Gibson's body?
21    A. Yes, I did.
22    Q. Where was that bullet removed from?
23    A. It was removed -- it was actually between the
24 right side of the liver and the overlying diaphragm.
25    Q. Let me show you what's been marked as State's

60

1 Exhibit 90 and its contents. Is this a manila envelope
2 where you placed your initials, the date, and the case
3 number assigned to the autopsy report of Terrence
4 Gibson?
5    A. Yes.
6    Q. Let me show you what's been marked for
7 identification purposes only as State's Exhibit 99. Is
8 that the autopsy report you did on Terrence Gibson?
9    A. Yes, it is.
10    Q. True and correct copy?
11    A. It is.
12    Q. Was that autopsy report made in the normal
13 course of the business of the medical examiner's office?
14    A. Yes, it was.
15    Q. Was it made -- the information that was placed
16 there -- made by someone who has personal knowledge of
17 the information summation?
18    A. Yes.
19    Q. Do you have care, custody, and control of the
20 records of the medical examiner's office?
21    A. Yes.
22    MS. CONNORS: Your Honor, at this time I
23 tender to defense counsel State's Exhibit 99.
24    MR. HILL: No objection, Your Honor.
25    THE COURT: State's 99 is admitted.

61

1    Q. (BY MS. CONNORS) Let me show you State's
2 Exhibit 90 and its contents. What is this, Doctor,
3 within the plastic bag that I removed from State's
4 Exhibit 90?
5    A. That's the bullet recovered from Mr. Gibson.
6    Q. Did you also place the medical legal number on
7 this plastic bag with your initials and the date that
8 you performed the autopsy?
9    A. Yes, I did.
10    MS. CONNORS: Your Honor, at this time I
11 tender to defense counsel State's Exhibit 90 and offer
12 it into evidence, State's Exhibit 90 and its contents.
13    MR. HILL: No objection.
14    THE COURT: State's 90 and its contents
15 are admitted.
16    Q. (BY MS. CONNORS) Doctor, when you performed an
17 external view of Mr. Gibson, did you find any tattoos on
18 his body?
19    A. Yes, Mr. Gibson had multiple tattoos.
20    Q. When you performed the examination of his body,
21 did you find any stippling on his body?
22    A. I did.
23    Q. Where did you find stippling?
24    A. I found stippling around the gunshot entrance
25 wound, and also on the front aspect of his left arm.

62

1    Q. When you say the front aspect of his left arm,
2 could you point to your arm and show us what you're
3 talking about? So it's up towards your shoulder; is
4 that correct, of your left arm?
5    A. On the arm itself, but on the very front aspect
6 of it.
7    Q. Doctor, can you explain to the jury what
8 stippling means, please?
9    A. Stippling refers to injuries left on the skin
10 as a result of discharge of a firearm. What it actually
11 is is grains of gunpowder that are propelled out behind
12 the bullet as it leaves the barrel of the gun; and along
13 with the bullet, these particles of powder impact on the
14 skin and they leave little injuries, abrasions, little
15 circular abrasions.
16    Q. If you see stippling on a person's body, what
17 does that indicate to you with respect to the distance,
18 how close the firearm was to that person?
19    A. It indicates that it's what we term in
20 forensics an intermediate range gunshot wound, which
21 means that it's anywhere from no more than eighteen
22 inches or two feet from the body.
23    Q. The bullet, State's Exhibit, I believe -- is it
24 90, Doctor -- that's next to you that you removed from
25 Terrence Gibson's body, what kind of bullet was that?

63

1    A.  It was a large caliber hollow-point bullet.
2    Q.  And what does a hollow-point bullet do once it
3  goes into a person's body?
4    A.  A hollow-point bullet has a hollowed-out point,
5  or the front of the bullet is hollowed out.  What that
6  tends to do is slow the bullet down.  As the bullet
7  expands, it impacts against the tissue, slows the bullet
8  down, and is essentially created to prevent perforating
9  injuries or prevent bullets from exiting the opposite
10  sides of the body.
11    Q.  What do you mean when you say perforating
12  injuries?
13    A.  Perforating is a wound that travels completely
14  through a body as opposed to when it just enters and
15  remains inside.
16    Q.  A hollow-point bullet is designed to cause more
17  damage if it enters a person's body?
18    A.  Yes.
19    Q.  Did you also, as part of your examination of
20  Mr. Gibson's body, did you take photographs?
21    A.  Yes, I did.
22    Q.  Let me show you what's been marked State's
23  Exhibits 100, 101, and 102.  Are these photographs that
24  you took when you performed the autopsy on Terrence
25  Gibson?

64

1    A.  Yes, they are.
2    MS. CONNORS:  Your Honor, at this time I
3  tender to defense counsel State's Exhibit 100, 101, 102,
4  and offer them into evidence.
5    MR. HILL:  I have no objection.
6    THE COURT:  State's 100, 101, and 102 are
7  admitted.
8    Q.  (BY MS. CONNORS)  Doctor, could you step down
9  and show the jury what you found?  You told the jury, I
10  believe, there were multiple tattoos; is that correct?
11    A.  Yes.
12    Q.  Are those shown on State's Exhibit 100?
13    A.  You see some of the tattoos on the right arm.
14    Q.  What are they tattoos of?
15    A.  There is a tattoo of a circle with blood
16  dripping from it and of a large cat scratching.
17    Q.  Was there also a tattoo of an old man?  Is
18  that shown on there?  I can't see.  Doctor, what does
19  State's Exhibit 101 show?
20    A.  This photograph shows the gunshot entrance
21  wound of the left side of the chest.  Also shows a large
22  tattoo of the left chest and the tattoo on the left arm.
23    Q.  And State's Exhibit 102, is this a closer --
24    A.  That is closer view of the same gunshot
25  entrance wound.

65

1    Q.  Doctor, was an analysis also performed of the
2  body fluids of Mr. Gibson to determine whether or not he
3  had any drugs in his system?
4    A.  Yes, it was.
5    Q.  Was there any alcohol in Mr. Gibson's system?
6    A.  There was not.
7    Q.  Was there any drugs in his body?
8    A.  There was not.
9    Q.  And the cause of death of Mr. Gibson was
10  gunshot wound to the left chest; is that correct?
11    A.  Yes.
12    Q.  What was the manner of death?
13    A.  Homicide.
14    MS. CONNORS:  I'll pass the witness, Your
15  Honor.
16    CROSS-EXAMINATION
17  BY MR. HILL:
18    Q.  Dr. Milton, my name is Wayne Hill.  You and I
19  have not met before?
20    A.  No.
21    Q.  I want to just kind of walk you through a
22  little bit so the jury might understand some of the
23  mechanics of protocols that you use in the medical
24  examiner's office regarding the performance of an
25  autopsy.

66

1    First of all, when the autopsy of Miss
2  Carmouche and the autopsy of Mr. Gibson were performed,
3  were there police officers present at the time?
4    A.  There were.
5    Q.  All right.  Is it pretty common for members of
6  the homicide division or some police agency to be
7  present when you're doing an autopsy?
8    A.  Yes.
9    Q.  When you have a body that you have the
10  responsibility of performing the autopsy on, are there
11  other factors that you take into consideration for
12  making a determination of death and a manner of death?
13    A.  Yes.
14    Q.  How do you go about doing that?
15    A.  A lot of what we use, as far as coming to a
16  final decision, as far as cause and manner of death, has
17  a lot to do with the scene investigation, police report,
18  any other information that could, you know, be --
19    Q.  Assist you?
20    A.  Exactly.
21    Q.  Is it clear to you, though, when you begin an
22  autopsy -- in other words, when you first come into the
23  examination room and you start to actually evaluate the
24  body, you already have information given to you, and the
25  police have already basically told you what their theory

67

1  is?
2       A.  Usually, yes.
3       Q.  And is that the situation in both of these
4  cases, that prior to you actually beginning the external
5  examination and then the internal examination, you had
6  already met with the homicide detectives?
7       A.  Not in this case.  I knew there were gunshot
8  wound injuries, but I hadn't met with them until
9  actually starting the autopsy.
10      Q.  Okay.  Are you talking with the officer during
11 the autopsy?
12      A.  Somewhat.
13      Q.  Do you at some point call them over and show
14 them certain aspects of what you're doing and talking
15 about there that's significant to their investigation?
16      A.  There are actually a lot of different styles
17 that the different police officers use.  Sometimes the
18 officer that's present has no knowledge of the case, and
19 other times they have some knowledge; but it's usually
20 an officer that's on the outskirts of the case and not
21 involved.
22      Q.  Okay.  Do you recall in the autopsy of Mary
23 Carmouche who the detective was that was present?
24      A.  I don't recall.
25      Q.  And what about with Mr. Gibson?

68

1       A.  I don't recall if they were involved with the
2  case or if they were there as an observer.
3       Q.  Okay.  You indicated that microscopic evidence
4  is often recovered from the body?
5       A.  Yes.
6       Q.  Would you describe for the jury the
7  significance of microscopic evidence?
8       A.  Microscopic evidence usually comes into play
9  when you have a natural death or a death that's with no
10 external injuries or causes, such as stab, gunshot
11 wound, or strangulation, et cetera.  It's usually a
12 young person who dies unexpectedly, and we're basically
13 looking for disease processes when we take small
14 sections of each organ and examine them under the
15 microscope to make sure they're functioning properly and
16 no disease process is going on.
17      Q.  How does that contrast with the phrase, trace
18 evidence?  Are you familiar with that phrase?
19      A.  Yes.
20      Q.  What is trace evidence?
21      A.  Trace evidence is -- and again, I want to
22 preface my statement by saying that's really not my area
23 of expertise.  I do have some experience with it.  Trace
24 evidence is basically a collection of evidence that's of
25 more or less a foreign material that's usually on the

69

1  external aspects of the body, the clothing, the skin,
2  and basically examining those external pieces of
3  information, fibers, body fluids, chips of paint, et
4  cetera.  And in case they could come into use later on
5  where, you know, evidence, did someone leave this at the
6  scene, et cetera, you can tie things in.
7       Q.  It's kind of like when fingerprints are left
8  behind?
9       A.  Right, right.
10      Q.  Okay.  When you examined the body of Mary
11 Carmouche, it's my understanding -- and if you need to
12 check your report, please do so; but the body is located
13 on December 8th at approximately 12:30 p.m.  Do you know
14 when someone from the Harris County Medical Examiner's
15 Office would have been dispatched and actually arrived
16 at the scene?
17      A.  No, I wouldn't know that.
18      Q.  Do you know whether or not your records reflect
19 whether body temperature was taken at the time the
20 M. E.'s Office arrives?
21      A.  Yes, sometimes that's done, but not as a
22 routine.  A lot of times body temperature is taken once
23 the body arrives at the morgue.
24      Q.  Was that done in this case?
25      A.  Let me check my report.  Yes, according to this

70

1  report, the body temperature was taken at the scene.
2       Q.  Okay.  And in your opinion, did that aid you in
3  fixing the time of death?
4       A.  It didn't.
5       Q.  What does that tell us, then, about if a body
6  temperature is a certain amount at the time of the
7  location of the body, help us understand why that would
8  or would not aid you in determining and fixing the time
9  of death?
10      A.  The reason that the body temperature is --
11 there are formulas that have been, you know, elucidated,
12 et cetera, that kind of gives you a range of usefulness
13 with the body temperature calculation.  The problem is
14 body temperature is variable in individuals.  It varies
15 based on activities, states of health; and the body
16 temperature decreases or increases according to
17 environmental conditions, the clothing, the temperature
18 outside, et cetera.  Is it windy?  Is it warm, humidity
19 et cetera?  So it's an extremely variable thing.  We
20 usually like to use a window that's based mostly on
21 rigor mortis, which is stiffness of the body and
22 lividity.
23      Q.  So in this instance, when you located the body
24 of Mary Carmouche, you had not been able to actually
25 fix, with any degree of certainty, the time of death?

71

1    A.  The fact that she had fixed lividity would make
2  me think she was there longer than twelve hours.  She
3  had rigor mortis still apparent at the time of the
4  autopsy; so I would say that before she was refrigerated
5  or placed in a cooling tank, she had probably been dead
6  between thirty-six and forty-eight hours at the far end
7  of the estimate.
8    Q.  And what about at the near end of the estimate?
9    A.  The near end, I'd say twenty-four to thirty-six
10 hours.
11   Q.  You mention the word variable when you talk
12 about the temperature and stuff?
13   A.  Right.
14   Q.  Let me ask you a couple of questions regarding
15 the gunshot wounds, themselves, that you observed.
16   A.  Uh-huh.
17   Q.  On Mary Carmouche, there is no stippling.
18 There is no contact with a weapon, right?
19   A.  Right, not on the skin.
20   Q.  Right.  And you can't say from what distance
21 the shot was fired that caused the injuries that you
22 observed?  In other words, you don't have a distance?
23   A.  No.
24   Q.  With regard to the injury that you checked on
25 Mr. Gibson, you indicated that there was faint

72

1  stippling?
2    A.  Correct.
3    Q.  And you indicated that would generally say
4  somewhere between eighteen and twenty-four inches?
5    A.  Somewhere within eighteen to twenty-four
6  inches, so a shorter distance than eighteen to
7  twenty-four inches.  And let me also say with regard to
8  stippling, an exact determination can't be made unless
9  the actual bullet type is used and test fired in the
10 exact gun; because different types of ammunition contain
11 different types of powder, different loads, et cetera.
12   Q.  I was going to ask you that very question.
13 Would the caliber of a weapon alter the distance from
14 which it had to be fired in order to generate the
15 stippling?
16   A.  Yes.
17   Q.  I didn't mean to interrupt you.  Does a larger
18 caliber weapon necessarily mean it could be fired from a
19 further distance and still cause the stippling to occur?
20   A.  Right.  A more powerful weapon -- say, for
21 example, a .357 Magnum versus a .38 Special.  I'd expect
22 to see stippling out to a greater distance with a more
23 powerful weapon, because there is more powder and more
24 powder is needed to generate velocity.
25   Q.  And I think in this case you described the

73

1  bullet as being a large caliber?
2    A.  Yes.
3    Q.  So that would mean a more powerful type handgun
4  would have had to have fired that?
5    A.  No, not particularly.  That's also quite
6  variable.  Different loads, the size or caliber of the
7  bullet.  There is no indication on the amount of powder
8  or the velocity that the bullet had.  You have slower
9  moving large bullets, faster moving large bullets, et
10 cetera; so, it's extremely variable.
11   Q.  So, the estimate you give of eighteen to
12 twenty-four inches could alter out to a greater
13 distance?
14   A.  It could, theoretically.
15   Q.  Now let me clarify something so I make sure the
16 jury understands.  State asked you what the cause of
17 death was.  That is an objective evaluation.  A metal
18 object came into contact with the tissue, did enough
19 damage to cause that person to cease to live?
20   A.  Correct.
21   Q.  When you talk about the manner of death, the
22 use of the word homicide does not equate to murder, does
23 it?
24   A.  It does not.
25   Q.  Homicide is defined as what?

74

1    A.  I define it as the death of one human being at
2  the hands of another.
3    Q.  Okay.
4    A.  It's -- and there again, there are gray zones
5  and varying opinions in the field of forensics with
6  regard to the usage of accidental deaths versus
7  homicide.  I tend to view the intentional death of one
8  human to another as a homicide.
9    Q.  Is that something that is in the protocol of
10 the Harris County Medical Examiner's Office?  In other
11 words, you don't -- when you give a manner of death and
12 it's signed by Doctor Joyce Carter, Chief Medical
13 Examiner, you don't say this was an intentional
14 homicide; it's homicide?
15   A.  Right, we don't.
16   Q.  And that designation does not say what the
17 circumstances were, whether it was an accident, whether
18 it was self-defense, whether the gun -- whatever
19 happened, you're saying that a person came to their
20 death as a result of unnatural causes?
21   A.  Correct.
22   Q.  All right.
23        MR. HILL:  May I have just one moment,
24 Judge?
25        THE COURT:  Yes.

75

1    Q.   (BY MR. HILL)  I just want to draw your
2   attention to two areas on each of the autopsies.  Is it
3   the genitourinary tract?   Am I pronouncing that
4   correctly?
5    A.   Correct.
6    Q.   And the gastrointestinal --
7    A.   Gastrointestinal tract.
8    Q.   Is that the tract you tested, examined, to see
9   if there was any food substance in the body?
10    A.   Right.
11    Q.   Can you tell from viewing the items that are in
12   the stomach and in the lining of the stomach going up to
13   the throat, I guess, whether or not a person has eaten
14   recently?
15    A.   Yes.
16    Q.   And can you tell what period of time may have
17   elapsed between the time that they ingested food and the
18   state that you find it in?
19    A.   Not really.  Again, without knowing the
20   substance of the food or how well it was chewed or
21   whether liquid was taken with it, it's -- again, it's
22   variable.  Essentially, it means that if a person ate a
23   small meal versus a medium size meal versus a large meal
24   and there is food left in the stomach when they're
25   discovered, usually means that it takes approximately

76

1   six hours for the stomach to completely empty.  So if we
2   find traces of food there in a substantial amount, it
3   means that they probably died within six hours or so of
4   their last meal.
5    Q.   As you look at these two particular autopsies
6   you performed, is there any identifiable food substance
7   that, you know, I see a kernel of corn, or something
8   that somebody could actually identify as a food
9   substance in the body when you performed both of these
10   autopsies?
11    A.   When I refer to partially digested food, if I
12   can't recognize a particle of food, say identify a
13   peanut, corn, or whatever, that's when I usually don't
14   mention it.  So if I said partially digested, it just
15   means it's a paste-like substance.
16    Q.   Okay.  And then, so what you draw as a
17   conclusion from that is that the person would have eaten
18   within six hours?
19    A.   Yes, within approximately a six-hour period,
20   six to six-and-a-half or so hours for a relatively large
21   meal.  You would expect to have food remaining in the
22   stomach, or a small meal within three hours, or a very
23   small meal within two.
24    Q.   Would you expect to be able to very clearly
25   identify the substance of the food if food had been

77

1   eaten and death had occurred within one hour?
2    A.   If it were -- depending on the type of food --
3    Q.   Okay.
4    A.   -- and the way it was -- how well it was
5   chewed, et cetera.  You know, if someone chews their
6   food very finely, you may just see a paste, or you may
7   see pieces of a crust of bread, et cetera.  But again,
8   it's variable to a degree.
9    Q.   Does the stomach continue to secrete enzymes or
10   anything after death occurs?
11    A.   No.
12    Q.   So anything you find in terms of stomach
13   content or other areas that you examine, you can fix
14   that that's how it was at the time of death, because the
15   stomach doesn't secrete things that keep breaking down
16   the food?
17    A.   Right.  But the enzymes that are secreted prior
18   to death are still present in the stomach itself, and
19   they continue to work after death.  But I would expect
20   there would be some cessation of the digestion.
21    Q.   Thank you, sir.
22        MR. HILL:  No further questions, Judge.
23        MS. CONNORS:  I have no further questions,
24   Your Honor.
25        THE COURT:  You may stand down.

78

1        Call your next, please.
2        MS. CONNORS:  Ralph Saldivar.
3        THE COURT:  Proceed, please.
4              RALPH SALDIVAR,
    having been first duly sworn, testified as follows:
5              DIRECT EXAMINATION
6   BY MS. CONNORS:
7    Q.   Sir, could you please introduce yourself to the
8   jury?
9    A.   I'm a peace officer with the City of Houston.
10   My name is Ralph Saldivar.
11    Q.   How long have you been a peace officer for
12   H.P.D.?
13    A.   Twenty-seven years.
14    Q.   What particular division of the Houston Police
15   Department are you assigned?
16    A.   Identification division.
17    Q.   And how long have you been in the
18   identification division?
19    A.   Twenty-seven years.
20    Q.   Can you explain to the jury, Mr. Saldivar, what
21   you do as part of your duties in the identification
22   division?
23    A.   I'm assigned to the latent print laboratory.
24   I've been there since 1985.  My duties as -- my title is
25

79

1    deputy administrator.  Three months ago it got changed.
2    I used to be a latent print examiner.
3         Q.  Let me stop you there.  Tell the jury what a
4    latent print is.
5         A.  A latent print is a reproduction of the ridges
6    that we have on our fingers, palms, and bottom of our
7    feet that are sometimes left behind when certain items
8    are touched.
9         Q.  Are you saying that every time you touch a
10   surface, you leave a latent print?
11        A.  No, ma'am, that's only in the movies.
12        Q.  And as part of your duties, you take what we
13   call fingerprints and latent prints and compare them and
14   determine whether or not they are usable or good enough
15   to be able to make an identification; is that correct?
16        A.  Only on latent prints we do evaluations.
17        Q.  What would -- you said only latent prints?
18        A.  Yes, ma'am.
19        Q.  What do you do an evaluation on?
20        A.  You mentioned latent prints and you mentioned
21   taking inked fingerprints.  They are two different.
22        Q.  Okay.  Tell the jury what you do with respect
23   to latent prints.
24        A.  Among my duties as a latent print examiner or
25   Deputy Administrator is to receive latent prints from

80

1    crime scenes, do an evaluation, to see if they're
2    suitable for identification.  I also receive evidence
3    from crime scenes to be processed in the latent lab,
4    using fingerprint powders, chemicals, photography,
5    lasers, in attempt to develop suitable latent prints.
6         Q.  During your twenty-seven years with the Houston
7    Police Department, have you received certain training
8    that allows you to do your job, Mr. Saldivar?
9         A.  Yes, ma'am.
10        Q.  And what is that training?
11        A.  Before working for the police department, I was
12   employed by the FBI, working also in their
13   identification division while employed with the FBI.  I
14   attended the FBI fingerprint school with the City of
15   Houston.  I've attended the basic identification -- the
16   Basic I.D. school at the D.P.S. Academy in Austin,
17   Texas.  I've attended the Advanced Latent Fingerprint
18   School at the D.P.S. Academy in Austin, Texas.  I've
19   attended a Palm Print Symposium at the Houston Police
20   Academy instructed by Mr. Ron Smith, who is Associate
21   Director of the Mississippi State Crime Lab.  I've
22   attended the Advanced Latent Fingerprints Photography
23   School at the Houston Police Academy, instructed by the
24   FBI.  And I have attended the Administrative Advanced
25   Latent Fingerprint School at the FBI Academy in

81

1    Quantico, Virginia.
2         Q.  As part of your duties on December 8th, 1998,
3    Mr. Saldivar, did you go to the vehicle examination
4    building at the Houston Police Department to process a
5    1994 blue Lexus with license plates B42 CRC?
6         A.  That is correct.
7         Q.  And when we talk about processing a vehicle,
8    what does that mean, sir?
9              THE COURT:  Can you hold up just a second?
10             (Off-the-record discussion.)
11             THE COURT:  Proceed, please.
12        Q.  (BY MS. CONNORS)  I'm not sure what my last
13   question I asked you was.  Can you explain to the jury
14   what that is, sir?
15        A.  When I'm assigned to process a vehicle, I do a
16   walk-through.  In other words, I like to see what's
17   there.  I want to make sure all photographs have been
18   taken -- that's what is needed -- inside the vehicle and
19   outside the vehicle.  Any damage to the vehicle I needed
20   recorded, as with photographs.  I don't know
21   photography.  I always get somebody to do it for me; and
22   most likely, it's the officer assigned to the vehicle
23   examination building.  Once they take the photograph,
24   then I come in and do my part.
25        Q.  Let me show you what's been admitted into

82

1    evidence as State's Exhibits 67.  Is this the blue Lexus
2    that you examined back on December 8th, 1998?
3         A.  Yes, ma'am.
4         Q.  Did you examine the interior of the blue Lexus
5    to see whether or not you could find any latent prints?
6         A.  Yes, ma'am, the interior and the outside of the
7    vehicle was processed for latent prints.
8         Q.  Just talking about the interior of the vehicle,
9    did you find any latent prints?
10        A.  Yes, ma'am, I did.
11        Q.  Where did you find the latent prints?
12        A.  Four latent prints were developed from -- they
13   were left inside the front passenger side door window,
14   driver's side front, top of the hood by the headlight,
15   and from inside lower door frame, rear passenger side,
16   inside by the seat.
17        Q.  And were you able to make a determination as to
18   whose latent prints those were?
19        A.  Yes, ma'am, did I.
20        Q.  And whose latent prints were they?
21        A.  Latent print comparison revealed that the
22   latent prints, two latent prints from inside the lower
23   door frame, by the rear passenger door inside by the
24   seat, is the right ring and right little fingers of
25   Mr. Dion Holley.

83
1      Q.  And did you make a determination as to the
2  other two latent prints, who they belonged to?
3      A.  They were not identified.
4      Q.  Did you compare those two other latent
5  prints -- and where did you say you found those in the
6  car?
7      A.  The ones that are identified?
8      Q.  The ones that were not identified.
9      A.  From the hood by the headlight and from the
10 front passenger side door window.
11     Q.  And you compared those two latent prints with
12 Kevin Walters; is that correct?
13     A.  That's correct.
14     Q.  With the defendant, Charles Mamou?
15     A.  That's correct.
16     Q.  With Mary Carmouche?
17     A.  That's correct.
18     Q.  Terrence Gibson?
19     A.  Terrence Dodson, Dion Holley, Samuel Johnson,
20 Terrence Gibson, and Howard Earl Scott.
21     Q.  And you were unable to identify who those two
22 latent prints belonged to; is that correct?
23     A.  That's correct.
24     Q.  On the outside of the vehicle, were you able to
25 find any latent prints?

84
1      A.  No, ma'am.
2      Q.  Were there items inside -- inside the car?
3      A.  Yes, there were.
4      Q.  And did you process items inside the car?
5      A.  Yes, I did.
6      Q.  Approximately how many items were there?
7      A.  I don't recall at this point, but I do know
8  that any item that I can process using fingerprint
9  powder is processed at that point.
10     Q.  And you took approximately fifty items with you
11 back to the police department to process; is that
12 correct?
13     A.  That's correct.
14     Q.  And that does not include the items that you
15 processed and left in the vehicle; is that correct?
16     A.  No, ma'am.  The items that I recovered to take
17 to the crime lab is to use other types of examination,
18 including chemicals that we cannot use at the crime --
19 or not the crime scene, but anyplace where there is not
20 a vent-a-hood.
21     Q.  Anyplace where there is not a what?
22     A.  A vent-a-hood.
23     Q.  What's that?
24     A.  A vent.
25     Q.  Of all the items that you processed, both

85
1  within the vehicle left there and the items you took
2  back to the police department, were you able to find any
3  latent prints?
4      A.  Yes, ma'am.
5      Q.  And where did you find any latent prints?
6      A.  From a piece of paper.  One was from the
7  passenger rear seat, and one was on the floorboard.
8      Q.  The paper that was on the passenger rear seat,
9  what kind of paper was that?
10     A.  I have it listed -- the one with the writing
11 numbers came from the driver's side -- excuse me --
12 driver's side floorboard, rear floorboard.
13     Q.  And the other paper that you talk about, where
14 did that come from, sir?
15     A.  It came from the driver's side rear seat, top
16 of the seat, and it's -- one says, "How to use your
17 message manager," and it gives information on how to
18 retrieve messages or whatever.
19     Q.  And it's a particular company that's explaining
20 how to retrieve your messages from the message manager?
21     A.  Yes, ma'am, Express Message Corporation, and a
22 phone number.
23     Q.  And you found how many latent prints on that
24 piece of paper concerning the message?
25     A.  One on each item.

86
1      Q.  And you compared those prints with a list of
2  people you just named?
3      A.  That's correct.
4      Q.  And you were not able to match up their prints
5  on either of those pieces of paper; is that correct?
6      A.  That's correct.
7      Q.  Did you also print State's Exhibit 31, the
8  Victoria's Secret bag?
9      A.  Yes, ma'am, I did.
10     Q.  And were you able to obtain any latent prints
11 on State's Exhibit 31?
12     A.  Yes, I was.
13     Q.  Were you able to make an identification with
14 the latent prints that you found on State's Exhibit 31?
15     A.  Yes, I did.
16     Q.  Let me -- when I talk about printing State's
17 Exhibit 31, did you also print the contents of State's
18 Exhibit 31?
19     A.  Those items right there, we don't print.  Those
20 items are chemically processed with a chemical called
21 ninhydrin, and I'll spell it:  N-I-N-H-Y-D-R-I-N.
22     Q.  All the newspaper clippings that are in State's
23 Exhibit No. 31, did you put ninhydrin on there?
24     A.  Yes, ma'am, along with the two other pieces
25 that I developed latent prints.

87

1    Q.   Let me show you what's been marked for
2  identification purposes as State's Exhibit 93.  Do you
3  recognize State's Exhibit 93?
4    A.   Yes, ma'am, I do.
5    Q.   What is State's Exhibit 93?
6    A.   They are two pieces of advertisement clippings
7  that were cut out that came from the paper bag.
8         MS. CONNORS:  Your Honor, at this time I
9  tender to defense counsel State's Exhibit 93 and offer
10 it in evidence.
11        MR. HILL:  We're not going to have any
12 objection, Your Honor.
13        THE COURT:  State's 93 is admitted.
14   Q.   (BY MS. CONNORS)  What did you find on State's
15 Exhibit 93, two pieces of --
16   A.   Newspaper clippings?
17   Q.   Yes, sir.
18   A.   Yes, there is one latent print that was
19 chemically developed.
20   Q.   At my request, did you take the fingerprints of
21 the defendant, Charles Mamou, who is on trial?
22   A.   Yes, ma'am.
23   Q.   Let me show you what's been marked as State's
24 Exhibit 95, are these the fingerprints of the defendant,
25 Charles Mamou?

88

1    A.   Yes, ma'am.  This is the right hand, left hand
2  fingerprints of Charles Mamou.
3    Q.   Did you do that this morning?
4    A.   Yes, I did.
5    Q.   The latent prints that you found on State's
6  Exhibit 93 -- did you photograph the latent prints found
7  on State's Exhibit 94?
8    A.   That is correct.
9    Q.   Did you compare those latent prints that you
10 found on the newspaper clippings, State's Exhibit 93,
11 that you removed from the Victoria's Secret bag, and
12 compare them with the defendant, Charles Mamou?
13   A.   Yes, ma'am, I did.
14   Q.   Were those latent prints found on State's
15 Exhibit 93 or taken from the bag, the defendant's
16 prints?
17   A.   One latent print.
18   Q.   And which latent -- which finger was that?
19   A.   One latent print was identified as a right
20 thumb.
21   Q.   And for the record, sir, could you please point
22 out the person whose fingerprints you took this morning
23 that are shown on State's Exhibit 95 and whose
24 fingerprint you found on the newspaper clipping, State's
25 Exhibit 93?

89

1    A.   Yes.  He's the black male with the brown suit
2  on.
3         MS. CONNORS:  Your Honor, may the record
4  reflect the witness has identified the defendant?
5         THE COURT:  It will.
6    Q.   (BY MS. CONNORS)  When you were processing the
7  inside of the vehicle, Mr. Saldivar, did you find an
8  unfired 9 millimeter bullet in that vehicle?
9    A.   Yes, ma'am.
10   Q.   And where did you find that unfired 9
11 millimeter bullet?
12   A.   It's on the little tray.
13   Q.   In the car?
14   A.   In the vehicle.
15   Q.   And this is a picture; is that correct, of the
16 blue Lexus with the unfired 9 millimeter bullet?
17   A.   Yes, ma'am.
18        MS. CONNORS:  Your Honor, at this time I
19 tender to defense counsel State's Exhibit 85 and offer
20 into evidence.
21        MR. HILL:  No objection.
22        THE COURT:  State's 85 is admitted.
23   Q.   (BY MS. CONNORS)  And State's Exhibit 97, is
24 that the unfired 9 millimeter bullet that's shown in
25 State's Exhibit 85?

90

1    A.   Yes, ma'am.
2    Q.   Mr. Saldivar, did you also process evidence
3  that was found at the scene of the shooting of Mary
4  Carmouche?
5    A.   Yes, ma'am.
6    Q.   Let's talk about that.  Did you process State's
7  Exhibit 89, an unfired bullet?
8    A.   Yes, I did.
9    Q.   And are those your -- is that your initials,
10 sir?
11   A.   Yes, R.G. has a circle around it.
12   Q.   And what type of chemical or fingerprint powder
13 did you use to process State's Exhibit -- contents of
14 State's Exhibit 89?
15   A.   Those types of items are strictly fingerprint
16 powder.
17   Q.   Does the type of surface affect whether or not
18 you're going to be able to obtain a fingerprint?
19   A.   Yes, ma'am, that is just one of the factors.
20   Q.   And the type of surface and the size of this
21 bullet in State's Exhibit 89, how would that affect
22 whether or not you could get a print?
23   A.   How it's handled.  To leave a latent print, all
24 we have to do is touch it.  But in order to leave a
25 latent print, we need certain ingredients.  Perspiration

91

1  is one of them, the type of surface.  Imagine an unfired
2  cartridge.  What is it that's going to be touching it?
3  When you touch it, are you going to roll your finger or
4  are you just going to hold it?   In a portion of latent
5  print to be identified, we need a certain area of the
6  finger; and in that area we need certain characteristics
7  to make a positive identification.  Otherwise, the
8  impression is not suitable.
9      Q.  If you take State's Exhibit 89 and you put it
10  in a magazine, put it in the firearm, and then ratchet
11  it or put State's Exhibit No. 89 in the chamber, would
12  that affect whether or not there might be a latent print
13  on there?
14      A.  Yes, ma'am, it will.
15      Q.  How would that affect?
16      A.  The fact that the force -- your finger is going
17  to be sliding.  It's going to be mushing it, the fact
18  that it's going to go into the magazine.  And most
19  likely, if it goes up to the barrel, it's going to
20  slide.
21      Q.  And were you able to obtain a latent print from
22  State's Exhibit 89?
23      A.  No, ma'am.
24      Q.  Were you also submitted three pieces of blue
25  plastic covered with dirt to determine -- examine it for

92

1  latent prints?
2      A.  That's correct.
3      Q.  Were you able to find any latent prints on the
4  dirty plastic?
5      A.  No, ma'am.
6      Q.  Were you also submitted a fireplace poker tool?
7      A.  That's correct.
8      Q.  Were you able to find any latent prints on the
9  fireplace poker tool?
10      A.  No, ma'am.
11      Q.  Let's go one step further.  With respect to a
12  bullet, if a bullet is placed in the magazine and then
13  fired and what's left or the cartridge casings, would
14  that affect a cartridge casing -- what effect would that
15  have once it's gone through the barrel and been actually
16  fired?
17      A.  We know that heat destroys latent prints.  When
18  a weapon fires a bullet, there is a tremendous amount of
19  heat generated.  If there is any latent print on the
20  cartridge itself, it's going to be destroyed.  And
21  again, sometimes they're covered with powder.  The black
22  powder is burnt.
23      MS. CONNORS:  I pass the witness, Your
24  Honor.
25

93

1                  CROSS-EXAMINATION
2  BY MR. HILL:
3      Q.  Am I to understand you to say that you can
4  never ever recover a latent print from a fired cartridge
5  casing?
6      A.  Only if it gets touched after it gets fired.
7      Q.  Okay.  So there is no scientific basis for
8  being able to determine if there is a fingerprint on a
9  fired cartridge case?
10      A.  Only after you process it.
11      Q.  If you knew that a crime scene had not been
12  disturbed and that people came up to a crime scene and
13  there were cartridge casings on the ground after having
14  been fired and that no one had touched them, there would
15  be no reason for even comparing them to see if there
16  were prints on them, right?
17      A.  No, it doesn't work like that.  If it's
18  evidence, it's going to be processed.
19      Q.  And that evidence is a body of science that you
20  are familiar with, because you're the deputy
21  administrator of the print lab over at H.P.D., right?
22      A.  No, sir.  I'm just one of the deputy
23  administrators assigned to the latent lab.  There is
24  seven of us.
25      Q.  Oh, they changed your title?

94

1      A.  They changed the title, the duties, and the pay
2  is the same.
3      Q.  You used to wear your blue uniform when you
4  come to court.  You wear a suit now?
5      A.  Yes, sir; because I have to go some other place
6  after here.
7      Q.  Well, let's talk a little bit about the value
8  of the latent print.  You were describing to the jury
9  that certain factors have to be present.  Now, you're
10  not -- when you say perspiration, you're not meaning to
11  suggest to the jury a person has to be sweating when
12  they touch something, correct?
13      A.  No, sir.
14      Q.  There are natural body oils and other pieces of
15  substance -- can I finish my question before you answer?
16  Okay.  There are things that are inherent on a person's
17  fingertips, or their feet for that matter, that leave
18  impressions on surfaces, correct?
19      A.  That's correct.
20      Q.  My question was, you were not trying to suggest
21  to the jury that in order to leave a print on a surface
22  that the person had to be perspiring or sweating?
23      A.  No, sir.  In the contrary, sometimes it works
24  against me when they perspire too much.
25      Q.  Okay.  Now, so you go through this whole Lexus,

95

1   and you testified about everything you've tested to see
2   if there were any kind of prints that you could testify
3   about; and you gave a list of people who did compare
4   the prints with. And after comparing the prints that
5   you were able to receive from the Lexus with those that
6   were submitted to you, you found no matches other than
7   Dion Holley?
8       A.  That's correct.
9       Q.  Let's move to the paper bag. I want to
10  understand you a little bit better about how you
11  actually print the contents; because of this entire bag,
12  you say there are two items that are reflected in
13  State's Exhibit 93 that actually have a fingerprint on
14  them?
15      A.  That's correct.
16      Q.  Now, is that to say that all of the other items
17  in that bag do not have fingerprints on them?
18      A.  No. It reflects and mentions that some papers
19  have no indication of being touched; and there were
20  other papers indicating they got touched, but no
21  suitable latent prints developed. The only ones we
22  photograph are the ones that can be identified.
23      Q.  Now, did you attempt to eliminate certain
24  prints based on the partial information that you had
25  from the other pieces of paper in here against the list

96

1   of names that had been previously given to you?
2       A.  If the latent print cannot be identified, then
3   it's worthless.
4       Q.  Okay.
5       A.  You cannot eliminate them, period.
6           MR. HILL: May I approach the witness,
7   Your Honor?
8           THE COURT: Yes.
9       Q.  (BY MR. HILL) I'm going to show you what's
10  already been marked now as State's Exhibit No. 94 and
11  ask you if you can identify that for us?
12      A.  Yes, I can.
13      Q.  What is that, please?
14      A.  It's a photograph of one of the latent prints
15  from one of the pieces of newspaper or advertisement.
16      Q.  Okay.
17          MR. HILL: May I approach the witness
18  again?
19          THE COURT: Yes.
20      Q.  (BY MR. HILL) Let me show you the contents of
21  State's Exhibit 97. We're not going to ask it be
22  introduced in evidence, but can you tell me what type of
23  bullet that is?
24      A.  It's a 9 millimeter R-P Lugar.
25      Q.  What type of bullet is that? Is there any

97

1   other descriptive information that you provide on that
2   type of bullet?
3       A.  It's fired by a semiautomatic pistol.
4       Q.  Okay. And can you tell us whether or not --
5   can you tell from looking at that whether that's a
6   hollow-point bullet or not?
7       A.  It is a hollow-point.
8       Q.  And this is the bullet that was found inside
9   the blue Lexus that you processed?
10      A.  That's correct.
11      Q.  I just want to clarify one thing. Miss Connors
12  asked you if she was going to talk to you about evidence
13  that was recovered from the scene where Mary Carmouche
14  was shot. You're not suggesting to this jury that you
15  have any specific information that Mary Carmouche was
16  actually shot at the location where her body was found,
17  do you?
18      A.  Do I have any?
19      Q.  Right.
20      A.  No, sir, I didn't go to the scene.
21      Q.  So you're not trying to suggest to the jury
22  that you believe that Mary Carmouche was shot on
23  Lynchester, where her body was recovered?
24      A.  No, sir, just what I read in the paper back
25  then and things like that.

98

1       Q.  All right. Also, I believe, if I'm not
2   mistaken, when the State was asking about Exhibit No.
3   89, when they first showed you this exhibit and they
4   asked you about your ability to take a fingerprint off
5   this, did you make certain assumptions when you
6   responded to that question?
7       A.  Repeat the question.
8       Q.  Sure. When they showed this to you and they
9   asked you about your ability to take a fingerprint off
10  this or lift a latent print, did you make certain
11  assumptions in responding to that question?
12      A.  No, sir.
13      Q.  Let me ask you, didn't you assume, in
14  responding, that you said that most people would hold
15  the bullet like this?
16      A.  No.
17      Q.  Okay. Show me how you said a person would
18  normally --
19      A.  If you go to load it in a clip --
20      Q.  .Okay.
21      A.  -- it's going to go like this; and you're going
22  to push down, because it's got to click. Then you've
23  got to shove it in there.
24      Q.  Okay.
25      A.  The area that's touching and the area that's

**99**

1  sliding and the force that you're using, the possibility
2  of leaving a latent is very, very slim, almost none.
3  Q.  Okay.
4  A.  But there will be an occasion that it got
5  touched.
6  Q.  Were there indications that this got touched?
7  A.  Yes, sir.
8  THE COURT:  Was that 89?
9  MR. HILL:  89.
10  Thank you very much, sir.  I have no
11  further questions.
12  MS. CONNORS:  I have no further questions.
13  THE COURT:  You may stand down.
14  Ladies and gentlemen, at this time we're
15  going to break for lunch.  All the previous admonitions
16  are still in effect.  Please go back in the jury room.
17  (Outside jury's presence:)
18  MR. HILL:  All we were going to do, Judge,
19  is -- State's Exhibit 94 is a photograph of the
20  fingerprint information taken off a slip of paper from
21  inside State's Exhibit No. 31.  We have agreed that
22  we're going to make a photocopy of this so that we can
23  delete the reference to the name, Tyrone Davis, with an
24  FBI number on it and a date; because that's a name
25  attributed to the defendant from some other matter.

**100**

1  THE COURT:  Tyrone Davis?
2  MR. HILL:  Tyrone Davis.
3  THE COURT:  That's an alias?
4  MR. MCCLELLAN:  The only problem -- I
5  don't know why we're entering it.  The photograph is --
6  you can tell is not very good to begin with.  You
7  couldn't see diddly on it anyway.  And by the time you
8  photocopy it, it's even going to be worse -- I hope
9  not -- to leave the impression that this guy doesn't
10  know what he's doing.  I mean, I can see what I believe
11  to be some type of prints there.  I'm just afraid that
12  in the --
13  THE COURT:  You want to photocopy for the
14  record; but for purposes in case the jurors ask for
15  it --
16  MR. MCCLELLAN:  He's going to make another
17  one.
18  MR. HILL:  That's fine.  Thank you.
19  (Lunch recess).
20  (Continuing after lunch.)
21  MR. MCCLELLAN:  State would offer into
22  evidence State's Exhibit 94.
23  MR. HILL:  No objection.
24  MR. MCCLELLAN:  The photograph we talked
25  about getting reduplicated.

**101**

1  (Jury is brought in and seated.)
2  THE COURT:  You have a tender?
3  MR. MCCLELLAN:  State would offer into
4  evidence State's Exhibit 94.
5  MR. HILL:  No objection.
6  THE COURT:  State's 94 will be admitted.
7  Call your next.
8  MR. MCCLELLAN:  State would call Robert
9  Baldwin.
10  ROBERT BALDWIN,
11  having been first duly sworn, testified as follows:
12  DIRECT EXAMINATION
13  BY MR. MCCLELLAN:
14  Q.  Would you state your name for the record,
15  please?
16  A.  Yes, sir.  Good afternoon.  My name is Robert
17  Baldwin.
18  Q.  Mr. Baldwin, how are you employed?
19  A.  I'm employed by the Houston Police Department.
20  My job title is Criminalist IV, and I'm assigned to the
21  H.P.D. Firearms Laboratory.
22  Q.  How long have you been with the H.P.D. Firearms
23  Laboratory?
24  A.  I'm in my eleventh year, sir.
25  Q.  Can you tell the ladies and gentlemen of the

**102**

1  jury about the training you have that qualifies you as a
2  firearms examiner?
3  A.  Yes, ma'am.  My formal education consists of
4  bachelor of science, a juris doctorate's degree.  I've
5  been in the field of criminalistics for in excess of
6  twenty years now and better than twelve of that have
7  been in firearms related examination.  I've received
8  specialized training at the FBI, A.T.F., Smith & Wesson
9  Arms, Colt Arms, Remmington Arms, Sig arms, Glock arms.
10  I've also done course work in forensic microscopy at
11  McCrone Institute.
12  Q.  Can you tell the ladies and gentlemen of the
13  jury, is it possible to take a casing that has been
14  fired in a firearm and determine whether another casing
15  has been fired out of the same firearm?
16  A.  Yes, sir, that is possible, again, depending on
17  the condition of the fired cartridge cases.  Assuming
18  that the condition of the exhibits -- of the fired
19  cartridge cases are suitable for comparison, yes, it can
20  be done.
21  Q.  And is it possible to take a projectile that is
22  fired from a firearm and compare it with another
23  projectile fired from a firearm and tell whether or not
24  they were fired in the same or in different firearms?
25  A.  Yes, sir, again, depending on the condition of

103

1  the fired bullets, it is possible to do that.
2      Q.  Okay.  And have you, on few or many occasions,
3  made comparisons of fired cartridge casings to determine
4  whether or not they came from a certain firearm or from
5  the same firearm?
6      A.  I've done that on numerous occasions.
7      Q.  Concerning fired projectiles or bullets from a
8  gun that have been fired through a gun, have you also
9  made numerous comparisons of those to determine what
10  type of firearm they were fired from or whether they
11  were fired from the same firearm?
12      A.  Yes, sir, on numerous occasions.
13      Q.  And is that the bulk of your work in the
14  firearms examination area with the Houston Police
15  Department?
16      A.  That's a major portion of the work that I do,
17  yes, sir.
18          MR. MCCLELLAN:  May I approach the
19  witness, Your Honor?
20          THE COURT:  Yes.
21      Q.  (BY MR. MCCLELLAN)  Let me show you what's been
22  marked as State's Exhibit No. 38 and ask you if you
23  examined State's Exhibits 38 during your work in this
24  case?
25      A.  Yes, sir, I did.

104

1      Q.  And was that a weapon that was submitted to you
2  in the firearms laboratory for you to test and examine?
3      A.  Yes, sir, it was.
4      Q.  And was State's Exhibit 38, when it was
5  submitted to you, were there also numerous live rounds
6  of ammunition that were submitted along with a clip?
7      A.  Yes, sir, there were a number of unfired
8  cartridges.
9      Q.  And let me show you what's been marked as
10  State's Exhibit 39 and ask you if those are the
11  remaining unfired cartridges that were submitted with
12  that firearm, State's Exhibit 38?
13      A.  Yes, sir, they are.
14      Q.  How many live rounds were submitted with
15  State's Exhibit 38 by the time you received them in the
16  laboratory?
17      A.  Twelve, sir.
18      Q.  How many remain?
19      A.  The contents of State's No. 39 are a total of
20  nine.
21      Q.  And what happened to the other three?
22      A.  As is our custom, we utilize three of the
23  cartridges that are submitted with the firearm for
24  testing.
25      Q.  And when you use it for testing, can you tell

105

1  the ladies and gentlemen of the jury what you do with a
2  firearm?
3      A.  Well, before actually test firing the gun, the
4  firearm was examined for its overall condition and
5  functionality.  The trigger pull is measured.  And once
6  those tests have been completed, the firearm is actually
7  test fired into a water recovery tank where we're able
8  to retrieve both the fired bullets, as well as the fired
9  cartridge cases.
10      Q.  Okay.  Did you have occasion then to compare
11  the fired cartridge cases that you recovered by test
12  firing State's Exhibit 38 with other cartridge cases
13  that were submitted to you as evidence in this case?
14      A.  Yes, sir, I did.
15      Q.  Let me show you what's been marked -- what's
16  been introduced into evidence as State's Exhibits 26
17  through 30 and ask you if you compared the fired
18  cartridge cases that you test fired in State's Exhibit
19  38 with State's Exhibits 28 through -- 26 through 30?
20      A.  Yes, sir, I did.
21      Q.  And do you have an opinion as to whether or not
22  State's Exhibit 38 fired the cartridge cases in State's
23  Exhibits 26 through 30?
24      A.  Yes, sir, I do have an opinion.
25      Q.  What is that opinion?

106

1      A.  That the five fired cartridge cases contained
2  in State's 26, 27, 28, 29, and 30 were not fired from a
3  9 millimeter semiautomatic pistol, which is State's
4  Exhibit 38.
5      Q.  Now when you fired State's Exhibit 38, was it
6  in a working order?
7      A.  Yes, sir, it was.
8      Q.  Did you also compare the fired -- am I using
9  the right term by saying bullets, or what do you call
10  the end that leaves through the gun?  What is that
11  called?
12      A.  Projectile would be fine, or fired bullet.
13      Q.  Okay.  Did you also compare the projectiles
14  that were test fired in State's Exhibits 38 with State's
15  Exhibits 79, 84, 90, and 91 to determine whether or not
16  State's Exhibit 84, 79, 90, or 91 were fired out of that
17  same State's Exhibit 38?
18      A.  Yes, sir, I did.
19      Q.  And what is your opinion?
20      A.  That none of the bullets contained in either
21  State's 79, 84, 90 or 91 were fired in this 9 millimeter
22  semiautomatic pistol, State's 38.
23      Q.  Were you able to, by comparison, determine
24  whether or not State's 26, 27, 28, 29, and 30 -- were
25  you able to determine, or do you have an opinion as to

107

1 whether or not they were fired out of the same firearm?
2     A. Yes, sir, I do have an opinion.
3     Q. What is that?
4     A. The five fired 9 millimeter Lugar cartridge
5 cases in those exhibits were fired out of a single
6 firearm.
7     Q. So State's Exhibits 26 through 30 were fired
8 out of the same firearm?
9     A. That is correct, sir.
10    Q. Did you -- was a firearm ever submitted to you
11 other than State's Exhibits 38?
12    A. No, sir.
13    Q. So you don't know what firearm fired those?
14    A. No, not the precise firearm. I do not have
15 that.
16    Q. Okay. Did you have an occasion to examine
17 State's Exhibit No. 89 as part of your firearms
18 examination work?
19    A. Yes, sir, I did.
20    Q. And that is a live round?
21    A. Non-fired cartridge, yes, sir.
22    Q. Okay. Were you able to make any type of
23 comparison between the live, unfired cartridge, State's
24 Exhibit 89, with any of the cartridge cases, State's
25 Exhibits 26 through 30?

108

1     A. Yes, sir. Only two with respect to certain
2 markings that were left by the magazine. There were
3 magazine markings present on the unfired cartridge,
4 which is contained in State's 89. And I compared the
5 magazine markings evident on that cartridge to the
6 magazine markings that were present on one of the 9
7 millimeter cartridge cases, specifically the cartridge
8 designated ECC-2.
9     Q. Okay. And when you made that comparison, do
10 you have an opinion as to whether or not they were in
11 the same magazine?
12    A. Yes, sir, I do.
13    Q. And what is that opinion?
14    A. That the fired -- unfired cartridge that is
15 contained in State's No. 89 was cycled at some time
16 through the same magazine as the fired cartridge case
17 which is designated ECC-2, which I believe is State's
18 Exhibit No. 27.
19    Q. Okay. So State's Exhibit No. 27, ECC-2, and
20 State's Exhibit No. 89, which is designated E-1 --
21    A. That's correct, sir.
22    Q. Okay. They have the same magazine marks?
23    A. That's correct, sir.
24    Q. Now, if you could take -- State's Exhibit No.
25 38 has a magazine with it; is that correct?

109

1     A. That's correct, sir.
2     Q. And is that what you're holding now?
3     A. Yes, sir.
4     Q. What you refer to as a magazine?
5     A. That is correct, sir.
6     Q. Can you tell me what causes the markings to be
7 left on State's Exhibit 27 and State's Exhibit 89? How
8 are those markings created from it being in a magazine?
9     A. Perhaps if I could be allowed to demonstrate.
10    Q. Okay.
11    A. When a magazine of the -- is loaded --
12    Q. You might want to step down here so they can
13 see, if you can.
14        MR. MCCLELLAN: Is this agreeable with the
15 Court?
16        THE COURT: Yes.
17    Q. (BY MR. MCCLELLAN) Be sure and keep your voice
18 up, please.
19    A. Yes, I will. What I have in my left hand is
20 a -- perhaps a typical detachable style magazine that
21 would be commonly used with a semiautomatic pistol. In
22 order to fire the firearm of the pistol, an individual
23 would have to load cartridges into the magazine as I'm
24 doing now. As you can see, I place the cartridge at the
25 top of the magazine; and I depress a part of the

110

1 magazine known as the follower, and the cartridge is
2 slid into position. And you do this, of course, until
3 you've either loaded the magazine to its full capacity
4 or however many you plan to place in the magazine. And
5 you'll notice that once the cartridge is placed into the
6 magazine, the cartridge at the top is being held in
7 position by these two extensions or top edges of the
8 magazine known as the lips of the magazine.
9        Once this magazine then would be inserted
10 into the firearm, the first thing that would have to be
11 done -- and I won't actually insert the magazine into
12 the firearm -- but if I were to insert this magazine
13 into the firearm, the first thing that would happen is
14 that this magazine would be positioned -- excuse me --
15 in such a manner that the first cartridge in the
16 magazine would be basically at the bottom area of the
17 slide. And once I release the slide or the slide, the
18 closing of the slide will force or strip that cartridge
19 from the top of the magazine and force it forward and
20 upward; and as that cartridge is forced out of that
21 magazine, there will be markings left on the side
22 wall -- this area -- of that cartridge. And so each
23 time this cartridge were to be cycled or passed through
24 the magazine in that manner, you would produce a pair of
25 magazine marks on the side wall of that cartridge.

111

1    Q.  Thank you.  So State's Exhibit 89, which is the

2  live round that was recovered from Lynchester, was in

3  the same -- has the same magazine marks as the fired

4  cartridge case, 27 -- State's Exhibit 27 that was

5  recovered from Lantern Point?

6    A.  That is correct, sir.

7    Q.  Were you able to compare the fired jacketed

8  lead bullets, which are State's Exhibits 79, 84, 90 and

9  91 with each other to determine whether or not you could

10  determine if they were fired -- any of those were fired

11  out of the same firearm?

12    A.  Yes, sir, I did exactly that type of

13  comparison.

14    Q.  And did you determine whether or not any of

15  those fired jacketed lead bullets were, in your opinion,

16  fired from the same firearm to the exclusion of all

17  others?

18    A.  Yes, sir.  I made that determination in a

19  comparison with respect to the fired bullet, which is

20  EB-2, which is State's 79, when as compared to the fired

21  jacketed bullet, which is designated EB-4, which is

22  State's No. 90.

23    Q.  And what was your opinion in relation to those

24  two?

25    A.  With respect to those two fired jacketed

112

1  bullets, it was my opinion that they were fired in the

2  same firearm.

3    Q.  As to State's Exhibits 84, 79, 90, and 91, were

4  you able to make -- arrive at any type of opinion

5  concerning all of those jacketed lead bullets?

6    A.  With respect to all four of the fired jacketed

7  bullets, they exhibited the same class characteristics.

8  That is, they were of the same caliber and had the same

9  number of lands and grooves, the same direction of twist

10  and width of rifling; however, it was only with respect

11  to State's 79 and State's 80 (sic) that I could actually

12  make an identification.

13        THE COURT:  I'm sorry.  Which two?

14        THE WITNESS:  79, Your Honor, and 90.

15    Q.  (BY MR. MCCLELLAN)  But as to all the fired

16  jacketed lead bullets, I believe you said they had the

17  same rifling characteristics?

18    A.  Same class characteristics.

19    Q.  Same class characteristics?

20    A.  That's correct, sir.

21    Q.  And the same rifling pattern?

22    A.  Well, that would be part of the class

23  characteristics.

24    Q.  Okay.  Class characteristics, so that -- which

25  is another way of saying class characteristics?

113

1    A.  Rifling caliber, as well as the caliber.

2    Q.  All four of those, State's Exhibits 79, 84, 90,

3  and 91, were what caliber of bullet?

4    A.  They're consistent with a 9 millimeter Lugar.

5    Q.  What is the direction of twist?

6    A.  To the right, sir.

7    Q.  And what is -- what are the numbers of lands

8  and grooves?

9    A.  Eight lands and grooves.

10    Q.  That's consistent with all four?

11    A.  That is correct, sir.

12    Q.  Is there anything in your -- any characteristic

13  or anything that you observed in your examination that

14  would exclude EB-3, which is State's Exhibit No. 91, the

15  bullet that was taken from Mary Carmouche, that would

16  exclude it from being fired in the same firearm that

17  fired all the other fired jacketed lead bullets?

18    A.  No, sir, there is not.

19        MR. MCCLELLAN:  I'll pass the witness,

20  Your Honor.

21        CROSS-EXAMINATION

22  BY MR. HILL:

23    Q.  Mr. Baldwin, I just have a couple of questions,

24  if I may.  When you use the word, same class

25  characteristics, how do you define the word, class?

114

1  I'm not sure if I understand what that means.

2    A.  Well, it's a group of characteristics, for

3  instance, probably best explained by the fact that if

4  you had two Smith & Wesson revolvers, Smith & Wesson .38

5  Specials, for instance, those would have the same

6  caliber.  They would have the same number of lands and

7  grooves, in that case five, the same direction of

8  twists, which would be to the right.  And traditionally,

9  their rifling pattern is about equal of the land widths

10  and groove widths.  That would be the class

11  characteristics, so that you would have many .38 Special

12  Smith & Wesson firearms having those characteristics.

13    Q.  Okay.  When you refer to class characteristics,

14  then, are you saying class is similar to manufacturer?

15  In other words, you just used the example of two

16  different Smith & Wesson .38 revolvers.

17    A.  Correct.

18    Q.  So would you always be describing the same

19  manufacturers' gun when we talk about class

20  characteristics, or could there be other manufacturers?

21    A.  There could be other manufacturers utilizing

22  the same class characteristics.  In other words, Smith &

23  Wesson uses a five lands and grooves rifling pattern.

24  There are other manufacturers that also use that same

25  five lands and grooves rifling pattern.  It's not

115

1   necessarily unique to one particular manufacturer.  It
2   can be, depending on if they use some very odd rifling
3   pattern.
4       Q.   And there are some guns that have something
5   like that that are real odd, that make them unique?
6       A.   Yes, there are some manufacturers.  For
7   instance, Glock uses a rifling pattern known as
8   polygonal rifling, which is fairly unusual.  And there
9   are probably only two or three other manufacturers using
10  them.
11      Q.   Would it be easier to identify a cartridge or a
12  bullet fired from a Glock than it would some other
13  weapon?
14      A.   Not necessarily.  It only applies to the class.
15      Q.   Because their characteristics are more unique?
16      A.   More unique.
17      Q.   And is this a product that the manufacturer's
18  wanting to make it that way?
19      A.   In some instances, it's a conscious effort.
20  Some instances, it's just a pattern that they have been
21  using for years.
22      Q.   But the idea of the lands and grooves that
23  we're talking about is the intention of having those
24  inside the barrel of the gun to project the bullet out
25  in a straight motion, right?

116

1       A.   Actually, it's not necessarily in a straight
2   motion, but to impart rotation to projectile in order to
3   increase its accuracy and stability in flight.
4       Q.   Ultimately, the result is they're doing these
5   manufacturing and tooling things to ensure the best they
6   can that when a bullet leaves the end of the barrel,
7   it's going to go straight as opposed to just going
8   wherever?
9       A.   That's a fairer statement.
10      Q.   May not be a very technical statement in your
11  world, but that's -- if I'm understanding it correctly,
12  that's --
13      A.   That's accurate, sir.
14      Q.   How many -- you use the phrase -- when
15  Mr. McClellan showed you the magazine from State's
16  Exhibit 38, you said it was a typical detachable
17  magazine?
18      A.   Yes, sir.
19      Q.   What makes it typical?
20      A.   Simply the fact that it's -- there are
21  magazines that are not detachable that would be unusual
22  in a pistol.  It uses a staggered magazine design, which
23  nowadays higher capacity pistols are using these
24  staggered magazines.  The magazine also narrows at the
25  top, and the single cartridge is being held on both

117

1   sides by two magazine clips.
2       Q.   Okay.  Do you have any idea as to how many of
3   those type of magazines are manufactured or are in
4   existence here in the United States?
5       A.   I'm sure there are many thousands.
6       Q.   When you make your examination, I assume you
7   are not using just your naked eye?
8       A.   That's correct, sir.
9       Q.   Could you describe to the jury, what is it that
10  you use to try and distinguish one item of evidence from
11  the next that you're comparing it with?
12      A.   First of all, the examination and comparison of
13  whether it be a fired bullet or fired cartridge case is
14  done on a specialized microscope known as a comparison
15  microscope; and by its design, that microscope allows me
16  to look at two exhibits simultaneously so that I have
17  one fired cartridge case on one stage and a second fired
18  cartridge case on another stage.  And I'm able to look
19  at those through a single set of eyepieces and a split
20  screen view so I can see the right-hand cartridge case
21  on the right side of the microscope, and view the left
22  hand on the left.  So I'm able to look at those two side
23  by side, simultaneously, under magnification.
24           Depending on the nature of the
25  examination, then I would be looking at -- if it was a

118

1   fired cartridge case, I was looking at the primer, I
2   would be looking at the breech face markings, firing pin
3   impression.  If it was the side wall of the cartridge
4   case that was fired, I would be looking at chamber
5   marks, extractor marks, items of that nature.
6       Q.   So when you have multiple cartridge cases, like
7   in this you had five that were fired, that were
8   submitted, do you take the first one and compare it to
9   the second and then the first to the third?  How do you
10  rerotate to see if each of the five match the other
11  characteristics?
12      A.   The -- quite typically, it would be the first
13  cartridge case that we'd start with and be doing it in
14  comparison to the breech face marks.  Again, it would
15  depend on each cartridge case, whether they do not
16  always mark identically.  And so in some areas there can
17  be variations.  And if I was able to match ECC-1, or
18  first cartridge case to ECC-2, I would probably continue
19  to compare two to one, three to one, and so forth.  But
20  if necessary, I could refer to one of the other ones if
21  it had already been identified to the first exhibit.
22      Q.   Is that what you did in this case, used one as
23  the standard and compared to it?
24      A.   Yes.
25      Q.   You mentioned something.  You said there might

119

1  be different marks on each of a particular piece of
2  evidence that's submitted.  Did I understand correctly
3  that there may not be exactly the same markings that
4  you're comparing on each of the five?
5      A.  The markings may not -- all the markings may
6  not reproduce off a cartridge case.
7      Q.  And in this situation, when you were comparing
8  the cartridge cases, did each of the cartridge cases
9  have an equal number of markings that you compared over
10  the partial markings that you were comparing?
11      A.  I really don't recall to that extent.  All I
12  can tell you is that based on the examination, I was
13  able to find enough individual markings, as well as
14  there was agreements of the class characteristics such
15  that I was able to determine that all five of the
16  cartridge cases were fired from one firearm.
17      Q.  Okay.  What are the different things that you
18  look at, the different -- well, you've described the
19  fact that these are magazine marks.  That is a -- what
20  is the word I'm looking for to describe what a magazine
21  mark is?  When you're making an evaluation, is that one
22  of the items that you look for?
23      A.  Let's be clear.  With respect to the five fired
24  cartridge cases, they are identified to each other.
25      Q.  Right.

120

1      A.  Magazine markings were not part of the initial
2  examination of those cartridge cases against one
3  another.
4      Q.  Okay.  The goal?
5      A.  The goal in that examination was to determine
6  if they were fired from the same firearm.  Magazine
7  marks are not produced during firing and, therefore,
8  would not be an appropriate marking to use for that type
9  of examination.
10      Q.  When are those marks actually produced on the
11  cartridge cases?
12      A.  The magazine marks?
13      Q.  Yes.
14      A.  Those would be produced, as I indicated, during
15  the time that a cartridge is stripped from the magazine
16  and is being chambered into the chambered firearm.
17      Q.  It doesn't occur when you're putting it into
18  the magazine; it's when it's being put into the
19  chamber --
20      A.  Yes.
21      Q.  -- from the magazine?
22      A.  That's correct.
23      Q.  What other type of -- maybe marking is the word
24  I'm looking for.  Those are the kind of markings you
25  look for to compare, right?

121

1      A.  In the comparison of the unfired cartridge,
2  there was a magazine marking that I was looking at.
3  With respect to the five fired cartridge cases, the
4  magazine marks were not part of that determination;
5  because I was trying to determine if the cartridge cases
6  were fired from the same gun.
7      Q.  Okay.  So what are you looking for on four?
8  You're seeing if they were fired from the same gun?
9      A.  That is, the markings left by the breech face,
10  the fire pin impression, and chamber marks.
11      Q.  Those were three different markings that you
12  described.  Do you find all three of those different
13  markings coming out the same on those four items?
14      A.  Yes, sir.
15      Q.  And how many other tests can you run -- or have
16  you run all the tests you can to determine what outcome
17  you have with regard to all the evidence that's
18  submitted to you?  Are there any other tests that you
19  would have done that could have gotten you any more
20  specific information?
21      A.  Only if I had the firearm.
22      Q.  Now you said that you do the comparison through
23  a comparison microscope?
24      A.  That's correct.
25      Q.  You take photographs through the microscope to

122

1  see what the two comparisons look like?
2      A.  No, sir, the scope that I have utilized or am
3  utilizing does not have photographic capability.
4      Q.  So you're looking at this with your eyepiece,
5  going through the microscope, making notes, and then
6  reaching conclusions as to whether or not you find
7  sufficient characteristics.  Did you say that they were
8  the same or similar?
9      A.  That's correct, sir.
10      Q.  And the only ones that can be positively
11  identified were No. 79 and No. 80?
12      A.  With respect to the fired bullets, yes, sir.
13      Q.  I'm sorry, 90.  Thank you, Mr. Baldwin.
14          MR. HILL:  I have no other questions,
15  Judge.
16          MR. MCCLELLAN:  Just a couple of other
17  things, if I might.
18          REDIRECT EXAMINATION
19  BY MR. MCCLELLAN:
20      Q.  You could have -- so if you had ten firearms
21  that are made of the same type -- that is a Beretta, I
22  guess, right?
23      A.  That's correct, sir.
24      Q.  So let's say you had ten Berettas made in
25  sequence.  You fired each of the ten Berettas.  Are you

123

1 going to be able to tell whether a bullet came from each
2 of those ten?
3   A.  Yes, you would.
4   Q.  And that's because of why?
5   A.  During the rifling process, each of those ten
6 firearms, the ten theoretical firearms, would have a
7 unique set of flaws on the interior surface of the
8 barrel that result from the actual cutting or removing
9 of the metal that's done during the rifling process; and
10 those imperfections would evidence themselves on the
11 surface of the bullet as striated markings, and you
12 would have a pattern of striated markings that would be
13 unique to that firearm.
14   Q.  Does that also hold true where magazine marks
15 that are made -- in other words, whenever the magazine
16 is made, it's made by tools much like whenever the
17 barrel of a gun is made with the magazine marks that are
18 left?  If you had the magazine -- I would expect if you
19 had ten magazines, would you be able to then cycle
20 throughout -- if that's a proper terminology -- rounds
21 from ten different magazines, ten different weapons, and
22 determine whether or not which was cycled through which
23 firearm?
24   A.  Theoretically, it could be done.  It would,
25 again, depend on how many markings were being produced

124

1 by the lips of the magazine as to whether or not you
2 would have enough markings to make that type of
3 determination.
4   Q.  Okay.  But were there sufficient markings on
5 State's Exhibit 89, a cartridge, and State's Exhibit 27,
6 cartridge case, for you to make an identification that
7 they were from the same magazine?
8   A.  In my opinion, yes, sir.
9   Q.  If a gun has a magazine, like you said, with a
10 loaded clip and a round has not been cycled into the
11 chamber -- let's say it's in this position, and I
12 assume -- I assume you could put the clip in it when
13 it's in a closed position like this, right?
14   A.  Yes, sir, you can.
15   Q.  And then if you had it in that position, if you
16 pulled the trigger, what's going to happen?
17   A.  If you did not chamber a cartridge, the hammer
18 would fall; but there would be no cartridge for the
19 firing pin to detonate.
20   Q.  So if there is not one in the chamber, you put
21 the clip in.  And in order for it to fire, you have to
22 bring it back and cycle a round into the chamber; is
23 that correct?
24   A.  That's correct, sir.
25   Q.  If you found a firearm, hypothetically, at a

125

1 scene where it was a full clip, but whenever the person
2 who first examined the firearm pulled back the cartridge
3 and found there were no -- there was not a live round in
4 there, would that firearm be able to be fired, having
5 not had live rounds in the barrel?  Would that firearm
6 be in a ready to be fired position?
7   A.  I'm afraid I got lost in the explanation.  In
8 order for that firearm to be in a condition for firing,
9 there must be a cartridge chambered.
10   Q.  All right.  If there is a cartridge chambered
11 and when you pull the gun back in a locked position -- I
12 guess I'm not going to be able to do that -- but if you
13 pull the gun back in a locked position -- if you have a
14 firearm and there is -- it's loaded and there is one in
15 the chamber, and instead of firing the firearm, you pull
16 the slide back as if you're thinking about there is not
17 one I need to chamber, and what's going to happen to the
18 live rounds that's in the chamber?
19   A.  That unfired cartridge should be extracted from
20 the chamber and ejected from the firearm.
21   Q.  Okay.
22   A.  And there was a magazine in position with
23 loaded cartridges still in the firearm.  The forward
24 motion of the slide would chamber the next cartridge
25 from the magazine and should leave the firearm in a

126

1 condition for firing.
2   Q.  Okay.  Have you also known -- well, let's do
3 this:  When you fire a semiautomatic such as the 9
4 millimeter Beretta that's there, when you fire the gun,
5 what happens to the cartridge case that is in the
6 chamber at the time you pull the trigger?
7   A.  The cartridge that is in the chamber at the
8 time that the trigger is pulled, that cartridge will be
9 detonated; and that would force the bullet down the
10 barrel, and the pressure generated by the detonation of
11 the cartridge would also force the slide to the rear.
12 And that would extract the fired cartridge case, and
13 also eject the fired cartridge case from the firearm.
14 That would also re-cock the action of the firearm, and
15 the forward motion of the slide would chamber the next
16 round and leave it in a ready-to-fire condition.
17   Q.  Are there firearms that when you fire a gun, as
18 opposed to the cartridge being ejected, it might jam in
19 the gun?  Have you encountered that situation before?
20   A.  Yes, that's not an uncommon situation in
21 semiautomatic pistols.
22   Q.  Okay.  The -- State's Exhibit No. 91 and
23 State's Exhibit No. 90 are fired bullets that you
24 examined; is that correct?
25   A.  Yes, sir.

127

1    Q.   Okay.  And did they come from a firearm?
2    A.   Yes, sir, they did.
3    Q.   And is a firearm a deadly weapon?
4    A.   Yes, sir.
5         MR. MCCLELLAN:  At this time, Your Honor,
6    the State would offer into evidence State's Exhibit 96,
7    the chart.
8         MR. HILL:  I have no problem, Judge.
9         THE COURT:  State's 96 is admitted.
10        MR. MCCLELLAN:  I'll pass the witness,
11   Your Honor.
12        MR. HILL:  May I just have a moment to
13   look at the chart?
14        THE COURT:  Yes.
15        MR. HILL:  I have no further questions,
16   Judge.  Thank you.
17        THE COURT:  You may stand down.
18        Would you approach, please?
19        (Off-the-record discussion.)
20        MR. MCCLELLAN:  State would offer into
21   evidence State's Exhibit 38, which would also have a
22   clip.
23        THE COURT:  38 will include the clip,
24   correct?
25        MR. MCCLELLAN:  Yes.

128

1         THE COURT:  Any objection?
2         MR. HILL:  No objection.
3         THE COURT:  38 is admitted, including the
4    clip.  What says the State?
5         MR. MCCLELLAN:  Your Honor, the State of
6    Texas rests.
7         THE COURT:  What says the defense?
8         MR. HILL:  May we take up a matter?
9         THE COURT:  You may.
10        All right, ladies and gentlemen, if you
11   would, please go back in the jury room.
12        (Outside jury's presence:)
13        MR. HILL:  Your Honor, at this time, in
14   Cause Number 800112, styled State of Texas versus
15   Charles Mamou, Jr., on behalf of Mr. Mamou, we would
16   make a motion for instructed verdict of not guilty.  We
17   don't believe that the evidence establishes, as alleged
18   in the indictment, that the defendant on trial is
19   responsible for having committed the offense as alleged.
20        More specifically, I don't believe there
21   was any evidence, credible evidence, in the record to
22   show that any acts attributed to Mr. Mamou were done
23   while in the course of committing or attempting to
24   commit kidnapping of Mary Carmouche or that the
25   defendant, Charles Mamou, intentionally caused the death

129

1    of Mary Carmouche by shooting Mary Carmouche with a
2    deadly weapon, namely, a firearm.
3         For those reasons, we would ask the Court
4    to instruct the jury to find the defendant not guilty.
5         THE COURT:  It's denied.
6         MR. HILL:  May I have just a moment?
7         (Jury is brought in and seated.)
8              ROGER RUFFCORN,
9    having been first duly sworn, testified as follows:
10             DIRECT EXAMINATION
11   BY MR. HILL:
12        Q.   Would you please state your name for the
13   members of the jury?
14        A.   My name is Roger Ruffcorn.
15        Q.   Where do you live, sir?
16        A.   I live in Houston, Texas.
17        Q.   How are you employed?
18        A.   I'm employed by Yellow Cab.  I'm the customer
19   service and driver services manager.
20        Q.   All right.  Would you tell the members of the
21   jury whether or not you ever actually drove a cab at one
22   point?
23        A.   Yes, I did.  I drove a cab from 1992 to 1994.
24        Q.   What type of work do you do now at Yellow Cab?
25   What are your responsibilities?

130

1    A.   My responsibilities include keeping records on
2    all the drivers, handling all the complaints that come
3    in concerning cab rides, lost and found articles, all
4    the drivers' complaints about things.  I also interview
5    all the new prospective drivers that come in, and also
6    teach the training class on a backup basis.
7    Q.   Okay.  Did I contact you and ask you to see
8    whether or not you had any records from the Yellow Cab
9    company reflecting the early morning hours of December
10   7th of 1998?
11   A.   Yes, you did.
12   Q.   And did I ask you, specifically, to look at an
13   address of 10800 Fondren, Number 1402?
14   A.   Yes, you did.
15   Q.   Did you conduct the search of those records to
16   see if you had any information relating to that address
17   and date?
18   A.   I did perform a search, yes.
19   Q.   Did you bring that record with you today in
20   court?
21   A.   I have it with me.
22        MR. HILL:  May I approach the witness,
23   Your Honor?
24        THE COURT:  Yes.
25   Q.   (BY MR. HILL)  Mr. Ruffcorn, I'm going to put

**131**

1  an exhibit on here -- it's going to be marked
2  Defendant's Exhibit No. 9 -- and ask you if you can
3  identify that document for me, please?
4      A.  I can.  These are -- that is a report that we
5  can generate from any given day up to a year in the
6  past.  We can do it by addresses, or we can do it by
7  zones.  We can perform the search by cab number, or by
8  an I.D. number, or by an address.
9      Q.  The records that you brought to court that are
10  reflected in Defense Exhibit No. 9, are they made at or
11  near the time of the event they are prepared?
12      A.  Are you --
13      Q.  In other words, the information that's
14  contained on Defense Exhibit No. 9, when that
15  information first comes in, is that when the document
16  that supports that is generated?
17      A.  No, we generate these documents on demand.
18      Q.  Okay.  But the information that's contained in
19  Defense Exhibit No. 9, that information is made at or
20  near the time of the events that are depicted?
21      A.  Right, it is automatically recorded on the hard
22  drive in the computer dispatch system and transferred to
23  tape after thirty days.
24      Q.  Is that information transmitted by a person
25  with knowledge, personal knowledge, of the information

**132**

1  contained thereon?
2      A.  Do you mean --
3      Q.  The person -- that dispatcher that's giving the
4  information, is he or she the one that's actually
5  preparing the records?
6      A.  Actually, when a person calls in for a taxi
7  cab, what we call a call taker enters the information
8  into the computer and hits a button that sends it to the
9  first available driver in the area.  And if nothing goes
10  awry, the only two people that ever know about the call
11  are the driver -- well, actually the driver and the call
12  taker and the person that called the cab.
13      Q.  Then are the records depicted in State's
14  Exhibit No. 9 kept in the regular course of the Yellow
15  Cab business?
16      A.  Yes, they are.
17          MR. HILL:  Your Honor, after tendering
18  them to the State, we would move to introduce
19  Defendant's Exhibit No. 9.
20          MR. MCCLELLAN:  May I take the witness on
21  voir dire, Your Honor?
22          THE COURT:  You may.
23
24
25

**133**

1              VOIR DIRE EXAMINATION
2  BY MR. MCCLELLAN:
3      Q.  There is a name that's listed -- there is a
4  bunch of names listed on State's Exhibit No. 9 where
5  it's -- it gives a name caller, and then it has a name.
6  When a person says a name, is there any way of
7  determining whether or not the person is giving their
8  correct name?
9      A.  No, there is not.
10      Q.  And the only name that you recorded is just one
11  name?  I mean, there is not a first and last name?
12      A.  Not usually, but there is sometimes.
13      Q.  Now when --
14          MR. MCCLELLAN:  May I approach the
15  witness, Your Honor?
16          THE COURT:  Yes.
17      Q.  (BY MR. MCCLELLAN)  Without saying those
18  words, what are the -- what would that determination
19  mean?  I mean, what would things -- there is a deal
20  here; it says GC.  What does GC stand for?
21      A.  That would be the gate code to get into the
22  apartments, and at the big box -- I'm sorry.  That would
23  be where the customer supposedly would be.
24      Q.  So, somebody's going to be at a big box?
25      A.  That could be the mailbox system or whatever.

**134**

1          MR. MCCLELLAN:  I'd object, Your Honor, to
2  Defense Exhibit No. 9 on the grounds that it contains
3  not only material unrelated to this case; but also,
4  someone has evidently marked certain things, and I don't
5  know what those relate to.  So --
6          MR. HILL:  We can remove all the other
7  matters and only introduce the one with --
8          (Off-the-record discussion.)
9          MR. MCCLELLAN:  I would also object to
10  relevance.
11          THE COURT:  It's overruled.  Defense 9 is
12  admitted.
13          DIRECT EXAMINATION CONTINUED
14  BY MR. HILL:
15      Q.  Let me hand back to you Defendant's Exhibit No.
16  9.  With regard to the call that is reflected at the
17  bottom of that sheet, again, the location where the call
18  was made to the cab driver that went out to a location,
19  what location did he go to?
20      A.  He went to 10800 Fondren.
21      Q.  Was there a particular apartment unit number?
22      A.  He was given Apartment Number 1402.
23      Q.  And the name of the caller?
24      A.  The caller said his name was Shawn.
25      Q.  Does your record reflect whether or not the

135
1    driver actually proceeded to that location and picked
2    somebody up?
3         A.  Well, we assume a lot in this business.
4    According to what the record shows, he was dispatched at
5    the same time that the call was placed; and he shows
6    that he turned his meter on five minutes later and
7    turned his meter off five minutes after he turned it on.
8    So he went approximately five minutes' worth of travel
9    time.
10        Q.  And that area of town that we're -- that's
11   reflected in Defendant's Exhibit No. 9, is that referred
12   to as Fondren Southwest area?
13        A.  Well, there are people that call it that.  We
14   call it Zone 529.
15        Q.  Okay.  Zone 529.  What is that zone like?
16   What is the perimeters of that zone?
17        A.  Without my zone map, I couldn't really tell you
18   the size of.  It takes up approximately one Key Map
19   page.
20        Q.  Okay.  Thank you.
21             MR. HILL:  I'll pass the witness.
22                  CROSS-EXAMINATION
23   BY MR. MCCLELLAN:
24        Q.  Is that Defense Exhibit No. 9?
25        A.  Yes.

136
1         Q.  It says 10800 Fondren.  And that would be what
2    someone told someone on your end?
3         A.  That's correct.
4         Q.  It has a phone number.  That would be what
5    someone told someone on your end?
6         A.  That's true.
7         Q.  And it's got a name, and it just says Shawn.
8    That would be what someone told someone on your end?
9         A.  Yes.
10        Q.  And there is no indication by that record that
11   anybody went to Apartment 1402, is there?
12        A.  No.
13        Q.  In fact, they went to a big box?  Isn't that's
14   what there is a notation at the side and --
15        A.  The directions say, yes.
16        Q.  -- at the big box.  Do you know where the big
17   box is?
18        A.  I don't know offhand.
19        Q.  Do you know if it's 10800 Fondren?
20        A.  Do I know where it is?
21        Q.  Yeah.
22        A.  Yes, sir.
23        Q.  I mean, do you know where the big box is?
24        A.  No, I do not.
25        Q.  Okay.  So when a person calls in, you don't

137
1    know if they're giving you the apartment number they're
2    in or they're just giving you an apartment number?
3         A.  That is true.
4         Q.  You don't know whether they're giving you the
5    phone number they're calling from or just giving you a
6    phone number?
7         A.  We do have caller I.D.
8         Q.  The question is -- so you're saying you checked
9    every time to make sure that's correct; because that's
10   not generated until later, upon demand?
11        A.  Well, this report, that's correct; but they do
12   look at the phone numbers that the person is giving,
13   according to the -- and cross check it with the one
14   you're looking at.
15        Q.  So somebody gives a phone number that's not
16   what they're calling from?  They don't enter that phone
17   number?
18        A.  Ofttimes they will ask what phone they are
19   calling from.
20        Q.  But it doesn't mean they don't record the
21   number that someone gave, though, does it?
22        A.  No, it doesn't.
23        Q.  Now, I think you said in comparing that record
24   or that kind of record, you're assuming a lot.  You're
25   assuming that someone is telling you their right name?

138
1         A.  Right.
2         Q.  You're assuming they're telling you the right
3    number?
4         A.  Huh?
5         Q.  You're assuming they're telling you the right
6    location, though I assume if you go to a location and
7    there is nobody there, then that would be a clue it was
8    the wrong location.  But you're assuming a lot of
9    information.  That information is not verified, is it?
10        A.  No.  The only time it comes into question is if
11   we get -- the caller called back, because the cab didn't
12   show up.
13        Q.  And, in fact, even though it says -- it shows
14   the meter was turned on at a certain time and turned off
15   at another time, that doesn't mean that the person even
16   picked someone up, does it?
17        A.  Not actually.  But if we don't get a call back,
18   we assume that happened.
19        Q.  I understand you assume.  Now it says a name
20   there, Shawn.  Do you know how many Shawns live over in
21   the 10800 block of Fondren?
22        A.  No, sir.
23        Q.  Do you know who that Shawn is?
24        A.  No.
25             MR. MCCLELLAN:  I'll pass the witness.

139

```
1                REDIRECT EXAMINATION
2   BY MR. HILL:
3       Q.  What time is it reflected that the call came in
4   and the driver went there, and what time did the driver
5   turn off his meter?
6       A.  We received a call at 3:59 a.m.; and it was
7   dispatched at the same time, 3:59.  And the meter was
8   turned on 4:04 a.m. and turned off 4:09 a.m.
9       Q.  Is the driver that's reflected in Defendant's
10  Exhibit No. 89, is he still employed with Yellow Cab?
11      A.  He never was employed.  All of our Yellow Cab
12  drivers are independent contractors, not employees of
13  the company; and this particular driver is no longer an
14  active driver with us.
15      Q.  Okay.  Thank you, sir.
16          MR. HILL:  I have no further questions.
17                RECROSS-EXAMINATION
18  BY MR. MCCLELLAN:
19      Q.  The record does not reflect, does it, where the
20  address to which the person was taken, if there was, in
21  fact, a person taken?
22      A.  That's correct, we do not keep that
23  information.
24      Q.  So there is no way -- you have no records that
25  would indicate where a person was delivered to if a
```

140

```
1   person had been picked up?
2       A.  Right.  That would be in the driver's records,
3   his own records.
4           MR. MCCLELLAN:  Pass the witness.
5           MR. HILL:  No further questions of this
6   witness.
7           THE COURT:  You may stand down.
8           MR. HILL:  Call Charles Mamou.
9       May I proceed, Your Honor?
10          THE COURT:  Please.
11          CHARLES HAROLD MAMOU, JR.,
12  having been first duly sworn, testified as follows:
13                DIRECT EXAMINATION
14  BY MR. HILL:
15      Q.  Would you please tell the members of the jury
16  what your name is?
17      A.  My name is Charles Harold Mamou, Jr.
18      Q.  How old are you, Mr. Mamou?
19      A.  Twenty-four years old.
20      Q.  I want to ask you, where did you grow up?
21      A.  Sunset, Louisiana.
22      Q.  Where is that in relation to Houston, Texas?
23      A.  It's about three hundred miles, about
24  three-and-a-half hours from Sunset, Louisiana.
25      Q.  Heard a lot of testimony.  I'm going to get
```

141

```
1   right to the point with you, if I may.  I want to ask
2   you if you know certain people.  Do you know a person by
3   the name of Terrence Dodson?
4       A.  I do.
5       Q.  He's your cousin?
6       A.  He's my first cousin.
7       Q.  Do you know a person by the name of Shawn
8   England?
9       A.  I do.
10      Q.  Who is that to you?
11      A.  He's just a business associate.
12      Q.  Do you know a person by the name of Timmy
13  Thomas?
14      A.  I do.
15      Q.  Who is Timmy Thomas?
16      A.  He was employed by me.
17      Q.  Where does Timmy Thomas live?
18      A.  In Sunset, Louisiana.
19      Q.  Where, in relation to where you are, to your
20  mother's house, does Timmy Thomas live?
21      A.  Six houses down from my mother's house.
22      Q.  Did you know a person by the name -- or do you
23  know a person by the name of Dion Holley?
24      A.  I do.
25      Q.  Do you know a person by the name of Mary
```

142

```
1   Carmouche?
2       A.  I do.
3       Q.  Did you know a person by the name of
4   Mr. Gibson, Terrence Gibson?
5       A.  I sure do.
6       Q.  These are all people -- and did you know
7   Mr. Samuel Bug Johnson?
8       A.  Yes, I do.
9       Q.  Howard and Robin Scott?
10      A.  Yes, I do.
11      Q.  Were these all individuals that you knew and
12  met within the first week of December, 1998?
13      A.  Yes, they were.
14      Q.  Here in Houston, Texas?
15      A.  Yes.
16      Q.  I'm sure there will be questions asked of you
17  regarding the circumstances that took place out on
18  Lantern Point Drive, but I want to bring you right to
19  the main point of this case.  I want you to tell the
20  members of the jury what took place when you got into
21  the blue Lexus out there on Lantern Point that we've
22  heard so much about.
23      A.  I jumped into the blue Lexus, and I was driving
24  in a lower position.
25          THE DEFENDANT:  Your Honor, may I show the
```

143

1    jury?
2            THE COURT: If he asks for you to.
3        Q.  (BY MR. HILL) You can do it from there. Just
4    try to show them how you were driving.
5        A.  I jumped into a vehicle; and I was driving like
6    this, stomping it, just mashing. I came to a stop sign,
7    I believe.
8        Q.  Let me ask you this: At the time that you took
9    off in the blue Lexus, where was Bug Johnson in the red
10   car?
11       A.  He had left me.
12       Q.  As you're driving off, do you become aware of
13   the fact there is somebody in the vehicle with you?
14       A.  I do.
15       Q.  And when does that occur?
16       A.  When I came to a stop at the stop sign.
17       Q.  What occurred?
18       A.  A head raised up from the back of the -- you
19   know, the back -- in the back of the car; and I seen the
20   girl, Miss Mary Carmouche, in the rearview mirror.
21       Q.  Did you say anything to her, or did she say
22   anything to you?
23       A.  She spoke to me first.
24       Q.  All right. Did you say anything to her in
25   response?

144

1        A.  Yes, I did.
2        Q.  What did you say to her?
3        A.  I told her that I didn't kill anybody.
4        Q.  Did you drive further at that point?
5        A.  I took a left when I came to my stop sign.
6        Q.  At the point in time you became aware of the
7    fact that Mary Carmouche was in the car, did you
8    indicate to her she had to stay in the car?
9        A.  No, I did not.
10       Q.  Was there a point in time where you came to any
11   location where you said anything else to her?
12       A.  I came to a caution -- not a caution light, a
13   red light. And I remember the street where I was at.
14       Q.  At Main Street?
15       A.  And they had a Burger King on the right side
16   and a club that I would go to on the left.
17       Q.  What, if anything, did you say to her at that
18   location?
19       A.  I told her to get out the car.
20       Q.  Did she respond to you?
21       A.  Yes, she did.
22       Q.  As a result of her response to you, did she get
23   out of the car?
24       A.  No, she did not.
25       Q.  At that point, did you believe that she was not

145

1    familiar with that area?
2            MR. MCCLELLAN: I object to leading, and
3    also object to speculation.
4            THE COURT: Sustained.
5        Q.  (BY MR. HILL) After she said something to you,
6    after you told her to get out of the car, where did you
7    go?
8        A.  The light turned green. I turned a left on
9    Main Street.
10       Q.  Where did you go from there?
11       A.  I'm driving. You know, I'm confused right now,
12   just driving. And there comes a car behind me, flashing
13   the bright lights on me.
14       Q.  And did you recognize what car that was?
15       A.  No, I did not.
16       Q.  What, if anything, did you do in response to
17   the car flashing your their lights at you?
18       A.  I thought it was the police, and then I noticed
19   the vehicle came into the other driver's lane and was
20   coming fast on me. And my first thought was there was
21   some more guys that was coming -- you know what I'm
22   saying? -- for the incident. And that's when Bug
23   Johnson pulled up on the side of me.
24       Q.  Bug Johnson is the guy that's driving in the
25   red or dark orange Concord or Intrepid?

146

1        A.  Yes, he is.
2        Q.  What do you do at that point?
3        A.  He raised his window down, and he was driving
4    with one hand. He had the cell phone in his other hand,
5    and he was talking to somebody. And he waved and
6    motioned, told me to follow him.
7        Q.  Did you do that?
8        A.  I did.
9        Q.  As this is taking place, is Miss Carmouche
10   saying anything in the backseat?
11       A.  Oh, she's not in the backseat. She's in the
12   front seat on the passenger side.
13       Q.  All right. Are you -- are you doing anything
14   to threaten her?
15       A.  Not at all.
16       Q.  Where do you go after you see Bug on your left
17   with a cell phone and he's motioning to you?
18       A.  Fondren Court Apartments.
19       Q.  When you get to Fondren Court Apartments --
20   whose apartment was he going to?
21       A.  Howard Scott.
22       Q.  Is that the location that Mr. Scott testified
23   yesterday he lived at, 10800 Fondren?
24       A.  It is.
25       Q.  Does that sound right?

147

```
1      A.  It is.
2      Q.  Where did he go?
3      A.  This was a dumpster -- Bug drove -- I was
4   following Bug, and Bug pressed the code.  He knew the
5   code to get into the gate, because you had to have a
6   code.  And we followed each other around the apartment
7   complex; and there was a dumpster, a trash can, and
8   that's where I parked the vehicle at.
9      Q.  All right.  What did you do when you parked the
10  vehicle there?
11     A.  I exited out the car, and I offered Miss
12  Carmouche to get out the vehicle.
13     Q.  Did she get out of the vehicle?
14     A.  Yes, she did.
15     Q.  Was there anybody there?   Did anybody else
16  come there other than Bug Johnson?
17     A.  Bug Johnson and Shawn England approached the
18  vehicle.
19     Q.  This is the Shawn England that you earlier
20  testified that you know?
21     A.  Yes, it is.
22     Q.  Can you describe Shawn England for us, please?
23     A.  Dark male, about 200 pounds, maybe, four or
24  five golds in his mouth.
25     Q.  When you say four or five golds in his mouth,
```

148

```
1   you mean gold teeth?
2      A.  Gold teeth.
3      Q.  And did you all stand around at the car, or did
4   Miss Carmouche run off?
5      A.  No, she didn't.
6      Q.  So there was Shawn England, Samuel Bug Johnson,
7   you, Mary Carmouche.  Did anybody else come there at
8   that time?
9      A.  Not at that time.
10     Q.  What did you do at that time?
11     A.  At that time I was crying, you know; and Shawn
12  pulled me on the side and he told me, Don't worry about
13  it.  You know what I'm saying?   Those guys deserve --
14  they got what they deserved, but I didn't see it that
15  way.
16     Q.  So what did you do after Shawn pulled you to
17  the side and made that statement to you?   Did you go
18  somewhere?
19     A.  We went inside the apartment complex.
20     Q.  Who is we?
21     A.  Me and Shawn only.
22     Q.  So Bug Johnson is outside?
23     A.  With Miss Carmouche.
24     Q.  Where is the car at that point?
25     A.  Still by the dumpster.
```

149

```
1      Q.  When you go inside with Shawn, who's inside the
2   house -- in the apartment, rather?
3      A.  Howard Scott, his wife, Robin, and their little
4   girl.
5      Q.  How long do you stay inside the apartment
6   there?
7      A.  Ten to fifteen minutes, not long.
8      Q.  What happens -- or is there anything that
9   happens that causes you to walk out of the apartment and
10  go back into the parking area?
11     A.  Howard Scott went in his bedroom where his wife
12  was, and he came out with three pairs of socks; and we
13  proceeded back to outside.
14     Q.  And once outside, what did you do?
15     A.  What did I do?
16     Q.  What did you see Howard Scott do?
17     A.  He gave a pair of socks to Shawn England.  He
18  gave a pair of socks to Samuel Johnson.
19     Q.  What did they do?
20     A.  They proceeded to search the Lexus.
21     Q.  When you say they proceeded to search the
22  Lexus, what does that mean?
23     A.  Shawn raised the hood of the vehicle, which the
24  hood was already halfway popped open.  Bug continued to
25  talk and have a conversation with Miss Carmouche at the
```

150

```
1   back of the car, and Howard Scott was inside of the
2   vehicle.
3      Q.  Were they looking for dope?
4      A.  Yes, they was.
5      Q.  And how long does that take?
6      A.  Maybe about thirty minutes.
7      Q.  What happens after everybody is standing there,
8   and these other guys are searching through the vehicle?
9   What's Miss Carmouche doing?
10     A.  She's having a conversation with, you know,
11  with Bug Johnson at the time.
12     Q.  Okay.  At some point does the search of the
13  vehicle end?
14     A.  Another party arrived at that point.
15     Q.  Who is that other party?
16     A.  I met him a few times.  I just know him by his
17  name, Skin or Kevin.  I found out his name was Kevin.
18     Q.  How did he get there?
19     A.  On a bicycle.
20     Q.  And how did he participate with the others?
21          MR. MCCLELLAN:  Object to leading.
22          THE COURT:  Sustained.
23     Q.  (BY MR. HILL)  Okay.  What did this individual
24  do?
25     A.  He didn't do nothing.  He just stood around.
```

151

1    Q.  What happens after everybody is looking through
2    the car?
3    A.  Shawn got upset.  He pulled me on the side.
4    Q.  Don't say what he said.
5    A.  Okay.
6    Q.  You took him to the side, and what did you do?
7    A.  My emotions was weird at this moment.  You
8    know, I didn't really do anything.
9    Q.  You just kind of stood there?
10   A.  He was talking to me.  You know, you don't want
11   me to say what he said?
12   Q.  You're not allowed to say what he said.  What
13   did you do?
14   A.  At that point me, Shawn, and Howard walked back
15   to the house, to his apartment.
16   Q.  What do you do when you're inside the house?
17   A.  They made me take my clothes off.
18   Q.  And do what?
19   A.  They threw them in the washer.  They gave me
20   some more clothes.  They told me to take a shower.
21   Q.  Did you do that?
22   A.  I did not take a shower, but I proceeded to the
23   bathroom for a little while.
24   Q.  All right.  And at some point, do you come out
25   of the bathroom and put some clothes on?

152

1    A.  Yes, ma'am (sic).
2    Q.  Who had your clothes?
3    A.  They took -- well, Howard took the clothes that
4    I had; and he put them in the washing machine, and he
5    gave me a pair of his clothes.
6    Q.  Which was what?  Do you recall what kind of
7    clothes that you wore, that he gave you?
8    A.  Black T-shirt, Nike shirt, and maybe some
9    shorts.
10   Q.  So, then what happened at that point?
11   A.  Shawn had a suggestion that we -- well, at that
12   point we just stayed around talking.
13   Q.  Okay.  Who is we, when you say we just sat
14   around talking?
15   A.  Me, Shawn, and Howard.
16   Q.  How long did y'all sit around for?
17   A.  About thirty more minutes, thirty or forty
18   minutes.
19   Q.  So where is Bug?  Where is Miss Carmouche?
20   And where is this guy, Skin or Ken, or whatever his name
21   is?
22   A.  They had left.
23   Q.  How do you know they left?
24   A.  Because Howard told me so.
25   Q.  What did they leave in?

153

1                MR. MCCLELLAN:  I object, unless he knows.
2                THE COURT:  Sustained.
3    Q.  (BY MR. HILL)  Did you ever go outside and see
4    whether or not the vehicles that had been there before
5    were still there?
6    A.  I did go outside.
7    Q.  What did you see?
8    A.  The Lexus was still parked there.
9    Q.  Where was it parked?
10   A.  Still by the dumpster this time.
11   Q.  Okay.  At some point after Bug, Skin, Miss
12   Carmouche leave, do you go outside and go anywhere?
13   A.  Yes, I do.
14   Q.  And could you tell the members of the jury what
15   you did?
16   A.  I went outside.  I left the apartment complex,
17   and there is a Burger King right next to the apartment
18   complex.  I went over there, and I tried to use the
19   phone to page a girlfriend of mine that was living in
20   Houston.
21   Q.  What did you do after attempting to contact the
22   girl that lived here in Houston?
23   A.  The phone that I was using, that I was trying,
24   could not accept incoming calls; so I just began to just
25   walk and think.

154

1    Q.  Okay.  And at some point -- how long are you
2    walking for?
3    A.  At some point, I only walked for an hour.
4    Q.  And do you eventually get back to the Fondren
5    Court --
6                MR. MCCLELLAN:  Object to leading.
7                THE COURT:  Sustained.
8    Q.  (BY MR. HILL)  Where do you go after walking
9    around?
10   A.  I go back to the apartment complex.
11   Q.  Where exactly do you go to?
12   A.  Howard's apartment complex here, and I was over
13   here.
14   Q.  What, if anything, did you observe?
15   A.  I observed Bug coming back, him and Skin,
16   Kevin.  Bug went into the apartment complex; and he came
17   out and stayed there for about five minutes, not long at
18   all.  He came back, jumped in his car.  Him and Kevin
19   left again.
20   Q.  Do you see Shawn England at all?
21   A.  Not at this moment, I do not.
22   Q.  All right.  You stay away from the apartment at
23   that point?
24   A.  Yes, I do.
25   Q.  For how long?

155

1    A.   Roughly, about another hour may have passed.
2    Q.   At some point, do you see Shawn?
3    A.   Well, not at this point.  I seen Bug and Kevin
4  again.  They came back to the apartment complex.
5    Q.   In which car?
6    A.   Bug Johnson's car.
7    Q.   Do you see where they go?
8    A.   Kevin got out of the vehicle this time, and he
9  jumped back on his bicycle.
10   Q.   And did what?
11   A.   He left.
12   Q.   Then what happened?
13   A.   And Bug left.
14   Q.   At that point, do you go back to the apartment?
15   A.   No.  At that point --
16   Q.   What happens at that point?
17   A.   At that point there, five minutes after that a
18 Yellow Cab came.  It was a Yellow Cab van.
19   Q.   Then what do you see, if anything?
20   A.   I seen Shawn England get inside the Yellow Cab.
21   Q.   After you saw Shawn get into the Yellow Cab,
22 what did you do?
23   A.   Counted to 100, because I was trying to build
24 my nerves up to go to the apartment complex.
25   Q.   Did you?

156

1    A.   Yeah, after I counted to about 300, I went
2  back.
3    Q.   And who was there at the apartments when you
4  went back there?
5    A.   It was only Howard, his wife, and his daughter.
6    Q.   And did you spend the night there?
7    A.   Yes, I did.
8    Q.   The next morning would have been Monday
9  morning, correct?
10   A.   Yes, it is.
11   Q.   Were you still at Howard's?
12   A.   Yes, I was.
13   Q.   You've heard the testimony from Terrence Dodson
14 and from Anthony Trail?
15   A.   That's correct.
16   Q.   Is that how -- how did that happen?  Were you
17 with them?  Did you talk to them?
18   A.   Me, Terrence Dodson, and Anthony Trail got
19 together about 9:00 that morning.
20   Q.   Okay.
21   A.   I called Anthony Trail to shoot some
22 basketball.  I wanted him to come pick me up, but he did
23 not know where I was.  So I say, Go pick up Terrence --
24 Dodson, Tator, because he had been to the apartment
25 complex.

157

1    Q.   Did they do that?
2    A.   Yes, they did.
3    Q.   Where did you guys go?
4    A.   We dropped Terrence Dodson off, my cousin.  And
5  we proceeded to his house, to Anthony Trail's house.
6    Q.   How long did you stay there?
7    A.   Till about 12:00 o'clock.
8    Q.   What did you do after that?
9    A.   Then we went over to Stephanie Mamou, my
10 cousin's apartment, where Tator lived.
11   Q.   And after that, where did you go?
12   A.   Then after that, Anthony Trail dropped me back.
13 Well, this time he went to the apartment complex where
14 Howard Scott lived and dropped me off.
15   Q.   And after you were dropped off, how did you get
16 back to Louisiana?
17   A.   Well, I did not leave that day.
18   Q.   All right.  Where did you spend that day, or
19 what did you do the rest of the time here before leaving
20 to go to Louisiana?
21   A.   Howard's -- when Anthony Trail dropped me back,
22 this girl Howard messes with named Kiki, she comes over
23 there.  She's a stripper; and she came picked us up from
24 the Burger King again, because he would never let her
25 come to the house.  And we went to Pasadena.

158

1    Q.   And where did you go in Pasadena?
2    A.   Howard's girlfriend, Kiki, had to work there;
3  and we just stayed and drunk.
4    Q.   That was all day Monday?
5    A.   No, not all day.  We returned back to the
6  apartment complex around 7:00.
7    Q.   And then what did you do?
8    A.   We went back over there to Howard's house.  And
9  his wife, Robin, told me I received a phone call from a
10 friend of mine named Roland.
11   Q.   So did you spend Monday evening here in
12 Houston?
13   A.   Yes, I did.
14   Q.   When do you eventually get back to Louisiana?
15   A.   Tuesday, around 6:30.
16   Q.   How do you get there?
17   A.   On a bus.
18   Q.   Who took you to the bus station?
19   A.   Anthony Trail.
20        MR. HILL:  May I have just a moment?
21 We'll pass the witness..
22                CROSS-EXAMINATION
23 BY MR. MCCLELLAN:
24   Q.   Mr. Mamou?
25   A.   Yes, sir, Mr. Lyn.

159

1    Q.   We've never talked before, right?
2    A.   We sure haven't.
3    Q.   I notice that you didn't say you knew Kevin
4  Walter.  Do you know Kevin Walter?
5    A.   I was never asked if I knew Kevin Walter.
6    Q.   But my question was, do you know Kevin Walter?
7    A.   Yes, I do, sir.
8    Q.   We just skipped him on the list of people?
9         MR. HILL:  I forgot to ask.  I'm sorry.
10        MR. MCCLELLAN:  That's all right.
11   Q.   (BY MR. MCCLELLAN) Now how long have you known
12  Mary Carmouche?
13   A.   I only known Miss Mary Carmouche for a couple
14  of hours.
15   Q.   How long had you known Dion Holley?
16   A.   He and I met physically Sunday; but we had
17  spoke on December 4th, when he came and told me they
18  were -- he had told me his name was Freaky Deaky.
19   Q.   How long had you known Terrence Gibson?
20   A.   Only a few hours.
21   Q.   And so you had never met Mary Carmouche, or
22  Terrence Gibson, or even Kevin Walter before December
23  the -- December -- you know, you knew Kevin Walter,
24  right?
25   A.   Yes, I did.

160

1    Q.   Because Kevin came down whenever you met him
2  over at the Shoney's, whenever you came down?
3    A.   Well, me and Kevin been there, been associating
4  before this Shoney's ordeal.
5    Q.   You mentioned that Timmy Thomas was employed?
6    A.   Yes, he was.
7    Q.   So he was one of your drug boys; because you're
8  a drug dealer, right?
9    A.   I was, but I'm --
10   Q.   Well, you're not a drug dealer now, but you've
11  been a drug dealer for how long?
12   A.   All my life.
13   Q.   Okay.   And Timmy Thomas is an employee as part
14  of your drug business?
15   A.   He was an employee of mine.
16   Q.   What kind of empire do you have?   How many
17  people you got working for you?  Kind of varies from day
18  to day?
19   A.   Not really.
20   Q.   Okay.  Well, how many people you got?  Too many
21  to count?
22   A.   No, sir, not at all.  You can say an estimate
23  of five.
24   Q.   Five people?
25   A.   Yes.

161

1    Q.   Can you name those people?
2    A.   I sure can --
3    Q.   Okay.
4    A.   -- if they would be present.
5    Q.   You can't name them if they're not present?
6    A.   I could -- sure, I sure can.
7    Q.   Okay.
8    A.   Cornel Landry.
9    Q.   Cornel who?
10   A.   Cornel Landry.
11   Q.   Where does Cornel Landry live?
12   A.   In Sunset, Louisiana.
13   Q.   Okay.
14   A.   Timmy Melancon out of Lafayette, Louisiana.
15   Q.   Mr. Melancon, was he the Melancon that was down
16  here on Labor Day?
17   A.   No.  Timmy Melancon, different relation.
18        MR. HILL:  Judge, may we approach the
19  bench?
20        (Off-the-record discussion.)
21        (At the bench:)
22        MR. HILL:  I have filed a motion in limine
23  regarding the extraneous murder from Labor Day.  And
24  he's trying to back door into asking him about Labor Day
25  through cross-examination, which I don't think is

162

1  relevant at all.
2         THE COURT:  If he understands that the
3  motion in limine is still in effect and we have to take
4  that up outside the presence of the jury.  That's not
5  what we're talking about, is it?   Are we talking about
6  that?
7         MR. MCCLELLAN:  I'm not going into
8  anything.  I'm talking about who people know.
9         THE COURT:  That's all.  I understand.
10        MR. MCCLELLAN:  I know what the rules are.
11        MR. HILL:  We'd appreciate it if we don't
12  have too many side-bars, Judge.
13        THE COURT:  I'd appreciate it, too.  I
14  notice it came from both sides of the table earlier,
15  though.
16        (Continuing in the jury's hearing:)
17   Q.   (BY MR. MCCLELLAN)  So, you know a Melancon
18  that lives here in Houston?
19   A.   No, I do not.
20   Q.   You know a guy named Bruiser?
21   A.   No, I do not.
22   Q.   Now you were ready to do a drug deal, right?  I
23  mean, hit a lick, what they call hit a lick?
24   A.   No.  It's called purchasing of drugs.
25   Q.   Purchasing of drugs?

163

1      A.  Yes.

2      Q.  And how many -- what size of transaction were
3   you thinking about purchasing?

4      A.  My intentions was to come out here and get a
5   half a kilo.

6      Q.  Half a kilo?

7      A.  That's right.

8      Q.  How much were you planning on paying for a half
9   a kilo?

10     A.  I had $9,000 on me.

11     Q.  Nine thousand in cash?  Were you planning on
12  paying cash for drugs?

13     A.  That's how it works.

14     Q.  Okay.  Does it also work sometimes when people
15  cut up pieces of paper to look like money and try to do
16  it that way?

17     A.  If I may explain that situation.

18     Q.  I'm just asking you if it works that way
19  sometimes?

20     A.  I don't know.

21     Q.  You've never been involved in that?

22     A.  No, I'm not saying that.  I'm just saying, I
23  don't know what you're trying to ask me.

24     Q.  Well, I'm asking you, have you ever heard of
25  situations where people cut up pieces of paper to look

164

1   like money and then try to buy drugs with paper as
2   opposed to --

3      A.  No, no, you can't buy drugs with paper.

4      Q.  Okay.  You can't try to rip people off?

5      A.  That's not my field.

6      Q.  You're just a businessman?

7      A.  Not anymore.

8      Q.  I understand.  Were a businessman, drug
9   businessman, right?

10     A.  When you lead the life of drugs, you know, you
11  get caught up in your own world.

12     Q.  The question was, are you a drug businessman?

13     A.  No, I'm not.

14     Q.  The $9,000 that you had, you got from working?

15     A.  No, I did not.

16     Q.  Got from selling drugs?

17     A.  Yes, I did.

18     Q.  Okay.  And you came down here to buy a half a
19  kilo?

20     A.  That's right.

21     Q.  And so, did you talk with Kevin Walter about
22  buying a half a kilo?

23     A.  Yes, I did.

24     Q.  Did you meet up with Kevin Walter and Dion
25  Holley?

165

1      A.  No, I did not meet up with Dion Holley at the
2   time.  I met with Kevin Walter.

3      Q.  Where did you meet Kevin Walter?

4      A.  At the hotel where I was staying, at Shoney's
5   off of 610.

6      Q.  I'm talking about December the 6th, 1998, the
7   whole time we have been talking about that time.  I want
8   to address that.

9      A.  Okay.

10     Q.  On December 6th, 1998, did you try to buy drugs
11  from Kevin Walter?

12     A.  Yes.

13     Q.  Okay.  And were you buying half a kilo or a
14  kilo?

15     A.  Well, it was his perception that he had showed
16  me a kilo and see if I wanted to purchase it.

17     Q.  Okay.  And who all was with Mr. Walter?

18     A.  At the first contact it was only him and
19  Mr. Dion Holley.

20     Q.  And that was at Papa's Barbeque?

21     A.  Well --

22     Q.  Near Papa's Barbeque?

23     A.  That was not the first time we went to the
24  north side area.

25     Q.  Talking about December 6th, 1998?

166

1      A.  That was also December 6th, 1998.

2      Q.  Where did you go?

3      A.  The first time we went to the north side area.
4   I don't know the street, but Kevin Walter had informed
5   us to go there.  It was by a Fiesta.

6      Q.  On the north side?

7      A.  Yes, sir.

8      Q.  And you went there -- well, there is a Fiesta
9   right on 45?

10     A.  I don't know the streets by name.

11     Q.  How did you get there?

12     A.  Bug Johnson drove.

13     Q.  But it was your deal?

14     A.  Yes, it was.

15     Q.  It wasn't Bug Johnson's deal?

16     A.  Not at all.

17     Q.  Bug Johnson a drug dealer?

18     A.  I do not know.

19     Q.  I mean, your being a drug dealer, you would
20  know who other drug dealers are, would you not?

21     A.  Well, looks can fool you sometimes.

22     Q.  Okay.  But as far as -- you know, Bug Johnson
23  wasn't a drug dealer?

24     A.  That's right.

25     Q.  Never dealt with -- have you dealt with Kevin

167

1   Walter prior to that time?
2       A.   Yes, I have.
3       Q.   So he is a drug dealer?
4       A.   Well, yes, he is.
5       Q.   He is?
6       A.   Uh-huh.
7       Q.   How many times have you bought from him?
8       A.   I have bought between -- before the December
9   6th incident.
10      Q.   What dollar amount do you recall?
11      A.   Only forty-five hundred, nine and nine, nine
12  ounces and nine ounces.
13      Q.   Have you ever bought from Dion Holley before?
14      A.   I have never.
15      Q.   And when y'all met by the Fiesta, what was the
16  deal?  Did he show you some dope?
17      A.   No.  He stalled us at the Fiesta.
18      Q.   Stalled?
19      A.   Yes.
20      Q.   Wanted to see the money?
21      A.   No.  There was a pay phone at the Fiesta.
22      Q.   Uh-huh.
23      A.   And we was talking about cell phones at first,
24  but he rung the pay phone.  And we were talking.  We
25  just -- with us talking, he said it was going to take

168

1   five minutes.  He had to find his cousin here.  He had
2   to find his cousin there.
3       Q.   Was Dion Holley with him at that time?
4       A.   No, he wasn't.
5       Q.   So, did y'all split up, or meet again, or what?
6       A.   We went to the north side for nothing, so we
7   went back to the south side.
8       Q.   Was Terrence Dodson with you?
9       A.   Yes, he was.
10      Q.   Is Terrence Dodson a drug dealer?
11      A.   No, he's not.
12      Q.   Just a guy that packs a .25?  Is that all or
13  what?
14      A.   No.  Me and my cousin -- I would use him
15  sometimes so that, you know, people would get
16  intimidated of his size.
17      Q.   Okay.  Did you use him on December 6th maybe to
18  use some intimidation?
19      A.   I did on both ends, because of Bug Johnson, as
20  well.
21      Q.   Bug not very intimidating?
22      A.   No, it's not that.  I just didn't know him.
23      Q.   So did y'all end up meeting at the Papa's
24  Barbeque?
25      A.   Yes, we did.

169

1       Q.   Did you have a Victoria's Secret bag filled
2   with cut-up pieces of paper?
3       A.   At that time we sure did.
4       Q.   Why?
5       A.   It was not filled with papers, though, at that
6   time.
7       Q.   Why would you have a paper bag filled with
8   money -- cut-up pieces of paper?
9       A.   Well, Bug Johnson was my cousin.  Terrence and
10  Johnson, they confirmed to me, installed in my mind,
11  that it may have been a rip-off.
12      Q.   Installed in your mind?
13      A.   That's right.
14      Q.   That it may have been a rip-off?
15      A.   That's correct.
16      Q.   Because you know Bug Johnson is a pretty
17  knowledgeable drug dealer?
18      A.   No, he's not.  He's not even a drug dealer.
19      Q.   And he was able to pick it up, but a drug
20  dealer like you wasn't able to pick it up?  He had to
21  install it in your mind?
22      A.   That's correct, because I had done business
23  with Kevin Walter before.
24      Q.   Been fooled by that; is that right?
25      A.   We learn from mistakes.

170

1       Q.   There you go.  So you had some pieces of paper.
2   You did the cutting?
3       A.   Excuse me?
4       Q.   You did the cutting of the paper?
5       A.   If I can recall, it was several of us did the
6   cutting.
7       Q.   Kind of group effort?
8       A.   No, it was not.
9       Q.   Wasn't a group effort?
10      A.   No.
11      Q.   Who all was cutting paper?
12      A.   Just me and my cousin, Terrence Dodson.
13      Q.   Just so happens the only fingerprints we find
14  is yours?
15      A.   On one paper.
16      Q.   As luck would have it, right?
17           MR. HILL:  Judge, could we avoid so much
18  side-bar from Mr. McClellan?
19           THE COURT:  Sustained.
20           MR. HILL:  Thank you.
21      Q.   (BY MR. MCCLELLAN)  So you're saying the first
22  time you met, it wasn't fill -- you hadn't done all your
23  cutting yet?
24      A.   No.  When we meet the first time, we did not
25  use this paper.

171

1    Q.   Second time you had the paper.  Thank you.  So
2  the money in the bag was not filled with paper.  Did you
3  put more in it later?
4    A.   No, sir.
5    Q.   About the amount of paper that's there now,
6  would that be the amount that was in there at the time?
7    A.   When we met at Papa's, that paper was not in
8  there.
9    Q.   So you didn't have any money cut up?
10    A.   The paper was cut up, yes, it was; but it was
11  not in the bag.
12    Q.   Now you didn't walk out with cut-up paper, did
13  you, and try to --
14    A.   Well, I offered to give it to Kevin; and I'm
15  sure he could have found out it was papers.
16    Q.   But you didn't offer it to Kevin?
17    A.   Excuse me?
18    Q.   You didn't offer it to Kevin?
19    A.   I sure did.
20    Q.   You offered him cut-up paper?
21    A.   No, it was not paper, sir.
22    Q.   What did you offer?
23    A.   It was my money.
24    Q.   Well, I thought you had already decided that it
25  was going to be a rip-off, so you were going to use

172

1  cut-up paper?
2    A.   That was not my words, sir.
3    Q.   All right.  I thought someone had installed in
4  your mind?
5    A.   There was going to be a rip-off.  I was taught
6  never to rip no one off.
7    Q.   Well, if there is going to be a rip-off, what
8  were you doing to protect yourself from a rip-off?
9    A.   I never said it was going to be a rip-off.
10  They suggested that it may be a rip-off.
11    Q.   And when I asked you why you had pieces of
12  paper cut up to put in a bag, you said because they
13  suggested that you were going to be ripped off?
14    A.   Did I not say I was -- I felt that I was going
15  to be ripped off.
16    Q.   And that's the reason you gave for cutting up
17  the pieces of paper.  So if that wasn't the reason you
18  cut up the pieces of paper, why did you cut up the
19  pieces of paper?
20    A.   After we went to the north side area the first
21  time and we came back to the south side, being that I
22  was paying Mr. Johnson, you know what I'm saying?  So he
23  suggested, Man, look, I'm telling you these boys from
24  the north side will possibly try to rob you.  Just have
25  some buy money.  His quote was, "Just have some buy

173

1  money."  If they have the drugs, I could purchase it.
2    Q.   Right, but why did you need to cut up pieces of
3  paper?
4    A.   I didn't need that.
5    Q.   So why did you and Terrence Dodson cut up
6  pieces of paper?
7    A.   Because, once again, I did it because for when
8  they suggested it to me, I felt that, okay, well, let's
9  do it.  But I already know Kevin Walter was going to
10  have the drugs.
11    Q.   Okay.  And so, you cut up the pieces of paper
12  before you went to the meeting at Papa's?
13    A.   That's correct.
14    Q.   But you didn't put it in the bag?
15    A.   No.  It was in the bag, but when we were
16  sitting in the Northline Mall, before Papa's.
17    Q.   I'm not talking about that.  I'm talking
18  Papa's.  I've forgotten --
19    A.   The money is not in the bag at Papa's.  I mean,
20  the paper is not in the bag at Papa's.
21    Q.   Okay.
22    A.   The money is.
23    Q.   The money's in the bag?
24    A.   The money is in the bag.
25    Q.   But you've already cut up the pieces of paper?

174

1    A.   That's correct.
2    Q.   And they're sitting in the car, waiting?
3    A.   The paper's sitting in the passenger's front
4  seat on the floor.
5    Q.   The passenger's front seat on the floor?
6    A.   That's correct.
7    Q.   That's where you were driving?
8    A.   No, that's where I was sitting at.
9    Q.   That's where you were riding?
10    A.   Yeah, uh-huh.
11    Q.   So you cut up all these pieces of paper and put
12  it on the front, right between your legs there on the
13  front?
14    A.   That's correct.
15    Q.   But you didn't put it in the bag; you had the
16  actual money in the bag?
17    A.   At this particular moment, yes.
18    Q.   And you showed that money to Kevin Walter and
19  said, Hey, here's the money.  Let's go.  Let's do it?
20    A.   That's right.
21    Q.   And they said, Huh-uh?
22    A.   Uh-huh.
23    Q.   Did you go to this other location off
24  Cavalcade?
25    A.   Yes, we did.

175

1    Q.   You've heard testimony about that?
2    A.   Well, I mean, we did.  I have no reason to lie.
3    Q.   Right.  You've heard testimony about going to
4   Cavalcade; so y'all went to Cavalcade, right?
5    A.   If that's the area, the name of the street,
6   yes, it is.
7    Q.   By some grocery stores, whether it be a Pigly
8   Wiggly or Sing-On?
9    A.   It was a grocery store.  It was closed, though.
10   Q.   And try to do a drug deal there?
11   A.   Right.
12   Q.   Didn't go down?
13   A.   No.
14   Q.   You still had the money?
15   A.   The bag was in the car.
16   Q.   All right.  The question was, you still had
17  your money?
18   A.   Oh, yeah, I still had my money.
19   Q.   Had you put the paper in the bag yet?
20   A.   No.
21   Q.   Still plan on doing a real deal?
22   A.   Well, at this time they said they were going --
23  me follow them to Cavalcade, as you said.  And they was
24  going to show me a sampler of the drugs first.
25   Q.   And did they?

176

1    A.   No, they didn't.
2    Q.   Okay.  Were they trying to get you to give them
3   the money so they could go get the drugs and bring them
4   to you?
5    A.   They came out at me once or twice, but then it
6   all changed.
7    Q.   So what else would there be?  I mean, if they
8   were going to show you the dope, then you just say, Why
9   aren't I seeing the dope?
10   A.   Well, my cousin, Terrence Dodson, and Kevin
11  Walter got into a heated argument.
12   Q.   They did.  But did you ever ask, How come I'm
13  not -- How come you won't show me the dope?
14   A.   I mean, that was a question that I asked; but
15  not to Dion Holley, to Kevin Walter.
16   Q.   To anybody?
17   A.   Yeah, to Kevin Walter.
18   Q.   Okay.  And so, the dope deal wasn't done?
19   A.   No.
20   Q.   Okay.  Then y'all meet up later another time?
21   A.   We left, and met up at Bennigan's.
22   Q.   Okay.  And was it your idea to meet up at
23  Bennigan's?
24   A.   Yes, it was.
25   Q.   Because that's your own turf, is it not?

177

1    A.   Yes, it is.
2    Q.   Well, not home turf; it's just your comfort
3   zone?
4    A.   Sure is.
5    Q.   Your father lives off Westridge?
6    A.   Yes, he does.
7    Q.   Okay.  You're familiar with that area?
8    A.   Yeah.  I mean, it's right off 610.
9    Q.   And you had met over there at Shoney's, which
10  is not too far from that location with Kevin before?
11   A.   Right.
12   Q.   And were you surprised whenever four people
13  showed up at Bennigan's?  As opposed to two, Kevin and
14  Holley, there are now two more people?
15   A.   None at all, not me.
16   Q.   All right.  And did y'all go inside Bennigan's?
17   A.   Yes, we did.
18   Q.   And some of them ate, and some of them didn't?
19   A.   If I could recall right, they all ate besides
20  Bug and I.
21   Q.   And then y'all were going to go to another
22  location to do the dope deal?
23   A.   I wanted to do it there.
24   Q.   Right there.  Now at that time, when you're at
25  Bennigan's --

178

1    A.   Uh-huh.
2    Q.   -- do you have the money -- do you have the
3   paper cut up inside a Victoria's Secret bag?
4    A.   No.
5    Q.   Okay.  Do you and Dion Holley go outside and
6   talk about the deal?
7    A.   Yes, we do.
8    Q.   In terms of now you're wanting to buy drugs
9   from them, right?
10   A.   Uh-huh.
11   Q.   Did you ask to get a lower price?
12   A.   At that time I came clean with Dion Holley,
13  because I thought he was a potential business partner.
14   Q.   And by coming clean, what do you mean?
15   A.   Well, I had been there for some time, couple of
16  days.  And I missed an awful lot of money in the clubs.
17  The friends I associated with did not have money.
18   Q.   When you say you came clean with him, that
19  means you told him what?
20   A.   I just told him that I only wanted nine ounces
21  of cocaine.
22   Q.   Because the deal before had been for a kilo?
23   A.   No, sir, not --
24   Q.   It's always been a 9-ounce deal?
25   A.   No, it was not.  It was for half.

179

1    Q.  So, how much is a half a kilo?
2    A.  A half a kilo is eighteen ounces, and nine
3  ounces is a quarter key.
4    Q.  So now you had backed down from wanting a
5  half -- did you start off wanting a half?
6    A.  Uh-huh.
7    Q.  When this deal on December 6th started and now
8  back down to you only want 9; is that right?
9    A.  That's correct.
10   Q.  Is that what you're telling us?  And what did
11  Dion say, okay, or what --
12   A.  He kept wanting to show me the whole key, you
13  know.  He kept wanting to show me the whole thing and
14  give me a sample.  You know what I'm saying?
15   Q.  Wouldn't that be a good idea to get a sample?
16   A.  Well, of course.  That's what I wanted; but at
17  the same time, I'm letting him know that all I want is
18  nine ounces; because in my mind, he touched -- well, I
19  see this guy here, me and him -- could do some real
20  business.
21   Q.  So did he show you a sample?
22   A.  No, he didn't.
23   Q.  Did he tell you why he didn't show you a
24  sample?
25   A.  No.

180

1    Q.  Did there come a time then when you left
2  Bennigan's by yourself and borrowed Bug's keys and went
3  somewhere?
4    A.  Yes.
5    Q.  Where did you go?
6    A.  Right next door to the Meadow Ridge Apartments.
7    Q.  What did you go there for?
8    A.  To get my money.
9    Q.  Was it real money?
10   A.  Well, you see, you skip so far.
11   Q.  Well, I'm just --
12   A.  Yeah, the real money.
13   Q.  How much money was that going to be?
14   A.  At that time I only had seven thousand, but I
15  was willing to spend forty-five hundred.
16   Q.  Do y'all then -- you go back to Bennigan's?
17   A.  That's correct.
18   Q.  And you've now got money, or you said you
19  didn't have the money when you went to Bennigan's?
20   A.  That's correct.
21   Q.  Now you're wanting him to show you the dope.
22  You didn't even have the money with you at Bennigan's?
23   A.  Well, you see, when they said to meet at
24  Bennigan's, we were next door to Meadow Ridge Apartments
25  with a friend, Blondel Richardson.

181

1    Q.  Another employee?
2    A.  No, that's a woman, female friend of mine.
3    Q.  You don't employ women?
4    A.  No.
5    Q.  So you didn't have the money at Bennigan's the
6  first time, but you went and got it and brought it back?
7    A.  Correct.
8    Q.  Again, you still don't have the cut-up pieces
9  of paper in the Victoria's Secret bag?
10   A.  Bug placed the paper to get the paper off his
11  car, off the floor of his car.  He placed it back in the
12  bag; because he's figuring, well, I'm about to buy the
13  drugs here at Bennigan's.
14   Q.  So it's just kind of a clean-up measure to keep
15  his car up?
16   A.  That's his personal hygiene, I guess.  I don't
17  know.
18   Q.  So at no time was this cut-up pieces of paper
19  going to be -- pretend to be money to buy dope?
20   A.  At Bennigan's?
21   Q.  Anywhere?
22   A.  Later on.
23   Q.  Later on?
24   A.  That's right.
25   Q.  Hadn't got there yet?

182

1    A.  No, we haven't.
2    Q.  So y'all end up leaving Bennigan's?
3    A.  Yeah, they suggested we leave Bennigan's.
4    Q.  Okay.  Now did they follow you or you follow
5  them?
6    A.  They followed us.
7    Q.  Okay.  And did you tell Bug where to go?
8    A.  Yes, I did.
9    Q.  Where did y'all go first?
10   A.  Fiesta parking lot.
11   Q.  And why did you go there?
12   A.  Well, because he said he didn't want to do
13  business at Bennigan's; because they had too many white
14  folks in the business, you know, watching and stuff.  So
15  we went to Fiesta.
16   Q.  When you go to the Fiesta, you don't go, like,
17  to the front door of the Fiesta.  You're in the parking
18  lot, and you're kind of away from where -- is Fiesta
19  open?
20   A.  Yes, it is.
21   Q.  So you're not there wanting to do a drug deal
22  in front of the open Fiesta; you're in that parking lot
23  a little further away from it?
24   A.  Not that further; because I have done business
25  in grocery parking lots, and I find it better to do

183

1    business like that.
2        Q.  All right.  Whenever you got to the Fiesta
3    parking lot, why didn't you do the deal there?
4        A.  I don't know.  Holley didn't want to do the
5    business there.
6        Q.  But what did -- he said he didn't want to do
7    business there?
8        A.  He seen a little security guard in a golf cart,
9    to which he assumed was the police.
10       Q.  So that's the reason he didn't want to do the
11   deal there?
12       A.  No.  That's when he --
13       Q.  That's what I'm saying.  That's when he didn't
14   want to do the deal?
15       A.  Uh-huh.
16       Q.  Were y'all's cars parked close together there
17   at the Fiesta, or were they parked far apart, kind of
18   like Kevin?
19       A.  Kind of like what Kevin said.
20       Q.  But Kevin said, you know, they're several
21   lengths apart.
22       A.  He exaggerated a little bit.
23       Q.  But there were -- y'all weren't next --
24   together like you were at Lantern Point?
25       A.  No.

184

1        Q.  Then where do you go?
2        A.  We went back to Meadow Ridge Apartments, to
3    Blondel Richardson's house.
4        Q.  You went to his house?
5        A.  Her house.
6        Q.  I'm sorry?  I'm sorry?
7        A.  Apartment.
8        Q.  You heard testimony about going to a parking
9    lot of some buildings.  So you're saying this is where
10   the parking lots of the buildings is?
11       A.  No.
12       Q.  That is a different deal?
13       A.  This is the true testimony I'm giving you.
14       Q.  I understand, sure.  So you go to Blondel
15   Richardson's apartment.  Do you go inside the apartment?
16       A.  No.  I get down to press the code, because it
17   has a security guard gate there.  But as I'm pressing
18   the code, sometimes the code changes.  And at the same
19   time I'm trying to go figure out the code, Dion Holley
20   jumps out of the Lexus.
21       Q.  And says, We ain't doing it here?
22       A.  He says, Man, I'm not doing no business here.
23   You might have a house full of people waiting for me.
24       Q.  You might have a house full of business
25   partners there or something?

185

1        A.  I can't speculate what he meant.
2        Q.  So where do you go then?
3        A.  Bug Johnston got aggravated and told Dion
4    Holley at that point, Man, that's all right.  I'm going
5    to my house.  Chucky, if you want to stay, you can.  So
6    I got back in the car, and Bug burned off.
7        Q.  Where did he go then?
8        A.  He turned down some street, and Dion Holley and
9    them in the Lexus followed us; and that's when we went
10   to the apartment buildings, the business buildings.
11       Q.  The business buildings, right.  And you're in
12   the parking lot of the business buildings, and do y'all
13   stop?
14       A.  Yes, sir.
15       Q.  And Dion -- Holley is following you in --
16       A.  Yes, sir.
17       Q.  --his car?  Now is he driving the car or is
18   Kevin Walter?
19       A.  Kevin Walter is driving.
20       Q.  They do -- y'all do a deal there?
21       A.  No.
22       Q.  So, who says this is not a cool place to do the
23   deal?
24       A.  Dion Holley seen -- the building must have some
25   kind of naval something, because I seen some guys with

186

1    the army suits on.  And Dion said, Oh, man, they got
2    cops everywhere, acting in a paranoid state.
3        Q.  So you went to another location?
4        A.  No, we did not go to another location.  Bug
5    Johnson just got frustrated and said, Man, I'm going.
6    I'm telling you his concern was he was trying to rob
7    him, and he got very upset.
8        Q.  So you and Bug Johnson -- you're the only two
9    in the car?
10       A.  We're the only two in the vehicle.
11       Q.  So where do y'all go?
12       A.  We take off; and he drives off to some side
13   street, which happens to be, now I know as, your Lantern
14   Point.
15       Q.  When you went to my Lantern Point, did y'all
16   stop?
17       A.  Yes, we did.
18       Q.  Why?
19       A.  The Lexus was blinking their flashlights at us,
20   the headlights.
21       Q.  Did the Lexus then stop behind y'all?
22       A.  Yeah.
23       Q.  And did Bug turn his car around?
24       A.  No, sir.
25       Q.  Car didn't ever turn around?

187

1     A.   Not yet, sir.
2     Q.   Well, eventually turn around?
3     A.   After Dion Holley got out.
4     Q.   Is he the one that said, Turn around?
5     A.   He got down and said, Man, okay, look.  It's
6   right here.  You know, I'm telling you it's right here.
7     Q.   Does Bug Johnson then turn the car around to
8   where they're facing?
9     A.   Yes, sir.
10     Q.   Like you've seen here in the diagram?
11     A.   That's right.
12     Q.   And when we have the cars facing each other,
13   who -- is this State's Exhibit 44?
14     A.   That would be correct.
15     Q.   Correct?
16     A.   Yes, sir.
17     Q.   Showing the right people in the right places?
18     A.   Yes, sir.
19     Q.   Walter driving, Terrence Gibson over here,
20   Carmouche in the back, and Holley over here?
21     A.   Well, no.  Oh, yeah, at that position Dion
22   Holley was never in the car.
23     Q.   He was out?
24     A.   He was out.
25     Q.   But he was out from that seat location?

188

1     A.   Right.
2     Q.   That seat is empty.  And then you're up here?
3     A.   Yes, ma'am (sic).
4     Q.   So after -- Dion Holley is out while the car is
5   being turned around?
6     A.   That's right.
7     Q.   Car gets turned around.  Do you get out?
8     A.   Yes, I do.
9     Q.   Do you have your money with you?
10     A.   I had my money in my waist belt right here; but
11   Bug threw me the bag, the Victoria's Secret bag.
12   Because he said, Chucky, you don't know this area.
13   Trust me.' And he had two pistols.
14     Q.   Who had two pistols?
15     A.   Bug Johnson.
16     Q.   So he threw you -- did you have a gun?
17     A.   I did not have a gun at this point.
18     Q.   All right.  So he threw you the bag.  He had
19   already kind of policed the area in the car and put the
20   paper in the bag.  He threw you that bag filled with
21   paper?
22     A.   Correct.
23     Q.   What did you think you were supposed to do with
24   that?
25     A.   That bag?  Honestly, I did not have no

189

1   concern, no bearing on my decision to do this deal.
2     Q.   All right.  So where did you go?
3     A.   I opened up -- well, after Mr. Samuel Johnson,
4   he also gave me the bag and he said, Here, take this
5   weapon.  And I took the weapon and I placed it right
6   here on my left side here, under my shirt, threw my
7   shirt over.  And I got down from the vehicle, and I
8   walked straight down into -- Dion Holley told me to go
9   in the back of the car, because the dope was in the back
10   of the Lexus.
11     Q.   Okay.  So you went and got out here.  You
12   got -- Johnson gave you the bag, plus gave you a
13   firearm?
14     A.   That's right.
15     Q.   9 millimeter semiautomatic?
16     A.   That's what it was.
17     Q.   You went down here?
18     A.   That's correct.
19     Q.   Met Holley in the back?
20     A.   No, I met Gibson.
21     Q.   Gibson at the back?
22     A.   Holley was in the front, about to raise up the
23   hood.  Bug Johnson and Holley was at the front of the
24   vehicles.
25     Q.   Both out of the vehicles?

190

1     A.   Both out of the vehicle.
2     Q.   Did they raise both hoods?
3     A.   When I last seen, Mr. Johnson was in the act of
4   raising his hood.
5     Q.   But you never saw the hood raised?
6     A.   No.
7     Q.   Never saw the hood of this vehicle raised?
8     A.   The hood was popped on the Lexus.
9     Q.   But not raised?
10     A.   Not raised.
11     Q.   And the hood was popped here, or do you know?
12     A.   He was in front of it.  Like I said, when I
13   passed by, he was in the act of raising it up.
14     Q.   So you and Gibson are in the back?
15     A.   That's correct.
16     Q.   And you got the money; you got a gun?
17     A.   Uh-huh.
18     Q.   What happens then?
19     A.   There was some discussion between me and
20   Mr. Gibson.
21     Q.   All right.  Business discussion?
22     A.   Well, he was just like, Let me see the money,
23   and I'm going to show you the dope, man.
24     Q.   Did you ask him, Let me see the dope, and I'll
25   show you the money?

191

1    A.  I don't recall.
2    Q.  Holley come to the back or not?
3    A.  Mr. Holley never came to the back.
4    Q.  Okay.  And so what -- I guess then at that
5  point, Mr. Gibson must have pulled a gun on you?
6    A.  No, he did not.
7    Q.  Oh, he didn't?
8    A.  Not at this point.
9    Q.  So what happens, while you're back in the back,
10  I mean, you're talking.  You're talking back and forth
11  about the deal, but --
12    A.  It didn't last that long.  I mean, it was not
13  long.
14    Q.  I understand, but you say he didn't pull a gun
15  at that point?
16    A.  At this point, when I went to the back of the
17  vehicle, he asked me to see the money.  I showed him my
18  waist line, where the green stack of money was raising
19  out of.  I had the bag in my hands, also, though, and --
20    Q.  You had lots of money underneath?  You had a
21  bag, plus the money?  You showed him the real money; and
22  you had a bag that, I guess, could pretend to be money?
23    A.  Like I said, the bag never had no bearing on
24  me.
25    Q.  You're carrying it?

192

1    A.  I did not really care about the bag.
2    Q.  But you were carrying it?
3    A.  Yes, I was carrying it.
4    Q.  I mean, why were you carrying it?
5    A.  Because Bug Johnson had gave it to me.
6    Q.  So, you know --
7    A.  At this point -- you know what I'm saying?  I'm
8  taking what he's telling me, you know, into
9  consideration; because it has been odd meeting with
10  Walter.  Like I said, we've been doing business; and we
11  had never been going through this situation.
12    Q.  Sorry.  What happens then?
13    A.  Mr. Gibson -- Mr. Dion says, What the hell is
14  going on back there?  And Mr. Gibson yelled back.  He
15  wanted to see the F-ing dope.  So Mr. Dion said, Show
16  them the F-ing dope.
17    Q.  And that's when Gibson pulled a gun?
18    A.  No, it was a look to which you could never
19  imagine.
20    Q.  Tell me about that look.
21    A.  I cannot describe it.
22    Q.  What happens then?
23    A.  Gibson raised up his shirt, and I seen the
24  handle of the gun.  And I turn my back in a running
25  position, and I raise up mine and I just fired.

193

1    Q.  How far away were you from Mr. Gibson when you
2  fired?
3    A.  Well, like I said, I was in the running
4  position when I fired.
5        MR. MCCLELLAN:  Could I ask the witness to
6  step down just for a moment, Your Honor?
7        THE COURT:  Yes.
8    Q.  (BY MR. MCCLELLAN)  Let's say this is the back
9  of the Lexus.  I'll be you and you be Gibson.
10    A.  You stand over there.
11    Q.  Is this the corner of the Lexus, where the
12  passenger seat would be where Mr. Hill is, or is this
13  more like in the middle of the trunk area?
14    A.  No, you would have to back up a little bit
15  more, because he was not that close.  This seems to be
16  about right.
17    Q.  This is how we're talking back and forth?
18    A.  That's right.
19    Q.  We're not here?
20    A.  No, we are not.
21    Q.  And you say that Gibson raises his shirt?
22    A.  Raised up his shirt.
23    Q.  You see a pistol?
24    A.  With a black handle.
25    Q.  You previously raised your shirt up to show the

194

1  money.
2    A.  I done like this to show the money.
3    Q.  Raised up like --
4    A.  The pistol was right here.
5    Q.  So he couldn't have seen the pistol when you
6  raised up your shirt to show the money?
7    A.  I don't believe he was looking for a pistol.
8    Q.  All right.  And when you saw the pistol, then
9  you say you pulled your gun?
10    A.  Uh-huh.
11    Q.  And then you started running and shooting or
12  what?  Tell me what --
13        THE DEFENDANT:  If I could, Your Honor, I
14  would like to demonstrate for the jury, as well as --
15        THE COURT:  You've got an attorney.  He'll
16  get you back on redirect.
17        MR. HILL:  Just let Mr. McClellan ask the
18  questions.
19    Q.  (BY MR. MCCLELLAN)  Go head and demonstrate.
20  You have the bag in what hand?
21    A.  I have the bag in this hand.
22    Q.  How do you have the bag?
23    A.  It was balled up like this.
24    Q.  You have the bag in that hand.  Are you holding
25  it down like --

195

1   A.   No, no, no.
2   Q.   Hold it like you were holding it.  And then, so
3 I raise up and I show you -- you see a pistol?
4   A.   Uh-huh.
5   Q.   All right.  Show me what happens now.
6   A.   I threw it to you.
7   Q.   Throw it to me.  Does he catch it?
8   A.   I don't know.
9   Q.   You just threw it to him.  All right.  You
10 don't know whether he caught it.  Then what do you do?
11   A.   Then I done like this.
12   Q.   And without looking?
13   A.   Without looking.
14   Q.   Shot back in his direction?
15   A.   Yes.
16   Q.   How many times did you shoot?
17   A.   I cannot recall.
18   Q.   Where was Dion Holley at this time?
19   A.   Dion Holley, to my understanding, was still in
20 the front of the Lexus with Mr. Johnson.
21   Q.   Did you fire at Dion Holley?
22   A.   No.
23   Q.   The only person you fired at was Gibson?
24   A.   Mr. --
25   Q.   He was the only person you fired at?

196

1   A.   No, no.
2   Q.   You fire at Gibson.  You didn't fire, at any
3 time, at Dion Holley?
4   A.   Not that I recall.
5   Q.   You're starting back now down this side
6 towards -- back towards where Bug Johnson's car is, and
7 what happens then?
8   A.   Well, Mr. Walter was coming towards the back.
9   Q.   So he had gotten out?
10   A.   Yes, he did.
11   Q.   Before the shot or --
12   A.   Before the shot.
13   Q.   He's already headed back in your direction?
14   A.   That's right.
15   Q.   Whenever you turn around and fire blindly
16 towards Gibson, and now you're heading down -- and you
17 must be running right into Walter?
18   A.   Mr. Walter.
19   Q.   What happens then?
20   A.   Mr. Walter, he makes a run back to the Lexus.
21 Looks like he's reaching for something.  I started
22 firing at him.
23   Q.   Started firing at him.  Okay.  You can go ahead
24 and have a seat.  How many times did you fire at him?
25   A.   I cannot recall.

197

1   Q.   Do you know what happened to Dion Holley?
2   A.   I seen him.
3   Q.   Okay.  Where do you see him?
4   A.   As I'm running, Bug Johnson passed on the side
5 of me like this.  And as I'm running, I pass up the
6 Lexus.  I'm running, and I see Mr. Gibson.
7   Q.   Okay.  Well, you had shot Mr. Gibson as you're
8 running?
9   A.   Not Mr. Gibson, Mr. Holley.
10   Q.   Okay.  You see -- so you run past the --
11   A.   A little past the front of the Lexus.
12   Q.   Past the front of the Lexus?  This is after you
13 had shot Kevin Walter?
14   A.   Right.
15   Q.   Don't know how many times you shot him?
16   A.   No, I do not.
17   Q.   After you shot Gibson and after you shot
18 Walter, you're running past the front of the Lexus and
19 you see Dion Holley where?
20   A.   He's stooping down in front of the Lexus, but a
21 little turned from the Lexus.
22   Q.   On the --
23   A.   He's on the left-hand side, the passenger side.
24   Q.   So he's stooping down like right over in here?
25   A.   No, sir.

198

1   Q.   In the front or the back?
2   A.   In the front.
3   Q.   In the front right here?
4   A.   Further.
5   Q.   Right here?
6   A.   Right about on there.
7   Q.   In between the cars?
8   A.   Uh-huh.
9   Q.   All right.  So did you shoot at him?
10   A.   No.
11   Q.   What's he doing?  When you say stooping down,
12 was he rung or just stooping down?
13   A.   No, he was stooping down.  We did not -- you
14 know, it was not like I'm looking at you.  It's not
15 nothing like that.  We seen each other, we spooked each
16 other, and I headed right back to the Lexus.
17   Q.   You spoke to each other?
18   A.   We spooked.
19   Q.   Spooked each other.  So you run back towards --
20 you're going back towards Johnson's car?
21   A.   No, Johnson's car is gone.
22   Q.   Johnson has already left.  Johnson ever fire
23 his gun?
24   A.   I do not know.
25   Q.   So why are you going that direction?

199

1    A.   Because in the presence of me was Mr. Holley.
2    Q.   In front of you, Mr. Holley?
3    A.   That's right.  And I seen Mr. Holley alive.
4    Q.   Right; but you said when you're going down the
5    side of the Lexus, Mr. Holley is kind of crouched down
6    over here?
7    A.   Uh-huh.
8    Q.   You see him; y'all spook each other?
9    A.   I run back to the Lexus on the driver's side
10   that way.
11   Q.   You stop and go right back here?
12   A.   That's correct.
13   Q.   You jump in the car?
14   A.   Yes, sir.
15   Q.   And you take off?
16   A.   That's right.
17   Q.   Okay.  And Mr. Holley doesn't do anything.  He
18   doesn't try to get in the car or anything?
19   A.   Everything happened so fast.  It was, you know,
20   fast.
21   Q.   Okay.  Now I believe you testified during
22   direct examination that you became aware that Mary
23   Carmouche was in the car when you got to the stop sign.
24   I guess that's the stop sign there at McNee and Lantern
25   Point Drive?

200

1    A.   I guess so.
2    Q.   Well, you knew Mary Carmouche was in the car
3    whenever you left Bennigan's?
4    A.   Well, I mean, the incident that happened was
5    not focused on Miss Mary Carmouche.
6    Q.   What incident?
7    A.   The incident that just took place, the incident
8    that I was a part of.  I was fearing for my life.
9    Q.   Fearing for your life.  You shot -- let me see
10   if I understand this correctly.  There are six people
11   that go to Lantern Point Drive?
12   A.   That's correct.
13   Q.   All right.  Two people come out of there not
14   shot and alive.  Only two people come out who are not
15   shot?
16   A.   No, I'm sorry.  I recall three.
17   Q.   All right.  Who's the third?
18   A.   Miss Carmouche.
19   Q.   So Mr. Gibson was shot and died, and Mr. Holley
20   was shot, and Mr. Walter was shot; but you're in fear of
21   your life, and neither you nor Bug Johnson are shot?
22   A.   That's right.  Well, Bug Johnson left there.
23   Q.   You had no choice but to take that Lexus?  I
24   mean, there was nothing else you could have done, right?
25   A.   Well, you know, like I said, I was, in my

201

1    intentions, you know, running for my life is what I was
2    doing.  But then when I seen Mr. Holley in the front of
3    the car, I did not know he had a weapon.  I did not know
4    what was going on with him.  I seen him.  He seen I.  We
5    spooked each other.  I ran back to the Lexus.
6    Q.   At any time did you hear any shots other than
7    the shots that you were creating?
8    A.   The only time I heard a shot was the first shot
9    when I drew my weapon.  I did not hear no shots.  I did
10   not see no one fall.  I did not see no one get shot.
11   Q.   Now you jump in the Lexus?
12   A.   That's correct.
13   Q.   And you take off.  And then you say what -- did
14   Mary Carmouche, just after you find out she's in the
15   backseat, she decided to crawl up in the front seat and
16   y'all go riding?
17   A.   No, sir no, sir.  When I came to the stop sign
18   at the whatever street --
19   Q.   Right.
20   A.   -- when I came there, I noticed Miss Carmouche
21   was in the vehicle.  Her first thing what she said was,
22   Did I kill Dion Holley?
23   Q.   Okay.
24   A.   And I replied, I did not kill anyone.
25   Q.   Well, you're wrong about that, right?  I mean,

202

1    Terrence Gibson -- the only person that shot Terrence
2    Gibson was you, and he died?
3    A.   That's correct.
4    Q.   Okay.  And you did kill him?
5    A.   Not -- it was not my intentions to kill him.
6    Q.   It was accidental?
7    A.   Mr. Lyn, I was just scared for my life.
8    Q.   Okay.  You're scared for your life, and you and
9    Bug Johnson and Mary Carmouche are the only people that
10   don't get shot out there?
11   A.   I mean, that's the way it happened, true
12   enough.  You know what I'm saying?
13   Q.   And other than asking you, Is Dion Holley
14   alive, did she say anything else?  Not what she said,
15   but did she say any other things?
16   A.   She said several things.
17   Q.   Now you -- well, was she upset?
18   A.   Not that I can recall.
19   Q.   Okay.  So Mary Carmouche, who had been with
20   Kevin Walter and Terrence Gibson and Dion Holley in a
21   car, sees those three people get shot.  You jump in the
22   car and drive off, and you had never met her until the
23   Bennigan's; is that right?
24   A.   I don't believe she seen no one get shot.
25   Q.   Because she was in the backseat?

203

1    A.  I think she was in -- laying down in the back
2  of the seat.
3    Q.  Now you would agree with me she heard a bunch
4  of gunshots, or it would have been available for her to
5  hear a bunch of gunshots?
6    A.  I'm sure she would have.
7    Q.  But she wasn't scared?
8    A.  She did not seem to be scared.
9    Q.  All right.  And other than Holley, she didn't
10 ask about anybody?
11   A.  All she said at the time was that I killed
12 Mr. Holley.
13   Q.  Okay.
14   A.  No one else.
15   Q.  Now, so, then she was -- you said you told her
16 to get out around at a Burger King or something?
17   A.  It was a light right across -- that crosses
18 Main Street, and I did not tell her to get out.  I asked
19 her if she wanted to get out.
20   Q.  Believe you testified on direct -- correct me
21 if I'm wrong -- that, I told her to get out of the car,
22 and she didn't get out of the car?
23   A.  That's a true statement, but I did not say it
24 the way you said it.
25   Q.  Tell me how you said it.

204

1    A.  I said, Would you get out of the car?
2    Q.  And she didn't get out?
3    A.  No.  She replied -- she said something to me
4  back.
5    Q.  All right.  Then you say you're going down the
6  street.  Where are you going?
7    A.  Where I'm going?   It's several things in my
8  mind.  I'm scared.
9    Q.  I said --
10   A.  I know what you said.
11   Q.  I'd like you to just answer that question.
12 Where were you going?
13   A.  To -- I was going to a friend's named Shannon
14 Johnson's house.
15   Q.  Where does that person live?
16   A.  She lives in Houston, Texas.
17   Q.  Can you be more specific than that?
18   A.  Hiram Clarke area.
19   Q.  You weren't going to go back to this apartment
20 that you had been trying to stop at earlier there, close
21 by?
22   A.  That apartment never came to my mind.
23   Q.  Never came to mind.  And so, where does this
24 other person live?   You said Hiram Clarke.  How would
25 you get there from 610?

205

1    A.  The Main Street area, the one I'm familiar
2  with, will take you straight there.
3    Q.  So, you're going down Main street, and the car
4  pulls up behind you flashing the lights, and you figure
5  these are the guys?
6    A.  No, sir.  I figured it was the police, was my
7  first thought.
8    Q.  So the police usually just flash their lights?
9  They don't have red and blue lights?
10   A.  Mr. Lyn, I'm telling you a true statement, what
11 I thought.
12   Q.  You ended up meeting Bug Johnson?
13   A.  That's correct.
14   Q.  He tells to you follow him?
15   A.  That's correct.
16   Q.  And you follow him back to the Fondren Court
17 Apartments?
18   A.  That's correct.
19   Q.  Just happen to be in the area where you've been
20 staying with Howard Scott?
21   A.  Excuse me?
22   Q.  Just happen to be in the area where you had
23 been staying with Howard Scott?
24   A.  That's correct.
25   Q.  Fondren Court Apartments?

206

1    A.  Well, he live right across the street.
2    Q.  I know that's where you've been staying.
3    A.  Uh-huh.
4    Q.  And Mary Carmouche is with you all this time?
5    A.  All this time.
6    Q.  You park the vehicle?
7    A.  I park the vehicle.
8    Q.  She gets out?
9    A.  She and I both get out.
10   Q.  All right.  And other people -- and I think
11 that's when you said Shawn England came up and said it
12 wasn't your fault?
13   A.  I mean, he came up to me first and pulled me on
14 the side and said something else.
15   Q.  Well, you testified that he had came up and
16 said it wasn't your fault?
17   A.  That's correct, before I even told him
18 anything.
19   Q.  Okay.  Shawn England with you?
20   A.  No, he wasn't.
21   Q.  But he still knew it wasn't your fault?
22   A.  Yes, he did.
23   Q.  All right.  And Mary is just kind of one of the
24 group, I mean, people coming up.  And she's real
25 comfortable with people, and she's not acting scared;

207

```
1   she's just talking?
2       A.  I could not tell you how Miss Carmouche was
3   acting, because I was not focusing on Miss Carmouche.
4       Q.  You said part of the time she was talking to
5   Bug?
6       A.  Bug Johnson only at that time, Mr. Bug Johnson.
7       Q.  All right.  And her and Bug Johnson known each
8   other before that day?
9       A.  I could not tell you.
10      Q.  And then a bunch -- you said you were crying?
11      A.  That's right.
12      Q.  Why were you crying?
13      A.  Because I was hurt inside.
14      Q.  Why were you hurt inside?
15      A.  I was just hurt by the situation that happened.
16      Q.  About not knowing whether or not you had even
17  hurt anybody?  You didn't even know you had shot
18  Terrence Gibson?
19      A.  Well, I did not know I shot Mr. Gibson; but I
20  seen Mr. Walter.  He did not fall.  He was just running,
21  so I knew he was alive.  And I seen Mr. Dion with my own
22  eyes, so I knew he was alive, also.  So, in my mind, I
23  did not kill no one at that time.
24      Q.  So, why are you crying?
25      A.  Because I'm fearing for my family in Louisiana,
```

208

```
1   because Mr. Walter knew where my mother lived.
2       Q.  So you're afraid they're going to come after
3   you?
4       A.  Not after me; after my family.
5       Q.  After your family.  Because you can take care
6   of yourself?
7       A.  I did not tell you that.
8       Q.  Well, but you can take care of yourself, can't
9   you?
10      A.  Every man should be able to take care of
11  himself.
12      Q.  All right.  Then Kevin arrived on a bicycle?
13      A.  I mean, that's a name I heard y'all introduce.
14  I know him better as Skin.
15      Q.  You didn't hear me introduce anything.
16      A.  I'm talking about the witnesses that got up
17  here.
18      Q.  All right.  So somebody -- that guy used to
19  ride a bicycle, you know as Skin.  Why did Shawn and
20  Howard Scott make you take off your clothes and take a
21  shower?
22      A.  They knew what had happened already.
23      Q.  Well, did you get blood all over you?
24      A.  I could not recall.  I don't know.
25      Q.  Then why you need to wash your clothes?
```

209

```
1       A.  They made me take off my clothes.  They gave me
2   some new clothes, because they had a plan.
3       Q.  Oh, now, who had the plan, Scott or --
4       A.  Mr. England.
5       Q.  Mr. England had a plan?
6       A.  Uh-huh.
7       Q.  They had you put on other clothes?
8       A.  That's correct.
9       Q.  And then, of course, Shawn got picked up by
10  Yellow Cab?
11      A.  Later on that night.
12      Q.  Over by the big box?
13      A.  No, he did not go by no box.  The cab pulled
14  right in front of Mr. Howard's apartment.
15      Q.  Is that right?
16      A.  That's right.
17      Q.  He come up to -- the cab come up to 1402?
18      A.  No.  Well, Mr. Howard's apartment is right
19  here.  There is a walkway, and you honk your horn.  And
20  if you're waiting on a cab, you're going to come
21  outside, I guess.
22      Q.  Well, I thought to get in there he had to punch
23  a code?
24      A.  He was already in there.
25      Q.  Who?
```

210

```
1       A.  The cab driver.
2       Q.  So he already knew the code, evidently?
3       A.  No.  I think if you call the apartment, I think
4   they have a little code, also.
5       Q.  So somebody, at 3:59 in the morning, answered
6   the phone so they can tell the cabbies what code to
7   punch in?
8       A.  Well, everybody was there and they was up.
9       Q.  Sounds like there was a lot of people out there
10  at the time you arrived back at Fondren.  About what
11  time did you arrive back there?
12      A.  At the time of the cab?
13      Q.  No, not the time of the cab, the time you
14  arrived back with the Lexus?
15      A.  Oh, it was 11:00 o'clock, about 11:15,
16  something around that time.
17      Q.  Oh, it was?
18      A.  Yeah, it was about -- it wasn't 12:00 o'clock
19  yet.  I know that much.
20      Q.  You heard the testimony about the ambulance --
21  the police officers arriving at 11, you know, 59,
22  something like that.  So they laid there for about
23  forty-five minutes before the police get there?
24      A.  Who laid?
25      Q.  Terrence and Kevin Walter?
```

211

1    A.  I was not there, so I don't know how long they
2    stayed there.
3    Q.  If you get back to the apartment at 11:15, they
4    had to lay there a long time before the police arrived?
5    A.  Well, I recall when we left Bennigan's, it was
6    around 10:15, something like that.
7    Q.  Now you heard Terrence Dodson testify?
8    A.  I sure did.
9    Q.  And he's your cousin?
10   A.  Yes, my first cousin.
11   Q.  And he testified that you told him a whole
12   bunch of different things than what you're testifying
13   to?
14   A.  That's right.
15   Q.  Are you saying Terrence Dodson is lying?
16   A.  I'm saying he is most definitely lying.
17   Q.  Well, was Anthony Trail lying when he said
18   that, you know, he took you over by his apartment the
19   next day, and you picked up some shades and said you had
20   some girl over there at this dead-end part near his
21   apartment that was performing oral sex on you?
22   A.  That part of Mr. Trail's statement is correct,
23   when I went over there to get the glasses.  The glasses
24   had been there since December 5th.
25   Q.  So this wasn't something that happened on

212

1    December the 6th?
2    A.  No, not at all, sir.
3    Q.  So your first cousin, Terrence Dodson, decides
4    to come in here and just make all kinds of lies up?
5    A.  Well, he also gave testimony that he was
6    threatened, if I'm not mistaken.
7    Q.  Threatened?
8    A.  By the police officers.
9    Q.  Oh, he's threatened by the police officers?
10   A.  I mean, I could have heard wrong; but I thought
11   that's what I heard.
12   Q.  Now the police officers did come to Lafayette
13   Louisiana, though, where you fled to and interviewed
14   you, right?
15   A.  Well, I went to Lafayette, Louisiana.
16   Q.  The question was, police officers came to
17   Lafayette, Louisiana from Houston to interview you, did
18   they not?
19   A.  The police officers from Houston?
20   Q.  Yes.
21   A.  Yes, they did.
22   Q.  Officer Ted Bloyd?
23   A.  He sure did.
24   Q.  And Officer Thad Badeaux or Detective Thad
25   Badeaux.  In fact, the first person you talked to after

213

1    being arrested was Detective Thad Badeaux?
2    A.  That's correct.
3    Q.  And the story you told him is pretty much the
4    story you told officer Ted Bloyd, or Detective Ted
5    Bloyd?
6    A.  I don't recall me talking to Detective Bloyd.
7    Q.  Not in Detective Badeaux's presence?  Detective
8    Badeaux, Ted Bloyd, and Officer King, all three of you
9    there together?
10   A.  All four of us were in the interrogation room,
11   that's correct.
12   Q.  And you talked to and told them about this
13   incident and what went down; is that right?
14   A.  Not in their presence.  I remember telling them
15   that my lawyer was downstairs, and I want to talk to him
16   first.
17   Q.  Well, would it be incorrect that you said that
18   you would talk to them off the record?
19   A.  I remember me talking to Mr. Thad Babineaux on
20   December 9th off the record.
21   Q.  Is that the same one as Badeaux?
22   A.  Badeaux.
23   Q.  Well, did you tell -- are you saying you did
24   not talk in the presence of Detective Ted Bloyd and
25   Officer King and Detective Thad Badeaux in Lafayette,

214

1    Louisiana, and talk to them about the events of this
2    day?
3    A.  I don't remember the conversation.
4    Q.  Well, do you recall telling them that?
5    MR. HILL:  Judge, I'm going to object to
6    him trying to impeach him with those statements.
7    THE COURT:  Approach.
8    We're going to take a break.  Please go
9    back in the jury room.
10   (Outside jury's presence:)
11   MR. HILL:  We object to the State asking
12   any questions regarding any alleged statement Mr. Mamou
13   made when he was in the custody of law enforcement
14   officials in Lafayette or other parishes of Louisiana.
15   The reason is it violates Texas Code of Criminal
16   Procedure, Article 38.22 and 38.23, Article 1, Section
17   9, 10, and 19 of the Texas Constitution, as well as the
18   Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments
19   to the U.S. Constitution.  We don't believe that it's
20   proper impeachment, that any testimony that is offered
21   at this point would be inappropriate; because the
22   defendant invoked his right to counsel, and the officers
23   in Louisiana violated his right to counsel once he had
24   invoked it.
25   THE COURT:  Did you want anything on the

215

1 record?
2 MR. MCCLELLAN: I believe we're entitled
3 to ask him about prior statements he made to the police
4 once he's placed himself on the stand.
5 THE COURT: I'll allow you to do that.
6 MR. HILL: My objection is overruled?
7 THE COURT: Yes, sir.
8 Bring them in, please.
9 (Jury is brought in and seated.)
10 THE COURT: Proceed.
11 Q. (BY MR. MCCLELLAN) Mr. Mamou, I believe we
12 were talking about your discussions in Louisiana with
13 Detective Bloyd and Officer King and Officer -- or
14 Detective Badeaux. Are you saying then you don't recall
15 making -- talking to them about the events of December
16 the 6th, 1998, in Louisiana?
17 A. I don't recall me talking to them. I recall
18 them talking to me.
19 Q. Do you recall telling them your side of the
20 story?
21 A. I don't recall.
22 Q. Okay. Are you saying you didn't, or you just
23 don't recall?
24 A. I'm just saying I don't recall.
25 Q. You say you do recall talking to Detective

216

1 Badeaux?
2 A. On the 9th of December.
3 Q. Right. And did you tell Detective Badeaux that
4 you had gone to Houston to do a dope deal?
5 A. I don't recall.
6 Q. Okay. Well, had you indicated to him that the
7 people that were shot there in Houston, meaning, I guess
8 Kevin Walter, Dion Holley, and Terrence Gibson, were
9 connected with Rap-a-lot Records, and they were very
10 dangerous people?
11 A. I don't think I mentioned all those boys
12 connecting with Rap-a-lot Records.
13 Q. Well, did you indicate that the people shot
14 were connected with Rap-a-lot Records and were very
15 dangerous?
16 A. I indicated that Mr. Holley claimed that he was
17 connected with Rap-a-lot Records.
18 Q. And that he was very dangerous?
19 A. No, I never said that.
20 Q. Did you tell Detective Thad when -- that you
21 say you don't recall telling him you came to Houston to
22 do a dope deal?
23 A. Not that I can recall.
24 Q. Do you recall telling him that you, in fact,
25 were going to do a dope deal with a Kevin Walter?

217

1 A. I think I did mention something like that,
2 dealing with Kevin Walter.
3 Q. And did you tell him that y'all met at
4 Bennigan's and went to a street where the dope deal was
5 going to go down; and while you were on that street
6 getting ready to do a dope deal, a car drove by and
7 opened fire on y'all?
8 A. I don't recall that.
9 Q. Are you saying you didn't tell the detective
10 that?
11 A. I'm not saying that. I'm saying I don't recall
12 the actual events that I told Mr. Badeaux on the night
13 of 9th of December.
14 Q. Well, did that happen? Did a car drive by and
15 people then fired shots at you?
16 A. No car drove by.
17 Q. Okay. You didn't lie to the officers, did you?
18 A. Excuse me?
19 Q. You didn't lie to the officers?
20 A. Not that I recall. I don't think I did.
21 Q. You're saying then that you didn't tell them
22 that -- well, did you tell them about the hood being
23 raised?
24 A. Who was them?
25 Q. The Detective Badeaux.

218

1 A. Oh, him.
2 Q. Him.
3 A. On the 9th?
4 Q. On the 9th, 10th, or anytime? Go ahead.
5 A. The only conversation me and Mr. Badeaux had
6 was on the 9th of December of 1998.
7 Q. And did you ever tell him about raising the
8 hood to see the dope?
9 A. I don't recall.
10 Q. And, in fact, you found out after you got the
11 Lexus that it was a Bible wrapped up that looked like a
12 kilo?
13 A. I don't recall that.
14 Q. Now the officers wouldn't make that up and put
15 it in their report now, would they?
16 MR. HILL: Judge, I don't know how he
17 would know what officers testified.
18 THE COURT: Sustained.
19 Q. (BY MR. MCCLELLAN) Are you saying you ever
20 remembered -- you never remember telling the detective
21 the events of December the 6th and the surrounding time
22 to Detective Ted Bloyd, who testified here in the
23 courtroom the other day?
24 A. Uh-huh. Like I said, again, I remember on
25 December the 10th, they came and he told me his

219

1  recollection of the story.
2  Q.  Question was, do you recall ever, from December
3  the 6th forward, ever telling Detective Ted Bloyd about
4  the events of December the 6th, 1998?
5          MR. HILL:  Judge, I'm going to object.  If
6  he could be more specific.
7          THE COURT:  It's overruled.
8          THE WITNESS:  I don't recall.
9  Q.  (BY MR. MCCLELLAN)  You don't recall?
10  A.  No, sir.
11  Q.  You never tell -- you never told Ted Bloyd
12  about you came to Houston for a dope deal?
13  A.  Me and Mr. Bloyd did not even speak.  Me and
14  Mr. King, the other detective, he spoke to him.
15  Q.  Was Ted Bloyd present?
16  A.  Yes, he was.
17  Q.  Did you ever say in the presence of Ted Bloyd,
18  Officer King, and Detective Ted Badeaux that you came to
19  Houston to do a dope deal in December of 1998?
20  A.  I cannot recall.
21  Q.  Did you ever tell them that you met up with a
22  Kevin Walter to do a dope deal?
23  A.  I think that did come about.
24  Q.  Did you ever tell them that you had $17,500, or
25  $17,000, around that amount of money?

220

1  A.  I don't recall that.
2  Q.  Okay.  Did you ever tell them you came there to
3  buy a kilo?
4  A.  I don't recall that.
5  Q.  Did you ever tell them you met up with Kevin
6  Walter, Dion Holley, and Terrence Gibson, or met up with
7  some people in a blue Lexus -- and forgot the name --
8  people in a blue Lexus to do a dope deal?
9  A.  Like I said, they was asking me some questions.
10  I don't recall me telling them that.
11  Q.  Did you ever tell them you noticed another car
12  kept following you around?
13  A.  No, I don't recall that.
14  Q.  Did you ever tell them you went to a dark place
15  and pulled the cars together?
16  A.  Like I said, I can recall them telling me that.
17  Q.  Did you ever say -- tell them that there is a
18  third vehicle pulled up and you heard gunfire?
19  A.  I never said that to Mr. Bloyd, nor did I say
20  that to Mr. King.
21  Q.  Never said it to anybody?
22  A.  I don't recall Mr. Badeaux on the 9th.
23  Q.  Did you ever say you, then, after the gunfire
24  from this third vehicle that drove by, jumped in your
25  car and left?

221

1  A.  I don't recall that.
2  Q.  Okay.  Now, do you ever recall talking to
3  Terrence Dodson about the events that you witnessed on
4  December the 6th, 1998?
5  A.  I never told Mr. Dodson about any events that
6  happened on December 6th of 1998.
7  Q.  Did you ever tell him that you jumped in the
8  Lexus and the girl was freaking out?
9  A.  I never, again, told Mr. Dodson any kind of
10  events that happened on December 6th, 1998.
11  Q.  Did you tell him that you drove the girl to an
12  abandoned house where the house was for sale?
13  A.  I never told Mr. Dodson, Terrence O'Neil
14  Dodson, my cousin, those things.
15  Q.  Did you ever tell Terrence Dodson that you took
16  the girl into the backyard of that house and had her
17  perform oral sex on you?
18  A.  I never told Mr. Dodson anything such as that.
19  Q.  Did you ever tell Terrence Dodson that upon her
20  performing oral sex on you, you then shot her one time
21  in the chest?
22  A.  I never told Mr. Terrence O'Neil Dodson, my
23  first cousin, that statement.
24  Q.  Did you ever tell him that the reason you
25  killed her is because you thought you had already killed

222

1  everybody else?
2  A.  No, sir.
3  Q.  Let's go back just for a moment, if we can, to
4  the Fiesta where you first drove.
5  A.  I did not drive.
6  Q.  Johnson drove, and you were in the car that Bug
7  Johnson was in, and y'all were being followed by the
8  Lexus?
9  A.  Uh-huh.
10  Q.  Now the reason the drug deal didn't go down
11  there is because, isn't it, Mr. Mamou, that Mr. Kevin
12  Walter had his car too far away?
13  A.  It's a false statement.
14  Q.  Okay.  Because if his car is too far away, you
15  won't be able to shoot Terrence Gibson and Dion Holley
16  and Kevin Walter; so somebody's going to get away and be
17  able to turn you in?
18  A.  That's a false statement.
19  Q.  And when you went to the location where the
20  buildings are, isn't the reason the drug deal didn't go
21  down there is because, again, Kevin Walter parked too
22  far away?
23  A.  That's a false statement.
24  Q.  And you could not kill everybody in the car,
25  which is what you had to do to get away with the deal?

223

```
1        A.   That's a false statement.
2        Q.   And isn't it true then when you finally got
3   them to follow you to Lantern Point Lane and someone
4   came up with the idea of putting the cars together to
5   make it look like you're giving the cars a boost in case
6   someone drove by or asked what was going on, that you
7   then had them where you wanted them?
8        A.   That's a false statement.
9        Q.   Because you were able, Mr. Mamou, were you not,
10  to get out of your car, to get Mr. Gibson and Mr. Holley
11  to the back of the car while Mr. Walter was sitting in
12  the car; and you were able to shoot both of them, come
13  back to the front of the car, and finish off Kevin
14  Walter.  And you had them all right where you needed
15  them?
16       A.   Mr. Dion Holley was in the front of the Lexus,
17  and that's a false statement.
18       Q.   And after shooting all three of those people,
19  thinking that they were all dead because you didn't see
20  anybody alive, you then jumped in that car; because you
21  had to have the car, because you knew that's where the
22  dope was?
23       A.   I seen Mr. Kevin Walter alive, as well as
24  Mr. Holley alive; and that's a false statement.
25       Q.   And you drove that car then along with Mary
```

224

```
1   Carmouche in the back, knowing that Mary Carmouche was
2   in the back; and you drove her over to that house on
3   Lynchester, and that's where you killed her in cold
4   blood.  Isn't it true?
5        A.   That's a false statement.
6        Q.   And isn't it true that you killed her for the
7   purpose that she could not ever be a witness, because
8   you thought you had already killed everybody else?
9        A.   No, sir.
10       Q.   So if I'm to understand you, Kevin Walter must
11  be telling untruths?
12       A.   That's a true statement.
13       Q.   Yeah.  Dion Holley must be telling untruths?
14       A.   That's a true statement.
15       Q.   About as far as you being the shooter?
16       A.   No, sir.
17       Q.   Because as I understand it, Kevin Walter says
18  you fired the gun, Dion Holley says you fired the gun.
19  Sam Johnson says you fired the gun.
20       A.   Mr. Johnson's testimony was not that I fired a
21  gun.
22       Q.   It wasn't?
23       A.   Not that I recall.
24       Q.   I thought Mr. Johnson said that it was kind of
25  half in and half out, and he saw you shoot Kevin Walter?
```

225

```
1        A.   Oh, maybe so.  I apologize to the jury.
2        Q.   And he saw you in the back of the car.  While
3   he didn't see you shoot Terrence Gibson, he heard a shot
4   and Terrence Gibson fell flat.  Did that happen?  Did
5   Terrence Gibson fall right where you shot him?
6        A.   I did not even see Mr. Gibson fall.
7        Q.   So everybody who was there, who is still alive,
8   says they saw you shoot; is that right?
9        A.   I know Mr. Kevin said I shot.  I know Mr. Bug
10  Johnson, since you have explained to me, said I shot;
11  but I'm not quite sure what Mr. Dion Holley said.
12       Q.   Well, there wasn't anybody out there that night
13  shooting a gun other than you, were they?
14       A.   Now that, I do not know.
15       Q.   You do know that there are five cartridge cases
16  that were recovered, and they all were fired from the
17  same firearm?
18       A.   That is an assumption.
19       Q.   Well, you heard testimony from Officer Baldwin.
20  You just think that's his assumption?
21       A.   No, sir, I do not.
22       Q.   Well, you heard him say that the five cartridge
23  cases down at Lantern Point Drive were all fired from
24  the same firearm?
25       A.   He didn't say that was his opinion.
```

226

```
1        Q.   He says that was his opinion based upon his
2   examination.
3        A.   Well, that was his opinion.
4        Q.   So you're saying it wasn't all fired out of
5   your gun?
6        A.   Mr. Lyn, I cannot tell you.  I may have shot
7   more than that, maybe less.  I do not know.  I was not
8   there counting the shots.
9        Q.   Okay.  Well, let me ask you this:  Back on
10  Lynchester, were you counting the shots there?
11       A.   Lynchester?  Where is that?
12       Q.   The abandoned house, where you took Mary
13  Carmouche.
14       A.   I'm sorry.  I did not even know that area.
15       Q.   You're saying you never told the detectives
16  what transpired?
17       A.   Not that I recall, sir.
18       Q.   You say that Mary Carmouche, during the time
19  that you -- she was in your presence, after the
20  shooting, never upset, never scared, didn't --
21       A.   Well, I don't really know her true feelings;
22  but she was not in a yelling rampage or nothing like
23  that.
24       Q.   Wasn't crying?
25       A.   No, sir.
```

227

1    Q.  Wasn't -- just looked like she was in shock?
2    A.  Not that I can recall.
3    Q.  Okay.  Wasn't begging that somebody let her go?
4    A.  No, sir.
5    Q.  She was just kind of going with the flow?
6    A.  If that's what you want to call it.
7    Q.  Well, I mean, she didn't try to leave?
8    A.  My intentions were not on her.  You know what
9    I'm saying?  She had a cut on her arm, and I gave her a
10   napkin for her cut.  Some glass had hit her, I believe
11   she had told me.
12   Q.  Some glass had hit her?
13   A.  On her arm, I believe.  I'm not sure.
14   Q.  Okay.  And that would be glass from the Lexus,
15   whenever you shot the window out?
16   A.  I don't know, sir.  I do not know what glass
17   she's talking about.
18   Q.  Where did you get the napkin?
19   A.  There was some napkins on the armrest, right
20   between the armrest, sir.
21   Q.  So you handed her a napkin?
22   A.  I sure did.
23   Q.  To tend to her wounds?
24   A.  No.  I just handed her a napkin, because she
25   had seen blood.

228

1    Q.  So was she bleeding a lot?
2    A.  No, sir, she was not.
3    Q.  So it wouldn't be any blood in the Lexus from
4    her?
5    A.  I don't know.
6    Q.  You didn't see anybody out at that scene shoot
7    a gun other than yourself, did you?
8    A.  Mr. Lyn, I didn't really see too much.
9    Q.  Well, did you ever -- after this event
10   happened, did you take the keys to the Lexus?
11   A.  If I took the keys to the Lexus?
12   Q.  Did you take the keys to the Lexus, keep them
13   with you?
14   A.  That night Howard Scott had the key to the
15   Lexus that night.
16   Q.  So you couldn't have gotten in the car,
17   bragging with Anthony Trail and with Terrence Dodson and
18   showed them the keys to the Lexus?
19   A.  I recall that incident, sir.
20   Q.  Did you do that?
21   A.  I did not brag about it that way.
22   Q.  What did you do?
23   A.  I showed Mr. Dodson the keys.
24   Q.  Why?
25   A.  It was just something I did.  I don't know why.

229

1    I just did.
2    Q.  Did you ask him if he knew where a chop shop
3    was?
4    A.  I never asked him about any chop shop.  He told
5    me he had a Mexican friend who owned a chop shop, where
6    I could get rid of the car, as well as those rims on the
7    car.
8    Q.  So did you do that?
9    A.  No, I did not.
10   Q.  Because you're not -- you wouldn't do that type
11   of criminal activity, right?
12   A.  No, I'm not saying that, Mr. Lyn.  I'm just
13   saying that was not my intentions on stealing any car.
14   Q.  Okay.  What were your intentions?
15   A.  To get away, Mr. Lyn.
16   Q.  After you got away, you were going to return
17   the car back to its rightful owner?
18   A.  Mr. Lyn, I left the car right there.
19   Q.  Why did you take the keys?
20   A.  I got the keys that morning from Mr. Howard
21   Scott; because Mr. Howard, that morning, wanted me to
22   move the vehicle, and I refused to move the vehicle.
23   Q.  So Howard Scott -- why would Howard Scott have
24   the vehicle?
25   A.  He had the keys that night.

230

1    Q.  He took them out of the Lexus?
2    A.  No, sir.  I gave it to him after he went back
3    to the Lexus and cleaned it down with some 409.
4    Q.  409?
5    A.  And a towel.
6    Q.  409?
7    A.  Yes, sir.
8    Q.  I guess he missed a couple of spots?
9    A.  I don't know.  I did not actually visualize him
10   cleaning the car.
11   Q.  And why would Howard Scott do that?
12   A.  Well, I think the parties that was there all
13   had a little something in it, Mr. Lyn.
14   Q.  Everybody there had a little something in it?
15   What do you mean?  They were all involved in this deal?
16   A.  Like I say, when I pulled up, they all knew
17   already what had happened.
18   Q.  News travels fast.  So Howard Scott's involved
19   in this deal?
20   A.  Excuse me?
21   Q.  Howard Scott's involved in this deal?
22   A.  Involved in what deal?  Could you be more
23   specific.
24   Q.  December the 6th dope deal, killing people,
25   destroying evidence?

231

1    A.  Mr. Lyn, like I said, my testimony was that he
2  was there.  He got the three socks, as well as he
3  cleaned the Lexus of the vehicle.
4    Q.  Because you were looking for that dope, right?
5    A.  There was no dope, Mr. Lyn.
6    Q.  I know, but they were looking for that dope?
7    A.  I don't know what they was doing.
8    Q.  Why would they have three socks?
9    A.  My conclusion, my opinion would be, yes, they
10  was looking for dope; but I don't live to give --
11  speculate on nobody else's statement.
12    Q.  You were not looking for the dope?
13    A.  I was not looking for any dope.
14    Q.  You were ready to buy some dope; but if you
15  can't buy it, I'm not taking it.  Is that your position?
16    A.  No, sir.  At that point in time -- at that
17  point in time, it was not about any dope.
18    Q.  What was it about then at that point in time?
19    A.  I wanted to go back home.
20    Q.  Well, you had gone here to do a dope deal?
21    A.  That's correct.
22    Q.  You had the money to do a dope deal.  You have
23  a chance now to get free dope, if there had been dope in
24  the car, and you're not one to get that free dope.  Is
25  that what you're trying to tell the jury?

232

1    A.  You have to wear my shoes, Mr. Lyn, at that
2  time.
3    Q.  I just soon not, but is that what you're trying
4  to tell the jury?
5    A.  I'm not trying to tell the jury that.  That's
6  what I'm telling the jury.
7    Q.  That you weren't interested in the dope.
8  That's the reason you took the car, isn't it?
9    A.  At that time, no, sir, I did not never say
10  that.  I took the car to get away.
11    Q.  All right.  Well, when you got away and you met
12  up with Bug Johnson there behind -- when he pulled up
13  behind you and flashed the lights, and you being there
14  on the side of the road, you should have said, Hey,
15  forget this, and jumped in his car and, Let us go, left
16  that Lexus there?
17    A.  I realize I'm saying the police may have been
18  looking for the vehicle.  The Lexus, also, was running
19  real bad.  It was low to the front.  My assumption was
20  the tire might have got shot; so I followed him, because
21  he told me follow.  So I followed.
22    Q.  Did the tire go flat while you were driving?
23    A.  I don't know.  I just know the car was running
24  low, in a lower position in front.
25    Q.  Now Terrence Dodson and Anthony Trail both

233

1  testified that you were continually calling up and
2  asking about this event.  Did the people die?  What
3  happened?  What happened to the girl and all of this?
4    A.  I called Mr. Dodson on December 9th, when I was
5  in Sunset, Louisiana, about the incident only because I
6  received a call, phone call from my father.  And my
7  father told me the police was looking for me, as well as
8  Mr. Dodson.  They wanted to charge us with capital
9  murder.  And if we do not turn ourself in, we was going
10  to be America's Most Wanted.  But my cell phone got --
11  the battery was dead, and it hung up on my daddy.  And
12  right after I charged the phone up, I received a call
13  from my mother.  And she was panicking because the
14  police was over there to the house.  And this time,
15  before I even talked to Mr. Dodson, I was in my house in
16  Opelousas, Louisiana, which I drove from Opelousas to
17  where the police was in Sunset, Louisiana.
18    Q.  You drove where?
19    A.  From one of my houses in Opelousas, Louisiana,
20  which is about fifteen minutes from Sunset, Louisiana;
21  and I went and meet the police over there.
22    Q.  Oh, so you drove to meet the police, because
23  you heard they were looking for you?
24    A.  Well, no, not really that.  I just drove to
25  Sunset to see what the hell was going on.

234

1    Q.  So, now, I understood you were found hiding in
2  a closet?
3    A.  Yes, sir.  But, you know, you only heard one
4  part of the story.  I hid in the closet; because when
5  they came to my friend's house, they had their weapons
6  drawn, banging on the door, about to knock it down.  So
7  I'm scared.
8    Q.  Well, I thought you had gone to Sunset,
9  Louisiana to talk to the police?
10    A.  I sure did, but the vehicle that was -- the
11  vehicle I was in -- thank you, please -- the vehicle I
12  was in was my friend, Dennis Dugas', vehicle.  I used
13  his car that night.  I went over to his house to bring
14  his vehicle back.  He was not there, but I had the keys
15  to his house.
16    Q.  And so when the police came to the door, you
17  said, Oh, boy, here's my chance.  I can tell them now
18  I've been looking for them; and now I found them, and I
19  can tell them what happened?
20    A.  Well, you know, that would be the logical
21  thing; but when you got -- they surround the house,
22  first of all, with pistols.  This is not nothing to play
23  with.  This is nothing to play with at all.
24    Q.  You drove to Sunset, Louisiana to talk to the
25  police.  Now my understanding is that police department

235

1  consists of three people, right?
2      A.  That's correct.  Oh, the police department?
3      Q.  Police department in Sunset, Louisiana?
4      A.  No, sir, we have more than three people that
5  work there.
6      Q.  How many you have?
7      A.  There is about six officers that work in the
8  Sunset Police Department.
9      Q.  Do you know where the police station is?
10     A.  Yes, I do.
11     Q.  Could have driven right to them?
12     A.  Sure could have.
13     Q.  Knocked on the door?
14     A.  Sure could have.
15     Q.  Said, Oh, I need to tell you what's going on?
16     A.  Sure could have.
17     Q.  And you didn't because of?
18     A.  Because there was more than the Sunset Police
19  Department.  If I can recall right, there was Opelousas
20  Parish Task Force, as well as Lafayette.
21     Q.  I'm not talking about when they came to Dugas'
22  house.  I'm talking about when you decided to go to
23  Sunset, Louisiana?
24     A.  That's what I'm talking about.  I also called
25  the Sunset Police Department and asked them what was

236

1  they looking for Charles, AKA Chucky Mamou for.
2      Q.  What did --
3      A.  The dispatch.
4      Q.  Did she tell you?
5      A.  They asked me where I was.
6      Q.  How did they know who you were?
7      A.  I was well-known in Sunset, Louisiana.
8      Q.  Why are you so well-known?
9      A.  A good guy.
10     Q.  I thought you were a dope dealer?
11     A.  Drug dealers -- not all drug dealers are bad,
12  Mr. Lyn.
13     Q.  And so in Sunset, Louisiana, drug dealers are
14  looked up to?
15     A.  It's a small community.  Everybody knows
16  everybody.
17     Q.  But drug dealers are looked up to in Sunset,
18  Louisiana?
19     A.  No, I would not go there now.
20     Q.  Because they have lots of money and lots of
21  nice things?
22     A.  Who?
23     Q.  Drug dealers?
24     A.  I don't know.
25     Q.  You have nice things and nice cars and stuff,

237

1  don't you?  Do you?
2      A.  I had.
3      Q.  Is this a tragedy then for you?
4      A.  No, sir.
5      Q.  That you lost all this?
6      A.  No, sir, not at all.
7      Q.  So you couldn't find the police in Sunset,
8  Louisiana, to tell what went on?
9      A.  There was one special cop that I was mainly
10  looking for.  His name was Jeffery Lanier.
11     Q.  And you know Jeffery how long?
12     A.  All my life.
13     Q.  Somebody you grew up with?
14     A.  He's older than me.  I never grew up with him.
15     Q.  You had to talk to him; you couldn't talk to
16  somebody else?
17     A.  I called the police, our Sunset Police
18  Department's dispatcher, asked what they was looking for
19  me for, and I wanted to speak to Jeffery Lanier.
20     Q.  So did you talk to Jeffery Lanier after you
21  were arrested?
22     A.  I did not talk to Mr. Lanier.
23     Q.  Initially, you were taken to the Sunset Police
24  Department, were you not?
25     A.  Yes.

238

1      Q.  Did you ask to talk to Jeffery Lanier there?
2      A.  No, sir.
3      Q.  But that's who you wanted to talk to?
4      A.  At the time before my arrest, yes, that's who I
5  wanted to talk to.
6      Q.  Everybody, basically, who's testified in the
7  case has lied against you?
8      A.  Everybody had a reason, Mr. Lyn.
9      Q.  Okay.  And wouldn't you think that the people
10  who were shot would be interested in getting the right
11  guy?
12     A.  I would believe so.
13     Q.  But they lie and are trying to get you?
14     A.  Excuse me, I didn't hear that.
15     Q.  They're lying and trying to get you?
16     A.  Trying to get me?  What you mean?
17     Q.  People are trying to convict you.  Why are they
18  trying to convict you when you didn't do anything wrong?
19     A.  Well, Mr. Lyn, in society before the incident
20  happened, they called me a carjacker.  I was not being
21  arrested for no drugs.  It was a carjack and a
22  kidnapping of a girl.  So this is why everybody else may
23  have had a perception of lying on me, Mr. Lyn.
24     Q.  So you figure everybody just -- if they believe
25  what they heard the first time, it would have been a

239

1   good samaritan got shot?
2       A.  If I heard that story, too, and I was on the
3   other end where you're at, I probably would have
4   believed them.
5       Q.  Well, in fact, you did hear that story.  And
6   didn't you tell Anthony Trail and Terrence Dodson that
7   wasn't no -- those boys didn't stop to help anybody;
8   that was a jack on a jack?
9       A.  That comment never did take place.
10      Q.  You know what a jack on a jack is?
11      A.  I mean, from -- I'm aware of what?
12      Q.  My next question was, do you know what a jack
13  on a jack is?
14      A.  Yes, I do.
15      Q.  You never said that word, that this was a jack
16  on a jack?
17      A.  No, sir.
18      Q.  Robbery on a robbery?
19      A.  No, sir, no, sir.
20      Q.  So Terrence Dodson, your cousin, comes in and
21  lies about you so that you could be convicted of capital
22  murder and possibly get the death penalty.  That's what
23  Terrence Dodson did.  Is that what you're saying?
24      A.  Mr. Dodson lied on me.  You know what I'm
25  saying?  I could sit here and tell y'all what I feel or

240

1   why he done it, but it's not that -- I go through pain,
2   knowing that's my first cousin.  But if I could recall
3   right, I could swear that I heard him say he was
4   threatened; he was going to be charged with two capital
5   murders.  And I wonder who told him that.
6       Q.  Well, you know, he never was charged with
7   anything.
8       A.  Oh, because apparently y'all had y'all's man
9   December 9th.
10      Q.  In fact, you had already been charged with
11  capital murder when he talked to the police; isn't that
12  true?
13      A.  Not to my knowledge, Mr. Lyn.  If I can recall
14  right, I was arrested for a probable cause warrant for
15  Harris County for aggravated robbery, not murder.
16      Q.  And by the 10th day of December, 1998, you had
17  been filed on for capital murder?
18      A.  I had no recollection of that.  I had not
19  received no indictment papers.  I had not received
20  nothing.
21      Q.  Because -- you didn't receive any indictment
22  papers, because you had fled to Sunset, Louisiana.
23  There wasn't an indictment anyway.  That comes later.
24  I'm talking about the filing of the charges, an open
25  warrant for your arrest?

241

1       A.  Well, I don't know how the court system works.
2       Q.  Well, you know how it works when you're in
3   Louisiana, and we were trying to extradite you back
4   here, do you not?
5       A.  I also know I wrote you a letter and told you
6   to come get me, did I not?
7       Q.  You sure did.  And then I found out, as soon as
8   we went over there to get you, that it took us from
9   January the 19th of 1999, until June of 1999, to get you
10  back; because you fought extradition every step of the
11  way, right?
12      A.  Let the record reflect --
13      Q.  Is that right or wrong?
14      A.  No, sir, I never fought.  No one told me
15  anything about extradition.
16      Q.  You weren't told by a Judge that -- didn't they
17  ask you if you wanted to waive extradition and come back
18  to Harris County, and you said no?
19      A.  I don't recall that.
20      Q.  Never told anybody that?
21      A.  I don't recall that.
22      Q.  Then how do you explain that it took so long to
23  get you back here?
24      A.  I recall me going to Opelousas Parish for
25  probation violation; because I was in Houston, Texas, is

242

1   what I recall, on February 9th of 1999.  I also recall
2   on April 26th, I went to the penitentiary and I was not
3   convicted of nothing.  It was Angola Penitentiary.
4       Q.  Well, you were convicted.  In fact, you were on
5   probation for possession of a controlled substance, were
6   you not?
7       A.  That took place in 1995, sir.
8       Q.  I understand, but you were on probation for
9   possession of a controlled substance with intent to
10  deliver?
11      A.  Yes, I was, for eighteen months.
12      Q.  Pardon?
13      A.  The probation violation was only for eighteen
14  months.
15      Q.  Question is --
16      A.  Yes, I was.
17      Q.  Thank you.  And your probation was revoked; and
18  you were sentenced to five years in the Louisiana
19  Department of Corrections, whatever they call it, and
20  sent to Angola; is that correct?
21      A.  That's a false statement.
22      Q.  It is?
23      A.  Yes, sir, I was sentenced to three years, half
24  of the three-year sentence, which was eighteen months,
25  not to no Angola Penitentiary.  Angola is a life

243

1  facility for lifers, people who are not going to come
2  home, maximum security.
3      Q.  Have you not seen a copy of your papers, where
4  you were convicted in Louisiana?
5      A.  If you have them, you can show them to me,
6  Mr. Lyn.
7      Q.  I got them.  Let me show you what's been marked
8  as State's Exhibit No. 112.  Says State of Louisiana
9  versus Charles Mamou, Jr.  Is that your address in
10  Sunset, Louisiana, 548 Martin Luther King Drive, date of
11  birth 12-6, 1974, social security number, black male.
12  Is that your information?
13      A.  Yes, it is.
14      Q.  Okay.  Court finds the defendant has violated
15  conditions of his probation, revokes same, and
16  defendant's ordered to serve the original sentence
17  previously imposed.  Defendant's consigned to the
18  Department of Corrections until the sentence can be
19  carried out.
20      A.  I don't see anything about Angola.
21      Q.  Doesn't say Angola.  It says to the Department
22  of Corrections.  Says you went up there for five years?
23      A.  No, eighteen months, sir.
24      Q.  Eighteen months.  Says, The Court will sentence
25  the defendant to serve five years to hard labor.

244

1      A.  Suspended.
2      Q.  I understand, but the suspension was overturned
3  whenever you had the revocation; and that's to serve the
4  time served?
5      A.  The Judge sentenced me to eighteen months.  I
6  get off this probation in April, 2,000.
7      Q.  You're not on probation?
8      A.  Well, revocation.
9      Q.  You're in the pen, right?
10      A.  That's right, I was.
11      Q.  Till we brought you back here to Harris County?
12      A.  I thank you.
13      Q.  Okay.  You're welcome.  And you were brought
14  back from the penitentiary here, not from probation,
15  because your probation had already been revoked, for
16  some other violation?
17      A.  My probation was revoked for having a pistol
18  and leaving the State of Texas, is what I went up in
19  front of Mr. Judge Alonzo Harris in Opelousas, 179th
20  District Court, Opelousas, Louisiana.
21      Q.  Over there they already determined you're
22  guilty of this offense.  Is that what you're saying?
23      A.  I presume so, sir.
24          MR. MCCLELLAN:  At this time, Your Honor,
25  State would offer into evidence State's Exhibit No. 112

245

1  and tender to defense counsel for his examination.
2          MR. HILL:  No objection, Your Honor.
3          THE COURT:  State's 112 is admitted.
4      Q.  (BY MR. MCCLELLAN) Did you tell Terrence Dodson
5  that one of the reasons you shot Mary Carmouche, in
6  addition to the fact you didn't want to leave any
7  witness, is because she started looking at you kind of
8  funny while she was performing oral sex on you?
9      A.  Me and Terrence O'Neill Dodson did not have any
10  conversation what took place on December 6th of 1998.
11      Q.  What about on December the 7th, 8th or 9th?
12      A.  We did not have any conversation, period, about
13  this incident on the 9th.  All I did was ask him what
14  was going on.  And he told me the cops had just went
15  over there and roughed him up and he was going to
16  Austin, Texas.  And he told me to leave, too.
17      Q.  Well, you had already left when I talked to
18  you then?
19      A.  No, he was talking about somewhere else.
20      Q.  Like Mexico?
21      A.  I presume so.
22      Q.  Well, so, he's telling the truth about that.
23  Didn't you want to know about tickets to Mexico?
24      A.  I didn't want to know about tickets to Mexico.
25  All I wanted to know was what was the people going over

246

1  there for.  And he told me, The cops are hot, man.  He
2  said, I'm going to Austin, Texas.  And he said it in a
3  laughing manner.  And five minutes after that, the house
4  got surrounded by the police.
5      Q.  And you don't think that is a laughing matter?
6      A.  This is nothing funny at all.
7      Q.  So Terrence Dodson tried to make light of it, I
8  guess?
9      A.  Tried to make a lie?
10      Q.  Tried to make light, tried to make levity,
11  tried to make it a funny thing when you said he was
12  laughing or --
13      A.  I was not saying he was laughing at the
14  incident.  I said he was laughing when he said he was
15  going to Austin, Texas.
16      Q.  Would -- you only met Mary Carmouche that one
17  day?
18      A.  Not even a day.  Like I said, a couple of
19  hours.
20      Q.  I assume you would agree with me that Mary
21  Carmouche did nothing to deserve the fate she met?
22      A.  I agree on that.
23      Q.  Would you agree with me that whoever it is that
24  shot and killed Mary Carmouche deserves the severest of
25  punishment?

247

1    A.  I agree that the police arrested a lot of
2  suspects who was also involved in this, and I agree they
3  let them go.
4             MR. MCCLELLAN:  I object to being
5  nonresponsive, Your Honor.
6             THE COURT:  Sustained.
7             MR. MCCLELLAN:  Ask the witness --
8             THE COURT:  Just answer the question,
9  please.
10            THE WITNESS:  Could you repeat the
11  question?
12    Q.  (BY MR. MCCLELLAN)  And if you don't understand
13  when I ask, I'll be happy to repeat it.  Would you agree
14  with me that whoever killed Mary Carmouche in the manner
15  and means in which she met her death deserves the
16  harshest of punishments?
17    A.  Most definitely.
18            MR. MCCLELLAN:  Pass the witness.
19            REDIRECT EXAMINATION
20  BY MR. HILL:
21    Q.  Mr. Mamou, I'm going to ask you a couple of
22  questions.  There are some things that Mr. McClellan
23  talked to you about.  I don't want to quibble over this
24  document, but let's just clarify something.  This thing
25  from Louisiana, just explain to the jury what you were

248

1  put on probation for and how the process worked that you
2  ended up being revoked?
3    A.  I was put on probation for carrying -- you
4  know, having possession of crack cocaine.
5    Q.  And then in February of this year, while you're
6  back in Louisiana, records reflect that you had a
7  hearing with some attorney by the name of -- it's on the
8  front page there, Mar --
9    A.  It's Glen Marcantel.  He's an attorney out of
10  Eunice, but he was not present.
11    Q.  Okay.  At that point in time the Judge revoked
12  your probation, okay, where did they physically take
13  you?
14    A.  I went back to Opelousas, the jail in
15  Opelousas.
16    Q.  Is that a county jail or a penitentiary?
17    A.  County jail.
18    Q.  Did you ever go to an actual penitentiary
19  facility?
20    A.  I went to two of them.
21    Q.  Which ones?
22    A.  Hunts Penitentiary in Louisiana, and I went to
23  Angola.
24    Q.  And during that period of time, you're being
25  taken from one penitentiary facility to another?

249

1    A.  Yes, sir.
2    Q.  Is that during the period of time the State of
3  Texas is attempting to bring you back to face charges on
4  the capital murder?
5    A.  I was not even informed Texas was trying to
6  come get me at all.  I'm just being transported back and
7  forth.
8    Q.  Are the prison officials taking you from one
9  location to another?
10    A.  Yes, sir.
11    Q.  What period of time are we talking about?
12  When, in 1999 is this happening to you?
13    A.  In February, I was in Opelousas.  In March I
14  went back to Lafayette.  In April I went to Hunts, and
15  in April -- no, May -- the ending of April, the
16  beginning of May, I went to Angola.
17    Q.  I thought you said you don't go to Angola,
18  because that's a life facility?
19    A.  You're not supposed to, sir.
20    Q.  From there, did you come directly to Houston?
21    A.  No, sir.
22    Q.  Where did you go?
23    A.  I went back to Lafayette.
24    Q.  From Lafayette, did they bring you into
25  Houston?

250

1    A.  Well, Lafayette had gave -- I think they called
2  out here, because an attorney presented himself to me
3  and said that Houston had so many days to come get me.
4    Q.  All right.  Now what is this deal about the
5  eighteen months?   The paperwork says you were sentenced
6  to the original sentence.
7    A.  Uh-huh.
8    Q.  Where do you come up with this eighteen months?
9    A.  Judge Alonzo Harris, he suspended the five
10  years probation hard labor and he gave me three years.
11  And out of the three years, he sentenced me to eighteen
12  months.  And when I called on the phone, I made parole
13  April of 2,000.
14    Q.  Well, that's in Louisiana?
15    A.  Yes, sir.
16    Q.  Let me ask you:  Did you kidnap Mary Carmouche?
17    A.  No, sir.
18    Q.  What happened to the gun once you got back to
19  Fondren Court Apartments?
20    A.  Shawn took it from me.
21    Q.  When you were in Louisiana, and you're in
22  Sunset or you're in Lafayette, when Mr. McClellan is
23  talking about the Detective Bloyd and others going to
24  talk to you, did you have an attorney at that point in
25  time?