

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. 73,708

**CHARLES MAMOU, JR., Appellant**

v.

**THE STATE OF TEXAS**

## ON DIRECT APPEAL FROM HARRIS COUNTY

JOHNSON, J., *delivered the opinion for a unanimous Court.*

## OPINION

Appellant was convicted of capital murder on October 12, 1999. TEX. PEN. CODE § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure, art. 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant

---

[1]Unless otherwise indicated, all future references to articles refer to Code of Criminal Procedure.

raises eight points of error, including challenges to the sufficiency of the evidence at both stages of the trial. We will affirm.

Appellant was indicted for murdering Mary Carmouche while in the course of committing or attempting to commit kidnapping.[2] The evidence at trial showed that on the afternoon of December 6, 1998, appellant called Kevin Walter and Dion Holley to inquire about buying cocaine. Walter and Holley agreed to sell appellant a kilo of cocaine for $20,000 that evening in the parking lot of Northline Mall in Houston; however, they actually planned to trick appellant into thinking that they had the cocaine and to take his money. Their friend, Terrance Gibson, overheard their conversation with appellant and "wanted in." Gibson agreed to drive in Walter's car with a gun and act as backup in case anything went wrong.

Meanwhile, appellant devised his own plan to rob Walter and Holley of the cocaine. Samuel "Bug" Johnson, driving a red Chrysler Concord, picked up appellant from Howard Scott's apartment at approximately 7:00 p.m. Johnson and appellant then picked up Terrence Dodson, appellant's cousin, from his home in southwest Houston. On the way to Northline Mall, they stopped at a convenience store and purchased a newspaper, which appellant cut into dollar-sized pieces and placed in a Victoria's Secret gift bag. Appellant's plan was to pretend to have cash in the bag, then to have Dodson pull his gun on Walter and Holley while appellant robbed them of the cocaine.

Walter and Holley arrived at the Northline Mall parking lot at around 7:30 p.m. in Holley's blue Lexus and parked next to Johnson's car. They exited the Lexus, and appellant

---

[2]The indictment alternatively alleged in the second paragraph that appellant murdered Mary Carmouche and Terrance Gibson during the same criminal transaction. The State abandoned the second paragraph prior to trial.

approached them with the Victoria's Secret bag in his hands. After they talked for a few minutes, Walter said that he felt uncomfortable with the location and told appellant to meet them in the parking lot of a nearby grocery store. They again failed to complete the transaction at the grocery store because both parties refused to show each other the drugs or the money. Appellant told Walter that he would call him later. Johnson and appellant then left the grocery store and drove Dodson home.

Walter and Holley left the grocery store and met up with Gibson at a Chevron station. Gibson followed them to Walter's house, dropped off Walter's car, and got into the Lexus with them. While they were driving around in the Lexus, they received a phone call from Holley's friend, seventeen-year-old Mary Carmouche. They picked up Carmouche from her parents' house and continued driving around until appellant called them. They arranged to meet appellant and Johnson at a Bennigan's restaurant on Southwest Freeway. When they arrived at Bennigan's, they went inside the restaurant, ordered food, and talked for a while. At some point, they decided to leave the restaurant and conduct their business elsewhere. They stopped at a few locations before deciding on Lantern Point Drive, a dark, isolated street.

When they arrived on Lantern Point Drive, they parked their cars facing each other to make it look as if one car was giving the other a "boost." Walter was in the driver's seat of the Lexus with Gibson in the passenger seat and Holley and Carmouche in the back seat. Gibson and appellant got out of the cars and went to the back of the Lexus. As Holley got out of the car to tell them that they were not parked in a good spot, he heard a gunshot. Holley started running towards a nearby field when he heard more gunshots and was shot in the arm.

Walter grabbed the steering wheel and tried to drive away when he heard the gunshots,

but appellant shot him through the car window before he could do so. The bullet shattered the glass of the closed window and hit him in the left shoulder. As Walter tried to exit the car, appellant shot him in the chest and stomach. Walter struggled with appellant and ran towards the back of the car. As he was running, he heard several more gunshots and was shot in the back. He saw Gibson lying on the ground and reached down to take his gun. When he looked up, he saw the red car and the Lexus drive away.

John Wayne McDonald, a security guard at a nearby apartment complex, heard gunshots coming from the direction of Lantern Point Drive and drove to the scene. He observed Walter and Gibson lying on the ground and Holley staggering toward Walter. Gibson's eyes were wide open and he had no pulse. McDonald also observed the gift bag containing newspaper on the ground. Walter and Holley told McDonald that they had been shot when they stopped to help a car that appeared to be in trouble. They stated that the assailants stole their car and drove away with Carmouche.

Houston Police Officer Oral R. Warren arrived on the scene and spoke with Holley, who told him that they stopped to help two black men whose car appeared to be in need of a jumpstart.[3] He stated that the men shot them, abducted Carmouche, and drove away in their red car and Holley's blue Lexus. He described Carmouche as a black, eighteen-year-old female wearing a red shirt and jeans. Walter and Holley were then transported to two separate medical facilities for treatment. Gibson died at the scene as a result of a gunshot wound to his chest.

On Monday afternoon, December 7, 1998, Holley's blue Lexus was found at an apartment complex in southwest Houston. The following day, December 8, 1998, Walter

---

[3] Holley testified that he told the false story to the authorities to avoid "getting in trouble."

admitted to Detective Ted Bloyd that a man named "Chucky" had shot him and gave Bloyd "Chucky's" telephone number. The telephone number was registered to Robin Scott, who lived with her husband, Howard Scott, in the apartment complex where the Lexus was found. The Scotts gave Bloyd consent to search their apartment, but appellant was no longer there. After speaking with the Scotts, Bloyd was informed that the body of a black female had just been discovered.

Alex Longoria, an employee of Reliant Energy HL&P, discovered the body at around noon on December 8, 1998. As Longoria entered the backyard of a vacant house at 9227 Lynchester to read the light meter, he saw the body of a young, black female lying on the ground clothed in blue jeans and a red shirt. When Houston Police Officer Larry Foltz arrived on the scene, he observed that the body was lying face down, there was blood on the ground, and there was an unfired bullet cartridge on the ground nearby. The house was locked and there were no signs of forced entry. Carmouche's father identified her body. Dr. Roger Milton, who performed Carmouche's autopsy, concluded that a single gun shot wound to her chest caused her death. The bullet entered her chest, traveled through her right lung, heart, and liver, and lodged in a muscle in her back.

Following the discovery of Carmouche's body, Detective G. J. Novak spoke with appellant's father, Charles Mamou, Sr., who directed him to Dodson. Dodson told Novak where to locate Johnson and Anthony Trail. After talking to these individuals, Novak put together photo spreads which contained pictures of Johnson and appellant. Walter and Holley identified them in the photo spreads. Once the identifications were made, Novak contacted investigator Thad Badeaux of the Lafayette Parish Sherriff's Office in Louisiana and requested him to arrest

appellant. Badeaux found appellant hiding in a closet in a house in Sunset, Louisiana, on December 9, 1998.

Appellant testified at trial that he shot Gibson and Walter, but he did not recall shooting Holley. With regard to the events that transpired after he left the scene of the shooting, appellant testified that he left Lantern Point Drive in the Lexus because Johnson had already driven away in the red car. He noticed Carmouche for the first time in his rearview mirror when he came to a stop sign at McNee and Lantern Point Drive. He asked her to get out of the car when he came to a stoplight near a Burger King on Main Street, but she did not exit the vehicle. After appellant drove through the stoplight, Johnson came up behind him in his car, flashed his lights, and motioned for appellant to follow him to Howard Scott's apartment. When they arrived at the apartment complex, Johnson, Scott, and Shawn England wiped down the interior of the Lexus and searched it for cocaine. At that time, a man named Kevin, also known as "Skin," arrived on a bicycle. When Appellant went inside the apartment with England and Scott and changed his clothes, Carmouche left in the red car with Johnson and "Skin." Appellant then went out for a short walk. When he came back to the apartment complex, he watched from a distance and observed Johnson and "Skin" return in Johnson's car. Later, Johnson left in his car, "Skin" left on his bicycle, and England left in a taxicab. After they left, appellant returned to Scott's apartment where he spent the night.

Johnson gave a different version of events. He testified that he saw appellant shoot Walter and drive away in the Lexus with Carmouche in the backseat. He followed appellant until they reached the intersection of Highway 610 and South Main. Appellant continued driving on South Main, but Johnson stayed on 610 and drove home. He did not hear from appellant again

until Tuesday, when appellant called him and told him "to shut the hell up" about what happened.

Scott also disputed appellant's version of events. Scott testified that appellant left his apartment with Johnson at around 7:00 p.m. on Sunday evening. Scott stayed home that evening, watched television for a while with England and another friend named "Ken," and then went to bed. He was awakened in the middle of the night by appellant knocking on the door. He opened the door for appellant and went back to bed. When he left the next morning to take his wife to work, appellant was still asleep.

Dodson testified that Johnson and appellant drove him home after they left the grocery store and that he did not hear from appellant until the next day, when appellant called him and told him to ride with Anthony Trail to a Burger King at Fondren and Belfort. When they arrived, appellant got in the car, showed them a set of car keys, and said that he had a Lexus. Trail and appellant took Dodson home. Trail testified that appellant then had him drive to a dead-end street in southwest Houston where he retrieved a pair of glasses. Trail testified that appellant said he had dropped the glasses when he was there with a female who performed oral sex on him. Appellant later had Trail take him to the bus station, and he went to Louisiana.

Dodson further testified that appellant called him from Louisiana. When Dodson told appellant that he had seen a news report about a stolen Lexus and a missing girl, appellant told him that he had been in a "shoot out" and that he had "burned off" with a girl in the Lexus. He stated that he had taken the girl to an abandoned house where she performed oral sex on him. He said that he had shot her afterwards because "she was looking at him funny" and he thought she was going to tell the police what happened.

Ralph Saldivar, the deputy administrator of the Houston Police Department's latent print laboratory, identified appellant's fingerprints on the newspaper clippings inside the Victoria's Secret bag found on Lantern Point Drive. Robert Baldwin, a criminalist in the Houston Police Department's firearms lab, performed tests on the bullets taken from the bodies of Carmouche and Gibson, the bullets found at both crime scenes, and a bullet fragment taken from Holley's arm. The tests revealed that the bullets taken from Gibson's body and Holley's arm were fired from the same firearm. These bullets, which were consistent with a nine millimeter Lugar pistol, shared the "same class characteristics" as a bullet recovered from the Lexus and the bullet taken from Carmouche's body. Baldwin concluded that the unfired bullet found near Carmouche's body was cycled through the same magazine as one of the nine millimeter Lugar cartridge casings found on Lantern Point Drive. He could not exclude the possibility that the bullet that killed Carmouche was fired from the same gun as the others.[4]

At the punishment phase, Louisiana State Police Sergeant Troy James Herbert testified that appellant was driving 100 miles per hour on the interstate highway in Lafayette on December 17, 1996. When Herbert stopped appellant for speeding, appellant initially failed to exit his vehicle as requested because he was talking on his cell phone. Appellant had a nine millimeter pistol in his waistband. A criminal records check revealed that appellant had been convicted of possession with intent to distribute cocaine in Louisiana on May 25, 1995. Herbert arrested appellant for speeding and being a felon in possession of a firearm.[5]

---

[4] Ballistics tests also showed that none of the bullets were fired from Gibson's gun.

[5] According to Herbert, the charge of being a felon in possession of a firearm was ultimately dismissed.

The State also presented evidence that appellant murdered Anthony "Bruiser" Williams in Houston on September 5, 1998. Joseph Melancon, appellant's childhood friend, testified that he and appellant had planned to go to a nightclub that evening. Appellant told Melancon that he wanted to stop at a convenience store on the way because "he needed to take care of something." Williams was waiting for them at the store. Melancon exited the car, and Williams left with appellant. About five minutes later, Melancon heard gunshots. He went to a nearby auto repair shop where he observed Williams lying on the ground and heard him say, "My boys shot me." Two police officers who were called to the scene testified that they observed numerous newspaper clippings in the shape of dollar bills scattered about in the parking lot.

Williams died later that evening as a result of a gunshot wound to his lower back. The next day, appellant called Melancon at his apartment. When Melancon asked appellant what happened "between him and his boy," appellant replied, "some bullshit." Melancon left his apartment and never returned because he was afraid of appellant. He eventually moved his family to Dallas and never saw appellant again.

Appellant contends in his second, third, fifth, sixth, and seventh points of error that the evidence was insufficient at both the guilt-innocence and punishment phases of the trial. Specifically, he contends that: (1) he did not commit the underlying offense of kidnapping, *see* TEX. PEN. CODE § 20.03; (2) there was insufficient corroboration of accomplice witness testimony, *see* art. 38.14; and (3) the evidence failed to show beyond a reasonable doubt that there is a probability that he will "commit criminal acts of violence that would constitute a continuing threat to society," *see* art. 37.071, § 2(b)(1).

In his second and third points of error, appellant argues that the evidence was both legally

and factually insufficient to support his capital murder conviction because the state failed to prove that he committed the underlying offense of kidnapping. In evaluating the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed.2d 560 (1979).

Here, the state was required to prove that appellant murdered Carmouche in the course of committing or attempting to commit kidnapping. TEX. PEN. CODE § 19.03(a)(2). A person commits the offense of kidnapping when he knowingly or intentionally abducts another person. TEX. PEN. CODE § 20.03(a). "Abduct" means to restrain a person with the intent to prevent her liberation by either: (1) secreting or holding her in a place where she is not likely to be found, or (2) using or threatening to use deadly force. TEX. PEN. CODE § 20.01(2). "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with her liberty, by moving her from one place to another or by confining her. TEX. PEN. CODE § 20.01(1). Restraint is accomplished without the victim's consent if deadly force, intimidation, or deception is used. *Id.* The state had the burden to prove that a restraint was accomplished and that appellant evidenced a specific intent to prevent Carmouche's liberation by either secretion or deadly force. *Santellan v. State,* 939 S.W.2d 155, 162 (Tex. Crim. App. 1997).

Appellant contends that the state failed to prove the underlying kidnapping offense because he did not "restrain" Carmouche. He contends that he fled for his safety in Holley's Lexus and that he did not know that Carmouche was hiding in the back seat until he reached the first stop sign. He asserts that Carmouche refused to get out of the car when he asked her to do

so and that she voluntarily accompanied him to the apartment complex where she left with Johnson.

The evidence at trial shows that appellant shot Carmouche's companions, left the scene in Holley's Lexus with Carmouche in the back seat, and transported her to a vacant house where he took her into the backyard and shot her. Johnson disputed appellant's version of events and testified that he last saw Carmouche in the Lexus with appellant. Dodson testified that appellant admitted to him that he drove away from a "shoot out" with a girl in a Lexus and that he took her to an abandoned house where he shot her because "she was scared" and "she was looking at him funny, like she was going to tell."

The jury could rationally infer from the evidence that appellant restrained Carmouche without her consent. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that appellant restrained Carmouche with the intent to prevent her liberation by either secretion or deadly force. *Jackson,* 443 U.S. at 319, 99 S. Ct. at 2789; *Santellan,* 939 S.W.2d at 162. Point of error two is overruled.

Holding the evidence to be legally sufficient, we turn to appellant's factual sufficiency claim. Under the factual sufficiency standard, we ask "whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Johnson v. State,* 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *Clewis v. State,* 922 S.W.2d 126, 131-32 (Tex. Crim. App. 1996). Accordingly, we will reverse the fact finder's determination only if "a manifest injustice has

occurred." *Johnson,* 23 S.W.3d at 12.

In support of his factual insufficiency argument, appellant again asserts that the state failed to prove the underlying kidnapping offense because he did not "restrain" Carmouche. However, Dodson testified that appellant admitted that he drove away from a "shoot out" with a girl in a Lexus and took her to an abandoned house where he shot her. Further, appellant admitted shooting Gibson, and ballistics tests revealed that the bullets taken from the bodies of Carmouche and Gibson shared the same class characteristics.

Appellant testified that he did not initially know that Carmouche was in the car, that she refused to get out of the car when he asked her to do so, and that she voluntarily accompanied him to Scott's apartment where she left with Johnson. Scott and Johnson, however, disputed appellant's version of events. The jurors were free to place whatever value they wished upon appellant's testimony. They apparently rejected his testimony and concluded that he restrained Carmouche when he transported her from Lantern Point Drive to the backyard of a vacant house, where he shot her. Viewing this evidence in a neutral light, we cannot say that the jury's finding that appellant kidnapped Carmouche is "manifestly unjust." *Johnson,* 23 S.W.3d at 12. Appellant's third point of error is overruled.

In his fifth and sixth points of error, appellant argues that the evidence was both legally and factually insufficient to support his capital murder conviction because there was insufficient corroboration of accomplice witness testimony. Appellant specifically argues that Terrence Dodson was an accomplice and that the State failed to corroborate his testimony as

required by art. 38.14.[6]

Art. 38.14 provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

An accomplice witness is someone who participated before, during, or after the commission of the crime. *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998); *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986). The fact that a witness knew of the crime and failed to disclose it, or even concealed it, does not make the witness an accomplice. *Id.* "In order to be an accomplice witness, there must be some evidence of an affirmative act on the witness' part to assist in commission of the offense." *Kunkle*, 771 S.W.2d at 440.

Although the evidence showed that Dodson initially participated in appellant's plan to rob Walter and Holley, there was no evidence that Dodson participated in Carmouche's kidnapping or murder. Dodson was present when appellant met with Walter and Holley at Northline Mall and the grocery store; however, appellant and Johnson took him home after they left the grocery store and he did not have any further contact with appellant until the next day. Dodson testified that appellant called him from Louisiana and admitted that he shot Carmouche; however, the fact that Dodson knew about the murder after it took place does not make him an accomplice. *Kunkle*, 771 S.W.2d at 439. There was no evidence that Dodson committed an affirmative act to assist appellant in the kidnapping or murder of Carmouche. *Id.* at 440.

---

[6] The jury charge included an accomplice-as-a-matter-of-fact instruction regarding Johnson. Appellant also requested accomplice-as-a-matter-of-fact instructions for Walter and Holley, but the trial court denied his request. Appellant did not request an accomplice instruction for Dodson.

Because Dodson was not an accomplice witness, his testimony was not subject to the corroboration requirement of art. 38.14. Appellant's fifth and sixth points of error are overruled.

In his seventh point of error, appellant asserts that the evidence is legally insufficient to support the jury's affirmative answer to the "future dangerousness" special issue. We review the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have concluded beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071 § 2(b)(1); *Reese v. State*, 33 S.W.3d 238, 244-45 (Tex. Crim. App. 2000); *Brooks v. State*, 990 S.W.2d 278, 284 (Tex. Crim. App.), *cert. denied*, 528 U.S. 956, 120 S. Ct. 384, 145 L. Ed.2d 300 (1999). Factors relevant to the jury's determination of whether the evidence supports a finding of future dangerousness include, but are not limited to: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (7) psychiatric evidence; and (8) character evidence. *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

Appellant was an admitted drug dealer who had been convicted of possession with intent to distribute cocaine in Louisiana. The following year, he was discovered in possession of a firearm after he was pulled over for speeding at a rate of 100 miles per hour on the interstate freeway in Louisiana. Melancon testified that, three months prior to Carmouche's murder,

appellant shot and killed Anthony Williams during a drug transaction which was similar in some respects to the incident on Lantern Point Drive. Melancon further testified that he left Houston immediately after the Williams murder because he feared appellant. Appellant became so angry during Melancon's testimony that he yelled at him in front of the jury and requested to leave the courtroom for the remainder of the proceedings.[7]

With regard to the instant offense, appellant admitted at trial that he shot Walter and Gibson on Lantern Point Drive before he left in Holley's car with Carmouche. According to Dodson, appellant admitted to him that he took a girl to a vacant house after a "shoot out" and then shot her because he thought she was going to tell police what happened.

Viewing the evidence in the light most favorable to the jury's affirmative finding on the "future dangerousness" special issue, we cannot say that this finding is irrational. Appellant's seventh point of error is overruled.

Appellant asserts in his fourth point of error that the trial court erred by denying his request to instruct the jury on the lesser-included offense of "false imprisonment."[8] In this point of error, appellant essentially argues that he did not "abduct" Carmouche after he left Lantern

---

[7]There was an outburst at the beginning of Melancon's testimony when appellant stated: "You're a goddamn liar. And let me tell you something. I did not kill Mary Carmouche. There is no evidence to convict me of something. Y'all didn't have no evidence, but y'all convicted me. Y'all think I'm Jeffrey Dahmer or somebody? Charge me with it. I'm tired of this goddamn shit, man." Appellant then expressed his desire to leave the courtroom for the remainder of the proceedings because he could not control himself.

[8]Appellant states in his brief that the trial court erred in denying his requested charge of "false imprisonment." "False imprisonment" is termed "unlawful restraint" in the Texas Penal Code. *See* TEX. PEN. CODE § 20.02.

Point Drive with her in the Lexus; instead, the evidence shows that he merely "restrained" her.[9]

We use a two-pronged test to determine whether a defendant is entitled to an instruction on a lesser included offense. *Rousseau v. State,* 855 S.W.2d 666, 673 (Tex. Crim. App.), *cert. denied,* 510 U.S. 919, 114 S. Ct. 313, 126 L. Ed.2d 260 (1993). The first step in our analysis is to determine if the lesser offense is included within the proof necessary to establish the offense charged. *Id.* Here, the first prong of the test has been satisfied because we have held that false imprisonment is a lesser-included offense of kidnapping. *Schweinle v. State,* 915 S.W.2d 17, 19 (Tex. Crim. App. 1996).

The second step is to determine if there is some evidence that would permit the jury to rationally find that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau,* 855 S.W.2d at 673. In making this determination, we review all of the evidence presented at trial. *Bignall v. State,* 887 S.W.2d 21, 23 (Tex. Crim. App. 1994). If a defendant presents evidence that he committed no offense or presents no evidence, and there is also no evidence showing that he is guilty only of a lesser-included offense, then a charge on a lesser-included offense is not required. *Bignall,* 887 S.W.2d at 24 (*citing Aguilar v. State,* 682 S.W.2d 556, 558 (Tex. Crim. App. 1985)).

The state's evidence showed that appellant abducted Carmouche. Appellant, who was armed with a nine-millimeter pistol and had just shot Carmouche's companions, "restrained"

---

[9] "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with her liberty, by moving her from one place to another or by confining her. TEX. PEN. CODE § 20.01(1). "False imprisonment," or unlawful restraint, is committed by restraint only. TEX. PEN. CODE § 20.02. Kidnapping is accomplished by abduction, which includes restraint, plus the intent to prevent liberation by either secretion or deadly force. TEX. PEN. CODE §§ 20.01 and 20.03.

Carmouche when he transported her from Lantern Point Drive to the backyard of a vacant house. He "intended to prevent [her] liberation" because he thought she was going to tell the police what happened. He used "secretion" to prevent her liberation by taking her to a secluded place where she was not likely to be found. He used "deadly force" to prevent her liberation when he shot her with his nine-millimeter pistol.

Appellant, on the other hand, testified that he neither abducted nor restrained Carmouche because he initially did not know that she was in the Lexus, she refused to exit the car as he asked when he discovered her in the backseat, and she voluntarily accompanied him to Scott's apartment where she left with Johnson. Appellant's own testimony that he committed no offense is not adequate to raise the issue of a lesser-included offense. *Bignall*, 887 S.W.2d at 24.

Because there was no evidence that would permit the jury to rationally find that appellant was guilty only of false imprisonment, appellant was not entitled to an instruction on the lesser-included offense of false imprisonment. *Rousseau*, 855 S.W.2d at 673; *Bignall*, 887 S.W.2d at 24. Point of error four is overruled.

In his eighth point of error, appellant asserts that the trial court erroneously refused to instruct the jury at punishment that the state had the burden to prove beyond a reasonable doubt that appellant committed the unadjudicated extraneous offenses.

We have repeatedly held that, so long as the jury has been properly instructed concerning the burden of proof with regard to the special issues, the trial court does not err in failing to submit in the punishment charge a separate instruction on the burden of proof on extraneous offenses. *See, e. g., Tong v. State*, 25 S.W.3d 707, 713 (Tex. Crim. App. 2000), *cert. denied*, ___ U.S. ___, 121 S. Ct. 2196, 149 L. Ed.2d 1027 (2001); *Kutzner v. State*, 994 S.W.2d 180, 188

18

(Tex. Crim. App. 1999); *Skinner v. State,* 956 S.W.2d 532, 546 (Tex. Crim. App. 1997), *cert. denied,* 523 U.S. 1079, 118 S. Ct. 1526, 140 L. Ed.2d 677 (1998). The record in the instant case reflects that the jury was told that the state had the burden to prove the issue of future dangerousness beyond a reasonable doubt. Thus, it was not error for the trial judge to deny appellant's requested instruction. Appellant's eighth point of error is overruled.

Appellant argues in his first point of error that the trial court erroneously overruled his objections during the state's cross-examination of a defense witness about parole eligibility. During the punishment phase, appellant called Dorothy Morgan, a parole supervisor for the Southern Region Institutional Parole Office with over eighteen years of experience, to testify about Parole Board procedures. Morgan testified that an inmate convicted of capital murder and sentenced to life in prison "would not be eligible for parole consideration for forty flat years." After his direct examination of Morgan, appellant orally requested a motion in limine to prevent the state from cross-examining her on "changes in the parole law" because it "involves speculation on the part of this witness as to what the Legislature would do." The trial court denied appellant's motion in limine.

During the State's cross-examination of Morgan, appellant objected to the state's questions on the grounds of speculation, materiality, and relevance. Appellant now claims on appeal that the state's cross-examination was contrary to the law and constituted "a blatant effort for the jurors to disregard their instructions and violate their oaths in answering the continuing threat special issue and the mitigation special issue." Because appellant's trial objections do not comport with the issue raised on appeal, he has preserved nothing for review. *See* TEX. R. APP. P. 33.1; *Broxton v. State,* 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *Turner v. State,* 805

S.W.2d 423, 431 (Tex. Crim. App.), *cert. denied,* 502 U.S. 870, 112 S. Ct. 202, 116 L. Ed.2d 162 (1991). Point of error one is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

Johnson, J.

Date Delivered: November 7, 2001

En banc

Do Not Publish