APPLICANT <u>CHARLES MAMOU, JR.</u>          APPLICATION NO.  <u>78,122-01</u>

11.071 APPLICATION
FOR WRIT OF HABEAS CORPUS                    <u>XXX</u>

DENY 11.071 APPLICATION FOR WRIT OF HABEAS CORPUS WITH
WRITTEN ORDER.

*Per Curiam*                                    2-5-14
JUDGE                                            DATE

# CCA Scanning Cover Sheet



2550403

CaseNumber: WR-78,122-01
EventDate: 12/12/2013
Style 1: MAMOU, CHARLES Jr.
Style 2:
Event code: 11.071 WRIT RECD

EventID: 2550403
Applicant first name: CHARLES
Applicant last name: MAMOU
Offense: 19.03
Offense code: Capital Murder
Trial court case number: 800112
Trial court name: 179th District Court
Trial court number: 321010179
County: Harris
Trial court ID: 613
Event map code: FILING
Event description: Habeas Corpus - Capital Death
Event description code: 11.071
Remarks: 1 Vol. CR

| ☐ Document Scanned | | ☐ Created or ☐ Appended |
|---|---|---|
| Scanned by          date | | Image ID |
| Comment | | |

WR- 78,122
AP- 73,708

Ex Parte

Application for Writ of Habeas Corpus

From Harris County

**CHARLES MAMOU JR.**
(Name of Applicant)

179TH Judicial District Court

TRIAL COURT WRIT NO. 0800112-A
CLERK'S SUMMARY SHEET

APPLICANT'S NAME:  CHARLES MAMOU JR.
(As reflected in judgment)

OFFENSE:  CAPITAL MURDER
(As reflected in judgment)

CAUSE NO.:  800112
(As reflected in judgment)

PLEA:  ☐ GUILTY  ☒ NOT GUILTY  ☐ NOLO CONTENDRE

SENTENCE:  DEATH
(Terms of years reflected in final judgment)

TRIAL DATE:  10-12-99
(Date sentence was imposed)

JUDGE'S NAME:  M. WILKINSON
(Judge presiding at trial)

APPEAL NO.:
(If applicable)

CITATION TO OPINION:  ☐ S.W. 2d ☐
(If applicable)

HEARING HELD:  ☐ YES  ☐ NO
(Pertaining to the Application for Writ of Habeas Corpus)

FINDINGS & CONCLUSIONS FILED:  ☒ YES  ☐ NO
(Pertaining to the Application for Writ of Habeas Corpus)

RECOMMENDATION:  ☐ GRANT  ☒ DENY  ☐ NONE
(Trial court's recommendation regarding the Writ of Habeas Corpus)

JUDGE'S NAME:  Kristen M. Guiney
(Judge presiding over habeas corpus proceeding)

**RECEIVED IN**
**COURT OF CRIMINAL APPEALS**

**DEC 12 2013**

**Abel Acosta, Clerk**

# POST CONVICTION

FROM:        179TH CRIMINAL COURT

OF

HARRIS COUNTY, TEXAS

CHARLES MAMOU JR.

APPLICANT

VS.

THE STATE OF TEXAS

RESPONDENT

REV. 01-02-04

# INDEX

**PAGE**

| | |
|---|---|
| CAPTION | 1 |
| APPLICATION FOR WRIT OF HABEAS CORPUS | 2 |
| LETTER TO APPLICANT | 56 |
| DISTRICT ATTORNEY ACKNOWLEDGMENT LETTER | 57 |
| UNOPPOSED MOTION/ORDER FOR EXTENSION PURSUANT TO TEX. CODE CRIM. PORC. ANN. ART. 110.71 § 4(b) | 58 |
| AFFIDAVIT OF TOM MORAN | 68 |
| LETTER TO APPLICANT | 88 |
| ATTORNEY FEES EXPENSE CLAIM | 89 |
| STATE'S MOTION FOR FILING AFFIDAVIT | 101 |
| LETTER TO APPLICANT | 103 |
| ORDER FOR WAYNE T. HILL, KURT BUDD WENTZ AND  FLOYD W. FREED TO FILE AFFIDAVIT | 104 |
| AFFIDAVIT OF FLOYD W. FREED III. | 111 |
| LETTER TO APPLICANT | 113 |
| REPONDENT'S ORIGINAL ANSWER | 114 |
| LETTER TO APPLICANT | 164 |
| MOTION FOR EVIDENTIARY HEARING | 165 |
| MOTION FOR THE APPOINTMENT OF A BALLISTICTS EXPERT | 167 |
| MOTION TO SUBSTITUTE COUNSEL | 174 |
| ORDER ON MOTION FOR SUBSTITUTE OF COUNSEL | 177 |

# INDEX

| | PAGE |
|---|---|
| ATTORNEY FEES EXPENSE CLAIM | 178 |
| MOTION THAT THE TRIAL COURT REQUEST AN EXTENSIO OF TIME FROM THE COURT OF CRIMINAL APPEALS | 185 |
| GRANTED ORDER FROM CRIMINAL APPEALS ON EXTENSION OF TIME | 187 |
| LETTER TO APPLICANT | 192 |
| AFFIDAVIT OF BRENDA MCNEIL | 193 |
| LETTER TO APPLICANT | 107 |
| SUPPLEMENTAL APPLICATION FOR POST-CONVICTION WRIT OF HAVEAS CORPUS | 196 |
| STATE'S PROPOSED FINDINGS OF FACT, CONCLUSION OF LAW AND ORDER | 242 |
| AFFIDAVIT OF WAYNE T. HILL | 252 |
| LETTER TO APPLICANT | 259 |
| MANDATE | 260 |
| OPINION | 261 |
| INDICTMENT | 281 |
| DOCKET SHEETS | 282 |
| JUDGMENT AND SENTENCE | 322 |
| CERTIFICATE OF THE CLERK | 324 |

                    REV: 01-02-04

CAPTION

THE STATE OF TEXAS      {IN THE 179th DISTRICT COURT

COUNTY OF HARRIS      {OF HARRIS COUNTY, TEXAS

At a regular term of the 179th District Court of Harris County, Texas, begun and holden

within and for the County of Harris and State of Texas, at Houston on the 4TH day

ofNovember, A.D. 2013 and which will adjourn on the 2ND day of February, A.D., 2014.

The Honorable KRISTEN M. GUINEY Judge thereof presiding, the following

proceedings came on to be heard, to-wit:


EX-PARTE              {

800112-A              {H A B E A S

vs. CHARELS MAMOU JR.    {C O R P U S

THE STATE OF TEXAS       {

# IN THE TEXAS COURT OF CRIMINAL APPEALS
## AUSTIN, TEXAS

### AND

# IN THE 179TH JUDICIAL DISTRICT COURT OF
## HARRIS COUNTY, TEXAS

<table>
<tr><td>Ex Parte CHARLES MAMOU, JR.</td><td>)(</td><td></td></tr>
<tr><td></td><td>)(</td><td>Case No. 800112-A</td></tr>
<tr><td></td><td>)(</td><td></td></tr>
<tr><td>APPLICANT</td><td>)(</td><td></td></tr>
</table>

## THIS IS A DEATH PENALTY CASE.

## APPLICATION FOR POST-CONVICTION WRIT OF
## HABEAS CORPUS

Respectfully submitted,

ROLAND BRICE MOORE III
Attorney For Applicant
1314 Texas Ave. Suite 1705
Houston, Texas 77002
713  229-8500
State Bar No. 14388100

# IN THE TEXAS COURT OF CRIMINAL APPEALS
## AUSTIN, TEXAS

### AND

## IN THE 179TH JUDICIAL DISTRICT COURT OF
## HARRIS COUNTY, TEXAS

|  |  |
|---|---|
| **Ex Parte CHARLES MAMOU, JR.** )( | |
| )( | **Case No.  800112-A** |
| )( | |
| **APPLICANT** )( | |

## THIS IS A DEATH PENALTY CASE.

## APPLICATION FOR POST-CONVICTION WRIT OF
## HABEAS CORPUS

Respectfully submitted,

ROLAND BRICE MOORE III
Attorney For Applicant
1314 Texas Ave. Suite 1705
Houston, Texas 77002
713  229-8500
State Bar No. 14388100

: 000003

NO. 800112-A

## IN THE COURT OF CRIMINAL APPEALS OF TEXAS
### AUSTIN, TEXAS

### NO. 800112-A

## IN THE 179TH JUDICIAL DISTRICT COURT OF
## HARRIS COUNTY, TEXAS

## EX PARTE CHARLES MAMOU, JR.

## APPLICATION FOR WRIT OF HABEAS CORPUS

**TO THE JUDGES OF THE COURT OF CRIMINAL APPEALS:**

**COMES NOW CHARLES MAMOU,** JR., Applicant herein, by and through is attorney, **ROLAND BRICE MOORE III,** and pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071 (Vernon Supp. 2000), files this application for writ of habeas corpus and in support thereof, would show the Court as follows:

### STATEMENT OF JURISDICTION

Applicant is illegally restrained in his liberty by Gary Johnson, Director of the Institutional Division of the Texas Department of Criminal Justice, pursuant to a sentence of death entered by the 179th Judicial District Court of Harris County in Cause No. 800112. This Writ is filed pursuant to Texas Code of Criminal Procedure Section 11.071. A copy of the judgment is attached hereto as Exhibit A.

Applicant was indicted in Cause No. 800112, with the offense of capital murder in the death of Mary Carmouche. (CR, 2-3). The indictment alleges that a

2

murder and a kidnapping were committed on December 7, 1998. The grand jury "true-billed" Applicant on March 3, 1999. (CR, 4.) After Applicant's plea of "not guilty," the case proceeded to a jury trial wherein Applicant was convicted of capital murder. (RR 21, 60.) The Jury answered the two statutory special issues with a "Yes" to the first issue, and a "No" for the second. By operation of law, the effect of these answers was the imposition of the death penalty. (RR 24, 49.) A Motion for New Trial was filed by trial counsel and was overruled by operation of law. (CR, 109.) This is Mr. Mamou's first Writ of Habeas Corpus.

Appointed counsel filed applicant's Appellate Brief on August 30, 2000. The State filed its reply brief on December 4, 2000. This Court has not decided Mr. Mamou's Appeal. 12-6-00. Before the 45 day deadline had expired, 179th District Court granted Applicant's Motion for an Extension of Time for an additional 90 days, Tex. Code Crim. Proc. Ann. art. 110.71 § 4(b).

## GROUNDS OF ERROR

I. Applicant was deprived of effective assistance of counsel at trial, as defined by TEX. CONST. art. I, § 10.

II. Applicant was deprived of effective assistance of counsel at trial, as defined by the Sixth Amendment, U. S. CONST. Amend VI.

III. Applicant was deprived of effective assistance of counsel on appeal, as defined by TEX. CONST. art. I, § 10.

IV. The Applicant was deprived of effective assistance of counsel on appeal, as defined by the Sixth Amendment, U. S. CONST. Amend VI.

3

V. The effect of the above deprivations deprived Applicant of the protection of Art. I § 13 of the Texas Constitution insofar as he was subjected to cruel and unusual punishment.

VI. The effect of the above deprivations deprived Applicant of the protection of the Eighth Amendment and the Fourteenth Amendment, U.S. Constitution, insofar as he was subjected to cruel and unusual punishment.

VII. The effect of the deprivation of the right to counsel resulted in a Denial of Due Process under the Fourteenth Amendment of the U.S. Constitution.

VIII.   The court improperly overruled an objection to the assistant district attorney's speculating that the legislature could lessen appellant's parole eligibility of forty years had a substantial effect on the decision of one of the jurors to vote for the death penalty.   This constituted a denial of due process under the fourteenth amendment of the u.s. constitution.

## STATEMENT OF FACTS

On December 6, 1998, the pair of Charles Mamou, the Petitioner, went with a friend "Bug" Johnson to meet with another group of young men that included Kevin Walter, Terrence Gibson, and Dion Holley.   Both groups had larceny in their hearts.  Mamou claimed to have $20,000 with which to purchase a kilo of cocaine.  He did not.  The other group claimed to have a kilo of cocaine. They did not.  (RR. 16, 26, ff.)

4

First, they agreed to meet at Northline Mall in Houston, where Mr. Walter and Mr. Holley and Mr. Gibson arrived in the blue Lexus belonging to Mr. Holley's family. (RR 16, 28, ff.)  Mamou and "Bug" Johnson drove up in a red Chrysler driven by the latter.  (RR 16, 32, ff.)   This first meeting ended in stalemate with each side attempting to maneuver the other side into a display of goods or cash.  (RR 16, 165.)

After the initial futile attempt at scamming each other, the putative "sellers" drove in the Lexus to pick up the complainant, Mary Carmouche at her residence. The parties to the deal agreed to meet at a Bennigan's.  (RR 16, 44-45.)   Again, no one could outmaneuver anyone else.  The Kevin Walter-Terrence Gibson group then followed Mamou and Johnson to a dark area on Lantern Point Drive, near the Astrodome where the cars parked nose-to-nose.  (RR 16, 48, ff.)

Mr. Mamou left the red Chrysler with a Victoria's Secret bag containing cut-up newspapers that he hoped would be taken as a bag full of money, and went to the back of the other car.  (RR 20, 189, ff.)  Terrence Gibson stood at the rear waiting for him.  After a short discussion, Gibson raised his shirt and Mamou saw a gun handle in his belt.  Mamou fired at Gibson.  He saw Kevin Walter reenter the Lexus, and which point he shot Walter several times.  When the shots were fired, Johnson fled in the Chrysler.  Mamou jumped in the blue Lexus where Mary Carmouche sat in the back seat.

The body of the complainant, Mary Carmouche, was discovered two days later in the backyard of a vacant house, dead of a gunshot wound to her chest.

(RR 18, 125-131.)   Terrance Gibson, the assistant medical examiner continued, also died of a gunshot wound to the chest.

The State's key witness was Terrance "Tater" Dodson, who participated in the early meeting to exchange non-existent cocaine for non-existent money.  (RR 19, 166.)  He testified that Mr. Mamou had admitted to him that he shot Miss Carmouche the next day after he had driven away with her.  (RR 19, 180.)

## SUMMARY OF THE ARGUMENT

Both at the pre-trial phase and during the punishment phase, Court-appointed counsel failed to object to inadmissible victim impact testimony regarding the effects of unadjudicated extraneous offenses against persons not named in the indictment.   The testimony was highly emotional and extremely prejudicial to Mr. Mamou.   In failing to exclude evidence that is patently inadmissible under Texas Law, either a preliminary hearing, or during trial, trial counsel's assistance was ineffective, and in the offing, Mr. Mamou was denied the effective assistance of counsel as guaranteed under both Texas and the Sixth Amendment of the U.S. Constitution.   The admission of this evidence was also a violation of the Eighth Amendment of the U.S. Constitution.   The result of the wrongful admission of this evidence was to render the punishment phase of the trial fundamentally unfair.

Additionally, Applicant was denied the due course of law and the due process of law by being foreclosed from presenting evidence regarding the

harmful effect of improper prosecutorial argument by Texas Rule of Evidence 606(b).

## GROUNDS OF ERROR I AND II

I. Applicant was deprived of effective assistance of counsel at trial, as defined by TEX. CONST. art. I, § 10.

II. Applicant was deprived of effective assistance of counsel at trial, as defined by the Sixth Amendment, U. S. CONST. Amend VI.

## STANDARD OF REVIEW

The right to effective assistance of counsel is guaranteed by Sixth and Fourteenth Amendments to the United States Constitution. U.S.C.A. Const. Amends. 6, 14. The State and Federal standards for ineffective assistance are now coextensive.

In order to prevail on a claim of ineffective assistance of counsel, appellant must meet the two part test set forth in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellant must show the following:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687, 104 S.Ct. at 2064. To establish ineffective assistance of counsel, appellant has the burden of proving a reasonable probability exists that, but for the counsel's deficient performance, the result of

the trial would have been different.  Strickland, 466 U.S. at 695, 104 S.Ct. at 2068.

It is not unconstitutional under federal law to introduce extraneous offense testimony as to the impact of the loss of the complainant named in the indictment. **Payne v. Tennessee**, 501 U.S. 808, 812 (1991). In **Payne v. Tennessee**, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), the United States Supreme Court overruled its earlier decision in **Booth v. Maryland**, 482 US 496, 96 Led 2d 440, 107 S. Ct. 2529 (1987.) **Payne** held that the Eighth Amendment does not bar the introduction of victim impact evidence at the punishment phase of a trial as regards the victim of the offense charged in the indictment.

However, some of **Booth** remains good law because **Payne** only applied to victim impact evidence as regards the complainant in a criminal case.  The implied holding of **Booth** that other victim impact evidence such as that regarding extraneous offenses is still unconstitutional.  This is crucial for this case and the law of Texas.  The Court of Criminal Appeals of Texas has drawn a sharp line between victims of the offense charged and victims of extraneous offenses. **Cantu v. State**, 939 S.W.2d 627 (Tex.Crim.App.1996.)   For exactly the same reasons that the U.S. Supreme Court had previously ruled that all such evidence is unconstitutional as regards victim impact testimony, the Texas Court of Criminal Appeals in **Cantu** ruled that extraneous victim impact testimony is inadmissible and per se a violation of Rule 401 of the Texas Rules of Evidence.  When claiming ineffective assistance for failing to object, an appellant must demonstrate that if

: 00010

trial counsel had objected the trial judge would have committed error in refusing to sustain the objection. **Vaughn v. State**, 931 S.W.2d 564, 566 (Tex.Cr.App.1996).

The Court of Criminal Appeals has refused to find any particular error to be *per se* ineffective assistance of counsel as a matter of law, it is possible that a single egregious error of omission or commission by appellant's counsel constitutes ineffective assistance.   **Jackson v. State**, 766 S.W.2d 504, 508 (Tex.Crim.App.1985) (failure of trial counsel to advise appellant that judge should assess punishment amounted to ineffective assistance of counsel) (modified on other grounds on remand from U.S. Supreme Court, **Jackson v. State**, 766 S.W.2d 518 (Tex.Crim.App.1988)).  See also **Ex parte Felton,** 815 S.W.2d at 735 (failure to challenge a void prior conviction used to enhance punishment rendered counsel ineffective).  This position finds support in opinions of the United States Supreme Court, which has also held that a single egregious error can sufficiently demonstrate ineffective assistance of counsel. **Murray v. Carrier**, 477 U.S. 478, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986);  **United States v. Cronic**, 466 U.S. 648, 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984)

### STATEMENT OF FACTS AS TO GROUND OF ERROR NUMBERS ONE AND TWO

Trial counsel filed a "Motion for Hearing on Admissibility of Evidence" (CR, 15) and a "Motion for Discovery of Victim Impact Testimony" (CR, 20) but never obtained a ruling on these motions. Likewise, the trial attorney filed   a

: 000011

"Defendant's Request For Disclosure Of Defendant's Arrest Conviction Record And Extraneous and/or Unadjudicated Acts Of Misconduct To Be Offered At Guilt Or Punishment" that was never ruled upon by the Court. (CR, 30.) The trial lawyers also filed a Motion in Limine requesting extraneous offense evidence; this motion does not have an order form attached to it. (CR, 74.)

The State furnished two extraneous lists to defense counsel. (CR, 58 & 61.) These lists do not include the murder of Terrence Gibson as a disclosed extraneous, even though his mother testified with profound emotional impact, as detailed above.

Unfortunately, no hearing was ever held on these Motions. No specific **Cantu** objection was made at trial to the heart-rending testimony of two extraneous-offense victim impact witnesses. Counsel did make a generalized objection at the start of the extraneous offense evidence, as follows (at RR. 22, 37.):

> "Judge, we object to the State being able to introduce any evidence regarding allegation of an extraneous murder offense alleged to have occurred on September 5th, 1998, [the Williams murder] wherein the State intends to call witnesses to try and place the defendant at the last scene with the person named as the complainant. We believe that to do so without the proof beyond a reasonable doubt that the defendant is responsible for that, in light of the fact that no criminal charges have been filed against him for that violation, either violates the due process clause of the Fifth Amendment of the U.S. Constitution, as well as the 19th Amendment of the U.S. Constitution, also, Article 1, Section 19 of the Texas Constitution, and Article 1.04 of the Code of Criminal Procedure. It's also a violation of the defendant's 6th Amendment right to confrontation under the U.S. Constitution, as well as the corollary article, Section 10, as well as Article 1, Section 10 of the Texas Constitution, and

10

Article 1.05 of the Texas Code of Criminal Procedure. It also constitutes cruel and unusual punishment under the 8th and 14th Amendments to the U.S. Constitution, as well as Article 1, Section 13 of the Texas Constitution. We believe that Article 37.0711 of the Texas Code of Criminal Procedure is unconstitutional for all of those reasons, for allowing the State to be able to proffer testimony that they cannot prove beyond a reasonable doubt and implicates the defendant in the commission of the crime charged or alleged. For those reasons, we move that none of this evidence be allowed in the presence of the jury.

THE COURT: Objection is overruled."

"

The older sister of Mr. Williams testified about its impact on her the family of the deceased in the extraneous case. She and the State made a strong emotional appeal to the jury to sentence him to death precisely because of the effect on Williams's son, on herself, and on her father and mother. The District Attorney conducted the following direct examination (from Vol. 22, Pg. 112, and ff.):

"Q, Where does your brother, James, live?

A. He lives in Lake Charles, Louisiana.

Q. Did he come here for the trial?

A. Yes.

Q, What about Aaron -- I'm sorry -- Anthony, Bruiser's son? What effect has it had on him?

A, He's okay, but if you talk about -- if you ask him too many questions about his dad, he stops talking.

Q, He clams up, won't talk about it? Have you ever been with Anthony, the little boy, since his dad's died when he's been asleep?

A. Yeah, when he spends the weekend at my house.

11

: 000013

Q. How does he act when he's asleep?

A. He imagines that his daddy is playing with him."

What juror could help buy weep at such testimony?  The direct examination

continued:

"Q. Does he speak about his daddy when he's asleep?

A., He tells his daddy to stop.

Q. How about with respect to the cemetery? Does ever ask about the

cemetery?

A.   All the time.

Q. What does he say?

A. Auntie, can you take me to the cemetery?

Q. How about, did he go to your brother's funeral?

A, Yes.

Q. Does he ever talk about that?

A. He wishes that his daddy's funeral was again so

he could see him.

Q, So it was an open casket at your brother's funeral?

A, Yes.

Q.     What effect has it had on you, Mrs. Williams?

A. Devastation, just -- what do you do? I'm the oldest of three

children, My baby brother is gone. I don't have but one brother left.

12

Q. Let me show you a picture, Miss Williams, State's Exhibit 128.

Was this a picture of your brother and his son?

Q, And when would that picture have been taken about how long

ago?

A, About five years ago.

Q, Okay. How is your dad doing, Miss Williams?  What effect has it

had on him?

A. He's fine physically. Mentally he's not,

Q. In what way is he not?

A, He's angry. He's hurtful,

Q. Did you try and ask him to come to the trial?

A, I asked him and my mother, and my mother said she wasn't

coming

Q.  What effect has it had on your mom.

A, Mentally she's still -- she doesn't want to deal with the fact that

my little brother is gone.

Q. Do you think she's accepted the fact that he's gone?

A.  I don't think she has, when she still talks about him like he's

coming.

Q. So she talks about him as if he's still alive; is that right?

A.  Yes.

13

Q. What other effects do you see, with respect to your brother's

death, on your moms

A, Her diabetes has gotten worse,

Q, How old is your mom?

A.      Fifty-three.

Q. Thank you, ma'am."

The State also called to the stand without objection from the defense

Patricia Dodson, the mother of Terrence Dodson, who in an extraneous offense,

was shot by Petitioner at the scene of the failed "deal." (From Vol. 22, 39.)

DIRECT EXAMINATION
BY MS. CONNORS:

Q. Miss Gibson, you are the same Patricia Gibson that testified

at the first part of the trial; is that right?

A. Yes, ma'am.

Q. Miss Gibson, what was the last time you saw your son, Terrence?

A. December the 7th, the 6th. That Sunday afternoon we all
convened at my mom's for church, and he was there. He came by.

Q. Were your other sons or any other children there?

A. Yes.

Q. Was your husband there?

A. Yes, he was. I'm sorry, no, not that Sunday, no, he was not.

Q. So both your sons, other sons, or just one there?

14

A. Yes, my sons and their girlfriends, yes.

Q. What were y'all doing at your mom's house when your son, Terrence, came?

A. We were looking at pictures. They asked to see their baby pictures And their baby pictures, the other two, their girlfriends. And we were on the floor looking at pictures.

Q. So, all of y'all were looking at past baby pictures of each of the children; is that correct?

A. That's correct.

Q. Were y'all enjoying yourself and laughing and having a good time?

A. Yes.

Q. When is the last time you laughed like that?

A. It's been a while.

Q. When your son left that evening, what did he say to you?

A. We were all on the floor, and he just walked in. And everybody just kind of said, hey, Terrence. Because we had been there, and we started all looking at pictures out on the floor. And we were just looking at baby pictures; and he stayed awhile, went in the kitchen. He always goes in to see what my mom cooks. And we laughed and talked awhile, and then his pager went off; and he said, mom, I'm fixing to go. And he went to my mom.

Q. What did he do when he went to your mom?

15

A. He normally kisses my mom on the way out, and he just kind of patted her on the head, and he was on his way out. And I said, Are you about to leave? he said, Yes. And I got up and I went in the garage with him.

Q. Did you say anything to him, or did you hug him at all?

A. Yes, I did. I said, Terrence, be careful. And he left.

Q. Did you say good-bye?

A. Yes, I did. And I always said, Mom loves you. So he knew that.

Q. And that's the last time you saw him alive?

A. That's correct.

Q. And how did you find out he had been killed?

A. I got a phone call about 1:15 Monday morning from Hermann Hospital, a Claudette at Hermann Hospital.

And she said, We have a young man here, and I'm not quite sure that it is your son. And she said, Does your son have a tattoo? And I said, Yes. She said, You need to get to Hermann Hospital as soon as you can.

Q. Did she tell you that he had been injured or how he had been injured?

A. No. She said, We have -- she didn't even say shot. She said, We

16

have a young man here, and I'm not even quite sure if it's your son;

but we need for you to get to the hospital as quickly as possible. And

she asked me did he have a tattoo, and I said yes.

Q. Who did you go to Hermann Hospital with?

A. My husband and I picked up my baby son on the way. I called

him immediately after that happened.

 I got the call, and I picked him up at his apartment.

Q. What is your baby son's name?

A. His name is Walter, IV, Walter Gibson, IV.

Q. How old is he?

A. They're thirteen months apart.

Q. When you say they?

A. Terrence is twenty-two and he's twenty-one. They're thirteen

months apart.

Q. Were they close?

A. Very much, yes.

Q. When you were driving to Hermann Hospital, about how long

 did that take from your house?

A. I would think not long, because I was driving very fast.

Q. What was going through your mind?

A. I guess I just thought probably he was injured or in a car wreck. I

didn't know.

: 00019

Q. When you got to the hospital, who did you speak with?

A. I went directly to the emergency room and asked for a Claudette, because she said she would be waiting when I got there.

Q. Did you speak with her?

A. Yes, I did. She took us immediately to the critical care waiting room. And I just assumed, I guess, by seeing critical care that he was in critical condition or what. All I wanted to do was get to him, And then she said, I'm going to take you around to the trauma center. And they took us around to the trauma center, And the lady, the nurse that was there said, The doctors need to come out and speak with you. We're going to take you back to a waiting area, of which they did.

Q. And how soon before you were able to speak with a doctor?

A. It was about three minutes. They came in. It was  shortly  after. And my family had already made it, Everybody was already there.

Q, What did the doctor say to you?

A. When they walked in, they asked us to sit down and said that they had did everything possible for my son and -- but the way the bullet went through his heart, there was no way to –

Q, When the doctor told you that the bullet had  gone   through   his heart and he had died, what went through your mind?

A. I was devastated,

18

Q, Were you able to go then see your son?

A. No, they wouldn't let me see him, But my oldest son and my husband said that they didn't think it would be a good idea, that they would go. And they went to see him.

Q. Did -- where did they have to go to see Terrence?

A. In the morgue of Ben Taub.

Q. So they had to go to Ben Taub to identify his body?

A. I'm sorry, in Hermann, in the morgue.

Q, Hermann Hospital?

A, Yes.

Q, Can you tell the jury what effect it's had on your younger son, Walter, the one that was thirteen months apart, from Terrence's being murdered?

A, I was very concerned about him, because they were so close. He had his own apartment. I shared with my cousin, I thought he would be one that would revert to drinking. And when he did, that's when we had a problem with him. We had to stay close to him and talk to him a lot, trying to get him to come to church with me; because he was having a very difficult time dealing with it, because they were very close.

Q. How about your older son? What effect has it had on him?

19

: 00021

A. I think more of him is because he actually saw Terrence, the last one to see him actually in the morgue and just see him that way. That was very difficult for him, and we've had to talk about it over and over again, But that's the last thing, other than seeing him at the funeral or whatever, He relives that over and over again.

Q. How about your husband, Miss Gibson? What 1effect has it had on burying his son?

A. We had to leave for awhile and just take an just to get away, be able to try to talk it out. And I think with him, it was that the -- the times that, I guess -- my son has a five-month-old baby he'll never get a chance to know, and we have had to talk it out.

Q. How about you, as a mom? What was it like to bury your son?

A. That's something that I have to live with everyday and think about. Is there something else I could

have said? Is there something else I could have done?  Terrence was a follower. He was not a leader. And think more so, of us being parents, trying to raise our boys up as good citizens and as good boys. But when they get a certain age, you can't make choices for them.  And he made some bad choices, as far as friends. And at twenty-two years old -- when he was young, we could choose his friends; but it seems like the more we talked to him, that made him feel big, or I don't know; but he  wasn't raised that way. And that's

20

: 000022

what, more everyday, I guess, that you have to live with every day,

coming up as a young boy in church and in a Christian family home,

that parents work hard to display hard-working parents,        And

when he got older he made decisions to be with what I consider the

wrong crowd, And that's, I guess, the  thing that's hard every day is,

is there something I could have said? Is there something else I could

have  did that my son would still be alive today?

Q. So you blame yourself a lot of the time, Miss Gibson?

A. I don't think so much. I think I did everything I could; because

when you get a certain age, they make choices. But these choices

cost him his life, and that's the thing I can't go back and undo and I

have to live with every day of my life.

Q. Thank you, ma'am.

   MS. CONNORS: I have no further questions,

Your Honor.

During final argument, Mrs. Claire Connors, argued for the State, "And

when he pulled the gun and he fired and killed Terrence and Anthony, he ripped

those families·apart.  He devastated and destroyed.  And that's all he's ever done,

with his drugs, with his guns."  (Vol. 24, 39.)  Derivations of the verb and noun

"devastate" and "devastation" were dramatic high points of the inadmissible

testimony and of the prosecutor's closing argument.

: 000023

## ARGUMENT AND AUTHORITIES

The Court of Criminal Appeals of Texas has drawn a sharp line between victims of the offense charged and victims of extraneous offenses. **Cantu v. State,** 939 S.W.2d 627 (Tex.Crim.App.1996.)  The latter are forbidden from being the subject of victim impact evidence, since such evidence is per se irrelevant under Rule 401 of the Texas Rules of Evidence.

Federal law is in accord.  In **Payne v. Tennessee,**  501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), the United States Supreme Court overruled its earlier decision in **Booth v. Maryland,** 482 US 496, 96 Led 2d 440, 107 S. Ct. 2529 (1987.) **Payne** held that the Eighth Amendment does not bar the introduction of victim impact evidence at the punishment phase of a trial as regards the victim of the offense charged in the indictment.

However, **Booth** remains good law as applied in this case because **Payne** only applied to victim impact evidence as regards the complainant in a criminal case.  The implied holding of **Booth** that other victim impact evidence such as that regarding extraneous offenses is still unconstitutional.  This is crucial for this case and the law of Texas. For exactly the same reasons that the U.S. Supreme Court had previously ruled that all such evidence is unconstitutional as regards victim impact testimony, the Texas Court of Criminal Appeals in **Cantu** ruled that extraneous victim impact testimony is inadmissible and per se a violation of Rule 401 of the Texas Rules of Evidence.

The exact factors relied upon by the majority in **Booth** are evident here.

22

The emotionally traumatized sister of Anthony "Bruiser" Williams, whom Applicant allegedly murdered in the only crime extraneous to the charged offense that the state presented. The harm from this error was magnified by the weakness of the evidence tying Petitioner to the extraneous murder, and the juridical fact that the Court refused over objection to give a "burden of proof" instruction to the jury regarding the extraneous. The State had only one witness to tie Mamou to the murder of Williams, who had not reported what little he knew about the offense for a long period of time before finally coming forward to the police. He had seen Mamou leaving a club with the man who was later murdered. There were no eyewitnesses to the murder, and the victim did not identify his assailant before dying.

The probability that the jury would find Mamou to be a danger in the future was dramatically increased by the State's improper tactic of victim impact testimony regarding the extraneous murder. Evidence as to impact of her on her family is not relevant as Mr. Mamou was not on trial for the murder of either Gibson or Williams. "Such evidence serves no purpose other than to inflame the jury." **Cantu,** supra.

Gibson and Williams were not the "victims" for whose death Applicant has been indicted and tried. The Court in the **Cantu** case held that **Payne** does not contemplate admission of such evidence as permissible under the Eighth Amendment.

To quote from **Cantu** again, the Texas Court of Criminal Appeals held that:

23

: 00025

"The danger of unfair prejudice to a defendant inherent in the introduction of "victim impact" evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high. The admission of such evidence would open the door to admission of victim impact evidence arising from any extraneous offense committed by a defendant. Extraneous victim impact evidence, if anything, is more prejudicial than the non-extraneous victim impact evidence found by this Court to be inadmissible in Smith, *supra*. We hold that such evidence is irrelevant under Tex.R.Crim.Evid. 401 and therefore irrelevant in the context of the special issues under Art. 37.071." **Cantu,** 939 S.W.2d at 637.

The trial judge could not have properly overruled the objection that trial counsel should have made.

The holding in Cantu means that the victim of the extraneous murder is not on trial, in general, nor was it put on trial in this case, so the victim's character of the extraneous offense, cannot be considered as aggravating or mitigating evidence.

As to the harmfulness of this error, this case presents a situation quite unlike the situation in **Cantu**. Here, the erroneous admission of the testimony from the two extraneous victim's relatives as to how painful the experience had been was harmful. The inadmissible testimony tripled the amount of testimony harmful to Mr. Mamou's future. Unlike **Cantu**, the State did advert to the inadmissible testimony in final argument, and emphasized it.

If the State replies that this testimony was harmless because it was not considered an important "make weight" in the jury's decision, why did the prosecutors feel the need to use it, in violation of the rule against its use?

24

On the state's theory, for instance, Kevin Walter had set up the deal. Terrance Gibson was a willing participant in the sham narcotics transaction. Dion Holley knew that the deal was going to be a "jack on a jack." The witless threesome had gone to pick up Mary Carmouche to come along to be in on a dope deal, for the thrill of the ride. These sordid facts made it imperative that the State pile on the testimony of persons who might be considered to be aggrieved who could offer fuel to the fire.

On punishment, Counsel failed to object on the proper State grounds to the inadmissible testimony about the impact of the loss of victims in extraneous crimes. Trial counsel did request and was refused a "reasonable doubt instruction" on the extraneous offense. The lack of such an instruction exponentially increased the harm of the State's proffer. The testimony was blatantly harmful, and prejudicial. Despite the hopes of appellate courts that the rule will be observed voluntarily by prosecutors, it will continue to be violated "willy nilly", unless this Court puts a stop to it by reversing this death sentence.

The Court ought to apply a stricter standard of review where the State flouts the law that it is entrusted to enforce. The second prong of Strickland requires that Petitioner prove prejudice to his right to a fair trial. Ipso facto, the State found their own case so weak that they fell back on improper evidence. In not objecting, counsel's performance fell below an objective standard of reasonableness.

25

But for counsel's abnegation, Mamou would have received a life sentence instead of the death penalty.  There was only one other legitimate victim impact witness, the mother of the victim, Mary Carmouche.  By more than tripling the amount of victim impact testimony, Mr. Mamou suffered the effects of constitutional error.  Not only was there a quantitative increase in testimony, the witnesses talked of baby pictures, and in unobjected-to hearsay, discussed the disfiguring emotional effects on every one else in the family.

No trial strategy could explain such an omission.  An Affidavit of Attorney Jim Leitner in support of the assertions of this point is appended to this Writ as Exhibit B.  If the Court finds that Counsel's objection was adequate to preserve error, Counsel argues below that he was denied the effective assistance of counsel on appeal, since the point was not raised on appeal. (See Grounds of Error III and IV.)

## CONCLUSION

As to the denial of Applicant's right to the effective assistance of counsel, the admission of the extraneous offense victim impact testimony  was Cantu error as a matter of state law, and Booth error as a matter of Federal law.

## GROUNDS OF ERROR III AND IV

III. On appeal, Mamou was denied the protection of the Texas Constitution's. Art. I, § 10 right to the effective assistance of counsel.

IV. Applicant was deprived of effective assistance of counsel on appeal, as defined by the Sixth Amendment, U. S. CONST. Amend VI.

: 00028

## STANDARD OF REVIEW

An accused is constitutionally entitled to the effective assistance of counsel on a direct appeal as of right. **Evitts v. Lucey**, 469 U.S. 387, 105 S.Ct. 105 830, 83 L. Ed. 2d. 821 (1985.) Applicant directs the Court to the Standards set out for Strickland in the first two points of this Writ.

## ARGUMENT AND AUTHORITIES

Because the error at trial regarding the wrongful admission of extraneous offense victim impact testimony was not preserved via objection, Mamou was also denied his right of effective assistance of counsel on appeal. There was a motion for a new trial, but it was overruled by operation of law. Nor was the issue argued in Mamou's appellate brief, presumably because appellate counsel felt that the issue had not been preserved at trial.

If the Court finds that trial Counsel did preserve error at trial, the Appellate Counsel is guilty of constitutionally defective representation by not raising the **Cantu** error in his direct appeal to this court.

Therefore, Mamou was denied the constitutional right to have counsel effectively represent him by presenting the extraneous victim impact evidence at a hearing on a Motion for New Trial, where the matter of trial counsel's trial strategy could have been preserved on appeal. Or he was denied the constitutional right to have counsel effectively represent him on appeal, since appellate counsel ignored the **Cantu** error.

27

: 000029

## GROUNDS OF ERROR NUMBERS FIVE AND SIX

V. The effect of the above deprivations deprived Applicant of the protection of Art. I § 13 of the Texas Constitution insofar as he was subjected to cruel and unusual punishment.

VI. The effect of the above deprivations deprived Applicant of the protection of the Eighth Amendment and the Fourteenth Amendment, U.S. Constitution, insofar as he was subjected to cruel and unusual punishment.

## STANDARD OF REVIEW

The Eighth Amendment prohibition against cruel and unusual punishment applies to the states through the due process clause of the Fourteenth Amendment. It is well settled that a jury's discretion to impose the death sentence must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." **Gregg v. Georgia**, 428 U.S. 153, 189 (1976) (joint opinion of Stewart, Power, And Stevens, JJ.); **California v. Ramos**, 463 U.S. 992, 999 (1983).

**Booth v. Maryland**, 482 US 496, 96 Led 2d 440, 107 S. Ct. 2529 (1987) held that the introduction of all victim impact evidence at the sentencing phase of a capital murder trial violates the Eighth Amendment. Payne as discussed above has overruled this much of the case. But the rationale of **Booth** is still alive and prohibits the introduction of non-complainant victim impact evidence.

## ARGUMENT AND AUTHORITIES

Applicant prays that the Court will refer to the arguments made earlier in conjunction with this point.

The Court in **Booth,** *supra.,* like the Texas Court of Criminal Appeals in **Cantu,** *supra.* found such information irrelevant to a capital sentencing decision, as is the testimony of Ms. Williams and Mrs. Gibson. The admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner in several ways. First, since the focus of the extraneous victim impact evidence is not on the defendant, or on the victim herself, but on the character and reputation of the extraneous victim and the effect on his family, factors which may be wholly unrelated to the blameworthiness of a particular defendant, allowing the jury to rely on such testimony therefore could result (a) in imposing the death sentence because of factors--such as the degree to which a family is willing and able to express its grief, or the relative worth of the victim's character--about which the defendant was unaware and that were irrelevant to the decision to kill, and (b) in diverting the jury's attention away from the defendant's background and record and from the circumstances of the crime.

Secondly, it would be difficult, if not impossible, to provide a fair opportunity to rebut the evidence contained in the extraneous offense victim impact testimony without shifting the focus of the sentencing hearing away from the defendant. Finally, the formal presentation by the state of the information in the extraneous victim impact testimony can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant, the admission of the extraneous offense testimony being inconsistent with the reasoned decisionmaking required in capital cases.

29

Again, this was the same rationale that was used in **Cantu** to forbid the State from exploiting such evidence.

Mr. Mamous' right to be protected from an arbitrary sentencing process was violated when the State was allowed to introduce inadmissible evidence without trial counsel's objection. The failure of counsel to protect his client from this evidence amounted to constitutionally defective counsel, and a denial of his rights under the Eighth Amendment.

This was not an individualized determination as required by the U.S. Constitution, because the State was allowed to introduce totally inflammatory, highly emotional, and irrelevant testimony at punishment.

## GROUND OF ERROR NUMBER SEVEN

VII. THE EFFECT OF THE DEPRIVATION OF THE RIGHT TO COUNSEL RESULTED IN A DENIAL OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION.

## STANDARD OF REVIEW

The State had an obligation to refrain from introducing evidence that it knew or should have known was inadmissible. The failure of the State's prosecutors to abide by the law that it is charged with enforcing amounted to a denial of due process under the Fourteen. Amendment of the U.S. Constitution. The prosecutor's good faith or bad faith is immaterial to the due process violation. **Brady v. Maryland**, 373 U.S. 83 (1963).

In federal habeas, the court reviews evidentiary rulings by a state trial judge by the standard that "the erroneous admission of prejudicial testimony does not

: 00032

justify habeas corpus relief unless it is 'material in the sense of a crucial, critical, highly significant factor.'" **Skillern v. Estelle**, 720 F2d. 839, 852 (5th Cir. 1983.), quoting **Porter v. Estelle**, 709 F2d. 944, 957, (5th Cir. 1983.)

## ARGUMENT AND AUTHORITIES

Applicant prays that the Court will refer to the arguments made earlier in conjunction with this point.

It was ipso facto crucial and critical or the State would not have flagrantly violated a standing rule about inadmissible evidence, unless they felt an overwhelming pressure based on the shortcomings of the case for death. The inadmissible victim impact testimony was crucial to the prosecution and devastating to the defense in the context of the trial as a whole. (Cf. **Gochicoa v. Johnson** ("*Gochicoa II*"), 118 F.3d 440 (5th Cir. 1997.)

## GROUND OF ERROR NUMBER EIGHT

VIII. The court improperly overruled an objection to the assistant district attorney's speculating that the legislature could lessen appellant's parole eligibility of forty years had a substantial effect on the decision of one of the jurors to vote for the death penalty. This constituted a denial of due process under the fourteenth amendment of the u.s. constitution.

## STANDARD OF REVIEW

**RULE 606 of the Texas Rules of evidence provides:**

"COMPETENCY OF JUROR AS A WITNESS
(a) At the Trial. A member of the jury may not testify as a witness before that jury in the trial of the case in which the juror is sitting as a juror. If the juror is called so to testify, the opposing party shall be afforded an opportunity to object out of the presence of the jury.
(b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not

: 00033

testify as to any matter or statement occurring during the jury's deliberations, or on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve."

## ARGUMENTS AND AUTHORITIES

After the Appellant had been found guilty of capital murder, Mr. Mamou called to testify on his behalf, Dorothy Morgan. (R.R. Vol 23, pp. 2-19). Ms Morgan was a parole supervisor for the Southern Region Institutional Parole Office. In essence, her testimony regarded the parole process as applied to a person convicted of capital murder and sentenced to life in prison. In pertinent part, she testified that such a person convicted in October of 1999 would be required to serve forty flat years before eligible parole (R.R. Vol 23, p. 13). Further, a two-third majority of the 18 number parole board would have to vote for a prisoner's parole (R.R. Vol 23, p. 14).

After counsel for Appellant passed Ms. Morgan, he approached the court to assert an oral Motion in Limine to preclude the State of Texas from cross examining the witness relating to changes in parole law and those things that might be considered as speculation (R.R. Vol 23, p.15) The court denied the Motion (R.R. Vol 23, p.15).

Immediately thereafter, the State began a series of questions calculated to inform the jury of changes in non-capital parole law (R.R. Vol 23, pp. 15-16).

32

A: Right.

Q: You indicated that the goal of the parole division, the first goal, is to protect society? A: True."

The trial court charged the jury at punishment (C.R. pp. 95-103). The charges contained specific language regarding parole eligibility being contingent on the Defendant serving forty (40) calendar years without consideration of good conduct time (C.R. p. 198).

The cross examination of the State of Texas was contrary to law applicable to the Defendant's case and invited the jurors to disregard the law, *Valencia v State,* 966 S.W. 2d 81 (Tex.Crim.App. 1997) and *Valencia v* **State,** 966 S.W. 2d 188 (Tex.Crim.App Houston (1st Dist) 1998, *pet. refused)* (opinion on remand).

Such questioning was a blatant effort for the jurors to disregard their instructions and violate their oaths in answering the continuing threat special issue and the mitigation special issue. This line of questioning had an effect on at least one juror. (See attached Appendix Exhibit C."

In **Simmons v South Carolina**, 512 U.S. 154, 165, 114 S. Ct. 2187, 2194, 129 2. Ed 2d 133 (1994) the United States Supreme Court recognized that due process mandated that a capital defendant be able to refute a prosecutor's erroneous argument with truthful sentencing information. To permit the State's questioning herein is to enable the State to speculate in every case that any sentence does not have meaning and should be ignored because the Legislature meets every two years and could change the law at any time they desired to do so.

: 88838

Thereafter, the State asked Ms Morgan "So today, as we sit here today, a person so convicted of capital murder and receives a life sentence must serve forty calendar years?"

The witness replied "That is right". The State then asked " You are not implying to this jury are you, that that could never be changed?" Trial counsel immediately objected "It calls for speculation on the part of this witness, Your Honor". The trial court stated "It's overruled"

Thereafter,  the State elicited the following:

Q: You're not implying to the Jury they could never be changed are you?

A: Well, I couldn't tell the jury that it would be or would not be. I'm just saying, I know today. And no, I cannot tell that.

Q: All right. Because that's not always been the law. Forty years day-for-day has not always been the law. It's a pretty recent situation.

A: That is true; however, it was less time. It was thirty-five.

Q: And before that it was even less time, wasn't it? Even before that, it was a life sentence, you might get out in eight or nine years?

A: Could be. Not capital felony.

Q: Are you sure about that? A: I'm not an attorney, no I wouldn't say.

Q: You said that the - so you cannot guarantee the ladies and gentlemen of the jury that forty years, calendar years, day-for-day, will never be changed. You can't assure us of that, can you? A: I can only tell the jury what it is today.

Q: I understand, which means that you cannot assure us it can never be changed?

33

The Defendant was irreparably harmed and in violation of his constitutional rights by the series of questions and responses elicited by the State of Texas. It is simply common sense and judicially recognized that jurors will reasonably believe that a Defendant who is even eligible for parole is a greater threat to society than one who is confined in prison and ineligible for parole. Appellant is entitled to a new punishment hearing because the trial court's error in permitting the State of Texas's speculative questions on parole revision by the Legislature.

The amended version of TEX. R. Evid. 606(b) is unconstitutional as applied to him, and abridges his substantive rights under Tex. R, App. P. 21 and his rights to the effective assistance of counsel and due process of law. Effective March 1, 1998, Rule 606(b) narrowed the subject matter of a juror's testimony upon an inquiry into the validity of a verdict or indictment.   Specifically, this narrowing denied him due process and due course of law by preventing trial counsel from presenting evidence of misconduct by the jury during its deliberations.

## GROUNDS OF ERROR NUMBER NINE

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT THE STATE HAD A BURDEN OF PROOF BEYOND A REASONABLE DOUBT ON THE MITIGATION SPECIAL ISSUE DENIED THE APPELLANT DUE PROCESS OF LAW.

### STATEMENT OF PERTINENT FACTS

The trial court's charge to the jury at the punishment stage of trial did not assign any burden of proof with respect to the second special issue, i.e. "Do you find from the evidence, taking into consideration all of the evidence, including the

35

circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances that a sentence of life imprisonment rather than a death sentence be imposed?" (CR, 97, 102).   This was in contrast to the first special issue, where the trial court's charge specifically stated that the State had the burden of proof beyond a reasonable doubt (CR, 96, 101).

## ARGUMENT AND AUTHORITIES

This Court has repeatedly stated that no burden of proof needs to be assigned in the court's charge regarding the mitigation issue. That line of cases now must be repudiated in light of **Apprendi v. New Jersey**, 530 U.S.466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**Waiver?**   A threshold question is whether the issue presented here was waived because the appellant did not make an objection, based on the reasoning used in **Apprendi,** to the punishment charge.   That question must be answered in the negative, for three reasons.

First, the failure to object to charge error simply does not create an absolute waiver.   Under **Almanza v. State,** 686 S.W.2d 157 (Tex. Crim. App. 1984), the lack of an objection or requested charge merely alters the harm analysis.   The appellant will return to that later in this supplemental brief.

Second, it is obvious that **Apprendi,** a June, 2000 decision, was not available to the appellant in a 1999 trial.   This gives rise to the "novelty" exception to the contemporaneous objection rule, as discussed in **Black v. State,** 816 S.W.2d

36

350, 368 (Tex. Crim. App. 1991, Campbell, J., concurring) and **Reed v. Ross**, 468

U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984).

Third, this Court has held that the State does not have the burden of proof

on the mitigation issue. **Howard v. State**, 941 S.W.2d 102, 119 (Tex. Crim. App.

1996); **Barnes v. State**, 876 S.W.2d 316 (Tex. Crim. App. 1994), **cert. denied**

513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). This line of cases

developed before **Apprendi,** and needs to be re-evaluated for reasons discussed

below, but they constituted the state of Texas law on the issue at the time of trial.

Therefore the "futility": exception to the contemporaneous objection rule, as

discussed in the majority opinion in **Black, supra** at 364 and **Reed v. Ross, supra**,

also applies.

The Due Process requirement in **Apprendi.** In **Apprendi** the Supreme

Court confronted a New Jersey prosecution where a judge increased the maximum

punishment for possession of a firearm by resort to a New Jersey statute which

allowed an increased punishment if a defendant "acted with a purpose to

intimidate an individual or group of individuals because of race, ..." The Court

framed the question presented as follows: "Whether the Due Process Clause of the

Fourteenth Amendment requires that a factual determination authorizing an

increase in the maximum prison sentence for an offense from 10 to 20 years be

made by a jury on the basis of proof beyond a reasonable doubt." 120 S.Ct. at

2351. For present purposes, it is fair to substitute the term "punishment" for

"prison sentence" and substitute the term "substantially" for the phrase "from 10

: 000039

to 20 years." The appellant is sure that no one on this Court doubts that an increase from life imprisonment to death is a substantial increase in punishment. That "death is different" already is well settled.

In **Apprendi** the Supreme Court first looked to the earlier decision in **Jones v. United States,** 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), as "foreshadowing" an answer to the question. Actually **Jones** was an exercise in federal statutory interpretation, and due process became an issue under the principle that, given competing possible constructions of a statute, an appellate court should use the construction which avoids constitutional concerns. **Jones,** 120 S.Ct. at 1222. **Jones** then drew upon cases arising from state courts to flesh out the due-process aspect of the right to have issues significantly determinative of punishment submitted to a jury in instances where a jury had not been waived. 120 S.Ct. at 1222-1224. The focus of this analysis in **Jones** was on the judge-jury dichotomy. In the Texas capital sentencing system, of course, a jury cannot be waived.

The portion of **Jones** which mattered in **Apprendi** was the footnoted statement that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt." **Apprendi,** 120 S.Ct. at 2355, citing **Jones,** 526 U.S. at 243, n. 6, 119 S.Ct. 1215, n. 6. Although the **Jones** footnote thus "foreshadowed" **Apprendi,** it remained for

the latter case to recognize a due-process basis, under the Fourteenth Amendment rather than the Fifth Amendment, for demanding that any fact which increased the maximum available sentence be submitted to a jury with a burden on the prosecution to prove the fact beyond a reasonable doubt.[1] In **Apprendi** the Court made it clear that it was not, as it had in **Jones,** engaging in statutory interpretation with constitutional law as a backdrop. Rather, **Apprendi** stressed that "at stake in this case are constitutional protections of surpassing importance." 120 S.Ct. 2348. That is very strong language, applied in a non-capital case, and the "heightened reliability" requirement for capital cases can only amplify its applicability here.

**Apprendi** decisively dispatched any notion that it mattered whether the fact increasing punishment happened to be labeled an "element" of the offense, stating that "merely using the label 'sentence enhancement'" in a statute "does not provide a principled basis" for avoiding due-process concerns. 120 S.Ct. at 2355. Reaching back into history, the Court found that "any possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgement by court as it existed

---

[1] Here it should be noted that **Jones** was issued on March 24, 1999. The punishment charge in this cause was submitted on April 22, 1999. That does not diminish any of the appellant's arguments concerning preservation. Obviously it does not change the **Almanza** rule. As to "novelty," the footnote in **Jones** did not at that time appear to have the prominence it took on in **Apprendi,** and the strict issue and holding in **Jones,** i.e. a statutory interpretation, did not point to the eventual holding in **Apprendi.** As to "futility," this Court continued its jurisprudence rejecting a prosecution burden of proof after **Jones,** so any argument expanding on the Jones footnote would have been futile in the trial court.

: 000041

during the years surrounding our Nation's founding." 120 S.Ct. at 2356.   A thorough historical review in **Apprendi** included the observation that, at least since **In re Winship,** 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), "we have made clear beyond peradventure that **Winship's** due process and associated jury protections extend, to some degree, to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence.' [**Almendarez-Torres v. United States,** 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)](Scalia, J., dissenting)."   To the extent **Almendarez-Torres** ran counter to this general principle, **Apprendi** distinguished it on its facts, notably because **Almendarez-Torres** was concerned with the *conceded* fact of prior offenses, and "no question concerning the right to a jury trial or the standard of proof that would apply to a contested issue of fact was before the Court." 120 S.Ct. at 2361.[2]

The Court wrapped up its analysis with this conclusion:

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.   With that exception, we endorse the statement of the rule set forth in the concurring opinions in [**Jones**]: "[I]t is

---

[2] The Court also noted that it was "arguable" that **Almendarez-Torres** was incorrectly decided. 120 S.Ct. at 2362.   The Court punted on that matter because **Apprendi** did not advance such an argument.   For what it is worth, the appellant says **Almendarez-Torres** was incorrectly decided, but it also is distinguishable.

: 000042

unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.  It is equally clear that such facts must be established by proof beyond a reasonable doubt. 526 U.S. at 252-253, 119 S.Ct. 1215 (opinion of Stevens, J.); see also **id**. at 253, 119 S.Ct. 1215 (opinion of Scalia, J.).120 S.Ct. at 2363.

The first sentence in that passage is potentially confusing with its reference to increasing a penalty "beyond the prescribed statutory maximum."   The State might argue, for example, that the statutory maximum in this instance is death.  Indeed, one decision of the federal Fifth Circuit seems to have engaged in this type of fallacious reasoning by focusing on the first sentence set out above in **United States v. Meshack,** 225 F.3d 556, 576 (5th Cir. 2000).   The fallacy of that approach to **Apprendi** is shown by three things.  First, the explicitly "endorsed" statements from the **Jones** concurring opinions make it clear that **Apprendi** was applying its rule to any facts which "increased the prescribed range" of punishment.  In other words,  the term "statutory maximum" in the first sentence of the excerpt above really refers to the "statutory maximum" in the absence of a fact which, by legislative prescription, allows a higher punishment.[3]  Second, the facts of **Apprendi** itself make it clear that the Supreme Court was concerned with a step up from one statutory maximum to another.   Third, a reading of **Apprendi**

---

[3]  In Texas, of course, a mitigation determination adverse to the defendant does not merely allow, but requires, a higher punishment.

: 000043

which limited it to situations where punishment went beyond that available *with* an adverse finding of an aggravating factor would, in effect, limit **Apprendi** to unauthorized-sentence situations, which plainly is not what the Supreme Court intended.

**Application to the Texas mitigation issue.** The appellant has found no Texas state cases at all, let alone any Texas capital cases, which have considered **Apprendi.** Its application is best understood by considering the nature of the mitigation issue in order to see how the **Apprendi** rationale fits. The mitigation issue poses a factual question which calls for various factual matters to be gathered, weighed, and compared, with the end result being a determination whether one set of considerations outweighs another. This is a factual issue, comparable to placing two objects on a scale and reaching a factual conclusion that one is heavier than the other. In **Howard, supra** this Court acknowledged that this is "technically a factual question" but then declared that it "is in reality a normative determination left to the subjective conscience of each juror." **Id.** at 119. "Normative" or not, the jury is answering a factual question. The answer to that factual question can determine whether or not a higher penalty will be applied than that which is authorized by statute in the absence of that factual determination. Thus the Texas mitigation issue is, for purposes of applying

42

**Apprendi,** analytically similar to the "hate purpose" factor which could increase the maximum punishment under the statute at issue in **Apprendi.**[4]

Some additional insight is provided by **Hoffman v. Arave,** __ F.3d __ (9th Cir. 2001)(2001 WL 6710, January 3, 2001).  A Ninth Circuit panel split on the application of **Apprendi** to an Idaho statutory aggravating factor.  A two-judge majority held that **Apprendi** did not overrule **Walton v. Arizona,** 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), even while acknowledging that the handwriting is on the wall:

> We are aware that four dissenting Justices in **Apprendi** asserted that
> **Apprendi**  effectively overruled **Walton,** and that one concurring
> Justice stated that **Walton** could be reexamined on "another day."
> But while **Apprendi** may raise some doubt about **Walton,** it is not
> our place to engage in anticipatory overruling.

**Hoffman,** slip opin., part V.  As the **Hoffman** dissenting judge pointed out, however, the **Apprendi** majority, which declined to specifically overrule **Walton,** included Justice Stevens, who already had called **Walton** into question through his concurring opinion in **Jones v. United States,** __ S.Ct. at ___.[5]  Equally

---

[4] The notion in **Howard** that jurors are really just making a "subjective" conscientious determination is, if anything, another good reason for applying **Apprendi.**  If a trained judge, applying statutory law with a fairly simple issue, falls short of what is required, the less structured context of the Texas mitigation issue is in even greater need of the **Apprendi** principles.

[5] A reasonable conclusion is that Justices Stevens and Thomas simply are waiting for a death-penalty case before repudiating **Walton.**  Justice Stevens

: 00045

important, the **Hoffman** dissent pointed out (as the **Apprendi** dissenters did) that **Walton** is at odds with the reasoning in **Apprendi**.

Article 37.071 does not allocate a burden of proof, but as **Jones** illustrates, any statutory interpretation should favor a construction which avoids constitutional infirmity. In this Court's extant case law on the mitigation issue, the effect of **Apprendi** has not been considered, mainly because this Court did not have the benefit of **Apprendi** when the line of cases analyzing the issue began. Thus *stare decisis* is no hurdle to what needs to be done here. This Court should hold, in light of **Apprendi**, that the State bears the burden of proof, beyond a reasonable doubt, that the mitigation issue should be answered in the negative. That being so, it also is incumbent upon a trial court to advise the jury of this requirement in its charge to the jury. ·The failure to do so in this cause was error.

**The Harm**:   Assuming that the "egregious harm" prong of **Almanza,** used in the absence of an objection or request, applies to this issue, this Court should hold that the error in omitting this instruction was harmful.   The allocation of the burden of proof is a matter of the utmost importance.   It not only determines how a special issue will be answered, but may determine whether the jurors are able to answer it at all.   That is to say, in a given case jurors well could end up divided on whether

---

(joined by three other justices) also pointed out, in **Brown v. Texas,** __ U.S. __, 1__ S.Ct. __, __ L.Ed.2d __ (19__)(Stevens., J., concurring) that it is desirable for lower courts to address death-penalty issues first, as that process adds to the likelihood that the Supreme Court ultimately will make the right decision on an issue.

the party with the burden of proof met that burden, even while recognizing that the party put on some relevant evidence. Such a stalemate on the mitigation issue would in itself compel the trial court to assess a life sentence rather than the death penalty. Art. 37.071, §2(g) V.A.C.C.P.. Appellant was denied due process as guaranteed by U.S. CONST. AMEND. XIV.

The sentence of death should be therefore be reversed and reformed to life. In the alternative Appellant would ask that the sentence of death be reversed and remanded to the trial court for new trial on punishment. In the alternative Appellant would ask that his conviction be reversed and remanded to the court below for a new trial.

**PRAYER**

The outcome of Mamou's trial would have been different but for the single catastrophic error by trial counsel of failing to object to the State's inadmissible victim impact witness evidence. The inadmissible victim impact testimony was crucial to the prosecution and devastating to the defense in the context of the trial as a whole.

**WHEREFORE, PREMISES CONSIDERED,** Applicant prays that a writ of habeas corpus issue, that the trial court conduct an oral hearing on his allegations, that the trial court enter findings of fact and conclusions of law recommending relief, that this Court grant relief, that Applicant's conviction be vacated and that this cause be remanded to the trial court for a new trial.

45

: 00047

Respectfully submitted,

ROLAND BRICE MOORE III
Attorney For Applicant
1314 Texas Ave. Suite 1705
Houston, Texas 77002
713  229-8500
State Bar No. 14388100

: 00048

NO. 800112-A

## IN THE COURT OF CRIMINAL APPEALS OF TEXAS
### AUSTIN, TEXAS

NO. 800112-A

## IN THE 179TH JUDICIAL DISTRICT COURT OF
### HARRIS COUNTY, TEXAS

## EX PARTE CHARLES MAMOU, JR.

## EXHIBIT VOLUME

---

**CONTENTS:**

1.  Exhibit A: Judgment and Sentence in Cause No.  800112 in the 179th Judicial District Court of Harris County

2.  Exhibit B: Affidavit of Attorney Roland Moore III

3.  Exhibit C: Affidavit of Attorney Jim Leitner

4.  Exhibit D: Affidavit of Investigator Cynthia Patterson

: 000049

NO. 800112

THE STATE OF TEXAS
VS.
    CHARLES MAMOU, JR.

RECORDER'S MEMORANDUM.
This instrument is of poor quality
and not satisfactory for photographic
recordation; and/or alterations were
present at the time of filming.

IN THE    179TH    DISTRICT

COURT OF HARRIS COUNTY, TEXAS

Change of Venue From: _____

## JUDGMENT - DEATH PENALTY

| | |
|---|---|
| Judge Presiding:   M WILKINSON | Date of Judgment: OCTOBER 12, 1999 |
| Attorney for State:  CLAIRE CONNORS & LYNN MCCLELLAN | Attorney for Defendant:  WAYNE HILL & KURT WENTZ |

Offense Convicted of:     CAPITAL MURDER AS CHARGED IN THE INDICTMENT

Degree: CAPITAL   Punishment Assessed: DEATH    Date Offense Committed: DECEMBER 7 ,1998
Charging Instrument: Indictment                Plea: Not Guilty

Affirmative Findings: (Circle appropriate selection - N/A not available or not applicable)
DEADLY WEAPON: (Yes) |No |N/A    FAMILY VIOLENCE: Yes |No (N/A)    HATE CRIME: Yes |No (N/A)

     The Defendant having been indicted in the above entitled and numbered cause for the felony offense indicated above and this cause being this day called for trial, the State appeared by her District Attorney as named above and the Defendant named above appeared in person with Counsel as named above, and both parties announced ready for trial.

     A Jury composed of    GREGORY DON ADAMS    and eleven others was selected, impanelled, and sworn. The indictment was read to the Jury, and the Defendant entered a plea of not guilty thereto, after having heard the evidence submitted; and having been charged by the Court as to their duty to determine the guilt or innocence of the Defendant and having heard argument of counsels, the Jury retired in charge of the proper officer and returned into open Court on  OCTOBER 12, 1999  , 19____, the following verdict, which was received by the Court and is here entered on record upon the minutes:

       "WE THE JURY, FIND THE DEFENDANT, CHARLES MAMOU, JR.
       GUILTY OF CAPITAL MURDER, AS CHARGED IN THE INDICTMENT."

     Thereupon, the Jury, in accordance with law, heard further evidence in consideration of punishment, and having been again charged by the Court, the jury retired in charge of the proper officer in consideration of punishment and returned into open Court on the  15TH  day of   OCTOBER   , 19 99 , the following verdict, which was received by the Court and is here entered of record upon the minutes:
(Special Issues/Verdict/Certification):
                  SPECIAL ISSUE NO.1
     DO YOU FIND FROM THE EVIDENCE BEYOND A REASONABLE DOUBT THAT THERE IS A PROBABILITY THAT THE DEFENDANT, CHARLES MAMOU, JR., WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY?
                ANSWER
   WE, THE JURY, UNANIMOUSLY FIND AND DETERMINE BEYOND A REASONABLE DOUBT THAT THE ANSWER TO THIS SPECIAL ISSUE IS "YES."
            s/sGREGORY DON ADAMS
            FOREMAN OF THE JURY

CRM-95  R06-30-94

(Special Issues - Continued):

SPECIAL ISSUE NO. 2

DO YOU FIND FROM THE EVIDENCE, TAKING INTO CONSIDERATION ALL
OF THE EVIDENCE, INCLUDING THE CIRCUMSTANCES OF THE OFFENCE, THE
DEFENDANT'S CHARACTER AND BACKGROUND, AND THE PERSONAL MORAL
CULPABILITY OF THE DEFENDANT, CHARLES MAMOU, JR., THAT THERE IS A
SUFFICIENT MITIGATING CIRCUMSTANCE OR CIRCUMSTANCES TO WARRANT THAT
A SENCENCE OF LIFE IMPRISONMENT RATHER THAN A DEATH SENTENCE BE
IMPOSED?

ANSWER

WE, THE JURY, UNANIMOUSLY FIND THAT THE ANSWER TO THIS SPECIAL ISSUE
IS "NO."                    s/s GREGORY DON ADAMS

VERDICT FOREMAN OF THE JURY

"WE, THE JURY, RETURN IN OPEN COURT THE ABOVE ANSWERS TO THE "SPECIAL
ISSUES" SUBMITTED TO US, AND THE SAME IS OUR VERDICT IN THIS CASE.

s/s GREGORY DON ADAMS
FOREMAN OF THE JURY

 

It is therefore considered, ordered, and adjudged by the Court that the Defendant is
guilty of the offense indicated above, a felony, as found by the verdict of the jury, and
that the said Defendant committed the said offense on the date indicated above, and that he
be punished as has been determined by the Jury, by death, and that Defendant be remanded to
jail to await further orders of this court.

And thereupon, the said Defendant was asked by the Court whether he had anything to say
why sentence should not be pronounced against him, and he answered nothing in bar thereof.

Whereupon the Court proceeded, in presence of said Defendant to pronounce sentence
against him as follows, to wit, "It is the order of the Court that the Defendant named above,
who has been adjudged to be guilty of the offense indicated above and whose punishment has
been assessed by the verdict of the jury and the judgment of the Court at Death, shall be
delivered by the Sheriff of Harris County, Texas immediately to the Director of the
Institutional Division, Texas Department of Criminal Justice or any other person legally
authorized to receive such convicts, and said Defendant shall be confined in said
Institutional Division in accordance with the provisions of the law governing the Texas
Department of Criminal Justice, Institutional Division until a date of execution of the said
Defendant is imposed by this Court after receipt in this Court of mandate of affirmance from
the Court of Criminal Appeals of the State of Texas.

The said Defendant is remanded to jail until said Sheriff can carry the directions of
this sentence. From which sentence an appeal is taken as a matter of law to the Court of
Criminal Appeals of the State of Texas.

Signed and entered on this the _____ day of OCT 1 5 1999 _____, 19_____.

10/18/1999
motion Now/withheld

JUDGE _____ DISTRICT COURT
Harris County, Texas

6890d 1282A000106

**STATE OF TEXAS**

**COUNTY OF HARRIS**

### AFFIDAVIT

Before me the undersigned authority this date personally appeared Roland

B. Moore III, who after being sworn by me did state upon his oath the following:

My name is Roland B. Moore III.  I am the attorney for the applicant, pursuant to

Tex. Code Crim. Proc. Art. 11.07. I have reviewed the foregoing application for

writ of habeas corpus and I state under oath that on information and belief the

facts contained in it are true and correct.

Dated:  April 18 , 2001

Roland Brice Moore III

Sworn to and subscribed before me, the undersigned on this the 18th day of

April, 2001, at Houston, Harris County, Texas.

NOTARY PUBLIC
My commission expires:  4-4-2005

MARITZA F. GUZMAN
MY COMMISSION EXPIRES
APRIL 4, 2005

The State Of Texas       §      Affidavit of Jim Leitner
County Of Harris        §

My name is Jim Leitner of 1314 Texas Ave., Suite 1206, Houston, Texas . I am an

attorney licensed in the State of Texas, with Texas Bar No. _12187900_ I have been

practicing law in the State of Texas since _1975_, primarily in the area of

criminal law. I have prepared and submitted a Section 11.071 writ of habeas corpus and

have authored numerous direct appeals in capital murder cases. I am Board Certified in

Criminal Law by the Texas Board of Legal Specialization. I have reviewed the trial

testimony of the extraneous victim impact witnesses in the case of State v. Mamou, 179th

District Court of Harris County, Texas, Cause no. 800112.

It is my professional opinion that it was not and could not be sound trial strategy

to fail to object to the extraneous victim impact testimony offered by the State against

Charles Mamou in his capital murder trial. **Cantu v. State**, 939 S.W.2d 627

(Tex.Crim.App.1996) holds that such testimony is inadmissible because it is irrelevant to

a determination as to the proper punishment in a capital murder trial. In my opinion, the

failure to make such an objection constitutes ineffective assistance of counsel under both

Texas State law and the federal law of the United States.

No one has promised me anything of benefit, nor have they forced me to make

this statement, and I make it of my own free will.

**FURTHER AFFIANT SAYETH NOT.**

_Jim Leitner_
Jim Leitner

DATE: _4-18-_, 2001
SIGNED AND SEALED before me, this the _18th_ day of _April_, 2001.

_John M. Petruzzi_
NOTARY PUBLIC

My commission expires: _1-29-2002_



JOHN M. PETRUZZI
MY COMMISSION EXPIRES
January 29, 2002

1

: 00053

NO.800112-A

THE STATE OF TEXAS

VS.

CHARLES MAMOU

IN THE 179TH DISTRICT COURT

OF

HARRIS COUNTY, TEXAS

### AFFIDAVIT

On this the 18th day of April, 2001 came before me Cynthia Patterson, who upon her oath deposed and said as follows:

At the request of Roland Moore, III appellate attorney, I interviewed six of the jurors in the capital murder trial of Charles Mamou. I was unable to locate two of the jurors and four jurors failed to respond to numerous messages requesting that they return my telephone calls.

During my interview with Tracy Lee Karam, she stated that the testimony of Mrs. Morgan, the Parole Supervisor, regarding the possibility of the parole laws changing in the future did effect her decision in regards to Special Issue #1. She explained that due to this testimony she "considered whether or not he would actually have to serve forty years" on a life sentence before becoming eligible for parole. She stated that she did not want to see him released after fifteen years or so.

_Cynthia Patterson_
Affiant

Subscribed and sworn to before me on this 18th day of April, 2001.

_Deanna Christine Calhoun_
Notary Public

DEANNA CHRISTINE CALHOUN
Notary Public, State of Texas
My Commission Expires
6-22-2004

: 00054

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that a true and correct copy of the foregoing Application for Writ of Habeas Corpus was hand-delivered to the in-box at the Court of Appeals for counsel for the State on this the 18th day of April, 2001. I also mailed a copy of this Writ to the Applicant where he resides on Death Row. In addition, I mailed by U.S. Mail postage prepaid a copy to Robert Huttash, Asst. Attorney General, Office of the State Attorney General, Austin, Texas.

_____
ROLAND BRICE MOORE III
Attorney for Applicant



# CHARLES BACARISSE
### HARRIS COUNTY DISTRICT CLERK

Direct Dial Line:
755-5738

September 26, 2001

ROLAND BRICE MOORE III
ATTORNEY FOR APPLICANT
1314 TEXAS AVE. SUITE 1705
HOUSTON, TEXAS  77002

RE:   Cause No.0800112-A
      179TH  District Court

Dear Applicant:

Your post-conviction application for writ of habeas corpus was received and filed on 04-18-01`.
Article 11.071 of the Texas Code of Criminal Procedure affords the State 120 days in which to
answer the application after having been served with said application and also allows the State to
request a 60-day extension of time in which to file its answer.  After the State files its answer, the
Court has 20 days to determine the manner of resolving issues, if any.  After the Court has
resolved issues, if any, the application, pursuant to the Court's order, shall be forwarded to the
Court of Criminal Appeals, in accordance with either Article 11.071, § 8 or Article 11.071, § 9.
In the event that the Court determines that your application is untimely or a subsequent
application, the application instead shall be forwarded to the Court of Criminal Appeals for its
consideration, pursuant to Article 11.071, § 5.

The records of the office reflect the following:

| **CAUSE NO.** | **PETITION FOR WRIT OF HABEAS CORPUS** | **DISPOSITION** |
| --- | --- | --- |
| | | |

<u>All</u> future correspondence should indicate the above listed cause number.

Very truly yours,

Criminal Post Trial Section
District Clerk's Office

RAR

1201 Franklin • P.O. Box 4651 • Houston, Texas 77210-4651

: 000055

BERT GRAHAM
FIRST ASSISTANT



DISTRICT ATTORNEY'S OFFICE
1201 FRANKLIN, SUITE 600
HOUSTON, TEXAS 77002-1923

## CHARLES A. ROSENTHAL, JR.
### DISTRICT ATTORNEY
### HARRIS COUNTY, TEXAS

Charles Bacarisse, District Clerk
Harris County, Texas
301 San Jacinto Street
Houston, Texas 77002

Re: Ex Parte CHARLES MAMOU JR.
No. 0800112-A in the 179TH
District Court of Harris County, Texas
Filing date: 09-18-01
Docketed by clerk (date):

Dear Sir:

I hereby acknowledge receipt of a copy of the above captioned post conviction petition for writ of habeas corpus, filed pursuant to article 11.071 of the Texas Code of Criminal Procedure (Death penalty case). Therefore, I waive service by certified mail as provided therein.

I understand that I have 30 days in which to answer.

Sincerely,

_____

SEP 2 7 2001
Date Received

Assistant District Attorney
Harris County, Texas

: 00057

NO. 800112-A
(TEXAS CRIMINAL COURT OF APPEALS NO. 73708)

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 179TH DISTRICT |
| | § | |
| VERSUS | § | COURT OF HARRIS COUNTY, |
| | § | |
| CHARLES MAMOU | § | TEXAS |

## UNOPPOSED MOTION FOR EXTENSION PURSUANT TO
### TEX. CODE CRIM. PROC. ANN. art. 110.71 § 4(b)

TO THE HONORABLE MICHAEL WILKINSON, JUDGE OF SAID
COURT:

COMES NOW CHARLES MAMOU, Applicant herein, by and through his
attorney, **Roland B. Moore III,** pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071
§ 4(b) (Vernon Supp. 2000), moves this Court for an additional 90 days to file his
application and in support thereof, would show the Court:

I.

This is an application for writ of habeas corpus in a capital murder case in
which the death penalty has been assessed. Counsel was appointed by this Court on
May 4, 2000. The writ would be due on January 18, 2001, the 45th day after the filing
of the State's Reply Brief with the Texas Court of Criminal Appeals. Counsel would
show that there is good cause for this Court to grant a 90-day extension of time to file
his original application.

FILED
CHARLES BACARISSE
District Clerk
JAN 16 2001
Time: _____
Harris County, Texas
By _____ Deputy

1

## II.

Counsel has discovered that there were reports that an automobile similar to the one driven by a witness against Applicant was seen in the area where the victim'' body was discovered. Counsel has filed a Freedom of Information Request with the Harris County District Attorney's Office.   To date, the Harris County District Attorney's Office has not responded to this request.

The Trial Court has ordered the unsealing of the list of jurors in this case.  The jurors have only recently received the Court's correspondence regarding contact by defense counsel.  Counsel needs additional time to interview the jurors in this case. Counsel is particularly concerned because Counsel is investigating the matter of the extraneous murder that was offered into evidence against Applicant, and hopes to have additional information or information that was presented in a confusing manner at trial as grist for his questioning of the jurors.

Additionally, trial counsel has retained a mental health expert, Dr. Fred Fason. Dr. Fason did not testify at trial. Dr. Fason needs additional time to review Mr. Mamou's mental health records.  Dr. Fason's report and findings are necessary for the prosecution of this application for writ of habeas corpus.

## III.

Applicant's counsel has conferred with counsel for the State and the State does

2

not oppose this request for additional time.

**WHEREFORE, PREMISES CONSIDERED,** Applicant prays that this

Court extend time to file his application for writ of habeas corpus until April 18,

2001.

Respectfully submitted,

Roland Brice Moore III
Attorney For Defendant
1314 Texas Ave. Suite 1705
Houston, Texas 77002
Office: 713 229-8500
Pager: 279-8248
State Bar No. 14388100
Attorney For Applicant

3

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the attached and foregoing document has been served on the Harris County District Attorney's Office by hand delivering a copy to the assistant district attorney handling the case or by sending a copy certified mail return receipt requested to 201 Fannin, Houston, Texas 77002, on this 16th Day of January, 2001.

ROLAND BRICE MOORE III

4

: 000061

NO. 800112-A

| THE STATE OF TEXAS | § | IN THE 179TH DISTRICT |
| | § | |
| VERSUS | § | COURT OF HARRIS COUNTY, |
| | § | |
| CHARLES MAMOU | § | TEXAS |

## ORDER

**CAME TO BE HEARD** Applicant's Unopposed Motion Pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071 § 4(b). The Court has read the pleadings, heard the argument of counsel and is fully informed. The finds **GOOD CAUSE** for the granting of this motion and the motion is in all things **GRANTED.**

**IT IS THEREFORE ORDERED** that pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071 § 4(b) (Vernon Supp. 2000), time to file the original application for writ of habeas corpus in the above case is extended until April 18, 2001.

SIGNED THIS _16th_ DAY OF January, 2001.

MICHAEL WILKINSON
JUDGE PRESIDING

: 000062



## 179TH DISTRICT COURT

HARRIS COUNTY CRIMINIAL JUSTICE CENTER

1201 FRANKLIN

HOUSTON, TEXAS 77002

J. MICHAEL WILKINSON
JUDGE

TELEPHONE
(713) 755-6340

May 4, 2000

Mr. Charles Mamou, Jr.
Execution No. 999333
12002 S. FM 350
Terrell Unit
Livingston, Texas 77351

Dear Sir:

The Court, having already found that you were indigent for the purpose of your capital murder trial in cause no. 800112 and for the purpose of your direct appeal of your conviction for capital murder, assumes that you are indigent for the purpose of habeas appeal.

Therefore, unless the Court learns that you are not indigent, the Court will appoint an attorney for the purpose of your habeas appeal. See the attached order.

MIKE WILKINSON
Presiding Judge
179TH District Court
Harris County, Texas

RECORDER'S MEMORANDUM.
This instrument is of poor quality
and not satisfactory for photographic
recordation; and/or alterations were
present at the time of filming.

: 00063

Cause No. 800112

| THE STATE OF TEXAS | § | IN THE 179TH DISTRICT COURT |
|---|---|---|
| VS. | § | OF |
| CHARLES MAMOU, JR., | § | HARRIS COUNTY, TEXAS |

## FINDINGS OF INDIGENCY FOR HABEAS COUNSEL APPOINTMENT

The Court, having considered that the defendant is sentenced to death in cause no. 800112, and that the defendant was sentenced to death on the 12TH day of October, 1999, **FINDS** pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071, § 2(b):

a) that the defendant is indigent, and

b) that the defendant desires appointment of counsel for the purpose of habeas proceedings ancillary to cause no. 800112, the primary case.

Therefore, the Court **APPOINTS** the following attorney to represent the defendant in capital habeas proceedings ancillary to cause no. 800112, the primary case:

NAME: Roland Brown Jr

ADDRESS: 1314 Texas Ave #705

Houston Texas 77002

PHONE: 7132298500

The Court **ORDERS** that a copy of this Court's order appointing habeas counsel be sent to appointed habeas counsel at the above-noted address and to Respondent, Roe Wilson; 201 Fannin; Houston, Texas 77002.

The Court **ORDERS**, pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071, § 2 (c), that the Clerk of the Court **immediately** forward to the Court of Criminal

Appeals the following:

    1.  a copy of the judgment in cause no. 800112, and

    2.  this Court's order appointing habeas counsel.

SIGNED this 4TH day of May, 2000.

MIKE WILKINSON
Presiding Judge
179TH District Court
Harris County, Texas

2

V3037 P0318

: 00065

NO. _786378_

THE STATE OF TEXAS

VS

_Andrea Avila Mascorro_

IN THE _262_ DISTRICT

COURT OF HARRIS COUNTY, TEXAS

Change of Venue From: _____

**JUDGMENT ON JURY VERDICT OF GUILTY – PUNISHMENT FIXED BY COURT OR JURY**

Judge Presiding: _M. Anderson_    Date of Judgment: _3-8-1999_

Attorney for State: _V. Wisser_    Attorney for Defendant: _R Castro, J. Bruce_    [ ] Waived Counsel

Offense: _Capital murder_

Degree: _special_    Date Offense Committed: _6-13-98_

Charging Instrument: Indictment/~~Information~~    Plea: _not guilty_    Costs: _$321 25_

Jury Verdict: _guilty_    Foreman: _R. Hatley_

(Circle appropriate selection -- N/A = not available or not applicable)

Plea to Enhancement Paragraph(s): True ¦ Not True ¦ (N/A)    Findings on Enhancement: True ¦ Not True ¦ (N/A)

Affirmative Findings: (Circle appropriate selection -- N/A = not available or not applicable)
DEADLY WEAPON: (Yes) ¦ No ¦ N/A    FAMILY VIOLENCE: Yes ¦ No ¦ (N/A)    HATE CRIME: Yes ¦ No ¦ (N/A)

Date Sentence Imposed: _3-8-99_    Date to Commence: _3-8-99_    Punishment Assessed by: (Court) ¦ Jury

Punishment and Place of Confinement: Institutional/~~State Jail~~ Division: _life TDC_    /Fine: _____

Time Credited: _257 days_    Total Amount of Restitution/Reparation/Reward: _____

Concurrent Unless Otherwise Specified: _____    Restitution/Reward to be Paid to:
Name: _____
Address: _____

Statement of Amount of Payment(s) required/Terms of Amount: _____

This cause being called for trial, the State appeared by the above named attorney, and the defendant appeared in person in open court, the above named counsel for Defendant also being present, or where a defendant is not represented by counsel, the Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel as indicated above, and the said Defendant having been duly arraigned and it appearing to the Court that Defendant was mentally competent and having pleaded as shown above to the charging instrument, both parties announced ready for trial and thereupon a jury, to-wit, the above named foreman and eleven others was duly selected, impaneled, and sworn, the jury having heard the charging instrument read and the Defendant's plea thereto and having heard evidence submitted and having been duly charged by the Court, retired in charge of the proper officer to consider the verdict, and afterward were brought into Court by the proper officer, the Defendant and defendant's counsel, if any, being present, and returned into open court the verdict set forth above, which was received the Court here now entered upon the minutes of the Court as shown above.

The Defendant having previously elected to have punishment assessed as indicated above. And when Defendant is shown above to have elected to have the jury assess punishment, such jury was called back into the box and heard evidence relative to the question of punishment and having been duly charged by the Court; they retired to consider such question and after having deliberated they returned into Court the verdict shown under punishment above; and when Defendant is shown above to have elected to have punishment fixed by the Court, in due form of law further evidence was heard by the Court relative to the question of punishment and the Court fixed punishment of the Defendant as shown above.

IT IS, THEREFORE, CONSIDERED AND ORDERED by the Court, in the presence of the Defendant, that the said judgment be and the same is hereby in all things approved and confirmed, and that the Defendant is adjudged guilty of the offense set forth above as found by the verdict of the jury, and said Defendant be punished in accordance with the Jury verdict or the Court's finding, as shown above and that the Defendant is sentenced to a term of confinement or fine or both, as indicated above, and that the said Defendant be delivered by the Sheriff to the Director of the Institutional or State Jail Division, Texas Department of Criminal Justice, as indicated above, or other person legally authorized to receive such convicts for the punishment assessed herein, and the said Defendant shall be confined for the above named term in accordance with the provisions of law governing such punishments and execution may issue as necessary. Further, the court finds the Presentence Investigation, if so ordered, was done according to the applicable provisions of Art. 42.12, Sec. 9, Code of Criminal Procedure.

The said Defendant was remanded to jail until said Sheriff can obey the directions of this judgment.

Plea Before Jury - Court/Jury Assessing Punishment
CRM-4  R08-12-94                    -1-

TO    COMPLETED ONLY WHEN IMPOSITION OF SENTENCE SUSPEN    ND DEFENDANT GRANTED COMMUNITY SUPERVISION.

[ ] On this the _____ day of _____, 19_____ imposition of this sentence is suspended and defendant is placed

on community supervision for _____ years pending his abiding by and not violating the terms and conditions of community supervision.

Clerk of the court furnished the probationer with a copy of the terms and conditions of community service.

---

```
                    B I L L   O F   C O S T S
```

Payment Type:_____ (S, I, D, M or L:) (NOTE: If "I" or "D" see attached order)
Jail Time: _____ __ H/D/M/Y CC: Y/N ___ Y=Yes N=No (jail/fine/cost concurrent)
Time Assessed TDCJ, (ID) Institutional/(SJ) State Jail;_____ Div:_____ ___ D/M/Y
Jail Credit: _____ __ H/D/M/Y Sentence to Begin Date: _____
(HCJ/SJ)_____ as a Condition of Community Supervision: _____ ____ H/D/M/Y
Additional Jail Credit: _____ ___ H/D/M/Y
Payable on or Before: _____ PLO: _____ Reward SPN: _____ COC:_____
_____ Hours of Sentence to be Served by Performing Community Service
Defendant to Serve Sentence by Electronic Monitoring? (Y or N):_____
NOTE TO SHERIFF:_____

| | | | | | | |
|---|---|---|---|---|---|---|
| Transcript at:_____ Pages........ | | | Crime Stoppers Fee......... | | 2 | 00 |
| Serving Capias: _____/Summons:_____.. | | | Jury Fee................... | | | |
| Summoning_____ Witness/Mileage........ | | | CJPF....................... | | 20 | 00 |
| Jury Fee................................ | | | LEOSEF..................... | | 1 | 50 |
| Taking: _____ Bonds.................... | | | CVCF....................... | | 45 | 00 |
| Commitment............................. | | | DCLCF...................... | | | |
| Release................................ | | | JCTF....................... | | 1 | 00 |
| Attachment............................. | | | Video Fee.................. | | | |
| Arrest W/O Warrant/Capias.............. | | | DWI Evaluation Fee......... | | | |
| ---------RECAPITULATION------------- | | | Reward Repayment........... | | | |
| Fine Amount............................ | | | Security Fee............... | | 5 | 00 |
| Miscellaneous Costs.................... | | | Records Preservation Fee... | | 10 | 00 |
| Judicial Fund Fee...................... | | | ACCA....................... | | | |
| Special Expense........................ | | | Financial Responsibility... | | | |
| Trial Fee.............................. | | | PTR Fee.................... | | | |
| District Attorney Fee.................. | | 40 | 00 | Attorney Fee............... | | | |
| Clerk's Fee............................ | | 40 | 00 | Breath Alcohol Testing..... | | | |
| Sheriff's Fees (Total)................. | | | Rehabilitation Fund........ | | | |
| Misdemeanor Costs...................... | | | Amount Probated/Waived..... | | | |
| MAP Traffic Costs...................... | | | TOTAL AMOUNT OWED.......... | | | |

---

Signed and entered this the _8_ day of __March__ A.D. 19 _99_.

Notice of Appeal: _3-8_ 19 _99_

Probation Expires: _____ 19____

Mandate Received: _____ 19____

PRESIDING JUDGE

After Mandate Received, Sentence to Begin Date is: _____

(Check ONLY if Applicable)

[ ] Defendant to be placed in the "S.A.I.P." (Boot Camp) program in the Texas Department of Criminal Justice, Institutional Division pursuant to Art.
    62.03 (c)-9 Revised Statutes/Article 42.12, Section 8, C.C.P.

Received on _____ day of _____, A.D., 19____ at _____ o'clock ___M.

Sheriff, Harris County, Texas

By:_____ Deputy

Entered _____

Verified _____

Defendant's
Right Thumbprint

CRM-4   08-12-94     -2-

RECORD. MEMORANDUM.
This instrument is of poor quality
and not satisfactory for photographic
recordation; and/or alterations were
present at the time of filming.

**STATE OF TEXAS**　　　　　　§
　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　§
**COUNTY OF HARRIS**　　　　　§
　　　　　　　　　　　　　　　§

**BEFORE ME,** the undersigned authority, appeared Tom Moran, a person

known unto me, and after being duly sworn, he deposes:

My name is Tom Moran. I am over 18 years of age, I have never been convicted of a felony and I am fully competent to make this affidavit. All facts contained herein are true and correct of my personal knowledge unless I state otherwise.

I am an attorney licensed to practice law in Texas. I was first licensed in May 1984. I also am licensed to practice before the Supreme Court of the United States, the United States Court of Appeals for the Fifth Circuit, the United States District Courts for the Northern, Eastern, Southern and Western Districts of Texas and the United States Army Court of Military Review (Currently the United States Army Court of Criminal Appeals). I also am admitted to practice before, and I have practiced before, the International Criminal Tribunal for the Former Yugoslavia in The Hague, The Netherlands.

I have represented numerous persons in habeas corpus proceedings in death penalty cases both before the Texas courts and in federal court. I have been either the attorney of record or assisted in several direct appeals in capital murder cases in which the death penalty has been assessed. I have been an attorney at the trial level in three capital murder cases in which the State sought the death penalty. I have attended numerous continuing legal education seminars on death penalty litigation, including the litigation of death penalty cases on habeas. I taught at seminars on capital murder cases sponsored by the District Judges Trying Criminal Cases in Harris County. I am certified to accept appointments in death penalty cases, both at the trial and the appellate

level, in Harris County and I am certified by the Texas Court of Criminal Appeals for the representation of indigent habeas corpus applicants pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.071 (Vernon Supp. 2001).

I have been requested by the habeas attorney for Charles Mamou to review a portion of the record and the application for writ of habeas corpus and to give an opinion whether the trial attorneys for Mr. Mamou were ineffective in his trial in *State v. Mamou*, No. 800112 in the 179th Judicial District Court of Harris County, Texas. In that trial, Mr. Mamou was charged with capital murder and was sentenced to death. In giving my opinion on whether trial counsel were ineffective, I am applying the standard announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).

I am relying on the following facts as the basis for my opinion. These facts were provided to me by the Applicant's habeas counsel. The facts I am relying on in arriving at my opinion are in a draft of the habeas petition which are attached to this affidavit and incorporated herein by reference. The documents provided to me by habeas counsel are pages number 3-18 and attached hereto.

For purposes of this affidavit, the most important facts (although not the only facts upon which I rely) are that the Applicant was charged, indicted and tried only for the capital murder of Mary Carmouche and that the State presented evidence as to the victim-impact related to "victims" other than Mary Carmouche. I also am relying on the fact that the State failed to disclose that it intended to introduce victim impact evidence related to those persons.

It is my opinion that following *Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App.), *cert. denied*, 522 U.S. 994 (1997), no reasonably well qualified lawyer would fail to object to the admission of so-called "extraneous victim impact testimony" in a Texas capital murder trial. In this regard, I am relying on the fact that *Cantu* was decided by the Court of Criminal Appeals on January 29, 1997, and Applicant was tried

2

for an offense committed on December 6, 1998, about 22 months *after* the *Cantu* opinion was released by the Court of Criminal Appeals and approximately one-year after the Supreme Court of the United States denied certiorari on December 1, 1997.

It is well-settled that an attorney, to provide effective assistance of counsel, must have a firm grasp of the facts of the case and the applicable law. An attorney cannot make strategic decisions in the absence of a firm grasp of the applicable law. And, if he makes strategic or tactical decisions in the absence of a firm grasp of the law, those decisions should not be entitled to deference.

It is my opinion based on the facts given to me that trial counsel's performance was deficient in failing to take all efforts to prevent the State from introducing victim impact evidence on a "victim" who is not named in the indictment. That is the clear holding of *Cantu* and no attorney who represented a defendant in a capital murder case in which the State was seeking the death penalty could have a firm grasp of the applicable law unless he was familiar *Cantu*. In my opinion, trial counsel's failure to object to the admission of that testimony constitutes deficient performance for purposes of *Strickland*.

Trial counsel's performance was deficient for another, related reason. The State failed to comply with a proper discovery request for the information related to victim impact evidence. If there was a proper discovery request and the State failed to disclose, then it was error for the trial court to admit the evidence for a reason unrelated to *Cantu*. If there was no proper discovery request or no ruling, trial counsel's performance was deficient for failing to make a proper request. And, if there was a proper request, trial counsel's performance was deficient for failure to object to the evidence when it was offered.

There could be no rational strategic reason for failure to object to the inadmissible extraneous victim impact evidence. Nothing in the testimony could possibly have helped the defendant and the testimony was highly prejudicial. In my opinion, any proffered "strategic reason"

3

for failing to object to the admission of the evidence or the failure to attempt to exclude it in a hearing outside the jury's presence would be simply a rationalization for a mistake or a failure to know the law.  This is especially true if the reason is something like "I do not like to object in front of the jury," because the issue could have been decided in a hearing outside the presence of the jury.

Without knowing more of the facts of the case, I cannot say definitively whether the error meets the prejudice prong of *Strickland*.

TOM MORAN

**SWORN TO AND SUBSCRIBED BEFORE ME ON THIS** 5 **DAY OF**

**2001.**

NOEMI INFANTE
Notary Public, State of Texas
My Commission Expires
06-03-2001

**NOTARY PUBLIC FOR**
**THE STATE OF TEXAS**

4

Tom:
Here's the pertinent part of the Writ.
Thanks, Roland

## STATEMENT OF FACTS

On December 6, 1998, the pair of Charles Mamou, the Petitioner, went with a friend "Bug" Johnson to meet with another group of young men that included Kevin Walter, Terrence Gibson, and Dion Holley.   Both groups had larceny in their hearts.  Mamou claimed to have $20,000 with which to purchase a kilo of cocaine.  He did not.  The other group claimed to have a kilo of cocaine.  They did not.  (RR. 16, 26, ff.)

First, they agreed to meet at Northline Mall in Houston, where Mr. Walter and Mr. Holley arrived in the blue Lexus belonging to Mr. Holley's family, and Mr. Gibson in another car.  (RR 16, 28, ff.)  Mamou and "Bug" Johnson drove up in a red Chrysler driven by the latter.  (RR 16, 32, ff.)  This first meeting ended in stalemate with each side attempting to maneuver the other side into a display of goods or cash.  (RR 16, 165.)

After the initial futile attempt at scamming each other, the putataive "sellers" drove in the Lexus  to pick up the complainant, Mary Carmouche at her residence.  The parties to the deal agreed to meet at a Bennigan's.  (RR 16, 44-45.)  Again, no one could outmaneuver anyone else.  The Kevin Walter-Terrene Gibson group then followed Mamou and Johnson to a dark area on Lantern Point Drive, near the Astrodome where the cars parked nose-to-nose.  (RR 16, 48, ff.)

3

: 00072

Mr. Mamou left the red Chrysler with a Victoria's Secret bag containing cut-up newspapers that he hoped would be taken as a bag full of money, and went to the back of the other car. (RR 20, 189, ff.) Terrence Gibson stood at the rear waiting for him. After a short discussion, Gibson raised his shirt and Mamou saw a gun handle in his belt. Mamou fired at Gibson. He saw Kevin Walter reenter the Lexus, and which point he shot Walter several times. When the shots were fired, Johnson fled in the Chrysler. Mamou jumped in the blue Lexus where Mary Carmouche sat in the back seat.

The body of the complainant, Mary Carmouche, was discovered two days later in the backyard of a vacant house, dead of a gunshot wound to her chest. (RR 18, 125-131.) Terrance Gibson, the assistant medical examiner continued, also died of a gunshot wound to the chest.

The State's key witness was Terrance "Tater" Dodson, who participated in the early meeting to exchange non-existent cocaine for non-existent money. (RR 19, 166.) He testified that Mr. Mamou had admitted to him that he shot Miss Carmouche the next day after he had driven away with her. (RR 19, 180.)

## SUMMARY OF THE ARGUMENT

Both at the pre-trial phase and during the punishment phase, Court-appointed counsel failed to object to inadmissible victim impact testimony regarding the effects of unadjudicated extraneous offenses against persons not named in the indictment. The testimony was highly emotional and extremely

4

: 00073

prejudicial to Mr. Mamou. In failing to exclude evidence that is patently

inadmissible under Texas Law, either a preliminary hearing, or during trial, trial

counsel's assistance was ineffective, and in the offing, Mr. Mamou was denied the

effective assistance of counsel as guaranteed under both Texas and the Sixth

Amendment of the U.S. Constitution. The admission of this evidence was also a

violation of the Eighth Amendment of the U.S. Constitution. The result of the

wrongful admission of this evidence was to render the punishment phase of the

trial fundamentally unfair.

### GROUNDS OF ERROR I. AND II.

Applicant was deprived of effective assistance of counsel on appeal, as defined by
TEX. CONST. art. I, § 10.

Applicant was deprived of effective assistance of counsel at trial, as defined by the
Sixth Amendment, U. S. CONST. Amend VI.

### STANDARD OF REVIEW

The right to effective assistance of counsel is guaranteed by Sixth and

Fourteenth Amendments to the United States Constitution. U.S.C.A.

Const.Amends. 6, 14. The State and Federal standards for iineffective assistance

are now coextensive.

5

In order to prevail on a claim of ineffective assistance of counsel, appellant must meet the two part test set forth in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellant must show the following:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687, 104 S.Ct. at 2064. To establish ineffective assistance of counsel, appellant has the burden of proving a reasonable probability exists that, but for the counsel's deficient performance, the result of the trial would have been different. Strickland, 466 U.S. at 695, 104 S.Ct. at 2068.

It is not unconstitutional under federal law to introduce extraneous offense testimony as to the impact of the loss of the complainant named in the indictment. **Payne v. Tennessee**, 501 U.S. 808, 812 (1991). In **Payne v. Tennessee**, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), the United States Supreme Court overruled its earlier decision in **Booth v. Maryland**, 482 US 496, 96 Led 2d 440, 107 S. Ct. 2529 (1987.) **Payne** held that the Eighth Amendment does not bar the introduction of victim impact evidence at the punishment phase of a trial as regards the victim of the offense charged in the indictment.

However, some of **Booth** remains good law because **Payne** only applied to victim impact evidence as regards the complainant in a criminal case. The implied

6

holding of **Booth** that other victim impact evidence such as that regarding extraneous offenses is still unconstitutional. This is crucial for this case and the law of Texas. The Court of Criminal Appeals of Texas has drawn a sharp line between victims of the offense charged and victims of extraneous offenses. **Cantu v. State**, 939 S.W.2d 627 (Tex.Crim.App.1996.) For exactly the same reasons that the U.S. Supreme Court had previously ruled that all such evidence is unconstitutional as regards victim impact testimony, the Texas Court of Criminal Appeals in **Cantu** ruled that extraneous victim impact testimony is inadmissible and per se a violation of Rule 401 of the Texas Rules of Evidence. When claiming ineffective assistance for failing to object, an appellant must demonstrate that if trial counsel had objected, the trial judge would have committed error in refusing to sustain the objection. **Vaughn v. State**, 931 S.W.2d 564, 566 (Tex.Cr.App.1996).

The Court of Criminal Appeals has refused to find any particular error to be *per se* ineffective assistance of counsel as a matter of law, it is possible that a single egregious error of omission or commission by appellant's counsel constitutes ineffective assistance. **Jackson v. State**, 766 S.W.2d 504, 508 (Tex.Crim.App.1985) (failure of trial counsel to advise appellant that judge should assess punishment amounted to ineffective assistance of counsel) (modified on other grounds on remand from U.S. Supreme Court, **Jackson v. State**, 766 S.W.2d 518 (Tex.Crim.App.1988)). See also **Ex parte Felton**, 815 S.W.2d at 735 (failure

7

: 00076

to challenge a void prior conviction used to enhance punishment rendered counsel ineffective).  This position finds support in opinions of the United States Supreme Court, which has also held that a single egregious error can sufficiently demonstrate ineffective assistance of counsel.  **Murray v. Carrier**, 477 U.S. 478, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986);  **United States v. Cronic**, 466 U.S. 648, 104 S.Ct. 2039, 2046 n. 20, 80 L.Ed.2d 657 (1984)

### STATEMENT OF FACTS AS TO GROUND OF ERROR NUMBERS ONE AND TWO

Trial counsel filed a "Motion for Hearing on Admissibility of Evidence" (CR, 15) and a "Motion for Discovery of Victim Impact Testimony" (CR, 20) but never obtained a ruling on these motions. Likewise, the trial attorney filed  a "Defendant's Request For Disclosure Of Defendant's Arrest Conviction Record And Extraneous and/or Unadjudicated Acts Of Misconduct To Be Offered At Guilt Or Punishment" that was never ruled upon by the Court.  (CR, 30.)  The trial lawyers also filed a Motion in Limine requesting extraneous offense evidence; this motion does not have an order form attached to it. (CR, 74.)

The State furnished two extraneous lists to defense counsel.  (CR, 58 & 61.) These lists do not include the murder of Terrence Gibson as a disclosed extraneous, even though his mother testified with profound emotional impact, as detailed above.

8

Unfortunately, no hearing was ever held on these Motions. No objection was made at trial to the heart-rending testimony of two extraneous-offense victim impact witnesses.

The older sister of Mr. Williams testified about its impact on her the family of the deceased in the extraneous case. She and the State made a strong emotional appeal to the jury to sentence him to death precisely because of the effect on Williams's son, on herself, and on her father and mother. The District Attorney conducted the following direct examination (from Vol. 22, Pg. 112, ff.):

"Q, Where does your brother, James, live?
A. He lives in Lake Charles, Louisiana.
Q. Did he come here for the trial?
A. Yes.
Q, What about Aaron -- I'm sorry -- Anthony, Bruiser's son? What effect has it had on him?
A, He's okay, but if you talk about -- if you ask him too many questions about his dad, he stops talking.
Q, He clams up, won't talk about it? Have you ever been with Anthony, the little boy, since his dad's died when he's been asleep?
A. Yeah, when he spends the weekend at my house.
Q. How does he act when he's asleep?
A. He imagines that his daddy is playing with him."
What juror could help buy weep at such testimony? The direct examination continued:
"Q. Does he speak about his daddy when he's asleep?
A., He tells his daddy to stop.
Q. How about with respect to the cemetery? Does ever ask about the cemetery?
A.  All the time.
Q. What does he say?
A. Auntie, can you take me to the cemetery?
Q. How about, did he go to your brother's funeral?
A, Yes.
Q. Does he ever talk about that?

9

A. He wishes that his daddy's funeral was again so
he could see him.

Q, So it was an open casket at your brother's funeral?

A, Yes.

Q.   What effect has it had on you, Mrs. Williams?

A. Devastation, just -- what do you do? I'm the oldest of three
children, My baby brother is gone. I don't have but one brother left.

Q. Let me show you a picture, Miss Williams, State's Exhibit 128.
Was this a picture of your brother and his son?

Q, And when would that picture have been taken about how long
ago?

A, About five years ago.

Q, Okay. How is your dad doing, Miss Williams?  What effect has it
had on him?

A. He's fine physically. Mentally he's not,

Q. In what way is he not?

A, He's angry. He's hurtful,

Q. Did you try and ask him to come to the trial?

A, I asked him and my mother, and my mother said she wasn't
coming

Q.   What effect has it had on your mom.

A, Mentally she's still -- she doesn't want to deal with the fact that
my little brother is gone.

Q. Do you think she's accepted the fact that he's gone?

A.  I don't think she has, when she still talks about him like he's
coming.

Q. So she talks about him as if he's still alive; is that right?

A.  Yes.

Q. What other effects do you see, with respect to your brother's
death, on your moms

A, Her diabetes has gotten  worse,

Q, How old is your mom?

   A. Fifty-three.

Q. Thank you, ma'am."

The State also called to the stand without objection from the defense
Patricia Dodson,  the mother of Terrence Dodson,  who in an extraneous offense,
was shot by Petitioner at the scene of the failed "deal."  (From Vol. 22, 39.)


DIRECT EXAMINATION
BY MS. CONNORS:


10

Q. Miss Gibson, you are the same Patricia Gibson that testified at the first part of the trial; is that right?

A. Yes, ma'am.

Q. Miss Gibson, what was the last time you saw your son, Terrence?

A. December the 7th, the 6th. That Sunday afternoon we all convened at my mom's for church, and he was there. He came by.

Q. Were your other sons or any other children there?

A. Yes.

Q. Was your husband there?

A. Yes, he was. I'm sorry, no, not that Sunday, no, he was not.

Q. So both your sons, other sons, or just one there?

A. Yes, my sons and their girlfriends, yes.

Q. What were y'all doing at your mom's house when your son, Terrence, came?

A. We were looking at pictures. They asked to see their baby pictures And their baby pictures, the other two, their girlfriends. And we were on the floor looking at pictures.

Q. So, all of y'all were looking at past baby pictures of each of the children; is that correct?

A. That's correct.

Q. Were y'all enjoying yourself and laughing and having a good time?

A. Yes.

11

Q. When is the last time you laughed like that?

A. It's been a while.

Q. When your son left that evening, what did he say to you?

A. We were all on the floor, and he just walked in. And everybody just kind of said, hey, Terrence. Because we had been there, and we started all looking at pictures out on the floor. And we were just looking at baby pictures; and he stayed awhile, went in the kitchen. He always goes in to see what my mom cooks. And we laughed and talked awhile, and then his pager went off; and he said, mom, I'm fixing to go. And he went to my mom.

Q. What did he do when he went to your mom?

A. He normally kisses my mom on the way out, and he just kind of patted her on the head, and he was on his way out. And I said, Are you about to leave? he said, Yes. And I got up and I went in the garage with him.

Q. Did you say anything to him, or did you hug him at all?

A. Yes, I did. I said, Terrence, be careful. And he left.

Q. Did you say good-bye?

A. Yes, I did. And I always said, Mom loves you. So he knew that.

Q. And that's the last time you saw him alive?

A. That's correct.

12

Q. And how did you find out he had been killed?

A. I got a phone call about 1:15 Monday morning from Hermann Hospital, a Claudette at Hermann Hospital.

And she said, We have a young man here, and I'm not quite sure that it is your son. And she said, Does your son have a tattoo? And I said, Yes. She said, You need to get to Hermann Hospital as soon as you can.

Q. Did she tell you that he had been injured or how he had been injured?

A. No. She said, We have -- she didn't even say shot. She said, We have a young man here, and I'm not even quite sure if it's your son; but we need for you to get to the hospital as quickly as possible. And she asked me did he have a tattoo, and I said yes.

Q. Who did you go to Hermann Hospital with?

A. My husband and I picked up my baby son on the way. I called him immediately after that happened.

I got the call, and I picked him up at his apartment.

Q. What is your baby son's name?

A. His name is Walter, IV, Walter Gibson, IV.

Q. How old is he?

A. They're thirteen months apart.

13

Q. When you say they?

A. Terrence is twenty-two and he's twenty-one. They're thirteen months apart.

Q. Were they close?

A. Very much, yes.

Q. When you were driving to Hermann Hospital, about how long did that take from your house?

A. I would think not long, because I was driving very fast.

Q. What was going through your mind?

A. I guess I just thought probably he was injured or in a car wreck. I didn't know.

Q. When you got to the hospital, who did you speak with?

A. I went directly to the emergency room and asked for a Claudette, because she said she would be waiting when I got there.

Q. Did you speak with her?

A. Yes, I did. She took us immediately to the critical care waiting room. And I just assumed, I

guess, by seeing critical care that he was in critical condition or what. All I wanted to do was get to him, And then she said, I'm going to take you around to the trauma center. And they took us

urse that was there said, The doctor need to come out and

14

: 00083

speak with you. We're going to take you back to a waiting area, of

which they did.

Q. And how soon before you were able to speak with a doctor?

A. It was about three minutes. They came in. It was shortly after.

And my family had already and there.

Q, What did the doctor say to you?

A. When they walked in, they asked us to sit down and said that they

had did everything possible for my son and -- but the way the bullet

went through his heart, there was no way to –

Q, When the doctor told you that the bullet had gone through his

heart and he had died, what went mind?

A. I was devastated,

Q, Were you able to go then see your son?

A. No, they wouldn't let me see him, But my oldest son and my

husband said that they didn't think it

would be a good idea, that they would go. And they went

to see him.

Q. Did -- where did they have to go to see Terrence?

A. In the morgue of Ben Taub.

Q. So they had to go to Ben Taub to identify his body?

A. I'm sorry, in Hermann, in the morgue.

15

Q, Hermann Hospital?

A, Yes.

Q, Can you tell the jury what effect it's had on your younger son, Walter, the one that was thirteen months apart, from Terrence's being murdered?

A, I was very concerned about him, because they were so close. He had his own apartment. I shared with my cousin, I thought he would be one that would revert to drinking. And when he did, that's when we had a problem with him. We had to stay close to him and talk to him a lot, trying to get him to come to church with me; because he was having a very difficult time dealing with it, because they were very close.

Q. How about your older son? What effect has it had on him?

A. I think more of him is because he actually saw Terrence, the last hat was very difficult for him since which we actually had to talk about it over and over again, But that's the last thing, other than seeing him at funeral or whatever, He relives that over and over again.

Q. How about your husband, Miss Gibson? What 1 effect has it had on burying his son?

16

A. We had to leave for awhile and just take an just to get away,

be able to try to talk it out. And I think with him, it was that the

-- the times that, I guess -- my son has a five-month-old baby

he'll never get a chance to know, and we have had to talk it out.

Q. How about you, as a mom? What was it like to bury your son?

A. That's something that I have to live with everyday and think

about. Is there something else I could

have said? Is there something else I could have done?  Terrence was

a follower. He was not a leader. And think more so, of us being

parents, trying to raise our boys up as good citizens and as good

they get a certain age. You can't make choices for them.   And he made some bad

hen he was young, we could, as far as friends. And it seems

like the more we talked to him, that made him feel big, or I don't

know; but he  wasn't raised that way. And that's what, more

everyday, I guess, that you have to live with every day, coming up as

a young boy in church and in a Christian family home, that parents

work hard to display hard-working parents,     And when he got

older he made decisions to be with what I consider the wrong crowd,

And that's, I guess, the   thing that's hard every day is, is there

17

something I could have said? Is there something else I could have

did that my son would still be alive today?

Q. So you blame yourself a lot of the time, Miss Gibson?

A. I don't think so much. I think I did everything I could;

because when you get a certain age, they make choices. But

these choices cost him his life, and that's the thing I can't go

back and undo and I have to live with every day of my life.

Q. Thank you, ma'am.

   MS. CONNORS: I have no further questions,

Your Honor,



# CHARLES BACARISSE
### HARRIS COUNTY DISTRICT CLERK

Direct Dial Line:
755-5738

November 13, 2001

MR. ROLAND BRICE MOORE, III
ATTORNEY FOR APPLICANT
1314 TEXAS AVENUE
HOUSTON, TEXAS 77002

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 800112-A in the 179TH District Court.

☐ State's Original Answer Filed

☒ Affidavit May 8, 2001

☐ Court Order Dated

☐ Respondent's Proposed Order Designating Issues And Order For filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order

☐ Other

Sincerely,
Criminal Post Trial Section
Harris County District Clerk's Office

lag

Enclosure(s) AFFIDAVIT OF TOM MORAN

**ATTORNEY FEES EXPENSE CLAIM-DISTRICT COURTS**
UNDER ARTICLE 26.05, CODE OF CRIMINAL PROCEDURE AS AMENDED

**Instructions**
1. ...r only one defendant and type of case per claim.
2. Before payment can be authorized, each item must be completed legibly in ink.
3. For investigations, paid bills must be submitted by the attorney for expenses claimed.
4. Forward completed claim to the presiding judge for approval.

## CAPITAL CASE COURT APPEARANCE INFORMATION

| COURT NUMBER | DEFENDANT NAME | CASE NUMBER(S) |
|---|---|---|
| 179* | Charlie Mamou | 800112 – A |

### SECTION 1: IN-COURT APPEARANCE

| DEATH CAPITAL | Number of Court Days/Hours | RATE (Judge Completes) | DAILY RATE Minimum | Maximum | TOTAL (not to exceed) | AMOUNT (Judge Completes) |
|---|---|---|---|---|---|---|
| Non-Trial Appearance (non-issue) | | | $130 | $400 | | $ |
| Trial-1st Chair | | | $270 | $540 | | |
| Trial-2nd Chair | | | $200 | $360 | | |
| Trial-1st Chair Contract - includes all fees except Investigation and Expert Witness fees. | | | | | | |
| Trial-2nd Chair Contract - includes all fees except Investigation and Expert Witness fees. | | | | | | |
| **NON-DEATH CAPITAL** | | | | | | |
| Non-Trial Appearance (non-issue) | | | $100 | $200 | $1000 | |
| Trial | | | $200 | $360 | | |

### SECTION 2: PRETRIAL HRG / MOTION W/TESTIMONY

| Death and Non-Death Capital | | | $150 | $250 | | |
|---|---|---|---|---|---|---|

### SECTION 3: OUT OF COURT HOURS

| Death Capital - Prior Written Court Approval Required. | | $50/hr | | | $2000 | |
|---|---|---|---|---|---|---|
| Non-Death Capital - Prior Written Court Approval Required. | | $50/hr | | | $1000 | |

### SECTION 4: INVESTIGATION

| Death and Non-Death With Court Written Court Approval Required | 9.6 | 50 | | | 505.00 | 505.00 |
|---|---|---|---|---|---|---|

### SECTION 5: EXPERT TESTIMONY

| Death and Non-Death Capital, Plus Expenses, Based on Current County Policy-Prior Written Court Approval Required. | | | | | | |
|---|---|---|---|---|---|---|

### SECTION 6: APPEALS

| **Capital-Death Penalty Sought** | | | $45 | | $13,000 | |
|---|---|---|---|---|---|---|
| Writ of Habeas Corpus - Death Penalty | 92.5 | 100 | | | | 9,250.00 |
| **Capital-Death Penalty Not Sought** | | | $45 | | $2,800 | |
| Petition for Discretionary Review Granted | | | | | $450 | |
| Petition for Discretionary Review NOT Granted | | | | | $300 | |
| New Brief After PDR Granted | | | | | $1,300 | |
| Oral Argument at Court of Criminal Appeals, Austin | | | | | $450 | |

### SECTION 7: MISCELLANEOUS

| Change of Venue-Reasonable Expenses, According to County Travel Policies | | | | | | |
|---|---|---|---|---|---|---|
| Other (Prior Approval of Fee Schedule Committee Required) | | | | | | |

List the dates of all Court Appearances for which charges are claimed above.

**TOTAL** 9,755.00

### PERSONAL INFORMATION

Social Security Num.: 464 – 76 – 7495    Telephone Number (713) 229 – 8500    Bar Card Number 14388100

Mailing Address (Number) (Street) 1314 Texas Ave #1705, Houston, Texas (City) (State) 77002 (Zip Code)

### CERTIFICATION

I, _____, Attorney at Law, swear or affirm to the Court Auditor that they may rely upon the information contained above to make payment according to the fee schedule adopted by the Board of Judges pursuant to Article 26.05 Code of Criminal Procedure effective September 1, 1987. I further swear or affirm that I have not received nor will receive any money or anything else of value for representing the accused, except as otherwise disclosed to the Court in writing.

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS

THE 13th DAY OF June A.D. 2004

_____ Attorney at Law (Signature)

Approved _____

_____ Presiding Judge (Signature)      _____ District Clerk Deputy (Signature)

179th
COURT NUMBER

BLUE - COURT      GREEN - AUDITOR      YELLOW - ATTORNEY

800112-A

No. ~~846938~~

| | | |
|---|---|---|
| CHARLES MAMOU | § | IN THE 179th DISTRICT |
| Petitioner | § | |
| | § | |
| VERSUS | § | COURT OF HARRIS COUNTY |
| THE STATE OF TEXAS, | § | F I L E D |
| Respondent | § | CHARLES BACARISSE |
| | | TEXAS District Clerk |

JUN 1 5 2001

THIS IS A DEATH PENALTY CASE   Time: _____

Harris County, Texas

EX PARTE CONFIDENTIAL MOTION FOR PAYMENT ~~OF EXPENSES~~ TO
RETAIN EXPERTS AND INVESTIGATOR, AND REIMBURSEMENT OF
COUNSEL'S OUT-OF-POCKET EXPENSES INTERIM PAYMENT FOR
APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

TO THE HONORABLE JUDGE OF SAID COURT:

Applicant, Charles Mamou, who has been found to be indigent according to the Texas Code of Criminal Procedure, Ann. Art. 11071, Section 2(b), requests this Court enter an Order providing and authorizing expenditure of funds for factual investigation, expert assistance, and reimbursement of counsel's out-of-pocket expenses, as authorized by Art. 11.07 1, section 3(b).

The full, fair and adequate identification, development, presentation, and litigation of many of Applicant's claims depend upon the provision of sufficient finds to secure the services an investigator. Applicant's court-appointed counsel is unable to independently fund this litigation or advance sufficient funds to prepay the expenses identified in this motion. In separate paragraphs below, Applicant will identify each anticipated claim requiring investigation and prepayment of expenses, the specific facts suggest that a claim of possible merit may exist, and an itemized list of anticipated expenses for each claim.

Appellant's Writ claims ineffective assistance of counsel at punishment, and denial of due course of law and due process at punishment.

WHEREFORE, Applicant, respectfully requests that the Court enter an order providing for the payment of $505 as reasonable expenses incurred to investigate and present the possible claim identified above, according to Art. 11.071, section 3(b) of the Texas Code of Criminal Procedure. The investigator's time sheet is attached hereto.

Respectfully submitted,

ROLAND BRICE MOORE III
ATTORNEY FOR DEFENDANT
1314 Texas Ave. Suite 1705
Houston, Texas 77002
713  229-8500
State Bar No. 14388100

80 0112 -A

No. 346993

| | | |
|---|---|---|
| CHARLES MAMOU | § | IN THE 179th DISTRICT |
| Petitioner | § | |
| | | |
| VERSUS | § | COURT OF HARRIS COUNTY, |
| THE STATE OF TEXAS, | § | TEXAS |
| Respondent | | |

## MOTION FOR INTERIM PAYMENT CODE CRIM. PROC. ART. 1 1.071
## DEATH PENALTY WRIT OF HABEAS CORPUS

ORDER

On this the _15th_ day of _June_, 2001, came to be heard the above motion of

counsel for the Defendant, after due consideration of the same the Court finds that the

Motion should in all things be GRANTED, Payment in the amount of

_$9,250.00_ should be made to the above counsel.

IT IS SO ORDERED,

_____
JUDGE PRESIDING

# McLAIN & PATTERSON
## INVESTIGATIONS

6630 Cypresswood Drive, Suite 200
Spring, Texas 77379

Telephone (281) 397-0605
Fax/Modem (281) 379-6916

Roland Moore, III
Attorney At Law
1314 Texas Ave. #1705
Houston, Texas 77002

Re: The State of Texas vs. Charles Mamou; In the 179th
District Court of Harris County, Texas

| Date | Description | Time |
|---|---|---|
| 10/20/00 - | Review transcript of trial | 2 hours |
| 10/25/00 - | Review Wayne Hill's file | 2 hours |
| 10/25/00 - | Interview Wayne Hill | ½ hour |
| 10/26/00 - | Interview Defendant at Terrell Unit - | 3 hours |
| 11/26/00 - | Interview Charles Mamou, Sr. | ½ hour |
| 01/22/01 - | Review D.A.'s file | 4 hours |
| 01/24/01 - | Review D.A.'s file | 2 ½ hours |
| 02/01/01 - | Review D.A.'s file | 3 hours |
| 02/05/01 - | Discuss case with attorney and deliver records to him | 1 hour |
| 03/07/01 - | Attempt to contact Samuel Johnson, Terrence Dodson, Michael Kraatz, Blondell Richardson, computer checks on Terrence Dodson, Blondell Richardson, Samuel Johnson, Dion Holley, Kevin Walter, Shawn Eaglin, Howard Scott, Anthony Trial, and Michael Kraatz | 3 hours |
| 03/14/01 - | Interview Shawn Eaglin, contact Charles Mamou, Sr. Interview Stephanie Felix, attempt to contact Lee Hunter and David Green | 3 hours |

V3385 P0226

| | | | |
|---|---|---|---|
| 03/18/01 - | Interview Angelice Mamou, Interview Stephanie Felix | - | 1 ½ hours |
| 03/19/01 - | Interview Zelda Hunter | - | ½ hour |
| 03/22/01 - | Attempt to locate Michael Gamble at 13831 Purple Martin | - | 1 ½ hours |
| 03/27/01 - | Interview Officer King, contact Angelice Mamou, Interview Michelle Mamou, run data search on Gamble | - | 1 ½ hours |
| 04/08/01 - | Contact Zelda Hunter | - | ½ hour |
| 04/10/01 - | Interview Officer King, Adam Peterson David Green, and Stephanie Felix | - | 1 ½ hours |
| 03/26/01 to 04/17/01 - | Interview Jurors | - | 2 hours |
| 04/18/01 - | Prepare Juror Affidavit | - | ½ hour |

TOTAL 33 hours

33 hours @ $60.00 per hour      $ 1,980.00

Expenses - Data Search/Gamble      25.00

           TOTAL    2,005.00
           Less Retainer    1,500.00

           TOTAL BALANCE DUE $   505.00

Respectfully submitted,
Cynthia Patterson

V33385 P0227

: 00094

No. 800112 - A

| CHARLES MAMOU, | § | IN THE 179th DISTRICT |
| Petitioner | | |
| | § | |
| VERSUS | § | COURT OF HARRIS COUNTY, |
| THE STATE OF TEXAS, | § | TEXAS |
| Respondent | | |

## MOTION FOR INTERIM PAYMENT
## CODE CRIM. PROC. ART. 11.071
## DEATH PENALTY WRIT OF HABEAS CORPUS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Roland Moore III attorney for the petitioner, Charles Mamou, and would respectfully show this court that attorney for the petitioner was appointed by this honorable court to represent the petitioner on his writ of habeas corpus on May 4, 2000, pursuant Code of Crim. Proc. Art 11.071.

Roland B. Moore III, attorney for the petitioner would respectfully move this Honorable Court to set a fee based upon the hours worked on petitioner's application for writ of habeas corpus and set forth in the attached worksheet. After such fee has been set by the Court, the undersigned attorney would ask that the Court direct the Auditor for Harris County, Texas to pay such fee prior to final orders of the Court Of Criminal Appeals in this matter.

F I L E D
CHARLES BACARISSE
District Clerk

JUN 1 5 2001

Time: _____
Harris County, Texas
By _____ Deputy

Respectfully submitted,

ROLAND BRICE MOORE III
ATTORNEY FOR DEFENDANT
1314 Texas Ave. Suite 1705
Houston, Texas 77002
713 229-8500
State Bar No. 14388100

THE STATE OF TEXAS

COUNTY OF HARRIS

Before me, the undersigned authority, on this day personally appeared Roland B. Moore III, who upon his oath did state:

"I have prepared and read the foregoing Motion and I state that the facts set forth in, such motion are true and correct to the best of my knowledge.

_____
Roland Brice Moore III, Affiant


Subscribed and sworn to before me this the 20th day April, 2001,
by the Affiant,  Roland B. Moore III.

Notary Public in and for the
State of Texas

No. 846093

| CHARLES MAMOU | § | IN THE 179th DISTRICT |
|---|---|---|
| Petitioner | § | |
| | | |
| VERSUS | § | COURT OF HARRIS COUNTY, |
| THE STATE OF TEXAS; | § | |
| Respondent | § | TEXAS |

### THIS IS A DEATH PENALTY CASE

EX PARTE CONFIDENTIAL MOTION FOR PAYMENT
OF EXPENSES TO COMPENSATE INVESTIGATOR,
AND REIMBURSEMENT OF COUNSEL'S OUT-OF-POCKET EXPENSES
INTERIM PAYMENT APPLICATION FOR
POST-CONVICTION WRIT OF HABEAS CORPUS

### ORDER

On this the day of _____ day of April, 2001, came to be heard the above motion of counsel for the Defendant. After due consideration of the same the Court finds that the Motion should in all things be granted; IT IS SO ORDERED, and the amount authorized shall not exceed $ _505__

IT IS SO ORDERED.

_____
JUDGE PRESIDING

: 00097

## APPOINTED COUNSEL WORKSHEET SUMMARY

Applicant's Name:   Charles Mamou
District Court:         179th District Court, Harris County, Texas
Cause Number:       800112-A
Counsel for Applicant:

      Roland B. Moore III
      Attorney at Law
      1314 Texas Avenue, Suite 1705
      Houston, Texas 77002
      (713)229-8500
      TBN: 1438100
      SSN: 76-0272374

      Appointed Counsel Fees:   92.5
      (Hours x $100.00)   ~~98.25~~  hours  $9250.00

      Expenses:

Appointed Counsel Travel Time:

      (9 Hours x $50.00)   __           $0

      TOTAL AMOUNT OF CLAIM:        $9250.00

(See attached worksheets for details)

Sheet1

**IN RE:  CHARLES MAMOU**
Case No. 800112, 179th District Court, Harris County, Texas

| | ACTIVITY | HOURS | |
|---|---|---|---|
| 8-May-00 | Review of Court documents | 1.5 | |
| 13-May-00 | Letter to client | 0.5 | |
| 6/30/2000 | Review of Case with App. Att | 2 | |
| 6/30/2000 | Visit with Client at TDC | 2 | |
| 6/30/2000 | Travel to and from TDC | | 5 |
| July 5-7, 2000 | Review of a transcript | 14 | |
| July 13-15, 2000 | Review of transcript | 12 | |
| July 19-21, 2000 | Review of transcript | 12 | |
| | | | |
| 10/16/2000 | Review of trial counsel file | 3 | |
| 10/17/2000 | Meeting with investigator | 2 | |
| 10/18/2000 | Prepare and file motion to | 1 | |
| | unseal juror's records | | |

**TOTAL: INTERIM VOUCHER PAID**                                50

| | | |
|---|---|---|
| 19-Oct-00 | Motion to Supplement Record | 2 |
| | procuring Motion for New Trial | |
| 11/20/2000 | Discussion of case with Death Penalty | 0.5 |
| | Resource Center Lawyers | |
| 11/21/2000 | Procure Jury list-unfound | 0.5 |
| 12/12/2000 | Attempt to Procure Jury list | 1 |
| 12/13/2000 | Attempt to Procure Jury list | 0.5 |
| 1/4/2001 | Preparation of jury letters | 2 |
| 1/16/2001 | Motion for Extension to file Writ | 1.5 |
| 1/23/2001 | Review of file at DA's office | 4 |
| 1/24/2000 | Discussion w/DA @ other car | 0.5 |
| 1/24/2000 | Review of file at DA's office | 3.5 |
| 2/1/2001 | Review of file at DA's office | 2 |
| 2/5/2001 | Review of client's correspondence, | 2 |
| | writing reply, legal reserach | |
| 2/9/2001 | Client correspondence | 0.75 |
| 3/5/2001 | Mamou files and research | 2 |
| 3/8/2001 | Research; Compose letters to trial lawyers | 4 |
| 3/27/2001 | Conversation with investigator | 0.5 |
| 3/28/2001 | Review of files at court; convesation with | 1.5 |
| | prosecutor; research | |
| 3/29/2001 | Legal research-Federal cases | |
| 3/30/2001 | Visit 179th;letter to Appellate lawyer, | 3 |
| | Freed, conversation with invest. | |
| 4/2/2001 | Review of model writs, research, drafting | 7 |
| 4/5/2001 | Procure and review police supplementals | 2 |
| 4/6/2001 | Legal research-Federal and Texas cases | 3 |
| 4/9/2001 | Research and drafting Writ | 1.5 |
| 4/10/2001 | Research and drafting Writ | 4 |
| | Correspondence and phone call | |
| 4/12/2001 | Review of treatises on State and Federal | 5 |

V3385 P0232

Sheet1

|  | Writ; composition of outline | |
|---|---|---|
| 4/13/2001 | Research and drafting Writ | 4.5 |
| 4/14/2001 | Research and drafting Writ | 4.5 |
| 4/15/2001 | Research and drafting Writ | 4 |
| 4/16/2001 | Research and drafting Writ | 4.25 |
| 4/17/2001 | Research and drafting Writ | 6.5 |
| 4/18/2001 | Research and drafting Writ | 11 |
|  | Filing Writ; procuring affidavits; Conversation with investigator | |
| 4/19/2001 | Making copies;mailing to Court of Criminal Appeals and State A.G. and Mamou. | 3 |
| 4/20/2001 | Conversation with trial lawyer | 0.5 |

|  | TOTAL HOURS X $100 | 92.5 | $9,250.00 |
|---|---|---|---|

Cause No. 800112-A

EX PARTE

§   IN THE 179th DISTRICT COURT

§   OF

CHARLES MAMOU, JR.,
       Applicant

§   HARRIS COUNTY, TEXAS

## STATE'S MOTION FOR FILING AFFIDAVIT

The State respectfully requests that the Court order defense counsel WAYNE T. HILL, KURT BUDD WENTZ, and FLOYD W. FREED to file affidavits in the above-captioned cause responding to the applicant's habeas allegations of ineffective assistance of counsel at trial and on appeal. The State requests that the Court order counsel to file affidavits (1) summarizing the actions taken to represent the applicant in cause no. 800112; (2) responding to the allegations of ineffective assistance of counsel contained in the application for writ of habeas corpus; and (3) specifically responding to the allegations that:

- trial counsel allegedly failed to object to the testimony of Yolanda Williams and Patricia Dodson as victim impact evidence concerning the effects of unadjudicated extraneous offenses against persons not named in the indictment;

- trial counsel allegedly failed to properly object to the prosecutor's argument and questioning concerning the possibility that the Texas Legislature might change the laws concerning parole eligibility;

- appellate counsel allegedly failed to raise the issue on direct appeal that the applicant's trial counsel

RECORDER'S MEMORANDUM.
This instrument is of poor quality and not satisfactory for photographic recordation; and/or alterations were present at the time of filming.

: 00101

was ineffective for allegedly failing to object to victim impact evidence of Yolanda Williams and Patricia Dodson; and

- appellate counsel failed to raise an issue on appeal that comported with trial counsel's objection to the prosecutor's argument and questioning concerning the possibility that the Texas Legislature might change the laws concerning parole eligibility.

Service has been accomplished by sending a copy of the State's motion on November 12, 2001 to habeas counsel: Mr. Roland Brice Moore, III; 1314 Texas Avenue, Suite 1705; Houston, Texas 77002.

**F I L E D**
CHARLES BACARISSE
District Clerk

NOV 1 2 2001

Time: _____
Harris County, Texas

By _____
Deputy

Respectfully submitted,

ERIC KUGLER
Assistant District Attorney
Harris County, Texas 77002
(713) 755-5826
(713) 755-5826 fax
TBC No. 00796910

Signed this 12th day of November, 2001.



# CHARLES BACARISSE
## HARRIS COUNTY DISTRICT CLERK

Direct Dial Line:
755-5738

November 13, 2001

MR. ROLAND BRICE MOORE, III
ATTORNEY FOR APPLICANT
1314 TEXAS AVENUE
HOUSTON, TEXAS 77002

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure,  please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 800112-A in the 179TH District Court.

☐ State's Original Answer Filed                    ,

☐ Affidavit                    ,

☐ Court Order Dated                    ,

☐ Respondent's Proposed Order Designating Issues  And Order  For filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order                    ,

☐ Other

Sincerely,
Criminal Post Trial Section
Harris County District Clerk's Office

lag

Enclosure(s) – STATE'S MOTION FOR FILING AFFIDAVIT

Cause No. 800112-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| CHARLES MAMOU, JR.,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## ORDER FOR FILING AFFIDAVIT

Having considered the applicant's application for writ of habeas corpus, the

Court **ORDERS** counsel WAYNE T. HILL, KURT BUDD WENTZ, and FLOYD

W. FREED to file affidavits in the above-captioned cause: (1) summarizing the

actions taken to represent the applicant in cause no. 800112; (2) responding to the

allegations of ineffective assistance of counsel contained in the application for writ

of habeas corpus; and (3) specifically responding to the allegations that counsel:

- trial counsel allegedly failed to object to the testimony of Yolanda Williams and Patricia Dodson as victim impact evidence concerning the effects of unadjudicated extraneous offenses against persons not named in the indictment;

- trial counsel allegedly failed to properly object to the prosecutor's argument and questioning concerning the possibility that the Texas Legislature might change the laws concerning parole eligibility;

- appellate counsel allegedly failed to raise the issue on direct appeal that the applicant's trial counsel was ineffective for allegedly failing to object to victim impact evidence of Yolanda Williams and Patricia Dodson; and

- appellate counsel failed to raise an issue on appeal that comported with trial counsel's objection to the prosecutor's argument and questioning concerning the possibility that the Texas Legislature might change the laws concerning parole eligibility.

Counsel WAYNE T. HILL, KURT BUDD WENTZ, and FLOYD W. FREED are **ORDERED** to file said affidavits with the Appellate Division of the District Clerk's Office within **TWENTY (20) DAYS** of the signing of this order.

THE CLERK IS **ORDERED** to send a copy of this order to the applicant, a copy of this order to the Respondent, and to serve copies of this order, the applicant's application, and the Respondent's answer to:

Mr. Wayne T. Hill
Attorney at Law
4615 Southwest Freeway, Suite 600
Houston, Texas 77027-0000

Mr. Kurt Budd Wentz
Attorney at Law
5629 FM 1960, Suite 115
Houston, Texas 77069-4214

Mr. Floyd W. Freed
Attorney at Law
6630 Cypresswood, Suite 600
Spring, Texas 77379

When the affidavits of WAYNE T. HILL, KURT BUDD WENTZ, and FLOYD W. FREED are received, the CLERK IS **ORDERED** to send a copies of said affidavits to the applicant's counsel: Mr. Roland Brice Moore, III; 1314 Texas Avenue, Suite 1705; Houston, Texas  77002, and a copy to the Respondent:  Eric Kugler; 1201 Franklin, 6th Floor; Houston, Texas 77002.

The COURT FURTHER **ORDERS** the Respondent and the applicant to file any proposed findings of fact within twenty (20) days after the affidavits of

WAYNE T. HILL, KURT BUDD WENTZ, and FLOYD W. FREED are filed. Upon the expiration of time to file the proposed findings of fact, the Clerk shall submit all the documents material to this cause to this Court.

The Clerk of the Court is **ORDERED NOT** to transmit at this time any documents in the above-styled case to the Court of Criminal Appeals until further ordered by this Court.

SIGNED this 12th day of November, 2001.

MICHAEL WILKINSON
Presiding Judge
179th District Court

3



# CHARLES BACARISSE
## HARRIS COUNTY DISTRICT CLERK

Direct Dial Line:
755-5738

November 14, 2001

MR. ROLAND BRICE MOORE, III
ATTORNEY FOR APPLICANT
1314 TEXAS AVENUE
HOUSTON, TEXAS 77002

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 800112-A in the 179TH District Court.

☐ State's Original Answer Filed                           ,

☐ Affidavit                        ,

☐ Court Order Dated                   ,

☐ Respondent's Proposed Order Designating Issues  And Order  For filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order                    ,

☒ Other ORDER FOR FILING AFFIDAVIT

Sincerely,
Criminal Post Trial Section
Harris County District Clerk's Office

lag

Enclosure(s) – ORDER FOR FILING AFFIDAVIT



: 00107



# CHARLES BACARISSE
## HARRIS COUNTY DISTRICT CLERK

Direct Dial Line:
755-5738

November 14, 2001

MR. WAYNE T. HILL
ATTORNEY AT LAW
4615 SOUTHWEST FREEWAY, SUITE 600
HOUSTON, TEXAS 77027-0000

RE:    CHARLES MAMOU, JR
       CAUSE #800112-A
       179TH DISTRICT COURT

Dear Sir:

Enclosed herewith please find a copy of the Court's Order wherein the court orders that WAYNE T. HILL, Attorney at Law, file an affidavit in response to allegations made in the petition for post conviction writ of habeas corpus in the above numbered and styled cause.

Sincerely,

Criminal Post Trial Section
Harris County District Clerk's Office

lag

Enclosure:  Respondent's Proposed Order Designating Issues and Order for Filing Affidavit, Respondent's Original Answer, Application for Writ of Habeas Corpus

CC:   John Jasuta



# CHARLES BACARISSE
## HARRIS COUNTY DISTRICT CLERK

Direct Dial Line:
755-5738

November 14, 2001

MR. KURT BUDD WENTZ
ATTORNEY AT LAW
5629 FM 1960, SUITE 115
HOUSTON, TEXAS 77069-4214

RE:     CHARLES MAMOU, JR
        CAUSE #800112-A
        179TH DISTRICT COURT

Dear Sir:

Enclosed herewith please find a copy of the Court's Order wherein the court orders that KURT BUDD
WENTZ, Attorney at Law, file an affidavit in response to allegations made in the petition for post
conviction writ of habeas corpus in the above numbered and styled cause.

Sincerely,

Criminal Post Trial Section
Harris County District Clerk's Office

lag

Enclosure:  Respondent's Proposed Order Designating Issues and Order for Filing Affidavit, Respondent's
            Original Answer, Application for Writ of Habeas Corpus

CC:     John Jasuta



# CHARLES BACARISSE
## HARRIS COUNTY DISTRICT CLERK

Direct Dial Line:
755-5738

November 14, 2001

MR. FLOYD FREED
ATTORNEY AT LAW
6630 CYPRESSWOOD, SUITE 600
HOUSTON, TEXAS 77379

RE:    CHARLES MAMOU, JR
        CAUSE #800112-A
        179TH DISTRICT COURT

Dear Sir:

Enclosed herewith please find a copy of the Court's Order wherein the court orders that FLOYD W. FREED, Attorney at Law, file an affidavit in response to allegations made in the petition for post conviction writ of habeas corpus in the above numbered and styled cause.

Sincerely,

Criminal Post Trial Section
Harris County District Clerk's Office

lag

Enclosure:  Respondent's Proposed Order Designating Issues and Order for Filing Affidavit, Respondent's Original Answer, Application for Writ of Habeas Corpus

CC:    John Jasuta



1201 Franklin   •   P.O. Box 4651   •   Houston, Texas 77210-4651

RECORDER'S MEMORANDUM.
This instrument is of poor quality
and not satisfactory for photographic
recordation; and/or alterations were
present at the time of filming

NO. 800,112-A

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| vs. | § | 179TH JUDICIAL DISTRICT |
| CHARLES MAMOU, JR. | § | HARRIS COUNTY, TEXAS |

AFFIDAVIT

THE STATE OF TEXAS   §
                     §
COUNTY OF HARRIS     §

BEFORE ME, the undersigned authority, on this day, personally appeared, FLOYD W. FREED, III, who after being by me duly sworn, deposed and stated as follows:

"My name is Floyd W. Freed, III. I am an attorney duly licensed to practice law in the State of Texas and I was the attorney of record for the Defendant, Charles Mamou, Jr., on appeal.

Appellate counsel did not raise on direct appeal any issues related to victim impact evidence of Yolanda Williams and Patricia Dodson due to the fact that trial counsel did not preserve error, if any, pursuant to Rule 33 of the Texas Rules of Appellate Procedure. Adverse rulings were not obtained on the Defendant's Motion for Victim Impact Testimony (C.R. 20) Further, trial counsel's objection at trial was not sufficient to preserve error related to victim impact testimony in that it did not relate to any specific testimony of Yolanda Williams and/or Patricia Dodson. Nor was a "running objection" sought to such testimony.

Appellate counsel did not raise ineffective assistance of counsel because the record was not developed for appellate purposes to raise the issue pursuant to the guidelines as set forward in Tong v. State, 25 S.W. 3rd 707, 712 (Tex. Crim. App. 2000).

Appellate counsel did raise speculation in his Point of Error One. The trial objection was set forth in an oral Motion in Limine which in part asked that cross examination by the State of Texas to be precluded as to examining the defense witness, Dorothy Morgan, as to future changes in the parole law. Appellate counsel avers that the issue raised on appeal does comport to the trial objection and adverse ruling thereon in whole or in part.

V35561 P05583

: 00111

I have read the foregoing Affidavit and it is true and correct to the best of my knowledge and belief.


Further Affiant saith not.



FLOYD W. FREED, III

SUBSCRIBED AND SWORN TO BEFORE ME by FLOYD W. FREED, III, on the 8th day of January, 2002, to certify which witness my hand and seal of office.

BERNARD L. MATHEWS
Notary Public, State of Texas
My Commission Expires
3-6-2004

Notary Public in and for the State of Texas



# CHARLES BACARISSE
## HARRIS COUNTY DISTRICT CLERK

Direct Dial Line:
755-5738

January 10, 2002

MR. ROLAND BRICE MOORE, III
ATTORNEY FOR APPLICANT
1314 TEXAS AVENUE
HOUSTON, TEXAS 77002

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 800112-A in the 179TH District Court.

☐ State's Original Answer Filed                    ,

☒ Affidavit January  9, 2002

☐ Court Order Dated                    ,

☐ Respondent's Proposed Order Designating Issues  And Order  For filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order                    ,

☐ Other

Sincerely,
Criminal Post Trial Section
Harris County District Clerk's Office

lag

Enclosure(s)   AFFIDAVIT OF FLOYD W. FREED, III

: 00113

Cause No. 800112-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| CHARLES MAMOU, JR.,<br>Applicant | § | HARRIS COUNTY, TEXAS |

## RESPONDENT'S ORIGINAL ANSWER

**F I L E D**

**CHARLES BACARISSE**
District Clerk

JAN 1 7 2002

Time:_____
Harris County, Texas
By_____
Deputy

ERIC KUGLER
Assistant District Attorney
Harris County, Texas
1201 Franklin, 6th Floor
Houston, Texas 77002
(713) 755-5826
(713) 755-5809 fax
Texas Bar ID #00796910

: 00114

Cause No. 800112-A

| | | |
|---|---|---|
| EX PARTE | § | IN THE 179th DISTRICT COURT |
| | § | OF |
| CHARLES MAMOU, JR., | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

## RESPONDENT'S ORIGINAL ANSWER

RESPONDENT, the State of Texas, by and through its Assistant District Attorney for Harris County, files this, its original answer, in the above-captioned cause, having been served with the applicant's original application for writ of habeas corpus, pursuant to the requirements of TEX. CODE CRIM. PROC. art. 11.071, and would show the following:

### I.

The applicant is confined pursuant to the judgment and sentence of the 179th District Court of Harris County, Texas, in cause number 800112 (hereinafter "the primary case"), wherein a jury convicted the applicant of the felony offense of capital murder. On October 15, 1999, the jury answered "yes" to the continuing threat special issue and "no" to the mitigation special issue, and the trial court assessed punishment at death (CR – 101-102). The Court of Criminal Appeals affirmed the applicant's conviction in a non-published opinion delivered on November 7, 2001. *Mamou v. State*, No. 73,708 (Tex. Crim. App. November 7, 2001).

2^n|993

## II.

Respondent denies the factual allegations made in the instant application, except those supported by official court records, and offers the following additional reply:

### STATEMENT OF FACTS

<u>State's Evidence at Guilt-Innocence</u>

Late on the evening of Sunday, December 6, 1998, John Wayne McDonald went to a Jack-in-the-Box restaurant on South Main Street in Houston to eat after work (RR XVI – 171-2). McDonald was employed as a security officer by the Villages of Westridge apartments, located at 2401 Westridge in Houston, Texas, near the Astrodome (RR XVI – 171-2). While at the Jack-in-the-Box, McDonald heard two distinct sets of gunshots (RR XVI – 174). He immediately went in the direction of the gunfire and ended up on Lantern Point Drive, an extremely isolated, dark, desolate area surrounded in part by vacant fields (RR. XVI – 52-53, 174, 187) (RR. XVII – 77-78).

Once there, McDonald saw no vehicles of any kind; however, he did see a heavyset man laying on the ground and a second man, who appeared to have been shot in the arm, staggering towards the heavyset man (RR. XVI – 174, 187). When McDonald came in the scene, the staggering man reached for a nearby nine-millimeter pistol, but McDonald picked up the weapon before the staggering man

2

: 00116

could reach it (RR. XVI – 175-6). McDonald found a third gunshot victim whose eyes were open and who had no pulse (RR. XVI – 180).

Near the wounded men, McDonald found a gift bag on the ground; the bag contained "some kind of paper that was cut up" (RR. XVI – 180-181). The men told Officer McDonald that they had been shot when they stopped to help someone who appeared to be having car trouble (RR. XVI – 188-89).

Eventually, O.R. Warren, Houston Police Department, arrived at Lantern Point Drive (RR. XVII – 71). He took the nine-millimeter pistol, which had not been fired, from Officer McDonald and spoke with the staggering man, Dion Holley, who had been shot in the arm (RR. XVII – 76, 108).

Holley told Warren that he and the other injured men had stopped to help two men whose red car was in need of a jumpstart; he also said that the men shot them and drove off, one in a red car and one in a blue Lexus that belonged to Holley's mother (RR.. XVII – 76). He also told Warren that a female friend of his named Mary had been abducted by the men (RR. XVII – 76-77). Holley described Mary as a black, eighteen-year-old female wearing a red shirt and jeans (RR. XVII – 77).

About two hours later, Detective Ted Bloyd, Houston Police Department, homicide division, arrived at Lantern Point Drive (RR. XVII – 85-86). He disbelieved Holley's "good Samaritan" story because of the remote location, the dark conditions, the lack of street-lights, and because of the gift bag containing

: 00117

cut-up newspaper (RR. XVII – 88-89). "It just didn't look right" to Bloyd; he believed the men had been involved in a narcotics transaction (RR. XVII – 89).

Bloyd went to Ben Taub Hospital in an attempt to interview Holley; however, Holley was evasive and extremely uncooperative (RR. XVII – 90-91). Bloyd was unable to talk with the heavyset man, Kevin Walter, because he was severely injured and undergoing surgery at the time (RR. XVI – 91).

Late Monday afternoon, December 7, 1998, the day after the shootings, the blue Lexus belonging to Holley's mother was found on the southwest side of Houston at an apartment complex located at 10800 Fondren (RR. XVII – 92).

On Tuesday, December 8, 1998, Boyd went to Hermann Hospital to speak with Kevin Walter (RR. XVII – 94-95). Walter was in the hospital's intensive care unit and was in serious condition (RR. XVII – 95-96). He began answering yes or no questions, but that became too painful, and he resorted to writing on a pad of paper (RR. XVII – 96). Walter gave Boyd the name of the person who had shot him, "Chucky," and a telephone number in Houston that Walter had used to contact Chucky (RR. XVI – 71-72) (RR. XVII – 96). The name given by Walter confirmed a name Bloyd had received from Houston Police public information officer John Canon by way of a newspaper reporter, who claimed to have gotten the shooter's name from Walter's father (RR. XVII – 91).

G.J. Novak, Houston Police Department, was working with Bloyd on the case and was able to determine that the phone number provided by Kevin Walter

: 00118

belonged to Robin Scott  (RR. XVII – 170).  Detective Novak spoke with Scott, who lived with her husband Howard Scott in apartment number 1402 at 10800 Fondren; that was the apartment complex where the blue Lexus had been discovered (RR. XVII – 171).

Howard Scott told the detectives that Charles "Chucky" Mamou, the applicant, had stayed at Scott's apartment on December 6, 1998  (RR. IXX – 123). The applicant left Scott's apartment around 7:00 p.m. that night  (RR. IXX – 126). According to Scott, the applicant returned to the Scotts' apartment around 2:00 a.m. Monday morning, December 7, 1998, with a friend named "Bug"  (RR.. IXX 128).  Scott told the applicant he had to leave the next day, Tuesday, December 8, 1998, after he talked with his wife Robin on the telephone (RR. IXX – 128). Although the officers searched the Scott's apartment at 10800 Fondren, they were unable to locate either the applicant or the missing Mary (RR. XVII – 96-97) (RR. IXX – 128).

Meanwhile, James Carmouche had been up early Monday morning, December 7, 1998, getting ready to go to work when he heard news reports that a teenage girl named Mary had been abducted  (RR. XX – 41-2).  Carmouche had a seventeen year-old daughter named Mary Carmouche who was a high-school student (RR. XVIII – 177).  Fearing the worst, he ran to his daughter's room only to find her gone  (RR. XX – 42).  Carmouche called his daughter's friends in a futile attempt to locate her  (RR. XX – 42).

5

: 00119

Around noon on December 8, 1998, on the far west side of Houston, a meter-reader for Reliant Energy made a grisly discovery (RR. XVII – 99). Alex Longoria found the body of a teenage girl laying face down in the backyard of a vacant house at 9227 Lynchester (RR. XVII – 99) (RR. XVIII – 125-27).

James Carmouche identified the teenage girl's body as his daughter Mary Carmouche, the complainant (RR. XVIII – 177). The complainant had been killed by a single bullet that entered her chest, penetrated her fifth rib, traveled through her right lung, through the right side of her heart, into her liver and ultimately lodged in her back muscle (RR. XX – 54-55). The perforation to her heart caused her to bleed internally until she died (RR. XX – 54).

In his continuing effort to locate the Lantern Point Drive shooter, Detective Novak went to 2600 Westridge in Houston, which was very close to Lantern Point Drive (RR. XVIII – 178-79). He spoke with the applicant's father, Charles Mamou, Sr., who directed them to Terrance "Tator" Dodson (RR. XVIII – 179). Dodson, the applicant's cousin, in turn directed the police to Samuel "Bug" Johnson (RR. XVII – 180).

After speaking to all the parties involved, Detective Novak asked Thad Badeaux with the Lafayette Parish Sheriff's Office to arrest the applicant (RR. IXX – 157-59). Badeaux found the applicant hiding in a closet inside a home in Sunset, Louisiana (RR. IXX – 161). The applicant was charged with capital murder (RR. XVIII – 183).

6

: 000120

Both Dodson and Johnson, along with Walter and Holley, ultimately detailed their involvement in the December 6th events and testified at the applicant's trial. Dodson and Johnson met up with the applicant in the early evening hours of December 6, 1998 (RR. IXX – 164-7). The applicant contacted Holley and Walter, and indicated he wanted to buy a kilo of cocaine from them (RR. XVI – 27-28) (RR. XVIII – 7-9) (RR. IXX – 24). The applicant's plan from its inception was not to pay for the kilo, but instead to have Dodson pull a gun on Walter and Holley and take the dope (RR. IXX 186-88).

The applicant, Dodson and Johnson, who were in a red car, went to Northline Mall on Houston's north side to meet with the supposed dope sellers, Walter and Holley (RR. XVI – 29-32) (RR. XVIII – 14-15) (RR. IXX – 25-26, 165-167). On the way to Northline Mall, the applicant bought a newspaper and cut it into dollar-bill sized pieces of paper (RR. IXX – 22-23, 170).

Unbeknownst to the applicant and his cohorts, however, Walter and Holley, who were in the blue Lexus, did not have a kilo of cocaine at all. Their plan was to trick the applicant into thinking they had a kilo and to get the applicant to give them his $20,000 (RR. XVI – 27-28, 163) (RR. XVIII – 11, 20). Terrance Gibson, a friend of Walter and Holley, waited with a pistol at a nearby location (RR. XVIII – 21-22).

The meeting at Northline Mall, did not prove very fruitful. Although the applicant held a Victoria's Secret bag, allegedly full of money, neither party

: 00121

trusted the other, and Walter asked the applicant to follow him to another location: a grocery store on Cavalcade  (RR. XVI – 34, 37) (RR. XVIII – 19-21).  At the Cavalcade location, the applicant wanted to see the kilo of cocaine, and Walter wanted to see the money; since neither party had either, the negotiations broke down, and the parties went their separate ways.  (RR. XVI – 38-39).

Walter and Holley picked up Gibson, who was at a nearby gas station in Walter's car; they parked Walter's car and continued to drive around in the blue Lexus  (RR. XVI – 41) (RR. XVIII – 26-27).  While they were riding around, Walter, Holley, and Gibson received a call from the complainant, whom Holley had met about a year and a half earlier when she worked at a gas station  (RR. XVIII – 6, 28).  The three men went to pick up the complainant at her home, then they all met the applicant and Johnson at a Bennigan's restaurant at Loop 610 and Kirby, near the Astrodome, in order to resume their negotiations (RR. XVI – 44-42, 44) (RR. XVIII – 30) (RR. IXX – 31).[1]

The parties left Bennigan's.  Johnson drove the red car with the applicant as a passenger, while Walter drove the blue Lexus with Gibson in the front passenger seat and with the complainant and Holley in the backseat  (RR. XVI – 44-45, 62-63) (RR. XVIII – 32, 37-38).  The parties drove to various locations before the

---

[1]  Terrance Dodson was not with the applicant and Johnson at Bennigan's because, after the negotiations broke down on the north side of town, he went home and had no further association with the applicant or Johnson that evening  (RR. XVI – 74-75) (RR. IXX – 172, 185).

: 00122

applicant ultimately led the blue Lexus to Lantern Point Drive  (RR. XVI – 52-53, 58) (RR. XVIII – 40) (RR. IXX – 36).  Once stopped, Gibson and the applicant went to the back of the Lexus, while Walter remained in the Lexus with Holley and the complainant still in the back seat  (RR. XVI – 63-64) (RR. XVIII – 41) (RR. IXX – 37-38).  Holley then got out of the Lexus to tell Gibson he didn't think the Lantern Point location was safe; on his way, he heard a gunshot  (RR. XVIII – 44).  As Holley ran towards a nearby field, he heard more gunshots and was hit in the arm  (RR. XVIII – 44).

When Walter heard the gunshots, he grabbed the Lexus's steering wheel in an attempt to leave the scene (RR. XVI – 65).  But before Walter could leave, the applicant appeared at his door and shot him in the shoulder through the closed window, shattering the glass  (RR. XVI – 65).  The applicant then opened Walter's door and shot him again in the stomach as Walter was getting out of the car  (RR. XVI – 65).  Before the applicant shot him a third time in the chest, Walter said, "Hey, whatever you do, don't hurt the girl." (RR. XVI – 66).

Walter hit the applicant in the face, and ran away  (RR. XVI – 66).  As he ran, the applicant shot Walter a fourth time in the back  (RR. XVI – 156-58).  Walter and Holley both heard the applicant take off in the blue Lexus  (RR. XVI – 67) (RR. XVIII – 45).

Johnson, who had remained inside the red car, heard gunshots after Gibson and the applicant met at the back of the Lexus  (RR. IXX – 37-38).  He watched as

: 00123

the applicant shot Walter in the chest, then jumped into and sped off in the blue Lexus (RR. IXX – 41-42). Johnson left Lantern Point Drive and went home (RR. IXX – 42).

It was after this shooting that the security guard, Officer McDonald, arrived and Holley told him the false story about stopping to help someone and then getting robbed (RR. XVIII – 47-48, 51-53). Holley told the story because he didn't want to get into any trouble (RR. XVIII – 47-48, 51-53). Walter suffered serious injuries and spent three weeks at Hermann Hospital (RR. XVI – 71). Gibson died as a result of the gunshot wound to his chest (RR. XVII – 59).

Neither Holley nor Walter ever saw the complainant again (RR. XVI – 134) (RR. XVIII – 54-55, 120). Despite her presence at Bennigan's, the complainant was not involved in the narcotics transaction; in the words of Kevin Walter, "she didn't have nothing to do with it" (RR. XVI – 134) (RR. XVIII – 54-55, 120).

The next day, the applicant called Johnson and told him to "shut the hell up"; the applicant then contacted his cousin, Anthony Trial (RR. IXX – 44). Trail drove the applicant to a dead-end street on the west side of Houston where the applicant retrieved a pair of glasses (RR. XX – 11-12). The applicant told Trail that he had dropped the glasses when he was with a female, who performed oral sex on him (RR. XX – 12-13). The applicant showed both Trail and Dodson some keys that he said belonged to a Lexus (RR. IXX – 173-174) (RR. XX – 7-9).

10

: 00124

After Trail and the applicant looked at news reports about the Lantern Point Drive shootings and the complainant's disappearance, Trail drove the applicant to the Greyhound bus station in downtown Houston, where the applicant boarded a bus to Louisiana (RR. IXX – 177) (RR. XX – 4-5, 13-14).

The applicant called Dodson several times from Louisiana and told him about what had transpired after Dodson had gone home on the night of the murder. According to the applicant, it had been a "jack on a jack," there was a shootout, and he "burned off" in a Lexus with a female (RR. IXX – 178-179). The applicant claimed that he shot one man in the arm, and another man several times, including once in the back, as the man ran away (RR. IXX – 179). Finally, he took the female to an abandoned house in Sugar Land where she performed oral sex on him, then he shot her because "she was looking at him funny, like she was going to tell. She was scared" (RR. IXX – 180-182).

Physical evidence introduced at trial implicated the applicant in the complainant's murder and substantiated the witness's testimony. The bullet fragment taken from Dion Holley's arm, the bullet that killed Gibson, and the bullet that killed the complainant were all fired from the same nine-millimeter semi-automatic pistol, which matched the fired cartridge cases found by Bloyd on Lantern Point Drive (RR. XX – 103-112) (St.Ex. 79, 90-91). Furthermore, Gibson's gun had not been fired at all (RR. XX – 103). Finally, the applicant's

11

: 00125

fingerprints were found on newspaper clippings inside the Victoria's Secret bag left behind on Lantern Point Drive (RR. XVII – 54) (RR. XX – 87-88).

## Defendant's Evidence at Guilt-Innocence

The applicant put forth the testimony of Roger Ruffcorn, a custodian of records for Yellow Cab, who stated that on December 7, 1998, a cab went to apartment 1402 at 10800 Fondren in response to a caller named "Shawn." (RR. XX – 129, 134).

The applicant took the stand in his defense. The applicant admitted he was a drug dealer, and that he participated in the failed narcotics transaction on December 6, 1998 (RR. XX – 141-144, 159-168). He claimed to have shot Gibson in self-defense, as the applicant ran away, because Gibson had flashed him "a look" and displayed a gun (RR. XX – 192-3). The applicant claimed that he did not intend to kill Gibson (RR. XX – 201-202). He claimed to have shot Walter because Walter had been reaching for something (RR. XX – 196). The applicant could not recall shooting Dion Holley (RR. XX – 195-6).

The applicant testified that he jumped into the Lexus and took off because he feared for his life and because Samuel Johnson had left him stranded (RR. XX – 142-143, 199-200). At a stop sign, the applicant became aware that the complainant was in the Lexus's backseat when he saw her in the rearview mirror as she sat up (RR. XX – 143). The applicant claimed that he did not tell the

: 00126

complainant that she had to stay in the car (RR. XX – 144).  When he approached Main Street, the applicant stopped at an intersection and told the complainant to get out of the car; however, he testified that she refused  (RR. XX – 144).

At some point, the applicant supposedly met up with Johnson, who was still driving the red car, at which point the complainant joined the applicant in the front seat  (RR. XX – 146).  The applicant was confused after his ordeal, and he followed Johnson to the Fondren Court Apartments at 10800 Fondren, where Howard Scott lived  (RR. XX – 146).  The applicant claimed that he parked the Lexus and left the complainant in the parking lot of that apartment complex with two men: Shawn England and a bicycle-rider called "Skin."  (RR. XX – 147-150).

## State's Evidence at Punishment

The State re-offered all of the evidence admitted during the guilt stage of trial (RR. XXII – 3).  In addition, the State put forth evidence of some other shootings and drug transactions that the applicant had committed immediately prior to the murder of the complainant.

Eric Beyer, a general surgery resident at the University of Texas, stated that when Kevin Walters was able to talk when was brought into the trauma room, but that there was a large amount of blood spewing from his liver (RR. XXII – 6-8).  Beyer stated that he had to tie off a major artery to remove the gall bladder and that drugs were found in Walter's system (RR. XXII – 10-14).

13

: 00127

Troy James Hebert, Louisiana State Police, testified that on December 17, 1996, he caught the applicant driving one hundred miles per hour in a fifty-five mile per hour zone (RR. XXII – 20).  The applicant stopped after more than three miles and was found to be carrying a nine-millimeter gun in his waistband (RR. XXII – 23).

On September 5, 1998, Steven Hooper, Houston Police Department, was dispatched to a shooting at the 14600 block of Alrover at Mannings Auto Repair (RR. XXII – 40).  A man who had been shot was being loaded into ambulance and Hooper saw many rectangular newspaper clippings in the shape of dollar bills at the scene (RR. XXII – 42).

On September 5, 1998, Christopher D. Duncan, Houston Police Department, went to 3420 West Fuqua in response to a shooting incident, and he observed scattered newspaper clippings in the shape of dollar bills in the parking lot at that location (RR. XXII – 54).

Joseph Melancon, one of the applicant's former school-mates, met with the applicant on September 5, 1998  (RR. XXII – 66).  While they were together, the applicant answered his cell phone, said, "You got that for me," and then drove to West Fuqua (RR. XXII – 68).  The applicant then went into a store, came out with two brown bags, got in the driver's seat of another car, and drove off with Anthony "Bruiser" Williams without saying anything to Malancon (RR. XXII – 72, 113).

14

: 00128

Melancon then heard a gunshot and saw Anthony laying on the ground saying, "My boys shot me. My boys shot me." (RR. XXII – 74).

Anthony Williams died the next day from a gunshot wound to the back (RR. XXII – 108).  That same day, the applicant called Melancon, who asked what happened; the applicant responded, "Some bullshit." (RR. XXII – 76).

Yolanda Williams, Anthony's sister, testified that Anthony's son imagines that his dad is playing with him when he is asleep (RR. XXII – 120).  Furthermore, as a result of the murder, Anthony's father became angry and hurtful, and his mother's diabetes worsened (RR. XXII – 120-121).

Patricia Gibson testified that she last saw her son Terrance on December 7 when they all got together for church (RR. XXII – 127).  Patricia stated that it was difficult to bury her son, that she raised him right, and that she does not blame herself (RR. XXII – 133).

Finally, the complainant's father testified that the complainant was a senior at Barbara Jordan HS and wanted to be a model or cosmetologist (RR. XXII – 142).  He stated that  approximately one thousand people came to the funeral (RR. XXII – 148).  He also testified that he and his daughter used to go on family outings, and that the complainant's death has affected her grandfather because they were very close (RR. XXII – 148, 150).

: 00129

## Defendant's Evidence at Punishment

Walter Quijano, a clinical psychologist, stated that the applicant's lack of gang involvement would predict less future dangerousness, that the rules in prison are more restrictive than in civilian population, and that the guards are specially trained to handle the inmates (RR. XXII – 164, 169, 171). Quijano also stated that a person's propensity for violence is highest in the late teens and early twenties and declines after that (RR. XXII – 173). [2]

Dorothy Morgan, a parole supervisor, testified that she would compile a parole case summary for any person convicted of capital murder, that she would update that file for thirty-nine years and six months, and that the file would include the person's life history as well as protest letters (RR. XXIII – 14). [3] Morgan also stated that the time for serving for capital murder has always increased and that it was currently longer than for any other type of crime (RR. XXIII – 20).

Shannon Johnson, a twenty-two year old who had known applicant for less than two years, stated that she saw the applicant at Blondell Richardson's on September 5, 1998 (RR. XXIII – 23). Likewise, David Wayne Green, the

---

[2] During cross examination, Quijano admitted that one person had escaped from death row and that Quijano had never talked to or met the applicant (RR. XXII – 186-187).

[3] During cross examination, Morgan stated that she could not be sure that the forty years mandatory incarceration would never change because it was a recent change in the law, and she conceded that there had been problems with individuals released on parole (RR. XXIII – 18, 19).

16

: 00130

applicant's first cousin, testified that on September 5, 1998 the applicant was at his house with a girl (RR. XXIII – 33).

Angelice Mary Johnson Mamou, the applicant's mother, testified that the applicant was born on December 6, 1974 (RR. XXIII – 35). The family moved to Houston when the applicant was three weeks old; however, Angelice returned to Sunset, Louisiana when the applicant was five years old (RR. XXIII – 38). The applicant once went to the hospital with a high fever because his "private" got blocked (RR. XXIII – 40). When the applicant was eight years old, he got an ulcer and stopped doing well in school (RR. XXIII – 41). He was well-mannered and well-behaved (RR. XXIII – 50).

Angelice testified that the applicant played the trombone and graduated high school with a GED; he signed up for the military but was not accepted (RR. XXIII – 44). The applicant had five children all by different mothers, and he sold drugs to support them (RR. XXIII – 46). According to Angelice, the applicant took care of his kids, and his sister looked up to him as a father-figure (RR. XXIII – 52). [4]

Michelle Mamou, the applicant's nineteen year-old sister, stated that the applicant was her father-figure and that he bought her a dress so that she could go to her graduation (RR. XXIII – 72, 76). She also stated that the applicant made her

_____

[4] During cross examination, Angelice admitted that she taught the applicant right from wrong and that the applicant never had a chance to do anything for his children except for one (RR. XXIII – 53, 58).

: 00131

stay in school and gave her a dollar to keep her from running away from home (RR. XXIII – 77).

Sedonia Marie Gotch, the applicant's ex-girlfriend and mother of one of his children, stated that the applicant had a good relationship with his family (RR. XXIII – 82). She also stated that he paid the light and insurance bills for his family (RR. XXIII – 84). [5]

Joseph Dwight Savoie, the applicant's uncle, testified that the applicant's grandfather was an alcoholic, that the applicant split time between his mother and his father while growing up, and that the applicant eventually resented his father (RR. XXIII – 96). He also stated that the applicant was not in gangs and took responsibility for his family (RR. XXIII – 101). [6]

Finally, Charles Mamou, Sr., the applicant's father, testified that he used to drink and gamble and was not a good father (RR. XXIII – 119). Nevertheless, he felt that he and the applicant were close and always able to talk (RR. XXIII – 123). [7]

---

[5] During cross examination, Gotch admitted that she only knew about one of the applicant's other children but that she did know that he was not faithful (RR. XXIII – 88, 90).

[6] During cross examination, Savoie admitted that the applicant was raised in a religious setting but that killing would violate any religion (RR. XXIII - 113).

[7] During cross examination, the applicant's father admitted that he did not pull a gun on anybody or rob them or shoot them and that the applicant told him that he did shoot three guys at Lantern Point (RR. XXIII – 127, 130).

: 00132

## REPLY TO APPLICANT'S FIRST THROUGH SEVENTH GROUNDS FOR RELIEF

In his first through fourth grounds for relief, the applicant claims that he received ineffective assistance of counsel. *Applicant's writ at 7-31.* Specifically, the applicant claims that trial counsel failed to object to victim impact testimony concerning the effects of unadjudicated offenses on the victims and that appellate counsel was ineffective for failing to raise such a claim on appeal. The applicant also claims that he is being subjected to cruel and unusual punishment and being deprived due process as a result of the same facts.

The Sixth Amendment of the U.S. Constitution guarantees a criminal defendant effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986) (stating that the *Strickland* standard is applied to ineffective assistance of counsel claims under the State constitution). In *Strickland*, the Supreme Court held that the benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.; see also Ex parte Butler*, 884 S.W.2d 782, 783 (Tex. Crim. App. 1994) (applying *Strickland* standard to application for habeas corpus relief alleging ineffective appellate counsel).

: 00133

In order to show ineffectiveness, the applicant must first show that counsel's performance was deficient. *Id.* at 687. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* In order to determine whether trial counsel's performance was deficient, this Court must weigh the defense attorney's representation under prevailing professional norms. *Craig v. State*, 825 S.W.2d 128, 129 (Tex. Crim. App. 1992). Assertions of ineffective assistance of counsel must be firmly founded in the record. *See Mercado v. State*, 615 S.W.2d 225, 228 (Tex. Crim. App. 1981); *Hawkins v. State*, 660 S.W.2d 65, 75 (Tex. Crim. App. 1983).

The *Strickland* Court further stated that in order to satisfy the prejudice requirement of the test,

> [i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding...
> 
> \*\*\*
> 
> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different...
> 
> \*\*\*
> 
> Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Id.,* 466 U.S. at 693, 694, 696. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Miniel v. State*, 831 S.W.2d 310, 323 (Tex. Crim. App. 1992), *cert. denied*, 506 U.S. 885 (1992). Prejudice requires a showing that counsel's deficient performance deprived the defendant of

: 00134

"a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

An appellate court does not judge trial counsel's decisions in hindsight and strongly presumes that counsel was competent. *See Miniel*, 831 S.W.2d at 323 (stressing the need to avoid the "distorting effects of hindsight"). Applicant has the burden to rebut this presumption by proving that his attorney's representation was not sound strategy. *Id.*

Whether the *Strickland* standard has been met is to be judged by the "totality of the representation," rather than by isolated acts or omissions of trial counsel, and the test is applied at the time of trial. *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986), *cert. denied*, 480 U.S. 940 (1987). In the primary case, Wayne Hill was appointed as the applicant's counsel on May 28, 1999 (CR – 5). The trial court appointed Kurt Wentz to serve as second chair counsel for the applicant on July 26, 1999 (CR – 10). Counsel thereafter appeared on the applicant's behalf at least two times and filed at least seventeen motions, including discovery and suppression motions (CR – 8, 9, 11, 15, 20, 23, 27, 30, 32, 34, 37, 38, 41, 49, 52, 55, 60, 74, 92).

Counsel then conducted a thorough voir dire and secured at least four non-agreed dismissals for cause (CR – 66-70). At the guilt stage, the applicant's trial counsel vigorously cross-examined all of the State's witnesses (RR. XVI – 77) (RR. XVII – 3, 55, 79, 100, 146) (RR. XVIII – 56, 131, 141, 164, 183) (RR. XIX –

: 00135

3, 49, 129, 162, 184) (RR. XX – 15, 36, 44, 65, 93, 113). Hill and Wentz argued for an acquittal based upon the alleged unreliability of the State's witnesses and based upon the lack of testimony from Shawn England (RR. XXI – 15-40).

During the punishment phase, trial counsel cross-examined all except for two of the State's witnesses (RR. XXII – 24, 46, 57, 80, 121, 135, 154). Hill and Wentz then put forth nine witnesses for the applicant, including a clinical psychologist, a parole supervisor, the applicant's parents, his uncle, his cousin, his sister, his ex-girlfriend, and an alibi witness on one of the extraneous offenses (RR. XXII – 158) (RR. XXIII – 3, 21, 31, 36, 72, 79, 93, 115). Both trial counsel made strong arguments for a life sentence based on the alleged lack of extraneous offense evidence, the alleged lack of bad conduct while the applicant was awaiting trial, and the claim that the applicant would be placed under close scrutiny if he received a life sentence (RR. XXIV – 9-29). Hill filed a motion for new trial based on sufficiency of the evidence, jury charge error, and the admission of extraneous offenses (CR – 109-111).

Floyd Freed was appointed as appellate counsel for the applicant on October 18, 1999 (CR – 108). Freed filed a forty-three page brief on direct appeal that raised eight points of error, including challenges to the sufficiency of the evidence and alleged jury charge error. The Court of Criminal Appeals addressed all of the issues raised and affirmed the conviction and punishment. *Mamou*, No.

: 00136

73,708. Thus, the applicant received effective assistance of counsel throughout the totality of the representation.

> *Trial counsel were effective with regard to their objections to alleged victim-impact testimony.*

The applicant bases his first through seventh grounds for relief on the punishment testimony of Yolanda Williams and Patricia Gibson, and on the State's argument that the applicant "ripped those families apart. He devastated and destroyed." *Applicant's writ at 11-21*. Yolanda was the sister of Anthony Williams, and Patricia was the mother of Terrance Gibson (RR. XXII – 113, 127). As stated previously, Yolanda testified about the effects of her brother's death on her family: his son had dreams that his father was playing with him, his father became angry and hurtful, and his mother's diabetes worsened (RR. XXII – 120-121). Patricia testified that it was difficult to bury her son, that she raised him right, and that she did not blame herself (RR. XXII – 133).

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the United States Supreme Court held that victim impact evidence was admissible because the State had a legitimate interest in countering the mitigating evidence of the defendant "by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Id.*, 501 U.S. at 825. The *Payne* Court also reasoned that the prior rule prohibiting such evidence "deprives the State of

23

: 000137

the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." *Id.* 501 U.S. at 825 (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987).  Thus, under *Payne*, the presumption would be that the testimony of Yolanda and Patricia was admissible.  However, the Court of Criminal Appeals has undercut this presumption.

In *Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997), a capital murder case, the defendant participated in the kidnapping, robbery, aggravated sexual assault, and murder of two victims; however, the indictment named only one of the victims. *Id.* at 630-631.  Victim impact testimony was elicited from the mother of the victim not alleged in the indictment; she testified about the second victim's character, the activities she enjoyed, her relationships with her family, and the effect of the victim's death on the rest of the family. *Id.* at 636.  The Court of Criminal Appeals held that it was error to admit victim-impact evidence for a victim not named in the indictment because this evidence was irrelevant and "would open the door to admission of victim impact evidence arising from any extraneous offense committed by a defendant." *Id.* at 637.  However, the *Cantu* court went on to hold that the evidence was harmless because it comprised less than twenty of over 700 pages of punishment evidence and because the State did not mention the evidence during its closing argument. *Id.* at 637-638

24

: 00138

In the primary case, Anthony Williams was not named in the indictment; rather, he was the victim of an extraneous murder (CR – 4). Terrance Gibson was named in the indictment; however, the State ultimately proceeded on the allegation pertaining to the complainant rather than on the allegation pertaining to Gibson (CR – 4) (RR. XVI – 3). Thus, Gibson arguably does not fit within the *Cantu* prohibition because he was named as a victim in the original indictment.

In *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App., 1998), the Court of Criminal Appeals revisited the issue of victim impact testimony. The *Mosley* court stated that

> We take this opportunity to announce a consistent, if not always clear-cut rule to be followed in future cases: Both victim impact and victim character evidence are admissible, in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence. Rule 403 limits the admissibility of such evidence when the evidence predominantly encourages comparisons based upon the greater or lesser worth or morality of the victim. *When the focus of the evidence shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society then the State exceeds the bounds of permissible testimony.* We recognize that this standard does not draw a bright and easy line for determining when evidence concerning the victim is admissible and when it is not. Trial judges should exercise their sound discretion in permitting some evidence about the victim's character and the impact on others' lives while limiting the amount and scope of such testimony.

*Id.* at 262 (emphasis added). In the primary case, the testimony of Yolanda and Patricia did not measure the worth of the victims compared to other members of society. Rather, as stated previously, both witnesses testified concerning the

25

effects of the victims' deaths of themselves and their family members (RR. XXII –
120-121, 133).  Thus, the testimony of Yolanda and Patricia was presumptively
admissible under *Mosley* because it did not exceed the bounds of permissible
testimony.

In *Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000), the Court of
Criminal Appeals stated that "[i]mpact testimony from the victims of an
extraneous offense is not the type of 'victim impact evidence' contemplated by
*Mosley* and *Payne v. Tennessee*, and therefore, was arguably objectionable." *Id.* at
714 (citations and footnote omitted).[8]  However, there is no textual support for this
statement in either *Mosley* or *Payne*.

Neither *Mosley* nor *Payne* explicitly limit their holding to victims of the
offense forming the basis for the capital murder conviction.  In fact, because
victim impact evidence is relevant in resolving the mitigation special issue
according to *Mosley*, it should logically apply to all offenses that are admitted for
the purposes of resolving the mitigation special issue.  In answering the mitigation
special issue, there is no principled distinction between murder victims of the
offense admitted during the guilt stage and murder victims of offenses admitted
during the punishment phase.  The "uniqueness of the victim" and "the harm

---

[8] The Court went on to state that "the record in the instant case is silent as to why
appellant's counsel failed to object and is therefore insufficient to overcome the
presumption that counsel's actions were part of a strategic plan." *Tong,* 25 S.W.3d at 714
(footnote omitted).

caused by the defendant" are not any less relevant because the crime was proved during punishment rather than during the guilt-innocence stage.

The *Payne* Court stated that it was appropriate for a jury, in assessing a defendant's moral culpability and blameworthiness, to "have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Payne*, 501 U.S. at 825. There is no principled reason to hold that the specific harm caused to a murder victim from the guilt-innocence stage is relevant in assessing a defendant's moral culpability and blameworthiness while the specific harm caused to a murder victim from the punishment stage is irrelevant in assessing a defendant's moral culpability and blameworthiness. In fact, depending on the facts, the victim impact for an extraneous offense may be even more probative on the mitigation issue.

The applicant has failed to show that he received a deficient performance from his trial counsel in failing to object to the testimony of Yolanda Williams and Patricia Gibson. As stated previously, the *Tong* Court ultimately held that counsel's failure to object to extraneous victim impact evidence was not presumptively ineffective but rather could be part of counsel's strategic plan. *Tong*, 25 S.W.3d at 714. In the present case, the court has ordered counsel to address the allegations of their ineffectiveness; however, the affidavits of trial counsel have not yet been received.

: 00141

Even if the applicant can meet the deficient performance prong of the *Strickland* test, he cannot meet the prejudice prong. The effect of the testimony of Yolanda and Patricia was harmless. Yolanda and Patricia were merely two witnesses out of the eighteen witnesses who testified during the punishment phase (RR. XXII – 3, 18, 38, 52, 61, 105, 112, 127, 138, 158) (RR. XXIII – 3, 21, 31, 36, 72, 79, 93, 115). The testimony about which the applicant complains occupies approximately ten pages of the record; however, the testimony of all the punishment phase witnesses takes up approximately 320 pages of the record (RR. XXII – 119-121, 127-134). Furthermore, the State's punishment argument did not specifically refer to the victim impact testimony of either Yolanda or Patricia (RR. XXIV – 5-9, 29-47). Thus, the impact of the complained-of evidence was harmless, and the applicant cannot satisfy the prejudice prong. *See Cantu*, 939 S.W.2d at 637-638 (stating that the evidence was harmless because it comprised less than twenty of over 700 pages of punishment evidence and because the State did not mention the evidence during its closing argument). Therefore, relief should be denied.

*Appellate counsel was effective with regard to the issues raised on direct appeal.*

The applicant must show that his appellate counsel's performance was deficient and that, but for the deficiency, the result of the proceeding would have been different. *See Ex parte Butler*, 884 S.W.2d 782, 783 (Tex. Crim. App. 1994)

: 00142

(applying *Strickland* standard to application for habeas corpus relief alleging ineffective appellate counsel). As stated previously, the applicant cannot satisfy the prejudice prong of the *Strickland* standard for his trial counsel. Thus, appellate counsel could not have been ineffective in failing to raise the issue. *See Riles v. State*, 595 S.W.2d 858, 861 (Tex. Crim. App. 1980) (indicating that the failure to make a meritless objection does not render counsel ineffective).

Appellate counsel Floyd Freed has responded to the applicant's allegations that he rendered ineffective assistance as follows:

> Appellate counsel did not raise on direct appeal any issues related to victim impact evidence of Yolanda Williams and Patricia [Gibson] due to the fact that trial counsel did not preserve error, if any, pursuant to Rule 33 of the Texas Rules of Appellate Procedure. Adverse rulings were not obtained on the Defendant's Motion for Victim Impact Testimony (C.R. 20) Further, trial counsel's objection at trial was not sufficient to preserve error related to victim impact testimony in that it did not relate to any specific testimony of Yolanda Williams and/or Patricia [Gibson]. Nor was a "running objection" sought to such testimony.
>
> Appellate counsel did not raise ineffective assistance of counsel because the record was not developed for appellate purposes to raise the issue pursuant to the guidelines as set forward in Tong v. State, 25 S.W. 3rd 707, 712 (Tex. Crim. App. 2000).
>
> Appellate counsel did raise speculation in his Point of Error One. The trial objection was set forth in an oral Motion in Limine which in part asked that cross examination by the State of Texas to be precluded as to examining the defense witness, Dorothy Morgan, as to future changes in the parole law. Appellate counsel avers that the issue raised on appeal does comport to the trial objection and adverse ruling thereon in whole or in part.

*State's Exhibit A, 1/8/2002 affidavit of Floyd Freed.* Appellate counsel's decisions were based on a reasonable strategy and had a plausible basis; therefore, the

: 00143

applicant received adequate representation on appeal. *Ex parte Burns*, 601 S.W.2d 370, 372 (Tex. Crim. App. 1980) (stating that an error in strategy will be deemed inadequate representation only if there is no plausible basis for counsel's action).

Even if the applicant received deficient performance on direct appeal, the applicant cannot meet the second prong of the *Strickland* test because he cannot show any harm. Appellate counsel's failure to raise certain claims has not prevented the applicant from raising those identical claims in the present proceeding, and those claims will be reviewed by the Court of Criminal Appeals. Thus, the applicant has failed to meet his burden under *Strickland*.

*The applicant is not being subjected to cruel and unusual punishment or being deprived due process as a result of the admission of victim impact testimony during the punishment phase.*

The United States Supreme Court has stated that the Eighth Amendment requires two evaluations before a court may impose the death penalty: "the eligibility decision and the selection decision." *Tuilaepa v. California*, 512 U.S. 967, 971 (1994). To be eligible for the death penalty, the trier of fact must be able to convict the defendant of murder and find one aggravating circumstance or its equivalent at either the guilt or penalty phase. *Id.* 512 U.S. at 972; *see also Romano v. Oklahoma*, 512 U.S. 1 (1994) (holding that states must establish a threshold below which the death penalty cannot be imposed).

: 00144

The Supreme Court has required states to establish "rational criteria that narrow the decisionmaker's judgment as to whether a particular defendant's case meets the threshold." *McCleskey v. Kemp*, 481 U.S. 279, 305 (1987). In Texas, the aggravating factor is contained in the definition of capital murder and in the requirement at punishment that the jury find the defendant to be a continuing threat to society. TEX. PENAL CODE § 19.03 (Vernon 1992) (stating that the jury must find murder accompanied by one of eight enumerated factors); *see also Jurek v. Texas*, 428 U.S. 262, 269 (1976) (holding the Texas death penalty scheme to be constitutional). The Supreme Court has further announced that "[w]hat is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983) (emphasis in original). That requirement is met when the jury is able to consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime. *Tuilaepa*, 512 U.S. at 972 (citing *Johnson v. Texas*, 509 U.S. 350, 361 (1993)). Thus, the applicant is not being subjected to cruel and unusual punishment as a result of Texas's death penalty system.

The applicant claims that he is being subjected to cruel and unusual punishment because two witnesses were allowed to testify concerning victim impact evidence during the punishment phase. *Applicant's writ at 28-30.* This claim fails for several reasons. First, the applicant failed to object to the testimony

: 00145

on this basis at trial, and therefore he cannot raise this claim in the present proceeding or any subsequent proceeding. *See Tucker v. State*, 990 S.W.2d 261, 262 (Tex. Crim. App. 1999) (stating that to preserve, error, the record must reflect the defendant complained to the trial court by way of a request, objection, or a motion that was timely and sufficiently specific to appraise the trial court of the basis of the complaint). Second, as stated previously, the victim impact evidence in question is actually permitted under *Payne*, and therefore, there was no violation of the applicant's federal constitutional rights. Finally, as stated previously, the admission of the evidence was harmless.

Based on the foregoing, the applicant has failed to show that he received ineffective assistance of counsel at trial or on appeal. The applicant has also failed to show that he is being subjected to cruel and unusual punishment or being deprived due process as a result of the admission of victim impact testimony during the punishment phase, or even that he preserved this complaint for review on this issue. Therefore, his first through seventh grounds for relief are meritless and should be denied.

## REPLY TO APPLICANT'S EIGHTH GROUND FOR RELIEF

In his second ground for relief, the applicant claims that the trial court erred in allowing a witness to be questioned concerning possible changes in the law concerning parole eligibility. *Applicant's writ at 31-35.*

: 00146

This ground for relief is based upon the punishment phase testimony of defense-witness Dorothy Morgan, a parole supervisor for the Southern Region Institutional Parole Office. She testified on direct examination regarding an inmate's parole eligibility consideration (RR. XXIII – 5-10). She stated that an individual convicted of capital murder and sentenced to confinement for life would not be "eligible for parole consideration for forty flat years" (RR. XXIII – 13).

During the State's cross-examination of Morgan, the following exchange occurred:

Q:   And during [your tenure with the parole division] you've seen lots of changes, have you not?

A:   I have.

Q:   And those changes have gone up, as far as parole eligibilities, and sometimes down?
[DEFENSE COUNSEL]: Your Honor, we would object; because this is a capital murder case, and only the consideration as to a capital murder parole situation should be considered by this jury. It would not be material and relevant as phrased with this particular witness.
THE COURT: I don't know he's asking anything other than about capital murder yet. It's overruled at this point.

Q:   ...You've seen lots of changes in that regard; is that correct?

A:   I have.

Q:   All right. And there was a time, was there not, when the parole laws were a certain way; and the Legislature changed the law, and you have to abide by whatever the Legislature changes; is that correct?

A:   That is true.

Q:   So today, as we sit here today, a person so convicted of capital murder receives a life sentence must serve for forty calendar years?

A:   That is right.

Q:   You are not implying to this jury, are you, that that could never be changed?

: 00147

> [DEFENSE COUNSEL]:  Objection.  It calls for speculation on the part of the witness, Your Honor.
>
> THE COURT:  It's overruled.
>
> Q:  …You're not implying to the jury that they could never be changed?
>
> A:  Well, I couldn't tell the jury that it would be or would not be.  I'm just saying, I know today.  And no, I cannot tell them that.
>
> Q:  All right.  Because that's not always been the law.  Forty years day-for-day had not always been the law.  It's a pretty recent situation.
>
> A:  That is true; however, it was less time.  It was thirty-five.
>
> Q:  And before that it was even less time, wasn't it?  Even before that, it was a life sentence, you might get out in eight or nine years?
>
> A:  Could be.  Not a capital felony.
>
> Q:  Are you sure about that?
>
> A:  I'm not an attorney, no, I wouldn't say.
>
> Q:  You said that – so you cannot guarantee the ladies and gentlemen of the jury that forty calendar years, day-for-day, will never ever be changed.  You can't assure us of that, can you?
>
> A:  I can only tell the jury what it is today.
>
> Q:  I understand, which means you cannot assure us it can never be changed?
>
> A:  Right.

(RR. XXIII – 16-18).  On re-direct examination, Morgan affirmed that during the eighteen-and-a-half years that she had worked for the Board of Pardons and Paroles, the time that an inmate found guilty of capital murder was required to spend in confinement before parole eligibility had always increased (RR. XXIII – 19).    Morgan also affirmed that a capital murder inmate at the time of the applicant's trial was required to serve longer in confinement before parole eligibility than any other type of inmate (RR. XXIII – 19).

34

The Court of Criminal Appeals rejected the applicant's contention on direct appeal that the trial court erroneously overruled his objections to the State's questions. *Mamou*, slip op. at 18-19. As stated by the Court of Criminal Appeals:

> Appellant argues in his first point of error that the trial court erroneously overruled his objections during the state's cross-examination of a defense witness about parole eligibility. During the punishment phase, appellant called Dorothy Morgan, a parole supervisor for the Southern Region Institutional Parole Office with over eighteen years of experience, to testify about Parole Board procedures. Morgan testified that an inmate convicted of capital murder and sentenced to life in prison "would not be eligible for parole consideration for forty flat years." After his direct examination of Morgan, appellant orally requested a motion in limine to prevent the state from cross-examining her on "changes in the parole law" because it "involves speculation on the part of this witness as to what the Legislature would do." The trial court denied appellant's motion in limine.
>
> During the State's cross-examination of Morgan, appellant objected to the state's questions on the grounds of speculation, materiality, and relevance. Appellant now claims on appeal that the state's cross-examination was contrary to the law and constituted a "blatant effort for the jurors to disregard their instructions and violate their oaths in answering the continuing threat special issue and mitigation special issue." Because appellant's trial objections do not comport with the issue raised on appeal, he has preserved nothing for review. Point of error one is overruled.

*Mamou*, slip op. at 18-19 (citations omitted). Because the applicant's eighth habeas complaint concerning the possible changes in parole eligibility law has been previously raised and rejected, this complaint need not be considered in the instant habeas proceeding or any subsequent proceedings. *Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984).

: 00149

Without waiving the foregoing, the admissibility and relevance of evidence must be determined in the context of the facts and circumstances surrounding each individual case. *Brandley v. State*, 691 S.W.2d 699, 706 (Tex. Crim. App. 1985). Thus, the trial court is given great leeway in its decision to admit or exclude evidence as it sees fit. *See Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992); *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990).

The standard of appellate review regarding a trial court's decision to admit evidence is abuse of discretion. *Montgomery*, 810 S.W.2d at 391. As long as the trial court's evidentiary ruling was at least within the "zone of reasonable disagreement", the reviewing Court should not intercede. *Id.*; *Dubose v. State*, 915 S.W.2d 493, 496 (Tex. Crim. App. 1996). If the trial court's decision is correct on any theory of the law applicable to the case, it should be sustained even though the trial court may have given the wrong reason, or no reason at all, for its ruling. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Calloway v. State*, 743 S.W.2d 645, 651-52 (Tex. Crim. App. 1988).

The trial court did not abuse its discretion in allowing the State to question Morgan concerning parole eligibility. The "Rule of Optional Completeness" provides that:

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence....

36

: 00150

TEX. R. EVID. 107 (Vernon 2000). Under this rule, the State was entitled to elicit Morgan's testimony because the applicant had opened the door during his direct examination of Morgan. On direct examination, Morgan testified about her extensive experience with the Southern Region Institutional Parole Office and parole eligibility procedures with a specific emphasis on how those procedures applied to individuals convicted of capital murder. Based on the Rule of Optional Completeness and based upon the record, the trial court did not abuse its discretion in permitting the State to follow up on the subject of parole eligibility procedures. *See Carter v. State*, 480 S.W.2d 735, 738 (Tex. Crim. App. 1972) (holding where subject matter is inquired into first by defense, same subject matter may be further explored on cross-examination by State).

The applicant has attached an affidavit allegedly made by one of the jurors in the primary case in support of this ground for relief. *Applicant's writ at 34.* However, this Court may not consider that affidavit in determining whether any unresolved factual issues exist in this case. Rule 606(b) of the Texas Rules of Criminal Evidence provides that a juror is not competent to testify or to give affidavit testimony about

> any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify as to any matter relevant to the validity of the verdict or indictment.

:00151

Tex. R. Evid. 606(b) (Vernon 2000); *see also Hill v. State*, 493 S.W.2d 847 (Tex. Crim. App. 1973) (holding that jurors may not impeach their verdicts by affidavit or testimony about their mental processes during deliberations).   Thus, that affidavit may not be considered in resolving this ground for relief. [9]

Without waiving the foregoing, even if the trial court erred in overruling the applicant's objections, any error was harmless.   The rules of evidence provide that error may not be predicated upon an evidentiary ruling unless a party's substantial right is affected.   Tex. R. Evid. 103 (Vernon 2000).

The Court of Criminal Appeals has treated a violation of evidentiary rules that results in the erroneous admission of evidence as non-constitutional error.   *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (applying Rule 44.2(b) harm analysis to the erroneous admission of hearsay evidence); *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).   Thus, reviewing courts should apply a Rule 44.2(b) harm analysis to any error and disregard the error unless it affected the applicant's substantial rights.   Tex. R. App. P. 44.2 (b) (Vernon. 2000).   A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *See King*, 953

---

[9] The applicant claims that Tex. R. Evid. 606(b) is unconstitutional as applied to him; however, he cites no authority in support of this proposition. *Applicant's writ at 35.* While the Court of Criminal Appeals has not directly addressed the issue, a lower court has held that Tex. R. Evid. 606(b) is constitutional, and the Court of Criminal Appeals has refused to reverse that holding. *Hines v. State* 3 S.W.3d 618 (Tex. App. – Texarkana, pet. ref'd).

: 00152

S.W.2d at 271.   A criminal conviction should not be overturned for non-constitutional error if the reviewing court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Johnson,* 967 S.W.2d at 417 (citing *King*).

The complained-of questioning by the State was insignificant in light of the other more damaging testimony including the primary offense as well as the extraneous murder and assaults committed by the applicant.  Furthermore, the jury was properly instructed by the trial court regarding parole law, and the State did not mention parole at all during jury argument or otherwise encourage the jury to "disregard the law." (CR 98).   There is no evidence that the jury had any difficulties in finding that the applicant would be a future danger.  The docket sheet reflects that the jury sent out one note indicating that they were unable to answer the mitigation special issue; however, there was no mention of problems with the future danger special issue, which is the only issue implicated by the parole eligibility evidence (CR -- 152).  Because no substantial right was affected by the trial court's evidentiary ruling, any error was not reversible and should be disregarded.

Based on the foregoing, the applicant has failed to show that the trial court erred in allowing a witness to be questioned concerning possible changes in the law concerning parole eligibility or that the applicant was harmed by the admission

: 00153

of such evidence.  Therefore, his eighth ground for relief is meritless and should be denied.

## REPLY TO APPLICANT'S NINTH GROUND FOR RELIEF

In his ninth ground for relief, the applicant claims that the trial court erred in failing to instruct the jury that the State had the burden of proof beyond a reasonable doubt on the mitigation special issue. *Applicant's writ at 35-45.*

The applicant acknowledges that the Court of Criminal Appeals has repeatedly refused to assign a burden of proof on the issue of mitigating evidence. *Applicant's writ at 36; see also Broussard v. State,* 910 S.W.2d 952, 959 (Tex. Crim. App. 1995) (citing *Penry v. State,* 903 S.W.2d 715 (Tex. Crim. App. 1995)). All that is constitutionally required is that the jury is given a vehicle with which it can consider and give effect to relevant mitigating evidence.  *Shannon v. State,* 942 S.W.2d 591, 599-600 (Tex. Crim. App. 1996)(citing *Tuilaepa v. California,* 512 U.S. 967, 979 (1994)).  The trial court is not required to instruct the jury how to weigh any particular mitigating factor in deciding punishment.  *Id.; see also Cantu,* 939 S.W.2d at 641 (Tex.  Crim. App. 1997) (holding that art. 37.071 (2)(e) not unconstitutional based on absence of burden of proof for mitigation instruction).

The applicant argues that the Texas line of cases holding that there is no burden needed for the mitigation issue has been "repudiated" in light of the

40

: 003154

Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466 (2000). In *Apprendi,* the defendant was accused of a second-degree felony with a punishment range of five to ten years. *Apprendi,* 530 U.S. at 467-69. The defendant pled guilty to the offense, and the trial judge found by a preponderance of the evidence that the offense fit within New Jersey's hate crime statute and, accordingly, sentenced the defendant to twelve years. The Supreme Court addressed the narrow issue of whether the due process clause of U.S. CONST. amend. XIV requires that the jury make a factual determination authorizing an increase in the maximum sentence on the basis of proof beyond a reasonable doubt. *Apprendi,* 530 U.S. at 475-476.

When answering the narrowly presented issue in *Apprendi,* the Court referred to its foreshadowing opinion in *Jones v. United States,* 526 U.S. 227 (1999), in which the Court construed a federal statute and noted that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* (quoting *Jones,* 526 U.S. at 243 n.6).

The *Apprendi* Court, construing a state statute, held that the due process clause of the Fourteenth Amendment also required that any fact, other than a prior conviction, that increased the sentence beyond the state statutory maximum must

: 00155

be submitted to a jury and proved beyond a reasonable doubt. *Apprendi,* 530 U.S. at 489. Thus, the *Apprendi* trial judge erred in increasing the defendant's sentence beyond the ten-year maximum after finding by a preponderance of the evidence that the crime was a racially motivated hate crime. In reaching its decision, the Supreme Court focused on the unconstitutionality of the defendant's exposure to a greater punishment than permissible by the jury's verdict, while noting the legitimacy of an alleged enhancement increasing the punishment range. *Id.* 530 U.S. at 488, 494, 496.

The Supreme Court further considered the *Apprendi* holding in light of *Walton v. Arizona,* 497 U.S. 639, 647-9 (1990), in which the Court upheld Arizona's death penalty sentencing procedure where a judge determined the existence of aggravating circumstances and the existence of any mitigating circumstances in order to impose either a life sentence or the death penalty. In *Walton,* the Supreme Court noted that Arizona's aggravating factors were standards to guide the judge's decision of life or death, rather than elements of the offense, and held that Arizona's especially heinous, cruel, or depraved aggravated circumstance provided sufficient guidance to the judge, pursuant to U.S. CONST. amends. VIII and XIV. *Id.*

The Supreme Court rejected the application of *Apprendi* to constitutional death penalty schemes, noting

> [f]inally, this Court has previously considered and rejected the argument that the principles guiding our decision today render

42

: 00156

invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. For reasons we have explained, the capital cases are not controlling:

> "Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed... The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge."

*Apprendi,* 530 U.S. at 496-497 (quoting *Almendarez-Torres v. U.S.*, 523 U.S. 224, 257 n.2 (1996)) (Scalia, J., dissenting) (emphasis deleted) (citation omitted).

In his concurring opinion in *Apprendi,* Justice Thomas claimed that the Constitution required a broader rule concerning elements of the offense than the rule adopted by the Court, but he declined to address the impact, if any, of the suggested broader rule on the Court's earlier decision in *Walton. Apprendi,* 530 U.S. at 522-523 (Thomas, J., concurring). Justice Thomas acknowledged the "unique context" for capital punishment and, while noting it was unnecessary to consider how his suggested broader rule applied to sentencing guidelines, stated that "[w]hether this distinction between capital crimes and all others, or some other distinction, is sufficient to put the former outside the rule that I have stated is a question for another day." *Id.*

Subsequent to the *Apprendi* decision, the Fifth Circuit Court of Appeals addressed the issue of the applicability of the *Apprendi* holding to drug cases

43

involving sentencing guidelines.   Although the Fifth Circuit found that the *Apprendi* decision overruled Fifth Circuit law treating the quantity of drugs as a sentencing factor instead of an element of the offense, the Court held that *Apprendi* is "specifically limited to facts which increase the penalty beyond the statutory maximum, and does not invalidate a court's factual finding for the purposes of determining the applicable Sentencing Guidelines." *United States v. Doggett*, 230 F.3d 160, 165 (5th Cir. 2000) (citing *United States v. Meshack*, 225 F.3d 556, 575-6 (5th Cir. 2000)) (holding *Apprendi* decision applicable only where sentence exceeds statutory maximum, not where sentence enhanced within statutory guidelines).

Relying on its prior decisions in *Doggett* and *Meshack*, the Fifth Circuit later held "that a fact used in sentencing that does not increase a penalty beyond the statutory maximum need not be alleged in the indictment and proved to a jury beyond a reasonable doubt." *United States v. Keith*, 230 F.3d 784, 787 (5th Cir. 2000).   The federal district court followed the Fifth Circuit's holdings when summarily rejecting a defendant's claim of *Apprendi* error where the defendant's sentence did not exceed the maximum punishment. *Brooks v. United States*, 2001 WL 15789 (N.D. Tex. Jan. 5, 2001).   Thus, regardless of Justice Thomas' suggested broader rule, the Supreme Court's holding in *Apprendi* is narrowly and specifically applicable only to cases where the punishment exceeds the maximum sentence.

44

The Fifth Circuit's treatment of the quantity of drugs as an element of the offense, rather than a sentencing factor, is not analogous to mitigating factors in capital cases. The Court of Criminal Appeals has specifically held that the Texas death penalty scheme special issues are not elements of the offense. *Moore v. State,* 969 S.W.2d 4 (Tex. Crim. App. 1998). The Court of Criminal Appeals has also declined to perform a sufficiency review of the jury's mitigation issue finding, noting that there is no evidence that a jury must consider *per se* mitigating. *McGinn v. State,* 961 S.W.2d 161 (Tex. Crim. App. 1998). Jurors individually decide what, if any, evidence mitigates against the death penalty and what weight to give such evidence; thus, an appellate review of the jury's mitigation finding would be "an exercise in speculation." *Shannon,* 942 S.W.2d at 597-9; *see also Cantu,* 939 S.W.2d at 640 (noting that Article 37.071 does not objectively define mitigating evidence and leaves determination to subjective standards of jurors). Therefore, the existence of mitigating factors cannot be considered an element of the offense; in fact, there are capital cases in which there are no mitigating factors.

Justice Scalia, in his concurring opinion in *Apprendi,* succinctly captured the Supreme Court's rationale and ultimate holding:

> I think it not unfair to tell a prospective felon that if he commits his contemplated crime he is exposing himself to a jail sentence of 30 years—and that if, upon conviction, he gets anything less than that he may thank the mercy of a tenderhearted judge (just as he may thank the tenderhearted parole commission if he is let out inordinately early, or the mercy of a tenderhearted governor if his sentence is commuted). Will there be disparities? Of course. But the criminal will never get *more* punishment than he bargained for

45

: 88159

<u>when he did the crime</u>, and his guilt of the crime (and hence the length of the sentence to which he is exposed) will be determined *beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens.*

*Apprendi*, 530 U.S. at 498 (Scalia, J., concurring) (emphasis added).

In the instant case, the applicant did not get more punishment than he bargained for when he committed the offense of capital murder, an offense with a minimum punishment of life imprisonment and a maximum punishment of death. TEX. CODE CRIM. PROC. art. 37.071. The jury, by its guilty verdict, found that the applicant was guilty of all the elements of capital murder (CR – 90). At the conclusion of the punishment phase, the trial court instructed the jury that the mandatory punishment for capital murder was death or life imprisonment (CR-95). The applicant's jury found that that there was a probability that the applicant would commit criminal acts of violence that would constitute a continuing threat to society (CR – 101). The jury then found that there was no sufficient circumstance(s) that warranted a sentence of life, rather than death (CR – 102). Accordingly, the trial judge sentenced the applicant to death, as mandated by TEX. CODE CRIM. PROC. art. 37.071(g).

The applicant was not assessed punishment beyond the maximum allowable punishment. Consideration of mitigating evidence for the purpose of a more lenient punishment cannot be considered an element of the offense requiring a burden of proof. Thus, the holding of *Apprendi* is inapplicable to the applicant's case and to the mitigation issue of the Texas death penalty statute.

46

Based on the foregoing, the applicant's ninth ground for relief is without merit and should be denied.

## III.

The applicant raises questions of law and fact that can be resolved by the Court of Criminal Appeals upon review of official court records and based upon the pending receipt of two affidavits from trial counsel.

## IV.

Service has been accomplished by sending a copy of this instrument to counsel for the applicant on this the 17th day of January, 2002.

Mr. Roland Moore
Attorney at Law
1314 Texas Ave., Suite 1705
Houston, Texas 77002

F I L E D
CHARLES BACARISSE
District Clerk

JAN 1 7 2002

Time: _____
Harris County, Texas

By _____ Deputy

Respectfully submitted,

ERIC KUGLER
Assistant District Attorney
Harris County, Texas
1201 Franklin, 6th Floor
Houston, Texas 77002
(713) 755-5826
(713) 755-5809 fax
Texas Bar ID #00796910

: 00161

NO. 800,112-A

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| vs. | § | 179TH JUDICIAL DISTRICT |
| CHARLES MAMOU, JR. | § | HARRIS COUNTY, TEXAS |

AFFIDAVIT

THE STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned authority, on this day, personally appeared, FLOYD W. FREED, III, who after being by me duly sworn, deposed and stated as follows:

"My name is Floyd W. Freed, III. I am an attorney duly licensed to practice law in the State of Texas and I was the attorney of record for the Defendant, Charles Mamou, Jr., on appeal.

Appellate counsel did not raise on direct appeal any issues related to victim impact evidence of Yolanda Williams and Patricia Dodson due to the fact that trial counsel did not preserve error, if any, pursuant to Rule 33 of the Texas Rules of Appellate Procedure. Adverse rulings were not obtained on the Defendant's Motion for Victim Impact Testimony (C.R. 20) Further, trial counsel's objection at trial was not sufficient to preserve error related to victim impact testimony in that it did not relate to any specific testimony of Yolanda Williams and/or Patricia Dodson. Nor was a "running objection" sought to such testimony.

Appellate counsel did not raise ineffective assistance of counsel because the record was not developed for appellate purposes to raise the issue pursuant to the guidelines as set forward in Tong v. State, 25 S.W. 3rd 707, 712 (Tex. Crim. App. 2000).

Appellate counsel did raise speculation in his Point of Error One. The trial objection was set forth in an oral Motion in Limine which in part asked that cross examination by the State of Texas to be precluded as to examining the defense witness, Dorothy Morgan, as to future changes in the parole law. Appellate counsel avers that the issue raised on appeal does comport to the trial objection and adverse ruling thereon in whole or in part.

STATE'S
EXHIBIT
A

I have read the foregoing Affidavit and it is true and correct to the best of my knowledge and belief.

Further Affiant saith not.



FLOYD W. FREED, III

SUBSCRIBED AND SWORN TO BEFORE ME by FLOYD W. FREED, III, on the 8th day of January, 2002, to certify which witness my hand and seal of office.

BERNARD L. MATHEWS
Notary Public, State of Texas
My Commission Expires
3-6-2004

Notary Public in and for the State of Texas

: 00163



# CHARLES BACARISSE
## HARRIS COUNTY DISTRICT CLERK

Direct Dial Line:
755-5738

January 17, 2002

MR. ROLAND MOORE
ATTORNEY AT LAW
1314 TEXAS AVE., SUITE 1705
HOUSTON, TEXAS 77002

To Whom It May Concern:

Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, please find enclosed copies of the documents indicated below concerning the Post Conviction Writ filed in cause number 800112-A in the 179TH District Court.

☒ State's Original Answer Filed January 17, 2002

☐ Affidavit ,

☐ Court Order Dated ,

☐ Respondent's Proposed Order Designating Issues And Order For filing Affidavit.

☐ Respondent's Proposed Findings of Fact and Order ,

☐ Other

Sincerely,
Criminal Post Trial Section
Harris County District Clerk's Office

lag

Enclosure(s) RESPONDENT'S ORIGINAL ANSWER

: 00164

NO. 800112-A

IN THE COURT OF CRIMINAL APPEALS OF TEXAS
AUSTIN, TEXAS

IN THE 179TH JUDICIAL DISTRICT COURT OF
HARRIS COUNTY, TEXAS

**F I L E D**
CHARLES BACARISSE
District Clerk

FEB 2 1 2002

Time:_____
Harris County, Texas
By_____
Deputy

EX PARTE CHARLES MAMOU, JR.

MOTION FOR EVIDENTIARY HEARING

Comes Now the Petitioner, Charles Mamou, Jr., Applicant herein, by and through his attorney, Roland Brice Moore III, and prays that the Court will set this matter for an evidentiary hearing. Applicant contends that there is a need for an evidentiary hearing because the principal issues in his case involving the deficient performance of trial and appellate counsel cannot be adequately explored without the testimony and cross-examination of the aforesaid previous counsel. Moreover, neither trial counsel has filed an affidavit in this case regarding the presence or absence of trial strategy with respect to the errors and omissions at trial. Such testimony is a *sine qua non* of a fair resolution of Applicant's claims.

Respectfully submitted,

ROLAND BRICE MOORE III
ATTORNEY FOR APPLICANT
1314 Texas Ave. Suite 1705
Houston, Texas 77002
713 229-8500
State Bar No. 14388100

*talk to Roland on*
*6/30/03 - still*
*need hearing*

: 00165

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion was delivered to Mr. Baldwin Chin, assistant district attorney assigned to the above-captioned Court,  on this the 21st day of Feb., 2002, by placing it in his box at the Harris County District Clerk's Office, and by faxing it to him at his office at 201 Fannin, Houston, Texas 77002.

_____
ROLAND BRICE MOORE III

NO. 800112-A

| THE STATE OF TEXAS | § | IN THE 179thDISTRICT |
| | § | |
| VERSUS | § | COURT OF HARRIS |
| | § | |
| CHARLES MAMOU | § | COUNTY, TEXAS |

## MOTION FOR THE APPOINTMENT OF A BALLISTICS EXPERT

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes CHARLES MAMOU, defendant in the above styled and numbered cause, by and through his attorney of record, and respectfully moves this Honorable Court to appoint a private investigator to assist him in the preparation of his defense, and for good cause shows the following:

I.

Defendant is charged with the felony offense of capital murder. The undersigned has been appointed as habeas counsel.

II.

Based on his limited investigation in this case, the undersigned counsel knows that there are potential issues involving the ballistics work done in this case by the Harris County Police Department. This work can only be reviewed properly and effectively through the use of a ballistics expert.

III.

Appointment of a ballistics expert is necessary to insure that defendant receive his rights to effective assistance of counsel, cross-examination and confrontation, and compulsory process, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 10 of the Texas Constitution; due process and due course of law, guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, §§ 13, 19 and 29; and, equal protection of the law, guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, §§ 3 and 3a of the Texas Constitution. Perry v. Lynaugh, 109 S.Ct. 2934 (1984); Ake v. Oklahoma, 105 S. Ct. 1087 (1985.)

IV.

Appointed counsel is entitled to reimbursement for reasonable expenses incurred with prior court approval for purposes of investigation. Tex. Code Crim. Proc. Ann. Art. 26.05(a).

V.

Undersigned counsel was appointed to represent the defendant because of his indigence. This indigence prevents

defendant from hiring a ballistics expert to assist in his defense.

VI.

Defendant requests that the Court appoint James Luther Booker, Ph.D., a ballistics expert, whose resume is attached hereto as an Appendix.

**WHEREFORE, PREMISES CONSIDERED,** defendant prays that this Court appoint a ballistics expert to assist him in the preparation of his defense and that the Court order the County Auditor to pay the costs of such investigative services.

Respectfully submitted,

ROLAND BRICE MOORE III
ATTORNEY FOR PETITIONER
1314 Texas Ave. Suite 1705
Houston, Texas 77002
Phone: 713  229-8500
Pager: 713 519 7823
State Bar No. 14388100

NO. 896075

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 351st DISTRICT |
| | § | |
| VERSUS | § | COURT OF HARRIS |
| | § | |
| CHARLES MAMOU | § | COUNTY, TEXAS |

**O R D E R**

On this the _____28th_____ day of _____May_____, 2003, came on to be heard defendant's **Motion For The Appointment Of A Ballistics Expert** to assist in the preparation of the defense.

This Court, after having read the pleadings and heard argument of counsel, is of the opinion that said motion should be granted:

It is therefore **ORDERED, ADJUDGED and DECREED** that James Luther Booker, Ph.D. is hereby appointed as the investigator for the defendant.

SIGNED on this the _____28th_____ day of _____MAY_____, 2003.

_____
JUDGE PRESIDING

# Central Texas Analytical Consultants

229 Lusk Creek Road • P. O. Box 569 • Eddy, Texas 76524-0569
(254) 859-3841 • FAX (254) 859-3456

**JAMES LUTHER BOOKER, Ph.D.,**
**Principal Consultant**

March, 2003

Central Texas Analytical Consultant
229 Lusk Creek Road
P.O. Box 569
Eddy, Texas 76524-0569

Telephone (254) 859-3841
FAX (254) 859-3456
e-mail: jlbooker@worldnet.att.net

## EDUCATION

Ph.D. in Analytical Chemistry, University of Washington, 1970
M.S. in Inorganic Chemistry, Texas Technological College, 1965
B.S. in Chemistry, Texas Technological College, 1963

## EXPERIENCE

Principal Consultant, Central Texas Analytical Consultants, (8 years)
Group Leader of Analytical Services, Ralph Wilson Plastics Co. (3 years)
Research Associate, James River Corp. (4 years)
Senior Research Scientist, Kimberly-Clark Corp. (7 years)
Director and Senior Forensic Scientist, Wyoming State Crime Laboratory (6 years)
Criminalist and Head of Firearms Section, California Dept. of Justice (2 years)
Assistant Professor of Analytical Chemistry, Stanislaus State College (2 years)
Visiting Research Scientist, U.S. A.F. Lunar Analysis Program (6 months)
Chemist Dow Chemical Co. (2 years)

## ACADEMIC and INSTRUCTIONAL

Texas State Technical College: Instructor (1995-1997)
University of Mary Hardin--Baylor: Adjunct Faculty (1991-1995)
Michigan State U.: Member of graduate committee, (1991)
U. of Wisconsin--Oshkosh: Adjunct Faculty, (1980-1990)
University of Wyoming: Adjunct Faculty (1976-1979)
University of Washington: Visiting Lecturer in Forensic Science (1975)
Sacramento State University: Adjunct Faculty (1973)
Wyoming Law Enforcement Academy: Instructor in: (1974-1980)
      Photography
      Crime Scene and Accident Reconstruction
      Physical Evidence -- General
      Physical Evidence -- Rape
      Physical Evidence -- Arson
      Physical Evidence -- Homicide
      Physical Evidence -- Toxicology and Substances of Abuse

## CONSULTING

Lawrence Livermore Laboratory (Security Level: "Q-Clearance") (1972-1973)

Pro Bono services to Public Defenders and Court Appointed Attorneys (1980-1994)

## TESTIMONY

Qualified as Expert Witness in U.S. District Court, in U.S. Military Court, in lower courts, and in District and Superior Courts in Alabama, Arizona, California, Colorado, Florida, Idaho, Illinois, Louisiana, Missouri, Montana, Nevada, Texas, Wisconsin, and Wyoming.

## PUBLICATIONS

### Book

Booker & Renfroe,       *"DWI Detection Tests: A Courtroom Guide to Accuracy and Reliability"*,
American Courtroom Publications (June, 2001)

### Articles

\*       "The Horizontal Gaze Nystagmus Test: Fraudulent Science in the American Courts"

\*\*       "Utilizing the Ideal Gas Law to Measure the Thickness of Aluminum Foil"

"End-Position Nystagmus as an Indicator of Ethanol Intoxication," *Science and Justice,* **41**, p113 (2001)

"Notes on the Federal Methamphetamine Sentencing Guidelines," *Voice for the Defense,* **29(5)**, p18 (2000)

"The 0.08 Intoxication Criterion: A Study in Science, Law, and Political Correctness," *Voice for the Defense,* **28(2)**, p28 (1999)

"The Application of the 'Known and Potential Rate of Error Criterion to the Standardized Battery of Field Sobriety Tests," *Voice for the Defense,* **27(9)**, p24 (1998)

"The Intoxilyzer 5000's Patent: A Technical Description of an Unworkable Device?," *Voice for the Defense,* **26(1)**, p18 (1997)

"The Field Test Paradox," *Voice for the Defense,* **25(2)**, p8 (1996)

"Standard Test Method for Qualitative Analysis of Volatile Extractables in Microwave Susceptors Used to Heat Food Products, *ASTM Standard Method No. F 1519-94,"* (1994).

"Whewhellite Rock Crust in the Lower Pecos Region of Texas," *Texas Journal of Science,* **46**, p165 (1994).

"Safety of Microwave-interactive Paperboard Packaging Materials," *Food Technology,* **43**, p110 (1989).

"The Production of Eugenol and Isoeugenol by Electrochemical Reduction of Spruce Lignin," *Cellulose Chem. Technol.,* **23(1)**, p23 1989.

"The Wisconsin Breath Testing Program: A Forensic Scientist's View," *Wisconsin Bar Bulletin,* **61(10)**, p12 (1988).

"Degradation Products of Irradiated Haloperidol: Implications for the Development of an Implantible Delivery System," *Pharmazie,* **43**, p31 (1988).

"Forensic Aspects of the Static and Dynamic Collection and Concentration of Volatile Organic Compounds," *Fenxi Huaxue,* **13(12)**, p942 (1985).

"Collecting Volatile Compounds by Simple Diffusion: An Alternative to Purge-and-Trap,"
*J. Chromatogr. Sci.*, **23**, p41 (1985).

"A Note on the Variability of Barium and Antimony Levels in Cartridge Primers and its Implication for Gunshot Residue Analysis," *For. Sci.*, **24**, p81 (1984).

"The Classification of Jacketed Sporting Rifle Bullets," *J. For. Sci.*, **25**, p786 (1980).

"The Examination of the Badly-Damaged Bullet," *For. Sci.*, **20**, p153 (1980).

"The Identification of Smokeless Powders and Their Residues by Pyrolysis Gas Chromatography,"
*J. For. Sci.*, **24**, p87 (1979).

"Pattern Recognition and Blind Assay Techniques Applied to the Forensic Separation of Whiskeys,"
*Anal. Chem. Acta*, **103**, p201 (1979).

"A Method for the Identification of Smokeless Powders and Their Residues by Thin Layer Chromatography of Their Minor Constituents," *For. Sci.*, **13**, p199 (1973).

"Rhenium(III) Bromide," *Inorganic Syntheses*, **10**, p58 (1967).

"Recovery of Oxides of Molybdenum from the Oxychloride," *U.S. Patent No. 3,420,629* (1969).

### Theses

"Investigation of the Mass Spectrometric Trace Analysis of Some First-Row Transition Metals using Volatile Beta-Diketonate Complexes," (Ph. D. Dissertation, 1970).

"Ammonolysis of Rhenium(III) Chloride and Rhenium(III) Bromide," (M.S. Thesis, 1965).

* Accepted for Publication, *Science and Justice*
** Accepted for Publication, *Journal of Chemical Education*

IN THE COURT OF CRIMINAL APPEALS, AUSTIN, TEXAS

AND

IN THE 179TH JUDICIAL DISTRICT COURT
OF HARRIS COUNTY, TEXAS

| | | |
|---|---|---|
| EX PARTE, | § | CAUSE NO. 800112 - A |
| | § | |
| CHARLES H. MAMOU, JR. | § | |
| | § | |
| APPLICANT | § | |

## MOTION TO SUBSTITUTE COUNSEL

COMES NOW, Charles H. Mamou, Jr., and asks that this Court grant permission to substitute

David K. Sergi as attorney of record in this case.

David K. Sergi, 109 E. Hopkins, Suite 200, San Marcos, Texas, 78666, phone (512)

392-5010, fax (512) 392-5042, State Bar number18036000 has been employed to represent Charles

H. Mamou, Jr.

Charles H. Mamou, Jr. approves this substitution. This substitution is not sought for delay only.

Charles H. Mamou, Jr. prays that the Court enter an order substituting David K. Sergi and

discharging Roland Brice Moore III as attorney of record for Charles H. Mamou, Jr.

Respectfully submitted,

DAVID K. SERGI & ASSOCIATES, P..C.
109 East Hopkins, Suite 200
San Marcos, Texas 78666
Telephone: (512) 392-5010/Fax: (512) 392-5042

BY: _____
David K. Sergi
Attorney for Charles H. Mamou, Jr.

F I L E D
CHARLES BACARISSE
District Clerk

JAN 1 9 2007

Harris County, Texas

By_____
Deputy

O:\CLIENTS\CURRENT\Mamou, Charles\06183crim\Pleadings\mtn to substitute counsel 12.11.06.wpd

: 00174