APPLICANT <u>CHARLES MAMOU, JR.</u>          APPLICATION NO.  <u>78,122-02</u>


SUBSEQUENT 11.071 APPLICATION
FOR WRIT OF HABEAS CORPUS              <u>XXX</u>


DISMISS SUBSEQUENT 11.071 APPLICATION FOR WRIT OF HABEAS
CORPUS WITH WRITTEN ORDER.

_Per Curiam_ _____              2-5-14
JUDGE                                              DATE

# CCA Scanning Cover Sheet



2553451

CaseNumber: WR-78,122-02
EventDate: 12/12/2013
Style 1: MAMOU, CHARLES Jr.
Style 2:
Event code: 11.071 WRIT RECD

EventID: 2553451
Applicant first name: CHARLES
Applicant last name: MAMOU
Offense: 19.03
Offense code: Capital Murder
Trial court case number: 800112
Trial court name: 179th District Court
Trial court number: 321010179
County: Harris
Trial court ID: 613
Event map code: FILING
Event description: Habeas Corpus - Capital Death
Event description code: 11.071
Remarks:

<table>
<tr><td>☐ <i>Document Scanned</i></td><td>☐ <i>Created or</i><br>☐ <i>Appended</i></td></tr>
<tr><td><i>Scanned by</i>     <i>date</i></td><td><i>Image ID</i></td></tr>
<tr><td colspan="2"><i>Comment</i></td></tr>
</table>

# IN THE 179TH JUDICIAL DISTRICT COURT OF HARRIS COUNTY, TEXAS

## AND

## IN THE COURT OF CRIMINAL APPEALS, AUSTIN, TEXAS

| | | |
|---|---|---|
| EX PARTE, | § | CAUSE NO. <u>800112-A</u> |
| | § | |
| CHARLES H. MAMOU, JR. | § | |
| | § | |
| APPLICANT | § | |

## SUPPLEMENTAL APPLICATION FOR
## <u>POST-CONVICTION WRIT OF *HABEAS CORPUS*</u>

David K. Sergi
DAVID K. SERGI & ASSOCIATES, P.C.
329 S. Guadalupe
San Marcos, Texas 78666
Telephone: (512) 392-5010
Fax (512) 392-5042
State Bar No. 18036000

ATTORNEY FOR APPLICANT

FILED
Chris Daniel
District Clerk

OCT 29 2013

Time _12:50 P_
Harris County, Texas
By _____
Deputy

: 00196

# IN THE 179TH JUDICIAL DISTRICT COURT
## OF HARRIS COUNTY, TEXAS

### AND

## IN THE COURT OF CRIMINAL APPEALS, AUSTIN, TEXAS

| | | |
|---|---|---|
| EX PARTE, | § | CAUSE NO. <u>800112-A</u> |
| | § | |
| CHARLES H. MAMOU, JR. | § | |
| | § | |
| APPLICANT | § | |

## SUPPLEMENTAL APPLICATION FOR
## <u>POST-CONVICTION WRIT OF *HABEAS CORPUS*</u>

David K. Sergi
DAVID K. SERGI & ASSOCIATES, P.C.
329 S. Guadalupe
San Marcos, Texas 78666
Telephone: (512) 392-5010
Fax (512) 392-5042
State Bar No. 18036000

ATTORNEY FOR APPLICANT

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES...........................................................................iv

STATEMENT OF JURISDICTION ...............................................................1

PROCEDURAL HISTORY ............................................................................1

STATEMENT OF FACTS ..............................................................................4

QUESTIONS FOR REVIEW .........................................................................6

POINT OF ERROR NUMBER ONE..............................................................7

Applicant Was Denied Due Process of Law When the Trial Court
Allowed Expert Testimony by Robert Baldwin Concerning
"Magazine Marks" in Direct Violation Of Tex. R. Evid. 702 and *Kelly
v. State.*

POINT OF ERROR NUMBER TWO..............................................................16

Applicant Was Denied Due Process of Law as Guaranteed Under the
Fourteenth Amendment to the U.S. Constitution by the State's Failure to
Disclose All Exculpatory Evidence as Required by *Brady v. Maryland.*

POINT OF ERROR NUMBER THREE ...........................................................26

Applicant Was Denied Due Process of Law as Guaranteed Under the
Fourteenth Amendment to the U.S. Constitution as a Result of the
State's Failure to Disclose Any Plea Agreements Entered Into With
Witnesses for the State in Exchange for Their Testimony at Trial.

POINT OF ERROR NUMBER FOUR ..............................................................29

Applicant Was Denied His Right to Effective Cross Examination of
the State's Witnesses as Guaranteed Under the Confrontation Clause
of the Sixth Amendment to the U.S. Constitution as a Result of the
State's Failure to Disclose All Impeachment Evidence as Required by
*Brady v. Maryland.*

**CONCLUSION** ................................................................................................35

**PRAYER** .......................................................................................................36

**CERTIFICATE OF SERVICE** ....................................................................38

# TABLE OF AUTHORITIES

**Cases**

*Alford v. United States*, 282 U.S. 687, 691-92 (1931) .............................................31

*Ashley v. Texas*, 319 F.2d 80, 85 (5th Cir.1963) .................................................22, 27

*Brady v. Maryland*,
    373 U.S. 83, 87 (1963) ........................ ii, 6, 16, 19, 22, 23, 25-27, 29, 30, 35,36

*Burkhalter v. State*, 493 S.W.2d 214, 215-18 (Tex.Crim.App. 1973) ....................28

*Carroll v. State*, 916 S.W.2d 494, 496-97 (Tex.Crim.App. 1996)....................30, 31

*Coble v. State*, 330 S.W.3d 253, 280 (Tex.Crim.App. 2010)..............................9, 10

*Crutcher v. State*, 481 S.W.2d 113, 114-17 (Tex.Crim.App. 1972) .......................24

*Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S.Ct. 1105, 39 L.Ed. 2d 347 (1974)....32

*Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) ..................................30, 32, 33

*Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed. 2d 934 (1965) .32

*Duggan v. State*, 778 S.W.2d 465, 468 (Tex.Crim.App. 1989) ..............................28

*Ex parte Brandley*, 781 S.W.2d 886,892-94 (Tex.Crim.App 1989) ...........22, 23, 25

*Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex.Crim.App. 2002)........................23

*Florio v. State* 532 S.W.2d 614, 616 (Tex.Crim.App. 1976)..................................24

*Giglio v. United States*, 405 U.S. 150, 154 (1972)................................................28

*Granger v. State*, 683 S.W.2d 387, 389-91 (Tex.Crim.App. 1984) ........................28

*Granviel v. State*, 552 S.W.2d 107, 119 (Tex.Crim.App. 1976)............................25

*Hurd v. State*, 725 S.W.2d 249, 252 (Tex.Crim.App. 1987)..................................31

*Kelly v. State*, 824 S.W.2d 568 (1992) ............................................................. 6-9, 12

*Kyles v. Whitely*, 514 U.S. 419, 434 (1995) ........................................................26

*Maxwell v. State*, 48 S.W.3d 196 (2001)............................................................31

*Miller v. State*, 741 S.W.2d 382, 389 (Tex.Crim.App. 1987) .................................30

*Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) .......................9

*Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) ................................................25

*Sexton v. State*, 93 S.W.3d 96 (Tex.Crim.App. 2002) .........................10, 11, 14, 15

*Shelby v. State*, 819 S.W.2d (Tex.Crim.App. 1991) ...................................30, 32, 33

*United States v. Agurs*, 427 U.S. 97, 107-114 (1976) ....................................22, 27

*United States v. Bagley*, 473 U.S. 667 (1985)..............................................25, 28

*United States v. Johnson*, 872 F.2d 612, 620 (5th Cir. 1989) ...............................23

*United States v. Onori*, 535 F.2d 938 (5th Cir. 1976) ........................................31

*Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000) .............................9

*Youngblood v. West Virginia*, 547 U.S. 867, 870 (2007) ......................................24

## Constitution

U.S. Const. amend VI........................................................ ii, 6, 29-31, 35

U.S. Const. amend XIV ................................ii, 3, 6, 16, 22, 26, 27, 30, 36

Texas Const. art. I, § 3 ..................................................................3

Texas Const. art. I, § 10 .................................................................30

## Statutes

Texas Code of Criminal Procedure Art. 11.07 ...................................................... 1, 3

## Rules

Tex.R.App. P. 44.2 ................................................................................................ 33

Tex.R.Evidence 702 ............................................................................... 6-9, 11, 15

## TO THE JUDGES OF THE COURT OF CRIMINAL APPEALS:

COMES NOW CHARLES MAMOU, JR., Applicant in the above-styled and numbered cause, by and through his attorney of record, David K. Sergi, and pursuant to Texas Code of Criminal Procedure Art. 11.071, files this supplemental application for writ of habeas corpus. Applicant respectfully asks that the Court consider this supplemental application and the claims contained herein. In support thereof, Applicant would show the court as follows:

## STATEMENT OF JURISDICTION

Applicant, Charles Mamou, Jr., is being unlawfully incarcerated on death row at the Polunsky Unit of the Texas Department of Criminal Justice in Livingston, Texas, pursuant to a sentence of death entered by the 179th Judicial District of Harris County in Cause #800112, in violation of the rights, privileges, and immunities guaranteed by the Constitution and laws of the State of Texas and by Constitution and laws of the United States, as more fully hereinafter described. This writ is filed pursuant to Texas Code of Criminal Procedure Article 11.071.

## PROCEDURAL HISTORY

Applicant was indicted in Cause #800112, with the offense of capital murder in the death of Mary Carmouche. The indictment alleged that a murder and kidnapping were committed on December 7, 1998. After Applicant's plea of "not guilty," the case proceeded to a jury trial wherein Applicant was convicted of

1

capital murder. The jury answered the two statutory special issue questions with a "Yes" to the first issue, and a "No" to the second. By operation of law, the effect of these answers was the imposition of the death penalty.

On direct appeal, this Court denied relief on each of the eight points of error raised by the Applicant by way of an unpublished opinion dated November 7, 2001. Previously, and before this Court's rendering of judgment on Applicant's direct appeal, Mr. Roland Moore acting as counsel for the Applicant filed an Application for Writ of Habeas Corpus with the convicting court, on or about April 18, 2001, raising eight possible grounds for relief. Subsequently, and without assistance of counsel, Applicant filed a *pro se* Subsequent Application for Writ of Habeas Corpus on June 13, 2003.

Despite the previous filing in this matter, and due to the fact that neither of the aforementioned writ applications at the time of this writing have been forwarded to this Court by the convicting court, Applicant now seeks to supplement his previously filed writ application with the claims contained herein.

## APPLICANT'S CLAIMS ARE COGNIZABLE UNDER ARTICLE 11.071, SECTION 5(A)

Applicant filed the original Application for a Writ of Habeas Corpus with this Court on April 18, 2001. As of now, the writ application has not yet been forwarded to the Texas Court of Criminal Appeals. At the trial court's request, this Court has presently extended the writs due date for the trial court to fully comply.

2

· 00204

It is for this reason, as well as the discovery of previously unavailable evidence, that Applicant now seeks to supplement the original Application.

Applicant contends that he should be allowed leave to file a supplemental Application for Writ of Habeas Corpus, as no determination or final disposition has occurred regarding the initial Application nor Applicant's *pro se* writ. Given this fact, this Application cannot properly be called a subsequent application, as that implies the claims within the initial application have already been considered and rejected.

Article 11.07(4)(a) permits supplemental Applications in non-capital cases, but precludes their use in death-penalty cases. Article 11.071 provides unequal treatment of those under sentence of death in violation of the equal protection clauses of the Texas Constitution, found in Article I, §3, and the Fourteenth Amendment to the U.S. Constitution.

There is no rational reason for treating these two classes of applicants differently. Non-capital applicants seeking habeas relief under Article 11.07 are limited only by the merit of their claims. Applicants sentenced to death, who seek review of their claims under Article 11.071, must focus not on the merit of their claims as much as the timeliness of their filing.

For these reasons, and because Applicant's initial writ application has not yet been ruled on by this Court, Applicant respectfully asks that the Court allow

3

: 00205

him to supplement his initial writ with the following claims for this Court's consideration.

## STATEMENT OF FACTS

On December 6, 1998, Charles Mamou (hereinafter referred to as "Applicant") accompanied by another man by the name of Samuel "Bug" Johnson went to meet another group of young men that included Kevin Walter, Terrence Gibson, and Dion Holley, for the purpose of engaging in an illegal drug transaction. Both parties were attempting to complete a sale of cocaine, in which Applicant was the purchaser and the group including, Walter, Gibson, and Holley were the sellers. From the evidence adduced at trial, it appears that Applicant did not have any money to purchase cocaine and Walter, Gibson, and Holley did not have any cocaine to sell.

The individuals in question all agreed to meet at a mall in Houston. Walter, Holley and Gibson arrived in a blue Lexus belonging to Holley's mother. Applicant and Johnson arrived in Johnson's red Chrysler, with Johnson driving. This meeting proved futile, as both sides refused to produce either drugs or cash. After going their separate ways, the party of Walker, Gibson, and Holley drove the Lexus to pick up a young female by the name of Mary Carmouche at her residence. The two groups then met once again at Bennigan's restaurant. After meeting inside the restaurant and grabbing something to eat, both parties left, supposedly to

4

seek out a convenient location to complete the drug deal. After driving to a parking lot and talking briefly, the two cars drove together to a dark area on Lantern Point Drive.

Upon arriving, the Lexus and the car occupied by the Applicant and Johnson proceeded to park facing each other on one side of the street. The Applicant exited the car and met Holley and Gibson at the rear of the parked Lexus. Walter and Mary Carmouche remained inside the Lexus. Samuel Johnson also remained in the driver's seat inside the other parked vehicle. After a short discussion, Gibson raised his shirt exposing a weapon in his waistband. At this point, the Applicant shot Gibson. As he ran into a nearby field, Holley was also shot by the Applicant. The Applicant next fired at Walter, who was still sitting in the driver's seat of the Lexus. Upon being shot, Walter exited the Lexus and lunged at the Applicant and he was shot again. Applicant then proceeded to jump in the Lexus, with Mary Carmouche still inside, and drive away. Johnson quickly followed in the red Chrysler.

The body of Mary Carmouche was discovered two days later in the backyard of a vacant house, dead of a gunshot wound to the chest. Terrance Gibson also died of his injuries. Applicant was indicted for the offense of capital murder in the death of Mary Carmouche. Applicant was convicted and sentenced to death.

# QUESTIONS FOR REVIEW

Applicant raises the following grounds for review:

1. APPLICANT WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT ALLOWED EXPERT TESTIMONY BY ROBERT BALDWIN CONCERNING "MAGAZINE MARKS" IN DIRECT VIOLATION OF TEX. R. EVID. 702 AND *KELLY v. STATE*.

2. APPLICANT WAS DENIED DUE PROCESS OF LAW AS GUARANTEED UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION BY THE STATE'S FAILURE TO DISCLOSE ALL EXCULPATORY EVIDENCE AS REQUIRED BY *BRADY v. MARYLAND*.

3. APPLICANT WAS DENIED DUE PROCESS OF LAW AS GUARANTEED UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AS A RESULT OF THE STATE'S FAILURE TO DISCLOSE ANY PLEA AGREEMENTS ENTERED INTO WITH WITNESSES FOR THE STATE IN EXCHANGE FOR THEIR TESTIMONY AT TRIAL.

4. APPLICANT WAS DENIED HIS RIGHT TO EFFECTIVE CROSS EXAMINATION OF THE STATE'S WITNESSES AS GUARANTEED UNDER THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AS A RESULT OF THE STATE'S FAILURE TO DISCLOSE ALL IMPEACHMENT EVIDENCE AS REQUIRED BY *BRADY v. MARYLAND*.

## POINT OF ERROR NUMBER ONE
### APPLICANT WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT ALLOWED EXPERT TESTIMONY BY ROBERT BALDWIN CONCERNING "MAGAZINE MARKS" IN DIRECT VIOLATION OF TEX. R. EVID. 702 AND *KELLY v. STATE.*

*Facts Relevant to Point of Error Number One*

During the guilt-innocence phase of Applicant's trial, the State offered the testimony of Houston Police Department expert Robert Baldwin. Through the testimony of Mr. Baldwin, the State attempted to prove that Applicant was responsible for the murder of Mary Carmouche. In the State's quest for a capital murder conviction, it elicited testimony from Mr. Baldwin that he was able to connect an unfired ammunition round, found where the body of Mary Carmouche was discovered, to ammunition casing collected at Lantern Point, from nothing more than the "magazine marks" on the shell casings. Although there was no other ballistic evidence which supported the State's claim that Applicant shot and killed Ms. Carmouche, Baldwin testified that they were both chambered from the same magazine.

Baldwin concluded this despite the absence of the weapon or the magazine which purportedly made these marks on the various ammunition casings. The scratches on the fired and unfired rounds were all that were available for analysis. And, on nothing more than this, Applicant was convicted and sentenced to death. To say that the State failed to make the necessary showing of reliability of this type

7

of evidence generally, much less its reliability as performed in this case, is a massive understatement.

## *Argument and Authorities*

Under Texas Rules of Evidence 702, a witness qualified as an expert is allowed to testify in opinion form where his scientific, technical or other specialized knowledge will assist the trier of fact. In *Kelly v. State*, 824 S.W.2d 568 (1992), this Court set forth the analytical framework for determining whether expert testimony is admissible under Rule 702.

Under *Kelly*, in its determination of reliability, a trial court may refer to seven non-exhaustive factors:

1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such community can be ascertained;

2) the existence of literature supporting or rejecting the underlying scientific theory and technique;

3) the clarity with which the underlying scientific theory and technique can be explained to the court;

4) the potential rate of error of the technique;

5) the availability of other experts to test and evaluate the technique;

6) the qualifications of the expert(s) testifying; and

7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Kelly*, 824 S.W.2d at 573.

8

Additionally, under Rule 702, the proponent of novel scientific evidence must prove to the trial court by clear and convincing evidence that the proffered evidence is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact at issue. *Id.; Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000). The party seeking to have the district court admit expert scientific testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable. This requires some objective, independent validation of the expert's methodology. The expert's assurances that he had utilized generally acceptable scientific methodology is insufficient. *Coble v. State*, 330 S.W.3d 253, 280 (Tex.Crim.App. 2010)(citing *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

The record in the instant case reveals that Baldwin's only validation of the methodology he employed was his own testimony. The expert evidence in this case, as well as it methodology, does not even come close to meeting the requirements for admissibility under Rule 702 and *Kelly*. In addition, in 2003, Baldwin was disciplined for deficient job performance. His work has been widely critiqued and his professional reputation is severely diminished.

## Flawed Evidence Used to Convict

This Court had before it evidence virtually identical to that offered in Applicant's case in *Sexton v. State*, 93 S.W.3d 96 (Tex.Crim.App. 2002). In *Sexton*, an expert witness related that cartridge casings from unfired bullets in Sexton's apartment matched those on fired casings discovered at the crime scene. *Id.* at 98.

The basis of the testimony of the expert in *Sexton*, which was rejected by this Court, was actually on stronger footing than that offered by Robert Baldwin in the instant case. Unlike the expert (Crumley) in *Sexton*, Baldwin offered nothing in support of his theory that he could "link" two separate ammunition rounds to a common magazine with nothing beyond an examination of the scratches on the shell casings. The ballistics expert in *Sexton* at least supported his contentions and methodology by referring to a couple of alleged learned authorities on the subject, albeit ones that this Court rejected for the most part. Baldwin made no such offering, referring not to outside sources, learned treatises on the subject or other experts for validation, but only on his own testimony. Clearly, this is wholly insufficient under this Court's dictates in *Coble*. *See, supra*.

Applicant contends that this Court's decision in *Sexton* is controlling and offers a brief analysis for the Court's consideration. As stated earlier, while this Court found ballistics expert Crumley's testimony failing to meet the requirements

10

of Rule 702, a scant review reveals that Robert Baldwin's testimony suffers from

an even greater infirmity. In *Sexton*, Crumley explained as follows:

> He [Crumley] stated that he based his conclusions on firearm and
> toolmark theories. The general theory behind toolmark examination is
> that harder metals will leave marks on softer metals when they come
> in contact with each other. The lips of a magazine, the part of a
> magazine that keeps the bullets in place, may come in contact with the
> softer shell casing and leave a mark. Crumley testified that the marks
> left on a cartridge from a magazine are unique to that magazine, like a
> fingerprint. If the magazine marks left on the cartridge cases are
> sufficiently clear, a firearms and toolmark expert may determine, with
> the use of a comparison microscope, whether the shells had been
> cycled through the same magazine.

*Sexton*, at 99.

However, Crumley's testimony did not withstand scrutiny under Rule 702,

and neither does the testimony of Robert Baldwin.

In its considerations of *Sexton*, the Court noted that the Fourth Court of

Appeals had observed that "toolmark theory for the identification of fired bullets

enjoys widespread acceptance and that Crumley, in his testimony, mentioned three

sources discussing the identification of fired cartridges from toolmarks." *Id.* at

100. The Court carefully examined the expert's sources noting that two made

"passing reference to magazine marks, but these are included in discussions for

identifying bullets that have been fired through a weapon where there are several

marks for comparison made by several components of the firearm." *Id.*

Consequently, this Court concluded that such references potentially supported toolmark theory generally but did not support its application in Sexton's case. *Id.* The Court further concluded that the first two *Kelly* factors, general acceptance by the relevant community and the existence of supporting literature, weighed against a finding of reliability. *Id.*

Next, this Court closely analyzed whether the potential rate of error weighed for or against admission into evidence. It concluded that Crumley's assertion of 100% accuracy was belied by known literature, which emphasized the following:

> [T]hese marks *may* enable an examiner to connect cartridge cases with the same weapon...The only literature explains what circumstances make it possible for an examiner to do so requires that the examiner possess knowledge of the manufacturing process of the tool surface *and have the tool available* for creating test toolmarks. In this case, the magazine or magazines that made the marks upon which Crumley based his identification were not found by Police. Therefore, Crumley was not able to make test marks for comparison. Also, Crumley did not say whether he was familiar with the manufacturing process of the magazine or magazines that he said left identifiable marks on the live rounds and cartridge cases.

*Id.* at 101.

This Court ultimately concluded that "the underlying theory of toolmark examination could be reliable in a given case, but that the State failed to produce evidence of the reliability of the technique used in this case." *Id.*

12

: 002 14

In the instant case, Robert Baldwin's testimony, and his "particular application" of toolmark theory, falls squarely and precisely within the ambit of this rule.

### Baldwin's Testimony and Conclusions

The crux of Baldwin's testimony was that, through his "magazine mark" analysis, he was able to tell that State's Exhibit 27 (a spent shell casing collected from Lantern Point) and State's Exhibit 89 (an unfired round recovered at the Lynchester address where Mary Carmouche was discovered) were both chambered from the same magazine. This was used by the State to link Applicant's presence at Lantern Point to the murder of Mary Carmouche. This was the State's entire case. In Baldwin's haphazard, abbreviated, untested, unreliable, and entirely subjective methodology, lie Applicant's conviction and subsequent sentence of death. With nothing more than a couple of scratches on two ammunition casings was Baldwin able to arrive at his "conclusions."

According to the *Pro Se* Application filed by Mr. Mamou, Baldwin also discusses State's Exhibits 55, 79 and 90 and once again comes to the conclusion that these "fired jacketed bullets" "were fired in the same firearm".

The problems with the evidence offered by Baldwin in Applicant's case are legion, and at the risk of being redundant, he would draw the Court's attention to the following for its consideration.

13

Mr. Baldwin drew his conclusions and provided damning testimony on behalf of the State without the benefit of examining a firearm, save for State's Exhibit 38, which he concluded did not fire any rounds used in his comparison. Most telling is the fact that Baldwin did not he have a magazine to use for "test marks" prior to concluding that Exhibits 27 and 89 were both chambered from the same magazine. As already stated, this Court upon reviewing the one authority used by expert Crumley in *Sexton*, placed a great deal of weight on this fact when it reversed and remanded due to the State's failure to show reliability of its expert's methodology and conclusions.

As evidence of the unusual and infrequent use of "magazine mark" evidence, Applicant would draw this Court's attention to the fact that a search on LexisNexis using the term "magazine marks" revealed only two cases in state or federal courts in Texas even referencing the term.

Of additional significance is the fact that during his testimony Baldwin did not present testimony indicating what if any specialized firearms training he had in toolmark comparison. Nor did Baldwin indicate how many times, if any, he had been asked to compare "magazine marks" or draw conclusions pertaining to them. In *Sexton*, for obvious reasons, Crumley cited to only two authorities on the subject of "magazine mark" analysis. As this Court observed, one of the authors per- formed such analysis only as a hobby and was not qualified as an expert on the

14

subject. Baldwin offered absolutely nothing in support of his scientific theories or methodology, only his own testimony. Apparently, Baldwin believed that the court should take his assertion that $1 + 1 = 3$ on nothing more than his opinion that it does. Whatever his motives or belief in this regard, his expert testimony failed miserable to meet the requirements of Rule 702 and this Court's pronouncement in *Kelly v. State*.

As this Court stated in *Sexton*, the only literature available explains what circumstances make it possible for an examiner to make a "magazine mark" comparison requires that the examiner possess knowledge of the manufacturing process of the tool surface *and have the tool available* for creating test toolmarks. Baldwin's comparison was entirely devoid of knowledge of the manufacturing process of the magazine he believed chambered, Exhibits 27 and 89. Applicant contends that the absence of a magazine for use in test marks, and with no knowledge regarding even the make, much less the manufacturing process of the magazine, Robert Baldwin's expert testimony was patently unreliable and hence, inadmissible at trial. As a result of the trial court allowing such unfounded opinions to be offered as science grounded in fact, Appellant has suffered harm and a due process deprivation under the State and Federal Constitution.

## POINT OF ERROR NUMBER TWO
## APPLICANT WAS DENIED DUE PROCESS OF LAW AS GUARANTEED UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION BY THE STATE'S FAILURE TO DISCLOSE ALL EXCULPATORY EVIDENCE AS REQUIRED BY *BRADY v. MARYLAND*[1]

Applicant was tried for, and convicted of, the capital murder of Mary Carmouche in Cause No. 800112 in the 179th District Court in Harris County, Texas. In making its case, the State relied primarily upon testimony of Applicant's accomplices as well as the putative "sellers" involved in the drug sale hoax along with the Applicant. Aside from the testimony of those involved in the transaction, namely, Dion Holley, Kevin Walter, Samuel "Bug" Johnson, and Terrence Dodson, the State offered little else actually connecting Applicant to the murder of Mary Carmouche.

*Availability of Witness Statements*

In light of the facts of this case, as well as their own admissions, all of these individuals could have been charged with various criminal offenses related to the sham drug transaction and the violence and death which occurred as a result.

---

[1] Applicant raises Claims One through Three on information and belief that despite trial counsel's formal request for any and all exculpatory and impeachment evidence relevant to Applicant's guilt or punishment, and while it is believed said evidence did exist, the prosecution failed to disclose it to Applicant's trial counsel, Mr. Wayne Hill. If any of the allegations regarding *Brady* material (the subject of this application) are shown to be without merit or to be incorrect, Applicant reserves the right to withdraw all or part of this writ application. It is the opinion of Applicant's habeas counsel that Mr. Hill has provided him with all relevant material pursuant to Mr. Sergi's numerous requests, and if this is not the case, Mr. Hill failed to do so based on reasons unknown to Applicant and Mr. Sergi.

Based upon information and belief, it appears that none of the State's witnesses were charged with any offense as a result of their participation in the crime resulting in Applicant's conviction and death sentence.

The police investigation into exactly what occurred the night of December 6, 1998 was limited at best, and seemed to focus almost immediately on Applicant, despite the possibility of alternate suspects in the murder of Mary Carmouche, including someone by the name of "Skin" and Shawn England who, according to the Applicant, were in her company the last time she was seen alive. At any rate, the investigation relied upon and was built around the inconsistent stories and half-truths conveyed to the authorities by the same men who would later testify on behalf of the State at Applicant's murder trial.

A thorough review of the prosecution's file by Applicant's investigator, Mr. Carl Deal, as well as an exhaustive survey of the files and documents provided by Mr. Hill has failed to turn up any written or recorded statements of the State's witnesses. As Applicant's habeas counsel, Counsel has exercised extreme diligence in attempting to establish the existence and/or location of any such statements.

In addition to the efforts described above, during the course of preparing the instant writ application, Counsel has corresponded with trial counsel Hill on numerous occasions via fax, phone, and U.S. mail regarding the existence of any

written or recorded statement in his possession. In fact, it is obvious from the letter to Mr. Hill dated 11/04/08, Mr. Sergi requested that Mr. Hill sign an affidavit confirming and summarizing their correspondence regarding this matter. Even after all of this time, Mr. Hill has not responded to Counsel's request.

Despite the effort of Applicant's habeas counsel, to date, the only information regarding witness statements to be uncovered are 34 pages of copied, handwritten notes, presumably taken by police officers, which were forwarded to Counsel's office by Mr. Hill on or about October 17, 2008. It is Applicant's belief that these notes are alleged to be those taken by police while interviewing Terrence Dodson, Samuel Johnson, Howard Scott, Robin Scott, and Anthony Trial. There was no explanation forwarded along with them, nor any indication of when they came into trial counsel's possession, only a cover letter listing the aforementioned names. Applicant finds it difficult to believe that these "notes" constitute the end result of the police investigation into the murder of Mary Carmouche in its entirety.

Aside from the obvious shortcomings revealed by a scant inspection of the notes, these document contain no signatures of the interviewer or the person being questioned, and appear to be entirely in the interviewer's words, recorded on blank, unlined paper. Only in some places, do they even mention who is present during the interview. These informal, barely legible, documents leave much to be desired

18

and are wholly inadequate given the nature and severity of the offense being investigated.

It is more than suspicious that such a shorthand and abbreviated method of investigation was used as the basis for a capital murder prosecution. To contend, as the State apparently has, that this was the net result, the sum total of the witness/suspect interview process in the murder investigation of a 17-year old in one of the nation's largest metropolitan areas, is as unbelievable as it is troubling. The fact that it ultimately resulted in a man being sent to death row makes it all the more shameful. Applicant submits to this Court that actual statements, including videotaped statements, were taken and not provided to defense counsel as they should have been. Their exact location at this time is anyone's guess.

*Facts Relevant to Point of Error Number Two*

Despite motions filed by trial counsel requesting all *Brady* material encompassing evidence either exculpatory or impeaching in nature, counsel was never provided with any statements given to police by Dion Holley, Kevin Walter, or "Bug" Johnson. As the only others present at the scene of the shooting, they were in a unique position and any prior inconsistent statements given by them to police would be both discoverable and necessary in the preparation of a defense. At trial, Holley, Walter, and Johnson all admitted to giving false statements to the police. A limited version of the "untruths" given by the witnesses were brought

· 00334

out on direct examination, apparently for the purposes of inoculating the jury as to the prior inconsistent statements. However, the defense was never provided with any statements given by these men to authorities around the time of the offense.

Kevin Walter, the driver of the blue Lexus, testified at trial that he never gave a statement to police; more specifically, he did not "recall" giving a written statement to police. (RR. Vol. XVI, p. 163). Given the seriousness of the offense and the attending violence which occurred, including the death of Mary Carmouche, it is extremely unlikely that a statement was not taken from Walter at the outset of the investigation by police. Further, Walter also states that when investigators came to the hospital to question him that, because he was unable to talk, he communicated with them by using handwritten notes. (RR. Vol. XVI, p. 141). Kevin Walter also admitted to lying to the police during their initial investigation. Walter's testimony consists of contradiction upon contradiction, yet, none of these statements were provided to the defense.

Another key State witness, Dion Holley, also testified that he initially lied to police and the security guards first present on the scene about what exactly had occurred that night. (RR. Vol. XVIII, p. 49, 51). In addition, to admitting that he lied in his earlier statements, his testimony contradicts Kevin Walter's on several points. His testimony serves only to drive home the point of exactly how many different versions of events have been told by the State's witnesses in this case. At

trial, Holley testified that he refused to give a statement to police about what happened on Lantern Point that evening. (RR. Vol. XVIII, p. 65). In fact, on cross-examination, Holley freely admitted that he had never been honest with the police regarding the case. (RR. Vol., XVIII, p. 59-60).

As for Samuel "Bug" Johnson, owner and driver of the vehicle occupied by Applicant on the night in question, he did provide a written statement to police. In fact, he spoke with the police on several occasions. At trial, Johnson testified that he had not been truthful with the police in his initial statements. (RR. Vol. XIX, p. 47). On cross-examination, Johnson again admitted to lying to police, and when asked whether he though his lies would benefit him or not, he responded, "I don't know, the day is not over with." (RR. Vol. XIX, p. 116).

Terrance Dodson, Applicant's cousin, gave a videotaped statement to Detective G.J. Novak shortly after the incident. At trial, Dodson testified that the Applicant had told Dodson what happened that night after they dropped Dodson off. Dodson testified that Applicant told him it had been a "jack on a jack," that there had been a shoot-out, and that he had "burned off" in a Lexus with a female. (RR. Vol. XIX, p. 178-79). According to Dodson's testimony, Applicant also stated that he took the female to an abandoned house where she performed oral sex on him before shooting her. (RR. Vol. XIX, p. 180-82). Applicant believes that Dodson was coerced into testifying and that he provided an inconsistent version of

events in his videotaped statement with Detective Novak. To Applicant's knowledge, neither statement was provided to the defense prior to trial.

Applicant contends that he should have been allowed to impeach these witnesses with their prior inconsistent statements given to police---had he been provided with such statements, he certainly would have done so. As the State's case was largely circumstantial, the testimony of the aforementioned individuals played an indispensable role in connecting the Applicant to the murder of Mary Carmouche. Rather than being able to challenge the credibility of these witnesses, the jury was allowed to take their testimony at face value, testimony which was riddled with inconsistencies throughout.

***Argument and Authorities***

A claim that the government violated *Brady v. Maryland*, by failing to disclose exculpatory and/or impeachment evidence to the defense, is cognizable via habeas corpus. *Ex parte Brandley*, 781 S.W.2d 886,892-94 (Tex.Crim.App 1989). The prosecution in a criminal case is required to disclose to the defendant all exculpatory evidence. Suppression of favorable evidence by the prosecution results in a violation of the defendant's right to due process under the Fourteenth Amendment. This is true whether the evidence pertains to guilt or punishment. *United States v. Agurs*, 427 U.S. 97, 107-114 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Ashley v. Texas*, 319 F.2d 80, 85 (5th Cir. 1963). The prohibition

22

against suppression of evidence favorable to the accused also extends to impeachment evidence if the information sought would be admissible under the rules of evidence. *U.S. v. Johnson*, 872 F.2d 612, 620 (5th Cir. 1989).

The failure of the State to turn over to the defense exculpatory evidence within its possession in a timely fashion that allows the defense to use it effectively at trial, will result in overturning a criminal conviction if it is shown by the defendant that: 1) the State failed to disclose the evidence, regardless of the good faith or bad faith of the prosecution; 2) the withheld evidence is favorable; and 3) the evidence is material, which requires a showing of a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed. *Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex.Crim.App. 2002). In light of the "materiality" requirement, the failure to disclose *Brady* evidence takes on added significance in the context of a prosecution based largely on circumstantial evidence, as opposed to direct evidence. *Brandley*, at 892.

The State, in its case in chief, offered little in the way of direct evidence linking Applicant to the crime. The State offered very little forensic evidence and less than conclusive ballistics evidence, relying entirely on the testimony of accomplices and those who had previously been untruthful with authorities and who had significant motive to testify falsely.

The State's duty to disclose exculpatory evidence to the defendant, under *Brady*, extends to evidence that is known only to police investigators and not to the prosecution. Individual prosecutors have a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police. *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2007). This duty of disclosure is also applicable to evidence favorable to the accused that would otherwise be protected from discovery. See *Crutcher v. State*, 481 S.W.2d 113, 114-17 (Tex.Crim.App. 1972); *Florio v. State* 532 S.W.2d 614, 616 (Tex.Crim.App. 1976). This would include any and all statements given to police or investigators by the state's witnesses, whether oral or written, and notes containing exculpatory or impeachment evidence, which would normally be protected as government work product.

Applicant believes that written statements were taken from the State's witnesses early in the investigation which he was not provided, despite his attorney's formal request for any and all such statements. As a result of this non-disclosure, Applicant's defense was prejudiced in that he was not able to sufficiently challenge the credibility of the State's witness' testimony at trial.

Additionally, the obligation to disclose favorable evidence is a continuing burden. This obligation applies to both the State and the court. Thus, if the State acquires information for the first time after the discovery has been completed, it

must disclose the material when it is received. *See Granviel v. State*, 552 S.W.2d 107, 119 (Tex.Crim.App. 1976). Similarly, if information that was deemed immaterial when first requested becomes important due to developments during the trial, the court is obligated to order the release of the material. *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987).

In *United States v. Bagley*, 473 U.S. 667 (1985), the U.S. Supreme Court held that the due process requirements addressed in *Brady* applied to the suppression of impeachment evidence, and where such evidence was suppressed, a new trial must be granted where the confidence in the outcome of the trial is undermined. *Id.* At 683. In contrast, a claim brought under *Brady* alone requires reversal only when the suppressed evidence is deemed "material." Evidence is considered material where there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, at 682.

However, as explained in *Brandley, supra*, and being applicable in this case, the "materiality" analysis is somewhat relaxed in the context of suppressed evidence resulting in convictions based largely on circumstantial evidence, as opposed to direct evidence, since the focus is whether the suppression affected the outcome of the trial. *Brandley*, at 892. The State's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense, not on

the evidence considered item by item. *Kyles v. Whitely*, 514 U.S. 419, 434 (1995).

Applicant respectfully submits to this Court that he is deserving of relief under

either a due process claim or one brought under *Brady v. Maryland*. As such,

Applicant prays that the writ should issue.

## POINT OF ERROR NUMBER THREE
## APPLICANT WAS DENIED DUE PROCESS OF LAW AS GUARANTEED UNDER THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AS A RESULT OF THE STATE'S FAILURE TO DISCLOSE ANY PLEA AGREEMENTS ENTERED INTO WITH WITNESSES FOR THE STATE IN EXCHANGE FOR THEIR TESTIMONY AT TRIAL

*Facts Relevant to Point of Error Number Three*

For purposes of brevity, Applicant incorporates by reference the facts stated

in the section pertaining to Point of Error Number Two. In addition, Applicant

would submit the following for the Court's consideration.

Dion Holley, Kevin Walter, Samuel "Bug" Johnson, and Terrance Dodson

were all called as witnesses and provided testimony on behalf of the State at

Applicant's trial. The State's case was largely circumstantial, and a conviction

could not have been secured without the testimony of these men. Asked on cross-

examination, they all gave evasive or incomplete answers on examination as to

whether they had been given any assurances regarding future prosecution in

exchange for their testimony.

26

It is highly unlikely, given the nature and seriousness of the offense, that these men would have voluntarily implicated themselves in the entire transaction (up to and including the murder Mary Carmouche) absent some sort of agreement regarding the future criminal liability. The government certainly could not have convicted Applicant without their testimony. Without the participation of these witnesses, it would have been impossible for the State to get an indictment, let alone a conviction. Therefore, the State had to secure their cooperation at any costs. At the time of this writing, Applicant has been unable to find any evidence indicating that any of the above-named individuals were ever charged with an offense in relation to the events occurring in the early morning hours of December 7, 1998.

## *Argument and Authorities*

The prosecution in a criminal case is required to disclose to the defendant all exculpatory evidence. Suppression of favorable evidence by the prosecution results in a violation of the defendant's right to due process under the Fourteenth Amendment. This is true whether the evidence pertains to guilt or punishment. *United States v. Agurs*, 427 U.S. 97, 107-114 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Ashley v. Texas*, 319 F.2d 80, 85 (5th Cir. 1963). Impeachment evidence, as well as exculpatory evidence, falls within the definition of favorable

evidence because, if disclosed and used effectively, it may make the difference between conviction and acquittal. *Bagley*, at 676.

Evidence such as that relating to the credibility of a witness whose testimony may be determinative of guilt or innocence is considered to be material. Evidence of any understanding or agreement concerning future prosecution of a key state's witness is therefore material to the witness' credibility and is required to be disclosed. *Giglio v. United States*, 405 U.S. 150, 154 (1972). It is not necessary for a direct promise or agreement to be conveyed to a witness for disclosure to be required; it is sufficient if the witness is told that testifying may help the witness' case. Such circumstances imply an agreement not to prosecute, and make disclosure of any agreement necessary. *Burkhalter v. State*, 493 S.W.2d 214, 215-18 (Tex.Crim.App. 1973).

The question at issue is the existence of some understanding for leniency between the State and the witness; it makes no difference whether the understanding is formal or informal. *Duggan v. State*, 778 S.W.2d 465, 468 (Tex.Crim.App. 1989). The failure to disclose such an agreement is reversible error. *Granger v. State*, 683 S.W.2d 387, 389-91 (Tex.Crim.App. 1984).

Applicant contends that this is precisely what occurred during the course of his trial. Most, if not all of the State's witnesses, were exposed to significant criminal liability for their involvement in the series of transactions that resulted in

the death of Mary Carmouche. It is difficult to understand why any of them, but especially Walter, Holley, and Johnson, would offer testimony on behalf of the State, implicating themselves even further in the crime, without some assurance that their cooperation would be rewarded.

The failure to disclose any "understandings" as to the future prosecution or lack thereof of the State's witnesses, seriously undermined Applicant's ability to mount an effective defense. It prevented defense counsel from vigorously challenging their credibility during cross-examination and allowed their obvious motives to be less than truthful to escape detection of the jury. As such, the jury would have placed undue weight on their testimony, implicating Applicant, when it should have viewed their testimony with great suspicion given their incentive to testify falsely in order to aid the State in securing a conviction against the Applicant.

## POINT OF ERROR NUMBER FOUR
**APPLICANT WAS DENIED HIS RIGHT TO EFFECTIVE CROSS EXAMINATION OF THE STATE'S WITNESSES AS GUARANTEED UNDER THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AS A RESULT OF THE STATE'S FAILURE TO DISCLOSE ALL IMPEACHMENT EVIDENCE AS REQUIRED BY *BRADY v. MARYLAND*.**

### *Facts Relevant to Point of Error Number Four*

Applicant incorporates by reference the facts listed in Points of Error Number Two and Three as discussed above.

## Arguments and Authorities

The failure to disclose any agreement or understanding between the State and its witnesses as to their non-prosecution violated Applicant's rights under the Confrontation Clause of the Sixth Amendment. The suppression of this evidence, in addition to being violative of due process principles and *Brady v. Maryland*, also precluded effective cross-examination of the witnesses offering evidence against the Applicant at trial, thereby also violating Applicant's right of confrontation under the Sixth Amendment.

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees an accused's right to be confronted with the witness against him. U.S. Const. amend. VI, XIV; Tex. Const. art I §10; *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *Carroll v. State*, 916 S.W.2d 494, 496-97 (Tex.Crim.App. 1996). The purpose of this right is to allow a defendant to cross-examine a witness, the principal means of testing a witness' credibility. *Shelby v. State*, 819 S.W.2d 544, 546 (Tex.Crim.App. 1991).

A defendant may cross-examine a witness on any subject "reasonably calculated to expose a motive, bias, or interest for the witness to testify." *Carroll*, 916 S.W.2d at 947; *Miller v. State*, 741 S.W.2d 382, 389 (Tex.Crim.App. 1987). In exercising this right, a defendant is allowed great latitude to show any fact, which would tend to establish ill feeling, bias, motive, or animus on the part of a

30

᠃᠙᠙᠍᠙᠙᠙

witness testifying against him. *Hurd v. State*, 725 S.W.2d 249, 252 (Tex.Crim.App. 1987). Cross-examination "allows facts to be brought out tending to discredit the witness by showing testimony in chief was untrue or biased." *Alford v. United States*, 282 U.S. 687, 691-92 (1931); *Carroll*, 916 S.W.2d at 497.

In fact, this Court cited to *Alford v. U.S.* in its opinion in *Maxwell v. State*, 48 S.W.3d 196 (2001) in recognizing the importance of the defense being able to expose motive or bias of the testifying witness who is facing prosecution or incarceration at the time his testimony is given on behalf of the State. *Id.* at 199. The primary purpose being to expose the witness' motivation in testifying one way or the other, as opposed to merely discrediting the witness.

In commenting on the extreme importance of the cross-examination of witnesses regarding possible plea agreements or understandings involving future prosecution, the Fifth Circuit in *U.S. v. Onori*, 535 F.2d 938 (1976), held:

> [T]he Sixth Amendment confrontation clause guarantees to a criminal defendant the right to cross-examine a witness against him. This right is especially important with respect to accomplices or other witnesses who may have a substantial reason to cooperate with the government. Indeed it is so important that the defendant is allowed to search for a deal between the government and the witness, even if there is no hard evidence that such a deal exists. What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists. *Id.* at 945.

Evidence that the witness is subject to a criminal charge or on probation can be used to show bias or interest. The exposure of a witness' motivation in

testifying is a proper and important function of the constitutionally protected right of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S.Ct. 1105, 39 L.Ed. 2d 347 (1974). "The jury is entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on testimony, which provided a crucial link in the proof...of the defendant's act." *Davis*, 415 U.S. at 317 (quoting *Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed. 2d 934 (1965).

A criminal defendant is said to state a violation of the Confrontation Clause by showing that he was prohibited from conducting otherwise proper cross-examination designed to show a bias on the part of the witness and "to expose to the jury the facts from which jurors...could appropriately draw inferences relating to the reliability of the witness." *Van Arsdall*, 475 U.S. at 680. (quoting *Davis*, 415 U.S. at 682). If the party claiming error is able to show that a "reasonable jury might have received a significantly different impression of the witness' credibility had their counsel been permitted to pursue his proposed line of cross-examination," then they have met their burden in establishing a Confrontation Clause violation. *Shelby*, 819 S.W.2d at 546 (Tex.Crim.App. 1991).

If, in fact, a Confrontation Clause violation occurred, the reviewing court must next determine whether the defendant suffered harm as a result. The denial of the opportunity to cross-examine does not fit within the limited class of

constitutional errors that are deemed prejudicial in every case. *Van Arsdall*, 475 U.S. at 682. Thus, Confrontation Clause violations are subject to harmless error analysis. *See* Tex.R.App. P. 44.2(a) (providing, in a criminal case, constitution errors subject to harmless error analysis require reversal unless the appellate court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment); see also *Shelby*, 819 S.W.2d at 547.

The appropriate inquiry in the case of a Confrontation Clause violation is whether, "assuming that the damaging potential or the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684. The determination of harm is based upon several factors, including: 1) the importance of the witness' testimony to the prosecution's case; 2) whether the testimony was cumulative; 3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; 4) the extent of cross examination otherwise permitted; and 5) the overall strength of the prosecution's case. *Van Arsdall*, 475 U.S. at 684; *Shelby*, 819 S.W.2d at 547.

Bearing each of these factors in mind, Applicant submits that he has made a prima facie showing of a Confrontation Clause violation. With regards to the importance of the witness' testimony to the prosecution's case, it was of paramount importance. In fact, the State could not have secured a conviction against

Applicant without the testimony of Mssrs. Holley, Walter, Johnson, and Dodson. Their participation and the testimony they provided, was not only important to the prosecution's case, it was vital; nor was the testimony unduly cumulative. There was some overlap between the testimony provided by the State's witnesses, each providing a slightly unique version of events based on what they were in a position to have heard or observed.

Additionally, while the witness' testimony served to corroborate one another's story to an extent, many inconsistencies went unexplored due to the fact that trial counsel was unable to rebut crucial parts of their testimony with their prior inconsistent statements. This is evident from the fact that, on several occasions, the prosecutor began his direct examination of the witness by conceding, or "inoculating" the jury to the fact that the witness was about to provide testimony inconsistent with earlier statements given to authorities. Also significant is the fact that the prosecution's case was almost entirely circumstantial. The State offered no direct evidence, ballistic, forensic, or otherwise which proved conclusively that Applicant killed Mary Carmouche.

It was only through the self-serving testimony of Holley, Walter, Johnson, and Dodson that the State was able to make its case against Applicant. Without the testimony of these witnesses, the prosecution of Applicant for the murder of Mary Carmouche would have collapsed before it had even begun.

As a result of the State's failure to provide the defense with the requested *Brady* material, including any and all statements that the witnesses provided to authorities in connection with this case, Applicant was denied the type of meaningful and effective cross-examination which the Constitution requires. Had Applicant been provided with all the *Brady* material believed to exist in this case, trial counsel would certainly have brought these inconsistencies to the attention of the jury for the purpose of impeaching the State's witnesses. Additionally, as Applicant's trial counsel was not made aware of any plea agreements or "understandings" existing between the prosecution and their witnesses, despite a formal request, the jury most certainly placed undue weight on the testimony of Holley, Walter, Johnson, and Dodson. Instead, it should have been viewed with the high degree of skepticism, which it would have had defense counsel been allowed to explore the motivation behind their testimony by way of cross-examination.

## CONCLUSION

Applicant would submit to this Court based on the aforementioned facts and analysis; that he has made a prima facie showing of a serious due process violation under both the state and federal constitution as a result of the trial court's admission of the highly dubious expert testimony of Robert Baldwin. Not only were Baldwin's theories unsupported by any learned treatise, they were not commonly accepted theories of methodology in the relevant scientific community

and are not capable of being repeated. Applicant suffered grievous injury as a result of Mr. Baldwin's testimony presented to the jury.

Applicant also contends that he has shown numerous constitutional violations flowing directly from the State's failure to provide Applicant with any and all evidence (either exculpatory in nature or impeaching as to the witnesses who testified on the State's behalf) as required by *Brady v. Maryland* and its progeny. As a result, Applicant's rights as guaranteed under the Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment were violated in the extreme. By denying Applicant the right to mount an effective defense and ultimately foreclosing any possibility of a meaningful cross-examination of the only witnesses against him, his conviction was virtually assured.

For all of these reasons, and in observance of the most fundamental tenets of due process, Applicant prays this Honorable Court issue a writ of habeas corpus in the above-entitled matter.

## PRAYER

WHEREFORE, Applicant prays that this Court:

A. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

B. Conduct a hearing at which argument may be offered concerning the allegations of his Application;

36

C.   Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of act and law raised by this Application or such hearing;

D.   Grant such other relief as may be necessary and appropriate.

Respectfully submitted,

DAVID K. SERGI & ASSOCIATES, P.C.
329 South Guadalupe
San Marcos, Texas 78666
Tel: (512) 392-5010/Fax: (512) 392-5042

BY:   .../s/ David K. Sergi
David K. Sergi
State Bar No. 18036000
Attorney for Charles Mamou, Jr.

# CERTIFICATE OF SERVICE

On October 24, 2013, this Supplemental Application for Post-Conviction

Writ of Habeas Corpus was delivered via:


**Via email @ : hardaway_lynn@dao.hctx.net**
Lynn Hardaway
Harris County District Attorney's Office
P.O. Box 4651
Houston, Texas 77210-4651

/s/ David K. Sergi
David K. Sergi